**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**

**CASE NO:** _____

In re Application of

THE BANK OF NEW YORK MELLON,
SOLELY IN ITS CAPACITY AS TRUSTEE
FOR THE TV AZTECA, S.A.B. DE C.V. 8.25%
SENIOR NOTES DUE 2024,

For an Order Pursuant to 28 U.S.C. §1782
To Conduct Discovery for Use in a Foreign
Proceeding

_____/

## <u>DECLARATION OF JUSTIN M. ELLIS</u>

JUSTIN M. ELLIS declares the following under penalty of perjury pursuant to 28 U.S.C. § 1746:

1.     I am an attorney in good standing of the bar of the State of New York.  I am a partner of MoloLamken LLP, counsel for applicant The Bank of New York Mellon, in its capacity as Trustee for the TV Azteca, S.A.B. de C.V. 8.25% Senior Notes Due 2024.

2.     This declaration is based upon my personal knowledge, as well as my review of the records described herein.  To the best of my knowledge, all exhibits attached hereto are true and accurate copies of the documents they purport to be, or relevant excerpts therefrom.

**<u>TV Azteca's Obligations, Default, and Breach of Contract Proceedings</u>**

3.     The Bank of New York Mellon acts as Trustee for the $400 million 8.25% Senior Notes due 2024 issued by TV Azteca, S.A.B. de C.V. ("TV Azteca") pursuant to an Indenture dated August 9, 2017, entered into by TV Azteca, the Subsidiary Guarantors under the Indenture,

the Trustee, and The Bank of New York Mellon, London Branch.  Ex. 1 (Joint stipulation of Uncontested Facts) ¶ 18.[1]  The Indenture is attached as **Exhibit 2**.

4.      The Notes were issued in the form of a single Global Note dated August 9, 2017. Global Note; Indenture § 2.1(a), (c).  The Global Note is attached as **Exhibit 3**.  The Notes' Offering Circular is attached as **Exhibit 4**.

5.      The Indenture includes restrictions on TV Azteca's ability to incur additional debt. Indenture § 3.9(a).  Approval from a majority of the Holders of the Notes is required to waive these restrictions.  Indenture § 9.2(a).  TV Azteca is required to notify the Trustee if it breaches its obligations under the Indenture.  Ex. 2 § 6.1(b); *id.* at 13 (definition of "Default").

6.      TV Azteca is required to provide quarterly and annual financial statements and reports under the Indenture.  Ex. 2 § 3.18.

7.      On February 9, 2021, TV Azteca publicly announced that it would not make the interest payment due on that date.  Ex. 1 ¶ 23.  A copy of TV Azteca's press release is attached as **Exhibit 5**.

8.      TV Azteca did not make interest or principal payments on the Notes after February 9, 2021, including scheduled payments due on August 9, 2021, February 9, 2022, August 9, 2022, February 9, 2023, August 9, 2023, February 9, 2024, August 9, 2024, February 9, 2025, August 9, 2025, and February 9, 2026.  The Subsidiary Guarantors under the Indenture have also not made any payments on the Notes.

9.      Attached as **Exhibits 6 and 7** are Notices of Events of Default the Trustee sent on March 22, 2021 and March 29, 2022, respectively, based on TV Azteca's failure to make required

---

[1] In an involuntary bankruptcy proceeding, TV Azteca stipulated to uncontested facts.  The stipulation of uncontested facts is attached as **Exhibit 1**.

interest payments on February 9, 2021, August 9, 2021, and February 9, 2022.

10.     Attached as **Exhibits 8 and 9** are Notices of Acceleration sent by the Trustee on August 5 and 8, 2022, respectively, require immediate payment of the Notes' principal.

11.     On August 26, 2022, the Trustee brought breach of contract claims in New York state court, which TV Azteca removed to the Southern District of New York.  *The Bank of New York Mellon v. TV Azteca, S.A.B. de C.V., et al.*, 22-cv-8164, Dkt. 1.  On March 17, 2026, the district court granted the Trustee leave to move for summary judgment against both TV Azteca and the Subsidiary Guarantors and stayed then-ongoing discovery in the action pending summary judgment.  Order at 22-23, *The Bank of New York Mellon v. TV Azteca, S.A.B. de C.V., et al.*, 22-cv-8164, Dkt. 241.  The parties are currently briefing the Trustee's summary judgment motion. *Id.*

12.     The proceedings in the Southern District of New York solely concern breaches of the Indenture by TV Azteca and the Subsidiary Guarantors.  Attached as **Exhibit 10** is a copy of the Complaint in that action.

13.     In addition, the protective order in the New York action restricts the use of discovery materials, including materials produced by third parties, in any other proceedings Attached as **Exhibit 11** is a copy of the New York action protective order.

14.     On February 26, 2026, TV Azteca announced that its shareholders approved the filing of a *concurso mercantil*.  A copy of the press release and its translation are attached as **Exhibit 12**.  That day, the Trustee requested additional information from TV Azteca concerning the shareholders' approval.  TV Azteca did not provide additional information.

15.     News media first reported on March 12, 2026 that TV Azteca filed the petition for a *concurso mercantil*.  The same day, the Trustee requested TV Azteca's petition and other

documents filed in connection with the *concurso mercantil.*  TV Azteca did not provide any documents filed in connection with the *concurso mercantil*.

16. On April 16, 2026, it was publicly reported that TV Azteca signed a $290 million loan with AlterBank, a St. Lucia-based bank, days before filing for the *concurso mercantil*. *See* Édgar Sígler and Xóchitl Herrera, *TV Azteca Took $290 Million Loan from Caribbean Bank Days Before Bankruptcy Filing*, 9FIN (Apr. 16, 2026), attached as **Exhibit 13**.  TV Azteca never reported this loan to the Trustee.

17. TV Azteca's *concurso* petition confirms that TV Azteca entered into the loan with AlterBank on January 29, 2026, and amended the loan on March 6, 2026, weeks after TV Azteca's shareholders voted to file the *concurso* and days before TV Azteca filed the *concurso* petition. *See* Castillo Decl. ¶33; *see also* Exs. 1-2 to Castillo Decl.

18. Since learning of the AlterBank loan, the Trustee and its counsel have investigated AlterBank and the loan.  According to AlterBank's website, AlterBank is an "alternative financial institution" incorporated under St. Lucia's International Banks Act.  AlterBank, "AlterBank," https://www.alterbank.com/.  According to AlterBank's Company Register filed with St. Lucia's Registry of International Business, AlterBank was founded in March 2023 by Juan Francisco Ramirez, after he acquired the shares of an entity known as State Trust Bank & Trust and renamed the entity to AlterBank.  Attached as **Exhibit 14** is AlterBank's Company Register, filed on February 17, 2026.  Attached as **Exhibit 15** is an amendment to AlterBank's incorporation documents changing the name of the entity from State Trust Bank & Trust to AlterBank.  Financial information about AlterBank, including information about its balance sheet or assets, is not publicly available.

19.     Available records show that Juan Francisco Ramirez, Alterbank's prior owner, was previously the owner and chairman of Nodus International Bank (Nodus), a Puerto Rican international banking entity.  In September 2025, Ramirez pleaded guilty for his role in leading a scheme to fraudulently obtain more than $13.6 million from Nodus, which ultimately led to the bank's failure in 2023.[2]

20.     Available records show that in October 2023, the Puerto Rico Office of the Commissioner of Financial Institutions (OCIF) revoked Nodus's banking license, placed the bank on permanent receivership, and ordered liquidation of the bank, following findings that the bank defrauded its depositors and creditors.  OCIF found that Ramirez had made fraudulent transfers to deplete Nodus's assets after it was ordered to liquidate.  OCIF found Ramirez and Nodus's co-owner personally liable for the bank's debts.  A certified translation of OCIF's "Complaint and Order for Piercing the Corporate Veil of Nodus International Bank, Inc. and Order of Restitution" ("OCIF Order") is attached as **Exhibit 16**.  The original version of the OCIF Order is attached as **Exhibit 17**.

21.     Available records show that during Nodus's OCIF-ordered liquidation, Ramirez proposed to transfer Nodus's assets to AlterBank in May 2024, which was then-owned by Ramirez. Ex. 16 ¶¶ 88, 129-31.  OCIF rejected that proposal because AlterBank was "not ready to receive new customers, as it did not possess the licenses required to operate in St. Lucia nor the

---

[2] Factual Proffer in Support of Guilty Plea, *United States v. Ramirez*, No. 25-cr-20384, Dkt. 71 (S.D. Fla. Nov. 22, 2025); *see also Press Release: Chairman of the Board of Puerto Rican Bank Pleads Guilty to Multimillion-Dollar Wire Fraud Conspiracy That Led to Bank's Collapse*, Dep't of Justice (Sep. 22, 2025), https://www.justice.gov/opa/pr/chairman-board-puerto-rican-bank-pleads-guilty-multimillion-dollar-wire-fraud-conspiracy-led.

infrastructure necessary to fulfill its obligations to the Receiver." Ex. 16 ¶¶ 130-31.  OCIF further described AlterBank as "not qualified to accept depositors."  Ex. 16 at 31.

22.  Available records show that in December 2024, Ramirez purported to resign from AlterBank's board and transfer his ownership of AlterBank to Augusto César Castillo Chávez, an individual in Mexico City.  Ex. 14 at PDF 3, 8, 10.[3]  Available records indicate that Mr. Castillo Chávez has no apparent experience owning or managing a financial institution.  At least one director and officer remained at AlterBank following Ramirez's resignation.  Ex. 14 at PDF 9.

23.  Available records show that AlterBank's current "Chief Business Officer" "responsible for the day-to-day business operations" and director, Blas Santander, worked with Mr. Ramirez at AlterBank before Mr. Ramirez's resignation. Ex. 14 at PDF 8-10; Ex. 18 (LinkedIn).

24.  Available records show that the following current and former officers and directors of AlterBank reside in the United States District for the Southern District of Florida:

(a)  Blas Santander, AlterBank's "Chief Business Officer" who is "responsible for the day-to-day business operations for the [b]ank" and director, is an American citizen whose address is 2501 Southwest 24th Avenue, Miami, Florida.  *See* Ex. 14 (AlterBank Register) at PDF 9; Ex. 18 (LinkedIn).

(b)  Alexander Soroka, a director, resides at 952 Mockingbird Lane, Apartment 603, Plantation, Florida.  Ex. 14 (AlterBank Register) at PDF 10; Ex. 19 (LinkedIn).

(c)  Timothy Richards is an American citizen and director whose address is 2000 Salzedo Street, Apartment 806, Coral Gables, Florida 33134.  Ex. 14 (AlterBank Register) at PDF 11; Ex. 20 (LinkedIn).

---

[3] References to exhibits' PDF pages are inclusive of the cover sheet identifying each exhibit.

(d) Alejandro Cespedes is an American citizen and Board Secretary and Economist whose address is 2967 Bridgeport Ave., Miami, Florida.  Ex. 14 (AlterBank Register) at PDF 12-13; Ex. 21 (LinkedIn).

(e) Julio Luis Santander is AlterBank's senior manager of regional operations based in Miami, Florida.  Ex. 22 (LinkedIn).

(f) Juan Ramirez, AlterBank's former owner and director, resides at 2821 S Bayshore Drive, Unit 11C, Miami, Florida.  Ex. 14 (AlterBank Register) at PDF 8.

25. The individual Respondents are United States citizens without any apparent connection to Mexico or St. Lucia.

26. AlterBank's LinkedIn page also shows that the Miami-Fort Lauderdale area has the highest number of individuals associated with AlterBank.  Ex. 23 (LinkedIn).

27. Counsel's investigation shows that AlterBank's address listed by St. Lucia's Financial Services Regulatory Authority is a mostly unoccupied office with just three staff members:  a receptionist, a marketing employee, and a manager.  Attached **Exhibit 24** is a document with photos of the building housing AlterBank's office taken on May 7, 2026, as part of counsel's investigation.

I declare under penalty of perjury that the foregoing is true and correct.

Executed:  June 2, 2026
New York, New York                                     */s/ Justin M. Ellis*
Justin M. Ellis

# Exhibit 1 to the Ellis Declaration

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

|  |  |  |
|---|---|---|
| In re: | ) | Chapter 11 |
|  | ) |  |
| TV Azteca, S.A.B. de C.V., *et al.*,[1] | ) | Case No. 23-10385 (LGB) |
|  | ) |  |
|  | ) | (Jointly Administered) |
| Alleged Debtors. | ) |  |
|  | ) |  |

## JOINT STIPULATION OF UNCONTESTED FACTS

---

[1] The Alleged Debtors in these cases are TV Azteca, S.A.B. de C.V.; Alta Empresa, S.A. de C.V.; Asesoría Especializada en Aviación, S.A. de C.V.; Equipo de Futbol Mazatlán, S.A. de C.V.; Producciones Dopamina, S.A. de C.V.; Azteca Records, S.A. de C.V.; Ganador Azteca, S.A.P.I. de C.V.; Operadora Mexicana de Televisión, S.A. de C.V.; Azteca Sports Rights LLC; Producciones Azteca Digital, S.A. de C.V.; Producciones Especializadas, S.A. de C.V.; Productora de Televisión Regional de TV Azteca, S.A. de C.V.; Promotora de Fútbol Rojinegros, S.A. de C.V.; Mazatlán Promotora de Fútbol, S.A. de C.V.; Publicidad Especializada en Medios De Comunicación de TV Azteca, S.A. de C.V.; S.C.I. de México, S.A. de C.V.; Servicios Aéreos Noticiosos, S.A. de C.V.; Servicios Especializados TAZ, S.A. de C.V.; Servicios y Mantenimiento del Futuro en Televisión, S.A. de C.V.; Corporación de Asesoría Técnica y de Producción, S.A. de C.V.; Editorial Mandarina, S.A. de C.V.; Multimedia Espectáculos y Atracciones, S.A. de C.V.; Servicios Foráneos de Administración, S.A. de C.V.; Servicios Locales de Producción, S.A. de C.V.; Azteca International Corporation; Stations Group, LLC; TV Azteca Honduras, S.A. de C.V.; Comercializadora de Televisión de Honduras, S.A. de C.V.; Incotel, S.A.; TVA Guatemala, S.A.; Lasimex, S.A. de C.V.; TV Azteca Global, S.L.U.; Azteca Comunicaciones Peru, S.A.C.; Redes Opticas, S.A.C.; Televisora del Valle de México, S.A.P.I. de C.V. The location of the Debtors' corporate headquarters is Periférico Sur 4121, colonia Fuentes del Pedregal, alcaldía Tlalpan, C.P. 14140, Ciudad de México, México.

## JOINT STIPULATION OF UNCONTESTED FACTS

**TV Azteca Background**

1.     TV Azteca, S.A.B. de C.V. ("TV Azteca") is one of the two largest producers of Spanish-language television content in the world.  (JX-017, Ex. B. at 14 [Rodriguez Decl.].).

2.     TV Azteca's principal offices are located in Mexico City, Mexico, and it is incorporated in Mexico.  (*Id.* ¶ 6.)  TV Azteca's business and operations consist primarily of over the air television broadcasting to audiences in Mexico and producing television content.  (*Id.* ¶ 5.) TV Azteca operates two national television networks in Mexico, "Azteca 7" and "Azteca Uno," that are available throughout the country.  (*Id.* ¶ 7.)  TV Azteca also operates hundreds of local channels in Mexico.  (*Id.*)  Outside of Mexico, TV Azteca operates television networks through local subsidiaries in two countries, Honduras and Guatemala.  (*Id.* ¶ 4 & Ex. B at 36.)

3.     TV Azteca's television broadcast business is regulated by the *Instituto Federal de Telecomunicaciones*, which was established in accordance with the Constitution of the United Mexican States.   TV Azteca and its subsidiaries hold six "concessions," which are telecommunications broadcast licenses granted by the government for a fixed term and to be renewed on a regular basis.  These concessions allow TV Azteca to "use and exploit[] [the] frequency bands of the radio spectrum for the provision of the Public Service of Digital Broadcast Television, for profit."  Without these concessions, TV Azteca would not be permitted to operate its broadcast television networks in Mexico.  (*Id.* ¶¶ 25-26.)

4.     TV Azteca stock is publicly traded on the Mexican Stock Exchange and on Spain's Latibex Exchange.  As of the Petition Date, a minority of TVA's shares were owned by the public. The rest of TV Azteca's shares are owned by Ricardo Benjamin Salinas Pliego, a Mexican citizen,

and two Mexican corporations affiliated with Mr. Salinas, Comunicaciones Avanzadas, S.A. de C.V. and Arrendadora Internacional Azteca, S.A. de C.V. (*Id.* ¶ 3.)

5.  TV Azteca has 50 direct and indirect subsidiaries. Those entities are organized under Mexican or other foreign law, and six are organized under U.S. law. Three of the six U.S. subsidiaries are not Alleged Debtors: Northstar Media, LLC, a Delaware limited liability company; Northstar McAllen License, LLC, a Delaware limited liability company; and Dopamine Entertainment, Inc., a Delaware corporation. (*Id.*, Ex. A.)

6.  The guarantors under the Indenture (as defined below) are subsidiaries of TV Azteca that provided a guarantee (the "Guarantors") pursuant to section 10.1 of the Indenture. (JX-008 § 10.1(a) [Indenture].) Thirty-four TV Azteca subsidiaries are Guarantors and Alleged Debtors: Alta Empresa, S.A. de C.V.; Asesoría Especializada En Aviación, S.A. de C.V.; Equipo de Futbol Mazatlan, S.A. de C.V.; Producciones Dopamina, S.A. de C.V.; Azteca Records, S.A. de C.V.; Ganador Azteca, S.A.P.I. de C.V.; Operadora Mexicana De Televisión, S.A. de C.V.; Azteca Sport Rights LLC; Producciones Azteca Digital, S.A. de C.V.; Producciones Especializadas, S.A. de C.V.; Productora De Televisión Regional De Tv Azteca, S.A. de C.V.; Promotora de Futbol Rojinegros, S.A. de C.V.; Mazatlán Promotora de Futbol, S.A. de C.V.; Publicidad Especializada en Medios de Comunicación de TV Azteca, S.A. de C.V.; S.C.I. de México, S.A. de C.V.; Servicios Aéreos Noticiosos, S.A. de C.V.; Servicios Especializados Taz, S.A. de C.V.; Servicios y Mantenimiento del Futuro en Televisión, S.A. de C.V.; Corporación de Asesoría Técnica y de Producción, S.A. de C.V.; Editorial Mandarina, S.A. de C.V.; Multimedia, Espectáculos y Atracciones, S.A. de C.V.; Servicios Foráneos de Administración, S.A. de C.V.; Servicios Locales De Producción, S.A. de C.V.; Azteca International Corporation; Stations Group, LLC; TV Azteca Honduras, S.A. de C.V; Comercializadora de Televisión de Honduras, S.A. de C.V.; Incotel S.A.;

3

TVA Guatemala S.A; Lasimex, S.A. de C.V.; TV Azteca Global, S.L.U.; Azteca Comunicaciones Perú, S.A.C.; Redes Opticas, S.A.C; Televisora del Valle de México, S.A.P.I. de C.V. (*Id.*)

7. Those Alleged Debtors are organized under the law of the following countries: 24 in Mexico; three in the United States; two in Perú; two in Honduras; two in Guatemala; and one in Spain. The three U.S. Alleged Debtor entities are: (i) Azteca International Corporation ("Azteca International"), a Delaware corporation; (ii) Stations Group, LLC ("Stations Group"), a Delaware limited liability company; (iii) Azteca Sport Rights, LLC ("Azteca Sport"), a Delaware limited liability company. (JX-017, Ex. A.)

**Certain Alleged Debtors' Contracts with U.S. Parties**

**A. Azteca America Network and Sale to HC2**

8. Until 2017, TV Azteca operated a television network in the United States, Azteca America Network ("Azteca America"), but sold the Azteca America in 2017 to HC2 Network Inc., a subsidiary of HC2 Holdings (collectively "HC2") for a purchase price of $33 million. (JX-026.) HC2 operated Azteca America etwork through the end of 2022 when it discontinued its operations. (JX-017 ¶ 16.) Azteca International licensed programming produced by TV Azteca to HC2 prior to the discontinuance of Azteca America in December 2022. (*Id.* ¶ 18; JX-027.) Today, TV Azteca does not operate any television networks in the United States, and Azteca America is not broadcast anywhere. (JX-017 ¶ 15.)

9. In the second and third quarters of 2017, stations related to Azteca America sold their spectrum rights in a Federal Communications Commission auction for $156 million. (JX-019 at 55.)

## B. Certain Alleged Debtors' Current Contracts with U.S. Counterparties

10.     Alleged Debtor Azteca International is party to a Soccer Rights Agreement dated June 23, 2022 with Univision Communications Inc. ("Univision"), with an effective date of July 1, 2023.  Pursuant to the Soccer Rights Agreement, Azteca International licenses to Univision the right to broadcast in the United States soccer matches of two Mexican soccer league clubs for a seven-year term running from 2023 through 2030.  (JX-036 ¶ 7; JX-069.) ████████████

████████████████████████████████ (JX-069.)

████████████████████████████████

████████████████████████████████

██████████████ (*Id.*) ████████████████████

████████████████████████████████

████████████████████████████████

████████████████████████████████

██████████ (*Id.*)

11.     Prior to the existing Soccer Rights Agreement, Azteca International and Univision were parties to a previous Soccer Rights Agreement, dated June 7, 2016, in which Azteca International licensed to Univision the rights to broadcast in the United States soccer matches occurring in Mexico for a seven-year term running from 2016 through 2023.  (JX-362.)

12.     Since September 15, 2017, TV Azteca and Amazon Digital Services LLC ("Amazon") have been parties to a Master License Agreement, which contains terms and conditions pursuant to which TV Azteca can license and make available to Amazon content and programming.  (JX-075.)  The specific terms that are applicable to any license for a particular title are to be set forth in separate addendum.  (*Id.*)  Unless specified otherwise in an addendum, any

license is restricted to the "Territory" set forth in the agreement.[2]  (*Id.*)  Under that Master License Agreement, TV Azteca and Amazon have executed two current license agreements pursuant to addenda.

- Subscription Video-on-Demand Deal Addendum, effective June 7, 2022, ████████████████████████████████████████████████████████████████████████████. (JX-094.)

- Amendment to Prime Video Direct Digital Video License Agreement, dated as of June 15, 2022, ███████████████████████████████████████████████████████████████████. (JX-095.)

13.    Alleged Debtors Azteca International and Azteca Sport are parties to agreements with PGA Tour, Inc. ("PGA Tour"), a Maryland corporation, to broadcast Mexican tournaments or host golf tournaments in Mexico or Latin America.

- Azteca Sport and PGA entered into the PGA Tour LatinoAmerica "Copa" (Cup) Sponsorship Agreement, dated May 17, 2021, pursuant to which PGA granted Azteca Sport the right to sponsor (or designate the sponsor of) the PGA Tour season in Latin America. ████████████████████████████████████████████████████████████████. (JX-072.)

- Azteca Sport and PGA Tour entered into the Title Sponsor Agreement 2022–2024, dated May 17, 2021, pursuant to which PGA Tour agreed to make Azteca Sport the title sponsor of an annual PGA Golf tournament in Mexico City (the "Mexican Championship") for the 2022–2024 seasons. ███████████████████████████████████████████████████████ (JX-074.)

---

[2] Territory is defined to include:  Anguilla; Antigua and Barbuda; Argentina; Aruba; The Bahamas; Barbados; Belize; Bermuda; Bonaire; Brazil; The British Virgin Islands; The Cayman Islands; Chile; Colombia; Costa Rica; Cuba (subject to lifting of embargo); Curacao; Dominica; Dominican Republic; Ecuador; El Salvador; French Guiana; Grenada; Guadalupe; Guatemala; Guyana; Haiti; Honduras; Jamaica; Mexico; Montserrat; The Netherlands Antilles; Nicaragua; Panama; Paraguay; Peru; Puerto Rico; Saba; St. Kitts & Nevis; St. Lucia; St. Martin; St. Vincent and the Grenadines; Suriname; Trinidad & Tobago; The Turks & Caicos Islands; Uruguay; The US Virgin Islands; and Venezuela.

- Azteca Sport and PGA Tour entered into the Tournament Agreement, dated as of May 17, 2021, ██████████████████████████████████████ ████████████ (JX-073.)

- Azteca International and PGA Tour entered into the Second Amendment to Audio-Visual Media Rights Agreement, dated February 27, 2017, ██████████████████████

████████████████████████████████████████

(JX-071.)

14. TV Azteca and CBS Studios, Inc. ("CBS") entered into the Free Television License Agreement, dated as of May 9, 2022, ██████████████████████████

██████████████████████████████████████████████████

████████████████████████████████ (JX-096.)

15. On December 27, 2022, TV Azteca, CPT Holdings and Sony Pictures Television UK Rights Limited ("Sony UK Rights"), and Teleset Mexico, S. de R.L. de C.V. entered into a Format License Agreement, ████████████████████████████

██████████████████████████████████████████████████

████████████████████████ (JX-378.)

16. On November 1, 2022, TV Azteca and Estrella Media, Inc. ("Estrella"), a California corporation, entered into a one-year Co-Production Agreement to produce and distribute "Premios de la Radio," an award show recognizing Spanish-language singers, which was to take place in Mexico City on November 3, 2022 and was to be broadcast via television in Mexico and the United States. (JX-082.)

17. In January 2021, TV Azteca and ICARO Media Group, Inc. ("ICARO"), a U.S. Corporation, entered into a Commercial Partnership and Licensing Agreement to develop, market, and distribute a TV Azteca-branded version of ICARO's video management application that is geo-blocked to Mexico and Canada. (JX-076.)

**The 2024 Notes**

18.     On August 9, 2017, TV Azteca issued $400 million in unsecured notes (the "Notes") pursuant to an indenture, dated as of August 9, 2017 (as amended, restated, supplemented or otherwise modified from time to time, the "Indenture"), which mature in 2024. As of year-end 2022, according to TV Azteca's financial reporting, its assets on its balance sheet were approximately $1.27 billion, its liabilities were approximately $1.15 billion, and its shareholder's equity was approximately $120 million (using a 2022 exchange rate of 0.0516 pesos to dollars). (JX-129 at 509, 510.)

19.     Under the terms of the Indenture, TV Azteca is obligated to make semi-annual interest payments at the rate of 8.250% per annum on the $400 million principal sum on August 9 and February 9 of each year during the term of the Indenture. (JX-008).

20.     The Indenture contains provisions concerning choice of law and forum selection. (JX-008 § 11.7.)

21.     Morgan Stanley, Jefferies Group LLC, and BCP Securities acted as underwriters for the issuance, and Winston & Strawn LLP acted as legal counsel to TV Azteca. (*Id.* §§ 1.1, 11.1.)

22.     TV Azteca sold the Notes via a roadshow. (JX-156, JX-157, JX-158). TV Azteca provided potential investors information about the Notes through an offering circular, dated August 2, 2017 (the "Offering Circular"). The Offering Circular stated that notes were "available only to non-U.S. persons." (JX-010.) The Offering Circular also described as a risk factor for investors that the Issuer could be "declared bankrupt by a Mexican Court or become[] subject to a reorganization or *concurso mercantil* proceeding in a Mexican court." (*Id.* at 26-27.)

23. Prior to February 9, 2021, TV Azteca paid interest when due under the Notes. On February 9, 2021, TV Azteca publicly announced that it would "defer" the interest payment due on that date. (JX-041.)

24. TV Azteca did not make interest payments on August 9, 2021, February 9, 2022, August 9, 2022, and February 2023. (JX-014.)

25. On May 3, 2022, beneficial holders of more than 25% of the aggregate principal amount of outstanding Notes (the "Directing Holders") purported to issue a notice of acceleration to TV Azteca and the Indenture Trustee (the "Holder Acceleration Notice"), which declared the unpaid principal of (and premium, if any) and accrued and unpaid interest on all the Notes to be due and payable immediately. (JX-013.)

26. On August 5, 2022, the Directing Holders directed the Indenture Trustee to issue a notice of acceleration to TV Azteca. On the same date, the Indenture Trustee issued a Notice of Acceleration to TV Azteca (the "First Trustee Acceleration Notice"). (JX-014.)

27. On August 8, 2022, the Indenture Trustee, at the direction of the Directing Holders, issued an amendment to the Trustee Acceleration Notice, which, as amended, declared the unpaid principal, premium, accrued and unpaid interest, and any other amounts owed on the Notes and under the Indenture to be due and payable immediately (the "Amended Trustee Acceleration Notice"). (JX-15.)

28. On August 8, 2022, TV Azteca issued a press release stating that it had "received a notification issued by the Bank of New York Mellon, trustee of the holders of the notes, informing about the intention of the early expiration of its $400 million dollars notes due 2024." (JX-087.)

**The Cebures Debt**

29.     On September 26, 2017, TV Azteca issued *certificados bursástiles*, a Mexican debt security, also known as "Cebures," in an aggregate principal amount of $4 billion pesos maturing on September 20, 2022.  (JX-017 ¶ 32.)  TV Azteca was the sole obligor of the obligations under the Cebures.  (*Id.*)

30.     On February 9, 2021, TV Azteca announced that it would amortize early up to 1.2 billion Mexican pesos of principal, out of 4 billion pesos of principal outstanding, of the Cebures. (JX-041.)

31.     On March 5, 2021, TV Azteca announced that it finalized the purchase and cancellation of 1.211 billion pesos of the Cebures in the secondary market.  (JX-086.).

32.     As of September 20, 2022 the Cebures were paid down in full.  (JX-017 ¶ 32.)

**The Banco Azteca Loan**

33.     As of March 9, 2020, TV Azteca entered into a secured credit line agreement with Banco Azteca, S.A., which is a bank organized under Mexican law.  (JX-032; JX-033.)  Banco Azteca is owned by Grupo Elektra, S.A.B. de C.V., and thus an affiliate of TV Azteca.  (JX-017 ¶ 28.)  TV Azteca-related concessions in Mexico collateralized the debt.  (JX-017 ¶ 28; JX-032; JX-033.)

34.     On January 6, 2021, TV Azteca entered into an amendment to the credit line agreement with Banco Azteca.  (JX-034; JX-035.)  Through this agreement, TV Azteca pledged additional collateral in the form of a trust that was to hold certain real estate properties.  (*Id.*; JX-017 ¶ 28.)

35.     As of December 31, 2022, TV Azteca had approximately $87 million in principal outstanding under the Banco Azteca loan.  (JX-017¶ 28.)

36.     On July 29, 2022, TV Azteca pledge additional collateral in the form of a pledge over the shares of three of its subsidiaries: Producciones Dopamina, S.A. de C.V., Producciones Azteca Digital, S.A. de C.V. and Televisión Azteca III, S.A. de C.V.  (JX-017 ¶ 12.)

**The Petitioning Creditors' Acquisitions of the Notes**

37.     On February 10, 2021, an affiliate of Petitioning Creditor Sandpiper Limited (the "Original Beneficial Owner") acquired $650,000 in principal amount of the Notes.

38.     The Original Beneficial Owner acquired additional notes on dates set forth in the Involuntary Petition.  The Original Beneficial Owner transferred its ownership of the Notes to Petitioning Creditor Sandpiper Limited on March 13, 2023.  (JX-001 at 35–6, 41.)

39.     On November 9, 2021, Petitioning Creditor Plenisfer Investments SICAV – Destination Value Total Return acquired Notes.  It acquired additional principal amount of the Notes on dates set forth in the Involuntary Petition.  (*Id.* at 6, 8.)

40.     On November 30, 2021, Petitioning Creditor Cyrus Opportunities Master Fund II, Ltd. acquired beneficial interests in the Notes.  It acquired additional Notes on dates set forth in the Involuntary Petition.  (*Id.* at 25–7.)

**TV Azteca Litigation**

**A. New York Litigation**

41.     On August 26, 2022, at the direction of the Directing Holders, including the Petitioning Creditors, the Indenture Trustee initiated litigation against TV Azteca and the original Guarantors under the Indenture in New York State Supreme Court (the "New York Litigation") by filing a motion pursuant to CPLR § 3213 for summary judgment in lieu of complaint (the "Summary Judgment Motion") seeking damages of $486,283,272, plus prejudgment interest, comprised of (i) accrued and unpaid interest up to the date of the First Trustee Acceleration Notice,

11

and the full amount of principal due under the Indenture at that time, collectively totaling $469,783,272, and (ii) a premium associated with certain optional redemptions under the Indenture (the "Redemption Premium") alleged to be due and owing due to the acceleration of the Notes, totaling $16,500,000.

42.     On September 23, 2022, TV Azteca and the other defendants timely removed the New York Litigation to the U.S. District Court for the Southern District of New York (the "Federal Litigation").

43.     On September 30, 2022, defendants filed an Opposition to Plaintiffs' Motion for Summary Judgment in Lieu of Complaint and to Compel Plaintiff to File a Complaint.

44.     On October 14, 2022, plaintiff filed a Notice of Voluntary Dismissal as to certain released Guarantors.  That same day, plaintiff filed a Memorandum of Law in Further Support of its Summary Judgment Motion and in opposition to defendants' Motion to Compel Plaintiff to File a Complaint.

45.     On October 21, 2022, Defendants filed a reply brief.

46.     The motions were fully briefed as of October 21, 2022 and are pending in the District Court of the Southern District of New York.  On March 21, 2023, plaintiff filed a Suggestion of Bankruptcy advising the court that involuntary chapter 11 petitions for bankruptcy were filed against the defendants and that the litigation was subject to the automatic stay.  The Federal Litigation has been stayed since that time.

**B.  TV Azteca U.S. Litigation with Diamond**

47.     On October 16, 2020, Diamond Films Netherlands Coöperatief U.A. ("Diamond"), a Dutch entity, commenced an action against TV Azteca in New York State Supreme Court for

breach of a license agreement between Diamond and TV Azteca. Diamond and TV Azteca are also parties to related litigation in Mexico.

48.    Diamond moved for a default judgment on December 30, 2021. On February 23, 2022, the court granted Diamond's motion for a default judgment and denied TV Azteca's motion to dismiss.

49.    TV Azteca later moved to vacate the default judgment on the grounds that service on TV Azteca was invalid. While that motion was pending, on March 31, 2023, Diamond advised the court that TV Azteca was subject of an involuntary petition for relief under chapter 11 and that the Bankruptcy Court had entered an Order Affirming and Enforcing the Automatic Stay. (JX-061.) Thereafter, the New York State Supreme Court denied TV Azteca's motion without prejudice to renewal. (JX-007.)

## C. Mexican Litigations

50.    On September 22, 2022, TV Azteca commenced litigation (the "September 2022 Mexican Litigation") against certain Noteholders and the Indenture Trustee in the Superior Court of Justice for Mexico City (the "Mexican Superior Court"). (JX-110.)

51.    TV Azteca's Complaint sought declaratory and injunctive relief to excuse TV Azteca's missed interest payments and to prevent any efforts by the Noteholder Defendants to collect either principal or interest under the Indenture because, among other things, the outbreak of the COVID-19 pandemic and subsequent related orders by the Mexican government represented "Acts of God and Force Majeure events" that rendered TV Azteca's performance under the Indenture impossible from the date the World Health Organization declared the COVID-19 outbreak a pandemic—March 11, 2020—until the present day. (*Id.* at 214–16.)

52.    On September 27, 2022, the Mexican Superior Court issued an ex parte injunction (the "First Injunction"), applicable to the defendants in the September 2022 Mexican Litigation. (JX-030.).

53.    The Indenture Trustee has been litigating with respect to the Mexican Litigation and the First Injunction, including answering the complaint, taking an appeal of the First Injunction and moving to vacate the First Injunction.  (JX-117.)

54.    ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

55.    On February 21, 2023, the Indenture Trustee was served with both the complaint associated with the September 2022 Mexican Litigation and the First Injunction.  (JX-108 ¶11.) Funds managed or associated with Cyrus Capital Partners, L.P. ("Cyrus Capital") and Contrarian Cap. Mgmt. LLC ("Contrarian") have been served with both the complaint associated with the September 2022 Mexican Litigation and the First Injunction.

56.    ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

57.    ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮.

---

[3] ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

58.     On May 5, 2023, the WHO declared that COVID-19 "no longer constitutes a public health emergency of international concern."  (JX-114.)  On May 9, 2023, Mexico's President López Obrador decreed that COVID-19 is no longer a health emergency in Mexico, stating that "[t]he extraordinary action in matters of general health that had the purpose of preventing, controlling and mitigating [COVID-19] . . . is hereby declared terminated."  (JX-115.)

59.     On May 12, 2023, the Indenture Trustee's counsel requested via a letter (the "May 12th Letter") to the Alleged Debtors' U.S. bankruptcy counsel Paul, Weiss, Rifkind, Wharton & Garrison LLP ("Paul, Weiss"), that TV Azteca vacate the First Injunction.  (JX-116.)

60.     On May 15, 2023, the Indenture Trustee filed on behalf of the Directing Holders before the Mexican Superior Court a submission requesting that the First Injunction be vacated on the grounds that the WHO has declared that COVID-19 "no longer constitutes a public health emergency of international concern" and that the Mexican president has issued a decree declaring that COVID-19 is no longer a health emergency in Mexico (the "Motion to Vacate").  (JX-117.)

61.     On May 17, 2023, Paul, Weiss responded to the May 12th Letter (the "May 17th Letter").  The May 17th Letter stated (1) that Paul, Weiss does not represent TV Azteca in the action pending before the Mexican Superior Court and (2) that the Indenture Trustee's counsel should reach out directly to TV Azteca's Mexican counsel.  (JX-118.)

62.     On August 24, 2023, the Mexican Superior Court "accepted" the Motion to Vacate and gave TV Azteca until August 30 to respond to the Motion to Vacate.  The First Injunction remains in effect.

63.     On May 9, 2023, at the Alleged Debtors' request, the Mexican Superior Court issued an order prohibiting the Alleged Debtors' release of financial reports for the first quarter of 2023.  (JX-122.)

64. On June 1, 2023, it was reported that the Mexican Stock Exchange suspended trading of TV Azteca's stock for TV Azteca's failure to report its Q1 2023 results. (JX-155.)

65. On June 30, 2023, counsel for the Petitioning Creditors submitted a request for arbitration against Mexico with the International Centre for Settlement of Investment Disputes, which submission was made on behalf of two investment advisors for the Petitioning Creditors. The arbitration request was made pursuant to the North America Free Trade Agreement, to which Mexico was a signatory, based on the Injunctions issued in Mexico. (JX-163.)

**Involuntary Petition**

66. On March 20, 2023, the Petitioning Creditors filed involuntary petitions seeking relief from this Court. On March 21, 2023, the Petitioning Creditors filed amended involuntary petitions correcting clerical errors.

67. Petitioning Creditor, Cyrus Opportunities Master Fund II, Ltd., is an entity organized under the laws of the Cayman Islands. Its investment advisor is Cyrus Capital. (JX-90.)

68. Petitioning Creditor, SandPiper Limited, is an entity organized under the law of the Cayman Islands. Its investment advisor is Contrarian, which is headquartered in Greenwich, Connecticut. (JX-089.)

69. Petitioning Creditor, Plenisfer Investments SICAV - Destination Value Total Return, is an entity organized under the laws of Luxembourg and managed by an investment manager registered in Italy.

Dated: August 25, 2023
New York, New York

By: /s/ Abid Qureshi
Michael S. Stamer
Abid Qureshi
David Giller
**AKIN GUMP STRAUSS HAUER & FELD LLP**
One Bryant Park
New York, NY 10036
Tel:     (212) 872-1000
Fax:     (212) 872-1002
Email: mstamer@akingump.com
       aqureshi@akingump.com
       dgiller@akingump.com

Sarah Link Schultz (*admitted pro hac vice*)
2300 North Field Street, Suite 1800
Dallas, Texas 75201
Tel:    (214) 969-2800
Fax:    (214) 969-4343
Email: sschultz@akingump.com

*Counsel to the Petitioning Creditors*

By: /s/ Jay Cohen
Jay Cohen
Kelley A. Cornish
Elizabeth R. McColm
William A. Clareman
Sean A. Mitchell
**PAUL, WEISS, RIFKIND, WHARTON & GARRISON LLP**
1285 Avenue of the Americas
New York, NY 10019-6064
Tel:     (212) 373-3000
Fax:     (212) 757-3990
Email: jcohen@paulweiss.com
       kcornish@paulweiss.com
       emccolm @paulweiss.com
       wclareman@paulweiss.com
       smitchell@ paulweiss.com

*Counsel to the Alleged Debtors*

# Exhibit 2 to the
# Ellis Declaration

*Execution Version*

**TV AZTECA, S.A.B. DE C.V.,**

**THE SUBSIDIARY GUARANTORS PARTY HERETO**

**THE BANK OF NEW YORK MELLON,**

**as TRUSTEE**

**and**

**THE BANK OF NEW YORK MELLON, LONDON BRANCH,**

**as PRINCIPAL PAYING AGENT**

**8.250% Senior Notes Due 2024**

**INDENTURE**

**Dated as of August 9, 2017**

NAI-1502882142v7

**TABLE OF CONTENTS**

**Page**

ARTICLE I
DEFINITIONS AND INCORPORATION BY REFERENCE

Section 1.1 Definitions .................................................................................................. 1

Section 1.2 Incorporation by Reference of Trust Indenture Act ...................................... 30

Section 1.3 Rules of Construction ................................................................................. 30

ARTICLE II
THE NOTES

Section 2.1 Form and Dating ........................................................................................ 30

Section 2.2 Execution and Authentication ..................................................................... 31

Section 2.3 Registrar and Paying Agent; Depositary ...................................................... 32

Section 2.4 Paying Agent to Hold Money in Trust ......................................................... 32

Section 2.5 Holder Lists ............................................................................................... 33

Section 2.6 Global Note Provisions .............................................................................. 33

Section 2.7 Legends ..................................................................................................... 34

Section 2.8 Transfer and Exchange .............................................................................. 34

Section 2.9 Mutilated, Destroyed, Lost or Stolen Notes ................................................ 36

Section 2.10 Temporary Notes ...................................................................................... 37

Section 2.11 Cancellation .............................................................................................. 37

Section 2.12 Defaulted Interest ...................................................................................... 37

Section 2.13 Additional Notes ........................................................................................ 38

ARTICLE III
COVENANTS

Section 3.1 Payment of Notes ....................................................................................... 38

Section 3.2 Maintenance of Office or Agency ................................................................ 39

Section 3.3 Corporate Existence .................................................................................... 40

Section 3.4 Payment of Taxes ....................................................................................... 40

Section 3.5 Compliance Certificate ............................................................................... 40

Section 3.6 Further Instruments and Acts ...................................................................... 40

Section 3.7 Waiver of Stay, Extension or Usury Laws .................................................... 40

Section 3.8 Repurchase Upon a Change of Control ........................................................ 41

Section 3.9 Limitation on Incurrence of Additional Indebtedness ................................... 42

**TABLE OF CONTENTS**
(continued)

Page

Section 3.10    Limitation on Guarantees.................................................................... 46

Section 3.11    Limitation on Restricted Payments................................................... 46

Section 3.12    Limitation on Asset Sales and Sales of Subsidiary Stock............................ 50

Section 3.13    Limitation on Designation of Unrestricted Subsidiaries............................. 53

Section 3.14    Limitation on Dividends and Other Payment Restrictions Affecting Restricted Subsidiaries......................................................................... 55

Section 3.15    Limitation on Liens............................................................................ 56

Section 3.16    Limitation on Transactions with Affiliates...................................... 57

Section 3.17    Conduct of Business .......................................................................... 58

Section 3.18    Reports to Holders ............................................................................ 58

Section 3.19    Listing ................................................................................................ 59

Section 3.20    Payment of Additional Amounts ...................................................... 60

Section 3.21    Suspension of Covenants .................................................................. 63

ARTICLE IV
SURVIVING ENTITY

Section 4.1     Merger, Consolidation and Sale of Assets........................................ 64

ARTICLE V
OPTIONAL REDEMPTION OF NOTES

Section 5.1     Optional Redemption ......................................................................... 67

Section 5.2     Optional Redemption upon Equity Offerings.................................. 67

Section 5.3     Optional Redemption for Changes in Withholding Taxes.............................. 68

Section 5.4     Optional Redemption Procedures ..................................................... 68

Section 5.5     Notice of Redemption ....................................................................... 68

Section 5.6     Selection of Notes to Be Redeemed in Part.................................... 70

Section 5.7     Deposit of Redemption Price............................................................ 70

Section 5.8     Notes Payable on Redemption Date ................................................ 70

Section 5.9     Unredeemed Portions of Partially Redeemed Note ....................... 71

ARTICLE VI
DEFAULTS AND REMEDIES

Section 6.1     Events of Default ............................................................................... 71

Section 6.2     Acceleration ....................................................................................... 72

**TABLE OF CONTENTS**
(continued)

Page

Section 6.3    Other Remedies.................................................................. 73

Section 6.4    Waiver of Past Defaults ................................................... 73

Section 6.5    Control by Majority ......................................................... 73

Section 6.6    Limitation on Suits.......................................................... 73

Section 6.7    Rights of Holders to Receive Payment ........................... 74

Section 6.8    Collection Suit by Trustee .............................................. 74

Section 6.9    Trustee May File Proofs of Claim, etc............................ 74

Section 6.10   Priorities ......................................................................... 75

Section 6.11   Undertaking for Costs ..................................................... 75

ARTICLE VII
TRUSTEE

Section 7.1    Duties of Trustee............................................................. 76

Section 7.2    Rights of Trustee............................................................. 77

Section 7.3    Individual Rights of Trustee ........................................... 79

Section 7.4    Trustee's Disclaimer ....................................................... 79

Section 7.5    Notice of Defaults........................................................... 79

Section 7.6    [Reserved] ....................................................................... 79

Section 7.7    Compensation and Indemnity ......................................... 79

Section 7.8    Replacement of Trustee .................................................. 80

Section 7.9    Successor Trustee by Merger........................................... 81

Section 7.10   Eligibility; Disqualification ............................................ 81

Section 7.11   Preferential Collection of Claims Against Company....... 82

Section 7.12   Appointment of Co-Trustee ........................................... 82

Section 7.13   The Agents....................................................................... 83

ARTICLE VIII
DEFEASANCE; DISCHARGE OF INDENTURE

Section 8.1    Legal Defeasance and Covenant Defeasance ................... 83

Section 8.2    Conditions to Defeasance ................................................ 84

Section 8.3    Application of Trust Money............................................. 86

Section 8.4    Repayment to Company................................................... 86

Section 8.5    Indemnity for U.S. Government Obligations.................... 86

**TABLE OF CONTENTS**
(continued)

Page

Section 8.6     Reinstatement......................................................................................... 86

Section 8.7     Satisfaction and Discharge..................................................................... 87

**ARTICLE IX**
**AMENDMENTS**

Section 9.1     Without Consent of Holders .................................................................. 87

Section 9.2     With Consent of Holders ....................................................................... 89

Section 9.3     Revocation and Effect of Consents and Waivers.................................. 90

Section 9.4     Notation on or Exchange of Notes........................................................ 90

Section 9.5     Trustee to Sign Amendments and Supplements ................................... 90

**ARTICLE X**
**NOTE GUARANTEES**

Section 10.1    Note Guarantees..................................................................................... 91

Section 10.2    Limitation on Liability; Termination, Release and Discharge...................... 94

Section 10.3    Right of Contribution............................................................................. 94

Section 10.4    No Subrogation ...................................................................................... 94

Section 10.5    Execution and Delivery of Note Guarantee .......................................... 95

Section 10.6    Additional Note Guarantees................................................................... 95

**ARTICLE XI**
**MISCELLANEOUS**

Section 11.1    Notices ................................................................................................... 95

Section 11.2    Communication by Holders with Other Holders ................................. 97

Section 11.3    Certificate and Opinion as to Conditions Precedent...................... 97

Section 11.4    Statements Required in Certificate or Opinion.................................... 97

Section 11.5    Rules by Trustee, Paying Agent and Registrar ................................... 97

Section 11.6    Payment Date Other than a Business Day ..................................... 98

Section 11.7    Governing Law, etc................................................................................ 98

Section 11.8    No Recourse Against Others.................................................................. 99

Section 11.9    Successors .............................................................................................. 99

Section 11.10   Duplicate and Counterpart Originals .................................................... 99

Section 11.11   Severability ......................................................................................... 100

Section 11.12   Currency Indemnity ............................................................................ 100

**TABLE OF CONTENTS**
(continued)

**Page**

Section 11.13     Table of Contents; Headings..........................................................................100

Section 11.14     USA Patriot Act.........................................................................................100

Section 11.15     Foreign Account Tax Compliance Act (FATCA) .......................................101

Section 11.16     Anti-Money Laundering, Terrorism and Economic Sanctions....................101

**EXHIBIT A**    **FORM OF NOTE**

**EXHIBIT B**    **FORM OF SUPPLEMENTAL INDENTURE FOR ADDITIONAL NOTE GUARANTEE**

INDENTURE, dated as of August 9, 2017, by and among TV Azteca, S.A.B. de C.V., a publicly traded variable capital corporation (*sociedad anónima bursátil de capital variable*) organized and existing under the laws of the United Mexican States ("Mexico"), the Subsidiary Guarantors party hereto, The Bank of New York Mellon, as trustee (the "Trustee") and The Bank of New York Mellon, London Branch, as initial Principal Paying Agent.

Each party hereto agrees as follows for the benefit of the other parties and for the equal and ratable benefit of the Holders of the Company's 8.250% Senior Notes Due 2024 issued under this Indenture.

## ARTICLE I

## DEFINITIONS AND INCORPORATION BY REFERENCE

Section 1.1     Definitions.

"Acquired Indebtedness" means Indebtedness of a Person or any of its Subsidiaries existing at the time such Person becomes a Restricted Subsidiary or at the time it merges or consolidates with the Company or any of its Restricted Subsidiaries or is assumed in connection with the acquisition of assets from such Person.  Such Indebtedness shall be deemed to have been Incurred at the time such Person becomes a Restricted Subsidiary or at the time it merges or consolidates with the Company or a Restricted Subsidiary or at the time such Indebtedness is assumed in connection with the acquisition of assets from such Person.

"Additional Amounts" has the meaning assigned to it in Section 3.20.

"Additional Note Board Resolutions" means resolutions duly adopted by the Board of Directors of the Company and each of the Subsidiary Guarantors and delivered to the Trustee in an Officers' Certificate providing for the issuance of Additional Notes (and the Guarantee by the Subsidiary Guarantors thereof).

"Additional Notes" means the Company's 8.250% Senior Notes Due 2024 originally issued after the Issue Date pursuant to Section 2.13, including any replacement Notes issued therefor.

"Additional Note Supplemental Indenture" means a supplement to this Indenture duly executed and delivered by the Company, each Subsidiary Guarantor and the Trustee pursuant to Article IX providing for the issuance of Additional Notes (and the Guarantee by the Subsidiary Guarantors thereof).

"Affiliate" means, with respect to any specified Person, any other Person who directly or indirectly through one or more intermediaries controls, or is controlled by, or is under common control with, such specified Person.  The term "control" means the possession, directly or indirectly, of the power to direct or cause the direction of the management and policies of a Person, whether through the ownership of voting securities, by contract or otherwise.  For purposes of this definition, the terms "controlling," "controlled by" and "under common control with" have correlative meanings.

NAI-1502882142v7

"Affiliate Transaction" has the meaning assigned to it in Section 3.16(a).

"Agents" means, collectively, the Registrar, any co-Registrar, the Principal Paying Agent, any other Paying Agents and any other agent appointed by the Company under this Indenture.

"Agent Members" has the meaning assigned to it in Section 2.6(b).

"Applicable Premium" means, with respect to any Note on any applicable Redemption Date, the excess, if any, of (a) the present value at such Redemption Date of (i) the redemption price of such Note at, August 9, 2021 (such redemption price being set forth in the table appearing in Section 5.1(b)) plus (ii) all required interest payments due on such Note through August 9, 2021 (excluding accrued but unpaid interest to the Redemption Date), computed in each case using a discount rate equal to the Treasury Rate as of such Redemption Date plus 50 basis points over (b) the outstanding principal amount of such Note.

"Asset Sale" means any direct or indirect sale, disposition, issuance, conveyance, transfer, lease (other than operating leases), assignment or other transfer, including a Sale and Leaseback Transaction (each, a "disposition") by the Company or any Restricted Subsidiary of:

(a)     any Capital Stock of any Restricted Subsidiary (but not Capital Stock of the Company); or

(b)     any property or assets (other than cash, Cash Equivalents or Capital Stock of the Company) of the Company or any Restricted Subsidiary.

Notwithstanding the preceding, the following items shall not be deemed to be Asset Sales:

(1)     the disposition of all or substantially all of the assets of the Company and its Restricted Subsidiaries as permitted under Section 4.1;

(2)     sales, leases, conveyances or other dispositions of real or personal property, including, without limitation, exchanges or swaps of real estate, for the development of the Company's or any of its Restricted Subsidiaries' projects in the ordinary course of business

(3)     for purposes of Section 3.12 only, the making of Restricted Payments permitted under Section 3.11 or any Permitted Investment;

(4) a disposition to the Company or a Restricted Subsidiary, including a Person that is or will become a Restricted Subsidiary immediately after the disposition;

(5)     any single transaction or series of related transactions that involves assets or Capital Stock of the Company or a Restricted Subsidiary having a Fair Market Value of less than U.S.$10.0 million;

(6)     a transfer of assets between or among the Company and any of its Restricted Subsidiaries;

NAI-1502882142v7

(7)     an issuance or sale of Capital Stock by a Restricted Subsidiary of the Company to the Company or any of its Restricted Subsidiaries;

(8)     any sale or other disposition of damaged, worn-out, obsolete or no longer useful assets or properties in the ordinary course of business;

(9)     any sale of assets received by the Company or any of its Restricted Subsidiaries upon the foreclosure on a Lien;

(10)     the good faith surrender or waiver of contract rights, tort claims or statutory rights in connection with a settlement; and

(11)     sales or other dispositions of inventory, advertising time (including barter transactions), receivables and current assets in the ordinary course of business.

"Asset Sale Offer" has the meaning assigned to it in Section 3.12(d).

"Asset Sale Offer Amount" has the meaning assigned to it in Section 3.12(d).

"Asset Sale Offer Notice" means written notice of an Asset Sale Offer made pursuant to Section 3.12, that shall state:

(1)     that an Asset Sale has occurred, the circumstances of the Asset Sale, the Net Cash Proceeds of which are included in the Asset Sale Offer, that an Asset Sale Offer is being made pursuant to Section 3.12, and that all Notes that are timely tendered will be accepted for payment, subject to proration, as described in Section 3.12;

(2)     the Asset Sale Offer Amount (including the portion thereof representing accrued interest) and the Asset Sale Offer Payment Date;

(3)     that any Notes or portions thereof not tendered or accepted for payment will continue to accrue interest;

(4)     that, unless the Company defaults in the payment of the Asset Sale Offer Amount with respect to Notes tendered and accepted for payment, all such Notes or portions thereof accepted for payment pursuant to the Asset Sale Offer shall cease to accrue interest from and after the Asset Sale Offer Payment Date;

(5)     that any Holder electing to have any Notes or portions thereof purchased pursuant to the Asset Sale Offer will be required to surrender such Notes, with the form entitled "Option of Holder to Elect Purchase" on the reverse of such Notes completed, to the Trustee at the place or places specified in the notice prior to the close of business on the third Business Day preceding the Asset Sale Offer Payment Date;

(6)     that any Holder shall be entitled to withdraw such election if the Trustee receives, not later than the close of business on the second Business Day preceding the Asset Sale Offer Payment Date, a notice of withdrawal, setting forth the name of the Holder, the principal amount of Notes delivered for purchase, and a statement that such Holder is

NAI-1502882142v7

withdrawing such Holder's election to have such Notes or portions thereof purchased pursuant to the Asset Sale Offer;

(7)     that any Holder electing to have Notes purchased pursuant to the Asset Sale Offer must specify the principal amount that is being tendered for purchase, which principal amount must be U.S.$200,000 and in integral multiples of U.S.$1,000 in excess thereof and any portion of Notes not tendered must satisfy the U.S.$200,000 minimum denomination requirement;

(8)     that any Holder of Certificated Notes whose Certificated Notes are being purchased only in part will be issued new Certificated Notes equal in principal amount to the unpurchased portion of the Certificated Note or Notes surrendered, which unpurchased portion will be equal in principal amount to U.S.$200,000 and in integral multiples of U.S.$1,000 in excess thereof;

(9)     that the Trustee will make a notation on the schedule of increases or decreases of any Global Note adjusting the principal amount thereof to be equal to the unpurchased portion of such Global Note; and

(10)     any other information necessary to enable any Holder to tender Notes and to have such Notes purchased pursuant to Section 3.12.

"Asset Sale Offer Payment Date" has the meaning assigned to it in Section 3.12(f).

"Authenticating Agent" has the meaning assigned to it in Section 2.2(d).

"Authorized Agent" has the meaning assigned to it in Section 11.7(c).

"Average Quarterly Balance" means, with respect to any Indebtedness incurred by the Company or its Restricted Subsidiaries under a revolving facility or line of credit, the quotient of (x) the sum of each Individual Quarterly Balance for each fiscal quarter ended on or prior to such date of determination and included in the Reference Period divided by (y) 4.

"Bankruptcy Law" means any bankruptcy, *concurso mercantil*, insolvency or other similar laws now or hereafter in effect.

"Bankruptcy Law Event of Default" means:

(1)     pursuant to or within the meaning of any Bankruptcy Law, any Bankruptcy Party (A) commences a voluntary case, (B) consents to the entry of an order for relief against it in an involuntary case, (C) consents to the appointment of a Custodian of it or for any substantial part of its property, or (D) makes a general assignment for the benefit of its creditors, or takes any comparable action under any comparable laws relating to insolvency; or

(2)     a court of competent jurisdiction enters an order or decree under any Bankruptcy Law that (A) is for relief against any Bankruptcy Party in an involuntary case, (B) appoints a Custodian of any Bankruptcy Party or for any substantial part of its property, or (C) orders the winding up or liquidation of any Bankruptcy Party, or any similar relief is granted

- 4 -

under any comparable laws and the order or decree remains unstayed and in effect for 60 consecutive days.

"Bankruptcy Party" means the Company, any Restricted Subsidiary of the Company that is a Significant Subsidiary or any group of Restricted Subsidiaries of the Company that, taken together, would constitute a Significant Subsidiary.

"Board of Directors" means, as to any Person, the board of directors, management committee, sole administrator or similar governing body of such Person or any duly authorized committee thereof.

"Board Resolution" means, with respect to any Person, a copy of a resolution certified by the Secretary or an Assistant Secretary of such Person to have been duly adopted by the Board of Directors of such Person and to be in full force and effect on the date of such certification, and delivered to the Trustee.

"Business Day" means a day other than a Saturday, Sunday or other day on which commercial banking institutions are authorized or required by law to close in New York City, Mexico City or London.

"Capitalized Lease Obligations" means, as to any Person, the obligations of such Person under a lease that are required to be classified and accounted for as capital lease obligations under IFRS.  For purposes of this definition, the amount of such obligations at any date shall be the capitalized amount of such obligations at such date, determined in accordance with IFRS.

"Capital Stock" means:

(1)     with respect to any Person that is a corporation, any and all shares, interests, participations or other equivalents (however designated and whether or not voting) of corporate stock, including each class of Common Stock and Preferred Stock of such Person;

(2)     with respect to any Person that is not a corporation, any and all partnership or other equity or ownership interests of such Person; and

(3)     any warrants, rights or options to purchase any of the instruments or interests referred to in clause (1) or (2) above.

"CASA" means Comunicaciones Avanzadas, S.A. de C.V.

"Cash Equivalents" means:

(1)     marketable direct obligations issued by, or unconditionally guaranteed by, the United States government or issued by any agency thereof and backed by the full faith and credit of the United States, in each case maturing within one year from the date of acquisition thereof;

- 5 -

(2)     *Certificados de la Tesoreria de la Federacion (Cetes)* or *Bonos de Desarrollo del Gobierno Federal (Bondes)*, in each case, issued by the government of Mexico and maturing not later than one year after the acquisition thereof;

(3)     marketable direct obligations issued by any state of the United States of America or any political subdivision of any such state or any public instrumentality thereof maturing within one year from the date of acquisition thereof and, at the time of acquisition, having one of the two highest ratings obtainable from either Moody's, S&P or Fitch or any successor thereto;

(4)     commercial paper maturing no more than one year from the date of creation thereof and at the time of acquisition, having a rating of at least F-1 from Fitch, at least P-1 from Moody's, or at least A-1 from S&P;

(5)     demand deposits, certificates of deposit, time deposits or bankers' acceptances maturing within one year from the date of acquisition thereof issued by (a) any bank organized under the laws of the United States of America or any state thereof or the District of Columbia, (b) any U.S. branch of a non-U.S. bank having at the date of acquisition thereof combined capital and surplus of not less than U.S.$500 million, (c) Nacional Financiera S.N.C., Banco Nacional de Comercio Exterior, S.N.C., Banco Nacional de Obras y Servicios Públicos, S.N.C. or Banco Azteca, S.A., , Institución de Banca Múltiple or (d) in the case of Mexican peso deposits, Banco Azteca, S.A., Institución de Banca Múltiple or any of the five top-rated banks (as evaluated by any Rating Agency) organized under the laws of Mexico;

(6)     repurchase obligations with a term of not more than seven days for underlying securities of the types described in clause (1) above entered into with any bank meeting the qualifications specified in clause (5) above; and

(7)     investments in money market funds which invest substantially all of their assets in securities of the types described in clauses (1) through (6) above.

"Certificated Note" means any Note issued in fully-registered certificated form (other than a Global Note), which shall be substantially in the form of Exhibit A, with appropriate legends as specified in Section 2.7 and Exhibit A.

"Change of Control" means the occurrence of one or more of the following events:

(1)     any Person or Group other than the Permitted Holders is or becomes the beneficial owner (as defined below), directly or indirectly, in the aggregate of more than 50% of the total voting power of the Voting Stock of the Company (including a Surviving Entity, if applicable);

(2)     during any period of two consecutive years, individuals who at the beginning of such period constituted the Board of Directors of the Company, together with any new directors whose election by such Board of Directors or whose nomination for election by the shareholders of the Company was approved by a vote of a majority of the directors of the Company then still in office who were either directors at the beginning of such period or whose

- 6 -

election or nomination for election was previously so approved, cease for any reason to constitute a majority of the Board of Directors of the Company then in office;

(3)      the Company consolidates with, or merges with or into, another Person, or the Company sells, conveys, assigns, transfers, leases or otherwise disposes of all or substantially all of the assets of the Company, determined on a consolidated basis, to any Person, other than a transaction where the Person or Persons that, immediately prior to such transaction "beneficially owned" the outstanding Voting Stock of the Company are, by virtue of such prior ownership, or Permitted Holders are, the "beneficial owners" in the aggregate of a majority of the total voting power of the then outstanding Voting Stock of the surviving or transferee person (or if such surviving or transferee Person is a direct or indirect Wholly Owned Subsidiary of another Person, such Person who is the ultimate parent entity), in each case whether or not such transaction is otherwise in compliance with this Indenture; or

(4)      the approval by the holders of Capital Stock of the Company of any plan or proposal for the liquidation or dissolution of the Company, whether or not otherwise in compliance with the provisions of this Indenture.

For purposes of this definition:

(a)      "beneficial owner" shall have the meaning specified in Rules 13d-3 and 13d-5 under the Exchange Act, except that any Person or Group shall be deemed to have "beneficial ownership" of all securities that such Person or Group has the right to acquire, whether such right is exercisable immediately, only after the passage of time or, except in the case of the Permitted Holders, upon the occurrence of a subsequent condition.

(b)      "Person" and "Group" shall have the meanings for "person" and "group" as used in Sections 13(d) and 14(d) of the Exchange Act; and

(c)      the Permitted Holders or any other Person or Group shall be deemed to beneficially own any Voting Stock of a Person held by any other Person (the "parent entity") so long as the Permitted Holders or such other Person or Group, as the case may be, beneficially own, directly or indirectly, in the aggregate at least 50% of the voting power of the Voting Stock of the parent entity and no other Person or Group beneficially owns an equal or greater amount of the Voting Stock of the parent entity.

"Change of Control Notice" means written notice of a Change of Control Offer made pursuant to Section 3.8, which notice shall govern the terms of the Change of Control Offer and shall state:

(1)      that a Change of Control has occurred, the circumstances or events causing such Change of Control and that a Change of Control Offer is being made pursuant to Section 3.8 , and that all Notes that are timely tendered will be accepted for payment;

(2)      the Change of Control Payment (including the portion thereof representing accrued interest), and the Change of Control Payment Date;

- 7 -

(3)      that any Notes or portions thereof not tendered or accepted for payment will continue to accrue interest;

(4)      that, unless the Company defaults in the payment of the Change of Control Payment with respect to Notes tendered and accepted for payment, all such Notes or portions thereof accepted for payment pursuant to the Change of Control Offer shall cease to accrue interest from and after the Change of Control Payment Date;

(5)      that any Holder electing to have any Notes or portions thereof purchased pursuant to a Change of Control Offer will be required to tender such Notes, with the form entitled "Option of Holder to Elect Purchase" on the reverse of such Notes completed, to the Trustee at the place or places specified in the notice prior to the close of business on the third Business Day preceding the Change of Control Payment Date;

(6)      that any Holder shall be entitled to withdraw such election if the Trustee receives, not later than the close of business on the second Business Day preceding the Change of Control Payment Date, a notice of withdrawal, setting forth the name of the Holder, the principal amount of Notes delivered for purchase, and a statement that such Holder is withdrawing such Holder's election to have such Notes or portions thereof purchased pursuant to the Change of Control Offer;

(7)      that any Holder electing to have Notes purchased pursuant to the Change of Control Offer must specify the principal amount that is being tendered for purchase, which principal amount must be U.S.$200,000 and integral multiples of U.S.$1,000 in excess thereof and any portion of Notes not tendered must satisfy the U.S.$200,000 minimum denomination requirement;

(8)      that any Holder of Certificated Notes whose Certificated Notes are being purchased only in part will be issued new Certificated Notes equal in principal amount to the unpurchased portion of the Certificated Note or Notes surrendered, which unpurchased portion will be equal in principal amount to U.S.$200,000 and integral multiples of U.S.$1,000 in excess thereof;

(9)      that the Trustee will make a notation on the schedule of increases or decreases of any Global Note adjusting the principal amount thereof to be equal to the unpurchased portion of such Global Note;

(10)      that, in the event that Holders of not less than 90% of the aggregate principal amount of the Outstanding Notes accept a Change of Control Offer and the Company or third party purchases all of the Notes held by such Holders, the Company will have the right, upon prior notice, to redeem all of the Notes that remain Outstanding in accordance with Section 3.8(h); and

(11)      any other information necessary to enable any Holder to tender Notes and to have such Notes purchased pursuant to Section 3.8.

"Change of Control Offer" has the meaning assigned to it in Section 3.8(c).

- 8 -

"Change of Control Payment" has the meaning assigned to it in Section 3.8(a).

"Change of Control Payment Date" has the meaning assigned to it in Section 3.8(c).

"Clearing Agency" means one or more of Euroclear, Clearstream, or the successor of either of them, in each case acting directly, or through a custodian, nominee or depository.

"Clearstream" means Clearstream Banking, *société anonyme*, or the successor to its securities clearance and settlement operations.

"CNBV" means the *Comision Nacional Bancaria y de Valores*, the Mexican National Banking and Securities Commission.

"Code" means the U.S. Internal Revenue Code of 1986, as amended as of the Issue Date.

"Commodity Agreement" means any commodity or raw material futures contract, commodity or raw materials option, or any other agreement designed to protect against or manage exposure to fluctuations in commodity or raw material prices.

"Common Depositary" means a depositary common to the Clearing Agencies, which initially shall be The Bank of New York Depository (Nominees) Limited, or any successor thereto.

"Common Stock" of any Person means any and all shares, interests or other participations in, and other equivalents (however designated and whether voting or non-voting) of such Person's common equity interests, whether outstanding on the Issue Date or issued after the Issue Date, and includes, without limitation, all series and classes of such common equity interests.

"Company" means TV Azteca, S.A.B. de C.V., a publicly traded variable capital corporation (*sociedad anónima bursátil de capital variable*), and its successors and assigns, including any Surviving Entity.

"Company Order" has the meaning assigned to it in Section 2.2(c).

"Comparable Treasury Issue" means the United States Treasury security or securities selected by an Independent Investment Banker as having an actual or interpolated maturity comparable to the remaining term of the Notes through August 9, 2021 that would be utilized, at the time of selection and in accordance with customary financial practice, in pricing new issues of corporate debt securities of a comparable maturity to August 9, 2021.

"Comparable Treasury Price" means, with respect to any Redemption Date (1) the average of the Reference Treasury Dealer Quotations for such Redemption Date, after excluding the highest and lowest such Reference Treasury Dealer Quotation, or (2) if the Company obtains fewer than four such Reference Treasury Dealer Quotations, the average of all such quotations.

- 9 -

"Consolidated EBITDA" means, for any Person for any period, Consolidated Net Income for such Person for such period, plus the following, without duplication, to the extent deducted or added in calculating such Consolidated Net Income:

      (1)     Consolidated Income Tax Expense for such Person for such period;

      (2)     Consolidated Interest Expense for such Person for such period;

      (3)     Consolidated Non-cash Charges for such Person for such period; and

      (4)     any income or loss from discontinued operations;

in each case as set forth for such Person in the most recent financial statements of such Person, prepared in accordance with IFRS.

"Consolidated Income Tax Expense" means, with respect to any Person for any period, the provision for federal, state, local and non-U.S. income taxes, and any applicable statutorily mandated employee profit sharing tax or similar payments, payable by such Person and its Subsidiaries (Restricted Subsidiaries in the case of the Company) for such period as determined on a consolidated basis in accordance with IFRS.

"Consolidated Interest Expense" means, for any Person for any period, the sum of, without duplication determined on a consolidated basis in accordance with IFRS:

      (1)     the aggregate of cash and non-cash interest expense of such Person and its Subsidiaries (Restricted Subsidiaries in the case of the Company) for such period determined on a consolidated basis in accordance with IFRS; and

      (2)     the interest component of Capitalized Lease Obligations paid, accrued and/or scheduled to be paid or accrued by such Person or its Subsidiaries (Restricted Subsidiaries in the case of the Company) during such period.

"Consolidated Leverage Ratio" means, as of any date of determination, the ratio of (1) Consolidated Total Indebtedness at the time of determination to (2) the Consolidated EBITDA of the Company and its Restricted Subsidiaries for the most recently ended four full fiscal quarters for which financial statements are available immediately preceding the date on which such event for which such calculation is being made shall occur; *provided* that:

      (1)     if the Company or any Restricted Subsidiary has Incurred, repaid, repurchased, redeemed, retired, defeased or otherwise discharged any Indebtedness since the beginning of such period that remains outstanding on such date of determination or if the transaction giving rise to the need to calculate the Consolidated Leverage Ratio involves an Incurrence, repayment, repurchase, redemption, retirement, defeasance or other discharge of Indebtedness, Consolidated EBITDA, Consolidated Interest Expense and Indebtedness for such period shall be calculated after giving effect on a pro forma basis to such Incurrence, repayment, repurchase, redemption, retirement, defeasance or other discharge of Indebtedness as if such Indebtedness had been Incurred or repaid, repurchased, redeemed, retired, defeased or otherwise discharged on the first day of such period;

- 10 -

(2)     if since the beginning of such period the Company or any Restricted Subsidiary will have made any Asset Sale or disposed of or discontinued any company, division, operating unit, segment, business, group of related assets or line of business or if the transaction giving rise to the need to calculate the Consolidated Leverage Ratio includes such an Asset Sale, Consolidated EBITDA, Consolidated Interest Expense and Indebtedness for such period shall be calculated after giving pro forma effect thereto (including the Incurrence of any Indebtedness) as if such Asset Sale, disposition or discontinuation occurred on the first day of such period;

(3)     if since the beginning of such period the Company or any Restricted Subsidiary (by merger or otherwise) will have made an Investment in any Restricted Subsidiary (or any Person that becomes a Restricted Subsidiary or is merged with or into the Company or a Restricted Subsidiary) or an acquisition of assets, including any acquisition of assets occurring in connection with a transaction causing a calculation to be made under this Indenture, which constitutes all or substantially all of a company, division, operating unit, segment, business or group of related assets or line of business, Consolidated EBITDA, Consolidated Interest Expense and Indebtedness for such period shall be calculated after giving pro forma effect thereto (including the Incurrence of any Indebtedness) as if such Investment or acquisition occurred on the first day of such period; and

(4)     if since the beginning of such period any Person (that subsequently became a Restricted Subsidiary or was merged with or into the Company or any Restricted Subsidiary since the beginning of such period) will have Incurred any Indebtedness or discharged any Indebtedness or made any disposition or any Investment or acquisition of assets that would have required an adjustment pursuant to clause (1), (2) or (3) above if made by the Company or a Restricted Subsidiary during such period, Consolidated EBITDA, Consolidated Interest Expense and Indebtedness for such period shall be calculated after giving pro forma effect thereto as if such transaction occurred on the first day of such period.

The pro forma calculations provided for in this definition of Consolidated Leverage Ratio shall be determined in good faith by a responsible financial or accounting Officer of the Company. If any Indebtedness bears a floating rate of interest and is being given pro forma effect, the interest expense on such Indebtedness shall be calculated as if the rate in effect on the date of determination had been the applicable rate for the entire period (taking into account any Interest Rate Agreement applicable to such Indebtedness if such Interest Rate Agreement has a remaining term in excess of 12 months).

"Consolidated Net Income" means, with respect to any Person for any period, the aggregate net income (or loss) of such Person and its Subsidiaries (Restricted Subsidiaries in the case of the Company) (after deducting (or adding) the portion of such net income (or loss) attributable to minority interests in Subsidiaries of such Person (Restricted Subsidiaries in the case of the Company)) for such period on a consolidated basis, determined in accordance with IFRS; *provided* that there shall be excluded therefrom to the extent reflected in such aggregate net income (loss):

(1)     net after-tax items classified as extraordinary gains or losses;

- 11 -

NAI-1502882142v7

(2)    the net income (but not loss) of any Subsidiary of such Person (Restricted Subsidiary in the case of the Company) to the extent that (and only so long as) a corresponding amount could not be distributed or otherwise transferred to such Person at the date of determination as a result of any restriction pursuant to the constituent documents of such Subsidiary (Restricted Subsidiary in the case of the Company) or any law, regulation, agreement or judgment applicable to any such distribution;

(3)    any gain (or loss) from foreign exchange translation or change in net monetary position;

(4)    any gains or losses (less all fees and expenses or charges relating thereto) attributable to the early extinguishment of Indebtedness and Hedging Obligations; and

(5)    the cumulative effect of changes in accounting principles.

"Consolidated Non-cash Charges" means, for any Person for any period the aggregate depreciation, amortization and other non-cash expenses or losses, of such Person and its Subsidiaries (Restricted Subsidiaries in the case of the Company) for such period, determined on a consolidated basis in accordance with IFRS (excluding any such charge which constitutes an accrual of or a reserve for cash charges for any future period or the amortization of a prepaid cash expense paid in a prior period after the Issue Date).

"Consolidated Tangible Assets" means, for any Person at any time, the total consolidated assets of such Person and its Subsidiaries (Restricted Subsidiaries in the case of the Company) as set forth on the balance sheet as of the most recent fiscal quarter of such Person, prepared in accordance with IFRS, less (i) Intangible Assets and (ii) any assets securing Non-Recourse Indebtedness.

"Consolidated Total Indebtedness" means, as at any date of determination, an amount equal to the sum of the aggregate amount of all outstanding Indebtedness of the Company and its Restricted Subsidiaries on a consolidated basis consisting of Indebtedness for borrowed money, Obligations in respect of Capitalized Lease Obligations and debt obligations evidenced by promissory notes and similar instruments; provided that Indebtedness of the Company and its Restricted Subsidiaries under any revolving credit facility or line of credit as at any date of determination shall be determined using the Average Quarterly Balance of such Indebtedness for the applicable Reference Period.

"Corporate Trust Office" means the office of the Trustee at which at any time its corporate trust business shall be principally administered, which office at the date hereof is located at 101 Barclay Street, 7th Floor East, New York, NY 10286, Fax (212) 815-5603, Attention: Global Corporate Trust, or such other address as the Trustee may designate from time to time by notice to the Holders and the Company, or the principal corporate trust office of any successor Trustee (or such other address as such successor Trustee may designate from time to time by notice to the Holders and the Company).

"Covenant Defeasance" has the meaning assigned to it in Section 8.1(c).

- 12 -

NAI-1502882142v7

"Covenant Suspension Event" has the meaning assigned to it in Section 3.21(a).

"Credit Facilities" means one or more debt facilities, commercial paper facilities, structured notes, certificates or other similar instruments (including any Cebures), in each case with banks, investment banks, *sociedades financieras de objeto múltiple*, *sociedades financieras de objeto limitado*, insurance companies, mutual funds and/or other institutional lenders or institutional investors, in each case providing for revolving credit or term loans or letters of credit, and in each case, as amended, extended, renewed, restated, Refinanced, supplemented or otherwise modified (in whole or in part, and without limitation as to amount, terms, conditions, covenants and other provisions) from time to time.

"Currency Agreement" means, in respect of any Person, any foreign exchange contract, currency swap agreement or other similar agreement as to which such Person is a party designed to hedge foreign currency risk of such Person.

"Custodian" means any receiver, trustee, assignee, liquidator, custodian or similar official under any Bankruptcy Law.

"Default" means any condition, event or act, which, with the lapse of time and/or the issue, making or giving of any notice, certification, declaration, demand, determination and/or request and/or the taking of any similar action and/or fulfillment of any similar condition would constitute, an Event of Default.

"Defaulted Interest" means overdue installments of interest.

"Designation" has the meaning assigned to it in Section 3.13(a).  "Designate," "Designated" and "Designating" will have the corresponding meanings.

"Designation Amount" has the meaning assigned to it in Section 3.13(a).

"Directive 2004/39/EC" means Directive 2004/39/EC of the European Parliament and of the Council on Markets in Financial Instruments (MiFID of April 21, 2004).

"disposition" has the meaning assigned to it in the definition of "Asset Sale."

"Disqualified Capital Stock" means that portion of any Capital Stock which, by its terms (or by the terms of any security into which it is convertible or for which it is exchangeable at the option of the holder thereof), or upon the happening of any event, matures or is mandatorily redeemable, pursuant to a sinking fund obligation or otherwise, or is redeemable at the sole option of the holder thereof, in any case, on or prior to the final maturity date of the Notes; *provided*, *however*, that any Capital Stock that would not constitute Disqualified Capital Stock but for provisions thereof giving holders thereof the right to require such Person to purchase or redeem such Capital Stock upon the occurrence of an "asset sale" or "change of control" occurring prior to the final maturity of the Notes shall not constitute Disqualified Capital Stock if:

(1)     the "asset sale" or "change of control" provisions applicable to such Capital Stock are not materially more favorable to the holders of such Capital Stock than the terms applicable to the Notes and described under Section 3.12 and Section 3.8, respectively; and

- 13 -

NAI-1502882142v7

(2)     any such requirement only becomes operative after compliance with such terms applicable to the Notes, including the purchase of any Notes tendered pursuant thereto.

The amount of any Disqualified Capital Stock shall be equal to the greater of its voluntary or involuntary liquidation preference and its maximum fixed repurchase price, but excluding accrued dividends, if any.  The amount of any Disqualified Capital Stock that does not have a fixed redemption, repayment or repurchase price shall be calculated in accordance with the terms of such Disqualified Capital Stock as if such Disqualified Capital Stock were redeemed, repaid or repurchased on any date on which the amount of such Disqualified Capital Stock is to be determined pursuant to this Indenture; *provided*, *however*, that if such Disqualified Capital Stock could not be required to be redeemed, repaid or repurchased at the time of such determination, the redemption, repayment or repurchase price shall be the book value of such Disqualified Capital Stock as reflected in the most recent financial statements of such Person.

"Equity Offering" means (i) a primary public offering of Qualified Capital Stock of the Company in accordance with applicable Mexican or other laws, rules and regulations, (ii) a rights offering of Qualified Capital Stock of the Company made generally to the holders of such Qualified Capital Stock or (iii) any private placement of Qualified Capital Stock of the Company to any Person, in each case other than issuances upon exercise of options by employees of the Company or any of its Subsidiaries.

"Euroclear" means Euroclear S.A./N.V., as operator of the Euroclear System, or its successor in such capacity.

"Event of Default" has the meaning assigned to it in Section 6.1(a).

"Exchange Act" means the Securities Exchange Act of 1934, as amended, or any successor statute or statutes thereto.

"Fair Market Value" means, with respect to any asset, the price (after deducting any liabilities relating to such assets) which could be negotiated in an arm's-length free market transaction, for cash, between a willing seller and a willing and able buyer, neither of which is under any compulsion to complete the transaction; *provided* that the Fair Market Value of any such asset or assets will be determined conclusively by the Board of Directors of the Company acting in good faith, and will be evidenced by a Board Resolution.

"Fitch" means Fitch Ratings, Inc. and any successor to its rating agency business.

"Global Note" means any Note issued in fully-registered global form, which shall be substantially in the form of Exhibit A, with appropriate legends as specified in Section 2.7 and Exhibit A.

"Guarantee" means any obligation, contingent or otherwise, of any Person directly or indirectly guaranteeing any Indebtedness of any other Person:

(1)     to purchase or pay, or advance or supply funds for the purchase or payment of, such Indebtedness of such other Person, whether arising by virtue of partnership

- 14 -

arrangements, or by agreement to keep-well, to purchase assets, goods, securities or services, to take-or-pay, or to maintain financial statement conditions or otherwise, or

(2)     entered into for purposes of assuring in any other manner the obligee of such Indebtedness of the payment thereof or to protect such obligee against loss in respect thereof, in whole or in part,

*provided* that "Guarantee" will not include endorsements for collection or deposit in the ordinary course of business.  "Guarantee" used as a verb has a corresponding meaning.

"Guaranteed Obligations" has the meaning assigned to it in Section 10.1(a).

"Hedging Obligations" means the obligations of any Person pursuant to any Interest Rate Agreement, Currency Agreement or Commodity Agreement.

"Holder" means the Person in whose name a Note is registered in the Note Register.

"IFRS" means International Financial Reporting Standards, as issued by the International Accounting Standards Board, as in effect on the Issue Date.

"Incur" means, with respect to any Indebtedness or other obligation of any Person, to create, issue, incur (including by conversion, exchange or otherwise), assume, Guarantee or otherwise become liable in respect of such Indebtedness or other obligation on the balance sheet of such Person (and "Incurrence," "Incurred" and "Incurring" will have meanings correlative to the preceding).

"Indebtedness" means with respect to any Person, without duplication:

(1)     the principal amount (or, if less, the accreted value) of all obligations of such Person for borrowed money;

(2)     the principal amount (or, if less, the accreted value) of all obligations of such Person evidenced by bonds, debentures, notes or other similar instruments;

(3)     all Capitalized Lease Obligations of such Person;

(4)     all obligations of such Person issued or assumed as the deferred purchase price of property, all conditional sale obligations and all obligations under any title retention agreement (but excluding trade accounts payable and other accrued liabilities arising in the ordinary course of business that are not overdue by 180 days or more or are being contested in good faith by appropriate proceedings promptly instituted and diligently conducted);

(5)     all letters of credit, banker's acceptances or similar credit transactions, including reimbursement obligations in respect thereof;

(6)     Guarantees and other contingent obligations of such Person in respect of Indebtedness referred to in clauses (1) through (5) above and clauses (8) and (9) below;

- 15 -

(7)     all Indebtedness of any other Person of the type referred to in clauses (1) through (6) which is secured by any Lien on any property or asset of such Person, the amount of such Indebtedness being deemed to be the lesser of the Fair Market Value of such property or asset or the amount of the Indebtedness so secured;

(8)     all net payment obligations under Hedging Obligations of such Person; and

(9)     all Disqualified Capital Stock issued by such Person.

"Indenture" means this Indenture, as amended or supplemented from time to time, including the Exhibits hereto.

"Independent Financial Advisor" means an accounting firm, appraisal firm, investment banking firm or consultant of internationally recognized standing that is, in the judgment of the Company's Board of Directors, qualified to perform the task for which it has been engaged and which is independent in connection with the relevant transaction, appointed by the Company at its own expense.

"Independent Investment Banker" means one of the Reference Treasury Dealers appointed by the Company.

"Individual Quarterly Balance" means, with respect to any Indebtedness incurred by the Company or its Restricted Subsidiaries under a revolving credit facility or line of credit during any fiscal quarter of the Company, the quotient of (x) the sum of the aggregate outstanding principal amount of all such Indebtedness at the end of each day of such quarter divided by (y) the number of days in such fiscal quarter.

"Intangible Assets" means with respect to any Person all unamortized debt discount and expense, unamortized deferred charges, restricted cash, goodwill, patents, trademarks, service marks, trade names, copyrights and all other items which would be treated as intangibles on the consolidated balance sheet of such Person prepared in accordance with IFRS.

"Interest Payment Date" means the stated due date of an installment of interest on the Notes as specified in the Form of Face of Note contained in Exhibit A.

"Interest Rate Agreement" of any Person means any interest rate protection agreement (including, without limitation, interest rate swaps, caps, floors, collars, derivative instruments and similar agreements) and/or other types of hedging agreements designed to hedge interest rate risk of such Person.

"Investment" means, with respect to any Person, any:

(1)     direct or indirect loan, advance or other extension of credit (including, without limitation, a Guarantee) to any other Person,

- 16 -

(2)    capital contribution to (by means of any transfer of cash or other property to others or any payment for property or services for the account or use of others) any other Person, or

(3)    any purchase or acquisition by such Person of any Capital Stock (but not including interests in bonds, notes, debentures or other securities or evidences of Indebtedness) issued by, any other Person.

"Investment" will exclude purchases and acquisitions of inventory, supplies, materials or equipment, accounts receivable or deposits, in each case arising in the ordinary course of business. "Invest," "Investing" and "Invested" will have corresponding meanings.

For purposes of Section 3.11, the Company shall be deemed to have made an "Investment" in an Unrestricted Subsidiary at the time of its Designation, which shall be valued at the Fair Market Value of the sum of the Relevant Proportion of the net assets of such Unrestricted Subsidiary at the time of its Designation and the amount of any Indebtedness of such Unrestricted Subsidiary Guaranteed by the Company or any Restricted Subsidiary or owed to the Company or any Restricted Subsidiary immediately following such Designation. Any property transferred to or from an Unrestricted Subsidiary shall be valued at its Fair Market Value at the time of the transfer. If the Company or any Restricted Subsidiary sells or otherwise disposes of any Capital Stock of a Restricted Subsidiary (including any issuance and sale of Capital Stock by a Restricted Subsidiary) such that, after giving effect to any such sale or disposition, such Restricted Subsidiary would cease to be a Subsidiary of the Company, the Company shall be deemed to have made an Investment on the date of any such sale or disposition equal to sum of the Fair Market Value of the Capital Stock of such former Restricted Subsidiary held by the Company or any Restricted Subsidiary immediately following such sale or other disposition and the amount of any Indebtedness of such former Restricted Subsidiary Guaranteed by the Company or any Restricted Subsidiary or owed to the Company or any other Restricted Subsidiary immediately following such sale or other disposition.

"Investment Grade Rating" means a rating equal to or higher than (i) Baa3 (or the equivalent) by Moody's, (ii) BBB- (or the equivalent) by Fitch, (iii) or BBB- (or the equivalent) by S&P, or (iv) if any of the foregoing entities cease to rate the Notes for reasons outside of the control of the Company, the equivalent investment grade credit rating from any other Rating Agency.

"Investment Return" means, in respect of any Investment (other than a Permitted Investment) made after the Issue Date by the Company or any Restricted Subsidiary:

(1)    (x) the proceeds in cash and the Fair Market Value of property other than cash received by the Company or any Restricted Subsidiary upon the sale, liquidation or repayment of such Investment or, in the case of a Guarantee, the amount of the Guarantee upon the unconditional release of the Company and its Restricted Subsidiaries in full, less any payments previously made by the Company or any Restricted Subsidiary in respect of such Guarantee and (y) any dividends or distribution received by the Company or any Restricted Subsidiary from an Unrestricted Subsidiary, to the extent such amounts were not otherwise included in Consolidated Net Income;

- 17 -

(2)     in the case of the Revocation of the Designation of an Unrestricted Subsidiary, an amount equal to the least of:

(a)     the Company's Investment in such Unrestricted Subsidiary at the time of such Revocation;

(b)     that portion of the Fair Market Value of the net assets of such Unrestricted Subsidiary at the time of Revocation that is proportionate to the Company's equity interest in such Unrestricted Subsidiary at the time of Revocation; and

(c)     the Designation Amount with respect to such Unrestricted Subsidiary upon its Designation which was treated as a Restricted Payment; and

(3)     in the event the Company or any Restricted Subsidiary makes any Investment in a Person that, as a result of or in connection with such Investment, becomes a Restricted Subsidiary, the Fair Market Value of the Investment of the Company and its Restricted Subsidiaries in such Person,

in the case of each of (1), (2) and (3), up to the amount of such Investment that was treated as a Restricted Payment under Section 3.11 *less* the amount of any previous Investment Return in respect of such Investment.

"Issue Date" means August 9, 2017.

"Issue Date Notes" means the U.S.$400,000,000 aggregate principal amount of Notes originally issued on the Issue Date and any replacement Notes issued therefor in accordance with this Indenture.

"Legal Defeasance" has the meaning assigned to it in Section 8.1(b).

"Lien" means any lien, mortgage, deed of trust, pledge, security trust (*Fidecomiso de Garantías*), security interest, charge or encumbrance of any kind (including any conditional sale or other title retention agreement, any lease in the nature thereof and any agreement to give any security interest); *provided* that the lessee in respect of a Capitalized Lease Obligation or Sale and Leaseback Transaction will be deemed to have Incurred a Lien on the property leased thereunder.

"Mexican Restructuring" means any case or other proceeding against the Company or any Subsidiary with respect to it or its debts under any bankruptcy, concurso mercantil, quiebra, insolvency or other similar law now or hereinafter in effect or seeking the appointment of a trustee, receiver, conciliador, liquidator, custodian or other similar official of it or any substantial part of its property.

"Maturity Date" means August 9, 2024.

"Moody's" means Moody's Investors Service, Inc., and any successor to its rating agency business.

- 18 -

"Net Cash Proceeds" means, with respect to any Asset Sale, the proceeds in the form of cash or Cash Equivalents, including payments in respect of deferred payment obligations when received in the form of cash or Cash Equivalents received by the Company or any of its Restricted Subsidiaries from such Asset Sale, net of:

(1)     reasonable out-of-pocket expenses and fees relating to such Asset Sale (including, without limitation, legal, accounting and investment banking fees and sales commissions);

(2)     taxes paid or payable in respect of such Asset Sale after taking into account any reduction in consolidated tax liability due to available tax credits or deductions and any tax sharing arrangements;

(3)     repayment of Indebtedness secured by a Lien permitted under this Indenture that is required to be repaid in connection with such Asset Sale; and

(4)     appropriate amounts to be provided by the Company or any Restricted Subsidiary, as the case may be, as a reserve, in accordance with IFRS, against any liabilities associated with such Asset Sale and retained by the Company or any Restricted Subsidiary, as the case may be, after such Asset Sale, including, without limitation, pension and other post-employment benefit liabilities, liabilities related to environmental matters and liabilities under any indemnification obligations associated with such Asset Sale, but excluding any reserves with respect to Indebtedness.

"Non-Recourse Indebtedness" with respect to any Person means Indebtedness of such Person for which (1) the sole legal recourse for collection of principal and interest on such Indebtedness is against the specific property identified in the instruments evidencing or securing such Indebtedness and such property was acquired with the proceeds of such Indebtedness or such Indebtedness was incurred within 365 days after the acquisition or construction of such property and (2) no other assets of such Person may be realized upon in collection of principal or interest on such Indebtedness.

"Note Guarantee" means any guarantee of the Company's Obligations under the Notes and this Indenture provided by a Restricted Subsidiary pursuant to Article X.

"Note Register" has the meaning assigned to it in Section 2.3(a).

"Notes" means any of the Company's 8.250% Senior Notes Due 2024 issued and authenticated pursuant to this Indenture.  All references to Notes shall include the Issue Date Notes and any Additional Notes, as applicable, unless the context requires otherwise.

"Obligations" means, with respect to any Indebtedness, any principal, interest (including, without limitation, Post-Petition Interest), penalties, fees, indemnifications, reimbursements, damages, and other liabilities payable under the documentation governing such Indebtedness, including in the case of the Notes and the Note Guarantees, this Indenture.

"Offering Circular" means the offering circular dated August 2, 2017 relating to the offering of the Issue Date Notes.

<div align="center">- 19 -</div>

"Officer" means, when used in connection with any action to be taken by the Company or a Subsidiary Guarantor, as the case may be, the Chairman of the Board of Directors, the Chief Executive Officer, the President, the Chief Financial Officer, the General Counsel, any Vice President, the Treasurer, the Controller, the Secretary or sole administrator of the Company or such Subsidiary Guarantor, as the case may be.

"Officers' Certificate" means, when used in connection with any action to be taken by the Company or a Subsidiary Guarantor, as the case may be, a certificate signed by two Officers or by an Officer and either an Assistant Treasurer or an Assistant Secretary of the Company or a Subsidiary Guarantor, as the case may be, and delivered to the Trustee.

"Official List of the SGX-ST" means the list of issuers maintained by SGX-ST.

"Opinion of Counsel" means a written opinion of counsel, who may be an employee of or counsel for the Company (except as otherwise provided in this Indenture) and which opinion shall be acceptable to the Trustee.

"Outstanding" means, as of the date of determination, all Notes theretofore authenticated and delivered under this Indenture, *except*:

      (i)    Notes theretofore canceled by the Trustee or delivered to the Trustee for cancellation;

      (ii)    Notes, or portions thereof, for the payment, redemption or, in the case of an Asset Sale Offer or Change of Control Offer, purchase of which money in the necessary amount has been theretofore deposited with the Trustee or any Paying Agent (other than the Company, a Subsidiary Guarantor or an Affiliate of the Company) in trust or set aside and segregated in trust by the Company, a Subsidiary Guarantor or an Affiliate of the Company (if the Company, a Subsidiary Guarantor or such Affiliate of the Company is acting as Paying Agent) for the Holders of such Notes; *provided* that, if Notes (or portions thereof) are to be redeemed or purchased, notice of such redemption or purchase has been duly given pursuant to this Indenture or provision therefor satisfactory to the Trustee has been made;

      (iii)    Notes which have been surrendered pursuant to Section 2.9 or in exchange for or in lieu of which other Notes have been authenticated and delivered pursuant to this Indenture, other than any such Notes in respect of which there shall have been presented to the Trustee proof satisfactory to it that such Notes are held by a protected purchaser in whose hands such Notes are valid obligations of the Company; and

      (iv)    solely to the extent provided in Article VIII, Notes which are subject to Legal Defeasance or Covenant Defeasance as provided in Article VIII;

*provided*, *however*, that in determining whether the Holders of the requisite aggregate principal amount of the Outstanding Notes have given any request, demand, authorization, direction, notice, consent or waiver under this Indenture, Notes owned by the Company or any other obligor upon the Notes or any Affiliate of the Company or of such other obligor shall be disregarded and deemed not to be Outstanding, except that, in determining whether the Trustee

- 20 -

NAI-1502882142v7

shall be protected in relying upon any such request, demand, authorization, direction, notice, consent or waiver, only Notes which a Trust Officer of the Trustee actually knows to be so owned shall be so disregarded.  Notes so owned which have been pledged in good faith may be regarded as Outstanding if the pledgee establishes to the satisfaction of the Trustee the pledgee's right so to act with respect to such Notes and that the pledgee is not the Company or any other obligor upon the Notes or any Affiliate of the Company or of such other obligor.

"Paying Agent" has the meaning assigned to it in Section 2.3(a). For the avoidance of doubt, the term "Paying Agent" includes the Principal Paying Agent and any other Paying Agent appointed from time to time.

"Permitted Acquisition Indebtedness" means Indebtedness of the Company or any of its Restricted Subsidiaries to the extent such Indebtedness was Indebtedness of (i) a Subsidiary prior to the date on which such Subsidiary became a Restricted Subsidiary or (ii) a Person that was merged or amalgamated into the Company or a Restricted Subsidiary, *provided* that on the date such Subsidiary became a Restricted Subsidiary or the date such Person was merged or amalgamated into the Company or a Restricted Subsidiary, as applicable, after giving *pro forma* effect thereto, (a) the Company, would be permitted to Incur at least U.S.$1.00 of additional Indebtedness pursuant to Section 3.9(a), or (b) the Consolidated Leverage Ratio of the Company and the Restricted Subsidiaries would be less than such Consolidated Leverage Ratio immediately prior to such transaction.

"Permitted Business" means the business or businesses conducted by the Company and its Restricted Subsidiaries as of the Issue Date and any business ancillary or complementary thereto.

"Permitted Holders" means (i) RBSP, (ii) any trust for the benefit of RBSP, his spouse, issue or immediate family, (iii) CASA or (iv) any Person directly or indirectly controlled by RBSP.

"Permitted Indebtedness" has the meaning set forth in Section 3.9(b).

"Permitted Investments" means:

(1)     Investments by the Company or any Restricted Subsidiary in any Person that is, or that result in any Person becoming, immediately after such Investment, a Restricted Subsidiary or constituting a merger or consolidation of such Person into the Company or with or into a Restricted Subsidiary, except for a Guarantee of Indebtedness of a Restricted Subsidiary that is not a Subsidiary Guarantor;

(2)     Investments by any Restricted Subsidiary in the Company;

(3)     Investments in cash and Cash Equivalents;

(4)     any extension, modification or renewal of any Investments existing as of the Issue Date (but not Investments involving additional advances, contributions or other investments of cash or property or other increases thereof, other than as a result of the accrual or

- 21 -

accretion of interest or original issue discount or payment-in-kind pursuant to the terms of such Investment as of the Issue Date);

(5)     Investments permitted pursuant to Section 3.16(b)(2) and Section 3.16(b)(5);

(6)     Investments received as a result of the bankruptcy or reorganization of any Person or taken in settlement of or other resolution of claims or disputes, and, in each case, extensions, modifications and renewals thereof;

(7)     Investments made by the Company or its Restricted Subsidiaries as a result of non-cash consideration permitted to be received in connection with an Asset Sale made in compliance with Section 3.12.

(8)     Investments in the form of Hedging Obligations permitted under Section 3.9(b)(5);

(9)     Investments in any Persons engaged in a Permitted Business (or a Person intending to engage in a Permitted Business immediately following such Investment) not to exceed the greater of (x) U.S.$100.0 million and (y) 10.0% of Consolidated Tangible Assets of the Company and its Restricted Subsidiaries at any one time outstanding;

(10)    receivables owing to the Company or any Restricted Subsidiary (including advances from advertisers) if created or acquired in the ordinary course of business and payable or dischargeable in accordance with customary trade terms;

(11)    payroll, travel, entertainment, relocation and similar advances to cover matters that are expected at the time of such advances ultimately to be treated as expenses for accounting purposes and that are made in the ordinary course of business;

(12)    loans or advances to employees made in the ordinary course of business consistent with past practices of the Company or such Restricted Subsidiary, not to exceed U.S.$5.0 million at any one time outstanding;

(13)    cash deposits with banks made in the ordinary course of business of the Company and its Restricted Subsidiaries, consistent with past practice, to secure payment of trade payables;

(14)    Investments in any Person to the extent such Investments consist of prepaid expenses, negotiable instruments held for collection and lease, utility and workers' compensation, performance and other similar deposits made in the ordinary course of business by the Company or any Restricted Subsidiary;

(15)    any Investment, to the extent the consideration therefor consists entirely of Qualified Capital Stock; and

(16)    Guarantees by the Company or any Restricted Subsidiary of any Obligations of CASA made in connection with the purchase of property or other assets to be

- 22 -

used in a Permitted Business (so long as, if CASA completes such purchase of property or other assets, then (x) each of the Company and CASA exercises commercially reasonable efforts to transfer such property or other assets to the Company or a Restricted Subsidiary and (y) such transfer is completed within one year of the Incurrence of such Indebtedness), not to exceed an aggregate of U.S.$50.0 million at any one time outstanding,

*provided, however*, that with respect to any Investment, the Company may, in its sole discretion, allocate all or any portion of any Investment and later re-allocate all or any portion of any Investment to, one or more of the above clauses (1) through (16) so that the entire Investment would be a Permitted Investment.

"Permitted Liens" means any of the following:

(1)     statutory Liens of landlords and Liens of carriers, warehousemen, mechanics, suppliers, materialmen, repairmen and other Liens imposed by law incurred in the ordinary course of business for sums not yet delinquent or being contested in good faith;

(2)     Liens Incurred or deposits made in the ordinary course of business in connection with workers' compensation, unemployment insurance and other types of social security, including any Lien securing letters of credit issued in the ordinary course of business consistent with past practice in connection therewith, or to secure the performance of tenders, statutory obligations, surety and appeal bonds, bids, contracts, leases, government performance and return-of-money bonds and other similar obligations (exclusive of obligations for the payment of borrowed money);

(3)     Liens upon specific items of inventory or other goods of any Person and any proceeds thereof securing such Person's obligations in respect of bankers' acceptances issued or created for the account of such Person to facilitate the purchase, shipment or storage of such inventory or other goods;

(4)     Liens securing reimbursement obligations with respect to commercial letters of credit which encumber documents and other property relating to such letters of credit and products and proceeds thereof;

(5)     Liens encumbering deposits (including in favor of financial institutions or governmental authorities) made to secure obligations arising from statutory, regulatory, contractual, or insurance or warranty requirements of the Company or a Restricted Subsidiary, including rights of offset and set-off;

(6)     Liens securing Hedging Obligations that relate to Indebtedness that is Incurred in accordance with Section 3.9;

(7)     Liens existing on the Issue Date and Liens to secure any Refinancing Indebtedness which is Incurred to Refinance any Indebtedness Incurred in accordance with Section 3.9 which has been secured by a Lien permitted under Section 3.15 other than Liens Incurred pursuant to clause (9) of the definition of "Permitted Liens"; *provided* that such new Liens:

- 23 -

(a)      are not materially less favorable to the Holders of Notes and are not materially more favorable to the lienholders with respect to such Liens than the Liens in respect of the Indebtedness being Refinanced, and

(b)      do not extend to any property or assets (or type of assets or property) other than the property or assets (or type of assets or property) securing the Indebtedness Refinanced by such Refinancing Indebtedness and the proceeds thereof;

(8)      purchase money Liens securing Purchase Money Indebtedness, Non-Recourse Indebtedness or Capitalized Lease Obligations Incurred to finance the acquisition or leasing of property and assets of the Company or a Restricted Subsidiary used in a Permitted Business, any improvements thereon and the reasonable costs and expenses incurred in connection therewith, *provided* that:

(a)      the related Purchase Money Indebtedness or Non-Recourse Indebtedness does not exceed the cost of such property, assets, and improvements thereon and the reasonable costs and expenses incurred in connection therewith and shall not be secured by any property or assets of the Company or any Restricted Subsidiary other than the property and assets so acquired or financed and the proceeds thereof, and

(b)      the Lien securing such Indebtedness will be created within 365 days of such acquisition or financing;

(9)      Liens securing an amount of Indebtedness under Credit Facilities at any one time outstanding not to exceed the greater of (x) U.S.$100.0 million and (y) 10.0% of the Consolidated Tangible Assets of the Company at such time;

(10)      any pledge or deposit of cash or property in conjunction with obtaining surety and performance bonds and letters of credit required to engage in constructing on-site and off-site improvements required by municipalities or other governmental authorities in the ordinary course of business;

(11)      Liens in favor of customs and revenue authorities arising as a matter of law to secure payment of customs duties in connection with the importation of goods;

(12)      Liens encumbering customary initial deposits and margin deposits, and other Liens that are customary in the industry and incurred in the ordinary course of business securing Indebtedness under Hedging Obligations and forward contracts, options, futures contracts, futures options or similar agreements or arrangement designed to protect the Company and its Restricted Subsidiaries from fluctuations in the price of commodities;

(13)      Liens for taxes, assessments or governmental charges or claims that are not yet delinquent or that are being contested in good faith by appropriate proceedings promptly instituted and diligently concluded; *provided* that any reserve or other appropriate provision as is required in conformity with IFRS has been made therefor;

(14)      licenses and sub-licenses of intellectual property in the ordinary course of business;

- 24 -

(15)   easements, rights of way, zoning and similar restrictions, reservations, restrictions or encumbrances in respect of real property or title defects that were not incurred in connection with Indebtedness and that do not in the aggregate materially adversely affect the value of said properties (as such properties are used by the Company or its Restricted Subsidiaries) or materially impair their use in the operation of the business of the Company and its Restricted Subsidiaries;

(16)   Liens on Capital Stock of an Unrestricted Subsidiary; and

(17)   Liens in favor of the Company or any Subsidiary Guarantor.

"Person" means an individual, partnership, limited partnership, corporation, company, limited liability company, unincorporated organization, trust or joint venture, or a governmental agency or political subdivision thereof.

"Post-Petition Interest" means all interest accrued or accruing after the commencement of any insolvency or liquidation proceeding (and interest that would accrue but for the commencement of any insolvency or liquidation proceeding) in accordance with and at the contract rate (including, without limitation, any rate applicable upon default) specified in the agreement or instrument creating, evidencing or governing any Indebtedness, whether or not, pursuant to applicable law or otherwise, the claim for such interest is allowed as a claim in such insolvency or liquidation proceeding.

"Preferred Stock" of any Person means any Capital Stock of such Person that has preferential rights over any other Capital Stock of such Person with respect to dividends, distributions or redemptions or upon liquidation.

"Primary Treasury Dealer" means a primary United States government securities dealer in New York City.

"Principal Paying Agent" means, initially, The Bank of New York Mellon, London Branch.

"Purchase Money Indebtedness" means Indebtedness Incurred for the purpose of financing all or any part of the purchase price, or other cost of construction or improvement of any property or asset; *provided* that the aggregate principal amount of such Indebtedness does not exceed the lesser of the Fair Market Value of such property or such purchase price or cost, including any Refinancing of such Indebtedness that does not increase the aggregate principal amount (or accreted amount, if less) thereof as of the date of Refinancing.

"Qualified Capital Stock" means any Capital Stock that is not Disqualified Capital Stock and any warrants, rights or options to purchase or acquire Capital Stock that is not Disqualified Capital Stock and that are not convertible into or exchangeable into Disqualified Capital Stock.

"RBSP" means Mr. Ricardo B. Salinas Pliego.

"Rating Agencies" means (i) Fitch, (ii) Moody's, (iii) S&P and (iv) if any of Fitch, Moody's or S&P shall not make a rating of the Notes publicly available for reasons outside the

- 25 -

control of the Company, a nationally recognized United States securities rating agency or agencies, as the case may be, selected by the Company, which shall be substituted for Fitch, Moody's and/or S&P, as the case may be.

"Reference Period" means the most recently ended four fiscal quarters for which internal financial statements are available as of such date of determination.

"Reference Treasury Dealer" means BCP Securities, LLC, Jefferies LLC and Morgan Stanley & Co. International plc or their respective affiliates which are primary United States government securities dealers and not less than one other leading primary United States government securities dealer in New York City reasonably designated by the Company; *provided*, *however*, that if any of the foregoing shall cease to be a Primary Treasury Dealer, the Company will substitute therefor another Primary Treasury Dealer.

"Reference Treasury Dealer Quotation" means, with respect to each Reference Treasury Dealer and any Redemption Date, the average, as determined by the Company, of the bid and asked price for the Comparable Treasury Issue (expressed in each case as a percentage of its principal amount) quoted in writing to the Company by such Reference Treasury Dealer at 3:30 pm New York City time on the third Business Day preceding such Redemption Date.

"Record Date" has the meaning assigned to it in the Form of Face of Note contained in Exhibit A.

"Redemption Date" means, with respect to any redemption of Notes, the date fixed for such redemption pursuant to this Indenture and the Notes.

"Refinance" means, in respect of any Indebtedness, to issue any Indebtedness in exchange for or to refinance, replace, defease or refund such Indebtedness in whole or in part. "Refinanced" and "Refinancing" will have correlative meanings.

"Refinancing Indebtedness" means Indebtedness of the Company or any Restricted Subsidiary issued to Refinance any other Indebtedness of the Company or a Restricted Subsidiary so long as:

(1) the aggregate principal amount (or initial accreted value, if applicable) of such new Indebtedness as of the date of such proposed Refinancing does not exceed the aggregate principal amount (or initial accreted value, if applicable) of the Indebtedness being Refinanced (plus the amount of any premium required to be paid under the terms of the instrument governing such Indebtedness and the amount of reasonable expenses incurred by the Company or such Restricted Subsidiary in connection with such Refinancing);

(2) such new Indebtedness has:

(a) a Weighted Average Life to Maturity that is equal to or greater than the Weighted Average Life to Maturity of the Indebtedness being Refinanced, and

(b) a final maturity that is equal to or later than the final maturity of the Indebtedness being Refinanced; and

- 26 -

(3)     if the Indebtedness being Refinanced is:

(a)     Indebtedness of the Company, then such Refinancing Indebtedness will be Indebtedness of the Company and/or a Subsidiary Guarantor,

(b)     Indebtedness of a Subsidiary Guarantor, then such Refinancing Indebtedness will be Indebtedness of the Company and/or such Subsidiary Guarantor, and

(c)     Subordinated Indebtedness, then such Refinancing Indebtedness shall be subordinated to the Notes or the relevant Note Guarantee, if applicable, at least to the same extent and in the same manner as the Indebtedness being Refinanced.

"Registrar" has the meaning assigned to it in Section 2.3(a).

"Relevant Date" has the meaning assigned to it in Section 3.20(a)(4).

"Relevant Proportion" means, with respect to the net assets of any Unrestricted Subsidiary, a percentage equal to the aggregate ownership interest that the Company and its Restricted Subsidiaries own, directly or indirectly, in such Unrestricted Subsidiary.

"Restricted Subsidiary" means any Subsidiary of the Company which at the time of determination is not an Unrestricted Subsidiary.

"Revocation" has the meaning set forth under Section 3.13(b).

"S&P" means S&P Global Ratings, a division of S&P Global Inc., and any successor to its rating agency business.

"Sale and Leaseback Transaction" means any direct or indirect arrangement with any Person or to which any such Person is a party providing for the leasing to the Company or a Restricted Subsidiary of any property, whether owned by the Company or any Restricted Subsidiary at the Issue Date or later acquired, which has been or is to be sold or transferred by the Company or such Restricted Subsidiary to such Person or to any other Person by whom funds have been or are to be advanced to the Company or a Restricted Subsidiary on the security of such property.

"SEC" means the U.S. Securities and Exchange Commission.

"Securities Act" means the Securities Act of 1933, as amended, or any successor statute or statutes thereto.

"Senior Indebtedness" means the Notes and the Note Guarantees and any other Indebtedness of the Company or any Subsidiary Guarantor that ranks equal in right of payment with the Notes or the relevant Note Guarantee, as the case may be.

"SGX-ST" means the Singapore Exchange Securities Trading Limited.

NAI-1502882142v7

"Significant Subsidiary" means a Subsidiary of the Company constituting a "Significant Subsidiary" of the Company in accordance with Rule 1-02(w) of Regulation S-X under the Securities Act in effect on the Issue Date.

"Special Record Date" has the meaning assigned to it in Section 2.12(a).

"Stated Maturity" means, with respect to any security, the date specified in such security as the fixed date on which the final payment of principal of such security is due and payable (but excluding any provision providing for the repurchase of such security at the option of the holder thereof upon the happening of any contingency unless such contingency has occurred).

"Subordinated Indebtedness" means, with respect to the Company or any Subsidiary Guarantor, any Indebtedness of the Company or such Subsidiary Guarantor, as the case may be which is expressly subordinated in right of payment to the Notes or the relevant Note Guarantee, as the case may be.

"Subsidiary" means, with respect to any Person, any other Person of which such Person owns, directly or indirectly, more than 50% of the voting power of the other Person's outstanding Voting Stock.

"Subsidiary Guarantor" means any Restricted Subsidiary which provides a Note Guarantee pursuant to this Indenture until such time as its Note Guarantee is released in accordance with this Indenture.

"Supplemental Indenture" means a supplemental indenture providing for the Note Guarantee of a Subsidiary Guarantor substantially in the form of Exhibit B hereto.

"Surviving Entity" has the meaning assigned to it in Section 4.1(a).

"Taxes" has the meaning assigned to it in Section 3.20(a).

"TIA" means the U.S. Trust Indenture Act of 1939, as amended, as in effect on the Issue Date.

"Treasury Rate" means, with respect to any Redemption Date, the rate per annum equal to the semi-annual equivalent yield to maturity or interpolated maturity (on a day count basis) of the Comparable Treasury Issue, assuming a price for the Comparable Treasury Issue (expressed as a percentage of its principal amount) equal to the Comparable Treasury Price for such Redemption Date.

"Trust Officer" means, when used with respect to the Trustee, any officer within the corporate trust department of the Trustee, having direct responsibility for the administration of this Indenture or any other officer of the Trustee to whom any corporate trust matter is referred because of such person's knowledge of and familiarity with the particular subject.

"Trustee" means the party named as such in the introductory paragraph of this Indenture until a successor replaces it in accordance with the terms of this Indenture and, thereafter, means the successor.

- 28 -

"Unrestricted Subsidiary" means any Subsidiary of the Company Designated as such pursuant to Section 3.13.  Any such Designation may be revoked by a Board Resolution of the Company, subject to the provisions of Section 3.13.

"U.S. Dollar Equivalent" means with respect to any monetary amount in a currency other than U.S. dollars, at any time for determination thereof, the amount of U.S. dollars obtained by converting such non-U.S. dollar currency involved in such computation into U.S. dollars at the spot rate for the purchase of U.S. dollars with the applicable non-U.S. dollar currency as published in The Wall Street Journal in the "Exchange Rates" column under the heading "Currency Trading" (or, if no longer so published, from an appropriate publicly available source of such market data) on the date two Business Days prior to such determination.

"U.S. Government Obligations" means direct obligations (or certificates representing an ownership interest in such obligations) of the United States of America (including any agency or instrumentality thereof) for the payment of which the full faith and credit of the United States of America is pledged and which are not callable or redeemable at the issuer's option.

"U.S. Legal Tender" means such coin or currency of the United States of America as at the time of payment shall be legal tender for the payment of public and private debts.

"Voting Stock" with respect to any Person, means securities of any class of Capital Stock of such Person entitling the holders thereof (whether at all times or only so long as no senior class of stock has voting power by reason of any contingency) to vote in the election of members of the Board of Directors (or equivalent governing body) of such Person.

"Weighted Average Life to Maturity" means, when applied to any Indebtedness at any date, the number of years (calculated to the nearest one-twelfth) obtained by dividing:

(1)      the then outstanding aggregate principal amount or liquidation preference, as the case may be, of such Indebtedness into

(2)      the sum of the products obtained by multiplying:

(a)      the amount of each then remaining installment, sinking fund, serial maturity or other required payment of principal or liquidation preference, as the case may be, including payment at final maturity, in respect thereof, by

(b)      the number of years (calculated to the nearest one-twelfth) which will elapse between such date and the making of such payment.

"Wholly Owned Subsidiary" means, for any Person, any Subsidiary (Restricted Subsidiary in the case of the Company) of which all the outstanding Capital Stock (other than, in the case of a Subsidiary not organized in the United States, directors' qualifying shares or an immaterial amount of shares required to be owned by other Persons pursuant to applicable law) is owned by such Person or any other Person that satisfies this definition in respect of such Person.

- 29 -

NAI-1502882142v7

Section 1.2    Incorporation by Reference of Trust Indenture Act.  If any provision of this Indenture limits, qualifies or conflicts with the duties that would be imposed on any person by any of Sections 310 to 318 of the TIA if this Indenture were qualified under the TIA, such imposed duties shall control.

All other TIA terms used in this Indenture that are defined by the TIA, defined in the TIA by reference to another statute or defined by rules or regulations of the SEC have the meanings assigned to them by such definitions.

Section 1.3    Rules of Construction.  Unless the context otherwise requires:

(1)    a term has the meaning assigned to it;

(2)    an accounting term not otherwise defined has the meaning assigned to it in accordance with IFRS;

(3)    "including" means including without limitation;

(4)    words in the singular include the plural and words in the plural include the singular;

(5)    references to the payment of principal of the Notes shall include applicable premium, if any; and

(6)    references to any payments on the Notes shall include Additional Amounts.

ARTICLE II

THE NOTES

Section 2.1    Form and Dating.

(a)    The Issue Date Notes will be issued in an aggregate principal amount of U.S.$400,000,000.  The Notes will be issued in fully-registered global form without coupons, and only in denominations of U.S.$200,000 and integral multiples of U.S.$1,000 in excess thereof.  The Notes and the Trustee's certificate of authentication shall be substantially in the form of Exhibit A.

(b)    The terms and provisions of the Notes set forth in the form of Note included in Exhibit A shall constitute, and are hereby expressly made, a part of this Indenture, and, to the extent applicable, the Company, the Subsidiary Guarantors and the Trustee, by their execution and delivery of this Indenture expressly agree to such terms and provisions and to be bound thereby.  Except as otherwise expressly permitted in this Indenture, all Notes shall be identical in all respects.  Notwithstanding any differences among them, all Notes issued under this Indenture shall vote and consent together on all matters as one class.

- 30 -

(c)      The Notes shall be issued initially in the form of one or more Global Notes substantially in the form of Exhibit A hereto, with such notations, legends or endorsements as specified in Section 2.7 or as otherwise required by law, stock exchange rule or depositary rule or usage, except as otherwise permitted herein.  The Company shall approve the form of the Notes and any notation, legend or endorsement on them.  Each Note shall be dated the date of its authentication.

(d)      The Notes, which shall be deposited on behalf of the purchasers of the Notes with the Common Depositary and registered in the name of the Common Depositary or its nominee, as the case may be, for the accounts of Persons entitled thereto at the Clearing Agencies, shall be duly executed by the Company and authenticated by the Trustee (or an Authenticating Agent appointed by the Trustee in accordance with Section 2.2) as hereinafter provided.

Section 2.2      Execution and Authentication.

(a)      Two Officers, one of whom shall be the Chairman of the Board of Directors, the President, the Chief Executive Officer or the Chief Financial Officer of the Company, shall sign the Notes for the Company by manual or facsimile signature.  If an Officer whose signature is on a Note no longer holds that office at the time the Trustee authenticates the Note, the Note shall be valid nevertheless.

(b)      A Note shall not be valid until an authorized signatory of the Trustee manually authenticates the Note.  The signature of the Trustee on a Note shall be conclusive evidence that such Note has been duly and validly authenticated and issued under this Indenture.

(c)      At any time and from time to time after the execution and delivery of this Indenture, the Trustee shall authenticate and make available for delivery Notes upon a written order of the Company signed by an Officer of the Company (the "Company Order").  A Company Order shall specify the amount of the Notes to be authenticated and the date on which the original issue of such Notes is to be authenticated.

(d)      The Trustee may appoint an agent (the "Authenticating Agent") reasonably acceptable to the Company to authenticate the Notes.  Unless limited by the terms of such appointment, any such Authenticating Agent may authenticate Notes whenever the Trustee may do so.  Each reference in this Indenture to authentication by the Trustee includes authentication by the Authenticating Agent.

(e)      In case a Surviving Entity has executed an indenture supplemental hereto with the Trustee pursuant to Article IV, any of the Notes authenticated or delivered prior to such transaction may, from time to time, at the request of the Surviving Entity, be exchanged for other Notes executed in the name of the Surviving Entity with such changes in phraseology and form as may be appropriate, but otherwise identical to the Notes surrendered for such exchange and of like principal amount; and the Trustee, upon Company Order of the Surviving Entity, shall authenticate and deliver Notes as specified in such order for the purpose of such exchange.  If Notes shall at any time be authenticated and delivered in any new name of a Surviving Entity pursuant to this Section 2.2 in exchange or substitution for or upon registration of transfer of any

- 31 -

Notes, such Surviving Entity, at the option of the Holders but without expense to them, shall provide for the exchange of all Notes at the time Outstanding for Notes authenticated and delivered in such new name.

Section 2.3    Registrar and Paying Agent; Depositary.

(a)    The Company shall maintain an office or agency where Notes may be presented or surrendered for payment (the "Paying Agent"), where Notes may be presented or surrendered for registration of transfer or for exchange and for the service of notices and demands to or upon the Company (other than the type contemplated by Section 11.7) in respect of the Notes and this Indenture.  The registrar (the "Registrar") shall keep a register of the Notes and of their transfer and exchange (the "Note Register").  The Company may have one or more co-Registrars and one or more additional Paying Agents. So long as the Notes are listed on the SGX-ST and the rules of the SGX-ST so require, the Company shall appoint and maintain a paying agent in Singapore, where such Notes may be presented or surrendered for payment or redemption in the event that the Global Note(s) representing such Notes is exchanged for Certificated Notes. In addition, in the event that the Global Note(s) is exchanged for Certificated Notes, an announcement of such exchange will be made by or on behalf of the Company through the SGX-ST. Such announcement will include all material information with respect to the delivery of the definitive Notes including details of the paying agent in Singapore. As the context requires, the term "Paying Agent" includes any additional paying agent as may be appointed by the Company from time to time.

(b)    The Company shall enter into an appropriate agency agreement with any Agent not a party to this Indenture.  The agreement shall implement the provisions of this Indenture that relate to such Agent.  The Company shall notify the Trustee in writing of the name and address of each such Agent.  If the Company fails to maintain a Registrar or Paying Agent, the Trustee shall act as such and shall be entitled to appropriate compensation therefor pursuant to Section 7.7.  The Company or any Subsidiary Guarantor may act as any Agent (other than Paying Agent for purposes of Article VIII).

(c)    The Company initially appoints the Trustee as Registrar and agent for service of demands and notices in connection with the Notes and this Indenture (other than the type contemplated by Section 11.7), until such time as another Person is appointed as such.  The Company initially appoints The Bank of New York Mellon, London Branch as Principal Paying Agent. The Trustee and the initial Principal Paying Agent accept the aforementioned appointments subject to the terms and conditions set forth herein.

(d)    The Company may change any Agent without notice to Holders.

(e)    The Company initially appoints each of the Clearing Agencies to act as a depositary with respect to the Notes. The Clearing Agencies have advised the Company and the Trustee that the Common Depositary will act as common depository for the Notes on behalf of the Clearing Agencies.

Section 2.4    Paying Agent to Hold Money in Trust.  The Company shall require each Paying Agent (other than the Trustee or one of its Affiliates) to agree in writing that such Paying

Agent shall hold in trust for the benefit of Holders or the Trustee all money held by such Paying Agent for the payment of principal of or interest on the Notes and shall notify the Trustee in writing of any Default by the Company or any Subsidiary Guarantor in making any such payment.  If the Company or any Subsidiary Guarantor or an Affiliate of the Company or any Subsidiary Guarantor acts as Paying Agent, it shall segregate the money held by it as Paying Agent and hold it as a separate trust fund.  The Company at any time may require a Paying Agent (other than the Trustee or one of its Affiliates) to pay all money held by it to the Trustee and to account for any funds disbursed by such Paying Agent.  Upon complying with this Section 2.4, the Paying Agent (if other than the Company or a Subsidiary Guarantor) shall have no further liability for the money delivered to the Trustee.  Upon any proceeding under any Bankruptcy Law with respect to the Company or any Subsidiary Guarantor or any Affiliate of the Company or any Subsidiary Guarantor, if the Company, a Subsidiary Guarantor or such Affiliate is then acting as Paying Agent, the Trustee shall replace the Company, such Subsidiary Guarantor or such Affiliate as Paying Agent.

Section 2.5    Holder Lists.  The Registrar shall preserve in as current a form as is reasonably practicable the most recent list available to it of the names and addresses of Holders.  If the Trustee is not the Registrar, the Company shall furnish to the Trustee, in writing at least seven Business Days before each Interest Payment Date and at such other times as the Trustee may request in writing, a list in such form and as of such date as the Trustee may reasonably require of the names and addresses of Holders.

Section 2.6    Global Note Provisions.

(a)    Each Global Note initially shall:  (i) be registered in the name of and delivered to the Common Depositary or the nominee of the Common Depositary and (ii) bear the appropriate legend(s), as set forth in Section 2.7 and Exhibit A.  Any Global Note may be represented by more than one certificate.  The aggregate principal amount of each Global Note may from time to time be increased or decreased by adjustments made on the records of the Trustee, as provided in this Indenture.

(b)    Members of, or participants in, the Clearing Agencies ("Agent Members") shall have no rights under this Indenture with respect to any Global Note held on their behalf by the Common Depositary under such Global Note, and the Common Depositary may be treated by the Company, the Subsidiary Guarantors, the Trustee, and each Agent and any of their respective agents as the absolute owner of such Global Note for all purposes whatsoever.  Notwithstanding the foregoing, nothing herein shall prevent the Company, the Subsidiary Guarantors, the Trustee, or any Agent or any of their respective agents from giving effect to any written certification, proxy or other authorization furnished by the Common Depositary or impair, as between the Clearing Agencies and their respective Agent Members, the operation of customary practices governing the exercise of the rights of an owner of a beneficial interest in any Global Note.  The registered Holder of a Global Note may grant proxies and otherwise authorize any Person, including Agent Members and Persons that may hold interests through Agent Members, to take any action that a Holder is entitled to take under this Indenture or the Notes.

NAI-1502882142v7

(c)       None of the Trustee, any Agent, the Company or any Subsidiary Guarantor shall have any responsibility or obligation to any beneficial owner of an interest in a Global Note, any Agent Member or other Person with respect to the accuracy of the records of the Clearing Agencies, the Common Depositary or any Agent Member, with respect to any ownership interest in the Notes or with respect to the delivery to any Agent Member, beneficial owner or other Person (other than the Clearing Agencies) of any notice (including any notice of redemption) or the payment of any amount or delivery of any Notes (or other security or property) under or with respect to such Notes.  All notices and communications to be given to the Holders and all payments to be made to Holders in respect of the Notes shall be given or made only to or upon the order of the registered Holders (which shall be the Common Depositary or its nominee in the case of a Global Note).  The rights of beneficial owners in any Global Note shall be exercised only through the Clearing Agencies subject to the applicable rules and procedures of the Clearing Agencies.  The Trustee, each Agent, the Company and the Subsidiary Guarantors may rely and shall be fully protected in relying upon information furnished by the Clearing Agencies with respect to its Agent Members and any beneficial owners.

Section 2.7      Legends.

(a)       Each Global Note shall bear the legend specified in Exhibit A on the face thereof.

(b)       Certificated Notes shall not bear the first three paragraphs of the legend specified in Exhibit A on the face thereof.

(c)       If Notes are issued upon the transfer, exchange or replacement of Notes bearing the legends set forth in Exhibit A hereto, the Notes so issued shall also bear such legends, except as otherwise permitted herein or by applicable law and at the written direction of the Company.

Section 2.8      Transfer and Exchange.

(a)

(i)       Subject to the other provisions of this Section 2.8, when Notes are presented to the Registrar or a co-Registrar with a request to register the transfer of such Notes or to exchange such Notes for an equal principal amount of Notes of other authorized denominations, the Registrar or co-Registrar shall register the transfer or make the exchange as requested if its requirements for such transaction are met; *provided* that any Notes presented or surrendered for registration of transfer or exchange shall be duly endorsed or accompanied by a written instrument of transfer in form satisfactory to the Registrar or co-Registrar, duly executed by the Holder thereof or his attorney duly authorized in writing.  To permit registrations of transfers and exchanges and subject to the other terms and conditions of this Article II, the Company will execute and upon Company Order the Trustee will authenticate Certificated Notes and Global Notes at the Registrar's or co-Registrar's written request.

(ii)       No service charge shall be made to a Holder for any registration of transfer or exchange, but the Company and the Registrar may require payment of a sum

- 34 -

sufficient to cover any transfer tax, assessments, or similar governmental charge payable in connection therewith (other than any such transfer taxes, assessments or similar governmental charges payable upon exchange or transfer pursuant to Section 2.8(c), Section 3.8, Section 3.12, Section 4.1 or Section 9.4).

(iii)     The Registrar or co-Registrar shall not be required to register the transfer of or exchange of any Note for a period beginning: (1) 15 days before the giving of a notice of redemption or an offer to repurchase Notes and ending at the close of business on the day such notice is given or (2) 15 days before an Interest Payment Date and ending on such Interest Payment Date.

(iv)     Prior to the due presentation for registration of transfer of any Note, the Company, the Subsidiary Guarantors, the Trustee, and each Agent may deem and treat the Person in whose name a Note is registered as the absolute owner of such Note for the purpose of receiving payment of principal of and interest on such Note and for all other purposes whatsoever, whether or not such Note is overdue, and none of the Company, the Subsidiary Guarantors, the Trustee, or any Agent shall be affected by notice to the contrary.

(v)     All Notes issued upon any registration of transfer or exchange pursuant to the terms of this Indenture shall evidence the same debt and shall be entitled to the same benefits under this Indenture as the Notes surrendered upon such registration of transfer or exchange.

(vi)     Notwithstanding any provision to the contrary herein, so long as a Global Note remains Outstanding and is held by or on behalf of the Common Depositary, transfers of a Global Note or of any beneficial interest therein, shall only be made in accordance with this Section 2.8 and Section 2.6).

(b)     Neither the Trustee nor any Agent shall have any obligation or duty to monitor, determine or inquire as to compliance with any restrictions on exchange or transfer imposed under this Indenture or under applicable law with respect to any exchange or transfer of any interest in any Note (including any transfers between or among Agent Members or beneficial owners in any Global Note) other than to require delivery of such certificates and other documentation or evidence as are expressly required by, and to do so if and when expressly required by, the terms of this Indenture, and to examine the same to determine substantial compliance as to form with the express requirements hereof.

(c)

(i)     Except as provided in this Section 2.8(c), owners of a beneficial interest in Global Notes will not be entitled to receive physical delivery of Certificated Notes.

(ii)     A Global Note deposited with the Common Depositary pursuant to Section 2.1 shall be transferred in whole to the beneficial owners thereof in the form of Certificated Notes only if such transfer complies with this Section 2.8 and (i) the

- 35 -

applicable Clearing Agency notifies the Company in writing that it is unwilling or unable to continue as the depositary and clearing system for such Global Note, or if at any time it becomes ineligible to serve as such a clearing system and a successor clearing system (which may be either Euroclear or Clearstream alone) is not appointed by the Company within 90 days of such notice or (ii) the Trustee has instituted, or has been directed to institute, any judicial proceeding in a court to enforce the rights of the Holders under the Notes and the Trustee has been advised by counsel that in connection with such proceeding it is necessary or appropriate for the Trustee to obtain possession of the Notes.

(iii)     Any Global Note that is transferable to the beneficial owners thereof in the form of Certificated Notes pursuant to this Section 2.8 shall be surrendered by the Common Depositary to the Trustee, to be so transferred, without charge, and the Trustee shall authenticate and deliver, upon such transfer of each portion of such Global Note, an equal aggregate principal amount of Notes of authorized denominations in the form of Certificated Notes.  Any portion of a Global Note transferred or exchanged pursuant to this Section 2.8 shall be executed, authenticated and delivered only in fully registered form without coupons in minimum denominations of U.S.$200,000 of principal amount and integral multiples of U.S.$1,000 in excess thereof and registered in such names as the Clearing Agencies shall direct the Trustee in writing.  Subject to the foregoing, a Global Note is not exchangeable except for a Global Note of like denomination to be registered in the name of the Common Depositary or its nominee.  In the event that a Global Note becomes exchangeable for Certificated Notes, payment of principal, premium, if any, and interest on the Certificated Notes will be payable, and the transfer of the Certificated Notes will be registrable, at the office or agency of the Company maintained for such purposes in accordance with Section 2.3.  Such Certificated Notes shall bear the applicable legends set forth in Exhibit A hereto.

(iv)     In the event of the occurrence of any of the events specified in Section 2.8(c)(ii), the Company will promptly make available to the Trustee a reasonable supply of Certificated Notes in definitive, fully registered form without interest coupons.

(v)     Persons exchanging beneficial interests in a Global Note for Certificated Notes shall be required to provide the Clearing Agencies with written instruction and other information required by the Company and the Registrar in order to complete, execute and deliver such Certificated Notes.

Section 2.9     Mutilated, Destroyed, Lost or Stolen Notes.

(a)     If a mutilated Note is surrendered to the Registrar or if the Holder of a Note claims that the Note has been lost, destroyed or wrongfully taken, the Company shall execute and upon Company Order the Trustee shall authenticate a replacement Note if the Company shall certify in an Officers' Certificate that the requirements of Section 8-405(a) of the New York Uniform Commercial Code are met.  If required by the Trustee or the Company, such Holder shall furnish an affidavit of loss and indemnity bond sufficient in the judgment of the Company and the Trustee to protect the Company, the Subsidiary Guarantors, the Trustee and the Agents from any loss that any of them may suffer if a Note is replaced, and, in the absence of

- 36 -

notice to the Company or the Trustee that such Note has been acquired by a protected purchaser, the Company shall execute and upon Company Order the Trustee shall authenticate and make available for delivery, in exchange for any such mutilated Note or in lieu of any such destroyed, lost or stolen Note, a new Note of like tenor and principal amount, bearing a number not contemporaneously Outstanding.

(b)     Upon the issuance of any new Note under this Section 2.9, the Company may require the payment of a sum sufficient to cover any tax or other governmental charge that may be imposed in relation thereto and any other expenses (including the fees and expenses of the Trustee) in connection therewith.

(c)     Every new Note issued pursuant to this Section 2.9 in exchange for any mutilated Note, or in lieu of any destroyed, lost or stolen Note, shall constitute an original additional contractual obligation of the Company, any Subsidiary Guarantor and any other obligor upon the Notes, whether or not the mutilated, destroyed, lost or stolen Note shall be at any time enforceable by anyone, and shall be entitled to all benefits of this Indenture equally and proportionately with any and all other Notes duly issued under this Indenture.

Section 2.10    Temporary Notes.  Until definitive Notes are ready for delivery, the Company may execute and upon Company Order the Trustee will authenticate and make available for delivery temporary Notes.  Temporary Notes will be substantially in the form of definitive Notes but may have variations that the Company considers appropriate for temporary Notes.  Without unreasonable delay, the Company will prepare and execute and upon Company Order the Trustee will authenticate and make available for delivery definitive Notes.  After the preparation of definitive Notes, the temporary Notes will be exchangeable for definitive Notes upon surrender of the temporary Notes at any office or agency maintained by the Company for that purpose and such exchange shall be without charge to the Holder.  Upon surrender for cancellation of any one or more temporary Notes, the Company will execute and upon Company Order the Trustee will authenticate and make available for delivery in exchange therefor one or more definitive Notes representing an equal principal amount of Notes.  Until so exchanged, the Holder of temporary Notes shall in all respects be entitled to the same benefits under this Indenture as a Holder of definitive Notes.

Section 2.11    Cancellation.  The Company at any time may deliver Notes to the Trustee for cancellation.  Each Agent shall forward to the Trustee any Notes surrendered to it for registration of transfer, exchange or payment.  The Trustee and no one else shall cancel and dispose of cancelled Notes in accordance with its policy of disposal or, upon the written instruction of the Company, return to the Company all Notes surrendered for registration of transfer, exchange, payment or cancellation.  The Company may not issue new Notes to replace Notes it has paid or delivered to the Trustee for cancellation for any reason other than in connection with a registration of transfer or exchange upon Company Order.

Section 2.12    Defaulted Interest.  When any installment of interest becomes Defaulted Interest, such installment shall forthwith cease to be payable to the Holders in whose names the Notes were registered on the Record Date applicable to such installment of interest.  Defaulted Interest (including any interest payable on such Defaulted Interest) may be paid by the Company as provided in Section 2.12(a).

- 37 -

(a)     The Company may elect to make payment of any Defaulted Interest (including any interest on such Defaulted Interest) to the Holders in whose names the Notes are registered at the close of business on a special record date for the payment of such Defaulted Interest (a "Special Record Date"), which shall be fixed in the following manner.  The Company shall notify the Trustee in writing of the amount of Defaulted Interest proposed to be paid and the date of the proposed payment, and at the same time the Company shall deposit with the Trustee an amount of money equal to the aggregate amount proposed to be paid in respect of such Defaulted Interest or shall make arrangements satisfactory to the Trustee for such deposit prior to the date of the proposed payment, such money when deposited to be held in trust for the benefit of the Holders entitled to such Defaulted Interest as provided in this Section 2.12(a). Thereupon the Trustee shall fix a Special Record Date for the payment of such Defaulted Interest, which shall be not more than 15 calendar days and not less than ten calendar days prior to the date of the proposed payment and not less than ten calendar days after the receipt by the Trustee of the notice of the proposed payment.  The Trustee shall promptly notify the Company of such Special Record Date and, in the name and at the expense of the Company, shall cause notice of the proposed payment of such Defaulted Interest and the Special Record Date therefor to be given to each Holder in accordance with Section 11.1, not less than ten calendar days prior to such Special Record Date.  Notice of the proposed payment of such Defaulted Interest and the Special Record Date therefor having been given as aforesaid, such Defaulted Interest shall be paid to the Holders in whose names the Notes are registered at the close of business on such Special Record Date.

Section 2.13   Additional Notes.  The Company may, from time to time, subject to compliance with any other applicable provisions of this Indenture (including, but not limited to, Section 3.9), without the consent of the Holders, pursuant to Additional Note Board Resolutions or an Additional Note Supplemental Indenture, create and issue pursuant to this Indenture Additional Notes having terms and conditions set forth in Exhibit A identical to those of the other Outstanding Notes, except that Additional Notes may have a different issue date and issue price from other Outstanding Notes, *provided* that any issue of Additional Notes that is to utilize the same CUSIP, Common Code and/or ISIN as a Note already issued under this Indenture shall be effected in a manner and under circumstances whereby the issue of Additional Notes is treated as a "qualified reopening" (within the meaning of US Treas. Reg. §1.1275-2(k)(3), or any successor provision, all as in effect at the time of the further issue) of the issue of Notes having the shared CUSIP, Common Code and/or ISIN.

ARTICLE III

COVENANTS

Section 3.1   Payment of Notes.

(a)     (1)     The Company shall pay the principal of and interest (including Defaulted Interest) on the Notes in U.S. Legal Tender on the dates and in the manner provided in the Notes and in this Indenture.  Prior to 10:00 a.m. New York City time on the Business Day immediately preceding each Interest Payment Date and the Maturity Date, the Company shall deposit with the Paying Agent in immediately available funds U.S. Legal Tender sufficient to make cash

- 38 -

payments due on such Interest Payment Date or the Maturity Date, as the case may be.  If the Company, a Subsidiary Guarantor or an Affiliate of the Company or of a Subsidiary Guarantor is acting as Paying Agent, the Company, such Subsidiary Guarantor or such Affiliate shall, prior to 10:00 a.m. New York City time on each Interest Payment Date or the Maturity Date, as the case may be, segregate and hold in trust U.S. Legal Tender sufficient to make cash payments due on such Interest Payment Date or the Maturity Date, as the case may be. Principal and interest shall be considered paid on the date due if on such date the Trustee or the Paying Agent (other than the Company, a Subsidiary Guarantor or an Affiliate of the Company or of a Subsidiary Guarantor) holds in accordance with this Indenture U.S. Legal Tender designated for and sufficient to pay all principal and interest then due and the Trustee or the Paying Agent, as the case may be, is not prohibited from paying such money to the Holders on that date pursuant to the terms of this Indenture.

(2)    Payments in respect of Notes represented by a Global Note (including principal, premium, if any, and interest) shall be made by the transfer of immediately available funds to the account specified by the Clearing Agencies. The Company shall make all payments in respect of a Certificated Note (including principal, premium, if any, and interest) by mailing a check to the registered address of each Holder thereof; *provided, however*, that payments on the Certificated Notes may also be made by wire transfer to a U.S. dollar account maintained by the payee with a bank in the United States if such Holder elects payment by wire transfer by giving written notice to the Company and the Trustee or the Paying Agent to such effect designating such account at least 10 Business Days immediately preceding the relevant due date for payment (or such other date as the Company and the Trustee or Paying Agent may accept in its discretion).

(b)    Notwithstanding anything to the contrary contained in this Indenture, the Company may, to the extent it is required to do so by law, deduct or withhold income or other similar taxes imposed by the United States of America from principal or interest payments hereunder.  The Trustee shall be entitled to receive from the Company, each Guarantor and each Holder forms W-9 or W-8, as applicable.  The Company agrees to pay interest on overdue principal and Defaulted Interest at the rate per annum specified on the face of the Notes.

Section 3.2    Maintenance of Office or Agency.

(a)    The Company shall maintain each office or agency required under Section 2.3.  The Company shall give prompt written notice to the Trustee of any change in the location of any such office or agency.  If at any time the Company shall fail to maintain any such required office or agency or shall fail to furnish the Trustee with the address thereof, such presentations, surrenders, notices and demands may be made or served at the Corporate Trust Office, and the Company hereby appoints the Trustee as its agent to receive all such presentations, surrenders, notices and demands.

(b)    The Company may also from time to time designate one or more other offices or agencies (in or outside of The City of New York) where the Notes may be presented or

- 39 -

NAI-1502882142v7

surrendered for any or all such purposes and may from time to time rescind any such designation; *provided*, *however*, that no such designation or rescission shall in any manner relieve the Company of its obligation to maintain an office or agency so long as the Notes are listed on the SGX-ST and the rules of the SGX-ST so require, in Singapore, for such purposes. The Company shall give prompt written notice to the Trustee of any such designation or rescission and any change in the location of any such other office or agency.

Section 3.3    Corporate Existence.  Except as permitted by the provisions of Article IV, the Company shall do or cause to be done all things necessary to preserve and keep in full force and effect its corporate existence.

Section 3.4    Payment of Taxes.  The Company shall pay or discharge or cause to be paid or discharged, before the same shall become delinquent, all taxes, assessments and governmental charges levied or imposed upon the Company or any Restricted Subsidiary or for which it is or any of them are otherwise liable, or upon the income, profits or property of the Company or any Restricted Subsidiary; *provided*, *however*, that the Company shall not be required to pay or discharge or cause to be paid or discharged any such tax, assessment or governmental  charge whose amount, applicability or validity is being contested in good faith by appropriate proceedings and for which appropriate reserves, if necessary (in the good faith judgment of management of the Company), are being maintained in accordance with IFRS.

Section 3.5    Compliance Certificate.

The Company and each Subsidiary Guarantor shall deliver to the Trustee within 120 days after the end of each fiscal year of the Company ending December 31, an Officers' Certificate certifying compliance with all of their respective obligations under this Indenture and stating whether or not any Default or Event of Default has occurred during the previous fiscal year. In such case, the certificate shall describe the Default or Event of Default, its status and what action the Company or any Subsidiary Guarantor is taking or proposes to take with respect thereto.

Section 3.6    Further Instruments and Acts.  The Company and each Subsidiary Guarantor shall execute and deliver such further instruments and do such further acts as may be required by applicable law or may be reasonably necessary or proper to comply with their respective obligations under this Indenture, the Notes and the Note Guarantees or as the Trustee may reasonably request to carry out more effectively the purpose of this Indenture.

Section 3.7    Waiver of Stay, Extension or Usury Laws.  The Company and each Subsidiary Guarantor covenants (to the fullest extent permitted by applicable law) that it will not at any time insist upon, or plead, or in any manner whatsoever claim or take the benefit or advantage of, any stay or extension law or any usury law or other law that would prohibit or forgive the Company or such Subsidiary Guarantor from paying all or any portion of the principal of or interest on the Notes as contemplated herein, wherever enacted, now or at any time hereafter in force, or which may affect the covenants or the performance of this Indenture. The Company and each Subsidiary Guarantor hereby expressly waives (to the fullest extent permitted by applicable law) all benefit or advantage of any such law and covenants that it will not hinder, delay or impede the execution of any power herein granted to the Trustee, but will suffer and permit the execution of every such power as though no such law had been enacted.

- 40 -

Section 3.8    Repurchase Upon a Change of Control.

(a)     Upon the occurrence of a Change of Control, each Holder shall have the right to require that the Company purchase, at such Holder's option, all or a portion (in minimum principal amounts of U.S.$200,000 or an integral multiple of U.S.$1,000 in excess thereof) of the Holder's Notes at a purchase price equal to 101.0% of the principal amount thereof, plus accrued and unpaid interest thereon to, but not including, the date of purchase (the "Change of Control Payment").

(b)     The Company shall notify the Trustee in writing promptly upon the occurrence of a Change of Control.

(c)     Within 30 days following the date upon which the Change of Control occurred, the Company must give a Change of Control Notice to each Holder, with a copy to the Trustee, offering to purchase the Notes as described above (a "Change of Control Offer").  The Change of Control Offer shall state, among other things, the purchase price, the purchase date, which must be no earlier than 30 days nor later than 60 days from the date of the Change of Control Notice, other than as may be required by law (the "Change of Control Payment Date"), and instructions and materials necessary to enable Holders of the Notes to tender Notes pursuant to the Change of Control Offer.

(d)     On the Business Day immediately preceding the Change of Control Payment Date, the Company shall, to the extent lawful, deposit with the Paying Agent U.S. Legal Tender in an amount equal to the Change of Control Payment in respect of all Notes or portions thereof so tendered. On the Change of Control Payment Date, the Company will, to the extent lawful:

(1)     accept for payment all Notes or portions thereof properly tendered and not withdrawn pursuant to the Change of Control Offer; and

(2)     deliver or cause to be delivered to the Trustee the Notes so accepted together with an Officers' Certificate stating the aggregate principal amount of Notes or portions thereof being purchased by the Company.

(e)     If only a portion of a Note is purchased pursuant to a Change of Control Offer, a new Note in a principal amount equal to the portion thereof not purchased shall be issued in the name of the Holder thereof upon cancellation of the original Note (or appropriate adjustments to the amount and beneficial interests in a Global Note will be made, as appropriate, in accordance with the applicable procedures of the relevant Clearing Agencies).  Notes (or portions thereof) purchased pursuant to a Change of Control Offer will be cancelled and cannot be reissued.

(f)     The Company shall not be required to make a Change of Control Offer upon a Change of Control if:

(1)     a third party makes the Change of Control Offer in the manner, at the times and otherwise in compliance with the requirements set forth in this Indenture applicable to a Change of Control Offer made by the Company and

- 41 -

NAI-1502882142v7

purchases all Notes properly tendered and not withdrawn pursuant to the Change of Control Offer, or

(2)     notice of redemption has been given pursuant to Section 5.5 hereof, unless and until there is a default in payment of the applicable redemption price.

(g)     A Change of Control Offer may be made in advance of a Change of Control, conditioned upon the occurrence of such Change of Control, if a definitive agreement is in place for the Change of Control at the time of making the Change of Control Offer.

(h)     In the event that Holders of not less than 90.0% of the aggregate principal amount of the Outstanding Notes accept a Change of Control Offer and the Company or a third party purchases all of the Notes held by such Holders, the Company shall have the right, on not less than 30 nor more than 60 days' prior notice, given not more than 30 days following the Change of Control Payment Date pursuant to the Change of Control Offer described above, to redeem all of the Notes that remain Outstanding following such purchase at a purchase price equal to the Change of Control Payment plus, to the extent not included in the Change of Control Payment, accrued and unpaid interest, if any, on the Notes that remain Outstanding, to, but not including, the payment date (subject to the right of Holders on the relevant Record Date to receive interest due on the relevant Interest Payment Date).

(i)     To the extent applicable, the Company shall comply with the requirements of all applicable securities laws and regulations in connection with the purchase of Notes in connection with a Change of Control Offer.  To the extent that the provisions of any applicable securities laws or regulations conflict with this Section 3.8, the Company shall comply with the applicable securities laws and regulations and will not be deemed to have breached its obligations under this Indenture by doing so.

Section 3.9     Limitation on Incurrence of Additional Indebtedness.

(a)     The Company (i) shall not, and shall not cause or permit any of its Restricted Subsidiaries to, directly or indirectly, Incur any Indebtedness, (ii) shall not, and shall not cause or permit any of its Restricted Subsidiaries to, Incur any Disqualified Capital Stock (other than Disqualified Capital Stock of Restricted Subsidiaries held by the Company or a Wholly Owned Subsidiary, so long as it is so held), and (iii) shall not cause or permit any of its Restricted Subsidiaries that is not a Subsidiary Guarantor to Incur any Preferred Stock (other than Preferred Stock of Restricted Subsidiaries held by the Company or a Wholly Owned Subsidiary, so long as it is so held), except, in each case, that the Company and any Subsidiary Guarantor may Incur Indebtedness or Disqualified Capital Stock and any Restricted Subsidiary that is not a Subsidiary Guarantor may Incur Preferred Stock if, at the time of and immediately after giving *pro forma* effect to the Incurrence thereof and the application of the proceeds therefrom, the Consolidated Leverage Ratio of the Company and its Restricted Subsidiaries would not have been greater than 3.5 to 1.0.

(b)     Notwithstanding paragraph (a) above, the Company and its Restricted Subsidiaries, as applicable, may Incur the following Indebtedness ("Permitted Indebtedness"):

- 42 -

(1)     Indebtedness in respect of the Issue Date Notes (including any Note Guarantee in respect thereof) and excluding Additional Notes;

(2)     Guarantees by any Subsidiary Guarantor of Indebtedness of the Company or any other Subsidiary Guarantor permitted under this Indenture; *provided* that if any such Guarantee is of Subordinated Indebtedness, then the Note Guarantee of such Subsidiary Guarantor shall be senior to such Subsidiary Guarantor's Guarantee of such Subordinated Indebtedness;

(3)     Indebtedness Incurred by the Company or any Subsidiary Guarantor under Credit Facilities (including Guarantees in respect thereof) in an aggregate principal amount at any one time outstanding not to exceed the greater of (x) U.S.$100.0 million and (y) 10.0% of Consolidated Tangible Assets;

(4)     other Indebtedness of the Company and its Restricted Subsidiaries outstanding on the Issue Date (excluding Indebtedness outstanding on the Issue Date deemed to be incurred under clause (3) of this Section 3.9(b);

(5)     Hedging Obligations entered into by the Company and its Restricted Subsidiaries in the ordinary course of business and not for speculative purposes, including, without limitation, Hedging Obligations in respect of the Notes;

(6)     intercompany Indebtedness between the Company and any Restricted Subsidiary or between any Restricted Subsidiaries; *provided* that:

(x)     if the Company or any Subsidiary Guarantor is the obligor on such Indebtedness and the payee is not the Company or any Subsidiary Guarantor, such Indebtedness must be expressly subordinated to the prior payment in full of all Obligations under the Notes and this Indenture, in the case of the Company, or such Subsidiary Guarantor's Note Guarantee, in the case of any such Subsidiary Guarantor,

(y)     in the event that at any time any such Indebtedness ceases to be held by the Company or a Restricted Subsidiary, such Indebtedness shall be deemed to be Incurred and not permitted by this clause (6) at the time such event occurs; and

(z)     the Company and any Restricted Subsidiary shall agree to vote such Indebtedness, or provide their consents in connection with such Indebtedness, in any Mexican Restructuring, in a manner that is consistent with the vote of, or the consents provided by, the holders of the Notes and other unaffiliated creditors of the same class as the Notes;

(7)     Indebtedness of the Company or any of its Restricted Subsidiaries arising from the honoring by a bank or other financial institution of a check, draft or similar instrument inadvertently (including daylight overdrafts paid in full by the close of business on the day such overdraft was Incurred) drawn against

- 43 -

insufficient funds in the ordinary course of business; *provided* that such Indebtedness is extinguished within five Business Days of Incurrence;

(8) Indebtedness of the Company or any of its Restricted Subsidiaries represented by letters of credit for the account of the Company or any Restricted Subsidiary, as the case may be, in order to provide security for workers' compensation claims, payment obligations in connection with self-insurance or similar requirements in the ordinary course of business;

(9) Indebtedness of the Company or any Restricted Subsidiary constituting Capitalized Lease Obligations or Purchase Money Indebtedness, in each case Incurred for the purpose of acquiring or financing all or any part of the purchase price or cost of construction or improvement of property or equipment used in the business of the Company or such Restricted Subsidiary in an aggregate principal amount at any one time outstanding not to exceed the greater of (x) U.S.$25.0 million and (y) 2.5% of Consolidated Tangible Assets;

(10) Indebtedness in respect of bid, performance or surety bonds in the ordinary course of business for the account of the Company or any of its Restricted Subsidiaries, including Guarantees or obligations of the Company or any Restricted Subsidiary with respect to letters of credit supporting such bid, performance or surety obligations (in each case other than for the payment of borrowed money);

(11) Refinancing Indebtedness in respect of:

(x) Indebtedness (other than Indebtedness owed to the Company or any Subsidiary of the Company) Incurred pursuant to paragraph (a) above (it being understood that no Indebtedness outstanding on the Issue Date is Incurred pursuant to such paragraph (a) above), or

(y) Indebtedness Incurred pursuant to clause (1), (4) (excluding Indebtedness outstanding on the Issue Date deemed to be incurred under clause (3) of this Section 3.9(b) or Indebtedness owed to the Company or a Subsidiary of the Company) or (11) of this Section 3.9(b);

(12) additional Indebtedness of the Company or any Restricted Subsidiary in an aggregate principal amount not to exceed U.S.$20.0 million at any one time outstanding (which amount may, but need not, be Incurred, in whole or in part, under Credit Facilities);

(13) the Guarantee by the Company of any Indebtedness Incurred by a Subsidiary Guarantor in accordance with the terms of this Indenture and the Notes;

(14) Guarantees by the Company or any Restricted Subsidiary of any Obligations of CASA made in connection with the purchase of property or other assets to be used in a Permitted Business (so long as, if CASA completes such

- 44 -

NAI-1502882142v7

purchase of property or other assets, then (x) each of the Company and CASA exercises commercially reasonable efforts to transfer such property or other assets to the Company or a Restricted Subsidiary, and (y) such transfer is completed within one year of the Incurrence of such Indebtedness), not to exceed an aggregate of U.S.$50 million at any one time outstanding; and

(15)    Permitted Acquisition Indebtedness.

(c)    For purposes of determining compliance with, and the outstanding principal amount of, any particular Indebtedness Incurred pursuant to and in compliance with, this Section 3.9:

(1)    The amount of Indebtedness issued at a price that is less than the principal amount thereof shall be equal to the amount of the liability in respect thereof determined in accordance with IFRS.

(2)    The accrual of interest, the accretion or amortization of original issue discount, the payment of regularly scheduled interest in the form of additional Indebtedness of the same instrument or the payment of regularly scheduled dividends on Preferred Stock or Disqualified Capital Stock in the form of additional Preferred Stock or Disqualified Capital Stock with the same terms shall not be deemed to be an Incurrence of Indebtedness or issuance of Preferred Stock or Disqualified Capital Stock for purposes of this Section 3.9; *provided* that any such outstanding additional Indebtedness or Preferred Stock or Disqualified Capital Stock paid in respect of Indebtedness Incurred pursuant to any provision of Section 3.9(b) shall be counted as Indebtedness outstanding thereunder for purposes of any future Incurrence under such provision.

(3)    In the event that Indebtedness meets the criteria of more than one of clauses (1) through (15) of Section 3.9(b), or is entitled to be Incurred pursuant to Section 3.9(a) above, the Company, in its sole discretion, will be permitted to classify such Indebtedness at the time of its Incurrence in any manner that complies with this Section 3.9. In addition, any Indebtedness originally classified as Incurred pursuant to clauses (1) through (15) of Section 3.9(b) or Section 3.9(a) may later be reclassified by the Company, in its sole discretion, such that it will be deemed to be Incurred pursuant to another of such clauses or Section 3.9(a) to the extent that such reclassified Indebtedness could be Incurred pursuant to such other clause or Section 3.9(a) at the time of such reclassification (*provided* that Indebtedness outstanding on the Issue Date under Credit Facilities shall at all times be deemed incurred under Section 3.9(b)(3).

(4)    For purposes of determining compliance with any U.S. dollar denominated restriction on the Incurrence of Indebtedness, the principal amount of Indebtedness denominated in a currency other than U.S. dollars shall be the U.S. Dollar Equivalent thereof.  Notwithstanding any other provision of this Section 3.9, the maximum amount of Indebtedness that the Company or any Restricted Subsidiary may incur pursuant to this Section 3.9 shall not be deemed

- 45 -

to be exceeded as a result solely of fluctuations in exchange rates or currency values.

(5)  For purposes of determining any particular amount of Indebtedness: (i) Guarantees, Liens or obligations with respect to letters of credit supporting Indebtedness otherwise included in the determination of such particular amount shall not be included and (ii) any Liens granted together with an equal and ratable Lien to secure the Notes and the Note Guarantees, pursuant to the provisions of this Indenture and the Notes shall not be treated as Indebtedness.

Section 3.10  <u>Limitation on Guarantees</u>.  The Company shall not permit any Restricted Subsidiary that is not a Subsidiary Guarantor to Guarantee any Indebtedness of the Company or to secure any Indebtedness of the Company with a Lien on the assets of such Restricted Subsidiary, unless contemporaneously therewith (or prior thereto) effective provision is made to Guarantee or secure the Notes, as the case may be, on an equal and ratable basis with such Guarantee or Lien for so long as such Guarantee or Lien remains effective, and in an amount equal to the amount of Indebtedness so Guaranteed or secured.  Any Guarantee by any such Restricted Subsidiary of Subordinated Indebtedness of the Company will be subordinated and junior in right of payment to the contemporaneous Guarantee of the Notes by such Restricted Subsidiary.

Section 3.11  <u>Limitation on Restricted Payments</u>.

(a)  The Company shall not, and shall not cause or permit any of its Restricted Subsidiaries to, directly or indirectly, take any of the following actions (each, a "<u>Restricted Payment</u>"):

(1)  declare or pay any dividend or return of capital or make any distribution on or in respect of shares of Capital Stock of the Company or any Restricted Subsidiary to holders of such Capital Stock, other than:

(x)  dividends, returns of capital or distributions payable in Qualified Capital Stock of the Company,

(y)  dividends, returns of capital or distributions payable to the Company and/or a Restricted Subsidiary, or

(z)  dividends, distributions or returns of capital made on a *pro rata* basis to the Company and its Restricted Subsidiaries, on the one hand, and minority holders of Capital Stock of a Restricted Subsidiary, on the other hand (or on a less than *pro rata* basis to any minority holder);

(2)  purchase, redeem or otherwise acquire or retire for value:

(x)  any Capital Stock of the Company, or

(y)  any Capital Stock of any Restricted Subsidiary held by an Affiliate of the Company (other than a Restricted Subsidiary) or any

- 46 -

Preferred Stock of a Restricted Subsidiary, except for Capital Stock held by the Company or a Restricted Subsidiary or purchases, redemptions, acquisitions or retirements for value of Capital Stock on a *pro rata* basis from the Company and/or any Restricted Subsidiaries, on the one hand, and minority holders of Capital Stock of a Restricted Subsidiary, on the other hand, according to their respective percentage ownership of the Capital Stock of such Restricted Subsidiary;

(3)     make any principal payment on, purchase, defease, redeem, prepay, decrease or otherwise acquire or retire for value, prior to any scheduled final maturity, scheduled repayment or scheduled sinking fund payment, as the case may be, any Subordinated Indebtedness (excluding (x) any intercompany Indebtedness between or among the Company and/or any Restricted Subsidiaries or (y) the purchase, repurchase or other acquisition of Indebtedness that is contractually subordinated to the Notes or any Note Guarantee, as the case may be, purchased in anticipation of satisfying a sinking fund obligation, principal installment or final maturity, in each case within one year of such date of purchase, repurchase or acquisition); or

(4)     make any Investment (other than Permitted Investments);

if at the time of the Restricted Payment and immediately after giving effect thereto:

(A)     a Default or an Event of Default shall have occurred and be continuing;

(B)     the Company is not able to Incur at least U.S.$1.00 of additional Indebtedness pursuant to Section 3.9(a); or

(C)     the aggregate amount (the amount expended for these purposes, if other than in cash, being the Fair Market Value of the relevant property) of the proposed Restricted Payment and all other Restricted Payments made subsequent to the Issue Date up to the date thereof shall exceed the sum of:

(i)     50% of cumulative Consolidated Net Income of the Company or, if such cumulative Consolidated Net Income of the Company is a loss, minus 100% of the loss, accrued during the period, treated as one accounting period, beginning in the fiscal quarter immediately preceding the fiscal quarter in which the Issue Date occurs, to the end of the most recent fiscal quarter for which consolidated financial information of the Company is available; plus

(ii)     100% of the aggregate net cash proceeds received by the Company or any Restricted Subsidiary from any Person (other than, in the case of any Restricted Subsidiary, from the Company or another Restricted Subsidiary) from any:

- 47 -

(1)     contribution to the equity capital of the Company not representing an interest in Disqualified Capital Stock or issuance or sale of Qualified Capital Stock of the Company, in each case, subsequent to the Issue Date, or

(2)     issuance or sale subsequent to the Issue Date (and, in the case of Indebtedness of a Restricted Subsidiary, at such time as it was a Restricted Subsidiary) of any Indebtedness of the Company or any Restricted Subsidiary that has been converted into or exchanged for Qualified Capital Stock of the Company,

excluding, in each case, any net cash proceeds:

(w)     received from a Subsidiary of the Company;

(x)     used to redeem Notes in accordance with the provisions under Section 5.2; or

(y)     applied in accordance with Section 3.11(b)(2) or (3) below; *plus*

(iii)     any Investment Return.

(b)     Notwithstanding paragraph (a) above, this Section 3.11 does not prohibit:

(1)     the payment of any dividend or distribution or the consummation of any irrevocable redemption of Subordinated Indebtedness within 60 days after the date of declaration of such dividend or distribution or giving of the redemption notice, as the case may be, if the dividend, distribution or redemption would have been permitted on the date of declaration or notice pursuant to the preceding paragraph; *provided* that such redemption shall be included (without duplication for the declaration) in the calculation of the amount of Restricted Payments;

(2)     the acquisition of any shares of Capital Stock of the Company,

(x)     in exchange for Qualified Capital Stock of the Company, or

(y)     through the application of the net proceeds received by the Company from a substantially concurrent sale of Qualified Capital Stock of the Company or a contribution to the equity capital of the Company not representing an interest in Disqualified Capital Stock, in each case not received from a Subsidiary of the Company;

*provided* that the value of any such Qualified Capital Stock issued in exchange for such acquired Capital Stock and any such net proceeds shall be excluded from Section 3.11(a)(C)(ii) above (and were not included therein at any time);

- 48 -

(3)      the voluntary prepayment, purchase, defeasance, redemption or other acquisition or retirement for value of any Subordinated Indebtedness solely in exchange for, or through the application of net proceeds of a substantially concurrent sale, other than to a Subsidiary of the Company, of:

(x)      Qualified Capital Stock of the Company, or

(y)      Refinancing Indebtedness for such Subordinated Indebtedness;

*provided* that the value of any Qualified Capital Stock issued in exchange for Subordinated Indebtedness and any net proceeds referred to above shall be excluded from Section 3.11(a)(C)(ii) above (and were not included therein at any time);

(4)      if no Default or Event of Default shall have occurred and be continuing, repurchases by the Company of Common Stock of the Company or options, warrants or other securities exercisable or convertible into Common Stock of the Company from any current or former employees, officers, directors or consultants of the Company or any of its Subsidiaries or their authorized representatives, estates, heirs, family members, spouses or former spouses upon the death, disability or termination of employment or directorship of such employees, officers or directors, or the termination of retention of any such consultants, in an amount not to exceed U.S.$5.0 million in any calendar year (with unused amounts in any calendar year being permitted to be carried over into succeeding calendar years) plus the cash proceeds of key man life insurance policies received by the Company and its Restricted Subsidiaries in such calendar year;

(5)      the repurchase of Capital Stock deemed to occur upon the exercise of stock options or warrants to the extent such Capital Stock represents a portion of the exercise price of those stock options or warrants;

(6)      the declaration and payment of regularly scheduled or accrued dividends or distributions to holders of any class or series of Disqualified Capital Stock of the Company or any Restricted Subsidiary issued on or after the Issue Date in accordance with the covenant set forth in Section 3.9;

(7)      upon the occurrence of a Change of Control and within 60 days after the completion of the offer to repurchase the Notes pursuant to Section 3.8, any repurchase, redemption or other acquisition or retirement for value of any Subordinated Indebtedness of the Company or any Subsidiary Guarantor required pursuant to the terms thereof as a result of such Change of Control; *provided* that (A) the terms of such purchase or redemption are substantially similar in all material respects to the comparable provision included in this Indenture, and (B) at the time of such purchase or redemption no Default or Event of Default shall have occurred and be continuing (or would result therefrom);

- 49 -

(8)     if no Default or Event of Default shall have occurred and be continuing, the purchase by the Company of fractional shares arising out of stock dividends, splits or combinations or business combinations;

(9)     payments or distributions in the nature of satisfaction of statutory redemption or dissenters' rights under Mexican law; and

(10)    if no Default or Event of Default shall have occurred and be continuing, the payment of cash dividends on or in respect of Capital Stock of the Company or the repurchase of Capital Stock of the Company in an aggregate amount not to exceed U.S.$10.0 million in any calendar year.

In determining the aggregate amount of Restricted Payments made subsequent to the Issue Date, amounts expended pursuant to clauses (1) (without duplication for the declaration of the relevant dividend), (4) and (7) of paragraph (b) of this Section 3.11 shall be included in such calculation and amounts expended pursuant to clauses (2), (3), (5), (6), (8), (9) and (10) above shall not be included in such calculation.

Section 3.12    Limitation on Asset Sales and Sales of Subsidiary Stock.

(a)     The Company shall not, and shall not permit any of its Restricted Subsidiaries to, consummate an Asset Sale unless:

(1)     the Company or the applicable Restricted Subsidiary, as the case may be, receives consideration at the time of the Asset Sale at least equal to the Fair Market Value of the assets or Capital Stock sold or otherwise disposed of, and

(2)     at least 75.0% of the consideration received for the assets or Capital Stock sold by the Company or the Restricted Subsidiary, as the case may be, in the Asset Sale shall be in the form of cash or Cash Equivalents received at the time of such Asset Sale.

(b)     For purposes of Section 3.12(a)(2), the following are deemed to be cash:

(x)     any liabilities (as shown prior to the date of such Asset Sale on the Company's or such Restricted Subsidiary's most recent consolidated balance sheet) of the Company or any of its Restricted Subsidiaries (other than contingent liabilities and liabilities that constitute Subordinated Indebtedness or are otherwise subordinated to the Notes) that are assumed by the transferee of any such assets and as a result of which the Company and its Restricted Subsidiaries are no longer responsible for such liabilities; and

(y)     the Fair Market Value of any Capital Stock of a Person engaged in a Permitted Business that will become, upon purchase, a Restricted Subsidiary or assets (other than current assets as determined in

- 50 -

accordance with IFRS or Capital Stock) to be used by the Company or any Restricted Subsidiary in a Permitted Business; and

(z)     any securities, Notes or other obligations received by the Company or any such Restricted Subsidiary from such transferee that are converted, sold for or exchanged by the Company or such Restricted Subsidiary into cash or Cash Equivalents within 120 days (180 days in the case of land sales) of the receipt thereof (subject to ordinary settlement periods), to the extent of the cash or Cash Equivalents received in that conversion, sale or exchange,

*provided* that amounts received pursuant to clauses (x) and (y) shall not be deemed to constitute Net Cash Proceeds for purposes of making an Asset Sale Offer.

(c)     The Company or such Restricted Subsidiary, as the case may be, may apply the Net Cash Proceeds of any such Asset Sale within 365 days thereof to:

(1)     repay any Senior Indebtedness of the Company or a Subsidiary Guarantor that is secured by a Lien,

(2)     make capital expenditures in a Permitted Business, or

(3)     purchase

(x)     assets (other than current assets as determined in accordance with IFRS or Capital Stock) to be used by the Company or any Restricted Subsidiary in a Permitted Business, or

(y)     all or substantially all of the assets of, or any Capital Stock of, a Person engaged in a Permitted Business if, after giving effect to any such acquisition of Capital Stock, the Permitted Business is or becomes a Restricted Subsidiary

from a Person other than the Company and its Restricted Subsidiaries; *provided* that, in the case of clauses (x) and (y), the Company will have complied with its obligations if (i) it enters into a binding commitment to acquire such assets or such Capital Stock within 365 days after receipt of such Net Cash Proceeds, (ii) such binding commitment is subject only to customary conditions and (iii) such acquisition is consummated within 180 days from the date of signing such binding commitment.

(d)     To the extent all or a portion of the Net Cash Proceeds of any Asset Sale are not applied within 365 days of the Asset Sale as set forth in Section 3.12(c)(1) or (2) (or, in the case of Section 3.12(c)(3) only, within such longer period set forth therein), the Company shall make an offer to purchase Notes (the "Asset Sale Offer"), at a purchase price equal to 100% of the principal amount of the Notes to be purchased, plus accrued and unpaid interest thereon, to, but not including, the date of purchase (the "Asset Sale Offer Amount"). The Company shall purchase pursuant to an Asset Sale Offer from all tendering Holders on a *pro rata* basis (subject

- 51 -

NAI-1502882142v7

to any necessary rounding), and, at the Company's option, on a *pro rata* basis with the holders of any other Senior Indebtedness with similar provisions requiring the Company to offer to purchase the other Senior Indebtedness with the proceeds of Asset Sales, that principal amount (or accreted value in the case of Indebtedness issued with original issue discount) of Notes and the other Senior Indebtedness to be purchased equal to such unapplied Net Cash Proceeds.  The Company may satisfy its obligations under this Section 3.12 with respect to the Net Cash Proceeds of an Asset Sale by making an Asset Sale Offer prior to the expiration of the relevant 365-day period (or, if applicable, such longer period set forth above with respect to Section 3.12(c)(3) only).

(e)       The Company may, however, defer an Asset Sale Offer until there is an aggregate amount of unapplied Net Cash Proceeds from one or more Asset Sales equal to or in excess of U.S.$15.0 million.  At that time, the entire amount of unapplied Net Cash Proceeds, and not just the amount in excess of U.S.$15.0 million, shall be applied as required pursuant to this Section 3.12.  Pending application in accordance with this Section 3.12, Net Cash Proceeds shall be applied to temporarily reduce revolving credit borrowings that can be reborrowed or Invested in Cash Equivalents.

(f)       Each Asset Sale Offer Notice shall be given to the record Holders as shown on the Note Register, with a copy to the Trustee, within 20 days following such 365th day (or, if applicable such longer period as set forth above with respect to Section 3.12(c)(3) only), offering to purchase the Notes pursuant to this Section 3.12, which notice shall govern the terms of the Asset Sale Offer.  Each Asset Sale Offer Notice will state, among other things, the purchase price, the purchase date, which must be no earlier than 30 days nor later than 60 days from the date the notice is provided, other than as may be required by law (the "Asset Sale Offer Payment Date"), and instructions and materials necessary to enable Holders to tender Notes pursuant to the Asset Sale Offer.

(g)       Upon receiving the Asset Sale Offer Notice, Holders may elect to tender their Notes in whole or in part in amounts of U.S.$200,000 or integral multiples of U.S.$1,000 in excess thereof in exchange for cash.

(h)       On the Business Day immediately preceding the Asset Sale Offer Payment Date, the Company shall, to the extent lawful, deposit with the Paying Agent U.S. Legal Tender in an amount equal to the Asset Sale Offer Amount in respect of all Notes or portions thereof so tendered. On the Asset Sale Offer Payment Date, the Company will, to the extent lawful:

(1)       accept for payment all Notes or portions thereof properly tendered and not withdrawn pursuant to the Asset Sale Offer; and

(2)       deliver or cause to be delivered to the Trustee the Notes so accepted together with an Officers' Certificate stating the aggregate principal amount of Notes or portions thereof being purchased by the Company.

(i)       To the extent Holders of Notes and holders of other Senior Indebtedness, if any, which are the subject of an Asset Sale Offer properly tender and do not withdraw Notes or the other Senior Indebtedness in an aggregate amount exceeding the amount of unapplied Net

- 52 -

Cash Proceeds, the Company shall purchase the Notes and the other Senior Indebtedness on a *pro rata* basis (subject to any necessary rounding) based on amounts tendered.  If only a portion of a Note is purchased pursuant to an Asset Sale Offer, a new Note in a principal amount equal to the portion thereof not purchased will be issued in the name of the Holder thereof upon cancellation of the original Note (or appropriate adjustments to the amount and beneficial interests in a Global Note will be made, as appropriate, in accordance with the applicable procedures of the relevant Clearing Agencies).  Notes (or portions thereof) purchased pursuant to an Asset Sale Offer shall be cancelled and cannot be reissued.

(j)     To the extent applicable, the Company shall comply with the requirements of all applicable securities laws and regulations in connection with the purchase of Notes pursuant to an Asset Sale Offer.  To the extent that the provisions of any applicable securities laws or regulations conflict with this Section 3.12, the Company shall comply with the applicable securities laws and regulations and shall not be deemed to have breached its obligations under this Section 3.12 by doing so.

(k)     Upon completion of an Asset Sale Offer, the amount of Net Cash Proceeds will be reset at zero.  Accordingly, to the extent that the aggregate amount of Notes and other Senior Indebtedness tendered pursuant to an Asset Sale Offer is less than the aggregate amount of unapplied Net Cash Proceeds, the Company and its Restricted Subsidiaries may use any remaining Net Cash Proceeds for any purpose not otherwise prohibited by this Indenture.

(l)     In the event of the transfer of substantially all (but not all) of the property and assets of the Company and its Restricted Subsidiaries as an entirety to a Person in a transaction permitted under Section 4.1, the Surviving Entity shall be deemed to have sold the properties and assets of the Company and its Restricted Subsidiaries not so transferred for purposes of this Section 3.12 and shall comply with the provisions of this covenant with respect to the deemed sale as if it were an Asset Sale.  In addition, the Fair Market Value of properties and assets of the Company or its Restricted Subsidiaries so deemed to be sold shall be deemed to be Net Cash Proceeds for purposes of this Section 3.12.

Section 3.13    Limitation on Designation of Unrestricted Subsidiaries.

(a)     The Company may designate after the Issue Date any Subsidiary of the Company as an "Unrestricted Subsidiary" under this Indenture (a "Designation") only if:

(1)     no Default or Event of Default shall have occurred and be continuing at the time of or after giving effect to such Designation and any transactions between the Company or any of its Restricted Subsidiaries and such Unrestricted Subsidiary are in compliance with Section 3.16;

(2)     at the time of and after giving effect to such Designation, the Company could Incur U.S.$1.00 of additional Indebtedness pursuant to Section 3.9(a); and

(3)     the Company would be permitted to make an Investment at the time of Designation (assuming the effectiveness of such Designation and treating such Designation as an Investment at the time of Designation) as a Restricted

- 53 -

Payment pursuant to Section 3.11(a) in an amount (the "Designation Amount") equal to the Company's Investment in such Subsidiary on such date, and

(4)     at the time of such Designation, neither the Company nor any Restricted Subsidiary will:

(x)     provide credit support for, subject any of its property or assets (other than the Capital Stock of any Unrestricted Subsidiary) to the satisfaction of, or Guarantee, any Indebtedness of such Subsidiary (including any undertaking, agreement or instrument evidencing such Indebtedness);

(y)     be directly or indirectly liable for any Indebtedness of such Subsidiary; or

(z)     be directly or indirectly liable for any Indebtedness which provides that the holder thereof may (upon notice, lapse of time or both) declare a default thereon or cause the payment thereof to be accelerated or payable prior to its final scheduled maturity upon the occurrence of a default with respect to any Indebtedness of such Subsidiary, except for any non recourse Guarantee given solely to support the pledge by the Company or any Restricted Subsidiary of the Capital Stock of such Subsidiary.

(b)     The Company may revoke any Designation of a Subsidiary as an Unrestricted Subsidiary (a "Revocation") only if:

(1)     no Default or Event of Default shall have occurred and be continuing at the time of and after giving effect to such Revocation; and

(2)     all Liens and Indebtedness of such Unrestricted Subsidiary outstanding immediately following such Revocation would, if Incurred at such time, have been permitted to be Incurred for all purposes of this Indenture.

(c)     Upon a Designation, (i) all existing Investments of the Company and its Restricted Subsidiaries in such Subsidiary will be deemed to be made at that time, (ii) all existing transactions between such Subsidiary and the Company or its Restricted Subsidiaries will be deemed entered into at that time, (iii) such Subsidiary will be released, if applicable, from its Note Guarantee, and (iv) such Subsidiary will cease to be subject to the provisions of this Indenture as a Restricted Subsidiary.

(d)     Upon a Revocation, (i) all of such Subsidiary's Indebtedness and Disqualified Capital Stock or Preferred Stock will be deemed Incurred at that time for purposes of Section 3.9 (ii) Investments in such Subsidiary previously charged under Section 3.11 will be credited thereunder, (iii) it may be required to issue a Note Guarantee pursuant to Article 10 and (iv) it will thereafter be subject to the provisions of this Indenture as a Restricted Subsidiary.

- 54 -

(e)     The Designation of a Subsidiary of the Company as an Unrestricted Subsidiary shall be deemed to include the Designation of all of the Subsidiaries of such Subsidiary.  All Designations and Revocations must be evidenced by resolutions of the Board of Directors of the Company, delivered to the Trustee certifying compliance with the preceding provisions.

Section 3.14   Limitation on Dividends and Other Payment Restrictions Affecting Restricted Subsidiaries.

(a)     Except as provided in paragraph (b) of this Section 3.14, the Company shall not, and shall not cause or permit any of its Restricted Subsidiaries to, directly or indirectly, create or otherwise cause or permit to exist or become effective any encumbrance or restriction on the ability of any Restricted Subsidiary to:

(1)     pay dividends or make any other distributions on or in respect of its Capital Stock to the Company or any other Restricted Subsidiary or pay any Indebtedness owed to the Company or any other Restricted Subsidiary;

(2)     make loans or advances to, or Guarantee any Indebtedness or other obligations of, or make any Investment in, the Company or any other Restricted Subsidiary; or

(3)     transfer any of its property or assets to the Company or any other Restricted Subsidiary.

(b)     Paragraph (a) of this Section 3.14 shall not apply to encumbrances or restrictions existing under or by reason of:

(1)     applicable law, rule, regulation or order;

(2)     this Indenture, the Notes and the Note Guarantees;

(3)     the terms of any Indebtedness or other agreement outstanding on the Issue Date, and any amendment, modification, restatement, renewal, restructuring, replacement or Refinancing thereof; *provided* that any such amendment, modification, restatement, renewal, restructuring, replacement or Refinancing is not materially more restrictive, taken as a whole, with respect to such encumbrances or restrictions than those in existence on the Issue Date;

(4)     customary non-assignment provisions of any contract and customary provisions restricting assignment or subletting in any lease governing a leasehold interest of any Restricted Subsidiary, or any customary restriction on the ability of a Restricted Subsidiary to dividend, distribute or otherwise transfer any asset which secures Indebtedness secured by a Lien, in each case permitted to be Incurred under this Indenture;

(5)     (x) any existing instrument governing Acquired Indebtedness not Incurred in connection with, or in anticipation or contemplation of, the relevant

- 55 -

acquisition, merger or consolidation, or (y) existing under any other existing agreement or instrument binding on a Person acquired or its assets or properties which encumbrance or restriction is not applicable to any Person, or the properties or assets of any Person, other than the Person or the properties or assets of the Person so acquired;

(6)     restrictions with respect to a Restricted Subsidiary of the Company imposed pursuant to a binding agreement which has been entered into for the sale or disposition of Capital Stock or assets of such Restricted Subsidiary; *provided* that such restrictions apply solely to the Capital Stock or assets of such Restricted Subsidiary being sold;

(7)     customary restrictions imposed on the transfer of copyrighted or patented materials;

(8)     an agreement governing Indebtedness of the Company or any Restricted Subsidiaries permitted to be Incurred subsequent to the date hereof in accordance with Section 3.9; *provided* that the provisions relating to such encumbrance or restriction contained in such agreement are not materially more restrictive than those contained in the Indebtedness or agreement referred to in Section 3.14(b)(3) above;

(9)     Purchase Money Indebtedness for property (including Capital Stock) acquired in the ordinary course of business and Capitalized Lease Obligations that impose restrictions on the property purchased or leased of the nature described in Section 3.14(a)(3) above;

(10)     Liens permitted to be incurred under Section 3.15 that limit the right of the debtor to dispose of or otherwise transfer the assets subject to such Lien or securing such Indebtedness and any proceeds thereof; or

(11)     organizational documents, shareholders' agreements, joint venture agreements or similar documents of, or related to, Restricted Subsidiaries that are not Wholly Owned Subsidiaries and which have been entered into with the approval of the Company's Board of Directors.

Section 3.15    Limitation on Liens.

(a)     The Company shall not, and shall not cause or permit any of its Restricted Subsidiaries to, directly or indirectly, Incur any Liens of any kind (except for Permitted Liens) against or upon any of their respective properties or assets (including without limitation Capital Stock of any Restricted Subsidiaries), whether owned on the Issue Date or acquired after the Issue Date, or any proceeds therefrom, to secure any Indebtedness unless contemporaneously therewith effective provision is made:

(1)     in the case of the Company or any Restricted Subsidiary other than a Subsidiary Guarantor, to secure the Notes and all other amounts due under this Indenture; and

- 56 -

NAI-1502882142v7

(2)     in the case of a Subsidiary Guarantor, to secure such Subsidiary Guarantor's Note Guarantee and all other amounts due under this Indenture;

in each case, equally and ratably with such Indebtedness (or, in the event that such Indebtedness is subordinated in right of payment to the Notes or such Note Guarantee, as the case may be, prior to such Indebtedness) with a Lien on the same properties and assets securing such Indebtedness for so long as such Indebtedness is secured by such Lien.

Section 3.16     Limitation on Transactions with Affiliates.

(a)     The Company shall not, and shall not permit any of its Restricted Subsidiaries to, directly or indirectly, enter into any transaction or series of related transactions (including, without limitation, the purchase, sale, lease or exchange of any property or the rendering of any service) with, or for the benefit of, any of its Affiliates (each an "Affiliate Transaction"), unless:

(1)     the terms of such Affiliate Transaction are no less favorable than those that could reasonably be expected to be obtained in a comparable transaction at such time on an arm's-length basis from a Person that is not an Affiliate of the Company;

(2)     in the event that such Affiliate Transaction involves aggregate payments, or transfers of property or services with Fair Market Value in excess of U.S.$7.5 million, the terms of such Affiliate Transaction will be approved by a majority of the members of the Board of Directors of the Company (including a majority of the disinterested members thereof), the approval to be evidenced by a Board Resolution stating that the Board of Directors has determined that such transaction complies with the preceding provisions; and

(3)     in the event that such Affiliate Transaction involves aggregate payments, or transfers of property or services with Fair Market Value in excess of U.S.$15.0 million, the Company will, prior to the consummation thereof, obtain a favorable opinion as to the fairness of such Affiliate Transaction to the Company and the relevant Restricted Subsidiary (if any) from a financial point of view from an Independent Financial Advisor and deliver the same to the Trustee.

(b)     The provisions of paragraph (a) of this Section 3.16 shall not apply to:

(1)     Affiliate Transactions with or among the Company and any Restricted Subsidiary or between or among Restricted Subsidiaries;

(2)     reasonable fees and compensation paid to, and any indemnity provided on behalf of, officers, directors, employees, consultants or agents of the Company or any Restricted Subsidiary as determined in good faith by the Company's Board of Directors;

(3)     Affiliate Transactions undertaken pursuant to any contractual obligations or rights in existence on the Issue Date and any amendment,

- 57 -

modification, extension or replacement of such agreement (so long as such amendment, modification, extension or replacement is not materially more disadvantageous to the Holders, taken as a whole, than the original agreement as in effect on the Issue Date);

(4)     any Restricted Payments made in compliance with Section 3.11;

(5)     loans and advances to officers, directors and employees of the Company or any Restricted Subsidiary for travel, entertainment, moving and other relocation expenses, in each case made in the ordinary course of business and not exceeding U.S.$3.0 million at any one time outstanding;

(6)     any issuance of Capital Stock (other than Disqualified Capital Stock) of the Company to Affiliates of the Company or to any director, officer, employee or consultant of the Company or any Restricted Subsidiary, and the granting and performance of registration rights;

(7)     the sale of advertising by the Company or any Restricted Subsidiary on terms that are no less favorable than those that could reasonably be expected to be obtained in a comparable transaction at such time on an arm's-length basis from a Person that is not an Affiliate of the Company; and

(8)     any employment agreement, employee benefit plan, officer or director indemnification agreement or any similar agreement entered into by the Company or any of its Restricted Subsidiaries in the ordinary course of business or consistent with past practice and payments pursuant thereto.

Section 3.17     Conduct of Business.  The Company and its Restricted Subsidiaries shall not engage in any business other than a Permitted Business.

Section 3.18     Reports to Holders.

(a)     So long as any Notes are Outstanding, the Company shall furnish to the Trustee:

(i)     within 120 days following the end of each of the Company's fiscal years, an annual report containing an "Operating and Financial Review" section with scope and content substantially similar to the corresponding section of the Offering Circular (after taking into consideration any changes to the business and operations of the Company after the Issue Date) for the periods covered by the financial information to be delivered pursuant to this Section 3.18(a)(i), consolidated audited income statements, statements of shareholders equity, balance sheets and cash flow statements and the related notes thereto for the Company for the two most recent fiscal years in accordance with IFRS, which need not, however, contain any reconciliation to IFRS or otherwise comply with Regulation S-X of the SEC, together with an audit report on such financial statements by the Company's independent auditors (in each case, presented in the English language);

- 58 -

(ii)      within 60 days following the end of the first three fiscal quarters in each of the Company's fiscal years, quarterly reports containing unaudited consolidated balance sheets, statements of income, statements of shareholders equity and statements of cash flows and the related notes thereto for the Company and the Subsidiaries on a consolidated basis, in each case for the quarterly period then ended and the corresponding quarterly period in the prior fiscal year and prepared in accordance with IFRS, which need not, however, contain any reconciliation to IFRS or otherwise comply with Regulation S-X of the SEC, together with an "Operating and Financial Review" section with scope and content substantially similar to the corresponding section of the Offering Circular (after taking into consideration any changes to the business and operations of the Company after the Issue Date) for the periods covered by the financial information to be delivered pursuant to this Section 3.18(a)(ii) (in each case, presented in the English language); and

(iii)      within 20 days following such filing, copies (including English translations thereof), if applicable, of public filings which reasonably would be material to Holders made with any securities exchange or securities regulatory agency or authority, *provided*, that the Company will not be required to so provide copies or English translations of (a) public filings which may be obtained from the SEC via the EDGAR system or its successors or (b) except to the extent required by paragraphs (i) and (ii) of this Section 3.18(a), annual or quarterly and other reports or other documents filed (in Spanish) with the CNBV and the Mexican Stock Exchange (*Bolsa Mexicana de Valores*).

In addition, each of the reports provided pursuant to this Section 3.18(a) shall include the Consolidated Leverage Ratio of the Company and its Restricted Subsidiaries for such period, together with an appropriate footnote or other disclosure providing in reasonable detail the calculation of such ratio.

(b)      None of the information provided pursuant to paragraph (a) of this Section 3.18 shall be required to comply with Regulation S-K as promulgated by the SEC.

(c)      Delivery of such reports, information and documents to the Trustee, as well as any opinion delivered pursuant to Section 3.16(a)(3), shall be for informational purposes only and the Trustee's receipt of such shall not constitute actual or constructive notice of any information contained therein or determinable from information contained therein, including the Company's compliance with any of the covenants contained in this Indenture (as to which the Trustee shall be entitled to conclusively rely upon an Officers' Certificate). The Trustee shall have no obligation to monitor the Company's compliance with its obligations to deliver reports and information in accordance with this Section 3.18.

Section 3.19    Listing.

(a)      So long as the Notes are listed on the SGX-ST and the rules of the SGX-ST so require, the Company shall appoint and maintain a Paying Agent in Singapore, where such Notes may be presented or surrendered for payment or redemption in the event that the Global Notes representing such Notes are exchanged for Certificated Notes. In addition, in the event that

- 59 -

the Global Notes are exchanged for Certificated Notes, an announcement of such exchange will be made by, or on behalf of, the Company through the SGX-ST. Such announcement will include all material information with respect to the delivery of the definitive Notes, including details of the Paying Agent in Singapore.

(b)     The Company agrees to notify promptly the Trustee whenever the Notes become listed on any stock exchange and of any delisting thereof.

Section 3.20   Payment of Additional Amounts.

(a)     Subject to Sections 3.20(b) and (c), the Company or, as the case may be, the Subsidiary Guarantors shall pay such additional amounts ("Additional Amounts") as may be necessary in order to ensure that the net amounts received by the Holders of Notes after any withholding or deduction for or on account of any present or future taxes, duties, levies, imposts, assessments or governmental charges (including penalties, interest and additions related thereto) (collectively, "Taxes") of whatever nature imposed or levied by Mexico or any authority in Mexico shall equal the respective amounts of principal and interest which would have been received in respect of the Notes in the absence of such withholding or deduction, and the delivery by the Company, or as the case may be, the Subsidiary Guarantors of any such Additional Amounts to the appropriate Mexican authorities shall constitute receipt by the relevant Holders of such Additional Amounts so delivered; except that no such Additional Amounts shall be payable with respect to:

(1)     any Taxes imposed solely because at any time there is or was a connection between the Holder or beneficial owner of the Note (or between a fiduciary, settler, beneficiary, member or owner of, or holder of power over, such holder or beneficial owner, if such holder or beneficial owner is an estate, trust, partnership or corporation) and Mexico (or any political subdivision or territory or possession thereof), including such Holder or beneficial owner (or such fiduciary, settler, beneficiary, member, owner or holder of a power) (i) being or having been a citizen or resident thereof for tax purposes, (ii) maintaining or having maintained an office, permanent establishment, or branch subject to taxation therein, or (iii) being or having been present or engaged in a trade or business therein (other than the mere receipt of payments under, or the ownership or holding of, a Note);

(2)     any estate, inheritance, gift, sales, stamp, personal property, transfer or similar Tax, assessment or other governmental charge imposed with respect to the Notes;

(3)     any Taxes imposed solely because the Holder or any other person having an interest in the Notes fails to comply with any certification, identification, information, documentation or other reporting requirement concerning the nationality, residence, identity or connection with Mexico of the Holder or any beneficial owner of the Note, if compliance is required by statute, regulation, officially published administrative practice of the taxing jurisdiction or by an applicable income tax treaty, which is in effect and to which Mexico is a

- 60 -

party, as a precondition to exemption from, or reduction in the rate of, the Tax and at least 30 days' prior to the first payment date with respect to which the Company or a Subsidiary Guarantor shall apply this clause, the Company or, as the case may be, the relevant Subsidiary Guarantor shall have notified the Holder of such Note that such Holder or beneficial owner will be required to comply with such certification, identification, information, documentation or other reporting requirement;

(4)     any Note presented for payment more than 15 days after the Relevant Date (as defined below) except to the extent that the Holder would have been entitled to such Additional Amounts on presenting such Note for payment on the last day of such 15-day period (the "Relevant Date" in respect of any payment being the date on which such payment first becomes due except that, if the full amount of the monies payable has not been received by the Paying Agent on or prior to such due date, being the date on which, the full amount of such monies having been so received, notice to that effect is duly given to the Holders in accordance with Section 11.1 hereof);

(5)     any Taxes required to be deducted or withheld by any Paying Agent from a payment on a Note, if such payment can be made without such deduction or withholding by any other Paying Agent who can make such payment in accordance with the terms of this Indenture and the Notes;

(6)     any Taxes which are payable otherwise than by deduction or withholding from payments on or in respect of any Note (other than stamp, transfer or other similar taxes);

(7)     any payment on a Note to any Holder who is a fiduciary or partnership or other than the sole beneficial owner of any such payment, to the extent that a beneficiary or settlor with respect to such fiduciary, a member of such a partnership or the beneficial owner of such payment would not have been entitled to the Additional Amounts had such beneficiary, settlor, member or beneficial owner been the Holder of such Note;

(8)     any Taxes payable otherwise than by deduction or withholding from payments on the Notes;

(9)     any Taxes withheld or deducted on or in respect of any Note under Section 1471 through 1474 of the Code (or any amended or successor version that is substantively comparable) and any current or future regulations or official interpretations thereof, any agreement entered into pursuant to Section 1471(b)(1) of the Code, any intergovernmental agreement between a non-U.S. jurisdiction and the United States with respect to the foregoing or any law, regulation or practice adopted pursuant to any such intergovernmental agreement; or

(10)     any combination of Section 3.20(a)(1) through (a)(9).

- 61 -

NAI-1502882142v7

(b)        The limitations on the obligations to pay Additional Amounts set forth in Section 3.20(a)(3) above shall not apply if (i) the provision of information, documentation or other evidence described in such Section 3.20(a)(3)  would be materially more onerous, in form, in procedure or in the substance of information disclosed, to a holder or beneficial owner of a note, than comparable information or other reporting requirements imposed under U.S. tax law (including the United States-Mexico income tax treaty), regulations (including temporary or proposed regulations) and administrative practice, or (ii) Article 166, Section II, paragraph (a) of the Mexican Income Tax Law (*Ley del Impuesto Sobre la Renta*) (or a substitute or equivalent provision, whether included in any law, rule or regulation) is in effect, unless (A) the provision of the information, documentation or other evidence described in such clause (c) above is expressly required by the applicable Mexican laws and regulations in order to apply Article 166, Section II, paragraph (a) of the Mexican Income Tax Law (or substitute or equivalent provision), (B) the Company cannot obtain the information, documentation or other evidence necessary to comply with the applicable Mexican laws and regulations on its own through reasonable diligence and (C) the Company otherwise would meet the requirements for application of the applicable Mexican laws and regulations. In addition, such Section 3.20(a)(3) above does not require, and shall not be construed to require, that any holder, including any non-Mexican pension fund, retirement fund, tax-exempt organization or financial institution, register, to the extent applicable, with the Tax Management Service (Servicio de Administracion Tributaria) or the Mexican Ministry of Finance and Public Credit (Secretaria de Hacienda y Credito Público) to establish eligibility for an exemption from, or a reduction of, Mexican withholding taxes, or take any other action different from providing periodic information thereto.

(c)        Upon request, the Company and the Subsidiary Guarantors shall provide the Trustee with documentation satisfactory to the Trustee evidencing the payment of Mexican taxes in respect of which the Company or any Subsidiary Guarantor has paid any Additional Amount.  The Company shall make copies of such documentation available to the Holders of the Notes or the Paying Agents upon request.

(d)        The Company shall pay all stamp and other duties, if any, which may be imposed by Mexico or any political subdivision thereof or taxing authority of or in the foregoing with respect to the execution and delivery of this Indenture or the issuance of the Notes.

(e)        In the event of any merger or other transaction described and permitted under Section 4.1, then all references to Mexico, Mexican law or regulations, and Mexican taxing authorities under this section (other than Section 3.20(b), which relates to an exception to the obligation to pay Additional Amounts under Section 3.20(a)(3)) and under Section 5.3 shall be deemed to also include the United States, the European Union and any political subdivision therein or thereof, United States and European Union laws or regulations, and any taxing authority of the United States or the European Union or any political subdivision therein or thereof, respectively.

(f)        At least 5 Business Days prior to the first payment date on the Notes and at least 5 Business Days prior to each payment date thereafter, the Company shall furnish to the Trustee and each Paying Agent an Officers' Certificate (but only if there has been any change with respect to the matters set forth in any previously delivered Officers' Certificate) instructing the Trustee and such Paying Agent as to whether any payment of principal of or any interest on

- 62 -

such Notes due on such payment date shall be made subject to deduction or withholding for or on account of any tax, duty, assessment or other governmental charge.  If any such deduction or withholding shall be required, then such Officers' Certificate shall specify the amount, if any, required to be deducted or withheld on such payment to the relevant recipient, shall certify that the Company shall pay the appropriate deduction or withholding amount to the appropriate taxing authority, and shall certify that the Company shall pay or cause to be paid to the Trustee or such Paying Agent Additional Amounts, if any, required.

(g)     Any reference in this Indenture or the Notes to principal, premium, interest or any other amount payable in respect of the Notes by the Company or any Subsidiary Guarantor will be deemed also to refer to any Additional Amount that may be payable with respect to that amount under the obligations referred to in this Section 3.20.

Section 3.21     Suspension of Covenants.

(a)     During any period of time that (i) the Notes have Investment Grade Ratings from at least two Rating Agencies, and (ii) no Default or Event of Default has occurred and is continuing (the occurrence of the events described in the foregoing clauses (i) and (ii) being collectively referred to as a "Covenant Suspension Event"), the Company and its Restricted Subsidiaries will not be subject to Sections 3.9, 3.10 (provided that such covenant shall apply to any Restricted Subsidiary that guarantees Indebtedness upon any Reversion Date (as defined below)), 3.11, 3.12, 3.13, 3.14, 3.16, 3.17 and 4.1(a)(2) (collectively, the "Suspended Covenants").

(b)     In the event that the Company and its Restricted Subsidiaries are not subject to the Suspended Covenants for any period of time as a result of the foregoing, and on any subsequent date (the "Reversion Date") the Covenant Suspension Event ceases to exist, then the Company and its Restricted Subsidiaries will thereafter again be subject to the Suspended Covenants.  The period of time between the date of the Covenant Suspension Event and the Reversion Date is referred to as the "Suspension Period." Notwithstanding that the Suspended Covenants may be reinstated, no Default or Event of Default will be deemed to have occurred as a result of a failure to comply with the Suspended Covenants during the Suspension Period (or upon termination of the Suspension Period or after that time based solely on events that occurred during the Suspension Period).

(c)     On the Reversion Date, all Indebtedness incurred during the Suspension Period will be classified to have been Incurred pursuant to Section 3.9(a) or Section 3.9(b) (to the extent such Indebtedness would be permitted to be Incurred thereunder as of the Reversion Date and after giving effect to Indebtedness Incurred prior to the Suspension Period and outstanding on the Reversion Date).  To the extent such Indebtedness would not be so permitted to be Incurred pursuant to Section 3.9(a) or Section 3.9(b), such Indebtedness will be deemed to have been outstanding on the Issue Date, so that it is classified as permitted under Section 3.9(b)(4). Calculations made after the Reversion Date of the amount available to be made as Restricted Payments under Section 3.11 will be made as though Section 3.11 had been in effect since the Issue Date and throughout the Suspension Period.  Accordingly, Restricted Payments made during the Suspension Period will reduce the amount available to be made as Restricted Payments under the Section 3.11(a).  For purposes of Section 3.12, on the Reversion Date, the

- 63 -

amount of Net Cash Proceeds of Asset Sales will be reset to the amount of Net Cash Proceeds in effect as of the first day of the Suspension Period ending on such Reversion Date.

(d)      The Company will give the Trustee written notice of any Covenant Suspension Event and in any event not later than ten Business Days after such Covenant Suspension Event has occurred.  In the absence of such notice, the Trustee shall assume without liability that the Suspended Covenants apply and are in full force and effect.  The Company will give the Trustee written notice of any occurrence of a Reversion Date not later than five Business Days after it becomes aware of such Reversion Date.  After any such notice of the occurrence of the Reversion Date, the Trustee shall assume without liability that the Suspended Covenants apply and are in full force and effect. In the absence of such notice of a Reversion Date, the Trustee shall assume without liability that the Suspended Covenants continue to be suspended.

ARTICLE IV

SURVIVING ENTITY

Section 4.1      Merger, Consolidation and Sale of Assets.

(a)      The Company shall not, in a single transaction or series of related transactions, consolidate or merge with or into any Person (whether or not the Company is the surviving or continuing Person), or sell, assign, transfer, lease, convey or otherwise dispose of (or cause or permit any Restricted Subsidiary to sell, assign, transfer, lease, convey or otherwise dispose of) all or substantially all of the Company's properties and assets (determined on a consolidated basis for the Company and its Restricted Subsidiaries), to any Person unless:

(1)      either:

(ii)      the Company (in the case of a consolidation or merger with or into any Person) shall be the surviving or continuing corporation; or

(iii)      the Person (if other than the Company) formed by such consolidation or into which the Company is merged or the Person which acquires by sale, assignment, transfer, lease, conveyance or other disposition the properties and assets of the Company and of the Company's Restricted Subsidiaries substantially as an entirety (the "Surviving Entity"):

(A)      shall be a corporation organized and validly existing under the laws of Mexico or the United States of America, any State thereof or the District of Columbia or any member state of the European Union, and

(B)      shall expressly assume, by supplemental indenture (in form and substance satisfactory to the Trustee), executed and delivered to the Trustee, the due and punctual payment of the principal of, and premium, if any, and interest on all of the Notes and the performance and observance of every covenant of the Notes and this Indenture on the part of the Company to be performed or observed;

- 64 -

(2)      immediately after giving effect to such transaction and the assumption contemplated by clause (a)(1)(iii)(B) of this <u>Section 4.1</u> (including giving effect on a *pro forma* basis to any Indebtedness, including any Acquired Indebtedness, Incurred or anticipated to be Incurred in connection with or in respect of such transaction), the Company or such Surviving Entity, as the case may be, will be able to Incur at least U.S.$1.00 of additional Indebtedness pursuant to <u>Section 3.9(a)</u>.

(3)      immediately before and immediately after giving effect to such transaction and the assumption contemplated by clause (a)(1)(iii)(B) of this <u>Section 4.1</u> (including, without limitation, giving effect on a *pro forma* basis to any Indebtedness, including any Acquired Indebtedness, Incurred or anticipated to be Incurred and any Lien granted in connection with or in respect of the transaction), no Default or Event of Default shall have occurred or be continuing;

(4)      each Subsidiary Guarantor (including Persons that become Subsidiary Guarantors as a result of the transaction) has confirmed by Supplemental Indenture that its Note Guarantee will apply for the Obligations of the Surviving Entity in respect of this Indenture and the Notes;

(5)      if the Company is organized under Mexican law and merges with a corporation, or the Surviving Entity is, organized under the laws of the United States, any State thereof or the District of Columbia or any member state of the European Union or the Company is organized under the laws of the United States, any State thereof or the District of Columbia  or any member state of the European Union and merges with a corporation, or the Surviving Entity is, organized under the laws of Mexico, the Company or the Surviving Entity will have delivered to the Trustee an Opinion of Counsel from each of (x) Mexico and (y) the United States or the applicable European Union member state, to the effect that, as applicable:

(i)      each Holder of the Notes will not recognize income, gain or loss for United States or European Union, as applicable, or Mexican income tax purposes as a result of the transaction and will be taxed in the Holder's home jurisdiction in the same manner and on the same amounts (assuming solely for this purpose that no Additional Amounts are required to be paid on the Notes) and at the same time as would have been the case if the transaction had not occurred;

(ii)      no other taxes on income, including capital gains, will be payable by Holders of the Notes under the laws of the United States or the European Union, as applicable, or Mexico relating to the acquisition, ownership or disposition of the Notes, including the receipt of interest or principal thereon; *provided* that the Holder does not use or hold, and is not deemed to use or hold the Notes in carrying on a business in the United States or the European Union, as applicable, or Mexico; and

- 65 -

(6)      the Company or the Surviving Entity has delivered to the Trustee an Officers' Certificate and an Opinion of Counsel from the relevant jurisdictions, each stating that the consolidation, merger, sale, assignment, transfer, lease, conveyance or other disposition and, if required in connection with such transaction, the supplemental indenture, comply with the applicable provisions of this Indenture and that all conditions precedent in this Indenture relating to the transaction have been satisfied.

(b)      For purposes of this Section 4.1, the transfer (by lease, assignment, sale or otherwise, in a single transaction or series of transactions) of all or substantially all of the properties or assets of one or more Restricted Subsidiaries of the Company, the Capital Stock of which constitutes all or substantially all of the properties and assets of the Company (determined on a consolidated basis for the Company and its Restricted Subsidiaries), shall be deemed to be the transfer of all or substantially all of the properties and assets of the Company.

(c)      Upon any consolidation, combination or merger or any transfer of all or substantially all of the properties and assets of the Company and its Restricted Subsidiaries in accordance with this Section 4.1, in which the Company is not the continuing corporation, the Surviving Entity formed by such consolidation or into which the Company is merged or to which such conveyance, lease or transfer is made will succeed to, and be substituted for, and may exercise every right and power of, the Company under this Indenture and the Notes with the same effect as if such Surviving Entity had been named as such and the Company shall be released from its obligations under the Notes and this Indenture.  For the avoidance of doubt, compliance with this Section 4.1 will not affect the obligations of the Company (including a Surviving Entity, if applicable) under Section 3.8, if applicable.

(d)      Each Subsidiary Guarantor shall not, and the Company shall not cause or permit any Subsidiary Guarantor to, consolidate with or merge into, or sell or dispose of all or substantially all of its assets to, any Person (other than the Company) that is not a Subsidiary Guarantor unless such transaction is otherwise in compliance with this Indenture and:

(1)      such Person (if such Person is the surviving entity) assumes all of the obligations of such Subsidiary Guarantor in respect of its Note Guarantee by executing a Supplemental Indenture and providing the Trustee with an Officers' Certificate and Opinion of Counsel from the relevant jurisdictions, each stating that the consolidation, merger, sale, assignment, transfer, lease, conveyance or other disposition and the Supplemental Indenture comply with the applicable provisions of this Indenture and all conditions precedent in this Indenture relating to the transaction have been satisfied;

(2)      such Note Guarantee is to be released as provided under Section 10.2 or

(3)      such sale or other disposition of substantially all of such Subsidiary Guarantor's assets is made in accordance with Section 3.12.

(e)      The provisions of this Section 4.1 will not apply to:

- 66 -

(1)      any transfer of the properties or assets of a Restricted Subsidiary to the Company, a Subsidiary Guarantor or another Restricted Subsidiary;

(2)      any merger of a Restricted Subsidiary into the Company, a Subsidiary Guarantor or another Restricted Subsidiary; or

(3)      any merger of the Company into a Wholly Owned Subsidiary of the Company;

so long as, in each case the Indebtedness of the Company and its Restricted Subsidiaries taken as a whole is not increased thereby.

ARTICLE V

OPTIONAL REDEMPTION OF NOTES

Section 5.1      Optional Redemption.

(a)      Prior to August 9, 2021, the Company may redeem the Notes, at its option, in whole at any time or in part from time to time, upon at least 30 days' but not more than 60 days' notice, at a redemption price equal to 100% of the principal amount thereof plus the Applicable Premium and accrued and unpaid interest to, but not including, the Redemption Date.

(b)      On and after August 9, 2021, the Company may redeem the Notes, at its option, in whole at any time or in part from time to time, upon at least 30 days' but not more than 60 days' notice, at the following redemption prices, expressed as percentages of the principal amount thereof, if redeemed during the twelve-month period commencing on August 9 of any year set forth below, plus accrued and unpaid interest to, but not including, the Redemption Date:

| Year | Percentage |
| --- | --- |
| 2021 ............................... | 104.125% |
| 2022 ............................... | 102.063% |
| 2023 ............................... | 100.000% |

Section 5.2      Optional Redemption upon Equity Offerings.

(a)      Prior to August 9, 2021, the Company may, at its option, at any time or from time to time, upon at least 30 days' but not more than 60 days' notice, use the net cash proceeds of one or more Equity Offerings to redeem up to 35% of the aggregate principal amount of the Notes issued under this Indenture at a redemption price equal to 108.250% of the principal amount thereof, plus accrued and unpaid interest to, but not including, the Redemption Date; *provided that*:

(1)      after giving effect to any such redemption at least 65% of the aggregate principal amount of the Notes issued under this Indenture remains Outstanding; and

- 67 -

(2)     the Company shall make such redemption not more than 90 days after the consummation of such Equity Offering.

Section 5.3    Optional Redemption for Changes in Withholding Taxes.

(a)    If, as a result of any amendment to, or change in, the laws (or any rules or regulations thereunder) of Mexico or any political subdivision or taxing authority or other instrumentality thereof or therein affecting taxation, or any amendment to or change in an official interpretation or application of such laws, rules or regulations, which amendment to or change of such laws, rules or regulations becomes effective on or after the Issue Date the Company or the Subsidiary Guarantors have become obligated or will become obligated, in each case, after taking all reasonable measures to avoid this requirement, to pay Additional Amounts in excess of those attributable to a Mexican withholding tax rate of 4.9% with respect to the Notes, then the Company may redeem the Notes, at its option, in whole but not in part at any time, upon at least 30 days' but not more than 60 days' notice, at a redemption price equal to 100% of the outstanding principal amount, plus accrued and unpaid interest and any Additional Amounts due thereon up to, but not including, the Redemption Date; provided, however, that (1) no notice of redemption for tax reasons may be given earlier than 90 days prior to the earliest date on which the Company or the Subsidiary Guarantors would be obligated to pay these Additional Amounts if a payment on the Notes were then due, and (2) at the time such notice of redemption is given such obligation to pay such Additional Amounts remains in effect.

(b)    Prior to the publication or delivery to Holders of any notice of redemption pursuant to this provision, the Company will deliver to the Trustee:

- an Officers' Certificate stating that the Company is entitled to effect the redemption and setting forth a statement of facts showing that the conditions precedent to the Company's right to redeem have occurred, and

- an opinion of Mexican legal counsel (which may be the Company's outside counsel) of recognized standing to the effect that the Company has or will become obligated to pay such Additional Amounts as a result of such change or amendment.

Section 5.4    Optional Redemption Procedures.

(a)    The Company shall evidence its election to redeem any Notes pursuant to Section 5.1, 5.2 or 5.3 by a Board Resolution delivered prior to delivery of notice of redemption to the Holders.

Section 5.5    Notice of Redemption.

(a)    The Company shall give (or direct the Trustee to give on its behalf) notice to the Holders of Notes to be redeemed pursuant to Section 5.1, 5.2 or 5.3 of this Indenture of any redemption the Company proposes to make at least 30 days (but not more than 60 days) before the Redemption Date.

(b)      Notice of any redemption will (i) in the case of Holders of Certificated Notes, be mailed by first-class mail, postage prepaid, to each Holder of Notes to be redeemed at its registered address and (ii) in the case of the Holders of Global Notes, be given in accordance with the customary procedures of the applicable Clearing Agency.  If the Company itself gives the notice, it shall also deliver a copy to the Trustee. This notice, once delivered by the Company to the Holders, shall be irrevocable.  If Notes are to be redeemed in part only, the notice of redemption will state the portion of the principal amount thereof to be redeemed.  A new Note in a principal amount equal to the unredeemed portion thereof (if any) will be issued in the name of the Holder thereof upon cancellation of the original Note (or appropriate adjustments to the amount and beneficial interests in a Global Note will be made, as appropriate).

(c)      The Company shall deliver to the Trustee, at least 45 days prior to the Redemption Date (unless the Trustee is satisfied with a shorter period), (i) notice of the proposed redemption and (ii) if the Company is not redeeming all Outstanding Notes or the Company directs the Trustee to give notice of redemption to Holders, an Officers' Certificate requesting that the Notes to be redeemed be selected in accordance with Section 5.6 and/or give notice of redemption and setting forth the information required by paragraph (d) of this Section 5.5 (with the exception of the identification of the particular Notes, or portions of the particular Notes, to be redeemed in the case of a partial redemption).  If the Company directs the Trustee to give notice of redemption, the Trustee shall give the notice in the name of the Company and at the Company's expense.

(d)      All notices of redemption shall state:

(1)      the Redemption Date,

(2)      the redemption price and the amount of any accrued interest payable as provided in Section 5.8,

(3)      whether or not the Company is redeeming all Outstanding Notes,

(4)      if the Company is not redeeming all Outstanding Notes, the aggregate principal amount of Notes that the Company is redeeming and the aggregate principal amount of Notes that will be Outstanding after the partial redemption, as well as the identification of the particular Notes, or portions of the particular Notes, that the Company is redeeming,

(5)      if the Company is redeeming only part of a Note, that on and after the Redemption Date, upon surrender of that Note, the Holder will receive, without charge, a new Note or Notes of authorized denominations for the principal amount of the Note remaining unredeemed,

(6)      that on the Redemption Date the redemption price and any accrued interest payable to the Redemption Date as provided in Section 5.6 shall become due and payable in respect of each Note, or the portion of each Note, to be redeemed, and, unless the Company defaults in making the redemption payment, that interest on each Note, or the portion of each Note, to be redeemed, shall cease to accrue on and after the Redemption Date,

- 69 -

(7)     the place or places where a Holder must surrender the Holder's Notes for payment of the redemption price,

(8)     that the redemption of Notes with unpaid and accrued interest to the Redemption Date will not affect the right of Holders on a Record Date to receive interest due on the related Interest Payment Date, and

(9)     the Common Code and ISIN, if any, listed in the notice or printed on the Notes, and that no representation is made as to the accuracy or correctness of such Common Code and ISIN.

Section 5.6    Selection of Notes to Be Redeemed in Part.

(a)     If the Company is not redeeming all Outstanding Notes, the Notes to be redeemed shall be settled in compliance with the requirements of the principal securities exchange, if any, on which the Notes are listed or, if the Notes are not then listed on a securities exchange, on a *pro rata* basis, by lot or by any other method as the Trustee shall deem fair and appropriate (subject, in each case, to the applicable procedures of the Clearing Agencies); *provided*, *however*, that if a partial redemption is made with the proceeds of an Equity Offering, selection of the Notes, or portions of the Notes, for redemption shall, subject to this Section 5.6, be made by the Trustee only on a *pro rata* basis or on as nearly a *pro rata* basis as is practicable (subject to the applicable procedures of the Clearing Agencies), unless that method is otherwise prohibited.  The Trustee shall make the selection from the Outstanding Notes not previously called for redemption.  The Trustee shall promptly notify the Company in writing of the Notes selected for redemption and, in the case of any Notes selected for partial redemption, the principal amount of the Notes to be redeemed.  In the event of a partial redemption by lot, the particular Notes to be redeemed shall be selected not less than 30 nor more than 60 days prior to the relevant Redemption Date from the Outstanding Notes not previously called for redemption. Notes selected for redemption shall be redeemed in portions (equal to U.S.$200,000 or any integral multiple of U.S.$1,000 in excess thereof) of the principal of Notes, subject to the minimum authorized denomination requirement of this Indenture.

(b)     For all purposes of this Indenture, unless the context otherwise requires, all provisions relating to redemption of Notes shall relate, in the case of any Note redeemed or to be redeemed only in part, to the portion of the principal amount of that Note which has been or is to be redeemed.

Section 5.7    Deposit of Redemption Price.  Prior to 10:00 a.m. New York City time on the Business Day immediately preceding the relevant Redemption Date, the Company shall deposit with the Trustee or with a Paying Agent (or, if the Company is acting as Paying Agent, segregate and hold in trust as provided in Section 2.4) an amount of U.S. Legal Tender in immediately available funds sufficient to pay the redemption price of, and accrued interest on, all the Notes that the Company is redeeming on the Redemption Date.

Section 5.8    Notes Payable on Redemption Date.  If the Company, or the Trustee on behalf of the Company, gives notice of redemption in accordance with this Article V, the Notes, or the portions of Notes, called for redemption shall, on the Redemption Date, become due and

- 70 -

payable at the redemption price specified in the notice (together with accrued interest, if any, to the Redemption Date), and from and after the Redemption Date (unless the Company shall default in the payment of the redemption price and accrued interest) such Notes or such portions of Notes shall cease to bear interest.  Upon surrender of any Note for redemption in accordance with the notice, the Company shall pay the redemption price for such Note, together with accrued interest, if any, to, but not including, the Redemption Date (subject to the rights of Holders of record on the relevant Record Date to receive interest due on the relevant Interest Payment Date).  If the Company shall fail to pay the redemption price for any Note called for redemption upon its surrender for redemption, the principal shall, until paid, bear interest from the Redemption Date at the rate borne by the Notes. Upon redemption of any Notes by the Company, such redeemed Notes shall be cancelled and may not be reissued.

Section 5.9    Unredeemed Portions of Partially Redeemed Note.  Upon surrender of a Note that is to be redeemed in part, the Company shall execute, and the Trustee shall authenticate and make available for delivery to the Holder of the Note at the expense of the Company, a new Note or Notes, of any authorized denomination as requested by the Holder, in an aggregate principal amount equal to, and in exchange for, the unredeemed portion of the principal of the Note surrendered.

## ARTICLE VI

## DEFAULTS AND REMEDIES

Section 6.1    Events of Default.

(a)    Each of the following is an "Event of Default":

(1)    default in the payment when due of the principal of or premium, if any, on any Notes, including the failure to make a required payment to purchase Notes tendered or to redeem Notes pursuant to an optional redemption, Change of Control Offer or an Asset Sale Offer;

(2)    default for 30 consecutive days or more in the payment when due of interest, or Additional Amounts, if any, on any Notes;

(3)    the failure to perform or comply with any of the provisions described under Section 4.1 for 20 consecutive days or more following written notice of such failure (i) to the Company from the Trustee or (ii) to the Company and the Trustee from Holders of at least 25.0% in aggregate principal amount of the Outstanding Notes;

(4)    the failure by the Company or any Restricted Subsidiary to comply with any other covenant or agreement contained in this Indenture or in the Notes for 45 consecutive days or more after written notice to the Company from the Trustee or to the Company and the Trustee from Holders of at least 25.0% in aggregate principal amount of the Outstanding Notes;

- 71 -

(5)     default by the Company or any Restricted Subsidiary under any Indebtedness which:

(1)     is caused by a failure to pay principal of or premium, if any, or interest on such Indebtedness prior to the expiration of any applicable grace period and which failure shall not have been cured or waived; or

(2)     results in the acceleration of such Indebtedness prior to its Stated Maturity;

and in either case the principal or accreted amount of Indebtedness covered by subclause (1) or (2) at the relevant time, aggregates U.S.$25.0 million or more;

(6)     failure by the Company or any of its Restricted Subsidiaries to pay one or more final judgments not subject to appeal against any of them, aggregating U.S.$25.0 million or more, which judgment(s) are not paid, discharged or stayed for a period of 60 days or more and which are not covered by insurance or bonds;

(7)     a Bankruptcy Law Event of Default; or

(8)     except as permitted in this Indenture, any Note Guarantee is held to be unenforceable or invalid in a judicial proceeding or ceases for any reason to be in full force and effect or any Subsidiary Guarantor, or any Person acting on behalf of any Subsidiary Guarantor, denies or disaffirms such Subsidiary Guarantor's obligations under its Note Guarantee.

(b)     The Company shall deliver to the Trustee upon becoming aware of any Default or Event of Default written notice of events which would constitute such Default or Event of Default, their status and what action the Company is taking or proposes to take in respect thereof.

Section 6.2     Acceleration.

(a)     If an Event of Default (other than an Event of Default specified in Section 6.1(a)(7) above with respect to the Company) shall occur and be continuing, the Trustee or the Holders of at least 25% in principal amount of Outstanding Notes may declare the unpaid principal of (and premium, if any) and accrued and unpaid interest on all the Notes to be immediately due and payable by notice in writing to the Company and the Trustee specifying the Event of Default and that it is a "notice of acceleration." If an Event of Default specified in Section 6.1(a)(7) above occurs with respect to the Company, then the unpaid principal of (and premium, if any) and accrued and unpaid interest on all the Notes shall become immediately due and payable without any declaration or other act on the part of the Trustee or any Holder.

(b)     At any time after a declaration of acceleration with respect to the Notes as described in Section 6.2(a), Holders of a majority in principal amount of the Outstanding Notes may rescind and cancel such declaration and its consequences:

- 72 -

NAI-1502882142v7

(1)     if the rescission would not conflict with any judgment or decree;

(2)     if all existing Events of Default have been cured or waived, except nonpayment of principal, interest or premium that has become due solely because of the acceleration;

(3)     to the extent the payment of such interest is lawful, interest on overdue installments of interest and overdue principal, which has become due otherwise than by such declaration of acceleration, has been paid; and

(4)     if the Company has paid the Trustee its reasonable compensation and reimbursed the Trustee for its reasonable expenses, disbursements and advances.

No rescission shall affect any subsequent Default or impair any rights relating thereto.

Section 6.3     Other Remedies.

(a)     If an Event of Default occurs and is continuing, the Trustee may pursue any available remedy to collect the payment of principal of and interest on the Notes or to enforce the performance of any provision of the Notes or this Indenture.

(b)     The Trustee may maintain a proceeding even if it does not possess any of the Notes or does not produce any of them in such proceeding.  A delay or omission by the Trustee or any Holder in exercising any right or remedy accruing upon an Event of Default shall not impair the right or remedy or constitute a waiver of or acquiescence in the Event of Default. No remedy is exclusive of any other remedy.  All available remedies are cumulative to the extent permitted by law.

Section 6.4     Waiver of Past Defaults.  The Holders of a majority in principal amount of Outstanding Notes may waive any existing Default or Event of Default under this Indenture, and its consequences, except a default in the payment of the principal of, premium, if any, or interest on any Notes.  For the avoidance of doubt, the Holders may not waive any declaration of acceleration with respect to the Notes, except as provided in Section 6.2(b).

Section 6.5     Control by Majority.  Subject to all provisions of this Indenture and applicable law, Holders of a majority in aggregate principal amount of the then Outstanding Notes have the right to direct the time, method and place of conducting any proceeding for any remedy available to the Trustee or of exercising any trust or power conferred on the Trustee, *provided* that, the Trustee shall be under no obligation to exercise any right or power under this Indenture at the request, order or direction of any Holders unless such Holders have offered to the Trustee indemnity reasonably satisfactory to it.

Section 6.6     Limitation on Suits.

(a)     No Holder of any Notes shall have any right to institute any proceeding with respect hereto or for any remedy under this Indenture, unless:

- 73 -

(1)    such Holder gives to the Trustee written notice of a continuing Event of Default;

(2)    Holders of at least 25% in principal amount of the then Outstanding Notes make a written request to pursue the remedy;

(3)    such Holders of the Notes provide to the Trustee reasonably satisfactory indemnity;

(4)    the Trustee does not comply within 60 days; and

(5)    during such 60-day period the Holders of a majority in principal amount of the Outstanding Notes do not give the Trustee a written direction which is inconsistent with the request;

*provided* that a Holder of a Note may institute suit for enforcement of payment of the principal of and premium, if any, or interest on such Note on or after the respective due dates expressed in such Note.

Section 6.7    Rights of Holders to Receive Payment.  Notwithstanding any other provision hereof (including, without limitation, Section 6.6), the right of any Holder to receive payment of principal of or interest on the Notes held by such Holder, on or after the respective due dates, Redemption Dates or repurchase date expressed in this Indenture or the Notes, or to bring suit for the enforcement of any such payment on or after such respective dates, shall not be impaired or affected without the consent of such Holder.

Section 6.8    Collection Suit by Trustee.  If an Event of Default specified in Section 6.1(a)(1) and Section 6.1(a)(2) occurs and is continuing, the Trustee may recover judgment in its own name and as trustee of an express trust against the Company and each Subsidiary Guarantor for the whole amount then due and owing (together with applicable interest on any overdue principal and, to the extent lawful, Defaulted Interest) and the amounts provided for in Section 7.7.

Section 6.9    Trustee May File Proofs of Claim, etc.

(a)    The Trustee may (irrespective of whether the principal of the Notes is then due):

(1)    file such proofs of claim and other papers or documents as may be necessary or advisable in order to have the claims of the Trustee and the Holders under this Indenture and the Notes allowed in any bankruptcy, insolvency, liquidation or other judicial proceedings relative to the Company, any Subsidiary Guarantor or any Subsidiary of the Company or their respective creditors or properties; and

(2)    collect and receive any moneys or other property payable or deliverable in respect of any such claims and distribute them in accordance with this Indenture.

Any receiver, trustee, liquidator, sequestrator (or other similar official) in any such proceeding is hereby authorized by each Holder to make such payments to the Trustee and, in the event that the Trustee shall consent to the making of such payments directly to the Holders, to pay to the Trustee any amount due to it for the reasonable compensation, expenses, taxes, disbursements and advances of the Trustee, its agent and counsel, and any other amounts due to the Trustee pursuant to Section 7.7.

(b)      Nothing in this Indenture shall be deemed to authorize the Trustee to authorize or consent to or accept or adopt on behalf of any Holder any plan of reorganization, arrangement, adjustment or composition affecting the Notes or the rights of any Holder thereof, or to authorize the Trustee to vote in respect of the claim of any Holder in any such proceeding.

Section 6.10    Priorities.  If the Trustee collects any money or property pursuant to this Article VI, it shall pay out the money or property in the following order:

FIRST:  to the Trustee for amounts due under Section 7.7;

SECOND:  if the Holders proceed against the Company directly without the Trustee in accordance with this Indenture, to Holders for their collection costs;

THIRD:  to Holders for amounts due and unpaid on the Notes for principal and interest, ratably, without preference or priority of any kind, according to the amounts due and payable on the Notes for principal and interest, respectively; and

FOURTH:  to the Company or, to the extent the Trustee collects any amount pursuant to Article X from any Subsidiary Guarantor, to such Subsidiary Guarantor, or to such party as a court of competent jurisdiction shall direct.

The Trustee may, upon notice to the Company, fix a record date and payment date for any payment to Holders pursuant to this Section 6.10.

Section 6.11    Undertaking for Costs.  In any suit for the enforcement of any right or remedy under this Indenture or in any suit against the Trustee for any action taken or omitted by it as Trustee, a court in its discretion may require the filing by any party litigant in the suit of an undertaking to pay the costs of the suit, and the court in its discretion may assess reasonable costs, including reasonable attorneys' fees and expenses, against any party litigant in the suit, having due regard to the merits and good faith of the claims or defenses made by the party litigant.  This Section 6.11 does not apply to a suit by the Trustee, a suit by the Company, a suit by a Holder pursuant to Section 6.7 or a suit by Holders of more than 10% in principal amount of Outstanding Notes.

NAI-1502882142v7

## ARTICLE VII

## TRUSTEE

Section 7.1     Duties of Trustee.

(a)     If a Default or an Event of Default has occurred and is continuing, the Trustee shall exercise the rights and powers vested in it by this Indenture and use the same degree of care and skill in their exercise as a prudent person would exercise or use under the circumstances in the conduct of his or her own affairs.

(b)     Except during the continuance of a Default or an Event of Default:

(1)     the Trustee undertakes to perform such duties and only such duties as are specifically set forth in this Indenture and no implied covenants or obligations shall be read into this Indenture against the Trustee; and

(2)     in the absence of bad faith on its part, the Trustee may conclusively rely, as to the truth of the statements and the correctness of the opinions expressed therein, upon certificates or opinions furnished to the Trustee and conforming to the requirements of this Indenture.  However, in the case of any such certificates or opinions which by any provisions hereof are specifically required to be furnished to the Trustee, the Trustee shall examine such certificates and opinions to determine whether or not they conform to the requirements of this Indenture.

(c)     The Trustee may not be relieved from liability for its own negligent action, its own negligent failure to act or its own willful misconduct, except that:

(1)     this paragraph (c) does not limit the effect of paragraph (b) of this Section 7.1;

(2)     the Trustee shall not be liable for any error of judgment made in good faith by a Trust Officer unless it is proved that the Trustee was negligent in ascertaining the pertinent facts; and

(3)     the Trustee shall not be liable with respect to any action it takes or omits to take in good faith in accordance with a direction received by it pursuant to Section 6.2, Section 6.5 or Section 6.8.

(d)     The Trustee shall not be liable for interest on, or the investment of, any money received by it except as the Trustee may agree in writing with the Company.

(e)     Money held in trust by the Trustee need not be segregated from other funds except to the extent required by law.

(f)     No provision hereof shall require the Trustee to expend or risk its own funds or otherwise incur financial liability in the performance of any of its duties under this

- 76 -

NAI-1502882142v7

Indenture or in the exercise of any of its rights or powers, if it shall have reasonable grounds to believe that repayment of such funds or adequate indemnity against such risk or liability is not reasonably assured to it.

(g)    Every provision of this Indenture relating to the conduct or affecting the liability of or affording protection to the Trustee and/or any Agent shall be subject to the provisions of this Article VII.

(h)    The Trustee shall be under no obligation to exercise any of the rights or powers vested in it by this Indenture at the request, order or direction of any of the Holders unless such Holders shall have offered to the Trustee security or indemnity reasonably satisfactory to it against the costs, expenses (including reasonable attorneys' fees and expenses) and liabilities that might be incurred by it in compliance with such request or direction.

Section 7.2    Rights of Trustee. Subject to Section 7.1 hereof and Sections 315(a) through (d) of the TIA:

(a)    The Trustee may rely upon, and shall be fully protected in acting or refraining from acting based upon any document reasonably believed by it to be genuine and to have been signed or presented by the proper Person. The Trustee need not investigate any fact or matter stated in any such document.

(b)    Before the Trustee acts or refrains from acting at the direction of the Company or any Subsidiary Guarantor, it may require an Officers' Certificate or an Opinion of Counsel.  The Trustee shall not be liable for any action it takes or omits to take in good faith in reliance on an Officers' Certificate or Opinion of Counsel.

(c)    The Trustee may act through its attorneys and agents and shall not be responsible for the misconduct or negligence of any agent appointed with due care.

(d)    The Trustee shall not be liable for any action it takes or omits to take in good faith which it believes to be authorized or within its rights or powers.

(e)    The Trustee may consult with counsel of its selection, and the advice or opinion of such counsel with respect to legal matters relating to this Indenture, the Notes and the Note Guarantees shall be full and complete authorization and protection from liability in respect to any action taken, omitted or suffered by it under this Indenture in good faith and in accordance with the advice or opinion of such counsel.

(f)    The Trustee shall not be bound to make any investigation into the facts or matters stated in any resolution, certificate, statement, instrument, opinion, report, notice, request, direction, consent, order, bond, debenture, note, other evidence of indebtedness or other paper or document, but the Trustee, in its discretion, may make such further inquiry or investigation into such facts or matters as it may see fit, and, if the Trustee shall determine to make such further inquiry or investigation, it shall be entitled, upon a 15 (fifteen) working days written notice to the Company, to examine the books, records and premises of the Company, personally or by agent or attorney at the sole cost of the Company. The Trustee shall incur no liability or additional liability of any kind by reason of such inquiry or investigation.

- 77 -

(g)     The Trustee shall not be deemed to have notice of any Default or Event of Default (other than payment default under Section 6.1(a)(1) or (2)) unless written notice of any event which is in fact such a Default or Event of Default is received by the Trustee at the Corporate Trust Office of the Trustee, and such notice references the Notes and this Indenture.

(h)     The rights, privileges, protections, immunities and benefits given to the Trustee, including, without limitation, its right to be indemnified, are extended to, and shall be enforceable by, the Trustee in each of its capacities under this Indenture, and to each Agent, custodian and other Person employed to act under this Indenture.

(i)     The Trustee may request that the Company and each Subsidiary Guarantor deliver an Officers' Certificate setting forth the names of individuals and/or titles of Officers authorized at such time to take specified actions pursuant to this Indenture, which Officers' Certificate may be signed by any person authorized to sign an Officers' Certificate, including any person specified as so authorized in any such certificate previously delivered and not superseded.

(j)     Any request, direction, order or demand of the Company and/or any Subsidiary Guarantor mentioned in this Indenture shall be sufficiently evidenced by an Officers' Certificate (unless other evidence in respect thereof be in this Indenture specifically prescribed); and any resolution of the Board of Directors of the Company or any Subsidiary Guarantor may be evidenced by a Board Resolution.

(k)     Notwithstanding any provisions in this Indenture to the contrary, in no event shall the Trustee be liable for any failure or delay in the performance of its obligations under this Indenture because of circumstances beyond its control, including, but not limited to, acts of God, flood, war (whether declared or undeclared), terrorism, fire, riot, strikes or work stoppages for any reason, embargo, government action, including any laws, ordinances, regulations or the like which restrict or prohibit the providing of the services contemplated by this Indenture, inability to obtain material, equipment, or communications or computer facilities, or the failure of equipment or interruption of communications or computer facilities, and other causes beyond its control whether or not of the same class or kind as specifically named above, it being understood that the Trustee shall use reasonable efforts that are consistent with accepted practices in the banking industry to resume performance as soon as practicable under the circumstances.

(l)     In no event shall the Trustee be responsible or liable for special, indirect, consequential or punitive loss or damage of any kind whatsoever (including, but not limited to, loss of profit), irrespective of whether the Trustee has been advised of the likelihood or such loss or damages and regardless of the form of action.

(m)     The permissive rights of the Trustee enumerated in this Indenture shall not be construed as duties.

(n)     Neither the Trustee nor any Agent shall have any liability or responsibility with respect to, or obligation or duty to monitor, determine or inquire (i) as to the Company's or any Subsidiary Guarantor's compliance with any covenant under this Indenture (other than the

- 78 -

NAI-1502882142v7

covenant to make payment on the Notes, including upon redemption or purchase by the Company pursuant to this Indenture), or (ii) as to whether or not any Rating Agency has adjusted the rating of the Notes.

Section 7.3    Individual Rights of Trustee.  The Trustee in its individual or any other capacity may become the owner or pledgee of Notes and may otherwise deal with the Company, the Subsidiary Guarantors or any of their Affiliates with the same rights it would have if it were not Trustee.  Any Agent may do the same with like rights.  However, the Trustee must comply with Section 7.10 and Section 7.11.

Section 7.4    Trustee's Disclaimer.  The Trustee shall not be responsible for and makes no representation as to the validity or adequacy of this Indenture or the Notes or the Note Guarantees, it shall not be accountable for the Company's use of the proceeds from the Notes, and it shall not be responsible for any statement of the Company in this Indenture, the Notes, the Offering Circular or in any other document issued in connection with the sale of the Notes or in the Notes other than the Trustee's certificate of authentication.

Section 7.5    Notice of Defaults.  If a Default or Event of Default occurs and is continuing and if such Default or Event of Default is a payment default or a Trust Officer has actual knowledge thereof, or has received written notice thereof pursuant to Section 7.2(g) above, the Trustee shall give to each Holder notice of the Default or Event of Default within 90 days after the Trustee has knowledge thereof. Except in the case of a Default or Event of Default in the payment of principal of, premium, if any, or interest on any Note, the Trustee may withhold the notice if and so long as a responsible Trust Officer in good faith determines that withholding the notice is in the interests of the Holders.

Section 7.6    [Reserved]

Section 7.7    Compensation and Indemnity.

(a)    The Company shall pay to the Trustee from time to time reasonable compensation for its acceptance of this Indenture and services under this Indenture as the Company and the Trustee shall from time to time agree in writing.  The Company shall pay the reasonable fees and expenses of the Trustee's counsel, incurred in the review, negotiation and delivery of this Indenture and related documentation, in connection with any amendments or supplements hereto and otherwise in connection with the performance of its services under this Indenture.  The Trustee's compensation shall not be limited by any law on compensation of a trustee of an express trust.  The Company shall reimburse the Trustee upon request for all reasonable out-of-pocket expenses incurred or made by it, including, without limitation, costs of collection, costs of preparing and reviewing reports, certificates and other documents, costs of preparation and mailing of notices to Holders and reasonable fees and expenses of counsel retained by the Trustee, in addition to the compensation for its services.  Such expenses shall include the reasonable compensation and expenses, disbursements and advances of the Trustee's agents, counsel, accountants and experts.

(b)    The Company and each of the Subsidiary Guarantors shall jointly and severally indemnify the Trustee against any and all loss, liability, damage, claim, cost or expense

- 79 -

(including, without limitation, reasonable attorneys' fees and expenses) incurred by it without negligence, willful misconduct or bad faith on its part in connection with its acceptance and administration of this trust and the performance of its duties under this Indenture and the exercise of its rights, including the costs and expenses of enforcing this Indenture (including this Section 7.7) and of defending itself against any claims (whether asserted by any Holder, the Company, any Subsidiary Guarantor or any other Person).  The Trustee shall notify the Company promptly of any claim for which it may seek indemnity.  Failure by the Trustee to so notify the Company shall not relieve the Company of its obligations under this Indenture except to the extent the Company or any Subsidiary Guarantor has been prejudiced thereby.  The Company shall defend the claim and the Trustee may have separate counsel and the Company shall pay the reasonable fees and expenses of such counsel.  The Company need not reimburse any expense or indemnify against any loss, liability or expense incurred by the Trustee through the Trustee's own negligence, willful misconduct or bad faith, as determined by a competent court of appropriate jurisdiction in a final, non-appealable judgment.

(c)     To secure payment obligations of the Company and the Subsidiary Guarantors in this Section 7.7, the Trustee shall have a lien prior to the Notes on all money or property held or collected by the Trustee other than money or property held in trust to pay principal of and interest on particular Notes.  The Trustee's right to receive payment of any reasonable amounts due under this Section 7.7 shall not be subordinated to any other liability or Indebtedness of the Company.

(d)     The indemnification and payment obligations of the Company and the Subsidiary Guarantors pursuant to this Section 7.7 shall survive the payment of the Notes, termination or the discharge of this Indenture and/or the resignation or removal of the Trustee.  When the Trustee incurs expenses after the occurrence of a Bankruptcy Law Event of Default, the expenses are intended to constitute expenses of administration under any Bankruptcy Law; *provided*, *however*, that this shall not affect the Trustee's rights as set forth in this Section 7.7 or Section 6.10.

Section 7.8     Replacement of Trustee.

(a)     The Trustee may resign at any time by so notifying the Company.  The Holders of a majority in principal amount of the Outstanding Notes may remove the Trustee by so notifying the Trustee and may appoint a successor Trustee reasonably acceptable to the Company.  The Company shall remove the Trustee if:

(1)     the Trustee fails to comply with Section 7.10;

(2)     the Trustee is adjudged bankrupt or insolvent;

(3)     a receiver or other public officer takes charge of the Trustee or its property; or

(4)     the Trustee otherwise becomes incapable of acting.

(b)     If the Trustee resigns or is removed by the Company or by the Holders of a majority in principal amount of the Outstanding Notes and such Holders do not reasonably

- 80 -

NAI-1502882142v7

promptly appoint a successor Trustee, or if a vacancy exists in the office of the Trustee for any reason (the Trustee in such event being referred to in this Indenture as the retiring Trustee), the Company shall promptly appoint a successor Trustee.

(c)     A successor Trustee shall deliver a written acceptance of its appointment to the retiring Trustee and to the Company.  Thereupon the resignation or removal of the retiring Trustee shall become effective, and the successor Trustee shall have all the rights, powers and duties of the Trustee under this Indenture.  The successor Trustee shall give notice of its succession to Holders.  The retiring Trustee, upon payment of its charges, shall promptly transfer all property held by it as Trustee to the successor Trustee, subject to the lien provided for in Section 7.7.

(d)     If a successor Trustee does not take office within 30 days after the retiring Trustee resigns or is removed, the retiring Trustee or the Holders of 10% in principal amount of the Outstanding Notes may petition, at the Company's expense, any court of competent jurisdiction for the appointment of a successor Trustee.

(e)     If the Trustee fails to comply with Section 7.10, any Holder may petition any court of competent jurisdiction for the removal of the Trustee and the appointment of a successor Trustee.

(f)     Notwithstanding the replacement of the Trustee pursuant to this Section 7.8, the Company's obligations under Section 7.7 shall continue for the benefit of the retiring Trustee.

Section 7.9     Successor Trustee by Merger.

(a)     If the Trustee consolidates with, merges or converts into, or transfers all or substantially all its corporate trust business (including this transaction) or assets to, another corporation or banking association, the resulting, surviving or transferee corporation without any further act shall be the successor Trustee.

(b)     In case at the time such successor or successors to the Trustee by consolidation, merger, conversion shall succeed to the trusts created by this Indenture, any of the Notes shall have been authenticated but not delivered, any such successor to the Trustee may adopt the certificate of authentication of any predecessor trustee, and deliver such Notes so authenticated; and in case at that time any of the Notes shall not have been authenticated, any successor to the Trustee may authenticate such Notes either in the name of any predecessor under this Indenture or in the name of the successor to the Trustee; and in all such cases such certificates shall have the full force which it is anywhere in the Notes or in this Indenture provided that the certificate of the Trustee shall have.

Section 7.10     Eligibility; Disqualification.  The Trustee shall at all times satisfy the requirements of TIA § 310(a).  The Trustee shall have a combined capital and surplus of at least U.S.$150.0 million as set forth in its most recent published annual report of condition.  The Trustee shall comply with TIA § 310(b); *provided*, *however*, that there shall be excluded from the operation of TIA § 310(b)(1) any indenture or indentures under which other securities or

- 81 -

NAI-1502882142v7

certificates of interest or participation in other securities of the Company are outstanding if the requirements for such exclusion set forth in TIA § 310(b)(1) are met.

Section 7.11   Preferential Collection of Claims Against Company.  The Trustee shall comply with TIA § 311(a), excluding any creditor relationship listed in TIA § 311(b).  A Trustee who has resigned or been removed shall be subject to TIA § 311(a) to the extent indicated.

Section 7.12   Appointment of Co-Trustee.

(a)   Notwithstanding any other provisions in this Indenture, at any time, solely for the purpose of meeting the legal requirements of any jurisdiction, the Trustee shall have the power and may execute and deliver all instruments necessary to appoint one or more Persons to act as separate trustee or trustees or as co-trustee or co-trustees, and to vest in such Person or Persons, in such capacity and subject to the other provisions of this Indenture, such powers, duties, obligations and rights as the Trustee may consider necessary or desirable.  No co-trustee under this Indenture shall be required to meet the terms of eligibility as a successor trustee under this Indenture and no notice to Holders of Notes of the appointment of a separate trustee or co-trustee shall be required under this Indenture.

(b)   Every separate trustee or co-trustee shall, to the extent permitted by law, be appointed and act subject to the following provisions and conditions:

(i)   all rights, powers, duties and obligations conferred or imposed upon the Trustee shall be conferred or imposed upon and exercised or performed by the Trustee and such separate trustee or co-trustee jointly (it being understood that such separate trustee or co-trustee is not authorized to act separately without the Trustee joining in such act), except to the extent that under any law of any jurisdiction in which any particular act or acts are to be performed the Trustee shall be incompetent or unqualified to perform such act or acts, in which event such rights, powers, duties and obligations shall be exercised and performed singly by such co-trustee, but solely at the direction of the Trustee;

(ii)   no trustee under this Indenture shall be personally liable by reason of any act or omission of any other trustee under this Indenture; and

(iii)   the Trustee may at any time accept the resignation of or remove any separate trustee or co-trustee.

(c)   Any notice, request or other writing given to the Trustee shall be deemed to have been given to each of the then separate trustees or co-trustees, as effectively as if given to each of them.  Every instrument appointing any separate trustee or co-trustee shall refer to this Indenture and the conditions of this Article VII.  Each separate trustee or co-trustee, upon its acceptance of the trusts conferred, shall be vested with the estates or property specified in its instrument of appointment, jointly with the Trustee, subject to all the provisions of this Indenture, specifically including every provision of this Indenture relating to the conduct of, affecting the liability of, or affording protection or rights (including the rights to compensation, reimbursement and indemnification under this Indenture) to, the Trustee.  Every such instrument shall be filed with the Trustee.

- 82 -

(d)     Any separate trustee or co-trustee may at any time constitute the Trustee or its agent or attorney-in-fact with full power and authority, to the extent not prohibited by law, to do any lawful act under or in respect of this Indenture on its behalf and in its name.  If any separate trustee or co-trustee shall die, become incapable of acting, resign or be removed, all of its estates, properties, rights, remedies and trusts shall vest in and be exercised by the Trustee, to the extent permitted by law, without the appointment of a new or successor trustee.

Section 7.13    The Agents.  The rights, protections, immunities and indemnities granted to the Trustee under this Article VII shall apply *mutatis mutandis* to each of the Agents.

ARTICLE VIII

DEFEASANCE; DISCHARGE OF INDENTURE

Section 8.1    Legal Defeasance and Covenant Defeasance.

(a)     The Company may, at its option and at any time, elect to have either paragraph (b) or (c) of this Section 8.1 be applied to its obligations with respect to the Outstanding Notes and all obligations of the Subsidiary Guarantors under the Note Guarantees upon compliance with the conditions set forth in Section 8.2.

(b)     Upon the Company's exercise under paragraph (a) of this Section 8.1 of the option applicable to this paragraph (b), the Company shall, subject to the satisfaction of the conditions set forth in Section 8.2, be deemed to have paid and discharged the entire Indebtedness represented by this Indenture, the Outstanding Notes and Note Guarantees after the deposit specified in Section 8.2(a) (hereinafter, "Legal Defeasance").  For this purpose, Legal Defeasance means that the Company shall be deemed to have paid and discharged the entire Indebtedness represented by the Outstanding Notes, which shall thereafter be deemed to be Outstanding only for the purposes of Section 8.3 and the other Sections of this Indenture referred to in clause (i) or (ii) of this paragraph (b) and to have satisfied all its other obligations under such Notes and under this Indenture (and the Trustee, on demand of and at the expense of the Company, shall execute proper instruments acknowledging the same), except for the following provisions, which shall survive until otherwise terminated or discharged under this Indenture:

(i)     the rights of Holders to receive payments, solely from the trust described below, in respect of the principal of, premium, if any, and interest on the Notes when such payments are due,

(ii)     the Company's obligations with respect to the Notes concerning issuing temporary Notes, registration of Notes, mutilated, destroyed, lost or stolen Notes and the maintenance of an office or agency for payments,

(iii)     the rights, powers, trusts, duties and immunities of the Trustee under this Indenture and the Company's and the Subsidiary Guarantors' obligations in connection therewith, and

(iv)     this Article VIII.

- 83 -

NAI-1502882142v7

Subject to compliance with this Article VIII, the Company may exercise its option under this paragraph (b) notwithstanding the prior exercise of its option under paragraph (c) of this Section 8.1.

(c)     Upon the Company's exercise under paragraph (a) of this Section 8.1 of the option applicable to this paragraph (c), the Company may, at its option and at any time, elect to have its obligations and the obligations of the Subsidiary Guarantors, subject to the satisfaction of the applicable conditions set forth in Section 8.2, released under the covenants (set forth in Sections 3.5, 3.8, 3.9, 3.10, 3.11, 3.12, 3.13, 3.14, 3.15, 3.16, 3.17, 3.18 and 4.1(a)(2)) with respect to the Outstanding Notes on and after the date the conditions set forth below are satisfied (hereinafter, "Covenant Defeasance"), and the Notes shall thereafter be deemed not Outstanding for the purposes of any direction, waiver, consent or declaration or act of Holders (and the consequences of any thereof) in connection with such covenants, but shall continue to be Outstanding for all other purposes under this Indenture.  For this purpose, such Covenant Defeasance means that, with respect to the Outstanding Notes, the Company may omit to comply with and shall have no liability in respect of any term, condition or limitation set forth in any such covenant, whether directly or indirectly, by reason of any reference elsewhere in this Indenture to any such covenant or by reason of any reference in any such covenant to any other provision in this Indenture or in any other document and such omission to comply shall not constitute a Default or an Event of Default with respect to the Notes or the Note Guarantees under Section 6.1(a) but the remainder of this Indenture and such Notes shall be unaffected thereby.

Section 8.2     Conditions to Defeasance.  The Company may exercise its Legal Defeasance option or its Covenant Defeasance option only if:

(a)     the Company has irrevocably deposited with the Trustee, in trust, for the benefit of the Holders U.S. Legal Tender, U.S. Government Obligations, or a combination thereof, in such amounts as will be sufficient without reinvestment, in the opinion of a nationally recognized investment bank, appraisal firm or firm of independent public accountants, to pay the principal of, premium, if any, and interest (including Additional Amounts) on the Notes on the stated date for payment thereof or on the applicable Redemption Date (provided that any redemption before Stated Maturity has been irrevocably provided for under arrangements satisfactory to the Trustee), as the case may be;

(b)     in the case of Legal Defeasance, the Company has delivered to the Trustee an Opinion of Counsel from counsel in the United States reasonably acceptable to the Trustee (subject to customary exceptions and exclusions) and independent of the Company to the effect that:

(1)     the Company has received from, or there has been published by, the Internal Revenue Service a ruling; or

(2)     since the Issue Date, there has been a change in the applicable U.S. federal income tax law,

- 84 -

and in either case to the effect that, and based thereon such Opinion of Counsel shall state that, the Holders will not recognize income, gain or loss for U.S. federal income tax purposes as a result of such Legal Defeasance and will be subject to U.S. federal income tax on the same amounts, in the same manner and at the same times as would have been the case if such Legal Defeasance had not occurred;

(c)     in the case of Covenant Defeasance, the Company has delivered to the Trustee an Opinion of Counsel in the United States reasonably acceptable to the Trustee (subject to customary exceptions and exclusions) to the effect that the Holders will not recognize income, gain or loss for U.S. federal income tax purposes as a result of such Covenant Defeasance and will be subject to U.S. federal income tax on the same amounts, in the same manner and at the same times as would have been the case if such Covenant Defeasance had not occurred;

(d)     in the case of Legal Defeasance or Covenant Defeasance, the Company has delivered to the Trustee:

(1)     an Opinion of Counsel from counsel in Mexico reasonably acceptable to the Trustee (subject to customary exceptions and exclusions) and independent of the Company to the effect that, based upon Mexican law then in effect, Holders will not recognize income, gain or loss for Mexican tax purposes, including withholding tax except for withholding tax then payable on interest payments due, as a result of Legal Defeasance or Covenant Defeasance, as the case may be, and will be subject to Mexican taxes on the same amounts and in the same manner and at the same time as would have been the case if such Legal Defeasance or Covenant Defeasance, as the case may be, had not occurred, or

(2)     a ruling directed to the Trustee received from the tax authorities of Mexico to the same effect as the Opinion of Counsel described in clause (1) above;

(e)     no Default or Event of Default shall have occurred and be continuing on the date of the deposit pursuant to Section 8.2(a) (except any Default or Event of Default resulting from the failure to comply with Section 3.9 as a result of the borrowing of the funds required to effect such deposit);

(f)     the Trustee has received an Officers' Certificate stating that such Legal Defeasance or Covenant Defeasance shall not result in a breach or violation of, or constitute a Default under this Indenture or any other material agreement or instrument to which the Company or any of its Subsidiaries is a party or by which the Company or any of its Subsidiaries is bound;

(g)     the Company has delivered to the Trustee an Officers' Certificate stating that the deposit was not made by the Company with the intent of preferring the Holders over any other creditors of the Company or any Subsidiary of the Company or with the intent of defeating, hindering, delaying or defrauding any other creditors of the Company or others;

(h)     the Company has delivered to the Trustee an Officers' Certificate and an Opinion of Counsel reasonably acceptable to the Trustee and independent of the Company, each

- 85 -

NAI-1502882142v7

stating that all conditions precedent provided for or relating to the Legal Defeasance or the Covenant Defeasance have been complied with (subject to customary exceptions and exclusions); and

(i)        the Company has delivered to the Trustee an Opinion of Counsel reasonably acceptable to the Trustee and independent of the Company to the effect that the trust funds will not be subject to the effect of any applicable bankruptcy, insolvency, reorganization or similar laws affecting creditors' rights generally (subject to customary exceptions and exclusions).

Section 8.3      Application of Trust Money.  The Trustee shall hold in trust U.S. Legal Tender and/or U.S. Government Obligations (including in each case proceeds thereon) deposited with it pursuant to this Article VIII.  It shall apply the deposited U.S. Legal Tender and/or U.S. Government Obligations (including in each case proceeds thereon) through the Paying Agent and in accordance with this Indenture to the payment of principal of and interest on the Notes.

Section 8.4      Repayment to Company.

(a)       Subject to Sections 7.7, 8.1 and 8.2, the Trustee and the Paying Agent shall promptly turn over to the Company upon written request any excess U.S. Legal Tender and/or U.S. Government Obligations held by them upon payment of all the obligations under this Indenture and shall thereupon be relieved from all liability with respect to such U.S. Legal Tender and/or U.S. Government Obligations.

(b)       Subject to any applicable abandoned property law, the Trustee and the Paying Agent shall pay to the Company upon written request any money held by them for the payment of principal of or interest on the Notes that remains unclaimed for two years, and, thereafter, *provided* that before making such payment the Trustee may at the expense of the Company publish once in a newspaper of general circulation in New York City, or send to each Holder entitled to such money, notice that the money remains unclaimed and that after a date specified in the notice (at least 30 days after the date of the publication or notice) any remaining unclaimed balance of money will be repaid to the Company. After payment to the Company, Holders entitled to the money must look to the Company for payment as general creditors.

Section 8.5      Indemnity for U.S. Government Obligations.  The Company shall pay and shall indemnify the Trustee against any tax, fee or other charge imposed on or assessed against deposited U.S. Government Obligations or the principal and interest received on such U.S. Government Obligations.

Section 8.6      Reinstatement.  If the Trustee or Paying Agent is unable to apply any U.S. Legal Tender and/or U.S. Government Obligations in accordance with this Article VIII by reason of any legal proceeding or by reason of any order or judgment of any court or governmental authority enjoining, restraining or otherwise prohibiting such application, the obligations of the Company under this Indenture and the Notes shall be revived and reinstated as though no deposit had occurred pursuant to this Article VIII until such time as the Trustee or Paying Agent is permitted to apply all such U.S. Legal Tender and/or U.S. Government Obligations in accordance with this Article VIII; *provided*, *however*, that, if the Company has made any

- 86 -

NAI-1502882142v7

payment of principal of or interest on any Notes because of the reinstatement of its obligations, the Company shall be subrogated to the rights of the Holders of such Notes to receive such payment from the U.S. Legal Tender or U.S. Government Obligations held by the Trustee or Paying Agent.

Section 8.7   Satisfaction and Discharge.  This Indenture shall be discharged and shall cease to be of further effect (except as to surviving rights or registration of transfer or exchange of the Notes, as expressly provided for in this Indenture) as to all Outstanding Notes when:

(a)     either:

(1)     all the Notes theretofore authenticated and delivered (except (i) lost, stolen or destroyed Notes which have been replaced or paid and (ii) Notes for whose payment U.S. Legal Tender and/or U.S. Government obligations have theretofore been deposited in trust (or segregated and held in trust by the Company) and thereafter repaid to the Company or discharged from such trust pursuant to Section 8.3 or 8.4, as applicable) have been delivered to the Trustee for cancellation; or

(2)     all Notes not theretofore delivered to the Trustee for cancellation have become due and payable by reason of the making of a notice of redemption or otherwise, or will become due and payable within one year, including as a result of a redemption notice given or to be properly given pursuant to this Indenture under arrangements satisfactory to the Trustee for giving the notice of redemption, and the Company has irrevocably deposited or caused to be deposited with the Trustee U.S. Legal Tender and/or U.S. Government Obligations sufficient without reinvestment to pay and discharge the entire Indebtedness on the Notes not theretofore delivered to the Trustee for cancellation, for principal of, premium, if any, and interest on the Notes to the date of deposit, together with irrevocable written instructions from the Company directing the Trustee to apply such funds to the payment;

(b)     the Company has paid all other sums payable under this Indenture and the Notes by it; and

(c)     the Company has delivered to the Trustee an Officers' Certificate and Opinion of Counsel each stating that all conditions precedent under this Indenture relating to the satisfaction and discharge of this Indenture have been complied with.

ARTICLE IX

AMENDMENTS

Section 9.1   Without Consent of Holders.

(a)     From time to time, the Company, the Subsidiary Guarantors (except that it shall not be necessary for any existing Subsidiary Guarantor to approve an amendment or execute a Supplemental Indenture for the purpose of adding or releasing any Subsidiary

- 87 -

Guarantors with respect to the Notes) and the Trustee, without the consent of the Holders, may amend or supplement this Indenture, the Notes or the Note Guarantees for certain specified purposes, including:

(1)     to cure any ambiguities, defects or inconsistencies in this Indenture or the Notes;

(2)     to provide for uncertificated Notes in addition to or in place of Certificated Notes;

(3)     to provide for the assumption of the Company's or a Subsidiary Guarantor's obligations in the case of a merger or consolidation or sale of all or substantially all of the Company's or such Subsidiary Guarantor's assets, as applicable, to the extent permitted under this Indenture;

(4)     to make any change that would provide any additional rights or benefits to the Holders of the Notes or that does not adversely affect the legal rights under this Indenture of any such Holder;

(5)     to conform the text of this Indenture, the Note Guarantees or the Notes to any provision of the "Description of Notes" contained in the Offering Circular to the extent that such provision in such "Description of Notes" was intended to be a verbatim recitation of a provision of this Indenture, the Note Guarantees or the Notes;

(6)     to allow any Subsidiary Guarantor to execute a Supplemental Indenture in order to provide a Note Guarantee with respect to the Notes and to release a Subsidiary Guarantor from its Note Guarantee in accordance with the terms of this Indenture;

(7)     to comply with the requirements of any applicable securities depositary;

(8)     to provide for a successor Trustee in accordance with the terms of this Indenture;

(9)     to otherwise comply with any requirement of this Indenture;

(10)     to issue Additional Notes as permitted by Section 2.2(c) and Section 2.13, which will have terms substantially identical to the other Outstanding Notes except as specified in Section 2.13, and which will be treated, together with any other Outstanding Notes, as a single issue of securities; and

(11)     to make any other changes which do not adversely affect the rights of any of the Holders of the Notes in any material respect;

(b)     After an amendment under this Section 9.1 becomes effective, the Company shall give to Holders a notice briefly describing such amendment.  The failure to give

- 88 -

such notice to all Holders, or any defect therein, shall not impair or affect the validity of an amendment under this Section 9.1.

Section 9.2    With Consent of Holders.

(a)    The Company, the Subsidiary Guarantors and the Trustee may amend this Indenture, the Notes or the Note Guarantees without notice to any Holder but with the written consent of the Holders of at least a majority in aggregate principal amount of the then Outstanding Notes (including, without limitation, consents obtained in connection with a purchase of, or tender offer or exchange offer for, Notes).  However, without the consent of each Holder affected thereby, no amendment may:

(1)    reduce the principal amount of Notes whose Holders must consent to an amendment, supplement or waiver;

(2)    reduce the rate of or change or have the effect of changing the time for payment of interest, including Defaulted Interest, on any Notes;

(3)    reduce the principal of or change or have the effect of changing the fixed maturity of any Notes, or change the date on which any Notes may be subject to redemption, or reduce the redemption price therefor;

(4)    make any Notes payable in money other than that stated in the Notes;

(5)    make any change in provisions of this Indenture entitling each Holder to receive payment of principal of, premium, if any, and interest on such Note on or after the due date thereof or to bring suit to enforce such payment, or permitting Holders of a majority in principal amount of Notes to waive Defaults or Events of Default;

(6)    amend, change or modify in any material respect the obligation of the Company to make and consummate a Change of Control Offer in respect of a Change of Control that has occurred or make and consummate an Asset Sale Offer with respect to any Asset Sale that has been consummated;

(7)    eliminate or modify in any manner a Subsidiary Guarantor's Obligations with respect to its Note Guarantee, which adversely affects Holders in any material respect, except as contemplated in this Indenture or Note Guarantee;

(8)    make any change to Section 3.20 that adversely affects the rights of any Holder or amends the terms of the Notes in a way that would result in a loss of exemption from taxes; and

(9)    make any change to the provisions of this Indenture or the Notes that adversely affects the ranking of the Notes.

- 89 -

NAI-1502882142v7

(b)     It shall not be necessary for the consent of the Holders under this Section 9.2 to approve the particular form of any proposed amendment, supplement or waiver, but it shall be sufficient if such consent approves the substance thereof.  The Trustee will be entitled to rely on such evidence as it deems appropriate, including an Opinion of Counsel and an Officers' Certificate, and the Trustee shall have no liability whatsoever in reliance upon the foregoing.

(c)     After an amendment, supplement or waiver under this Section 9.2 becomes effective, the Company shall give to Holders a notice briefly describing such amendment, supplement or waiver.  The failure to give such notice to all Holders, or any defect therein, shall not impair or affect the validity of an amendment, supplement or waiver under this Section 9.2.

Section 9.3     Revocation and Effect of Consents and Waivers.

(a)     A consent to an amendment, supplement or waiver by a Holder of a Note shall bind the Holder and every subsequent Holder of that Note or portion of the Note that evidences the same debt as the consenting Holder's Note, even if notation of the consent or waiver is not made on the Note.  However, any such Holder or subsequent Holder may revoke the consent or waiver as to such Holder's Note or portion of the Note if the Trustee receives the notice of revocation before the date the amendment, supplement or waiver becomes effective.  After an amendment, supplement or waiver becomes effective, it shall bind every Holder, except as otherwise provided in this Article IX.  An amendment, supplement or waiver shall become effective upon receipt by the Trustee of the requisite number of written consents under Section 9.2.

(b)     The Company may, but shall not be obligated to, fix a record date, which need not be the date provided in TIA § 316(c) to the extent it would otherwise be applicable, for the purpose of determining the Holders entitled to give their consent or take any other action described above or required or permitted to be taken pursuant to this Indenture.  If a record date is fixed, then notwithstanding the immediately preceding paragraph, those Persons who were Holders at such record date (or their duly designated proxies), and only those Persons, shall be entitled to give such consent or to revoke any consent previously given or to take any such action, whether or not such Persons continue to be Holders after such record date.  No such consent shall be valid or effective for more than 90 days after such record date if the requisite consent is not obtained from Holders of the applicable principal amount of Notes.

Section 9.4     Notation on or Exchange of Notes.  If an amendment or supplement changes the terms of a Note, the Company may require the Holder of the Note to deliver it to the Trustee.  The Trustee may place an appropriate notation on the Note regarding the changed terms and return it to the Holder.  Alternatively, if the Company so determines, the Company in exchange for the Note will execute and upon Company Order the Trustee will authenticate a new Note that reflects the changed terms.  Failure to make the appropriate notation or to issue a new Note shall not affect the validity of such amendment or supplement.

Section 9.5     Trustee to Sign Amendments and Supplements.  The Trustee shall sign any amendment or supplement authorized pursuant to this Article IX if the amendment or

NAI-1502882142v7

supplement does not adversely affect the rights, duties, liabilities or immunities of the Trustee.  If the proposed amendment or supplement does adversely affect the rights, duties, liabilities or immunities of the Trustee, the Trustee may but need not sign it.  In signing such amendment or supplement the Trustee shall be entitled to receive indemnity reasonably satisfactory to it and to receive, and shall be fully protected in relying upon, in addition to the documents required pursuant to Section 11.3, an Opinion of Counsel and an Officers' Certificate opining or certifying, as the case may be, to the effect that such amendment is permitted or authorized by the terms and conditions of this Indenture.

ARTICLE X

NOTE GUARANTEES

Section 10.1    Note Guarantees.

(a)    Subject to Section 10.2(a), each Subsidiary Guarantor hereby fully, unconditionally and irrevocably guarantees, as primary obligor and not merely as surety, jointly and severally with each other Subsidiary Guarantor, to each Holder and the Trustee the full and punctual payment when due, whether at maturity, by acceleration, by redemption or otherwise, of the Obligations of the Company under the Notes and this Indenture (such guaranteed Obligations, the "Guaranteed Obligations").  Each Subsidiary Guarantor further agrees (to the extent permitted by law) that the Guaranteed Obligations may be extended or renewed, in whole or in part, without notice or further assent from it, and that it will remain bound under this Article X notwithstanding any such extension or renewal.  Each Subsidiary Guarantor hereby agrees to pay, in addition to the amounts stated above, any and all expenses (including reasonable counsel fees and expenses) incurred by the Trustee or the Holders in enforcing any rights under any Note Guarantee.

(b)    Notwithstanding anything in this Indenture to the contrary, the Company shall cause any existing or future Restricted Subsidiary (including upon a Revocation of the Designation of a Subsidiary as an Unrestricted Subsidiary) that (A) as of the last date of any fiscal quarter and with respect to the Company and its Subsidiaries, individually represents at least 5% of the consolidated total assets of the Company and its Subsidiaries, as determined in accordance with IFRS, or (B) for any twelve-month period ending as of the last day of any fiscal quarter, individually represents at least 5% of the Consolidated  EBITDA of the Company, to become a Subsidiary Guarantor, in accordance with Section 10.6. Notwithstanding the foregoing, the Company shall at all times cause the Company and the then-existing Subsidiary Guarantors, collectively, to represent (y) as of the last date of each fiscal quarter, at least 85% of the consolidated total assets of the Company and its Subsidiaries, as determined in accordance with IFRS, and (z) for the twelve-month period ending as of the last day of each fiscal quarter, at least 85% of Consolidated EBITDA.

(c)    Each Subsidiary Guarantor waives to the extent permitted by law presentation to, demand of payment from and protest to the Company of any of the Guaranteed Obligations and also waives to the extent permitted by law notice of protest for nonpayment.  Each Subsidiary Guarantor waives to the extent permitted by law notice of any Default under the Notes or the Guaranteed Obligations.  The Guaranteed Obligations of each Subsidiary Guarantor

- 91 -

NAI-1502882142v7

under this Indenture shall not, to the extent permitted by law, be affected by (i) the failure of the Trustee or any Holder to assert any claim or demand or to enforce any right or remedy against the Company or any other Person under this Indenture, the Notes or any other agreement or otherwise; (ii) any extension or renewal of any thereof; (iii) any rescission, waiver, amendment or modification of any of the terms or provisions of this Indenture, the Notes or any other agreement; (iv) the release of any security held by any Holder or the Trustee for the Guaranteed Obligations or any of them; (v) the failure of the Trustee or any Holder to exercise any right or remedy against any other Subsidiary Guarantor; or (vi) any change in the ownership of the Company.

(d)     Each Subsidiary Guarantor further agrees that its Note Guarantee in this Indenture constitutes a guarantee of payment when due (and not a guarantee of collection) and waives any right to require that any resort be had by the Trustee or any Holder to any security held for payment of the Guaranteed Obligations.

(e)     Each of the Subsidiary Guarantors further expressly waives irrevocably and unconditionally:

(i)     any right it may have to first require the Trustee or any Holder to proceed against, initiate any actions before a court of law or any other judge or authority, or enforce any other rights or security or claim payment from the Company or any other Person (including any Subsidiary Guarantor or any other guarantor) before claiming from it under this Indenture;

(ii)     any right to which it may be entitled to have the assets of the Company or any other Person (including any Subsidiary Guarantor or any other guarantor) first be used, applied or depleted as payment of the Company's or the Subsidiary Guarantors' obligations under this Indenture, prior to any amount being claimed from or paid by any of the Subsidiary Guarantors under this Indenture;

(iii)     any right to which it may be entitled to have claims under this Indenture divided between the Subsidiary Guarantors; and

(iv)     to the extent applicable, the benefits of *orden*, *excusión*, *division*, *quita* and *espera* and any right specified in articles 2814, 2815, 2817, 2818, 2819, 2820, 2821, 2822, 2823, 2826, 2837, 2838, 2839, 2840, 2845, 2846, 2847 and any other related or applicable articles that are not explicitly set forth in this Indenture because of Subsidiary Guarantor's knowledge thereof of the *Código Civil Federal* of Mexico, and the *Código Civil* of each State of the Mexican Republic and the Federal District of Mexico.

(f)     The obligations assumed by each Subsidiary Guarantor under this Indenture shall not be affected by the absence of judicial request of payment by the Trustee or a Holder to the Company or by whether any such person takes timely action pursuant to articles 2848 and 2849 of the *Código Civil Federal of Mexico* and the *Código Civil* of each State of Mexico and the Federal District of Mexico and each Subsidiary Guarantor hereby expressly waives the provisions of such articles.

- 92 -

(g)      The obligations of each Subsidiary Guarantor under this Indenture shall not be subject to any reduction, limitation, impairment or termination for any reason (other than payment of the Guaranteed Obligations in full), including any claim of waiver, release, surrender, alteration or compromise, and shall not be subject to any defense of setoff, counterclaim, recoupment or termination whatsoever or by reason of the invalidity, illegality or unenforceability of the Guaranteed Obligations or otherwise.  Without limiting the generality of the foregoing, the obligations of each Subsidiary Guarantor in this Indenture shall not be discharged or impaired or otherwise affected by the failure of the Trustee or any Holder to assert any claim or demand or to enforce any remedy under this Indenture, the Notes or any other agreement, by any waiver or modification of any thereof, by any default, failure or delay, willful or otherwise, in the performance of the Guaranteed Obligations, or by any other act or thing or omission or delay to do any other act or thing which may or might in any manner or to any extent vary the risk of such Subsidiary Guarantor or would otherwise operate as a discharge of such Subsidiary Guarantor as a matter of law or equity.

(h)      Each Subsidiary Guarantor further agrees that its Note Guarantee in this Indenture shall continue to be effective or be reinstated, as the case may be, if at any time payment, or any part thereof, of principal of or interest on any of the Guaranteed Obligations is rescinded or must otherwise be restored by the Trustee or any Holder upon the bankruptcy or reorganization of the Company or otherwise.

(i)      In furtherance of the foregoing and not in limitation of any other right which any Holder has at law or in equity against each Subsidiary Guarantor by virtue hereof, upon the failure of the Company to pay any of the Guaranteed Obligations when and as the same shall become due, whether at maturity, by acceleration, by redemption or otherwise, each Subsidiary Guarantor hereby promises to and will, upon receipt of written demand by the Trustee, forthwith pay, or cause to be paid, in cash, to the Trustee or the Holders an amount equal to the sum of:

(i)      the unpaid amount of such Guaranteed Obligations then due and owing; and

(ii)      accrued and unpaid interest on such Guaranteed Obligations then due and owing (but only to the extent not prohibited by law).

(j)      Each Subsidiary Guarantor further agrees that, as between such Subsidiary Guarantor, on the one hand, and the Trustee and the Holders, on the other hand:

(i)      the maturity of the Guaranteed Obligations may be accelerated as provided in this Indenture for the purposes of its Note Guarantee in this Indenture, notwithstanding any stay, injunction or other prohibition preventing such acceleration in respect of the Guaranteed Obligations; and

(ii)      in the event of any such declaration of acceleration of the Guaranteed Obligations, the Guaranteed Obligations (whether or not due and payable) shall forthwith become due and payable by such Subsidiary Guarantor for the purposes of its Note Guarantee.

NAI-1502882142v7

Section 10.2    Limitation on Liability; Termination, Release and Discharge.

(a)    The Guaranteed Obligations of each Subsidiary Guarantor in respect of its Note Guarantee under this Indenture shall be limited to the maximum amount as shall not result in the Guaranteed Obligations constituting a fraudulent conveyance, fraudulent transfer or similar illegal transfer under applicable law.

(b)    Each Subsidiary Guarantor shall be released and relieved of its obligations (or in the case of Covenant Defeasance, certain of its obligations) under its Note Guarantee in the event:

i.    there is a Legal Defeasance or a Covenant Defeasance of the Notes pursuant to Article VIII;

ii.    there is a sale or other disposition of (y) Capital Stock of such Subsidiary Guarantor following which such Subsidiary Guarantor is no longer a direct or indirect Subsidiary of the Company or (z) all or substantially all of the assets of the Subsidiary Guarantor (other than to the Company or a Subsidiary Guarantor) otherwise permitted by and in accordance with this Indenture;

iii.    such Subsidiary Guarantor is designated as an Unrestricted Subsidiary in accordance with Section 3.13; or

iv.    if the Note Guarantee was required pursuant to the terms of this Indenture, the cessation of the circumstances requiring the Note Guarantee;

*provided* that the transaction is carried out pursuant to and in accordance with all other applicable provisions hereof.

Section 10.3    Right of Contribution.  Each Subsidiary Guarantor that makes a payment or distribution under a Note Guarantee will be entitled to a contribution from each other Subsidiary Guarantor in a *pro rata* amount, based on the net assets of each Subsidiary Guarantor determined in accordance with IFRS.  The provisions of this Section 10.3 shall in no respect limit the obligations and liabilities of each Subsidiary Guarantor to the Trustee and the Holders and each Subsidiary Guarantor shall remain liable to the Trustee and the Holders for the full amount guaranteed by such Subsidiary Guarantor under this Indenture.

Section 10.4    No Subrogation.  Each Subsidiary Guarantor agrees that it shall not be entitled to any right of subrogation in respect of any Guaranteed Obligations until payment in full in cash of all Guaranteed Obligations.  If any amount shall be paid to any Subsidiary Guarantor on account of such subrogation rights at any time when all of the Guaranteed Obligations shall not have been paid in full in cash, such amount shall be held by such Subsidiary Guarantor in trust for the Trustee and the Holders, segregated from other funds of such Subsidiary Guarantor, and shall, forthwith upon receipt by such Subsidiary Guarantor, be turned over to the Trustee in the exact form received by such Subsidiary Guarantor (duly

- 94 -

endorsed by such Subsidiary Guarantor to the Trustee, if required), to be applied against the Guaranteed Obligations.

Section 10.5   Execution and Delivery of Note Guarantee.  The execution by each Subsidiary Guarantor of this Indenture (or, a Supplemental Indenture in accordance with Section 10.6, if applicable) evidences the Note Guarantee of such Subsidiary Guarantor, whether or not the Person signing as an Officer of such Subsidiary Guarantor still holds that office at the time of authentication of any Note.

Section 10.6   Additional Note Guarantees.  The Company covenants and agrees that, if at any time after the date hereof any Person becomes a Restricted Subsidiary (including upon a Revocation of the Designation of a Subsidiary as an Unrestricted Subsidiary), the Company shall, after becoming aware of such event, if required pursuant to Section 10.1, cause such Restricted Subsidiary promptly to become a Subsidiary Guarantor on a senior basis by executing a Supplemental Indenture and providing the Trustee with an Officers' Certificate and Opinion of Counsel pursuant to Section 11.4 hereof and to comply in all respects with the provisions of this Indenture and the Notes, as applicable; *provided*, *however*, that each Subsidiary Guarantor will be automatically and unconditionally released and discharged from its obligations under such additional Note Guarantee only in accordance with Section 10.2.

ARTICLE XI

MISCELLANEOUS

Section 11.1   Notices.

(a)   Any notice, demand, request, instruction or communication shall be in English and in writing and delivered in person, by mailed by first-class mail, postage prepaid, overnight courier, or by facsimile, addressed as follows:

if to the Company and the Subsidiary Guarantors:

TV Azteca, S.A.B. de C.V.
Insurgentes Sur 3579
Col. Tlalpan la joya
14000, México, D.F.
México
Attention: Rodrigo Pliego

with a copy to:

Winston & Strawn, LLP
200 Park Avenue
New York, NY 10166-4193
Attention: Allen Miller, Esq.

if to the Trustee:

- 95 -

The Bank of New York Mellon
Attention: Global Corporate Trust
101 Barclay Street, 7th Floor East
New York, NY 10286
U.S.A.
Fax No.:  (212) 815-5603

if to the Principal Paying Agent:

The Bank of New York Mellon, London Branch
Attention: Global Corporate Trust
101 Barclay Street, 7th Floor East
New York, NY 10286
U.S.A.
Fax No.:  (212) 815-5603

The Company or the Trustee by notice to the other may designate additional or different addresses for subsequent notices or communications.

(b)        Any notice or communication in writing to the Company will be deemed given upon the earlier of (x) actual receipt or (y) (i) when delivered in person or (ii) 10 days after mailing when mailed by registered first class mail, or (iii) when sent by facsimile transmission, with transmission confirmed or PDF format, or (iv) three days when delivered by international courier. Any notice to the Trustee will be effective only upon receipt.

(c)        Any notice or communication given to (i) a registered Holder of a Certificated Note shall be mailed to the Holder at the Holder's address as it appears in the Note Register and shall be sufficiently given if so mailed within the time prescribed or (ii) a registered Holder of a Global Note shall be given to the applicable Clearing Agency in accordance with its applicable procedures.

(d)        Failure to give a notice or communication to a Holder or any defect in it shall not affect its sufficiency with respect to other Holders.  If a notice or communication is mailed in the manner provided above, it is duly given, whether or not the addressee receives it.

(e)        Any notice or communication delivered to the Company under the provisions in this Indenture shall constitute notice to the Subsidiary Guarantors.

(f)        The Trustee shall accept electronic transmissions; *provided* (i) the Trustee shall not have any duty or obligation to verify or confirm that the Person sending instructions, directions, reports, notices or other communications or information by electronic transmission is, in fact, a Person authorized to give such instructions, directions, reports, notices or other communications or information on behalf of the party purporting to send such electronic transmission; and the Trustee shall not have any liability for any losses, claims, damages, liabilities, costs or expenses incurred or sustained by any party as a result of such reliance upon or compliance with such instructions, directions, reports, notices or other communications or information and (ii) each other party agrees to assume all risks arising out of the use of electronic

- 96 -

NAI-1502882142v7

methods to submit instructions, directions, reports, notices or other communications or information to the Trustee, including without limitation the risk of the Trustee acting on unauthorized instructions, notices, reports or other communications or information, and the risk of interception and misuse by third parties.

Section 11.2   Communication by Holders with Other Holders.  Holders may communicate pursuant to TIA § 312(b) with other Holders with respect to their rights under this Indenture (including the Note Guarantees) or the Notes.  The Company, the Subsidiary Guarantors, the Trustee, the Agents and anyone else shall have the protection of TIA § 312(c).

Section 11.3   Certificate and Opinion as to Conditions Precedent.  Upon any request or application by the Company to the Trustee to take or refrain from taking any action under this Indenture, the Company shall furnish to the Trustee:

(1)   an Officers' Certificate in form and substance reasonably satisfactory to the Trustee stating that, in the opinion of the signer, all conditions precedent, if any, provided for in this Indenture relating to the proposed action have been complied with; and

(2)   an Opinion of Counsel in form and substance reasonably satisfactory to the Trustee stating that, in the opinion of such counsel, all such conditions precedent have been complied with.

Section 11.4   Statements Required in Certificate or Opinion.  Each certificate or opinion, including each Officers' Certificate or Opinion of Counsel with respect to compliance with a covenant or condition provided for in this Indenture shall include:

(1)   a statement that the individual making such certificate or opinion has read such covenant or condition;

(2)   a brief statement as to the nature and scope of the examination or investigation upon which the statements or opinions contained in such certificate or opinion are based;

(3)   a statement that, in the opinion of such individual, he has made such examination or investigation as is necessary to enable him to express an informed opinion as to whether or not such covenant or condition has been complied with; and

(4)   a statement as to whether or not, in the opinion of such individual, such covenant or condition has been complied with.

In giving an Opinion of Counsel, counsel may rely as to factual matters on an Officers' Certificate or on certificates of public officials.

Section 11.5   Rules by Trustee, Paying Agent and Registrar.  The Trustee may make reasonable rules for action by, or a meeting of, Holders.  The Agents may make reasonable rules for their functions.

NAI-1502882142v7

Section 11.6    Payment Date Other than a Business Day.  If any payment with respect to a payment of any principal of, premium, if any, or interest on any Note (including any payment to be made on any Redemption Date or date fixed for purchase of any Note) is due on a day which is not a Business Day, then the payment need not be made on such date, but may be made on the next succeeding Business Day with the same force and effect as if made on such date, and no interest will accrue for the intervening period. If a regular Record Date or a Special Record Date falls on a day that is not a Business Day, such record date shall not be affected.

Section 11.7    Governing Law, etc.

(a)    THIS INDENTURE (INCLUDING EACH NOTE GUARANTEE) AND THE NOTES SHALL BE GOVERNED BY, AND CONSTRUED IN ACCORDANCE WITH, THE LAW OF THE STATE OF NEW YORK.  EACH OF THE PARTIES HERETO HEREBY WAIVES ANY RIGHT TO TRIAL BY JURY IN ANY ACTION, PROCEEDING OR COUNTERCLAIM ARISING OUT OF OR RELATING TO THIS INDENTURE, EACH NOTE GUARANTEE OR THE NOTES OR ANY TRANSACTION RELATED HERETO OR THERETO TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW.

(b)    Each of the parties hereto:

(i)    agrees that any suit, action or proceeding against it arising out of or relating to this Indenture (including the Note Guarantees) or the Notes, as the case may be, may be instituted in any court of the State of New York or any United States court sitting, in each case, in the Borough of Manhattan, The City of New York, New York, United States of America, and any appellate court from any court thereof,

(ii)    waives to the fullest extent permitted by applicable law, any objection which it may now or hereafter have to the laying of venue of any such suit, action or proceeding, any immunity from the jurisdiction of such courts over any suit, action or proceeding, its right to bring action in any other jurisdiction that may apply by virtue of its present or future domicile or for any other reason, any claim that any suit, action or proceeding in such a court has been brought in an inconvenient forum and any right to any other jurisdiction to which it may be entitled on account of place of residence or domicile, or for any other reason,

(iii)    irrevocably consents and submits to the exclusive jurisdiction of any court of the State of New York or any United States court sitting, in each case, in the Borough of Manhattan, The City of New York, New York, United States of America, and any appellate court from any court thereof,

(iv)    agrees that final judgment in any such suit, action or proceeding brought in such a court shall be conclusive and binding and may be enforced in the courts of the jurisdiction of which it is subject by a suit upon judgment, and

(v)    agrees that service of process by mail to the Authorized Agent at the address specified in this Indenture shall constitute personal service of such process on it in any such suit, action or proceeding.

- 98 -

(c)     The Company and the Subsidiary Guarantors have each appointed Law Debenture Corporate Services Inc. with offices currently at 801 2nd Avenue, Suite 403, New York, NY 10017, as their authorized agent for service (the "Authorized Agent") upon whom all writs, process and summonses may be served in any suit, action or proceeding brought in connection with this Indenture, the Notes or any Note Guarantee which may be instituted in any state or federal court in The City of New York, Borough of Manhattan.  The Company and the Subsidiary Guarantors hereby represent and warrant that the Authorized Agent has accepted such appointment and has agreed to act as said agent for service of process, and the Company and the Subsidiary Guarantors agree to take any and all action, including the filing of any and all documents, that may be necessary to continue each such appointment in full force and effect as aforesaid so long as the Notes remain Outstanding.  The Company and the Subsidiary Guarantors agree that the appointment of the Authorized Agent shall be irrevocable so long as any of the Notes remain Outstanding or until the irrevocable appointment by the Company and the Subsidiary Guarantors of a successor agent in The City of New York, New York as each of their authorized agent for such purpose and the acceptance of such appointment by such successor. Service of process upon the Authorized Agent shall be deemed, in every respect, effective service of process upon the Company and the Subsidiary Guarantors.

(d)     To the extent that any of the Company and the Subsidiary Guarantors have or hereafter may acquire any immunity (sovereign or otherwise) from any legal action, suit or proceeding, from jurisdiction of any court or from set-off or any legal process (whether service or notice, attachment in aid or otherwise) with respect to itself or any of its property, the Company and the Subsidiary Guarantors hereby irrevocably waive and agree not to plead or claim such immunity in respect of their obligations under this Indenture, the Notes or any Note Guarantee.

(e)     Nothing in this Section 11.7 shall affect the right of the Trustee or any Holder of the Notes to serve process in any other manner permitted by law.

Section 11.8     No Recourse Against Others.  An incorporator, director, officer, employee, stockholder or controlling person, as such, of the Company or any Subsidiary Guarantor shall not have any liability for any obligations of the Company or such Subsidiary Guarantor under the Notes or this Indenture (including the Note Guarantees) or for any claims based on, in respect of or by reason of such obligations or their creation.  By accepting a Note, each Holder shall waive and release all such liability.  The waiver and release shall be part of the consideration for the issue of the Notes.

Section 11.9     Successors.  All agreements of the Company and the Subsidiary Guarantors in this Indenture and the Notes shall bind their respective successors.  All agreements of the Trustee in this Indenture shall bind its successors.

Section 11.10     Duplicate and Counterpart Originals.  The parties may sign any number of copies of this Indenture.  One signed copy is enough to prove this Indenture.  This Indenture may be executed in any number of counterparts, each of which so executed shall be an original, but all of them together represent the same agreement.

- 99 -

Section 11.11  Severability.  In case any provision in this Indenture or in the Notes shall be invalid, illegal or unenforceable, the validity, legality and enforceability of the remaining provisions shall not in any way be affected or impaired thereby.

Section 11.12  Currency Indemnity

(a)     U.S. Legal Tender is the sole currency of account and payment for all sums payable by the Company or any Subsidiary Guarantor under or in connection with the Notes, this Indenture or any Note Guarantee, including damages.  Any amount received or recovered in currency other than U.S. Legal Tender (whether as a result of, or of the enforcement of, a judgment or order of a court of any jurisdiction, in the winding-up or dissolution of the Company, any Subsidiary or otherwise) by any Holder of the Notes in respect of any sum expressed to be due to it from the Company or any Subsidiary Guarantor shall only constitute a discharge of them under the Notes, this Indenture and any Note Guarantee only to the extent of the U.S. Legal Tender amount which the recipient is able to purchase with the amount so received or recovered in that other currency on the date of that receipt or recovery (or, if it is not practicable to make that purchase on that date, on the first date on which it is practicable to do so).  If that U.S. Legal Tender amount is less than the U.S. Legal Tender amount expressed to be due to the recipient under the Notes or this Indenture, to the extent permissible under applicable law, the Company and the Subsidiary Guarantors shall jointly and severally indemnify and hold harmless the recipient against any loss sustained by it in making any such purchase.  In any event, the Company and the Subsidiary Guarantors shall jointly and severally indemnify the Holder against the cost of making any purchase of U.S. Legal Tender.  For the purposes of this Section 11.12, it will be sufficient for the Holder of a Note to certify in a satisfactory manner that it would have suffered a loss had an actual purchase of U.S. Legal Tender been made with the amount received in that other currency on the date of receipt or recovery (or, if a purchase of U.S. Legal Tender on such date had not been practicable, on the first date on which it would have been practicable) and that the change of the purchase date was needed.

(b)     The indemnities of the Company and the Subsidiary Guarantors contained in this Section 11.12, to the extent permitted by law:  (i) constitute a separate and independent obligation from the other obligations of the Company and the Subsidiary Guarantors under this Indenture and the Notes; (ii) shall give rise to a separate and independent cause of action against the Company and the Subsidiary Guarantors; (iii) shall apply irrespective of any indulgence granted by any Holder of the Notes from time to time; and (iv) shall continue in full force and effect notwithstanding any other judgment, order, claim or proof for a liquidated amount in respect of any sum due under the Notes.

Section 11.13  Table of Contents; Headings.  The table of contents and headings of the Articles and Sections of this Indenture have been inserted for convenience of reference only, are not intended to be considered a part hereof and shall not modify or restrict any of the terms or provisions hereof.

Section 11.14  USA Patriot Act. The parties hereto acknowledge that, in accordance with Section 326 of the USA Patriot Act (Title III of Pub. L. 107-56 (signed into law on October 26, 2001)) (as amended, modified or supplemented from time to time, the "USA Patriot Act"), the Trustee, like all financial institutions, is required to obtain, verify, and record information that

- 100 -

NAI-1502882142v7

identifies each person or legal entity that opens an account.  The parties to this Indenture agree that they will provide the Trustee with such information as the Trustee may request in order for the Trustee to satisfy the requirements of the USA Patriot Act.

Section 11.15  Foreign Account Tax Compliance Act (FATCA). In order to comply with applicable tax laws, rules and regulations (inclusive of directives, guidelines and interpretations promulgated by competent authorities) in effect from time to time (including, without limitation, Sections 1471 to 1474 of the U.S. Internal Revenue Code of 1986, as amended, "Applicable Law"), the Company agrees (i) to provide to the Trustee sufficient information about Holders or other applicable parties and/or transactions (including any modification to the terms of such transactions) so the Trustee can determine whether it has tax related obligations under Applicable Law, (ii) that the Trustee shall be entitled to make any withholding or deduction from payments under the Indenture to the extent necessary to comply with Applicable Law for which the Trustee shall not have any liability, and (iii) to hold the Trustee harmless for any losses it may suffer due to the actions it takes to comply with such Applicable Law.  The terms of this section shall survive the termination of this Indenture.

Section 11.16  Anti-Money Laundering, Terrorism and Economic Sanctions.

(a)     The Trustee or any Agent may take and instruct any delegate to take any action which it reasonably considers appropriate so as to comply with any applicable law, regulation, request of a public or regulatory authority or any internal group policy (including any "Know Your Client" and/or other compliance policy) which relates to the prevention of fraud, money laundering, terrorism or other criminal activities or the provision of financial and other services to sanctioned persons or entities.  Such action may include but is not limited to the interception and investigation of transactions on the Company's accounts (particularly those involving the international transfer of funds) including the source of the intended recipient of funds paid into or out of the Company's accounts.  None of the Trustee, any Agent or any delegate will be liable for any loss (whether direct or consequential and including, without limitation, loss of profit or interest) caused in whole or in part by any actions which are taken by the Trustee, any Agent or any delegate in good faith pursuant to this Section 11.16.

(b)     The Company covenants and represents that neither it nor, to its knowledge, any of its affiliates, subsidiaries, directors or officers are the target or subject of any sanctions enforced by the US Government, (including, without limitation, the Office of Foreign Assets Control of the US Department of the Treasury ("OFAC") or the US Department of State), the United Nations Security Council, the European Union, Her Majesty's Treasury, or other relevant sanctions authority (collectively "Sanctions").

(c)     The Company covenants and represents that neither it nor any of its affiliates, subsidiaries, directors or officers will directly or indirectly use any repayments/reimbursements made pursuant to this agreement, (i) to fund or facilitate any activities of or business with any person who, at the time of such funding or facilitation, is the subject or target of Sanctions, (ii) to fund or facilitate any activities of or business with any country or territory that is the target or subject of sanctions, or (iii) in any other manner that will result in a violation of Sanctions by any person.

*[Signature pages follow]*

- 101 -

NAI-1502882142v7

IN WITNESS WHEREOF, the parties have caused this Indenture to be duly executed as of the date first written above.

**TV AZTECA, S.A.B. DE C.V.**, as Issuer

By: _____
Name: Esteban Galíndez Aguirre
Title: Chief Financial Officer

By: _____
Name: Rafael Rodríguez Sánchez
Title: General Counsel and Legal Director

ADMINISTRADORA GRUPO TVA, S.A. DE C.V.
ALTA EMPRESA, S.A. DE C.V.
ASESORÍA ESPECIALIZADA EN AVIACIÓN, S.A.
     DE C.V.
ATLÉTICO MORELIA, S.A. DE C.V.
AZTECA CONECTA PRODUCCIONES, S.A. DE
     C.V.
AZTECA NOVELAS, S.A.P.I. DE C.V.
AZTECA RECORDS, S.A. DE C.V.
AZTECA TELECASTING, S. DE R.L. DE C.V.
AZTECA WEB, S.A. DE C.V.
CLUB DE FUTBOL ROJINEGROS, S.A. DE C.V.
COMERCIACOM, S.A. DE C.V.
ESTUDIOS AZTECA, S.A. DE C.V.
FINBOR MÉXICO, S.A. DE C.V.
GANADOR AZTECA, S.A.P.I. DE C.V.
GRUPO TV AZTECA, S.A. DE C.V.
INVERSORA MEXICANA DE PRODUCCIÓN, S.A.
     DE C.V.
OPERADORA MEXICANA DE TELEVISIÓN, S.A.
     DE C.V.
ORGANIZACIÓN DE TORNEOS Y EVENTOS
     DEPORTIVOS, S.A. DE C.V.
PRODUCCIONES AZTECA DIGITAL, S.A. DE
     C.V.
PRODUCCIONES ESPECIALIZADAS, S.A. DE
     C.V.
PRODUCTORA DE TELEVISIÓN REGIONAL DE
     TV AZTECA, S.A. DE C.V.
PROFESIONALES Y ADMINISTRATIVOS EN
     SERVICIOS INMOBILIARIOS, S.A. DE C.V.

*[Signature Page to Indenture]*

IN WITNESS WHEREOF, the parties have caused this Indenture to be duly executed as of the date first written above.

**TV AZTECA, S.A.B. DE C.V.**, as Issuer

By: _____
Name: Esteban Galíndez Aguirre
Title: Chief Financial Officer


By: _____
Name: Rafael Rodríguez Sánchez
Title: General Counsel and Legal Director

ADMINISTRADORA GRUPO TVA, S.A. DE C.V.
ALTA EMPRESA, S.A. DE C.V.
ASESORÍA ESPECIALIZADA EN AVIACIÓN, S.A.
    DE C.V.
ATLÉTICO MORELIA, S.A. DE C.V.
AZTECA CONECTA PRODUCCIONES, S.A. DE
    C.V.
AZTECA NOVELAS, S.A.P.I. DE C.V.
AZTECA RECORDS, S.A. DE C.V.
AZTECA TELECASTING, S. DE R.L. DE C.V.
AZTECA WEB, S.A. DE C.V.
CLUB DE FUTBOL ROJINEGROS, S.A. DE C.V.
COMERCIACOM, S.A. DE C.V.
ESTUDIOS AZTECA, S.A. DE C.V.
FINBOR MÉXICO, S.A. DE C.V.
GANADOR AZTECA, S.A.P.I. DE C.V.
GRUPO TV AZTECA, S.A. DE C.V.
INVERSORA MEXICANA DE PRODUCCIÓN, S.A.
    DE C.V.
OPERADORA MEXICANA DE TELEVISIÓN, S.A.
    DE C.V.
ORGANIZACIÓN DE TORNEOS Y EVENTOS
    DEPORTIVOS, S.A. DE C.V.
PRODUCCIONES AZTECA DIGITAL, S.A. DE
    C.V.
PRODUCCIONES ESPECIALIZADAS, S.A. DE
    C.V.
PRODUCTORA DE TELEVISIÓN REGIONAL DE
    TV AZTECA, S.A. DE C.V.
PROFESIONALES Y ADMINISTRATIVOS EN
    SERVICIOS INMOBILIARIOS, S.A. DE C.V.

*[Signature Page to Indenture]*

PROMOTORA DE FUTBOL ROJINEGROS, S.A. DE C.V.

PROMOTORA DE FUTBOL MORELIA, S.A. DE C.V.

PUBLICIDAD ESPECIALIZADA EN MEDIOS DE COMUNICACIÓN DE TV AZTECA, S.A. DE C.V.

S.C.I. DE MÉXICO, S.A. DE C.V.

SERVICIOS AÉREOS NOTICIOSOS, S.A. DE C.V.

SERVICIOS ESPECIALIZADOS TAZ, S.A. DE C.V.

SERVICIOS Y MANTENIMIENTO DEL FUTURO EN TELEVISIÓN, S.A. DE C.V.

TELEVISIÓN AZTECA, S.A. DE C.V.

TV AZTECA COMERCIALIZADORA, S.A. DE C.V.

CORPORACIÓN DE ASESORÍA TÉCNICA Y DE PRODUCCIÓN, S.A. DE C.V.

each a Subsidiary Guarantor

By: _____
Name: Rafael Rodríguez Sánchez
Title:  Attorney-in-fact

COMERCIALIZADORA DE PUBLICIDAD AZTECA, S.A. DE C.V.

COMERCIALIZADORA EN MEDIOS DE COMUNICACIÓN DE TV AZTECA, S.A. DE C.V.

EDITORIAL MANDARINA, S.A. DE C.V.

MULTIMEDIA, ESPECTÁCULOS Y ATRACCIONES, S.A. DE C.V.

RED AZTECA INTERNACIONAL, S.A. DE C.V.

SERVICIOS FORÁNEOS DE ADMINISTRACIÓN, S.A. DE C.V.

SERVICIOS LOCALES DE PRODUCCIÓN, S.A. DE C.V.

each a Subsidiary Guarantor

By: _____
Name: Félix Vidal Mena Tamayo
Title: Attorney-in-fact

*[Signature Page to Indenture]*

AGENCIA AZTECA, INC.
AZTECA AMERICA TV SPOT SALES
AZTECA INTERNATIONAL CORPORATION
AZTECA STATIONS, LLC
STATIONS GROUP, LLC
SCTV, INC.
KAZA AZTECA AMERICA INC
SOUTHERN CALIFORNIA TV LLC

each a Subsidiary Guarantor

By:
Name: Horacio Medal Ordóñez
Title:

By:
Name: Ernesto Ortega Oltra
Title:

FUNDACION AZTECA AMERICA, LLC

a Subsidiary Guarantor

By:
Name: Horacio Medal Ordóñez
Title:

By:
Name:
Title:

TV AZTECA HONDURAS, S.A. DE C.V.
COMERCIALIZADORA DE TELEVISION DE
HONDURAS, S.A. DE C.V.

each a Subsidiary Guarantor

By:
Name: Melvin Reniery Canales Espinal
Title: Attorney-in-fact

*[Signature Page to Indenture]*

AGENCIA AZTECA, INC.
AZTECA AMERICA TV SPOT SALES
AZTECA INTERNATIONAL CORPORATION
AZTECA STATIONS, LLC
STATIONS GROUP, LLC
SCTV, INC.
KAZA AZTECA AMERICA INC
SOUTHERN CALIFORNIA TV LLC

each a Subsidiary Guarantor


By: _____
Name: Horacio Medal Ordóñez
Title:


By: _____
Name: Ernesto Ortega Olira
Title:


FUNDACION AZTECA AMERICA, LLC

a Subsidiary Guarantor


By: _____
Name: Horacio Medal Ordóñez
Title:


By: _____
Name: LUIS J. Echarte
Title: Attorney in fact

TV AZTECA HONDURAS, S.A. DE C.V.
COMERCIALIZADORA DE TELEVISION DE
HONDURAS, S.A. DE C.V.

each a Subsidiary Guarantor


By: _____
Name: Melvin Remery Canales Espinal
Title: Attorney-in-fact


*[Signature Page to Indenture]*

AGENCIA AZTECA, INC.
AZTECA AMERICA TV SPOT SALES
AZTECA INTERNATIONAL CORPORATION
AZTECA STATIONS, LLC
STATIONS GROUP, LLC
SCTV, INC.
KAZA AZTECA AMERICA INC
SOUTHERN CALIFORNIA TV LLC

each a Subsidiary Guarantor

By: _____
Name: Horacio Medal Ordóñez
Title:

By: _____
Name: Ernesto Ortega Oltra
Title:

FUNDACION AZTECA AMERICA, LLC

a Subsidiary Guarantor

By: _____
Name: Horacio Medal Ordóñez
Title:

By: _____
Name:
Title:

TV AZTECA HONDURAS, S.A. DE C.V.
COMERCIALIZADORA DE TELEVISIÓN DE
HONDURAS, S.A. DE C.V.

each a Subsidiary Guarantor

By: _____
Name: Melvin Remiery Candles Espinal
Title: Attorney-in-fact

*[Signature Page to Indenture]*

AZTECA COMUNICACIONES PERU, S.A.C.

a Subsidiary Guarantor

By: _____

Name: francisco madrozo

Title: CEO

By: _____

Name: José montes dePeroito

Title: General Counsel

REDES OPTICAS, S.A.C.

a Subsidiary Guarantor

By: _____

Name: Rocío Castillo

Title: CEO

By: _____

Name: Rafoel Rodriguez

Title: Attorney-In-fact.

TELEVISORA DEL VALLE DE MEXICO, S.A. DE C.V.

a Subsidiary Guarantor

By: _____

Name: Reyna Adriana Amador Sanchez

Title: Attorney-in-fact

[Signature Page to Indenture]

AZTECA COMUNICACIONES PERU, S.A.C.

a Subsidiary Guarantor

By: _____

Name   *Francisco   Madrazo*
Title   *CEO*

By: _____

Name   *José Montes de Peroito*
Title:   *General Counsel*

REDES OPTICAS, S.A.C.

a Subsidiary Guarantor

By: _____

Name   *Rocío Castillo*
Title:   *CEO*

By: _____

Name   *Rafael Rodriguez*
Title:   *Attorney-In-fact*

TELEVISORA DEL VALLE DE MEXICO, S.A. DE
C.V.

a Subsidiary Guarantor

By: _____

Name:   Reyna Adriana Amador Sanchez
Title:   Attorney-in-fact

*[Signature Page to Indenture]*

INCOTEL S.A.
TVA GUATEMALA S.A.

each a Subsidiary Guarantor


By: _____
  Name: Guillermo Wilkins González
  Title: Attorney-in-fact


LASIMEX, S.A. DE C.V.
TV AZTECA GLOBAL, S.L.U.

a Subsidiary Guarantor


By: _____
  Name: Pedro Martín Molina Reyes
  Title: Attorney-in-fact


*[Signature Page to Indenture]*

AZTECA COMUNICACIONES PERÚ, S.A.C.

a Subsidiary Guarantor

By: _____
 Name:
Title:

By: _____
Name:
Title:

REDES OPTICAS, S.A.C.

a Subsidiary Guarantor

By: _____
Name:
Title:

By: _____
Name:
Title:

TELEVISORA DEL VALLE DE MÉXICO, S.A. DE C.V.

a Subsidiary Guarantor

By: _____
Name: Reyna Adriana Amador Sánchez
Title: Attorney-in-fact

*[Signature Page to Indenture]*

AGENCIA AZTECA, INC.
AZTECA AMERICA TV SPOT SALES
AZTECA INTERNATIONAL CORPORATION
AZTECA STATIONS, LLC
STATIONS GROUP, LLC
SCTV, INC.
KAZA AZTECA AMERICA INC
SOUTHERN CALIFORNIA TV LLC

each a Subsidiary Guarantor


By: _____
Name: Horacio Medal Ordóñez
Title:

By: _____
Name: Ernesto Ortega Oltra
Title: CFO


FUNDACION AZTECA AMERICA, LLC

a Subsidiary Guarantor


By: _____
Name: Horacio Medal Ordóñez
Title:


By: _____
Name:
Title:


TV AZTECA HONDURAS, S.A. DE C.V.
COMERCIALIZADORA DE TELEVISIÓN DE
HONDURAS, S.A. DE C.V.

each a Subsidiary Guarantor


By: _____
Name: Melvin Reniery Canales Espinal
Title: Attorney-in-fact


*[Signature Page to Indenture]*

INCOTEL S.A.
TVA GUATEMALA S.A.

each a Subsidiary Guarantor

By: _____
Name: Guillermo Wilkins González
Title: Attorney-in-fact

LASIMEX, S.A. DE C.V.
TV AZTECA GLOBAL, S.L.U.

a Subsidiary Guarantor

By: _____
Name: Pedro Martín Molina Reyes
Title: Attorney-in-fact

[Signature Page to Indenture]

**THE BANK OF NEW YORK MELLON,**
as Trustee and Registrar

By: _Wanda Camacho_

Name:

Title:    Wanda Camacho
          Vice President

*[Signature page to Indenture]*

**THE BANK OF NEW YORK MELLON,
LONDON BRANCH,**
as Principal Paying Agent

By: _Wanda Camacho_

Name:
Title:      Wanda Camacho
            Vice President

*[Signature page to Indenture]*

**EXHIBIT A**

**FORM OF NOTE**

[*Include the bracketed language for Global Notes only.*]

[THIS IS A GLOBAL NOTE WITHIN THE MEANING OF THE INDENTURE REFERRED TO HEREINAFTER.

UNLESS THIS GLOBAL NOTE IS PRESENTED BY AN AUTHORIZED REPRESENTATIVE OF EUROCLEAR S.A./N.V., AS OPERATOR OF THE EUROCLEAR SYSTEM ("EUROCLEAR") OR CLEARSTREAM BANKING, SOCIÉTÉ ANONYME ("CLEARSTREAM") TO THE COMPANY OR ITS AGENT FOR REGISTRATION OF TRANSFER, EXCHANGE, OR PAYMENT, AND ANY GLOBAL NOTE ISSUED IS REGISTERED IN THE NAME OF THE BANK OF NEW YORK DEPOSITORY (NOMINEES) LIMITED, AS THE COMMON DEPOSITARY FOR EUROCLEAR AND CLEARSTREAM (THE "COMMON DEPOSITARY"), OR IN SUCH OTHER NAME AS IS REQUESTED BY AN AUTHORIZED REPRESENTATIVE OF EUROCLEAR AND CLEARSTREAM (AND ANY PAYMENT IS MADE TO THE COMMON DEPOSITARY OR TO SUCH OTHER ENTITY AS IS REQUESTED BY AN AUTHORIZED REPRESENTATIVE OF EUROCLEAR AND CLEARSTREAM), ANY TRANSFER, PLEDGE OR OTHER USE HEREOF FOR VALUE OR OTHERWISE BY OR TO ANY PERSON IS WRONGFUL IN AS MUCH AS THE REGISTERED OWNER HEREOF, THE COMMON DEPOSITARY, HAS AN INTEREST HEREIN.

TRANSFERS OF THIS GLOBAL NOTE SHALL BE LIMITED TO TRANSFERS IN WHOLE, BUT NOT IN PART, TO THE COMMON DEPOSITARY (OR TO A SUCCESSOR THEREOF) OR TO A NOMINEE OF EUROCLEAR AND CLEARSTREAM (OR TO A SUCCESSOR THEREOF OR SUCH SUCCESSOR'S NOMINEE).]

THIS NOTE (AND THE RELATED NOTE GUARANTEES) HAVE NOT BEEN REGISTERED UNDER THE U.S. SECURITIES ACT OF 1933, AS AMENDED (THE "SECURITIES ACT") AND MAY NOT BE OFFERED, SOLD, PLEDGED OR OTHERWISE TRANSFERRED EXCEPT IN ACCORDANCE WITH THE FOLLOWING SENTENCE. BY ITS ACQUISITION HEREOF OR OF A BENEFICIAL INTEREST HEREIN, THE ACQUIRER

(1)   REPRESENTS THAT IT IS NOT A U.S. PERSON (WITHIN THE MEANING OF REGULATION S UNDER THE SECURITIES ACT) AND

(2)   AGREES FOR THE BENEFIT OF THE COMPANY THAT IT WILL NOT OFFER, SELL, PLEDGE OR OTHERWISE TRANSFER THIS NOTE OR ANY BENEFICIAL INTEREST HEREIN, EXCEPT IN ACCORDANCE WITH THE SECURITIES ACT AND ANY APPLICABLE SECURITIES LAWS OF ANY STATE OF THE UNITED STATES AND ONLY (A) TO THE COMPANY, (B) PURSUANT TO A REGISTRATION STATEMENT WHICH HAS BECOME EFFECTIVE UNDER THE SECURITIES ACT, (C) IN AN OFFSHORE TRANSACTION IN COMPLIANCE WITH RULE 904 OF REGULATION S UNDER THE SECURITIES ACT, OR (D) PURSUANT TO AN EXEMPTION FROM THE

NAI-1502882142v7                                    A-1

A-2

REGISTRATION REQUIREMENTS OF THE SECURITIES ACT PROVIDED BY RULE 144 UNDER THE SECURITIES ACT OR ANY OTHER AVAILABLE EXEMPTION FROM THE REGISTRATION REQUIREMENTS OF THE SECURITIES ACT.

PRIOR TO THE REGISTRATION OF ANY TRANSFER IN ACCORDANCE WITH ABOVE, THE ISSUER RESERVES THE RIGHT TO REQUIRE THE DELIVERY OF SUCH LEGAL OPINIONS, CERTIFICATIONS OR OTHER EVIDENCE AS MAY REASONABLY BE REQUIRED IN ORDER TO DETERMINE THAT THE PROPOSED TRANSFER IS BEING MADE IN COMPLIANCE WITH THE SECURITIES ACT AND APPLICABLE STATE SECURITIES LAWS. NO REPRESENTATION IS MADE AS TO THE AVAILABILITY OF ANY RULE 144 EXEMPTION FROM THE REGISTRATION REQUIREMENTS OF THE SECURITIES ACT.

## FORM OF FACE OF NOTE

No. [____]                                      Principal Amount U.S.$[_____]

[*If the Note is a Global Note include the following two lines*:
as revised by the Schedule of Increases and
Decreases in Global Note attached hereto]

Common Code [•]
ISIN [•]

TV Azteca, S.A.B. de C.V., a publicly traded variable capital corporation (*sociedad anónima bursátil de capital variable*) organized and existing under the laws of the United Mexican States, promises to pay to The Bank of New York Depository (Nominees) Limited, or registered assigns, the principal sum of U.S.$[                ] [*If the Note is a Global Note, add the following,* as revised by the Schedule of Increases and Decreases in Global Note attached hereto], on August 9, 2024.

|  |  |
|---|---|
| Interest Rate: | 8.250% per annum |
| Interest Payment Dates: | August 9 and February 9, commencing on [        ][1] |
| Record Dates: | July 26 and January 26 |

Reference is hereby made to the further provisions of this Note set forth on the reverse hereof, which will for all purposes have the same effect as if set forth at this place.

---

[1] February 9, 2018 for Initial Notes.

A-2

Additional provisions of this Note are set forth on the other side of this Note.

**TV AZTECA, S.A.B. DE C.V.**

By: _____
    Name:
    Title:

By: _____
    Name:
    Title:

TRUSTEE'S CERTIFICATE OF
 AUTHENTICATION

THE BANK OF NEW YORK MELLON,
as Trustee, certifies
that this is one of
the Notes referred
to in the Indenture.

By: _____
        Authorized Signatory                    Date: _____

NAI-1502882142v7                                 A-2

**FORM OF REVERSE SIDE OF NOTE**

**8.250% Senior Notes Due 2024**

Capitalized terms used but not defined herein shall have the meanings assigned to them in the Indenture referred to below unless otherwise indicated.

1.    Interest

TV Azteca, S.A.B. de C.V., a publicly traded variable capital corporation (*sociedad anónima bursátil de capital variable*) organized and existing under the laws of the United Mexican States (and its successors and assigns under the Indenture hereinafter referred to, the "Company"), promises to pay interest on the principal amount of this Note at the rate per annum shown above.

The Company will pay interest semi-annually in arrears on each Interest Payment Date of each year commencing on [    ][2]; *provided* that, if any such Interest Payment Date is a day which is not a Business Day, then the payment need not be made on such date, but may be made on the next succeeding Business Day with the same force and effect as if made on such Interest Payment Date, and no interest will accrue for the intervening period.

Interest on the Notes will accrue from, and include, the most recent date to which interest has been paid on the Notes or, if no interest has been paid, from and including the [Issue Date][3].  Interest will be computed on the basis of a 360-day year of twelve 30-day months.

The Company shall pay interest (including Post-Petition Interest in any proceeding under any Bankruptcy Law) on overdue principal and, to the extent such payments are lawful, interest on Defaulted Interest without regard to any applicable grace periods at the rate shown on this Note, as provided in the Indenture.

2.    Indenture; Note Guarantees

This is one of the Notes issued under an Indenture, dated as of August 9, 2017 (as it may be amended or supplemented from time to time in accordance with the terms thereof, the "Indenture"), between the Company, the Subsidiary Guarantors and the Trustee.  The terms of the Notes include those stated in the Indenture and those made part of the Indenture by reference to the TIA.  The Indenture is not, and is not required to be, qualified under the applicable provisions of the TIA and does not incorporate by reference all provisions of the TIA.  The Notes are subject to all such terms, and Holders are referred to the Indenture and the TIA for a statement of those terms.  Each Holder by accepting a Note agrees to be bound by all of the terms and provisions of the Indenture, as amended or supplemented from time to time. To the

---

[2] February 9, 2018 for Initial Notes.

[3] For Additional Notes: insert the most recent date to which interest has been paid on outstanding Notes.

extent permitted by applicable law, in the event of any inconsistency between the terms of this Note and the terms of the Indenture, the terms of the Indenture will control.

The Notes are general unsecured obligations of the Company.  Subject to the conditions set forth in the Indenture and without the consent of the Holders, the Company may issue Additional Notes.  All Notes (including all Additional Notes) will be treated as a single class of securities under the Indenture and will vote together for all purposes. The Notes are not, and will not be, entitled to the benefit of any mandatory sinking fund.

This Note is guaranteed by the Subsidiary Guarantors, as set forth in the Indenture.

3.      Redemption; Mandatory Redemption; Discharge Prior to Redemption or Maturity

This Note is subject to optional redemption, and may be the subject of a Change of Control Offer or an Asset Sale Offer, in each case, as further described in the Indenture.

If the Company deposits with the Trustee U.S. Legal Tender and/or U.S. Government Obligations sufficient to pay the then outstanding principal of, premium, if any, and accrued interest on the Notes to redemption or Stated Maturity, the Company may in certain circumstances be discharged from the Indenture and the Notes or may be discharged from certain of its obligations under certain provisions of the Indenture..

4.      Denominations; Transfer; Exchange

The Notes are in fully registered form without coupons, and only in minimum denominations of U.S.$200,000 and integral multiples of U.S.$1,000 in excess thereof.  A Holder may transfer or exchange Notes in accordance with the Indenture.  The Trustee may require a Holder, among other things, to furnish appropriate endorsements or transfer documents and to pay any taxes and fees required by law or permitted by the Indenture. Pursuant to the Indenture, there are certain periods during which the Trustee will not be required to register the transfer of or exchange any Note or certain portions of a Note.

5.      Persons Deemed Owners

The registered Holder of this Note may be treated as the owner of it for all purposes.

6.      Defaults and Remedies

If an Event of Default, as defined in the Indenture, occurs and is continuing and has not been waived, the Trustee or the Holders of at least 25% in aggregate principal amount of the Notes then Outstanding may declare all the Notes to be due and payable. If a Bankruptcy Law Event of Default with respect to a Bankruptcy Party occurs and is continuing, the Notes automatically become due and payable. Holders may not enforce the Indenture or the Notes except as provided in the Indenture. The Trustee may require indemnity reasonably satisfactory to it before it enforces the Indenture or the Notes. Subject to certain limitations, Holders of a majority in principal amount of the Notes then outstanding may direct the Trustee in its exercise of remedies.

7.      Amendment and Waiver

        Subject to certain exceptions, the Indenture and the Notes may be amended, and Defaults may be waived, with the consent of the Holders of a majority in principal amount of the Outstanding Notes. Without notice to or the consent of any Holder, the Company and the Trustee may amend or supplement the Indenture or the Notes to, among other things, cure any ambiguities, defects or inconsistencies in the Indenture or this Note.

8.      Authentication

        This Note shall not be valid until an authorized signatory of the Trustee (or an Authenticating Agent acting on its behalf) manually signs the certificate of authentication on the other side of this Note.

9.      Abbreviations

        Customary abbreviations may be used in the name of a Holder or an assignee, such as TEN COM (=tenants in common), TEN ENT (=tenants by the entirety), JT TEN (=joint tenants with rights of survivorship and not as tenants in common), CUST (=custodian) and U/G/M/A (=Uniform Gift to Minors Act).

10.     Common Code and ISIN

        Pursuant to a recommendation promulgated by the Committee on Uniform Security Identification Procedures the Company has caused the Common Code and ISIN to be printed on the Notes and has directed the Trustee to use the Common Code and ISIN in notices of redemption as a convenience to Holders.  No representation is made as to the accuracy of such numbers either as printed on the Notes or as contained in any notice of redemption and reliance may be placed only on the other identification numbers placed thereon.

11.     Governing Law

        This Note shall be governed by, and construed in accordance with, the laws of the State of New York.

        The Company will furnish to any Holder upon written request and without charge to the Holder a copy of the Indenture which has in it the text of this Note.  Requests may be made to:

        TV Azteca, S.A.B. de C.V.
        Insurgentes Sur 3579
        Col. Tlalpan la joya
        14000, México, D.F.
        México

## ASSIGNMENT FORM

To assign this Note, fill in the form below:

(I) or (we) assign and transfer this Note to:

_____

_____

_____

_____
(Print or type assignee's name, address and zip code)

_____
(Insert assignee's Social Security or Tax I.D. Number)

and irrevocably appoint _____
as agent to transfer this Note on the books of the Company.  The agent may substitute another to act for him.

Date:_____          Your Signature:_____

Sign exactly as your name appears on the other side of this Note.

Signature
Guarantee*:        _____
                   (Signature must be guaranteed)

_____

*        The signature(s) should be guaranteed by an eligible guarantor institution (banks, stockbrokers, savings and loan associations and credit unions with membership in an approved signature guarantee medallion program), pursuant to Exchange Act Rule 17Ad-15 (or other signature guarantor acceptable to the Trustee).

NAI-1502882142v7                    A-6

A-7

[*To be attached to Global Notes only*]

**SCHEDULE OF INCREASES OR DECREASES IN GLOBAL NOTE**

The following increases or decreases in this Global Note have been made:

| Date of increase or decrease | Amount of decrease in Principal Amount of this Global Note | Amount of increase in Principal Amount of this Global Note | Principal Amount of this Global Note following such decrease or increase | Signature of authorized signatory of Trustee |
|---|---|---|---|---|
| _____ | _____ | _____ | _____ | _____ |

NAI-1502882142v7

A-7

## OPTION OF HOLDER TO ELECT PURCHASE

If you want to elect to have this Note purchased by the Company pursuant to Section 3.12 or Section 3.8 of the Indenture, check either box:

☐                        ☐

Section 3.12        Section 3.8

If you want to elect to have only part of this Note purchased by the Company pursuant to Section 3.12 or Section 3.8 of the Indenture, state the principal amount (which must be U.S.\$200,000 and integral multiples of U.S.\$1,000 in excess thereof) that you want to have purchased by the Company: U.S.\$

Date: _____        Your Signature _____
                         (Sign exactly as your name appears on the
                         other side of the Note)

Signature                _____
Guarantee*:              (Signature must be guaranteed)

\*        The signature(s) should be guaranteed by an eligible guarantor institution (banks, stockbrokers, savings and loan associations and credit unions with membership in an approved signature guarantee medallion program), pursuant to Exchange Act Rule 17Ad-15 (or other signature guarantor acceptable to the Trustee).

NAI-1502882142v7                        A-8

**EXHIBIT B**

FORM OF SUPPLEMENTAL INDENTURE
FOR ADDITIONAL NOTE GUARANTEE

This Supplemental Indenture, dated as of [_____] (this "Supplemental Indenture"), is by and among [name of additional Subsidiary Guarantor], a [_____] [corporation][limited liability company] (the "New Subsidiary Guarantor"), TV Azteca, S.A.B. de C.V., a publicly traded variable capital corporation (*sociedad anónima bursátil de capital variable*) organized and existing under the laws of the United Mexican States (together with its successors and assigns, the "Company"), and The Bank of New York Mellon, as trustee (the "Trustee") under the Indenture referred to below.

W I T N E S S E T H:

WHEREAS, the Company, the Subsidiary Guarantors party thereto and the Trustee have heretofore executed and delivered an Indenture, dated as of August 9, 2017 (as amended, supplemented, waived or otherwise modified, the "Indenture"), providing for the issuance of 8.250% Senior Notes Due 2024 of the Company;

WHEREAS, pursuant to Sections 10.1 and 10.6 of the Indenture, the Company is required to cause certain Restricted Subsidiaries created or acquired by the Company to execute and deliver to the Trustee this Supplemental Indenture providing an additional Note Guarantee pursuant to which such Restricted Subsidiaries will unconditionally guarantee, jointly and severally with the other Subsidiary Guarantors, the Company's full and prompt payment of the Obligations in respect of the Indenture and the Notes; and

WHEREAS, pursuant to Section 9.1 of the Indenture, the New Subsidiary Guarantor, the Trustee and the Company are authorized to execute and deliver this Supplemental Indenture to supplement the Indenture, without the consent of any Holder;

NOW, THEREFORE, in consideration of the foregoing and for other good and valuable consideration, the receipt of which is hereby acknowledged, the New Subsidiary Guarantor, the Company and the Trustee mutually covenant and agree for the equal and ratable benefit of the Holders of the Notes as follows:

ARTICLE I
DEFINITIONS

Section 1.1.  Defined Terms.  Unless otherwise defined in this Supplemental Indenture, terms defined in the Indenture are used herein as therein defined.

ARTICLE II
AGREEMENT TO BE BOUND; GUARANTEE

Section 2.1.  Agreement to be Bound.  The New Subsidiary Guarantor hereby becomes a party to the Indenture as a Subsidiary Guarantor and as such will have all of the rights and be subject to all of the obligations and agreements of a Subsidiary Guarantor under the

NAI-1502882142v7                                    B-1

Indenture.  The New Subsidiary Guarantor hereby agrees to be bound by all of the provisions of the Indenture applicable to a Subsidiary Guarantor and to perform all of the obligations and agreements of a Subsidiary Guarantor under the Indenture.

Section 2.2.  Guarantee.  The New Subsidiary Guarantor hereby fully, unconditionally and irrevocably guarantees, as primary obligor and not merely as surety, jointly and severally with each other Subsidiary Guarantor, to each Holder of the Notes and the Trustee, the full and punctual payment when due, whether at maturity, by acceleration, by redemption or otherwise, of the Obligations, all of the foregoing to the extent set forth in Article X of the Indenture.

Section 2.3.  Waivers.  The New Subsidiary Guarantor hereby expressly affirms each of the agreements and waivers of the Subsidiary Guarantors set forth in Article X of the Indenture.

ARTICLE III
MISCELLANEOUS

Section 3.1.  Notices.  Any notice or communication delivered to the Company under the provisions of the Indenture shall constitute notice to the New Subsidiary Guarantor.

Section 3.2.  Parties.  Nothing expressed or mentioned herein is intended or shall be construed to give any Person, firm or corporation, other than the Holders and the Trustee, any legal or equitable right, remedy or claim under or in respect of this Supplemental Indenture or the Indenture or any provision herein or therein contained.

Section 3.3.  Governing Law, etc.  This Supplemental Indenture shall be governed by and subject to the provisions set forth in Section 11.7 of the Indenture.

Section 3.4.  Severability.  In case any provision in this Supplemental Indenture shall be invalid, illegal or unenforceable, the validity, legality and enforceability of the remaining provisions shall not in any way be affected or impaired thereby and such provision shall be ineffective only to the extent of such invalidity, illegality or unenforceability.

Section 3.5.  Ratification of Indenture; Supplemental Indenture Part of Indenture; No Liability of Trustee.  Except as expressly amended hereby, the Indenture is in all respects ratified and confirmed and all the terms, conditions and provisions thereof shall remain in full force and effect.  This Supplemental Indenture shall form a part of the Indenture for all purposes, and every Holder of Notes heretofore or hereafter authenticated and delivered shall be bound hereby.  The Trustee makes no representation or warranty as to the validity or sufficiency of this Supplemental Indenture or any Note Guarantee.

Section 3.6.  Duplicate and Counterpart Originals.  The parties may sign any number of copies of this Supplemental Indenture.  One signed copy is enough to prove this Supplemental Indenture.  This Supplemental Indenture may be executed in any number of counterparts, each of which so executed shall be an original, but all of them together represent the same agreement.

Section 3.7.  <u>Headings</u>.  The headings of the Articles and Sections in this Supplemental Indenture have been inserted for convenience of reference only, are not intended to be considered as a part hereof and shall not modify or restrict any of the terms or provisions hereof.

IN WITNESS WHEREOF, the parties hereto have caused this Supplemental Indenture to be duly executed as of the date first above written.

**TV AZTECA, S.A.B. DE C.V.**

By: _____
  Name:
  Title:

By: _____
  Name:
  Title:

[**NAME OF NEW SUBSIDIARY
  GUARANTOR**],
 as a New Subsidiary Guarantor

By: _____
  Name:
  Title:

By: _____
  Name:
  Title:

NAI-1502882142v7        B-3

**THE BANK OF NEW YORK MELLON**,
as Trustee

By: _____

Name:

Title:

# Exhibit 3 to the Ellis Declaration

THIS IS A GLOBAL NOTE WITHIN THE MEANING OF THE INDENTURE REFERRED TO HEREINAFTER.

UNLESS THIS GLOBAL NOTE IS PRESENTED BY AN AUTHORIZED REPRESENTATIVE OF EUROCLEAR S.A./N.V., AS OPERATOR OF THE EUROCLEAR SYSTEM ("EUROCLEAR") OR CLEARSTREAM BANKING, SOCIÉTÉ ANONYME ("CLEARSTREAM") TO THE COMPANY OR ITS AGENT FOR REGISTRATION OF TRANSFER, EXCHANGE, OR PAYMENT, AND ANY GLOBAL NOTE ISSUED IS REGISTERED IN THE NAME OF THE BANK OF NEW YORK DEPOSITORY (NOMINEES) LIMITED, AS THE COMMON DEPOSITARY FOR EUROCLEAR AND CLEARSTREAM (THE "COMMON DEPOSITARY"), OR IN SUCH OTHER NAME AS IS REQUESTED BY AN AUTHORIZED REPRESENTATIVE OF EUROCLEAR AND CLEARSTREAM (AND ANY PAYMENT IS MADE TO THE COMMON DEPOSITARY OR TO SUCH OTHER ENTITY AS IS REQUESTED BY AN AUTHORIZED REPRESENTATIVE OF EUROCLEAR AND CLEARSTREAM), ANY TRANSFER, PLEDGE OR OTHER USE HEREOF FOR VALUE OR OTHERWISE BY OR TO ANY PERSON IS WRONGFUL IN AS MUCH AS THE REGISTERED OWNER HEREOF, THE COMMON DEPOSITARY, HAS AN INTEREST HEREIN.

TRANSFERS OF THIS GLOBAL NOTE SHALL BE LIMITED TO TRANSFERS IN WHOLE, BUT NOT IN PART, TO THE COMMON DEPOSITARY (OR TO A SUCCESSOR THEREOF) OR TO A NOMINEE OF EUROCLEAR AND CLEARSTREAM (OR TO A SUCCESSOR THEREOF OR SUCH SUCCESSOR'S NOMINEE).

THIS NOTE (AND THE RELATED NOTE GUARANTEES) HAVE NOT BEEN REGISTERED UNDER THE U.S. SECURITIES ACT OF 1933, AS AMENDED (THE "SECURITIES ACT") AND MAY NOT BE OFFERED, SOLD, PLEDGED OR OTHERWISE TRANSFERRED EXCEPT IN ACCORDANCE WITH THE FOLLOWING SENTENCE. BY ITS ACQUISITION HEREOF OR OF A BENEFICIAL INTEREST HEREIN, THE ACQUIRER

    (1)    REPRESENTS THAT IT IS NOT A U.S. PERSON (WITHIN THE MEANING OF REGULATION S UNDER THE SECURITIES ACT) AND

    (2)    AGREES FOR THE BENEFIT OF THE COMPANY THAT IT WILL NOT OFFER, SELL, PLEDGE OR OTHERWISE TRANSFER THIS NOTE OR ANY BENEFICIAL INTEREST HEREIN, EXCEPT IN ACCORDANCE WITH THE SECURITIES ACT AND ANY APPLICABLE SECURITIES LAWS OF ANY STATE OF THE UNITED STATES AND ONLY (A) TO THE COMPANY, (B) PURSUANT TO A REGISTRATION STATEMENT WHICH HAS BECOME EFFECTIVE UNDER THE SECURITIES ACT, (C) IN AN OFFSHORE TRANSACTION IN COMPLIANCE WITH RULE 904 OF REGULATION S UNDER THE SECURITIES ACT, OR (D) PURSUANT TO AN EXEMPTION FROM THE REGISTRATION REQUIREMENTS OF THE SECURITIES ACT PROVIDED BY RULE 144 UNDER THE SECURITIES ACT OR ANY OTHER AVAILABLE EXEMPTION FROM THE REGISTRATION REQUIREMENTS OF THE SECURITIES ACT.

PRIOR TO THE REGISTRATION OF ANY TRANSFER IN ACCORDANCE WITH ABOVE, THE ISSUER RESERVES THE RIGHT TO REQUIRE THE DELIVERY OF SUCH LEGAL OPINIONS, CERTIFICATIONS OR OTHER EVIDENCE AS MAY REASONABLY BE REQUIRED IN ORDER TO DETERMINE THAT THE PROPOSED TRANSFER IS BEING MADE IN COMPLIANCE WITH THE SECURITIES ACT AND APPLICABLE STATE SECURITIES LAWS. NO REPRESENTATION IS MADE AS TO THE AVAILABILITY OF ANY RULE 144 EXEMPTION FROM THE REGISTRATION REQUIREMENTS OF THE SECURITIES ACT.

No. 1

Principal Amount U.S.$400,000,000
as revised by the Schedule of Increases and
Decreases in Global Note attached hereto

Common Code: 166240646
ISIN: XS1662406468

TV Azteca, S.A.B. de C.V., a publicly traded variable capital corporation (*sociedad anónima bursátil de capital variable*) organized and existing under the laws of the United Mexican States, promises to pay to The Bank of New York Depository (Nominees) Limited, or registered assigns, the principal sum of U.S.$400,000,000, as revised by the Schedule of Increases and Decreases in Global Note attached hereto, on August 9, 2024.

| | |
|---|---|
| Interest Rate: | 8.250% per annum |
| Interest Payment Dates: | August 9 and February 9, commencing on February 9, 2018 |
| Record Dates: | July 26 and January 26 |

Reference is hereby made to the further provisions of this Note set forth on the reverse hereof, which will for all purposes have the same effect as if set forth at this place.

Additional provisions of this Note are set forth on the other side of this Note.

TV AZTECA, S.A.B. DE C.V.

By: _____
Name:  Rafael Rodriguez Sanchez
Title:  General Counsel and Legal Director

By: _____
Name:
Title:

TRUSTEE'S CERTIFICATE OF
AUTHENTICATION

THE BANK OF NEW YORK MELLON,
as Trustee, certifies
that this is one of
the Notes referred
to in the Indenture.

By: _____
　　　　Authorized Signatory

Date: _____

[*Signature Page to Global Note*]

Additional provisions of this Note are set forth on the other side of this Note.

**TV AZTECA, S.A.B. DE C.V.**

By: _Esteban Jal__

Name: Esteban Galindez Aguirre

Title: Chief Financial Officer

By: _____

Name:

Title:

TRUSTEE'S CERTIFICATE OF
AUTHENTICATION

THE BANK OF NEW YORK MELLON,
as Trustee, certifies
that this is one of
the Notes referred
to in the Indenture.

By: _____        Date: _____

    Authorized Signatory

*[Signature Page to Global Note]*

Additional provisions of this Note are set forth on the other side of this Note.

**TV AZTECA, S.A.B. DE C.V.**

By: _____
        Name:
        Title:


By: _____
        Name:
        Title:


TRUSTEE'S CERTIFICATE OF
AUTHENTICATION

THE BANK OF NEW YORK MELLON,
as Trustee, certifies
that this is one of
the Notes referred
to in the Indenture.

By: _Wanda Camacho_
        Authorized Signatory

Date: _August 9, 2017_

*[Signature Page to Global Note]*

**8.250% Senior Notes Due 2024**

Capitalized terms used but not defined herein shall have the meanings assigned to them in the Indenture referred to below unless otherwise indicated.

1.      Interest

TV Azteca, S.A.B. de C.V., a publicly traded variable capital corporation (*sociedad anónima bursátil de capital variable*) organized and existing under the laws of the United Mexican States (and its successors and assigns under the Indenture hereinafter referred to, the "Company"), promises to pay interest on the principal amount of this Note at the rate per annum shown above.

The Company will pay interest semi-annually in arrears on each Interest Payment Date of each year commencing on February 9, 2018; *provided* that, if any such Interest Payment Date is a day which is not a Business Day, then the payment need not be made on such date, but may be made on the next succeeding Business Day with the same force and effect as if made on such Interest Payment Date, and no interest will accrue for the intervening period.

Interest on the Notes will accrue from, and include, the most recent date to which interest has been paid on the Notes or, if no interest has been paid, from and including the August 9, 2017. Interest will be computed on the basis of a 360-day year of twelve 30-day months.

The Company shall pay interest (including Post-Petition Interest in any proceeding under any Bankruptcy Law) on overdue principal and, to the extent such payments are lawful, interest on Defaulted Interest without regard to any applicable grace periods at the rate shown on this Note, as provided in the Indenture.

2.      Indenture; Note Guarantees

This is one of the Notes issued under an Indenture, dated as of August 9, 2017 (as it may be amended or supplemented from time to time in accordance with the terms thereof, the "Indenture"), between the Company, the Subsidiary Guarantors and the Trustee. The terms of the Notes include those stated in the Indenture and those made part of the Indenture by reference to the TIA. The Indenture is not, and is not required to be, qualified under the applicable provisions of the TIA and does not incorporate by reference all provisions of the TIA. The Notes are subject to all such terms, and Holders are referred to the Indenture and the TIA for a statement of those terms. Each Holder by accepting a Note agrees to be bound by all of the terms and provisions of the Indenture, as amended or supplemented from time to time. To the extent permitted by applicable law, in the event of any inconsistency between the terms of this Note and the terms of the Indenture, the terms of the Indenture will control.

The Notes are general unsecured obligations of the Company. Subject to the conditions set forth in the Indenture and without the consent of the Holders, the Company may issue Additional Notes. All Notes (including all Additional Notes) will be treated as a single

class of securities under the Indenture and will vote together for all purposes. The Notes are not, and will not be, entitled to the benefit of any mandatory sinking fund.

This Note is guaranteed by the Subsidiary Guarantors, as set forth in the Indenture.

3. Redemption; Mandatory Redemption; Discharge Prior to Redemption or Maturity

This Note is subject to optional redemption, and may be the subject of a Change of Control Offer or an Asset Sale Offer, in each case, as further described in the Indenture.

If the Company deposits with the Trustee U.S. Legal Tender and/or U.S. Government Obligations sufficient to pay the then outstanding principal of, premium, if any, and accrued interest on the Notes to redemption or Stated Maturity, the Company may in certain circumstances be discharged from the Indenture and the Notes or may be discharged from certain of its obligations under certain provisions of the Indenture..

4. Denominations; Transfer; Exchange

The Notes are in fully registered form without coupons, and only in minimum denominations of U.S.$200,000 and integral multiples of U.S.$1,000 in excess thereof. A Holder may transfer or exchange Notes in accordance with the Indenture. The Trustee may require a Holder, among other things, to furnish appropriate endorsements or transfer documents and to pay any taxes and fees required by law or permitted by the Indenture. Pursuant to the Indenture, there are certain periods during which the Trustee will not be required to register the transfer of or exchange any Note or certain portions of a Note.

5. Persons Deemed Owners

The registered Holder of this Note may be treated as the owner of it for all purposes.

6. Defaults and Remedies

If an Event of Default, as defined in the Indenture, occurs and is continuing and has not been waived, the Trustee or the Holders of at least 25% in aggregate principal amount of the Notes then Outstanding may declare all the Notes to be due and payable. If a Bankruptcy Law Event of Default with respect to a Bankruptcy Party occurs and is continuing, the Notes automatically become due and payable. Holders may not enforce the Indenture or the Notes except as provided in the Indenture. The Trustee may require indemnity reasonably satisfactory to it before it enforces the Indenture or the Notes. Subject to certain limitations, Holders of a majority in principal amount of the Notes then outstanding may direct the Trustee in its exercise of remedies.

7. Amendment and Waiver

Subject to certain exceptions, the Indenture and the Notes may be amended, and Defaults may be waived, with the consent of the Holders of a majority in principal amount of the Outstanding Notes. Without notice to or the consent of any Holder, the Company and the Trustee

may amend or supplement the Indenture or the Notes to, among other things, cure any ambiguities, defects or inconsistencies in the Indenture or this Note.

8.      Authentication

This Note shall not be valid until an authorized signatory of the Trustee (or an Authenticating Agent acting on its behalf) manually signs the certificate of authentication on the other side of this Note.

9.      Abbreviations

Customary abbreviations may be used in the name of a Holder or an assignee, such as TEN COM (=tenants in common), TEN ENT (=tenants by the entirety), JT TEN (=joint tenants with rights of survivorship and not as tenants in common), CUST (=custodian) and U/G/M/A (=Uniform Gift to Minors Act).

10.     Common Code and ISIN

Pursuant to a recommendation promulgated by the Committee on Uniform Security Identification Procedures the Company has caused the Common Code and ISIN to be printed on the Notes and has directed the Trustee to use the Common Code and ISIN in notices of redemption as a convenience to Holders.  No representation is made as to the accuracy of such numbers either as printed on the Notes or as contained in any notice of redemption and reliance may be placed only on the other identification numbers placed thereon.

11.     Governing Law

This Note shall be governed by, and construed in accordance with, the laws of the State of New York.

The Company will furnish to any Holder upon written request and without charge to the Holder a copy of the Indenture which has in it the text of this Note.  Requests may be made to:

> TV Azteca, S.A.B. de C.V.
> Insurgentes Sur 3579
> Col. Tlalpan la joya
> 14000, México, D.F.
> México

## ASSIGNMENT FORM

To assign this Note, fill in the form below:

(I) or (we) assign and transfer this Note to:

_____

_____

_____

_____

(Print or type assignee's name, address and zip code)

_____

(Insert assignee's Social Security or Tax I.D. Number)

and irrevocably appoint _____
as agent to transfer this Note on the books of the Company.  The agent may substitute another to act for him.

Date:_____          Your Signature:_____

Sign exactly as your name appears on the other side of this Note.

Signature
Guarantee*:          _____
                     (Signature must be guaranteed)

_____

*      The signature(s) should be guaranteed by an eligible guarantor institution (banks, stockbrokers, savings and loan associations and credit unions with membership in an approved signature guarantee medallion program), pursuant to Exchange Act Rule 17Ad-15 (or other signature guarantor acceptable to the Trustee).

## SCHEDULE OF INCREASES OR DECREASES IN GLOBAL NOTE

The following increases or decreases in this Global Note have been made:

| Date of increase or decrease | Amount of decrease in Principal Amount of this Global Note | Amount of increase in Principal Amount of this Global Note | Principal Amount of this Global Note following such decrease or increase | Signature of authorized signatory of Trustee |
|---|---|---|---|---|
| _____ | _____ | _____ | _____ | _____ |

## OPTION OF HOLDER TO ELECT PURCHASE

If you want to elect to have this Note purchased by the Company pursuant to Section 3.12 or Section 3.8 of the Indenture, check either box:

☐        ☐

Section 3.12    Section 3.8

If you want to elect to have only part of this Note purchased by the Company pursuant to Section 3.12 or Section 3.8 of the Indenture, state the principal amount (which must be U.S.$200,000 and integral multiples of U.S.$1,000 in excess thereof) that you want to have purchased by the Company: U.S.$

Date: _____    Your Signature _____
                 (Sign exactly as your name appears on the
                 other side of the Note)

Signature
Guarantee*:        _____
                 (Signature must be guaranteed)

\*      The signature(s) should be guaranteed by an eligible guarantor institution (banks, stockbrokers, savings and loan associations and credit unions with membership in an approved signature guarantee medallion program), pursuant to Exchange Act Rule 17Ad-15 (or other signature guarantor acceptable to the Trustee).

# Exhibit 4 to the Ellis Declaration

**IMPORTANT NOTICE**

**NOT FOR DISTRIBUTION TO ANY U.S. PERSON.**

**THIS OFFERING IS AVAILABLE ONLY TO NON-U.S. PERSONS, WITHIN THE MEANING OF REGULATION S UNDER THE U.S. SECURITIES ACT OF 1933, AS AMENDED (THE "SECURITIES ACT") OUTSIDE THE U.S.**

**IMPORTANT:   You must read the following before continuing.**   The following applies to the Offering Circular following this page, and you are advised to read this carefully before reading, accessing or making any other use of the Offering Circular.  In accessing the Offering Circular, you agree to be bound by the following terms and conditions, including any modifications to them any time you receive any information from us as a result of such access.

NOTHING IN THIS ELECTRONIC TRANSMISSION CONSTITUTES AN OFFER OF SECURITIES FOR SALE IN ANY JURISDICTION WHERE IT IS UNLAWFUL TO DO SO.  THE SECURITIES HAVE NOT BEEN, AND WILL NOT BE, REGISTERED UNDER THE SECURITIES ACT, OR THE SECURITIES LAWS OF ANY STATE OF THE UNITED STATES OR OTHER JURISDICTION AND THE SECURITIES MAY NOT BE OFFERED OR SOLD WITHIN THE UNITED STATES OR TO, OR FOR THE ACCOUNT OR BENEFIT OF, U.S. PERSONS (AS DEFINED IN REGULATION S UNDER THE SECURITIES ACT), EXCEPT PURSUANT TO AN EXEMPTION FROM, OR IN A TRANSACTION NOT SUBJECT TO, THE REGISTRATION REQUIREMENTS OF THE SECURITIES ACT AND APPLICABLE LAWS OF OTHER JURISDICTIONS.

THE OFFERING CIRCULAR AND THE OFFER OF THE NOTES ARE ONLY ADDRESSED TO AND DIRECTED AT PERSONS IN MEMBER STATES OF THE EUROPEAN ECONOMIC AREA WHO ARE "QUALIFIED INVESTORS" WITHIN THE MEANING OF ARTICLE 2(1)(E) OF THE PROSPECTUS DIRECTIVE (DIRECTIVE 2003/71/EC, AS AMENDED) AND RELATED IMPLEMENTATION MEASURES IN MEMBER STATES ("QUALIFIED INVESTORS").   IN ADDITION, IN THE UNITED KINGDOM THE OFFERING CIRCULAR IS ONLY BEING DISTRIBUTED TO QUALIFIED INVESTORS WHO HAVE PROFESSIONAL EXPERIENCE IN MATTERS RELATING TO INVESTMENTS FALLING WITHIN ARTICLES 19(5) AND 19(2)(A) TO (D) OF THE FINANCIAL SERVICES AND MARKETS ACT 2000 (FINANCIAL PROMOTION) ORDER 2005, AND OTHER PERSONS TO WHOM IT MAY OTHERWISE LAWFULLY BE COMMUNICATED (ALL SUCH PERSONS TOGETHER REFERRED TO AS "RELEVANT PERSONS").   ANY INVESTMENT OR INVESTMENT ACTIVITY TO WHICH THIS OFFERING CIRCULAR RELATES IS AVAILABLE ONLY TO (I) IN THE UNITED KINGDOM, RELEVANT PERSONS, AND (II) IN ANY MEMBER STATE OF THE EUROPEAN ECONOMIC AREA OTHER THAN THE UNITED KINGDOM, QUALIFIED INVESTORS, AND WILL BE ENGAGED IN ONLY WITH SUCH PERSONS.  IN ADDITION, NO PERSON MAY COMMUNICATE OR CAUSE TO BE COMMUNICATED ANY INVITATION OR INDUCEMENT TO ENGAGE IN INVESTMENT ACTIVITY, WITHIN THE MEANING OF SECTION 21 OF THE FINANCIAL SERVICES AND MARKETS ACT 2000 (THE "FSMA"), RECEIVED BY IT IN CONNECTION WITH THE ISSUE OR SALE OF THE NOTES OTHER THAN IN CIRCUMSTANCES IN WHICH SECTION 21(1) OF THE FSMA DOES NOT APPLY TO US.

THE FOLLOWING OFFERING CIRCULAR MAY NOT BE FORWARDED OR DISTRIBUTED TO ANY OTHER PERSON AND MAY NOT BE REPRODUCED IN ANY MANNER WHATSOEVER.  ANY FORWARDING, DISTRIBUTION OR REPRODUCTION OF THIS DOCUMENT IN WHOLE OR IN PART IS UNAUTHORIZED.  FAILURE TO COMPLY WITH THIS DIRECTIVE MAY RESULT IN A VIOLATION OF THE SECURITIES ACT OR THE APPLICABLE LAWS OF OTHER JURISDICTIONS.

**Confirmation of your Representation:**  In order to be eligible to view this Offering Circular or make an investment decision with respect to the securities, investors must be non-U.S. persons (within the meaning of Regulation S under the Securities Act) outside the U.S.  This Offering Circular is being sent at your request and by accepting the e-mail and accessing this Offering Circular, you shall be deemed to have represented to us that (1) you and any customers you represent are non-U.S. persons (within the meaning of Regulation S under the Securities Act) and that the electronic mail address that you gave us and to which this Offering Circular has been delivered is not located in the U.S., and (2) that you consent to delivery of such Offering Circular by electronic transmission.

You are reminded that this Offering Circular has been delivered to you on the basis that you are a person into whose possession this Offering Circular may be lawfully delivered in accordance with the laws of the jurisdiction in which you are located and you may not, nor are you authorized to, deliver this Offering Circular to any other person.

The materials relating to the offering do not constitute, and may not be used in connection with, an offer or solicitation in any place where offers or solicitations are not permitted by law.  If a jurisdiction requires that the offering be made by a licensed broker or dealer and the Initial Purchasers or any affiliate of the Initial Purchasers is a licensed broker or dealer in that jurisdiction, the offering shall be deemed to be made by the Initial Purchasers or such affiliate on behalf of the issuer in such jurisdiction.

This Offering Circular has been sent to you in an electronic form.  You are reminded that documents transmitted via this medium may be altered or changed during the process of electronic transmission, and consequently neither the Initial Purchasers, nor any person who controls them nor any of their directors, officers, employees nor any of their agents nor any affiliate of any such person accept any liability or responsibility whatsoever in respect of any difference between this Offering Circular distributed to you in electronic format and the hard copy version available to you on request from the Initial Purchasers.

**OFFERING CIRCULAR**



# TV AZTECA, S.A.B. DE C.V.
## $400,000,000
## 8.250% Senior Notes due 2024

———————————————

TV Azteca, S.A.B. de C.V. is offering $400,000,000 aggregate principal amount of our 8.250% Senior Notes due 2024 (the "notes").  The notes will be issued under an indenture to be dated as of August 9, 2017 (the "Indenture").

The principal of the notes will mature on August 9, 2024. The notes will bear interest at a rate of  8.250%, payable semi-annually on August 9 and February 9 of each year, commencing on February 9, 2018.

The notes will be TV Azteca's senior unsecured general obligations. The notes will be fully and unconditionally guaranteed on a joint and several basis by all of TV Azteca's existing subsidiaries and certain future material subsidiaries, as described under "*Description of Notes—Note Guarantees*" (collectively, the "Guarantors" and each a "Guarantor").  The notes and guarantees will rank equally in right of payment with all of our and the Guarantors' existing and future senior indebtedness and senior to all of our and the Guarantors' existing and future subordinated indebtedness, subject to certain statutory preferences under Mexican law (including tax, social security and labor obligations).  The notes will effectively rank junior to all of our and the Guarantors' secured indebtedness to the extent of the value of the assets securing such indebtedness.  The notes and guarantees will be structurally subordinated to the indebtedness and other liabilities, including trade payables, of our subsidiaries that are not Guarantors.

At our option, we may redeem the notes on or after August 9, 2021 at the redemption prices set forth in this offering circular ("Offering Circular").  Prior to August 9, 2021, we may redeem the notes, in whole or in part, by paying the principal amount of the notes plus the applicable "make whole" premium and accrued interest to, but excluding, the redemption date. Prior to  August 9, 2021, we may also redeem up to 35% of the notes with the proceeds of certain equity offerings. If we experience a change of control, we will be required to make an offer to purchase the notes at a purchase price equal to 101% of the principal amount, plus accrued and unpaid interest to, but excluding, the repurchase date. If we sell assets under certain circumstances, we will be required to make an offer to purchase the notes at a purchase price equal to 100% of the principal amount, plus accrued and unpaid interest to, but excluding, the repurchase date.  In addition, in the event of certain changes in the Mexican withholding tax treatment relating to payments on the notes, we may redeem all (but not less than all) of the notes at 100% of their principal amount, plus accrued and unpaid interest to, but excluding, the redemption date.  There is no sinking fund for the notes.

No public market currently exists for the notes.  Approval-in-principle has been received for the listing and quotation of the notes on the Singapore Exchange Securities Trading Limited ("**SGX-ST**"). The SGX-ST assumes no responsibility for the correctness of any of the statements made or opinions expressed or reports contained in this Offering Circular. Approval-in-principle for the listing and quotation of the notes on the SGX-ST is not to be taken as an indication of the merits of the offering, the Company, its subsidiaries (including the Guarantors), their respective associated companies, their respective joint venture companies or the notes.  The notes will be issued in denominations of $200,000 each or integral multiples of $1,000 in excess thereof. The notes will be traded on the SGX-ST in a minimum board lot size of $200,000 for so long as any of the notes are listed on the SGX-ST and the rules of the SGX-ST so require. See "*Listing and General Information*."

**Investing in the notes involves risks.  See "*Risk Factors*" beginning on page 20.**

**Price: 100.000%**

plus accrued interest, if any, from August 9, 2017.

Delivery of the notes in book-entry form will be made on or about August 9, 2017.

**THE NOTES HAVE NOT BEEN AND WILL NOT BE REGISTERED WITH THE REGISTRO NACIONAL DE VALORES (THE "NATIONAL SECURITIES REGISTRY") MAINTAINED BY THE COMISION NACIONAL BANCARIA Y DE VALORES (THE NATIONAL BANKING AND SECURITIES COMMISSION, OR "CNBV"), AND MAY NOT BE OFFERED OR SOLD PUBLICLY, OR OTHERWISE BE THE SUBJECT OF BROKERAGE ACTIVITIES, IN MEXICO, EXCEPT THAT THE NOTES MAY BE OFFERED TO INVESTORS QUALIFYING AS INSTITUTIONAL AND QUALIFIED INVESTORS PURSUANT TO THE PRIVATE PLACEMENT EXEMPTION SET FORTH IN ARTICLE 8 OF THE LEY DEL MERCADO DE VALORES, AS AMENDED (THE "MEXICAN SECURITIES MARKET LAW," OR "LMV").  AS REQUIRED UNDER THE LMV, WE WILL NOTIFY THE CNBV OF THE ISSUANCE OF THE NOTES INCLUDING THE PRINCIPAL CHARACTERISTICS OF THE NOTES AND THE OFFERING OF THE NOTES OUTSIDE OF MEXICO.  SUCH NOTICE WILL BE DELIVERED TO THE CNBV TO COMPLY WITH A LEGAL REQUIREMENT AND FOR INFORMATION PURPOSES ONLY, AND THE DELIVERY TO AND THE RECEIPT BY THE CNBV OF SUCH NOTICE, DOES NOT CONSTITUTE OR IMPLY ANY CERTIFICATION AS TO THE INVESTMENT QUALITY OF THE NOTES, OUR SOLVENCY, LIQUIDITY OR CREDIT QUALITY OR THE ACCURACY OR COMPLETENESS OF THE INFORMATION PROVIDED IN THIS OFFERING CIRCULAR.  THE INFORMATION CONTAINED IN THIS OFFERING CIRCULAR IS EXCLUSIVELY THE RESPONSIBILITY OF THE COMPANY AND HAS NOT BEEN REVIEWED OR AUTHORIZED BY THE CNBV. IN MAKING AN INVESTMENT DECISION, ALL INVESTORS, INCLUDING ANY MEXICAN INVESTORS WHO**

**MAY ACQUIRE NOTES FROM TIME TO TIME, MUST RELY ON THEIR OWN REVIEW AND EXAMINATION OF THE COMPANY AND THE GUARANTORS.**

The notes have not been and will not be registered under the U.S. Securities Act of 1933, as amended (the "Securities Act").  The notes may not be offered or sold within the United States or to U.S. persons, and may only be sold to non-U.S. persons in offshore transactions in reliance on Regulation S under the Securities Act. For certain restrictions on the transfer of the notes, see "*Notice to Investors.*"

———————————————

| *Joint Book-Runner* | *Joint Book-Runner* | *Joint Book-Runner and Global Coordinator* |
|:---:|:---:|:---:|
| **BCP Securities** | **Jefferies** | **Morgan Stanley** |

*Co-Manager*



**The date of this Offering Circular is August 2, 2017.**

**TABLE OF CONTENTS**

Page

| | Page |
|---|---|
| Important Notice.............................................. 1 | Our Business.................................................... 58 |
| Disclosure Regarding Forward-Looking Statements...... 3 | Directors and Senior Management ............................... 83 |
| Presentation of Certain Financial and Other Information.............................................. 4 | Principal Shareholders.................................... 87 |
| Summary.......................................................... 6 | Related Party Transactions ......................................... 89 |
| The Offering ...................................................... 12 | Description of Notes.................................................... 91 |
| Summary Historical and Other Financial Information . 16 | Book-Entry; Delivery and Form............................... 134 |
| Risk Factors....................................................... 20 | Plan of Distribution ................................................. 136 |
| Use of Proceeds ................................................ 31 | Notice to Investors.................................................... 143 |
| Capitalization.................................................... 32 | Taxation................................................................... 145 |
| Exchange Rates ................................................. 33 | Available Information................................................ 147 |
| Selected Historical Financial Information ................... 34 | Listing and General Information................................ 148 |
| Operating and Financial Review ................................ 37 | Index to Consolidated Financial Statements................ F-1 |

_____

**IMPORTANT NOTICE**

The terms "TV Azteca," "Company," "we," "us" and "our" in this Offering Circular refer to TV Azteca, S.A.B. de C.V. together with its subsidiaries on a consolidated basis except as otherwise specified.

This Offering Circular has been prepared solely by TV Azteca and the Guarantors, which have confirmed to BCP Securities, LLC, Jefferies LLC and Morgan Stanley & Co. International plc (the "Initial Purchasers") that, as of the date hereof, this Offering Circular does not contain any untrue statement of a material fact or omit to state any material fact necessary to make the statements herein, in light of the circumstances under which they are made, not misleading. None of the Initial Purchasers has independently verified the information contained herein. Accordingly, no representation, warranty or undertaking, express or implied, is made and no responsibility or liability is accepted by the Initial Purchasers as to the accuracy or completeness of this Offering Circular or any supplement hereto.

This Offering Circular is personal to each offeree and does not constitute an offer to any other person or to the public generally to subscribe for or otherwise acquire these securities. Distribution of this Offering Circular to any person other than the offeree and any person retained to advise such offeree with respect to its purchase is unauthorized, and any disclosure of any of its contents, without TV Azteca's prior written consent, is prohibited. Each prospective investor, by accepting delivery of this Offering Circular, agrees to the foregoing and agrees to make no photocopies of this Offering Circular or any documents referred to in this Offering Circular.

TV Azteca and the Guarantors have appointed the Initial Purchasers, in such capacity with respect to the notes, and have authorized and requested the Initial Purchasers to circulate this Offering Circular in connection therewith. This Offering Circular does not obligate TV Azteca to accept any offer to subscribe for or purchase the notes. We have not, and the Initial Purchasers have not, authorized anyone to provide you with any information other than that contained in this Offering Circular or to which we have referred you. We take no responsibility for, and can provide no assurances as to the reliability of, any other information that others may give you.

The notes may not be publicly offered or traded in Mexico unless the same are offered or traded pursuant to the provisions of Article 8 of the LMV and regulations issued thereunder. The information contained in this Offering Circular is solely the responsibility of TV Azteca and the Guarantors. Neither the U.S. Securities and Exchange Commission (the "SEC"), the CNBV, nor any other regulatory authority has reviewed or approved these securities, nor have any of the foregoing authorities passed upon or endorsed the merits of this offering or the accuracy or adequacy of this Offering Circular. Any representation to the contrary may constitute a criminal offense. The terms of the offering have been notified to the CNBV for information purposes only which does not constitute a certification as to the investment quality of the notes or of TV Azteca's solvency.

This Offering Circular is not intended to provide the basis of any credit, taxation, legal, investment or other evaluation and should not be considered as a recommendation by TV Azteca, any of the Guarantors or the Initial Purchasers that any recipient of this Offering Circular should purchase any of the notes. Each recipient contemplating

the purchase of any of the notes is advised to consult its own tax adviser, attorney and business adviser as to tax, business and related matters concerning the purchase of notes and to make, and shall be deemed to have made, its own independent investigation in relation to the notes and the financial condition and affairs of, and its own appraisal of the creditworthiness of, TV Azteca and each of the Guarantors.  None of TV Azteca, any of the Guarantors or the Initial Purchasers makes any comment about the treatment for taxation purposes of payments or receipts in respect of the notes to or by a holder of notes or the legality of the purchase of notes by an investor under applicable investment or similar laws.

Neither the delivery of this Offering Circular by any Initial Purchaser nor the offering, sale or delivery of any notes shall, in any circumstances, create any implication that the information contained herein is true subsequent to the date hereof or the date upon which this Offering Circular has been most recently amended or supplemented or that there has been no adverse change in the financial situation of TV Azteca or any of the Guarantors since the date hereof or, as the case may be, the date upon which this Offering Circular has been most recently amended or supplemented. You should not assume that the information contained in this Offering Circular is accurate as of any date other than the date on the front cover of this Offering Circular.

We are not, and the initial purchasers are not, making an offer to sell these securities in any jurisdiction where such offer is not permitted by applicable law. Any persons into whose possession this Offering Circular or any notes come are required by TV Azteca, each of the Guarantors and the Initial Purchasers to inform themselves of, and to observe, any such restrictions. See "*Notice to Investors*."

The notes are subject to restrictions on transferability and resale and may not be transferred or resold except as permitted under applicable securities laws (or exemptions therefrom). As a prospective purchaser, you should be aware that you may be required to bear the financial risks of this investment through its maturity. Please refer to the sections in this Offering Circular entitled "Plan of Distribution" and "Transfer Restrictions."

Unless otherwise noted, market and industry data and other information used throughout this Offering Circular are based on TV Azteca's estimates.  Such estimates are derived from TV Azteca's review of internal surveys and independent industry publications, government publications, and reports by market research firms or other published independent sources, which we believe to be accurate.  Although TV Azteca believes its sources, including its estimates, are reliable, it has not independently verified any third-party information and cannot guarantee its accuracy or completeness.  This data is subject to change and cannot always be verified with complete certainty due to limits on the availability and reliability of raw data, the voluntary nature of the data gathering process and other limitations and uncertainties inherent in any statistical survey of market or industry data. As a result, you should be aware that market and industry data set forth herein, and estimates and beliefs based on such data, may not be reliable.

Any information contained in this Offering Circular that has been sourced from a third party has been accurately reproduced and as far as TV Azteca or the Guarantors are aware or able to ascertain from information published by such third parties, no facts have been omitted which would render the reproduced information inaccurate or misleading.  Any such third party information is identified in this Offering Circular with its source.

_____

2

**DISCLOSURE REGARDING FORWARD-LOOKING STATEMENTS**

This Offering Circular includes forward-looking statements.  These forward-looking statements include, without limitation, those regarding our future financial position and results of operations, our strategy, plans, objectives, goals and targets, future developments in the markets in which we participate or are seeking to participate or anticipated regulatory changes in the markets in which we operate or intend to operate.  In some cases, forward-looking statements can be identified by terminology such as "aim," "anticipate," "believe," "continue," "could," "estimate," "expect," "forecast," "guidance," "intend," "may," "plan," "potential," "predict," "project," "should" or "will" or the negative of such terms or other comparable terminology.

By their nature, forward-looking statements involve risks and uncertainties because they relate to events and depend on circumstances that may or may not occur in the future.  We caution potential investors that forward looking statements are not guarantees of future performance and are based on numerous assumptions and that our actual results of operations, including our financial condition and liquidity, may differ materially from (and be more negative than) those made in, or suggested by, the forward-looking statements contained in this Offering Circular.  In addition, even if our results of operations, including our financial condition and liquidity and the development of the industries in which we operate, are consistent with the forward-looking statements contained in this Offering Circular, those results or developments may not be indicative of results or developments in subsequent periods.  Important factors that could cause these differences include, but are not limited to:

- our ability to repay existing and future debt;

- risks related to the renewal of broadcast concessions;

- risks related to possible conflicts of interest;

- risks related to our competitive position;

- risks related to the seasonal and cyclical nature of our business;

- the absence, cancellation or non-broadcasting of major broadcast events;

- risks related to our material advertising agreements, including the loss of one or more of our key advertisers;

- the cost of producing and acquiring our programming;

- our reliance on key personnel of our subsidiaries;

- changes in regulatory, administrative or economic conditions affecting the media industry;

- risks related to our business, strategy, expectations about growth in demand for our products and services and business operations, financial condition and results of operations;

- risks related to Azteca International Corporation;

- foreign currency exchange fluctuations relative to the U.S. dollar against the peso;

- risks related to Mexico's social, political or economic environment;

- risks related to the development of new technologies;

- our ability to enter and integrate into new markets;

- the result of pending litigations;

- risks related to the ownership, payment and amount of cash dividends to shareholders; and

- risks associated with market demand for and liquidity of the notes.

Potential investors should read the sections of this Offering Circular entitled "*Risk Factors,*" "*Operating and Financial Review*" and "*Our Business*" for a more complete discussion of the factors that could affect our future performance and the markets in which we operate.  In light of these risks, uncertainties and assumptions, the forward-looking events described in this Offering Circular may not occur.  We undertake no obligation to update or revise any forward-looking statement, whether as a result of new information or future events or developments.

## PRESENTATION OF CERTAIN FINANCIAL AND OTHER INFORMATION

In this Offering Circular, all references to "$" and "U.S. dollars" refer to the lawful currency of the United States of America (the "United States" or the "U.S."). All references to "Ps." or "pesos" refer to the lawful currency of the United Mexican States ("Mexico").

This Offering Circular contains TV Azteca's unaudited consolidated financial statements as of and for the six months ended June 30, 2017 and 2016, including the notes thereto, and TV Azteca's audited consolidated financial statements as of and for the years ended December 31, 2016 and 2015, including the notes thereto. TV Azteca's consolidated financial statements as of and for the years ended December 31, 2016 and 2015 have been audited by its independent auditors, Salles, Sáinz-Grant Thornton, S.C. ("Salles"), a member of Grant Thornton International. Salles is a member of the Association of Public Accountants of Mexico (*Colegio de Contadores Públicos de México, A.C.*, or "CCPM"). As of December 28, 2016, TV Azteca's consolidated financial statements no longer include Azteca Comunicaciones Colombia's ("ACC") operations in Colombia. These operations qualify as those of an associate company and were recorded using the equity method for the six months ended June 30, 2017. For comparison purposes, ACC's operations in Colombia for the six months ended June 30, 2016 were included under the heading "(Loss) from discontinued operations." Financial information for the years ended December 31, 2016 and 2015 consolidates ACC's operations in Colombia. Financial information for the last twelve months ended June 30, 2017 and 2016 do not consolidate ACC's operations in Colombia.

TV Azteca's consolidated financial statements are stated in pesos and are prepared in accordance with International Financial Reporting Standards ("IFRS"), as issued by the International Accounting Standards Board ("IASB"). U.S. dollar amounts presented in this Offering Circular have been translated from peso amounts solely for the convenience of the reader. Unless otherwise indicated, the exchange rate used in converting pesos into U.S. dollars for amounts derived from the financial statements as of and for the six months ended June 30, 2017 and 2016 was determined by reference to the period-end exchange rate of Ps.17.8973 and Ps.18.9113 per U.S. dollar, respectively. Unless otherwise indicated, the exchange rate used in converting pesos into U.S. dollars for amounts derived from the financial statements as of and for the year ended December 31, 2016 and 2015 was determined by reference to the period-end exchange rate of Ps.20.6640 and Ps.17.2065 per U.S. dollar, respectively. The exchange rates used are those published by the *Banco de México* in the Official Gazette of the Federation (*Diario Oficial de la Federación* or the "Official Gazette") as the rate for the payment of obligations denominated in non-Mexican currency payable in Mexico. For additional information see "*Exchange Rates*." No representation is being made that the peso or dollar amounts shown in this Offering Circular could have been or could be converted into U.S. dollars or pesos at the rates shown in this Offering Circular or at any other rate.

### Note Regarding Non-GAAP Financial Measures

A body of generally accepted accounting principles is commonly referred to as "GAAP." For this purpose, a non-GAAP financial measure is generally defined as one that purports to measure historical or future financial performance, financial position or cash flows, but excludes or includes amounts that would not be so adjusted in the most comparable GAAP measure.

TV Azteca discloses in this Offering Circular certain non-GAAP financial measures, including EBITDA. TV Azteca believes that EBITDA is useful for the purpose of understanding its financial performance as well as its ability to satisfy principal and interest obligations under its indebtedness and to fund capital expenditures and operations requirements. Even though commonly used as a financial indicator in Mexico and abroad, EBITDA is not a measure of financial performance under IFRS.

TV Azteca calculates EBITDA by adding to operating income: (i) depreciation and amortization and (ii) other expenses, net. Other expenses, net, reflects certain costs, expenses or other payments that are not representative of TV Azteca's operational performance, which may include legal expenses, charitable contributions and costs associated with the impairment of assets. TV Azteca's calculation of EBITDA may include or exclude certain items that may not be included or excluded in calculations of EBITDA provided by other companies. TV Azteca's calculation of EBITDA does not include any adjustments to exclude the impact of unusual or non-recurring events, restructuring or other one-time charges or discontinued operations.

EBITDA is provided for information purposes only and should not be considered in isolation, or as a substitute for operating income or net income, as a measure of operating performance, as a substitute for cash flows from operations or as a measure of liquidity. EBITDA has material limitations that impair its value as a measure of a company's overall profitability since it does not address certain financial figures. EBITDA and other non-GAAP financial measures included in this Offering Circular are not a substitute for IFRS measures of financial performance.

5

**Trademarks and Service Marks**

For convenience, the trademarks and service marks referred to in this Offering Circular are listed without the ®, TM and SM symbols, but TV Azteca intends to assert, and notify others of, its rights in and to these trademarks and service marks to the fullest extent under applicable law. Each trademark, trade name or service mark of any other company appearing in this Offering Circular belongs to its holder.

**SUMMARY**

*This summary highlights selected information described in greater detail elsewhere in this Offering Circular. It does not contain all of the information that may be important to you. This Offering Circular describes the terms of the notes that we are offering, as well as information regarding our business and detailed financial information. You should read the entire Offering Circular carefully, including the risk factors and financial statements, before making an investment decision. The terms "TV Azteca," "Company," "we," "us" and "our" in this Offering Circular refer to TV Azteca, S.A.B. de C.V. together with its subsidiaries on a consolidated basis except as otherwise specified.*

**Overview**

TV Azteca is one of the two largest producers of Spanish-language television content in the world and the second largest television broadcasting company in Mexico based on broadcast advertising market share.

TV Azteca holds 180 concessions granted by the Mexican government, enabling it to transmit up to 786 over-the-air broadcast signals. For the last twelve months ended June 30, 2017, TV Azteca reached an average of 93.1% of households in Mexico and captured 36% of the Mexican television broadcast advertising market.

TV Azteca owns and operates two high definition national television networks, "Azteca 7" and "Azteca 13." TV Azteca also operates two new over-the-air signals: "adn40," a local channel that reaches 84.5 million people in Mexico (previously Proyecto 40, which was broadcasted over-the-air in Mexico City), and "a+," a network of 35 local channels across the country that produce local news, sports and regional entertainment content. a+ has the capacity to broadcast different commercials in one or more cities simultaneously by way of its 422 antennas.

TV Azteca is widely recognized for its high quality original content. For the year ended December 31, 2016, its programming reached on average 88 million viewers in Mexico monthly and its original content represented approximately 48% of its total primetime programming on Azteca 7 and Azteca 13. It owns 54 state-of-the-art multi-level television production studios and in 2016 produced more than 30,000 hours of digital, HD, 4K and multi-platform television content, including reality shows, talk shows and news, sports, music, variety programs and traditional soap operas (*telenovelas*), some of which are progressively evolving into dynamic program series. TV Azteca's original content is aired on its networks in the United States, Guatemala and Honduras and it has been exported to more than 100 countries in the Americas, Europe, Asia and Africa. TV Azteca also owns a Spanish-language television broadcast network in the United States known as Azteca America that reaches more than 12.3 million viewers during primetime programming.

In addition to its content and broadcasting operations, TV Azteca owns a drama school, two Mexican professional soccer teams and Azteca Internet. TV Azteca is also engaged in other businesses through joint ventures and strategic partnerships, including a concession to operate and maintain a fiber optic network developed by TV Azteca in Peru and a 40% owned fiber optic network in Colombia.

TV Azteca's consolidated revenues for the six months ended June 30, 2017 and for the year ended December 31, 2016 was Ps.7,017.3 million ($392.1 million) and Ps.14,197 million ($687.0 million), respectively. For the six months ended June 30, 2017 and for the year ended December 31, 2016, TV Azteca had net income of Ps.451.5 million ($25.2 million) and net loss of Ps.3,172.9 million ($153.5 million), respectively. TV Azteca's EBITDA for the twelve months ended June 30, 2017 was Ps.4,044.1 million ($226.0 million).

*Corporate Structure*

The following structure chart shows a simplified organizational structure for TV Azteca as of June 30, 2017, including its principal subsidiaries, all of which are wholly owned by TV Azteca, and a description of their main business activities. The notes will be fully and unconditionally guaranteed on a joint and several basis by all of TV Azteca's existing subsidiaries and certain future material subsidiaries, as described under "*Description of Notes—Note Guarantees.*"



## Business Strengths

*One of the Two Largest Spanish-Language Content Producers in the World and a Market Leader in Mexico*

TV Azteca is one of the two largest content producers of Spanish-language television content in the world (measured by revenue against comparable publicly traded companies) and the second largest television broadcasting company in Mexico (measured by broadcast advertising market share). It produces a variety of programs, including traditional soap operas (*telenovelas*), including in their newly evolved form as program series, as well as reality shows, talk shows and news, sports, music and variety programs. TV Azteca believes it is a leading producer of some of the most innovative, inspirational and popular Spanish-language content in the world, which has cultivated large and loyal audiences that attract diverse advertisers.  In the six months ended June 30, 2017, TV Azteca produced approximately 17,000 hours of original content. In each of 2016 and 2015, TV Azteca produced approximately 48% and 50%, respectively, of the Mexican national weekday primetime program hours aired on its networks (excluding programming produced by its local branches).

*Strong Industry Fundamentals in its Core Domestic Market*

TV Azteca's primary focus and vision is concentrated on the Mexican broadcast television market, where over-the-air television broadcasting continues to be the most efficient way to reach the Mexican population. For the year ended December 31, 2016, over-the-air television broadcasting captured the highest expenditure in advertising, representing 48.6% of the country's total advertising market. In addition, over-the-air television broadcasting has the highest household reach in the country with a 93.1% rate of penetration for the year ended December 31, 2016. This rate is significantly higher than that of any other advertising alternative, including radio, pay television and internet, which reached 61.5%, 52.1% and 47.0%, respectively, of households in Mexico for the year ended December 31, 2016. Further, over-the-air television broadcasting of advertisements requires significantly fewer advertising spots to reach a higher percentage of the population.

In Mexico, over-the-air television broadcasting continues to be a very efficient way to reach the greatest number of households: on average there are two television sets per household; the average head of household watches television for approximately five hours and forty-seven minutes per day; 61% of the population, or approximately 70 million people, watch television between one and four hours daily; six out of ten pay television subscribers continue to watch over-the-air television broadcast channels; only 4.5% of households have access to high speed internet, which is required to watch online video content; and only 6.7 million people subscribe to over-the-top ("OTT") services such as Netflix.

*Uniquely Positioned, Large Scale Infrastructure in Mexico*

The media and broadcasting industries in TV Azteca's core market require significant capital investment and technical expertise, which makes it difficult for new competitors to enter these businesses. Barriers to entry for potential broadcasters include an already-established extensive infrastructure, the limited availability of land to construct transmission sites, the existence of highly customized station facilities and a scarcity of engineers to design, operate and maintain television broadcast facilities. In addition, TV Azteca's position as one of the world's leading producers of Spanish-language programming, with nearly 60 long-term contractual relationships with major content providers (including Fox, Sony, Disney, the Mexican Soccer Federation (Mexican national soccer team) and a number of teams playing in the Mexican Soccer League) with an average term of three years, creates significant obstacles to the entry of other potential content providers.

Against this backdrop, TV Azteca benefits from a strong brand and an established operating history. TV Azteca's 458 transmission sites located throughout Mexico allow it to reach approximately 93.1% of households in Mexico at least 23.5 hours a day, seven days a week. In addition to its extensive and sophisticated transmission technology, TV Azteca has 54 state-of-the-art multi-level television production studios that facilitated TV Azteca's ability to produce over 30,000 hours of high quality content for the year ended December 31, 2016. Moreover, throughout its operating history, TV Azteca has developed the ability to effectively navigate the complex regulatory framework of the telecommunications industry.

*Broad Programming with Innovative Content, Driving a Diverse High-Quality Client Base*

Over the last few years, TV Azteca has redesigned its programming in an effort to respond to changing demands and to appeal to all viewers. As part of our programming efforts, TV Azteca has engaged in partnership with international first-class production companies to co-produce innovative content. TV Azteca's broad program offering has allowed it to reach a wide-range of viewers across all demographics through its national and local channels.

The broad reach of TV Azteca's program offerings has driven a diverse, high-quality client base. TV Azteca's client base includes numerous blue-chip companies spanning a wide range of industries, which allows it to better withstand downward swings in the economy. As of June 30, 2017, TV Azteca's 10 largest clients accounted for approximately 18% of its advertising revenues. See "*Our Business—Description of the Business—Television Advertising Sales.*"

*Fully Integrated Company with the Ability to Leverage Core Capabilities*

TV Azteca is a fully integrated telecommunications company with a complete array of resources to source, produce and distribute television content. Moreover, TV Azteca is well-positioned to leverage these core capabilities toward reaching larger audiences across platforms and leveraging existing content to access new revenue streams. TV Azteca has resources dedicated to every stage of the television business and to the distribution of video content across new platforms. From the cultivation of creative talent at its drama school, to the production of national and local original content at its television studios throughout Mexico, to the broadcast and distribution of content across national and local channels and diverse platforms to increasingly large audiences, TV Azteca is able to cost effectively control each stage of the production, sale and distribution process. This business model allows TV Azteca to produce high quality content that is delivered to a large and loyal audience in a manner that increases the lifetime value of produced content.

*Strong Financial and Liquidity Profile*

TV Azteca maintains significant cash positions and targets long-term rather than short-term debt financing, which allows it to maintain financial stability and flexibility in a fast moving market. In addition, in connection with spectrum auctions by the U.S. Federal Communications Commission ("FCC") in the United States, Azteca International Corporation ("AIC"), which produces Azteca America content, received $156 million (pre-tax) in the third quarter of 2017 from spectrum sales by stations in Los Angeles and San Francisco that are related to AIC and Azteca America. TV Azteca currently intends to use a portion of the proceeds of this spectrum sale to repay existing indebtedness. TV Azteca's liquidity allows it to capture market opportunities that may require an initial cash investment, such as promotional packages for its advertising clients. As of the twelve months ended June 30, 2017 and the years ended Decembers 31, 2016 and 2015, TV Azteca's net debt to EBITDA ratio was 3.0x, 3.7x and 4.8x, respectively, and its total debt to EBITDA ratio was 3.8x, 5.0x and 6.0x, respectively. During the past five fiscal years, TV Azteca made large capital expenditures in non-core businesses that proved to be break-even or unprofitable ventures. Under its new leadership, TV Azteca has revised its strategy to focus on its core businesses and seek to maintain high EBITDA margins.

TV Azteca's revenues for the year ended December 31, 2016 increased by 10.4% compared to the year ended December 31, 2015, and during the six months ended June 30, 2017, TV Azteca's revenues increased by 14.5% compared to the same period in 2016, which is well above Mexican population and GDP growth for this period and, alongside strict control in operating expenditures, has allowed for steady cash flow generation.

*Talented and Renewed Management Team with Vast Industry Experience*

Over the last 25 years, TV Azteca's management has helped guide the company to a leading market position in Mexico and more broadly within the Spanish-speaking market. Recently, TV Azteca revamped its management under the direction of its Chief Executive Officer, Benjamin Salinas, who has redirected TV Azteca's strategy to focus on its core television broadcast business. In line with this strategy, TV Azteca's senior management, with an average of ten years of experience in the telecommunications industry, has focused on producing, co-producing and purchasing inspiring, creative, bold and innovative content such as "Rosario Tijeras," "MasterChef", "La Isla" and "Hasta Que Te Conocí," which drew in substantial audiences during the twelve months ended June 30, 2017. While TV Azteca actively recruits outside talent to manage the business, it also focuses on developing in-house talent by training and mentoring personnel, developing a talent pipeline to meet TV Azteca's future management needs.

**Business Strategies**

*Focus on High-Quality Multi-platform Content*

TV Azteca believes the key to revenue generation in the television industry is a combination of the ability to anticipate and adapt to changes in consumer preferences and behavior on a timely basis and to consistently carry high quality content that is responsive to consumer tastes and behavior. TV Azteca's driving strategy to maintain and increase revenues is to produce and purchase the highest quality content that focuses on the evolving demands of viewers, including the Mexican broadcast television market that is now complemented by OTT services, the internet and other mobile platforms.

TV Azteca's strategy for producing inspiring, creative, bold and innovative content is based on a flexible approach to the television broadcast business that implements the vision of TV Azteca's new executive leadership and centers on diversifying talent and incorporating new forms of production. TV Azteca has steered away from the use of exclusivity contracts with its core talent, which has paved the way for TV Azteca to attract new audiences through the use of a variety of actors, writers, producers and directors. In addition, TV Azteca's use of new forms of production, including co-production arrangements, which allow TV Azteca to share the cost of production and maintain premium quality content, and selective work for hire production, where TV Azteca finances a third-party's production under TV Azteca's supervision and guidance, enables TV Azteca to obtain the rights to cutting-edge, innovative content. TV Azteca intends to continue to focus its resources on developing, maintaining and improving the high quality of its core over-the-air networks to continue attracting loyal audiences and advertising revenues.

TV Azteca's content strategy also includes a focus on acquiring the broadcast rights to television blockbusters and major special events, such as boxing matches, regular season NFL games and the Super Bowl, the FIFA World Cup and other international soccer championships, Mexican national team soccer games, some of the Mexican Soccer League games and golf tournaments. TV Azteca has long-term agreements for an average term of three years with major content providers such as Sony, Fox and Disney, which grant the right to broadcast film and television programs that have proven popular outside Mexico. TV Azteca believes it can improve profit margins by making partial purchases of certain sports broadcast rights at reduced rates and producing innovative and cost-efficient programming that is appealing to viewers.

*Expand Internet and Social Media Presence*

TV Azteca anticipates generating new sources of revenue by expanding its internet presence through enhancement of its own online platform for streaming video content and enlarging the availability of its video content on established third-party online platforms. TV Azteca's main strategy to increase internet revenues is to shift TV Azteca's focus from online pop-up ad displays to online video advertising.

TV Azteca's strategy for significantly expanding its online video advertising concentrates on consolidating its various websites and providing all its available video content on one main website and accompanying mobile apps, Azteca Internet, that is expected to launch in August 2017. TV Azteca is further expanding the availability of its video content to more online platforms through sales to popular OTT services, including Netflix and Hulu, in addition to its already strong presence on Facebook, YouTube and Twitter.

TV Azteca believes its strategic shift from online pop-up ad displays to online video advertising on Azteca Internet and other online platforms positions TV Azteca to be a key player in the digital space compared to its

competitors who do not have the same capacity to generate original video content or acquire the necessary broadcasting rights for purchased content and music. TV Azteca believes it can gain a strategic benefit by emerging as an early initiator of online video advertising, since it anticipates that the value of online pop-up ad displays will continue to decline due to the availability of ad blocks. As a result, TV Azteca believes its strategy places it in a superior position to its competitors in the long-term, as the currently dominant over-the-air television broadcast progressively shifts to an online market. During the time required for the Mexican market to develop the necessary infrastructure for broadband internet to penetrate the country and become readily available to the Mexican population at high quality, TV Azteca will be able to develop significant know-how that it believes will serve as an important competitive advantage. In the immediate future, TV Azteca anticipates its strategy will allow it to benefit simultaneously from incremental growth in digital advertising sales and from ancillary revenues from over-the-air television broadcasting as advertisers will be incentivized to use both mediums.

*Reach New Clients through Local Advertising Sales on a+ Platform*

TV Azteca is focused on offering local advertisers the most economical way to reach the largest number of potential customers. To benefit from this source of revenue, TV Azteca introduced a+, a network of 35 local channels that produce locally meaningful content such as news, sports and entertainment. TV Azteca's strategy for increasing local advertising sales through this expansive network is based on its unique position to geographically customize the transmission of local programming and advertisements in one or more cities simultaneously by way of its 458 transmission sites. TV Azteca aims to double its 8% local share of TV Azteca's total revenue over the next five years with a+'s launch by gaining new local and regional customers that traditionally advertise on the radio, press, internet and other local media. TV Azteca's strategy and technology offers local businesses the option to target the transmission of its advertisements to a specific city or cities, or within a particular region. No other television competitor in Mexico is able to offer its advertisers the same level of geographic customization of its target audience.

*Price Leading Rates for Advertisers*

Historically, TV Azteca has been a market price leader in advertising sales. In 2016, TV Azteca was able to increase prices at a double-digit rate, on average, for all customers, and in the six month period ended June 30, 2017, TV Azteca increased prices by a mid-single digit. TV Azteca believes that the value gained by customers historically through advertisements on over-the-air broadcast television provides significant opportunities to introduce further price increases going forward. TV Azteca plans to strategically and cumulatively increase prices over the next several years to compensate for the increase in costs to produce and acquire popular, high-quality content.

**Company Information**

TV Azteca is a *Sociedad Anónima Bursátil de Capital Variable*, publicly traded variable capital corporation organized under the laws of Mexico. Our deed of incorporation was executed on June 2, 1993, and was registered with the *Registro Público de Comercio* (the "Public Registry") of Mexico City on July 13, 1993 under the commercial file number 167346. Our deed of incorporation will expire in 2092. Our principal offices are located at Avenida Periférico Sur número 4121, Colonia Fuentes del Pedregal, Mexico City, C.P. 14141, Mexico. Our telephone number is +52 (55) 1720-1313. Our website is located at www.irtvazteca.com. Information contained on, or accessible through, our websites, is not incorporated by reference herein and shall not be considered part of this Offering Circular.

**Recent Developments**

As part of TV Azteca's broader liability management strategies, on July 21, 2017, TV Azteca announced that it intends to redeem all of the outstanding 7.5% senior notes due 2018 (the "Medium Term Notes due 2018") that were issued pursuant to the Medium Term Notes Programme (the "MTN Programme") on August 21, 2017. The redemption is expected to be funded by cash generated from TV Azteca's operations and with a peso-denominated credit facility, which is in line with TV Azteca's strategy to substitute U.S. dollar-denominated liabilities for local currency debt and further strengthen its capital structure. TV Azteca has entered into this Ps.1,597.1 million credit facility with Banco Azteca, S.A., which has a term that extends to September 30, 2020 and accrues interest at a floating interest rate of TIIE plus 2.0%. It includes monthly interest payments, with all principal outstanding coming due at maturity in 2020.

TV Azteca is currently in the process of establishing a new program of *certificados bursátiles* (Mexican debt securities, referred to as "Cebures"), which TV Azteca intends to use to refinance a portion of its existing indebtedness. This program will be denominated in pesos (or an equivalent sum in U.S. dollars or *Unidades de Inversión*) and will permit TV Azteca to select from issuing short-term notes with amounts not exceeding Ps.3

billion ($168 million) with maturities of up to 364 days or issuing medium or long-term notes with amounts not exceeding Ps.10 billion ($559 million) with maturities from 365 days and a maximum of 30 years.

For further information on TV Azteca's indebtedness, see "*Operating and Financial Review—Management's Overview—Indebtedness.*"

**THE OFFERING**

The following is a brief summary of some of the terms of this offering of the notes. For a more complete description of the terms of the notes, see "*Description of Notes*" in this Offering Circular.

| | |
|---|---|
| Issuer | TV Azteca, S.A.B. de C.V. |
| Notes Offered | $400,000,000 aggregate principal amount of 8.250% senior notes due 2024. |
| Offering Price | 100.000%, plus accrued interest, from August 9, 2017. |
| Maturity | August 9, 2024. |
| Interest payment dates | August 9 and February 9 of each year, commencing on February 9, 2018. Payments will be made to the persons who are registered holders at the close of business on July 26 and January 26, respectively, immediately preceding the applicable interest payment date, whether or not a Business Day. |
| Guarantees | The payment of principal, interest and premium on the notes will be fully and unconditionally guaranteed, jointly and severally, on a senior unsecured basis by each of the TV Azteca's existing and future material subsidiaries, as described in "*Description of Notes—Note Guarantees*." |
| Ranking | The notes and the guarantees will: |

- rank equal in right of payment with all of our and the Guarantors' other existing and future senior indebtedness;
- rank senior in right of payment to all of our and the Guarantors' existing and future subordinated indebtedness, if any, subject to certain statutory preferences under Mexican law (including tax, social security and labor obligations);
- be effectively subordinated to all of our and the Guarantors' existing and future secured indebtedness to the extent of the value of the assets securing such indebtedness;
- be structurally subordinated to all existing and future indebtedness and other liabilities, including trade payables, of our subsidiaries that do not guarantee the notes; and
- rank junior to all of our obligations preferred by statute (such as tax and labor obligations).

As of June 30, 2017, TV Azteca and its subsidiaries had consolidated total indebtedness of Ps.15,234 million ($851.2 million), of which none was secured.

| | |
|---|---|
| Optional redemption | On or after August 9, 2021 we may redeem the notes, in whole or in part, at the redemption prices set forth under "*Description of Notes—Optional Redemption*," plus accrued and unpaid interest to, but excluding, the date of redemption. |

Prior to August 9, 2021, we may redeem the notes, in whole or in part, by paying the principal amount of the notes plus the applicable "make whole" premium, plus accrued and unpaid interest to, but excluding, the date of redemption. See "*Description of Notes—Optional Redemption*."

| | |
|---|---|
| Optional redemption upon equity offering················· ·········· | Prior to August 9, 2021 we may use the net cash proceeds of certain equity offerings to redeem up to 35% of the aggregate principal amount of the notes issued under the indenture at a redemption price equal to 108.250% of the principal amount thereof, plus accrued and unpaid interest to, but excluding, the date of redemption; *provided* that: |

- after giving effect to any such redemption at least 65% of the aggregate principal amount of the notes initially issued under the indenture remains outstanding; and

- we make such redemption not more than 90 days after the consummation of such equity offering.

See "*Description of Notes—Optional Redemption—Optional Redemption Upon Equity Offerings*."

| | |
|---|---|
| Additional amounts·························· | All payments by us or the Guarantors in respect of the notes, whether of principal or interest, will be made without withholding or deduction for or on account of any Mexican taxes, unless required by law, in which case, subject to specified exceptions and limitations, we and the Guarantors will pay such additional amounts as may be required so that the net amount received by the holders of the notes in respect of principal, interest or other payments on the notes, after any such withholding or deduction, will not be less than the amount that would have been received by such holders in the absence of any such withholding or deduction. See "*Description of Notes— Additional Amounts*." |
| Optional redemption for changes in withholding taxes··························· | If, as a result of certain changes in Mexican tax laws applicable to payments under the notes, we become obligated to pay additional amounts in excess of amounts attributable to a Mexican withholding tax rate of 4.9% with respect to the notes, then we may redeem the notes, in whole but not in part, at any time at 100% of the outstanding principal amount, plus accrued and unpaid interest to, but excluding, the date of redemption. See "*Description of Notes—Optional Redemption—Optional Redemption for Changes in Withholding Taxes*." |
| Change of control and asset sales ·········· | If a Change of Control (as defined in the "*Description of Notes*") occurs, we will be required to make an offer to purchase the notes at a purchase price equal to 101% of the principal amount, plus accrued and unpaid interest to, but excluding, the date of purchase. If we sell assets under certain circumstances, we will be required to make an offer to purchase the notes at a purchase price equal to 100% of the principal amount, plus accrued and unpaid interest to, but excluding, the date of purchase. See "*Description of Notes—Repurchase Upon a Change of Control*" and "*Description of Notes—Certain Covenants—Limitation on Asset Sales and Sales of Subsidiary Stock*." |
| Use of proceeds ······························ | We estimate that the net proceeds from this offering of the notes will be approximately $395.0 million.  We expect to use the net proceeds for the partial repayment of TV Azteca's $500 million notes due 2020 ("Medium Term Notes due 2020") and for general corporate purposes, including the payment of fees and expenses related to this offering.  See "*Use of Proceeds*." |

13

| | |
|---|---|
| Certain covenants · · · · · · · · · · · · · · · · · · · · · · | The indenture will contain certain covenants that, among other things, will limit our ability and the ability of our subsidiaries to: |

- incur additional indebtedness or issue disqualified or preferred stock;

- pay dividends on our capital stock, purchase, redeem or otherwise acquire or retire our capital stock or subordinated indebtedness, or make certain investments;

- sell assets, including capital stock of our subsidiaries;

- create limitations on the ability of our restricted subsidiaries to pay dividends, make loans or transfer property to us;

- create liens;

- consolidate, merge or transfer assets; and

- engage in transactions with affiliates.

These covenants are subject to important exceptions and qualifications. See "*Description of Notes—Certain Covenants*."

If the notes obtain investment grade ratings from at least two rating agencies and no default has occurred and is continuing, the foregoing covenants will be suspended and have no effect (with the exception of covenants that contain limitations on liens and certain consolidations, mergers and transfer of assets) for so long as two rating agencies maintain their investment grade rating.

| | |
|---|---|
| Events of default · · · · · · · · · · · · · · · · · · · · · · · | For a discussion of certain events of default that will permit acceleration of the principal of the notes plus accrued interest, and any other amounts due with respect to the notes, see "*Description of Notes—Events of Default*." |
| Further issuances · · · · · · · · · · · · · · · · · · · · · | Subject to the limitations contained in the indenture, we may from time to time, without notice to or consent of the holders of the notes, create and issue an unlimited principal amount of additional notes of the same series as the notes offered pursuant to this Offering Circular. See "*Description of Notes—Additional Notes*." |
| Transfer restrictions · · · · · · · · · · · · · · · · · · | We have not registered, and we are not required to and do not plan to register, the notes under the Securities Act and, unless so registered, the notes may not be offered or sold except pursuant to an exemption from, or in a transaction not subject to, the registration requirements of the Securities Act and applicable U.S. state securities laws. See "*Notice to Investors*." |

The notes have not been and will not be registered in the National Securities Registry maintained by the CNBV and may not be offered or sold publicly or otherwise be subject to brokerage activities in Mexico, except that the notes may be offered to investors that qualify as institutional or qualified investors pursuant to the private placement exemption set forth in Article 8 of the LMV.

As required under the LMV, we will notify the CNBV of the offering of the notes outside of Mexico. Such notice will be delivered to the CNBV to comply with a legal requirement and for information purposes only, and the delivery to and the receipt by the CNBV of such notice, does not imply any certification as to the investment quality of the notes or

14

| | |
|---|---|
| | our solvency, liquidity or credit quality or the accuracy or completeness of the information contained in this Offering Circular. |
| Book-entry; form and denominations | The notes will be issued in the form of one or more global notes without coupons, registered in the name of the common depositary for Euroclear Bank S.A./N.V. ("Euroclear") and Clearstream Banking, *société anonyme*, Luxembourg ("Clearstream"). The notes will be issued in minimum denominations of $200,000 and integral multiples of $1,000 in excess thereof. See "*Book-Entry; Delivery and Form*." |
| Listing | Approval-in-principle has been received for the listing and quotation of the notes on the SGX-ST. The notes will be in denominations of $200,000 each or integral multiples of $1,000 in excess thereof. The notes will be traded on the SGX-ST in a minimum board lot size of $200,000 for so long as any of the notes are listed on the SGX-ST and the rules of the SGX-ST so require. |
| Risk factors | See "*Risk Factors*" and the other information in this Offering Circular for a discussion of factors you should carefully consider before deciding to invest in the notes. |
| Governing law | New York. |
| Trustee and registrar | The Bank of New York Mellon. |
| Paying Agent | The Bank of New York Mellon, London Branch. |
| Singapore Listing Agent | Norton Rose Fulbright (Asia) LLP. |

15

**SUMMARY HISTORICAL FINANCIAL AND OTHER INFORMATION**

The following tables present TV Azteca's summary historical financial and other information as of the dates and for the periods indicated. TV Azteca's consolidated financial statements are stated in pesos and are prepared in accordance with IFRS, as issued by IASB. The summary historical financial and other information as of and for the six months ended June 30, 2017 and 2016 has been derived from TV Azteca's unaudited consolidated financial statements as of and for the six months ended June 30, 2017 and 2016. The summary historical financial and other information as of and for the years ended December 31, 2016 and 2015 has been derived from TV Azteca's audited consolidated financial statements as of and for the years ended December 31, 2016 and 2015. See TV Azteca's consolidated financial statements beginning on page F-1 of this Offering Circular. TV Azteca's consolidated financial statements as of and for the years ended December 31, 2016 and 2015 have been audited by its independent auditors, Salles, a member of Grant Thornton International. Salles is a member of the CCPM. The summary historical financial and other information for the twelve month periods ended June 30, 2017 and June 30, 2016 have been derived by adding our results for the six month periods ended June 30, 2017 and June 30, 2016, respectively, to our results for the years ended December 31, 2016 and December 31, 2015, respectively, and then deducting therefrom our results for the six month periods ended June 30, 2016 and June 30, 2015, respectively. The summary historical financial and other information for the twelve months ended June 30, 2017 has been prepared for illustrative purposes only and is not necessarily representative of our results of operations for any future period or our financial condition at any future date.

U.S. dollar amounts presented in the following tables have been translated from peso amounts solely for the convenience of the reader. The exchange rate used in converting pesos into U.S. dollars for amounts derived from the financial statements as of and for the six months and twelve months ended June 30, 2017 was determined by reference to the period-end exchange rate of Ps.17.8973 per U.S. dollar.  The exchange rate used in converting pesos into U.S. dollars for amounts derived from the financial statements as of and for the year ended December 31, 2016 was determined by reference to the period-end exchange rate of Ps.20.6640 per U.S. dollar.

For additional information regarding financial information presented in this Offering Circular, see "*Presentation of Certain Financial and Other Information*."

The summary historical financial and other information included herein is qualified in its entirety and should be read together with the other sections of this Offering Circular and the financial statements included herein and their related notes.

16

The following tables present summary historical financial and other information of TV Azteca as of and for the periods indicated:

| | Six months ended June 30[1] | | | Year ended December 31[1] | | |
|---|---|---|---|---|---|---|
| | 2017 | 2017 | 2016 | 2016 | 2016 | 2015 |
| | ($) | (Ps.) | (Ps.) | ($) | (Ps.) | (Ps.) |
| | (in millions, except as otherwise indicated) | | | | | |
| **Income Statement:** | | | | | | |
| Revenues | 392.1 | 7,017.3 | 6,128.7 | 687.0 | 14,196.6 | 12,859.5 |
| Costs of programming, production and broadcasting | (266.0) | (4,760.4) | (3,791.8) | (435.0) | (8,988.8) | (8,719.8) |
| Selling and administrative expenses | (36.6) | (655.4) | (671.5) | (73.5) | (1,519.6) | (1,605.2) |
| Depreciation and amortization | (22.9) | (409.6) | (345.3) | (44.8) | (924.9) | (910.2) |
| Other expenses, net[2] | (40.8) | (730.7) | (224.8) | (89.5) | (1,850.2) | (1,028.4) |
| Operating income | 25.8 | 461.2 | 1,095.3 | 44.2 | 913.1 | 595.8 |
| Share of profit (loss) from equity accounted investments | (5.1) | (90.4) | 6.6 | 1.1 | 23.3 | (13.4) |
| Comprehensive gain (loss) on financing | 34.5 | 617.9 | (1,197.5) | (153.2) | (3,164.7) | (2,514.3) |
| Income (loss) before taxes on earnings | 55.2 | 988.6 | (95.7) | (107.8) | (2,228.2) | (1,931.9) |
| Taxes on earnings | (30.0) | (537.1) | (622.0) | (45.7) | (944.7) | (715.7) |
| Income (loss) from continuing operations | 25.2 | 451.5 | (717.7) | (153.5) | (3,172.9) | (2,647.6) |
| (Loss) from discontinued operation | - | - | (370.9) | - | - | - |
| Net income (loss) | 25.2 | 451.5 | (1,088.6) | (153.5) | (3,172.9) | (2,647.6) |
| EBITDA[3] | 89.5 | 1,601.5 | 1,665.4 | 178.5 | 3,688.2 | 2,534.4 |
| | | | | | | |
| **Balance Sheet:** | | | | | | |
| **Current Assets:** | | | | | | |
| Cash and cash equivalents | 169.0 | 3,024.5 | 2,754.8 | 216.3 | 4,470.3 | 2,938.4 |
| Trade and other receivables | 595.3 | 10,654.8 | 8,576.0 | 299.9 | 6,198.0 | 6,244.1 |
| Performance rights | 148.9 | 2,665.0 | 2,303.4 | 107.0 | 2,210.6 | 2,082.5 |
| Other current assets [4] | 142.1 | 2,543.3 | 2,952.5 | 141.0 | 2,913.2 | 3,062.2 |
| Total current assets | 1,055.3 | 18,887.6 | 16,586.7 | 764.2 | 15,792.1 | 14,327.2 |
| **Non-current Assets:** | | | | | | |
| Trade long-term | 28.4 | 507.7 | 86.1 | - | - | 165.4 |
| Performance rights | 136.1 | 2,436.6 | 2,594.2 | 156.3 | 3,229.5 | 2,382.0 |
| Property and equipment, net | 215.5 | 3,856.2 | 4,105.3 | 198.9 | 4,111.1 | 4,192.5 |
| Television concessions, net | 375.7 | 6,723.8 | 10,241.0 | 521.9 | 10,785.5 | 9,933.6 |
| Deferred tax assets | 86.4 | 1,546.1 | 2,404.3 | 88.3 | 1,825.1 | 2,524.3 |
| Other non-current assets [5] | 102.0 | 1,826.3 | 3,418.8 | 88.1 | 1,820.8 | 3,154.8 |
| Total non-current assets | 944.1 | 16,896.7 | 22,849.7 | 1,053.6 | 21,772.0 | 22,352.6 |
| **Total assets** | 1,999.4 | 35,784.3 | 39,436.4 | 1,817.9 | 37,564.1 | 36,679.8 |
| **Short-term liabilities** | | | | | | |
| Trade and other payables | 204.2 | 3,654.5 | 5,602.6 | 174.9 | 3,614.8 | 4,103.8 |
| Financial debt[6] | 259.1 | 4,637.0 | - | - | - | - |
| Deferred revenue [7] | 450.8 | 8,068.5 | 6,359.9 | 319.1 | 6,593.8 | 4,956.3 |
| Other short-term liabilities [8] | 64.7 | 1,157.5 | 1,374.3 | 75.7 | 1,564.7 | 750.9 |
| Total short-term liabilities | 978.8 | 17,517.5 | 13,336.8 | 569.7 | 11,773.3 | 9,811.0 |
| **Long-term liabilities** | | | | | | |
| Loans from American Tower Corporation -ATC- | 92.6 | 1,657.3 | 1,694.2 | 91.6 | 1,891.9 | 1,582.6 |
| Medium Term Notes Program -MTN- | 499.5 | 8,939.9 | 14,624.2 | 792.2 | 16,369.5 | 13,630.1 |
| Deferred revenue [7] | 71.9 | 1,287.7 | 1,939.8 | 52.0 | 1,075.5 | 1,902.5 |
| Deferred tax liabilities | 17.4 | 310.9 | 548.2 | 29.1 | 601.6 | 1,041.2 |
| Employee benefits | 10.5 | 188.0 | 197.2 | 9.1 | 188.0 | 197.2 |
| Total long-term liabilities | 691.9 | 12,383.8 | 19,003.6 | 974.0 | 20,126.5 | 18,353.6 |
| **Total liabilities** | 1,670.7 | 29,901.3 | 32,340.4 | 1,543.7 | 31,899.8 | 28,164.6 |
| **Total stockholders' equity** | 328.7 | 5,883.1 | 7,096.1 | 274.1 | 5,664.4 | 8,515.3 |
| | | | | | | |
| **Cash Flow:** | | | | | | |
| Net cash from/(used) in: | | | | | | |
| Operating activities | 15.2 | 271.9 | 892.9 | 190.6 | 3,939.0 | 1,173.5 |
| Investing activities | (9.7) | (174.4) | (380.0) | (45.7) | (944.0) | (1,477.1) |
| Financing activities | (86.2) | (1,543.3) | (696.5) | (70.8) | (1,463.2) | (2,287.1) |

| | Twelve months ended June 30[12] | | | Year ended December 31[12] | | |
|---|---|---|---|---|---|---|
| | 2017 | 2017 | 2016 | 2016 | 2016 | 2015 |
| | ($) | (Ps.) | (Ps.) | ($) | (Ps.) | (Ps.) |
| | (in millions, except as otherwise indicated) | | | | | |
| **Other Information:** | | | | | | |
| EBITDA [3] | 226.0 | 4,044.1 | 3,519.4 | 178.5 | 3,688.2 | 2,534.4 |
| Total debt [9] | 851.2 | 15,234.2 | 16,318.4 | 883.7 | 18,261.4 | 15,212.7 |
| Net debt [10] | 682.2 | 12,209.7 | 13,563.6 | 667.4 | 13,791.1 | 12,274.3 |
| Interest expense | 80.5 | 1,441.6 | 1,342.3 | 69.4 | 1,434.9 | 1,256.3 |
| Total debt / EBITDA | 3.8 | 3.8 | 4.6 | 5.0 | 5.0 | 6.0 |
| Net debt / EBITDA | 3.0 | 3.0 | 3.9 | 3.7 | 3.7 | 4.8 |
| EBITDA / interest expense | 2.8 | 2.8 | 2.6 | 2.6 | 2.6 | 2.0 |
| Free cash flow [11] | 180.5 | 3,230.4 | 2,519.3 | 129.8 | 2,681.4 | 1,153.7 |

| | Twelve months ended June 30, 2017 [12] | |
|---|---|---|
| | ($) | (Ps.) |
| | (in millions, except as otherwise indicated) | |
| **Pro Forma Other Information[13]:** | | |
| Total debt | 729.2 | 13,051.4 |
| Net debt | 582.6 | 10,426.9 |
| Total debt / EBITDA | 3.2 | 3.2 |
| Net debt / EBITDA | 2.6 | 2.6 |

_____

(1) The figures for the six months ended June 30, 2017 do not consolidate ACC's operations in Colombia, which were recorded using the equity method for the six months ended June 30, 2017.  For comparison purposes, the results of ACC's operations for the six months ended June 30, 2016 were included under the heading "(Loss) from discontinued operations." The figures for the years ended December 31, 2016 and 2015 consolidate ACC's operations.

(2) "Other expenses, net" includes (i) donations, (ii) fees for legal advisory services, (iii) other non-operative expenses and (iv) non-cash charges such as impairment from Colombian and other telecommunication assets.

(3) EBITDA is provided for information purposes only and should not be considered in isolation, or as a substitute for operating income or net income, as a measure of operating performance, as a substitute for cash flows from operations or as a measure of liquidity. TV Azteca calculates EBITDA by adding depreciation, amortization and other expenses, net to operating income. See "*Note Regarding Non-GAAP Financial Measures*" for important information regarding the limitations of EBITDA. The following tables set forth the reconciliation of EBITDA for the periods indicated:

| | Six months ended June 30[12] | | |
|---|---|---|---|
| | 2017 | 2017 | 2016 |
| | ($) | (Ps.) | (Ps.) |
| | (in millions, except as otherwise indicated) | | |
| **Reconciliation of EBITDA:** | | | |
| Operating income | 25.8 | 461.2 | 1,095.3 |
| (+) Depreciation and amortization | 22.9 | 409.6 | 345.3 |
| (+) Other expenses, net | 40.8 | 730.7 | 224.8 |
| EBITDA | 89.5 | 1,601.5 | 1,665.4 |

| | Twelve months ended June 30[12] | | | Year ended December 31[12] | | |
|---|---|---|---|---|---|---|
| | 2017 | 2017 | 2016 | 2016 | 2016 | 2015 |
| | ($) | (Ps.) | (Ps.) | ($) | (Ps.) | (Ps.) |
| | | | (in millions, except as otherwise indicated) | | | |
| **Reconciliation of EBITDA:** | | | | | | |
| Operating income | 126.2 | 2,259.1 | 1,820.6 | 44.2 | 913.1 | 595.8 |
| (+) Depreciation and amortization | 45.0 | 806.0 | 690.8 | 44.8 | 924.9 | 910.2 |
| (+) Other expenses, net | 54.7 | 979.0 | 1,008.0 | 89.5 | 1,850.2 | 1,028.4 |
| EBITDA | 226.0 | 4,044.1 | 3,519.4 | 178.5 | 3,688.2 | 2,534.4 |

(4) Amounts listed for "other current assets" are the sum of the following line items on TV Azteca's balance sheet: (i) current tax assets, (ii) related parties, (iii) other financial assets and (iv) inventories.

(5) Amounts listed for "other non-current assets" are the sum of the following line items on TV Azteca's balance sheet: (i) other intangible assets and (ii) investments accounted for using the equity method and other.

(6) There will be no amounts under "financial debt" after giving effect to the redemption of all of the remaining outstanding Medium Term Notes due 2018, which is expected to occur on August 21, 2017.

(7) Figures included in "deferred revenue" correspond solely to advertising advances. See "*Operating and Financial Review—Management's Overview—Critical Accounting Policies and Estimates—Critical Accounting Policies—Recognition of Revenue*" and "*Operating and Financial Review—Management's Overview—Critical Accounting Policies and Estimates—Critical Accounting Policies—Advertising Advances*."

(8) Amounts listed for "other short-term liabilities" are the sum of the following line items on TV Azteca's balance sheet: (i) performance rights, (ii) related parties, and (iii) current tax liabilities.

(9) Amounts listed for "total debt" in pesos are the sum of the following line items on TV Azteca's balance sheet: (i) loans from American Tower Corporation ("ATC"); and (ii) the MTN Programme. After giving effect to the redemption of all of the outstanding Medium Term Notes due 2018, which is expected to occur on August 21, 2017, total debt will be Ps.12,194 million ($681.3 million). For further information on TV Azteca's redemption of the Medium Term Notes due 2018, see "*Summary—Recent Developments*."

(10) Amounts listed for "net debt" are equal to the result of netting total debt (see footnote 9 above) with the cash and cash equivalents on TV Azteca's balance sheet.

(11) Free cash flow is calculated as EBITDA – Capex.

(12) The figures for the six and twelve months ended June 30, 2017 and 2016 exclude ACC's operations while the figures for the years ended December 31, 2016 and 2015 consolidate ACC's operations.

(13) Pro Forma to give effect to this offering and the use of proceeds therefrom (See "*Use of Proceeds*"), the July 14, 2017 redemption of $60.0 million of Medium Term Notes due 2018, and the refinancing of the remaining outstanding Medium Term Notes due 2018 with cash on hand and borrowings under the Banco Azteca term loan facility. Pro Forma Other Information does not reflect the issuance of Cebures pursuant to the new program that TV Azteca is currently in the process of establishing. See "*—Recent Developments*."

**RISK FACTORS**

*Following are certain risks associated with our business and the investment in our securities. The risks and uncertainties described below are not the only risks that we face but represent some of the risks that our management considers important. Some of the risks of investing in our securities are general risks relating to entering into transactions in Mexico. Other risks are specific to our operations. Should any of the following risks materialize, they may materially and adversely affect operations, our financial condition or operating results. Should the foregoing happen, the trading price of the notes may diminish and investors may lose their investment in whole or in part.*

**Risks Related to TV Azteca's Operations**

*TV Azteca's indebtedness and the payment of its debt may adversely affect its operations.*

As of June 30, 2017, TV Azteca has incurred indebtedness of Ps.15,234 million ($851.2 million). TV Azteca may not generate sufficient cash to pay the principal amount, interest and other amounts payable in respect of such indebtedness, and there is no guarantee that market conditions will allow TV Azteca to refinance its existing indebtedness to maturity. TV Azteca's indebtedness could have negative consequences, including:

- requiring the use of a substantial portion of its cash flow to pay its debt, reducing the available cash flow for other purposes, including capital investments, marketing efforts, plans for future growth and distributions payable to its stockholders;

- limiting its ability to obtain additional financing or refinance its existing debt;

- placing TV Azteca at a possible disadvantage relative to its competitors with lower levels of debt and competitors with greater access to capital resources; and

- increasing its vulnerability to less flexibility in its operations or the Mexican economy in general.

*TV Azteca's business is regulated by the Mexican government and its business may be harmed if its broadcast concessions, which expire in 2021, are not renewed or are revoked.*

To broadcast commercial television in Mexico, a broadcaster must have a concession granted by the Mexican government. Such concessions include one or more broadcast television channels and may only be revoked during their term under very limited circumstances. All of TV Azteca's concessions expire on December 31, 2021, since they were renewed by the Mexican government based on the agreement published in the Official Gazette on July 2, 2004, which adopted the ATSC A/53 technological standard for the transition to digital terrestrial television (the "DTT Agreement"). TV Azteca may seek the renewal of its concessions upon their expiration. In the past, the Mexican government has typically renewed the concessions of those concessionaires that comply with the requisite procedures set forth for renewal under Mexican law and on the respective concession title. However, if the Mexican government, through the IFT, does not renew one or more of TV Azteca's concessions in 2021, TV Azteca will not be able to operate the channels covered by such concessions. A failure to renew or a revocation of TV Azteca's concessions would have a material adverse effect on TV Azteca's business, financial condition and results of operations. See "*Our Business—Regulatory.*"

*Possible conflicts of interest may adversely affect TV Azteca's business, financial condition and results of operations.*

Approximately 64.8% of TV Azteca is owned directly or indirectly by Ricardo B. Salinas Pliego and his family. Consequently, Mr. Salinas Pliego has the power to elect a majority of TV Azteca's directors and determine the outcome of actions that require stockholder approval. The interests of Mr. Salinas Pliego could conflict with or differ from the interests of noteholders. For example, the concentration of ownership could delay, defer or prevent a change of control or impede a merger, takeover or other business combination that our management may otherwise view favorably. So long as Mr. Salinas Pliego continues to beneficially own the majority of our common stock, he will maintain the ability to strongly influence or effectively control our decisions. There can be no assurance that the interests of Mr. Salinas Pliego will coincide with those of the noteholders and that the interests of the noteholders will not be adversely affected as a result.

TV Azteca has engaged, and will likely continue to engage in the future, in a variety of transactions with related parties, including Grupo Elektra, S.A.B. de C.V. ("Grupo Elektra"), Banco Azteca, S.A., Institución de Banca Múltiple ("Banco Azteca"), Total Play Telecomunicaciones, S.A. de C.V., Arrendadora Internacional Azteca,

20

S.A. de C.V. ("Arrendadora Internacional Azteca") and other entities that are affiliates of TV Azteca or in which Ricardo B. Salinas Pliego and other shareholders who control TV Azteca hold shares. There can be no assurance that such transactions will not be affected by conflicts of interest between such related parties and TV Azteca.

*Television broadcasting in Mexico is highly competitive and TV Azteca can make no assurances about its ability to overcome competitive challenges.*

Television broadcasting in Mexico is highly competitive and the popularity of television shows, an important factor in advertising sales, is readily susceptible to change. TV Azteca faces competition from other television stations. In particular, we face substantial competition from Televisa, TV Azteca's principal competitor. Televisa is one of the leading producers of Spanish-language television programming in the world with over 40 years of experience producing *telenovelas* and entertainment programs. Televisa also has significant interests in other media, including cable television, satellite television, publishing, radio, movies, video, music and internet, which enable Televisa to offer its advertising clients competitive packages combining advertising in various media that TV Azteca is unable to replicate.

Additionally, TV Azteca expects increased competition from new entrants to the Mexican television broadcasting market. In March 2015, the Federal Telecommunications Institute ("IFT"), the Mexican regulatory body that oversees Mexican telecommunications and broadcasting, announced Grupo Radio Centro and Imagen Television ("Cadenatres") as the winning bidders of two over-the-air broadcasting licenses with separate national coverage. Cadenatres completed the process and received its license. However, because Grupo Radio Centro failed to pay the amount they bid for their over-the-air broadcasting license, the IFT declared their bid null and void. As a result, the portion of the spectrum that was going to be assigned to Grupo Radio Centro is under auction once more. The new bid is for 148 channels for digital terrestrial television to be licensed individually or in packages, depending on the coverage area desired. See "*Our Business—Competition—General Information—Two New Channels of Over-the-Air Television*." Over time, such new entrants may capture market share in the Mexican market, which could adversely affect TV Azteca's business, financial condition and profitability.

TV Azteca cannot assure you that it will be able to maintain or improve its share of the Mexican television advertising or viewing markets, nor can it assure you that the costs of acquiring or producing programming through affiliated companies of TV Azteca and/or third-party companies unaffiliated with TV Azteca, or the prices at which it sells advertising time, will not be adversely affected by competition. In addition to competing with conventional, digital terrestrial television stations, including certain government-run stations and those owned by or affiliated with Televisa, Cadenatres or other new entrants, TV Azteca also competes for Mexican television viewers with cable television providers. Cable television, multi-channel multipoint distribution systems ("MMDS") and direct-to-home ("DTH") satellite services represent a further source of competition for TV Azteca's advertising sales, audiences and program rights. The IFT, in its 2016 Third Quarter Report, notes that there are 20.5 million cable television subscribers.

In addition, the United States and Mexico are parties to an agreement with respect to cross-border satellite television broadcasts. Under this agreement, the Mexican government allows U.S. satellite broadcasting companies to provide DTH satellite services to Mexican households. TV Azteca cannot assure you that cable television, MMDS and DTH services will not capture a more significant share of the Mexican television audience and television advertising market in the future.

*An increase in the popularity of alternative communication technology may cause a shift in demand for digital terrestrial broadcast television that may adversely affect TV Azteca's business, financial condition and results of operations.*

As new technologies and platforms for the distribution, sale and viewing of content are developed and increase in prevalence worldwide, TV Azteca expects that there will be an increase in the demand in Mexico for alternatives to broadcast television, including online platforms that allow content developers to deliver their programming directly to audiences.

The increasing prevalence of alternative communication technology and the development of new alternative communication technologies as well as expanding broadband service may change audience behavior by facilitating the ability of audiences to view video content online using their personal computers, televisions, phones, tablets, videogame consoles, and other devices. In addition, such alternative communication technology may increasingly enable advertisers to bypass the programming delivered by TV Azteca and deliver content directly to a consumer, which may impact TV Azteca's audience size and the rates TV Azteca receives from its advertisers.

21

TV Azteca believes that adoption and consumer acceptance of alternative communication technology will occur in Mexico at a moderate rate due to low broadband penetration rates in Mexico. However, there can be no assurance that the adoption of alternative communication technology will occur at a moderate pace in Mexico as TV Azteca expects. Although TV Azteca has adopted a strategy to accelerate the development of online platforms to allow TV Azteca to deliver its video content directly to viewers in an effort to capture incremental revenue to broadcast programming in the medium term, there can be no assurance that this strategy will be successful.

*The seasonal nature of TV Azteca's business affects TV Azteca's revenues and income and could impact TV Azteca's profitability.*

TV Azteca's business has experienced and is expected to continue to experience seasonality, which is common in the television industry. TV Azteca's advertising revenues, which are recognized when advertising goes on the air, are generally higher in the fourth quarter because of the high level of advertising during the holiday season. Consequently, TV Azteca's results of operations are largely dependent on revenues in the fourth quarter, and a decrease in revenue in the fourth quarter could adversely affect TV Azteca's results of operations for the year. See "*Operating and Financial Review—Management's Overview—Critical Accounting Policies and Estimates—Critical Accounting Policies—Seasonality of Sales.*"

*The absence, cancellation or non-broadcasting of major broadcast events could adversely affect TV Azteca's business, financial condition and profitability.*

In the past, TV Azteca has generated substantial advertising revenues from broadcasting recurring major sporting and entertainment events. TV Azteca's broadcasting of the Olympic Games, the World Cup, the UEFA Champions League, Mexican national soccer team games, boxing world championships and reality shows increased net income significantly during the periods in which they were aired. The absence or cancellation of major broadcast events in certain years could adversely affect TV Azteca's business, financial condition and profitability. Similarly, TV Azteca's financial results may be affected in years when an important broadcasting event is held that has a large television audience in Mexico and TV Azteca does not have the rights to broadcast such event.

*If TV Azteca loses one or more of its key advertisers, it may lose a significant source of income.*

For the six months ended June 30, 2017, the most significant advertisers for TV Azteca were: Grupo Elektra, Cervecería Cuauhtémoc Moctezuma, Procter & Gamble de México, Bayer de México, Frabel, Genomma Lab International, Cervecería Modelo de México, Havas Media, CPIF Venture, AT&T Comunicaciones Digitales, Radio Movil Dipsa, The Coca-Cola Export Corporation, Pegaso PCS, Bimbo and Mondelez México, among others. The top 10 advertisers (and their affiliates) for TV Azteca represented 18% of TV Azteca's net revenue. All contracts are non-refundable and paid in advance for fixed one year terms. The inability of TV Azteca to renew its relationships with any of its main advertisers could adversely affect its operating results.

*The cost of producing and acquiring TV Azteca's programming may increase.*

TV Azteca's variable operating costs include the production and acquisition of programming. The cost of producing original programming varies considerably depending on the type of program, and is generally more expensive than acquiring broadcast rights to externally produced programming. In general, the production of *telenovelas*—a key component of TV Azteca's program offerings—is more expensive relative to the production of other types of programming.

If TV Azteca fails to effectively anticipate and manage the costs of producing its original programming or of acquiring broadcast rights for externally produced programming, its programming costs may increase at a rate higher than its advertising revenues. If such costs increase substantially, TV Azteca's profitability may be negatively affected.

*TV Azteca is a holding company and can pay its liabilities only through the cash flow from its subsidiaries or out of the proceeds of its financings.*

TV Azteca is a holding company with no significant assets other than the stock of its subsidiaries. In order to pay its obligations, TV Azteca must rely on income from dividends, loans and other cash flow from its subsidiaries or debt or equity financings. Because TV Azteca is a holding company, the claims of its creditors are structurally subordinated to the claims of its subsidiaries' creditors with respect to the assets of such subsidiaries. As of June 30, 2017, TV Azteca's consolidated subsidiaries had no debt with third parties but this may change in the

22

future. For a description of certain of TV Azteca's obligations and liabilities, see "*Operating and Financial Review—Management's Overview—Indebtedness.*"

The ability of our subsidiaries to pay dividends or distributions is subject to Mexican legal requirements, which in general terms provide that a Mexican corporation may declare and pay dividends or distributions only out of the profits reflected in its year-end financial statements, if such payment is approved by its stockholders and is made after the creation of required legal reserves and the absorption or satisfaction of losses suffered in previous fiscal years.

*TV Azteca is dependent on key personnel of its subsidiaries and third-party companies not affiliated with TV Azteca, some of whom are represented by labor unions.*

TV Azteca has no direct employees and all personnel in the administration and operation of TV Azteca's business are supplied by TV Azteca's subsidiaries and third-party companies that are not affiliated with TV Azteca. TV Azteca's success depends in large part upon the abilities and efforts of the senior management and key employees of TV Azteca's subsidiaries.

Likewise, TV Azteca's future success depends on its continuing ability to identify, train and retain qualified management personnel who are hired by TV Azteca's affiliates and/or third-party companies unaffiliated with TV Azteca. There is significant competition for qualified personnel and there are no assurances that TV Azteca will be able to attract, integrate or retain them.

As of June 30, 2017, approximately 11.3% of TV Azteca's employees are represented by a television union, with a smaller number represented by the actors' guild or musicians' union. These contracts are reviewed annually with respect to salaries and every two years with respect to benefits. Our inability to renegotiate such contracts could have an adverse effect on TV Azteca's operations.

*TV Azteca may experience liquidity difficulties.*

TV Azteca may experience liquidity difficulties in the event of an economic crisis in Mexico or in any other parts of the world. In addition, any significant decrease in TV Azteca's advertising revenue or a significant increase in its operating costs could cause TV Azteca to experience future liquidity difficulties. The same would happen with any significant increase in the cost of pesos for the payment of TV Azteca's debt denominated in U.S. dollars. However, TV Azteca intends to hedge its obligations on the notes to reduce its exposure to adverse movements in exchange rates using derivative financial instruments such as forward contracts, options, futures or other strategies with no exotic elements or variables or leverage. These hedging transactions may be closed in established markets such as Mexder (Mexican Derivatives Market), Chicago Board of Trade or with Financial Institutions in Over the Counter transactions. Although we currently intend to enter into these hedging transactions, there can be no assurance that we will do so in a timely manner or at all. In the absence of such hedges, our liquidity position could be materially adversely affected by exchange rate fluctuations.

*Changes in telecommunications laws and regulations could adversely affect TV Azteca's business, financial condition and results of operations.*

TV Azteca is regulated by the Telecommunications and Broadcasting Law (*Ley Federal de Telecomunicaciones y Radiodifusión* or the "LFTR"), among others, which may be amended in a manner which could adversely affect the way that certain laws and regulations are enforced or interpreted, and new laws or regulations could be adopted. For example, on June 12, 2013, changes to the applicable legal framework related to telecommunications and broadcasting (the "Telecom Reform") came into force. As a result of the Telecom Reform, the LFTR was published in the Official Gazette, and became effective on August 13, 2014. The LFTR amends, supplements and repeals certain provisions related to previous telecommunications and broadcasting legislation, in order to be consistent with the Telecom Reform. The Telecom Reform, the LFTR and any regulations related thereto to be issued by the President and IFT, as applicable, and certain actions recently taken by IFT, or to be taken by IFT from time to time, affect or could significantly and adversely affect our business, results of operations and financial condition. There can be no assurance that there may be other changes to Mexican laws and regulations that could directly affect TV Azteca's business, financial condition and results of operations. See "*Our Business—Regulatory.*"

23

*Disputes involving TV Azteca regularly result in, and in the future may result in, the need to use considerable financial resources and valuable management attention to resolve such disputes.*

TV Azteca is a defendant in various legal proceedings and claims and is a plaintiff in others. TV Azteca incurs significant legal expenses in connection with these disputes. In addition, the disputes may distract TV Azteca's management and staff, which are provided by TV Azteca's subsidiaries and/or unrelated third parties, from their usual responsibilities. While TV Azteca does not expect that the final disposition of any of these litigation matters will have a material adverse effect on its business, financial condition or results of operation, there can be no assurance that this will not be the case. See also, "*Our Business—Judiciary, Administrative or Arbitral Processes.*"

**Risks Related to AIC**

*AIC is subject to risks related to its joint ventures with affiliated stations.*

AIC, a subsidiary of TV Azteca, is a U.S. based company that launched Azteca America, a Spanish-language television broadcast network with a nationwide reach within the United States.  AIC represents approximately 9% of the revenue of TV Azteca as of June 30, 2017.  See "*Our Business—Description of the Business—TV Azteca's International Television Networks—United States.*"

Unlike TV Azteca whose strategy focuses on the Mexican market, AIC's future growth strategy focuses on entering into partnership agreements with existing digital terrestrial television broadcast stations that can enhance or expand its operations in the United States. Likewise, the growth strategy is enhanced by the execution of distribution contracts with cable and satellite television companies. The negotiation of partnership agreements for additional stations and television systems, as well as the integration of new stations in Azteca America may require stations to incur significant costs and utilize valuable management time and resources. The failure to achieve the expected benefits of any station partnership or to successfully integrate the operations of newly partnered stations may also adversely affect AIC's financial condition and results of operation.

If AIC cannot renew its partnership agreements with digital terrestrial television stations or restricted television systems or cannot enter into new partnership and/or distribution contracts, AIC's revenues may decline significantly.

The various partnership agreements with television stations and the distribution contracts with restricted television systems that AIC has executed will end or may end following a specified period. If AIC cannot agree on new terms to continue its partnership with a station operator or cable system, or find a comparable partnership or cable system in the designated market area served by the station, the revenue generated by Azteca America may decrease significantly and could have a materially adverse effect on TV Azteca's business, financial condition and results of operations.

*AIC's inability to sell advertising time on its channels would adversely affect its revenues and operations.*

AIC's operations depend on its ability to sell advertising time in the United States. AIC's ability to sell advertising time largely depends on ratings and the overall level of demand for television advertising in the United States. A decline in U.S. economic activity may reduce overall advertising demand and thus adversely affect AIC's ability to generate advertising revenue. A decline in audience ratings (because of competition, a lack of popular programming, or changes in viewers' preferences) would also adversely affect AIC's revenue as it directly depends on audience ratings. In addition, audience ratings for a new television network may take longer to develop given that there are multiple options available, in both English and Spanish, for American Spanish speakers. Additionally, because AIC focuses on a Spanish speaking audience, its level of audience will depend on:

- the desire of a Spanish speaking audience in the United States to see Spanish language programming; and

- the growth of a Spanish speaking audience due to constant migration and the continuous use of the Spanish language among Spanish speakers in the United States.

If any of these factors changes, Azteca America may lose some of its target audience, resulting in a decline in ratings and a loss of advertising revenue.

Because the Hispanic population in the United States is highly concentrated on a geographical basis, a regional decline in economic conditions or other negative developments in particular markets can have a significant adverse effect on Azteca America's operations.

24

As of January 19, 2016, approximately 61.4% of the Hispanic population in the United States lived in the states of California, Florida, New York, Texas and Illinois. The top 10 Hispanic markets, including the cities of Los Angeles, New York, Miami-Fort Lauderdale, Houston, Dallas and Chicago, together account for 50.64% of Spanish speaking households with a television. As a result, a significant decline in revenues from station operations in these markets, whether due to a decline in regional economic activity, increased competition or otherwise, may have a material adverse effect on the financial performance of Azteca America and could have a materially adverse effect on TV Azteca's business, financial condition and results of operations.

**Risks Related to Doing Business in Mexico**

*Depreciation of the peso relative to the U.S. dollar may adversely affect TV Azteca's ability to repay debt and other obligations as well as its business, financial condition and results of operations.*

Currently, TV Azteca does not hedge its exposure to currency risk. Declines in the value of the peso relative to the U.S. dollar will increase the interest and repayment costs in pesos of TV Azteca's existing U.S. dollar-denominated indebtedness, including the indebtedness incurred in this offering, and increase the cost in pesos of TV Azteca's other dollar-denominated expenditures. Such declines could also cause TV Azteca to recognize foreign exchange losses and could adversely affect its ability to meet its interest and principal obligations on its indebtedness. A significant portion of TV Azteca's operating costs and other expenditures are dollar-denominated. These costs include the payments TV Azteca makes for the programming broadcast rights, for the leasing of satellite transponders and for purchases of capital equipment. Since the majority of TV Azteca's revenue is denominated in pesos, the increased costs are not offset by any exchange-related increase in revenue.

Due to the significant economic relationship between Mexico and the United States, the value of the peso has been subject to significant fluctuations with respect to the U.S. dollar in the past and may be subject to significant fluctuations in the future. Any future devaluations of the peso could adversely affect TV Azteca's business, financial condition and results of operations. See "*Risk Factors—Risks Related to TV Azteca's Operations—TV Azteca may experience liquidity difficulties.*"

*TV Azteca's business, financial condition and results of operation are dependent on the Mexican economy, which may be adversely affected by developments in the United States.*

A decline in economic growth, high rates of inflation and high interest rates in Mexico generally have an adverse effect on TV Azteca's operations. Slower growth in the Mexican economy will generally result in reduced advertising spending. In the event that inflation returns to high levels while economic growth slows, TV Azteca's business, financial condition, results of operations, and the market price of its securities may be affected. Also, high interest rates and economic instability could increase TV Azteca's costs of financing.

In addition, the Mexican economy is heavily influenced by the U.S. economy and the U.S. government policies due to the North American Free Trade Agreement ("NAFTA") and high level of economic activity between the two countries. However, the election of Donald Trump as the president of the United States and the control of both the House of Representatives and Senate of the United States by the Republican Party may create uncertainty regarding the future of NAFTA and trade between the U.S. and Mexico as President Trump, on May 18, 2017, notified the U.S. Congress that he intends to initiate negotiations with Canada and Mexico to modernize NAFTA to better implement U.S. trade policy objectives. According to the Bipartisan Congressional Trade Priorities and Accountability Act of 2015, said notification formally launched a 90-day countdown before talks between the three countries can begin. The U.S. Trade Representative Robert Lighthizer announced that NAFTA negotiations among the United States, Mexico, and Canada will take place in Washington D.C. from August 16, 2017 through August 20, 2017. The re-negotiation or termination of NAFTA and/or other U.S. government policies that may be adopted under the Trump administration may have a material adverse effect on the Mexican economy, which, in turn, may adversely affect TV Azteca's business, financial condition and results of operations.

*Fluctuations in the U.S. economy or the global economy in general may adversely affect Mexico's economy and TV Azteca's business, financial condition and results of operations.*

Mexico's economy is vulnerable to market downturns and economic slowdowns in the United States and elsewhere in the world. Financial problems or an increase in risk related to investment in emerging economies could limit foreign investment in Mexico and adversely affect the Mexican economy. Mexico has historically experienced uneven periods of economic growth and was adversely affected by the global economic crisis that started in the late-2000s. Although Mexico, the U.S. and other governments have taken steps to increase liquidity in the financial markets, there can be no assurance that such measures will lead to sustained growth of the overall business

25

environment in which TV Azteca operates and any future economic downturn in the U.S. or global economy could adversely affect TV Azteca's business, financial condition and results of operations. For instance, demand for advertising may decrease because of reduced consumer spending on TV Azteca advertised products or because advertisers choose to reduce advertising costs. In addition, consumer demand generally decreases during economic crises.

*The Mexican government exercises significant influence over the economy.*

The Mexican federal government has exercised, and continues to exercise, significant influence over the Mexican economy. Mexican federal governmental actions and policies concerning the economy, state-owned enterprises and state controlled, funded or influenced financial institutions often fail to meet their objectives and TV Azteca cannot assure that their current or future governmental actions and policies will meet their objectives, which could have a significant impact on private sector entities in general, the market and on TV Azteca in particular.

*Fluctuations in interest rates and inflation may adversely affect TV Azteca's business, financial condition and results of operations.*

Any negative fluctuation in interest rates could have an adverse effect on TV Azteca's financial condition because the amount of interest may increase with regard to potential indebtedness incurred in the future, which could be owed under a variable rate. According to Banco de México, annual inflation was 2.1% and 3.4% for the years ended December 31, 2015 and 2016, respectively. Any significant increase in the inflation rate in Mexico could adversely affect TV Azteca's business, financial condition and results of operations because inflation can adversely affect consumer purchasing power, which may affect TV Azteca's advertisers and the sale by TV Azteca of advertising time on its networks.

*The political situation in Mexico may adversely affect TV Azteca's business, financial condition and results of operations.*

Political instability in Mexico has been a determining factor for investment. In recent years, the political situation has experienced major changes and political stability is not yet guaranteed. As a Mexican corporation with a significant percentage of its assets and operations in Mexico, TV Azteca's business, financial condition and results of operations may be adversely affected in the event of political change or instability.

*If the Mexican Government imposes restrictions and exchange controls, TV Azteca's ability to repay debt in U.S. dollars may be adversely affected.*

In the past, the Mexican economy has experienced balance of payments deficits and shortages in foreign exchange reserves. TV Azteca cannot guarantee that the Mexican federal government will not implement a restrictive exchange control policy in the future. A restrictive exchange control policy may prevent or restrict TV Azteca's access to U.S. dollars and limit its ability to repay its debt. In addition, TV Azteca cannot predict what impact a restrictive exchange control policy would have on the Mexican economy in general.

*Mergers in various economic sectors may result in highly concentrated advertising markets.*

Many companies in Mexico are subject to a worldwide trend of mergers and acquisitions, which may result in fewer companies competing in the market and, therefore, fewer companies advertising themselves on television. In recent years, this trend of mergers and acquisitions has been particularly significant in the telecommunications, financial, pharmaceutical and beverage sectors in Mexico, resulting in highly concentrated industries.

As a result of such mergers and acquisitions, the subsequent decrease in the number of companies advertising themselves on television may negatively impact TV Azteca's advertising sales and as a result could adversely affect TV Azteca's business, financial condition and results of operations.

**Risks Related to the Notes**

*Payment on the notes may not be made or may be limited if TV Azteca or one or more of the Guarantors is declared bankrupt.*

If TV Azteca or any of the Guarantors is declared bankrupt by a Mexican Court or becomes subject to a reorganization or *concurso mercantil* proceeding in a Mexican court, the obligations of TV Azteca or such Guarantor (as the case may be) under the notes would:

- except in the case that the notes have become secured, be converted into pesos at the exchange rate prevailing at the time of a declaration of bankruptcy or reorganization or *concurso mercantil* and from

26

pesos into inflation indexed units at the exchange rate prevailing at that time and would not be adjusted to take into account any devaluation of the peso to the U.S. dollar after such conversion;

- be dependent upon the outcome of the bankruptcy or reorganization proceedings, and payment, if any, would be made after all of its unsecured creditors have properly filed claims and to the extent funds are sufficient;

- cease to accrue interest against the Issuer or the relevant Guarantor, as the case may be, except in the case that the notes have become secured, interest may accrue up to the value of the collateral; and

- be subject to certain statutory preferences including tax, social security and labor claims and, except in the case that the notes have become secured, claims of secured creditors.

There is also limited relevant related legal precedent or judicial history. For such reasons, the ability of the holders of the notes to effectively collect payments due under the notes may be compromised or subject to delay.

In addition, under Mexican law, it is possible that in the event TV Azteca or any of the Guarantors is declared insolvent, bankrupt or become subject to *concurso mercantil*, any amount by which the stated principal amount of the notes exceeds their accumulated value (which includes accumulated and unpaid interest) may be regarded as not matured and, therefore, claims of holders of the notes may be allowed only to the extent of the accumulated value of the notes. At present, there are very few Mexican legal precedents regarding bankruptcy or *concurso mercantil* in Mexico on this point and, accordingly, uncertainty exists as to how a Mexican court would measure the claims of holders of the notes.

*There is a limited market for the notes.*

There is currently no active secondary market for the notes and such a market may not develop once the offer has been made. The price at which the notes are traded may be subject to various factors, such as interest rates, market conditions for similar instruments, macroeconomic conditions in Mexico and abroad and TV Azteca's and the Guarantors' financial situation. If this secondary market does not develop, the liquidity of the notes may be negatively affected, the holders of the notes may not be able to sell the notes in the market and either (i) may be unable to recover all or part of the price initially paid for the notes or (ii) may have to sell the notes at prices far below the price initially paid.

Approval-in-principle has been received for the listing of the notes on SGX-ST. No assurance can be given that the notes, once listed, will continue to be listed and trade on SGX-ST.

We also can make no assurances that holders of notes will be able to sell their notes at a particular time or that the prices that such holders receive when they sell the notes will be equal to or more than the prices they paid for the notes. Future trading prices of the notes will depend on many factors, including:

- TV Azteca's operating performance and financial condition;

- ratings of TV Azteca's debt published by credit ratings agencies;

- the level, direction and volatility of market interest rates generally;

- the time remaining to maturity of the notes;

- the liquidity of the notes generally and the interest of securities dealers in making a market in the notes;

- the market for similar securities; and

- general economic and political conditions.

*TV Azteca is leveraged and its leverage and debt service obligations could adversely affect its business.*

As of June 30, 2017, TV Azteca had Ps.15,234 million ($851.2 million) of indebtedness. If TV Azteca is not able to generate enough cash to pay the principal, interest and other amounts due under its indebtedness, or if market conditions do not permit TV Azteca to repay or refinance its existing indebtedness at maturity, TV Azteca could suffer various negative consequences. These include:

- requiring the dedication of a substantial portion of its cash flow from operations to service indebtedness, thereby reducing the amount of cash flow available for other purposes, including capital expenditures, marketing efforts, future growth plans and distributions payable to its shareholders;

27

- limiting its ability to obtain additional financing or to refinance its existing indebtedness;

- placing it at a possible competitive disadvantage relative to less leveraged competitors and competitors with greater access to capital resources;

- increasing its vulnerability to downturns in its business or the Mexican economy generally; and

- limiting its ability to make cash distributions to its shareholders.

*Service of process must be effected in person.*

In connection with the notes, Law Debenture Corporate Services Limited has been appointed, designated and empowered as agent for service of process to be notified of any legal action related to the issuance of the notes. This type of notification must be made in person to be valid under Mexican law. Notice of legal action by mail does not constitute personal notification under Mexican law. Therefore, if any notification of legal action is made by mail or other means, other than in person, a final judgment rendered in the legal action may not be enforced in the courts of Mexico.

*Payment of judgments may be made in pesos.*

Under the Mexican Monetary Law (*Ley Monetaria de los Estados Unidos Mexicanos)*, in the event that any proceedings are brought in Mexico seeking performance of TV Azteca's obligations under the notes TV Azteca may discharge its obligations denominated in any currency, other than pesos, by paying pesos converted at the prevailing exchange rate on the date payment is made. This rate is currently determined by *Banco de México* and published in the Official Gazette. If payment is made in Mexico and TV Azteca elects to make payments due on the notes in pesos in accordance with the Mexican Monetary Law, the amounts paid may be converted by the payee into the U.S. dollars or any other currency and, if converted, such amounts may not be sufficient at such time to purchase U.S. dollars or any other currency equal to the amount of the principal, interest or additional amounts due on the notes. As a result, there may be a shortfall for judgments obtained in Mexico. No separate action exists or is enforceable in Mexico for compensation of any shortfall.

*It may be difficult to enforce civil liabilities against TV Azteca, the Guarantors or TV Azteca's or the Guarantors' directors, officers and controlling persons.*

TV Azteca and the Guarantors other than AIC are organized under the laws of Mexico, and most of TV Azteca's and the Guarantors' directors, officers and controlling persons reside in Mexico. In addition, a substantial portion of the assets of TV Azteca, the Guarantors and the directors, officers and controlling persons of TV Azteca and the Guarantors, are located outside of the United States. As a result, it may be difficult for investors to effect service of process within the United States on such persons or to enforce any judgments rendered against them. There is doubt as to the enforceability against such persons in original actions in Mexican courts, of liabilities predicated solely on New York law as to the enforceability in Mexican courts of judgments obtained in the courts of the United States.

*TV Azteca may not have the ability to raise the funds necessary to finance the offer to purchase the notes required by the indenture upon a Change of Control.*

If there is a Change of Control (as defined in the indenture governing the notes), TV Azteca would be required by the indenture governing the notes to make an offer to purchase all outstanding notes at a price equal to 101% of the principal amount of the notes, plus any accrued and unpaid interest through the date of purchase.

The source of funds for any payment will be TV Azteca's available cash or cash generated from other sources, including borrowings, sales of assets or sales of equity. However, TV Azteca cannot guarantee that it will have sufficient funds to pay all of the debts that may be due and payable at that time. TV Azteca may not be able to repurchase the notes upon a change of control because it may not have sufficient financial resources to purchase all of the notes that are tendered upon a change of control. TV Azteca's failure to repurchase the notes upon a change of control would be a default under the notes, which default may, in turn, trigger cross-acceleration provisions in other debt instruments.

*The notes and the guarantees by the Guarantors will be effectively subordinated to TV Azteca's secured debt and to certain claims preferred by statute.*

TV Azteca's obligations under the notes and the obligations of the Guarantors under the guarantees are unsecured. As a result, the notes and the guarantees will be effectively subordinated to all of TV Azteca's and the Guarantors' secured debt to the extent of the value of the collateral securing such debt. Although TV Azteca and the Guarantors do not have any secured debt outstanding as of the issue date of the notes, the indenture governing the

notes permits TV Azteca to incur secured debt in the future. In the event that TV Azteca or the Guarantors are not able to repay amounts due under any existing or future secured debt obligations, creditors could proceed against the collateral guaranteeing such indebtedness. In that event, any proceeds upon a realization of the collateral would be applied first to amounts due under the secured debt obligations before any proceeds would be available to make payments on the notes. If there is a default, the value of this collateral may not be sufficient to repay both TV Azteca's secured creditors and the holders of the notes.

*To the extent that certain of TV Azteca's subsidiaries are not Guarantors, TV Azteca's obligations with respect to the notes will be effectively subordinated to all liabilities of these non-Guarantor subsidiaries.*

Initially, all of TV Azteca's existing subsidiaries will be Guarantors of the notes.  However, with respect to future subsidiaries, only certain material subsidiaries will be required to become Guarantors, as described under "*Description of Notes.*" To the extent that certain of TV Azteca's future subsidiaries that are not Guarantors or TV Azteca's current Guarantors are released from their guarantees, any right that TV Azteca or the Guarantors have to receive assets of any of the non-Guarantor subsidiaries upon the liquidation or reorganization of those subsidiaries, and the consequent rights of holders of notes to realize proceeds from the sale of any of those subsidiaries' assets, will be effectively subordinated to the claims of that subsidiary's creditors, including trade creditors and holders of debt of that subsidiary.

*The guarantees may not be enforceable.*

The guarantees provide a basis for a direct claim against the Guarantors; however, it is possible that the guarantees may not be enforceable. In the event that a Guarantor becomes subject to a reorganization or *concurso mercantil* or similar proceeding or to bankruptcy, the relevant guarantee may be deemed to have been a fraudulent transfer and declared void, based upon the Guarantor being deemed not to have received fair consideration or a direct benefit in exchange for such guarantee, or similar principles.

If a Guarantor's guarantee is voided as a fraudulent conveyance or found to be unenforceable for any reason, the holders of the notes will not have a claim against the Guarantor and will only be a creditor of TV Azteca or any other Guarantor whose obligation was not set aside or found to be unenforceable.

On the basis of historical financial information, recent operating history and other factors, TV Azteca believes that each Guarantor, after giving effect to its respective guarantee, will not be insolvent, will not have unreasonably small capital for the business in which it is engaged and will not have incurred debts beyond its ability to pay such debts as they mature. However, TV Azteca cannot assure the holders of the notes as to what standard a court would apply in making such determinations or that a court would agree with its conclusions in this regard.

*The credit rating of the notes may be subject to review.*

Credit ratings issued with respect to the notes may be subject to review for different reasons related to TV Azteca, Mexico, or other issues that in the opinion of the respective rating agencies may impact the possibility of repayment.

*Modifications to the current tax scheme may adversely affect the notes.*

There is no guarantee that the current tax scheme applicable to the notes will not be modified in the future, which may adversely affect (i) the tax rate; (ii) the interest accrued by the notes (including greater withholdings); (iii) transactions executed with the notes; and (iv) the holders of the notes.

*The provisions of the indenture generally will not apply to any unrestricted subsidiaries and therefore their ability to incur debt, encumber their assets and make payments and distributions, among other matters, is not limited thereby.*

Generally, the covenants and events of default included in the indenture do not apply to unrestricted subsidiaries. See "Description of Notes." As a result, the indenture imposes no limitations on the ability of any unrestricted subsidiaries to incur debt, make restricted payments, pledge their assets, make asset sales, and permit restrictions on their ability to pay dividends or make other distributions to us or issue their stock to third parties. While TV Azteca currently does not have any unrestricted subsidiaries, it will be permitted, subject to certain limitations, to designate new or existing subsidiaries as unrestricted subsidiaries.

*The indenture governing the notes imposes significant operating and financial restrictions, which may prevent TV Azteca from capitalizing on business opportunities.*

The indenture governing the notes imposes significant operating and financial restrictions on TV Azteca. These restrictions will, subject to certain exceptions, limit TV Azteca's ability, and the ability of its restricted subsidiaries, to, among other things:

- incur additional indebtedness;

- make restricted payments, including dividends or other distributions;

- make investments;

- sell capital stock of TV Azteca's subsidiaries;

- guarantee other indebtedness;

- create or assume liens;

- enter into agreements that restrict the ability of TV Azteca's restricted subsidiaries to pay dividends or make other distributions;

- enter into transactions with affiliates; and

- consolidate, merge or sell all or substantially all of TV Azteca's assets.

*There are restrictions on your ability to transfer the notes.*

The notes have not been and will not be at any time in the future registered under the U.S. Securities Act or any U.S. state securities laws and may not be offered or sold except pursuant to an exemption from the registration requirements of the Securities Act.  Any resales of the notes will be subject to the transfer restrictions described under the section entitled "*Notice to Investors*."

30

## USE OF PROCEEDS

We estimate that the net proceeds from the offering of these notes will be approximately $395.0 million.

We expect to use the net proceeds from the sale of notes for the partial repayment of TV Azteca's $500 million Medium Term Notes due 2020 and for general corporate purposes, including the payment of fees and expenses related to this offering.

## CAPITALIZATION

The following table sets forth the cash and cash equivalents and capitalization of TV Azteca and its subsidiaries (all of which shall initially be Guarantors) as of June 30, 2017 (i) on an actual basis and (ii) as adjusted to give effect to the issuance and sale of the notes in this offering and the use of the net estimated proceeds therefrom, and is derived from, and qualified in its entirety by reference to, TV Azteca's consolidated financial statements, which have been prepared in accordance with IFRS, as issued by IASB. This table should be read in conjunction with TV Azteca's consolidated financial statements included in the Offering Circular.

For convenience of the reader only, amounts as of June 30, 2017 have been translated into U.S. dollars at the exchange rate published by the *Banco de México* in the Official Gazette as the rate for the payment of obligations denominated in non-Mexican currency payable in Mexico as of June 30, 2017, of Ps.17.8973 per U.S. dollar.  No representation is being made that the peso or dollar amounts shown herein could have been or could be converted into U.S. dollars or pesos at any rate. Except as set forth below or as otherwise disclosed in this Offering Circular, as of the date hereof there has been no material change in TV Azteca's capitalization since June 30, 2017.

| | As of June 30, 2017 | | | |
|---|---|---|---|---|
| | Actual | Actual | As adjusted [2] | As adjusted [2] |
| | ($) | (Ps.) | ($) | (Ps.) |
| | (in millions, except as otherwise indicated) | | | |
| Cash and cash equivalents | 169.0 | 3,024.5 | 146.6 | 2,624.5[3] |
| **Short-term debt:** | | | | |
| Medium Term Notes due 2018[1] | 259.1 | 4,637.0 | — | — |
| Total short-term debt[1] | 259.1 | 4,637.0 | — | — |
| **Long-term debt:** | | | | |
| Medium Term Notes due 2020 | 499.5 | 8,939.9 | 147.4 | 2,638.1 |
| 8.250% Senior Notes due 2024 offered hereby | — | — | 400.0 | 7,158.9 |
| Credit Facility in Pesos[1] | — | — | 89.2 | 1,597.2 |
| ATC Long-Term Credit Facility | 92.6 | 1,657.3 | 92.6 | 1,657.3 |
| Total long-term debt | 592.1 | 10,597.2 | 729.2 | 13,051.4 |
| **Stockholders' equity:** | | | | |
| Total stockholders' equity | 328.7 | 5,883.1 | 328.7 | 5,883.1 |
| Total capitalization | 1,179.9 | 21,117.3 | 1,057.9 | 18,934.5 |

---

(1)   On July 14, 2017, TV Azteca redeemed $60 million. The remaining outstanding Medium Term Notes due 2018 are expected to be redeemed on August 21, 2017. The redemption is expected to be funded by cash on hand and with a Ps.1,597.1 million credit facility with Banco Azteca, S.A., which has a term through  September 30, 2020 and accrues interest at a floating interest rate of TIIE plus 2.0%. See "*Summary—Recent Developments*."

(2)   As adjusted amounts do not reflect the issuance of Cebures pursuant to a new program that TV Azteca is currently in the process of establishing.  The new program, which TV Azteca intends to use to refinance a portion of its existing indebtedness, may be denominated in pesos, U.S. Dollars or Unidades de Inversion and is expected to permit TV Azteca to select from issuing short-term notes up to Ps. 3.0 billion ($168.0 million) with maturities of up to 364 days or issuing medium- or long-term notes with amounts not exceeding Ps.10.0 billion ($559.0 million) with maturities from 365 days and a maximum of 30 years.

(3)   This amount includes the $156 million (pre-tax) received by AIC in the third quarter of 2017 from spectrum sales.

**EXCHANGE RATES**

Mexico has a free market for foreign exchange, and the Mexican government allows the peso to float freely against the U.S. dollar. There can be no assurance that the Mexican government will maintain its current policies with regard to the peso or that the peso will not depreciate or appreciate significantly in the future.

The following table sets forth, for the periods indicated, the period-end and average exchange rate published by *Banco de México* expressed in pesos per U.S. dollar. The rates shown below are in nominal pesos that have not been restated in constant currency units. No representation is made that the peso amounts referred to in this Offering Circular could have been or could be converted into U.S. dollars at any particular rate or at all.

| | Exchange Rate [1] | |
| --- | --- | --- |
| | **Period End** | **Average** [2] |
| **Year Ended December 31** | | |
| 2014 | 14.7180 | 13.2983 |
| 2015 | 17.2065 | 15.8542 |
| 2016 | 20.6640 | 18.6567 |
| **Six Months Ended** | | |
| June 30, 2016 | 18.9113 | 18.0341 |
| June 30, 2017 | 17.8973 | 19.4890 |
| **Monthly** | | |
| February 2017 | 19.8335 | 20.3525 |
| March 2017 | 18.8092 | 19.4165 |
| April 2017 | 19.0670 | 18.7812 |
| May 2017 | 18.5121 | 18.7997 |
| June 2017 | 17.8973 | 18.2081 |
| July 2017 | 17.6886 | 17.8365 |
| August 2017 (through August 2) | 17.8646 | 17.8041 |

_____

(1) The exchange rates are the exchange rates published by the *Banco de México* in the Official Gazette as the rate for the payment of obligations denominated in non-Mexican currency payable in Mexico.  The exchange rate is determined by *Banco de México* on banking days, by an average of quotations of the exchange market of wholesale operations to be settled on the second banking day of its determination. *Banco de México* announces the exchange rate after 12 noon Mexico City time on each banking day.  Each listed exchange rate is published by *Banco de México* in the Official Gazette on the next banking day of its determination as a reference to settle operations the second working day following the settlement date.

(2) The average rate means the average of the daily exchange rate during the relevant period.

## SELECTED HISTORICAL FINANCIAL INFORMATION

**Selected Financial Data**

The following table presents TV Azteca's selected historical financial information as of the dates and for the periods indicated. TV Azteca's consolidated financial statements are stated in pesos and are prepared in accordance with IFRS, as issued by IASB. The selected historical financial information as of and for the six months ended June 30, 2017 and 2016 has been derived from TV Azteca's unaudited consolidated financial statements as of and for the six months ended June 30, 2017 and 2016. The selected historical financial information as of and for the years ended December 31, 2016 and 2015 has been derived from TV Azteca's audited consolidated financial statements as of and for the years ended December 31, 2016 and 2015. See TV Azteca's consolidated financial statements beginning on page F-1 of this Offering Circular. TV Azteca's consolidated financial statements as of and for the years ended December 31, 2016 and 2015 have been audited by its independent auditors, Salles, a member of Grant Thornton International. Salles is a member of the CCPM.

U.S. dollar amounts presented in the following table have been translated from peso amounts solely for the convenience of the reader. The exchange rate used in converting pesos into U.S. dollars for amounts derived from the financial statements as of and for the six months ended June 30, 2017 was determined by reference to the period-end exchange rate of Ps.17.8973 per U.S. dollar.  The exchange rate used in converting pesos into U.S. dollars for amounts derived from the financial statements as of and for the year ended December 31, 2016 was determined by reference to the period-end exchange rate of Ps.20.6640 per U.S. dollar.

For additional information regarding financial information presented in this Offering Circular, see "*Presentation of Certain Financial and Other Information*."

The selected historical financial information included herein is qualified in its entirety and should be read together with the other sections of this Offering Circular and the financial statements included herein and their related notes.

The following table presents selected historical financial information of TV Azteca as of and for the periods indicated:

| | Six months ended June 30[1] | | | Year ended December 31[1] | | |
|---|---|---|---|---|---|---|
| | 2017 | 2017 | 2016 | 2016 | 2016 | 2015 |
| | ($) | (Ps.) | (Ps.) | ($) | (Ps.) | (Ps.) |
| | | | (in millions, except as otherwise indicated) | | | |
| **Income Statement:** | | | | | | |
| Revenues | 392.1 | 7,017.3 | 6,128.7 | 687.0 | 14,196.6 | 12,859.5 |
| Costs of programming, production and broadcasting | (266.0) | (4,760.4) | (3,791.8) | (435.0) | (8,988.8) | (8,719.8) |
| Selling and administrative expenses | (36.6) | (655.4) | (671.5) | (73.5) | (1,519.6) | (1,605.2) |
| Depreciation and amortization | (22.9) | (409.6) | (345.3) | (44.8) | (924.9) | (910.2) |
| Other expenses, net[2] | (40.8) | (730.7) | (224.8) | (89.5) | (1,850.2) | (1,028.4) |
| Operating income | 25.8 | 461.2 | 1,095.3 | 44.2 | 913.1 | 595.8 |
| Share of profit (loss) from equity accounted investments | (5.1) | (90.4) | 6.6 | 1.1 | 23.3 | (13.4) |
| Comprehensive gain (loss) on financing | 34.5 | 617.9 | (1,197.5) | (153.2) | (3,164.7) | (2,514.3) |
| Income (loss) before taxes on earnings | 55.2 | 988.6 | (95.7) | (107.8) | (2,228.2) | (1,931.9) |
| Taxes on earnings | (30.0) | (537.1) | (622.0) | (45.7) | (944.7) | (715.7) |
| Income (loss) from continuing operations | 25.2 | 451.5 | (717.7) | (153.5) | (3,172.9) | (2,647.6) |
| (Loss) from discontinued operation | - | - | (370.9) | - | - | - |
| Net income (loss) | 25.2 | 451.5 | (1,088.6) | (153.5) | (3,172.9) | (2,647.6) |
| | | | | | | |
| **Balance Sheet:** | | | | | | |
| **Current Assets:** | | | | | | |
| Cash and cash equivalents | 169.0 | 3,024.5 | 2,754.8 | 216.3 | 4,470.3 | 2,938.4 |
| Trade and other receivables | 595.3 | 10,654.8 | 8,576.0 | 299.9 | 6,198.0 | 6,244.1 |
| Performance rights | 148.9 | 2,665.0 | 2,303.4 | 107.0 | 2,210.6 | 2,082.5 |
| Other current assets [3] | 142.1 | 2,543.3 | 2,952.5 | 141.0 | 2,913.2 | 3,062.2 |
| Total current assets | 1,055.3 | 18,887.6 | 16,586.7 | 764.2 | 15,792.1 | 14,327.2 |
| **Non-current Assets:** | | | | | | |
| Trade long-term | 28.4 | 507.7 | 86.1 | - | - | 165.4 |
| Performance rights | 136.1 | 2,436.6 | 2,594.2 | 156.3 | 3,229.5 | 2,382.0 |
| Property and equipment, net | 215.5 | 3,856.2 | 4,105.3 | 198.9 | 4,111.1 | 4,192.5 |
| Television concessions, net | 375.7 | 6,723.8 | 10,241.0 | 521.9 | 10,785.5 | 9,933.6 |
| Deferred tax assets | 86.4 | 1,546.1 | 2,404.3 | 88.3 | 1,825.1 | 2,524.3 |
| Other non-current assets [4] | 102.0 | 1,826.3 | 3,418.8 | 88.1 | 1,820.8 | 3,154.8 |
| Total non-current assets | 944.1 | 16,896.7 | 22,849.7 | 1,053.6 | 21,772.0 | 22,352.6 |
| **Total assets** | 1,999.4 | 35,784.3 | 39,436.4 | 1,817.9 | 37,564.1 | 36,679.8 |
| **Short-term liabilities** | | | | | | |
| Trade and other payables | 204.2 | 3,654.5 | 5,602.6 | 174.9 | 3,614.8 | 4,103.8 |
| Financial debt[5] | 259.1 | 4,637.0 | - | - | - | - |
| Deferred revenue [6] | 450.8 | 8,068.5 | 6,359.9 | 319.1 | 6,593.8 | 4,956.3 |
| Other short-term liabilities [7] | 64.7 | 1,157.5 | 1,374.3 | 75.7 | 1,564.7 | 750.9 |
| Total short-term liabilities | 978.8 | 17,517.5 | 13,336.8 | 569.7 | 11,773.3 | 9,811.0 |
| **Long-term liabilities** | | | | | | |
| Loans from American Tower Corporation -ATC- | 92.6 | 1,657.3 | 1,694.2 | 91.6 | 1,891.9 | 1,582.6 |
| Medium Term Notes Program -MTN- | 499.5 | 8,939.9 | 14,624.2 | 792.2 | 16,369.5 | 13,630.1 |
| Deferred revenue [6] | 71.9 | 1,287.7 | 1,939.8 | 52.0 | 1,075.5 | 1,902.5 |
| Deferred tax liabilities | 17.4 | 310.9 | 548.2 | 29.1 | 601.6 | 1,041.2 |
| Employee benefits | 10.5 | 188.0 | 197.2 | 9.1 | 188.0 | 197.2 |
| Total long-term liabilities | 691.9 | 12,383.8 | 19,003.6 | 974.0 | 20,126.5 | 18,353.6 |
| **Total liabilities** | 1,670.7 | 29,901.3 | 32,340.4 | 1,543.7 | 31,899.8 | 28,164.6 |
| **Total stockholders' equity** | 328.7 | 5,883.1 | 7,096.1 | 274.1 | 5,664.4 | 8,515.3 |
| | | | | | | |
| **Cash Flow:** | | | | | | |
| Net cash from/(used) in: | | | | | | |
| Operating activities | 15.2 | 271.9 | 892.9 | 190.6 | 3,939.0 | 1,173.5 |
| Investing activities | (9.7) | (174.4) | (380.0) | (45.7) | (944.0) | (1,477.1) |
| Financing activities | (86.2) | (1,543.3) | (696.5) | (70.8) | (1,463.2) | (2,287.1) |

———————————

(1)   The figures for the six months ended June 30, 2017 do not consolidate ACC's operations in Colombia, which were recorded using the equity method for the six months ended June 30, 2017.  For comparison purposes, the results of ACC's operations

for the six months ended June 30, 2016 were included under the heading "(Loss) from discontinued operations." The figures for the years ended December 31, 2016 and 2015 consolidate ACC's operations.

(2)   "Other expenses, net" includes (i) donations, (ii) fees for legal advisory services, (iii) other non-operative expenses and (iv) non-cash charges such as impairment from Colombian and other telecommunication assets.

(3)   Amounts listed for "other current assets" are the sum of the following line items on TV Azteca's balance sheet: (i) current tax assets, (ii) related parties, (iii) other financial assets and (iv) inventories.

(4)   Amounts listed for "other non-current assets" are the sum of the following line items on TV Azteca's balance sheet: (i) other intangible assets and (ii) investments accounted for using the equity method and other.

(5)   There will be no amounts under "financial debt" after giving effect to the redemption of all of the remaining outstanding Medium Term Notes due 2018, which is expected to occur on August 21, 2017.

(6)   Figures included in "deferred revenue" correspond solely to advertising advances. See "*Operating and Financial Review—Management's Overview—Critical Accounting Policies and Estimates—Critical Accounting Policies—Recognition of Revenue*" and "*Operating and Financial Review—Management's Overview—Critical Accounting Policies and Estimates—Critical Accounting Policies—Advertising Advances*."

(7)   Amounts listed for "other short-term liabilities" are the sum of the following line items on TV Azteca's balance sheet: (i) performance rights, (ii) related parties, and (iii) current tax liabilities.

**OPERATING AND FINANCIAL REVIEW**

*This Operating and Financial Review should be read together with TV Azteca's consolidated financial statements and related notes included in this Offering Circular. Please also see "Presentation of Certain Financial and Other Information."*

**Operating Results by Country**

TV Azteca, though its subsidiaries and associates, primarily operates in Mexico, United States, Peru and Colombia. Prior to December 28, 2016, TV Azteca consolidated ACC, through which TV Azteca conducted operations in Colombia.  For the year ended December 31, 2016, ACC generated net loss of Ps.2,081 million ($100.7 million), operating loss of Ps. 1,981 million ($95.8 million) and negative EBITDA of Ps.420.0 million ($20.3 million) and accounted for an impairment charge of Ps.1,376.5 million ($66.6 million).  Following a private capitalization of ACC, as of December 28, 2016, ACC is no longer consolidated by TV Azteca, but is accounted for using the equity method with respect to TV Azteca's remaining 40% stake. See "*Our Business—Description of the Business—Other Operations—Colombia Project*" for further details. Below is a summary of the key operating results by country for the six months ended June 30, 2017 and June 30, 2016 and the years ended December 31, 2016 and 2015, which has been provided for the convenience of the reader. For a more detailed analysis of TV Azteca's consolidated operating results for such periods, see "*Operating and Financial Review—Management's Overview—Results of Operations*."

*Six Months Ended June 30, 2017 Compared to Six Months Ended June 30, 2016*

*Mexico*

Revenues

Revenues for the six months ended June 30, 2017 increased by 21%, or Ps.1,057 million ($73.9 million), to Ps.6,043 ($337.6 million) from Ps.4,986 million ($263.7 million) for the same period in 2016.  This increase was mainly due to the popularity of entertainment and other programs broadcasted during the  past six months ended June 30, 2017, which generated millions of viewers in Mexico and resulted in increased advertising sales, as well as revenue from the World Golf Championships-Mexico Championship tournament (the "WGC Mexico Championship") organized by TV Azteca.

Costs and expenses

Costs and expenses for the six months ended June 30, 2017 increased by 22%, or Ps.759 million ($52.9 million), to Ps.4,268 million ($238.5 million) from Ps.3,509 million ($185.6 million) for the same period in 2016. This increase was mainly due to costs related to the organization of the WGC Mexico Championship.

Depreciation and amortization and other expenses

Depreciation and amortization and other expenses for the six months ended June 30, 2017 decreased 5%, or Ps.24 million ($0.2 million), to Ps.507 million ($28.3 million) from Ps.531 million ($28.1 million) for the same period in 2016 mainly due to lower advisory fees and charitable donations.

Operating Income

As a result of the above, operating income for the six months ended June 30, 2017 increased 34%, or Ps.322 million ($20.8 million), to Ps.1,268 million ($70.8 million) from Ps.946 million ($50.0 million) for the same period in 2016.

EBITDA

EBITDA for the six months ended June 30, 2017 increased 20%, or Ps.298 million ($21.1 million), to Ps.1,775 million ($99.2 million) from Ps.1,477 million ($78.1 million) for the same period in 2016.

*United States*

Revenues

Revenues for the six months ended June 30, 2017 increased by 9%, or Ps.56 million ($5.0 million) to Ps.666 million ($37.2 million) from Ps.610 million ($32.2 million) for the same period in 2016. This increase was primarily due to exchange rate fluctuations, as well as the monetization of content that is popular among Hispanic audiences in the United States.

Costs and expenses

Costs and expenses for the six months ended June 30, 2017 increased by 22%, or Ps.147 million ($10.2 million), to Ps.802 million ($44.8 million) from Ps.655 million ($34.6 million) for the same period in 2016. This increase was mainly due to exchange rate fluctuations and increased costs and expenses in connection with expansion of geographic coverage in the east coast of the United States.

Depreciation and amortization and other expenses

Depreciation and amortization and other expenses for the six months ended June 30, 2017 increased 2,055%, or Ps.596 million ($33.4 million), to Ps.625 million ($34.9 million) from Ps.29 million ($1.5 million) for the same period in 2016. This increase was primarily the result of impairment of telecommunications assets during 2017, including, among other things, equipment and assets that became obsolete due to technology changes and expired broadcasting rights.

Operating Loss

As a result of the above, operating loss for the six months ended June 30, 2017 was Ps.761 million ($42.5 million) as compared to an operating loss of Ps.74 million ($3.9 million) for the same period in 2016.

EBITDA

TV Azteca's operations in the United States generated a negative EBITDA of Ps.136 million ($7.6 million) for the six months ended June 30, 2017 as compared to a negative EBITDA of Ps.45 million ($2.4 million) for the same period in 2016.

*Peru*

Revenues

Revenues for the six months ended June 30, 2017 decreased by 45%, or Ps.227 million ($11.1 million) to Ps.275 million ($15.4 million) from Ps.502 million ($26.5 million) for the same period in 2016. This decrease was mainly due to lower reimbursements from the Peruvian government during 2017 for payments made by Azteca Comunicaciones Perú ("ACP") for the construction and maintenance of the Red Dorsal Nacional de Fibra Óptica fiber optic network in Peru as the construction of the network and related reimbursements were completed in 2016.

Costs and expenses

Costs and expenses for the six months ended June 30, 2017 increased by 26%, or Ps.60 million ($4.1 million), to Ps.295 million ($16.5 million) from Ps.235 million ($12.4 million) for the same period in 2016. This increase was primarily due to the increased cost of maintaining the Red Dorsal Nacional de Fibra Óptica fiber optic network, which was not fully present during 2016 when the network was under construction.

Depreciation and amortization and other expenses

Negative depreciation and amortization and other expenses for the six months ended June 30, 2017 was Ps.4 million ($0.2 million), which did not change from the same period in 2016.

Operating Loss

As a result of the above, TV Azteca's operations in Peru generated an operating loss of Ps.24 million ($1.3 million) for the six months ended June 30, 2017 as compared to an operating income of Ps.263 million ($13.9 million) for the same period in 2016.

EBITDA

TV Azteca's operations in Peru generated a negative EBITDA of Ps.20 million ($1.1 million) for the six months ended June 30, 2017 as compared to an EBITDA of Ps.267 million ($14.1 million) for the same period in 2016.

38

*Year Ended December 31, 2016 Compared to Year Ended December 31, 2015*

*Mexico*

<u>Revenues</u>

Revenues for the year ended December 31, 2016 increased by 4%, or Ps.449 million ($82.9 million), to Ps.11,214 ($542.7 million) from Ps.10,765 million ($625.6 million) for 2015.  This increase was mainly due to increased advertising sales resulting from the popularity of TV Azteca's programming with large audiences that constitute the target market of numerous Mexican advertisers.

<u>Costs and expenses</u>

Costs and expenses for the year ended December 31, 2016 decreased by 8%, or Ps.600 million ($106.6 million), to Ps.7,370 million ($356.6 million) from Ps.7,970 million ($463.2 million) for 2015. This decrease was mainly attributable to (i) efficiency gains in production through co-productions that allowed cost sharing with other producers, and (ii) reduction in selling and administrative expenses due to increased operating efficiencies.

<u>Depreciation and amortization and other expenses</u>

Depreciation and amortization and other expenses for the year ended December 31, 2016 decreased 29%, or Ps.465 million ($38.1 million), to Ps.1,133 million ($54.8 million) from Ps.1,598 million ($92.9 million) for 2015. This decrease was mainly as a result of the provision for impairment of assets made in 2015, which reflected lower value of certain transmission assets.

<u>Operating Income</u>

As a result of the above, operating income for the year ended December 31, 2016 increased 126%, or Ps. 1,514 million ($61.5 million), to Ps.2,711 million ($131.1 million) from Ps.1,197 million ($69.6 million) for 2015.

<u>EBITDA</u>

EBITDA for the year ended December 31, 2016 increased 38%, or Ps.1,049 million ($23.6 million), to Ps.3,844 million ($186.0 million) from Ps.2,795 million ($162.4 million) for 2015.

*United States*

<u>Revenues</u>

Revenues for the year ended December 31, 2016 increased by 20%, or Ps.228 million ($0.1 million) to Ps.1,370 million ($66.3 million) from Ps.1,142 million ($66.4 million) for 2015. This increase was mainly due to the depreciation of the peso versus the U.S. dollar during 2016.

<u>Costs and expenses</u>

Costs and expenses for the year ended December 31, 2016 increased by 20%, or Ps.227 million ($0.1 million), to Ps.1,339 million ($64.7 million) from Ps.1,112 million ($64.6 million) for 2015. This increase was primarily attributable to the depreciation of the peso versus the U.S. dollar during 2016.

<u>Depreciation and amortization and other expenses</u>

Depreciation and amortization and other expenses for the year ended December 31, 2016 increased 11%, or Ps.6 million ($0.2 million), to Ps.61 million ($3 million) from Ps.55 million ($3.2 million) for 2015, mainly as a result of an increase in the peso amount of U.S. dollar denominated fixed assets, attributable to the depreciation of the peso versus the U.S. dollar in the period.

<u>Operating Income</u>

As a result of the above, operating income for the year ended December 31, 2016 increased 20%, or Ps.5 million ($0.1 million), to Ps.30 million ($1.5 million) from Ps.25 million ($1.5 million) for 2015.

<u>EBITDA</u>

EBITDA for the year ended December 31, 2016 increased 3%, or Ps.1 million ($0.05 million), to Ps.31 million ($1.5 million) from Ps.30 million ($1.7 million) for 2015.

*Peru*

Revenues

Revenues for the year ended December 31, 2016 increased by 202%, or Ps.520 million ($22.7 million) to Ps.777 million ($37.6 million) from Ps.257 million ($14.9 million) for 2015.  This increase was mainly attributable to increased reimbursements from the Peruvian government for payments made by ACP for the construction and maintenance of the Red Dorsal Nacional de Fibra Óptica fiber optic network in Peru.

Costs and expenses

Costs and expenses for the year ended December 31, 2016 increased by 205%, or Ps.345 million ($15 million), to Ps.513 million ($24.8 million) from Ps.168 million ($9.8 million) for 2015. This increase was primarily due to higher  costs  related to the construction and maintenance of the Red Dorsal Nacional de Fibra Óptica fiber optic network.

Depreciation and amortization and other expenses

Depreciation and amortization and other expenses for the year ended December 31, 2016 increased 40%, or Ps.2 million ($0.1 million), to Ps.7 million ($0.3 million) from Ps.5 million ($0.3 million) for 2015, mainly as a result of higher depreciation from increased furniture and office equipment.

Operating Income

As a result of the above, operating income for the year ended December 31, 2016 increased 206%, or Ps.173 million ($7.5 million), to Ps.257 million ($12.4 million) from Ps.84 million ($4.9 million) for 2015.

EBITDA

EBITDA for the year ended December 31, 2016 increased 197%, or Ps.175 million ($7.6 million), to Ps.264 million ($12.8 million) from Ps.89 million ($5.2 million) for 2015.

*Colombia*

Prior to December 28, 2016, TV Azteca consolidated ACC, through which TV Azteca conducted operations in Colombia. As of December 28, 2016, ACC is no longer consolidated by TV Azteca, but is accounted for using the equity method with respect to TV Azteca's remaining 40% stake.

Revenues

Revenues for the year ended December 31, 2016 increased by 23%, or Ps.142 million ($0.9 million) to Ps.749 million ($36.2 million) from Ps.607 million ($35.3 million) for 2015. This increase was primarily attributable to increased revenue from telecommunications services through the fiber-optic network operated by ACC.

Costs and expenses

Costs and expenses for the year ended December 31, 2016 increased by 20%, or Ps.198 million ($0.2 million), to Ps.1,169 million ($56.6 million) from Ps.971 million ($56.4 million).  Costs during the period include rent paid for transmission towers and space to operate telecommunications nodes, as well as the maintenance and operation of the network.

Depreciation and amortization and other expenses

Depreciation and amortization and other expenses for the year ended December 31, 2016 increased 480%, or Ps.1,292 million ($59.9 million), to Ps.1,561 million ($75.5 million) from Ps.269 million ($15.6 million) for 2015, mainly a result of provision for impairment charges in 2015.

Operating Loss

As a result of the above, operating loss for the year ended December 31, 2016 was Ps.1,981 million ($95.8 million) as compared to an operating loss of Ps.633 million ($36.8 million) for 2015.

EBITDA

TV Azteca's operations in Colombia generated a negative EBITDA of Ps.420 million ($20.3 million) for the year ended December 31, 2016 as compared to a negative EBITDA of Ps.364 million ($21.2 million) for 2015.

40

**Management's Overview**

*Critical Accounting Policies and Estimates*

TV Azteca's critical accounting policies and estimates are described in detail in the notes to its financial statements (see Note 4 to the consolidated financial statements as of and for the years ended December 31, 2016 and 2015).

*Critical Accounting Policies*

TV Azteca believes that the following are some of the most critical accounting policies applied in the preparation of its consolidated financial statements.

Recognition of Revenue

TV Azteca's revenue is derived primarily from the sale of advertising time at the national and local levels minus sales commissions.

Most advertising agreements are entered into during the last quarter of each year for commercials to be broadcasted in the next year. Upon signing (or tacit acceptance by the clients, as the case may be) of the advertising agreements, TV Azteca records the cash or other assets, as the case may be, received as advertising advances (see "*Our Business—Description of the Business—Television Advertising Sales*" and *"—Results of Operations—Advertising Advances*") as an asset in its balance sheet, and its obligation to broadcast the advertisement as deferred revenue in its balance sheet. Advertising advances are non-monetary liabilities, as they represent TV Azteca's obligation to provide services in the future.

The advertising advances registered in the balance sheet as deferred revenue at the end of each year, are recognized as revenue in the income statement for the following year, only when, and to the extent that, the commercials are broadcasted.

TV Azteca maintains reserves for doubtful accounts that are the result of clients' inability to make the required payments. Each client is analyzed individually. If the financial condition of TV Azteca's clients worsens, thus affecting their ability to make payments, additional estimates may be required.

For the six months ended June 30, 2017 and June 30, 2016 and the years ended December 31, 2016 and 2015, approximately 63%, 70%, 54% and 53%, respectively, of TV Azteca's net revenues, was attributable to advertising advances made before the relevant year.

Broadcast Rights

The cost of broadcast rights is amortized in different ways, depending on the license period, the use of the programs, and management's estimate of revenues that will be re-obtained by each on-air broadcast of the programs. The cost of acquired broadcast rights is amortized as the program and events are aired, and in advance when the rights pertain to multiple broadcasts. Since September 2011, broadcast rights for internally produced contents are amortized in their entirety as they are broadcasted, except in the case of soap operas, which are amortized 90% when they air in Mexico and the remaining 10% when they are sold in other countries, and specials, which are amortized 80% when they air in Mexico and 20% when they are sold in the United States. TV Azteca bases its estimates on historical experience and on other assumptions. If actual results differ from these estimates, there may be an adverse effect on TV Azteca's financial results. See "*Our Business—Description of the Business— Principal Business, Distribution Channels.*"

Intangible Assets

*Initial recognition.* The costs attributed directly to the development phase of a project are recorded as intangible assets, to the extent that they meet the following requirements for recognition:

- the costs can be measured reliably;

- the project is technically and commercially viable;

- there are sufficient resources to complete the project;

- the intangible asset can be used or sold; and

- the intangible asset is likely to produce future economic benefits.

41

Development costs that do not meet these criteria for capitalization are recorded as costs of programming, production and broadcasting as they are incurred.

Costs directly attributable to the development phase include employee costs incurred during software development, in addition to the appropriate percentage of overhead expenses and the cost of loans.

*Subsequent calculations.* Intangible assets, including internally developed capitalized software, are accounted for using the cost model, whereby capitalized costs are amortized on a straight-line basis over their estimated useful lives, as these assets are considered to have a definite life. Intangible assets with a definite life are amortized over the course of the period in which future economic benefits are expected to be obtained, using the straight-line method. The residual value and the estimated useful life are reviewed annually. Intangible assets with an indefinite life are not amortized, given that it is not possible to specify when future economic benefits will end. These assets are subject to evaluation for potential impairment on an annual basis or earlier if circumstances warrant it.

As of June 30, 2017 and December 31, 2016, the Company recorded an impairment reserve of Ps.595 million (Azteca Americas' spectrum sales) and Ps.1,377 million (Colombia's assets), respectively.

Deferred Taxes

As part of the process of preparing the consolidated financial statements, both the assessed and deferred income tax needs to be determined. This process is conducted by applying the relevant tax rate to all the time differences between the accounting and tax balances of assets and liabilities expected to be materialized in the future. It also includes accounting for the treatment of items such as advertising advances, broadcasting rights and inventories, assets, machinery and equipment and tax losses to be amortized, provisions, and estimates for bad debts. These differences produce deferred tax assets and liabilities that are included in the consolidated balance sheet. TV Azteca must then determine the possibility that its deferred tax assets may be recovered from future taxable income and, to the extent recovery is not deemed possible, establish a valuation reserve. As a valuation reserve is established or increased during a period, an expenditure within the reserve for deferred tax income must be included in the income statement.

Recognition of the Effects of the Tax Consolidation Regime Derived from the 2010 Tax Reform.

On December 7, 2009, a decree amending, adding and repealing various tax provisions was published in the Official Gazette, which went into effect on January 1, 2010 (the "2010 Tax Reform").

The 2010 Tax Reform modifies the tax consolidation regime to establish that the payment of income tax related to the benefits of tax consolidation must be made in installments within the sixth to tenth years after the year in which those benefits are used.

The 2010 Tax Reform establishes, in general terms, the benefits of the tax consolidation regime of prior years may be derived from the following items:

- Tax losses taken advantage of in the tax consolidation.

- Losses on disposal of shares individually pending deduction by the entity that generated them.

- Special items of consolidation arising from transactions between the consolidating companies.

- Dividends distributed by the consolidating subsidiaries that did not come from the balance of the Net Tax Profit Account (CUFIN) or the Reinvested Net Tax Profit Account (CUFINRE) distributed since 1999.

- Differences between the registers, consolidated and individual Net Tax Profit Accounts, and Reinvested Net Tax Profit Accounts.

These provisions were applied for the first time in 2010 on the benefits accumulated for the years 2004 and earlier, with the pertinent tax payment made as of 2010 and until 2014.

Against this payment, on the accumulated profits of 2004 and previous years, *amparo* proceeding 323/2010 was filed. Currently and prior to various stages of the proceedings, the Fifth Circuit Court on Administrative Matters of the First Circuit resolved that it was appropriate to dismiss the matter regarding the controlled companies, and denied the constitutional relief known as an *amparo* and protection of federal justice to TV Azteca.

42

Based on the criteria issued by the Supreme Court of Justice of the Nation (*Suprema Corte de Justicia de la Nación*), in which it was determined that Articles 64, 65, 68, 70-A, 71-A, 78 and Transitory Fourth, Section IV of the Income Tax Law that are related to the changes to the tax consolidation regime in effect as of 2010, the above does not contravene the fundamental rights of tax legality, legal certainty, proportionality, equality, equity and non-retroactivity provided for in the Mexican Constitution.

Likewise, the 2010 Tax Reform has had a second, third and fourth application on the benefits related to fiscal years 2005, 2006 and 2007, and the reasons for which the respective payments were made from 2011 to 2015, and from 2013 to 2017, respectively.

These payments were also contested through the filing of *amparo* proceeding 46/2011. The Fifth Collegiate Court on Administrative Matters of the First Circuit dismissed the suit on the grounds that the same companies were disputing the same issue as in the *amparo* proceeding 323/2010.

Based on the above, the present case has been definitively concluded.

Recognition of the Effects of the Tax Consolidation Regime Derived from the 2014 Tax Reform.

On December 11, 2013, decree amending, adding and repealing various tax provisions was published in the Official Gazette, which went into effect on January 1, 2014 (the "2014 Tax Reform").

On the occasion of the repeal of the Income Tax Law published in the Official Gazette on January 1, 2002 and in effect until December 31, 2013, the parent company that was authorized to determine its consolidated tax result deconsolidated all the companies of the group, including itself, for which it will pay the tax that it has deferred under the tax consolidation regime derived from the 2014 Tax Reform.

The benefits of the tax consolidation regime for which the deconsolidation tax will have to be paid may be derived from the following items:

- Special consolidation items.

- Tax losses taken advantage of in the fiscal consolidation.

- Losses arising from the disposal of shares of controlled companies and that could not be deducted by the company that generated them.

- By dividends or profits not deriving from their net tax profit account, which the controlled companies paid to other companies in the same consolidation group.

- By comparing the individual net tax profit accounts of the controlled companies and the same account of the parent company with the record of the consolidated net tax profit account, when the latter is lower than the former.

The payments for income tax for deconsolidation may be made for a period of 5 years or 10 years, depending on the option chosen for its payment. TV Azteca chose to pay the deferred tax in 5 years. Payments have been made as follows: 25% in May 2014; 25% in April 2015; 20% in April 2016; and 15% in April 2017. A payment of 15% is expected to be made in April 2018.

Contingent Liabilities

Contingent liabilities may not evolve as expected. Therefore, they are subject to constant assessment in order to determine the likelihood of an actual future expense. If it is likely that resources will be spent on an item treated as a contingent liability, the corresponding provision must be recorded in the financial statements for the period in which the change in likelihood of occurrence has occurred.

TV Azteca is a party in various legal proceedings and lawsuits during the normal course of its operations. Based on the legal advice that TV Azteca has received from its legal counsel, as well as from additional information, TV Azteca has not identified any provision in its financial statements as a result of the aforementioned legal proceedings.

Effects of the Devaluation of the Peso and Inflation

*General Information*. For the fiscal year ended December 31, 2016 and 2015, the gross domestic product growth of Mexico was 2.3% and 2.5%, respectively. Interest rates on Mexican government treasury certificates to 28 days (CETES) averaged 4.15% and 2.98% in 2016 and 2015, respectively.

Inflation for the six months ended June 30, 2017 and June 30, 2016 and the years ended December 31, 2016 and 2015 was 3.2%, 0.3%, 3.4% and 3.1%, respectively.

As of December 31, 2016, the peso depreciated to Ps.20.6640 per U.S. dollar, a decrease of 20.1% in value as compared to December 31, 2015.

*Operating Costs in U.S. Dollars.* TV Azteca has significant operating costs in U.S. dollars, attributable largely to the cost of purchased programming and the rental of satellite transponder capabilities, which for the six months ended June 30, 2017 and June 30, 2016 and the years ended December 31, 2016 and 2015, accounted for approximately 26%, 19%, 20% and 19%, respectively, of TV Azteca's total costs and expenses.

*Comprehensive gain or loss on financing.* TV Azteca registers a foreign exchange gain or loss on its monetary assets and liabilities denominated in U.S. dollars when the peso appreciates or depreciates in relation to the U.S. dollar.

As of June 30, 2017 and December 31, 2016, almost all of TV Azteca's debt was denominated in U.S. dollars. As of June 30, 2017 and December 31, 2016, TV Azteca had approximately $872.0 million and $961.0 million, respectively, of monetary liabilities denominated in U.S. dollars, which accounted for approximately 53% and 62%, respectively, of its total debt. TV Azteca's dollar-denominated monetary assets as of June 30, 2017 and December 31, 2016 amounted to approximately $96.0 million and $126.6 million, respectively. In 2016 and 2015, exchange losses were generated as a result of the combination of a liability position during the year and a depreciation of the peso against the U.S. dollar (see Notes 17 and 18 to the consolidated financial statements as of and for the years ended December 31, 2016 and 2015). TV Azteca's interest income is positively affected by inflation, as TV Azteca receives higher returns on its temporary investments, which are primarily short-term fixed deposits in pesos at Mexican banks.

During 2015, the other financial expenses increased compared to 2014, mainly due to the payment of surety bonds for the construction of the fiber optic network in Peru. During 2016, the other financial expenses experienced a decrease compared to 2015, mainly due to the decrease in amortization of expenses of the line of credit in Peru.

Advertising Advances

Advertising advances are non-monetary liabilities because they represent TV Azteca's obligation to provide services in the future. The amount of advertising advances on the balance sheet is credited when the commercials are broadcasted.

Advertising Time Presales

For the six months ended June 30, 2017 and June 30, 2016 and the years ended December 31, 2016 and 2015, 48%, 44%, 57% and 48%, respectively, of TV Azteca's net revenues were attributable to advertising time presales made before that fiscal year. As of December 31, 2016, advertising time presales amounted to Ps.7,669.0 million, representing an increase of 11.82% over the advertising time presales recorded in 2015. The advertising time presales recorded at the end of each fiscal year represent the revenues that TV Azteca will recognize during the following calendar year.

Other Sales

*Advertising barter arrangements.* Advertising barter arrangements (see "*Our Business—Description of the Business—Television Advertising Sales*") are accounted for in the same way as other advertising advances, and the amounts owed to TV Azteca are determined based on the fair market value of the goods, services, or other assets received by TV Azteca. For the six months ended June 30, 2017 and June 30, 2016 and the years ended December 31, 2016 and 2015, revenue from advertising barter arrangements represented Ps.96.0 million, Ps.163.8 million, Ps.364.0 million and Ps.403.0 million, respectively, which represented approximately 1%, 3%, 3% and 3% of TV Azteca's net sales for the same periods.

*Infomercials, Shared-Risk Advertisements and Integrated Advertising.* TV Azteca sells part of the unsold advertising time to infomercial producers and shared-risk advertisers (see "*Our Business—Description of the Business—Television Advertising Sales*"). In the case of infomercials, TV Azteca charges a fee for the advertisement air time but does not participate in the proceeds of the sale of the products shown during the infomercial; whereas in the case of shared-risk advertising, TV Azteca charges no (or a minimum) advertising fee, but instead receives a percentage of the gross sales of the product or products offered occurred within a specific period after the advertisement is aired. For example, TV Azteca broadcasts advertisements of musical recordings, at minimal or no cost, under contracts that entitle TV Azteca to receive a share of the sales of the recordings for a certain time after the airing of the advertisements. TV Azteca also receives revenues from "integrated advertising," which consists in the exhibition of products during the transmission of internally produced contents.

For the six months ended June 30, 2017 and June 30, 2016, revenues from infomercials and integrated advertising, amounted to Ps.53.0 million and Ps.839.0 million (totaling Ps.892.0 million) and Ps.85 million and Ps.832 million (totaling Ps.917 million), respectively. For the year ended December 31, 2016, revenues from infomercials and integrated advertising, these revenues amounted to Ps.167.0 million and Ps.1,838.0 million, respectively, totaling Ps.2,005.0 million. For the year ended December 31, 2015, revenues from infomercials and integrated advertising, amounted to Ps.147.0 million and Ps.2,075.0 million, respectively, totaling Ps.2,222.0 million.

Infomercials, shared-risk advertisements and integrated advertising accounted, on an aggregate basis, for approximately 13%, 15%, 14% and 17% of TV Azteca's net income for the six months ended June 30, 2017 and June 30, 2016 and the years ended December 31, 2016 and 2015, respectively.

<u>Seasonality of Sales</u>

TV Azteca's television broadcasting operations are seasonal. Advertising revenues, which are accrued when the advertising airs, are usually higher in the fourth quarter due to the high level of advertising that is broadcasted as a result of the holiday season.

<u>Regularity of Important Broadcast Events</u>

TV Azteca's net income fluctuates as a result of the frequency with which TV Azteca broadcasts important events. Historically, the broadcasting of important events by TV Azteca has increased advertising sales during the period in which these were on air. This reflects the larger audiences during the hours that these important events are broadcast and the fact that advertisers pay a premium related to these important broadcast events.

*Critical Accounting Estimates*

Beginning January 1, 2012, TV Azteca adopted IFRS as issued by the IASB for the preparation of its financial statements, to comply with the regulations established by the CNBV. The preparation of its consolidated financial statements requires TV Azteca to make critical estimates that affect the amount of assets, liabilities, income, and expenditures reported, as well as disclosure related to contingent assets and liabilities. TV Azteca considers an accounting estimate critical if:

- it requires to make assumptions about the information, due to the fact that the relevant information was not available on time or because it included matters that were highly uncertain at the time that it was made; and

- there are changes in the estimates or there are different estimates that could have been selected and that would have had a material impact on the financial condition or results of operations.

TV Azteca makes estimates in order to calculate, for example, internally generated costs of software and development, deferred taxes on earnings, impairment, useful lives of depreciable assets, broadcast rights, business combinations, allowances for doubtful accounts, defined benefit obligations, fair value of financial instruments, and fair value of derivative financial instruments. TV Azteca continually evaluates its estimates based on historical experience and other factors that are believed to be reasonable under the circumstances. Actual results may differ, perhaps significantly, from these estimates under different assumptions or conditions.

*Key Factors Affecting TV Azteca's Results of Operations*

*Revenue Generation*

TV Azteca's revenue is mainly generated by its sales of advertising air time and its exports of original programming.

The following chart depicts TV Azteca's revenue generation breakdown by country for the last twelve months ended June 30, 2017:



The following chart depicts TV Azteca's revenue generation breakdown by country for the six months ended June 30, 2017:



Revenues from Mexico accounted for 86%, 81%, 83% and 88% of TV Azteca's consolidated revenues for the six months ended June 30, 2017 and 2016, and the years ended December 31, 2016 and 2015, respectively.

Revenues from United States accounted for 9%, 10%, 10% and 9% of TV Azteca's consolidated revenues for the six months ended June 30, 2017 and 2016, and the years ended December 31, 2016 and 2015, respectively.

Revenues from Peru accounted for 4%, 8%, 6% and 2% of TV Azteca's consolidated revenues for the six months ended June 30, 2017 and 2016, and the years ended December 31, 2016 and 2015, respectively.

Other sources of revenue for TV Azteca accounted, on an aggregate basis, for 0%, 1%, 1% and 1% of TV Azteca's consolidated revenues for the six months ended June 30, 2017 and 2016, and the years ended December 31, 2016 and 2015, respectively (see "*The Business—Description of the Business—Other Operations*").

Key Factors Affecting TV Azteca's Revenue Generation

Key factors affecting TV Azteca's revenue generation include content quality and programming decisions and strategies. High-quality content combined with effective programming strategies generally translate into higher ratings and therefore, increased revenue generation. Conversely, if TV Azteca's television content ceases to be widely accepted by audiences or is not continuously replenished with popular content, TV Azteca's revenues could be adversely affected.

In addition, TV Azteca's business has experienced and is expected to continue to experience seasonality due to, among other things, seasonal advertising patterns and seasonal influences on people's viewing habits. TV Azteca typically recognizes a disproportionately large percentage of its revenue from advertising sales in the fourth quarter because of the high level of advertising during the holiday season.

TV Azteca's revenue generation is also affected by infrequently recurring major broadcast events, such as the FIFA World Cup, the UEFA Champions League, the Mexican national soccer team games and major boxing matches and other extraordinary events. These events tend to have a positive effect on TV Azteca's revenue generation during the period in which they occur, to the extent that TV Azteca is able to acquire the relevant broadcast rights. On the other hand, the lack of special events in a given period or the inability to acquire the relevant broadcast rights may translate into decreased revenue generation. In order to increase revenue generation during periods where there are no major special events or when TV Azteca is not able to avail itself of the relevant broadcast rights, TV Azteca manages programming strategies by introducing alternative new high-quality content, including soap operas (*telenovelas*), series, blockbuster movies and reality shows.

TV Azteca's revenues are affected by competition for advertising revenues with other television broadcasters and other advertising media. TV Azteca's principal competitor in Mexico is Televisa. TV Azteca's revenues are also affected by changes in clients' advertising expenditures related to economic prospects of advertisers or industries, increased competition for the leisure time of audiences and audience fragmentation, the growing use of new technologies, or the economy in general. Any of these or other factors may cause advertisers to alter their spending priorities. In addition, advertisers' willingness to purchase advertising from TV Azteca may be adversely affected by lower audience ratings. Advertising sales and rates also are dependent on audience measurement and could be affected by changes in audience measurement methodologies.

*Costs of programming, production and broadcasting*

For the six months ended June 30, 2017 and 2016, and the years ended December 31, 2016 and 2015, costs of programming, production and broadcasting accounted for 88%, 85%, 84% and 83%, respectively, of TV Azteca's consolidated total operating costs and expenses.

TV Azteca's most significant variable operating costs relate to the production and acquisition of content.

The following chart depicts TV Azteca's costs of programming, production and broadcasting for the six months ended June 30, 2017:

47



Costs related to production accounted for 79%, 73%, 73% and 75% of TV Azteca's consolidated total costs of programming, production and broadcasting for the six months ended June 30, 2017 and 2016, and the years ended December 31, 2016 and 2015, respectively.

Costs related to programming accounted for 21%, 26%, 26% and 24% of TV Azteca's consolidated total costs of programming, production and broadcasting for the six months ended June 30, 2017 and 2016, and the years ended December 31, 2016 and 2015, respectively.

Costs related to broadcasting accounted for 1% of TV Azteca's consolidated total costs of programming, production and broadcasting in each of the six months ended June 30, 2017 and 2016, and the years ended December 31, 2016 and 2015.

<u>Key Factors Affecting TV Azteca's Costs of Operations</u>

The cost of producing original programming varies considerably depending on the type of program, and is generally more expensive than acquiring broadcast rights to externally produced programming. In addition, producing soap operas (*telenovelas*) is more expensive than other types of programming. TV Azteca manages the impact of these production costs on its operating margin mainly by increasing sales efforts to ensure sufficient advertising revenue for costly productions and reducing its production costs on other productions.

With respect to content purchased from other producers, even if TV Azteca is not outbid by its competitors for the rights to new, popular programming or in connection with the renewal of popular programming currently licensed by TV Azteca, intense competition for popular programming licensed from third parties puts pressure on license prices which increases costs.

TV Azteca has implemented, and plans to continue to implement, strict cost control initiatives in connection with its internally produced programming and the purchase of externally produced programming. With respect to TV Azteca's internally produced programming, these cost control initiatives include establishing clearly defined profitability targets for each stage of the production process, maintaining strict controls on hiring decisions, and controlling the costs of talent through the hiring of members of the TV Azteca acting school. With respect to the purchase of externally produced programming, TV Azteca focuses on acquiring programs that it believes will generate a greater number of viewers in its target audience and thereby generate significant advertising revenues as compared to the purchase costs.

*Results of Operations*

The following table sets forth, for the periods indicated, selected results of operations data for TV Azteca:

| | Six months ended June 30 | | | Year ended December 31 | | |
|---|---|---|---|---|---|---|
| | 2017 | 2017 | 2016 | 2016 | 2016 | 2015 |
| | (Unaudited) | | | (Audited) | | |
| | ($) | (Ps.) | (Ps.) | ($) | (Ps.) | (Ps.) |
| | (in millions) | | | | | |
| Revenues | 392.1 | 7,017.3 | 6,128.7 | 687.0 | 14,196.6 | 12,859.5 |
| Costs of programming, production and broadcasting | (266.0) | (4,760.4) | (3,791.8) | (435.0) | (8,988.8) | (8,719.8) |
| Selling and administrative expenses | (36.6) | (655.4) | (671.5) | (73.5) | (1,519.6) | (1,605.2) |
| Depreciation and amortization | (22.9) | (409.6) | (345.3) | (44.8) | (924.9) | (910.2) |
| Other expenses, net | (40.8) | (730.7) | (224.8) | (89.5) | (1,850.2) | (1,028.4) |
| Operating income | 25.8 | 461.2 | 1,095.3 | 44.2 | 913.1 | 595.8 |
| Comprehensive gain (loss) on financing | 34.5 | 617.9 | (1,197.5) | (153.2) | (3,164.7) | (2,514.3) |
| Income (loss) before taxes on earnings | 55.2 | 988.6 | (95.7) | (107.8) | (2,228.2) | (1,931.9) |
| Taxes on earnings | (30.0) | (537.1) | (622.0) | (45.7) | (944.7) | (715.7) |
| Income (loss) from continuing operations | 25.2 | 451.5 | (717.7) | (153.5) | (3,172.9) | (2,647.6) |
| (Loss) from discontinued operations | - | - | (370.9) | - | - | - |
| Net income (loss) | 25.2 | 451.5 | (1,088.6) | (153.5) | (3,172.9) | (2,647.6) |

The following table sets forth, for the periods indicated, results of operations data for TV Azteca as a percentage of TV Azteca's revenues:

| | Six months ended June 30 | | Year ended December 31 | |
|---|---|---|---|---|
| | 2017 | 2016 | 2016 | 2015 |
| | (Unaudited) | | (Audited) | |
| Revenues | 100.0 | 100.0 | 100.0 | 100.0 |
| Costs of programming, production and broadcasting | (67.8) | (61.9) | (63.3) | (67.8) |
| Selling and administrative expenses | (9.3) | (11.0) | (10.7) | (12.5) |
| Total costs and expenses | (77.2) | (72.8) | (74.0) | (80.3) |
| Depreciation and amortization | (5.8) | (5.6) | (6.5) | (7.1) |
| Other expenses, net | (10.4) | (3.7) | (13.0) | (8.0) |
| Operating income | 6.6 | 17.9 | 6.4 | 4.6 |

*Six Months Ended June 30, 2017 Compared to Six Months Ended June 30, 2016*

Revenues

Revenues for the six months ended June 30, 2017 increased by 14%, or Ps.889 million ($68.1 million), to Ps.7,017 million ($392.1 million) from Ps.6,129 million ($324.1 million) for the same period in 2016.  This increase was mainly due to the popularity of entertainment and other programs broadcasted during the six months ended June 30, 2017, which generated millions of viewers in Mexico and resulted in increased advertising sales, as well as revenue related to the WGC Mexico Championship golf tournament, organized by TV Azteca, and exchange rate fluctuations, as well as the monetization of content that is popular among Hispanic audiences in the United States, which was partially offset by the lower reimbursements from the Peruvian government during the six months ended June 30, 2017 for payments made by ACP for the construction and maintenance of the Red Dorsal Nacional de Fibra Óptica fiber optic network in Peru.

Costs of programming, production and broadcasting

Costs of programming, production and broadcasting for the six months ended June 30, 2017 increased by 26%, or Ps.969 million ($65.5 million), to Ps.4,760 million ($266.0 million) from Ps.3,792 million ($200.5 million) for the same period in 2016.  This increase was primarily attributable to increased costs of programming, production and broadcasting, costs related to the organization of the WGC Mexico Championship golf tournament, exchange rate fluctuations and increased costs and expenses in connection with the expansion of geographic coverage in the U.S. east coast, and to the increased cost of maintaining the Red Dorsal Nacional de Fibra Óptica fiber optic network, which was not fully present during the six months ended June 30, 2016 when the network was under construction.

49

<u>Selling and administrative expenses</u>

Selling and administrative expenses for the six months ended June 30, 2017 decreased by 2%, or Ps.16 million ($1.1 million), to Ps.655 million ($36.6 million) from Ps.672 million ($35.5 million) for the same period in 2016.  This decrease was mainly due to operating efficiency gains attributable to strict budgeting.

<u>Depreciation and amortization</u>

Depreciation and amortization for the six months ended June 30, 2017 increased by 19%, or Ps.64 million ($4.6 million), to Ps.410 million ($22.9 million) from Ps.345 million ($18.2 million) for the same period in 2016, largely due to the acquisition of assets to operate high definition equipment, as well as maintenance and improvement of buildings during 2016 and 2015, which has increased the basis of assets that can be depreciated.

<u>Other expenses, net</u>

Other expenses, net for the six months ended June 30, 2017 increased by 225%, or Ps.506 million ($28.9 million), to Ps.731 million ($40.8 million) from Ps.225 million ($11.9 million) for the same period in 2016. This increase was mostly due to the impairment of Azteca America's spectrum. In 2017, stations in Los Angeles and San Francisco related to Azteca America won a spectrum auction designed by the FCC. The book value recorded by Azteca America for the spectrum of these stations was higher than the value determined by the FCC, which required that the book value be adjusted.

<u>Operating income</u>

As a result of the above, operating income for the six months ended June 30, 2017 decreased by 58%, or Ps.634 million ($32.1 million), to Ps.461 million ($25.8 million) from Ps.1,095 million ($57.9 million) for the same period in 2016.

<u>Comprehensive gain or loss on financing</u>

Comprehensive gain on financing for the six months ended June 30, 2017 was Ps.618 million ($34.5 million) as compared to a comprehensive loss on financing of Ps.1,198 million ($63.3 million) for the same period in 2016. This change was primarily attributable to (i) a gain in net foreign exchange of Ps.1,782 million ($99.6 million) derived from a net liability position in U.S. dollars and an appreciation of the peso against the U.S. dollar at the end of the six month period ended June 30, 2017; (ii) a gain of Ps.31 million ($1.7 million) in other financial expenses; (iii) an increase of Ps.11 million ($0.6 million) in interest earned due to a period-to-period decrease in cash and cash equivalents, which were partially offset by an increase of Ps.8 million ($0.5 million) in interest paid due to the effect of exchange rate depreciation on the peso equivalent of TV Azteca's debt, which is denominated in U.S. dollars (see "—*Critical Accounting Policies and Estimates—Critical Accounting Policies—Effects of the Devaluation of the Peso and Inflation*").

<u>Income before taxes on earnings</u>

Income before taxes on earnings for the six months ended June 30, 2017 increased by Ps.1,084 million ($50.2 million), to Ps.989 million ($55.2 million from a loss of Ps.96 million ($5.0 million) for the same period in 2016.

<u>Taxes on earnings</u>

Taxes on earnings for the six months ended June 30, 2017, decreased by 14%, or Ps.85 million ($2.9 million), to Ps.537 million ($30.0 million) from Ps.622 million ($32.9 million) for the same period in 2016 (see "—*Critical Accounting Policies and Estimated—Critical Accounting Policies—Deferred Taxes*").

<u>Net income or loss</u>

As a result of the above, net income for the six months ended June 30, 2017 increased by 141% or Ps.1,540 million ($82.8 million), to a net income of Ps.452 million ($25.2 million) from a net loss of Ps.1,089 million ($57.6 million) for the same period in 2016.

<u>Free cash flow</u>

Free cash flow for the six months ended June 30, 2017 increased by 10%, or Ps.129 million ($11 million), to Ps.1,399 million ($78 million) from Ps.1,270 million ($67 million) for the same period in 2016.

*Year Ended December 31, 2016 Compared to Year Ended December 31, 2015*

Revenues

Revenues for the year ended December 31, 2016 increased by 10.4% or Ps.1,337 million ($60.3 million), to Ps.14,197 million ($687.0 million) from Ps.12,859 million ($747.3 million) for 2015. The increase was mainly due to increased advertising sales resulting from the popularity of TV Azteca's programming with large audiences that constitute the target market of numerous Mexican advertisers and revenues derived from the reimbursements from the Peruvian government for payments made by ACP for the construction and maintenance of the Red Dorsal Nacional de Fibra Óptica fiber optic network in Peru.

For the year ended December 31, 2016, revenues from Mexico, United States, and export of internally generated content to other countries, other businesses and the fiber optic business accounted for 69.2%, 9.8%, 2.0%, 8.2% and 10.8% of TV Azteca's total revenue, respectively.

The revenues generated in Mexico come from clients who advertise their products throughout the country in TV Azteca's national broadcasting programming, as well as local clients that are announced regionally through TV Azteca's 35 local branches, where local ads can be inserted. National advertising accounted for approximately 70% of TV Azteca's total revenue in 2016 and 71% in 2015. TV Azteca considers that the performance of national advertising sales is to some extent a function of Mexican national economic activity, particularly consumer demand.

Revenues in the United States are derived mainly from Azteca America, as well as from the KAZA–TV Los Angeles station, which TV Azteca started to operate under a multi-year local marketing contract that came into effect on July 1, 2003. Revenues in the United States accounted for 9.8% and 10.9% of TV Azteca's total revenue in the fiscal years ending on December 31, 2016 and 2015.

TV Azteca has exported its internally generated content to more than 100 countries. In 2016, programming exports accounted for 2.0% of TV Azteca's total revenue. TV Azteca considers that Mexico's cultural ties with other countries and the quality of TV Azteca's programming content are key factors for further growth of programming exports in the coming years.

In 2016, revenues generated by the operation relating to the fiber optic businesses in Colombia and Peru accounted for 10.8% of TV Azteca's total revenue.

Costs of programming, production and broadcasting

Costs of programming, production and broadcasting for the year ended December 31, 2016 increased by 3%, or Ps.269 million ($71.8 million), to Ps.8,989 million ($435.0 million) from Ps.8,720 million ($506.8 million) for 2015. The increase was mainly attributable to the incurrence of significant costs in 2016 in connection with the purchase of broadcast rights for Atlas F.C. soccer team, the construction costs related to ACC and ACP's fiber optic networks, and the depreciation of the peso versus the U.S. dollar during 2016.

Selling and administrative expenses

Selling and administrative expenses for the year ended December 31, 2016 decreased by 5%, or Ps.86 million ($19.7 million), to Ps.1,520 million ($73.6 million) from Ps.1,605 million ($93.3 million) for 2015. The decrease was mainly attributable to decrease in personnel expenses, operating expenses and travel expenses.

Depreciation and amortization

Depreciation and amortization for the year ended December 31, 2016 increased by 2%, or Ps.15 million ($8.1 million), to Ps.925 million ($44.8 million) from Ps.910 million ($52.9 million) for 2015, largely due to the acquisition of equipment necessary to operate in high definition due to the switch from analog to digital broadcasting.

Other expenses, net

Other expenses, net for the year ended December 31, 2016 increased by 80%, or Ps.822 million ($29.8 million), to Ps.1,850 million ($89.5 million) from Ps.1,028 million ($59.7 million) for 2015. This increase was primarily due to the provision for impairment of assets made in 2016 in the amount equal to Ps.1,377 million  in connection with the impairment of assets of ACC, which reflects the reduction of value of the transmission assets of ACC.

51

Operating income

As a result of the above, operating income for the year ended December 31, 2016 increased by 53%, or Ps.317 million ($9.6 million), to Ps.913 million ($44.2 million) from Ps.596 million ($34.6 million) for 2015.

Comprehensive gain or loss on financing

Comprehensive loss on financing for the year ended December 31, 2016 increased by 26%, or Ps.651 million ($7.1 million), to a Ps.3,165 million ($153.2 million) loss from a Ps.2,514 million ($146.1 million) loss for 2015. This change was primarily due to (i) an increase in interest paid in 2016 of Ps.179 million ($8.7 million), mainly caused by the increase in the exchange rate as compared with the previous year; (ii) a decrease in interest earned of Ps.16 million ($0.8 million) due to lower yield levels in 2016; (iii) a foreign exchange loss in 2016 of Ps.1,651 million ($79.9 million), compared to a foreign exchange loss of Ps. 1,187 million ($68.9 million) for 2015, as a result of a net liability position in dollars and a depreciation of the peso against the U.S. dollar at the end of 2016; and (iv) a decrease in other financial expenses for Ps.9 million ($0.4 million), mainly due to the payment of sureties for the construction of the fiber optic network in Peru  (see "—*Critical Accounting Policies and Estimates—Critical Accounting Policies—Effects of the Devaluation of the Peso and Inflation*").

Loss before taxes on earnings

Loss before taxes on earnings for the year ended December 31, 2016 increased by 15%, or Ps.296 million ($4.5 million), to Ps.2,228 million ($107.8 million) from Ps.1,932 million ($112.3 million) for 2015. The income tax for the fiscal year ended December 31, 2016, increased by 32% or Ps.229 million ($4.1 million), to Ps. $945 million ($45.7 million) from Ps.716 million ($41.6 million) for 2015.

Net loss

As a result of the above, net loss for the year ended December 31, 2016 increased by 19.8%, or Ps.525 million ($0.3 million), to Ps.3,173 million ($153.6 million) from Ps.2,648 million ($153.9 million) for 2015.

Free cash flow

Free cash flow for the year ended December 31, 2016 increased by 132%, or Ps.1,528 million ($63 million), to Ps.2,681 million ($130 million) from Ps.1,154 million ($67 million) for 2015.

*Liquidity and Capital Resources*

*Liquidity*

Factors that may influence TV Azteca's liquidity and capital resources as discussed below include:

- TV Azteca's ability to generate sufficient free cash flow;

- the ability of TV Azteca's subsidiaries to make distributions;

- factors that affect the results of operations of TV Azteca, including general economic conditions, demand for commercial advertising, the competitive environment, the relative popularity of TV Azteca's programs, demographic changes in TV Azteca's market areas and regulation; and

- factors that affect TV Azteca's access to bank financing and capital markets, including interest rate and exchange rate fluctuations, availability of credit and operational risks of TV Azteca.

TV Azteca's principal sources of liquidity include cash and cash equivalents on hand, advance sales of advertising time (see "—*Advertising Advances*") and uncommitted sources of short-term financing. The sources of short- and medium-term funding for TV Azteca include: a $130 million Euro Commercial Paper Program (the "ECP Program") and a medium-term Euro Notes Program for $1 billion. Under the ECP Program, TV Azteca periodically issues promissory notes with maturities not exceeding 365 days. Under the medium-term Euro Notes Program, TV Azteca may issue periodic promissory notes with maturities greater than 360 days and a maximum of 10 years. In addition, TV Azteca is currently in the process of establishing a new Mexican debt securities (*Certificados Bursatiles*) program for Ps.10 billion ($559 million) under which TV Azteca may issue short-term notes with amounts not exceeding Ps.3 billion ($168 million) and maturities up to 364 days or medium or long-term notes with amounts not exceeding Ps.10 billion ($559 million) and maturities from 365 days and a maximum of 30 years. Preliminary terms and conditions are subject to approval by the CNBV (*Comisión Nacional Bancaria y de Valores*).

TV Azteca's net working capital decreased by 66% to Ps.1,370 million ($77 million) as of June 30, 2017 from Ps.4,019 million ($194 million) as of December 31, 2016. This was mainly due to recognition of TV Azteca's $300 million Medium Term Notes due 2018 as a short-term liability and a 32% decrease in cash to Ps.3,025 million ($169 million) as of June 30, 2017, from Ps.4,470 million ($216 million) as of December 31, 2016 mainly due to a partial cancelation on this bond (see " — *MTN Programme*").

TV Azteca's net working capital decreased by 11% to Ps.4,019 million ($171 million) as of December 31, 2016 from Ps.4,516 million ($262 million) as of December 31, 2015. This was mainly due to an increase of TV Azteca's cash, which was offset by an increase of TV Azteca's deferred income and performance rights.

Cash and marketable financial instruments for TV Azteca decreased by 32% to Ps.3,025 million ($169 million) as of June 30, 2017 from Ps.4,470 million ($216 million) as of December 31, 2016.  This change was due principally to a $42.5 million partial cancelation of TV Azteca's $300 million Medium Term Notes due 2018, which was paid with cash generated by the operation of the company (see "— *MTN Programme*").

TV Azteca and the Guarantors had consolidated total indebtedness of Ps.15,234 million ($851.2 million) as of June 30, 2017 compared to Ps.18,261 million ($884 million) as of December 31, 2016. This decrease was largely due to the partial cancelation mentioned above and by a 13% appreciation of the Mexican currency against the U.S. dollar.

Cash and cash equivalents increased by 52% to Ps.4,470 million ($216 million) as of December 31, 2016 from Ps.2,938 million ($171 million) as of December 31, 2015. This change was due principally to (i) collection of accounts receivable; (ii) a $75 million payment under the ECP Program on August, 26, 2015; and (iii) a 27% decrease in capital expenditures to Ps.1,007 million ($48.7 million) at the end of 2016 from Ps.1,381 million ($80.2 million) the previous year.

TV Azteca and the Guarantors had consolidated total indebtedness of Ps.18,261 million ($884 million) as of December 31, 2016 compared to Ps.15,213 million ($884 million) as of December 31, 2015. This 20% increase was largely due to a 20% depreciation of the Mexican currency against the U.S. dollar.

The following chart sets forth TV Azteca's generation and application of cash for the periods indicated:

| | Six months ended June 30 | | | | Year ended December 31 | | | |
|---|---|---|---|---|---|---|---|---|
| | 2017 | 2017 | 2016 | 2016 | 2016 | 2016 | 2015 | 2015 |
| | (IFRS Unaudited) | | | | (IFRS Audited) | | | |
| | ($) | (Ps.) | ($) | (Ps.) | ($) | (Ps.) | ($) | (Ps.) |
| | | | | | (in millions) | | | |
| Net cash provided by (used in): | | | | | | | | |
| Operating activities .............................. | 15.2 | 272 | 47.2 | 893 | 190.6 | 3,939 | 68.2 | 1,173 |
| Investing activities................................. | (9.7) | (174) | (20.1) | (380) | (45.7) | (944) | (85.8) | (1,477) |
| Financing activities ............................. | (86.2) | (1,543) | (36.8) | (697) | (70.8) | (1,463) | (132.9) | (2,287) |
| Cash and cash equivalents at period end.. | 169.0 | 3,025 | 145.7 | 2,755 | 216.3 | 4,470 | 170.8 | 2,938 |

Net cash provided by operating activities for the six months ended June 30, 2017 decreased by 70%, or Ps.621 million ($32.0 million), to Ps.272 million ($15.2 million) from Ps.893 million ($47.2 million) for the same period in 2016. This decrease was mainly due to the purchase of broadcasting rights for sports events such as international soccer matches, boxing matches and football games as well as program series and blockbuster movies and a decrease in supplier accounts payable.

Net cash used in investing activities for the six months ended June 30, 2017 decreased by 54%, or Ps.206 million ($10.4 million), to Ps.174 million ($9.7 million) from Ps.380 million ($20.1 million) for the same period in 2016. This decrease was mainly due to the acquisition of players for Atlas F.C. and Monarcas Morelia.

Net cash used in financing activities for the six months ended June 30, 2017 increased by 122%, or Ps.847 million ($49.4 million), to Ps.1,543 million ($86.2 million) from Ps.697 million ($36.8 million) for the same period in 2016. This increase was mainly due to partial cancellation of $42.5 million of TV Azteca's $300 million Medium Term Notes due 2018 and higher interest expenses as a result of depreciation of the peso versus the U.S. dollar.

Net cash provided by operating activities for the year ended December 31, 2016 increased by 236%, or Ps.2,766 million ($122.4 million), to Ps.3,939 million ($190.6 million) from Ps.1,173 million ($68.2 million) for 2015. This increase was mainly due to higher revenues from advertising sales, reduction of costs for talent, reduction of operating expenses and collection of accounts receivable, including reimbursement from the Peruvian

government of the expenses incurred in connection with the Red Dorsal Nacional de Fibra Óptica fiber optic network in Peru and collection for transmission rights of Azteca America.

Net cash used in investing activities for the year ended December 31, 2016 decreased by 36%, or Ps.533 million ($40.1 million), to Ps.944 million ($45.7 million) from Ps.1,477 million ($85.8 million) for 2015. This decrease was mainly due to acquisition of high definition equipment and intangible assets.

Net cash used in financing activities for the year ended December 31, 2016 decreased by 36%, or Ps.824 million ($62.1 million), to Ps.1,463 million ($70.8 million) from Ps.2,287 million ($132.9 million) for 2015. This decrease was mainly due to a non-recurring $75 million payment under the ECP Program on August, 26, 2015.

For more detail, see "*Consolidated Statements of Cash Flows*" set forth in TV Azteca's consolidated financial statements as of and for the years ended December 31, 2016 and 2015.

*Advertising Advances*

Under TV Azteca's "Azteca Plan," advertisers generally are required to pay their advertising commitment in full within four months of the date they sign an advertising contract. TV Azteca also offers flexibility to advertisers by providing them an option to pay for advertising by making a cash deposit ranging from 10% to 20% of their advertising commitment, with the balance payable in installments over the term of the advertising contract, typically one year. No adjustments are made for inflation during the term of a contract.

Since pre-sales of advertising time are generally made in the last quarter of the year, TV Azteca's cash and marketable securities are normally at their highest level in December and at their lowest level in the third quarter of a calendar year. Generally, as the proceeds generated from pre-sales of advertising time are depleted (together with other sources of cash flow), TV Azteca relies upon sources of short-term financing, which are subsequently repaid, typically in the fourth quarter of a calendar year with the proceeds from the pre-sales of advertising time for the following year. As of December 31, 2016, TV Azteca had generated Ps.7,669 million ($371.1 million) in pre-sales of advertising time to be aired in 2017.

*Indebtedness*

The following chart sets forth TV Azteca's indebtedness as of June 30, 2017:

| Description | TV Azteca Indebtedness as of June 30, 2017 | | | |
|---|---|---|---|---|
| | ($)[1] | (Ps.) | Rate | Maturity |
| | (in millions) | | | |
| Medium Term Notes due 2018[2] | 259.1 | 4,637 | 7.500% | 2018 |
| Medium Term Notes due 2020 | 499.5 | 8,940 | 7.625% | 2020 |
| ATC Long-Term Credit Facility | 92.6 | 1,657 | 13.109% | 2069 |
| **Total Indebtedness** | **851.2** | **15,234** | | |

(1)   The exchange rate used in converting pesos into U.S. dollars for amounts derived from the balance sheet as of June 30, 2017 was determined by reference to the period-end exchange rate of June 30, 2017 (Ps.17.8973 per U.S. dollar). The amounts shown are presented net of issuance costs.

(2)   All of the outstanding Medium Term Notes due 2018 is expected to be redeemed on August 21, 2017. See "*Summary—Recent Developments.*"

TV Azteca's total debt as of June 30, 2017 matures on the dates set forth below:

| Date Due | Total TV Azteca Indebtedness as of June 30, 2017 | |
| | ($)[1] | (Ps.) |
| | (in millions) | |
| 2017 | 0 | 0 |
| 2018[2] | 259.1 | 4,637 |
| 2019 | 0 | 0 |
| 2020 | 499.5 | 8,940 |
| 2069 | 92.6 | 1,657 |
| **Total** | **851.2** | **15,234** |

(1)  The exchange rate used in converting pesos into U.S. dollars for amounts derived from the balance sheet as of June 30, 2017 was determined by reference to the period-end exchange rate of June 30, 2017 (Ps.17.8973 per U.S. dollar). The amounts shown are presented net of issuance costs.

(2)  All of the outstanding Medium Term Notes due 2018 is expected to be redeemed on August 21, 2017. See "*Summary—Recent Developments*."

*MTN Programme*

On June 1, 2005, TV Azteca established the MTN Programme for $200 million with Geronimo Capital Markets Ltd. as the negotiator and principal operator. The MTN Programme allowed TV Azteca to issue and have unpaid balances of up to $200 million in promissory notes on any date with a term of one to seven years.

On May 25, 2011, TV Azteca amended the existing MTN Programme to, among other things, increase its capacity to $500 million and include BCP Securities, LLC and Jefferies & Company, Inc., as negotiators and operators along with Geronimo Capital Markets Ltd. On the same day, TV Azteca issued the Medium Term Notes due 2018 under the MTN Programme in the amount of $300 million at an annual rate of 7.5%, whose interest payment dates are on May and November 25 of each year until its maturity on May 25, 2018. In November 2011, the first interest payment was made for an amount of $11.25 million.

On September 4, 2013, TV Azteca again modified the existing MTN Programme to, among other things, increase its capacity to $1 billion. On September 19, 2013, TV Azteca issued Medium Term Notes due 2020 under the MTN Programme in the amount of $500 million at an annual rate of 7.625%, whose interest payment dates are March and September 18 of each year until its maturity on September 18, 2020. In March 2014, the first interest payment was made in the amount of $19.06 million.

On March 15, 2017, TV Azteca redeemed $42.5 million of its Medium Term Notes due 2018. This cancellation was carried out through a repurchase operation that the company previously performed with cash generated by its operations. On June 14, 2017, TV Azteca announced that it will redeem another $60 million of the Medium Term Notes due 2018, which resulted in an aggregate debt reduction of $102.5 million as of July 14, 2017. On July 21, 2017, TV Azteca announced that it intends to redeem all of the remaining outstanding Medium Term Notes due 2018 on August 21, 2017.

Pursuant to the terms and conditions of the MTN Programme documents, TV Azteca shall comply with certain restrictive covenants, among others, in connection with: (i) limitations with respect to the incurrence of additional indebtedness, (ii) limitations on guarantees, (iii) limitations on certain restricted payments, (iv) limitations on the sale of assets or capital stock of its subsidiaries, (v) limitations on the establishment of liens or other encumbrances on its assets, (vi) limitations on mergers, spin-offs or the transfer of all or a substantial part of its assets, and (vii) limitations on transactions with related parties. In addition, TV Azteca may only participate in businesses similar or complementary to those carried out before the issue and TV Azteca must provide the holders of the issue and the Bank of New York Mellon (as trustee) with its quarterly financial statements, its annual financial statements, and any other relevant information that TV Azteca submits to the CNBV or the Mexican Stock Exchange.

*ATC Long-Term Credit Facility*

In February 2000, TV Azteca entered into a credit agreement with a Mexican subsidiary of ATC, pursuant to which TV Azteca was granted two long-term loans for an aggregate amount of $119.8 million (the "ATC Long-Term Credit Facility").

The ATC Long-Term Credit Facility consists of a $91.8 million unsecured loan and a $28.0 million loan that was secured by certain TV Azteca properties. The $28.0 million secured term loan expired in February 2005, but was renewed annually for successive one-year periods due to the fact that the ATC Towers Lease remained in effect. On November 27, 2013, the $28.0 million loan was fully repaid in advance with funds obtained from the issuance of the Medium Term Notes due 2020. The remaining ATC Long-Term Credit Facility accrues interest at a rate of 13.109% per year and is guaranteed by certain subsidiaries of TV Azteca.

The remaining ATC Long-Term Credit Facility is due in 2020 and will automatically be extended for an additional 50-year term to the extent that the ATC Towers Lease remains in effect (see "*Our Business—Property—Transmission Sites*"). TV Azteca may prepay the loan after 2020, in whole or in part, and with no applicable penalty. The loan is subject to a total or partial mandatory prepayment in the event TV Azteca terminates all or some of the leases under the ATC Towers Lease.

*Capital Expenditures*

Capital expenditures for the six months ended June 30, 2017 was Ps.202.7 million ($11.3 million), and for the years ended December 31, 2016 and 2015 was Ps.1,007 million ($48.7 million), Ps.1,381 million ($80.2 million), respectively. Such capital expenditures were primarily related to the expansion and improvements made to the television production and broadcasting facilities of TV Azteca (see "*Our Business—Property*"), including acquisition of transmitters to expand the coverage of TV Azteca's channels and improve the quality and operation of its broadcasting signal, renovation of its production facilities and maintenance, remodeling and renovation of its buildings and office facilities. Most of the capital expenditures made by TV Azteca are payable in U.S. dollars. The following summarizes TV Azteca's capital expenditures by category for the six months ended June 30, 2017 and for the years ended December 31, 2016 and 2015:

| | Six months ended June 30 | Year ended December 31 | |
| --- | --- | --- | --- |
| | 2017 | 2016 | 2015 |
| | (Ps.) | (Ps.) | (Ps.) |
| | (in millions) | | |
| Broadcast & Maintenance | 147 | 631 | 353 |
| HD CAPEX | 56 | 287 | 831 |
| Colombia | 0 | 89 | 197 |
| **Total** | 203 | 1,007 | 1,381 |

As a result of TV Azteca's operating strategy, TV Azteca does not expect, for the foreseeable future, to make major capital expenditures outside the scope of its core television broadcasting business, which would include loans, credit support and capital investments in its affiliates.

*Contractual and Other Obligations*

The following summarizes TV Azteca's contractual obligations as of June 30, 2017, and the effect such obligations are expected to have on its liquidity and cash flows in future periods:

**Contractual Obligations**

**Payments due by year**

| Description | Total | | 2017 | | 2018[1] | | 2019 | | 2020 | |
| --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- |
| | (Ps.) | ($) | (Ps.) | ($) | (Ps.) | ($) | (Ps.) | ($) | (Ps.) | ($) |
| | | | | | (in millions) | | | | | |
| Principal amount of indebtedness | 14,317.8 | 800.0 | - | - | 5,369.2 | 300.0 | - | - | 8,948.7 | 500.0 |
| Interest payable | 3,840.8 | 214.6 | 1,297.6 | 72.5 | 1,095.3 | 61.2 | 894.9 | 50.0 | 553.0 | 30.9 |
| Satellite transponders | 162.9 | 9.1 | 39.4 | 2.2 | 41.2 | 2.3 | 41.2 | 2.3 | 41.2 | 2.3 |
| Equipment lease | 7.2 | 0.4 | 1.8 | 0.1 | 1.8 | 0.1 | 1.8 | 0.1 | 1.8 | 0.1 |
| Broadcasting rights | 2,326.6 | 130.0 | 841.2 | 47.0 | 728.4 | 40.7 | 579.9 | 32.4 | 177.2 | 9.9 |
| **Total** | **20,655.3** | **1,154.1** | **2,180.0** | **121.8** | **7,235.9** | **404.3** | **1,517.8** | **84.8** | **9,721.9** | **543.2** |

(1)   The amounts shown in this table does not take into account the redemption of all of the outstanding Medium Term Notes due 2018, which is expected to be redeemed on August 21, 2017. See "*Summary—Recent Developments*."

*Internal Control*

TV Azteca has an internal control system that is based on the updating, observance and fulfillment of policies, codes and guidelines that provide certainty to the operations performed. Those responsible for the internal control system are the Chief Executive Officer and the Chief Financial Officer in coordination with TV Azteca's Board of Directors and the Audit Committee.

**OUR BUSINESS**

**General**

TV Azteca is one of the two largest producers of Spanish-language television content in the world and the second largest television broadcasting company in Mexico based on broadcast advertising market share.

TV Azteca holds 180 concessions granted by the Mexican government, enabling it to transmit up to 786 over-the-air broadcast signals. For the last twelve months ended June 30, 2017, TV Azteca reached an average of 93.1% of households in Mexico and captured 36% of the Mexican television broadcast advertising market.

TV Azteca owns and operates two high definition national television networks, "Azteca 7" and "Azteca 13." TV Azteca also operates two new over-the-air signals: "adn40," a local channel that reaches 84.5 million people in Mexico (previously Proyecto 40, which was broadcasted over-the-air in Mexico City), and "a+," a network of 35 local channels across the country that produce local news, sports and regional entertainment content. a+ has the capacity to broadcast different commercials in one or more cities simultaneously by way of its 422 antennas.

TV Azteca is widely recognized for its high quality original content. For the year ended December 31, 2016, its programming reached on average 88 million viewers in Mexico monthly and its original content represented approximately 48% of its total primetime programming on Azteca 7 and Azteca 13. It owns 54 state-of-the-art multi-level television production studios and in 2016 produced more than 30,000 hours of digital, HD, 4K and multi-platform television content, including reality shows, talk shows and news, sports, music, variety programs and traditional soap operas (*telenovelas*), some of which are progressively evolving into dynamic program series. TV Azteca's original content is aired on its networks in the United States, Guatemala and Honduras and it has been exported to more than 100 countries in the Americas, Europe, Asia and Africa. TV Azteca also owns a Spanish-language television broadcast network in the United States known as Azteca America that reaches more than 12.3 million viewers during primetime programming.

In addition to its content and broadcasting operations, TV Azteca owns a drama school, two Mexican professional soccer teams and Azteca Internet. TV Azteca is also engaged in other businesses through joint ventures and strategic partnerships, including a concession to operate and maintain a fiber optic network developed by TV Azteca in Peru and a 40% owned fiber optic network in Colombia.

TV Azteca's consolidated revenues for the six months ended June 30, 2017 and for the year ended December 31, 2016 was Ps.7,017.3 million ($392.1 million) and Ps.14,197 million ($687.0 million), respectively. For the six months ended June 30, 2017 and for the year ended December 31, 2016, TV Azteca had net income of Ps.451.5 million ($25.2 million) and net loss of Ps.3,172.9 million ($153.5 million), respectively. TV Azteca's EBITDA for the twelve months ended June 30, 2017 was  Ps.4,044.1 million ($226.0 million).

*Corporate Structure*

The following structure chart shows a simplified organizational structure for TV Azteca as of June 30, 2017, including its principal subsidiaries, all of which are wholly owned by TV Azteca, and a description of their main business activities. The notes will be fully and unconditionally guaranteed on a joint and several basis by all of TV Azteca's existing subsidiaries and certain future material subsidiaries, as described under "*Description of Notes—Note Guarantees.*"



## Business Strengths

*One of the Two Largest Spanish-Language Content Producers in the World and a Market Leader in Mexico*

TV Azteca is one of the two largest content producers of Spanish-language television content in the world (measured by revenue against comparable publicly traded companies) and the second largest television broadcasting company in Mexico (measured by broadcast advertising market share). It produces a variety of programs, including traditional soap operas (*telenovelas*), including in their newly evolved form as program series, as well as reality shows, talk shows and news, sports, music and variety programs. TV Azteca believes it is a leading producer of some of the most innovative, inspirational and popular Spanish-language content in the world, which has cultivated large and loyal audiences that attract diverse advertisers.  In the six months ended June 30, 2017, TV Azteca produced approximately 17,000 hours of original content. In each of 2016 and 2015, TV Azteca produced approximately 48% and 50%, respectively, of the Mexican national weekday primetime program hours aired on its networks (excluding programming produced by its local branches).

*Strong Industry Fundamentals in its Core Domestic Market*

TV Azteca's primary focus and vision is concentrated on the Mexican broadcast television market, where over-the-air television broadcasting continues to be the most efficient way to reach the Mexican population. For the year ended December 31, 2016, over-the-air television broadcasting captured the highest expenditure in advertising, representing 48.6% of the country's total advertising market. In addition, over-the-air television broadcasting has the highest household reach in the country with a 93.1% rate of penetration for the year ended December 31, 2016. This rate is significantly higher than that of any other advertising alternative, including radio, pay television and internet, which reached 61.5%, 52.1% and 47.0%, respectively, of households in Mexico for the year ended December 31, 2016. Further, over-the-air television broadcasting of advertisements requires significantly fewer advertising spots to reach a higher percentage of the population.

In Mexico, over-the-air television broadcasting continues to be a very efficient way to reach the greatest number of households: on average there are two television sets per household; the average head of household watches television for approximately five hours and forty-seven minutes per day; 61% of the population, or approximately 70 million people, watch television between one and four hours daily; six out of ten pay television subscribers continue to watch over-the-air television broadcast channels; only 4.5% of households have access to high speed internet, which is required to watch online video content; and only 6.7 million people subscribe to OTT services such as Netflix.

*Uniquely Positioned, Large Scale Infrastructure in Mexico*

The media and broadcasting industries in TV Azteca's core market require significant capital investment and technical expertise, which makes it difficult for new competitors to enter these businesses. Barriers to entry for potential broadcasters include an already-established extensive infrastructure, the limited availability of land to construct transmission sites, the existence of highly customized station facilities and a scarcity of engineers to design, operate and maintain television broadcast facilities. In addition, TV Azteca's position as one of the world's leading producers of Spanish-language programming, with nearly 60 long-term contractual relationships with major content providers (including Fox, Sony, Disney, the Mexican Soccer Federation (Mexican national soccer team) and a number of teams playing in the Mexican Soccer League) with an average term of three years, creates significant obstacles to the entry of other potential content providers.

Against this backdrop, TV Azteca benefits from a strong brand and an established operating history. TV Azteca's 458 transmission sites located throughout Mexico allow it to reach approximately 93.1% of households in Mexico at least 23.5 hours a day, seven days a week. In addition to its extensive and sophisticated transmission technology, TV Azteca has 54 state-of-the-art multi-level television production studios that facilitated TV Azteca's ability to produce over 30,000 hours of high quality content for the year ended December 31, 2016. Moreover, throughout its operating history, TV Azteca has developed the ability to effectively navigate the complex regulatory framework of the telecommunications industry.

*Broad Programming with Innovative Content, Driving a Diverse High-Quality Client Base*

Over the last few years, TV Azteca has redesigned its programming in an effort to respond to changing demands and to appeal to all viewers. As part of our programming efforts, TV Azteca has engaged in partnership with international first-class production companies to co-produce innovative content. TV Azteca's broad program offering has allowed it to reach a wide-range of viewers across all demographics through its national and local channels.

The broad reach of TV Azteca's program offerings has driven a diverse, high-quality client base. TV Azteca's client base includes numerous blue-chip companies spanning a wide range of industries, which allows it to better withstand downward swings in the economy. As of June 30, 2017, TV Azteca's 10 largest clients accounted for approximately 18% of its advertising revenues. See "*Our Business—Description of the Business—Television Advertising Sales*."

*Fully Integrated Company with the Ability to Leverage Core Capabilities*

TV Azteca is a fully integrated telecommunications company with a complete array of resources to source, produce and distribute television content. Moreover, TV Azteca is well-positioned to leverage these core capabilities toward reaching larger audiences across platforms and leveraging existing content to access new revenue streams. TV Azteca has resources dedicated to every stage of the television business and to the distribution of video content across new platforms. From the cultivation of creative talent at its drama school, to the production of national and local original content at its television studios throughout Mexico, to the broadcast and distribution of content across national and local channels and diverse platforms to increasingly large audiences, TV Azteca is able to cost effectively control each stage of the production, sale and distribution process. This business model allows TV Azteca to produce high quality content that is delivered  to a large and loyal audience in a manner that increases the lifetime value of produced content.

*Strong Financial and Liquidity Profile*

TV Azteca maintains significant cash positions and targets long-term rather than short-term debt financing, which allows it to maintain financial stability and flexibility in a fast moving market.  In addition, in connection with spectrum auctions by the FCC in the United States, AIC, which produces Azteca America content, received $156 million (pre-tax) in the third quarter of 2017 from spectrum sales by stations in Los Angeles and San Francisco that are related to AIC and Azteca America. TV Azteca currently intends to use a portion of the proceeds of this spectrum sale to repay existing indebtedness. TV Azteca's liquidity allows it to capture market opportunities that may require an initial cash investment, such as promotional packages for its advertising clients. As of the twelve months ended June 30, 2017 and the years ended Decembers 31, 2016 and 2015, TV Azteca's net debt to EBITDA ratio was 3.0x, 3.7x and 4.8x, respectively, and its total debt to EBITDA ratio was 3.8x, 5.0x and 6.0x, respectively. During the past five fiscal years, TV Azteca made large capital expenditures in non-core businesses that proved to be break-even or unprofitable ventures. Under its new leadership, TV Azteca has revised its strategy to focus on its core businesses and seek to maintain high EBITDA margins.

TV Azteca's revenues for the year ended December 31, 2016 increased by 10.4% compared to the year ended December 31, 2015, and during the six months ended June 30, 2017, TV Azteca's revenues increased by 14.5% compared to the same period in 2016, which is well above Mexican population and GDP growth for this period and, alongside strict control in operating expenditures, has allowed for steady cash flow generation.

*Talented and Renewed Management Team with Vast Industry Experience*

Over the last 25 years, TV Azteca's management has helped guide the company to a leading market position in Mexico and more broadly within the Spanish-speaking market. Recently, TV Azteca revamped its management under the direction of its Chief Executive Officer, Benjamin Salinas, who has redirected TV Azteca's strategy to focus on its core television broadcast business. In line with this strategy, TV Azteca's senior management, with an average of ten years of experience in the telecommunications industry, has focused on producing, co-producing and purchasing inspiring, creative, bold and innovative content such as "Rosario Tijeras," "MasterChef", "La Isla" and "Hasta Que Te Conocí," which drew in substantial audiences during the twelve months ended June 30, 2017. While TV Azteca actively recruits outside talent to manage the business, it also focuses on developing in-house talent by training and mentoring personnel, developing a talent pipeline to meet TV Azteca's future management needs.

**Business Strategies**

*Focus on High-Quality Multi-platform Content*

TV Azteca believes the key to revenue generation in the television industry is a combination of the ability to anticipate and adapt to changes in consumer preferences and behavior on a timely basis and to consistently carry high quality content that is responsive to consumer tastes and behavior. TV Azteca's driving strategy to maintain and increase revenues is to produce and purchase the highest quality content that focuses on the evolving demands of viewers, including the Mexican broadcast television market that is now complemented by OTT services, the internet and other mobile platforms.

TV Azteca's strategy for producing inspiring, creative, bold and innovative content is based on a flexible approach to the television broadcast business that implements the vision of TV Azteca's new executive leadership and centers on diversifying talent and incorporating new forms of production. TV Azteca has steered away from the use of exclusivity contracts with its core talent, which has paved the way for TV Azteca to attract new audiences through the use of a variety of actors, writers, producers and directors. In addition, TV Azteca's use of new forms of production, including co-production arrangements, which allow TV Azteca to share the cost of production and maintain premium quality content, and selective work for hire production, where TV Azteca finances a third-party's production under TV Azteca's supervision and guidance, enables TV Azteca to obtain the rights to cutting-edge, innovative content. TV Azteca intends to continue to focus its resources on developing, maintaining and improving the high quality of its core over-the-air networks to continue attracting loyal audiences and advertising revenues.

TV Azteca's content strategy also includes a focus on acquiring the broadcast rights to television blockbusters and major special events, such as boxing matches, regular season NFL games and the Super Bowl, the FIFA World Cup and other international soccer championships, Mexican national team soccer games, some of the Mexican Soccer League games and golf tournaments. TV Azteca has long-term agreements for an average term of three years with major content providers such as Sony, Fox and Disney, which grant the right to broadcast film and television programs that have proven popular outside Mexico. TV Azteca believes it can improve profit margins by making partial purchases of certain sports broadcast rights at reduced rates and producing innovative and cost-efficient programming that is appealing to viewers.

*Expand Internet and Social Media Presence*

TV Azteca anticipates generating new sources of revenue by expanding its internet presence through enhancement of its own online platform for streaming video content and enlarging the availability of its video content on established third-party online platforms. TV Azteca's main strategy to increase internet revenues is to shift TV Azteca's focus from online pop-up ad displays to online video advertising.

TV Azteca's strategy for significantly expanding its online video advertising concentrates on consolidating its various websites and providing all its available video content on one main website and accompanying mobile apps, Azteca Internet, that is expected to launch in August 2017. TV Azteca is further expanding the availability of its video content to more online platforms through sales to popular OTT services, including Netflix and Hulu, in addition to its already strong presence on Facebook, YouTube and Twitter.

TV Azteca believes its strategic shift from online pop-up ad displays to online video advertising on Azteca Internet and other online platforms positions TV Azteca to be a key player in the digital space compared to its

competitors who do not have the same capacity to generate original video content or acquire the necessary broadcasting rights for purchased content and music. TV Azteca believes it can gain a strategic benefit by emerging as an early initiator of online video advertising, since it anticipates that the value of online pop-up ad displays will continue to decline due to the availability of ad blocks. As a result, TV Azteca believes its strategy places it in a superior position to its competitors in the long-term, as the currently dominant over-the-air television broadcast progressively shifts to an online market. During the time required for the Mexican market to develop the necessary infrastructure for broadband internet to penetrate the country and become readily available to the Mexican population at high quality, TV Azteca will be able to develop significant know-how that it believes will serve as an important competitive advantage. In the immediate future, TV Azteca anticipates its strategy will allow it to benefit simultaneously from incremental growth in digital advertising sales and from ancillary revenues from over-the-air television broadcasting as advertisers will be incentivized to use both mediums.

*Reach New Clients through Local Advertising Sales on a+ Platform*

TV Azteca is focused on offering local advertisers the most economical way to reach the largest number of potential customers. To benefit from this source of revenue, TV Azteca introduced a+, a network of 35 local channels that produce locally meaningful content such as news, sports and entertainment. TV Azteca's strategy for increasing local advertising sales through this expansive network is based on its unique position to geographically customize the transmission of local programming and advertisements in one or more cities simultaneously by way of its 458 transmission sites. TV Azteca aims to double its 8% local share of TV Azteca's total revenue over the next five years with a+'s launch by gaining new local and regional customers that traditionally advertise on the radio, press, internet and other local media. TV Azteca's strategy and technology offers local businesses the option to target the transmission of its advertisements to a specific city or cities, or within a particular region. No other television competitor in Mexico is able to offer its advertisers the same level of geographic customization of its target audience.

*Price Leading Rates for Advertisers*

Historically, TV Azteca has been a market price leader in advertising sales. In 2016, TV Azteca was able to increase prices at a double-digit rate, on average, for all customers, and in the six month period ended June 30, 2017, TV Azteca increased prices by a mid-single digit. TV Azteca believes that the value gained by customers historically through advertisements on over-the-air broadcast television provides significant opportunities to introduce further price increases going forward. TV Azteca plans to strategically and cumulatively increase prices over the next several years to compensate for the increase in costs to produce and acquire popular, high-quality content.

**Description of the Business**

*TV Azteca's Mexican Television Networks*

TV Azteca's core business in Mexico is the content production and operation of its over-the-air television networks, which are broadcast throughout Mexico.

*Azteca 13*

Azteca 13 targets women of different backgrounds by focusing on promoting female empowerment. TV Azteca produces or co-produces all of the content for Azteca 13, with TV Azteca producing 60% of programming hours during 2016. The network's programming consists primarily of program series, reality shows, news programs, talk shows, musical variety programs and sports broadcasts, principally soccer.

*Azteca 7*

Azteca 7 primarily targets young families, with programming consisting mainly of newscasts, program series, sports and community social service, among others. During 2016, TV Azteca produced 23% of Azteca 7's total programming hours.

*adn40*

In March 2017, TV Azteca announced the rebranding of Proyecto 40 as "adn40," to satisfy the public's demand for agile and timely information. adn40 is the only 24 hour news and opinion channel on Mexican over-the-air television, currently reaching a potential 84.5 million people in Mexico with a goal of reaching the entire country in the near future.

adn40 features some of the most talented and popular news presenters in Mexico, covering sports and other popular topics. adn40 primarily targets upper middle class adults, allowing TV Azteca to target advertisers with a national reach looking to reach viewers in this upper middle class market.

*a+*

In March 2017, TV Azteca launched a network of local channels called "a+". With a focus on regional markets, TV Azteca's local channels aim to double its 8% share of TV Azteca's total revenue – which was equivalent to Ps.1,127 million ($54.5 million) in 2016 – within five years. a+ looks to achieve this through the production of popular regionally focused content in order to draw in advertisers away from local radio, local press and the internet.

 TV Azteca currently owns 458 transmission sites that allow it to simultaneously air different commercials in the various cities in which a+ airs. TV Azteca has 35 local stations that produce local news, sports and regional entertainment programming that is aired in certain time slots designated for such local programming. In total, approximately 20% of the programming on these channels is locally focused, including programs that are produced and financed by TV Azteca's local stations or by other local producers. In 2015, 2016 and for the six months ended June 30, 2017, TV Azteca's local television stations produced approximately 9.0%, 8.0% and 8.6% of the programming broadcast on local channels, respectively.

*TV Azteca's International Television Networks*

TV Azteca exports its programming to countries outside of Mexico in three different ways: (i) TV Azteca produces cable networks that are available for distribution by cable providers throughout the world, (ii) TV Azteca has a television concession through which it operates various internationally based television networks, and (iii) TV Azteca licenses original content and related intellectual property relating to specific programs to television producers throughout the world.

*Channels for broadcast in restricted television systems*

In addition to its over-the-air television networks, TV Azteca produces four non-broadcast cable networks in Mexico. Cable distributors can acquire the broadcast rights to include any of these 24-hour networks in their channel lineup, but TV Azteca does not broadcast them on any of its channels. In April 2013, under the commercial brand of AZ TV de Paga, TV Azteca created a business unit for the purpose of managing, producing and distributing the channels and their content, which is offered to the different pay-TV platforms in the national and international market.

*National and International Portfolio*

Currently, the national and international portfolio is made up of the following channels:

| NATIONAL | INTERNATIONAL |
|---|---|
| 13-1 | |
| 13-2 | |
| AZ Mundo | AZ Mundo |
| AZ Clic | AZ Clic |
| AZ Corazón MX | AZ Corazón |
| AZ Cinema | AZ Cinema |
| a+ | |

AZ Mundo provides coverage in 22 countries including Mexico, Argentina, Chile, Ecuador, Honduras, Peru, Uruguay, Bolivia, Colombia, El Salvador, Nicaragua, Puerto Rico, Canada, Costa Rica, Guatemala, Panama, Dominican Republic, Equatorial Guinea, Germany, Austria, Switzerland and Spain, reaching an estimated 12.8 million television households.

AZ Corazón is currently distributed internationally to 21 countries, including Mexico, Argentina, Chile, Ecuador, Honduras, Peru, Uruguay, Bolivia, Colombia, El Salvador, Nicaragua, Puerto Rico, Costa Rica, Guatemala, Panama, the Dominican Republic, Equatorial Guinea, Germany, Switzerland, Austria and Spain, reaching an estimated 12.2 million television households. This channel is also available on the AT&T platform in the United States, with about 200,000 subscribers.

AZ Clic offers its viewers lifestyle content, music and shows as part of a portfolio of pay-TV platform channels that are not broadcast on over-the-air television. It currently reaches more than 700,000 subscribers within

the national territory of Mexico, and is being offered in international markets including Mexico, Argentina, Chile, Ecuador, Honduras, Peru, Uruguay, Bolivia, Colombia, El Salvador, Nicaragua, Puerto Rico, Costa Rica, Guatemala, Panama, the Dominican Republic, Switzerland, Austria and the African continent, reaching 3.8 million subscribers.

AZ Cinema Portfolio Channel offers the national and international markets the most comprehensive film catalog from the golden age of Mexican cinema until the 1980's, with 100% refurbished films offered in HD format. AZ Cinema is broadcast internationally and is currently offered in 18 countries including Mexico, Argentina, Chile, Ecuador, Honduras, Peru, Uruguay, Bolivia, Colombia, El Salvador, Nicaragua, Puerto Rico, Costa Rica, Guatemala, Panama, Dominican Republic, Switzerland, Austria and the African continent, reaching over 3.7 million households since its launch in May 2015.

Channels 13-1 and 13-2 are transmitted through the SKY, Izzi and Total Play platforms, as well as other regional platforms in Mexico. The programming is the same as that of Azteca 13, but transmitted with a one and two hour delay in transmission, respectively.

*Licensed content*

AZ Contenidos, as part of AIC, is a catalog created for the sale of TV Azteca produced content that is distributed internationally. Through the website tvaztecainternational.com and the AZ Content App on iOS and Android, viewers can review the content that TV Azteca has to offer and purchase such content through the catalog.

In addition to selling broadcast rights to its television networks around the world, TV Azteca has licensed original content and related intellectual property to television producers in over 100 countries throughout the world. The sale of the right to broadcast or develop its original content allows TV Azteca to leverage its library of programming already broadcast in Mexico. In 2015, 2016 and the six months ended June 30, 2017, TV Azteca exported 6,879, 5,994, and 2,653 hours of programming, respectively.

*United States*

TV Azteca operates the Azteca America network through its subsidiary, AIC. Azteca America is a Spanish-language over-the-air television network broadcast throughout the United States. The network broadcasts *telenovelas*, program series, reality programs, sports and news broadcasts, and other entertainment programming, including specialized content aimed at U.S. Hispanic audiences. Azteca America is available over-the-air through television broadcast stations and cable and satellite television distributors that operate in 69 markets throughout the United States, reaching an aggregate 88% of the U.S. Hispanic population. During primetime, TV Azteca reaches more than 12.3 million viewers. Revenues in the United States accounted for 9.5%, 9.8% and 10.9% of TV Azteca's total revenue in the six months ended June 30, 2017 and the fiscal years ended December 31, 2016 and 2015, respectively.

Through stations owned by AIC, TV Azteca competed in a spectrum auction process organized by the FCC, which offered concessionaires of "*full power*" and "*Class A*" frequency stations the opportunity to participate in the sale of their frequencies. The AIC-affiliated stations in Los Angeles and San Francisco won the auction, which is now complete. As a result of the auction, AIC received $156 million (pre-tax) in the third quarter of 2017. This sum is the result of certain AIC investments in and programing relationships with KAZA-TV in Los Angeles and KEMO-TV in San Francisco. The US licensees of these stations chose to surrender the stations' spectrum in the auction and AIC's relationship with these stations for the right to share in the proceeds of the sales. In addition, the licensees of KAZA-TV and KEMO-TV retained the ability to share a channel with another U.S. television station and continue broadcasting. AIC's relationship with these stations continues, with the potential for additional revenue in the future.

Additionally, in accordance with partnership agreements signed with other broadcasters, AIC was granted exclusive licenses to televise AIC programming in its respective markets. These agreements have terms of two to ten years. In exchange for providing this programming, AIC receives 50% of available advertising time.

*Guatemala*

TV Azteca has a television concession in Guatemala through which it operates three networks broadcast in several cities throughout Guatemala. The three channels, 31 Azteca Guate, Canal 35 and Canal 22, each broadcast local programming produced by TV Azteca.

64

*Honduras*

On November 4, 2013, TV Azteca was granted a 15 year concession to render broadcasting services to the Republic of Honduras through digital technology. The service consists of a digital channel with coverage in the complete territory of Honduras.

Broadcasting transmitters are currently located in the cities of Tegucigalpa, San Pedro Sula and La Ceiba. Additional transmitters will soon be installed in different cities of the country.

*Programming*

TV Azteca is one of the two largest producers of Spanish-language television content in the world. TV Azteca believes that its ability to provide a diverse mixture of quality programming has been, and will remain, one of its principal assets. TV Azteca focuses on producing and acquiring content that attracts viewers from its many target audiences. TV Azteca also believes that the development of distinct identities for each of its channels has helped TV Azteca capture a growing share of the television viewing public in Mexico, providing advertisers the ability to target specific demographic groups in their advertising.

In order to maintain the high quality of its programming, TV Azteca gathers focus groups and conducts surveys to evaluate the expected popularity of new programming ideas. TV Azteca also uses some of its unsold advertising time to aggressively promote both its internally produced programming and the programming it purchases, in order to generate and maintain the interest of viewers.

*Programming produced by TV Azteca*

TV Azteca produces a variety of programs, including program series, reality shows, news, sports transmissions, music programs, contest programs, talk shows and variety programs. In 2015, 2016 and the six months ended June 30, 2017, TV Azteca produced approximately 50%, 55% and 41%, respectively, of the primetime programming during weekdays that aired on its channels (excluding programming produced by its local branches).

On weekends in 2015, 2016 and the six months ended June 30, 2017, TV Azteca produced approximately 65%, 53% and 55%, respectively, of the hours of programming aired during primetime hours (excluding programming produced by its local branches).

TV Azteca produced four *telenovelas* in 2015, which represented 383 hours of programming, five program series (formerly *telenovelas*) in 2016 that represented 197 hours of programming and four program series during the six months ended June 30, 2017, which represented 153 hours of programming.

In 2015, TV Azteca produced MasterChef, the successful world-class cuisine reality show, for the Mexican market and achieved record viewership rates for Sunday primetime. In 2016, MasterChef Junior, the version of the program featuring children, was launched to further MasterChef's position as one of the most successful television franchises in the country.

TV Azteca's news programming includes evening primetime newscasts aimed at target audiences on their television channels. *Hechos,* a news program broadcast on Azteca 13, presents a deeper analysis of daily news, both within the country and internationally, and is one of the most relevant nationwide newscasts in Mexico.

In addition, new news materials are produced to be broadcast within local programming, including: informative spaces, ranging from morning news to mid-day and night-time news, with regional information. In addition, it generates informative news features and special programs for local contingencies.

The sports programming produced internally by TV Azteca focuses on broadcasting premier division tournament matches for professional Mexican soccer, sports commentary programs and producing programs to broadcast various sports events such as international soccer matches, boxing matches and football games. Soccer is the most popular sport in Mexico, and broadcasts of Mexico's LigaMX premier division matches generate large audiences. TV Azteca has the broadcast rights for local matches of six teams from the premier division, known as the "Liga MX" ("MX league"), including Monarcas Morelia and Atlas F.C.

*Purchased programming*

TV Azteca obtains programming from approximately 59 different distributors. TV Azteca's investment in purchased content has been reoriented so that in the coming years, a greater investment share will be allocated to the generation of original and internally produced content. A substantial part of its purchased programming comes from strategic alliances with major studios such as: Buena Vista Internacional (Disney), 20th Century Fox, Sony Pictures, as well as different independent vendors such as Gussi, among others. The programming purchased by TV Azteca mainly consists of films and program series recognized worldwide. In acquiring content, new formats have been

65

added, which allow TVAzteca to improve its offering to its viewers. Any programs purchased by TV Azteca that are not in Spanish are then dubbed into Spanish prior to delivery. TV Azteca pays the distributor an additional fee for this service. In the years 2015 and 2016, purchased programming constituted approximately 50%, and 51%, respectively, of the combined weekday hours of primetime programming broadcasted by TV Azteca channels. TV Azteca has also entered into contracts to broadcast sports programming, including the EuroCup, the FIFA World Cup, and the National Football League ("NFL"). TV Azteca generally uses its own commentators to broadcast international sporting events. Also, TV Azteca has entered into contracts for broadcasting special events, such as Miss Universe and the Oscars.

TV Azteca has a license to broadcast the World Cup 2018, which will be held in Russia, and also holds the broadcast rights for certain games in the EuroCup and other events organized by the *Union des Associations Européennes de Football* ("UEFA"). Also, TV Azteca holds the broadcast rights for the UEFA Champions League and UEFA Supercup, for the 2016-2017 season.

### Strategic Alliances

TV Azteca has produced and will continue to co-produce different genres of programs with many leading companies in the field. The search for new business models with prominent producers will continue in the near future. TV Azteca enters into strategic alliances for the acquisition and production of content. Examples include:

Buena Vista Contract. Since 1998, TV Azteca has had exclusive license agreements with Buena Vista International, Inc., a subsidiary of The Walt Disney Company, to broadcast the programming of Buena Vista on various TV Azteca channels. In 2013, Azteca Novelas renewed the Buena Vista International, Inc. contract for another five years. TV Azteca has maintained a strong relationship with Buena Vista as a result of the co-development of new projects such as the program series "Hasta Que Te Conocí," "El César" and "Selena." TV Azteca expects to renew these agreements in 2018.

Contract with Fox. In December 2009, TV Azteca signed an exclusive license agreements for five years through its content distributor, Twentieth Century Fox International Televisión, Inc. ("Fox"), to broadcast diverse content, including movies and program series on the channels that TV Azteca operates. This contract was renewed in December 2015 for a term of five years.

Contract with Sony. In December 2009, TV Azteca signed an exclusive licensing contract for four years through one of its subsidiaries with CPT Holdings, Inc. ("Sony"), to broadcast various content, including movies and program series, on the programming of the channels that TV Azteca operates. In 2014, this contract was renewed for a five year term. In 2016, the contract was renegotiated and was broadened to cover the co-production of new programs between Sony and TV Azteca, such as "Rosario Tijeras" and "Escape Perfecto."

Contract with Telefilms. In 2012, TV Azteca signed a licensing agreement with Telefilms to broadcast movies through over-the-air channels. In 2016, this contract was renewed for a seven year term.

### Television Advertising Sales

### General

For the six months ended June 30, 2017 and the years ended December 31, 2016 and December 31, 2015, approximately 62.4%, 71.8% and 70.8% of TV Azteca's net revenue was derived from the sale of national and local advertising. TV Azteca offers advertising payment plans to its advertisers. Sales are made throughout the year via signed contracts between TV Azteca and its customers for advertising over an agreed period. TV Azteca offers its clients the option to buy a fixed amount of advertising time for a set price. In setting advertising rates, TV Azteca considers, among other factors, the rates offered by its competitors and the likely effects of an increase in rates on advertising volume.

TV Azteca sold approximately 89% of the advertising time on its channels during primetime on weekdays during the six months ended June 30, 2017 and the years ended December 31, 2016 and 2015. TV Azteca signed advertising contracts with some of its subsidiaries, to whom it makes a certain amount of unsold advertising time available each year. In addition, TV Azteca sells a portion of its unsold advertising time to shared-risk advertisers and to companies that produce infomercials to improve their operating results and cash flow. TV Azteca also uses unsold advertising time to broadcast promotional programming and to broadcast government notifications and public service announcements.

### Integrated Advertising

TV Azteca receives revenues for "integrated advertising," which involves the placement of products during the programs internally produced by TV Azteca. Total revenues for this type of advertising represented 13%, 14%

and 17% of TV Azteca's net revenue during the six months ended June 30, 2017 and the years ended December 31, 2016 and 2015, respectively.

*Barter Sales*

Periodically, TV Azteca carries out barter sales with third parties, with which it exchanges advertising time for goods and services. These types of advertising sales represented 1%, 3% and 3% during the six months ended June 30, 2017 and the years ended December 31, 2016 and 2015, respectively. TV Azteca has also signed barter contracts, particularly with some of its subsidiaries, to obtain value from its unsold advertising time.

*Other Operations*

*Internet Operations*

TV Azteca is improving its online strategy to provide all its available video content on one main website and accompanying mobile apps that focuses on user experience. TV Azteca will provide all of its internally generated content to website visitors and app users along with exclusive materials relating to TV Azteca's most successful programs. In particular, TV Azteca will focus its efforts on online video advertising as opposed to pop-up ad displays, as TV Azteca believes that online video advertising functions as a stronger complement to over-the-air broadcasting, both in terms of sales and audience experience.

TV Azteca believes that internet operations do not represent a significant threat to broadcast television in Mexico due to the demographics of the country, low broadband penetration rates in Mexico and the quality of internet services. Nevertheless, TV Azteca believes it is ready to be a multi-platform company that will soon be able to broadcast its premium content on every single platform.

The internet revenues for the six months ended June 30, 2017 and for the years ended December 31, 2016 and 2015, totaled Ps.64 million ($3.6 million), Ps.108 million ($5.2 million) and Ps.118 million ($6.8 million), respectively.

*Soccer Teams*

TV Azteca owns two soccer teams in the premier league of professional soccer in Mexico, known as the Liga MX: Monarcas Morelia (since 1996) and Atlas F.C. (since 2014).

*WGC Mexico Championship*

In March 2017, TV Azteca organized the WGC Mexico Championship, one of the most popular golf events in the world. The revenue generated from this tournament amounted to Ps.556 million ($31.1 million).

*Colombia Project*

In November 2011, the Unión Temporal Fibra Óptica Colombia ("UT"), a joint venture of ACC, a subsidiary of TV Azteca, and Total Play Telecomunicaciones, S.A. de C.V., entered into an agreement with the Ministry of Information of Technologies and Communications of the Republic of Colombia (*Ministerio de Tecnologías de la Informacíon y las Comunicaciones de Colombia*, or "MINTIC") to build (over a 30 month period) and operate (for a 15 year period) a fiber optic network that would cover 753 municipalities and 2,000 institutions. The construction was completed and covers almost 80% of Colombia, making it the largest fiber optic network in Latin America.  Pursuant to the agreement, the government of Colombia was required to commit $235 million toward the construction of the network and UT is responsible for all maintenance and other capital expenditures relating to the network during the 15 years UT operates it.

At the Ordinary Shareholders' Meeting held on November 16, 2016, it was resolved that all shareholders of TV Azteca would have the option to participate in the private capitalization of ACC through a mechanism established by TV Azteca for that purpose. The mechanism allowed for a capitalization of up to 60% of ACC, and each shareholder could invest to receive its *pro rata* share of its interest in TV Azteca.

As a result, shareholders agreed to invest $60 million, and TV Azteca, which had invested $40 million during the year, continues to hold a 40% stake in ACC.

TV Azteca consolidated ACC's financial statements through December 27, 2016. Since TV Azteca was diluted by another investor and is no longer the major shareholder of ACC, TV Azteca ceased consolidating ACC's financial statements as of December 31, 2016. Instead, as of December 28, 2016, TV Azteca began valuing ACC using the equity method.

67

*Peru Project*

On December 23, 2013, TV Azteca participated and won a public bid to build a national fiber optic network in Peru. The goal was to design, construct and maintain a fiber optic network nationally on routes defined by the government of Peru, as well as to render data transmission services to other telecommunication operators and the entities and bodies of the government of Peru.

In June 2014, ACP, a subsidiary of TV Azteca, executed a 20-year concession agreement with the government of Peru for the design, financing, construction, operation and maintenance of a 13,400 km fiber optic network connecting 23 regions, 180 cities and 136 municipalities. The construction of the fiber optic network was completed at the end of 2016, and the total cost of construction totaled approximately $323 million, an amount that was reimbursed to TV Azteca by the government of Peru (the "Investment Retribution").

In April 2015, ACP, together with a group of international institutional investors, participated in a securitization of the collection rights to be received from the government of Peru as part of the Investment Retribution for an amount of $ 241 million, with an implied annual discount rate of 5.875%. The Peruvian operation is under analysis and evaluation by TV Azteca's management.

**Competition**

*General Information*

Television stations compete for revenue with other television stations in their markets and other forms of media such as radio, newspapers, magazines, external publicity, roadside advertising and internet. Television stations also face competition from cable television, MMDS and DTH satellite services. These other programming, entertainment and video distribution services can increase competition for television stations through transmission signals not otherwise available for the audience.

*Televisa*

The main competitor of TV Azteca is Televisa. Televisa is the owner and operator of channels 48, 49, 50 and 44 with digital transmissions, which were previously channels 2, 4, 5 and 9, respectively, with digital transmissions. Each channel is transmitted throughout Mexico with varying levels of coverage. Televisa generated the majority of Mexican television advertising sales in each one of the last three years.

*Two New Channels of Over-the-Air Television*

On March 7, 2014, the IFT published in the Official Gazette an invitation to a public auction for the concessions of two new national digital networks. The invitation provided that the concessions for the national digital networks would be granted for a term of 20 years for the operation of stations with, among other characteristics, mandatory geographic coverage in 123 locations corresponding to 246 channels within the Mexican territory.

In March 2015, IFT announced Grupo Radio Centro and Cadenatres as the winning bidders of the two over-the-air broadcasting licenses with separate national coverage. Cadenatres completed the process and received its license. However, because Grupo Radio Centro failed to pay the amount they bid for their over-the-air broadcasting license, the IFT declared their bid null and void. As a result, the portion of the spectrum that was going to be assigned to Grupo Radio Centro is under auction once more. The new bid is for 148 channels for digital terrestrial television to be licensed individually or in packages, depending on the coverage area desired.

Cadenatres, a subsidiary of Grupo Empresarial Ángeles, has less experience in the television industry and its only experience in the over-the-air television industry prior to the auction was through its broadcast of channel 28 with analog transmissions and broadcast signal coverage in Mexico City and the surrounding area, which was later replaced by a mirror digital channel after analog transmissions shutdown. Cadenatres also has experience in broadcasting cable television in the rest of the country. Nevertheless, Grupo Empresarial Ángeles, the group to which Cadenatres belongs, has extensive experience in the financial, healthcare, hotel, publishing and radio sectors in Mexico.

On November 25, 2016, the IFT published in the Official Gazette the invitation for the public auction of the concessions for the use, utilization and commercial exploitation of the 148 transmission channels for the provision of over-the-air television broadcasting ("Bid No. IFT-6"). The auction is ongoing and is expected to conclude in December 2017 with the announcement of concession title winners.

*Providers of DTH*

Pay television services in general require an initial connection fee as well as a periodic subscription fee, and offer a higher number of channels. According to the General Guidelines Regarding the Provisions of Section 1

68

of the Eight Article of the Transitory Decree Amending and Supplementing a Number of Provisions of Articles 6, 7, 27, 28, 73, 78, 94 and 105 of the Mexican Constitution in Telecommunications, (*Acuerdo mediante el cual el Pleno del Instituto Federal de Telecomuncaciones emite los Lineamientos generals en relación con lo dispuesto por la fracción I del artículo octavo transitorio del Decreto por el que se reforman y adicionan diversas disposiciones de los artículos 6o., 7o., 27, 28, 73, 78, 94 y 105 de la Constitución Política de los Estados Unidos Mexicanos, en Materia de Telecomunicaciones*, or the "Guidelines"), cable television services and satellite services of DTH or MMDS must include over-the-air television channels, taking into account the modalities set forth in the Guidelines. SKY, a DTH service provider, transmits the channels commercially known as Azteca 7 and Azteca 13 throughout Mexico in accordance with an arrangement with TV Azteca. Many pay television services are offered by companies that are supported by multi-national media conglomerates with substantial resources. Televisa is a partner of the multi-national company that provides DTH services in Mexico and other parts of the world. In its 2016 quarterly statistical report, the IFT indicated that as of the third quarter of 2016, there were 20.5 million pay television subscribers. TV Azteca believes that a significant number of pay television consumers are concentrated in the metropolitan area of Mexico City and along the Mexico-United States boarder.

*Univisión and Telemundo*

Univisión and Telemundo are the main competitors of Azteca America in the Spanish-language television broadcast market in the United States. Both Univisión and Telemundo have established networks in many of the United States television markets that Azteca America targets or intends to target. In addition, in January 2002, Univisión launched the Telefutura network (now Unimas), a network in Spanish that can be seen on several over-the-air television transmission stations in addition to national cable systems.

Telemundo and Univisión each have a higher network of partners and greater financial resources than AIC. In addition, each one of these competitors has certain programming advantages over AIC. In 2002, NBC bought out Telemundo. As a part of the buyout, NBC provided Telemundo the rights to transmit certain NBC programming in the Spanish-language television broadcast market in the United States. In addition, Univisión has entered into long-term program license agreements with Televisa and Corporación Venezolana de Televisión, C.A., another prominent producer of Spanish programming. These contracts provide Univisión a significant amount of quality programming that can be used to attract and retain United States Spanish speaking viewers.

Azteca America also competes with several English operators that transmit Spanish signals and simultaneously transmit certain programming in English and Spanish for their United States Spanish speaking viewers.

**Property**

TV Azteca's properties include two television stations in Mexico City and 35 television stations in other urban areas throughout Mexico, including Monterrey, Guadalajara and Veracruz, where it produces and broadcasts television content. TV Azteca's national networks are broadcast from one of the two Mexico City television stations through satellite transponders and then to TV Azteca's 458 transmission sites (each of which is comprised of a transmission tower, antennas and transmitters) located throughout Mexico. These transmission sites in turn broadcast the signals to viewers nationwide.

*Television Stations*

TV Azteca owns its two Mexico City television stations: the Ajusco station and the Azteca Novelas station, which are comprised of offices and production facilities.

The Ajusco station includes TV Azteca's corporate offices, nine television studios that are mainly used for the production of live content and the transmission facilities where national content is broadcast from.

The Azteca Novelas station includes a total of 12 television studios, seven of which are new state-of the-art television studios with multilevel sound stages for high definition and 4K television production, which were originally constructed in 2012 and recently renovated. In addition, TV Azteca owns 33 local television studios located throughout the country.

The Ajusco and Azteca Novelas stations comprise an aggregate of approximately 72,595 square meters of land and 96,119 square meters of constructed space.

Most of TV Azteca's other 35 television stations in other urban areas are leased for terms ranging from three to five years.

*Transmission Sites*

TV Azteca owns and operates all of its 458 transmission sites (each of which is comprised of a transmission tower, antennas and transmitters). Approximately 28% of the property on which these transmission sites are located is owned by TV Azteca. Approximately 60% are used by TV Azteca pursuant to leases with terms ranging from five to ten years.  The remaining sites are used by TV Azteca pursuant to easements granted by owners of the land.

Each of TV Azteca's 458 transmission sites contains one transmission tower. Each of these towers and transmitters are owned and operated by TV Azteca.

In February 2000, TV Azteca entered into a transmission tower space lease agreement (the "ATC Towers Lease") with a Mexican subsidiary of ATC. Pursuant to the ATC Towers Lease, TV Azteca has leased unused space in its transmission towers to ATC (which ATC then rents to third-parties, including, on occasion, TV Azteca or its affiliates) for a 20-year term that expires in 2020. Unless the lease is terminated by the parties, it will automatically be extended for an additional 50-year term. In consideration for the lease, ATC is required to make annual payments of $1.5 million to TV Azteca. ATC also granted TV Azteca a $91.8 million unsecured loan (see "*Operating and Financial Review—Management Overview—Liquidity—ATC Long-Term Credit Facility*"), under which TV Azteca must make yearly principal payments of $1.5 million, that are offset with the payments due by ATC to TV Azteca under the ATC Towers Lease. The loan is due in 2020 and will automatically be extended for an additional 50-year term, to the extent that the ATC Towers Lease remains in effect.  If TV Azteca terminates the lease in whole or in part after 2020, the termination triggers a mandatory prepayment (total or partial, as the case may be) under the loan agreement.

*Satellites*

To broadcast content from its Mexico City television station to its transmission sites throughout Mexico, TV Azteca uses satellite transponders which receive the signal from the Mexico City television station and reroute it to the transmission sites.

TV Azteca has entered satellite capacity agreements with Panamsat de México, S. de R.L., de C.V. ("Panamsat") and with Satelites Mexicanos, S.A. de C.V. ("SatMex").

Under the agreement with Panamsat, TV Azteca has access to signal line services through two satellite transponders: a 16 MHz satellite transponder for a term that expires in 2022 and a 36 MHz satellite transponder for a term that expires in August 2024. In 2016, TV Azteca paid approximately Ps.6.2 million ($0.3 million) for these services.

Under the agreement with SatMex, TV Azteca has access to signal line services through a 36MHz satellite transponder. The agreement expires in January 2021. In 2016, TV Azteca paid approximately Ps.20.7 million ($1.0 million) for this service.

Upon expiration of these agreements, TV Azteca will either negotiate an extension or find another satellite capacity services provider in its ordinary course of business.

**Patents, Licenses, Brands and Other Contracts**

TV Azteca owns a large number of brands. Among those that TV Azteca considers the most important are the institutional brands such as TV Azteca, Azteca, Azteca Novelas, Azteca Trece, Azteca Siete, a+, Fundacion Azteca, Azteca Internet, Proyecto 40, adn40, Grupo Salinas and Monarcas Morelia.

Likewise, TV Azteca owns diverse reservations of rights of exclusive use of television program titles and fictional characters, as well as musical works and television programs. Additionally, all the programs and *telenovelas* produced by TV Azteca have their own brands and music.

**Employees**

As of June 30, 2017, 6,165 individuals provided services to TV Azteca. Of these, 1,638 were independent contractors. 3,039 of TV Azteca's personnel performed administrative duties, 302 were managers or executive managers, 489 were employed in sales and 697 were union members.

Approximately 11.3% of TV Azteca's employees are represented by a television union, with a smaller number represented by the actors' guild or musicians' union. Under Mexican law, the terms of compensation for contracts entered into by TV Azteca and its unionized employees are subject to annual renegotiation. All other contract terms are renegotiated every two years.

TV Azteca has not experienced any labor strikes and it maintains good relationships with the unions representing its employees.

**Main Customers**

For the six months ended June 30, 2017, the most significant advertisers for TV Azteca were: Grupo Elektra, Cervecería Cuauhtémoc Moctezuma, Procter & Gamble de México, Bayer de México, Frabel, Genomma Lab International, Cervecería Modelo de México, Havas Media, CPIF Venture, AT&T Comunicaciones Digitales, Radio Movil Dipsa, The Coca-Cola Export Corporation, Pegaso PCS, Bimbo, Mondelez México, among others. For the six months ended June 30, 2017 and the years ended December 31, 2016 and 2015, the top 10 advertisers for TV Azteca and their affiliates represented 18%, 18% and 16% of TV Azteca's net revenue, respectively.

**Legislation and Regulatory**

*Restrictions that affect the Holders of Securities*

The ownership of shares of Mexican companies by foreigners is regulated in a general manner by the Foreign Investment Law (*Ley de Inversión Extranjeras*) and the Regulation of the Foreign Investment Act, and of the National Register of Foreign Investments (*Reglamento de la Ley de Inversión Extranjera y del Registro Nacional de Inversiones Extranjeras*, or the "Foreign Investment Regulation").

In addition, the Constitutional Reform on Matters of Telecommunications (*Reforma Constitucional en Materia de Telecomunicaciones*) allows foreign investment in broadcasting for up to 49%, whenever there is reciprocity in the country that the investor or financial agent that controls the latter instance is in. The corporate bylaws of TV Azteca contain a foreigner exclusion clause (the "Eligible Mexican Holders"). TV Azteca has "neutral" investment shares and other "neutral" investment securities.

TV Azteca has limited the ownership of its Series A shares and Series D-A shares to Eligible Mexican Holders and the credit institutions that act as trustees according to the Foreign Investment Law and Regulation. In addition, TV Azteca has obtained authorization by the General Directorate of Foreign Investments to issue Series D-L shares, Series L shares and the CPOs, all of which qualify as neutral investment shares.

A holder not considered an Eligible Mexican Holder who directly purchases Series A shares or Series D-A shares in violation of TV Azteca corporate by-laws will not have any right as a shareholder with respect to said shares.

The foreign investors of Series A shares and Series D-A shares represented by the CPOs, are the holders of "neutral investment" and do not affect the control of TV Azteca.

The Law and the Foreign Investment Regulation also requires that TV Azteca register any foreign owner of CPOs before the National Foreign Investment Register. A foreign owner of CPOs that has not been registered has no right to vote on any of the underlying shares of the CPOs that, being registered, would have a right to vote on or to receive dividends with respect to the underlying shares of the CPOs. TV Azteca has registered Nacional Financiera S.N.C., Institución de Banca de Desarrollo, as the depository of the CPOs to comply with this requirement.

The corporate bylaws of TV Azteca prohibit foreign states and/or governments from being the owners of shares of TV Azteca, with the understanding that the ownership of shares of TV Azteca or CPOs by pension or retirement funds organized for the benefit of employees of state and municipal government dependencies, or other non-Mexican government dependencies, does not violate the corporate bylaws.

*Concessions*

The LFTR regulates, on a convergent basis, the use and exploitation of the radio-electric spectrum, and the telecommunications networks, as well as the rendering of broadcasting, cable, satellite pay-TV and telecommunications services.

Concessions for the commercial use of spectrum are granted through public bid processes. Such concessions are granted for a fixed term, subject to renewal in accordance with LFTR. Renewal of concessions for the use of spectrum require, among others: (i) the request of such renewal to IFT in the year prior to the last fifth period of the fixed term of the related concession; (ii) to be in compliance with the concession holder's obligations under the LFTR, other applicable regulations, and the concession title; (iii) a declaration by IFT that it is not in the public interest to recover the spectrum granted under the related concession; and (iv) the acceptance by the concession holder of any new conditions for renewing the concession as set forth by IFT, including the payment of a related fee.

TV Azteca has been granted 12 concession titles to commercially operate and exploit 180 broadcast television channels, including channel 26 of Mexico City, which transmits the programming of adn40 (previously Proyecto 40); as well as 278 complementary authorizations, which enable the efficient reception of signals in their respective coverage areas.

From 2005 to 2008, the Federal Commission of Telecommunications (*Comisión Federal de Telecomunicaciones* or the "COFETEL"), a decentralized entity of the Secretariat of Communications and Transport (*Secretaría de Comunicaciones y Transportes*, or "SCT"), granted TV Azteca authorization to install and operate second digital transmission channels, accessories to the primary concessions, in fulfillment of the implementation policy of the DTT in Mexico, which are channels 24 and 25 of Mexico City; 31 and 33 of Guadalajara, Jal, 39 and 43 of Monterrey, N.L.; and ten channels more to be installed on the northern border of the country, which were installed during 2005 and 2006, which are: 28 and 29 from Tijuana, B.C.; 34 and 36 from Juárez City, Chihuahua; 51 and 50 from Nuevo Laredo Tamaulipas; 28 and 25 from Mexicali, B.C.; 36 from Reynosa, Tamaulipas; 33 from Matamoros, Tamaulipas, 12 from Matamoros, Tamaulipas; 41 and 43 from Celaya, Guanajuato; 27 and 35 from Toluca, State of Mexico; 33 and 31 from Perote, Veracruz; 27 and 24 from Puebla, Puebla; 26 and 43 from Querétaro, Querétaro.

During 2009, the COFETEL granted TV Azteca digital channels for simultaneous transmissions with their respective similar channels in the followings states: State of Mexico (7 channels), Guanajuato (2 channels), Hidalgo (1 channel), Puebla (2 channels) and Veracruz (2 channels), as a part of the transition process to the DTT.

During 2010, the COFETEL granted TV Azteca digital channels in the following states: Coahuila (1 channel), Jalisco (1 channel), Michoacán (1 channel), Morelos (2 channels) and Nuevo León (10 channels), as a part of the transition process to the DTT.

In 2011, the COFETEL granted TV Azteca digital channels in the following states: Aguascalientes (3 channels), Baja California Sur (5 channels), Campeche (3 channels), Chiapas (9 Channels), Chihuahua (2 channels), Colima (6 channels), Durango (3 channels), Guerrero (8 channels, Hidalgo (3 channels), Jalisco (3 channels), Michoacán (5 channels), Nayarit (2 channels), Oaxaca (9 channels), Puebla (1 channel), Quintana Roo (4 channels), San Luis Potosí (5 channels), Sinaloa (6 channels), Sonora (3 channels), Tabasco (3 channels), Tamaulipas (2 channels), Veracruz (2 channels), Yucatán (4 channels) and Zacatecas (4 channels), as a part of the transition process to the DTT.

In 2012, the COFETEL granted TV Azteca digital channels in the following states: Baja California (5 channels), Baja California Sur (7 channels), Campeche (1 channel), Chihuahua (6 channels), Coahuila (8 channels), Durango (5 channels), Guerrero (1 channel), Jalisco (1 channel), Oaxaca (1 channel), Puebla (1 channel), Quintana Roo (1 channel), San Luis Potosí (2 channels),Sonora (6 channels), Tamaulipas (5 channels) and Veracruz (3 channels), as a part of the transition process to the DTT.

In 2013 the COFETEL granted TV Azteca two digital channels in Ciudad del Carmen, Campeche, as a part of the transition process to the DTT.

In 2014 the IFT granted TV Azteca a digital channel in Sabinas Nueva Rosita, Coahuila, as a part of the transition process to the DTT.

In 2015, the IFT granted TV Azteca a digital channel in Ojinaga, Chihuahua, and another in Puerto Escondido, Oaxaca, as well as several complementary channels in gray areas that were detected when turning on the main channels, as a part of the transition process to the DTT. The process of requesting complementary stations in the gray areas that are going to be detected in the concession coverage areas occurs continuously.

Pursuant to the LFTR, concessionaires will now only have one integrated multiservice concession to provide telecommunication and, possibly broadcasting services. Integrated multiservice concessions will be granted for a term of up to 30 years with the possibility to renew them, for the same term originally granted. Renewal of integrated multiservice concessions require, among others: (i) to request its renewal from the IFT within the year prior to the last five year period of the fixed term of the related concession; (ii) to be in compliance with the concession holder's obligations under the LFTR, other applicable regulations, and the concession title; and (iii) the acceptance by the concession holder of any new conditions for renewing the concession as set forth by IFT. IFT shall resolve any request for renewal of the telecommunications concessions within 180 business days of its request. Failure by IFT to respond within such period of time shall be interpreted as if the request for renewal has been granted.

On March 7, 2014, IFT published in the Official Gazette an invitation to a public auction for the concession for the two new national digital networks. The invitation provided that the concessions for the national digital

72

networks would be granted for a term of 20 years for the operation of stations with, among other characteristics, mandatory geographic coverage in 123 locations corresponding to 246 channels within the Mexican territory.

The Company was prevented from participating as a bidder in this public auction. In March 2015, IFT announced Grupo Radio Centro and Cadenatres as the winning bidders of the two over-the-air broadcasting licenses with separate national coverage. Cadenatres completed the process and received its license. However, because Grupo Radio Centro failed to pay the amount they bid for their over-the-air broadcasting license, the IFT declared their bid null and void. As a result, the portion of the spectrum that was going to be assigned to Grupo Radio Centro is under auction once more. The new bid is for 148 channels for digital terrestrial television to be licensed individually or in packages, depending on the coverage area desired.

As a result of the Telecom Reform, certain provisions of the LFTR and Guidelines related to the distribution of more than one channel of programming on the same transmission channel, or multiplexing, were passed. Such provisions optimize the use of the spectrum; for example, where the 6MHz spectrum was used entirely to broadcast only one channel of programming in analog, new technologies now allow for more than one channel of programming to be broadcast digitally on the same transmission channel.

*Renewal process for TV Azteca concessions*

TV Azteca has two concessionaires that hold concessions granted by the SCT: (i) Televisión Azteca, S.A. de C.V. ("Televisión Azteca"), which has 11 concessions, consisting of 179 TV channels that were renewed on August 25, 2004 and are valid until December 31, 2021; and (ii) Televisora del Valle de México, S.A.P.I. de C.V. ("TVM"), which has one concession, consisting of one channel in Mexico City that was renewed on December 13, 2006 and is valid until December 31, 2021.

Renewing concessions for the use of spectrum require, among others: (i) the submission of a request to the IFT during the year prior to the remaining one-fifth of the term of the relevant concession; (ii) compliance with the concessionaire obligations enumerated under the LFTR, other applicable regulations, and the concession title; (iii) a declaration by the IFT that it is not in the public's interest to recover the spectrum granted under the relevant concession; and (iv) the acceptance by the concessionaire of any new conditions for the renewal of the concession as set forth by the IFT, including the payment of a renewal fee.

The term for renewing Televisión Azteca's concessions commenced on July 13, 2017 and will commence for TMV on December 28, 2017.

*Supervision of Operations*

To ensure that broadcasting is performed in accordance with the provisions established in the concession title, the LFTR and Guidelines, IFT is entitled to monitor compliance by exercising powers of supervision and verification: for example, the IFT can perform technical inspections of the television stations and the concessionaire must file annual reports with IFT.

On February 15, 2017, the Mexican Ministry of Interior (*Secretaría de Gobernación*) published in the Official Gazette an amendment to the regulations of broadcast television programming guidelines that provides for different age classifications for programming (*Lineamientos de clasificación de contenidos audiovisuales de las transmisiones radiodifundidas y del servicio de televisión y audio restringidos* or the "Programming Guidelines Amendment"), which became effective on February 16, 2017, substituting in full force and effect the previous amendment published on November 4, 2015. The Programming Guidelines Amendment for broadcast television is as follows: (i) programs classified "D" exclusively for adults only may broadcast after midnight to 5:00 am; (ii) programs classified "C" for adults may broadcast only after 9:00 p.m. to 5:59 am; (iii) programs classified "B15" for adults and teenagers over 15 years old may be broadcast only after 7:00 p.m. to 5:59 am; (iv) programs classified "B" for teenagers and adults may be broadcast only after 4:00 p.m. to 5:59 am; (v) programs classified "A" for all the public and programs classified "AA" for child audience may be broadcast at any time.

*Content for Children and Teenagers*

The LFTR includes new criteria for programming addressed for children and teenagers. Each concessionaire is also required to transmit each day, free of charge, up to 30 minutes of programming promoting cultural, educational, family counseling and other social matters, using programming provided by the Mexican government.

*Restrictions on Advertising*

Mexican law regulates the type and content of advertising broadcast on television. In order to prevent the transmission of misleading advertising, without affecting freedom of expression and dissemination, the broadcasting of advertisements presented as journalistic news or information is prohibited. Under current law, advertisements of

73

alcoholic beverages (other than beer and wine) may be broadcast only after 10:00 p.m. and advertisements for tobacco products are prohibited.  Advertising for alcoholic beverages must not be excessive and must be combined with general promotions of nutrition and general hygiene. Health Law Guidelines were published in the Official Gazette on April 15, 2014 and became effective on July 7, 2014 for the advertisement of the following products: snacks, flavored drinks, candies, chocolates, or foods similar to chocolates and became effective for the remaining products on January 1, 2015.

TV advertisement will not take up more than 18% of broadcast time on any day in TV. However, this percentage can be increased by an additional 2% when at least 20% of the content programmed is a national production. Another 5% of advertisement time can be added when at least 20% of the content programmed is an independent national production.  There are no restrictions on maximum rates.

*Additional Rights for Audiences*

Among others, the LFTR imposes new obligations on concessionaires. Under the LFTR, concessionaires must have a code of ethics and appoint an Ombudsman, whom shall not have been employed by the respective concessionaire or concessionaires during a period of two years prior to his/her appointment. The Ombudsman can be appointed (i) individually by the relevant concessionaire, (ii) jointly by several concessionaires or (iii) by a body or chamber which represents concessionaires. The *Cámara Nacional de la Industria de Radio y Televisión* ("CIRT") or Mexican Chamber of Television and Radio Broadcasters, has appointed a person who is authorized to act as an Ombudsman for all of its concessionaire members who decide to retain him. On November 29, 2016, IFT issued the Guidelines for the Defense of the Audiences, which were published on December 21, 2016 in the Official Gazette. These guidelines and some related provisions of the LFTR were constitutionally challenged by the Executive Branch and the Senate particularly for concerns that they restrict freedom of speech. The resolution of the procedures is pending and they will be resolved by the Supreme Court of Justice. In addition to the obligations established in the LFTR, such guidelines emphasize that the concessionaires must (i) make sure that when broadcasting news, the reporting of factual material is clearly distinguished from commentaries and personal analysis, (ii) submit electronic, online and telephone programming guides for people with disabilities, (iii) establish specific actions to distinguish between advertising and content, (iv) offer programming that is subtitled and dubbed in Spanish; and (v) provide sign language for the hearing impaired in at least one of their most-watched nationwide news programs. These guidelines establish the procedure before the Ombudsman for the defense of the rights of the audiences. The obligations imposed by the guidelines will become effective on August 14, 2017 unless they are further postponed by IFT or the Supreme Court resolves them otherwise.

*Government Broadcast Time*

Television stations must provide to the government of Mexico up to 18 minutes per day of television broadcast time and 35 minutes per day of radio broadcast time between 6:00 a.m. and midnight, in each case distributed in an equitable and proportionate manner and as agreed by both parties.  Any time not used by the government of Mexico on any day is forfeited.  Generally, the government of Mexico uses all or substantially all of the broadcast time available to it under this tax.

*Mexican Electoral Amendment*

In 2007, the Mexican Federal Congress published an amendment to the Mexican Constitution (the "2007 Constitutional Amendment"), pursuant to which, among other things, the *Instituto Federal Electoral*, or the Federal Electoral Institute ("IFE"), has the exclusive right to manage and use the Official Television Broadcast Time and the Official Radio Broadcast Time (together with the Official Television Broadcast Time, the "Official Broadcast Time"). In February 2014, the Mexican Federal Congress approved a constitutional amendment creating the *Instituto Nacional Electoral*, or the National Electoral Institute ("INE"), which replaced the IFE. The INE has the same functions and powers as the former IFE and regulates the services of radio and television in the same manner, except that the INE participates in the electoral campaigns in federal, state and local procedures by distributing the Official Broadcast Time among the political parties.  The INE has the exclusive right to use Official Broadcast Time for its own purposes and for the use of political parties in Mexico (as provided for in the Mexican Constitution) for self promotion and, when applicable, to promote their electoral campaigns during election day, pre-campaign and campaign periods.

The INE and the political parties must comply with certain requirements of the 2007 Constitutional Amendment for the use of Official Broadcast Time.  During federal electoral periods, the INE will be granted, per the 2007 Constitutional Amendment, 48 minutes per day on each radio station and television channel, to be used during pre-campaign periods from two to three minutes per broadcast hour on each radio station and television channel, of which all political parties in Mexico will be jointly entitled, to use one minute per broadcast hour.  During campaign periods, at least 85% of the 48 minutes per day shall be allocated among the political

74

parties, and the remaining 15% may be used by the INE or by any other electoral authority for its own purposes.  During non-electoral periods, the INE will be assigned up to 12% of the Official Broadcast Time, half of which shall be allocated among the political parties.  In the event that local elections are held simultaneously with federal elections, the broadcast time granted to the INE shall be used for the federal and the local elections.  During any other local electoral periods, the allocation of broadcast time will be made pursuant to the criteria established by the 2007 Constitutional Amendment and as such criteria is described in applicable law.

In addition to the foregoing and pursuant to the 2007 Constitutional Amendment, political parties are forbidden to purchase or acquire advertising time directly or through third parties, from radio or television stations; likewise, third parties shall not acquire advertising time from radio or television stations for the broadcasting of advertisements which may influence the electoral decisions of Mexican citizens, nor in favor or against political parties or candidates to offices elected by popular vote.

*Regulation of the participation of minors in Communicational media*

On December 4, 2014, the General Law regarding the Rights of Girls, Boys and Teenagers (*Ley General de los Derechos de Niñas, Niños y Adolescentes*) was published on the Official Gazette, which addresses certain scenarios where the consent of the parental or tutelage authority of the minors must be obtained, in the case of interviews; it also establishes a series of principles and measures to consider on behalf the media to protect the intimacy of the minors.

*Stations on the Border*

Broadcasts from television stations located on the Mexican-United States border are governed by a bilateral treaty signed by the governments of both countries. The Agreement Relating to Assignments and Usage of Television Broadcasting Channels in the Frequency Range 470-806 MHz Along the United States-Mexico Border established criteria that all stations on the border must comply with regarding broadcasting power, antenna height and the allowable distance from the border. TV Azteca believes that it is in compliance with all aspects of the treaty.

*United States*

The U.S. communications industry, including the operation of broadcast television networks and stations, is subject to federal regulation, particularly pursuant to the Communications Act of 1934, as amended, and the rules and regulations promulgated thereunder by the FCC (the "Communications Act"). The Communications Act empowers the FCC to, among other things, regulate certain aspects of broadcast programming and the relationship between broadcast television networks and their affiliated broadcast television stations.

*Foreign Ownership of Broadcast Television Stations in the United States*

The Communications Act prohibits the issuance of a broadcast license to, or the holding of a broadcast license by a foreign corporation, which is any corporation of which more than 20% of the capital stock is beneficially or nominally owned or voted by non-U.S. citizens or their representatives or by a foreign government or a representative thereof, or by any corporation organized under the laws of a foreign country. The Communications Act also authorizes the FCC, if the FCC determines that it would be in the public interest, to prohibit the issuance of a broadcast license to, or the holding of a broadcast license by, any corporation directly or indirectly controlled by any other corporation of which more than 25% of the capital stock is beneficially or nominally owned or voted by foreign entities. The FCC has issued interpretations of existing law under which these restrictions in modified form apply to other forms of business organizations, including partnerships.

*Other Broadcast Television Regulation in the United States*

The FCC regulates television broadcast stations, which generally must apply to the FCC for renewal of their licenses every eight years. Renewal will be granted to the extent that the FCC finds that (i) the station has served the public interest; (ii) there have been no serious violations by the licensee under the Communications Act described above or the FCC rules; and (iii) there have been no other violations by the licensee of the Communications Act or the FCC rules which, taken together, indicate a pattern of abuse. The FCC also administers other aspects of broadcast television regulation, including the following: restrictions on the ownership of multiple media outlets in one market, or on a national basis; limits on the amount of commercial advertising during children's programming; requirements that stations air a certain amount of informational or educational programming directed at children; restrictions on "indecent" programming; and requirements affecting the availability and cost of political advertising time. In addition, FCC rules governing network affiliation agreements mandate that a television broadcast station licensee retain the right to reject or refuse network programming under certain circumstances, or substitute programming that the licensee reasonably believes to be of greater local or national importance.

75

Violations of FCC rules and regulations can result in substantial monetary forfeitures, periodic reporting conditions, short-term license renewal and, in egregious cases, denial of license renewal or revocation of license.

*Other Regulatory Considerations in the United States*

The foregoing does not purport to be a complete discussion of all provisions of the Communications Act referenced or other acts of the U.S. Congress or of the rules, regulations and policies of the FCC. For further information, reference should be made to the Communications Act itself, to other congressional acts, and rules, regulations and public notices promulgated periodically by the FCC. There are additional regulations and policies of the FCC and other federal agencies that govern political broadcasts, public affairs programming, broadcast advertising and other matters affecting TV Azteca's U.S. business and operations.

**Regulatory Changes**

Existing Mexican laws and regulations applicable to TV Azteca have, from time to time, been amended in a manner in which the way that such laws are enforced or interpreted could change, and new laws and regulations have been enacted, which may have an impact on TV Azteca's business, financial condition and results of operations. Some of these laws and regulations include:

*Telecom Reform and Broadcasting Regulations*

On June 12, 2013, the Telecom Reform came into force. The Telecom Reform, the LFTR and secondary regulations issued by the President and IFT, as applicable, and certain actions recently taken by IFT, an organization with constitutional autonomy responsible for overseeing the radio and television broadcasting industries and telecommunications, including all aspects of economic competition, affect or could significantly and adversely affect our business, results of operations and financial position.

The Telecom Reform created two regulatory bodies that are independent from the executive branch of government: COFECE (which assumed the functions of the former Mexican Antitrust Commission, except in the areas of telecommunications and broadcasting (television and radio), and IFT (which oversees the Mexican telecommunications and broadcasting (television and radio) industries, including all antitrust matters relating to those industries). In addition, specialized federal courts empowered to review all rulings, actions and omissions of these independent regulatory bodies were created. No stay or injunction will suspend any measure or action taken by these regulatory bodies. Therefore, subject to limited exceptions, until any decision, action or omission by these regulatory bodies is declared void by a competent court through a binding and final judgment, COFECE's or IFT's decision, action or omission will be valid and will have full force and legal effect.

IFT is empowered, among other things, to (i) oversee the Mexican telecommunications (including cable and satellite pay-TV) and broadcasting (television and radio) industries, including all antitrust matters related to these industries; (ii) set limits to national and regional frequencies that can be exploited by a concession holder, or to the cross-ownership of telecommunications, television or radio businesses that serve the same market or geographical zone that may include the divestment of certain assets to comply with such limits; (iii) issue asymmetric regulation; (iv) grant and revoke telecommunications, television and radio concessions; (v) approve any assignment or transfer of control of such concessions; (vi) revoke a concession for various reasons, including in the case of a breach by a concessionaire of a non-appealable decision confirming the existence of illegal antitrust conduct ("*practica monopólica*"); and (vii) determine the payment to be made to the government for the granting of concessions.

Concessions for the use of spectrum will only be granted through public bid processes. On March 7, 2014, IFT published in the Official Gazette an invitation to a public auction for the concession for the two national digital networks which will be granted for a term of 20 years for the operation of stations with, among other characteristics, mandatory geographic coverage in 123 locations corresponding to 246 channels within the Mexican territory.

In March 2015, IFT issued its ruling announcing Grupo Radio Centro and Imagen Television as winning bidders for two free to air broadcasting licenses with separate national coverage. However, since Grupo Radio Centro failed to pay the amount they bid for their free to air broadcasting license, the IFT's ruling announcing them as a winning bidder was declared null and void and they will not receive the license. As a result, the portion of the spectrum that was going to be assigned to Grupo Radio Centro is in an auction process. The new bid is for 148 channels on broadcast television.

Access to information and communication technologies, as well as broadcasting and telecommunications services (including broadband), is established as a constitutional right. The Telecom Reform further requires that such information be diverse and timely, and that any person may search, receive and disclose information and ideas of any kind through any media. Among other things, the LFTR contemplates the right of audiences to be able to

receive content that reflects ideological pluralism, that the news is distinguishable from the reporter's opinions, and to have the right to replicate the news.

The Telecom Reform permits 100% foreign ownership in satellite and telecommunications services and increases to up to 49% the level of permitted foreign ownership in television and radio services, subject to reciprocity of the originating foreign investment country.

As a result of the Telecom Reform and LFTR, starting on September 10, 2013, concessionaries of broadcast services have been required to permit pay-TV concessionaries to retransmit broadcast signals, free of charge and without discrimination, within the same geographic coverage area simultaneously and without modifications, including advertising, and with the same quality of the broadcast signal, except in certain specific cases provided in the LFTR. Also, since September 10, 2013, our pay-TV licensees are required to retransmit broadcast signals of others, free of charge and on a non-discriminatory basis, subject to certain exceptions and additional requirements provided for in the Telecom Reform.

On February 27, 2014, the Guidelines were published in the Official Gazette, which include, among other obligations, the obligation of concessionaries of broadcast television licenses to permit the retransmission of their broadcast signals and the obligation of pay-TV concessionaries to allow such retransmission (without requiring the prior consent of the broadcast television concessionaries) in the same geographic coverage zone for free (subject to certain exceptions) and in a non-discriminatory manner in its entirety, simultaneously and without modifications by the broadcasting concessionaire, including advertising, and with the same quality of the broadcast signal without requiring consent from the broadcast television concessionaries.

The Telecom Reform calls for the National Development Plan. The National Development Plan includes a program for installing broadband connections in public facilities, which would identify the number of sites to be connected per year to promote access to broadband in public buildings dedicated to investigation, health, education, social services and in other facilities owned by the government.

Mexico's transition to digital television was completed on December 31, 2015. Frequencies released as a consequence of such digitalization were transferred back to the Mexican State.

The LFTR establishes a renewal procedure that will result in the granting of a renewal of an integrated multiservice concession (when involving radio-electric spectrum or orbital resources, a concession to exploit such spectrum is required) in order to provide telecommunications and possibly, broadcasting services.  The integrated multiservice concession will be awarded for renewable 30 year terms. Renewal of integrated multiservice concessions require, among others: (i) to request its renewal to IFT within the year prior to the last fifth period of the fixed term of the related concession; (ii) to be in compliance with the concession holder's obligations under the LFTR, other applicable regulations, and the concession title; and (iii) the acceptance by the concession holder of any new conditions for renewing the concession as set forth by IFT. IFT shall resolve any request for renewal of the telecommunications concessions within 180 business days of its request.  Failure by IFT to respond within such period of time shall be interpreted as if the request for renewal has been granted.

The LFTR also contemplates that concession holders that operate a public network of telecommunications must (i) abstain from charging long distance fees for calls made by users to any national destination; (ii) if there was no other concession holder providing similar services in a certain territory, the concession holder providing the service in such territory shall have to continue providing the services; and (iii) concession holders must adopt the open architecture designs for the network to guarantee the interconnection and interoperation of their network.

The LFTR establishes the maximum amount of time that a concession holder providing broadcasting services with commercial purposes can use for commercial advertising. The maximum amount of advertising time is set at 18% of the total broadcasting time for each television channel, and the maximum amount for radio stations shall not exceed 40% of the total broadcasting time for each channel.

The LFTR establishes that those concession holders providing broadcasting services shall offer broadcasting services and advertising spaces to any person or corporation that requires them on a non-discriminatory basis and on market terms granting the terms, packages, conditions, and rates in force at the time of the request. Additionally, the law provides that balance shall be maintained between advertising and programming.  Advertising shall be subject to several rules, including the maximum time allowed for advertising (i.e. 18% of the total available time per channel in free to air television; 40% in radio; and 6 minutes per hour on pay-television and audio).

*Other recent regulatory changes*

As a result of the amendments to the Mexican Constitution and the must-offer and must-carry regulations issued by IFT, starting on September 10, 2013, concessionaires of broadcast services have been required to permit pay-TV concessionaires to retransmit broadcast signals, free of charge and on a non-discriminatory basis, within the same geographic coverage area simultaneously and without modifications, including advertising, and with the same quality of the broadcast signal, except in certain specific cases provided in the Telecom Reform.  Also, since September 10, 2013, pay-TV concessionaires are required to retransmit broadcast signals of free television concessionaires, free of charge and on a non-discriminatory basis, subject to certain exceptions and additional requirements provided for in the Telecom Reform.

On February 27, 2014, the "General Guidelines Regarding the Provisions of Section 1 of the Eight Article of the Transitory Decree Amending and Supplementing a Number of Provisions of Articles 6, 7, 27, 28, 73, 78, 94 and 105 of the Mexican Constitution in Telecommunications," or the Guidelines, were published in the Official Gazette, which include, among other obligations, the obligation of concessionaires of broadcast television licenses to permit the retransmission of their broadcast signals and the obligation of pay-TV concessionaires to perform such retransmission (without requiring the prior consent of the broadcast television concessionaires) in the same geographic coverage zone for free (subject to certain exceptions) and in a non-discriminatory manner in its entirety, simultaneously and without modifications, including advertising, and with the same quality of the broadcast signal without requiring consent from the broadcast television concessionaires.

On April 3, 2014, TV Azteca filed an amparo proceeding challenging the constitutionality of the Guidelines. On February 2015, certain amendments to the Guidelines were published in the Official Gazette, which among other provisions, require pay-TV concessionaires to retransmit the broadcast signals on all the commercial packages they offer to their subscribers and not only on their basic packages.

The Telecom Reform provided for a public bid or auction to grant licenses to establish the national digital networks.  The "Auction Program for Digital Television Broadcast Frequencies" took place in 2014 and the first part of 2015.

The LFTR provides that integrated multiservice concessions will be renewed for terms equal to the maximum terms for which they could be granted, namely, up to 30 years.  To request the renewal of a concession, a concession holder must (i) file its request with IFT one year prior to the beginning of the fifth period of the term of the concession; (ii) comply with its obligations established in the applicable laws and in the concession title; and (iii) accept the new conditions that IFT may impose.  In such cases, IFT will issue its ruling within 180 days following the date the concession holder files the renewal request.  If IFT does not issue its ruling within 180 days the renewal will be automatically granted.

In the case of concessions for the use of radio-electric spectrum, the maximum term of renewal is 20 years. Renewal of concessions for the use of spectrum require, among others: (i) to request such renewal to IFT in the year prior to the last fifth period of the fixed term of the related concession; (ii) to be in compliance with the concession holder's obligations under the LFTR, other applicable regulations, and the concession title; (iii) a declaration by IFT that there is no public interest in recovering the spectrum granted under the related concession; and (iv) the acceptance by the concession holder of any new conditions for renewing the concession as set forth by IFT, including the payment of a related fee. To our knowledge, no spectrum granted for broadcasting services in Mexico has been recovered by the Mexican government in the past several years for public interest reasons; however, the Company is unable to predict the outcome of any action by IFT in this regard.

Overall, the Telecom Reform, the LFTR and secondary regulations already issued and to be issued by the executive power or IFT, as applicable, as well as any actions taken by IFT, may increase our operating costs. Moreover, the entry of new market participants and the introduction of new products could result in an impairment to the prices of some of our products and/or costs and adversely affect our results in some business segments in future periods. See also, "*Our Business—Applicable Legislation and Tax Positions—Concessions*".

**Environmental Performance**

In mid-2008, jointly with our related companies, we created an business unit specialized in the efficient use of energy and natural resources, with its main objective being the reduction of the environmental impact of TV Azteca's operations and the improvement of energy management and natural resources within the organization.  TV Azteca created this business unit to help transform TV Azteca into a sustainable company in order to become more competitive in global markets.

As part of an institutional framework plan, we have implemented several strategies, which include searching for the best use of energy and to care for the environment in an organized and permanent manner. TV Azteca has sought to evolve and remain on the forefront of topics relevant to the environment and to corporate social responsibility. As a result, through specific actions taken in order to increase TV Azteca's energy efficiency and other actions done through Fundación Azteca, TV Azteca will put itself on the cutting edge on environmental matters.

*Programs in Mexico*

- **Un Nuevo Bosque (A New Forest).** This is a TV Azteca project that started in July 2002 by local station TV Azteca Jalisco with the support of the National Forest Commission, local councils and the Government of Jalisco.  This project aims to preserve the Mexico's natural reserves through reforestation. In 13 years, more than 1.5 million trees have been planted, and more than 300 reforestations have been performed in 33 cities throughout Mexico, with the support of more than 150,000 volunteers.

- **Limpiemos Nuestro México (Let's Clean Up Our Mexico).** This is the campaign of awareness, action and education that aims to create a change in the environmental and sustainability culture in our country. Since 2009, more than 8.8 million volunteers have joined in the task of picking up more than 188.5 thousand tons of garbage all over the country.

- **Waste Separation Program.** Internally, Grupo Salinas created a program for waste separation in all the companies of the group, including TV Azteca, which consists of the separation of waste and it temporary storage and recovery. This program is promoted through internal awareness campaigns promoted within through companies' communication platforms such as portals and magazines.

- **Energy efficiency programs.** This is a program created to improve energy efficiency. This program includes the management, monitoring, awareness and communication, technology changes (when cost-effective), and research and implementation of new technologies.

- **Energy conservation and efficiency campaign with focus on gender.** Throughout 2015, TV Azteca worked together with the *Deutsche Gesellschaft für Internationale Zusammenarbeit* (GIZ) in Mexico, with the goal of training and empowering both female and male employees of TV Azteca, and all of society in general regarding the use of energy from a gender perspective. This initiative earned international recognition from the German press.

- **Renewable Energy Program:** Starting from June 2012, TV Azteca started a self-sufficiency electrical project, by using wind generated power and geothermal energy at different facilities owned by Grupo Salinas. Approximately 52% of the energy used by TV Azteca is generated by renewable energy sources.

*Achievements in energy conservation and environment 2016*

Along with the production and broadcast of programs that foster social participation in environmental matters, TV Azteca, through the specialized business group at Grupo Salinas focusing on energy and the environment,  has established strategies to reduce the environmental impact of its operations on different environmental matters.

TV Azteca is aiming its efforts on environmental matters and has dedicated to investment for the research and development of energy efficiency processes; separation and final disposal of urban solid waste; measurement of greenhouse effect gas emissions (GEI); and education and training for environmental restoration.

In order to correctly manage its energy consumption, TV Azteca bases its operations on:

• The Energy Management System, which verifies that energy consumption matches the billing produced by the Comisión Federal de Electricidad (CFE).

• The Energy Savings Seal, an internal tool used by all Grupo Salinas companies to evaluate, validate and certify purchases of efficient lighting equipment, air conditioning and any other electrical equipment.

In addition, it complies with the provisions set forth by the following Mexican standards:

• NOM-001-SEDE-2012, Electrical installation safety.

• NOM-030 y 031-ENER-2012, Energy efficiency and minimum parameters for LED lighting.

• NOM-025-STPS-2008, Lighting conditions for work centers.

• NMX-AA-164-SCFI-2013, Minimum environmental criteria for sustainable buildings.

79

- National Emissions Registry (RENE) of the General Law for Climate Change.

Compliance with these standards guarantees employee safety, comfortable work centers and efficient use of electrical energy of all processes; in order to guarantee this, in 2015 Grupo Salinas implemented its Energy Management System, a platform for comprehensive energy management whose objectives —based on the results of the period— are:

- Facilitate auditable data for information management

- Analyze trends, issue reports, generate alarms and automatize calculations

- Enable transparent traceability of information regarding consumption, self-supply and billing of energy for any period and business unit

- Function as a decision-making tool

- Detect potential savings in technological and operating projects

The methodology used to calculate the energy consumption of TV Azteca is the international protocol developed by the Efficiency Valuation Organization (EVO), whose objective is to measure and guarantee energy savings, reduce costs and systematize the process for measuring and verifying energy performance.

During 2016, TV Azteca consumed 245,000 gigajoules, of which 31% came from renewable sources such as wind and geothermal energy which helped to reduce electrical energy consumption by 76,000 gigajoules. The evolution of TV Azteca's consumption practices transformed its environmental commitment:



In compliance with the *Ley General de Cambio Climático*, TV Azteca updates its National Emissions Registry annually, by which TV Azteca reports CO2 and greenhouse effect gas emissions.

The National Emissions Registry focuses on the identification of the main sources of emissions and the establishment of programs for consumption reduction and mitigation of environmental impact. TV Azteca uses the methodology produced and disseminated by the National Emissions Registry to calculate the Company's emissions, which are then included in the indicators published by SEMARNAT as emission factors.

In 2016, TV Azteca released 3,582 tons of $CO_2$ and stopped the emission of 9,240 tons of $CO_2$.

TV Azteca, through its content, is able to raise social awareness about the responsible use of natural resources, such as water, while also raising awareness amongst its employees on a daily basis. In accordance to the environmental policy of TV Azteca, no water sources are affected, whether through overexploitation for consumption or by discharge of toxic substances.

TV Azteca has created a manual for classifying solid waste that is used for improving the company's management of the waste it generates. To achieve this, the company has established a program at all its corporate facilities calling for separation of waste into four groups: organic, inorganic, recyclable, and hazardous. In 2016, close to a million kilograms of waste were generated, of which approximately 19,000 kilograms were recycled.

**Judiciary, Administrative or Arbitral Processes**

*Proyecto 40 (now adn40)*

TV Azteca has engaged in a number of disputes with Mr. Javier Moreno Valle ("Moreno Valle"), Corporación de Noticias e Información, S.A. de C.V. ("CNI") and Televisora del Valle de México ("TVM") , the company that holds the Proyecto 40 concession, in connection with the operation of Proyecto 40 and various shareholders meetings of TVM.

TV Azteca currently operates Proyecto 40 pursuant to an operating agreement dated December 10, 1998, among TV Azteca, CNI and TVM.

In 2000, CNI suspended TV Azteca´s broadcasting rights on Proyecto 40.  TV Azteca sued CNI, TVM and Moreno Valle for breach of the operating agreement.  In 2005, a final and non-appealable ruling was made in favor of TV Azteca.  TV Azteca currently operates Proyecto 40 pursuant to the operating agreement.

In connection with a credit agreement entered into in 1998 between TV Azteca as creditor and CNI as borrower, Moreno Valle pledged over 51% of the shares of TVM capital stock to TV Azteca.

When TVM failed to hold an annual shareholders' meeting for four consecutive years, TV Azteca sued for the right, as creditor of CNI and potential future shareholder of TVM, to convene a TVM shareholders' meeting. A court ruled in favor of TV Azteca, and in one of the TVM shareholders' meetings, shareholders authorized a capital increase by means of which TV Azteca acquired a controlling interest in TVM.

Although there can be no assurance that TV Azteca will prevail in its disputes with CNI, TVM and Moreno Valle regarding TV Azteca's controlling interest in TVM, TV Azteca's management believes that its position will ultimately be upheld and therefore, TV Azteca has not set aside any related reserves.

*Legal actions and proceedings promoted against the Federal Code of Electoral Institutions and Procedures*

In January 2008, a Decree was published in the Official Gazette where the Federal Code of Electoral Institutions and Procedures ("COFIPE") would come into effect, which would be abolished in 2014 and replaced by the General Law of Electoral Institutions and Procedures *(Ley General de Instituciones y Procedimientos Electorales)*.

At the time, the IFE (now known as the INE) sanctioned TV Azteca for alleged breaches in the transmission of a number of promotional spots associated with political parties and electoral authorities, in an amount of approximately Ps.200 million ($11.2 million). These fines were confirmed by the Electoral Tribunal of the Federation Judiciary Power, the Supreme Court of Justice and district judges.

On the other hand, the IFE had imposed sanctions against TVAzteca in amounts totaling approximately Ps.16.5 million ($0.9 million), for the alleged breach of several provisions of the COFIPE due to airing advertisements for politically focused magazines on television, due to the ads allegedly containing political propaganda. These fines were confirmed by the Electoral Tribunal of the Federation Judiciary Power.

Additionally, the IFE imposed a sanction of approximately Ps.22 million ($1.2 million) for TV Azteca's alleged breach of COFIPE due to TV Azteca's failure to transmit promotional ads of political parties and electoral authorities on restricted television systems, SKY and Cablevisión. These fines were disputed through a writ of amparo and the suits were dismissed.

Finally, the IFE had imposed sanctions against TV Azteca for an amount of approximately Ps.1.7 million, related to a number of alleged infractions within the COFIPE, which were confirmed by the Electoral Tribunal of the Federation Judiciary Power.

*The IFT issues the Guidelines.*

On February 27, 2014, the Guidelines were published in the Official Gazette, which have been the subject of later modifications.

In June 2013, the Constitutional Reform established that broadcasting signals with coverage of 50% or more of the national territory must allow free retransmission on satellite restricted television. In February 2014, the IFT declared "Azteca Siete" and "Azteca trece" signals with coverage of more than 50% of the national territory.  As a result, TV Azteca must allow the retransmission of its signals for free.

TV Azteca believes that the February 2014 determination was incorrect, and as a result has instituted several indirect mechanisms to protect itself against the Guidelines and its amendments, since none of the 178 signals that are being licensed by TV Azteca fulfills the requirement of coverage of 50% or more of the national territory. These protection mechanisms were based on pronouncements made by the District Tribunals of Administrative Matters Specialized in Economical, Radio Broadcast and Telecommunication Competence.

In 2015 and 2016, the District Tribunals of Administrative Matters Specialized in Economical, Radio Broadcast and Telecommunication Competence pronounced the dismissal of these trials, finding that, even if the act was not constitutional, the protection mechanisms were found unconstitutional, a result that TV Azteca is currently appealing with a final resolution still pending.

Recently, with respect to one protection mechanism, the court determined that the Guidelines did not result in damages to TV Azteca due to the fact that TV Azteca did not have a claim to royalties for transmissions regulated under the Guidelines, a result that TV Azteca is currently evaluating.

Three additional protection mechanisms utilized by TV Azteca are pending definitive resolution.

*Legal actions and proceedings promoted against the "Decree issuing the Federal Law of Telecommunications and Radio Broadcasting and the Public System of Radio Broadcasting of the Mexican State Law; which also amends, adds and abolishes several rulings regarding telecommunications and radio broadcasting," published in the Official Gazette on July 14, 2014.*

On July 14, 2014, a decree was published in the Official Gazette called the "Decree issuing the Federal Law of Telecommunications and Radio Broadcasting and the Public System of Radio Broadcasting of the Mexican State Law; which also amends, adds and abolishes several rulings regarding telecommunications and radio broadcasting."

TV Azteca took several indirect measures to protect itself from certain provisions of such decree, not in respect to its entirety of the legislation but only related to certain specific provisions that TV Azteca considered to be in violation of the Constitution of Mexico. These measures of protection were based on findings of the second and first District Tribunals of Administrative Matters Specialized in Economical, Radio Broadcast and Telecommunication Competence.

These measures challenged, among other topics, the regulation of the retransmission of radio broadcast signals by restricted television licensees.

In 2015 and 2016, the trials concluded without having obtained the protection from Federal Justice.

The rest of the promoted measures are still pending, without a sentence of a definitive resolution by this date.

*Law of Commercial Bankruptcy*

TV Azteca is not subject to Articles 9 and 10 of the Law of Commercial Bankruptcy of Mexico (*Ley de Concursos Mercantiles*).

**DIRECTORS AND SENIOR MANAGEMENT**

**Directors**

TV Azteca's board of directors (the "Board") is comprised of 11 members, out of which 4 are independent directors, who are elected for one-year terms by TV Azteca's general ordinary shareholders' meeting. The current term of office of each director will expire on April 25, 2018. The address of each director is Periférico Sur 4121, Col. Fuentes del Pedregal, Tlalpan, 14141, Mexico City, Mexico.

The following table sets forth the names of TV Azteca's current directors, their ages as of June 30, 2017 and their positions and year of appointment:

| Name | Age | Position | Director Since |
|---|---|---|---|
| Ricardo B. Salinas Pliego [1] [2] | 61 | Chairman of the Board/Non-independent Director/Significant Shareholder | 1993 |
| Pedro Padilla Longoria [2] | 51 | Non-independent Director | 1993 |
| Guillermo E. Salinas Pliego [1] | 57 | Non-independent Director | 1998 |
| Mario San Román Flores [2] | 58 | Non-independent Director/Director General | 2004 |
| Luis Jorge Echarte Fernández [2] | 71 | Non-independent Director | 1999 |
| Joaquín Arrangoiz Orvañanos [2] | 60 | Non-independent Director | 1998 |
| Francisco X. Borrego Hinojosa Linage [2] | 52 | Non-independent Director | 2004 |
| Francisco Javier Murguía Díaz | 77 | Independent Director | 2004 |
| Ignacio Cobián Villegas | 53 | Independent Director | 2006 |
| Sergio Manuel Gutiérrez Muguerza | 66 | Independent Director | 2000 |
| José Ignacio Sánchez Conde | 62 | Independent Director | 2010 |

(1)   Ricardo B. Salinas Pliego and Guillermo E. Salinas Pliego are brothers.

(2)   Alternate directors for these persons are: Carlos Díaz Alonso and Rodrigo Fernández Capdevielle.

The following provides biographical information about the directors of TV Azteca.

*Ricardo B. Salinas Pliego.* Mr. Salinas Pliego has been Chairman of the Board of TV Azteca since 1993 and Chairman of the Board of Grupo Elektra since 1993. Mr. Salinas Pliego also serves on the board of directors of numerous other Mexican companies. Mr. Salinas Pliego received a degree in accounting from the Instituto Tecnológico de Estudios Superiores de Monterrey and received a Master of Finance degree from the Freeman School of Business at Tulane University in 1979. In 2015, Mr. Salinas Pliego was distinguished as *Doctor Honoris Causa* by the Universidad Autónoma de Guadalajara.

*Pedro Padilla Longoria.* Mr. Padilla has served as a director of TV Azteca since 1993 and was the Chief Executive Officer of Grupo Elektra between 1993 and 2000. Mr. Padilla served as Chief Executive Officer of TV Azteca from October 2001 to July 2004, and from July 14, 2004 as Chief Executive Officer of Grupo Salinas. Mr. Padilla also serves on the board of directors of Grupo Elektra and Banco Azteca. Mr. Padilla received a law degree from the Universidad Nacional Autónoma de México.

*Guillermo E. Salinas Pliego.* Mr. Salinas has served as director of TV Azteca since 1998 and serves as member of the Board of Banco Azteca since 2002. He also co-founded the Universidad CNCI and acts as Chairman of Grupo Avalanz. Mr. Salinas is a Certified Public Accountant, holding an undergraduate degree in accounting from the Instituto Tecnológico de Estudios Superiores de Monterrey in Monterrey.

*Mario San Román Flores.* Mr. San Román is responsible for the execution of strategic projects and is an advisor to the Chief Executive Officer of TV Azteca since 2015. Previously, he served as Chief Executive Officer of TV Azteca from 2004 to 2015. Mr. San Román served as Chief Operations Officer of TV Azteca from 2002 to July 2004, as Marketing Vice President from August 1998 to March 1999, as Director of Azteca 13 from March 1999 to June 2000 and as Director of Channels from June 2000 to 2002. Mr. San Román received a bachelor's degree in communication sciences from the Universidad Iberoamericana.

*Luis Jorge Echarte Fernández*. Mr. Echarte has served as a director of TV Azteca since November 1999. Currently, he serves as Chairman of the Board of Azteca America Network, after being Chairman and Chief Executive Officer of the same company. Prior to joining TV Azteca as Chief Financial Officer, he was Vice President of Finance and Administration at Grupo Elektra. Mr. Echarte holds undergraduate degrees from Memphis State University and the University of Florida and has completed the Executive Management Program at Stanford University.

*Joaquín Arrangoiz Orvañanos*. Mr. Arrangoiz has served as a director of TV Azteca since 1998 and also serves as Director of Sales and Corporate Relations of Grupo Salinas. His functions include sales, business development, strategic management, exchanges, acquisitions, real estate and synergies. Mr. Arrangoiz has served on the board of directors of prominent Mexican companies, such as Grupo Eusebio Gayosso, Grupo ARSACO, Grupo Osiris, and Salinas y Rocha. Mr. Arrangoiz received a degree in Business Administration from Universidad Nacional Autónoma de Mexico. Later, he pursued a postgraduate on marketing in University of California Los Angeles and received a master's degree in Instituto Panamericano de Alta Dirección de Empresas. He is member of the Young Presidents Organization (YPO).

*Francisco X. Borrego Hinojosa Linage*. Mr. Borrego has served as the General Counsel and Legal Director of TV Azteca since August 1993. Mr. Borrego also serves as Vice President of legal matters on Grupo Salinas. Mr. Borrego received a degree in law from the Escuela Libre de Derecho.

*Francisco Javier Murguía Díaz*. Mr. Murguía has served as an independent director of TV Azteca since April 2004. Mr. Murguía is a leading producer of commercial and short-length films in Latin America, and has served as President of the Mexican Association of Filmmakers, the National Council of Advertising and the Mexican Association of Advertising.

*Ignacio Cobián Villegas*. Mr. Cobián has served as independent director of TV Azteca since 2006. He is the founding member and has been Chief Executive Officer of Timbermart, S.A., a company specializing in marketing timber products, from 1999 to the present. Mr. Cobián formerly served as founding member and Chief Executive Officer of Corteza, S.A. de C.V., a company specializing in producing and marketing timber furniture and other timber products from 1998 to 1999. Mr. Cobián received a bachelor's degree in Business Administration from the Universidad de las Américas and obtained a professional certificate in Business Administration from the University of California in San Diego.

*Sergio Manuel Gutiérrez Muguerza*. Mr. Gutiérrez has served as independent director of TV Azteca since April 2000. He serves as independent director and Chairman of the audit committee of TV Azteca, in his capacity of expert in finance. Mr. Gutiérrez has served as Chief Executive Officer of Deacero, S.A., a steel and wire company, since 1981. He has also served as a director of Alpek, S.A. de C.V., a petrochemical company, and ING Comercial América, an insurance company, since 1997. Mr. Gutiérrez received a degree in Industrial Engineering from Purdue University.

*José Ignacio Sánchez Conde*. Mr. Sánchez Conde has served as independent director of TV Azteca since 2010. He also serves as Chief Executive Officer of the lighting company Sánchez Conde Iluminación; he previously served as Director of Advertising and Marketing for the Grupo CIFRA (Aurrera) from 1979 to 1982. From 1982 to 1991, he acted as Chief Executive Officer General of LSI de Mexico, a lighting company, and from 1992 to 2001as Finance Officer for Grupo ARSACO. He is currently a member of the board of GMD Resorts and Grupo Mexicano de Desarrollo, and served as independent director of Grupo Móvil Access. Mr. Sánchez Conde has a bachelor's degree in Communication Sciences from the Universidad Anáhuac, with Advertising and Television as his special subject.

*Board Practices*

TV Azteca's by-laws require at least 25% of the Board members to be independent, who are not employed by or affiliated with TV Azteca's controlling shareholders. Mr. Sergio Manuel Gutiérrez Muguerza, Francisco Javier Murguía Díaz, Ignacio Cobián Villegas and José Ignacio Sánchez Conde are TV Azteca's current independent directors.  Holders of TV Azteca's Series A shares are entitled to elect at least 60% of TV Azteca's board of directors members and each holder of at least 10% of TV Azteca's capital stock with limited vote (Series "D-A" and "D-L" shares, and after conversion, Series "L" shares) are entitled to appoint one director to the Board.

TV Azteca's by-laws require the Board to maintain committees comprised of at least three directors, all of them must be independent, to cover each of the following matters: related party transactions, capital transactions, audit and compensation. All members of the audit committee must be independent. The current audit committee is comprised of three independent members.

84

The audit committee operates independently from any other committee that the Board may decide to form, provided that, as of the date of this Offering Circular such committee also complies with the corporate practices obligations set forth in the LMV. In addition to any other obligations conferred by the board of directors, TV Azteca's corporate by-laws and the LMV, such committee has, among others, the following obligations:

- Opining on all transactions that require Board approval, provided that the value of the transactions under review, individually or in the aggregate, is equal to or greater than five percent of TV Azteca's consolidated assets, as reported in the immediately previous quarter.

- Recommending the appointment of independent experts as and when it is considered appropriate, for their opinion on transactions which require Board approval.

- Reviewing financial statements, internal control and internal audit systems, as well as the activities and independence of the external auditors and the activities of the Committee itself.

- Referring to TV Azteca's Legal Director any legal proceedings of which they have knowledge that may have been initiated against TV Azteca's employees.

- Recommending to the board the appointment, compensation and maintenance of an accounting firm and setting forth procedures to resolve any disputes between TV Azteca's Board and its external auditors related to the preparation of TV Azteca's financial statements.

- Notifying the Board of material irregularities detected relating to the exercise of their functions and, if applicable, notifying the appropriate corrective action, or recommending the action to be taken.

- Ensuring compliance by the Chief Executive Officer of the resolutions approved by the shareholders' meetings and the Board meetings, in accordance with the instructions of such corporate bodies.

- Preparing an annual report related to its obligations, to be submitted to the Board and distributed to the TV Azteca shareholders at the general ordinary shareholders' meeting.

The members of the audit committee are Mr. Francisco Javier Murguía Díaz, Ignacio Cobián Villegas and Sergio Manuel Gutiérrez Muguerza, who serves as Chairman of the committee.

*Oversight*

Oversight of management and the conduct and performance of TV Azteca's business is the responsibility of the audit committee and the third party auditor that conducts TV Azteca's external audit.

**Executive Officers**

The following table sets forth the names of TV Azteca's executive officers, their ages as of June 30, 2017 and their positions and year of appointment as an executive officer:

| Name | Age | Position | Executive Officer Since |
|------|-----|----------|-------------------------|
| Ricardo B. Salinas Pliego | 61 | Chairman of the Board | 1993 |
| Benjamin Francisco Salinas Sada | 33 | Chief Executive Officer | 2015 |
| Esteban Galindez Aguirre | 52 | Chief Financial Officer | 2000 |
| Joaquín Arrangoiz Orvañanos | 60 | Co-Director of Sales | 1997 |
| Rafael Rodríguez Sánchez | 40 | General Counsel and Legal Director | 2013 |
| Carlos Díaz Alonso | 51 | Co-Director of Sales | 2004 |

The following provides biographical information about TV Azteca's executive officers. See "*Directors and Senior Management—Directors*" for biographical information on Ricardo B. Salinas Pliego and Joaquín Arrangoiz Orvañanos.

*Benjamin Francisco Salinas Sada*. Mr. Salinas Sada serves as TV Azteca's Chief Executive Officer since 2015, and has previously worked over a decade in industries such as media, media production, marketing of goods, services and energy. Mr. Salinas Sada has been a member of the Strategic Executive Committee of Grupo Salinas

85

during the last five years, and has a bachelor's degree in Financial Management from the Instituto Tecnológico y de Estudios Superiores de Monterrey.

*Esteban Galindez Aguirre*. Mr. Galindez Aguirre serves as TV Azteca's Chief Financial Officer since 2015, and has broad experience in different strategic positions since 2000 at Grupo Elektra, where he served as Chief Financial Officer and performed positions on planning, financial strategy, budgetary control, and treasury as well as the design and implementation of programs aimed to drive operational efficiency. He has a bachelor's degree on Business Management at the Universidad Iberoamericana, and holds a masters' degree in Management at the McGill University, in Canada. Mr. Galindez Aguirre is also a Chartered Financial Analyst (CFA).

*Rafael Rodríguez Sánchez*. Mr. Rodríguez has served as TV Azteca's General Counsel since May 1, 2013. From July 2003 until April 2013, he served as legal counsel for corporate, regulatory and special projects at Iusacell. Since 2014, Mr. Rodríguez was appointed Secretary non-member of the Board of Directors of TV Azteca. From December 2000 to July 2003 was a legal manager for TV Azteca's sports, news and entertainment division. Prior to that, he worked in the corporate law area at PricewaterhouseCoopers in Mexico City. Mr. Rodríguez received his Law degree from Universidad La Salle. He also completed a seminar program on telecommunications at the Instituto Tecnológico Autónomo de México and a seminar program on International Sports Law at the Institute of Directors in London, UK.

*Carlos Díaz Alonso*. Mr. Díaz has served as TV Azteca's Director of Sales since 2004. Mr. Díaz received a bachelor's degree in Business Administration from the Universidad Anáhuac.

**PRINCIPAL SHAREHOLDERS**

**Principal Shareholders**

As of June 30, 2017, CASA, which is controlled by Mr. Ricardo Benjamín Salinas Pliego, is the owner of the majority 64.9% of the outstanding shares of TV Azteca and Arrendadora Internacional Azteca, which is a subsidiary of CASA by 99.81%, owns the (3.10%) of the total outstanding shares of TV Azteca, which have full voting rights. TV Azteca has seven main subsidiaries controlled by 99.99% comprised by AIC, a business in Delaware, United States, and six Mexican businesses: Televisión Azteca, S.A. de C.V., Azteca Novelas, S.A.P.I. de C.V., Red Azteca Internacional, S.A. de C.V., Comerciacom, S.A. de C.V., Estudios Azteca, S.A. de C.V. and Operadora Mexicana de Televisión, S.A. de C.V. Likewise, TV Azteca has a subsidiary in Guatemala, named TVA Guatemala, S.A., two subsidiaries in Honduras, named TV Azteca Honduras, S.A. de C.V. and Comercializadora de TV de Honduras, S.A. de C.V., as well as a branch in Colombia, named TV Azteca sucursal Colombia, a subsidiary in Peru named Azteca Comunicaciones Perú, S.A.C., and it counts with 56 additional subsidiaries, both direct and indirect.

**Capital Stock**

TV Azteca's capital stock is comprised of Series A shares, Series D-A shares and Series D-L shares as of the date of this Offering Circular. Holders of Series A shares have voting rights at TV Azteca's general shareholders' meetings. Holders of Series D-A and D-L shares have voting rights only in limited circumstances, and have a preferential dividend right.

In August 2017, Series D-A shares will become eligible to be exchanged for Series A shares, and Series D-L shares will become eligible to be exchanged for Series L shares. Series L shares will be granted voting rights under limited circumstances.

TV Azteca is working with the National Banking Commission and the National Foreign Investments Commission in order to extend the conversion term of Series D-A into Series A and Series D-L into Series L, all of them representative of TV Azteca's capital stock, to forty years counted from the constitution of the irrevocable trust identified with the number 987-8. It is expected to extend the term before its expiration. TV Azteca expects that such extension will occur in August 2017.

In connection with the foregoing, on July 12, 2017, TV Azteca held: (i) General Extraordinary Shareholders' meeting; (ii) Special meetings for Series D-A and D-L; and (iii) CPO's holders meeting, through the common representative.

Authorized, issued, and paid-in capital stock of TV Azteca as of December 31, 2016 is summarized as follows:

| Shares Series | Authorized (in thousands) | Paid (in thousands) | Total ($) |
|---|---|---|---|
| A | 5,318,079 | 4,633,711 | 370,957 |
| D-A | 2,613,878 | 2,163,829 | 172,132 |
| D-L | 2,613,878 | 2,163,829 | 172,132 |
| **Total** | **10,545,835** | **8,961,369** | **715,221** |

As of December 31, 2016, TV Azteca's shares were listed on the following securities exchanges:

| Characteristics of the securities | Country of Stock Exchange | Ticker symbol | Stock Exchange |
|---|---|---|---|
| Series A, Series -A, Series-L and Certificates of Common Participation (CPOs), each one represents one A Share, one D-A share, and one D-L share. | Mexico | TVAZTCA | Mexican Stock Exchange |
| 10 CPO Units. | Spain | XTZA | Latin American Securities Market |

87

**Dividends**

The approval, amount and payment of dividends is determined by shareholders at TV Azteca's general ordinary shareholders' meeting. Resolutions shall be valid only if adopted by the affirmative vote of the majority of the Series A shares, in general, but not necessarily based on the recommendation of the Board of Directors. Dividends are declared based in the audited financial statements for the previous fiscal year, considering TV Azteca's operating results, financial condition and capital requirements, and on general business conditions. Under TV Azteca's by-laws and the LGSM, the gross profits of TV Azteca are applied as described below.

At the general annual ordinary shareholders' meeting of TV Azteca, the Board of Directors submits for the approval of the holders of the Series A shares, the financial statements of TV Azteca for the previous fiscal year, together with the report thereon by the Board. If the general annual ordinary shareholders' meeting approves the financial statements, then it will determine the allocation of TV Azteca's net profits for the preceding year. LGMS require allocating at least 5% of such net profits to a legal reserve, which is not thereafter available for distribution except as a stock dividend, until the amount of the legal reserve equals 20% of TV Azteca's historical capital stock (before restatement effect). Thereafter, the general annual ordinary shareholders' meeting may determine and allocate a certain percentage of net profits to any general or special reserve, including a reserve for open-market purchases of TV Azteca's shares. The remainder of net profits is available for distribution in the form of dividends to all the shareholders.

Holders of Series D-A shares and Series D-L shares (directly or through CPO's) are entitled to receive an annual, cumulative preferred dividend. Following payment in full of this preferred dividend, holders of Series A shares may determine the payment of ordinary dividends to holders of Series A shares, Series D-A shares and Series D-L shares. After the conversion of the Series D-A shares into Series A shares and the Series D-L shares into Series L shares, all shares of TV Azteca will participate on a pro rata basis in dividend distributions.

TV Azteca has also entered into certain financial agreements, which contain terms and conditions that may restrict or limit the payment of dividends.

For the past three years, we have paid the following dividends to the Series D-A and Series D-L shareholders:

| Year | Dividend in Ps. Per Share D-A | Dividend in Ps. Per Share D-L | Date of Payment |
|---|---|---|---|
| 2014 | 0.00399 | 0.00399 | 12/05/2013 |
| 2015 | 0.00399 | 0.00399 | 05/29/2015 |
| 2016 | 0.00399 | 0.00399 | 05/31/2016 |

## RELATED PARTY TRANSACTIONS

Historically, TV Azteca has engaged, and expects to continue to engage, in a variety of transactions with its affiliates, including entities owned or controlled by TV Azteca or its controlling shareholders. TV Azteca has an audit committee comprised of three independent directors who review certain of its proposed transactions, including transactions with affiliates, to determine whether these transactions are related to its business and, in the case of a transaction with an affiliate, to determine whether such transaction is consummated on terms that are at least as favorable to TV Azteca as terms that would be obtainable at the time for a comparable transaction or series of similar transactions in arm's-length dealings with an unrelated third person.

The LMV requires the audit committee to review and make recommendations on any transaction with an affiliate with the exception of (i) transactions that do not involve a material amount, (ii) transactions entered into in the ordinary course of business and (iii) transactions made on an arm's-length basis. Notwithstanding the foregoing, the transactions described in (i) to (iii) require audit committee and Board approval if they relate to the purchase or sale of assets, granting of a guarantee or incurrence of debt involving an amount equal to or greater than 5% of TV Azteca's consolidated assets. For further information on the role of the audit committee, see "*Directors and Senior Management—Directors—Board Practices.*" In addition, the provisions of the LMV require that prior to Board approval of the transaction, a fairness opinion must be delivered with respect to the purchase or sale of assets, granting of a guarantee or incurrence of debt involving an amount equal to or greater than 10% of its consolidated assets. The fairness opinion must be provided by an independent advisor that meets the criteria set forth in the LMV, which includes being financially and economically independent from TV Azteca, providing no other services except audit services to TV Azteca and other criteria that generally result in a requirement that the advisor to be a partner of a recognized audit firm.

TV Azteca has outstanding receivables and payables, and undertook transactions with related parties as described below:

| | Six months ended June 30 | | | | Year ended December 31 | | | |
|---|---|---|---|---|---|---|---|---|
| | 2017 | | 2016 | | 2016 | | 2015 | |
| | ($) | (Ps.) | ($) | (Ps.) | ($) | (Ps.) | ($) | (Ps.) |
| | | | | (in millions) | | | | |
| **Accounts Receivable:** | | | | | | | | |
| Comunicaciones Avanzadas, S.A. de C.V. (Holding Company) | 30.5 | 545.6 | 28.8 | 544.0 | 28.3 | 584.9 | 29.7 | 510.5 |
| Organizacion de Torneos y Eventos Deportivos, S.A. de C.V. | - | - | - | - | 5.5 | 113.7 | - | - |
| Grupo Elektra, S.A.B. de C.V. and subsidiaries | 13.5 | 241.8 | 9.1 | 172.0 | 5.1 | 105.7 | 5.1 | 88.5 |
| Total Play Telecomunicaciones, S.A. de C.V. | 1.7 | 31.0 | 1.5 | 29.0 | 1.5 | 31.9 | 0.8 | 13.2 |
| Desarrollos Infraestructura y Construcción G.S., S.A. de C.V. | - | - | 1.8 | 34.0 | 1.7 | 34.3 | 2.0 | 34.3 |
| Arrendadora Internacional Azteca, S.A. de C.V. | 3.7 | 66.8 | 2.4 | 45.0 | 1.1 | 22.5 | 1.8 | 30.5 |
| Adamantium Private Security Services, S. de R.L. de C.V. | 0.3 | 5.0 | 3.5 | 66.0 | 0.1 | 2.8 | 4.2 | 71.9 |
| Other | 4.6 | 82.1 | 2.6 | 49.0 | 2.2 | 45.0 | 1.9 | 31.9 |
| **Total** | **54.3** | **972.2** | **49.7** | **939.0** | **45.5** | **940.8** | **45.5** | **780.8** |
| | | | | | | | | |
| **Accounts Payable:** | | | | | | | | |
| Selabe Diseños, S.A. de C.V. (Selabe) | 7.3 | 131.3 | 2.6 | 49.0 | 4.3 | 88.2 | - | - |
| Globo Re, S.A. | - | - | 9.4 | 177.0 | - | - | 9.3 | 160.1 |
| Procesos Boff, S. de R.L. de C.V. | - | - | - | - | 0.5 | 9.3 | - | - |
| Other related parties | - | - | 4.9 | 92.0 | - | - | - | - |
| **Total** | **7.3** | **131.3** | **16.9** | **318.0** | **4.8** | **97.5** | **9.3** | **160.1** |

TV Azteca's most significant related party transactions are described below:

*Advertising Revenue*

TV Azteca's advertising revenue from related parties amounted to Ps.343.4 million ($19.2 million), Ps.660.1 million ($31.9 million) and Ps.430 million ($25.0 million) for the six months ended June 30, 2017 and the years ended December 31, 2016 and 2015, respectively.

*Grupo Elektra*

TV Azteca and Grupo Elektra have annual advertising contracts and the rights under these contracts may not be assigned by Grupo Elektra to third parties. As of June 30, 2017, December 31, 2016 and 2015 revenue from Grupo Elektra amounted to Ps.287.8 million ($16.1 million), Ps.584 million ($28.3 million) and Ps.412.5 million ($24.0 million), respectively.

*Total Play Telecomunicaciones, S.A. de C.V (*"Total Play")

In each of the six months ended June 30, 2017 and the years ended December 31, 2016 and 2015, TV Azteca and Total Play had annual advertising contracts and the rights under these contracts may not be assigned by Total Play to third parties. As of June 30, 2017, December 31, 2016 and 2015, revenue from Total Play amounted to Ps.55.6 million ($3.1 million), Ps.76.1 million ($3.7 million) and Ps.17.7 million ($1.0 million), respectively.

*Interest Income*

In the six months ended June 30, 2017 and the years ended December 31, 2016 and 2015, TV Azteca made short-term loans to related parties and interest income for these loans amounted to Ps.1.8 million ($0.1 million), Ps.16.2 million ($0.8 million) and Ps.18.1 million ($1.1 million), respectively.

*Marketing and Production Revenue*

TV Azteca and Banco Azteca entered into various contracts for the production and marketing of the products and services of Banco Azteca on the over-the-air television channels 7 and 13. For the six months ended June 30, 2017 and the years ended December 31, 2016 and 2015, revenue from these contracts amounted to Ps.38.1 million ($2.1 million), Ps.98.0 million ($4.7 million) and Ps.22.9 million ($1.3 million), respectively.

*Equipment Leasing Contracts*

TV Azteca has leased from Arrendadora Internacional Azteca transportation and computing equipment with an option to buy. Most of the terms of the lease agreements are three to four years. At the end of the term, TV Azteca may opt to acquire the leased goods, extend the leasing term or return the leased goods, by notification at least 90 days prior to the expiration of the contract.  For the six months ended June 30, 2017 and the years ended December 31, 2016 and 2015, assets acquired under these contracts amounted to Ps.0.0 million ($0.0 million), Ps.0.6 million ($0.0 million) and Ps.1.0 million ($0.1 million), respectively, and the payments made by TV Azteca under these contracts amounted to $0.03 million, $2.0 million and $2.5 million, respectively.

*Donations*

In the six months ended June 30, 2017 and the years ended December 31, 2016 and 2015, TV Azteca donated funds to its related parties Fundación TV Azteca, A. C., Asociación Azteca Amigos de la Cultura y las Artes, A.C, and Caminos de la Libertad, Ideas y Debates, A.C., for an aggregate amount equal to Ps.22.5 million ($1.3 million), Ps.155.1 million ($7.5 million) and Ps.145.8 million ($8.5 million), respectively. These related parties are authorized by the tax authorities to receive donations and issue the respective supporting documentation.

*Recovery of other receivables from other related parties*

TV Azteca periodically evaluates the recoverability of other receivables from related parties and when it is determined that these accounts are not recoverable, they are charged to other expenses.

As of June 30, 2017, December 31, 2016 and 2015, all receivables from related parties of TV Azteca and its subsidiaries have been reviewed with respect to impairment indicators. As of December 31, 2015, certain receivables were impaired and, therefore, an allowance for doubtful accounts from related parties was recorded in the amount of Ps.92.5 million ($5.4 million), which was accounted for under the line item "other expenses" of TV Azteca's statement of comprehensive income. Part of these accounts were recovered in the amount of Ps.86.4 million ($4.2 million) in 2016; therefore, the impairment recognized was reversed in the amount recovered.

*Banco Azteca Credit Facility*

TV Azteca has entered into a loan agreement with Banco Azteca, S.A., which has provided TV Azteca with a  peso-denominated credit facility. This Ps.1,597.1 million credit facility has a term that extends to September 30, 2020 and accrues interest at a floating interest rate of TIIE plus 2.0%. It includes monthly interest payments, with all principal outstanding coming due at maturity in 2020.

**DESCRIPTION OF NOTES**

We will issue the notes under an Indenture (the "*Indenture*"), to be dated the Issue Date, between us, the Subsidiary Guarantors and The Bank of New York Mellon, as Trustee (the "*Trustee*").  We summarize below certain provisions of the Indenture, but do not restate the Indenture in its entirety.  We urge you to read the Indenture because it, and not this description, defines your rights.  You can obtain a copy of the Indenture in the manner described under "*Available Information*."

You can find the definition of capitalized terms used in this section under "—*Certain Definitions*." Unless otherwise specified, when we refer to:

- the "Issuer" in this section, we mean TV Azteca, S.A.B. de C.V., and not its Subsidiaries, and

- "notes" in this section, we mean the notes originally issued on the Issue Date and any additional notes, collectively.

**General**

The notes will:

- be general unsecured obligations of the Issuer,

- rank equal in right of payment with all other existing and future Senior Indebtedness of the Issuer,

- rank senior in right of payment to all existing and future Subordinated Indebtedness of the Issuer, if any,

- be effectively subordinated to all existing and future secured Indebtedness of the Issuer and the Subsidiary Guarantors to the extent of the assets securing such Indebtedness,

- be unconditionally guaranteed on a general unsecured senior basis by all of the Issuer's existing and certain future Restricted Subsidiaries,

- be structurally subordinated to all existing and future Indebtedness and other liabilities, including trade payables, of the Issuer's Subsidiaries that do not guarantee the notes, and

- rank junior to all obligations preferred by statute (such as tax, social security and labor obligations).

As of June 30, 2017, on a pro forma basis after giving effect to this offering, the transactions described under "*Use of Proceeds,*" the July 14, 2017 redemption of $60 million of Medium Term Notes due 2018, and the refinancing of the remaining outstanding Medium Term Notes due 2018 with cash on hand and borrowings under the Banco Azteca term loan facility :

- the Issuer and its Subsidiaries would have had consolidated total indebtedness of Ps.13,051.4 million ($729.2 million),

- the Issuer and the Subsidiary Guarantors would have had consolidated total indebtedness of Ps.13,051.4 million ($729.2 million), of which none would have been secured,

- because all of the Issuer's existing Subsidiaries will be Subsidiary Guarantors on the Issue Date, the Issuer's Subsidiaries that are not Subsidiary Guarantors would have had consolidated total indebtedness of Ps.0.0 million ($0.0 million).

The above figures do not reflect the issuance of Cebures pursuant to the new program that TV Azteca is currently in the process of establishing.  See "*Summary—Recent Developments*."

**Additional Notes**

Subject to the limitations set forth under "—*Certain Covenants—Limitation on Incurrence of Additional Indebtedness*," the Issuer and its Subsidiaries may incur additional Indebtedness.  At the Issuer's option, this additional Indebtedness may consist of additional notes ("*additional notes*") issued by the Issuer in one or more transactions, which have identical terms (other than issue date and issue price) as notes issued on the Issue Date. The notes and any additional notes will be treated as a single class for all purposes under the Indenture, and holders of additional notes would have the right to vote together with holders of notes issued on the Issue Date as one class.

**Principal, Maturity and Interest**

The notes will be general unsecured obligations of the Issuer and the Subsidiary Guarantors.

91

On the Issue Date, the Issuer will issue notes initially in an aggregate principal amount of $400,000,000. The Issuer will issue notes in minimum denominations of $200,000 and integral multiples of $1,000 in excess thereof.  The notes will mature on August 9, 2024.  The notes will not be entitled to the benefit of any mandatory redemption or sinking fund.

Interest on the notes will accrue at the rate of 8.250% per annum and will be payable semi-annually in arrears on each August 9 and February 9, commencing on February 9, 2018.  Payments will be made to the persons who are registered holders at the close of business on July 26 and January 26, respectively, immediately preceding the applicable interest payment date, whether or not a Business Day, until the date of maturity or earlier redemption. The Trustee shall not be required to register the transfer of, or exchange of, any note for a period beginning (i) 15 days prior to the giving of a notice of redemption or an offer to repurchase notes, and ending at the close of business on the day such notice is given or (ii) 15 days before an interest payment date and ending on such interest payment date.

Interest on the notes will accrue from the most recent date to which interest has been paid or, if no interest has been paid, from and including the date of issuance. Interest will be computed on the basis of a 360-day year comprised of twelve 30-day months. The redemption of notes with unpaid and accrued interest to the redemption date will not affect the right of holders of record on a record date to receive interest due on an interest payment date.

If the Stated Maturity or any interest payment or redemption date falls on a day which is not a Business Day, payment of interest, principal and premium, if any, with respect to the notes will be made on the next succeeding Business Day with the same force and effect as if made on the due date, and no interest on such payment will accrue from and after such due date.

Initially, The Bank of New York Mellon London Branch, the London branch of the Trustee will act as paying agent and the Trustee will act as registrar for the notes.  The Issuer may change any paying agent or registrar without notice to holders of notes.  If at any time certificated notes have been issued and are outstanding and a holder of certificated notes has given wire transfer instructions to the Issuer and the Trustee in writing at least 10 days in advance of the due date for a payment, the Issuer will make all principal, premium and interest payments on those notes in accordance with those instructions.  All other payments on the notes will be made at the office or agency of the paying agent and registrar in New York City unless the Issuer elects to make interest payments by check mailed to the registered holders of notes at their registered addresses. Payments made with respect to notes held in registered global form will be made in accordance with the applicable procedures of the depositary.

Approval-in-principle has been received from the Singapore Exchange Securities Trading Limited (the "SGX-ST") for the listing and quotation of the notes on the Official List of the SGX-ST. In addition, in the event that the global note(s) is exchanged for certificated notes, an announcement of such exchange will be made by or on behalf of the Issuer through the SGX-ST. Such announcement will include all material information with respect to the delivery of the certificated notes including details of the paying agent in Singapore.

Subject to any applicable abandoned property law, the Trustee and the paying agents shall pay to the Issuer upon written request any money held by them for the payment of interest, principal and premium, if any, on the notes that remains unclaimed for two years, and, thereafter, holders of notes entitled to any such money must look to the Issuer for payment as general creditors.

**Additional Amounts**

The Issuer will be required by Mexican law to deduct Mexican withholding taxes, and pay such taxes to the Mexican tax authorities, from payments of interest, and amounts deemed interest, on the notes made to investors who are not residents of Mexico for tax purposes, and will pay additional amounts on those payments of interest to the extent described below ("*Additional Amounts*").

The Issuer or, as the case may be, the Subsidiary Guarantors will pay such Additional Amounts as may be necessary in order to ensure that the net amounts received by the holders of notes after any withholding or deduction for or on account of any present or future taxes, duties, levies, imposts, assessments or governmental charges (including penalties, interest and additions related thereto) (collectively, "*Taxes*") of whatever nature imposed or levied by Mexico or any authority in Mexico shall equal the respective amounts of principal and interest which would have been received in respect of the notes in the absence of such withholding or deduction, and the delivery by the Issuer, or as the case may be, the Subsidiary Guarantors of any such Additional Amounts to the appropriate Mexican authorities shall constitute receipt by the relevant holders of such Additional Amounts so delivered; except that no such Additional Amounts shall be payable with respect to:

    (a)  any Taxes imposed solely because at any time there is or was a connection between the holder or beneficial owner of the note (or between a fiduciary, settlor, beneficiary, member or owner of, or

92

holder of power over, such holder or beneficial owner, if such holder or beneficial owner is an estate, trust, partnership or corporation) and Mexico (or any political subdivision or territory or possession thereof), including such holder or beneficial owner (or such fiduciary, settlor, beneficiary, member, owner or holder of a power) (i) being or having been a citizen or resident thereof for tax purposes, (ii) maintaining or having maintained an office, permanent establishment, or branch subject to taxation therein, or (iii) being or having been present or engaged in a trade or business therein (other than the mere receipt of payments under, or the ownership or holding of, a note);

(b)   any estate, inheritance, gift, sales, stamp, personal property, transfer or similar Tax, assessment or other governmental charge imposed with respect to the notes;

(c)   any Taxes imposed solely because the holder of the notes or any other person having an interest in the notes fails to comply with any certification, identification, information, documentation or other reporting requirement concerning the nationality, residence, identity or connection with Mexico of the holder or any beneficial owner of the note, if compliance is required by statute, regulation, officially published administrative practice of the taxing jurisdiction or by an applicable income tax treaty, which is in effect and to which Mexico is a party, as a precondition to exemption from, or reduction in the rate of, the Tax and at least 30 days' prior to the first payment date with respect to which the Issuer or a Subsidiary Guarantor shall apply this clause, the Issuer or, as the case may be, the relevant Subsidiary Guarantor shall have notified the holder of such note that such holder or beneficial owner will be required to comply with such certification, identification, information, documentation or other reporting requirement;

(d)   any note presented for payment more than 15 days after the Relevant Date (as defined below) except to the extent that the holder of the note would have been entitled to such Additional Amounts on presenting such note for payment on the last day of such 15-day period ("*Relevant Date*" in respect of any payment being the date on which such payment first becomes due except that, if the full amount of the monies payable has not been received by the paying agent on or prior to such due date, being the date on which, the full amount of such monies having been so received, notice to that effect is duly given to the holders in accordance with the Indenture);

(e)   any Taxes required to be deducted or withheld by any paying agent from a payment on a note, if such payment can be made without such deduction or withholding by any other paying agent who can make such payment in accordance with the terms of the Indenture and the notes;

(f)   any Taxes which are payable otherwise than by deduction or withholding from payments on or in respect of any note (other than stamp, transfer or other similar taxes);

(g)   any payment on a note to any holder of such note who is a fiduciary or partnership or other than the sole beneficial owner of any such payment, to the extent that a beneficiary or settlor with respect to such fiduciary, a member of such a partnership or the beneficial owner of such payment would not have been entitled to the Additional Amounts had such beneficiary, settlor, member or beneficial owner been the holder of such note;

(h)   any Taxes payable otherwise than by deduction or withholding from payments on the notes;

(i)   any Taxes withheld or deducted on or in respect of any note under Section 1471 through 1474 of the U.S. Internal Revenue Code of 1986, as amended as of the issue date (or any amended or successor version that is substantively comparable) and any current or future regulations or official interpretations thereof, any agreement entered into pursuant to Section 1471(b)(1) of the Code, any intergovernmental agreement between a non-U.S. jurisdiction and the United States with respect to the foregoing or any law, regulation or practice adopted pursuant to any such intergovernmental agreement; or

(j)   any combination of (a) through (i) above.

The limitations on our obligations to pay Additional Amounts set forth in clause (c) above shall not apply if (i) the provision of information, documentation or other evidence described in such clause (c) would be materially more onerous, in form, in procedure or in the substance of information disclosed, to a holder or beneficial owner of a note, than comparable information or other reporting requirements imposed under U.S. tax law (including the United States-Mexico income tax treaty), regulations (including temporary or proposed regulations) and administrative practice, or (ii) Article 166, Section II, paragraph (a) of the Mexican Income Tax Law (Ley del Impuesto Sobre la Renta) (or a substitute or equivalent provision, whether included in any law, rule or regulation) is in effect, unless (A) the provision of the information, documentation or other evidence described in such clause (c) above is

93

expressly required by the applicable Mexican laws and regulations in order to apply Article 166, Section II, paragraph (a) of the Mexican Income Tax Law (or substitute or equivalent provision), (B) we cannot obtain the information, documentation or other evidence necessary to comply with the applicable Mexican laws and regulations on our own through reasonable diligence and (C) we otherwise would meet the requirements for application of the applicable Mexican laws and regulations.

In addition, such clause (c) above does not require, and shall not be construed to require, that any holder, including any non-Mexican pension fund, retirement fund, tax-exempt organization or financial institution, register, to the extent applicable, with the Tax Management Service (Servicio de Administracion Tributaria) or the Mexican Ministry of Finance and Public Credit (Secretaria de Hacienda y Credito Público) to establish eligibility for an exemption from, or a reduction of, Mexican withholding taxes, or take any other action different from providing periodic information thereto.

Upon request, the Issuer and the Subsidiary Guarantors will provide the Trustee with documentation satisfactory to the Trustee evidencing the payment of Mexican taxes in respect of which the Issuer has paid any Additional Amount. The Issuer will make copies of such documentation available to the holders of the notes or the paying agent upon request.

The Issuer shall pay all stamp and other duties, if any, which may be imposed by Mexico or any political subdivision thereof or taxing authority of or in the foregoing with respect to the execution and delivery of the Indenture or the issuance of the notes.

Any reference in this Offering Circular, the Indenture or the notes to principal, premium, interest or any other amount payable in respect of the notes by the Issuer or any Subsidiary Guarantor will be deemed also to refer to any Additional Amount that may be payable with respect to that amount under the obligations referred to in this subsection.

In the event of any merger or other transaction described and permitted under "Limitation on Merger, Consolidation and Sale of Assets," then all references to Mexico, Mexican law or regulations, and Mexican taxing authorities under this section (other than the paragraph directly following (j) above, which relates to an exception to the obligation to pay Additional Amounts under (c) above) and under "Optional Redemption—Optional Redemption for Changes in Withholding Taxes," shall be deemed to also include the United States, the European Union, any jurisdiction through which payment is made and any political subdivision in or of the foregoing, laws or regulations of the United States, European Union or such jurisdiction through which payment is made, and any taxing authority of the United States, the European Union, any jurisdiction through which payment is made or any political subdivision in or of the foregoing, respectively.

**Note Guarantees**

Each Subsidiary Guarantor will, jointly and severally, unconditionally guarantee the performance of all Obligations of the Issuer under the Indenture and the notes.  The Obligations of each Subsidiary Guarantor in respect of its Note Guarantee will be limited to the maximum amount as will result in such Obligations not constituting a fraudulent conveyance, fraudulent transfer or similar illegal transfer under applicable law.  See "*Risk Factors—Risks Related to the Notes—The guarantees may not be enforceable*."

Each Subsidiary Guarantor will be released and relieved of its obligations (or in the case of Covenant Defeasance, certain of its obligations) under its Note Guarantee in the event:

(1)     there is a Legal Defeasance or a Covenant Defeasance of the notes as described under "—*Legal Defeasance and Covenant Defeasance*";

(2)     there is a sale or other disposition of (i) Capital Stock of such Subsidiary Guarantor following which such Subsidiary Guarantor is no longer a direct or indirect Subsidiary of the Issuer or (ii) all or substantially all of the assets of the Subsidiary Guarantor (other than to the Issuer or a Subsidiary Guarantor) otherwise permitted by and  in accordance with the Indenture;

(3)     such Subsidiary Guarantor is designated as an Unrestricted Subsidiary in accordance with "—*Certain Covenants—Limitation on Designation of Unrestricted Subsidiaries*"; or

(4)     if the Note Guarantee was required pursuant to the terms of the Indenture, the cessation of the circumstances requiring the Note Guarantee;

*provided* that the transaction is carried out pursuant to and in accordance with all other applicable provisions of the Indenture.

94

The Issuer will cause any existing or future Restricted Subsidiary (including upon a Revocation of the Designation of a Subsidiary as an Unrestricted Subsidiary) that (A) as of the last date of any fiscal quarter and with respect to the Issuer and its Subsidiaries, individually represents at least 5% of the consolidated total assets of the Issuer and its Subsidiaries, as determined in accordance with IFRS, or (B) for any twelve-month period ending as of the last day of any fiscal quarter, individually represents at least 5% of the Consolidated EBITDA of the Issuer, to become a Subsidiary Guarantor, execute a supplemental indenture and deliver to the Trustee an Officers' Certificate and an Opinion of Counsel.  Notwithstanding the foregoing, the Issuer shall at all times cause the Issuer and the then-existing Subsidiary Guarantors, collectively, to represent (Y) as of the last date of the each fiscal quarter, at least 85% of the consolidated total assets of the Issuer and its Subsidiaries, as determined in accordance with IFRS, and (Z) for the twelve-month period ending as of the last day of each fiscal quarter, at least 85% of Consolidated EBITDA.

On the Issue Date, all of the Issuer's existing Subsidiaries will be Subsidiary Guarantors.

As of the Issue Date, there will be no Unrestricted Subsidiaries.  The Issuer's Unrestricted Subsidiaries will not guarantee the notes.  In the event of a *concurso mercantil*, bankruptcy, liquidation or reorganization of these non-guarantor Subsidiaries, these non-guarantor Subsidiaries will pay the holders of their debt and their trade creditors before they will be able to distribute any of their assets to the Issuer.  In addition, holders of minority equity interests in Subsidiaries of the Issuer may receive distributions prior to or pro rata with the Issuer depending on the terms of the equity interests.  See "*Risk Factors—Risks Related to the Notes—To the extent that Certain of TV Azteca's subsidiaries are not Guarantors, TV Azteca's obligations with respect to the notes will be effectively subordinated to all liabilities of these non-Guarantor subsidiaries*."

**Optional Redemption**

*Optional Redemption.*  Except as stated below, the Issuer may not redeem the notes prior to August 9, 2021.  On and after August 9, 2021, the Issuer may redeem the notes, at its option, in whole at any time or in part from time to time, upon at least 30 days' but not more than 60 days' notice, at the following redemption prices, expressed as percentages of the principal amount thereof, if redeemed during the twelve-month period commencing on August 9 of any year set forth below, plus accrued and unpaid interest to, but not including, the redemption date:

| Year | Percentage |
|------|-----------|
| 2021 ............................................. | 104.125% |
| 2022 ............................................ | 102.063% |
| 2023 and thereafter ....................... | 100.000% |

Prior to August 9, 2021, the Issuer may redeem the notes, at its option, in whole at any time or in part from time to time, upon at least 30 days' but not more than 60 days' notice, at a redemption price equal to 100% of the principal amount thereof plus the Applicable Premium, plus accrued and unpaid interest to, but not including, the redemption date.

"*Applicable Premium*" means, with respect to any note on any applicable redemption date, the excess, if any, of (a) the present value at such redemption date of (i) the redemption price of the note, at August 9, 2021 (such redemption price being set forth in the table appearing above) *plus* (ii) all required interest payments due on the note through August 9, 2021 (excluding accrued but unpaid interest to the redemption date), computed in each case using a discount rate equal to the Treasury Rate as of such redemption date *plus* 50 basis points over (b) the outstanding principal amount of such note.

"*Comparable Treasury Issue*" means the United States Treasury security or securities selected by an Independent Investment Banker as having an actual or interpolated maturity comparable to the remaining term of the notes through August 9, 2021 that would be utilized, at the time of selection and in accordance with customary financial practice, in pricing new issues of corporate debt securities of a comparable maturity to August 9, 2021.

"*Comparable Treasury Price*" means, with respect to any redemption date (1) the average of the Reference Treasury Dealer Quotations for such redemption date, after excluding the highest and lowest such Reference Treasury Dealer Quotation, or (2) if the Issuer obtains fewer than four such Reference Treasury Dealer Quotations, the average of all such quotations.

"*Independent Investment Banker*" means one of the Reference Treasury Dealers appointed by the Issuer.

"*Reference Treasury Dealer*" means BCP Securities, LLC, Jefferies LLC and Morgan Stanley & Co. International plc or their respective affiliates which are primary United States government securities dealers and not

95

less than one other leading primary United States government securities dealers in New York City reasonably designated by the Issuer; *provided, however*, that if any of the foregoing shall cease to be a primary United States government securities dealer in New York City (a "*Primary Treasury Dealer*"), the Issuer will substitute therefor another Primary Treasury Dealer.

"*Reference Treasury Dealer Quotation*" means, with respect to each Reference Treasury Dealer and any redemption date, the average, as determined by the Issuer, of the bid and asked price for the Comparable Treasury Issue (expressed in each case as a percentage of its principal amount) quoted in writing to the Issuer by such Reference Treasury Dealer at 3:30 pm New York City time on the third Business Day preceding such redemption date.

"*Treasury Rate*" means, with respect to any redemption date, the rate per annum equal to the semi-annual equivalent yield to maturity or interpolated maturity (on a day count basis) of the Comparable Treasury Issue, assuming a price for the Comparable Treasury Issue (expressed as a percentage of its principal amount) equal to the Comparable Treasury Price for such redemption date.

*Optional Redemption upon Equity Offerings.*  Prior to August 9, 2021, the Issuer may, at its option, at any time or from time to time, upon at least 30 days' but not more than 60 days' notice, use the net cash proceeds of one or more Equity Offerings to redeem in the aggregate up to 35.0% of the aggregate principal amount of the notes issued under the Indenture at a redemption price equal to 108.250% of the principal amount thereof, plus accrued and unpaid interest to, but not including, the redemption date ; *provided* that:

(1)     after giving effect to any such redemption at least 65.0% of the aggregate principal amount of the notes issued under the Indenture remains outstanding; and

(2)     the Issuer shall make such redemption not more than 90 days after the consummation of such Equity Offering.

"*Equity Offering*" means (i) a primary public offering of Qualified Capital Stock of the Issuer in accordance with applicable Mexican or other laws, rules and regulations, (ii) a primary rights offering of Qualified Capital Stock of the Issuer made generally to the holders of such Qualified Capital Stock or (iii) any primary private placement of Qualified Capital Stock of the Issuer to any Person, in each case other than issuances upon exercise of options by employees of the Issuer or any of its Subsidiaries.

*Optional Redemption for Changes in Withholding Taxes*.  If, as a result of any amendment to, or change in, the laws (or any rules or regulations thereunder) of Mexico or any political subdivision or taxing authority thereof, or any amendment to or change in an official interpretation or application of such laws, rules or regulations, which amendment to or change of such laws, rules or regulations becomes effective on or after the Issue Date, the Issuer or the Subsidiary Guarantors have become obligated or will become obligated, in each case, after taking all reasonable measures to avoid this requirement, to pay Additional Amounts in excess of 4.9% with respect to the notes (see "—*Additional Amounts*" and "*Taxation—Mexican Taxation*"), then the Issuer may redeem the notes, at its option, in whole but not in part at any time, upon at least 30 days' but not more than 60 days' notice, at a redemption price equal to 100.0% of the outstanding principal amount, plus accrued and unpaid interest and any Additional Amounts due thereon to, but not including, the redemption date; *provided, however*, that (1) no notice of redemption for tax reasons may be given earlier than 90 days prior to the earliest date on which the Issuer or the Subsidiary Guarantors would be obligated to pay these Additional Amounts if a payment on the notes were then due, and (2) at the time such notice of redemption is given such obligation to pay such Additional Amounts remains in effect.

Prior to the publication or delivery to holders of any notice of redemption pursuant to this provision, the Issuer will deliver to the Trustee:

•     an Officers' Certificate stating that the Issuer is entitled to effect the redemption and setting forth a statement of facts showing that the conditions precedent to the Issuer's right to redeem have occurred, and

•     an opinion of Mexican legal counsel (which may be the Issuer's outside counsel) of recognized standing to the effect that the Issuer has or will become obligated to pay such Additional Amounts as a result of such change or amendment.

The Issuer will give notice of any redemption to the Trustee and the applicable depositary pursuant to the provisions described under "—*Certain Covenants—Notices*" at least 30 days (but not more than 60 days) before the redemption date.

*Optional Redemption Procedures*.  In the event that less than all of the notes are to be redeemed at any time, selection of notes for redemption will be made by the Trustee in compliance with the requirements of the

principal securities exchange, if any, on which notes are listed or, if the notes are not then listed on a securities exchange, on a pro rata basis, by lot or by any other method as the Trustee shall deem fair and appropriate (subject, in each case, to the applicable procedures of the depositary). If a partial redemption is made with the proceeds of an Equity Offering, selection of the notes or portions thereof for redemption will, subject to the preceding sentence, be made by the Trustee only on a pro rata basis or on as nearly a pro rata basis as is practicable (subject to the applicable procedures of the depositary), unless the method is otherwise prohibited.  No notes of a principal amount of $200,000 or less may be redeemed in part, and notes of a principal amount in excess of $200,000 may be redeemed in part in multiples of $1,000 only.

Notice of any redemption will (i) in the case of holders of certificated notes, be mailed by first-class mail, postage prepaid, at least 30 but no more than 60 days before the redemption date to each holder of notes to be redeemed at its registered address and (ii) in the case of the holders of global notes, be given in accordance with the customary procedures of the applicable depositary.  If notes are to be redeemed in part only, the notice of redemption will state the portion of the principal amount thereof to be redeemed.  Notice of redemption, once given to the holders of the notes, will be irrevocable.  The Issuer will give notice of any redemption to the Trustee and the applicable depositary pursuant to the provisions described under "—*Certain Covenants—Notices*" at least 30 days (but not more than 60 days) before the redemption date.

If notes are redeemed in part, a new note in a principal amount equal to the unredeemed portion thereof (if any) will be issued in the name of the holder thereof upon cancellation of the original note (or appropriate adjustments to the amount and beneficial interests in a global note will be made, as appropriate, in accordance with the applicable procedures of the depositary).

On the redemption date, the Issuer will pay the redemption price for any note to be redeemed, together with accrued and unpaid interest thereon to, but not including, the redemption date.  On and after the redemption date, interest will cease to accrue on notes or portions thereof called for redemption, as long as the Issuer has deposited with the paying agent funds in satisfaction of the applicable redemption price pursuant to the Indenture.  Upon redemption of any notes by the Issuer, such redeemed notes will be cancelled and cannot be reissued.

The Issuer and its affiliates may, at any time and from time to time, purchase notes in the open market, in privately negotiated transactions or otherwise.

## Repurchase Upon a Change of Control

Upon the occurrence of a Change of Control, each holder of notes will have the right to require that the Issuer purchase, at such holder's option, all or a portion (in minimum principal amounts of $200,000 or an integral multiple of $1,000 in excess thereof) of the holder's notes at a purchase price equal to 101.0% of the principal amount thereof, plus accrued and unpaid interest thereon to, but not including, the date of purchase (the "*Change of Control Payment*").

The Issuer shall notify the Trustee in writing promptly upon the occurrence of a Change of Control.

Within 30 days following the date upon which the Change of Control occurred, the Issuer must give written notice to each holder, with a copy to the Trustee, offering to purchase the notes as described above (a "*Change of Control Offer*").  The Change of Control Offer shall state, among other things, the purchase price, the purchase date, which must be no earlier than 30 days nor later than 60 days from the date of the notice, other than as may be required by law (the "*Change of Control Payment Date*"), and instructions and materials necessary to enable holders of the notes to tender notes pursuant to the Change of Control Offer.

On the Business Day immediately preceding the Change of Control Payment Date, the Issuer will, to the extent lawful, deposit with the paying agent funds in an amount equal to the Change of Control Payment in respect of all notes or portions thereof so tendered.  On the Change of Control Payment Date, the Issuer will, to the extent lawful:

(1)      accept for payment all notes or portions thereof properly tendered and not withdrawn pursuant to the Change of Control Offer; and

(2)      deliver or cause to be delivered to the Trustee the notes so accepted together with an Officers' Certificate stating the aggregate principal amount of notes or portions thereof being purchased by the Issuer.

If only a portion of a note is purchased pursuant to a Change of Control Offer, a new note in a principal amount equal to the portion thereof not purchased (if any) will be issued in the name of the holder thereof upon cancellation of the original note (or appropriate adjustments to the amount and beneficial interests in a global note

will be made, as appropriate, in accordance with the applicable procedures of the depositary).  Notes (or portions thereof) purchased pursuant to a Change of Control Offer will be cancelled and cannot be reissued.

The Issuer will not be required to make a Change of Control Offer upon a Change of Control if (1) a third party makes the Change of Control Offer in the manner, at the times and otherwise in compliance with the requirements set forth in the Indenture applicable to a Change of Control Offer made by the Issuer and purchases all notes properly tendered and not withdrawn pursuant to the Change of Control Offer, or (2) notice of redemption has been given pursuant to the Indenture as described above under the caption "—*Optional Redemption,*" unless and until there is a default in payment of the applicable redemption price.

A Change of Control Offer may be made in advance of a Change of Control, conditioned upon the occurrence of such Change of Control, if a definitive agreement is in place for the Change of Control at the time of making the Change of Control Offer.

In the event that holders of not less than 90.0% of the aggregate principal amount of the outstanding notes accept a Change of Control Offer and the Issuer or a third party purchases all of the notes held by such holders, the Issuer will have the right, on not less than 30 nor more than 60 days' prior notice, given not more than 30 days following the Change of Control Payment Date pursuant to the Change of Control Offer described above, to redeem all of the notes that remain outstanding following such purchase at a purchase price equal to the Change of Control Payment plus, to the extent not included in the Change of Control Payment, accrued and unpaid interest, if any, on the notes that remain outstanding, to, but not including, the payment date.

Other existing and future Indebtedness of the Issuer may contain prohibitions on the occurrence of events that would constitute a Change of Control or require that Indebtedness be repurchased upon a Change of Control. Moreover, the exercise by the holders of their right to require the Issuer to repurchase the notes upon a Change of Control could cause a default under such Indebtedness even if the Change of Control itself does not. If a Change of Control Offer occurs, there can be no assurance that the Issuer will have available funds sufficient to make the Change of Control Payment for all the notes that might be delivered by holders seeking to accept the Change of Control Offer.  In the event the Issuer is required to purchase outstanding notes pursuant to a Change of Control Offer, the Issuer expects that it would seek third-party financing to the extent it does not have available funds to meet its purchase obligations and any other obligations in respect of Senior Indebtedness.  However, there can be no assurance that the Issuer would be able to obtain necessary financing.   The Change of Control purchase feature of the notes may in certain circumstances make more difficult or discourage a sale or takeover of us and, thus, the removal of incumbent management.

Holders will not be entitled to require the Issuer to purchase their notes in the event of a takeover, recapitalization, leveraged buyout or similar transaction which does not result in a Change of Control.  In addition, clause (2) of the definition of "Change of Control" includes the sale, conveyance, assignment, transfer, lease or other disposition of all or substantially all of the assets of the Issuer and its consolidated Subsidiaries.  Although there is a limited body of case law interpreting the phrase "substantially all," there is no established definition of how this phrase is to be interpreted under applicable law.  Accordingly, the application of this provision is uncertain.

To the extent applicable, the Issuer will comply with the requirements of all applicable securities laws and regulations in connection with the purchase of notes in connection with a Change of Control Offer.  To the extent that the provisions of any applicable securities laws or regulations conflict with the "Repurchase Upon a Change of Control" provisions of the Indenture, the Issuer will comply with the applicable securities laws and regulations and will not be deemed to have breached its obligations under the Indenture by doing so.

**Certain Covenants**

***Suspension of Covenants***

During any period of time that (i) the notes have Investment Grade Ratings from at least two Rating Agencies, and (ii) no Default or Event of Default has occurred and is continuing (the occurrence of the events described in the foregoing clauses (i) and (ii) being collectively referred to as a "*Covenant Suspension Event*"), the Issuer and its Restricted Subsidiaries will not be subject to the provisions of the Indenture described under:

- "—*Limitation on Incurrence of Additional Indebtedness*";

- "—*Limitation on Guarantees*" (*provided* that such covenant shall apply to any Restricted Subsidiary that guarantees Indebtedness upon any Reversion Date (as defined below));

- "—*Limitation on Restricted Payments*";

- "—*Limitation on Asset Sales and Sales of Subsidiary Stock*";

98

- "—*Limitation on Designation of Unrestricted Subsidiaries*";

- "—*Limitation on Dividend and Other Payment Restrictions Affecting Restricted Subsidiaries*";

- clause (b) of "—*Limitation on Merger, Consolidation and Sale of Assets*";

- "—*Limitation on Transactions with Affiliates*"; and

- "—*Conduct of Business*";

(collectively, the "*Suspended Covenants*").

In the event that the Issuer and its Restricted Subsidiaries are not subject to the Suspended Covenants for any period of time as a result of the foregoing, and on any subsequent date (the "*Reversion Date*") the Covenant Suspension Event ceases to exist, then the Issuer and its Restricted Subsidiaries will thereafter again be subject to the Suspended Covenants.   The period of time between the date of the Covenant Suspension Event and the Reversion Date is referred to as the "*Suspension Period*." Notwithstanding that the Suspended Covenants may be reinstated, no Default or Event of Default will be deemed to have occurred as a result of a failure to comply with the Suspended Covenants during the Suspension Period (or upon termination of the Suspension Period or after that time based solely on events that occurred during the Suspension Period).

On the Reversion Date, all Indebtedness incurred during the Suspension Period will be classified to have been incurred pursuant to paragraph (1) of "—*Limitation on Incurrence of Additional Indebtedness*" below or one of the clauses set forth in paragraph (2) of "—*Limitation on Incurrence of Additional Indebtedness*" below (to the extent such Indebtedness would be permitted to be incurred thereunder as of the Reversion Date and after giving effect to Indebtedness incurred prior to the Suspension Period and outstanding on the Reversion Date).   To the extent such Indebtedness would not be so permitted to be incurred pursuant to paragraph (1) or (2) of "—*Limitation on Incurrence of Additional Indebtedness*", such Indebtedness will be deemed to have been outstanding on the Issue Date, so that it is classified as permitted under clause (d) of paragraph (2) of "—*Limitation on Incurrence of Additional Indebtedness*".   Calculations made after the Reversion Date of the amount available to be made as Restricted Payments under "—*Limitation on Restricted Payments*" will be made as though the covenant described under "—*Limitation on Restricted Payments*" had been in effect since the Issue Date and throughout the Suspension Period.   Accordingly, Restricted Payments made during the Suspension Period will reduce the amount available to be made as Restricted Payments under the first paragraph of "—*Limitation on Restricted Payments*." For purposes of "—*Limitation on Asset Sales*," on the Reversion Date, the amount of Net Cash Proceeds of Asset Sales will be reset to the amount of Net Cash Proceeds in effect as of the first day of the Suspension Period ending on such Reversion Date.

The Issuer will give the Trustee written notice of any Covenant Suspension Event and in any event not later than ten Business Days after such Covenant Suspension Event has occurred.   In the absence of such notice, the Trustee shall assume the Suspended Covenants apply and are in full force and effect.   The Issuer will give the Trustee written notice of any occurrence of a Reversion Date not later than five Business Days after it becomes aware of such Reversion Date.   After any such notice of the occurrence of the Reversion Date, the Trustee shall assume the Suspended Covenants apply and are in full force and effect.   In the absence of such notice of a Reversion Date, the Trustee may assume that the Suspended Covenants continue to be suspended.

### Limitation on Incurrence of Additional Indebtedness

(1)      The Issuer (i) will not, and will not cause or permit any of its Restricted Subsidiaries to, directly or indirectly, Incur any Indebtedness, (ii) will not, and will not cause or permit any of its Restricted Subsidiaries to, Incur any Disqualified Capital Stock (other than Disqualified Capital Stock of Restricted Subsidiaries held by the Issuer or a Wholly Owned Restricted Subsidiary, so long as it is so held), and (iii) will not cause or permit any of its Restricted Subsidiaries that is not a Subsidiary Guarantor to Incur any Preferred Stock (other than Preferred Stock of Restricted Subsidiaries held by the Issuer or a Wholly Owned Subsidiary, so long as it is so held), except, in each case, that the Issuer and any Subsidiary Guarantor may Incur Indebtedness or Disqualified Capital Stock and any Restricted Subsidiary that is not a Subsidiary Guarantor may Incur Preferred Stock if, at the time of and immediately after giving pro forma effect to the Incurrence thereof and the application of the proceeds therefrom, the Consolidated Leverage Ratio would not have been greater than 3.5 to 1.0.

(2)      Notwithstanding paragraph (1) above, the Issuer and its Restricted Subsidiaries, as applicable, may Incur the following Indebtedness ("*Permitted Indebtedness*"):

(a)      Indebtedness in respect of the notes issued on the Issue Date and the Note Guarantees in respect thereof;

(b)   Guarantees by any Subsidiary Guarantor of Indebtedness of the Issuer or any other Subsidiary Guarantor permitted under the Indenture; *provided* that if any such Guarantee is of Subordinated Indebtedness, then the Note Guarantee of such Subsidiary Guarantor shall be senior to such Subsidiary Guarantor's Guarantee of such Subordinated Indebtedness;

(c)   Indebtedness Incurred by the Issuer or any Subsidiary Guarantor under Credit Facilities (including Guarantees in respect thereof) in an aggregate principal amount at any time outstanding not to exceed the greater of (x) $ 100.0 million and (y) 10.0% of Consolidated Tangible Assets;

(d)   other Indebtedness of the Issuer and its Restricted Subsidiaries outstanding on the Issue Date (excluding Indebtedness outstanding on the Issue Date deemed to be incurred under clause (c) above);

(e)   Hedging Obligations entered into by the Issuer and its Restricted Subsidiaries in the ordinary course of business and not for speculative purposes, including, without limitation, Hedging Obligations in respect of the notes;

(f)   intercompany Indebtedness between the Issuer and any Restricted Subsidiary or between any Restricted Subsidiaries; *provided* that:

    (A)   if the Issuer or any Subsidiary Guarantor is the obligor on such Indebtedness and the payee is not the Issuer or any Subsidiary Guarantor, such Indebtedness must be expressly subordinated to the prior payment in full of all Obligations under the notes and the Indenture, in the case of the Issuer, or such Subsidiary Guarantor's Note Guarantee, in the case of any such Subsidiary Guarantor;

    (B)   in the event that at any time any such Indebtedness ceases to be held by the Issuer or a Restricted Subsidiary, such Indebtedness shall be deemed to be Incurred and not permitted by this clause (f) at the time such event occurs; and

    (C)   the Issuer and any Restricted Subsidiary shall agree to vote such Indebtedness, or provide their consents in connection with such Indebtedness, in any Mexican Restructuring, in a manner that is consistent with the vote of, or the consents provided by, the holders of the notes and other unaffiliated creditors of the same class as the notes;

(g)   Indebtedness of the Issuer or any of its Restricted Subsidiaries arising from the honoring by a bank or other financial institution of a check, draft or similar instrument inadvertently (including daylight overdrafts paid in full by the close of business on the day such overdraft was Incurred) drawn against insufficient funds in the ordinary course of business; *provided* that such Indebtedness is extinguished within five Business Days of Incurrence;

(h)   Indebtedness of the Issuer or any of its Restricted Subsidiaries represented by letters of credit for the account of the Issuer or any Restricted Subsidiary, as the case may be, in order to provide security for workers' compensation claims, payment obligations in connection with self-insurance or similar requirements in the ordinary course of business;

(i)   Indebtedness of the Issuer or any Restricted Subsidiary constituting Capitalized Lease Obligations or Purchase Money Indebtedness, in each case Incurred for the purpose of acquiring or financing all or any part of the purchase price or cost of construction or improvement of property or equipment used in the business of the Issuer or such Restricted Subsidiary in an aggregate amount at any time outstanding not to exceed the greater of (x) $25.0 million and (y) 2.5% of Consolidated Tangible Assets;

(j)   Indebtedness in respect of bid, performance or surety bonds in the ordinary course of business for the account of the Issuer or any of its Restricted Subsidiaries, including Guarantees or obligations of the Issuer or any Restricted Subsidiary with respect to letters of credit supporting such bid, performance or surety obligations (in each case other than for the payment of borrowed money);

(k)   Refinancing Indebtedness in respect of:

    (A)   Indebtedness (other than Indebtedness owed to the Issuer or any Subsidiary of the Issuer) Incurred pursuant to paragraph (1) above (it being understood that no Indebtedness outstanding on the Issue Date is Incurred pursuant to such paragraph (1) above), or

(B)    Indebtedness Incurred pursuant to clause (a), (d) (excluding Indebtedness outstanding on the Issue Date deemed to be incurred under clause (c) above or Indebtedness owed to the Issuer or a Subsidiary of the Issuer) or (k) of this covenant;

(l)    additional Indebtedness of the Issuer or any Restricted Subsidiary in an aggregate principal amount not to exceed $20.0 million at any one time outstanding (which amount may, but need not, be Incurred, in whole or in part, under Credit Facilities);

(m)    the Guarantee by the Issuer of any Indebtedness Incurred by a Subsidiary Guarantor in accordance with the terms of the Indenture and the notes;

(n)    Guarantees by the Issuer or any Restricted Subsidiary of any Obligations of CASA made in connection with the purchase of property or other assets to be used in a Permitted Business (so long as, if CASA completes such purchase of property or other assets, then (x) each of the Issuer and CASA exercises commercially reasonable efforts to transfer such property or other assets to the Issuer or a Restricted Subsidiary, and (y) such transfer is completed within one year of the Incurrence of such Indebtedness), not to exceed an aggregate of $50 million at any one time outstanding; and

(o)    Permitted Acquisition Indebtedness.

(3)    For purposes of determining compliance with, and the outstanding principal amount of, any particular Indebtedness Incurred pursuant to and in compliance with, this covenant:

(a)    The amount of Indebtedness issued at a price that is less than the principal amount thereof will be equal to the amount of the liability in respect thereof determined in accordance with GAAP.

(b)    The accrual of interest, the accretion or amortization of original issue discount, the payment of regularly scheduled interest in the form of additional Indebtedness of the same instrument or the payment of regularly scheduled dividends on preferred stock or Disqualified Capital Stock in the form of additional preferred stock or Disqualified Capital Stock with the same terms will not be deemed to be an Incurrence of Indebtedness or issuance of preferred stock or Disqualified Capital Stock for purposes of this covenant; *provided* that any such outstanding additional Indebtedness or preferred stock or Disqualified Capital Stock paid in respect of Indebtedness Incurred pursuant to any provision of paragraph (2) of this covenant will be counted as Indebtedness outstanding thereunder for purposes of any future Incurrence under such provision.

(c)    In the event that Indebtedness meets the criteria of more than one of the clauses of Permitted Indebtedness described above, or is entitled to be Incurred pursuant to paragraph (1) of this covenant, the Issuer, in its sole discretion, will be permitted to classify such Indebtedness at the time of its Incurrence in any manner that complies with this covenant. In addition, any Indebtedness originally classified as Incurred pursuant to any clause of Permitted Indebtedness or clause (l) of this covenant may later be reclassified by the Issuer, in its sole discretion, such that it will be deemed to be Incurred pursuant to another of such clauses or clause (l) of this covenant to the extent that such reclassified Indebtedness could be Incurred pursuant to such other clause or clause (l) of this covenant at the time of such reclassification (provided that Indebtedness outstanding on the Issue Date under Credit Facilities shall at all times be deemed incurred under clause (c) above).

(d)    For purposes of determining compliance with any U.S. dollar-denominated restriction on the Incurrence of Indebtedness, principal amount of Indebtedness denominated in a currency other than U.S. dollars shall be the U.S. Dollar Equivalent thereof. Notwithstanding any other provision of this covenant, the maximum amount of Indebtedness that the Issuer or any Restricted Subsidiary may incur pursuant to this covenant shall not be deemed to be exceeded as a result solely of fluctuations in exchange rates or currency values.

(e)    For purposes of determining any particular amount of Indebtedness: (i) Guarantees, Liens or obligations with respect to letters of credit supporting Indebtedness otherwise included in the determination of such particular amount shall not be included and (ii) any Liens granted, together with an equal and ratable Lien to secure the notes and the Note Guarantees, pursuant to provisions of the Indenture and the notes shall not be treated as Indebtedness.

*Limitation on Guarantees*

The Issuer will not permit any Restricted Subsidiary of the Issuer that is not a Subsidiary Guarantor to Guarantee any Indebtedness of the Issuer or to secure any Indebtedness of the Issuer with a Lien on the assets of such Restricted Subsidiary, unless contemporaneously therewith (or prior thereto) effective provision is made to Guarantee or secure the notes, as the case may be, on an equal and ratable basis with such Guarantee or Lien for so long as such Guarantee or Lien remains effective, and in an amount equal to the amount of Indebtedness so Guaranteed or secured.  Any Guarantee by any such Restricted Subsidiary of Subordinated Indebtedness of the Issuer will be subordinated and junior in right of payment to the contemporaneous Guarantee of the notes by such Restricted Subsidiary.

*Limitation on Restricted Payments*

The Issuer will not, and will not cause or permit any of its Restricted Subsidiaries to, directly or indirectly, take any of the following actions (each, a "*Restricted Payment*"):

(a)      declare or pay any dividend or return of capital or make any distribution on or in respect of shares of Capital Stock of the Issuer or any Restricted Subsidiary to holders of such Capital Stock, other than:

- dividends, returns of capital or distributions payable in Qualified Capital Stock of the Issuer,

- dividends, returns of capital or distributions payable to the Issuer and/or a Restricted Subsidiary, or

- dividends, distributions or returns of capital made on a pro rata basis to the Issuer and its Restricted Subsidiaries, on the one hand, and minority holders of Capital Stock of a Restricted Subsidiary, on the other hand (or on a less than pro rata basis to any minority holder);

(b)      purchase, redeem or otherwise acquire or retire for value:

- any Capital Stock of the Issuer, or

- any Capital Stock of any Restricted Subsidiary held by an Affiliate of the Issuer (other than a Restricted Subsidiary) or any Preferred Stock of a Restricted Subsidiary, except for Capital Stock held by the Issuer or a Restricted Subsidiary or purchases, redemptions, acquisitions or retirements for value of Capital Stock on a *pro rata* basis from the Issuer and/or any Restricted Subsidiaries, on the one hand, and minority holders of Capital Stock of a Restricted Subsidiary, on the other hand, according to their respective percentage ownership of the Capital Stock of such Restricted Subsidiary;

(c)      make any principal payment on, purchase, defease, redeem, prepay, decrease or otherwise acquire or retire for value, prior to any scheduled final maturity, scheduled repayment or scheduled sinking fund payment, as the case may be, any Subordinated Indebtedness (excluding (x) any intercompany Indebtedness between or among the Issuer and/or any Restricted Subsidiaries or (y) the purchase, repurchase or other acquisition of Indebtedness that is contractually subordinated to the notes or any Note Guarantee, as the case may be, purchased in anticipation of satisfying a sinking fund obligation, principal installment or final maturity, in each case within one year of such date of purchase, repurchase or acquisition); or

(d)      make any Investment (other than Permitted Investments);

if at the time of the Restricted Payment and immediately after giving effect thereto:

(1)      a Default or an Event of Default shall have occurred and be continuing;

(2)      the Issuer is not able to Incur at least $1.00 of additional Indebtedness pursuant to paragraph (1) of "—*Limitation on Incurrence of Additional Indebtedness*"; or

(3)      the aggregate amount (the amount expended for these purposes, if other than in cash, being the Fair Market Value of the relevant property) of the proposed Restricted Payment and all other Restricted Payments made subsequent to the Issue Date up to the date thereof shall exceed the sum of:

102

(A)   50% of cumulative Consolidated Net Income of the Issuer or, if such cumulative Consolidated Net Income of the Issuer is a loss, minus 100% of the loss, accrued during the period, treated as one accounting period, beginning in the fiscal quarter immediately preceding the fiscal quarter in which the Issue Date occurs, to the end of the most recent fiscal quarter for which consolidated financial information of the Issuer is available; plus

(B)   100% of the aggregate net cash proceeds received by the Issuer or any Restricted Subsidiary from any Person (other than, in the case of any Restricted Subsidiary, from the Issuer or another Restricted Subsidiary) from any:

- contribution to the equity capital of the Issuer (not representing an interest in Disqualified Capital Stock) or issuance or sale of Qualified Capital Stock of the Issuer, in each case, subsequent to the Issue Date, or

- issuance or sale subsequent to the Issue Date (and, in the case of Indebtedness of a Restricted Subsidiary, at such time as it was a Restricted Subsidiary) of any Indebtedness of the Issuer or any Restricted Subsidiary that has been converted into or exchanged for Qualified Capital Stock of the Issuer,

excluding, in each case, any net cash proceeds:

(x)   received from a Subsidiary of the Issuer;

(y)   used to redeem notes under "—*Optional Redemption—Optional Redemption Upon Equity Offerings*"; or

(z)   applied in accordance with clause (2) or (3) of the second paragraph of this covenant below; *plus*

(B)   any Investment Return.

Notwithstanding the preceding paragraph, this covenant does not prohibit:

(1)   the payment of any dividend or distribution or the consummation of any irrevocable redemption of Subordinated Indebtedness within 60 days after the date of declaration of such dividend or distribution or giving of the redemption notice, as the case may be, if the dividend, distribution or redemption would have been permitted on the date of declaration or notice pursuant to the preceding paragraph; *provided* that such redemption shall be included (without duplication for the declaration) in the calculation of the amount of Restricted Payments;

(2)   the acquisition of any shares of Capital Stock of the Issuer,

(x)   in exchange for Qualified Capital Stock of the Issuer, or

(y)   through the application of the net proceeds received by the Issuer from a substantially concurrent sale of Qualified Capital Stock of the Issuer or a contribution to the equity capital of the Issuer (not representing an interest in Disqualified Capital Stock), in each case not received from a Subsidiary of the Issuer;

*provided* that the value of any such Qualified Capital Stock issued in exchange for such acquired Capital Stock and any such net proceeds shall be excluded from clause (3)(B) of the first paragraph of this covenant (and were not included therein at any time);

(3)   the voluntary prepayment, purchase, defeasance, redemption or other acquisition or retirement for value of any Subordinated Indebtedness solely in exchange for, or through the application of net proceeds of a substantially concurrent sale, other than to a Subsidiary of the Issuer, of:

(x)   Qualified Capital Stock of the Issuer or

(y)   Refinancing Indebtedness for such Subordinated Indebtedness;

*provided* that the value of any Qualified Capital Stock issued in exchange for Subordinated Indebtedness and any net proceeds referred to above shall be excluded from clause (3)(B) of the first paragraph of this covenant (and were not included therein at any time);

(4)   if no Default or Event of Default shall have occurred and be continuing, repurchases by the Issuer of Common Stock of the Issuer or options, warrants or other securities exercisable or convertible into Common Stock of the Issuer from any current or former employees, officers, directors or

103

consultants of the Issuer or any of its Subsidiaries or their authorized representatives estates, heirs, family members, spouses or former spouses upon the death, disability or termination of employment or directorship of such employees, officers or directors, or the termination of retention of any such consultants, in an amount not to exceed $5.0 million in any calendar year (with unused amounts in any calendar year being permitted to be carried over into succeeding calendar years) plus the cash proceeds of key man life insurance policies received by the Issuer and its Restricted Subsidiaries in such calendar year;

(5)    the repurchase of Capital Stock deemed to occur upon the exercise of stock options or warrants to the extent such Capital Stock represents a portion of the exercise price of those stock options or warrants;

(6)    the declaration and payment of regularly scheduled or accrued dividends or distributions to holders of any class or series of Disqualified Capital Stock of the Issuer or any Restricted Subsidiary issued on or after the Issue Date in accordance with the covenant set forth under "—*Limitation on Incurrence of Additional Indebtedness*";

(7)    upon the occurrence of a Change of Control and within 60 days after the completion of the offer to repurchase the notes pursuant to the covenant described under "—*Repurchase Upon a Change of Control*" above, any repurchase, redemption or other acquisition or retirement for value of any Subordinated Indebtedness of the Issuer or any Subsidiary Guarantor required pursuant to the terms thereof as a result of such Change of Control; *provided* that (A) the terms of such purchase or redemption are substantially similar in all material respects to the comparable provision included in the Indenture, and (B) at the time of such purchase or redemption no Default or Event of Default shall have occurred and be continuing (or would result therefrom);

(8)    if no Default or Event of Default shall have occurred and be continuing, the purchase by the Issuer of fractional shares arising out of stock dividends, splits or combinations or business combinations;

(9)    payments or distributions in the nature of satisfaction of statutory redemption or dissenters' rights under Mexican law; and

(10)    if no Default or Event of Default shall have occurred and be continuing, the payment of cash dividends on or in respect of Capital Stock of the Issuer or the repurchase of Capital Stock of the Issuer in an aggregate amount not to exceed $10.0 million in any calendar year.

In determining the aggregate amount of Restricted Payments made subsequent to the Issue Date, amounts expended pursuant to clauses (1) (without duplication for the declaration of the relevant dividend), (4) and (7) above shall be included in such calculation and amounts expended pursuant to clauses (2), (3), (5), (6), (8), (9) and (10) above shall not be included in such calculation.

### Limitation on Asset Sales and Sales of Subsidiary Stock

The Issuer will not, and will not permit any of its Restricted Subsidiaries to, consummate an Asset Sale unless:

(a)    the Issuer or the applicable Restricted Subsidiary, as the case may be, receives consideration at the time of the Asset Sale at least equal to the Fair Market Value of the assets or Capital Stock sold or otherwise disposed of, and

(b)    at least 75.0% of the consideration received for the assets or Capital Stock sold by the Issuer or the Restricted Subsidiary, as the case may be, in the Asset Sale shall be in the form of cash or Cash Equivalents received at the time of such Asset Sale.

For purposes of this clause (b), each of the following will be deemed to be cash:

(i)    any liabilities (as shown on the Issuer's or such Restricted Subsidiary's most recent consolidated balance sheet) of the Issuer or any of its Restricted Subsidiaries (other than contingent liabilities and liabilities that constitute Subordinated Indebtedness or are otherwise subordinated to the notes) that are assumed by the transferee of any such assets and as a result of which the Issuer and its Restricted Subsidiaries are no longer responsible for such liabilities; and

(ii)    the Fair Market Value of any Capital Stock of a Person engaged in a Permitted Business that will become, upon purchase, a Restricted Subsidiary or assets (other than current

104

<div style="margin-left:2em">

assets as determined in accordance with GAAP or Capital Stock) to be used by the Issuer or any Restricted Subsidiary in a Permitted Business; and

(iii)     any securities, notes or other obligations received by the Issuer or any such Restricted Subsidiary from such transferee that are converted, sold for or exchanged by the Issuer or such Restricted Subsidiary into cash or Cash Equivalents within 120 days (180 days in the case of land sales) of the receipt thereof (subject to ordinary settlement periods), to the extent of the cash or Cash Equivalents received in that conversion, sale or exchange,

*provided* that amounts received pursuant to clauses (i) and (ii) shall not be deemed to constitute Net Cash Proceeds for purposes of making an Asset Sale Offer.

</div>

The Issuer or such Restricted Subsidiary, as the case may be, may apply the Net Cash Proceeds of any such Asset Sale within 365 days thereof to:

(a)     repay any Senior Indebtedness of the Issuer or a Subsidiary Guarantor secured by a Lien,

(b)     make capital expenditures in a Permitted Business, or

(c)     purchase

(1)     assets (other than current assets as determined in accordance with GAAP or Capital Stock) to be used by the Issuer or any Restricted Subsidiary in a Permitted Business, or

(2)     all or substantially all of the assets of, or any Capital Stock of, a Person engaged in a Permitted Business if, after giving effect to any such acquisition of Capital Stock, the Permitted Business is or becomes a Restricted Subsidiary

from a Person other than the Issuer and its Restricted Subsidiaries; *provided* that, in the case of clauses (1) and (2), the Issuer will have complied with its obligations if (i) it enters into a binding commitment to acquire such assets or such Capital Stock within 365 days after receipt of such Net Cash Proceeds, (ii) such binding commitment is subject only to customary conditions and (iii) such acquisition is consummated within 180 days from the date of signing such binding commitment.

To the extent all or a portion of the Net Cash Proceeds of any Asset Sale are not applied within 365 days of the Asset Sale as set forth in clause (a) or (b) (or, in the case of clause (c) only, within such longer period set forth therein) of the immediately preceding paragraph, the Issuer will make an offer to purchase notes (the "*Asset Sale Offer*"), at a purchase price equal to 100% of the principal amount of the notes to be purchased, plus accrued and unpaid interest thereon, to, but not including, the date of purchase (the "*Asset Sale Offer Amount*").  The Issuer will purchase pursuant to an Asset Sale Offer from all tendering holders on a pro rata basis (subject to any necessary rounding), and, at the Issuer's option, on a pro rata basis with the holders of any other Senior Indebtedness with similar provisions requiring the Issuer to offer to purchase the other Senior Indebtedness with the proceeds of Asset Sales, that principal amount (or accreted value in the case of Indebtedness issued with original issue discount) of notes and the other Senior Indebtedness to be purchased equal to such unapplied Net Cash Proceeds.  The Issuer may satisfy its obligations under this covenant with respect to the Net Cash Proceeds of an Asset Sale by making an Asset Sale Offer prior to the expiration of the relevant 365-day period (or, if applicable, such longer period set forth above with respect to clause (c) only).

The Issuer may, however, defer an Asset Sale Offer until there is an aggregate amount of unapplied Net Cash Proceeds from one or more Asset Sales equal to or in excess of $15.0 million.  At that time, the entire amount of unapplied Net Cash Proceeds, and not just the amount in excess of $15.0 million, will be applied as required pursuant to this covenant.  Pending application in accordance with this covenant, Net Cash Proceeds will be applied to temporarily reduce revolving credit borrowings that can be reborrowed or Invested in Cash Equivalents.

Each notice of an Asset Sale Offer will be made by written notice to each record holder of notes as shown on the register of holders, with a copy to the Trustee, within 20 days following such 365th day (or, if applicable, such longer period set forth above with respect to clause (c) only), offering to purchase the notes as described above. Each notice of an Asset Sale Offer will state, among other things, the purchase price, the purchase date, which must be no earlier than 30 days nor later than 60 days from the date of the notice, other than as may be required by law (the "*Asset Sale Offer Payment Date*"), and instructions and materials necessary to enable holders of the notes to tender notes pursuant to the Asset Sale Offer.  Upon receiving notice of an Asset Sale Offer, holders of notes may elect to tender their notes in whole or in part in amounts of $200,000 or integral multiples of $1,000 in excess thereof in exchange for cash.

<div style="text-align:center">105</div>

On the Business Day immediately preceding the Asset Sale Offer Payment Date, the Issuer will, to the extent lawful, deposit with the paying agent funds in an amount equal to the Asset Sale Offer Amount in respect of all notes or portions thereof so tendered.  On the Asset Sale Offer Payment Date, the Issuer will, to the extent lawful:

(1)      accept for payment all notes or portions thereof properly tendered and not withdrawn pursuant to the Asset Sale Offer; and

(2)      deliver or cause to be delivered to the Trustee the notes so accepted together with an Officers' Certificate stating the aggregate principal amount of notes or portions thereof being purchased by the Issuer.

To the extent holders of notes and holders of other Senior Indebtedness, if any, which are the subject of an Asset Sale Offer properly tender (and do not withdraw notes or the other Senior Indebtedness) in an aggregate amount exceeding the amount of unapplied Net Cash Proceeds, the Issuer will purchase the notes and the other Senior Indebtedness on a *pro rata* basis (subject to any necessary rounding) based on amounts tendered.  If only a portion of a note is purchased pursuant to an Asset Sale Offer, a new note in a principal amount equal to the portion thereof not purchased will be issued in the name of the holder thereof upon cancellation of the original note (or appropriate adjustments to the amount and beneficial interests in a global note will be made, as appropriate, in accordance with the applicable procedures of the depositary).  Notes (or portions thereof) purchased pursuant to an Asset Sale Offer will be cancelled and cannot be reissued.

To the extent applicable, the Issuer will comply with the requirements of all applicable securities laws and regulations in connection with the purchase of notes in connection with an Asset Sale Offer.  To the extent that the provisions of any applicable securities laws or regulations conflict with the "Asset Sale" provisions of the Indenture, the Issuer will comply with the applicable securities laws and regulations and will not be deemed to have breached its obligations under the Indenture by doing so. Upon completion of an Asset Sale Offer, the amount of Net Cash Proceeds will be reset at zero.  Accordingly, to the extent that the aggregate amount of notes and other Senior Indebtedness tendered pursuant to an Asset Sale Offer is less than the aggregate amount of unapplied Net Cash Proceeds, the Issuer and its Restricted Subsidiaries may use any remaining Net Cash Proceeds for any purpose not otherwise prohibited by the Indenture.   In the event of the transfer of substantially all (but not all) of the property and assets of the Issuer and its Restricted Subsidiaries as an entirety to a Person in a transaction permitted under "—Limitation on Merger, Consolidation and Sale of Assets," the Surviving Entity will be deemed to have sold the properties and assets of the Issuer and its Restricted Subsidiaries not so transferred for purposes of this covenant and will comply with the provisions of this covenant with respect to the deemed sale as if it were an Asset Sale.  In addition, the Fair Market Value of properties and assets of the Issuer or its Restricted Subsidiaries so deemed to be sold will be deemed to be Net Cash Proceeds for purposes of this covenant.

### *Limitation on Designation of Unrestricted Subsidiaries*

The Issuer may designate after the Issue Date any Subsidiary of the Issuer as an "Unrestricted Subsidiary" under the Indenture (a "*Designation*") only if:

(1)      no Default or Event of Default shall have occurred and be continuing at the time of or after giving effect to such Designation and any transactions between the Issuer or any of its Restricted Subsidiaries and such Unrestricted Subsidiary are in compliance with "—*Limitation on Transactions with Affiliates*";

(2)      at the time of and after giving effect to such Designation, the Issuer could Incur $1.00 of additional Indebtedness pursuant to paragraph (1) of "—*Limitation on Incurrence of Additional Indebtedness*"; and

(3)      the Issuer would be permitted to make an Investment at the time of Designation (assuming the effectiveness of such Designation and treating such Designation as an Investment at the time of Designation) as a Restricted Payment pursuant to the first paragraph of "—*Limitation on Restricted Payments*" or as a Permitted Investment  in an amount (the "*Designation Amount*") equal to the Issuer's Investment in such Subsidiary on such date; and

(4)      at the time of such Designation, neither the Issuer nor any Restricted Subsidiary will:

(a)      provide credit support for, subject any of its property or assets (other than the Capital Stock of any Unrestricted Subsidiary) to the satisfaction of, or Guarantee, any Indebtedness of such Subsidiary (including any undertaking, agreement or instrument evidencing such Indebtedness);

(b)      be directly or indirectly liable for any Indebtedness of such Subsidiary; or

106

(c)   be directly or indirectly liable for any Indebtedness which provides that the holder thereof may (upon notice, lapse of time or both) declare a default thereon or cause the payment thereof to be accelerated or payable prior to its final scheduled maturity upon the occurrence of a default with respect to any Indebtedness of such Subsidiary, except for any non-recourse Guarantee given solely to support the pledge by the Issuer or any Restricted Subsidiary of the Capital Stock of such Subsidiary.

The Designation of a Subsidiary of the Issuer as an Unrestricted Subsidiary shall be deemed to include the Designation of all of the Subsidiaries of such Subsidiary.

Upon a Designation, (i) all existing Investments of the Issuer and its Restricted Subsidiaries in such Subsidiary will be deemed to be made at that time, (ii) all existing transactions between such Subsidiary and the Issuer or its Restricted Subsidiaries will be deemed entered into at that time, (iii) such Subsidiary will be released, if applicable, from its Note Guarantee, and (iv) such Subsidiary will cease to be subject to the provisions of the Indenture as a Restricted Subsidiary.

The Issuer may revoke any Designation of a Subsidiary as an Unrestricted Subsidiary (a "*Revocation*") only if:

(1)   no Default or Event of Default shall have occurred and be continuing at the time of and after giving effect to such Revocation; and

(2)   all Liens and Indebtedness of such Unrestricted Subsidiary outstanding immediately following such Revocation would, if Incurred at such time, have been permitted to be Incurred for all purposes of the Indenture.

Upon a Revocation, (i) all of such Subsidiary's Indebtedness and Disqualified Capital Stock or Preferred Stock will be deemed Incurred at that time for purposes of "—*Limitation on Incurrence of Additional Indebtedness*," (ii) Investments in such Subsidiary previously charged under "—*Limitation on Restricted Payments*" will be credited thereunder, (iii) it may be required to issue a Note Guarantee pursuant to "—*Note Guarantees*," and (iv) it will thereafter be subject to the provisions of the Indenture as a Restricted Subsidiary.

All Designations and Revocations must be evidenced by resolutions of the Board of Directors of the Issuer, delivered to the Trustee certifying compliance with the preceding provisions.

### *Limitation on Dividend and Other Payment Restrictions Affecting Restricted Subsidiaries*

(a)   Except as provided in paragraph (b) below, the Issuer will not, and will not cause or permit any of its Restricted Subsidiaries to, directly or indirectly, create or otherwise cause or permit to exist or become effective any encumbrance or restriction on the ability of any Restricted Subsidiary to:

(1)   pay dividends or make any other distributions on or in respect of its Capital Stock to the Issuer or any other Restricted Subsidiary or pay any Indebtedness owed to the Issuer or any other Restricted Subsidiary;

(2)   make loans or advances to, or Guarantee any Indebtedness or other obligations of, or make any Investment in, the Issuer or any other Restricted Subsidiary; or

(3)   transfer any of its property or assets to the Issuer or any other Restricted Subsidiary.

(b)   Paragraph (a) above will not apply to encumbrances or restrictions existing under or by reason of:

(1)   applicable law, rule, regulation or order;

(2)   the Indenture, the notes and the Note Guarantees;

(3)   the terms of any Indebtedness or other agreement outstanding on the Issue Date, and any amendment, modification, restatement, renewal, restructuring, replacement or Refinancing thereof; *provided* that any such amendment, modification, restatement, renewal, restructuring, replacement or Refinancing is not materially more restrictive, taken as a whole, with respect to such encumbrances or restrictions than those in existence on the Issue Date;

(4)   customary non-assignment provisions of any contract and customary provisions restricting assignment or subletting in any lease governing a leasehold interest of any Restricted Subsidiary, or any customary restriction on the ability of a Restricted Subsidiary to dividend, distribute or

107

otherwise transfer any asset which secures Indebtedness secured by a Lien, in each case permitted to be Incurred under the Indenture;

(5) (x) any existing instrument governing Acquired Indebtedness not Incurred in connection with, or in anticipation or contemplation of, the relevant acquisition, merger or consolidation, or (y) existing under any other existing agreement or instrument binding upon a Person acquired or its assets or properties which encumbrance or restriction is not applicable to any Person, or the properties or assets of any Person, other than the Person or the properties or assets of the Person so acquired;

(6) restrictions with respect to a Restricted Subsidiary of the Issuer imposed pursuant to a binding agreement which has been entered into for the sale or disposition of Capital Stock or assets of such Restricted Subsidiary; *provided* that such restrictions apply solely to the Capital Stock or assets of such Restricted Subsidiary being sold;

(7) customary restrictions imposed on the transfer of copyrighted or patented materials;

(8) an agreement governing Indebtedness of the Issuer or any Restricted Subsidiaries permitted to be Incurred subsequent to the date of the Indenture in accordance with the covenant set forth under "—*Limitation on Incurrence of Additional Indebtedness*"; *provided* that the provisions relating to such encumbrance or restriction contained in such agreement are not materially more restrictive than those contained in the Indebtedness or agreements referred to in clause (3);

(9) Purchase Money Indebtedness for property (including Capital Stock) acquired in the ordinary course of business and Capitalized Lease Obligations that impose restrictions on the property purchased or leased of the nature described in clause (3) of paragraph (a) above;

(10) Liens permitted to be incurred under the provisions of the covenant described below under the caption "—*Limitation on Liens*" that limit the right of the debtor to dispose of or otherwise transfer the assets subject to such Lien or securing such Indebtedness and any proceeds thereof;

(11) organizational documents, shareholders' agreements, joint venture agreements or similar documents of, or related to, Restricted Subsidiaries that are not Wholly Owned Subsidiaries and which have been entered into with the approval of the Issuer's Board of Directors.

### *Limitation on Liens*

The Issuer will not, and will not cause or permit any of its Restricted Subsidiaries to, directly or indirectly, Incur any Liens of any kind (except for Permitted Liens) against or upon any of their respective properties or assets (including without limitation Capital Stock of any Restricted Subsidiaries), whether owned on the Issue Date or acquired after the Issue Date, or any proceeds therefrom, to secure any Indebtedness unless contemporaneously therewith effective provision is made:

(1) in the case of the Issuer or any Restricted Subsidiary other than a Subsidiary Guarantor, to secure the notes and all other amounts due under the Indenture; and

(2) in the case of a Subsidiary Guarantor, to secure such Subsidiary Guarantor's Note Guarantee of the notes and all other amounts due under the Indenture;

 in each case, equally and ratably with such Indebtedness (or, in the event that such Indebtedness is subordinated in right of payment to the notes or such Note Guarantee, as the case may be, prior to such Indebtedness) with a Lien on the same properties and assets securing such Indebtedness for so long as such Indebtedness is secured by such Lien.

### *Limitation on Merger, Consolidation and Sale of Assets*

The Issuer will not, in a single transaction or series of related transactions, consolidate or merge with or into any Person (whether or not the Issuer is the surviving or continuing Person), or sell, assign, transfer, lease, convey or otherwise dispose of (or cause or permit any Restricted Subsidiary to sell, assign, transfer, lease, convey or otherwise dispose of) all or substantially all of the Issuer's properties and assets (determined on a consolidated basis for the Issuer and its Restricted Subsidiaries), to any Person unless:

(a) either:

(1) the Issuer (in the case of a consolidation or merger with or into any Person) shall be the surviving or continuing corporation; or

108

(2)    the Person (if other than the Issuer) formed by such consolidation or into which the Issuer is merged or the Person which acquires by sale, assignment, transfer, lease, conveyance or other disposition the properties and assets of the Issuer and of the Issuer's Restricted Subsidiaries substantially as an entirety (the "*Surviving Entity*"):

    (A)    shall be a corporation organized and validly existing under the laws of Mexico or the United States of America, any State thereof or the District of Columbia or any member state of the European Union, and

    (B)    shall expressly assume, by supplemental indenture (in form and substance satisfactory to the Trustee), executed and delivered to the Trustee, the due and punctual payment of the principal of, and premium, if any, and interest on all of the notes and the performance and observance of every covenant of the notes and the Indenture on the part of the Issuer to be performed or observed;

(b)    immediately after giving effect to such transaction and the assumption contemplated by clause (a)(2)(B) above (including giving effect on a pro forma basis to any Indebtedness, including any Acquired Indebtedness, Incurred or anticipated to be Incurred in connection with or in respect of such transaction), the Issuer or such Surviving Entity, as the case may be, will be able to Incur at least $1.00 of additional Indebtedness pursuant to paragraph (1) of "—*Limitation on Incurrence of Additional Indebtedness*";

(c)    immediately before and immediately after giving effect to such transaction and the assumption contemplated by clause (a)(2)(B) above (including, without limitation, giving effect on a pro forma basis to any Indebtedness, including any Acquired Indebtedness, Incurred or anticipated to be Incurred and any Lien granted in connection with or in respect of the transaction), no Default or Event of Default shall have occurred or be continuing;

(d)    each Subsidiary Guarantor (including Persons that become Subsidiary Guarantors as a result of the transaction) has confirmed by supplemental indenture that its Note Guarantee will apply for the Obligations of the Surviving Entity in respect of the Indenture and the notes;

(e)    if the Issuer is organized under Mexican law and merges with a corporation, or the Surviving Entity is, organized under the laws of the United States, any State thereof or the District of Columbia or any member state of the European Union or the Issuer is organized under the laws of the United States, any State thereof or the District of Columbia or any member state of the European Union and merges with a corporation, or the Surviving Entity is, organized under the laws of Mexico, the Issuer or the Surviving Entity will have delivered to the Trustee an Opinion of Counsel from each of (x) Mexico and (y) the United States or the applicable European Union member state, to the effect that, as applicable:

    (i)    the holders of the notes will not recognize income, gain or loss for United States or European Union, as applicable, or Mexican income tax purposes as a result of the transaction and will be taxed in the holder's home jurisdiction in the same manner and on the same amounts (assuming solely for this purpose that no Additional Amounts are required to be paid on the notes) and at the same time as would have been the case if the transaction had not occurred;

    (ii)    no other taxes on income, including capital gains, will be payable by holders of the notes under the laws of the United States or the European Union, as applicable, or Mexico relating to the acquisition, ownership or disposition of the notes, including the receipt of interest or principal thereon; *provided* that the holder does not use or hold, and is not deemed to use or hold the notes in carrying on a business in the United States or the European Union, as applicable, or Mexico; and

(f)    the Issuer or the Surviving Entity has delivered to the Trustee an Officers' Certificate and Opinions of Counsel from the relevant jurisdictions, each stating that the consolidation, merger, sale, assignment, transfer, lease, conveyance or other disposition and, if required in connection with such transaction, the supplemental indenture, comply with the applicable provisions of the Indenture and that all conditions precedent in the Indenture relating to the transaction have been satisfied.

For purposes of this covenant, the transfer (by lease, assignment, sale or otherwise, in a single transaction or series of transactions) of all or substantially all of the properties or assets of one or

109

more Restricted Subsidiaries of the Issuer, the Capital Stock of which constitutes all or substantially all of the properties and assets of the Issuer (determined on a consolidated basis for the Issuer and its Restricted Subsidiaries), will be deemed to be the transfer of all or substantially all of the properties and assets of the Issuer.

Upon any consolidation, combination or merger or any transfer of all or substantially all of the properties and assets of the Issuer and its Restricted Subsidiaries in accordance with this covenant, in which the Issuer is not the continuing corporation, the Surviving Entity formed by such consolidation or into which the Issuer is merged or to which such conveyance, lease or transfer is made will succeed to, and be substituted for, and may exercise every right and power of, the Issuer under the Indenture and the notes with the same effect as if such Surviving Entity had been named as such and the Issuer shall be released from its obligations under the notes and the Indenture. For the avoidance of doubt, compliance with this covenant will not affect the obligations of the Issuer (including a Surviving Entity, if applicable) under "—*Repurchase Upon a Change of Control*," if applicable.

Each Subsidiary Guarantor will not, and the Issuer will not cause or permit any Subsidiary Guarantor to, consolidate with or merge into, or sell or dispose of all or substantially all of its assets to, any Person (other than the Issuer) that is not a Subsidiary Guarantor unless such transaction is otherwise in compliance with the Indenture and:

(1)     such Person (if such Person is the surviving entity) assumes all of the obligations of such Subsidiary Guarantor in respect of its Note Guarantee by executing a supplemental indenture and providing the Trustee with an Officers' Certificate and Opinions of Counsel from the relevant jurisdictions, each stating that the consolidation, merger, sale, assignment, transfer, lease, conveyance or other disposition and the supplemental indenture comply with the applicable provisions of the Indenture and all conditions precedent in the Indenture relating to the transaction have been satisfied;

(2)     such Note Guarantee is to be released as provided under "—*Note Guarantees*"; or

(3)     such sale or other disposition of substantially all of such Subsidiary Guarantor's assets is made in accordance with "—*Limitation on Asset Sales and Sales of Subsidiary Stock*."

The provisions of this covenant will not apply to:

(1)     any transfer of the properties or assets of a Restricted Subsidiary to the Issuer, a Subsidiary Guarantor or another Restricted Subsidiary;

(2)     any merger of a Restricted Subsidiary into the Issuer, a Subsidiary Guarantor or another Restricted Subsidiary; or

(3)     any merger of the Issuer into a Wholly Owned Subsidiary of the Issuer;

so long as, in each case the Indebtedness of the Issuer and its Restricted Subsidiaries taken as a whole is not increased thereby.

### *Limitation on Transactions with Affiliates*

(1)     The Issuer will not, and will not permit any of its Restricted Subsidiaries to, directly or indirectly, enter into any transaction or series of related transactions (including, without limitation, the purchase, sale, lease or exchange of any property or the rendering of any service) with, or for the benefit of, any of its Affiliates (each an "*Affiliate Transaction*"), unless:

(a)     the terms of such Affiliate Transaction are no less favorable than those that could reasonably be expected to be obtained in a comparable transaction at such time on an arm's-length basis from a Person that is not an Affiliate of the Issuer;

(b)     in the event that such Affiliate Transaction involves aggregate payments, or transfers of property or services with Fair Market Value in excess of $7.5 million, the terms of such Affiliate Transaction will be approved by a majority of the members of the Board of Directors of the Issuer (including a majority of the disinterested members thereof), the approval to be evidenced by a Board Resolution stating that the Board of Directors has determined that such transaction complies with the preceding provisions; and

(c)     in the event that such Affiliate Transaction involves aggregate payments, or transfers of property or services with Fair Market Value in excess of $15.0 million, the Issuer will, prior to the consummation thereof, obtain a favorable opinion as to the fairness of such Affiliate Transaction to the Issuer and the relevant Restricted Subsidiary (if any) from a financial point of view from an

110

Independent Financial Advisor and deliver the same to the Trustee, upon which the Trustee shall be entitled to rely without liability to any Person.

(2)      Paragraph (1) above will not apply to:

(a)      Affiliate Transactions with or among the Issuer and any Restricted Subsidiary or between or among Restricted Subsidiaries;

(b)      reasonable fees and compensation paid to, and any indemnity provided on behalf of, officers, directors, employees, consultants or agents of the Issuer or any Restricted Subsidiary as determined in good faith by the Issuer's Board of Directors;

(c)      Affiliate Transactions undertaken pursuant to any contractual obligations or rights in existence on the Issue Date and any amendment, modification, extension or replacement of such agreement (so long as such amendment, modification, extension or replacement is not materially more disadvantageous to the holders of notes, taken as a whole, than the original agreement as in effect on the Issue Date);

(d)      any Restricted Payments made in compliance with "—*Limitation on Restricted Payments*" or any Permitted Investments;

(e)      loans and advances to officers, directors and employees of the Issuer or any Restricted Subsidiary for travel, entertainment, moving and other relocation expenses, in each case made in the ordinary course of business and not exceeding $3.0 million outstanding at any one time;

(f)      any issuance of Capital Stock (other than Disqualified Capital Stock) of the Issuer to Affiliates of the Issuer or to any director, officer, employee or consultant of the Issuer or any Restricted Subsidiary, and the granting and performance of registration rights;

(g)      the sale of advertising by the Issuer or any Restricted Subsidiary on terms that are no less favorable than those that could reasonably be expected to be obtained in a comparable transaction at such time on an arm's-length basis from a Person that is not an Affiliate of the Issuer; and

(h)      any employment agreement, employee benefit plan, officer or director indemnification agreement or any similar agreement entered into by the Issuer or any of its Restricted Subsidiaries in the ordinary course of business or consistent with past practice and payments pursuant thereto.

### *Conduct of Business*

The Issuer and its Restricted Subsidiaries will not engage in any business other than a Permitted Business.

### *Reports to Holders*

So long as any notes are outstanding, the Issuer will furnish to the Trustee:

(a)      within 120 days following the end of each of the Issuer's fiscal years, an annual report containing an "Operating and Financial Review" section with scope and content substantially similar to the corresponding section of this Offering Circular (after taking into consideration any changes to the business and operations of the Issuer after the Issue Date) for the periods covered by the financial information to be delivered pursuant to this clause (a), consolidated audited income statements, statements of shareholders equity, balance sheets and cash flow statements and the related notes thereto for the Issuer for the two most recent fiscal years in accordance with GAAP, which need not, however, contain any reconciliation to U.S. GAAP or otherwise comply with Regulation S-X of the U.S. Securities and Exchange Commission, together with an audit report on such financial statements by the Issuer's independent auditors (in each case, presented in the English language);

(b)      within 60 days following the end of the first three fiscal quarters in each of the Issuer's fiscal years, quarterly reports containing unaudited consolidated balance sheets, statements of income, statements of shareholders equity and statements of cash flows and the related notes thereto for the Issuer and the Subsidiaries on a consolidated basis, in each case for the quarterly period then ended and the corresponding quarterly period in the prior fiscal year and prepared in accordance with GAAP, which need not, however, contain any reconciliation to U.S. GAAP or otherwise comply with Regulation S-X of the U.S. Securities and Exchange Commission, together with an "Operating and Financial Review" section with scope and content substantially similar to the corresponding section of this Offering Circular (after taking into consideration any changes to the business and operations of the Issuer after the Issue Date) for the periods covered by the financial

111

information to be delivered pursuant to this clause (b), (in each case, presented in the English language); and

(c)     within 20 days following such filing, copies (including English translations thereof), if applicable, of public filings which reasonably would be material to the holders of notes made with any securities exchange or securities regulatory agency or authority, *provided*, that the Issuer will not be required to so provide copies or English translations of (a) public filings which may be obtained from the U.S. Securities and Exchange Commission (the "SEC") via the EDGAR system or its success or (b) except to the extent required by paragraphs (a) and (b), annual or quarterly and other reports or other documents filed (in Spanish) with the CNBV and the Mexican Stock Exchange (*Bolsa Mexicana de Valores*).

In addition, each of the reports provided pursuant to the prior sentence shall include the Consolidated Leverage Ratio for such period, together with an appropriate footnote or other disclosure providing in reasonable detail the calculation of such ratio.

None of the information provided pursuant to the preceding paragraph shall be required to comply with Regulation S-K as promulgated by the SEC.

Delivery of such reports, information and documents to the Trustee shall be for informational purposes only and the Trustee's receipt of such shall not constitute actual or constructive notice of any information contained therein or determinable from information contained therein, including the Issuer's compliance with any of the covenants contained in the Indenture (as to which the Trustee will be entitled to conclusively rely upon an officer's certificate).

### Listing

Approval-in-principle has been received for the listing and quotation of the notes on the Official List of the SGX-ST. The SGX-ST assumes no responsibility for the correctness of any of the statements made or opinions expressed or reports contained in this offering circular. Approval-in-principle from and admission of the notes to the Official List of the SGX-ST and quotation of the notes on the SGX-ST are not to be taken as an indication of the merits of the offering, the Issuer, and its subsidiaries (including the Subsidiary Guarantors), their respective associated companies, their respective joint venture companies or the notes. The notes will be in denominations of $200,000 each or integral multiples of $1,000 in excess thereof. The notes will be traded on the SGX-ST in a minimum board lot size of $200,000 for so long as any of the notes are listed on the SGX-ST and the rules of the SGX-ST so require. The SGX-ST is not a regulated market for the purposes of Directive 2004/39/EC.

So long as the notes are listed on the SGX-ST and the rules of the SGX-ST so require, we shall appoint and maintain a paying agent in Singapore, where such notes may be presented or surrendered for payment or redemption in the event that the global notes representing such notes are exchanged for certificated notes. In addition, in the event that the global notes are exchanged for certificated notes, an announcement of such exchange will be made by, or on behalf of, the Issuer through the SGX-ST. Such announcement will include all material information with respect to the delivery of the definitive notes, including details of the paying agent in Singapore.

### Events of Default

The following are "Events of Default":

(1)     default in the payment when due of the principal of or premium, if any, on any notes, including the failure to make a required payment to purchase notes tendered or to redeem notes pursuant to an optional redemption, Change of Control Offer or an Asset Sale Offer;

(2)     default for 30 consecutive days or more in the payment when due of interest, or Additional Amounts, if any, on any notes;

(3)     the failure to perform or comply with any of the provisions described under "—*Certain Covenants—Limitation on Merger, Consolidation and Sale of Assets*" for 20 consecutive days or more following written notice of such failure (i) to the Issuer from the Trustee (at the direction of the requisite amount of holders) or (ii) to the Issuer and the Trustee from holders of at least 25.0% in aggregate principal amount of the outstanding notes;

(4)     the failure by the Issuer or any Restricted Subsidiary to comply with any other covenant or agreement contained in the Indenture or in the notes for 45 consecutive days or more after written notice to the Issuer from the Trustee or to the Issuer and the Trustee from holders of at least 25.0% in aggregate principal amount of the outstanding notes;

112

(5)     default by the Issuer or any Restricted Subsidiary under any Indebtedness which:

      (A)     is caused by a failure to pay principal of or premium, if any, or interest on such Indebtedness prior to the expiration of any applicable grace period and which failure shall not have been cured or waived; or

      (B)     results in the acceleration of such Indebtedness prior to its Stated Maturity;

      and in either case the principal or accreted amount of Indebtedness covered by subclause (A) or (B) at the relevant time, aggregates $25.0 million or more;

(6)     failure by the Issuer or any of its Restricted Subsidiaries to pay one or more final judgments not subject to appeal against any of them, aggregating $25.0 million or more, which judgment(s) are not paid, discharged or stayed for a period of 60 days or more and which are not covered by insurance or bonds;

(7)     the Issuer or any Restricted Subsidiary that is a Significant Subsidiary or any group of Restricted Subsidiaries that, taken together, would constitute a Significant Subsidiary pursuant to or within the meaning of any Bankruptcy Law (A) commences a voluntary case, (B) consents to the entry of an order for relief against it in an involuntary case, (C) consents to the appointment of a Custodian of it or for any substantial part of its property, or (D) makes a general assignment for the benefit of its creditors, or takes any comparable action under any comparable laws relating to insolvency;

(8)     a court of competent jurisdiction enters an order or decree under any Bankruptcy Law that (A) is for relief against the Issuer or any Restricted Subsidiary that is a Significant Subsidiary or any group of Restricted Subsidiaries that, taken together, would constitute a Significant Subsidiary in an involuntary case, (B) appoints a Custodian of the Issuer or any Restricted Subsidiary that is a Significant Subsidiary or any group of Restricted Subsidiaries that, taken together, would constitute a Significant Subsidiary or for any substantial part of its property, or (C) orders the winding up or liquidation of the Issuer or any Restricted Subsidiary that is a Significant Subsidiary or any group of Restricted Subsidiaries that, taken together, would constitute a Significant Subsidiary, or any similar relief is granted under any comparable laws and the order or decree remains unstayed and in effect for 60 consecutive days; or

(9)     except as permitted by the Indenture, any Note Guarantee is held to be unenforceable or invalid in a judicial proceeding or ceases for any reason to be in full force and effect or any Subsidiary Guarantor, or any Person acting on behalf of any Subsidiary Guarantor, denies or disaffirms such Subsidiary Guarantor's obligations under its Note Guarantee.

If an Event of Default (other than an Event of Default specified in clauses (7) or (8) above with respect to the Issuer) shall occur and be continuing, the Trustee or holders of at least 25.0% in principal amount of outstanding notes may declare the unpaid principal of (and premium, if any) and accrued and unpaid interest on all the notes to be immediately due and payable by notice in writing to the Issuer and the Trustee specifying the Event of Default and that it is a "notice of acceleration." If an Event of Default specified in clauses (7) or (8) above occurs with respect to the Issuer, then the unpaid principal of (and premium, if any) and accrued and unpaid interest on all the notes will become immediately due and payable without any declaration or other act on the part of the Trustee or any holder of notes.

The Trustee is not to be charged with knowledge of any Default or Event of Default or knowledge of any cure of any Default or Event of Default unless either (i) an authorized officer of the Trustee with direct responsibility for administration of the Indenture has actual knowledge of such Default or Event of Default or (ii) written notice of such Default or Event of Default has been given to the Trustee by the Issuer or any holder of notes.

At any time after a declaration of acceleration with respect to the notes as described in the preceding paragraph, holders of a majority in principal amount of the outstanding notes may rescind and cancel such declaration and its consequences:

(1)     if the rescission would not conflict with any judgment or decree;

(2)     if all existing Events of Default have been cured or waived, except nonpayment of principal, interest or premium that has become due solely because of the acceleration;

(3)     to the extent the payment of such interest is lawful, interest on overdue installments of interest and overdue principal, which has become due otherwise than by such declaration of acceleration, has been paid; and

113

(4) if the Issuer has paid the Trustee its reasonable compensation and reimbursed the Trustee for its reasonable expenses, disbursements and advances.

No rescission will affect any subsequent Default or impair any rights relating thereto.  Holders of a majority in principal amount of the notes may waive any existing Default or Event of Default under the Indenture, and its consequences, except a default in the payment of the principal of, premium, if any, or interest on any notes.

The Trustee is under no obligation to exercise any of its rights or powers under the Indenture at the request, order or direction of any of the holders of notes, unless such holders have offered to the Trustee indemnity reasonably satisfactory to it.  Subject to all provisions of the Indenture and applicable law, holders of a majority in aggregate principal amount of the then outstanding notes have the right to direct the time, method and place of conducting any proceeding for any remedy available to the Trustee or exercising any trust or power conferred on the Trustee.

No holder of any notes will have any right to institute any proceeding with respect to the Indenture or for any remedy thereunder, unless:

(1) such holder gives to the Trustee written notice of a continuing Event of Default;

(2) holders of at least 25.0% in principal amount of the then outstanding notes make a written request to pursue the remedy;

(3) such holders of notes provide to the Trustee satisfactory indemnity;

(4) the Trustee does not comply within 60 days; and

(5) during such 60 day period holders of a majority in principal amount of the outstanding notes do not give the Trustee a written direction which is inconsistent with the request;

*provided* that a holder of a note may institute suit for enforcement of payment of the principal of and premium, if any, or interest on such note on or after the respective due dates expressed in such note.

The Issuer is required to deliver to the Trustee written notice of any event which would constitute certain Defaults or Events of Default, their status and what action the Issuer is taking or proposes to take in respect thereof.  In addition, the Issuer and each Subsidiary Guarantor is required to deliver to the Trustee, within 120 days after the end of each fiscal year of the Issuer, an Officers' Certificate certifying compliance with all of their respective obligations under the Indenture and stating whether or not any Default or Event of Default has occurred during the previous fiscal year.

The Indenture will provide that if a Default or Event of Default occurs, is continuing and is actually known to a responsible officer of the Trustee, the Trustee must give to each holder of notes notice of the Default or Event of Default within 90 days after the Trustee has knowledge thereof.  Except in the case of a Default or Event of Default in the payment of principal of, premium, if any, or interest on any note, the Trustee may withhold notice if and so long as a responsible trust officer in good faith determines that withholding notice is in the interests of the holders of notes.

**Legal Defeasance and Covenant Defeasance**

The Issuer may, at its option and at any time, elect to have its obligations discharged with respect to the outstanding notes and all obligations of the Subsidiary Guarantors under the Note Guarantees discharged ("*Legal Defeasance*").  Such Legal Defeasance means that the Issuer will be deemed to have paid and discharged the entire indebtedness represented by the outstanding notes and Note Guarantees after the deposit specified in clause (1) of the second following paragraph, except for:

(1) the rights of holders of notes to receive payments, solely from the trust described below, in respect of the principal of, premium, if any, and interest on the notes when such payments are due;

(2) the Issuer's obligations with respect to the notes concerning issuing temporary notes, registration of notes, mutilated, destroyed, lost or stolen notes and the maintenance of an office or agency for payments;

(3) the rights, powers, trust, duties and immunities of the Trustee and the Issuer's and the Subsidiary Guarantors' obligations in connection therewith; and

(4) the Legal Defeasance provisions of the Indenture.

114

In addition, the Issuer may, at its option and at any time, elect to have its obligations and the obligations of the Subsidiary Guarantors released with respect to most of the covenants (including, without limitation, obligations to make Change of Control Offers, Asset Sale Offers and certain of the obligations described under "—*Certain Covenants*") that are described in the Indenture ("*Covenant Defeasance*") and thereafter any omission to comply with such obligations will not constitute a Default or Event of Default with respect to the notes or the Note Guarantees.  In the event Covenant Defeasance occurs, certain events (not including non-payment, bankruptcy, receivership, reorganization and insolvency events) described under "—*Events of Default*" will no longer constitute an Event of Default with respect to the notes.

In order to exercise either Legal Defeasance or Covenant Defeasance:

(1)            the Issuer must irrevocably deposit with the Trustee, in trust, for the benefit of the holders of notes cash in U.S.  dollars, certain direct non-callable obligations of, or guaranteed by, the United States, or a combination thereof, in such amounts as will be sufficient without reinvestment, in the opinion of a nationally recognized investment bank, appraisal firm or firm of independent public accountants, to pay the principal of, premium, if any, and interest (including Additional Amounts) on the notes on the stated date for payment thereof or on the applicable redemption date, as the case may be;

(2)            in the case of Legal Defeasance, the Issuer has delivered to the Trustee an Opinion of Counsel from counsel in the United States reasonably acceptable to the Trustee (subject to customary exceptions and exclusions) and independent of the Issuer to the effect that:

(a)            the Issuer has received from, or there has been published by, the Internal Revenue Service a ruling; or

(b)            since the Issue Date, there has been a change in the applicable U.S.  federal income tax law,

and in either case, based thereon, such Opinion of Counsel shall state that, the holders of notes will not recognize income, gain or loss for U.S.  federal income tax purposes as a result of such Legal Defeasance and will be subject to U.S.  federal income tax on the same amounts, in the same manner and at the same times as would have been the case if such Legal Defeasance had not occurred;

(3)            in the case of Covenant Defeasance, the Issuer has delivered to the Trustee an Opinion of Counsel in the United States reasonably acceptable to the Trustee (subject to customary exceptions and exclusions) to the effect that the holders of notes will not recognize income, gain or loss for U.S.  federal income tax purposes as a result of such Covenant Defeasance and will be subject to U.S. federal income tax on the same amounts, in the same manner and at the same times as would have been the case if such Covenant Defeasance had not occurred;

(4)            in the case of Legal Defeasance or Covenant Defeasance, the Issuer has delivered to the Trustee:

(a)            an Opinion of Counsel from counsel in Mexico reasonably acceptable to the Trustee (subject to customary exceptions and exclusions) and independent of the Issuer to the effect that, based upon Mexican law then in effect, holders of notes will not recognize income, gain or loss for Mexican tax purposes, including withholding tax except for withholding tax then payable on interest payments due, as a result of Legal Defeasance or Covenant Defeasance, as the case may be, and will be subject to Mexican taxes on the same amounts and in the same manner and at the same time as would have been the case if such Legal Defeasance or Covenant Defeasance, as the case may be, had not occurred, or

(b)            a ruling directed to the Trustee received from the tax authorities of Mexico to the same effect as the Opinion of Counsel described in clause (a) above;

(5)            no Default or Event of Default shall have occurred and be continuing on the date of the deposit pursuant to clause (1) of this paragraph (except any Default or Event of Default resulting from the failure to comply with "—*Certain Covenants—Limitation on Incurrence of Additional Indebtedness*" as a result of the borrowing of the funds required to effect such deposit);

(6)            the Trustee has received an officer's certificate stating that such Legal Defeasance or Covenant Defeasance shall not result in a breach or violation of, or constitute a default under the Indenture or any other material agreement or instrument to which the Issuer or any of its Subsidiaries is a party or by which the Issuer or any of its Subsidiaries is bound;

115

(7)        the Issuer has delivered to the Trustee an Officers' Certificate stating that the deposit was not made by the Issuer with the intent of preferring holders of notes over any other creditors of the Issuer or any Subsidiary of the Issuer or with the intent of defeating, hindering, delaying or defrauding any other creditors of the Issuer or others;

(8)        the Issuer has delivered to the Trustee an Officers' Certificate and an Opinion of Counsel reasonably acceptable to the Trustee and independent of the Issuer, each stating that all conditions precedent provided for or relating to the Legal Defeasance or the Covenant Defeasance have been complied with (subject to customary exceptions and exclusions); and

(9)        the Issuer has delivered to the Trustee an Opinion of Counsel reasonably acceptable to the Trustee and independent of the Issuer to the effect that the trust funds will not be subject to the effect of any applicable bankruptcy, insolvency, reorganization or similar laws affecting creditors' rights generally (subject to customary exceptions and exclusions).

**Satisfaction and Discharge**

The Indenture will be discharged and will cease to be of further effect (except as to surviving rights or registration of transfer or exchange of the notes, as expressly provided for in the Indenture) as to all outstanding notes when:

(1)    either:

    (a)    all the notes theretofore authenticated and delivered (except lost, stolen or destroyed notes which have been replaced or paid and notes for whose payment money has theretofore been deposited in trust or segregated and held in trust by the Issuer and thereafter repaid to the Issuer or discharged from such trust) have been delivered to the Trustee for cancellation; or

    (b)    all notes not theretofore delivered to the Trustee for cancellation have become due and payable by reason of the making of a notice of redemption or otherwise, or will become due and payable within one year, including as a result of a redemption notice given or to be properly given pursuant to the Indenture, and the Issuer has irrevocably deposited or caused to be deposited with the Trustee funds or certain direct, non-callable obligations of, or guaranteed by, the United States sufficient without reinvestment to pay and discharge the entire Indebtedness on the notes not theretofore delivered to the Trustee for cancellation, for principal of, premium, if any, and interest on the notes to the date of deposit, together with irrevocable instructions from the Issuer directing the Trustee to apply such funds to the payment;

(2)    the Issuer has paid all other sums payable under the Indenture and the notes by it; and

(3)    the Issuer has delivered to the Trustee an Officers' Certificate and Opinion of Counsel stating that all conditions precedent under the Indenture relating to the satisfaction and discharge of the Indenture have been complied with.

**Modification of the Indenture**

From time to time, the Issuer, the Subsidiary Guarantors (except that no existing Subsidiary Guarantor need agree to an amendment or execute a supplemental indenture to add Subsidiary Guarantors with respect to the notes) and the Trustee, without the consent of the holders, may amend or supplement the Indenture, the notes or the Note Guarantees for certain specified purposes, including:

(1) to cure any ambiguities, defects or inconsistencies in the Indenture or the notes;

(2) to provide for uncertificated notes in addition to or in place of certificated notes;

(3) to provide for the assumption of the Issuer's or a Subsidiary Guarantor's obligations in the case of a merger or consolidation or sale of all or substantially all of the Issuer's or such Subsidiary Guarantor's assets, as applicable, to the extent permitted under the Indenture;

(4) to make any change that would provide any additional rights or benefits to the holders of the notes or that does not adversely affect the legal rights under the Indenture of any such holder;

(5) to conform the text of the Indenture, the Note Guarantees or the notes to any provision of this "Description of Notes" to the extent that such provision in this "Description of Notes" was intended to be a verbatim recitation of a provision of the Indenture, the Note Guarantees or the notes;

116

(6) to allow any Subsidiary Guarantor to execute a supplemental indenture and/or a Note Guarantee with respect to the notes and to release Subsidiary Guarantors from the Note Guarantee in accordance with the terms of the Indenture;

(7) to comply with the requirements of any applicable securities depositary;

(8) to provide for a successor Trustee in accordance with the terms of the Indenture;

(9) to otherwise comply with any requirement of the Indenture;

(10) to issue additional notes; and

(11) to make any other changes which do not adversely affect the rights of any of the holders of the notes in any material respect.

The Trustee will be entitled to rely on such evidence as it deems appropriate, including on an Opinion of Counsel and Officers' Certificate, and shall have no liability whatsoever in reliance upon the foregoing.

Other modifications and amendments of the Indenture or the notes may be made with the consent of the holders of a majority in principal amount of the then outstanding notes issued under the Indenture, except that, without the consent of each holder affected thereby, no amendment may (with respect to any notes held by a non-consenting holder):

(1)     reduce the principal amount of notes whose holders must consent to an amendment, supplement or waiver;

(2)     reduce the rate of, or change or have the effect of changing the time for payment of, interest, including defaulted interest, on any notes;

(3)     reduce the principal of, or change or have the effect of changing the fixed maturity of, any notes, or change the date on which any notes may be subject to redemption, or reduce the redemption price therefor;

(4)     make any notes payable in money other than that stated in the notes;

(5)     make any change in provisions of the Indenture entitling each holder of notes to receive payment of principal of, premium, if any, and interest on such note on or after the due date thereof or to bring suit to enforce such payment, or permitting holders of a majority in principal amount of notes to waive Defaults or Events of Default;

(6)     amend, change or modify in any material respect the obligation of the Issuer to make and consummate a Change of Control Offer in respect of a Change of Control that has occurred or make and consummate an Asset Sale Offer with respect to any Asset Sale that has been consummated;

(7)     eliminate or modify in any manner a Subsidiary Guarantor's obligations with respect to its Note Guarantee which adversely affects holders of notes in any material respect, except as contemplated in the Indenture or Note Guarantee;

(8)     make any change in the provisions of the Indenture described under "—*Additional Amounts*" that adversely affects the rights of any holder or amends the terms of the notes in a way that would result in a loss of exemption from taxes; and

(9)     make any change to the provisions of the Indenture or the notes that adversely affect the ranking of the notes.

117

**Governing Law; Jurisdiction; Waiver of Stay, Extension and Usury Laws**

The Indenture and the notes will be governed by and construed in accordance with the law of the State of New York.  Each of the parties to the Indenture consents to the exclusive jurisdiction of any court of the State of New York or any United States court sitting, in each case, in the Borough of Manhattan, The City of New York, New York, United States of America, and any appellate court from any court thereof.  Each of the parties to the Indenture agrees that final judgment in any suit, action or proceeding brought in such courts shall be conclusive and binding upon such party and may be enforced in any court to the jurisdiction of which such party is subject by a suit upon such judgment.

Each of the parties to the Indenture waives, to the fullest extent permitted by law, any objection to any suit, action or proceeding that may be brought in connection with the Indenture, the notes or any Note Guarantee in such courts on the grounds of venue, any immunity from the jurisdiction of such courts over any suit, action or proceeding, its right to bring action in any other jurisdiction that may apply by virtue of its present or future domicile or for any other reason and any other right to which it may be entitled on account of place of residence or domicile, and further waives and agrees not to plead or claim in any such court that such suit, action or proceeding brought in any such court has been brought in an inconvenient forum.

Each of the Issuer and the Subsidiary Guarantors have appointed an agent for service in The City of New York of all writs, process and summonses in any suit, action or proceeding brought in connection with the Indenture, the notes or any Note Guarantee in such courts.  Each of the Issuer and the Subsidiary Guarantors agrees that such appointment shall be irrevocable so long as any of the notes remain outstanding or until the irrevocable appointment by each of the Issuer and the Subsidiary Guarantors of a successor in The City of New York as its authorized agent for such purpose and the acceptance of such appointment by such successor.  Each of the Issuer and the Subsidiary Guarantors further agrees to take any and all action, including the filing of any and all documents and instruments that may be necessary to continue such appointment in full force and effect as aforesaid.

The Issuer and each Subsidiary Guarantor covenants (to the fullest extent permitted by applicable law) that it will not at any time insist upon, plead, or in any manner whatsoever claim or take the benefit or advantage of, any stay or extension law or any usury law or other law that would prohibit or forgive the Issuer or such Subsidiary Guarantor from paying  all  or any portion  of the principal of or interest  on the notes as contemplated herein, wherever enacted, now or at any time hereafter in force, or which may affect the covenants or the performance of the notes. The Issuer and each Subsidiary Guarantor hereby expressly waives (to the fullest extent permitted by applicable law) all benefit or advantage of any such law, and covenants that it will suffer and permit the execution of every such power as though no such law had been enacted.

**The Trustee**

Except during the continuance of an Event of Default, the Trustee will perform only such duties as are specifically set forth in the Indenture.  During the existence of an Event of Default, the Trustee will exercise such rights and powers vested in it by the Indenture, and use the same degree of care and skill in its exercise as a prudent person would exercise or use under the circumstances in the conduct of his or her own affairs.   The Indenture contains certain limitations on the rights of the Trustee, should it become a creditor of the Issuer, to obtain payments of claims in certain cases or to realize on certain property received in respect of any such claim as security or otherwise.

**No Personal Liability**

An incorporator, director, officer, employee, stockholder or controlling person, as such, of the Issuer or any Subsidiary Guarantor shall not have any liability for any obligations of the Issuer or such Subsidiary Guarantor under the notes (including the Note Guarantees) or the Indenture or for any claims based on, in respect of or by reason of such obligations or their creation.  By accepting a note, each holder waives and releases all such parties from such liability.

**Currency Indemnity**

The Issuer and each Subsidiary Guarantor will pay all sums payable under the Indenture or the notes solely in U.S. dollars.  Any amount that you receive or recover in a currency other than U.S. dollars in respect of any sum expressed to be due to you from the Issuer or any Subsidiary Guarantor will only constitute a discharge to us to the extent of the U.S. dollar amount which you are able to purchase with the amount received or recovered in that other currency on the date of the receipt or recovery or, if it is not practicable to make the purchase on that date, on the first date on which you are able to do so.  If the U.S. dollar amount is less than the U.S. dollar amount expressed to be due to you under any note, to the extent permissible under applicable law, the Issuer and the Subsidiary Guarantors will jointly and severally indemnify you against any loss you sustain as a result.  In any event, the Issuer

118

and the Subsidiary Guarantors will jointly and severally indemnify you against the cost of making any purchase of U.S. dollars.  For the purposes of this paragraph, it will be sufficient for you to certify in a satisfactory manner that you would have suffered a loss had an actual purchase of U.S. dollars been made with the amount received in that other currency on the date of receipt or recovery or, if it was not practicable to make the purchase on that date, on the first date on which you were able to do so.  In addition, you will also be required to certify in a satisfactory manner the need for a change of the purchase date.

The indemnities described above:

- constitute a separate and independent obligation from the other obligations of the Issuer and the Subsidiary Guarantors;

- will give rise to a separate and independent cause of action;

- will apply irrespective of any indulgence granted by any holder of notes; and

- will continue in full force and effect despite any other judgment, order, claim or proof for a liquidated amount in respect of any sum due under any note.

**The Global Notes and the Clearing Systems**

Except as set forth below, the notes will be issued in registered, global form without interest coupons (the "global notes") in denominations of $200,000 or integral multiples of $1,000 in excess thereof. The global notes will be deposited with, or on behalf of, a common depositary for Euroclear and Clearstream and registered in the name of the common depositary or its nominee.  See "*Book-Entry; Delivery and Form*."

**Certain Definitions**

Set forth below is a summary of certain of the defined terms used in the Indenture.  Reference is made to the Indenture for a full definition of all such terms, as well as any other terms used herein for which no definition is provided.

"*Acquired Indebtedness*" means Indebtedness of a Person or any of its Subsidiaries existing at the time such Person becomes a Restricted Subsidiary or at the time it merges or consolidates with the Issuer or any of its Restricted Subsidiaries or is assumed in connection with the acquisition of assets from such Person.  Such Indebtedness will be deemed to have been Incurred at the time such Person becomes a Restricted Subsidiary or at the time it merges or consolidates with the Issuer or a Restricted Subsidiary or at the time such Indebtedness is assumed in connection with the acquisition of assets from such Person.

"*Additional Amounts*" has the meaning set forth under "—*Additional Amounts*" above.

"*additional notes*" has the meaning set forth under "—*Additional Notes*" above.

"*Affiliate*" means, with respect to any specified Person, any other Person who directly or indirectly through one or more intermediaries controls, or is controlled by, or is under common control with, such specified Person. The term "control" means the possession, directly or indirectly, of the power to direct or cause the direction of the management and policies of a Person, whether through the ownership of voting securities, by contract or otherwise. For purposes of this definition, the terms "controlling," "controlled by" and "under common control with" have correlative meanings.

"*Asset Sale*" means any direct or indirect sale, disposition, issuance, conveyance, transfer, lease (other than operating leases), assignment or other transfer, including a Sale and Leaseback Transaction (each, a "*disposition*") by the Issuer or any Restricted Subsidiary of:

(a) any Capital Stock of any Restricted Subsidiary (but not Capital Stock of the Issuer); or

(b) any property or assets (other than cash, Cash Equivalents or Capital Stock of the Issuer) of the Issuer or any Restricted Subsidiary.

Notwithstanding the preceding, the following items will not be deemed to be Asset Sales:

(1) the disposition of all or substantially all of the assets of the Issuer and its Restricted Subsidiaries as permitted under "—*Certain Covenants—Limitation on Merger, Consolidation and Sale of Assets*";

(2) sales, leases, conveyances or other dispositions of real or personal property, including, without limitation, exchanges or swaps of real estate, for the development of the Issuer's or any of its Restricted Subsidiaries' projects in the ordinary course of business;

119

(3)    for purposes of "*—Certain Covenants—Limitation on Asset Sales and Sales of Subsidiary Stock*" only, the making of Restricted Payments permitted under "*—Certain Covenants—Limitation on Restricted Payments*" or any Permitted Investment;

(4)    a disposition to the Issuer or a Restricted Subsidiary, including a Person that is or will become a Restricted Subsidiary immediately after the disposition;

(5)    any single transaction or series of related transactions that involves assets or Capital Stock of the Issuer or a Restricted Subsidiary having a Fair Market Value of less than $10.0 million;

(6)    a transfer of assets between or among the Issuer and any of its Restricted Subsidiaries;

(7)    an issuance or sale of Capital Stock by a Restricted Subsidiary of the Issuer to the Issuer or any of its Restricted Subsidiaries;

(8)    any sale or other disposition of damaged, worn-out, obsolete or no longer useful assets or properties in the ordinary course of business;

(9)    any sale of assets received by the Issuer or any of its Restricted Subsidiaries upon the foreclosure on a Lien;

(10)    the good faith surrender or waiver of contract rights, tort claims or statutory rights in connection with a settlement; and

(11)    sales or other dispositions of inventory, advertising time (including barter transactions), receivables and current assets in the ordinary course of business.

"*Asset Sale Offer*" has the meaning set forth under "*—Certain Covenants—Limitation on Asset Sales and Sales of Subsidiary Stock.*"

"*Average Quarterly Balance*" means, with respect to any Indebtedness incurred by the Issuer or its Restricted Subsidiaries under a revolving facility or line of credit, the quotient of (x) the sum of each Individual Quarterly Balance for each fiscal quarter ended on or prior to such date of determination and included in the Reference Period divided by (y) 4.

"*Bankruptcy Law*" means any bankruptcy, *concurso mercantil*, insolvency or other similar laws now or hereafter in effect.

"*Board of Directors*" means, as to any Person, the board of directors, management committee, sole administrator or similar governing body of such Person or any duly authorized committee thereof.

"*Board Resolution*" means, with respect to any Person, a copy of a resolution certified by the Secretary or an Assistant Secretary of such Person to have been duly adopted by the Board of Directors of such Person and to be in full force and effect on the date of such certification, and delivered to the Trustee.

"*Business Day*" means a day other than a Saturday, Sunday or other day on which commercial banking institutions are authorized or required by law to close in New York City, Mexico or London.

"*Capitalized Lease Obligations*" means, as to any Person, the obligations of such Person under a lease that are required to be classified and accounted for as capital lease obligations under GAAP. For purposes of this definition, the amount of such obligations at any date will be the capitalized amount of such obligations at such date, determined in accordance with GAAP.

"*Capital Stock*" means:

(1)    with respect to any Person that is a corporation, any and all shares, interests, participations or other equivalents (however designated and whether or not voting) of corporate stock, including each class of Common Stock and Preferred Stock of such Person;

(2)    with respect to any Person that is not a corporation, any and all partnership or other equity or ownership interests of such Person; and

(3)    any warrants, rights or options to purchase any of the instruments or interests referred to in clause (1) or (2) above.

"*CASA*" means Comunicaciones Avanzadas, S.A. de C.V.

"*Cash Equivalents*" means:

(1)   marketable direct obligations issued by, or unconditionally guaranteed by, the United States government or issued by any agency thereof and backed by the full faith and credit of the United States, in each case maturing within one year from the date of acquisition thereof;

(2)   *Certificados de la Tesoreria de la Federacion (Cetes) or Bonos de Desarrollo del Gobierno Federal (Bondes)*, in each case, issued by the government of Mexico and maturing not later than one year after the acquisition thereof;

(3)   marketable direct obligations issued by any state of the United States of America or any political subdivision of any such state or any public instrumentality thereof maturing within one year from the date of acquisition thereof and, at the time of acquisition, having one of the two highest ratings obtainable from either Moody's, S&P or Fitch or any successor thereto;

(4)   commercial paper maturing no more than one year from the date of creation thereof and at the time of acquisition, having a rating of at least F-1 from Fitch, at least P-1 from Moody's, or at least A-1 from S&P;

(5)   demand deposits, certificates of deposit, time deposits or bankers' acceptances maturing within one year from the date of acquisition thereof issued by (a) any bank organized under the laws of the United States of America or any state thereof or the District of Columbia, (b) any U.S. branch of a non-U.S. bank having at the date of acquisition thereof combined capital and surplus of not less than $500 million, (c) Nacional Financiera S.N.C., Banco Nacional de Comercio Exterior, S.N.C., Banco Nacional de Obras y Servicios Públicos, S.N.C. or Banco Azteca, S.A., Institución de Banca Múltiple or (d) in the case of Mexican peso deposits, Banco Azteca, S.A., Institución de Banca Múltiple or any of the five top-rated banks (as evaluated by any Rating Agency) organized under the laws of Mexico;

(6)   repurchase obligations with a term of not more than seven days for underlying securities of the types described in clause (1) above entered into with any bank meeting the qualifications specified in clause (5) above; and

(7)   investments in money market funds which invest substantially all of their assets in securities of the types described in clauses (1) through (6) above.

"*Change of Control*" means the occurrence of one or more of the following events:

(1)   any Person or Group other than the Permitted Holders is or becomes the beneficial owner (as defined below), directly or indirectly, in the aggregate of more than 50% of the total voting power of the Voting Stock of the Issuer (including a Surviving Entity, if applicable);

(2)   during any period of two consecutive years, individuals who at the beginning of such period constituted the Board of Directors of the Issuer, together with any new directors whose election by such Board of Directors or whose nomination for election by the shareholders of the Issuer was approved by a vote of a majority of the directors of the Issuer then still in office who were either directors at the beginning of such period or whose election or nomination for election was previously so approved, cease for any reason to constitute a majority of the Board of Directors of the Issuer then in office;

(2)   the Issuer consolidates with, or merges with or into, another Person, or the Issuer sells, conveys, assigns, transfers, leases or otherwise disposes of all or substantially all of the assets of the Issuer, determined on a consolidated basis, to any Person, other than a transaction where the Person or Persons that, immediately prior to such transaction "beneficially owned" the outstanding Voting Stock of the Issuer are, by virtue of such prior ownership, or Permitted Holders are, the "beneficial owners" in the aggregate of a majority of the total voting power of the then outstanding Voting Stock of the surviving or transferee person (or if such surviving or transferee Person is a direct or indirect Wholly Owned Subsidiary of another Person, such Person who is the ultimate parent entity), in each case whether or not such transaction is otherwise in compliance with the Indenture; or

(3)   the approval by the holders of Capital Stock of the Issuer of any plan or proposal for the liquidation or dissolution of the Issuer, whether or not otherwise in compliance with the provisions of the Indenture.

For purposes of this definition:

121

(a) "beneficial owner" will have the meaning specified in Rules 13d-3 and 13d-5 under the Exchange Act, except that any Person or Group will be deemed to have "beneficial ownership" of all securities that such Person or Group has the right to acquire, whether such right is exercisable immediately, only after the passage of time or, except in the case of the Permitted Holders, upon the occurrence of a subsequent condition;

(b) "Person" and "Group" will have the meanings for "person" and "group" as used in Sections 13(d) and 14(d) of the U.S. Securities Exchange Act of 1934, as amended; and

(c) the Permitted Holders or any other Person or Group will be deemed to beneficially own any Voting Stock of a Person held by any other Person (the "*parent entity*") so long as the Permitted Holders or such other Person or Group, as the case may be, beneficially own, directly or indirectly, in the aggregate at least 50% of the voting power of the Voting Stock of the parent entity and no other Person or Group beneficially owns an equal or greater amount of the Voting Stock of the parent entity.

"*Change of Control Payment*" has the meaning set forth under "—*Repurchase Upon a Change of Control.*"

"*Change of Control Payment Date*" has the meaning set forth under "—*Repurchase Upon a Change of Control.*"

"*CNBV*" means the *Comision Nacional Bancaria y de Valores*, the Mexican National Banking and Securities Commission.

"*Commodity Agreement*" means any commodity or raw material futures contract, commodity or raw materials option, or any other agreement designed to protect against or manage exposure to fluctuations in commodity or raw material prices.

"*Common Stock*" of any Person means any and all shares, interests or other participations in, and other equivalents (however designated and whether voting or non-voting) of such Person's common equity interests, whether outstanding on the Issue Date or issued after the Issue Date, and includes, without limitation, all series and classes of such common equity interests.

"*Consolidated EBITDA*" means, for any Person for any period, Consolidated Net Income for such Person for such period, plus the following, without duplication, to the extent deducted or added in calculating such Consolidated Net Income:

(1) Consolidated Income Tax Expense for such Person for such period;

(2) Consolidated Interest Expense for such Person for such period;

(3) Consolidated Non-cash Charges for such Person for such period; and

(4) any income or loss from discontinued operations,

in each case as shown on such Person as set forth in the most recent financial statements of such Person, prepared in accordance with GAAP.

"*Consolidated Income Tax Expense*" means, with respect to any Person for any period, the provision for federal, state, local and non-U.S. income taxes, and any applicable statutorily mandated employee profit sharing tax or similar payments, payable by such Person and its Subsidiaries (Restricted Subsidiaries in the case of the Issuer) for such period as determined on a consolidated basis in accordance with GAAP.

"*Consolidated Interest Expense*" means, for any Person for any period, the sum of, without duplication determined on a consolidated basis in accordance with GAAP:

(1) the aggregate of cash and non-cash interest expense of such Person and its Subsidiaries (Restricted Subsidiaries in the case of the Issuer) for such period determined on a consolidated basis in accordance with GAAP; and

(2) the interest component of Capitalized Lease Obligations paid, accrued and/or scheduled to be paid or accrued by such Person or its Subsidiaries (Restricted Subsidiaries in the case of the Issuer) during such period.

"*Consolidated Leverage Ratio*" means, as of any date of determination, the ratio of (1) Consolidated Total Indebtedness at the time of determination to (2) the Issuer's and the Restricted Subsidiaries' Consolidated EBITDA for the most recently ended four full fiscal quarters for which financial statements are

122

available immediately preceding the date on which such event for which such calculation is being made shall occur; *provided* that:

(1)     if the Issuer or any Restricted Subsidiary has Incurred, repaid, repurchased, redeemed, retired, defeased or otherwise discharged any Indebtedness since the beginning of such period that remains outstanding on such date of determination or if the transaction giving rise to the need to calculate the Consolidated Leverage Ratio involves an Incurrence, repayment, repurchase, redemption, retirement, defeasement or other discharge of Indebtedness, Consolidated EBITDA, Consolidated Interest Expense and Indebtedness for such period will be calculated after giving effect on a pro forma basis to such Incurrence, repayment, repurchase, redemption, retirement, defeasement or other discharge of Indebtedness as if such Indebtedness had been Incurred or repaid, repurchased, redeemed, retired, defeased or otherwise discharged on the first day of such period:

(2)     if since the beginning of such period the Issuer or any Restricted Subsidiary will have made any Asset Sale or disposed of or discontinued any company, division, operating unit, segment, business, group of related assets or line of business or if the transaction giving rise to the need to calculate the Consolidated Leverage Ratio includes such an Asset Sale, Consolidated EBITDA, Consolidated Interest Expense and Indebtedness for such period will be calculated after giving pro forma effect thereto (including the Incurrence of any Indebtedness) as if such Asset Sale, disposition or discontinuation occurred on the first day of such period.

(3)     if since the beginning of such period the Issuer or any Restricted Subsidiary (by merger or otherwise) will have made an Investment in any Restricted Subsidiary (or any Person that becomes a Restricted Subsidiary or is merged with or into the Issuer or a Restricted Subsidiary) or an acquisition of assets, including any acquisition of assets occurring in connection with a transaction causing a calculation to be made hereunder, which constitutes all or substantially all of a company, division, operating unit, segment, business or group of related assets or line of business, Consolidated EBITDA, Consolidated Interest Expense and Indebtedness for such period will be calculated after giving pro forma effect thereto (including the Incurrence of any Indebtedness) as if such Investment or acquisition occurred on the first day of such period; and

(4)     if since the beginning of such period any Person (that subsequently became a Restricted Subsidiary or was merged with or into the Issuer or any Restricted Subsidiary since the beginning of such period) will have Incurred any Indebtedness or discharged any Indebtedness or made any disposition or any Investment or acquisition of assets that would have required an adjustment

pursuant to clause (1), (2) or (3) above if made by the Issuer or a Restricted Subsidiary during such period, Consolidated EBITDA, Consolidated Interest Expense and Indebtedness for such period will be calculated after giving pro forma effect thereto as if such transaction occurred on the first day of such period.

The pro forma calculations will be determined in good faith by a responsible financial or accounting Officer of the Issuer. If any Indebtedness bears a floating rate of interest and is being given pro forma effect, the interest expense on such Indebtedness will be calculated as if the rate in effect on the date of determination had been the applicable rate for the entire period (taking into account any Interest Rate Agreement applicable to such Indebtedness if such Interest Rate Agreement has a remaining term in excess of 12 months).

"*Consolidated Net Income*" means, with respect to any Person for any period, the aggregate net income (or loss) of such Person and its Subsidiaries (Restricted Subsidiaries in the case of the Issuer) (after deducting (or adding) the portion of such net income (or loss) attributable to minority interests in Subsidiaries of such Person (Restricted Subsidiaries in the case of the Issuer)) for such period on a consolidated basis, determined in accordance with GAAP; *provided* that there shall be excluded therefrom to the extent reflected in such aggregate net income (loss):

(1)     net after-tax items classified as extraordinary gains or losses;

(2)     the net income (but not loss) of any Subsidiary of such Person (Restricted Subsidiary in the case of the Issuer) to the extent that (and only so long as) a corresponding amount could not be distributed or otherwise transferred to such Person at the date of determination as a result of any restriction pursuant to the constituent documents of such Subsidiary (Restricted

123

Subsidiary in the case of the Issuer) or any law, regulation, agreement or judgment applicable to any such distribution;

(3)    any gain (or loss) from foreign exchange translation or change in net monetary position;

(4)    any gains or losses (less all fees and expenses or charges relating thereto) attributable to the early extinguishment of Indebtedness and Hedging Obligations; and

(5)    the cumulative effect of changes in accounting principles.

"*Consolidated Non-cash Charges*" means, for any Person for any period the aggregate depreciation, amortization and other non-cash expenses or losses, of such Person and its Subsidiaries (Restricted Subsidiaries in the case of the Issuer) for such period, determined on a consolidated basis in accordance with GAAP (excluding any such charge which constitutes an accrual of or a reserve for cash charges for any future period or the amortization of a prepaid cash expense paid in a prior period after the Issue Date).

"*Consolidated Tangible Assets*" means, for any Person at any time, the total consolidated assets of such Person and its Subsidiaries (Restricted Subsidiaries in the case of the Issuer) as set forth on the balance sheet as of the most recent fiscal quarter of such Person, prepared in accordance with GAAP, less (i) Intangible Assets and (ii) any assets securing Non-Recourse Indebtedness.

"*Consolidated Total Indebtedness*" means, as at any date of determination, an amount equal to the sum of the aggregate amount of all outstanding Indebtedness of the Issuer and its Restricted Subsidiaries on a consolidated basis consisting of Indebtedness for borrowed money, Obligations in respect of Capitalized Lease Obligations and debt obligations evidenced by promissory notes and similar instruments; *provided* that Indebtedness of the Issuer and its Restricted Subsidiaries under any revolving credit facility or line of credit as at any date of determination shall be determined using the Average Quarterly Balance of such Indebtedness for the applicable Reference Period.

"*Covenant Defeasance*" has the meaning set forth under "—*Legal Defeasance and Covenant Defeasance*."

"*Covenant Suspension Event*" has the meaning set forth under "—*Certain Covenants—Suspension of Covenants*."

"*Credit Facilities*" means one or more debt facilities, commercial paper facilities, structured notes, certificates or other similar instruments (including any Cebures), in each case with banks, investment banks, *sociedades financieras de objeto múltiple*, *sociedades financieras de objeto limitado*, insurance companies, mutual funds and/or other institutional lenders or institutional investors, in each case providing for revolving credit or term loans or letters of credit, and in each case, as amended, extended, renewed, restated, Refinanced, supplemented or otherwise modified (in whole or in part, and without limitation as to amount, terms, conditions, covenants and other provisions) from time to time.

"*Currency Agreement*" means, in respect of any Person, any foreign exchange contract, currency swap agreement or other similar agreement as to which such Person is a party designed to hedge foreign currency risk of such Person.

"*Custodian*" means any receiver, trustee, assignee, liquidator, custodian or similar official under any Bankruptcy Law.

"*Default*" means any condition, event or act, which, with the lapse of time and/or the issue, making or giving of any notice, certification, declaration, demand, determination and/or request and/or the taking of any similar action and/or fulfillment of any similar condition would constitute, an Event of Default.

"*Designation*" and "*Designation Amount*" have the meanings set forth under "—*Certain Covenants— Limitation on Designation of Unrestricted Subsidiaries*" above.

"*Disqualified Capital Stock*" means that portion of any Capital Stock which, by its terms (or by the terms of any security into which it is convertible or for which it is exchangeable at the option of the holder thereof), or upon the happening of any event, matures or is mandatorily redeemable, pursuant to a sinking fund obligation or otherwise, or is redeemable at the sole option of the holder thereof, in any case, on or prior to the final maturity date of the notes; *provided*, *however*, that any Capital Stock that would not constitute Disqualified Capital Stock but for provisions thereof giving holders thereof the right to require such Person to purchase or redeem such Capital Stock upon the occurrence of an "asset sale" or "change of control" occurring prior to the final maturity of the notes shall not constitute Disqualified Capital Stock if:

(1)  the "asset sale" or "change of control" provisions applicable to such Capital Stock are not materially more favorable to the holders of such Capital Stock than the terms applicable to the notes and described under "—*Certain Covenants—Limitation on Sales of Assets and Subsidiary Stock*" and "—*Repurchase Upon a Change of Control*"; and

(2)  any such requirement only becomes operative after compliance with such terms applicable to the notes, including the purchase of any notes tendered pursuant thereto.

The amount of any Disqualified Capital Stock shall be equal to the greater of its voluntary or involuntary liquidation preference and its maximum fixed repurchase price, but excluding accrued dividends, if any.  The amount of any Disqualified Capital Stock that does not have a fixed redemption, repayment or repurchase price will be calculated in accordance with the terms of such Disqualified Capital Stock as if such Disqualified Capital Stock were redeemed, repaid or repurchased on any date on which the amount of such Disqualified Capital Stock is to be determined pursuant to the Indenture; *provided*, *however*, that if such Disqualified Capital Stock could not be required to be redeemed, repaid or  repurchased at the time of such determination, the redemption, repayment or repurchase price will be the book value of such Disqualified Capital Stock as reflected in the most recent financial statements of such Person.

"*Equity Offering*" has the meaning set forth under "—*Optional Redemption*."

"*Event of Default*" has the meaning set forth under "—*Events of Default*."

"*Exchange Act*" means the Securities Exchange Act of 1934, as amended, or any successor statute or statutes thereto.

"*Fair Market Value*" means, with respect to any asset, the price (after deducting any liabilities relating to such assets) which could be negotiated in an arm's-length free market transaction, for cash, between a willing seller and a willing and able buyer, neither of which is under any compulsion to complete the transaction; *provided* that the Fair Market Value of any such asset or assets will be determined conclusively by the Board of Directors of the Issuer acting in good faith and will be evidenced by a Board Resolution.

"*Fitch*" means Fitch Ratings, Inc., and any successor to its rating agency business.

"*GAAP*" means IFRS, as in effect on the Issue Date.

"*Guarantee*" means any obligation, contingent or otherwise, of any Person directly or indirectly guaranteeing any Indebtedness of any other Person:

(1)  to purchase or pay, or advance or supply funds for the purchase or payment of, such Indebtedness of such other Person, whether arising by virtue of partnership arrangements, or by agreement to keep-well, to purchase assets, goods, securities or services, to take-or-pay, or to maintain financial statement conditions or otherwise, or

(2)  entered into for purposes of assuring in any other manner the obligee of such Indebtedness of the payment thereof or to protect such obligee against loss in respect thereof, in whole or in part,

*provided* that "Guarantee" will not include endorsements for collection or deposit in the ordinary course of business. "Guarantee" used as a verb has a corresponding meaning.

"*Hedging Obligations*" means the obligations of any Person pursuant to any Interest Rate Agreement, Currency Agreement or Commodity Agreement.

"*IFRS*" means International Financial Reporting Standards, as issued by the International Accounting Standards Board.

"*Incur*" means, with respect to any Indebtedness or other obligation of any Person, to create, issue, incur (including by conversion, exchange or otherwise), assume, Guarantee or otherwise become liable in respect of such Indebtedness or other obligation on the balance sheet of such Person (and "Incurrence," "Incurred" and "Incurring" will have meanings correlative to the preceding).

"*Indebtedness*" means with respect to any Person, without duplication:

(1)  the principal amount (or, if less, the accreted value) of all obligations of such Person for borrowed money;

(2)  the principal amount (or, if less, the accreted value) of all obligations of such Person evidenced by bonds, debentures, notes or other similar instruments;

125

(3)     all Capitalized Lease Obligations of such Person;

(4)     all obligations of such Person issued or assumed as the deferred purchase price of property, all conditional sale obligations and all obligations under any title retention agreement (but excluding trade accounts payable and other accrued liabilities arising in the ordinary course of business that are not overdue by 180 days or more or are being contested in good faith by appropriate proceedings promptly instituted and diligently conducted);

(5)     all letters of credit, banker's acceptances or similar credit transactions, including reimbursement obligations in respect thereof;

(6)     Guarantees and other contingent obligations of such Person in respect of Indebtedness referred to in clauses (1) through (5) above and clauses (8) and (9) below;

(7)     all Indebtedness of any other Person of the type referred to in clauses (1) through (6) which is secured by any Lien on any property or asset of such Person, the amount of such Indebtedness being deemed to be the lesser of the Fair Market Value of such property or asset or the amount of the Indebtedness so secured;

(8)     all net payment obligations under Hedging Obligations of such Person; and

(9)     all Disqualified Capital Stock issued by such Person.

"*Independent Financial Advisor*" means an accounting firm, appraisal firm, investment banking firm or consultant of internationally recognized standing that is, in judgment of the Issuer's Board of Directors, qualified to perform the task for which it has been engaged and which is independent in connection with the relevant transaction appointed by the Issuer at its own expense.

"*Individual Quarterly Balance*" means, with respect to any Indebtedness incurred by the Issuer or its Restricted Subsidiaries under a revolving credit facility or line of credit during any fiscal quarter of the Issuer, the quotient of (x) the sum of the aggregate outstanding principal amount of all such Indebtedness at the end of each day of such quarter divided by (y) the number of days in such fiscal quarter.

"*Intangible Assets*" means with respect to any Person all unamortized debt discount and expense, unamortized deferred charges, restricted cash, goodwill, patents, trademarks, service marks, trade names, copyrights and all other items which would be treated as intangibles on the consolidated balance sheet of such Person prepared in accordance with GAAP.

"*Interest Rate Agreement*" of any Person means any interest rate protection agreement (including, without limitation, interest rate swaps, caps, floors, collars, derivative instruments and similar agreements) and/or other types of hedging agreements designed to hedge interest rate risk of such Person.

"*Investment*" means, with respect to any Person, any:

(1)     direct or indirect loan, advance or other extension of credit (including, without limitation, a Guarantee) to any other Person,

(2)     capital contribution to (by means of any transfer of cash or other property to others or any payment for property or services for the account or use of others) any other Person, or

(3)     any purchase or acquisition by such Person of any Capital Stock (but not including interests in bonds, notes, debentures or other securities or evidences of Indebtedness) issued by, any other Person.

"Investment" will exclude purchases and acquisitions of inventory, supplies, materials or equipment, accounts receivable or deposits, in each case arising in the ordinary course of business.  "Invest," "Investing" and "Invested" will have corresponding meanings.

For purposes of "—*Certain Covenants—Limitation on Restricted Payments*," the Issuer will be deemed to have made an "Investment" in an Unrestricted Subsidiary at the time of its Designation, which will be valued at the Fair Market Value of the sum of the Relevant Proportion of the net assets of such Unrestricted Subsidiary at the time of its Designation and the amount of any Indebtedness of such Unrestricted Subsidiary Guaranteed by the Issuer or any Restricted Subsidiary or owed to the Issuer or any Restricted Subsidiary immediately following such Designation.  Any property transferred to or from an Unrestricted Subsidiary will be valued at its Fair Market Value at the time of the transfer.  If the Issuer or any Restricted Subsidiary sells or otherwise disposes of any Capital Stock of a Restricted Subsidiary (including any issuance and sale of Capital Stock by a Restricted Subsidiary) such that, after giving effect to any such sale or disposition, such Restricted Subsidiary would cease to be a Subsidiary of the

126

Issuer, the Issuer will be deemed to have made an Investment on the date of any such sale or disposition equal to sum of the Fair Market Value of the Capital Stock of such former Restricted Subsidiary held by the Issuer or any Restricted Subsidiary immediately following such sale or other disposition and the amount of any Indebtedness of such former Restricted Subsidiary Guaranteed by the Issuer or any Restricted Subsidiary or owed to the Issuer or any other Restricted Subsidiary immediately following such sale or other disposition.

"*Investment Grade Rating*" means a rating equal to or higher than (i) Baa3 (or the equivalent) by Moody's, (ii) BBB- (or the equivalent) by Fitch, (iii) or BBB- (or the equivalent) by S&P, or (iv) if any of the foregoing entities cease to rate the notes for reasons outside of the control of the Issuer, the equivalent investment grade credit rating from any other Rating Agency.

"*Investment Return*" means, in respect of any Investment (other than a Permitted Investment) made after the Issue Date by the Issuer or any Restricted Subsidiary:

(1) (x) the proceeds in cash and the Fair Market Value of property other than cash received by the Issuer or any Restricted Subsidiary upon the sale, liquidation or repayment of such Investment or, in the case of a Guarantee, the amount of the Guarantee upon the unconditional release of the Issuer and its Restricted Subsidiaries in full, less any payments previously made by the Issuer or any Restricted Subsidiary in respect of such Guarantee and (y) any dividends or distribution received by the Issuer or any Restricted Subsidiary from an Unrestricted Subsidiary, to the extent such amounts were not otherwise included in Consolidated Net Income;

(2) in the case of the Revocation of the Designation of an Unrestricted Subsidiary, an amount equal to the least of:

(a) the Issuer's Investment in such Unrestricted Subsidiary at the time of such Revocation;

(b) that portion of the Fair Market Value of the net assets of such Unrestricted Subsidiary at the time of Revocation that is proportionate to the Issuer's equity interest in such Unrestricted Subsidiary at the time of Revocation; and

(c) the Designation Amount with respect to such Unrestricted Subsidiary upon its Designation which was treated as a Restricted Payment; and

(3) in the event the Issuer or any Restricted Subsidiary makes any Investment in a Person that, as a result of or in connection with such Investment, becomes a Restricted Subsidiary, the Fair Market Value of the Investment of the Issuer and its Restricted Subsidiaries in such Person,

in the case of each of (1), (2) and (3), up to the amount of such Investment that was treated as a Restricted Payment under "*—Certain Covenants—Limitation on Restricted Payments*" less the amount of any previous Investment Return in respect of such Investment.

"*Issue Date*" means the first date of issuance of notes under the Indenture.

"*Legal Defeasance*" has the meaning set forth under "*—Legal Defeasance and Covenant Defeasance.*"

"*Lien*" means any lien, mortgage, deed of trust, pledge, security trust (*Fidecomiso de Garantías*), security interest, charge or encumbrance of any kind (including any conditional sale or other title retention agreement, any lease in the nature thereof and any agreement to give any security interest); *provided* that the lessee in respect of a Capitalized Lease Obligation or Sale and Leaseback Transaction will be deemed to have Incurred a Lien on the property leased thereunder.

"*Mexican Restructuring*" means any case or other proceeding against the Issuer or any Subsidiary with respect to it or its debts under any bankruptcy, *concurso mercantil*, *quiebra*, insolvency or other similar law now or hereinafter in effect or seeking the appointment of a trustee, receiver, conciliador, liquidator, custodian or other similar official of it or any substantial part of its property.

"*Moody's*" means Moody's Investors Service, Inc., and any successor to its rating agency business.

"*Net Cash Proceeds*" means, with respect to any Asset Sale, the proceeds in the form of cash or Cash Equivalents, including payments in respect of deferred payment obligations when received in the form of cash or Cash Equivalents received by the Issuer or any of its Restricted Subsidiaries from such Asset Sale, net of:

(1) reasonable out-of-pocket expenses and fees relating to such Asset Sale (including, without limitation, legal, accounting and investment banking fees and sales commissions);

127

(2)     taxes paid or payable in respect of such Asset Sale after taking into account any reduction in consolidated tax liability due to available tax credits or deductions and any tax sharing arrangements;

(3)     repayment of Indebtedness secured by a Lien permitted under the Indenture that is required to be repaid in connection with such Asset Sale; and

(4)     appropriate amounts to be provided by the Issuer or any Restricted Subsidiary, as the case may be, as a reserve, in accordance with GAAP, against any liabilities associated with such Asset Sale and retained by the Issuer or any Restricted Subsidiary, as the case may be, after such Asset Sale, including, without limitation, pension and other post-employment benefit liabilities, liabilities related to environmental matters and liabilities under any indemnification obligations associated with such Asset Sale, but excluding any reserves with respect to Indebtedness.

"*Non-Recourse Indebtedness*" with respect to any Person means Indebtedness of such Person for which

(1)     the sole legal recourse for collection of principal and interest on such Indebtedness is against the specific property identified in the instruments evidencing or securing such Indebtedness and such property was acquired with the proceeds of such Indebtedness or such Indebtedness was incurred within 365 days after the acquisition or construction of such property and

(2)     no other assets of such Person may be realized upon in collection of principal or interest on such Indebtedness.

"*Note Guarantee*" means any guarantee of the Issuer's Obligations under the notes and the Indenture provided by a Restricted Subsidiary pursuant to the Indenture.

"*Obligations*" means, with respect to any Indebtedness, any principal, interest (including, without limitation, Post-Petition Interest), penalties, fees, indemnifications, reimbursements, damages, and other liabilities payable under the documentation governing such Indebtedness, including, in the case of the notes and the Note Guarantees, the Indenture.

"*Officer*" means, when used in connection with any action to be taken by the Issuer or a Subsidiary Guarantor, as the case may be, the Chairman of the Board of Directors, the Chief Executive Officer, the President, the Chief Financial Officer, any Vice President, the Treasurer, the Controller, the Secretary or sole administrator of the Issuer or such Subsidiary Guarantor, as the case may be.

"*Officers' Certificate*" means, when used in connection with any action to be taken by the Issuer or a Subsidiary Guarantor, as the case may be, a certificate signed by two Officers or by an Officer and either an Assistant Treasurer or an Assistant Secretary of the Issuer or a Subsidiary Guarantor, as the case may be, and delivered to the Trustee.

"*Opinion of Counsel*" means a written opinion of counsel, who may be an employee of or counsel for the Issuer (except as otherwise provided in the Indenture) and which opinion shall be acceptable to the Trustee.

"*Permitted Acquisition Indebtedness*" means Indebtedness of the Issuer or any of its Restricted Subsidiaries to the extent such Indebtedness was Indebtedness of (i) a Subsidiary prior to the date on which such Subsidiary became a Restricted Subsidiary or (ii) a Person that was merged or amalgamated into the Issuer or a Restricted Subsidiary, *provided* that on the date such Subsidiary became a Restricted Subsidiary or the date such Person was merged or amalgamated into the Issuer or a Restricted Subsidiary, as applicable, after giving pro forma effect thereto, (a) the Issuer would be permitted to Incur at least $1.00 of additional Indebtedness pursuant to paragraph (1) under "—*Certain Covenants—Limitation on Incurrence of Additional Indebtedness*," or (b) the Consolidated Leverage Ratio of the Issuer and the Restricted Subsidiaries would be less than the Consolidated Leverage Ratio immediately prior to such transaction.

"*Permitted Business*" means the business or businesses conducted by the Issuer and its Restricted Subsidiaries as of the Issue Date and any business ancillary or complementary thereto.

"*Permitted Holders*" means (i) RBSP, (ii) any trust for the benefit of RBSP, his spouse, issue or immediate family, (iii) CASA or (iv) any Person directly or indirectly controlled by RBSP.

"*Permitted Indebtedness*" has the meaning set forth under clause (2) of "—*Certain Covenants—Limitation on Incurrence of Additional Indebtedness*."

"*Permitted Investments*" means:

128

(1) Investments by the Issuer or any Restricted Subsidiary in any Person that is, or that result in any Person becoming, immediately after such Investment, a Restricted Subsidiary or constituting a merger or consolidation of such Person into the Issuer or with or into a Restricted Subsidiary, except for a Guarantee of Indebtedness of a Restricted Subsidiary that is not a Subsidiary Guarantor;

(2) Investments by any Restricted Subsidiary in the Issuer;

(3) Investments in cash and Cash Equivalents;

(4) any extension, modification or renewal of any Investments existing as of the Issue Date (but not Investments involving additional advances, contributions or other investments of cash or property or other increases thereof, other than as a result of the accrual or accretion of interest or original issue discount or payment-in-kind pursuant to the terms of such Investment as of the Issue Date);

(5) Investments permitted pursuant to clause (2)(b) or (e) of "*—Certain Covenants—Limitation on Transactions with Affiliates*";

(6) Investments received as a result of the bankruptcy or reorganization of any Person or taken in settlement of or other resolution of claims or disputes, and, in each case, extensions, modifications and renewals thereof;

(7) Investments made by the Issuer or its Restricted Subsidiaries as a result of non-cash consideration permitted to be received in connection with an Asset Sale made in compliance with the covenant described under "*—Certain Covenants—Limitation on Asset Sales and Sales of Subsidiary Stock*";

(8) Investments in the form of Hedging Obligations permitted under clause (2)(e) of "*—Certain Covenants—Limitation on Incurrence of Additional Indebtedness*;*"

(9) Investments in a Persons engaged in a Permitted Business (or a Person intending to engage in a Permitted Business immediately following such Investment) not to exceed the greater of (x) $100.0 million or (y) 10.0% of Consolidated Tangible Assets of the Issuer and its Restricted Subsidiaries at any one time outstanding;

(10) receivables owing to the Issuer or any Restricted Subsidiary (including advances from advertisers) if created or acquired in the ordinary course of business and payable or dischargeable in accordance with customary trade terms;

(11) payroll, travel, entertainment, relocation and similar advances to cover matters that are expected at the time of such advances ultimately to be treated as expenses for accounting purposes and that are made in the ordinary course of business;

(12) loans or advances to employees made in the ordinary course of business consistent with past practices of the Issuer or such Restricted Subsidiary, not to exceed $5.0 million at any one time outstanding;

(13) cash deposits with banks made in the ordinary course of business of the Issuer and its Restricted Subsidiaries, consistent with past practice, to secure payment of trade payables;

(14) Investments in any Person to the extent such Investments consist of prepaid expenses, negotiable instruments held for collection and lease, utility and workers' compensation, performance and other similar deposits made in the ordinary course of business by the Issuer or any Restricted Subsidiary;

(15) any Investment, to the extent the consideration therefor consists entirely of Qualified Capital Stock; and

(16) Guarantees by the Issuer or any Restricted Subsidiary of any Obligations of CASA made in connection with the purchase of property or other assets to be used in a Permitted Business (so long as, if CASA completes such purchase of property or other assets, then (x) each of the Issuer and CASA exercises commercially reasonable efforts to transfer such property or other assets to the Issuer or a Restricted Subsidiary and (y) such transfer is completed within one year of the Incurrence of such Indebtedness), not to exceed an aggregate of $50.0 million at any one time outstanding,

*provided, however*, that with respect to any Investment, the Issuer may, in its sole discretion, allocate all or any portion of any Investment and later re-allocate all or any portion of any Investment to, one or more of the above clauses (1) through (16) so that the entire Investment would be a Permitted Investment.

"*Permitted Liens*" means any of the following:

(1)     statutory Liens of landlords and Liens of carriers, warehousemen, mechanics, suppliers, materialmen, repairmen and other Liens imposed by law incurred in the ordinary course of business for sums not yet delinquent or being contested in good faith;

(2)     Liens Incurred or deposits made in the ordinary course of business in connection with workers' compensation, unemployment insurance and other types of social security, including any Lien securing letters of credit issued in the ordinary course of business consistent with past practice in connection therewith, or to secure the performance of tenders, statutory obligations, surety and appeal bonds, bids, contracts, leases, government performance and return-of-money bonds and other similar obligations (exclusive of obligations for the payment of borrowed money);

(3)     Liens upon specific items of inventory or other goods of any Person and any proceeds thereof securing such Person's obligations in respect of bankers' acceptances issued or created for the account of such Person to facilitate the purchase, shipment or storage of such inventory or other goods;

(4)     Liens securing reimbursement obligations with respect to commercial letters of credit which encumber documents and other property relating to such letters of credit and products and proceeds thereof;

(5)     Liens encumbering deposits (including in favor of financial institutions or governmental authorities) made to secure obligations arising from statutory, regulatory, contractual, or insurance or warranty requirements of the Issuer or a Restricted Subsidiary, including rights of offset and set-off;

(6)     Liens securing Hedging Obligations that relate to Indebtedness that is Incurred in accordance with "—*Certain Covenants—Limitation on Incurrence of Additional Indebtedness*";

(7)     Liens existing on the Issue Date and Liens to secure any Refinancing Indebtedness which is Incurred to Refinance any Indebtedness below which has been secured by a Lien permitted under the covenant described under "—*Certain Covenants—Limitation on Liens*," not incurred pursuant to clause (9) of the definition of "Permitted Liens" and which Indebtedness has been Incurred in accordance with the covenant described under "—*Certain Covenants—Limitation on Incurrence of Additional Indebtedness*"; *provided* that such new Liens:

(a)     are no materially less favorable to the holders of notes and are not materially more favorable to the lienholders with respect to such Liens than the Liens in respect of the Indebtedness being Refinanced and

(b)     do not extend to any property or assets (or type of assets or property) other than the property or assets (or type of assets or property) securing the Indebtedness Refinanced by such Refinancing Indebtedness and the proceeds thereof;

(8)     purchase money Liens securing Purchase Money Indebtedness, Non-Recourse Indebtedness or Capitalized Lease Obligations Incurred to finance the acquisition or leasing of property and assets of the Issuer or a Restricted Subsidiary used in a Permitted Business, any improvements thereon and the reasonable costs and expenses incurred in connection therewith; *provided* that:

(a)     the related Purchase Money Indebtedness or Non-Recourse Indebtedness does not exceed the cost of such property, assets, and improvements thereon and the reasonable costs and expenses incurred in connection therewith and shall not be secured by any property or assets of the Issuer or any Restricted Subsidiary other than the property and assets so acquired or financed and the proceeds thereof; and

(b)     the Lien securing such Indebtedness will be created within 365 days of such acquisition or financing;

(9)     Liens securing an amount of Indebtedness under Credit Facilities outstanding at any one time not to exceed the greater of (x) $100.0 million or (y) 10.0% of the Consolidated Tangible Assets of the Issuer at such time;

130

(10) any pledge or deposit of cash or property in conjunction with obtaining surety and performance bonds and letters of credit required to engage in constructing on-site and off-site improvements required by municipalities or other governmental authorities in the ordinary course of business;

(11) Liens in favor of customs and revenue authorities arising as a matter of law to secure payment of customs duties in connection with the importation of goods;

(12) Liens encumbering customary initial deposits and margin deposits, and other Liens that are customary in the industry and incurred in the ordinary course of business securing Indebtedness under Hedging Obligation and forward contracts, options, futures contracts, futures options or similar agreements or arrangement designed to protect the Issuer and its Restricted Subsidiaries from fluctuations in the price of commodities;

(13) Liens for taxes, assessments or governmental charges or claims that are not yet delinquent or that are being contested in good faith by appropriate proceedings promptly instituted and diligently concluded; provided that any reserve or other appropriate provision as is required in conformity with GAAP has been made therefor;

(14) licenses and sub-licenses of intellectual property in the ordinary course of business;

(15) easements, rights of way zoning and similar restrictions, reservations, restrictions or encumbrances in respect of real property or title defects that were not incurred in connection with Indebtedness and that do not in the aggregate materially adversely affect the value of said properties (as such properties are used by the Issuer or its Restricted Subsidiaries) or materially impair their use in the operation of the business of the Issuer and its Restricted Subsidiaries;

(16) Liens on Capital Stock of an Unrestricted Subsidiary; and

(17) Liens in favor of the Issuer or any Subsidiary Guarantor.

"*Person*" means an individual, partnership, limited partnership, corporation, company, limited liability company, unincorporated organization, trust or joint venture, or a governmental agency or political subdivision thereof.

"*Post-Petition Interest*" means all interest accrued or accruing after the commencement of any insolvency or liquidation proceeding (and interest that would accrue but for the commencement of any insolvency or liquidation proceeding) in accordance with and at the contract rate (including, without limitation, any rate applicable upon default) specified in the agreement or instrument creating, evidencing or governing any Indebtedness, whether or not, pursuant to applicable law or otherwise, the claim for such interest is allowed as a claim in such insolvency or liquidation proceeding.

"*Preferred Stock*" of any Person means any Capital Stock of such Person that has preferential rights over any other Capital Stock of such Person with respect to dividends, distributions or redemptions or upon liquidation.

"*Purchase Money Indebtedness*" means Indebtedness Incurred for the purpose of financing all or any part of the purchase price, or other cost of construction or improvement of any property or asset; *provided* that the aggregate principal amount of such Indebtedness does not exceed the lesser of the Fair Market Value of such property or such purchase price or cost, including any Refinancing of such Indebtedness that does not increase the aggregate principal amount (or accreted amount, if less) thereof as of the date of Refinancing.

"*Qualified Capital Stock*" means any Capital Stock that is not Disqualified Capital Stock and any warrants, rights or options to purchase or acquire Capital Stock that is not Disqualified Capital Stock and that are not convertible into or exchangeable into Disqualified Capital Stock.

"*RBSP*" means Mr. Ricardo B. Salinas Pliego.

"*Rating Agencies*" means (i) Fitch, (ii) Moody's, (iii) S&P, and (iv) if any of Fitch, Moody's or S&P shall not make a rating of the notes publicly available for reasons outside the control of the Issuer, a nationally recognized United States securities rating agency or agencies, as the case may be, selected by the Issuer, which shall be substituted for Fitch, Moody's and/or S&P, as the case may be.

"*Reference Period*" means the most recently ended four fiscal quarters for which internal financial statements are available as of such date of determination.

"*Refinance*" means, in respect of any Indebtedness, to issue any Indebtedness in exchange for or to refinance, replace, defease or refund such Indebtedness in whole or in part. "*Refinanced*" and "*Refinancing*" will have correlative meanings.

131

"*Refinancing Indebtedness*" means Indebtedness of the Issuer or any Restricted Subsidiary issued to Refinance any other Indebtedness of the Issuer or a Restricted Subsidiary so long as:

(1) the aggregate principal amount (or initial accreted value, if applicable) of such new Indebtedness as of the date of such proposed Refinancing does not exceed the aggregate principal amount (or initial accreted value, if applicable) of the Indebtedness being Refinanced (plus the amount of any premium required to be paid under the terms of the instrument governing such Indebtedness and the amount of reasonable expenses incurred by the Issuer or such Restricted Subsidiary in connection with such Refinancing);

(2) such new Indebtedness has:

 (a) a Weighted Average Life to Maturity that is equal to or greater than the Weighted Average Life to Maturity of the Indebtedness being Refinanced, and

 (b) a final maturity that is equal to or later than the final maturity of the Indebtedness being Refinanced; and

(3) if the Indebtedness being Refinanced is:

 (a) Indebtedness of the Issuer, then such Refinancing Indebtedness will be Indebtedness of the Issuer and/or a Subsidiary Guarantor,

 (b) Indebtedness of a Subsidiary Guarantor, then such Refinancing Indebtedness will be Indebtedness of the Issuer and/or such Subsidiary Guarantor, and

 (c) Subordinated Indebtedness, then such Refinancing Indebtedness shall be subordinate to the notes or the relevant Note Guarantee, if applicable, at least to the same extent and in the same manner as the Indebtedness being Refinanced.

"*Relevant Proportion*" means, with respect to the net assets of any Unrestricted Subsidiary, a percentage equal to the aggregate ownership interest that the Issuer and its Restricted Subsidiaries own, directly or indirectly, in such Unrestricted Subsidiary.

"*Restricted Subsidiary*" means any Subsidiary of the Issuer which at the time of determination is not an Unrestricted Subsidiary.

"*Revocation*" has the meaning set forth under "*—Certain Covenants—Limitation on Designation of Unrestricted Subsidiaries.*"

"*S&P*" means S&P Global Ratings, a division of S&P Global Inc., and any successor to its rating agency business.

"*Sale and Leaseback Transaction*" means any direct or indirect arrangement with any Person or to which any such Person is a party providing for the leasing to the Issuer or a Restricted Subsidiary of any property, whether owned by the Issuer or any Restricted Subsidiary at the Issue Date or later acquired, which has been or is to be sold or transferred by the Issuer or such Restricted Subsidiary to such Person or to any other Person by whom funds have been or are to be advanced to the Issuer or a Restricted Subsidiary on the security of such property.

"*Securities Act*" means the Securities Act of 1933, as amended, or any successor statute or statutes thereto.

"*Senior Indebtedness*" means the notes and the note guarantees and any other Indebtedness of the Issuer or any Subsidiary Guarantor that ranks equal in right of payment with the notes or the relevant Note Guarantee, as the case may be.

"*Significant Subsidiary*" means a Subsidiary of the Issuer constituting a "Significant Subsidiary" of the Issuer in accordance with Rule 1-02(w) of Regulation S-X under the Securities Act in effect on the Issue Date.

"*Stated Maturity*" means, with respect to any security, the date specified in such security as the fixed date on which the final payment of principal of such security is due and payable, including pursuant to any mandatory redemption provision (but excluding any provision providing for the repurchase of such security at the option of the holder thereof upon the happening of any contingency unless such contingency has occurred).

"*Subordinated Indebtedness*" means, with respect to the Issuer or any Subsidiary Guarantor, any Indebtedness of the Issuer or such Subsidiary Guarantor, as the case may be which is expressly subordinated in right of payment to the notes or the relevant Note Guarantee, as the case may be.

"*Subsidiary*" means, with respect to any Person, any other Person of which such Person owns, directly or indirectly, more than 50% of the voting power of the other Person's outstanding Voting Stock.

"*Subsidiary Guarantor*" means any Restricted Subsidiary which provides a Note Guarantee pursuant to the Indenture until such time as its Note Guarantee is released in accordance with the Indenture.

"*Surviving Entity*" has the meaning set forth under "—*Certain Covenants—Limitation on Merger, Consolidation and Sale of Assets*."

"*Unrestricted Subsidiary*" means any Subsidiary of the Issuer designated as such pursuant to "—*Certain Covenants—Limitation on Designation of Unrestricted Subsidiaries*." Any such Designation may be revoked by a Board Resolution of the Issuer, subject to the provisions of such covenant.

"*U.S. Dollar Equivalent*" means with respect to any monetary amount in a currency other than U.S. dollars, at any time for determination thereof, the amount of U.S. dollars obtained by converting such non-U.S. dollar currency involved in such computation into U.S. dollars at the spot rate for the purchase of U.S. dollars with the applicable non-U.S. dollar currency as published in The Wall Street Journal in the "Exchange Rates" column under the heading "Currency Trading" (or, if no longer so published, from an appropriate publicly available source of such market data) on the date two Business Days prior to such determination.

"*Voting Stock*" with respect to any Person, means securities of any class of Capital Stock of such Person entitling the holders thereof (whether at all times or only so long as no senior class of stock has voting power by reason of any contingency) to vote in the election of members of the Board of Directors (or equivalent governing body) of such Person.

"*Weighted Average Life to Maturity*" means, when applied to any Indebtedness at any date, the number of years (calculated to the nearest one-twelfth) obtained by dividing:

(1)     the then outstanding aggregate principal amount or liquidation preference, as the case may be, of such Indebtedness into

(2)     the sum of the products obtained by multiplying:

(a)     the amount of each then remaining installment, sinking fund, serial maturity or other required payment of principal or liquidation preference, as the case may be, including payment at final maturity, in respect thereof, by

(b)     the number of years (calculated to the nearest one-twelfth) which will elapse between such date and the making of such payment.

"*Wholly Owned Subsidiary*" means, for any Person, any Subsidiary (Restricted Subsidiary in the case of the Issuer) of which all the outstanding Capital Stock (other than, in the case of a Subsidiary not organized in the United States, directors' qualifying shares or an immaterial amount of shares required to be owned by other Persons pursuant to applicable law) is owned by such Person or any other Person that satisfies this definition in respect of such Person.

**BOOK-ENTRY; DELIVERY AND FORM**

Notes sold in offshore transactions in reliance on Regulation S will be represented by a permanent global note in fully registered form without interest coupons (the "global note") in denominations of $200,000 or integral multiples of $1,000 in excess thereof, and will be registered in the name of a common depositary (the "Common Depositary") for the accounts of Euroclear and Clearstream and deposited with a Common Depositary. The notes are not issuable in bearer form.

The notes will be subject to certain restrictions on transfer as described in "*Notice to Investors*."

**Global Note**

Upon the issuance of the global note, Euroclear or Clearstream will credit, on its internal system, the respective principal amount of the individual beneficial interests represented by such global notes to the accounts of persons who have accounts with Euroclear or Clearstream ("Clearing System Participants"). Ownership of beneficial interests in the global note will be limited to Clearing System Participants or persons who hold interests through Clearing System Participants. Ownership of beneficial interests in the global note will be shown on, and the transfer of that ownership will be effected only through, records maintained by Euroclear or Clearstream or its nominee (with respect to interests of Clearing System Participants) and the records of Clearing System Participants (with respect to interests of persons other than Clearing System Participants).

So long the notes are held in the form of a global note, the Common Depositary, or its nominee, will be the sole registered owner or holder of a global note, and will be considered the sole owner or holder of the notes represented by such global note for all purposes under the Indenture and the notes. Except in the limited circumstances described below under "—*Individual Definitive Notes*," owners of beneficial interests in a global note will not be entitled to have any portions of such global note registered in their names, will not receive or be entitled to receive physical delivery of notes in individual definitive form and will not be considered the owners or holders of the global note (or any notes represented thereby) under the Indenture or the notes.

In addition, no beneficial owner of an interest in a global note will be able to transfer that interest except in accordance with Euroclear or Clearstream's applicable procedures (in addition to the requirements set forth in the Indenture). The registrar or the Trustee may require a holder, among other things, to furnish appropriate endorsements and transfer documents in connection with a transfer of notes. Holders will be required to pay all taxes and fees due on transfer.

Payments of the principal of, premium (if any) on, and interest on the global note will be made to the Common Depositary or its nominee, as the registered owner thereof. None of us, the Trustee, the registrar, any paying agent, any other agent of the Company or the Initial Purchasers will have any responsibility or liability for any aspect of the records relating to or payments made on account of beneficial ownership interests in a global note or for maintaining, supervising or reviewing any records relating to such beneficial ownership interests.

We anticipate that upon receipt of any payment of principal, premium or interest in respect of a global note, the Common Depositary will promptly credit Clearing System Participants' accounts with payments in amounts proportionate to their respective beneficial interests in the principal amount of the global note as shown on its records. We also expect that payments by Clearing System Participants to owners of beneficial interests in the global note held through such Clearing System Participants will be governed by standing instructions and customary practices, as is now the case with securities held for the accounts of customers registered in the names of nominees for such customers. Such payments will be the responsibility of such Clearing System Participants.

Transfers between Clearing System Participants will be effected in accordance with Euroclear or Clearstream's procedures, and will be settled in same-day funds. The laws of some jurisdictions may require that certain persons take physical delivery of securities in definitive form. Consequently, the ability to transfer beneficial interests in a global note to such persons may be limited. Because Euroclear or Clearstream can only act on behalf of Clearing System Participants, who in turn act on behalf of indirect participants and certain banks, the ability of a person having a beneficial interest in a global note to pledge such interest to persons or entities that do not participate in the Euroclear or Clearstream system, or otherwise take actions in respect of such interest, may be affected by the lack of a physical individual definitive certificate in respect of such interest. Transfers between accountholders in Euroclear and Clearstream will be effected in the ordinary way in accordance with their respective rules and operating procedures.

Euroclear and Clearstream have advised that the Common Depositary will take any action permitted to be taken by a registered holder of notes only at the direction of one or more Clearing System Participants to whose account or accounts with Euroclear or Clearstream interests in a global note are credited and only in respect of such portion of the aggregate principal amount of the notes as to which such Clearing System Participant(s) has or have

134

given such direction. However, in the limited circumstances described below, Euroclear or Clearstream will exchange the global note for individual definitive notes bearing a restrictive legend, which will be distributed to the Clearing System Participants. Holders of indirect interests in the global notes through Clearing System Participants have no direct rights to enforce such interests while the notes are in global form.

The giving of notices and other communications by Euroclear or Clearstream to Clearing System Participants, by Clearing System Participants to persons who hold accounts with them and by such persons to holders of beneficial interests in a global note will be governed by arrangements between them, subject to any statutory or regulatory requirements as may exist from time to time.

None of us, the Trustee, the registrar, any paying agent, or any other agent of the Company, or the Initial Purchasers will have any responsibility for the performance of Euroclear or Clearstream or their respective participants, the Common Depositary, Clearing System Participants, other indirect participants or accountholders of their respective obligations under the rules and procedures governing their operations.

**Individual Definitive Notes**

If (1) Euroclear or Clearstream, or any successor to Euroclear or Clearstream, notifies us in writing that it is unwilling or unable to continue as a clearing system for a global note, or becomes ineligible to serve as such a clearing system, and a successor clearing system (which could be either Euroclear or Clearstream alone) is not appointed by us within 90 days or (2) the Trustee has instituted or has been directed to institute any judicial proceeding in a court to enforce the rights of the noteholders under the notes and the Trustee has been advised by counsel that in connection with such proceeding it is necessary or appropriate for the Trustee to obtain possession of the notes, we will issue individual definitive notes in registered form in exchange for the global note. Upon receipt of such notice from Euroclear or Clearstream, we will use our reasonable best efforts to make arrangements with Euroclear or Clearstream, as the case may be, for the exchange of interests in the global note for individual definitive notes and cause the requested individual definitive notes to be executed and delivered to the registrar in sufficient quantities and authenticated by the registrar for delivery to holders. Persons exchanging interests in a global note for individual definitive notes will be required to provide the registrar with written instruction and other information required by us and the registrar to complete, execute and deliver such individual definitive notes. Individual definitive notes delivered in exchange for the global note or beneficial interests therein will be registered in the names, and issued in any approved denominations, requested by Euroclear or Clearstream.

Before any individual definitive note may be transferred to a person who takes delivery in the form of an interest in any global note, the transferor will be required to provide the Trustee with written instrument of transfer as provided in the form attached to the Indenture, duly executed by the individual or his duly authorized attorney in writing.

Individual definitive notes will not be eligible for clearing and settlement through Euroclear or Clearstream.

**PLAN OF DISTRIBUTION**

Subject to the terms and conditions set forth in the purchase agreement, among us and BCP Securities, LLC, Jefferies LLC, and Morgan Stanley & Co. International plc, as initial purchasers of the notes, we have agreed to sell to the initial purchasers principal amounts of the notes indicated in the table below opposite their respective names:

| Initial purchasers | Principal Amount |
|---|---|
| BCP Securities, LLC ................................................................................ | $133,333,333.33 |
| Jefferies LLC ......................................................................................... | $133,333,333.33 |
| Morgan Stanley & Co. International plc..................................................... | $133,333,333.34 |
| Total..................................................................................... | $400,000,000.00 |

Subject to the terms and conditions set forth in the purchase agreement, the initial purchasers have agreed, severally and not jointly, to purchase all of the notes sold under the purchase agreement if any of these notes are purchased. If an initial purchaser defaults, the purchase agreement provides that the purchase commitments of the non-defaulting initial purchasers may be increased or the purchase agreement may be terminated.

The purchase agreement provides that the obligations of the initial purchasers are subject to certain conditions, including the receipt by the initial purchasers of officers' certificates and legal opinions and approval of certain legal matters by their counsel. Under the purchase agreement, we and the Guarantors have agreed, jointly and severally, to indemnify the initial purchasers and their controlling persons against certain liabilities in connection with this offering, and to contribute to payments that the initial purchasers may be required to make in respect of those liabilities.

The notes have not been and will not be registered under the Securities Act or any U.S. state securities laws.  The initial purchasers propose to resell the notes outside the United States to non-U.S. persons in reliance on Regulation S ("Regulation S") under the Securities Act.  In connection with such sales, the initial purchasers have agreed that they will not offer or sell, any notes within the United States except in accordance with Rule 903 of Regulation S under the Securities Act. Accordingly, neither the initial purchasers nor their affiliates or any persons acting on their behalf have engaged or will engage in any directed selling efforts with respect to the notes.

The notes will initially be offered at the price indicated on the cover page of this Offering Circular.  After the initial offering of the notes, the offering price and other selling terms of the notes may be changed at any time without notice.

We have agreed that for a period of 90 days after the date of this Offering Circular, without the prior written consent of the initial purchasers, we will not offer, sell, pledge, contract to sell or otherwise dispose of or transfer any debt securities issued or guaranteed by us or any of our subsidiaries that has a term of more than one year.

Actinver Securities, Inc. acted as a member of the selling group in the distribution of the notes.

**Transfer Restrictions and Liquidity**

The notes will be subject to significant restrictions on resale and transfer as described under "*Notice to Investors*."

No market for the notes currently exists. Approval-in-principle has been received to admit the notes for the listing and quotation of the notes on the SGX-ST. The initial purchasers have advised us that, following the completion of this offering, they currently intend to make a market in the notes as permitted by applicable laws and regulations.  However, the initial purchasers are not obligated to do so, and the initial purchasers may discontinue any market making activities with respect to the notes at any time in their sole discretion.  Accordingly, no assurance can be given that there will be a liquid trading market for the notes, that you will be able to sell any of the notes held by you at a particular time or that the prices that you receive when you sell will be favorable.  Each purchaser of the notes, by its purchase of the notes, will be deemed to have made certain acknowledgements, representations, warranties and agreements as set forth under "*Notice to Investors*."

**Stabilization**

The initial purchasers have advised us that certain persons participating in the offering may engage in transactions, including overallotment, stabilizing bids, syndicate covering transactions or the imposition of penalty bids, which may have the effect of stabilizing or maintaining the market price of the notes at a level above that which might otherwise prevail in the open market.  Overallotment involves syndicate sales in excess of the offering size, which creates a syndicate short position.  A stabilizing bid is a bid for the purchase of notes on behalf of the initial purchasers for the purpose of fixing or maintaining the price of the notes.  A syndicate covering transaction is the bid for or the purchase of notes on behalf of the initial purchasers to reduce a short position incurred by the initial purchasers in connection with the offering.  A penalty bid is an arrangement permitting the initial purchasers to reclaim the selling concession otherwise accruing to a syndicate member in connection with the offering if the notes originally sold by such syndicate member are purchased in a syndicate covering transaction and therefore have not been effectively placed by such syndicate member. Neither we nor the initial purchasers make any representation or prediction as to the direction or magnitude of any effect that the transactions described above may have on the price of the notes.  The initial purchasers are not obligated to engage in these activities and, if commenced, any of the activities may be discontinued at any time.

**Electronic Distribution**

An offering circular in electronic format may be made available by e-mail or through other online services maintained by the initial purchasers or their affiliates.  In those cases, prospective investors may view offering terms online and may be allowed to place orders online.  The initial purchasers may agree with us to allocate a specific number of notes for sale to online brokerage account holders.  Any such allocation for online distributions will be made by the initial purchasers on the same basis as other allocations.  Other than the offering circular in electronic format, the information on the initial purchasers' web site and any information contained in any other web site maintained by the initial purchasers is not part of the offering circular, has not been approved and/or endorsed by us or the initial purchasers and should not be relied upon by investors.

**Affiliations**

The initial purchasers and certain of their affiliates are full service financial institutions engaged in various activities,  which may include securities trading, commercial and investment banking, financial advisory, investment management, investment research, principal investment, hedging, financing and brokerage activities.  The initial purchasers and certain of their affiliates have, from time to time, performed, and may in the future perform, various financial advisory and investment banking services for the issuer, for which they received or will receive customary fees and expenses.

In the ordinary course of their various business activities, the initial purchasers and certain of their affiliates may make or hold a broad array of investments and actively trade debt and equity securities (or related derivative securities) and financial instruments (including bank loans) for their own account and for the accounts of their customers, and such investment and securities activities may involve securities and/or instruments of the issuer.  The initial purchasers and certain of their affiliates may also make investment recommendations and/or publish or express independent research views in respect of such securities or instruments and may at any time hold, or recommend to clients that they acquire, long and/or short positions in such securities and instruments.

**Disclaimers About Jurisdictions**

Neither we nor the initial purchasers are making an offer to sell, or seeking offers to buy, the notes in any jurisdiction where the offer and sale is not permitted.  You must comply with all applicable laws and regulations in force in any jurisdiction in which you purchase, offer or sell the notes or possess or distribute this Offering Circular, and you must obtain any consent, approval or permission required for your purchase, offer or sale of the notes under the laws and regulations in force in any jurisdiction to which you are subject or in which you make such purchases, offers or sales.  Neither we nor the initial purchasers will have any responsibility therefor.

The notes have not been, and will not be, registered under the Securities Act, and may not be offered or sold in the United States except pursuant to an exemption from, or in a transaction not subject to, the registration requirements of the Securities Act. The notes are being offered and sold only in offshore transactions outside the United States in reliance on Regulation S. Accordingly, none of TV Azteca and the initial purchasers has engaged, or will engage, in any directed selling efforts in the United States with respect to the notes. Resales of the notes are restricted as described under "*Notice to Investors*".

137

**Notice to Prospective Investors in the European Economic Area**

In relation to each member state of the European Economic Area, which has implemented the Prospectus Directive, or "Relevant Member States," with effect from and including the date on which the Prospectus Directive is implemented in that Relevant Member State, or the Relevant Implementation Date, an offer to the public of any notes which are the subject of the offering contemplated by this offering circular may not be made in that Relevant Member State, except that an offer to the public in that Relevant Member State of any notes may be made at any time with effect from and including the Relevant Implementation Date under the following exemptions under the Prospectus Directive, if they have been implemented in that Relevant Member State:

- to any legal entity which is a qualified investor as defined in the Prospectus Directive;
- to fewer than 150, natural or legal persons (other than qualified investors as defined in the Prospectus Directive), as permitted under the Prospectus Directive, subject to obtaining the prior consent of the relevant dealer or dealers nominated by us for any such offer; or
- in any other circumstances falling within Article 3(2) of the Prospectus Directive;

provided that no such offer of notes shall result in a requirement for the publication by us, the initial purchasers or any representative of a prospectus pursuant to Article 3 of the Prospectus Directive.

Any person making or intending to make any offer of notes within the European Economic Area should only do so in circumstances in which no obligation arises for us or the initial purchasers to produce a prospectus for such offer.  Neither we nor the initial purchasers have authorized, nor do they authorize, the making of any offer of notes through any financial intermediary, other than offers made by the initial purchasers which constitute the final offering of notes contemplated in this offering circular.

For the purposes of this provision, and your representation below, the expression an "offer to the public" in relation to any notes in any Relevant Member State means the communication in any form and by any means of sufficient information on the terms of the offer and any notes to be offered so as to enable an investor to decide to purchase any notes, as the same may be varied in that Relevant Member State by any measure implementing the Prospectus Directive in that Relevant Member State and the expression "Prospectus Directive" means Directive 2003/71/EC (and amendments thereto, including the 2010 PD Amending Directive, to the extent implemented in the Relevant Member State) and includes any relevant implementing measure in each Relevant Member State. The expression "2010 PD Amending Directive" means Directive 2010/73/EU.

Each person in a Relevant Member State who receives any communication in respect of, or who acquires any notes under, the offer of notes contemplated by this offering circular will be deemed to have represented, warranted and agreed to and with us and the initial purchasers that:

1) it is a "qualified investor" within the meaning of the law in that Relevant Member State implementing Article 2(1)(e) of the Prospectus Directive; and

2) in the case of any notes acquired by it as a financial intermediary, as that term is used in Article 3(2) of the Prospectus Directive, (a) the notes acquired by it in the offering have not been acquired on behalf of, nor have they been acquired with a view to their offer or resale to, persons in any Relevant Member State other than "qualified investors" (as defined in the Prospectus Directive), or in circumstances in which the prior consent of the representatives has been given to the offer or resale; or (b) where notes have been acquired by it on behalf of persons in any Relevant Member State other than qualified investors, the offer of those notes to it is not treated under the Prospectus Directive as having been made to such persons.

**Notice to Prospective Investors in United Kingdom**

This communication is only being distributed to and is only directed at (i) persons who are outside the United Kingdom or (ii) investment professionals falling within Article 19(5) of the Financial Services and Markets Act 2000 (Financial Promotion) Order 2005, or the Order, or (iii) high net worth companies, and other persons to whom it may lawfully be communicated, falling within Article 49(2)(a) to (d) of the Order (all such persons together being referred to as "relevant persons").  The notes are only available to, and any invitation, offer or agreement to subscribe, purchase or otherwise acquire such notes will be engaged in only with, relevant persons. Any person who is not a relevant person should not act or rely on this offering circular or any of its contents.

Each of the initial purchasers has advised that:

138

1)   it has only communicated or caused to be communicated and will only communicate or cause to be communicated an invitation or inducement to engage in investment activity (within the meaning of Section 21 of the United Kingdom FSMA) received by it in connection with the issue or sale of any notes in circumstances in which Section 21(1) of the FSMA does not, or would not, apply to us; and

2)   it has complied and will comply with all applicable provisions of the FSMA with respect to anything done by it in relation to the notes in, from or otherwise involving the United Kingdom.

**Notice to Prospective Investors in Switzerland**

This offering circular, as well as any other material relating to the notes which are the subject of the offering contemplated by this offering circular, do not constitute an issue prospectus pursuant to Article 652a of the Swiss Code of Obligations.  The notes will not be listed on the SWX Swiss Exchange and, therefore, the documents relating to the notes, including, but not limited to, this offering circular, do not claim to comply with the disclosure standards of the listing rules of SWX Swiss Exchange and corresponding prospectus schemes annexed to the listing rules of the SWX Swiss Exchange.  The notes are being offered in Switzerland by way of a private placement, i.e., to a small number of selected investors only, without any public offer and only to investors who do not purchase the notes with the intention to distribute them to the public.  The investors will be individually approached by us from time to time.  This offering circular, as well as any other material relating to the notes, is personal and does not constitute an offer to any other person.  This offering circular may only be used by those investors to whom it has been handed out in connection with the offering described herein and may neither directly nor indirectly be distributed or made available to other persons without our express consent.  It may not be used in connection with any other offer and shall in particular not be copied and/or distributed to the public in (or from) Switzerland.

**Notice to Prospective Investors in the Dubai International Financial Centre**

This offering circular relates to an Exempt Offer in accordance with the Offered Securities Rules of the Dubai Financial Services Authority, or the DFSA.  This offering circular is intended for distribution only to persons of a type specified in the Offered Securities Rules of the DFSA.  It must not be delivered to, or relied on by, any other person.  The DFSA has no responsibility for reviewing or verifying any documents in connection with Exempt Offers.  The DFSA has not approved this offering circular nor taken steps to verify the information set forth herein and has no responsibility for this offering circular.  The notes to which this offering circular relates may be illiquid and/or subject to restrictions on their resale.  Prospective purchasers of the notes offered should conduct their own due diligence on the notes.  If you do not understand the contents of this offering circular you should consult an authorized financial advisor.

**Notice to Prospective Investors in Hong Kong**

The notes may not be offered or sold in Hong Kong by means of any document other than (i) in circumstances which do not constitute an offer to the public within the meaning of the Companies Ordinance (Cap. 32, Laws of Hong Kong), or (ii) to "professional investors" within the meaning of the Securities and Futures Ordinance (Cap. 571, Laws of Hong Kong) and any rules made thereunder, or (iii) in other circumstances which do not result in the document being a "prospectus" within the meaning of the Companies Ordinance (Cap. 32, Laws of Hong Kong) and no advertisement, invitation or document relating to the notes may be issued or may be in the possession of any person for the purpose of issue (in each case whether in Hong Kong or elsewhere), which is directed at, or the contents of which are likely to be accessed or read by, the public in Hong Kong (except if permitted to do so under the laws of Hong Kong) other than with respect to notes which are or are intended to be disposed of only to persons outside Hong Kong or only to "professional investors" within the meaning of the Securities and Futures Ordinance (Cap. 571, Laws of Hong Kong) and any rules made thereunder.

**Notice to Prospective Investors in Japan**

The notes offered in this offering circular have not been and will not be registered under the Financial Instruments and Exchange Law of Japan.  The notes have not been offered or sold and will not be offered or sold, directly or indirectly, in Japan or to or for the account of any resident of Japan (including any corporation or other entity organized under the laws of Japan), except (i) pursuant to an exemption from the registration requirements of the Financial Instruments and Exchange Law and (ii) in compliance with any other applicable requirements of Japanese law.

139

**Notice to Prospective Investors in Singapore**

This Offering Circular has not been registered as a prospectus with the Monetary Authority of Singapore. Accordingly, this Offering Circular and any other document or material in connection with the offer or sale, or invitation for subscription or purchase, of the notes may not be circulated or distributed, nor may the notes be offered or sold, or be made the subject of an invitation for subscription or purchase, whether directly or indirectly, to persons in Singapore other than (i) to an institutional investor (as defined in Section 4A of the Securities and Futures Act ( Chapter 289 of Singapore) (the "**SFA**")) pursuant to Section 274 of the SFA,  (ii) to a relevant person (as defined in Section 275(2) of the SFA) pursuant to Section 275(1) of the SFA, or any person pursuant to Section 275(1A), and in accordance with the conditions specified in Section 275 of the SFA or (iii) otherwise pursuant to, and in accordance with the conditions of, any other applicable provision of the SFA.

Where the notes are subscribed or purchased under Section 275 of the SFA by a relevant person which is:

(a)     a corporation (which is not an accredited investor (as defined in Section 4A of the SFA)) the sole business of which is to hold investments and the entire capital stock of which is owned by one or more individuals, each of whom is an accredited investor; or

(b)     a trust (where the trustee is not an accredited investor) whose sole purpose is to hold investments and each beneficiary is an accredited investor,

securities (as defined in Section 239(1) of the SFA) of that corporation or the beneficiaries' rights and interest (howsoever described) in that trust shall not be transferable for six months after that corporation or that trust has acquired the notes pursuant to an offer made under Section 275 except:

(1)     to an institutional investor or to a relevant person defined in Section 275(2) of the SFA, or to any person arising from an offer referred to in Section 275(1A) or Section 276(4)(i)(B) of the SFA;

(2)     where no consideration is or will be given for the transfer;

(3)     where the transfer is by operation of law;

(4)     as specified in Section 276(7) of the SFA; or

(5)     as specified in Regulation 32 of the Securities and Futures (Offers of Investments) (Shares and Debentures) Regulations 2005 of Singapore.

**Notice to Prospective Investors in Canada**

The notes may be sold only to purchasers purchasing, or deemed to be purchasing, as principal that are accredited investors, as defined in National Instrument 45-106 Prospectus Exemptions or subsection 73.3(1) of the Securities Act (Ontario), and are permitted clients, as defined in National Instrument 31-103 Registration Requirements, Exemptions and Ongoing Registrant Obligations.  Any resale of the notes must be made in accordance with an exemption from, or in a transaction not subject to, the prospectus requirements of applicable securities laws.

Securities legislation in certain provinces or territories of Canada may provide a purchaser with remedies for rescission or damages if this offering circular (including any amendment thereto) contains a misrepresentation, provided that the remedies for rescission or damages are exercised by the purchaser within the time limit prescribed by the securities legislation of the purchaser's province or territory.  The purchaser should refer to any applicable provisions of the securities legislation of the purchaser's province or territory for particulars of these rights or consult with a legal advisor.

Pursuant to section 3A.3 of National Instrument 33-105 Underwriting Conflicts (NI 33-105), the initial purchasers are not required to comply with the disclosure requirements of NI 33-105 regarding underwriter conflicts of interest in connection with this offering.

**Notice to Prospective Investors in Mexico**

The notes have not been and will not be registered with the Mexican National Securities Registry (*Registro Nacional de Valores*) maintained by the CNBV, and, therefore, may not be offered or sold publicly or otherwise be the subject of brokerage activities in Mexico.  The notes may only be offered in Mexico pursuant to the exemptions

to registration provided in article 8 of the Mexican Securities Market Law (*Ley del Mercado de Valores*).  As required under the Mexican Securities Market Law, we will notify the CNBV of the terms and conditions of this offering of the notes outside of Mexico, for informational and statistical purposes only.  The delivery to, and the receipt by, the CNBV of such notice does not constitute or imply a certification as to the investment quality of the notes, our or the subsidiary guarantor's solvency, liquidity or credit quality or the accuracy or completeness of the information set forth in this offering circular.  This offering circular is solely our responsibility and has not been reviewed or authorized by the CNBV. The acquisition of the notes by investors, including Mexican investors, will be made under their own responsibility.

**Notice to Prospective Investors in Chile**

Pursuant to Law No. 18,045 of Chile (the securities market law of Chile) and Rule (*Norma de Carácter General*) No. 336, dated June 27, 2012, issued by the Superintendency of Securities and Insurance of Chile (*Superintendencia de Valores y Seguros de Chile*, or the SVS), the notes may be privately offered in Chile to certain "qualified investors" identified as such by Rule No. 336 (which in turn are further described in Rule No. 216, dated June 12, 2008, of the SVS).

Rule No. 336 requires the following information to be provided to prospective investors in Chile:

1) Date of commencement of the offer:  June 20, 2017.  The offer of the notes is subject to Rule No. 336, dated June 27, 2012, issued by the SVS;

2) The notes and this offering circular are not registered with the Securities Registry (*Registro de Valores*) of the SVS, nor with the foreign securities registry (*Registro de Valores Extranjeros*) of the SVS and as such are not subject to the oversight of the SVS;

3) Since the notes are not registered in Chile, there is no obligation by the issuer to make publicly available information about the notes in Chile;

4) The notes shall not be subject to a public offering in Chile unless registered with the relevant Securities Registry of the SVS.

   *La oferta de los valores comienza el  20 de Junio de 2017 y está acogida a la Norma de Carácter General 336 de la Superintendencia de Valores y Seguros de Chile (la "SVS").  La oferta versa sobre valores no inscritos en el Registro de Valores o en el Registro de Valores Extranjeros que lleva la SVS, por lo que los valores no están sujetos a la fiscalización de dicho organismo.  Por tratarse de valores no inscritos, no existe obligación por parte del emisor de entregar en Chile información pública respecto de los valores.  Estos valores no pueden ser objeto de oferta pública a menos que sean inscritos en el registro de valores correspondiente.*

**Notice to Prospective Investors in France**

Neither this offering circular nor any other offering material relating to the notes described in this offering circular has been submitted to the clearance procedures of the *Autorité des Marchés Financiers* or of the competent authority of another member state of the European Economic Area and notified to the *Autorité des Marchés Financiers*.  The notes have not been offered or sold and will not be offered or sold, directly or indirectly, to the public in France.  Neither this offering circular nor any other offering material relating to the notes has been or will be:

- released, issued, distributed or caused to be released, issued or distributed to the public in France; or

- used in connection with any offer for subscription or sale of the notes to the public in France. Such offers, sales and distributions will be made in France only:

- to qualified investors (*investisseurs qualifiés*) and/or to a restricted circle of investors (*cercle restreint d'investisseurs*), in each case investing for their own account, all as defined in, and in accordance with, articles L.411-2, D.411-1, D.411-2, D.734-1, D.744-1, D.754-1 and D.764-1 of the French *Code Monétaire et Financier*;

- to investment services providers authorized to engage in portfolio management on behalf of third parties; or

- in a transaction that, in accordance with article L.411-2-II-1°-or-2°-or 3° of the French *Code Monétaire et Financier* and article 211-2 of the General Regulations (*Règlement Général*) of the *Autorité des Marchés Financiers*, does not constitute a public offer (*appel public à l'épargne*).

The notes may *be* resold directly or indirectly, only in compliance with articles L.411-1, L.411-2, L.412-1 and L.621-8 through L.621-8-3 of the French *Code Monétaire et Financier*.

**Notice to Prospective Investors in Colombia**

The notes will not be authorized by the *Superintendencia Financiera de Colombia* (Colombian Superintendency of Finance) and *will* not be registered under the *Registro Nacional de Valores y Emisores* (Colombian National Registry of Securities and Issuers), and, accordingly, the notes will not be offered or sold to persons in Colombia except in circumstances which do not result in a public offering under Colombian law.

**Notice to Prospective Investors in Peru**

The offer of the notes, this offering circular and the notes have not been, and will not be, registered with the *Comisión Nacional Supervisora de Empresas y Valores* (the Peruvian Securities and Exchange Commission).  The offer of the notes in Peru is not considered a public offering and will not be launched in Peru except in circumstances which do not constitute public offering or distribution under Peruvian laws and regulations.  This notice is for informative purposes and it does not constitute public offering of any kind.

**NOTICE TO INVESTORS**

The notes (and the guarantees) have not been registered under the Securities Act and may not be offered or sold within the United States or to, or for the account or benefit of, U.S. persons except pursuant to an exemption from, or in a transaction not subject to, the registration requirements of the Securities Act. Accordingly, the notes are being offered and sold only in offshore transactions outside the United States to persons other than U.S. persons, or foreign purchasers, which term shall include dealers or other professional fiduciaries in the United States acting on a discretionary basis for foreign beneficial owners (other than an estate or trust), in reliance upon Regulation S under the Securities Act.

By its purchase of notes, each purchaser of notes will be deemed to:

(1)     represent that it is purchasing the notes for its own account or an account with respect to which it exercises sole investment discretion and that it and any such account is a foreign purchaser that is outside the United States (or a foreign purchaser that is a dealer or other fiduciary as referred to above);

(2)     acknowledge that the notes (and the guarantees) have not been registered under the Securities Act and may not be offered or sold within the United States or to, or for the account or benefit of, U.S. persons except as set forth below;

(3)     agree that it will deliver to each person to whom it transfers notes notice of any restriction on transfer of such notes;

(4)     if it is a foreign purchaser outside the United States, (a) understand that the notes will be represented by the Regulation S global note and that transfers are restricted as described below and (b) represent and agree that it will not sell short or otherwise sell, transfer or dispose of the economic risk of the notes into the United States or to a U.S. person; and

(5)     understand that until registered under the Securities Act, the notes (other than those issued to foreign purchasers or in substitution or exchange therefor) will bear a legend to the following effect unless otherwise agreed by us and the holder thereof:

THIS NOTE (AND RELATED NOTE GUARANTEES) HAVE NOT BEEN REGISTERED UNDER THE U.S. SECURITIES ACT OF 1933, AS AMENDED (THE "SECURITIES ACT") AND MAY NOT BE OFFERED, SOLD, PLEDGED OR OTHERWISE TRANSFERRED EXCEPT IN ACCORDANCE WITH THE FOLLOWING SENTENCE. BY ITS ACQUISITION HEREOF OR OF A BENEFICIAL INTEREST HEREIN, THE ACQUIRER

(1)     REPRESENTS THAT IT IS NOT A U.S. PERSON (WITHIN THE MEANING OF REGULATION S UNDER THE SECURITIES ACT) AND

(2)     AGREES FOR THE BENEFIT OF THE COMPANY THAT IT WILL NOT OFFER, SELL, PLEDGE OR OTHERWISE TRANSFER THIS NOTE OR ANY BENEFICIAL INTEREST HEREIN, EXCEPT IN ACCORDANCE WITH THE SECURITIES ACT AND ANY APPLICABLE SECURITIES LAWS OF ANY STATE OF THE UNITED STATES AND ONLY

(A) TO THE COMPANY,

(B) PURSUANT TO A REGISTRATION STATEMENT WHICH HAS BECOME EFFECTIVE UNDER THE SECURITIES ACT,

(C) IN AN OFFSHORE TRANSACTION IN COMPLIANCE WITH RULE 904 OF REGULATION S UNDER THE SECURITIES ACT, OR

(D) PURSUANT TO AN EXEMPTION FROM REGISTRATION PROVIDED BY RULE 144 UNDER THE SECURITIES ACT OR ANY OTHER AVAILABLE EXEMPTION FROM THE REGISTRATION REQUIREMENTS OF THE SECURITIES ACT.

PRIOR TO THE REGISTRATION OF ANY TRANSFER IN ACCORDANCE WITH ABOVE, THE ISSUER RESERVES THE RIGHT TO REQUIRE THE DELIVERY OF SUCH LEGAL OPINIONS, CERTIFICATIONS OR OTHER EVIDENCE AS MAY REASONABLY BE REQUIRED IN ORDER TO DETERMINE THAT THE PROPOSED TRANSFER IS BEING MADE IN COMPLIANCE WITH THE SECURITIES ACT AND APPLICABLE STATE SECURITIES LAWS. NO REPRESENTATION IS MADE AS TO THE AVAILABILITY OF ANY RULE 144 EXEMPTION FROM THE REGISTRATION REQUIREMENTS OF THE SECURITIES ACT; and

(6)      acknowledge that we and the initial purchasers will rely upon the truth and accuracy of the foregoing acknowledgments, representations and agreements, and agree that if any of the acknowledgements, representations or warranties deemed to have been made by it by its purchase of notes are no longer accurate, it shall promptly notify us and the initial purchasers; and if it is acquiring notes as a fiduciary or agent for one or more investor accounts, it represents that it has sole investment discretion with respect to each such account and it has full power to make the foregoing acknowledgments, representations and agreements on behalf of each such account.

Notes sold outside of the United States to persons other than U.S. persons, will be freely transferable to persons other than U.S. persons.

144

## TAXATION

*This summary is general information only. Prospective purchasers of notes should consult their tax advisors as to the Mexican or other tax consequences of the purchase, ownership and disposition of the notes, including the effect of any foreign, state, municipal or local tax laws to which they are subject.*

**Mexican Taxation**

This summary of certain Mexican tax considerations deals only with holders of the Notes that are not residents of Mexico for Mexican tax purposes and that do not conduct a trade or business through a permanent establishment for tax purposes in Mexico (a "Foreign Holder"), but does not purport to be a comprehensive description of all the tax considerations that may be relevant to a decision to purchase, hold or dispose of the Notes.

This summary is based on the federal tax laws of Mexico as in effect on the date of this Offering Circular (including the Tax Treaty described below), as well as on federal rules and regulations of Mexico in effect on or before such date. All of the foregoing are subject to change, which change could apply retroactively and could affect the continued validity of this summary.

For purposes of Mexican taxation, an individual is a resident of Mexico if he has established his domicile in Mexico, unless he has a domicile in a foreign country and his personal and economic relations (center of vital interest) are not in Mexico (except for Mexican public officers or governmental employees). Under the *Código Fiscal de la Federación* (the Mexican Tax Code, or "MTC"), the center of vital interest of an individual is deemed to be located in Mexico if: (i) the source of wealth income in respect of more than 50% of the total income obtained by the individual in a calendar year is derived from Mexican sources, or (ii) the individual's principal place of business is located within Mexican territory. An individual of Mexican nationality is presumed to be a resident of Mexico for tax purposes unless such person demonstrates otherwise. A legal entity is a resident of Mexico if its main administration or effective management is located in Mexico. If a non-Mexican tax resident has a permanent establishment for tax purposes in Mexico, such permanent establishment shall be required to pay taxes in Mexico on taxable income attributable to such permanent establishment in accordance with relevant Mexican tax provisions.

*Taxation of Interest and Principal*

Under the Ley del Impuesto Sobre la Renta (the Mexican Income Tax Law, or "MITL"), payments of interest made by TV Azteca or any Guarantor in respect of the Notes (including payments of principal in excess of the issue price of such Notes, which, under Mexican law, are deemed to be interest) to a Foreign Holder will generally be subject to Mexican Income Tax (the "Withholding Tax") assessed at a rate of 4.9% because the Notes will be placed, through banks or brokerage houses, in a country which has entered into a treaty to avoid double taxation with Mexico which is in effect, the notice set forth in Article 7, second paragraph, of the LMV will be filed with the CNBV, describing the most relevant terms and conditions of the offer of the Notes (the "CNBV Notice") and the relevant requirements set forth in the MITL and by the SAT through general rules (the "Rules") are expected to be complied with, including that the persons or entities referred to in sections (x) and (y) below are not the effective beneficiaries of 5.0% or more of the aggregate amount of each interest payment. If the requirements under such Rules are not complied with, withholding tax on the payment of interest on the Notes will be assessed at a rate of 10%. The Rules, together with other tax regulations, are enacted on an annual basis, and therefore, no assurances can be given that the Rules will be extended or that equivalent Rules will be enacted.

The withholding tax rates of 4.9% and 10% mentioned above will not be applicable if the effective beneficiaries that receive, either directly or indirectly, individually or in conjunction with related parties, more than 5% of the interest derived from the Notes are: (x) shareholders of TV Azteca or the relevant Guarantor, as the case may be, that own, directly or indirectly, individually or collectively, with related persons more than 10% of TV Azteca's or the relevant Guarantor's, as the case may be, voting stock or (y) corporations more than 20% of the stock of which is owned, directly or indirectly, individually or collectively, with related persons of TV Azteca or the relevant Guarantor, as the case may be. For such purposes, parties are considered to be related parties when one of them holds interest in the business of the other, when they have common interests, or when a third person has an interest in their business or assets. In this case, the interest will be subject to Withholding Tax at a general tax rate of 35%.

Payments of interest made by TV Azteca or any Guarantor with respect to the Notes to non-Mexican pension or retirement funds will be exempt from Mexican withholding taxes, *provided* that any such fund (i) is the effective beneficiary of the interest, (ii) is duly incorporated pursuant to the laws of its country of origin (regardless of the type of organization), (iii) is exempt from income tax in such country, and according to the general rules issued by the SAT, (iv) the pension or retirement funds deliver the necessary documentation to the Company accrediting its nature as a pension or retirement fund.

145

TV Azteca and the Guarantors have agreed, subject to specified exceptions and limitations, to pay additional amounts to the holders of the Notes in respect of the Withholding Tax described above.

Under the MITL and regulations thereunder, a Foreign Holder will not be subject to any Mexican taxes in respect of payments of principal made by TV Azteca or any Guarantor with respect to the Notes (except to the extent such payments of principal are in excess of the issue price of the Notes).

*Taxation of Dispositions of Notes*

Payments in excess of the issue price of the Notes resulting from the sale made by a Foreign Holder of the Notes, are deemed to be interest for Mexican tax purposes, to the extent the purchaser of the Notes is a Mexican resident or a foreign resident with a permanent establishment for tax purposes in Mexico. In addition, purchases of the Notes by a non-Mexican tax resident below par value may be subject to Withholding Tax if the seller of the Notes is either a Mexican resident or a foreign resident with a permanent establishment for tax purposes in Mexico.

Capital gains resulting from the sale or other disposition of the Notes by a Foreign Holder to another Foreign Holder will not be subject to Mexican income or other similar taxes.

*Transfer and Other Taxes*

There are no Mexican stamp, registration of similar taxes payable by a Foreign Holder in connection with the purchase, ownership or disposition of any Notes.  A Foreign Holder of Notes will not be liable for Mexican estate, gift, inheritance or similar tax with respect to the Notes.

**Payments of Interest**

Under Council Directive 2003/48/EC on the taxation of savings income (the "Savings Directive"), each Member State of the European Union, or EU, is required to provide to the tax authorities of another Member State details of payments of interest or other similar income paid by a person within its jurisdiction to, or secured by such a person for, an individual beneficial owner resident in, or certain limited types of entities established in, that other Member State; however, for a transitional period, Austria and Luxembourg will (unless during such period they elect otherwise) instead apply a withholding system in relation to such payments. Under such withholding system, the beneficial owner of the interest payment must be allowed to elect that certain provision of information procedures should be applied instead of withholding. The current rate of withholding is 35%. The transitional period is to terminate at the end of the first full fiscal year following the conclusion of agreements by certain non-EU countries to exchange of information procedures relating to interest and other similar income.

A number of non-EU countries, and certain dependent or associated territories of certain Member States, have adopted or agreed to adopt similar measures (either provision of information or transitional withholding) in relation to payments made by a person within its jurisdiction to, or secured by such a person for, an individual beneficial owner resident in, or certain limited types of entities established in, a Member State. In addition, the Member States have entered into provision of information or transitional withholding arrangements with certain of those dependent or associated territories in relation to payments made by a person in a Member State to, or secured by such a person for, an individual beneficial owner resident in, or certain limited types of entities established in, one of those countries or territories.

A proposal for amendments to the Savings Directive has been published, including a number of suggested changes which, if implemented, would broaden the scope of the rules described above. No Additional Amounts will be payable with respect to a note where withholding or deduction is imposed or levied on a payment pursuant to the Savings Directive or any other EU directive implementing the conclusions of the ECOFIN Council meeting of November 26-27, 2000 on the taxation of savings income, or any law implementing or complying with, or introduced in order to conform to, such a directive. If any Definitive Notes are issued, the Issuer will, to the extent permitted by law, maintain a paying agent in a Member State that will not be obliged to withhold or deduct tax pursuant to the Savings Directive or any such directive or law. Holders should consult their tax advisors regarding the implications of the Savings Directive in their particular circumstances.

**AVAILABLE INFORMATION**

For so long as notes are listed on the Official List of the SGX-ST, copies of the following items will be available in physical form at the offices of TV Azteca, located at Avenida Periférico Sur número 4121, Col. Fuentes del Pedregal, Mexico City, C.P. 14141, Mexico:

- this Offering Circular;

- the Indenture governing the notes;

- the constitutional documents of TV Azteca and the guarantors;

- consolidated audited financial statements of TV Azteca and its subsidiaries as of and for the years ended December 31, 2016 and 2015, in each case together with the audit reports prepared in connection therewith;

- consolidated unaudited interim financial statements of TV Azteca and its subsidiaries as of and for the six months ended June 30, 2017 and 2016;

- the most recently published audited consolidated financial statements (if any) of TV Azteca and its subsidiaries, in each case together with any audit reports prepared in connection therewith;

- the most recently published unaudited interim financial statements (if any) of TV Azteca and its subsidiaries, in each case together with any review reports prepared in connection therewith; and

- any other documents relating to the offering of notes referred to herein.

**LISTING AND GENERAL INFORMATION**

The information contained in this Offering Circular is solely the responsibility of TV Azteca.  TV Azteca, having taken all reasonable care, confirms that the information contained in this Offering Circular is, to the best of its knowledge, in accordance with the facts and contains no omission likely to affect its import.

Since June 30, 2017, there has been no significant change in the financial or trading position of TV Azteca or TV Azteca and its consolidated subsidiaries (including each of the Guarantors) ("TV Azteca's Group") and since December 31, 2016 there has been no material adverse change in the financial position or prospects of TV Azteca or TV Azteca's Group which is not otherwise disclosed in this Offering Circular.

The notes may at any time, but are not required to, be listed on one or more stock exchanges. Approval-in-principle has been received for the listing and quotation of the notes on the SGX-ST. The SGX-ST assumes no responsibility for the correctness of any of the statements made or opinions expressed or reports contained in this Offering Circular. Approval in-principle for the listing and quotation of the notes on the SGX-ST is not to be taken as an indication of the merits of the offering, TV Azteca, its subsidiaries (including the Guarantors), their respective associated companies, their respective joint venture companies or the notes. The notes will be traded on the SGX-ST in a minimum board lot size of $200,000 for so long as any of the Notes are listed on the SGX-ST.

For so long as the notes are listed on the SGX-ST and the rules of the SGX-ST so require, TV Azteca shall appoint and maintain a paying agent in Singapore, where such notes may be presented or surrendered for payment or redemption in the event that the global note(s) representing such notes is exchanged for definitive notes. In addition, in the event that the global note(s) is exchanged for certificated notes, an announcement of such exchange will be made by or on behalf of TV Azteca through the SGX-ST. Such announcement will include all material information with respect to the delivery of the definitive notes including details of the paying agent in Singapore.

The global notes will be deposited upon issuance with a common depositary for Euroclear and Clearstream, Luxembourg.

TV Azteca estimates that it will incur approximately $18,400 in costs related to the approval of this Offering Circular by the SGX-ST.

Except as disclosed in this Offering Circular, within the 12 months preceding the date of this Offering Circular neither TV Azteca nor TV Azteca's Group is or has been involved in any governmental, legal or arbitration proceedings (including any such proceedings which are pending or threatened of which TV Azteca or TV Azteca's Group is aware) which may have, or have in such period had, significant effects on the financial position or profitability of TV Azteca and/or TV Azteca's Group.

The price and amount of notes to be issued will be determined by TV Azteca and the initial purchasers at the time of issue in accordance with prevailing market conditions.

TV Azteca has obtained all necessary consents, approvals and authorizations in connection with the issuance of notes. The issuance of the notes was authorized by resolutions of the board of directors of TV Azteca passed on July 19, 2017.

Certain legal matters in connection with the offering of the notes will be passed upon for TV Azteca by Winston & Strawn LLP, New York, New York.  The initial purchasers have been represented by Jones Day, New York, New York.

TV Azteca's consolidated financial statements as of and for the years ended December 31, 2016 and 2015 have been audited by its independent auditors, Salles, a member of Grant Thornton International. Salles is a member of the CCPM and its address is Periférico Sur 4348, Colonia Jardines del Pedregal, 04500, Mexico City, Mexico.

TV Azteca is a publicly held corporation with variable capital (*sociedad anónima bursátil de capital variable*) organized under the laws of Mexico. The public deed containing TV Azteca's deed of incorporation was executed on June 2, 1993 and the same was registered in the Public Registry on July 13, 1993 under the commercial file 167346. The term of TV Azteca's incorporation is 99 years beginning on the date of TV Azteca's incorporation. TV Azteca's principal executive offices are located at Avenida Periférico Sur número 4121, Colonia Fuentes del Pedregal, Mexico City, C.P. 14141, Mexico.  TV Azteca's telephone number at that location is +1 (52) (55) 1720-1313. TV Azteca's Internet addresses are www.irtvazteca.com and www.tvazteca.com.  Information available on TV Azteca's websites is not a part of, nor is it incorporated by reference into, this Offering Circular.

**INDEX TO CONSOLIDATED FINANCIAL STATEMENTS**

<div align="right">**Page**</div>

**Unaudited Condensed Interim Consolidated Financial Statements of TV Azteca as of June 30, 2017 and 2016**................................. ............................ ............................ ............................. .............................F-2

Condensed consolidated statements of financial position as of June 30, 2017 and 2016..............................F-3

Condensed consolidated statements of comprehensive income for the six months ended June 30, 2017 and 2016................................................................................................................ ........................F-4

Condensed consolidated statements of changes in equity for the six months ended June 30, 2017 and 2016................................................................................................... ...........................F-5

Condensed consolidated statements of cash flows for the six months ended June 30, 2017 and 2016.........F-6

Notes to the condensed interim consolidated financial statements ............................... .............................F-7

**Audited Consolidated Financial Statements and Independent Auditor's Report of TV Azteca as of December 31, 2016 and 2015**................................................................... .........................F-15

Consolidated statements of financial position as of December 31, 2016 and 2015 ............................... .......F-23

Consolidated statements of comprehensive income for the years ended December 31, 2016 and 2015 .......F-24

Consolidated statements of changes in equity for the years ended December 31, 2016 and 2015.................F-25

Consolidated statements of cash flows for the years ended December 31, 2016 and 2015...........................F-26

Notes to the consolidated financial statements ................................................................. ...........................F-27

Condensed Interim Consolidated Financial Statements

TV Azteca, S.A.B. de C.V. and subsidiaries

(Subsidiary of Comunicaciones Avanzadas, S.A. de C.V.)

June 30, 2017 and 2016



**TV Azteca, S.A.B. de C.V. and Subsidiaries**
(Subsidiary of Comunicaciones Avanzadas, S.A. de C.V.)

## Condensed consolidated statements of financial position
### As of June 30, 2017 and 2016
(Stated in thousands of Mexican pesos)

| | June 2017 | June 2016 | December 2016 |
|---|---|---|---|
| **Assets** | | | |
| **Current** | | | |
| Cash and cash equivalents | $ 3,024,538 | $ 2,754,841 | $ 4,470,314 |
| Trade and other receivables | 10,654,792 | 8,575,950 | 6,197,984 |
| Current tax assets | 671,521 | 728,245 | 764,868 |
| Related parties | 972,233 | 938,587 | 940,735 |
| Other financial assets | 755,529 | 815,959 | 1,005,345 |
| Performance rights | 2,665,036 | 2,303,448 | 2,210,591 |
| Inventories | 143,997 | 469,698 | 202,304 |
| **Total current assets** | 18,887,646 | 16,586,728 | 15,792,141 |
| | | | |
| **Non-current** | | | |
| Trade long-term | 507,680 | 86,075 | - |
| Performance rights | 2,436,567 | 2,594,242 | 3,229,525 |
| Property and equipment, net | 3,856,229 | 4,105,334 | 4,111,107 |
| Television concessions, net | 6,723,812 | 10,240,989 | 10,785,466 |
| Other intangible assets | 1,477,851 | 3,007,002 | 1,488,596 |
| Investments accounted for using the equity method and other | 348,461 | 411,821 | 332,180 |
| Deferred income taxes | 1,546,117 | 2,404,283 | 1,825,118 |
| **Total non-current assets** | 16,896,717 | 22,849,746 | 21,771,992 |
| **Total assets** | $ 35,784,363 | $ 39,436,474 | $ 37,564,133 |
| | | | |
| **Liabilities** | | | |
| **Short-term** | | | |
| Medium Term Note Program -MTN- | $ 4,636,975 | $ - | $ - |
| Trade and other payables | 3,654,521 | 5,602,574 | 3,614,804 |
| Performance rights | 425,980 | 646,993 | 1,087,327 |
| Related parties | 131,297 | 318,452 | 97,571 |
| Current tax liabiities | 600,184 | 408,921 | 379,731 |
| Deferred revenue | 8,068,515 | 6,359,908 | 6,593,844 |
| **Total short-term liabilities** | 17,517,472 | 13,336,848 | 11,773,277 |
| | | | |
| **Long-term** | | | |
| Loans from American Tower Corporation -ATC- | 1,657,276 | 1,694,161 | 1,891,869 |
| Medium Term Note Program -MTN- | 8,939,850 | 14,624,210 | 16,369,456 |
| Deferred revenue | 1,287,700 | 1,939,803 | 1,075,503 |
| Employee benefits | 188,035 | 197,187 | 188,035 |
| Deferred income taxes, 2010 and 2014 tax reforms | 310,935 | 548,177 | 601,622 |
| **Total long-term liabilities** | 12,383,796 | 19,003,538 | 20,126,485 |
| **Total liabilities** | 29,901,268 | 32,340,386 | 31,899,762 |
| | | | |
| **Equity** | | | |
| Capital stock | 716,884 | 717,057 | 715,229 |
| Premium on stock issued | 207,419 | 207,419 | 207,419 |
| Legal reserve | 153,229 | 153,229 | 153,229 |
| Reserve for stock repurchases | 605,653 | 619,328 | 600,584 |
| Other components of equity | (219,849) | (1,296,489) | (201,976) |
| Retained earnings | 4,408,100 | 6,667,677 | 4,165,317 |
| **Equity attributable to owners of the parent** | 5,871,436 | 7,068,221 | 5,639,802 |
| Non-controlling interest | 11,659 | 27,867 | 24,569 |
| **Total equity** | 5,883,095 | 7,096,088 | 5,664,371 |
| **Total liabilities and equity** | $ 35,784,363 | $ 39,436,474 | $ 37,564,133 |

The accompanying condensed notes are an integral part of these consolidated financial statements.

**TV Azteca, S.A.B. de C.V. and Subsidiaries**
(Subsidiary of Comunicaciones Avanzadas, S.A. de C.V.)

2

## Condensed consolidated statements of comprehensive income
**For the six month periods ended June 30, 2017 and 2016**
(Stated in thousands of Mexican pesos)

| | | 2017 | | 2016 |
|---|---|---|---|---|
| **Revenue** | $ | **7,017,303** | $ | 6,128,711 |
| | | | | |
| Cost of programming, production, and broadcasting | | **4,760,399** | | 3,791,801 |
| Selling and administrative expenses | | **655,413** | | 671,547 |
| **Total costs and expenses** | | **5,415,812** | | 4,463,348 |
| | | | | |
| **Operating profit before depreciation and amortization and other expenses** | | **1,601,491** | | 1,665,363 |
| | | | | |
| Depreciation and amortization | | **409,616** | | 345,272 |
| Other expenses, net | | **730,715** | | 224,818 |
| **Operating profit** | | **461,160** | | 1,095,273 |
| | | | | |
| **Share of profit from equity accounted investments** | | **(90,387)** | | 6,599 |
| | | | | |
| **Comprehensive gain or loss on financing:** | | | | |
| Interest expense | | **(697,036)** | | (688,605) |
| Interest income | | **52,833** | | 41,942 |
| Other financial expenses | | **(20,835)** | | (51,440) |
| Exchange gain (loss), net | | **1,282,890** | | (499,419) |
| | | **617,852** | | (1,197,522) |
| **Profit (loss) before taxes on earnings** | | **988,625** | | (95,650) |
| Taxes on earnings | | **537,108** | | 622,037 |
| **Profit (loss) from continuing operations** | | **451,517** | | (717,687) |
| | | | | |
| **Loss from discontinued operations** | | **-** | | (370,923) |
| | | | | |
| **Profit (loss) for the year** | $ | **451,517** | $ | (1,088,610) |
| | | | | |
| **Other comprehensive income:** | | | | |
| *Items that will be reclassified subsequently to profit or loss* | | | | |
| Exchange differences on translating foreign operations | | **(680,850)** | | 318,746 |
| Loss on avaible-for-sale financial assets | | **(249,815)** | | (132,328) |
| Cash flow hedging, gains (losses) | | **710,792** | | (505,022) |
| **Other comprehensive loss for the year** | | **(219,873)** | | (318,604) |
| **Total comprehensive income (loss) for the year** | $ | **231,644** | $ | (1,407,214) |
| | | | | |
| **Net profit (loss) for the year attributable to:** | | | | |
| Non-controlling interest | | **(10,688)** | | (13,138) |
| Owners of the parent | | **462,205** | | (1,075,472) |
| | $ | **451,517** | $ | (1,088,610) |
| | | | | |
| **Total comprehensive income (loss) for the year attributable to:** | | | | |
| Non-controlling interest | | **(10,688)** | | (13,138) |
| Owners of the parent | | **242,332** | | (1,394,076) |
| | $ | **231,644** | $ | (1,407,214) |

The accompanying condensed notes are an integral part of these consolidated financial statements.

**TV Azteca, S.A.B. de C.V. and Subsidiaries** [3]
**(Subsidiary of Comunicaciones Avanzadas, S.A. de C.V.)**

## Condensed consolidated statements of changes in equity
**For the six month periods ended June 30, 2017 and 2016**
(Stated in thousands of Mexican pesos)

| | Capital stock | Premium on stock issued | Legal reserve | Reserve for stock repurchases | Other components of equity | Retained earnings | Total attributable to owners of parent | Non-controlling interest | Total equity |
|---|---|---|---|---|---|---|---|---|---|
| Balances as of January 1, 2016 | $ 716,436 | $ 207,419 | $ 153,229 | $ 614,617 | $ (1,620,645) | $ 8,403,215 | $ 8,474,271 | $ 41,005 | $ 8,515,276 |
| Preferred dividends paid | - | - | - | - | - | (17,306) | (17,306) | - | (17,306) |
| Sale of treasury stock | 17,108 | - | - | 134,989 | - | - | 152,097 | - | 152,097.00 |
| Stock repurchase | (16,487) | - | - | (130,278) | - | - | (146,765) | - | 146,765.00 |
| Transactions with owners | 621 | - | - | 4,711 | - | (17,306) | (11,974) | - | (11,974) |
| Net loss for the period | - | - | - | - | - | (1,075,472) | (1,075,472) | (13,138) | (1,088,610) |
| Appropriation to retained earnings | - | - | - | - | 642,760 | (642,760) | - | - | - |
| Other comprehensive loss | - | - | - | - | (318,604) | - | (318,604) | - | (318,604) |
| Total comprehensive loss for the period | - | - | - | - | 324,156 | (1,718,232) | (1,394,076) | (13,138) | (1,407,214) |
| Balances as of June 30, 2016 | $ 717,057 | $ 207,419 | $ 153,229 | $ 619,328 | $ (1,296,489) | $ 6,667,677 | $ 7,068,221 | $ 27,867 | $ 7,096,088 |
| Balances as of January 1, 2017 | $ 715,229 | $ 207,419 | $ 153,229 | $ 600,584 | $ (201,976) | $ 4,165,317 | $ 5,639,802 | $ 22,347 | $ 5,662,149 |
| Preferred dividends paid | - | - | - | - | - | (17,422) | (17,422) | - | (17,422) |
| Sale of treasury stock | 15,921 | - | - | 172,142 | - | - | 188,063 | - | 188,063 |
| Stock repurchase | (14,266) | - | - | (167,073) | - | - | (181,339) | - | (181,339) |
| Transactions with owners | 1,655 | - | - | 5,069 | - | (17,422) | (10,698) | - | (10,698) |
| Net loss for the period | - | - | - | - | - | 462,205 | 462,205 | (10,688) | 451,517 |
| Appropriation to retained earnings | - | - | - | - | 202,000 | (202,000) | - | - | - |
| Other comprehensive loss | - | - | - | - | (219,873) | - | (219,873) | - | (219,873) |
| Total comprehensive loss for the period | - | - | - | - | (17,873) | 260,205 | 242,332 | (10,688) | 231,644 |
| Balances as of June 30, 2017 | $ 716,884 | $ 207,419 | $ 153,229 | $ 605,653 | $ (219,849) | $ 4,408,100 | $ 5,871,436 | $ 11,659 | $ 5,883,095 |

The accompanying condensed notes are an integral part of these consolidated financial statements.

F-5

## TV Azteca, S.A.B. de C.V. and Subsidiaries
**(Subsidiary of Comunicaciones Avanzadas, S.A. de C.V.)**

4

# Condensed consolidated statements of cash flows
## For the six month periods ended June 30, 2017 and 2016
(Stated in thousands of Mexican pesos)

|  | 2017 | 2016 |
|---|---:|---:|
| **OPERATING ACTIVITIES:** | | |
| Profit (loss) before taxes on earnings | $ 988,625 | $ (95,650) |
| | | |
| Items related to investing activities | | |
| Depreciation and amortization | 409,616 | 415,744 |
| Impairment of long-lived assets | 594,628 | - |
| Share of profit from equity accounted investments | 90,387 | (6,599) |
| Gain on sale of property and equipment | (8,849) | (305) |
| Profit loss from discontinued operations | - | (357,945) |
| Items related to financing activities: | | |
| Unrealized exchange loss | (2,437,125) | 410,572 |
| Interest expense | 697,036 | 688,605 |
| | 334,318.00 | 1,054,422 |
| | | |
| Accounts receivable | (1,486,824) | (2,939,172) |
| Related parties | 2,228 | 573 |
| Inventories | 58,307 | 197,303 |
| Performance rights | (322,834) | (165,424) |
| Accounts payable and accrued expenses | 290,546 | 1,797,329 |
| Deferred revenue | 1,686,865 | 1,440,879 |
| Deferred income taxes, 2010 and 2014 tax reforms | (290,687) | (492,974) |
| Net cash flows from operating activities | 271,919 | 892,936 |
| | | |
| **INVESTING ACTIVITIES:** | | |
| Acquisitions of property and equipment | (202,781) | (223,624) |
| Proceeds from disposals of property and equipment | 28,429 | 18,148 |
| Investments accounted for using the equity method and other | - | (1,703) |
| Investments in intangibles | - | (172,832) |
| Net cash flows from investing activities | (174,352) | (380,011) |
| | | |
| **FINANCING ACTIVITIES:** | | |
| Repayment of borrowings, net | (832,053) | - |
| Interest paid | (695,523) | (684,535) |
| Preferred dividends paid | (17,422) | (17,306) |
| Net cash flows from financing activities | (1,543,343) | (696,501) |
| | | |
| Decrease in cash and cash equivalents | (1,445,776) | (183,576) |
| Cash and cash equivalents at beginning of year | 4,470,314 | 2,938,417 |
| Cash and cash equivalents at end of year | $ 3,024,538 | $ 2,754,841 |

The accompanying condensed notes are an integral part of these consolidated financial statements.

# TV Azteca, S.A.B de C.V. and Subsidiaries

<sup>5</sup>

## Notes to the condensed interim consolidated financial statements

## June 30, 2017 and 2016

(Stated in thousands of Mexican pesos and thousands of U.S. dollars, except where stated otherwise, as well as per share amounts and exchange rates)

### 1.    NATURE OF OPERATIONS

TV Azteca, S.A.B. de C.V. (the Company or TVA) was acquired by its present stockholders in July 1993. The main business of TV Azteca, S.A.B. de C. V. and its subsidiaries include: (i) the transmission and production of television programs; (ii) sale of advertising time; and (iii) operating a fiber optic network in Colombia (until December 2016) and Perú.

### 2.    GENERAL INFORMATION AND BASIS OF PREPARATION

The interim consolidated condensed financial statements (the interim financial statements) apply to the six months ended at June 30, 2017 and are presented in Mexican pesos, the Company's functional currency. These interim financial statements have been prepared in accordance with International Accounting Standard (IAS) 34 "Interim Financial Reporting" and do not include all the information required for annual financial statements, in accordance with International Financial Reporting Standards (IFRS). They should be taken as a whole with the consolidated financial statements ended at December 31, 2016.

The Company is the holding company of the Group ultimately. The Company is a Publicly Held Variable Capital Corporation (S.A.B. de C.V., for its acronym in Spanish), with a duration of 99 years beginning 1993. Its main offices are located at Periférico Sur 4121, Colonia Fuentes del Pedregal, Postal Code 14141, Mexico City, Mexico.

The interim financial statements are unaudited and have been approved and authorized to be issued by the Board of Directors on July 19, 2017.

### 3.    SIGNIFICANT ACCOUNTING POLICIES

The interim financial statements have been prepared in accordance with the accounting policies described in Note 4 to the audited financial statements at December 31, 2016, except for the following IFRS´s amendments beginning January 1, 2017:

- Recognition of deferred tax assets for unrealized losses (Amendments to IAS 12)
- Disclosure initiative (Amendments to IAS 7)
- Annual improvements 2014-2016 (IFRS 12 Disclosure of interests in other entities: Clarification of the scope of the Standard).

Adoption of the above exceptions had no impact on the consolidated financial statements of the Group.

### 4.    ESTIMATES

Upon preparing the financial statements, Management realizes several judgments, estimates, and assumptions for the recognition and measurement of assets, liabilities, revenues, and expenses. Actual results can differ from judgments, estimates, and assumptions made by Management, and they will seldom be equal to estimated results.

The judgments, estimations and assumptions used in the interim financial statements are the same criteria used by Management in applying accounting policies and uncertainty in estimates in the annual financial statements ended at December 31, 2016, except for those used in the estimate of the provision of taxes on earnings, which were determined in the interim financial statements using the best information available for their calculation.

**TV Azteca, S.A.B. de C.V. and Subsidiaries**                                                          **8**
**(Subsidiary of Comunicaciones Avanzadas, S.A. de C.V.)**
**Notes to the condensed interim consolidated financial statements as of June 30, 2017 and 2016**

5.      **MAIN EVENTS AND TRANSACTIONS**

   a)   <u>Fiber optic network Colombia</u>

During 2016, pursuant to the analyses and evaluations performed by Management with respect to impairment indicators, the Group recognized an impairment charge amounting in its intangible assets to $1,376,526, which is presented in "other expenses" of the accompanying consolidated statements of comprehensive income.

Moreover, the Group analyzed the perspectives and valuation of its investment in the telecommunications business in Colombia to define the long-term approach more accurately, and determined that this business would require an additional investment of capital amounting to US$100 million in the short-term to develop last mile infrastructure; therefore, it entered into an agreement with the shareholders which set forth that the Group would contribute US$40 million and the remaining US$60 million would be contributed by another group of shareholders.

On December 27, 2016, the shareholder agreement was concluded and the capitalizations discussed were formalized; therefore, beginning that date, the Group stopped having control over the telecommunications business in Colombia, and consequently: (i) the assets and liabilities of the companies involved stopped being consolidated; and (ii) the investment in those companies qualifies as an associate and are valued by using the equity method.

As a result of the foregoing and for comparison purposes, Management restated the statement of comprehensive income for the period from January 1 to June 30, 2017, to present the results of operating the business in Colombia under the heading "Discontinued operations".

   b)   <u>Debt prepayment</u>

On March 2017, the Group prepaid a portion of its long-term debt in the amounts of US$42.5 million, due May 2018, pursuant to the issue of US$300 million of the MTN Program.

   c)   <u>Golf tournament</u>

Derived from a collaboration agreement of the "PGA Tour Golf Tournament" held between the PGA Tour, Inc., Chapultepec Golf Club and a subsidiary of the Company, the Group undertakes to make all necessary disbursements and arrangements to carry out the golf tournament to be held in Mexico in March of each year, during the seven years following the date of signature of the contract.

On March 2017, the Company held the First International Golf Tournament of the "PGA Tour", whose organization rights for the next 7 years were awarded to the Company.

   d)   <u>New television channels</u>

On March 2017, TVA announced: (i) the transformation of image and content of Channel 40, now known as "ad40", which will be a dynamic channel focused on news and live sports 24 hours a day on open television in Mexico. Its signal will be transmitted through channels 1.2 of open television in México and 40.1 in the Valley of Mexico, in addition to being available on the main pay television systems; and (ii) the startup of the new "a+" television channel, television signal that offers a network of local channels that will produce contents for the needs and preferences of each community, and it will be transmitted through channel 7.2 of open television in Mexico, and it will start with local signals in Mexico City, Guadalajara, León, Monterrey, and Toluca.

<u>Auction process of the spectrum</u>
On April, 2017, the Company participated and won the auction for the sale of spectrum and transmission licenses held through its subsidiaries in the United States of America, organized by the FCC, achieving a sale price of USD$156 million, and recognized an impairment charge in amount of USD$32.9 million (equivalents to $595 million), wich is presented in "other expenses, net" within the condensed consolidated statement of comprehensive income.

The FCC will award the frequencies and make the payments to the winners within ninety days subsequent to the date published.

**TV Azteca, S.A.B. de C.V. and Subsidiaries**                                                9
**(Subsidiary of Comunicaciones Avanzadas, S.A. de C.V.)**
**Notes to the condensed interim consolidated financial statements as of June 30, 2017 and 2016**

### 6. ACCOUNTS RECEIVABLE

|  | 2017 | 2016 |
|---|---|---|
| Trade and other receivables | $ 11,162,472 | $ 8,662,025 |
| Related parties | 972,233 | 938,587 |
| Taxes recoverable | 671,521 | 728,245 |
|  | $ 12,806,226 | $ 10,328,857 |

### 7. RELATED PARTY BALANCES AND TRANSACTIONS

|  | 2017 | 2016 |
|---|---|---|
| **Accounts receivable:** |  |  |
| Comunicaciones Avanzadas, S.A. de C.V. (Holding Company) | $ 545,603 | $ 544,346 |
| Grupo Elektra, S.A.B. de C.V. and subsidiaries (Grupo Elektra) | 241,806 | 172,455 |
| Arrendadora Internacional Azteca, S.A. de C.V. | 66,788 | 45,156 |
| Total Play Telecomunicaciones, S.A. de C.V. | 30,978 | 28,511 |
| Adamantium Private Security Services, S. de R.L. de C.V. | 4,961 | 66,239 |
| Desarrollos Infraestructura y Construcción G.S., S.A. de C.V. | - | 34,000 |
| Other | 82,097 | 47,880 |
|  | $ 972,233 | $ 938,587 |
|  |  |  |
| **Accounts payable:** |  |  |
| Selabe Diseños, S.A. de C.V. (Selabe) | $ 131,297 | $ 49,165 |
| Globo Re, S.A. | - | 176,964 |
| Other | - | 92,323 |
|  | $ 131,297 | $ 318,452 |

### 8. PROPERTY AND EQUIPMENT

| | Balance at January 1, 2017 | Additions | Disposals | Depreciation for the year | Balance at June 30, 2017 | Estimated useful life (Years) |
|---|---|---|---|---|---|---|
| Buildings | $1,422,605 | $ 57,439 | $ 7,750 | $ 71,259 | $ 1,401,035 | 33 |
| Operating equipment | 1,326,033 | 82,061 | 18,245 | 200,944 | 1,188,905 | 6 & 20 |
| Furniture and office equipment | 49,882 | 3,446 | 107 | 5,698 | 47,523 | 10 |
| Transportation equipment | 279,712 | 81,298 | 84,056 | 40,037 | 236,917 | 5 |
| Other fixed assets | 290,358 | 37,032 | 293 | 71,746 | 255,351 | 4 |
| Land | 681,395 | - | - | - | 681,395 | - |
| Construction-in-progress | 61,122 | 220,210 | 236,229 | - | 45,103 | - |
| | $4,111,107 | $ 481,486 | $ 346,680 | $ 389,684 | $ 3,856,229 | |

| As of June 30, 2016 | | | | | | |
|---|---|---|---|---|---|---|
| Buildings | $1,350,775 | $ 17,266 | $ - | $ 43,696 | $1,324,345 | 33 |
| Operating equipment | 1,419,621 | 108,537 | 759 | 189,709 | 1,337,690 | 6 & 20 |
| Furniture and office equipment | 52,068 | 6,024 | - | 5,146 | 52,946 | 10 |
| Transportation equipment | 314,995 | 61,371 | 61,570 | 44,076 | 270,720 | 5 |
| Fiber Optic Network | 27,012 | - | 27,012 | - | - | - |
| Other fixed assets | 268,998 | 65,947 | 1,633 | 60,695 | 272,617 | 4 |
| Land | 688,131 | 1,052 | - | - | 689,183 | - |
| Construction-in-progress | 70,855 | 366,261 | 279,283 | - | 157,833 | - |
| | $4,192,455 | $ 626,458 | $ 370,257 | $ 343,322 | $4,105,334 | |

**TV Azteca, S.A.B. de C.V. and Subsidiaries**
**(Subsidiary of Comunicaciones Avanzadas, S.A. de C.V.)**
**Notes to the condensed interim consolidated financial statements as of June 30, 2017 and 2016**

10

### 9.    OTHER INTANGIBLE ASSETS

As of June 30, 2017 and 2016, this caption is summarized as follows:

| | 2017 | 2016 |
|---|---|---|
| Payments to Corporación de Noticias e Información, S.A. de C.V. | $ 374,852 | $ 374,852 |
| Players' registration costs and affiliation rights | 799,666 | 682,752 |
| Fiber optic network Colombia | - | 1,479,062 |
| Atlas Soccer Team acquisition | 188,579 | 188,579 |
| Fiber optic network Peru | 41,054 | 74,916 |
| Other assets, net | 73,700 | 206,841 |
| | $ 1,477,851 | $ 3,007,002 |

### 10.    EQUITY

a)  Stockholders resolutions

At the General Stockholders' Meeting held on April 25, 2017 and April 27, 2016, a dividend was declared in the amount of $17,267 and $17,304, respectively, which corresponds to preferred stock dividends for series D-A and series D-L shareholders. Those dividends were paid out of the Net Taxable Income Account (CUFIN for its acronym in Spanish). Moreover, it was resolved to transfer the amount of ($202,000) and ($642,760), respectively, recorded in other capital components to retained earnings, as shown in the consolidated statement of changes in stockholders' equity.

b)  Resolutions adopted on the year ended December 31, 2010

On April 30, 2010, a cash reimbursement was approved in proportion to the stockholdings of each stockholder at the General Extraordinary Stockholders' Meeting, up to the amount of $322,000, payable in the amounts and on the dates determined by Management, in accordance with the Company's economic capacity. This reimbursement implied a fixed minimum capital stock decrease of the Company in the amount of $9,944. As of June 30, 2017 and 2016, the balance payable of this reimbursement amounted to $238,358, and it is presented in the consolidated statement of financial position within accounts payable and accrued liabilities.

c)  Stock repurchase

For the period ended June 30, 2017 and 2016, the Company decreased its capital stock in the amount of $14,266 and $16,487, respectively, on the repurchase of 66,789 thousand shares and 25,070 thousand shares in each year. Shares were repurchased in the amount of $181,339 and $146,765, respectively. The value thereof was charged to capital stock, and the difference was charged to the reserve for stock repurchases.

d)  Other capital components

| | Translation effect | Available-for-sale financial assets | Cash flow hedges | Total |
|---|---|---|---|---|
| Balance as of January 1, 2017 | $ 1,843,067 | $ (52,735) | $ (1,992,308) | $ (201,976) |
| Exchange differences on translating foreign operations | (680,850) | - | - | (680,850) |
| Cash flow hedges | - | - | 710,792 | 710,792 |
| Loss on investment available-for-sale | - | (249,815) | - | (249,815) |
| Reclassifications to retained earnings | - | 202,000 | | 202,000 |
| Balance as of June 30, 2017 | $ 1,162,217 | $ (100,550) | $ (1,281,516) | $ (219,849) |

**TV Azteca, S.A.B. de C.V. and Subsidiaries**                                                                 11
**(Subsidiary of Comunicaciones Avanzadas, S.A. de C.V.)**
**Notes to the condensed interim consolidated financial statements as of June 30, 2017 and 2016**

| | Translation effect | | Available-for-sale financial assets | Cash flow hedges | Total |
|---|---|---|---|---|---|
| Balance as of January 1, 2016 | $ | 621,573 | $ (642,361) | $(1,599,865) | $(1,620,653) |
| Exchange differences on translating foreign operations | | 318,746 | - | - | 318,746 |
| Cash flow hedges | | - | - | (505,022) | (505,022) |
| Loss on investment available-for-sale | | - | (132,328) | - | (132,328) |
| Reclassifications to retained earnings | | - | 642,768 | - | 642,768 |
| Balance as of June 30, 2016 | $ | 940,319 | $ (131,921) | $ (2,104,887) | $ (1,296,489) |

## 11.   FINANCIAL INFORMATION BY SEGMENT

Management currently identifies five lines of service of the Group as operating segments. These operating segments are supervised by the person who makes strategic decisions, which are made based on the adjusted operating results of the segment.

National Television

This segment is comprised of television services in Mexican territory, including local stations. Income is derived mainly from the sale of time on screen nation wide and locally less commissions on sales.

Azteca America

This segment consists of television services in the territory of the United States of America, directed primarily for the Hispanic community that resides in that territory.

Exports

This segment is comprised mainly of the exports of programs that were of wide interest for global audiences primarily in the countries of Latin America and Europe.

Fiber optic network

This segment is derived mainly from the transactions related to Azteca Comunicaciones Colombia and Azteca Comunicaciones Peru in charge of construction, operation, and maintenance of the fiber-optic network in Colombia and Peru, respectively.

Tournament Golf

This segment corresponds mainly to the operation of the organization of the golf tournament of the PGA tour mentioned in note 5 above.

As of June 30, 2017

| | National Television | Azteca America | Guatemala y Honduras | Exports | Fiber optic | Golf | Consolidated total |
|---|---|---|---|---|---|---|---|
| Net sales | $ 5,373,128 | $ 666,457 | $ 29,588 | $ 117,636 | $ 274,513 | $ 555,981 | $ 7,017,303 |
| Costs | 3,051,423 | 802,365 | 56,606 | - | 295,093 | 554,912 | 4,760,399 |
| Gross profit (loss) | 2,321,705 | (135,908) | (27,018) | 117,636 | (20,580) | 1,069 | 2,256,904 |
| Operating expenses | 1,386,128 | - | - | - | - | - | 1,386,128 |
| Depreciation and amortization | 374,507 | 26,841 | 4,439 | - | 3,829 | - | 409,616 |
| Operating income (loss) | $ 561,070 | $ (162,749) | $ (31,457) | $ 117,636 | $ (24,409) | $ 1,069 | $ 461,160 |

**TV Azteca, S.A.B. de C.V. and Subsidiaries**  12
**(Subsidiary of Comunicaciones Avanzadas, S.A. de C.V.)**
**Notes to the condensed interim consolidated financial statements as of June 30, 2017 and 2016**

As of June 30, 2016

| | National Television | Azteca America | Guatemala y Honduras | Exports | Fiber optic | Golf | Consolidated total |
|---|---|---|---|---|---|---|---|
| Net sales | $ 4,933,977 | $ 609,542 | $ 24,300 | $ 8,598 | $ 502,294 | $ - | $ 6,128,711 |
| Costs | 2,845,931 | 655,123 | 55,289 | - | 235,458 | - | 3,791,801 |
| Gross profit (loss) | 2,088,046 | (45,581) | (30,989) | 58,598 | 266,836 | - | 2,336,910 |
| Operating expenses | 896,365 | - | - | - | - | - | 896,365 |
| Depreciation and amortization | 310,510 | 26,979 | 4,527 | - | 3,256 | - | 345,272 |
| Operating income (loss) | $ 881,171 | $ (72,560) | $ (35,516) | $ 58,598 | $ 263,580 | $ - | $ 1,095,273 |

## 12.   SEASONALITY

The Company's television transmission operations are seasonal. Advertising revenues, which are recognized when the advertisement comes out on the air, are generally higher in the fourth quarter, due to the high level of advertising that comes out on the air as a result of the Christmas season.

The Company's revenues fluctuate as a result of the frequency with which the Company transmits significant events (Olympic Games, World Soccer Cups, among other things). Historically, the transmission of significant events by the Company has increased advertising sales during the periods in which they came out on the air. This reflects higher audiences during the hours in which those significant events were transmitted, and the fact that advertisers pay a premium related to those significant transmission events.

## 13.   FINANCIAL ASSETS AND LIABILITIES

The fair values of financial instruments were determined by using information available on the market and other valuation techniques that require judgment by Management. Moreover, the use of different assumptions and valuation methods can have a material effect on the estimated amounts of fair value.

The financial instruments, which after their initial recognition are quantified at their fair value, are grouped in levels from 1 to 3 based on the degree to which fair value is observed, as shown below:

- Level 1 – valuation based on prices quoted on the market (unadjusted) for identical assets or liabilities;

- Level 2 – valuation with indicators other than the quoted prices included in Level 1, but include observable indicators for an asset or liability, either directly (quoted prices) or indirectly (derivations of these prices); and

- Level 3 – valuation techniques are applied that include indicators for assets and liabilities that are not based on observable market information (unobservable indicators).

a.   Financial assets and liabilities are classified as follows:

| | Available-for-sale *at fair value* | Loans and accounts receivable and other liabilities *at amortized cost* | Total | Available-for-sale *at fair value* | Loans and accounts receivable and other liabilities *at amortized cost* | Total |
|---|---|---|---|---|---|---|
| **Financial assets:** | | As of June 30, 2017 | | | As of June 30, 2016 | |
| Cash and cash equivalents | $    – | $ 3,024,538 | $   3,024,538 | $    – | $ 2,754,841 | $ 2,754,841 |
| Short and long-term trade and other receivables | – | 11,608,527 | 11,608,527 | – | 9,039,200 | 9,039,200 |
| Related parties | – | 840,936 | 840,936 | – | 620,135 | 620,135 |
| Available-for-sale assets | 755,529 | – | 755,529 | 815,959 | – | 815,959 |
| | $ 755,529 | $ 15,474,001 | $ 16,229,530 | $ 815,959 | $12,414,176 | $ 13,230,135 |

**TV Azteca, S.A.B. de C.V. and Subsidiaries**
**(Subsidiary of Comunicaciones Avanzadas, S.A. de C.V.)**
**Notes to the condensed interim consolidated financial statements as of June 30, 2017 and 2016**

13

**Financial liabilities:**

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| Accounts payable | $ | – | $ 4,080,501 | $ 4,080,501 | $ – | $ 6,249,567 | $ 6,249,567 |
| Short and long-term debt | | – | 15,234,101 | 15,234,101 | – | 16,318,371 | 16,318,371 |
| | $ | – | $ 19,314,602 | $ 19,314,602 | $ – | $22,567,938 | $ 22,567,938 |

    b.   Financial debt

Loans include the following short- and long-term financial liabilities:

| | Short-term | | Long-term | |
|---|---|---|---|---|
| | 2017 | 2016 | 2017 | 2016 |
| **Financial liabilities:** | | | | |
| American Tower Corporation -ATC- | $ - | $ - | $ 1,657,276 | $ 1,694,161 |
| Program Medium Term Note -MTN- | 4,636,975 | - | 8,939,850 | 14,624,210 |
| | $ 4,636,975 | $ - | $ 10,597,126 | $ 16,318,371 |

Long-term financial liabilities fair values were determined by calculating their present values at the reporting date, by using fixed effective market interest rates available to the Group. Changes in fair value that go to profit or loss have not been included since financial assets are carried at amortized cost in the consolidated statement of financial position.

## 14.   EARNINGS PER SHARE

Both basic and diluted earnings per share have been calculated by using earnings attributable to the stockholders of the Holding Company (TV Azteca, S.A.B. de C.V.) as the numerator, that is, it was not necessary to make adjustments to earnings in 2017 and 2016.

The weighted average number of shares for purposes of diluted earnings per share can be reconciled with the weighted number of ordinary shares used in the calculation of basic earnings per share as follows:

| | 2017 | 2016 |
|---|---|---|
| Amounts stated in thousands of shares: | | |
| Weighted average of the number of shares used in the base of earnings per share | 8,958,394 | 8,967,085 |
| Shares considered issued without taking into account share based payments | 1,587,441 | 1,578,749 |
| Weighted average of the number of shares used in diluted earnings per share | 10,545,835 | 10,545,834 |

## 15.   CONTINGENCIES

For the period ended at June 30, 2017, there have been no significant changes in the legal course of the litigations.

## 16.   COMMITMENTS

    a   Leases

The Company rents the use of satellite transponders for the service of receipt and conduction of the satellite signal. It has the commitment of paying US$25 (IS21 satellite) and US$74 (Galaxy 19 satellite) every month, for the three contracts entered into with Panamsat de México, S. de R.L. de C.V. The expenses include a monthly fixed payment and others based on the use thereof. The lease agreements have a one-year mandatory duration, automatically and successively renewable for identical periods up to 2021, and 2024, respectively.

The Company has entered into a contract with Satélites Mexicanos, S.A. de C.V., for the rental and use of satellite transponders (Satmex 6 satellite) for the service of receipt and conduction of the signal. It has the commitment of paying a monthly amount of US$86.4 every month. This amount will increase 5% annually up to the date of expiration of the contract, which is not until 2021.

**TV Azteca, S.A.B. de C.V. and Subsidiaries**                                                                                    **14**
**(Subsidiary of Comunicaciones Avanzadas, S.A. de C.V.)**
**Notes to the condensed interim consolidated financial statements as of June 30, 2017 and 2016**

    b    Performance rights

The Company has entered into license agreements with its performance rights suppliers for the long-term acquisition of materials of programs when such programs are available for their first broadcast. As of June 30, 2017, the commitments for the acquisition of materials amount to US$47,000, US$40,721, and US$32,370, with due dates in 2017, 2018 and 2019, respectively. Moreover, some of these contracts do not show a current obligation due to their uncertain nature. Further, some can be marketed in accordance with their specific characteristics.

    c    Advertising rights

In June 2010, the Company entered into an advertising rights assignment contract with Super Publicidad, S.A. de C.V., which sets forth that effective 2012 and up to 2022, the rights of spaces are obtained for exhibiting advertising, as well as the use of part of the facilities of the Mexico City Arena. The total value of the consideration amounts to US$3,500, which has been paid in full.

    d    Fiber optic network Peru

On December 23, 2013, the Company participated in and was awarded the bid of the National Dorsal Fiber Optic Network in Peru. The purpose of this bidding is to design, build, and maintain a Dorsal Fiber Optic Network in routes already defined by the Government of Peru, as well as to render data transmission services to other telecommunications operators, as well as the entities and agencies of that government.

The main characteristics of that contract are the following:

1.   **Signatories:**

    Ministry of Transportation and Communications (Grantor) and Azteca Comunicaciones Perú, S.A.C. (Concessionaire)

2.   **Subject matter of the contract:**

    The grantor establishes a juridical relationship of public law with the Concessionaire whereby the Concessionaire is granted the right to economically operate the National Fiber Optic Backbone Network (RDNFO). The Concessionaire binds itself to design, finance, display, operate, and maintain the assets of the Concession, and to render the services through the RDNFO during the term of the concession, and that of its eventual renewals, subject to the tariff regime.

3.   **Value of the Contract:**

    A concession agreement was signed with the Peruvian Government for 20 years through the Ministry of Transportation and Communication (MTC) in June 2014. That agreement set forth the bases for the design, financing, construction, operation, and maintenance of 13,400 km of Fiber Optic Network that will connect 23 regions, 180 cities, and 136 municipalities. The minimum execution term of the work should be completed in 24 months, through six delivery stages in June 2016.

As of June 30, 2016, the Company had met the obligations set forth in the concession agreement.

## 17.   EVENTS SUBSEQUENT TO THE REPORTING DATE

On July 14, 2017, the Group prepaid a portion of its long-term debt in the amounts of US$60 million, pursuant to the issue of US$300 million of the MTN Program.



Consolidated Financial Statements and Independent Auditor's Report

TV Azteca, S.A.B. de C.V. and subsidiaries

(Subsidiary of Comunicaciones Avanzadas, S.A. de C.V.)

December 31, 2016 and 2015

F-15



# Table of Contents

**Independent auditor's report**                                                                      **1**

**Consolidated statements of financial position**                                                    **7**

**Consolidated statements of comprehensive income**                                                  **8**

**Consolidated statements of changes in equity**                                                     **9**

**Consolidated statements of cash flows**                                                            **10**

**Notes to the consolidated financial statements**                                                   **11**

| | | |
|---|---|---|
| 1 | Nature of operations and general information | 11 |
| 2 | Basis of preparation and statement of compliance with IFRSs | 11 |
| 3 | Changes in accounting policies | 11 |
| 4 | Summary of accounting policies | 13 |
| 5 | Cash and cash equivalents | 32 |
| 6 | Trade and other receivables | 32 |
| 7 | Inventories | 32 |
| 8 | Property and equipment | 33 |
| 9 | Other intangible assets | 34 |
| 10 | Investments accounted for using the equity method and other | 36 |
| 11 | Trade and other payables | 37 |
| 12 | Related party balances and transactions | 37 |
| 13 | Financial debt | 39 |
| 14 | Employee benefits | 40 |
| 15 | Taxes on earnings | 41 |
| 16 | Financial assets and liabilities | 43 |
| 17 | Financial instruments risk | 45 |
| 18 | Equity | 46 |
| 19 | Earnings per share | 49 |
| 20 | Capital management policies and procedures | 49 |
| 21 | Financial income and costs | 49 |
| 22 | Other expenses, net | 49 |
| 23 | Financial information by segment | 50 |
| 24 | Contingencies | 51 |
| 25 | Commitments | 52 |
| 26 | Telecommunications reform | 55 |
| 27 | Seasonality | 55 |
| 28 | Events subsequent to the reporting date | 55 |



# Independent auditor's report

To the Stockholders of

TV Azteca, S.A.B. de C.V. and Subsidiary Companies
(Subsidiary of Comunicaciones Avanzadas, S.A. de C.V.):

## Opinion

We have audited the consolidated financial statements of TV Azteca, S.A.B. de C.V. and Subsidiary Companies (the Group), a subsidiary of Comunicaciones Avanzadas, S.A. de C.V., which comprise the consolidated statements of financial position as of December 31, 2016 and 2015, and the consolidated statements of comprehensive income, consolidated statements of changes in equity and consolidated statements of cash flows for the years then ended, and notes to the consolidated financial statements, including a summary of significant accounting policies.

In our opinion, the accompanying consolidated financial statements present fairly, in all material respects, the consolidated financial position of TV Azteca, S.A.B. de C.V. and Subsidiary Companies (a subsidiary of Comunicaciones Avanzadas, S.A. de C.V.), as of December 31, 2016 and 2015, and their consolidated financial performance and their consolidated cash flows for the years then ended in accordance with International Financial Reporting Standards (IFRSs), as issued by the International Accounting Standards Board (IASB).

## Basis for opinion

We conducted our audit in accordance with International Standards on Auditing (ISAs). Our responsibilities under those standards are further described in the "Auditor's responsibilities for the audit of the consolidated financial statements" section of our report. We are independent of the Group in accordance with the Code of Ethics as issued by the Instituto Mexicano de Contadores Públicos, A.C., and we have fulfilled our other ethical responsibilities applicable to our audits of consolidated financial statements in Mexico in accordance with such code. We believe that the audit evidence we have obtained is sufficient and appropriate to provide a basis for our opinion.

## Key audit matters

Key audit matters are those matters that, in our professional judgment, were of most significance in our audit of the consolidated financial statements of the current period. These matters were addressed in the context of our audit of the consolidated financial statements as a whole, and in forming our opinion thereon, and we do not provide a separate opinion on these matters. For each key audit matter, we describe how it was addressed in our audit.

F-17

Salles Sainz
Grant Thornton

1

| Key audit matter | How the matter was addressed in our audit |
|---|---|
| **Impairment of intangible assets – Fiber optic network Colombia. (See note 9).** | |
| Pursuant to the analyses and evaluations performed by the Group with respect to impairment indicators of non-current assets related to the foreign subsidiary in charge of the project named "Fiber optic network Colombia", a charge was recognized in income in the amount of $1,377 million, which is presented in Other expenses in the accompanying consolidated statements of comprehensive income. Consequently, the long-lived value of the respective Cash Generating Unit (CGU) was reduced to zero.<br><br>In addition, the Group analyzed the perspectives and valuation of its investment in this business with a long-term approach and determined that this business would require an additional short-term investment amounting to 100 million U.S. dollars to develop last mile infrastructure; therefore, pursuant to a resolution adopted by the stockholders dated December 27, 2016, the contribution of the Group was formalized in the amount of 40 million U.S. dollars, as well as the remaining contribution amounting to 60 million U.S. dollars made by another group of shareholders. Accordingly, the investment is classified as an investment in an associated company beginning that date.<br><br>Evaluate the perspectives of the investments held abroad for defining the long-term approach of the Group more accurately, considering the current economic scenarios of the jurisdictions in which it operates implies significant legal actions on future results of the business and the discount rates applied to expected future cash flows estimates. | Our audit procedures were performed mainly by the audit teams of the Group and of the component in Colombia, and included the review of the assumptions used by Management in its impairment analysis models of the relevant CGUs. We verified the historical data and external benchmarks used for assuring ourselves that they were in acceptable ranges.<br><br>We tested the integrity of the models supported by our own specialists and we carried out audit procedures on the calculations prepared by Management. We responded to the valuation drawn up by Management, considering the models and premises used for the determination of the fair values of long-lived assets, and verified the financial information included in the models.<br><br>We considered that the disclosures related to the impairment analysis determined, which are presented in the financial statements of the Group, are appropriate. |

| Key audit matter | How the matter was addressed in our audit |
|---|---|
| **Revenue recognition of advertising services. (See note 4y).** | |
| Advertising service revenues represent around 80% of the consolidated net sales. Their recognition is based on the information reported by the system developed by the Group for such | We evaluated the policy established by the Group to recognize advertising service revenues, and we verified that the policy was in line with the relevant accounting standards and guidelines. |

Salles Sainz

Grant Thornton

1

| | |
|---|---|
| purposes. The data of the "spots" or commercials that are transmitted daily, audience reports, amounts of contracts, and other information are inputted into the system to generate that information, as described in note 4y to the accompanying consolidated financial statements.<br><br>The manual data input and information transmission processes carried out in and between the different systems up to the book entry recorded of revenues might generate risks of error in the recognition of revenues from advertising transmitted. | Moreover, we tested that the policy implemented was functioning.<br><br>Our procedures included the understanding and testing of the operating effectiveness of the controls established for revenue recognition, evaluation and review of the reconciliation processes between those systems and the general accounting system, visualization and management of relationships with the customer of the Group (advertising contracts).<br><br>This verification of the controls is supported by substantive audit procedures that include, among other things, the reconciliation of cash flows received with the revenues recorded in a sample of customers, audit tests of deferred and cumulative revenue balances, including the total invoices issued during the period, as well as verifying that the contractual terms with customers coincide with the information inputted into the systems.<br><br>Our intervention in the systems consisted in performing tests of the general Information Technology (IT) control environment of the systems used to record revenues, followed by tests of the processes to evaluate the integrity and accuracy of the information processed in those systems. |

| Key audit matter | How the matter was addressed in our audit |
|---|---|
| **Property and equipment, and Concessions. (See notes 8 and 4p)** | |
| The nature of the business model implies that the Group maintains significant investments in property and equipment, as well as in intangible assets, the evaluation of their capitalization and the determination of their useful lives require significant judgments by Management. In addition, these assets are required to be evaluated periodically to determine if they will be entirely recoverable and, if applicable, identify the existence of impairment indicators.<br><br>Uncertainty partially emerges due to the unpredictable impact of factors relative to | We evaluated the policies for the recognition of assets of property and equipment, as well as intangible assets, in accordance with the regulatory guidelines of International Accounting Standards: IAS 16 Property, Plant and Equipment and IAS 38 Intangible Assets.<br><br>Our audit procedures included, among other things, the understanding of the relevant business projects, documentary review of a sample of the capitalization of non-current assets, verification of the authorizations by Management for their capitalization, as well as |

F-19

Salles Sainz
Grant Thornton

| competition, technological, political and economic environment in the commercial performance, but also to regulatory changes required by the Governments of the locations where the operations of the Group are undertaken. | the reasonableness of the useful life allotted to capitalized non-current assets.<br><br>In addition, we examined if there were impairment indicators in non-current assets, considering our understanding of the business, as well as the validation of the impairment analysis models drawn up by Management. |
| --- | --- |

### Information other than the financial statements and Auditor's report thereon

Management is responsible for the other information, which is comprised of financial and non-financial information other than the consolidated financial statements and our audit report, which will be included in the annual Report and the annual Report filed with the National Banking and Securities Commission (NBSC) and the shareholders, respectively, since those reports will be issued after the date of this report.

Our opinion on the consolidated financial statements does not cover the other information and we do not express any form of assurance conclusion thereon.

In connection with our audit of the consolidated financial statements, our responsibility is to read the other information and, in doing so, consider whether the other information is materially inconsistent with the consolidated financial statements or our knowledge obtained in the audit or otherwise appears to be materially misstated.

If, based on the work we have performed, we conclude that there is a material misstatement of that other information, we are required to report that fact to those charged with governance.

### Responsibilities of Management and those charged with governance for the consolidated financial statements.

Management is responsible for the preparation and fair presentation of the consolidated financial statements in accordance with IFRSs, and for such internal control as management determines is necessary to enable the preparation of consolidated financial statements that are free from material misstatement, whether due to fraud or error.

In preparing the consolidated financial statements, Management is responsible for assessing the Group's ability to continue as a going concern, disclosing, as applicable, matters related to going concern and using the going concern basis of accounting principle unless Management either intends to liquidate the Group or to cease operations, or has no realistic alternative but to do so.

Those charged with governance are responsible for overseeing the Group's financial reporting process.

### Auditor's responsibilities for the audit of the consolidated financial statements

Our objectives are to obtain reasonable assurance about whether the consolidated financial statements as a whole are free from material misstatement, whether due to fraud or error, and to issue an auditor's report that includes our opinion. Reasonable assurance is a high level of assurance, but is not a guarantee that an

Salles Sainz
Grant Thornton

2

audit conducted in accordance with ISAs will always detect a material misstatement when it exists. Misstatements can arise from fraud or error and are considered material if, individually or in the aggregate, they could reasonably be expected to influence the economic decisions of users taken on the basis of these consolidated financial statements.

As part of an audit in accordance with ISAs, we exercise professional judgment and maintain professional skepticism throughout the audit. We also:

- Identify and assess the risks of material misstatement of the consolidated financial statements, whether due to fraud or error, design and perform audit procedures responsive to those risks, and obtain audit evidence that is sufficient and appropriate to provide a basis for our opinion. The risk of not detecting a material misstatement resulting from fraud is higher than for one resulting from error, as fraud may involve collusion, forgery, intentional omissions, misrepresentations, or the override of internal control.

- Obtain an understanding of internal control relevant to the audit in order to design audit procedures that are appropriate in the circumstances, but not for the purpose of expressing an opinion on the effectiveness of the Group's internal control.

- Evaluate the appropriateness of accounting policies used and the reasonableness of accounting estimates and related disclosures made by Management.

- Conclude on the appropriateness of Management's use of the going concern basis of accounting and, based on the audit evidence obtained, whether a material uncertainty exists related to events or conditions that may cast significant doubt on the Group's ability to continue as a going concern. If we conclude that a material uncertainty exists, we are required to draw attention in our auditor's report to the related disclosures in the consolidated financial statements or, if such disclosures are inadequate, to modify our opinion. Our conclusions are based on the audit evidence obtained up to the date of our auditor's report. However, future events or conditions may cause the Group to cease to continue as a going concern.

- Evaluate the overall presentation, structure and content of the consolidated financial statements, including the disclosures, and whether the consolidated financial statements represent the underlying transactions and significant events in a manner that achieves fair presentation.

- Obtain sufficient appropriate audit evidence regarding the financial information of the subsidiaries or business activities within the Group to express an opinion on the consolidated financial statements of the Group. We are responsible for the direction, supervision and performance of the Group audit. We remain solely responsible for our audit opinion.

We communicate with those charged with governance regarding, among other matters, the planned scope and timing of the audit and significant audit findings, including any significant deficiencies in internal control that we identify during our audit.

We also provide those charged with governance with a statement that we have complied with relevant ethical requirements regarding independence, and to communicate with them all relationships and other matters that may reasonably be thought to bear on our independence, and where applicable, related safeguards.



2

From the matters communicated with those charged with governance, we determine those matters that were of most significance in the audit of the consolidated financial statements of the current period and are therefore the key audit matters. We describe these matters in our auditor's report.

The engagement partner on the audit resulting in this independent auditor´s report is:

SALLES, SAINZ – GRANT THORNTON, S.C.

C.P.C. José Franco Minero

Mexico City, Mexico.
March 24, 2017

F-22

**TV Azteca, S.A.B. de C.V. and subsidiaries** [2]
**(Subsidiary of Comunicaciones Avanzadas, S.A. de C.V.)**

## Consolidated statements of financial position
**As of December 31, 2016 and 2015**
(Stated in thousands of Mexican pesos)

| | Notes | 2016 | 2015 |
|---|---|---|---|
| **Assets** | | | |
| **Current** | | | |
| Cash and cash equivalents | 5 | $ 4,470,314 | $ 2,938,417 |
| Trade and other receivables | 6 | 6,197,984 | 6,244,083 |
| Current tax assets | | 764,868 | 831,496 |
| Related parties | 12 | 940,735 | 780,769 |
| Other financial assets | 16 | 1,005,345 | 782,956 |
| Performance rights | 4l | 2,210,591 | 2,082,524 |
| Inventories | 7 | 202,304 | 667,001 |
| **Total current assets** | | 15,792,141 | 14,327,246 |
| | | | |
| **Non-current** | | | |
| Trade long-term | 6 | - | 165,375 |
| Performance rights | 4l | 3,229,525 | 2,381,973 |
| Property and equipment, net | 8 | 4,111,107 | 4,192,455 |
| Television concessions, net | | 10,785,466 | 9,933,622 |
| Other intangible assets | 9 | 1,488,596 | 2,795,464 |
| Investments accounted for using the equity method and other | 10 | 332,180 | 359,404 |
| Deferred income taxes | 15 | 1,825,118 | 2,524,283 |
| **Total non-current assets** | | 21,771,992 | 22,352,576 |
| **Total assets** | | $ 37,564,133 | $ 36,679,822 |
| | | | |
| **Liabilities** | | | |
| **Short-term** | | | |
| Trade and other payables | 11 | $ 3,614,804 | $ 4,103,839 |
| Performance rights | 4l | 1,087,327 | 379,224 |
| Related parties | 12 | 97,571 | 160,061 |
| Current tax liabiities | | 379,731 | 211,577 |
| Deferred revenue | | 6,593,844 | 4,956,303 |
| **Total short-term liabilities** | | 11,773,277 | 9,811,004 |
| | | | |
| **Long-term** | | | |
| Loans from American Tower Corporation -ATC- | 13 | 1,891,869 | 1,582,600 |
| Medium Term Note Program -MTN- | 13 | 16,369,456 | 13,630,083 |
| Deferred revenue | 4y | 1,075,503 | 1,902,529 |
| Employee benefits | 14 | 188,035 | 197,187 |
| Deferred income taxes, 2010 and 2014 tax reforms | 15 | 601,622 | 1,041,151 |
| **Total long-term liabilities** | | 20,126,485 | 18,353,550 |
| **Total liabilities** | | 31,899,762 | 28,164,554 |
| | | | |
| **Equity** | 18 | | |
| Capital stock | | 715,229 | 716,436 |
| Premium on stock issued | | 207,419 | 207,419 |
| Legal reserve | | 153,229 | 153,229 |
| Reserve for stock repurchases | | 600,584 | 614,617 |
| Other components of equity | | (201,976) | (1,620,653) |
| Retained earnings | | 4,165,317 | 8,403,215 |
| **Equity attributable to owners of the parent** | | 5,639,802 | 8,474,263 |
| Non-controlling interest | | 24,569 | 41,005 |
| **Total equity** | | 5,664,371 | 8,515,268 |
| **Total liabilities and equity** | | $ 37,564,133 | $ 36,679,822 |

The accompanying notes are an integral part of these consolidated financial statements.

F-23

**TV Azteca, S.A.B. de C.V. and subsidiaries**   [2]
(Subsidiary of Comunicaciones Avanzadas, S.A. de C.V.)

## Consolidated statements of comprehensive income
### For the years ended December 31, 2016 and 2015
(Stated in thousands of Mexican pesos)

| | Notes | 2016 | 2015 |
|---|---|---|---|
| **Revenue** | 4y | $ **14,196,571** | $ 12,859,487 |
| | | | |
| Cost of programming, production, and broadcasting | | **8,988,756** | 8,719,773 |
| Selling and administrative   expenses | | **1,519,593** | 1,605,226 |
| **Total costs and expenses** | | **10,508,349** | 10,324,999 |
| | | | |
| **Operating income before depreciation and amortization and other expenses** | | **3,688,222** | 2,534,488 |
| | | | |
| Depreciation and amortization | | **924,923** | 910,245 |
| Other expenses, net | 22 | **1,850,178** | 1,028,442 |
| **Operating income** | | **913,121** | 595,801 |
| | | | |
| **Share of profit from equity accounted investments** | 10 | **23,309** | (13,430) |
| | | | |
| **Comprehensive gain or loss on financing:** | | | |
| Interest expense | 13 | **(1,434,915)** | (1,256,342) |
| Interest income | 21 | **91,273** | 107,440 |
| Other financial expenses | 21 | **(169,565)** | (178,335) |
| Exchange loss, net | | **(1,651,447)** | (1,187,049) |
| | | **(3,164,654)** | (2,514,286) |
| **Loss before taxes on earnings** | | **(2,228,224)** | (1,931,915) |
| Taxes on earnings | 15 | **944,721** | 715,690 |
| **Loss for the  year** | | $ **(3,172,945)** | $ (2,647,605) |
| | | | |
| **Other comprehensive income (loss) for the year** | | | |
| *Items that will not be reclassified subsequently to profit or loss* | | | |
| Effect from translation | 18g | **800,179** | 667,893 |
| Loss on financial assets available  -for-sale | 18g | **(53,142)** | (643,105) |
| Cash flow hedge (loss) for the current year | 18g | **(392,443)** | (1,010,248) |
| **Other comprehensive income (loss) for the year** | | **354,594** | (985,460) |
| **Total comprehensive loss for the year** | 4cc | $ **(2,818,351)** | $ (3,633,065) |
| | | | |
| **Net loss for  the year attributable to:** | | | |
| Non-controlling interest | | **(16,436)** | (13,804) |
| Owners of the parent | | **(3,156,509)** | (2,633,801) |
| | | $ **(3,172,945)** | $ (2,647,605) |
| | | | |
| **Total comprehensive loss for the year attributable to:** | | | |
| Non-controlling interest | | **(16,436)** | (13,804) |
| Owners of the parent | | **(2,801,915)** | (3,619,261) |
| | | $ **(2,818,351)** | $ (3,633,065) |

| | Notes | Pesos | Pesos |
|---|---|---|---|
| **Loss per share** | | | |
| *Basic loss per share* | | | |
| Loss from continuing  operations | 19 | $ **(0.35)** | $ (0.30) |
| | | | |
| *Loss earnings per share* | | | |
| Loss from continuing  operations | 19 | $ **(0.29)** | $ (0.20) |

**The accompanying notes are an integral part of these consolidated financial statements.**

# TV Azteca, S.A.B. de C.V. and subsidiaries
(Subsidiary of Comunicaciones Avanzadas, S.A. de C.V.)

## Consolidated statements of changes in equity
**For the years ended December 31, 2016 and 2015**

(Stated in thousands of Mexican pesos)

| | Notes | Capital stock | Premium on stock issued | Legal reserve | Reserve for stock repurchases | Other components of equity | Retained earnings | Total attributable to owners of parent | Non-controlling interest | Total equity |
|---|---|---|---|---|---|---|---|---|---|---|
| Balances as of January 1, 2015 | | $ 715,344 | $ 207,419 | $ 153,229 | $ 600,582 | $ (584,041) | $ 11,003,132 | $ 12,095,665 | $ 54,809 | $ 12,150,474 |
| Preferred dividends paid | 18 | - | - | - | - | - | (17,268) | (17,268) | - | (17,268) |
| Sale of treasury stock | | 3,233 | - | - | 41,466 | - | - | 44,699 | - | 44,699 |
| Stock repurchase | | (2,141) | - | - | (27,431) | - | - | (29,572) | - | (29,572) |
| Transactions with owners | | 1,092 | - | - | 14,035 | - | (17,268) | (2,141) | - | (2,141) |
| Net loss for the year | | - | - | - | - | - | (2,633,801) | (2,633,801) | (13,804) | (2,647,605) |
| Appropriation to retained earnings | 4i | - | - | - | - | (51,152) | 51,152 | - | - | - |
| Other comprehensive loss | 18 | - | - | - | - | (985,460) | - | (985,460) | - | (985,460) |
| Total comprehensive loss for the year | | - | - | - | - | (1,036,612) | (2,582,649) | (3,619,261) | (13,804) | (3,633,065) |
| Balances as of December 31, 2015 | | $ 716,436 | $ 207,419 | $ 153,229 | $ 614,617 | $ (1,620,653) | $ 8,403,215 | $ 8,474,263 | $ 41,005 | $ 8,515,268 |
| Preferred dividends paid | 18 | - | - | - | - | - | (17,306) | (17,306) | - | (17,306) |
| Sale of treasury stock | | 2,516 | - | - | 17,509 | - | - | 20,025 | - | 20,025 |
| Stock repurchase | | (3,723) | - | - | (31,542) | - | - | (35,265) | - | (35,265) |
| Transactions with owners | | (1,207) | - | - | (14,033) | - | (17,306) | (32,546) | - | (32,546) |
| Net loss for the year | | - | - | - | - | - | (3,156,509) | (3,156,509) | (16,436) | (3,172,945) |
| Appropriation to retained earnings | 4i | - | - | - | - | 1,064,083 | (1,064,083) | - | - | - |
| Other comprehensive loss | 18 | - | - | - | - | 354,594 | - | 354,594 | - | 354,594 |
| Total comprehensive loss for the year | | - | - | - | - | 1,418,677 | (4,220,592) | (2,801,915) | (16,436) | (2,818,351) |
| Balances as of December 31, 2016 | | $ 715,229 | $ 207,419 | $ 153,229 | $ 600,584 | $ (201,976) | $ 4,165,317 | $ 5,639,802 | $ 24,569 | $ 5,664,371 |

The accompanying notes are an integral part of these consolidated financial statements.

**TV Azteca, S.A.B. de C.V. and subsidiaries**
(Subsidiary of Comunicaciones Avanzadas, S.A. de C.V.)

10

## Consolidated statements of cash flows
### For the years ended December 31, 2016 and 2015
(Stated in thousands of Mexican pesos)

|  | 2016 | 2015 |
|---|---|---|
| **OPERATING ACTIVITIES:** | | |
| Loss before taxes on earnings | $ (2,228,224) | $ (1,931,915) |
| | | |
| Items related to investing activities | | |
| Depreciation and amortization | 924,923 | 910,245 |
| Impairment of long-lived assets | 1,376,526 | 532,000 |
| Share of profit from equity accounted investments | (23,309) | 13,430 |
| Gain from the sale of associated company | (194,883) | - |
| Loss (gain) on sale of property and equipment | 603 | (7,316) |
| Other comprehensive loss | - | (1,980,865) |
| Items related to financing activities: | | |
| Unrealized exchange loss | 2,656,199 | 1,187,049 |
| Interest expense | 1,434,915 | 1,256,342 |
| | 3,946,750 | (21,030) |
| | | |
| Accounts receivable | 278,102 | (744,816) |
| Related parties | (274,121) | (331,562) |
| Inventories | 464,697 | (489,565) |
| Performance rights | (267,516) | 173,475 |
| Accounts payable and accrued expenses | (748,032) | 1,775,085 |
| Deferred revenue | 810,515 | 1,515,299 |
| Taxes on earnings | 221,600 | (102,450) |
| Deferred income taxes, 2010 and 2014 tax reforms | (492,975) | (600,955) |
| Net cash flows from operating activities | 3,939,020 | 1,173,481 |
| | | |
| **INVESTING ACTIVITIES:** | | |
| Acquisitions of property and equipment | (685,684) | (1,128,053) |
| Proceeds from disposals of property and equipment | 92,989 | 152,516 |
| Investments accounted for using the equity method and other | (78,144) | 49,920 |
| Proceeds from disposals of associated company | 323,560 | - |
| Financial assets available-for-sale | (275,531) | (298,939) |
| Investments in intangibles | (321,141) | (252,591) |
| Net cash flows from investing activities | (943,951) | (1,477,147) |
| | | |
| **FINANCING ACTIVITIES:** | | |
| Proceeds from borrowings | - | (1,105,605) |
| Repayment of borrowings, net | (1,430,626) | (1,179,308) |
| Stock repurchases | (35,265) | (29,572) |
| Sale of treasury stock | 20,025 | 44,699 |
| Preferred dividends paid | (17,306) | (17,268) |
| Net cash flows from financing activities | (1,463,172) | (2,287,054) |
| | | |
| Increase (decrease) in cash and cash equivalents | 1,531,897 | (2,590,720) |
| Cash and cash equivalents at beginning of year | 2,938,417 | 5,529,137 |
| | | |
| Cash and cash equivalents at end of year | $ 4,470,314 | $ 2,938,417 |

The accompanying notes are an integral part of these consolidated financial statements.

F-26

# TV Azteca, S.A.B de C.V. and Subsidiaries

[11]

## Notes to the consolidated financial statements

## December 31, 2016 and 2015

(Stated in thousands of Mexican pesos and thousands of U.S. dollars, except where stated otherwise, as well as per share amounts and exchange rates)

### 1.      NATURE OF OPERATIONS AND GENERAL INFORMATION:

TV Azteca, S.A.B. de C.V. was acquired by its present stockholders in July 1993. The main business of TV Azteca, S.A.B. de C. V. and its subsidiaries include: (i) the transmission and production of television programs; (ii) sale of advertising time; and (iii) operating a fiber optic network in Colombia (until December 2016) and Peru.

When the terms "the Company" or "the Holding company" are used in the notes to the financial statements, they refer to TV Azteca, S.A.B. de C.V. without its consolidated subsidiaries. When the terms "the Company and its subsidiaries" or "the Group" are used, it refers to TV Azteca, S.A.B. de C.V. together with its consolidated subsidiaries.

The common shares of the Company (AZTECA.CPO) are listed in the Mexican Stock Exchange (BMV, for its acronym in Spanish) and in Latibex, an international market dedicated to Latin American shares in Euros, regulated by the currently enacted laws of the Spanish Stock Market.

The Company is the holding company of the Group ultimately. The Company is a Publicly Held Variable Capital Corporation (S.A.B. de C.V., for its acronym in Spanish), with a duration of 99 years beginning 1993. Its main offices are located at: Periférico Sur 4121, Colonia Fuentes del Pedregal, Mexico City, Mexico, Postal Code 14141.

### 2.      BASIS OF PREPARATION AND STATEMENT OF COMPLIANCE WITH INTERNATIONAL FINANCIAL REPORTING STANDARDS (IFRSs):

The accompanying consolidated financial statements of the Group have been prepared in accordance with International Financial Reporting Standards (IFRSs), issued by the International Accounting Standards Board (IASB).

IFRSs are comprised of: a) IFRSs and International Accounting Standards (IASs), their Improvements and Interpretations of IFRSs and IASs (IFRIC and SIC).

The consolidated financial statements for the year ended December 31, 2016 and 2015 were approved and authorized to be issued by the Chief Executive Officer, Mr. Benjamín Salinas Sada, and the Director of Finance, Mr. Esteban Galíndez Aguirre.

The Mexican General Corporate Law and the by-laws of the Company, grant stockholders the possibility to amend the financial statements after they have been issued. The accompanying consolidated financial statements will be submitted for approval at the General Stockholders' Annual Meeting.

During 2016, the Group has not applied any new accounting policies (see note 3 below), or made other changes of retrospecitve application that have a material effect on the consolidated statement of financial position as of January 1, 2015. Accordingly, the Group is not required to present a third statement of financial position as of that date.

### 3.      CHANGES IN ACCOUNTING POLICIES:

*New standards, interpretations, and amendments that went into effect beginning January 1, 2016*

The Group has not adopted any new standards or amendments that are already effective. The standards and amendments that are effective for the first time in 2016 (for entities with a December 31, 2016 year end) and are

**TV Azteca, S.A.B. de C.V. and Subsidiaries**                                                    **28**
**(Subsidiary of Comunicaciones Avanzadas, S.A. de C.V.)**
**Notes to the consolidated financial statements as of December 31, 2016 and 2015**

applicable to the Group are:

- Annual improvements to IFRS's 2012-2014 cycle

- Disclosure Initiative (Amendments to IAS 1)

- Clarification of Acceptable Methods of Depreciation and Amortisation (Amendments to IAS 16 and IAS 38)

- Accounting for Acquisitions of Interests in Joint Operations (Amendments to IFRS 11)

- Investment Entities: Applying the Consolidation Exception (Amendments to IFRS 10, IFRS 12 and IAS 27).

These amendments do not represent changes in the accounting policies and do not have a significant impact on the financial statements of the Group.

Annual improvements to IFRSs 2012-2014 cycle, published in September 2014, established improvements to some IFRSs; a summary of the issues addressed is as follows:

| IFRS | Standard affected | Summary of amendment |
|------|-------------------|----------------------|
| IFRS 5 | Non-current Assets Held for Sale and Discontinued Operations | Changes in methods of disposal |
| IFRS 7 | Financial Instruments: Disclosures | Servicing contracts and applicability of the amendments to IFRS 7 to condensed interim financial statements |
| IFRS 19 | Employee Benefits | Discount rate: regional market issue |
| IFRS 34 | Interim Financial Reporting | Disclosure of information 'elsewhere in the interim financial report' |

***New standards that are not yet effective and have not been adopted early by the Group***

New standards have been published by the IASB that are not yet effective, and have not been adopted early by the Group. Information on those expected to be relevant to the Group's financial statements is provided below.

a.   IFRS 9 'Financial Instruments'

This new standard introduces extensive changes to IAS 39's guidance on the classification and measurement of financial assets and introduces a new 'expected credit loss' model for the impairment of financial assets. IFRS 9 also provides new guidance on the application of hedge accounting.

Group's Management has started to assess the impact of IFRS 9, but is not yet in a position to provide quantified information. At this stage, the main areas of expected impact are as follows:

- The classification and measurement of financial assets will need to be reviewed based on the new criteria that considers the assets' contractual cash flows and the business model in which they are managed;

- An expected credit loss-based impairment will need to be recognized on the Group's trade receivables and investments in debt-type assets currently classified as available-for-sale and held-to-maturity, unless classified at fair value through profit or loss, in accordance with the new criteria;

- It will no longer be possible to measure equity investments at cost less impairment and all such investments will instead be measured at fair value. Changes in fair value will be presented in profit or loss, unless an irrevocable designation is made to present them in other comprehensive income.

- The fair value option for certain financial liabilities implies that changes in fair value will be recognized in comprehensive income to the extent those changes relate to the Group's own credit risk.

**TV Azteca, S.A.B. de C.V. and Subsidiaries**                                                    **29**
**(Subsidiary of Comunicaciones Avanzadas, S.A. de C.V.)**
**Notes to the consolidated financial statements as of December 31, 2016 and 2015**

IFRS 9 is effective for annual reporting periods beginning on or after January 1, 2018. However, its early adoption is permitted.

The Group adopted this standard early in 2014, with respect to the option of the application that refers to the recognition of fair value of equity instruments in other comprehensive income that will not be transferred subsequently to profit or loss. However, the Group can make transfers from profit or loss to retained earnings within stockholders' equity.

 b. IFRS 15 'Revenue from contracts with customers'

IFRS 15 presents new requirements for the recognition of revenue, replacing IAS 18 'Revenue', IAS 11 'Construction Contracts', and several revenue-related Interpretations. The new standard establishes a control-based revenue recognition model and provides additional guidance in many areas not covered in detail under existing IFRSs, including how to account for arrangements with multiple performance obligations, variable pricing, customer refund rights, supplier repurchase options, and other common complexities.

IFRS 15 is effective for reporting periods beginning on or after January 1, 2018. Management has started to assess the impact of IFRS 15, but is not yet in a position to provide quantified information. Its early application is permitted.

 c. IFRS 16 'Leases'

IFRS 16 will replace IAS 17 and three related Interpretations. It completes the IASB's long-running project to overhaul lease accounting. Leases will be recorded on the statement of financial position in the form of a right-of-use asset and a lease liability.

IFRS 16 is effective from periods beginning on or after January 1, 2019. Management is yet to fully assess the impact of the standard and therefore is unable to provide quantified information.

The main impacts of the application of this IFRS are related to the lease contracts as discussed in note 25 a).

**4.**  **SUMMARY OF ACCOUNTING POLICIES:**

 a. Overall considerations

The significant accounting policies used by the Group to prepare the accompanying consolidated financial statements are summarized below:

 b. Basis for consolidation

The Group's financial statements consolidate those of the holding company and all its subsidiaries as of December 31, 2016 and 2015. The Group controls a subsidiary when that subsidiary is exposed or is entitled to variable returns derived from its involvement with the subsidiary, and it has the capacity to apply those returns through its power over the subsidiary. All the subsidiaries present their financial information for consolidation purposes as of December 31, 2016 and 2015, in compliance with the policies adopted by the Group.

All significant transactions and balances of the Group are eliminated in consolidation, including unrealized profit or loss in operations between them. In the cases in which there are unrealized losses on the sale of assets between the Group, consolidation is reversed so that the asset involved is also tested for impairment from a Group perspective. The amounts reported in the financial statements of the subsidiaries are adjusted when necessary to assure consistency with the Group's accounting policies.

The gains or losses and other comprehensive income items of the subsidiaries acquired or sold during the year are recognized as of the effective date of the acquisition or up to the effective date of the disposition, as appropriate, considering that control is obtained through the acquisition and lost at the time of the sale.

**TV Azteca, S.A.B. de C.V. and Subsidiaries**                                                                                           **30**
**(Subsidiary of Comunicaciones Avanzadas, S.A. de C.V.)**
**Notes to the consolidated financial statements as of December 31, 2016 and 2015**

Non-controlling interests, presented as part of equity, represent the portion of a subsidiary's profit or loss and net assets that is not held by the Group. The Group attributes total comprehensive income or loss of subsidiaries between the owners of the parent and the non-controlling interests based on their respective ownership interests.

Changes in equity interest of a subsidiary, without loss of control, are accounted for as a capital transaction. If the Company loses control of a subsidiary, it:

    I.   Writes off assets (including goodwill) and liabilities of the subsidiary;

    II.  Writes off the carrying amount of the non-controlled equity interest;

    III. Derecognizes the cumulative translation effect that has been recorded in stockholders' equity;

    IV. Recognizes the fair value of the consideration received;

    V.  Recognizes the fair value of the retained investment;

    VI. Recognizes any surplus or deficit in income (loss) for the period; and

    VII. Reclassifies the equity interest previously recognized as other comprehensive income items to earnings, losses, or retained gains, as appropriate, as of the Company had directly sold the related assets or liabilities.

As discussed in note 10, beginning December 27, 2016, the Company stopped consolidating the investment in the subsidiary Companies that have the fiber optic operation in Colombia. Consequently, it stopped consolidating the assets and liabilities of those Companies as at that date, based on the procedure discussed in the foregoing paragraph.

The main subsidiary companies included in the consolidated financial statements, as well as the percentage of equity therein and their main business activity are as follows:

| Company | Country | Activity | % of share 2016 | % of share 2015 |
|---|---|---|---|---|
| Televisión Azteca, S.A. de C.V. | Mexico | Operation of radio stations and television channels. | 100.00 | 100.00 |
| TV Azteca Comercializadora, S.A. de C.V. | Mexico | Transmission and production of television programs and services rendered. | 100.00 | 100.00 |
| Red Azteca Internacional, S.A. de C.V. | Mexico | Transmission and production of television programs, mainly Channel 7. | 100.00 | 100.00 |
| Estudios Azteca, S.A. de C.V. | Mexico | Sale of advertising time. | 100.00 | 100.00 |
| Atlético Morelia, S.A de C.V. | Mexico | Sport activities | 100.00 | 100.00 |
| Club de Fútbol Rojinegros S.A. de C.V. | Mexico | Sport activities | 100.00 | 100.00 |
| Comerciacom, S.A. de C.V. | Mexico | Transmission and production of television programs, mainly Channel 7. | 100.00 | 100.00 |
| Comercializadora en Medios de Comunicación de TV Azteca, S.A. de C.V. | Mexico | Sale of advertising time. | 100.00 | 100.00 |
| Azteca Novelas, S.A.P.I. de C.V. | Mexico | Transmission and production of television programs. | 100.00 | 100.00 |
| Servicios Especializados TAZ, S.A. de C.V. | Mexico | Diverse services | 100.00 | 100.00 |
| Producciones Especializadas, S.A. de C.V. | Mexico | Diverse services | 100.00 | 100.00 |
| Corporación de Asesoría Técnica y de Producción, S.A. de C.V. | Mexico | Diverse services | 100.00 | 100.00 |
| Operadora Mexicana de Televisión, S.A. de C.V. | Mexico | Operation of radio stations and television channels. | 100.00 | 100.00 |

**TV Azteca, S.A.B. de C.V. and Subsidiaries**                                           **31**
**(Subsidiary of Comunicaciones Avanzadas, S.A. de C.V.)**
**Notes to the consolidated financial statements as of December 31, 2016 and 2015**

| | | | | |
|---|---|---|---|---|
| Inversora Mexicana de Producción, S.A. de C.V. | Mexico | Diverse services | 100.00 | 100.00 |
| Servicios Aéreos Noticiosos, S.A. de C.V. | Mexico | Air taxi services | 100.00 | 100.00 |
| SCI de México, S.A. de C.V. | Mexico | Advisory and consulting services | 100.00 | 100.00 |
| Servicios Locales de Producción, S.A. de C.V. | Mexico | Diverse services | 100.00 | 100.00 |
| Servicios Foráneos de Administración, S.A. de C.V. | Mexico | Diverse services | 100.00 | 100.00 |
| Azteca International Corporation | United States of America | Transmission and production of television programs and sale of advertising time. | 100.00 | 100.00 |
| KAZA Azteca America, Inc. | United States of America | Transmission and production of television programs and sale of advertising time. | 100.00 | 100.00 |
| TVA Guatemala | Guatemala | Operation of radio stations and television channels and sale of advertising time. | 100.00 | 100.00 |
| Incotel | Guatemala | Operation of radio stations and television channels and sale of advertising time. | 100.00 | 100.00 |
| TV Azteca Global, S. L. U. | Spain | Operation of radio stations and television channels and sale of advertising time. | 100.00 | 100.00 |
| Televisora del Valle de México, S.A.P.I. de C.V. | Mexico | Operation of radio stations and television channels. | 51.01 | 51.01 |
| Azteca Comunicaciones Colombia[1] | Colombia | Construction and operation of fiber optic network | 100.00 | 100.00 |
| Azteca Telecomunicaciones Colombia[1] | Colombia | Diverse services | 100.00 | 100.00 |
| Azteca Comunicaciones Peru | Peru | Construction and operation of fiber optic network | 80.00 | 80.00 |
| Azteca Honduras | Honduras | Operation of radio stations and television channels and sale of advertising time. | 100.00 | 100.00 |

[1] Beginning December 27, 2016, the Company stopped controlling these subsidiary Companies (see note 10).

    c.   Business combinations

The Group applies the acquisition method to account for business combinations. The consideration transferred by the Group to obtain control of a subsidiary is calculated as the sum of fair values as of the date of acquisition of the assets transferred, liabilities incurred or assumed, and equity interests issued by the Group, which includes the fair value of any asset or liability that emerges from the contingent payment agreement. Acquisition costs are expensed as incurred.

The Group recognizes identifiable assets acquired and liabilities assumed in the business combination, regardless of whether they were previously recognized in the financial statements of the party acquired prior to the acquisition. Assets acquired and liabilities assumed are generally issued at their fair value at the acquisition date.

Goodwill is determined after identifiable intangible assets are recognized individually. It is calculated as the excess of the sum of: a) the fair value of the payment transferred; b) the amount recognized of any non-controlled interest of the entity acquired; and c) the fair value at the date of acquisition of any existing capital equity in the acquired entity over the fair values as of the date of acquisition of the identifiable net assets. If the fair values of the identifiable net assets exceed the sum calculated above, this amount in excess (e.g. bargain purchase) is immediately recognized in income.

If the business combination is realized in stages, the carrying value of the prior interest of the acquirer in the acquiree

**TV Azteca, S.A.B. de C.V. and Subsidiaries**                                                                                                                       **32**
**(Subsidiary of Comunicaciones Avanzadas, S.A. de C.V.)**
**Notes to the consolidated financial statements as of December 31, 2016 and 2015**

as of the date of acquisition is adjusted to fair value as of the date of acquisition, and any difference is recognized in income.

The measurement period will not exceed one year, beginning the date of acquisition. During the measurement period, the acquirer will retroactively adjust the amounts recognized provisionally at the date of acquisition to reflect the new information obtained on events and circumstances existing at the measurement date and, if they had been known, they would have been applied to the measurement of the amounts recognized as of that date.

d.   Investments accounted for using the equity method and other permanent investments

Associates are those entities on which the company can exercise significant influence, but they are neither subsidiaries nor joint venture

A joint venture is a joint arrangement whereby the parties that have joint control over the arrangement are entitled to the net assets of the arrangement. These parties are denominated participants in a joint venture.

Investments in associates and joint ventures are accounted for by using the equity method. Any goodwill or adjustment to fair value attributable to the equity of the Group in the associate or joint venture is not recognized separately, and it is included in the amount recognized as an investment.

The carrying value recorded in investments in associates and joint ventures is increased or decreased to recognize the Group's equity in earnings and other comprehensive items of the associate and joint venture, adjusted when it is necessary to assure the consistency of the Group's policies.

Unrealized gains and losses in the transactions between the Group, its associates, and joint ventures are eliminated in the proportion of equity of the Group in those entities. When unrealized losses are eliminated, the asset involved is also tested for impairment.

Investments in associates and joint and other permanent investments are reviewed for impairment at least at each reporting date to identify whether there is any objective evidence that those assets are impaired; if so, an impairment loss is recognised for the amount by which the asset's carrying amount exceeds its recoverable amount.

e.   Translation of foreign currency

*Functional and presentation currency*

The items included in the financial statements of each one of the entities comprising the Group are measured in the currency of the primary economic environment where each entity operates, that is, its "functional currency". The consolidated financial statements are presented in the "Mexican peso" currency, which is also the functional currency of the holding company.

*Foreign currency balances and transactions*

Foreign currency operations are translated into the entity's functional currency, in this case, that of the Group, by using the exchange rates prevailing at the dates of the transactions (spot exchange rate). Foreign exchange gains and losses resulting from the liquidation of such operations and valuation of monetary items at the year-end exchange rate are recognized in the statement of comprehensive income, except those identified with the "Foreign transactions" paragraphs discussed herein below.

Nonmonetary captions are measured at historical cost (translated by using the exchange rates at the date of the transaction), except for nonmonetary captions measured at fair value, which are translated by using the exchange rates as of the date on which fair value was determined.

*Foreign transactions*

In the Group's financial statements, all assets, liabilities, and transactions of the entities of the Group realized with a

**TV Azteca, S.A.B. de C.V. and Subsidiaries**                                                      **33**
**(Subsidiary of Comunicaciones Avanzadas, S.A. de C.V.)**
**Notes to the consolidated financial statements as of December 31, 2016 and 2015**

functional currency other than the Mexican peso (Group's presentation currency) are translated into pesos at the time of consolidation. The functional currency of the entities of the Group has remained unchanged during the reporting period.

At the time of consolidation, assets and liabilities have been translated into Mexican pesos at the closing exchange rate at the date of the report. Revenues and expenses have been translated into the Group's presentation currency at an average exchange rate during the reporting period. Foreign exchange differences are charged/credited to other items of comprehensive income, and they are recognized as an effect of translation in other capital accounts. Likewise, the exchange differences generated by financial instruments that have been designated as hedges of a foreign business by Group Management are charged/credited to other items of comprehensive income. At the time of disposing of a foreign currency operation, the cumulative effects of translation recognized in capital are reclassified to income and recognized as part of the gain or loss on disposal. Goodwill and adjustments to fair value arising from the acquisition of a foreign entity have been treated as assets and liabilities of the foreign entity, and have been translated into pesos at the closing exchange rate.

*Hedged net investments in a foreign business.*

The Group applies hedge accounting to foreign currency differences generated between the functional currency of the foreign operation and the functional currency of the parent company, regardless if the net investment is maintained directly or through another holding company.

Foreign currency differences resulting from the remeasurement of a financial liability designated as a hedge of a net investment in a business abroad are recognized in other comprehensive income, to the degree in which the hedge is effective. Such differences are recorded in income to the degree in which the hedge is ineffective. When part of the hedge of a net investment is eliminated, the corresponding amount in other comprehensive income is transferred to income as part of the elimination gain or loss (see note 18g).

The accrued gain or loss on the hedge instrument related to the effective part of the hedge that has been accrued in the foreign currency translation provision, will be reclassified from equity to income for the period as a reclassification adjustment at the time of the disposition or partial disposition of the foreign business.

As of December 31, 2016, and 2015, the effect recognized by the Group on the hedge of net investments in a foreign business is shown within the accompanying consolidated statement of changes in stockholders' equity.

    f.    Financial information by segment

Operating segments are defined as the components of an entity, geared toward developing business activities on which revenues, costs, and expenses are generated. Moreover, its operating income or loss is reviewed regularly by the entity's maximum governing body to decide on the resources that should be allocated to the segment and evaluate their performance in connection with the segment itself by using specific financial information.

In connection with the years in which they are presented, the Group has operated in the following business segments: National television, Azteca America, Performance rights, and Other (see note 23).

    g.    Cash and cash equivalents

Cash and cash equivalents comprise cash on hand and bank deposits in checking accounts and investments available highly liquid that are readily convertible into cash and which are subject to an insignificant risk of changes in value.

    h.    Trade and other receivables

*Trade receivables*

Accounts receivable represent amounts owed by customers, derived mainly from sales of advertising services rendered in the normal course of the Group's operations. When they are expected to be collected in a period of one year or less from the closing date (or in the normal cycle of business operations in the event that this cycle should

**TV Azteca, S.A.B. de C.V. and Subsidiaries**                                                                    **34**
**(Subsidiary of Comunicaciones Avanzadas, S.A. de C.V.)**
**Notes to the consolidated financial statements as of December 31, 2016 and 2015**

exceed this period), are presented as current assets. In the event that the above should not be complied with, they are presented as non-current assets.

*Other receivables*

Other receivables apply mainly to loans and others that give the right to collect fixed or determinable amounts that are not listed on an active market. The assets of this category are classified as current assets; except if they are expected to be collected after a year has elapsed from the closing date. In that case, they are classified as non-current assets.

    i.    Financial instruments

*Recognition, initial measurement and de-recognition*

Financial assets and liabilities are recognized at the trading date, which is the date on which the Group commits itself to buy or sell the financial asset or liability. They are initially measured at fair value adjusted for operating costs, except financial assets and financial liabilities carried at fair value through profit or loss (FVTPL) that are initially measured at fair value.

Financial assets are de-recognized when contractual rights to the cash flows of a financial asset expire or when the financial asset and all the substantial risks and benefits have been transferred.

A financial liability is de-recognized when it is extinguished, discharged, written off or it expires. Financial assets and financial liabilities are potentially measured as described below:

*Classification and subsequent measurement of financial assets*

For purposes of subsequent measurements, financial assets that are not those designated and effective as hedging instruments are classified in the following categories, at the time of their initial recognition:

- loans and receivables

- financial assets at fair value through profit or loss

- held-to-maturity investments

- available-for-sale financial assets

The category determines the subsequent measurement, as well as if any resulting revenue or expense is recognized in income or other items of comprehensive income.

All financial assets except those that are carried at fair value through income or losses are subject to an impairment test at least on every report date.

All revenues and expenses related to financial assets recognized in income are presented in "financial costs", "financial revenues" or "other financial items", except for the impairment of trade accounts receivable which is presented in "other expenses".

*Loans and receivables*

Loans and receivables are non-derivative financial assets with fixed or determinable payments that are not listed on an active market. After the original recognition, they are assessed at amortized cost, by using the effective interest method, less the provision for impairment. The discount is omitted in the cases in which the effect of the discount is immaterial. The Group's cash and cash equivalents, as well as trade accounts receivable and most of the other accounts receivable are placed in this category of financial instruments.

Significant accounts receivable are considered individually for impairment when they are past due or when there is

**TV Azteca, S.A.B. de C.V. and Subsidiaries**                                                        35
**(Subsidiary of Comunicaciones Avanzadas, S.A. de C.V.)**
**Notes to the consolidated financial statements as of December 31, 2016 and 2015**

objective evidence that a specific payment will fall into non-performance. Accounts receivable not considered impaired individually are reviewed for impairment in groups, which are determined by reference to the industry and region of the counterparty and other shared credit risk characteristics. The estimate of the impairment loss is then determined based on recent historical non-performance rates of the counterparty for each group identified.

*Financial assets at fair value through profit or loss (FVTPL)*

Financial assets at fair value through profit or loss include financial assets that are classified as held for trading or that meet certain conditions and are designated to FVTPL at the time of the initial recognition. All derivative financial instruments enter into this category, except those designated and effective as hedging instruments, to which hedge accounting requirements are applied.

Assets in this category are measured at fair value with the profit or loss recognized in the statement of comprehensive income. Fair values of derivative financial instruments are determined by reference to active market operations or by using a valuation technique when there is no active market.

*Investments held-to-maturity*

Investments held-to-maturity are non-derivative financial assets with fixed or determinable payments, and fixed maturities other than loans and accounts receivable. Investments are classified as held-to-maturity if the Group has the intent and capacity to hold them to maturity. As of December 31, 2016 and 2015, the Group has no investments classified with these characteristics.

Investments held-to-maturity are subsequently measured at amortized cost by using the effective interest method. In the event that there should be objective evidence that the investment is impaired, determined by reference to external credit classifications, the financial asset is measured at the present value of estimated future cash flows. Any change in the carrying amount of the investment including impairment losses is recognized in income or loss.

*Available-for-sale financial assets*

Financial assets available-for-sale are non-derivative financial assets that are designated in this category and do not qualify for being included in any of the other categories of financial assets. Financial assets available-for-sale include investments in securities managed by a foreign financial institution, securities listed in the stock market, and equity investments in Media Capital Investment (MCI), private equity fund, as discussed in note 16.

Equity investments in MCI are measured at cost less any impairment charge, since their fair value cannot be valued reliably at present. The Group recognized an impairment charge for the total of that investment in 2015, which is maintained as at the date of the report (see note 16).

Changes in fair value of financial assets available-for-sale are recognized in other comprehensive income, except for impairment losses and exchange differences in monetary assets, which are recognized in profit or loss. When an asset is disposed of or it is determined to be impaired, the accrued gain or loss that was recognized in other items of comprehensive income is reclassified from equity to income, and it is presented as a reclassification adjustment in other items of comprehensive income. Interest is calculated by using the effective interest method, and dividends are recognized in income under 'financial revenues' (see note 4aa).

The reversal of impairment losses is recognized in other items of comprehensive income, except financial assets that are debt securities, whose recognition in income is realized only if the reversal can be objectively related to an event that occurs after having recognized the impairment loss.

As of December 31, 2016 and 2015, the Group maintains investments in securities classified as a vailable-for-sale financial assets as discussed in note 16. The effects of the changes in fair value of these investments are presented in other comprehensive income.

*Classification and subsequent measurement of financial liabilities*

The Group's financial liabilities include loans, trade payables, and other payables.

**TV Azteca, S.A.B. de C.V. and Subsidiaries**                                                    36
**(Subsidiary of Comunicaciones Avanzadas, S.A. de C.V.)**
**Notes to the consolidated financial statements as of December 31, 2016 and 2015**

Financial liabilities are subsequently measured at amortized cost by using the effective interest method, except financial liabilities that are held for trading or have been designated at fair value through profit or loss, which are subsequently kept in books at fair value with the profit or loss recognized in income. As at December 31, 2016 and 2015, the Group does not maintain financial liabilities for trading or subsequently measured at fair value.

All derivative financial instruments not designated or ineffective as hedging instruments are accounted for at fair value through profit or loss. The effects of evaluation and assessment of the hedged item in fair value hedges are recorded in the statement of financial position in assets or liabilities, as applicable.

All charges related to interest and, if applicable, any change in the fair value of an instrument are reported in income and included in "financial costs" or "financial revenues".

*Derivative financial instruments*

A specific accounting treatment is required for derivatives designated as hedging instruments in all cash flow hedges. In order to qualify as hedge accounting, the hedge must meet certain strict conditions, with respect to the documentation, likelihood of occurrence of the hedge operation and hedge effectiveness. The remaining derivative financial instruments are accounted for at fair value through profit or loss.

As of December 31, 2016 and 2015, the Group neither has interest rate nor exchange rate hedge contracts.

j.    Bank loans and other loans

Net fair value is initially recognized net of any operating cost attributable directly to the issue of the instrument. Interest generating liabilities are subsequently calculated at amortized cost, by using the effective interest rate method, which assures that any interest expense during the period up to the complete payment is at a constant rate on the balance of the liability recorded in the statement of financial position. Interest expense includes initial operating costs and premiums payable at the time when they are amortized, as well as any interest or coupon payable while the liability is unpaid.

k.    Borrowings costs

The borrowings costs directly attributable to the acquisition, construction or production of an asset that qualifies are capitalized during the time period required to complete and prepare the asset for its intended use or sale. Other loan costs are expensed in the period in which they occur and reported in "financial costs" (see notes 13 and 21). During 2016 and 2015, the Group has not capitalized costs since they are not identified directly with the acquisition of assets.

l.    Performance rights

Performance rights represent the right acquired for broadcasting programs and events under license agreements, as well as the cost of internal productions.

Rights and obligations derived from performance rights acquired are originally recorded as an asset at their cost of acquisition when contracts are signed and the material is available. A liability is recognized on the unpaid part, if applicable. The portion of performance rights that is going to be used in the next twelve months is classified as a current asset. The cost of performance rights is amortized as programs and events are broadcasted.

As of December 31, 2016 and 2015, the balances of performance rights included internal productions in the amount of $508,050 and $566,331, respectively, as well in 2015 as advances for performance rights in the amount of $1,037,002. Third party rights are amortized at the time they are used which normally occurs in the current month. The performance rights of internal productions are amortized totally, except in the case of soap operas, of which 90% are amortized as broadcasted in Mexico, and the remaining 10% as sold in other countries.

Perpetual performance rights are amortized in a period in which the expected economic benefit is estimated to be obtained. As of December 31, 2016 and 2015, perpetual performance rights amounted to $487,196 and $481,869, respectively.

**TV Azteca, S.A.B. de C.V. and Subsidiaries**
**(Subsidiary of Comunicaciones Avanzadas, S.A. de C.V.)**
**Notes to the consolidated financial statements as of December 31, 2016 and 2015**

<div align="right">37</div>

m.   Inventories

Inventories of merchandise and materials are originally valued at the lower of their acquisition cost or their net realization value. The costs of exchangeable items are ordinarily assigned by using the average cost formula. The net realization value is the estimated selling price in the normal course of business, less any applicable selling expense.

n.   Property and equipment

*Buildings, computer equipment and other operating equipment*

Buildings, computer equipment and other operating equipment (including accessories and furniture) are recorded at the cost of acquisition or manufacturing cost, including any cost directly attributable for transferring the assets to the location where they would be located, as well as to be in the necessary conditions for operating in the manner provided for by Management. All other minor repair and maintenance costs are recognized in the statement of comprehensive income during the period in which they are incurred.

These assets are measured by using the cost model that consists of cost less accumulated depreciation and impairment losses.

Depreciation is recognized based on the straight-line method, which is applied to the cost of the asset less its residual value and considering its estimated useful life at the following rates:

| | |
|---|---|
| Buildings | 3% |
| Operating equipment | 5% & 16% |
| Furniture and office equipment | 10% |
| Transportation equipment | 20% |
| Computer equipment | 25% |

Values and estimated useful life of assets are reviewed at least once a year, and they are updated as required.

Gains or losses derived from the disposal of property, plant and equipment are determined as differences between the proceeds of the disposal and the recorded value of assets, and recognized in income as part of "other income and expenses", in the item of "selling and administrative expenses", as appropriate.

o.   Leased assets

*Finance leases*

The economic ownership of the leased asset is transferred to the lessee if the lessee substantially assumes all the risks and rewards related to the ownership of the leased asset. The pertinent asset is recognized in the statement of financial position as an asset and a liability in the same amount, the lower between the fair value of the leased asset and the present value of the minimum lease payments. Payments are distributed in two parts, financial charges and debt reduction. That financial cost will be distributed among the periods comprising the lease term, so that a consistent interest rate is obtained in each period on the balance of the unamortized debt.

The Group maintains transportation equipment under financial lease agreements entered into with related companies as described in note 12. As of December 31, 2016 and 2015, the net carrying value of such equipment amounted to $1,956 and $2,942, respectively. Expected useful lives of these equipments are determined by reference to comparable owned assets or over the term of the lease, if shorter.

*Operating Leases*

Payments of operating lease agreements are recognized as an expense based on the straight-line method over the term of the lease. The associated costs such as maintenance and insurance are expensed as incurred.

**TV Azteca, S.A.B. de C.V. and Subsidiaries**                                                              **38**
**(Subsidiary of Comunicaciones Avanzadas, S.A. de C.V.)**
**Notes to the consolidated financial statements as of December 31, 2016 and 2015**

During 2016 and 2015, payments were made on this item in the amount of $196,831 and $203,336, respectively, which are included in the caption of cost of programming, production, and transmission of the accompanying consolidated statement of comprehensive income.

      p.   Television concessions

The television concessions that qualify as indefinite useful life intangible assets were determined in conformity with IAS 38. Accordingly, they are not subject to amortization. Instead, concessions are subject to annual impairment tests regardless of any impairment indicator of value.

As of December 31, 2016 and 2015, the concessions were considered under a single cash-generating unit. Its value amounted to $10,785,466 and $9,933,622, respectively. It is comprised mainly of the concessions of channel 7 and channel 13 in Mexico, Guatemala, Azteca America, and Honduras, as well as for the disbursements for the acquisition of Channel 40 in the amount of $374,852, are considered as part of the value of the concessions, wich are reported as part of other intangible assets, pursuant to the litigious matters described in note 9. During 2016 and 2015, the increase in the value of the concessions is due to the increase from the valuation in the closing exchange rate of the foreign concessions in the amount of $851,844 and $610,905, respectively.

*Red Azteca Concessions; channels 7 and 13*

In complying with the provisions set forth in the Mexican Federal Radio and Television Law and through the Ministry of Communications and Transportation (SCT for its acronym in Spanish), on August 25, 2004, all television concessions were extended through certificates of concession renewal for transmission of frequencies, which expire on December 31, 2021.

These certificates of renewal set forth the obligation of implementing land digital technology at television stations in an equal number to analogical stations, in conformity with the standards and policies set forth by the SCT. The Federal Telecommunications Institute (IFT for its acronym in Spanish) has been the competent authority since September 9, 2013 in the period, terms and conditions set forth in those certificates of renewal, as part of the transition process of analogous transmissions to those of high definition. That term expires on December 31, 2021. The certificates of renewal include calendars for the implementation described above which have been complied with by the Group as of December 31, 2015.

*Channel 40*

In the opinion of the Company's legal advisors, the right of expropriation of the concession of Channel 40 is owned by the Company. Pursuant to the foregoing, the disbursements realized to acquire Channel 40 were considered as part of the value of the Concessions. Pursuant to the issue described in note 9, the disbursements in the amount of $374,852 made for the acquisition of Channel 40 are presented as part of other intangible assets.

*Azteca America Concessions*

The ownership, operation, and sale of television stations in the United States of America are regulated by the Federal Communications Commission (FCC), which acts under the authority granted by the Communications Act of 1934 (the "Communications Act").

Television stations are governed by the broadcast licenses granted by the FCC for maximum eight year terms and are subject to renewal, upon petition filed with the FCC, which will generally grant a renewal application if it is proven that: (i) the station has served the public interest, advisability, and need; (ii) there have been no serious violations by the licensee of the Communications Act or the standards and regulations of the FCC; and (iii) there have been no other violations by the licensee of the Communications Act or the overall standards and regulations of the FCC, that constitute a pattern of bad behavior.

The Communications Act prohibits the assignment of a broadcast license or transfer of control of a broadcast license without prior approval of the FCC. Likewise the Communications Act prohibits the issuance of a broadcast license or

**TV Azteca, S.A.B. de C.V. and Subsidiaries**                                                          **39**
**(Subsidiary of Comunicaciones Avanzadas, S.A. de C.V.)**
**Notes to the consolidated financial statements as of December 31, 2016 and 2015**

holding a broadcast license by any company of which more than 20% of the capital stock belongs to non US citizens, a foreign government or any company organized under the laws of a foreign country.

As of December 31, 2016, Azteca International Corporation and its subsidiaries have no knowledge of any violation of the Communications Act.

**Northstar – UVM concession**

On January 6, 2014, based on the consent issued by the Federal Communications Commission (FCC) of the United States of America on December 24, 2015, Stations Group, LLC (a subsidiary of Azteca International Corporation) was merged with Una Vez Mas, LLP (UVM), with the participation of Northstar Media, LLC, as the License Holder of the stations owned by UVM.

From 2008 to 2013, Azteca International Corporation (AIC) made various loans to Una Vez Mas LLP (UVM) and Subsidiary Companies in an amount approximating US$76,421, at interest rates ranging between 7% and 9%. Various promissory notes were signed secured by the gains on the sale of the companies that held the licenses of the concessions for operating UVM television stations. Those concessions include three stations considered "full power", ten stations considered "Class A", and eighteen stations considered "low power", located in different cities in US territory.

As a result of the nonperformance by UVM, various legal actions were filed and as at January 31, 2013, AIC and UVM signed the following documents: Letter of intent, Distribution and Support Agreement, and the Term Sheet of the main terms and conditions of the UVM restructuring and the merger with a new subsidiary company of AIC.

AIC and UVM executed a Time Brokerage Agreement (TBA) with the merger agreement on June 30, 2013, since the parties agreed that AIC would operate UVM's stations and cover operating expenses up to the date of the merger. For purposes of the merger, AIC incorporated Stations Group, Inc. (SG) which is currently in charge of operating the stations.

In accordance with the purchase and assignment contract (purchase contract) entered into between Northstar Media, LLC (Associate of AIC) as the buyer on June 30, 2013, and Una Vez Mas, LLP, Una Vez Mas Dallas, LLC, Una Vez Mas Houston, LLC, and Una Vez Mas San Francisco, LLC, (subsidiaries of UVM and holders of the licenses as sellers), the amount of US$700 was set as the purchase price of their shares.

AIC and Northstar Media, LLC entered into an option contract in which AIC has an option to buy the stock of Northstar Media, LLC, in the amount of US$350, plus interest at a 6.5% annual rate during the time elapsed up to the stock call option. AIC has the right to assign the call option to a third party of US nationality in order to comply with the rules of FCC with regard to foreign investments.

Pursuant to the option that AIC has as discussed in prior paragraphs, AIC consolidates its financial statements with those of Northstar Media, LLC, and its subsidiary companies, which include all the license holding companies.

**Southern California TV LLC (SCTV) concession**

Due to the transactions and negotiations carried out by AIC with Grupo Pappas Telecasting, various debts were generated charged to Grupo Pappas Telecasting. In February 2003, Grupo Pappas issued a promissory note (the PTSC promissory note) in benefit of the Company in the amount of US $128,000. That promissory note was secured by the assets of the Pappas Telecasting station of Southern California (PTSC), currently Southern California License, LLC, in Los Angeles, California. Since Grupo Pappas did not settle the above promissory note, this was the reason for repeated renewals and even the amount increased due to new loans and capitalized interest, thereby reaching an amount of US$155,970. Pursuant to a contact, a new buy option was established of the capital of PTSC (the PTSC Option), in the event that the promissory note should not be settled.

In accordance with the option contract (the PTSC Option Contract) entered into between the Company and Dennis J. Davis (DD), LeBon G. Abercrombie (LA), Pappas Telecasting Companies, and Harry J. Pappas (HP) on December

**TV Azteca, S.A.B. de C.V. and Subsidiaries**                                              **40**
**(Subsidiary of Comunicaciones Avanzadas, S.A. de C.V.)**
**Notes to the consolidated financial statements as of December 31, 2016 and 2015**

27, 2007, the Company exercised the call option to purchase the shares of PTSC (the PTSC Option) on December 30, 2009.

For purposes of exercising the PTSC Option, SCTV, Inc. (SCTV) was incorporated and had Azteca International Corporation and DD as stockholders. The latter contributed its equity in PTSC to SCTV. By the same token, the Company and DD entered into an option contract (the DD Option), whereby the Company will have an option to buy the DDs equity in SCTV in the amount of $5,500. The Company has the right to assign DDs Option to a third party of US nationality in order to comply with the rules of the United States (FCC) with regard to foreign investments.

On the other hand, LA assigned its equity interest in PTSC to SCTV, in exchange for a promissory note in the amount of $5,500. SCTV will make quarterly payments to LA for 5 years that will be applicable to the value of the promissory note. Also, in accordance with the PTSC Option Contract, the Company obtained the equity interest of HP and PTC in PTSC, and contributed that equity interest to SCTV in order for SCTV to have 100% of the shares of PTSC.

In October 2010, the date to enforce the PTSC's promissory note was extended up to 2022. The duration of the Local Market Contract (LMC), entered into originally between the Company and PTSC with respect to the Los Angeles station for three years in 2003, was also extended up to 2022. Furthermore, it went into effect since the promissory note had not been paid on or prior to its initial due date. Under the terms of this contract, the annual rent for the station in the amount of $17,907 continues to be in effect, which are offset dollar by dollar by the interest generated by the promissory note. Moreover, Pappas Telecasting of Southern California, LLC (PTSC) changed its corporate name to Southern California TV, LLC (SCTV LLC) in October 2010.

Finally, in the last quarter of 2010, the FCC approved the transfer of the shares of PTSC, now SCTV, LLC, to SCTV, Inc., thereby completing the exercise of the option.

Since SCTV, Inc. and its subsidiary Companies, including SCTV, LLC (SCTV, LLC), consolidate their financial statements with those of AIC and, in turn, AIC consolidates its financial statements with those of the Group, the amount of the promissory note receivable from SCTV, LLC is recognized as the value of the concession held indirectly by this company. As of December 31, 2016 and 2015, the promissory note receivable amounts to $155,970.

*Azteca Honduras Concession*

On November 4, 2013, the Group obtained a license of concession with duration of fifteen years, for rendering the radio broadcasting service through a digital channel with nationwide coverage in Honduras.

q.   Governmental subsidies

Governmental subsidies are initially recognized as deferred income when there is reasonable certainty that they will be received and that the Company will meet the obligations associated with the subsidy. The subsidies that offset expenses incurred by the Company, are recognized in income systematically in the same period in which expenses were recognized. Subsidies whose primary condition is for the Company to build or acquire non-current assets are recognized as deferred income and transferred to income systematically and rationally over the useful life of the assets.

Subsidies related to assets are presented as deductions of the carrying amount of the asset in the statement of financial position. By the same token, the recognition of deferred revenue from subsidies is shown as a decrease in the depreciation expense of the asset in the statement of comprehensive income.

r.   Other intangible assets

*Initial recognition*

Costs attributed directly to the development stage of a project are recognized as intangible assets as they meet the following requirements:

**TV Azteca, S.A.B. de C.V. and Subsidiaries**                                                                41
**(Subsidiary of Comunicaciones Avanzadas, S.A. de C.V.)**
**Notes to the consolidated financial statements as of December 31, 2016 and 2015**

- costs can be measured reliably

- the project is technically and commercially viable

- the Group intends and has sufficient resources to complete the project

- the Group has the capacity to use or sell the intangible asset

- the intangible asset will generate probable future economic benefits

Development costs that do not meet these criteria for capitalization are expensed as incurred.

Costs directly attributable to the development stage include employee costs incurred in the development of software, in addition to the adequate portion of the pertinent fixed expenses and borrowings costs.

Fiber optic network Colombia

Costs and expenses incurred for the development of the fiber optic backbone network project directly attributable to the preparation of the asset for its use in accordance with Management's expectations are capitalized, which were totally impaired in 2016 pursuant to various analyses performed by Group Management. In addition, those analyses determined that this investment would require additional capitalization. Accordingly, the Group contributed 40% and the rest was contributed by other shareholders; therefore, beginning December 27, 2016, the Group participates in this investment with that percentage. As at December 27, 2016, the project had a 99% of completion, and the amortized amount is shown in the item of "depreciation and amortization" and its impairment amount is shown in the item "other expenses, net" within the consolidated statement of comprehensive income (see notes 9 and 22).

Fiber optic network Peru

Costs and expenses incurred during concession process were capitalized. Costs incurred for the development of the fiber optic backbone network project are recognized in income. As at December 31, 2016, the project is in progress, and it will be amortized when expected economic benefits start to be received. As of December 31, 2016, the construction stage and delivery of the optic fiber network has been entirely completed (see note 9).

Players' registration costs

Players' registration costs whose acquisition is considered final are amortized in accordance with the time that comprises the duration of the player's contract, when the offer of their services on the domestic football soccer market merits it as such, and the estimated time of the "Professional Life" of the player, which in no case exceeds the term of the contract. This is why the latter is the maximum amortization time. Player's registration costs acquired on loan (temporary) are amortized during the time comprising that loan. The cost for transferring players is not recognized until the time of the sale or retirement thereof.

Affiliation rights

The right of affiliation with the Mexican Soccer Federation (*Federación Mexicana de Fútbol*) by franchise of the First Division "A" was recognized at its acquisition cost. As of December 31, 2016 and 2015, the value of the right of affiliation did not exceed its recovery value. These affiliation rights are not amortized due to the impossibility of defining the termination of future economic benefits accurately. Those assets are subject to an annual assessment for possible impairment or before if merited by circumstances.

Acquisition of software

Software licenses acquired are capitalized considering the costs incurred for acquiring and installing specific software.

Software developed internally

Expenses of the research stage for computer and telecommunications systems are recognized as an expense when

**TV Azteca, S.A.B. de C.V. and Subsidiaries**                                                                    42
**(Subsidiary of Comunicaciones Avanzadas, S.A. de C.V.)**
**Notes to the consolidated financial statements as of December 31, 2016 and 2015**

incurred, and expenses identified in the development stage are capitalized.

*Subsequent measurement*

Intangible assets including capitalized software developed internally are accounted for by using the cost model whereby capitalized costs are amortized on a straight-line basis over their estimated useful lives, since these assets are considered definite-lived assets. Residual values and useful lives are reviewed on each reporting date. They are currently subject to impairment tests as described in the following paragraph.

    s.    Impairment of the value of assets

The Group periodically evaluates the recovery value of tangible and long-lived intangible assets, including goodwill to determine the existence of indicators that those values exceed their recovery value.

For purposes of evaluating impairment, assets are grouped on the lowest levels for which there is an independent adequate cash inflow (cash generating units). As a result, assets are tested individually for impairment and some are tested at cash generating unit level.

Cash generating units to which goodwill is assigned, indefinite-lived intangible assets, and intangible assets that are still not available for use undergo impairment tests at least once a year. The rest of the individual assets or cash generating units are tested for impairment, provided that there is an event or change in circumstances which indicates that the amount recorded cannot be recovered.

An impairment loss is recognized in the amount in which the recorded value of the asset or cash generating unit exceeds its recovery value, which applies to the higher amount between fair value less cost to sell and value in use. To determine the value in use, Management estimates the expected future cash flows of cash generating unit and determines an adequate interest rate to be able to calculate the present value of those cash flows. The data used for impairment testing procedures are directly linked to the most recent budget approved by the Group, adjusted as necessary to exclude the effects of future reorganizations and improvements of assets. Discount factors are determined individually for cash generating unit and reflect their respective risk profiles, as evaluated by Management.

Impairment losses for cash generating units reduce the amount recorded first of any goodwill assigned to that cash generating unit. The remaining impairment loss is charged to other long-lived assets on a prorated basis in the cash generating unit. Except for goodwill, all assets are evaluated subsequently to confirm that any impairment loss that has been previously recognized no longer exists. An impairment charge is reversed if the recoverable value of the cash generating unit exceeds the carrying book value.

*Impairment test*

For purposes of the annual impairment test, working capital assets, fixed assets, concessions, and other intangible assets are considered as a single cash generating unit (CGU), pursuant to the assumption that the Group has proprietary assets to operate independently as a going concern, which generates economic flows and its own financial information, which enables it to be analyzed individually at the date of the analysis.

Fair value, less disposition costs is the technique used to determine the recoverable amount. This fair value is calculated through the estimate of market capitalization, by multiplying the average closing price of the share of the last twelve months at the valuation date by the number of shares at the same date. The value of the total debt as well as minority interest, are subsequently aggregated to obtain total invested capital.

As at December 31, 2016, the Group recorded an impairment charge in its intangible assets (fiber optic network Colombia) as discussed in note 9.

    t.    Income tax

IAS 12 "Income Taxes" sets forth that the tax due is determined based on currently enacted tax legislation and is

**TV Azteca, S.A.B. de C.V. and Subsidiaries**                                                         **43**
**(Subsidiary of Comunicaciones Avanzadas, S.A. de C.V.)**
**Notes to the consolidated financial statements as of December 31, 2016 and 2015**

recorded in income for the period to which it is attributable. The effects of deferred taxes consist of applying the tax rate applicable to all those temporary differences between book and tax balances of assets and liabilities that are expected to materialize in the future, related to: (i) deductible and taxable temporary differences; (ii) the offsetting of prior period tax loss carryforwards; and (iii) the offsetting of unused prior year credits (unused tax credit carryforwards)

Deferred income tax assets are recognized if it is likely that future tax benefits will be obtained against those that can be offset.

Deferred income tax liabilities derived from investments in subsidiaries and associates are recognized except when reversal of those temporary differences can be controlled by the Group, and it is likely that the temporary difference will be reversed in the foreseeable future.

Deferred tax assets and liabilities are offset only when the Group has the right and intent to offset current tax assets and liabilities of the same tax authority.

Deferred tax assets are recognized when it is more likely than not that they can be used against future taxable income. The foregoing is determined based on the Group's budget on future operating income, adjusted by significant items that are reconciled for taxable income and by the limits on the use of tax losses or other unappropriated tax assets. Deferred tax liabilities are always provided for entirely.

    u.   Non-current assets and liabilities classified as held-for-sale

When the Group intends to sell a non-current asset or a group of assets (a group for disposal), and if the sale is highly likely in the next twelve months, the assets or group for disposal are classified as "held-for-sale" and they are presented separately in the statement of financial position. Liabilities are classified as "held-for-sale" and presented as such in the statement of financial position if they are directly associated with a group for disposal.

Assets classified as "held-for-sale" are measured at their carrying value immediately before their classification as the lower of held-for-sale or their fair value, less their cost to sell. However, some assets "held-for-sale" such as financial assets or deferred tax assets continue to be measured in conformity with the Group's accounting policy for those assets. No asset classified as "held-for-sale" is subject to depreciation or amortization after they are classified as "held-for-sale".

As of December 31, 2016, the Group did not intend to dispose of any asset or set of assets.

    v.   Employee benefits

*Termination and retirement benefits*

The Group grants a benefit to personnel after their employment relationship is terminated either by dismissal or voluntary separation. In accordance with IAS 19 "Employee benefits", this practice constitutes an obligation assumed by the Company with its personnel, which is recorded based on annual calculations prepared by independent actuaries.

*Benefits for seniority bonuses and pensions*

The Group does not operate pension plans. However, there is a provision that recognizes the cost of the years of service of personnel, which was determined based on actuarial calculations.

The liability recognized in the statement of financial position for defined benefit plans is the present value of defined benefit obligations (DBO) at the reporting date, together with any adjustment on unrecognized actuarial gains or losses and prior service costs.

The liability also considers the Group's specific expectation of future salary increases. Discount factors are determined close to every fiscal year end in reference to the high quality government paper that is denominated in the

**TV Azteca, S.A.B. de C.V. and Subsidiaries**                                              **44**
**(Subsidiary of Comunicaciones Avanzadas, S.A. de C.V.)**
**Notes to the consolidated financial statements as of December 31, 2016 and 2015**

currency in which benefits will be paid.

These assumptions were developed by Management with the expert advice furnished by independent actuarial appraisers. Other assumptions are based on Management's experience.

> w.   Provisions, contingent liabilities and contingent assets

Provisions are recognized when current obligations as a result of a past event are likely to lead to an outflow of economic resources by the Group and the amounts can be estimated with certain reliability. The time or amount of that outflow can still be uncertain. A current obligation is derived from the presence of any legal or constructive commitment that has resulted from past events, for example: product warranties granted, legal disputes or onerous contracts.

Provisions for restructuring are recognized only if a formal detailed plan has been developed or implemented for restructuring, or management has at least announced the main characteristics of the plan for persons who are affected or it has started to be implemented. Provisions are not recognized on future operating losses.

Provisions are measured based on the estimated expense required to cancel the current obligation, pursuant to the most reliable evidence available at the date of presentation of the financial statements, including risks and uncertainties associated with the current obligation. In the cases in which there are a similar number of obligations, the possibility that a disbursement may be required for cancellation is determined through the consideration of that type of obligations as a whole. Provisions are discounted at their present values in the cases in which the value in time of the money is material.

Any reimbursements that the Group considers that it is going to be collected from a third party in connection with an obligation are recognized as a separate asset. However, this asset cannot exceed the amount of the related provision.

In those cases in which an outflow of economic resources is considered unlikely or remotely probable as a result of current obligations, no liability is recognized unless it is presumed in the course of a business combination (see note 4c). Contingent liabilities are recognized in a business combination at the date of acquisition when there is a current obligation that is derived from past events, and fair value can be recognized reliably, even if the outflow of economic resources is unlikely. They are subsequently measured based on the higher amount between a comparable provision as described above and the amount recognized at the date of acquisition, less any amortization.

> x.   Equity, capital reserves and dividends payment

Capital stock represents the par value of shares issued.

*Premium on stock issued*

The premium on stock issued includes any premium received for the issue of share capital. Any operating cost associated with the issue of shares is deducted from the premium on stock issued, net of any benefit from the related tax on earnings.

*Reserve for stock repurchases*

In accordance with the Securities Market Law, the Company created a capital reserve by appropriating a Reserve for stock repurchases from retained earnings, in order to strengthen the offer and demand for its shares on the Securities Market. Shares acquired and temporarily withdrawn from the market are considered as treasury stock that are presented as a capital stock decrease, until placed again on the market. When repurchased stock is sold, a gain or loss is not recognized in income, but stockholders' equity is increased or decreased.

*Other components*

Other components of capital include the following:

**TV Azteca, S.A.B. de C.V. and Subsidiaries**                                                                                    **45**
**(Subsidiary of Comunicaciones Avanzadas, S.A. de C.V.)**
**Notes to the consolidated financial statements as of December 31, 2016 and 2015**

- Effects of translation - these include the effect of translation of currencies from the Group's foreign entities into pesos (see note 4e)

- Reserve for financial assets and liabilities available-for-sale and cash flow hedges -these include gains and losses related to this type of financial instruments (see note 4i).

*Retained earnings*

Retained earnings include all current and prior period earnings reduced, if applicable, by current and prior year losses, dividends paid, and transfers to other capital accounts.

All operations with owners of the parent are recorded separately in equity.

Distributions of dividends payable to stockholders are charged to retained earnings and included in "Other liabilities" when dividends have been declared, but have not been paid at the reporting date. As of December 31, 2016 and 2015, dividends declared were fully paid.

    y.   Revenue recognition

Revenues are measured by reference to the fair value of the payment received or receivable by the Group of goods provided or services rendered, without counting sales taxes, rebates and commercial discounts.

Revenues on advertising contracts are recognized as the advertising contracted is broadcasted. Revenue consists of revenues obtained from advertisers less sales commissions. Sales commissions amounted to $1,173,853 and $950,459, for the years ended December 31, 2016 and 2015, respectively.

*Revenues from advertising contracts*

Revenues from advertising contracts are recognized as the advertising contracted is broadcasted.

*Income from unsold advertising time*

The Company recurrently markets unsold advertising time to infomercials, shared risk advertisers, and through integrated advertising. Infomercials are charged at a fee contracted for the time that the advertisement lasts. For shared risk advertisements, a percentage is received of gross sales of the products offered during the period of time negotiated after the advertisement is broadcasted. Integrated advertising revenue applies to the presentation and use of products during the broadcasting of internal programming. Revenue for these items accounted for 14.12% and 17.28% of net sales as of December 31, 2016 and 2015, respectively.

*Deferred income from advertising time*

The Group essentially handles two types of advertising advance contracts with its customers. On one hand, there are contracts in which advertisers choose to pay the total advertising contracted within the four months subsequent to the date on which the contract is signed. On the other hand, there are contracts in which the Group permits customers to make payments in installments, which are generally supported by notes over the period in which advertising is broadcasted. In both cases, the Company enters into some contracts with its customers for terms exceeding one year.

Cash or other assets received and the balance due from customers, as well as the obligation to provide advertising under any type of contracts entered into are recorded when those contracts are signed or the customer has tacitly accepted. Advertising advances or deferred obligations are credited to net sales when the advertising contracted is broadcasted. Revenue recognition is based on the information reported by the systems to those that incorporate the programming data transmitted daily, audience measurements, amounts of contracts, and other information.

Advances from advertisers or deferred obligations are valued at selling prices of services. Management estimates that approximately 51% of those obligations represent the cost of the service to be rendered.

**TV Azteca, S.A.B. de C.V. and Subsidiaries**                                                                46
**(Subsidiary of Comunicaciones Avanzadas, S.A. de C.V.)**
**Notes to the consolidated financial statements as of December 31, 2016 and 2015**

*Barter transactions*

Barter operations represent transactions that do not imply any cash flow whereby the Company sells advertising time to third or related parties, in exchange for certain assets or services. These transactions are originally recorded at the market value of the assets or services agreed upon in barter contracts in the caption of receivables from advertisers. In the years ended December 31, 2016 and 2015, net revenue derived from barter transactions amounted to $344,408 and $403,367, respectively.

z.  Operating expenses

Operating expenses are recognized in income at the time services are rendered.

aa.  Interest income and interest expenses and dividends received

Interest income and interest expenses are reported on an accrual basis, by using the effective interest method. Dividends income that is not from investments in associates is recognized at the time at which the Group is eligible to receive the payment.

bb.  Earnings per share

Ordinary basic earnings per share are calculated by dividing the holding Company's equity by the weighted average of ordinary shares outstanding during the fiscal year. Diluted earnings per share are determined by adjusting the holding Company's equity, under the assumption that the entity's commitments would be realized to issue or exchange its own shares. Basic earnings are equal to diluted earnings, since there are no transactions that might potentially dilute the earning.

cc.  Comprehensive loss

Comprehensive loss mainly consists of net loss, translation effects, and effects of valuation of financial instruments available-for-sale, which are reflected in equity and do not represent capital contributions, decreases, and distributions. The amounts of comprehensive loss of 2016 and 2015 are stated in historical pesos.

dd. Management's significant criteria upon applying accounting policies and uncertainty in estimates

The estimates and judgments used for the preparation of the financial statements are continually assessed and searched for in the historical experience and other factors, including projections of future events considered reasonable under current circumstances.

*Management's significant criteria*

Management's significant judgments in the application of the Group's accounting policies that have a significant effect on the financial statements are described below:

Internally generated costs of software and development

Significant judgment is required to distinguish the research stage from the development stage and determine if they meet the capitalization requirements of development costs. After capitalization, Management monitors to see if those requirements continue to be met and if there are indicators that such capitalized costs can be impaired.

Deferred tax assets

The amount on which a deferred tax asset can be recognized is based on the evaluation of the likelihood of having future taxable income on which the Group's deferred tax assets can be used. Significant judgment can further be required upon evaluating the impact of certain legal or economic limits or uncertainty in different tax jurisdictions.

**TV Azteca, S.A.B. de C.V. and Subsidiaries**                                                                                           **47**
**(Subsidiary of Comunicaciones Avanzadas, S.A. de C.V.)**
**Notes to the consolidated financial statements as of December 31, 2016 and 2015**

*Uncertainty of estimate*

Information on significant judgements, estimates and assumptions that have more significance on the recognition and measurement of assets, liabilities, revenues, and expenses is provided below. Actual results can be substantially different.

Non-financial asset impairment

In the evaluation of impairment, Management determines the recoverable value of each asset or cash generating unit, based on the expected cash flows and determines an adequate interest rate to be able to calculate the present value of those cash flows. Uncertainty of the estimate is related to the assumptions on future operating income and the determination of an adequate discount rate.

Useful lives of depreciable assets

Management reviews the useful lives of depreciable assets on each reporting date, based on the expected use of each asset. Uncertainty in these estimates is derived from the technical obsolescence that can modify the expected use of the asset, including software and computer equipment.

Performance rights

Management periodically evaluates the validity of the licenses of the titles for transmission and the capacity of these rights to generate future revenues.

Inventories

Management estimates the net realizable values of inventories, taking into consideration the most reliable evidence available at the reporting date. Future realization of these inventories can be affected by future technology or other changes on the market that can reduce selling prices.

Business combinations

Management uses valuation techniques to determine the fair values of the elements of a business acquisition. The fair value of the contingent payment is particularly dependent upon various results that can affect future earnings.

Allowance for doubtful accounts

The Company determines the allowance for doubtful accounts by studying factors such as: (i) the customer's financial position; (ii) the delay in collection; (iii) guarantees or warranties granted by the customer; and (iv) historical uncollectibility trends. This implies that Management makes allowances for uncollectibility at the date of preparation of the financial statements that will not necessarily behave as such in reality.

Defined benefit obligation

Management determines the DBO based on the number of critical assumptions, such as standard inflation rates, trends of health care service costs and mortality, discount rates, and future increases in expected salaries. Variations of these assumptions can impact the amount of the DBO and the pertinent annual expense on defined benefits (the analysis is furnished in note 14).

Fair value of financial instruments

Management uses valuation techniques to measure the fair value of financial instruments in which there are no active market quotes available. Consequently, Management considers estimates and assumptions based on market information and observable data that might be used by market participants upon setting a price on the instrument. In the cases in which there are no observable data, Management uses the best estimate on the assumptions that might be made by market participants. These fair value estimates of financial instruments can vary from actual prices that can be reached in arm's length transactions at the date of the report (see note 16).

**TV Azteca, S.A.B. de C.V. and Subsidiaries**
**(Subsidiary of Comunicaciones Avanzadas, S.A. de C.V.)**
**Notes to the consolidated financial statements as of December 31, 2016 and 2015**

48

### 5.   CASH AND CASH EQUIVALENTS:

Cash and cash equivalents are summarized as follows:

| | | 2016 | | 2015 |
|---|---|---|---|---|
| Petty cash funds and checking accounts | $ | 2,322,290 | $ | 1,446,864 |
| Short-term investments | | 2,148,024 | | 1,491,553 |
| Total cash and cash equivalentss | $ | 4,470,314 | $ | 2,938,417 |

### 6.   TRADE AND OTHER RECEIVABLES:

Trade and other receivable balances, classified on financial and non-financial assets, are summarized as follows:

| | | 2016 | | 2015 |
|---|---|---|---|---|
| Trade receivables | $ | 6,409,290 | $ | 6,213,297 |
| Allowance for doubtful accounts | | (589,989) | | (489,102) |
| Trade receivables, net | | 5,819,301 | | 5,724,195 |
| Other receivables | | 263,489 | | 565,489 |
| Financial assets | | 6,082,790 | | 6,289,684 |
| Prepaid expenses | | 115,194 | | 119,774 |
| Non-financial assets | | 115,194 | | 119,774 |
| Total trade and other receivables, short-term and long-term | $ | 6,197,984 | $ | 6,409,458 |

The net carrying value of short-term and long-term receivables is considered to approximate their fair value.

Trade accounts receivable as of December 31, 2016 and 2015, include: (i) barter transactions in the amount of $264,612 and $373,282, respectively; and (ii) related party balances in the amount of $453,080 and $573,282, respectively.

As of December 31, 2016 and 2015, trade accounts and other receivables were reviewed with respect to impairment indicators. Certain accounts were identified that were impaired and pursuant thereto, the allowance for doubtful accounts was increased in those years. Consequently, net income for the Group was affected as shown below:

| | | 2016 | | 2015 |
|---|---|---|---|---|
| Opening balance January 1 | $ | (489,102) | $ | (406,874) |
| Increases | | (201,900) | | (88,097) |
| Write-offs | | 101,013 | | 5,869 |
| Ending balance December 31 | $ | (589,989) | $ | (489,102) |

### 7.   INVENTORIES:

As of December 31, 2016 and 2015, inventories are summarized as follows:

| | | 2016 | | 2015 |
|---|---|---|---|---|
| Fiber optic materials, supplies and replacement parts in Peru | $ | 169,058 | $ | 479,462 |
| Fiber optic materials and replacement parts in Colombia | | - | | 161,553 |
| Other inventories | | 33,246 | | 25,986 |
| | $ | 202,304 | $ | 667,001 |

**TV Azteca, S.A.B. de C.V. and Subsidiaries**                                                                 49
**(Subsidiary of Comunicaciones Avanzadas, S.A. de C.V.)**
**Notes to the consolidated financial statements as of December 31, 2016 and 2015**

## 8.    PROPERTY AND EQUIPMENT:

Property and equipment are summarized as follows:

|  | 2016 | 2015 |
|---|---|---|
| Buildings | $   2,913,209 | $   2,755,349 |
| Operating equipment | 6,591,995 | 6,329,690 |
| Furniture and office equipment | 382,760 | 399,360 |
| Transportation equipment | 1,042,610 | 1,034,207 |
| Fiber optic | 1,276,978 | 1,189,545 |
|  | 12,207,552 | 11,708,151 |
| Less – Accumulated depreciation | (8,838,960) | (8,274,682) |
|  | 3,368,592 | 3,433,469 |
| Land | 681,394 | 688,131 |
| Construction-in-progress | 61,121 | 70,855 |
|  | $    4,111,107 | $    4,192,455 |

The reconciliation of account activity for the years ended December 31, 2016, and 2015, is shown below:

### Reconciliation as of December 31, 2016

|  | Balance at beginning of year, net of accumulated depreciation | Additions | Disposals | Depreciation for the year | Balance at end of year, net of accumulated depreciation | Estimated useful life (years) |
|---|---|---|---|---|---|---|
| Buildings | $  1,350,775 | $ 163,637 | $        102 | $      91,706 | $  1,422,604 | 33 |
| Operating equipment | 1,419,621 | 279,261 | 1,135 | 371,714 | 1,326,033 | 6 & 20 |
| Furniture and office equipment | 52,068 | 5,708 | 2 | 7,892 | 49,882 | 10 |
| Transportation equipment | 314,995 | 186,776 | 137,803 | 84,255 | 279,713 | 5 |
| Other fixed assets | 296,010 | 141,015 | 28,794 | 117,873 | 290,358 | 4 |
| Land | 688,131 | - | 6,736 | - | 681,395 | - |
| Construction-in-progress | 70,855 | 618,811 | 628,544 | - | 61,122 | - |
|  | $  4,192,455 | $1,395,208 | $ 803,116 | $     673,440 | $  4,111,107 |  |

### Reconciliation as of December 31, 2015

|  | Balance at beginning of year, net of accumulated depreciation | Additions | Disposals | Depreciation for the year | Balance at end of year, net of accumulated depreciation | Estimated useful life (years) |
|---|---|---|---|---|---|---|
| Buildings | $  1,363,912 | $      91,877 | $      13,746 | $      91,268 | $  1,350,775 | 33 |
| Operating equipment | 850,216 | 901,247 | 1,654 | 330,188 | 1,419,621 | 6 & 20 |
| Furniture and office equipment | 55,637 | 6,054 | 3 | 9,620 | 52,068 | 10 |
| Transportation equipment | 364,596 | 178,510 | 132,748 | 95,363 | 314,995 | 5 |
| Fiber-optic network | 62,060 | - | 62,060 | - | - | - |
| Other fixed assets | 217,985 | 179,777 | 338 | 101,414 | 296,010 | 4 |
| Land | 689,130 | - | 999 | - | 688,131 | - |
| Construction-in-progress | 87,117 | 1,196,225 | 1,212,487 | - | 70,855 | - |
|  | $  3,690,653 | $2,553,690 | $1,424,035 | $     627,853 | $  4,192,455 |  |

**TV Azteca, S.A.B. de C.V. and Subsidiaries**                                                    50
**(Subsidiary of Comunicaciones Avanzadas, S.A. de C.V.)**
**Notes to the consolidated financial statements as of December 31, 2016 and 2015**

*Components under construction – Construction-in-progress*

As of December 31, 2016 and 2015, constructions in progress corresponded mainly to the investment realized for the change from analogical transmission technology to digital technology.

All charges for depreciation and impairment are included as part of depreciation, amortization, and impairment of non-financial assets. As of December 31, 2016 and 2015, it was not necessary to make any impairment charges.

### 9.    OTHER INTANGIBLE ASSETS:

As of December 31, 2016 and 2015, this caption is summarized as follows:

|  | 2016 | 2015 |
|---|---|---|
| Payments to Corporación de Noticias e Información, S.A. de C.V. | $ 374,852 | $ 374,852 |
| Players' registration costs and affiliation rights | 732,299 | 535,277 |
| Fiber optic Colombia | - | 1,397,298 |
| Atlas Soccer Team acquisition | 188,579 | 188,579 |
| Fiber optic Peru | 31,279 | 21,406 |
| Other assets, net | 161,587 | 278,052 |
|  | $ 1,488,596 | $ 2,795,464 |

The reconciliation of operations is as follows:

|  | CNI | Fiber optic Colombia | Fiber optic Peru | Players' registration costs | Franchise and Atlas Trademark | Others | Total |
|---|---|---|---|---|---|---|---|
| Balance as of January 1, 2015 | $374,852 | $1,197,605 | $ 35,375 | $547,495 | $188,579 | $212,788 | $2,556,694 |
| Increases | - | 424,277 | - | 273,020 | - | 121,994 | 819,291 |
| Reclassifications | - | - | (12,891) | - | - | - | (12,891) |
| Sale of players | - | - | - | (162,778) | - | - | (162,778) |
| Amortization | - | (224,584) | (1,078) | (122,460) | - | (56,730) | (404,852) |
| Balance as of December 31, 2015 | $374,852 | $1,397,298 | $ 21,406 | $535,277 | $188,579 | $278,052 | $2,795,464 |
| Balance as of January 1, 2016 | $374,852 | $1,397,298 | $ 21,406 | $535,277 | $188,579 | $278,052 | $2,795,464 |
| Increases | - | - | 69,874 | 349,423 | - | 32,804 | 452,101 |
| Sale of players | - | - | - | (78,135) | - | - | (78,135) |
| Impairment | - | (1,376,526) | - | - | - | - | (1,376,526) |
| Amortization | - | (20,772) | (60,001) | (74,266) | - | (149,269) | (304,308) |
| Balance as of December 31, 2016 | $374,852 | $ - | $ 31,279 | $732,299 | $188,579 | $161,587 | $1,488,596 |

**Corporación de Noticias e Información, S.A. de C.V. (CNI)**

On December 10, 1998, the Company and its subsidiary Operadora Mexicana de Televisión, S.A. de C.V. (OMT) signed a Joint Venture Agreement with CNI and Televisora del Valle de México, S.A.P.I. de C.V. (TVM), which establishes the bases for: (i) the possible acquisition by TVA of shares issued by TVM; (ii) the operation and marketing of Channel 40 by OMT; (iii) the programming of Channel 40; and (iv) a credit granted by TVA to CNI and the documents discussed below, among other things, were signed:

a)   A Loan Agreement signed on October 9, 1998, whereby the Company granted a loan in the amount of US$10,000 in favor of CNI over a ten year term, with a 3-year grace period as of the drawdown of the loan. Interest on the credit was equivalent to the highest rate paid by the Company plus 0.25 points. To secure the

**TV Azteca, S.A.B. de C.V. and Subsidiaries**                                                     **51**
**(Subsidiary of Comunicaciones Avanzadas, S.A. de C.V.)**
**Notes to the consolidated financial statements as of December 31, 2016 and 2015**

loan, a pledge was created applicable to 51% of the shares representative of the capital stock of TVM, held by Mr. Javier Moreno Valle Suarez. Those shares will be pledged until the loan and its related costs are paid in full. As of July 2000, CNI had drawn down US$10,000 of this loan.

b)   The Company entered into an assignment of rights and obligations contract (the "Assignment Contract") with CNI that CNI had with TVM under which the Company would market, program, and operate television Channel 40. Under that Contract, TVA delivered US$15,000 to CNI, which were considered as a 50% prepayment of the EBITDA for the first three years of the Contract. As of December 31, 1999, the Company delivered the total US$15,000 described, which will be amortized against the EBITDA generated in operating Channel 40 over a maximum 10-year period.

In July 2000, CNI suspended the transmission of the Company's signal, which was an obligation set forth in the joint venture agreement. As an answer to this and other actions, the Company has filed various lawsuits against CNI, TVM, and Mr. Moreno Valle.

In September 2005, the Seventh Civil Court handed down a ruling whereby; a) TVM and CNI nonperformed the Assignment Contract; b) TVM and CNI were ordered to perform the Assignment Contract; and c) TVM and CNI were ordered to pay damages and harm, as well as (legal) expenses and costs. The Fourth Civil Court confirmed the ruling handed down by the court of original jurisdiction, TVM and CNI filed appeals for constitutional relief against the rulings handed down by the fourth division in the appeal filed by the defendant, on which the final ruling was handed down by the First Civil Three-Judge Court, in the sense of confirming the judgment for the plaintiff that sentenced TVM and CNI, except for the sentence of the payment of expenses and costs.

In execution and performance of the final ruling handed down by the Seventh Civil Judge, Channel 40 again started to broadcast the programming furnished by the Company, in reliance on the contracts signed between TVM and the Company in 1998, which were restored and recognized by the person who acts as both sole director and CEO.

In spite of a lack of certainty, the Company considers that it will prevail in the various disputes it has with CNI, TVM, and Mr. Moreno Valle and, therefore, no provision has been made for this matter.

**Fiber optic network Colombia**

A branch of the Company in Colombia was awarded the bid for the construction of a fiber optic network (the network) in 753 municipalities and 2,000 public institutions in Colombia during 2011. The objective of this operation is to design, install, put into service, operate, manage, and maintain this telecommunications network. The Colombian branch has a 2.5-year period to build the network, and holds the concession to be operated for a 15-year period.

The resources for the construction of the network proceed from a subsidy granted by the Government of Colombia, supplemented by the Group's own resources. The Colombian branch is subject to certain conditions for obtaining the subsidy, among other things, is highlighted by the free service with certain limitations rendered for the use of the fiber optic network to 2,000 public institutions of the government of Colombia for a five year period, the construction in due time and proper form of the network and the operation and maintenance thereof for fifteen years. The commitments acquired by the Group are disclosed in note 25. All the stipulated conditions have been complied with during the validity of the contract.

At December 31, 2016, pursuant to the analyses and evaluations performed by Management with respect to impairment indicators, the Group recognized an impairment charge amounting to $1,376,526, which is presented in "other expenses" of the accompanying consolidated statements of comprehensive income (see note 22).

Moreover, the Group analyzed the perspectives and valuation of its investment in the telecommunications business in Colombia to define the long-term approach more accurately, and determined that this business would require an additional investment of capital amounting to US$100 million in the short-term to develop last mile infrastructure; therefore, it entered into an agreement with the shareholders which set forth that the Group would contribute US$40 million and the remaining US$60 million would be contributed by another group of shareholders.

**TV Azteca, S.A.B. de C.V. and Subsidiaries**                                                                    **52**
**(Subsidiary of Comunicaciones Avanzadas, S.A. de C.V.)**
**Notes to the consolidated financial statements as of December 31, 2016 and 2015**

On December 27, 2016, the shareholder agreement was concluded and the capitalizations discussed were formalized; therefore, beginning that date, the Group stopped having control over the telecommunications business in Colombia, and consequently: (i) the assets and liabilities of the companies involved stopped being consolidated; and (ii) the investment in those companies will be valued by using the equity method.

### Governmental subsidies

The subsidy granted by the Government of Colombia amounted to $415,000 million Colombian pesos (which were equivalent to approximately $2,000 million Mexican pesos at that time), and it was supplemented with its own funds. The Colombian branch was subject to meeting the conditions discussed in the foregoing paragraphs, which have been met as at December 31, 2016.

As of December 31, 2015, the assets generated by stages one and two of the fiber-optic network, amount to $132,875, and correspond to the fifteen undivided proportionate shares of ownership of the optical network accrued as at that date. The trustee fees corresponding to the unaccrued fifteen undivided proportionate shares of ownership amount to $2,837,943. Both amounts of the subsidy obligation are presented netted in the consolidated statement of financial position.

### Fiber optic network Peru

In June 2014, Azteca Comunicaciones Perú, S.A.C. entered into a contract with the Peruvian government to carry out the project named "National Fiber Optic Backbone Network" (RDNFO for its acronym in Spanish) with a term of 20 years. That contract established the bases for the design, financing, construction, operation, and maintenance of 13,400 km of a fiber optic network through which 23 regions, 180 cities, and 136 municipalities will be connected. The execution time of the work is 24 months, and it should be completed through six delivery stages by June 2016. The total estimated investment amounts to US$323 million contributed by the Peruvian government.

As of December 31, 2016, all the stages of the fiber optic network were delivered to the Government of Peru. The stages already delivered generated the considerations corresponding to the redistributions on investment, which were discounted by the Group.

### 10.   INVESTMENTS ACCOUNTED FOR USING THE EQUITY METHOD ANDOTHER:

The balance of the investment in associated companies is summarized as shown below:

|  | 2016 | 2015 |
|---|---|---|
| Súper Espectáculos, S.A. de C.V. (Arena Monterrey) | $ 212,539 | $ 191,439 |
| Azteca Comunicaciones Colombia | 60,879 | - |
| Globo Re, S.A. (Resident abroad) | - | 128,780 |
| Other investments | 58,762 | 39,185 |
|  | $ 332,180 | $ 359,404 |

Condensed information of assets, liabilities, revenues, and results of associated companies, as well as the percentage of equity of the Company as of December 31, 2016 and 2015, is presented below:

| Name | Assets | Liabilities | Revenues | Income/ (Loss) | % of equity |
|---|---|---|---|---|---|
| As of December 31, 2016- | | | | | |
| Súper Espectáculos, S.A. de C.V. (Arena Monterrey) | $ 2,684,815 | $ 1,388,492 | $1,312,828 | $ 112,669 | 20% |
| Azteca Comunicaciones Colombia | 1,313,639 | 731,069 | 749,218 | (1,389,011) | 40% |
| As of December 31, 2015- | | | | | |
| Súper Espectáculos, S.A. de C.V. | $ 2,710,142 | $ 1,532,832 | $1,245,026 | $ 29,967 | 20% |
| Globo Re, S.A. | 704,036 | 160,754 | 1,026 | 1,330 | 27% |

**TV Azteca, S.A.B. de C.V. and Subsidiaries**                                                                                53
**(Subsidiary of Comunicaciones Avanzadas, S.A. de C.V.)**
**Notes to the consolidated financial statements as of December 31, 2016 and 2015**

As indicated in note 9 above, beginning December 27, 2016, Azteca Colombia qualifies as an associate. The condensed information as of December 31, 2015, is included below:

| Name | Assets | Liabilities | Revenues | (Loss) |
|---|---|---|---|---|
| Azteca Comunicaciones Colombia | 2,233,877 | 1,424,875 | 607,206 | (588,273) |

On July 29, 2016, the Group disposed of the investment that it held in its associated company Globo Re, S.A., thereby generating a gain amounting to $194,883.

The Group disposed of equity in other permanent investments at a carrying value amounting to $38,946 in 2015.

As of December 31, 2016 and 2015, the Company recognized an increase in its investments in associates through the equity method in the amounts of $23,309 and $26,352, respectively, according to its percentage of equity in the comprehensive income of its associated companies. Those amounts are presented in the consolidated statement of comprehensive income within the line of Equity in earnings of associates, including an effect on that income due to an impairment in other permanent investments amounting to ($19,786) as a result of 2015.

As of December 31, 2016 and 2015, the Group holds other investments where it has no significant influence with a net book value amounting to $58,762 and $39,185, respectively, whose carrying value is similar to fair value.

## 11.    TRADE AND OTHER PAYABLES:

Trade accounts and other payables are summarized as follows:

|  | 2016 | 2015 |
|---|---|---|
| Trade payables and creditors | $ 1,375,795 | $ 1,967,656 |
| Interest payable | 278,709 | 233,148 |
| Operating costs and expenses | 1,381,158 | 1,537,902 |
| Contributions and other payables | 579,142 | 365,133 |
|  | $ 3,614,804 | $ 4,103,839 |

## 12.    RELATED PARTY BALANCES AND TRANSACTIONS:

Related party balances, which are not guaranteed and will be settled in cash, are as follows:

|  | 2016 | 2015 |
|---|---|---|
| **Accounts receivable:** |  |  |
| Comunicaciones Avanzadas, S.A. de C.V. (Holding Company) | $ 584,860 | $ 510,526 |
| Organización de Torneos y Eventos Deportivos, S.A. de C.V. | 113,736 | - |
| Grupo Elektra, S.A.B. de C.V. and subsidiaries (Grupo Elektra) | 105,654 | 88,471 |
| Total Play Telecomunicaciones, S.A. de C.V. | 31,880 | 13,209 |
| Desarrollos Infraestructura y Construcción G.S., S.A. de C.V. | 34,283 | 34,283 |
| Arrendadora Internacional Azteca, S.A. de C.V. | 22,485 | 30,479 |
| Adamantium Private Security Services, S. de R.L. de C.V. | 2,809 | 71,896 |
| Other | 45,028 | 31,905 |
|  | $ 940,735 | $ 780,769 |
| **Accounts payable:** |  |  |
| Selabe Diseños, S.A. de C.V. (Selabe) | $ 88,230 | $ - |
| Globo Re, S.A. | - | 160,061 |
| Procesos Boff, S. de R.L. de C.V. | 9,341 | - |
|  | $ 97,571 | $ 160,061 |

**TV Azteca, S.A.B. de C.V. and Subsidiaries**                                                     54
**(Subsidiary of Comunicaciones Avanzadas, S.A. de C.V.)**
**Notes to the consolidated financial statements as of December 31, 2016 and 2015**

The most significant related party transactions carried out are described below, wich were carried out as if the terms of the considerations for related party transactions were equivalent to similar transactions carried out with independent third parties:

**Advertising income**

Income from advertising broadcasted contracted with related parties amounted to $660,112 and $429,953 for the years ended December 31, 2016 and 2015, respectively.

Grupo Elektra, S.A.B. de C.V. and subsidiaries (Grupo Elektra)

During 2016 and 2015, the Company and Grupo Elektra entered into annual advertising; the rights under the terms of these contracts cannot be transferred to third parties by Grupo Elektra. As of December 31, 2016 and 2015, revenues from Grupo Elektra amounted to $583,989 and $412,523, respectively.

Total Play Telecomunicaciones, S.A. de C.V. (Total Play)

The Company entered into annual advertising contracts in 2016 and 2015; the rights under the terms of these contracts cannot be transferred to third parties by Total Play. As at December 31, 2016 and 2015, revenues from Total Play amounted to $76,123 and $17,700, respectively.

**Interest earned**

During the years ended at December 31, 2016 and 2015, the Company granted short-term loans to related parties. In the years then ended, interest earned pursuant to these loans amounted to $16,225 and $18,117, respectively

**Revenues on productions and promotions**

Banco Azteca, S.A. (Affiliated Company, subsidiary of Grupo Elektra)

The Company and Banco Azteca have entered into various production and promotion contracts of the products and services of Banco Azteca on open television channels 7 and 13. As of December 31, 2016 and 2015, revenues from these contracts amounted to $98,033 and $22,969, respectively.

**Income from leasing property**

The Company (as a lessor), entered into a lease agreement of real property with a subsidiary of GSF Telecom Holdings, S.A.P.I. de C.V.; the amount of the rent is increased every year. As of December 31, 2016 and 2015, the lease revenue set forth in this agreement amounted to $9,412 and $5,396, respectively.

**Leased equipment**

The Company has entered into operating leasing agreements with a purchase option with AIA, an affiliated company. The Company is the lessee and AIA is the lessor. To date exhibits have been executed for leasing vehicles and computers. The term of those agreements is in effect over the terms set forth in each one of the exhibits of the equipment leased, which are generally from 3 to 4 years. The terms computed in those exhibits will be binding for both parties, except in the event that the lessor should terminate those agreements early if any of the assumptions set forth in the agreements should occur. At the end of the term of every exhibit, the Company may choose to acquire the assets under lease agreements, extend the term or return the leased assets, with a notification of at least 90 calendar days prior to its expiration. The monthly rent under the terms of the agreement is fixed, in conformity with each one of the exhibits.

Pursuant to the characteristics of the lease agreements discussed above and in conformity with currently enacted standards, they may be capitalized. For the years ended December 31, 2016 and 2015, the assets acquired under these agreements amounted to $602 and $1,046 respectively. During 2016 and 2015, lease payments were made amounting to $1,956 and $2,537, respectively.

**TV Azteca, S.A.B. de C.V. and Subsidiaries**                                                    **55**
**(Subsidiary of Comunicaciones Avanzadas, S.A. de C.V.)**
**Notes to the consolidated financial statements as of December 31, 2016 and 2015**

### Donations

In the years ended December 31, 2016 and 2015, the Company delivered donations to Fundación TV Azteca, A.C., Asociación Azteca Amigos de la Cultura y las Artes y Caminos de la Libertad, Ideas y Debate, A.C., related parties, in the amounts of $155,115 and $145,777, respectively. These related parties are authorized by the tax authorities to receive donations and issue the respective supporting documentation.

### Recovery of other receivables from related parties

The Company periodically evaluates the recoverability of other receivables from related parties; when it is determined that these accounts are not recoverable, they are charged to other expenses.

As of December 31, 2016 and 2015, all receivables from related parties of the Group have been reviewed with respect to impairment indicators. As of December 31, 2015, due to the evaluation discussed above, certain receivables were impaired and, therefore, an allowance for doubtful accounts from related parties was recorded in the amount of $92,451, and it is presented in the item of "other expenses" of the accompanying statement of comprehensive income. Those impaired receivables correspond mainly to related parties with the investment in MCI discussed in note 16. Part of these accounts were recovered in the amount of $86,363 in 2016; therefore, the impairment recognized was reversed in the amount recovered.

### Employee benefits granted to key management personnel

The benefits granted to the Company's executive personnel amounted to $65,000 in 2016 and 2015.

### 13.    FINANCIAL DEBT:

The company had the following financial debt:

|  | 2016 | | 2015 |
|---|---|---|---|
| ATC Long-term loans | $    1,891,869 | $ | 1,582,600 |
| Long-term program MTN | 16,369,456 | | 13,630,083 |
|  | $    18,261,325 | $ | 15,212,683 |

### ATC long-term loans

On February 11, 2000, the Company entered into a long-term loan agreement up to US$119,800 with a Mexican subsidiary of ATC (ATC Long-Term Loan). The loan is comprised: (i) an unsecured tranche of US$91,752 and (ii) a tranche of US$28,000 for working capital, secured by certain real property owned by the Company. In June 2003, the Company and the Mexican subsidiary of ATC amended the original agreement. Pursuant to the terms of the amended agreement, the annual interest rate of each of the loans is 13.109%. The Company's payment obligations pursuant to the ATC long-term loans are secured by three of the main subsidiaries of the Company. The initial maturity of the US$91,752 loan, pursuant to the ATC long-term loans is February 11, 2020, which can be extended while the contract of the overall tower project (which is described herein below) remains in effect. On November 27, 2013, the loan in the amount of US$28,000 was repaid early with funds obtained from the MTN Program.

In February 2000, the Company, together with its subsidiary Televisión Azteca, S.A. de C.V., executed a master tower project contract with a Mexican subsidiary company of ATC for duration of 70 years, for renting space not used by the Company in its operations up to 190 broadcasting towers of the Company. As a consideration of the payment of US$1,500 as an annual lease and, in turn, the Company granted ATC the right to market and lease the unused space in the Company's broadcasting towers to third parties, as well as to the Company's affiliated companies, and guaranteed the collection of all the relative revenues for account of ATC. The Company has the title deeds of the towers and is responsible for its operation and maintenance.

The SCT approved this contract on February 10, 2000. After the expiration of the 20 initial years of the ATC long-term loan, the Company has the right to purchase the total or a portion of the revenues and assets relative to marketing the rights at any time from ATC at fair market value, with the proportionate amount of the remaining principal of the ATC long-term loan.

**TV Azteca, S.A.B. de C.V. and Subsidiaries**                                                    56
**(Subsidiary of Comunicaciones Avanzadas, S.A. de C.V.)**
**Notes to the consolidated financial statements as of December 31, 2016 and 2015**

Accrued interest payable as of December 31, 2016 and 2015, on these loans received amounted to US$12,061 and US$12,028, equivalents to $226,298 and $192,043, respectively; and they are reported in the item "Interest expense" within the consolidated statements of comprehensive income.

**MTN Program**

On June 1, 2005, the Company established the Medium Term Notes Program (MTN) in an initial amount of US$200 million. On May 25, 2011, the program to increase its capacity up to US$500 million was modified, and an issue was made of US$300 million at a 7.5% annual interest rate. The due dates of interest are every May 25 and November 25, up to its maturity on May 25 2018.

On September 4, 2013, the Company modified the program to increase its capacity up to US$1,000 million again. Toward that end, an issue was carried out in the amount of US$500 million at a 7.625% annual rate on September 19, 2013. Its due dates on interest payments are March 18 and September 18 every year, up to its due date of September 18, 2020.

As of December 31, 2016 and 2015, the amount of MTN program issuance expenses pending amortization against income, which is presented decreasing the debt for said issuance amounts to $126,063 and $168,877, respectively.

Accrued interest payable as of December 31, 2016 and 2015, on these loans received amounted to US$63.7 millions and US$63.7 millions, equivalent to $1,194 millions and $1,018 millions, respectively; which are included in "Interest expense" within the consolidated statements of comprehensive income.

*Maturities of loans*

The maturities of portions of loans contracted by the Group as of December 31, 2016, are shown below:

| Year | | Amount | |
|------|---|--------|---|
| 2018 | $ | 6,159,832 | |
| 2020 | | 12,101,493 | (*) |
| | $ | 18,261,325 | |

(*) It includes US$91,752 (equivalent to $1,891,868) of the long-term loan from ATC, whose due date can be extended while the overall project contract of towers remains effective.

## 14. EMPLOYEE BENEFITS:

a. Employee benefits expense

The expense recognized for employee benefits are as follows:

| | | 2016 | | 2015 |
|---|---|------|---|------|
| Production cost: | | | | |
| Employee benefits expenses | $ | 815,027 | $ | 834,850 |
| Selling and administrative expenses: | | | | |
| Employee benefits expenses | | 240,733 | | 232,085 |
| | $ | 1,055,759 | $ | 1,066,935 |

b. Seniority premium

| | | 2016 | | 2015 |
|---|---|------|---|------|
| Defined benefit obligations (DBO) | $ | 66,774 | $ | 64,588 |
| **Projected net liability** | | 66,774 | | 64,588 |

**TV Azteca, S.A.B. de C.V. and Subsidiaries**                                        57
(Subsidiary of Comunicaciones Avanzadas, S.A. de C.V.)
Notes to the consolidated financial statements as of December 31, 2016 and 2015

| | | | | |
|---|---|--:|---|--:|
| Labor cost of present service | | 5,104 | | 5,047 |
| Financial cost | | 4,776 | | 4,547 |
| Prior service recognized in the period | | 318 | | 95 |
| Actuarial immediate recognition (gains/losses) | | 33,088 | | (6,550) |
| **Net cost for the period** | $ | 43,286 | $ | 3,139 |

c.   Separation upon retirement

| | | 2016 | | 2015 |
|---|---|--:|---|--:|
| Defined benefit obligations (DBO) | $ | 121,261 | $ | 132,599 |
| **Projected net liability** | | 121,261 | | 132,599 |
| Labor cost of present service | | 9,966 | | 10,586 |
| Financial cost | | 9,751 | | 10,311 |
| Prior service recognized in the period | | (17,303) | | 316 |
| Actuarial immediate recognition (gains/losses) | | 23,126 | | (27,950) |
| **Net cost for the period** | $ | 25,540 | $ | (6,737) |

The projected net liability is summarized below:

| | | 2016 | | 2015 |
|---|---|--:|---|--:|
| Seniority Premium | $ | 66,774 | $ | 64,588 |
| Separation upon retirement | | 121,261 | | 132,599 |
| **Employee benefits** | $ | 188,035 | $ | 197,187 |

The Company enters into specialized contracts with different suppliers with companies that have the capacity to pay off credits derived from subordinated debentures contracted with their own personnel. These companies offer these services to the company and they have the capacity to offer the service to any third party. They are established companies that have their own domicile. They have their own, sufficient elements to be responsible for their obligations with the persons who they use for rendering their services. Likewise, the Company neither establishes nor supervises the work of the persons contracted by the provider to realize the service. This is done directly by the service company with its own personnel.

**15.   TAXES ON EARNINGS:**

a.   Provision for taxes on earnings

As of December 31, 2016 and 2015, the provision for income tax is as follows:

| | | 2016 | | 2015 |
|---|---|--:|---|--:|
| Income tax expense– Integration regime | $ | 88,414 | $ | 98,340 |
| Income tax expense– General law regime | | 48,649 | | 14,766 |
| Income tax expense– Foreign subsidiaries | | 54,826 | | 47,741 |
| Deferred income tax | | 699,386 | | 430,880 |
| Income tax up date pursuant to tax reform | | 53,446 | | 130,841 |
| | $ | 944,721 | $ | 715,690 |

b.   Income tax

Integration Regime

On February 17, 2014, the Group filed a notice for purposes of the Optional Regime for Groups of Companies, effective January 1, 2014.

**TV Azteca, S.A.B. de C.V. and Subsidiaries**                                                     58
**(Subsidiary of Comunicaciones Avanzadas, S.A. de C.V.)**
**Notes to the consolidated financial statements as of December 31, 2016 and 2015**

In general terms, the Optional Regime for Groups of Companies has the following characteristics:

a) Income Tax is deferred for each company comprising the group of companies. The amount to be deferred is obtained by applying the Factor of Integrated Taxable Income that will be determined by the integrating company (the Company) based on the taxable income and tax losses of each one of the companies that form part of the Group. Consequently, there is no tax return per integration, since each company forming part of the group will file its annual tax return individually.

b) The corresponding payment on Income Tax assessed on the Group and its subsidiaries will be deferred up to three years or before if any of the assumptions that bind them to break up or when the integrator no longer meets any of the requirements for comprising the group of companies.

For 2016 and 2015, the Company incurred a tax loss amounting to $1,172,759 and $368,525, respectively, which differs from its separate book loss, due mainly to the recognition of the equity method in income of subsidiary companies, annual cumulative adjustment, and nondeductible items.

During 2016 and 2015, pursuant to the integration regime, the Company and its subsidiaries that form part of that regime were subject to taxes on earnings amounting to $88,414 and $98,340, respectively. Integrated taxable income differs from book income, due mainly to those items that accrue over time and are deducted differently for book and tax purposes for the recognition of the impact of inflation for tax purposes, as well as those items that only affect book or integrated taxable income.

General Law Regime for other Mexican subsidiaries

The Subsidiary companies that do not form part of the Integration Regime, determine its income tax based on their individual results under the General Law Regime; they subject to taxes on earnings amounting to $48,649 and $14,766 in 2016 and 2015, respectively.

Income tax for foreign subsidiaries

Foreign subsidiaries determine its income tax based on their individual results, in accordance with the specific tax law of its country. Foreign companies, mainly Azteca America and Peru, were subject to taxes on earnings amounting to $54,826 and $47,741 in 2016 and 2015, respectively.

c. Deferred income tax

As of December 31, 2016 and 2015, the asset on cumulative deferred income tax effect is summarized as follows:

|  | 2016 | 2015 |
|---|---|---|
| Excess of tax over book value of assets and liabilities, net | $ 2,275,084 | $ 2,781,116 |
| Add - Tax loss carryforwards | 8,061,379 | 8,450,169 |
|  | 10,336,463 | 11,231,285 |
| Income tax rate | 30% | 30% |
| Deferred income tax asset | 3,100,939 | 3,369,385 |
| Add – Tax credits from subsidiaries abroad | - | 134,830 |
| Less - Valuation allowance | (1,275,821) | (979,932) |
|  | $ 1,825,118 | $ 2,524,283 |

This deferred income tax asset is due basically to the accumulated tax loss carryforwards, the net effect of advances from advertisers, the valuation of financial instruments available-for-sale, the excess of tax value over book value of property and equipment, and the tax benefits generated by the operations in Colombia. Due to the uncertainty that part of the total of this deferred asset may not be recovered in its entirety, the Group has assumed a conservative position and has decided to create a valuation allowance of the deferred income tax asset, as shown in the above chart.

**TV Azteca, S.A.B. de C.V. and Subsidiaries**                                                                    59
**(Subsidiary of Comunicaciones Avanzadas, S.A. de C.V.)**
**Notes to the consolidated financial statements as of December 31, 2016 and 2015**

As of December 31, 2016 and 2015, the effective tax rate is as follows:

|  | 2016 | 2015 |
|---|---|---|
|  | % | % |
| Income tax rate | 30 | 30 |
| Expenses and other nondeductible ítems | (56) | (46) |
| Differences between book and tax inflation | (15) | (20) |
| Equity in earnings (losses) of associated companies | (1) | (1) |
| Effective tax rate | (42) | (37) |

Recognition of the effects of the Tax Consolidation Regime derived from the 2014 Tax Reform:

On December 2013, the Federal Official Gazette published the Federal Government's "Decree that amends, adds, and withdraws various tax provisions", effective January 1, 2014 ("the 2014 Tax Reform"). The new income tax law sets forth new taxable items, eliminates some tax treatments, and amends some taxation and deduction schemes, which will arise significant effects in 2014, mainly related to elimination of the tax consolidation regime.

As a result of this decree, effective Janaury 1 2014, the Company no longer determines the income tax on a consolidated basis. As at December 31, 2013, deferred income tax due to deconsolidation determined for the years from 2008 to 2013, in accordance with the 2014 fiscal reform and considered as final, amounts to $1,599,565, which will be settled in five years, and it was generated by tax loss carryforwards used in the tax consolidation regime of those years. As at December 31, 2016 and 2015, the outstanding amount for this item amounts to $420,797 and $853,214, respectively.

Recognition of the effects of the Tax Consolidation Regime derived from the 2010 Tax Reform:

In December 2009, Federal Government, published the executive order that amends, aggregates and repeals various tax provisions to Income Tax Law, effective Janaury 1 2010 ("the 2010 Tax Reform"). These modifications included setting five years as a maximum deferred income tax due, which should be covered in five annual payments (25% in the first and second year, 20% in the third year, and 15% in the fourth and fifth year) beginning the sixth year subsequent to that year in which the tax benefits were used through the tax consolidation mechanism. Deferred income tax determined for 2007, 2006, 2005, 2004, and prior thereto, in accordance with the 2010 tax reform, will continue to be paid in the same terms and periods set forth up to the law in effect as of December 31, 2013. The remaining balance payable amounts to $563,954 as at December 31, 2013, which will be liquidated from 2015 to 2017. As at December 31, 2016 and 2015, the outstanding amount for this item amounts to $180,825 and $187,937, respectively

Reconciliation of deferred income tax assets and liabilities due to the 2010 and 2014 Tax Reforms:

|  | 2016 | 2015 |
|---|---|---|
| Opening balance | $ 1,041,151 | $ 1,511,265 |
| ( + ) Effect of restated losses subject to tax | 53,446 | - |
| ( - ) Payments | (492,975) | (600,955) |
| Ending balance | $ 601,622 | $ 1,041,151 |

As discussed in note 4t above, the effects of the Company's tax loss carryforwards and those of its subsidiaries, are presented as part of the comprehensive calculation, and the impairment of each one was assessed.

## 16.   FINANCIAL ASSETS AND LIABILITIES:

The fair values of financial instruments were determined by using information available on the market and other valuation techniques that require judgment by Management. Moreover, the use of different assumptions and valuation methods can have a material effect on the estimated amounts of fair value.

The financial instruments which after their initial recognition are quantified at their fair value are grouped in levels from

**TV Azteca, S.A.B. de C.V. and Subsidiaries**                                                        **60**
**(Subsidiary of Comunicaciones Avanzadas, S.A. de C.V.)**
**Notes to the consolidated financial statements as of December 31, 2016 and 2015**

1 to 3 based on the degree to which fair value is observed, as shown below:

- Level 1 – valuation based on prices quoted on the market (unadjusted) for identical assets or liabilities;

- Level 2 – valuation with indicators other than the quoted prices included in Level 1, but include observable indicators for an asset or liability, either directly (quoted prices) or indirectly (derivations of these prices); and

- Level 3 – valuation techniques are applied that include indicators for assets and liabilities that are not based on observable market information (unobservable indicators).

a.  Financial assets and liabilities are classified as follows:

| | Note | Available-for-sale *at fair value* | Loans and accounts receivable and other liabilities *at amortized cost* | Total | Available-for-sale *at fair value* | Loans and accounts receivable and other liabilities *at amortized cost* | Total |
|---|---|---|---|---|---|---|---|
| | | | As of December 31, 2016 | | | As of December 31, 2015 | |
| **Financial assets:** | | | | | | | |
| Cash and cash equivalents | 5 | $         – | $ 4,470,314 | $ 4,470,314 | $         – | $ 2,938,417 | $ 2,938,417 |
| Short and long-term trade and other receivables | 6 | – | 6,672,779 | 6,672,779 | – | 6,289,684 | 6,289,684 |
| Related parties | 12 | – | 843,164 | 843,164 | – | 620,708 | 620,708 |
| Available-for-sale assets | 4i | 1,005,345 | – | 1,005,345 | 782,956 | – | 782,956 |
| | | $1,005,345 | $11,986,257 | $12,991,602 | $ 782,956 | $ 9,848,809 | $ 10,631,765 |
| **Financial liabilities:** | | | | | | | |
| Accounts payable | 11 | $         – | $ 4,702,131 | $ 4,702,131 | $         – | $ 4,483,063 | $ 4,483,063 |
| Short and long-term debt | 13 | – | 18,261,325 | 18,261,325 | – | 15,212,683 | 15,212,683 |
| | | $         – | $22,963,456 | $22,963,456 | $         – | $19,695,746 | $19,695,746 |

As of December 31, 2016 and 2015, available-for-sale assets correspond to investments in a securities portfolio managed by a foreign financial institution. These assets are presented in the consolidated statement of financial position in the item of other financial instruments.

As of December 31, 2016, assets available-for-sale correspond to: i) an investment amounting to $439,549 in a private equity fund named Media Capital Investment LP (MCI) domiciled in the United Kingdom, which mainly invests in telecommunications technology and other related companies. On December 31, 2015, the Group recorded an impairment allowance amounting to $439,549 correspond to the direct investment in MCI. That allowance is reported in the accompanying consolidated statement of comprehensive income in the item of other expenses.

In 2016 and 2015, the Group realized the total investments in capital securities listed in the New York Stock Exchange, which generated aggregated (loss) earnings amounting to ($642,768) and $51,152, and they were presented in other comprehensive income (OCI), and reclassified to retained earnings, as shown in the consolidated statement of changes in equity.

b.  Financial Debt

Loans include the following short- and long-term financial liabilities:

| | Short-term | | Long-term | |
|---|---|---|---|---|
| | 2016 | 2015 | 2016 | 2015 |
| **Financial liabilities:** | | | | |
| American Tower Corporation -ATC- | $         - | $         - | $ 1,891,869 | $ 1,582,600 |
| Program Medium Term Note -MTN- | - | - | 16,369,456 | 13,630,083 |
| | $         - | $         - | $18,261,325 | $15,212,683 |

**TV Azteca, S.A.B. de C.V. and Subsidiaries**                                                                          **61**
**(Subsidiary of Comunicaciones Avanzadas, S.A. de C.V.)**
**Notes to the consolidated financial statements as of December 31, 2016 and 2015**

Long-term financial liabilities fair values were determined by calculating their present values at the reporting date, by using fixed effective market interest rates available to the Group. Changes in fair value that go to profit or loss have not been included since financial assets are carried at amortized cost in the consolidated statement of financial position.

## 17.   FINANCIAL INSTRUMENTS RISK:

Activities with financial instruments presume the assumption or transfer of one or various types of risks by the entities that trade with them. The main risks associated with financial instruments are:

•   Credit risk: likelihood that one of the parties to the financial instrument contract fails to meet his contractual obligations due to reasons of insolvency or inability to pay and results in a financial loss for the other party.

•   Market risk: likelihood that losses are generated in the value of the positions maintained, as a result of changes in the market prices of financial instruments. In turn, it includes three types of risks:

-   Interest rate risk: this arises as a consequence of variations in market interest rates.
-   Foreign exchange rate risk: this arises as a consequence of variations in exchange rates between currencies.
-   Price risk: this arises as a consequence of changes in market prices, or due to specific factors of the instrument itself, or due to factors that affect all instruments traded on a concrete market.

•   Liquidity risk: likelihood that an entity cannot meet its payment commitments or, in order to meet them, it has to resort to obtaining funds in encumbering conditions or placing its image and reputation at risk.

a.   Credit risk management – it is caused mainly by liquid funds and trade accounts receivable.

The Company's policy is to operate with banks and financial institutions with high credit ratings provided by credit rating agencies to reduce the possibility of default by their counterparties. With respect to trade accounts receivable, the Company grants commercial credit to companies or governmental entities that are financially sound, have a good reputation on the market, and many of them are recurring customers.

The Company periodically evaluates the financial conditions of its customers and does not believe that there is a significant risk of loss, due to a concentration of credit in its customer portfolio. The allowance for doubtful accounts is considered to cover its potential credit risk adequately, which represents a calculation of losses incurred due to impairment of its accounts receivable. As of December 31, 2016, the receivables aged more than 90 days amount to $672,399, which are covered by the allowance for doubtful accounts.

b.   Market risk management

i.   Interest rate risk - As of December 31, 2016 and 2015, the Group has no exposure to variable interest rates, since its total debt accrues interest at fixed rates (see note 13).

ii.   Exchange rate risk management - the Company realizes foreign currency transactions; therefore, it is exposed to fluctuations in the different exchange rates with which it operates. As of December 31, 2016 and 2015, the Company had not contracted hedging instruments against foreign exchange risks.

At December 31, 2016 and 2015 the company had the following US dollar denominated assets and liabilities:

|  | Short-term | | Long-term | |
|---|---|---|---|---|
| As of December 31, 2016 | | | | |
| Financial assets | US$ | 126,551 | US$ | - |
| Financial liabilities | | 75,397 | | 885,638 |
| **Total Exposure** | **US$** | **51,154** | **US$** | **(885,638)** |
| As of December 31, 2015 | | | | |
| Financial assets | US$ | 151,730 | US$ | - |
| Financial liabilities | | 44,659 | | 881,960 |
| Total Exposure | **US$** | **107,071** | **US$** | **(881,960)** |

**TV Azteca, S.A.B. de C.V. and Subsidiaries**                                                      **62**
**(Subsidiary of Comunicaciones Avanzadas, S.A. de C.V.)**
**Notes to the consolidated financial statements as of December 31, 2016 and 2015**

As of March 24, 2017, date of issuance of the accompanying consolidated financial statements, the unaudited foreign currency position is similar to the position held as of December 31, 2016.

As of December 31, 2016 and 2015, and as of March 24, 2017, the exchange rates for the US dollar were $20.6194, $17.2487 and $18.9877, respectively.

As of December 31, 2015, the Group presents a net short position in U.S. dollars; therefore, if the peso had strengthened (weakened) 10% against the dollar, and the rest of the variables had remained constant, net income for the year would have increased (decreased) in the amount of $1,720,655 as a result of the net exchange gain (loss) in the translation of monetary assets and liabilities in dollars not hedged with a derivative financial instrument.

c.   Liquidity risk management - The Company has established appropriate policies to mitigate the liquidity risk through: (i) the follow-up on working capital; (ii) the review of their actual and projected cash flows; and (iii) the reconciliation of profiles of maturities of their financial assets and liabilities. This allows the Group's Management to manage short- and long-term financing requirements, by maintaining reserves of cash and the disposition of credit lines.

## 18.   EQUITY:

a.   Capital stock

The Company's capital stock is comprised of Series "A" shares, Series "D-A" shares, and Series "D-L" shares. Holders of Series "A" shares have voting rights at the Company's General Stockholders' Meetings. Holders of Series "D-A-" and "D-L" have voting rights only in limited circumstances, and have a preferential dividend right.

The rights of all holders of all series of capital stock are identical, except for the limitations with respect to Series "A" and "D-A" shares held by persons other than eligible Mexican holders. Series "A" shares cannot be exchanged for any other type of securities of the Company. Series "D-A" shares may be exchanged for Series "A" shares on the tenth anniversary of their original issue; they will have the same characteristics of current Series "A" shares outstanding. Series "D- L" shares may be exchanged for Series "L" shares on the tenth anniversary of their original issue. Series "L" shares, which will be exchanged for Series "D-L" shares, will grant voting rights to their holders, only in limited circumstances.

The tenth anniversary for the exchange or swap of Series "D-A" and "D-L" shares for Series "A" and "L" shares, respectively, was completed in August 2007. However, on April 30, 2007, at the General Extraordinary Stockholders' Meeting, the stockholders resolved to extend the term referred to above to 20 years, as of their issuance date. Consequently, the date for the exchange or swap of stock will be in August 2017. This extension was authorized by the NBSC on November 9, 2007, subject to meeting all the pertinent requirements.

Authorized, issued, and paid-in capital stock of the Company as of December 31, 2016 and 2015 is summarized as follows:

|  | Authorized shares (thousands) | Shares paid (thousands) | Capital stock |
|---|---|---|---|
| Series "A" | 5,318,079 | 4,633,711 | $ 370,959 |
| Series "D-A" | 2,613,878 | 2,163,829 | 172,135 |
| Series "D-L" | 2,613,878 | 2,163,829 | 172,135 |
|  | 10,545,835 | 8,961,369 | $ 715,229 |

As of December 31, 2016 and 2015, the Company's shares are listed on the following securities exchanges:

**TV Azteca, S.A.B. de C.V. and Subsidiaries**                                                                    **63**
**(Subsidiary of Comunicaciones Avanzadas, S.A. de C.V.)**
**Notes to the consolidated financial statements as of December 31, 2016 and 2015**

| Characteristics of the securities | Country listed in | Ticket symbol | Stock exchange |
|---|---|---|---|
| Certificates of common participation (CPOs), each one represents one A Share, one D-A Share, and one D-L Share | Mexico | AZTECACPO | Mexican Stock Exchange |
| 10 CPO Units | Spain | XTZA | Latin American Securities Market |

Resolutions adopted on the year ended December 31, 2016 and 2015

At the General Stockholders' Meeting held on April 27, 2016 and April 29, 2015, a dividend was declared in the amount of $17,304 and $17,268, respectively, which corresponds to preferred stock dividends for series D-A and series D-L shareholders. Those dividends were paid out of the Net Taxable Income Account (CUFIN). Moreover, it was resolved to transfer the amount of ($643,848) and $51,152, respectively, recorded in other capital components to retained earnings, as shown in the consolidated statement of changes in stockholders' equity.

Resolutions adopted on the year ended December 31, 2010

On April 30, 2010, a cash reimbursement was approved in proportion to the stockholdings of each stockholder at the General Extraordinary Stockholders' Meeting, up to the amount of $322,000, payable in the amounts and on the dates determined by Management, in accordance with the Company's economic capacity. This reimbursement implied a fixed minimum capital stock decrease of the Company in the amount of $9,944. As of December 31, 2016 and 2015, the balance payable of this reimbursement amounted to $238,358, and it is presented in the consolidated statement of financial position within accounts payable and accrued liabilities.

b.   Stock repurchase

For the years ended December 31, 2016 and 2015, the Company decreased its capital stock in the amount of $3,723 and $2,141, respectively, on the repurchase of 25,430 thousand shares and 25,070 thousand shares in each year. Shares were repurchased in the amount of $35,265 and $29,572, respectively. The value thereof was charged to capital stock, and the difference was charged to the reserve for stock repurchases.

c.   Legal reserve

Net income for the year is subject to the legal provision which requires that at least 5% of that income be appropriated to increase the legal reserve until that reserve equals one-fifth of the total capital stock. As of December 31, 2016 and 2015 the balance of the legal reserve accounts for 21% of capital stock. The balance of the legal reserve may not be distributed to the stockholders during the existence of the Company, except as stock dividends.

d.   Distribution of earnings

Net taxable income account (CUFIN for its *acronym* in Spanish):

As of December 31, 2016, the restated balance of the "net taxable income account" (CUFIN) amounts to $7,599,357. No income tax will be assessed in connection with the distribution of dividends or earnings to stockholders up to that amount. Legal entities that distribute dividends or earnings that are not drawn against the CUFIN should calculate and pay the applicable tax. Toward that end, the tax that should be paid on dividends or earnings distributed should be aggregated thereto.

The tax that should be aggregated in terms of the foregoing paragraph will be determined by multiplying the amount of the dividends or earnings by the 1.4286 factor, and a 30% tax rate will be applied to the result. The tax determined is considered final and it may be credited against income tax for the year in which such a tax is paid and in the two following fiscal years. This balance may be restated up to the date earnings are distributed by using the National Consumer Price Index (NCPI).

**TV Azteca, S.A.B. de C.V. and Subsidiaries**                                                               64
**(Subsidiary of Comunicaciones Avanzadas, S.A. de C.V.)**
**Notes to the consolidated financial statements as of December 31, 2016 and 2015**

At the General Ordinary Stockholders' Meeting held on April 27, 2016 and April 29, 2015, the stockholders resolved to pay preferred dividends in the amount of $17,304 and $17,268, respectively. Those dividends are free of tax on dividends distributed, since they were paid out of the CUFIN balance.

Beginning 2014, dividends paid to individuals and foreign residents are subject to a 10% tax, which is a final payment. This rule applies only to the distributions of earnings generated beginning January 1, 2014.

e.   Capital reductions

As of December 31, 2016, the restated balance of the "restated contributed capital account" (CUCA, for its acronym in Spanish) amounts to $5,401,673. In the case of a reimbursement or capital decreases in favor of the stockholders, the excess of that reimbursement over this amount will be treated as a distributed earning for tax purposes.

Likewise, in the event that stockholders' equity should exceed the balance of the CUCA, the spread will be considered as a dividend or distributed earning subject to the payment of income tax. If the earnings referred to above are paid out of the CUFIN, there will be no corporate tax payable due to the capital decrease or reimbursement. Otherwise, it should be treated as dividends or earnings distributed, as set forth in the Income Tax Law.

f.   Employee stock option plan

Effective the fourth quarter of 1997, the Company adopted an employee stock option plan that was granted to employees who render their services to the Company and its subsidiaries, whereby options were granted to all employees contracted as of December 31, 1996. Prices set fluctuated from 0.29 dollars to 0.39 dollars per CPO, with a higher number of options for executive level employees, as well as the most creative actors, presenters, and creative personnel.

No options were exercised for this plan during 2016 and 2015. As of December 31, 2016 and 2015, options not yet exercised amount to 19 million CPOs of the 241 million authorized.

g.   Other capital components

An analysis of other capital components is shown below:

| | Translation effect | Available-for-sale financial assets | Cash flow hedges | Total |
|---|---|---|---|---|
| Balance as of January 1, 2016 | $  621,573 | $     (642,361) | $ (1,599,865) | $(1,620,653) |
| Exchange differences on translating foreign operations | 800,179 | - | - | 800,179 |
| Cash flow hedges | - | - | (392,443) | (392,443) |
| Loss on investment available-for-sale | - | (53,142) | - | (53,142) |
| Reclassifications to retained earnings | 421,315 | 642,768 | - | 1,064,083 |
| Balance as of December 31, 2016 | $1,843,067 | $     (52,735) | $ (1,992,308) | $ (201,976) |

| | Translation effect | Available-for-sale financial assets | Cash flow hedges | Total |
|---|---|---|---|---|
| Balance as of January 1, 2015 | $   (46,320) | $      51,896 | $   (589,617) | $ (584,041) |
| Exchange differences on translating foreign operations | 667,893 | - | - | 667,893 |
| Cash flow hedges | | - | (1,010,248) | (1,010,248) |
| Loss on investment available-for-sale | - | (918,577) | - | (918,577) |
| Reclassifications to retained earnings | - | (51,152) | - | (51,152) |
| Subtotal before taxes | 667,893 | (969,729) | (1,010,248) | (1,312,084) |
| Deferred tax benefit | - | 275,472 | - | 275,472 |
| Balance as of December 31, 2015 | $  621,573 | $     (642,361) | $ (1,599,865) | $(1,620,653) |

**TV Azteca, S.A.B. de C.V. and Subsidiaries**                                                     65
**(Subsidiary of Comunicaciones Avanzadas, S.A. de C.V.)**
**Notes to the consolidated financial statements as of December 31, 2016 and 2015**

### 19.   EARNINGS PER SHARE:

Both basic and diluted earnings per share have been calculated by using earnings attributable to the stockholders of the Holding Company (TV Azteca, S.A.B. de C.V.) as the numerator, that is, it was not necessary to make adjustments to earnings in 2016 and 2015.

The weighted average number of shares for purposes of diluted earnings per share can be reconciled with the weighted number of ordinary shares used in the calculation of basic earnings per share as follows:

|                                                                                          | 2016 | 2015 |
| --- | --- | --- |
| Amounts stated in thousands of shares: | | |
| Weighted average of the number of shares used in the base of earnings per share | 8,961,369 | 8,967,085 |
| Shares considered issued without taking into account share based payments | 1,584,465 | 1,578,749 |
| Weighted average of the number of shares used in diluted earnings per share | 10,545,834 | 10,545,834 |

### 20.   CAPITAL MANAGEMENT POLICIES AND PROCEDURES:

The objectives of the Group's capital management are to:

- Guarantee the Group's ability to continue as a going concern
- Provide an adequate return to stockholders by setting prices on products and services commensurate with the level of risk.

The Group's objective in capital management is to maintain a financial proportion of capital to financing.

The Group establishes the amount of capital in proportion with its general financial structure, that is, equity and financial liabilities that are not a loan. The Group manages its capital structure and makes adjustments thereto, due to changes in economic conditions and risk characteristics of the assets involved. In order to be able to maintain or adjust capital structure, the Group can adjust the amount of dividends paid to the stockholders, return capital to the stockholders, issue new shares or sell assets to reduce the debt.

The loan agreement related to the MTN Program sets forth certain financial limitations for the Group. Its capacity to obtain additional financing is limited as at December 31, 2016 and 2015. The additional affirmative and negative covenants set forth in that contract were complied with in their entirety.

### 21.   FINANCIAL INCOME AND COSTS:

Interest paid applies to amortizations of the financial debt. Interest income applies to investments in marketable securities listed on the stock exchange.

The caption of other expenses is summarized as shown below:

|                                        | 2016      | 2015      |
| --- | --- | --- |
| Administration (Cebures Trusts)        | $    22,046 | $    20,734 |
| Fees on financial operations           | 11,061    | 11,744    |
| MTN program (bonds issuance)           | 46,580    | 44,836    |
| Other                                  | 89,878    | 101,021   |
|                                        | $   169,565 | $   178,335 |

### 22.   OTHER EXPENSES, NET:

This caption is summarized as shown below:

**TV Azteca, S.A.B. de C.V. and Subsidiaries**                                     66
(Subsidiary of Comunicaciones Avanzadas, S.A. de C.V.)
Notes to the consolidated financial statements as of December 31, 2016 and 2015

| | 2016 | 2015 |
|---|---|---|
| Legal advisory services | $ 152,038 | $ 209,188 |
| Donations | 201,628 | 174,476 |
| Impairment of financial instruments and long-lived assets | 1,376,526 | 532,000 |
| Other | 119,986 | 112,778 |
| | $ 1,850,178 | $ 1,028,442 |

## 23.    FINANCIAL INFORMATION BY SEGMENT:

Management currently identifies five lines of service of the Group as operating segments (see note 4f). These operating segments are supervised by the person who makes strategic decisions, which are made based on the adjusted operating results of the segment.

National Television

These segments are comprised of television services in Mexican territory, including local stations. Income is derived mainly from the sale of time on screen nationwide and locally, less commissions on sales.

Azteca America

This segment consists of television services in the territory of the United States of America, directed primarily for the Hispanic community that resides in that territory.

Programming rights

This segment is comprised mainly of the exports of programs that were of wide interest for global audiences primarily in the countries of Latin America and Europe.

Fiber-optic network

This segment is derived mainly from the transactions related to Azteca Comunicaciones Colombia and Azteca Comunicaciones Peru in charge of construction, operation, and maintenance of the fiber-optic network in Colombia and Peru, respectively.

Other segments

This segment consists mainly of operations relative to the promotion of billboard advertisements, soccer teams, concerts, and Internet, among other things.

| As at December 31, 2016 | National Television | Azteca America | Programming rights | Fiber optic | Other segments | Consolidated total |
|---|---|---|---|---|---|---|
| Net Sales | $9,828,223 | $1,391,213 | $ 290,015 | $ 1,526,975 | $1,160,145 | $ 14,196,571 |
| Costs and expenses | 7,519,847 | 1,092,304 | 88,089 | 2,590,234 | 1,068,053 | 12,358,527 |
| Depreciation and amortization | 678,242 | 54,822 | 3,555 | 178,898 | 9,406 | 924,923 |
| Operating income (loss) | $1,630,134 | $ 244,087 | $ 198,371 | $(1,242,157) | $ 82,686 | $ 913,121 |

| As at December, 2015 | National Television | Azteca America | Programming rights | Fiber optic | Other segments | Consolidated total |
|---|---|---|---|---|---|---|
| Net Sales | $9,140,049 | $1,402,779 | $ 436,290 | $ 863,964 | $1,016,405 | $ 12,859,487 |

**TV Azteca, S.A.B. de C.V. and Subsidiaries**                                                                          **67**
**(Subsidiary of Comunicaciones Avanzadas, S.A. de C.V.)**
**Notes to the consolidated financial statements as of December 31, 2016 and 2015**

| | | | | | | |
|---|---:|---:|---:|---:|---:|---:|
| Costs and expenses | 8,066,161 | 949,387 | 72,009 | 1,098,922 | 1,166,962 | 11,353,441 |
| Depreciation and amortization | 586,658 | 49,400 | 5,308 | 257,705 | 11,174 | 910,245 |
| Operating income (loss) | $ 487,230 | $ 403,992 | $ 358,973 | $ (492,663) | $ (161,731) | $ 595,801 |

## 24.   CONTINGENCIES:

Various legal suits and appeals for guarantees have been filed against the Group, and some of them are in proceedings as of December 31, 2016. Unless some of them have been recognized as a provision, Management considers that these lawsuits are unjustified and that the likelihood that they will require a liquidation to be made by the Group is remote. This evaluation is consistent with the independent advice of external advisors.

The main contingencies are described below:

a   Federal Electoral Institute

***Legal actions and proceedings filed against the Federal Code of Electoral Institutions and Procedures.***

The Executive Order whereby the Federal Code of Electoral Institutions and Procedures (COFIPE for its acronym in Spanish), amended in 2007, was published in the Official Daily Gazette in January 2008.

The Group filed a series of appeals for constitutional relief against various provisions of that Code, for considering that it affected its legal jurisdiction by violating a series of individual guarantees, as well as imposing additional charges on the Company which it has maintained and operated as a radio and television licensee. The Supreme Court of Justice resolved to dismiss those appeals for constitutional relief.

Subsequently, the National Electoral Institute (INE, formerly Federal Electoral Institute) filed special punishable special proceedings against the Company for presumed nonperformances in the transmission of various promotional spots of political parties and Electoral Authorities which, at the issue date of these financial statements, amount to approximately $200 million. These fines were confirmed by the Federal Electoral Court, the Supreme Court, and District Courts.

On the other hand, the INE has imposed two sanctions on the Company in punishable special proceedings that amount to a total of $16,5 million approximately, for considering that they violated various provisions of the COFIPE by telecasting spots advertised in political magazines on television and for considering that those spots contained political propaganda. These fines were confirmed by the Federal Electoral Court.

Further, the INE imposed a sanction in the amount of $22 million approximately for considering that the COFIPE was being violated for not telecasting promotion of political parties and electoral authorities in the restricted television systems of SKY and Cablevision. These fines were challenged in an appeal for constitutional relief and the complaints were dismissed by those Judges.

Finally, the INE has imposed sanctions to Televisión Azteca, S.A. de C.V. in special sanctioning proceedings in an amount approximating $1.7 million, for various behaviors considered as violations in the COFIPE. These resolutions were confirmed by the Electoral Court of the Federal Judicial Branch.

In February 2014, the Company agreed with the Federal Tax Service (SAT *for its acronym in Spanish*) to realize the payment in the sum of $198,117 with related charges, under the installment payment scheme.

The Company concluded the partial payments to the SAT in February 2015.

b   Corporación de Noticias e Información (CNI)

The Company has filed various lawsuits against CNI, TVM and Mr. Moreno Valle. In spite of a lack of certainty, Company's Management considers that it will prevail in the various disputes it has with CNI, TVM and Mr. Moreno

**TV Azteca, S.A.B. de C.V. and Subsidiaries**                                                        68
**(Subsidiary of Comunicaciones Avanzadas, S.A. de C.V.)**
**Notes to the consolidated financial statements as of December 31, 2016 and 2015**

Valle and, therefore, no provision has been made for this matter.

As of December 31, 2016 and 2015, the Company has a liquid credit and due and payable against CNI in the amount of US$10 million. Further, ordinary and default interest and trial expenses have not been quantified yet.

    c    Other litigations and lawsuits

The Company and its subsidiaries are parties to various legal actions and lawsuits during the normal course of their operations. The Company's legal advisors indicate that there are various trials and contingent demands at the issue date of these financial statements, whose related amounts cannot be reasonable estimated to date.

The proceedings and litigations involved that are quantified amount to $618,246. The Company's Management and its legal advisors consider that none of these legal actions against the Company, including those not quantifiable individually or on a consolidated basis, will have any significant adverse impact on their businesses or financial position. Consequently, no provision has been made for these purposes.

**25.    COMMITMENTS:**

    a    Leases

The Company rents the use of satellite transponders for the service of receipt and conduction of the satellite signal. It has the commitment of paying US$25 (IS21 satellite) and US$74 (Galaxy 19 satellite) every month, for the three contracts entered into with Panamsat de México, S. de R.L. de C.V. The expenses include a monthly fixed payment and others based on the use thereof. The lease agreements have a one year mandatory duration, automatically and successively renewable for identical periods up to 2021, and 2024, respectively.

The Company has entered into a contract with Satélites Mexicanos, S.A. de C.V., for the rental and use of satellite transponders (Satmex 6 satellite) for the service of receipt and conduction of the signal. It has the commitment of paying a monthly amount of US$86.4 every month. This amount will increase 5% annually up to the date of expiration of the contract which is not until 2021.

As of December 31, 2016, the Group had the following minimum annual commitments for the use of satellite transponders:

|  |  | Thousands of dollars |
|---|---|---|
| 2017 | US$ | 2,242 |
| 2018 |  | 2,285 |
| 2019 |  | 2,328 |
| 2020 and thereafter |  | 7,041 |
|  | US$ | 13,896 |

    b    Performance rights

The Company has entered into license agreements with its performance rights suppliers for the long-term acquisition of materials of programs when such programs are available for their first broadcast. As at December 31, 2016, the commitments for the acquisition of materials amount to US$47,000, US$40,721, and US$32,370, with due dates in 2017, 2018 and 2019, respectively. Moreover, some of these contracts do not show a current obligation due to their uncertain nature. Further, some can be marketed in accordance with their specific characteristics.

    c    Advertising rights

In June 2010, the Company entered into an advertising rights assignment contract with Super Publicidad, S.A. de C.V., which sets forth that effective 2012 and up to 2022, the rights of spaces are obtained for exhibiting advertising, as well as the use of part of the facilities of the Mexico City Arena. The total value of the consideration amounts to US$3,500, which has been paid in full.

TV Azteca, S.A.B. de C.V. and Subsidiaries                                                                    69
(Subsidiary of Comunicaciones Avanzadas, S.A. de C.V.)
Notes to the consolidated financial statements as of December 31, 2016 and 2015

d    Colombia project

In September 2011, the Ministry of Information Technology and Communications of Colombia (MINTIC) published the terms of reference of the National Fiber Optic Project ("the Project"). The purpose of this technology is to spread or extend this technology to at least 400 municipalities of that country, in order to reach the goal of 753 municipalities connected to 2014. The Project will have an investment in the amount of $415,000 million Colombian pesos (equivalent to approximately $2,000 million Mexican pesos) by the government of Colombia.

In order to participate in that bidding, the Company, together with its related party Total Play Telecomunicaciones, S.A. de C.V., formed the Unión Temporal Fibra Óptica Colombia (the UT). On November 4, 2011, the MINTIC decided to award the contract to the UT to undertake the Project.

The characteristics of that contract are the following:

1.   **Signatories:**

UT and the Information Technology and Telecommunications Fund (TIC Fund).

2.   **Subject matter of the contract:**

The UT will develop a fiber optic network, operate it, maintain, and assume the management of the services in at least seven hundred and fifty-three (753) municipalities and 2,000 public institutions forming 4 groups. Toward that end, the TIC Fund will contribute certain resources ("Development Resources").

3.   **Value of the contract:**

$415,837,649,402 (four hundred and fifteen billion eight hundred and thirty-seven million six hundred and forty-nine thousand four hundred and two Colombian pesos, including Value Added Tax). The budget items allocated by the Colombian government are distributed as follows:

| Years | Maximum amount (billions of Colombian pesos) |
|-------|-----------------------------------------------|
| 2011  | 196.2 |
| 2012  | 109.6 |
| 2013  | 99.6  |
| 2015  | 29.9  |

4.   **Term:**

Seventeen years and six months.

5.   **Trust:**

A management and payment trust was created between the MINTIC (trustor and primary beneficiary), the UT (secondary beneficiary), and Bancolombia S.A. (trustee). The purpose of the trust agreement is to create an autonomous patrimony for the management and administration of: (i) the Development Resources that the TIC Fund allocated to the UT in the conditions and for the purposes related to the execution of the agreement and the Project Documents; and (ii) the assets acquired with the Development Resources or with proprietary resources of the trustor for the execution of the contract.

6.   **General scheme of the project:**

The construction will last 30 months (2.5 years), and the network will operate for 180 months (15 years). During the construction stage, the trust will reimburse the UT for the amount of the costs and expenses incurred, subject to the authorization of the inspector designated by the MINTIC.

**TV Azteca, S.A.B. de C.V. and Subsidiaries**                                                70
**(Subsidiary of Comunicaciones Avanzadas, S.A. de C.V.)**
**Notes to the consolidated financial statements as of December 31, 2016 and 2015**

7.   **Stages and time schedule of the project:**

The Project will be executed in three stages, with three groups of municipalities for its execution that will determine the maximum performance terms of the stages included in the Project Time Schedule.

At the end of 2013, the Company participated and won the award of two additional biddings, whose services are installed on the network and the concession it already has there.

The first bidding awarded was named "Kioskos Vive Digital" and was awarded to the Company on December 19, 2013, and its purpose consists of installing and operating Internet access points at predetermined public institutions where users can have wireless access to the network.

The second bidding obtained is named "Digital Connections" and was awarded to the Company on December 27, 2013, which consists of installing last mile accesses to previously determined homes in which Internet service will be provided with a subsidized rate. Around 120,000 connections are calculated to be installed in homes throughout Colombia.

As at December 31, 2016, the Company has met the obligations of the bidding contract.

e    Fiber optic network Peru

On December 23, 2013, the Company participated in and was awarded the bid of the National Dorsal Fiber Optic Network in Peru. The purpose of this bidding is to design, build, and maintain a Dorsal Fiber Optic Network in routes already defined by the Government of Peru, as well as to render data transmission services to other telecommunications operators, as well as the entities and agencies of that government.

The characteristics of that contract are the following:

1.   **Signatories:**

Ministry of Transportation and Communications (Grantor) and Azteca Comunicaciones Perú, S.A.C. (Concessionaire)

2.   **Subject matter of the contract:**

The grantor establishes a juridical relationship of public law with the Concessionaire whereby the Concessionaire is granted the right to economically operate the National Fiber Optic Backbone Network (RDNFO). The Concessionaire binds itself to design, finance, display, operate, and maintain the assets of the Concession, and to render the services through the RDNFO during the term of the concession, and that of its eventual renewals, subject to the tariff regime.

3.   **Value of the Contract:**

A concession agreement was signed with the Peruvian Government for 20 years through the Ministry of Transportation and Communication (MTC) in June 2014. That agreement set forth the bases for the design, financing, construction, operation, and maintenance of 13,400 km of Fiber Optic Network that will connect 23 regions, 180 cities, and 136 municipalities. The minimum execution term of the work should be completed in 24 months, through 6 delivery stages in June 2016.

The delivery dates of the Backbone Network are as follows:

| Delivery | Contractual delivery date | Region | Maximum amount (Thousands of millions of US$) |
|---|---|---|---|
| Delivery 1 | 17-Mar-15 | Huancavelica includes the interconnection in Lurín and to NAP Peru | 60.7 |
| Delivery 2 | June 17-15 | Ayacucho, Apurímac, Ica | 40.8 |

**TV Azteca, S.A.B. de C.V. and Subsidiaries**                                        71
**(Subsidiary of Comunicaciones Avanzadas, S.A. de C.V.)**
**Notes to the consolidated financial statements as of December 31, 2016 and 2015**

| Delivery 3 | Sept. 17-15 | Huánuco, Pasco | 18.6 |
|---|---|---|---|
| Delivery 4 | Dec. 17-15 | Cusco, Arequipa, Junín, Ancash, Lima, Callao, Moquegua, Tacna, Ucayali | 46.3 |
| Delivery 5 | 17-Mar-16 | Puno, Madre de Dios, La Libertad, Lambayeque, Piura, Cajamarca | 59.7 |
| Delivery 6 | June 17-16 | San Martin, Amazonas, Loreto | 15.5 |

The total estimated investment amounts to US$323 million contributed by the Peruvian government.

4.   **Term:**

The concession is granted for a period of twenty (20) years, counted beginning 2014.

5.   **Trust:**

The concessionaire will create the Backbone Network Trust in order to manage the total revenues and available revenues and, if appropriate, the payment of net excess funds and premium on income, among other things.

The Trustees of the Backbone Network Trust will be: (i) the Concessionaire for the quarterly payment of the RPI and RPMO, and eventual payment of the premium on income; and (ii) the Grantor for the eventual payment of net excess funds.

As at December 31, 2016, the Company had met the obligations set forth in the concession agreement.

## 26.   TELECOMMUNICATIONS REFORM:

On June 11, 2013, the Decree that amends and aggregates various provisions of Articles 6, 7, 27, 28, 73, 78, 94, and 105 of the Constitution of the Mexican United States in telecommunications matters (Constitutional Telecommunications Reform), was published in the Official Daily Gazette.

The "Decree on which the Federal Telecommunications and Broadcasting Law is issued and the Law of the Public Broadcasting system of the Mexican State and various provisions are amended, aggregated, and repealed in telecommunications and broadcasting matters" was published in the Official Daily Gazette on July 14, 2014.

As at December 31, 2016, the Company has implemented measures to comply with the new legal system.

## 27.   SEASONALITY:

The Company's television transmission operations are seasonal. Advertising revenues, which are recognized when the advertisement comes out on the air, are generally higher in the fourth quarter, due to the high level of advertising that comes out on the air as a result of the Christmas season.

The Company's revenues fluctuate as a result of the frequency with which the Company transmits significant events (Olympic Games, World Soccer Cups, among other things). Historically, the transmission of significant events by the Company has increased advertising sales during the periods in which they came out on the air. This reflects higher audiences during the hours in which those significant events were transmitted, and the fact that advertisers pay a premium related to those significant transmission events.

## 28.   EVENTS SUBSEQUENT TO THE REPORTINGDATE:

Through its subsidiary Company AIC, the Group is competing in an auction process of the spectrum that operates in reliance on the transmission concessions held by AIC and its subsidiaries organized by the FCC, which consists of the opportunity that station concessionaires with "*Full Power*" and "*Class A*" frequencies have of participating in the sale of their frequencies, in order for the FCC to offer them to mobile technology companies to meet market needs. It is estimated that the FCC will publish the results between April and May 2017. The FCC will award the frequencies and make the payments to the winners within ninety days subsequent to the date published.

**TV Azteca, S.A.B. de C.V. and Subsidiaries**                                                                          72
**(Subsidiary of Comunicaciones Avanzadas, S.A. de C.V.)**
**Notes to the consolidated financial statements as of December 31, 2016 and 2015**

F-72

On March 14, 2017, the Group prepaid a portion of its long-term debt in the amount of US$ 42.5 million, due May 2018, pursuant to the issue of US$300 million of the MTN Program (see note 13).

In March 2017, the Group announced: (i) the transformation of image and content of Channel 40, now known as "ad40", which will be a dynamic channel focused on news and live sports 24 hours a day on open television in Mexico. Its signal will be transmitted through channels 1.2 in the interior of Mexico and 40.1 in the Valley of Mexico, in addition to being available on the main pay television systems; and (ii) the startup of the new "a+" television channel, television signal that offers a network of local channels that will produce contents for the needs and preferences of each community, and it will be transmitted through channel 7.2 of open television in Mexico, and it will start with local signals in Mexico City, Guadalajara, León, Monterrey, and Toluca.

There has been no event that requires any adjustment or that does not require an adjustment, but is significant between the reporting date and authorization date.

**ISSUER**

**TV Azteca, S.A.B. de C.V.**
Periférico Sur 4121
Col. Fuentes del Pedregal
Tlalpan, 14141, Mexico City, Mexico

**PRINCIPAL GUARANTORS**

**Azteca International Corporation**
1139 Grand Central Ave.
Glendale, CA 91201, United States

**Azteca Novelas, S.A.P.I. de C.V.**
Calz. de Tlalpan No. 2818
Col. San Pablo Tepetlapa
04840, Mexico City, Mexico

**Estudios Azteca, S.A. de C.V.**
Calz. de Tlalpan No. 2818
Col. San Pablo Tepetlapa
04840, Mexico City, Mexico

**Inversora Mexicana de Producción,
S.A. de C.V.**
Periférico Sur 4121
Col. Fuentes del Pedregal
Tlalpan 14141, Mexico City, Mexico

**Operadora Mexicana de Televisión,
S.A. de C.V.**
Periférico Sur 4121
Col. Fuentes del Pedregal
Tlalpan 14141, Mexico City, Mexico

**Televisión Azteca, S.A. de C.V**
Periférico Sur 4121
Col. Fuentes del Pedregal
Tlalpan 14141, Mexico City, Mexico

**PAYING AGENT**

**The Bank of New York Mellon, London Branch**
One Canada Square
London E14 5AL
England

**TRUSTEE AND REGISTRAR**

**The Bank of New York Mellon**
101 Barclay Street 7 E
New York, NY 10286

**LEGAL ADVISERS**

*To the Issuer*
**Winston & Strawn LLP**
200 Park Avenue
New York, NY 10166, United States

*To the Joint Book-Running Managers*
**Jones Day**
250 Vesey Street
New York, NY 10281, United States

*To the Trustee*
**Jones Walker LLP**
201 St. Charles Avenue
New Orleans, LA 70170

*To the Issuer and the Guarantors
as to Mexican Law*
**Nader, Hayaux y Goebel, S.C.**
Paseo de los Tamarindos 400 B, Bosques de las Lomas
Cuajimalpa, 05120 Mexico City, Mexico

**SINGAPORE LISTING AGENT**

**Norton Rose Fulbright (Asia) LLP**
1 Raffles Quay
#34-02 North Tower
Singapore 048583

# Exhibit 5 to the
# Ellis Declaration



**TV AZTECA ANNOUNCES EARLY AMORTIZATION OF *CERTIFICADOS BURSÁTILES* UP TO $1,200 MILLION PESOS**

**—The operation is part of the strategy to maintain the financial and operational viability of the company and to continue providing audiences with the best broadcast television and digital media content—**

**Mexico City, February 9, 2021**—TV Azteca, S.A.B. de C.V. (BMV: AZTECACPO; Latibex: XTZA), one of the two largest producers of Spanish-language television programming in the world, today announced that as part of its strategy to maintain financial and operational viability, will early amortize up to $1,200 million pesos of the principal — $4,000 million pesos — of the *Certificados Bursátiles* (CEBURES) maturing 2022; date on which the company will continue to comply with the remainder of the principal and interests on a timely manner.

For more than a year, TV Azteca implemented a strict strategy of financial and operational efficiencies to ensure its long-term viability, facing with certainty a crisis in the broadcast television industry that experienced a decline of more than 40% in the advertising market in the last five years; we are also experiencing the consolidation of competitors on digital media and the increase in the cost of content production.

Moreover, this panorama has been aggravated by the deterioration of economic indicators derived from the pandemic caused by the SARS-CoV-2 virus, resulting in lower sales due to a sharp reduction in advertising investment. Within this complex environment, the company will seek to maintain its financial health by making the amortization of the CEBURES.

Also, TV Azteca contemplates to reorganize its debt in foreign currency by initiating a constructive dialogue with holders of the $400 million dollar notes due 2024. Therefore, it has announced the deferment of the payment of the coupon corresponding to February 2021, expecting to reach briefly an agreement that responds to the context and the situation of the company.

Consequently, José Luis Riera Kinkel, General Director of Corporate Finance of Grupo Salinas, has been appointed responsible for the debt reorganization process, who will be accompanied by Moelis & Company LLC and Alfaro, Dávila y Scherer, S.C. (AD&S),

highly specialized global financial advisory companies with extensive experience in processes of this type.

About these announcements, Rafael Rodríguez Sánchez, CEO of TV Azteca, commented: "*As part of our operational efficiencies and cost reduction strategy to be competitive in the long-term, today we started a debt reorganization process as an unequivocal sign that we are acting in an orderly and responsible manner, and we will continue to do so*". Mr. Rodriguez added that he is optimistic and confident that favorable agreements will be reached in this process for all parties and for the future of the Mexican television.

TV Azteca reaffirms its commitment to continue on the path of achieving financial and operational efficiencies that allow it to ensure its long-term viability to continue offering audiences the best content on broadcast television and on digital media.

**About TV Azteca**

TV Azteca is one of the two largest producers of Spanish-language television programming in the world, operating four television networks in Mexico: Azteca uno, Azteca 7, adn40 and a+, through more than 300 owned and operated stations across the country. The company also owns TV Azteca Digital, operator of several of the most visited digital platforms and social networks in Mexico.

TV Azteca is a Grupo Salinas company (www.gruposalinas.com), a group of dynamic, fast growing, and technologically advanced companies focused on creating: economic value through market innovation and goods and services that improve standards of living; social value to improve community wellbeing; and environmental value by reducing the negative impact of its business activities. Created by Mexican entrepreneur Ricardo B. Salinas (www.ricardosalinas.com), Grupo Salinas operates as a management development and decision forum for the top leaders of member companies. Each of the Grupo Salinas companies operates independently, with its own management, board of directors and shareholders. Grupo Salinas has no equity holdings. The group of companies shares a common vision, values and strategies for achieving rapid growth, superior results and world-class performance.

*Except for historical information, the matters discussed in this press release are concepts about the future that involve risks and uncertainty that may cause actual results to differ materially from those projected. Other risks that may affect TV Azteca and its subsidiaries are presented in documents sent to the securities authorities.*

**Investor Relations:**

| **Bruno Rangel** | **Rolando Villarreal** |
|---|---|
| Grupo Salinas | TV Azteca, S.A.B. de C.V. |
| Tel. +52 (55) 2601-5400, ext. 11502 | Tel. +52 (55) 2601-5400, ext. 11508 |
| jrangelk@gruposalinas.com.mx | rvillarreal@tvazteca.com.mx |

**Press Relations:**

**Luciano Pascoe**
Tel. +52 (55) 1720 1313 ext. 36553
lpascoe@gruposalinas.com.mx

# Exhibit 6 to the Ellis Declaration



**BNY MELLON**

March 22, 2021

TV Azteca, S.A.B. de C.V.
Insurgentes Sur 3579
Col. Tlalpan la joya
14000, México, D.F.
México
Attention: Rodrigo Pliego

<div align="center">

**NOTICE OF EVENT OF DEFAULT**
TV Azteca S.A.B. de C.V. 8.250% Senior Notes due 2024

</div>

Dear Sir:

Pursuant to an Indenture dated as of August 9, 2017 ("Indenture") by and between TV Azteca, S.A.B. de C.V. ("Company"), certain Subsidiary Guarantors thereto ("Subsidiary Guarantors"), The Bank of New York Mellon, as Trustee, ("Trustee"), and The Bank of New York Mellon, London Branch as Principal Paying Agent, the Company issued its 8.250% Senior Notes due 2024 ("Notes"). Capitalized terms used but not defined herein shall have the meanings ascribed to them in the Indenture.

The Trustee has received the Company's letter dated March 9, 2021, wherein the Company provides a copy of its February 9, 2021, press release regarding an interest payment that was due on February 9, 2021, but was not paid, and advises that the Company had begun discussions with representatives of certain Holders, while further advising that the Company will keep the Trustee informed regarding the progress of such discussions.

As a result of the Company's failure to pay the interest due on February 9, 2021, which default has continued for thirty (30) consecutive days and remains continuing, an Event of Default has occurred under Section 6.1(a)(2) of the Indenture. Pursuant to, *inter alia*, Sections 6.3 and 7.7 of the Indenture, the Company and the Subsidiary Guarantors have an obligation to pay and indemnify the Trustee for, among other things, the fees and expenses of the Trustee, including its reasonable attorneys' fees and expenses. In connection with the Indenture and the Event of Default, the Trustee has retained the law firm of Riker, Danzig, Scherer, Hyland & Perretti, LLP (Joseph L. Schwartz and Curtis M. Plaza) to represent the Trustee in this matter. The Trustee hereby notifies the Company and the Subsidiary Guarantors that the Trustee will seek payment and indemnification of claims related to the Event of Default, including timely payment of the fees and expenses of the Trustee and its counsel. The Trustee will forward to the Company periodic statements of such fees and expenses for payment by the Company and Subsidiary Guarantors pursuant to the Indenture.

Communications to the Trustee can be directed to BNY Mellon, Attn: Alex T. Chang, Vice President, Default Administration Group, 240 Greenwich Street, New York, NY 10286, alex.chang@bnymellon.com; and to the Trustee's counsel, Riker, Danzig, Scherer, Hyland & Perretti, LLP, Attn: Joseph Schwartz and Curtis Plaza, P.O. Box 1981, 1 Speedwell Ave, Morristown, New Jersey, 07962-1981; jschwartz@riker.com and cplaza@riker.com.

TV Azteca S.A.B. de C.V. 8.250% Senior Notes due 2024
Notice of Event of Default to Company and Subsidiary Guarantors
March 22, 2021

Pursuant to Section 11.1(e) of the Indenture, notice delivered to the Company shall constitute notice to the Subsidiary Guarantors.

The Trustee expressly reserves all rights, powers, privileges and remedies available to it under the Indenture and at law, and nothing herein shall be deemed a waiver of such rights, powers, privileges and remedies.

<div align="right">The Bank of New York Mellon, as Trustee</div>

cc:   Paul, Weiss, Rifkind, Wharton & Garrison LLP
1285 6th Avenue
New York, NY 10019
Attn:  Alan W. Kornberg (akornberg@paulweiss.com)
       Elizabeth McColm (emccolm@paulweiss.com)

Winston & Strawn, LLP
200 Park Avenue
New York, NY 10166-4193
Attn:  Allen Miller (amiller@winston.com)
(per Section 11.1 of Indenture)

# Exhibit 7 to the
# Ellis Declaration



March 29, 2022

TV Azteca, S.A.B. de C.V.
Insurgentes Sur 3579
Col. Tlalpan la joya
14000, México, D.F.
México
Attention: Rodrigo Pliego

**NOTICE OF CONTINUING EVENTS OF DEFAULT**
TV Azteca S.A.B. de C.V. 8.250% Senior Notes due 2024

Dear Sir:

Pursuant to an Indenture dated as of August 9, 2017 ("Indenture") by and between TV Azteca, S.A.B. de C.V. ("Company"), certain Subsidiary Guarantors thereto ("Subsidiary Guarantors"), The Bank of New York Mellon, as Trustee ("Trustee"), and The Bank of New York Mellon, London Branch as Principal Paying Agent, the Company issued its 8.250% Senior Notes due 2024 ("Notes"). Capitalized terms used herein shall have meanings ascribed in the Indenture.

The Trustee previously notified the Company of the occurrence of an Event of Default pursuant to Section 6.1(a)(2) of the Indenture as a result of the Company's failure to make payments due on the Notes on February 9, 2021. The Company has since failed to make payments due on the Notes on August 9, 2021, and February 9, 2022, which constitute additional Events of Default under Section 6.1(a)(2) of the Indenture. Payment should be made immediately.

The Trustee is in communication with an ad hoc group of Holders, represented by the law firm of Akin Gump Strauss Hauer & Feld, LLP, regarding the pursuit of remedies.

Pursuant to, *inter alia*, Sections 6.3 and 7.7 of the Indenture, the Company and the Subsidiary Guarantors are obligated to pay and indemnify the Trustee for, among other things, the fees and expenses of the Trustee, including its reasonable attorneys' fees and expenses. As previously advised, the Trustee has retained the law firm of Riker, Danzig, Scherer, Hyland & Perretti, LLP to represent the Trustee in connection with the Indenture and the Events of Default. By separate correspondence, the Trustee will submit invoices for the fees and expenses of the Trustee and its counsel for payment by the Company and the Subsidiary Guarantors.

Communications to the Trustee can be directed to BNY Mellon, Attn: Alex T. Chang, Vice President, Default Administration Group, 240 Greenwich Street, New York, NY 10286, alex.chang@bnymellon.com; and to the Trustee's counsel, Riker, Danzig, Scherer, Hyland & Perretti, LLP, Attn: Joseph Schwartz and Curtis Plaza, P.O. Box 1981, 1 Speedwell Ave, Morristown, New Jersey, 07962-1981; jschwartz@riker.com and cplaza@riker.com.

TV Azteca S.A.B. de C.V. 8.250% Senior Notes due 2024
Notice of Continuing Events of Default to Company and Subsidiary Guarantors
March 29, 2022

Pursuant to Section 11.1(e) of the Indenture, notice delivered to the Company shall constitute notice to the Subsidiary Guarantors.

The Trustee expressly reserves all rights, powers, privileges and remedies available to it under the Indenture and at law, and nothing herein shall be deemed a waiver of such rights, powers, privileges and remedies.

<div align="right">The Bank of New York Mellon, as Trustee</div>

cc:    Paul, Weiss, Rifkind, Wharton & Garrison LLP
1285 6th Avenue
New York, NY 10019
Attn:  Alan W. Kornberg (akornberg@paulweiss.com)
       Elizabeth McColm (emccolm@paulweiss.com)

Winston & Strawn, LLP
200 Park Avenue
New York, NY 10166-4193
Attn:  Allen Miller (amiller@winston.com)
(per Section 11.1 of Indenture)

# Exhibit 8 to the Ellis Declaration



**BNY MELLON**

August 5, 2022

<u>VIA FACSIMILE, REGISTERED FIRST CLASS MAIL, AND OVERNIGHT COURIER</u>

To the Company and Subsidiary Guarantors (as defined in the Indenture, referenced below):

TV Azteca, S.A.B. de C.V.
Insurgentes Sur 3579
Col. Tlalpan la joya
14000, México, D.F.
México
Attention: Rodrigo Pliego

with a copy to:

Winston & Strawn, LLP
200 Park Avenue
New York, NY 10166-4193
Attention: Allen Miller, Esq.
(per Section 11.1 of Indenture)

**Re:**  Indenture dated as of August 9, 2017, governing the 8.250% Senior Notes due August 9, 2024 in aggregate principal amount outstanding of $400,000,000 (the "***Notes***"), by and among TV Azteca, S.A.B. de C.V. (the "***Company***"), the Subsidiary Guarantors party thereto, The Bank of New York Mellon, as trustee (the "***Trustee***"), and The Bank of New York Mellon, London Branch, as initial Principal Paying Agent (the "***Indenture***").

Ladies and Gentlemen:

The undersigned Trustee is acting at the direction of the beneficial owners (the "***Holders***") of a majority in aggregate principal amount of the outstanding Notes issued pursuant to the Indenture. Capitalized terms used herein but not otherwise defined herein have the meanings set forth in the Indenture.

The interest payments in respect of the Notes due and payable on February 9, 2021, August 9, 2021 and February 9, 2022, respectively, were not paid and have not been paid as of the date hereof (such failures, the "***Interest Payment Defaults***"). As specified in Section 6.1(a)(2) of the Indenture, because such failures to pay interest on the Notes when due have continued for thirty (30) consecutive days in each instance, such Interest Payment Defaults became Events of Default under the Indenture on March 12, 2021, September 9, 2021 and March 12, 2022, respectively, due to lapse of time.

Based on the foregoing, the Trustee, by this notice in writing to the Company, declares the unpaid principal of $400,000,000, and accrued and unpaid interest on all the Notes to be due and payable immediately as provided under Section 6.2(a) of the Indenture.

This acceleration notice is a limited, specific notice and is not in limitation of, and shall not be construed to limit, waive or otherwise modify any other default or Event of Default. The undersigned Trustee and the Holders reserve all of their rights to pursue any available remedies by proceeding at law or in equity to, among other things and without limitation, collect the payment of the principal of and the interest on the Notes or to enforce the performance of any provision of the Notes or the Indenture.

TV Azteca, S.A.B. de C.V.
The Subsidiary Guarantors under the Indenture
August 5, 2022

THE BANK OF NEW YORK MELLON,
as Trustee under the Indenture

Name: Gerard F. Facendola
Title:   Director

cc:     Paul, Weiss, Rifkind, Wharton & Garrison LLP
        1285 6th Avenue
        New York, NY 10019
        Attn:   Alan W. Kornberg (akornberg@paulweiss.com)
                Elizabeth McColm (emccolm@paulweiss.com)

        TV Azteca S.A.B. de C.V.
        Perifierico Sur 4121
        COL Fuentes del Pedregal
        Mexico City, DF 14140
        Mexico
        Attn:   Rodrigo Pliego

        TV Azteca S.A.B. de C.V.
        Perifierico Sur 4121
        COL Fuentes del Pedregal
        Mexico City, DF 14140
        Mexico
        Attn:   Rafael Rodriguez Sanchez (Director General, CEO)

        TV Azteca S.A.B. de C.V.
        Perifierico Sur 4121
        COL Fuentes del Pedregal
        Mexico City, DF 14140
        Mexico
        Attn:   Jorge Luis Zuniga Montiel (Director General de Finanzas, CFO)

        SAINZ ABOGADOS, S.C.
        Blvd. Manuel Avila Camacho #24, Piso 21
        Lomas de Chapultepec, Miguel Hidalgo,
        CDMX 11000, Mexico
        Attn:   Alejandro Sainz

# Exhibit 9 to the
# Ellis Declaration



## BNY MELLON

August 8, 2022

**VIA FACSIMILE, REGISTERED FIRST CLASS MAIL, OVERNIGHT COURIER, PDF/ELECTRONIC MAIL AND/OR HAND DELIVERY**

To the Company and Subsidiary Guarantors (as defined in the Indenture, referenced below):

TV Azteca, S.A.B. de C.V.                    with a copy to:
Insurgentes Sur 3579
Col. Tlalpan la joya                         Winston & Strawn, LLP
14000, México, D.F.                          200 Park Avenue
México                                       New York, NY 10166-4193
Attention: Rodrigo Pliego                    Attention: Allen Miller, Esq.
                                             (per Section 11.1 of Indenture)

**Re:**   Indenture dated as of August 9, 2017, governing the 8.250% Senior Notes due August 9, 2024 in aggregate principal amount outstanding of $400,000,000 (the "*Notes*"), by and among TV Azteca, S.A.B. de C.V. (the "*Company*"), the Subsidiary Guarantors party thereto, The Bank of New York Mellon, as trustee (the "*Trustee*"), and The Bank of New York Mellon, London Branch, as initial Principal Paying Agent (the "*Indenture*").

Ladies and Gentlemen:

Notice specifying the Interest Payment Defaults (as defined below) and acceleration as a result thereof was given by the undersigned Trustee pursuant to Section 6.2(a) of the Indenture on August 5, 2022.

The undersigned Trustee is acting at the direction of the beneficial owners (the "*Holders*") of a majority in aggregate principal amount of the outstanding Notes issued pursuant to the Indenture. Capitalized terms used herein but not otherwise defined herein have the meanings set forth in the Indenture.

The interest payments in respect of the Notes due and payable on February 9, 2021, August 9, 2021 and February 9, 2022, respectively, were not paid and have not been paid as of the date hereof (such failures, the "*Interest Payment Defaults*"). As specified in Section 6.1(a)(2) of the Indenture, because such failures to pay interest on the Notes when due have continued for thirty (30) consecutive days in each instance, such Interest Payment Defaults became Events of Default under the Indenture on March 12, 2021, September 9, 2021 and March 12, 2022, respectively, due to lapse of time.

Based on the foregoing, the Trustee, by this notice in writing to the Company, declares the unpaid principal of $400,000,000, premium, accrued and unpaid interest, and any other amounts owed on the Notes, and under the Indenture, to be due and payable immediately as provided under Section 6.2(a) of the Indenture.

This acceleration notice is a limited, specific notice and is not in limitation of, and shall not be construed to limit, waive or otherwise modify any other default or Event of Default. The

TV Azteca, S.A.B. de C.V.
The Subsidiary Guarantors under the Indenture
August 8, 2022

undersigned Trustee and the Holders reserve all of their rights to pursue any available remedies by proceeding at law or in equity to, among other things and without limitation, collect the payment of the principal of, premium, interest, and any other amounts owed on the Notes, and under the Indenture, or to enforce the performance of any provision of the Notes or the Indenture.

THE BANK OF NEW YORK MELLON,
as Trustee under the Indenture

Name: Gerard F. Facendola
Title:  Director

cc:   Paul, Weiss, Rifkind, Wharton & Garrison LLP
      1285 6th Avenue
      New York, NY 10019
      Attn:  Alan W. Kornberg (akornberg@paulweiss.com)
      Elizabeth McColm (emccolm@paulweiss.com)

      TV Azteca S.A.B. de C.V.
      Perifierico Sur 4121
      COL Fuentes del Pedregal
      Mexico City, DF 14140
      Mexico
      Attn:  Rodrigo Pliego

      TV Azteca S.A.B. de C.V.
      Perifierico Sur 4121
      COL Fuentes del Pedregal
      Mexico City, DF 14140
      Mexico
      Attn:  Rafael Rodriguez Sanchez (Director General, CEO)

      TV Azteca S.A.B. de C.V.
      Perifierico Sur 4121
      COL Fuentes del Pedregal
      Mexico City, DF 14140
      Mexico
      Attn:  Jorge Luis Zuniga Montiel (Director General de Finanzas, CFO)

      TV Azteca S.A.B. de C.V.
      Attn:  Jose Luis Riera Kinkel (jlriera@gruposalinas.com.mx)
      Attn:  Rolando Villareal (rvillarreal@tvazteca.com.mx)
      Attn:  Bruno Rangel (jrangelk@gruposalinas.com.mx)
      Attn:  Luciano Pascoe (lpascoe@gruposalinas.com.mx)

TV Azteca, S.A.B. de C.V.
The Subsidiary Guarantors under the Indenture
August 8, 2022


SAINZ ABOGADOS, S.C.
Blvd. Manuel Avila Camacho #24, Piso 21
Lomas de Chapultepec, Miguel Hidalgo,
CDMX 11000, Mexico
Attn:   Alejandro Sainz (asainz@sainzmx.com)

# Exhibit 10 to the Ellis Declaration

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| THE BANK OF NEW YORK MELLON, SOLELY IN ITS CAPACITY AS TRUSTEE FOR THE TV AZTECA, S.A.B. DE C.V. 8.25% SENIOR NOTES DUE 2024, <br><br> Plaintiff, <br><br> v. <br><br> TV AZTECA, S.A.B. DE C.V.; ALTA EMPRESA, S.A. DE C.V.; ASESORÍA ESPECIALIZADA EN AVIACIÓN, S.A. DE C.V.; AZTECA RECORDS, S.A. DE C.V.; AZTECA SPORTS RIGHTS LLC; EQUIPO DE FUTBOL MAZATLAN, S.A. DE C.V.; GANADOR AZTECA, S.A.P.I. DE C.V.; MAZATLAN PROMOTORA DE FUTBOL, S.A. DE C.V.; OPERADORA MEXICANA DE TELEVISIÓN, S.A. DE C.V.; PRODUCCIONES AZTECA DIGITAL, S.A. DE C.V.; PRODUCCIONES DOPAMINA, S.A. DE C.V.; PRODUCCIONES ESPECIALIZADAS, S.A. DE C.V.; PRODUCTORA DE TELEVISIÓN REGIONAL DE TV AZTECA, S.A. DE C.V.; PROMOTORA DE FUTBOL ROJINEGROS, S.A. DE C.V.; PUBLICIDAD ESPECIALIZADA EN MEDIOS DE COMUNICACIÓN DE TV AZTECA, S.A. DE C.V.; S.C.I. DE MÉXICO, S.A. DE C.V.; SERVICIOS AÉREOS NOTICIOSOS, S.A. DE C.V.; SERVICIOS ESPECIALIZADOS TAZ, S.A. DE C.V.; SERVICIOS Y MANTENIMIENTO DEL FUTURO EN TELEVISIÓN, S.A. DE C.V.;  CORPORACIÓN DE ASESORÍA TÉCNICA Y DE PRODUCCIÓN, S.A. DE C.V.; EDITORIAL | Case No. 1:22-cv-08164-PGG <br><br> Hon. Paul G. Gardephe <br><br> **COMPLAINT** |

MANDARINA, S.A. DE C.V.; MULTIMEDIA, ESPECTÁCULOS Y ATRACCIONES, S.A. DE C.V.; SERVICIOS FORÁNEOS DE ADMINISTRACIÓN, S.A. DE C.V.; SERVICIOS LOCALES DE PRODUCCIÓN, S.A. DE C.V.; AZTECA INTERNATIONAL CORPORATION; STATIONS GROUP LLC; TV AZTECA HONDURAS, S.A. DE C.V.; COMERCIALIZADORA DE TELEVISIÓN DE HONDURAS, S.A. DE C.V.; INCOTEL S.A.; TVA GUATEMALA S.A.; LASIMEX, S.A. DE C.V.; TV AZTECA GLOBAL, S.L.U.; AZTECA COMUNICACIONES PERÚ, S.A.C.; REDES OPTICAS, S.A.C.; TELEVISORA DEL VALLE DE MÉXICO, S.A. DE C.V.,

Defendants.

Plaintiff The Bank of New York Mellon ("BNY Mellon" or the "Trustee"), solely in its capacity as Trustee for the TV Azteca, S.A.B. de C.V. 8.25% Senior Notes Due 2024 (the "Notes"), for its Complaint against TV Azteca, S.A.B. de C.V. ("TV Azteca"), and Alta Empresa, S.A. de C.V.; Asesoría Especializada En Aviación, S.A. de C.V.; Azteca Records, S.A. de C.V.; Azteca Sports Rights LLC; Equipo de Futbol Mazatlan, S.A. de C.V.; Ganador Azteca, S.A.P.I. de C.V.; Mazatlan Promotora de Futbol, S.A. de C.V.; Operadora Mexicana de Televisión, S.A. de C.V.; Producciones Azteca Digital, S.A. de C.V.; Producciones Dopamina, S.A. de C.V.; Producciones Especializadas, S.A. de C.V.; Productora de Televisión Regional de TV Azteca, S.A. de C.V.; Promotora de Futbol Rojinegros, S.A. de C.V.; Publicidad Especializada en Medios de Comunicación de TV Azteca, S.A. de C.V.; S.C.I. de México, S.A. de C.V.; Servicios Aéreos Noticiosos, S.A. de C.V.; Servicios Especializados Taz, S.A. de C.V.; Servicios y Mantenimiento del Futuro en Televisión, S.A. de C.V.; Corporación de Asesoría Técnica y de Producción, S.A.

2

de C.V.; Editorial Mandarina, S.A. de C.V.; Multimedia, Espectáculos y Atracciones, S.A. de C.V.; Servicios Foráneos de Administración, S.A. de C.V.; Servicios Locales de Producción, S.A. de C.V.; Azteca International Corporation; Stations Group LLC; TV Azteca Honduras, S.A. de C.V.; Comercializadora de Televisión de Honduras, S.A. de C.V.; Incotel S.A.; TVA Guatemala S.A.; Lasimex, S.A. de C.V.; TV Azteca Global, S.L.U.; Azteca Comunicaciones Perú, S.A.C.; Redes Opticas, S.A.C.; Televisora del Valle de México, S.A. de C.V. (the "Guarantors"), alleges as follows:

## NATURE OF THE ACTION

1. This is a breach of contract action arising out of Defendants' failure to pay hundreds of millions of dollars in principal and interest that they owe under the Notes.

2. TV Azteca issued $400,000,000 of the Notes and sold them to investors under an Indenture it executed with the Trustee in 2017. In that Indenture, and in the Global Note attached to the Indenture, TV Azteca unconditionally promised to make regularly scheduled interest payments to holders of the Notes. TV Azteca also unconditionally promised to pay the Notes' principal in full when the Notes matured in August 2024. And the Guarantors – all TV Azteca subsidiaries – backed up that promise with an unconditional guarantee of payment.

3. TV Azteca and the Guarantors have defaulted on their obligations. Beginning in February 2021, TV Azteca failed to make any interest payments when they came due. When the Notes matured in August 2024, TV Azteca failed to pay the Notes' principal in full. And TV Azteca's Guarantors have also failed to make good on their guarantee.

4. To remedy Defendants' defaults, the Trustee brings this suit as trustee of an express trust to recover all amounts due by TV Azteca and the Guarantors for the benefit of the holders of the Notes.

## PARTIES

5. BNY Mellon is a New York chartered bank with its principal place of business in New York, New York.

6. TV Azteca is a corporation organized under the laws of the United Mexican States ("Mexico") with its principal place of business in Mexico.

7. Alta Empresa, S.A. de C.V. is a corporation organized under the laws of Mexico with its principal place of business in Mexico.

8. Asesoría Especializada En Aviación, S.A. de C.V. is a corporation organized under the laws of Mexico with its principal place of business in Mexico.

9. Azteca Records, S.A. de C.V. is a corporation organized under the laws of Mexico with its principal place of business in Mexico.

10. Azteca Sports Rights LLC, a/k/a Azteca Sport Right LLC, is a limited liability corporation organized under the laws of Delaware. Azteca Sports Rights has three members – TV Azteca, Impulsora de Negocias Omega, S.A. de C.V., and Comunicaciones Avanzadas, S.A. de C.V. – each of which is incorporated in Mexico and maintains its principal place of business in Mexico.

11. Equipo de Futbol Mazatlan, S.A. de C.V. is a corporation organized under the laws of Mexico with its principal place of business in Mexico.

12. Ganador Azteca, S.A.P.I. de C.V. is a corporation organized under the laws of Mexico with its principal place of business in Mexico.

13. Mazatlan Promotora de Futbol, S.A. de C.V. is a corporation organized under the laws of Mexico with its principal place of business in Mexico.

14. Operadora Mexicana de Televisión, S.A. de C.V. is a corporation organized under

the laws of Mexico with its principal place of business in Mexico.

15. Producciones Azteca Digital, S.A. de C.V. is a corporation organized under the laws of Mexico with its principal place of business in Mexico.

16. Producciones Dopamina, S.A. de C.V. is a corporation organized under the laws of Mexico with its principal place of business in Mexico.

17. Producciones Especializadas, S.A. de C.V. is a corporation organized under the laws of Mexico with its principal place of business in Mexico.

18. Productora de Televisión Regional de TV Azteca, S.A. de C.V. is a corporation organized under the laws of Mexico with its principal place of business in Mexico.

19. Promotora de Futbol Rojinegros, S.A. de C.V. is a corporation organized under the laws of Mexico with its principal place of business in Mexico.

20. Publicidad Especializada en Medios de Comunicación de TV Azteca, S.A. de C.V. is a corporation organized under the laws of Mexico with its principal place of business in Mexico.

21. S.C.I. de México, S.A. de C.V. is a corporation organized under the laws of Mexico with its principal place of business in Mexico.

22. Servicios Aéreos Noticiosos, S.A. de C.V. is a corporation organized under the laws of Mexico with its principal place of business in Mexico.

23. Servicios Especializados Taz, S.A. de C.V. is a corporation organized under the laws of Mexico with its principal place of business in Mexico.

24. Servicios y Mantenimiento del Futuro en Televisión, S.A. de C.V. is a corporation organized under the laws of Mexico with its principal place of business in Mexico.

25. Corporación de Asesoría Técnica y de Producción, S.A. de C.V. is a corporation organized under the laws of Mexico with its principal place of business in Mexico.

26.     Editorial Mandarina, S.A. de C.V. is a corporation organized under the laws of Mexico with its principal place of business in Mexico.

27.     Multimedia, Espectáculos y Atracciones, S.A. de C.V. is a corporation organized under the laws of Mexico with its principal place of business in Mexico.

28.     Servicios Foráneos de Administración, S.A. de C.V. is a corporation organized under the laws of Mexico with its principal place of business in Mexico.

29.     Servicios Locales de Producción, S.A. de C.V. is a corporation organized under the laws of Mexico with its principal place of business in Mexico.

30.     Azteca International Corporation is a Delaware corporation with its principal place of business in California.

31.     Stations Group LLC is a limited liability corporation organized under the laws of Delaware.  Stations Group LLC has one member – Azteca International Corporation – which is incorporated in Delaware and maintains its principal place of business in California.

32.     TV Azteca Honduras, S.A. de C.V. is a corporation organized under the laws of Honduras with its principal place of business in Honduras.

33.     Comercializadora de Televisión de Honduras, S.A. de C.V. is a corporation organized under the laws of Honduras with its principal place of business in Honduras.

34.     Incotel S.A. is a corporation organized under the laws of Guatemala with its principal place of business in Guatemala.

35.     TVA Guatemala S.A. is a corporation organized under the laws of Guatemala with its principal place of business in Guatemala.

36.     Lasimex, S.A. de C.V. is a corporation organized under the laws of Mexico with its principal place of business in Mexico.

37.  TV Azteca Global, S.L.U. is a corporation organized under the laws of Spain with its principal place of business in Spain.

38.  Azteca Comunicaciones Perú, S.A.C. is a corporation organized under the laws of Peru with its principal place of business in Peru.

39.  Redes Opticas, S.A.C. is a corporation organized under the laws of Peru with its principal place of business in Peru.

40.  Televisora del Valle de México, S.A. de C.V. is a corporation organized under the laws of Mexico with its principal place of business in Mexico.

41.  All Defendants other than TV Azteca itself are subsidiaries and affiliates of TV Azteca.

## JURISDICTION AND VENUE

42.  This Court has jurisdiction under 28 U.S.C. § 1332(a)(3) because this action is between citizens of different States in which citizens of foreign states are additional parties, and because the amount in controversy exceeds $75,000.

43.  This Court has personal jurisdiction over TV Azteca and the Guarantors because the parties irrevocably consented and submitted to this Court's jurisdiction for any action arising out of or relating to the Notes or Indenture and agreed that any such suit may be brought in this Court.  Indenture (attached as Exhibit A) § 11.7(b)(i), (iii).

44.  Venue is proper because TV Azteca and the Guarantors waived, "to the fullest extent permitted by applicable law," any objection to venue in this District.  Indenture, Ex. A § 11.7(b)(ii).  Venue is also proper under 28 U.S.C. § 1391(f)(1) because a substantial part of the events and omissions giving rise to this claim arose in this District.  Moreover, TV Azteca and the

7

Guarantors waived any defense that this Court would be an inconvenient forum for this action. Indenture, Ex. A § 11.7(b)(ii).

## FACTUAL ALLEGATIONS

**I.      The Indenture**

**A.      TV Azteca's Obligations**

45.      The Indenture is a contract entered into as of August 9, 2017 among TV Azteca, the Guarantors, the Trustee, and The Bank of New York Mellon, London Branch, as principal paying agent.

46.      The Indenture is governed by the laws of the State of New York.  Ex. A § 11.7(a).

47.      The Indenture is, and at all relevant times was, a valid, binding agreement.

48.      The Bank of New York Mellon is the Trustee under the Indenture, and has been the Trustee continuously since the date of the Indenture and the Global Note.  Ex. A at 1.

49.      TV Azteca issued the Notes pursuant to the Indenture.  The Notes were issued in global note form with the fully registered "Global Note," attached as <u>Exhibit B</u>.  "The terms" of the Global Note "include those stated in the Indenture."  Ex. B at 7.

50.      Under the Global Note and Indenture, TV Azteca promised to pay the principal sum of $400,000,000 on August 9, 2024 (the "Maturity Date").  TV Azteca also promised to make semi-annual interest payments on February 9 and August 9 of each year at the rate of 8.250% per annum on any outstanding and unpaid principal or interest.  Global Note, Ex. B at 7, § 1.

51.      Overdue principal and interest continues to accrue interest at the same 8.25% rate without regard to any applicable grace periods.  Ex. A at § 3.1(b); Ex. B at 7, § 1.  TV Azteca lacks authority under the Indenture to defer or change the due date of any interest or principal payment without the consent of a majority of Holders of the Notes.  *Cf.* Ex. A. at §§ 6.4, 9.2(a),

### B. The Guarantors' Obligations

52. The Guarantors "fully, unconditionally and irrevocably" guaranteed the Notes "jointly and severally with each other," guaranteeing "full and punctual payment when due" to each Noteholder and the Trustee, "whether at maturity, by acceleration, by redemption or otherwise." Indenture, Ex. A § 10.1(a).

53. As part of that guaranty, the Guarantors waived any "reduction, limitation, impairment, or termination" or any "defense of setoff, counterclaim, recoupment, or termination whatsoever or by reason of the invalidity, illegality, or unenforceability of the Guaranteed Obligations or otherwise." Indenture, Ex. A § 10.1(g). Further, the Guarantors agreed that their guaranty is one of payment, not collection, and waived any right to demand that the Trustee first look to TV Azteca or its assets for satisfaction of TV Azteca's debts before seeking payment of that amount from the Guarantors. *Id.* § 10.1(b)-(c).

54. In fact, the Guarantors agreed to be bound as primary obligors, not merely sureties, and waived any right to notice of default of TV Azteca's obligations. Indenture, Ex. A § 10.1(a), (c). As such, the Trustee would be entitled to immediately enforce TV Azteca's obligations against the Guarantors if TV Azteca defaulted, without first giving any notice or demand to the Guarantors.

55. However, Section 10.1(i) also states, that without "limitation of any other right which any Holder has at law or in equity," the Guarantors promised to pay any unpaid obligations of the company upon written demand by the Trustee. Indenture, Ex. A § 10.1(i). Such notice is

effective upon notice to TV Azteca, which, under Sections 11.1(a) and 11.1(e) of the Indenture, constitutes notice to each of the Guarantors.

### C. Remedies Upon Events of Default

56. Under the Indenture, either "default in the payment when due of the principal" owed, or "default for 30 consecutive days or more in the payment when due of interest" constitute an "Event of Default." Indenture, Ex. A § 6.1(a).

57. If an Event of Default occurs and continues, the Trustee or the holders of at least 25% in principal amount of the Notes that are outstanding may, by notice in writing to TV Azteca, accelerate the Notes and "declare the unpaid principal of (and premium, if any) and accrued and unpaid interest on all the Notes to be immediately due and payable." Indenture, Ex. A § 6.2(a).

58. In an Event of Default, the Trustee may pursue any available remedy to collect the payment of principal and interest on the Notes or to enforce the performance of any provision of the Notes or Indenture. Indenture, Ex. A, § 6.3(a). Among other remedies, the Trustee may seek judgment as trustee of an express trust against TV Azteca and the Guarantors for the "whole amount then due," including principal and interest. Indenture, Ex. A §§ 6.1(a), 6.8.

59. TV Azteca and the Guarantors further agreed to indemnify the Trustee against all losses and costs, including without limitation, reasonable attorney's fees and expenses, incurred by it without negligence, willful misconduct, or bad faith on its part in connection with its acceptance and administration of the trust and its performance of its duties under the Indenture, including the costs and expenses of enforcing this Indenture against TV Azteca and the Guarantors, as well as the cost of collecting the amounts due. Indenture, Ex. A §§ 6.8, 7.7(a)-(b), 10.1(a).

## II.     TV Azteca's Breaches of the Indenture

60.     On February 9, 2021, TV Azteca failed to make the scheduled interest payment, in whole or in part, required by the Indenture and Global Note.  Since then, TV Azteca has failed to make any scheduled interest payments, including the payments due on August 9, 2021, February 9, 2022, August 9, 2022, February 9, 2023, August 9, 2023, February 9, 2024, August 9, 2024, and February 9, 2025.

61.     TV Azteca also failed to repay the Notes' $400 million in principal, in whole or in part, when the Notes matured on August 9, 2024.

62.     The Guarantors also have not made any of the Notes' interest or principal payments that TV Azteca missed, despite their unconditional guarantee to do so.

63.     TV Azteca's (and the Guarantors') failure to make the required interest payments when due, and failure to cure that non-payment within 30 days (or, in fact, at any time thereafter), constituted an Event of Default under the Indenture.  TV Azteca's (and the Guarantors') failure to repay the Notes' principal when it became due likewise constituted an Event of Default.

64.     On at least March 22, 2021 and March 29, 2022, the Trustee sent TV Azteca additional notices of Events of Default pursuant to the Indenture based on TV Azteca's failure to make required interest payments on February 9, 2021, August 9, 2021, and February 9, 2022.  In each of those notices of default, the Trustee also made demand upon the Guarantors to pay all unpaid amounts owed by TV Azteca.

65.     On May 3, 2022, the holders of more than 25% of the aggregate principal amount of outstanding Notes issued a notice of acceleration to TV Azteca and the Trustee pursuant to and in accordance with Section 6.2 of the Indenture.  Indenture, Ex. A § 6.2(a).  The holders' Notice

11

of Acceleration specified that the missed interest payments were continuing Events of Default and stated that it was a "notice of acceleration" under Section 6.2 of the Indenture.

66.     Three days later, the Trustee sent TV Azteca a letter further advising TV Azteca that the requisite number of holders had accelerated the Notes' principal and accrued and unpaid interest because of the ongoing Events of Default.

67.     In addition to the holders' Notice of Acceleration, the Trustee issued a separate Notice of Acceleration on August 5, 2022.  The Trustee's notice was sent to TV Azteca and the Guarantors in accordance with Section 6.2 of the Indenture.  That notice stated that the three initial missed interest payments (February 2021, August 2021, and February 2022) were Events of Default under the Indenture and stated that it was a "notice of acceleration" within the meaning of Section 6.2 of the Indenture.  Notice of Acceleration (attached as Exhibit C).  TV Azteca acknowledged receipt of the August 5 Notice of Acceleration on August 9, 2022.

68.     As a result of the holders' and Trustee's respective notices of acceleration, the Notes—including the unpaid interest and principal—were thus "immediately due and payable" on August 5, 2022.  Indenture, Ex. A § 6.2(a).

69.     The notices of acceleration and Events of Default have not been waived by a majority of holders pursuant to Sections 6.2(b) and 6.4, respectively, of the Indentures.

70.     Each of the notices of acceleration and of Events of Default also constituted written demand to the Guarantors pursuant to Sections 10.1(a), 11.1(a), and 11.1(e) of the Indenture.

71.     Despite the notices of acceleration, and despite the Notes' maturity date in August 2024, neither TV Azteca nor the Guarantors have made any payment with respect to the Notes since August 9, 2020.

72.     Under the Global Note and Indenture, interest continues to accrue on the unpaid

12

principal and the defaulted interest at the Notes' interest rate of 8.25%.

73.    As of the date of this Complaint, TV Azteca and the Guarantors now owe more than $580 million under the Notes, including principal, missed interest payments, and accrued interest on the defaulted principal and interest without regard to any applicable grace periods.

## COUNT I

### Breach of Contract

74.    All foregoing paragraphs are incorporated by reference herein.

75.    The Global Note and the Indenture are valid and enforceable contracts executed by TV Azteca and the Guarantors.

76.    TV Azteca and the Guarantors failed to make payments due on February 9, 2021, August 9, 2021, February 9, 2022, or any time thereafter, as required by the terms of the Global Note and the Indenture.

77.    Each of TV Azteca's failures to make its required interest payments, and its continuing default for 30 consecutive days after each missed payment, constituted Events of Default.

78.    To date, none of TV Azteca or any of the Guarantors have cured, in whole or in part, any of the missed payments that constitute Events of Default.

79.    The Notes' principal and all unpaid interest on the Notes accrued to date became immediately due and payable no later than August 5, 2022 as a result of the Events of Default caused by TV Azteca's and the Guarantors' missed (and uncured) interest payments and the holders' and Trustee's respective notices of acceleration relating to those Events of Default.

13

80.     Under the Global Note and Indenture, TV Azteca and the Guarantors remain obligated to pay interest on accrued and unpaid principal and interest at the Notes' stated interest rate of 8.25% until those amounts due are paid or reduced to judgment.

81.     In addition to the Notices of Acceleration, the Notes' principal and all unpaid interest and interest accrued to date thereon also became due when the Notes matured on August 9, 2024.

82.     TV Azteca and the Guarantors have failed to pay any principal owed under the Notes and have failed to pay any missed or accrued interest since at least February 2021.

83.     TV Azteca and the Guarantors therefore owe the entire principal amount of the Global Note, the missed interest payments, and accrued and unpaid interest on the missed principal and interest payments.

84.     TV Azteca's and the Guarantors' failure to pay principal when due also constitute an Event of Default.

85.     Under Sections 6.8, 7.7(b), and 10.1(a) of the Indenture, TV Azteca and the Guarantors are also liable to indemnify the Trustee for all costs and expenses incurred in enforcing the Indenture and TV Azteca and the Guarantors' breaches thereof, including reasonable attorney's fees and expenses and costs of collection.

## **PRAYER FOR RELIEF**

WHEREFORE the Trustee respectfully requests that the Court enter judgment in its favor and against Defendants as follows:

A.     Declaring that the Global Note, which incorporates the Indenture, is an enforceable, valid, and unconditional obligation owed by TV Azteca and the Guarantors;

B.     Declaring that TV Azteca and the Guarantors have breached the Global Note and

14

the Indenture by failing to make required principal and interest payments;

C.      Awarding damages to the Trustee in an amount to be proven at trial;

D.      Awarding the Trustee pre-judgment and post-judgment interest;

E.      Awarding the Trustee its reasonable attorney's fees, expenses, and costs of collection; and

F.      Awarding the Trustee such other and further relief as the Court deems just and equitable.


July 11, 2025

New York, New York

Respectfully submitted.


/s/ Justin M. Ellis
Justin M. Ellis
Eric Rolston
MOLOLAMKEN LLP
430 Park Avenue
New York, NY  10022
Tel:    (212) 607-8160
jellis@mololamken.com
erolston@mololamken.com

*Attorneys for The Bank of New York Mellon ("Trustee"), solely in its capacity as Trustee for the TV Azteca, S.A.B. de C.V. 8.25% Senior Notes Due 2024*

15

# Exhibit 11 to the Ellis Declaration

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

THE BANK OF NEW YORK MELLON, SOLELY IN ITS CAPACITY AS TRUSTEE FOR THE TV AZTECA, S.A.B. DE C.V. 8.25% SENIOR NOTES DUE 2024,

       Plaintiff,

       v.

TV AZTECA, S.A.B. DE C.V.; ALTA EMPRESA, S.A. DE C.V.; ASESORÍA ESPECIALIZADA EN AVIACIÓN, S.A. DE C.V.; AZTECA RECORDS, S.A. DE C.V.; AZTECA SPORTS RIGHTS LLC; EQUIPO DE FUTBOL MAZATLAN, S.A. DE C.V.; GANADOR AZTECA, S.A.P.I. DE C.V.; MAZATLAN PROMOTORA DE FUTBOL, S.A. DE C.V.; OPERADORA MEXICANA DE TELEVISIÓN, S.A. DE C.V.; PRODUCCIONES AZTECA DIGITAL, S.A. DE C.V.; PRODUCCIONES DOPAMINA, S.A. DE C.V.; PRODUCCIONES ESPECIALIZADAS, S.A. DE C.V.; PRODUCTORA DE TELEVISIÓN REGIONAL DE TV AZTECA, S.A. DE C.V.; PROMOTORA DE FUTBOL ROJINEGROS, S.A. DE C.V.; PUBLICIDAD ESPECIALIZADA EN MEDIOS DE COMUNICACIÓN DE TV AZTECA, S.A. DE C.V.; S.C.I. DE MÉXICO, S.A. DE C.V.; SERVICIOS AÉREOS NOTICIOSOS, S.A. DE C.V.; SERVICIOS ESPECIALIZADOS TAZ, S.A. DE C.V.; SERVICIOS Y MANTENIMIENTO DEL FUTURO EN TELEVISIÓN, S.A. DE C.V.; CORPORACIÓN DE ASESORÍA TÉCNICA Y DE PRODUCCIÓN, S.A. DE C.V.; EDITORIAL MANDARINA, S.A. DE C.V.; MULTIMEDIA, ESPECTÁCULOS Y ATRACCIONES, S.A. DE C.V.; SERVICIOS FORÁNEOS DE ADMINISTRACIÓN, S.A. DE C.V.; SERVICIOS LOCALES DE PRODUCCIÓN, S.A. DE C.V.; AZTECA INTERNATIONAL CORPORATION; STATIONS GROUP LLC;

Case No. 1:22-cv-08164-PGG

Hon. Paul G. Gardephe

**STIPULATED**
**CONFIDENTIALITY**
**AGREEMENT AND**
**PROTECTIVE ORDER**

1

TV AZTECA HONDURAS, S.A. DE C.V.;
COMERCIALIZADORA DE TELEVISIÓN DE
HONDURAS, S.A. DE C.V.; INCOTEL S.A.;
TVA GUATEMALA S.A.; LASIMEX, S.A. DE
C.V.; TV AZTECA GLOBAL, S.L.U.;
AZTECA COMUNICACIONES PERÚ, S.A.C.;
REDES OPTICAS, S.A.C.; TELEVISORA DEL
VALLE DE MÉXICO, S.A. DE C.V.,

Defendants.

PAUL G. GARDEPHE, U.S.D.J.:

WHEREAS, the parties to this action (collectively the "Parties" and individually a "Party") request that this Court issue a protective order pursuant to Federal Rule of Civil Procedure 26(c) to protect the confidentiality of nonpublic and competitively sensitive information that they may need to disclose in connection with discovery in this action;

WHEREAS, the Parties, through counsel, agree to the following terms; and

WHEREAS, this Court finds good cause exists for issuance of an appropriately tailored confidentiality order governing the pretrial phase of this action,

IT IS HEREBY ORDERED that any person subject to this Order – including without limitation the Parties to this action (including their respective corporate parents, successors, and assigns), their representatives, agents, experts and consultants, all third parties providing discovery in this action, and all other interested persons with actual or constructive notice of this Order — will adhere to the following terms, upon pain of contempt:

1.      With respect to "Discovery Material" (i.e., information of any kind produced or disclosed in the course of discovery in this action, including any and all copies, abstracts, digests, notes, summaries, and excerpts thereof) that a person has designated as "Confidential" pursuant to this Order, no person subject to this Order may disclose such Confidential Discovery Material to anyone else except as this Order expressly permits:

2

2.      The Party or person producing or disclosing Discovery Material

("Producing Party") may designate as Confidential only the portion of such material that it

reasonably and in good faith believes consists of:

(a)      previously non-disclosed financial information (including without

limitation profitability reports or estimates, percentage fees, design fees,

royalty rates, minimum guarantee payments, sales reports, and sale

margins);

(b)      previously non-disclosed material relating to ownership or control of any

non-public company;

(c)      previously non-disclosed business plans, product-development

information, or marketing plans;

(d)      any information of a personal or intimate nature regarding any individual;

or

(e)      any other category of information this Court subsequently affords

confidential status.

3.      With respect to the Confidential portion of any Discovery Material other

than deposition transcripts and exhibits, the Producing Party or its counsel may designate such

portion as "Confidential" by: (a) stamping or otherwise clearly marking as "Confidential" the

protected portion in a manner that will not interfere with legibility or audibility; and (b)

producing for future public use another copy of said Discovery Material with the confidential

information redacted.

4.      A Producing Party or its counsel may designate deposition exhibits or

portions of deposition transcripts as Confidential Discovery Material either by:  (a) indicating on

the record during the deposition that a question calls for Confidential information, in which case

3

the reporter will bind the transcript of the designated testimony in a separate volume and mark it as "Confidential Information Governed by Protective Order;" or (b) notifying the reporter and all counsel of record, in writing, within 30 days after a deposition has concluded, of the specific pages and lines of the transcript that are to be designated "Confidential," in which case all counsel receiving the transcript will be responsible for marking the copies of the designated transcript in their possession or under their control as directed by the Producing Party or that person's counsel. During the 30-day period following a deposition, all Parties will treat the entire deposition transcript as if it had been designated Confidential.

5.　　　The failure to designate particular Discovery Material as "Confidential" shall not operate to waive a Producing Party's right to later designate such Discovery Material as Confidential. If at any time before the trial of this action a Producing Party realizes that it should have designated as Confidential some portion(s) of Discovery Material that it previously produced without limitation, the Producing Party may so designate such material by so apprising all prior recipients in writing. Thereafter, this Court and all persons subject to this Order will treat such designated portion(s) of the Discovery Material as Confidential.

6.　　　Nothing contained in this Order will be construed as: (a) a waiver by a Party or person of its right to object to any discovery request; (b) a waiver of any privilege or protection; or (c) a ruling regarding the admissibility at trial of any document, testimony, or other evidence.

7.　　　Where a Producing Party has designated Discovery Material as Confidential, other persons subject to this Order may disclose such information only to the following persons:

(a)　　　the Parties to this action, their insurers, and counsel to their insurers;

(b)　　　Beneficial holders of the TV Azteca S.A.B. de C.V. 8.25% Senior Notes

4

due 2024 who are jointly-represented by Plaintiff's counsel in connection with this matter, or any other such beneficial holders of the TV Azteca S.A.B. de C.V. 8.25% Senior Notes due 2024 who have contacted, and complied with the instructions of, Plaintiff's counsel of record;

(c)     counsel retained specifically for this action, including any paralegal, clerical, or other assistant that such outside counsel employs and assigns to this matter;

(d)     outside vendors or service providers (such as copy-service providers and document-management consultants) that counsel hire and assign to this matter;

(e)     any mediator or arbitrator that the Parties engage in this matter or that this Court appoints, provided such person has first executed a Non-Disclosure Agreement in the form annexed as an Exhibit hereto;

(f)     as to any document, its author, its addressee, and any other person indicated on the face of the document as having received a copy;

(g)     any witness who counsel for a Party in good faith believes may be called to testify at trial or deposition in this action, provided such person has first executed a Non-Disclosure Agreement in the form annexed as an Exhibit hereto;

(h)     any person a Party retains to serve as an expert witness or otherwise provide specialized advice to counsel in connection with this action, provided such person has first executed a Non-Disclosure Agreement in the form annexed as an Exhibit hereto;

(i)     stenographers engaged to transcribe depositions the Parties conduct in this

5

action; and

(j)     this Court, including any appellate court, its support personnel, and court reporters.

8.      Before disclosing any Confidential Discovery Material to any person referred to in subparagraphs 7(b), 7(e), 7(g), or 7(h) above, counsel must provide a copy of this Order to such person, who must sign a Non-Disclosure Agreement in the form annexed as an Exhibit hereto stating that he or she has read this Order and agrees to be bound by its terms. Said counsel must retain each signed Non-Disclosure Agreement, and produce it to opposing counsel either before such person is permitted to testify (at deposition or trial) or receive Confidential Discovery Material (in the case of persons referred to in subparagraph 7(b)), or at the conclusion of the case, whichever comes first.

9.      In accordance with paragraph 2 of this Court's Individual Practices, any party filing documents under seal must simultaneously file with the Court a letter brief and supporting declaration justifying – on a particularized basis – the continued sealing of such documents. The parties should be aware that the Court will unseal documents if it is unable to make "specific, on the record findings . . . demonstrating that closure is essential to preserve higher values and is narrowly tailored to serve that interest." Lugosch v. Pyramid Co. of Onondaga, 435 F.3d 110, 120 (2d Cir. 2006).

10.     The Court also retains discretion whether to afford confidential treatment to any Discovery Material designated as Confidential and submitted to the Court in connection with any motion, application, or proceeding that may result in an order and/or decision by the Court. All persons are hereby placed on notice that the Court is unlikely to seal or otherwise afford confidential treatment to any Discovery Material introduced in evidence at trial, even if such material has previously been sealed or designated as Confidential.

6

11. In filing Confidential Discovery Material with this Court, or filing portions of any pleadings, motions, or other papers that disclose such Confidential Discovery Material ("Confidential Court Submission"), the Parties shall publicly file a redacted copy of the Confidential Court Submission via the Electronic Case Filing System. The Parties shall file an unredacted copy of the Confidential Court Submission under seal with the Clerk of this Court, and the Parties shall serve this Court and opposing counsel with unredacted courtesy copies of the Confidential Court Submission.

12. Any Party who objects to any designation of confidentiality may at any time before the trial of this action serve upon counsel for the Producing Party a written notice stating with particularity the grounds of the objection. If the Parties cannot reach agreement promptly, counsel for all affected Parties will address their dispute to this Court in accordance with paragraph 4(E) of this Court's Individual Practices.

13. Pursuant to Rule 502(d) of the Federal Rules of Evidence, if a Producing Party inadvertently produces Discovery Materials that the Producing Party later claims in good faith should not have been produced because of a privilege, including but not limited to the attorney-client privilege, or other protection, such as work-product protection, the production of that material shall not be deemed to constitute the waiver any applicable privileges or protections. In such circumstances, when the Producing Party becomes aware that privileged or protected material was produced, it must notify the Parties and request, at the Producing Party's election, either the return or the destruction of the produced material. Within five (5) business days after receiving such notification, the receiving Parties shall, as instructed, return or destroy and confirm the destruction of all such produced material, including all copies, notes, or summaries thereof in any receiving Parties' work product. The receiving Parties shall not use the contents of such privileged or protected material for any

7

purpose, including in connection with any effort seeking to compel production of the produced material for reasons other than its production or any information about the contents of the material that was gained due to its production. This Order shall not prevent any Party from challenging the designation of such material as privileged or protected and moving to compel production of allegedly privileged or protected documents. If a receiving Party becomes aware during the review of any material that such material likely to be privileged or subject to any other protection, the receiving Party shall, within five (5) business days, notify the Producing Party and sequester the material until the Producing Party has had a reasonable opportunity to respond.

14. Any Party who requests additional limits on disclosure (such as "attorneys' eyes only" in extraordinary circumstances), may at any time before the trial of this action serve upon counsel for the recipient Parties a written notice stating with particularity the grounds of the request. If the Parties cannot reach agreement promptly, counsel for all affected Parties will address their dispute to this Court in accordance with paragraph 4(E) of this Court's Individual Practices.

15. Recipients of Confidential Discovery Material under this Order may use such material solely for the prosecution and defense of this action and any appeals thereto, and not for any business, commercial, or competitive purpose or in any other litigation proceeding. Nothing contained in this Order, however, will affect or restrict the rights of any Party with respect to its own documents or information produced in this action.

16. Nothing in this Order will prevent any Party from producing any Confidential Discovery Material in its possession in response to a lawful subpoena or other compulsory process, or if required to produce by law or by any government agency having jurisdiction, provided that such Party gives written notice to the Producing Party as soon as

8

reasonably possible to enable the Producing Party to have an opportunity to appear and be heard on whether that information should be disclosed, and if permitted by the time allowed under the request, at least 10 days before any disclosure. Upon receiving such notice, the Producing Party will bear the burden to oppose compliance with the subpoena, other compulsory process, or other legal notice if the Producing Party deems it appropriate to do so.

17.     Each person who has access to Discovery Material designated as Confidential pursuant to this Order must take all due precautions to prevent the unauthorized or inadvertent disclosure of such material.

18.     Within 60 days of the final disposition of this action – including all appeals – all recipients of Confidential Discovery Material must either return it – including all copies thereof – to the Producing Party, or, upon permission of the Producing Party, destroy such material – including all copies thereof.  In either event, by the 60-day deadline, the recipient must certify its return or destruction by submitting a written certification to the Producing Party that affirms that it has not retained any copies, abstracts, compilations, summaries, or other forms of reproducing or capturing any of the Confidential Discovery Material.  Notwithstanding this provision, the attorneys that the Parties have specifically retained for this action may retain an archival copy of all pleadings, motion papers, transcripts, deposition recordings, exhibits, expert reports, legal memoranda, correspondence, or attorney work product, even if such materials contain Confidential Discovery Material.  Any such archival copies that contain or constitute Confidential Discovery Material remain subject to this Order.

19.     This Order will survive the termination of the litigation and will continue to be binding upon all persons to whom Confidential Discovery Material is produced or disclosed.

20.     This Court will retain jurisdiction over all persons subject to this Order to

the extent necessary to enforce any obligations arising hereunder or to impose sanctions for any contempt thereof.

SO STIPULATED AND AGREED.

| | |
|---|---|
| */s/ Justin M. Ellis* | */s/ Harold S. Shaftel* |
| Dated: | Dated: |
| Justin M. Ellis | Harold S. Shaftel |
| MOLOLAMKEN LLP | GREENBERG TRAURIG, LLP |
| 430 Park Avenue | One Vanderbilt Avenue |
| New York, New York  10022 | New York, New York  10017 |
| Tel:  (212) 607-8760 | Tel:  (212) 801-6400 |
| jellis@mololamken.com | shaftelh@gtlaw.com |

Dated: New York, New York

November 3, 2025

SO ORDERED.

Paul G. Gardephe
United States District Judge

10

# Exhibit 12 to the Ellis Declaration

← **Post**

 **Grupo Salinas** ✔
@gruposalinas

En los últimos años, @Azteca ha enfrentado y superado grandes desafíos financieros: desde el pago de licencias al gobierno en 2018, el impacto negativo del COVID-19, una negociación compleja con acreedores internacionales y, recientemente, el pago al @SATMX.

Este contexto nos obliga a ser responsables y tomar acciones decisivas para sanear las finanzas y reordenar los pasivos de la compañía.

Es por ello que hoy, en su Asamblea de Accionistas, fue aprobada la reorganización corporativa, operativa y financiera de la empresa, mediante un concurso mercantil voluntario, herramienta legal que le permitirá preservar su valor y asegurar su continuidad operativa.

Acá más información sobre el tema:

Translate post



10:39 AM · Feb 26, 2026 · **1.3M** Views



# INICIA TV AZTECA
# PROCESO DE REORGANIZACIÓN

*– Ante los retos de una industria dinámica, la transformación del ecosistema publicitario, el crecimiento del mundo digital, la presión derivada del pago de licencias en 2018, el impacto del COVID-19 y el pago total de los impuestos al SAT este año, los accionistas aprobaron la reorganización de sus pasivos mediante un concurso mercantil voluntario –*

*– Esta estrategia permitirá a la compañía garantizar la continuidad de sus operaciones a largo plazo para seguir cerca de sus audiencias, colaboradores y clientes –*

**Ciudad de México, 26 de febrero de 2026**— Como es sabido, en los últimos años, la industria de la televisión —en México y a nivel global— ha enfrentado transformaciones profundas, como la evolución del mundo publicitario y la irrupción transversal del ecosistema digital.

Adicionalmente al entorno internacional, la empresa enfrentó retos financieros importantes: desde el desembolso de más de 3,800 millones de pesos por las licencias en 2018, hasta la pandemia de COVID-19, que impactó la inversión publicitaria y afectó las ventas.

Asimismo, en 2021, se inició un proceso responsable para reorganizar sus compromisos financieros, incluida su deuda en moneda extranjera. Desde entonces, ha privilegiado el diálogo para alcanzar un acuerdo justo, acorde con las circunstancias que atraviesa la empresa.

A todo lo anterior se suma el pago de los impuestos al Servicio de Administración Tributaria (SAT) el pasado mes de enero, que fue liquidado en su totalidad, lo que implicó otro impacto financiero significativo.

Frente a este escenario complejo, son necesarias una serie de estrategias y acciones decisivas enfocadas en sanear sus finanzas y ordenar integralmente sus pasivos. Es por ello que, como parte de los acuerdos alcanzados en su Asamblea General Extraordinaria de Accionistas del día de hoy, fue aprobada la reorganización corporativa, operativa y financiera de la compañía y sus empresas subsidiarias mediante un concurso mercantil voluntario, cuya solicitud se presentará en los próximos días.

Sobre este mecanismo legal, Rafael Rodríguez Sánchez, Director General de TV Azteca, comentó: "*El concurso mercantil permite, con la supervisión de un juez, reordenar de manera estructurada y equitativa los pasivos de una empresa de acuerdo con su capacidad de pago. Se trata de una herramienta de última instancia que busca preservar el valor de la compañía, asegurar la continuidad de sus operaciones y facilitar el cumplimiento ordenado de sus obligaciones sin interrumpir su funcionamiento, lo que demuestra una decisión responsable por parte de la empresa*".

TV Azteca mantiene su compromiso de fortalecer sus eficiencias financieras y operativas, con el objetivo de garantizar su gran capacidad para generar y producir contenidos de alta calidad y relevancia que le permitan seguir acompañando a México en el vasto mundo multiplataforma en el largo plazo.

**---000---**

**Relación con Prensa:**
Luciano Pascoe
Tel. +52 (55) 1720 1313 ext. 36553
lpascoe@gruposalinas.com.mx

| Posts | Affiliates | Answers | Highlights | (Illegible) |

*[Logo: Grupo Salinas Since 1906]*

This tweet comes from the following link: https://x.com/gruposalinas/status/2027045771065819616?s=20

## Grupo Salinas ✅ @gruposalinas 4 d          X

In recent years, @Azteca has faced and overcome major financial challenges: from paying government licenses in 2018, to the negative impact of COVID-19, complex negotiations with international creditors, and, most recently, payment to @SATMX.

This context forces us to be responsible and take decisive action to clean up the company's finances and reorganize its liabilities.

That is why today, at its Shareholders' Meeting, the corporate, operational, and financial reorganization of the company was approved through voluntary bankruptcy proceedings, a legal tool that will allow it to preserve its value and ensure its operational continuity.

## Here is more information on the subject:

*[Logo Tv azteca®]*

**TV AZTECA BEGINS REORGANIZATION PROCESS**

*- Given the challenges of a dynamic industry, the transformation of the advertising ecosystem, the growth of the digital world, the pressure derived from the payment of licenses in 2018, the impact of COVID-19, and the full payment of taxes to the SAT this year, shareholders approved the reorganization of their liabilities through a voluntary bankruptcy proceeding.*

*- This strategy will allow the company to ensure the continuity of its operations in the long term so that it can remain close to its audiences, collaborators, and customers –*

**Mexico City, February 26, 2026** – As is well known, in recent years, the television industry – in Mexico and globally – has faced profound transformations, such as the evolution of the advertising world and the cross-cutting emergence of the digital ecosystem.

Along with the international situation, the company faced some big financial challenges from spending over 3.8 billion pesos on licenses in 2018 to the COVID-19 pandemic, which hit advertising investment and sales.

Likewise, in 2021, a responsible process was initiated to reorganize its financial commitments, including its foreign currency debt. Since then, it has prioritized dialogue to reach a fair agreement, in line with the circumstances the company is facing.

In addition to all of the above, taxes were paid to the Tax Administration Service (SAT) last January, which were settled in full, resulting in another significant financial impact.

Faced with this complex scenario, a series of decisive strategies and actions are necessary, focused on restructuring its finances and comprehensively organizing its liabilities. That is why, as part of the agreements reached at today's Extraordinary General Shareholders' Meeting, the corporate, operational, and financial reorganization of the company and its subsidiaries was approved through a voluntary bankruptcy proceeding, the application for which will be filed in the next few days.

On this legal mechanism, Rafael Rodriguez Sánchez, CEO of TV Azteca, commented "Commercial bankruptcy allows, under the supervision of a judge, the structured and equitable reorganization of a company's liabilities in accordance with its ability to pay. It is a tool of last resort that seeks to preserve the value of the company, ensure the continuity of its operations, and facilitate the orderly fulfillment of its obligations without interrupting its operations, demonstrating a responsible decision on the part of the company."

TV Azteca remains committed to strengthening its financial and operational efficiencies, aiming to ensure its ability to generate and produce high-quality, relevant content that will enable it to continue accompanying Mexico in the vast multiplatform world over the long term.

---000---

**Press contact:**
Luciano Pascoe
Tel. +52 (55) 1720 1313 ext. 36553
lpascoe@gruposalinas.com.mx



[Logo
Tv azteca®]

# TV AZTECA BEGINS
# REORGANIZATION PROCESS

*- Given the challenges of a dynamic industry, the transformation of the advertising ecosystem, the growth of the digital world, the pressure derived from the payment of licenses in 2018, the impact of COVID-19, and the full payment of taxes to the SAT this year, shareholders approved the reorganization of their liabilities through a voluntary bankruptcy proceeding.*

*- This strategy will allow the company to ensure the continuity of its operations in the long term so that it can remain close to its audiences, collaborators, and customers –*

**Mexico City, February 26, 2026 –** As is well known, in recent years, the television industry – in Mexico and globally – has faced profound transformations, such as the evolution of the advertising world and the cross-cutting emergence of the digital ecosystem.

Along with the international situation, the company faced some big financial challenges: from spending over 3.8 billion pesos on licenses in 2018 to the COVID-19 pandemic, which hit advertising investment and sales.

Likewise, in 2021, a responsible process was initiated to reorganize its financial commitments, including its foreign currency debt. Since then, it has prioritized dialogue to reach a fair agreement, in line with the circumstances the company is facing.

In addition to all of the above, taxes were paid to the Tax Administration Service (SAT) last January, which were settled in full, resulting in another significant financial impact.

Faced with this complex scenario, a series of decisive strategies and actions are necessary, focused on restructuring its finances and comprehensively organizing its liabilities. That is why, as part of the agreements reached at today's Extraordinary General Shareholders' Meeting, the corporate, operational, and financial reorganization of the company and its subsidiaries was approved through a voluntary bankruptcy proceeding, the application for which will be filed in the next few days.



On this legal mechanism, Rafael Rodríguez Sánchez, CEO of TV Azteca, commented: "Commercial bankruptcy allows, under the supervision of a judge, the structured and equitable reorganization of a company's liabilities in accordance with its ability to pay. It is a tool of last resort that seeks to preserve the value of the company, ensure the continuity of its operations, and facilitate the orderly fulfillment of its obligations without interrupting its operations, demonstrating a responsible decision on the part of the company."

TV Azteca remains committed to strengthening its financial and operational efficiencies, aiming to ensure its ability to generate and produce high-quality, relevant content that will enable it to continue accompanying Mexico in the vast multiplatform world over the long term.

---000---

**Press contact:**
Luciano Pascoe
Tel. +52 (55) 1720 1313 ext. 36553
lpascoe@gruposalinas.com.mx

2



TRANSLATION CERTIFICATE (SPANISH TO ENGLISH)

The undersigned interpreter and translator **Luis Alberto Cruz Aguilar** authorized by the Superior Court of Justice of Mexico City as *Expert Translator in Foreign Languages: "English"*, in accordance with **Order 41-04/2024** issued by the Judiciary Council of Mexico City and the current *List of Auxiliary Experts for the Administration of Justice of the Judicial Branch of Mexico City* published in the *Judicial Bulletin* No. 34 of February 23, 2024 and which took effect on that same date, hereby **CERTIFIES** by affixing my seal and rubric on each of the 03 (_____ "three" _____) page(s) hereof, that this document is a true, faithful and complete translation to the best of my knowledge and belief of the original document before me.

In Mexico City, on ___March___ 03 2026

# Exhibit 13 to the Ellis Declaration

TV Azteca took $290m loan from Caribbean bank days before bankruptcy filing (9fin)

 **TV Azteca**

---

9fin-Distressed    LATAM

# TV Azteca took $290m loan from Caribbean bank days before bankruptcy filing (9fin)

08:05 16 April 2026 • 3 min read

_Édgar Sígler_ and _Xóchitl Herrera_

Mexican broadcaster TV Azteca signed a MXN 5bn ($290m) loan with financial institution Alterbank to partially pay the MXN 10.4bn ($600m) it owed to Mexico's tax authority SAT, just days before it filed for bankruptcy protection (_concurso mercantil_), _9fin_ sources said.

The loan from Alterbank, a Saint Lucia-based bank, is part of the debt TV Azteca presented in its petition for protection under Mexican bankruptcy law, the sources said.

The broadcaster controlled by Mexican billionaire Ricardo Salinas Pliego fully paid the outstanding taxes, instead of accepting a settlement offer from the SAT to pay 25% upfront and the remainder over the next 18 months starting in February, said one source. That decision pushed the company to file for bankruptcy, the source added.

Meanwhile, sister company Grupo Elektra accepted a payment plan to settle its own MXN 22bn ($1.27bn) tax bill in January. A spokesperson said at the time the group would sell assets to fund both companies' payments. Both tax claims — an aggregate MXN 51bn ($3bn) before a SAT discount — were derived from a November 2025 Supreme Court ruling that ended a 20-year controversy, as reported.

TV Azteca's largest recognized debt is its defaulted $400m cross-border bond, which it listed as $532m, or 37% of total debt, the source said. TV Azteca needs over 50% of creditors to agree to a restructuring plan for the court to accept it, the sources said. TV Azteca might seek a 60% haircut from creditors, although it didn't state that in the concurso filing, said one of the sources.

TV Azteca took $210 million from Caribbean bank days before bankruptcy filing (9fin)

According to *9fin* sources, TV Azteca had proposed a 60% to 75% haircut to bondholders at various points during negotiations — and mediation ordered by a US court in 2023 — since the company defaulted on the 2024s in 2021. But the offer was never made officially, and the company didn't negotiate in good faith, said the sources.

The First District Court in Commercial Bankruptcy Matters in Mexico City granted the general legal protections available to companies that file for bankruptcy, but denied some specific requests such as extending protection against asset seizures to TV Azteca subsidiaries, since only the holding company filed for concurso, sources said.

TV Azteca might add some subsidiaries or affiliates — such as TV Azteca 3, the company that holds the network concessions — to the bankruptcy filing, said sources.

The debtor's lawyers have argued in a US legal proceeding that the company didn't violate the US District Court for the Southern District of New York's prior anti-suit injunction with the filing, because only the holding company filed, as reported.

Judges typically refuse to protect assets held by subsidiaries that are not filing for, or included in, the *concurso,* because Mexican bankruptcy law is designed to avoid the so-called umbrella effect, in which a company's protections extend to its subsidiaries, the sources explained. This means other TV Azteca subsidiaries may be subject to asset seizures.

The Mexican court overseeing the case approved the appointment of Samuel Egure Lascano as the visitor for this first phase of the concurso last week, according to court records. Egure, who is registered as a bankruptcy specialist with the Federal Institute of Insolvency Experts (IFECOM), must now ascertain the company meets the requirements for a bankruptcy proceeding in Mexico, and report his findings to the judge, under local law.

TV Azteca and Alterbank didn't reply to a request for comment.

# Exhibit 14 to the
# Ellis Declaration

Case 1:26-mc-23885-JEM   Document 3   Entered on FLSD Docket 06/03/2026   Page 457 of 589

Filed for registration pursuant to Section 119 (1) International Business Companies Act, Cap. 12.14
Filed by Corporate Services St. Lucia (1996) Ltd. - Registered Agent

# REGISTERS OF ALTER BANK LTD.

# COMPANY REGISTRATION # 2007 - 00022

At January 28, 2026

## 1.    Registered Office Details and Changes of Registered Office

The Registered Office of Alter Bank Ltd. is:

Pointe Seraphine
P. O. Box 195
Castries
Saint Lucia



# Alter Bank Ltd.

*formerly StateTrust Bank & Trust Ltd.*

## IBC # 2007-00022 incorporated on January 23rd, 2007.

## 2.    Share Register

**Class of Shares: Common**                                   **Authorized Share Capital:  US$3,000,000.00**

| No. | Date of Application | Name, address and description of applicant | No of Shares Applied For | Amount of Deposits | Distinctive nos. of shares allotted | | Total Amount in respect of shares allocated | Certificate Number | Notes |
|---|---|---|---|---|---|---|---|---|---|
| | | | | | From | To | | | |
| 1 | January 23, 2007 | StateTrust International Holding Company Inc. Pointe Seraphine Castries St. Lucia | 500,000 | $500,000 | 1 | 500,000 | 500,000 | 1 | CANCELLED 366,923 shares redeemed further to Master Agreement and Plan of Reorganization. |
| 2 | October 1, 2016 | StateTrust International Holding Company Inc. Pointe Seraphine Castries St. Lucia | 133,077 | - | 1 | 133,077 | 133,077 | 2 | CANCELLED Shares transferred to Juan Francisco Ramirez. |
| 3 | March 22, 2023 | Juan Francisco Ramirez 2821 S Bayshore Dr Unit 11C Miami, Florida 33133 | 133,077 | - | 1 | 133,077 | 133,077 | 3 | CANCELLED Shares transferred to Augusto Cesar Castillo. |
| 4 | December 30, 2024 | Augusto Cesar Castillo Chavez Galileo 339, PH 401 Colonia Polanco Mexico City Mexico | 133,077 | - | 1 | 133,077 | 133,077 | 4 | |



SAINT LUCIA
REGISTRY OF INTERNATIONAL BUSINESS

FEB 17 2026

FILED

Case 1:26-mc-23885-JEM   Document 3   Entered on FLSD Docket 06/03/2026   Page 459 of 589

# Alter Bank Ltd.
*formerly StateTrust Bank & Trust Ltd.*
### IBC # 2007-00022 incorporated on January 23rd, 2007.

## 2.1 Register of Beneficial Owners

| Name | Address | Nationality | Number of Shares Held | Percentage (%) Ownership |
|------|---------|-------------|-----------------------|--------------------------|
| | | | | |
| Augusto Cesar Castillo Chavez | Galileo 339, PH 401 Colonia Polanco Mexico City Mexico | Venezuelan | 133,077 | 100% |



SAINT LUCIA
REGISTRY OF INTERNATIONAL BUSINESS

FEB 17 2026

FILED

Case 1:26-mc-23885-JEM   Document 3   Entered on FLSD Docket 06/03/2026   Page 460 of 589

# Alter Bank Ltd.

*formerly StateTrust Bank & Trust Ltd.*

**IBC # 2007-00022 incorporated on January 23rd, 2007.**

## 3. Register of Directors

| Name: | Jose Luis Turnes |
|---|---|
| Address: | 800 Brickell Avenue, Suite 100<br>Miami<br>Florida, 33131 |
| Business Occupation: | Director |
| Nationality | American |
| Date of Appointment | January 23, 2007 |
| Date of Resignation | April 11, 2023 |
| | |
| | |

| Name: | David Vurgait |
|---|---|
| Address: | 800 Brickell Avenue, Suite 100<br>Miami<br>Florida, 33131 |
| Business Occupation: | Director |
| Nationality | American |
| Date of Appointment | January 23, 2007 |
| Date of Resignation | September 30, 2019 |
| | |
| | |



SAINT LUCIA
REGISTRY OF INTERNATIONAL BUSINESS
FEB 17 2026
FILED

## Alter Bank Ltd.

*formerly StateTrust Bank & Trust Ltd.*

**IBC # 2007-00022 incorporated on January 23rd, 2007.**

| | |
|---|---|
| Name: | Lourdes Ponte |
| Address: | 800 Brickell Avenue, Suite 100<br>Miami<br>Florida, 33131 |
| Business Occupation: | Director |
| Nationality | American |
| Date of Appointment | January 23, 2007 |
| Date of Resignation | April 11, 2023 |
| | |
| | |

| | |
|---|---|
| Name: | Uri Benhamron |
| Address: | 800 Brickell Avenue, Suite 100<br>Miami<br>Florida, 33131 |
| Business Occupation: | Director |
| Nationality | American |
| Date of Appointment | January 23, 2007 |
| Date of Resignation | June 30, 2008 |
| | |
| | |



SAINT LUCIA
REGISTRY OF INTERNATIONAL BUSINESS

FEB 17 2026

FILED

# Alter Bank Ltd.

*formerly StateTrust Bank & Trust Ltd.*

## IBC # 2007-00022 incorporated on January 23rd, 2007.

| | |
|---|---|
| Name: | Kendall Gill |
| Address: | Castries<br>St. Lucia |
| Business Occupation: | Director |
| Nationality | St. Lucian |
| Date of Appointment | April 1, 2009 |
| Date of Resignation | - |
| | |
| | |

| | |
|---|---|
| Name: | Rene Emilio Faria Gonzalez |
| Address: | 110 Beverly Street, at. 604<br>Boston, Masachusetts<br>02114, USA |
| Business Occupation: | Director |
| Nationality | Venezuelan |
| Date of Appointment | November 20, 2019 |
| Date of Resignation | April 11, 2023 |
| | |
| | |



SAINT LUCIA
REGISTRY OF INTERNATIONAL BUSINESS

FEB 17 2026

FILED

Case 1:26-mc-23885-JEM   Document 3   Entered on FLSD Docket 06/03/2026   Page 463 of 589

*Alter Bank Ltd.*

*formerly StateTrust Bank & Trust Ltd.*

*IBC # 2007-00022 incorporated on January 23rd, 2007.*

## 3.   Register of Directors

| Name: | Juan Francisco Ramirez |
|---|---|
| Address: | 2821 S Bayshore Drive<br>Unit 11C<br>Miami, Florida<br>USA 33133 |
| Business Occupation: | Director |
| Nationality | American |
| Date of Appointment | April 11, 2023 |
| Date of Resignation | December 30, 2024 |
| | |
| | |

| Name: | Wilbert Owen Bascom |
|---|---|
| Address: | 15681 SW 147th CT<br>Miami, Florida<br>USA, 33187 |
| Business Occupation: | Director |
| Nationality | American |
| Date of Appointment | April 11, 2023 |
| Date of Resignation | Deceased |
| | |
| | |

SAINT LUCIA
REGISTRY OF INTERNATIONAL BUSINESS

FEB 17 2026

FILED

Case 1:26-mc-23885-JEM   Document 3   Entered on FLSD Docket 06/03/2026   Page 464 of 589

**Alter Bank Ltd.**

*formerly StateTrust Bank & Trust Ltd.*

**IBC # 2007-00022 incorporated on January 23rd, 2007.**

| Name: | Blas Santander |
|---|---|
| Address: | 2501 SW 24th Avenue<br>Miami<br>Florida, USA |
| Business Occupation: | Director |
| Nationality | American |
| Date of Appointment | September 20, 2023 |
| Date of Resignation | - |
| | |
| | |

| Name: | Tomas Hernandez |
|---|---|
| Address: | Cond la Castellana<br>Etapa 2<br>Calle Cibeles<br>Polg B, Casa No. 17<br>San Salvador, El Salvador |
| Business Occupation: | Director |
| Nationality | Spanish |
| Date of Appointment | September 20, 2023 |
| Date of Resignation | April 14, 2025 |
| | |
| | |



SAINT LUCIA
REGISTRY OF INTERNATIONAL BUSINESS

FEB 17 2026

FILED

## Alter Bank Ltd.

*formerly StateTrust Bank & Trust Ltd.*

**IBC # 2007-00022 incorporated on January 23rd, 2007.**

| Name: | Augusto Cesar Castillo Chavez |
|---|---|
| Address: | Galileo 339, PH 401<br>Colonia Polanco<br>Mexico City<br>Mexico |
| Business Occupation: | Businessman |
| Nationality | Venezuelan |
| Date of Appointment | December 30, 2024 |
| Date of Resignation | - |
| | |
| | |

| Name: | Alexander Soroka |
|---|---|
| Address: | 952 Mockingbird<br>Apt 603 Plantation<br>FL 33324<br>USA |
| Business Occupation: | Director |
| Nationality | - |
| Date of Appointment | April 16, 2025 |
| Date of Resignation | - |
| | |
| | |



SAINT LUCIA
REGISTRY OF INTERNATIONAL BUSINESS
FEB 17 2026
FILED

Case 1:26-mc-23885-JEM   Document 3   Entered on FLSD Docket 06/03/2026   Page 466 of 589

**Alter Bank Ltd.**
*formerly StateTrust Bank & Trust Ltd.*
**IBC # 2007-00022 incorporated on January 23rd, 2007.**

| | |
|---|---|
| Name: | Timothy Richards |
| Address: | 2000 Salzedo Street<br>Apartment 806<br>Coral Gables<br>Florida, USA |
| Business Occupation: | Attorney |
| Nationality | American |
| Date of Appointment | July 17, 2025 |
| Date of Resignation | - |
| | |
| | |



SAINT LUCIA
REGISTRY OF INTERNATIONAL BUSINESS

FEB 17 2026

FILED

**Alter Bank Ltd.**

*formerly StateTrust Bank & Trust Ltd.*

*IBC # 2007-00022 incorporated on January 23rd, 2007.*

## 6. Register of Secretaries

| Name: | Uri Benhamron |
|---|---|
| Address: | 800 Brickell Avenue, Suite 100 Miami Florida, 33131 |
| Business Occupation: | Director |
| Nationality | |
| Date of Birth | |
| Date of Appointment | January 23, 2007 |
| Date of Resignation | June 30, 2008 |
| | |
| | |

| Name: | Lourdes Ponte |
|---|---|
| Address: | 800 Brickell Avenue, Suite 100 Miami Florida, 33131 |
| Business Occupation: | Director |
| Nationality | |
| Date of Birth | - |
| Date of Appointment | June 30, 2008 |
| Date of Resignation | April 11, 2023 |
| | |
| | |



SAINT LUCIA
REGISTRY OF INTERNATIONAL BUSINESS
FEB 17 2026
FILED

**Alter Bank Ltd.**

*formerly StateTrust Bank & Trust Ltd.*

**IBC # 2007-00022 incorporated on January 23rd, 2007.**

| Name: | Alejandro Cespedes |
|---|---|
| Address: | 2967 Bridgeport Ave<br>Miami<br>Florida, USA |
| Business Occupation: | Economist |
| Nationality | American |
| Date of Birth | - |
| Date of Appointment | April 11, 2023 |
| Date of Resignation | NA |
| | |
| | |

| Name: | Aurea Lafeuillee |
|---|---|
| Address: | South Hills<br>Cap Estate<br>Gros Islet<br>S. Lucia |
| Business Occupation: | Accountant |
| Nationality | St. Lucian |
| Date of Birth | - |
| Date of Appointment | April 25, 2025 |
| Date of Resignation | - |
| | |
| | |

SAINT LUCIA
REGISTRY OF INTERNATIONAL BUSINESS
FEB 17 2026
FILED

# Exhibit 15 to the
# Ellis Declaration



## INTERNATIONAL BUSINESS COMPANIES ACT, CAP 12.14

### SECTION 9

## APPLICATION TO REGISTER AMENDMENT TO
## ARTICLES & MEMORANDUM OF ASSOCIATION

| Name of Company: | STATE TRUST BANK & TRUST LTD. |
|---|---|

We, **Corporate Services St. Lucia (1996) Limited**  (Licensed Registered Agent No. **RA 007**), hereby apply to register an amendment to the MEMORANDUM of the above-named Company and append hereto the amended and restated Memorandum of Association of the International Business Company.

This amendment is required for the purposes of being compliant with the changes in law pursuant to the International Business Companies (Amendment) Act (No. 17 of 2019).

We certify that the amendment has been effected by RESOLUTION and in accordance with the Act.

Signed by: ...........................................

**Corporate Services St. Lucia (1996) Limited**
Registered Agent

27/04/23
Date

---

I certify that this document was registered on this 19th day of May 2023.

...........................................
REGISTRAR
International Business Companies

SAINT LUCIA
REGISTRY OF INTERNATIONAL BUSINESS

MAY 19 2023

FILED

## SAINT LUCIA

### CERTIFICATE OF AMENDMENT

*(International Business Companies Act, Cap 12.14: section 10 (5))*

> **Alter Bank Ltd.**
> **No. 2007-00022**

Name of Company/Number of Company

This is to certify that the above named international business company has changed its name from
**StateTrust Bank & Trust Ltd.**

Dated this 19 May 2023.

_____

**Registrar**
**International Business Companies**

SAINT LUCIA
REGISTRY OF INTERNATIONAL BUSINESS

MAY 19 2023

FILED

**StateTrust Bank & Trust Ltd.**
**IBC No. 2007 - 00022**

### AMENDMENT FOR CHANGE OF NAME

Pursuant to Article 76 of the Articles of Association and Section 12, of the Memorandum of Association, of **StateTrust Bank & Trust Ltd.,** (herein after referred to as the Company):

| | |
|---|---|
| **ARTICLES /**<br>**MEMORANDUM**<br>**OF ASSOCIATION** | **BE IT RESOLVED** that the Articles and Memorandum of Association of the Company be amended and name of the Company shall be changed to **Alter Bank Ltd.** |

Signed by:     **Corporate Services St. Lucia (1996) Limited**
Per:

SAINT LUCIA
REGISTRY OF INTERNATIONAL BUSINESS

MAY 19 2023

FILED

_____
Registered Agent

_____27/04/23_____
Date



# SAINT LUCIA

## THE INTERNATIONAL BUSINESS COMPANIES ACT, 12.14

### AMENDED AND RESTATED
### MEMORANDUM OF ASSOCIATION
### OF

### Alter Bank Ltd.

### International Business Company

1.  The Name of the Company is **Alter Bank Ltd.**

2.  The Registered Agent of the Company will be **Corporate Services St. Lucia (1996) Limited.**

3.  The Registered Office of the Company will be located at the offices of **Corporate Services St. Lucia (1996) Limited, Pointe Seraphine, Castries, St. Lucia.**

4.  (1) The Company is established to engage in any act or activity that is not prohibited under any law in force in Saint Lucia.

    (2) The Company shall have all such powers as are permitted by law in force in Saint Lucia, irrespective of corporate benefit, to perform all acts and engage in all activities necessary or conducive to the conduct, promotion or attainment of the object of the Company.

    (3) The Company may not, unless it is licensed to do so under the law in force in Saint Lucia carry on—

    (a) banking business;

    (b) the business of insurance or reinsurance;

    (c) mutual fund business or the business of mutual fund administration;

    (d) the business of financial services representation.

    **(4) The Company will be liable to income tax under the Income Tax Act, Cap.15.02 of the revised Laws of Saint Lucia.**

REGISTRY OF INTERNATIONAL BUSINESS

MAY 19 2023

FILED

5. Shares in the company shall be issued in the currency of **United States Dollars.**

6. Capital - the authorised capital of the Company is **$3,000,000**; and the authorised capital is made up of 3,000,000 common shares at $1.00 par value with one vote for each share.

7. The designations, powers, preferences, rights, qualifications, limitations and restrictions of each class and series of shares that the company is authorised to issue shall be fixed by a resolution of the directors, but the directors shall not allocate different rights as to voting, dividends, redemption or distributions on liquidation unless the Memorandum of Association is amended to create separate classes of shares and all the aforesaid rights as to voting, dividends, redemption and distributions is identical in each separate class.

8. If at any time the authorised capital is divided into different classes or series of shares, the rights attached to any class or series (unless otherwise provided by the terms of issue of the shares of that class or series) may, whether or not the Company is being wound up, be varied with the consent in writing of the holders of not less than 3/4 of the issued shares of that class or series and of the holders of not less than 3/4 of the issued shares of any other class or series of shares which may be affected by such variation.

9. The rights conferred on the holders of the shares of any class issued with preferred or other rights shall not, unless otherwise expressly provided by the terms of the issue of the shares of that class, be deemed to be varied by the creation or issue of further shares ranking pari pasu therewith.

10. The Company may amend its Memorandum of Association and Articles of Association by a resolution of members or directors.

11. The meaning of words in this Memorandum of Association is as defined in the Articles of Association.

For the purpose of amending the above-named International Business Company under the laws of Saint Lucia, Corporate Services St. Lucia (1996) Limited hereby subscribe our name to this Memorandum of Association on this 27th day of April, 2023.

..............................................                    ..............27/4/23..............

**REGISTERED AGENT**                              **DATE**

SAINT LUCIA
REGISTRY OF INTERNATIONAL BUSINESS

MAY 19 2023

FILED

# ARTICLES OF ASSOCIATION
## OF
### Alter Bank Ltd. - IBC

1. In these Articles, if not inconsistent with the subject or context, the words and expressions standing in the first column of the following table shall bear the meanings set opposite them respectively in the second column thereof.

| Words | Meanings |
|---|---|
| capital | The sum of the aggregate par value of all out-standing shares with par value of the Company and shares with par value held by the Company as treasury shares plus: |
| | (a) the aggregate of the amounts designated as capital of all outstanding shares without par value of the Company and shares without par value held by the Company as treasury shares, and |
| | (b) the amounts as are from time to time transferred from surplus to capital by a resolution of directors. |
| member | A person who holds shares in the Company. |
| resolution of directors | (a) a resolution approved at a duly constituted meeting of directors of the Company or of a committee of directors of the Company by the affirmative vote of a simple majority of the directors present who voted and did not abstain where the meeting was called on proper notice or if on short notice, if those directors not present have waived notice; or |
| | (c) a resolution consented to in writing by all directors or of all members of the committee, as the case may be. |
| resolution of members | (a) A resolution approved at a duly constituted meeting of the members of the Company by the affirmative vote of: |
| | i. a simple majority of the votes of the shares which were present at the meeting and were voted and not abstained, or |
| | ii. a simple majority of the votes of each class or series of shares which were present at the meeting and entitled to vote thereon as a class or series and were voted and not abstained and of a simple majority of the votes of the |



SAINT LUCIA
REGISTRY OF INTERNATIONAL BUSINESS

MAY 19 2023

FILED

1

remaining shares entitled to vote thereon which were present at the meeting and were voted and not abstained; or

(b)  a resolution consented to in writing by:

i.   an absolute majority of the votes of shares entitled to vote thereon, or

ii.  an absolute majority of the votes of each class or series of shares entitled to vote thereon as a class or series and of an absolute majority of the votes of the remaining shares entitled to vote thereon;

| | |
|---|---|
| securities | Shares and debt obligations of every kind, and options, warrants and rights to acquire shares, or debt obligations. |
| surplus | The excess, if any at the time of the determination, of the total assets of the Company over the aggregate of its total liabilities, as shown in its books of account, plus the Company's capital. |
| the Memorandum | The Memorandum of Association of the Company as originally framed or as from time to time amended. |
| the Act | The International Business Companies Act, 1999. |
| the Seal | The Common Seal of the Company. |
| these Articles | These Articles of Association as originally framed or as from time to time amended. |
| treasury Shares | Shares in the Company that were previously issued but were repurchased, redeemed or otherwise acquired by the Company and not cancelled. |

"Written" or any term of like import includes words typewritten, printed, painted, engraved, lithographed, photographed or represented or reproduced by any mode of representing or reproducing words in a visible form.

In these Articles the word "person" includes a trust, the estate of a de-ceased individual, a partnership, or an unincorporated association of persons.

Save as aforesaid any words or expressions defined in the Act shall bear the same meaning in these Articles.

2

Words denoting the singular shall include the plural and vice versa and words denoting the masculine shall include the feminine.

A reference in these Articles to voting in relation to shares shall be construed as a reference to voting by members holding the shares except that it is the votes allocated to the shares that shall be counted and not the number of members who actually voted and a reference to shares being present at a meeting shall be given a corresponding construction.

A reference to money in these Articles is a reference to the currency of the United States of America unless otherwise stated.

## REGISTERED SHARES

2. The Company shall issue to every member holding shares in the Company a certificate signed by a director or officer of the Company and under the Seal specifying the share or shares held by him and the signatures of the director or officer and the Seal may be facsimiles.

3. If a share certificate for shares is worn out or lost it may be renewed on production of the worn out certificate or on satisfactory proof of its loss together with such indemnity as may be required by a resolution of directors. Any member receiving such share certificate shall indemnify and hold the Company and its directors and officers harmless from any loss or liability which it or they may incur by reason of wrongful or fraudulent use or representation made by any person by virtue of the possession of such share certificate.

4. If several persons are registered as joint holder of any shares, any one of such persons may give an effectual receipt of any dividend payable in respect of such shares.

## SHARES, AUTHORIZED CAPITAL AND CAPITAL

5. Subject to the provisions of these Articles the unissued shares of the Company shall be at the disposal of the directors who may offer, allot, grant options over or otherwise dispose of the shares to such persons, at such times and upon such terms and conditions and subject to such designations, powers, preferences, rights, qualifications, limitations and restrictions whether in regard to dividend, voting, return of capital or otherwise as the Company may be resolution of directors determine.

6. Shares in the Company shall be issued for money, services rendered, personal property, an estate in real property, a promissory note or other binding obligation to contribute money or property or any combination of the foregoing as shall be determined by a resolution of directors.

MAY 19 2023

7. Shares in the Company may be issued for such amount of consideration as the directors may from time to time by resolution of directors determine, except that in the case of shares with par value, the amount shall not be less than the par value, and in the absence

3

of fraud the decision of the directors as to the value of the consideration received by the Company in respect of the issue is conclusive unless a question of law is involved.

8.  A share issued by the Company upon conversion of, or in exchange for, another share or a debt obligation or other security in the Company, shall be treated for all purposes as having been issued for money equal to the consideration received or deemed to have been received by the Company in respect of the other share, debt obligation or security.

9.  The Company may dispose of treasury shares on such terms and conditions as the Company may by resolution of directors determine.

10. The Company may issue fractions of a share and a fractional share shall have the same corresponding fractional liabilities, limitations, preferences, privileges, qualifications, restrictions, rights and other attributes of a whole share of the same class or series of shares.

11. Upon the issue by a company incorporated under this Act of a share without par value, the consideration in respect of the share constitutes capital to the extent designated by the directors and the excess constitutes surplus, except that the directors must designate as capital an amount of the consideration that is at least equal to the amount that the shares is entitled to as a preference, if any, in the assets of the Company upon liquidation of the Company.

12. The Company may purchase, redeem or otherwise acquire and hold its own shares only out of surplus but no purchase, redemption or other acquisition shall be made unless the directors determine that immediately after the purchase, redemption or other acquisition:

    (a) the Company will be able to satisfy its liabilities as they become due in the ordinary course of its business; and

    (b) the realizable assets of the Company will not be less than the sum of its total liabilities, other than deferred taxes, as shown in the books of account, and its capital;

    and, in the absence of fraud, the decision of the directors as to the realizable assets of the Company is conclusive, unless a question of law is involved.

13. The Company may only purchase or otherwise acquire its own shares without fulfilling the requirements of Regulation 12 in exchange for newly issued shares of equal value in the Company or pursuant to an order of the court.

14. Shares that the Company purchases, redeems or otherwise acquires pursuant to Regulations 12 or 13 may be cancelled or held as treasury shares unless the shares are purchased, redeemed or otherwise acquired out of capital pursuant to Regulation 31 in which case they shall be cancelled but they shall be available for reissue. Upon the cancellation of a share, the amount included as capital of the Company with respect to that share shall be deducted from the capital of the Company.

4

15. Where shares in the Company are held by the Company as treasury shares or are held by another company of which the Company holds, directly or indirectly, shares having more than 50 percent of the votes in the election of directors of the other company, such shares of the Company are not entitled to vote or to have dividends paid thereon and shall not be treated as outstanding for any purpose except for purposes of determining the capital of the Company.

16. No notice of a trust, whether expressed, implied or constructive, shall be entered in the share register.

## TRANSFER OF SHARES

17. Subject to any limitations in the Memorandum, registered shares in the Company may be transferred by a written instrument of transfer signed by the transferor and containing the name and address of the transferee, but in the absence of such written instrument of transfer the directors may accept such evidence of a transfer of shares as they consider appropriate.

18. The Company shall not be required to treat a transferee of a registered share in the Company as a member until the transferee's name has been entered in the share register.

19. Subject to any limitations in the Memorandum, the Company must on the application of the transferor or transferee of a registered share in the Company enter in the share register the name of the transferee of the share save that the registration of transfers may be suspended and the share register closed at such times and for such periods as the Company may from time to time by resolution of directors determine provided always that such registration shall not be suspended and the share register closed for more than 60 days in any period of 12 months.

## TRANSMISSION OF SHARES

SAINT LUCIA
REGISTRY OF INTERNATIONAL BUSINESS
MAY 19 2023

20. The executor or administrator of a deceased member, the guardian of an incompetent member or the trustee of a bankrupt member shall be the only person recognized by the Company as having any title to his share but they shall not be entitled to exercise any rights as a member of the Company until they have proceeded as set forth in the next following two regulations.

21. Any person becoming entitled by operation of law or otherwise to a share or shares in consequence of the death, incompetence or bankruptcy of any member may be registered as a member upon such evidence being produced as may reasonable be required by the directors. An application by any such person to be registered as a member shall for all purposes be deemed to be a transfer of shares of the deceased, incompetent or bankrupt member and the directors shall treat it as such.

22. Any person who has become entitled to a share or shares in consequence of the death, incompetence or bankruptcy of any member may, instead of being registered himself, request in writing that some person to be named by him be registered as the transferee of such share or shares and such request shall likewise be treated as if it were a transfer.

23. What amounts to incompetence on the part of a person is a matter to be determined by the court having regard to all the relevant evidence and the circumstances of the case.

## REDUCTION OR INCREASE IN AUTHORIZED
## CAPITAL OR CAPITAL

24. With the prior or subsequent approval by a resolution of members, the Company may by a resolution of directors amend its Memorandum to increase or reduce its authorized capital and in connection therewith the Company may increase or reduce the number of shares which the Company may issue, increase or reduce the par value of any of its shares or effect any combination of the foregoing.

25. Where the Company reduces its authorized capital under the foregoing regulation, then, for purposes of computing the capital of the Company, any capital that before the reduction was represented by shares but immediately following the reduction is not longer represented by shares shall be deemed to be capital transferred from surplus to capital.

26. The Company may amend its Memorandum to divide the shares, including issued shares, of a class or series of shares into a larger number of shares of the same class or series.

27. The Company may amend its Memorandum to combine the shares, including issued shares, of a class or series of shares into a smaller number of shares of the same class or series.

28. The capital of the Company may by a resolution of directors be increased by transferring an amount of the surplus of the Company to capital and, subject to the provisions of Regulations 29 and 30, the capital of the Company may be reduced by transferring an amount of the capital of the company to surplus.

29. No reduction of capital shall be effected that reduces the capital of the Company to an amount that is less than the aggregate par value of all outstanding shares with par value and all shares with par value held by the Company as treasury shares and the aggregate of the amounts designated as capital of all outstanding shares without par value and all shares without par value held by the Company as treasury shares that are entitled to a preference, if any, in the assets of the Company upon liquidation of the Company.

30. No reduction of capital shall be effected unless the directors determine that immediately after the reduction the Company will be able to satisfy its liabilities as they become due in the ordinary course of its business and that the realizable assets of the Company will not be less than its total liabilities, other than deferred taxes, as shown in the books of the

Company and its remaining capital, and, in the absence of fraud, the decision of the directors as to the realizable value of the assets of the Company is conclusive, unless a question of law is involved.

31. Where the Company reduces its capital under Regulation 28 the  Company may:

   (a) return to its members any amount received by the Company upon the issue of any of its shares;

   (b) purchase, redeem or otherwise acquire its shares out of capital; or

   (c) cancel any capital that is lost or not represented by assets having a realizable value.

## MEETINGS AND CONSENTS OF MEMBERS

32. The directors of the Company may convene meetings of the members of the Company at such times and in such manner and places within or outside Saint Lucia as the directors consider necessary or desirable.

33. Upon the written request of members holding more than 50 percent of the outstanding voting shares in the Company the directors shall convene a meeting of members.

34. The directors shall give not less than 7 days notice of meetings of members to those persons whose names on the date the notice is given appear as members in the share register of the Company.

35. A meeting of members held in contravention of the requirement in Regulation 34 is valid:

   (a) if members holding not less than 90 percent of the total number of shares entitled to vote on all matters to be considered at the meeting, or 90 percent of the votes of each class or series of shares where members are entitled to vote thereon as a class or series  together with not less than a 90 percent majority of the remaining votes, have agreed to shorter notice of the meeting, or

   (b) if all members holding shares entitled to vote on all or any matters to be considered at the meeting have waived notice of the meeting and for this purpose presence at the meeting shall be deemed to constitute waiver.

36. The inadvertent failure of the directors to give notice of a meeting to a member, or the fact that a member has not received notice, does not invalidate the meeting.

37. A member may be represented at a meeting of members by a proxy who may speak and vote on behalf of the member.

SAINT LUCIA
REGISTRY OF INTERNATIONAL BUSINESS

MAY 19 2023

FILED

7

38.  The instrument appointing a proxy shall be produced at the place appointed for the meeting before the time for holding the meeting at which the person named in such instrument proposes to vote.

39.  An instrument appointing a proxy shall be in substantially the following form or such other form as the Chairman of the meeting shall accept as properly evidencing the wishes of the member appointing the proxy. Only members who are individuals may appoint proxies.

**[Name of Company]**

I/We _____ being a member of the above Company with _____ shares HEREBY APPOINT _____ of _____ or failing him _____ of _____ To be my/our proxy to vote for me/us at the meeting of members to be held on the _____ day of _____ and at any adjournment thereof.

**[Any restrictions on voting to be inserted here.]**

Signed this_____ day of _____

_____
*Member*

40.  The following shall apply in respect of joint ownership of shares:

(a) if two or more persons hold shares jointly each of them may be present in person or by proxy at a meeting of members and may speak as a member.

(b) if only one of the joint owners is present in person or by proxy he may vote on behalf of all joint owners, and

(c) if two or more of the joint owners are present in person or by proxy they must vote as one.

41.  A member shall be deemed to be present at a meeting of members if he participates by telephone or other electronic means and all members participating in the meeting are able to hear each other.

42.  A meeting of members is duly constituted if, at the commencement of the meeting, there are present in person or by proxy not less than 50 percent of the votes of the shares of each class or series of shares entitled to vote on resolutions of members to be considered at the meeting. If a quorum be present, notwithstanding the fact that such quorum may be represented by only one person then such person may resolve any matter and a certificate signed by such person accompanied where such person be a proxy by a copy of the proxy form shall constitute a valid resolution of members.

8

43. If within two hours from the time appointed for the meeting a quorum is not present, the meeting, if convened upon the requisition of members, shall be dissolved; in any other case it shall stand adjourned to the next business day at the same time and place or to such other time and place as the directors may determine, and if at the adjourned meeting there are not present within one hour from the time appointed for the meeting in person or by proxy not less than one third of the votes of the shares or each class or series of shares entitled to vote on the resolutions to be considered by the meting, the meeting shall be dissolved.

44. At every meeting of members, the Chairman of the Board of Directors shall preside as chairman of the meeting. If there is not Chairman of the Board of Directors or if the Chairman of the Board of Directors is not present at the meeting, the members present shall choose some one of their number to be the chairman. If the members are unable to choose a chairman for any reason, then the person representing the greatest number of voting shares present in person or by prescribed form of proxy at the meeting shall preside as chairman failing which the oldest individual member or representative of a member present shall take the chair.

45. The chairman may, with the consent of the meeting, adjourn any meeting from time to time, and from place to place, but no business shall be transacted at any adjourned meeting other than the business left unfinished at the meeting from which the adjournment took place.

46. At any meeting of the members the chairman shall be responsible for deciding in such manner as he shall consider appropriate whether any resolution has been carried or not and the result of his decision shall be announced to the meeting and recorded in the minutes thereof. If the chairman shall have any doubt as to the outcome of any resolution put to the vote, he shall cause a poll to be taken of all votes cast upon such resolution, but if the chairman shall fail to take a poll then any member present in person or by proxy who disputes the announcement by the chairman of the result of any vote may immediately following such announcement demand that a poll be taken and the chairman shall there-upon cause a poll to be taken. If a poll is taken at any meeting, the result thereof shall be duly recorded in the minutes of that meting by the chairman.

47. Any person other than an individual shall be regarded as one member and subject to Regulation 48 the right of any individual to speak for or represent such member shall be determined by the law of the jurisdiction where, and by the documents by which, the person is constituted or derives its existence. In case of doubt, the directors may in good faith seek legal advice from any qualified person and unless and until a court of competent jurisdiction shall otherwise rule, the directors may rely and act upon such advice without incurring any liability to any member.

MAY 19 2023

48. Any person other than an individual which is a member of the Company may by resolution of its directors or other governing body authorize such person as it thinks fit to act as its representative at any meeting of the Company or of any class of members of the

9

Company, and the person so authorized shall be entitled to exercise the same powers on behalf of the person which he represents as that person could exercise of it were an individual member of the Company.

49. The chairman of any meeting at which a vote is cast by proxy or on behalf of any person other than an individual may call for a notarially certified copy of such proxy or authority which shall be produced within 7 days of being so requested or the votes cast by such proxy or on behalf of such person shall be disregarded.

## DIRECTORS

50. The first directors of the Company shall be elected by the subscribers to the Memorandum and thereafter, the directors shall be elected by the directors or the members for such term as the directors or the members determine. A director may be an individual or a company.

51. The minimum number of directors shall be three and the maximum number shall be ten.

52. Each director shall hold office until his successor takes office or until his death, resignation or removal.

53. A director may be removed from office, with or without cause, by a resolution of members or by resolution of directors.

54. A director may resign his office by giving written notice of his resignation to the Company and the resignation shall have effect from the date the notice is received by the Company or from such later date as may be specified in the notice.

55. A vacancy in the Board of Directors may be filled by a resolution of members or by a resolution of a majority of the remaining directors.

56. With the prior or subsequent approval by a resolution of members, the directors may, by a resolution of directors, fix the emoluments of directors with respect to services to be rendered in any capacity to the Company.

57. A director shall not require a share qualification, but nevertheless shall be entitled to attend and speak at any meeting of the members of the Company and at any separate meeting of the holders of any class or series of shares in the Company.

## POWERS OF DIRECTORS

58. The business and affairs of the Company shall be managed by the directors who may pay all expenses incurred preliminary to and in connection with the formation and registration of the Company and may exercise all such powers of the Company as are not by the Act or by the Memorandum or these Articles required to be exercised by the members of the Company, subject to any delegation of such powers as may be

authorized by these Articles and to such requirements as may be prescribed by a resolution of members; but no requirement made by a resolution of members shall prevail if it be inconsistent with these Articles nor shall such requirement invalidate any prior act of the directors which would have been valid if such requirement had not been made.

59.   The directors may, by a resolution of directors, appoint any person, including a person who is a director, to be an officer or agent of the Company.

60.   Every officer or agent of the Company has such powers and authority of the directors, including the power and authority to affix the Seal, as are set forth in these Articles or in the resolution of directors appointing the officer or agent, except that no officer or agent has any power or authority with respect to the matters requiring a resolution of directors under the Act.

61.   Any director who is a body corporate may appoint any person its duly authorized representative for the purpose of representing it at meetings of the Board of Directors or with respect to unanimous written consents.

62.   The continuing directors may act notwithstanding any vacancy in their body, save that if their number is reduced below the number fixed by or pursuant to these Articles as the necessary quorum for a meeting of directors, the continuing directors or director may act only for the purpose of increasing the number of directors to that number or summoning a meeting of members.

63.   All cheques, promissory notes, drafts, bills of exchange and other negotiable instruments and all receipts for moneys paid to the Company, shall be signed, drawn, accepted, endorsed or otherwise executed, as the case may be, in such manner as the directors shall from time to time by resolution determine.

## PROCEEDINGS OF DIRECTORS

SAINT LUCIA
REGISTRY OF INTERNATIONAL BUSINESS
MAY 19 2023

64.   The directors of the Company or any committee thereof may meet at such times and in such manner and places within or outside Saint Lucia as the directors may determine to be necessary or desirable.

65.   A director shall be deemed to be present at a meeting of directors if he participates by telephone or other electronic means and all directors participating in the meeting are able to hear each other.

66.   A director shall be given not less than 3 days notice of meetings of directors. A meeting of directors held without 3 days notice having been given to all directors shall be valid if all the directors entitled to vote at the meeting have waived notice of the meeting and for this purpose, the presence of a director at a meeting shall be deemed to constitute a waiver on his or her part. The inadvertent failure to give notice of a meeting to a director, or the fact that a director has not received the notice, does not invalidate the meeting.

11

67.  A director may by a written instrument appoint an alternate who need not be a director and an alternate is entitled to attend meetings in the absence of the director who appointed him and to vote or consent in place of the director.

68.  A meeting of directors is duly constituted for all purposes if at the commencement of the meeting there are present in person or by alternate not less than one half of the total number of directors, unless there are only 2 directors in which case the quorum shall be 2.

69.  If the Company shall have only one director the provisions herein contained for meetings of the directors shall not apply but such sole director shall have full power to represent and act for the Company in all matters as are not by the Act or the Memorandum or these Articles required to be exercised by the members of the Company and in lieu of minutes of a meeting shall record in writing and sign a note or memorandum of all matters requiring a resolution of directors. Such a note or memorandum shall constitute sufficient evidence of such resolution for all purposes.

70.  At every meeting of the directors the Chairman of the Board of Directors shall preside as chairman of the meeting. If there is no chairman of the Board of Directors or if the Chairman of the Board of Directors is not present at the meeting the Vice-Chairman of the Board of Directors shall preside. If there is no Vice Chairman of the Board of Directors or if the Vice Chairman of the Board of Directors is not present at the meeting the directors present shall choose some one of their number to be chairman of the meeting.

71.  The directors shall cause the following corporate records to be kept:

    (a) minutes of all meetings of directors, members, committees of directors, committees of officers and committees of members;

    (b) copies of all resolutions consented to by directors, members, committees of directors, committees of officers and committees of members; and

    (c) such other accounts and records as the directors by resolution of directors consider necessary or desirable in order to reflect the financial position of the Company.

72.  The books, records and minutes shall be kept at the registered office of the Company.

73.  The directors may, by a resolution of directors, designate one or more committees each consisting of one or more directors.

74.  Each committee of directors has such powers and authorities as the directors, including the power and authority to affix the Seal as set forth in the resolution of directors establishing the committee, except that no committee has any power or authority with respect to the matters requiring a resolution of directors under Regulations 55 and 59.

12

75. The meetings and proceedings of each committee of directors consisting of 2 or more members shall be governed mutatis mutandis by the provisions of these Articles regulating the proceedings of directors so far as the same are not suspended by any provisions in the resolution establishing the committee.

## OFFICERS

76. The Company may by resolution of directors appoint officers of the Company at such times as shall be considered necessary or expedient. Such officers may consist of a Chairman of the Board of Directors, a Vice Chairman of the Board of Directors, a President and one or more Vice Presidents, Secretaries and Treasurers and such other officers as may from time to time be deemed desirable. Any number of offices may be held by the same person.

77. The officers shall perform such duties as shall be prescribed at the time of their appointment subject to any modification in such duties as may be prescribed thereafter by resolution of directors or resolution of members, but in the absence of any specific allocation of duties it shall be the responsibility of the Chairman of the Board of Directors to preside at all meetings of directors and members, the Vice Chairman to act in the absence of the Chairman, the President to manage the day to day affairs of the Company, the Vice Presidents to act in order of seniority in the absence of the President but otherwise to perform such duties as may be delegated to them by the President, the Secretaries to maintain the share register, minute books and records (other than financial records) of the Company and to ensure compliance with all procedural requirements imposed on the Company by applicable law, and the Treasurer to be responsible for the financial affairs of the Company.

78. The salaries of all officers shall be fixed by resolution of directors.

79. The officers of the Company shall hold office until their successors are duly elected and qualified, but any officer elected or appointed by the directors may be removed at any time, with or without cause, by resolution of directors. Any vacancy occurring in any office of the Company may be filled by resolution of directors.

SAINT LUCIA
REGISTRY OF INTERNATIONAL BUSINESS
MAY 19 2023

## CONFLICT OF INTERESTS

80. If the requirements of Regulations 81 and 82 are satisfied, no agreement or transaction between the Company and one or more of its directors or liquidators, or any person in which any director or liquidator has a financial interest or to whom any director or liquidator is related, including as a director or liquidator of that other person, is void or voidable for this reason only or by reason only that the director or liquidator is present at the meeting of directors or liquidators or at the meeting of the committee of directors or liquidators that approves the agreement or transaction or that the vote or consent of the director or liquidator is counted for that purpose.

13

81. An agreement or transaction referred to in Regulation 80 is valid if:

(a) the material facts of the interest of each director or liquidator in the agreement or transaction and his interest on or relationship to any other party to the agreement or transaction are disclosed in good faith or are known by the other directors or liquidators; and

(b) the agreement or transaction is approved or ratified by a resolution of directors or liquidators that has been approved without counting the vote or consent of any interested director or liquidator or by the unanimous vote or consent of all disinterested directors or liquidators if the votes or consents of all disinterested directors or liquidators are insufficient to approve a resolution of directors or liquidators.

82. An agreement or transaction referred to in Regulation 80 is valid if:

(a) the material facts of the interest of each director or liquidator in the agreement or transaction and his interest in or relationship to any other party to the agreement or transaction are disclosed in good faith or are known by the members entitled to vote at a meeting of members; and

(b) the agreement or transaction is approved or ratified by a resolution of members.

83. A director or liquidator who has an interest in any particular business to be considered at a meeting of directors, liquidators or members may be counted for purposes of determining whether the meeting is duly constituted.

## INDEMNIFICATION

84. Subject to Regulation 85, the Company may indemnify against all expenses, including legal fees, and against all judgements, fines and amounts paid in settlement and reasonably incurred in connection with legal, administrative or investigative proceedings any person who:

(a) is or was a party or is threatened to be made a party to any threatened, pending or completed proceedings, whether civil, criminal, administrative or investigative, by reason of the fact that the person is or was a director, an officer or a liquidator of the Company; or

(b) is or was, at the request of the Company, serving as a director, officer or liquidator of, or in other capacity is or was acting for, another company or a partnership, joint venture, trust or other enterprise.

85. Regulation 84 only applies to a person referred to in that subsection if the person acted honestly and in good faith with a view to the best interests of the Company and, in the

14

case of criminal proceedings, the person had no reasonable cause to believe that his conduct was unlawful.

86. The decision of the directors as to whether the person acted honestly and in good faith and with a view to the best interests of the Company and as to whether the person had no reasonable cause to believe that his conduct was unlawful, is in the absence of fraud, sufficient for the purposes of this Regulation, unless a question of law is involved.

87. The termination of any proceedings by any judgement, order, settlement, conviction or the entering of a nolle prosequi does not, by itself, create a presumption that the person did not act honestly and in good faith and with a view to the best interests of the Company or that the person had reasonable cause to believe that his conduct was unlawful.

88. If a person referred to in Regulation 84 has been successful in defense of any proceedings referred to in that Regulation the person is entitled to be indemnified against all expenses, including legal fees, and against all judgements, fines and amounts paid in settlement and reasonably incurred by the person in connection with the proceedings.

89. The Company may purchase and maintain insurance in relation to any person who is or was a director, an officer or a liquidator of the Company, or who at the request of the Company is or was serving as a director, an officer or a liquidator of, or in any other capacity is or was acting for, another company or a partnership, joint venture, trust or other enterprise, against any liability asserted against the person and incurred by the person in that capacity, whether or not the Company has or would have had the power to indemnify the person against the liability under Regulation 84.

90. The directors shall provide for the safe custody of the Seal. The Seal when affixed to any written instrument shall be witnessed by a director or any other person so authorized from time to time by resolution of directors. The directors may provide for a facsimile of the Seal and of the signature of any director or authorized person which may be reproduced by printing or other means on any instrument and it shall have the same force and validity as if the seal had been affixed to such instrument and the same had been signed as hereinbefore described.

## DIVIDENDS

91. The Company may by a resolution of directors declare and pay dividends in money, shares, or other property but dividends shall only be declared and paid out of surplus. In the event that dividends are paid in specie the directors shall have responsibility for establishing and recording in the resolution of directors authorizing the dividends, a fair and proper value for the assets to be so distributed.

92. The directors may from time to time pay to the members such interim dividends as appear to the directors to be justified by the profits of the Company.

93. The directors may, before declaring any dividend, set aside out of the profits of the Company such sum as they think proper as a reserve fund, and may invest the sum so set apart as a reserve fund upon such securities as they may select.

94. No dividend shall be declared and paid unless the directors determine that immediately after the payment of the dividend the Company will be able to satisfy its liabilities as they become due in the ordinary course of its business and the realizable value of the assets of the Company will not be less than the sum of its total liabilities, other than deferred taxes, as shown in its books of account, and its capital. In the absence of fraud, the decision of the directors as to the realizable value of the as-sets of the company is conclusive, unless a question of law is involved.

95. Notice of any dividend that may have been declared shall be given to each member in manner hereinafter mentioned and all dividends unclaimed for 3 years after having been declared may be forfeited by resolution of directors for the benefit of the Company.

96. No dividend shall bear interest as against the Company.

97. A share issued as a dividend by the Company shall be treated for all purposes as having been issued for money equal to the surplus that is transferred to capital upon the share.

98. In the case of a dividend of authorized but unissued shares with par value, an amount equal to the aggregate par value of the shares shall be transferred from surplus to capital at the time of the distribution.

99. In the case of a dividend of authorized but unissued shares without par value, the amount designated by the directors shall be transferred from surplus to capital at the time of the distribution, except that the directors must designate as capital an amount that is at least equal to the amount that the shares are entitled to as a preference, if any, in the assets of the Company upon liquidation of the Company.

100. A division of the issued and outstanding shares of a class or series of shares into a larger number of shares of the same class or series having a proportionately smaller par value does not constitute a dividend of shares.

## ACCOUNTS

101. The books of account shall be kept at the registered office of the Company.

102. The directors shall unless such requirement be waived by resolution of members cause to be made out and shall serve on the members or lay before a meeting of members at some date not later than eighteen months after the incorporation of the Company and subsequently once at least in every calendar year a profit and loss account for a period in the case of the first account since the incorporation of the Company and in any other case, since the preceding account, made to a date not earlier than the date of the notice by more than twelve months, and a balance sheet as at the date to which the profit and loss

16

account is made up. The Company's profit and loss account and balance sheet shall be drawn up so as to give respectively a true and fair view of the profit or loss of the Company for that financial period, and a true and fair view of the state of affairs of the Company as at the end of that financial period.

103. A copy of such profit and loss account and balance sheet shall be served on every member in the manner and with similar notice to that pre-scribed herein for calling a meeting of members or upon such shorter notice as the members may agree to accept.

104. The Company may by resolution of directors include in the computation of surplus for any purpose the unrealized appreciation of the assets of the Company, and, in the absence of fraud, the decision of the directors as to the value of the assets is conclusive, unless a question of law is involved.

## AUDIT

105. The Company may by resolution of members call for the accounts to be examined by auditors.

106. The first auditors shall be appointed by resolution of directors; sub-sequent auditors shall be appointed by a resolution of members.

107. The auditors may be members of the Company but no director or other officer shall be eligible to be an auditor of the Company during his continuance in office.

108. The remuneration of the auditors of the Company:

(a) in the case of auditors appointed by the directors, may be fixed by resolution of directors;

(b) subject to the foregoing, shall be fixed by resolution of members or in such manner as the Company may by resolution of members determine.

109. The auditors shall examine each profit and loss account and balance sheet required to be served on every member of the Company or laid before a meeting of the members of the Company and shall state in a written report whether or not:

MAY 19 2023

(a) In their opinion the profit and loss account and balance sheet give a true and fair view respectively of the profit and loss for the period covered by the accounts, and of the state of affairs of the Company at the end of that period;

(b) all the information and explanations required by the auditors have been obtained.

110. The report of the auditors shall be annexed to the accounts and shall be read at the meeting of members at which the accounts are laid before the Company or shall be served on the members.

17

111. Every auditor of the Company shall have a right of access at all times to the books of account and vouchers of the Company, and shall be entitled to require from the officers of the Company such information and explanations as he thinks necessary for the performance of the duties of the auditors.

112. The auditors of the Company shall be entitled to receive notice of, and to attend any meetings of members of the Company at which the Company's profit and loss account and balance sheet are to be presented.

## NOTICES

113. Any notice, information or written statement to be given by the Company to members must be served in the case of members holding registered shares by mail addressed to each member at the address shown in the share register.

114. Any summons, notice, order, document, process, information or written statement to be served on the Company may be served by leaving it, or by sending it by registered mail addressed to the Company, at its registered office, or by leaving it with, or by sending it by registered mail, to the registered agent of the Company.

115. Service of any summons, notice, order, document, process, information or written statement to be served on the Company may be proved by showing that the summons, notice, order, document, process, information or written statement was mailed in such time as to admit to its being delivered in the normal course of delivery within the period prescribed for service and was correctly addressed and the postage was prepaid.

## PENSION AND SUPERANNUATION FUNDS

116. The directors may establish and maintain or procure the establishment and maintenance of any non-contributory pension or superannuation funds for the benefit of, and give or procure the giving of donations, gratuities, pensions, allowances or emoluments to any persons who are or were at any time in the employment or service of the Company or any company which is a subsidiary of the Company or is allied to or associated with the Company or with any such subsidiary, or who are or were at any time directors or officers of the Company or of any such other company as aforesaid or who hold or held any salaried employment or office in the Company or such other company, or any persons in whose welfare the Company or any such other company as aforesaid is or has been at any time interested, and to the wives, widows, families and dependents of any such person, and may make payments for or towards the insurance of any such persons as aforesaid, and may do any of the matters aforesaid either alone or in conjunction with any such other company as aforesaid. Subject always, if the Act shall so require, to particulars with respect thereto being disclosed to the members, and to the proposal being approved by the Company by resolution of members, a director holding any such employment, or office shall be entitled to participate in and retain for his own benefit any such donation, gratuity, pension allowance or emolument.

18

## ARBITRATION

117. Whenever any difference arises between the Company on the one hand and any of the members or their executors, administrators or assigns on the other hand, touching the true intent and construction or the incidence or consequences of these Articles or of the Act touching anything done or executed, omitted or suffered in pursuance of the Act touching any breach or alleged breach or otherwise relating to the premises of to these Articles, or to any Act or Ordinance affecting the Company or to any of the affairs of the Company such difference shall, unless the parties agree to refer the same to a single arbitrator, be referred to 2 arbitrators one to be chosen by each of the parties to the difference and the arbitrators shall before entering on the reference appoint an umpire.

118. If either party to the reference makes default in appointing an arbitrator either originally or by way of substitution (in the event that an appointed arbitrator shall die, be incapable of acting or refuse to act) for 10 days after the other party has given him notice to appoint the same, such other party may appoint an arbitrator to act in the place of the arbitrator of the defaulting party.

## VOLUNTARY WINDING UP AND DISSOLUTION

119. The Company may voluntarily commence to wind up and dissolve by a resolution of members but if the Company has never issued shares it may voluntarily commence to wind up and dissolve by resolution of directors.

## CONTINUATION

120. The Company may by a resolution of members or by a resolution passed unanimously by all directors of the Company continue as a company incorporated under the laws of a jurisdiction outside of Saint Lucia in the manner provided under those laws.

We, **Corporate Services St. Lucia (1996) Limited**, for the purpose of amending the above-named International Business Company under the laws of Saint Lucia, Corporate Services St. Lucia (1996) Limited hereby subscribe our name to this Articles of Association on this 27th day of April, 2023.

SAINT LUCIA
REGISTRY OF INTERNATIONAL BUSINESS

MAY 19 2023

FILED

_____
Registered Agent

April 27, 2023
Date

19

*International Business Companies (Amendment) Act*

**SAINT LUCIA**

## STATUTORY DECLARATION

We, **Corporate Services St. Lucia (1996) Limited,** Registered Agent No. LRA 007, licensed under the Registered Agent and Trustee Licensing Act, Cap. 12.12, apply herein on behalf of the Company **ALTER BANK LTD. No. 2007-00022** for the purposes of being compliant with the changes in law pursuant to the International Business Companies (Amendment) Act (No. 17 of 2019), and in so doing do solemnly and sincerely declare that we have complied with the following laws of Saint Lucia -

1.   The Money Laundering (Prevention) Act, Cap.12.20

2.   The Anti-Terrorism Act, Cap. 3.16, and

3.   The Income Tax Act, Cap.15.02

And we make this declaration conscientiously believing the same to be true and in accordance with the Statutory Declaration Act, Cap. 2.14 of the Laws of Saint Lucia.

SAINT LUCIA
REGISTRY OF INTERNATIONAL BUSINESS

MAY 19 2023

FILED

SWORN TO at                                         )
on the 27ᵗʰ day of April, 2022                     )
                                                    )
                                                    )
                                                    )
BEFORE ME:                                          )      .................................
                                                    )             Declarant
                                                    )

REV. N.P. HUSBANDS
ST. LUCIA, W.I.
Justice of the Peace

.................................
**NOTARY ROYAL**



# FINANCIAL SERVICES REGULATORY AUTHORITY

May 9, 2023

Ms. Fleur Ferdinand
Corporate Secretary
Corporate Services St. Lucia (1996) Ltd.
P. O. Box 195
Pointe Seraphine
**Castries**

Dear Ms. Ferdinand,

**Re: StateTrust Bank & Trust Ltd. (StateTrust Bank)- Change of Particulars**

The Financial Services Regulatory Authority acknowledges receipt of your email correspondence received on May 9, 2023 which comprised the Change of Particulars request dated May 5, 2023.

Please note that the Authority has no objection to the change of name from StateTrust Bank & Trust Ltd., to **Alter Bank Ltd.**

Please find attached for your reference, the signed "Notice of Change of Particulars" form indicating the Authority's approval.

Additionally, the Certificate of Amendment reflecting the change of name should be submitted to the Authority once finalized.

Please be guided accordingly.

Yours faithfully,

**Nathalie Dusauzay**
**Executive Director**

/je

Encl.

> SAINT LUCIA
> REGISTRY OF INTERNATIONAL BUSINESS
> MAY 19 2023
> FILED

6th Floor, Francis Compton Building, Waterfront, Castries, Saint Lucia, West Indies
Telephone: (758) 468-2990/2991  Fax: (758) 451-7655  Email: finsersup@gosl.gov.lc

## FORM 3

(Regulation 5)

### NOTICE OF CHANGE OF PARTICULARS

*(International Banks Act: Section 6)*

### (TO BE COMPLETED IN DUPLICATE)

Date: May 5, 2023

To:   Executive Director
      Financial Services Regulatory Authority
      Castries, **SAINT LUCIA**

Dear Sir/Madam:

We hereby notify you that we have changed the particulars set forth in our application for licence as follows:

Approval is requested for the following changes for the reasons outlined:

1.   Change of Name from StateTrust Bank & Trust Ltd. to **Alter Bank Ltd.** following change of ownership of the entity.

Yours faithfully,

Name: Juan Ramirez, Director

Signature ................................................

**SAINT LUCIA**
REGISTRY OF INTERNATIONAL BUSINESS

MAY 19 2023

FILED

APPROVED, except as maybe set forth in an attachment hereto.

................................................................

**Financial Services Regulatory Authority**

FINANCIAL SERVICES
REGULATORY AUTHORITY

MAY 09 2023

SAINT LUCIA

# Exhibit 16 to the Ellis Declaration

GOVERNMENT OF PUERTO RICO
OFFICE OF THE COMMISSIONER OF FINANCIAL INSTITUTIONS
SAN JUAN, PUERTO RICO

| | |
|---|---|
| OFFICE OF THE COMMISSIONER OF FINANCIAL INSTITUTIONS<br>Complainant<br>v.<br><br>NODUS INTERNATIONAL BANK, INC.<br>TOMÁS NIEMBRO CONCHA AND<br>JUAN RAMÍREZ SILVA<br>Respondents | CASE NO.: C-24-D-003<br><br>RE:      Piercing the Corporate Veil; Shareholders Liability; Restitution |

## COMPLAINT AND ORDER FOR PIERCING THE CORPORATE VEIL OF NODUS INTERNATIONAL BANK, INC. AND ORDER RESTITUTION

### I. INTRODUCTION

As recognized by our highest court, "the State, as part of its power of reason of state (raison d'état), has the authority to regulate professions, based on reasons of high public interest such as health, safety, and general welfare," which is why "over the years, the financial industry has been regulated because it is of significant public, economic, and social interest."[1] In accordance with these principles, the legislation establishing the Office of the Commissioner of Financial Institutions ("OCIF"), *the Office of the Commissioner of Financial Institutions Act*, Act No. 4 of October 11, 1985[2], ("Act No. 4-1985"), clearly establishes in its statement of purpose, with respect to the banking, securities, and financial institutions industries in Puerto Rico, that "it is the State's inescapable responsibility to ensure that the interests of those linked to these industries as **depositors**, creditors, shareholders, or through other type of association are protected." (Emphasis added). Accordingly, our Court of Appeals has indicated that, from the statement of purposes of Act No. 4-1985, "it follows that the primary purpose of the OCIF is to **protect customers, creditors, or shareholders from illegal acts and fraudulent activities.**"[3] (Emphasis added).

The OCIF, in turn, has the specific duty to supervise and regulate international banking entities ("IBEs"), that operate under a license issued pursuant to Section 7 of the *Law Regulating the International Banking Center*, Act No. 52 of August 11, 1989[4] ("Act No. 52-1989"). Due to their nature, the success of an IBE depends on: (i) the constant exchange of information with the OCIF, and (ii) that such information reflects financial soundness, compliance with applicable regulations and laws, and transparency in their operations. Thus, by law, IBEs are prohibited, *inter alia*, from accepting deposits and borrowing money from domestic persons[5], so that deposits held in this type of entity are exclusively from foreign entities and persons, who rely on, and trust in, the supervision and oversight by the OCIF.

Given the significant mandate delegated to the OCIF by the Legislative Assembly— namely, the protection of individuals who have entrusted their funds and their trust to the IBEs, as well as the soundness of Puerto Rico's banking system, the OCIF has not hesitated - nor will it hesitate - to intervene with those entities, their directors and shareholders, that fail to fulfill their statutory duties, particularly when such failure results, as in the present case, in: (i) the banking entity lacks of a sound financial and economic condition and /or (ii) operates or is

[Illegible initials]

---

[1] Piovanetti v. S.L.G. Touma, S.L.G. Tirado 178 D.P.R. 745, 759 (2010).
[2] 7 L.P.R.A. §2001 et *seq.*
[3] Office of the Commissioner of Financial Institutions v. Northstar Mortp. Corp., No. C04-ND-006, 2007 WL 3244752, at *5 (P.R. Cir. Sept. 26, 2007).
[4] 7 L.P.R.A. §232a.
[5] *See* 7 L.P.R.A. §232j(b)(1).

RECTUM TRANSLATIONS   PERITO TRADUCTOR
LUIS ALBERTO CRUZ AGUILAR
TSJCDMX        BJ 23/02/21

1

managed in such a manner that the public and/or the persons and entities that have funds in its custody are at risk of being defrauded.

Against this specific legal backdrop and following several examinations that evidenced the steady deterioration of the economic and financial conditions of Nodus International Bank, Inc. ("Nodus"), that the OCIF intervened to carry out its liquidation with the primary purpose of protecting its depositors, upon the execution by the Shareholders on May 5, 2023, and by the OCIF on May 8, 2023, of a Voluntary Liquidation Plan ("Liquidation Plan"), as part of the Liquidation Plan, the firm Driven, P.S.C. was appointed Administrator ("Driven" or "Administrator") to ensure faithful compliance of the conditions stipulated in the Plan. On June 5, 2023, the shareholders of Nodus executed the *"Engagement Letter"* confirming Driven as the Administrator.

The Liquidation Plan provided important mechanisms to the then officers and directors of Nodus (two of whom - specifically, Mr. Tomás Niembro Concha ("Mr. Niembro") and Mr. Juan F. Ramírez Silva ("Mr. Ramírez") - were, and continue to be, also owners), for the orderly winding down of the IBE's operations, under the scrutiny of the OCIF and the supervision of the Administrator. It should be noted that, at the time the Liquidation Plan was executed, given Nodus's financial condition at that moment, it was evident that, at best, the IBE was operating with serious executive-level deficiencies or, at worst, the IBE, through its shareholders and then directors, was involved in a corporate scheme involving affiliated entities aimed at, at a minimum, enriching themselves for personal gain, thereby defrauding Nodus depositors.

It should also be noted that, prior to the date the Liquidation Plan was executed, OCIF had already received more than twenty (20) judicial and extrajudicial claims from depositors from various countries, including, but not limited to, Argentina, Uruguay, Colombia, and Brazil, all of which had requested the transfer of funds deposited in Nodus accounts to other accounts, and that Nodus was neither making the funds available to the depositors nor providing clear and precise explanations for not doing so. In other words, in addition to the clear and evident deterioration of Nodus's financial and economic condition, the OCIF encountered the claim from dozens of depositors that their funds were, for all intents and purposes, tied up within Nodus's operations. All of this, as detailed below, was occurring while Nodus continued to conduct transactions with affiliated entities, including, but not limited to, Nodus Finance LLC ("Nodus Finance") and Financial Technology & Marketing Services, Ltd. ("Financial Technology" hereinafter, "Affiliated Entities"), of which Mr. Niembro and Mr. Ramírez (collectively, "Shareholders or Co-Respondents") are owners, shareholders, and/or persons in control.

Nevertheless, following the results of the preliminary investigations conducted by the Administrator and notified to the OCIF, upon the execution of the Liquidation Plan, the co-respondents, as shareholders of Nodus, instead of utilizing the mechanisms for the orderly liquidation of Nodus's operations, continued to abuse the corporate structure of Nodus (and several other Affiliated Entities) to enrich themselves at the expense of the depositors. Thus, for example, under the guise that they would assist Nodus in the effective implementation of the Liquidation Plan, Nodus relied on Financial Technology, an entity organized pursuant to the laws of Barbados, with offices in Venezuela, wholly owned by the entity Administradora de Recursos de Altamira, of which, in turn, Mr. Niembro is the ultimate beneficiary, who is a co-respondent in this case. However, the Administrator later realized that, through Financial Technology, Mr. Niembro was, in fact, receiving a "salary" that resulted in an indirect benefit from the liquidation process, and that he was using this corporate structure to obtain funds from Nodus given that, in his personal capacity, he would not have access to those funds as a citizen of Venezuela without legal presence in the United States (of America). In light thereof, the Administrator requested all account statements of Financial Technology at Nodus and of Mr. Niembro and noted that the amount previously allocated to Mr. Niembro was not consistent with his duties within the liquidation process since, according to the Liquidation Plan, directors and officers could not receive proceeds related to dividend distributions or to commissions, but rather, their compensation was limited exclusively to the dissolution of Nodus.

[Illegible initials]



As for Nodus Finance, on April 28, 2023 (7 days before the execution of the Liquidation Plan, and over a month after the OCIF notified Nodus that it was required to liquidate the IBE), Nodus, **without the consent or authorization of the OCIF,** entered into an agreement with Nodus Finance whereby **(i)** Nodus purchased from Nodus Finance a loan portfolio in the amount of $26,011,780.08, simultaneously eliminating Nodus Finance's debts to Nodus in the amount of $25,738,875.65, and **(ii)** they agreed that Nodus Finance would receive a certain sum of money from Nodus for acting as the administrator of those loans. In other words, one week before the execution of the Liquidation Plan, the Shareholders, who were and remain owners of both Nodus Finance and Nodus, released Nodus Finance from a liquid debt of **$25,738,875.65,** a sum that could have been used for the benefit of Nodus depositors, in exchange for a portfolio of delinquent and defaulted loans and an administration fee for the collection of those loans. In fact, although the portfolio was allegedly composed of mortgage loans, Dirven's investigation revealed that the vast majority of the loans are not secured by any collateral.

In addition to this scandalous transaction, between June 20, 2023, and August 29, 2023, the Shareholders, as directors of both entities, reduced the balance of Nodus Finance funds deposited with Nodus from **$986,313.83** to $25.28, thus effectively depleting virtually all funds from the Nodus Finance account, despite the fact that the Liquidation Plan established the priority order of payments to be made to complete the orderly liquidation of the IBE and it prohibited the distribution of assets to the Shareholders until Nodus's debts were repaid. It is clear that, within the Nodus Finance liquidation process, had it been any other creditor without control over Nodus, it would not have been able to withdraw its funds from Nodus's accounts. Thus, during a certain period of the liquidation process, the Nodus Shareholders **(i)** had at least three (3) of their own corporate entities to allegedly carry out the liquidation of Nodus, with Nodus Finance and Financial Technology receiving monthly payments for that purpose, and **(ii)** utilized their control over all those entities to profit at the expense of their depositors and in disregard of public policy and the applicable law.

In addition to the foregoing, the Administrator, following several unsuccessful attempts to consolidate Nodus's assets in order to begin the deposit liquidation phases stipulated in the Liquidation Plan, as a result of the Shareholders' misrepresentation, presented to the OCIF a realistic assessment of the collectability of Nodus's assets, which, taken altogether with the foregoing, clearly evidenced that removing the directors and officers of Nodus, among whom were the Shareholders, was the mandatory course of action to safeguard the depositor's interests of the depositors. In light of this situation, on October 3, 2023, the OCIF issued a *Complaint and Provisional and Permanent Order for the Appointment of a Receiver and Revocation of License* ("Order Appointing Receiver"), by means of which it removed the officers and directors, with the board of directors in their substitution, and the management of Nodus with the Administrator as substitute, Driven ("Receiver"). Following the appointment of the Receiver, an objective third party independent from the co-respondents, the OCIF became aware that the magnitude of the scheme carried out by the Shareholders, using Nodus and the Affiliated Entities as an economic conduit to defraud its depositors, is even greater than previously understood. Accordingly the OCIF believes that, absent the imposition of personal liability upon the co-respondents to restore certain amounts that inexplicably vanished, the depositors would suffer severe economic harm. It should be noted that our highest court has held that **it is justified for an agency to pierce the corporate veil of an entity** "for the purpose of performing its functions in the administration of a law that imposes upon it the responsibility to regulate and supervise an industry," as is int this case with international banking.[6]

[Illegible initials]

---

[6] S. Porto Rico Sugar Corp. v. Junta Azucarera, 88 D.P.R. 43, 58–59 (1963) (concluding that "Junta Azucarera was justified in piercing the corporate veil for the purpose of carrying out its functions in administering the Sugar Act." If the sugar shipping operation were allowed to be artificially fragmented through the interposition of various sister corporations, and if these corporations were to make profits from such an operation, this would circumvent the mandate of the aforementioned Article 8 of the Sugar Act, 5 L.P.R.A. §377, and the public policy embodied in the Act - to guarantee farmers (colonos) fair treatment in their dealings with the mills -would be thwarted.")



LUIS ALBERTO CRUZ AGUILAR
TSJCDMX     BJ 23/02/24

For these reasons, and those set forth below, the OCIF has determined that there is sufficient legal basis to pierce the Corporate Veil of Nodus and hold the Shareholders personally liable, ordering them to jointly and severally provide restitution in the amount of no less than **$26,825,189.48** in order to satisfy the amounts owed to depositors. The OCIF, however, notes that its investigations and those of the Recipient are ongoing, and that, should additional facts emerge for which the Shareholders are personally liable, the OCIF will amend this complaint to include a list of such facts for those purposes.

## II. SUMMARY OF COURSE OF ACTION AND GROUNDS THEREFOR

1. The OCIF, pursuant to the supervisory and oversight authority delegated to it, files this *Complaint,* piercing the Corporate Veil of the IBE, Nodus, arising from the violations of Act No. 4-1985 and Act No. 52-1989 committed by Mr. Niembro and Mr. Ramírez, so that they may be held personally and jointly liable for the debts and obligations of the aforementioned entity.

2. This aforementioned, given that the Shareholders, who hold 63.31% and 36.69% of Nodus's shares, respectively, have engaged in a series of fraudulent acts that have caused the insolvency of the cited entity to the detriment of the interests of depositors and creditors.

3. In particular, the actions of the co-respondents have completely thwarted the process of dissolution and liquidation of Nodus as ordered by the OCIF, as they have used the aforementioned Affiliated Entities to obtain economic benefits not provided for in the Liquidation Plan and in the orders issued by the OCIF for that purpose.

4. As is well known, the OCIF, as a regulatory entity, is tasked with ensuring strict compliance with the provisions of Act No. 4-1985 and Act No. 52-1989, and the clear public policy contained in those statutes to prevent the public or individuals and entities holding funds or securities in the IBEs, in this case, in Nodus, from being defrauded or suffering irreparable harm.

5. In turn, it is a well-established regulation that piercing the corporate veil is justified and shareholders may be held personally liable when "the control exercised over the corporation is used to defraud or commit acts that are illegal or contrary to public policy." C. Díaz Olivo, *Corporations: A Treatise on Corporate Law,* Puerto Rico, 2016, p. 130; *see also* <u>D.A.Co. v. Alturas Fl. Dev. Corp. et al.,</u> 132 D.P.R. 905 (1993) (citing <u>Cruz v. Ramírez,</u> 75 D.P.R. 947, 954 (1954)) ("It is also well known that the Courts will disregard the legal personality of a corporation and hold the shareholders' assets liable for the corporation's debts and obligations in those cases where the corporation is a passive economic conduit *("business conduit")* of its sole shareholders, who exclusively and personally receive *the* benefits produced by corporate administration [and] if **necessary to prevent fraud or the pursuit of an illegal purpose or to prevent a clear inequity or wrong")**. (Emphasis added).

6. In light of the foregoing, and in order to protect the public interest and prevent widespread harm, the OCIF files this *Complaint* in so doing it to pierce the Corporate Veil of Nodus and hold the Shareholders personally and jointly liable for the debts and obligations of the aforementioned IBE. The OCIF orders the co-respondents to perform restitution for the sum of **$26,825,189.48** corresponding to: **(i)** the unauthorized purchase and/or unauthorized transfer of the Nodus Finance loan portfolio to Nodus on April 28, 2023, seven (7) days prior to the execution of the Liquidation Plan, for the price of $25,738,875.65; **(ii)** $986,313.83 for transfers made by the Shareholders to withdraw funds from Nodus Finance deposited with Nodus; and **(iii)** the amount of $100,000.00 in "fees" received by Mr. Niembro form the moment of the Order Appointing the Receiver through January 2024 in a completely unjustified manner and in total disregard for the depositors.

7. In addition, the OCIF is imposing a fine of $50,000.00 on the Shareholders, $25,000.00 each, for the distribution of $50,000.00 in preferred shares carried out without OCIF authorization on April 17, 2023, weeks before the execution of the Liquidation Plan.

[Illegible initials]

4

RECTUM TRANSLATIONS  PERITO TRADUCTOR
LUIS ALBERTO CRUZ AGUILAR
TSJCDMX        BJ 23/02/24

## III. JURISDICTION

8.      Act No. 4-1985 grants the OCIF the responsibility to supervise, oversee, and examine IBEs organized pursuant to the laws of Puerto Rico that operate or conduct business in Puerto Rico, such as Nodus. Pursuant to Act No. 4-1985, the OCIF is empowered to administer and implement Act No. 52-1989. Thus, Act No. 4-1985, Act No. 52-1989, Act No. 38-2017, as amended, known as the *Uniform Administrative Procedure Act of the Government of Puerto Rico* ("Act No. 38-2017"), and Regulation No. 3920 of June 23, 1989, as amended, known as the *Regulation Governing Adjudication Procedures under the Jurisdiction of the Office of the Commissioner of Financial Institutions* ("Regulation No. 3920"), empower the Commissioner to issue necessary orders, where appropriate and convenient, to enforce the laws or regulations under his/hers jurisdiction.

9.      In particular, Article 10 of Act No. 4-1985[7] provides as follows:

(a) The Commissioner, in addition to the powers and authority conferred herein, shall have the power and authority to:

...

> (3) Address, investigate, and resolve complaints filed with the Board or the Commissioner's Office.

...

> (4) Initiate any legal remedies, actions, or proceedings necessary or appropriate to give effect to the purposes of this chapter or any other law or regulation, the enforcement or oversight of which has been assigned to him/her, whether represented by his/her attorneys or by the Secretary of Justice, upon request to that effect.

...

> (8) Perform all acts necessary for the effective achievement of the purposes of this Act.

*See* 7 L.P.R.A. §2010(a)(3), (4), and (8). (Emphasis added).

10.      Additionally, Act No. 52-1989 grants the OCIF broad authority to suspend or revoke an IBE's license and place it under receivership. In particular, Section 3(a) of Act No. 52-1989 provides as follows:

(a) The Commissioner shall:

...

> (6) supervise, oversee, and audit international banking entities and require them to submit periodic reports and other information specified in the Commissioner's regulations;

...

> (8) ensure the financial soundness and operational adequacy of international banking entities and ensure that they comply with applicable laws and regulations and with any measure or requirement that the Commissioner may impose upon them by order, regulation, circular letter, or guidance documents applicable to IBIs;

> (9) revoke or suspend a license to operate an international banking entity or impose other sanctions that the Commissioner may deem necessary and appropriate in accordance with the Commissioner's Regulations; provided further that any person whose license has been revoked or suspended or upon whom any other sanction has been imposed shall have the right to request a hearing in accordance with the regulations provided for in Section 23 of this Act;

---

[7] 7 L.P.R.A. §2010.

LEGAL TRANSLATIONS   PERITO TRADUCTOR
LUIS ALBERTO CRUZ AGUILAR
TSJCDMX       BJ 23/02/24

(10) suspend, remove, or sanction any director, officer, employee, agent, or individual acting in a similar capacity for an international banking entity  who violates, or knowingly or negligently permits another person violating this Act, any Regulation or order of the Commissioner, or articles of incorporation, bylaws, limited liability company contract, partnership contract, or other document by which the international banking entity is organized, as the case may be, or the license issued pursuant to this Act. Any individual who is suspended, removed, or sanctioned may request a hearing in accordance with the regulations provided in Section 23 of this Act;

...

(12) take all actions and impose all remedies necessary to enforce this Act or its regulations.

...

*See* 7 L.P.R.A. §232a(a)(6), (8), (9), (10), and (12).

11.    In addition to the foregoing, Section 20 of Act No. 52-1989 grants the OCIF Commissioner the power and authority to impose such penalties as he deems fair and necessary:

(a) **If any director, officer, or individual** acting in a similar capacity **of an international banking entity** or of a person of which the banking entity is a unit **violates**, or knowingly or negligently permits any director, officer, agent, or employee of the Banking Entity or of the person of which the banking entity, is a unit, to **violate this Act, the Commissioner's regulations**, or any provision of the certificate of incorporation, contract of partnership, or **other written document establishing the international banking entity, the Commissioner** shall notify and summon the interested parties to an administrative hearing in accordance with the regulations provided for in Section 23 of this Act. Upon the conclusion of the hearing and after the Commissioner determines that any provision mentioned in this subsection has been violated, **the Commissioner shall take appropriate action**, including the suspension or removal of such director, officer, or individual.

(c)   **Any director, officer, or employee of the international banking institution** or of the person which the international banking institution is a unit of, who unlawfully appropriates, embezzles, misappropriates, or **willfully misuses any monies, funds, credits, or securities of an international banking institution**, or who, without proper authorization, issues any certificate of deposit, order or bill of exchange, executes any kind of acceptance, assigns any note, bond, bank draft, or bill of exchange; and any person who, with the same intent, aids or abets any director, officer, or employee in violating any provision of this section, **shall be guilty of a felony and, upon conviction, shall be punished by imprisonment for a term of not less than ten (10) years nor more than twenty (20) years, or a fine of not less than fifteen thousand dollars ($15,000) nor more than thirty thousand dollars ($30,000), or both such penalties at the discretion of the court.**

(d) ...

(e) The Commissioner is authorized to:

(1) **Impose and collect administrative fines** of not less than five thousand dollars ($5,000.00) nor more than twenty-five thousand dollars ($25,000.00) **for each violation** of the provisions of this Act or the provisions contained in the rules and regulations that may be promulgated pursuant thereto.

(2) **Order the restitution or reimbursement of payments received** in violation of the provisions of this Act or any rules or regulations that may be promulgated thereto, or any other remedy deemed necessary to enforce the purposes of this Act.

[Illegible initials]

> (3) Impose and collect administrative fines of not less than one thousand dollars ($1,000.00) nor more than ten thousand dollars ($10,000.00) for each day that the international banking entity fails to comply with the requirements or orders issued by the Commissioner.

See 7 L.P.R.A. §232p(a), (c), and (e)(1)(2)(3). (Emphasis added).

12. The provisions of Act No. 52-1989 shall prevail over any other laws of Puerto Rico that are inconsistent with the referred Act. See 7 L.P.R.A. §232x(b).

13. Section 28 of Act No. 52-1989 provides that "[t]his Act, being necessary for the welfare of the People of Puerto Rico, shall be interpreted liberally so as to achieve its purposes." [8]

14. Additionally, the Liquidation Plan is an agreement between Nodus, the Shareholders, and the OCIF, the terms of which are binding on them, their successors, and third parties as provided by law. See 31 L.P.R.A. §9754.

15. As a result of the foregoing, and in accordance with applicable legal provisions, the OCIF files this Complaint, further providing that, pursuant to Section 21 of Act No. 52-1989, the Exhibits to this Complaint are filed with it in a sealed confidential envelope for the sole benefit of Nodus, the Shareholders, and their respective legal representatives, unless a Court requires their disclosure.

## IV. INFORMATION ON THE RESPONDENTS

16. The complainant, **Nodus International Bank, Inc.,** is an IBE, organized pursuant to the laws of the Government of Puerto Rico since August 12, 2009, and held license number IBE-60 issued by the OCIF pursuant to Act No. 52-1989, until the moment the OCIF revoked its license by means of the Order Appointing a Receiver dated October 3, 2023; with physical and mailing address at 252 Ave. Ponce de León, Suite 1501, San Juan, Puerto Rico 00918.

17. The co-respondent, **Mr. Tomás Niembro Concha,** --owner of 63.31% of the outstanding shares of Nodus -- is of legal age, a resident of ███████████████ and email tomas.niembro@nodusbank.com. During the period relevant to the facts of this Complaint, Mr. Niembro also served as President of Nodus.

18. The co-respondent, Mr. Juan F. Ramírez Silva, -- owner of 36.69% of Nodus's outstanding shares --,is a U.S. citizen and resident of ███████████████ and email juan.ramirez@nodusbank.com. During the period relevant to the facts of this Complaint, Mr. Ramírez also served as Chairman of the Board of Directors of Nodus.

## V. STATEMENT OF FACTS

### A. Background on Nodus, the Liquidation Plan, and the Receivership Order.

#### i. *Origin of Nodus*

19. On June 12, 2009, Optivalores Investment Company Ltd. ("Optivalores") filed an Application for a license to organize an international banking entity under the name Nodus. As of that date, Optivalores held 100% of Nodus's shares.

20. On August 3, 2009, the OCIF issued a permit authorizing Nodus to organize as an IBE.

21. On November 12, 2009, Nodus filed an License Authorization to commence operations as an IBE.

22. On November 17, 2009, the OCIF issued License No. IBE-60, authorizing Nodus to operate as an IBE.

[Illegible initials]

---

[8] It should be noted that Section 23 of Act No. 52-1989 remained unmodified after amendments of Act No. 110-2013.

23. On February 25, 2010, Nodus announced that it had commenced operations effective February 22, 2010.

### ii. Examination of Nodus and Events Leading to Its Liquidation

24. Following an order by the OCIF, the first examination of Nodus was conducted on February 15, 2012, evaluating its operations as an IBE from December 31, 2011, through March 14, 2012. According to the Uniform Classification System for Financial Institutions, the aforementioned examination rated Nodus as a "less than satisfactory" institution, with a score of "3"[9]. *See* Exhibit 1-A.

25. As a result of the deficiencies identified in that examination, the OCIF directed Nodus's Board of Directors to do the following: (i) capital injection to address insolvency issues; (ii) implement policies and procedures to address the deficiencies in the loan portfolio and credit issues; (iii) review of policies and procedures to strengthen the entity's operational structure and establish appropriate parameters to ensure investments consistent with the IBE's financial reality.[10]

26. On March 3, 2014, the second examination of Nodus was conducted, specifically covering the entity's operations from December 31, 2013, to March 27, 2014. The examination revealed the following:

> *The Entity's overall financial condition has deteriorated since the last examination and is considered deficient. The Entity has accumulated losses over the past three years and has been depleting its capital position. [...] The Allowance for Loans and Lease Losses (ALLL) established by the Entity's (sic) is inadequate given the risk exposure within the portfolio. The examination reveals several apparent violations and internal & routine control deficiencies, a lack of written methodology for the ALLL and improvements needed in the Liquidity Contingency Policy.*

*See* Exhibit 1-B.

27. In addition, apparent violations of the *Bank Secrecy Act* and the *Anti-Money Laundering* Act ("BSA/AML") were found. In this regard, according to the Uniform Classification System Financial Institutions. The referred examination rated Nodus with a score of "4"[11], meaning it has serious financial and managerial deficiencies.

---

[9] Typically, IBEs with a rating of "3":

> *...exhibit some degree of supervisory concern in one or more of the component areas. These financial institutions exhibit a combination of weaknesses that may range from moderate to severe; however, the magnitude of the deficiencies generally will not cause a component to be rated more severely than 4. Management may lack the ability or willingness to effectively address weaknesses within appropriate time frames. Financial institutions in this group are generally less capable of withstanding business fluctuations and more vulnerable to outside influences than those institutions rated a composite 1 or 2. Additionally, these financial institutions may be in significant noncompliance with laws and regulations. Risk management practices may be less than satisfactory relative to the institution's size, complexity, and risk profile. These financial institutions require more than normal supervision, which may include formal or informal enforcement actions. Failure appears unlikely, however, given the overall strength and financial capacity of these institutions. See https://www.fdic.gov/regulations/examinations/ratings/.*

[10] Specifically, the OCIF ordered the following:

- **Capital** — The Board shall ensure that the institution does not reach a state of insolvency caused by ongoing operating losses. A capital injection is necessary to ensure that the Entity remains capitalized.
- **Credit Administration** — The Board shall take appropriate actions to establish appropriate Policies and Procedures for the risk portfolio to which the entity is exposed when engaging in such activity. The Board must ensure that the procedures implemented are effective and monitor the portfolio's performance.
- **Revenue** — The Board shall establish mechanisms to improve operating results and revenue performance so that revenue serves as a source for increasing capital.
- **Corporate Governance** — The Board will ensure that all policies and procedures are reviewed in line with the entity's operational reality and risk profile. It must improve policies and procedures for investments as well as review them periodically.

[Illegible initials]

8



28.     Following the alarming rating received by Nodus, the OCIF once again ordered the Nodus Board of Directors to immediately address several issues, requiring the IBE, among other things, to: (i) develop and implement a strategic plan including a budget and asset growth plan; (ii) submit a formal capitalization plan to address its insolvency and prevent future operational losses; (iii) improve the performance of its assets; and (d) review and improve its internal policies and procedures.[12]

29.     On September 10, 2014, Nodus issued a *Board of Directors Resolution* (*Board Resolution*) to, among other things:

> *...take all necessary steps, consistent with other provisions of the RESOLUTION and with sound banking practices, to correct and prevent the findings identified in the December 31, 2013 ROE, prepared by the OCFI, and address each concern identified in the ROE and ensure that the Entity is operated with adequate management supervision and Board oversight to prevent unsafe and unsound banking practices and to ensure compliance with applicable provisions of law and/or regulations.*

30.     On August 26, 2015, the third examination of Nodus was conducted, specifically covering the entity's operations from June 30, 2015, to December 4, 2015. The examination revealed the following:

> *The Entity's overall financial condition is considered deficient and continues to exhibit similar deficiencies previously noted in the last examination. The Entity has accumulated losses over the past three years and has been depleting its capital position.*
>
> *The Authority's assets decreased by 27.5% when compared to December 31, 2014. Both the loan and investment portfolios decreased by $3.4 million, caused by the lack of liquidity. As of the date of the examination, the investment portfolio was impacted by several securities that presented significant unrealized losses and when evaluated under Other Than Temporary Impairment (OTTI), were considered impaired. The Allowance for Loan and Lease Losses (ALLL) established by the Entity is inadequate considering the risk exposure within the portfolio. The examination reveals several apparent violations and deficiencies and internal routine control deficiencies. The Board of Directors (BOD), Compliance, Credit Committee and ALCO still needs to be adequately supported and provide evidence that the overall operations of the Entity are being monitored by Management (which includes BOD).*

---

[11] In turn, IBEs with a rating of "4":

> *...exhibit unsafe and unsound practices or conditions. There are serious financial or managerial deficiencies that result in unsatisfactory performance. The problems range from severe to critically deficient. The weaknesses and problems are not being satisfactorily addressed or resolved by the board of directors and management. Financial institutions in this group generally are not capable of withstanding business fluctuations. There may be significant noncompliance with laws and regulations. Risk management practices are generally unacceptable relative to the institution's size, complexity, and risk profile. Close supervisory attention is required, which means, in most cases, formal enforcement action is necessary to address the problems. [...] Failure is a distinct possibility if the problems and weaknesses are not satisfactorily addressed and resolved. Id.*

[12] Specifically, the OCIF ordered the following:

> - *To develop and implement a Strategic Plan, including budget and asset growth plan.*
> - *To submit a formal capital plan to cover insolvency, to prevent [...] sic future operational losses and for the institution's risk and growth.*
> - *Reduce classified and non-performing assets.*
> - *Improve earnings performance.*
> - *Review and improve policies and procedures (Credit, Investment, and Liquidity Contingency Plan). In addition, an Allowance for Loan and Lease Losses (ALLL) written methodology should be established.*
> - *The minutes of the Board of Directors (BOD), Credit Committee, and ALCO (Asset and Liability Committee) meetings require significant improvements. These minutes must contain, at least: an appropriate agenda, the attendance, quorum determination, approval of previous minutes, determination and a summary of each area discussed in such meetings, including financial data. Minutes must include detailed information and evidence that the overall operations of the Entity are monitored by management and the Board. In addition, the minutes must include AML/BSA Activities.*

[Illegible initials]

9



See Exhibit 1-C.

31.     Furthermore, apparent violations of Act No. 52-1989, Regulation No. 5653, and the BSA/AML were found. To that end, as indicated by the Uniform Classification System for Financial Institutions, the aforementioned examination again rated Nodus with a score of "4," meaning serious financial and managerial deficiencies.

32.     Consequently, and due to Nodus's rating, the OCIF ordered Nodus's Board of Directors to immediately address several issues, including: (i) improving the *Bank Secrecy Act* and *Anti-Money Laundering (BSA/AML)* compliance program; (ii) updating its strategic and business plan; (iii) increasing capital to a level commensurate with the IBE's risk exposure; (iv) improving the return on its assets; (iv) improving its *underwriting* practices[13]:

33.     As a result of Nodus's failure to comply with the OCIF's requirements following the examinations conducted, as well as with the provisions of *the Board of Directors' Resolution*, the OCIF was compelled to act. Consequently, on May 5, 2016, the OCIF and the aforementioned Financial Institution executed a *Memorandum of Understanding* whereby Nodus agreed to:

> ...take all necessary steps, consistent with other provisions of the Memorandum and sound banking practices, to correct and prevent the unsafe or unsound banking practices and violations of law and/or regulations identified in the Report; address each deficiency identified in the Report and ensure that the Entity is being operated with adequate management supervision and Board oversight to prevent any future unsafe or unsound banking practices and violations of law and/or regulations.

34.     Aware of the institution's precarious situation, on April 20, 2017, Veninvest PR Corp., controlled by Mr. Niembro, and Canoma Corporation, controlled by Mr. Ramírez, requested authorization from the OCIF to acquire the shares of Nodus.

35.     On May 2, 2017, the OCIF authorized the change of control of Optivalores Investment Company Ltd. to Veninvest PR Corp., controlled by Mr. Niembro, and to Canoma Corporation, controlled by Mr. Ramírez, after they acquired 96% of the common shares ($8 million) and the 650,000 preferred shares ($400,000.00) of Nodus.

36.     Accordingly, on October 16, 2017, the fourth examination of Nodus was conducted, specifically of the entity's operations following the execution of the *Memorandum of Understanding*. This examination once again revealed the following:

> The overall financial condition of the Entity still needs improvement as reflected in the capital, asset, quality, and management component ratings. Earnings performance is considered less than satisfactory. Operations and internal controls are satisfactory. The IT environment is also a concern in this examination; therefore, efforts and time are needed to bring the IT function to an adequate level. A Key component of the June 30, 2015 Memorandum of Understanding (MOU) is the successful implementation of all actions outlined in the corresponding action plan, which must result in an overall improvement of the

---

[13] Specifically, the OCIF ordered the following:
- To improve the Bank Secrecy Act and Anti-Money Laundering (BSA/AML) Compliance Program.
- To update the Strategic and Business Plan.
- Increase capital to a level commensurate with the Entity's risk exposure.
- Reduce classified and non-performing assets.
- Improve earnings performance.
- Review and enhance the Credit Policy.
- Improve investment and credit underwriting practices.
- Increase the Allowance for Loan and Lease Losses (ALLL) to an appropriate level and validate the methodology.
- The minutes of meetings held by the Board of Directors (BOD), the Credit Committee, and the Assets and Liabilities Committee (ALCO) require significant improvement. These minutes must include, at a minimum: an appropriate agenda, a list of attendees, a determination of quorum, approval of the previous minutes, decisions made, and a summary of each topic discussed at the meeting, including financial data. Minutes must include detailed information and evidence that the Entity's overall operations are monitored by Management and the BOD

[Illegible initials]

10

*Entity's risk profile. While Management has developed remediation plans, several of the actions need improvement. Therefore, implementation of the remediation plans remain[s] in the middle and/or final phase. As a result, action plans will require more attention and efforts by Management before compliance with the goals of the MOU can be achieved.*

See <u>Exhibit 1-D.</u>

37.     Accordingly, and as indicated by the Uniform System for the Classification of Financial Institutions, the aforementioned examination again rated Nodus with a score of "4," meaning serious financial and managerial deficiencies.

38.     Consequently, the OCIF urged Nodus Board of Directors, at that moment under the administration of the Shareholders, to immediately address the following:
- *Fully comply with the provisions of the MOU.*
- *Reduce the volume of adversely classified items classified.*
- *Provide resources to its lending function.*
- *Maintain an adequate allowance for loan losses balance.*
- *Identify, monitor, and reduce both credit and funding concentrations.*
- *Enhance and implement remediation measures as to the IT environment.*
- *Improve the level and quality of oversight and support.*
- *Establish controls and procedures to avoid instances of non-compliance.*
- *Strengthen [and] enhance the due diligence and monitoring system in the BSA/AML Program.*

39.     On April 24, 2018, the OCIF and Nodus entered into a *Second Memorandum of Understanding* given the entity's financial condition following the fourth examination. In this regard, the OCIF, upon representations by Mr. Niembro and Mr. Ramírez, expressly ordered Nodus to correct all deficiencies identified in the examination. Specifically, the OCIF again directed that:

> *Beginning on the effective date of this Memorandum, the Entity shall take all steps necessary, consistent with other provisions of this Memorandum and sound banking practices, to correct and prevent the unsafe or unsound banking practices and violations of law and/or regulations identified in the Report. It also shall address each deficiency identified in the Report and ensure that the Entity is being operated with adequate management supervision and Board oversight to prevent any future unsafe or unsound banking practice[s] and violations of laws and/or regulations.*

40.     Subsequently, on June 1, 2018, Mr. Niembro was appointed president of Nodus.

41.     During Mr. Niembro's presidency, on October 12, 2018, Nodus requested authorization from the OCIF to issue and sell preferred shares in the amount of $4,000,000.00, for the purpose of meeting the IBE's regulatory capital requirements. On October 1, 2018, the OCIF authorized the amendment to the Certificate of Incorporation for such purposes.

42.     On August 5, 2019, Nodus notified the OCIF that its Board of Directors had ratified Mr. Ramírez as Chairman of the Board and Mr. Niembro as President of Nodus. *See* <u>Exhibit 2</u>.

43.     On November 12, 2019, following an application by Nodus, the OCIF authorized the transfer of the shares of Veninvest PR Corp. and Canoma Corporation to the Shareholders in their personal capacity. Consequently, Mr. Niembro and Mr. Ramírez became holders of all of Nodus's common shares, with 50% and 50% respectively. In other words, as of November 12, 2019, Nodus ceased to operate as an IBE whose shareholders and owners were legal entities, and became one whose owners were directly Mr. Niembro and Mr. Ramírez. *See* <u>Exhibit 3</u>.

[illegible initials]

11



44. In these circumstances, on January 18, 2022, the fifth and final examination of Nodus was conducted. Specifically, of the entity's operations from July 1, 2017, to September 30, 2021, and its compliance with the provisions of the *Second Memorandum of Understanding*. The examination revealed the following:

> *The asset quality problems, credit administration, and underwriting weaknesses negatively impacted earnings and capital. The Entity's capital position indicates a critically deficient level such that the Entity's viability and solvency is threatened. An urgent capital contribution from shareholders or other external sources of financial support is required, this last action requiring prior approval by the Commissioner. Earnings level is insufficient to support operations and maintain appropriate capital and allowance levels. Earnings component was evaluated as of the examination date; however, subsequent events indicate that the Entity is still experiencing losses that pose a distinct threat to its viability through the erosion of capital.*

> *The Entity's BSA/AML compliance program remains deficient in three core elements, resulting in apparent violations and failure to comply with the provisions of the MOU issued as results of prior examination. **While the Entity intended to strengthen and improve the BSA/AML compliance program, examiners identified persistent deficiencies regarding critical aspects of the internal controls, independent testing, and the BSA Officer functions.** (Emphasis added).*

*See* **Exhibit 1-E**.

45. Accordingly, and according to the Uniform Financial Institution Rating System, the aforementioned examination rated Nodus with a score of "5"[14], the lowest and most critical rating in that system.

46. Specifically, the examination revealed that Nodus had violated the law as follows:

    a. Violation of Section 13(b)(6) of Act No. 52-1989 by granting unauthorized loans or financing to Affiliated Entities:

        i. On September 6, 2021, Nodus, without proper authorization from the OCIF, granted a loan of $600,000.00 to Campomarino S.A. Panama, a company owned by Mr. Ricardo Fernández Barrueco, who had been a preferred shareholder of Nodus since June 23, 2021. *See* **Exhibit 1-E,** on p. 30.

        ii. **In turn, between September 19, 2019, and September 29, 2021, Nodus, without OCIF authorization and without conducting the corresponding repayment analysis, purchased from its affiliate Nodus Finance—an entity organized pursuant to the laws of Florida, and in which Messrs. Niembro and Ramírez were also shareholders, each holding 50% -- $25.3 million in forty-seven (47) promissory notes; this activity is considered financing to shareholders, which is strictly prohibited by Section 13(b)(6) of Act No. 52-1989.** *See* **Exhibit 1-E,** pp. 9, 29–30. This transaction was *also* conducted in violation of Article 10(g)(3) of Regulation 5653, as it involved an investment in securities or shares of an affiliated institution, representing more than twenty-five percent (25%) of Nodus's net capital, without prior notification or approval by the OCIF. **Id.** Through these investment transactions, **Nodus**

[Illegible initials]

---

[14] IBEs with a rating of "5":

> *...exhibit extremely unsafe and unsound practices or conditions; exhibit a critically deficient performance; often contain inadequate risk management practices relative to the institution's size, complexity, and risk profile; and are of the greatest supervisory concern. The volume and severity of problems are beyond management's ability or willingness to control or correct. Immediate outside financial or other assistance is needed in order for the financial institution to be viable. Ongoing supervisory attention is necessary [... ].*



Finance became a debtor of Nodus for $25.3 million, without collateral or guarantor.

iii. Furthermore, the aforementioned examination revealed that on September 6, 2021, Nodus, without prior authorization from the OCIF, granted a loan in the amount of $3,950,000.00 (representing 32.59% of Nodus's total capital) to Intercorp MS LLC. This was done without any record of an application evaluation and approval process *(underwriting)* having been conducted. *See* Exhibit 1-E, p. 9. Intercorp MS LLC is an entity organized pursuant to the laws of Florida that offers conventional loans and lending services, originating loans and selling them to Nodus. Id. The loan to Intercorp is also considered financing to shareholders, which is completely prohibited by Section 13(b)(6) of Act No. 52-1989, *supra*. *See* Exhibit 1-E, at pp. 9 and 60.

b. Violation of the *Act to Unify and Strengthen America by Appropriate Means to Intercept and Obstruct Terrorism*, as amended, 115 Stat. 272 (2001)[15] Nodus's failure to maintain adequate internal controls, inadequate independent testing, an ineffective BSA officer, and deficient *Enhanced Due Diligence* (EDD), transaction monitoring, identification, and reporting. *See* Exhibit 1-E, on p. 30.

c. Nodus's violation of Section 14(c) of Act No. 52-1989 by failing to file twenty-four (24) required suspicious activity reports and by filing forty-eight (48) suspicious activity reports late, as discussed with Nodus's BSA Compliance Officer[16]. *See* Exhibit 1-E, on pp. 30–31.

47.     Consequently, OCIF informed the Board of Directors of Nodus, whose chairman was Mr. Ramírez, of the matters requiring immediate action, namely:

- *Fully comply with the provisions of the determined Enforcement Action.*
- *Reduce the volume of adversely classified loans.*
- *Improve credit underwriting and loan administration practices.*
- *Provide resources to its lending function.*
- *Maintain an adequate allowance for loan losses balance (ALLL).*
- *Identify, monitor, and reduce both credit and funding concentrations.*
- *Plan to achieve profitability.*
- *Improve the level and quality of oversight and support.*
- *Establish controls and procedures to prevent instances of non-compliance.*
- *Provide immediate capital injection to an extent commensurate with the Entity's risk exposure to support asset growth and absorb ongoing operational losses.*
- *Develop a revised system of internal controls designed to ensure full compliance with BSAS taking into consideration its size and risk profile. Strengthen enhance due diligence and monitoring system in the BSA/AML Program. Address all internal control deficiencies of BSAS Compliance and correct all violations to local laws and regulations and apparent violations of federal regulations, as cited in this Report.*

---

[15] Known as the USA Patriot Act. *See* 7 L.P.R.A. §232(m). In turn, compliance with the *USA Patriot Act* is a requirement for EBLs pursuant to Section 14 of Act No. 52-1989. *See* 7 L.P.R.A. §232j-1.

[16] Compliance with the requirement to file suspicious activity reports is a requirement for EBLs pursuant to Section 14(c) of Act No. 52-1989. *See* 7 L.P.R.A. §232j-1(c).

[Illegible initials]



48.    On October 13, 2022, the OCIF provided Nodus, *on* a confidential basis pursuant to Section 3(a)(11) of Act No. 52-1989, with the *Report of Examination* containing the results of the fifth examination, along with *the Cover Letter* and the invoice for the examination fee.

49.    After requesting a thirty (30)-day extension, on December 14, 2022, Nodus submitted its response to the examination, where it assured to the OCIF that it would address the issues raised in the examination. However, several months later, Nodus failed to fulfill its obligations.

### iii.    OCIF's Intervention and the Nodus Liquidation Process

50.    Specifically, and as evidence of the IBE's condition, the OCIF received numerous claims from various depositors regarding Nodus's refusal to complete the fund transfers they had requested and the entity's failure to provide valid arguments to justify such conduct.

S1.    Specifically, the claims filed with the OCIF against Nodus, which collectively totaled more than **$1,317,443.14** in funds that Nodus depositors unsuccessfully attempted to recover, demonstrated the need to take control of the entity.

| Claimant | Claim Summary |
|---|---|
| FIXON Group | On **August 9, 2022**, Mr. Emanuel Raspanti, president of Grupo FIXON, a Buenos Aires, Argentina-based entity, filed a complaint with the OCIF against Nodus. In essence, he stated that his business group held several accounts with Nodus and that the aforementioned Financial Institution had frozen their funds. He added that Nodus was not responding or was providing vague answers regarding when it would credit or debit the funds, for which he requested the intervention and immediate action of the OCIF. |
| Mr. José Luis Bissone | On **November 19, 2022**, Mr. José Luis Bissone filed a complaint with the OCIF against Nodus which he denounced the actions of the aforementioned Financial Institution in canceling his debit card and withholding his funds without allowing him to withdraw them. In his claim, Mr. Bissone also stated that he attempted to contact Nodus through various means to resolve the situation but was unsuccessful. In this context, Mr. Bissone requested the intervention of the OCIF, after the FDIC advised him to take that course of action. |
| Mr. Alexander Veyre | On **January 24, 2023**, Mr. Alexander Veyre sent an email to the OCIF's Complaints Division stating that one of his clients had encountered problems while attempting to transfer funds from his Nodus account. Along those lines, he added that the aforementioned IBE had attempted to justify the problem but had not offered any specific solution. Specifically, he stated that he suspected it was a case of "BANKING FRAUD," and therefore requested that the matter be addressed the matter immediately. |
| Mr. Eduardo Rodriguez Llarens | On **February 27, 2023**, Mr. Eduardo Rodriguez Llarens filed a *complaint* with the OCIF against Nodus. The previously, in order to request the Commissioner's intervention regarding the pattern of irregularities committed by Nodus in failing to complete certain fund transfers that he requested, namely, one in the amount of $20,000.00 and another in the amount of $25,000.00. |
| Mr. Alberto Ricci Ferre | On **March 14, 2023**, Mr. Alberto Ricci Ferre copied the OCIF on an email sent to Nodus in which he insisted that the funds transfer he had requested on **February 8, 2023**, be completed. Specifically, Mr. Ricci Ferre copied the OCIF so that, as a regulatory body, it would assist him in obtaining the requested funds that were in Nodus's possession. Mr. Ricci Ferre included all communications exchanged with Nodus regarding the requested transfer. |
| Ms. Cinthia Gawianski | On **March 22, 2023**, Ms. Cinthia Gawianski filed a *claim* with the OCIF against Nodus. In it, Ms. Gawianski alleged that on January 12, 2023, she requested that Nodus transfer $118,000.00 to one of her personal accounts and that the Financial Institution, even though it indicated that the transfer was in the process of being sent, never completed the transfer nor allowed her to access her funds through other means. Specifically, Ms. Gawianski mentioned that Mr. Ramírez, director of Nodus, sent her several emails in which he indicated that Nodus had experienced problems with certain correspondent banks, which they were allegedly resolving, and that they would contact her. In short, the claimant argued that "[m]ore than two months had already passed, and [she] still did not have access to [her] funds. Nor were [she] allowed to obtain them by check or even by traveling to withdraw them in cash." Along with her complaint, Ms. Gawianski included as evidence the communications exchanged with Mr. Niembro, Mr. Ramírez, and Nodus. |
| Ms. Mariela Korn | On **March 23, 2023**, Ms. Mariela Korn filed a *complaint* with the OCIF against Nodus. In summary, she alleged that on **February 24, 2023**, she requested that Nodus transfer $19,542.00. However, she argued that Nodus had not processed the request and had not set a date to do so, but rather justified the delay by stating that they were in the process of changing their correspondent bank. Given these circumstances, Ms. Korn requested that the OCIF order Nodus to complete the requested transfer. As part of her *claim*, Ms. Korn included as evidence several of the emails she exchanged with Nodus. |
| Eurocam S.A. | On **March 24, 2023**, Eurocam S.A. filed a *claim* with the OCIF against Nodus. In the complaint, Eurocam stated that on January 11, 2023, it requested that Nodus transfer $78,000.00 to one of its accounts at ItalBank International, Inc., which, as of that date, had not been completed by Nodus. Specifically, Eurocam argued that the delay in completing the requested transfer violated Section 4-302 of the *Puerto Rico Commercial Transactions Act*. Furthermore, it alleged that Nodus was depriving it of the free disposal of its funds by failing to provide an alternative mechanism to access the funds it had deposited at the IBE. As part of its *Complaint*, Eurocam included as evidence the Commercial *Deposit Account Contract* executed with Nodus; email correspondence with Ms. Rosa Tinedo, Business Executive Manager at Nodus; and account statements from the IBE entity at Nodus. |

Illegible initials]

14



| Mr. Juan Arroyo | On **March 28, 2023**, Mr. Juan Arroyo filed a *complaint* with the OCIF against *Nodus*. In short, he *stated* that he held a business account with the aforementioned Financial Institution but had been unable to make withdrawals or transfer funds. Furthermore, Mr. Arroyo argued that despite his repeated efforts to contact the institution to access the funds or withdraw them in full, he had been unsuccessful, and therefore requested the intervention of the OCIF. |
|---|---|
| **SG Investment Newsletter** | In the **March 2023** issue of the SG Investment Newsletter, the OCIF was copied on a chain of emails sent to Nodus, in which the OCIF requested that the aforementioned IBE complete the fund transfers requested in the amount of $730,000.00 or, alternatively, to schedule a meeting to address the matter, which caused delays in its operations and inconveniences with its clients and suppliers. However, as it appears, Nodus never responded to the communications. |
| Mr. Adrián Marchan Ramos | On **April 14, 2023**, Mr. Adrián Marchan Ramos filed a *complaint* with the OCIF against Nodus via email. In essence, he alleged that on **March 30, 2023**, he requested that Nodus transfer certain funds he needed to cover the costs of cancer treatment, but that the aforementioned EBS, contrary to the provisions of its internal policy, did not complete the transfer. Specifically, he argued that Nodus's actions had *caused* him *harm*. As part of his complaint, Mr. Marchan Ramos included as evidence the emails exchanged with Nodus. |
| Mr. Esteban Wilder | On **April 19, 2023**, Mr. Esteban Wilder filed a *claim* with the OCIF against Nodus. In summary, he claimed that on **February 22, 2023**, he requested a transfer of all his funds; however, he alleged that Nodus never completed the transaction. He noted that he contacted Mr. Ramírez via email and WhatsApp, and that neither he nor the company provided a concrete answer regarding when the transfer would be completed. In light of this, Mr. Wilder requested the intervention of the OCIF. |
| Mr. Dennys López | On **April 24, 2023**, Mr. Dennys López sent an email to the OCIF's Complaints Division in which he reported several irregularities regarding Nodus. Specifically, Mr. López alleged that the aforementioned IBE: 1) canceled all debit cards in December 2022 and had not yet reissued them; 2) it took approximately one (1) month to process a funds transfer, and 3) when a transfer was requested, Nodus indicated that it was not effective and charged a commission of $175.00.00 (sic) for that transaction. In short, Mr. López alleged that Nodus had withheld his money by canceling his debit card and failing to complete the requested transfers. |
| Mr. Federico R. Rosbaco | On **April 26, 2023**, Mr. Federico R. Rosbaco filed a *complaint* with the OCIF against Nodus. In it, Mr. Rosbaco alleged that on January 12, 2023, he requested that Nodus disburse $300,000.00 from his Individual DDA account via wire transfer. Subsequently, on **January 27, 2023**, Mr. Rosbaco requested a new transfer, this time in the amount of $90,000.00. However, he noted that Nodus never completed the aforementioned transfers, despite the multiple communications and applications made to that effect. In this context, Mr. Rosbaco requested that the OCIF order Nodus to immediately transfer the requested amount and, furthermore, order the closure of the account along with the transfer of the remaining balance. As part of his *claim*, Mr. Rosbaco included the following documents as evidence: 1) Natural Person account application form; 2) Emails with Nodus staff; 3) Communication via WhatsApp with Mr. Ramírez, 4) Out-of-court claim against Nodus filed by the law firm Wolf Popper LLP. |
| Ms. Michelle Veronesi | On **April 27, 2023**, Ms. Michelle Veronesi sent an email to the Complaints Division of the OCIF requesting assistance from that administrative body. This was because on April 6, 2023, she had requested a transfer of $14,901.14, which Nodus never completed. Ms. Veronesi included the emails sent to the aforementioned financial institution. |
| Ms. Maria Nella Elías | On **May 2, 2023**, Ms. Maria Nella Elias sent an email to the OCIF's Complaints Division to obtain information on the procedure for filing a complaint against Nodus. |
| Ms. Begoña Ozon | On **May 2, 2023**, Ms. Begoña Ozon sent an email to the OCIF's Complaints Division requesting an investigation into Nodus's irregularities regarding its customers, specifically the Financial Institution's delay -- two month --in sending her a debit card so she could access her funds. Ms. Begoña Ozon included in her communication the emails sent by Nodus; in one, they informed her that they would send the debit card within fifteen (15) days, and in the other, two months later, they stated that the debit card was in the process of being issued. |
| Mr. Daniel Castro | On **May 2, 2023**, Mr. Daniel Castro filed a *complaint* with the OCIF against Nodus for the Financial Institution's failure to process the requested funds transfer. |
| Mr. Daniel Villela | On **May 3, 2023**, Mr. Daniel Villela sent an email to the OCIF's Complaints Division reporting Nodus's refusal to complete the funds transfer he had requested. |
| Mr. Jesús Gómez | On **May 5, 2023**, Mr. Jesús Gómez filed a *complaint* with the OCIF against Nodus. This followed his request on April 3, 2023, for a transfer to Nodus in the amount of $32,500.00, which was not completed. Given these circumstances, and in the absence of a response from Nodus, Mr. Gómez requested the intervention of the OCIF. Mr. Gómez included with his *claim* the emails received from and sent to Nodus. |
| Ms. Vicky Arena | On **May 8, 2023**, Ms. Vicky Arena sent an email to the OCIF's Complaints Division reporting Nodus's refusal to complete the funds transfer she had requested. |
| Mr. Federico López Mañan | On **May 9, 2023**, Mr. Federico López Mañan filed a *Complaint* with the OCIF against Nodus. In short, he alleged that in March 2023 he requested a funds transfer to one of his suppliers, but that the transaction was never completed. This occurred despite his repeated efforts to obtain an explanation and gain possession of the funds held by the aforementioned Financial Institution. |
| Mr. Alejandro Brizio | On **May 9, 2025**, Mr. Alejandro Brizio sent an email to the OCIF's Complaints Division seeking information on the procedure to follow to file a claim against Nodus after the Financial Institution failed to complete the requested transfer of funds from his Nodus account to his Santander Spain account. Specifically, Mr. Brizio argued that, in response to his multiple claims, Nodus merely replied that they were handling the matter. |

See **Exhibit 4**.

52.     In addition to the claims filed against Nodus, the OCIF learned that the aforementioned Financial Institution was named as a Respondent in a multi-million-dollar debt

[Illegible initials]

15



collection lawsuit filed by Consorcio De Empresas Mendocinas Para Potrerillos S.A. -- a corporation organized pursuant to the laws of Argentina -- in the United States District Court for the District of Puerto Rico, in Case No. 23-01132-SCC. In that case, the plaintiff stated that on January 31, 2023, it requested a transfer of $6,500,000.00 from the $6,586,917.66 it had deposited in its Nodus account, and that, after several exchanges, Nodus canceled the transfer application without specific justification, citing "internal policies." *See* **Exhibit 5**.

53. It follows from the foregoing that Nodus, without any justification, failed to process the transfer applications to make available to its depositors a sum of not less than **$7,800,000.00**.

54. As a result, given Nodus's failure to address the deficiencies identified over the years—in particular, those identified in the audits conducted by the OCIF— and due to the critical operational, financial, and administrative (management) condition of it, on **March 9, 2023**, the OCIF and Nodus, through their respective legal representatives, held a meeting during which the OCIF notified Nodus of its decision to liquidate the operations of the IBE.

55. This was done in order to prevent Nodus from continuing to cause irreparable harm to its own interests, to those of individuals and entities holding funds or securities with Nodus, and to the public interest. To that end, the OCIF presented Nodus with several alternatives for carrying out the liquidation in a voluntary and orderly manner.

56. After several exchanges, **between March 24 and 28, 2023**, Nodus affirmatively stated that it would opt for the consensual liquidation of the IBE by submitting a voluntary Liquidation Plan.

57. On **May 5 and 8, 2023**, the OCIF, Nodus, and the Shareholders finally executed the *Plan* for *the Voluntary Liquidation and Dissolution of Nodus International Bank, Inc. See* **Exhibit 6.**

S8. The effective date of the Liquidation Plan was May 8, 2023 ("Effective Date").

59. Pursuant to the Liquidation Plan, Nodus agreed to cease its operations and continue operating under its license, on a limited basis, for the sole and exclusive purpose of liquidating its assets for the benefit of its depositors. *See* **Exhibit 6,** at pp. 4–5; see *also* **Exhibit 7,** p. 2, referring to *Section 4(B).*

60. The Liquidation Plan was amended on August 3, 2023, through a document titled *First Amendment to Plan of Voluntary Liquidation and Dissolution of Nodus International Bank* (the "Amendment"). *See* **Exhibit 7**.

61. The Amendment to the Liquidation Plan was intended to clarify the following: (i) that the liquidation period of the Liquidation Plan would not exceed eighteen (18) months from the Effective Date ("Liquidation Period"); (ii) the order of priority of payments for the liquidation; (iii) that no distribution would be made to the Shareholders until certain events occurred and only after obtaining a determination from OCIF to that effect; and (iv) that, with respect to communications between Nodus and its clients, such communications must be made in writing, with a copy to the Plan Administrator, unless the communication had been requested directly by the Plan Administrator, and for information approved by the Plan Administrator. *See* **Exhibit 7,** on p. 2, referring to *Section 3;* on pp. 4–5, referring to *Section 5(A);* on pp. 2–5, referring to *Section 5(C);* on p. 4, referring to *Section 14.*

62. The other terms and conditions of the Liquidation Plan remained unchanged by the Amendment and in full force and effect. *See* **Exhibit 7,** p. 4, *Section 2.*

63. The Liquidation Plan and the Amendment specifically provided as follows regarding the Liquidation Period:

[Illegible initials]

16



*During the liquidation period, Nodus shall limit its business activities to winding up its business and affairs, marshalling and preserving the value of its assets, and shall distribute Nodus's assets in accordance with the provisions of this Plan. Among the activities that Nodus is permitted to engage in as part of the winding up of its business and affairs is the completion of the Look Back Review, including the filing of Suspicious Activity Reports (SARs) which may be required to be filed by Nodus as a result thereof.*

See **Exhibit 7,** on page 2, referring to *Section 4(B).*

64.     In turn, the Liquidation Plan and the Amendment provided for the orderly payment of all of Nodus's obligations to its depositors and third parties, as well as for operating expenses, in accordance with an order of priority. *See* **Exhibit 7,** at pp. 4–5, regarding *Section 5(A).*

65.     Specifically, the Liquidation Plan expressly provided that the distribution of Nodus's assets to the Shareholders was prohibited until all of the IBE's obligations had been paid. *See* **Exhibit 7,** p. 5, regarding *Section 5(C).*

66.     It also provided that directors' compensation during the Liquidation Period would be the same as that which they received at the time of execution the Liquidation Plan. *See* **Exhibit 6,** pp. 9–10, *Section 16.*

67.     In light of the clear provisions of the Liquidation Plan, Nodus's shareholders and directors were expressly prohibited from receiving, directly or indirectly, any compensation that would be inconsistent with those provisions.

68.     To comply with the provisions of the Liquidation Plan, it was stipulated that Nodus would have a period of fifteen (15) days from the date of its execution to propose a candidate to serve as plan administrator and that, if such period elapsed without a candidate being proposed, Driven would be appointed as administrator. *See* **Exhibit 6,** p. 9, *Section 13.*

69.     In turn, the Liquidation Plan provided that the OCIF would modify the appointment of the administrator—that is, Driven—to serve as Nodus's Receiver in the event that the latter was unable to establish and fully fund a cash reserve or was unable to complete the transactions as provided in the Liquidation Plan within the agreed-upon timeframe, that is, within the Liquidation Period. *See* **Exhibit 6,** p. 11, *Section 22.*

70.     Given these circumstances, and with the agreed-upon period having elapsed without Nodus proposing any candidate, Driven was officially appointed as administrator of the Liquidation Plan on June 5, 2023. *See* **Exhibit 6,** p. 9, *Section 13.*

71.     That said, and insofar as is relevant here, it appears from the documents provided by the Shareholders to Driven as part of the administration that the then-members of Nodus's Board of Directors, prior to execution the Liquidation Plan and with full knowledge of the facts, approved a payment of preferred stock dividends in favor of five shareholders, including Mr. Niembro, as of March 31, 2023, payable on April 17, 2023. *See* **Exhibit 4-A.** This was done without OCIF's authorization and with the clear intent of obtaining benefits to the detriment of depositors.

72.     Likewise, on April 28, 2023[17], without prior authorization from the OCIF and knowing that the liquidation process was imminent and about to begin, Nodus entered into an agreement with Nodus Finance whereby the latter purchased a loan portfolio of $26,011,780.08 Nodus, also agreeing to a loan administration fee. *See* **Exhibit 8-A,** at pp. 1, 23, and 28–29; in particular, *Sections 1.1 and 2.23.*

73.     Although the agreement stated that Nodus would pay the amount of $26,011,780.08 to Nodus Finance; however, Nodus's financial statements show that the IBE accepted Nodus Finance's loan portfolio as partial payment of the debt it owed the latter owed to Nodus as a result of the 47 promissory notes it acquired between 2019 and 2021. *See* **Exhibit 8-C.**

[Illegible initials]

---

[17] It should be noted that, on that same date, the Shareholders, through Nodus's legal representative, sent an email to OCIF's legal representatives stating that the Shareholders had accepted the terms and conditions of the liquidation Plan that had been in negotiations since March 2023. See **Exhibit 8-B.**

17

74.    In carrying out this transaction, during the discussions leading up to the finalization of the Liquidation Plan, and days before its execution, Nodus lost the possibility of recovering the $26,011,780.06 owed to it by Nodus Finance upon the maturity date of promissory notes, and instead accepted as payment for that debt a portfolio of delinquent and defaulted loans, most of which were unsecured, while also assuming the responsibility and risk of collecting them. Specifically, Nodus's financial statements show that, from March 2023 to April 2023, Nodus reported a reduction of $25,324,407.65 in its promissory note assets. This reduction resulted in a direct benefit for Nodus Finance by freeing it from a liquid debt to Nodus and simultaneously increasing its deposit account (DDA) at Nodus by $272,904.43, all to the direct detriment of the IBE depositors.

75.    In fact, certain communications exchanged between Nodus and Nodus Finance in January 2024 indicate that the Shareholders acknowledged that, of the $26,011,780.08 loan portfolio, at least $8,000,000.00 was potentially uncollectible. See **Exhibit 8-D.**

76.    Therefore, the Shareholders used the control they held over Nodus to benefit Nodus Finance—owned by Mr. Niembro and Mr. Ramírez—prior to entering the Liquidation Plan. In other words, despite failing to make available to its depositors the amount of more than **$7,800,000.00**, Nodus, as of those same dates, wrote off **$26,011,780.08** in Nodus Finance's debts, while also agreeing to certain administrative fees payable by Nodus.

77.    With full knowledge of the foregoing, Nodus filed its Liquidation Budget ("Budget") with the OCIF, in which it represented that it would have the necessary liquidity to comply with the ordered liquidation of its assets within the Liquidation Period. See **Exhibit 9.** In light of such representations, the OCIF approved the Budget submitted by Nodus.

78.    As part of the Liquidation Plan, as of June 5, 2023, the Shareholders presented to Driven, the Administrator appointed at that time, a loan portfolio of approximately $83.9 million in principal, of which 88.38% were unsecured loans and of which only 11.62% of the repayment was secured by collateral. In addition, 41.99% of the loan portfolio (equivalent to $3.2 million) was concentrated in individuals or entities from Venezuela.

79.    In turn, as of June 5, 2023, the Shareholders indicated they were convinced that, regardless of U.S. Generally Accepted Accounting Principles *(U.S. GAAP Standards),* the majority or 100% of the loan portfolio could be collected, with the exception of those subject to legal proceedings, given that the loans had been made *to* the Shareholders' personal clients, whom, according *to* them, *they* were certain would be responsible for repayment, even though the loans were unsecured.

80.    Furthermore, as of June 5, 2023, the Shareholders represented to Driven, then the Plan Administrator, that Nodus had approximately $22.6 million in liquid assets and cash, or cash equivalents, which were exclusive of the aforementioned loan portfolio. See **Exhibit 10.**

81.    Specifically, the Shareholders' representation regarding the availability of the approximately $22.6 million in cash stemmed from the following assets:

[Illegible initials]

18



| Cash Accounts | Balances |
|---|---|
| Firstbank of PR | $ 392,479.97 |
| Atlas Bank - Panama | $ 4,845,575.24 |
| Atlas Financial Group (FC Stone) | $ 4.00 |
| Dinosaur Merchant Bank | $ 1,982,265.01 |
| EuroExchange / Convera | $ 234,799.00 |
| Payblr Compensation Account | $ 108,234.56 |
| Payblr/Mastercard Collateral | $ 357,930.00 |
| Bantransfer Inc. | $ 5,803.74 |
| BCB Commercial Bank | $ 10,000.00 |
| Crossbar FX | $ 1,025,543.60 |
| **Total - Cash Accounts** | **$8,962,635.12** |

| CDs/Promissory Notes/Other Properties | Balances |
|---|---|
| Ourmicrolending | $4,220,000.00 |
| Promissory notes from LF (Mi Papaya LLC) and NF (Nodus Finance LLC) | $1,124,000.00 |
| Other Properties (OREO) | $5,006,016.00 |
| Promissory notes | $3,047,375.30 |
| **Total - CDs and Promissory Notes** | **$13,397,391.30** |

| Restricted Accounts | Balances |
|---|---|
| Firstbank of Puerto Rico | $300,000.00 |
| **Total Restricted Accounts** | **$300,000.00** |

| | |
|---|---|
| **Total Cash and Cash Equivalents** | **$22,660,026.42** |

See **Exhibit 10.**

82.     It should be noted that, prior to the execution  of the Liquidation Plan, Mr. Niembro stated that he would inject an additional $2,000,000.00 into Nodus, through which he would become a 63.31% shareholder of Nodus, with Mr. Ramírez retaining ownership of the remaining 36.69%. However, this capital injection did not materialize until months after the original attempt, as the funds originated from Mr. Niembro's account at Atlas Bank (Panama), S.A. ("Atlas Bank"), an entity currently under receivership by its regulator, the Superintendency of Banks of Panama, due to fraud schemes.

83.     It should be noted that Nodus's initial strategy for implementing the aforementioned Liquidation Plan, as expressed by its shareholders and directors, consisted of selling its client portfolio to Atlas Bank—a corporation organized and incorporated pursuant to *the laws* of the Republic of Panama—for a *sum* of money corresponding to 90% of the deposits, an amount that — together with its assets — would be sufficient to pay all obligations and operating expenses in the order established in the Liquidation Plan.

84.     At that time, the Shareholders represented to Driven and the OCIF **(i)** that they were at an advanced stage of negotiations with Atlas Bank for the latter to purchase Nodus's loan portfolio for a minimum amount of $60,000,000.00 and **(ii)** that, furthermore, Atlas Bank was interested in transferring the equivalent amount in deposit accounts, with a projected loss of approximately 10%.

85.     However, on July 11, 2023, Driven met with representatives from Atlas Bank, including Mr. Andrew Russell, president of Atlas Bank, Darío Herrera, Germán Martans, Tomás Polanco (Mr. Niembro's contact), and Mr. Niembro, and it emerged from that meeting that Atlas Bank was interested in acquiring no more than forty-five million dollars ($45,000,000.00) from Nodus's portfolio.

86.     Accordingly, on August 7, 2023, Atlas Bank, through its president, Mr. Andrew Russell, submitted an initial offer to Nodus to acquire its customer portfolio for an amount of up to approximately thirty million dollars ($30,000,000.00). See **Exhibit 11.**

87.     However, on September 15, 2023, the Superintendency of Banks of Panama, the regulatory authority for Atlas Bank, issued Resolution SBP-BAN-R-2023-01296 (the "Atlas Resolution"), by which it: (i) ordered the assumption of administrative and operational control of Atlas Bank; (ii) ordered the suspension of all banking operations of Atlas Bank, and (iii) appointed Mr. Jaime De Gamboa Gamboa as interim administrator of Atlas Bank. Preceding, the aforementioned entity, like Nodus, engaged in certain activities that led to its insolvency. See **Exhibit 12.**

[Illegible initials]

19

88.     On September 15, 2023, the Shareholders of Nodus submitted a new proposal to Driven to transfer 100% of Nodus's loan portfolio, no longer to Atlas Bank, but to its affiliate Nodus Finance and to Alter Bank Ltd. ("Alter Bank"), an entity owned by Mr. Ramírez. *See* Exhibit 13.

89.     On September 28, 2023, Nodus and Driven, as Plan Administrator, held a meeting with the OCIF in which they discussed the situation with Atlas Bank and the status of the liquidation.

90.     During that meeting, as part of the investigations conducted by the Administrator, the OCIF became aware of the risk to Nodus's deposits posed by the shareholders' simultaneous payments to affiliated entities, namely Nodus Finance and Financial Technology.

91.     Specifically, at that meeting, the Administrator notified the OCIF that it had initiated an investigation due to certain unusual transactions—outside the ordinary course of the IBE's business—carried out by the IBE with Nodus Finance and Financial Technology before or after the Effective Date and the Administrator's appointment.

92.     In particular, regarding Nodus Finance, the Administrator indicated that he had requested Nodus Finance's account statements from the Effective Date of the Liquidation Plan up to that time (prior to the meeting), which showed a balance of
$986,313.83 as of June 20, 2023. *See* Exhibit 14, p. 2.

93.     On June 21, 2023, the Administrator sent an email to the Shareholders reiterating that internal transfers within Nodus without the Administrator's authorization were prohibited. *See* Exhibit 15.

94.     Notwithstanding the foregoing, the Administrator indicated that as of August 29, 2023, the Nodus Finance account at Nodus showed a balance of only $25.28. *See* Exhibit 14, p. 3.

95.     As for Financial Technology, the Administrator reported that he also requested all of Financial Technology's bank statements from Nodus and from Mr. Niembro, as well as all details and supporting documentation for Financial Technology's invoices, in order to evaluate the payment being made to that entity. As a result of this investigation, the Administrator identified through Nodus's bank statements that Mr. Niembro was allocating certain lump-sum amounts to himself under the heading "TNC Fees." When questioned about these entries, Mr. Niembro indicated that they corresponded to his salary at Nodus, his dividends as a shareholder, his responsibilities as a director, his commissions, his position as President of Financial Technology, and various accounting responsibilities for Financial Technology, which he stated could not be processed through the IBE's accounts due to its geographic location in Venezuela.

96.     Given these circumstances, after execution  the Liquidation Plan, Mr. Niembro, rather than waiving his compensation, continued to receive a certain amount of money as salary through Financial Technology, although it had been reduced by nearly half, on the grounds that he would assist in completing the dissolution of Nodus. See Exhibits 16-A, 16-B.[18] Specifically, the "Salary" for Mr. Niembro, which was included in the Budget, was authorized exclusively after Mr. Niembro represented that he would provide advisory services to Nodus regarding the collection of loans and the migration of the IBE's portfolios.

---

[18] It should be noted that, according to the contract between Nodus and Financial Technology, executed on July 1, 2014, Financial Technology would provide services inter alia "international market research, product and service development, product promotion and sales, technological implementation and development, and managerial and technical consulting." *See* Exhibit 16-C, p. 1. In exchange for these services, Financial Technology would bill at a rate of $300.00 per hour. Id. at p. 8, *Section 8.* In practice, it turned out that Financial Technology billed in advance based on a budget created to cover its alleged contractual functions.

[Illegible initials]

20



97.     Thus, Mr. Niembro received **$25,000.00** per month through Financial Technology until January 2024. This was allegedly for the purpose of providing collection and migration services on behalf of Nodus, even though none of his actions resulted in the expected collections. This is because, during this period, only $1,480,349.00 of the $33,047,722.00 (i.e., less than 5.00%) of the past-due balances was collected. It is worth noting that these collections mostly corresponded to customers who had never failed to make their payments, so there was no evidence of an increase due to Mr. Niembro's alleged collection efforts.

98.     As a result of the alarming actions and false representations made by the shareholders of Nodus, and in order to prevent them from continuing to bleed the IBE dry, on October 3, 2023, the OCIF issued a *Complaint and Provisional and Permanent Order for the Appointment of a Receiver and Revocation of License* against Nodus. *See* **Exhibit 17.**

99.     Through the Receivership Order, the OCIF revoked Nodus's license to operate as an IBE and appointed Driven as Nodus's independent receiver, replacing Nodus's management, officers, and board of directors with Driven. To that end, the OCIF authorized Driven to take possession of and control all the assets and liabilities of the aforementioned entity in order to complete the liquidation process in accordance with the provisions of the Liquidation Plan and Budget.

100.    In turn, in the Receivership Order, the OCIF ordered Nodus to provide all information requested by Driven necessary to **complete** the liquidation and identify assets, as well as to take the strictest security measures to secure, guarantee, preserve, and maintain the integrity of all assets identified in Nodus's consolidated and audited financial statements, the reports, books, records, accounting records, and any other documents related to its operations.

101.    On October 13, 2023, Mr. Niembro, Mr. Ramírez, and Mr. José Gregorio Suárez appeared before the OCIF via *a Response to Complaint and a provisional and permanent order for the appointment of a receiver and revocation of license,* acquiescing to the OCIF's determination.

102.    After evaluating the positions of Nodus and the Shareholders regarding the Receivership Order, on October 16, 2023, the OCIF issued a *Resolution* whereby it: (i) revoked Nodus's license; (ii) confirmed the Receivership Order in its entirety, thereby making it permanent until the liquidation proceedings are concluded, and (iii) canceled a hearing it had previously scheduled. *See* **Exhibit 18.**

103.    Following several procedural developments, on December 8, 2023, the OCIF issued an *Amended Nunc Pro Tunc Resolution* to clarify that the corporate name of the receiver was Driven, P.S.C. *See* **Exhibit 19.**

### iv.    Events Following the Order Appointing the Receiver

104.    Following Driven's appointment as Nodus's Receiver, it has continued to examine and investigate the IBE's financial affairs. As part of its duties as Receiver, Driven became aware of the following irregularities:

### a)    The loan portfolio

105.    As of January 31, 2024, after conducting its analyses and investigations and holding multiple meetings in various jurisdictions, the Receiver reported that more than 65% of Nodus's loan portfolio is classified, according to *U.S. GAAP Standards,* under the category of losses. *See* **Exhibit 10.**

106.    Specifically, of the collateralized loans, which comprise 11.62% of the IBE portfolio, approximately 50% are subject to legal proceedings due to registration defects, placing Nodus in second priority with respect to the pledged collateral. As a result, less than 5% of the portfolio consists of collateralized loans subject to foreclosure. *See* **Exhibit 10.**

[Illegible initials]

21



107. It should be noted that Driven encountered this situation **despite its purchase of more than thirty (30) loans from Nodus Finance on April 28, 2023, which the Shareholders classified as mortgage loans.**

108. As of December 31, 2023, of the outstanding balance of principal and interest, nearly 65% (representing $54,513,252.00 of the total amount owed of $84,535,366.00) of the debtor clients are located outside the United States, with 42.26% (with balances of $35,722,224.00) of these located in Venezuela, which significantly increases the risk that the amounts owed will be uncollectible. *See* **Exhibit 10.**

109. As of January 31, 2024, the Shareholders presented Driven with a new analysis of the collectability of the loan portfolio, projecting the recovery of approximately $59.7 million of the balance reported as outstanding of $84.5 million as of December 31, 2023. This analysis clearly showed that less than 90% of the loan portfolio balance is collectible, according to the Shareholders' own representations to the OCIF and the Receiver. *See* **Exhibit 10.**

110. As if that were not enough, Mr. Niembro, through Nodus Finance, went even further, proposing, via an email dated February 1, 2024, to collect loans from clients in Venezuela (despite previous unsuccessful attempts) in exchange for a monthly payment of **$80,000.00** and an **8% commission** on the amounts recovered. *See* **Exhibit 21.**

111. It is important to note that, although the Shareholders have emphatically claimed since the Receivership Order was issued that they can collect the full outstanding balance of the loan portfolio; to date, **the Shareholders have not actually collected those amounts.** Worse still, instead of making the necessary efforts to comply with the OCIF's order, the Shareholders have focused on minimizing the consequences of their actions and have attempted to blame the OCIF, the Receiver, and others for Nodus's current situation.

112. Furthermore, as of February 29, 2024, a total of $33,047,722.00 of the outstanding principal balance of the loan portfolio had come due, and from October 2023 to February 29, 2024, Nodus, through the Receiver, has collected only $1,480,349.00 (approximately 4% of the amounts due as of February 29, 2024). *See* **Exhibit 10.**

113. In addition to the foregoing, **although the Receiver never instructed Nodus's clients to stop making payments on their respective loans,** many Nodus clients have stopped paying, and others are waiting for their loans to be transferred to the Shareholders' entities in order to make payments. *See* **Exhibit 10.**

114. In turn, as part of its ongoing investigation into Nodus's financial affairs, Driven has encountered numerous additional liquidity issues and ongoing complications in its efforts to take possession of the IBE's assets.

b) **Liquid assets available for liquidation.**

115. Despite the Shareholders' initial representations regarding the availability of liquid assets, as of January 31, 2024, Driven projected that, of $21.3 million, approximately $13.9 million could be made liquid. Of the $13.9 million, the Receiver has immediate control over only $2,361,166.00 in cash available in Nodus's various operating accounts. *See* **Exhibit 10.**

116. The *value* of certain *other* Nodus *assets*, inter alia certain promissory notes issued by Nodus Finance (in the case of the promissory notes issued by Nodus Finance and Mi Papaya LLC[19], classified as *Other Investments* with no value) and a piece of property located in

[Illegible initials]

---

[19] As for the promissory notes of Nodus Finance and Mi Papaya LLC, they were identified as *IF and NF Promissory Notes.*

22

ACTUM TRANSLATIONS    PERITO TRADUCTOR
LUIS ALBERTO CRUZ AGUILAR
TSJCDMX        BJ 23/02/24

New York was significantly lower than what was originally represented by the Shareholders. *See* **Exhibit 10**.

117.    Specifically, the Receiver identified the following issues regarding the alleged liquidity that the Shareholders claimed that the IBE possessed:

> i.    **Atlas Bank** — Following the issuance of the Atlas Bank Resolution, the former Administrator, now the Receiver, learned through discussions with Mr. Jaime De Gamboa Gamboa, interim administrator of Atlas Bank, that on November 21, 2023, Atlas Bank filed a criminal complaint against Nodus and Mr. Niembro, following the unexplained disappearance of funds from National Advisors Corporation, a brokerage firm where most of Atlas Bank's funds were held.[20]   As a result of these events, Mr. Gamboa explained to Driven that he estimated Nodus would only be able to recover about 10% of its funds, that is, approximately **$475,702.00** of the **$4,757,024.00** that the Shareholders had represented as being available. *See* **Exhibit 10**.

---

[20] On November 21, 2023, *Atlas* Bank (Panama), S.A. filed *a lawsuit* against National Advisor Corp, Mr. Niembro, Nodus, inter alia. This was due to the alleged commission of crimes against the economic order, specifically financial crimes and money laundering, to the detriment of the aforementioned Banking Entity. In summary, Atlas Bank alleged that, between July 2022 and June 2023, the brokerage firm National Advisor Corp. carried out several unusual transactions from the investment account Atlas Bank it held to various clients of the latter. The bank indicated that those who served as general manager and interim general manager of Atlas Bank for the years 2022 and 2023 organized a fraudulent scheme in agreement with National Advisor Corp. to benefit certain Natural Persons and Legal Entities. *See* **Exhibit 20.**

In particular, Atlas Bank highlighted in its *Complaint* the following transactions carried out by National Advisor Corp. as part of the scheme:

a.    A transfer of **$2,208,000.00** was made on July 5, 2022, from the Atlas Bank account to the account ▮▮▮▮▮ owned by Mr. Niembro. Atlas Bank further states that on the same day, July 5, 2022, Mr. Niembro, without the bank's approval, transferred **$2,000,000.00** to the account ▮▮ owned by Nodus. Subsequently, on August 9, 2022, Nodus, through its account ▮▮▮▮ transferred the same amount, namely $2,000,000.00, to the account ▮▮▮▮ belonging to Mr. Niembro.

b.    A total transfer of **$4,760,000.00** was made on August 22, 2022, from the Atlas Bank account to the account ▮▮▮▮ owned by Campo Marino, S.A. In this regard, Atlas Bank indicates that on August 23, 2022, Campo Marino, S.A. gradually transferred a total of **$4,722,818.68** from its account at National Advisor to the account ▮▮▮▮ belonging to Nodus.

c.    Transfer of **$2,100,000.00** made on September 12, 2022, from the Atlas Bank account to the account ▮▮▮▮ owned by COODEM, R.L. On the same day, COODEM, R.L. transferred the sum of $1,044,639.50 to the account ▮▮▮ belonging to Nodus.

d.    A transfer of **$7,450,000.00** was made on November 18, 2022, from the Atlas Bank account to the account ▮▮▮▮ owned by Campo Marino, S.A. On the same date, Campo Marino, S.A. made two transfers to the account ▮▮▮▮ owned by Nodus, one for **$3,350,203.00** and another for **$3,981,773.00**.

e.    A transfer of **$6,000,000.00** was made on December 27, 2022, from the Atlas Bank account to the account ▮▮▮▮ owned by Campo Marino, S.A. In turn, on December 27, 2022, Campo Marino, S.A. transferred the sum of $128,000.00 to the account ▮▮▮▮ owned by Mr. Niembro, and on December 28, 2022 Campo Marino, S.A. transferred **$4,735,498.11** to the account ▮▮▮▮ belonging to Nodus.

f.    A transfer of **$2,128,000.00** was made on December 30, 2022, from the Atlas Bank account to the account ▮▮▮▮ owned by Campo Marino, S.A. On that same date, Campo Marino, S.A. transferred **$2,000,000.00** to the account ▮▮▮▮ owned by Mr. Niembro; the latter, in turn, transferred the $2,000,000.00 to the account ▮▮▮▮ owned by Nodus. Id.

In light of the foregoing, Atlas Bank argued in its complaint that National Advisor Corp. exceeded its authority in managing Atlas Bank's investment and custody account by carrying out the transactions described above for the benefit of third parties who had no relationship with Atlas Bank and without the authorization of the Banking Entity's directors. Likewise, it alleged that Mr. Niembro, Nodus, and other entities received and executed transfers of significant amounts into their bank accounts, originating from and related to Atlas Bank's account at National Advisor Corp., thereby committing the crime against the economic order, specifically financial crimes and money laundering, as defined in the Penal Code of Panama. Finally, Atlas Bank sought damages in the amount of $60,000,000.00. Id.

[Illegible initials]



23

ii. **Crossbar FX** — On July 14, 2023, the Administrator was notified that Crossbar FX had filed a claim against its custodian, BSI Group LLC, given that Nodus held assets with Crossbar FX totaling $1,024,614.60, along with other client accounts that had disappeared. Crossbar FX sent Nodus weekly updates on the status of its pending claim against its custodian; however, Driven decided *to retain* legal counsel, iLaw, in the United Kingdom to oversee Crossbar FX's proceedings and initiate a formal claim to recover the outstanding funds. As of today, the Receiver estimates that the funds in Nodus's account at Crossbar FX cannot be recovered and, therefore, does not include them in its liquidity projections. *See* **Exhibit 10**.

iii. **Our MicroLending LLC** — According to the Shareholders, Nodus held two (2) certificates of deposit ("CDs") at an institution called Our MicroLending in Florida. When the Receiver began reviewing the available information and supporting documents for the CDs, the Receiver realized that these were not CDs but rather investment certificates that served as revolving Lines of Credit to Our MicroLending so that they could provide smaller loans to their own clients. After further investigation, the Receiver discovered that Our MicroLending is a lending company organized pursuant to the laws of the state of Florida that provides microfinance loans to small business owners. Both Investment Certificates had a maturity date of October 11, 2023. After multiple discussions with Our MicroLending, they revealed that they were unable to settle and make the required total payments of $4.2 million upon the maturity of the Investment Certificates. Consequently, the Receiver did not have access to this $4.2 million in early October as needed to execute the liquidation of Nodus. As of today, there is still a total outstanding principal balance of $3,035,000.00. The Receiver negotiated with Our MicroLending to accept partial payments as they become available from its own collections. Although the Receiver expects to receive the total amount of the outstanding principal, there is no formal projected timeline to guarantee when these balances will be fully settled. *See* **Exhibit 10**.

iv. **Funds Blocked by OFAC** — As of June 2023, Nodus had a total of **$9,935,950.33** in funds blocked by the Office of Foreign Assets Control of the U.S. Department of the Treasury ("OFAC"). Pursuant to OFAC requirements, Nodus was required to deposit the entirety of those funds into an interest-bearing account from which only OFAC-authorized debits may be made. Consequently, this amount of $9.9 million created additional liquidity problems for the IBE. *See* **Exhibit 10.**

118. Consequently, as of January 31, 2024, Driven had only $2,361,166.00 available.

c) **Repayment efforts.**

i. *Initial Liquidation Analysis*

119. Based on the Shareholders' representations as of June 5, 2023, Driven submitted to the OCIF an initial liquidation analysis (the "Initial Liquidation Analysis") to provide *waterfall* payments to depositors, which consisted of five (5) phases according to the Liquidation Plan, namely:

a. **Phase 1**: Close all accounts with balances of $55.00 or less;

[Illegible initials]

24



b. **Phase 2**: Settlement of all accounts of $7,000.00 or less, using a maximum of $3,000,000.00 from the funds in Nodus's account at Atlas Bank;

c. **Phase 3**: Transfer of a maximum amount of $60,000,000.00 in loans to Atlas Bank, along with an equivalent amount in deposit accounts;

d. **Phase 4**: Migration of the remaining amount of the loan portfolio and its equivalent value in deposit accounts to Nodus Finance, or to a Trust at ILH Trust in Panama (a Trust created by a law firm in Panama—identified by the Shareholders—to manage funds and/or margin accounts; the purpose of ILH Trust was to carry out a temporary migration that would eventually be transferred to Alter Bank, a new Banking Entity organized by Mr. Ramírez in Saint Lucia);

e. **Phase 5**: Settlement of all remaining amounts, if any, to the Shareholders.

120.    The Initial Liquidation Analysis projected a 10% loss, based on the original offer made by Atlas Bank, and therefore estimated a recovery and repayment of 90% of *Nodus* deposits.

121.    On July 18, 2023, Nodus, with the Administrator's authorization, sent an official notice informing all customers whose accounts had balances of less than $55.00 of the closure of those accounts, thereby completing Phase 1 of the Initial Liquidation Analysis.

122.    On August 23, 2023, as part of a test program, Driven successfully processed the settlement of four (4) accounts with balances under $5,000.00 through Mi Papaya LLC, a payment processing entity recommended by the Shareholders.

123.    However, due to the aforementioned complications with the funds at Atlas Bank, the disappearance of assets from Crossbar FX, and the Shareholders' unsuccessful efforts to collect on the loan portfolio, Driven was unable to implement Phase 2, or subsequent phases, of the Initial Liquidation Analysis.

### ii.    Second Liquidation Analysis and Migration efforts

124.    Following the issuance of the Receivership Order and after the Nodus Shareholders complied with it, Driven began a second analysis to implement the liquidation of Nodus (the "Second Liquidation Analysis"), which consisted of the following:

a. **Phase 2**: A total of approximately $5,000,000.00 would be used, with a projected loss of 30%, to liquidate all accounts with balances of less than $20,000.00, based on an analysis of the availability of funds at that time;

b. **Phase 3**: it would be carried out by migrating deposits to those customers who choose between Nodus Finance and Alter Bank, with a projected loss of 10%

i. Those customers who chose Nodus Finance would migrate with a promissory note, of a one year maturity term, which could be renewed for two (2) years, at an Interest Rate of 3%, with quarterly payments;

ii. Customers who chose Alter Bank would migrate their funds into three (3) year certificates of deposit at an interest rate of 1%;

c. **Phase 4**: Would consist of the liquidation of all remaining customers who did not opt for the migration, without a specific loss projection.

125.    According to the Second Liquidation Analysis, the Receiver would retain a portion of the loan portfolio to ensure payment to depositors who opted for Phase 4 of the Liquidation Plan.

[Illegible initials]

25

126.    By November 1, 2023, the Receiver sent all customers of Phase 2 an offer to (i) receive 70% of their deposits through a payment processing entity, or (ii) wait for Phase 4.

127.    On December 7, 2023, the Receiver sent a second offer to customers in Phase 3 to (i) transfer their deposits to Nodus Finance via a promissory note; (ii) transfer their *funds* to Alter Bank as a certificate of deposit; or (iii) wait for Phase 4 for the liquidation of their deposits.

128.    In light of this, Driven proposed that all remaining loans be transferred to Nodus Finance, creating a promissory note issued by Nodus Finance and payable to Driven, acting on behalf of Nodus, so that Nodus Finance would pay Nodus the portion corresponding to the total collections from the portfolio. In response to this counterproposal, Mr. Niembro suggested that the promissory note be divided into two (2) parts, and that the responsibility for collection be divided equally among the Shareholders.

129.    Subsequently, the Shareholders submitted to the Receiver- who in turn forwarded it to the OCIF - a list of preselected loans corresponding to their personal clients who allegedly would be willing to migrate to their respective entities. **However, upon analyzing that list, the Receiver realized that the loans Nodus would retain for Phase 4 would be insufficient to cover the remaining deposits, and that the losses Nodus would incur would be disproportionate compared to the loans that would migrate to Nodus Finance and Alter Bank.**

130.    However, Alter Bank was not ready to receive new customers, as it did not possess the licenses required to operate in Saint Lucia nor the infrastructure necessary to fulfill its obligations to the Receiver.

131.    Given these circumstances, the Receiver, having determined in his professional judgment that the shareholders' migration proposals were not feasible, submitted them to the OCIF, and the OCIF agreed that they were not feasible because depositors would essentially remain in their current position, and those depositors that opted for Phase 4 would suffer even greater losses.

132.    In light of the foregoing, as of this date, the Receiver continues to evaluate additional alternatives to address Nodus's insolvency and lack of liquidity, which include additional third-party support to manage collection efforts, the reduction of the liquidation budget, and the pursuit of legal claims against entities in possession of Nodus's assets.

## VI. CONCLUSIONS OF LAW

### A. Authority delegated to the OCIF

As is well known, the OCIF, by virtue of Act No. 4-1985, is the government regulatory entity responsible for supervising and overseeing Financial Institutions and Banking Entities organized pursuant to the laws of Puerto Rico that operate or conduct business in this jurisdiction, particularly, and as relevant here, those organized pursuant to Act No. S2-1989. Art. 3 of Act No. 4-1985[21]. Specifically, the OCIF has the inescapable responsibility to ensure "that the interests of those linked to these industries as depositors, creditors, shareholders, or other types of stakeholders are protected." *See* Explanatory Memorandum of Act No. 4-1985.

In order to comply with this public policy, the Legislative Assembly delegated to the OCIF Commissioner, inter alia, the authority to: (a) revoke or suspend a license to operate an IBE when, among other instances, the Commissioner finds that the entity is being managed in a manner inconsistent with the public interest; (b) appoint a receiver and order the dissolution of an IBE; (c) impose such sanctions as it deems necessary and appropriate in accordance with its Regulations; and (d) suspend, dismiss, or otherwise sanction any director or officer, employee,

---

[21] 7 L.P.R.A. §2003.

[Illegible initials]



26

agent, or individual acting in a similar capacity for an international Banking Entity, who violates or knowingly or negligently allows others to violate the Act, its Regulations, an order, or any written document established by the Entity.[22] *See* Sec. 3(a)(9) and (10) of Act No. 52-1989.

In turn, in order to ensure the effective fulfillment of the delegated duties, the Commissioner was empowered to "[i]nitiate any legal remedies, actions, or proceedings that may be necessary or appropriate to give effect to the purposes of this Act or any other Act or regulation, the enforcement or oversight of which has been entrusted to him, [...]". Art. 10(a)(4) of Act No. 4-1985, 7 L.P.R.A. §2010. Therefore, the Legislative Assembly granted the Commissioner the authority to perform all acts and file all remedies necessary for the effective enforcement of the statutes and regulations under his administration and jurisdiction. *See* Art. 10(a)(8) of Act No. 4-1985, 7 L.P.R.A. §2010; *see also* Sec. 3(a)(12) of Act No. 52-1989, 7 L.P.R.A. §232a.

Thus, for example, in OCIF v. Northstar Mortgage Corp., et al., 2007WL3244752 (2007), the Court of Appeals, relying on the broad powers delegated to the OCIF, recognized the authority of that government agency to grant Restitution as a remedy, "in order to uphold the rights of consumers who obtained services from the financial industry." This was based on the court's recognition of the "protective nature of the OCIF against fraudulent and deceptive practices by unscrupulous entities and individuals in the [financial] industry." I. In light of this, the Court of Appeals upheld the OCIF's ruling ordering Mortgage Mall, Northstar, Yadira Rivera Isaac, Ulises Vega Morales, and the Joint Property Partnership formed *by* them to jointly and severally perform restitution for the aggrieved parties in the amount of $799,806.14. I.

In accordance with the foregoing, and as applicable here, Section 20 of Act No. 52-1989, 7 L.P.R.A. §232p, in its subparagraph (e), expressly provides that the Commissioner may "**order restitution or reimbursement of payments received in violation of the provisions of this Act** or any rule or regulation that may be promulgated pursuant thereto, **or any other remedy deemed necessary to enforce the purposes of this Act**." (Emphasis added).

Subsection (a) of the aforementioned section reads as follows: "[i]f any director, officer, or individual acting in a similar capacity of an international Banking Entity or of a person of which the Banking Entity is a unit violates, or knowingly or negligently permits any director, officer, agent, or employee of the Banking Entity or of the person of which the Banking Entity is a unit to violate this Act, the Commissioner's regulations, or any provision of the certificate of incorporation, contract of association, or other written document establishing the international Banking Entity, the Commissioner shall notify and summon the interested parties to an administrative hearing in accordance with the regulations provided for in Section 23 of this Act. Once the hearing has been held and after the Commissioner determines that any of the aforementioned provisions has been violated in this subsection, the Commissioner shall take appropriate action, including the suspension or removal of such director, officer, or individual."[23]

---

[22] With regard to the Commissioner's authority to appoint a receiver and order the dissolution of an international Banking Entity, Article 10(b) of Act No. 4-1985, 7 L.P.R.A. §2010, provides as follows:

> [i]f, as a result of an audit, examination, or inspection, or of a report submitted by an examiner, it is demonstrated that the financial institution lacks a sound economic and financial position or that it is operated or managed in such a way that the public or the persons and entities that have funds or securities in its custody are at risk of being defrauded, and in the absence of a specific provision in the law governing the financial institution in question that similarly empowers the Commissioner, the Commissioner may assume the management and administration of the financial institution and promptly appoint a receiver, which, in the case of insured financial institutions, may be its insurer.
>
> [...]
> The receiver so appointed shall administer the financial institution in accordance with the provisions of the Act and the regulations governing it, and in accordance with the regulations promulgated by the Commissioner for Receiverships or emergency measures declared pursuant to this section. Such receivership shall terminate upon the complete liquidation of the financial institution if necessary, or when the operations of the institution, as certified by the receiver, permit, in the Commissioner's judgment, the return of the administration of the institution to its duly elected and appointed officers and officials, given the circumstances as the Commissioner may stipulate. [...]

[Illegible initials]

27

Consequently, and pursuant to the aforementioned Section 20 of Act No. 52-1989, the OCIF Commissioner may order any IBE or any person, including, but not limited to, the shareholders, officers, and employees of the entity in their official or personal capacity, to be held accountable for acts that are contrary to the laws and Regulations that the OCIF is charged with enforcing. This necessarily includes ordering the piercing of the corporate veil of a given entity to impose personal liability on its shareholders.

### B. Doctrine of piercing the corporate veil

In our jurisdiction, it is a well-established rule that the legal personality of corporations shall be respected, provided that this does not amount to "sanctioning fraud, promoting injustice, evading a statutory obligation, defeating public policy, justifying inequality, protecting fraud, or defending crime." Díaz Aponte v. Comunidad San José, Inc., 130 D.P.R. 782 (1992). If any of the aforementioned circumstances exist, the Supreme Court of Puerto Rico has ruled that piercing the corporate veil of the entity is justified. This is done to prevent the improper use of the corporation as a tool to perpetuate fraud, commit illegal acts, or act contrary to public policy. Díaz Olivo, op. cit., at pp. 119 and 130.

"However, in order to pierce the corporate veil, it is naturally required that sufficient evidence be presented to justify imposing liability—beyond the corporate entity—on the directors, officers, or shareholders of the corporation." (Emphasis added is ours) Díaz Aponte v. Comunidad San José, Inc., supra, citing San Miguel Fertil. Corp. v. P.R. Drvdock, 94 D.P.R. 424, 430 (1967). Along these lines, our Supreme Court has ruled that it is appropriate to disregard the legal personality of a corporation and **subject the shareholders' assets** to liability for the corporation's debts and obligations in those cases in which the corporation is merely an "alter ego" or a passive economic conduit ("business conduit") of its sole shareholders, who receive, exclusively and personally, the profits generated by the corporation's operations, provided that this is necessary to prevent fraud or the pursuit of an illegal purpose, or to prevent a clear injustice or wrong. D.A.Co. v. Alturas Fl. Dev. Corp. et al., 132 D.P.R. 905, 925 (1993).

In this regard, it has been noted that fraudulent conduct occurs when, for example, "representations are made to the creditor to the effect that the corporation will act in a certain manner and this does not ultimately occur, [...], for example [...], when [the shareholders] commit not to withdraw funds from the corporation or not to pay dividends, while the loan amount remains outstanding, and then act contrary to what they had committed to the creditor." Díaz Olivo, op. cit., p. 133. Therefore, it is that deceptive or illegal conduct that causes the precariousness or uncollectibility of the debt which, in accordance with public policy and the conceptual foundations of the Principle of Accountability, justifies disregarding the corporation to hold the shareholders personally liable for the outstanding debt. Id. to p. 132.

In other words, "if shareholders drain the company of its resources and leave it financially unable to address the basic and inherent risks associated with the conduct of its business, their conduct demonstrates a serious disregard for the corporation's obligations and for those potentially affected by its actions. Such conduct is reckless and amounts in practical terms to an intent to defraud those who can reasonably be expected to be negatively impacted by the risks inherent in the conduct of corporate business, as [has been] held, this type of fraudulent conduct, which disregards the interests of creditors, is what fully justifies piercing the corporate veil." Id. to p. 138.

[Illegible initials]

---

[23] Section 20(a) of Act No. 52-1989, 7 L.P.R.A. §232p.



28

In turn, the Supreme Court of Puerto Rico has ruled that "transfers for valuable consideration made by persons against whom a judgment of conviction has previously been entered in any court, or against whom a writ of attachment has been issued, are presumed to be fraudulent." De Jesús Díaz v. Carrero, 112 D.P.R. 631, 636 (1982). See also U.S. Fid. & Guar. Co. v. Guzman, 2012 WL 4790314, (Sept. 20, 2012), report and recommendation adopted sub nom. United States Fid. & Guar. Co. v. Cobian-Guzman No. CV 10-1078 (FAB), 2012 WL 12996294 (D.P.R. Oct. 5, 2012) ("The traditional case of fraud with respect to a creditor is when a debtor transfers money to a third party to avoid paying the creditor." "In evaluating the potential existence of fraud, the following elements must be considered: **Haste in the alienation, the debtor's insolvency, the relationship of kinship, closeness, or trust with the acquirer, the state of the business of the transferring owner, and the judicial claims** against him." (citing In re El Mundo Corp., 208 B.R. 781, 783 (D.P.R. 1997) and De Jesús Díaz v. Carrero, 112 D.P.R. at 637)). (Emphasis added). In the context of piercing the corporate veil of a defendant, the U.S. District Court for the District of Puerto Rico has stated that "to prove intent to defraud, a plaintiff must show either that the defendant intended to receive a benefit or intended to cause actual or potential loss." Situ v. O'Neill, 124 F. Supp. 3d 34 (D.P.R. 2015).

In order to determine whether there is an adequate separation between the corporation and its shareholders for the purposes of Piercing the Corporate Veil, our case law suggests that the following factors, inter alia, should be taken into consideration: (1) the shareholder's control over corporate affairs; (2) the treatment of the corporation's assets as personal assets; (3) the unrestricted withdrawal of corporate capital; (4) the commingling of personal assets with corporate assets; (5) the corporation's inadequate capital structure; (6) the lack of corporate records; (7) noncompliance with corporate formalities; (8) the inactivity of the other officers and directors; (9) the practice of not declaring dividends; and (10) the public presentation of the shareholder as personally liable for the corporation's obligations and for the administration of the corporation, without regard to his or her separate liability. D.A.Co. v. Alturas Fl. Dev. Corp. et al., supra, at 928. The key point in all cases is to examine the nature of corporate transactions so as not to be misled by their formalities and thus prevent public policy from being defeated through corporate fiction. Id., p. 926.

For more than sixty (60) years, our legal system has recognized the authority of administrative agencies to pierce the corporate veil of legal entities and impose personal liability when necessary to carry out the functions delegated to them. See S. Puerto Rico Sugar Corp. v. Junta Azucarera, 88 D.P.R. 43, 58–59 (1963). In S. Puerto Rico Sugar Corp. v. Junta Azucarera, supra, the Supreme Court of Puerto Rico upheld the decision of the Puerto Rico Sugar Board to pierce the corporate veil for the purpose of performing the administrative functions delegated to it pursuant to its organic law, namely, the Puerto Rico Sugar Act, Act No. 426 of May 13, 1951, 5 L.P.R.A. 371 et seq.

In particular, in the aforementioned case, our Supreme Court stated that "[c]orporate entities may be disregarded when they are used as instruments to circumvent a clear legislative intent." Id., pp. 56–57. In light of this, and after interpreting the enabling statute of the Sugar Board—whose text regarding the delegation of powers is similar to the content of Act No. 52-1989 and Act No. 4-1985[24] , the Supreme Court ruled that the agency in that case had assumed "jurisdiction over a matter regarding which it [h]ad full legal authority to do so: to investigate the veracity and reasonableness of the discounts that the petitioner had granted to the farmers for shipping and marketing expenses." It further stated that, allowing the artificial

---

[24] Specifically, the Supreme Court stated as follows: "Although the Sugar Board is responsible for the detailed regulation and supervision of the sugar industry in Puerto Rico, as is customary in such cases, is empowered by law to examine witnesses, take statements, conduct inquiries, inspections, and investigations, hold hearings, and perform all acts necessary and appropriate in the performance of its duties." S. Puerto Rico Sugar Corp., supra, p. 44, citing Art. 23 of Act No. 426 of May 13, 1951, 5 L.P.R.A. §392.

[Illegible initials]



fragmentation of the transaction in question by inserting various affiliated corporations "would circumvent the clear mandate [...] of the Sugar Law [...] and would undermine the public policy enshrined in that Law to ensure that farmers receive fair treatment in their dealings with the mills." Id., pp. 58–59. Consequently, the Supreme Court upheld the agency's determination to pierce the Corporate Veil and noted the following:

> neither the Sugar Board nor this Court can allow a legal fiction, no matter how skillful and ingenious it may seem at first glance, to destroy the rights that the law grants to farmers and the principles of equitable treatment that must govern the relations between the parties.

Consistent with the foregoing, in Puerto Rico Insurance Commissioner v. Total, 2010WL6559677, the Court of Appeals recognized the authority of the Office of the Insurance Commissioner to, under the oversight and adjudication powers delegated to it, impose joint and several liability on the directors and shareholders of a certain corporation for its debts. This, of course, is provided that the agency conducts the appropriate investigation and analysis, and that substantial evidence emerges from the Administrative File justifying such action—that is, Piercing the Corporate Veil and imposing shareholder liability on the shareholders or directors.

Finally, we must recall the maxim that states that "[a]cts performed in violation of the law are void, except in cases where the law itself provides for their validity." Art. 4 of the Civil Code of 1930.[25] See López v. J. Gus Lallande, 144 D.P.R. 774, 790 (1998); Santiago Marrero v. Superior Court, 89 D.P.R. 835 (1964); Hernández v. Avala, 68 D.P.R. 956 (1948). It is a firmly established rule that "[a]n unlawful transaction confers no rights and, according to the cited authority, is null and void, as if it had never taken place." López v. J. Gus Lallande, supra. Accordingly, Art. 17 of the Civil Code of 2020[26] in turn states that "[a]n act performed pursuant to the protection of a law, which pursues a result that is prohibited or contrary to the legal system, is considered to **have been executed in fraud of the law** and does not prevent the proper application of the law that was sought to be violated." (Emphasis added). For its part, and as relevant here, Section 13(b)(6) of Act No. 52-1989[27] provides that an IBE may grant **any type of financing or credit to** any of its directors, officers, employees, or shareholders only when previously authorized in writing by the Commissioner.

### C. Applicability

In light of the applicable legal provisions and the facts set forth above, OCIF hereby files this *Complaint*. This is because there is sufficient legal basis to determine that the shareholders have drained Nodus of its assets; therefore, it is appropriate to pierce the corporate veil of Nodus and hold the shareholders personally and jointly liable for Nodus's debts to its depositors, creditors, and customers. As is evident, Nodus has been used as *an alter ego or passive economic conduit* for its Shareholders and directors—namely, Messrs. Niembro and Ramírez—for the purpose of not only obtaining direct and indirect financial remuneration but also of undermining the State's public policy.

It is clear from the facts set forth above that the Shareholders, even though they assured the OCIF that Nodus would fulfill its obligations and committed to following the Liquidation Plan and the Payment Order established therein, have used their control over Nodus to receive liquid assets from the entity that were intended to satisfy its creditors' claims. Specifically, as detailed previously, following the meeting held on March 9, 2023, in which the OCIF, through its legal representatives, notified Nodus that it must liquidate its operations, and given the circumstances in which, during that same period, Nodus received applications from its depositors to make available to them more than **$7,800,000.00** from its funds, Nodus, through

[Illegible initials]

---

[25] Equivalent to Art. 16 of the Civil Code of 2020, 31 L.P.R.A. §5335. 31 L.P.R.A. ant. sec. 4.
[26] L.P.R.A. §5336.
[27] 7 L.P.R.A. §232j(b)(6).

30



its shareholders, between March 9, 2023, and May 5, 2023—when the Liquidation Plan was executed—arranged an alleged purchase of more than **$26,000,000.00** in loans from Nodus Finance, clearly depleting the assets and capital of Nodus, while simultaneously injecting millions into Nodus Finance.

As if that weren't enough, the Shareholders orchestrated this transaction in clear disregard of Nodus's interests by acquiring - in exchange for releasing Nodus Finance from a debt of over **$26,000,000.00** - a portfolio of "mortgage" loans that, according to Driven's investigation, turned out to be more than 95% unsecured by any collateral[28] (making them extremely difficult to collect), all while agreeing to an additional payment to Nodus Finance based on the pretext that it was an "administration fee." However, what is even worse is that Nodus carried out this transaction to the clear detriment of its depositors **after the OCIF had met with the Shareholders to explain that they should liquidate their operations to protect the depositors.** In addition to this, during this same period, **Nodus distributed dividends to its shareholders, payable on April 17, 2023**, in the amount of $50,000.00, clearly transferring (without OCIF authorization) Nodus's assets in the face of the imminent liquidation ordered by the OCIF, and then executed the Liquidation Plan that took effect on May 8, 2023. Furthermore, from the Order Appointing the Receiver until January 2024, Mr. Niembro, through Financial Technology, received $100,000.00 in "fees" or Salaries, without having contributed anything to collect Nodus's loans and repay its depositors. In doing so, from the liquidation of Nodus (which, to date, has not been completed for the reasons set forth herein), the Shareholders have profited through Nodus Finance and Financial Technology, using two corporate entities in addition to Nodus to allegedly assist with the liquidation of the IBE, without such intervention having yielded any benefit to Nodus or the depositors to date. In addition, the Shareholders, using their positions as directors of Nodus and Nodus Finance, withdrew the balance of $986,313.83 that Nodus Finance held in its Nodus account—an amount that, had they not been persons *in* control of Nodus, they would not otherwise have been able to withdraw during the liquidation process. There is no doubt, then, that Nodus, through the Shareholders, defrauded not only its depositors but also OCIF itself and the Receiver through a series of transactions that were completely unlawful and fraudulent.

The shareholders, however, did not stop there. Once the Liquidation Plan was executed, millions of dollars disappeared from accounts associated with Nodus—assets that, despite the efforts of Driven, a third-party firm specializing in liquidations, have not been recovered. Faced with this dire situation, after the Receivership Order was issued, the Shareholders' Course of Action then shifted, proposing to migrate (to the detriment of their depositors, as detailed above) the depositors' accounts to their own entities, Nodus Finance and Alter Bank (despite and with full knowledge that the latter was not qualified to accept depositors), while clearly instructing Nodus customers to stop paying their loans until the migration was completed[29]. As detailed above, while these exchanges were taking place, Mr. Niembro's proposal was to do what he had not done throughout the entire liquidation process: collect the loans in Venezuela, **in exchange for an annual salary of $960,000.00, plus an 8% commission on the amounts collected.** As if that were not enough, on November 21, 2023, following events and facts substantially similar to those set forth herein that the Shareholders carried out in other jurisdictions, Atlas Bank filed a criminal complaint for financial crimes and money laundering to its detriment, seeking damages in the amount of $60,000,000.00. It is indisputable that the Shareholders have no interest, nor ever had any interest, in protecting their depositors and customers, but rather in continuing to enrich themselves through a series of transactions

[Illegible initials]

---

[28] *See* **Exhibit 10a**, p. 8, *Subsection A(ii)*

[29] It should be noted that had the migration of loans to Nodus Finance been carried out according to the terms originally proposed by the Shareholders and not accepted by the Receiver or the OCIF, Nodus Finance would potentially have had loans that it sold to Nodus in exchange for the release of more than $26,000,000.00 in debt.

DIRECTUM TRANSLATIONS · PERITO TRADUCTOR
LUIS ALBERTO CRUZ AGUILAR
TSJCDMX · BJ 23/02/24

through the legal fiction of separate corporate entities, just as they have done in other jurisdictions.

In addition to the numerous unlawful transfers with the Affiliated Entities described above, Mr. Niembro, in agreement with Mr. Ramírez, used the control he held over Nodus to, in agreement with his other entities, directly divert Nodus's resources to the detriment of the interests of the entity itself, its depositors, and its creditors, in complete violation of the letter and spirit of the Liquidation Plan. The Shareholders' actions in engaging in transactions not contemplated in the Liquidation Plan for their own financial benefit through a series of legal fictions demonstrate a clear disregard and serious contempt for the IBE's obligations toward OCIF, as well as for the interests of the beneficiaries and creditors. In turn, all of the foregoing demonstrates that there is no adequate separation between the Shareholders and Nodus, and that the lack of such adequate separation has been used to defraud Nodus's depositors and creditors and for purposes that are clearly unlawful and contrary to public policy. The reckless conduct of Mr. Niembro and Mr. Ramírez has, without a doubt, been clearly intended to defraud - and has clearly defrauded - not only the OCIF, the regulatory body for IBEs, but also all persons with an interest in its liquidation.

It is clear that the Shareholders used the control they exercised over Nodus (and the entire portfolio of the IBE's outstanding loans) to commit acts contrary to the public policy aimed at the orderly liquidation of the Financial Institution. The fraudulent conduct of Mr. Niembro and Mr. Ramírez has led to Nodus's precarious financial situation and, consequently, its inability to fulfill its obligations as agreed upon in the Liquidation Plan. "This type of fraudulent conduct, which disregards the interests of creditors, is precisely what legitimately justifies piercing the corporate veil." Díaz Olivo, *op. cit.*, p. 138.

In the present case, as evidenced by the documents and information in the possession of the OCIF, several factors are present that justify piercing the Corporate Veil of Nodus to impose personal liability on the Shareholders. Specifically, there is no dispute that: (1) Mr. Niembro and Mr. Ramírez retained control over information and corporate affairs even though the IBE had a Manager; (2) the Shareholders engaged in unrestricted withdrawal of corporate capital by conducting transactions without the knowledge and/or consent of the Manager; (3) the Shareholders maintained an inadequate and deficient capital structure for the IBE by making unilateral decisions not approved by the OCIF, the Administrator, or the Receiver; and (4) the Shareholders repeatedly failed to observe corporate formalities by disregarding the Administrator's directives and presence, knowing that such transactions had been prohibited. In addition to the foregoing, **one week prior to the execution of the Liquidation Plan**, and with full knowledge of all the deficiencies identified by the OCIF regarding, among other things, liquidity and internal controls, the Shareholders used their joint control of Nodus Finance and Nodus to have the latter release Nodus Finance from $26,000,000.00 in debt, (i) thereby preventing Nodus and, eventually, Driven from collecting such amounts from Nodus Finance through judicial or extrajudicial means for the benefit of its depositors, and (ii) transferring to Nodus the full risk of a completely deficient loan portfolio that has virtually no collateral.

Given these circumstances and Nodus's insolvency resulting from the fraudulent actions of Mr. Niembro and Mr. Ramírez, it is appropriate that they be held personally liable for the entity's debts. Therefore, the OCIF has sufficient grounds, pursuant to, among others, Act No. 4-1985 and Act No. 52-1989, to exercise its broad powers to prevent irreparable harm from being caused or potentially caused to the interests of Nodus, and/or to the individuals and entities holding funds or securities at it and its creditors.

[Illegible initials]

32



## VII.   ORDER

Pursuant to the powers and authority conferred upon the Commissioner by Act No. 4-1985, Act No. 52-1989, and the regulations issued thereto, this *Complaint* is hereby issued, and the following is ordered:

(i)    Piercing the Corporate Veil of Nodus International Bank, Inc.;

(ii)   By engaging in the conduct described above, Mr. Niembro and Mr. Ramírez violated Act No. 4-1985 and Act No. 52-1989;

(iii)  Mr. Niembro and Mr. Ramírez are hereby **ORDERED**, pursuant to the strictest Notice of Legal Consequences, to be jointly and severally liable with Nodus for all of the IBE's debts, in addition to jointly and severally performing restitution for the sum of not less than **$26,825,189.48**, with the provision it shall be used to satisfy Nodus's obligations to its depositors and creditors;

(iv)   Pursuant to Section 20(c) of Act No. 52-1989, both Mr. Niembro *and Mr.* Ramírez are hereby **IMPOSED**, pursuant to the Strict Notice of Legal *Consequences,* a fine of **$25,000.00** each, for the distribution of $50,000.00 in dividends to preferred shareholders on April 17, 2023, without prior authorization from the OCIF; and

(v)    Mr. Niembro and Mr. Ramírez are **PROHIBITED** from conducting business in the financial industry of Puerto Rico, directly or indirectly, for a period of ten (10) years.

## VIII.   GENERAL NOTICES

Pursuant to Act No. 38-2017 and Regulation No. 3920, the Respondents are hereby notified that they may accept the proposed fines and penalties and report their compliance or payment as set forth in this *Complaint* within **twenty (20) days** of receipt thereof and must comply with the order within the established time limits.

In accordance with the provisions of this *Complaint* and within **twenty (20) days** of its receipt, the affected party may request a hearing ("Application for Hearing") by submitting a written application to that effect and may file its written Response with the Secretariat of the Office of the Commissioner of Financial Institutions, PO Box 11855, San Juan, Puerto Rico 00910-3855. The OCIF will schedule the matter for a hearing within the next fifteen (15) days from receipt of the written Application for Hearing, for the purpose of providing the affected party with the opportunity to be heard; the OCIF may, upon conclusion of the formal adjudicative proceeding, confirm, modify, or dismiss the *Complaint,* in accordance with the recommendations of the designated Examining Officer. The Application for Hearing does not exempt the affected party from filing its response to this *Complaint* within the aforementioned timeframe. The filing of an Application for Hearing shall not suspend or modify in any way the terms of this *Complaint* unless the OCIF provides otherwise.

If no hearing is requested, the OCIF will consider that the affected party has acquiesced and consented to the issuance of the proposed orders and fines and may therefore enforce the *complaint* without further delay or additional Notification.

Once the hearing has been held, any party adversely affected by the OCIF's decision, or by a partial or final order, may request reconsideration within **twenty (20) days**, counted from the date the Notification of the decision or order is filed in the case record. Provided that, if the date of filing a copy of the Notification of the agency's order or decision in the case file differs from the date of mailing via regular mail or electronic transmission of the Notification, the period shall be calculated from the date of mailing via regular mail or electronic transmission, as applicable. The application for reconsideration must be in writing, clearly stating the term *"Motion for Reconsideration"* as the title of the application. The filing of a *Motion for*

[Illegible initials]

33



DIRECTUM TRANSLATIONS    PERITO TRADUCTOR
LUIS ALBERTO CRUZ AGUILAR
TSJCDMX        BJ 23/02/24

*Reconsideration* shall not stay or otherwise affect the terms of this *Complaint* unless the Commissioner orders otherwise.

Within fifteen (15) days of the filing *of* a *Motion for Reconsideration*, the OCIF must consider it. If it rejects the motion outright or fails to act within fifteen (15) days, the period for requesting a review shall begin anew from the date of notification of such rejection or from the expiration of those fifteen (15) days, as the case may be. If a decision is made upon its consideration, the period for requesting review shall begin to run from the date a copy of the agency's Notification of the resolution definitively resolving the motion for reconsideration is filed in the record. Such resolution must be issued and filed in the record within ninety (90) days following the filing of the motion for reconsideration. If the OCIF grants the motion for reconsideration but fails to take any action regarding the motion within ninety (90) days of its filing, it shall lose jurisdiction over the motion, and the period for requesting judicial review shall begin to run from the expiration of that ninety (90)-day period, unless the agency, for good cause and within those ninety (90) days, extends the period for rendering a decision by a period not to exceed thirty (30) additional days. If the date of filing a copy of the Notification of the Order or Decision in the case file differs from the date of mailing by regular mail or electronic transmission of such Notification, the period shall be calculated from the date of mailing by regular mail or electronic transmission, as applicable.

A party adversely affected by a final order or decision of the OCIF that has exhausted all remedies provided by the OCIF may file an application for judicial review with the Court of Appeals of Puerto Rico within thirty (30) days, in accordance with Section 4.2 of Act No. 38-2017.

This *Complaint* does not relieve *the* Respondents of liability for *other* violations arising from this *Complaint or* that come to the OCIF's attention after the filing of the Notification of this Complaint. In such a case, the OCIF reserves the right to amend the *Complaint* to include additional allegations, violations, fines, and remedies, subject to applicable laws.

The Respondents are hereby notified that, pursuant to the provisions of Article 20(c) of Act 4-1985, the OCIF may impose an administrative fine of no more than **FIVE THOUSAND ($5,000.00)** for each day of noncompliance with the orders issued pursuant the provisions of the Act, up to a maximum of **FIFTY THOUSAND ($50,000.00) DOLLARS**. In the event of total or partial noncompliance with this Complaint, the OCIF, in accordance with the statutory jurisdiction conferred by Act 4-1985, may request the Court of First Instance, Superior Chamber of San Juan, to enforce this Order, subject to penalty of contempt, and to impose fines and sanctions in addition to those the OCIF deems appropriate, along with any other relief available at law.

Issued in San Juan, Puerto Rico, today, April 4, 2024.

**SO ORDERED AND NOTIFIED.**

[Illegible signature]

_____

**Natalia I. Zequeira Diaz**
Commissioner

_____

Translator's Note: Certain sections of the source document were originally drafted in English. Such sections have been left unchanged, as they appear in the original text.

DIRECTUM TRANSLATIONS   PERITO TRADUCTOR
LUIS ALBERTO CRUZ AGUILAR
TSJCDMX   BJ 23/02/24

34

TRANSLATION CERTIFICATE (SPANISH TO ENGLISH)

The undersigned interpreter and translator **Luis Alberto Cruz Aguilar** authorized by the Superior Court of Justice of Mexico City as *Expert Translator in Foreign Languages: "English"*, in accordance with **Order 41-04/2024** issued by the Judiciary Council of Mexico City and the current *List of Auxiliary Experts for the Administration of Justice of the Judicial Branch of Mexico City* published in the *Judicial Bulletin* No. 34 of February 23, 2024 and which took effect on that same date, hereby **CERTIFIES** by affixing my seal and rubric on each of the 34 ( "thirty - four" ) page(s) hereof, that this document is a true, faithful and complete translation to the best of my knowledge and belief of the original document before me.

In Mexico City, on ____May____ 11, 2026

DIRECTUM TRANSLATIONS   PERITO TRADUCTOR
LUIS ALBERTO CRUZ AGUILAR
TSJCDMX        BJ 23/02/24

# Exhibit 17 to the
# Ellis Declaration

GOBIERNO DE PUERTO RICO
OFICINA DEL COMISIONADO DE INSTITUCIONES FINANCIERAS
SAN JUAN, PUERTO RICO

| | |
|---|---|
| OFICINA DEL COMISIONADO DE INSTITUCIONES FINANCIERAS<br>Querellante<br>v.<br><br>NODUS INTERNATIONAL BANK, INC. TOMÁS NIEMBRO CONCHA Y JUAN RAMÍREZ SILVA<br>Querellados | CASO NÚM.: C-24-D-003<br><br>SOBRE: Descorrer Velo Corporativo; Responsabilidad accionistas; Restitución |

**QUERELLA Y ORDEN PARA DESCORRER EL VELO CORPORATIVO DE NODUS INTERNATIONAL BANK, INC. E IMPONER RESTITUCIÓN**

## I. INTRODUCCIÓN

Según ha reconocido nuestro más alto foro, "el Estado, como parte de su poder de razón de estado, tiene la facultad para reglamentar las profesiones, fundamentado en razones de alto interés público como la salud, la seguridad y el bienestar general", razón por la cual "a través de los años se ha reglamentado la industria financiera por ésta estar revestida de un alto interés público, económico y social".[1] En armonía con dichos principios, la legislación mediante la cual se creó la Oficina del Comisionado de Instituciones Financieras ("OCIF"), la *Ley de la Oficina del Comisionado de Instituciones Financieras*, Ley Núm. 4 de 11 de octubre de 1985[2], ("Ley Núm. 4-1985"), en su exposición de motivos, claramente establece, en cuanto a la industria de la banca, de valores, y de instituciones financieras en Puerto Rico, que "[e]s responsabilidad ineludible del Estado asegurar que estén protegidos los intereses de aquellos que están vinculados a estas industrias por ser **depositantes**, acreedores, accionistas u otro tipo de asociación". (Énfasis suplido). En consonancia, nuestro Tribunal de Apelaciones ha indicado que, de la propia exposición de motivos de la Ley Núm. 4-1985 "se desprende que el fin primordial de la OCIF es **proteger a los clientes, acreedores o accionistas de actuaciones ilegales y fraudulentas**".[3] (Énfasis suplido).

La OCIF tiene, a su vez, el deber específico de supervisar y fiscalizar las entidades bancarias internacionales ("EBIs"), las cuales operan bajo una licencia expedida a tenor con la Sección 7 de la *Ley Reguladora del Centro Bancario Internacional*, Ley Núm. 52 de 11 de agosto de 1989[4], ("Ley Núm. 52-1989"). Por su naturaleza, el éxito de las EBIs está predicado en: (i) en el intercambio constante de información con la OCIF, y (ii) en que dicha información refleje solidez financiera, cumplimiento con las regulaciones y legislaciones aplicables, y transparencia en sus operaciones. Ello pues, por disposición legislativa, las EBIs tienen prohibido, *inter alia*, aceptar depósitos y tomar dinero a préstamo de personas domésticas[5], por lo que los depósitos mantenidos en este tipo de entidad son exclusivamente de entidades y personas extranjeras, quienes dependen y confían en la supervisión y fiscalización por parte de la OCIF.



Ante la significativa encomienda delegada a la OCIF por parte de la Asamblea Legislativa, a saber, la protección de los individuos que han depositado tanto fondos como su confianza en las EBIs y de la solidez del sistema bancario de Puerto Rico, la OCIF no ha escatimado – ni escatimará – en intervenir con aquellas entidades, y sus directores y accionistas, que incumplan con sus deberes estatutarios, particularmente, cuando dicho incumplimiento tenga como consecuencia, como en el presente este caso, que: (i) la entidad bancaria carezca de una situación

---

[1] Piovanetti v. S.L.G.Touma, S.L.G. Tirado, 178 D.P.R. 745, 759 (2010).
[2] 7 L.P.R.A. §2001 *et seq.*
[3] Oficina del Comisionado de Instituciones Financieras v. Northstar Mortg. Corp., No. C04-ND-006, 2007 WL 3244752, at *5 (P.R. Cir. Sept. 26, 2007).
[4] 7 L.P.R.A. §232a.
[5] *Véase*, 7 L.P.R.A. §232j(b)(1).

1

económica y financiera sólida, y/o (ii) opere o se administre de tal manera que el público y/o las personas y entidades que tengan fondos bajo su custodia estén en peligro de ser defraudados.

Fue ante este específico cuadro legal, y luego de varios exámenes que reflejaron el constante deterioro de las condiciones económicas y financieras de Nodus International Bank, Inc. ("Nodus"), que la OCIF intervino para efectuar su liquidación con el fin cardinal de proteger a sus depositantes, resultando dicha intervención en la firma por los Accionistas el 5 de mayo de 2023 y por la OCIF el 8 de mayo de 2023, de un Plan de Liquidación Voluntario ("Plan de Liquidación"). Como parte de dicho Plan de Liquidación, la firma Driven, P.S.C. fue nombrada Administrador ("Driven" o "Administrador") con el fin de velar por el fiel cumplimiento de las condiciones estipuladas en el Plan. El 5 de junio de 2023, los accionistas de Nodus firmaron el "*Engagement Letter*" mediante el cual confirmaron a Driven como Administrador.

El Plan de Liquidación proveía importantes herramientas a los entonces oficiales y directores de Nodus (de los cuales dos – específicamente, el Sr. Tomás Niembro Concha ("Sr. Niembro") y el Sr. Juan F. Ramírez Silva ("Sr. Ramírez") – también eran y siguen siendo dueños) para la disolución ordenada de las operaciones de la EBI, bajo el escrutinio de la OCIF y la supervisión del Administrador. Cabe destacar que, a la firma del Plan de Liquidación, por la condición financiera de Nodus en ese momento, resultaba evidente que, en el mejor de los casos, la EBI estaba operando con serias deficiencias a nivel ejecutivo o, en el peor, la EBI, por conducto de sus accionistas y entonces directores, estaba involucrada en un esquema corporativo mediante entidades afiliadas dirigido a, como mínimo, enriquecerse para lucro personal, defraudando así a los depositantes de Nodus.

Cabe destacar, además, que, previo a la fecha de la firma del Plan de Liquidación, la OCIF ya había recibido más de veinte (20) reclamaciones judiciales y extrajudiciales por parte de depositantes de varios países, incluyendo, pero sin limitarse a Argentina, Uruguay, Colombia, y Brasil, las cuales tenían como tema común que habían solicitado la transferencia de cantidades depositadas en las cuentas de Nodus a otras cuentas, y que Nodus no estaba poniendo los fondos a disposición de los depositantes, ni proveyendo explicaciones claras y concretas para no hacerlo. En otras palabras, además del claro y evidente deterioro de la condición financiera y económica de Nodus, la OCIF se topó con la reclamación común de decenas de depositantes de que sus fondos estaban, para todos los efectos, secuestrados en la operación de Nodus. Todo esto, según se detalla más adelante, estaba ocurriendo mientras Nodus continuaba efectuando transacciones con entidades afiliadas, incluyendo, pero no limitándose a Nodus Finance LLC ("Nodus Finance") y Financial Technology & Marketing Services, Ltd. ("Financial Technology" en adelante, "Entidades Afiliadas"), de las cuales el Sr. Niembro y el Sr. Ramírez (en conjunto, "Accionistas o co-querellados") son dueños, accionistas y/o personas también en control.

Ahora bien, tras los resultados de las investigaciones preliminares llevadas a cabo por el Administrador y notificadas a la OCIF, luego de la firma del Plan de Liquidación, los co-querellados, como accionistas de Nodus, en lugar de aprovechar las herramientas para la ordenada liquidación de las operaciones de Nodus, continuaron abusando de la estructura corporativa de Nodus (y varias otras Entidades Afiliadas) para lucrarse preferentemente, en perjuicio de los depositantes. Así, por ejemplo, bajo el subterfugio de que asistirían a Nodus en la implementación efectiva del Plan de Liquidación, Nodus contaba con Financial Technology, una entidad organizada bajo las leyes de Barbados, con oficinas físicas en Venezuela, de la cual es dueña en su totalidad la entidad Administradora de Recursos de Altamira, de la cual, a su vez, el Sr. Niembro es el beneficiario final, aquí co-querellado. No obstante, posteriormente el  Administrador se percató de que, a través de Financial Technology, el Sr. Niembro estaba, en efecto, recibiendo un "salario" que resultó en un beneficio indirecto del proceso de liquidación, y que estaba utilizando dicha estructura corporativa para obtener fondos de Nodus dado que, en su carácter personal, no tendría acceso a ellos por ser ciudadano de Venezuela sin presencia legal en los Estados Unidos. Ante ello, el Administrador solicitó todos los estados de cuenta de Financial Technology en Nodus y del Sr. Niembro, y notó que el monto previamente asignado al Sr. Niembro no era cónsono con sus deberes dentro del proceso de liquidación dado que, bajo el Plan de Liquidación, los directores y oficiales no podían tener ganancias relacionadas a distribución de dividendos ni comisiones, sino que su remuneración estaba limitada exclusivamente a la disolución de Nodus.

2

En cuanto a Nodus Finance, el 28 de abril de 2023 (7 días antes de la firma del Plan de Liquidación, y más de un mes desde que la OCIF le notificó a Nodus que debía liquidar la EBI) Nodus, **sin consentimiento ni autorización de la OCIF**, firmó un acuerdo con Nodus Finance mediante el cual **(i)** Nodus compró a Nodus Finance una cartera de préstamos por la cantidad de $26,011,780.08, simultáneamente eliminando deudas de Nodus Finance para con Nodus por la cantidad de $25,738,875.65. y **(ii)** pactaron que Nodus Finance recibiría determinada suma de dinero de Nodus por actuar como administrador de dichos préstamos. En otras palabras, una semana antes de la firma del Plan de Liquidación, los Accionistas, quienes eran y siguen siendo dueños tanto de Nodus Finance como de Nodus liberaron a Nodus Finance de una deuda líquida de **$25,738,875.65** que se pudo haber utilizado para beneficio de los depositantes de Nodus, a cambio de una cartera de préstamos morosa y delincuente y con un cargo de administración para el cobro de esos mismos préstamos. De hecho, a pesar de que la cartera era presuntamente de préstamos hipotecarios, de la investigación realizada por Driven surgió que la gran mayoría de los préstamos no están garantizados por ningún colateral.

En adición a esta escandalosa transacción, entre el 20 de junio de 2023 y el 29 de agosto de 2023, los Accionistas, utilizando sus posiciones de directores en ambas entidades, redujeron el balance de fondos de Nodus Finance depositados en Nodus de **$986,313.83** a $25.28, esfumándose así prácticamente la totalidad de los fondos de la cuenta de Nodus Finance, a pesar de que el Plan de Liquidación disponía el esquema de prioridad de pagos a hacerse para consumar la liquidación ordenada de la EBI y que el Plan de Liquidación prohibía la distribución de activos a los Accionistas hasta que se repagaran las deudas de Nodus. Claro está, dentro del proceso de liquidación Nodus Finance, de haber sido cualquier otro acreedor sin control de Nodus, no hubiese podido retirar sus fondos de las cuentas de Nodus. Así, durante cierto periodo del proceso de liquidación, los Accionistas de Nodus **(i)** tenían al menos tres (3) de sus propias entidades corporativas para presuntamente consumar la liquidación de Nodus, con Nodus Finance y Financial Technology recibiendo pagos mensuales para dicho fin y **(ii)** utilizando su control en todas esas entidades para lucrarse en perjuicio de sus depositantes y en menosprecio de la política pública y la legislación aplicable.

En adición a lo anterior, el Administrador, tras varios intentos fallidos en consolidar los activos de Nodus para poder dar comienzo con las etapas de liquidación de depósitos estipuladas en el Plan de Liquidación como consecuencia de la falsa representación de los Accionistas, presentó a la OCIF un marco real de la cobrabilidad de los activos de Nodus, la cual, colectivamente con lo anterior, claramente reflejaba que remover a los directores y oficiales de Nodus, entre los cuales estaban los Accionistas, era el curso de acción mandatorio para salvaguardar los intereses de los depositantes. Ante esta realidad, el 3 de octubre de 2023, la OCIF emitió una *Querella y Orden Provisional y Permanente Para el Nombramiento de un Síndico y Revocación de Licencia* ("Orden de Designación de Síndico"), mediante la cual destituyó a los oficiales y directores, sustituyéndolos a éstos, a la junta de directores, y a la gerencia de Nodus, por el Administrador, Driven ("Síndico"). Tras la designación del Síndico, un tercero objetivo y desligado de los co-querellados, la OCIF ha advenido en conocimiento de que la magnitud del esquema por parte de los Accionistas, utilizando a Nodus y las Entidades Afiliadas como conducto económico para defraudar a sus depositantes, es de una envergadura aún mayor, por lo que estima que, sin la imposición de responsabilidad personal a los co-querellados para restituir ciertas cantidades que inexplicablemente se esfumaron, los depositantes se verían gravemente perjudicados a nivel económico. Cabe destacar que nuestro más alto foro ha expuesto que **es**  **justificada la actuación de una agencia de descorrer el velo corporativo de una entidad** "a los fines de desempeñar sus funciones en la administración de una ley que le impone la responsabilidad de reglamentar y supervisar una industria", como lo es en este caso la de banca internacional.[6]

---

[6] S. Porto Rico Sugar Corp. v. Junta Azucarera, 88 D.P.R. 43, 58–59 (1963) (concluyendo que "la Junta Azucarera estuvo justificada al descorrer el velo corporativo a los fines de desempeñar sus funciones en la administración de la Ley Azucarera. Si se permitiese que la operación del embarque de azúcar se fraccionase artificialmente mediante la interpolación de varias corporaciones hermanas, y que éstas hiciesen ganancias en dicha operación, se estaría evadiendo el claro mandato del Art. 8 antes citado de la Ley Azucarera, 5 L.P.R.A. §377, y se estaría frustrando la política pública contenida en dicha Ley de garantizar a los colonos un trato justo en sus relaciones con los molinos".)

Por estas razones, y las expuestas más adelante, la OCIF ha determinado que existe base legal suficiente para descorrer el velo corporativo de Nodus e imponerle responsabilidad personal a los Accionistas, ordenándole a éstos últimos a que a restituyan personal y solidariamente una suma no menor a **$26,825,189.48** en aras de satisfacer las cuantías adeudadas a los depositantes. La OCIF, sin embargo, destaca que sus investigaciones y las del Síndico continúan su curso, y que, de surgir hechos adicionales por los cuales los Accionistas deban responder en su carácter personal, la OCIF enmendará la presente querella para incluir la relación de tales hechos para esos fines.

## II. RESUMEN DE CURSO DE ACCIÓN Y MOTIVOS PARA LA MISMA

1.      La OCIF, al amparo del poder de supervisión y fiscalización que le fue delegado, presenta esta *Querella*, descorriendo el velo corporativo de la EBI, Nodus, a raíz de las violaciones a la Ley Núm. 4-1985 y la Ley Núm. 52-1989 incurridas por el Sr. Niembro y el Sr. Ramírez, a los fines de que respondan personal y solidariamente por las deudas y obligaciones de la referida entidad.

2.      Lo anterior, toda vez que los Accionistas, ambos dueños equitativamente en un 63.31% y 36.69% respectivamente de las acciones de Nodus, han incurrido en una serie de actos fraudulentos que han provocado la insolvencia de la referida entidad en detrimento de los intereses de los depositantes y de los acreedores.

3.      En particular, las actuaciones de los co-querellados han frustrado por completo el proceso de disolución y liquidación de Nodus según ordenado por la OCIF, al éstos utilizar la referidas Entidades Afiliadas para obtener beneficios económicos no contemplados en el Plan de Liquidación, y las órdenes emitidas por la OCIF a esos fines.

4.      Como es sabido, la OCIF, como entidad fiscalizadora, está llamada a velar por el fiel cumplimiento de lo dispuesto en la Ley Núm. 4-1985 y la Ley Núm. 52-1989, y la clara política pública contenida en dichos estatutos de evitar que el público o las personas y las entidades con fondos o valores en las EBIs, en este caso en Nodus, sean defraudadas o se les ocasione un daño irreparable.

5.      A su vez, es norma reiterada que procede descorrer el velo corporativo e imponerles responsabilidad personal a los accionistas cuando "el control que se posee sobre la corporación se utiliza para defraudar y cometer actos ilegales o contrarios a la política pública". C. Díaz Olivo, *Corporaciones: Tratado Sobre Derecho Corporativo*, Puerto Rico, 2016, pág. 130; *véase, además*, D.A.Co. v. Alturas Fl. Dev. Corp. y otro, 132 D.P.R. 905 (1993) (citando a Cruz v. Ramírez, 75 D.P.R. 947, 954 (1954)) ("Sabido es, igualmente, que los tribunales descartarán la personalidad jurídica de una corporación y sujetarán el patrimonio de los accionistas para responder por las deudas y obligaciones de la corporación en aquellos casos en los cuales esta sea un conducto o instrumento económico pasivo (*"business conduit"*) de sus únicos accionistas, recibiendo éstos exclusiva y personalmente los beneficios producidos por la gestión corporativa [y] **si ello es necesario para evitar un fraude o la realización de un propósito ilegal o para evitar una clara inequidad o mal (***"wrong"***)").** (Énfasis suplido).



6.      A la luz de lo anterior, y en aras de proteger el interés público y evitar un perjuicio común, la OCIF emite la presente *Querella* de manera que se descorra el velo corporativo de Nodus y los Accionistas respondan, personal y solidariamente, por las deudas y obligaciones de la referida EBI. La OCIF le ordena a los co-querellados restituir la suma por la cantidad de **$26,825,189.48** correspondientes a: **(i)** la compra y/o transferencia no autorizada de la cartera de préstamos de Nodus Finance a Nodus el 28 de abril de 2023, siete (7) días previo a la firma el Plan de Liquidación, por el precio de $25,738,875.65; **(ii)** $986,313.83 por las transferencias hechas por los Accionistas para retirar los fondos de Nodus Finance depositados en Nodus y; **(iii)** la cantidad de $100,000.00 de "honorarios" recibidos por el Sr. Niembro desde la Orden de Designación del Síndico hasta enero de 2024 de manera completamente injustificada y en total menosprecio de los depositantes.

7.      En adición, la OCIF le impone la cantidad de $50,000.00 de multa a los Accionistas, $25,000.00 a cada uno, por la distribución de $50,000.00 por acciones preferidas llevada a cabo, sin autorización de la OCIF, el 17 de abril de 2023, semanas antes de la firma del Plan de Liquidación.

## III. JURISDICCIÓN

8.      La Ley Núm. 4-1985, le otorga a la OCIF la responsabilidad de supervisar, fiscalizar y examinar las EBIs organizadas conforme a las leyes de Puerto Rico que operen o realicen negocios en Puerto Rico, como lo es Nodus. Por virtud de la Ley Núm. 4-1985, la OCIF está facultada para administrar e implementar la Ley Núm. 52-1989. Así, la Ley Núm. 4-1985, la Ley Núm. 52-1989, la Ley Núm. 38-2017, según enmendada, conocida como *Ley de Procedimiento Administrativo Uniforme del Gobierno de Puerto Rico* ("Ley Núm. 38-2017"), y el Reglamento Núm. 3920 de 23 de junio de 1989, según enmendado, conocido como *Reglamento para Reglamentar los Procedimientos de Adjudicación bajo la Jurisdicción de la Oficina del Comisionado de Instituciones Financieras* ("Reglamento Núm. 3920"), facultan al Comisionado para emitir cualquier orden necesaria, apropiada y conveniente para hacer valer las leyes o los reglamentos bajo su jurisdicción.

9.      En particular, el Artículo 10 de la Ley Núm. 4-1985[7], establece lo siguiente:

(a) El Comisionado, además de los poderes y facultades transferidos por la presente, tendrá poderes y facultades para:

...

(3) Atender, investigar y resolver las querellas presentadas a la Junta o a la Oficina del Comisionado.

....

(4) Interponer cualesquiera remedios, acciones o procedimientos legales que fueran necesarios o convenientes para hacer efectivos los propósitos de este capítulo o cualquier otra ley o reglamento, cuyo cumplimiento o fiscalización le haya sido asignada, ya sea representado por sus abogados o por el Secretario de Justicia, previa solicitud a tales efectos.

...

(8) Realizar todos aquellos actos necesarios para el logro eficaz de los propósitos de esta ley.

*Véase,* 7 L.P.R.A. §2010(a)(3),(4), y (8). (Énfasis suplido).

10.      Por otra parte, la Ley Núm. 52-1989 otorga a la OCIF amplios poderes para suspender o revocar la licencia de una EBI y poner a dicha institución en sindicatura. En particular, la Sección 3(a) de la Ley Núm. 52-1989 expone lo siguiente:

(a) El Comisionado deberá:

...

(6) supervisar, fiscalizar y auditar las entidades bancarias internacionales y requerir de ellas informes periódicos y otra información especificada en los reglamentos del Comisionado

...

(8) velar por la seguridad financiera y adecuacidad operacional de las entidades bancarias internacionales y asegurarse de que cumplan con las leyes y reglamentos aplicables y con cualquier medida o requisito que el Comisionado les requiera mediante orden, reglamento o carta circular o documentos guía aplicables a las EBIs;

(9) revocar o suspender una licencia para operar una entidad bancaria internacional o imponer otras sanciones que pueda creer necesarias y apropiadas a tenor con sus reglamentos; disponiéndose, además, que cualquier persona cuya licencia haya sido revocada o suspendida o se le haya impuesto alguna otra sanción, tendrá derecho a solicitar una vista con arreglo al reglamento provisto en la Sección 23 de esta Ley;

(10) suspender, destituir o sancionar a cualquier director, oficial, empleado, agente o individuo que actúe en una capacidad similar para una entidad bancaria internacional y que viole o voluntaria o negligentemente permita

---

[7] 7 L.P.R.A. §2010.

5

que otra persona viole esta Ley, cualquier reglamento u orden del Comisionado, o artículos de incorporación, artículos de organización, estatutos corporativos ("bylaws"), el contrato de compañía de responsabilidad limitada, el contrato de sociedad, u otro documento mediante el cual se organice la entidad bancaria internacional, según sea el caso, o la licencia expedida bajo esta Ley. Cualquier individuo que sea suspendido, destituido o sancionado podrá solicitar una vista con arreglo al reglamento provisto en la Sección 23 de esta Ley;

....

**(12)** realizar todos aquellos actos e imponer aquellos remedios que sean necesarios para hacer cumplir esta Ley o su reglamento.

...

*Véase,* 7 L.P.R.A. §232a(a)(6),(8),(9), (10) y (12).

11.     En adición a lo anterior, la Sección 20 de la Ley Núm. 52-1989, confiere al Comisionado de la OCIF el poder y la facultad de imponer aquellas penalidades que estime justas y necesarias:

(a)  **Si cualquier director, oficial o individuo** que actúe en una capacidad similar **de una entidad bancaria internacional** o de una persona de la cual la entidad bancaria internacional es una unidad, **violara** o voluntaria o negligentemente permitiera a cualquier director, oficial, agente o empleado de la entidad bancaria internacional o de la persona de la cual la entidad bancaria internacional es una unidad, que viole **esta ley, los reglamentos del Comisionado** o cualquier disposición del certificado de incorporación, contrato de sociedad **u otro documento escrito que establezca la entidad bancaria internacional, el Comisionado** señalará y citará a las partes interesadas a una vista administrativa con arreglo al reglamento provisto en la Sección 23 de esta ley. Celebrada la vista y luego de que el Comisionado determine que se ha violado alguna disposición mencionada en este inciso, éste **tomará la acción que corresponda**, incluyendo la suspensión o destitución de dicho director, oficial o individuo.

...

(c)  **Cualquier director, oficial o empleado de la entidad bancaria internacional** o de la persona de la cual la entidad bancaria internacional es una unidad, **que** se apropie ilegalmente, desfalque, sustraiga o **voluntariamente haga mal uso de cualesquiera dineros, fondos, créditos o valores de una entidad bancaria internacional**, o que sin estar debidamente autorizado expida o gire cualquier certificado de depósito, gire cualquier orden o letra de cambio, realice cualquier clase de aceptación, cesión de una nota, bono, giro, letra de cambio, y cualquier persona que con la misma intención ayude o incite a cualquier director, oficial o empleado a violar cualquier disposición de esta sección, **incurrirá en un delito grave y convicto que fuere será castigado con reclusión por un término no menor de diez (10) años ni mayor de veinte (20) años, o con una multa no menor de quince mil dólares ($15,000) ni mayor de treinta mil dólares ($30,000), o ambas penas a discreción del tribunal.**

(d)  ...

(e)  El Comisionado queda autorizado a:



(1)  **Imponer y cobrar multas administrativas** no menores de cinco mil dólares ($5,000.00) ni mayores de veinticinco mil dólares ($25,000.00) **por cada violación** a las disposiciones de esta Ley o las disposiciones contenidas en las reglas y reglamentos que podrían ser promulgados en virtud de las mismas.

(2)  **Imponer la restitución o reembolso de aquellos pagos recibidos en contravención a las disposiciones de esta Ley o a cualquier regla o reglamento que podrían ser promulgados en virtud de la misma, o cualquier otro remedio que entienda necesario para hacer cumplir los propósitos de esta Ley.**

(3)  Imponer y cobrar multas administrativas no menores de mil dólares ($1,000.00) ni mayores de diez mil dólares ($10,000.00) por cada día en que la entidad bancaria internacional deje de cumplir con los requerimientos u órdenes dictadas por el Comisionado.

6

*Véase*, 7 L.P.R.A. §232p(a), (c) y (e)(1)(2)(3). (Énfasis suplido).

12.     Las disposiciones de la Ley Núm. 52-1989 deberán prevalecer sobre cualesquiera otras leyes de Puerto Rico que sean inconsistentes con dicha ley. *Véase*, 7 L.P.R.A. §232x(b).

13.     La Sección 28 de la Ley Núm. 52-1989 establece que "[e]sta ley por ser necesaria para el bienestar del Pueblo de Puerto Rico, deberá ser interpretada liberalmente de manera que se logren sus propósitos".[8]

14.     Por otra parte, el Plan de Liquidación es un convenio entre Nodus, los Accionistas y la OCIF, cuyos términos tienen fuerza de ley entre éstos, sus sucesores y ante terceros en la forma que dispone la ley. *Véase*, 31 L.P.R.A. §9754.

15.     Como consecuencia de lo antes expuesto, y de conformidad con las disposiciones legales aplicables, la OCIF emite la presente *Querella*, disponiéndose, además, que de conformidad con la Sección 21 de la Ley Núm. 52-1989, los *Exhibits* de esta *Querella* se radican junto a ella en un sobre sellado confidencial para el beneficio único de Nodus, los Accionistas y sus respectivos representantes legales, salvo que un Tribunal requiera su divulgación.

## IV. INFORMACIÓN DE LOS QUERELLADOS

16.     La querellada, **Nodus International Bank, Inc.**, es una EBI, organizada bajo las leyes del Gobierno de Puerto Rico desde el 12 de agosto de 2009, la cual tuvo licencia número EBI-60 expedida por la OCIF al amparo de la Ley Núm. 52-1989, hasta que la OCIF revocó su licencia mediante la Orden de Designación de Síndico de 3 de octubre de 2023; con dirección física y postal en 252 Ave. Ponce de León, Suite 1501 San Juan, Puerto Rico 00918.

17.     El co-querellado, **Sr. Tomás Niembro Concha**, -- dueño del 63.31% de las acciones en circulación de Nodus --, es mayor de edad, residente de ███████████████████ ███████████████████████████████████████████████ y correo electrónico tomas.niembro@nodusbank.com. Durante el periodo de tiempo pertinente a los hechos de la presente *Querella*, el Sr. Niembro fungía, además, como Presidente de Nodus.

18.     El co-querellado, **Sr. Juan F. Ramírez Silva**, -- dueño del 36.69% de las acciones en circulación de Nodus --, es ciudadano americano y residente de ████████████████ y correo electrónico juan.ramirez@nodusbank.com. Durante el periodo de tiempo pertinente a los hechos de la presente *Querella*, el Sr. Ramírez fungía, además, como Presidente de la Junta de Directores de Nodus.

## V. RELACIÓN DE HECHOS

A.  **Trasfondo sobre Nodus, el Plan de Liquidación y la Orden de Sindicatura.**

      *i.   Origen de Nodus*



19.     El 12 de junio de 2009, Optivalores Investment Company Ltd. ("Optivalores") presentó una *Solicitud de permiso para organizar* una *entidad bancaria internacional* con el nombre de Nodus. A esa fecha, Optivalores era el tenedor del 100% de las acciones de Nodus.

20.     El 3 de agosto de 2009, la OCIF emitió un permiso mediante el cual autorizó a Nodus a organizarse como una EBI.

21.     El 12 de noviembre de 2009, Nodus presentó una *Solicitud de Licencia* para comenzar sus operaciones como una EBI.

22.     El 17 de noviembre de 2009, la OCIF expidió la licencia número EBI-60, mediante la cual autorizó a Nodus a operar como una EBI.

---

[8]   Precisa señalar que la Sección 23 de la Ley Núm. 52-1989 quedó inalterada tras las enmiendas introducidas mediante la Ley Núm. 110-2013.

23. El 25 de febrero de 2010, Nodus notificó el comienzo de sus operaciones efectivo el 22 de febrero de 2010.

### ii. *Exámenes a Nodus y Eventos que Resultaron en su Liquidación*

24. Tras ser ordenado por la OCIF, el 15 de febrero de 2012 se realizó el primer examen de Nodus, donde se evaluaron las operaciones de dicha EBI desde el 31 de diciembre de 2011 hasta el 14 de marzo de 2012. Según surge del Sistema Uniforme de Clasificación de Instituciones Financieras, el referido examen calificó a Nodus como una institución "menos que satisfactoria" con una puntuación de "3"[9]. *Véase*, **Exhibit 1-A**.

25. Como consecuencia de las deficiencias identificadas en dicho examen, la OCIF, en términos generales, le ordenó a la Junta de Directores de Nodus lo siguiente: (i) requerimiento de inyección de capital para atender los asuntos de insolvencia; (ii) implementación de políticas y procedimientos para atender las claras deficiencias de la cartera de préstamos y temas de crédito; (iii) llevar a cabo una revisión de políticas y procedimientos para fortalecer la estructura operacional de la entidad y establecer parámetro adecuados para asegurar inversiones cónsonas con la realidad financiera de la EBI.[10]

26. El 3 de marzo de 2014, se llevó a cabo el segundo examen de Nodus, particularmente, de las operaciones de dicha entidad desde el 31 de diciembre de 2013 hasta el 27 de marzo de 2014. El referido examen reflejó lo siguiente:

> The Entity's overall financial condition deteriorated since the last examination, and it is considered deficient. The Entity presents three years of accumulated losses and has been depleting the capital position. [...] The Allowance for Loans and Leases Losses (ALLL) established by the Entity's is inadequate considering the risk exposure within the portfolio. The examination reveals several apparent violations and internal & routine control deficiencies, lack of written methodology for the ALLL and improvements needed in the Liquidity Contingency Policy.

*Véase*, **Exhibit 1-B**.

27. Además, se encontraron violaciones aparentes al *Bank Secrecy Act* y al *Anti-Money Laundering* ("BSA/AML"). A tales efectos, según surge del Sistema Uniforme de Clasificación de

---

[9] De ordinario, las EBIs con una calificación de "3":

> ...exhibit some degree of supervisory concern in one or more of the component areas. These financial institutions exhibit a combination of weaknesses that may range from moderate to severe; however, the magnitude of the deficiencies generally will not cause a component to be rated more severely than 4. Management may lack the ability or willingness to effectively address weaknesses within appropriate time frames. Financial institutions in this group generally are less capable of withstanding business fluctuations and are more vulnerable to outside influences than those institutions rated a composite 1 or 2. Additionally, these financial institutions may be in significant noncompliance with laws and regulations. Risk management practices may be less than satisfactory relative to the institution's size, complexity, and risk profile. These financial institutions require more than normal supervision, which may include formal or informal enforcement actions. Failure appears unlikely, however, given the overall strength and financial capacity of these institutions. Véase, https://www.fdic.gov/regulations/examinations/ratings/.

[10] Específicamente, la OCIF ordenó lo siguiente:



- **Capital** – La Junta deberá asegurarse que la institución no alcance un status de insolvencia causado por las continuas pérdidas operacionales. Una inyección de capital es necesaria para asegurar que la Entidad continúe capitalizada.
- **Administración de Crédito** – La Junta deberá tomar las acciones apropiadas para establecer Políticas y Procedimientos apropiados para la cartera de riesgo al que está expuesta la entidad al incurrir en dicha actividad. La Junta también debe asegurarse que los procedimientos implementados sean efectivos además de monitorear el comportamiento de la cartera.
- **Ingresos** – la Junta deberá establecer mecanismos para mejorar los resultados operacionales y el desempeño de los ingresos para que éstos sean una fuente para aumentar el Capital.
- **Gobierno Corporativo** – La Junta debe asegurarse que todas las políticas y procedimientos sean revisados a tono con la realidad operacional y riesgo de la Entidad. Esta deberá mejorar políticas y procedimientos para las Inversiones y revisarlas periódicamente.

Instituciones Financieras, el referido examen calificó a Nodus con una puntuación de "4"[11], entiéndase, con serias deficiencias financieras y gerenciales.

28.     Tras la alarmante calificación que recibió Nodus, la OCIF, nuevamente, le ordenó a la Junta de Directores de Nodus atender de manera inmediata varios puntos requiriéndole a la EBI, entre otras cosas: (i) desarrollar e implementar un plan estratégico incluyendo un presupuesto y planificación de crecimiento de activos; (ii) presentar un plan formal de capitalización para cubrir su insolvencia y prevenir pérdidas operacionales futuras; (iii) mejorar el rendimiento de sus activos; y (d) revisar y mejorar sus políticas y procedimientos internos[12].

29.     El 10 de septiembre de 2014, Nodus emitió una *Resolución de la Junta de Directores (Board Resolution)* para, entre otras cosas:

> ...take all steps necessary, consistent with other provisions of the RESOLUTION and with sound banking practices, to correct and prevent the findings identified in the December 31, 2013 ROE, prepared by the OCFI, and address each concern identified in the ROE and ensure that the Entity is operated with adequate management supervision and Board oversight to prevent unsafe and unsound banking practices and to ensure compliance with applicable provisions of law and/or regulations.

30.     El 26 de agosto de 2015, se llevó a cabo el tercer examen de Nodus, particularmente, de las operaciones de dicha entidad desde el 30 de junio de 2015 hasta el 4 de diciembre de 2015. El referido examen reflejó lo siguiente:

> The Entity's overall financial condition is considered deficient and remains with similar deficiencies previously noted in the last examination. The Entity presents three years of accumulated losses and has been depleting its capital position.
>
> The Entity's assets decreased 27.5% when compared to December 31, 2014. Both the loan and investment portfolios decreased by $3.4 million, caused by the lack of liquidity. As of the date of examination, the investment portfolio was impacted by several securities that presented significant unrealized losses and when evaluated by Other Than Temporary Impairment (OTTI) were considered impaired. The Allowance for Loan and Lease Losses (ALLL) established by the Entity is inadequate considering the risk exposure within the portfolio. The examination reveals several apparent violations and internal routine control deficiencies. The Board of Directors (BOD), Compliance, Credit Committee and ALCO minutes still needs to be adequately supported and provide evidence that the overall operations of the Entity are being monitored by Management (which includes BOD).

---

[11] Por su parte, las EBIs con una calificación de "4":

> ...exhibit unsafe and unsound practices or conditions. There are serious financial or managerial deficiencies that result in unsatisfactory performance. The problems range from severe to critically deficient. The weaknesses and problems are not being satisfactorily addressed or resolved by the board of directors and management. Financial institutions in this group generally are not capable of withstanding business fluctuations. There may be significant noncompliance with laws and regulations. Risk management practices are generally unacceptable relative to the institution's size, complexity, and risk profile. Close supervisory attention is required, which means, in most cases, formal enforcement action is necessary to address the problems. [...] Failure is a distinct possibility if the problems and weaknesses are not satisfactorily addressed and resolved. Id.

[12] Específicamente, la OCIF ordenó lo siguiente:
- To develop and implement a Strategic Planning, including budget and asset growth plan.
- To submit a formal capital plan, to cover insolvency, to prevent [...]sic future operational losses and for the institution risk and growth.
- Reduce classified and non-performing assets.
- Improve earnings performance.
- Review and improve policies and procedures (Credit, Investment, and Liquidity Contingency Plan). In addition, an Allowance for Loan and Lease Losses (ALLL) written methodology should be established.
- The minutes of the Board of Directors (BOD), Credit Committee and ALCO (Assets and Liabilities Committee) meetings need significant improvements. These minutes must contain, at least: an appropriate agenda, the attendance, quorum determination, approval of prior minutes, determination and a summary of each area discussed in such meetings, including financial data. Minutes must include detailed information and evidence that the overall operations of the Entity are monitored by management and the Board. In addition, the minutes must include the AML/BSA Activities.

*Véase,* **Exhibit 1-C**.

31.     Además, se encontraron violaciones aparentes a la Ley Núm. 52-1989, al Reglamento Núm. 5653 y al BSA/AML. A tales efectos, según surge del Sistema Uniforme de Clasificación de Instituciones Financieras, el referido examen calificó nuevamente a Nodus con una puntuación de "4", entiéndase, con serias deficiencias financieras y gerenciales.

32.     Así las cosas, y debido a la calificación de Nodus, la OCIF le ordenó a la Junta de Directores de Nodus a atender de forma inmediata varios asuntos, incluyendo: (i) mejorar el programa de cumplimiento con el *Bank Secrecy Act* y *Anti-Money Laundering (BSA/AML)*, (ii) actualizar su plan estratégico y de negocios; (iii) mejorar el capital a un nivel que fuera proporcional a la exposición de riesgo de la EBI; (iv) mejorar el rendimiento de sus activos; (iv) mejorar sus prácticas de *underwriting*[13]:

33.     Como consecuencia del incumplimiento de Nodus con los requerimientos de la OCIF tras los exámenes realizados, así como como con lo dispuesto en la *Resolución de la Junta de Directores,* la OCIF se vio en la obligación de tomar acción. Así las cosas, el 5 de mayo de 2016 la OCIF y la referida entidad financiera suscribieron un *Memorando de Entendimiento* mediante el cual Nodus se obligó a:

> *...take all steps necessary, consistent with other provisions of the Memorandum and sound banking practices, to correct and prevent the unsafe or unsound banking practices and violations of law and/or regulations identified in the Report; address each deficiency identified in the Report and ensure that the Entity is being operated with adequate management supervision and Board oversight to prevent any future unsafe or unsound banking practices and violations of law and/or regulations.*

34.     Con conocimiento de la precaria situación de la institución el 20 de abril de 2017, Veninvest PR Corp., controlada por el Sr. Niembro, y Canoma Corporation, controlada por el Sr. Ramírez, le solicitaron autorización a la OCIF para adquirir las acciones de Nodus.

35.     El 2 de mayo de 2017, la OCIF autorizó el cambio de control de Optivalores Investment Company Ltd. a Veninvest PR Corp., controlada por el Sr. Niembro, y a Canoma Corporation, controlada por el Sr. Ramírez, tras estos adquirir el 96% de las acciones ordinarias ($8 millones) y las 650,000 acciones preferidas ($400,000.00) de Nodus.

36.     Así las cosas, el 16 de octubre de 2017 se llevó a cabo el cuarto examen de Nodus, particularmente, de las operaciones de dicha entidad tras haberse suscrito el *Memorando de Entendimiento*. El referido examen reflejó una vez más lo siguiente:

> *The overall financial condition of the Entity still needs improvement as reflected in the capital, asset, quality, and management component ratings. Earnings performance is considered less than satisfactory. Operations and internal controls are satisfactory. The IT environment is also a concern in this examination; therefore, efforts and time are needed to bring the IT function to an adequate level. A Key component of the June 30, 2015 Memorandum of Understanding (MOU) is the successful implementation of all actions*

---

[13] Específicamente, la OCIF ordenó lo siguiente:
- *To improve the Bank Secrecy Act and Anti-Money Laundering (BSA/AML) Compliance Program.*
- *To update the Strategic and Business Plan.*
- *Improve capital to a level that is commensurate with the Entity's risk exposure.*
- *Reduce classified and non-performing assets.*
- *Improve earnings performance.*
- *Review and enhance Credit Policy.*
- *Improve investment and credit underwriting practices.*
- *Increase the Allowance for Loan and Lease Losses (ALLL) to an appropriate level and validate the methodology.*
- *The minutes of meetings held by the Board of Directors (BOD), Credit Committee and ALCO (Assets and Liabilities Committee) meetings need significant improvements. These minutes must contain, at least: an appropriate agenda, the attendance, quorum determination, approval of prior minutes, determinations and a summary of each area discussed in such meeting, including financial data. Minutes must include detail[ed] information and evidence that the overall operations of the Entity are monitored by Management and the BOD.*



10

*outlined in the corresponding action plan, which must result in an overall improvement of the Enity's risk profile. While Management has developed remediation plans, several of the actions need improvement. Therefore, implementation of the remediation plans remain[s] in the middle and/or final phase. As a result, action plans will require more attention and efforts by Management before compliance with the goals of the MOU can be achieved.*

*Véase,* **Exhibit 1-D.**

37.     En consonancia, y según surge del Sistema Uniforme de Clasificación de Instituciones Financieras, el referido examen calificó nuevamente a Nodus con una puntuación de "4", entiéndase, con serias deficiencias financieras y gerenciales.

38.     En consecuencia, la OCIF instó a la Junta de Directores de Nodus, quien ahora estaba bajo la administración de los Accionistas, a atender de forma inmediata los siguientes asuntos:
- *Fully comply with the provisions of the MOU.*
- *Reduce the volume of adversely classified items.*
- *Provide resources to its lending function.*
- *Maintain an adequate allowance for loan losses balance.*
- *Identify, monitor, and reduce both credit and funding concentrations.*
- *Enhance and implement remediation measures as to the IT environment.*
- *Improve the level and quality of oversight and support.*
- *Establish controls and procedures to avoid instances of non-compliance.*
- *Strengthen [and] enhance due diligence and monitoring system in the BSA/AML Program.*

39.     El 24 de abril de 2018, la OCIF y Nodus otorgaron un *Segundo Memorando de Entendimiento* debido al estado financiero de la entidad tras el cuarto examen. En ese sentido, la OCIF, tras las representaciones del Sr. Niembro y el Sr. Ramírez, le ordenó expresamente a Nodus a corregir todas las deficiencias según identificadas en el examen. En específico, la OCIF dispuso nuevamente que:

*Beginning on the effective date of this Memorandum, the Entity shall take all steps necessary, consistent with other provisions of this Memorandum and sound banking practices, to correct and prevent the unsafe or unsound banking practices and violations of law and/or regulations identified in the Report. It also shall address each deficiency identified in the Report and ensure that the Entity is being operated with adequate management supervision and Board oversight to prevent any future unsafe or unsound banking practice[s] and violations of law and/or regulations.*

40.     **Posteriormente, el 1 de junio de 2018 el Sr. Niembro fue designado presidente de Nodus.**

41.     Bajo la presidencia del Sr. Niembro, el 12 de octubre de 2018, Nodus le solicitó a la OCIF autorización para llevar a cabo la emisión y venta de acciones preferidas por la cantidad de $4,000,000.00, con el propósito de cumplir con el capital reglamentario de la EBI. El 15 de octubre de 2018, la OCIF autorizó la enmienda al Certificado de Incorporación para tales fines.

42.     **El 5 de agosto de 2019, Nodus le notificó a la OCIF que la Junta de Directores de dicha entidad había ratificado al Sr. Ramírez como Presidente de la Junta y al Sr. Niembro como Presidente de Nodus.** *Véase,* **Exhibit 2.**

43.     **El 12 de noviembre de 2019, tras cierta solicitud de Nodus, la OCIF autorizó la transferencia de las acciones de Veninvest PR Corp. y Canoma Corporation a los Accionistas en su carácter personal. En consecuencia, el Sr. Niembro y el Sr. Ramírez advinieron tenedores de la totalidad de las acciones comunes de Nodus, con un 50% y 50% respectivamente. Es decir, a partir del 12 de noviembre de 2019, Nodus cesó de operar como una EBI cuyos accionistas y dueños eran entidades jurídicas, a una cuyos dueños eran directamente el Sr. Niembro y el Sr. Ramírez.** *Véanse,* **Exhibit 3.**

11

44.     Así las cosas, el 18 de enero de 2022 se llevó a cabo el quinto y último examen de Nodus. Particularmente, de las operaciones de dicha entidad desde el 1 de julio de 2017 hasta el 30 de septiembre de 2021 y el cumplimiento de ésta con lo dispuesto en el *Segundo Memorando de Entendimiento*. El referido examen reflejó lo siguiente:

> The asset quality problems, credit administration and underwriting weaknesses negatively impacted earnings and capital. The Entity's capital position indicates a critically deficient level such that the Entity's viability and solvency is threatened. Urgent capital contribution from shareholders or other external sources of financial support is required, this last action requiring prior approval by the Commissioner. Earnings level is insufficient to support operations and maintain appropriate capital and allowance levels. Earnings component was evaluated as of examination date; however, subsequent events reflect that the Entity still experiencing losses that represent a distinct threat to its viability through the erosion of capital.

> The Entity's BSA/AML compliance program remains deficient in three core elements, resulting in apparent violations and failure to comply with the provisions of the MOU issued as results of prior examination. **While the Entity intended to strengthen and improve the BSA/AML compliance program, examiners identified persistent deficiencies surrounding critical aspects of the <u>internal controls</u>, independent testing, and the BSA Officer functions.** (Énfasis suplido).

*Véase*, **Exhibit 1-E**.

45.     En consonancia, y según surge del Sistema Uniforme de Clasificación de Instituciones Financieras, el referido examen calificó a Nodus con una puntuación de "5"[14], la más baja y crítica de dicho sistema de calificación.

46.     En específico, el aludido examen reflejó que Nodus había incurrido en las siguientes violaciones de ley:

a.  Violación a la Sección 13(b)(6) de la Ley Núm. 52-1989 al otorgar préstamos o financiamientos no autorizados a Entidades Afiliadas:

>   i.  El 6 de septiembre de 2021 Nodus, sin la debida autorización de la OCIF, otorgó un préstamo de $600,000.00 a Campomarino S.A. Panamá, una compañía del Sr. Ricardo Fernández Barrueco quien era accionista preferido de Nodus desde el 23 de junio de 2021, . *Véase*, **Exhibit 1-E**, en la pág. 30.

>   ii. **A su vez, entre el 19 de septiembre del 2019 al 29 de septiembre de 2021, Nodus, sin la autorización de la OCIF y sin realizar el análisis de repago correspondiente, le compró a su afiliada Nodus Finance -- entidad organizada bajo las leyes de Florida, y de la cual los señores Niembro y Ramírez también eran accionistas con el 50% cada uno -- $25.3 Millones en cuarenta y siete (47) pagarés; esta actividad es considerada como un financiamiento a los accionistas, la cual está totalmente prohibida por la Sección 13(b)(6) de la Ley Núm. 52-1989.** *Véase*, **Exhibit 1-E**, en las págs. 9, 29-30. Esta transacción, además, se realizó en violación del Artículo 10(g)(3) del Reglamento 5653 toda vez que se trató de una inversión en valores o acciones de una institución afiliada, que representó más del veinticinco por ciento (25%) del capital neto de Nodus, sin previa notificación ni aprobación por parte de la OCIF. *Íd*. Mediante estas transacciones de inversión, **Nodus Finance se**



---

[14] Las EBIs con una calificación de "5":

> ...exhibit extremely unsafe and unsound practices or conditions; exhibit a critically deficient performance; often contain inadequate risk management practices relative to the institution's size, complexity, and risk profile; and are of the greatest supervisory concern. The volume and severity of problems are beyond management's ability or willingness to control or correct. Immediate outside financial or other assistance is needed in order for the financial institution to be viable. Ongoing supervisory attention is necessary [...].

12

convirtió en deudor de Nodus por los $25.3 Millones, sin colateral ni garantía alguna.

iii. Asimismo, del aludido examen surgió que el 6 de septiembre de 2021, Nodus, sin previa autorización de la OCIF, otorgó un préstamo por la suma de $3,950,000.00 (representando el 32.59% del capital total de Nodus) a favor de Intercorp MS LLC. Lo anterior, sin que constara que se hubiese realizado un proceso de evaluación y aprobación de solicitud de préstamo (*underwriting*). *Véase*, **Exhibit 1-E**, en la pág. 9. Intercorp MS LLC es una entidad organizada bajo las leyes de Florida, que ofrece préstamos convencionales y servicios de préstamos, originando préstamos y vendiéndoselos a Nodus. *Íd*. El préstamo a favor de Intercorp también es considerado como un financiamiento a los accionistas, lo cual está completamente prohibido por la Sección 13(b)(6) de la Ley Núm. 52-1989, *supra*. *Véase*, **Exhibit 1-E**, en las págs. 9 y 60.

b. Violación a la *Ley para la Unificación y Fortalecimiento de América mediante las Herramientas Apropiadas para Interceptar y Obstruir el Terrorismo*, según enmendada, 115 Stat. 272 (2001)[15] al Nodus reflejar controles internos inadecuados, pruebas independientes inadecuadas, oficial de BSA ineficiente, *Enhanced Due Diligence* (EDD) y monitoreo de transacciones deficiente, identificación y reporte. *Véase*, **Exhibit 1-E**, en la pág. 30.

c. Incumplimiento por parte de Nodus con la Sección 14(c) de la Ley Núm. 52-1989 al no presentar veinticuatro (24) reportes de actividad sospechosa que eran necesarios y reportar de manera tardía cuarenta y ocho (48) informes de actividad sospechosa, según lo discutido con el Oficial de Cumplimiento de BSA de Nodus[16]. *Véase*, **Exhibit 1-E**, en la págs. 30-31.

47.   En consecuencia, la OCIF le informó a la Junta de Directores de Nodus, cuyo presidente era el Sr. Ramírez, los asuntos que requerían acción inmediata, a saber:

- *Fully comply with the provisions of the determined Enforcement Action.*
- *Reduce the volume of adversely classified items.*
- *Improve credit underwriting and loan administration practices.*
- *Provide resources to its lending function.*
- *Maintain an adequate allowance for loan losses balance (ALLL).*
- *Identify, monitor, and reduce both credit and funding concentrations.*
- *Plan to achieve profitability.*
- *Improve the level and quality of oversight and support.*
- *Establish controls and procedures to avoid instances of non-compliance.*
- *Provide immediate capital injection to a level that is commensurate with the Entity's risk exposure and support asset growth and absorb ongoing operational losses.*
- *Develop a revised system of internal controls designed to ensure full compliance with BSAS taking into consideration its size and risk profile. Strengthen enhance due diligence and monitoring system in the BSA/AML Program. Address all internal control deficiencies of BSA Compliance and correct all violations to local laws and regulations and all apparent violations to federal regulations, as cited in this Report.*

---

[15] Conocida como el USA Patriot Act. *Véase*, 7 L.P.R.A. §232(m). A su vez, el cumplimiento con el *USA Patriot Act* es un requisito para las EBIs, en virtud de la Sección 14 de la Ley Núm. 52-1989. *Véase*, 7 L.P.R.A. §232j-1.

[16] El cumplimiento con la radicación de informes de actividad sospechosa es un requisito para las EBIs, en virtud de la Sección 14(c) de la Ley Núm. 52-1989. *Véase*, 7 L.P.R.A. §232j-1(c).

13

48. El 13 de octubre de 2022, la OCIF le entregó a Nodus, de manera confidencial en virtud de la Sección 3(a)(11) de la Ley Núm. 52-1989, el *Report of Examination* con los resultados del quinto examen, junto al *Cover Letter* y la factura por concepto de derecho de examen.

49. Luego de solicitar una prórroga de treinta (30) días, el 14 de diciembre de 2022 Nodus presentó su contestación al examen. En éste, la referida entidad le representó a la OCIF que atendería los señalamientos objeto del examen. No obstante, transcurridos varios meses, Nodus incumplió con sus obligaciones.

### iii. Intervención de la OCIF y el Proceso de Liquidación de Nodus

50. De forma específica, y como evidencia del estado de la EBI, la OCIF recibió múltiples reclamaciones de varios depositantes relacionadas a la negativa de Nodus en completar las transferencias de fondos solicitadas por éstos y la falta de argumentos válidos por parte de la entidad para justificar dicho proceder.

51. En específico, las reclamaciones presentadas ante la OCIF en contra de Nodus, las cuales colectivamente sumaban más de **$1,317,443.14** en fondos que los depositantes de Nodus intentaron recuperar sin éxito, evidenciaron la necesidad de tomar control de la entidad.

| Reclamante | Resumen de Reclamación |
|---|---|
| Grupo FIXON | El 9 de agosto de 2022 el Sr. Emanuel Raspanti, presidente del Grupo FIXON, entidad de Buenos Aires, Argentina, presentó una *Reclamación* ante la OCIF en contra de Nodus. En esencia, indicó que su grupo empresarial tenía varias cuentas en Nodus y que la referida entidad financiera había congelado sus fondos. Añadió que Nodus no respondía o brindaba respuestas imprecisas respecto a cuándo acreditaría o debitaría los fondos, por lo que solicitó la intervención y acción inmediata de la OCIF. |
| Sr. José Luis Bissone | El 19 de noviembre de 2022 el Sr. José Luis Bissone presentó una *Reclamación* ante la OCIF en contra de Nodus mediante la cual denunció las actuaciones de la referida entidad financiera al cancelar su tarjeta de débito y retener su dinero sin posibilidad de retirar el mismo. A su vez, el señor Bissone indicó en su reclamo que intentó comunicarse con Nodus por diversos medios para resolver la situación, pero que no tuvo éxito. En ese contexto, el señor Bissone solicitó la intervención de la OCIF, tras la FDIC indicarle dicho curso a seguir. |
| Sr. Alexander Veyre | El 24 de enero de 2023 el Sr. Alexander Veyre cursó un correo electrónico a la división de Querellas de la OCIF mediante el cual adujo que uno de sus clientes había experimentado problemas al intentar transferir fondos de su cuenta en Nodus. En esa línea, añadió que la referida EBI había intentado justificar el problema, pero que no brindaba ninguna solución específica. En específico, adujo que sospechaba que se trataba de "BANKING FRAUD", por lo que solicitó que se atendiera el asunto de inmediato. |
| Sr. Eduardo Rodríguez Llarens | El 27 de febrero de 2023 el Sr. Eduardo Rodríguez Llarens presentó una *Reclamación* ante OCIF en contra de Nodus. Lo anterior, en aras solicitar la intervención del Comisionado ante el patrón de irregularidades en que incurrió Nodus al no completar ciertas transferencias de fondos que éste solicitó, a saber, una por la suma de **$20,000.00** y otra por la suma de **$25,000.00**. |
| Sr. Alberto Ricci Ferre | El 14 de marzo de 2023 el Sr. Alberto Ricci Ferre copió a la OCIF en un correo electrónico cursado a Nodus mediante el cual éste insistió en que se completara la transferencia de fondos que solicitó el **8 de febrero de 2023**. En específico, el señor Ricci Ferre copió a la OCIF para que como ente regulador lo ayudara a obtener los fondos solicitados que estaban en posesión de Nodus. El señor Ricci Ferre incluyó todas las comunicaciones intercambiadas con Nodus sobre la transferencia solicitada. |
| Sra. Cinthia Gawianski | El 22 de marzo de 2023 la Sra. Cinthia Gawianski presentó una *Reclamación* ante la OCIF en contra de Nodus. En ésta, la señora Gawianski alegó que el **12 de enero de 2023** le solicitó a Nodus una transferencia de **$118,000.00** a una de sus cuentas personales y que la entidad financiera, aun cuando le reflejó que la transferencia se encontraba en proceso de envío, nunca realizó la transferencia, ni le permitió disponer de sus fondos por otros medios. En específico, la señora Gawianski mencionó que el Sr. Ramírez, director de Nodus, le envió varios correos electrónicos en los cuales le indicó que Nodus había experimentado problemas con ciertos bancos corresponsales, los cuales estaban presuntamente resolviendo, y que se comunicarían con esta. En fin, la reclamante adujo que "[p]asaron más de 2 meses ya y [seguía] sin disponer de [sus] fondos. Tampoco [le] permit[ían] obtenerlos por medio de un cheque o incluso viajando y retirándolos en efectivo". Junto con su reclamación la señora Gawianski incluyó como evidencia las comunicaciones intercambiadas con el Sr. Niembro, el Sr. Ramírez y con Nodus. |
| Sra. Mariela Korn | El 23 de marzo de 2023 la Sra. Mariela Korn presentó una *Reclamación* ante la OCIF en contra de Nodus. En suma, adujo que el **24 de febrero de 2023** solicitó a Nodus la transferencia de **$19,542.00**. No obstante, arguyó que la referida EBI no había procesado la misma y que no establecía una fecha para hacerlo, sino que justificaban la dilación al señalar que estaban en proceso de cambio del banco corresponsal. Así las cosas, la señora Korn le solicitó a la OCIF que le ordenara a Nodus a completar la transferencia solicitada. Como parte de su *Reclamación* la señora Korn incluyó como evidencia varios de los correos electrónicos que intercambió con Nodus. |
| Eurocam S.A. | El 24 de marzo de 2023 Eurocam S.A. presentó una *Reclamación* ante la OCIF en contra de Nodus. En ésta, la referida entidad indicó que el 11 de enero de 2023 le solicitó a Nodus una transferencia de **$78,000.00** a una de sus cuentas en ItalBank International, Inc., la cual a la fecha no había sido completada por Nodus. En específico, Eurocam adujo que la demora en completar la transferencia solicitada infringía la Sec. 4-302 de la *Ley de Transacciones Comerciales de Puerto Rico*. Además, alegó que Nodus le estaba privando de disponer libremente de sus fondos al no proporcionarle un mecanismo alternativo para acceder a los fondos que tenía depositados en dicha EBI. Como parte de su *Reclamación*, Eurocam incluyó como evidencia el *Contrato de cuentas de depósito comercial* suscrito con Nodus; comunicación vía email con la Sra. Rosa Tinedo, Business Executive Manager de Nodus, y los estados de cuentas de dicha entidad en Nodus. |



14

| | |
|---|---|
| Sr. Juan Arroyo | El **28 de marzo de 2023** el Sr. Juan Arroyo presentó una *Reclamación* ante la OCIF en contra de Nodus. En suma, adujo que mantenía una cuanta empresarial con la referida entidad financiera, pero que no había podido realizar retiros o transferencias de fondos. Asimismo, el señor Arroyo arguyó que a pesar de los múltiples esfuerzos para comunicarse con la entidad para poder disponer de los fondos o retirar la totalidad de éstos, no había tenido éxito, por lo que solicitó la intervención de la OCIF. |
| Informativo SG Investment | El **31 de marzo de 2023** Informativo SG Investment copió a la OCIF en una cadena de correos electrónicos que le cursó a Nodus mediante los cuales le solicitaron a la referida EBI que completara las transferencias de fondos solicitadas por $730,000.00 o, en la alternativa, una reunión para atender el asunto el cual le generó retrasos en sus operaciones e inconvenientes con sus clientes y proveedores. No obstante, según se desprende, Nodus nunca respondió a las comunicaciones. |
| Sr. Adrián Marchan Ramos | El **14 de abril de 2023** el Sr. Adrián Marchan Ramos presentó, vía correo electrónico, una *Reclamación* ante la OCIF en contra en Nodus. En esencia, alegó que el **30 de marzo de 2023** solicitó a Nodus la transferencia de ciertos fondos que necesitaba para sufragar los costos de un tratamiento oncológico, pero que la referida EBI, contrario a lo dispuesto en su política interna, no completó la misma. En específico, adujo que las actuaciones de Nodus le había ocasionado daños. Como parte de su *Reclamación* el señor Marchan Ramos incluyó como evidencia los correos electrónicos intercambiados con Nodus. |
| Sr. Esteban Wilder | El **19 de abril de 2023** el Sr. Esteban Wilder presentó una *Reclamación* ante la OCIF en contra de Nodus. En suma, adujo que el **22 de febrero de 2023** solicitó una transferencia por el total de sus fondos, no obstante, alegó que Nodus nunca completó dicha transacción. Señaló que se comunicó con el Sr. Ramírez, vía email y por WhatsApp, y que tanto éste como la entidad no le brindaron una respuesta concreta sobre cuándo completarían la transferencia. A la luz de ello, el señor Wilder solicitó la intervención de la OCIF. |
| Sr. Dennys López | El **24 de abril de 2023** el Sr. Dennys López cursó un correo electrónico a la división de Querellas de la OCIF mediante el cual denunció varias irregularidades de Nodus. En particular, el señor López adujo que la referida EBI: 1) en diciembre de 2022 canceló todas las tarjetas de débito y que a la fecha no las había enviado nuevamente; 2) que demoraba aproximadamente un (1) mes en realizar una transferencia de fondos, y 3) que cuando se le solicitaba una transferencia Nodus indicaba que la misma no era efectiva y por dicho trámite cobraba una comisión de $175.00.00. En fin, el señor López adujo que Nodus había retenido su dinero al cancelarle su tarjeta de debido y al no completar las trasferencias solicitadas. |
| Sr. Federico R. Rosbaco | El **26 de abril de 2023** el Sr. Federico R. Rosbaco presentó una *Reclamación* ante la OCIF en contra de Nodus. En ésta, el señor Rosbaco alegó que el **12 de enero de 2023** le solicitó a Nodus el desembolso mediante transferencia de $300,000.00 de su cuanta DDA Individual. Posteriormente, el **27 de enero de 2023** el señor Rosbaco solicitó una nueva transferencia, esta vez por la suma de $90,000.00. No obstante, señaló que Nodus nunca completó las referidas transferencias, a pesar de las múltiples comunicaciones y solicitudes que se le hicieron a esos fines. En ese contexto, el señor Rosbaco le requirió a la OCIF que le ordenara a Nodus a transferir de inmediato la suma solicitada y que, además, ordenara el cierre de la cuenta más la transferencia del balance restante. Como parte de su *Reclamación* el señor Rosbaco incluyó como evidencia los siguientes documentos: 1) Ficha de solicitud de cuenta-persona natural; 2) Correo electrónicos con personal de Nodus; 3) comunicación vía WhatsApp con el Sr. Ramírez, 4) reclamación extrajudicial a Nodus por la firma Wolf Popper LLP. |
| Sra. Michelle Veronesi | El **27 de abril de 2023** la Sra. Michelle Veronesi cursó un correo electrónico a la división de Querellas de la OCIF mediante el cual solicitó la asistencia del referido Foro administrativo. Lo anterior, toda vez que el 6 de abril de 2023 solicitó una transferencia de $14,901.14 que Nodus nunca completó. La señora Veronesi incluyó los correos electrónicos enviados a la referida entidad financiera. |
| Sra. María Nella Elias | El **2 de mayo de 2023** la Sra. María Nella Elias cursó un correo electrónico a la división de Querellas de la OCIF en aras de obtener información sobre el procedimiento a seguir para instar una querella en contra de Nodus. |
| Sra. Begoña Ozon | El **2 de mayo de 2023** la Sra. Begoña Ozon cursó un correo electrónico a la división de Querellas de la OCIF mediante el cual solicitó que se evaluaran las irregularidades de Nodus para con sus clientes, particularmente, la demora de la referida entidad financiera en enviarle una tarjeta de débito -- 2 meses -- para poder disponer de sus fondos. La señora Begoña Ozon incluyó con su comunicación los correos electrónicos cursados por Nodus, en uno le expresaron que le enviaran la tarjeta de débito en un periodo de quince (15) días y en el otro, dos meses después, es decir, que la tarjeta de débito se encuentraba en proceso de emisión. |
| Sr. Daniel Castro | El **2 de mayo de 2023** el Sr. Daniel Castro presentó una *Reclamación* ante la OCIF en contra de Nodus por la referida entidad financiera incumplir con la transferencia de fondos según fue solicitada. |
| Sr. Daniel Villela | El **3 de mayo de 2023** el Sr. Daniel Villela cursó un correo electrónico a la división de Querellas de la OCIF denunciando la negativa de Nodus de completar la transferencia de fondos solicitada por este. |
| Sr. Jesús Gómez | El **5 de mayo de 2023** el Sr. Jesús Gómez presentó una *Reclamación* ante la OCIF en contra de Nodus. Ello, tras el 3 de abril de 2023 solicitar una transferencia a Nodus por la suma de $32,500.00 que no fue completada. Así las cosas, y ante la falta de respuesta por parte de Nodus, el señor Gómez solicitó la intervención de la OCIF. El señor Gómez incluyó con su *Reclamación* los correo electrónicos recibidos y cursados a Nodus. |
| Sra. Vicky Arena | El **8 de mayo de 2023** la Sra. Vicky Arena cursó un correo electrónico a la división de Querellas de la OCIF denunciando la negativa de Nodus a completar la transferencia de fondos que solicitó. |
| Sr. Federico López Mañan | El **9 de mayo de 2023** el Sr. Federico López Mañan presentó una *Reclamación* ante la OCIF en contra de Nodus. En suma, adujo que durante el mes de marzo de 2023 solicitó una transferencia de fondos a uno de sus proveedores, pero que dicha transacción nunca fue completada. Lo anterior, a pesar de los múltiples esfuerzos realizados para obtener una explicación y lograr disponer de los fondos en posesión de la referida entidad financiera. |
| Sr. Alejandro Brizio | El **9 de mayo de 2023** el Sr. Alejandro Brizio cursó un correo electrónico a la división de Querellas de la OCIF, en aras de obtener información sobre el procedimiento a seguir para instar una reclamación en contra de Nodus tras la referida entidad financiera no completar la transferencia de fondos solicitada de su cuenta en Nodus a su cuenta en Santander España. En específico, el señor Brizio adujo que, ante sus múltiples reclamos, Nodus únicamente le respondía que se estaban ocupando del caso. |

*Véase,* **Exhibit 4**.



52.     En adición a las reclamaciones presentadas en contra de Nodus, la OCIF advino en conocimiento que la referida entidad financiera figuraba como parte demandada en una acción

judicial millonaria de cobro, instada por Consorcio De Empresas Mendocinas Para Potrerillos S.A. -- una corporación organizada bajo las leyes de Argentina -- en la Corte de Distrito de los Estados Unidos para el Distrito de Puerto Rico, en el Caso Núm. 23-01132-SCC. En esta, el demandante expuso que el 31 de enero de 2023 solicitó una transferencia por la cantidad de $6,500,000.00 de los $6,586,917.66 que tenía depositados en su cuenta de Nodus, y que, luego de varios intercambios, Nodus anuló la solicitud de transferencia sin una justificación concreta, por "políticas internas". *Véase*, **Exhibit 5.**

53.     De lo anterior se desprende que Nodus, sin justificación alguna, dejó de completar las solicitudes de transferencia para hacerle disponible a sus depositantes una suma no menor de **$7,800,000.00**.

54.     Como consecuencia de ello, ante el fallode Nodus en atender las deficiencias identificadas a través de los años, en particular, aquellos identificados en los exámenes efectuados por la OCIF, y debido al estado crítico a nivel operacional, financiero y administrativo (gerencia) de la referida entidad, el **9 de marzo de 2023** la OCIF y Nodus, con sus respectivos representantes legales, llevaron a cabo una reunión mediante la cual la OCIF le notificó a Nodus su determinación de liquidar las operaciones de la EBI.

55.     Lo anterior, en aras de evitar que Nodus continuara causando daños irreparables a sus intereses, a los de las personas y las entidades con fondos o valores en dicha institución y al interés público. A esos efectos, la OCIF le brindó varias alternativas a Nodus para efectuar la liquidación de manera voluntaria y ordenada.

56.     Luego de varios intercambios, **entre el 24 y 28 de marzo de 2023**, Nodus afirmativamente expresó que optaría por la liquidación, de manera consensual, de la EBI mediante la presentación de un plan de liquidación voluntario.

57.     El **5 y 8 de mayo de 2023** finalmente la OCIF, Nodus y los Accionistas firmaron el *Plan of Voluntary Liquidation and Dissolution of Nodus International Bank, Inc. Véase*, **Exhibit 6.**

58.     La fecha de efectividad del Plan de Liquidación fue el 8 de mayo de 2023 ("Fecha de Efectividad").

59.     Mediante el Plan de Liquidación, Nodus acordó cesar sus operaciones y continuar operando con su licencia, de forma limitada, para el único y exclusivo fin de liquidar sus activos en beneficio de sus depositantes. *Véase*, **Exhibit 6**, en las págs. 4-5; *véase, además*, **Exhibit 7**, p. 2, refiriéndose a la *Sección 4(B)*.

60.     El Plan de Liquidación fue enmendado el 3 de agosto de 2023, a través de un documento titulado *First Amendment to Plan of Voluntary Liquidation and Dissolution of Nodus International Bank* (la "Enmienda"). *Véase*, **Exhibit 7.**

61.     La Enmienda al Plan de Liquidación tuvo el fin de aclarar lo siguiente: (i) que el periodo de liquidación bajo el Plan de Liquidación no excedería de dieciocho (18) meses desde la Fecha de Efectividad ("Periodo de Liquidación"); (ii) el orden de prioridad de pagos para la liquidación; (iii) que no se haría distribución alguna a los Accionistas hasta que ocurrieran ciertos eventos y, sólo luego de obtener una determinación por parte de OCIF a esos efectos, y (iv) que, en cuanto a las comunicaciones entre Nodus y sus clientes, las mismas debían llevarse a cabo por escrito, con copia al Administrador del Plan, salvo que la comunicación hubiese sido solicitada  directamente por éste, y para la información aprobada por el Administrador del Plan. *Véase*, **Exhibit 7**, en la pág. 2, refiriéndose a la *Sección 3*; en las págs. 4-5, refiriéndose a la *Sección 5(A)*; en la págs. 2-5, refiriéndose a la *Sección 5(C)*; en la pág. 4, refiriéndose a la *Sección 14*.

62.     Los demás términos y condiciones del Plan de Liquidación quedaron inalterados por la Enmienda y en plena fuerza y vigor. *Véase*, **Exhibit 7**, p. 4, *Sección 2*.

63.     El Plan de Liquidación y la Enmienda exponían específicamente lo siguiente en cuanto al Periodo de Liquidación:

*During the Liquidation Period, Nodus shall limit its business activities to winding up its business and affairs, marshalling and preserving the value of its assets, and shall distribute Nodus's assets in accordance with the provisions of this Plan. Among the activities that Nodus is permitted to engage in as part of its winding up its business and affairs is the completion of the Look Back Review, including the filing of Suspicious Activity Reports (SARs) which may be required to be filed by Nodus as a result thereof.*

*Véase,* **Exhibit 7**, en la pág. 2, refiriéndose a la *Sección 4(B).*

64.     A su vez, el Plan de Liquidación y la Enmienda dispusieron para el pago ordenado de todas las obligaciones de Nodus para con sus depositantes y terceros, así como para los gastos operacionales, siguiendo un orden de prioridad. *Véase,* **Exhibit 7**, en las págs. 4-5, refiriéndose a la *Sección 5(A).*

65.     En concreto, el Plan de Liquidación estableció expresamente que la distribución de activos de Nodus a los Accionistas estaba prohibida hasta tanto se cumpliera con el pago de todas las obligaciones de la EBI. *Véase,* **Exhibit 7**, en la pág. 5, refiriéndose a la *Sección 5(C).*

66.     Asimismo, dispuso que la compensación de los directores durante el Periodo de Liquidación sería la misma que éstos recibían al momento de suscribir el Plan de Liquidación. *Véase,* **Exhibit 6**, en las págs. 9-10, *Sección 16.*

67.     A la luz de las claras disposiciones del Plan de Liquidación, los Accionistas y los directores de Nodus estaban claramente impedidos de recibir, directa o indirectamente, compensaciones que resultaran inconsistentes con lo allí dispuesto.

68.     A los fines de cumplir con lo dispuesto en el Plan de Liquidación se dispuso que Nodus tendría un término de quince (15) días desde su firma para proponer un candidato que fungiera como administrador del plan y que, de transcurrir dicho término sin haber propuesto uno, Driven sería designado como administrador. *Véase,* **Exhibit 6**, en la pág. 9, *Sección 13.*

69.     A su vez, el Plan de Liquidación proveía para que la OCIF modificara la designación del administrador -- entiéndase, de Driven -- a síndico de Nodus en la eventualidad de que esta última no pudiese establecer y financiar completamente una reserva de efectivo o no pudiese completar las transacciones según dispuestas en el Plan de Liquidación en el término acordado, es decir, dentro del Periodo de Liquidación. *Véase,* **Exhibit 6**, en la pág. 11, *Sección 22.*

70.     Así las cosas, y transcurrido el término acordado sin que Nodus propusiera algún candidato, el 5 de junio de 2023 se designó oficialmente a Driven como administrador del Plan de Liquidación. *Véase,* **Exhibit 6**, en la pág. 9, *Sección 13.*

71.     Establecido lo anterior, y en lo aquí pertinente, de lo documentos provistos por los Accionistas a Driven como parte de la administración se desprende que los entonces miembros de la Junta de Directores de Nodus, previo a firmar el Plan de Liquidación y con pleno conocimiento, aprobaron un pago de dividendos de acciones preferidas a favor de 5 accionistas incluyendo al Sr. Niembro al 31 de marzo de 2023, pagadero al 17 de abril de 2023. *Véase,* **Exhibit 4-A**. Lo anterior, sin la autorización de la OCIF y con el claro propósito de obtener beneficios en detrimento de los depositantes.

72.     Asimismo, el 28 de abril de 2023[17], sin autorización previa de la OCIF y a sabiendas de la inminencia del proceso de liquidación el cual estaba próximo a comenzar, Nodus firmó un acuerdo con Nodus Finance mediante el cual ésta le compró a dicha entidad una cartera de préstamos de $26,011,780.08, pactando además un cargo por administración de préstamos. *Véase,* **Exhibit 8-A**, en las págs. 1, 23 y 28-29; en particular, *Secciones 1.1 y 2.23.*

73.     A pesar de que el acuerdo exponía que Nodus pagaría la cantidad de $26,011,780.08 a Nodus Finance, en su lugar, los estados financieros de Nodus reflejan que la EBI aceptó la cartera de préstamos de Nodus Finance en pago parcial de la deuda que tenía

---

[17] Cabe destacar que, en esa misma fecha, los Accionistas, a través del representante legal de Nodus, cursaron un correo electrónico a los representantes legales de la OCIF en el cual expresaba que los Accionistas habían aceptado los términos y condiciones del Plan de Liquidación que se llevaba negociando desde marzo de 2023. *Véase,* **Exhibit 8-B**.

ésta última para con Nodus producto de los 47 pagarés que adquirió entre el 2019 y el 2021. *Véase*, **Exhibit 8-C**.

74.     Al realizar esta transacción, durante las conversaciones conducentes a concretizar el Plan de Liquidación y días antes de suscribir el mencionado Plan, Nodus dejó de tener la posibilidad de recobrar los **$26,011,780.06** que le adeudaba Nodus Finance llegada la fecha cierta de dichos pagarés, y en su lugar aceptó como pago de la referida deuda una cartera de préstamos morosa y delincuente, y en su mayoría sin colateral, asumiendo además la responsabilidad y riesgo de cobrar dichos préstamos. Concretamente, de los estados financieros de Nodus surge que, de marzo 2023 a abril 2023, Nodus presentó una reducción de **$25,324,407.65** en sus activos de pagarés. Esta reducción resultó en un beneficio directo para Nodus Finance al liberarse de una deuda líquida con Nodus y obtener un simultáneo incremento en su cuenta de depósito (DDA) en Nodus por la cantidad de $272,904.43, todo en detrimento directo de los depositantes de la EBI.

75.     De hecho, de ciertas comunicaciones intercambiadas entre Nodus y Nodus Finance en enero de 2024, surge que los Accionistas reconocían que de la cartera de préstamos por $26,011,780.08, al menos $8,000,000.00 eran posiblemente incobrables. *Véase*, **Exhibit 8-D**.

76.     Por tanto, los Accionistas utilizaron el control que poseían sobre Nodus para, previo a entrar en el Plan de Liquidación, beneficiar a Nodus Finance, cuyos dueños eran el Sr. Niembro y el Sr. Ramírez. En otras palabras, a pesar de no estar poniendo a disposición de sus depositantes la cantidad de más de **$7,800,000.00**, para esas mismas fechas, Nodus eliminó **$26,011,780.08** de deudas de Nodus Finance, pactando, además, ciertos cargos administrativos pagaderos por Nodus.

77.     Con pleno conocimiento de lo anterior, Nodus presentó ante la OCIF su Presupuesto de Liquidación ("Presupuesto") en el que representó que tendría la liquidez necesaria para cumplir con la liquidación ordenada de sus activos dentro del Periodo de Liquidación. *Véase*, **Exhibit 9**. A la luz de tales representaciones, la OCIF aprobó el Presupuesto sometido por Nodus.

78.     Como parte del Plan de Liquidación, al 5 de junio de 2023 los Accionistas le presentaron a Driven, Administrador designado en ese momento, una cartera de préstamos de aproximadamente $83.9 Millones en principal, del cual 88.38% eran préstamos no asegurados y de cuyo repago sólo el 11.62% estaba asegurado con algún colateral. En adición a ello, 41.99% de la cartera de préstamos (equivalentes a $35.2 Millones) se concentraba en individuos o entidades de Venezuela.

79.     A su vez, para el 5 de junio de 2023, los Accionistas indicaron estar convencidos de que, independientemente de los principios generalmente aceptados de contabilidad de los Estados Unidos (*U.S. GAAP Standards*), la mayoría o el 100% de la cartera de préstamos se podría cobrar, con excepción de aquellos sujetos a procedimientos legales, dado que los préstamos se habían dado a clientes personales de los Accionistas, sobre quienes, según ellos, les constaba serían responsables al momento de pagar, aun siendo los préstamos no asegurados.

 80.     Por otra parte, al 5 de junio de 2023, los Accionistas le representaron a Driven, entonces Administrador del Plan, que Nodus tenía aproximadamente $22.6 Millones en activos líquidos y efectivo, o sus equivalentes, los cuales eran exclusivos de la cartera de préstamos antes mencionada. *Véase*, **Exhibit 10**.

81.     Específicamente, la representación de los Accionistas sobre la disponibilidad de los aproximadamente $22.6 Millones en efectivo surgía de los siguientes activos:

18

| Cuentas con Efectivo | Balances |
|---|---|
| Firstbank of PR | $ 392,479.97 |
| Atlas Bank - Panamá | $ 4,845,575.24 |
| Atlas Financial Group (FC Stone) | $ 4.00 |
| Dinosaur Merchant Bank | $ 1,982,265.01 |
| EuroExchange / Convera | $ 234,799.00 |
| Payblr Compensation Account | $ 108,234.56 |
| Payblr/Mastercard Collateral | $ 357,930.00 |
| Bantransfer Inc. | $ 5,803.74 |
| BCB Commercial Bank | $ 10,000.00 |
| Crossbar FX | $ 1,025,543.60 |
| **Total - Cuentas con Efectivo** | **$8,962,635.12** |

| CD's/Pagarés/Otros Inmuebles | Balances |
|---|---|
| Ourmicrolending | $4,220,000.00 |
| Pagarés de LF (Mi Papaya LLC) y NF (Nodus Finance LLC) | $1,124,000.00 |
| Otros Inmuebles (OREO) | $5,006,016.00 |
| Pagarés | $3,047,375.30 |
| **Total - CD's y Pagarés** | **$13,397,391.30** |

| Cuentas Restringidas | Balances |
|---|---|
| Firstbank de Puerto Rico | $300,000.00 |
| **Total Cuentas Restringidas** | **$300,000.00** |

| | |
|---|---|
| **Total de Efectivo y Equivalentes** | **$22,660,026.42** |

*Véase*, **Exhibit 10**.

82. Cabe destacar que, previo a la firma del Plan de Liquidación, el Sr. Niembro expresó que realizaría una inyección de capital de $2,000,000.00 adicionales a Nodus, a través de la cual éste se convertiría en 63.31% accionista de Nodus, quedando el Sr. Ramírez como dueño del 36.69% restante. No obstante, esta inyección de capital no se materializó hasta meses luego de su intento original toda vez que los fondos provenían de la cuenta del Sr. Niembro en Atlas Bank (Panamá), S.A. ("Atlas Bank"), entidad que actualmente se encuentra intervenida por su regulador, la Superintendencia de Bancos de Panamá, por esquemas de fraude.

83. Es menester apuntar, que la estrategia inicial de Nodus para implementar el referido Plan de Liquidación, según expresada por sus Accionistas y directores, consistía en la venta de su cartera de clientes a Atlas Bank -- una sociedad anónima organizada y constituida bajo las leyes de la República de Panamá --, por una suma de dinero correspondiente al 90% de los depósitos, cantidad que – juntamente con sus activos – serían suficientes para pagar todas las obligaciones y gastos operacionales según el orden establecido en el Plan de Liquidación.

84. Para ese momento, los Accionistas le representaron a Driven y a la OCIF **(i)** que estaban en una etapa avanzada de las negociaciones con Atlas Bank para que éste comprara la cartera de préstamos de Nodus por una cantidad mínima de $60,000,000.00 y **(ii)** que, además, Atlas Bank estaba interesado en migrar el equivalente en cuentas de depósito, con una pérdida proyectada de aproximadamente 10%.



85. No obstante, el 11 de julio de 2023, Driven se reunió con personal de Atlas Bank, incluyendo al Sr. Andrew Russell, presidente de Atlas Bank, Darío Herrera, Germán Martans, Tomás Polanco (contacto del Sr. Niembro), y el Sr. Niembro, y de dicha reunión surgió que Atlas Bank tenía interés en adquirir no más de cuarenta y cinco millones de dólares ($45,000,000.00) de la cartera de Nodus.

86. Así las cosas, el 7 de agosto de 2023, Atlas Bank, a través de su presidente el Sr. Andrew Russell, le cursó una oferta inicial a Nodus para adquirir su cartera de clientes por un monto de hasta alrededor de treinta millones de dólares ($30,000,000.00). *Véase*, **Exhibit 11**.

87. No obstante, el 15 de septiembre de 2023, la Superintendencia de Bancos de Panamá, entidad regulatoria de Atlas Bank, emitió la Resolución SBP-BAN-R-2023-01296 (la "Resolución de Atlas"), mediante la cual: (i) ordenó la toma de control administrativo y operativo de Atlas Bank; (ii) ordenó la suspensión de todas las operaciones bancarias de Atlas Bank, y (iii) designó al Sr. Jaime De Gamboa Gamboa como administrador interino del referido banco. Lo

19

anterior, por la referida entidad, al igual que Nodus, incurrir en ciertas actividades que provocaron su insolvencia. *Véase*, **Exhibit 12**.

88.     El mismo 15 de septiembre de 2023, los Accionistas de Nodus le remitieron una **nueva propuesta a Driven para transferir el 100% de la cartera de préstamos de Nodus, ya no a Atlas Bank, sino a su afiliada Nodus Finance y a Alter Bank Ltd. ("Alter Bank"), entidad perteneciente al Sr. Ramírez.** *Véase*, **Exhibit 13**.

89.     El 28 de septiembre de 2023, Nodus y Driven, como Administrador del Plan, sostuvieron una reunión con la OCIF en la cual discutieron lo acontecido con Atlas Bank y el estatus de la liquidación.

90.     Durante dicha reunión, como parte de las investigaciones realizadas por el Administrador, la OCIF advino en conocimiento del riesgo a los depósitos de Nodus por las actuaciones simultáneas de los Accionistas de pagos a Entidades Afiliadas, entiéndase, a Nodus Finance y a Financial Technology.

91.     Específicamente, en dicha reunión, el Administrador le notificó a la OCIF que había comenzado una investigación debido a ciertas transacciones inusuales -- fuera del curso ordinario de la EBI -- efectuadas por la EBI con Nodus Finance y Financial Technology antes o posterior a la Fecha de Efectividad y la designación del Administrador.

92.     En particular, en cuanto a Nodus Finance, el Administrador indicó que había solicitado los estados de cuenta de Nodus Finance desde la Fecha de Efectividad del Plan de Liquidación hasta ese momento (antes de la reunión), los cuales reflejaron un balance de **$986,313.83** al 20 de junio de 2023. *Véase*, **Exhibit 14**, p. 2.

93.     El 21 de junio de 2023, el Administrador le cursó un correo electrónico a los Accionistas mediante el cual les reiteró que las transferencias internas de Nodus sin autorización del Administrador estaban prohibidas. *Véase*, **Exhibit 15**.

94.     No obstante lo anterior, el Administrador indicó que al 29 de agosto de 2023 la cuenta de Nodus Finance en Nodus reflejaba un balance de solo $25.28. *Véase*, **Exhibit 14**, p. 3.

95.     Por su parte, en cuanto a Financial Technology, el Administrador informó que también solicitó todos los estados de cuenta de Financial Technology en Nodus y del Sr. Niembro, al igual que todos los detalles e información en apoyo de las facturas de Financial Technology, en aras de evaluar el pago que se estaba realizando a esta entidad. Como resultado de dicha investigación, el Administrador identificó a través de los estados bancarios de Nodus que, el Sr. Niembro se estaba asignando ciertas sumas en alzada en concepto de "Honorarios TNC". Al cuestionar las mencionadas partidas, el Sr. Niembro indicó que las mismas correspondían a su salario en Nodus, sus dividendos como accionista, su responsabilidad en carácter de director, sus comisiones, su posición como Presidente de Financial Technology y varias responsabilidades contables de Financial Technology, las cuales indicó no se podían efectuar a través de las cuentas de la EBI debido a su posicionamiento geográfico en Venezuela.

96.     Así las cosas, el Sr. Niembro luego de firmar el Plan de Liquidación en lugar de desistir de la compensación, continuó recibiendo cierta suma de dinero en concepto de salario a través de Financial Technology, aunque reducido a casi la mitad, al éste representar que ayudaría a completar la disolución de Nodus. *Véanse*, **Exhibits 16-A, 16-B**.[18] En específico, el "salario" a favor del Sr. Niembro, el cual estaba contemplado en el Presupuesto, fue autorizado exclusivamente tras la representación del Sr. Niembro de que éste brindaría asesoría a Nodus para el cobro de los préstamos y la migración de las carteras de la EBI.

---

[18] Cabe destacar que, del contrato entre Nodus y Financial Technology, firmado el 1 de julio de 2014, surge que Financial Technology brindaría servicios de, entre otros "investigación de mercados internacionales, desarrollo de productos y servicios, promoción y venta de productos, implementación y desarrollo tecnológico y asesoría gerencial y técnica". *Véase*, **Exhibit 16-C**, en la pág. 1. A cambio de dichos servicios, Financial Technology facturaría a una tarifa de $300.00 por hora. *Íd*. En la pág. 8, *Sección 8*. En la práctica, resultó que Financial Technology facturaba por adelantado basándose en un presupuesto creado para atender sus presuntas funciones contractuales.

97.     Así, el Sr. Niembro estuvo recibiendo la suma de **$25,000.00** mensuales a través de Financial Technology, hasta enero de 2024. Ello, con el alegado propósito de proveer servicios de cobro y migración a favor de Nodus, a pesar de que ninguna de sus actuaciones resultó en el cobro esperado. Lo anterior, toda vez que, durante este periodo, sólo se cobraron $1,480,349.00 de los $33,047,722.00 (es decir, menos de 5.00%) de los balances vencidos. Cabe mencionar que estos cobros correspondían en su mayoría a clientes que nunca habían dejado de efectuar sus pagos, por lo que no se evidenció un aumento por las presuntas gestiones de cobro del Sr. Niembro.

98.     Como consecuencias de las alarmantes actuaciones y falsas representaciones hechas por parte de los Accionistas de Nodus y en aras de evitar que éstos continuaran desangrando a la EBI, el 3 de octubre de 2023 la OCIF emitió una *Querella y Orden Provisional y Permanente para el Nombramiento de un Síndico y Revocación de Licencia* en contra de Nodus. *Véase*, **Exhibit 17**.

99.     Mediante la Orden de Sindicatura, la OCIF revocó la licencia de Nodus para operar como una EBI y designó a Driven como síndico independiente de Nodus, sustituyendo la gerencia, los directores y la junta de directores de Nodus, por Driven. A esos fines, la OCIF autorizó a Driven a tomar posesión y control de todos los activos y pasivos de la referida entidad en aras de completar el proceso de liquidación de acuerdo con lo dispuesto en el Plan de Liquidación y el Presupuesto.

100.    A su vez, en la Orden de Sindicatura la OCIF le ordenó a Nodus a proveer toda la información solicitada por Driven conducente a completar la liquidación y descubrir activos, así como a tomar las más estrictas medidas de seguridad para asegurar, garantizar, conservar y mantener íntegros la totalidad de los activos identificados en los estados financieros consolidados y auditados de Nodus, los informes, libros, registros, récords de contabilidad y cualesquiera otros documentos relacionados con su operación.

101.    El 13 de octubre de 2023, el Sr. Niembro, el Sr. Ramírez y el Sr. José Gregorio Suárez, comparecieron ante la OCIF mediante *Contestación a Querella y orden provisional y permanente para el nombramiento de un síndico y revocación de licencia*, allanándose a la determinación de la OCIF.

102.    Evaluada la posición de Nodus y de los Accionistas en torno a la Orden de Sindicatura, el 16 de octubre de 2023 la OCIF emitió una *Resolución* mediante la cual: (i) revocó la licencia de Nodus; (ii) confirmó en su totalidad la Orden de Sindicatura, impartiéndole así carácter permanente a ésta hasta tanto culmine el procedimiento de liquidación, y (iii) dejó sin efecto cierta vista que había pautado. *Véase*, **Exhibit 18**.

103.    Tras varios eventos procesales, el 8 de diciembre de 2023 la OCIF emitió una *Resolución Enmendada Nunc Pro Tunc* a los fines de aclarar que el nombre corporativo del síndico era Driven, P.S.C. *Véase*, **Exhibit 19**.

### iv.    *Eventos posteriores a la Orden de Designación de Síndico*

104.    Luego del nombramiento de Driven como síndico de Nodus, éste ha continuado indagando e investigando los asuntos financieros de la EBI. Como parte de sus funciones como síndico, Driven advino en conocimiento de las siguientes irregularidades:

#### a)   La cartera de préstamos

105.    Al 31 de enero de 2024, luego de conducir sus análisis e investigaciones y de múltiples reuniones en diversas jurisdicciones, el Síndico informó que más del 65% de la cartera de préstamos de Nodus están catalogados, según los *U.S. GAAP Standards*, bajo la categoría de pérdidas. *Véase*, **Exhibit 10**.

106.    Específicamente, de los préstamos garantizados con colateral, los cuales comprenden un 11.62% de la cartera de la EBI, aproximadamente el 50% se encuentran en procesos judiciales por asuntos de defectos registrales, poniendo a Nodus en segundo rango en torno al colateral pignorado. Como resultado de ello, menos del 5% de la cartera corresponde a préstamos garantizados con colateral susceptible a ejecución. *Véase*, **Exhibit 10**.

21

107.     Cabe destacar que Driven se topó con esta situación **a pesar de la compra de Nodus a Nodus Finance el 28 de abril de 2023 de más de treinta (30) préstamos, catalogados por los Accionistas como préstamos hipotecarios.**

108.     Al 31 de diciembre de 2023, del balance adeudado de principal e interés, casi 65% (representando $54,513,252.00 del total adeudado de $84,535,366.00) de los clientes deudores se encuentran fuera de los Estados Unidos, estando el 42.26% (con balances de $35,722,224.00) de éstos en Venezuela, lo que aumenta significativamente el riesgo de que las cuantías adeudadas sean incobrables. *Véase*, **Exhibit 10**.

109.     Al 31 de enero de 2024, los Accionistas le presentaron a Driven un nuevo análisis de posibilidad de cobro de la cartera de préstamos, proyectando la recuperación de aproximadamente $59.7 millones del balance reflejado como adeudado de $84.5 millones al 31 de diciembre de 2023. Dicho análisis claramente reflejó que menos del 90% del balance de la cartera de préstamos es cobrable, según las propias representaciones de los Accionistas ante la OCIF y el Síndico. *Véase*, **Exhibit 10**.

110.     Como si fuera poco, el Sr. Niembro, a través de Nodus Finance, fue aún más allá, proponiendo, mediante un correo electrónico con fecha del 1 de febrero de 2024, cobrar los préstamos de clientes en Venezuela (en circunstancias de que antes había sido infructuoso) a cambio de un pago mensual de **$80,000.00** y una comisión de **8%** sobre las cantidades recobradas. *Véase,* **Exhibit 21**.

111.     Es importante destacar que, a pesar de que desde que se emitió la Orden de Sindicatura, los Accionistas han enfáticamente representado que pueden cobrar la totalidad del balance adeudado de la cartera de préstamos, a la fecha, el cobro de dichas cuantías **por parte de los Accionistas no se ha concretado.** Peor aún, en lugar de realizar los esfuerzos necesarios para cumplir con lo ordenado por la OCIF, los Accionistas se han dedicado a minimizar las consecuencias de sus actos, y han tratado de culpar a la OCIF, al Síndico y a otros de la situación actual de Nodus.

112.     Por otra parte, al 29 de febrero de 2024, se había vencido un total de $33,047,722.00 del balance de principal adeudado de la cartera de préstamos, y de octubre de 2023 al 29 de febrero de 2024, Nodus, por conducto del Síndico, ha cobrado únicamente $1,480,349.00 (aproximadamente 4% de las cantidades vencidas para el 29 de febrero de 2024). *Véase*, **Exhibit 10**.

113.     En adición a lo anterior, **a pesar de que el Síndico nunca dio una instrucción a los clientes de Nodus para que dejaran de hacer pagos sobre sus respectivos préstamos,** muchos clientes de Nodus han dejado de pagar y otros están a la espera de que sus préstamos migren a las entidades de los Accionistas para efectuar los pagos. *Véase*, **Exhibit 10**.

114.     A su vez, como parte de sus deberes de investigación continua de los asuntos financieros de Nodus, Driven se ha topado con numerosos problemas adicionales de liquidez y constantes complicaciones en sus esfuerzos de tomar posesión de los activos de la EBI.

### b) Activos líquidos disponible para liquidación.

115.     A pesar de las representaciones iniciales de los Accionistas sobre la disponibilidad de activos líquidos, al 31 de enero de 2024, Driven proyectó que, de $21.3 Millones, aproximadamente $13.9 Millones se podrán hacer líquidos. De los $13.9 Millones, el Síndico únicamente tiene control inmediato de efectivo disponible en las diferentes cuentas operacionales de Nodus de $2,361,166.00. *Véase*, **Exhibit 10**.

116.     El valor de algunos otros activos de Nodus, entre los cuales estaban ciertos pagarés de Nodus Finance (en caso de los pagarés de Nodus Finance y Mi Papaya LLC[19], categorizados como *Other Investments* de ningún valor) y una propiedad inmueble localizada en

---

[19] En cuanto a los pagarés de Nodus Finance y Mi Papaya LLC, los mismos estaban identificados como *LF and NF Promissory Notes*.

22

Nueva York, eran significativamente menor que lo originalmente representado por los Accionistas. *Véase*, **Exhibit 10**.

117.     En específico, el Síndico identificó las siguientes situaciones en torno a la presunta liquidez que los Accionistas alegaron tenía la EBI:

i.     **Atlas Bank** – Luego de emitida la Resolución de Atlas Bank, el antes Administrador ahora Síndico, mediante conversaciones con el Sr. Jaime De Gamboa Gamboa, administrador interino de Atlas Bank, advino en conocimiento de que el 21 de noviembre de 2023, Atlas Bank presentó una demanda criminal contra Nodus y el Sr. Niembro, ante la inexplicable desaparición de los fondos de National Advisors Corporation, una casa de valores donde estaban la mayoría de los fondos de Atlas Bank.[20] Como resultado de dichos eventos, el Sr. Gamboa explicó a Driven que estimaba que Nodus sólo podría recuperar alrededor de 10% de sus fondos, es decir, aproximadamente **$475,702.00** de los **$4,757,024.00** que los Accionistas habían representado estaban disponibles. *Véase*, **Exhibit 10**.

---

[20] El 21 de noviembre de 2023 Atlas Bank (Panamá), S.A. presentó una *Querella Penal* en contra de National Advisor Corp, el Sr. Niembro, Nodus, entre otros. Lo anterior, por la presunta comisión del delito Contra el Orden Económico, en las modalidades de Delitos Financieros y Blanqueo de Capitales en perjuicio de la referida entidad bancaria. En suma, Atlas Bank adujo que, entre julio de 2022 a junio de 2023, la Casa de Valores National Advisor Corp., realizó varias transacciones inusuales desde la cuenta de inversión que tenía Atlas Bank en dicha Casa de Valores, a varios clientes de esta última. La referida entidad bancaria indicó que quienes fungían como gerente general y gerente general interino de Atlas Bank para los años 2022 y 2023, organizaron un esquema fraudulento en común acuerdo con National Advisor Corp. para beneficiar a ciertas personas naturales y jurídicas. *Véase*, **Exhibit 20**.

En particular, Atlas Bank resaltó en su *Querella* las siguientes transacciones realizadas por National Advisor Corp. como parte del esquema:

a.     Transferencia de **$2,208,000.00** realizada el 5 de julio de 2022 de la cuenta de Atlas Bank a la cuenta ▉▉▉▉▉ propiedad del Sr. Niembro. Atlas Bank menciona, además, que el mismo 5 de julio de 2022 el Sr. Niembro, sin existir una aprobación por parte del banco, transfirió los **$2,000,000.00** a la cuanta ▉▉▉▉▉ propiedad de Nodus. Posteriormente, el 9 de agosto de 2022 Nodus, a través de su cuenta ▉▉▉▉▉, transfirió la misma cuantía, entiéndase, los **$2,000,000.00**, a la cuenta ▉▉▉▉▉ propiedad del Sr. Niembro.

b.     Transferencia total de **$4,760,000.00** realizada el 22 de agosto de 2022 de la cuenta de Atlas Bank a la cuenta ▉▉▉▉▉ propiedad de Campo Marino, S.A. En esa línea, Atlas Bank indica el 23 de agosto de 2022 Campo Marino, S.A. transfirió gradualmente un total de **$4,722,818.68** de su cuenta en National Advisor a la cuenta ▉▉▉▉▉ perteneciente a Nodus.

c.     Transferencia de **$2,100,000.00** realizada el 12 de septiembre de 2022 de la cuenta de Atlas Bank a la cuenta ▉▉▉▉▉ propiedad de COODEM, R.L. Es mismo día, COODEM, R.L. transfirió la suma de **$1,044,639.50** a la cuenta ▉▉▉▉▉ perteneciente a Nodus.

d.     Transferencia de **$7,450,000.00** realizada el 18 de noviembre de 2022 de la cuenta de Atlas Bank a la cuenta ▉▉▉▉▉ propiedad de Campo Marino, S.A. En igual fecha, Campo Marino, S.A. realizó dos transferencias a la cuenta ▉▉▉▉▉ propiedad de Nodus, una por **$3,350,203.00** y otra por la suma de **$3,981,773.00**.

e.     Transferencia de **$6,000,000.00** realizada el 27 de diciembre de 2022 de la cuenta de Atlas Bank a la cuenta ▉▉▉▉▉ propiedad de Campo Marino, S.A. A su vez, el 27 de diciembre de 2022 Campo Marino, S.A. transfirió la suma de $128,000.00 a la cuenta ▉▉▉▉▉ propiedad del Sr. Niembro y el 28 de diciembre de 2022 dicha entidad, entiéndase, Campo Marino, S.A. transfirió **$4,735,498.11** a la cuenta ▉▉▉▉▉ perteneciente a Nodus.

f.     Transferencia de **$2,128,000.00** realizada el 30 de diciembre de 2022 de la cuenta de Atlas Bank a la cuenta ▉▉▉▉▉ propiedad de Campo Marino, S.A. En esa misma fecha, Campo Marino, S.A. transfirió **$2,000,000.00** a la cuenta ▉▉▉▉▉ propiedad del Sr. Niembro y éste último, a su vez, transfirió los **$2,000,000.00** a la cuenta ▉▉▉▉▉ propiedad de Nodus. *Íd.*

A la luz de lo anterior, Atlas Bank arguyó en su *Querella* que National Advisor Corp. se extralimitó en el manejo de la cuenta de inversión y custodia de Atlas Bank al realizar las transacciones antes descritas en beneficio de terceros que no mantenían ninguna relación con Atlas Bank y sin la autorización de los Directores de la referida entidad bancaria. Asimismo, alegó que el Sr. Niembro, Nodus y demás entidades recibieron y ejecutaron transferencias por montos significativos en sus cuentas bancarias, provenientes y relacionadas a la cuenta de Atlas Bank en el National Advisor Corp., cometiendo así el delito Contra el Orden Económico, en las modalidades de Delitos Financieros y Blanqueo de Capitales según tipificado en el Código Penal de Panamá. Por último, Atlas Bank solicitó una indemnización en daños por la suma de $60,000,000.00. *Íd.*



23

ii. **Crossbar FX** –El 14 de julio de 2023, se notificó al Administrador que Crossbar FX había iniciado una reclamación contra su custodio BSI Group LLC dado que Nodus tenía activos en Crossbar FX, por un total de $1,024,614.60 dólares, junto con otras cuentas de clientes que habían desaparecido. Crossbar FX envió a Nodus actualizaciones semanales sobre el estado de su reclamación pendiente contra su custodio, sin embargo Driven decidió contratar a un asesor legal, iLaw, en el Reino Unido para supervisar el procedimiento de Crossbar FX y comenzar una reclamación formal para cobrar los fondos pendientes. A día de hoy, el Síndico estima que los fondos de la cuenta de Nodus en Crossbar FX no podrán recuperarse y, por tanto, no los tiene en cuenta en sus proyecciones de liquidez. *Véase*, **Exhibit 10**.

iii. **Our MicroLending LLC** – Según los Accionistas, Nodus tenía dos (2) certificados de depósito ("CD") en una institución llamada Our MicroLending en Florida. En el momento en el que el Síndico comenzó a revisar la información disponible y los documentos de respaldo del CD, el Síndico se percató de que estos no eran CDs si no certificados de inversión que servían como líneas de crédito de almacenamiento a Our MicroLending para que pudieran proporcionar préstamos más pequeños a sus propios clientes. Después de una investigación adicional, el Síndico descubrió que Our MicroLending es una compañía de préstamos organizada bajo las leyes del estado de Florida que otorga préstamos de microfinanzas a propietarios de pequeñas empresas. Ambos Certificados de Inversión tenían fecha de vencimiento el 11 de octubre de 2023. Después de múltiples conversaciones con Our MicroLending, revelaron que no pudieron liquidar y realizar los pagos totales requeridos de $ 4.2 millones al vencimiento de los Certificados de Inversión. En consecuencia, el Síndico no tuvo acceso a estos $4.2 millones a principios de octubre como se necesitaba para ejecutar la liquidación de Nodus. Al día de hoy, todavía hay un saldo total de capital pendiente de $3,035,000.00. El Síndico negoció con Our MicroLending para aceptar pagos parciales a medida que estuvieran disponibles en sus propios cobros. A pesar de que el Síndico espera recibir el monto total del capital pendiente, no existe un marco de tiempo formal proyectado para garantizar cuándo se liquidarán por completo dichos saldos. *Véase*, **Exhibit 10**.

iv. **Fondos Bloqueados por OFAC** – Para junio de 2023, Nodus tenía un total de **$9,935,950.33** de fondos bloqueados por la Oficina de Control de Activos Extranjeros del Departamento del Tesoro de los Estados Unidos ("OFAC" por sus siglas en inglés). En virtud de los requerimientos de OFAC, Nodus debía depositar la totalidad de esas cantidades en una cuenta que genere intereses, de la cual sólo se pueden hacer débitos autorizados por OFAC. Ante ello, dicha cuantía de $9.9 Millones le creó a la EBI problemas adicionales de liquidez. *Véase*, **Exhibit 10**.

118.    Dado lo anterior, al 31 de enero de 2024, Driven sólo tenía disponible la cantidad de $2,361,166.00.

c) **Esfuerzos de repago.**

i. *Análisis de Liquidación Inicial*

119.    Basándose en las representaciones de los Accionistas al 5 de junio de 2023, Driven presentó a la OCIF un análisis de liquidación inicial (el "Análisis de Liquidación Inicial") para proveer pagos escalonados (*waterfall*) a los depositantes, el cual consistía en cinco (5) fases en virtud del Plan de Liquidación, a saber:

a. **Fase 1**: Cierre de todas las cuentas con balances de $55.00 o menos;

24

b. **Fase 2**: Liquidación de todas las cuentas de $7,000.00 o menos, utilizando un máximo de $3,000,000.00 de los fondos en la cuenta de Nodus en Atlas Bank;

c. **Fase 3**: Migración de una cantidad máxima de $60,000,000.00 de préstamos a Atlas Bank, junto con una cantidad equivalente a ésta en cuentas de depósitos;

d. **Fase 4**: Migración de la cantidad restante de la cartera de préstamos y su valor equivalente en cuentas de depósito a Nodus Finance, o a un fideicomiso en ILH Trust en Panamá (un fideicomiso creado por una firma legal en Panamá- identificada por los Accionistas- para administrar fondos y/o cuentas marginales; el propósito de ILH Trust era llevar a cabo una migración temporera que eventualmente se migraría a Alter Bank, una nueva entidad bancaria organizada por el Sr. Ramírez en Santa Lucía);

e. **Fase 5**: Liquidación de todas las cuantías restantes, si alguna, a los Accionistas.

120. El Análisis de Liquidación Inicial proyectaba una pérdida de 10%, a base de la oferta original hecha por Atlas Bank, por lo que estimaba una recuperación y repago del 90% de los depósitos de Nodus.

121. El 18 de julio de 2023, Nodus, con la autorización del Administrador, envió una comunicación oficial notificándole a todos los clientes cuyas cuentas tenían balances de menos de $55.00 del cierre de las mismas, completando así la Fase 1 del Análisis de Liquidación Inicial.

122. El 23 de agosto de 2023, como parte de un programa piloto de prueba, Driven procesó exitosamente la liquidación de cuatro (4) cuentas de menos de $5,000.00 a través de Mi Papaya LLC, una entidad de procesamiento de pagos sugerida por los Accionistas.

123. No obstante, debido a las complicaciones antes descritas con los fondos en Atlas Bank, la desaparición de activos en Crossbar FX y la infructuosa gestión de cobro de la cartera de préstamos por parte de los Accionistas, Driven no pudo implementar la Fase 2, ni las subsiguientes, del Análisis de Liquidación Inicial.

### ii. Segundo Análisis de Liquidación y esfuerzos de Migración

124. Ante la emisión de la Orden de Sindicatura y tras los Accionistas de Nodus allanarse a esta, Driven comenzó un segundo análisis para implementar la liquidación de Nodus (el "Segundo Análisis de Liquidación"), el cual consistía en lo siguiente:

a. **Fase 2**: Se utilizaría un total de aproximadamente $5,000,000.00, con una pérdida proyectada de 30%, para liquidar todas las cuentas con balances menores a $20,000.00, a base de un análisis de los fondos disponibles a ese momento;

b. **Fase 3**: se llevaría a cabo mediante la migración de depósitos a aquellos clientes que escogieran entre Nodus Finance y Alter Bank, con una pérdida proyectada de 10%

    i. Aquellos clientes que escogieran a Nodus Finance migrarían con un pagaré, con el término de un año, el cual se podría renovar a dos (2), con una tasa de interés de 3%, y pagos trimestrales;

    ii. Aquellos clientes que escogieran a Alter Bank migrarían con certificados de depósito con un término de tres (3) años a una tasa de interés de 1%;

c. **Fase 4**: Consistiría en la liquidación de todos los clientes restantes que no optaron por la migración, sin una proyección determinada de pérdida.

125. Bajo el Segundo Análisis de Liquidación, el Síndico retendría una porción de la cartera de préstamos para asegurar el pago a los depositantes que optaron por la Fase 4 del Plan de Liquidación.

25

126.     Para el 1 de noviembre de 2023, el Síndico envió a todos los clientes ubicados en la Fase 2 una oferta para (i) recibir el 70% de sus depósitos a través de una entidad de procesamiento de pagos, o (ii) esperar por la Fase 4.

127.     El 7 de diciembre de 2023, el Síndico envió una segunda oferta a los clientes ubicados en la Fase 3 para (i) migrar sus depósitos a Nodus Finance mediante un pagaré; (ii) migrar sus fondos a Alter Bank como un certificado de depósito o (iii) esperar por la Fase 4 para la liquidación de sus depósitos.

128.     Ante ello, Driven propuso que todos los préstamos restantes se migraran a Nodus Finance, creando un pagaré emitido por Nodus Finance, pagadero a Driven, como representante de Nodus, para que Nodus Finance pagara a Nodus la porción correspondiente a la totalidad de cobros de la cartera. En respuesta a dicha contrapropuesta, el Sr. Niembro sugirió que el pagaré se dividiera en dos (2), y que la responsabilidad de cobro se dividiera equitativamente entre los Accionistas.

129.     Posteriormente, los Accionistas le presentaron al Síndico, quien a su vez lo remitió a la OCIF, una lista de préstamos preseleccionados correspondientes a clientes personales de éstos que alegaban estarían dispuestos a migrar a sus respectivas entidades. **No obstante, al analizar dicha lista, el Síndico se percató de que los préstamos con los que se quedaría Nodus para la Fase 4 serían insuficientes para cubrir los depósitos restantes, y que las pérdidas que asumiría Nodus serían desproporcionadas en comparación con los préstamos que migrarían a Nodus Finance y Alter Bank.**

130.     Sin embargo, Alter Bank no estaba listo para recibir clientes nuevos, ya que no poseía las licencias requeridas para operar en Santa Lucía ni la infraestructura necesaria para cumplir con las obligaciones para con el Síndico.

131.     Así las cosas, el Síndico, entendiendo, bajo su juicio comercial, que las propuestas de migración de los Accionistas no eran viables, presentó las mismas a la OCIF, y la OCIF estuvo de acuerdo en la falta de viabilidad de éstas dado que, a base de ellas, los depositantes estarían esencialmente en la misma posición actual, y que aquellos que optaran por la Fase 4 sufrirían pérdidas aún mayores.

132.     A la luz de todo lo anterior, a la fecha, el Síndico continúa evaluando alternativas adicionales para atender la insolvencia y falta de liquidez de Nodus, las cuales incluyen apoyo adicional de terceros para gestionar esfuerzos de cobro, la reducción del presupuesto de liquidación, y el continuar con reclamaciones legales contra entidades que están en posesión de activos de Nodus.

## VI. CONCLUSIONES DE DERECHO

### A. Poderes delegados a la OCIF

Como es sabido, la OCIF, por virtud de la Ley Núm. 4-1985, es la entidad gubernamental regulatoria responsable de supervisar y fiscalizar las entidades financieras y bancarias organizadas conforme a las leyes de Puerto Rico que operen o realicen negocios en esta jurisdicción, particularmente, y en lo aquí pertinente, aquellas organizadas al amparo de la Ley Núm. 52-1989. Art. 3 de la Ley Núm. 4-1985[21]. En específico, la OCIF tiene la responsabilidad ineludible de asegurar "que estén protegidos los intereses de aquellos que están vinculados a estas industrias por ser depositantes, acreedores, accionistas u otro tipo de asociación". *Véase*, Exposición de Motivos de la Ley Núm. 4-1985.



A los fines de cumplir con dicha política pública, la Asamblea Legislativa le delegó al Comisionado de la OCIF, entre otros, el poder de: (a) revocar o suspender una licencia para operar una EBI cuando, entre otras instancias, ésta encontrase que la entidad es conducida de una manera no consistente con el interés público; (b) nombrar un síndico y ordenar la disolución de una EBI; (c) imponer aquellas sanciones que entienda necesarias y apropiadas a tenor con sus reglamentos, y (d) suspender, despedir o en otra forma sancionar a cualquier director u oficial,

---

[21] 7 L.P.R.A. §2003.

empleado, agente o individuo que actúe en una capacidad similar para una entidad bancaria internacional, que viole o voluntaria o negligentemente permita que otras personas violen la ley, sus reglamentos, orden o cualquier documento escrito que establezca la entidad.[22] *Véase*, Sec. 3(a)(9) y (10) de la Ley Núm. 52-1989.

A su vez, en aras de viabilizar la consecución de los deberes delegados, se facultó al Comisionado a "[i]nterponer cualesquiera remedios, acciones o procedimientos legales que fueran necesarios o convenientes para hacer efectivos los propósitos de esta ley o cualquier otra ley o reglamento, cuyo cumplimiento o fiscalización le haya sido designada, [...]". Art. 10(a)(4) de la Ley Núm. 4-1985, 7 L.P.R.A. §2010. Por tanto, la Asamblea Legislativa dotó al Comisionado de autoridad para realizar todos aquellos actos e interponer aquellos remedios necesarios para el logro eficaz de los estatutos y reglamentos bajo su administración y jurisdicción. *Véase*, Art. 10(a)(8) de la Ley Núm. 4-1985, 7 L.P.R.A. §2010; *véase, además*, Sec. 3(a)(12) de la Ley Núm. 52-1989, 7 L.P.R.A. §232a.

Así, por ejemplo, en OCIF v. Northstar Mortgage Corp., et al., 2007WL3244752 (2007), el Tribunal de Apelaciones, al amparo de los amplios poderes que le fueron delegados a la OCIF, reconoció la facultad de la referida entidad gubernamental para conceder la restitución como remedio, ello, "en aras de vindicar los derechos de los consumidores que obt[enían] servicios de la industria financiera". Lo anterior, al dicho foro reconocer el "carácter proteccionista de la OCIF ante prácticas fraudulentas y engañosas de entidades y personas inescrupulosas en la industria [financiera]". Íd. A la luz de ello, el Tribunal de Apelaciones confirmó la determinación de la OCIF que ordenó a Mortgage Mall, Northstar, Yadira Rivera Isaac, Ulises Vega Morales y la Sociedad Legal de Bienes Gananciales compuesta por estos, a restituir solidariamente a los perjudicados la suma de $799,806.14. Íd.

Cónsono con lo anterior, y en lo aquí pertinente, la Sec. 20 de la Ley Núm. 52-1989, 7 L.P.R.A. §232p, en su sub inciso (e), establece expresamente que el Comisionado podrá "**imponer la restitución o reembolso de aquellos pagos recibidos en contravención de las disposiciones de este Ley o** a cualquier regla o reglamento que podrían ser promulgados en virtud de la misma, **o cualquier otro remedio que entienda necesario para hacer cumplir los propósitos de esta Ley**". (Énfasis suplido).

Por su parte, el sub inciso (a) de la mencionada sección expone como sigue: "[s]i cualquier director, oficial o individuo que actúe en una capacidad similar de una entidad bancaria internacional o de una persona de la cual la entidad bancaria internacional es una unidad, violara o voluntaria o negligentemente permitiera a cualquier director, oficial, agente o empleado de la entidad bancaria internacional o de la persona de la cual la entidad bancaria internacional es una unidad, que viole esta ley, los reglamentos del Comisionado o cualquier disposición del certificado de incorporación, contrato de sociedad u otro documento escrito que establezca la entidad bancaria internacional, el Comisionado señalará y citará a las partes interesadas a una vista administrativa con arreglo al reglamento provisto en la Sección 23 de esta ley. Celebrada la vista y luego de que el Comisionado determine que se ha violado alguna disposición mencionada

---

[22] Respecto a la facultad del Comisionado para nombrar un síndico y ordenar la disolución de una entidad bancaria internacional, el Art. 10(b) de la Ley Núm. 4-1985, 7 L.P.R.A. §2010, establece lo siguiente:

> [s]i como consecuencia de una auditoría, examen o inspección o de un informe rendido por un examinador, se demuestre que la institución financiera carece de una situación económica y financiera sólida o que está operada o administrada de tal manera que el público o las personas y entidades que tengan fondos o valores bajo su custodia estén en peligro de ser defraudados y en ausencia de disposición específica en la ley que regule la institución financiera en cuestión y que lo faculte similarmente, el Comisionado podrá asumir la dirección y administración de la institución financiera, y nombrar con prontitud un síndico, que en el caso de instituciones financieras aseguradas podrá ser su ente asegurador.

> [...]

> El síndico así nombrado administrará la institución financiera de acuerdo a las disposiciones de la ley y reglamentos que gobiernan dicha institución y a tenor con los reglamentos promulgados por el Comisionado para sindicaturas o medidas de emergencia declaradas bajo esta sección. Dicha sindicatura terminará con la total liquidación de la institución financiera si así fuere necesario o cuando las operaciones de la misma según lo certifique el síndico, permitan, a juicio del Comisionado, devolver la administración de la institución a sus funcionarios y oficiales, debidamente electos y nombrados, bajo aquellas circunstancias que estipule el Comisionado. [...].

27

en este inciso, éste <u>tomará la acción que corresponda</u>, incluyendo la suspensión o destitución de dicho director, oficial o individuo".[23]

Consecuentemente, y por virtud de la aludida Sección 20 de la Ley Núm. 52-1989, el Comisionado de la OCIF podrá ordenar a cualquier EBI o a cualquier persona, incluyendo, pero sin limitarse, a los accionistas, oficiales y empleados de la entidad en su carácter oficial o personal, a responder por aquellos actos que sean contrarios a las leyes y reglamentos que ésta viene llamada a fiscalizar. Lo anterior, incluye necesariamente ordenar que se descorra el velo corporativo de determinada entidad para imponerle responsabilidad personal a los accionistas de dicha entidad.

### B. Doctrina de descorrer el velo corporativo

En nuestra jurisdicción, es norma reiterada que la personalidad jurídica de las corporaciones se respetará, siempre que ello no equivalga a "sancionar un fraude, promover una injusticia, evadir una obligación estatutaria, derrotar la política pública, justificar la inequidad, proteger el fraude o defender el crimen". <u>Díaz Aponte v. Comunidad San José, Inc.</u>, 130 D.P.R. 782 (1992). Presente una de las mencionadas circunstancias, el Tribunal Supremo de Puerto Rico ha sentenciado que se justifica descorrer el velo corporativo de la entidad. Ello, en aras de evitar la utilización indebida de la corporación como instrumento para perpetuar un fraude, cometer actos ilegales, o contrario a la política pública. Díaz Olivo, *op. cit.*, a las págs. 119 y 130.

Ahora bien, para que proceda descorrer el velo corporativo se requiere, naturalmente, que se presente evidencia suficiente que justifique la imposición de responsabilidad, más allá del ente corporativo, a los directores, oficiales o <u>accionistas</u> de la corporación". (Subrayado nuestro) <u>Díaz Aponte v. Comunidad San José, Inc.</u>, *supra* citando a <u>San Miguel Fertil. Corp. v. P.R. Drydock</u>, 94 D.P.R. 424, 430 (1967). En esa línea, nuestro Máximo Foro ha sentenciado que procede descartar la personalidad jurídica de una corporación y <u>sujetar el patrimonio de los accionistas</u> para responder por las deudas y obligaciones de la corporación en aquellos casos en los cuales la corporación es meramente un "alter ego" o conducto o instrumento económico pasivo (*"business conduit"*) de sus únicos accionistas, recibiendo éstos, exclusiva y personalmente, los beneficios producidos por la gestión corporativa y si ello es necesario para evitar un fraude o la realización de un propósito ilegal o para evitar una clara inequidad o mal (*"wrong"*). <u>D.A.Co. v. Alturas Fl. Dev. Corp. y otro</u>, 132 D.P.R. 905, 925 (1993).

Sobre el particular, se ha señalado que se incurre en conducta fraudulenta cuando, por ejemplo, "al acreedor se le hacen representaciones al efecto de que la corporación habrá de actuar de cierta manera y ello no acurre así finalmente, [...] por ejemplo [...] cuando [los accionistas] se comprometen a no retirar recursos de la corporación o a no pagar dividendos, mientras el monto del préstamo esté al descubierto, y luego proceden de forma contraria a lo que se habían comprometido con el acreedor". Díaz Olivo, *op. cit.*, a la pág. 133. Por tanto, es esa conducta engañosa o ilegal que provoca la precariedad o incobrabilidad del crédito la que, en armonía con la política pública y los fundamentos conceptuales del principio de responsabilidad limitada, justifica que se desconozca a la corporación, para hacer a los accionistas responsables personalmente del crédito pendiente. <u>Íd.</u>, a la pág. 132.



En otras palabras, "si los accionistas sangran a la entidad y la dejan desamparada en términos económicos para afrontar los riesgos básicos e inherentes que acarrea el desarrollo de su actividad, su conducta denota un grave menosprecio hacia las obligaciones de la corporación y los potenciales afectados por sus actuaciones. Esa conducta es temeraria y equivale en términos prácticos a la intención de defraudar a las personas que razonablemente se debe prever que han de ser impactadas de forma negativa por los riegos inherentes al desarrollo de la actividad corporativa, como [se ha] sostenido, este tipo de conducta fraudulenta y en menosprecio de los intereses de los acreedores es la que con plena legitimidad sirve de apoyo para descorrer el velo de la personalidad jurídica de una corporación". <u>Íd.</u>, a la pág. 138.

---

[23] Sec. 20(a) de la Ley Núm. 52-1989, 7 L.P.R.A. §232p.

A su vez, el Tribunal Supremo de Puerto Rico ha sentenciado que "se presumen fraudulentas las enajenaciones a título oneroso, hechas por aquellas personas contra las cuales se hubiese pronunciado antes sentencia condenatoria en cualquier instancia, o expedido mandamiento de embargo de bienes". De Jesús Díaz v. Carrero, 112 D.P.R. 631, 636 (1982). Véase, además, U.S. Fid. & Guar. Co. v. Guzman, 2012 WL 4790314, (Sept. 20, 2012), report and recommendation adopted sub nom. United States Fid. & Guar. Co. v. Cobian-Guzman, No. CV 10-1078 (FAB), 2012 WL 12996294 (D.P.R. Oct. 5, 2012) ("The traditional case of fraud in regards to a creditor is when a debtor transfers money to a third party to avoid paying the creditor".. "In evaluating the potential existence of fraud, the following elements must be considered: **Haste in the alienation, the debtor's insolvency, the relationship of kinship, closeness or trust with the acquirer, the state of the business of the conveyor owner and of the judicial claims against him**.") (citando In re El Mundo Corp., 208 B.R. 781, 783 (D.P.R. 1997) y, De Jesús Díaz v. Carrero, 112 D.P.R. en la pág. 637)). (Énfasis suplido). En el contexto de descorrer el velo corporativo de un demandado, la Corte de Distrito para el Distrito de Puerto Rico ha expuesto que "to prove intent to defraud, a plaintiff must show either that the defendant intended to receive a benefit or intended to cause actual or potential loss." Situ v. O'Neill, 124 F. Supp. 3d 34 (D.P.R. 2015).

En aras de determinar si existe una separación adecuada entre la corporación y sus accionistas para fines de descorrer el velo corporativo, nuestra jurisprudencia sugiere que se tomen en consideración, entre otros, los siguientes factores: (1) el control del accionista sobre los asuntos corporativos; (2) el trato de los activos de la corporación como activos personales; (3) el retiro irrestricto del capital corporativo; (4) la mezcla de activos personales con activos corporativos; (5) la estructura del capital inadecuado de la corporación; (6) la falta de archivos corporativos; (7) la inobservancia de formalidades corporativas; (8) la inactividad de los demás oficiales y directores; (9) la práctica de no declarar dividendos, y (10) la presentación pública del accionista como responsable en su carácter personal por las obligaciones de la corporación, y por el manejo de la corporación, sin atención a su responsabilidad independiente. D.A.Co. v. Alturas Fl. Dev. Corp. y otro, supra, a la pág. 928. Lo fundamental en todos los casos es que se observe la naturaleza de las transacciones corporativas para no dejarse engañar por las formalidades de las mismas y así evitar que mediante la ficción corporativa se derrote la política pública. Íd., pág. 926.

En nuestro ordenamiento jurídico, desde hace ya más de sesenta (60) años, se ha reconocido la autoridad de las agencias administrativas para descorrer el velo corporativo de las entidades jurídicas e imponer responsabilidad personal, cuando ello sea necesario para la consecución de las funciones que le fueron delegadas. Véase, S. Porto Rico Sugar Corp. v. Junta Azucarera, 88 D.P.R. 43, 58–59 (1963). En S. Porto Rico Sugar Corp. v. Junta Azucarera, supra, el Tribunal Supremo de Puerto Rico avaló la determinación de la Junta Azucarera de Puerto Rico de descorrer el velo corporativo a los fines desempeñar las funciones de administración que le había sido delegadas en su ley orgánica, entiéndase, en la Ley Azucarera de Puerto Rico, Ley Núm. 426 de 13 de mayo de 1951, 5 L.P.R.A. 371 et seq.



En particular, en el aludido caso nuestro Máximo Foro indicó que "[l]as entidades corporativas pueden descartarse cuando son instrumentos para evadir un claro propósito legislativo". Íd., págs. 56-57. A la luz de ello, y tras interpretar la ley habilitadora de la Junta Azucarera cuyo texto en cuanto a la delegación de poderes es similar al contenido de Ley Núm. 52-1989 y la Ley Núm. 4-1985[24], el Tribunal Supremo sentenció que la agencia en ese caso había asumido "jurisdicción sobre un asunto sobre el cual t[enía] perfecto derecho en ley para hacerlo: investigar la veracidad y razonabilidad de los descuentos que por concepto de gastos de embarque y mercadeo la peticionaria ha hecho a los colonos". Exponiendo, además, que, de

---

[24] En específico, el Tribunal Supremo expuso como sigue: "[p]or estar la Junta Azucarera encargada de una detallada reglamentación y supervisión de la industria azucarera de Puerto Rico, dicha Junta, como es corriente en estos casos, está facultada por ley para examinar testigos, tomar declaraciones, hacer indagaciones, inspecciones e investigaciones, celebrar audiencias y realizar todos los actos que sean necesarios y propios en el desempeño de sus deberes". S. Porto Rico Sugar Corp., supra, pág. 44, citando el Art. 23 de la Ley Núm. 426 de 13 de mayo de 1951, 5 L.P.R.A. §392.

permitir el fraccionamiento artificial de la operación allí en cuestión mediante la interpolación de varias corporaciones hermanas, "se estaría evadiendo el claro mandato [...] de la Ley Azucarera [...] y se estaría frustrando la política pública contenida en dicha Ley de garantizar a los colonos un trato justo en sus relaciones con los molinos". Íd., págs. 58-59. En consecuencia, el Tribunal Supremo confirmó la determinación de la agencia de descorrer el velo corporativo y advirtió lo siguiente:

> ni la Junta Azucarera ni este Tribunal pueden permitir que, por medio de una ficción legal, no importa lo hábil e ingeniosa que parezca a primera vista, se destruyan los derechos que la ley otorga a los colonos y los principios de trato equitativo que deben regir las relaciones entre las partes.

Cónsono con lo anterior, en Comisionado de Seguros de Puerto Rico v. Total, 2010WL6559677, el Tribunal de Apelaciones reconoció la facultad de la Oficina del Comisionado de Seguros para, al amparo del poder de fiscalización y adjudicación que le fue delegado, imponerles a los directores y accionistas de cierta corporación responsabilidad solidaria por las deudas de la referida entidad. Lo anterior, claro está siempre que la agencia realice la investigación y el análisis adecuado, y del expediente administrativo surja evidencia sustancial que justifique dicho proceder, entiéndase, descorrer el velo corporativo e imponerle responsabilidad a los accionistas o directores.

Por último, debemos recordar la máxima que postula que "[s]on nulos los actos ejecutados contra lo dispuesto en la ley, salvo los casos en que la misma ley ordene su validez". Art. 4 del Código Civil de 1930.[25] Véase, López v. J. Gus Lallande, 144 D.P.R. 774, 790 (1998); Santiago Marrero v. Tribunal Superior, 89 D.P.R. 835 (1964); Hernández v. Ayala, 68 D.P.R. 956 (1948). Es norma firmemente establecida que "[u]na transacción ilícita no concede derecho y, según la autoridad aludida, yace nula e inexistente, como si nunca se hubiese llevado a cabo". López v. J. Gus Lallande, supra. En consonancia, el Art. 17 del Código Civil de 2020[26] a su vez expone que "[e]l acto realizado al amparo de una ley, que persigue un resultado prohibido o contrario al ordenamiento jurídico, se **considera ejecutado en fraude de la ley** y no impide la debida aplicación de la ley que se haya tratado de incumplir". (Énfasis suplido). Por su parte, y en lo aquí pertinente, la Sec. 13(b)(6) de la Ley Núm. 52-1989[27], establece que una EBI podrá conceder **cualquier tipo de financiamiento o crédito** a cualquiera de sus directores, oficiales, empleados o accionistas, únicamente cuando sea previamente autorizado por escrito por el Comisionado.

### C. Aplicación

A la luz de las disposiciones legales aplicables y los hechos antes expuestos, la OCIF emite la presente *Querella*. Lo anterior, pues existe base legal suficiente para determinar que los Accionistas han sangrado a Nodus, por lo que procede descorrer el velo corporativo de la referida entidad e imponerles responsabilidad personal y solidaria a éstos por las deudas de Nodus para con sus depositantes, acreedores y clientes. Según se desprende, Nodus ha sido utilizada como *alter ego* o conducto económico pasivo de sus Accionistas y directores, entiéndase, de los señores Niembro y Ramírez, con el fin de no sólo obtener remuneración económica de forma directa e indirecta, sino de derrotar la política pública del Estado.



De los hechos expuestos se desprende que los Accionistas, aun cuando le representaron a la OCIF que Nodus cumpliría con sus obligaciones y se comprometieron a seguir el Plan de Liquidación y el orden de pago allí establecido, han utilizado su control sobre Nodus para recibir activos líquidos de la entidad que estaban destinados a satisfacer las acreencias de ésta. Específicamente, según detallado previamente, luego de la reunión llevaba a cabo el 9 de marzo de 2023, en la cual la OCIF, a través de sus representantes legales, le notificaron a Nodus que debía liquidar sus operaciones, y en circunstancias en las que, para ese mismo periodo, Nodus recibió solicitudes de sus depositantes para que pusieran a su disposición más de **$7,800,000.00**

---

[25] Equivalente al Art. 16 del Código Civil de 2020, 31 L.P.R.A. §5335. 31 L.P.R.A. ant. sec. 4.
[26] 31 L.P.R.A. §5336.
[27] 7 L.P.R.A. §232j(b)(6).

de sus fondos, Nodus, a través de sus Accionistas, entre el 9 de marzo de 2023 al 5 de mayo de 2023, cuando se firmó el Plan de Liquidación, gestionaron una alegada compra de más de **$26,000,000.00** de préstamos de Nodus Finance, claramente mermando los activos y capital de Nodus, simultáneamente haciendo una inyección millonaria a Nodus Finance.

Como si ello fuera poco, los Accionistas gestionaron dicha transacción, en claro menosprecio de los intereses de Nodus al haber adquirido – a cambio de liberar a Nodus Finance de una deuda de más de **$26,000,000.00** – una cartera de préstamos "hipotecarios" que, ante la investigación de Driven, más del 95% resultaron no estar garantizados por colateral alguno[28] (haciendo los mismos sumamente difíciles de cobrar) todo ello pactando un pago adicional a Nodus Finance bajo el subterfugio de que el mismo era un "cargo por administración". No obstante, lo que es todavía peor, es que Nodus llevó a cabo esta transacción en claro perjuicio de sus depositantes **luego de la OCIF haberse reunido con los Accionistas para exponerle que debían liquidar sus operaciones para proteger a los depositantes**. En adición a ello, durante este mismo periodo, **Nodus distribuyó dividendos a sus Accionistas pagaderos el 17 de abril de 2023** por la cantidad de $50,000.00, claramente enajenando (sin autorización de la OCIF) activos de Nodus ante la inminente liquidación ordenada por la OCIF, para luego firmar el Plan de Liquidación que entró en efectividad el 8 de mayo de 2023. Por otra parte, desde la Orden de Designación del Síndico hasta enero de 2024, el Sr. Niembro, a través de Financial Technology, recibió **$100,000.00** de "honorarios" o salarios, sin que éste haya aportado nada para cobrar los préstamos de Nodus y poder repagar a sus depositantes. Al así hacerlo, de la liquidación de Nodus (la cual, a la fecha, no ha podido ser consumada por las razones aquí expuestas) los Accionistas se han lucrado por conducto de Nodus Finance y Financial Technology, utilizando dos entidades corporativas adicionales a Nodus para presuntamente asistir con la liquidación de la EBI sin que al día de hoy dicha intervención haya redundado en beneficio alguno para Nodus y los depositantes. En adición a ello, los Accionistas, utilizando su posición de directores de Nodus y de Nodus Finance, retiraron el balance de $986,313.83 que Nodus Finance tenía en su cuenta de Nodus, cantidad que, de no haber sido personas en control de Nodus, de otro modo no hubiesen podido retirar en el proceso de liquidación. No cabe duda entonces de que Nodus, a través de los Accionistas, no solamente defraudó a sus depositantes, si no a la propia OCIF y al Síndico, mediante una serie de transacciones que fueron completamente ilícitas y fraudulentas.

Los Accionistas, sin embargo, no se detuvieron ahí. Una vez firmado el Plan de Liquidación, han desaparecido millones de dólares de cuentas asociadas a Nodus, activos que, a pesar de los esfuerzos de Driven, una entidad tercera especializada en liquidaciones, no se han podido recuperar. Ante este nefasto escenario, luego de emitida la Orden de Sindicatura, el curso de acción de los Accionistas entonces cambió de rumbo, proponiendo migrar (en perjuicio de sus depositantes, según detallado más arriba) las cuentas de los depositantes a sus propias entidades, Nodus Finance y Alter Bank (a pesar y a sabiendas de que esta última no estaba apta para recibir depositantes), mientras claramente instruían a clientes de Nodus a dejar de pagar sus préstamos hasta tanto la migración se consumara[29]. Según detallado arriba, mientras estos intercambios se llevaban a cabo, la propuesta del Sr. Niembro fue de hacer lo que no había hecho durante todo el proceso de liquidación: cobrar los préstamos en Venezuela, **a cambio de un salario de $960,000.00 anuales, más una comisión de 8% sobre las cantidades cobradas**. Como si ello fuera poco, el 21 de noviembre de 2023, a raíz de eventos y hechos sustancialmente similares a los aquí expuestos que los Accionistas llevaron a cabo en otras jurisdicciones, Atlas Bank presentó una querella penal por cometer delitos financieros y blanqueo de capitales en perjuicio de dicha entidad bancaria, solicitando una indemnización en daños por la suma de $60,000,000.00. Resulta irrefutable que los Accionistas no tienen ni tuvieron interés alguno en proteger a sus depositantes y clientes, sino de continuar enriqueciéndose a través de una serie



---

[28] *Véase*, **Exhibit 10**, p. 8, *Subsección A(ii)*

[29] Cabe destacar que el efecto de haberse llevado a cabo la migración de préstamos a Nodus Finance, según los términos originalmente propuestos por los Accionistas y no aceptados por el Síndico ni la OCIF, Nodus Finance potencialmente hubiese préstamos que le vendió a Nodus a cambio de la liberación de más de **$26,000,000.00** de deudas.

31

de transacciones mediante la ficción jurídica de entidades corporativas separadas, tal y como han hecho en otras jurisdicciones.

En adición a las múltiples transferencias ilícitas con las Entidades Afiliadas descritas arriba, el Sr. Niembro, en común acuerdo con el Sr. Ramírez, utilizó el control que poseía sobre Nodus para, en concierto con sus otras entidades, directamente mermar recursos de Nodus en detrimento de los intereses de la propia entidad, los depositantes y los acreedores, en total contravención con el texto y espíritu del Plan de Liquidación. Las actuaciones de los Accionistas de incurrir en transacciones no contempladas en la Plan de Liquidación para su propio beneficio económico mediante una serie de ficciones legales denotan un claro desaire y grave menosprecio hacia las obligaciones de la EBI para con OCIF, así como de los intereses de los beneficiarios y de los acreedores. A su vez, todo lo anterior demuestra que no existe una separación adecuada entre los Accionistas y Nodus, y que la falta de dicha separación adecuada ha sido utilizada para defraudar a los depositantes y acreedores de Nodus y para fines claramente ilícitos y contrarios a la política pública. La conducta temeraria del Sr. Niembro y del Sr. Ramírez, sin lugar a duda, ha tenido la clara intención de defraudar -- y claramente han defraudado -- no sólo a la OCIF, organismo regulador de las EBI, sino a todas las personas con interés en la liquidación de dicha entidad.

Surge claramente que los Accionistas utilizaron el control que ejercían sobre Nodus (y toda la cartera de préstamos por cobrar de la EBI) para cometer actos contrarios a la política pública que procuraba la liquidación ordenada de la entidad financiera. La conducta fraudulenta del Sr. Niembro y del Sr. Ramírez ha provocado la precariedad de Nodus y, en consecuencia, la imposibilidad de ésta de cumplir con sus obligaciones en la forma pactada en el Plan de Liquidación. "[E]ste tipo de conducta fraudulenta y en menosprecio de los intereses de los acreedores es la que con plena legitimidad sirve de apoyo para descorrer el velo de la personalidad jurídica de una corporación". Díaz Olivo, *op. cit.*, pág. 138.

En el presente caso, según surge de los documentos y la información en posesión de la OCIF, están presentes varios de los factores que justifican se descorra el velo corporativo de Nodus para imponerle responsabilidad personal a los Accionistas. En específico, no existe controversia respecto a que: (1) el Sr. Niembro y el Sr. Ramírez mantuvieron el control de la información y los asuntos corporativos aun cuando la EBI contaba con un Administrador; (2) los Accionistas incurrieron en retiro irrestricto de capital corporativo al realizar transacciones sin el conocimiento y/o consentimiento del Administrador; (3) los Accionistas mantuvieron una estructura de capital inadecuada y deficiente de la EBI al tomar decisiones unilaterales no aprobadas por la OCIF, el administrador o el Síndico, y (4) los Accionistas inobservaron reiteradamente las formalidades corporativas al ignorar los mandatos y la presencia del Administrador, a sabiendas de que dichas transacciones les habían sido prohibidas. En adición a lo anterior, **una semana antes de la firma del Plan de Liquidación**, y con pleno conocimiento de todas las deficiencias levantadas por la OCIF de, entre otras cosas, liquidez y controles internos, los Accionistas utilizaron su control común de Nodus Finance y Nodus para que ésta última liberara a Nodus Finance de $26,000,000.00 de deuda, **(i)** evitando así que Nodus y, eventualmente Driven, pudieran cobrarle judicial o extrajudicialmente dichas cuantías a Nodus Finance para beneficio de sus depositantes y **(ii)** transmitiéndole a Nodus el riesgo completo de una cartera de préstamos completamente deficiente y que prácticamente no tiene ningún colateral en garantía.

 Así las cosas, y ante el estado de insolvencia de Nodus como consecuencia de las actuaciones fraudulentas del Sr. Niembro y del Sr. Ramírez, corresponde que éstos respondan personalmente por las deudas de la entidad. Por ello, la OCIF tiene base suficiente, en virtud de, entre otras, la Ley Núm. 4-1985 y la Ley Núm. 52-1989, para activar sus amplios poderes para evitar que se cause o pudiera causar un daño irreparable a los intereses de Nodus, y/o de las personas y entidades con fondos o valores en la institución y los acreedores de dicha entidad.

32

## VII.   ORDEN

A tenor con los poderes y facultades que le confieren al Comisionado la Ley Núm. 4-1985, la Ley Núm. 52-1989, y los reglamentos emitidos, se expide la presente *Querella* y se dispone lo siguiente:

(i)     Se descorre el velo corporativo de Nodus International Bank, Inc.;

(ii)    Al incurrir en la conducta antes descrita el Sr. Niembro y el Sr. Ramírez violaron la Ley Núm. 4-1985 y la Ley Núm. 52-1989;

(iii)   Se **ORDENA** al Sr. Niembro y al Sr. Ramírez, bajo el más estricto apercibimiento de severas sanciones, a ser responsables de manera solidaria con Nodus por todas las deudas de la EBI, además de restituir personal y solidariamente la suma no menor de **$26,825,189.48**, disponiéndose que dicha suma se utilizará para satisfacer las obligaciones de Nodus para con sus depositantes y acreedores;

(iv)    Se **IMPONE**, de conformidad a la Sección 20(c) de la Ley Núm. 52-1989, tanto al Sr. Niembro y al Sr. Ramírez, bajo el más estricto apercibimiento de severas sanciones, una multa de **$25,000.00** cada uno, por la distribución de $50,000.00 de dividendos a accionistas preferentes el 17 de abril de 2023 sin la autorización previa de la OCIF; y

(v)     Se les **PROHÍBE** a los Sr. Niembro y al Sr. Ramírez a realizar negocios en la industria financiera de Puerto Rico, directa o indirectamente, por un periodo de diez (10) años.

## VIII.   APERCIBIMIENTOS GENERALES

A tenor con la Ley Núm. 38-2017 y el Reglamento Núm. 3920 se apercibe a los Querellados que pueden allanarse a las multas y sanciones propuestas e informar su cumplimiento o pago según dispuesto en esta *Querella* en el término de **veinte (20) días** contados a partir del recibo de ésta, y cumplir con lo ordenado dentro de los términos establecidos.

De conformidad con lo expuesto en esta *Querella* y dentro del término de **veinte (20) días** contados a partir del recibo de ésta, la parte afectada podrá solicitar la celebración de una vista ("Solicitud de Vista") mediante solicitud escrita al efecto, y presentar su Contestación por escrito en la Secretaría de la Oficina del Comisionado de Instituciones Financieras, PO Box 11855, San Juan, Puerto Rico 00910-3855. La OCIF señalará el asunto para vista dentro de los próximos quince (15) días contados a partir del recibo de la Solicitud de Vista escrita, a los fines de brindarle a la parte afectada la oportunidad de ser oído, pudiendo la OCIF, luego de concluido el procedimiento adjudicativo formal, confirmar, modificar o dejar sin efecto la *Querella*, de conformidad a las recomendaciones del Oficial Examinador designado. La Solicitud de Vista no exime a la parte afectada de presentar su alegación responsiva a esta *Querella*, en el término antes indicado. La presentación de una Solicitud de Vista no paralizará, ni modificará de manera alguna los términos de la presente *Querella* a menos que la OCIF disponga otra cosa.

De no solicitarse la vista, la OCIF entenderá que la parte afectada se allanó y que consintió a la expedición de las órdenes y multas propuestas, por lo que puede hacer cumplir la *Querella* sin mayor dilación ni notificación adicional.



Celebrada la vista, cualquier parte adversamente afectada por la resolución, u orden parcial o final de la OCIF podrá solicitar reconsideración dentro del término de **veinte (20) días**, contados a partir de la fecha de archivo en autos de la notificación de la resolución u orden. Disponiéndose que, si la fecha de archivo en autos de copia de la notificación de la orden o resolución de la agencia es distinta a la del depósito en el correo ordinario o del envío por medio electrónico de dicha notificación, el término se calculará a partir de la fecha del depósito en el correo ordinario o del envío por medio electrónico, según corresponda. La solicitud de reconsideración deberá ser por escrito, consignándose claramente el término *"Moción de Reconsideración"* como título para la solicitud. La radicación de una *Moción de Reconsideración*

33

no paralizará, ni modificará de manera alguna los términos de la presente *Querella* a menos que el Comisionado disponga otra cosa.

Dentro de los quince (15)días de haberse presentado una *Moción de Reconsideración* la OCIF deberá considerarla. Si la rechazare de plano o no actuare dentro de los quince (15) días, el término para solicitar revisión comenzará a transcurrir nuevamente desde que se notifique dicha denegatoria o desde que expiren esos quince (15) días, según sea el caso. Si se tomare alguna determinación en su consideración, el término para solicitar revisión empezará a contarse desde la fecha en que se archive en autos una copia de la notificación de la resolución de la agencia resolviendo definitivamente la moción de reconsideración. Tal resolución deberá ser emitida y archivada en autos dentro de los noventa (90) días siguientes a la radicación de la moción de reconsideración. Si la OCIF acoge la moción de reconsideración pero deja de tomar alguna acción con relación a la moción dentro de los noventa (90) días de ésta haber sido radicada, perderá jurisdicción sobre la misma y el término para solicitar la revisión judicial empezará a contarse a partir de la expiración de dicho término de noventa (90) días, salvo que la agencia, por justa causa y dentro de esos noventa (90) días, prorrogue el término para resolver por un período que no excederá de treinta (30) días adicionales. Si la fecha de archivo en autos de copia de la notificación de la orden o resolución es distinta a la del depósito en el correo ordinario o del envío por medio electrónico de dicha notificación, el término se calculará a partir de la fecha del depósito en el correo ordinario o del envío por medio electrónico, según corresponda.

Una parte adversamente afectada por una orden o resolución final de la OCIF y que haya agotado todos los remedios provistos por la OCIF podrá presentar una solicitud de revisión judicial ante el Tribunal de Apelaciones de Puerto Rico, dentro de un término de treinta (30) días conforme a la Sección 4.2 de la Ley Núm. 38-2017.

La presente *Querella* no releva a los Querellados de otras violaciones que surjan como resultado de esta *Querella* o que la OCIF advenga en conocimiento luego del archivo en autos de la notificación de ésta. En dicho caso, la OCIF se reserva el derecho de enmendar la *Querella* para incluir alegaciones, violaciones, multas y remedios adicionales, sujeto a las leyes aplicables.

Se apercibe a los Querellados, que a tenor con lo dispuesto en el Artículo 20(c) de la Ley 4-1985, la OCIF podrá imponer una multa administrativa no mayor de **CINCO MIL ($5,000.00) DÓLARES** por cada día que se deje de cumplir con las órdenes dictadas bajo las disposiciones de ley, hasta un máximo de **CINCUENTA MIL ($50,000.00) DÓLARES**. En caso de incumplimiento total o parcial de esta Querella, la OCIF, en auxilio de la jurisdicción estatutaria conferida por la Ley 4-1985, podrá solicitar del Tribunal de Primera Instancia, Sala Superior de San Juan, que ponga en vigor la misma, so pena de desacato, e imponga multas y sanciones adicionales a las que la OCIF entienda que correspondan, con cualquier otro pronunciamiento que en derecho proceda.

Dada en San Juan, Puerto Rico, hoy __4__ de abril de 2024.

**REGÍSTRESE Y NOTIFÍQUESE.**

_____
Lcda. Natalia I. Zequeira Díaz
Comisionada

34

# Exhibit 18 to the
# Ellis Declaration

## Contactar

www.linkedin.com/in/blas-
s-99196ab5 (LinkedIn)

## Aptitudes principales

Customer Experience
Account Management
Customer Service

## Languages

Español (Native or Bilingual)
Inglés (Native or Bilingual)

## Publications

Graduate Thesis

PROPOSAL OF A BANCARIZATION
PLAN FOR PEOPLE OF THE
INFORMAL SECTOR OF THE
ECONOMY IN THE PETARE
PARISH FOR 2014

PROPUESTA DE UN PLAN
DE BANCARIZACION PARA
LAS PERSONAS DEL SECTOR
INFORMAL DE LA ECONOMIA DE
LA PARROQUIA DE PETARE

# Blas S.

Finance / Banking
Miami, Florida, Estados Unidos

## Extracto

Dynamic and results-driven with decades of experience in driving strategic initiatives and fostering organizational growth. My career has been defined by a commitment to innovation, operational excellence, and building high-performing teams. I possess a strong ability to translate complex business challenges into actionable strategies that enhance profitability and market share.

With a proven track record in Banking, Finance and Business Advising, I excel in developing and implementing business development strategies, forging strategic partnerships, and optimizing operational processes. My leadership style emphasizes collaboration and empowering teams to achieve their full potential, ensuring alignment with the company's vision and goals.

I am passionate about leveraging data-driven insights to inform decision-making and drive sustainable growth. I thrive in fast-paced environments and am adept at navigating change while maintaining a focus on customer satisfaction and stakeholder engagement.

Let's connect to explore opportunities for collaboration and growth in the ever-evolving business landscape.

## Experiencia

AlterBank
Co-Founder / Managing Director / Chief Business Officer
mayo de 2023 - Present (3 años 1 mes)
I am responsible for the day-to-day business operations for the Bank and lead the team of Customer Success Managers. I work closely with the CEO and other senior managers to develop and implement strategic plans to grow and develop bank operations. I also work with the finance and accounting departments to ensure that the company's financial goals are met.

Business Advising
Business Development
diciembre de 2016 - Present (9 años 6 meses)
Miami, Florida, United States

As BDO I am required to help shape the overall business vision and customer base. Im in charge of developing plans and strategies to control more segments of the marketplace and determine the direction a company will take in its attempt to do this. I have a firm understanding of market and industry dynamics, and Im responsible for maintaining relationships with other powerful industry and business professionals who are directly related to the particular market The Company is in. I with chief financial professionals on budgets and costs, and work with the president, board members, and operating officers to determine company goals and practices.

I also work closely with the sales department to help develop plans and strategies for acquiring new customers and business opportunities. I am responsible for coordinating sales forecasts and keeping a close eye on customer accounts. My position is directly responsible for the supervision of the sales team.

Photography
Freelance Photographer
febrero de 2010 - Present (16 años 4 meses)

Capturing light to immortalize an instant for eternity. Graphic reporter covering news in Venezuela, for the necessity of sincere news about what is happening in the country. Photography correspondent for  El Nuevo Pais news paper, Zeta magazine and freelance photographer for PanAm Post agency from 2010 to 2017........ since 2017 I am now based out of Miami Florida

Financial Technology, Ltd.
Customer Success Manager
febrero de 2011 - mayo de 2023 (12 años 4 meses)
Miami, Florida

Qualify leads from campaigns as sales opportunities, contact potential clients through calls and emails, arrange personal meeting, present the company to potential clients, identify client needs and suggest appropriate solutions, customize product solutions to increase customer satisfaction, build longterm trusting relationships with clients, proactively seek new business opportunities, stay up-to-date with new products and services.
High experience with CRM (Salesforce) as user and manager.

High understanding of sales performance metrics.

High level of understanding and use of spreadsheets and charts (MS Excel)

### International Banking
### Senior Relationship Manager
febrero de 2011 - abril de 2023 (12 años 3 meses)
Miami, Florida

I provide banking and lending solutions to clients from around the world, for both personal and business accounts.

As senior relationship manager i attracted and managed financial relationships for the bank with over 250 high profile clients with great success.

Qualify leads from campaigns as sales opportunities, contact potential clients through calls and emails, arrange personal meeting, present the company to potential clients, identify client needs and suggest appropriate solutions, customize product solutions to increase customer satisfaction, build longterm trusting relationships with clients, proactively seek new business opportunities, stay up-to-date with new products and services.
High experience with CRM (Salesforce) as user and manager.
High understanding of sales performance metrics.
High level of understanding and use of spreadsheets and charts (MS Excel).

### De Solutions
### Finance Officer
agosto de 2017 - diciembre de 2022 (5 años 5 meses)
Miami, Florida

overseeing the financial operations of the company and making decisions based on the company's financial stability. My duties include monitoring cash flow, meeting with the CEO to discuss the best practices for company finances and coming up with strategic plans to improve the company's overall financial health

### Distribuidora Luxtron
### Commercial Operations Manager / Owner
agosto de 2007 - enero de 2020 (12 años 6 meses)
Caracas

Manage commercial operations for this all in one car shop. Mechanical, cosmetic and parts, as well as car wash.

The business has expanden from one small location to 3 all-in-one locations, and operate with great success.

———

## Educación

Universidad Metropolitana (VE)
Advanced studies, Financial Engineering · (2016 - 2017)

Universidad Metropolitana (VE)
Bachelor of Business Administration - BBA, Banking and Finance · (2009 - 2014)

Florida Atlantic University
Biochemical Engineering · (2005 - 2007)

American Heritage Schools - Palm Beach Campus
High School Diploma · (2000 - 2005)

# Exhibit 19 to the Ellis Declaration

## Contact

www.linkedin.com/in/alexsoroka1
(LinkedIn)

## Top Skills

Anti-Money Laundering

Risk Management

FinTech

## Languages

Russian

## Certifications

Certified Digital Media Collector
(CDMC)

Security+

Certified Digital Forensic Examiner
(CDFE)

# Alexander Soroka, MBA

Executive and Board Director - Technology and Financial Services
Miami-Fort Lauderdale Area

## Summary

20 years in the private and public sectors, providing oversight for delivery of complex systems to clients in national security, defense, legal, and financial industires.

---

## Experience

RIIG - HOOTL
President
May 2023 - Present (3 years 1 month)

AlterBank
Member Board of Directors
April 2025 - Present (1 year 2 months)

Solterra Trading
Managing Partner
May 2025 - Present (1 year 1 month)
Miami, Florida, United States

Mercantile Bank International
EVP
May 2023 - June 2024 (1 year 2 months)
Miami, Florida, United States

Custody & Settlements Solutions for Fiat and Digital Assets

Cinch
Co-Founder & COO
December 2019 - June 2024 (4 years 7 months)
Miami/Fort Lauderdale Area

SATSS LLC
Business Development Support
April 2023 - December 2023 (9 months)

DSP/RF/Geospatial specialist developing novel software and hardware solutions

International Union Bank - IUBank
Chief Technology Officer
January 2021 - March 2023 (2 years 3 months)
Miami, Florida, United States

Analyst Warehouse LLC
Defense and Aerospace Executive, VP & CTO
February 2011 - February 2017 (6 years 1 month)

General Dynamics AIS
Reverse Malware Engineer
August 2010 - February 2011 (7 months)

USAF
Technical Intelligence Analyst
June 1999 - August 2010 (11 years 3 months)

———

# Education

The Wharton School
General Management Program  · (2020 - 2022)

Yale School of Management
Global Executive Leadership Program · (2017 - 2018)

Columbia Business School
Executive Education, Private Equity · (2019)

Harvard Business School
Executive Education, Foundation of Private Equity and Venture Capital · (2019)

Columbia University in the City of New York
Master of Science (M.S.), Information and Knowledge Strategy · (2012 - 2013)

# Exhibit 20 to the Ellis Declaration

## Contact

www.linkedin.com/in/timothy-
richards-9097a34b (LinkedIn)

# Timothy Richards

Managing Partner at Richards & Partners P.A.
Miami, Florida, United States

## Experience

The Richards Group
Managing Partner

Richards & Partners P.A.
Managing Partner
August 1991 - Present (34 years 10 months)
2665 South Bayshore Drive, Suite 703, Miami, Florida 33133

———

# Exhibit 21 to the Ellis Declaration

## Contact

www.linkedin.com/in/a-cs
(LinkedIn)

## Top Skills

Business English

Credit

Key Performance Indicators

## Certifications

Certified Anti-Money Laundering
Specialist

# Alejandro Cespedes

Senior Manager - US Ecosystem Operations
Miami, Florida, United States

## Experience

**Western Union**
Senior Manager - US Ecosystem Operations
October 2023 - Present (2 years 8 months)
Miami, Florida, United States

**NodusBank**
5 years 2 months

COO
October 2019 - April 2023 (3 years 7 months)

VP Business Manager
March 2018 - October 2019 (1 year 8 months)

**Banco Federal**
VP of Finance & Deputy EVP
September 2016 - March 2018 (1 year 7 months)
Dominican Republic

**Conoma Capital**
Finance and Business Development
March 2013 - September 2016 (3 years 7 months)

**SGCIB**
Credit Analyst
July 2011 - March 2013 (1 year 9 months)

**The Rohatyn Group**
Risk Intern
June 2010 - August 2010 (3 months)

---

## Education

**Tufts University**
· (2008 - 2011)

Page 2 of 2

# Exhibit 22 to the Ellis Declaration

## Contact

www.linkedin.com/in/julio-luis-santander-79b475242 (LinkedIn)

## Top Skills

Teamwork
Problem Solving
Attention to Detail

## Languages

English (Native or Bilingual)
Spanish (Native or Bilingual)

# Julio Luis Santander

Senior Manager of Regional Operations
Miami, Florida, United States

## Summary

Julio Luis Santander Tovar is a dynamic business analyst at AlterBank, blending legal expertise and psychological insights. With a degree in Law and ongoing studies in Psychology from Universidad Metropolitana, he brings a versatile skill set to the team. His past roles at Kimberly-Clark Venezuela, Debeg Solutions LLC and Premier Access Solutions LLC have honed his attention to detail, adaptability, and problem solving abilities. Complementing his formal education, Julio has completed various Coursera courses in finance, psychology, and human resource management. At AlterBank, Julio leverages his bilingual proficiency and meticulous approach to enhance operational efficiencies and foster positive client relationships.

We are a bank that offers customized financial solutions, with innovative digital platforms and exclusive investment strategies. We focus on understanding and exceeding our clients' expectations, providing exceptional service and relationships based on trust. We also support small and medium-sized businesses with international trade products and efficient payment solutions. Our vision is to be your trusted financial partner, committed to your success and prosperity.

_____

## Experience

**AlterBank**
Senior Manager of Regional Operations
April 2024 - Present (2 years 2 months)

**Premier Access Solutions LLC**
Business Development Analyst
2022 - 2023 (1 year)

**Debeg Solutions LLC**

Business Analyst
2019 - 2022 (3 years)

Kimberly-Clark
Junior Lawyer
2010 - 2012 (2 years)
Caracas, Federal District, Venezuela

―――――

## Education

Universidad Metropolitana (VE)
Law

Universidad Metropolitana (VE)
Psychology

# Exhibit 23 to the Ellis Declaration

LinkedIn

I'm looking for...

## AlterBank

Escape Limitations, Embrace Possibilities!

Banking · Castries · 333 followers · 11-50 employees

+ Follow    Message    ...

Home    About    Posts    Jobs    **People**    Insights

### 13 associated members ⓘ

‹  ›

Search employees by title, keyword or school

| Where they live | + Add |
| --- | --- |
| 4 | Florida, United States |
| 4 | United States |
| 4 | Miami-Fort Lauderdale Area |
| 3 | Panama City |
| 3 | Panama |

| Where they studied | + Add |
| --- | --- |
| 5 | Universidad Metropolitana (VE) |
| 2 | The University of the West Indies |
| 2 | UCAB - Universidad Católica Andrés Bello |
| 1 | International School of Panama |
| 1 | Florida International University - College of ... |

● ○ ○ ○ ○ ○

## People you may know



**Blas S.** · 3rd
Finance / Banking

Message



**Myreen Cenac ...** · 3rd
Risk & Compliance, Banking&
Leadership Professional....

Message



**Alexander Soro...** · 3rd
Executive and Board Director -
Technology and Financial Services

3K followers

Follow







### Pages people also viewed

**369**
Blockchain Services
297 followers

+ Follow

**CABLOCK - Cámara Boliviana de Blockchain**
Non-profit Organizations
2,772 followers

+ Follow

**Tompkins Ventures**
Transportation, Logistics, Supply Chain and Storage
1,769 followers

+ Follow

Show all →

### People also follow

**Federal Bar Association**
Legal Services
17,037 followers

 Caleb & 1 other connection follow this page

+ Follow

**New York State Bar Association**
Legal Services
44,736 followers

 Pratik & 1 other connection follow this page

+ Follow

**Bloomberg Law**
Legal Services
78,165 followers

Sanaiya & 3 other connections follow this page

+ Follow

Show all →



**Mariana Gonzál**  · 3rd
Analista QA | Product Owner |
Oficial de Operaciones en...



**Dinnel Jn Baptis**  · 3rd
Finance Professional &
Entrepreneur



**Antonio José R**  · 3rd
Finanzas | Tecnología | Procesos

Message

Message

Message



Linked in
Your job search **powered by**
your network

Explore jobs



**LinkedIn Member**
Senior Consultant in Payments &
Compliance | Government and...



**Mary Dubravsk...**  · 3rd
IT & Security Manager

Provides services - IT Consulting

Message



**LinkedIn Member**
General Manager, Alter Bank Ltd.
FCCA, FICB.



**Julio Luis Santa...**  · 3rd
Senior Manager of Regional
Operations

Provides services - Financial Advisory,
Business Consulting, Financial
Consulting

Message

**Cristobal Lopez...**  · 3rd
Chief Business Development
Officer at AlterBank

Message

**Jose Antonio Ya...**  · 3rd
Custody Operations Coordinator

Message

**Juan Guillermo ...**  · 3rd
COO

Message



1

