**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**
**MIAMI DIVISION**

*In re:* Application of

THE BANK OF NEW YORK MELLON, in its capacity as TRUSTEE FOR THE TV AZTECA, S.A.B. DE C.V. 8.25% SENIOR NOTES DUE 2024,

to Conduct Discovery for Use in a Foreign Proceeding Pursuant to 28 U.S.C. § 1782.

Case No. 1:26-mc-23885-JEM

*Expedited Consideration Requested*

**DECLARATION OF DANIEL PULECIO-BOEK IN SUPPORT OF**
**NON-PARTY TV AZTECA, S.A.B. DE C.V.'S EXPEDITED MOTION TO**
**INTERVENE AND, UPON INTERVENTION, FOR A PROTECTIVE ORDER**

I, Daniel Pulecio-Boek, pursuant to 28 U.S.C. § 1746, declare as follows:

1.    I am a Shareholder at Greenberg Traurig, LLP, counsel to non-party TV Azteca, S.A.B. de C.V. ("TV Azteca") in connection with this proceeding. I also serve as counsel of record for TV Azteca in *The Bank of New York Mellon, solely in its capacity as Trustee for the TV Azteca, S.A.B. de C.V. 8.25% Senior Notes due 2024 v. TV Azteca, S.A.B. de C.V., et al.*, No. 1:22-cv-08164-PGG-BM (S.D.N.Y.) (the "SDNY Litigation").

2.    I submit this declaration in support of TV Azteca's Expedited Motion to Intervene and, Upon Intervention, for a Protective Order Limiting Any Deposition of Juan Ramirez, Quashing the Ramirez Deposition Notice, and Adjourning the Deposition Until Resolution of This Motion (the "Motion").

**I.    TV Azteca, the Notes, and the SDNY Litigation**

3.    TV Azteca is a Mexican multimedia company with its principal place of business in Mexico City, Mexico. In 2017, TV Azteca issued $400 million in aggregate principal amount

1

of 8.25% Senior Notes due 2024 (the "Notes") pursuant to an Indenture dated as of August 9, 2017 (the "Indenture"), for which The Bank of New York Mellon (the "Trustee") serves as trustee.

4.     Attached hereto as **Exhibit A** is a true and correct copy of the Indenture. Section 3.4 of the Indenture expressly obligates TV Azteca to pay taxes when due, providing that TV Azteca "shall pay or discharge, or cause to be paid or discharged, before the same shall become delinquent, all taxes, assessments and governmental charges levied or imposed upon" TV Azteca.

5.     On February 9, 2021, TV Azteca issued a press release announcing, among other things, the "deferment of the payment of the coupon corresponding to February 2021." Attached hereto as **Exhibit B** is a true and correct copy of that press release.

6.     On March 22, 2021, TV Azteca was sent a document entitled "Notice of Event of Default." Attached hereto as **Exhibit C** is a true and correct copy of that document. On March 29, 2022, TV Azteca was sent a document entitled "Notice of Continuing Events of Default." Attached hereto as **Exhibit D** is a true and correct copy of that document.

7.     The Trustee, acting at the direction of certain beneficial holders of the Notes (the "Noteholders"), thereafter commenced a breach-of-contract action against TV Azteca and certain of its affiliates in New York state court, which TV Azteca removed to the United States District Court for the Southern District of New York. That action is the SDNY Litigation. Discovery in the SDNY Litigation is currently stayed, and the Trustee's motion for summary judgment and motion for leave to amend the complaint remain pending.

## II.     The Mexican Tax Ruling, the AlterBank Loan, and the *Concurso*

8.     On November 13, 2025, the Mexican Supreme Court affirmed a substantial tax liability against TV Azteca, which TV Azteca had been disputing for years.

9.     As alleged by TV Azteca in the SDNY Litigation, that adverse ruling followed months of intense and public lobbying by Noteholders of TV Azteca's 2017 issuance of the notes, including efforts to influence (i) the President of Mexico, who repeatedly made clear during her morning press conferences her position supporting the U.S. Noteholders over TV Azteca, and (ii) the Mexican judiciary, which is popularly elected and predominantly aligned with the President's political party, into taking actions adverse to TV Azteca. These allegations are set forth in detail in TV Azteca's proposed Third-Party Complaint filed in the SDNY Litigation. Attached hereto as **Exhibit E** is a true and correct copy of TV Azteca's proposed Third-Party Complaint, filed in the SDNY Litigation.

10.    Following the November 13, 2025 tax ruling, TV Azteca faced the risk that the Mexican government would seize its operations and take its assets in satisfaction of the tax liability. To prevent any such action, TV Azteca paid the tax debt, which was approximately $200 million.

11.    To fund the payment of the tax liability, TV Azteca obtained a loan from AlterBank Limited ("AlterBank") (the "AlterBank Loan").

12.    The tax liability, TV Azteca's payment of that liability, and the AlterBank Loan were each publicly reported and were known to the Trustee and to the Noteholders. Attached hereto as **Exhibit F** is a true and correct copy of a news article dated April 16, 2026, and published at https://www.9fin.com/insights/tv-azteca-loan-bankruptcy-filing, reporting on the AlterBank Loan.

13.    On March 10, 2026, TV Azteca filed a petition for *concurso mercantil* in Mexico, a proceeding that is analogous in function to a Chapter 11 reorganization proceeding under the United States Bankruptcy Code.

14.     On July 7, 2026, the *concurso* court declared TV Azteca to be in *concurso mercantil* and commenced the *conciliación* (reorganization) stage, which has a statutory duration of 185 days. Attached hereto as **Exhibit G** is a true and correct copy of the *concurso* court's July 7, 2026 decision.

### III.     The Trustee's § 1782 Application and the SDNY Discovery Stay

15.     Based on my review of the docket in this proceeding, on June 2, 2026, the Trustee filed an *ex parte* application under 28 U.S.C. § 1782 (the "Application," ECF 1) seeking leave to serve subpoenas on AlterBank and on six individuals: Blas Santander, Alexander Soroka, Timothy Richards, Alejandro Cespedes, Julio Luis Santander, and Juan Ramirez. The Application states that its purpose is to obtain "U.S. discovery into a potential $290 million fraudulent transfer at issue in a Mexican bankruptcy proceeding," ECF 1 at 1, that the Trustee "intends to challenge the AlterBank loan in the Mexican *concurso* proceedings," *id*. at 8, and that it seeks the discovery "to investigate and prosecute claims challenging the loan—including potential fraudulent transfer claims—in the *concurso*," *id.* at 14.

16.     On June 4, 2026, the Court entered an Order authorizing the Trustee to serve the proposed subpoenas. ECF 12.

17.     On June 8, 2026, four days after entry of that Order, TV Azteca raised the Application with the court in the SDNY Litigation, because TV Azteca was concerned that the Trustee's § 1782 discovery might contravene the discovery stay that the court had previously entered in that case.

18.     At a hearing held on July 15, 2026, in the SDNY Litigation, the court stated that the discovery stay in that action "doesn't prevent any party from attempting to make use of the § 1782 proceeding." At that same hearing, my colleague advised the court that TV Azteca had not

yet intervened in this proceeding and expressly reserved TV Azteca's right to do so. Attached hereto as **Exhibit H** is a true and correct copy of the transcript of the July 15, 2026 hearing.

19.     Based on my review of the docket in this proceeding, AlterBank has moved to vacate the Court's § 1782 Order on the ground that AlterBank is not "found" in this District, and that motion remains pending. On July 28, 2026, the Trustee moved for an extension of time until August 11, 2026, to respond to that motion, ECF 26, and on July 29, 2026, the Court ordered a response to the extension motion by August 3, 2026, ECF 27. As of the date of this declaration, the Court has not ruled on AlterBank's motion to vacate.

**IV.     Juan Ramirez, the Subpoena, the Document Production, and the Deposition Notice**

20.     The Trustee alleges that Juan Ramirez founded AlterBank in 2023 but "purported to resign from AlterBank's board and transferred ownership of AlterBank" in December 2024. ECF 1 at 6. The Application further reflects that the AlterBank Loan was negotiated, executed, and later amended in early 2026—more than a year after Mr. Ramirez allegedly severed his connection to AlterBank—and before the March 10, 2026 *concurso* petition. *Id.* at 5. The Application identifies Mr. Ramirez only as one of AlterBank's "directors, senior officers, and a former owner" who is "likely to have information" concerning the subpoena topics. *Id.* at 12–13. The Application does not identify any connection between Mr. Ramirez and the AlterBank Loan, TV Azteca, or the *concurso*.

21.     On March 20, 2026, the United States Department of Justice issued a press release announcing that Mr. Ramirez had pleaded guilty to conspiracy to commit wire fraud in connection with the failure of Nodus International Bank. Attached hereto as **Exhibit I** is a true and correct copy of that press release. Mr. Ramirez has not yet been sentenced.

22.     Based on my review of the Application and of the documents produced by Mr. Ramirez as described below, Nodus International Bank has no connection to AlterBank or to TV Azteca, and the Application does not allege otherwise.

23.     Following entry of the Court's June 4, 2026 Order, the Trustee served on Mr. Ramirez a subpoena seeking both deposition testimony and the production of documents (the "Subpoena"). Attached hereto as **Exhibit J** is a true and correct copy of the Subpoena, as attached to the Application.

24.     Mr. Ramirez produced documents in response to the Subpoena. On July 15, 2026, and July 21, 2026, the Trustee served copies of those documents on TV Azteca. Based on a review of these documents, the production does not appear to contain *any* reference to the AlterBank Loan, to TV Azteca, or to any relationship between AlterBank and TV Azteca.

25.     On July 21, 2026, the Trustee served on TV Azteca a Notice of Deposition of Juan Ramirez (the "Deposition Notice"), unilaterally setting Mr. Ramirez's deposition for August 10, 2026, at 10:00 a.m. in Coral Gables, Florida. Attached hereto as **Exhibit K** is a true and correct copy of the Deposition Notice.

26.     The Deposition Notice does not identify any subject matter or topic for examination. It does not state, or otherwise indicate, that the examination of Mr. Ramirez will be limited to the topics stated in the Application.

## V.     Conferral and Basis for Expedited Consideration

27.     Pursuant to Local Rule 7.1(a)(3), on July 30, 2026, my colleagues Hal S. Shaftel and John C. Molluzzo Jr. conferred by Zoom with counsel for the Trustee, Justin Ellis and Zachary Ingber of MoloLamken LLP, regarding the scope of the noticed Ramirez deposition. Counsel were unable to reach agreement as to the deposition.

28.     On July 30, 2026, Mr. Shaftel and Mr. Molluzzo conferred by telephone with Mr. Brant Hadaway at Diaz, Reus & Targ LLP, counsel for AlterBank. AlterBank does not object to the relief sought by TV Azteca.

29.     On July 31, 2026, co-counsel, Jesus Suarez, conferred with counsel for Juan Ramirez, Lilly Ann Sanchez of the LS Law Firm, who takes no position on the Motion and will work with the parties to reschedule deposition to a mutually agreed upon date and time.

30.     Expedited consideration is necessary because the deposition of Mr. Ramirez is presently scheduled to proceed on August 10, 2026, before the Court will have ruled on the Motion in the ordinary course. Absent expedited relief, the deposition will proceed without any judicial determination of its propriety or scope, and any testimony obtained may be used by the Trustee against TV Azteca in the *concurso*, which is ongoing.

I declare under penalty of perjury under the laws of the United States that the foregoing declaration is true and correct.

Dated: Washington, District of Columbia
        August 3, 2026                                    */s/ Daniel Pulecio-Boek*_____
                                                          Daniel Pulecio-Boek

7

# Exhibit A

Case 1:23-cv-01164-PGG Document 30-1 Filed 07/15/08 Page 26 of 137

*Execution Version*

**TV AZTECA, S.A.B. DE C.V.,**

**THE SUBSIDIARY GUARANTORS PARTY HERETO**

**THE BANK OF NEW YORK MELLON,**

**as TRUSTEE**

**and**

**THE BANK OF NEW YORK MELLON, LONDON BRANCH,**

**as PRINCIPAL PAYING AGENT**

**8.250% Senior Notes Due 2024**

**INDENTURE**

**Dated as of August 9, 2017**

NAI-1502882142v7

**TABLE OF CONTENTS**

**Page**

ARTICLE I
DEFINITIONS AND INCORPORATION BY REFERENCE

Section 1.1    Definitions .................................................................................................... 1

Section 1.2    Incorporation by Reference of Trust Indenture Act ...................................... 30

Section 1.3    Rules of Construction .................................................................................. 30

ARTICLE II
THE NOTES

Section 2.1    Form and Dating ......................................................................................... 30

Section 2.2    Execution and Authentication ...................................................................... 31

Section 2.3    Registrar and Paying Agent; Depositary ....................................................... 32

Section 2.4    Paying Agent to Hold Money in Trust .......................................................... 32

Section 2.5    Holder Lists ................................................................................................. 33

Section 2.6    Global Note Provisions ................................................................................ 33

Section 2.7    Legends ....................................................................................................... 34

Section 2.8    Transfer and Exchange ................................................................................ 34

Section 2.9    Mutilated, Destroyed, Lost or Stolen Notes .................................................. 36

Section 2.10   Temporary Notes ........................................................................................ 37

Section 2.11   Cancellation ............................................................................................... 37

Section 2.12   Defaulted Interest ....................................................................................... 37

Section 2.13   Additional Notes ......................................................................................... 38

ARTICLE III
COVENANTS

Section 3.1    Payment of Notes ........................................................................................ 38

Section 3.2    Maintenance of Office or Agency ................................................................ 39

Section 3.3    Corporate Existence .................................................................................... 40

Section 3.4    Payment of Taxes ........................................................................................ 40

Section 3.5    Compliance Certificate ................................................................................ 40

Section 3.6    Further Instruments and Acts ....................................................................... 40

Section 3.7    Waiver of Stay, Extension or Usury Laws ..................................................... 40

Section 3.8    Repurchase Upon a Change of Control ......................................................... 41

Section 3.9    Limitation on Incurrence of Additional Indebtedness .................................... 42

**TABLE OF CONTENTS**
(continued)

Page

| | | |
|---|---|---|
| Section 3.10 | Limitation on Guarantees | 46 |
| Section 3.11 | Limitation on Restricted Payments | 46 |
| Section 3.12 | Limitation on Asset Sales and Sales of Subsidiary Stock | 50 |
| Section 3.13 | Limitation on Designation of Unrestricted Subsidiaries | 53 |
| Section 3.14 | Limitation on Dividends and Other Payment Restrictions Affecting Restricted Subsidiaries | 55 |
| Section 3.15 | Limitation on Liens | 56 |
| Section 3.16 | Limitation on Transactions with Affiliates | 57 |
| Section 3.17 | Conduct of Business | 58 |
| Section 3.18 | Reports to Holders | 58 |
| Section 3.19 | Listing | 59 |
| Section 3.20 | Payment of Additional Amounts | 60 |
| Section 3.21 | Suspension of Covenants | 63 |

ARTICLE IV
SURVIVING ENTITY

| | | |
|---|---|---|
| Section 4.1 | Merger, Consolidation and Sale of Assets | 64 |

ARTICLE V
OPTIONAL REDEMPTION OF NOTES

| | | |
|---|---|---|
| Section 5.1 | Optional Redemption | 67 |
| Section 5.2 | Optional Redemption upon Equity Offerings | 67 |
| Section 5.3 | Optional Redemption for Changes in Withholding Taxes | 68 |
| Section 5.4 | Optional Redemption Procedures | 68 |
| Section 5.5 | Notice of Redemption | 68 |
| Section 5.6 | Selection of Notes to Be Redeemed in Part | 70 |
| Section 5.7 | Deposit of Redemption Price | 70 |
| Section 5.8 | Notes Payable on Redemption Date | 70 |
| Section 5.9 | Unredeemed Portions of Partially Redeemed Note | 71 |

ARTICLE VI
DEFAULTS AND REMEDIES

| | | |
|---|---|---|
| Section 6.1 | Events of Default | 71 |
| Section 6.2 | Acceleration | 72 |

**TABLE OF CONTENTS**
(continued)

Page

Section 6.3     Other Remedies ........................................................................................ 73

Section 6.4     Waiver of Past Defaults ............................................................................ 73

Section 6.5     Control by Majority .................................................................................. 73

Section 6.6     Limitation on Suits ................................................................................... 73

Section 6.7     Rights of Holders to Receive Payment ..................................................... 74

Section 6.8     Collection Suit by Trustee ........................................................................ 74

Section 6.9     Trustee May File Proofs of Claim, etc ...................................................... 74

Section 6.10    Priorities .................................................................................................. 75

Section 6.11    Undertaking for Costs .............................................................................. 75

ARTICLE VII
TRUSTEE

Section 7.1     Duties of Trustee ...................................................................................... 76

Section 7.2     Rights of Trustee ...................................................................................... 77

Section 7.3     Individual Rights of Trustee ..................................................................... 79

Section 7.4     Trustee's Disclaimer ................................................................................ 79

Section 7.5     Notice of Defaults .................................................................................... 79

Section 7.6     [Reserved] ................................................................................................ 79

Section 7.7     Compensation and Indemnity ................................................................... 79

Section 7.8     Replacement of Trustee ........................................................................... 80

Section 7.9     Successor Trustee by Merger .................................................................... 81

Section 7.10    Eligibility; Disqualification ..................................................................... 81

Section 7.11    Preferential Collection of Claims Against Company ................................. 82

Section 7.12    Appointment of Co-Trustee ...................................................................... 82

Section 7.13    The Agents ............................................................................................... 83

ARTICLE VIII
DEFEASANCE; DISCHARGE OF INDENTURE

Section 8.1     Legal Defeasance and Covenant Defeasance ............................................ 83

Section 8.2     Conditions to Defeasance ......................................................................... 84

Section 8.3     Application of Trust Money ...................................................................... 86

Section 8.4     Repayment to Company ............................................................................ 86

Section 8.5     Indemnity for U.S. Government Obligations ............................................. 86

# TABLE OF CONTENTS
(continued)

**Page**

Section 8.6    Reinstatement................................................................................... 86

Section 8.7    Satisfaction and Discharge................................................................ 87

## ARTICLE IX
## AMENDMENTS

Section 9.1    Without Consent of Holders ............................................................. 87

Section 9.2    With Consent of Holders .................................................................. 89

Section 9.3    Revocation and Effect of Consents and Waivers............................. 90

Section 9.4    Notation on or Exchange of Notes.................................................... 90

Section 9.5    Trustee to Sign Amendments and Supplements ............................... 90

## ARTICLE X
## NOTE GUARANTEES

Section 10.1    Note Guarantees................................................................................ 91

Section 10.2    Limitation on Liability; Termination, Release and Discharge........ 94

Section 10.3    Right of Contribution........................................................................ 94

Section 10.4    No Subrogation ................................................................................. 94

Section 10.5    Execution and Delivery of Note Guarantee ..................................... 95

Section 10.6    Additional Note Guarantees............................................................. 95

## ARTICLE XI
## MISCELLANEOUS

Section 11.1    Notices .............................................................................................. 95

Section 11.2    Communication by Holders with Other Holders ............................. 97

Section 11.3    Certificate and Opinion as to Conditions Precedent........................ 97

Section 11.4    Statements Required in Certificate or Opinion................................ 97

Section 11.5    Rules by Trustee, Paying Agent and Registrar ............................... 97

Section 11.6    Payment Date Other than a Business Day ....................................... 98

Section 11.7    Governing Law, etc........................................................................... 98

Section 11.8    No Recourse Against Others............................................................. 99

Section 11.9    Successors ......................................................................................... 99

Section 11.10    Duplicate and Counterpart Originals ............................................... 99

Section 11.11    Severability ...................................................................................... 100

Section 11.12    Currency Indemnity ......................................................................... 100

**TABLE OF CONTENTS**
(continued)

**Page**

Section 11.13    Table of Contents; Headings ...................................................................... 100

Section 11.14    USA Patriot Act ....................................................................................... 100

Section 11.15    Foreign Account Tax Compliance Act (FATCA) ....................................... 101

Section 11.16    Anti-Money Laundering, Terrorism and Economic Sanctions .................... 101

**EXHIBIT A**          **FORM OF NOTE**

**EXHIBIT B**          **FORM OF SUPPLEMENTAL INDENTURE FOR ADDITIONAL NOTE GUARANTEE**

INDENTURE, dated as of August 9, 2017, by and among TV Azteca, S.A.B. de C.V., a publicly traded variable capital corporation (*sociedad anónima bursátil de capital variable*) organized and existing under the laws of the United Mexican States ("Mexico"), the Subsidiary Guarantors party hereto, The Bank of New York Mellon, as trustee (the "Trustee") and The Bank of New York Mellon, London Branch, as initial Principal Paying Agent.

Each party hereto agrees as follows for the benefit of the other parties and for the equal and ratable benefit of the Holders of the Company's 8.250% Senior Notes Due 2024 issued under this Indenture.

## ARTICLE I

## DEFINITIONS AND INCORPORATION BY REFERENCE

Section 1.1    Definitions.

"Acquired Indebtedness" means Indebtedness of a Person or any of its Subsidiaries existing at the time such Person becomes a Restricted Subsidiary or at the time it merges or consolidates with the Company or any of its Restricted Subsidiaries or is assumed in connection with the acquisition of assets from such Person.  Such Indebtedness shall be deemed to have been Incurred at the time such Person becomes a Restricted Subsidiary or at the time it merges or consolidates with the Company or a Restricted Subsidiary or at the time such Indebtedness is assumed in connection with the acquisition of assets from such Person.

"Additional Amounts" has the meaning assigned to it in Section 3.20.

"Additional Note Board Resolutions" means resolutions duly adopted by the Board of Directors of the Company and each of the Subsidiary Guarantors and delivered to the Trustee in an Officers' Certificate providing for the issuance of Additional Notes (and the Guarantee by the Subsidiary Guarantors thereof).

"Additional Notes" means the Company's 8.250% Senior Notes Due 2024 originally issued after the Issue Date pursuant to Section 2.13, including any replacement Notes issued therefor.

"Additional Note Supplemental Indenture" means a supplement to this Indenture duly executed and delivered by the Company, each Subsidiary Guarantor and the Trustee pursuant to Article IX providing for the issuance of Additional Notes (and the Guarantee by the Subsidiary Guarantors thereof).

"Affiliate" means, with respect to any specified Person, any other Person who directly or indirectly through one or more intermediaries controls, or is controlled by, or is under common control with, such specified Person.  The term "control" means the possession, directly or indirectly, of the power to direct or cause the direction of the management and policies of a Person, whether through the ownership of voting securities, by contract or otherwise.  For purposes of this definition, the terms "controlling," "controlled by" and "under common control with" have correlative meanings.

"Affiliate Transaction" has the meaning assigned to it in Section 3.16(a).

"Agents" means, collectively, the Registrar, any co-Registrar, the Principal Paying Agent, any other Paying Agents and any other agent appointed by the Company under this Indenture.

"Agent Members" has the meaning assigned to it in Section 2.6(b).

"Applicable Premium" means, with respect to any Note on any applicable Redemption Date, the excess, if any, of (a) the present value at such Redemption Date of (i) the redemption price of such Note at, August 9, 2021 (such redemption price being set forth in the table appearing in Section 5.1(b)) plus (ii) all required interest payments due on such Note through August 9, 2021 (excluding accrued but unpaid interest to the Redemption Date), computed in each case using a discount rate equal to the Treasury Rate as of such Redemption Date plus 50 basis points over (b) the outstanding principal amount of such Note.

"Asset Sale" means any direct or indirect sale, disposition, issuance, conveyance, transfer, lease (other than operating leases), assignment or other transfer, including a Sale and Leaseback Transaction (each, a "disposition") by the Company or any Restricted Subsidiary of:

(a) any Capital Stock of any Restricted Subsidiary (but not Capital Stock of the Company); or

(b) any property or assets (other than cash, Cash Equivalents or Capital Stock of the Company) of the Company or any Restricted Subsidiary.

Notwithstanding the preceding, the following items shall not be deemed to be Asset Sales:

(1) the disposition of all or substantially all of the assets of the Company and its Restricted Subsidiaries as permitted under Section 4.1;

(2) sales, leases, conveyances or other dispositions of real or personal property, including, without limitation, exchanges or swaps of real estate, for the development of the Company's or any of its Restricted Subsidiaries' projects in the ordinary course of business

(3) for purposes of Section 3.12 only, the making of Restricted Payments permitted under Section 3.11 or any Permitted Investment;

(4) a disposition to the Company or a Restricted Subsidiary, including a Person that is or will become a Restricted Subsidiary immediately after the disposition;

(5) any single transaction or series of related transactions that involves assets or Capital Stock of the Company or a Restricted Subsidiary having a Fair Market Value of less than U.S.$10.0 million;

(6) a transfer of assets between or among the Company and any of its Restricted Subsidiaries;

- 2 -

NAI-1502882142v7

(7)     an issuance or sale of Capital Stock by a Restricted Subsidiary of the Company to the Company or any of its Restricted Subsidiaries;

(8)     any sale or other disposition of damaged, worn-out, obsolete or no longer useful assets or properties in the ordinary course of business;

(9)     any sale of assets received by the Company or any of its Restricted Subsidiaries upon the foreclosure on a Lien;

(10)     the good faith surrender or waiver of contract rights, tort claims or statutory rights in connection with a settlement; and

(11)     sales or other dispositions of inventory, advertising time (including barter transactions), receivables and current assets in the ordinary course of business.

"Asset Sale Offer" has the meaning assigned to it in Section 3.12(d).

"Asset Sale Offer Amount" has the meaning assigned to it in Section 3.12(d).

"Asset Sale Offer Notice" means written notice of an Asset Sale Offer made pursuant to Section 3.12, that shall state:

(1)     that an Asset Sale has occurred, the circumstances of the Asset Sale, the Net Cash Proceeds of which are included in the Asset Sale Offer, that an Asset Sale Offer is being made pursuant to Section 3.12, and that all Notes that are timely tendered will be accepted for payment, subject to proration, as described in Section 3.12;

(2)     the Asset Sale Offer Amount (including the portion thereof representing accrued interest) and the Asset Sale Offer Payment Date;

(3)     that any Notes or portions thereof not tendered or accepted for payment will continue to accrue interest;

(4)     that, unless the Company defaults in the payment of the Asset Sale Offer Amount with respect to Notes tendered and accepted for payment, all such Notes or portions thereof accepted for payment pursuant to the Asset Sale Offer shall cease to accrue interest from and after the Asset Sale Offer Payment Date;

(5)     that any Holder electing to have any Notes or portions thereof purchased pursuant to the Asset Sale Offer will be required to surrender such Notes, with the form entitled "Option of Holder to Elect Purchase" on the reverse of such Notes completed, to the Trustee at the place or places specified in the notice prior to the close of business on the third Business Day preceding the Asset Sale Offer Payment Date;

(6)     that any Holder shall be entitled to withdraw such election if the Trustee receives, not later than the close of business on the second Business Day preceding the Asset Sale Offer Payment Date, a notice of withdrawal, setting forth the name of the Holder, the principal amount of Notes delivered for purchase, and a statement that such Holder is

- 3 -

NAI-1502882142v7

withdrawing such Holder's election to have such Notes or portions thereof purchased pursuant to the Asset Sale Offer;

(7)     that any Holder electing to have Notes purchased pursuant to the Asset Sale Offer must specify the principal amount that is being tendered for purchase, which principal amount must be U.S.$200,000 and in integral multiples of U.S.$1,000 in excess thereof and any portion of Notes not tendered must satisfy the U.S.$200,000 minimum denomination requirement;

(8)     that any Holder of Certificated Notes whose Certificated Notes are being purchased only in part will be issued new Certificated Notes equal in principal amount to the unpurchased portion of the Certificated Note or Notes surrendered, which unpurchased portion will be equal in principal amount to U.S.$200,000 and in integral multiples of U.S.$1,000 in excess thereof;

(9)     that the Trustee will make a notation on the schedule of increases or decreases of any Global Note adjusting the principal amount thereof to be equal to the unpurchased portion of such Global Note; and

(10)     any other information necessary to enable any Holder to tender Notes and to have such Notes purchased pursuant to Section 3.12.

"Asset Sale Offer Payment Date" has the meaning assigned to it in Section 3.12(f).

"Authenticating Agent" has the meaning assigned to it in Section 2.2(d).

"Authorized Agent" has the meaning assigned to it in Section 11.7(c).

"Average Quarterly Balance" means, with respect to any Indebtedness incurred by the Company or its Restricted Subsidiaries under a revolving facility or line of credit, the quotient of (x) the sum of each Individual Quarterly Balance for each fiscal quarter ended on or prior to such date of determination and included in the Reference Period divided by (y) 4.

"Bankruptcy Law" means any bankruptcy, *concurso mercantil*, insolvency or other similar laws now or hereafter in effect.

"Bankruptcy Law Event of Default" means:

(1)     pursuant to or within the meaning of any Bankruptcy Law, any Bankruptcy Party (A) commences a voluntary case, (B) consents to the entry of an order for relief against it in an involuntary case, (C) consents to the appointment of a Custodian of it or for any substantial part of its property, or (D) makes a general assignment for the benefit of its creditors, or takes any comparable action under any comparable laws relating to insolvency; or

(2)     a court of competent jurisdiction enters an order or decree under any Bankruptcy Law that (A) is for relief against any Bankruptcy Party in an involuntary case, (B) appoints a Custodian of any Bankruptcy Party or for any substantial part of its property, or (C) orders the winding up or liquidation of any Bankruptcy Party, or any similar relief is granted

- 4 -

under any comparable laws and the order or decree remains unstayed and in effect for 60 consecutive days.

"Bankruptcy Party" means the Company, any Restricted Subsidiary of the Company that is a Significant Subsidiary or any group of Restricted Subsidiaries of the Company that, taken together, would constitute a Significant Subsidiary.

"Board of Directors" means, as to any Person, the board of directors, management committee, sole administrator or similar governing body of such Person or any duly authorized committee thereof.

"Board Resolution" means, with respect to any Person, a copy of a resolution certified by the Secretary or an Assistant Secretary of such Person to have been duly adopted by the Board of Directors of such Person and to be in full force and effect on the date of such certification, and delivered to the Trustee.

"Business Day" means a day other than a Saturday, Sunday or other day on which commercial banking institutions are authorized or required by law to close in New York City, Mexico City or London.

"Capitalized Lease Obligations" means, as to any Person, the obligations of such Person under a lease that are required to be classified and accounted for as capital lease obligations under IFRS. For purposes of this definition, the amount of such obligations at any date shall be the capitalized amount of such obligations at such date, determined in accordance with IFRS.

"Capital Stock" means:

(1) with respect to any Person that is a corporation, any and all shares, interests, participations or other equivalents (however designated and whether or not voting) of corporate stock, including each class of Common Stock and Preferred Stock of such Person;

(2) with respect to any Person that is not a corporation, any and all partnership or other equity or ownership interests of such Person; and

(3) any warrants, rights or options to purchase any of the instruments or interests referred to in clause (1) or (2) above.

"CASA" means Comunicaciones Avanzadas, S.A. de C.V.

"Cash Equivalents" means:

(1) marketable direct obligations issued by, or unconditionally guaranteed by, the United States government or issued by any agency thereof and backed by the full faith and credit of the United States, in each case maturing within one year from the date of acquisition thereof;

- 5 -

NAI-1502882142v7

(2)      *Certificados de la Tesoreria de la Federacion (Cetes)* or *Bonos de Desarrollo del Gobierno Federal (Bondes)*, in each case, issued by the government of Mexico and maturing not later than one year after the acquisition thereof;

(3)      marketable direct obligations issued by any state of the United States of America or any political subdivision of any such state or any public instrumentality thereof maturing within one year from the date of acquisition thereof and, at the time of acquisition, having one of the two highest ratings obtainable from either Moody's, S&P or Fitch or any successor thereto;

(4)      commercial paper maturing no more than one year from the date of creation thereof and at the time of acquisition, having a rating of at least F-1 from Fitch, at least P-1 from Moody's, or at least A-1 from S&P;

(5)      demand deposits, certificates of deposit, time deposits or bankers' acceptances maturing within one year from the date of acquisition thereof issued by (a) any bank organized under the laws of the United States of America or any state thereof or the District of Columbia, (b) any U.S. branch of a non-U.S. bank having at the date of acquisition thereof combined capital and surplus of not less than U.S.$500 million, (c) Nacional Financiera S.N.C., Banco Nacional de Comercio Exterior, S.N.C., Banco Nacional de Obras y Servicios Públicos, S.N.C. or Banco Azteca, S.A., , Institución de Banca Múltiple or (d) in the case of Mexican peso deposits, Banco Azteca, S.A., Institución de Banca Múltiple or any of the five top-rated banks (as evaluated by any Rating Agency) organized under the laws of Mexico;

(6)      repurchase obligations with a term of not more than seven days for underlying securities of the types described in clause (1) above entered into with any bank meeting the qualifications specified in clause (5) above; and

(7)      investments in money market funds which invest substantially all of their assets in securities of the types described in clauses (1) through (6) above.

"Certificated Note" means any Note issued in fully-registered certificated form (other than a Global Note), which shall be substantially in the form of Exhibit A, with appropriate legends as specified in Section 2.7 and Exhibit A.

"Change of Control" means the occurrence of one or more of the following events:

(1)      any Person or Group other than the Permitted Holders is or becomes the beneficial owner (as defined below), directly or indirectly, in the aggregate of more than 50% of the total voting power of the Voting Stock of the Company (including a Surviving Entity, if applicable);

(2)      during any period of two consecutive years, individuals who at the beginning of such period constituted the Board of Directors of the Company, together with any new directors whose election by such Board of Directors or whose nomination for election by the shareholders of the Company was approved by a vote of a majority of the directors of the Company then still in office who were either directors at the beginning of such period or whose

- 6 -

NAI-1502882142v7

election or nomination for election was previously so approved, cease for any reason to constitute a majority of the Board of Directors of the Company then in office;

(3)     the Company consolidates with, or merges with or into, another Person, or the Company sells, conveys, assigns, transfers, leases or otherwise disposes of all or substantially all of the assets of the Company, determined on a consolidated basis, to any Person, other than a transaction where the Person or Persons that, immediately prior to such transaction "beneficially owned" the outstanding Voting Stock of the Company are, by virtue of such prior ownership, or Permitted Holders are, the "beneficial owners" in the aggregate of a majority of the total voting power of the then outstanding Voting Stock of the surviving or transferee person (or if such surviving or transferee Person is a direct or indirect Wholly Owned Subsidiary of another Person, such Person who is the ultimate parent entity), in each case whether or not such transaction is otherwise in compliance with this Indenture; or

(4)     the approval by the holders of Capital Stock of the Company of any plan or proposal for the liquidation or dissolution of the Company, whether or not otherwise in compliance with the provisions of this Indenture.

For purposes of this definition:

(a)     "beneficial owner" shall have the meaning specified in Rules 13d-3 and 13d-5 under the Exchange Act, except that any Person or Group shall be deemed to have "beneficial ownership" of all securities that such Person or Group has the right to acquire, whether such right is exercisable immediately, only after the passage of time or, except in the case of the Permitted Holders, upon the occurrence of a subsequent condition.

(b)     "Person" and "Group" shall have the meanings for "person" and "group" as used in Sections 13(d) and 14(d) of the Exchange Act; and

(c)     the Permitted Holders or any other Person or Group shall be deemed to beneficially own any Voting Stock of a Person held by any other Person (the "parent entity") so long as the Permitted Holders or such other Person or Group, as the case may be, beneficially own, directly or indirectly, in the aggregate at least 50% of the voting power of the Voting Stock of the parent entity and no other Person or Group beneficially owns an equal or greater amount of the Voting Stock of the parent entity.

"Change of Control Notice" means written notice of a Change of Control Offer made pursuant to Section 3.8, which notice shall govern the terms of the Change of Control Offer and shall state:

(1)     that a Change of Control has occurred, the circumstances or events causing such Change of Control and that a Change of Control Offer is being made pursuant to Section 3.8 , and that all Notes that are timely tendered will be accepted for payment;

(2)     the Change of Control Payment (including the portion thereof representing accrued interest), and the Change of Control Payment Date;

- 7 -

NAI-1502882142v7

(3)    that any Notes or portions thereof not tendered or accepted for payment will continue to accrue interest;

(4)    that, unless the Company defaults in the payment of the Change of Control Payment with respect to Notes tendered and accepted for payment, all such Notes or portions thereof accepted for payment pursuant to the Change of Control Offer shall cease to accrue interest from and after the Change of Control Payment Date;

(5)    that any Holder electing to have any Notes or portions thereof purchased pursuant to a Change of Control Offer will be required to tender such Notes, with the form entitled "Option of Holder to Elect Purchase" on the reverse of such Notes completed, to the Trustee at the place or places specified in the notice prior to the close of business on the third Business Day preceding the Change of Control Payment Date;

(6)    that any Holder shall be entitled to withdraw such election if the Trustee receives, not later than the close of business on the second Business Day preceding the Change of Control Payment Date, a notice of withdrawal, setting forth the name of the Holder, the principal amount of Notes delivered for purchase, and a statement that such Holder is withdrawing such Holder's election to have such Notes or portions thereof purchased pursuant to the Change of Control Offer;

(7)    that any Holder electing to have Notes purchased pursuant to the Change of Control Offer must specify the principal amount that is being tendered for purchase, which principal amount must be U.S.$200,000 and integral multiples of U.S.$1,000 in excess thereof and any portion of Notes not tendered must satisfy the U.S.$200,000 minimum denomination requirement;

(8)    that any Holder of Certificated Notes whose Certificated Notes are being purchased only in part will be issued new Certificated Notes equal in principal amount to the unpurchased portion of the Certificated Note or Notes surrendered, which unpurchased portion will be equal in principal amount to U.S.$200,000 and integral multiples of U.S.$1,000 in excess thereof;

(9)    that the Trustee will make a notation on the schedule of increases or decreases of any Global Note adjusting the principal amount thereof to be equal to the unpurchased portion of such Global Note;

(10)    that, in the event that Holders of not less than 90% of the aggregate principal amount of the Outstanding Notes accept a Change of Control Offer and the Company or third party purchases all of the Notes held by such Holders, the Company will have the right, upon prior notice, to redeem all of the Notes that remain Outstanding in accordance with Section 3.8(h); and

(11)    any other information necessary to enable any Holder to tender Notes and to have such Notes purchased pursuant to Section 3.8.

"Change of Control Offer" has the meaning assigned to it in Section 3.8(c).

- 8 -

"Change of Control Payment" has the meaning assigned to it in Section 3.8(a).

"Change of Control Payment Date" has the meaning assigned to it in Section 3.8(c).

"Clearing Agency" means one or more of Euroclear, Clearstream, or the successor of either of them, in each case acting directly, or through a custodian, nominee or depository.

"Clearstream" means Clearstream Banking, *société anonyme*, or the successor to its securities clearance and settlement operations.

"CNBV" means the *Comision Nacional Bancaria y de Valores*, the Mexican National Banking and Securities Commission.

"Code" means the U.S. Internal Revenue Code of 1986, as amended as of the Issue Date.

"Commodity Agreement" means any commodity or raw material futures contract, commodity or raw materials option, or any other agreement designed to protect against or manage exposure to fluctuations in commodity or raw material prices.

"Common Depositary" means a depositary common to the Clearing Agencies, which initially shall be The Bank of New York Depository (Nominees) Limited, or any successor thereto.

"Common Stock" of any Person means any and all shares, interests or other participations in, and other equivalents (however designated and whether voting or non-voting) of such Person's common equity interests, whether outstanding on the Issue Date or issued after the Issue Date, and includes, without limitation, all series and classes of such common equity interests.

"Company" means TV Azteca, S.A.B. de C.V., a publicly traded variable capital corporation (*sociedad anónima bursátil de capital variable*), and its successors and assigns, including any Surviving Entity.

"Company Order" has the meaning assigned to it in Section 2.2(c).

"Comparable Treasury Issue" means the United States Treasury security or securities selected by an Independent Investment Banker as having an actual or interpolated maturity comparable to the remaining term of the Notes through August 9, 2021 that would be utilized, at the time of selection and in accordance with customary financial practice, in pricing new issues of corporate debt securities of a comparable maturity to August 9, 2021.

"Comparable Treasury Price" means, with respect to any Redemption Date (1) the average of the Reference Treasury Dealer Quotations for such Redemption Date, after excluding the highest and lowest such Reference Treasury Dealer Quotation, or (2) if the Company obtains fewer than four such Reference Treasury Dealer Quotations, the average of all such quotations.

- 9 -

NAI-1502882142v7

"Consolidated EBITDA" means, for any Person for any period, Consolidated Net Income for such Person for such period, plus the following, without duplication, to the extent deducted or added in calculating such Consolidated Net Income:

(1)     Consolidated Income Tax Expense for such Person for such period;

(2)     Consolidated Interest Expense for such Person for such period;

(3)     Consolidated Non-cash Charges for such Person for such period; and

(4)     any income or loss from discontinued operations;

in each case as set forth for such Person in the most recent financial statements of such Person, prepared in accordance with IFRS.

"Consolidated Income Tax Expense" means, with respect to any Person for any period, the provision for federal, state, local and non-U.S. income taxes, and any applicable statutorily mandated employee profit sharing tax or similar payments, payable by such Person and its Subsidiaries (Restricted Subsidiaries in the case of the Company) for such period as determined on a consolidated basis in accordance with IFRS.

"Consolidated Interest Expense" means, for any Person for any period, the sum of, without duplication determined on a consolidated basis in accordance with IFRS:

(1)     the aggregate of cash and non-cash interest expense of such Person and its Subsidiaries (Restricted Subsidiaries in the case of the Company) for such period determined on a consolidated basis in accordance with IFRS; and

(2)     the interest component of Capitalized Lease Obligations paid, accrued and/or scheduled to be paid or accrued by such Person or its Subsidiaries (Restricted Subsidiaries in the case of the Company) during such period.

"Consolidated Leverage Ratio" means, as of any date of determination, the ratio of (1) Consolidated Total Indebtedness at the time of determination to (2) the Consolidated EBITDA of the Company and its Restricted Subsidiaries for the most recently ended four full fiscal quarters for which financial statements are available immediately preceding the date on which such event for which such calculation is being made shall occur; *provided* that:

(1)     if the Company or any Restricted Subsidiary has Incurred, repaid, repurchased, redeemed, retired, defeased or otherwise discharged any Indebtedness since the beginning of such period that remains outstanding on such date of determination or if the transaction giving rise to the need to calculate the Consolidated Leverage Ratio involves an Incurrence, repayment, repurchase, redemption, retirement, defeasance or other discharge of Indebtedness, Consolidated EBITDA, Consolidated Interest Expense and Indebtedness for such period shall be calculated after giving effect on a pro forma basis to such Incurrence, repayment, repurchase, redemption, retirement, defeasance or other discharge of Indebtedness as if such Indebtedness had been Incurred or repaid, repurchased, redeemed, retired, defeased or otherwise discharged on the first day of such period;

- 10 -

(2)      if since the beginning of such period the Company or any Restricted Subsidiary will have made any Asset Sale or disposed of or discontinued any company, division, operating unit, segment, business, group of related assets or line of business or if the transaction giving rise to the need to calculate the Consolidated Leverage Ratio includes such an Asset Sale, Consolidated EBITDA, Consolidated Interest Expense and Indebtedness for such period shall be calculated after giving pro forma effect thereto (including the Incurrence of any Indebtedness) as if such Asset Sale, disposition or discontinuation occurred on the first day of such period;

(3)      if since the beginning of such period the Company or any Restricted Subsidiary (by merger or otherwise) will have made an Investment in any Restricted Subsidiary (or any Person that becomes a Restricted Subsidiary or is merged with or into the Company or a Restricted Subsidiary) or an acquisition of assets, including any acquisition of assets occurring in connection with a transaction causing a calculation to be made under this Indenture, which constitutes all or substantially all of a company, division, operating unit, segment, business or group of related assets or line of business, Consolidated EBITDA, Consolidated Interest Expense and Indebtedness for such period shall be calculated after giving pro forma effect thereto (including the Incurrence of any Indebtedness) as if such Investment or acquisition occurred on the first day of such period; and

(4)      if since the beginning of such period any Person (that subsequently became a Restricted Subsidiary or was merged with or into the Company or any Restricted Subsidiary since the beginning of such period) will have Incurred any Indebtedness or discharged any Indebtedness or made any disposition or any Investment or acquisition of assets that would have required an adjustment pursuant to clause (1), (2) or (3) above if made by the Company or a Restricted Subsidiary during such period, Consolidated EBITDA, Consolidated Interest Expense and Indebtedness for such period shall be calculated after giving pro forma effect thereto as if such transaction occurred on the first day of such period.

The pro forma calculations provided for in this definition of Consolidated Leverage Ratio shall be determined in good faith by a responsible financial or accounting Officer of the Company. If any Indebtedness bears a floating rate of interest and is being given pro forma effect, the interest expense on such Indebtedness shall be calculated as if the rate in effect on the date of determination had been the applicable rate for the entire period (taking into account any Interest Rate Agreement applicable to such Indebtedness if such Interest Rate Agreement has a remaining term in excess of 12 months).

"Consolidated Net Income" means, with respect to any Person for any period, the aggregate net income (or loss) of such Person and its Subsidiaries (Restricted Subsidiaries in the case of the Company) (after deducting (or adding) the portion of such net income (or loss) attributable to minority interests in Subsidiaries of such Person (Restricted Subsidiaries in the case of the Company)) for such period on a consolidated basis, determined in accordance with IFRS; *provided* that there shall be excluded therefrom to the extent reflected in such aggregate net income (loss):

(1)      net after-tax items classified as extraordinary gains or losses;

- 11 -

NAI-1502882142v7

(2) the net income (but not loss) of any Subsidiary of such Person (Restricted Subsidiary in the case of the Company) to the extent that (and only so long as) a corresponding amount could not be distributed or otherwise transferred to such Person at the date of determination as a result of any restriction pursuant to the constituent documents of such Subsidiary (Restricted Subsidiary in the case of the Company) or any law, regulation, agreement or judgment applicable to any such distribution;

(3) any gain (or loss) from foreign exchange translation or change in net monetary position;

(4) any gains or losses (less all fees and expenses or charges relating thereto) attributable to the early extinguishment of Indebtedness and Hedging Obligations; and

(5) the cumulative effect of changes in accounting principles.

"Consolidated Non-cash Charges" means, for any Person for any period the aggregate depreciation, amortization and other non-cash expenses or losses, of such Person and its Subsidiaries (Restricted Subsidiaries in the case of the Company) for such period, determined on a consolidated basis in accordance with IFRS (excluding any such charge which constitutes an accrual of or a reserve for cash charges for any future period or the amortization of a prepaid cash expense paid in a prior period after the Issue Date).

"Consolidated Tangible Assets" means, for any Person at any time, the total consolidated assets of such Person and its Subsidiaries (Restricted Subsidiaries in the case of the Company) as set forth on the balance sheet as of the most recent fiscal quarter of such Person, prepared in accordance with IFRS, less (i) Intangible Assets and (ii) any assets securing Non-Recourse Indebtedness.

"Consolidated Total Indebtedness" means, as at any date of determination, an amount equal to the sum of the aggregate amount of all outstanding Indebtedness of the Company and its Restricted Subsidiaries on a consolidated basis consisting of Indebtedness for borrowed money, Obligations in respect of Capitalized Lease Obligations and debt obligations evidenced by promissory notes and similar instruments; provided that Indebtedness of the Company and its Restricted Subsidiaries under any revolving credit facility or line of credit as at any date of determination shall be determined using the Average Quarterly Balance of such Indebtedness for the applicable Reference Period.

"Corporate Trust Office" means the office of the Trustee at which at any time its corporate trust business shall be principally administered, which office at the date hereof is located at 101 Barclay Street, 7th Floor East, New York, NY 10286, Fax (212) 815-5603, Attention: Global Corporate Trust, or such other address as the Trustee may designate from time to time by notice to the Holders and the Company, or the principal corporate trust office of any successor Trustee (or such other address as such successor Trustee may designate from time to time by notice to the Holders and the Company).

"Covenant Defeasance" has the meaning assigned to it in Section 8.1(c).

NAI-1502882142v7

"Covenant Suspension Event" has the meaning assigned to it in Section 3.21(a).

"Credit Facilities" means one or more debt facilities, commercial paper facilities, structured notes, certificates or other similar instruments (including any Cebures), in each case with banks, investment banks, *sociedades financieras de objeto múltiple*, *sociedades financieras de objeto limitado*, insurance companies, mutual funds and/or other institutional lenders or institutional investors, in each case providing for revolving credit or term loans or letters of credit, and in each case, as amended, extended, renewed, restated, Refinanced, supplemented or otherwise modified (in whole or in part, and without limitation as to amount, terms, conditions, covenants and other provisions) from time to time.

"Currency Agreement" means, in respect of any Person, any foreign exchange contract, currency swap agreement or other similar agreement as to which such Person is a party designed to hedge foreign currency risk of such Person.

"Custodian" means any receiver, trustee, assignee, liquidator, custodian or similar official under any Bankruptcy Law.

"Default" means any condition, event or act, which, with the lapse of time and/or the issue, making or giving of any notice, certification, declaration, demand, determination and/or request and/or the taking of any similar action and/or fulfillment of any similar condition would constitute, an Event of Default.

"Defaulted Interest" means overdue installments of interest.

"Designation" has the meaning assigned to it in Section 3.13(a). "Designate," "Designated" and "Designating" will have the corresponding meanings.

"Designation Amount" has the meaning assigned to it in Section 3.13(a).

"Directive 2004/39/EC" means Directive 2004/39/EC of the European Parliament and of the Council on Markets in Financial Instruments (MiFID of April 21, 2004).

"disposition" has the meaning assigned to it in the definition of "Asset Sale."

"Disqualified Capital Stock" means that portion of any Capital Stock which, by its terms (or by the terms of any security into which it is convertible or for which it is exchangeable at the option of the holder thereof), or upon the happening of any event, matures or is mandatorily redeemable, pursuant to a sinking fund obligation or otherwise, or is redeemable at the sole option of the holder thereof, in any case, on or prior to the final maturity date of the Notes; *provided*, *however*, that any Capital Stock that would not constitute Disqualified Capital Stock but for provisions thereof giving holders thereof the right to require such Person to purchase or redeem such Capital Stock upon the occurrence of an "asset sale" or "change of control" occurring prior to the final maturity of the Notes shall not constitute Disqualified Capital Stock if:

(1)     the "asset sale" or "change of control" provisions applicable to such Capital Stock are not materially more favorable to the holders of such Capital Stock than the terms applicable to the Notes and described under Section 3.12 and Section 3.8, respectively; and

- 13 -

(2)     any such requirement only becomes operative after compliance with such terms applicable to the Notes, including the purchase of any Notes tendered pursuant thereto.

The amount of any Disqualified Capital Stock shall be equal to the greater of its voluntary or involuntary liquidation preference and its maximum fixed repurchase price, but excluding accrued dividends, if any.  The amount of any Disqualified Capital Stock that does not have a fixed redemption, repayment or repurchase price shall be calculated in accordance with the terms of such Disqualified Capital Stock as if such Disqualified Capital Stock were redeemed, repaid or repurchased on any date on which the amount of such Disqualified Capital Stock is to be determined pursuant to this Indenture; *provided*, *however*, that if such Disqualified Capital Stock could not be required to be redeemed, repaid or repurchased at the time of such determination, the redemption, repayment or repurchase price shall be the book value of such Disqualified Capital Stock as reflected in the most recent financial statements of such Person.

"Equity Offering" means (i) a primary public offering of Qualified Capital Stock of the Company in accordance with applicable Mexican or other laws, rules and regulations, (ii) a rights offering of Qualified Capital Stock of the Company made generally to the holders of such Qualified Capital Stock or (iii) any private placement of Qualified Capital Stock of the Company to any Person, in each case other than issuances upon exercise of options by employees of the Company or any of its Subsidiaries.

"Euroclear" means Euroclear S.A./N.V., as operator of the Euroclear System, or its successor in such capacity.

"Event of Default" has the meaning assigned to it in Section 6.1(a).

"Exchange Act" means the Securities Exchange Act of 1934, as amended, or any successor statute or statutes thereto.

"Fair Market Value" means, with respect to any asset, the price (after deducting any liabilities relating to such assets) which could be negotiated in an arm's-length free market transaction, for cash, between a willing seller and a willing and able buyer, neither of which is under any compulsion to complete the transaction; *provided* that the Fair Market Value of any such asset or assets will be determined conclusively by the Board of Directors of the Company acting in good faith, and will be evidenced by a Board Resolution.

"Fitch" means Fitch Ratings, Inc. and any successor to its rating agency business.

"Global Note" means any Note issued in fully-registered global form, which shall be substantially in the form of Exhibit A, with appropriate legends as specified in Section 2.7 and Exhibit A.

"Guarantee" means any obligation, contingent or otherwise, of any Person directly or indirectly guaranteeing any Indebtedness of any other Person:

(1)     to purchase or pay, or advance or supply funds for the purchase or payment of, such Indebtedness of such other Person, whether arising by virtue of partnership

- 14 -

NAI-1502882142v7

arrangements, or by agreement to keep-well, to purchase assets, goods, securities or services, to take-or-pay, or to maintain financial statement conditions or otherwise, or

(2)     entered into for purposes of assuring in any other manner the obligee of such Indebtedness of the payment thereof or to protect such obligee against loss in respect thereof, in whole or in part,

*provided* that "Guarantee" will not include endorsements for collection or deposit in the ordinary course of business.  "Guarantee" used as a verb has a corresponding meaning.

"Guaranteed Obligations" has the meaning assigned to it in Section 10.1(a).

"Hedging Obligations" means the obligations of any Person pursuant to any Interest Rate Agreement, Currency Agreement or Commodity Agreement.

"Holder" means the Person in whose name a Note is registered in the Note Register.

"IFRS" means International Financial Reporting Standards, as issued by the International Accounting Standards Board, as in effect on the Issue Date.

"Incur" means, with respect to any Indebtedness or other obligation of any Person, to create, issue, incur (including by conversion, exchange or otherwise), assume, Guarantee or otherwise become liable in respect of such Indebtedness or other obligation on the balance sheet of such Person (and "Incurrence," "Incurred" and "Incurring" will have meanings correlative to the preceding).

"Indebtedness" means with respect to any Person, without duplication:

(1)     the principal amount (or, if less, the accreted value) of all obligations of such Person for borrowed money;

(2)     the principal amount (or, if less, the accreted value) of all obligations of such Person evidenced by bonds, debentures, notes or other similar instruments;

(3)     all Capitalized Lease Obligations of such Person;

(4)     all obligations of such Person issued or assumed as the deferred purchase price of property, all conditional sale obligations and all obligations under any title retention agreement (but excluding trade accounts payable and other accrued liabilities arising in the ordinary course of business that are not overdue by 180 days or more or are being contested in good faith by appropriate proceedings promptly instituted and diligently conducted);

(5)     all letters of credit, banker's acceptances or similar credit transactions, including reimbursement obligations in respect thereof;

(6)     Guarantees and other contingent obligations of such Person in respect of Indebtedness referred to in clauses (1) through (5) above and clauses (8) and (9) below;

- 15 -

NAI-1502882142v7

(7)    all Indebtedness of any other Person of the type referred to in clauses (1) through (6) which is secured by any Lien on any property or asset of such Person, the amount of such Indebtedness being deemed to be the lesser of the Fair Market Value of such property or asset or the amount of the Indebtedness so secured;

(8)    all net payment obligations under Hedging Obligations of such Person; and

(9)    all Disqualified Capital Stock issued by such Person.

"Indenture" means this Indenture, as amended or supplemented from time to time, including the Exhibits hereto.

"Independent Financial Advisor" means an accounting firm, appraisal firm, investment banking firm or consultant of internationally recognized standing that is, in the judgment of the Company's Board of Directors, qualified to perform the task for which it has been engaged and which is independent in connection with the relevant transaction, appointed by the Company at its own expense.

"Independent Investment Banker" means one of the Reference Treasury Dealers appointed by the Company.

"Individual Quarterly Balance" means, with respect to any Indebtedness incurred by the Company or its Restricted Subsidiaries under a revolving credit facility or line of credit during any fiscal quarter of the Company, the quotient of (x) the sum of the aggregate outstanding principal amount of all such Indebtedness at the end of each day of such quarter divided by (y) the number of days in such fiscal quarter.

"Intangible Assets" means with respect to any Person all unamortized debt discount and expense, unamortized deferred charges, restricted cash, goodwill, patents, trademarks, service marks, trade names, copyrights and all other items which would be treated as intangibles on the consolidated balance sheet of such Person prepared in accordance with IFRS.

"Interest Payment Date" means the stated due date of an installment of interest on the Notes as specified in the Form of Face of Note contained in Exhibit A.

"Interest Rate Agreement" of any Person means any interest rate protection agreement (including, without limitation, interest rate swaps, caps, floors, collars, derivative instruments and similar agreements) and/or other types of hedging agreements designed to hedge interest rate risk of such Person.

"Investment" means, with respect to any Person, any:

(1)    direct or indirect loan, advance or other extension of credit (including, without limitation, a Guarantee) to any other Person,

- 16 -

Case 1:26-cv-23885-JEM-4-DOC Document 30-1 Entered on FLSD Docket 08/03/2026 Page 32 of 385

(2)     capital contribution to (by means of any transfer of cash or other property to others or any payment for property or services for the account or use of others) any other Person, or

(3)     any purchase or acquisition by such Person of any Capital Stock (but not including interests in bonds, notes, debentures or other securities or evidences of Indebtedness) issued by, any other Person.

"Investment" will exclude purchases and acquisitions of inventory, supplies, materials or equipment, accounts receivable or deposits, in each case arising in the ordinary course of business.  "Invest," "Investing" and "Invested" will have corresponding meanings.

For purposes of Section 3.11, the Company shall be deemed to have made an "Investment" in an Unrestricted Subsidiary at the time of its Designation, which shall be valued at the Fair Market Value of the sum of the Relevant Proportion of the net assets of such Unrestricted Subsidiary at the time of its Designation and the amount of any Indebtedness of such Unrestricted Subsidiary Guaranteed by the Company or any Restricted Subsidiary or owed to the Company or any Restricted Subsidiary immediately following such Designation. Any property transferred to or from an Unrestricted Subsidiary shall be valued at its Fair Market Value at the time of the transfer. If the Company or any Restricted Subsidiary sells or otherwise disposes of any Capital Stock of a Restricted Subsidiary (including any issuance and sale of Capital Stock by a Restricted Subsidiary) such that, after giving effect to any such sale or disposition, such Restricted Subsidiary would cease to be a Subsidiary of the Company, the Company shall be deemed to have made an Investment on the date of any such sale or disposition equal to sum of the Fair Market Value of the Capital Stock of such former Restricted Subsidiary held by the Company or any Restricted Subsidiary immediately following such sale or other disposition and the amount of any Indebtedness of such former Restricted Subsidiary Guaranteed by the Company or any Restricted Subsidiary or owed to the Company or any other Restricted Subsidiary immediately following such sale or other disposition.

"Investment Grade Rating" means a rating equal to or higher than (i) Baa3 (or the equivalent) by Moody's, (ii) BBB- (or the equivalent) by Fitch, (iii) or BBB- (or the equivalent) by S&P, or (iv) if any of the foregoing entities cease to rate the Notes for reasons outside of the control of the Company, the equivalent investment grade credit rating from any other Rating Agency.

"Investment Return" means, in respect of any Investment (other than a Permitted Investment) made after the Issue Date by the Company or any Restricted Subsidiary:

(1)     (x) the proceeds in cash and the Fair Market Value of property other than cash received by the Company or any Restricted Subsidiary upon the sale, liquidation or repayment of such Investment or, in the case of a Guarantee, the amount of the Guarantee upon the unconditional release of the Company and its Restricted Subsidiaries in full, less any payments previously made by the Company or any Restricted Subsidiary in respect of such Guarantee and (y) any dividends or distribution received by the Company or any Restricted Subsidiary from an Unrestricted Subsidiary, to the extent such amounts were not otherwise included in Consolidated Net Income;

- 17 -

(2)      in the case of the Revocation of the Designation of an Unrestricted Subsidiary, an amount equal to the least of:

(a)      the Company's Investment in such Unrestricted Subsidiary at the time of such Revocation;

(b)      that portion of the Fair Market Value of the net assets of such Unrestricted Subsidiary at the time of Revocation that is proportionate to the Company's equity interest in such Unrestricted Subsidiary at the time of Revocation; and

(c)      the Designation Amount with respect to such Unrestricted Subsidiary upon its Designation which was treated as a Restricted Payment; and

(3)      in the event the Company or any Restricted Subsidiary makes any Investment in a Person that, as a result of or in connection with such Investment, becomes a Restricted Subsidiary, the Fair Market Value of the Investment of the Company and its Restricted Subsidiaries in such Person,

in the case of each of (1), (2) and (3), up to the amount of such Investment that was treated as a Restricted Payment under Section 3.11 *less* the amount of any previous Investment Return in respect of such Investment.

"Issue Date" means August 9, 2017.

"Issue Date Notes" means the U.S.$400,000,000 aggregate principal amount of Notes originally issued on the Issue Date and any replacement Notes issued therefor in accordance with this Indenture.

"Legal Defeasance" has the meaning assigned to it in Section 8.1(b).

"Lien" means any lien, mortgage, deed of trust, pledge, security trust (*Fidecomiso de Garantías*), security interest, charge or encumbrance of any kind (including any conditional sale or other title retention agreement, any lease in the nature thereof and any agreement to give any security interest); *provided* that the lessee in respect of a Capitalized Lease Obligation or Sale and Leaseback Transaction will be deemed to have Incurred a Lien on the property leased thereunder.

"Mexican Restructuring" means any case or other proceeding against the Company or any Subsidiary with respect to it or its debts under any bankruptcy, concurso mercantil, quiebra, insolvency or other similar law now or hereinafter in effect or seeking the appointment of a trustee, receiver, conciliador, liquidator, custodian or other similar official of it or any substantial part of its property.

"Maturity Date" means August 9, 2024.

"Moody's" means Moody's Investors Service, Inc., and any successor to its rating agency business.

- 18 -

NAI-1502882142v7

"Net Cash Proceeds" means, with respect to any Asset Sale, the proceeds in the form of cash or Cash Equivalents, including payments in respect of deferred payment obligations when received in the form of cash or Cash Equivalents received by the Company or any of its Restricted Subsidiaries from such Asset Sale, net of:

(1)     reasonable out-of-pocket expenses and fees relating to such Asset Sale (including, without limitation, legal, accounting and investment banking fees and sales commissions);

(2)     taxes paid or payable in respect of such Asset Sale after taking into account any reduction in consolidated tax liability due to available tax credits or deductions and any tax sharing arrangements;

(3)     repayment of Indebtedness secured by a Lien permitted under this Indenture that is required to be repaid in connection with such Asset Sale; and

(4)     appropriate amounts to be provided by the Company or any Restricted Subsidiary, as the case may be, as a reserve, in accordance with IFRS, against any liabilities associated with such Asset Sale and retained by the Company or any Restricted Subsidiary, as the case may be, after such Asset Sale, including, without limitation, pension and other post-employment benefit liabilities, liabilities related to environmental matters and liabilities under any indemnification obligations associated with such Asset Sale, but excluding any reserves with respect to Indebtedness.

"Non-Recourse Indebtedness" with respect to any Person means Indebtedness of such Person for which (1) the sole legal recourse for collection of principal and interest on such Indebtedness is against the specific property identified in the instruments evidencing or securing such Indebtedness and such property was acquired with the proceeds of such Indebtedness or such Indebtedness was incurred within 365 days after the acquisition or construction of such property and (2) no other assets of such Person may be realized upon in collection of principal or interest on such Indebtedness.

"Note Guarantee" means any guarantee of the Company's Obligations under the Notes and this Indenture provided by a Restricted Subsidiary pursuant to Article X.

"Note Register" has the meaning assigned to it in Section 2.3(a).

"Notes" means any of the Company's 8.250% Senior Notes Due 2024 issued and authenticated pursuant to this Indenture.  All references to Notes shall include the Issue Date Notes and any Additional Notes, as applicable, unless the context requires otherwise.

"Obligations" means, with respect to any Indebtedness, any principal, interest (including, without limitation, Post-Petition Interest), penalties, fees, indemnifications, reimbursements, damages, and other liabilities payable under the documentation governing such Indebtedness, including in the case of the Notes and the Note Guarantees, this Indenture.

"Offering Circular" means the offering circular dated August 2, 2017 relating to the offering of the Issue Date Notes.

- 19 -

"Officer" means, when used in connection with any action to be taken by the Company or a Subsidiary Guarantor, as the case may be, the Chairman of the Board of Directors, the Chief Executive Officer, the President, the Chief Financial Officer, the General Counsel, any Vice President, the Treasurer, the Controller, the Secretary or sole administrator of the Company or such Subsidiary Guarantor, as the case may be.

"Officers' Certificate" means, when used in connection with any action to be taken by the Company or a Subsidiary Guarantor, as the case may be, a certificate signed by two Officers or by an Officer and either an Assistant Treasurer or an Assistant Secretary of the Company or a Subsidiary Guarantor, as the case may be, and delivered to the Trustee.

"Official List of the SGX-ST" means the list of issuers maintained by SGX-ST.

"Opinion of Counsel" means a written opinion of counsel, who may be an employee of or counsel for the Company (except as otherwise provided in this Indenture) and which opinion shall be acceptable to the Trustee.

"Outstanding" means, as of the date of determination, all Notes theretofore authenticated and delivered under this Indenture, *except*:

(i)     Notes theretofore canceled by the Trustee or delivered to the Trustee for cancellation;

(ii)     Notes, or portions thereof, for the payment, redemption or, in the case of an Asset Sale Offer or Change of Control Offer, purchase of which money in the necessary amount has been theretofore deposited with the Trustee or any Paying Agent (other than the Company, a Subsidiary Guarantor or an Affiliate of the Company) in trust or set aside and segregated in trust by the Company, a Subsidiary Guarantor or an Affiliate of the Company (if the Company, a Subsidiary Guarantor or such Affiliate of the Company is acting as Paying Agent) for the Holders of such Notes; *provided* that, if Notes (or portions thereof) are to be redeemed or purchased, notice of such redemption or purchase has been duly given pursuant to this Indenture or provision therefor satisfactory to the Trustee has been made;

(iii)     Notes which have been surrendered pursuant to Section 2.9 or in exchange for or in lieu of which other Notes have been authenticated and delivered pursuant to this Indenture, other than any such Notes in respect of which there shall have been presented to the Trustee proof satisfactory to it that such Notes are held by a protected purchaser in whose hands such Notes are valid obligations of the Company; and

(iv)     solely to the extent provided in Article VIII, Notes which are subject to Legal Defeasance or Covenant Defeasance as provided in Article VIII;

*provided*, *however*, that in determining whether the Holders of the requisite aggregate principal amount of the Outstanding Notes have given any request, demand, authorization, direction, notice, consent or waiver under this Indenture, Notes owned by the Company or any other obligor upon the Notes or any Affiliate of the Company or of such other obligor shall be disregarded and deemed not to be Outstanding, except that, in determining whether the Trustee

- 20 -

shall be protected in relying upon any such request, demand, authorization, direction, notice, consent or waiver, only Notes which a Trust Officer of the Trustee actually knows to be so owned shall be so disregarded. Notes so owned which have been pledged in good faith may be regarded as Outstanding if the pledgee establishes to the satisfaction of the Trustee the pledgee's right so to act with respect to such Notes and that the pledgee is not the Company or any other obligor upon the Notes or any Affiliate of the Company or of such other obligor.

"Paying Agent" has the meaning assigned to it in Section 2.3(a). For the avoidance of doubt, the term "Paying Agent" includes the Principal Paying Agent and any other Paying Agent appointed from time to time.

"Permitted Acquisition Indebtedness" means Indebtedness of the Company or any of its Restricted Subsidiaries to the extent such Indebtedness was Indebtedness of (i) a Subsidiary prior to the date on which such Subsidiary became a Restricted Subsidiary or (ii) a Person that was merged or amalgamated into the Company or a Restricted Subsidiary, *provided* that on the date such Subsidiary became a Restricted Subsidiary or the date such Person was merged or amalgamated into the Company or a Restricted Subsidiary, as applicable, after giving *pro forma* effect thereto, (a) the Company, would be permitted to Incur at least U.S.$1.00 of additional Indebtedness pursuant to Section 3.9(a), or (b) the Consolidated Leverage Ratio of the Company and the Restricted Subsidiaries would be less than such Consolidated Leverage Ratio immediately prior to such transaction.

"Permitted Business" means the business or businesses conducted by the Company and its Restricted Subsidiaries as of the Issue Date and any business ancillary or complementary thereto.

"Permitted Holders" means (i) RBSP, (ii) any trust for the benefit of RBSP, his spouse, issue or immediate family, (iii) CASA or (iv) any Person directly or indirectly controlled by RBSP.

"Permitted Indebtedness" has the meaning set forth in Section 3.9(b).

"Permitted Investments" means:

(1) Investments by the Company or any Restricted Subsidiary in any Person that is, or that result in any Person becoming, immediately after such Investment, a Restricted Subsidiary or constituting a merger or consolidation of such Person into the Company or with or into a Restricted Subsidiary, except for a Guarantee of Indebtedness of a Restricted Subsidiary that is not a Subsidiary Guarantor;

(2) Investments by any Restricted Subsidiary in the Company;

(3) Investments in cash and Cash Equivalents;

(4) any extension, modification or renewal of any Investments existing as of the Issue Date (but not Investments involving additional advances, contributions or other investments of cash or property or other increases thereof, other than as a result of the accrual or

- 21 -

accretion of interest or original issue discount or payment-in-kind pursuant to the terms of such Investment as of the Issue Date);

(5)     Investments permitted pursuant to <u>Section 3.16(b)(2)</u> and <u>Section 3.16(b)(5)</u>;

(6)     Investments received as a result of the bankruptcy or reorganization of any Person or taken in settlement of or other resolution of claims or disputes, and, in each case, extensions, modifications and renewals thereof;

(7)     Investments made by the Company or its Restricted Subsidiaries as a result of non-cash consideration permitted to be received in connection with an Asset Sale made in compliance with <u>Section 3.12</u>.

(8)     Investments in the form of Hedging Obligations permitted under <u>Section 3.9(b)(5)</u>;

(9)     Investments in any Persons engaged in a Permitted Business (or a Person intending to engage in a Permitted Business immediately following such Investment) not to exceed the greater of (x) U.S.\$100.0 million and (y) 10.0% of Consolidated Tangible Assets of the Company and its Restricted Subsidiaries at any one time outstanding;

(10)     receivables owing to the Company or any Restricted Subsidiary (including advances from advertisers) if created or acquired in the ordinary course of business and payable or dischargeable in accordance with customary trade terms;

(11)     payroll, travel, entertainment, relocation and similar advances to cover matters that are expected at the time of such advances ultimately to be treated as expenses for accounting purposes and that are made in the ordinary course of business;

(12)     loans or advances to employees made in the ordinary course of business consistent with past practices of the Company or such Restricted Subsidiary, not to exceed U.S.\$5.0 million at any one time outstanding;

(13)     cash deposits with banks made in the ordinary course of business of the Company and its Restricted Subsidiaries, consistent with past practice, to secure payment of trade payables;

(14)     Investments in any Person to the extent such Investments consist of prepaid expenses, negotiable instruments held for collection and lease, utility and workers' compensation, performance and other similar deposits made in the ordinary course of business by the Company or any Restricted Subsidiary;

(15)     any Investment, to the extent the consideration therefor consists entirely of Qualified Capital Stock; and

(16)     Guarantees by the Company or any Restricted Subsidiary of any Obligations of CASA made in connection with the purchase of property or other assets to be

- 22 -

used in a Permitted Business (so long as, if CASA completes such purchase of property or other assets, then (x) each of the Company and CASA exercises commercially reasonable efforts to transfer such property or other assets to the Company or a Restricted Subsidiary and (y) such transfer is completed within one year of the Incurrence of such Indebtedness), not to exceed an aggregate of U.S.$50.0 million at any one time outstanding,

provided, however, that with respect to any Investment, the Company may, in its sole discretion, allocate all or any portion of any Investment and later re-allocate all or any portion of any Investment to, one or more of the above clauses (1) through (16) so that the entire Investment would be a Permitted Investment.

"Permitted Liens" means any of the following:

(1)     statutory Liens of landlords and Liens of carriers, warehousemen, mechanics, suppliers, materialmen, repairmen and other Liens imposed by law incurred in the ordinary course of business for sums not yet delinquent or being contested in good faith;

(2)     Liens Incurred or deposits made in the ordinary course of business in connection with workers' compensation, unemployment insurance and other types of social security, including any Lien securing letters of credit issued in the ordinary course of business consistent with past practice in connection therewith, or to secure the performance of tenders, statutory obligations, surety and appeal bonds, bids, contracts, leases, government performance and return-of-money bonds and other similar obligations (exclusive of obligations for the payment of borrowed money);

(3)     Liens upon specific items of inventory or other goods of any Person and any proceeds thereof securing such Person's obligations in respect of bankers' acceptances issued or created for the account of such Person to facilitate the purchase, shipment or storage of such inventory or other goods;

(4)     Liens securing reimbursement obligations with respect to commercial letters of credit which encumber documents and other property relating to such letters of credit and products and proceeds thereof;

(5)     Liens encumbering deposits (including in favor of financial institutions or governmental authorities) made to secure obligations arising from statutory, regulatory, contractual, or insurance or warranty requirements of the Company or a Restricted Subsidiary, including rights of offset and set-off;

(6)     Liens securing Hedging Obligations that relate to Indebtedness that is Incurred in accordance with Section 3.9;

(7)     Liens existing on the Issue Date and Liens to secure any Refinancing Indebtedness which is Incurred to Refinance any Indebtedness Incurred in accordance with Section 3.9 which has been secured by a Lien permitted under Section 3.15 other than Liens Incurred pursuant to clause (9) of the definition of "Permitted Liens"; provided that such new Liens:

- 23 -

(a)  are not materially less favorable to the Holders of Notes and are not materially more favorable to the lienholders with respect to such Liens than the Liens in respect of the Indebtedness being Refinanced, and

(b)  do not extend to any property or assets (or type of assets or property) other than the property or assets (or type of assets or property) securing the Indebtedness Refinanced by such Refinancing Indebtedness and the proceeds thereof;

(8)  purchase money Liens securing Purchase Money Indebtedness, Non-Recourse Indebtedness or Capitalized Lease Obligations Incurred to finance the acquisition or leasing of property and assets of the Company or a Restricted Subsidiary used in a Permitted Business, any improvements thereon and the reasonable costs and expenses incurred in connection therewith, *provided* that:

(a)  the related Purchase Money Indebtedness or Non-Recourse Indebtedness does not exceed the cost of such property, assets, and improvements thereon and the reasonable costs and expenses incurred in connection therewith and shall not be secured by any property or assets of the Company or any Restricted Subsidiary other than the property and assets so acquired or financed and the proceeds thereof, and

(b)  the Lien securing such Indebtedness will be created within 365 days of such acquisition or financing;

(9)  Liens securing an amount of Indebtedness under Credit Facilities at any one time outstanding not to exceed the greater of (x) U.S.$100.0 million and (y) 10.0% of the Consolidated Tangible Assets of the Company at such time;

(10)  any pledge or deposit of cash or property in conjunction with obtaining surety and performance bonds and letters of credit required to engage in constructing on-site and off-site improvements required by municipalities or other governmental authorities in the ordinary course of business;

(11)  Liens in favor of customs and revenue authorities arising as a matter of law to secure payment of customs duties in connection with the importation of goods;

(12)  Liens encumbering customary initial deposits and margin deposits, and other Liens that are customary in the industry and incurred in the ordinary course of business securing Indebtedness under Hedging Obligations and forward contracts, options, futures contracts, futures options or similar agreements or arrangement designed to protect the Company and its Restricted Subsidiaries from fluctuations in the price of commodities;

(13)  Liens for taxes, assessments or governmental charges or claims that are not yet delinquent or that are being contested in good faith by appropriate proceedings promptly instituted and diligently concluded; *provided* that any reserve or other appropriate provision as is required in conformity with IFRS has been made therefor;

(14)  licenses and sub-licenses of intellectual property in the ordinary course of business;

- 24 -

(15)     easements, rights of way, zoning and similar restrictions, reservations, restrictions or encumbrances in respect of real property or title defects that were not incurred in connection with Indebtedness and that do not in the aggregate materially adversely affect the value of said properties (as such properties are used by the Company or its Restricted Subsidiaries) or materially impair their use in the operation of the business of the Company and its Restricted Subsidiaries;

(16)     Liens on Capital Stock of an Unrestricted Subsidiary; and

(17)     Liens in favor of the Company or any Subsidiary Guarantor.

"Person" means an individual, partnership, limited partnership, corporation, company, limited liability company, unincorporated organization, trust or joint venture, or a governmental agency or political subdivision thereof.

"Post-Petition Interest" means all interest accrued or accruing after the commencement of any insolvency or liquidation proceeding (and interest that would accrue but for the commencement of any insolvency or liquidation proceeding) in accordance with and at the contract rate (including, without limitation, any rate applicable upon default) specified in the agreement or instrument creating, evidencing or governing any Indebtedness, whether or not, pursuant to applicable law or otherwise, the claim for such interest is allowed as a claim in such insolvency or liquidation proceeding.

"Preferred Stock" of any Person means any Capital Stock of such Person that has preferential rights over any other Capital Stock of such Person with respect to dividends, distributions or redemptions or upon liquidation.

"Primary Treasury Dealer" means a primary United States government securities dealer in New York City.

"Principal Paying Agent" means, initially, The Bank of New York Mellon, London Branch.

"Purchase Money Indebtedness" means Indebtedness Incurred for the purpose of financing all or any part of the purchase price, or other cost of construction or improvement of any property or asset; *provided* that the aggregate principal amount of such Indebtedness does not exceed the lesser of the Fair Market Value of such property or such purchase price or cost, including any Refinancing of such Indebtedness that does not increase the aggregate principal amount (or accreted amount, if less) thereof as of the date of Refinancing.

"Qualified Capital Stock" means any Capital Stock that is not Disqualified Capital Stock and any warrants, rights or options to purchase or acquire Capital Stock that is not Disqualified Capital Stock and that are not convertible into or exchangeable into Disqualified Capital Stock.

"RBSP" means Mr. Ricardo B. Salinas Pliego.

"Rating Agencies" means (i) Fitch, (ii) Moody's, (iii) S&P and (iv) if any of Fitch, Moody's or S&P shall not make a rating of the Notes publicly available for reasons outside the

- 25 -

NAI-1502882142v7

control of the Company, a nationally recognized United States securities rating agency or agencies, as the case may be, selected by the Company, which shall be substituted for Fitch, Moody's and/or S&P, as the case may be.

"Reference Period" means the most recently ended four fiscal quarters for which internal financial statements are available as of such date of determination.

"Reference Treasury Dealer" means BCP Securities, LLC, Jefferies LLC and Morgan Stanley & Co. International plc or their respective affiliates which are primary United States government securities dealers and not less than one other leading primary United States government securities dealer in New York City reasonably designated by the Company; *provided*, *however*, that if any of the foregoing shall cease to be a Primary Treasury Dealer, the Company will substitute therefor another Primary Treasury Dealer.

"Reference Treasury Dealer Quotation" means, with respect to each Reference Treasury Dealer and any Redemption Date, the average, as determined by the Company, of the bid and asked price for the Comparable Treasury Issue (expressed in each case as a percentage of its principal amount) quoted in writing to the Company by such Reference Treasury Dealer at 3:30 pm New York City time on the third Business Day preceding such Redemption Date.

"Record Date" has the meaning assigned to it in the Form of Face of Note contained in Exhibit A.

"Redemption Date" means, with respect to any redemption of Notes, the date fixed for such redemption pursuant to this Indenture and the Notes.

"Refinance" means, in respect of any Indebtedness, to issue any Indebtedness in exchange for or to refinance, replace, defease or refund such Indebtedness in whole or in part. "Refinanced" and "Refinancing" will have correlative meanings.

"Refinancing Indebtedness" means Indebtedness of the Company or any Restricted Subsidiary issued to Refinance any other Indebtedness of the Company or a Restricted Subsidiary so long as:

(1)     the aggregate principal amount (or initial accreted value, if applicable) of such new Indebtedness as of the date of such proposed Refinancing does not exceed the aggregate principal amount (or initial accreted value, if applicable) of the Indebtedness being Refinanced (plus the amount of any premium required to be paid under the terms of the instrument governing such Indebtedness and the amount of reasonable expenses incurred by the Company or such Restricted Subsidiary in connection with such Refinancing);

(2)     such new Indebtedness has:

(a)     a Weighted Average Life to Maturity that is equal to or greater than the Weighted Average Life to Maturity of the Indebtedness being Refinanced, and

(b)     a final maturity that is equal to or later than the final maturity of the Indebtedness being Refinanced; and

- 26 -

(3)    if the Indebtedness being Refinanced is:

(a)    Indebtedness of the Company, then such Refinancing Indebtedness will be Indebtedness of the Company and/or a Subsidiary Guarantor,

(b)    Indebtedness of a Subsidiary Guarantor, then such Refinancing Indebtedness will be Indebtedness of the Company and/or such Subsidiary Guarantor, and

(c)    Subordinated Indebtedness, then such Refinancing Indebtedness shall be subordinated to the Notes or the relevant Note Guarantee, if applicable, at least to the same extent and in the same manner as the Indebtedness being Refinanced.

"Registrar" has the meaning assigned to it in Section 2.3(a).

"Relevant Date" has the meaning assigned to it in Section 3.20(a)(4).

"Relevant Proportion" means, with respect to the net assets of any Unrestricted Subsidiary, a percentage equal to the aggregate ownership interest that the Company and its Restricted Subsidiaries own, directly or indirectly, in such Unrestricted Subsidiary.

"Restricted Subsidiary" means any Subsidiary of the Company which at the time of determination is not an Unrestricted Subsidiary.

"Revocation" has the meaning set forth under Section 3.13(b).

"S&P" means S&P Global Ratings, a division of S&P Global Inc., and any successor to its rating agency business.

"Sale and Leaseback Transaction" means any direct or indirect arrangement with any Person or to which any such Person is a party providing for the leasing to the Company or a Restricted Subsidiary of any property, whether owned by the Company or any Restricted Subsidiary at the Issue Date or later acquired, which has been or is to be sold or transferred by the Company or such Restricted Subsidiary to such Person or to any other Person by whom funds have been or are to be advanced to the Company or a Restricted Subsidiary on the security of such property.

"SEC" means the U.S. Securities and Exchange Commission.

"Securities Act" means the Securities Act of 1933, as amended, or any successor statute or statutes thereto.

"Senior Indebtedness" means the Notes and the Note Guarantees and any other Indebtedness of the Company or any Subsidiary Guarantor that ranks equal in right of payment with the Notes or the relevant Note Guarantee, as the case may be.

"SGX-ST" means the Singapore Exchange Securities Trading Limited.

- 27 -

"Significant Subsidiary" means a Subsidiary of the Company constituting a "Significant Subsidiary" of the Company in accordance with Rule 1-02(w) of Regulation S-X under the Securities Act in effect on the Issue Date.

"Special Record Date" has the meaning assigned to it in Section 2.12(a).

"Stated Maturity" means, with respect to any security, the date specified in such security as the fixed date on which the final payment of principal of such security is due and payable (but excluding any provision providing for the repurchase of such security at the option of the holder thereof upon the happening of any contingency unless such contingency has occurred).

"Subordinated Indebtedness" means, with respect to the Company or any Subsidiary Guarantor, any Indebtedness of the Company or such Subsidiary Guarantor, as the case may be which is expressly subordinated in right of payment to the Notes or the relevant Note Guarantee, as the case may be.

"Subsidiary" means, with respect to any Person, any other Person of which such Person owns, directly or indirectly, more than 50% of the voting power of the other Person's outstanding Voting Stock.

"Subsidiary Guarantor" means any Restricted Subsidiary which provides a Note Guarantee pursuant to this Indenture until such time as its Note Guarantee is released in accordance with this Indenture.

"Supplemental Indenture" means a supplemental indenture providing for the Note Guarantee of a Subsidiary Guarantor substantially in the form of Exhibit B hereto.

"Surviving Entity" has the meaning assigned to it in Section 4.1(a).

"Taxes" has the meaning assigned to it in Section 3.20(a).

"TIA" means the U.S. Trust Indenture Act of 1939, as amended, as in effect on the Issue Date.

"Treasury Rate" means, with respect to any Redemption Date, the rate per annum equal to the semi-annual equivalent yield to maturity or interpolated maturity (on a day count basis) of the Comparable Treasury Issue, assuming a price for the Comparable Treasury Issue (expressed as a percentage of its principal amount) equal to the Comparable Treasury Price for such Redemption Date.

"Trust Officer" means, when used with respect to the Trustee, any officer within the corporate trust department of the Trustee, having direct responsibility for the administration of this Indenture or any other officer of the Trustee to whom any corporate trust matter is referred because of such person's knowledge of and familiarity with the particular subject.

"Trustee" means the party named as such in the introductory paragraph of this Indenture until a successor replaces it in accordance with the terms of this Indenture and, thereafter, means the successor.

- 28 -

"Unrestricted Subsidiary" means any Subsidiary of the Company Designated as such pursuant to Section 3.13. Any such Designation may be revoked by a Board Resolution of the Company, subject to the provisions of Section 3.13.

"U.S. Dollar Equivalent" means with respect to any monetary amount in a currency other than U.S. dollars, at any time for determination thereof, the amount of U.S. dollars obtained by converting such non-U.S. dollar currency involved in such computation into U.S. dollars at the spot rate for the purchase of U.S. dollars with the applicable non-U.S. dollar currency as published in The Wall Street Journal in the "Exchange Rates" column under the heading "Currency Trading" (or, if no longer so published, from an appropriate publicly available source of such market data) on the date two Business Days prior to such determination.

"U.S. Government Obligations" means direct obligations (or certificates representing an ownership interest in such obligations) of the United States of America (including any agency or instrumentality thereof) for the payment of which the full faith and credit of the United States of America is pledged and which are not callable or redeemable at the issuer's option.

"U.S. Legal Tender" means such coin or currency of the United States of America as at the time of payment shall be legal tender for the payment of public and private debts.

"Voting Stock" with respect to any Person, means securities of any class of Capital Stock of such Person entitling the holders thereof (whether at all times or only so long as no senior class of stock has voting power by reason of any contingency) to vote in the election of members of the Board of Directors (or equivalent governing body) of such Person.

"Weighted Average Life to Maturity" means, when applied to any Indebtedness at any date, the number of years (calculated to the nearest one-twelfth) obtained by dividing:

(1)     the then outstanding aggregate principal amount or liquidation preference, as the case may be, of such Indebtedness into

(2)     the sum of the products obtained by multiplying:

(a)     the amount of each then remaining installment, sinking fund, serial maturity or other required payment of principal or liquidation preference, as the case may be, including payment at final maturity, in respect thereof, by

(b)     the number of years (calculated to the nearest one-twelfth) which will elapse between such date and the making of such payment.

"Wholly Owned Subsidiary" means, for any Person, any Subsidiary (Restricted Subsidiary in the case of the Company) of which all the outstanding Capital Stock (other than, in the case of a Subsidiary not organized in the United States, directors' qualifying shares or an immaterial amount of shares required to be owned by other Persons pursuant to applicable law) is owned by such Person or any other Person that satisfies this definition in respect of such Person.

- 29 -

Section 1.2     Incorporation by Reference of Trust Indenture Act.  If any provision of this Indenture limits, qualifies or conflicts with the duties that would be imposed on any person by any of Sections 310 to 318 of the TIA if this Indenture were qualified under the TIA, such imposed duties shall control.

All other TIA terms used in this Indenture that are defined by the TIA, defined in the TIA by reference to another statute or defined by rules or regulations of the SEC have the meanings assigned to them by such definitions.

Section 1.3     Rules of Construction.  Unless the context otherwise requires:

(1)     a term has the meaning assigned to it;

(2)     an accounting term not otherwise defined has the meaning assigned to it in accordance with IFRS;

(3)     "including" means including without limitation;

(4)     words in the singular include the plural and words in the plural include the singular;

(5)     references to the payment of principal of the Notes shall include applicable premium, if any; and

(6)     references to any payments on the Notes shall include Additional Amounts.

ARTICLE II

THE NOTES

Section 2.1     Form and Dating.

(a)     The Issue Date Notes will be issued in an aggregate principal amount of U.S.$400,000,000.  The Notes will be issued in fully-registered global form without coupons, and only in denominations of U.S.$200,000 and integral multiples of U.S.$1,000 in excess thereof.  The Notes and the Trustee's certificate of authentication shall be substantially in the form of Exhibit A.

(b)     The terms and provisions of the Notes set forth in the form of Note included in Exhibit A shall constitute, and are hereby expressly made, a part of this Indenture, and, to the extent applicable, the Company, the Subsidiary Guarantors and the Trustee, by their execution and delivery of this Indenture expressly agree to such terms and provisions and to be bound thereby.  Except as otherwise expressly permitted in this Indenture, all Notes shall be identical in all respects.  Notwithstanding any differences among them, all Notes issued under this Indenture shall vote and consent together on all matters as one class.

- 30 -

NAI-1502882142v7

(c)    The Notes shall be issued initially in the form of one or more Global Notes substantially in the form of Exhibit A hereto, with such notations, legends or endorsements as specified in Section 2.7 or as otherwise required by law, stock exchange rule or depositary rule or usage, except as otherwise permitted herein.  The Company shall approve the form of the Notes and any notation, legend or endorsement on them.  Each Note shall be dated the date of its authentication.

(d)    The Notes, which shall be deposited on behalf of the purchasers of the Notes with the Common Depositary and registered in the name of the Common Depositary or its nominee, as the case may be, for the accounts of Persons entitled thereto at the Clearing Agencies, shall be duly executed by the Company and authenticated by the Trustee (or an Authenticating Agent appointed by the Trustee in accordance with Section 2.2) as hereinafter provided.

Section 2.2    Execution and Authentication.

(a)    Two Officers, one of whom shall be the Chairman of the Board of Directors, the President, the Chief Executive Officer or the Chief Financial Officer of the Company, shall sign the Notes for the Company by manual or facsimile signature.  If an Officer whose signature is on a Note no longer holds that office at the time the Trustee authenticates the Note, the Note shall be valid nevertheless.

(b)    A Note shall not be valid until an authorized signatory of the Trustee manually authenticates the Note.  The signature of the Trustee on a Note shall be conclusive evidence that such Note has been duly and validly authenticated and issued under this Indenture.

(c)    At any time and from time to time after the execution and delivery of this Indenture, the Trustee shall authenticate and make available for delivery Notes upon a written order of the Company signed by an Officer of the Company (the "Company Order").  A Company Order shall specify the amount of the Notes to be authenticated and the date on which the original issue of such Notes is to be authenticated.

(d)    The Trustee may appoint an agent (the "Authenticating Agent") reasonably acceptable to the Company to authenticate the Notes.  Unless limited by the terms of such appointment, any such Authenticating Agent may authenticate Notes whenever the Trustee may do so.  Each reference in this Indenture to authentication by the Trustee includes authentication by the Authenticating Agent.

(e)    In case a Surviving Entity has executed an indenture supplemental hereto with the Trustee pursuant to Article IV, any of the Notes authenticated or delivered prior to such transaction may, from time to time, at the request of the Surviving Entity, be exchanged for other Notes executed in the name of the Surviving Entity with such changes in phraseology and form as may be appropriate, but otherwise identical to the Notes surrendered for such exchange and of like principal amount; and the Trustee, upon Company Order of the Surviving Entity, shall authenticate and deliver Notes as specified in such order for the purpose of such exchange.  If Notes shall at any time be authenticated and delivered in any new name of a Surviving Entity pursuant to this Section 2.2 in exchange or substitution for or upon registration of transfer of any

- 31 -

Notes, such Surviving Entity, at the option of the Holders but without expense to them, shall provide for the exchange of all Notes at the time Outstanding for Notes authenticated and delivered in such new name.

Section 2.3    Registrar and Paying Agent; Depositary.

(a)    The Company shall maintain an office or agency where Notes may be presented or surrendered for payment (the "Paying Agent"), where Notes may be presented or surrendered for registration of transfer or for exchange and for the service of notices and demands to or upon the Company (other than the type contemplated by Section 11.7) in respect of the Notes and this Indenture.  The registrar (the "Registrar") shall keep a register of the Notes and of their transfer and exchange (the "Note Register").  The Company may have one or more co-Registrars and one or more additional Paying Agents. So long as the Notes are listed on the SGX-ST and the rules of the SGX-ST so require, the Company shall appoint and maintain a paying agent in Singapore, where such Notes may be presented or surrendered for payment or redemption in the event that the Global Note(s) representing such Notes is exchanged for Certificated Notes. In addition, in the event that the Global Note(s) is exchanged for Certificated Notes, an announcement of such exchange will be made by or on behalf of the Company through the SGX-ST. Such announcement will include all material information with respect to the delivery of the definitive Notes including details of the paying agent in Singapore. As the context requires, the term "Paying Agent" includes any additional paying agent as may be appointed by the Company from time to time.

(b)    The Company shall enter into an appropriate agency agreement with any Agent not a party to this Indenture.  The agreement shall implement the provisions of this Indenture that relate to such Agent.  The Company shall notify the Trustee in writing of the name and address of each such Agent.  If the Company fails to maintain a Registrar or Paying Agent, the Trustee shall act as such and shall be entitled to appropriate compensation therefor pursuant to Section 7.7.  The Company or any Subsidiary Guarantor may act as any Agent (other than Paying Agent for purposes of Article VIII).

(c)    The Company initially appoints the Trustee as Registrar and agent for service of demands and notices in connection with the Notes and this Indenture (other than the type contemplated by Section 11.7), until such time as another Person is appointed as such.  The Company initially appoints The Bank of New York Mellon, London Branch as Principal Paying Agent. The Trustee and the initial Principal Paying Agent accept the aforementioned appointments subject to the terms and conditions set forth herein.

(d)    The Company may change any Agent without notice to Holders.

(e)    The Company initially appoints each of the Clearing Agencies to act as a depositary with respect to the Notes. The Clearing Agencies have advised the Company and the Trustee that the Common Depositary will act as common depository for the Notes on behalf of the Clearing Agencies.

Section 2.4    Paying Agent to Hold Money in Trust.  The Company shall require each Paying Agent (other than the Trustee or one of its Affiliates) to agree in writing that such Paying

- 32 -

Agent shall hold in trust for the benefit of Holders or the Trustee all money held by such Paying Agent for the payment of principal of or interest on the Notes and shall notify the Trustee in writing of any Default by the Company or any Subsidiary Guarantor in making any such payment.  If the Company or any Subsidiary Guarantor or an Affiliate of the Company or any Subsidiary Guarantor acts as Paying Agent, it shall segregate the money held by it as Paying Agent and hold it as a separate trust fund.  The Company at any time may require a Paying Agent (other than the Trustee or one of its Affiliates) to pay all money held by it to the Trustee and to account for any funds disbursed by such Paying Agent.  Upon complying with this Section 2.4, the Paying Agent (if other than the Company or a Subsidiary Guarantor) shall have no further liability for the money delivered to the Trustee.  Upon any proceeding under any Bankruptcy Law with respect to the Company or any Subsidiary Guarantor or any Affiliate of the Company or any Subsidiary Guarantor, if the Company, a Subsidiary Guarantor or such Affiliate is then acting as Paying Agent, the Trustee shall replace the Company, such Subsidiary Guarantor or such Affiliate as Paying Agent.

Section 2.5    Holder Lists.  The Registrar shall preserve in as current a form as is reasonably practicable the most recent list available to it of the names and addresses of Holders.  If the Trustee is not the Registrar, the Company shall furnish to the Trustee, in writing at least seven Business Days before each Interest Payment Date and at such other times as the Trustee may request in writing, a list in such form and as of such date as the Trustee may reasonably require of the names and addresses of Holders.

Section 2.6    Global Note Provisions.

(a)    Each Global Note initially shall:  (i) be registered in the name of and delivered to the Common Depositary or the nominee of the Common Depositary and (ii) bear the appropriate legend(s), as set forth in Section 2.7 and Exhibit A.  Any Global Note may be represented by more than one certificate.  The aggregate principal amount of each Global Note may from time to time be increased or decreased by adjustments made on the records of the Trustee, as provided in this Indenture.

(b)    Members of, or participants in, the Clearing Agencies ("Agent Members") shall have no rights under this Indenture with respect to any Global Note held on their behalf by the Common Depositary under such Global Note, and the Common Depositary may be treated by the Company, the Subsidiary Guarantors, the Trustee, and each Agent and any of their respective agents as the absolute owner of such Global Note for all purposes whatsoever.  Notwithstanding the foregoing, nothing herein shall prevent the Company, the Subsidiary Guarantors, the Trustee, or any Agent or any of their respective agents from giving effect to any written certification, proxy or other authorization furnished by the Common Depositary or impair, as between the Clearing Agencies and their respective Agent Members, the operation of customary practices governing the exercise of the rights of an owner of a beneficial interest in any Global Note.  The registered Holder of a Global Note may grant proxies and otherwise authorize any Person, including Agent Members and Persons that may hold interests through Agent Members, to take any action that a Holder is entitled to take under this Indenture or the Notes.

- 33 -

(c)     None of the Trustee, any Agent, the Company or any Subsidiary Guarantor shall have any responsibility or obligation to any beneficial owner of an interest in a Global Note, any Agent Member or other Person with respect to the accuracy of the records of the Clearing Agencies, the Common Depositary or any Agent Member, with respect to any ownership interest in the Notes or with respect to the delivery to any Agent Member, beneficial owner or other Person (other than the Clearing Agencies) of any notice (including any notice of redemption) or the payment of any amount or delivery of any Notes (or other security or property) under or with respect to such Notes.  All notices and communications to be given to the Holders and all payments to be made to Holders in respect of the Notes shall be given or made only to or upon the order of the registered Holders (which shall be the Common Depositary or its nominee in the case of a Global Note).  The rights of beneficial owners in any Global Note shall be exercised only through the Clearing Agencies subject to the applicable rules and procedures of the Clearing Agencies.  The Trustee, each Agent, the Company and the Subsidiary Guarantors may rely and shall be fully protected in relying upon information furnished by the Clearing Agencies with respect to its Agent Members and any beneficial owners.

Section 2.7     Legends.

(a)     Each Global Note shall bear the legend specified in Exhibit A on the face thereof.

(b)     Certificated Notes shall not bear the first three paragraphs of the legend specified in Exhibit A on the face thereof.

(c)     If Notes are issued upon the transfer, exchange or replacement of Notes bearing the legends set forth in Exhibit A hereto, the Notes so issued shall also bear such legends, except as otherwise permitted herein or by applicable law and at the written direction of the Company.

Section 2.8     Transfer and Exchange.

(a)

(i)     Subject to the other provisions of this Section 2.8, when Notes are presented to the Registrar or a co-Registrar with a request to register the transfer of such Notes or to exchange such Notes for an equal principal amount of Notes of other authorized denominations, the Registrar or co-Registrar shall register the transfer or make the exchange as requested if its requirements for such transaction are met; *provided* that any Notes presented or surrendered for registration of transfer or exchange shall be duly endorsed or accompanied by a written instrument of transfer in form satisfactory to the Registrar or co-Registrar, duly executed by the Holder thereof or his attorney duly authorized in writing.  To permit registrations of transfers and exchanges and subject to the other terms and conditions of this Article II, the Company will execute and upon Company Order the Trustee will authenticate Certificated Notes and Global Notes at the Registrar's or co-Registrar's written request.

(ii)     No service charge shall be made to a Holder for any registration of transfer or exchange, but the Company and the Registrar may require payment of a sum

- 34 -

sufficient to cover any transfer tax, assessments, or similar governmental charge payable in connection therewith (other than any such transfer taxes, assessments or similar governmental charges payable upon exchange or transfer pursuant to Section 2.8(c), Section 3.8, Section 3.12, Section 4.1 or Section 9.4).

(iii) The Registrar or co-Registrar shall not be required to register the transfer of or exchange of any Note for a period beginning: (1) 15 days before the giving of a notice of redemption or an offer to repurchase Notes and ending at the close of business on the day such notice is given or (2) 15 days before an Interest Payment Date and ending on such Interest Payment Date.

(iv) Prior to the due presentation for registration of transfer of any Note, the Company, the Subsidiary Guarantors, the Trustee, and each Agent may deem and treat the Person in whose name a Note is registered as the absolute owner of such Note for the purpose of receiving payment of principal of and interest on such Note and for all other purposes whatsoever, whether or not such Note is overdue, and none of the Company, the Subsidiary Guarantors, the Trustee, or any Agent shall be affected by notice to the contrary.

(v) All Notes issued upon any registration of transfer or exchange pursuant to the terms of this Indenture shall evidence the same debt and shall be entitled to the same benefits under this Indenture as the Notes surrendered upon such registration of transfer or exchange.

(vi) Notwithstanding any provision to the contrary herein, so long as a Global Note remains Outstanding and is held by or on behalf of the Common Depositary, transfers of a Global Note or of any beneficial interest therein, shall only be made in accordance with this Section 2.8 and Section 2.6).

(b) Neither the Trustee nor any Agent shall have any obligation or duty to monitor, determine or inquire as to compliance with any restrictions on exchange or transfer imposed under this Indenture or under applicable law with respect to any exchange or transfer of any interest in any Note (including any transfers between or among Agent Members or beneficial owners in any Global Note) other than to require delivery of such certificates and other documentation or evidence as are expressly required by, and to do so if and when expressly required by, the terms of this Indenture, and to examine the same to determine substantial compliance as to form with the express requirements hereof.

(c)

(i) Except as provided in this Section 2.8(c), owners of a beneficial interest in Global Notes will not be entitled to receive physical delivery of Certificated Notes.

(ii) A Global Note deposited with the Common Depositary pursuant to Section 2.1 shall be transferred in whole to the beneficial owners thereof in the form of Certificated Notes only if such transfer complies with this Section 2.8 and (i) the

- 35 -

NAI-1502882142v7

applicable Clearing Agency notifies the Company in writing that it is unwilling or unable to continue as the depositary and clearing system for such Global Note, or if at any time it becomes ineligible to serve as such a clearing system and a successor clearing system (which may be either Euroclear or Clearstream alone) is not appointed by the Company within 90 days of such notice or (ii) the Trustee has instituted, or has been directed to institute, any judicial proceeding in a court to enforce the rights of the Holders under the Notes and the Trustee has been advised by counsel that in connection with such proceeding it is necessary or appropriate for the Trustee to obtain possession of the Notes.

(iii) Any Global Note that is transferable to the beneficial owners thereof in the form of Certificated Notes pursuant to this Section 2.8 shall be surrendered by the Common Depositary to the Trustee, to be so transferred, without charge, and the Trustee shall authenticate and deliver, upon such transfer of each portion of such Global Note, an equal aggregate principal amount of Notes of authorized denominations in the form of Certificated Notes. Any portion of a Global Note transferred or exchanged pursuant to this Section 2.8 shall be executed, authenticated and delivered only in fully registered form without coupons in minimum denominations of U.S.$200,000 of principal amount and integral multiples of U.S.$1,000 in excess thereof and registered in such names as the Clearing Agencies shall direct the Trustee in writing. Subject to the foregoing, a Global Note is not exchangeable except for a Global Note of like denomination to be registered in the name of the Common Depositary or its nominee. In the event that a Global Note becomes exchangeable for Certificated Notes, payment of principal, premium, if any, and interest on the Certificated Notes will be payable, and the transfer of the Certificated Notes will be registrable, at the office or agency of the Company maintained for such purposes in accordance with Section 2.3. Such Certificated Notes shall bear the applicable legends set forth in Exhibit A hereto.

(iv) In the event of the occurrence of any of the events specified in Section 2.8(c)(ii), the Company will promptly make available to the Trustee a reasonable supply of Certificated Notes in definitive, fully registered form without interest coupons.

(v) Persons exchanging beneficial interests in a Global Note for Certificated Notes shall be required to provide the Clearing Agencies with written instruction and other information required by the Company and the Registrar in order to complete, execute and deliver such Certificated Notes.

Section 2.9    Mutilated, Destroyed, Lost or Stolen Notes.

(a)    If a mutilated Note is surrendered to the Registrar or if the Holder of a Note claims that the Note has been lost, destroyed or wrongfully taken, the Company shall execute and upon Company Order the Trustee shall authenticate a replacement Note if the Company shall certify in an Officers' Certificate that the requirements of Section 8-405(a) of the New York Uniform Commercial Code are met. If required by the Trustee or the Company, such Holder shall furnish an affidavit of loss and indemnity bond sufficient in the judgment of the Company and the Trustee to protect the Company, the Subsidiary Guarantors, the Trustee and the Agents from any loss that any of them may suffer if a Note is replaced, and, in the absence of

- 36 -

notice to the Company or the Trustee that such Note has been acquired by a protected purchaser, the Company shall execute and upon Company Order the Trustee shall authenticate and make available for delivery, in exchange for any such mutilated Note or in lieu of any such destroyed, lost or stolen Note, a new Note of like tenor and principal amount, bearing a number not contemporaneously Outstanding.

(b)     Upon the issuance of any new Note under this Section 2.9, the Company may require the payment of a sum sufficient to cover any tax or other governmental charge that may be imposed in relation thereto and any other expenses (including the fees and expenses of the Trustee) in connection therewith.

(c)     Every new Note issued pursuant to this Section 2.9 in exchange for any mutilated Note, or in lieu of any destroyed, lost or stolen Note, shall constitute an original additional contractual obligation of the Company, any Subsidiary Guarantor and any other obligor upon the Notes, whether or not the mutilated, destroyed, lost or stolen Note shall be at any time enforceable by anyone, and shall be entitled to all benefits of this Indenture equally and proportionately with any and all other Notes duly issued under this Indenture.

Section 2.10    Temporary Notes.  Until definitive Notes are ready for delivery, the Company may execute and upon Company Order the Trustee will authenticate and make available for delivery temporary Notes.  Temporary Notes will be substantially in the form of definitive Notes but may have variations that the Company considers appropriate for temporary Notes.  Without unreasonable delay, the Company will prepare and execute and upon Company Order the Trustee will authenticate and make available for delivery definitive Notes.  After the preparation of definitive Notes, the temporary Notes will be exchangeable for definitive Notes upon surrender of the temporary Notes at any office or agency maintained by the Company for that purpose and such exchange shall be without charge to the Holder.  Upon surrender for cancellation of any one or more temporary Notes, the Company will execute and upon Company Order the Trustee will authenticate and make available for delivery in exchange therefor one or more definitive Notes representing an equal principal amount of Notes.  Until so exchanged, the Holder of temporary Notes shall in all respects be entitled to the same benefits under this Indenture as a Holder of definitive Notes.

Section 2.11    Cancellation.  The Company at any time may deliver Notes to the Trustee for cancellation.  Each Agent shall forward to the Trustee any Notes surrendered to it for registration of transfer, exchange or payment.  The Trustee and no one else shall cancel and dispose of cancelled Notes in accordance with its policy of disposal or, upon the written instruction of the Company, return to the Company all Notes surrendered for registration of transfer, exchange, payment or cancellation.  The Company may not issue new Notes to replace Notes it has paid or delivered to the Trustee for cancellation for any reason other than in connection with a registration of transfer or exchange upon Company Order.

Section 2.12    Defaulted Interest.  When any installment of interest becomes Defaulted Interest, such installment shall forthwith cease to be payable to the Holders in whose names the Notes were registered on the Record Date applicable to such installment of interest.  Defaulted Interest (including any interest payable on such Defaulted Interest) may be paid by the Company as provided in Section 2.12(a).

- 37 -

(a)     The Company may elect to make payment of any Defaulted Interest (including any interest on such Defaulted Interest) to the Holders in whose names the Notes are registered at the close of business on a special record date for the payment of such Defaulted Interest (a "Special Record Date"), which shall be fixed in the following manner.  The Company shall notify the Trustee in writing of the amount of Defaulted Interest proposed to be paid and the date of the proposed payment, and at the same time the Company shall deposit with the Trustee an amount of money equal to the aggregate amount proposed to be paid in respect of such Defaulted Interest or shall make arrangements satisfactory to the Trustee for such deposit prior to the date of the proposed payment, such money when deposited to be held in trust for the benefit of the Holders entitled to such Defaulted Interest as provided in this Section 2.12(a).  Thereupon the Trustee shall fix a Special Record Date for the payment of such Defaulted Interest, which shall be not more than 15 calendar days and not less than ten calendar days prior to the date of the proposed payment and not less than ten calendar days after the receipt by the Trustee of the notice of the proposed payment.  The Trustee shall promptly notify the Company of such Special Record Date and, in the name and at the expense of the Company, shall cause notice of the proposed payment of such Defaulted Interest and the Special Record Date therefor to be given to each Holder in accordance with Section 11.1, not less than ten calendar days prior to such Special Record Date.  Notice of the proposed payment of such Defaulted Interest and the Special Record Date therefor having been given as aforesaid, such Defaulted Interest shall be paid to the Holders in whose names the Notes are registered at the close of business on such Special Record Date.

Section 2.13   Additional Notes.  The Company may, from time to time, subject to compliance with any other applicable provisions of this Indenture (including, but not limited to, Section 3.9), without the consent of the Holders, pursuant to Additional Note Board Resolutions or an Additional Note Supplemental Indenture, create and issue pursuant to this Indenture Additional Notes having terms and conditions set forth in Exhibit A identical to those of the other Outstanding Notes, except that Additional Notes may have a different issue date and issue price from other Outstanding Notes, *provided* that any issue of Additional Notes that is to utilize the same CUSIP, Common Code and/or ISIN as a Note already issued under this Indenture shall be effected in a manner and under circumstances whereby the issue of Additional Notes is treated as a "qualified reopening" (within the meaning of US Treas. Reg. §1.1275-2(k)(3), or any successor provision, all as in effect at the time of the further issue) of the issue of Notes having the shared CUSIP, Common Code and/or ISIN.

ARTICLE III

COVENANTS

Section 3.1   Payment of Notes.

(a)     (1)     The Company shall pay the principal of and interest (including Defaulted Interest) on the Notes in U.S. Legal Tender on the dates and in the manner provided in the Notes and in this Indenture.  Prior to 10:00 a.m. New York City time on the Business Day immediately preceding each Interest Payment Date and the Maturity Date, the Company shall deposit with the Paying Agent in immediately available funds U.S. Legal Tender sufficient to make cash

- 38 -

NAI-1502882142v7

payments due on such Interest Payment Date or the Maturity Date, as the case may be.  If the Company, a Subsidiary Guarantor or an Affiliate of the Company or of a Subsidiary Guarantor is acting as Paying Agent, the Company, such Subsidiary Guarantor or such Affiliate shall, prior to 10:00 a.m. New York City time on each Interest Payment Date or the Maturity Date, as the case may be, segregate and hold in trust U.S. Legal Tender sufficient to make cash payments due on such Interest Payment Date or the Maturity Date, as the case may be.  Principal and interest shall be considered paid on the date due if on such date the Trustee or the Paying Agent (other than the Company, a Subsidiary Guarantor or an Affiliate of the Company or of a Subsidiary Guarantor) holds in accordance with this Indenture U.S. Legal Tender designated for and sufficient to pay all principal and interest then due and the Trustee or the Paying Agent, as the case may be, is not prohibited from paying such money to the Holders on that date pursuant to the terms of this Indenture.

(2)     Payments in respect of Notes represented by a Global Note (including principal, premium, if any, and interest) shall be made by the transfer of immediately available funds to the account specified by the Clearing Agencies.  The Company shall make all payments in respect of a Certificated Note (including principal, premium, if any, and interest) by mailing a check to the registered address of each Holder thereof; *provided, however*, that payments on the Certificated Notes may also be made by wire transfer to a U.S. dollar account maintained by the payee with a bank in the United States if such Holder elects payment by wire transfer by giving written notice to the Company and the Trustee or the Paying Agent to such effect designating such account at least 10 Business Days immediately preceding the relevant due date for payment (or such other date as the Company and the Trustee or Paying Agent may accept in its discretion).

(b)     Notwithstanding anything to the contrary contained in this Indenture, the Company may, to the extent it is required to do so by law, deduct or withhold income or other similar taxes imposed by the United States of America from principal or interest payments hereunder.  The Trustee shall be entitled to receive from the Company, each Guarantor and each Holder forms W-9 or W-8, as applicable.  The Company agrees to pay interest on overdue principal and Defaulted Interest at the rate per annum specified on the face of the Notes.

Section 3.2     Maintenance of Office or Agency.

(a)     The Company shall maintain each office or agency required under Section 2.3.  The Company shall give prompt written notice to the Trustee of any change in the location of any such office or agency.  If at any time the Company shall fail to maintain any such required office or agency or shall fail to furnish the Trustee with the address thereof, such presentations, surrenders, notices and demands may be made or served at the Corporate Trust Office, and the Company hereby appoints the Trustee as its agent to receive all such presentations, surrenders, notices and demands.

(b)     The Company may also from time to time designate one or more other offices or agencies (in or outside of The City of New York) where the Notes may be presented or

- 39 -

surrendered for any or all such purposes and may from time to time rescind any such designation; *provided*, *however*, that no such designation or rescission shall in any manner relieve the Company of its obligation to maintain an office or agency so long as the Notes are listed on the SGX-ST and the rules of the SGX-ST so require, in Singapore, for such purposes. The Company shall give prompt written notice to the Trustee of any such designation or rescission and any change in the location of any such other office or agency.

Section 3.3    Corporate Existence.  Except as permitted by the provisions of Article IV, the Company shall do or cause to be done all things necessary to preserve and keep in full force and effect its corporate existence.

Section 3.4    Payment of Taxes.  The Company shall pay or discharge or cause to be paid or discharged, before the same shall become delinquent, all taxes, assessments and governmental charges levied or imposed upon the Company or any Restricted Subsidiary or for which it is or any of them are otherwise liable, or upon the income, profits or property of the Company or any Restricted Subsidiary; *provided*, *however*, that the Company shall not be required to pay or discharge or cause to be paid or discharged any such tax, assessment or governmental  charge whose amount, applicability or validity is being contested in good faith by appropriate proceedings and for which appropriate reserves, if necessary (in the good faith judgment of management of the Company), are being maintained in accordance with IFRS.

Section 3.5    Compliance Certificate.

The Company and each Subsidiary Guarantor shall deliver to the Trustee within 120 days after the end of each fiscal year of the Company ending December 31, an Officers' Certificate certifying compliance with all of their respective obligations under this Indenture and stating whether or not any Default or Event of Default has occurred during the previous fiscal year. In such case, the certificate shall describe the Default or Event of Default, its status and what action the Company or any Subsidiary Guarantor is taking or proposes to take with respect thereto.

Section 3.6    Further Instruments and Acts.  The Company and each Subsidiary Guarantor shall execute and deliver such further instruments and do such further acts as may be required by applicable law or may be reasonably necessary or proper to comply with their respective obligations under this Indenture, the Notes and the Note Guarantees or as the Trustee may reasonably request to carry out more effectively the purpose of this Indenture.

Section 3.7    Waiver of Stay, Extension or Usury Laws.  The Company and each Subsidiary Guarantor covenants (to the fullest extent permitted by applicable law) that it will not at any time insist upon, or plead, or in any manner whatsoever claim or take the benefit or advantage of, any stay or extension law or any usury law or other law that would prohibit or forgive the Company or such Subsidiary Guarantor from paying all or any portion of the principal of or interest on the Notes as contemplated herein, wherever enacted, now or at any time hereafter in force, or which may affect the covenants or the performance of this Indenture. The Company and each Subsidiary Guarantor hereby expressly waives (to the fullest extent permitted by applicable law) all benefit or advantage of any such law and covenants that it will not hinder, delay or impede the execution of any power herein granted to the Trustee, but will suffer and permit the execution of every such power as though no such law had been enacted.

- 40 -

Section 3.8    Repurchase Upon a Change of Control.

(a)    Upon the occurrence of a Change of Control, each Holder shall have the right to require that the Company purchase, at such Holder's option, all or a portion (in minimum principal amounts of U.S.$200,000 or an integral multiple of U.S.$1,000 in excess thereof) of the Holder's Notes at a purchase price equal to 101.0% of the principal amount thereof, plus accrued and unpaid interest thereon to, but not including, the date of purchase (the "Change of Control Payment").

(b)    The Company shall notify the Trustee in writing promptly upon the occurrence of a Change of Control.

(c)    Within 30 days following the date upon which the Change of Control occurred, the Company must give a Change of Control Notice to each Holder, with a copy to the Trustee, offering to purchase the Notes as described above (a "Change of Control Offer"). The Change of Control Offer shall state, among other things, the purchase price, the purchase date, which must be no earlier than 30 days nor later than 60 days from the date of the Change of Control Notice, other than as may be required by law (the "Change of Control Payment Date"), and instructions and materials necessary to enable Holders of the Notes to tender Notes pursuant to the Change of Control Offer.

(d)    On the Business Day immediately preceding the Change of Control Payment Date, the Company shall, to the extent lawful, deposit with the Paying Agent U.S. Legal Tender in an amount equal to the Change of Control Payment in respect of all Notes or portions thereof so tendered. On the Change of Control Payment Date, the Company will, to the extent lawful:

(1)    accept for payment all Notes or portions thereof properly tendered and not withdrawn pursuant to the Change of Control Offer; and

(2)    deliver or cause to be delivered to the Trustee the Notes so accepted together with an Officers' Certificate stating the aggregate principal amount of Notes or portions thereof being purchased by the Company.

(e)    If only a portion of a Note is purchased pursuant to a Change of Control Offer, a new Note in a principal amount equal to the portion thereof not purchased shall be issued in the name of the Holder thereof upon cancellation of the original Note (or appropriate adjustments to the amount and beneficial interests in a Global Note will be made, as appropriate, in accordance with the applicable procedures of the relevant Clearing Agencies). Notes (or portions thereof) purchased pursuant to a Change of Control Offer will be cancelled and cannot be reissued.

(f)    The Company shall not be required to make a Change of Control Offer upon a Change of Control if:

(1)    a third party makes the Change of Control Offer in the manner, at the times and otherwise in compliance with the requirements set forth in this Indenture applicable to a Change of Control Offer made by the Company and

- 41 -

NAI-1502882142v7

purchases all Notes properly tendered and not withdrawn pursuant to the Change of Control Offer, or

(2) notice of redemption has been given pursuant to Section 5.5 hereof, unless and until there is a default in payment of the applicable redemption price.

(g) A Change of Control Offer may be made in advance of a Change of Control, conditioned upon the occurrence of such Change of Control, if a definitive agreement is in place for the Change of Control at the time of making the Change of Control Offer.

(h) In the event that Holders of not less than 90.0% of the aggregate principal amount of the Outstanding Notes accept a Change of Control Offer and the Company or a third party purchases all of the Notes held by such Holders, the Company shall have the right, on not less than 30 nor more than 60 days' prior notice, given not more than 30 days following the Change of Control Payment Date pursuant to the Change of Control Offer described above, to redeem all of the Notes that remain Outstanding following such purchase at a purchase price equal to the Change of Control Payment plus, to the extent not included in the Change of Control Payment, accrued and unpaid interest, if any, on the Notes that remain Outstanding, to, but not including, the payment date (subject to the right of Holders on the relevant Record Date to receive interest due on the relevant Interest Payment Date).

(i) To the extent applicable, the Company shall comply with the requirements of all applicable securities laws and regulations in connection with the purchase of Notes in connection with a Change of Control Offer. To the extent that the provisions of any applicable securities laws or regulations conflict with this Section 3.8, the Company shall comply with the applicable securities laws and regulations and will not be deemed to have breached its obligations under this Indenture by doing so.

Section 3.9    Limitation on Incurrence of Additional Indebtedness.

(a) The Company (i) shall not, and shall not cause or permit any of its Restricted Subsidiaries to, directly or indirectly, Incur any Indebtedness, (ii) shall not, and shall not cause or permit any of its Restricted Subsidiaries to, Incur any Disqualified Capital Stock (other than Disqualified Capital Stock of Restricted Subsidiaries held by the Company or a Wholly Owned Subsidiary, so long as it is so held), and (iii) shall not cause or permit any of its Restricted Subsidiaries that is not a Subsidiary Guarantor to Incur any Preferred Stock (other than Preferred Stock of Restricted Subsidiaries held by the Company or a Wholly Owned Subsidiary, so long as it is so held), except, in each case, that the Company and any Subsidiary Guarantor may Incur Indebtedness or Disqualified Capital Stock and any Restricted Subsidiary that is not a Subsidiary Guarantor may Incur Preferred Stock if, at the time of and immediately after giving *pro forma* effect to the Incurrence thereof and the application of the proceeds therefrom, the Consolidated Leverage Ratio of the Company and its Restricted Subsidiaries would not have been greater than 3.5 to 1.0.

(b) Notwithstanding paragraph (a) above, the Company and its Restricted Subsidiaries, as applicable, may Incur the following Indebtedness ("Permitted Indebtedness"):

- 42 -

NAI-1502882142v7

(1)     Indebtedness in respect of the Issue Date Notes (including any Note Guarantee in respect thereof) and excluding Additional Notes;

(2)     Guarantees by any Subsidiary Guarantor of Indebtedness of the Company or any other Subsidiary Guarantor permitted under this Indenture; *provided* that if any such Guarantee is of Subordinated Indebtedness, then the Note Guarantee of such Subsidiary Guarantor shall be senior to such Subsidiary Guarantor's Guarantee of such Subordinated Indebtedness;

(3)     Indebtedness Incurred by the Company or any Subsidiary Guarantor under Credit Facilities (including Guarantees in respect thereof) in an aggregate principal amount at any one time outstanding not to exceed the greater of (x) U.S.$100.0 million and (y) 10.0% of Consolidated Tangible Assets;

(4)     other Indebtedness of the Company and its Restricted Subsidiaries outstanding on the Issue Date (excluding Indebtedness outstanding on the Issue Date deemed to be incurred under clause (3) of this Section 3.9(b);

(5)     Hedging Obligations entered into by the Company and its Restricted Subsidiaries in the ordinary course of business and not for speculative purposes, including, without limitation, Hedging Obligations in respect of the Notes;

(6)     intercompany Indebtedness between the Company and any Restricted Subsidiary or between any Restricted Subsidiaries; *provided* that:

(x)     if the Company or any Subsidiary Guarantor is the obligor on such Indebtedness and the payee is not the Company or any Subsidiary Guarantor, such Indebtedness must be expressly subordinated to the prior payment in full of all Obligations under the Notes and this Indenture, in the case of the Company, or such Subsidiary Guarantor's Note Guarantee, in the case of any such Subsidiary Guarantor,

(y)     in the event that at any time any such Indebtedness ceases to be held by the Company or a Restricted Subsidiary, such Indebtedness shall be deemed to be Incurred and not permitted by this clause (6) at the time such event occurs; and

(z)     the Company and any Restricted Subsidiary shall agree to vote such Indebtedness, or provide their consents in connection with such Indebtedness, in any Mexican Restructuring, in a manner that is consistent with the vote of, or the consents provided by, the holders of the Notes and other unaffiliated creditors of the same class as the Notes;

(7)     Indebtedness of the Company or any of its Restricted Subsidiaries arising from the honoring by a bank or other financial institution of a check, draft or similar instrument inadvertently (including daylight overdrafts paid in full by the close of business on the day such overdraft was Incurred) drawn against

- 43 -

insufficient funds in the ordinary course of business; *provided* that such Indebtedness is extinguished within five Business Days of Incurrence;

(8)     Indebtedness of the Company or any of its Restricted Subsidiaries represented by letters of credit for the account of the Company or any Restricted Subsidiary, as the case may be, in order to provide security for workers' compensation claims, payment obligations in connection with self-insurance or similar requirements in the ordinary course of business;

(9)     Indebtedness of the Company or any Restricted Subsidiary constituting Capitalized Lease Obligations or Purchase Money Indebtedness, in each case Incurred for the purpose of acquiring or financing all or any part of the purchase price or cost of construction or improvement of property or equipment used in the business of the Company or such Restricted Subsidiary in an aggregate principal amount at any one time outstanding not to exceed the greater of (x) U.S.$25.0 million and (y) 2.5% of Consolidated Tangible Assets;

(10)     Indebtedness in respect of bid, performance or surety bonds in the ordinary course of business for the account of the Company or any of its Restricted Subsidiaries, including Guarantees or obligations of the Company or any Restricted Subsidiary with respect to letters of credit supporting such bid, performance or surety obligations (in each case other than for the payment of borrowed money);

(11)     Refinancing Indebtedness in respect of:

(x)     Indebtedness (other than Indebtedness owed to the Company or any Subsidiary of the Company) Incurred pursuant to paragraph (a) above (it being understood that no Indebtedness outstanding on the Issue Date is Incurred pursuant to such paragraph (a) above), or

(y)     Indebtedness Incurred pursuant to clause (1), (4) (excluding Indebtedness outstanding on the Issue Date deemed to be incurred under clause (3) of this Section 3.9(b) or Indebtedness owed to the Company or a Subsidiary of the Company) or (11) of this Section 3.9(b);

(12)     additional Indebtedness of the Company or any Restricted Subsidiary in an aggregate principal amount not to exceed U.S.$20.0 million at any one time outstanding (which amount may, but need not, be Incurred, in whole or in part, under Credit Facilities);

(13)     the Guarantee by the Company of any Indebtedness Incurred by a Subsidiary Guarantor in accordance with the terms of this Indenture and the Notes;

(14)     Guarantees by the Company or any Restricted Subsidiary of any Obligations of CASA made in connection with the purchase of property or other assets to be used in a Permitted Business (so long as, if CASA completes such

- 44 -

purchase of property or other assets, then (x) each of the Company and CASA exercises commercially reasonable efforts to transfer such property or other assets to the Company or a Restricted Subsidiary, and (y) such transfer is completed within one year of the Incurrence of such Indebtedness), not to exceed an aggregate of U.S.$50 million at any one time outstanding; and

(15) Permitted Acquisition Indebtedness.

(c) For purposes of determining compliance with, and the outstanding principal amount of, any particular Indebtedness Incurred pursuant to and in compliance with, this Section 3.9:

(1) The amount of Indebtedness issued at a price that is less than the principal amount thereof shall be equal to the amount of the liability in respect thereof determined in accordance with IFRS.

(2) The accrual of interest, the accretion or amortization of original issue discount, the payment of regularly scheduled interest in the form of additional Indebtedness of the same instrument or the payment of regularly scheduled dividends on Preferred Stock or Disqualified Capital Stock in the form of additional Preferred Stock or Disqualified Capital Stock with the same terms shall not be deemed to be an Incurrence of Indebtedness or issuance of Preferred Stock or Disqualified Capital Stock for purposes of this Section 3.9; *provided* that any such outstanding additional Indebtedness or Preferred Stock or Disqualified Capital Stock paid in respect of Indebtedness Incurred pursuant to any provision of Section 3.9(b) shall be counted as Indebtedness outstanding thereunder for purposes of any future Incurrence under such provision.

(3) In the event that Indebtedness meets the criteria of more than one of clauses (1) through (15) of Section 3.9(b), or is entitled to be Incurred pursuant to Section 3.9(a) above, the Company, in its sole discretion, will be permitted to classify such Indebtedness at the time of its Incurrence in any manner that complies with this Section 3.9. In addition, any Indebtedness originally classified as Incurred pursuant to clauses (1) through (15) of Section 3.9(b) or Section 3.9(a) may later be reclassified by the Company, in its sole discretion, such that it will be deemed to be Incurred pursuant to another of such clauses or Section 3.9(a) to the extent that such reclassified Indebtedness could be Incurred pursuant to such other clause or Section 3.9(a) at the time of such reclassification (*provided* that Indebtedness outstanding on the Issue Date under Credit Facilities shall at all times be deemed incurred under Section 3.9(b)(3).

(4) For purposes of determining compliance with any U.S. dollar denominated restriction on the Incurrence of Indebtedness, the principal amount of Indebtedness denominated in a currency other than U.S. dollars shall be the U.S. Dollar Equivalent thereof. Notwithstanding any other provision of this Section 3.9, the maximum amount of Indebtedness that the Company or any Restricted Subsidiary may incur pursuant to this Section 3.9 shall not be deemed

- 45 -

to be exceeded as a result solely of fluctuations in exchange rates or currency values.

(5) For purposes of determining any particular amount of Indebtedness: (i) Guarantees, Liens or obligations with respect to letters of credit supporting Indebtedness otherwise included in the determination of such particular amount shall not be included and (ii) any Liens granted together with an equal and ratable Lien to secure the Notes and the Note Guarantees, pursuant to the provisions of this Indenture and the Notes shall not be treated as Indebtedness.

Section 3.10    Limitation on Guarantees.  The Company shall not permit any Restricted Subsidiary that is not a Subsidiary Guarantor to Guarantee any Indebtedness of the Company or to secure any Indebtedness of the Company with a Lien on the assets of such Restricted Subsidiary, unless contemporaneously therewith (or prior thereto) effective provision is made to Guarantee or secure the Notes, as the case may be, on an equal and ratable basis with such Guarantee or Lien for so long as such Guarantee or Lien remains effective, and in an amount equal to the amount of Indebtedness so Guaranteed or secured.  Any Guarantee by any such Restricted Subsidiary of Subordinated Indebtedness of the Company will be subordinated and junior in right of payment to the contemporaneous Guarantee of the Notes by such Restricted Subsidiary.

Section 3.11    Limitation on Restricted Payments.

(a)    The Company shall not, and shall not cause or permit any of its Restricted Subsidiaries to, directly or indirectly, take any of the following actions (each, a "Restricted Payment"):

(1)    declare or pay any dividend or return of capital or make any distribution on or in respect of shares of Capital Stock of the Company or any Restricted Subsidiary to holders of such Capital Stock, other than:

(x)    dividends, returns of capital or distributions payable in Qualified Capital Stock of the Company,

(y)    dividends, returns of capital or distributions payable to the Company and/or a Restricted Subsidiary, or

(z)    dividends, distributions or returns of capital made on a *pro rata* basis to the Company and its Restricted Subsidiaries, on the one hand, and minority holders of Capital Stock of a Restricted Subsidiary, on the other hand (or on a less than *pro rata* basis to any minority holder);

(2)    purchase, redeem or otherwise acquire or retire for value:

(x)    any Capital Stock of the Company, or

(y)    any Capital Stock of any Restricted Subsidiary held by an Affiliate of the Company (other than a Restricted Subsidiary) or any

- 46 -

Preferred Stock of a Restricted Subsidiary, except for Capital Stock held by the Company or a Restricted Subsidiary or purchases, redemptions, acquisitions or retirements for value of Capital Stock on a *pro rata* basis from the Company and/or any Restricted Subsidiaries, on the one hand, and minority holders of Capital Stock of a Restricted Subsidiary, on the other hand, according to their respective percentage ownership of the Capital Stock of such Restricted Subsidiary;

(3)      make any principal payment on, purchase, defease, redeem, prepay, decrease or otherwise acquire or retire for value, prior to any scheduled final maturity, scheduled repayment or scheduled sinking fund payment, as the case may be, any Subordinated Indebtedness (excluding (x) any intercompany Indebtedness between or among the Company and/or any Restricted Subsidiaries or (y) the purchase, repurchase or other acquisition of Indebtedness that is contractually subordinated to the Notes or any Note Guarantee, as the case may be, purchased in anticipation of satisfying a sinking fund obligation, principal installment or final maturity, in each case within one year of such date of purchase, repurchase or acquisition); or

(4)      make any Investment (other than Permitted Investments);

if at the time of the Restricted Payment and immediately after giving effect thereto:

(A)      a Default or an Event of Default shall have occurred and be continuing;

(B)      the Company is not able to Incur at least U.S.$1.00 of additional Indebtedness pursuant to Section 3.9(a); or

(C)      the aggregate amount (the amount expended for these purposes, if other than in cash, being the Fair Market Value of the relevant property) of the proposed Restricted Payment and all other Restricted Payments made subsequent to the Issue Date up to the date thereof shall exceed the sum of:

(i)      50% of cumulative Consolidated Net Income of the Company or, if such cumulative Consolidated Net Income of the Company is a loss, minus 100% of the loss, accrued during the period, treated as one accounting period, beginning in the fiscal quarter immediately preceding the fiscal quarter in which the Issue Date occurs, to the end of the most recent fiscal quarter for which consolidated financial information of the Company is available; plus

(ii)      100% of the aggregate net cash proceeds received by the Company or any Restricted Subsidiary from any Person (other than, in the case of any Restricted Subsidiary, from the Company or another Restricted Subsidiary) from any:

- 47 -

(1)     contribution to the equity capital of the Company not representing an interest in Disqualified Capital Stock or issuance or sale of Qualified Capital Stock of the Company, in each case, subsequent to the Issue Date, or

(2)     issuance or sale subsequent to the Issue Date (and, in the case of Indebtedness of a Restricted Subsidiary, at such time as it was a Restricted Subsidiary) of any Indebtedness of the Company or any Restricted Subsidiary that has been converted into or exchanged for Qualified Capital Stock of the Company,

excluding, in each case, any net cash proceeds:

(w)     received from a Subsidiary of the Company;

(x)     used to redeem Notes in accordance with the provisions under Section 5.2; or

(y)     applied in accordance with Section 3.11(b)(2) or (3) below; *plus*

(iii)     any Investment Return.

(b)     Notwithstanding paragraph (a) above, this Section 3.11 does not prohibit:

(1)     the payment of any dividend or distribution or the consummation of any irrevocable redemption of Subordinated Indebtedness within 60 days after the date of declaration of such dividend or distribution or giving of the redemption notice, as the case may be, if the dividend, distribution or redemption would have been permitted on the date of declaration or notice pursuant to the preceding paragraph; *provided* that such redemption shall be included (without duplication for the declaration) in the calculation of the amount of Restricted Payments;

(2)     the acquisition of any shares of Capital Stock of the Company,

(x)     in exchange for Qualified Capital Stock of the Company, or

(y)     through the application of the net proceeds received by the Company from a substantially concurrent sale of Qualified Capital Stock of the Company or a contribution to the equity capital of the Company not representing an interest in Disqualified Capital Stock, in each case not received from a Subsidiary of the Company;

*provided* that the value of any such Qualified Capital Stock issued in exchange for such acquired Capital Stock and any such net proceeds shall be excluded from Section 3.11(a)(C)(ii) above (and were not included therein at any time);

- 48 -

NAI-1502882142v7

(3)     the voluntary prepayment, purchase, defeasance, redemption or other acquisition or retirement for value of any Subordinated Indebtedness solely in exchange for, or through the application of net proceeds of a substantially concurrent sale, other than to a Subsidiary of the Company, of:

(x)     Qualified Capital Stock of the Company, or

(y)     Refinancing Indebtedness for such Subordinated Indebtedness;

*provided* that the value of any Qualified Capital Stock issued in exchange for Subordinated Indebtedness and any net proceeds referred to above shall be excluded from Section 3.11(a)(C)(ii) above (and were not included therein at any time);

(4)     if no Default or Event of Default shall have occurred and be continuing, repurchases by the Company of Common Stock of the Company or options, warrants or other securities exercisable or convertible into Common Stock of the Company from any current or former employees, officers, directors or consultants of the Company or any of its Subsidiaries or their authorized representatives, estates, heirs, family members, spouses or former spouses upon the death, disability or termination of employment or directorship of such employees, officers or directors, or the termination of retention of any such consultants, in an amount not to exceed U.S.$5.0 million in any calendar year (with unused amounts in any calendar year being permitted to be carried over into succeeding calendar years) plus the cash proceeds of key man life insurance policies received by the Company and its Restricted Subsidiaries in such calendar year;

(5)     the repurchase of Capital Stock deemed to occur upon the exercise of stock options or warrants to the extent such Capital Stock represents a portion of the exercise price of those stock options or warrants;

(6)     the declaration and payment of regularly scheduled or accrued dividends or distributions to holders of any class or series of Disqualified Capital Stock of the Company or any Restricted Subsidiary issued on or after the Issue Date in accordance with the covenant set forth in Section 3.9;

(7)     upon the occurrence of a Change of Control and within 60 days after the completion of the offer to repurchase the Notes pursuant to Section 3.8, any repurchase, redemption or other acquisition or retirement for value of any Subordinated Indebtedness of the Company or any Subsidiary Guarantor required pursuant to the terms thereof as a result of such Change of Control; *provided* that (A) the terms of such purchase or redemption are substantially similar in all material respects to the comparable provision included in this Indenture, and (B) at the time of such purchase or redemption no Default or Event of Default shall have occurred and be continuing (or would result therefrom);

- 49 -

(8)    if no Default or Event of Default shall have occurred and be continuing, the purchase by the Company of fractional shares arising out of stock dividends, splits or combinations or business combinations;

(9)    payments or distributions in the nature of satisfaction of statutory redemption or dissenters' rights under Mexican law; and

(10)    if no Default or Event of Default shall have occurred and be continuing, the payment of cash dividends on or in respect of Capital Stock of the Company or the repurchase of Capital Stock of the Company in an aggregate amount not to exceed U.S.$10.0 million in any calendar year.

In determining the aggregate amount of Restricted Payments made subsequent to the Issue Date, amounts expended pursuant to clauses (1) (without duplication for the declaration of the relevant dividend), (4) and (7) of paragraph (b) of this Section 3.11 shall be included in such calculation and amounts expended pursuant to clauses (2), (3), (5), (6), (8), (9) and (10) above shall not be included in such calculation.

Section 3.12    Limitation on Asset Sales and Sales of Subsidiary Stock.

(a)    The Company shall not, and shall not permit any of its Restricted Subsidiaries to, consummate an Asset Sale unless:

(1)    the Company or the applicable Restricted Subsidiary, as the case may be, receives consideration at the time of the Asset Sale at least equal to the Fair Market Value of the assets or Capital Stock sold or otherwise disposed of, and

(2)    at least 75.0% of the consideration received for the assets or Capital Stock sold by the Company or the Restricted Subsidiary, as the case may be, in the Asset Sale shall be in the form of cash or Cash Equivalents received at the time of such Asset Sale.

(b)    For purposes of Section 3.12(a)(2), the following are deemed to be cash:

(x)    any liabilities (as shown prior to the date of such Asset Sale on the Company's or such Restricted Subsidiary's most recent consolidated balance sheet) of the Company or any of its Restricted Subsidiaries (other than contingent liabilities and liabilities that constitute Subordinated Indebtedness or are otherwise subordinated to the Notes) that are assumed by the transferee of any such assets and as a result of which the Company and its Restricted Subsidiaries are no longer responsible for such liabilities; and

(y)    the Fair Market Value of any Capital Stock of a Person engaged in a Permitted Business that will become, upon purchase, a Restricted Subsidiary or assets (other than current assets as determined in

- 50 -

NAI-1502882142v7

accordance with IFRS or Capital Stock) to be used by the Company or any Restricted Subsidiary in a Permitted Business; and

(z) any securities, Notes or other obligations received by the Company or any such Restricted Subsidiary from such transferee that are converted, sold for or exchanged by the Company or such Restricted Subsidiary into cash or Cash Equivalents within 120 days (180 days in the case of land sales) of the receipt thereof (subject to ordinary settlement periods), to the extent of the cash or Cash Equivalents received in that conversion, sale or exchange,

*provided* that amounts received pursuant to clauses (x) and (y) shall not be deemed to constitute Net Cash Proceeds for purposes of making an Asset Sale Offer.

(c) The Company or such Restricted Subsidiary, as the case may be, may apply the Net Cash Proceeds of any such Asset Sale within 365 days thereof to:

(1) repay any Senior Indebtedness of the Company or a Subsidiary Guarantor that is secured by a Lien,

(2) make capital expenditures in a Permitted Business, or

(3) purchase

(x) assets (other than current assets as determined in accordance with IFRS or Capital Stock) to be used by the Company or any Restricted Subsidiary in a Permitted Business, or

(y) all or substantially all of the assets of, or any Capital Stock of, a Person engaged in a Permitted Business if, after giving effect to any such acquisition of Capital Stock, the Permitted Business is or becomes a Restricted Subsidiary

from a Person other than the Company and its Restricted Subsidiaries; *provided* that, in the case of clauses (x) and (y), the Company will have complied with its obligations if (i) it enters into a binding commitment to acquire such assets or such Capital Stock within 365 days after receipt of such Net Cash Proceeds, (ii) such binding commitment is subject only to customary conditions and (iii) such acquisition is consummated within 180 days from the date of signing such binding commitment.

(d) To the extent all or a portion of the Net Cash Proceeds of any Asset Sale are not applied within 365 days of the Asset Sale as set forth in Section 3.12(c)(1) or (2) (or, in the case of Section 3.12(c)(3) only, within such longer period set forth therein), the Company shall make an offer to purchase Notes (the "Asset Sale Offer"), at a purchase price equal to 100% of the principal amount of the Notes to be purchased, plus accrued and unpaid interest thereon, to, but not including, the date of purchase (the "Asset Sale Offer Amount"). The Company shall purchase pursuant to an Asset Sale Offer from all tendering Holders on a *pro rata* basis (subject

- 51 -

NAI-1502882142v7

to any necessary rounding), and, at the Company's option, on a *pro rata* basis with the holders of any other Senior Indebtedness with similar provisions requiring the Company to offer to purchase the other Senior Indebtedness with the proceeds of Asset Sales, that principal amount (or accreted value in the case of Indebtedness issued with original issue discount) of Notes and the other Senior Indebtedness to be purchased equal to such unapplied Net Cash Proceeds. The Company may satisfy its obligations under this Section 3.12 with respect to the Net Cash Proceeds of an Asset Sale by making an Asset Sale Offer prior to the expiration of the relevant 365-day period (or, if applicable, such longer period set forth above with respect to Section 3.12(c)(3) only).

(e)     The Company may, however, defer an Asset Sale Offer until there is an aggregate amount of unapplied Net Cash Proceeds from one or more Asset Sales equal to or in excess of U.S.$15.0 million. At that time, the entire amount of unapplied Net Cash Proceeds, and not just the amount in excess of U.S.$15.0 million, shall be applied as required pursuant to this Section 3.12. Pending application in accordance with this Section 3.12, Net Cash Proceeds shall be applied to temporarily reduce revolving credit borrowings that can be reborrowed or Invested in Cash Equivalents.

(f)     Each Asset Sale Offer Notice shall be given to the record Holders as shown on the Note Register, with a copy to the Trustee, within 20 days following such 365th day (or, if applicable such longer period as set forth above with respect to Section 3.12(c)(3) only), offering to purchase the Notes pursuant to this Section 3.12, which notice shall govern the terms of the Asset Sale Offer. Each Asset Sale Offer Notice will state, among other things, the purchase price, the purchase date, which must be no earlier than 30 days nor later than 60 days from the date the notice is provided, other than as may be required by law (the "Asset Sale Offer Payment Date"), and instructions and materials necessary to enable Holders to tender Notes pursuant to the Asset Sale Offer.

(g)     Upon receiving the Asset Sale Offer Notice, Holders may elect to tender their Notes in whole or in part in amounts of U.S.$200,000 or integral multiples of U.S.$1,000 in excess thereof in exchange for cash.

(h)     On the Business Day immediately preceding the Asset Sale Offer Payment Date, the Company shall, to the extent lawful, deposit with the Paying Agent U.S. Legal Tender in an amount equal to the Asset Sale Offer Amount in respect of all Notes or portions thereof so tendered. On the Asset Sale Offer Payment Date, the Company will, to the extent lawful:

(1)     accept for payment all Notes or portions thereof properly tendered and not withdrawn pursuant to the Asset Sale Offer; and

(2)     deliver or cause to be delivered to the Trustee the Notes so accepted together with an Officers' Certificate stating the aggregate principal amount of Notes or portions thereof being purchased by the Company.

(i)     To the extent Holders of Notes and holders of other Senior Indebtedness, if any, which are the subject of an Asset Sale Offer properly tender and do not withdraw Notes or the other Senior Indebtedness in an aggregate amount exceeding the amount of unapplied Net

- 52 -

Cash Proceeds, the Company shall purchase the Notes and the other Senior Indebtedness on a *pro rata* basis (subject to any necessary rounding) based on amounts tendered. If only a portion of a Note is purchased pursuant to an Asset Sale Offer, a new Note in a principal amount equal to the portion thereof not purchased will be issued in the name of the Holder thereof upon cancellation of the original Note (or appropriate adjustments to the amount and beneficial interests in a Global Note will be made, as appropriate, in accordance with the applicable procedures of the relevant Clearing Agencies). Notes (or portions thereof) purchased pursuant to an Asset Sale Offer shall be cancelled and cannot be reissued.

(j)    To the extent applicable, the Company shall comply with the requirements of all applicable securities laws and regulations in connection with the purchase of Notes pursuant to an Asset Sale Offer. To the extent that the provisions of any applicable securities laws or regulations conflict with this Section 3.12, the Company shall comply with the applicable securities laws and regulations and shall not be deemed to have breached its obligations under this Section 3.12 by doing so.

(k)    Upon completion of an Asset Sale Offer, the amount of Net Cash Proceeds will be reset at zero. Accordingly, to the extent that the aggregate amount of Notes and other Senior Indebtedness tendered pursuant to an Asset Sale Offer is less than the aggregate amount of unapplied Net Cash Proceeds, the Company and its Restricted Subsidiaries may use any remaining Net Cash Proceeds for any purpose not otherwise prohibited by this Indenture.

(l)    In the event of the transfer of substantially all (but not all) of the property and assets of the Company and its Restricted Subsidiaries as an entirety to a Person in a transaction permitted under Section 4.1, the Surviving Entity shall be deemed to have sold the properties and assets of the Company and its Restricted Subsidiaries not so transferred for purposes of this Section 3.12 and shall comply with the provisions of this covenant with respect to the deemed sale as if it were an Asset Sale. In addition, the Fair Market Value of properties and assets of the Company or its Restricted Subsidiaries so deemed to be sold shall be deemed to be Net Cash Proceeds for purposes of this Section 3.12.

Section 3.13    Limitation on Designation of Unrestricted Subsidiaries.

(a)    The Company may designate after the Issue Date any Subsidiary of the Company as an "Unrestricted Subsidiary" under this Indenture (a "Designation") only if:

(1)    no Default or Event of Default shall have occurred and be continuing at the time of or after giving effect to such Designation and any transactions between the Company or any of its Restricted Subsidiaries and such Unrestricted Subsidiary are in compliance with Section 3.16;

(2)    at the time of and after giving effect to such Designation, the Company could Incur U.S.$1.00 of additional Indebtedness pursuant to Section 3.9(a); and

(3)    the Company would be permitted to make an Investment at the time of Designation (assuming the effectiveness of such Designation and treating such Designation as an Investment at the time of Designation) as a Restricted

- 53 -

Payment pursuant to Section 3.11(a) in an amount (the "Designation Amount") equal to the Company's Investment in such Subsidiary on such date, and

(4) at the time of such Designation, neither the Company nor any Restricted Subsidiary will:

(x) provide credit support for, subject any of its property or assets (other than the Capital Stock of any Unrestricted Subsidiary) to the satisfaction of, or Guarantee, any Indebtedness of such Subsidiary (including any undertaking, agreement or instrument evidencing such Indebtedness);

(y) be directly or indirectly liable for any Indebtedness of such Subsidiary; or

(z) be directly or indirectly liable for any Indebtedness which provides that the holder thereof may (upon notice, lapse of time or both) declare a default thereon or cause the payment thereof to be accelerated or payable prior to its final scheduled maturity upon the occurrence of a default with respect to any Indebtedness of such Subsidiary, except for any non recourse Guarantee given solely to support the pledge by the Company or any Restricted Subsidiary of the Capital Stock of such Subsidiary.

(b) The Company may revoke any Designation of a Subsidiary as an Unrestricted Subsidiary (a "Revocation") only if:

(1) no Default or Event of Default shall have occurred and be continuing at the time of and after giving effect to such Revocation; and

(2) all Liens and Indebtedness of such Unrestricted Subsidiary outstanding immediately following such Revocation would, if Incurred at such time, have been permitted to be Incurred for all purposes of this Indenture.

(c) Upon a Designation, (i) all existing Investments of the Company and its Restricted Subsidiaries in such Subsidiary will be deemed to be made at that time, (ii) all existing transactions between such Subsidiary and the Company or its Restricted Subsidiaries will be deemed entered into at that time, (iii) such Subsidiary will be released, if applicable, from its Note Guarantee, and (iv) such Subsidiary will cease to be subject to the provisions of this Indenture as a Restricted Subsidiary.

(d) Upon a Revocation, (i) all of such Subsidiary's Indebtedness and Disqualified Capital Stock or Preferred Stock will be deemed Incurred at that time for purposes of Section 3.9 (ii) Investments in such Subsidiary previously charged under Section 3.11 will be credited thereunder, (iii) it may be required to issue a Note Guarantee pursuant to Article 10 and (iv) it will thereafter be subject to the provisions of this Indenture as a Restricted Subsidiary.

- 54 -

NAI-1502882142v7

(e)     The Designation of a Subsidiary of the Company as an Unrestricted Subsidiary shall be deemed to include the Designation of all of the Subsidiaries of such Subsidiary.  All Designations and Revocations must be evidenced by resolutions of the Board of Directors of the Company, delivered to the Trustee certifying compliance with the preceding provisions.

Section 3.14     Limitation on Dividends and Other Payment Restrictions Affecting Restricted Subsidiaries.

(a)     Except as provided in paragraph (b) of this Section 3.14, the Company shall not, and shall not cause or permit any of its Restricted Subsidiaries to, directly or indirectly, create or otherwise cause or permit to exist or become effective any encumbrance or restriction on the ability of any Restricted Subsidiary to:

(1)     pay dividends or make any other distributions on or in respect of its Capital Stock to the Company or any other Restricted Subsidiary or pay any Indebtedness owed to the Company or any other Restricted Subsidiary;

(2)     make loans or advances to, or Guarantee any Indebtedness or other obligations of, or make any Investment in, the Company or any other Restricted Subsidiary; or

(3)     transfer any of its property or assets to the Company or any other Restricted Subsidiary.

(b)     Paragraph (a) of this Section 3.14 shall not apply to encumbrances or restrictions existing under or by reason of:

(1)     applicable law, rule, regulation or order;

(2)     this Indenture, the Notes and the Note Guarantees;

(3)     the terms of any Indebtedness or other agreement outstanding on the Issue Date, and any amendment, modification, restatement, renewal, restructuring, replacement or Refinancing thereof; *provided* that any such amendment, modification, restatement, renewal, restructuring, replacement or Refinancing is not materially more restrictive, taken as a whole, with respect to such encumbrances or restrictions than those in existence on the Issue Date;

(4)     customary non-assignment provisions of any contract and customary provisions restricting assignment or subletting in any lease governing a leasehold interest of any Restricted Subsidiary, or any customary restriction on the ability of a Restricted Subsidiary to dividend, distribute or otherwise transfer any asset which secures Indebtedness secured by a Lien, in each case permitted to be Incurred under this Indenture;

(5)     (x) any existing instrument governing Acquired Indebtedness not Incurred in connection with, or in anticipation or contemplation of, the relevant

- 55 -

acquisition, merger or consolidation, or (y) existing under any other existing agreement or instrument binding on a Person acquired or its assets or properties which encumbrance or restriction is not applicable to any Person, or the properties or assets of any Person, other than the Person or the properties or assets of the Person so acquired;

(6)     restrictions with respect to a Restricted Subsidiary of the Company imposed pursuant to a binding agreement which has been entered into for the sale or disposition of Capital Stock or assets of such Restricted Subsidiary; *provided* that such restrictions apply solely to the Capital Stock or assets of such Restricted Subsidiary being sold;

(7)     customary restrictions imposed on the transfer of copyrighted or patented materials;

(8)     an agreement governing Indebtedness of the Company or any Restricted Subsidiaries permitted to be Incurred subsequent to the date hereof in accordance with Section 3.9; *provided* that the provisions relating to such encumbrance or restriction contained in such agreement are not materially more restrictive than those contained in the Indebtedness or agreement referred to in Section 3.14(b)(3) above;

(9)     Purchase Money Indebtedness for property (including Capital Stock) acquired in the ordinary course of business and Capitalized Lease Obligations that impose restrictions on the property purchased or leased of the nature described in Section 3.14(a)(3) above;

(10)     Liens permitted to be incurred under Section 3.15 that limit the right of the debtor to dispose of or otherwise transfer the assets subject to such Lien or securing such Indebtedness and any proceeds thereof; or

(11)     organizational documents, shareholders' agreements, joint venture agreements or similar documents of, or related to, Restricted Subsidiaries that are not Wholly Owned Subsidiaries and which have been entered into with the approval of the Company's Board of Directors.

Section 3.15    Limitation on Liens.

(a)     The Company shall not, and shall not cause or permit any of its Restricted Subsidiaries to, directly or indirectly, Incur any Liens of any kind (except for Permitted Liens) against or upon any of their respective properties or assets (including without limitation Capital Stock of any Restricted Subsidiaries), whether owned on the Issue Date or acquired after the Issue Date, or any proceeds therefrom, to secure any Indebtedness unless contemporaneously therewith effective provision is made:

(1)     in the case of the Company or any Restricted Subsidiary other than a Subsidiary Guarantor, to secure the Notes and all other amounts due under this Indenture; and

- 56 -

NAI-1502882142v7

(2) in the case of a Subsidiary Guarantor, to secure such Subsidiary Guarantor's Note Guarantee and all other amounts due under this Indenture;

in each case, equally and ratably with such Indebtedness (or, in the event that such Indebtedness is subordinated in right of payment to the Notes or such Note Guarantee, as the case may be, prior to such Indebtedness) with a Lien on the same properties and assets securing such Indebtedness for so long as such Indebtedness is secured by such Lien.

Section 3.16 Limitation on Transactions with Affiliates.

(a) The Company shall not, and shall not permit any of its Restricted Subsidiaries to, directly or indirectly, enter into any transaction or series of related transactions (including, without limitation, the purchase, sale, lease or exchange of any property or the rendering of any service) with, or for the benefit of, any of its Affiliates (each an "Affiliate Transaction"), unless:

(1) the terms of such Affiliate Transaction are no less favorable than those that could reasonably be expected to be obtained in a comparable transaction at such time on an arm's-length basis from a Person that is not an Affiliate of the Company;

(2) in the event that such Affiliate Transaction involves aggregate payments, or transfers of property or services with Fair Market Value in excess of U.S.$7.5 million, the terms of such Affiliate Transaction will be approved by a majority of the members of the Board of Directors of the Company (including a majority of the disinterested members thereof), the approval to be evidenced by a Board Resolution stating that the Board of Directors has determined that such transaction complies with the preceding provisions; and

(3) in the event that such Affiliate Transaction involves aggregate payments, or transfers of property or services with Fair Market Value in excess of U.S.$15.0 million, the Company will, prior to the consummation thereof, obtain a favorable opinion as to the fairness of such Affiliate Transaction to the Company and the relevant Restricted Subsidiary (if any) from a financial point of view from an Independent Financial Advisor and deliver the same to the Trustee.

(b) The provisions of paragraph (a) of this Section 3.16 shall not apply to:

(1) Affiliate Transactions with or among the Company and any Restricted Subsidiary or between or among Restricted Subsidiaries;

(2) reasonable fees and compensation paid to, and any indemnity provided on behalf of, officers, directors, employees, consultants or agents of the Company or any Restricted Subsidiary as determined in good faith by the Company's Board of Directors;

(3) Affiliate Transactions undertaken pursuant to any contractual obligations or rights in existence on the Issue Date and any amendment,

- 57 -

modification, extension or replacement of such agreement (so long as such amendment, modification, extension or replacement is not materially more disadvantageous to the Holders, taken as a whole, than the original agreement as in effect on the Issue Date);

(4)     any Restricted Payments made in compliance with Section 3.11;

(5)     loans and advances to officers, directors and employees of the Company or any Restricted Subsidiary for travel, entertainment, moving and other relocation expenses, in each case made in the ordinary course of business and not exceeding U.S.$3.0 million at any one time outstanding;

(6)     any issuance of Capital Stock (other than Disqualified Capital Stock) of the Company to Affiliates of the Company or to any director, officer, employee or consultant of the Company or any Restricted Subsidiary, and the granting and performance of registration rights;

(7)     the sale of advertising by the Company or any Restricted Subsidiary on terms that are no less favorable than those that could reasonably be expected to be obtained in a comparable transaction at such time on an arm's-length basis from a Person that is not an Affiliate of the Company; and

(8)     any employment agreement, employee benefit plan, officer or director indemnification agreement or any similar agreement entered into by the Company or any of its Restricted Subsidiaries in the ordinary course of business or consistent with past practice and payments pursuant thereto.

Section 3.17     Conduct of Business.  The Company and its Restricted Subsidiaries shall not engage in any business other than a Permitted Business.

Section 3.18     Reports to Holders.

(a)     So long as any Notes are Outstanding, the Company shall furnish to the Trustee:

(i)     within 120 days following the end of each of the Company's fiscal years, an annual report containing an "Operating and Financial Review" section with scope and content substantially similar to the corresponding section of the Offering Circular (after taking into consideration any changes to the business and operations of the Company after the Issue Date) for the periods covered by the financial information to be delivered pursuant to this Section 3.18(a)(i), consolidated audited income statements, statements of shareholders equity, balance sheets and cash flow statements and the related notes thereto for the Company for the two most recent fiscal years in accordance with IFRS, which need not, however, contain any reconciliation to IFRS or otherwise comply with Regulation S-X of the SEC, together with an audit report on such financial statements by the Company's independent auditors (in each case, presented in the English language);

- 58 -

NAI-1502882142v7

(ii)     within 60 days following the end of the first three fiscal quarters in each of the Company's fiscal years, quarterly reports containing unaudited consolidated balance sheets, statements of income, statements of shareholders equity and statements of cash flows and the related notes thereto for the Company and the Subsidiaries on a consolidated basis, in each case for the quarterly period then ended and the corresponding quarterly period in the prior fiscal year and prepared in accordance with IFRS, which need not, however, contain any reconciliation to IFRS or otherwise comply with Regulation S-X of the SEC, together with an "Operating and Financial Review" section with scope and content substantially similar to the corresponding section of the Offering Circular (after taking into consideration any changes to the business and operations of the Company after the Issue Date) for the periods covered by the financial information to be delivered pursuant to this Section 3.18(a)(ii) (in each case, presented in the English language); and

(iii)     within 20 days following such filing, copies (including English translations thereof), if applicable, of public filings which reasonably would be material to Holders made with any securities exchange or securities regulatory agency or authority, *provided*, that the Company will not be required to so provide copies or English translations of (a) public filings which may be obtained from the SEC via the EDGAR system or its successors or (b) except to the extent required by paragraphs (i) and (ii) of this Section 3.18(a), annual or quarterly and other reports or other documents filed (in Spanish) with the CNBV and the Mexican Stock Exchange (*Bolsa Mexicana de Valores*).

In addition, each of the reports provided pursuant to this Section 3.18(a) shall include the Consolidated Leverage Ratio of the Company and its Restricted Subsidiaries for such period, together with an appropriate footnote or other disclosure providing in reasonable detail the calculation of such ratio.

(b)     None of the information provided pursuant to paragraph (a) of this Section 3.18 shall be required to comply with Regulation S-K as promulgated by the SEC.

(c)     Delivery of such reports, information and documents to the Trustee, as well as any opinion delivered pursuant to Section 3.16(a)(3), shall be for informational purposes only and the Trustee's receipt of such shall not constitute actual or constructive notice of any information contained therein or determinable from information contained therein, including the Company's compliance with any of the covenants contained in this Indenture (as to which the Trustee shall be entitled to conclusively rely upon an Officers' Certificate). The Trustee shall have no obligation to monitor the Company's compliance with its obligations to deliver reports and information in accordance with this Section 3.18.

Section 3.19     Listing.

(a)     So long as the Notes are listed on the SGX-ST and the rules of the SGX-ST so require, the Company shall appoint and maintain a Paying Agent in Singapore, where such Notes may be presented or surrendered for payment or redemption in the event that the Global Notes representing such Notes are exchanged for Certificated Notes. In addition, in the event that

- 59 -

the Global Notes are exchanged for Certificated Notes, an announcement of such exchange will be made by, or on behalf of, the Company through the SGX-ST. Such announcement will include all material information with respect to the delivery of the definitive Notes, including details of the Paying Agent in Singapore.

(b)     The Company agrees to notify promptly the Trustee whenever the Notes become listed on any stock exchange and of any delisting thereof.

Section 3.20    Payment of Additional Amounts.

(a)     Subject to Sections 3.20(b) and (c), the Company or, as the case may be, the Subsidiary Guarantors shall pay such additional amounts ("Additional Amounts") as may be necessary in order to ensure that the net amounts received by the Holders of Notes after any withholding or deduction for or on account of any present or future taxes, duties, levies, imposts, assessments or governmental charges (including penalties, interest and additions related thereto) (collectively, "Taxes") of whatever nature imposed or levied by Mexico or any authority in Mexico shall equal the respective amounts of principal and interest which would have been received in respect of the Notes in the absence of such withholding or deduction, and the delivery by the Company, or as the case may be, the Subsidiary Guarantors of any such Additional Amounts to the appropriate Mexican authorities shall constitute receipt by the relevant Holders of such Additional Amounts so delivered; except that no such Additional Amounts shall be payable with respect to:

(1)     any Taxes imposed solely because at any time there is or was a connection between the Holder or beneficial owner of the Note (or between a fiduciary, settler, beneficiary, member or owner of, or holder of power over, such holder or beneficial owner, if such holder or beneficial owner is an estate, trust, partnership or corporation) and Mexico (or any political subdivision or territory or possession thereof), including such Holder or beneficial owner (or such fiduciary, settler, beneficiary, member, owner or holder of a power) (i) being or having been a citizen or resident thereof for tax purposes, (ii) maintaining or having maintained an office, permanent establishment, or branch subject to taxation therein, or (iii) being or having been present or engaged in a trade or business therein (other than the mere receipt of payments under, or the ownership or holding of, a Note);

(2)     any estate, inheritance, gift, sales, stamp, personal property, transfer or similar Tax, assessment or other governmental charge imposed with respect to the Notes;

(3)     any Taxes imposed solely because the Holder or any other person having an interest in the Notes fails to comply with any certification, identification, information, documentation or other reporting requirement concerning the nationality, residence, identity or connection with Mexico of the Holder or any beneficial owner of the Note, if compliance is required by statute, regulation, officially published administrative practice of the taxing jurisdiction or by an applicable income tax treaty, which is in effect and to which Mexico is a

- 60 -

party, as a precondition to exemption from, or reduction in the rate of, the Tax and at least 30 days' prior to the first payment date with respect to which the Company or a Subsidiary Guarantor shall apply this clause, the Company or, as the case may be, the relevant Subsidiary Guarantor shall have notified the Holder of such Note that such Holder or beneficial owner will be required to comply with such certification, identification, information, documentation or other reporting requirement;

(4)     any Note presented for payment more than 15 days after the Relevant Date (as defined below) except to the extent that the Holder would have been entitled to such Additional Amounts on presenting such Note for payment on the last day of such 15-day period (the "Relevant Date" in respect of any payment being the date on which such payment first becomes due except that, if the full amount of the monies payable has not been received by the Paying Agent on or prior to such due date, being the date on which, the full amount of such monies having been so received, notice to that effect is duly given to the Holders in accordance with Section 11.1 hereof);

(5)     any Taxes required to be deducted or withheld by any Paying Agent from a payment on a Note, if such payment can be made without such deduction or withholding by any other Paying Agent who can make such payment in accordance with the terms of this Indenture and the Notes;

(6)     any Taxes which are payable otherwise than by deduction or withholding from payments on or in respect of any Note (other than stamp, transfer or other similar taxes);

(7)     any payment on a Note to any Holder who is a fiduciary or partnership or other than the sole beneficial owner of any such payment, to the extent that a beneficiary or settlor with respect to such fiduciary, a member of such a partnership or the beneficial owner of such payment would not have been entitled to the Additional Amounts had such beneficiary, settlor, member or beneficial owner been the Holder of such Note;

(8)     any Taxes payable otherwise than by deduction or withholding from payments on the Notes;

(9)     any Taxes withheld or deducted on or in respect of any Note under Section 1471 through 1474 of the Code (or any amended or successor version that is substantively comparable) and any current or future regulations or official interpretations thereof, any agreement entered into pursuant to Section 1471(b)(1) of the Code, any intergovernmental agreement between a non-U.S. jurisdiction and the United States with respect to the foregoing or any law, regulation or practice adopted pursuant to any such intergovernmental agreement; or

(10)     any combination of Section 3.20(a)(1) through (a)(9).

NAI-1502882142v7

(b)     The limitations on the obligations to pay Additional Amounts set forth in Section 3.20(a)(3) above shall not apply if (i) the provision of information, documentation or other evidence described in such Section 3.20(a)(3)  would be materially more onerous, in form, in procedure or in the substance of information disclosed, to a holder or beneficial owner of a note, than comparable information or other reporting requirements imposed under U.S. tax law (including the United States-Mexico income tax treaty), regulations (including temporary or proposed regulations) and administrative practice, or (ii) Article 166, Section II, paragraph (a) of the Mexican Income Tax Law (*Ley del Impuesto Sobre la Renta*) (or a substitute or equivalent provision, whether included in any law, rule or regulation) is in effect, unless (A) the provision of the information, documentation or other evidence described in such clause (c) above is expressly required by the applicable Mexican laws and regulations in order to apply Article 166, Section II, paragraph (a) of the Mexican Income Tax Law (or substitute or equivalent provision), (B) the Company cannot obtain the information, documentation or other evidence necessary to comply with the applicable Mexican laws and regulations on its own through reasonable diligence and (C) the Company otherwise would meet the requirements for application of the applicable Mexican laws and regulations. In addition, such Section 3.20(a)(3) above does not require, and shall not be construed to require, that any holder, including any non-Mexican pension fund, retirement fund, tax-exempt organization or financial institution, register, to the extent applicable, with the Tax Management Service (Servicio de Administracion Tributaria) or the Mexican Ministry of Finance and Public Credit (Secretaria de Hacienda y Credito Público) to establish eligibility for an exemption from, or a reduction of, Mexican withholding taxes, or take any other action different from providing periodic information thereto.

(c)     Upon request, the Company and the Subsidiary Guarantors shall provide the Trustee with documentation satisfactory to the Trustee evidencing the payment of Mexican taxes in respect of which the Company or any Subsidiary Guarantor has paid any Additional Amount.  The Company shall make copies of such documentation available to the Holders of the Notes or the Paying Agents upon request.

(d)     The Company shall pay all stamp and other duties, if any, which may be imposed by Mexico or any political subdivision thereof or taxing authority of or in the foregoing with respect to the execution and delivery of this Indenture or the issuance of the Notes.

(e)     In the event of any merger or other transaction described and permitted under Section 4.1, then all references to Mexico, Mexican law or regulations, and Mexican taxing authorities under this section (other than Section 3.20(b), which relates to an exception to the obligation to pay Additional Amounts under Section 3.20(a)(3)) and under Section 5.3 shall be deemed to also include the United States, the European Union and any political subdivision therein or thereof, United States and European Union laws or regulations, and any taxing authority of the United States or the European Union or any political subdivision therein or thereof, respectively.

(f)     At least 5 Business Days prior to the first payment date on the Notes and at least 5 Business Days prior to each payment date thereafter, the Company shall furnish to the Trustee and each Paying Agent an Officers' Certificate (but only if there has been any change with respect to the matters set forth in any previously delivered Officers' Certificate) instructing the Trustee and such Paying Agent as to whether any payment of principal of or any interest on

- 62 -

NAI-1502882142v7

such Notes due on such payment date shall be made subject to deduction or withholding for or on account of any tax, duty, assessment or other governmental charge.  If any such deduction or withholding shall be required, then such Officers' Certificate shall specify the amount, if any, required to be deducted or withheld on such payment to the relevant recipient, shall certify that the Company shall pay the appropriate deduction or withholding amount to the appropriate taxing authority, and shall certify that the Company shall pay or cause to be paid to the Trustee or such Paying Agent Additional Amounts, if any, required.

(g) Any reference in this Indenture or the Notes to principal, premium, interest or any other amount payable in respect of the Notes by the Company or any Subsidiary Guarantor will be deemed also to refer to any Additional Amount that may be payable with respect to that amount under the obligations referred to in this Section 3.20.

Section 3.21 Suspension of Covenants.

(a) During any period of time that (i) the Notes have Investment Grade Ratings from at least two Rating Agencies, and (ii) no Default or Event of Default has occurred and is continuing (the occurrence of the events described in the foregoing clauses (i) and (ii) being collectively referred to as a "Covenant Suspension Event"), the Company and its Restricted Subsidiaries will not be subject to Sections 3.9, 3.10 (*provided* that such covenant shall apply to any Restricted Subsidiary that guarantees Indebtedness upon any Reversion Date (as defined below)), 3.11, 3.12, 3.13, 3.14, 3.16, 3.17 and 4.1(a)(2) (collectively, the "Suspended Covenants").

(b) In the event that the Company and its Restricted Subsidiaries are not subject to the Suspended Covenants for any period of time as a result of the foregoing, and on any subsequent date (the "Reversion Date") the Covenant Suspension Event ceases to exist, then the Company and its Restricted Subsidiaries will thereafter again be subject to the Suspended Covenants.  The period of time between the date of the Covenant Suspension Event and the Reversion Date is referred to as the "Suspension Period."  Notwithstanding that the Suspended Covenants may be reinstated, no Default or Event of Default will be deemed to have occurred as a result of a failure to comply with the Suspended Covenants during the Suspension Period (or upon termination of the Suspension Period or after that time based solely on events that occurred during the Suspension Period).

(c) On the Reversion Date, all Indebtedness incurred during the Suspension Period will be classified to have been Incurred pursuant to Section 3.9(a) or Section 3.9(b) (to the extent such Indebtedness would be permitted to be Incurred thereunder as of the Reversion Date and after giving effect to Indebtedness Incurred prior to the Suspension Period and outstanding on the Reversion Date).  To the extent such Indebtedness would not be so permitted to be Incurred pursuant to Section 3.9(a) or Section 3.9(b), such Indebtedness will be deemed to have been outstanding on the Issue Date, so that it is classified as permitted under Section 3.9(b)(4). Calculations made after the Reversion Date of the amount available to be made as Restricted Payments under Section 3.11 will be made as though Section 3.11 had been in effect since the Issue Date and throughout the Suspension Period.  Accordingly, Restricted Payments made during the Suspension Period will reduce the amount available to be made as Restricted Payments under the Section 3.11(a).  For purposes of Section 3.12, on the Reversion Date, the

NAI-1502882142v7

amount of Net Cash Proceeds of Asset Sales will be reset to the amount of Net Cash Proceeds in effect as of the first day of the Suspension Period ending on such Reversion Date.

(d)     The Company will give the Trustee written notice of any Covenant Suspension Event and in any event not later than ten Business Days after such Covenant Suspension Event has occurred.  In the absence of such notice, the Trustee shall assume without liability that the Suspended Covenants apply and are in full force and effect.  The Company will give the Trustee written notice of any occurrence of a Reversion Date not later than five Business Days after it becomes aware of such Reversion Date.  After any such notice of the occurrence of the Reversion Date, the Trustee shall assume without liability that the Suspended Covenants apply and are in full force and effect. In the absence of such notice of a Reversion Date, the Trustee shall assume without liability that the Suspended Covenants continue to be suspended.

## ARTICLE IV

## SURVIVING ENTITY

Section 4.1     <u>Merger, Consolidation and Sale of Assets</u>.

(a)     The Company shall not, in a single transaction or series of related transactions, consolidate or merge with or into any Person (whether or not the Company is the surviving or continuing Person), or sell, assign, transfer, lease, convey or otherwise dispose of (or cause or permit any Restricted Subsidiary to sell, assign, transfer, lease, convey or otherwise dispose of) all or substantially all of the Company's properties and assets (determined on a consolidated basis for the Company and its Restricted Subsidiaries), to any Person unless:

(1)     either:

(ii)     the Company (in the case of a consolidation or merger with or into any Person) shall be the surviving or continuing corporation; or

(iii)     the Person (if other than the Company) formed by such consolidation or into which the Company is merged or the Person which acquires by sale, assignment, transfer, lease, conveyance or other disposition the properties and assets of the Company and of the Company's Restricted Subsidiaries substantially as an entirety (the "<u>Surviving Entity</u>"):

(A)     shall be a corporation organized and validly existing under the laws of Mexico or the United States of America, any State thereof or the District of Columbia or any member state of the European Union, and

(B)     shall expressly assume, by supplemental indenture (in form and substance satisfactory to the Trustee), executed and delivered to the Trustee, the due and punctual payment of the principal of, and premium, if any, and interest on all of the Notes and the performance and observance of every covenant of the Notes and this Indenture on the part of the Company to be performed or observed;

(2) immediately after giving effect to such transaction and the assumption contemplated by clause (a)(1)(iii)(B) of this <u>Section 4.1</u> (including giving effect on a *pro forma* basis to any Indebtedness, including any Acquired Indebtedness, Incurred or anticipated to be Incurred in connection with or in respect of such transaction), the Company or such Surviving Entity, as the case may be, will be able to Incur at least U.S.$1.00 of additional Indebtedness pursuant to <u>Section 3.9(a)</u>.

(3) immediately before and immediately after giving effect to such transaction and the assumption contemplated by clause (a)(1)(iii)(B) of this <u>Section 4.1</u> (including, without limitation, giving effect on a *pro forma* basis to any Indebtedness, including any Acquired Indebtedness, Incurred or anticipated to be Incurred and any Lien granted in connection with or in respect of the transaction), no Default or Event of Default shall have occurred or be continuing;

(4) each Subsidiary Guarantor (including Persons that become Subsidiary Guarantors as a result of the transaction) has confirmed by Supplemental Indenture that its Note Guarantee will apply for the Obligations of the Surviving Entity in respect of this Indenture and the Notes;

(5) if the Company is organized under Mexican law and merges with a corporation, or the Surviving Entity is, organized under the laws of the United States, any State thereof or the District of Columbia or any member state of the European Union or the Company is organized under the laws of the United States, any State thereof or the District of Columbia or any member state of the European Union and merges with a corporation, or the Surviving Entity is, organized under the laws of Mexico, the Company or the Surviving Entity will have delivered to the Trustee an Opinion of Counsel from each of (x) Mexico and (y) the United States or the applicable European Union member state, to the effect that, as applicable:

(i) each Holder of the Notes will not recognize income, gain or loss for United States or European Union, as applicable, or Mexican income tax purposes as a result of the transaction and will be taxed in the Holder's home jurisdiction in the same manner and on the same amounts (assuming solely for this purpose that no Additional Amounts are required to be paid on the Notes) and at the same time as would have been the case if the transaction had not occurred;

(ii) no other taxes on income, including capital gains, will be payable by Holders of the Notes under the laws of the United States or the European Union, as applicable, or Mexico relating to the acquisition, ownership or disposition of the Notes, including the receipt of interest or principal thereon; *provided* that the Holder does not use or hold, and is not deemed to use or hold the Notes in carrying on a business in the United States or the European Union, as applicable, or Mexico; and

- 65 -

(6)      the Company or the Surviving Entity has delivered to the Trustee an Officers' Certificate and an Opinion of Counsel from the relevant jurisdictions, each stating that the consolidation, merger, sale, assignment, transfer, lease, conveyance or other disposition and, if required in connection with such transaction, the supplemental indenture, comply with the applicable provisions of this Indenture and that all conditions precedent in this Indenture relating to the transaction have been satisfied.

(b)      For purposes of this Section 4.1, the transfer (by lease, assignment, sale or otherwise, in a single transaction or series of transactions) of all or substantially all of the properties or assets of one or more Restricted Subsidiaries of the Company, the Capital Stock of which constitutes all or substantially all of the properties and assets of the Company (determined on a consolidated basis for the Company and its Restricted Subsidiaries), shall be deemed to be the transfer of all or substantially all of the properties and assets of the Company.

(c)      Upon any consolidation, combination or merger or any transfer of all or substantially all of the properties and assets of the Company and its Restricted Subsidiaries in accordance with this Section 4.1, in which the Company is not the continuing corporation, the Surviving Entity formed by such consolidation or into which the Company is merged or to which such conveyance, lease or transfer is made will succeed to, and be substituted for, and may exercise every right and power of, the Company under this Indenture and the Notes with the same effect as if such Surviving Entity had been named as such and the Company shall be released from its obligations under the Notes and this Indenture.  For the avoidance of doubt, compliance with this Section 4.1 will not affect the obligations of the Company (including a Surviving Entity, if applicable) under Section 3.8, if applicable.

(d)      Each Subsidiary Guarantor shall not, and the Company shall not cause or permit any Subsidiary Guarantor to, consolidate with or merge into, or sell or dispose of all or substantially all of its assets to, any Person (other than the Company) that is not a Subsidiary Guarantor unless such transaction is otherwise in compliance with this Indenture and:

(1)      such Person (if such Person is the surviving entity) assumes all of the obligations of such Subsidiary Guarantor in respect of its Note Guarantee by executing a Supplemental Indenture and providing the Trustee with an Officers' Certificate and Opinion of Counsel from the relevant jurisdictions, each stating that the consolidation, merger, sale, assignment, transfer, lease, conveyance or other disposition and the Supplemental Indenture comply with the applicable provisions of this Indenture and all conditions precedent in this Indenture relating to the transaction have been satisfied;

(2)      such Note Guarantee is to be released as provided under Section 10.2 or

(3)      such sale or other disposition of substantially all of such Subsidiary Guarantor's assets is made in accordance with Section 3.12.

(e)      The provisions of this Section 4.1 will not apply to:

- 66 -

NAI-1502882142v7

(1) any transfer of the properties or assets of a Restricted Subsidiary to the Company, a Subsidiary Guarantor or another Restricted Subsidiary;

(2) any merger of a Restricted Subsidiary into the Company, a Subsidiary Guarantor or another Restricted Subsidiary; or

(3) any merger of the Company into a Wholly Owned Subsidiary of the Company;

so long as, in each case the Indebtedness of the Company and its Restricted Subsidiaries taken as a whole is not increased thereby.

## ARTICLE V

## OPTIONAL REDEMPTION OF NOTES

Section 5.1 Optional Redemption.

(a) Prior to August 9, 2021, the Company may redeem the Notes, at its option, in whole at any time or in part from time to time, upon at least 30 days' but not more than 60 days' notice, at a redemption price equal to 100% of the principal amount thereof plus the Applicable Premium and accrued and unpaid interest to, but not including, the Redemption Date.

(b) On and after August 9, 2021, the Company may redeem the Notes, at its option, in whole at any time or in part from time to time, upon at least 30 days' but not more than 60 days' notice, at the following redemption prices, expressed as percentages of the principal amount thereof, if redeemed during the twelve-month period commencing on August 9 of any year set forth below, plus accrued and unpaid interest to, but not including, the Redemption Date:

| Year | Percentage |
|------|------------|
| 2021 .............................. | 104.125% |
| 2022 .............................. | 102.063% |
| 2023 .............................. | 100.000% |

Section 5.2 Optional Redemption upon Equity Offerings.

(a) Prior to August 9, 2021, the Company may, at its option, at any time or from time to time, upon at least 30 days' but not more than 60 days' notice, use the net cash proceeds of one or more Equity Offerings to redeem up to 35% of the aggregate principal amount of the Notes issued under this Indenture at a redemption price equal to 108.250% of the principal amount thereof, plus accrued and unpaid interest to, but not including, the Redemption Date; *provided that*:

(1) after giving effect to any such redemption at least 65% of the aggregate principal amount of the Notes issued under this Indenture remains Outstanding; and

- 67 -

NAI-1502882142v7

(2)     the Company shall make such redemption not more than 90 days after the consummation of such Equity Offering.

Section 5.3    Optional Redemption for Changes in Withholding Taxes.

(a)    If, as a result of any amendment to, or change in, the laws (or any rules or regulations thereunder) of Mexico or any political subdivision or taxing authority or other instrumentality thereof or therein affecting taxation, or any amendment to or change in an official interpretation or application of such laws, rules or regulations, which amendment to or change of such laws, rules or regulations becomes effective on or after the Issue Date the Company or the Subsidiary Guarantors have become obligated or will become obligated, in each case, after taking all reasonable measures to avoid this requirement, to pay Additional Amounts in excess of those attributable to a Mexican withholding tax rate of 4.9% with respect to the Notes, then the Company may redeem the Notes, at its option, in whole but not in part at any time, upon at least 30 days' but not more than 60 days' notice, at a redemption price equal to 100% of the outstanding principal amount, plus accrued and unpaid interest and any Additional Amounts due thereon up to, but not including, the Redemption Date; provided, however, that (1) no notice of redemption for tax reasons may be given earlier than 90 days prior to the earliest date on which the Company or the Subsidiary Guarantors would be obligated to pay these Additional Amounts if a payment on the Notes were then due, and (2) at the time such notice of redemption is given such obligation to pay such Additional Amounts remains in effect.

(b)    Prior to the publication or delivery to Holders of any notice of redemption pursuant to this provision, the Company will deliver to the Trustee:

- an Officers' Certificate stating that the Company is entitled to effect the redemption and setting forth a statement of facts showing that the conditions precedent to the Company's right to redeem have occurred, and

- an opinion of Mexican legal counsel (which may be the Company's outside counsel) of recognized standing to the effect that the Company has or will become obligated to pay such Additional Amounts as a result of such change or amendment.

Section 5.4    Optional Redemption Procedures.

(a)    The Company shall evidence its election to redeem any Notes pursuant to Section 5.1, 5.2 or 5.3 by a Board Resolution delivered prior to delivery of notice of redemption to the Holders.

Section 5.5    Notice of Redemption.

(a)    The Company shall give (or direct the Trustee to give on its behalf) notice to the Holders of Notes to be redeemed pursuant to Section 5.1, 5.2 or 5.3 of this Indenture of any redemption the Company proposes to make at least 30 days (but not more than 60 days) before the Redemption Date.

NAI-1502882142v7

(b)      Notice of any redemption will (i) in the case of Holders of Certificated Notes, be mailed by first-class mail, postage prepaid, to each Holder of Notes to be redeemed at its registered address and (ii) in the case of the Holders of Global Notes, be given in accordance with the customary procedures of the applicable Clearing Agency.  If the Company itself gives the notice, it shall also deliver a copy to the Trustee. This notice, once delivered by the Company to the Holders, shall be irrevocable.  If Notes are to be redeemed in part only, the notice of redemption will state the portion of the principal amount thereof to be redeemed.  A new Note in a principal amount equal to the unredeemed portion thereof (if any) will be issued in the name of the Holder thereof upon cancellation of the original Note (or appropriate adjustments to the amount and beneficial interests in a Global Note will be made, as appropriate).

(c)      The Company shall deliver to the Trustee, at least 45 days prior to the Redemption Date (unless the Trustee is satisfied with a shorter period), (i) notice of the proposed redemption and (ii) if the Company is not redeeming all Outstanding Notes or the Company directs the Trustee to give notice of redemption to Holders, an Officers' Certificate requesting that the Notes to be redeemed be selected in accordance with Section 5.6 and/or give notice of redemption and setting forth the information required by paragraph (d) of this Section 5.5 (with the exception of the identification of the particular Notes, or portions of the particular Notes, to be redeemed in the case of a partial redemption).  If the Company directs the Trustee to give notice of redemption, the Trustee shall give the notice in the name of the Company and at the Company's expense.

(d)      All notices of redemption shall state:

(1)      the Redemption Date,

(2)      the redemption price and the amount of any accrued interest payable as provided in Section 5.8,

(3)      whether or not the Company is redeeming all Outstanding Notes,

(4)      if the Company is not redeeming all Outstanding Notes, the aggregate principal amount of Notes that the Company is redeeming and the aggregate principal amount of Notes that will be Outstanding after the partial redemption, as well as the identification of the particular Notes, or portions of the particular Notes, that the Company is redeeming,

(5)      if the Company is redeeming only part of a Note, that on and after the Redemption Date, upon surrender of that Note, the Holder will receive, without charge, a new Note or Notes of authorized denominations for the principal amount of the Note remaining unredeemed,

(6)      that on the Redemption Date the redemption price and any accrued interest payable to the Redemption Date as provided in Section 5.6 shall become due and payable in respect of each Note, or the portion of each Note, to be redeemed, and, unless the Company defaults in making the redemption payment, that interest on each Note, or the portion of each Note, to be redeemed, shall cease to accrue on and after the Redemption Date,

- 69 -

(7)     the place or places where a Holder must surrender the Holder's Notes for payment of the redemption price,

(8)     that the redemption of Notes with unpaid and accrued interest to the Redemption Date will not affect the right of Holders on a Record Date to receive interest due on the related Interest Payment Date, and

(9)     the Common Code and ISIN, if any, listed in the notice or printed on the Notes, and that no representation is made as to the accuracy or correctness of such Common Code and ISIN.

Section 5.6     Selection of Notes to Be Redeemed in Part.

(a)     If the Company is not redeeming all Outstanding Notes, the Notes to be redeemed shall be settled in compliance with the requirements of the principal securities exchange, if any, on which the Notes are listed or, if the Notes are not then listed on a securities exchange, on a *pro rata* basis, by lot or by any other method as the Trustee shall deem fair and appropriate (subject, in each case, to the applicable procedures of the Clearing Agencies); *provided*, *however*, that if a partial redemption is made with the proceeds of an Equity Offering, selection of the Notes, or portions of the Notes, for redemption shall, subject to this Section 5.6, be made by the Trustee only on a *pro rata* basis or on as nearly a *pro rata* basis as is practicable (subject to the applicable procedures of the Clearing Agencies), unless that method is otherwise prohibited.  The Trustee shall make the selection from the Outstanding Notes not previously called for redemption.  The Trustee shall promptly notify the Company in writing of the Notes selected for redemption and, in the case of any Notes selected for partial redemption, the principal amount of the Notes to be redeemed.  In the event of a partial redemption by lot, the particular Notes to be redeemed shall be selected not less than 30 nor more than 60 days prior to the relevant Redemption Date from the Outstanding Notes not previously called for redemption. Notes selected for redemption shall be redeemed in portions (equal to U.S.$200,000 or any integral multiple of U.S.$1,000 in excess thereof) of the principal of Notes, subject to the minimum authorized denomination requirement of this Indenture.

(b)     For all purposes of this Indenture, unless the context otherwise requires, all provisions relating to redemption of Notes shall relate, in the case of any Note redeemed or to be redeemed only in part, to the portion of the principal amount of that Note which has been or is to be redeemed.

Section 5.7     Deposit of Redemption Price.  Prior to 10:00 a.m. New York City time on the Business Day immediately preceding the relevant Redemption Date, the Company shall deposit with the Trustee or with a Paying Agent (or, if the Company is acting as Paying Agent, segregate and hold in trust as provided in Section 2.4) an amount of U.S. Legal Tender in immediately available funds sufficient to pay the redemption price of, and accrued interest on, all the Notes that the Company is redeeming on the Redemption Date.

Section 5.8     Notes Payable on Redemption Date.  If the Company, or the Trustee on behalf of the Company, gives notice of redemption in accordance with this Article V, the Notes, or the portions of Notes, called for redemption shall, on the Redemption Date, become due and

- 70 -

payable at the redemption price specified in the notice (together with accrued interest, if any, to the Redemption Date), and from and after the Redemption Date (unless the Company shall default in the payment of the redemption price and accrued interest) such Notes or such portions of Notes shall cease to bear interest. Upon surrender of any Note for redemption in accordance with the notice, the Company shall pay the redemption price for such Note, together with accrued interest, if any, to, but not including, the Redemption Date (subject to the rights of Holders of record on the relevant Record Date to receive interest due on the relevant Interest Payment Date). If the Company shall fail to pay the redemption price for any Note called for redemption upon its surrender for redemption, the principal shall, until paid, bear interest from the Redemption Date at the rate borne by the Notes. Upon redemption of any Notes by the Company, such redeemed Notes shall be cancelled and may not be reissued.

Section 5.9    Unredeemed Portions of Partially Redeemed Note. Upon surrender of a Note that is to be redeemed in part, the Company shall execute, and the Trustee shall authenticate and make available for delivery to the Holder of the Note at the expense of the Company, a new Note or Notes, of any authorized denomination as requested by the Holder, in an aggregate principal amount equal to, and in exchange for, the unredeemed portion of the principal of the Note surrendered.

ARTICLE VI

DEFAULTS AND REMEDIES

Section 6.1    Events of Default.

(a)    Each of the following is an "Event of Default":

(1)    default in the payment when due of the principal of or premium, if any, on any Notes, including the failure to make a required payment to purchase Notes tendered or to redeem Notes pursuant to an optional redemption, Change of Control Offer or an Asset Sale Offer;

(2)    default for 30 consecutive days or more in the payment when due of interest, or Additional Amounts, if any, on any Notes;

(3)    the failure to perform or comply with any of the provisions described under Section 4.1 for 20 consecutive days or more following written notice of such failure (i) to the Company from the Trustee or (ii) to the Company and the Trustee from Holders of at least 25.0% in aggregate principal amount of the Outstanding Notes;

(4)    the failure by the Company or any Restricted Subsidiary to comply with any other covenant or agreement contained in this Indenture or in the Notes for 45 consecutive days or more after written notice to the Company from the Trustee or to the Company and the Trustee from Holders of at least 25.0% in aggregate principal amount of the Outstanding Notes;

- 71 -

(5)     default by the Company or any Restricted Subsidiary under any Indebtedness which:

> (1)     is caused by a failure to pay principal of or premium, if any, or interest on such Indebtedness prior to the expiration of any applicable grace period and which failure shall not have been cured or waived; or

> (2)     results in the acceleration of such Indebtedness prior to its Stated Maturity;

and in either case the principal or accreted amount of Indebtedness covered by subclause (1) or (2) at the relevant time, aggregates U.S.$25.0 million or more;

(6)     failure by the Company or any of its Restricted Subsidiaries to pay one or more final judgments not subject to appeal against any of them, aggregating U.S.$25.0 million or more, which judgment(s) are not paid, discharged or stayed for a period of 60 days or more and which are not covered by insurance or bonds;

(7)     a Bankruptcy Law Event of Default; or

(8)     except as permitted in this Indenture, any Note Guarantee is held to be unenforceable or invalid in a judicial proceeding or ceases for any reason to be in full force and effect or any Subsidiary Guarantor, or any Person acting on behalf of any Subsidiary Guarantor, denies or disaffirms such Subsidiary Guarantor's obligations under its Note Guarantee.

(b)     The Company shall deliver to the Trustee upon becoming aware of any Default or Event of Default written notice of events which would constitute such Default or Event of Default, their status and what action the Company is taking or proposes to take in respect thereof.

Section 6.2     Acceleration.

(a)     If an Event of Default (other than an Event of Default specified in Section 6.1(a)(7) above with respect to the Company) shall occur and be continuing, the Trustee or the Holders of at least 25% in principal amount of Outstanding Notes may declare the unpaid principal of (and premium, if any) and accrued and unpaid interest on all the Notes to be immediately due and payable by notice in writing to the Company and the Trustee specifying the Event of Default and that it is a "notice of acceleration." If an Event of Default specified in Section 6.1(a)(7) above occurs with respect to the Company, then the unpaid principal of (and premium, if any) and accrued and unpaid interest on all the Notes shall become immediately due and payable without any declaration or other act on the part of the Trustee or any Holder.

(b)     At any time after a declaration of acceleration with respect to the Notes as described in Section 6.2(a), Holders of a majority in principal amount of the Outstanding Notes may rescind and cancel such declaration and its consequences:

(1)	if the rescission would not conflict with any judgment or decree;

(2)	if all existing Events of Default have been cured or waived, except nonpayment of principal, interest or premium that has become due solely because of the acceleration;

(3)	to the extent the payment of such interest is lawful, interest on overdue installments of interest and overdue principal, which has become due otherwise than by such declaration of acceleration, has been paid; and

(4)	if the Company has paid the Trustee its reasonable compensation and reimbursed the Trustee for its reasonable expenses, disbursements and advances.

No rescission shall affect any subsequent Default or impair any rights relating thereto.

Section 6.3	Other Remedies.

(a)	If an Event of Default occurs and is continuing, the Trustee may pursue any available remedy to collect the payment of principal of and interest on the Notes or to enforce the performance of any provision of the Notes or this Indenture.

(b)	The Trustee may maintain a proceeding even if it does not possess any of the Notes or does not produce any of them in such proceeding.  A delay or omission by the Trustee or any Holder in exercising any right or remedy accruing upon an Event of Default shall not impair the right or remedy or constitute a waiver of or acquiescence in the Event of Default.  No remedy is exclusive of any other remedy.  All available remedies are cumulative to the extent permitted by law.

Section 6.4	Waiver of Past Defaults.  The Holders of a majority in principal amount of Outstanding Notes may waive any existing Default or Event of Default under this Indenture, and its consequences, except a default in the payment of the principal of, premium, if any, or interest on any Notes.  For the avoidance of doubt, the Holders may not waive any declaration of acceleration with respect to the Notes, except as provided in Section 6.2(b).

Section 6.5	Control by Majority.  Subject to all provisions of this Indenture and applicable law, Holders of a majority in aggregate principal amount of the then Outstanding Notes have the right to direct the time, method and place of conducting any proceeding for any remedy available to the Trustee or of exercising any trust or power conferred on the Trustee, *provided* that, the Trustee shall be under no obligation to exercise any right or power under this Indenture at the request, order or direction of any Holders unless such Holders have offered to the Trustee indemnity reasonably satisfactory to it.

Section 6.6	Limitation on Suits.

(a)	No Holder of any Notes shall have any right to institute any proceeding with respect hereto or for any remedy under this Indenture, unless:

NAI-1502882142v7

(1) such Holder gives to the Trustee written notice of a continuing Event of Default;

(2) Holders of at least 25% in principal amount of the then Outstanding Notes make a written request to pursue the remedy;

(3) such Holders of the Notes provide to the Trustee reasonably satisfactory indemnity;

(4) the Trustee does not comply within 60 days; and

(5) during such 60-day period the Holders of a majority in principal amount of the Outstanding Notes do not give the Trustee a written direction which is inconsistent with the request;

*provided* that a Holder of a Note may institute suit for enforcement of payment of the principal of and premium, if any, or interest on such Note on or after the respective due dates expressed in such Note.

Section 6.7    Rights of Holders to Receive Payment.  Notwithstanding any other provision hereof (including, without limitation, Section 6.6), the right of any Holder to receive payment of principal of or interest on the Notes held by such Holder, on or after the respective due dates, Redemption Dates or repurchase date expressed in this Indenture or the Notes, or to bring suit for the enforcement of any such payment on or after such respective dates, shall not be impaired or affected without the consent of such Holder.

Section 6.8    Collection Suit by Trustee.  If an Event of Default specified in Section 6.1(a)(1) and Section 6.1(a)(2) occurs and is continuing, the Trustee may recover judgment in its own name and as trustee of an express trust against the Company and each Subsidiary Guarantor for the whole amount then due and owing (together with applicable interest on any overdue principal and, to the extent lawful, Defaulted Interest) and the amounts provided for in Section 7.7.

Section 6.9    Trustee May File Proofs of Claim, etc.

(a)    The Trustee may (irrespective of whether the principal of the Notes is then due):

(1) file such proofs of claim and other papers or documents as may be necessary or advisable in order to have the claims of the Trustee and the Holders under this Indenture and the Notes allowed in any bankruptcy, insolvency, liquidation or other judicial proceedings relative to the Company, any Subsidiary Guarantor or any Subsidiary of the Company or their respective creditors or properties; and

(2) collect and receive any moneys or other property payable or deliverable in respect of any such claims and distribute them in accordance with this Indenture.

- 74 -

Any receiver, trustee, liquidator, sequestrator (or other similar official) in any such proceeding is hereby authorized by each Holder to make such payments to the Trustee and, in the event that the Trustee shall consent to the making of such payments directly to the Holders, to pay to the Trustee any amount due to it for the reasonable compensation, expenses, taxes, disbursements and advances of the Trustee, its agent and counsel, and any other amounts due to the Trustee pursuant to Section 7.7.

(b)     Nothing in this Indenture shall be deemed to authorize the Trustee to authorize or consent to or accept or adopt on behalf of any Holder any plan of reorganization, arrangement, adjustment or composition affecting the Notes or the rights of any Holder thereof, or to authorize the Trustee to vote in respect of the claim of any Holder in any such proceeding.

Section 6.10    Priorities.  If the Trustee collects any money or property pursuant to this Article VI, it shall pay out the money or property in the following order:

FIRST:  to the Trustee for amounts due under Section 7.7;

SECOND:  if the Holders proceed against the Company directly without the Trustee in accordance with this Indenture, to Holders for their collection costs;

THIRD:  to Holders for amounts due and unpaid on the Notes for principal and interest, ratably, without preference or priority of any kind, according to the amounts due and payable on the Notes for principal and interest, respectively; and

FOURTH:  to the Company or, to the extent the Trustee collects any amount pursuant to Article X from any Subsidiary Guarantor, to such Subsidiary Guarantor, or to such party as a court of competent jurisdiction shall direct.

The Trustee may, upon notice to the Company, fix a record date and payment date for any payment to Holders pursuant to this Section 6.10.

Section 6.11    Undertaking for Costs.  In any suit for the enforcement of any right or remedy under this Indenture or in any suit against the Trustee for any action taken or omitted by it as Trustee, a court in its discretion may require the filing by any party litigant in the suit of an undertaking to pay the costs of the suit, and the court in its discretion may assess reasonable costs, including reasonable attorneys' fees and expenses, against any party litigant in the suit, having due regard to the merits and good faith of the claims or defenses made by the party litigant.  This Section 6.11 does not apply to a suit by the Trustee, a suit by the Company, a suit by a Holder pursuant to Section 6.7 or a suit by Holders of more than 10% in principal amount of Outstanding Notes.

## ARTICLE VII

## TRUSTEE

Section 7.1    Duties of Trustee.

(a)    If a Default or an Event of Default has occurred and is continuing, the Trustee shall exercise the rights and powers vested in it by this Indenture and use the same degree of care and skill in their exercise as a prudent person would exercise or use under the circumstances in the conduct of his or her own affairs.

(b)    Except during the continuance of a Default or an Event of Default:

(1)    the Trustee undertakes to perform such duties and only such duties as are specifically set forth in this Indenture and no implied covenants or obligations shall be read into this Indenture against the Trustee; and

(2)    in the absence of bad faith on its part, the Trustee may conclusively rely, as to the truth of the statements and the correctness of the opinions expressed therein, upon certificates or opinions furnished to the Trustee and conforming to the requirements of this Indenture.  However, in the case of any such certificates or opinions which by any provisions hereof are specifically required to be furnished to the Trustee, the Trustee shall examine such certificates and opinions to determine whether or not they conform to the requirements of this Indenture.

(c)    The Trustee may not be relieved from liability for its own negligent action, its own negligent failure to act or its own willful misconduct, except that:

(1)    this paragraph (c) does not limit the effect of paragraph (b) of this Section 7.1;

(2)    the Trustee shall not be liable for any error of judgment made in good faith by a Trust Officer unless it is proved that the Trustee was negligent in ascertaining the pertinent facts; and

(3)    the Trustee shall not be liable with respect to any action it takes or omits to take in good faith in accordance with a direction received by it pursuant to Section 6.2, Section 6.5 or Section 6.8.

(d)    The Trustee shall not be liable for interest on, or the investment of, any money received by it except as the Trustee may agree in writing with the Company.

(e)    Money held in trust by the Trustee need not be segregated from other funds except to the extent required by law.

(f)    No provision hereof shall require the Trustee to expend or risk its own funds or otherwise incur financial liability in the performance of any of its duties under this

- 76 -

NAI-1502882142v7

Indenture or in the exercise of any of its rights or powers, if it shall have reasonable grounds to believe that repayment of such funds or adequate indemnity against such risk or liability is not reasonably assured to it.

(g)  Every provision of this Indenture relating to the conduct or affecting the liability of or affording protection to the Trustee and/or any Agent shall be subject to the provisions of this Article VII.

(h)  The Trustee shall be under no obligation to exercise any of the rights or powers vested in it by this Indenture at the request, order or direction of any of the Holders unless such Holders shall have offered to the Trustee security or indemnity reasonably satisfactory to it against the costs, expenses (including reasonable attorneys' fees and expenses) and liabilities that might be incurred by it in compliance with such request or direction.

Section 7.2  Rights of Trustee. Subject to Section 7.1 hereof and Sections 315(a) through (d) of the TIA:

(a)  The Trustee may rely upon, and shall be fully protected in acting or refraining from acting based upon any document reasonably believed by it to be genuine and to have been signed or presented by the proper Person. The Trustee need not investigate any fact or matter stated in any such document.

(b)  Before the Trustee acts or refrains from acting at the direction of the Company or any Subsidiary Guarantor, it may require an Officers' Certificate or an Opinion of Counsel.  The Trustee shall not be liable for any action it takes or omits to take in good faith in reliance on an Officers' Certificate or Opinion of Counsel.

(c)  The Trustee may act through its attorneys and agents and shall not be responsible for the misconduct or negligence of any agent appointed with due care.

(d)  The Trustee shall not be liable for any action it takes or omits to take in good faith which it believes to be authorized or within its rights or powers.

(e)  The Trustee may consult with counsel of its selection, and the advice or opinion of such counsel with respect to legal matters relating to this Indenture, the Notes and the Note Guarantees shall be full and complete authorization and protection from liability in respect to any action taken, omitted or suffered by it under this Indenture in good faith and in accordance with the advice or opinion of such counsel.

(f)  The Trustee shall not be bound to make any investigation into the facts or matters stated in any resolution, certificate, statement, instrument, opinion, report, notice, request, direction, consent, order, bond, debenture, note, other evidence of indebtedness or other paper or document, but the Trustee, in its discretion, may make such further inquiry or investigation into such facts or matters as it may see fit, and, if the Trustee shall determine to make such further inquiry or investigation, it shall be entitled, upon a 15 (fifteen) working days written notice to the Company, to examine the books, records and premises of the Company, personally or by agent or attorney at the sole cost of the Company. The Trustee shall incur no liability or additional liability of any kind by reason of such inquiry or investigation.

- 77 -

(g)    The Trustee shall not be deemed to have notice of any Default or Event of Default (other than payment default under Section 6.1(a)(1) or (2)) unless written notice of any event which is in fact such a Default or Event of Default is received by the Trustee at the Corporate Trust Office of the Trustee, and such notice references the Notes and this Indenture.

(h)    The rights, privileges, protections, immunities and benefits given to the Trustee, including, without limitation, its right to be indemnified, are extended to, and shall be enforceable by, the Trustee in each of its capacities under this Indenture, and to each Agent, custodian and other Person employed to act under this Indenture.

(i)    The Trustee may request that the Company and each Subsidiary Guarantor deliver an Officers' Certificate setting forth the names of individuals and/or titles of Officers authorized at such time to take specified actions pursuant to this Indenture, which Officers' Certificate may be signed by any person authorized to sign an Officers' Certificate, including any person specified as so authorized in any such certificate previously delivered and not superseded.

(j)    Any request, direction, order or demand of the Company and/or any Subsidiary Guarantor mentioned in this Indenture shall be sufficiently evidenced by an Officers' Certificate (unless other evidence in respect thereof be in this Indenture specifically prescribed); and any resolution of the Board of Directors of the Company or any Subsidiary Guarantor may be evidenced by a Board Resolution.

(k)    Notwithstanding any provisions in this Indenture to the contrary, in no event shall the Trustee be liable for any failure or delay in the performance of its obligations under this Indenture because of circumstances beyond its control, including, but not limited to, acts of God, flood, war (whether declared or undeclared), terrorism, fire, riot, strikes or work stoppages for any reason, embargo, government action, including any laws, ordinances, regulations or the like which restrict or prohibit the providing of the services contemplated by this Indenture, inability to obtain material, equipment, or communications or computer facilities, or the failure of equipment or interruption of communications or computer facilities, and other causes beyond its control whether or not of the same class or kind as specifically named above, it being understood that the Trustee shall use reasonable efforts that are consistent with accepted practices in the banking industry to resume performance as soon as practicable under the circumstances.

(l)    In no event shall the Trustee be responsible or liable for special, indirect, consequential or punitive loss or damage of any kind whatsoever (including, but not limited to, loss of profit), irrespective of whether the Trustee has been advised of the likelihood or such loss or damages and regardless of the form of action.

(m)    The permissive rights of the Trustee enumerated in this Indenture shall not be construed as duties.

(n)    Neither the Trustee nor any Agent shall have any liability or responsibility with respect to, or obligation or duty to monitor, determine or inquire (i) as to the Company's or any Subsidiary Guarantor's compliance with any covenant under this Indenture (other than the

- 78 -

NAI-1502882142v7

covenant to make payment on the Notes, including upon redemption or purchase by the Company pursuant to this Indenture), or (ii) as to whether or not any Rating Agency has adjusted the rating of the Notes.

Section 7.3    Individual Rights of Trustee.  The Trustee in its individual or any other capacity may become the owner or pledgee of Notes and may otherwise deal with the Company, the Subsidiary Guarantors or any of their Affiliates with the same rights it would have if it were not Trustee.  Any Agent may do the same with like rights.  However, the Trustee must comply with Section 7.10 and Section 7.11.

Section 7.4    Trustee's Disclaimer.  The Trustee shall not be responsible for and makes no representation as to the validity or adequacy of this Indenture or the Notes or the Note Guarantees, it shall not be accountable for the Company's use of the proceeds from the Notes, and it shall not be responsible for any statement of the Company in this Indenture, the Notes, the Offering Circular or in any other document issued in connection with the sale of the Notes or in the Notes other than the Trustee's certificate of authentication.

Section 7.5    Notice of Defaults.  If a Default or Event of Default occurs and is continuing and if such Default or Event of Default is a payment default or a Trust Officer has actual knowledge thereof, or has received written notice thereof pursuant to Section 7.2(g) above, the Trustee shall give to each Holder notice of the Default or Event of Default within 90 days after the Trustee has knowledge thereof. Except in the case of a Default or Event of Default in the payment of principal of, premium, if any, or interest on any Note, the Trustee may withhold the notice if and so long as a responsible Trust Officer in good faith determines that withholding the notice is in the interests of the Holders.

Section 7.6    [Reserved]

Section 7.7    Compensation and Indemnity.

(a)    The Company shall pay to the Trustee from time to time reasonable compensation for its acceptance of this Indenture and services under this Indenture as the Company and the Trustee shall from time to time agree in writing.  The Company shall pay the reasonable fees and expenses of the Trustee's counsel, incurred in the review, negotiation and delivery of this Indenture and related documentation, in connection with any amendments or supplements hereto and otherwise in connection with the performance of its services under this Indenture.  The Trustee's compensation shall not be limited by any law on compensation of a trustee of an express trust.  The Company shall reimburse the Trustee upon request for all reasonable out-of-pocket expenses incurred or made by it, including, without limitation, costs of collection, costs of preparing and reviewing reports, certificates and other documents, costs of preparation and mailing of notices to Holders and reasonable fees and expenses of counsel retained by the Trustee, in addition to the compensation for its services.  Such expenses shall include the reasonable compensation and expenses, disbursements and advances of the Trustee's agents, counsel, accountants and experts.

(b)    The Company and each of the Subsidiary Guarantors shall jointly and severally indemnify the Trustee against any and all loss, liability, damage, claim, cost or expense

- 79 -

NAI-1502882142v7

(including, without limitation, reasonable attorneys' fees and expenses) incurred by it without negligence, willful misconduct or bad faith on its part in connection with its acceptance and administration of this trust and the performance of its duties under this Indenture and the exercise of its rights, including the costs and expenses of enforcing this Indenture (including this Section 7.7) and of defending itself against any claims (whether asserted by any Holder, the Company, any Subsidiary Guarantor or any other Person). The Trustee shall notify the Company promptly of any claim for which it may seek indemnity. Failure by the Trustee to so notify the Company shall not relieve the Company of its obligations under this Indenture except to the extent the Company or any Subsidiary Guarantor has been prejudiced thereby. The Company shall defend the claim and the Trustee may have separate counsel and the Company shall pay the reasonable fees and expenses of such counsel. The Company need not reimburse any expense or indemnify against any loss, liability or expense incurred by the Trustee through the Trustee's own negligence, willful misconduct or bad faith, as determined by a competent court of appropriate jurisdiction in a final, non-appealable judgment.

(c)     To secure payment obligations of the Company and the Subsidiary Guarantors in this Section 7.7, the Trustee shall have a lien prior to the Notes on all money or property held or collected by the Trustee other than money or property held in trust to pay principal of and interest on particular Notes. The Trustee's right to receive payment of any reasonable amounts due under this Section 7.7 shall not be subordinated to any other liability or Indebtedness of the Company.

(d)     The indemnification and payment obligations of the Company and the Subsidiary Guarantors pursuant to this Section 7.7 shall survive the payment of the Notes, termination or the discharge of this Indenture and/or the resignation or removal of the Trustee. When the Trustee incurs expenses after the occurrence of a Bankruptcy Law Event of Default, the expenses are intended to constitute expenses of administration under any Bankruptcy Law; *provided*, *however*, that this shall not affect the Trustee's rights as set forth in this Section 7.7 or Section 6.10.

Section 7.8     Replacement of Trustee.

(a)     The Trustee may resign at any time by so notifying the Company. The Holders of a majority in principal amount of the Outstanding Notes may remove the Trustee by so notifying the Trustee and may appoint a successor Trustee reasonably acceptable to the Company. The Company shall remove the Trustee if:

(1)     the Trustee fails to comply with Section 7.10;

(2)     the Trustee is adjudged bankrupt or insolvent;

(3)     a receiver or other public officer takes charge of the Trustee or its property; or

(4)     the Trustee otherwise becomes incapable of acting.

(b)     If the Trustee resigns or is removed by the Company or by the Holders of a majority in principal amount of the Outstanding Notes and such Holders do not reasonably

- 80 -

promptly appoint a successor Trustee, or if a vacancy exists in the office of the Trustee for any reason (the Trustee in such event being referred to in this Indenture as the retiring Trustee), the Company shall promptly appoint a successor Trustee.

(c)     A successor Trustee shall deliver a written acceptance of its appointment to the retiring Trustee and to the Company.  Thereupon the resignation or removal of the retiring Trustee shall become effective, and the successor Trustee shall have all the rights, powers and duties of the Trustee under this Indenture.  The successor Trustee shall give notice of its succession to Holders.  The retiring Trustee, upon payment of its charges, shall promptly transfer all property held by it as Trustee to the successor Trustee, subject to the lien provided for in Section 7.7.

(d)     If a successor Trustee does not take office within 30 days after the retiring Trustee resigns or is removed, the retiring Trustee or the Holders of 10% in principal amount of the Outstanding Notes may petition, at the Company's expense, any court of competent jurisdiction for the appointment of a successor Trustee.

(e)     If the Trustee fails to comply with Section 7.10, any Holder may petition any court of competent jurisdiction for the removal of the Trustee and the appointment of a successor Trustee.

(f)     Notwithstanding the replacement of the Trustee pursuant to this Section 7.8, the Company's obligations under Section 7.7 shall continue for the benefit of the retiring Trustee.

Section 7.9     Successor Trustee by Merger.

(a)     If the Trustee consolidates with, merges or converts into, or transfers all or substantially all its corporate trust business (including this transaction) or assets to, another corporation or banking association, the resulting, surviving or transferee corporation without any further act shall be the successor Trustee.

(b)     In case at the time such successor or successors to the Trustee by consolidation, merger, conversion shall succeed to the trusts created by this Indenture, any of the Notes shall have been authenticated but not delivered, any such successor to the Trustee may adopt the certificate of authentication of any predecessor trustee, and deliver such Notes so authenticated; and in case at that time any of the Notes shall not have been authenticated, any successor to the Trustee may authenticate such Notes either in the name of any predecessor under this Indenture or in the name of the successor to the Trustee; and in all such cases such certificates shall have the full force which it is anywhere in the Notes or in this Indenture provided that the certificate of the Trustee shall have.

Section 7.10     Eligibility; Disqualification.  The Trustee shall at all times satisfy the requirements of TIA § 310(a).  The Trustee shall have a combined capital and surplus of at least U.S.$150.0 million as set forth in its most recent published annual report of condition.  The Trustee shall comply with TIA § 310(b); *provided*, *however*, that there shall be excluded from the operation of TIA § 310(b)(1) any indenture or indentures under which other securities or

- 81 -

certificates of interest or participation in other securities of the Company are outstanding if the requirements for such exclusion set forth in TIA § 310(b)(1) are met.

Section 7.11    Preferential Collection of Claims Against Company.  The Trustee shall comply with TIA § 311(a), excluding any creditor relationship listed in TIA § 311(b).  A Trustee who has resigned or been removed shall be subject to TIA § 311(a) to the extent indicated.

Section 7.12    Appointment of Co-Trustee.

(a)    Notwithstanding any other provisions in this Indenture, at any time, solely for the purpose of meeting the legal requirements of any jurisdiction, the Trustee shall have the power and may execute and deliver all instruments necessary to appoint one or more Persons to act as separate trustee or trustees or as co-trustee or co-trustees, and to vest in such Person or Persons, in such capacity and subject to the other provisions of this Indenture, such powers, duties, obligations and rights as the Trustee may consider necessary or desirable.  No co-trustee under this Indenture shall be required to meet the terms of eligibility as a successor trustee under this Indenture and no notice to Holders of Notes of the appointment of a separate trustee or co-trustee shall be required under this Indenture.

(b)    Every separate trustee or co-trustee shall, to the extent permitted by law, be appointed and act subject to the following provisions and conditions:

(i)    all rights, powers, duties and obligations conferred or imposed upon the Trustee shall be conferred or imposed upon and exercised or performed by the Trustee and such separate trustee or co-trustee jointly (it being understood that such separate trustee or co-trustee is not authorized to act separately without the Trustee joining in such act), except to the extent that under any law of any jurisdiction in which any particular act or acts are to be performed the Trustee shall be incompetent or unqualified to perform such act or acts, in which event such rights, powers, duties and obligations shall be exercised and performed singly by such co-trustee, but solely at the direction of the Trustee;

(ii)    no trustee under this Indenture shall be personally liable by reason of any act or omission of any other trustee under this Indenture; and

(iii)    the Trustee may at any time accept the resignation of or remove any separate trustee or co-trustee.

(c)    Any notice, request or other writing given to the Trustee shall be deemed to have been given to each of the then separate trustees or co-trustees, as effectively as if given to each of them.  Every instrument appointing any separate trustee or co-trustee shall refer to this Indenture and the conditions of this Article VII.  Each separate trustee or co-trustee, upon its acceptance of the trusts conferred, shall be vested with the estates or property specified in its instrument of appointment, jointly with the Trustee, subject to all the provisions of this Indenture, specifically including every provision of this Indenture relating to the conduct of, affecting the liability of, or affording protection or rights (including the rights to compensation, reimbursement and indemnification under this Indenture) to, the Trustee.  Every such instrument shall be filed with the Trustee.

- 82 -

(d)     Any separate trustee or co-trustee may at any time constitute the Trustee or its agent or attorney-in-fact with full power and authority, to the extent not prohibited by law, to do any lawful act under or in respect of this Indenture on its behalf and in its name.  If any separate trustee or co-trustee shall die, become incapable of acting, resign or be removed, all of its estates, properties, rights, remedies and trusts shall vest in and be exercised by the Trustee, to the extent permitted by law, without the appointment of a new or successor trustee.

Section 7.13    The Agents.  The rights, protections, immunities and indemnities granted to the Trustee under this Article VII shall apply *mutatis mutandis* to each of the Agents.

ARTICLE VIII

DEFEASANCE; DISCHARGE OF INDENTURE

Section 8.1    Legal Defeasance and Covenant Defeasance.

(a)     The Company may, at its option and at any time, elect to have either paragraph (b) or (c) of this Section 8.1 be applied to its obligations with respect to the Outstanding Notes and all obligations of the Subsidiary Guarantors under the Note Guarantees upon compliance with the conditions set forth in Section 8.2.

(b)     Upon the Company's exercise under paragraph (a) of this Section 8.1 of the option applicable to this paragraph (b), the Company shall, subject to the satisfaction of the conditions set forth in Section 8.2, be deemed to have paid and discharged the entire Indebtedness represented by this Indenture, the Outstanding Notes and Note Guarantees after the deposit specified in Section 8.2(a) (hereinafter, "Legal Defeasance").  For this purpose, Legal Defeasance means that the Company shall be deemed to have paid and discharged the entire Indebtedness represented by the Outstanding Notes, which shall thereafter be deemed to be Outstanding only for the purposes of Section 8.3 and the other Sections of this Indenture referred to in clause (i) or (ii) of this paragraph (b) and to have satisfied all its other obligations under such Notes and under this Indenture (and the Trustee, on demand of and at the expense of the Company, shall execute proper instruments acknowledging the same), except for the following provisions, which shall survive until otherwise terminated or discharged under this Indenture:

(i)     the rights of Holders to receive payments, solely from the trust described below, in respect of the principal of, premium, if any, and interest on the Notes when such payments are due,

(ii)    the Company's obligations with respect to the Notes concerning issuing temporary Notes, registration of Notes, mutilated, destroyed, lost or stolen Notes and the maintenance of an office or agency for payments,

(iii)   the rights, powers, trusts, duties and immunities of the Trustee under this Indenture and the Company's and the Subsidiary Guarantors' obligations in connection therewith, and

(iv)    this Article VIII.

- 83 -

Subject to compliance with this Article VIII, the Company may exercise its option under this paragraph (b) notwithstanding the prior exercise of its option under paragraph (c) of this Section 8.1.

(c)    Upon the Company's exercise under paragraph (a) of this Section 8.1 of the option applicable to this paragraph (c), the Company may, at its option and at any time, elect to have its obligations and the obligations of the Subsidiary Guarantors, subject to the satisfaction of the applicable conditions set forth in Section 8.2, released under the covenants (set forth in Sections 3.5, 3.8, 3.9, 3.10, 3.11, 3.12, 3.13, 3.14, 3.15, 3.16, 3.17, 3.18 and 4.1(a)(2)) with respect to the Outstanding Notes on and after the date the conditions set forth below are satisfied (hereinafter, "Covenant Defeasance"), and the Notes shall thereafter be deemed not Outstanding for the purposes of any direction, waiver, consent or declaration or act of Holders (and the consequences of any thereof) in connection with such covenants, but shall continue to be Outstanding for all other purposes under this Indenture.  For this purpose, such Covenant Defeasance means that, with respect to the Outstanding Notes, the Company may omit to comply with and shall have no liability in respect of any term, condition or limitation set forth in any such covenant, whether directly or indirectly, by reason of any reference elsewhere in this Indenture to any such covenant or by reason of any reference in any such covenant to any other provision in this Indenture or in any other document and such omission to comply shall not constitute a Default or an Event of Default with respect to the Notes or the Note Guarantees under Section 6.1(a) but the remainder of this Indenture and such Notes shall be unaffected thereby.

Section 8.2    Conditions to Defeasance.  The Company may exercise its Legal Defeasance option or its Covenant Defeasance option only if:

(a)    the Company has irrevocably deposited with the Trustee, in trust, for the benefit of the Holders U.S. Legal Tender, U.S. Government Obligations, or a combination thereof, in such amounts as will be sufficient without reinvestment, in the opinion of a nationally recognized investment bank, appraisal firm or firm of independent public accountants, to pay the principal of, premium, if any, and interest (including Additional Amounts) on the Notes on the stated date for payment thereof or on the applicable Redemption Date (provided that any redemption before Stated Maturity has been irrevocably provided for under arrangements satisfactory to the Trustee), as the case may be;

(b)    in the case of Legal Defeasance, the Company has delivered to the Trustee an Opinion of Counsel from counsel in the United States reasonably acceptable to the Trustee (subject to customary exceptions and exclusions) and independent of the Company to the effect that:

(1)    the Company has received from, or there has been published by, the Internal Revenue Service a ruling; or

(2)    since the Issue Date, there has been a change in the applicable U.S. federal income tax law,

- 84 -

and in either case to the effect that, and based thereon such Opinion of Counsel shall state that, the Holders will not recognize income, gain or loss for U.S. federal income tax purposes as a result of such Legal Defeasance and will be subject to U.S. federal income tax on the same amounts, in the same manner and at the same times as would have been the case if such Legal Defeasance had not occurred;

(c)     in the case of Covenant Defeasance, the Company has delivered to the Trustee an Opinion of Counsel in the United States reasonably acceptable to the Trustee (subject to customary exceptions and exclusions) to the effect that the Holders will not recognize income, gain or loss for U.S. federal income tax purposes as a result of such Covenant Defeasance and will be subject to U.S. federal income tax on the same amounts, in the same manner and at the same times as would have been the case if such Covenant Defeasance had not occurred;

(d)     in the case of Legal Defeasance or Covenant Defeasance, the Company has delivered to the Trustee:

(1)     an Opinion of Counsel from counsel in Mexico reasonably acceptable to the Trustee (subject to customary exceptions and exclusions) and independent of the Company to the effect that, based upon Mexican law then in effect, Holders will not recognize income, gain or loss for Mexican tax purposes, including withholding tax except for withholding tax then payable on interest payments due, as a result of Legal Defeasance or Covenant Defeasance, as the case may be, and will be subject to Mexican taxes on the same amounts and in the same manner and at the same time as would have been the case if such Legal Defeasance or Covenant Defeasance, as the case may be, had not occurred, or

(2)     a ruling directed to the Trustee received from the tax authorities of Mexico to the same effect as the Opinion of Counsel described in clause (1) above;

(e)     no Default or Event of Default shall have occurred and be continuing on the date of the deposit pursuant to Section 8.2(a) (except any Default or Event of Default resulting from the failure to comply with Section 3.9 as a result of the borrowing of the funds required to effect such deposit);

(f)     the Trustee has received an Officers' Certificate stating that such Legal Defeasance or Covenant Defeasance shall not result in a breach or violation of, or constitute a Default under this Indenture or any other material agreement or instrument to which the Company or any of its Subsidiaries is a party or by which the Company or any of its Subsidiaries is bound;

(g)     the Company has delivered to the Trustee an Officers' Certificate stating that the deposit was not made by the Company with the intent of preferring the Holders over any other creditors of the Company or any Subsidiary of the Company or with the intent of defeating, hindering, delaying or defrauding any other creditors of the Company or others;

(h)     the Company has delivered to the Trustee an Officers' Certificate and an Opinion of Counsel reasonably acceptable to the Trustee and independent of the Company, each

- 85 -

stating that all conditions precedent provided for or relating to the Legal Defeasance or the Covenant Defeasance have been complied with (subject to customary exceptions and exclusions); and

(i)　　the Company has delivered to the Trustee an Opinion of Counsel reasonably acceptable to the Trustee and independent of the Company to the effect that the trust funds will not be subject to the effect of any applicable bankruptcy, insolvency, reorganization or similar laws affecting creditors' rights generally (subject to customary exceptions and exclusions).

Section 8.3　　Application of Trust Money.　The Trustee shall hold in trust U.S. Legal Tender and/or U.S. Government Obligations (including in each case proceeds thereon) deposited with it pursuant to this Article VIII.　It shall apply the deposited U.S. Legal Tender and/or U.S. Government Obligations (including in each case proceeds thereon) through the Paying Agent and in accordance with this Indenture to the payment of principal of and interest on the Notes.

Section 8.4　　Repayment to Company.

(a)　　Subject to Sections 7.7, 8.1 and 8.2, the Trustee and the Paying Agent shall promptly turn over to the Company upon written request any excess U.S. Legal Tender and/or U.S. Government Obligations held by them upon payment of all the obligations under this Indenture and shall thereupon be relieved from all liability with respect to such U.S. Legal Tender and/or U.S. Government Obligations.

(b)　　Subject to any applicable abandoned property law, the Trustee and the Paying Agent shall pay to the Company upon written request any money held by them for the payment of principal of or interest on the Notes that remains unclaimed for two years, and, thereafter, *provided* that before making such payment the Trustee may at the expense of the Company publish once in a newspaper of general circulation in New York City, or send to each Holder entitled to such money, notice that the money remains unclaimed and that after a date specified in the notice (at least 30 days after the date of the publication or notice) any remaining unclaimed balance of money will be repaid to the Company. After payment to the Company, Holders entitled to the money must look to the Company for payment as general creditors.

Section 8.5　　Indemnity for U.S. Government Obligations.　The Company shall pay and shall indemnify the Trustee against any tax, fee or other charge imposed on or assessed against deposited U.S. Government Obligations or the principal and interest received on such U.S. Government Obligations.

Section 8.6　　Reinstatement.　If the Trustee or Paying Agent is unable to apply any U.S. Legal Tender and/or U.S. Government Obligations in accordance with this Article VIII by reason of any legal proceeding or by reason of any order or judgment of any court or governmental authority enjoining, restraining or otherwise prohibiting such application, the obligations of the Company under this Indenture and the Notes shall be revived and reinstated as though no deposit had occurred pursuant to this Article VIII until such time as the Trustee or Paying Agent is permitted to apply all such U.S. Legal Tender and/or U.S. Government Obligations in accordance with this Article VIII; *provided, however*, that, if the Company has made any

- 86 -

payment of principal of or interest on any Notes because of the reinstatement of its obligations, the Company shall be subrogated to the rights of the Holders of such Notes to receive such payment from the U.S. Legal Tender or U.S. Government Obligations held by the Trustee or Paying Agent.

Section 8.7    Satisfaction and Discharge.  This Indenture shall be discharged and shall cease to be of further effect (except as to surviving rights or registration of transfer or exchange of the Notes, as expressly provided for in this Indenture) as to all Outstanding Notes when:

(a)    either:

(1)    all the Notes theretofore authenticated and delivered (except (i) lost, stolen or destroyed Notes which have been replaced or paid and (ii) Notes for whose payment U.S. Legal Tender and/or U.S. Government obligations have theretofore been deposited in trust (or segregated and held in trust by the Company) and thereafter repaid to the Company or discharged from such trust pursuant to Section 8.3 or 8.4, as applicable) have been delivered to the Trustee for cancellation; or

(2)    all Notes not theretofore delivered to the Trustee for cancellation have become due and payable by reason of the making of a notice of redemption or otherwise, or will become due and payable within one year, including as a result of a redemption notice given or to be properly given pursuant to this Indenture under arrangements satisfactory to the Trustee for giving the notice of redemption, and the Company has irrevocably deposited or caused to be deposited with the Trustee U.S. Legal Tender and/or U.S. Government Obligations sufficient without reinvestment to pay and discharge the entire Indebtedness on the Notes not theretofore delivered to the Trustee for cancellation, for principal of, premium, if any, and interest on the Notes to the date of deposit, together with irrevocable written instructions from the Company directing the Trustee to apply such funds to the payment;

(b)    the Company has paid all other sums payable under this Indenture and the Notes by it; and

(c)    the Company has delivered to the Trustee an Officers' Certificate and Opinion of Counsel each stating that all conditions precedent under this Indenture relating to the satisfaction and discharge of this Indenture have been complied with.

ARTICLE IX

AMENDMENTS

Section 9.1    Without Consent of Holders.

(a)    From time to time, the Company, the Subsidiary Guarantors (except that it shall not be necessary for any existing Subsidiary Guarantor to approve an amendment or execute a Supplemental Indenture for the purpose of adding or releasing any Subsidiary

- 87 -

Guarantors with respect to the Notes) and the Trustee, without the consent of the Holders, may amend or supplement this Indenture, the Notes or the Note Guarantees for certain specified purposes, including:

(1) to cure any ambiguities, defects or inconsistencies in this Indenture or the Notes;

(2) to provide for uncertificated Notes in addition to or in place of Certificated Notes;

(3) to provide for the assumption of the Company's or a Subsidiary Guarantor's obligations in the case of a merger or consolidation or sale of all or substantially all of the Company's or such Subsidiary Guarantor's assets, as applicable, to the extent permitted under this Indenture;

(4) to make any change that would provide any additional rights or benefits to the Holders of the Notes or that does not adversely affect the legal rights under this Indenture of any such Holder;

(5) to conform the text of this Indenture, the Note Guarantees or the Notes to any provision of the "Description of Notes" contained in the Offering Circular to the extent that such provision in such "Description of Notes" was intended to be a verbatim recitation of a provision of this Indenture, the Note Guarantees or the Notes;

(6) to allow any Subsidiary Guarantor to execute a Supplemental Indenture in order to provide a Note Guarantee with respect to the Notes and to release a Subsidiary Guarantor from its Note Guarantee in accordance with the terms of this Indenture;

(7) to comply with the requirements of any applicable securities depositary;

(8) to provide for a successor Trustee in accordance with the terms of this Indenture;

(9) to otherwise comply with any requirement of this Indenture;

(10) to issue Additional Notes as permitted by Section 2.2(c) and Section 2.13, which will have terms substantially identical to the other Outstanding Notes except as specified in Section 2.13, and which will be treated, together with any other Outstanding Notes, as a single issue of securities; and

(11) to make any other changes which do not adversely affect the rights of any of the Holders of the Notes in any material respect;

(b) After an amendment under this Section 9.1 becomes effective, the Company shall give to Holders a notice briefly describing such amendment. The failure to give

- 88 -

NAI-1502882142v7

such notice to all Holders, or any defect therein, shall not impair or affect the validity of an amendment under this <u>Section 9.1</u>.

Section 9.2 <u>With Consent of Holders</u>.

(a) The Company, the Subsidiary Guarantors and the Trustee may amend this Indenture, the Notes or the Note Guarantees without notice to any Holder but with the written consent of the Holders of at least a majority in aggregate principal amount of the then Outstanding Notes (including, without limitation, consents obtained in connection with a purchase of, or tender offer or exchange offer for, Notes). However, without the consent of each Holder affected thereby, no amendment may:

(1) reduce the principal amount of Notes whose Holders must consent to an amendment, supplement or waiver;

(2) reduce the rate of or change or have the effect of changing the time for payment of interest, including Defaulted Interest, on any Notes;

(3) reduce the principal of or change or have the effect of changing the fixed maturity of any Notes, or change the date on which any Notes may be subject to redemption, or reduce the redemption price therefor;

(4) make any Notes payable in money other than that stated in the Notes;

(5) make any change in provisions of this Indenture entitling each Holder to receive payment of principal of, premium, if any, and interest on such Note on or after the due date thereof or to bring suit to enforce such payment, or permitting Holders of a majority in principal amount of Notes to waive Defaults or Events of Default;

(6) amend, change or modify in any material respect the obligation of the Company to make and consummate a Change of Control Offer in respect of a Change of Control that has occurred or make and consummate an Asset Sale Offer with respect to any Asset Sale that has been consummated;

(7) eliminate or modify in any manner a Subsidiary Guarantor's Obligations with respect to its Note Guarantee, which adversely affects Holders in any material respect, except as contemplated in this Indenture or Note Guarantee;

(8) make any change to <u>Section 3.20</u> that adversely affects the rights of any Holder or amends the terms of the Notes in a way that would result in a loss of exemption from taxes; and

(9) make any change to the provisions of this Indenture or the Notes that adversely affects the ranking of the Notes.

NAI-1502882142v7

Case 1:26-cv-12385-JBM-64-DPCGmenD60ument-Entered on FLSD Docket 07/03/2026 Page 105 of 385

(b)     It shall not be necessary for the consent of the Holders under this Section 9.2 to approve the particular form of any proposed amendment, supplement or waiver, but it shall be sufficient if such consent approves the substance thereof.  The Trustee will be entitled to rely on such evidence as it deems appropriate, including an Opinion of Counsel and an Officers' Certificate, and the Trustee shall have no liability whatsoever in reliance upon the foregoing.

(c)     After an amendment, supplement or waiver under this Section 9.2 becomes effective, the Company shall give to Holders a notice briefly describing such amendment, supplement or waiver.  The failure to give such notice to all Holders, or any defect therein, shall not impair or affect the validity of an amendment, supplement or waiver under this Section 9.2.

Section 9.3     Revocation and Effect of Consents and Waivers.

(a)     A consent to an amendment, supplement or waiver by a Holder of a Note shall bind the Holder and every subsequent Holder of that Note or portion of the Note that evidences the same debt as the consenting Holder's Note, even if notation of the consent or waiver is not made on the Note.  However, any such Holder or subsequent Holder may revoke the consent or waiver as to such Holder's Note or portion of the Note if the Trustee receives the notice of revocation before the date the amendment, supplement or waiver becomes effective.  After an amendment, supplement or waiver becomes effective, it shall bind every Holder, except as otherwise provided in this Article IX.  An amendment, supplement or waiver shall become effective upon receipt by the Trustee of the requisite number of written consents under Section 9.2.

(b)     The Company may, but shall not be obligated to, fix a record date, which need not be the date provided in TIA § 316(c) to the extent it would otherwise be applicable, for the purpose of determining the Holders entitled to give their consent or take any other action described above or required or permitted to be taken pursuant to this Indenture.  If a record date is fixed, then notwithstanding the immediately preceding paragraph, those Persons who were Holders at such record date (or their duly designated proxies), and only those Persons, shall be entitled to give such consent or to revoke any consent previously given or to take any such action, whether or not such Persons continue to be Holders after such record date.  No such consent shall be valid or effective for more than 90 days after such record date if the requisite consent is not obtained from Holders of the applicable principal amount of Notes.

Section 9.4     Notation on or Exchange of Notes.  If an amendment or supplement changes the terms of a Note, the Company may require the Holder of the Note to deliver it to the Trustee.  The Trustee may place an appropriate notation on the Note regarding the changed terms and return it to the Holder.  Alternatively, if the Company so determines, the Company in exchange for the Note will execute and upon Company Order the Trustee will authenticate a new Note that reflects the changed terms.  Failure to make the appropriate notation or to issue a new Note shall not affect the validity of such amendment or supplement.

Section 9.5     Trustee to Sign Amendments and Supplements.  The Trustee shall sign any amendment or supplement authorized pursuant to this Article IX if the amendment or

- 90 -

NAI-1502882142v7

supplement does not adversely affect the rights, duties, liabilities or immunities of the Trustee.  If the proposed amendment or supplement does adversely affect the rights, duties, liabilities or immunities of the Trustee, the Trustee may but need not sign it.  In signing such amendment or supplement the Trustee shall be entitled to receive indemnity reasonably satisfactory to it and to receive, and shall be fully protected in relying upon, in addition to the documents required pursuant to Section 11.3, an Opinion of Counsel and an Officers' Certificate opining or certifying, as the case may be, to the effect that such amendment is permitted or authorized by the terms and conditions of this Indenture.

ARTICLE X

NOTE GUARANTEES

Section 10.1    Note Guarantees.

(a)    Subject to Section 10.2(a), each Subsidiary Guarantor hereby fully, unconditionally and irrevocably guarantees, as primary obligor and not merely as surety, jointly and severally with each other Subsidiary Guarantor, to each Holder and the Trustee the full and punctual payment when due, whether at maturity, by acceleration, by redemption or otherwise, of the Obligations of the Company under the Notes and this Indenture (such guaranteed Obligations, the "Guaranteed Obligations").  Each Subsidiary Guarantor further agrees (to the extent permitted by law) that the Guaranteed Obligations may be extended or renewed, in whole or in part, without notice or further assent from it, and that it will remain bound under this Article X notwithstanding any such extension or renewal.  Each Subsidiary Guarantor hereby agrees to pay, in addition to the amounts stated above, any and all expenses (including reasonable counsel fees and expenses) incurred by the Trustee or the Holders in enforcing any rights under any Note Guarantee.

(b)    Notwithstanding anything in this Indenture to the contrary, the Company shall cause any existing or future Restricted Subsidiary (including upon a Revocation of the Designation of a Subsidiary as an Unrestricted Subsidiary) that (A) as of the last date of any fiscal quarter and with respect to the Company and its Subsidiaries, individually represents at least 5% of the consolidated total assets of the Company and its Subsidiaries, as determined in accordance with IFRS, or (B) for any twelve-month period ending as of the last day of any fiscal quarter, individually represents at least 5% of the Consolidated  EBITDA of the Company, to become a Subsidiary Guarantor, in accordance with Section 10.6. Notwithstanding the foregoing, the Company shall at all times cause the Company and the then-existing Subsidiary Guarantors, collectively, to represent (y) as of the last date of each fiscal quarter, at least 85% of the consolidated total assets of the Company and its Subsidiaries, as determined in accordance with IFRS, and (z) for the twelve-month period ending as of the last day of each fiscal quarter, at least 85% of Consolidated EBITDA.

(c)    Each Subsidiary Guarantor waives to the extent permitted by law presentation to, demand of payment from and protest to the Company of any of the Guaranteed Obligations and also waives to the extent permitted by law notice of protest for nonpayment. Each Subsidiary Guarantor waives to the extent permitted by law notice of any Default under the Notes or the Guaranteed Obligations.  The Guaranteed Obligations of each Subsidiary Guarantor

- 91 -

under this Indenture shall not, to the extent permitted by law, be affected by (i) the failure of the Trustee or any Holder to assert any claim or demand or to enforce any right or remedy against the Company or any other Person under this Indenture, the Notes or any other agreement or otherwise; (ii) any extension or renewal of any thereof; (iii) any rescission, waiver, amendment or modification of any of the terms or provisions of this Indenture, the Notes or any other agreement; (iv) the release of any security held by any Holder or the Trustee for the Guaranteed Obligations or any of them; (v) the failure of the Trustee or any Holder to exercise any right or remedy against any other Subsidiary Guarantor; or (vi) any change in the ownership of the Company.

(d) Each Subsidiary Guarantor further agrees that its Note Guarantee in this Indenture constitutes a guarantee of payment when due (and not a guarantee of collection) and waives any right to require that any resort be had by the Trustee or any Holder to any security held for payment of the Guaranteed Obligations.

(e) Each of the Subsidiary Guarantors further expressly waives irrevocably and unconditionally:

(i) any right it may have to first require the Trustee or any Holder to proceed against, initiate any actions before a court of law or any other judge or authority, or enforce any other rights or security or claim payment from the Company or any other Person (including any Subsidiary Guarantor or any other guarantor) before claiming from it under this Indenture;

(ii) any right to which it may be entitled to have the assets of the Company or any other Person (including any Subsidiary Guarantor or any other guarantor) first be used, applied or depleted as payment of the Company's or the Subsidiary Guarantors' obligations under this Indenture, prior to any amount being claimed from or paid by any of the Subsidiary Guarantors under this Indenture;

(iii) any right to which it may be entitled to have claims under this Indenture divided between the Subsidiary Guarantors; and

(iv) to the extent applicable, the benefits of *orden, excusión, division, quita* and *espera* and any right specified in articles 2814, 2815, 2817, 2818, 2819, 2820, 2821, 2822, 2823, 2826, 2837, 2838, 2839, 2840, 2845, 2846, 2847 and any other related or applicable articles that are not explicitly set forth in this Indenture because of Subsidiary Guarantor's knowledge thereof of the *Código Civil Federal* of Mexico, and the *Código Civil* of each State of the Mexican Republic and the Federal District of Mexico.

(f) The obligations assumed by each Subsidiary Guarantor under this Indenture shall not be affected by the absence of judicial request of payment by the Trustee or a Holder to the Company or by whether any such person takes timely action pursuant to articles 2848 and 2849 of the *Código Civil Federal of Mexico* and the *Código Civil* of each State of Mexico and the Federal District of Mexico and each Subsidiary Guarantor hereby expressly waives the provisions of such articles.

- 92 -

(g)      The obligations of each Subsidiary Guarantor under this Indenture shall not be subject to any reduction, limitation, impairment or termination for any reason (other than payment of the Guaranteed Obligations in full), including any claim of waiver, release, surrender, alteration or compromise, and shall not be subject to any defense of setoff, counterclaim, recoupment or termination whatsoever or by reason of the invalidity, illegality or unenforceability of the Guaranteed Obligations or otherwise.  Without limiting the generality of the foregoing, the obligations of each Subsidiary Guarantor in this Indenture shall not be discharged or impaired or otherwise affected by the failure of the Trustee or any Holder to assert any claim or demand or to enforce any remedy under this Indenture, the Notes or any other agreement, by any waiver or modification of any thereof, by any default, failure or delay, willful or otherwise, in the performance of the Guaranteed Obligations, or by any other act or thing or omission or delay to do any other act or thing which may or might in any manner or to any extent vary the risk of such Subsidiary Guarantor or would otherwise operate as a discharge of such Subsidiary Guarantor as a matter of law or equity.

(h)      Each Subsidiary Guarantor further agrees that its Note Guarantee in this Indenture shall continue to be effective or be reinstated, as the case may be, if at any time payment, or any part thereof, of principal of or interest on any of the Guaranteed Obligations is rescinded or must otherwise be restored by the Trustee or any Holder upon the bankruptcy or reorganization of the Company or otherwise.

(i)      In furtherance of the foregoing and not in limitation of any other right which any Holder has at law or in equity against each Subsidiary Guarantor by virtue hereof, upon the failure of the Company to pay any of the Guaranteed Obligations when and as the same shall become due, whether at maturity, by acceleration, by redemption or otherwise, each Subsidiary Guarantor hereby promises to and will, upon receipt of written demand by the Trustee, forthwith pay, or cause to be paid, in cash, to the Trustee or the Holders an amount equal to the sum of:

(i)      the unpaid amount of such Guaranteed Obligations then due and owing; and

(ii)      accrued and unpaid interest on such Guaranteed Obligations then due and owing (but only to the extent not prohibited by law).

(j)      Each Subsidiary Guarantor further agrees that, as between such Subsidiary Guarantor, on the one hand, and the Trustee and the Holders, on the other hand:

(i)      the maturity of the Guaranteed Obligations may be accelerated as provided in this Indenture for the purposes of its Note Guarantee in this Indenture, notwithstanding any stay, injunction or other prohibition preventing such acceleration in respect of the Guaranteed Obligations; and

(ii)      in the event of any such declaration of acceleration of the Guaranteed Obligations, the Guaranteed Obligations (whether or not due and payable) shall forthwith become due and payable by such Subsidiary Guarantor for the purposes of its Note Guarantee.

NAI-1502882142v7

Section 10.2    Limitation on Liability; Termination, Release and Discharge.

(a)    The Guaranteed Obligations of each Subsidiary Guarantor in respect of its Note Guarantee under this Indenture shall be limited to the maximum amount as shall not result in the Guaranteed Obligations constituting a fraudulent conveyance, fraudulent transfer or similar illegal transfer under applicable law.

(b)    Each Subsidiary Guarantor shall be released and relieved of its obligations (or in the case of Covenant Defeasance, certain of its obligations) under its Note Guarantee in the event:

> i.    there is a Legal Defeasance or a Covenant Defeasance of the Notes pursuant to Article VIII;
>
> ii.   there is a sale or other disposition of (y) Capital Stock of such Subsidiary Guarantor following which such Subsidiary Guarantor is no longer a direct or indirect Subsidiary of the Company or (z) all or substantially all of the assets of the Subsidiary Guarantor (other than to the Company or a Subsidiary Guarantor) otherwise permitted by and in accordance with this Indenture;
>
> iii.  such Subsidiary Guarantor is designated as an Unrestricted Subsidiary in accordance with Section 3.13; or
>
> iv.   if the Note Guarantee was required pursuant to the terms of this Indenture, the cessation of the circumstances requiring the Note Guarantee;

*provided* that the transaction is carried out pursuant to and in accordance with all other applicable provisions hereof.

Section 10.3    Right of Contribution.  Each Subsidiary Guarantor that makes a payment or distribution under a Note Guarantee will be entitled to a contribution from each other Subsidiary Guarantor in a *pro rata* amount, based on the net assets of each Subsidiary Guarantor determined in accordance with IFRS.  The provisions of this Section 10.3 shall in no respect limit the obligations and liabilities of each Subsidiary Guarantor to the Trustee and the Holders and each Subsidiary Guarantor shall remain liable to the Trustee and the Holders for the full amount guaranteed by such Subsidiary Guarantor under this Indenture.

Section 10.4    No Subrogation.  Each Subsidiary Guarantor agrees that it shall not be entitled to any right of subrogation in respect of any Guaranteed Obligations until payment in full in cash of all Guaranteed Obligations.  If any amount shall be paid to any Subsidiary Guarantor on account of such subrogation rights at any time when all of the Guaranteed Obligations shall not have been paid in full in cash, such amount shall be held by such Subsidiary Guarantor in trust for the Trustee and the Holders, segregated from other funds of such Subsidiary Guarantor, and shall, forthwith upon receipt by such Subsidiary Guarantor, be turned over to the Trustee in the exact form received by such Subsidiary Guarantor (duly

NAI-1502882142v7

endorsed by such Subsidiary Guarantor to the Trustee, if required), to be applied against the Guaranteed Obligations.

Section 10.5    Execution and Delivery of Note Guarantee.  The execution by each Subsidiary Guarantor of this Indenture (or, a Supplemental Indenture in accordance with Section 10.6, if applicable) evidences the Note Guarantee of such Subsidiary Guarantor, whether or not the Person signing as an Officer of such Subsidiary Guarantor still holds that office at the time of authentication of any Note.

Section 10.6    Additional Note Guarantees.  The Company covenants and agrees that, if at any time after the date hereof any Person becomes a Restricted Subsidiary (including upon a Revocation of the Designation of a Subsidiary as an Unrestricted Subsidiary), the Company shall, after becoming aware of such event, if required pursuant to Section 10.1, cause such Restricted Subsidiary promptly to become a Subsidiary Guarantor on a senior basis by executing a Supplemental Indenture and providing the Trustee with an Officers' Certificate and Opinion of Counsel pursuant to Section 11.4 hereof and to comply in all respects with the provisions of this Indenture and the Notes, as applicable; *provided*, *however*, that each Subsidiary Guarantor will be automatically and unconditionally released and discharged from its obligations under such additional Note Guarantee only in accordance with Section 10.2.

## ARTICLE XI

## MISCELLANEOUS

Section 11.1    Notices.

(a)    Any notice, demand, request, instruction or communication shall be in English and in writing and delivered in person, by mailed by first-class mail, postage prepaid, overnight courier, or by facsimile, addressed as follows:

if to the Company and the Subsidiary Guarantors:

> TV Azteca, S.A.B. de C.V.
> Insurgentes Sur 3579
> Col. Tlalpan la joya
> 14000, México, D.F.
> México
> Attention: Rodrigo Pliego

with a copy to:

> Winston & Strawn, LLP
> 200 Park Avenue
> New York, NY 10166-4193
> Attention: Allen Miller, Esq.

if to the Trustee:

- 95 -

NAI-1502882142v7

The Bank of New York Mellon
Attention: Global Corporate Trust
101 Barclay Street, 7th Floor East
New York, NY 10286
U.S.A.
Fax No.: (212) 815-5603

if to the Principal Paying Agent:

The Bank of New York Mellon, London Branch
Attention: Global Corporate Trust
101 Barclay Street, 7th Floor East
New York, NY 10286
U.S.A.
Fax No.: (212) 815-5603

The Company or the Trustee by notice to the other may designate additional or different addresses for subsequent notices or communications.

(b)     Any notice or communication in writing to the Company will be deemed given upon the earlier of (x) actual receipt or (y) (i) when delivered in person or (ii) 10 days after mailing when mailed by registered first class mail, or (iii) when sent by facsimile transmission, with transmission confirmed or PDF format, or (iv) three days when delivered by international courier. Any notice to the Trustee will be effective only upon receipt.

(c)     Any notice or communication given to (i) a registered Holder of a Certificated Note shall be mailed to the Holder at the Holder's address as it appears in the Note Register and shall be sufficiently given if so mailed within the time prescribed or (ii) a registered Holder of a Global Note shall be given to the applicable Clearing Agency in accordance with its applicable procedures.

(d)     Failure to give a notice or communication to a Holder or any defect in it shall not affect its sufficiency with respect to other Holders.  If a notice or communication is mailed in the manner provided above, it is duly given, whether or not the addressee receives it.

(e)     Any notice or communication delivered to the Company under the provisions in this Indenture shall constitute notice to the Subsidiary Guarantors.

(f)     The Trustee shall accept electronic transmissions; *provided* (i) the Trustee shall not have any duty or obligation to verify or confirm that the Person sending instructions, directions, reports, notices or other communications or information by electronic transmission is, in fact, a Person authorized to give such instructions, directions, reports, notices or other communications or information on behalf of the party purporting to send such electronic transmission; and the Trustee shall not have any liability for any losses, claims, damages, liabilities, costs or expenses incurred or sustained by any party as a result of such reliance upon or compliance with such instructions, directions, reports, notices or other communications or information and (ii) each other party agrees to assume all risks arising out of the use of electronic

- 96 -

NAI-1502882142v7

methods to submit instructions, directions, reports, notices or other communications or information to the Trustee, including without limitation the risk of the Trustee acting on unauthorized instructions, notices, reports or other communications or information, and the risk of interception and misuse by third parties.

Section 11.2    Communication by Holders with Other Holders.  Holders may communicate pursuant to TIA § 312(b) with other Holders with respect to their rights under this Indenture (including the Note Guarantees) or the Notes.  The Company, the Subsidiary Guarantors, the Trustee, the Agents and anyone else shall have the protection of TIA § 312(c).

Section 11.3    Certificate and Opinion as to Conditions Precedent.  Upon any request or application by the Company to the Trustee to take or refrain from taking any action under this Indenture, the Company shall furnish to the Trustee:

(1)    an Officers' Certificate in form and substance reasonably satisfactory to the Trustee stating that, in the opinion of the signer, all conditions precedent, if any, provided for in this Indenture relating to the proposed action have been complied with; and

(2)    an Opinion of Counsel in form and substance reasonably satisfactory to the Trustee stating that, in the opinion of such counsel, all such conditions precedent have been complied with.

Section 11.4    Statements Required in Certificate or Opinion.  Each certificate or opinion, including each Officers' Certificate or Opinion of Counsel with respect to compliance with a covenant or condition provided for in this Indenture shall include:

(1)    a statement that the individual making such certificate or opinion has read such covenant or condition;

(2)    a brief statement as to the nature and scope of the examination or investigation upon which the statements or opinions contained in such certificate or opinion are based;

(3)    a statement that, in the opinion of such individual, he has made such examination or investigation as is necessary to enable him to express an informed opinion as to whether or not such covenant or condition has been complied with; and

(4)    a statement as to whether or not, in the opinion of such individual, such covenant or condition has been complied with.

In giving an Opinion of Counsel, counsel may rely as to factual matters on an Officers' Certificate or on certificates of public officials.

Section 11.5    Rules by Trustee, Paying Agent and Registrar.  The Trustee may make reasonable rules for action by, or a meeting of, Holders.  The Agents may make reasonable rules for their functions.

- 97 -

Section 11.6    Payment Date Other than a Business Day.  If any payment with respect to a payment of any principal of, premium, if any, or interest on any Note (including any payment to be made on any Redemption Date or date fixed for purchase of any Note) is due on a day which is not a Business Day, then the payment need not be made on such date, but may be made on the next succeeding Business Day with the same force and effect as if made on such date, and no interest will accrue for the intervening period. If a regular Record Date or a Special Record Date falls on a day that is not a Business Day, such record date shall not be affected.

Section 11.7    Governing Law, etc.

(a)    THIS INDENTURE (INCLUDING EACH NOTE GUARANTEE) AND THE NOTES SHALL BE GOVERNED BY, AND CONSTRUED IN ACCORDANCE WITH, THE LAW OF THE STATE OF NEW YORK.  EACH OF THE PARTIES HERETO HEREBY WAIVES ANY RIGHT TO TRIAL BY JURY IN ANY ACTION, PROCEEDING OR COUNTERCLAIM ARISING OUT OF OR RELATING TO THIS INDENTURE, EACH NOTE GUARANTEE OR THE NOTES OR ANY TRANSACTION RELATED HERETO OR THERETO TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW.

(b)    Each of the parties hereto:

(i)    agrees that any suit, action or proceeding against it arising out of or relating to this Indenture (including the Note Guarantees) or the Notes, as the case may be, may be instituted in any court of the State of New York or any United States court sitting, in each case, in the Borough of Manhattan, The City of New York, New York, United States of America, and any appellate court from any court thereof,

(ii)    waives to the fullest extent permitted by applicable law, any objection which it may now or hereafter have to the laying of venue of any such suit, action or proceeding, any immunity from the jurisdiction of such courts over any suit, action or proceeding, its right to bring action in any other jurisdiction that may apply by virtue of its present or future domicile or for any other reason, any claim that any suit, action or proceeding in such a court has been brought in an inconvenient forum and any right to any other jurisdiction to which it may be entitled on account of place of residence or domicile, or for any other reason,

(iii)    irrevocably consents and submits to the exclusive jurisdiction of any court of the State of New York or any United States court sitting, in each case, in the Borough of Manhattan, The City of New York, New York, United States of America, and any appellate court from any court thereof,

(iv)    agrees that final judgment in any such suit, action or proceeding brought in such a court shall be conclusive and binding and may be enforced in the courts of the jurisdiction of which it is subject by a suit upon judgment, and

(v)    agrees that service of process by mail to the Authorized Agent at the address specified in this Indenture shall constitute personal service of such process on it in any such suit, action or proceeding.

NAI-1502882142v7

Case 1:26-md-23865-JEM-DCC Document 30-1 Entered on FLSD Docket 08/04/2025 Page 114 of 385

(c)        The Company and the Subsidiary Guarantors have each appointed Law Debenture Corporate Services Inc. with offices currently at 801 2nd Avenue, Suite 403, New York, NY 10017, as their authorized agent for service (the "Authorized Agent") upon whom all writs, process and summonses may be served in any suit, action or proceeding brought in connection with this Indenture, the Notes or any Note Guarantee which may be instituted in any state or federal court in The City of New York, Borough of Manhattan.  The Company and the Subsidiary Guarantors hereby represent and warrant that the Authorized Agent has accepted such appointment and has agreed to act as said agent for service of process, and the Company and the Subsidiary Guarantors agree to take any and all action, including the filing of any and all documents, that may be necessary to continue each such appointment in full force and effect as aforesaid so long as the Notes remain Outstanding.  The Company and the Subsidiary Guarantors agree that the appointment of the Authorized Agent shall be irrevocable so long as any of the Notes remain Outstanding or until the irrevocable appointment by the Company and the Subsidiary Guarantors of a successor agent in The City of New York, New York as each of their authorized agent for such purpose and the acceptance of such appointment by such successor. Service of process upon the Authorized Agent shall be deemed, in every respect, effective service of process upon the Company and the Subsidiary Guarantors.

(d)        To the extent that any of the Company and the Subsidiary Guarantors have or hereafter may acquire any immunity (sovereign or otherwise) from any legal action, suit or proceeding, from jurisdiction of any court or from set-off or any legal process (whether service or notice, attachment in aid or otherwise) with respect to itself or any of its property, the Company and the Subsidiary Guarantors hereby irrevocably waive and agree not to plead or claim such immunity in respect of their obligations under this Indenture, the Notes or any Note Guarantee.

(e)        Nothing in this Section 11.7 shall affect the right of the Trustee or any Holder of the Notes to serve process in any other manner permitted by law.

Section 11.8    No Recourse Against Others.  An incorporator, director, officer, employee, stockholder or controlling person, as such, of the Company or any Subsidiary Guarantor shall not have any liability for any obligations of the Company or such Subsidiary Guarantor under the Notes or this Indenture (including the Note Guarantees) or for any claims based on, in respect of or by reason of such obligations or their creation.  By accepting a Note, each Holder shall waive and release all such liability.  The waiver and release shall be part of the consideration for the issue of the Notes.

Section 11.9    Successors.  All agreements of the Company and the Subsidiary Guarantors in this Indenture and the Notes shall bind their respective successors.  All agreements of the Trustee in this Indenture shall bind its successors.

Section 11.10  Duplicate and Counterpart Originals.  The parties may sign any number of copies of this Indenture.  One signed copy is enough to prove this Indenture.  This Indenture may be executed in any number of counterparts, each of which so executed shall be an original, but all of them together represent the same agreement.

NAI-1502882142v7

Section 11.11  <u>Severability</u>.  In case any provision in this Indenture or in the Notes shall be invalid, illegal or unenforceable, the validity, legality and enforceability of the remaining provisions shall not in any way be affected or impaired thereby.

Section 11.12  <u>Currency Indemnity</u>

(a)  U.S. Legal Tender is the sole currency of account and payment for all sums payable by the Company or any Subsidiary Guarantor under or in connection with the Notes, this Indenture or any Note Guarantee, including damages.  Any amount received or recovered in currency other than U.S. Legal Tender (whether as a result of, or of the enforcement of, a judgment or order of a court of any jurisdiction, in the winding-up or dissolution of the Company, any Subsidiary or otherwise) by any Holder of the Notes in respect of any sum expressed to be due to it from the Company or any Subsidiary Guarantor shall only constitute a discharge of them under the Notes, this Indenture and any Note Guarantee only to the extent of the U.S. Legal Tender amount which the recipient is able to purchase with the amount so received or recovered in that other currency on the date of that receipt or recovery (or, if it is not practicable to make that purchase on that date, on the first date on which it is practicable to do so).  If that U.S. Legal Tender amount is less than the U.S. Legal Tender amount expressed to be due to the recipient under the Notes or this Indenture, to the extent permissible under applicable law, the Company and the Subsidiary Guarantors shall jointly and severally indemnify and hold harmless the recipient against any loss sustained by it in making any such purchase.  In any event, the Company and the Subsidiary Guarantors shall jointly and severally indemnify the Holder against the cost of making any purchase of U.S. Legal Tender.  For the purposes of this <u>Section 11.12</u>, it will be sufficient for the Holder of a Note to certify in a satisfactory manner that it would have suffered a loss had an actual purchase of U.S. Legal Tender been made with the amount received in that other currency on the date of receipt or recovery (or, if a purchase of U.S. Legal Tender on such date had not been practicable, on the first date on which it would have been practicable) and that the change of the purchase date was needed.

(b)  The indemnities of the Company and the Subsidiary Guarantors contained in this <u>Section 11.12</u>, to the extent permitted by law:  (i) constitute a separate and independent obligation from the other obligations of the Company and the Subsidiary Guarantors under this Indenture and the Notes; (ii) shall give rise to a separate and independent cause of action against the Company and the Subsidiary Guarantors; (iii) shall apply irrespective of any indulgence granted by any Holder of the Notes from time to time; and (iv) shall continue in full force and effect notwithstanding any other judgment, order, claim or proof for a liquidated amount in respect of any sum due under the Notes.

Section 11.13  <u>Table of Contents; Headings</u>.  The table of contents and headings of the Articles and Sections of this Indenture have been inserted for convenience of reference only, are not intended to be considered a part hereof and shall not modify or restrict any of the terms or provisions hereof.

Section 11.14  <u>USA Patriot Act</u>.  The parties hereto acknowledge that, in accordance with Section 326 of the USA Patriot Act (Title III of Pub. L. 107-56 (signed into law on October 26, 2001)) (as amended, modified or supplemented from time to time, the "<u>USA Patriot Act</u>"), the Trustee, like all financial institutions, is required to obtain, verify, and record information that

NAI-1502882142v7

identifies each person or legal entity that opens an account. The parties to this Indenture agree that they will provide the Trustee with such information as the Trustee may request in order for the Trustee to satisfy the requirements of the USA Patriot Act.

Section 11.15 Foreign Account Tax Compliance Act (FATCA). In order to comply with applicable tax laws, rules and regulations (inclusive of directives, guidelines and interpretations promulgated by competent authorities) in effect from time to time (including, without limitation, Sections 1471 to 1474 of the U.S. Internal Revenue Code of 1986, as amended, "Applicable Law"), the Company agrees (i) to provide to the Trustee sufficient information about Holders or other applicable parties and/or transactions (including any modification to the terms of such transactions) so the Trustee can determine whether it has tax related obligations under Applicable Law, (ii) that the Trustee shall be entitled to make any withholding or deduction from payments under the Indenture to the extent necessary to comply with Applicable Law for which the Trustee shall not have any liability, and (iii) to hold the Trustee harmless for any losses it may suffer due to the actions it takes to comply with such Applicable Law. The terms of this section shall survive the termination of this Indenture.

Section 11.16 Anti-Money Laundering, Terrorism and Economic Sanctions.

(a) The Trustee or any Agent may take and instruct any delegate to take any action which it reasonably considers appropriate so as to comply with any applicable law, regulation, request of a public or regulatory authority or any internal group policy (including any "Know Your Client" and/or other compliance policy) which relates to the prevention of fraud, money laundering, terrorism or other criminal activities or the provision of financial and other services to sanctioned persons or entities. Such action may include but is not limited to the interception and investigation of transactions on the Company's accounts (particularly those involving the international transfer of funds) including the source of the intended recipient of funds paid into or out of the Company's accounts. None of the Trustee, any Agent or any delegate will be liable for any loss (whether direct or consequential and including, without limitation, loss of profit or interest) caused in whole or in part by any actions which are taken by the Trustee, any Agent or any delegate in good faith pursuant to this Section 11.16.

(b) The Company covenants and represents that neither it nor, to its knowledge, any of its affiliates, subsidiaries, directors or officers are the target or subject of any sanctions enforced by the US Government, (including, without limitation, the Office of Foreign Assets Control of the US Department of the Treasury ("OFAC") or the US Department of State), the United Nations Security Council, the European Union, Her Majesty's Treasury, or other relevant sanctions authority (collectively "Sanctions").

(c) The Company covenants and represents that neither it nor any of its affiliates, subsidiaries, directors or officers will directly or indirectly use any repayments/reimbursements made pursuant to this agreement, (i) to fund or facilitate any activities of or business with any person who, at the time of such funding or facilitation, is the subject or target of Sanctions, (ii) to fund or facilitate any activities of or business with any country or territory that is the target or subject of sanctions, or (iii) in any other manner that will result in a violation of Sanctions by any person.

*[Signature pages follow]*

- 101 -

IN WITNESS WHEREOF, the parties have caused this Indenture to be duly executed as of the date first written above.

**TV AZTECA, S.A.B. DE C.V.**, as Issuer

By: _____
Name: Esteban Galíndez Aguirre
Title: Chief Financial Officer

By: _____
Name: Rafael Rodríguez Sánchez
Title: General Counsel and Legal Director

ADMINISTRADORA GRUPO TVA, S.A. DE C.V.
ALTA EMPRESA, S.A. DE C.V.
ASESORÍA ESPECIALIZADA EN AVIACIÓN, S.A.
    DE C.V.
ATLÉTICO MORELIA, S.A. DE C.V.
AZTECA CONECTA PRODUCCIONES, S.A. DE
    C.V.
AZTECA NOVELAS, S.A.P.I. DE C.V.
AZTECA RECORDS, S.A. DE C.V.
AZTECA TELECASTING, S. DE R.L. DE C.V.
AZTECA WEB, S.A. DE C.V.
CLUB DE FUTBOL ROJINEGROS, S.A. DE C.V.
COMERCIACOM, S.A. DE C.V.
ESTUDIOS AZTECA, S.A. DE C.V.
FINBOR MÉXICO, S.A. DE C.V.
GANADOR AZTECA, S.A.P.I. DE C.V.
GRUPO TV AZTECA, S.A. DE C.V.
INVERSORA MEXICANA DE PRODUCCIÓN, S.A.
    DE C.V.
OPERADORA MEXICANA DE TELEVISIÓN, S.A.
    DE C.V.
ORGANIZACIÓN DE TORNEOS Y EVENTOS
    DEPORTIVOS, S.A. DE C.V.
PRODUCCIONES AZTECA DIGITAL, S.A. DE
    C.V.
PRODUCCIONES ESPECIALIZADAS, S.A. DE
    C.V.
PRODUCTORA DE TELEVISIÓN REGIONAL DE
    TV AZTECA, S.A. DE C.V.
PROFESIONALES Y ADMINISTRATIVOS EN
    SERVICIOS INMOBILIARIOS, S.A. DE C.V.

*[Signature Page to Indenture]*

IN WITNESS WHEREOF, the parties have caused this Indenture to be duly executed as of the date first written above.

**TV AZTECA, S.A.B. DE C.V.**, as Issuer

By: _Esteban Jal G._

Name: Esteban Galíndez Aguirre
Title: Chief Financial Officer

By: _____
Name: Rafael Rodríguez Sánchez
Title: General Counsel and Legal Director

ADMINISTRADORA GRUPO TVA, S.A. DE C.V.
ALTA EMPRESA, S.A. DE C.V.
ASESORÍA ESPECIALIZADA EN AVIACIÓN, S.A.
    DE C.V.
ATLÉTICO MORELIA, S.A. DE C.V.
AZTECA CONECTA PRODUCCIONES, S.A. DE
    C.V.
AZTECA NOVELAS, S.A.P.I. DE C.V.
AZTECA RECORDS, S.A. DE C.V.
AZTECA TELECASTING, S. DE R.L. DE C.V.
AZTECA WEB, S.A. DE C.V.
CLUB DE FUTBOL ROJINEGROS, S.A. DE C.V.
COMERCIACOM, S.A. DE C.V.
ESTUDIOS AZTECA, S.A. DE C.V.
FINBOR MÉXICO, S.A. DE C.V.
GANADOR AZTECA, S.A.P.I. DE C.V.
GRUPO TV AZTECA, S.A. DE C.V.
INVERSORA MEXICANA DE PRODUCCIÓN, S.A.
    DE C.V.
OPERADORA MEXICANA DE TELEVISIÓN, S.A.
    DE C.V.
ORGANIZACIÓN DE TORNEOS Y EVENTOS
    DEPORTIVOS, S.A. DE C.V.
PRODUCCIONES AZTECA DIGITAL, S.A. DE
    C.V.
PRODUCCIONES ESPECIALIZADAS, S.A. DE
    C.V.
PRODUCTORA DE TELEVISIÓN REGIONAL DE
    TV AZTECA, S.A. DE C.V.
PROFESIONALES Y ADMINISTRATIVOS EN
    SERVICIOS INMOBILIARIOS, S.A. DE C.V.

*[Signature Page to Indenture]*

PROMOTORA DE FUTBOL ROJINEGROS, S.A.
DE C.V.
PROMOTORA DE FUTBOL MORELIA, S.A. DE
C.V.
PUBLICIDAD ESPECIALIZADA EN MEDIOS DE
COMUNICACIÓN DE TV AZTECA, S.A.
DE C.V.
S.C.I. DE MÉXICO, S.A. DE C.V.
SERVICIOS AÉREOS NOTICIOSOS, S.A. DE C.V.
SERVICIOS ESPECIALIZADOS TAZ, S.A. DE C.V.
SERVICIOS Y MANTENIMIENTO DEL FUTURO
EN TELEVISIÓN, S.A. DE C.V.
TELEVISIÓN AZTECA, S.A. DE C.V.
TV AZTECA COMERCIALIZADORA, S.A. DE
C.V.
CORPORACIÓN DE ASESORÍA TÉCNICA Y DE
PRODUCCIÓN, S.A. DE C.V.

each a Subsidiary Guarantor

By: _____
Name: Rafael Rodríguez Sánchez
Title: Attorney-in-fact

COMERCIALIZADORA DE PUBLICIDAD
AZTECA, S.A. DE C.V.
COMERCIALIZADORA EN MEDIOS DE
COMUNICACIÓN DE TV AZTECA, S.A.
DE C.V.
EDITORIAL MANDARINA, S.A. DE C.V.
MULTIMEDIA, ESPECTÁCULOS Y
ATRACCIONES, S.A. DE C.V.
RED AZTECA INTERNACIONAL, S.A. DE C.V.
SERVICIOS FORÁNEOS DE ADMINISTRACIÓN,
S.A. DE C.V.
SERVICIOS LOCALES DE PRODUCCIÓN, S.A.
DE C.V.

each a Subsidiary Guarantor

By: _____
Name: Félix Vidal Mena Tamayo
Title: Attorney-in-fact

*[Signature Page to Indenture]*

AGENCIA AZTECA, INC.
AZTECA AMERICA TV SPOT SALES
AZTECA INTERNATIONAL CORPORATION
AZTECA STATIONS, LLC
STATIONS GROUP, LLC
SCTV, INC.
KAZA AZTECA AMERICA INC
SOUTHERN CALIFORNIA TV LLC

each a Subsidiary Guarantor

By:
Name: Horacio Medal Ordóñez
Title:

By:
Name: Ernesto Ortega Oltra
Title:

FUNDACION AZTECA AMERICA, LLC

a Subsidiary Guarantor

By:
Name: Horacio Medal Ordóñez
Title:

By:
Name:
Title:

TV AZTECA HONDURAS, S.A. DE C.V.
COMERCIALIZADORA DE TELEVISION DE
HONDURAS, S.A. DE C.V.

each a Subsidiary Guarantor

By:
Name: Melvin Reniery Canales Espinal
Title: Attorney-in-fact

*[Signature Page to Indenture]*

AGENCIA AZTECA, INC.
AZTECA AMERICA TV SPOT SALES
AZTECA INTERNATIONAL CORPORATION
AZTECA STATIONS, LLC
STATIONS GROUP, LLC
SCTV, INC.
KAZA AZTECA AMERICA INC
SOUTHERN CALIFORNIA TV LLC

each a Subsidiary Guarantor

By: _____
Name: Horacio Medal Ordóñez
Title:

By: _____
Name: Ernesto Ortega Olira
Title:

FUNDACION AZTECA AMERICA, LLC

a Subsidiary Guarantor

By: _____
Name: Horacio Medal Ordóñez
Title:

By: _____
Name: LUIS J. Echarte
Title: Attorney in fact

TV AZTECA HONDURAS, S.A. DE C.V.
COMERCIALIZADORA DE TELEVISION DE
HONDURAS, S.A. DE C.V.

each a Subsidiary Guarantor

By: _____
Name: Melvin Reniery Canales Espinal
Title: Attorney-in-fact

*[Signature Page to Indenture]*

AGENCIA AZTECA, INC.
AZTECA AMERICA TV SPOT SALES
AZTECA INTERNATIONAL CORPORATION
AZTECA STATIONS, LLC
STATIONS GROUP, LLC
SCTV, INC.
KAZA AZTECA AMERICA INC
SOUTHERN CALIFORNIA TV LLC

each a Subsidiary Guarantor

By: _____
Name: Horacio Medal Ordóñez
Title:

By: _____
Name: Ernesto Ortega Oltra
Title:

FUNDACION AZTECA AMERICA, LLC

a Subsidiary Guarantor

By: _____
Name: Horacio Medal Ordóñez
Title:

By: _____
Name:
Title:

TV AZTECA HONDURAS, S.A. DE C.V.
COMERCIALIZADORA DE TELEVISIÓN DE
HONDURAS, S.A. DE C.V.

each a Subsidiary Guarantor

By: _____
Name: Melvin Remjery Candles Espinal
Title: Attorney-in-fact

[Signature Page to Indenture]

AZTECA COMUNICACIONES PERU, S.A.C.

a Subsidiary Guarantor

By: _____
   Name: francisco madrozo
   Title: CEO

By: _____
   Name: José montes de Peroito
   Title: General Counsel

REDES OPTICAS, S.A.C.

a Subsidiary Guarantor

By: _____
   Name: Rocío Castillo
   Title: CEO

By: _____
   Name: Rafael Rodriguez
   Title: Attorney-In-fact.

TELEVISORA DEL VALLE DE MEXICO, S.A. DE C.V.

a Subsidiary Guarantor

By: _____
   Name: Reyna Adriana Amador Sanchez
   Title: Attorney-in-fact

[Signature Page to Indenture]

AZTECA COMUNICACIONES PERU, S.A.C

a Subsidiary Guarantor

By: _____
Name: *Francisco Madrazo*
Title: *CEO*

By: _____
Name: *José Montes de Peralto*
Title: *General Counsel*

REDES OPTICAS, S.A.C.

a Subsidiary Guarantor

By: _____
Name: *Rocío Castillo*
Title: *CEO*

By: _____
Name: *Rafael Rodríguez*
Title: *Attorney-In-fact.*

TELEVISORA DEL VALLE DE MEXICO, S.A. DE
C.V.

a Subsidiary Guarantor

By: _____
Name:   Reyna Adriana Amador Sanchez
Title:   Attorney-in-fact

[Signature Page to Indenture]

INCOTEL S.A.
TVA GUATEMALA S.A.

each a Subsidiary Guarantor


By: _____
  Name: Guillermo Wilkins González
  Title: Attorney-in-fact


LASIMEX, S.A. DE C.V.
TV AZTECA GLOBAL, S.L.U.

a Subsidiary Guarantor


By: _____
  Name: Pedro Martín Molina Reyes
  Title: Attorney-in-fact

*[Signature Page to Indenture]*

AZTECA COMUNICACIONES PERÚ, S.A.C.

a Subsidiary Guarantor

By: _____
 Name:
Title:

By: _____
Name:
Title:

REDES OPTICAS, S.A.C.

a Subsidiary Guarantor

By: _____
Name:
Title:

By: _____
Name:
Title:

TELEVISORA DEL VALLE DE MÉXICO, S.A. DE C.V.

a Subsidiary Guarantor

By: _____
Name: Reyna Adriana Amador Sánchez
Title: Attorney-in-fact

*[Signature Page to Indenture]*

AGENCIA AZTECA, INC.
AZTECA AMERICA TV SPOT SALES
AZTECA INTERNATIONAL CORPORATION
AZTECA STATIONS, LLC
STATIONS GROUP, LLC
SCTV, INC.
KAZA AZTECA AMERICA INC
SOUTHERN CALIFORNIA TV LLC

each a Subsidiary Guarantor

By: _____
Name: Horacio Medal Ordóñez
Title:

By: _____
Name: Ernesto Ortega Oltra
Title: CFO

FUNDACION AZTECA AMERICA, LLC

a Subsidiary Guarantor

By: _____
Name: Horacio Medal Ordóñez
Title:

By: _____
Name:
Title:

TV AZTECA HONDURAS, S.A. DE C.V.
COMERCIALIZADORA DE TELEVISIÓN DE
HONDURAS, S.A. DE C.V.

each a Subsidiary Guarantor

By: _____
Name: Melvin Reniery Canales Espinal
Title: Attorney-in-fact

[Signature Page to Indenture]

INCOTEL S.A.
TVA GUATEMALA S.A.

each a Subsidiary Guarantor


By: _____
Name: Guillermo Wilkins González
Title: Attorney-in-fact


LASIMEX, S.A. DE C.V.
TV AZTECA GLOBAL, S.L.U.

a Subsidiary Guarantor


By: _____
Name: Pedro Martín Molina Reyes
Title: Attorney-in-fact

*[Signature Page to Indenture]*

**THE BANK OF NEW YORK MELLON,**
as Trustee and Registrar

By: _Wanda Camacho_

Name:

Title:     Wanda Camacho
           Vice President

*[Signature page to Indenture]*

**THE BANK OF NEW YORK MELLON, LONDON BRANCH,**
as Principal Paying Agent

By: _____

Name:
Title:      Wanda Camacho
            Vice President

*[Signature page to Indenture]*

**EXHIBIT A**

**FORM OF NOTE**

[*Include the bracketed language for Global Notes only.*]

[THIS IS A GLOBAL NOTE WITHIN THE MEANING OF THE INDENTURE REFERRED TO HEREINAFTER.

UNLESS THIS GLOBAL NOTE IS PRESENTED BY AN AUTHORIZED REPRESENTATIVE OF EUROCLEAR S.A./N.V., AS OPERATOR OF THE EUROCLEAR SYSTEM ("EUROCLEAR") OR CLEARSTREAM BANKING, SOCIÉTÉ ANONYME ("CLEARSTREAM") TO THE COMPANY OR ITS AGENT FOR REGISTRATION OF TRANSFER, EXCHANGE, OR PAYMENT, AND ANY GLOBAL NOTE ISSUED IS REGISTERED IN THE NAME OF THE BANK OF NEW YORK DEPOSITORY (NOMINEES) LIMITED, AS THE COMMON DEPOSITARY FOR EUROCLEAR AND CLEARSTREAM (THE "COMMON DEPOSITARY"), OR IN SUCH OTHER NAME AS IS REQUESTED BY AN AUTHORIZED REPRESENTATIVE OF EUROCLEAR AND CLEARSTREAM (AND ANY PAYMENT IS MADE TO THE COMMON DEPOSITARY OR TO SUCH OTHER ENTITY AS IS REQUESTED BY AN AUTHORIZED REPRESENTATIVE OF EUROCLEAR AND CLEARSTREAM), ANY TRANSFER, PLEDGE OR OTHER USE HEREOF FOR VALUE OR OTHERWISE BY OR TO ANY PERSON IS WRONGFUL IN AS MUCH AS THE REGISTERED OWNER HEREOF, THE COMMON DEPOSITARY, HAS AN INTEREST HEREIN.

TRANSFERS OF THIS GLOBAL NOTE SHALL BE LIMITED TO TRANSFERS IN WHOLE, BUT NOT IN PART, TO THE COMMON DEPOSITARY (OR TO A SUCCESSOR THEREOF) OR TO A NOMINEE OF EUROCLEAR AND CLEARSTREAM (OR TO A SUCCESSOR THEREOF OR SUCH SUCCESSOR'S NOMINEE).]

THIS NOTE (AND THE RELATED NOTE GUARANTEES) HAVE NOT BEEN REGISTERED UNDER THE U.S. SECURITIES ACT OF 1933, AS AMENDED (THE "SECURITIES ACT") AND MAY NOT BE OFFERED, SOLD, PLEDGED OR OTHERWISE TRANSFERRED EXCEPT IN ACCORDANCE WITH THE FOLLOWING SENTENCE. BY ITS ACQUISITION HEREOF OR OF A BENEFICIAL INTEREST HEREIN, THE ACQUIRER

(1)     REPRESENTS THAT IT IS NOT A U.S. PERSON (WITHIN THE MEANING OF REGULATION S UNDER THE SECURITIES ACT) AND

(2)     AGREES FOR THE BENEFIT OF THE COMPANY THAT IT WILL NOT OFFER, SELL, PLEDGE OR OTHERWISE TRANSFER THIS NOTE OR ANY BENEFICIAL INTEREST HEREIN, EXCEPT IN ACCORDANCE WITH THE SECURITIES ACT AND ANY APPLICABLE SECURITIES LAWS OF ANY STATE OF THE UNITED STATES AND ONLY (A) TO THE COMPANY, (B) PURSUANT TO A REGISTRATION STATEMENT WHICH HAS BECOME EFFECTIVE UNDER THE SECURITIES ACT, (C) IN AN OFFSHORE TRANSACTION IN COMPLIANCE WITH RULE 904 OF REGULATION S UNDER THE SECURITIES ACT, OR (D) PURSUANT TO AN EXEMPTION FROM THE

NAI-1502882142v7                                      A-1

A-2

REGISTRATION REQUIREMENTS OF THE SECURITIES ACT PROVIDED BY RULE 144 UNDER THE SECURITIES ACT OR ANY OTHER AVAILABLE EXEMPTION FROM THE REGISTRATION REQUIREMENTS OF THE SECURITIES ACT.

PRIOR TO THE REGISTRATION OF ANY TRANSFER IN ACCORDANCE WITH ABOVE, THE ISSUER RESERVES THE RIGHT TO REQUIRE THE DELIVERY OF SUCH LEGAL OPINIONS, CERTIFICATIONS OR OTHER EVIDENCE AS MAY REASONABLY BE REQUIRED IN ORDER TO DETERMINE THAT THE PROPOSED TRANSFER IS BEING MADE IN COMPLIANCE WITH THE SECURITIES ACT AND APPLICABLE STATE SECURITIES LAWS. NO REPRESENTATION IS MADE AS TO THE AVAILABILITY OF ANY RULE 144 EXEMPTION FROM THE REGISTRATION REQUIREMENTS OF THE SECURITIES ACT.

# FORM OF FACE OF NOTE

No. [____]                                        Principal Amount U.S.$[_____]

*[If the Note is a Global Note include the following two lines*:
as revised by the Schedule of Increases and
Decreases in Global Note attached hereto]

Common Code [•]
ISIN [•]

TV Azteca, S.A.B. de C.V., a publicly traded variable capital corporation
(*sociedad anónima bursátil de capital variable*) organized and existing under the laws of the
United Mexican States, promises to pay to The Bank of New York Depository (Nominees)
Limited, or registered assigns, the principal sum of U.S.$[                    ] [*If the Note is a
Global Note, add the following,* as revised by the Schedule of Increases and Decreases in Global
Note attached hereto], on August 9, 2024.

| | |
|---|---|
| Interest Rate: | 8.250% per annum |
| Interest Payment Dates: | August 9 and February 9, commencing on [        ][1] |
| Record Dates: | July 26 and January 26 |

Reference is hereby made to the further provisions of this Note set forth on the
reverse hereof, which will for all purposes have the same effect as if set forth at this place.

---

[1] February 9, 2018 for Initial Notes.

NAI-1502882142v7                          A-1

A-2

Additional provisions of this Note are set forth on the other side of this Note.

**TV AZTECA, S.A.B. DE C.V.**

By: _____
        Name:
        Title:

By: _____
        Name:
        Title:

TRUSTEE'S CERTIFICATE OF
 AUTHENTICATION

THE BANK OF NEW YORK MELLON,
as Trustee, certifies
that this is one of
the Notes referred
to in the Indenture.

By: _____
        Authorized Signatory               Date: _____

NAI-1502882142v7                A-2

**FORM OF REVERSE SIDE OF NOTE**

**8.250% Senior Notes Due 2024**

Capitalized terms used but not defined herein shall have the meanings assigned to them in the Indenture referred to below unless otherwise indicated.

1. Interest

TV Azteca, S.A.B. de C.V., a publicly traded variable capital corporation (*sociedad anónima bursátil de capital variable*) organized and existing under the laws of the United Mexican States (and its successors and assigns under the Indenture hereinafter referred to, the "Company"), promises to pay interest on the principal amount of this Note at the rate per annum shown above.

The Company will pay interest semi-annually in arrears on each Interest Payment Date of each year commencing on [    ][2]; *provided* that, if any such Interest Payment Date is a day which is not a Business Day, then the payment need not be made on such date, but may be made on the next succeeding Business Day with the same force and effect as if made on such Interest Payment Date, and no interest will accrue for the intervening period.

Interest on the Notes will accrue from, and include, the most recent date to which interest has been paid on the Notes or, if no interest has been paid, from and including the [Issue Date][3]. Interest will be computed on the basis of a 360-day year of twelve 30-day months.

The Company shall pay interest (including Post-Petition Interest in any proceeding under any Bankruptcy Law) on overdue principal and, to the extent such payments are lawful, interest on Defaulted Interest without regard to any applicable grace periods at the rate shown on this Note, as provided in the Indenture.

2. Indenture; Note Guarantees

This is one of the Notes issued under an Indenture, dated as of August 9, 2017 (as it may be amended or supplemented from time to time in accordance with the terms thereof, the "Indenture"), between the Company, the Subsidiary Guarantors and the Trustee. The terms of the Notes include those stated in the Indenture and those made part of the Indenture by reference to the TIA. The Indenture is not, and is not required to be, qualified under the applicable provisions of the TIA and does not incorporate by reference all provisions of the TIA. The Notes are subject to all such terms, and Holders are referred to the Indenture and the TIA for a statement of those terms. Each Holder by accepting a Note agrees to be bound by all of the terms and provisions of the Indenture, as amended or supplemented from time to time. To the

---

[2] February 9, 2018 for Initial Notes.

[3] For Additional Notes: insert the most recent date to which interest has been paid on outstanding Notes.

NAI-1502882142v7                                    A-3

extent permitted by applicable law, in the event of any inconsistency between the terms of this Note and the terms of the Indenture, the terms of the Indenture will control.

The Notes are general unsecured obligations of the Company. Subject to the conditions set forth in the Indenture and without the consent of the Holders, the Company may issue Additional Notes. All Notes (including all Additional Notes) will be treated as a single class of securities under the Indenture and will vote together for all purposes. The Notes are not, and will not be, entitled to the benefit of any mandatory sinking fund.

This Note is guaranteed by the Subsidiary Guarantors, as set forth in the Indenture.

3. <u>Redemption; Mandatory Redemption; Discharge Prior to Redemption or Maturity</u>

This Note is subject to optional redemption, and may be the subject of a Change of Control Offer or an Asset Sale Offer, in each case, as further described in the Indenture.

If the Company deposits with the Trustee U.S. Legal Tender and/or U.S. Government Obligations sufficient to pay the then outstanding principal of, premium, if any, and accrued interest on the Notes to redemption or Stated Maturity, the Company may in certain circumstances be discharged from the Indenture and the Notes or may be discharged from certain of its obligations under certain provisions of the Indenture..

4. <u>Denominations; Transfer; Exchange</u>

The Notes are in fully registered form without coupons, and only in minimum denominations of U.S.$200,000 and integral multiples of U.S.$1,000 in excess thereof. A Holder may transfer or exchange Notes in accordance with the Indenture. The Trustee may require a Holder, among other things, to furnish appropriate endorsements or transfer documents and to pay any taxes and fees required by law or permitted by the Indenture. Pursuant to the Indenture, there are certain periods during which the Trustee will not be required to register the transfer of or exchange any Note or certain portions of a Note.

5. <u>Persons Deemed Owners</u>

The registered Holder of this Note may be treated as the owner of it for all purposes.

6. <u>Defaults and Remedies</u>

If an Event of Default, as defined in the Indenture, occurs and is continuing and has not been waived, the Trustee or the Holders of at least 25% in aggregate principal amount of the Notes then Outstanding may declare all the Notes to be due and payable. If a Bankruptcy Law Event of Default with respect to a Bankruptcy Party occurs and is continuing, the Notes automatically become due and payable. Holders may not enforce the Indenture or the Notes except as provided in the Indenture. The Trustee may require indemnity reasonably satisfactory to it before it enforces the Indenture or the Notes. Subject to certain limitations, Holders of a majority in principal amount of the Notes then outstanding may direct the Trustee in its exercise of remedies.

NAI-1502882142v7                                        A-4

7.      Amendment and Waiver

Subject to certain exceptions, the Indenture and the Notes may be amended, and Defaults may be waived, with the consent of the Holders of a majority in principal amount of the Outstanding Notes. Without notice to or the consent of any Holder, the Company and the Trustee may amend or supplement the Indenture or the Notes to, among other things, cure any ambiguities, defects or inconsistencies in the Indenture or this Note.

8.      Authentication

This Note shall not be valid until an authorized signatory of the Trustee (or an Authenticating Agent acting on its behalf) manually signs the certificate of authentication on the other side of this Note.

9.      Abbreviations

Customary abbreviations may be used in the name of a Holder or an assignee, such as TEN COM (=tenants in common), TEN ENT (=tenants by the entirety), JT TEN (=joint tenants with rights of survivorship and not as tenants in common), CUST (=custodian) and U/G/M/A (=Uniform Gift to Minors Act).

10.     Common Code and ISIN

Pursuant to a recommendation promulgated by the Committee on Uniform Security Identification Procedures the Company has caused the Common Code and ISIN to be printed on the Notes and has directed the Trustee to use the Common Code and ISIN in notices of redemption as a convenience to Holders.  No representation is made as to the accuracy of such numbers either as printed on the Notes or as contained in any notice of redemption and reliance may be placed only on the other identification numbers placed thereon.

11.     Governing Law

This Note shall be governed by, and construed in accordance with, the laws of the State of New York.

The Company will furnish to any Holder upon written request and without charge to the Holder a copy of the Indenture which has in it the text of this Note.  Requests may be made to:

> TV Azteca, S.A.B. de C.V.
> Insurgentes Sur 3579
> Col. Tlalpan la joya
> 14000, México, D.F.
> México

NAI-1502882142v7                    A-5

## ASSIGNMENT FORM

To assign this Note, fill in the form below:

(I) or (we) assign and transfer this Note to:

_____

_____

_____

_____

(Print or type assignee's name, address and zip code)

_____

(Insert assignee's Social Security or Tax I.D. Number)

and irrevocably appoint _____
as agent to transfer this Note on the books of the Company.  The agent may substitute another to act for him.

Date:_____        Your Signature:_____

Sign exactly as your name appears on the other side of this Note.

Signature
Guarantee*:        _____
(Signature must be guaranteed)

_____

\*        The signature(s) should be guaranteed by an eligible guarantor institution (banks, stockbrokers, savings and loan associations and credit unions with membership in an approved signature guarantee medallion program), pursuant to Exchange Act Rule 17Ad-15 (or other signature guarantor acceptable to the Trustee).

[*To be attached to Global Notes only*]

## SCHEDULE OF INCREASES OR DECREASES IN GLOBAL NOTE

The following increases or decreases in this Global Note have been made:

| Date of increase or decrease | Amount of decrease in Principal Amount of this Global Note | Amount of increase in Principal Amount of this Global Note | Principal Amount of this Global Note following such decrease or increase | Signature of authorized signatory of Trustee |
| --- | --- | --- | --- | --- |
| _____ | _____ | _____ | _____ | _____ |

## OPTION OF HOLDER TO ELECT PURCHASE

If you want to elect to have this Note purchased by the Company pursuant to Section 3.12 or Section 3.8 of the Indenture, check either box:

☐                           ☐

Section 3.12              Section 3.8

If you want to elect to have only part of this Note purchased by the Company pursuant to Section 3.12 or Section 3.8 of the Indenture, state the principal amount (which must be U.S.$200,000 and integral multiples of U.S.$1,000 in excess thereof) that you want to have purchased by the Company: U.S.$

Date: _____      Your Signature _____
                       (Sign exactly as your name appears on the
                       other side of the Note)

Signature               _____
Guarantee*:             (Signature must be guaranteed)

*        The signature(s) should be guaranteed by an eligible guarantor institution (banks, stockbrokers, savings and loan associations and credit unions with membership in an approved signature guarantee medallion program), pursuant to Exchange Act Rule 17Ad-15 (or other signature guarantor acceptable to the Trustee).

NAI-1502882142v7                           A-8

FORM OF SUPPLEMENTAL INDENTURE
FOR ADDITIONAL NOTE GUARANTEE

This Supplemental Indenture, dated as of [_____] (this "Supplemental Indenture"), is by and among [name of additional Subsidiary Guarantor], a [_____] [corporation][limited liability company] (the "New Subsidiary Guarantor"), TV Azteca, S.A.B. de C.V., a publicly traded variable capital corporation (*sociedad anónima bursátil de capital variable*) organized and existing under the laws of the United Mexican States (together with its successors and assigns, the "Company"), and The Bank of New York Mellon, as trustee (the "Trustee") under the Indenture referred to below.

W I T N E S S E T H:

WHEREAS, the Company, the Subsidiary Guarantors party thereto and the Trustee have heretofore executed and delivered an Indenture, dated as of August 9, 2017 (as amended, supplemented, waived or otherwise modified, the "Indenture"), providing for the issuance of 8.250% Senior Notes Due 2024 of the Company;

WHEREAS, pursuant to Sections 10.1 and 10.6 of the Indenture, the Company is required to cause certain Restricted Subsidiaries created or acquired by the Company to execute and deliver to the Trustee this Supplemental Indenture providing an additional Note Guarantee pursuant to which such Restricted Subsidiaries will unconditionally guarantee, jointly and severally with the other Subsidiary Guarantors, the Company's full and prompt payment of the Obligations in respect of the Indenture and the Notes; and

WHEREAS, pursuant to Section 9.1 of the Indenture, the New Subsidiary Guarantor, the Trustee and the Company are authorized to execute and deliver this Supplemental Indenture to supplement the Indenture, without the consent of any Holder;

NOW, THEREFORE, in consideration of the foregoing and for other good and valuable consideration, the receipt of which is hereby acknowledged, the New Subsidiary Guarantor, the Company and the Trustee mutually covenant and agree for the equal and ratable benefit of the Holders of the Notes as follows:

ARTICLE I
DEFINITIONS

Section 1.1.  Defined Terms.  Unless otherwise defined in this Supplemental Indenture, terms defined in the Indenture are used herein as therein defined.

ARTICLE II
AGREEMENT TO BE BOUND; GUARANTEE

Section 2.1.  Agreement to be Bound.  The New Subsidiary Guarantor hereby becomes a party to the Indenture as a Subsidiary Guarantor and as such will have all of the rights and be subject to all of the obligations and agreements of a Subsidiary Guarantor under the

NAI-1502882142v7                                    B-1

Indenture.  The New Subsidiary Guarantor hereby agrees to be bound by all of the provisions of the Indenture applicable to a Subsidiary Guarantor and to perform all of the obligations and agreements of a Subsidiary Guarantor under the Indenture.

Section 2.2.  Guarantee.  The New Subsidiary Guarantor hereby fully, unconditionally and irrevocably guarantees, as primary obligor and not merely as surety, jointly and severally with each other Subsidiary Guarantor, to each Holder of the Notes and the Trustee, the full and punctual payment when due, whether at maturity, by acceleration, by redemption or otherwise, of the Obligations, all of the foregoing to the extent set forth in Article X of the Indenture.

Section 2.3.  Waivers.  The New Subsidiary Guarantor hereby expressly affirms each of the agreements and waivers of the Subsidiary Guarantors set forth in Article X of the Indenture.

ARTICLE III
MISCELLANEOUS

Section 3.1.  Notices.  Any notice or communication delivered to the Company under the provisions of the Indenture shall constitute notice to the New Subsidiary Guarantor.

Section 3.2.  Parties.  Nothing expressed or mentioned herein is intended or shall be construed to give any Person, firm or corporation, other than the Holders and the Trustee, any legal or equitable right, remedy or claim under or in respect of this Supplemental Indenture or the Indenture or any provision herein or therein contained.

Section 3.3.  Governing Law, etc.  This Supplemental Indenture shall be governed by and subject to the provisions set forth in Section 11.7 of the Indenture.

Section 3.4.  Severability.  In case any provision in this Supplemental Indenture shall be invalid, illegal or unenforceable, the validity, legality and enforceability of the remaining provisions shall not in any way be affected or impaired thereby and such provision shall be ineffective only to the extent of such invalidity, illegality or unenforceability.

Section 3.5.  Ratification of Indenture; Supplemental Indenture Part of Indenture; No Liability of Trustee.  Except as expressly amended hereby, the Indenture is in all respects ratified and confirmed and all the terms, conditions and provisions thereof shall remain in full force and effect.  This Supplemental Indenture shall form a part of the Indenture for all purposes, and every Holder of Notes heretofore or hereafter authenticated and delivered shall be bound hereby.  The Trustee makes no representation or warranty as to the validity or sufficiency of this Supplemental Indenture or any Note Guarantee.

Section 3.6.  Duplicate and Counterpart Originals.  The parties may sign any number of copies of this Supplemental Indenture.  One signed copy is enough to prove this Supplemental Indenture.  This Supplemental Indenture may be executed in any number of counterparts, each of which so executed shall be an original, but all of them together represent the same agreement.

NAI-1502882142v7                                                    B-2

Section 3.7.  <u>Headings</u>.  The headings of the Articles and Sections in this Supplemental Indenture have been inserted for convenience of reference only, are not intended to be considered as a part hereof and shall not modify or restrict any of the terms or provisions hereof.

IN WITNESS WHEREOF, the parties hereto have caused this Supplemental Indenture to be duly executed as of the date first above written.

**TV AZTECA, S.A.B. DE C.V.**

By: _____
    Name:
    Title:

By: _____
    Name:
    Title:

[**NAME OF NEW SUBSIDIARY GUARANTOR**],
    as a New Subsidiary Guarantor

By: _____
    Name:
    Title:

By: _____
    Name:
    Title:

**THE BANK OF NEW YORK MELLON**,
 as Trustee


By:  _____
  Name:
  Title:

# Exhibit B



**TV AZTECA ANNOUNCES EARLY AMORTIZATION OF *CERTIFICADOS BURSÁTILES* UP TO $1,200 MILLION PESOS**

**—The operation is part of the strategy to maintain the financial and operational viability of the company and to continue providing audiences with the best broadcast television and digital media content—**

**Mexico City, February 9, 2021**—TV Azteca, S.A.B. de C.V. (BMV: AZTECACPO; Latibex: XTZA), one of the two largest producers of Spanish-language television programming in the world, today announced that as part of its strategy to maintain financial and operational viability, will early amortize up to $1,200 million pesos of the principal — $4,000 million pesos — of the *Certificados Bursátiles* (CEBURES) maturing 2022; date on which the company will continue to comply with the remainder of the principal and interests on a timely manner.

For more than a year, TV Azteca implemented a strict strategy of financial and operational efficiencies to ensure its long-term viability, facing with certainty a crisis in the broadcast television industry that experienced a decline of more than 40% in the advertising market in the last five years; we are also experiencing the consolidation of competitors on digital media and the increase in the cost of content production.

Moreover, this panorama has been aggravated by the deterioration of economic indicators derived from the pandemic caused by the SARS-CoV-2 virus, resulting in lower sales due to a sharp reduction in advertising investment. Within this complex environment, the company will seek to maintain its financial health by making the amortization of the CEBURES.

Also, TV Azteca contemplates to reorganize its debt in foreign currency by initiating a constructive dialogue with holders of the $400 million dollar notes due 2024. Therefore, it has announced the deferment of the payment of the coupon corresponding to February 2021, expecting to reach briefly an agreement that responds to the context and the situation of the company.

Consequently, José Luis Riera Kinkel, General Director of Corporate Finance of Grupo Salinas, has been appointed responsible for the debt reorganization process, who will be accompanied by Moelis & Company LLC and Alfaro, Dávila y Scherer, S.C. (AD&S),

highly specialized global financial advisory companies with extensive experience in processes of this type.

About these announcements, Rafael Rodríguez Sánchez, CEO of TV Azteca, commented: "*As part of our operational efficiencies and cost reduction strategy to be competitive in the long-term, today we started a debt reorganization process as an unequivocal sign that we are acting in an orderly and responsible manner, and we will continue to do so*". Mr. Rodriguez added that he is optimistic and confident that favorable agreements will be reached in this process for all parties and for the future of the Mexican television.

TV Azteca reaffirms its commitment to continue on the path of achieving financial and operational efficiencies that allow it to ensure its long-term viability to continue offering audiences the best content on broadcast television and on digital media.

**About TV Azteca**

TV Azteca is one of the two largest producers of Spanish-language television programming in the world, operating four television networks in Mexico:  Azteca uno, Azteca 7, adn40 and a+, through more than 300 owned and operated stations across the country. The company also owns TV Azteca Digital, operator of several of the most visited digital platforms and social networks in Mexico.

TV Azteca is a Grupo Salinas company (www.gruposalinas.com), a group of dynamic, fast growing, and technologically advanced companies focused on creating: economic value through market innovation and goods and services that improve standards of living; social value to improve community wellbeing; and environmental value by reducing the negative impact of its business activities. Created by Mexican entrepreneur Ricardo B. Salinas (www.ricardosalinas.com), Grupo Salinas operates as a management development and decision forum for the top leaders of member companies. Each of the Grupo Salinas companies operates independently, with its own management, board of directors and shareholders. Grupo Salinas has no equity holdings. The group of companies shares a common vision, values and strategies for achieving rapid growth, superior results and world-class performance.

*Except for historical information, the matters discussed in this press release are concepts about the future that involve risks and uncertainty that may cause actual results to differ materially from those projected. Other risks that may affect TV Azteca and its subsidiaries are presented in documents sent to the securities authorities.*

**Investor Relations:**

| **Bruno Rangel** | **Rolando Villarreal** |
|---|---|
| Grupo Salinas | TV Azteca, S.A.B. de C.V. |
| Tel. +52 (55) 2601-5400, ext. 11502 | Tel. +52 (55) 2601-5400, ext. 11508 |
| jrangelk@gruposalinas.com.mx | rvillarreal@tvazteca.com.mx |

**Press Relations:**

**Luciano Pascoe**
Tel. +52 (55) 1720 1313 ext. 36553
lpascoe@gruposalinas.com.mx

2

# Exhibit C



**BNY MELLON**

March 22, 2021

TV Azteca, S.A.B. de C.V.
Insurgentes Sur 3579
Col. Tlalpan la joya
14000, México, D.F.
México
Attention: Rodrigo Pliego

**NOTICE OF EVENT OF DEFAULT**
TV Azteca S.A.B. de C.V. 8.250% Senior Notes due 2024

Dear Sir:

Pursuant to an Indenture dated as of August 9, 2017 ("Indenture") by and between TV Azteca, S.A.B. de C.V. ("Company"), certain Subsidiary Guarantors thereto ("Subsidiary Guarantors"), The Bank of New York Mellon, as Trustee, ("Trustee"), and The Bank of New York Mellon, London Branch as Principal Paying Agent, the Company issued its 8.250% Senior Notes due 2024 ("Notes"). Capitalized terms used but not defined herein shall have the meanings ascribed to them in the Indenture.

The Trustee has received the Company's letter dated March 9, 2021, wherein the Company provides a copy of its February 9, 2021, press release regarding an interest payment that was due on February 9, 2021, but was not paid, and advises that the Company had begun discussions with representatives of certain Holders, while further advising that the Company will keep the Trustee informed regarding the progress of such discussions.

As a result of the Company's failure to pay the interest due on February 9, 2021, which default has continued for thirty (30) consecutive days and remains continuing, an Event of Default has occurred under Section 6.1(a)(2) of the Indenture. Pursuant to, *inter alia*, Sections 6.3 and 7.7 of the Indenture, the Company and the Subsidiary Guarantors have an obligation to pay and indemnify the Trustee for, among other things, the fees and expenses of the Trustee, including its reasonable attorneys' fees and expenses. In connection with the Indenture and the Event of Default, the Trustee has retained the law firm of Riker, Danzig, Scherer, Hyland & Perretti, LLP (Joseph L. Schwartz and Curtis M. Plaza) to represent the Trustee in this matter. The Trustee hereby notifies the Company and the Subsidiary Guarantors that the Trustee will seek payment and indemnification of claims related to the Event of Default, including timely payment of the fees and expenses of the Trustee and its counsel. The Trustee will forward to the Company periodic statements of such fees and expenses for payment by the Company and Subsidiary Guarantors pursuant to the Indenture.

Communications to the Trustee can be directed to BNY Mellon, Attn: Alex T. Chang, Vice President, Default Administration Group, 240 Greenwich Street, New York, NY 10286, alex.chang@bnymellon.com; and to the Trustee's counsel, Riker, Danzig, Scherer, Hyland & Perretti, LLP, Attn: Joseph Schwartz and Curtis Plaza, P.O. Box 1981, 1 Speedwell Ave, Morristown, New Jersey, 07962-1981; jschwartz@riker.com and cplaza@riker.com.

TV Azteca S.A.B. de C.V. 8.250% Senior Notes due 2024
Notice of Event of Default to Company and Subsidiary Guarantors
March 22, 2021

Pursuant to Section 11.1(e) of the Indenture, notice delivered to the Company shall constitute notice to the Subsidiary Guarantors.

The Trustee expressly reserves all rights, powers, privileges and remedies available to it under the Indenture and at law, and nothing herein shall be deemed a waiver of such rights, powers, privileges and remedies.

The Bank of New York Mellon, as Trustee

cc:    Paul, Weiss, Rifkind, Wharton & Garrison LLP
       1285 6th Avenue
       New York, NY 10019
       Attn:   Alan W. Kornberg (akornberg@paulweiss.com)
              Elizabeth McColm (emccolm@paulweiss.com)

       Winston & Strawn, LLP
       200 Park Avenue
       New York, NY 10166-4193
       Attn:   Allen Miller (amiller@winston.com)
       (per Section 11.1 of Indenture)

# Exhibit D



March 29, 2022

TV Azteca, S.A.B. de C.V.
Insurgentes Sur 3579
Col. Tlalpan la joya
14000, México, D.F.
México
Attention: Rodrigo Pliego

**NOTICE OF CONTINUING EVENTS OF DEFAULT**
TV Azteca S.A.B. de C.V. 8.250% Senior Notes due 2024

Dear Sir:

Pursuant to an Indenture dated as of August 9, 2017 ("Indenture") by and between TV Azteca, S.A.B. de C.V. ("Company"), certain Subsidiary Guarantors thereto ("Subsidiary Guarantors"), The Bank of New York Mellon, as Trustee ("Trustee"), and The Bank of New York Mellon, London Branch as Principal Paying Agent, the Company issued its 8.250% Senior Notes due 2024 ("Notes"). Capitalized terms used herein shall have meanings ascribed in the Indenture.

The Trustee previously notified the Company of the occurrence of an Event of Default pursuant to Section 6.1(a)(2) of the Indenture as a result of the Company's failure to make payments due on the Notes on February 9, 2021. The Company has since failed to make payments due on the Notes on August 9, 2021, and February 9, 2022, which constitute additional Events of Default under Section 6.1(a)(2) of the Indenture. Payment should be made immediately.

The Trustee is in communication with an ad hoc group of Holders, represented by the law firm of Akin Gump Strauss Hauer & Feld, LLP, regarding the pursuit of remedies.

Pursuant to, *inter alia*, Sections 6.3 and 7.7 of the Indenture, the Company and the Subsidiary Guarantors are obligated to pay and indemnify the Trustee for, among other things, the fees and expenses of the Trustee, including its reasonable attorneys' fees and expenses. As previously advised, the Trustee has retained the law firm of Riker, Danzig, Scherer, Hyland & Perretti, LLP to represent the Trustee in connection with the Indenture and the Events of Default. By separate correspondence, the Trustee will submit invoices for the fees and expenses of the Trustee and its counsel for payment by the Company and the Subsidiary Guarantors.

Communications to the Trustee can be directed to BNY Mellon, Attn: Alex T. Chang, Vice President, Default Administration Group, 240 Greenwich Street, New York, NY 10286, alex.chang@bnymellon.com; and to the Trustee's counsel, Riker, Danzig, Scherer, Hyland & Perretti, LLP, Attn: Joseph Schwartz and Curtis Plaza, P.O. Box 1981, 1 Speedwell Ave, Morristown, New Jersey, 07962-1981; jschwartz@riker.com and cplaza@riker.com.

101 Barclay Street
New York, NY 10286

TV Azteca S.A.B. de C.V. 8.250% Senior Notes due 2024
Notice of Continuing Events of Default to Company and Subsidiary Guarantors
March 29, 2022

Pursuant to Section 11.1(e) of the Indenture, notice delivered to the Company shall constitute notice to the Subsidiary Guarantors.

The Trustee expressly reserves all rights, powers, privileges and remedies available to it under the Indenture and at law, and nothing herein shall be deemed a waiver of such rights, powers, privileges and remedies.

The Bank of New York Mellon, as Trustee

cc:     Paul, Weiss, Rifkind, Wharton & Garrison LLP
        1285 6th Avenue
        New York, NY 10019
        Attn:  Alan W. Kornberg (akornberg@paulweiss.com)
               Elizabeth McColm (emccolm@paulweiss.com)

        Winston & Strawn, LLP
        200 Park Avenue
        New York, NY 10166-4193
        Attn:  Allen Miller (amiller@winston.com)
        (per Section 11.1 of Indenture)

# Exhibit E

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| THE BANK OF NEW YORK MELLON, SOLELY IN ITS CAPACITY AS TRUSTEE FOR THE TV AZTECA, S.A.B. DE C.V. 8.25% SENIOR NOTES DUE 2024, | Case No. 1:22-cv-08164-PGG |
| Plaintiff, | Hon. Paul G. Gardephe |
| v. | **THIRD PARTY COMPLAINT** |
| TV AZTECA, S.A.B. DE C.V.; ALTA EMPRESA, S.A. DE C.V.; ASESORÍA ESPECIALIZADA EN AVIACIÓN, S.A. DE C.V.; AZTECA RECORDS, S.A. DE C.V.; AZTECA SPORTS RIGHTS LLC; EQUIPO DE FUTBOL MAZATLAN, S.A. DE C.V.; GANADOR AZTECA, S.A.P.I. DE C.V.; MAZATLAN PROMOTORA DE FUTBOL, S.A. DE C.V.; OPERADORA MEXICANA DE TELEVISIÓN, S.A. DE C.V.; PRODUCCIONES AZTECA DIGITAL, S.A. DE C.V.; PRODUCCIONES DOPAMINA, S.A. DE C.V.; PRODUCCIONES ESPECIALIZADAS, S.A. DE C.V.; PRODUCTORA DE TELEVISIÓN REGIONAL DE TV AZTECA, S.A. DE C.V.; PROMOTORA DE FUTBOL ROJINEGROS, S.A. DE C.V.; PUBLICIDAD ESPECIALIZADA EN MEDIOS DE COMUNICACIÓN DE TV AZTECA, S.A. DE C.V.; S.C.I. DE MÉXICO, S.A. DE C.V.; SERVICIOS AÉREOS NOTICIOSOS, S.A. DE C.V.; SERVICIOS ESPECIALIZADOS TAZ, S.A. DE C.V.; SERVICIOS Y MANTENIMIENTO DEL FUTURO EN TELEVISIÓN, S.A. DE C.V.; CORPORACIÓN DE ASESORÍA TÉCNICA Y DE PRODUCCIÓN, S.A., DE C.V.; EDITORIAL MANDARINA, S.A. DE C.V.; MULTIMEDIA, ESPECTÁCULOS Y ATRACCIONES, S.A. DE C.V.; SERVICIOS FORÁNEOS DE ADMINISTRACIÓN, S.A. DE C.V.; SERVICIOS LOCALES DE PRODUCCIÓN, S.A. DE C.V.; AZTECA INTERNATIONAL CORPORATION; STATIONS GROUP LLC; TV AZTECA HONDURAS, S.A. DE C.V.; COMERCIALIZADORA DE | |

TELEVISIÓN DE HONDURAS, S.A. DE C.V.; INCOTEL S.A.; TVA GUATEMALA S.A.; LASIMEX, S.A. DE C.V.; TV AZTECA GLOBAL, S.L.U.; AZTECA COMUNICACIONES PERÚ, S.A.C.; REDES OPTICAS, S.A.C.; TELEVISORA DEL VALLE DE MÉXICO, S.A. DE C.V.

Defendants.

TV AZTECA, S.A.B. DE C.V.; ALTA EMPRESA, S.A. DE C.V.; ASESORÍA ESPECIALIZADA EN AVIACIÓN, S.A. DE C.V.; AZTECA RECORDS, S.A. DE C.V.; AZTECA SPORTS RIGHTS LLC; EQUIPO DE FUTBOL MAZATLAN, S.A. DE C.V.; GANADOR AZTECA, S.A.P.I. DE C.V.; MAZATLAN PROMOTORA DE FUTBOL, S.A. DE C.V.; OPERADORA MEXICANA DE TELEVISIÓN, S.A. DE C.V.; PRODUCCIONES AZTECA DIGITAL, S.A. DE C.V.; PRODUCCIONES DOPAMINA, S.A. DE C.V.; PRODUCCIONES ESPECIALIZADAS, S.A. DE C.V.; PRODUCTORA DE TELEVISIÓN REGIONAL DE TV AZTECA, S.A. DE C.V.; PROMOTORA DE FUTBOL ROJINEGROS, S.A. DE C.V.; PUBLICIDAD ESPECIALIZADA EN MEDIOS DE COMUNICACIÓN DE TV AZTECA, S.A. DE C.V.; S.C.I. DE MÉXICO, S.A. DE C.V.; SERVICIOS AÉREOS NOTICIOSOS, S.A. DE C.V.; SERVICIOS ESPECIALIZADOS TAZ, S.A. DE C.V.; SERVICIOS Y MANTENIMIENTO DEL FUTURO EN TELEVISIÓN, S.A. DE C.V.; CORPORACIÓN DE ASESORÍA TÉCNICA Y DE PRODUCCIÓN, S.A., DE C.V.; EDITORIAL MANDARINA, S.A. DE C.V.; MULTIMEDIA, ESPECTÁCULOS Y ATRACCIONES, S.A. DE C.V.; SERVICIOS FORÁNEOS DE ADMINISTRACIÓN, S.A. DE C.V.; SERVICIOS LOCALES DE PRODUCCIÓN, S.A. DE C.V.; AZTECA INTERNATIONAL CORPORATION; STATIONS GROUP LLC; TV AZTECA HONDURAS, S.A. DE C.V.; COMERCIALIZADORA DE TELEVISIÓN DE HONDURAS, S.A. DE C.V.; INCOTEL S.A.; TVA GUATEMALA S.A.;

LASIMEX, S.A. DE C.V.; TV AZTECA GLOBAL, S.L.U.; AZTECA COMUNICACIONES PERÚ, S.A.C.; REDES OPTICAS, S.A.C.; TELEVISORA DEL VALLE DE MÉXICO, S.A. DE C.V.

        Third-Party Plaintiffs,

          v.

CYRUS CAPITAL PARTNERS, L.P. AND CONTRARIAN CAPITAL MANAGEMENT, LLC

        Third-Party Defendants.

Defendants/Third-Party Plaintiffs TV Azteca, S.A.B. de C.V., Alta Empresa, S.A. de C.V., Asesoría Especializada En Aviación, S.A. de C.V., Azteca Records, S.A. de C.V., Azteca Sports Rights LLC, Equipo de Futbol Mazatlan, S.A. de C.V., Ganador Azteca, S.A.P.I. de C.V., Mazatlan Promotora de Futbol, S.A. de C.V., Operadora Mexicana de Televisión, S.A. de C.V., Producciones Azteca Digital, S.A. de C.V., Producciones Dopamina, S.A. de C.V., Producciones Especializadas, S.A. de C.V., Productora de Televisión Regional de TV Azteca, S.A. de C.V., Promotora de Futbol Rojinegros, S.A. de C.V., Publicidad Especializada en Medios de Comunicación de TV Azteca, S.A. de C.V., S.C.I. de México, S.A. de C.V., Servicios Aéreos Noticiosos, S.A. de C.V., Servicios Especializados Taz, S.A. de C.V., Servicios y Mantenimiento del Futuro en Televisión, S.A. de C.V., Corporación de Asesoría Técnica y de Producción, S.A. de C.V., Editorial Mandarina, S.A. de C.V., Multimedia, Espectáculos y Atracciones, S.A. de C.V., Servicios Foráneos de Administración, S.A. de C.V., Servicios Locales de Producción, S.A. de C.V., Azteca International Corporation, Stations Group LLC, TV Azteca Honduras, S.A. de C.V., Comercializadora de Televisión de Honduras, S.A. de C.V., Incotel S.A., TVA Guatemala S.A., Lasimex, S.A. de C.V., TV Azteca Global, S.L.U., Azteca Comunicaciones Perú, S.A.C., Redes

3

Opticas, S.A.C., and Televisora del Valle de México, S.A. de C.V. (collectively, "Defendants"), as and for their Third Party Complaint against Third Party Defendants Cyrus Capital Partners, L.P. and Contrarian Capital Management, LLC states on personal knowledge as to themselves, and on information and belief as to all other matters, as follows:

### INTRODUCTION

1. This Third-Party Complaint arises from a series of reckless and negligent actions by Third-Party Defendants Cyrus Capital Partners, L.P. ("Cyrus") and Contrarian Capital Management, LLC ("Contrarian")—actions that have caused catastrophic financial harm to Defendants/Third-Party Plaintiffs.

2. Specifically, Cyrus and Contrarian, acting as the majority Holders of the Notes and at all relevant times directing the prosecution of this litigation, deliberately took unlawful steps contrary to applicable Mexican law for punitive reasons to pressure the Mexican government into imposing massive tax liabilities and penalties against Defendants/Third-Party Plaintiffs.

3. In the midst of a highly charged political environment in Mexico, and with full knowledge of the adversarial relationship between the current administration and Grupo Salinas (which is how the public identifies Defendants in Mexico) and its leader, Ricardo Salinas-Pliego, Cyrus and Contrarian targeted a lobbying campaign against Defendants based on false, misleading and/or reckless accusations.

4. Their efforts, undertaken after the election of President Claudia Sheinbaum-Pardo ("President Sheinbaum"), were designed to weaponize the machinery of the Mexican state— including its judiciary—against Defendants/Third-Party Plaintiffs. This campaign culminated in the Mexican Supreme Court's November 13, 2025, decision upholding hundreds of millions of

dollars in tax penalties against Defendants, a direct result of the political pressure orchestrated by Cyrus and Contrarian.

5. As a direct and foreseeable consequence of these negligent and reckless acts—acts which violate fundamental principles of Mexican law—Defendants/Third-Party Plaintiffs have suffered damages exceeding $400 million. Through this action, Defendants/Third-Party Plaintiffs seek to hold Cyrus and Contrarian accountable for their wrongful conduct and to recover the damages inflicted by their actions.

## PARTIES

6. Cyrus is a limited liability partnership organized under the laws of the State of Delaware, with a principal place of business in New York, NY 10022.

7. Contrarian is a limited liability company organized under the laws of the State of Delaware, with a principal place of business located in Greenwich, CT 06830.

## JURISDICTION AND VENUE

8. This Court has jurisdiction under 28 U.S.C. § 1332(a)(3) because this action is between citizens of different States in which citizens of foreign states are additional parties, and because the amount in controversy exceeds $75,000.

9. This Court has personal jurisdiction over the Third-Party Defendants because the Noteholders, through Plaintiff, consented and submitted to this Court's jurisdiction for any action arising out of or relating to the Notes or Indenture and agreed that any such suit may be brought in this Court.

10. Venue is proper because Third-Party Defendants waived, "to the fullest extent permitted by applicable law," any objection to venue in this District. Indenture, Ex. A § 11.7(b)(ii). Venue is also proper under 28 U.S.C. § 1391(f)(1) because a substantial part of the events and

omissions giving rise to this claim arose in this District. Moreover, TV Azteca and the Guarantors waived any defense that this Court would be an inconvenient forum for this action. Indenture, Ex. A § 11.7(b)(ii).

11.     Venue is also proper under the Court's Anti-Injunction Order, dated September 22, 2025. ECF No. 97. Pursuant to that Order, Defendants dismissed then-existing litigation in Mexico relating to this case and are "enjoined from prosecuting any legal actions in Mexico arising from the Indenture, or commencing any new legal actions in Mexico arising from the Indenture." *Id*. at 39-40. The allegations herein relate to the Holders of the Notes seeking improper leverage with respect to disputes over the Indenture. Accordingly, this is the proper venue in which Defendants may now bring these claims, which are related to the claim asserted by Plaintiff against Defendants.

## FACTUAL ALLEGATIONS

### Contrarian and Cyrus' Arbitration Against Mexico

12.     Contrarian and Cyrus are Holders of the Notes on which Plaintiff seeks a recovery in this action. Contrarian and Cyrus own a substantial portion of the Notes and directed Plaintiff to bring this action against Defendants/Third-Party Plaintiffs.

13.     As background, in 2023, Contrarian and Cyrus commenced an international investment arbitration claim at the International Centre for Settlement of Investment Disputes against the Mexican government arguing that Mexican courts had denied them due process in connection with litigations in Mexico filed by TV Azteca. According to Contrarian and Cyrus, the Mexican courts' alleged denial of due process prevented them from collecting on the Notes.

14.     In that arbitration, which is ongoing, Contrarian and Cyrus seek, as damages, the full principal amount of the Notes plus interest.

Contrarian and Cyrus Acted Recklessly by
Lobbying the Mexican Government Against Defendants-Third Party Plaintiffs

15.     Since the election of President Sheinbaum in 2024, Contrarian and Cyrus have engaged in a reckless lobbying campaign urging President Sheinbaum, the leader of the MORENA political party, to have the Mexican government coerce Defendants/Third-Party Plaintiffs into paying the amounts allegedly owed under the Notes.

16.     Defendants/Third-Party Plaintiffs are perceived in Mexico as part of Grupo Salinas, a large corporate conglomerate.  The public perceives Grupo Salinas to be subject to the leadership of Ricardo Salinas-Pliego, one of the most successful businessmen in Mexican history.

17.     Mr. Salinas-Pliego is and has been a vocal critic of MORENA, the socialist political party that has governed Mexico since 2018.  Indeed, Mr. Salinas-Pliego is perceived in Mexico as one of the most high-profile opposition figures to MORENA.  This has earned Mr. Salinas-Pliego and the companies that are perceived to comprise Grupo Salinas the ire of the Mexican government for the past seven years.  As a result, since 2018, MORENA and its leaders treat Mr. Salinas-Pliego and companies perceived to be associated with Grupo Salinas as political adversaries.

18.     Andres Manuel Lopez-Obrador, the Mexican President from 2018 to 2024, and his administration, repeatedly targeted companies perceived to be within Grupo Salinas with public statements attacking and disparaging those companies, including Defendants/Third-Party Plaintiffs.  Since her election in 2024, President Sheinbaum picked up Mr. Lopez-Obrador's mantle of bias against Grupo Salinas.  Like her predecessor, President Sheinbaum conducts daily morning press conferences (often lasting hours).  President Sheinbaum refers almost daily to Mr. Salinas-Pliego, Grupo Salinas in general, or specific companies perceived to be part of Grupo Salinas, including Defendants/Third-Party Plaintiffs.  It appears there is no other corporate group that is mentioned more often by President Sheinbaum than Grupo Salinas.  Contrarian and Cyrus

7

lobbied against Defendants and Grupo Salinas in a highly polarized and volatile political environment, in which the public record reflects that President Sheinbaum treats Mr. Salinas-Pliego and companies associated with Grupo Salinas as political adversaries.

19. Indeed, pressed by Contrarian and Cyrus, President Sheinbaum has a record of recent unfounded public statements attacking, disparaging and/or defaming Mr. Salinas-Pliego or Grupo Salinas in general, and/or Defendants/Third-Party Plaintiffs in particular, with regards to the dispute involving the Notes.

20. Contrarian and Cyrus knew or should have known that their actions could result in severe and drastic actions by Mexico against Defendants/Third-Party Plaintiffs. Contrarian and Cyrus knew or should have known that in lobbying Mexico to strongarm Defendants/Third-Party Plaintiffs, the Mexican government could intensify its attacks on and harassment of Defendants/Third-Party Plaintiffs. Indeed, this is exactly what happened.

<u>President Sheinbaum's Statements in Support of Contrarian and Cyrus</u>

21. On September 19, 2025, President Sheinbaum began making specific references to Contrarian and Cyrus' dispute with Defendants/Third-Party Plaintiffs.

22. In particular, President Sheinbaum stated that Contrarian and Cyrus had requested that the Mexican government "intervene" to cause Defendants/Third-Party Plaintiffs to pay all amounts allegedly owed under the Notes.

23. On September 30, 2025, President Sheinbaum announced that she would personally meet with Contrarian and Cyrus.

24. On October 8, 2025, a spokesperson for the Noteholders issued a public statement indicating that the Noteholders looked forward to meeting with President Sheinbaum to pursue

8

their "joint interest in recovering the large amounts of money" allegedly owed by Defendants/Third-Party Plaintiffs to the Mexican government and to the Noteholders.

25. On October 23, 2025, President Sheinbaum stated that Defendants/Third-Party Plaintiffs "must pay" the Noteholders and that the Noteholders would soon meet with the Mexican Ministry of Finance, which oversees, directs and controls the Mexican equivalent of the IRS.

<u>The Mexican Supreme Court's Ruling Against Defendants/Third-Party Plaintiffs</u>

26. On November 13, 2025, the Mexican Supreme Court issued a final ruling denying several challenges that Defendants/Third-Party Plaintiffs had filed against a series of multi-hundred-million-dollar tax penalties levied by the Mexican federal tax authority (equivalent to the IRS). This effectively caused Defendants/Third-Party Plaintiffs to become indebted for over $400 million to the Mexican federal government.

27. The membership of the Mexican Supreme Court is aligned with President Sheinbaum and her political party, as described in numerous news reports.

28. For context, in 2025, the Mexican court system underwent a dramatic transformation. As a result of constitutional amendments proposed and advanced by MORENA, all federal and state judges in Mexico, including the Mexican Supreme Court, became publicly elected officials. The first judicial election took place in June 2025. As multiple international, independent human rights and media organizations have reported, all of the Justices in the Mexican Supreme Court that were elected in the judicial election are members of or affiliated with MORENA or are otherwise influenced by and/or aligned with President Sheinbaum and her administration.[1]

---

[1] *See, e.g.,* (<u>Human Rights Watch</u>) <u>https://www.hrw.org/news/2025/09/01/mexico-electoral-process-undermines-judicial-independence</u>, *Mexico: Electoral Process Undermines Judicial Independent,* Human Rights Watch, dated September 1, 2025*;* (<u>New York Times</u>)

29.     As such, the judicial election effectively placed the Mexican Supreme Court (and the majority of the Mexican judiciary) under MORENA's control.  This has been publicly reported and documented by multiple sources.

30.     Contrarian and Cyrus' reckless conduct directly or indirectly resulted in the Mexican Supreme Court's November 13, 2025 ruling against Defendants/Third-Party Plaintiffs.[2]

31.     Contrarian and Cyrus knew or should have known that the Mexican Supreme Court is aligned with of President Sheinbaum and her political party and that President Sheinbaum could exercise direct or indirect influence on the Mexican Supreme Court against Defendants/Third-Party Plaintiffs.

## COUNT I

### (Negligence Under Mexican Law)

32.     Defendants/Third-Party Plaintiffs incorporate their allegations in the previous paragraphs as if fully set forth herein.

33.     Under Article 1910 of the Mexican Federal Civil Code and under Article 1910 of the Mexico City Civil Code, a party is liable for any damages that it causes to another party by acting either intentionally or negligently.  Negligent conduct includes any careless conduct or conduct without proper diligence.

---

https://www.nytimes.com/2025/06/15/world/americas/mexico-courts-election-results.html, *In Mexico, Thousands Ran for Office, Few Voted and One Party Dominated It All,* The New York Times, dated June 15, 2025; (The Economist) https://www.economist.com/the-americas/2025/05/15/mexico-will-be-the-only-country-that-elects-all-its-judges, *Mexico will be the only country that elects all its judges*, The Economist, dated May 15, 2025.

[2] The Mexican government has recently launched other attacks against Defendants including audits into their employment practices.  Defendants reserve the right to amend this pleading as more facts come to light about the role (if any) of Contrarian and Cyrus' lobbying in these new additional attacks.

34.     Contrarian and Cyrus have acted recklessly.  As described more fully above, they misleadingly lobbied President Sheinbaum to try to have the Mexican government coerce Defendants/Third-Party Plaintiffs into paying the amounts allegedly owed under the Notes.  This occurred in a highly polarized and volatile political environment, in which President Sheinbaum treats all companies perceived to be associated with Grupo Salinas as public enemies.

35.     As such, Contrarian and Cyrus' conduct increased the risk that the Mexican government would take severe actions against Defendants/Third-Party Plaintiffs.  Contrarian and Cyrus' reckless conduct directly or indirectly resulted in the Mexican Supreme Court's November 13, 2025 ruling against Defendants/Third-Party Plaintiffs.

36.     Contrarian and Cyrus were aware, or reasonably should have been aware, that their lobbying efforts could provoke the Mexican government to take extraordinary and adverse measures against Defendants/Third-Party Plaintiffs.  Their intervention, given the prevailing political climate and the antagonism between the administration and Grupo Salinas, foreseeably contributed to unfounded public criticisms and punitive actions, culminating in the Mexican Supreme Court's November 13, 2025 ruling.

37.     As a result of Contrarian and Cyrus' recklessness, Defendants/Third-Party Plaintiffs have suffered and continue to suffer significant injury, including but not limited to financial loss, damage to reputation, and loss of business opportunities.

WHEREFORE, Defendants/Third-Party Plaintiffs request the following relief:

A.     Awarding Third-Party Plaintiffs damages in the amount of at least $400 million, with an exact amount to be determined at trial;

B.     Awarding Third-Party Plaintiffs such other and further relief as the Court deems just and proper.

Dated:  New York, New York
        December 17, 2025

                                 GREENBERG TRAURIG, LLP

                                 */s/ Hal S. Shaftel*
                                 Hal S. Shaftel
                                 John C. Molluzzo Jr.
                                 One Vanderbilt Avenue
                                 New York, New York 10017
                                 Tel:  (212) 801-9200
                                 Fax:  (212) 801-6400
                                 shaftelh@gtlaw.com
                                 molluzzoj@gtlaw.com

                                 GREENBERG TRAURIG, LLP
                                 Daniel Pulecio-Boek
                                 2101 L Street N.W.
                                 Washington, DC 20037
                                 Tel:  (202) 331-3117
                                 pulecioboekd@gtlaw.com

                                 *Counsel to Defendants-Third Party*
                                 *Plaintiffs*

# Exhibit F

# TV Azteca took $290m loan from Caribbean bank days before bankruptcy filing

**9f** **9fin.com**/insights/tv-azteca-loan-bankruptcy-filing



Mexican broadcaster **TV Azteca** signed a MXN 5bn ($290m) loan with financial institution **Alterbank** to partially pay the MXN 10.4bn ($600m) it owed to Mexico's tax authority SAT, just days before it filed for bankruptcy protection (*concurso mercantil*), *9fin* sources said.

The loan from Alterbank, a Saint Lucia-based bank, is part of the debt TV Azteca presented in its petition for protection under Mexican bankruptcy law, the sources said.

The broadcaster controlled by Mexican billionaire Ricardo Salinas Pliego fully paid the outstanding taxes, instead of accepting a settlement offer from the SAT to pay 25% upfront and the remainder over the next 18 months starting in February, said one source. That decision pushed the company to file for bankruptcy, the source added.

Meanwhile, sister company **Grupo Elektra** accepted a payment plan to settle its own MXN 22bn ($1.27bn) tax bill in January. A spokesperson said at the time the group would sell assets to fund both companies' payments. Both tax claims — an aggregate MXN 51bn ($3bn) before a SAT discount — were derived from a November 2025 Supreme Court ruling that ended a 20-year controversy, as reported.

TV Azteca's largest recognized debt is its defaulted $400m cross-border bond, which it listed as $532m, or 37% of total debt, the source said. TV Azteca needs over 50% of creditors to agree to a restructuring plan for the court to accept it, the sources said. TV Azteca might seek a 60% haircut from creditors, although it didn't state that in the concurso filing, said one of the sources.

According to *9fin* sources, TV Azteca had proposed a 60% to 75% haircut to bondholders at various points during negotiations — and mediation ordered by a US court in 2023 — since the company defaulted on the 2024s in 2021. But the offer was never made officially, and the company didn't negotiate in good faith, said the sources.

The First District Court in Commercial Bankruptcy Matters in Mexico City granted the general legal protections available to companies that file for bankruptcy, but denied some specific requests such as extending protection against asset seizures to TV Azteca subsidiaries, since only the holding company filed for concurso, sources said.

TV Azteca might add some subsidiaries or affiliates — such as TV Azteca 3, the company that holds the network concessions — to the bankruptcy filing, said sources.

The debtor's lawyers have argued in a US legal proceeding that the company didn't violate the US District Court for the Southern District of New York's prior anti-suit injunction with the filing, because only the holding company filed, as reported.

Judges typically refuse to protect assets held by subsidiaries that are not filing for, or included in, the *concurso,* because Mexican bankruptcy law is designed to avoid the so-called umbrella effect, in which a company's protections extend to its subsidiaries, the sources explained. This means other TV Azteca subsidiaries may be subject to asset seizures.

The Mexican court overseeing the case approved the appointment of Samuel Egure Lascano as the visitor for this first phase of the concurso last week, according to court records. Egure, who is registered as a bankruptcy specialist with the Federal Institute of Insolvency Experts (IFECOM), must now ascertain the company meets the requirements for a bankruptcy proceeding in Mexico, and report his findings to the judge, under local law.

TV Azteca and Alterbank didn't reply to a request for comment.

# Exhibit G



FORMA A-45

1

JUZGADO PRIMERO DE DISTRITO EN MATERIA DE CONCURSOS MERCANTILES, CON RESIDENCIA EN LA CIUDAD DE MÉXICO Y JURISDICCIÓN EN TODA LA REPÚBLICA MEXICANA

SENTENCIA DECLARACIÓN DE CONCURSO MERCANTIL
CONCURSO MERCANTIL 22/2026-II.

PODER JUDICIAL DE LA FEDERACIÓN

Ciudad de México, seis de julio de dos mil veintiséis.

**V I S T O S** los autos, para resolver la **declaración de concurso mercantil** en el expediente **22/2026-II**, de la comerciante **TV Azteca, sociedad anónima bursátil de capital variable**; y,

**R E S U L T A N D O S**

**PRIMERO. Solicitud de concurso mercantil.** Mediante escrito presentado el **diez de marzo de dos mil veintiséis**, por **TV Azteca, sociedad anónima bursátil de capital variable**, en la Oficina de Correspondencia Común de los Juzgados de Distrito en Materia de Concursos Mercantiles, y turnado a este órgano jurisdiccional el día siguiente hábil, solicitó su declaración en estado de concurso mercantil en la **etapa de conciliación**; fundando su petición en los hechos y consideraciones de derecho contenidos en la referida solicitud.

**SEGUNDO. Radicación, admisión y trámite del concurso mercantil.** Por auto de **trece de marzo de dos mil veintiséis**, se radicó el asunto bajo el número de expediente **22/2026-II**.

Posteriormente, el **veinte de marzo de dos mil veintiséis**, previo desahogo de prevención, se admitió a trámite la solicitud planteada; asimismo, se giró oficio al **Instituto Federal de Especialistas de Concursos Mercantiles**, para que designara **visitador**, y se otorgaron como providencias precautorias:

2

*"1)* Con fundamento en la fracción I, del artículo 37 de la ley concursal, se prohíbe a la **comerciante TV Azteca, sociedad anónima bursátil de capital variable,** hacer pagos que <u>tengan como origen obligaciones vencidas con anterioridad a la admisión</u> de la solicitud de concurso mercantil.

*2)* La suspensión de todo procedimiento de ejecución (judicial, administrativo, contractual o extracontractual) o trabe de embargo en contra de los bienes y derechos de la **comerciante,** <u>que tengan como origen obligaciones vencidas con anterioridad a la admisión,</u> con fundamento en lo establecido en la fracción II, del artículo 37 de la Ley de Concursos Mercantiles.

Sin que dicha medida implique la paralización de la substanciación de los procesos seguidos en contra de la **comerciante,** sino que significa la suspensión de la ejecución material sobre sus bienes y derechos, es decir, se refiere a la suspensión del procedimiento de remate, de adjudicación, entre otros similares, tendentes a desintegrar la masa concursal.

Respecto a esta medida cautelar, con fundamento en lo dispuesto por el artículo 65, segundo párrafo de la ley de la materia, se precisa que cuando el mandato de embargo o ejecución sea de carácter laboral, la suspensión no surtirá efectos respecto de lo dispuesto en la fracción XXIII, del apartado A, del artículo 123 constitucional y sus disposiciones reglamentarias, considerando los salarios de los dos años anteriores al concurso mercantil.

Asimismo, con fundamento en lo dispuesto por el artículo 69 de la ley de la materia, dicha medida implica la suspensión de los procedimientos administrativos de ejecución de los créditos fiscales en contra de la **comerciante,** ello hasta en tanto se dicte sentencia que niegue el estado de concurso mercantil o bien, en su caso, fenezca el plazo para la etapa de conciliación.

En el entendido que las autoridades fiscales competentes podrán continuar con los actos necesarios para la determinación y aseguramiento de los créditos fiscales a cargo de la **comerciante.**

Se precisa que el presunto estado de concurso mercantil de la **comerciante,** no es causa para interrumpir el pago de las contribuciones fiscales o de seguridad social ordinarias a su cargo, por ser indispensables para la operación de la empresa.

*3)* Con fundamento en la fracción III, del artículo 37 de la ley de la materia, se prohíbe a la **comerciante,** realizar operaciones de enajenación o gravamen de los bienes principales de su empresa.

*4)* Se prohíbe el aseguramiento sobre bienes propiedad de la **comerciante,** que resulten indispensables para la operación ordinaria de ésta; incluyendo, sin limitación, aseguramientos ordenados por autoridades locales o federales, con fundamento en la fracción IV, del artículo 37 de la ley de la materia.

*5)* Se prohíbe realizar transferencias de recursos o valores a favor de terceros, en términos de la fracción VI, del artículo 37 de la ley de la materia.

(...)

*A)* Se prohíbe suspender, revocar, rescindir, terminar y/o cancelar contratos, preparatorios o definitivos, pendientes de ejecución de los que sea parte **TV Azteca, sociedad anónima bursátil de capital variable,** ello hasta en tanto se emita sentencia que niegue la declaración de concurso



JUZGADO PRIMERO DE DISTRITO EN MATERIA DE CONCURSOS MERCANTILES, CON RESIDENCIA EN LA CIUDAD DE MÉXICO Y JURISDICCIÓN EN TODA LA REPÚBLICA MEXICANA

SENTENCIA DECLARACIÓN DE CONCURSO MERCANTIL
CONCURSO MERCANTIL 22/2026-II.

mercantil o bien, cuando sea declarado dicho estado, el **conciliador** que en su caso sea designado, manifieste si se opone o no a su cumplimiento, en términos de lo previsto por el artículo 92 de la ley de la materia.

**B)** Se ordena tener por no puesta, salvo las excepciones expresamente establecidas en la Ley de Concursos Mercantiles, cualquier estipulación contractual que con motivo de la presentación de la solicitud de concurso mercantil, o de su declaración, establezca modificaciones que agraven para la **comerciante** los términos de los contratos en los que forme parte.

**C)** Se prohíbe suspender, revocar, rescindir, cancelar, modificar, limitar o afectar, total o parcialmente, cualquier concesión, permiso, licencia, autorización, registro, inscripción, título habilitante o cualquier otro derecho otorgado a favor de la **comerciante** que le permita operar.

En el entendido que dicha medida no es motivo ni justificación para que la **comerciante** deje de cumplir con el pago de los derechos generados con motivo del uso de las concesiones públicas que explota.

Asimismo, la medida otorgada no constituye ningún impedimento para que la autoridad reguladora competente en la materia de telecomunicaciones, ejerza sus facultades de regulación, supervisión, vigilancia o sanción a la **comerciante** con motivo del que ejerce del espectro radioeléctrico.

**D)** Se prohíbe a las instituciones del sistema financiero mexicano en las que la **comerciante TV Azteca, sociedad anónima bursátil de capital variable**, mantenga cuentas aperturadas de transferir, disponer, embargar, detener, descontar, deducir, retener, compensar y/o utilizar los recursos que se encuentren administrados en dichas cuentas o sean parte del patrimonio de aquéllas, salvo las excepciones previstas para los casos de embargos antes señaladas.

Sin que las medidas decretadas beneficien a las empresas afiliadas o subsidiarias de la **comerciante**; puesto que, como ya se refirió, el artículo 37, fracción II de la ley de la materia, prevé expresamente que las providencias precautorias únicamente están dirigidas a proteger los bienes y derechos de la empresa sujeta al proceso."

**TERCERO. Designación de visitador y orden de visita.** Por oficio **IFECOM/DG/0810/2026** el **Instituto Federal de Especialistas de Concursos Mercantiles**, hizo del conocimiento que designó como **visitador** a **Samuel Ricardo Egure Lascano**, a quien por auto de **diez de abril de dos mil veintiséis**, se tuvo por aceptado y protestado el cargo conferido.

Asimismo, en dicho proveído se ordenó practicar a la **comerciante** la visita de verificación a que se refieren los

4

artículos 30 y 31 de la Ley de Concursos Mercantiles.

La cual inició el **veinte de abril de dos mil veintiséis**, donde el **visitador** oportunamente levantó acta en la que hizo constar los hechos relativos al objeto de la visita, de los que tuvieron conocimiento él y sus auxiliares.

**CUARTO. Presentación de Dictamen.** En proveído de **veinte de mayo de dos mil veintiséis**, se tuvo al **visitador** exhibiendo dictamen razonado y circunstanciado, por lo que se ordenó ponerlo a la vista de la **comerciante** por **cinco días** para que alegara lo que a su derecho conviniera.

Asimismo, por auto de **uno de junio de dos mil veintiséis**, se ordenó poner los autos a la vista de la suscrita juzgadora para pronunciar la sentencia que hoy se dicta al tenor de los siguientes:

**C O N S I D E R A N D O S**

**PRIMERO. Competencia.** Este Juzgado Primero de Distrito en Materia de Concursos Mercantiles, con residencia en la Ciudad de México y jurisdicción en toda la República Mexicana, **es competente para resolver lo concerniente a la declaración de concurso mercantil**, de conformidad con el artículo 104, fracción II de la Constitución Política de los Estados Unidos Mexicanos; Acuerdo General 4/2022[1] del extinto Pleno del Consejo de la Judicatura Federal, relativo al inicio de funciones de este órgano jurisdiccional; 56, fracción II de la Ley Orgánica del Poder Judicial de la Federación, y los numerales 9o, 10, 11, 20, 41, 42 y 43 de la Ley de

---

[1] **Artículo 3. Los Juzgados Primero y Segundo de Distrito en Materia de Concursos Mercantiles** tendrán su residencia en la Ciudad de México y jurisdicción en la República Mexicana para conocer de todas las controversias en materia concursal a que se refieren el artículo 59, fracción II, de la Ley Orgánica del Poder Judicial de la Federación y la Ley de Concursos Mercantiles; así como de los juicios de amparo indirecto relacionados con esta materia.

Scanned with CS CamScanner



JUZGADO PRIMERO DE DISTRITO EN MATERIA DE CONCURSOS MERCANTILES, CON RESIDENCIA EN LA CIUDAD DE MÉXICO Y JURISDICCIÓN EN TODA LA REPÚBLICA MEXICANA
SENTENCIA DECLARACIÓN DE CONCURSO MERCANTIL
CONCURSO MERCANTIL 22/2026-II.

PODER JUDICIAL DE LA FEDERACIÓN

Concursos Mercantiles.

**SEGUNDO. Legitimación.** La legitimación de la **solicitante** del concurso para promover se encuentra acreditada en términos de los artículos 4o, fracción II, 9o, fracción I y 20 de la Ley de Concursos Mercantiles, que prevén que el concurso mercantil puede ser presentado por personas morales que tengan el carácter de **comerciante** y, en el caso **TV Azteca, sociedad anónima bursátil de capital variable**, acredita tenerlo con los documentos exhibidos con el escrito de solicitud, en específico con:

- Copia certificada del instrumento notarial **ciento ochenta y cuatro mil ochocientos cuarenta** de **veintitrés de julio de dos mil veinticinco**, pasada ante la fe del notario público **ciento treinta y cinco** de la Ciudad de México.

Elemento de convicción al que se concede pleno valor probatorio, con fundamento en el artículo 1292 del Código de Comercio, de aplicación supletoria a la Ley de Concursos Mercantiles.

Al respecto, la especie y forma de constitución de la **solicitante** implica su carácter de **comerciante** en términos de lo dispuesto por el artículo 3o, fracción II del Código de Comercio, en el que se establece que se reputan **comerciantes** a las sociedades constituidas con arreglo a las leyes mercantiles, y a su vez, la fracción IV del artículo 1o de la Ley General de Sociedades Mercantiles, entre las especies de sociedades mercantiles reconocen a la sociedad anónima, en tanto que el numeral 4º de esa ley, expresa que se reputan mercantiles las sociedades que se constituyan en alguna de las formas reconocidas en el mencionado artículo

Scanned with
CS CamScanner



6

1o de la propia ley.

De lo que se sigue que la **solicitante** acreditó su calidad de **comerciante**.

Además, el artículo 20 de la Ley de Concursos Mercantiles prevé que el **comerciante** que considere que ha incurrido en el incumplimiento generalizado de sus obligaciones, en términos de cualquiera de los supuestos establecidos en el artículo 10 de ese ordenamiento, podrá solicitar que se declare en concurso mercantil, como se hizo en el presente caso.

**TERCERO. Estudio de la acción concursal.** Tomando en consideración que en forma primordial se debe concluir si la **solicitante** del concurso **TV Azteca, sociedad anónima bursátil de capital variable**, incumplió generalizadamente en el pago de sus obligaciones, como requisito indispensable para ser declarada en concurso mercantil, es necesario señalar que los artículos 9 y 10 de la Ley de Concursos Mercantiles, disponen que procede la declaración de concurso mercantil de un **comerciante** cuando así lo solicite y se demuestre el incumplimiento generalizado de sus obligaciones de pago, con dos o más **acreedores** distintos, que tengan por lo menos **treinta días** de haber vencido, representen el **treinta y cinco por ciento** o más de todas las obligaciones a cargo de la **comerciante**, o bien, no tenga activos para hacer frente a por lo menos el **ochenta por ciento** de sus obligaciones vencidas a la fecha de presentación de la solicitud.

Por su parte, el artículo 42 de la ley de la materia, dispone que la sentencia que se dicte debe considerar lo manifestado, probado y alegado por las partes; así como, razonar las pruebas aportadas, incluyendo el dictamen del **visitador**.



7

JUZGADO PRIMERO DE DISTRITO EN MATERIA DE CONCURSOS MERCANTILES, CON RESIDENCIA EN LA CIUDAD DE MÉXICO Y JURISDICCIÓN EN TODA LA REPÚBLICA MEXICANA

SENTENCIA DECLARACIÓN DE CONCURSO MERCANTIL
CONCURSO MERCANTIL 22/2026-II.

PODER JUDICIAL DE LA FEDERACIÓN

Expuesto lo anterior, y toda vez que en principio en el **considerando segundo** de la presente resolución, quedó acreditada la calidad de **comerciante** de la **solicitante** de concurso, se analiza si incumplió generalizadamente en el pago de sus obligaciones.

La comerciante en la solicitud de concurso mercantil presentada, y en especial de la memoria razonada de las causas que la sitúan en incumplimiento en el pago de sus obligaciones, se desprende que esencialmente indicó:

**1. Presión Fiscal Inminente.**

Enfrenta créditos fiscales determinados por el Servicio de Administración Tributaria, por aproximadamente **$8,692,000,000.00 (ocho mil seiscientos noventa y dos millones de pesos 00/100 moneda nacional)**, por concepto de Impuesto Sobre la Renta de los ejercicios fiscales de dos mil nueve y dos mil trece, con multas y recargos; por lo cual, el riesgo de ejecución administrativa —incluyendo inmovilización de cuentas bancarias e intervención de la empresa— la obligó a contratar financiamiento urgente por hasta **$5,000,000,000.00 (cinco mil millones de pesos 00/100 moneda nacional)**, lo que incrementó su pasivo y deterioró aún más su capital.

**2. Pasivos por Bonos en Estados Unidos.**

En dos mil diecisiete, emitió bonos en Estados Unidos de América, por **USD $400,000,000 (cuatrocientos millones de dólares 00/100 moneda de curso legal en los Estados Unidos de América)** con vencimiento en agosto de dos mil veinticuatro, al no poder pagar, la deuda creció a **USD**

8

$532,000,000.00 (quinientos treinta y dos millones de dólares 00/100 moneda de curso legal en los Estados Unidos de América).

Los fondos tenedores de esos bonos escalaron el conflicto a nivel político-institucional, involucrando al gobierno Mexicano en un arbitraje internacional y generando presión pública que deterioró el entorno crediticio y reputacional de la empresa, desde dos mil veintiuno se intentaron negociaciones y mediación formal sin llegar a acuerdo.

### 3. Transformación Estructural de la Industria de Medios.

Su modelo de negocio depende casi exclusivamente de la publicidad en televisión abierta; sin embargo, dicha industria ha sufrido una caída estructural global derivada de:

- La migración de audiencias hacia plataformas de *streaming* (**Netflix, Amazon, Disney+, YouTube**).
- La fragmentación de audiencias y la pérdida del *rating* como indicador comercial relevante.
- La captación del gasto publicitario por parte de **Google, Meta** y **TikTok**, que concentran cerca del 68% (sesenta y ocho por ciento) de la publicidad en internet.

### 4. Impacto del COVID-19.

La pandemia aceleró el declive ya en marcha, puesto que la inversión publicitaria colapsó en dos mil veinte y la industria televisiva cayó 30% (treinta por ciento) durante ese periodo, y América Latina fue la región más afectada, sin que los ingresos del sector hayan recuperado los niveles prepandemia, incluso al momento de la presentación del concurso.



9

JUZGADO PRIMERO DE DISTRITO EN MATERIA DE CONCURSOS MERCANTILES, CON RESIDENCIA EN LA CIUDAD DE MÉXICO Y JURISDICCIÓN EN TODA LA REPÚBLICA MEXICANA

SENTENCIA DECLARACIÓN DE CONCURSO MERCANTIL
CONCURSO MERCANTIL 22/2026-II.

PODER JUDICIAL DE LA FEDERACIÓN

5. Contracción del Gasto Publicitario Gubernamental.

A partir de dos mil dieciocho, la política de austeridad del gobierno federal redujo de manera sistemática y sostenida su inversión publicitaria en medios tradicionales, y se estima una caída acumulada de aproximadamente **36%** (treinta y seis por ciento) en términos reales entre dos mil diecinueve y dos mil veinticuatro, eliminando lo que había sido una fuente de ingreso estable y predecible.

6. Entorno Macroeconómico Adverso.

El Producto Interior Bruto de México creció en promedio apenas 0.77% (cero punto setenta y siete por ciento) anual entre dos mil dieciocho y dos mil veinticinco; asimismo, la inflación acumulada del período fue de 38.8% (treinta y ocho punto ocho por ciento), encareciendo los costos de producción.

De igual forma, las altas tasas de interés agravaron el costo del endeudamiento, y la incertidumbre económica general contrajo la inversión publicitaria del sector privado.

7. Intensificación de la Competencia.

Que ya no compite solo con **Televisa** e **Imagen TV**, sino también con sistemas de cable, plataformas satelitales, operadores de Plataformas Digitales, todos disputando simultáneamente audiencias, publicidad y contenidos.

Motivos que refiere han detonado su incumplimiento generalizado de obligaciones.

Scanned with
CamScanner

10

Para acreditar lo anterior, la **comerciante** exhibió junto con el escrito de solicitud de declaración de concurso mercantil, en los formatos del **Instituto Federal de Especialistas de Concursos Mercantiles**, los documentos siguientes:

1. Estados financieros auditados de los ejercicios fiscales correspondientes a:

- **Dos mil veintidós.**
- **Dos mil veintitrés.**
- **Dos mil veinticuatro.**
- **Dos mil veinticinco, sin auditar.**
- **De enero de dos mil veintiséis.**

2. Memoria razonada de las causas que sitúan a la comerciante en incumplimiento en el pago de sus obligaciones.

3. Relación de Acreedores.

4. Relación de Deudores.

5. Inventario de todos los bienes del comerciante.

6. Relación de juicios en los cuales el comerciante es parte.

7. Acuerdos de los actos corporativos necesarios para solicitar la declaración en concurso mercantil, en específico, la copia certificada del instrumento notarial **ciento ochenta y ocho mil setecientos diez** de **veintiséis de febrero de dos mil veintiséis,** pasada ante la fe del notario público **ciento treinta y cinco** en la Ciudad de México.

8. Propuesta de convenio preliminar de pago a acreedores.

9. Propuesta preliminar de conservación de la empresa.

Documentales a las que, estimadas en conjunto, se concede pleno valor probatorio, en términos de los artículos 1292 y 1296 del Código de Comercio, de aplicación supletoria a la Ley de Concursos Mercantiles.

De las cuales se advierte que, la **comerciante** ha incumplido generalizadamente en el pago de sus obligaciones, como se aprecia de la **relación de los presuntos acreedores, estados financieros de la empresa**



JUZGADO PRIMERO DE DISTRITO EN MATERIA DE CONCURSOS MERCANTILES, CON RESIDENCIA EN LA CIUDAD DE MÉXICO Y JURISDICCIÓN EN TODA LA REPÚBLICA MEXICANA

SENTENCIA DECLARACIÓN DE CONCURSO MERCANTIL
CONCURSO MERCANTIL 22/2026-II.

concursada descritos e inventario de sus diversos bienes.

Lo cual se corrobora con el **dictamen exhibido por el visitador**, al que se concede pleno valor probatorio, de acuerdo con lo dispuesto por el artículo 1301 del Código de Comercio, de aplicación supletoria a la Ley de Concursos Mercantiles, del cual se desprende que siguió los lineamientos establecidos por la legislación mencionada; señaló que revisó información y documentación que fue proporcionada por la **comerciante** en cumplimiento a la orden de visita; indicó el período marcado en ésta; tomó en consideración los hechos planteados en la solicitud; además, mencionó los datos por los que llegó al resultado y satisfizo los requisitos que se establecen en el numeral 40 de la ley de la materia.

Asimismo, se observa que el **especialista** refirió que el importe de las obligaciones de pago que tienen por lo menos **treinta días de vencidas**, constituyen el **64.73% (sesenta y cuatro punto setenta y tres por ciento)** del importe total de obligaciones de pago de la **comerciante**, vencidas y no vencidas; en tanto que, el porcentaje del total de activos para hacer frente a las obligaciones de pago vencidas a la fecha de presentación de la solicitud de concurso mercantil, es del **7.07% (siete punto cero siete por ciento)**, como se observa de la tabla siguiente:

| | | Cuantía en moneda nacional |
|---|---|---|
| 1 | Obligaciones de pago que tienen por lo menos 30 días de vencidas a la fecha de presentación de la solicitud y que corresponden a 228 acreedores distintos (total de la sección 1). | 315,611,251,120.35 |
| 2 | Obligaciones de pago con menos de 30 días de vencidas a la fecha de presentación de la solicitud (total de la sección 2). | 410,742,626.25 |

12

| | | |
|---|---|---|
| A=1+2 | Total de obligaciones de pago vencidas a la fecha de presentación de la solicitud. | $15,921,993,746.58 |
| 3 | Obligaciones de pago no vencidas a la fecha de presentación de la solicitud (total de la sección 3). | $8,039,379,471.78 |
| B=A+3 | Total de obligaciones a cargo de comerciante, vencidas y no vencidas. | $23,961,373,218.36 |
| 4 | Total de activos líquidos concursales para hacer frente a por lo menos el ochenta por ciento de las obligaciones de pago vencidas a la fecha de presentación de la solicitud (total de la sección 5). | $1,125,918,631.90 |
| 1 ÷ B | Porcentaje de: Obligaciones de pago que tienen por lo menos 30 días de vencidas / Total de obligaciones de pago a cargo del comerciante, vencidas y no vencidas. | 64.73% |
| 4 ÷ A | Porcentaje de: Total de activos para hacer frente / Total de obligaciones de pago vencidas a la fecha de presentación de la solicitud. | 7.07% |

Acorde con lo expuesto, una vez adminiculadas las pruebas rendidas por la **comerciante**, sus manifestaciones y el referido dictamen, este órgano jurisdiccional considera que la **concursada incurrió en incumplimiento generalizado de sus obligaciones de pago a más de dos acreedores distintos**, aunado a que se actualizan los supuestos previstos en las fracciones I y II del artículo 10 de la Ley de Concursos Mercantiles.

Puesto que, del dictamen rendido por el **visitador** se advierte que las obligaciones que tienen por lo menos treinta días de haber vencido a la fecha de presentación de la solicitud, representan más del 35% (treinta y cinco por ciento) de todas las obligaciones de pago a cargo de la comerciante a esa fecha, lo que resulta suficiente para tener por demostrado el supuesto de concurso mercantil, previsto en la fracción I del precepto legal en cita.

Asimismo, porque se aprecia que el porcentaje del total de activos de la **comerciante** para hacer frente a las obligaciones de pago vencidas a la fecha de presentación de la solicitud de concurso mercantil es inferior a 80% (ochenta por ciento), lo que resulta suficiente para tener por demostrado el supuesto de concurso mercantil, previsto en la fracción II del precepto legal en cita.

Scanned with CamScanner



JUZGADO PRIMERO DE DISTRITO EN MATERIA DE CONCURSOS MERCANTILES, CON RESIDENCIA EN LA CIUDAD DE MÉXICO Y JURISDICCIÓN EN TODA LA REPÚBLICA MEXICANA

**SENTENCIA DECLARACIÓN DE CONCURSO MERCANTIL**
**CONCURSO MERCANTIL 22/2026-II.**

En esa tesitura, **SE DECLARA PROCEDENTE LA SOLICITUD DE DECLARACIÓN DE CONCURSO MERCANTIL** con apertura en la **ETAPA DE CONCILIACIÓN** de la **comerciante TV Azteca, sociedad anónima bursátil de capital variable**, con las consecuencias que se describen en los puntos resolutivos de la presente resolución, en términos de los artículos 43 al 45, 47, 65, 66, 69, 89, 112, 149, 278, fracción IV y 291 de la Ley de Concursos Mercantiles.

**CUARTO. Medidas precautorias.** Siendo esta juzgadora rectora del procedimiento de concurso mercantil y teniendo todas las facultades necesarias para cumplir lo que prevé la Ley de Concursos Mercantiles, **SE DEJAN SUBSISTENTES** únicamente las medidas cautelares consistentes en:

*"1)* Con fundamento en la fracción I, del artículo 37 de la ley concursal, se prohíbe a la comerciante *TV Azteca, sociedad anónima bursátil de capital variable, hacer pagos que tengan como origen obligaciones vencidas con anterioridad a la admisión de la solicitud de concurso mercantil.*

*2)* La suspensión de todo procedimiento de ejecución (judicial, administrativo, contractual o extracontractual) no trabe de embargo en contra de los bienes del comerciante, *que tengan como origen obligaciones vencidas con anterioridad a la admisión,* con fundamento en lo establecido en la fracción II, del artículo 37 de la Ley de Concursos Mercantiles.

*Sin que dicha medida implique la paralización de la substanciación de los procesos seguidos en contra de la* **comerciante**, *sino que significa la suspensión de la ejecución material sobre sus bienes y derechos, es decir, se refiere a la suspensión del procedimiento de remate, de adjudicación, entre otros similares, tendentes a desintegrar la masa concursal.*

*Respecto a esta medida cautelar, con fundamento en lo dispuesto por el artículo 65, segundo párrafo de la ley de la materia, se precisa que cuando el mandato de embargo o ejecución sea de carácter laboral, la suspensión no surtirá efectos respecto de lo dispuesto en la fracción XXIII, del apartado A, del artículo 123 constitucional y sus disposiciones reglamentarias, considerando los salarios de los dos años*

Scanned with
CS CamScanner

14

anteriores al concurso mercantil.

Asimismo, con fundamento en lo dispuesto por el artículo 69 de la ley de la materia, dicha medida implica la suspensión de los procedimientos administrativos de ejecución de los créditos fiscales en contra de la **comerciante**, ello hasta en tanto se dicte sentencia que niegue el estado de concurso mercantil o bien, en su caso, fenezca el plazo para la etapa de conciliación.

En el entendido que las autoridades fiscales competentes podrán continuar con los actos necesarios para la determinación y aseguramiento de los créditos fiscales a cargo de la **comerciante**.

Se precisa que el presunto estado de concurso mercantil de la **comerciante**, no es causa para interrumpir el pago de las contribuciones fiscales o de seguridad social ordinarias a su cargo, por ser indispensables para la operación de la empresa.

**3)** Con fundamento en la fracción III, del artículo 37 de la ley de la materia, se prohíbe a la **comerciante**, realizar operaciones de enajenación o gravamen de los bienes principales de su empresa.

**4)** Se prohíbe el aseguramiento sobre bienes propiedad de la **comerciante**, que resulten indispensables para la operación ordinaria de ésta; incluyendo, sin limitación, aseguramientos ordenados por autoridades locales o federales, con fundamento en la fracción IV, del artículo 37 de la ley de la materia.

**5)** Se prohíbe realizar transferencias de recursos o valores a favor de terceros, en términos de la fracción VI, del artículo 37 de la ley de la materia.

(...)

**A)** Se prohíbe suspender, revocar, rescindir, terminar y/o cancelar contratos, preparatorios o definitivos, pendientes de ejecución de los que sea parte **TV Azteca, sociedad anónima bursátil de capital variable**, ello hasta en tanto se emita sentencia que niegue la declaración de concurso mercantil o bien, cuando sea declarado dicho estado, el **conciliador** que en su caso sea designado, manifieste si se opone o no a su cumplimiento, en términos de lo previsto por el artículo 92 de la ley de la materia.

**B)** Se ordena tener por no puesta, salvo las excepciones expresamente establecidas en la Ley de Concursos Mercantiles, cualquier estipulación contractual que con motivo de la presentación de la solicitud de concurso mercantil, o de su declaración, establezca modificaciones que agraven para la **comerciante** los términos de los contratos en los que forme parte.

(...)

**D)** Se prohíbe a las instituciones del sistema financiero mexicano en las que la **comerciante TV Azteca, sociedad anónima bursátil de capital variable**, mantenga cuentas aperturadas de transferir, disponer, embargar, detener, descontar, deducir, retener, compensar y/o utilizar los recursos que se encuentren administrados en dichas cuentas o sean parte del patrimonio de aquéllas, salvo las excepciones previstas para los casos de embargos antes señaladas.

Sin que las medidas decretadas beneficien a las empresas afiliadas o subsidiarias de la **comerciante**; puesto que, como ya se refirió, el artículo 37, fracción II de la ley de la materia, prevé expresamente que las



**PODER JUDICIAL DE LA FEDERACIÓN**

JUZGADO PRIMERO DE DISTRITO EN MATERIA DE CONCURSOS MERCANTILES, CON RESIDENCIA EN LA CIUDAD DE MÉXICO Y JURISDICCIÓN EN TODA LA REPÚBLICA MEXICANA
SENTENCIA DECLARACIÓN DE CONCURSO MERCANTIL
CONCURSO MERCANTIL 22/2026-II.

*providencias precautorias únicamente están dirigidas a proteger los bienes y derechos de la empresa sujeta al proceso.".*

Sin que, con fundamento en lo dispuesto por el artículo 38 de la Ley de Concursos Mercantiles, continúe vigente la medida precautoria decretada en auto de **veinte de marzo de dos mil veintiséis**, consistente en:

*"C) Se prohíbe suspender, revocar, rescindir, cancelar, modificar, limitar o afectar, total o parcialmente, cualquier concesión, permiso, licencia, autorización, registro, inscripción, título habilitante o cualquier otro derecho otorgado a favor de la comerciante que le permita operar.*
*En el entendido que dicha medida no es motivo ni justificación para que la comerciante deje de cumplir con el pago de los derechos generados con motivo del uso de las concesiones públicas que explota.*
*Asimismo, la medida otorgada no constituye ningún impedimento para que la autoridad reguladora competente en la materia de telecomunicaciones, ejerza sus facultades de regulación, supervisión, vigilancia o sanción a la comerciante con motivo del uso que ejerce del espectro radioeléctrico."*

Puesto que, como se verá más adelante en esta sentencia, la comerciante no es titular de alguna concesión, por lo cual, se decreta el levantamiento de dicha medida, aunado a que, como se ha señalado en autos, las providencias precautorias en términos de lo previsto por el artículo 37, fracción II de la Ley de Concursos Mercantiles, únicamente benefician a los bienes y derechos de la concursada.

Ahora bien, las que se dejan subsistentes se estiman necesarias para mantener el curso ordinario del negocio, proteger la masa concursal de la **comerciante**, y no crear mayores contingencias a la parte **concursada** agravando su situación actual.

Además, en protección de los derechos de los

16

**acreedores**, evitando que el incumplimiento generalizado de las obligaciones de la **solicitante** ponga en riesgo a los **comerciantes** con las que mantienen relaciones de negocio, así como, a efecto de evitar cualquier menoscabo a la masa concursal con motivo de la declaración de concurso mercantil.

**QUINTO. Fecha de retroacción.** Con apoyo en los artículos 43, fracción X, y 112 de la Ley de Concursos Mercantiles, se señala como fecha de retroacción del concurso el **nueve de octubre de dos mil veinticinco.**

Por lo expuesto y fundado, se

## R E S U E L V E

**PRIMERO. Declaración de concurso mercantil.** Es procedente la solicitud de concurso mercantil presentada por **TV Azteca, sociedad anónima bursátil de capital variable**, al haberse acreditado que dicha **comerciante**, de acuerdo con lo dispuesto por el artículo 10 de la Ley de Concursos Mercantiles, incurrió en incumplimiento generalizado en el pago de sus obligaciones; por lo que, con esta fecha **SEIS DE JULIO DE DOS MIL VEINTISÉIS, SE DECLARA EN CONCURSO MERCANTIL A LA CITADA COMERCIANTE**, quien tiene su domicilio en **Periférico Sur, número 4121, colonia Fuentes del Pedregal, alcaldía Tlalpan, código postal 14140, Ciudad de México.**

**SEGUNDO. Etapa de Conciliación.** Se declara abierta la **ETAPA DE CONCILIACIÓN** por **ciento ochenta y cinco días naturales**, contados a partir del día en que se haga la publicación en el Diario Oficial de la Federación de la presente resolución, con fundamento en lo dispuesto por el artículo 145 de la Ley de Concursos Mercantiles.


Scanned with CamScanner



JUZGADO PRIMERO DE DISTRITO EN MATERIA DE CONCURSOS MERCANTILES, CON RESIDENCIA EN LA CIUDAD DE MÉXICO Y JURISDICCIÓN EN TODA LA REPÚBLICA MEXICANA

SENTENCIA DECLARACIÓN DE CONCURSO MERCANTIL
CONCURSO MERCANTIL 22/2026-II.

PODER JUDICIAL DE LA FEDERACIÓN

**TERCERO. Se pide al IFECOM señalamiento de Conciliador.** Con fundamento en lo dispuesto por el artículo 43, fracción IV, de la Ley de Concursos Mercantiles, se ordena al **Instituto Federal de Especialistas de Concursos Mercantiles** que dentro del término de **CINCO DÍAS** y a través del procedimiento aleatorio previamente establecido, designe **conciliador para fungir en este asunto**, quien dentro de los **TRES DÍAS** siguientes a su designación deberá hacer del conocimiento de los acreedores su nombramiento y señalar un domicilio dentro de la jurisdicción de este juzgado para el cumplimiento de las obligaciones que impone la Ley de Concursos Mercantiles.

En tanto se efectúa designación de **conciliador**, el **comerciante**, sus administradores, gerentes y dependientes tendrán las obligaciones que la ley atribuye a los depositarios.

Ahora bien, se precisa que dicho organismo es el competente para designar a la persona que fungirá como conciliadora en el presente proceso concursal, toda vez que al realizar una consulta en el Registro Público de Concesiones[2], se desprende que las diversas sociedades **TV Azteca III, sociedad anónima de capital variable** y **Televisora del Valle de México, sociedad anónima promotora de inversión de capital variable**, son las titulares de las concesiones para explotar los canales de televisión, ligados a la aquí concursada; por lo cual, al ser sociedades no sujetas al presente proceso, no es aplicable lo dispuesto por los artículos 237 y 238 de la Ley de

---

[2]    Consultables    en
https://rpc.ift.org.mx/vrpc/RpcSearchController/showConcesionInfo?idConcesion=FER040432 CO-105174 y https://rpc.ift.org.mx/vrpc/pdfs/190815-TECNICA-010709.pdf

Scanned with  CamScanner

18

Concursos Mercantiles.

**CUARTO. Lista de acreedores en dictamen visitador.** Sin que la siguiente relación agote el procedimiento de reconocimiento, graduación y prelación de créditos, se hace del conocimiento de los interesados que, del contenido del dictamen emitido por el **visitador**, se desprende que son presuntivamente **acreedores** de la **comerciante**:

| NO. | NOMBRE Y DOMICILIO DE LOS PRESUNTOS ACREEDORES | TOTAL EN MONEDA NACIONAL |
|---|---|---|
| 1 | 27 MICRAS INTERNACIONAL SA DE CV<br>NORTE 35 695 COLONIA COLTONGO AZCAPOTZALCO CIUDAD DE MÉXICO C. P. 02630 MÉXICO | $1,249,689.68 |
| 2 | 5M2 ANDENES SAPI DE CV<br>CONSTITUYENTES 956 COLONIA LOMAS ALTAS MIGUEL HIDALGO CIUDAD DE MÉXICO C. P. 11950 MÉXICO | $7,825,563.54 |
| 3 | 929 MARKETING INC<br>RUE CARTIER 3529 PLATEAU-MONT-ROYAL MONTREAL QUEBEC H2K 4G1 CANADÁ | $35,645.61 |
| 4 | 99 DEGREES & CO SC<br>PASEO DE LA REFORMA 222 T3 1908 COLONIA JUÁREZ CUAUHTÉMOC CIUDAD DE MÉXICO<br>C. P. 06600 MÉXICO | $1,270.20 |
| 5 | ABARCA TRADUCCIÓN E INTERPRETACIÓN SC<br>SIRACUSA 59-A COLONIA LOMAS ESTRELLA IZTAPALAPA CIUDAD DE MÉXICO C. P. 09890 MÉXICO | $15,776.00 |
| 6 | ABASTO BÁSICO SA DE CV<br>BODEGA F 8A SN COLONIA CENTRAL DE ABASTO IZTAPALAPA CIUDAD DE MÉXICO C. P. 09040 MÉXICO | $22,006.00 |
| 7 | ADA JOSEFINA MENDOZA ARTEAGA<br>PRIV EMILIANO ZAPATA 109 COLONIA SANTA ANITA IZTAPALAPA CIUDAD DE MÉXICO C. P. 08300 MÉXICO | $93,500.00 |
| 8 | ADDALLY SOLUTIONS BV<br>ÁMSTERDAM SESTRAATWEG 18 BAARN BAARN ULTRECHT 3743 PAÍSES BAJOS | $39,548,040.75 |
| 9 | ADJ PRODUCTS GROUP MÉXICO S DE RL DE CV<br>AVENIDA SANTA ANA 30 COLONIA LERMA DE VILLADA LERMA ESTADO DE MÉXICO C. P. 52000 MÉXICO | $7,187.17 |



JUZGADO PRIMERO DE DISTRITO EN MATERIA DE CONCURSOS MERCANTILES, CON RESIDENCIA EN LA CIUDAD DE MÉXICO Y JURISDICCIÓN EN TODA LA REPÚBLICA MEXICANA

SENTENCIA DECLARACIÓN DE CONCURSO MERCANTIL

CONCURSO MERCANTIL 22/2026-II.

19

PODER JUDICIAL DE LA FEDERACIÓN

| | | |
|---|---|---|
| 10 | ADMINISTRACIÓN PATRIMONIAL PARA PROFESIONISTAS SA DE CV<br><br>AHUEHUETES NORTE 861 COLONIA BOSQUES DE LAS LOMAS MIGUEL HIDALGO CIUDAD DE MÉXICO C. P. 11700 MÉXICO | $160,080.00 |
| 11 | ADRIANA AGREDANO RUBALCABA<br><br>RUBÉN DARÍO 271 COLONIA CIRCUNVALACIÓN VALLARTA GUADALAJARA JALISCO C. P. 44680 MÉXICO | $5,799.99 |
| 12 | ADVANSEC SC<br><br>MORELOS 2 COLONIA SAN LUCAS TEPETLACALCO TLALNEPANTLA DE BAZ ESTADO DE MÉXICO C. P. 54055 MÉXICO | $98,638.92 |
| 13 | ADVERTISING RESEARCH FOUNDATION INC<br><br>PARK AVENUE SOUTH 432 NEW YORK NEW YORK 10016 ESTADOS UNIDOS DE AMÉRICA | $273,600.56 |
| 14 | AGUILAR BAYONA JESÚS<br><br>CARR LIBRE DURANGO TORREÓN KM. 50 COLONIA EJIDO ENRIQUE CALDERÓN RODRÍGUEZ PANUCO DE COLORADO DURANGO C. P. 34775 MÉXICO | $93,080.37 |
| 15 | AGZA TRADUCTORES SA DE CV<br><br>PASEO DE LA REFORMA 300 PISO 9 COLONIA JUÁREZ CUAUHTÉMOC CIUDAD DE MÉXICO<br><br>C. P. 06600 MÉXICO | $700.00 |
| 16 | AIM SPORTS LLC<br><br>BROADWAY 29 NUEVA YORK NEW YORK NEW YORK 10019 ESTADOS UNIDOS DE AMÉRICA | $222,452.50 |
| 17 | AKAM MÉXICO TECHNOLOGIES S DE RL DE CV<br><br>PASEO DE LA REFORMA 404 COLONIA JUÁREZ CUAUHTÉMOC CIUDAD DE MÉXICO C. P. 06600 MÉXICO | $299,500.00 |
| 18 | ALDABA ARTE SA DE CV<br><br>SÓCRATES 136 COLONIA PALMAS POLANCO MIGUEL HIDALGO CIUDAD DE MÉXICO C. P. 11560 MÉXICO | $59,090.00 |
| 19 | ALDEA SOLUTIONS INC<br><br>COTE DE LIESSE 8550 SUITE 200 SAINT-LAURENT MONTREAL QUEBEC H4T 1H2 CANADÁ | $355,034.19 |
| 20 | ALEJANDRO LEAL MORA<br><br>BAHÍA DE GUANTÁNAMO 64 COLONIA VERÓNICA ANZURES MIGUEL HIDALGO MORELOS C.P. 11300 MÉXICO | $3,729.40 |
| 21 | ALFREDO RIVERON CALZADA<br><br>CUMBRES DE ACULTZING 26 COLONIA NARVARTE PONIENTE BENITO JUÁREZ CIUDAD DE MÉXICO C. P. 03020 MÉXICO | $364,273.32 |

JUZGADO PRIMERO DE DISTRITO EN MATERIA DE CONCURSOS MERCANTILES, CON RESIDENCIA EN LA CIUDAD DE MÉXICO Y JURISDICCIÓN EN TODA LA REPÚBLICA MEXICANA

Scanned with CamScanner

20

| | | |
|---|---|---|
| 22 | ALICIA HERNÁNDEZ VALENCIA<br><br>LÁZARO CADENAS 168 COLONIA VILLA ARTESANAL PARACHO MICHOACÁN C. P. 60257 MÉXICO | $1,000.00 |
| 23 | ALL WHEEL MOTORSPORTS SA DE CV<br><br>LAGO WENNER 16 16 COLONIA GRANADA MIGUEL HIDALGO CIUDAD DE MÉXICO C. P. 11490 MÉXICO | $43,276.12 |
| 24 | AM TECNOLOGÍA SA DE CV<br><br>CALLE DIAGONAL SAN ANTONIO 934 COLONIA DEL VALLE CENTRO BENITO JUÁREZ CIUDAD DE MÉXICO C. P. 03100 MÉXICO | $79,056.63 |
| 25 | AMAIRANI BECERRIL SANTIAGO<br><br>CERRADA 1RA DE AQUILES SERDÁN 5 COLONIA SANTIAGO TEPALCATLALPAN XOCHIMILCO CIUDAD DE MÉXICO C. P. 16200 MÉXICO | $106,232.00 |
| 26 | AMBIENTE KREATIVO EMPRESARIAL SA DE CV<br><br>PLAYA AZUL 319 COLONIA AGRÍCOLA PANTALÁN IZTACALCO CIUDAD DE MÉXICO C. P. 08810 MÉXICO | $15,457.26 |
| 27 | AMX CONTENIDO SA DE CV<br><br>LAGO ZÚRICH 245 COLONIA AMPLIACIÓN GRANADA MIGUEL HIDALGO CIUDAD DE MÉXICO C. P. 11529 MÉXICO | $39,712,864.72 |
| 28 | ANDREA EHRLICH TORRES TRUEBA<br><br>MERCED GÓMEZ, LOCAL 1 7 COLONIA MERCED GÓMEZ BENITO JUÁREZ CIUDAD DE MÉXICO C. P. 03930 MÉXICO | $31,635.75 |
| 29 | ANÚNCIATE EN EL ORIENTE SA DE CV<br><br>NEZAHUALCÓYOTL 180 COLONIA RAÚL ROMERO NEZAHUALCÓYOTL ESTADO DE MÉXICO C. P. 57630 MÉXICO | $158,338.13 |
| 30 | ARACELI SÁNCHEZ RIVERA<br><br>SAN FELIPE 85 TB 107 COLONIA XOCO BENITO JUÁREZ CIUDAD DE MÉXICO C. P. 03330 MÉXICO | $9,625.00 |
| 31 | ARGOIT MÉXICO SAPI DE CV<br><br>PASEO DE LA REFORMA 180 COLONIA JUÁREZ CUAUHTÉMOC CIUDAD DE MÉXICO C. P. 06600 MÉXICO | $373,932.73 |
| 32 | ARMENDÁRIZ FLORES CARLOS ABIUD<br><br>MINA 5 COLONIA CIUDAD CAMARGO CENTRO CHIHUAHUA CHIHUAHUA C. P. 33700 MÉXICO | $93,796.70 |
| 33 | AROCHI & LINDNER SC<br><br>AVENIDA INSURGENTES SUR 1605 PISO 20 COLONIA SAN JOSÉ INSURGENTES BENITO JUÁREZ CIUDAD DE MÉXICO C. P. 03900 MÉXICO | $94,030.41 |
| 34 | ARRENDADORA INTERNACIONAL AZTECA SA DE CV<br><br>AVENIDA TEOPANZOLCO 669 COLONIA REFORMA CUERNAVACA MORELOS C. P. 62260 MÉXICO | $1,182,098.52 |

Scanned with
CamScanner



21

JUZGADO PRIMERO DE DISTRITO EN MATERIA DE CONCURSOS MERCANTILES, CON RESIDENCIA EN LA CIUDAD DE MÉXICO Y JURISDICCIÓN EN TODA LA REPÚBLICA MEXICANA

SENTENCIA DECLARACIÓN DE CONCURSO MERCANTIL
CONCURSO MERCANTIL 22/2026-II.

| | | |
|---|---|---|
| 35 | ARREZ HERNÁNDEZ JOSÉ GUADALUPE<br>SUR 101B COLONIA SECTOR POPULAR IZTAPALAPA CIUDAD DE MÉXICO C. P. 09060 MÉXICO | $2,400.00 |
| 36 | ARTURO RAMOS SOBARZO<br>MANZANA G LOTE 1 ED F DEP 301 COLONIA LLANO DE LOS BÁEZ ECATEPEC DE MORELOS ESTADO DE MÉXICO C. P. 55055 MÉXICO | $104,887.77 |
| 37 | ASESORES PUBLICITARIOS DE TIJUANA S DE RL DE CV<br>AGUA CALIENTE 8582 COLONIA ZONA CENTRO TIJUANA BAJA CALIFORNIA C. P. 22000 MÉXICO | $140,924.81 |
| 38 | ASOCIACIÓN DE CONDÓMINOS DE CAMPECHE HILLS AC<br>CEIBA MANZANA 4 SN COLONIA LERMA CAMPECHE CAMPECHE C. P. 24500 MÉXICO | $18,000.00 |
| 39 | ASOCIACIÓN INTERNACIONAL DE RADIODIFUSIÓN - AIR CARLOS QUIJANO 1264 MONTEVIDEO 11100 URUGUAY | $331,774.56 |
| 40 | AUTOMECANICA TAPATÍA SA DE CV<br>AV PATRIA 1213 884 COLONIA JARDINES TEPEYAC ZAPOPAN JALISCO C. P. 45034 MÉXICO | $2,793.94 |
| 41 | AUTOUNO MOTORS SA DE CV<br>INSURGENTES SUR 1572 COLONIA CRÉDITO CONSTRUCTOR BENITO JUÁREZ CIUDAD DE MÉXICO C. P. 03940 MÉXICO | $29,972.41 |
| 42 | AXTEL SAB DE CV<br>BLVD DÍAZ ORDAZ KM. 3.33 L-1 COLONIA COLONIA UNIDAD SAN PEDRO MUNICIPIO SAN PEDRO GARZA NUEVO LEÓN C. P. 66215 MÉXICO | $306,240.73 |
| 43 | AYALA NEIRA JOSÉ LUIS<br>HACIENDA LOS FRESNO 165 COLONIA LÁZARO CÁRDENAS CUAUTITLÁN IZCALLI ESTADO DE MÉXICO C. P. 54800 MÉXICO | $118,088.00 |
| 44 | AYSEL SERVICIOS SA DE CV<br>ESTÍO 4 COLONIA ÁNGEL ZIMBRON AZCAPOTZALCO CIUDAD DE MÉXICO C. P. 02099 MÉXICO | $348,000.00 |
| 45 | BA INNOVATION MÉXICO<br>IGLESIA 2 TORRE E 103 COLONIA TIZAPAN ÁLVARO OBREGÓN CIUDAD DE MÉXICO C. P. 01090 MÉXICO | $47,935.39 |
| 46 | BAKU PUBLICIDAD Y MARKETING SA DE CV<br>MARIANO ESCOBEDO 476 PISO 12 COLONIA ANZURES MIGUEL HIDALGO CIUDAD DE MÉXICO C. P. 11590 MÉXICO | $345,680.00 |
| 47 | BALTAZAR LÓPEZ JIMÉNEZ<br>5 DE MAYO 19 COLONIA SAN ANDRÉS TOTOLTEPEC TLALPAN CIUDAD DE MÉXICO C. P. 14400 MÉXICO | $29,706.00 |

Scanned with CamScanner



22

| | | |
|---|---|---|
| 48 | **BAWARE SA DE CV**<br><br>PIRULES 5 5 COLONIA SAN VICENTE CHICOLOAPAN DE JUÁREZ CHICOLOAPAN ESTADO DE MÉXICO C. P. 56370 MÉXICO | $63,176.51 |
| 49 | **BAXAL EXECUTIVE SEARCH SAS DE CV**<br><br>HIPÓLITO TAINE 244 COLONIA POLANCO V SECCIÓN MIGUEL HIDALGO CIUDAD DE MÉXICO C. P. 11560 MÉXICO | $13,650.00 |
| 50 | **BEKER 5.0 SAPI DE CV**<br><br>AV SANTA FE 505 1501 COLONIA CUAJIMALPA DE MORELOS CUAJIMALPA DE MORELOS CIUDAD DE MÉXICO C. P. 05349 MÉXICO | $3,298,150.45 |
| 51 | **BENITA GUERRERO VELÁZQUEZ**<br><br>MEDIA LUNA SN SN COLONIA CERRO DE QUIMIXTEPEC METZTITLÁN HIDALGO C. P. 43350 MÉXICO | $30,000.00 |
| 52 | **BH TRADE MARKET SA DE CV**<br><br>SAN ANDRÉS ATOTO 155 COLONIA UNIDAD SAN ESTEBAN NAUCALPAN DE JUÁREZ ESTADO DE MÉXICO C. P. 53550 MÉXICO | $26,920.78 |
| 53 | **BITÁCORA SOCIAL MÉXICO S DE RL DE CV**<br><br>MINERVA 87 COLONIA CRÉDITO CONSTRUCTOR BENITO JUÁREZ CIUDAD DE MÉXICO C. P. 03940 MÉXICO | $100,000.00 |
| 54 | **BLOOMBERG LP**<br><br>LEXINGTON AVENUE 731 NUEVA YORK MIDTOWN MANHATTAN NEW YORK 10022 ESTADOS UNIDOS DE AMÉRICA | $794,728.82 |
| 55 | **BOTELLO Y BENAVIDES SC**<br><br>GUSTAVO BAZ PRADA 309 COLONIA LA FLORIDA TLALNEPANTLA DE BAZ ESTADO DE MÉXICO C. P. 54060 MÉXICO | $114,700.84 |
| 56 | **BRENDA GARCÍA NÁPOLES**<br><br>DURANGO 245 COLONIA ROMA NORTE CUAUHTÉMOC CIUDAD DE MÉXICO C. P. 06700 MÉXICO | $2,785.28 |
| 57 | **BRUM RAMÍREZ ASESORES EN NEGOCIOS SC**<br><br>AV INSURGENTES SUR 1605 COLONIA SAN JOSÉ INSURGENTES DELEGACIÓN BENITO JUÁREZ CIUDAD DE MÉXICO C. P. 3900 MÉXICO | $57,721.50 |
| 58 | **BRYAN OSVALDO ACOSTA SÁNCHEZ**<br><br>SIMÓN BOLÍVAR 9 COLONIA LAS AMÉRICAS ECATEPEC DE MORELOS ESTADO DE MÉXICO<br><br>C. P. 55076 MÉXICO | $50,000.00 |
| 59 | **BUILD YOUR DREAMS BUSSES MÉXICO S DE RL DE CV**<br><br>RIO DE SAN JOAQUÍN 436 PISO 12 COLONIA AMPLIACIÓN GRANADA MIGUEL HIDALGO CIUDAD DE MÉXICO C. P. 11529 MÉXICO | $45,951,593.99 |

Scanned with
CamScanner



FORMA A-65

23

JUZGADO PRIMERO DE DISTRITO EN MATERIA DE CONCURSOS MERCANTILES, CON RESIDENCIA EN LA CIUDAD DE MÉXICO Y JURISDICCIÓN EN TODA LA REPÚBLICA MEXICANA

SENTENCIA DECLARACIÓN DE CONCURSO MERCANTIL
CONCURSO MERCANTIL 22/2026-II.

PODER JUDICIAL DE LA FEDERACIÓN

| | | |
|---|---|---|
| 60 | BUSTOS JAIMEZ SALOMÓN<br>CASAHUATES 14 COLONIA TAXCO DE ALARCÓN TAXCO DE ALARCÓN GUERRERO C. P. 40253 MÉXICO | $4,698.00 |
| 61 | BYASO MANTENIMIENTO INTEGRAL S DE RL DE CV<br>ISLA MONTAGUE 976 COLONIA SAN FELIPE TORREÓN COAHUILA C. P. 27085 MÉXICO | $35,536.03 |
| 62 | CADENA RADIODIFUSORA MEXICANA SA DE CV<br>CALZADA DE TLALPAN 3000 COLONIA ESPARTACO COYOACÁN CIUDAD DE MÉXICO C. P. 04870 MÉXICO | $17,218,234.88 |
| 63 | CADGRAFICS SA DE CV<br>NORTE 56-A 5204 COLONIA TABLAS DE SAN AGUSTÍN GUSTAVO A MADERO CIUDAD DE MÉXICO C. P. 07860 MÉXICO | $43,622.00 |
| 64 | CAHNOS SA DE CV<br>IRAPUATO 188 COLONIA PEÑÓN DE LOS BAÑOS VENUSTIANO CARRANZA CIUDAD DE MÉXICO C. P. 15520 MÉXICO | $311,905.63 |
| 65 | CAJAS FUERTES BULL SAFE SA DE CV<br>ALTADENA 44, C 44 COLONIA NÁPOLES BENITO JUÁREZ CIUDAD DE MÉXICO C. P. 03810 MÉXICO | $22,500.00 |
| 66 | CALLI YUU S DE RL DE CV<br>PRIVADA DE LA 19 PONIENTE 4512 3 COLONIA BELISARIO DOMÍNGUEZ HEROICA PUEBLA DE ZARAGOZA PUEBLA C. P. 72180 MÉXICO | $9,016.54 |
| 67 | CALZADO VAN VIEN SA DE CV<br>CALLE HÉROES DE NACOZARI 205 COLONIA REFORMA Y FERROCARRILES NACIONALES TOLUCA ESTADO DE MÉXICO C. P. 50070 MÉXICO | $1,795.00 |
| 68 | CAMACHO PÉREZ JOSÉ EDUARDO<br>MIGUEL HIDALGO 50 50 COLONIA SOTO LA MARINA TAMPICO TAMAULIPAS C. P. 87670 MÉXICO | $126,879.44 |
| 69 | CANON MEXICANA S DE RL DE CV<br>BLVD MANUEL ÁVILA CAMACHO 138 COLONIA LOMAS DE CHAPULTEPEC MIGUEL HIDALGO CIUDAD DE MÉXICO C. P. 11000 MÉXICO | $8,087.57 |
| 70 | CARLOS JAIME ESTRADA PÉREZ<br>20 DE NOV SUR 411 COLONIA CENTRO LINARES NUEVO LEÓN C. P. 67700 MÉXICO | $146,085.82 |
| 71 | CAROLINA CALDERÓN BADILLO<br>MINA LA GALLEGA 1 COLONIA FRACC LOMAS DE BERNÁRDEZ GUADALUPE ZACATECAS C. P. 98610 MÉXICO | $36,382.59 |

24

| | | |
|---|---|---|
| 72 | **CASTRO ZAVALA JESÚS ANTONIO**<br><br>BLVD FRANCISCO LABASTIDA OCHOA 164 COLONIA LAGO TRES RÍOS CULIACÁN SINALOA<br><br>C. P. 80027 MÉXICO | $117,083.06 |
| 73 | **CBRE MÉXICO GWS S DE RL DE CV**<br><br>PEDREGAL 24 COLONIA MOLINO DEL REY MIGUEL HIDALGO CIUDAD DE MÉXICO C. P. 11040 MÉXICO | $16,773.78 |
| 74 | **CCT MÉXICO SA DE CV**<br><br>ABRAHAM LINCOLN 6217 6217 COLONIA PASEO DE LAS MITRAS MONTERREY NUEVO LEÓN C. P. 64118 MÉXICO | $18,570.32 |
| 75 | **CERTSUPERIOR S DE RL DE CV**<br><br>JAVIER BARROS SIERRA 540 TORRE 1 P 5025 COLONIA SANTA FE ÁLVARO OBREGÓN CIUDAD DE MÉXICO C. P. 01210 MÉXICO | $17,297.91 |
| 76 | **CESAR ARGEL LÓPEZ LUNA**<br><br>CALLE CAYETANO ANDRADE, CASA 74 50 COLONIA SANTA MARTHA ACATITLA IZTAPALAPA CIUDAD DE MÉXICO C. P. 09510 MÉXICO | $27,952.39 |
| 77 | **CESARFER SA DE CV**<br><br>AVENIDA GAVILÁN 151 COLONIA GUADALUPE DEL MORAL IZTAPALAPA CIUDAD DE MÉXICO<br><br>C. P. 09300 MÉXICO | $522,240.00 |
| 78 | **CFE SUMINISTRADOR DE SERVICIOS BÁSICOS**<br><br>PASEO DE LA REFORMA 164 COLONIA JUÁREZ CUAUHTÉMOC CIUDAD DE MÉXICO C. P. 06600 MÉXICO | $6,691,498.34 |
| 79 | **CHANTIRI ESPINOSA AVELINO ANDRÉS**<br><br>1A ORIENTE NORTE 52 COLONIA CINTALAPA CINTALAPA CHIAPAS C. P. 30400 MÉXICO | $87,741.26 |
| 80 | **CHRISTIAN RUBÉN CABRERA**<br><br>CALLE F LUIS M PONCE 106 COLONIA CENTRO TULANCINGO DE BRAVO HIDALGO C. P. 43626 MÉXICO | $1,740.00 |
| 81 | **CICOVISA SA DE CV**<br><br>AMORES 134 COLONIA DEL VALLE CENTRO BENITO JUÁREZ CIUDAD DE MÉXICO C. P. 03100 MÉXICO | $10,294.14 |
| 82 | **CIH TELECOMUNICACIONES DE MÉXICO SA DE CV**<br><br>RENATO LEDUC 321 COLONIA TORIELLO GUERRA TLALPAN CIUDAD DE MÉXICO C. P. 14050 MÉXICO | $51,152.00 |
| 83 | **CINTAS COVE SA DE CV**<br><br>CALLE JACARANDAS 13 COLONIA SAN ISIDRO CUAUTITLÁN IZCALLI ESTADO DE MÉXICO<br><br>C. P. 54730 MÉXICO | $19,843.45 |
| 84 | **CIPRÉS BRIBIESCA JUAN CARLOS**<br><br>CORREGIDORA 167 COLONIA MIGUEL HIDALGO TLALPAN | $18,580.00 |



Scanned with CamScanner



JUZGADO PRIMERO DE DISTRITO EN MATERIA DE CONCURSOS MERCANTILES, CON RESIDENCIA EN LA CIUDAD DE MÉXICO Y JURISDICCIÓN EN TODA LA REPÚBLICA MEXICANA

PODER JUDICIAL DE LA FEDERACIÓN

25

SENTENCIA DECLARACIÓN DE CONCURSO MERCANTIL

CONCURSO MERCANTIL 22/2026-II.

| | | |
|---|---|---|
| | CIUDAD DE MÉXICO C. P. 14260 MÉXICO | |
| 85 | CÍRCULO LABORAL SA DE CV<br>MIGUEL DE CERVANTES 301 TORRE NTE PISO 10 COLONIA GRANADA MIGUEL HIDALGO CIUDAD DE MÉXICO C. P. 11520 MÉXICO | $15,299.28 |
| 86 | CIRION TECHNOLOGIES MÉXICO S DE RL<br>LAGO ZÚRICH 96 COLONIA AMPLIACIÓN GRANADA MIGUEL HIDALGO CIUDAD DE MÉXICO. C. P. 11529 MÉXICO | $31,320.00 |
| 87 | CLES DE MÉXICO SA DE CV<br>PROGRESO 803 COLONIA CHIHUAHUA CENTRO CHIHUAHUA CHIHUAHUA C. P. 31000 MÉXICO | $1,685.72 |
| 88 | COLONIA VERANIEGA EL MIRADOR SA DE CV<br>AL MIRADOR KM. 3.5 COLONIA VALLE DEL MIRADOR MONTERREY NUEVO LEÓN C. P. 64750 MÉXICO | $13,247,621.76 |
| 89 | COMERCIALIZADORA INU SA DE CV<br>BLVD MANUEL ÁVILA CAMACHO 32 OFIC 401 COLONIA LOMAS DE CHAPULTEPEC I SECCIÓN MIGUEL HIDALGO CIUDAD DE MÉXICO C. P. 11000 MÉXICO | $1,434,340.63 |
| 90 | COMERCIO INTELIGENTE SA DE CV<br>SAN FRANCISCO 1902 COLONIA DEL VALLE CENTRO BENITO JUÁREZ CIUDAD DE MÉXICO C. P. 03100 MÉXICO | $296,214.89 |
| 91 | COMPAÑÍA LATINOAMÉRICA DE MARKETING Y COMUNICACIÓN SA DE CV<br>HORACIO 1501 COLONIA CHAPULTEPEC MORALES MIGUEL HIDALGO CIUDAD DE MÉXICO<br>C. P. 11570 MÉXICO | $192,757.50 |
| 92 | COMPLANT LEGAL SC<br>LAFONTAINE 35 COLONIA POLANCO CHAPULTEPEC MIGUEL HIDALGO CIUDAD DE MÉXICO<br>C. P. 11560 MÉXICO | $217,500.00 |
| 93 | COMSERTEL ELECTRONICS SA DE CV<br>MIGUEL RAMOS ARIZPE 7 COLONIA GUERRERO CUAUHTÉMOC CIUDAD DE MÉXICO C. P. 06300 MÉXICO | $8,450.00 |
| 94 | COMUNEROS RECONOCIDOS DE HUITZILAC MORELOS SC<br>BENITO JUÁREZ SN COLONIA CENTRO HUITZILAC MORELOS C. P. 62510 MÉXICO | $66,878.48 |
| 95 | COMUNIDAD AGRARIA COLIBRÍ HUITZILAC MORELOS SC<br>CORREGIDORA 2 COLONIA HUITZILAC HUITZILAC MORELOS C. P. 62510 MÉXICO | $208,800.00 |
| 96 | COMUNIDAD SAN MIGUEL DEL CARRIZAL STDS<br>DOMICILIO CONOCIDO SN COLONIA SANTA LUCIA | |



Scanned with CamScanner




26

| | | |
|---|---|---|
| | CONCORDIA SINALOA C. P. 82660 MÉXICO | $62,180.43 |
| 97 | CONDISTA INTERNATIONAL LLC<br>NW 102 AVE 2105 3RD. FLOOR MIAMI MIAMI FLORIDA 33172 ESTADOS UNIDOS DE AMÉRICA | $101,239.02 |
| 98 | CONSORCIO INTEGRAL JALIX INGENIUS SA DE CV<br>PARQUE DE ORIZABA 2, SIN NUMERO 2 SN COLONIA EL PARQUE NAUCALPAN DE JUÁREZ ESTADO DE MÉXICO C. P. 53398 MÉXICO | $1,195,540.43 |
| 99 | CONSTRUCCIONES FRACTALES OTOCH SA DE CV<br>PASEOS DE ECHEGARAY SUR 221 COLONIA HACIENDA DE ECHEGARAY NAUCALPAN DE JUÁREZ ESTADO DE MÉXICO C. P. 53300 MÉXICO | $108,152.62 |
| 100 | CONSTRUCCIONES PARA LA INDUSTRIA Y TELECOMUNICACIÓN SA DE CV<br>AV ORIENTE 5 COLONIA ZONA INDUSTRIAL TIZAYUCA CIUDAD DE MÉXICO C. P. 43804 MÉXICO | $9,756.60 |
| 101 | CONSTRUCCIONES Y PROMOCIONES GUERRERO SA DE CV<br>PASEO SAN ISIDRO 400 COLONIA SANTA CRUZ METEPEC ESTADO DE MÉXICO C. P. 52140 MÉXICO | $203,234.95 |
| 102 | CONTENIDOS DIGITALES SPA<br>BARROS ARANA 492 OFI 78 CONCEPCIÓN CONCEPCIÓN CONCEPCIÓN 4030000 CHILE | $25,519.75 |
| 103 | CONTINENTAL PLLC<br>ALCÁZAR AVENUE CORAL 245 SUITE 640 FLORIDA FLORIDA FLORIDA 33134 ESTADOS UNIDOS DE AMÉRICA | $277,620.72 |
| 104 | COORDINADORA DE CARRIERS SA DE CV<br>AV SAN JERÓNIMO 210 COLONIA SAN JERÓNIMO MONTERREY NUEVO LEÓN C. P. 64640 MÉXICO | $562,276.00 |
| 105 | COPIADORAS OCCIDENTALES Y SERVICIOS SA DE CV<br>AV. VENUSTIANO CARRANZA 118 COLONIA JARDINES DEL VALLE MEXICALI BAJA CALIFORNIA C. P. 21270 MÉXICO | $2,851.20 |
| 106 | CORPORACIÓN INTERNACIONAL DE EQUIPOS Y COCINAS SA DE CV<br>RIO SENA 12 COLONIA CUAUHTÉMOC CUAUHTÉMOC CIUDAD DE MÉXICO C. P. 06500 MÉXICO | $545,775.00 |
| 107 | CORPORACIÓN NOVAVISION S DE RL DE CV<br>INSURGENTES SUR 694 COLONIA DEL VALLE CENTRO BENITO JUÁREZ CIUDAD DE MÉXICO C. P. 03100 MÉXICO | $3,226.61 |
| 108 | CORPORATIVO ENCISO SC<br>AVENIDA 5 DE MAYO 933 COLONIA CENTRO VERACRUZ VERACRUZ C. P. 91700 MÉXICO | $394,071.00 |
| 109 | CORPORATIVO MENFIS SC<br>AZCAPOTZALCO LA VILLA 308 204 D COLONIA SANTA CATARINA AZCAPOTZALCO CIUDAD DE MÉXICO C. P. 02250 | $120,640.00 |



Scanned with
CamScanner



FORMA A-65

27

JUZGADO PRIMERO DE DISTRITO EN MATERIA DE CONCURSOS MERCANTILES, CON RESIDENCIA EN LA CIUDAD DE MÉXICO Y JURISDICCIÓN EN TODA LA REPÚBLICA MEXICANA

SENTENCIA DECLARACIÓN DE CONCURSO MERCANTIL
CONCURSO MERCANTIL 22/2026-II.

| | | |
|---|---|---|
| | MÉXICO | |
| 110 | COWORKING BANDERAS SA DE CV<br>FCO MEDINA ASCENCIO 3987 406 COLONIA PUERTO VALLARTA FRACC. MARINA VALLARTA JALISCO C. P. 48335 MÉXICO | $30,154.25 |
| 111 | CPS DIGITAL SA DE CV<br>VIA DR. GUSTAVO BAZ PRADA 100 COLONIA INDUSTRIAL ALCE BLANCO NAUCALPAN DE JUÁREZ ESTADO DE MÉXICO C. P. 53370 MÉXICO | $18,065.11 |
| 112 | CRATIVO PRODUCTION SA DE CV<br>BELISARIO DOMÍNGUEZ 3500, 1304 3500 COLONIA MARGARITA MAZA DE JUÁREZ GUADALAJARA JALISCO C. P. 44300 MÉXICO | $184,993.44 |
| 113 | CREEL RODRÍGUEZ Y ABOGADOS SC<br>BOSQUE DE CIRUELOS 304 P1 DEPTO. 102 COLONIA BOSQUE DE LAS LOMAS MIGUEL HIDALGO CIUDAD DE MÉXICO C. P. 11700 MÉXICO | $290,000.00 |
| 114 | CRISÓSTOMO MARCELO MARÍA DE LOS ÁNGELES<br>DOMICILIO CONOCIDO SN COLONIA TEPEACA PUEBLA PUEBLA C. P. 75200 MÉXICO | $91,299.08 |
| 115 | CTUX SA DE CV<br>ENRIQUE SERRANO MZ 329 LT. 54 4 COLONIA LA PRESITA CUAUTITLÁN IZCALLI ESTADO DE MÉXICO C. P. 54763 MÉXICO | $7,087.60 |
| 116 | CULLIGAN WATER MÉXICO SA DE CV<br>CAMPOS ELÍSEOS, PISO 5 385B COLONIA POLANCO V SECCIÓN MIGUEL HIDALGO CIUDAD DE MÉXICO C. P. 11560 MÉXICO | $32,498.00 |
| 117 | DADMEX S DE RL DE CV<br>NICOLÁS COPÉRNICO 102 COLONIA SAN MATEO OTZACATIPAN TOLUCA ESTADO DE MÉXICO C. P. 50200 MÉXICO | $18,748.21 |
| 118 | DALET DIGITAL MEDIA SYSTEMS USA INC<br>88 PINE STREET 88 8TH FLOOR NUEVA YORK NEW YORK NUEVA YORK 10005 ESTADOS UNIDOS DE AMÉRICA | $698,462.72 |
| 119 | DATAFACTORY MX S DE RL DE CV<br>BAHÍA GUANTÁNAMO 70 COLONIA VERÓNICA ANZURES MIGUEL HIDALGO CIUDAD DE MÉXICO C. P. 11300 MÉXICO | $79,650.00 |
| 120 | DATAXIS<br>10 RUE PERGOLESE 10 PARIS PARIS PARIS 75116 FRANCIA | $66,099.48 |
| 121 | DAVID ALEJANDRO TALAMANTES OLIVAS<br>CALLE ALFREDO CHÁVEZ 9807 COLONIA LAS MALVINAS | $9,087.86 |

Scanned with CamScanner

28

| | | |
|---|---|---|
| | CHIHUAHUA CHIHUAHUA C. P. 31456 MÉXICO | |
| 122 | DC-ALTERNA SA DE CV<br><br>CALLE 19 96 COLONIA GENERAL IGNACIO ZARAGOZA VENUSTIANO CARRANZA CIUDAD DE MÉXICO C. P. 15000 MÉXICO | $703,804.43 |
| 123 | DECOFRIS I SAPI DE CV<br><br>INGENIEROS MILITARES 105 COLONIA LOMAS DE SOTELO MIGUEL HIDALGO CIUDAD DE MÉXICO C. P. 11200 MÉXICO | $1,000,159.64 |
| 124 | DELI ROCKS SA DE CV<br><br>CORREGIDORA 840 COLONIA MIGUEL HIDALGO 2DA SECCIÓN TLALPAN CIUDAD DE MÉXICO C. P. 14250 MÉXICO | $626.40 |
| 125 | DELIO RENAN PACHO NOVELO<br><br>11 PONIENTE 203 COLONIA UNIDAD MORELOS MÉRIDA YUCATÁN C. P. 97190 MÉXICO | $176,927.00 |
| 126 | DESARROLLO INMOBILIARIO DE MONCLOVA SA DE CV<br><br>ALLENDE 401 COLONIA MONCLOVA CENTRO COAHUILA COAHUILA C. P. 25700 MÉXICO | $36,074.12 |
| 127 | DESPACHO DÍAZ MIRON SC<br><br>RINCÓN GRAL 107 COLONIA GENERAL PEDRO MARÍA ANAYA BENITO JUÁREZ CIUDAD DE MÉXICO C. P. 03340 MÉXICO | $58,000.00 |
| 128 | DHL EXPRESS MÉXICO SA DE CV<br><br>FUERZA AÉREA MEXICANA 540 COLONIA FEDERAL VENUSTIANO CARRANZA CIUDAD DE MÉXICO C. P. 15700 MÉXICO | $256,775.19 |
| 129 | DIDOMI SAS<br><br>BOULEVARD DE SEBASTOPOL 137 PARIS PARIS 75002 FRANCIA | $272,753.82 |
| 130 | DIGOSOFT S DEE RL DE CV<br><br>GOLDSMITH 40 COLONIA POLANCO III SECCIÓN MIGUEL HIDALGO HIDALGO C. P. 11550 MÉXICO | $59,585.20 |
| 131 | DIKEN INTERNATIONAL S DE RL DE CV<br><br>INDUSTRIA AEROESPACIAL 2900 2900 COLONIA PARQUE INDUSTRIAL SALTILLO RAMOS AR RAMOS ARIZPE COAHUILA C. P. 25900 MÉXICO | $6,085.94 |
| 132 | DILIMPIO SA DE CV<br><br>CUAUHTÉMOC 508 COLONIA DEL EMPLEADO CUERNAVACA MORELOS C. P. 62250 MÉXICO | $4,851.28 |
| 133 | DISPOSITIVOS ELECTRÓNICOS Y DE CONTROL SA DE CV<br><br>CEDRO 512 COLONIA ATLAMPA CUAUHTÉMOC CIUDAD DE MÉXICO C. P. 06450 MÉXICO | $25,909.00 |
| 134 | DISTRIBUIDORA ARCA CONTINENTAL<br><br>AVE. SAN JERÓNIMO PTE. 813 COLONIA SAN JERÓNIMO MONTERREY NUEVO LEÓN C. P. 64640 MÉXICO | $14,100.00 |

Scanned with
CS CamScanner



JUZGADO PRIMERO DE DISTRITO EN MATERIA DE CONCURSOS MERCANTILES, CON RESIDENCIA EN LA CIUDAD DE MÉXICO Y JURISDICCIÓN EN TODA LA REPÚBLICA MEXICANA

SENTENCIA DECLARACIÓN DE CONCURSO MERCANTIL

CONCURSO MERCANTIL 22/2026-II.

PODER JUDICIAL DE LA FEDERACIÓN

29

| 135 | DISTRIBUIDORA DE ENLACES ELECTRÓNICOS SA DE CV<br>OSCAR WILDE 143 COLONIA COLINAS DE SAN JERÓNIMO MONTERREY NUEVO LEÓN C. P. 64630 MÉXICO | $245,190.35 |
|---|---|---|
| 136 | DRIVE CINEMA SA DE CV<br>SPENCER 411 101 COLONIA POLANCO V SECCIÓN MIGUEL HIDALGO CIUDAD DE MÉXICO. C. P. 11560 MÉXICO | $1,500,000.02 |
| 137 | ECODELI COMERCIAL SA DE CV<br>AV. RESTAURADORES ORIENTE 1001 COLONIA LOS ARCOS LEÓN GUANAJUATO C. P. 37490 MÉXICO | $413.34 |
| 138 | EDICIONES EL PAÍS SL<br>MIGUEL YUSTE 40 MADRID MADRID 28037 ESPAÑA | $2,162,470.14 |
| 139 | EDITEL NEGOCIOS COMERCIALES SA DE CV<br>FCO ROJAS GLEZ 541 COLONIA LADRÓN DE GUEVARA GUADALAJARA JALISCO C. P. 44650 MÉXICO | $110,752.37 |
| 140 | EDITORIAL PRENSARIO SRL<br>LAS CASAS 3535 BOEDO CIUDAD AUTÓNOMA DE BUENOS AIRES BUENOS AIRES 1238 ARGENTINA | $81,882.34 |
| 141 | EEG ENTERPRISES INC<br>MAIN ST 586 FARMINGDALE BAVIERA 11735 ALEMANIA | $1,000,146.44 |
| 142 | EGEO ESTRATEGIAS Y PROYECTOS ADMINISTRATIVOS SC<br>SANTA FE 440 COLONIA SANTA FE CUAJIMALPA CUAJIMALPA DE MORELOS CIUDAD DE MÉXICO C. P. 05348 MÉXICO | $417,500.67 |
| 143 | EJIDO BOMINTZHA<br>PLAZA DE LA CONSTITUCIÓN SN COLONIA TULA DE ALLENDE TULA DE ALLENDE HIDALGO<br>C. P. 42832 MÉXICO | $26,349.86 |
| 144 | EJIDO FRESNILLO<br>CONOCIDO SN COLONIA CENTRO FRESNILLO ZACATECAS C. P. 99010 MÉXICO | $98,624.89 |
| 145 | EJIDO LA CUCHILLA<br>BENITO JUÁREZ SN COLONIA CENTRO MUZQUIZ COAHUILA C. P. 26350 MÉXICO | $154,532.73 |
| 146 | ELECTRICIDAD Y TECNOLOGÍA SA DE CV<br>PLAZA NECAXA 2 COLONIA CUAUHTÉMOC CUAUHTÉMOC CIUDAD DE MÉXICO C. P. 06500 MÉXICO | $45,766.33 |
| 147 | ELEVADORES SCHINDLER SA DE CV<br>CAMINO A SAN MATEO 2 COLONIA FRACC ANEXO JARDINES DE SAN MATEO NAUCALPAN DE JUÁREZ ESTADO DE MÉXICO C. P. 53240 MÉXICO | $496,489.66 |

Scanned with
CS CamScanner

30



| | | |
|---|---|---|
| 148 | EMPACK DE MÉXICO SA DE CV<br>LEBRIJA 58 58 COLONIA CERRO DE LA ESTRELLA IZTAPALAPA CIUDAD DE MÉXICO C. P. 09860 MÉXICO | $28,353.33 |
| 149 | EMPRESAS DE TELECOMUNICACIÓN DEL CERRO CHIQUIHUITE AC<br>LA BRECHA SN COLONIA TLALPEXCO GUSTAVO A MADERO CIUDAD DE MÉXICO C. P. 07188 MÉXICO | $126,201.73 |
| 150 | EMPRESAS ISAL S DE RL CV<br>GUYANA HOLANDESA 207 COLONIA VISTA HERMOSA MONTERREY NUEVO LEÓN C. P. 64620 MÉXICO | $691,686.92 |
| 151 | ENFORCER UNITS FIRE SERVICE PLUSE MÉXICO SA DE CV<br>INSTITUTO TÉCNICO INDUSTRIAL 11 COLONIA SANTA MARÍA LA RIBERA CUAUHTÉMOC CIUDAD DE MÉXICO C. P. 06400 MÉXICO | $209,514.21 |
| 152 | ENRIQUE ALEJANDRO ALVIZO<br>CALLE ENVASE 402 COLONIA EL MANTE EL MANTE TAMAULIPAS C. P. 89840 MÉXICO | $58,505.55 |
| 153 | ENRIQUE CASTILLO DÍAZ<br>EJIDO 76 COLONIA SAN FRANCISCO CULHUACAN COYOACÁN CIUDAD DE MÉXICO C. P. 04260 MÉXICO | $146,160.00 |
| 154 | ENRIQUE MORALES MANRIQUE<br>NORTE 80 4705 COLONIA NUEVA TENOCHTITLAN GUSTAVO A MADERO GUSTAVO A MADERO CIUDAD DE MÉXICO C. P. 07890 MÉXICO | $704,734.17 |
| 155 | ENRIQUE ZAMORA NAVA<br>MIGUEL ÁNGEL 87 COLONIA MODERNA BENITO JUÁREZ ESTADO DE MÉXICO C. P. 03510 MÉXICO | $65,707.04 |
| 156 | ENVATO ELEMENTS PTY LDT<br>PO BOX COLLINS STREET WEST 16122 MELBOURNE VICTORIA 8007 AUSTRALIA | $42,497.33 |
| 157 | EÓLICA DE LOS ALTOS SAPI DE CV<br>EMILIO CASTELAR 75 COLONIA POLANCO IV SECCIÓN MIGUEL HIDALGO CIUDAD DE MÉXICO C. P. 11550 MÉXICO | $14,267.63 |
| 158 | EPISODIO ESENCIAL SA DE CV<br>BOLÍVAR 31 COLONIA CENTRO (ÁREA 1) CUAUHTÉMOC CIUDAD DE MÉXICO C. P. 06000 MÉXICO | $174.00 |
| 159 | EQUIPOS TÉCNICOS CINEMATOGRÁFICOS SA DE CV<br>EULALIO GUTIÉRREZ 7 COLONIA SAN JUAN JOYA IZTAPALAPA CIUDAD DE MÉXICO C. P. 09839 MÉXICO | $14,600.00 |
| 160 | ESPINO Y ASOCIADOS SC<br>PASEO DE LAS PALMAS 731 COLONIA LOMAS DE CHAPULTEPEC I SECCIÓN MIGUEL HIDALGO CIUDAD DE MÉXICO C. P. 11000 MÉXICO | $46,400.00 |
| | ESPINOSA DE LOS MONTEROS JORGE | |

Scanned with CamScanner



FORMA A-65

31

JUZGADO PRIMERO DE DISTRITO EN MATERIA DE CONCURSOS MERCANTILES, CON RESIDENCIA EN LA CIUDAD DE MÉXICO Y JURISDICCIÓN EN TODA LA REPÚBLICA MEXICANA

SENTENCIA DECLARACIÓN DE CONCURSO MERCANTIL

CONCURSO MERCANTIL 22/2026-II.

PODER JUDICIAL DE LA FEDERACIÓN

| | | |
|---|---|---|
| 161 | 26 PONIENTE 3116 COLONIA VALLE DORADO PUEBLA PUEBLA C. P. 72070 MÉXICO | $216,943.50 |
| 162 | ESTRATEGIA EN SUMINISTROS INTERNACIONALES SA DE CV<br><br>ANTONIO MACEO 67 COLONIA ESCANDÓN MIGUEL HIDALGO CIUDAD DE MÉXICO C. P. 11800 MÉXICO | $5,196.02 |
| 163 | ESTUDIOS CLÍNICOS DR T J ORIARD SA DE CV<br><br>ADOLFO LÓPEZ MATEOS 313 COLONIA NEZAHUALCÓYOTL EVOLUCIÓN PONIENTE ESTADO DE MÉXICO C. P. 57708 MÉXICO | $31,100.00 |
| 164 | EUROELECTRICA SA DE CV<br><br>AÑO DE JUÁREZ 253 COLONIA GRANJAS DE SAN ANTONIO IZTAPALAPA CIUDAD DE MÉXICO C. P. 09070 MÉXICO | $50,638.64 |
| 165 | EXCELENCIA EN INNOVACIONES TECNOLÓGICAS EXCINTEC SC DE RL DE CV<br><br>AV CHAPULTEPEC 70 COLONIA SAN GREGORIO ATLAPULCO XOCHIMILCO CIUDAD DE MÉXICO C. P. 16600 MÉXICO | $27,000.00 |
| 166 | EXPERTOS EN INFRAESTRUCTURA Y TELECOMUNICACIONES EXIT SA DE CV<br><br>VENECIA 135 COLONIA VALLE DORADO TLALNEPANTLA DE BAZ ESTADO DE MÉXICO C. P. 54020 MÉXICO | $12,098.80 |
| 167 | F6 PROCUREMENT PARTNERS SC<br><br>MANUEL ÁVILA CAMACHO 5 COLONIA LOMAS DE SOTELO NAUCALPAN DE JUÁREZ ESTADO DE MÉXICO C. P. 53390 MÉXICO | $149,488.53 |
| 168 | FÁBRICA DE MARAVILLAS SAS DE CV<br><br>OBRERO MUNDIAL 156 COLONIA DEL VALLE CENTRO BENITO JUÁREZ CIUDAD DE MÉXICO<br><br>C. P. 03100 MÉXICO | $6,375.98 |
| 169 | FACTUMEX SA DE CV<br><br>DARWIN 74, 301 74 COLONIA ANZURES MIGUEL HIDALGO CIUDAD DE MÉXICO C. P. 11590 MÉXICO | $1,606,455.00 |
| 170 | FARLUX INTERNATIONAL SA<br><br>PARAGUAY 2141 OF 401 2141 2141 MONTEVIDEO MONTEVIDEO 11800 URUGUAY | $26,694.30 |
| 171 | FELIPE FERNANDO RAMÍREZ JIMÉNEZ<br><br>MORELOS 14 COLONIA BARRIO EL CALVARIO ASUNCIÓN NOCHIXTLAN OAXACA C. P. 69600 MÉXICO | $134,130.60 |
| 172 | FENRIR Y SKOLL SA DE CV | |

JUZGADO PRIMERO DE DISTRITO EN MATERIA DE CONCURSOS MERCANTILES, CON RESIDENCIA EN LA CIUDAD DE MÉXICO Y JURISDICCIÓN EN TODA LA REPÚBLICA MEXICANA

Scanned with
CS CamScanner

32

| | | |
|---|---|---|
| | CHICHEN ITZA MZ 29 LT 14 COLONIA SUPERMANZANA 59 BENITO JUÁREZ QUINTANA ROO<br><br>C. P. 77515 MÉXICO | $5,200.00 |
| 173 | FERNANDO ESTRADA GARCÍA<br>PLAZA POPOCATÉPETL 45 2 COLONIA HIPÓDROMO CUAUHTÉMOC CIUDAD DE MÉXICO C.<br><br>P. 06100 MÉXICO | $9,371.80 |
| 174 | FIBRA HOTELERA SC<br>SANTA FE 481 PISO 7 COLONIA SANTA FE CUAJIMALPA CUAJIMALPA DE MORELOS CIUDAD DE MÉXICO C. P. 05348 MÉXICO | $3,145.30 |
| 175 | FIDEICOMISO F1596<br>SANTA FE 481 PISO 7 COLONIA SANTA FE CUAJIMALPA CUAJIMALPA DE MORELOS CIUDAD DE MÉXICO C. P. 05348 MÉXICO | $872,120.10 |
| 176 | FIDEICOMISO OPSIMEX 4594 SA DE CV<br>AV DE LAS PALMAS 781 COLONIA LOMAS DE CHAPULTEPEC III SECCIÓN MIGUEL HIDALGO CIUDAD DE MÉXICO C. P. 11000 MÉXICO | $446,642.83 |
| 177 | FIVE BITS INC<br>GONZALO CRANCE 181 CIUDAD DEL SABER BALBOA BALBOA 0801 PANAMÁ | $1,067,772.00 |
| 178 | FONDO NACIONAL DE FOMENTO AL TURISMO<br>TECOYOTITLA 100 COLONIA FLORIDA ÁLVARO OBREGÓN CIUDAD DE MÉXICO C. P. 1030 MÉXICO | $338,772.93 |
| 179 | FORMAS EFICIENTES SA DE CV<br>AVENIDA LOS ÁNGELES 303 1 B COLONIA SAN MARTIN XOCHINAHUAC AZCAPOTZALCO CIUDAD DE MÉXICO C. P. 02120 MÉXICO | $51,478.63 |
| 180 | FRANCISCO CASTILLO LARA<br>PROL MAXIMINO SERDÁN SN COLONIA AQUILES SERDÁN NOGALES VERACRUZ C. P. 94720 MÉXICO | $6,149.45 |
| 181 | FRUGAR DE CALVILLO SA DE CV<br>CARR CALVILLO JALPA KM. 3.5 COLONIA POPULAR CALVILLO AGUASCALIENTES C. P. 20800 MÉXICO | $324,757.08 |
| 182 | FUMI DIP CONTROL DE PLAGAS SA DE CV<br>RUBÉN DARIO 127 A COLONIA MODERNA BENITO JUÁREZ CIUDAD DE MÉXICO C. P. 03510 MÉXICO | $24,215.00 |
| 183 | GAPO TELECOMUNICACIONES SA DE CV<br>RAFAEL ÁNGEL DE LA PEÑA 69 COLONIA OBRERA CUAUHTÉMOC CIUDAD DE MÉXICO C. P. 06800 MÉXICO | $2,300.00 |
| 184 | GARCÍA GARCÍA MARIO<br>MIGUEL HIDALGO 37 COLONIA ZITÁCUARO CENTRO ZITÁCUARO MICHOACÁN C. P. 61500 MÉXICO | $13,446.00 |

Scanned with

CamScanner



FORMA A-65

33

JUZGADO PRIMERO DE DISTRITO EN MATERIA DE CONCURSOS MERCANTILES, CON RESIDENCIA EN LA CIUDAD DE MÉXICO Y JURISDICCIÓN EN TODA LA REPÚBLICA MEXICANA

SENTENCIA DECLARACIÓN DE CONCURSO MERCANTIL

CONCURSO MERCANTIL 22/2026-II.

| | | |
|---|---|---|
| 185 | GARCÍA TREVIÑO SIMÓN<br><br>MANUEL M PONCE 214 COLONIA COLINAS DE SAN JERÓNIMO MONTERREY NUEVO LEÓN<br><br>C. P. 64630 MÉXICO | $66,727.63 |
| 186 | GARPABA SA DE CV<br><br>CALLE PASEO DE LOS SICOMOROS 238 COLONIA ARBOLEDAS DE SAN JAVIER 3A SECCIÓN PACHUCA DE SOTO HIDALGO C. P. 42084 MÉXICO | $1,186.68 |
| 187 | GAS URIBE SA DE CV<br><br>RECURSOS DEL GAS SN COLONIA LA LOMA TLALNEPANTLA DE BAZ ESTADO DE MÉXICO<br><br>C. P. 54060 MÉXICO | $46,801.60 |
| 188 | GASTELUM MIRANDA ABOGADOS SA DE CV<br><br>BOSQUES DE ALISOS 45B COLONIA BOSQUES DE LAS LOMAS CUAJIMALPÁ DE MORELOS CIUDAD DE MÉXICO C. P. 05120 MÉXICO | $14,127,715.30 |
| 189 | GATESAIR LLC<br><br>WISMAN LANE 3200 QUINCY ILLINOIS 62301-1252 ESTADOS UNIDOS DE AMÉRICA | $200,296.23 |
| 190 | GBT TRAVEL SERVICES MÉXICO S DE RL DE CV<br><br>MONTES URALES 505 COLONIA LOMAS DE CHAPULTEPEC II SECCIÓN MIGUEL HIDALGO CIUDAD DE MÉXICO C. P. 11000 MÉXICO | $76,544.87 |
| 191 | GC MEXICANA DE VALUACIÓN SA DE CV<br><br>PLAYA CORTES 554 COLONIA REFORMA IZTACCIHUATL SUR IZTACALCO CIUDAD DE MÉXICO C. P. 08840 MÉXICO | $60,610.00 |
| 192 | GEOTÉRMICA PARA EL DESARROLLO SAPI DE CV<br><br>MONTES URALES 460 COLONIA LOMAS DE CHAPULTEPEC III SECCIÓN MIGUEL HIDALGO CIUDAD DE MÉXICO C. P. 11000 MÉXICO | $14,267.63 |
| 193 | GERARDO AGUILAR MORFIN<br><br>INVERNADERO 335 COLONIA FRACCIONAMIENTO COSTA VERDE BOCA DEL RIO VERACRUZ C. P. 94294 MÉXICO | $16,414.00 |
| 194 | GIVIG SA DE CV<br><br>CALLE CICERÓN 605 COLONIA LOS MORALES POLANCO EN MÉXICO MIGUEL HIDALGO CIUDAD DE MÉXICO C. P. 11010 MÉXICO | $4,432,300.15 |
| 195 | GLOBAL SPONSORSHIP GROUP SA DE CV<br><br>MARÍA ESTHER ZUNO 153 COLONIA REVOLUCIÓN BOCA DEL RIO VERACRUZ C. P. 94296 MÉXICO | $130,000.00 |

JUZGADO PRIMERO DE DISTRITO EN MATERIA DE CONCURSOS MERCANTILES, CON RESIDENCIA EN LA CIUDAD DE MÉXICO Y JURISDICCIÓN EN TODA LA REPÚBLICA MEXICANA


Scanned with
CamScanner




34

| | | |
|---|---|---|
| 196 | GLORIA JACQUELINE MACÍAS GUZMÁN<br><br>MARIO TALAVERA 30 COLONIA TEQUILA CENTRO TEQUILA JALISCO C. P. 46400 MÉXICO | $24,849.17 |
| 197 | GOBIERNO DE LA CUIDAD DE MÉXICO<br><br>PLAZA DE LA CONSTITUCIÓN SN COLONIA CENTRO (ÁREA 1) CUAUHTÉMOC CIUDAD DE MÉXICO C. P. 06000 MÉXICO | $1,820,650.78 |
| 198 | GOBIERNO DEL ESTADO DE VERACRUZ DE IGNACIO DE LA LLAVE<br><br>AVENIDA XALAPA 301 COLONIA UNIDAD DEL BOSQUE XALAPA VERACRUZ C. P. 91010 MÉXICO | $6,000.00 |
| 199 | GÓMEZ HUERTA CESAR<br><br>IGNACIO ALLENDE 71 COLONIA CENTRO PARRAS COAHUILA C. P. 27980 MÉXICO | $4,350.00 |
| 200 | GONZÁLEZ GALLARDO MANUEL<br><br>TIGRE 25 COLONIA DEL VALLE CENTRO BENITO JUÁREZ CIUDAD DE MÉXICO C. P. 03100 MÉXICO | $798,557.04 |
| 201 | GONZÁLEZ RODRÍGUEZ JIMMY<br><br>CORREGIDORA 224 COLONIA FERROCARRIL APATZINGÁN MICHOACÁN C. P. 60690 MÉXICO | $4,698.00 |
| 202 | GOOGLE LLC<br><br>AMPHITHEATRE PARKWAY 1600 MOUNTAIN VIEW CALIFORNIA MOUNTAIN VIEW CALIFORNIA CALIFORNIA 94043 ESTADOS UNIDOS DE AMÉRICA | $906,207.60 |
| 203 | GP-SERVICIOS E INSTALACIONES SA DE CV<br><br>TEZOQUIPA 127 127 COLONIA LA JOYA TLALPAN CIUDAD DE MÉXICO C. P. 14090 MÉXICO | $330,400.69 |
| 204 | GRANAU SA DE CV<br><br>AV. JOSÉ PARRES ARIAS 495 COLONIA EL VIGIA ZAPOPAN JALISCO C. P. 45140 MÉXICO | $41,578.83 |
| 205 | GRAPHOS OFFICE SA DE CV<br><br>BLVD ADOLFO RUIZ CORTINES 5243 3ER PISO B COLONIA ISIDRO FABELA TLALPAN CIUDAD DE MÉXICO C. P. 14030 MÉXICO | $158,245.38 |
| 206 | GREENBERG TRAURIG LLP<br><br>DORAL 8400 400 MIAMI MIAMI FLORIDA 33116 ESTADOS UNIDOS DE AMÉRICA | $6,455,296.42 |
| 207 | GRUPO ANAMAURIS S DE RL DE CV<br><br>LÁZARO CÁRDENAS 16 COLONIA SAN LUCAS TEPETLACALCO TLALNEPANTLA DE BAZ ESTADO DE MÉXICO C. P. 54055 MÉXICO | $1,160,448.32 |
| 208 | GRUPO AUDIO DISENO SA DE CV<br><br>MITLA 146 COLONIA NARVARTE PONIENTE BENITO JUÁREZ CIUDAD DE MÉXICO C. P. 03020 MÉXICO | $118,956.84 |
| 209 | GRUPO CALQUE SA DE CV<br><br>AVENIDA BONAMPAK 2 COLONIA SUPERMANZANA 8 | $12,949.46 |

Scanned with CamScanner



FORMA A-65

35

JUZGADO PRIMERO DE DISTRITO EN MATERIA DE CONCURSOS MERCANTILES, CON RESIDENCIA EN LA CIUDAD DE MÉXICO Y JURISDICCIÓN EN TODA LA REPÚBLICA MEXICANA

SENTENCIA DECLARACIÓN DE CONCURSO MERCANTIL

CONCURSO MERCANTIL 22/2026-II.

| | | |
|---|---|---|
| | BENITO JUÁREZ QUINTANA ROO C. P. 77504 MÉXICO | |
| 210 | GRUPO DE MULTIMEDIA MOVIBLE SA DE CV<br>FILADELFIA 119 601 COLONIA NÁPOLES BENITO JUÁREZ CIUDAD DE MÉXICO C. P. 03810 MÉXICO | $645,300.00 |
| 211 | GRUPO DE SERVICIOS PARA FLOTILLAS SA DE CV<br>CARRETERA FEDERAL MÉXICO TEXCOCO KM 29.5 COLONIA SAN VICENTE CHICOLOAPAN DE JUÁREZ CHICOLOAPAN ESTADO DE MÉXICO C. P. 56370 MÉXICO | $28,499.14 |
| 212 | GRUPO EMPRESARIAL ANCAR SA DE CV<br>PUERTO CORTES 50 COLONIA JARDINES DE SANTA CLARA ECATEPEC DE MORELOS ESTADO DE MÉXICO C. P. 55450 MÉXICO | $366,148.20 |
| 213 | GRUPO ETERCOM SA DE CV<br>VÍCTOR HUGO 91 COLONIA PORTALES BENITO JUÁREZ CIUDAD DE MÉXICO C. P. 03300 MÉXICO | $13,847.08 |
| 214 | GRUPO INDUSTRIAL ARMADA DEL BAJÍO S DE RL DE CV<br>ZETA 310 COLONIA INDUSTRIAL DELTA LEÓN GUANAJUATO C. P. 37545 MÉXICO | $31,140.20 |
| 215 | GRUPO INSME SA DE CV<br>GRANJAS PARCELA 33 COLONIA SANTA CATARINA YECAHUIZOTL VALLE DE CHALCO SOLIDARIDAD ESTADO DE MÉXICO C. P. 56619 MÉXICO | $34,000.00 |
| 216 | GRUPO KILIMANJARO SA DE CV<br>BAHÍA DE SANTA BÁRBARA 38 302 COLONIA VERÓNICA ANZURES MIGUEL HIDALGO CIUDAD DE MÉXICO C. P. 11300 MÉXICO | $354,775.56 |
| 217 | GRUPO MULTIMEDIA LAUMAN SAPI DE CV<br>GUILLERMO GONZÁLEZ 600 PLANTA BA COLONIA SANTA FE ÁLVARO OBREGÓN CIUDAD DE MÉXICO C. P. 01210 MÉXICO | $120,000.00 |
| 218 | GRUPO RADIO CENTRO SAB DE CV<br>AV. CONSTITUYENTES 1154 COLONIA LOMAS ALTAS MIGUEL HIDALGO CIUDAD DE MÉXICO<br>C. P. 11950 MÉXICO | $10,492,555.12 |
| 219 | GRUPO UNIBRAND SA DE CV<br>LATERAL RECTA A CHOLULA 2812 COLONIA BERTHA SAN ANDRÉS CHOLULA PUEBLA C. P. 72810 MÉXICO | $598.56 |
| 220 | GRUPO ZAP COM SA DE CV<br>ZAPOTECAS 16 COLONIA DEGOLLADO IZTAPALAPA CIUDAD DE MÉXICO C. P. 09704 MÉXICO | $193,471.50 |
| 221 | GSTA PRODUCTOS SA DE CV<br>XICHU 208 COLONIA MODERNA LEÓN GUANAJUATO C. P. | $4,356.00 |



JUZGADO PRIMERO DE DISTRITO EN MATERIA DE CONCURSOS MERCANTILES, CON RESIDENCIA EN LA CIUDAD DE MÉXICO Y JURISDICCIÓN EN TODA LA REPÚBLICA MEXICANA

Scanned with
CamScanner



36

| | | |
|---|---|---|
| | 37328 MÉXICO | |
| 222 | GUILLERMO GARZA CASTILLO<br><br>JUSTO SIERRA SUR 382 COLONIA ZONA CENTRO ACUÑA COAHUILA C. P. 26200 MÉXICO | $207,726.69 |
| 223 | GUILLERMO ISMAEL RODRÍGUEZ<br><br>MORELOS NORTE 4444 COLONIA NUEVO REFUGIO GÓMEZ PALACIO DURANGO C. P. 35029 MÉXICO | $126,872.00 |
| 224 | GURMILAN & ASOCIADOS SC<br><br>VIVEROS DE COYOACÁN 210 COLONIA VIVEROS DE LA LOMA TLALNEPANTLA DE BAZ ESTADO DE MÉXICO C. P. 54080 MÉXICO | $25,000.00 |
| 225 | GUTIÉRREZ & PINEDA INTERNACIONAL SA DE CV<br><br>AVENIDA TAXQUEÑA 1231 COLONIA CAMPESTRE CHURUBUSCO COYOACÁN CIUDAD DE MÉXICO C. P. 04200 MÉXICO | $12,460.72 |
| 226 | GUZDAN SERVICES SA DE CV<br><br>LAGO ALBERTO 442 TORRE A COLONIA ANÁHUAC I SECCIÓN MIGUEL HIDALGO CIUDAD DE MÉXICO C. P. 11320 MÉXICO | $299,230.78 |
| 227 | HAR HUMAN BRAIN SC<br><br>XOCHICALCO 674 COLONIA LETRÁN VALLE BENITO JUÁREZ CIUDAD DE MÉXICO C. P. 03650 MÉXICO | $7,833.91 |
| 228 | HAVAS MEDIA SA DE CV<br><br>PASEO DE LA REFORMA 296 PISO 44 COLONIA JUÁREZ CUAUHTÉMOC CIUDAD DE MÉXICO<br><br>C. P. 06600 MÉXICO | $18,366,666.66 |
| 229 | HELPDESK SA DE CV<br><br>CARRETERA MÉXICO-TOLUCA 1725 COLONIA COOPERATIVA PALO ALTO CUAJIMALPA DE MORELOS CIUDAD DE MÉXICO C. P. 05110 MÉXICO | $84,253.94 |
| 230 | HERMES MUSIC SA DE CV<br><br>NARANJO 76 76 COLONIA SANTA MARÍA LA RIBERA CUAUHTÉMOC CIUDAD DE MÉXICO C.<br><br>P. 06400 MÉXICO | $29,950.20 |
| 231 | HERNÁNDEZ ZARAZÚA MARÍA GRACIELA<br><br>JOSÉ MARÍA MORELOS SN COLONIA CAPILLA CHIAPA DE CORZO CHIAPAS C. P. 29160 MÉXICO | $247,184.05 |
| 232 | HISPASAT MÉXICO SA DE CV<br><br>SANTA FE 428 COLONIA SANTA FE CUAJIMALPA CUAJIMALPA DE MORELOS CIUDAD DE MÉXICO C. P. 05348 MÉXICO | $255,760.00 |
| 233 | HPH MÉXICO SA DE CV<br><br>AV. EJERCITO NACIONAL 418 1201 1202 COLONIA CHAPULTEPEC MORALES MIGUEL HIDALGO CIUDAD DE | $36,733,333.32 |

Scanned with CamScanner


38

| | | |
|---|---|---|
| 246 | IGSA SA DE CV<br><br>PROL. PASEO DE LA REFORMA 2977 COLONIA CUAJIMALPA CUAJIMALPA DE MORELOS CIUDAD DE MÉXICO C. P. 05000 MÉXICO | $19,371.40 |
| 247 | ILIANA MARTÍNEZ SÁNCHEZ<br><br>GRAL BRAVO 233 COLONIA CHAPULTEPEC NORTE MORELIA MICHOACÁN C. P. 58260 MÉXICO | $73,417.14 |
| 248 | IMPERMEABILIZACIONES IMPERTAPA SA DE CV<br><br>AV INSURGENTES SUR 2342 ACC A COLONIA CHIMALISTAC ÁLVARO OBREGÓN CIUDAD DE MÉXICO C. P. 01070 MÉXICO | $45,520.26 |
| 249 | INACOM DE MÉXICO SA DE CV<br><br>MIGUEL ÁNGEL DE QUEVEDO 91 COLONIA CHIMALISTAC ÁLVARO OBREGÓN CIUDAD DE MÉXICO C. P. 01070 MÉXICO | $17,404,259.27 |
| 250 | INCONO M2 SA DE CV<br><br>CTO PLAZA ESMERALDA 6 COLONIA LOMAS DE VALLE ESCONDIDO ATIZAPÁN DE ZARAGOZA ESTADO DE MÉXICO C. P. 52930 MÉXICO | $169,280.67 |
| 251 | INECON PRODUCTORA Y CONSERVADORA SA DE CV<br><br>REVOLUCIÓN 1877 OFICINA 1 COLONIA SAN ÁNGEL ÁLVARO OBREGÓN CIUDAD DE MÉXICO C. P. 01000 MÉXICO | $6,400,000.00 |
| 252 | INFIELD ESTRATEGIA DEPORTIVA S DE RL DE CV<br><br>CALLE DE LAS ARBOLEDAS 23 COLONIA INSURGENTES CUICUILCO COYOACÁN CIUDAD DE MÉXICO C. P. 04530 MÉXICO | $1,279,828.58 |
| 253 | INGENIERÍA ELÉCTRICA ELECTRÓNICA Y ELECTROMECÁNICA SA DE CV<br><br>AV NUEVO LEÓN 209 COLONIA HIPÓDROMO CONDESA CUAUHTÉMOC CIUDAD DE MÉXICO. C. P. 06170 MÉXICO | $262,768.84 |
| 254 | INGENIERÍA EN ELEVADORES SA DE CV<br><br>CEYLAN 715 COLONIA LAS SALINAS AZCAPOTZALCO CIUDAD DE MÉXICO C. P. 02360 MÉXICO | $155,324.00 |
| 255 | INGENIERÍA EN NEGOCIOS DE SANEAMIENTO Y CONSTRUCCIÓN S DE RL DE CV<br><br>AV HOMERO 538 INT 303 A COLONIA POLANCO V SECCIÓN MIGUEL HIDALGO CIUDAD DE MÉXICO C. P. 11560 MÉXICO | $212,245.00 |
| 256 | INGREDIENTA GOURMET SAPI<br><br>PRADO NORTE 565 COLONIA LOMAS DE CHAPULTEPEC V SECCIÓN MIGUEL HIDALGO CIUDAD DE MÉXICO C. P. 11000 MÉXICO | $2,114.97 |
| 257 | INMOBILIARIA COLINA DE LAS ÁGUILAS SA DE CV<br><br>BUENOS AIRES 2770, 1 PISO B 2770 COLONIA PROVIDENCIA 4TA SECCIÓN GUADALAJARA JALISCO C. P. 44639 MÉXICO | $45,203.45 |
| 258 | INMOBILIARIA SIOR S DE RL DE CV<br><br>ADOLFO RUIZ CORTINES SN COLONIA CENTRO | $107,251.77 |

Scanned with
CamScanner



FORMA A-52

39

JUZGADO PRIMERO DE DISTRITO EN MATERIA DE CONCURSOS MERCANTILES, CON RESIDENCIA EN LA CIUDAD DE MÉXICO Y JURISDICCIÓN EN TODA LA REPÚBLICA MEXICANA

PODER JUDICIAL DE LA FEDERACIÓN

SENTENCIA DECLARACIÓN DE CONCURSO MERCANTIL

CONCURSO MERCANTIL 22/2026-II.

| | | |
|---|---|---|
| | VILLAHERMOSA TABASCO C. P. 86030 MÉXICO | |
| 259 | INNOVACIÓN ECOLÓGICA VERT S DE RL DE CV<br>AV BUENAVISTA 45 COLONIA BUENAVISTA TULTITLÁN ESTADO DE MÉXICO C. P. 54955 MÉXICO | $12,700.00 |
| 260 | INSTALACIONES TORRES SANTANA SA DE CV<br>AVENIDA DE LAS TORRES MANZANA 26 33 COLONIA SANTIAGO ACAHUALTEPEC IZTAPALAPA CIUDAD DE MÉXICO C. P. 09600 MÉXICO | $59,161.25 |
| 261 | INTEGRACIÓN DE ESPACIOS CORPORATIVO SA DE CV<br>AVENIDA NUEVO LEÓN 253 503 COLONIA ESCANDÓN MIGUEL HIDALGO CIUDAD DE MÉXICO C. P. 11800 MÉXICO | $43,445.26 |
| 262 | INTEGRADORES CREATIVOS FÉNIX SA DE CV<br>AVENIDA SAN BERNABÉ 123 COLONIA GUADALUPE INN MAGDALENA CONTRERAS CIUDAD DE MÉXICO C. P. 10200 MÉXICO | $411,667.30 |
| 263 | INTELIGLOBE SA DE CV<br>AVENIDA PASEO DE LA REFORMA 180 PISO 14 COLONIA JUÁREZ CUAUHTÉMOC CIUDAD DE MÉXICO C. P. 06600 MÉXICO | $731,929.26 |
| 264 | INTERFACTURA SAPI DE CV<br>SAN FRANCISCO 170A COLONIA LA FAMA SANTA CATARINA NUEVO LEÓN C. P. 66100 MÉXICO | $16,293.36 |
| 265 | INTERIORES Y FACHADAS ARQUITECTÓNICAS SA DE CV<br>DESCARTES 89 COLONIA LOMAS DE TEPALCAPA ATIZAPÁN DE ZARAGOZA ESTADO DE MÉXICO C. P. 52928 MÉXICO | $13,800.00 |
| 266 | INTERNATIONAL MEDIA SERVICES INC<br>SANTA MÓNICA BLVD 3017 SUITE 201C SANTA MÓNICA CALIFORNIA CALIFORNIA 90404 ESTADOS UNIDOS DE AMÉRICA | $1,644,279.90 |
| 267 | INVERSIONES E INMUEBLES IMPERIAL SA DE CV<br>JUAN JOSÉ TORRES LANDA 3005 COLONIA SAN ISIDRO LEÓN GUANAJUATO C. P. 37530 MÉXICO | $203,856.10 |
| 268 | IPG MEDIA BRANDS COMMUNICATIONS SA<br>AVENIDA MIGUEL DE CERVANTES SAAVEDRA 193 COLONIA GRANADA MIGUEL HIDALGO CIUDAD DE MÉXICO C. P. 11520 MÉXICO | $19,996,606.85 |
| 269 | IPSO MARKETING SC<br>JESÚS DEL MONTE 41 COLONIA HACIENDA DE LAS PALMAS HUIXQUILUCAN ESTADO DE MÉXICO C. P. 52763 MÉXICO | $1,266,403.17 |
| 270 | IRMA SALAZAR MONCAYO<br>AV. LÁZARO CÁRDENAS SUR 506 COLONIA VICTORIA DE DURANGO CENTRO DURANGO DURANGO C. P. 34000 | $76,329.69 |

JUZGADO PRIMERO DE DISTRITO EN MATERIA DE CONCURSOS MERCANTILES, CON RESIDENCIA EN LA CIUDAD DE MÉXICO Y JURISDICCIÓN EN TODA LA REPÚBLICA MEXICANA

Scanned with CamScanner



40

| | | |
|---|---|---|
| | MÉXICO | |
| 271 | ISA MULTIMEDIA SA DE CV<br><br>CULTURAS PREHISPÁNICAS 172 COLONIA GRANJAS DE SAN ANTONIO IZTAPALAPA CIUDAD DE MÉXICO C. P. 09070 MÉXICO | $6,555,335.97 |
| 272 | ISABEL VICTORIA GÓMEZ CHAVIRA<br><br>MORAS 506 COLONIA DEL VALLE CENTRO BENITO JUÁREZ CIUDAD DE MÉXICO C. P. 03100 MÉXICO | $108,607.96 |
| 273 | IVÁN VACA MARTÍNEZ<br><br>AVE LA LAGUNA 131 COLONIA MELCHOR OCAMPO ECATEPEC DE MORELOS ESTADO DE MÉXICO C. P. 55338 MÉXICO | $49,194.00 |
| 274 | JA DEL RIO SC<br><br>SAO PAULO 2373 COLONIA PROVIDENCIA GUADALAJARA JALISCO C. P. 44630 MÉXICO | $150,000.00 |
| 275 | JACKSON WALKER LLP<br><br>ROSS AVE. 2323 SUITE 600 DALLAS, TEXAS DALLAS TEXAS 30989 ESTADOS UNIDOS DE AMÉRICA | $247,804.97 |
| 276 | JAR ELECTRÓNICA APLICADA SA DE CV<br><br>LÁZARO CÁRDENAS 1007 COLONIA VALLE DE SAN AGUSTÍN SAN PEDRO GARZA GARCÍA NUEVO LEÓN C. P. 66278 MÉXICO | $40,897.44 |
| 277 | JERÓNIMO ALVARADO CONSTRUCCIONES Y MONTAJES SA DE CV<br><br>LAGO CHAPALA 2 COLONIA SANTO DOMINGO SANTA MARÍA AJOLOAPAN ESTADO DE MÉXICO C. P. 55754 MÉXICO | $112,198.64 |
| 278 | JESÚS BOCANEGRA SÁNCHEZ<br><br>VENUSTIANO CARRANZA 514 COLONIA EJIDO LA CUCHILLA MUZQUIZ COAHUILA C. P. 26350 MÉXICO | $14,094.00 |
| 279 | JORGE LIRA SÁNCHEZ<br><br>CARLOS HANK GONZÁLEZ 35 COLONIA AMPLIACIÓN COCEM TULTITLAN ESTADO DE MÉXICO C. P. 54913 MÉXICO | $672.80 |
| 280 | JORGE LUIS ALCOCER BERNÉS<br><br>CERRADA DE ILÍADA 56 COLONIA LOMAS DE AXOMIATLA ÁLVARO OBREGÓN CIUDAD DE MÉXICO C. P. 01820 MÉXICO | $22,471.52 |
| 281 | JORGE LUIS PAPAQUI ELIZALDE<br><br>CIRCUITO JUAN PABLO II 429 COLONIA SAN BALTAZAR CAMPECHE PUEBLA PUEBLA C. P. 72550 MÉXICO | $3,193.48 |
| 282 | JORGE RICARDO MÁRQUEZ ORTIZ<br><br>JOHN F KENNEDY 110 COLONIA ISIDRO FABELA TLALPAN CIUDAD DE MÉXICO C. P. 14030 MÉXICO | $3,000.00 |
| 283 | JOSÉ DE JESÚS VILLASEÑOR GUTIÉRREZ<br><br>BOULEVARD ANACLETO GONZÁLEZ FLORES 404 COLONIA COMERCIAL DEL SUR TEPATITLÁN DE MORELOS JALISCO | $324,788.59 |



Scanned with
CamScanner

FORMA A-85

41

JUZGADO PRIMERO DE DISTRITO EN MATERIA DE CONCURSOS MERCANTILES, CON RESIDENCIA EN LA CIUDAD DE MÉXICO Y JURISDICCIÓN EN TODA LA REPÚBLICA MEXICANA

SENTENCIA DECLARACIÓN DE CONCURSO MERCANTIL

CONCURSO MERCANTIL 22/2026-II.

| | | |
|---|---|---|
| | C. P. 47600 MÉXICO | |
| 284 | JOSÉ DOMÍNGUEZ XALATE<br>JUAN DE LA LUZ ENRÍQUEZ SN SN COLONIA EL COCAL SANTIAGO TUXTLA VERACRUZ C. P. 95835 MÉXICO | $37,213.90 |
| 285 | JOSÉ LUIS FERNÁNDEZ LÓPEZ<br>CALZADA VENTURA PUEN 999 COLONIA DEL EMPLEADO MORELIA MICHOACÁN C. P. 58280 MÉXICO | $73,336.85 |
| 286 | JUAN CARLOS HERRERA BALDERAS<br>CALLE NORTE 74 5223 COLONIA BONDOJITO GUSTAVO A MADERO CIUDAD DE MÉXICO C.P. 07850 MÉXICO | $138,762.50 |
| 287 | JUAN JOSÉ GONZÁLEZ GASPAR<br>PORFIRIO DÍAZ 15 COLONIA JARDINES DE ATIZAPÁN ATIZAPÁN DE ZARAGOZA ESTADO DE MÉXICO C. P. 52978 MÉXICO | $77,395.20 |
| 288 | JUAN MANUEL AHUED SODA<br>CRUZ DEL SUR 157 COLONIA PRADO CHURUBUSCO COYOACÁN CIUDAD DE MÉXICO C. P. 04230 MÉXICO | $3,798.77 |
| 289 | JUAN MANUEL NARVÁEZ SANTOS<br>ART 27 30 COLONIA ADALBERTO TEJEDA BOCA DEL RIO VERACRUZ C. P. 94298 MÉXICO | $290.00 |
| 290 | JUDITH JIMÉNEZ RAMÍREZ<br>VICENTE GUERRERO 401 COLONIA TEZONTEPEC CUERNAVACA MORELOS C. P. 62250 MÉXICO | $12,568.60 |
| 291 | JULIÁN VENTOSA TANUS<br>AVENIDA JUÁREZ 2925 COLONIA LA PAZ PUEBLA PUEBLA C. P. 72160 MÉXICO | $304,143.46 |
| 292 | JUNTA GENERAL DE ASISTENCIA<br>HIDALGO 500 COLONIA PACHUCA DE SOTO CENTRO PACHUCA HIDALGO HIDALGO C. P. 42000 MÉXICO | $157,826.75 |
| 293 | JUSTONE SOLUTIONS SAPI DE CV<br>RIO DE LA MAGDALENA 326 208 COLONIA LA OTRA BANDA ÁLVARO OBREGÓN CIUDAD DE MÉXICO C. P. 01090 MÉXICO | $2,042,360.96 |
| 294 | KAMIPET SA DE CV<br>GUILLERMO GONZÁLEZ 600 COLONIA SANTA FE ÁLVARO OBREGÓN CIUDAD DE MÉXICO C.P. 01210 MÉXICO | $10,648,082.81 |
| 295 | KAREN HARFUCH YAPUR<br>PINO 96 COLONIA COLONIA FLORIDA ÁLVARO OBREGÓN CIUDAD DE MÉXICO C. P. 01030 MÉXICO | $4,455.00 |

JUZGADO PRIMERO DE DISTRITO EN MATERIA DE CONCURSOS MERCANTILES, CON RESIDENCIA EN LA CIUDAD DE MÉXICO Y JURISDICCIÓN EN TODA LA REPÚBLICA MEXICANA

Scanned with CamScanner

JUZGADO PRIMERO DE DISTRITO EN MATERIA DE CONCURSOS MERCANTILES, CON RESIDENCIA EN LA CIUDAD DE MÉXICO Y JURISDICCIÓN EN TODA LA REPÚBLICA MEXICANA

SENTENCIA DECLARACIÓN DE CONCURSO MERCANTIL

CONCURSO MERCANTIL 22/2026-II.

43

| | | |
|---|---|---|
| 309 | LIMPIEZA VAL SA DE CV<br>RIO TIBER 38 201 COLONIA CUAUHTÉMOC CUAUHTÉMOC CIUDAD DE MÉXICO C. P. 06500 MÉXICO | $522,240.02 |
| 310 | LIMPIFEX SA DE CV<br>LÁZARO GARZA AYALA 110 COLONIA BARRIO TAMPIQUITO SAN PEDRO NUEVO LEÓN C. P. 66240 MÉXICO | $1,914.00 |
| 311 | LIV GOLF EVENTS LTD<br>SOUTH BANK CENTRAL 30 LONDRES GREATER LONDON SE1 REINO UNIDO | $80,082,900.00 |
| 312 | LIZBETH GARCÍA ESPINOSA<br>DR BALMIS 472 COLONIA DOCTORES CUAUHTÉMOC CIUDAD DE MÉXICO C. P. 06720 MÉXICO | $11,955.00 |
| 313 | LOGICALIS MÉXICO S DE RL DE CV<br>AV EJÉRCITO NACIONAL 678 COLONIA POLANCO IV SECCIÓN MIGUEL HIDALGO CIUDAD DE MÉXICO C. P. 11550 MÉXICO | $14,490,686.12 |
| 314 | LOSADA DOMÍNGUEZ LEONARDO RAMIRO<br>LIBERTAD 612 COLONIA MANTE CENTRO TAMPICO TAMAULIPAS C. P. 89800 MÉXICO | $164,213.68 |
| 315 | MA REMEDIOS GONZÁLEZ MORENO<br>AV DE LOS TANQUES SN COLONIA TORRES DE POTRERO ÁLVARO OBREGÓN CIUDAD DE MÉXICO C. P. 01840 MÉXICO | $32,930.00 |
| 316 | LOYA CHAVIRA DIANA SOLEDAD<br>CUAUHTÉMOC 1 COLONIA HIDALGO DEL PARRAL CENTRO HIDALGO DEL PARRAL CHIHUAHUA C. P. 33800 MÉXICO | $297,049.47 |
| 317 | LUCERO CRISTÓBAL RUIZ<br>FRONTERA SN COLONIA CAMPO MAGALLANES CÁRDENAS TABASCO C. P. 86480 MÉXICO | $10,000.00 |
| 318 | LUIS REY GARCÍA PONCE<br>NIÑOS HÉROES 7 COLONIA SAN BERNARDINO CHALCHIHUAPAN OCOYUCAN PUEBLA C. P. 72850 MÉXICO | $174,978.84 |
| 319 | LUMAIRE SA DE CV<br>CENTRO ESCOLAR MANZANA, LOTE 41 33 COLONIA ZONA ESCOLAR GUSTAVO A MADERO CIUDAD DE MÉXICO C. P. 07230 MÉXICO | $257,767.18 |
| 320 | LUZ MEDICA FARMACÉUTICA Y HOSPITALARIA SA DE CV<br>ÁLVARO OBREGÓN 121 COLONIA ROMA NORTE CUAUHTÉMOC CIUDAD DE MÉXICO C. P. 06700 MÉXICO | $40,145.04 |
| 321 | M AND G HAPPY PEOPLE SA DE CV<br>AVENIDA EL IMÁN 580 COLONIA PEDREGAL DE CARRASCO COYOACÁN CIUDAD DE MÉXICO C. P. 04700 | $3,49... |



JUZGADO PRIMERO DE DISTRITO EN MATERIA DE CONCURSOS MERCANTILES, CON RESIDENCIA EN LA CIUDAD DE MÉXICO Y JURISDICCIÓN EN TODA LA REPÚBLICA MEXICANA


Scanned with CamScanner

44

| | | |
|---|---|---|
| | MÉXICO | |
| 322 | MACROINVERSIONES DE MÉXICO SA DE CV<br><br>CALLE 70 422 COLONIA CENTRO MÉRIDA YUCATÁN C. P. 97000 MÉXICO | $92,800.00 |
| 323 | MAGNITE INC<br><br>BROADWAY 1250 15TH FLOOR NUEVA YORK NEW YORK NUEVA YORK 10001 ESTADOS UNIDOS DE AMÉRICA | $227,353.93 |
| 324 | MAQUINAS DIESEL SA DE CV<br><br>AV. INDUSTRIALES DEL PONIENTE 2300 2300 COLONIA CENTRO SANTA CATARINA NUEVO LEÓN C. P. 66350 MÉXICO | $4,449.05 |
| 325 | MARCOZER SA DE CV<br><br>CIRCUITO MOISÉS SOLANA 790 COLONIA PRADOS DEL MIRADOR QUERÉTARO QUERÉTARO C. P. 76070 MÉXICO | $4,640.00 |
| 326 | MARÍA ALEJANDRA MIGUEL ORTIZ<br><br>CALLE TOTONACAS 347 COLONIA AJUSCO COYOACÁN CIUDAD DE MÉXICO C. P. 04300 MÉXICO | $1,044.23 |
| 327 | MARÍA DEL CARMEN CASTAÑEDA ESPINOSA<br><br>CALLE 2 7 COLONIA EL RODEO TEPIC NAYARIT C. P. 63060 MÉXICO | $93,031.10 |
| 328 | MARÍA EUGENIA MENDOZA HERRERA<br><br>JUÁREZ SUR 216 LOCAL 1 COLONIA TEXCOCO DE MORA CENTRO TEXCOCO ESTADO DE MÉXICO C. P. 56100 MÉXICO | $27,574.36 |
| 329 | MARÍA GUADALUPE LIZARDI RAMONES<br><br>PLAZA DE LA CONSTITUCIÓN 141 COLONIA CENTRO (ÁREA 1) CUAUHTÉMOC CIUDAD DE MÉXICO C. P. 06000 MÉXICO | $8,000.00 |
| 330 | MARÍA HUERTA PÉREZ<br><br>CALLE 3 109 COLONIA BOULEVARES ZACATECAS ZACATECAS C. P. 98065 MÉXICO | $78,775.25 |
| 331 | MARKTUBE SA DE CV<br><br>PRADO NORTE 612 COLONIA LOMAS DE CHAPULTEPEC I SECCIÓN MIGUEL HIDALGO CIUDAD DE MÉXICO C. P. 11000 MÉXICO | $541,176.85 |
| 332 | MARTIN ALMANZA OVIEDO<br><br>GUERRERO SN COLONIA SÓCRATES RIZO GALEANA NUEVO LEÓN C. P. 67850 MÉXICO | $204,134.12 |
| 333 | MARTÍNEZ ORNELAS JUAN MANUEL<br><br>CALLE B 40 INT 2 COLONIA FORTÍN DE LAS FLORES TIJUANA BAJA CALIFORNIA C. P. 22114 MÉXICO | $311,547.83 |
| 334 | MARTÍNEZ ZAVALA JESÚS SALVADOR<br><br>PROFESORA MARÍA MARTÍNEZ 150 COLONIA FRACCIONAMIENTO QUINTA MAGISTERIAL SANTIAGO PAPASQUIARO DURANGO C. P. 34649 MÉXICO | $102,717.56 |
| | MAS MARKETING CONSULTORES SC | |

Scanned with
CS CamScanner



FORMA A-65

45

JUZGADO PRIMERO DE DISTRITO EN MATERIA DE CONCURSOS MERCANTILES, CON RESIDENCIA EN LA CIUDAD DE MÉXICO Y JURISDICCIÓN EN TODA LA REPÚBLICA MEXICANA

SENTENCIA DECLARACIÓN DE CONCURSO MERCANTIL

CONCURSO MERCANTIL 22/2026-II.

| | | |
|---|---|---|
| 335 | PROLONGACIÓN CARLOS SALAZAR PONIENTE 2840 COLONIA CHEPEVERA MONTERREY NUEVO LEÓN C. P. 64030 MÉXICO | $794,347.83 |
| 336 | MASTER CHOICE SA DE CV<br>AV. MAGALLANES 1155 COLONIA SANTA ANITA GUADALAJARA JALISCO C. P. 45600 MÉXICO | $33,667.00 |
| 337 | MATC DIGITAL S DE RL DE CV<br>BOULEVARD MANUEL ÁVILA CAMACHO 32 COLONIA LOMAS DE CHAPULTEPEC MIGUEL HIDALGO CIUDAD DE MÉXICO C. P. 11000 MÉXICO | $168,109.75 |
| 338 | MÁXIMO SEGUNDO ARRIAGA<br>SUR 109-A 652 COLONIA SECTOR POPULAR IZTAPALAPA CIUDAD DE MÉXICO C. P. 09060 MÉXICO | $6,088.70 |
| 339 | MAYA ESQUIVEL JOSÉ LUIS<br>ÁLVARO OBREGÓN 293 COLONIA CENTRO PURÉPERO MICHOACÁN C. P. 58760 MÉXICO | $17,113.70 |
| 340 | MBCS-MAGNA S DE RL DE CV<br>MIGUEL DE CERVANTES SAAVED 193 COLONIA GRANADA MIGUEL HIDALGO CIUDAD DE MÉXICO C. P. 11520 MÉXICO | $1,508,000.00 |
| 341 | MEDIA DEPORTES MÉXICO S DE RL DE CV<br>PERIFÉRICO SUR 4355 COLONIA JARDINES EN LA MONTAÑA TLALPAN CIUDAD DE MÉXICO<br>C. P. 14210 MÉXICO | $10,220,800.22 |
| 342 | MEDIA PARTNER ADVERTISING SL<br>CALLE TINTE 11 D ALCALÁ DE HENARES MADRID MADRID 28801 ESPAÑA | $10,479,274.52 |
| 343 | MEDIARITHMICS<br>AVENUE DE L'OPÉRA 14 PARIS PARIS 75001 FRANCIA | $1,487,762.32 |
| 344 | MEDIASTREAM SPA<br>AV PEDRO DE VALDIVIA 1215 OF 201 REGIÓN METROPOLITANA PROVIDENCIA SANTIAGO PROVIDENCIA 7500917 CHILE | $1,533,330.20 |
| 345 | MEDINA TOBIAS AMPARO<br>MANUEL JOSÉ OTHÓN SN COLONIA CEDRAL CENTRO CEDRAL SAN LUIS POTOSÍ SAN LUIS POTOSÍ C. P. 78520 MÉXICO | $68,400.80 |
| 346 | MEDIO TURNO SA DE CV<br>CERES 19 DEPTO. 101 COLONIA CRÉDITO CONSTRUCTOR BENITO JUÁREZ CIUDAD DE MÉXICO C. P. 03940 MÉXICO | $2,015,691.81 |
| 347 | MELÉNDEZ LÓPEZ SANTOYO Y BARREDA SC<br>TABASCO 117 COLONIA ROMA NORTE CUAUHTÉMOC CIUDAD DE MÉXICO C. P. 06700 MÉXICO | $154,606.80 |

JUZGADO PRIMERO DE DISTRITO EN MATERIA DE CONCURSOS MERCANTILES, CON RESIDENCIA EN LA CIUDAD DE MÉXICO Y JURISDICCIÓN EN TODA LA REPÚBLICA MEXICANA

Scanned with
CamScanner

46

| | | |
|---|---|---|
| 348 | MERK-COM SA DE CV<br>AMORES 1618 COLONIA DEL VALLE CENTRO BENITO JUÁREZ CIUDAD DE MÉXICO C. P. 03100 MÉXICO | $2,320,000.00 |
| 349 | MESINO FIGUEROA REYNA INÉS<br>GÉMINIS MANZANA 13 COLONIA CENTRO ZIHUATANEJO DE AZUETA GUERRERO C. P. 4089 MÉXICO | $13,446.00 |
| 350 | META PLATFORMS IRELAND LL<br>MERRION ROAD 4 DUBLÍN 2 IRLANDA | $7,480.81 |
| 351 | METLIFE MÉXICO SA<br>INSURGENTES SUR 1457 COLONIA INSURGENTES MIXCOAC. BENITO JUÁREZ CIUDAD DE MÉXICO C. P. 03920 MÉXICO | $2,567.10 |
| 352 | MIGUEL ÁNGEL ROSAS ZARATE<br>AVENIDA SALVADOR NAVA MARTÍNEZ 1333 COLONIA SANTA FE SUR SAN LUIS POTOSÍ SAN LUIS POTOSÍ C. P. 78350 MÉXICO | $11,959.60 |
| 353 | MIJARES ANGOITIA CORTES Y FUENTES SC<br>JAVIER BARRO 540 COLONIA SANTA FE ÁLVARO OBREGÓN CIUDAD DE MÉXICO C. P. 01210 MÉXICO | $139,200.00 |
| 354 | MILES MÉXICO AMÉRICA VIAJES SA DE CV<br>MINNESOTA 3 COLONIA NÁPOLES BENITO JUÁREZ CIUDAD DE MÉXICO C. P. 03810 MÉXICO | $41,688.00 |
| 355 | MM ESPACIOS PUBLICITARIOS SA DE CV<br>JUAN VÁZQUEZ DE MELLA 481 205 COLONIA POLANCO II SECCIÓN MIGUEL HIDALGO CIUDAD DE MÉXICO C. P. 11530 MÉXICO | $2,726,298.55 |
| 356 | MÓNICA GUADALUPE RUIZ MORALES<br>7A. SUR PONIENTE 22 COLONIA CENTRO LAS MARGARITAS CHIAPAS C. P. 30187 MÉXICO | $65,708.59 |
| 357 | MONROY GÓMEZ MARÍA DEL ROCÍO<br>TEXCOCO 257 COLONIA CLAVERÍA AZCAPOTZALCO CIUDAD DE MÉXICO C. P. 02080 MÉXICO | $63,374.00 |
| 358 | MONTERO GUERRA MARÍA LUISA<br>CIRCUITO EL CAMPEADOR 327 COLONIA FRACC. EL CID MAZATLÁN SINALOA CULIACÁN SINALOA C. P. 82110 MÉXICO | $22,439.67 |
| 359 | MORENO VILLANUEVA ARTURO<br>BRADLEY 44 COLONIA ANZURES MIGUEL HIDALGO CIUDAD DE MÉXICO C. P. 11590 MÉXICO | $170,349.65 |
| 360 | MOST PUBLICIDAD SA DE CV<br>PASEO DE LOS TAMARINDOS 384 COLONIA COOPERATIVA PALO ALTO CUAJIMALPA DE MORELOS CIUDAD DE MÉXICO C. P. 05110 MÉXICO | $10,104,422.64 |
| 361 | MUEVE ARQUITECTURA SA DE CV<br>EJERCITO NACIONAL 505 COLONIA GRANADA MIGUEL | $375,705.03 |



Scanned with
CS CamScanner



FORMA A-65

47

JUZGADO PRIMERO DE DISTRITO EN MATERIA DE CONCURSOS MERCANTILES, CON RESIDENCIA EN LA CIUDAD DE MÉXICO Y JURISDICCIÓN EN TODA LA REPÚBLICA MEXICANA

SENTENCIA DECLARACIÓN DE CONCURSO MERCANTIL

CONCURSO MERCANTIL 22/2026-II.

| | | |
|---|---|---|
| | HIDALGO CIUDAD DE MÉXICO C. P. 11520 MÉXICO | |
| 362 | MUNICIPIO DE CHINA STDS<br>PALACIO MUNICIPAL SN SN COLONIA CENTRO CHINA NUEVO LEÓN C. P. 67050 MÉXICO | $50,000.00 |
| 363 | MUNICIPIO DE HUEHUETAN CHIAPAS<br>PALACIO MUNICIPAL SN COLONIA HUEHUETAN HUEHUETAN. CHIAPAS C. P. 30660 MÉXICO | $139,200.00 |
| 364 | MUNICIPIO DE TECOMAN COLIMA STDS<br>MEDELLÍN 280 COLONIA TECOMAN CENTRO TECOMAN COLIMA C. P. 28100 MÉXICO | $15,000.00 |
| 365 | MURGUÍA Y ASOCIADOS SC<br>BUENOS AIRES 27701 COLOMA PROVIDENCIA GUADALAJARA JALISCO C. P. 44630 MÉXICO | $740,723.51 |
| 366 | MURIS SALINAS CONSULTORES SC<br>LINCOLN 4343 COLONIA NUEVO LAREDO SAN RAFAEL TAMAULIPAS C. P. 88200 MÉXICO | $193,758.00 |
| 367 | NADER HAYAUX Y GOEBEL SC<br>PASEO DE LOS TAMARINDOS 400 PISO 7 COLONIA BOSQUES DE LAS LOMAS CUAJIMALPA DE MORELOS CIUDAD DE MÉXICO C. P. 05120 MÉXICO | $409,465.65 |
| 368 | NATIVE ADS DE MÉXICO SA DE CV<br>BAJA CALIFORNIA 274 PISO 2 COLONIA HIPÓDROMO CUAUHTÉMOC CIUDAD DE MÉXICO C.<br>P. 06100 MÉXICO | $2,018,400.00 |
| 369 | NAZIFH DIGITAL ROOM SA DE CV<br>ADOLFO PRIETO 1415 COLONIA TLACOQUEMECATL BENITO JUÁREZ CIUDAD DE MÉXICO<br>C. P. 03200 MÉXICO | $397,211.84 |
| 370 | NEW MEDICAL HEALTH SERVICES SA DE CV<br>FELIPE VILLANUEVA 88 4 COLONIA GUADALUPE INN ÁLVARO OBREGÓN CIUDAD DE MÉXICO C. P. 01020 MÉXICO | $52,666.25 |
| 371 | NEXT TELEKOM SAPI DE CV<br>DAVID ALFARO SIQUEIROS 104 COLONIA DEL VALLE SECTOR ORIENTE SAN PEDRO GARZA GARCÍA NUEVO LEÓN C. P. 66269 MÉXICO | $54,720.00 |
| 372 | NIMIROVSKI SHARON ISRAEL 758 TELAVIT ISRAEL | $73,755.79 |
| 373 | NOMAD AGENCY INC<br>COASTAL 6192 LEWES DELAWARE DELAWARE 19958 INGLATERRA | $176,182.38 |
| | NOTARIA 185 CDMX SC | |

48



| 374 | ALBORADA 124 COLONIA PARQUE DEL PEDREGAL TLALPAN CIUDAD DE MÉXICO C. P. 14010 MÉXICO | $4,231.21 |
|---|---|---|
| 375 | NOTARIAS 211 Y 135 DE LA CDMX SC<br><br>PROVIDENCIA 1000 COLONIA DEL VALLE CENTRO BENITO JUÁREZ CIUDAD DE MÉXICO C.P. 03100 MÉXICO | $115,000.00 |
| 376 | NOTICIAS AS MÉXICO SA DE CV<br><br>PASEO DE LA REFORMA, PISO 6 231 COLONIA CUAUHTÉMOC CUAUHTÉMOC CIUDAD DE MÉXICO C. P. 06500 MÉXICO | $5,365,833.39 |
| 377 | NOVELO DZIB MIGUEL ÁNGEL<br><br>16 119 COLONIA VALLADOLID CENTRO VALLADOLID YUCATÁN C. P. 97780 MÉXICO | $4,050.00 |
| 378 | NVG NETWORK, SA DE CV<br><br>INSURGENTES SUR 1458 COLONIA ACTIPAN BENITO JUÁREZ CIUDAD DE MÉXICO C. P. 03230 MÉXICO | $50,000.00 |
| 379 | OF LIMPIEZA PROFESIONAL SA DE CV<br><br>PROVIDENCIA 400 DEPTO. 403 COLONIA DEL VALLE CENTRO BENITO JUÁREZ CIUDAD DE MÉXICO C. P. 03100 MÉXICO | $177,244.15 |
| 380 | OFFICE TIENDA DIGITAL SA DE CV<br><br>DIVISIÓN DEL NORTE 500 COLONIA CHIHUAHUA CHIHUAHUA CHIHUAHUA C. P. 31203 MÉXICO | $4,195.56 |
| 381 | OMG DIVERSIFIED SERVICES GROUP SA DE CV<br><br>GUILLERMO GONZÁLEZ CAMA 800 COLONIA SANTA FE ÁLVARO OBREGÓN CIUDAD DE MÉXICO C. P. 01210 MÉXICO | $10,672,000.00 |
| 382 | OMNI PRINTER SA DE CV<br><br>MONZON 173 COLONIA CERRO DE LA ESTRELLA IZTAPALAPA CIUDAD DE MÉXICO C. P. 09860 MÉXICO | $139,383.58 |
| 383 | OMORFI 20I SA DE CV<br><br>MONTECITO 38 P-24 OF-28 COLONIA NÁPOLES BENITO JUÁREZ CIUDAD DE MÉXICO C. P. 03810 MÉXICO | $1,500.01 |
| 384 | OPERADORA DE CINEMAS SA DE CV<br><br>JAVIER BARROS SIERRA 540 COLONIA SANTA FE ÁLVARO OBREGÓN CIUDAD DE MÉXICO. C. P. 01210 MÉXICO | $2,838,493.09 |
| 385 | OPERADORA DE SERVICIOS RITZEN SA DE CV<br><br>CIRCUITO CIRCUNVALACIÓN PONIENTE 8 COLONIA CIUDAD SATÉLITE NAUCALPAN DE JUÁREZ ESTADO DE MÉXICO C. P. 53100 MÉXICO | $942,183.36 |
| 386 | OPTIMUM MEDIA DIRECTION DE MÉXICO SA DE CV<br><br>GUILLERMO GONZÁLEZ CAMARENA 800 COLONIA SANTA FE ÁLVARO OBREGÓN CIUDAD DE MÉXICO C. P. 01210 MÉXICO | $32,334,712.45 |
| 387 | OSCAR ALEJANDRO TURRUBIATES ROSAS<br><br>PRIMERO DE MAYO 110 COLONIA GUADALUPE VICTORIA | $497,859.62 |

Scanned with  CamScanner



FORMA A-55

49

JUZGADO PRIMERO DE DISTRITO EN MATERIA DE CONCURSOS MERCANTILES, CON RESIDENCIA EN LA CIUDAD DE MÉXICO Y JURISDICCIÓN EN TODA LA REPÚBLICA MEXICANA

SENTENCIA DECLARACIÓN DE CONCURSO MERCANTIL

CONCURSO MERCANTIL 22/2026-II.

| | | |
|---|---|---|
| | TAMPICO TAMAULIPAS C. P. 8908 MÉXICO | |
| 388 | OSCAR ARIEL ARÉVALO MOTA <br> SANTANA 62 5 COLONIA SAN MIGUEL TECAMACHALCO NAUCALPAN DE JUÁREZ ESTADO DE MÉXICO C. P. 53970 MÉXICO | $45,000.00 |
| 389 | OTELO ADMINISTRACIÓN DE NEGOCIOS SC <br> RIO ELBA 10 COLONIA CUAUHTÉMOC CUAUHTÉMOC CIUDAD DE MÉXICO C. P. 06500 MÉXICO | $57,409.46 |
| 390 | OUT OF HOME DIGITAL SAPI DE CV <br> REFORMA 36 COLONIA JUÁREZ CUAUHTÉMOC CIUDAD DE MÉXICO C. P. 06600 MÉXICO | $14,100.00 |
| 391 | PABLO ZEHLE GONZÁLEZ <br> CIRCUITO DE LAS HACIENDAS NORTE 4 COLONIA TEQUISQUIAPAN TEQUISQUIAPAN QUERÉTARO C. P. 76795 MÉXICO | $25,770.01 |
| 392 | PADILLA GONZÁLEZ JOSÉ PRAXEDIS <br> SÁNCHEZ TABOADA 1600 COLONIA ZONA RIO TIJUANA BAJA CALIFORNIA C. P. 22000 MÉXICO | $337,834.70 |
| 393 | PADUA SOPORTE SC <br> XOCHICALCO 674 COLONIA LETRÁN VALLE BENITO JUÁREZ CIUDAD DE MÉXICO C. P. 03650 MÉXICO | $15,003.75 |
| 394 | PANAMSAT DE MÉXICO S DE RL DE CV <br> JORGE JIMÉNEZ CANTÚ MZ 14 LT 14 COLONIA LOMAS DE VALLE ESCONDIDO ATIZAPÁN DE ZARAGOZA ESTADO DE MÉXICO C. P. 52930 MÉXICO | $2,828,127.61 |
| 395 | PAPELERA PRINCIPADO SA DE CV <br> TLÁHUAC 84 COLONIA SANTA ISABEL INDUSTRIAL IZTAPALAPA CIUDAD DE MÉXICO C. P. 09820 MÉXICO | $343.48 |
| 396 | PAULINA CONDE LUGO <br> DEL MEZQUITAL MZ 6 LOTE 27 COLONIA VALLE DE SAN JAVIER 6A SECCIÓN PACHUCA DE SOTO HIDALGO C. P. 42086 MÉXICO | $62,103.13 |
| 397 | PAVILION DISEÑO Y ARQUITECTURA SA DE CV <br> INSURGENTES SUR 303 COLONIA HIPÓDROMO CUAUHTÉMOC CIUDAD DE MÉXICO C. P. 06100 MÉXICO | $75,337.89 |
| 398 | PÉREZ FRANCO JUAN MANUEL <br> ALMERÍA 239 COLONIA EL DORADO 1RA SECC AGUASCALIENTES AGUASCALIENTES C. P. 20235 MÉXICO | $41,218.76 |
| 399 | PINTO Y SHEHOAH SC <br> DURANGO 245 11 COLONIA ROMA NORTE CUAUHTÉMOC CIUDAD DE MÉXICO C. P. 06700 MÉXICO | $176,000.00 |

JUZGADO PRIMERO DE DISTRITO EN MATERIA DE CONCURSOS MERCANTILES, CON RESIDENCIA EN LA CIUDAD DE MÉXICO Y JURISDICCIÓN EN TODA LA REPÚBLICA MEXICANA



50

| | | |
|---|---|---|
| 400 | PLANNING SOLUTIONS SC<br><br>CALLE DE LOS MONTES ALTOS 6913 COLONIA RESIDENCIAL CUMBRES III CHIHUAHUA CHIHUAHUA C. P. 31216 MÉXICO | $141,538.49 |
| 401 | PLATÓN ADMINISTRACIÓN Y DIRECCIÓN EMPRESARIAL SC<br><br>MIGUEL ÁNGEL DE QUEVEDO 24 COLONIA EXHACIENDA DE GUADALUPE CHIMALISTAC ÁLVARO OBREGÓN CIUDAD DE MÉXICO C. P. 01050 MÉXICO | $344,132.34 |
| 402 | PPLACE TECHNOLOGIES S DE RL DE CV<br><br>AV. PASEO DE LA REFORMA 296 COLONIA JUÁREZ CUAUHTÉMOC CIUDAD DE MÉXICO C. P 06600 MÉXICO | $3,936,550.00 |
| 403 | PRACTICAL HOME AND INDUSTRY SANITARY SA DE CV<br><br>EMILIANO ZAPATA 1012 COLONIA AMPLIACIÓN MOMOXPAN SAN PEDRO CHOLULA PUEBLA<br><br>C. P. 72760 MÉXICO | $35,087.50 |
| 404 | PRAKE CONSULTORES Y ASESORES SA DE CV<br><br>RUBÉN DARÍO 1109 COLONIA PROVIDENCIA GUADALAJARA CIUDAD DE MÉXICO C. P. 44630 MÉXICO | $1,276,000.00 |
| 405 | PRODUCCIÓN AND DISTRIBUCIÓN CORP<br><br>12480 NW 25TH STREET 12480 SUITE 115 DORAL FLORIDA MIAMI 33178 ESTADOS UNIDOS DE AMÉRICA | $26,694.30 |
| 406 | PRODUCCIÓN BTL SA DE CV<br><br>PERIFÉRICO SUR 4349 LOC 13 COLONIA JARDINES EN LA MONTAÑA TLALPAN CIUDAD DE MÉXICO C. P. 14210 MÉXICO | $11,612.70 |
| 407 | PRODUCTOS METÁLICOS STEELE SA DE CV<br><br>BLVD MIGUEL DE CERVANTES SAAVEDRA 183 COLONIA GRANADA MIGUEL HIDALGO CIUDAD DE MÉXICO C. P. 11520 MÉXICO | $123,739.30 |
| 408 | PROEPTA SA DE CV<br><br>GALILEO 11 COLONIA POLANCO V SECCIÓN MIGUEL HIDALGO CIUDAD DE MÉXICO C. P. 11560 MÉXICO | $2,252.49 |
| 409 | PROMOTORA DE BIENES Y SERVICIOS DELTA SA DE CV<br><br>AGUIRRE LAREDO 6715 COLONIA PARTIDO LA FUENTE B JUÁREZ CHIHUAHUA C. P. 32370 MÉXICO | $60,138.20 |
| 410 | PROTELECOM, SA DE CV<br><br>PARQUE DE MARBELLA 17 COLONIA PARQUES DE LA HERRADURA HUIXQUILUCAN CIUDAD DE MÉXICO C. P. 52786 MÉXICO | $47,480.26 |
| 411 | PROTESA SERVICIOS ESPECIALIZADOS EN EQUIPO GASTRONÓMICO S DE RL DE CV ABELARDO RODRÍGUEZ 286 COLONIA VICENTE VILLADA NEZAHUALCÓYOTL ESTADO DE MÉXICO C. P. 57710 MÉXICO | $37,393.76 |
| 412 | PUBLICA ADVERTISING SA DE CV<br><br>PASEO DE LA REFORMA 115 1703 COLONIA LOMAS DE | $30,372,962.61 |

Scanned with
CamScanner



FORMA A-85

51

JUZGADO PRIMERO DE DISTRITO EN MATERIA DE CONCURSOS MERCANTILES, CON RESIDENCIA EN LA CIUDAD DE MÉXICO Y JURISDICCIÓN EN TODA LA REPÚBLICA MEXICANA

SENTENCIA DECLARACIÓN DE CONCURSO MERCANTIL

CONCURSO MERCANTIL 22/2026-II.

| | | |
|---|---|---|
| | CHAPULTEPEC I SECCIÓN MIGUEL HIDALGO CIUDAD DE MÉXICO C. P. 11000 MÉXICO | |
| 413 | PUBLICIDAD VIRTUAL SA DE CV<br>PROLONGACIÓN BOSQUES DE LA REFORMA 1813 COLONIA LOMAS DE VISTA HERMOSA CUAJIMALPA DE MORELOS CIUDAD DE MÉXICO C. P. 05100 MÉXICO | $14,987,563.89 |
| 414 | PUBLIMAX SA DE CV<br>RIO TAMESÍ 300 COLONIA COL. MÉXICO MONTERREY NUEVO LEÓN C. P. 64740 MÉXICO | $7,740,796.90 |
| 415 | PURPOSE FINANCIAL INC<br>N CHURCH STREET SPARTANBURG 135 CAROLINA DEL SUR CAROLINA DEL SUR CAROLINA DEL SUR 29304 ESTADOS UNIDOS DE AMÉRICA | $1,086,674.41 |
| 416 | PYM EN SISTEMAS ELÉCTRICOS Y DE POTENCIA SA DE CV<br>DIECISÉIS 73 COLONIA AMPLIACIÓN PROGRESO NACIONAL GUSTAVO A MADERO CIUDAD DE MÉXICO C. P. 07650 MÉXICO | $658,776.27 |
| 417 | QM-ADJUSTERS<br>MELCHOR OCAMPO 430 COLONIA ROMERO DE TERREROS COYOACÁN CIUDAD DE MÉXICO C. P. 04310 MÉXICO | $19,984.48 |
| 418 | QUÍMICA MEXICANA INDUSTRIAL SA DE CV<br>CARRETERA CUAUTITLÁN TEOLOYUCAN 4 COLONIA FRACC IND XHALA CUAUTITLÁN IZCALLI ESTADO DE MÉXICO C. P. 54750 MÉXICO | $19,387.64 |
| 419 | RÍOS ABOGADOS SC<br>HALLEY 21 COLONIA ANZURES MIGUEL HIDALGO CIUDAD DE MÉXICO C. P. 11590 MÉXICO | $121,800.00 |
| 420 | RACKSPACE INTERNATIONAL GMBH<br>PFINGSTWEIDSTRASSE 60 ZÜRICH ZÜRICH SCHYZ 8005 SUIZA | $4,310,700.92 |
| 421 | RADIO PUBLICIDAD XH MÉXICO SA DE CV<br>CONSTITUYENTES 1154 PISO 10 COLONIA LOMAS ALTAS MIGUEL HIDALGO CIUDAD DE MÉXICO C. P. 11950 MÉXICO | $465,049.96 |
| 422 | RAEC LOGÍSTICA EN EVENTOS S DE RL DE CV<br>CALLE DURANGO 84 COLONIA ROMA NORTE CUAUHTÉMOC CIUDAD DE MÉXICO C. P. 06700 MÉXICO | $417,333.40 |
| 423 | RAK SA DE CV<br>ING. MILITARES 70 COLONIA ARGENTINA PONIENTE MIGUEL HIDALGO CIUDAD DE MÉXICO<br>C. P. 11230 MÉXICO | $148,112.16 |
| 424 | RED POINT MED SA DE CV | |

JUZGADO PRIMERO DE DISTRITO EN MATERIA DE CONCURSOS MERCANTILES, CON RESIDENCIA EN LA CIUDAD DE MÉXICO Y JURISDICCIÓN EN TODA LA REPÚBLICA MEXICANA

Scanned with
CamScanner

52



| | | | |
|---|---|---|---|
| | JUAN RUIZ DE ALARCÓN 1817 COLONIA SATÉLITE PUEBLA PUEBLA C. P. 72320 MÉXICO | $28,307,550.75 | |
| 425 | REDS COMM SA DE CV<br><br>ÓPALO 1736 COLONIA JUÁREZ BONANZA CHIHUAHUA C. P. 32472 MÉXICO | $21,000.00 | |
| 426 | RENTAS DEL PEDREGAL SA DE CV<br><br>BOULEVARD ROCHA CORDE 305 COLONIA PRIVADAS DEL PEDREGAL SAN LUIS POTOSÍ SAN LUIS POTOSÍ C. P. 78295 MÉXICO | $54,972.21 | |
| 427 | RHCORP SA DE CV<br><br>PAPAGAYO 607 COLONIA MAZATLÁN FERROCARRILERA SINALOA C. P. 82013 MÉXICO | $28,842.24 | |
| 428 | RIBESA CORPORATION<br><br>INDUSTRY AV 14408 TEXAS CALIFORNIA 78045 ESTADOS UNIDOS DE AMÉRICA | $192,198.96 | |
| 429 | RICARDO ALEJANDRO SALAZAR VALDEZ<br><br>13 73 COLONIA JARDINES DE SANTA CLARA ECATEPEC DE MORELOS ESTADO DE MÉXICO. C. P. 55450 MÉXICO | $37,905.91 | |
| 430 | RIVERA GAXIOLA ABOGADOS SC<br><br>BOULEVARD MANUEL ÁVILA 32 COLONIA LOMAS DE CHAPULTEPEC III SECCIÓN MIGUEL HIDALGO CIUDAD DE MÉXICO C. P. 11000 MÉXICO | $7,844,564.96 | |
| 431 | RNR OPERACIONES SA DE CV<br><br>SÓCRATES 378 COLONIA POLANCO V SECCIÓN MIGUEL HIDALGO CIUDAD DE MÉXICO C.P. 11560 MÉXICO | $2,660,271.50 | |
| 432 | RODRIGO UWALDO QUINTANA YÁNEZ<br><br>AVENIDA 20 DE NOVIEMBRE 3112 COLONIA JARAMILLO NUEVO CASAS GRANDES CHIHUAHUA C. P. 31758 MÉXICO | $13,446.00 | |
| 433 | ROGELIO MÁRQUEZ GUZMÁN<br><br>SAN BENJAMÍN MZ 629 LT 9 COLONIA PEDREGAL DE SANTA ÚRSULA COYOACÁN CIUDAD DE MÉXICO C. P. 04600 MÉXICO | $13,456.00 | |
| 434 | ROHDE AND SCHWARZ DE MÉXICO S DE RL DE CV<br><br>JAVIER BARROS 540 PISO 8 OFNA 804 COLONIA SANTA FE ÁLVARO OBREGÓN CIUDAD DE MÉXICO C. P. 01210 MÉXICO | $162,059.32 | |
| 435 | ROTOPLAS SA DE CV<br><br>CALLE ANÁHUAC 91 COLONIA EL MIRADOR COYOACÁN CIUDAD DE MÉXICO C. P. 04950 MÉXICO | $120,927.68 | |
| 436 | RUBRICA MEDIA MARKET SA DE CV<br><br>JESÚS DEL MONTE 39 PISO 2B COLONIA JESÚS DEL MONTE HUIXQUILUCAN ESTADO DE MÉXICO C. P. 52764 MÉXICO | $155,531.65 | |
| 437 | RUY ALONSO REBOLLEDO<br><br>VERACRUZ, DEPTO 304 7 COLONIA CONDESA CUAUHTÉMOC CIUDAD DE MÉXICO C. P. 06140 MÉXICO | $69,600.00 | |

Scanned with
CS CamScanner



FORMA A-65

53

JUZGADO PRIMERO DE DISTRITO EN MATERIA DE CONCURSOS MERCANTILES, CON RESIDENCIA EN LA CIUDAD DE MÉXICO Y JURISDICCIÓN EN TODA LA REPÚBLICA MEXICANA

SENTENCIA DECLARACIÓN DE CONCURSO MERCANTIL

CONCURSO MERCANTIL 22/2026-II.

| | | |
|---|---|---|
| 438 | SAGA DEL CUPATITZIO SA DE CV<br><br>MACARENA 32 COLONIA EL INGUAMBO URUAPAN MICHOACÁN C. P. 60130 MÉXICO | $84,000.00 |
| 439 | SALESFORCE COM INC<br><br>MISSION STREET 415 3RD. FLOOR SAN FRANCISCO SAN FRANCISCO SAN FRANCISCO, CA 94105 ESTADOS UNIDOS DE AMÉRICA | $3,589,998.42 |
| 440 | SALVADOR ÁNGELES IRIGOYEN<br><br>RIO SAN ÁNGEL 86 B COLONIA GUADALUPE INN ÁLVARO OBREGÓN CIUDAD DE MÉXICO C.<br><br>P. 01020 MÉXICO | $161,058.00 |
| 441 | SAN PANCHO LAB SA DE CV<br><br>PL. VILLA DE MADRID 1 COLONIA ROMA NORTE CUAUHTÉMOC CIUDAD DE MÉXICO C. P. 06700 MÉXICO | $178,751.74 |
| 442 | SÁNCHEZ QUIJANO MIGUEL ÁNGEL<br><br>EMILIANO ZAPATA 188 COLONIA CUAUTEPEC DE HINOJOSA LA ESPERANZA HIDALGO C. P. 43740 MÉXICO | $12,450.00 |
| 443 | SANDRA ANDREA ELIZABETH ORTIZ LÓPEZ<br><br>CALLE TEMASCALILLO MZ 14 COLONIA CRUZ DEL FAROL TLALPAN CIUDAD DE MÉXICO C.P. 14248 MÉXICO | $17,247.40 |
| 444 | SATÉLITES MEXICANOS SA DE CV<br><br>AV. PASEO DE LA REFORMA 222 COLONIA JUÁREZ CUAUHTÉMOC CIUDAD DE MÉXICO C. P 06600 MÉXICO | $1,015,771.50 |
| 445 | SD ORIENTE SA DE CV<br><br>SAN JERÓNIMO 538 PISO 1 COLONIA JARDINES DEL PEDREGAL ÁLVARO OBREGÓN CIUDAD DE MÉXICO C. P. 01900 MÉXICO | $145,572.27 |
| 446 | SECRETARIA DE FINANZAS DE LA CIUDAD DE MÉXICO<br><br>PLAZA DE LA CONSTITUCIÓN 1 COLONIA CENTRO (ÁREA 1) CUAUHTÉMOC CIUDAD DE MÉXICO C. P. 06000 MÉXICO | $4,213.01 |
| 447 | SEGUIMIENTO TEMÁTICO SA DE CV<br><br>SANTA CATALINA 328 COLONIA INSURGENTES SAN BORJA BENITO JUÁREZ CIUDAD DE MÉXICO C. P. 03100 MÉXICO | $39,107.19 |
| 448 | SEGURIDAD CORPORATIVA ALERTA SA DE CV<br><br>PADRE MIER PONIENTE 866 COLONIA CENTRO MONTERREY NUEVO LEÓN C. P. 64000 MÉXICO | $162,237.35 |
| 449 | SELLCOM SOLUTIONS MÉXICO SA DE CV<br><br>JESÚS DEL MONTE 7 COLONIA FRACC HACIENDA DE LAS PALMAS HUIXQUILUCAN ESTADO DE MÉXICO C. P. 52763 MÉXICO | $35,292.00 |

JUZGADO PRIMERO DE DISTRITO EN MATERIA DE CONCURSOS MERCANTILES, CON RESIDENCIA EN LA CIUDAD DE MÉXICO Y JURISDICCIÓN EN TODA LA REPÚBLICA MEXICANA

54



| | | |
|---|---|---|
| 450 | SERTRES DEL NORTE SA DE CV<br>CALLE 18 67 COLONIA SAN PEDRO DE LOS PINOS BENITO JUÁREZ CIUDAD DE MÉXICO C.<br>P. 03800 MÉXICO | $617,111.62 |
| 451 | SERVICIO PROFESIONAL VLH DE MÉXICO SA DE CV<br>LAGO ZÚRICH 219 COLONIA AMPLIACIÓN GRANADA MIGUEL HIDALGO CIUDAD DE MÉXICO<br>C. P. 11529 MÉXICO | $14,026,642.94 |
| 452 | SERVICIO Y MANTENIMIENTO DE MOTOS SA DE CV<br>CHIHUAHUA 200 COLONIA ROMA NORTE CUAUHTÉMOC CIUDAD DE MÉXICO C. P. 06700 MÉXICO | $8,480.00 |
| 453 | SERVICIOS BROXEL SAPI DE CV<br>AV MARIO PANI 400 PISO 1 COLONIA SANTA FE CUAJIMALPA CUAJIMALPA DE MORELOS CIUDAD DE MÉXICO C. P. 05348 MÉXICO | $205,619.60 |
| 454 | SERVICIOS ESPECIALIZADOS DE INGENIERÍA Y SUPERVISIÓN SA DE CV<br>AV. CHAPULTEPEC 153 107 COLONIA JUÁREZ CUAUHTÉMOC CIUDAD DE MÉXICO C. P. 06600 MÉXICO | $47,067.89 |
| 455 | SERVICIOS INTEGRALES DE INFORMACIÓN ESTRATÉGICA DE NEGOCIOS ALC SC BOULEVARD DE LOS REYES 6206 COLONIA SAN MARTINITO SAN ANDRÉS CHOLULA PUEBLA C. P. 72825 MÉXICO | $131,078.75 |
| 456 | SERVICIOS PHILLY SA DE CV<br>COYOACÁN 1704.COLONIA DEL VALLE CENTRO BENITO JUÁREZ CIUDAD DE MÉXICO C. P. 03100 MÉXICO | $258,446.13 |
| 457 | SERVICIOS PROFESIONALES AH KIM PECH SA DE CV<br>AV CENTRAL 168-A COLONIA SAN JOSÉ CAMPECHE CAMPECHE C. P. 24040 MÉXICO | $6,920.34 |
| 458 | SI VALE MÉXICO SA DE CV<br>PASEO DE LA REFORMA 284 PISO 23 COLONIA JUÁREZ CUAUHTÉMOC CIUDAD DE MÉXICO. C. P. 06600 MÉXICO | $7,412.04 |
| 459 | SIMILARWEB LTD<br>MENACHEM BEGI FLOOR 41 121 TEL AVIV 6701203 ISRAEL | $226,599.01 |
| 460 | SISTEMAS CONTINO DEL PACÍFICO SA DE CV<br>PASEO RIO SONORA SUR 170 COLONIA PROYECTO RIO SONORA HERMOSILLO SONORA C.P. 83270 MÉXICO | $4,093.77 |
| 461 | SISTEMAS DIGITALES EN AUDIO Y VIDEO SA DE CV<br>PESTALOZZI 245 COLONIA NARVARTE PONIENTE BENITO JUÁREZ CIUDAD DE MÉXICO C.P. 03020 MÉXICO | $257,511.12 |
| 462 | SITEC-LII Y ASOCIADOS SC<br>INSURGENTES SUR 1855 COLONIA GUADALUPE INN ÁLVARO OBREGÓN CIUDAD DE MÉXICO C. P. 01020 MÉXICO | $14,808,189.55 |

Scanned with CamScanner



FORMA A-65

55

JUZGADO PRIMERO DE DISTRITO EN MATERIA DE CONCURSOS MERCANTILES, CON RESIDENCIA EN LA CIUDAD DE MÉXICO Y JURISDICCIÓN EN TODA LA REPÚBLICA MEXICANA

SENTENCIA DECLARACIÓN DE CONCURSO MERCANTIL
CONCURSO MERCANTIL 22/2026-II.

| 463 | SKAXI SA DE CV<br><br>MELCHOR OCAMPO 228 202 COLONIA CUAUHTÉMOC CUAUHTÉMOC CIUDAD DE MÉXICO. C. P. 06500 MÉXICO | $314,991.28 |
|---|---|---|
| 464 | SNOWFLAKE INC<br><br>450 CONCAR DRIVE 450 SAN MATEO CALIFORNIA 94402 ESTADOS UNIDOS DE AMÉRICA | $213,554.40 |
| 465 | SOCIEDAD OPERADORA DE LA TORRE DE CHIAPAS SA DE CV<br><br>BOULEVARD ANDRÉS SERRA ROJAS 1090 COLONIA COL. PASO LIMÓN TUXTLA GUTIÉRREZ CHIAPAS C. P. 29045 MÉXICO | $116,863.45 |
| 466 | SOLUCIONES CARROT S DE RL DE CV<br><br>CAMINO A SAN PEDRO MÁRTIR 184 COLONIA CHIMALCOYOC TLALPAN CIUDAD DE MÉXICO. C. P. 14630 MÉXICO | $234,330.71 |
| 467 | SOLUCIONES CREATIVAS MALAK S DE RL<br><br>EDUARDO PALLARES Y P 207 COLONIA SAN LUCAS COYOACÁN CIUDAD DE MÉXICO C. P. 04030 MÉXICO | $920,641.64 |
| 468 | SOLUCIONES DE IMAGEN APLIK SA DE CV<br><br>DE LA NARANJA 1 BODEGA E COLONIA INDUSTRIAL ALCE BLANCO NAUCALPAN DE JUÁREZ CIUDAD DE MÉXICO C. P. 53370 MÉXICO | $24,313.03 |
| 469 | SOLUCIONES EN MEDIOS MASIVOS SA DE CV<br><br>AVENIDA LÓPEZ MATEOS NORTE 530 COLONIA LADRÓN DE GUEVARA GUADALAJARA JALISCO C. P. 44600 MÉXICO | $150,983.99 |
| 470 | SOLUCIONES INTEGRALES ELYM S DE RL DE CV<br><br>CAMINO DEL ÉXITO 19 COLONIA CAMPESTRE ARAGÓN GUSTAVO A MADERO CIUDAD DE MÉXICO C. P. 07530 MÉXICO | $44,568.75 |
| 471 | SONY DE MÉXICO SA DE CV<br><br>AVENIDA LA FE 50 COLONIA SANTA FE ÁLVARO OBREGÓN CIUDAD DE MÉXICO C. P. 01210 MÉXICO | $146,646.59 |
| 472 | SRI LEGAL SC<br><br>TONALÁ 177 177 202 COLONIA ROMA NORTE CUAUHTÉMOC CIUDAD DE MÉXICO C. P. 06700 MÉXICO | $85,260.00 |
| 473 | STATIONFY INC<br><br>2443 FILLMORE STREET 2443 SAN FRANCISCO CALIFORNIA 94115 ESTADOS UNIDOS DE AMÉRICA | $282,514.68 |
| 474 | STOICME SA DE CV<br><br>BAHÍA DE GUANTÁNAMO 79 COLONIA VERÓNICA ANZURES MIGUEL HIDALGO CIUDAD DE MÉXICO C. P. 11300 MÉXICO | $203,530.00 |

JUZGADO PRIMERO DE DISTRITO EN MATERIA DE CONCURSOS MERCANTILES, CON RESIDENCIA EN LA CIUDAD DE MÉXICO Y JURISDICCIÓN EN TODA LA REPÚBLICA MEXICANA



56

| | | |
|---|---|---|
| 475 | STULZ MÉXICO SA DE CV<br><br>INSURGENTES SUR 64 COLONIA JUÁREZ CUAUHTÉMOC CIUDAD DE MÉXICO C. P. 06600 MÉXICO | $45,380.31 |
| 476 | STYPE NORWAY AS<br><br>TOLLBUGATA 27 SENTRUM OSLO OSLO 0157 NORUEGA | $1,972,120.78 |
| 477 | SUPORTIKA DE MÉXICO SA DE CV<br><br>BRADLEY 66 COLONIA ANZURES MIGUEL HIDALGO CIUDAD DE MÉXICO C. P. 11590 MÉXICO | $3,693.12 |
| 478 | TABACOS DE SANTA FE SA DE CV<br><br>PINO 343 COLONIA SANTA MARÍA LA RIBERA CUAUHTÉMOC CIUDAD DE MÉXICO C. P. 06400 MÉXICO | $5,160.00 |
| 479 | TANIA CARINA DURAN CABRERA<br><br>VOLCÁN PARICUTIN 8 COLONIA LOS VOLCANES TLALPAN CIUDAD DE MÉXICO C. P. 14440 MÉXICO | $15,433.60 |
| 480 | TECNOLOGÍA EN COMUNICACIONES Y REDES SA DE CV .<br><br>CALLE 7 375 COLONIA RESIDENCIAL PENSIONES MÉRIDA YUCATÁN C. P. 97217 MÉXICO | $22,880.00 |
| 481 | TECNORAMPA SA DE CV<br><br>CARRETERA FEDERAL MÉXICO-QUERÉTARO 175+494 COLONIA LA ESTANCIA QUERÉTARO QUERÉTARO C. P. 76729 MÉXICO | $10,210.00 |
| 482 | TELEFONÍA POR CABLE SA DE CV<br><br>LÁZARO CÁRDENAS 1694 COLONIA DEL FRESNO 1RA SECCIÓN GUADALAJARA JALISCO C.P. 44900 MÉXICO | $154,518.00 |
| 483 | TELÉFONOS DE MÉXICO SA DE CV<br><br>PARQUE VÍA 198 COLONIA CUAUHTÉMOC CUAUHTÉMOC CIUDAD DE MÉXICO C. P. 06599 MÉXICO | $264,932.02 |
| 484 | TELÉFONOS DEL NOROESTE SA DE CV<br><br>AV PIO PICO 1525 COLONIA ZONA CENTRO TIJUANA BAJA CALIFORNIA C. P. 22000 MÉXICO | $10,732.01 |
| 485 | TELEVERA RED SAPI DE CV<br><br>GALILEO 50 COLONIA POLANCO IV SECCIÓN MIGUEL HIDALGO CIUDAD DE MÉXICO C. P. 11550 MÉXICO | $1,556,834.66 |
| 486 | TELEXTANTE SA DE CV<br><br>EJE 3 SUR FERROCARRIL DE RIO FRIO 419 COLONIA CUCHILLA DEL MORAL IZTAPALAPA CIUDAD DE MÉXICO C. P. 09319 MÉXICO | $37,862.40 |
| 487 | TEODORO LOREDO SUAREZ<br><br>RIO GRANDE 5 COLONIA ARROYO HONDO ZARAGOZA SAN LUIS POTOSÍ C. P. 79540 MÉXICO | $278,857.58 |
| 488 | TERI AND MON SC<br><br>RIO TIGRIS 32 COLONIA CUAUHTÉMOC CUAUHTÉMOC CIUDAD DE MÉXICO C. P. 06500 MÉXICO | $290,000.00 |

Scanned with
CS CamScanner



PODER JUDICIAL DE LA FEDERACIÓN

FORMA A-55

57

JUZGADO PRIMERO DE DISTRITO EN MATERIA DE CONCURSOS MERCANTILES, CON RESIDENCIA EN LA CIUDAD DE MÉXICO Y JURISDICCIÓN EN TODA LA REPÚBLICA MEXICANA

SENTENCIA DECLARACIÓN DE CONCURSO MERCANTIL
CONCURSO MERCANTIL 22/2026-II.

| | | |
|---|---|---|
| 489 | TESORERÍA DE LA FEDERACIÓN<br><br>AVENIDA CONSTITUYENTES 1001 COLONIA COLONIA BELÉN DE LAS FLORES ÁLVARO OBREGÓN CIUDAD DE MÉXICO C. P. 1000 MÉXICO | $310,845.02 |
| 490 | TESORERÍA DEL GOBIERNO DE LA CIUDAD DE MÉXICO<br><br>AV FRAY SERVANDO TESERA DE MIER 77 COLONIA CENTRO (ÁREA 1) CUAUHTÉMOC CIUDAD DE MÉXICO C. P. 06000 MÉXICO | $249,228.00 |
| 491 | TETRA 40 SA DE CV<br><br>CALACOAYA 17 COLONIA NUEVA IXTACALA TLALNEPANTLA DE BAZ ESTADO DE MÉXICO C.P. 54160 MÉXICO | $186,388.72 |
| 492 | THAPLOT SA DE CV<br><br>RÍO DE LA PLATA 202 COLONIA DEL VALLE SAN PEDRO GARZA GARCÍA NUEVO LEÓN C. P. 66220 MÉXICO | $116,000.00 |
| 493 | THE GROUP BROADCAST TELCO AND POST SOLUTIONS S DE RL DE CV<br><br>PEDREGAL 24 PISO 3 COLONIA MOLINO DEL REY MIGUEL HIDALGO CIUDAD DE MÉXICO C.P. 11040 MÉXICO | $4,440,580.25 |
| 494 | TODO SOBRE ELECTRÓNICOS Y MEDIOS SA DE CV<br><br>SANTA FE 428 COLONIA SANTA FE CUAJIMALPA CUAJIMALPA DE MORELOS CIUDAD DE MÉXICO C. P. 05348 MÉXICO | $2,320,000.00 |
| 495 | TRANSPORTADORA GERMAN SA DE CV<br><br>ISABEL LA CATÓLICA 714 INTERIOR 1 COLONIA ÁLAMOS BENITO JUÁREZ CIUDAD DE MÉXICO C. P. 03400 MÉXICO | $21,240.00 |
| 496 | TRES PUNTO CERO DIGITAL SA DE CV<br><br>COLIMA 395 A COLONIA ROMA NORTE CUAUHTÉMOC CIUDAD DE MÉXICO C. P. 06700 MÉXICO | $620,762.40 |
| 497 | TROOP Y COMPAÑÍA SA DE CV<br><br>GOLFO DE TEHUANTEPEC 10 COLONIA TACUBA MIGUEL HIDALGO CIUDAD DE MÉXICO C.<br><br>P. 11410 MÉXICO | $78,474.00 |
| 498 | TRUSTNET DE MÉXICO SA DE CV<br><br>PARRAL 6 COLONIA CONDESA CUAUHTÉMOC CIUDAD DE MÉXICO C.P. 06140 MÉXICO | $2,136,407.85 |
| 499 | TUBI INC<br><br>MONTGOMERY STREET 315 FLOOR 16 SAN FRANCISCO SAN FRANCISCO CALIFORNIA 94104 ESTADOS UNIDOS DE AMÉRICA | $64,154,513.70 |
| 500 | TV CORPORATIVO DE SONORA SA DE CV<br><br>GARMENDIA 200 COLONIA CENTRO HERMOSILLO SONORA | $17,210.00 |

JUZGADO PRIMERO DE DISTRITO EN MATERIA DE CONCURSOS MERCANTILES, CON RESIDENCIA EN LA CIUDAD DE MÉXICO Y JURISDICCIÓN EN TODA LA REPÚBLICA MEXICANA

Scanned with CamScanner

58

| | | |
|---|---|---|
| | C. P. 83000 MÉXICO | |
| 501 | TV CORPORATIVO DEL VALLE YAQUI SA DE CV<br><br>AV. MIGUEL ALEMÁN 225 COLONIA CENTRO OBREGÓN SONORA C. P. 85000 MÉXICO | $6,751.01 |
| 502 | UBER MÉXICO TECHNOLOGY & SOFTWARE SA DE CV<br><br>BLVD MANUEL ÁVILA CAMACHO 137 PISO 8 COLONIA POLANCO I SECCIÓN MIGUEL HIDALGO CIUDAD DE MÉXICO C. P. 11510 MÉXICO | $247,789.75 |
| 503 | UNIÓN EDITORIALISTA SA DE CV<br><br>INDEPENDENCIA 300 COLONIA GUADALAJARA CENTRO GUADALAJARA JALISCO C. P. 44100 MÉXICO | $696,023.20 |
| 504 | UNIÓN SAN JOSÉ YAJONI S DE RL DE CV<br><br>VIOLETAS 401 COLONIA REFORMA OAXACA DE JUÁREZ OAXACA C. P. 68050 MÉXICO | $98,437.09 |
| 505 | UNIVERSIDAD NACIONAL AUTÓNOMA DE MÉXICO<br><br>AVENIDA UNIVERSIDAD 3000 COLONIA UNIVERSIDAD NACIONAL AUTÓNOMA DE MÉXICO COYOACÁN CIUDAD DE MÉXICO C. P. 04510 MÉXICO | $31,856.38 |
| 506 | UNO Y MEDIO PUBLICIDAD MÉXICO SA DE CV<br><br>SANTA FE 505 PISO 16 COLONIA SANTA FE CUAJIMALPA CUAJIMALPA DE MORELOS CIUDAD DE MÉXICO C. P. 05348 MÉXICO | $2,382,786.54 |
| 507 | VALET PARKING BPS S DE RL DE CV<br><br>SAN JERÓNIMO 819 112-B COLONIA SAN JERÓNIMO LIDICE MAGDALENA CONTRERAS CIUDAD DE MÉXICO C. P. 10200 MÉXICO | $618,304.75 |
| 508 | VALSAT LIFESTYLE TECHNOLOGY GROUP SA DE CV<br><br>REY HUEMAN MZ 37 LT1 COLONIA AJUSCO COYOACÁN CIUDAD DE MÉXICO C. P. 04300 MÉXICO | $148,983.08 |
| 509 | VEHÍCULOS Y SOLUCIONES AUTOMOTRICES SA DE CV<br><br>UNIVERSIDAD 502 COLONIA UNIDAD GANADERA AGUASCALIENTES AGUASCALIENTES C.P. 20130 MÉXICO | $4,611.01 |
| 510 | VERNE Y POLTER SAS DE CV<br><br>TAPACHULA 29 COLONIA ROMA SUR CUAUHTÉMOC CIUDAD DE MÉXICO C. P. 06760 MÉXICO | $25,000.00 |
| 511 | VIDA TEA MÉXICO SA DE CV<br><br>ADOLFO RUIZ CORTINEZ 5440 COLONIA OLÍMPICA COYOACÁN CIUDAD DE MÉXICO C. P. 04710 MÉXICO | $48,834.55 |
| 512 | VIDONNY COMERCIALIZADORA SAS<br><br>SAN HIPÓLITO 6 A COLONIA TECÁMAC DE FELIPE VILLANUEVA CENTRO TECÁMAC ESTADO DE MÉXICO C. P. 55740 MÉXICO | $4,524.00 |
| 513 | VIEWPOINT MEDIA & AUDIO SOLUTIONS TECHNOLOGY SA DE CV<br><br>IPN 2126 COLONIA SAN JOSÉ TICOMAN GUSTAVO A | $68,265.00 |

Scanned with CamScanner

FORMA A-65

59

JUZGADO PRIMERO DE DISTRITO EN MATERIA DE CONCURSOS MERCANTILES, CON RESIDENCIA EN LA CIUDAD DE MÉXICO Y JURISDICCIÓN EN TODA LA REPÚBLICA MEXICANA

SENTENCIA DECLARACIÓN DE CONCURSO MERCANTIL

CONCURSO MERCANTIL 22/2026-II.

| | | |
|---|---|---|
| | MADERO CIUDAD DE MÉXICO C. P. 07340 MÉXICO | |
| 514 | VIGI KLEAN DEL SURESTE SA DE CV<br><br>INSURGENTES NORTE 1655 INT 1 COLONIA GUADALUPE INSURGENTES GUSTAVO A MADERO ESTADO DE MÉXICO C. P. 07870 MÉXICO | $39,609.60 |
| 515 | VIGSLA TECNOLOGÍA Y SERVICIOS SA DE CV<br><br>CASAS GRANDES 341 COLONIA NARVARTE ORIENTE BENITO JUÁREZ CIUDAD DE MÉXICO<br><br>C. P. 03023 MÉXICO | $21,506.25 |
| 516 | VILLA SAN JACINTO MALINALCO SA DE CV<br><br>AV. FFCC DE RÍO FRÍO 419 B51 COLONIA CUCHILLA DEL MORAL IZTAPALAPA CIUDAD DE MÉXICO C. P. 09319 MÉXICO | $24,466.98 |
| 517 | VILLASANTE Y FREYMAN SC<br><br>ALEJANDRO DUMAS 148 COLONIA POLANCO III SECCIÓN MIGUEL HIDALGO CIUDAD DE MÉXICO C. P. 11540 MÉXICO | $92,800.00 |
| 518 | VINOTECA DE MÉXICO SA DE CV<br><br>CONSTITUCIÓN 411 COLONIA CENTRO MONTERREY NUEVO LEÓN C. P. 64000 MÉXICO | $672,680.71 |
| 519 | VISIÓN Y DESARROLLO SEIS SA DE CV<br><br>CALZADA ZAVALETA 1108 COLONIA SANTA CRUZ BUENAVISTA PUEBLA PUEBLA C. P. 72150 MÉXICO | $215,351.97 |
| 520 | VIVENDEX BIENES Y PROMOCIONES INMOBILIARIAS SA DE CV<br><br>HIDALGO 243 COLONIA NIÑOS HÉROES QUERÉTARO QUERÉTARO C. P. 76010 MÉXICO | $127,096.05 |
| 521 | WAGORU S DE RL DE CV<br><br>HAMBURGO 159 COLONIA JUÁREZ CUAUHTÉMOC CIUDAD DE MÉXICO C. P. 06600 MÉXICO | $964,503.00 |
| 522 | WDC MÉXICO S DE RL DE CV<br><br>PERIFÉRICO SUR 3299 COLONIA FUENTES DEL PEDREGAL TLALPAN CIUDAD DE MÉXICO<br><br>C. P. 14140 MÉXICO | $53,009,100.00 |
| 523 | WINSTEAD PC<br><br>REINAISSANCE TOWER 1201 ELM ST 1201 DALLAS, TX TEXAS TEXAS 05400 ESTADOS UNIDOS DE AMÉRICA | $28,473.92 |
| 524 | WINTERHALTER LAVALOZAS Y SISTEMAS DE LAVADO INDUSTRIAL DE MÉXICO S DE RL DE CV<br><br>DR LICEAGA, PISO 7 7 COLONIA DOCTORES CUAUHTÉMOC CIUDAD DE MÉXICO C. P. 06720 MÉXICO | $1,914.00 |
| | WIVBOOST S DE RL DE CV<br><br>SIERRA NEVADA 130 PLANTA BAJA COLONIA LOMAS | |

JUZGADO PRIMERO DE DISTRITO EN MATERIA DE CONCURSOS MERCANTILES, CON RESIDENCIA EN LA CIUDAD DE MÉXICO Y JURISDICCIÓN EN TODA LA REPÚBLICA MEXICANA

Scanned with CamScanner



60

| | | |
|---|---|---|
| 525 | CHAPULTEPEC III SECCIÓN MIGUEL HIDALGO CIUDAD DE MÉXICO C. P. 11000 MÉXICO | $9,512,713.49 |
| 526 | WOW GAMES SAPI DE CV<br><br>HIDALGO 241 COLONIA BARRIO SAN MIGUEL IZTAPALAPA CIUDAD DE MÉXICO C. P. 09360 MÉXICO | $1,120.00 |
| 527 | WPP MEDIA MANAGEMENT<br><br>LAGO ALBERTO 319 P3 COLONIA GRANADA MIGUEL HIDALGO CIUDAD DE MÉXICO C. P. 11520 MÉXICO | $48,742,186.05 |
| 528 | YAMAHA DE MÉXICO SA DE CV<br><br>AVENIDA INSURGENTES SUR 1647 PISO 9 COLONIA SAN JOSÉ INSURGENTES BENITO JUÁREZ CIUDAD DE MÉXICO C. P. 03900 MÉXICO | $1,500.00 |
| 529 | ZAPATA VELASCO GÓMEZ MONT ABOGADOS SC<br><br>ALEJANDRO DUMAS 53 COLONIA POLANCO CHAPULTEPEC MIGUEL HIDALGO CIUDAD DE MÉXICO C. P. 11560 MÉXICO | $75,000.00 |
| 530 | ZEMSANIA MÉXICO SA DE CV<br><br>DARWIN 74 301 COLONIA ANZURES MIGUEL HIDALGO CIUDAD DE MÉXICO C. P. 11590 MÉXICO | $133,400.00 |
| 531 | ZETRAK SA DE CV<br><br>CARRETERA MÉXICO 623 COLONIA SAN ANTONIO POLOTITLAN DE LA ILUSTRACIÓN ESTADO DE MÉXICO C. P. 54235 MÉXICO | $67,000.00 |
| 532 | BUENA VISTA INTERNATIONAL, INC.<br><br>SOUTH BUENAVISTA STREET 500 BURBANK CALIFORNIA 91521 ESTADOS UNIDOS | $368,755,825.44 |
| 533 | RCN TELEVISIÓN, S.A.<br><br>AV LAS AMÉRICAS 65 82 PUENTE ARANDA BOGOTÁ 111311 COLOMBIA | $1,879,723.63 |
| 534 | UNIVERSAL CITY STUDIOS PRODUCTIONS LLLP<br><br>UNIVERSAL CITY PLAZA, BUILDING 100 1440 - 11TH FLOOR CALIFORNIA 91608 ESTADOS UNIDOS | $129,221,470.78 |
| 535 | WARNER BROS INTERNATIONAL TELEVISIÓN DISTRIBUTION, INC.<br><br>WARNER BLVD BUILDING 4000 156S - 4TH FLOOR BURBANK CALIFORNIA 91522 ESTADOS UNIDOS | $104,716,461.97 |
| 536 | CPT HOLDINGS, INC.<br><br>WEST WASHINGTON BLVD 10202 CULVER CITY CALIFORNIA 90232 ESTADOS UNIDOS | $27,238,614.57 |
| 537 | DIAMOND FILMS NETHERLAND COORPORATIEF UA<br><br>PRINS BERHARDPLEIN 200 ÁMSTERDAM 1097JB REINO DE LOS PAÍSES BAJOS | $403,009,909.20 |
| 538 | PROMOCIONES ZANFER, S.A. DE C.V.<br><br>DIEGO RIVERA 2311 COLONIA ZONA URBANA RIO TIJUANA TIJUANA C. P. 22010 MÉXICO | $18,820,000.00 |

Scanned with
CS CamScanner

FORMA A-45

61

JUZGADO PRIMERO DE DISTRITO EN MATERIA DE CONCURSOS MERCANTILES, CON RESIDENCIA EN LA CIUDAD DE MÉXICO Y JURISDICCIÓN EN TODA LA REPÚBLICA MEXICANA

SENTENCIA DECLARACIÓN DE CONCURSO MERCANTIL
CONCURSO MERCANTIL 22/2026-II.

| | | |
|---|---|---|
| 539 | OPERADORA DE ESCENARIOS DEPORTIVOS, S.A. DE C.V. (PUEBLA AP'24 CL'25)<br><br>BOULEVARD DE LOS REYES 6206 401 COLONIA SAN MARTINITO SAN ANDRÉS CHOLULA PUEBLA C. P. 72825 MÉXICO | $9,280,000.00 |
| 540 | ASOCIACIÓN DE EQUIPOS PROFESIONALES DE BEISBOL DE LA LIGA MEXICANA, A.C.<br><br>INSURGENTES SUR 797 3 Y 4 COLONIA NÁPOLES BENITO JUÁREZ CIUDAD DE MÉXICO C.P. 03810 MÉXICO | $2,255,968.00 |
| 541 | MTV NETWORKS LATIN AMÉRICA, INC.<br><br>N.W. 6TH STREET 161 MIAMI FLORIDA 33136 ESTADOS UNIDOS | $45,567,935.16 |
| 542 | FREMANTLEMEDIA MÉXICO, S.A. DE C.V.<br><br>PERIFÉRICO SUR 4249 COLONIA JARDINES DE LA MONTAÑA TLALPAN CIUDAD DE MÉXICO. C. P. 14210 MÉXICO | $6,519,246.53 |
| 543 | TELEVISA, S.A. DE C.V.<br><br>AV. VASCO DE QUIROGA 2000 COLONIA PUEBLO SANTA FE ÁLVARO OBREGÓN CIUDAD DE MÉXICO C. P. 01210 MÉXICO | $185,756,258.96 |
| 544 | NO BOXING NO LIFE SQUAD, S.A. DE C.V.<br><br>ZALATITAN 534 JARDINES DE LA PAZ NORTE GUADALAJARA JALISCO 44860 MÉXICO | $2,477,231.04 |
| 545 | BBC STUDIOS DISTRIBUTION LIMITED<br><br>WOOD LANE 101 0 W12 7FW REINO UNIDO | $83,642.14 |
| 546 | ACUN MEDYA LIMITED<br><br>TOWER ROAD 243/A SLIEMA SLM 1604 MALTA | $556,442,137.23 |
| 547 | SINERGIA DEPORTIVA; S.A. DE C.V.<br><br>ESTADIO UNIVERSITARIO SAN NICOLÁS DE LOS GARZA PUERTA 13 COLONIA SAN NICOLÁS DE LA GARZA SAN NICOLÁS DE LA GARZA NUEVO LEÓN C. P. 66455 MÉXICO | $143,705,472.48 |
| 548 | FC JUÁREZ, S. DE R.L. DE C.V.<br><br>AV. CAMPOS ELÍSEOS 5TO PISO 9050 5 COLONIA N/A CIUDAD JUÁREZ CHIHUAHUA C. P. 32470 MÉXICO | $41,287,184.00 |
| 549 | 3 AMIGOS PROMOTIONS, S.A. DE C.V.<br><br>JOSÉ MARÍA VELASCO 2632 INT.1-D2A COLONIA ZONA URBANA RIO TIJUANA TIJUANA BAJA CALIFORNIA C. P. 22010 MÉXICO | $372,991.85 |
| 550 | ASESORÍA ESPECIALIZADA EN AVIACIÓN, S.A. DE C.V.<br><br>CALLE 5 HANGAR 45 OFICINA 19 B COLONIA SAN PEDRO TOTOLTEPEC TOLUCA ESTADO DE MÉXICO C. P. 50226 MÉXICO | $5,804,860.75 |

JUZGADO PRIMERO DE DISTRITO EN MATERIA DE CONCURSOS MERCANTILES, CON RESIDENCIA EN LA CIUDAD DE MÉXICO Y JURISDICCIÓN EN TODA LA REPÚBLICA MEXICANA

Scanned with CamScanner

62

| | | |
|---|---|---|
| 551 | AZNETWORK, S.C. <br> SIMÓN BOLÍVAR 25 201 COLONIA CENTRO (ÁREA 1) CUAUHTÉMOC CIUDAD DE MÉXICO C. P. 06000 MÉXICO | $15,097,629.57 |
| 552 | AZTECA INTERNACIONAL CORPORATION <br> NORTH BRAND BOULEVARD 611 SUITE 1300 GLENDALE CALIFORNIA 91203 ESTADOS UNIDOS DE AMÉRICA | $22,952,781.89 |
| 553 | AZTECA NOVELAS II, S.A. DE C.V. <br> CALZADA DE TLALPAN 2818 COLONIA EX EJIDO SAN PABLO TEPETLAPA COYOACÁN CIUDAD DE MÉXICO C. P. 04840 MÉXICO | $22,304,635.94 |
| 554 | AZTECA RECORDS, S.A. DE C.V. <br> PERIFÉRICO SUR 4121 COLONIA FUENTES DEL PEDREGAL TLALPAN CIUDAD DE MÉXICO. C. P. 14140 MÉXICO | $324,181,783.31 |
| 555 | EQUIPO DE FUTBOL MAZATLÁN, S.A. DE C.V. <br> AVENIDA MÚNICH S/N S/N COLONIA PRADERA DORADA MAZATLÁN SINALOA C. P. 82139 MÉXICO | $10,171,350.65 |
| 556 | EQUIPOS DUO, S.C. <br> SIMÓN BOLÍVAR 25 201 COLONIA CENTRO (ÁREA 1) CUAUHTÉMOC CIUDAD DE MÉXICO C. P. 06000 MÉXICO | $50,449.11 |
| 557 | GANADOR AZTECA, S.A.P.I. DE C.V. <br> AVENIDA AGUIRRE LAREDO 6727 11CD COLONIA LA FUENTE JUÁREZ CHIHUAHUA C. P. 32370 MÉXICO | $17,004,573.22 |
| 558 | INMOBILIARIA ROCA DEL PEDREGAL, S.A. DE C.V. <br> PERIFÉRICO SUR 4121 COLONIA FUENTES DEL PEDREGAL TLALPAN CIUDAD DE MÉXICO. C. P. 14140 MÉXICO | $1,781,186.24 |
| 559 | LASIMEX, S.A. DE C.V. <br> PERIFÉRICO SUR 4119 TORRE B PISO 2 COLONIA FUENTES DEL PEDREGAL TLALPAN CIUDAD DE MÉXICO C. P. 14140 MÉXICO | $90,708,683.11 |
| 560 | MERCADOTECNIA TVA, S.C. <br> PERIFÉRICO SUR 4121 COLONIA FUENTES DEL PEDREGAL TLALPAN CIUDAD DE MÉXICO. C. P. 14140 MÉXICO | $244,489,802.81 |
| 561 | MULTIMEDIA ESPECTÁCULOS Y ATRACCIONES, S.A. DE C.V. <br> PERIFÉRICO SUR 4121 COLONIA FUENTES DEL PEDREGAL TLALPAN CIUDAD DE MÉXICO. C. P. 14141 MÉXICO | $237,407,385.85 |
| 562 | OPERADORA GANADOR TV AZTECA, S.A. DE C.V. <br> PERIFÉRICO SUR 4121 COLONIA FUENTES DEL PEDREGAL TLALPAN CIUDAD DE MÉXICO. C. P. 14140 MÉXICO | $257,507.89 |
| 563 | OPERADORA MEXICANA DE TELEVISIÓN, S.A. DE C.V. <br> PERIFÉRICO SUR 4121 COLONIA FUENTES DEL PEDREGAL TLALPAN CIUDAD DE MÉXICO C. P. 14140 MÉXICO | $763,328,904.50 |
| 564 | PRODUCCIONES AZTECA DIGITAL, S.A. DE C.V. <br> PERIFÉRICO SUR 4121 COLONIA FUENTES DEL PEDREGAL | $93,700,037.11 |



Scanned with CamScanner

FORMA A-65

63

JUZGADO PRIMERO DE DISTRITO EN MATERIA DE CONCURSOS MERCANTILES, CON RESIDENCIA EN LA CIUDAD DE MÉXICO Y JURISDICCIÓN EN TODA LA REPÚBLICA MEXICANA

SENTENCIA DECLARACIÓN DE CONCURSO MERCANTIL

CONCURSO MERCANTIL 22/2026-II.

| | | |
|---|---|---|
| | TLALPAN CIUDAD DE MÉXICO. C. P. 14141 MÉXICO | |
| 565 | PRODUCCIONES DOPAMINA, S.A. DE C.V.<br>PERIFÉRICO SUR 4121 COLONIA FUENTES DEL PEDREGAL TLALPAN CIUDAD DE MÉXICO. C. P. 14140 MÉXICO | $258,025,960.41 |
| 566 | PRODUCCIONES ESPECIALIZADAS, S.A. DE C.V.<br>SIMÓN BOLÍVAR 25 201 COLONIA CENTRO (ÁREA 1) CUAUHTÉMOC CIUDAD DE MÉXICO C.P. 06000 MÉXICO | $133,756,897.46 |
| 567 | PROMOTORA DE TORNEOS Y ESPECTÁCULOS PÚBLICOS, S.A. DE C.V.<br>PERIFÉRICO SUR 4121 COLONIA FUENTES DEL PEDREGAL TLALPAN CIUDAD DE MÉXICO. C. P. 14140 MÉXICO | $517,418,299.54 |
| 568 | SCI DE MÉXICO, S.A. DE C.V.<br>AVENIDA INSURGENTES SUR 2376 2DO PISO / 201 D COLONIA CHIMALISTAC ÁLVARO OBREGÓN CIUDAD DE MÉXICO C. P. 01070 MÉXICO | $363,989.66 |
| 569 | SERVICIOS ESPECIALIZADOS TAZ, S.A. DE C.V.<br>PERIFÉRICO SUR 4119 TORRE B PISO 1 COLONIA FUENTES DEL PEDREGAL TLALPAN CIUDAD DE MÉXICO C. P. 14140 MÉXICO | $100,802,665.37 |
| 570 | SERVICIOS LOCALES DE PRODUCCIÓN, S.A. DE C.V.<br>PERIFÉRICO SUR 4121 TORRE PRODUCCIÓN PLANTA BAJA COLONIA FUENTES DEL PEDREGAL TLALPAN CIUDAD DE MÉXICO C. P. 14140 MÉXICO | $28,603,165.32 |
| 571 | SINOT, S.C.<br>AVENIDA INSURGENTES SUR 1605 PISO 15 MÓDULO 4 COLONIA SAN JOSÉ INSURGENTES BENITO JUÁREZ CIUDAD DE MÉXICO C. P. 03900 MÉXICO | $19,125,947.91 |
| 572 | STATIONS GRUOP, LLC<br>BRICKELL AVENUE 1221 SUITE 2520 MIAMI FLORIDA ESTADOS UNIDOS DE AMÉRICA | $3,419.54 |
| 573 | TELEVISIÓN AZTECA III, S.A. DE C.V.<br>AVENIDA INSURGENTES SUR 2376 PISO 1 OFICINA 102 COLONIA CHIMALISTAC ÁLVARO OBREGÓN CIUDAD DE MÉXICO C. P. 01070 MÉXICO | $1,400,792,254.36 |
| 574 | TRIENIO, S.C.<br>AVENIDA INSURGENTES SUR 1605 PISO 15 MÓDULO 4 COLONIA SAN JOSÉ INSURGENTES BENITO JUÁREZ CIUDAD DE MÉXICO C. P. 03900 MÉXICO | $35,811,846.71 |
| 575 | ADAMANTIUM PRIVATE SECURITY SERVICES, S. DE R.L DE C.V.<br>MATÍAS ROMERO 1221 PISO 1 Y 2 COLONIA DEL VALLE SUR BENITO JUÁREZ CIUDAD DE MÉXICO C. P. 03100 MÉXICO | $1,531,548.63 |

JUZGADO PRIMERO DE DISTRITO EN MATERIA DE CONCURSOS MERCANTILES, CON RESIDENCIA EN LA CIUDAD DE MÉXICO Y JURISDICCIÓN EN TODA LA REPÚBLICA MEXICANA

Scanned with CamScanner

64

| 576 | COMPAÑÍA OPERADORA DE TEATROS, S.A. DE C.V.<br>AV FF CC DE RIO FRIO 419 A 14 COLONIA CUCHILLA DEL MORAL IZTAPALAPA CIUDAD DE MÉXICO C. P. 09310 MÉXICO | $165,799.19 |
|---|---|---|
| 577 | DIALOGUS PROCESOS, S.A.P.I. DE C.V.<br>PERIFÉRICO SUR 4121 COLONIA FUENTES DEL PEDREGAL TLALPAN CIUDAD DE MÉXICO. C. P. 14141 MÉXICO | $504,209.46 |
| 578 | FUNDACIÓN TV AZTECA, A.C.<br>AVENIDA MONTES URALES 460 PISO 2 COLONIA LOMAS DE CHAPULTEPEC III SECCIÓN MIGUEL HIDALGO CIUDAD DE MÉXICO C.P. 11000 MÉXICO | $68,000.00 |
| 579 | GRUPO SALINAS TELECOM, S.A. DE C.V.<br>PERIFÉRICO SUR 4121 COLONIA FUENTES DEL PEDREGAL TLALPAN CIUDAD DE MÉXICO. C. P. 14141 MÉXICO | $11,000,000.00 |
| 580 | NUEVA ELEKTRA DEL MILENIO, S.A. DE C.V.<br>AVENIDA FFCC DE RIO FRIO 419 BW COLONIA CUCHILLA DEL MORAL IZTAPALAPA CIUDAD DE MÉXICO C. P. 09319 MÉXICO | $10,420,385.59 |
| 581 | PARADIN DE MÉXICO, S.A. DE C.V.<br>PRIVADA MIGUEL NOREÑA 27 PISO 2 COLONIA SAN JOSÉ INSURGENTES BENITO JUÁREZ CIUDAD DE MÉXICO C. P. 03900 MÉXICO | $18,808,240.00 |
| 582 | SERVICIOS DE ASESORÍA EN MEDIOS DE COMUNICACIÓN GS, S.A. DE C.V. PERIFÉRICO SUR 4121 COLONIA FUENTES DEL PEDREGAL TLALPAN CIUDAD DE MÉXICO. C. P. 14140 MÉXICO | $40,958,240.98 |
| 583 | TIENDAS SÚPER PRECIO, S.A.P.I. DE C.V.<br>AVENIDA JAVIER BARROS SIERRA 540 TORRE 1 PISO 5 OFICINA 5071 COLONIA LOMAS DE SANTA FE ÁLVARO OBREGÓN CIUDAD DE MÉXICO C. P. 01210 MÉXICO | $1,295,017.15 |
| 584 | TOTAL BOX, S.A DE C.V.<br>AV. SAN JERÓNIMO 252 PISO 6 COLONIA LA OTRA BANDA COYOACÁN CIUDAD DE MÉXICO. C. P. 04519 MÉXICO | $6,023.44 |
| 585 | TOTAL PLAY TELECOMUNICACIONES, S.A.P.I. DE C.V.<br>AV. SAN JERÓNIMO 252 PISO 6 COLONIA LA OTRA BANDA COYOACÁN CIUDAD DE MÉXICO. C. P. 04519 MÉXICO | $7,026,559.20 |
| 586 | TOTALSEC, S.A. DE C.V.<br>PERIFÉRICO SUR 4121 COLONIA FUENTES DEL PEDREGAL TLALPAN CIUDAD DE MÉXICO. C. P. 14140 MÉXICO | $7,595,444.47 |
| 587 | INSTITUTO MEXICANO DEL SEGURO SOCIAL<br>AV. PASEOS DE LA REFORMA 476 COLONIA JUÁREZ CUAUHTÉMOC, CUAUHTÉMOC C. P. 06600 MÉXICO | $1,051,962.00 |
| 588 | INSTITUTO DEL FONDO NACIONAL DE LA VIVIENDA PARA LOS TRABAJADORES<br>AV. BARRANCA DEL MUERTO 280 COLONIA GUADALUPE INN ÁLVARO OBREGÓN ÁLVARO OBREGÓN C. P. 01029 | $431,899.00 |



Scanned with CamScanner



65

FORMA A.44

JUZGADO PRIMERO DE DISTRITO EN MATERIA DE CONCURSOS MERCANTILES, CON RESIDENCIA EN LA CIUDAD DE MÉXICO Y JURISDICCIÓN EN TODA LA REPÚBLICA MEXICANA

SENTENCIA DECLARACIÓN DE CONCURSO MERCANTIL

CONCURSO MERCANTIL 22/2026-II.

| | | |
|---|---|---|
| | MÉXICO | |
| 589 | SECRETARIA DE FINANZAS AGUASCALIENTES<br>AV. DE LA CONVENCIÓN 102 COLONIA DEL TRABAJO AGUASCALIENTES AGUASCALIENTES C. P. 20180 MÉXICO | $1,980.00 |
| 590 | SECRETARIA DE FINANZAS DE LA CIUDAD DE MÉXICO<br>PLAZA DE LA CONSTITUCIÓN 1 COLONIA CENTRO CUAUHTÉMOC CUAUHTÉMOC C. P. 06600 MÉXICO | $95,326.00 |
| 591 | GOBIERNO DEL ESTADO DE MICHOACÁN<br>CALZADA VENTURA PUENTE 112 COLONIA CHAPULTEPEC NORTE MORELIA MORELIA C. P. 58260 MÉXICO | $896.00 |
| 592 | SECRETARIA DE FINANZAS DE CHIHUAHUA<br>VENUSTIANO CARRANZA Y ALDAMA 1100 COLONIA CENTRO CHIHUAHUA CHIHUAHUA C. P. 31000 MÉXICO | $2,343.00 |
| 593 | SECRETARIA DE FINANZAS Y TESORERÍA DE PUEBLA<br>VÍA ATLIXCÁYOTL 1101 1ER PISO COLONIA CONCEPCIÓN LAS LAJAS ATLIXCÁYOTL ATLIXCÁYOTL C. P. 72190 MÉXICO | $5,058.00 |
| 594 | GOBIERNO DEL ESTADO DE GUANAJUATO<br>PASE DE LA PRESA 172 COLONIA CENTRO GUANAJUATO GUANAJUATO C. P. 36094 MÉXICO | $5,348.00 |
| 595 | GOBIERNO DEL ESTADO DE MÉXICO<br>AV. SEBASTIÁN LERDO DE TEJADA 300 COLONIA CENTRO TOLUCA TOLUCA C. P. 50000 MÉXICO | $759.00 |
| 596 | SECRETARIA DE ADMINISTRACIÓN Y FINANZAS DE YUCATÁN<br>CALLE 59 X AV. ITZÁES Y CALLE 90 NA COLONIA CENTRO MÉRIDA MÉRIDA C. P. 97000 MÉXICO | $886.00 |
| 597 | SERVICIO DE ADMINISTRACIÓN TRIBUTARIA<br>AV. HIDALGO 77 COLONIA GUERRERO CUAUHTÉMOC CUAUHTÉMOC C. P. 06600 MÉXICO | $83,454,311.00 |
| 598 | MEDIUM TERM NOTE / THE BANK OF NEW YORK MELLON<br>GREENWICH STREET 240 NEW YORK NEW YORK NEW YORK 10286 EE.UU. | $10,399,061,168.39 |
| 599 | ALTERBANK, LTD<br>RODNEY BAY COMMERCIAL BOULEVARD SUITE 3 RODNEY BAY RODNEY BAY GROS-ISLET LC01 401 SANTA LUCÍA | $4,237,903,819.44 |
| 600 | NUMCHI SERVICIOS, S.A.P.I. DE C.V. | $1,807,942,212.82 |

JUZGADO PRIMERO DE DISTRITO EN MATERIA DE CONCURSOS MERCANTILES, CON RESIDENCIA EN LA CIUDAD DE MÉXICO Y JURISDICCIÓN EN TODA LA REPÚBLICA MEXICANA

Scanned with CamScanner

66

| HAMBURGO 206 503 COLONIA JUÁREZ CUAHUTÉMOC CIUDAD DE MÉXICO C. P. 06700 MÉXICO | |

**QUINTO. Fecha de retroacción.** Con apoyo en el artículo 43, fracción X y 112 de la Ley de Concursos Mercantiles, se señala como **fecha de retroacción** del concurso el día **nueve de octubre de dos mil veinticinco.**

**SEXTO. Arraigo.** Esta sentencia produce efectos de **ARRAIGO** de los integrantes del Consejo de Administración de la empresa **TV Azteca, sociedad anónima bursátil de capital variable**, o en su caso, de quienes sean responsables de la administración, para el sólo efecto de que no puedan separarse del lugar de su domicilio sin dejar mandato o apoderado debidamente instruido y expensado, en términos del artículo 47 de la Ley de Concursos Mercantiles.

**SÉPTIMO. Procedimiento de reconocimiento de créditos.** Se ordena al conciliador inicie el procedimiento de reconocimiento de créditos, efectuando de oficio en los términos establecidos por los artículos 121 y 123 de la Ley de Concursos Mercantiles su determinación; deberá elaborar la lista de créditos a cargo de la **comerciante** que propone reconocer, con base entre otras fuentes, en la contabilidad, con los demás documentos que permitan determinar su pasivo, con la información que la propia **concursada** y su personal están obligados a proporcionar, la información que se desprenda del dictamen del **visitador** y de las solicitudes de reconocimiento que se le presenten.

**OCTAVO. Se hace del conocimiento acreedores residentes dentro de la República y en el extranjero que pueden presentar solicitudes de reconocimiento de crédito.** Se hace del conocimiento de los **acreedores** residentes en la República Mexicana que aquellos que así lo


Scanned with CamScanner

FORMA A-65

67

JUZGADO PRIMERO DE DISTRITO EN MATERIA DE CONCURSOS MERCANTILES, CON RESIDENCIA EN LA CIUDAD DE MÉXICO Y JURISDICCIÓN EN TODA LA REPÚBLICA MEXICANA
SENTENCIA DECLARACIÓN DE CONCURSO MERCANTIL
CONCURSO MERCANTIL 22/2026-II.

deseen, presenten al **conciliador** en el domicilio que éste señale para el cumplimiento de sus obligaciones, sus solicitudes de reconocimiento de crédito conforme a lo dispuesto por el artículo 125 de la Ley de Concursos Mercantiles, sin perjuicio de lo ordenado en el resolutivo que antecede. Los acreedores residentes en el extranjero podrán presentar dichas solicitudes, si a sus intereses conviene, ante la persona y lugar indicados, dentro de un plazo de cuarenta y cinco días naturales conforme el artículo 291 de la Ley de Concursos Mercantiles.

**NOVENO. Orden de poner en posesión del conciliador documentos.** De acuerdo con lo dispuesto en el artículo 43, fracción VI de la Ley de Concursos Mercantiles **se ordena poner a disposición del conciliador**, de inmediato, los libros, registros y demás documentos de la empresa **concursada**, así como, los recursos necesarios para sufragar los gastos de registro y las publicaciones previstas en la ley de la materia.

**DÉCIMO. Orden de permitir las labores del conciliador.** Se ordena a la **comerciante** permita al **conciliador** y a los **interventores**, en su caso, la realización de las actividades propias de sus cargos.

**DÉCIMO PRIMERO. Suspensión de pagos.** Se ordena a la **comerciante** suspender el pago de los adeudos contraídos con anterioridad a la fecha en que surta efectos esta sentencia; salvo los que sean indispensables para la operación ordinaria de la empresa, incluido cualquier crédito indispensable para mantener la operación ordinaria de la empresa y la liquidez necesaria durante la tramitación del concurso mercantil, respecto de los cuales deberá informar

JUZGADO PRIMERO DE DISTRITO EN MATERIA DE CONCURSOS MERCANTILES, CON RESIDENCIA EN LA CIUDAD DE MÉXICO Y JURISDICCIÓN EN TODA LA REPÚBLICA MEXICANA

68

dentro de las setenta y dos horas siguientes de efectuados, en un principio a la suscrita juzgadora y, una vez que sea dado a conocer el nombre del **conciliador**, deberá reportarlos directamente a dicho especialista, por ser el encargado de vigilar la contabilidad y todas las operaciones que realice la comerciante, en términos del artículo 75 de la Ley de Concursos Mercantiles.

En el entendido de que, la presente sentencia no será causa para interrumpir las obligaciones laborales ordinarias de la **comerciante**, así como, el pago de contribuciones fiscales o de seguridad social ordinarias de la **concursada** por ser indispensables para la operación ordinaria de la empresa, tal y como lo establecen los artículos 66 y 69 de la Ley de Concursos Mercantiles.

**DÉCIMO SEGUNDO. Suspensión mandamientos de ejecución.** Se ordena que durante la etapa de conciliación sea suspendido todo mandamiento de embargo o ejecución contra los bienes y derechos de la **comerciante**, con las excepciones a que se refiere el artículo 65 de la Ley de Concursos Mercantiles, es decir, el mandamiento de embargo o ejecución de carácter laboral, en términos de lo dispuesto en la fracción XXIII, del apartado A, del artículo 123 constitucional y sus disposiciones reglamentarias, considerando los salarios de los **dos años** anteriores al concurso mercantil.

**DÉCIMO TERCERO. Publicación en el Diario Oficial de la Federación y en el diario de mayor circulación.** Se ordena al conciliador que, dentro de los **CINCO DÍAS** siguientes a su designación, tramite la publicación por una vez de un extracto de esta sentencia, en el Diario Oficial de la Federación y en uno de los periódicos de mayor circulación en la República Mexicana.



FORMA A-65

69

JUZGADO PRIMERO DE DISTRITO EN MATERIA DE CONCURSOS MERCANTILES, CON RESIDENCIA EN LA CIUDAD DE MÉXICO Y JURISDICCIÓN EN TODA LA REPÚBLICA MEXICANA

SENTENCIA DECLARACIÓN DE CONCURSO MERCANTIL
CONCURSO MERCANTIL 22/2026-II.

Para lo cual se ordena desde ahora elaborar los edictos conteniendo dicho extracto, así como, los oficios correspondientes y ponerlos a disposición del **conciliador.**

**DÉCIMO CUARTO. Inscripción de sentencia en los Registros Públicos correspondientes.** Se ordena al conciliador que, dentro de los **CINCO DÍAS** siguientes a su designación, solicite la inscripción de esta sentencia en el registro público de comercio que corresponda al domicilio de la **comerciante** y en todos aquellos lugares en donde tenga una agencia, sucursal o bienes sujetos a inscripción en algún registro público.

Para tal efecto se ordena desde ahora expedir copias certificadas, así como, elaborar el oficio necesario y ponerlo a disposición del **conciliador.**

**DÉCIMO QUINTO. Diversos Juicios.** Las acciones promovidas y los juicios seguidos por la comerciante y las promovidas y los seguidos contra ella, que se encuentren en trámite al dictarse esta sentencia, que tengan un contenido patrimonial, no se acumularán al juicio concursal, **sino que se seguirán por la comerciante bajo la vigilancia del conciliador.**

En ese sentido, la **concursada** deberá informar al **especialista** de la existencia de dichos procedimientos, al día siguiente que sea de su conocimiento su designación, como establece el artículo 84 de la Ley de Concursos Mercantiles.

**DÉCIMO SEXTO Precisión sobre intereses de créditos y conversión a UDI's.** En términos del artículo 89 de la Ley de Concursos Mercantiles, con independencia del



70

lugar originalmente pactado para pago, los créditos a cargo de la concursada que carezcan de garantía real dejarán de causar intereses a la fecha de esta sentencia; si no hubieren sido denominados originalmente en UDI´s, se convertirán a dicha unidad previa conversión a moneda nacional de los que en su caso estuvieren denominados en moneda extranjera; el tipo de cambio y la equivalencia de las citadas unidades serán los determinados por el Banco de México para la fecha de esta sentencia.

Así también, con independencia del lugar originalmente pactado para pago, los créditos con garantía real, a partir de la fecha de esta sentencia, sólo causarán intereses ordinarios y hasta por el valor de la garantía; se mantendrán en la moneda o unidad en que originalmente se denominaron, pero también se convertirán a UDI´s sólo para cuantificar el alcance de su participación en las decisiones en que así se requiera, caso en el cual, se empleará la equivalencia antes mencionada.

**DÉCIMO SÉPTIMO. Medidas precautorias.** Siendo esta juzgadora rectora del procedimiento de concurso mercantil y teniendo todas las facultades necesarias para cumplir lo que prevé la Ley de Concursos Mercantiles, **SE DEJAN SUBSISTENTES** únicamente las providencias precautorias señaladas en el considerando **CUARTO** de esta sentencia.

**DÉCIMO OCTAVO. Expedición de copias.** Expídase a costa de quien teniendo interés jurídico lo solicite, copia simple o certificada de esta sentencia.

**Notifíquese; vía electrónica a la comerciante y al visitador; por oficio al Instituto Federal de Especialistas de Concursos Mercantiles; Secretaría de Hacienda y Crédito Público; Servicio de Administración Tributaria;**



FORMA A A5

71

JUZGADO PRIMERO DE DISTRITO EN MATERIA DE CONCURSOS MERCANTILES, CON RESIDENCIA EN LA CIUDAD DE MÉXICO Y JURISDICCIÓN EN TODA LA REPÚBLICA MEXICANA
SENTENCIA DECLARACIÓN DE CONCURSO MERCANTIL
CONCURSO MERCANTIL 22/2026-II.

Secretaría de Administración y Finanzas de la Ciudad de México; Instituto Mexicano del Seguro Social; Comisión Reguladora de Telecomunicaciones; Instituto del Fondo Nacional de la Vivienda para los Trabajadores y al Centro Federal de Conciliación y Registro Laboral; a los posibles acreedores y demás partes se entenderán notificadas una vez que se publique la sentencia en el Diario Oficial de la Federación, de conformidad con lo dispuesto por el artículo 44 de la Ley de Concursos Mercantiles, de ser el caso, a los acreedores residentes en el extranjero, también conforme a lo establecido en las leyes aplicables.

Así lo resolvió y firma electrónicamente **Tessy del Rocío Covarrubias Torres**, Jueza Primero de Distrito en Materia de Concursos Mercantiles, con residencia en la Ciudad de México y jurisdicción en toda la República Mexicana, quien actúa en unión de **Roberto Abihud Victoria Villela**, secretario, que autoriza y da fe.

Ravv

En esta fecha, se ordenó girar los oficios **3910, 3911, 3912, 3913, 3914, 3915, 3916 y 3917/2026. Conste.**

Se da fe que la presente sentencia se incorporó al expediente electrónico que obra en el SISE; asimismo, se certifica que el archivo electrónico correspondiente coincide en su totalidad con las constancias físicas. **Conste.**

La persona actuaria hace constar que las notificaciones correspondientes a esta resolución, fueron debidamente digitalizadas y vinculadas al expediente electrónico. **Doy fe.**

El que suscribe, licenciado **Roberto Abihud Victoria Villela**, Secretario del Juzgado Primero de Distrito en Materia de Concursos Mercantiles con residencia en la Ciudad de México y jurisdicción en toda la República Mexicana, **certifico:** que en la presente resolución marqué con fuente color rojo (modelo RGB 255,0,0) todos los datos personales y sensibles de las partes intervinientes, a efecto de que una vez consultable, aparezcan asteriscos en lugar de aquellos; asimismo, que realicé el procedimiento necesario para que la presente resolución sea consultable en el Sistema Integral de Seguimiento de Expedientes, y en versión pública en las páginas https://www.serviciosenlinea.pjf.gob.mx/juicioenlinea/SentenciaVersionPublica/MenuSentencia y https://ejusticia.cjf.gob.mx/BuscadorSISE/#/BusqExp, y cumplí con las condiciones que se indican en la Circular JDGGJ/STG/17/2020.



JUZGADO PRIMERO DE DISTRITO EN MATERIA DE CONCURSOS MERCANTILES, CON RESIDENCIA EN LA CIUDAD DE MÉXICO Y JURISDICCIÓN EN TODA LA REPÚBLICA MEXICANA

72

publicada en la sección de avisos del SISE el dieciséis de octubre de dos mil veinte. **Doy Fe.**

Scanned with CamScanner



## PODER JUDICIAL DE LA FEDERACIÓN

**EVIDENCIA CRIPTOGRÁFICA - TRANSACCIÓN**

Archivo Firmado:
159732617_4157000041293660034.p7m
Autoridad Certificadora:
AUTORIDAD CERTIFICADORA
Firmante(s): 2

| FIRMANTE | | | | | |
|---|---|---|---|---|---|
| Nombre: | ROBERTO ABIHUD VICTORIA VILLELA | | Validez: | BIEN | Vigente |
| **FIRMA** | | | | | |
| No Serie: | 30.30.30.31.30.30.30.30.30.35.31.35.34.32.38.36.38.33 | | Revocación: | Bien | No revocado |
| Fecha (UTC/ CDMX) | 07/07/26 02:01 25 - 06/07/26 20:01 25 | | Status: | Bien | Valida |
| Algoritmo: | RSA-SHA256 | | | | |
| Cadena de firma: | 61 ea 10 78 1b f8 66 24 6d 67 fe 22 07 55 dc 74 d6 b7 8b be 47 3b 9f 2f f2 a4 95 25 58 9d 41 dd 63 c8 8e 8e b4 5e b1 08 db 84 1f 43 e2 a7 51 96 72 6f 59 ea 11 dd 9f 67 fb aa 9d 3f 44 71 ed b4 08 2c 8f 7c 4e 4d b6 e2 0c 10 d4 67 f8 21 4a 75 85 b6 b9 f6 59 a0 00 be 13 53 a4 eb f6 e4 1e 1f 76 d7 bc 35 72 e1 93 01 34 df ec ed 74 ec 0c 71 c9 cf 0b 59 41 4f 1c b8 25 0e bd 95 7a 27 92 ee 08 59 d0 69 db f1 00 5d 50 77 b2 91 e7 1b 86 06 b8 c3 79 09 26 a2 eb 41 9a 59 09 df ea 6f f2 f7 67 aa 04 fb 90 56 34 0b f2 76 05 6d ea f5 07 5d 15 09 fa fc df d1 24 4b 7f 34 4a 80 27 00 d3 33 f7 93 bb 52 c3 45 f3 d5 b9 32 fa a5 67 38 1b 44 4e 36 62 6f 6c 8b 87 66 e8 e3 71 ca 4d cf b4 9b 0a a7 45 57 aa 09 cc 0d be f2 48 a2 43 e9 5e 45 49 9a f6 6f a9 48 c6 a1 c5 6c d2 75 db 49 d1 ba | | | | |
| **OCSP** | | | | | |
| Fecha: (UTC/ CDMX) | 07/07/26 02:01 26 - 06/07/26 20:01 26 | | | | |
| Nombre del respondedor: | Servicio OCSP SAT | | | | |
| Emisor del respondedor: | AUTORIDAD CERTIFICADORA | | | | |
| Número de serie: | 30.30.30.30.31.30.30.30.30.30.35.31.35.34.32.38.36.38.33 | | | | |
| **TSP** | | | | | |
| Fecha : (UTC/ CDMX) | 07/07/26 02:01 26 - 06/07/26 20:01 26 | | | | |
| Nombre del emisor de la respuesta TSP: | Autoridad Emisora de Sellos de Tiempo del Consejo de la Judicatura Federal | | | | |
| Emisor del certificado TSP: | Autoridad Certificadora Intermedia del Consejo de la Judicatura Federal | | | | |
| Identificador de la respuesta TSP: | 177766530 | | | | |
| Datos estampillados: · | uh7IWA0S97K92OQJ2C5O2kn9Cas= | | | | |

JUZGADO PRIMERO DE
DISTRITO EN MATERIA DE
CONCURSOS MERCANTILES,
CON RESIDENCIA EN LA CIUDAD
DE MÉXICO Y JURISDICCIÓN EN
TODA LA REPÚBLICA MEXICANA

Scanned with
CS CamScanner




## PODER JUDICIAL DE LA FEDERACIÓN

| FIRMANTE | | | | | |
|---|---|---|---|---|---|
| Nombre: | TESSY DEL ROCIO COVARRUBIAS TORRES | | Validez: | BIEN | Vigente |

| FIRMA | | | | | |
|---|---|---|---|---|---|
| No Serie: | 70.6a.66.20.63.6a.66.33.00.00.00.00.00.00.00.00.01.38.28 | | Revocación: | Bien | No revocado |
| Fecha (UTC/ CDMX) | 07/07/26 02:09:58 - 06/07/26 20:09:58 | | Status: | Bien | Valida |
| Algoritmo: | RSA-SHA256 | | | | |
| Cadena de firma: | 3c 4f a1 38 3b 99 a9 4a a7 af 83 3c d4 de d6 13 18 68 5d bc d4 45 87 8d 8b c0 9a a2 f8 92 84 38 df 3c f6 9b 66 e3 2a a9 d0 8b bb 3d c7 34 e2 14 20 8a d3 e9 8d 7e b2 44 8a ea 0c c3 74 e7 65 87 f6 85 8c 43 11 51 ad cf 86 d9 1d 96 32 df 57 f2 23 45 42 25 38'a5 3c ac 9b 9b 1d 06 2a b3 f7 6c 90 b5 24 02 81 be 2a a5 b7 6e bf fe 68 02 d7 ee 74 82 82 75 91 54 fa 7b e0 b8 a9 d1 1d 7b 74 5f e9 51 5c a9 3e a1 30 b6 9d 62 42 22 0f a1 37 99 7f 1e 95 40 2b 44 06 6e 6b a2 1b cb d6 18 a7 4a 0d 08 a0 c9 f8 5c e0 6c a7 00 15 7d 90 62 7e 02 a1 8f 0a f6 58 18 92 30 48 3c 77 1e 7d 5c 58 da 55 55 8e a8 c9 5a 44 19 77 c8 82 59 b4 05 a7 94 11 9c 37 33 47 37 d5 c4 71 65 a0 11 93 24 94 cd ab b8 dd b5 6c c6 28 76 ad 6e 6e a6 31 07 31 22 dc cc 26 42 63 c0 b8 7b bb 18 c0 12 bf a7 41 bf 9f 4a 18 22 80 12 96 a9 08 c7 9a 19 91 d9 da 37 68 be c3 fd 92 cf 80 d2 9c 2b de c6 85 18 49 bd 53 71 a3 e1 ae a5 1a 3e e3 a2 c6 e8 af 58 52 6d cb 98 f2 bb 9a 03 62 3d 15 99 c8 34 f6 15 e9 6a 58 92 1d 46 20 d5 78 09 58 b8 7a 16 00 f1 bb 63 27 90 7f 5a bd 31 9c 98 8c 08 53 9f de f1 55 4d 64 37 36 d0 35 15 8d ca 80 8c aa e6 a8 c6 52 72 6d 62 b3 2d 7b 4b e2 c2 72 55 04 3f 0b 41 85 50 | | | | |

| OCSP | |
|---|---|
| Fecha: (UTC/ CDMX) | 07/07/26 02:09:58 - 06/07/26 20:09:58 |
| Nombre del respondedor: | Servicio OCSP ACI del Consejo de la Judicatura Federal |
| Emisor del respondedor: | Autoridad Certificadora Intermedia del Consejo de la Judicatura Federal |
| Número de serie: | 70.6a.66.20.63.6a.66.33.00.00.00.00.00.00.00.00.01.38.28 |

| TSP | |
|---|---|
| Fecha : (UTC/ CDMX) | 07/07/26 02:09:59 - 06/07/26 20:09:59 |
| Nombre del emisor de la respuesta TSP: | Autoridad Emisora de Sellos de Tiempo del Consejo de la Judicatura Federal |
| Emisor del certificado TSP: | Autoridad Certificadora Intermedia del Consejo de la Judicatura Federal |
| Identificador de la respuesta TSP: | 177768751 |
| Datos estampillados: | Vq1Y2on5cuD2RdEpq1zMjLqYkp8= |

Scanned with CamScanner

**Juzgado Primero de Distrito en Materia de Concursos Mercantiles, con residencia en la Ciudad de México y jurisdicción en toda la República Mexicana**

PODER JUDICIAL DE LA FEDERACIÓN

**CONCURSO MERCANTIL 22/2026-II.**

### NOTIFICACION PERSONAL EN EL JUZGADO

En la Ciudad de México, a las **diez horas con quince minutos** del **siete de julio de dos mil veintiséis**, la actuaria judicial adscrita al Juzgado Primero de Distrito en Materia de Concursos Mercantiles, con residencia en la Ciudad de México y jurisdicción en toda la República Mexicana, licenciada **Fabiola Aroche Alquicira, notifico** en el local de este órgano a **Juan Pablo Reyes de la Mora** autorizado de la **comerciante TV Azteca, sociedad anónima bursátil de capital variable,** quien se identifica con credencial para votar con **IDMEX2977073304**, expedida a su favor por el Instituto Nacional Electoral, con fotografía, la cual concuerda con sus rasgos fisonómicos, documento del que se da fe de tenerlo a la vista y en este acto se devuelve a su propietario, corriéndole traslado con copia autorizada, íntegra y legible de la **sentencia de declaración de concurso mercantil de seis de julio de dos mil veintiséis,** dictada en el concurso mercantil **22/2026** de este índice, debidamente sellada, cotejada y con firmas electrónicas. Con lo anterior se da por terminada la presente diligencia, firmando de conformidad, recibido y enterado la persona notificada. **Doy fe.**

El compareciente,
**Juan Pablo de la Mora Reyes** autorizado de la comerciante TV Azteca, sociedad anónima bursátil de capital variable

JUZGADO PRIMERO DE DISTRITO EN MATERIA DE CONCURSOS MERCANTILES, CON RESIDENCIA EN LA CIUDAD DE MÉXICO Y JURISDICCIÓN EN TODA LA REPÚBLICA MEXICANA

**La Actuaria Judicial.
Fabiola Aroche Alquicira**

Scanned with CamScanner

**Translation by DeepL.com**



FIRST DISTRICT COURT FOR COMMERCIAL BANKRUPTCY MATTERS, WITH SEAT IN MEXICO CITY AND JURISDICTION THROUGHOUT THE MEXICAN REPUBLIC

JUDGMENT DECLARING COMMERCIAL BANKRUPTCY

COMMERCIAL BANKRUPTCY CASE 22/2026-11.

PODER JUDICIAL DE LA FEDERACIÓN

Mexico City, July 7, 2026.

HAVING REVIEWED the case file, in order to rule on the petition for commercial bankruptcy in case 22/2026-II, filed by the business entity TV Azteca, a publicly traded corporation with variable capital, and,

## HEREBY RULES

FIRST. Petition for commercial bankruptcy. By means of the petition filed on March 10, 2026, by TV Azteca;› a publicly traded corporation with variable capital, and which was received by the Joint Correspondence Office of the District Courts in the Commercial Bankruptcy Division and forwarded to this court on the following business day, TV Azteca requested a declaration of its status as being in commercial bankruptcy at the conciliation stage; basing its petition on the facts and legal considerations contained in the aforementioned petition.

SEGUNDO. Radicación, admisión y trámite del concurso mercantil. Por auto de **trece de marzo de dos mil veintiséis**, se radicó el asunto bajo el número de expediente 22/2026-II.

Subsequently, on the twenty-twenty-sixth, following the hearing of arguments and after the petition filed, and the Federal Institute Federal of Specialists for Commercial Bankruptcy Proceedings, requesting that it appoint an inspector, and the following as precautionary measures:

Scanned with
CamScanner"



*"1) Pursuant to* subsection (1) *of Article 37 of the* Insolvency Law, *the* company TV Azfeca, *a* publicly traded *corporation with variable capital, is prohibited from* making payments <u>*intended to settle claims that*</u> are due *and payable* <u>*prior to the*</u> company's <u>*admission*</u> *to insolvency proceedings.*

*2) The suspension* of *all* enforcement *proceedings (judicial, administrative,* contractual, *or* extracontractual) *or the* attachment *of* the company's *assets and rights,* <u>*arising from obligations that became due prior to the admission, is prohibited,* </u> *pursuant to* the *provisions of paragraph 11 of Article 37 of the* Commercial *Insolvency Law.*

*This measure does not imply a halt to the proceedings against the* merchant, *nor does it mean the suspension of enforcement actions* against her *assets and rights; rather, it refers to the suspension of the auction, award, and other similar procedures aimed at liquidating the bankruptcy* estate.

*With regard to this precautionary measure, based on the provisions of Article 65,* second *paragraph, of the relevant* law*, it* is specified *that when* the *attachment or* enforcement *order is of a provisional nature, the suspension* shall *not* apply *with respect to* the *provisions of Section XXIII of Subsection A of Article 123 of the Constitution and* its *implementing regulations, taking into account the wages for the two years* preceding the commercial bankruptcy.

*Likewise, based on the provisions of Article 69 of the relevant law, this measure* entails *the suspension of administrative proceedings for the enforcement of tax claims against* the *business, until such time as a judgment is rendered denying the* declaration *of bankruptcy or, as the case may be, the deadline for the* settlement period *expires.*



*En el entendido que las autoridades fiscales competentes podrán continuar con los actos necesarios para la determinación y aseguramiento de los créditos fiscales a cargo* of the **business.**

*It should be noted that the merchant's presumed state of insolvency is not grounds for suspending payment of the tax or social security contributions for which it is liable, as these are essential for the company's continued operation.*

*3) Pursuant to Section III of* Article *37 of the relevant law,* the **merchant** *is prohibited from disposing of or encumbering the principal assets of its business.*

*4) It is prohibited* to place liens *on assets owned by the business owner that are essential to the business's normal operations; this includes, without limitation,* seizures *ordered by local or federal authorities, pursuant to Section IV of* Article *37 of the relevant law.*

*5/ It is prohibited to transfer* funds *or securities to third parties, pursuant to Section VI of Article 37 of the relevant law.*

*A)   It is prohibited to suspend, revoke, rescind, or terminate or* cancel *contracts for       preliminary or final contracts, pending the execution of       **and** involving **TV Azleca, S.**A. **or a variable-capital company,** until such time as a judgment is issued denying the declaration of bankruptcy*

Scanned with
CamScanner"



FIRST DISTRICT COURT FOR COMMERCIAL BANKRUPTCY MATTERS, LOCATED IN MEXICO CITY AND WITH JURISDICTION THROUGHOUT THE MEXICAN REPUBLIC

JUDGMENT DECLARING COMMERCIAL BANKRUPTCY

COMMERCIAL BANKRUPTCY CASE M/2026-II.

PODER JUDICIAL DE LA FEDERACIÓN

*or, once such status is declared, the* trustee *designated in such cases, as applicable, must state whether or not they object to its enforcement, in accordance* with *the provisions of Article 92 of the relevant law.*

*B)      Any contractual provision that, as a result of the filing of the petition for commercial insolvency or the declaration thereof, establishes modifications that worsen the contractor's obligations to the merchant shall be deemed null and* void*, except for those exceptions expressly established in the Commercial Insolvency Law,*

*IOS ¢/UP /Ó/7DB {h2/fg.*

CJ *reserves the right to suspend, revoke, terminate, cancel, modify, limit,* or *otherwise affect, in whole or in part, any concession, permit,* license, *authorization, registration, inspection, approval, or any other right granted to the merchant that allows it to operate.*

*It is "understood that such a measure is neither a reason nor justification for the merchant to cease paying the fees arising from the* use *of the public* concessions *it operates.*

*Likewise, the exemption granted does not constitute any impediment* to *the competent telecommunications* regulatory *authority* exercising *its regulatory powers, including oversight, monitoring, or sanctioning the merchant in connection with its use of the radio* spectrum*.*

*D) Institutions within* the *financial* system *in which the company "TV Azteca, Sociedad Anónima de Capital Variable" maintains accounts from transferring, disposing of, seizing, freezing, "i,", debiting, deducting, withholding,* offsetting, *and/or using the funds*

*\*¢/z/e that  are managed in said accounts or are part of the assets of said accounts, except for the exceptions*

*\.'-"'"x.:  provided for in the cases of seizures indicated above.*

*"--             Provided that the* measures *ordered do not benefit* the *"affiliated companies or* subsidiaries *of the merchant; since, as already mentioned,* Article *37, subsection (l), of the Bankruptcy Law expressly provides that precautionary measures are solely intended to "protect* the *assets and rights of the company subject to the proceedings."*

THIRD. Appointment of an Inspector and Inspection Order. By official letter IFECOH/DG/0810/2026, the Federal Institute of Commercial Bankruptcy Specialists announced that it had appointed Samuel Ricardo Egure Lascano as inspector, whose appointment was deemed accepted and his oath of office taken by order dated April 10, 2026,

conferido.

Asimismo, en dicho proveído se ordenó practicar a la

merchant accepted the verification visit referred to

Scanned with

"CamScanner"



Articles 30 and 31 of the Commercial Bankruptcy Law.

The proceedings began on April 20, 2026, at which time the inspector duly drew up a report setting forth the facts relating to the subject matter of the inspection, as known to him and his assistants.

FOURTH. Submission of the Report. By order dated May 20, 2026, the inspector was directed to submit a reasoned and detailed report, whereupon it was ordered that the report be made available to the business owner for five days so that she could present any arguments in her defense.

Likewise, by order dated July 1, 2026, it was ordered that the case file be made available to the aforementioned judge so that she might render the judgment hereby issued, which *reads as* follows:

## CONSIDERATIONS

FIRST. Jurisdiction. This First District Court for Commercial Bankruptcy Matters, with its seat in Mexico City and jurisdiction throughout the Mexican Republic, has jurisdiction to rule on all matters concerning the declaration of commercial bankruptcy, in accordance with Article 104, Section I, of the Political Constitution of the United Mexican States; General Agreement 4/2D22' of the now-defunct Plenary Session of the Federal Judiciary Council, regarding the commencement of this court's functions; Section 56, Subsection II of the Organic Law of the Federal Judiciary; and Sections 9, 10, 11, 20, 41, 42, and 43 of the Law on

---

• Article 3. The First and Second District Courts for Commercial Matters shall have their seat in the City of Mexico and jurisdiction throughout the Mexican Republic to hear all disputes in matters subject to *the jurisdiction of the aforementioned law, as set forth inSection* 59, Subsection II, of the Organic Law of the Federal Judiciary and the Commercial Bankruptcy Law; as well as the appeals for amparo related to this matter.

Scanned with

"CamScanner"

COURT OF APPEALS FOR THE 9TH DISTRICT IN MATTERS OF BANKRUPTCY ¡gł:ftcd,NnLl=g, coH nû9łocNCṭA rN I.A clunAo nr. MčXłCO Y JUfłlsl31CCIÓN THROUGHOUT THE MEXICAN REPUBLIC

9IN YEuCiA OrCl-ARACIOx gE CONCUn6O Mra0 ANTÏL
COMMERCIAL TENDER 23/20204I.

Commercial Tenders.

SECOND. Notice. The notice to the applicant regarding the tender to renew its contract, issued in accordance with Articles 10, Section II, 9, Sections 1 and 20 of the Commercial Tenders Law, which provide that the commercial tender may not be submitted by legal entities that have the status of a merchant and, in the case of TV Azteca, a publicly traded corporation with variable capital, as evidenced by the documents submitted with the application, specifically:

- A certified copy of Notarial Instrument No. 184,840 of July 2, 2025, executed before Notary Public No. 135 of Mexico City.

'Evidence to which full probative value is granted

•tp batory, based on Article 129Z of the Commercial Code, Commerce, which applies supplementarily to the Law on Appeals

Mercantiles.

Al respecto, la especie y forma de constitución de la solicitante implica su carácter de comerciante en términos of the provisions of Article 30, Secestablece que se reputan merchants to companies          constituidas con arreglo a las commercial laws, and in turn, subsection Ęṭÿ iłdlÃÏt          ttä *dż* *'* " the General Law on Commercial Companies          , among the types of commercial companies, recognizes the corporation, whereas paragraph 4 of that law states that companies formed in any of the forms recognized in the aforementioned article

:      Scanned with

"CamScanner"



Section 1 of the law itself.

From which it follows that the applicant proved her status as a merchant.

Furthermore, Article 20 of the Commercial Bankruptcy Act provides that a merchant who considers that he or she has

"incurred a general failure to fulfill their obligations," in accordance with any of the circumstances set forth in Article 10 of that law, may file for commercial insolvency, as was done in the present case.

THIRD. Analysis of the insolvency proceeding. Taking into consideration that, first and foremost, it must be determined whether the petitioner in this insolvency proceeding, TV Azteca, a publicly traded corporation with variable capital, was in general default on the payment of its obligations—an indispensable requirement for being declared in commercial insolvency— it is necessary to note that Articles 9 and 10 of the Commercial Bankruptcy Law provide that a merchant may be declared in commercial bankruptcy when the merchant so requests and it is demonstrated that there has been a widespread failure to meet its payment obligations to two or more distinct creditors, where such obligations have been past due for at least thirty days and represent thirty-five percent

or more of all the **merchant's** obligations**,**

or, alternatively, the merchant lacks assets to cover at least eighty percent of its obligations that are past due as of the date the petition is filed.

For its part, Article 42 of the relevant law provides that the judgment rendered must take into account the statements, evidence, and arguments presented by the parties, as well as provide a rationale for the evidence submitted, including the **inspector's** report**.**

Scanned with
CamScanner"

FIRST **COMMERCIAL** BANK OF ESTRISO, SPECIALIZING IN **COMMERCIAL**
BANKRUPTCY MATTERS, **WITH ITS HEADQUARTERS** IN MEXICO CITY AND
OPERATIONS THROUGHOUT THE MEXICAN REPUBLIC

JUDGMENT DECLARING COMMERCIAL BANKRUPTCY

COMMERCIAL BANKRUPTCY CASE 2212026-1a.

In light of the foregoing, and given that, in principle, the second recital of this resolution established the applicant's status as a commercial entity, it is determined that the applicant has generally failed to meet its financial obligations.

From the content of the filed petition for bankruptcy, and in particular from the detailed statement of the reasons for the applicant's failure to pay its obligations, it appears that the applicant essentially indicated:

1. Imminent Tax Pressure.

It faces tax liabilities determined by the Tax Administration Service (SAT) in the amount of approximately 58,692,000,000.00 (fifty-eight billion six hundred ninety-two million pesos, 0/100, in **national** currency), for the following items:

income tax for the fiscal years of two '09 and 2013, including fines and surcharges; for which, risk of enforcement administrative —including freezing of bank accounts and intervention in the company forced it to take out loans in hasta **$5,000,000,000.00 (cinco mil millones de pesos** 00/100 of the national currency). This further eroded its capital.

2. Pasivos por Bonos en Estados Unidos)

In 2017, it issued bonos en Estados Unidos the United States, for USD 6,400,000,000 cuatrocientos millones in bonds (00/100 of the legal tender of the United States of America) maturing in August 2014; since it was unable to pay, the debt grew to USD

Scanned with
CamScanner"



8

5,200,000 BBD.00 (five thousand two hundred million dollars 00/100, legal tender in the United States of America).

The funds holding these bonds escalated the political and institutional conflict, involving the Mexican government in international arbitration and generating public pressure that undermined the company's credit and reputational standing; since 2021, negotiations and formal mediation have been attempted without reaching an agreement.

3.  Structural Transformation of the Media Industry.

Its business model depends almost exclusively on advertising on free-to-air television; however, this industry has suffered a global structural decline resulting from:

The migration of audiences to *streaming platforms* (NeMix, Amazon, Disney+, YouTube).

• Audience fragmentation and the loss of *ratings* as a relevant commercial indicator.

The share of advertising spending captured by Google, Meta, and TikTok, which account for about 68% (sixty-eight percent) of online advertising.

4. Impact of COVID-19.

The pandemic accelerated the decline that was already underway, as advertising spending plummeted in 2020 and the television industry fell by 30% (thirty percent) during that period; Latin America was the hardest-hit region, and the sector's revenues had not yet recovered to pre-pandemic levels, even at the time of the contest's announcement.

: Scanned with CamScanner"

THE FIRST OF ITS KIND IN TERMS OF COMMERCIAL CONTESTS, BASED IN MEXICO CITY AND WITH A NATIONAL PRESENCE THROUGHOUT THE MEXICAN REPUBLIC

DECISION DECLARING COMMERCIAL BANKRUPTCY
COMMERCIAL BID M/ZO26-Jł.

5. Contract of Government Government Advertising.

Starting in 2018, the federal government's austerity policy systematically and steadily reduced its advertising investment in traditional media, and a cumulative decline of approximately 36%+ (thirty-six percent) is estimated in real terms between 2019 and 2024, eliminating what had been a stable and predictable source of revenue.

6. Adverse Macroeconomic Environment.

Mexico's Gross Domestic Product grew by an average of just 0.7% (zero point seven seven percent) annually between 2018 and 2025; furthermore, the cumulative inflation for the period was 38.8% (thirty-eight point eight percent), excluding production costs

- production."

Similarly, high interest rates exacerbated the cost of borrowing, and general economic uncertainty reduced advertising investment in the sector                    , rt

7. Intensified Competition. Â

It no longer involves just Televisa and but also with cable systems and platform operators simultaneously competing for audiences,

Reasons that have highlighted their widespread failure to fulfill their obligations.

Scanned with
CamScanner"

To substantiate the foregoing, the business owner submitted, along ¢the written petition for a declaration of commercial bankruptcy, in the forms provided by the Federal Institute of Commercial Bankruptcy Specialists, the following documents:

1.  Audited financial statements for the fiscal years corresponding to:

- Two **thousand twenty-two.**
- Two thousand twenty-three.
- 2024.
- 2025, unaudited.
- As of January 2026.

2.  Reasoned report on the causes that have led the merchant to default on the payment of her obligations.

3.  List of Creditors.

4.  List of debtors.

Inventory of all the merchant's assets.

6. List of lawsuits in which the merchant is a party.

7. Resolutions regarding the corporate actions necessary to file for bankruptcy, specifically, a certified copy of notarial instrument number 188,710, dated February 26, 2026, executed before Notary Public No. 35 in Mexico City.

8.  Proposal for a preliminary agreement on payments to creditors.

9.  Preliminary proposal for the preservation of the business.

These documents, considered as a whole, are granted full probative value, pursuant to Articles 1292 and 1296 of the Commercial Code, which apply supplementarily to the Commercial Bankruptcy Law.

These indicate that the business owner has generally failed to meet her payment obligations, as can be seen from the list of alleged creditors and the company's financial statements

Scanned with
CamScanner"

FIRST REGISTRY COURT                    IN MATENLA  and        COMMERCIAL
COMMERCIAL BANKRUPTCY, WITH JURISDICTION IN MEXICO CITY   JURISDICTION
AND THROUGHOUT THE MEXICAN REPUBLIC
                    JUDGMENT OR DECISION ON THE BANKRUPTCY PROCEEDING:<Nnç

**of the bankrupt party** (including an inventory of various assets).

This is corroborated by the report submitted by the inspector, to which full probative value is accorded, in accordance with the provisions of Article 1301 of the Commercial Code, which applies supplementarily to the Commercial Bankruptcy Law, from which it follows that the guidelines established by the aforementioned legislation were followed;

he noted that he reviewed information and documentation that was provided by the **Merchant** in compliance with the inspection order; he indicated that the code contained therein took into consideration the facts set forth in the request; furthermore,

mencionó the data that led to the conclusion and met the los requirements set forth in Section 40 of the Law on the matter.

"Likewise, it is noted that the specialist stated that the amount of payment obligations that are at least thirty days past due constitutes 64.73% (sixty-four point seventy-three percent) of the total amount of the merchant's payment obligations, both past due and not yet due; whereas the percentage of total assets available to cover past-due payment obligations as of the date of filing of the commercial reorganization petition is 7.07% (seven point zero seven percent)*

bankruptcy, is 7.07% (seven point zero seven

), as shown in the following table \Á * ;*      percent

| | | Cuantía en moneda nacional |
|---|---|---|
| | Oggaene, payment received for at least 3 days of trails as of the date of this report, Icltud and which correspond to 72¥ ecr8e0of• _ d súllos (tO\dT d8 & 90¢¢idf3 1 ). | 115,515,251,120.35 |
| z | Payment Obligations  a con menos de 30 días vencidas a la fecha de presentación de la solicitud (total de la sección 2). | 14,318,742,026.93 |

Scanned with
CamScanner

| A•1+ | lori <e ¢x lqac<'nes ce pego •enodas e la locha Q | $15,921,993,746.58 |
|---|---|---|
| | Obligaciones de pago no vencidas a la fecha de presentación de la solicitud (total de la sección 3). | $8,039,379,471.78 |
| B•A+ 3 | Total de obligaciones a cargo de comerciante vencidas y no vencidas. | $23,961,373,218.36 |
| 4 | Total de activos líquidos concursales para hace frente a por lo menos el ochenta por ciento de la obligaciones de pago vencidas a la fecha de presentación de la solicitud (total de la sección 5). | $1,125,918,631.90 |
| 1.+ B | Porcentaje de: Obligaciones de pago que tienen por lo menos 30 días de vencidas / Total de obligaciones | 64.73% |
| 4 + A | Source: Tom oe ecows for IrerXe feces<br>Total de obligaciones de pago vencidas a la fecha de | 7.07% |

In accordance with the foregoing, having reviewed the evidence submitted by the merchant, her statements, and the aforementioned ruling, this court finds that the debtor company committed a widespread breach of its payment obligations to more than two different creditors, in addition to the fact that the conditions set forth in sections I and II of Article 10 of the

„. Commercial Insolvency. t}t

",t   Since, as indicated in the report submitted by the inspector, it is evident that the obligations that are at least thirty t- days past due as of the date the application was filed, account for more than 35°á (thirty-five percent) of all payment obligations owed by the business as of that date, this is sufficient to establish the existence of commercial insolvency, as provided for in subsection I of the aforementioned legal provision.

Furthermore, since it is evident that the percentage of the merchant's total assets available to meet payment obligations that were past due as of the date the petition for commercial insolvency was filed is less than 80% (eighty percent), this is sufficient to establish the existence of commercial insolvency, as provided for in subsection II of the cited legal provision.

Scanned with
CamScanner"

FIRST DISTRICT COURT FOR COMMERCIAL INSOLVENCY MATTERS, WITH SEAT
IN MEXICO CITY AND JURISDICTION THROUGHOUT THE MEXICAN REPUBLIC
DECISION DECLARING COMMERCIAL BANKRUPTCY
COMMERCIAL BANKRUPTCY CASE 2Z/2026-II.

In light of the foregoing, THE

BID          OF   DECLARATION   OF   BANKRUPTCY

I. COMMERCIAL NOTICE regarding the commencement of the

CONCILIATION STAGE in the bankruptcy proceedings of TV

Azteca, a publicly traded corporation with variable capital, with

the consequences described

in the relevant sections of this resolution,

accordance with Articles 43 through 45, 47, 65, 66, 69, 89,

112, 149, 278, Section IV, and 291 of the Commercial

Bankruptcy Law.

FOURTH. Precautionary measures. As this court is the

adjudicating authority in the commercial insolvency proceeding

and possesses all the necessary powers to carry out the

provisions      the   "Commercial    Bankruptcy"   Act,   THE

FOLLOWING ARE

IN FORCE only                              precautionary

measures

Con fundamento en la fracción I, del artículo 37 de

rsal, se prohíbe a la comerciante TV Azteca,

ónima bursátil de capital variable, hacer pagos

como origen obligaciones vencidas con

anterioridad a la admisión de la solicitud de concurso

mercantil.

2) La suspensión de todo procedimiento de ejecución

judicial, administrative, *contractual,* or   extrajudicial, no trabe

*seizure of the assets*

*comerciante,* q *have* q com

that have become due prior to   *admi*

of the provisions set forth in Section II of the law \3Z rgá P@Jgb .

ge,'.'XXISAN C¢'//C¢/r3QS M6r¢anfi/eS

*Without this measure* implying *the* suspension of the   *la*

*proceedings initiated against*                      tra   *the*

*merchant,* but *rather signifies the suspension of the enforcement*

*material sobre sus bienes y derechos, es decir, se refiere a la*

suspension *of the* auction and *award procedures, among* other

*similar* measures*, aimed at dissolving the* specific estate.

*With regard to this precautionary measure, based on the*

*provisions* of *Article 65, second paragraph,* of *the* relevant *law, it*

*is specified that when* the grounds for the attachment or

*enforcement* are *of* a *labor* nature, *the* suspension *shall* not

*take effect with respect to the provisions of Section 11,*

*Subsection A, of* ArticleArticle *123 of the Constitution and its*

*regulatory* provisions*, taking into account the wages* for the two

*years*

Scanned with
CamScanner"

]4

prior to the *bankruptcy proceedings.*

Likewise, based on the *provisions of* Article 4Xt of the *relevant* law*, said measure* entails *the* suspension *of* administrative enforcement *proceedings* against the debtor's assets under commercial law, until such time *as* a judgment is rendered *denying the state* of bankruptcy *or,* as the case may be, the deadline for *filing*

*It* is understood that the competent tax *authorities may continue to take* the *necessary* steps *for the* assessment *and collection* of tax *liabilities*

*It is specified that the* presumed *state of commercial insolvency of the* **company** *in question is* <u>not sufficient</u> *to interrupt the payment of* **ordinary** *tax or social security contributions* **due by it,** as these are *essential* for its operation

3/ Pursuant to paragraph iii *of* Article 37 *of the Bankruptcy Law, the company is* prohibited from *carrying out* transactions that involve the disposal *or* encumbrance of *its* principal *business assets.*

*4) It is prohibited* to seize or attach *property* belonging to a commercial enterprise that is *indispensable* **to its** *ordinary operations, including,* without limitation,

\* • those **ordered** *by local or* federal *authorities,* **based on** *Section IV of Article 37 of the* Malena.

S} It *is prohibited to transfer* resources or assets to third parties, *pursuant to* Section *VI of Article 37 of the law on this* matter.

A) *It is prohibited to suspend,* revoke, *rescind,* terminate, and/or cancel *provisional* or *definitive contracts,* even *if their execution* is pending, with *respect* to Oursáltf, a public limited company with variable capital, *until such time* as a final judgment is rendered denying the declaration of commercial *insolvency, or until Guarida is declared bankrupt,* and *the* trustee *appointed in such case states whether or not he opposes its enforcement,* in *accordance with the provisions of* Article 2 *of the* Insolvency *Law.*

It is *hereby* ordered that this ruling *be deemed* valid, subject to the *exceptions expressly* provided for *in the* Commercial Arbitration *Law,* any *contractual provision that, on the* grounds of *the filing of the petition for arbitration or its declaration, establishes modifications that* affect the terms *of the contracts to* which the parties are a party,

D) *Institutions within* the *Mexican financial* system *that* trade in the 7V Azfeca market are *prohibited from*, *under* any *circumstances, engaging in any activity that could be deemed illegal. They may not transfer, dispose of, attach,* pledge, *discount, deduct, offset, and/or use the funds held in such accounts or* forming *part of* the assets *of such institutions,* except as provided *for* in the **cases** *of* **attachments** as **indicated above.**

*The measures* to be taken shall not *benefit* the *company's affiliated or subsidiary* companies: *since, as already mentioned,* Article *37, Section 11 of the relevant law expressly states that* the

: Scanned with

"CamScanner"

FIRST INSTANCE COURT OF COMPETITION IN COMMERCIAL MATTERS, WITH SEAT IN MEXICO CITY AND JURISDICTION OVER THE ENTIRE MEXICAN REPUBLIC

JUDGMENT DECLARING THE COMPETITION VALID

COMMERCIAL BID M/Z026-II.

*providencias precautorias únicamente están dirigidas a* You protect the assets and assets *‹IQ |Ø 4' Ag0 z ı ŞÇj et g t3 |*

Without prejudice to the provisions of Article 38 of the Commercial Bankruptcy Law, the precautionary measure ordered in the ruling of March 20, 2021, shall remain in effect, consisting of:

*'c) It is prohibited to suspend,* revoke, *"divide, channel, rTlOd/F/¢8d, lifTlitar,"* or *affect, in whole or in part, any concession, permit, "license, or* authorization,

*registro, Inscripción, título habilitante o cualquier otro* or *right granted to* the merchant *that* allows *it* to operate. *" " "*

*It is understood that said* measure is neither a reason *nor* a justification for *"the* company*'s failure to comply* with *the payment of the fees* due for *the use of the public concessions granted by the State."*

*Furthermore,* * the measure *granted* does not constitute any *impediment to the regulatory authority's* involvement in the *telecommunications* sector*,* " . . . ' " * ¥/exercise its powers of regulation, *supervision, monitoring, and sanctioning against* the **company** on the grounds of ": ': Your use *of the radio spectrum."*

. Since, as will be seen, "the ruling... the Merchant is not the owner of the property in question, the lifting is hereby ordered in addition to, as has been noted, precautionary measures in accordance with

rticle 37, Section II of the Law on benefit only the debtor in bankruptcy.             BIE

Now, the provisions that are allowed to remain in effect are deemed necessary to maintain the ordinary course of business, protect the debtor's estate, and avoid creating further contingencies for the debtor that would exacerbate its current situation.

Furthermore, to protect the rights of the

creditors, preventing the widespread breach of the applicant's obligations from jeopardizing the merchants with whom it maintains business relationships, as well as to avoid any impairment of the bankruptcy estate resulting from the declaration of commercial bankruptcy

.

FIFTH. Retroactive Date. Pursuant to Articles 43, subsection X, and 112 of the Commercial Insolvency Law, the retroactive date of the insolvency proceeding is set as October 9, 2025.

Based on the foregoing and well-founded grounds, it is

## IT IS HEREBY ORDERED

FIRST. Declaration of commercial insolvency. The petition for commercial insolvency filed by ș,ti TV Aztaca, a publicly traded corporation .tt **variable capital, is well-founded**, as it has been established that said business, of }ț accordance with the provisions of Article 10 of the Law on .t Commercial Bankruptcy Law, was in widespread default on the payment of its obligations; therefore, on this date, JULY 6, 2026, THE AFOREMENTIONED **MERCHANT,** whose registered address is Periférico Sur, number 4121, Colonia Fuentes del Pedregal, Tlalpan borough, ZIP code 14140, Mexico City, is hereby DECLARED IN COMMERCIAL BANKRUPTCY.

SECOND. Conciliation Phase. The CONCILIATION PHASE is hereby declared open for one hundred and eight and five calendar days, counted from the day this resolution is published in the Official Gazette of the Federation, pursuant to the provisions of Article 145 of the Commercial Bankruptcy Law.

:   Scanned with

"CamScanner"

17

FIRST DISTRICT COURT FOR COMMERCIAL BANKRUPTCY MATTERS, WITH SEAT IN THE CITY OF MEXICO AND JURISDICTION THROUGHOUT THE MEXICAN REPUBLIC

JUDGMENT DECLARING COMMERCIAL BANKRUPTCY

COMMERCIAL BANKRUPTCY CASE No. 22/2026-11.

THIRD. The FECOM is hereby ordered to appoint a conciliator. Pursuant to the provisions of Article 43, Section IV, of the Commercial Bankruptcy Law, the Federal Institute of Specialists in Commercial Bankruptcy is hereby ordered, within a period of FIVE DAYS and through the previously established random selection procedure, appoint a conciliator to serve in this matter, who, within THREE DAYS following his or her appointment, must notify the creditors of his or her appointment and designate an address within the jurisdiction of this court for the fulfillment of the obligations imposed by the Commercial Bankruptcy Law.

"Commercial.                    *'-

En tanto se efectúa designación de **conciliador**, el **comerciante**, sus administradores, gerentes y dependientes tendrán las obligaciones que la ley atribuye a los depositarios.

Now, it is necessary to clarify that said body is the competent authority to appoint the person que fungirá como in this proceeding concursal, toda vez que

. Upon consulting the Registry of Concessions, it appears that the various entities of TV Azteca III, a corporation

Televisora del Valle de **México,**

promoter of Inversiórt.,.de

holders of the concessions for egitotaz...

television, linked to the aforementioned company; therefore, since they are companies not subject to this proceeding, the provisions of Articles 237 and 238 of the Law on

—————————————

•               Con vult abtex          in hrtg"ÿyrJz¢_if‹_orR_mx/vrgc/RpcSearchController/showÇoriçes'oninfn*i1Cenr•sign-fEft0ég4_M_C0.10si 71 and httgsyzs¢ ift orx m•/vr¢c/odfs/l9fl8 S TECNiCA 0107g9 edr

Scanned with
CamScanner

16

Commercial Bankruptcy Proceedings.

FOURTH. List of creditors in the auditor's report. Without the following list exhausting the procedure for recognition, classification, and priority of claims, interested parties are hereby notified that, based on the content of the report issued by the auditor, the following are presumed to be creditors of the merchant:

| NO. | NOMBRE Y DOMICILIO DE LOS PRESUNTOS ACREEDORES | TOTAL EN MONEDA |
|---|---|---|
| | 27 MCRAS INTERMC1OML SA OE CV NORTE 35 695 COLONIA COLTONGO AZCAPOTZALCO ¢'•R/DAO DE MÉXICO C. P., 02630 MEXICO | $1,249,689.68 |
| 2 | Su› AaDEisES SAPi DE CV CO+IS3¥T\IYEHT5S 9S6 CDLOMIA L¢I¥tA6 A€TA5 f FGUEL HtDALGD ¢4UDAO DE MÉXICO C. P. ¥1e50 MEXICO | *'" ' |
| | 929 MARKETING INC RUE caamER 3szs PLATZAU -uouT-ROYAL MOUTREAL | G3s.HcG1 |
| 3 | 99 DEGREES & CO SC PASEO DE LA REFORMA 22S T3 908 COLONIA JUÁREZ CUAUHTÉMOC CIUDAD DE MÉXICO C. P. 06600 MÉXICO | $1,270.20 |
| 4 | | |
| 5 | ABAr‹¢ATRADUCCIDNE iNTERPRETAO0«i Sc 6 Syracuse £4-A CPLOMA LOMAS ESTRELLA IZTAPALAPA CIUDAD DE MÉXICO C. P. 09890 MÉXICO | , ' |
| 6 | BASIC SUPPLY DEPARTMENT OF CV BODEGA F 8A SN COLONIA CENTRAL DE ABASTO ZTAPALAPA, MEXICO CITY, ZIP CODE 09040, MEXICO | $22,006.00 |
| | ADA JOSMM MENOOM APTEAIZA warx 'c ouaxo oE u/'rrco c. e. masao u xico | $93,500.00 |
| 8 | ADDALLY SOLUTIONS BV AMSTERoAM sEsTIzAAT»/Eo 1s BAAnu aAARM UtTREcHT | ¥S6,s‹0.0‹0.7s |
| 9 | ADJ PRODUCT9 GROUP MEXICO S DE RL OE CU AVENIDA SANTA ANA 30 COLONIA LERMA DE VILLADA | $7,187.17 |

Scanned with CamScanner"



FIRST **DISTRICT** COURT **FOR** COMMERCIAL BANKRUPTCY MATTERS No. 9, WITH SEAT IN **THE CITY OF** MEXICO AND **JURISDICTION** OVER THE ENTIRE REPUBLIC OF MEXICO

**JUDGMENT OR DECLARATION OF COMMERCIAL BANKRUPTCY**
Commercial Bankruptcy Case No. zzc¢z6-Jl.

PODER JUDICIAL DE LA FEDERACIÓN

| | | | |
|---|---|---|---|
| and | ADMINISTRATION OF THE ESTATE FOR THE PURPOSE OF DISTRIBUTING ASSETS<br><br>AHUEHUEttO FIOR7E ¥¢J CDLOMA BO9OUES DE LA9 LOMAS MIGUEL HIDALGO CITY OF MEXICO ZIP CODE J1700 | | $160,080.00 |
| '' | AOBANA **AGREOMO RU8ALCABA**<br><br>**RU8CN DARIO 27'\** CIRCUITO **VALLARTA NEIGHBORHOOD GUADALAJARA JALISCO C. P. 44680 MÉXICO** | | " |
| 12 | ADVANSEC 6C<br><br>**MORELOS 2 COLONIA SAN LUCAS TEPETLACALCO TLALNEPANTLA DE BAZ ESTADO DE MÉXICO C. P. 54055** | | $98,638.92 |
| 13 | AovERtzsl«O WISHES TO l¢HFOU»0A sOx »jc<br><br>PARft AVENUE S0UT\l 4S2 NEW YOR¥t flM YORI't Jg¢J8 E5T‹DO6 U›tloos'os aa€aicx | | ¥273,640.S6 |
| }.^ | As\xLAe BAYOMA JE80s "" "- !•Ü"<br><br>GAnitLlaRE 'oURAxaÇl tO9RE0M nM. SO COLONM EJlocl e^ieiovE cxro¢nótt sooelsusz rcriuco ac cProe+oo **DURANGO C. P. 34775 MÉXICO** | | G^3,0C' 27 |
| 15 | **AGZA TRADUCTORES SA DE CV**<br><br>**PASEO DE LA REFORMA 300 PISO 9 COLONIA JUÁREZ CUAUHTÉMOC CIUDAD DE MÉXICO**<br><br>**C. P. 06600 MÉXICO** | | $700. |
| 16 | **AIM SPORTS LLC**<br><br>**BROADWAY 29 NUEVA YORK NEW YORK NEW YORK 10019 ESTADOS UNIDOS DE AMÉRICA** | | $222, |
| '* | xKAu uExlco Tzcmpoctes s peFIL oe w<br><br>PASEP DE M ' RMA COLD/+Ls JUARM CLtAUXY¢MOC CMoAÔ OE uEXICO C.P. 0¢6¢0 MSXKO | | G .'00 '0 |
| '* | **ALOABA ARTE SA DE CV**<br><br>8ÓCaATE9 13C COLOxI» PALMAS l•OMxCO M+GUcL HIDMcO CluOAO OE UÉXfCO A P. 11S6o MÉ¥Zco | | $59,090.00 |
| 19 | **ALDEA SOLUTIONS INC**<br><br>**COTE DE LIESSE 8550 SUITE 200 SAINT-LAURENT** MONTREAL QUE8tC HIT 1H2 CANAOA | | $355,034.19 |
| 20 | ALEJAfiORO LEAL MORA<br><br>BAHIA DE GUAHTAMAND 64 COLOMA VERÓNICA MZLIRES MGMEL FI1DALGO MORELOS ZIP CODE 11300 MÉMCO | | $3,729.40 |
| | cuuenxg DE cCULTZIIC 26 COLOlitA NARVARTE **PONIENTE BENITO JUÁREZ CIUDAD DE MÉXICO C. P. 03020 MEXICO** | | |

Scanned with
CamScanner"



ZO

| | | |
|---|---|---|
| 22 | AUC\A I4ERkAHDEZ VALENCIA<br>LAZARO CADE»A9 1eB COLONIA VILLA ARTESANxL<br>**PARACHO MICHOACÁN C. P. 60257 MÉXICO** | t L00&00 |
| 23 | *LtWHE£L0OTORSn0NTS6*0EEY<br>MGO WENNER 16, COLONIA GRANADA MIGUEL<br>**HIDALGO CIUDAD DE MÉXICO C. P. 11490 MÉXICO** | 543,276 13 |
| 2a | AM TECH OLOGIA SA DE CV<br>c1Lce otAcoux L sAN MTouio s3‹coLou‹A orL vaLrc cEnTao<br>aE+/iTO JuARzz cluDcD oE Mexico c. p. 03l g0 uMco | $79.056.63 |
| 25 | AMAtRA/d BECERR L sA«MGO<br>CERRADA IRA OE AQUILES 9EPOAN S COLONIA<br>SA«TtAGO TEPALCATLAI_PA« xOCHI¥¥LcO CITY OF<br>MEXICO ZIP CODE 16200 MEXICO | $100.232.00 |
| | AMeIEnTE xREATiVO EMPREsARIAL 9A DE CV<br>PLAYA MUL 319 COLONIA AGRICOLA PMTALAN<br>**IZTACALCO CIUDAD DE MÉXICO C. P. 08810 MÉXICO** | $15,457.20 |
| 27 | *B¥1QNTEWDOE4DECV<br>LAGO ZLIRICH 24s, COLONIA AMPLJACIÓN GRANAOA, MIGUEL<br>HIDALGO, CITY OF MEXICO, ZIP CODE 1529, MEXICO | $39,712,864.72 |
| 28 | **ANDREA EHRLICH TORRES TRUEBA**<br>**MERCED GÓMEZ, LOCAL 1 7 COLONIA MERCED GÓMEZ**<br>**BENITO JUÁREZ CIUDAD DE MÉXICO C. P. 03930 MÉXICO** | $31,635.75 |
| 29 | ADVERTISE WITH OF4ENTE SA DE CV<br>NEZAHUALÓYOTL 160 RAÚL ROMERO NEIGHBORHOOD,<br>NEZAHUALCÓYOTL, STATE OF MEXICO, C.P. 57630, MEXICO | $150.338.13 |
| 30 | Attn: EM 9AHCHEZ NVEIZA<br>&A or FEMPE, Te 07, Colonia Xocd, Benito Juárez | Dt62S00 |
| 31 | xnso‹r Mexico scR oe cv<br>Paseo de la Reforma 1a0 Colonia Juárez, C.U.N.A.C., City of<br>Mexico, C.P. 0000, Mexico | izTi,*ii z |
| 32 | **ARMENDÁRIZ FLORES CARLOS ABIUD**<br>x0« s COLONIA OUOxD CAHARÜ0 CENTRO JUAREZ<br>EHtHUMUA C P. 33700 MEMO | $93.706.70 |
| 33 | AROCfll TO MNDHER 3C<br>AVE BtOA IN 9URG ENTE 9 9UR G60s **PIBO** 30 **COLONIA** 9AN<br>Jose eisuRcc›‹j-es ae++rro JuAnez ciuoco oe uexico<br>ZIP Code 039¢0 SMCO | $94.030.41 |
| 34 | ARREfioAOORA›NTERNACioNAL AZYECA 6A OE CV<br>cvcnBax    Tzoex/tzoLco ae8 color+ra ReroRMa<br>**CUERNAVACA MORELOS C. P. 62260 MÉXICO** | $1.182.098.52 |



"CamScanner"

Scanned with

"CamScanner"

Case 1:26-mc-23885-JEM   Document 30-1   Entered on FLSD Docket 08/03/2026   Page 265 of 385

FIRST **DISTRICT** COURT FOR COMMERCIAL BANKRUPTCY MATTERS, WITH SEAT **IN** MEXICO **CITY** AND JURISDICTION THROUGHOUT THE MEXICAN REPUBLIC

NOTICE **OF** COMMERCIAL **BANKRUPTCY PROCEEDINGS**

COMMERCIAL **BANKRUPTCY** Z2/2026-JI.

| | | |
|---|---|---|
| ** | **ARREZ HERNÁNDEZ JOSÉ GUADALUPE**<br>his first comment, Ector l•orulax WCP                 c<br>City of Mexico, ZIP Code 0496ê              CO | *'      °^ |
| | **ARTURO RAMOS SOBARZO**<br>Block 0, Lot I, Section F, Lot 301, Coloma Llahi, Oe Lo9 Baez, Ecatepec de Modelos, State of Mexico, ZIP Code | '*'  '" |
| | AOEgoeEÇ rUe\dClfAfttO4 aE jtJUAM ã DE RL DE CV<br>AGIM CxIJExTE e5r2 CPLPI'«A zoM CENTRD TMJ<br>BAJA CAUF9RNIa, ZIP Code 229g0, MEXICO              @ | |
| ss | **ASOCIACIÓN DE CONDÓMINOS DE CAMPECHE HILLS AC**<br>coac n        x sx ;.coLow . LE k cAuncHs<br>**CAMPECHE C. P. 24500 MEXICO** | t1s,00¢.04 |
| 39 | **ASOCIACIÓN INTERNACIONAL DE RADIODIFUSIÓN - AIR CARLOS QUIJANO 1264 MONTEVIDEO 11100 URUGUAY** | $331,774.58 |
| 4s | AUTOMATIC CABIN TAPA7IA 6A BY IV<br>‹V l•ATRIA ‹1‹1¿aat ¢OLOuIA JARPInEs YEeEYAc<br>Z,APoPwJMJ6COc fi,•tyeMMEoco | cz, s1H<br>" |
| "/ | AuTouno d0          sA OE ¢V<br>luOURO t zS sUR 1S72 COLOR CR2oTO CONSTRUCTOR | G3S,0' '1 |
| 42 | **BLVD DÍAZ ORDAZ KM. 3.33 L-1 COLONIA COLONIA UNIDAD SAN PEDRO MUNICIPIO SAN PEDRO GARZA NUEVO LEÓN C.** | $306,240.73 |
| ^ | AYALA, NEF.K JO3 LL¥S                ,<br>HAciEuu« LDs' ETzeBNo 1¥S COLo+dA LÁzARO CARDExA9<br>**CUAUTITLÁN IZCALLI ESTADO DE MÉXICO C. P. 54800** | " |
| | AYSEL SERVICE $A OF DV<br>ESTAO 4 CCiLG+IH ANGEL ZiMBR9N #2CAPQT2AL<br>**CIUDAD DE MÉXICO C. P. 02099 MÉXICO** | |
| *' | **BA INNOVATION MÉXICO**<br>IGLESM 2 7DFtRE C 1ã3 CDLOMA TIZAPM<br>€lBR€GÓN CMDAD OE MÉXfCP ZIP Code 91090 MEXICO | |
| 46 | **BAKU PUBLICIDAD Y MARKETING SA DE CV**<br>MARIANO ESCOBEDO 476 PISO 12 COLONIA ANZURES MIGUEL HIDALGO CIUDAD DE MÉXICO C. P. 11590 MEXICO | |
| 47 | **BALTAZAR LÓPEZ JIMÉNEZ**<br>5 DE MAYO 19 COLONIA SAN ANDRÉS TOLTEPEC TLALPAN | |

:     Scanned with
"CamScanner"



| | | |
|---|---|---|
| **48** | **BAWARE SA DE CV**<br><br>RauMs s s LOCATION aA« v›CENTE CHIC9LclAPM DE **JUÁREZ CHICOLOAPAN ESTADO DE MÉXICO C. P. 56370** | *^' ** |
| | BAxM EXECUTIVE SMRCtj SGs OF Cy<br><br>**HIPÓLITO TAINE 244 COLONIA POLANCO V SECCIÓN**<br>¥Gl›EL rtIDALGO OUoAn nE MEXICO C. P. 1t560 »ÉX O | $13,650.00 |
| **50** | **BEKER 5.0 SAPI DE CV**<br><br>AV SA«TA FE S¢S 1s01 COLOMA CUMMLPA OE MORELOS cuAJluALpA DE UORCLoS CILIOAo oE uExlco c. e. ess49 | ^"^–^ |
| YES | #tNR*EUERR ROV[tAC0UEE<br><br>ME¢'tA LUM Sn 5M COLOMIA CEREO 0G QulMtxTEPE C ^ETZTTTLAN FIIO1LG@ C. P. 4J3S0 NÉXICCl | ^^* ^ |
| | **BH TRADE MARKET SA DE CV**<br><br>**8ANAEDR2SAFDIO95SCOLCeüA1aMD*D94wEStEBMN** HAUCALPM DE JUAREZ, STATE OF MEXICO, ZIP CODE s3sSo | |
| **53** | **BITÁCORA SOCIAL MÉXICO S DE RL DE CV**<br><br>MixERvA 87 Coloua CRÉDrfo col¢szRucToe BEfBzo<br>JUAREZ CITY, MEXICO C.P. g3940 l4EXIC O | 'to'.o |
| **54** | BLOOMBERG jJ•<br><br>LExlxCTDx AV5xUE ›'31 xUEVA YPRr MiP7OWn uAuHxz-ryu new yonx 1orzz EszAoos un‹ooa aa AMERICA | " ^ |
| **55** | **BOTELLO Y BENAVIDES SC**<br><br>**GUSTAVO BAZ PRADA 309 COLONIA LA FLORIDA** TLALi‹EPAMTLx DE eAZ cgrAoo DE MEa¢O C.P. S4060 | $114,700.84 |
| **56** | **BRENDA GARCÍA NÁPOLES**<br><br>DUFL* sGO z4s COLOMBIA RC'MA ^O E CUA*lH!8M C CkJDA• OE MÉDICO C. P. 06700 ACO | " |
| **57** | BRUM nAMIREz ASE 5Oe¢S Ex ¥EcOCl06 6c<br><br>cv fusuRocn Es suR lsos coLo•a^ sAu José lNsuRoznTzs oeLeMcJóN BEHTTO uUAREz CITY OF MEXICO ZIP CODE 390li MEXICO | ' ' |
| | BRY»« O$YALoO Aç¢iSTA SANCHEZ<br><br>SIMÓN eOL!VAe 9 C¢›LONL4 LAs AuÉnlCAS ECAYEPEC DE M¢tFtELO6 ESTAoo oe MEXICO<br><br>**C. P. 55076 MÉXICO** | ' ^ |
| **59** | auto xoun oxzxJ4s eusses uÉxico s oe RL oE w<br><br>Rlo Oc BM JoAaulN ¢ss Peso 12 coLel8A AuPuxció« oRa+txoa taiGuEL +oDxLco cioox£i From Mexico c. P. 11929 | "' " * |

Scanned with
"CamScanner"

FORMA A-61

23

FIRST DISTRICT COURT FOR COMMERCIAL BANKRUPTCY MATTERS, WITH SEAT IN MEXICO CITY AND JURISDICTION THROUGHOUT THE MEXICAN REPUBLIC

JUDGMENT DECLARING COMMERCIAL BANKRUPTCY

COMMERCIAL BANKRUPTCY CASE M/202&4l,

| | | |
|---|---|---|
| ^ | **BUSTOS JAIMEZ SALOMÓN** <br> Case No. 20241, filed by Yaxco or Clsncóa 'rcxco against ALxncóu cuERRcno c. P. *ross u5xico | '^ ^^ |
| II | aYaso ysnTENiuanTO lnTEcRAk s oE FiL DE cv <br> ISLA MO«TAaUE s7¢ COLOI'«A sxP FELwE TORREOn | C3s.S4G.e3 |
| " | **CADENA RADIODIFÚSORA MEXICANA SA DE CV** <br> cci •aA se TrALP•x ¥40e COL‹arA rsP*a7ACo CO¥OACAu CMOAo OE MSXICO c. P. 0+679 MExiCO | " " '*''²'*''*'' |
| 63 | CAoG£¢*d°fcS BA DE CV <br> NORTE 56-A 5204 COLONIA TABLAS DE SAN AGUSTÍN GUSTAVO A MADERO CIUDAD DE N | $43,622.00 |
| .^. | txAetlATO . 1e¥ E oisiA 4 $6N os LOS ax/iO6 <br> VENUSTIANO CARRANZA CIUDAD DE MÉXICO C. P. 15520 MÉXICO | ^' ^' |
| 65 | **CAJAS FUERTES BULL SAFE SA DE CV** <br> ALTADENA 44 C 44 COLONIA NÁPOLES BENITO JUÁREZ CIUDAD DE MÉXICO C. P. 03810 MÉXICO | $22,500.00 |
| 66 | PRIVADA DE LA 19 PONIENTE 4512 3 COLONIA BELISARIO DOMÍNGUEZ HEROICA PUEBLA DE ZARAGOZA PUEBLA C. P. 72180 MÉXICO | $9,016.54 |
| 67 | CALLE HÉROES DE NACOZARI 205 COLONIA REFORMA Y FERROCARRILES NACIONALES TOLUCA MÉXICO C. P. 50070 MÉXICO | $1,795.00 |
| | c CuC› P£i+EZ z0s £ z0UnRDO <br> MGu£L HiDi£G0 SO si C0L0i«n SOIO e uARi«z <br> TAMPICO TAMAULIPAS C. P. 87670 MÉXICO | $126,879.44 |
| 69 | **CANON MEXICANA S DE RL DE CV** <br> BLVD MANUEL ÁVILA CAMACHO 138 COLONIA LOMAS DE CHAPULTEPEC MIGUEL HIDALGO CIUDAD DE MEXICO C. P. | $8,087.57 |
| 70 | **CARLOS JAIME ESTRADA PÉREZ** <br> 20 DE NOV SUR 411 COLONIA CENTRO LINARES NUEVO LEÓN C. P. 67700 MÉXICO | $146,085.02 |
| | **CAROLINA CALDERÓN BADILLO** <br> HftA LA cALLE0A 1 coLouA FRxcc BERNÁRDEZ GUADALUPE ZACATECAS C. P. 98010 MÉXICO | $36,352.59 |






| | | |
|---|---|---|
| 72 | CASYRO ZAVALA 0ESú8 I'sTOFIIO<br><br>BLVo FTZANCISCO LAaA9TDA O6HOA \64 COLOI'XA LAGO TRE8 RIOS CMACAN MMAcOA<br><br>**C. P. 80027 MÉXICO** | "1T'06100 |
| 73 | CBRE MEXICO GwS S DE RL DE C'd<br><br>PEDaEGxL 2t COLONIA MOLBIO DEL REY          MiGUEL HIDALGO MEXICO CITY ZIP CODE 11040 MEXICO | ^'''^ |
| 74 | **CCT MÉXICO SA DE CV**<br><br>ABRAHcu uucoc6 sztr sz‹y co¢ouA P‹SEO DE LAS OTRAS u0›ITERREY NUEVO LEófi ZIP Code 6xtt6 MEXICO | /t8,S7D AA |
| 75 | CERTSUPERIOR S OF RLOE ¢U<br><br>JAVtER BARqoS SIEReA HO TeRRE 1 P s02s COLONIA 5ArtT< rE ALVARO oBREG0n CITY OF u¢XI¢O ZIP CODE | |
| 76 | **CESAR ARGEL LÔPEZ LUNA**<br><br>CAE     cA'rETA«O        Dex0e, HOUSE 7‹ s0 COLONIA SANTA ¥€ANTHA ACATITLA IZTAPALAPA CITY OF MEXICO ZIP CODE | ''* |
| | **CESARFER SA DE CV**<br><br>Avenue A'BLAH ISI COcouw cucoxLues oEL ue €ZFAPALAPA MEXICO CITY<br><br>**C. P. 09300 MÉXICO** | '^        ''^ |
| 78 | CFE SLIMI/'UC          R PE 9ERVIC/O8 BA3ICDB<br><br>p,ssEo oE LA ReroRux 1st **cototUc** JuAREz cuAUHTÉMOc clUDx OF MEXICO C. 8. o6s uÉx^o | '  '''* |
| 79 | cHAHTitcl ESPtMOEA AvctJfio AHORES<br><br>NORTH SIDE, COLONIA CINTALARA, MEXICO CITY<br>nixrcs c r. 3w¢o ucx:Ico | se7,741.26 |
| 80 | CIJRI6TtMI RUBÉN CABRERA<br><br>cxLzz r cuis u eoxcE the cocom‹            ceH no<br>**TULANCINGO DE BRAVO HIDALGO C. P. 43626 MÉXICO** | ''    *^ |
| 81 | €4cOVI3A SA DE CV<br><br>AMORES tH COLCiNIA DOL VALLE CENTRO BENTTO JUA tEZ MEXICO CITY ZIP CODE 93190 HM1cO | * '     '* |
| 82 | CIH TE    COMUNICAOONES OE MÉXiCO SA PE CV<br><br>**RENATO LEDUC 321 COLONIA TORIELLO GUERRA TLALPAN CIUDAD DE MÉXICO C. P. 14050 MÉXICO** | $51,152.00 |
| | **CINTAS COVE SA DE CV**<br><br>cxzLs JACx Ix+sDAG 13 Colifia San Istoro Cuauttan<br><br>**C. P. 54730 MÉXICO** | '' |
| | **CIPRÉS BRIBIESCA JUAN CARLOS**<br><br>conseooonx ss7 cOLo+cix uisuec rsoxLao TL-^i-+'^n | '''^''' |

"CamScanner"

Scanned with

"CamScanner"



PODER JUDICIAL DE LA FEDERACIÓN

25

FIRST COURT OF SPECIAL JURISDICTION IN YERBA, FOR COMMERCIAL BANKRUPTCY PROCEEDINGS, WITH SEAT IN MEXICO CITY AND JURISDICTION THROUGHOUT THE **MEXICAN** REPUBLIC

DECLARATION OF COMMERCIAL BANKRUPTCY •

COMMERCIAL **BANKRUPTCY CASE** 22/2026-II•

| | | |
|---|---|---|
| | CITY OF MEXICO, ZIP CODE 14260, MEXICO | |
| 85 | CleCULO LABORAL SA de CV<br><br>Calle de Cervantes 30, Edificio N7E, 10th Floor, Colonia opa+uoA uicuEr nioaLso ciuoxo aa uÉoco c. e,1Isyo **MÉXICO** | ″* |
| 86 | Union of Mexico S.S.X.C.<br><br>LAco ZURiCFI 9t COLoHIA AMf•LtACIóN GRAIJAOA MloUEL HoALG@ CITY OF MEXICO. C.P. 1J529 M 'XICO | ,″′*,″″ |
| 87 | PROGRESS OF THE COLONY OF CHIHUACU, CENTRAL CHIHUAHUA, C.P. 51000 MÉTDD          =i; | $1,685.72 |
| 88 | COLONEL       M EL +dRA0OR SA oE¢V<br>**AL MIRADOR KM. 3.5 COLONIA VALLE DEL MIRADOR MONTERREY NUEVO LEÓN C. P. 64750 MÉXICO**<br><br>**COMERCIALIZADORA IMU SA DE CV** | $13,247,621.76 |
| ** | Btvn MAnKL CLASSROOM› CAMACHo 3 Or1o 401 aot0y LOM'S DE CItAPUL,}     Ç I szcCtON MIGUEL **HIDALOO** **CIUDAD DE MÉXICO C. P. 11000 MÉXICO** | ·· ,,,,,,,,, |
| 90 | ooMERct•iaTcMGE¥ITE &g DE CV<br>W<br>**SAN FRANCISCO 1902 COLONIA DEL VALLE CENTRO** | $296,214.89 |
| 91 | **MARKETING**<br>cauul'4cAn0n sA oE cv<br><br>noascio tso1 as lx cwPurzcl•sc uonxrxs umucL<br>**HIDALGO CIUDAD DE MÉXICO**<br><br>**C. P. 11570 MÉXICO**<br><br>**COMPLANT LEGAL SC** | $192,757.50 |
| 92 | ixfou'rxxiE   3s' coLouH CoUXRGO      cnx+'uLTc cc<br>**MiGUEL HIDALGO CIUDAD DE MEXICO**<br><br>**C. P. 11560 MÉXICO** | ^       ″^ |
| 93 | | $6,450.00 |
| 94 | CDMUMEeO5 REC9›lOCl•DS nE nUlTziLAC<br><br>BEiaTO JuAREZ sN cDLoulA CEXTRD I‹ul          rr | s66J7&+¥ |
| BS | CDRR6GIgORA 2 CDLDI'+ÍA<br>**C. P. 62510 MÉXICO** | 0B, |
| | CDMU6iloAD GAN MGUEL DEL CAR+¥ZAt- SE<br><br>DOHclLjo couocjoo su coLoNfA sAurc LUCIA | |



:   Scanned with
CamScanner"



26

| | | |
|---|---|---|
| | ÇtjHCORDIA StMLOA C. P. s2660 MEXICO | $62,180.43 |
| 97 | **CONDISTA INTERNATIONAL LLC**<br>kW 101 Ave. 2t0s 3rd Floor uiAMI MMH Ft.OeloA 331+*<br>**ESTADOS UNIDOS DE AMÉRICA** | ' *    '* |
| 98 | COHSORCIO I iTcGRAL JAMX INGEN)U8 9A OE CU<br>Oeizabx Park 2, No. 2, in Colonia El<br>PARQUE JUAÑEZ IN MEXICO CITY c. P | ، ،،،،،،،،؍؍؍ |
| 99 | **COkSTRUCOONES FRACTALES OTOCH SA DE CV**<br>Paseos de Echegaray Sur 221, Coloms, Hacienda de Echegaray, Naucalpan, 0e Juárez, State of Mexico<br>ZIP CODE 3300 MEXICO | ، 08 1 |
| 100 | consT+tuccioues        xlzx        tx        luDus7RIA        ¥<br>**TELECOM** JMcAoOx sir oe cv<br>cv onicxze s known as zoax PtovsT xc mmcc<br>CNDAO OF MEXICO, ZIP CODE 43604, MEXICO | $9,756.60 |
| 101 | GUERRERO CONSTRUCTION AND DEVELOPMENT 6A OE CV<br>PASEO BAN I9IORO 400 COLON+ SANTA CRUZ METEPEC STATE OF MEXICO ZIP CODE S2140 MÉXTCO | |
| 102 | **CONTENTS** €XG\TALE9 BPA<br>BAfiROS Aaxt •st on es coxcerCtÓN CO+/CEPGtóH<br>CONCEPT 4,030,000 CHILfi | M,S19.7S |
| 103 | £OMTINEMTAL PLLG '<br>ALCAZAR AVENUE, No. 245, Suite 640, FLORIDA, FLORIDA, FLORIDA 331s4 EST jjOS UIgI0O3 OE MÉMCA | $2T7.62GT2 |
| 104 | CGORDTNAOORA OE CARFtfERS SA DE CV<br>**AV  SAN  JERÓNIMO  210  COLONIA  SAN  JERÓNIMO  MONTERREY NUEVO LEÓN C. P. 64640 MÉXICO** | $562,276.00 |
| 105 | CORPORATE DECISIONS AND SERVICES FOR D\I'<br>Av. VExUSTI« IO CARR«MzA IIS ¢OL0iBA J‹RoinEs<br>**VALLz MEXICAMBAJAcALEORfTLAC. P. 21270 MEXICO** | '*'^"^ |
| 106 | INTERMEDIARY CORPORATION FOR EXHIBITIONS AND CONFERENCES, S.A. de C.V.<br>RIO SEKA 12, COLONIA CUAUHTsuoc, cuxun €uoc<br>City of HExsCO, ZIP Code 0&s00, MEXICO | $545,775.00 |
| 107 | NOYAYLSIOX 9 CORPORATION, S.A. de C.V.<br>IHSURGMTES SUR 6S4 COLONIA DEL VALLE CENTRO **BENITO** JUAREZ ¢ UDA0 OF MEXICO ZIP CODE 03100 FXÉXJCO | " ' |
| 108 | **CORPORATIVO ENCISO SC**<br>AVENIDA 6 DE MAYO 933 COLONIA CENTRO YSRACRM VERACRM ZIP Code ¥1700 MA cO | 93M,é71.00 |
| 109 | GOAPOxsTNO MEnns SC<br>azcxeozz«zco rx vxtx sos zo4 D colorc sxur‹<br>CATARINA >7rAPDTzALCO CITY OF »MCO ZIP CODE 022So | ' °' |

: Scanned with CamScanner"



FORMA A-65

27

FIRST DISTRICT COURT FOR COMMERCIAL BANKRUPTCY MATTERS, **WITH** JURISDICTION IN THE CITY OF MEXICO AND THROUGHOUT THE **MEXICAN** REPUBLIC

PODER JUDICIAL DE LA FEDERACIÓN

JUDGMENT DECLARING COMMERCIAL BANKRUPTCY

COMMERCIAL BANKRUPTCY CASE 2Z/2026-JI.

| | | |
|---|---|---|
| | **MEXICO** | |
| '' | COWORKISG BANERAG 9A DE CV<br><br>FCD MEDe'IA cSCE NCIO 39s7 to6 COLOHIA rUERTO VALLKRTc FBxCc. MxnınA V4L LAFI tA JAMSCO C. P. 4B339 NEDCO | ' |
| 111 | **CPS DIGITAL SA DE CV**<br><br>VIA DR. GUS7A¥o 6AZ PRADA 100 COLOMIA I10M9TRIAL ALCE BMMGO oAUC ALPAIJ 0E JUAREX E3TAD0 DE u£Xıco c. P. szJ70 uûXlco | '_   *'' |
| | CRAwVO PROOLlcTIDN BA 0E CV<br><br>3500,   1304   3500<br>EZ GUADALÁJARA J | $184,993.44 |
| tt3 | CRE>L RORIGUEZ & ATTORNEYS, SC<br><br>**BOSOUE OE** CIRU'ELO9 301 *e1 OEPTD. 1¢2 **COLONIA** BOSQUE DE LAG LOtaA6 ¥¥GU         nI0ALGO CITY OF **MÉXICO C. P. 11700 MÉXICO** | ''" |
| 114 | CRISÓSTOMO MARCELO MARIA DE LOS ÁNGELES<br><br>**DOMICILIO   CONOCIDO   SN   COLONIA   TEPEACA   PUEBLA PUEBLA C. P. 75200 MÉXICO** | $91,299.08 |
| 115 | **CTUX SA DE CV**<br><br>MAE      SERRAHO AZ 3Z9 LT. 54 * COLONIA M PRESIIA **CUAUTITLÁN IZCALLI ESTADO DE MÉXICO, C. P. 54763** | '  '' |
| f18 | **CULLIGAN WATER MÉXICO SA DE CV**<br><br>cA»POS ELISECıS, rtSO s sSsB COLOxıA PorANCo V **SECCIÓN MIGUEL HIDALGO CIUDAD DE MÉXICO C. P. 11560 MÉXICO** | * *^ ^ |
| 117 | **DADMEX S DE RL DE CV**<br><br>**NICOLÁS   COPÉRNICO   102   COLONIA   SAN   MATEO OTZACATIPAN TOLUCA ESTADO DE MÉXICO C. 50200** | $18,748.21 |
| 114 | UN  OICCRA L UEOTC SYSTEMS USC UC<br><br>6B RNE STÎTEET 66 BM FLOOR /THURSDAY NEW YORK fIEW NEW YORK<br>New York's Logs EGr os uuıDos Dz xu£Rıcc | $698,862.72 |
| 119 | xtxrxCTge'r ux s oe xL oE cv<br><br>BMIA GUAHİ¥xAMO 7th COLONIA VERONICA MZURES **MIGUEL HIDALGO CIUDAD DE MÉXICO C. P. 11300 MÉXICO** | $79,650.00 |
| 120 | DATAXIS<br><br>1g RUE PERGOLESE 10 PARIO PAI4S Pxas est • rruBîf«Tf | li§€#Jî@ f.1 IT a<br>aMcl   OO    t*Mı |
| 121 | DAV... AI MAI»PO TAI A»ANTE9 ..IVAS...<br>**CALLE ALFREDO CHÁVEZ 9807 COLONIA LAS MALVINAS.** | $9,087.86 |

JUZGADO PRIMERO DE DE MEX CON JURISDICCIÓN EN TODA LA REPUBLICA MEXICANA



| | | |
|---|---|---|
| | CHIHUAHUA CHIHUAHUA C. P. 31456 MÉXICO | |
| 122 | DC-ALTERNA SA DE CV<br><br>vEMUSTIMO CARRAI¢Zx CRUOAO DE MÉXICO C. P. 1H00 | $703,804.43 |
| 123 | DECOFRIS I SAPI DE CV<br><br>INGENIEROS MILITARES 105 COLONIA LOMAS DE SOTELO WOUEL HIDALGO CITY OF MEXICO ZIP CODE 11200 HÉ-RICO | $1,000,159.64 |
| 124 | DELI ROCKS SA DE CV<br><br>CORREGIDORA 840 COLONIA MIGUEL HIDALGO 2DA 8ECC+ÓFI YLALPAN, STATE OF MEXICO, ZIP CODE 1J2S0 | $626.40 |
| s2s | oELIO RENAM PACHO uOVcLO<br><br>l1 PONEI'fTE 203 UNIOAD NEIGHBORHOOD T4ORZLO9 MCRtOA YLICATAH ZIP CODE 97190 MEXICO | $176,927.00 |
| 126 | o25ARROLcp inueaiu«eie os uoxcçoVA 9A DE CV<br><br>ALI.ENOE SOI COLONIA MOPCLOVA CEMT¥IO COAHLÍLA ca*+iuiL«c. p. zszoe mexico | 0 &,07t1T |
| 12T | OIAZ MIRÓN SC OFFICE<br><br>Corner of General 1g7 Colcini» GEMEex» Pedro María Amaya Bení1o uUÁHEz City of Mexico, Zip Code 03S40 | $58,000.00 |
| 128 | DHL EXPRESS MÉXICO SA DE CV<br><br>FUERZA AÉREA MEXICANA 540 COLONIA FEDERAL VENUSTIANO CARRANZA CIUDAD DE MÉXICO C. P. 15700 | $256,775.19 |
| 129 | DIDOMI SAS<br><br>8D¢ILEVAIt DE 5EBAsToPDL 137 PARFS PARIS 7S002 | $272,753.82 |
| 130 | DIGOSOFT S DEE RL DE CV<br><br>soLOSMrTIJ 40 CDLOMA eoLAaCO III 6EC óN »iGUEL HIDALGO HIDALGO C. P. 11550 MÉXICO | SSS.saSZS |
| 13d | DtUEN INTERMTfONAL 6 DE RL DE CV<br><br>xousreic xesoesexcw z9¥O 2Boo COLOUIA PARouE IxovszescL ssLTiuLo pauos xn xszsos aslzec aoAriuiLx c. P. 2ssoo Mexico | $6,085.94 |
| 132 | DILIMPIO SA DE CV<br><br>CLIAUHTEMDC MI8 COLOH1A THE EMPLOYEE CUERMVACA MOREL€8 C. fi. 82250 MEXICO | $4,851.28 |
| 133 | DJSPOSTIWO9 ELECTRONICS AND CONTROL 5A BY CU<br><br>CEDnO st1 CDLONIA ATLAMPA CUAUxT6MOC CIUOAO Os á C°CP0M#0M6K< | $25,909.00 |
| 134 | pt9TRBMoOlcA ARcA cOfiTINEfiYAI-<br><br>Av. San Jerónimo P7 013 Colonia San Jerónimo MONTERREY NUEVO LEÓN C. P. 64640 MÉXICO | $14,100.00 |

"CamScanner"

: Scanned with

"CamScanner"



DISTRICT COURT OF uzrcnix for commercial disputes, with exclusive jurisdiction over the case and territorial jurisdiction within the Republic of Mexico

**SENTENCIA DECLARACIÓN DE CONCURSO MERCANTIL**

COMMERCIAL BANKRUPTCY PROCEEDING 2Z/Z020-J(.

| | | |
|---|---|---|
| * | **DISTRIBUIDORA DE ENLACES ELECTRÓMCOS SA DE CV**<br>OSCAR WILDE "3 COLOI IA COuuAs OE SAN JEROHIuO uoNTERREY NUEVO LEON C. P. 84430 MCxI€O | $249.90.35 |
| ® | ORIVE CINEMA SA DE €V<br>SPENCER 411 101 COLOHIA POLANCO V SECCIÖH NIGUE¢ »IaALG0 CnJOAO oz xtNCO. C. r. ‹\se0 M¢xICP | $1,500,000.02 |
| | ECODEM COMERCIAL 4^ BE CV<br>Ay. RE97AURADOR£ 5 ORcHTE 1«¥‹ COLOuIA LOß ARCOS re6x ou‹xuu4to P.O. Box 37‹e‹ *atoco* | $413.34 |
| 138 | EPICIOHE6 EL PARS 5L<br>**MIGUEL YUSTE 40 MADRID MADRID 28037 ESPAÑA** | $2.162,470.14 |
| * | F¢o RaiAS eLzZ 64 ¢OLDht« rx          DE GuGH«AA<br>**GUADALAJARA JALÍSCO C. P. 44650 MÉXICO** | t1t0.ys127 |
| ' | EDITORIAL PRM9AR¥ BRL<br>LA9 CASAS 35SS BOEDO AUTONOMOUS CITY OF BUENOS **AIRES BUENOS AIRES 1290 ARGENTINA** | '*'' " |
| 141 | **MAIN ST 586 FARMINGDALE BAVIERA 11735 ALEMANIA** | $1,000,146.44 |
| | **EGEO ESTRATEGIAS Y PROYECTOS ADMINISTRATIVOS SC**<br>**SANTA FE 440 COLONIA SANTA FE CUAJIMALPA CUAJIMALPA DE MORELOS CIUDAD DE MÉXICO C. P. 05348** | $417,500.67 |
| ' | **EJIDO BOMINTZHA**<br>PLAZA DE LA CONSTITUCIÓN ON COLONIA STREET, NEAR<br>**C. P. 42832 MÉXICO** | $26,349.86 |
| T44 | MD0 ERE5isILtO<br>CDxDCp›o SH COLONIA CENTRO ARKNILLO ZACATECAS ZIP 49010 MEXICO | Sg8.823.¥g |
| ‹XS | **EJIDO LA CUCHILLA**<br>BEMTO JUAnzZ sx C¢tOHIA CEIJTRD MUZQUiZ COMcliLA<br>**C. P. 26350 MÉXICO** | $154,532.73 |
| "*^ | ELECTAIcIDAO AND TECHNOLOGY« 9A OF CV<br>PLAzA xEcAXA 2 COLoMA cUAUnTsuoC CUAU8T¢MOC | $45,766.83 |
| *! | ELVAOREG SCH4J0LER M oE CV<br>CAA¥MO A SAH NATEO 2 COLONIA FRA.CC AIJEXO J‹RiXHEs ac sAfi MATcO u‹Uc‹LPAx DE zU/ RM<br>**ESTADO DE MÉXICO C. P. 53240 MÉXICO** | $496,489.60 |

**JUZGADO PRIMERO DE DISTRITO E MATERIA CONCURSOS MERCANTILES, CON RESIDENCIA EN LA CIUDAD DE MÉXICO Y JURISDICCIÓN EN TODA LA REPÚBLICA MEXICANA**

Scanned with "CamScanner"

30

| 148 | EMPACK DE MÉXICO SA DE CV<br><br>LEBRIJA 58 58 COLONIA CERRO DE LA ESTRELLA IZTAPALAPA CIUDAD DE MÉXICO C. P. 09860 MÉXICO | $28,353.33 |
|---|---|---|
| 149 | TELECOMMUNICATIONS COMPANIES IN CERRO CHIQUIHUITE AC<br><br>LA BRECHA SN COLONIA TLALPEXCO GUSTAVO A MADERO | $126,201.73 |
| 150 | EMPRESAS ISAL S DE RL CV<br>Dutch 2¢T Colombia Beautiful View<br>MONTERREY NUEVO LEÓN C. P. 64620 MÉXICO | '^^*'*** |
| 151 | E8roecER uB7s nRE sze¥tcc PLusE ¥lÉxTco w 0e cv<br><br>INSTITUTO TÉCNICO INDUSTRIAL 11 COLONIA SANTA MARÍA LA RIBERA CUAUHTÉMOC CIUDAD DE MÉXICO C. P. 06400 MÉXICO | $209,514.21 |
| 152 | ENRIQUE ALEJANDRO ALVIZO<br>ENVA8E STREET 402 CDLO¥¥A EL  BAN'TE EL MNTE<br>7 1 cuuPcs c. P. 6sscg utxtco | $5¥,S0S-SS |
| 153 | ENRIQUE CASTILLO DÍAZ<br>5.aoo  You've won the rex+iosco  cuuiuxcw<br>COYOACAH, OE CITY, MEXICO, ZIP CODE 04760 ¥XA¥TCO | *'^"'" |
| ¥Sd | ENRIQUE MORALES MANRIQUE<br>l'iDi¥TE 60 J70S caLOlaA ouevA YcHoc++TTtLAN CUSTAyO A xAOERo sUSTAVo A Mxzlcr‹O cMDAD oe MExfCD ZIP Code | |
| 155 | ENRIQUE ZAMORA NAVA<br><br>ESTADO DE MÉXICO C. P. 03510 MÉXICO | |
| 156 | SENT BY Dg£JaTg Ply j.gT<br>P.O. BOX CO\JjxS 9+rtEET WEST 1¥1u MaLaOuRxE czonlx sas7 axisrexux | S4z.‹9t.33 |
| 157 | EÓLICA DE LOS ALTOS SAPI DE CV<br>Euiuo cAsjgLAg 7s cOLoHIA PoLANco rv sEcció«<br>MIcUEL FtIoALGO €zUOAD DE MÉXICO C. P. 11sS0 MCX+GO | *"" |
| 158 | ercocxe eseu        sir oe cv<br><br>cRJ9A• DE ukoc€t, P.O. Box 06000, Mexico City | $174.00 |
| | EQUIPOS TÉCNICOS CINEMATOGRÁFICOS SA DE CV<br><br>TAPALAPA, MEXICO CITY, ZIP CODE 09630, MEXICO | |
| 160 | Mexico, ZIP Code 1000, uÉoco<br>ao••e•oSA 0E t0s uorrzc+t0s u0ecz | |

"CamScanner"

: Scanned with

Case 1:26-mc-23885-JEM   Document 30-1   Entered on FLSD Docket 08/03/2026   Page 279 of 385

"CamScanner"



FORM A A-55

31

FIRST DISTRICT COURT FOR BANKRUPTCY MATTERS
COMMERCIAL BANKRUPTCY, WITH SEAT **IN** MEXICO **CITY** AND JURISDICTION THROUGHOUT THE MEXICAN REPUBLIC

JUDGMENT OR DECLARATION OF COMMERCIAL **BANKRUPTCY**

COMMERCIAL BANKRUPTCY Z2/2026-Ji.

PODER JUDICIAL DE LA FEDERACIÓN

| | | |
|---|---|---|
| J61 | 26 PONIENTE 31t6 VALLE DORADO NEIGHBORHOOD, PUEBLA **PUEBLA C. P. 72070 MÉXICO** | $Z1B,BM$0 |
| 162 | ESTRATEGIA EM 8UMINI8TROS INTERNACIONALES, S.A. de C.V.<br><br>Au oNrO MACEO t7 COLOMA EscMDO» MIoUeL HIoA¢GO MEXICO CITY ZIP CODE 11I0¥ MEXICO | $5,196.02 |
| '^ | ESTUDIOS CLÍNICOS P.R. T. J. ORIARO, S.A. de C.V.<br><br>AOOLFO LÓPM MATEO8 2t3 COLOMiA kEZxHuALC6YOTL c vDLUCr6N PDI'aENTE es7ADO DE **MÉXICO C. P. 57708 MÉXICO** | ' " ^ |
| '^^ | EUROELECTRICA 6A OE CV<br><br>YEAR OF JIAREZ 2S3 COLONIA "GRA«JA5" OF SAN ÁUTOH!O zzTAeALAPA CkJOAD' OF MEX/C¢t G. p. 09o7a **MÉXICO** | '^ ^"^ |
| 165 | **EXCELENCIA EN INNOVACIONES TECNOLÓGICAS EXCINTEC SC DE RL DE CV**<br><br>**AV CHAPULTEPEC 70 COLONIA SAN GREGORIO** wjw+•ULCO xocH¥ CO ClúoAo DE M€XicO        P. 16600 **MÉXICO** | $27,000.00 |
| t | TEMCONUI4CACIOFIESEXTT 6A OK GV<br><br>vzurca I'»s coLoulc val        DopADo BT-AuNEPAxtLA De **BAZ ESTADO DE MÉXICO C. P. 54020 MÉXICO** | $12,098.80 |
| 167 | FGi•eOCURGuEI'/Y PAfiTNERs sC<br><br>**MANUEL ÁVILA CAMACHO 5 COLONIA LOMAS DE SOTELO NAUCALPAN DE JUÁREZ ESTADO DE MÉXICO C. P. 53390 MÉXICO** | $149,488.53 |
| 168 | **FÁBRICA DE MARAVILLAS SAS DE CV**<br><br>**OBRERO MUNDIAL 156 COLONIA DEL VALLE CENTRO** eEulro aué+tzz c¥Jaxo os uExico<br><br>**C. P. 03100 MÉXICO** | $6,375.98 |
| ' | **FACTUMEX SA DE CV**<br><br>DARW'IM t4, 301 74 COLORADO AI¢ZURES MIGt/EL HIOALCO **CIUDAD DE MÉXICO C. P. 11590 MÉXICO** | •  * |
| t7O | F*RLUzIM1ERH*WON e*<br><br>PARAGUAY 2141 o        Xd1 214t  2t4i MON7EvIDEo **MONTEVIDEO 11800 URUGUAY** | |
| 1'1 | FEMPE FErtn••D0 AAuI4cZ JMGNEZ<br><br>MORELOS 11 COLONIA BAREIO EL CALVA, ASUNCIÓN **NOCHIXTLAN OAXACA C. P. 69600 MÉXICO** | |
| 172 | REMITIR AND SKOLL9A DE CV | |



J JZGADO PRIM ERO DE

U\aTrl1O ñM •.••t-tT f'u, Do CONcURsOn InEi;        •‹ ril.E s, WITH RESIDENCE IN L.*, CITY OF MEXICO, AND JURISDICTION IN THE REPUBLIC OF MEXICO AND LAN

Scanned with
CamScanner

J2

| | | |
|---|---|---|
| | CHICHEN ITZA MZ 29 LT 14 COLONIA SUPERMANZANA 59 BENITO JUÁREZ QUINTANA ROO <br><br> C. P. 77515 MÉXICO | Ss     oo |
| 173 | FERNANDO ESTRADA GARCÍA, <br> PL»zA POPocAT£ PEtL 45 2 cOLOrtIA HPÔOROMO <br> **CUAUHTÉMOC CIUDAD DE MÉXICO C.** <br><br> P. 06100 MÉXICO | $9,371.80 |
| 174 | EÏBRAHOTELERA SC <br> SA•ITA FE 461 RSO 7 CoLoxlx ScutA FE CUMIuALI•A <br> cUAJiu I+'c nc uoncLos c«Jo«o oe ußxIco c. P. os34a | N . 1Gæ |
| 175 | FØB6OM!SD F1s96 <br> **SANTA FE 481 PISO 7 COLONIA SANTA FE CUAJIMALPA** <br> CU+I\uALPA DE uORELo9 CMOAo O'E MMCO C, P, 0S'3‹6 <br> uGoce | S67Z,12O.l0 |
| 176 | **FIDEICOMISO OPSIMEX 4594 SA DE CV** <br> ‹v    oE as       PnLuA9 7H Coroux Couns  We <br> CHAPULTEPEC, Mjuel Hioalßo Section, ¢IU0AD of <br> **MÉXICO C. P. 11000 MÉXICO** | M46,64t83 |
| 177 | **FIVE BITS INC** <br> GOrJzALO CRAucE IBM CIUD»o oEL SABER BALBOA | $1,067,772.00 |
| 178 | tDHDDB*OOH*LDEfOBtHTQ•*LTUB5wO <br> TECOY9TiTM 100 COLONY FLORIDA ALVARO OBREGÔM <br> **CIUDAD DE MÉXICO C. P. 1030 MÉXICO** | $338,772.93 |
| 179 | KORł AS EF1OElfTE8 9A DE CV <br> **AVENIDA LOS ÁNGELES 303 1 B COLONIA SAN MARTIN** <br> XOcH¥'IAH\J1C AZcAPOTzALGO City of Mexico C. e. | $51,478.63 |
| 180 | **FRANCISCO CASTILLO LARA** <br> prtoL uxxluiuq sEnoAn su coLoiJtx xouiLcs senoÁe <br> **NOGALES VERACRUZ C. P. 94720 MÉXICO** | $6,149.45 |
| 181 | **FRUGAR DE CALVILLO SA DE CV** <br> **CARR CALVILLO JALPA KM. 3.5 COLONIA POPULAR** <br> c«LviLLO AGUASCAR/ExTE6 G.P. 20aee MßX+CO | $324,757.08 |
| 182 | FULf dïP CONJ'ROL OE PLAGAS SA DE CV <br> **RUBÉN DARIO 127 A COLONIA MODERNA BENITO JUÁREZ** <br> CITY OF MEXICO, ZIP CODE 03s10, MEXICO | $24,215.00 |
| ' | **GAPO TELECOMUNICACIONES SA DE CV** <br> RArAzL ArtGEL OE M PE6A CO COLONt^ OBRZRA <br> CUAUB7ÉMoC City of Mexico, Zip Code 0Gs00 MßAIcO | •    '' |
| 184 | **GARCÍA GARCÍA MARIO** <br> **MIGUEL HIDALGO 37 COLONIA ZITÁCUARO CENTRO** <br> ZrIAcUA»D selCHOACAu, Zip Code ¥1S00, Mexico | $13,446.00 |

Scanned with
CamScanner"



FORMA A-65

FIRST DISTRICT COURT FOR COMMERCIAL BANKRUPTCY MATTERS, WITH SEAT IN THE CITY OF MEXICO AND JURISDICTION THROUGHOUT THE MEXICAN REPUBLIC

JUDGMENT DECLARING COMMERCIAL BANKRUPTCY

COMMERCIAL **BANKRUPTCY CASE** 22/2026-II.

PODER JUDICIAL DE LA FEDERACIÓN

| | | |
|---|---|---|
| | **GARCÍA TREVIÑO SIMÓN**<br>Manuel M. Ponce 114, Colonia Coms de San **JERÓNIMO MONTERREY NUEVO LEÓN**<br>C. P. 64630 MÉXICO | ' ''' |
| '** | **GARPABA SA DE CV**<br>ccLre ecsEo oe cos stcouo/to9 t›e cocouiA<br>AeBOLEaAS De S»u .IAvlEq ÍA aECCIDH PACHUcA DE 8OTO HioALOo ¢. P.»t0es ›ztxi.¢O | ''*' |
| " | **GAS URIBE SA DE CV**<br>GAS SAFETY AT THE MEXICAN LODGE IN THE STATE OF MEXICO "a<br>C. P. 54060 MÉXICO | $46,801.60 |
| ' | aAs?zLUM MIL      LAWYER9 bA aFC¥'-'*<br>BO99LIES D¥ AN9     c'yB G    l•lfA BO9OUE9 and<br>LDMAS C IAJacxL PA of u0eELOb CIUOAD OF MEXICO C. r. ¢s z¢uAtlco " '      "    ''' | G14,127,71S30 |
| 189 | 6MAn LÁúE 3v00 QLl»l¢:Y ILuu¢X6 cZ3o1-12s2 STATES **UNIDOS DE AMÉRICA** | $200,296.23 |
| 190 | ç.Bt/3eAVcL SEnVICEs MA@CO s OE RL D£ Cv<br>**MONTES URALES 505 COLONIA LOMAS DE CHAPULTEPEC II SECCIÓN MIGUEL HIDALGO CIUDAD DE MÉXICO C. P. 11000 MÉXICO** | $76,544.87 |
| 191 | **GC MEXICANA DE VALUACIÓN SA DE CV**<br>PLxyn cDeTEs s>+ c'oLOhgA. a@0RMA t2TAcciHuATL SOUTH OF IZTXCALCO, MEXICO CITY, ZIP CODE 0e0a0 MMCO | '• |
| * | CEO ÉRu›ca Pxex cL oEsxRRoLLo sxR DE cv<br>MOuTES IJRALEB 460 LOMAS DE CHxPULTEPEC NEIGHBORHOOD e ulcuzu section HoxLco city of uExlco c. e. | *' ''' |
| 193 | eERA00o‹cuiuxeuonnu<br>**INVERNADERO 335 COLONIA FRACCIONAMIENTO COSTA VERDE BOCA DEL RIO VERACRUZ C. P. 94294 MÉXICO** | $16,414.00 |
| 194 | GMG SA DE CV<br>60* CICERÓN STREET, LOS MORALES, POLAIJCO, MEXICO MIGUEL nBALGO, CIUoAO, MEXICO, ZIP CODE 1t010, MEXICO | $4,432,300.15 |
| 198 | GLOBAL &PoM5OR5I+IP GROUP S.A. de C.V.<br>)g p es xen zuHo 1st coLew RzVoLucOu eocx DEL BO YERACRUZ 6 P. 842S6 MEXICO | $130,000.00 |

JUZGADO PRIMERO DE DISTRITO EN MATERIA DE

WITH RESIDENCIA EN LA CIUDAD DE MÉXICO Y JURISDICCIÓN EN

I HAVE MET kII ItCAÜI"IL S

Scanned with
CamScanner"

| | | |
|---|---|---|
| 196 | GLt TUA JACOUEMNE MA€lA9 GtlZMAN<br><br>MARIO CALAVERA 30 **COLONIA TEQUILA CENTRO** TeQuluA JAMSCO ZIP CODE 46400 MEXICO | 924.64s.17 |
| t97 | GOVERNMENT OF THE CITY OF MEXICO<br><br>PLAZA DE LA CONSTITUCIÓN, COLONIA CENTRO (AREA 1), CIALAUHTÉMOC, MEXICO CITY, ZIP CODE 600A, MEXICO | ' |
| 198 | GOVERNMENT OF THE STATE OF VERACRUZ, IGNACIO DE LA LLAVE<br><br>301 Xalapa Avenue, Coloma, Barrio del Bosque<br>Xalapa, Veracruz, ZIP Code 110, Mexico | ss,iʼoo.ofi |
| 199 | **GOMEZ HUERTA** CE9AR<br><br>IGNACIO ALLENDE 71 GATLON CENTRO PARRA9 cO¥+luILA ZIP Code t7e8e uÉxtco | S4,3S0.90 |
| 200 | GONZALEZ GALLARDO MANUEL<br><br>TIGRE 25 COLONIA OEL VALLE CENTRO BMITO **JUÁREZ** MEXICO CITY ZIP CODE 03100 MÉXTGO | 7B8,SS7.04 |
| 201 | GONZALEZ RODRIGUEZ JtLf Y<br><br>**CORREGIDORA 224,** APATZTINGAN RAILWAY NEIGHBORHOOD, OACAN, ZIP CODE 60690, HÉXTGO | M.698.00 |
| 202 | **GOOGLE LLC**<br><br>AMPHN¥4EATRE    **PARKWAY    1600 MOUNTAIN**<br>VIEW Cx IFORxtA MOUuTAilj "iE¥v cAL/FORMA GAIJFORNI<br>s4o4z United States of America | " |
| 203 | GP-SERVICIOS EINSTATACIDNES SA DE 6V<br><br>TcZO I‹PA 127 1Zz COcOMA LA JOYA Tt•ALP«x **CITY DE MÉXICO C. P. 14090 MÉXICO** | S330,‹N 69 |
| 204 | GHANA, I SA DE CV<br><br>JAMSCO P.O. Box 4S140 MEXICO | **$41,578.83** |
| 205 | GRAPHOS OFFICE SA OE CV<br><br>Aoolpd Rum Corttnes Blvd. 5244, 3rd Floor, B, Colonia ISIDRO FABRIZO, P.N. CIUOSO, MEXICO CITY, C.I. Frodo | |
| 206 | GREENBERG TRAURIG LLP<br><br>DOI<AL 8x00 xe0 Miami MMMI FLORIDA 33‹‹6 UNITED UNITED STATES OF AMERICA | SG,45S,z96.42 |
| 207 | GRUPO **AI'IAMAUI,** S. de R.L. o.C.V.<br><br>LÁZARO    :ARDEIJAS    18    COLO^!A    9AI'J    LUCA°•<br>**TEPETLACALCO** TLAMEPAIJTLA OE BAZ STATE OF MEXICO C-P. S40M MEXICO | "      " |
| 208 | **GRUPO AUDIO DISENO SA DE CV**<br><br>iaiTLA 148 CO5OioA xARyARTE POnlENtE BENiTO JUAnEZ CMDAn DE HEx+CO C. P. 0302o MEXiCO | ' |
| 209 | GRUPO CALOUE 6A DE CV<br><br>AvE› IDA BOMxuP<‹ 2 COLOxiA gUPERMAMzANA  8 | *'^  ^ |



FORMA A-45

35

FIRST DISTRICT COURT FOR COMMERCIAL BANKRUPTCY MATTERS, WITH SEAT IN *MEXICO CITY* AND JURISDICTION OVER THE ENTIRE MEXICAN REPUBLIC

JUDGMENT DECLARING COMMERCIAL BANKRUPTCY

COMMERCIAL BANKRUPTCY CASE No. Zg/ZO26-II.

|  |  |  |
|---|---|---|
|  | BENITO JIJAREZ i:tLiiNTMA ROO C. P. TTS04 MEXICO |  |
| 210 | MULTIMEDIA GROUP / 5A DE ¢N<br><br>MEXICO CITY, ZIP CODE 08B10, MÉRCO | $645,300.00 |
| '" | **GRUPO DE SERVICIOS PARA FLOTILLAS SA DE CV**<br>Federal Highway Mexico-Texcoco, Xu 19.S, Colonia 9an, Vice•ze O-+Icoloapa, O.E. Juárez, Chicol0a9ah | '2^,'09 |
| ** | MC4R SA OE CV BUSINESS GROUP<br>PUERTO CONIES Se Gol-OMA JARIsaEs 9E eA«4x CLAÁA ECATEPEC DE »ORELCI9 E6TAoo De MMCd"C. e. sS•S0 **MÉXICO** | '*^ |
| 213 | cRtJPP E1ERCOM CA OE CV<br>**víCTOR HUGO 91 COLONIA** POerALE5"araI O JUARzz **CIUDAD DE MÉXICO C. P. 03300 MÉXICO** | "*^' ^ |
| 214 | CRUPO THUSTRIM NAVY OF THE BA•lf0 6 DE RL ¢'E ¢V<br>**ZETA 310 COLONIA INDUSTRIAL DELTA LEÓN GUANAJUÁTO C. P. 37545 MÉXICO** | $31,140.20 |
| '" | **GRUPO INSME SA DE CV**<br>cR•M•s PÜAcELA 33 ¢OLO•›IA S‹•*‹ C^ ^Ri•• yccAxulzOTc v os çxxcco souoAAioco EsTAoo oEu5xicoc. e sesIs yÉxzco | ^*"'^ |
| g<br>216 | cFtu£'o luduxnumo sxóc cv<br>**BAHÍA DE SANTA BÁRBARA 38 302 COLONIA VERÓNICA ANZURES** MIGUEL HlgAzGo Cit/DAu oE MEXICO C. P. 11500 MEXICO | $354,775.56 |
|  | **GRUPO MULTIMEDIA LAUMÁN SAPI DE CV.**<br>GU+LLERMO GONZALEZ ¢'00 GROUND FLOOR, COLDNIA SANTA FE | '*" |
| 2t6 | RADt£t GROUP CEnTRO SAB DE CV<br>gy and m ‹ ‹ss " ¢oLOxLA LOHAG ALTgg<br>**MIGUEL HIDALGO CIUDAD DE MÉXICO**<br>**C. P. 11950 MÉXICO** | SJ9,492.5wt2 |
| 219 | UNIBRAHO GROUP gA DE DV<br>**LATERAL RECTA A CHOLULA 2812 COLONIA BERTHA SAN** Aflorés Choltila Puebla C, P. 7Z619 MMC¢l | $598.56 |
| " | GRUPD ZIP COM 9A DE CV<br>ZAPOTECAS fe COLONrA DEG€lL»oO IzTs+'ALAPA State of Mexico, P.O. Box 97aa, Mexico | $193,471.58 |
| zz1 | xlcnu zoe coLoNf zsogyeuc Lcóu GUANAJUATO C. P. | $4,356.00 |

36

| | | |
|---|---|---|
| | **37328 MÉXICO** | |
| 222 | **GUILLERMO GARZA CASTILLO**<br><br>JU67O 6lcRRA SUn 3a2 C0LO›II« tOxA C6NFRO ACU9A coxHu\cx c. r. aeon ul'xlco | t207.72 6ł |
| 223 | OUtLLERHO ISMAEL /toOftl0UEZ<br><br>**MORELOS NORTE 4444 COLONIA NUEVO REFUGIO GÓMEZ** PALACID DURANOO L P. 3S029 MEXICO | **$126,672.00** |
| 224 | **GURMILAN & ASOCIADOS SC**<br><br>W¥CROs FROM COYOACAN a\0 CDLOl'aA UTTERS OF THE HILL IN ALNEPANTLA, BAZ, STATE OF MEXICO C. ▪. | "" ^ |
| 225 | GUTIÉRREZ ß **NATIONAL UTE** WHEEL M OF CV<br><br>**AVENIDA TAXQUEÑA 1231 COLONIA CAMPESTRE** C›IURU8U9CO COYOACAN, MUNICIPALITY OF UßX C◄l C. P. 0‹20▪ MEXICO | **$12,460.72** |
| 226 | **CUZDAN** SERVICES SA DE CV<br><br>**LACO ALBERTO 442** TOWER A, ATJMUAC I<br>**MIGUEL** HtDALCO **SECTION, CITY OF** MEXICO, ZIP CODE 11310 | ' |
| 7 | HAR HUMAN BRAIN SC<br><br>**XOCHICALCO 674 COLONIA LETRÁN VALLE BENITO** JUAREZ, **CITY OF** MEXICO, ZIP CODE 93¥¥0, MEXICO | \| $7,833.91 |
| 228 | P.O. Box LA FORMA zsg ełso +4 colofdA Juarez<br>**CUAUHTÉMOC CIUDAD DE MÉXICO**<br><br>**C. P. 06600 MÉXICO** | *" ' |
| 229 | HELPDESK EA ELE CV<br><br>COOP in Palo Alto, Malpa de Morelog, Mexico City, C.P. 0 MEXICO | |
| 230 | HEITMES MV6IC ßA o£ Cv<br><br>**NARAHJO 76 7¥** COLOMM NAl'fTA **UARIA LA** BERA *<br>**CUAUNTÉMOC CITY OF** MßXlCp C.<br><br>P. oc4o0 uÉx¥co | |
| Z31 | HERIJANDEZ ZARAZÚA MARÍA GAAOEM<br><br>JO9ù M eÏA MOr¢GLOS SH COLONIA MRLLA CH1A°A D5<br>**CORZO CHIAPAS ZIP CODE 2S180** MEXICO | *"' |
| OZ | **HISPASAT** MÉXICO SA DE CU<br><br>SAxTA FE a2a COLONIA SxnTA FE CUMIMALPA '^ '^" CUa IMArJ"A DE MOnELOC CITY OF MEXICO C. P. 05M8<br>MEXICO | |
| | Nen U Xico S‹ Oc W<br><br>1v. NATIONAL ACADEMY "1s 'lz01 1202 CŒ.QMIA '^'*^' *<br>c+tAl'uLTEPcc uORALEs ulGuEL I-¥DALco cMoAo oc | |

Scanned with
CamScanner"



| # | | |
|---|---|---|
| 246 | **IGSA SA DE CV**<br><br>PROL. PASEO DE LA REFORMA zs77 COLON\x cucJ‹HALPA CUXJIMALP1 DE MDRELOS MEXICO CITY ZIP CODE 05000 MEXICO | *'*'^ |
| 2¢7 | **ILIANA MARTíNEZ SÁNCHEZ**<br><br>GRAL BRAVO 233 COLOI'XA CMPULTEPEC IgORTE MO9ELIA MtcHOAcAN ZIP Code 5a2so MEXICO | "    ᵐ⁴⁷* |
| 248 | IMPERMEABIMZAOONE5 tMPERTAPA SA DE CV<br><br>AV fl"tSURGENTES SUR 2Sc2 ACc x Cocoklc ¢riiu‹ustcc ÁLVcRo OB9EG6N CiUOAO OE M€XICD C. P. e1o7a MEXICO | ,    tS20 ÁÓ |
| ZCS | **INACOM DE** MEXICO, S.A. de C.V.<br><br>MIGUEL ANCEL DE QUEVEDO 91 COLOMA CHIMALISTAC ALVARO OBREc6• ¢4UDA0 DE M£xICO ZIP Code e1079 MEXICO | "    *!   "" |
| 250 | INCONO M2 SA DE CV<br><br>**CTO PLAZA ESMERALDA 6 COLOMA, LOMA DE VALLE ESCONDIDO, ATIZAPAN DE ZARAGOZA, STATE OF MEXICO**, ZIP CODE 52930, MEXICO | " |
| 351 | IHECON PRODUCTION AND CANNING SA OE CV<br><br>REVOLUCIÓN 16TT, OFFICE 1, COLONIA SAN ÁNGEL, ALVARO OBREGÓN, MEXICO CITY, ZIP CODE 01000, MEXICO | '    "   ' |
| 252 | **INFIELD DEFENSIVE STRATEGY, S**.A. de C.V.<br><br>23 Calle de las Arboledas, Colonia Insurgentes CUKUILCO COYOACM MEXICO CITY ZIP CODE 04530 MEXICO | and B2S.58 |
| 253 | I/GENERAL       ELECTRICAL       ELECTRONICS AND EMCTROMECAMCA SA DE CV<br><br>Av. Nuevo León 209, Colonia Hipódromo Condesa Cuahtémoc, Mexico City, ZIP Code 06170, Mexico | $262,768.84 |
| | **INGENIERIA EN ELEVA9ORES SA DE CV**<br><br>Ceytan 71s, Colonia Las Samnas, Azcapoiztán, CO **CIUDAD DE MÉXICO C. P. 02360 MÉXICO** | '*^" |
| 255 | ENGINEERING IN TRANSPORTATION AND CONSTRUCTION S. de R.L. de C.V.<br><br>**AV HOMERO 538 INT 303 A COLONIA POLANCO V SECCIÓN** ujcuEc HiDxLso auoxo se uÉxIco, Tax ID No. Mexico | $212,245.00 |
| 256 | INGREDIENTE COURMET SAPI<br><br>**PRADO NORTE 565 COLONIA LOMAS DE CHAPULTEPEC V** HIGLf€L **HIDALGO** SECTION, MEXICO CITY, ZIP CODE 11000 | $2,114.97 |
| 257 | **INMOBILIARIA COLINA DE LAS ÁGUILAS SA DE CV**<br><br>BUMOS AIRES 2770, 1 RSO  B 2770 COLONIA PRQYIOENCIA 7A SECTION GUAOA "JA&A JAUOCO" ZIP CODE c463s MEXICO | '   ' |
| 258 | INMOBILIZED ON THE 9TH OF RL OF 0V<br><br>Adolfo Rufz Cornes, Coloma Center | o74s1 'r |

Scanned with
CamScanner"

FORMA A-63

J9

FIRST COURT OF APPEALS IN MATTERS OF COMMERCIAL BANKRUPTCY, WITH JURISDICTION OVER THE STATE OF MEXICO AND EXTENDED TO THE ENTIRE MEXICAN REPUBLIC

JUDGMENT DECLARING COMMERCIAL BANKRUPTCY

COMMERCIAL BANKRUPTCY CASE No. M/2026-Jj.

PODER JUDICIAL DE LA FEDERACIÓN

| | | |
|---|---|---|
| 259 | INNOVATION IN CYBER SECURITY VERt 9 OF THE CY<br>Av BMEnAvts7A 4s COLDxIA BUcuAvl9TA TULzItLAN<br>**ESTADO DE MÉXICO C. P. 54955 MÉXICO** | ^ |
| 260 | IN8TALAC¥CINE8 TORREB BANtANA SA DE CV<br>**AVENIDA DE LAS TORRES MANZANA 26 33 COLONIA**<br>a«NTIA0Q ACAnUáLTEPEC "fzTAPsMPA clU0A0 DE<br>uuaCo C. P.'t9s00 M¢XICg | $59,161.25 |
| t61 | INTEGRACIÓN DE ESPACIOS CORPORATIVO SA DE CV<br>AyEMDA Nuevo León        e¢S COLOuI» E9CAx0   ÓN<br>s¥GUEL f0axusO ClUOúD DC »Exlco c P. 1 só¥ MMICO | '*^' |
| 262 | a EoRAOoxEs CREAtNO9 F ›aA sA aBEV<br>AvEnlac $Aa eEÄ0ABt 'ts3 c0LOf¥A @ADALUPE eils '* '^'"^ MAGOAM«A uwi raEeAS CIIIDAD oE MGodo c. r. t030O<br>**MÉXICO** | |
| 263 | Ilzf'auncoee sA D$'cv<br>AvEI4DA PASEO oé' ¥'R¥£OeeA 1e0 R$O 14 C0LOM!A<br>**JUÁREZ CUAUHTÉMOC, CIUDAD DE MÉXICO C. P. 06600**<br>**MÉXICO** | |
| 264 | **INTERFACTURA SAPI DE CV**<br>**SAN FRANCISCO 170A COLONIA LA FAMA SANTA CATARINA**<br>**NUEVO LEÓN C. P. 66100 MÉXICO** | $16,293.36 |
| 265 | **INTERIORES Y FACHADAS ARQUITECTÓNICAS SA DE CV**<br>DE$CARTES 69 COLOfltA LOMAS DE ¥EPALCAPA ATtZAPAN """" ``<br>OE ZAeAGOM ES1'AÓ0 oE uE«CO r. 53sZs M£¥tco. | |
| 266 | **INTERNATIONAL MEDIA SERVICES INC**<br>SAMTÉ MOMKA 'aLvtt 3D1J' 5LgU* 301C" 3AfITA MONICA """"""<br>cAuroRNlx cxLpoRnlx . ¥¢4o4 cstsoos uuloas o£ | |
| | **INVERSIONES E INMUEBLES IMPERIAL SA DE CV**<br>JIJM JOSÉ TORRES LANDA 3005 COLON\A SAN ISIORO LE6IJ<br>CUAnAJuA7O ZIP 17sS0 MEXICO | |
| 268 | **IPG MEDIA BRANDS COMMUNICATIONS SA**<br>AUfihlDA ¥IGUEu DE CERVAI¢FES SAAVEDRA tg3 COL£I¢•llA<br>eerainox uev¥c nioweo civoxo o«u¢xice c. e. t1szo | $19,996,606.85 |
| 269 | JE6tI9 OEL MONTE 41 COLOIdA MOEnDA DE LAS PALMAS<br>**HUIXQUILUCAN ESTADO DE MÉXICO C. P. 52783 MÉXICO** | $1,266,403.17 |
| 170 | IRBA OAM 'J•.MONCAYO<br>**AV. LÁZARO CÁRDENAS SUR 508 COLONIA VICTORIA DE**<br>**DURANGO CENTRO DU lANGO DURANGO C. P. 34080** | $76,329.69 |

JUZGADO PRIMERO DE DISTRITO EN MATERIA DE CONCURSOS MERCANTILES, CON RESIDENCIA EN LA CIUDAD DE MÉXICO Y JURISDICCION EN TODA LA REPÚBLICA MEXICANA

Scanned with
CamScanner"

40



| | | MÉXICO | |
|---|---|---|---|
| 271 | | ISA MULTIMEDIA SA DE CV CULTURAS PREHISPÁNICAS 172 COLONIA GRANJAS DE SAN ANTONIO IZTAPALAPA CIUDAD DE MÉXICO C. P. 09070 MÉXICO | $6,555,335.97 |
| 272 | | ISABEL VICTORIA GÓMEZ CHAVIRA MORAS 506 COLONIA DEL VALLE CENTRO BENITO JUÁREZ CIUDAD DE MÉXICO C. P. 03100 MÉXICO | $108,607.96 |
| 273 | | IVÁN VACA MARTÍNEZ AVE LA LAGUNA 131 COLONIA MELCHOR OCAMPO ECATEPEC DE MORELOS ESTADO DE MÉXICO C. P. 55338 MÉXICO | $49,194.00 |
| 274 | | JA DEL RIO SC SAO PAULO 2373 COLONIA PROVIDENCIA GUADALAJARA JALISCO C. P. 44630 MÉXICO | $150,000.00 |
| 275 | | JACKSON WALKER LLP ROSS AVE. 2323 SUITE 600 DALLAS, TEXAS DALLAS TEXAS 30989 ESTADOS UNIDOS DE AMÉRICA | $247,804.97 |
| 276 | | JAR ELECTRÓNICA APLICADA SA DE CV LÁZARO CÁRDENAS 1007 COLONIA VALLE DE SAN AGUSTÍN SAN PEDRO GARZA GARCÍA NUEVO LEÓN C. P. 66278 MÉXICO | $40,897.44 |
| 277 | | JERÓNIMO ALVARADO CONSTRUCCIONES Y MONTAJES SA DE CV LAGO CHAPALA 2 COLONIA SANTO DOMINGO SANTA MARÍA AJOLOAPAN ESTADO DE MÉXICO C. P. 55754 MÉXICO | $112,198.64 |
| 278 | | JESÚS BOCANEGRA SÁNCHEZ VENUSTIANO CARRANZA 514 COLONIA EJIDO LA CUCHILLA MUZQUIZ COAHUILA C. P. 26350 MÉXICO | $14,094.00 |
| 279 | | JORGE LIRA SÁNCHEZ CARLOS HANK GONZÁLEZ 35 COLONIA AMPLIACIÓN COCEM TULTITLAN ESTADO DE MÉXICO C. P. 54913 MÉXICO | $672.80 |
| 280 | | JORGE LUIS ALCOCER BERNÉS CERRADA DE ILÍADA 56 COLONIA LOMAS DE AXOMIATLA ÁLVARO OBREGÓN CIUDAD DE MÉXICO C. P. 01820 MÉXICO | $22,471.52 |
| 281 | | JORGE LUIS PAPAQUI ELIZALDE CIRCUITO JUAN PABLO II 429 COLONIA SAN BALTAZAR CAMPECHE PUEBLA PUEBLA C. P. 72550 MÉXICO | $3,193.48 |
| 282 | | JORGE RICARDO MÁRQUEZ ORTIZ JOHN F KENNEDY 110 COLONIA ISIDRO FABELA TLALPAN CIUDAD DE MÉXICO C. P. 14030 MÉXICO | $3,000.00 |
| 283 | | JOSÉ DE JESÚS VILLASEÑOR GUTIÉRREZ BOULEVARD ANACLETO GONZÁLEZ FLORES 404 COLONIA COMERCIAL DEL SUR TEPATITLÁN DE MORELOS JALISCO | $324,788.59 |

Scanned with CamScanner



FORMAA-85

FIRST DISTRICT COURT FOR BANKRUPTCY MATTERS 5tERCAN7IL59, WITH RESIDENCE IN THE CITY OF MEXICO AND *JURISDICTION* THROUGHOUT THE **MEXICAN** REPUBLIC

PODER JUDICIAL DE LA FEDERACIÓN

JUDGMENT DECLARING COMMERCIAL BANKRUPTCY

COMMERCIAL BANKRUPTCY CASE 22/2026-JI.

| | | |
|---|---|---|
| | C. P. 47600 MÉXICO | |
| 284 | **JOSÉ DOMÍNGUEZ XALATE**<br>Juan DE LA Luz EnnlQuEz, formerly of Coroula, Et ¢o¢At.<br>**SANTIAGO TUXTLA VERACRUZ C. P. 95835 MÉXICO** | $37,213.90 |
| 285 | José Luis Ferrario López<br>**CALZADA VENTURA PUEN 999 COLONIA DEL EMPLEADO MORELIA MICHÓACÁN C. P. 58280 MÉXICO** | $73,336.85 |
| 286 | Juan CsnLos NeqREnx EctoERcs<br>Ca,t,ç'g lyortTx 7y g$$$ pLOMA aoNooJtTo GUS7AV'O *A<br>**MADERO CIUDAD DE MÉXICO C.P. 07850 MÉXICO** | $138,762.50 |
| 287 | **JUAN JOSÉ GONZÁLEZ GASPAR**<br>**PORFIRIO DÍAZ 15 COLONIA JARDINES DE ATIZAPÁN ATIZAPÁN DE ZARAGOZA ESTADO DE MÉXICO C. P. 52970 MÉXICO** | $77,395.20 |
| 288 | **JUAN MANUEL AHUED SODA**<br>ceuz ocL suq jsy cocoiax r xro cnunuausco coroqcAk ciuoxo'jj€ u6xicp c. P. 04z3s u£xico | $3,798.77 |
| 289 | **JUAN MANUEL NARVÁEZ SANTOS**<br>AqT 27 3o cOl.ante x£iwecwo TzJEos eoca oe1 eio | $290.00 |
| 290 | **JUDITH JIMÉNEZ RAMÍREZ**<br>**VICENTE GUERRERO 401 COLOMA TEZONTEPEC** | t12.s66 60 |
| 291 | **JULIÁN VENTOSA TANUS**<br>AVExtDA JúAr Ez 2ez9 cOLqHiÜ La pAz PUE era PuEeuA | $304,143.46 |
| zez | **GENERAL ASSEMBLY gE** A$IS1'ENC1A<br>moxLso soo coLoutx eacnuca oE SOTo cEnTRo<br>**PACHUCA HIDALGO HIDALGO C. P. 42000 MÉXICO** | $1S7,62&7$ |
| 293 | uusTouE Solutions SAPt DE cV<br>£BO OF JdAGOALEtiA 2Z€ZN8 COLONIA LA OTRA BATTOA ALvARO €lBREcOM GMOAo OF M£xICO r. 0J09o MEXICO | $2.04z.S60.B6 |
| 294 | K**EPET6*DECV<br>**GUILLERMO GONZÁLEZ 600 COLONIA SANTA FE ÁLVARO** OBREGÓN CfuaAo OF MÉxtC9 IP. 01210 MSXI6¢i | $10,646,082.61 |
| 295 | **KAREN HARFUCH YAPUII**<br>PINO gg COLOn\A CoLQ«I« rLOAIoA JVxeO o8REG I CITY OF MEXICO ZIP Code 01039 /XÉXtCO | $4,455.00 |

UZGADO PRIMERO DE DISTRITO EN MATERIA DE CONCURSOS MERCANTILES, CON RESIDENCIA EN LA CIUDAD DE MÉXICO Y JURISDICCIÓN EN TODA LA REPÚBLICA MEXICANA

Scanned with
CamScanner"



44

FIRST COURT OF COMMERCIAL BANKRUPTCY, WITH SEAT IN MEXICO CITY
AND JURISDICTION THROUGHOUT THE MEXICAN REPUBLIC
NOTICE OF COMMERCIAL BANKRUPTCY PROCEEDINGS
Commercial Bankruptcy Case No. ZZ/z026-Jî.

| | | |
|---|---|---|
| | **LIMPIEZA VAL SA DE CV**<br><br>20th Street, Colonia Cuauhtémoc, Mexico City, C.P. 000594, Mexico | " ’ *" ’* |
| | MMRFEX SA PE cV<br><br>LAZARo caftZA A'Y'aLA t te cot•oNIA eARafO T AuetGL To s•u ecDRo rtucvo ceöf c. r. eez+o u5xico | " ’’’* |
| p | MV 0OLF EVENT6 LTD<br><br>**SQUTH exM CCNTR#L JO tOHbREC oRrm1ER (ON0Oh SE1 REINO UNIDO** | G*00#2$0000 |
| 312 | uzeczH cARcf« Esr'snosA       ”<br><br>**OR BALMIS 472 COLONIA DOCTORÉS CUAUHTÉMOC** c1uoxo ae xtsx1Co c. P, aszzo •tLx1cO | $11,955.00 |
| ” | Av cJE ‹c1Te i‹x¢:1c1•xL’ 7sü coLo sA eoLA•co 1v<br>**SECCIÓN MIGUEL HIDALGO CIUDAD DE MÉXICO C. P.** | * * ’°* |
| 314 | LOSAOA soMlfiGUM LkD/aAR0o RA¥sRO<br><br>**LIBERTAD 612 COLONIA MANTE CENTRO TAMPICO** | $164,213.68 |
| *".. | **MA REMEDIOS GONZÁLEZ MORENO**<br><br>"Av D THE TAHQUEs sN COLÖI¥x Tc:IneEs OF THE PASTURE ALVARD OBREGÖM CjuoAo DE >€xsCO P. 01MI MG̃x1CO 6 | ^* oo |
| 316 | LOTA GH«vvtA fitAH» B OeED«0<br><br>CUAVΈtG¥0¢ '1 COLOXIA r¥DALoO DEL ‹R«A¢, CE 1s'xO "SOMETHING OF THE PARnAL C+ I+IUAHUA ¢. r. 3sses Mexico | " |
| 317 | **LUCERO CRISTÓBAL RUIZ** | $10,000.00 |
| ' | Ltss REY CAgclA POnCE<br><br>l'sROs H£ROE9 7 COLOHIA       S»a   BERHAR¢xMO cHxzcnTHu +• x ocomCxn euEew a r•, 7ysso u€xico | * ^ |
| | **LUMAIRE SA DE CV**<br><br>MAXZANA SCHOOL CENTER, LOT 4e 34, COLONIA 2ONA, s9Co xrt oUs7AvO, MADERO, MEXICO CITY, ZIP CODE | ' ” |
| | **LUZ MEDICA FARMACÉUTICA Y HOSPITALARIA SA DE CV**<br><br>Acv»+to DaeecÖa 1st coLorsx Rc›uA yoRTc c tAUHT8MOC City of Mexico, Zip Code 0a70e, Mexico | "o"*** |
| 321 | **M AND G HAPPY PEOPLE SA DE CV**<br><br>**AVENIDA EL IMÁN 580 COLONIA PEDREGAL DE** CARAAKCO cOroAcAu ctuoao gE uExlco C. r. ocyoo | $3,495.08 |

JUZGADO PRIMERO DE DISTRITO EN MATERIA DE CONCURSO MERCANTILES CON RESIDENCIA EN LA CIUDAD DE MÉXICO Y JURISDICCIÓN EN TODA LA REPÚBLICA MEXICANA

Scanned with
CamScanner



44

| | | |
|---|---|---|
| | **MEXICO** | |
| 322 | MACRDIHYER94ONEs DE NLXIGO SA DE CV CxzLE 7¢ 42z COLUMBIA CENTRAL Nf'IzIDA 'rUCATAN C. P. | $92,800.00 |
| St3 | **MAGNITE INC** 8ROAOWAY t2s0 t¥Tu FLOOR NEW YORK "New York, United States of America" | t227.3 392 |
| 324 | **MAQUINAS DIESEL SA DE CV** AV, INDUSTRIALS OF THE WEST 23¢0 2300 CDLONIA CENTRO SANTA CATARINA NUEVO LÉON P.O. Box ss3s0 MEXICO | $4,449.05 |
| tus | **MARCOZER SA DE CV** CixC«TO uoiS6S sOLA«1 790 c¢iLO A PRAOOs DEL MIADO QUER{FARO QUERETARO C. P. z6070 MEXICO | $4,640.00 |
| 326 | MArt\x **ALEJANDRA** u cucL ce‹Tlz COLE TOTOFIACAS 347 COLONIA A.IUSCO COYOACAN CkJDAO OE MEXICO ¢. P. 04300 MEXICO | $1,044.23 |
| 327 | **MARIA DEL CARMEN CASTANEDA ESPINOSA** 27th **Street, El Rodeo Third Block, Myarit, ZIP Code** 62060 | $93,031.10 |
| 328 | xxM Eucersc uenoOZA **HERRERA** JUAREZ SUR, CALLE 1, CDLOHH, TEXCOCO, DE M0£TA CENTRO TE;¢CqCO STATE OF MEXICO ZIP CODE 56100 EsÉXsCD | $27,574.36 |
| 329 | **MARÍA GUADALUPE** MZx++£lf **RAMONES** Plaza de la Constitución 111, Col. Outá Cer+R¢i (AR€x fy cuxunzMoc ciuoxo os ucxico c. r. osooo usxico | $8.00 00 |
| 330 | **MARIA HUERTA** PEl\EZ 3rd Street, Colonia Bolívar, MCATgCA6 zxcczEcxs c. e. 9soss uExlco | $78,775.25 |
| 331 | MARKTU8E GA DE CV PRAOO NORTE 612 COLONL4 LOMAS DE CHAPML¥E/•EC I GECCIóN **MICUEL** HIDALGO MEXICO CITY ZIP CODE J1006 | $541,176.85 |
| 332 | MARTIN ALIANZA OVIEDO GUERRERO SN COLONIA SÓCRATES Lazo sxcexux xueve Ls0n, C.P. Craso Uczico | $204,134.12 |
| 333 | ta¥tj1u O8sJELAS JUAN tANUEL STREET B 40, INT 2, FORT4N DE LAI FLORES NEIGHBORHOOD, TI.IUAlyA BMA CAMFORNFA C P. 2211J, MEXICO | S311,S4T.83 |
| 334 | MARTÍNEZ ZXVALA JESÚS **SALVAOOR** eeorssow ux+tix uxmfnzz uso cococi« rnxCCjONAHiExzO Qrll rA MAG4STERiAL 6ANTiA'sO PAPAs¢iUIARO **DURANGO** C. P. 34649 MEXICO | 9102,117.s6 |
| | MARITIME CONSULTING SERVICES SC | |

Scanned with
CamScanner



FIRST DISTRICT COURT FOR COMMERCIAL BANKRUPTCY MATTERS, WITH SEAT IN THE CITY OF MEXICO AND JURISDICTION THROUGHOUT THE MEXICAN REPUBLIC

JUDGMENT DECLARING COMMERCIAL BANKRUPTCY

COMPETITION 8fERCANTIL 2Z/Z026-JJ.

PODER JUDICIAL DE LA FEDERACIÓN

| | | |
|---|---|---|
| 335 | PROPOSAL BY CARLOS 5ALAZAR PONIEMTE a*0 COLOx\ ¢HEPEvERA MOxTzRREY aUrYO ‹E0u c. r. | sTS4,347.43 |
| 336 | **MASTER CHOICE SA DE CV** 9 UST MAGALLAISE AVENUE, COLONIA SANTA ANI7A cucoxrxJcnx Jxtisco c. e, xsso¢ uzxico | t33,667.80 |
| 337 | MATC BICITAL S, S.A. de C.V. BOLILEVARD uAl iJCL ,tviLA cAMACHO az COLONIA LOMA9 **DE CHÀPULTEPEC MIGUEL HIDALGO CIUDAD DE MÉXICO C.** | " 7S |
| 338 | South I¢g-A, Colonia Sector Popular A. Paz, City of OEUEO¢'.o, C.N., O0oto, Mexico | P'"' ** |
| 3g | MA'yA ESOIJIVEI- JOSE LL4S Álvaro . OARRC0Y 2e3 Colo+CA Centeo Purepero vse++a«cAH c. P. sg7c4 nčoGo -, | S17.1izzo |
| | HGMEL DE CERVq 8S 6AAVED . \93 COLOfrIG G AOA **MIGUEL HIDALGO CIUDAD DE MÉXICO C. P. 11520 MÉXICO** | , 0' 000.00 |
| f' | uEoiA oEPoxTE6 HcxiCo S DE nL oz cv ' _ctr¢loco sun x3ss corouic Jxeoucs Ea LA uouzxsx TrALPcu C1UDAO os k¢›ocO | ."' "e. o zz |
| @ | STREET TI"TE 11 D AČCALA DE HauA"ES uAonlP MAPRI9 | s19,J7s *.5Z |
| | AVEFIdE De v^o'r'ŠaA 1 RAD PArtto rS0aj FeAHOA | S1 67.76182 |
| | **MEDIASTREAM SPÀ** AV PEORO DE V hAA 12JS OF 2g1 REGI0*i METRC'P€LTTANA PROVINCE OF SANTIAGO PROVINCE 7S00t17 Cf1M | " ' " |
| 345 | **MEDINA TOBIAS AMPÁRO** MANUEL JOSÉ OTHÓN SN COLONIA CEDRAL CENTRO CEDRAL SAH LUIS PUTOSI SÀN LEgS PUTDSI ZIP CODE 7S57@ | $68,400.80 |
| | MEDIO TLIRNO 5A DE CV CERE9 t9 OEPTO. 101 COLOhfA CRČOIO CONSTRUCTOR BEHITO uUAnEz cNDA0 0E N€XICO C. P. 939t¢ M£XIC i | $2,015,681.81 |
| " | MEL£pDEZ LOPEZ $An70YO AND 8ARREDA SC DI TF ITO E fT [.1,'.Tc ‹ lyt {3 TAaA5CO 117 ¢;QLONIA ROex MORJE ciuo‹o oE uLxxo c.n. ¢woo ucxicp | 3154,606.80 |

CONCLU... ERCAÑTILES, CON RESIDENCIA EN L. CIUDAD DE MÉXI:O Y JURISDICCIÓN EN TODA LA REPÚBLICA MEXICANA

Scanned with
CamScanner"



46

| | | |
|---|---|---|
| 348 | NCRX-COM SA DE CV<br><br>AMORES 1616 COLONIA DEL '¥ALLG CGNTRD 8ENFTO uuA^^z chu   o o8 uCxsco c.P. y31gg uExico | $2,320,000.00 |
| 349 | **MESINO FIGUEROA REYNA INÉS**<br><br>GÉMIXI9 MAI'tzANA 13 CCILoHIA CEHTRO ol UATAxEJO OE ASTUTA GUcRReRO c. P..‹0e5 MÉxf¢0 | $13,446.00 |
| 350 | -< n mei roxie IRELxtgo LL<br><br>uERRI0N ROAo 1 DUBLIN 2IRLAnoA | $7,480.81 |
| 351 | **METLIFE MÉXICO SA**<br><br>r»SURGEM›ES SUR 1tS7 CoLour4 luSURGCNIES MIXCOAC.<br>**BENITO JUÁREZ CIUDAD DE MÉXICO C. P. 03920 MÉXICO** | $2,567.10 |
| 352 | MIGUEL AttGEL Ro9As ZA£tATE<br><br>AVEi‹eA SALVAOOa uAyA MxrvinEz t2z3 COLONIA SANTA FE 8UR GAN LUIS POTOSÍ SAN LLX9 POTOSÍ C. P. t6J50 MEXICO | t11.60 |
| 353 | JARE6 AF/ODITtA COR7ES Y FUENTES SC<br><br>JAVIER BARRO 540 CDLOHIA SMTA FE ALVARO OBREGÓN C1tJOAO DE 'M1CD C.P. 0t2t0 MEXICO | $139,200.00 |
| 354 | MILES MEXICO AMERICA VIÁuGS 6A DE cV<br><br>NNHESOTJ S ¢OLoMx uAPOL¢S 06M7O JUA+¢Z CMOAO 0£ MÉMCO C P 03B10 MEXICO | $41,688.00 |
| 355 | **MM ESPACIOS PUBLICITARIOS SA DE CV**<br><br>**JUAN VÁZQUEZ DE MELLA 481 205 COLONIA POLANCO II**<br>MI6LIEL FI+0ALGO SECTION, CITY OF MEXICO, ZIP CODE 11930 | $2,726,298.55 |
| 356 | +40H\fi • fi'UADALUPE RUIZ MORALES<br><br>71 SMR, PoulEPTE Zz CoLOMA, CENTItO **LA5 MARGARITAS CHIAPAS C. P. 30187 MÉXICO** | $65,708.59 |
| 2S7 | HONROY GÓMEZ KIARA DEL ROCíO<br><br>TEXCOCO MT CDL€iHtA CLAVERÍA AZCAP€TZALCP | $63,374.00 |
| 358 | **MONTERO GUERRA MARÍA LUISA**<br><br>EL CAMPEA0CI Circuit +t 327 COLDMA, EL CB uAzxTLAN Subdivision, SjMALOA, CULJACAN, S.IMLOA, C.P. a21ta | $22,439.67 |
| 359 | MORENO VILLANUEVA ARMRO<br><br>**BRADLEY 44 COLONIA ANZURES MIGUEL HIDALGO CIUDAD DE MÉXICO C. P. 11590 MÉXICO** | t170,349.6S |
| 360 | osT PUBMctDxo sA DE CV<br><br>RASEO DE LOS TAMARIMDOS 314 COOP-Et+AJ1VA NEIGHBORHOOD PALo ALTo cUAJIMLPA, MORELOS, CITY OF MEXICO | $10.104.422.64 |
| HI | **MUEVE ARQUITECTURA SA DE CV**<br><br>**EJERCITO NACIONAL 505 COLONIA GRANADA MIGUEL** | $375,705.03 |

Scanned with
CamScanner"



FORMA A-65

47

FIRST DISTRICT COURT FOR COMMERCIAL BANKRUPTCY MATTERS No. 5, WITH JURISDICTION OVER THE STATE OF MEXICO AND THROUGHOUT THE MEXICAN REPUBLIC

JUDGMENT DECLARING COMMERCIAL **BANKRUPTCY**

COMMERCIAL BANKRUPTCY CASE No. M/z026-4i.

| | | |
|---|---|---|
| | IOOALGO CITY OF MÉÑGO, ZIP CODE 11520, MEXICO | |
| 362 | **MUNICIPIO DE CHINA STDS**<br>MUNICIPAL PALACE, 5¥ Sa Colora, Center, Corner of<br>**NUEVO LEÓN C. P. 67050 MÉXICO** | s50,¢I00.00 |
| 2 2 | CHIAPAS TRANSPORTATION DEPARTMENT<br>Ps rACF2    uu«IC PAGE    sH    CO cO z    HuE HuE I<br>**HUEHUETAN. CHIAPAS C. P. 30660 MÉXICO** | $iii e0.Si |
| 364 | **MUNICIPIO DE TECOMAN COLIMA STDS**<br>**MEDELLÍN 280 COLONIA TECOMAN CENTRO TECOMAN COLIMA C. P. 28100 MÉXICO** | $15,000.00 |
| 365 | MURGUIA T ASDCIA0€9 SC      ”<br>**BUENOS AIRES 27701 COLOMA PROVIDÉNCIA GUADALAJARA JALISCO C. P. 44630 MÉXICO** | $740,723.51 |
| 366 | iauns "LIxAs CpxsuLToREs              -"<br>**LINCOLN 4343 COLONIA NUEVO LAREDO SAN RAFAEL TAMAULIPAS C. P. 88200 MÉXICO** | $193,758.00 |
| 367 | **NADER HAYAUX Y GOEBEL SC**<br>**PASEO DE LOS TAMARINDOS 400 PISO 7 COLONIA BOSQUES DE LAS LOMAS CUAJIMALPA DE MORELOS CIUDAD DE MÉXICO C. P. 05120 MÉXICO** | $409,465.65 |
| '^ | i‹ATfVE AoS pE M£ziCO sA DE CV<br>iÁJn"'* cxUronHix 274 ztso z col.oxu raP0onouo<br>**CUAUHTÉMOC CIUDAD DE MÉXICO C.**<br>**P. 06100 MÉXICO** | ''''' '‹‹ '' |
| 369 | **NAZIFH DIGITAL ROOM SA DE CV**<br>**ADOLFO PRIETO 1415 COLONIA TLACOQUEMECATL BENITO** JUAREZ CtU9Ao OF MEXICO " ' "<br>**C. P. 03200 MÉXICO** | $397,211.84 |
| 370 | **NEW MEDICAL HEALTH SERVICES SA DE CV**<br>**FELIPE VILLANUEVA 88 4 COLONIA GUADALUPE INN** | $52,666.25 |
| * !. | NEXz 7cLc«OM sA ¥ De CV<br>DAvIo MF«RD . 5iQUEIROs t0» CDLOriIA DEL . VM1x sEcTqn çiqgnTc sM ezoeo cARZA cARcfA nuE¥'o LEóu c. P. ¥szss uáoco | . - |
| S72 | MMIROVSJ¢I SHARON ISRAEL 7S6 TEMVIT ISRAEL | $73,755.79 |
| 373 | **NOMAD AGENCY INC**<br>COASTAL 6192 LE¥¥E5 DEMWARE DELAW E 199so z+GLATEf¢I¢s | $176,182.38 |
| | NOTARY 14S CDUX SC | |

JUZGADO PRIMERO DE DISTRITO EN MATERIA DE co0COMMERCIAL COURSES. CON RESIDENCIA EH LA CtUOAC DE MÉXICO Y JURISDICCIÓN EN tg@ALA REPtJBL!FA MEXiCAN

Scanned with<br>CamScanner"

48



| 374 | ALBORADA 124 COLONIA PARQUE DEL PEDREGAL TLALPAN CIUDAD DE MÉXICO C. P. 14010 MÉXICO | $4,231.21 |
|---|---|---|
| 375 | NOTARIAS 211 Y 135 DE LA CDMX SC<br><br>PROVIDENCIA 1000 COLONIA DEL VALLE CENTRO BENITO JUÁREZ CIUDAD DE MÉXICO C.P. 03100 MÉXICO | $115,000.00 |
| 376 | NOTICIAS AS MÉXICO SA DE CV<br><br>PASEO DE LA REFORMA, PISO 6 231 COLONIA CUAUHTÉMOC CUAUHTÉMOC CIUDAD DE MÉXICO C. P. 06500 MÉXICO | $5,365,833.39 |
| 377 | NOVELO DZIB MIGUEL ÁNGEL<br><br>16 119 COLONIA VALLADOLID CENTRO VALLADOLID YUCATÁN C. P. 97780 MÉXICO | $4,050.00 |
| 378 | NVG NETWORK, SA DE CV<br><br>INSURGENTES SUR 1458 COLONIA ACTIPAN BENITO JUÁREZ CIUDAD DE MÉXICO C. P. 03230 MÉXICO | $50,000.00 |
| 379 | OF LIMPIEZA PROFESIONAL SA DE CV<br><br>PROVIDENCIA 400 DEPTO. 403 COLONIA DEL VALLE CENTRO BENITO JUÁREZ CIUDAD DE MÉXICO C. P. 03100 MÉXICO | $177,244.15 |
| 380 | OFFICE TIENDA DIGITAL SA DE CV<br><br>DIVISIÓN DEL NORTE 500 COLONIA CHIHUAHUA CHIHUAHUA CHIHUAHUA C. P. 31203 MÉXICO | $4,195.56 |
| 381 | OMG DIVERSIFIED SERVICES GROUP SA DE CV<br><br>GUILLERMO GONZÁLEZ CAMA 800 COLONIA SANTA FE ÁLVARO OBREGÓN CIUDAD DE MÉXICO C. P. 01210 MÉXICO | $10,672,000.00 |
| 382 | OMNI PRINTER SA DE CV<br><br>MONZON 173 COLONIA CERRO DE LA ESTRELLA IZTAPALAPA CIUDAD DE MÉXICO C. P. 09860 MÉXICO | $139,383.58 |
| 383 | OMORFI 201 SA DE CV<br><br>MONTECITO 38 P-24 OF-28 COLONIA NÁPOLES BENITO JUÁREZ CIUDAD DE MÉXICO C. P. 03810 MÉXICO | $1,500.01 |
| 384 | OPERADORA DE CINEMAS SA DE CV<br><br>JAVIER BARROS SIERRA 540 COLONIA SANTA FE ÁLVARO OBREGÓN CIUDAD DE MÉXICO. C. P. 01210 MÉXICO | $2,838,493.09 |
| 385 | OPERADORA DE SERVICIOS RITZEN SA DE CV<br><br>CIRCUITO CIRCUNVALACIÓN PONIENTE 8 COLONIA CIUDAD SATÉLITE NAUCALPAN DE JUÁREZ ESTADO DE MÉXICO C. P. 53100 MÉXICO | $942,183.36 |
| 386 | OPTIMUM MEDIA DIRECTION DE MÉXICO SA DE CV<br><br>GUILLERMO GONZÁLEZ CAMARENA 800 COLONIA SANTA FE ÁLVARO OBREGÓN CIUDAD DE MÉXICO C. P. 01210 MÉXICO | $32,334,712.45 |
| 387 | OSCAR ALEJANDRO TURRUBIATES ROSAS<br><br>PRIMERO DE MAYO 110 COLONIA GUADALUPE VICTORIA | $497,859.62 |


Scanned with
CamScanner



FORMA A-65

43

FIRST COURT OF FIRST INSTANCE FOR COMMERCIAL **BANKRUPTCY** MATTERS, WITH JURISDICTION OVER THE CITY OF MEXICO AND THROUGHOUT THE MEXICAN REPUBLIC

JUDGMENT DECLARING COMMERCIAL BANKRUPTCY

COMMERCIAL BANKRUPTCY Zz/Z02b-II.

PODER JUDICIAL DE LA FEDERACIÓN

| | | |
|---|---|---|
| | Taxtrco Tamaulipas, C.P. 90a, Mexico City | |
| 366 | Oscar Ariel Crévallo Uota<br>**SANTANA** 62. 5th Colonia. HGUEL 7ECAMACHALCO<br>**NAUCALPAN DE JUÁREZ ESTADO DE MÉXICO C. P. 53970** | $45.000.00 |
| 389 | OTELO AOM NEOOOI S QC INSTRUCTION<br>**RIO ELBA 10 COLONIA CUAUHTÉMOC CUAUHTÉMOC**<br>City of Mexico, B.P. Box 00, Mexico | t£7.40S ss |
| 390 | **OUT OF HOME DIGITAL SAPI DE CV**<br>**REFORMA 36 COLONIA JUÁREZ CUAUHTÉMOC CIUDAD DE MÉXICO C. P. 06600 MÉXICO** | $ \ 4,100.00 |
| 3s1 | PABLO ZENLE OONZÁLCZ<br>**CIRCUITO DE LAS HACIENDAS NORTE 4 COLONIA TEQUISQUIAPAN TEQUISQUIAPAN QUERÉTARO C. P. 76795** | $25.770.01 |
| "* | SAxcHEz TABOAOA"1Gel COLO«M zOnA ruO ¥zAJMA 6AJA čAtJrOR+IIA Č. r: Z¥b00 Mexico | ᵗ ᵗ ᵗ ᵗ ᵗ ᵗ ᵗ ᵗ |
| J83 | **PADUA SOPORTE SC**<br>xoci-sccLco s74 crolax rEJ'+IAW vaLez øcnrro<br>**JUÁREZ CIUDAD DE MÉXICO C. P. 03650 MÉXICO** | $15.003.75 |
| 394 | **PANAMSAT DE MÉXICO S DE RL DE CV**<br>JonGE uiuGnEZ cAltT+j uz 1c Lt 1e coLoMA L¢ '4As ÕE<br>**VALLE ESCONDIDO ATIZAPÁN DE ZARAGOZA ESTADO DE MÉXICO C. P. 52930 MÉXICO** | $2.928.127.61 |
| 395 | PxrE£EeA pqincipxzio Sx gE cv "                    "-<br>TLAFiUAC . 64 COLoeitA .* OANTA ISA8EL INDU5TRMt-<br>**IZTAPALAPA CIUDAD DE MÉXICO C. P. 09820 MÉXICO** | $343.48 |
| 396 | **PAULINA CONDE LUGO**<br>DEL u5zourtxL uz ¥ LoTz z7 coLouiA vcLLE œ 9w<br>**JAVIER 6A SECCIÓN PACHUCA DE SOTO HIDALGO C. P. 42086 MÉXICO** | $62,103.13 |
| 397 | **INSURGENTES SUR 303 COLONIA HIPÓDROMO,**<br>**CUAUHTÉMOC CIUDAD DE MÉXICO C. P. 06100 MÉXICO** | $75.137.99 |
| 99ã | **PÉREZ FRANCO JUAN MANUEL**<br>**ALMERÍA 239 COLONIA EL DORADO 1RA SECC.**<br>**AGUASCALIENTES AGUASCALIENTES C. P. 20235 MÉXICO** | $41.210.76 |
| 399 | **PINTO Y SHEHOAH SC**<br>**DURANGO 245 11 COLONIA ROMA NORTE CUAUHTÉMOC CIUDAD DE MÉXICO C. P. 06700 MÉXICO** | $176.000.00 |

JUZGADO PRIMERO DE DISTRITO EN MATERIA DE CONCURSOS MERCANTILES, CON RESIDENCIA EN LA CIUDAD DE MEXICO Y JURISDICCION EN TODA LA REPÚBLICA MEXICANA

Scanned with
CamScanner





SO

| | | |
|---|---|---|
| 400 | **PLANNING SOLUTIONS SC**<br><br>CALLE DE LOS MONTES ALTOS 6913 COLONIA RESIDENCIAL CUMBRES III CHIHUAHUA CHIHUAHUA C. P. 31216 MÉXICO | $141,538.49 |
| 401 | **PLATÓN ADMINISTRACIÓN Y DIRECCIÓN EMPRESARIAL SC**<br><br>MIGUEL ÁNGEL DE QUEVEDO 24 COLONIA EXHACIENDA DE GUADALUPE CHIMALISTAC ÁLVARO OBREGÓN CIUDAD DE MÉXICO C. P. 01050 MÉXICO | $344,132.34 |
| 402 | PPI.^CE ECx«OLoG!E8 g oa RL gE CV<br><br>^v. P*'sEo ^c I.A REFORu^ zee coLoutA JvAAsz CUAUHTÉMOC CIUDAD DE MÉXICO C. P 06600 MÉXICO | $3,936,550.00 |
| 403 | **PRACTICAL HOME AND INDUSTRY SANITARY SA DE CV**<br><br>EMILIANO ZAPATA 1012 COLONIA AMPLIACIÓN MOMOXPAN SAN PEDRO CHOLULA PUEBLA<br><br>C. P. 77760 MÉXICO | $35,087.50 |
| | PR*M*CO*SULT#R*STASE$ORE4SA0EGV<br><br>RUB6N DARIO 1tlT0 COLOHtA PRoVIDEnCl6 GMDALAJARA CITY OF MEXICO ZIP CODE 44s2t tdÉXiCO | $1,276,000.00 |
| 405 | **PRODUCCIÓN AND DISTRIBUCIÓN CORP**<br><br>12480 NW ZTTIJ STREET 12‹e0 SOUTH 11s OOEAc FLORIDA MIAMI 3317e UNITED STATES OF M£eM | $26,694.30 |
| 406 | i•eooucclóN aTL 9A DE CV<br><br>PERRÉRFCO 6UR 3349 LOC 13 COLONIA JONRONES ON THE MOUNTAIN AT 9Ax C UDA0 OF MEXICO. ZIP CODE 14Z o | ¥11.¢1 70 |
| | PRODUCT: METAUCOS OTEELE BA OF €i/<br><br>BCVo M«sUEL oE CERVxr/TE8 BAAYEOed t03 COLONM | $123,739.30 |
| 408 | **PROEPTA SA DE CV**<br><br>GA£TEO II EOLOF¥A POI-A+zcO V SECOÓN MIGUEL HRDALGO €¡¢IOAO oE MAXIco C.P. 11s64 Hi'xlcO | $2,252.49 |
| 409 | PROmD7DRABs8,EH£S¥SCA€QO00ELT*5*OCCV<br><br>qoulRAE LAREoO 67ts COLOMZA PARTIDO M FUCNTG B JUÁREZ CHIHUAHUA C. P. 32370 MÉXICO | $60,138.20 |
| 410 | I• TOTELECOM, S.A. •E IV<br><br>HERRADURA HMX¢lLITLUCAH CITY OF MEXICO ZIP CODE 52T9ü Mexico | $47,480.26 |
| | I•eozssc Secretarial Services E+t Cauteo<br>**GASTRONÓMICO S DE RL DE CV ABELARDO RODRÍGUEZ** zbG EDLO JIA viCE«TE VILZAOA uEZAHIJALCÓYOTL ESY 0 OE HÉxtco c. P. S7710 MEXICO | $37,393.76 |
| alt | **PUBLICA ADVERTISING SA DE CV**<br><br>PASEO DE LA REFORMA 116 t703 COLOI'dA LOMA6 DE | sw,3rz.e#i$i |

"CamScanner"

Scanned with

"CamScanner"



FORMA A-61

51

FIRST DISTRICT COURT FOR COMMERCIAL BANKRUPTCY MATTERS, WITH SEAT IN MEXICO CITY AND JURISDICTION THROUGHOUT THE MEXICAN REPUBLIC

JUDGMENT DECLARING COMMERCIAL BANKRUPTCY

COMMERCIAL BANKRUPTCY Z2/t036-IT.

PODER JUDICIAL DE LA FEDERACIÓN



| | | |
|---|---|---|
| | CNAPULTEPEC, STATE OF HIDALGO, MÉXICO C. P. 11000 MÉXICO | |
| *" | PUBLICIDAD VIRTUAL SA DE CV PROLOHSACIO.I BO9oUE 9 OG THE REFORM OF 1t13 COL0'HtA LOkA9 OF vzSTA HERNO4A CUMUALPA OK MORELDS CIUDAD DE MÉXICO C. P. 95100 MÉXICO | '1', 7,'0 'g |
| 414 | RIO TAMÉSÍ 300 COLONIA COL. MÉXICO MONTERREY I¢UÇVO LEON C. P. 6t740 ME CO | $7,740,796.90 |
| 415 | FINANCIAL PURPOSE ¥XC N CHURCH STREET SPARTANBURG 135 CAROLINA DEL SUR CAROLINA DEL SUR CAROLINA DEL SUR 29304 ESTADOS UNIDOS DE AMÉRICA | $1,086,674.41 |
| 416 | PYU Et'I ELECTRICAL SYSTEMS AND OE P y ctA SA OF IV DIECISÉIS 73 COLONIA AMPLIACIÓN PROGRESO NACIONAL GUSTAVO A' NAOERO, CLUAXO, MEXICO G. P. OYOSO | $658,776.27 |
| 417 | QM-ADJUSTERS MELCHOR OCAMPO 430 COLONIA ROMERO DE TERREROS COYOACÁN CIUDAD DE MÉXICO C. P. 04310 MÉXICO | $19,984.48 |
| 418 | QUÍMICA MEXICANA INDUSTRIAL SA DE CV CARRETERA CUAUTITLÁN TEOLOYUCAN 4 COLONIA FRACC IND XHALA CUAUTITLÁN IZCALLI ESTADO DE MÉXICO C. P. 54750 MÉXICO | $19,387.64 |
| 419 | RÍOS ABOGADOS SC HALLEY 21 COLONIA ANZURES MIGUEL HIDALGO CIUDAD DE MÉXICO C. P. 11590 MÉXICO | $121,500.00 |
| 4zo | RACKSPACE INTERNATIONAL GMBH rFsNcsTw£›ostRAssE co z0plcn 2ueicH scl•lTz aoos $'uZA | fe,y10,T0o.el |
| ^' | RADIO PUBLICIDAD XH MÉXICO SA DE CV CON8YTT\JYeuTes SIM FLOOR Io COLOI'+ÍA c£ MORE MTA$ zaouEL Hiocroo cluoAo pe utxico c. r. 11eso z4Éxc;o | |
| ** | RAEC LOGÍSTICA EN EVENTOS S DE RL DE CV DURANGO STREET ¥t cOLDHIA ROMA NoaTE CUAUHTÉMOC CIUDAD DE MÉXICO C. P. 06700 MÉXICO | |
| | *NC. MMTARE9 70 COL¢InlA ARGE xWM PoJ'IlEnTE MIGUEL HIDALGO CIUDAD DE MÉXICO ZIP Code T1230 MEXICO | |
| | | |

"CamScanner"

Scanned with

"CamScanner"



| | JLIAti RM OE ALARCO+I 1€17 COLOMA 6ATCMtG PtIEBM **PUEBLA C. P. 72320 MÉXICO** | S2S.S0f,SS0.?5 |
|---|---|---|
| 425 | REOS CONM SA DE CV  1tst C O›«A  AAM BOl.‹A›¢Zx ¢+«UArMA ¢. P. | s2100¢.N |
| 426 | **RENTAS DEL PEDREGAL SA DE CV** **BOULEVARD ROCHA CORDE 305 COLONIA PRIVADAS DEL PEDREGAL SAN LUIS POTOSÍ SAN LUIS POTOSÍ C. P. 78295** | $54,972.21 |
| 427 | **RHCORP SA DE CV** **PAPAGAYO 607 COLONIA MAZATLÁN FERROCARRILERA SINALOA C. P. 82013 MÉXICO** | $28,842.24 |
| €a | RIBESA CORPORATION  tN0¢IsT¥‹T cv l¥a0g TzxAS cadrOR+dA 70d4S ESTAoos | t1e2,1Scss |
| | **RICARDO ALEJANDRO SALAZAR VALDEZ**  tS 7s CBO+aA JAROINGs OE sAxTA craax EcAtEPEc DE uonsc.os sstcoo ns uM›ca c. r. ss4so uzaco | **' |
| | **RIVERA GAXIOLA ABOGADOS SC**  MANUEL AVAC BOULEVARD 3$ COtOMA LOMAS DE CHAPULTEPEC to SECOOt•l ulcUEL l•oALoo cxJoAo dG MÉTOO C. P. 11¢l¢ttl MEXICO | |
| 431 | **RNR OPERACIONES SA DE CV**  SÔCRAY£6 S7s CoLONM Po€AHCo V 8EcoÓN **MiCUEL** úitioo cluaxo oe uEx+cO ce. ‹1s6g riXIco | " |
| 432 | eoceUco uwxtJ>o Quairx«c táaiez  **AVENIDA 20 DE NOVIEMBRE 3112 COLONIA JARAMILLO NUEVO CASAS GRANDES CHIHUAHUA C. P. 31758 MÉXICO** | $13,446.00 |
| | **ROGELIO MÁRQUEZ GUZMÁN**  $,AH BENJAMIN DIZ &ze LT 4 COLOntA PEDREGAL DE &AFITA LjR6LB.A CO>0AcM CzUOAo DO M€xtCO C. r. ¥4600 | *"3,*K ¥ |
| | ¢»azE AND SCHWARZ OF MÉ¥¥CO S DE RL DE CV  Mvxs BAA9Os 5•• RSO a oruA tec coL0MA 6AxTA FE Avxxowaccó• ouoxo oe osrco c r. 0t3t0 ucx›co | *  *  ""^ |
| " | **ROTOPLAS SA DE CV**  C LEE AAAH¢tAC fit COLOe¥A EL ¥¥eX0OR COYOACM cx/o "ooc ucoco c.P. ¥•ess a xico | "'???? ''?'' |
| | **RUBRICA MEDIA MARKET SA DE CV**  JESÚO DEL BQNTE 39 PI9'O 2B CDLO+4A JE9ÚS DEL MOxTE HULK KATCM ES.7 ¥zG 0G MÉxICO6 P. MT¥d MÊxtCO | *'       "' |
| | **RUY ALONSO REBOLLEDO**  UERAC*tIJ¥, DErTo S04 7 CoLDMA              COMoE6A **CUAUHTÉMOC CIUDAD DE MÉXICO C. P. 06140 MÉXICO** | '"  " |

"CamScanner"

: Scanned with

"CamScanner"

Case 1:26-mc-23885-JEM   Document 30-1   Entered on FLSD Docket 08/03/2026   Page 302 of 385

FORMA A-65

FIRST COURT OF FIRST INSTANCE FOR COMMERCIAL BANKRUPTCY MATTERS, WITH SEAT IN THE CITY OF MEXICO AND JURISDICTION THROUGHOUT THE MEXICAN REPUBLIC

JUDGMENT DECLARING COMMERCIAL BANKRUPTCY

COMMERCIAL BANKRUPTCY CASE M/2026•II.

| | | |
|---|---|---|
| 438 | SAGA DEL CUPA... SA DE CV<br>MGCAnENA 32, CDLDI'aA EL rnGUAMBO URUA»Ali MICHOACÁN C. P. 60130 MÉXICO | G6J.s00.00 |
| 439 | 6ALE6FoRcE WITH P'iC<br>NSSION STacrT tt1 SnP. rLooR $*N rRMCŒCO SAn FRAyCI8CO 6AN FRAHCrSCO, cA ¥‹10s UNITED STATES OF AMERICA | |
| 440 | 3ALVADOR ANGELM IRIGOY<br>RIO SAN ÁNGEL 85 B COLONIA GUADALUPE INN ÁLVARO OaREcOH CMoA0 oE >€XICO C.<br>P. 01420 MMICP | $161,058.00 |
| ¥41 | sa,M PAI+CHq LAg SA DE CY<br>et. "VILLA OC MAORIO I SOLDf A .:GDNA " ^€RT8 CUAUHTÉMOC CIUDAD DE MÉXICO C. P. 06700 MÉXICO | $178,751.74 |
| 442 | SÁNCHEZ QUIJANO MIGUEL ÁNGEL<br>EMILIANO ZAPATA 188 COLONIA CUAUTEPEC DE HINOJOSA LA ESPERANZA HIDALGO C. P. 43740 MÉXICO | $12,450.00 |
| 443 | sxxoes xłj Bcx woægj+ioe-róecz<br>c E SC LO M 14 COLOMA CRUZ OEL FARŒ. TLALPAI‹ C‹UOAO OF MÉ<CO Ce. 1c›ac NGx D | |
| 444 | ar,yô Tee uEz ceos 4A aG cv<br>Bird -PJŁsEo DE"*LA Ft£FO4M t2ż xlA JUARM cuxurnÉuqc ccaøo oE Mexico c. e ecsoo øLxlco | |
| 445 | 6AŃ JEqŒ¢ltaO" 9S4 R8O 1' COLOŁ¥A JARDPIÉS DEL PEDREGAL ÁLVARO OBREGÓN CIUDAD DE MÉXICO C. P. 01900 MÉXICO | |
| ''' | SECRETARY OF FAMILIES OF THE GOVERNMENT OF MEXICO<br>Prxz DE w co•wrruciöu 1 coLo ix ccutRo ‹AAzx xţ CUAUHTÉMOC CIUDAD DE MÉXICO C. P. 06000 MÉXICO | |
| 447 | Secretary of the Mexican Foreign Ministry<br>SANTA CATALINA 328 COLONIA INSURGENTES SAN BORJA BENITO JUÁREZ CIUDAD DE MÉXICO C. P. 03100 MÉXICO | $39,107.19 |
| '' | SEGURIDAD CORPORATIVA ALERTA SA DE CV<br>PADRG PER PONIE›tTE ecG ¢OLOl'aA CGMT9o MOaTEnr‹E». FIUEYO LEÒn C.P. 6f000 MEXICO | $162,237.35 |
| 449 | SELLCOM SOLUTIONS MÉXICO SA DE CV<br>JESÚS DEL MONTE 7 COLONIA FRACC HACIENDA DE LAS PALMAS HUIXQUILUCAN ESTADO DE MÉXICO C. P. 52783 | $35,292.00 |

JUZGADO PRIMERO DE DISTRITO EN MATERIA DE CONCURSOS MERCANTILES, CON RESIDENCIA EN LA CIUDAD DE MÉXICO Y JURISDICCIÓN EN TODA LA REPÚBLICA MEXICANA

Scanned with CamScanner"



54

| | | |
|---|---|---|
| 450 | 8ERTRES OEL NORTE &c DE CV<br><br>Cxu    1s 6› COLONIA SAN PEDRO DE LOS RÍOS<br>•TÚAREZ, JUDGE OF MEXICO CITY C.<br><br>**P. 03800 MÉXICO** | '*"""  '* |
| 451 | **SERVICIO PROFESIONAL VLH DE MÉXICO SA DE CV**<br><br>LAGO ZÚ 'ICH 219 COLONIA MPMAOÓN GRAHAOA MTGUEL MtDALGO CITY OF MEXICO<br><br>**C. P. 11529 MÉXICO** | *" ' " |
| 452 | SE ^O0 * CANTEI fIMfCfJTq 0€M0T06 SP OC cV<br><br>**CHIHUAHUA  200  COLONIA  ROMA  NORTE  CUAUHTÉMOC** | $8,480.00 |
| 453 | SE V!COS BROXEL SAPI DE CV<br><br>cv MA+«o By leo nsa 1 cocoi+x swTc rE<br>cUMMAi.PA cU xMALrA DE MOeELos C«/o«0 oE MEXICO C.P. 0534S MEXICO | *^'^ |
| 454 | SC9' CDS       E PEOMdZADO5       DE      INGMIERfA<br>AND 5UPCRV\StÔN 6A DE CV<br><br>**AV.   CHAPULTEPEC   153   107   COLONIA   JUÁREZ**<br>cunurrr¢uoc ctuDcD oe u¢:oca c. r. ossoo u€xlco | $47,067.89 |
| 455 | COMPREHENSIVE INFORMATION SERVICES<br>zs'raAztcicA oE business Ace se aouccvAso OE LoS REVES 6zo¢ COLoNtA 9x+1 ¥t^q JtB7O M/¢ AxDR¥s c+ioLULA PCIEBLA C. P. 72s2S MEXICO | $131,078.75 |
| 456 | **SERVICIOS PHILLY SA DE CV**<br><br>coYCuXCM Jt0c. couontx oeL vxLce cEnTRo acteto<br>JUAREZ, STATE OF MEXICO, ZIP CODE 03100 MMJ¢O | e*s*,**'13 |
| | PROFESSIONAL SERVICES AT KLM PECH SA DE C.V.<br><br>•v           L 16e-x coLo*/ix sex JosS cxueEcnE<br>CMPECHZ P.O. Box 24at0, Mexico | $6,920 |
| 457 | **SI VALE MÉXICO SA DE CV**<br><br>264 Paseo de la Reforma, RSO ZS, **Colonia Juez**<br>**CUAUHTÉMOC CIUDAD DE MÉXICO. C. P. 06600 MÉXICO** | G7,41104 |
| 459 | **SIMILARWEB LTD**<br><br>MENACI•tEM BEc FLOOR '41 t21 TEL AVIV e7912e3 ISRAEL | $zzs,Sss.OT |
| 460 | sstEuAs Pacific fixed line is oz= cv<br><br>**PASEO  RIO  SONORA  SUR 170 COLONIA  PROYECTO RIO SONORA HERMOSILLO SONORA C.P. 83270 MÉXICO** | ▼▼ˈ |
| | S‹EMAs zx¢a7‹LcS E» AUOIo Y VciEo 4‹ pE Cv PE8TALDZD<br><br>Z4S COLDNIA MARVARTE POME/'+TE OEMTO<br>**JUÁREZ CIUDAD DE MÉXICO C.P. 03020 MÉXICO** | "' |
| 462 | **SITEC-LJI Y ASOCIADOS SC**<br><br>**INSURGENTES  SUR  1855  COLONIA  GUADALUPE  INN**<br>ALvauao oeeccóu ctuoao ac uExico c. e. gloze ssExzco | $14,808,189.55 |

Scanned with
CamScanner"

FORMA A-55

55

FIRST DISTRICT COURT FOR COMMERCIAL BANKRUPTCY MATTERS, WITH SEAT IN THE CITY OF MEXICO AND JURISDICTION THROUGHOUT THE **MEXICAN** REPUBLIC
JUDGMENT DECLARING COMMERCIAL BANKRUPTCY
MERCANTiL COMPETITION 22/2026-11.

| | | |
|---|---|---|
| | SKaxI OA OE CV<br><br>MELC›jOR OCAMPo 22s 202 COLO IA CUAUrITÉuOC ij,x,uriTÉ oc c[uo o oE kjÉXICO. C. P, 06500 MEXICO | "ˀ"^ˀ |
| 464 | S 8OYYF LAftE lfíC<br><br>450 CONCAR DRIVE 450 SAN MATEO, CALIFORNIA 94X02 UNITED STATES OF AMERICA | S213.5M.4¢ |
| 465 | OE CHIAPAS TOWER OPERATING COMPANY, S.A. DE **CV**<br><br>ANDRÉS SERRA ROJAS BOULEVARD 1D9D COLONIA COM PASD LIMON T\JXTLA GUT! DEZ  CHAPA$ ZIP CODE 290X5 | $11D,663.45 |
| 466 | CARROT SOLUTIONS S, S.A. de C.V.                        " *'<br><br>**CAMINO  A  SAN  PEDRO  MÁRTIR  184  COLONIA** cHIuxLCo<OC TLALPM MEXICO CITY      MEXICO- C-  •  "^ˀ^ | $234,330.71 |
| 8 | **SOLUCIONES CREATIVAS MALAK S DE RL**<br><br>EDUAR@O P LGARE $ y '@ 20] JAN LUCAS NEIGHBORHOOD, COYOACÁN, MEXICO CITY, ZIP CODE 0•*03O M !CO . | '92 •.6'1.6* |
| | IMACÉN APLIK S.A. de C.V.<br><br>OF THE NA  üi3A \ **BOOEGA E COcONIA** INDUSTRIAL ALCE amnco rt ucxLPxH in the City of Mexico, C. P. w3ro tatxico | ^"     '* |
| ˀ | SOLUTION IN MASS MEDIA AT IV AVENIDA LÓPEZ **MATEOS**<br><br>NORTE 539, COLONIA LADRON OE **GUEVARA GUADALAJARA JALISCO C. P. 44600 MÉXICO** | '"* |
| **'' | COMPREHENSIVE SOLUTIONS ELYM S DE RL DE"CV<br><br>Tax Office No. 19. Colonia Campestre Aragón Gustavo A. Madero, Mexico City, ZIP Code 07530, Mexico | S'*,568.75 |
| * | SOHY OF MEXICO CITY<br><br>AVENIDA LX FE 0 COLONIA SANTA FE ALVARO OBREGÓN MEXICO CITY ZIP CODE 01210 MEXICO | 5148.64   59 |
| | **SRI LEGAL 5C**<br><br>zoaAU\ 1zz .1zz . zzz cocomx RouA nasce..<br>CUAUHTÁMOC, MEXICO CITY, ZIP CODE 06700, MEXICO | '* |
| ^^ | **STATIONFY INC**<br><br>24a3 Fillmore Street 2eA3 San Francisco, California " 94115 UNITED STATES OF AMERICA | $282.514.68 |
| "' | SYCgCME BA DE CV<br><br>BAHIA OE CUANTÀNAMO 79 COLONIA VERDICA AZURES HGUE HIDx GO MEXICO CITY 1 P. 11300 MEXICO | $203.530.00 |

JUZGADO PRIMERO DE
DISTRITO EN MATERIA DE
CONCURSOS MERCANTILES,
CON RESIDENCIA EN LA CIUDAD
DE MÉXICO Y JURISDICCION EN
TODA LA REPÚBLICA MEXICAN/

Scanned with
CamScanner"

56

| | | |
|---|---|---|
| 475 | STULZ MÉXICO SA DE CV<br><br>INSURGENTES SUR 64 COLONIA JUÁREZ CUAUHTÉMOC CIUDAD DE MÉXICO C. P. 06600 MÉXICO | $45,380.31 |
| 476 | STYPE NORWAY AS<br><br>TOLLBUGATA 27 SENTRUM OSLO OSLO 0157 NORUEGA | $1,972,120.78 |
| 477 | SUPORTIKA DE MÉXICO SA DE CV<br><br>BRADLEY 66 COLONIA ANZURES MIGUEL HIDALGO CIUDAD DE MÉXICO C. P. 11590 MÉXICO | $3,693.12 |
| 478 | TABACOS DE SANTA FE SA DE CV<br><br>PINO 343 COLONIA SANTA MARÍA LA RIBERA CUAUHTÉMOC CIUDAD DE MÉXICO C. P. 06400 MÉXICO | $5,160.00 |
| 479 | TANIA CARINA DURAN CABRERA<br><br>VOLCÁN PARICUTIN 8 COLONIA LOS VOLCANES TLALPAN CIUDAD DE MÉXICO C. P. 14440 MÉXICO | $15,433.60 |
| 480 | TECNOLOGÍA EN COMUNICACIONES Y REDES SA DE CV     .<br><br>CALLE 7 375 COLONIA RESIDENCIAL PENSIONES MÉRIDA YUCATÁN C. P. 97217 MÉXICO | $22,880.00 |
| 481 | TECNORAMPA SA DE CV<br><br>CARRETERA FEDERAL MÉXICO-QUERÉTARO 175+494 COLONIA LA ESTANCIA QUERÉTARO QUERÉTARO C. P. 76729 MÉXICO | $10,210.00 |
| 482 | TELEFONÍA POR CABLE SA DE CV<br><br>LÁZARO CÁRDENAS 1694 COLONIA DEL FRESNO 1RA SECCIÓN GUADALAJARA JALISCO C.P. 44900 MÉXICO | $154,518.00 |
| 483 | TELÉFONOS DE MÉXICO SA DE CV<br><br>PARQUE VÍA 198 COLONIA CUAUHTÉMOC CUAUHTÉMOC CIUDAD DE MÉXICO C. P. 06599 MÉXICO | $264,932.02 |
| 484 | TELÉFONOS DEL NOROESTE SA DE CV<br><br>AV PIO PICO 1525 COLONIA ZONA CENTRO TIJUANA BAJA CALIFORNIA C. P. 22000 MÉXICO | $10,732.01 |
| 485 | TELEVERA RED SAPI DE CV<br><br>GALILEO 50 COLONIA POLANCO IV SECCIÓN MIGUEL HIDALGO CIUDAD DE MÉXICO C. P. 11550 MÉXICO | $1,556,834.66 |
| 486 | TELEXTANTE SA DE CV<br><br>EJE 3 SUR FERROCARRIL DE RIO FRIO 419 COLONIA CUCHILLA DEL MORAL IZTAPALAPA CIUDAD DE MÉXICO C. P. 09319 MÉXICO | $37,862.40 |
| 487 | TEODORO LOREDO SUAREZ<br><br>RIO GRANDE 5 COLONIA ARROYO HONDO ZARAGOZA SAN LUIS POTOSÍ C. P. 79540 MÉXICO | $278,857.58 |
| 488 | TERI AND MON SC<br><br>RIO TIGRIS 32 COLONIA CUAUHTÉMOC CUAUHTÉMOC CIUDAD DE MÉXICO C. P. 06500 MÉXICO | $290,000.00 |



Scanned with
CamScanner



PODER JUDICIAL DE LA FEDERACIÓN

FORMA A-45

57

FIRST DISTRICT COURT FOR COMMERCIAL BANKRUPTCY MATTERS, WITH ITS SEAT IN MEXICO CITY AND JURISDICTION THROUGHOUT THE MEXICAN REPUBLIC
JUDGMENT (DECLARATION **OF COMMERCIAL BANKRUPTCY)**
COMMERCIAL **BANKRUPTCY** ZZ/2026-II•

| | | |
|---|---|---|
| 489 | FEDERAL TREASURY<br><br>AVENIDA CONSTITUYENTES 1001, COLONIA BELÉN DE LAS FLORES, **ALVARO** OBREGÓN, MEXICO CITY, C. P. 1000 MEXICO | $310,845.02 |
| 4é0 | MEXICO CITY GOVERNMENT<br><br>AV KRAY SERVAHDO TESERA DE NIER 77 COLONIA CENTRO (AREA 1) CUAUHTÉMOC CITY OF MEXICO C. P. 06000 MEXICO | t249,22&00 |
| 491 | YETRA 40 S.A. de C.V.<br><br>CAL<cOAYA 17 COLONIA lvUEVA IXTACALA TLALNEPA«TLA Oe BAZ EszADO OE M@DO C.P. S4160 | $186,388.72 |
| 492 | HAPI.OT 5A DE CY<br><br>ftIO OE LA PLATA 'Z02 C,OLOMA DEL'VALLE 9AN PEDRO GARZA GÈRCfÍ kUEVO LEÉix C..P. 60ZZ0 ME8!CO | 118,000.00 |
| 493 | T«E GROUP BRaAb?Asi TEi.ó ''Îl'!D PO.ST     ^^ *<br>ÒÈ RL DE CV<br><br>PEOeEGAL 24 PISÒ' cOL0i'fIA MOMMO DEL RE MIGUEL HIDAtGg CIUOAO DE       CO ZIP 11040 MEXICO | $4,440,580.25 |
| 494 | 'To00 regarding electronic and ucQos, oE «v<br><br>É«uTA UE É*8 c0LOI'?A sANTx . FE CUMMALPA C,IJÀaMLPn oE MOnELOs oUoÜD OE M¢XiCO c..P: o53•s MÉXICO. '''' | $2,320,000.00 |
| 495 | TRA SPQRTAOQRA CERAN SA DE CV. '        •<br><br>isceec w caTòucx"7i"c" itndnom 1 coi•oniA,Ai.xuos<br>**BENITO JUÁREZ CIUDAD DE MÉXICO C. P. 03400 MÉXICO** | 521,240.00 |
| 496 | TéESMWTOG CdGWSL6AD8CV<br><br>**COLIMA 395 A COLONIA ROMA NORTE CUAUHTÉMOC CIUDAD DE MÉXICO C. P. 06700 MÉXICO** | $$20,762.40 |
| 497 | TROOP Y COMPAÚIA SA OE CV<br><br>GOI-FO DE TEHUANTEPEC 10, TACIJBA NEIGHBORHOOD, MIGUEL HIDALGO, MEXICO CITY 6<br><br>P. 11410 MEXICO | $78,474.00 |
| 498 | **TRUSTNET DE MEXICO SA DE CV**<br><br>PARRAL 6, CONDESA CUAUMTÈMOC NEIGHBORHOOD, | $2,136,407.85 |
| 499 | **TUBI INC**<br><br>MONTGOMERY STREET 315, 16TH FLOOR, SAN FRANCISCO, CALIFORNIA 94144, UNITED STATES OE | $64,194,513.70 |
| 500 | SONORA CORPORATE TV 5A, S.A. de C.V.<br><br>GARMENDIA 200, COLONIA CENTRO, HERMOSILLO, SONORA | flt8Se¥OO FP  I.EFO OF<br>Ptl6TOITO FIG  ,JTTESI/'. DI |



CONTESTS OPEN TO RESIDENTS OF MEXICO CITY AND THOSE FROM ALL OVER THE COUNTRY.
/ùof IC

:     Scanned with

"CamScanner"

| | | |
|---|---|---|
| | C. P. 83000 MÉXICO | |
| 501 | TV CORPO!ʳ£AW¥ʹO OEL VALLE YAŒX SA DE cV<br>**AV. MIGUEL ALEMÁN 225 COLONIA CENTRO OBREGÓN SONORA C. P. 85000 MÉXICO** | $6,751.01 |
| 502 | *fiiaz« ø fi co* TECrmoLoGY ß SOFT¥‹ARE 3« Œ Cy PŒAMCO i<br>**BLVD MANUEL ÁVILA CAMACHO 137 PISO 8 COLONIA** SECOON MIGŁIEL HEîALGO ŒUOAO DE MEXICO | $247,789.75 |
| 503 | **UNIÓN EDITORIALISTA SA DE CV**<br>**INDEPENDENCIA 300 COLONIA GUADALAJARA CENTRO** ouAoAL lcRx Jxusco, Z.P. 44‹0 oußXtco | $696,023.20 |
| 504 | UNION LAH JOSE YAJOtd S Œ RL Œ cV<br>'vso ET s *No. 4* COLONA REČ ORMA OAXACA OE JUÑREZ<br>**OAXACA C. P. 68050 MÉXICO** | 9S4,c37.èS |
| 505 | LiæhæeSlOAD HxClo IxL ALrTÔH£e4A OF MEXICO<br>**AVENIDA UNIVERSIDAD 3000 COLONIA UNIVERSIDAD NACIONAL AUTÓNOMA DE MÉXICO COYOACÁN CIUDAD DE MÉXICO C. P. 04510 MÉXICO** | $31,856.38 |
| 506 | One and a half eueuoocD McxsCo 8A DE CV<br>SANTA FE SYS FLOOR 16 COLONIA SANTA FE CUMI*¥ALPA CUMMAL 'A DE MORSLßS CITY OF NÊXRO C. R. | ? ‹‹ ?? ∙∙∙ |
| 507 | v*ir'**eDHsBPtt0tRtetcV<br>3AN JERÔ!ʳ!¥+€t lU 1t2-B CDLOfsIA SAN JERÒNNO LAXCE MßOALEM CŒ¥TRSRAS CITY OF MEXICO C. P. 10300 | " |
| 508 | wz    L 'EswLr Tec+t*+oLc*c'r sRoue sø De cv<br>RsY FŧusuxN us s7 tT1 corotstx suusco coyoxcAx ¢lcroA oc Hcoc9 c.P. e43œ M5Xîco | ^    *^ |
| 509 | vcH   The Solutions to the Problems 8x Oc cv<br>UNIVERSITY    502 COLONIA Uŧ!tDAP OAHADERA AGMSCAMEezTE6 AGUASCALIMTE 5 C P. 2o13o MCx!CO | " |
| 510 | **VERNE Y POLTER SAS DE CV'**<br>YAPaŒiuLx zs coiotJ¢x RDu^ suR cuau+‹Tduoc 6x/oA@Oc ucoco c.P. 0sz¢o N£8ico | ∙∙∙    ^ |
| | **VIDA TEA MÉXICO SA DE CV**<br>A£∙¢∙ 0 RIM    CORJ1PEZ s440 COLoHtc oLbsFʹlcA cOYO«CAf‹ ÖUOAO DE M£O¢:O C. P. 0<71e u£xgCe | ∙** * |
| 512 | **VIDONNY COMERCIALIZADORA SAS**<br>H ^óIJTO c A CŒ-4NŁA TECAMAC D£ FE1JPE<br>**VILLANUEVA CENTRO TECÁMAC ESTADO DE MÉXICO C. P** | '*' |
| sts | | $68,265.00 |

Scanned with

"CamScanner"



FORMA A-45

FIRST COURT OF APPEALS IN MATTERS OF COMMERCIAL BANKRUPTCY, WITH SEAT IN THE CITY OF MEXICO AND JURISDICTION OVER THE ENTIRE MEXICAN REPUBLIC

JUDICIAL DE LA FEDERACIÓN

NOTICE OF COMMERCIAL BANKRUPTCY PROCEEDINGS
COMMERCIAL BANKRUPTCY M/2026-JI.

|  |  |  |
|---|---|---|
|  | NAOERO, MEXICO CITY, ZIP CODE 47340, MEXICO |  |
| 514 | Southeast District Court of Mexico City<br>jx9URGE« c 9 nQRTE 165S INr 1 CORONH GU5oALUPE iHSURGE5TES GUSTAVO A MAOERD c9TADO DE MEXICO C, P. 07070 MÉXICO | " |
| 515 | VIGSLA TECHNOLOGY AND SERVICES, S.A. de C.V.<br>341 Casas Grandes, Colonia Parvarté Oriente, Bejít Juárez, Mexico City<br>C. P. 03023 MÉXICO | ' |
| 516 | VILLA SAN JACINTO MALINALCO SA DE CV<br>Av. FrCC de Río Frío PIB        C.PLO   M. C        DEL MORAL  IZTAPALAPA  CIUDAD  DE  MÉXICO  C.  P.  09319 | ** ' |
| 517 | cczJxuono Duuxs 1•¥ coí¢eaA eo *c^ ^<br>jaGUEL »laAL»O CIUDAu ÓE kt  i«Ó C. P. 11S^0 | SECCIÓN MÉXICO | $92,600.00 |
| 518 | vtMoTfiCA gE NEXICO M DE CV<br>        411 'C oijlA"CE 'TRo MONrGRez¥ NUEVo LzÓN 0 P 64000 MEXICO | srm,6¥0.7 |
| 519 | vlsóft and DrSxsnOLLO So8 &A D^ CV<br>CDA        AVDA 1  6                q  gg<br>BUENAVISTA PUEBLA PUEBLA C. P. 72150 MÉXICO | IMJ5,3SL97 |
| 520 | v‹venozx eieNEs r reououones rnnoa«u+uxs sA oE CV<br>HIDALGO  243  COLONIA  NIÑOS  HÉROES  QUERÉTARO QUERÉTARO C. P. 76010 MÉXICO | $127, |
| 521 | WAGORU S DE RL DE CV<br>HA•40URGO 1s9 COLONIA .iMAREz CIJAUHY£MOC CITY DE MÉXICO C. P. 06600 MÉXICO | S96s,so1o0 |
| 522 | WDC MEXICO g 0G RL DE CV<br>e5nr6eico suR 3zos coLout« rUEMTE3 DEL PEORFML<br>Q P: 1g140 MEXICO | ' " *' |
| 523 | HHSTEAD PC<br>RBNAIS9ANCE TO /ER 1101 ELM ST 1201. •M.LAS, TX TEXAS TEXAS 054¥0 UNITED STATES OF AMERICA | $28,473.92 |
| 524 | WINTERH4, DISHWASHERS AND ST6EMAS OF llvousTFtsa,L pE uExico s oE FtL oe cv<br>From LtCEAcx. et9O T 7 COLQutA ¢tOcTORE9 ¢UAUHT CIUOAO, Mexico City, C.P. /Isygo, Mexico | LAVADO<br>ÉMOC | $1,914.00 |
|  | SIERRA NEVADA 130 PLANTA BAJA COLONIA LOMAS |  |

JUZGADO PRIMERO DE DISTRITO EN MATERIA DE CONCURSOS MERCANTILES, CON RESIDENCIA EN LA CIUDAD DE MÉXICO Y JURISDICCIÓN EN TODA LA REPÚBLICA MEXICANA

: Scanned with
"CamScanner"



| a | c | tnP*cnsEcciOn*scuct-c›ats‹acoc›*moz | ›i.›,t.;1*e |
|---|---|---|---|
| | | WDW GMES SAPI, LLC | $1.120 |
| | | I-tIOALCO 24I, Colonia Barrio 3, kBGUEL. fZ7APALAPA CR/zlAo DE HÉxt¢O C. P. g93cg MEXICO | |
| 527 | | WPP ME£ A MAHACEMENT | $48,742,186.05 |
| | | LAGO  ALBERTO  319  P3  COLONIA  GRANADA  MIGUEL | |
| | | YAMAHA DE MÉXICO SA DE CV' | *"      " |
| | | AvEnloA INSLIRoC"MES SUR tei7 RSCI 0 COLOMIA San JOSÉ INSURGENTES BENITO JUÁREZ CIUDAD DE MÉXICO C. P. 03900 MÉXICO | |
| 529 | | ZAPATA VELA5C€i od'MEZ MOPT A8OCA00S 9¢ ALEJANDRO DUMAS 33 COLONIA POLANCO CHAPULTEPEC MIGUEL HDALGO UMAS 33 MEXICO C. P. 11500 MEXICO | $75,000.00 |
| 530 | | ZGMSMM HÉx›CO 6A DE w DARWIN DE is›xico 6.¶- isso MEXICO COLONIA ANZURES  MIGUEL  HIDALGO | $133,400.00 |
| ' | | ZETRAIt kA DG CV CgRRc"rzRa ¥sÉxzCo ea2 COLDIdA BA+J á,MTD^IIO POLOTTTLAH DE LA tLMSTRACO*¢ ESTAD 88 MEXICO C. P. | "  '" |
| 532 | | BUEISA VISTA tNT€RMTIOMAI-, PJC. 6O«TH BUEMV S A s›+tEET s¢0 BURBAn cALr'D»r• ^ »sz  is chaos ulvoos | t36*.tss.s25'*‹ |
| 533 | | RCN TELEVISION. B1 AV LAS AMÉRICAS 65 82 PUENTE ARANDA BOGOTÁ 111311 | $1,879,723.63 |
| 534 | | uuf¥za       crFy STUD+D9 PRODUCTION9 LLC UNIVERSAL CITY PLAZA, BUILDING 100 1440 - 11TH FLOOR CALIFORNIA 91608 ESTADOS UNIDOS | 3149,221,470. |
| | | DtSTRBtJTtGM, 1NC• FLOOR BURBMIS CAUFORMA 915» ESTA¢io0 LffdDos | $104,716,461.97 |
| sue | | CPT HOLDINGS, INC. wgsz wcsFti+jcTon acvo le7oz cuLvc t ci1"¥ c^L*DerdA 40232 UNITED STATES | 92r,zss,s1*sz |
| 537 | | DIAMOND FILMS NETHERLAND COORPORATIEF UA PRINS BERHARDPLEIN 200 ÁMSTERDAM 1097JB REINO DE LOS PAÍSES BAJOS | $403,009,909.20 |
| | | eeouoçionEs       fircR, S.A. de C.V. | |

"CamScanner"

Scanned with

Case 1:26-mc-23885-JEM   Document 30-1   Entered on FLSD Docket 08/03/2026   Page 312 of 385

"CamScanner"



JUDICIAL DE LA FEDERAÓON

"G1"

FIRST COURT OF COMPETITION AND COMMERCIAL BANKRUPTCY
MATTERS, WITH SEAT IN MEXICO CITY AND JURISDICTION THROUGHOUT
THE MEXICAN REPUBLIC

JUDGMENT OR DECLARATION OF **COMMERCIAL** BANKRUPTCY

COMMERCIAL BANKRUPTCY CASE M2026-II.

| | | |
|---|---|---|
| | OPERADORA DE ESCENARIOS DEPORTIVOS, S.A. DE C.V. (PUEBLA AP'Z4 CL'75) <br><br> BOULEVARD DE LOS REYES 8206 401 COLONIA SAN MARTINiTO SAN ANORÉS CHDLIJLA PUcBLA C, P. 77e25 | $9,280,000.00 |
| 540 | Association of Professional Teams of BEI£8¢i¢ OE <br> **LA LIGA MEXICANA, A.C.** <br><br> INSURGENTES SUR 79, Blocks 3 and 4, COLONIA NÁPOLES, BENITO JUAREZ, CIJLOAD, MEXICO CITY, ZIP CODE: 0 M xlc | $2,255,968.00 |
| .Ñ1. <br> ' " | **MTV NETWORKS LATIN AMÉRICA, INC.** <br> N.W. 6TH STREET 161 MIMI FLORIDA 3J136 E5TA0'OS UI'¥OOS | MS,S67.93516 |
| | **FREMANTLEMEDIA MÉXICO, S.A. DE C.V.** <br><br> PETtIFÉRICO SUR ¥249. COLONIA JARDINES DELA * ^ * TLALÍ•At‹ CITY OF MEXICO. *. P. 1*2tÁMEx›CO | S6,-51"' " |
| | **TELEVISA, S.A. DE C.V.** <br><br> AV. vA5CQ OE OTFLROGA 2›‹» cocofaA PUEB¢O SAL+TA FE ALVARO"ÓBREGó/'I c\U0»Ó DÉ MEXI¢O Ü e ai21o •ÉXIC0 | '. ' ' |
| 544 | NO aoxING NO UFE'S À; s. DE Y. <br> ZALATITAN 534 JARDINES DE LA PAZ NORTE GUADALAJARA JALISCO 44860 MÉXICO | $2,477,231.04 |
| 64S <br> t <br> •F | "_x <br> .BBC.STUDIOG OISTRIBUTIDN MNTED <br><br> Wóoo LANE 1o1 9 WsZ 7rlW RBMO UMI0o | $83,642.14 |
| Sa6 | **ACUN MEDYA LIMITED.** <br> TOWER RoA0 244"s "SLi? t64d MLTA: | $556,442,137.23 |
| | BINERGIÁ"DEPORTIVA; 51 DE £.V- <br><br> SAN NICOLÁS UNIVERSITY STADIUM IN LO9 GARZA GATE 13 COLONIA EX+J NICOLÁS DE LA GARZA SAIJ MCDLÁS DE LA G>p a, N\jEVO LEÓN c. P. 66c5s MEXICO | *" "*¹" |
| | **FC JUÁREZ, S. DE R.L. DE C.V.** <br><br> Av. Campos Eusebios, Colonia N/A <br> .? Ciudad Juárez, Chihuahua, C.P. 3**70, Mexico | " " oo |
| | **3 AMÍGOS PROMOTIONS, S.A. DE C.V.** <br><br> JOSÉ MARIA VELASCO 263t II+T.t-DZA COLONIA ZONA URBAttA RIO TiJUAJA TIJUANA BAJA cALIFDIUd‹A C. P. | $372,991.B5 |
| | Special Advisor, xvu,c‹óu, se. oE c.v. <br><br> CAJ.\s s Ha.u‹sasi es orlciI'tA 19 e Colonw Sau Pero Yotoltepec Toluca State of Mexico ZIP Code 50226 MEXICO | $5,804,650.75 |

JUZGADO PRIMERO DE INSTITUTE OF ,Qp COURSESMERCANTILES, ON RESIDENCE:‹ E'. L,ñ CITY DE MÉXICO Y JURISDICCIÓN EN TODA LA REPÚBLICA MEXICANA

: Scanned with CamScanner"



| | | |
|---|---|---|
| 551 | **AZNETWORK, S.C.**<br><br>Ct›AU+IYgMQg C»joAD t›E MtxIC€l C. P. 0600s MLO | $15,097,629.57 |
| 552 | **AZTECA INTERNACIONAL CORPORATION**<br><br>**NORTH BRAND BOULEVARD 611 SUITE 1300 GLENDALE CALIFORNIA 91203 ESTADOS UNIDOS DE AMÉRICA** | |
| 553 | **AZTECA NOVELAS II. S.A. DE C.V.**<br>cv.z«oxoETtaj • i zsh cocouix zx zxoo sex rxaLo zzt•sn.aux coyoccAx c«toxo as st€xico c. e. e4cc4 | $22,304,635.94 |
| 554 | **PERIFÉRICO SUR 4121 COLONIA FUENTES DEL PEDREGAL TLALPAN CIUDAD DE MÉXICO. C. P. 14140 MÉXICO** | $324,181,783.31 |
| 555 | **EQUIPO DE FUTBOL MAZATLÁN, S.A. DE C.V.**<br>**AVENIDA MÚNICH S/N S/N COLONIA PRADERA DORADA** | $10,171,350.65 |
| 556 | EDtßRO8 DUO. 6ß<br><br>**CUAUHTÉMOC CIUDAD DE MÉXICO C. P. 06000 MÉXICO** | $50,449.11 |
| | **GANADOR AZTECA, S.A.P.I. DE C.V.**<br>AvEM A AOMaaE LAREoO s727 t icD cOLoraA LA **FUENTE JUÁREZ CHIHUAHUA C. P. 32370 MÉXICO** | " ' |
| | iNMOBkIAMA RØCA DEL PEOfiEGAL. 6A D2 QU.<br>ecæztæco sum x1z1 coLo«r rvcurzs our PeoRsGAL and "u•A" clLtoAo OE MŁX O.C.P. 141+t »/'ocO | ' '" '* |
| | w woz cv.<br>eclcțrtøco øvn c1țe Tonax B płso 2 cOLDHtA FuoÎTcs oec Peoezcxc ztxcpAs cwaao oa ußxico c. . 14l‹o | * ' '"**'' |
| 560 | **MERCADOTECNIA TVA, S.C.**<br>**PERIFÉRICO SUR 4121 COLONIA FUENTES DEL PEDREGAL TLALPAN CIUDAD DE MÉXICO. C. P. 14140 MÉXICO** | $244,489,802.81 |
| 561 | **MULTIMEDIA ESPECTÁCULOS Y ATRACCIONES. S.A. DE C.V.**<br>ecærcæco sun <1á1 coLœa meuTes oEc PcoAEoAk z eox Ouzixo oe ołuco. c. r. ‹Jț<1 uEx›co | $237,407,385.85 |
| | **OPERADORA GANADOR TV AZTECA, S.A. DE C.V.**<br>PE ¢IFEØCO 8UR 4121 CODHM FUMTZS OEL PEDRE6AL PM MLI€iAo DE MEx+CO. C. P. 1J1¥0 ¥¢ßXtOO | ' '" |
| | ¢ '€AA0•DFŁA UE¥ÍCANA DE TEc(EViMOM. ß1 DE C.V.<br>P€+e¥t ¥CO SUR aT¥1 D •ŁO+lIA FUENTE8 PEL PEDREGAL xa ouoxo oxutx*so c r 14 4o ucoco | ' '" |
| 564 | emxx›ccioues xzrzcc Corr u, so oe c.v.<br>**PERIFÉRICO SUR 4121 COLONIA FUENTES DEL PEDREGAL** | $93,700,037.11 |

: Scanned with
CamScanner"

FORMA A-69

63

FIRST DISTRICT COURT FOR COMMERCIAL MATTERS, WITH SEAT IN THE CITY OF MEXICO AND JURISDICTION THROUGHOUT THE MEXICAN REPUBLIC

JUDGMENT DECLARING A COMMERCIAL BANKRUPTCY

COMMERCIAL LAWSUIT 22/2026•/J.

PODER JUDICIAL DE LA FEDERACIÓN

| | | |
|---|---|---|
| | **TLALPAN**, MEXICO CITY. C P !***8 MMUP | |
| 565 | PRODUCTION 9 DOP, 1st of cv. <br><br> PE&IF C ICO suR "Il ¢0LOxIA FUExTES Dcl- f'E0RE cAL TLALPAl4 CITY OF UGMO. G. P. 14180 MC¥X'•O | ** *' |
| 566 | SPECIAL OFFERS. s.1 OE C.V. <br><br> **SIMÓN BOLÍVAR 25 201 COLONIA CENTRO (ÁREA 1) CUAUHTÉMOC CIUDAD DE MÉXICO C.P. 06000 MÉXICO** | $133,756,897.46 |
| 567 | PRODUCTION OF TORNADOES AND PUBLIC SPECIATIONS. 5.1 C.V., <br><br> PEBF CeiCO SUR 4i21 cCILOI'«A FME¥TES DEL. PEORE TLALI•Ax CMDAP OF NÉxJcO c. ,i•. ‹•s•0 ^•EXU tt | $517,418,299.54 |
| 568 | **SCI DE MEXICO, S.A: DE C.V.** <br><br> **AVENIDA INSURGENTES SUR 2376 2DO PISO / 201 D** cotoFtcc' clilua1IsTÀc ALvARO o8 EGÓH 0MO^D PE **MÉXICO C. P. 01070 MÉXICO** | $363,989.66 |
| 569 | **PERIFÉRICO SUR 4119 TORRE B PISO 1 COLONIA FUENTES DEL PEDREGAL TLALPAN CIUDAD DE MÉXICO C. P. 14140** | $100,802,665.37 |
| 570 | SERvICl€9 Us OF rRO0UcOóN, 6.A. Oa O.V. <br><br> **PERIÉÉRICO SUR 4121 TORRE PRODUCCIÓN PLANTA BAJA** Col.OiaA FOE‹TgS OF THE +EOREaAc 1LAl.e•I• ¢¥JOA@ AL u£aco c . 1414a u6:aca | $28,603,165.32 |
| .£'/ '*" | &MOT¿ S.C. <br><br> AVEI'¥0A "IliSU EHTfjS "6UR 1B0S 'I3O :19 "MM*'4 cOLOHtA SAN JOSE /N0URgENTE8- gmFro 7UAFIEZ OUóxODe MExl 0 C.P. 43e00 átEoCO | ' ‹*" "" |
| ¥7z | s'rAnoxs oeucx•. Luc <br><br> eR+¢xELL AVENUE I2y1 "" sLrTz zsz4 MIAut FLOIZIDA -STATES Vr/K:›€S OE MTBDA | ta 1s.S+ |
| '" | inspection "ace" and "se" c.v. <br><br> AVzMIoA IUS¢IRGcNTE4 SOUTH 237s RSO ‹ Orl6i•• 1ee ¢DrO»L< Cr¥MMJsrAC ALVARO OBREGÓu CRJOAD OE MEoco c. P. o‹o7o oáoco | "''''‹^ " |
| 574 | **TRIENIO, S.C.** <br><br> COLOHId. SAN JOSÉ ‹ isURGE›‹TES BMITO JUAaEZ **CIUDAD DE MÉXICO C. P. 03900 MÉXICO** | |
| WS | ADAMANT¥Ju PfclVATC 6FCU+MTY SERVICES, S. de R.L. DC " c.v. <br><br> MATIAS R•MÁRCI t22t RSO 1 AND 2 CC'LC'NfA OF THE SOUTHERN VALLEY, JUAZ COMMAND, MEXICO CITY, C-P. 0310g MEA›CO | $1,537,540. |

auzcaOO FRt*v'ü-RO UN o+sTn+TocMtzATEnt Or CONTEST" MERCAN ILES. OON RESIDENCY AT THE CIUDAD DE MÉXICO Y JURISDICCIÓN EN TODA LA REPÚBLICA MEXICANA

Scanned with CamScanner"

€4

!^ O^ERAÕORA DE TEATROS. 5.1 DE C.V.

AV *F CC OE RND FRTO 4I0 TO 14 COLO¥ftA CUCH8LL^ OF THE "'*''"''"
Oaxc TAPALAPA, MEXICO CITY, c. é• 9SS1#

DtALOGuS PROCESOS, S.A.P.3. DE C.V.

PEF0FÉ£¥CO SUfi st21 FUENTES DEL F'EDRE^^L NEIGHBORHOOD        * '"
TLALPAN, MEXICO CITY. ZIP CODE 14141 MÉTCO

**FUNDACIÓN TV AZTECA, A.C.**

578  **AVENIDA MONTES URALES 460 PISO 2 COLONIA LOMAS DE**   $68,000.00
CnAPuLW"zc Bs 6cccBá+I MIGUEL Eso^8ao chu Ao ^^
h¥6¥tCO IP. 1100a MEXICO

GRUPO sA¢JMs TELECD s. CA OE C.v.

579  PE d£ÉztICO SLIR 4¥22 **COLONIA** FUENTES •**        *        "      "
**TLALPAN,** MEXICO CITY—ZIP CODE: 04141

**NUEVA ELEKTRA DEL MILENIO. S.A. DE C.V.**

580  AVENIDA FFCc DE eO FnsO «19 Bv¥ cDLO•4A 0uCH1Lt.A Do   $10,420,385.59
MORAL          AP   , City of Mexico* ZIP Code 00010

PAFtAoIN DE MEXICO, DEPARTMENT OF GOVERNMENT

581  PRIVATE MtGMeL NORE zA 27, 2nd FLOOR, SAN JOSC NEIGHBORH $18,808,240.00
txsuRcc      S. A.E.S.O. JtiARez Ctuoxo Oe Uáx›co C.P.

SERVICES OR SUPPLIES. CHA UEO+OS OR COUN+CXCIÓ+A
GS. E- • DE o.V. PERF£RtCO SLIR 4121 COLONH            $40,958,240.98
582  **FUENTES DEL PEDREGAL TLALPAN CIUDAD DE MÉXICO.**

Yxu*oxs Super Paeoo, ASP.L ac mv.

AVEN@A JAVIER BARROS 9IERRA MO TORRE 1ST FLOOR 5   $1,295,017.15
583  OricPIA sórl couotaW ooeañs oE BANTA rE ALvARo Daaecó«
clua«o oe ucxx o c. P. otzlo ucxtco

**TOTAL BOX, S.A DE C.V.**

a'P. sA++ ueRozaeo zsz esso s cioHss cx Listen to me as+son G6,0t .44
co'rmcAes ciuoao De u¢xlco. c.P. ots1s uÉaa o

**TOTAL PLAY TELECOMUNICACIONES, S.A.P.I. DE C.V.**

**COYOACÁN CIUDAD DE MÉXICO. C. P. 04519 MÉXICO**

TOTALSEC. SA DE QV.

586  e niFÉ+‹sCO 8UR 4 at C  ODIA rUE»ze9 DEL PEoaEGA«   1z,sss              r

587 AV• PA9EOS OF **THE REFORM** 476 COLUMN In light   $1,051,962.00
cuau+rr€uoc, cucurrtsuoc c. e. asa6e ucxco

ST8TUYO oW GO+JDO MCIO+CAL OE LA '«f¥1EHDA PARA

**AV. BARRANCA DEL MUERTO 280 COLONIA GUADALUPE
INN ÁLVARO OBREGÓN ÁLVARO OBREGÓN C. P. 01029**

Scanned with
CamScanner"



FIRST DISTRICT COURT FOR COMMERCIAL BANKRUPTCY MATTERS, WITH SEAT IN THE CITY OF MEXICO AND JURISDICTION THROUGHOUT THE MEXICAN REPUBLIC
JUDGMENT DECLARING COMMERCIAL BANKRUPTCY
COMMERCIAL BANKRUPTCY CASE M/2026.‹l.

| | | |
|---|---|---|
| | MEXICO | |
| | SECRETARIAT OF FINANCE, AGUACAUENLES AV. DE LA CONVENCIÓN 102, COLONIA DEL TRABAJO CuxŞcsrlE5TE5 AGUAS CAUEMTES, ZIP CODE 20160, MEXICO | $1,980.00 |
| 59g | SECRETARIAT OF FINANCE OF THE CITY OF MEXICO Plaza de la Constitución 1, Colonia Centro Cuauhtémoc, C.P. 0000, Mexico | $95,326.N |
| ss1 | GOBIERNO DEL ESTADO DE MICHOACAN c     DA VZPTURA PUSNTE 112 COLOMA CHAFUi.TÎ Ec NORTE MORCLIA MORELIA C. P- 582Ø N£XK | SSæ.œ |
| 592 | SECRETARIA DE FINANZAS DE CHIHUAHUA VENUSTIANO CARRANZA Y ALDAMA 1100 COLONIA CENTRO CHIHUAHUA CHIHUAHUA C. P. 31000 MÉXICO | G£343.00 |
| ^ | SECRETARIAT OF FINANCE, TREASURY, AND PUBLIC WORKS VIA ATLIXCAYÒ7L 1‹0\ iEa""rs .'COLONIA CO^CEPCIÔ« 'Lą$ LAJAS ATUxcAYOTL ATLJYCÁYOTL C.P.72190 UÉ-XfCO | $5,058.00 |
| B4 | GOVERNMENT OF THE STATE OF GUATEMALA PASE -D'E É ":P. 0s 1zZ CDLOtaA CENT«O CUANMUATO GUANAJUATO C. P. 36094 MÉXICO | S     00 |
| 595 | GOBIERNO DEL ESTADO DE MÉXICO AT. 6EBA57IAN. I-5A•O OE TEJAOA 300 COt•ONŁA CEMTRO Toluca, Volume C - P. 50,000 Mexico | $759.00 |
| 59s | SECRETARY   OE   ADMI   S7aACTION   AND   FINANCE   FR YUCATAN CALLE 59 X AV. ITZÁES Y CALLE 90 NA COLONIA CENTRO | 5,086.00 |
| 07 | 5ER€CODE#D€iN1STR#C1ONWDBUT*B* •v. rco•Lco 77 coLaW auERReRo cucuLiztuoc CÜAUHTÉÑOC C. P. 06¥#o MEXICO | $83,454,311.00 |
| s¥B | uEzsuu zEnu Note I+w Bxua or luzw yoex ueuLou QREENMCH STREET 24o IsEw YORK NEW YORK NEW YORK 10286 EE.UU. | $10,399,061,168.39 |
| | ALTERBANK. LT0 RD0'NEW BAY COMMERCIAL BOULEVARD SUITE 3 ROONEY BAY RODNEY BAY GROS-ISLET LC01 401 SANTA LUCÍA | $4,217,903,819.44 |
| 600 | NUMC SERVICES, SAPJ. DEAv. | $1,807,942,212.82 |

JUEGADO PRIMERO DE
DISTRITO EN MATERIA DE
CONCURSOS MERCANTILES.
CON RESIDENCIA EN LA CIUDAD
TODA LA REPUBLICA MEXICANA

:   Scanned with
CamScanner"

| HAMBURGO 20¥ S03 COLONIA JUARE'¢ CU^+*U*EMDC MEXICO CITY, ZIP CODE 0ez0¥ MEXICO | |

FIFTH. Retroactive Date. Pursuant to Article 43, Section X, and Article 112 of the Commercial Bankruptcy Law, the retroactive date of the bankruptcy proceeding is set as October 9, 2025.

SIXTH. Restraining Order. This judgment imposes a RESIDENCE ORDER on the members of the Board of Directors of TV Azteca, a publicly traded corporation with variable capital, or, where applicable, on those responsible for its management, for the sole purpose of preventing them from leaving their place of residence without appointing a duly instructed and paid-for representative or attorney-in-fact, in accordance with Article 47 of the Commercial Bankruptcy Law.

SEVENTH. Procedure for recognition of

*t}      claims. The conciliator is ordered to initiate the procedure for "t• recognition of claims, summoning ex officio the

,-      terms established by Articles 12a and 123 of the

.* Commercial Insolvency Law; the conciliator shall prepare a list of the debts owed by the debtor that he or she proposes to recognize, based, among other sources, on the accounting records, other documents that allow for the determination of the debtor's liabilities, the information that the debtor and its personnel are required to provide, the information contained in the inspector's report, and the applications for recognition submitted to him or her.

EIGHTH. Creditors residing within the Republic and abroad **are hereby notified** that they may **file** applications **for recognition** of claims. **Creditors** residing in the Mexican Republic are hereby notified that those who so

Scanned with
CamScanner

FIRST DISTRICT COURT FOR COMMERCIAL BANKRUPTCY MATTERS, WITH SEAT IN MEXICO *CITY* AND JURISDICTION THROUGHOUT THE MEXICAN REPUBLIC

JUDGMENT: DECLARATION OF COMMERCIAL BANKRUPTCY

COMMERCIAL BANKRUPTCY CASE M2026-II.

Creditors are hereby requested to submit their claims for recognition of debt to the conciliator at the address designated by the conciliator for the fulfillment of their obligations, in accordance with the provisions of Article 125 of the Commercial Bankruptcy Law, without prejudice to the provisions of the preceding ruling. Creditors residing abroad may file such claims, if it is in their best interest, with the person and at the location indicated, within a period of forty-five calendar days, in accordance with Article 291 of the Commercial Bankruptcy Law.

NINTH. Order to place the conciliator. In accordance with the provisions of the Article 43, Section VII of the Commercial Proceedings Act

*I ¡oË.libels.          tegl rOS    'dnmźs   document d" of ll the bankrupt company, as well as the necessary resources to cover registration and publication costs /-as provided for in the relevant law.



TENTH. Order to allow the conciliator to perform his duties. The merchant is ordered to allow the conciliator and the auditors, if any, to carry out the activities inherent to their positions.

ELEVENTH. Suspension of payments. The merchant is ordered to suspend payment of debts incurred prior to   the date on which this judgment takes effect; except for those payments that are essential for the ordinary operation of the business, including any credit necessary to maintain the ordinary operation of the business and the necessary liquidity during the commercial reorganization proceedings;

commercial insolvency proceedings, with respect to which it is determined

JUZGADO PRIMERO DE DISTRITO EN MATERIA DE CONCURSOS MERCANTILES. CON RESIDENCIA EN LA CIUDAD DE MÉXICO Y JURISDICCIÓN EN TODA LA REPÚBLICA MEXICANA

Scanned with CamScanner"

68

within seventy-two hours of their occurrence, initially to this presiding judge, and, once the name of the conciliator is disclosed, they must be reported directly to said specialist, as he is responsible for overseeing the accounting and all operations carried out by the business, pursuant to Article 75 of the Commercial Bankruptcy Law.

It is understood that this ruling shall not serve as grounds for interrupting the merchant's ordinary labor obligations, nor the payment of ordinary tax or social security contributions by the debtor, as these are essential for the ordinary operation of the business, as established in Articles 66 and 69 of the Commercial Bankruptcy Law.

TWELFTH. Suspension of **Enforcement** Orders**.** It is hereby ordered that, during the conciliation phase, all attachment or enforcement orders against the merchant's assets and rights be suspended, subject to the exceptions set forth in Article 65 of the Commercial Bankruptcy Law, that is, attachment or enforcement orders of a labor nature, pursuant to the provisions of Section XXIII, Subsection A, of Article 123 of the Constitution and its implementing regulations, taking into account wages for the two years preceding the commercial insolvency proceeding.

THIRTEENTH. Publication in the Official Gazette of the Federation and in the newspaper with the widest circulation. The conciliator is ordered, within FIVE DAYS following his or her appointment, to arrange for the one-time publication of an excerpt from this judgment in the Official Gazette of the Federation and in one of the newspapers with the widest circulation in the Mexican Republic.

: Scanned with CamScanner"



69

FIRST DISTRICT COURT FOR **COMMERCIAL** BANKRUPTCY MATTERS, **WITH SEAT IN** MEXICO CITY AND JURISDICTION THROUGHOUT THE MEXICAN REPUBLIC
JUDGMENT DECLARING COMMERCIAL BANKRUPTCY
COMMERCIAL BANKRUPTCY CASE 2Z/2026-II.

To that end, it is hereby ordered that notices containing said extract, as well as the corresponding official correspondence, be prepared immediately and made available to the conciliator.

FOURTEENTH. **Registration of** the judgment in the appropriate **public** registries. The conciliator is hereby ordered, within FIVE DAYS following his or her appointment, to request the registration of this judgment in the public commercial registry corresponding to **the merchant's** place of **business** and in all locations where the merchant has an agency, branch, or assets subject to registration in any public registry.

To that end, the conciliator is hereby ordered to issue certified copies, as well as to draft the necessary official letter and submit it to the conciliator's:

'FIFTEENTH. Various Lawsuits. The actions •"filed and the proceedings initiated by the merchant, as well as those filed and initiated against her, which are pending at the time this judgment is rendered and which involve financial claims, shall not be consolidated into the bankruptcy proceedings but **shall be continued by the merchant under the supervision** of **the conciliator.**

In this regard, the debtor must provide written notice of the existence of such proceedings no later than the day following the date on which it becomes aware of their existence, as provided for in Article 84 of the Commercial Bankruptcy Law.

SIXTEENTH **Claims** and **Conversion** to UDIs. **Precisión sobre intereses de** te V of the article %9 of the Commercial Bankruptcy Act, regardless of the

Scanned with
CamScanner"

place o•e •ᵢ * • ‹ r•cted for payment, the auditors in charge of the defendant who lack royal authority shall cease to charge interest as of the date of this ruling; if they have not

originally denominated in UDIs, they shall be converted to said unit following conversion to the national currency of those that were denominated in foreign currency; the exchange rate and the equivalence of the aforementioned units shall be those determined by the Bank of Mexico as of the date of this judgment.

Likewise, regardless of the place originally agreed upon for payment, secured credits, as of the date of this judgment, shall accrue only ordinary interest and only up to the value of the security; they shall be maintained in the currency and unit in which they were originally denominated. However, they will also be converted to UDIs solely to quantify the extent of their participation in decisions where so required, in which case the aforementioned equivalence shall be applied.

SEVENTEENTH. **Precautionary measures.** As this court is the presiding authority in the commercial insolvency proceedings and possesses all the necessary powers to comply with the provisions of the Commercial Insolvency Law, ONLY the precautionary orders set forth in the FOURTH recital of this judgment shall remain in effect.

EIGHTEENTH. Issuance of Copies. A simple or certified copy of this judgment shall be issued at the expense of any party with legal standing who requests it.

Notification: electronically to the merchant and the inspector; by official letter to the Federal Institute of Commercial Bankruptcy Specialists; the Ministry of Finance and Public Credit; the Tax Administration Service;

: Scanned with
, CamScanner-

FORMA A-61

FIRST COURT OF OSTRJTO IN THE MATTER OF COMMERCIAL BANKRUPTCY PROCEEDINGS. WITH SEAT IN THE CITY OF MEXICO AND JURISDICTION THROUGHOUT THE REPUBLIC FOR MEXICANS

JUDGMENT DECLARING COMMERCIAL **BANKRUPTCY**

COMMERCIAL COMPETITION 22/2026-Jł.

Secretariat of Administration and Finance of Mexico City; Mexican Social Security Institute; Telecommunications Regulatory Commission; Institute of the National Housing Fund for Workers, and the Federal Center for Labor Conciliation and Registration; potential creditors and other parties shall be deemed notified once the ruling is published in the Official Gazette of the Federation, in accordance with the provisions of

**Article 4** of the Commercial Bankruptcy Law, if the caso, a los creditors residing abroad, also in accordance with the applicable en las leyes applicable. *

Así lo resolvió y firma electrónicamente **Tessy del Rocío Covarrubias Torres**, Jueza Primero de Distrito en Materia de Concursos Mercantiles, con residencia en la Ciudad de México y jurisdicción en toda la República Mexicana, quien actúa en unión de **Roberto Abihud Victoria Villela**, secretario, que autoriza y da fe. Ravv

- As of this date, the following budgets have been approved: 3910, 3B11, z912, s913, and s914. 301a, 39t6, and y917/zo2s. Let it be noted.

It is hereby certified that the present judgment was incorporated into the electronic file maintained by the SISE; furthermore, it is certified that the corresponding electronic file is fully consistent with the records fiSiCBS. Certified.

The court clerk certifies that the documents corresponding to this resolution were duly digitized and linked to the electronic case file. I hereby certify,

I, the undersigned, Roberto Abihud Victoria Viłłeła, Secretary of the First District Court for Commercial Bankruptcy Proceedings, residing in Mexico City and having jurisdiction throughout the Mexican Republic, hereby certify: that in the present resolución document, using the color red (RGB value 255,0,0), I) todos los datos persons and representatives of the parties involved were present, in case, as has sometimes happened, characters appear as asterisks instead of "...", I have carried out the necessary procedure to ensure that the presente resolución is recognized by the Comprehensive Monitoring System en versión pública en las páginas (SIS). For further information, see: https://www.nerviGgşgnlinea.pĵf.gob.mx/Juicigęnfinea/Srńt¿ńć(àVgjxtonPubliça/MgnuSgntgnda and ti f Comply with the conditions specified in the Circular JDGG3/STG/17/2020

OISTRI1-O LU MATERIA D:: CONCURSOS MERCANTILES, CON RESIDENCIA EN LA CIUDAD DE MÉXICO Y JURISDICCIÓN EN TODA LA REPÚBLICA MEXICANA

Scanned with CamScanner"

Published in the BISE notices section on October 22. Date:

: Scanned with
CamScanner-



JUDICIAL BOARD OF THE FEDERATION

**EVIDENCIA CRIPTOGRÁFICA - TRANSACCIÓN**

Archivo Firmado:
159732617_4157000041293660034.p7m

Firmante(s): 2

| | | | Status: | Bien | Válida |
|---|---|---|---|---|---|
| | 30.30.30.30.31.30.30.30.30.30.30.35.: | | | | |
| Fecha | 07/07/26 02:01:25 - 06/07/26 20:01:25 | | | | |
| | RSA-SHA256 | | | | |

de firma:
```
61 aa 10 78 1b f8 66 24 6d 67 fe 22 07 55 dc 74
d6 b7 8b be 47 3b 9f 2f f2 a4 95 25 58 9d 41 dd
63 c6 8e 8e b4 5a b1 08 db 84 1f 43 a2 a7 51 96
72 6f 59 ea 11 dd 9f 67 fb aa 9d 3f 44 71 ed b4
08 2c 8f 7c 4e 4d b6 a2 0c 10 d4 67 f8 21 4a 75
85 b6 b9 f6 59 a0 00 be 13 53 a4 eb f6 e4 1e 1f
76 d7 bc 35 72 e1 93 01 34 df ac ed 74 ac 0c 71
c9 cf 0b 59 41 4f 1c b6 25 0a bd 95 7a 27 92 ae
08 59 d0 69 db f1 00 5d 50 77 b2 91 e7 1b 86 06
b8 c3 79 09 26 a2 ab 41 9a 59 09 df ea 6f f2 f7
67 aa 04 fb 90 56 34 0b f2 76 05 6d ea f5 07 5d
15 09 fa fc cf d1 24 4b 7f 34 4a 80 27 00 d3 33
f7 93 bb 52 c3 45 f5 d5 b9 32 fa a5 67 38 1b 44
4e 36 62 6f 6c 8b 87 66 e8 e3 71 ca 4d cf b4 9b
0a a7 45 57 aa 09 cc 0d be f2 48 a2 43 e9 5a 45
49 9a f6 6f a9 48 c6 a1 c5 6c d2 75 db 49 d1 ba
```

**Nombre del respondedor:**
**Emisor del respondedor:**
**Número de serie:**          30.30.30.30.31.30.30.30.30.30.30.35.31.35.34.32.38.36.38.33          UNIDOS A.

JUDGES THE CASE REGARDING
THE COMPETITION AMONG
GIRLS. WITH JURISDICTION IN THE
CITY
OF HIGHER EDUCATION AND JUSTICE
7OaA TO THE REPORT "k:EXjf".As'

Scanned with

CamScanner-





## JUDICIAL AUTHORITY OF THE FEDERATION

e1'B0aB Sã 1ã 9Z.S0dt6 77 1e /'g WSBds

11 9c 37 33 47 37 d5 c4 71 65 a0 11 93 24 94 cd
ab b8 dd b5 6c c6 28 76 ad 6e 6e a6 31 07 31 22

| | |
|---|---|
| **Fecha : (UTC/ C** | 07/07/26 02 09:59 - 06/07/26 20 09:59 |
| **Nombre del emisor de la respuesta TSP:** | |
| **Emisor del certificado TSP:** | Autoridad Certificadora Intermedia del Consejo de la Judicatura Federal |

: Scanned with

CamScanner-

First District Court for Commercial Bankruptcy Proceedings, located in Mexico City and having jurisdiction throughout the Mexican Republic

COMMERCIAL BANKRUPTCY CASE 2212026-II.

### PERSONAL SERVICE AT THE COURT

In Mexico City, at ten fifteen on July 7, 2026, the court clerk assigned to the First District Court for Commercial Insolvency Proceedings, located in Mexico City and having jurisdiction throughout the Mexican Republic, Ms. Fabiola Aroche **Alquicira,** served notice at the court's premises to Juan Pablo Reyes "de la Mora," an authorized representative of the business TV Azteca, a publicly traded corporation with variable capital, who identified himself with a voter ID card bearing the number IDMEX2977073304, issued in his name by the National Electoral Institute, with a photograph, which

matches his physical features, a document that is hereby certified as

: having it on file, and hereby returning it to its owner, with

a certified copy, complete and legible, of the judgment of

declaraci Commercial Arbitration Award of July 6, 2000

26, issued in commercial bankruptcy case No. 22/2026 of this Index,

duly stamped, verified, and bearing electronic signatures. With the foregoing

This proceeding is hereby concluded, and I sign to confirm,

Received and acknowledged by the person notified. Certified.

The appearing party,

Juaq. PabTo‹c|.e la Mora Réyes, authorized representative of the merchant                Azteca, sóciedad a publicly traded corporation"         varia e

JUZGADO PRIMERO DE DISTRITO EN MATERIA DE CONCURSOS MERCANTILES, CON RESIDENCIA EN LA CIUDAD DE MÉXICO Y JURISDICCIÓN EN TGDA LAF«E£'L‹fSI.IL"W fVLXJCA

The       Judicial District.

Fabi   a Aroche Alquicira

Scanned with
CamScanner*

# Exhibit H

                    UNITED STATES DISTRICT COURT
                   SOUTHERN DISTRICT OF NEW YORK
        ------------------------------:

        THE BANK OF NEW YORK MELLON,   : Case No.: 22-cv-8164

                         Plaintiff, :

             v.                       :

        TV AZTECA, S.A.B. de C.V.,     : New York, New York

        et al.,                       : July 15, 2026

                         Defendants.:

        ------------------------------:


             TRANSCRIPT OF STATUS CONFERENCE HEARING

              BEFORE THE HONORABLE BARBARA C. MOSES

                 UNITED STATES MAGISTRATE JUDGE




        APPEARANCES:

        For Trustee            MoloLamken LLP
                               BY:  Justin M. Ellis, Esq.
                                    Zach Ingber, Esq.
                               430 Park Avenue
                               New York, New York 10022

        For Defendant:         GREENBERG TRAURIG LLP
                               BY:  Hal Shaftel, Esq.
                                    John C. Molluzzo, Esq.
                               One Vanderbilt Avenue
                               New York, New York 10017



        Proceedings recorded by electronic sound recording;
        Transcript produced by transcription service.



          AMM TRANSCRIPTION SERVICE  -  631.334.1445

THE DEPUTY CLERK:  The Court now calls the Bank of New York Mellon v. TV Azteca, S.A.B. de C.V., et al.; Case Number: 22-cv-8164.

Counsel, please make your appearances for the record.

MR. ELLIS:  Good morning, your Honor. Justin Ellis and Zach Ingber, MoloLamken, for the Trustee.  With me here today is Curtis Plaza, external general counsel for the Trustees.

THE COURT:  All right.  Mr. Ellis. Mr. Plaza.

MR. SHAFTEL:  Good morning, your Honor. Hal Shaftel, together with John Molluzzo, from the Greenberg Traurig firm, on behalf of the TV Azteca defendants.

THE COURT:  Mr. Shaftel.

Mr. -- I'm sorry, Molluzza?

MR. SHAFTEL:  Molluzzo.

THE COURT:  Molluzzo.  My apologies.  All right.

Good morning, everybody.  We are here today on the letter motion of the defendants, TV Azteca, and various affiliates for some kind of relief in connection with the Trustee's recent § 1782 petition filed in a federal court in Florida.

Let me begin, if I might, by asking for an update from Florida.  I see that the judge there issued what's typically the first step in a § 1782 petition, which is an ex parte order.  What often, although not necessarily comes after that, is that the party whose ox is being gored, not technically the respondent, but the party against whom the discovery is going to be used in the foreign proceeding -- in this case, TV Azteca -- comes into the § 1782 court, intervenes, and makes various arguments to the § 1782 court as to why this discovery should not, in fact, go forward.

Anything like that happening in Florida? Let me hear from the Trustee first.

MR. ELLIS:  Of course, your Honor.

That has not happened.  TV Azteca has not intervened.  We served the subpoenas pursuant to the Court's order.  Some but not all of the respondents have just moved to quash or, I suppose, vacate the subpoenas.

THE COURT:  They've moved to quash.

MR. ELLIS:  Exactly.  Two of them --

THE COURT:  On their own steam, asserting their own objections, not TV Azteca's objections?

MR. ELLIS:  Correct.

They did raise similar arguments to what TV Azteca is raising here about the discovery stay in this court.

They are also arguing various things under the *Intel* test.  Notably, they are not challenging any of the allegations the Trustee made.  But that's two of the respondents --

THE COURT:  But there's no -- but that's ridiculous.  Let me just say this at the beginning so we don't waste time here.

I don't see any of the issues which are before me today or in the foreseeable future as depending on whether there was or was not financial skullduggery between TV Azteca and AlterBank. That's not why we're here.

MR. ELLIS:  I agree with that, your Honor. It's just two of the respondents that are challenging our subpoenas, AlterBank and an employee of AlterBank named Blas -- B-L-A-S -- Santander.

THE COURT:  Okay.

Mr. Shaftel, you looked like you had something you wanted to add to that.

MR. SHAFTEL:  Only, your Honor, we -- we certainly have not intervened.  I am not planning imminently -- well, my clients are not imminently

planning to intervene, preserving all rights.

I do believe there are some --

THE COURT:  Well, if you're going to do it, don't wait.

MR. SHAFTEL:  Okay.  Yeah, there are some very serious --

THE COURT:  There's going to be a laches argument if you do.

MR. SHAFTEL:  I just read a brief that came across the transom last night.  There's some very serious jurisdictional issues there.  I think the Trustee is trying to base jurisdiction on former -- the presence of former directors in the Southern District of Florida.  It's a St. Lucia financial institution.

So to some extent, that § 1782 application may become moot, but there are some very serious issues here, which I think do remain very much alive.

THE COURT:  Okay.

So, so far in the Southern District of Florida, the respondents, the subpoena recipients, have raised various objections by motion, motion to quash or something.  Is it a motion to vacate the initial --

MR. SHAFTEL:  Vacate.

THE COURT:  -- ex parte order?  Okay.

TV Azteca, which may well be cheering them on from the sidelines, has not appeared or sought to intervene under its own name, which, of course, limits the arguments that can be made to the Southern District of Florida.  But that's your strategic decision.  I don't dictate that.

Which is a good segue, I guess, into what I'm going to say next, which is, generally speaking, I don't dictate what the Southern District of Florida can or can't do or what either parties or non-parties here can or can't argue in the Southern District of Florida.  And I think that TV Azteca recognizes this, or at least recognized it by the time that they filed their reply letter brief on July the 2nd.

So if I understand the current state of play -- Mr. Shaftel, please tell me if I'm with you here -- TV Azteca seeks from this Court, from me, in the form of, essentially, a species of protective order, perhaps under Rule 26, an order saying to the Trustee, whatever you get in Florida, you can't use here.

Is that what you want?

AMM TRANSCRIPTION SERVICE  -  631.334.1445

MR. SHAFTEL:  I think that is --

THE COURT:  One of the things you want?

MR. SHAFTEL:  -- a large chunk.  It may be the most substantial chunk of what we want.

I also -- I think in addition to Rule 26 and the inherent authority of this Court would invoke the goose/gander rule.

THE COURT:  The which rule?

MR. SHAFTEL:  Goose/gander rule.  The time-honored goose --

THE COURT:  Oh, the "what's good for the" rule?

MR. SHAFTEL:  What's good for the goose is --

THE COURT:  I understand the equitable arguments here, but, look, both sides here, from a procedural standpoint, in my view, have been way too clever by half.  Everybody is trying to have it both ways here, one way or the other.

MR. SHAFTEL:  Your Honor, can I speak to that issue?  And it's why we view this as serious.

There's three sequential items that occurred.  And I think it's important for the Court to appreciate and for us to --

THE COURT:  I think I appreciate what

AMM TRANSCRIPTION SERVICE  -  631.334.1445

happened, but go ahead.

MR. SHAFTEL:  It does start with a March --

THE COURT:  I understand about the stay motion, which -- while the stay motion was pending, the plaintiff sent you some document demands with respect to this alleged financial skullduggery. Then the plaintiff got a stay motion.  Then the plaintiff went to Florida to go behind the back of the stay motion, in your view.

MR. SHAFTEL:  That's the half of it, but there's another half.

As your Honor points out, we did not persuade your Honor that discovery should proceed. We vigorously objected.  We didn't prevail on that issue.  One day --

THE COURT:  And by the way, just a procedural note here:  You didn't object under Rule 72(a) to my stay order to the district judge, correct?

MR. SHAFTEL:  That is correct, your Honor.

THE COURT:  Which means that's not an appealable issue for you.

MR. SHAFTEL:  And we're not here today to revisit that issue.  That's simply the starting point, an important starting point in what in the

chronology then unfolds.

Together with the stay -- oh, and your Honor was very explicit in your stay order that there may be other claims, other issues that fall out of the summary judgment briefing, which the same order allowed to --

THE COURT:  I'm glad you brought that up.

MR. SHAFTEL:  Okay.

THE COURT:  The order explicitly said -- and I'm paraphrasing here -- I don't think you all need any discovery with respect to the summary judgment motion that the Trustee says it's going to make.  But if when they file that summary judgment motion, TV Azteca discovers an argument why my stay should be modified, you can come back to me at that point.  But you didn't.

MR. SHAFTEL:  That holding applied to both sides --

THE COURT:  Uh-huh.

MR. SHAFTEL:  -- that if either side wants to pursue discovery, once the summary judgment briefing is --

THE COURT:  Once you saw the --

MR. SHAFTEL:  -- delineated, not that you can then go off unilaterally and pursue discovery.

You go back to your Honor in the last --

THE COURT:  If you want to do discovery in the Southern District of New York.

MR. SHAFTEL:  So what happens on -- I think it was June the 1st -- we file our opposition to the summary judgment, I guess, briefs -- there was two summary judgment motions, and invoke Rule 56(d), that, among other grounds, summary judgment is unwarranted because discovery is required.

THE COURT:  Sure.  And --

MR. SHAFTEL:  One day later --

THE COURT:  And, as you know, the summary judgment motions are not before me, but I glanced at the briefs once they all came in at the end -- well, maybe it's the end.  I guess there's one more surreply left to go.

So I saw your Rule 56(d) arguments, but they were addressed to the breach-of-contract claim and/or the affirmative defenses as articulated in the pleadings as they now stand.

MR. SHAFTEL:  One day after that opposition, or oppositions in the plural, I think we -- the Trustee files the § 1782 application.

THE COURT:  Right.

MR. SHAFTEL:  Is this my -- it's a

grievance.  Is it my biggest grievance?  I'm not there yet.  But it's a grievance, okay, because you know, a day earlier, I would have put in as part of my 56(d) or as part of my advocacy in opposition to summary judgment -- look at the discovery the Trustee is seeking, and in their § 1782 application, they explicitly open the door that it may be used in U.S. litigation.

THE COURT:  They do, but they don't argue that they are going to use their § 1782 discovery in connection with the pleadings as they currently exist.  And I don't see how it would be relevant to the pleadings as they currently exist.

What the Trustee argues, I think, is that the § 1782 evidence we are going to use in the Mexican concurso -- and by the way, if we manage to amend our complaint in the Southern District of New York to allege new claims arising out of the alleged financial skullduggery of TV Azteca, then this evidence that we're asking for in Florida would be relevant to our new claims.

I think that's --

MR. SHAFTEL:  Your Honor --

THE COURT:  I think that's the argument.

MR. SHAFTEL:  I don't believe that is

AMM TRANSCRIPTION SERVICE  -  631.334.1445

perfectly fair to what their brief says.  There's no articulation, oh, this will only relate to our new claims, all right.  We're, sort of, reading that gloss in.  But then let's get to the new claims.

So one day after --

THE COURT:  Also, that motion is also not before me, as you know.

MR. SHAFTEL:  No.  But it's all very relevant to the relief we are seeking today.  This is the context for that relief.

So one day after, all right, I put in my 56(d) argument, they then seek discovery.

Within a week of seeking discovery within this other district, they assert --

THE COURT:  Make their emergency motion to amend.

MR. SHAFTEL:  -- the new claims.

THE COURT:  Right.

MR. SHAFTEL:  Okay.  They were drafting that complaint.  They knew that amended, prepared, amended complaint.

THE COURT:  Okay.  Listen.  I'm going to say this one more time -- I'm going to say two things.

I do understand the sequence of events

here, number one.  Number two, both sides here, it seems to me, have some pretty good -- I'll call them grievances because I'm not sure they're legally actionable under all of the relevant statutes and rules.  But both sides here have argued with some weight that the other side is being very sneaky and running around implementing legal strategies without telling the other side what it's doing.

MR. SHAFTEL:  Your Honor, if I could just --

THE COURT:  They claim that you sneakily went and got this financing from AlterBank, and then that you -- "you," TV Azteca, sneakily went and filed this concurso and wouldn't even show them the petition for weeks and weeks and weeks.

So these allegations are going both ways --

MR. SHAFTEL:  But --

THE COURT:  -- and I'm not sure how relevant any of them are to what we're here on today.

MR. SHAFTEL:  Your Honor, what was just referenced are allegations which we hotly, vigorously dispute.  What I'm now walking through is a chronology that can't be disputed because seeking the § 1782 discovery -- remember, there's a third

item.

They seek the § 1782 discovery.  Within a week, they file to amend the pleading to capture the very issues subject to that § 1782 discovery.

THE COURT:  Correct.  So you --

MR. SHAFTEL:  Then they do one other item, your Honor.

THE COURT:  So you agree with me.  You agree with me, that in your view, what the § 1782 discovery would be relevant to in the Southern District of New York is, or at least is primarily, the new claims that they don't yet have leave to plead.

MR. SHAFTEL:  They're certainly relevant to the "new claims" in significant part.  I'm not -- I don't think I would agree that they don't bear relevance on the pending claims.  We don't have the discovery yet, so it's hard to know in advance.

But I want to point out the third and, I think, actually, the most troublesome aspect of this chronology, is not only are they seeking to amend the complaint to add these new claims, they also are seeking to have the new claims adjudicated through trial or through disposition --

THE COURT:  On an expedited --

AMM TRANSCRIPTION SERVICE  -  631.334.1445

MR. SHAFTEL: -- within 45 days.

So they are jump-starting --

THE COURT: Most of those 45 days have already run.

MR. SHAFTEL: So, your Honor, in a crazy, lopsided way, they are jump-starting the discovery on the new claims while telling the district court, telling --

THE COURT: I get that.

MR. SHAFTEL: -- Judge Gardephe, oh, let's get this all done in 45 days.

Well, they are not getting it done in 45 days. They started on June the 2nd.

THE COURT: I get that.

MR. SHAFTEL: And --

THE COURT: But remember why we're here. Remember why we're here. You want me, first and foremost, to tell the Trustee that whatever it gets in Florida it can't use here, ever, under any circumstances. I'm putting a gloss on your letter now. Ever, under any circumstances, whether they succeed in amending or don't succeed in amending, whether Judge Gardephe gives them an expedited schedule or doesn't give them an expedited schedule.

Do you have any authority that says --

beyond my general authority under Rule 26 and my inherent authority to sequence and order discovery, do you have any analogous cases that you can think of where a court has decreed in advance that discovery lawfully obtained through a § 1782 process elsewhere can't be used in my court, ever?

MR. SHAFTEL: We do cite the Court to cases which preclude parties from, in the face of a discovery stay, backdooring discovery through parallel, extrinsic proceedings.

THE COURT: Well, you cited *Koch v. Greenberg*, right? And that case involved, if I recall it, two cases that were both filed in the Southern District of New York under two different docket numbers. And the question wasn't whether the subpoena results could be used -- whether the subpoena results from Case Number 2 could be used in Case Number 1. The question was whether the subpoena could be enforced. And the same court, the Southern District of New York, was ruling on enforcement of the subpoena, as would have been ruling on admissibility of the discovery later.

Here, we have two separate and co-equal United States district courts. And the Southern District of Florida is in charge of determining

whether the Trustee can get what it wants through that § 1782 petition.

MR. SHAFTEL:  And we're not asking -- we tried to clarify this, I guess, in our follow-up letter.  We are not asking, you know, for an anti-suit injunction.  That proceeding will run its course.

We do believe Rule 26 and inherent authority and otherwise, this Court can obviously assess and evaluate what evidence comes and does not come in.

THE COURT:  Or --

MR. SHAFTEL:  Works all the time.  It's the flip side -- I think it's the flip side of the same coin.

THE COURT:  Just to --

MR. SHAFTEL:  You know, you put in some document on summary judgment after the close of fact discovery that you didn't produce, you know, eight out of ten judges may say no to that.  So -- and I think this is just a logical extension of that situation.

THE COURT:  Just to complete my survey of the relevant case law, which is not exhaustive -- I depend on what the parties -- at least, I start with

what the parties show me.

You also cited a case from Judge Nathan when she was here in the district court where she was faced with a § 1782 petition and, in her capacity as the § 1782 judge was very skeptical that the proceeds of that discovery were going to be used in the forum proceeding.  Again, that's something for a § 1782 judge to think about and make a decision about, not mine.

And I understand that you are not directly asking me to interfere in the § 1782 proceeding or to decide for the Southern District of Florida what discovery can take place against whom, et cetera, et cetera.

What you're asking me for is an advanced preclusion order when I don't know yet what the Trustee is going to get in Florida; whether it's going to go first to Mexico and use it there, which is what it says in Florida is its primary use for the § 1782 discovery; whether Judge Gardephe is going to permit the Trustee to amend to add claims that would make this Florida discovery, in my view, directly relevant to the new claims in the Southern District of New York; whether, if he permits the Trustee to amend, he's going to authorize some form

of expedited discovery or not.  I don't know any of these things yet.

I agree with you that I have the power to keep discovery out if I feel that there's something inherently unfair or unequal about the way in which it was obtained or the timing with which it was obtained, and it puts the other party at an unfair disadvantage.  But there are a lot of ways to skin that cat, and an advanced preclusion order doesn't strike me as the best way.

MR. SHAFTEL:  If it's premature, getting back to the issue of waiver or sitting on your hands, you know, our position is clear in the record.  We think it was improper.  We think it was real gamesmanship.  But we also did not want to, recognizing that last page of your Honor's March order, which said, you want discovery, come here first if you want the stay modified in any respect.

THE COURT:  I'm not sure that's a fair reading of the last page of my March 17th order.

MR. SHAFTEL:  Well, given our reading of it, we did want to -- we did want to come to the Court and, as I say, the "good for the goose, good for the gander" rule.  And we do not read your order and don't want to be accused of tripping over it

inadvertently.  We do not read your Honor's order precluding us, in aid of the concurso or another foreign proceeding, from seeking § 1782 discovery as well.

THE COURT:  For use in the concurso.

MR. SHAFTEL:  Discovery is stayed in this action for use in the concurso or some other parallel proceeding.

THE COURT:  By definition --

MR. SHAFTEL:  I'm not aware of any.

THE COURT:  By definition under § 1782, you have to make the pitch to the § 1782 court, that the discovery is for use in a "foreign proceeding."  I presume nobody seems to be arguing here that a Mexican bankruptcy proceeding would count for that purpose.

Now, if you do that under § 1782, I can see a situation in which the § 1782 judge might raise her or his eyebrows and say, TV Azteca, what do you need discovery for?  It's your bankruptcy.  You know everything that you need to know.

But, again, just as I said a moment ago about the current § 1782 petition filed by the Trustee, that would be the § 1782 court's job, not mine.

AMM TRANSCRIPTION SERVICE  -  631.334.1445

MR. SHAFTEL:  If I'm faulted for trying to be for this side more candid and explicit, we just, you know, wanted to clarify, given the Trustee's implementation of the stay order, you know, what our reading is of it as well and what it allows us, in parallel, to do as well.

THE COURT:  All right.

So I think you had a backup ask in your reply letter brief, as I read it, which is, I think, what you just said.

You say, quote, on page 2:  "TV Azteca, therefore, requests that the Court clarify that its stay order does not restrict either party's ability to seek § 1782 discovery for use in the concurso."

MR. SHAFTEL:  That's right, your Honor.

I would just, I think, tweak the reference to "backup" because I think these are independent --

THE COURT:  All right.  Second, then.  Not backup.  Second request in order in which you articulated them.  All right.

And you may or may not have a third request in there.  I'm not 100 percent certain.  But you do appear to argue, towards the bottom of the second page of your reply brief, that you seek a "symmetrical restriction running the other way."

I'm not sure what you mean by that.  Maybe I'm misreading your brief.  Maybe that's not --

MR. SHAFTEL:  Certainly, the intent in terms of the relief being requested was, one, you know, I wouldn't call it outright preclusion.  We did appreciate we are not there yet, but an instruction that if discovery being obtained in these simultaneous, if not overlapping, matters cannot be used in this case absent, you know, clearance from the Court.  These aren't simply, you know, typical documents that the Trustee should be able to produce -- oh, these are documents in our possession, custody and control.  We obtained them through this discovery -- when it is a backdoor.  It is an end run around the stay.

So I think maybe that first request really was less in outright preclusion.  I appreciate we're early, way early on that, but more of an instruction, that there is a burden here, given the circumstances and the overlapping discovery simultaneous with the stay that Trustee requested.

So that's the first relief.  And the second is relief -- or at least I want it to be on the record that we, too, will plan to seek § 1782 discovery in aid of the concurso or some other

foreign proceeding if it arises, and we are not seeing that as violative of the discovery stay in this case.

THE COURT:  Thank you.

Let me hear from Mr. Ellis.  Or whose motion is this?  Mr. Ellis?

MR. ELLIS:  Not my motion, your Honor, but it is my § 1782 petition.

THE COURT:  No.  I mean, who is arguing for the Trustee before me today?

MR. ELLIS:  I am, your Honor.  Yes.

THE COURT:  All right.  So let me begin -- I want to back up now, if you don't mind.

On March the 13th of this year, while you had a motion pending before me for leave to make an early discovery -- sorry, an early summary judgment motion without any discovery, you served in this action -- on the caption of this action, you served a third request for production of documents on TV Azteca and its affiliates, seeking, as I understand it, substantially the same discovery that you're now seeking under § 1782 in the Southern District of Florida.  You're telling the Southern District of Florida that it's for use in the concurso.

What was your plan for using it when you

AMM TRANSCRIPTION SERVICE  -  631.334.1445

served document demands in this case seeking that information?

MR. ELLIS:  We were seeking information which we were raising with Judge Gardephe when we told him of our concerns about the concurso.  As you know, this has all been ex parte so far.  We're on the outside looking in.

THE COURT:  What claim or defense that you had pleaded in this action as of March of 2026 was this third set of RFPs relevant to?

MR. ELLIS:  We are concerned about compliance with the anti-suit injunction, your Honor.

THE COURT:  So it wasn't actually relevant substantively to either the Trustee's claim for breach of contract or TV Azteca's many affirmative defenses.  It was relevant to a procedural irregularity that you were concerned about?

MR. ELLIS:  Count 1.  It's not relevant to Count 1, your Honor.  No.

THE COURT:  And you say it was relevant to whether TV Azteca had violated the anti-suit injunction?

MR. ELLIS:  Yes.

THE COURT:  Well, if your theory was that

filing the Mexican concurso violated the anti-suit injunction, then surely you didn't need discovery into, for example, documents sufficient to show the identities, amounts held, and votes of all shareholders who voted regarding the concurso, et cetera.

I mean, I just -- let's be honest with one another. It seems to me that your third set of RFPs was, in fact, an effort to use the discovery processes of this court, the Southern District of New York, to obtain discovery for use either in, A, the concurso itself, where you hope to bring fraudulent conveyance claims; or B, for use in a broadened version of this case after you convince the Court to allow you to amend your complaint.

MR. ELLIS: Potentially, yes, for the second, and I should be very clear about that. Our concerns were about the interference with the jurisdiction of this Court and this Court's authority under the forum selection clause to hear this case.

Perhaps we could have more narrowly tailored those requests. I recognize that. But we're not trying to use this as a backdoor to get to the concurso, and we're certainly not trying to hide

what we're doing in any one court from any other court.  We've been very transparent.

THE COURT:  I understand you were transparent in Florida about the existence of the stay here.  Everybody here is too clever by half.

MR. ELLIS:  I understand.

THE COURT:  I think I may have mentioned that previously.  Everybody here wants everything, everywhere, all the time.  I know that movie won a lot of prizes, but it's not impressing the critics here in the Southern District of New York.

MR. ELLIS:  I understand, your Honor.  And it's not our intent to try to be clever here.  It's not our intent to try to manipulate the rules to get some advantage in one court that we couldn't get in another court.  It is that we -- and this is why I mentioned the things about AlterBank, not because I think you're going to grant relief or not grant relief today because you think the claims, as you put, as skullduggery are accurate -- you don't have the proof before you -- but because we are in a corner here that we filed these complaints.

We did proceed on Count 1 arguing that we didn't need discovery because the claims were straightforward, but we didn't know what was

AMM TRANSCRIPTION SERVICE  -  631.334.1445

happening at the same time we were preparing that summary judgment motion and trying to get this case, the collection action part of that case, move forward.  We didn't know that they had taken out what appears to be this massive secured loan at a time when they're insolvent.  And, again, they can dispute that if they want.

THE COURT:  Well, they say that you did know because it was revealed -- I don't know -- last February or something like that.

MR. ELLIS:  Right.  They've made arguments about the press reports and what we knew or should have known.  But the main thing is, to our view, we couldn't get the concurso --

THE COURT:  Mr. Shaftel, did we chat about body language when we were here before?

MR. SHAFTEL:  I don't remember that, your Honor.

THE COURT:  Trial rules, please.  Thank you.

Go ahead.

MR. ELLIS:  Sorry.

We learned these facts from the concurso petition in a way that we could act on them.  I don't think it would be well appreciated if we filed

complaints based on source news reports.

But we got the concurso petition in May and were in a bind because, yes, we moved for summary judgment. We just learned these new facts which may make any judgment we get on Count 1 worthless; that if they have been able to manipulate these rules so that they've stripped the company of its assets, they've incurred all this new debt, they've manipulated intercompany voting rules in the way we talk about in the intercompany claim part of the complaint, what we got on Count 1 could be effectively worthless in a nightmare scenario.

And, furthermore, we face, as we describe, these very tight deadlines in the concurso proceeding, as we understand them from Mexican counsel, to act.

So that's why we filed the § 1782 petition in Florida, not for use in this action, because there is no live claim that's -- to which those targets -- that evidence would be relevant, but because we genuinely need to use that in Mexico on an expedited basis if we are to show, as we believe, the AlterBank loan is a fraudulent conveyance.

We have also asserted different claims, much narrower claims, I'll note, in New York. We're

not saying that we're going to prove the AlterBank loan as a fraudulent conveyance in Counts 2 through 5 of our complaint.  We're saying that it violates the indentures rules on permitted debt and the granting of liens.

There will be some overlap between the AlterBank discovery in the § 1782 proceeding and, if the amended complaint is granted, the discovery in the SDNY.  But as you know, motion to amend has not been granted, and we don't know what's going to be granted, and we don't know what's going to be within scope in that case.

THE COURT:  You do understand, I take it, that if the district judge grants your motion to amend and you immediately pop up with an armful of documents or other discovery that you've obtained in the Southern District of Florida and say, here's our evidence, Judge Gardephe, please give us an expedited resolution, you do understand that that's going to seem a little unfair because you got the drop on that discovery.

MR. ELLIS:  I understand.  Our intention is not to get the drop on TV Azteca.  That's why we informed them that we were serving the § 1782 petitions.  We served them notice of subpoenas under

Rule 45.  We are going to give them our subpoena returns when we get them in Florida.

This is not an opportunity for us to have this discovery, digest it, get some early advantage, and then try to force TV Azteca to respond with less time.  We want to be transparent.  We don't think the facts are going to hurt here.  We think -- we want sunshine on our side.

THE COURT:  All right.

Look, my inclination here is to do nothing.  And I don't -- and by that, I don't mean that there won't be something for me to do at the next step or the step after that.  In the scenario that I just discussed with Mr. Ellis, should the Trustee attempt to bring those § 1782 subpoena returns into this case without having consented to a lifting of the discovery stay here, for example, or without giving TV Azteca a decent shot at reciprocal discovery, whatever reciprocal might look like under the circumstance, that's going to be obviously problematic for the Trustee.

But I can't really think of any good reason why I, sitting in the Southern District of New York, should try to anticipate each and every eventuality in which those subpoena returns could turn up as

evidence here and proactively preclude them without knowing what the circumstances are going to be at that point.

So I think my ruling here is that, to the extent the defendants are seeking an advance preclusion order, denied without prejudice to a future preclusion order when the facts are more clear.

And to the extent the defendants are seeking a clarification of my March 17th stay order, denied because no clarification is required.

I think, as Mr. Shaftel has just acknowledged, the order doesn't prevent any party from attempting to make use of the § 1782 proceeding in another United States district court.

And as to whether any particular § 1782 petition is appropriate or inappropriate will be up to the district or magistrate judge who draws that petition when it's filed, not up to me.

Any final words?  Because I don't want to let you leave before we talk about the Belgian situation.

MR. SHAFTEL:  Your Honor, not on the § 1782 issue.  We understand the Court.  Appreciate it. Thank you.

THE COURT:  All right.  Let's move to Belgium then.

MR. SHAFTEL:  Which also means we move to Molluzzo.

THE COURT:  All right.

Mr. Molluzzo, what's happening in Belgium?

MR. MOLLUZZO:  So my understanding that's -- what's happening is -- in Belgium is that the letters rogatory was initially sent to the Belgian Public Prosecutor's Office, which then transferred it to the Belgian court that handles these.

Our Belgian law firm, Strelia, sought to obtain clarification as far as status and what was occurring in that court.  And the court told Strelia that they viewed the letters rogatory as stating that they could only communicate with the Court -- being this Court --

THE COURT:  What?  I'm supposed to call them up on the phone?  I don't think so.

MR. MOLLUZZO:  Exactly.  So that's why we sought clarification and submitted the proposed order to your --

THE COURT:  So your Belgian counsel says that if I sign this order, then your Belgian counsel

can talk to the folks they need to talk to in Belgium?

MR. MOLLUZZO:  Correct.

THE COURT:  Okay.

Any objection?

MR. ELLIS:  That's fine by us.

THE COURT:  I'll sign the order.

MR. MOLLUZZO:  Thank you, your Honor.

THE COURT:  Anything further for today?

MR. ELLIS:  Just one possibly precautionary request.

As you've seen, we've asked for very expedited treatment of the motion to amend.  If that's granted, if we get our request, in theory, we're off to the races.  We're off to trial in 45 days.

If Judge Gardephe grants the motion to amend -- and I recognize he may or may not -- we just ask that we could get back here together promptly so that we can make sure discovery proceeds on the track that we need it to proceed.

We're ready to go.  We've got our requests for production ready.  We've got our 26(a)(1)s. We're going to do everything we can to make this move, but we just ask that early cooperation happen

here so that we can make that happen on the schedule we're hoping for.

THE COURT:  Well, just like I told the loyal opposition, I'm not inclined to issue orders today about what I will do two or three steps down the road, depending on what happens then.

You know where I live.  I'm on vacation next week, and I have criminal duty for one week in August, but other than that, you know where to find me, and you can generally find me in a hurry if you need to.

MR. ELLIS:  Just please don't be surprised if we try to find you in a hurry.  I can at least say, though, my hope is it's not going to happen next week.

THE COURT:  Well, remind me.  Did Judge Gardephe give you a schedule for additional briefing on the request to amend and for expedition?

MR. ELLIS:  He put in a briefing schedule.  Everything's going to be fully served and filed on the docket today.

THE COURT:  All right.  So after that, it will just be in the district judge's hands?

MR. ELLIS:  Correct.

THE COURT:  Well, I guess I'll find out

when you find out.

MR. ELLIS:  Yes, your Honor.

THE COURT:  All right.  So I'll go ahead, I'll sign the Belgian order.

MR. MOLLUZZO:  Thank you, your Honor.

THE COURT:  Do you need an original of that?  Or can we just put it on the docket?

MR. MOLLUZZO:  I think the docket is fine. Yes.

THE COURT:  Actually, let me think about this.  Proposed order authorizing counsel to communicate.

All right.  We'll put it on the docket.

MR. MOLLUZZO:  Thank you.

THE COURT:  And if you need some fancy copy with, you know, sealing wax and stuff, I think you get that from the Clerk's Office.

MR. MOLLUZZO:  We know where to find you.

THE COURT:  No.  I think you get that from the Clerk's Office.  I don't know.  You figure that out.

All right.  We'll be adjourned.

MR. MOLLUZZO:  Thank you, your Honor.

Thank you all very much.

0o0

AMM TRANSCRIPTION SERVICE  -  631.334.1445

C E R T I F I C A T E


     I, Adrienne M. Mignano, certify that the

foregoing transcript of proceedings in the case of

The Bank of New York Mellon v. TV Azteca, S.A.B. de

C.V., et al.; Docket #22CV8164 was prepared using

digital transcription software and is a true and

accurate record of the proceedings.


*Adrienne M. Mignano*

Signature _____

          ADRIENNE M. MIGNANO, RPR


Date:      July 16, 2026












AMM TRANSCRIPTION SERVICE  -  631.334.1445

# Exhibit I

7/31/26, 4:13 PM
Office of Public Affairs | Former Bank CEO Pleads Guilty to Multimillion-Dollar Wire Fraud Conspiracy and Venezuela Sanctions Ev…

Case 1:26-mc-23885-JEM | Document 30-1 | Entered on FLSD Docket 08/03/2026 | Page 366 of 385



**PRESS RELEASE**

# Former Bank CEO Pleads Guilty to Multimillion-Dollar Wire Fraud Conspiracy and Venezuela Sanctions Evasion Scheme

Friday, March 20, 2026

**For Immediate Release**

Office of Public Affairs

The former Chief Executive Officer of Nodus International Bank (Nodus Bank), a Puerto Rican international bank, pleaded guilty yesterday for leading a scheme to fraudulently obtain at least $24.9 million from Nodus Bank and conspiring to evade U.S. sanctions against Venezuela.

"The defendant abused his position as CEO, turning the bank he managed into his own personal ATM and unlawfully transacting with a sanctioned individual," said Assistant Attorney General A. Tysen Duva of the Justice Department's Criminal Division. "The defendant's crimes undermine the integrity of our financial system, threaten economic prosperity, and harm national security. The Criminal Division will investigate and prosecute fraudsters to protect financial markets and promote safety and prosperity for all Americans."

"This defendant used his position as CEO to siphon more than $24 million, hide conflicts of interest, and help drive the bank's collapse," said U.S. Attorney Jason A. Reding Quiñones for the Southern District of Florida. "The scheme also involved efforts to evade U.S. sanctions tied to Venezuela's state-owned oil company, PDVSA. As a career prosecutor and former state trial judge, I've learned that following the money reveals the truth. Here, it exposed both fraud and

7/31/26, 4:13 PM
Case 1:26-mc-23885-JEM | Document 30-1 | Entered on FLSD Docket 08/03/2026 | Page 367 of
Office of Public Affairs | Former Bank CEO Pleads Guilty for Multimillion-Dollar Wire Fraud Conspiracy and Venezuela Sanctions Ev…
385

sanctions violations. We will hold accountable anyone who abuses our financial system for personal gain."

"Corporate titles don't place anyone above the law," said Ron Loecker, Special Agent in Charge, IRS Criminal Investigation, Florida Field Office. "Executive level fraud has real victims, and yesterday's outcome is a step toward restoring accountability and confidence in the banking system. IRS Special Agents, alongside our partners, will keep bringing transparency to complex financial crimes and delivering results."

According to court filings, Tomás Niembro Concha, 64, of Miami, Florida, conspired with others to siphon money from Nodus Bank, ultimately leading to the bank's failure in 2023. Niembro and his co-conspirators concealed from other Nodus Bank board members and executives and the bank's regulator that certain investments and loans were for the benefit of Niembro and Board Chairman Juan Ramirez, in violation of Puerto Rican law. From 2017 to 2023, Niembro, Ramirez and others caused Nodus Bank to invest $11 million in a Miami-based lender so those funds could be loaned to Niembro and Ramirez for their own benefit. Niembro and his co-conspirators knew that these transactions were illegal and concealed their conduct through the sham investments.

Between January 2018 and September 2021, Niembro and Ramirez also fraudulently induced Nodus Bank's board and comptroller to agree to buy at least 47 promissory notes totaling approximately $25.3 million from Nodus Finance, a Miami-based company that Niembro and Ramirez jointly owned, so they could use the proceeds of the transactions for themselves.

In early March 2023, Nodus's regulator, the Office of the Commissioner of Financial Institutions of Puerto Rico (OCIF), notified the bank it would be placed into liquidation. Niembro and Ramirez fraudulently caused Nodus Bank to accept a loan portfolio from Nodus Finance to pay down the debt from the 47 promissory notes.

Moreover, between 2021 and 2023, Niembro conspired with others to conduct prohibited financial transactions with an individual designated as a Specially Designated National (SDN) by the U.S. Department of the Treasury's Office of Foreign Assets Control (OFAC) for providing material support to Venezuela's state-owned oil company, Petróleos de Venezuela, S.A. (PDVSA). To satisfy an outstanding loan of approximately $2.5 million that the SDN's company had with Nodus Bank prior to the imposition of sanctions, Niembro and the SDN devised a scheme to cause Nodus Bank to foreclose on the SDN's home in Southampton, NY — for which they obtained OFAC authorization — but separately reached a "private" agreement to induce Nodus Bank to sell the property back to the SDN for $4 million through a front company — a transaction that was strictly prohibited by U.S. sanctions and not otherwise licensed by OFAC.

Niembro pleaded guilty to a two-count Information charging conspiracy to commit wire fraud and conspiracy to violate the International Emergency Economic Powers Act (IEEPA). Each

7/31/26, 4:13 PM    Office of Public Affairs | Former Bank CEO Pleads Guilty to Multimillion-Dollar Wire Fraud Conspiracy and Venezuela Sanctions Ev…

Case 1:26-mc-23885-JEM | Document 30-1 | Entered on FLSD Docket 08/03/2026 | Page 368 of 385

charge carries a maximum penalty of 20 years in prison. Niembro's sentencing has been scheduled for June 8. As part of his plea agreement, Niembro agreed to forfeit at least $16.9 million, which represents the value of the proceeds he derived from the wire fraud conspiracy. A federal judge will determine any sentence after considering the U.S. Sentencing Guidelines and other statutory factors.

IRS Criminal Investigation (IRS-CI) investigated the case with support from OCIF and the Treasury Executive Office for Asset Forfeiture (TEOAF).

Trial Attorneys Javier Urbina and Samir Paul of the Criminal Division's Money Laundering, Narcotics and Forfeiture Section (MNF) and Assistant U.S. Attorney Felipe Plechac-Diaz for the Southern District of Florida are prosecuting the case.

This prosecution is part of the Homeland Security Task Force (HSTF) initiative established by Executive Order 14159, Protecting the American People Against Invasion. The HSTF is a whole-of-government partnership dedicated to eliminating criminal cartels, foreign gangs, transnational criminal organizations, and human smuggling and trafficking rings operating in the United States and abroad. Through historic interagency collaboration, the HSTF directs the full might of United States law enforcement towards identifying, investigating, and prosecuting the full spectrum of crimes committed by these organizations, which have long fueled violence and instability within our borders. In performing this work, the HSTF places special emphasis on investigating and prosecuting those engaged in child trafficking or other crimes involving children. The HSTF further utilizes all available tools to prosecute and remove the most violent criminal aliens from the United States. HSTF Miami comprises agents and officers from IRS Criminal Investigation with the prosecution being led by Bank Integrity Unit of the Money Laundering Narcotics and Forfeiture Section of the Department of Justice and by the United States Attorney's Office for the Southern District of Florida.

MNF's mission is to take the profit out of crime, eliminate drug cartels, and protect the U.S. financial system. MNF pursues criminal prosecutions and criminal and civil asset recovery actions involving: financial facilitators who launder profits for criminals; financial institutions and their officers and employees whose actions threaten the U.S. financial system and financial institutions; international money launderers who support transnational organized crime; and the top command and control of international drug trafficking organizations.

MNF's Bank Integrity Unit investigates and prosecutes banks and other financial institutions, including their officers, managers and employees whose actions threaten the integrity of the individual institution or the wider financial system.

*Updated March 20, 2026*

7/31/26, 4:39 PM    Office of Public Affairs | Former Bank CEO Pleads Guilty for Multimillion-Dollar Wire Fraud Conspiracy and Venezuela Sanctions Ev…

Case 1:26-mc-23885-JEM | Document 30-1 | Entered on FLSD Docket 08/03/2026 | Page 369 of 385

## Components

[Criminal Division](#)    [Criminal - Money Laundering, Narcotics and Forfeiture Section](#)    [USAO - Florida, Southern](#)

Press Release Number: 26-275

# Related Content

---

**PRESS RELEASE**

## Four Men Plead Guilty to $2M Minnesota Medicaid Fraud

Four Minnesota men pleaded guilty to defrauding Minnesota's Housing Stabilization Services (HSS) program out of approximately $2.2 million and concealing the scheme by using artificial intelligence to create fake records...

July 24, 2026

---

**PRESS RELEASE**

## Nevada Tax Preparers Indicted for Conspiracy to Defraud the United States and Preparing False Tax Returns for Clients

A federal grand jury returned an indictment yesterday charging three Las Vegas tax return preparers with conspiracy to defraud the United States and willfully preparing false tax returns for clients.

July 23, 2026

---

**PRESS RELEASE**

7/31/26, 4:13 PM
Office of Public Affairs | Former Bank CEO Pleads Guilty for Multimillion-Dollar Wire Fraud Conspiracy and Venezuela Sanctions Ev…

Case 1:26-mc-23885-JEM Document 30-1 Entered on FLSD Docket 08/03/2026 Page 370 of 385

## Two Men Charged with $52 million COVID-19 Tax Credit Fraud Conspiracy

A California man was arrested yesterday after a grand jury sitting in Harrisburg, Pennsylvania returned an indictment charging him with conspiracy, mail fraud and money laundering.

July 21, 2026



**Office of Public Affairs**

U.S. Department of Justice
950 Pennsylvania Avenue, NW
Washington DC 20530

Office of Public Affairs Direct Line
202-514-2007

Department of Justice Main Switchboard
202-514-2000

# Exhibit J

AO 88A (Rev. 12/20) Subpoena to Testify at a Deposition in a Civil Action

# UNITED STATES DISTRICT COURT
### for the
### Southern District of Florida

| | |
|---|---|
| **In re Application of The Bank of New York Mellon, solely in its capacity as Trustee for the TV Azteca, S.A.B. de C.V. 8.25% Senior Notes due 2024, for an order pursuant to 28 U.S.C. § 1782** ) | |
| *Plaintiff* ) | |
| v. ) | Civil Action No. |
| ) | |
| ) | |
| *Defendant* ) | |

### SUBPOENA TO TESTIFY AT A DEPOSITION IN A CIVIL ACTION

To:              Juan Ramirez
2821 S Bayshore Drive, Unit 11C, Miami, Florida
*(Name of person to whom this subpoena is directed)*

☑ Testimony: YOU ARE COMMANDED to appear at the time, date, and place set forth below to testify at a deposition to be taken in this civil action. If you are an organization, you must promptly confer in good faith with the party serving this subpoena about the following matters, or those set forth in an attachment, and you must designate one or more officers, directors, or managing agents, or designate other persons who consent to testify on your behalf about these matters:

| Place:  Fridman Fels & Soto, PLLC, 150 Alhambra Circle, Suite 715, Coral Gables, FL 33134 (305) 569-7701 | Date and Time: |
|---|---|

The deposition will be recorded by this method:  Court Reporter and Videographer

☑ *Production:* You, or your representatives, must also bring with you to the deposition the following documents, electronically stored information, or objects, and must permit inspection, copying, testing, or sampling of the material:  See Exhibit A

The following provisions of Fed. R. Civ. P. 45 are attached – Rule 45(c), relating to the place of compliance; Rule 45(d), relating to your protection as a person subject to a subpoena; and Rule 45(e) and (g), relating to your duty to respond to this subpoena and the potential consequences of not doing so.

Date: _____

               *CLERK OF COURT*
                                                 OR

_____                    _____
   *Signature of Clerk or Deputy Clerk*                         *Attorney's signature*

The name, address, e-mail address, and telephone number of the attorney representing *(name of party)*  **The Bank of New York Mellon solely in its capacity as Trustee for the TV Azteca, S.A.B. de C.V. 8.25% Senior Notes due 2024** , who issues or requests this subpoena, are:

Daniel S. Fridman, Fridman Fels & Soto, PLLC, 150 Alhambra Circle, Suite 715, Coral Gables, FL 33134 (305) 569-7720 daniel.fridman@ffslawfirm.com

### Notice to the person who issues or requests this subpoena
If this subpoena commands the production of documents, electronically stored information, or tangible things before trial, a notice and a copy of the subpoena must be served on each party in this case before it is served on the person to whom it is directed. Fed. R. Civ. P. 45(a)(4).

AO 88A  (Rev.  12/20) Subpoena to Testify at a Deposition in a Civil Action (Page 2)

Civil Action No.

## PROOF OF SERVICE
### *(This section should not be filed with the court unless required by Fed. R. Civ. P. 45.)*

I received this subpoena for *(name of individual and title, if any)* _____

on *(date)* _____ .

❒ I served the subpoena by delivering a copy to the named individual as follows: _____

_____

_____  on *(date)* _____ ; or

❒ I returned the subpoena unexecuted because: _____

_____ .

Unless the subpoena was issued on behalf of the United States, or one of its officers or agents, I have also
tendered to the witness the fees for one day's attendance, and the mileage allowed by law, in the amount of

$ _____ .

My fees are $ _____ for travel and $ _____ for services, for a total of $ ___0.00___ .

I declare under penalty of perjury that this information is true.

Date: _____

_____
*Server's signature*

_____
*Printed name and title*

_____
*Server's address*

Additional information regarding attempted service, etc.:

# Federal Rule of Civil Procedure 45 (c), (d), (e), and (g) (Effective 12/1/13)

**(c) Place of Compliance.**

**(1)** *For a Trial, Hearing, or Deposition.* A subpoena may command a person to attend a trial, hearing, or deposition only as follows:
　**(A)** within 100 miles of where the person resides, is employed, or regularly transacts business in person; or
　**(B)** within the state where the person resides, is employed, or regularly transacts business in person, if the person
　　**(i)** is a party or a party's officer; or
　　**(ii)** is commanded to attend a trial and would not incur substantial expense.

**(2)** *For Other Discovery.* A subpoena may command:
　**(A)** production of documents, electronically stored information, or tangible things at a place within 100 miles of where the person resides, is employed, or regularly transacts business in person; and
　**(B)** inspection of premises at the premises to be inspected.

**(d) Protecting a Person Subject to a Subpoena; Enforcement.**

**(1)** *Avoiding Undue Burden or Expense; Sanctions.* A party or attorney responsible for issuing and serving a subpoena must take reasonable steps to avoid imposing undue burden or expense on a person subject to the subpoena. The court for the district where compliance is required must enforce this duty and impose an appropriate sanction—which may include lost earnings and reasonable attorney's fees—on a party or attorney who fails to comply.

**(2)** *Command to Produce Materials or Permit Inspection.*
　**(A)** *Appearance Not Required.* A person commanded to produce documents, electronically stored information, or tangible things, or to permit the inspection of premises, need not appear in person at the place of production or inspection unless also commanded to appear for a deposition, hearing, or trial.
　**(B)** *Objections.* A person commanded to produce documents or tangible things or to permit inspection may serve on the party or attorney designated in the subpoena a written objection to inspecting, copying, testing, or sampling any or all of the materials or to inspecting the premises—or to producing electronically stored information in the form or forms requested. The objection must be served before the earlier of the time specified for compliance or 14 days after the subpoena is served. If an objection is made, the following rules apply:
　　**(i)** At any time, on notice to the commanded person, the serving party may move the court for the district where compliance is required for an order compelling production or inspection.
　　**(ii)** These acts may be required only as directed in the order, and the order must protect a person who is neither a party nor a party's officer from significant expense resulting from compliance.

**(3)** *Quashing or Modifying a Subpoena.*

　**(A)** *When Required.* On timely motion, the court for the district where compliance is required must quash or modify a subpoena that:

　　**(i)** fails to allow a reasonable time to comply;
　　**(ii)** requires a person to comply beyond the geographical limits specified in Rule 45(c);
　　**(iii)** requires disclosure of privileged or other protected matter, if no exception or waiver applies; or
　　**(iv)** subjects a person to undue burden.
　**(B)** *When Permitted.* To protect a person subject to or affected by a subpoena, the court for the district where compliance is required may, on motion, quash or modify the subpoena if it requires:

　　**(i)** disclosing a trade secret or other confidential research, development, or commercial information; or
　　**(ii)** disclosing an unretained expert's opinion or information that does not describe specific occurrences in dispute and results from the expert's study that was not requested by a party.
　**(C)** *Specifying Conditions as an Alternative.* In the circumstances described in Rule 45(d)(3)(B), the court may, instead of quashing or modifying a subpoena, order appearance or production under specified conditions if the serving party:
　　**(i)** shows a substantial need for the testimony or material that cannot be otherwise met without undue hardship; and
　　**(ii)** ensures that the subpoenaed person will be reasonably compensated.

**(e) Duties in Responding to a Subpoena.**

**(1)** *Producing Documents or Electronically Stored Information.* These procedures apply to producing documents or electronically stored information:
　**(A)** *Documents.* A person responding to a subpoena to produce documents must produce them as they are kept in the ordinary course of business or must organize and label them to correspond to the categories in the demand.
　**(B)** *Form for Producing Electronically Stored Information Not Specified.* If a subpoena does not specify a form for producing electronically stored information, the person responding must produce it in a form or forms in which it is ordinarily maintained or in a reasonably usable form or forms.
　**(C)** *Electronically Stored Information Produced in Only One Form.* The person responding need not produce the same electronically stored information in more than one form.
　**(D)** *Inaccessible Electronically Stored Information.* The person responding need not provide discovery of electronically stored information from sources that the person identifies as not reasonably accessible because of undue burden or cost. On motion to compel discovery or for a protective order, the person responding must show that the information is not reasonably accessible because of undue burden or cost. If that showing is made, the court may nonetheless order discovery from such sources if the requesting party shows good cause, considering the limitations of Rule 26(b)(2)(C). The court may specify conditions for the discovery.

**(2)** *Claiming Privilege or Protection.*
　**(A)** *Information Withheld.* A person withholding subpoenaed information under a claim that it is privileged or subject to protection as trial-preparation material must:
　　**(i)** expressly make the claim; and
　　**(ii)** describe the nature of the withheld documents, communications, or tangible things in a manner that, without revealing information itself privileged or protected, will enable the parties to assess the claim.
　**(B)** *Information Produced.* If information produced in response to a subpoena is subject to a claim of privilege or of protection as trial-preparation material, the person making the claim may notify any party that received the information of the claim and the basis for it. After being notified, a party must promptly return, sequester, or destroy the specified information and any copies it has; must not use or disclose the information until the claim is resolved; must take reasonable steps to retrieve the information if the party disclosed it before being notified; and may promptly present the information under seal to the court for the district where compliance is required for a determination of the claim. The person who produced the information must preserve the information until the claim is resolved.

**(g) Contempt.**
The court for the district where compliance is required—and also, after a motion is transferred, the issuing court—may hold in contempt a person who, having been served, fails without adequate excuse to obey the subpoena or an order related to it.

---

For access to subpoena materials, see Fed. R. Civ. P. 45(a) Committee Note (2013).

## EXHIBIT A

## DEFINITIONS

1.      "You" or "your" means you, Juan Ramirez, and all Persons acting on your behalf.

2.      "Person" means any natural person, corporation, association, business entity, or other legal entity, as well as its officers, directors, members, partners, employees, agents, or representatives.

3.      "Control," "Controlled," or "Controlling" means the ability, directly or indirectly to direct or cause the direction of any Person, whether through majority ownership of such Person or otherwise.

4.      "Communication" or "Communications" means the transmittal of information (in the form of facts, ideas, inquiries or otherwise).  It includes transmission via email, mail, messages, correspondence, forms, reports, or any other Documents.

5.      "Document" includes without limitation any letters, e-mails, electronic files, electronic data, reports, publications, presentations, contracts, analyses, valuations, records, summaries, transcripts, accounts, business records, data compilations, or other hard copy or electronic documents, communications, or other information in whatever form.

6.      "Concerning" means referring to, constituting, evidencing, recording, reflecting, substantiating, describing, summarizing, identifying, or relating to in any way, directly or indirectly, in whole or in part.

7.      "Relating to" means directly or indirectly, in whole or in part, concerning, constituting, evidencing, recording, reflecting, substantiating, describing, summarizing, identifying, referring to in any way, or in any way relevant.

8.      "Affiliate" means, with respect to any Person, any other Person who, directly or indirectly, is owned or Controlled by a common Person.  TV Azteca affiliates include any Grupo Salinas entity, as well as any other Person that, directly or indirectly, is owned or Controlled by Ricardo Salinas Pliego.

9.      "Subsidiary" of any company means any other company of which a majority of the voting stock is owned, directly or indirectly, by such company.

10.     "AlterBank" means AlterBank, Limited, as well as each Person acting under its Control or in which it has an interest, including each of its members, officers, directors, employees, partners, corporate parents, Subsidiaries, Affiliates, attorneys, and agents.

11.     "TV Azteca" means TV Azteca, S.A.B. de C.V., as well as each Person acting under its Control or in which it has an interest, including each of its members, officers, directors, employees, partners, corporate parents, Subsidiaries, Affiliates, attorneys, and agents.

12.     "Grupo Salinas" means any Person that is a member of Grupo Salinas, as well as any of such Person's directors, members, officers, directors, employees, partners, corporate parents, Subsidiaries, Affiliates, attorneys, and agents.  Grupo Salinas includes TV Azteca, Banco Azteca, and Grupo Elektra.

## INSTRUCTIONS

1.      If any portion of any document is responsive to any request, produce the entire document.  If any requested document cannot be produced in full, produce the document to the extent possible, specifying each reason for your inability to produce the remainder.

2.      In responding to any request, you must produce all documents in your possession, custody, or control, regardless of whether you possess the documents directly and regardless of whether it is in this District.  A document is in your possession, custody, or control if it is in your

2

custody or if it is in the custody of any other Person and you (1) own such document in whole or in part; (2) have a right by contract, statute, order, or otherwise to use, inspect, examine, or copy the document; (3) have an understanding, whether express or implied, that you may use, inspect, examine, or copy the document; or (4) have the practical ability to use, inspect, examine, or copy the document.

3.      For any responsive Document that is redacted or withheld in whole or part on the basis of any assertion of privilege or other exemption from disclosure, provide a log identifying (1) the nature of the privilege or exemption asserted; (2) the nature of the document; (3) the title of the document; (4) the date of the document; (5) all Persons who prepared, sent, or received the document; (6) the number of pages; and (7) the contents or subject matter of the document or redacted or withheld portion thereof with sufficient detail to explain the basis for the privilege or exemption asserted.

4.      Any electronically stored information ("ESI") should be produced in its native electronic form—i.e., the format in which it was originally created with all metadata intact.  When producing ESI for electronic mail systems such as Microsoft Outlook or Gmail, provide all responsive emails and, if applicable, e-mail attachments and any related documents, in their respective mail container format (i.e., .PST for Outlook).  To the extent any ESI requires redaction prior to production, said ESI should be produced in .pdf format.

5.      If you encounter any ambiguity in any Request or any Definition or Instruction, explain in your response the matter deemed ambiguous and the construction you used in responding to the Request.

6.      The documents produced in response to the Requests shall be produced as they are kept in the ordinary course of business and shall be organized so that Plaintiff can ascertain the

3

files in which they were located, their relative order in such files, and how such files were maintained.

7. Words importing the singular shall include the plural and vice versa. The words "any" and "all" shall mean "any and all." The words "and" and "or" shall be construed conjunctively or disjunctively to include anything that would otherwise be excluded. The use of a verb in any tense shall be construed to include the use of the verb in all other tenses. The use of capital letters, lowercase letters, or quotation marks shall not limit the scope of any term.

8. Unless otherwise specified, the time period for the requests herein is January 1, 2023, to the present.

## DOCUMENTS TO BE PRODUCED

1. Any agreements entered into between AlterBank and TV Azteca, including any credit agreements, as well any other Documents executed in connection with such agreements or in connection with any amendments to such agreements.

2. Documents or Communications relating to any credit agreement between AlterBank and TV Azteca, including those relating to TV Azteca's ability to repay any obligations, AlterBank's expected profit or loss on such credit agreement, funds transfers between AlterBank and TV Azteca, any amendments to such credit agreement, AlterBank's role in connection with such credit agreement (including as arranger, administrative agent, and collateral agent), TV Azteca's use of borrowed proceeds, assets securing any borrowing, AlterBank's funding for any loan or other credit agreement, and any diligence into TV Azteca's ability to repay any borrowing.

3. Communications with TV Azteca, its Affiliates, Subsidiaries, owners, officers, employees, agents, or anyone else acting on behalf of or in concert with TV Azteca, including

4

Grupo Salinas and its owners, managers, companies, Affiliates, Subsidiaries, officers, directors, and agents.

4. Documents and Communications relating to TV Azteca's financial condition or solvency, including TV Azteca's initiation of *concurso mercantil* or other insolvency proceedings.

5. Documents and Communications concerning TV Azteca's other creditors, including TV Azteca's default on any other indebtedness and any AlterBank loan or other credit agreement's impact on TV Azteca's ability to repay other creditors.

6. Documents sufficient to show any Persons with direct or indirect ownership or Control of AlterBank, including through any intermediaries.

7. Documents relating to AlterBank's monthly, quarterly, and annual financial position since January 1, 2023, including:

   a. Audited and unaudited monthly, quarterly or annual financial statements;

   b. Other monthly, quarterly, or annual reports;

   c. Documents concerning AlterBank's financial position filed with any regulatory authority;

   d. Documents listing any loan or other credit agreement in which AlterBank acted as arranger, initial lender, administrative agent, or collateral agent;

   e. Budgets or projections of AlterBank's financial position, including its balance sheet, income, or cash flows;

   f. Presentations or reports discussing AlterBank's financial position, including those prepared for AlterBank's, owners, directors, or potential investors;

   g. Documents concerning AlterBank's funding sources, capital and use of capital, including any outstanding loans or other credit agreements.

## DEPOSITION

This Subpoena also requires You to appear for a deposition at the time and place specified. You must be prepared to provide deposition testimony regarding the following topics:

1.      Your role as owner and director of AlterBank, including your role relating to any agreement entered into between AlterBank and TV Azteca.

2.      Any agreements between AlterBank and TV Azteca, including:

    a.   The terms, negotiation, funding sources, proposed uses, and execution of any agreement with TV Azteca, as well as the timing and manner of such agreement's negotiation and execution;

    b.   AlterBank's due diligence relating to any loan or other agreement;

    c.   Your awareness of TV Azteca's financial position, including its capital structure, prior defaults, solvency, filing for a *concurso*, and pre-existing creditors;

    d.   AlterBank's approval process for entering any credit agreement with TV Azteca, including the Persons who took part in the decision to enter or approve such loan; and

    e.   Persons who took part in negotiation or execution of any credit agreement with TV Azteca, including any Persons other than AlterBank or TV Azteca.

3.      Your relationship to TV Azteca and Grupo Salinas.

4.      AlterBank's relationship to TV Azteca and Grupo Salinas, including:

    a.   Alterbank's financial relationship with TV Azteca, Grupo Salinas, their companies, owners, Affiliates, and Subsidiaries, as well as any Person affiliated with Grupo Salinas or TV Azteca, including Ricardo Salinas Pliego;

b.  Grupo Salinas's role concerning any agreement between AlterBank and TV Azteca;

c.  AlterBank's communications with TV Azteca and Grupo Salinas between January 1, 2024 and the present;

d.  The relationship between AlterBank's owner and directors and any Grupo Salinas entity; and

e.  AlterBank's involvement, if any, in TV Azteca's payment of tax obligations.

5.  AlterBank's operations between January 1, 2023 and the present, including:

a.  AlterBank's management practices;

b.  The regions in which AlterBank operates;

c.  AlterBank's financial recording and reporting practices;

d.  The types of financial services AlterBank offers;

e.  The sources of AlterBank's capital;

f.  AlterBank's lending history, including the number of loans outstanding, the average size of each loan, its history of extending any loans above $1 million, $10 million, or $100 million; and

g.  The role of AlterBank's current or former owners and directors, including Augusto César Castillo Chávez, Juan Francisco Ramirez, and Blas Santander.

6.  Your relationship to AlterBank's current or former owners and directors, including Augusto César Castillo Chávez and Juan Francisco Ramirez.

# Exhibit K

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

CASE NO: 1:26-mc-23885-JEM

IN RE: THE BANK OF NEW YORK
MELLON, SOLELY IN ITS CAPACITY
AS TRUSTEE FOR THE TV AZTECA,
S.A.B. DE C.V. 8.25% SENIOR NOTES
DUE 2024,

     Petitioner.

_____/

### <u>NOTICE OF DEPOSITION OF JUAN RAMIREZ</u>

PLEASE TAKE NOTICE, that pursuant to 28 U.S.C. §1782(a) and the Federal Rules of Civil Procedure, The Bank of New York Mellon, solely in its capacity as Trustee for the TV Azteca, S.A.B. de C.V. 8.25% Senior Notes Due 2024, by and through its undersigned attorneys, will depose respondent Juan Ramirez on August 10, 2026, at 10:00 a.m. ET.  The deposition will take place at the office of Lilly Ann Sanchez of the LS Law Firm, 2800 Ponce de Leon Boulevard, Suite 1100, Coral Gables, FL, 33134.

The deposition will take place under oral examination and be conducted under oath before an officer authorized to take such testimony.  It will be recorded by stenography, audio and/or videotape, and if necessary will continue on succeeding business days until completed or adjourned.  The examination will take place at the date and location listed above, or on such other date and location as the parties mutually agree.  The testimony taken may be used for any and all appropriate purposes as provided by the Federal Rules of Civil Procedure and the Federal Rules of Evidence.

Respectfully submitted,

/s/ Justin M. Ellis

Justin M. Ellis (*pro hac vice*)
Zachary R. Ingber (*pro hac vice*)
Eric J. Rolston (*pro hac vice*)
MoloLamken LLP
430 Park Avenue
New York, NY 10022
Tel.: (212) 607-8159
jellis@mololamken.com

Daniel S. Fridman, Esq.
Florida Bar No. 176478
Anel Viamontes, Esq.
Florida Bar No.: 1018250
FRIDMAN FELS & SOTO, PLLC
150 Alhambra Circle, Suite 715
Coral Gables, FL. 33134
Tel: (305) 569-7701
daniel.fridman@ffslawfirm.com

*Counsel for The Bank of New York Mellon,
Solely in its Capacity as Trustee for the
TV Azteca, S.A.B. de C.V. 8.25% Senior
Notes due 2024*

## <u>CERTIFICATE OF SERVICE</u>

I HEREBY CERTIFY that on July 21, 2026, I served a true and correct copy of the

foregoing via electronic mail to all counsel of record.

*/s/ Justin M. Ellis*

Justin M. Ellis
