**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**
**MIAMI DIVISION**

| | |
|---|---|
| *In re:* Application of<br><br>THE BANK OF NEW YORK MELLON, in its capacity as TRUSTEE FOR THE TV AZTECA, S.A.B. DE C.V. 8.25% SENIOR NOTES DUE 2024,<br><br>to Conduct Discovery for Use in a Foreign Proceeding Pursuant to 28 U.S.C. § 1782. | Case No. 1:26-mc-23885-JEM<br><br>*Expedited Consideration Requested* |

**REPLY DECLARATION OF DANIEL PULECIO-BOEK IN SUPPORT OF NON-PARTY TV AZTECA, S.A.B. DE C.V.'S EXPEDITED MOTION TO INTERVENE AND, UPON INTERVENTION, FOR A PROTECTIVE ORDER**

I, Daniel Pulecio-Boek, pursuant to 28 U.S.C. § 1746, declare as follows:

1. I am a Shareholder at Greenberg Traurig, LLP, counsel to non-party TV Azteca, S.A.B. de C.V. ("TV Azteca") in connection with this proceeding. I also serve as counsel of record for TV Azteca in *The Bank of New York Mellon, solely in its capacity as Trustee for the TV Azteca, S.A.B. de C.V. 8.25% Senior Notes due 2024 v. TV Azteca, S.A.B. de C.V., et al.*, No. 1:22-cv-08164-PGG-BM (S.D.N.Y.) (the "SDNY Litigation").

2. I submit this reply declaration in support of TV Azteca's Expedited Motion to Intervene and, Upon Intervention, for a Protective Order Limiting Any Deposition of Juan Ramirez, Quashing the Ramirez Deposition Notice, and Adjourning the Deposition Until Resolution of This Motion (the "Motion").

**The Trustee's Fraudulent Transfer Claim in the *Concurso***

3. On August 18, 2026, the Trustee, through its Mexican counsel Fernando del Castillo Elorza, filed a Motion to Declare Acts in Creditor Fraud (the "Trustee Motion") with the First Civil Court for Insolvency Proceedings in Mexico City, in the *concurso mercantil* proceeding

captioned *In re TV Azteca, S.A.B. de C.V.*, Case No. 22/2026. Attached hereto as **Exhibit L** is a true and correct copy of the Trustee Motion, together with an English translation by DeepL.com.

4. As part of the evidence submitted in support of the Trustee Motion, the Trustee attached and relied upon the following items obtained through this Section 1782 proceeding: (i) documents produced by Mr. Juan Ramirez in response to the Subpoena served in this proceeding; (ii) corporate registry records of AlterBank Limited obtained in this proceeding; (iii) a declaration of Jose Romero Esclusa, CEO of AlterBank, given in this proceeding on July 14, 2026; and (iv) orders of this Court. *See* Exhibit L.

5. In the Trustee Motion, the Trustee expressly represented to the Mexican court that "documentary, testimonial, and other types of evidence continue to be obtained; once produced, this evidence will be submitted to Your Honor for admission and evaluation in accordance with the standards of the proceedings at hand." Exhibit L at 28.

I declare under penalty of perjury under the laws of the United States that the foregoing declaration is true and correct.

Dated: August 27, 2026

*<u>/s/ Daniel Pulecio-Boek</u>*
Daniel Pulecio-Boek

# Exhibit L

## (English Translation Follows Spanish Language Document)

JUZGADO PRIMERO DE DISTRITO EN MATERIA DE CONCURSOS MERCANTILES
2026 AGO 18 AM 9:30
CON RESIDENCIA EN LA CIUDAD DE MÉXICO Y JURISDICCIÓN EN TODA LA REPÚBLICA MEXICANA

34 anexo

011058

**COMERCIANTE: TV AZTECA, S.A.B. DE C.V.**

**PROCEDIMIENTO DE CONCURSO MERCANTIL**

**EXPEDIENTE: 22/2026**

**INCIDENTE DE INEFICACIA DE ACTOS EN FRAUDE DE ACREEDORES**

**C. JUEZ PRIMERO DE DISTRITO EN MATERIA DE CONCURSOS MERCANTILES, CON RESIDENCIA EN LA CIUDAD DE MÉXICO Y JURISDICCIÓN EN TODA LA REPÚBLICA MEXICANA.**

**FERNANDO DEL CASTILLO ELORZA,** en mi carácter de apoderado general para pleitos y cobranzas de **THE BANK OF NEW YORK MELLON en su carácter de Fiduciario** (en adelante,"**BNY**" o el "**Trustee**", indistintamente) personalidad que acredito y solicito me sea reconocida en términos del primer testimonio del instrumento público número 70,138 de fecha 10 de agosto de 2026, otorgada ante la fe del licenciado Luis Eduardo Paredes Sánchez, titular de la notaría número 180 de la Ciudad de México, misma que se agrega de forma digitalizada al presente como **ANEXO 1**, la cual **manifiesto bajo formal protesta de decir verdad** que es una copia fiel e íntegra del original, ante Usted, respetuosamente, comparezco y expongo:

**AUTORIZACIÓN DE ACCESO AL EXPEDIENTE ELECTRÓNICO**

Con fundamento en lo dispuesto por los artículos 33, 35 y 36 del Acuerdo General 12/2020 del Pleno del Consejo de la Judicatura Federal (en adelante, "**Acuerdo 12/2020**"), solicito la autorización para consultar el expediente electrónico que se forme con motivo del presente asunto, así como para recibir las notificaciones electrónicas, al usuario en el Portal de Servicios en Línea del Poder Judicial de la Federación "**AnaElizalde**", que corresponde a la licenciada en derecho **ANA LAURA ELIZALDE LEÓN** (Cédula Profesional 4455257), con correo electrónico aelizalde@dc-ca.mx.

**PERSONAS AUTORIZADAS**

Autorizo en términos amplios de lo dispuesto por el tercer párrafo del artículo 1069 del Código de Comercio, de aplicación supletoria a la Ley de Concursos Mercantiles, a los licenciadas en derecho **ANA LAURA ELIZALDE LEÓN** (Cédula Profesional 4455257), **GABRIELA GUADALUPE MEZA DÍAZ DE LEÓN** (Cédula Profesional 3720580), **ALEJANDRA REA ANAYA** (Cédula Profesional 12051950) y **MARICRUZ CERVERA MEDINA** (Cédula Profesional 12550854), indistintamente, quienes quedan facultados en términos amplios de dicho precepto legal, y únicamente para oír y recibir notificaciones, así

como para recoger toda clase de documentos y valores, imponerse de autos y tomar fotografías de las constancias del expediente a los señores **ROCÍO RIVERA ROJAS, LIZZET JHOANA RAMÍREZ CERVANTES, JULIA LOZA HERRERA** y **RODRIGO ARTURO LUNA GONZÁLEZ.**

**INCIDENTE DE INEFICACIA DE ACTOS EN FRAUDE DE ACREEDORES**

Con fundamento en lo dispuesto por los artículos 112, 113, 114, 267 y demás relativos y aplicables de la Ley de Concursos Mercantiles (en adelante, la "**LCM**") promuevo en nombre de mi representada el presente **INCIDENTE DE INEFICACIA DE ACTOS EN FRAUDE DE ACREEDORES** en contra de:

A. **TV AZTECA, S.A.B. DE C.V.** (en adelante, la "**Comerciante**" o "**TVA**", indistintamente), quien tiene su domicilio para ser emplazada en **Boulevard Manuel Ávila Camacho número 32, piso 11, colonia Lomas de Chapultepec, Alcaldía Miguel Hidalgo, Código Postal 11000, Ciudad de México**.

Mediante el presente incidente se reclaman las siguientes:

**PRESTACIONES**

FERNANDO DEL CASTILLO ELORZA

A. La declaración de la ineficacia del contrato de crédito de fecha 29 de enero de 2026 celebrado entre **Alter Bank, LTD** (en adelante, "**AlterBank**") en su carácter de agente estructurador, acreditante inicial, agente administrativo y agente de garantías y **TVA** como acreditado, así como de su convenio modificatorio y de reexpresión de fecha 06 de marzo de 2026.

B. En consecuencia, la ineficacia de dicho crédito frente a la masa y el resto de los acreedores reconocidos (según estos se determinen en la sentencia de reconocimiento, graduación y prelación de créditos).

C. La declaración de que, como consecuencia de la ineficacia de dicho crédito frente a la Masa, AlterBank no puede ser reconocido como acreedor dentro del presente procedimiento concursal y tampoco puede suscribir la propuesta de convenio concursal que se presente.

D. Los gastos y costas que deriven del presente incidente.

**LEGITIMACIÓN DE BNY COMO FIDUCIARIO Y DERECHOS DE LOS TENEDORES**

BNY actúa como Fiduciario (*Trustee*) conforme al Contrato de Emisión (*Indenture*) de fecha 09 de agosto de 2017, celebrado entre TVA, las subsidiarias garantes y BNY, respecto de los Bonos Preferentes al 8.250% con vencimiento en 2024.

BNY actúa por cuenta y para beneficio de los titulares de los intereses beneficiarios representados por la Nota Global.

Conforme al Contrato de Emisión de Bonos, BNY tiene el derecho y el deber de hacer cumplir las obligaciones de TVA y de las subsidiarias garantes, incluyendo la presentación y persecución de reclamaciones en procedimientos de insolvencia, como lo es el presente concurso mercantil.

**RESERVA DE DERECHOS**

Se manifiesta a su Señoría que el presente incidente se promueve con base en la información contenida en la Solicitud de Declaración de Concurso Mercantil y el resto de los formatos que a la misma se acompañaron, presentada por TVA el 10 de marzo de 2026 ante la Oficialía de Partes Común de los Juzgados de Distrito en Materia de Concursos Mercantiles con Residencia en la Ciudad de México y Jurisdicción en toda la República Mexicana (en adelante, la "**Solicitud de Concurso**").

Asimismo, se promueve el presente incidente con base en la información pública disponible en los diversos medios de comunicación que se citan a lo largo del Incidente; **sin embargo, se manifiesta bajo protesta de decir verdad que mi representada no ha tenido acceso ni conocimiento del contenido exacto del Contrato de Crédito y su Convenio Modificatorio y de Reexpresión por no ser parte en la celebración de los mismos.**

Finalmente, toda vez que mi representada comparece al procedimiento de concurso mercantil mediante el presente incidente, **me reservo en su nombre su derecho a ampliarlo**, si una vez impuesta del contenido del expediente en que se actúa se advierten elementos que pudieran ser materia del incidente que se promueve.

**CAPÍTULO ESPECIAL SOBRE LA ACCIÓN DE INEFICACIA DE LOS ACTOS COMETIDOS EN FRAUDE DE ACREEDORES EN MATERIA DE CONCURSOS MERCANTILES**

**1. Periodo de Retroacción**

En términos de lo dispuesto por el artículo 112 de la Ley de Concursos Mercantiles (en adelante, la "**LCM**"), la fecha de retroacción es el día 270 natural inmediato anterior a la fecha de la sentencia de declaración del concurso mercantil.

En el concurso mercantil que nos ocupa, la **Fecha de Retroacción** es el **09 de octubre de 2025**, tal como se determinó en la sentencia de declaración de concurso mercantil de fecha 06 de julio de 2026 dictada por su Señoría.

Es de explorado derecho que la retroacción es entendida como la época en que se considera que en **el estado patrimonial del concursado ya existía el incumplimiento generalizado de pagos** (estado de impotencia patrimonial, no transitorio, que impiden al deudor cumplir regularmente con sus obligaciones líquidas y exigibles, mediante recursos genuinos); por ello, **la retroacción tiene su razón de ser en la falta de coincidencia entre el momento en que comienza el incumplimiento generalizado de obligaciones, que es presupuesto para la declaración de concurso mercantil, y el momento de su declaración judicial, periodo en el que opera la presunción de que los actos realizados por el deudor han sido consumados en perjuicio de los acreedores** y, de ahí, que se actualice la retroactividad de los efectos de la sentencia de concurso, a fin de eliminar las consecuencias dañosas que, para ello, tales actos pudieran eventualmente haber producido.

En ese sentido se han pronunciado nuestros más altos Tribunales:

> Registro digital: 166207
> Instancia: Tribunales Colegiados de Circuito
> Novena Época
> Materias(s): Civil
> Tesis: VI.1o.C.132 C
> Fuente: Semanario Judicial de la Federación y su Gaceta. Tomo XXX, Octubre de 2009, página 1413
> Tipo: Aislada
>
> **CONCURSOS MERCANTILES. CONCEPTO DE RETROACCIÓN Y SUS CONSECUENCIAS.**
>
> De una interpretación contextual de la Ley de Concursos Mercantiles, se tiene que la retroacción es entendida como la época en que se considera que, en el estado patrimonial del concursado, ya existía el incumplimiento generalizado de pagos (estado de impotencia patrimonial, no transitorio, que impide al deudor cumplir regularmente con sus obligaciones líquidas y exigibles, mediante recursos genuinos), por ello, la retroacción tiene su razón de ser en la falta de coincidencia entre el momento en que comienza el incumplimiento generalizado de obligaciones, que es presupuesto para la declaración de concurso mercantil, y el de su declaración judicial, periodo en el que opera la presunción de que los actos realizados por el deudor han sido consumados en perjuicio de los acreedores; de ahí que se actualice la retroactividad de los efectos de la sentencia de concurso, a fin de eliminar las consecuencias dañosas que para ello tales actos pudieran eventualmente haber producido; esto es, la retroacción es el periodo decretado por el Juez, mediante el cual se pretende hacer coincidir el estado legal de incumplimiento generalizado de obligaciones, con el estado de incumplimiento generalizado de obligaciones de hecho, posibilitándose la declaración de ineficacia de todas aquellas operaciones o actos realizados por el comerciante en esa época, a la que se retrotraen los efectos de la declaración judicial.
>
> PRIMER TRIBUNAL COLEGIADO EN MATERIA CIVIL DEL SEXTO CIRCUITO.
> Amparo en revisión 105/2009. **********. 2 de julio de 2009. Mayoría de votos. Disidente: Enrique Zayas Roldán. Ponente: Rosa María Temblador Vidrio. Secretario: Ciro Carrera Santiago.

**2. Actos que constituyen fraude de acreedores**

El artículo 114 de la LCM establece un catálogo **objetivo** (es decir independiente del elemento volitivo de las partes) que se materializan como actos en fraude de acreedores, en cuya fracción III se señalan como tal las operaciones celebradas por el Comerciante en las que se hubieren pactado **condiciones o términos que se aparten de manera significativa de las condiciones prevalecientes en el mercado** en el que se hayan celebrado, en la fecha de su celebración, o de los usos o prácticas mercantiles. En el caso, el Contrato de Crédito y su Convenio Modificatorio y de Reexpresión actualizan este supuesto, pues documentan un crédito garantizado de hasta US$290,000,000.00 otorgado a una compañía abiertamente insolvente por una institución sin historial de otorgar créditos a TVA ni financiamientos de tamaño comparable, en términos que incluso colocaban en riesgo la propia viabilidad de AlterBank, tal como se expone en el presente.

A continuación, el artículo en cita:

> ***Artículo 114.*** *- Son actos en fraude de acreedores, los siguientes, siempre que se hayan llevado a cabo a partir de la fecha de retroacción:*
>
> ...
>
> ***III.*** *Las operaciones celebradas por el Comerciante en las que se hubieren pactado condiciones o términos que se aparten de manera significativa de las condiciones prevalecientes en el mercado en el que se hayan celebrado, en la fecha de su celebración, o de los usos o prácticas mercantiles.*
>
> ...

### 3. Actos que se presumen cometidos en fraude de acreedores

La Ley de Concursos Mercantiles establece la presunción legal de que el otorgamiento de garantías o incremento de las vigentes, cuando la obligación original no las contemplaba es un acto cometido en fraude de acreedores **salvo que el interesado pruebe su buena fe.**

A continuación, el artículo en cita:

> **Artículo 115.**- Se presumen actos en fraude de acreedores, si se realizan a partir de la fecha de retroacción, salvo que el interesado pruebe su buena fe:
>
> **I.**- El otorgamiento de garantías o incremento de las vigentes, cuando la obligación original no contemplaba dicha garantía o incremento, y…

### 4. Consecuencias de que un acto sea celebrado en fraude de acreedores

Conforme a lo dispuesto por el artículo 113 de la LCM, la consecuencia legal establecida para los actos cometidos en fraude de acreedores consiste en que éstos sean **ineficaces** frente a la Masa.

Doctrinalmente se ha determinado a la ineficacia en este sentido:

> *En sentido amplio, la ineficacia es un género que comprende la privación total o parcial de los efectos de un acto jurídico entre las partes o frente a terceros. Dentro de sus especies encontramos la invalidez (nulidad y anulabilidad), la inexistencia, la inoponibilidad, la revocación, la resolución y la rescisión.*
>
> *La ineficacia jurídica, strictu sensu, se identifica con la inoponibilidad que consiste en la privación de los efectos típicos del acto, es decir, los limita ante el incumplimiento de alguna condicionante. Tal ineficacia torna inoponible el acto, es decir, permite al tercero interesado actuar como si el acto no existiese.*[1]

Es decir, las consecuencias jurídicas de que un acto haya sido celebrado en fraude de acreedores, como ocurre en el caso que nos ocupa, tiene como consecuencia **necesaria** que los derechos y obligaciones que derivan del mismo no puedan ser oponibles a los acreedores de la comerciante ni a la Masa. Esto es, el acreedor que haya intervenido en el acto celebrado en fraude de acreedores ***(i)*** no podrá ser reconocido en la sentencia de reconocimiento, graduación y prelación de créditos y, en consecuencia, ***(ii)*** no podrá suscribir el convenio propuesto dentro del procedimiento.

Lo anterior tiene que ser así pues es la única manera de salvaguardar los derechos de los acreedores que actuaron de buena fe con el comerciante y proteger la integridad de la Masa. La legislación concursal proscribe que los derechos y obligaciones existentes entre la comerciante y un acreedor que participó en la celebración de un acto en fraude de acreedores –sobre todo en un acto que es taxativamente catalogado como tal por la ley, como en el presente caso– burlen los principios de la ley a través del ejercicio de derechos tales como la suscripción del convenio concursal en perjuicio de terceros.

En mérito de lo anterior y, tal como se acredita en el presente, el crédito otorgado por AlterBank es un acto celebrado en fraude de acreedores por lo que no deberá ser reconocido en la sentencia de reconocimiento, graduación y prelación de créditos –que automáticamente lo elimina de la suma total de pasivos a cargo de la comerciante– y no tendrá el derecho a suscribir la propuesta de convenio que en su momento se presente.

## CAPÍTULO ESPECIAL SOBRE ALTER BANK

*Alter Bank Limited* es una entidad con doble naturaleza jurídica: ***(i)*** como entidad corporativa, es una Sociedad Comercial Internacional (*IBC- International Business Company*) y, ***(ii)*** como institución financiera, es un banco internacional con licencia para operar como tal.

Alter Bank es una sociedad incorporada conforme a la Ley de Sociedades Comerciales Internacionales de Santa Lucía (IBC Act), originalmente constituida y registrada el 23 de enero de 2007 como *StateTrust Bank & Trust Limited*, cambiando de

---

[1] López Gianopoulos, Set Leonel, "La retroacción de los efectos de la sentencia de concurso mercantil. Un análisis desde la seguridad jurídica", *Revista del Instituto de la Judicatura Federal*, México, Instituto de la Judicatura Federal – Consejo de la Judicatura Federal, 2013, pp. 119-138, en específico p. 127. Disponible en: https://revistas-colaboracion.juridicas.unam.mx/index.php/judicatura/article/viewFile/32106/29099

nombre a *Alter Bank Limited*, mediante la resolución de accionistas con efectos al 19 de mayo de 2023.

Por su parte, también es un banco internacional establecido en Santa Lucía e incorporado conforme al Capítulo 12.17 de la Ley de Bancos Internacionales de Santa Lucía (*International Banks Act*), operando con una licencia Clase A No. IB/007(A), emitida por la *Autoridad Reguladora de Servicios Financieros de Santa Lucía* (FSRA) de Santa Lucía. [2]

Conforme a la Ley de Bancos Internacionales, una licencia Clase A permite realizar operaciones bancarias con terceros sin restricción, y requiere un capital mínimo pagado de USD 2,200,000.00 (Dos millones doscientos mil dólares de los Estados Unidos de América), debiendo mantener un depósito regulatorio de USD 300,000.00 (Trescientos mil dólares de los Estados Unidos de América. [3]

De acuerdo con información documental obtenida en el proceso regulado en la Sección 1782 del Título 28 del Código de los Estados Unidos (*Discovery*) seguido ante el Juez de Distrito de los Estados Unidos para el Distrito Sur de Florida, División de Miami, Caso No. 26-23885-MC-MARTINEZ que se acompaña como **ANEXO 2** con su traducción al español por perito certificado como **ANEXO 2 BIS**, AlterBank presentó diversos documentos que formaron parte de los requerimientos exigidos por la FSRA durante el proceso de obtención de su licencia, en el año 2024. De esos documentos, se desprende que el modelo de negocio propuesto por AlterBank se enfoca en ofrecer y prestar sus servicios a **pequeñas y medianas** empresas involucradas en comercio internacional, pagos transfronterizos y servicios bancarios internacionales personalizados.

Su proyección financiera propuesta para este año 2026, implicaba tener activos equivalentes a USD 49,076,134.23 (Cuarenta y nueve millones setenta y seis mil ciento treinta y cuatro dólares de los Estados Unidos de América 23/100), **préstamos por USD 14,356,051.00 (Catorce millones trescientos cincuenta y seis mil cincuenta y un dólares de los Estados Unidos de América 00/100)**, depósitos por USD 45,940,000.00 (Cuarenta y cinco millones novecientos cuarenta mil dólares de los Estados Unidos de América 00/100), entre otras proyecciones para ese año. [4]

Incluso, proyectaron un volumen de transacciones por año, siendo que en 2026 proyectaron un total de 7,674 transacciones que equivaldrían a USD 173,000,000.00 (Ciento setenta y tres millones de dólares 00/100). Entre ellas, las transacciones de salida por transferencias o envío de fondos equivaldrían a $84,500,000.00 (Ochenta y cuatro millones quinientos mil dólares de los Estados Unidos de América 00/100), siendo un total de 3,803

---

[2] Financial Services Regulatory Authority - Regulated Entities
[3] https://fsrastlucia.org/index.php/international-sector/international-banks/overview
[4] Página 8 del Anexo 2 y Anexo 2 Bis (páginas numeradas como JR-Alter).

transacciones, y el resto lo proyectaron como transacciones por recibir, es decir, recursos o fondos que esperaban recibir durante el año.

Por otro lado, de los estados financieros no auditados de AlterBank de fecha 31 de marzo de 2024, se desprende que a esa fecha el banco tenía un total de activos equivalentes a **USD 2.3 millones de dólares de los Estados Unidos de América.** [5]

De acuerdo con la información presentada el crédito otorgado a la comerciante excede de manera considerable las proyecciones del plan de negocio de AlterBank, incluso para el año 2028. No sólo en el valor de la transacción, sino también en el tamaño del cliente, ya que TVA es una empresa con presencia nacional e internacional, siendo una de las principales productoras y difusoras de contenido en español a nivel mundial, que cotizó en la Bolsa Mexicana de Valores como una Sociedad Anónima Bursátil.

Asimismo, la operación parece alejarse de la distribución geográfica contemplada en el plan de negocios, el cual proyectaba que aproximadamente el 80% (ochenta por ciento) de las transacciones se concentraría en Estados Unidos y solo el 20% (veinte por ciento) en otros mercados internacionales.

En este caso, si AlterBank se desvió del plan de negocio presentado para 2024, tuvo que haber informado a la FSRA, autoridad competente en Santa Lucía, de acuerdo con lo explicado por la experta **Renée T. St. Rose KC** en su opinión emitida que se agrega como **ANEXO 3** y su traducción al español por perito certificado como **ANEXO 3 BIS**, de la que se desprende que era obligación del banco reportar un cambio en su plan de negocios.

FERNANDO DEL CASTILLO ELORZA

El crédito que otorgó AlterBank fue exclusivamente a una sola empresa en México, es decir, un cliente que, al momento en el que se otorgó el crédito, había hecho público que enfrentaba las dificultades de una situación financiera deteriorada, siendo que esa única transacción superó cualquier proyección presentada por AlterBank para el periodo 2024 a 2028.

A mayor abundamiento, el **10 de mayo de 2023** la propia TVA publicó en su página de internet "*que el día de hoy el Juzgado Sexagésimo Tercero de lo Civil de la Ciudad de México ordenó a la empresa no presentar al público información relativa a su situación financiera, lo anterior con el fin de no causar incertidumbre*". Lo anterior se acredita con la publicación que se acompaña al presente como **ANEXO 4** y se encuentra disponible en el enlace: https://www.irtvazteca.com/es/comunicados-de-prensa.

Es decir, desde por lo menos **tres años previos** a la celebración del contrato de crédito con AlterBank, TVA había ocultado su información financiera del público inversionista.

---

[5] Páginas 320 a 334 del Anexo 2 y Anexo 2 Bis (páginas numeradas como JR-Alter).

Asimismo, el 26 de febrero de 2026 Grupo Salinas publicó un comunicado en el que informó los acuerdos alcanzados en la Asamblea General Extraordinaria de Accionistas de TVA de fecha 26 de febrero de 2026, en la que fue aprobada la reorganización corporativa, operativa y financiera de la compañía y sus empresas subsidiarias mediante un concurso mercantil voluntario, cuya solicitud se presentaría en los próximos días, lo anterior en virtud de que manifestaron que desde el año 2018 enfrentaron retos financieros y que desde el año 2021 se inició un proceso para reorganizar sus compromisos financieros **incluída su deuda en moneda extranjera**. El comunicado se acompaña al presente como **ANEXO 5**, mismo que es un hecho notorio para su Señoría por encontrarse publicado en la página de internet de Grupo Salinas https://www.gruposalinas.com/noticias/notas/comienza-tv-azteca-proceso-reorganizacion/.

De acuerdo con el registro corporativo de AlterBank, obtenido del Registro Sociedades Comerciales Internacionales, con relación al proceso de *Discovery*, mismo que se agrega al presente como **ANEXO 6** y su traducción al español por perito certificado como **ANEXO 6 BIS**, los miembros del Consejo de Administración de AlterBank al 28 de enero de 2026, es decir, al momento de que se celebró el contrato de crédito con TVA, son los siguientes: **Wilbert Owen Bascom** (nombrado el 11 de abril de 2023, posteriormente registrado en el Registro como fallecido, sin que se indique la fecha de fallecimiento); **Blas Santander** (Miami, Florida; nombrado el 20 de septiembre de 2023 y renunció el 31 de marzo de 2026); **Timothy Richards** (Coral Gables, Florida; nombrado el 17 de julio de 2025 y renunció el 26 de junio de 2026); **Alexander Soroka** (Plantation, Florida; nombrado el 16 de abril de 2025 y renunció el 17 de junio de 2026); **Augusto César Castillo Chávez** (Ciudad de México, México; nombrado el 30 de diciembre de 2024); y **Kendall Gill** (Santa Lucía; nombrado el 1 de abril de 2009).

Resulta particularmente relevante que diversos miembros del Consejo de Administración que participaban en la dirección de Alter Bank al momento de la celebración del crédito con TVA, dejaron sus cargos en los meses inmediatamente posteriores al inicio del proceso de *Discovery* en Estados Unidos.

Como se desprende de la declaración de José Romero Esclusa, Director General de AlterBank de fecha 14 de julio de 2026, residente en Panamá, declaración rendida en el caso Caso No. 26-23885-MC-MARTINEZ de *Discovery* en Florida, Estados Unidos, que se agrega a la presente como **ANEXO 7** y su traducción al español por perito certificado autorizado por el Consejo de la Judicatura Federal como **ANEXO 7 BIS:** Blas Santander (residente en Miami, Florida) renunció el **31 de marzo de 2026**; Timothy Richards (residente en Miami, Florida) renunció el **26 de junio de 2026**; y Alexander Soroka (residente en Miami, Florida) renunció el **17 de junio de 2026**. Todos ellos miembros del Consejo de Administración, que presentaron sus renuncias coincidentemente en fechas posteriores al

*Discovery* que se había iniciado en Miami, Florida, Estados Unidos, lugar donde residían y podían ser cuestionados con relación al crédito otorgado a TVA.

Por otro lado, de acuerdo con la información obtenida del registro corporativo de AlterBank en Santa Lucía de fecha 28 de enero de 2026, el beneficiario y propietario del 100% (cien por ciento) de las acciones emitidas de AlterBank es el señor **Augusto César Castillo Chávez**, de nacionalidad venezolana y el único director con domicilio registrado en México. Llama la atención que, pese a figurar como beneficiario final del 100% (cien por ciento) de AlterBank y como integrante de su Consejo de Administración al momento de la celebración del crédito con TVA, no se localizaron fuentes públicas que acrediten experiencia profesional, trayectoria ejecutiva o participación relevante de Augusto César Castillo Chávez en instituciones bancarias, financieras o del mercado de capitales. Asimismo, tampoco se identificaron entrevistas, publicaciones especializadas, perfiles corporativos o antecedentes públicos que permitan asociarlo con actividades de dirección o gestión dentro del sector financiero, más allá de su vinculación con AlterBank.

Antes de eso, el registro muestra que el señor Juan Francisco Ramirez, es el anterior beneficiario y propietario del 100% (cien por ciento) de las acciones emitidas por AlterBank desde el **22 de marzo de 2023** y hasta el 30 de diciembre de 2024.

FERNANDO DEL CASTILLO ELORZA

La información reportada en el registro de Santa Lucía, se contradice de la evidencia obtenida en el proceso de *Discovery*, de la que se desprende el correo electrónico de 1° de junio de 2023 [6] sobre una reunión de accionistas que se llevó a cabo el 31 de mayo de 2023, en el que se compartió la distribución accionaria de AlterBank al **31 de mayo de 2023**: ***(i)*** Juan Ramírez (30.95%), quien inició un juicio en Santa Lucía en contra de AlterBank por el traspaso de sus acciones[7]; ***(ii)*** Blas Santanader (15.47%) y, ***(iii)*** Agusto César Castillo Chávez y Tomas Hernádez (53.58%). La razón por la cual se reporta que estos últimos son propietarios de las mismas acciones es desconocida por mi representada a la fecha. Asimismo, la razón por la que se registró una distribución accionaria distinta a la reportada en información interna de AlterBank también es desconocida a la fecha.

Además, la investigación del *Trustee* sugiere que anteriores propietarios y afiliados de AlterBank se encuentran vinculados con actos de fraude y evasión de sanciones, circunstancia que refuerza la falta de capacidad y de credibilidad comercial de la institución para celebrar una operación de esta magnitud.

Derivado de todo lo anterior, la operación con TVA se aparta de manera considerable de las proyecciones financieras de AlterBank, el perfil de clientes y la escala operativa contemplados por la institución al momento de solicitar su licencia en Santa Lucía en el año

[6] Página 78 y 79 del Anexo 2 y del Anexo 2 Bis (páginas numeradas como JR- Alter).
[7] Página 133 a 145 del Anexo2 y del Anexo 2 Bis (páginas numeradas como JR- Alter).

2024. Lo anterior, sumado al hecho que AlterBank celebró un contrato de crédito con una empresa en evidente insolvencia, como se explicará a lo largo de este incidente.

**HECHOS**

1. El 10 de marzo de 2026, TVA presentó su solicitud de declaración de concurso mercantil en etapa de conciliación (en adelante, la "**Solicitud de Concurso**") ante la Oficialía de Partes Común de los Juzgados de Distrito en Materia de Concursos Mercantiles con Residencia en la Ciudad de México y Jurisdicción en toda la República Mexicana.

2. La Solicitud de Concurso fue admitida por su Señoría mediante auto de 20 de marzo de 2026.

3. Mediante sentencia de 06 de julio de 2026 se declaró en concurso mercantil en etapa de conciliación a TVA, señalando como **fecha de retroacción el 09 de octubre de 2025** (en adelante, la "**Sentencia de Concurso**"), tal como se advierte del edicto publicado.

4. La Sentencia de Concurso se publicó en el Diario Oficial de la Federación y en el periódico el "Universal" el 10 de agosto de 2026. Lo anterior constituye un hecho notorio para su Señoría.

5. El 29 de enero de 2026, es decir, apenas mes y medio antes de su solicitud de concurso mercantil, TVA celebró en su carácter de acreditado un contrato de crédito con AlterBank, este último en su carácter de agente estructurador, acreditante inicial, agente administrativo y agente de garantías. Dicho crédito fue otorgado hasta por la cantidad de $5,000,000,000.00 (cinco mil millones de pesos 00/100 M.N.) según fue narrado por TVA en el inciso "5" de la Sección 2 de la Solicitud de Concurso.

   Toda vez que mi representada no es parte en el contrato de referencia, solicito respetuosamente a su Señoría requiera a TVA para que lo exhiba dentro del presente incidente, a efecto de conocer su contenido y ejercer los derechos correspondientes.

6. Posteriormente, el 06 de marzo de 2026 TVA y AlterBank celebraron un convenio modificatorio y de reexpresión al Contrato de Crédito señalado en el hecho "5" que antecede.

   Toda vez que mi representada no es parte en el convenio de referencia, solicito respetuosamente a su Señoría requiera a TVA para que lo exhiba dentro del presente incidente, a efecto de conocer su contenido y ejercer los derechos correspondientes.

7. La celebración del Contrato de Crédito y su Convenio Modificatorio y de Reexpresión se encuentra reconocida y confesada de forma libre, voluntaria y

espontánea por TVA en *(i)* su solicitud de declaración en concurso mercantil (página 27), *(ii)* en la Sección 2 denominada "Manifestación de Incumplimiento o inminencia de incumplimiento generalizado en el pago de obligaciones del comerciante" (incisos 5 y 6) y *(iii)* en el Anexo 3 denominado "Relación de Acreedores" (señalando a AlterBank como acreedor en el inciso 4).

8. Ahora bien, la celebración del Contrato de Crédito y su posterior Convenio Modificatorio y de Reexpresión constituyen una operación claramente fuera de las condiciones de mercado y de los usos bancarios y comerciales, toda vez que, para el 29 de enero de 2026, fecha en la que inicialmente se celebró el contrato de crédito, **era ya un hecho notorio la situación de insolvencia de TVA.**

9. Esto, toda vez que por lo menos desde 2025 existen diversas publicaciones periodísticas que hicieron público el incumplimiento por parte de TVA a sus obligaciones de pago derivadas de la emisión de las **8.250% Senior Notes Due 2024**, realizada al amparo del Contrato de Emisión (Indenture) de fecha 09 de agosto de 2017, por un monto de principal de US$400,000,000.00 (cuatrocientos millones de dólares de los Estados Unidos de América), con vencimiento el 09 de agosto de 2024, respecto de la cual TVA dejó de pagar intereses desde el 09 de febrero de 2021 y no ha realizado pagos de principal ni intereses desde entonces, figurando BNY en su carácter de Fiduciario y The Bank of New York Mellon, London Branch en su carácter de Agente Principal de Pago.

Sin perjuicio de que lo anterior constituye un hecho notorio por ser objeto de publicaciones periodísticas en diversos medios de comunicación, se acompañan al presente como **ANEXO 8** las notas publicadas por los siguientes periódicos:

a) **Periódico Reforma**, nota publicada el 22 de julio de 2025, disponible en el enlace: https://www.reforma.com/aprietan-a-tv-azteca-acreedores-en-ny/ar3042710

b) **Proceso**, nota publicada el 31 de diciembre de 2025, disponible en el enlace: https://www.proceso.com.mx/nacional/justicia/2025/12/31/tribunales-acorralan-tv-azteca-grupo-elektra-de-ricardo-salinas-pliego-363593.html

c) **Expansión**, nota publicada el 03 de diciembre de 2025, disponible en el enlace: https://expansion.mx/tecnologia/2025/12/03/la-crisis-que-acecha-a-tv-azteca

10. Del contenido de las notas periodísticas invocadas en el hecho anterior se advierte que era del dominio público que TVA se encontraba en problemas financieros y que había incumplido con sus obligaciones de pago a por lo menos los beneficiarios de la nota global emitida en 2017, así como que se encontraba impugnando diversos créditos fiscales que ascendían a miles de millones de pesos. Asimismo, por lo menos desde diciembre de 2025, TVA había hecho público que su situación financiera y sus pasivos fiscales hacían financieramente imposible pagar las Notas.

11. Es más, desde 2023 la propia TVA publicó en su página de internet "*que el día de hoy el Juzgado Sexagésimo Tercero de lo Civil de la Ciudad de México ordenó a la empresa no presentar al público información relativa a su situación financiera, lo anterior con el fin de no causar incertidumbre*". Lo anterior se acredita con la publicación que se acompaña al presente como **ANEXO 4** y se encuentra disponible en el enlace: https://www.irtvazteca.com/es/comunicados-de-prensa.

12. Lo anterior no tuvo implicaciones menores, pues incluso el 30 de enero de 2023, Fitch Ratings confirmó la calificación de TV Azteca en "*Restricted Default*" ("RD"), con motivo de dicho incumplimiento no subsanado en el pago de intereses de las notas senior, y afirmó en "C/RR4" la calificación de la emisión correspondiente. El 21 de diciembre de 2023, Fitch Ratings **retiró (*withdrew*) por completo la calificación de TV Azteca, señalando expresamente falta de acceso a información suficiente para mantenerla.**

Es decir, era información pública que no existía certeza ni transparencia respecto a la información financiera de TVA. Es más, lo que existía era un ocultamiento de ésta.

13. El estado de estrés financiero de TVA también se advierte de sus estados financieros –presentados como Anexo 1 de la Solicitud de Concurso– ya que el "Estado de Situación Financiera" correspondiente al ejercicio de 2025 muestra lo siguiente:

   a) Un **Total de Pasivos** por la cantidad de **$29,926,016,000.00 (veintinueve mil novecientos veintiséis millones, dieciséis mil pesos 00/100 M.N.).**

   b) Un **Total de Activos** por la cantidad de **$27,006,133,000.00 (veintisiete mil seis millones ciento treinta y tres mil pesos 00/100 M.N.).**

Es decir, es **evidente** que los pasivos de TVA superaban a los activos desde el ejercicio de 2025, por lo que, resulta inverosímil que una institución bancaria decidiera otorgarle un crédito en enero de 2026 a una sociedad en dicha situación de estrés financiero e "insolvencia técnica".

Es más, su **capital contable** para el ejercicio 2025 era $2,919,882,000.00 (Dos mil novecientos diecinueve millones ochocientos ochenta y dos mil pesos 00/100 M.N.), monto que es significativamente menor al importe del crédito contratado con AlterBank.

Para mejor referencia, a continuación, el extracto correspondiente del Anexo 1 de la Solicitud de Concurso:

| | |
|---|---|
| **Capital Contable** | |
| Capital Social | 765,142 |
| Reservas y otros conceptos de capital | 5,615,626 |
| Resultados Acumulados | (4,234,845) |
| Resultados del Ejercicio | (5,066,805) |
| **Suma Capital Contable** | (2,919,887) |
| **Suma Pasivo y Capital Contable** | 27,006,133 |

**14.** Dicho estrés financiero claramente subsistía en enero de 2026 el mes inmediato anterior a la contratación del crédito –presupuesto de que ahora se encuentre declarada en concurso mercantil–. Conforme a los estados financieros que presentó la Comerciante con su Solicitud de Concurso, su capital contable era de $3,136,785,000.00 (tres mil ciento treinta y seis millones setecientos ochenta y cinco mil pesos 00/100 M.N.), **monto significativamente menor al importe del crédito contratado con AlterBank.**

Para mejor referencia, a continuación, el extracto correspondiente del Anexo 1 de la Solicitud de Concurso:

| | |
|---|---|
| **Capital Contable** | |
| Capital Social | 766,142 |
| Reservas y otros conceptos de capital | 5,615,626 |
| Resultados Acumulados | (9,300,650) |
| Resultados del Ejercicio | (216,903) |
| **Suma Capital Contable** | (3,136,785) |
| **Suma Pasivo y Capital Contable** | 25,851,356 |

A mayor abundamiento, la suma de activos de TVA al 31 de enero de 2026 era de **$25,851,356,000.00** (Veinticinco mil ochocientos cincuenta y un millones trescientos cincuenta y seis mil pesos 00/100 M.N.) y la suma de sus pasivos, de **$28,988,141,000.00** (Veintiocho mil novecientos ochenta y ocho millones ciento cuarenta y un mil pesos 00/100 M.N.). **Sobra decir que era evidente la situación de insolvencia y falta de capacidad de pago de TVA.**

**15.** De acuerdo con el marco regulatorio, las condiciones imperantes en el mercado y los usos y costumbres, la situación financiera de TVA tuvo que ser hecha del conocimiento de AlterBank previo al otorgamiento del crédito objeto del presente incidente, ya que es la información **mínima** que cualquier institución financiera solicita para determinar la capacidad de pago del acreditado, sobre todo, tomando en consideración el importe objeto del crédito que nos ocupa.

AlterBank se encontraba obligado a realizar un *due diligence* de TVA y recabar la información correspondiente a su situación financiera y obligaciones existentes, esto

es así en términos de su regulación aplicable, tal como se expone en los párrafos 25, 26, 36 y 37 de la opinión emitida por la experta **Renée T. St. Rose KC** que se agrega como **ANEXO 3** y su traducción al español por perito certificado como **ANEXO 3 BIS.** En obvio de repeticiones innecesarias, solicito se tenga por reproducido como si a la letra se insertase lo expresado en la Opinión en los párrafos señalados.

Asimismo, se menciona en los párrafos 11, 13, 14, 15, 38, 39, 40, entre otros, de la opinión de experto que se acompaña al presente como **ANEXO 9,** emitida por Mauricio Basila Lago –ex Director Director General de Emisoras y Vicepresidente de Supervisión Bursátil de la Comisión Nacional Bancaria y de Valores– y Paul Yamil José Aguilar ("Basila Abogados"), mismos que solicito se tengan aquí por reproducidos como si a la letra se insertase en obvio de repeticiones innecesarias.

Ambas opiniones concluyen y reflejan que constituye un estándar internacional de sanas prácticas bancarias realizar una debida y rigurosa diligencia para operaciones de crédito como la celebrada entre AlterBank y TVA.

**16.** De lo hasta aquí expuesto se advierte que *(i)* TVA se encontraba en insolvencia desde 2025, circunstancia que es congruente con la fecha de retroacción señalada por su Señoría en la Sentencia de Concurso (09 de octubre de 2025) –se destaca que su capital contable al 31 de enero de 2026 era de $3,136,785,000.00 (tres mil ciento treinta y seis millones setecientos ochenta y cinco mil pesos 00/100 M.N.), **monto significativamente menor al importe del crédito contratado con AlterBank,** sin que existan indicios de un aumento de capital posterior (cuya realización sería contraria al estado de insolvencia que originó su concurso mercantil), ***(ii)*** su insolvencia consta en sus propios estados financieros y en diversas notas periodísticas y ***(iii)*** a pesar de existir una notoria condición de insolvencia, AlterBank decidió otorgarle un crédito a TVA por la cantidad de **USD $290,000,000.00 (doscientos noventa millones de dólares, moneda de curso legal en los Estados Unidos de América)** cuando era más que obvio que TVA iba a incumplir con sus obligaciones de pago.

Se destaca también que dicho crédito constituyó el primer endeudamiento nuevo con un tercero que TVA contrajo en por lo menos cuatro años.

**17.** Aunado a la insolvencia de TVA y su manifiesta incapacidad de pago, el importe del crédito otorgado por AlterBank resulta completamente ajeno al plan de negocio de dicho banco para 2026, que proyectaba tener activos equivalentes a USD 49,076,134.23 (Cuarenta y nueve millones setenta y seis mil ciento treinta y cuatro dólares de los Estados Unidos de América 23/100), **préstamos por USD 14,356,051.00 (Catorce millones trescientos cincuenta y seis mil cincuenta y un dólares de los Estados Unidos de América 00/100)**, depósitos por USD

45,940,000.00 (Cuarenta y cinco millones novecientos cuarenta mil dólares de los Estados Unidos de América 00/100), entre otras proyecciones para ese año.[8]

Lo anterior se encuentra acreditado también en la opinión emitida por la experta **Renée T. St. Rose KC**, que se agrega como **ANEXO 3** y su traducción al español por perito certificado como **ANEXO 3 BIS** particularmente, en los párrafos 58, 59 y 73 inciso "e", mismos que solicito se tengan aquí por reproducidos como si a la letra se insertase en obvio de repeticiones innecesarias.

**18.** De acuerdo con la información presentada por TVA y la documentación obtenida en el proceso de *Discovery*, el crédito otorgado a la Comerciante excede de manera considerable las proyecciones del plan de negocio de AlterBank, incluso para el año 2028. No sólo en el valor de la transacción, sino también en el tamaño del cliente, ya que TVA es una empresa con presencia nacional e internacional, siendo una de las principales productoras y difusoras de contenido en español a nivel mundial, que cotizó en la Bolsa Mexicana de Valores como una Sociedad Anónima Bursátil.

**19.** Es decir, un banco con proyecciones de negocio consistentes en el otorgamiento de créditos a pequeñas y medianas empresas le otorgó un crédito a una empresa que no cumple con dichas características y no sólo eso, sino que se encontraba claramente en estado de insolvencia (circunstancia que necesariamente tuvo que haber sido conocida por AlterBank como parte del proceso de análisis de riesgo) y, por si fuera poco, el importe del crédito representa más del capital que tenía proyectado AlterBank para el año 2026.

FERNANDO DEL CASTILLO ELORZA
[illegible]

Todo lo anterior se aparta claramente de las condiciones de mercado para este tipo de créditos y de la regulación que rige a AlterBank en Santa Lucía, tal como concluye la experta **Renée T. St. Rose KC** en la opinión que se agrega como **ANEXO 3** y su traducción al español por perito certificado como **ANEXO 3 BIS** particularmente, en los párrafos 74 y 75, mismos que solicito se tengan aquí por reproducidos como si a la letra se insertasen en obvio de repeticiones innecesarias.

**20.** Otro elemento que robustece lo apartado de las condiciones de mercado en que se otorgó el crédito en cuestión, es la irrisoria fecha de vencimiento, que de acuerdo con la información señalada por TVA en el Anexo 3 de su Solicitud de Concurso, **es el 29 de julio de 2026**. Resulta imposible de creer que una institución bancaria otorgue un crédito a una empresa insolvente por **USD $290,000,000.00 (doscientos noventa millones de dólares moneda de curso legal en los Estados Unidos de América)** y espere que se lo pague en seis meses, especialmente teniendo en cuenta que TVA, como ya se acreditó, manifestó públicamente encontrarse en crisis financiera.

---

[8] Página 8 del Anexo 2 y Anexo 2 Bis (páginas numeradas como JR-Alter).

21. Ahora, conforme a lo narrado por TVA en su Solicitud de Concurso respecto a la contratación del crédito con AlterBank, dicho crédito fue contratado con motivo de lo siguiente:

**a) En la Solicitud de Declaración**

...En efecto, **TV AZTECA** enfrentaba litigios por adeudos o créditos determinados por la autoridad fiscal, por las siguientes sumas: (i) $3,902,000,000.00 (Tres mil novecientos dos millones de pesos M.N.) por concepto de Impuesto sobre la Renta del ejercicio fiscal 2009 (incluyendo multas y recargos); y (ii) $4,790,000,000.00 (Cuatro mil setecientos noventa millones de pesos 00/100 M.N.) correspondientes al Impuesto Sobre la Renta del ejercicio fiscal 2013 (incluyendo multas y recargos).

Lo anterior se tornó especialmente riesgoso para la viabilidad de **TV AZTECA**, visto que el Código Fiscal de la Federación faculta a la autoridad fiscal a ejecutar créditos fiscales mediante el procedimiento administrativo de ejecución...

En ese contexto, la presión pública e institucional *–al incrementar el riesgo de ejecución fiscal y de afectación inmediata de caja–* obligó a la sociedad a priorizar liquidez para evitar disrupciones operativas críticas.

Por ello, ante la inminencia de medidas de cobro coactivo y la potencial pérdida/restricción de caja, la sociedad se vio compelida a obtener y/o utilizar financiamiento adicional y urgente para atender el pasivo fiscal y mitigar el riesgo de paralización operativa.

Esto impactó directamente la viabilidad como unidad productiva: la detraída o la inmovilización de caja y/o el aumento de pasivos financieros (costos por intereses, garantías, vencimientos) redujo la capacidad de cumplir obligaciones ordinarias de operación (salarios, insumos, transmisión, proveedores críticos) y elevó el riesgo de incumplimiento a diversos acreedores.

Dicho contexto orilló a **TV AZTECA** a adquirir un financiamiento urgente *–con las consecuencias que ello implica–* Alter Bank LTD por la cantidad de hasta $5,000,000,000.00 (Cinco mil millones de pesos 00/100 M.N.); ello como una medida defensiva e indispensable orientada a preservar: **(i)** la continuidad operativa; **(ii)** la estabilidad laboral; y **(iii)** la integridad de activos estratégicos para la operación; sin embargo, a la par, incrementó el pasivo de la Sociedad, deterioró su estructura de capital y redujo su capacidad de maniobra financiera, contribuyendo al agravamiento del estado de insolvencia...

**b) En la Sección 2 de la Solicitud de Declaración**

Dicho crédito ALTER fue adquirido por la compañía como financiamiento adicional y urgente para atender el pasivo fiscal y mitigar el riesgo de paralización operativa…

**22.** Es decir, TVA afirma que contrató el crédito con AlterBank con la finalidad de salvaguardar su operación; sin embargo, dicho crédito se encuentra garantizado mediante las hipotecas constituidas el **06 de marzo de 2026** sobre los títulos de concesión de ***(i)*** Televisora del Valle de México, S.A.P.I. de C.V. y ***(ii)*** Televisión Azteca III, S.A. de C.V. –ambas subsidiarias **controladas** por TVA–.

Lo anterior contradice por completo el supuesto propósito de contratación del crédito, ya que las condiciones financieras de TVA hacían evidente que iba a incumplir con sus obligaciones de pago –situación que fácilmente debió advertir AlterBank a través del análisis de riesgo que debe realizar como institución financiera–, derivando en la ejecución de dichas garantías que **claramente pondría en riesgo su negocio y operación.** Es difícil creer que TVA no previera la posibilidad de ejecución de las garantías otorgadas ante el incumplimiento de pago.

**23.** Con independencia del riesgo del negocio de TVA, el otorgamiento del crédito por parte de AlterBank claramente pone en riesgo su propia viabilidad económica y continuación de negocio, por lo que, es absurdo pensar que estamos en presencia de una operación dentro de las condiciones de mercado. Ninguna institución financiera pondría en riesgo su viabilidad financiera y regulatoria por otorgarle un crédito a un cliente que evidentemente le va a incumplir.

El otorgamiento del crédito a TVA es claramente inusual para una institución bancaria de la naturaleza de AlterBank –insistiendo en la situación de notoria insolvencia de TVA– y alejada del marco normativo aplicable conforme a la legislación de Santa Lucía, tal como expone la experta **Renée T. St. Rose KC** en la opinión que se agrega como **ANEXO 3** y su traducción al español por perito certificado como **ANEXO 3 BIS** particularmente, en el párrafo 27, mismo que solicito se tengan aquí por reproducidos como si a la letra se insertasen en obvio de repeticiones innecesarias.

El crédito objeto del presente incidente es claramente contrario a los Principios para la Gestión de Riesgo Crediticio, el Marco de Supervisión para la Medición y el Control de Grandes Exposiciones y demás Principios y criterios aplicables conforme a los Principios del Comité de Supervisión Bancaria de Basilea (BCBS) y Basilea III que rigen las sanas prácticas y usos bancarios internacionalmente.

**24.** El incumplimiento a las condiciones de mercado y las sanas prácticas bancarias se robustece si analizamos los Estándares Internacionales de Basilea III en particular los Principios para la Gestión de Riesgo Crediticio *"Principles for the Management of Credit Risk"*.

Dichos Principios constituyen, por sí mismos, un estándar global prudencial, para cualquier institución que cumpla con estándares internacionales comúnmente aceptados y aplicables. El marco de Basilea se articula en tres pilares: capital sensible al riesgo, revisión supervisora y disciplina de mercado, de forma que el otorgamiento de crédito no es un acto discrecional de la institución, sino un proceso regulado.

El *Principio 5* del BCBS exige que las instituciones de crédito establezcan límites de exposición a nivel de acreditado individual y de grupos de contrapartes relacionadas, dicho principio es recogido por la legislación de Santa Lucía, particularmente en la sección 15 de la Ley de Bancos Internacionales de Santa Lucía, con relación a la Nota Orientativa N° 11 de la Autoridad Reguladora de Servicios Financieros de Santa Lucía (*FSRA*), tal como expone la experta **Renée T. St. Rose KC** en la opinión que se agrega como **ANEXO 3** y su traducción al español por perito certificado como **ANEXO 3 BIS** particularmente, en los párrafos 27, 32 y en la Sección "F" de dicho documento, mismos que solicito se tengan aquí por reproducidos como si a la letra se insertasen en obvio de repeticiones innecesarias.

La asunción de una exposición crediticia individual de USD $290,000,000.00 (Doscientos Noventa Millones de Dólares, Moneda de los Estados Unidos de América) constituye una concentración de riesgo extrema conforme a dicho estándar, claramente fuera de las condiciones de mercado y usos bancarios.

**25.** Por si lo anterior fuera poco, AlterBank aceptó las garantías hipotecarias (en segundo lugar) constituidas sobre los títulos de concesión de los que son titulares Televisora del Valle de México, S.A.P.I. de C.V. y Televisión Azteca III, S.A. de C.V. **en segundo lugar**. Esto es, AlterBank aceptó que se le garantizara un crédito que claramente iba a ser incumplido con unas concesiones respecto de las que ya existía un acreedor hipotecario con mejor prelación, circunstancia que resulta contraria a lo que cualquier institución bancaria busca para garantizar el cumplimiento de un crédito del importe del otorgado a TVA.

Lo anterior se acredita con las "Constancias de Inscripción en el Registro Público de Concesiones" que se acompañan al presente como **ANEXO 10.**

La inscripción de las hipotecas en favor de AlterBank constituye un hecho notorio para su Señoría toda vez que las Constancias de Folio se encuentran disponibles en la página oficial de la Comisión Reguladora de Telecomunicaciones y disponibles en

los enlaces: https://sert.ift.org.mx//tarifasVE/upload/files/gravamenes/101772_4758_260616161426.pdf y https://sert.ift.org.mx//tarifasVE/upload/files/gravamenes/101771_3933_260616161219.pdf

Como expone la experta **Renée T. St. Rose KC** en la opinión que se agrega como **ANEXO 3** y su traducción al español por perito certificado como **ANEXO 3 BIS** particularmente, en los párrafos 29 y 30 de dicho documento, mismos que solicito se tengan aquí por reproducidos como si a la letra se insertasen en obvio de repeticiones innecesaria que las garantías hipotecarias son de tal naturaleza que un banco internacional prudente de Clase A autorizado en Santa Lucía no las aceptaría, en el curso ordinario de la práctica bancaria comercial, sin contar con documentación excepcional que respalde la justificación de la operación, la evaluación crediticia, el valor y la exigibilidad de las garantías, así como las aprobaciones internas y regulatorias requeridas. En cualquier caso, e independientemente de la caracterización regulatoria de la exposición, la mitigación del riesgo de crédito que normalmente proporciona una garantía hipotecaria se encuentra, con base en la información disponible, sustancialmente reducida en el presente caso.

Asimismo, como se refiere a lo largo del presente, los principios del BCBS y el Marco de Basilea III, constituyen el referente prudencial internacionalmente reconocido para exposiciones crediticias de esta naturaleza. Bajo dicho estándar, la adhesión del Acreditante a una garantía hipotecaria constituida originalmente en 2020 en favor de un tercero, actualmente, *Numchi Servicios, S.A.P.I. de C.V.*, sin que conste su cobertura económica efectiva, recibe un tratamiento prudencial más conservador y un menor reconocimiento como mitigante de riesgo. Estos elementos son consistentes con la premisa de que las características del Crédito no se apegan a las mejores prácticas internacionales de otorgamiento de crédito aplicables a instituciones de crédito, tal como se expone en la opinión que se acompaña como **ANEXO 9**.

**26.** La contravención a las condiciones de mercado y usos comerciales se vuelve aún más evidente tomando en consideración que a la fecha de celebración del Convenio Modificatorio y de Reexpresión de 06 de marzo de 2026 y de la constitución de las garantías hipotecarias señaladas, TVA **ya había adoptado los actos corporativos para solicitar su declaración en concurso mercantil**, tal como se advierte del Anexo 8 de la Solicitud de Concurso, al que se acompañó la escritura pública número 188,710 de fecha **26 de febrero de 2026**, otorgada ante la fe del licenciado Eduardo Garduño García Villalobos, titular de la Notaría número 135 de la Ciudad de México, actuando en el protocolo de la Notaría número 211 de esta misma Ciudad.

Del contenido de dicha escritura se advierte lo siguiente:

a) TVA publicó la convocatoria a la Asamblea Extraordinaria de Accionistas el 10 de febrero de 2026 en el Sistema Electrónico de la Secretaría de Economía; es decir, **tan sólo 12 días después de la contratación del crédito con AlterBank** con la supuesta finalidad de evitar el incumplimiento a diversos acreedores.

b) En Asamblea Extraordinaria de Accionistas de **26 de febrero de 2026** se aprobó que TVA solicitara su declaración en concurso mercantil.

Es decir, TVA celebró el contrato de crédito y el convenio modificatorio y de reexpresión del crédito **a sabiendas** de que iba a presentar su solicitud de declaración de concurso mercantil, con lo que se pone en evidencia su mala fe respecto a la contratación del crédito que nos ocupa ya que no existía la supuesta inminencia de un procedimiento de ejecución por parte de la autoridad fiscal, ya que conforme al artículo 69 de la Ley de Concursos Mercantiles, la declaración en concurso mercantil tiene como efecto suspender los procedimientos administrativos de ejecución de los créditos fiscales.

La publicación de la convocatoria a que hace referencia en el inciso "a" del presente hecho constituye un hecho notorio para su Señoría por realizarse en el Sistema Electrónico de la Secretaría de Economía.

27. La Solicitud de Concurso fue presentada el día 10 de marzo de 2026, esto es, **12 días después** de la aprobación de que TVA solicitara su declaración en concurso mercantil y tan sólo **4 días** después de que se celebrara el Convenio Modificatorio y de Reexpresión con AlterBank y se constituyeran las garantías hipotecarias por parte de las empresas subordinadas antes referidas, lo que pone en evidencia la irregularidad de las operaciones celebradas entre TVA y AlterBank, así como el trato claramente preferente a este acreedor en particular frente al resto de los acreedores de la Comerciante.

28. En mérito de todo lo expuesto, es evidente que AlterBank otorgó un crédito a TVA en completa contravención a las condiciones de mercado y a los usos comerciales y bancarios, al tener conocimiento de la insolvencia de TVA y al tener conocimiento de que ya contaba con autorización para presentar su solicitud de concurso mercantil con anterioridad a la celebración del Convenio Modificatorio y de Reexpresión (esto, como parte de la información que debe recabar de forma previa a la celebración de actos de esta naturaleza).

29. Por otro lado, la propia constitución de garantías hipotecarias en favor de AlterBank el 06 de marzo de 2026 constituyen en sí mismo un acto en fraude de acreedores, en términos de lo dispuesto por la fracción I del artículo 115 de la Ley de Concursos Mercantiles.

Esto, ya que como se expone en el presente incidente las hipotecas fueron constituidas el 06 de marzo de 2026, **fecha posterior al contrato de crédito celebrado el 29 de enero de 2026.**

Toda vez que mi representada no es parte del contrato mediante el que se otorgó la garantía hipotecaria, solicito a su Señoría requiera al Notario 135 de la Ciudad de México, para que exhiba en el presente incidente la escritura pública número 188,839 de fecha 06 de marzo de 2026, mismo que obre en el protocolo a su cargo, apercibiéndolo con la medida de apremio que estime pertinente su Señoría para el caso de que no lo haga en el término que señale.

En consecuencia, solicito se gire atento oficio al citado Notario para que, en auxilio de la administración de justicia, exhiba el instrumento mencionado o remita copia certificada del mismo para que sea agregada a los autos y valorada en el momento procesal oportuno.

**30.** Ahora bien, no pasa inadvertido que las hipotecas en cita fueron otorgadas por las sociedades Televisora del Valle de México, S.A.P.I. de C.V. y Televisión Azteca III, S.A. de C.V.; sin embargo, TVA es accionista mayoritaria y controladora[9] de dichas sociedades, tal como reconoce en su Solicitud de Concurso. Para pronta referencia, a continuación, la solicitud en su parte conducente:

FERNANDO DEL CASTILLO ELORZA

> <u>**Canales de Televisión Mexicana de TV AZTECA.**</u>
>
> **13.- TV AZTECA actualmente es la accionista mayoritaria de 2 (dos) sociedades concesionarias que operan directamente 180 canales independientes de televisión digital terrestre distribuidos a lo largo del territorio nacional. Estos canales son operados en forma independiente, dentro de los cuales se difunde a través de sus señales diverso contenido atendiendo a la cobertura que cada uno de dichos canales tiene. A dichos canales se les reconoce para efectos de identificación comercial en sus títulos de concesión como Azteca 7, Azteca Uno y adn Noticias.**

Dicho control no es un dato aislado ni irrelevante para el presente incidente: fue precisamente a través de éste que TVA decidió y ejecutó, por conducto de las sociedades garantes, el otorgamiento de las hipotecas a favor de AlterBank, con posterioridad al otorgamiento del crédito y ya aprobado el inicio del presente

---

[9] **Artículo 15.-** …

Para efectos de lo dispuesto en esta Ley, se entenderá que integran un grupo societario las sociedades controladoras y controladas conforme a lo siguiente:

**I.-** Se considerarán sociedades controladoras aquellas que, directa o indirectamente, mantengan la titularidad de derechos que permitan ejercer el voto respecto de más del cincuenta por ciento del capital de otra sociedad, tengan poder decisorio en sus asambleas, estén en posibilidad de nombrar a la mayoría de los miembros del órgano de administración, o que por cualquier otro medio tengan facultades de tomar las decisiones fundamentales de una sociedad…

concurso mercantil. Es decir, TVA utilizó la estructura societaria bajo su control como instrumento para colocar a AlterBank en una posición de ventaja frente al resto de los acreedores, en un momento en que TVA ya conocía y había determinado su propio estado de insolvencia, a sabiendas de que la constitución de dichas hipotecas sí tiene efectos dentro del concurso mercantil en que se actúa, en términos de la jurisprudencia con número de registro digital 2026693, que se cita más adelante.

31. En ese sentido, y con independencia de que se encuentra actualizado el supuesto previsto en la fracción I del artículo 115 de la Ley de Concursos Mercantiles, se hace énfasis en que es claro que TVA impulsó y decidió el otorgamiento de las garantías señaladas al ser el acreditado en el crédito otorgado por AlterBank, beneficiando indebidamente a AlterBank dentro del proceso de concurso mercantil que ya había aprobado iniciar, exhibiendo una vez más su mala fe.

32. Conforme a la jurisprudencia que se invoca a continuación, el acreedor que tenga una garantía hipotecaria constituida en su favor por un tercero que no sea la comerciante sujeta a concurso mercantil conserva su grado de acreedor con garantía real dentro de dicho procedimiento concursal.

**Registro digital:** 2026693
**Instancia:** Plenos Regionales
**Undécima Época**
**Materia(s):** Constitucional, Civil
**Tesis:** PR.C.CS. J/2 C (11a.)
**Fuente:** Gaceta del Semanario Judicial de la Federación. Libro 26, Junio de 2023, Tomo V, página 4959
**Tipo:** Jurisprudencia

**CONCURSOS MERCANTILES. LA GARANTÍA HIPOTECARIA CONSTI TUIDA EN BIENES DE UN TERCERO NO DEUDOR, EN EJERCICIO DE LA LIBERTAD CONTRACTUAL O DE NEGOCIACIÓN ESTABLECIDA EN EL ARTÍCULO 5o. DE LA CONSTITUCIÓN GENERAL, OPERA COMO UN INSTRUMENTO DE NEGOCIACIÓN EN LA ETAPA DE CONCILIACIÓN.**

Hechos: Los Tribunales Colegiados de Circuito contendientes, al analizar si el acreedor con garantía hipotecaria constituida en bienes de un tercero no deudor debe ser reconocido con el carácter de preferente en la sentencia de reconocimiento, graduación y prelación de créditos, arribaron a conclusiones contrarias, pues mientras uno consideró que la prerrogativa que se otorga a los créditos con garantía real no está condicionada al hecho de que el crédito reclamado sea propiedad del comerciante concursado, el otro resolvió que para efecto de considerar a un acreedor con un privilegio especial, deben formar parte de la masa del concurso.

Criterio jurídico: El Pleno Regional en Materia Civil de la Región Centro-Sur, con residencia en Guadalajara, Jalisco establece que es fundamental el reconocimiento de acreedor con garantía real hipotecaria en bienes de un tercero no deudor, en la sentencia de reconocimiento, graduación y prelación de créditos, porque de esa manera se vuelve efectivo el principio constitucional de libertad contractual o de negociación, pues aun cuando no forme parte de la masa concursal, el acreedor reconocido tiene la posibilidad de utilizar la hipoteca como instrumento de negociación.

Justificación: El contrato de hipoteca a favor del acreedor sobre bienes de un tercero no deudor es susceptible de tener un efecto útil en esta otra etapa de

conciliación del concurso mercantil, pues aun cuando no forme parte de la masa concursal, el acreedor reconocido con ese grado de preferencia tiene la posibilidad de utilizar la hipoteca como instrumento de negociación en términos del artículo 89 de la Ley de Concursos Mercantiles, con las ventajas que ello conlleva, en uso de su libertad contractual o de negociación. En efecto, conforme a lo previsto en el artículo 3o. de la Ley de Concursos Mercantiles, el objetivo de la conciliación es lograr la conservación de la empresa del comerciante mediante el convenio que suscriba con sus acreedores reconocidos. En esa etapa y eventual celebración del convenio necesariamente debe respetarse la autonomía de la voluntad, en su vertiente de libertad contractual o de negociación, por tratarse de un acuerdo entre particulares. Lo anterior, porque se trata de un ámbito donde las partes de una relación jurídica son libres para gestionar su propio interés y regular sus relaciones, sin injerencias externas, salvo que se involucren bienes no disponibles. De otra forma, implicaría una intervención injustificada en la libertad de negociación de los participantes en el concurso mercantil.

PLENO REGIONAL EN MATERIA CIVIL DE LA REGIÓN CENTRO-SUR, CON RESIDENCIA EN GUADALAJARA, JALISCO.

Contradicción de criterios 12/2023. Entre los sustentados por los Tribunales Colegiados Segundo y Tercero, ambos en Materia Civil del Tercer Circuito. 13 de abril de 2023. Tres votos de la Magistrada Martha Leticia Muro Arellano, quien formuló voto concurrente y de los Magistrados Héctor Martínez Flores y Cuauhtémoc Cuéllar De Luna. Ponente: Magistrado Cuauhtémoc Cuéllar De Luna. Secretarios: Laura Icazbalceta Vargas, Miguel Mora Pérez y Luis Fernando Castillo Portillo.
Criterios contendientes:
El sustentado por el Segundo Tribunal Colegiado en Materia Civil del Tercer Circuito, al resolver el amparo directo 275/2018, y el diverso sustentado por el Tercer Tribunal Colegiado en Materia Civil del Tercer Circuito, al resolver el amparo directo 573/2021.
Esta tesis se publicó el viernes 16 de junio de 2023 a las 10:22 horas en el Semanario Judicial de la Federación y, por ende, se considera de aplicación obligatoria a partir del lunes 19 de junio de 2023, para los efectos previstos en el punto noveno del Acuerdo General Plenario 1/2021.

FERNANDO DEL CASTILLO ELORZA

Tal como se lee de en la jurisprudencia anterior, la finalidad de respetar el grado del acreedor hipotecario es que el acreedor reconocido con ese grado de preferencia tenga la posibilidad de utilizar la hipoteca como instrumento de negociación en términos del artículo 89 de la Ley de Concursos Mercantiles, cuestión que evidentemente era del conocimiento de TVA, quien impulsó el otorgamiento de dichas garantías con la finalidad de favorecer a AlterBank en perjuicio del resto de los acreedores.

**33.** Ahora, con independencia de la hipótesis prevista en la fracción I del artículo 115 de la LCM, la aceptación de dicha garantía por parte de AlterBank constituye otra condición fuera de mercado –aplicable a la hipótesis prevista en la fracción III del artículo 114 de la LCM–, ya que bajo el marco de Basilea III, las garantías reales reciben un reconocimiento más favorable en la ponderación del riesgo y en la estimación de la Severidad de la Pérdida (LGD) **únicamente cuando constituyen un gravamen de primer grado, directo y suficiente sobre el bien afectado**, circunstancia que **no acontece en el presente caso**, pues AlterBank es acreedor hipotecario en **segundo** lugar respecto a los títulos de concesión de Televisora del Valle de México, S.A.P.I. de C.V. y Televisión Azteca III, S.A. de C.V., tal como se acredita con las Constancias de Inscripción en el Registro Público de Concesiones con número de inscripción 101771 y 101772 que se acompañan al presente como **ANEXO 10,** sin perjuicio de ser un hecho notorio para su Señoría por encontrarse

publicadas en una página oficial. Lo expresado en este párrafo se expone también en la opinión que se acompaña como **ANEXO 9**, solicitando se tenga por reproducido como si a la letra se insertase en obvio de repeticiones innecesarias.

En virtud de lo expuesto en líneas anteriores, las garantías otorgadas se apartan por completo de las sanas prácticas bancarias y las condiciones de mercado para este tipo de operaciones.

**34.** Por todo lo anterior es evidente que el crédito objeto del presente incidente fue contratado en contravención a las condiciones de mercado, debido a la situación de incumplimiento, falta estructural de liquidez e imposibilidad de refinanciamiento ordinario de TV Azteca que exigían demostrar una fuente primaria de pago suficiente, la viabilidad del adeudo agregado, límites de exposición disponibles, reservas y capital congruentes con el riesgo y una garantía con valor residual efectivo para la celebración del crédito con AlterBank.

La garantía hipotecaria no modifica esta conclusión, pues ya estaba vinculada con una obligación anterior y no se cuenta con elementos para determinar su valor de realización ni cobertura residual. En consecuencia, el financiamiento se aparta de estándares aceptables en capacidad de pago, administración de riesgos, diversificación y mitigación que tanto los principios internacionales como la legislación de Santa Lucía exigen para considerar una operación compatible con las sanas prácticas y usos bancarios nacionales e internacionales.

Por el contrario, la existencia de dicha garantía únicamente actualiza otra conducta que la ley concursal presume como fraudulenta (establecida en la fracción I del artículo 115 de la LCM).

**35.** Se concluye que estamos en presencia de un acto celebrado a modo y de manera fraudulenta por TVA para diluir a los acreedores como los que representa BNY en su carácter de *Trustee* y lograr la aprobación de un convenio abusivo como el que propuso en su Solicitud de Concurso. Lo anterior es evidente, pues en la Solicitud de Concurso se lista a AlterBank como acreedor con garantía real y con prelación superior a las Notas, mientras que la propuesta de convenio concursal contempla para los acreedores comunes una quita de hasta 90% (noventa por ciento) del monto reconocido —es decir, el pago de sólo 10%— y permite que los acreedores garantizados, incluyendo AlterBank, recuperen significativamente más, incluso mediante la venta de activos de radiodifusión, como son las concesiones.

**MANIFESTACIÓN BAJO FORMAL PROTESTA DE DECIR VERDAD**

Con fundamento en lo dispuesto por la fracción VI del artículo 3 del Acuerdo 12/2020 del Pleno del Consejo de la Judicatura Federal, ***manifiesto bajo formal protesta de decir verdad*** que los documentos que se acompañan al presente escrito son una copia fiel y exacta en archivo electrónico en formato PDF de los documentos originales que obran en poder de la Quejosa, disponibles en el domicilio procesal señalado en el capítulo correspondiente y que se encuentran a disposición de ese H. Juzgado de Distrito en caso de así requerirse por dicha autoridad jurisdiccional.

## VALORACIÓN INTEGRAL DE LA DEMANDA

Invoco en favor de mi representada el criterio **jurisprudencial** que a continuación se transcribe, conforme al que la demanda es un acto jurídico susceptible de interpretación integral a la luz de los documentos que a ella se acompañan. Es decir, para la resolución del presente incidente deberán valorarse los documentos que se acompañan, independientemente de su ofrecimiento como pruebas en el siguiente capítulo, sin que mi representada se encuentre obligada a transcribirlos.

Registro digital: 178475
Instancia: Tribunales Colegiados de Circuito
Novena Época
Materia(s): Civil
Tesis: XVII.2o.C.T. J/6
Fuente: Semanario Judicial de la Federación y su Gaceta.
Tomo XXI, Mayo de 2005, página 1265
Tipo: Jurisprudencia

FERNANDO DEL CASTILLO ELORZA

**DEMANDA EN EL JUICIO NATURAL. EL ESTUDIO INTEGRAL DEBE COMPRENDER LOS DOCUMENTOS ANEXOS.**

En virtud de que la demanda constituye un todo, su interpretación debe ser integral, de manera que si de su contenido se advierte que se expusieron los motivos esenciales de la causa de pedir, y en relación con ellos se hace cita de **los documentos fundatorios de la acción así como de los relacionados con el litigio, exhibiéndolos, debe considerarse que forman parte de la demanda y su contenido, integrado a ella; pues estimar lo contrario implicaría que en la demanda respectiva se tuvieran que reproducir íntegramente todas aquellas cuestiones contenidas en esos medios de convicción, lo cual resultaría tan complejo como innecesario,** pues para el juzgador el estudio de la demanda no se limita al escrito inicial, sino que comprende además el análisis de los documentos que la acompañan, porque son parte integrante de ella. De no ser así, se podría incurrir en rigorismos tales como el tener que reproducir en el escrito inicial de demanda, tanto los documentos base de la acción como los que se relacionen con el litigio.

SEGUNDO TRIBUNAL COLEGIADO EN MATERIAS CIVIL Y DE TRABAJO DEL DÉCIMO SÉPTIMO CIRCUITO.
Amparo directo 178/2002. Ernesto Rodríguez Padilla y otra. 12 de abril de 2002. Unanimidad de votos. Ponente: José de Jesús González Ruiz. Secretario: Rogerio Ariel Rojas Novelo.
Amparo directo 310/2003. GMAC Mexicana, S.A. de C.V., S.F. de O.L.F., antes denominada ABA-Motriz Financiamiento, S.A. de C.V., S.F. de O.L., Ábaco Grupo Financiero. 29 de agosto de 2003. Unanimidad de votos. Ponente: José Martín Hernández Simental. Secretaria: Margarita de Jesús García Ugalde.
Amparo directo 504/2004. Jaime Arturo Buendía Jiménez. 30 de septiembre de 2004. Unanimidad de votos. Ponente: Salvador Murguía Munguía. Secretario: Abel Ascencio López.
Amparo directo 66/2005. Luis Manuel Romo Quevedo y otra. 18 de febrero de 2005. Unanimidad de votos. Ponente: Salvador Murguía Munguía. Secretario: José Julio Rojas Vieyra.
Amparo directo 151/2005. Instituto de Seguridad y Servicios Sociales de los Trabajadores del Estado. 18 de marzo de 2005. Unanimidad de votos. Ponente: José de Jesús González Ruiz. Secretario: Abel Ascencio López.
Nota: Por ejecutoria del 20 de junio de 2018, la Primera Sala declaró inexistente la contradicción de tesis 404/2017 derivada de la denuncia de la que fue objeto el criterio contenido en esta tesis, al estimarse que no son discrepantes los criterios materia de la denuncia respectiva.

(El énfasis es propio).

**PRUEBAS**

1. **DOCUMENTAL PÚBLICA.-** Consistente en el primer testimonio del instrumento público número 70,138 de fecha 10 de agosto de 2026, otorgada ante la fe del licenciado Luis Eduardo Paredes Sánchez, titular de la notaría número 180 de la Ciudad de México, misma que se agrega de forma digitalizada al presente como **ANEXO 1**.

Con este documento se acredita la personalidad con la que comparece el suscrito, el C. Fernando del Castillo Elorza, como apoderado legal de THE BANK OF NEW YORK MELLON en su carácter de Fiduciario.

Esta prueba se relaciona con los hechos "1" a "35" del presente incidente.

2. **DOCUMENTAL PÚBLICA.-** Consistente en la orden de fecha 03 de junio de 2026 dictada por el juez José E. Martinez, Juez de Distrito de los Estados Unidos para el Distrito Sur de Florida, División de Miami, en el Caso No. 26-23885-MC-MARTINEZ, por la que admitió la solicitud presentada por mi representada THE BANK OF NEW YORK MELLON, para iniciar un proceso conforme a la Sección 1782 del Título 28 del Código de los Estados Unidos (28 U.S.C. Sección 1782), documental debidamente apostillada, acompañada de su traducción al español por perito certificado del Consejo de la Judicatura Federal, que se agrega como **ANEXO 11** y **ANEXO 11 BIS**, respectivamente.

La legislación de los Estados Unidos permite que un tribunal estadounidense ordene la obtención de pruebas (Discovery) de una entidad que "resida o sea encontrada" en los Estados Unidos para su utilización en un procedimiento extranjero o internacional. Conforme al proceso previsto en la Sección 1782 del Título 28 del Código de los Estados Unidos, el tribunal de distrito en el que una persona resida o sea encontrada podrá ordenarle que rinda testimonio o declaración, o que produzca un documento u otro objeto para su uso en un procedimiento extranjero o internacional.

La Suprema Corte de los Estados Unidos ha explicado que la Sección 1782 es el resultado de los esfuerzos del Congreso estadounidense, a lo largo de 150 años, para proporcionar asistencia de los tribunales federales en la obtención de pruebas destinadas a ser utilizadas en tribunales extranjeros.

El 02 de junio de 2026, el THE BANK OF NEW YORK MELLON, en su carácter de Fiduciario, presentó una solicitud en términos de la Sección 1782, ante el Tribunal de Distrito de los Estados Unidos para el Distrito Sur de Florida, División de Miami (*Tribunal de Florida*), con el fin de obtener pruebas de AlterBank Limited, de sus directivos y funcionarios, quienes fueron ubicados en Florida, Estados Unidos. Lo anterior, buscando

obtener información relacionada con el préstamo por USD 290,000,000.00 (Doscientos noventa millones de dólares de los Estados Unidos de América) otorgado por AlterBank Limited a TV Azteca S.A.B de C.V. el 29 de enero de 2026.

Como se demuestra con la documental pública exhibida, el 03 de junio de 2026, el Tribunal de Florida admitió la solicitud de BNY y autorizó la notificación de citatorios dirigidos a AlterBank Limited y, a seis de sus funcionarios y directores.

Derivado de lo anterior, el proceso de *Discovery* se encuentra actualmente en curso y BNY llevó a cabo las notificaciones correspondientes, **por lo que se siguen obteniendo pruebas documentales, testimoniales y otro tipo de evidencia que, una vez que sea producida, se ofrecerá ante su Señoría a efecto de que se admita y sea valorada conforme a los estándares del proceso en el que se actúa**.

*Manifestando bajo formal protesta de decir verdad* que mi representada se ve imposibilitada para precisar qué documentos se obtendrán dentro del procedimiento mencionado, por lo que, se reserva su derecho a ofrecerlos como prueba en el momento procesal oportuno, una vez que tenga conocimiento de los mismos.

Con esta prueba se acredita que inició un proceso de *Discovery* en Estados Unidos con motivo de los hechos que dieron lugar a la acción de fraude que se promueve en esta vía, mismo que se encuentra en trámite y cuyo objeto es auxiliar a la administración de justicia, abonando al acervo probatorio del proceso que se ventila ante su Señoría, para que, en el momento procesal oportuno, este Juzgado resuelva como procedentes las prestaciones reclamadas por mi representada.

FERNANDO DEL CASTILLO ELORZA
14-02-27 16:09:27

Esta prueba se relaciona con los hechos "1" al "35" del presente incidente.

**3. DOCUMENTAL PÚBLICA.-** Consistente en la orden de fecha 24 de junio de 2026 dictada por el juez José E. Martinez, Juez de Distrito de los Estados Unidos para el Distrito Sur de Florida, División de Miami en el Caso No. 26-23885-MC-MARTINEZ, por el que determinó los plazos en los que AlterBank Limitited y Blas Santander (funcionario de AlterBank) deben presentar sus respuestas conforme a las reglas de ese proceso de la Sección 1782, documental debidamente apostillada, acompañada de su traducción al español por perito certificado del Consejo de la Judicatura Federal, que se agrega como **ANEXO 12** y **ANEXO 12 BIS**, respectivamente.

Con esta prueba se acredita que el proceso de *Discovery* se encuentra en trámite y que, derivado de que los plazos apenas transcurrieron en el mes de agosto de 2026, se producirán nuevas pruebas documentales, testimoniales y otro tipo de evidencia relacionadas con el préstamo por USD 290,000,000.00 (Doscientos noventa millones de dólares de los Estados Unidos de América) otorgado por AlterBank Limited a TV Azteca S.A.B de C.V. el

29 de enero de 2026, mismas que se ofrecerán en el momento procesal oportuno para que sean valoradas por su Señoría.

*Manifestando bajo formal protesta de decir verdad* que mi representada se ve imposibilitada para precisar qué documentos se obtendrán dentro del procedimiento mencionado, por lo que, se reserva su derecho a ofrecerlos como prueba en el momento procesal oportuno, una vez que tenga conocimiento de los mismos.

Con esta prueba se acredita que inició un proceso de *Discovery* en Estados Unidos con motivo de los hechos que dieron lugar a la acción que se promueve en esta vía, mismo que se encuentra en trámite y cuyo objeto es auxiliar a la administración de justicia, abonando al acervo probatorio del proceso que se ventila ante su Señoría, para que, en el momento procesal oportuno, este Juzgado resuelva como procedentes las prestaciones reclamadas por mi representada.

Esta prueba se relaciona con los hechos "1" a "35" del presente incidente.

4. **DOCUMENTAL.-** Consistente en el documento obtenido dentro del *Discovery* regulado en la Sección 1782 del Título 28 del Código de Estados Unidos, No. 26-23885-MC- MARTINEZ, ante el Juez de Distrito de los Estados Unidos para el Distrito Sur de Florida, División de Miami, producido por el señor Juan Francisco Ramirez, ex funcionario de Alter Bank Limited, mismo que se acompañan con su debida traducción al español por perito certificado del Consejo de la Judicatura Federal, como **ANEXO 2** y **ANEXO 2 BIS**, respectivamente.

Con esta prueba se acredita, entre otras cosas: ***(i)*** el modelo de negocio de Alter Bank Limited proyectado para los años 2024 a 2028; ***(ii)*** el proceso de obtención del capital regulatorio requerido para obtener la licencia para operar como banco internacional en Santa Lucía en el año 2024; ***(iii)*** la obtención de la licencia para operar como banco Clase A conforme a la ley vigente en Santa Lucía; ***(iv)*** las acciones iniciadas por Juan Ramirez en contra de Alter Bank Limited; ***(v)*** los estados financieros no auditados de Alter Bank Limited al 31 de Marzo de 2024 que denotan activos por únicamente USD 2.3 millones de dólares; ***(vi)*** correo de 1 de junio de 2023, con el asunto "Minuta Reunión Accionistas 31 de mayo de 2023", de la que se desprende la nueva base accionaria de AlterBank Limited, en la que el señor Tomas Hernández (nacionalidad en El Salvador) y Blas Santander (nacionalidad en Estados Unidos) son dueños de un porcentaje del banco.

Esta prueba se relaciona con los hechos "1" a "35" del incidente.

5. **DOCUMENTAL.-** Consistente en la declaración de José Romero Esclusa, Director General de AlterBank de fecha 14 de julio de 2026, residente en Panamá, declaración rendida en el caso Caso No. 26-23885-MC-MARTINEZ de *Discovery* en

Florida, Estados Unidos, que se agrega a la presente como **ANEXO 7** y su traducción al español por perito certificado autorizado por el Consejo de la Judicatura Federal como **ANEXO 7 BIS.**

Con la prueba de mérito se acredita que Blas Santander (residente en Miami, Florida) renunció el **31 de marzo de 2026**; Timothy Richards (residente en Miami, Florida) renunció el **26 de junio de 2026**; y Alexander Soroka (residente en Miami, Florida) renunció el **17 de junio de 2026**. Todos ellos miembros del Consejo de Administración, que presentaron sus renuncias coincidentemente en fechas posteriores al *Discovery* que se había iniciado en Miami, Florida, Estados Unidos, lugar donde residían y podían ser cuestionados con relación al crédito otorgado a TVA.

La prueba es pertinente para lo anterior, toda vez que en dicha declaración consta literalmente la información mencionada.

Esta prueba se relaciona con los hechos "1" al "35" del incidente.

**6.** **DOCUMENTAL.-** Consistente en el registro corporativo de Alter Bank Limited en el Registro de Sociedades Comerciales Internacionales de Santa Lucía al 28 de enero de 2026, con su debida traducción al español por perito certificado del Consejo de la Judicatura Federal, que se acompaña como **ANEXO 6** y **ANEXO 6 BIS**, respectivamente, obtenida con relación al proceso de *Discovery* No. 26-23885-MC- MARTINEZ.

FERNANDO DEL CASTILLO FLORZA
[illegible]
14-02-27 16:02:27

Con esta prueba se acredita, entre otras cosas: ***(i)*** el registro corporativo de Alter Bank Limited No. 2007-00022; ***(ii)*** la fecha de incorporación de Alter Bank Limited el 23 de enero de 2007 antes *StateTrust Bank & Trust Limited*; ***(iii)*** la titularidad del venezolano Augusto César Castillo Chávez como titular del 100% de las acciones de Alter Bank Limited; ***(iv)*** los miembros del Consejo de Administración a la fecha de celebración del contrato de crédito con TVA; ***(v)*** la toma de decisiones de Alter Bank a la fecha de celebración del contrato de crédito con TVA se encontraba principalmente en Florida y México.

Esta prueba se relaciona con los hechos "1" al "35" del incidente.

**7.** **DOCUMENTAL.-** Consistente en la opinión emitida por la licenciada en derecho **Renée T. St. Rose KC**, quien es experta en la materia mercantil, bancaria y financiera, conforme a la legislación de Santa Lucía y del Caribe Oriental –tal como se acredita con sus credenciales consistentes en ***(i)*** Carta Patente de fecha 02 de abril de 2025, emitida por el Secretario Privado del Gobernador General de Santa Lucía debidamente apostillada (misma que se acompaña dentro del **ANEXO 3**); ***(ii)*** el Certificado para el Ejercicio Profesional emitido por el Titular del Registro de la Alta Corte de Justicia en el Estado de Santa Lucía de fecha 30 de diciembre de 2025, debidamente apostillado (mismo que se acompaña dentro del **ANEXO 3**) y ***(iii)*** su currículum vitae (mismo que se acompaña

dentro del **ANEXO 3**), todos ellos traducidos al español por perito traductor certificado autorizado por el Consejo de la Judicatura Federal (traducciones que se acompañan como parte del **ANEXO 3 BIS**).

Dicha opinión se acompaña al presente como **ANEXO 3** con su su traducción al español por perito certificado del Consejo de la Judicatura Federal como **ANEXO 3 BIS**.

Con la prueba en cita se acredita que el crédito otorgado por Alter Bank Limited se encuentra fuera de las condiciones ordinarias de mercado aplicables en Santa Lucía, considerando el marco regulatorio vigente y aplicable en dicha jurisdicción, las prácticas comúnmente observadas en operaciones de esta naturaleza y, en términos generales, el propio modelo de negocio de Alter Bank Limited.

La prueba de referencia es idónea para acreditar lo anterior, toda vez que el derecho extranjero es materia de prueba y su interpretación puede ser válidamente establecida por un profesionista del derecho de la jurisdicción de que se trate, en este caso, Santa Lucía.

Esta prueba se relaciona con los hechos "1" al "35" del presente incidente.

**8.** **DOCUMENTAL.-** Consistente en la opinión emitida por los licenciados en derecho **Mauricio Basila Lago** y **Paul Yamil José Aguilar**, quienes son expertos en la materia bancaria y derecho financiero, misma que se agrega como **ANEXO 9**. Sus credenciales se acreditan con sus cédulas profesionales emitida por Dirección General de Profesiones a cargo de la Secretaría de Educación Pública que se acompañan como **ANEXO 9 BIS**.

Con la prueba en cita se acredita que el crédito otorgado por Alter Bank Limited se encuentra fuera de las condiciones ordinarias de mercado aplicables conforme al marco regulatorio internacional que establece las condiciones estándar de mercado para este tipo de operaciones, las prácticas comúnmente observadas en operaciones de esta naturaleza y, en términos generales, el propio modelo de negocio de Alter Bank Limited.

La prueba de referencia es idónea para acreditar lo anterior, toda vez que quienes suscriben la misma son expertos en materia bancaria.

Esta prueba se relaciona con los hechos "1" al "35" del presente incidente.

**9.** **DOCUMENTAL.-** Consistente en el comunicado de prensa realizado el **10** **e mayo de 2023** por la propia TVA en su página de internet informando "*que el día de hoy l Juzgado Sexagésimo Tercero de lo Civil de la Ciudad de México ordenó a la empresa no resentar al público información relativa a su situación financiera, lo anterior con el fin de causar incertidumbre*". Lo anterior se acredita con la publicación que se acompaña al

presente como **ANEXO 4** y se encuentra disponible en el enlace: https://www.irtvazteca.com/es/comunicados-de-prensa.

Con dicha prueba se acredita que TVA ocultaba su información financiera e incluso se decretaron medidas judiciales para ello, con lo que se acredita la opacidad sobre dicha situación, que era indispensable para que cualquier institución de crédito o institución bancaria le otorgara un crédito, más aún un crédito del importe del otorgado por AlterBank.

La prueba en cita es idónea, toda vez que es información pública emitida y publicada por la propia TVA en la que reconoce que no hacía pública su información financiera, pese a tener la obligación legal de hacerlo por ser una empresa que cotizaba en la Bolsa Mexicana de Valores.

Esta prueba se relaciona con los hechos "1" al "35" del presente incidente.

**10. DOCUMENTAL.-** Consistente en el comunicado de fecha 26 de febrero de 2026 en el que Grupo Salinas informó los acuerdos alcanzados en la Asamblea General Extraordinaria de Accionistas de TVA de fecha 26 de febrero de 2026, en la que fue aprobada la reorganización corporativa, operativa y financiera de la compañía y sus empresas subsidiarias mediante un concurso mercantil voluntario, cuya solicitud se presentaría en los próximos días, lo anterior en virtud de que manifestaron que desde el año 2018 enfrentaron retos financieros y que desde el año 2021 se inició un proceso para reorganizar sus compromisos financieros **incluida su deuda en moneda extranjera**. El comunicado se acompaña al presente como **ANEXO 5**, sin perjuicio de que es un hecho notorio para su Señoría por encontrarse publicado en la página de internet de Grupo Salinas https://www.gruposalinas.com/noticias/notas/comienza-tv-azteca-proceso-reorganizacion/

Con dicha prueba se acredita que TVA reconoció enfrentar dificultades económicas desde 2018 y 2021, así como haber aprobado presentar su solicitud de concurso mercantil el 26 de febrero de 2026, circunstancias que hacen evidente que el crédito objeto del presente incidente se otorgó fuera de las condiciones de mercado y en contravención a las sanas prácticas y usos bancarios y comerciales.

La prueba en cita es idónea, toda vez que es información pública emitida y publicada por la propia TVA en la que reconoce que su emproblemada situación financiera desde 2018 y 2021, así como la aprobación para solicitar su declaración en concurso mercantil menos de un mes después de haber contratado el crédito objeto del presente incidente.

Esta prueba se relaciona con los hechos "1" al "35" del presente incidente.

**11. DOCUMENTAL.-** Consistente en la nota periodística de fecha 22 de julio de 2025 publicada en el **Periódico Reforma**, que se acompaña como **ANEXO 8**, misma que

puede consultarse en el enlace https://www.reforma.com/aprietan-a-tv-azteca-acreedores-en-ny/ar3042710.

Con esta prueba se acredita que TV Azteca, S.A.B. de C.V. se encontraba en una situación de deterioro económico desde el año 2025, es decir, con anterioridad a la celebración del contrato de crédito con Alter Bank Limited.

Esta prueba constituye un hecho notorio para su Señoría en términos de la Jurisprudencia de rubro *PÁGINAS WEB O ELECTRÓNICAS. SU CONTENIDO ES UN HECHO NOTORIO Y SUSCEPTIBLE DE SER VALORADO EN UNA DECISIÓN JUDICIAL* citada al pie de página. [10]

Esta prueba se relaciona con los hechos "1" al "35" del presente incidente.

**12. DOCUMENTAL.-** Consistente en la nota periodística de fecha 31 de diciembre de 2025 que se acompaña como **ANEXO 8**, publicada por el periódico **Proceso** disponible en el enlace: https://www.proceso.com.mx/nacional/justicia/2025/12/31/tribunales-acorralan-tv-azteca-grupo-elektra-de-ricardo-salinas-pliego-363593.html.

Con esta prueba se acredita que TV Azteca, S.A.B. de C.V. se encontraba en una situación de deterioro económico desde el año 2025, es decir, con anterioridad a la celebración del contrato de crédito con Alter Bank Limited.

---

[10] Registro digital: 2030262 Instancia: Tribunales Colegiados de Circuito Undécima Época Materias(s): Civil, Común Tesis: I.3o.C. J/8 K (11a.) Fuente: Gaceta del Semanario Judicial de la Federación. Libro 48, Abril de 2025, Tomo II, Volumen 2, página 882 Tipo: Jurisprudencia **PÁGINAS WEB O ELECTRÓNICAS. SU CONTENIDO ES UN HECHO NOTORIO Y SUSCEPTIBLE DE SER VALORADO EN UNA DECISIÓN JUDICIAL.** Hechos: El inconforme alega que la notificación personal, consistente en el emplazamiento de la parte demandada en el juicio de origen, no se entendió con ninguna de las personas previstas en el artículo 116 del Código de Procedimientos Civiles para el Distrito Federal, aplicable para la Ciudad de México, es decir, con el interesado, representante, mandatario, procurador o autorizado en autos, pues se realizó en un domicilio diverso al de la administración de la empresa demandada, que coincide con una de las sucursales que aparecen publicadas en la página electrónica de ésta. Criterio jurídico: Este Tribunal Colegiado de Circuito determina que el contenido de las páginas web o electrónicas es un hecho notorio y susceptible de ser valorado en una decisión judicial. Justificación: Lo anterior, porque los datos publicados en documentos o páginas situados en redes informáticas constituyen un hecho notorio por formar parte del conocimiento público a través de esos medios al momento en que se dicta una resolución judicial, de conformidad con el artículo 88 del Código Federal de Procedimientos Civiles. Ahora bien, el acceso al uso de Internet para buscar información sobre la existencia de personas morales, establecimientos mercantiles, domicilios y en general cualquier dato publicado en redes informáticas, forma parte de la cultura normal de sectores específicos de la sociedad dependiendo del tipo de información de que se trate; de ahí que si bien no es posible afirmar que esa información se encuentra al alcance de todos los sectores de la sociedad, lo cierto es que sí es posible determinar si por el tipo de datos un hecho forma parte de la cultura normal de un sector de la sociedad y pueda ser considerado como notorio por el juzgador y, consecuentemente, valorado en una decisión judicial, por tratarse de un dato u opinión común indiscutible, no por el número de personas que conocen ese hecho, sino por la notoriedad, accesibilidad, aceptación e imparcialidad de este conocimiento. TERCER TRIBUNAL COLEGIADO EN MATERIA CIVIL DEL PRIMER CIRCUITO. Amparo en revisión 365/2012. 7 de diciembre de 2012. Unanimidad de votos. Ponente: Neófito López Ramos. Secretaria: Ana Lilia Osorno Arroyo. Amparo directo 383/2020. 5 de noviembre de 2020. Unanimidad de votos. Ponente: Sofía Verónica Ávalos Díaz. Secretario: Víctor Hugo Solano Vera. Recurso de reclamación 31/2021. 29 de septiembre de 2021. Unanimidad de votos. Ponente: Sofía Verónica Ávalos Díaz. Secretario: José Manuel Martínez Villicaña. Amparo directo 358/2021. 27 de octubre de 2021. Unanimidad de votos. Ponente: Sofía Verónica Ávalos Díaz. Secretario: Saulo García Morán. Amparo directo 647/2021. 2 de febrero de 2022. Unanimidad de votos. Ponente: Víctor Francisco Mota Cienfuegos. Secretario: José Francisco Díaz Estúa Avelino. Nota: Por ejecutoria del 13 de octubre de 2021, la Segunda Sala de la Suprema Corte de Justicia de la Nación declaró inexistente la contradicción de tesis 159/2021, derivada de la denuncia de la que fue objeto el criterio sustentado en el amparo en revisión 365/2012 que forma parte de los precedentes de esta tesis, en virtud de que "los tribunales colegiados tomaron distintos elementos que en cada caso valoraron para determinar si se trataba de un hecho notorio o no, y tal circunstancia impide tener un mismo punto de partida para llegar a una conclusión."

Esta tesis se publicó el viernes 11 de abril de 2025 a las 10:15 horas en el Semanario Judicial de la Federación y, por ende, se considera de aplicación obligatoria a partir del lunes 14 de abril de 2025, para los efectos previstos en el punto noveno del Acuerdo General Plenario 1/2021.

# Translation by DeepL.com

FIRST CIVIL COURT FOR INSOLVENCY PROCEEDINGS COMMERCIAL 111
AUG 18, 2026, 9:30 AM

WITH RESIDENCE IN MEXICO CITY AND WITH JURISDICTION THROUGHOUT THE REPUBLIC

**BUSINESS ENTITY: TV AZTECA, S.A.B. DE C.V.**

34 an(x0'

**COMMERCIAL BANKRUPTCY PROCEEDINGS.**

011058

**CASE NO.: 22/2026**

**MOTION TO DECLARE ACTS IN CREDITOR FRAUD**

**HONORABLE FIRST DISTRICT JUDGE FOR COMMERCIAL BANKRUPTCY MATTERS, RESIDING IN MEXICO CITY AND HAVING JURISDICTION THROUGHOUT THE MEXICAN REPUBLIC.**

**FERNANDO DEL CASTILLO ELORZA**, in my capacity as general attorney-in-fact for litigation and collections for **THE BANK OF NEW YORK MELLON** in its capacity as **Trustee** (hereinafter, "BNY" or the "Trustee," interchangeably), a capacity which I attest to and request be recognized in accordance with the first certification of public instrument No. 70,138 dated August 10, 2026, executed before the notary public Luis Eduardo Paredes Sánchez, head of Notary Public Office No. 180 in Mexico City, which is attached hereto in digitized form as **EXHIBIT 1**, and which **I hereby declare, under solemn oath, to be** a **true** and complete copy of the original. I respectfully appear before you and state the following:

**AUTHORIZATION TO ACCESS THE ELECTRONIC CASE FILE**

Pursuant to the provisions of Articles 33, 35, and 36 of General Agreement 12/2020 of the Plenary Session of the Federal Judiciary Council (hereinafter, **Agreement 12/2020**"), I request authorization to access the electronic case file created in connection with this matter, as well as to receive electronic notifications, via the **"AnaElizalde"** Online Services Portal of the Federal Judiciary, assigned to **ANA LAURA ELIZALDE LEÓN**, Esq. (Professional License No. 4455257), whose email address is aelizalde@dc-ca.mx.

**AUTHORIZED PERSONS**

I hereby authorize, in accordance with the broad terms of the third paragraph of Article 1069 of the Commercial Code—which applies on a supplementary basis to the Commercial Bankruptcy Law—the following individuals holding law degrees: **ANA LAURA ELIZALDE LEÓN** (Professional License No. 4455257), **GABRIELA GUADALUPE MEZA DÍAZ DE LEÓN** (Professional License No. 3720580), **ALEJANDRA REA ANAYA** (Professional License No. 12051950), and **MARICRUZ CERVERA MEDINA** (Professional License No. 12550854), collectively, who are hereby authorized in broad terms under said legal provision, solely to hear and receive notifications, as well

as to collect all types of documents and securities, review the case file, and take photographs of the evidence in the file from Ms. **ROCÍO RIVERA ROJAS,** Ms. **LIZZET JHOANA RAMÍREZ CERVANTES,** Ms. **JULIA LOZA HERRERA**, and **Mr. RODRIGO ARTURO LUNA GONZÁLEZ**.

**MOTION TO DECLARE ACTS IN FRAUD OF CREDITORS INEFFECTIVE**

Pursuant to the provisions of Articles 112, 113, 114, 267, and other relevant and applicable provisions of the Commercial Bankruptcy Law (hereinafter, the "LCM"), I hereby file, on behalf of my client, this **MOTION TO DECLARE ACTS INEFFECTIVE DUE TO FRAUD AGAINST CREDITORS** against:

A. TV AZTECA, S.A.B. DE C.V. (hereinafter, the "Merchant" or "TVA, " interchangeably), whose address for service is **32 Manuel Ávila Camacho Boulevard, 11th floor, Lomas de Chapultepec neighborhood, Miguel Hidalgo Municipality, ZIP Code 11000, Mexico City.**

**This motion seeks the following:**

**REMEDIES**

FERNANDO DEL CASTILLO FLORZA
JUDICIAL JURISDICTION 37834-2431-2-16
1-402-27 16-07-27

A. A declaration that ~~the~~ credit ~~agreement~~ dated January 29, 2026, entered into between **Alter Bank, LTD** (hereinafter**"AlterBank"**), acting as structuring agent, initial lender, administrative agent, and collateral agent, and TVA as borrower, as well as its amendment and restatement agreement dated March 6, 2026, ~~is void~~.

**B.** Consequently, the invalidity of said credit against the estate and the remaining recognized creditors (as determined in the judgment recognizing, ranking, and prioritizing claims).

**C.** A declaration that, as a result of the ineffectiveness of said claim against the estate, AlterBank cannot be recognized as a creditor in these bankruptcy proceedings nor can it sign the proposed bankruptcy agreement that may be submitted.

**D.** The expenses and costs arising from this motion.

**STANDING OF BNY AS TRUSTEE AND RIGHTS OF THE HOLDERS**

**BNY acts as Trustee pursuant to the Indemnity Agreement dated August 9, 2017, entered into between TVA, the guarantor subsidiaries, and BNY, with respect to the 8.250% Senior Notes due 2024.**

**BNY acts on behalf of and for the benefit of the holders of the beneficial interests represented by the Global Note.**

Pursuant to the Bond Indemnity Agreement, BNY has the right and duty to enforce the obligations of TVA and the guarantor subsidiaries, including the filing and pursuit of claims in insolvency proceedings, such as the present bankruptcy proceeding.

**RESERVATION OF RIGHTS**

It is hereby stated to Your Honor that this motion is filed based on the information contained in the Petition for a Declaration of Commercial Insolvency and the other forms accompanying it, filed by TVA on March 10, 2026, with the Joint Clerk's Office of the District Courts for Commercial Insolvency Proceedings, located in Mexico City and having jurisdiction throughout the Mexican Republic (hereinafter, the "Petition for Commercial Insolvency").

Furthermore, this motion is filed based on publicly available information in the various media outlets cited throughout the motion; **however, it is hereby stated under oath that my client has had neither access to nor knowledge of the exact content of the Credit Agreement and its Amendment and Restatement Agreement, as my client was not a party to those agreements.**

Finally, since my client is participating in the commercial bankruptcy proceedings through this motion, **I reserve the right on her behalf to expand the scope of this motion** if, upon review of the case file, elements are identified that could be relevant to the motion being filed.

**SPECIAL CHAPTER ON ACTIONS TO DECLARE ACTS COMMITTED IN FRAUD AGAINST CREDITORS INCOMEFECTIVE IN COMMERCIAL BANKRUPTCY PROCEEDINGS**

**1. Retroactive Period**

Pursuant to the provisions of Article 112 of the Commercial Bankruptcy Law (hereinafter, the "LCM"), the retroactive date is the 270th calendar day immediately preceding the date of the judgment declaring commercial bankruptcy.

In the commercial insolvency proceeding at hand, the **Retroactive Date is October 9, 2025**, as determined in the judgment declaring commercial insolvency dated July 6, 2026, issued by Your Honor.

It is well-established law that the retroactive date is understood as the point in time at which it is deemed that **a general default on payments already existed** in **the debtor's financial condition** (a non-transitory state of financial insolvency that prevents the debtor from regularly fulfilling its liquid and due obligations through genuine resources); therefore, **retroactivity is justified by the discrepancy between the time when the widespread failure to meet obligations begins—which is a prerequisite for the declaration of bankruptcy—and the time of its judicial declaration, a period during which there is a presumption that the acts performed by the debtor were carried out to the detriment of the creditors;** and, hence, the retroactive effect of the insolvency judgment is applied in order to eliminate the harmful consequences that such acts might have caused.

**Our highest courts have ruled in this regard:**

Digital Record: 166207
Level: Collegiate Circuit Courts
Ninth Era
Subject(s): Civil
Precedent: VI.1o.C.132 C
Source: Federal Judicial Weekly and its Gazette. Volume XXX, October 2009, page 1413
Type: Isolated

**COMMERCIAL BANKRUPTCY. THE CONCEPT OF RETROACTION AND ITS CONSEQUENCES.**

From a contextual interpretation of the Commercial Bankruptcy Law, it follows that retroactive effect is understood as the point in time at which it is deemed that, in the financial condition of the bankrupt party, there was already widespread default on payments (a non-transitory state of financial insolvency that prevents the debtor from regularly fulfilling its liquid and enforceable obligations through genuine resources), therefore, retroactivity is justified by the discrepancy between the time when the widespread failure to meet obligations begins—which is a prerequisite for the declaration of commercial insolvency—and the time of its judicial declaration, a period during which the presumption applies that the acts performed by the debtor were carried out to the detriment of the creditors; hence, the retroactive effect of the insolvency judgment is applied in order to eliminate any harmful consequences that such acts might have caused; that is, retroactivity is the period decreed by the judge, through which the legal state of widespread default on obligations is intended to coincide with the de facto state of widespread default on obligations, thereby enabling the declaration of the invalidity of all transactions or acts carried out by the business owner during that period, to which the effects of the judicial declaration are retroactively applied.

FIRST COLLEGIATE COURT FOR CIVIL MATTERS OF THE SIXTH CIRCUIT.
**Amparo Appeal 105/2009. ***********. July 2, 2009. Majority opinion. Dissenting opinion: Enrique Zayas Roldán. Reporting Judge: Rosa María Temblador Vidrio. Clerk: Ciro Carrera Santiago.**

**2. Acts Constituting Fraud Against Creditors**

FRIGNANTO DPL CASTELLO PIORZA
26100 (VC) 134820+09032003513 73K303431243K
1482-27 02/16/27

Article 114 of the Commercial Code (LCM) establishes an **objective** list (i.e., independent of the parties' intent) of acts that constitute fraud against creditors. Section III of this article identifies as such any transactions entered into by the merchant in which **conditions or terms** have been agreed upon **that deviate significantly from the prevailing market conditions** at the time **the transaction** was entered into, as of the date of their execution, or from commercial customs or practices. In this case, the Credit Agreement and its Amendment and Restatement Agreement meet this criterion, as they document a secured loan of up to US$290,000,000.00 granted to a company that was clearly insolvent by an institution with no history of granting loans to TVA or financing of comparable size, under terms that even jeopardized AlterBank's own viability, as set forth herein.

**The following is the cited article:**

***Article 114.***— *The following acts constitute acts in fraud of creditors, provided they were carried out on or after the retroactive date:*

***III. Transactions entered into by the merchant in which conditions or terms were agreed upon that deviate significantly from the prevailing market conditions at the time the transaction was entered into, or from commercial customs or practices.***

**3. Acts Presumed to Be Committed in Fraud of Creditors**

The Commercial Insolvency Act establishes a legal presumption that the granting of security interests or the increase of existing ones—when the original obligation did not provide for them—constitutes an act committed in fraud of creditors , **unless the party concerned proves its good faith**.

**The relevant article is as follows:**

**Article 115.**— Acts are presumed to be committed in fraud of creditors if they are performed on or after the retroactive date, unless the interested party proves good faith:

**I.**— The granting of guarantees or the increase of existing guarantees, when the original obligation did not provide for such a guarantee or increase, and...

**4. Consequences of an Act Committed in Fraud of Creditors**

Pursuant to the provisions of Article 113 of the LCM, the legal consequence established for acts committed in fraud of creditors is that such acts are **ineffective** against the estate.

**Legal doctrine has defined this invalidity as follows:**

> *In a broad sense, ineffectiveness is a category that encompasses the total or partial deprivation of the effects of a legal act between the parties or vis-à-vis third parties. Among its subcategories are invalidity (nullity and voidability), non-existence, unenforceability, revocation, rescission, and termination.*
>
> *Legal ineffectiveness, in the strict sense, is identified with unenforceability, which consists of the deprivation of the typical effects of the act; that is, it limits those effects due to the failure to meet a certain condition. Such ineffectiveness renders the act unenforceable; that is, it allows the interested third party to act as if the act did not exist.*[1]

In other words, the legal consequences of an act having been entered into in fraud of creditors—as is the case here— **necessarily** entail that the rights and obligations arising from it cannot be enforced against the merchant's creditors or the estate. That is, a creditor who has participated in the act entered into in fraud of creditors (*i*) cannot be recognized in the judgment acknowledging, classifying, and ranking claims and, consequently, (*ii*) cannot sign the proposed settlement agreement within the proceedings.

This must be the case, as it is the only way to safeguard the rights of creditors who acted in good faith with the business and to protect the integrity of the estate. Insolvency law prohibits the rights and obligations existing between the merchant and a creditor who participated in an act committed in fraud of creditors—especially an act that is expressly classified as such by law, as in the present case—from circumventing the principles of the law through the exercise of rights such as signing the insolvency agreement to the detriment of third parties.

FRIGNANTO DEL CASTELLO FLORA
30014001300030003/03033317303030331342
02/14/27 16:09:27

In light of the foregoing and as evidenced herein, the loan granted by AlterBank constitutes an act committed in fraud of creditors; therefore, it must not be recognized in the judgment recognizing, classifying, and ranking claims—which automatically excludes it from the total amount of liabilities owed by the merchant—and AlterBank will not have the right to sign the proposed arrangement when it is eventually submitted.

## SPECIAL CHAPTER ON ALTER BANK

*Alter Bank Limited* is an entity with a dual legal status: *(i)* as a corporate entity, it is an International Business*Company (IBC)*; and *(ii)* as a financial institution, it is an international bank licensed to operate as such.

Alter Bank is a company incorporated under the International Business Companies Act of Saint Lucia (IBC Act), originally formed and registered on January 23, 2007, as *StateTrust Bank & Trust Limited*, changing its name to

[1] López Gianopoulos, Set Leonel, "The Retroactive Effects of a Commercial Bankruptcy Judgment: An Analysis from the Perspective of Legal Certainty," *Journal of the Federal Judiciary Institute*, Mexico, Federal Judiciary Institute – Federal Judiciary Council, 2013, pp. 119–138, specifically p. 127. Available at: https://revistas-colaboracion.juridicas.unam.mx/index.php/judicatura/article/viewFile/32106/29099

***Alter Bank Limited*, pursuant to a shareholders' resolution effective May 19, 2023.**

It is also an international bank established in Saint Lucia and incorporated under Chapter 12.17 of the International Banks*Act* of Saint Lucia, operating under a Class A license No. IB/007(A), issued by the *Financial Services Regulatory Authority* (FSRA) *of Saint Lucia.* [2]

Under the International Banks Act, a Class A license permits unrestricted banking operations with third parties and requires a minimum paid-in capital of USD 2,200,000.00 (two million two hundred thousand United States dollars), with a regulatory deposit of USD 300,000.00 (three hundred thousand United States dollars).[3]

Based on documentary evidence obtained during the proceedings governed by Section 1782 of Title 28 of the United States Code (*Discovery*) before the United States District Judge for the Southern District of Florida, Miami Division, Case No. 26-23885-MC-MARTINEZ, which is attached as **EXHIBIT 2** along with its Spanish translation by a certified expert as **EXHIBIT 2 BIS**, AlterBank submitted various documents that were part of the requirements mandated by the FSRA during the process of obtaining its license in 2024. These documents show that the business model proposed by AlterBank focuses on offering and providing services to **small and medium-sized** enterprises engaged in international trade, cross-border payments, and customized international banking services.

Its proposed financial projection for 2026 called for assets totaling USD 49,076,134.23 (forty-nine million seventy-six thousand one hundred thirty-four dollars and 23/100 of the United States of America), **loans totaling USD 14,356,051.00 (fourteen million three hundred fifty-six thousand fifty-one United States dollars 00/100)**, and deposits of USD 45,940,000.00 (forty-five million nine hundred forty thousand United States dollars 00/100), among other projections for that year.[4]

They even projected an annual transaction volume, forecasting a total of 7,674 transactions in 2026, equivalent to USD 173,000,000.00 (one hundred seventy-three million dollars 00/100). Among these, outbound transactions via transfers or remittances would total $84,500,000.00 (eighty-four million five hundred thousand U.S. dollars 00/100), comprising a total of 3,803

[2] **Financial Services Regulatory Authority - Regulated Entities**
[3] https://fsrastlucia.org/index.php/international-sector/international-banks/overview
[4] Page 8 of Annex 2 and Annex 2 Bis (pages numbered as JR-Alter).

**transactions, and the remainder was reported as transactions receivable—that is, funds they expected to receive during the year.**

Furthermore, AlterBank's unaudited financial statements as of March 31, 2024, show that as of that date, the bank had total assets equivalent to **USD 2.3 million**.[5]

According to the information provided, the loan granted to the merchant considerably exceeds the projections in AlterBank's business plan, even for the year 2028. This is true not only in terms of the transaction's value but also in terms of the client's size, as TVA is a company with a national and international presence—one of the world's leading producers and broadcasters of Spanish-language content—that was listed on the Mexican Stock Exchange as a publicly traded corporation.

Furthermore, the transaction appears to deviate from the geographic distribution outlined in the business plan, which projected that approximately 80% (eighty percent) of transactions would be concentrated in the United States and only 20% (twenty percent) in other international markets.

In this case, if AlterBank deviated from the business plan submitted for 2024, it should have reported this to the FSRA, the competent authority in Saint Lucia, as explained by expert **Renée T. St. Rose KC** in her opinion, attached as **ANNEX 3**, and its Spanish translation by a certified expert, attached as **ANNEX 3 BIS**, from which it follows that the bank was obligated to report a change to its business plan.

FRINANDO PFL CASTELLO BLUMZA
JUNIOR) 30501036306351573836343313418
02/14/27 4:02:27 PM

The loan granted by AlterBank was exclusively to a single company in Mexico—that is, a client who, at the time the loan was granted, had publicly disclosed that it was facing difficulties due to a deteriorated financial situation—and that single transaction exceeded any projections presented by AlterBank for the period from 2024 to 2028.

Furthermore, **on May 10, 2023,** TVA itself published on its website *"that today the Sixty-Third Civil Court of Mexico City ordered the company not to disclose to the public information regarding its financial situation, in order to avoid causing uncertainty."* This is substantiated by the publication attached hereto as **ANNEX 4** and available at the following link: https://www.irtvazteca.com/es/comunicados-de-prensa.

In other words, for at least **three years prior** to entering into the loan agreement with AlterBank, TVA had concealed its financial information from the investing public.

[5] **Pages 320 through 334 of Annex 2 and Annex 2 Bis (pages numbered as JR-Alter).**

Furthermore, on February 26, 2026, Grupo Salinas issued a press release announcing the resolutions adopted at TVA's Extraordinary General Shareholders' Meeting held on February 26, 2026, at which the corporate, operational, and financial reorganization of the company and its subsidiaries was approved through a voluntary bankruptcy proceeding, the application for which would be filed in the coming days, as they stated that they had faced financial challenges since 2018 and that, beginning in 2021, a process had been initiated to reorganize their financial obligations, **including their foreign-currency debt**. The press release is attached hereto as **ANNEX 5**, which is a matter of public knowledge to Your Honor as it is published on the Grupo Salinas website at https://www.gruposalinas.com/noticias/notas/comienza-tv-azteca-proceso-reorganizacion/.

According to AlterBank's corporate record, obtained from the International Commercial Companies Registry, in connection with the *discovery* process—which is attached hereto as **EXHIBIT 6**, along with its Spanish translation by a certified translator as **EXHIBIT 6 BIS**—the members of AlterBank's Board of Directors as of January 28, 2026, that is, at the time the loan agreement with TVA was entered into, are as follows: **Wilbert Owen Bascom** (appointed on April 11, 2023; subsequently recorded in the Registry as deceased, without the date of death being indicated); **Blas Santander** (Miami, Florida; appointed on September 20, 2023, and resigned on March 31, 2026); **Timothy Richards** (Coral Gables, Florida; appointed on July 17, 2025, and resigned on June 26, 2026); **Alexander Soroka** (Plantation, Florida; appointed on April 16, 2025, and resigned on June 17, 2026); **Augusto César Castillo Chávez** (Mexico City, Mexico; appointed on December 30, 2024); and **Kendall Gill** (Saint Lucia; appointed on April 1, 2009).

It is particularly noteworthy that several members of the Board of Directors who were involved in the management of Alter Bank at the time the loan agreement with TVA was entered into left their positions in the months immediately following the commencement of the *discovery* process in the United States.

As evident from the statement by José Romero Esclusa, CEO of AlterBank, dated July 14, 2026, a resident of Panama, given in Case No. 26-23885-MC-MARTINEZ *in Florida*, United States—which is attached hereto as **EXHIBIT 7**, along with its Spanish translation by a certified expert authorized by the Federal Judiciary Council as **EXHIBIT 7 BIS**—Blas Santander (a resident of Miami, Florida) resigned on **March 31, 2026**; Timothy Richards (resident of Miami, Florida) resigned on **June 26, 2026**; and Alexander Soroka (resident of Miami, Florida) resigned on **June 17, 2026**. All of them were members of the Board of Directors who submitted their resignations coincidentally on dates subsequent to

*Discovery* proceedings that had been initiated in Miami, Florida, United States—the place where they resided and could be questioned regarding the loan granted to TVA.

Furthermore, according to information obtained from AlterBank's corporate registry in Saint Lucia dated January 28, 2026, the beneficial owner of 100% (one hundred percent) of AlterBank's issued shares is Mr. **Augusto César Castillo Chávez**, a Venezuelan national and the only director with a registered address in Mexico. It is noteworthy that, despite being listed as the ultimate beneficiary of 100% (one hundred percent) of AlterBank and as a member of its Board of Directors at the time the loan agreement with TVA was entered into, no public sources were found to substantiate Augusto César Castillo Chávez's professional experience, executive track record, or significant involvement in banking, financial, or capital market institutions. Likewise, no interviews, specialized publications, corporate profiles, or public records were identified that would link him to leadership or management activities within the financial sector, beyond his association with AlterBank.

Prior to that, the record shows that Mr. Juan Francisco Ramirez was the previous beneficiary and owner of 100% (one hundred percent) of the shares issued by AlterBank from **March 22, 2023**, through December 30, 2024.

SIGNED BY PO DEL CASTILLO EL URZA
JUANMANJUANMANJUANMANJUANMANJUAN
02/14/27 4:02:27 PM

The information reported in the Saint Lucia registry contradicts the evidence obtained during the *discovery* process, which includes the June 1, 2023, email [6] regarding a shareholders' meeting held on May 31, 2023, during which AlterBank's share distribution as **of May 31, 2023,** was disclosed **: (i)** Juan Ramírez (30.95%), who filed a lawsuit in Saint Lucia against AlterBank regarding the transfer of his shares[7]; **(ii)** Blas Santanader (15.47%); and **(iii)** Agustín César Castillo Chávez and Tomás Hernández (53.58%). The reason why the latter two are reported to hold the same shares is unknown to my client as of this date. Likewise, the reason why a share distribution different from that reported in AlterBank's internal records was registered is also unknown as of this date.

Furthermore, the *Trustee's* investigation suggests that former owners and affiliates of AlterBank are linked to acts of fraud and evasion of sanctions, a circumstance that reinforces the institution's lack of capacity and commercial credibility to enter into a transaction of this magnitude.

As a result of all of the above, the transaction with TVA deviates significantly from AlterBank's financial projections, customer profile, and operational scale as contemplated by the institution at the time it applied for its license in Saint Lucia in the year

---

[6] **Pages 78 and 79 of Annex 2 and Annex 2 Bis (pages numbered as JR-Alter).**

[7] Pages 133–145 of Annex 2 and Annex 2 Bis (pages numbered as JR-Alter).

2024. The foregoing, coupled with the fact that AlterBank entered into a loan agreement with a company that was clearly insolvent, as will be explained throughout this proceeding.

**FACTS**

1. On March 10, 2026, TVA filed its petition for a declaration of commercial insolvency in the conciliation stage (hereinafter, the "Insolvency Petition") with the Joint Clerk's Office of the District Courts for Commercial Insolvency Matters, located in Mexico City and having jurisdiction throughout the Mexican Republic.

2. The Bankruptcy Petition was admitted by the Honorable Judge by order dated March 20, 2026.

3. By judgment dated July 6, 2026, TVA was declared to be in commercial bankruptcy in the conciliation stage, **with October 9, 2025**, designated as **the retroactive date** (hereinafter the "Bankruptcy Judgment"), as indicated in the published edict.

4. The Insolvency Judgment was published in the Official Gazette of the Federation and in the newspaper "Universal" on August 10, 2026. This constitutes a matter of public record for Your Honor.

5. On January 29, 2026—that is, just a month and a half before filing for bankruptcy—TVA, in its capacity as borrower, entered into a credit agreement with AlterBank, which acted as structuring agent, initial lender, administrative agent, and collateral agent. This credit was granted in the amount of up to $5,000,000,000.00 (five billion pesos 00/100 M.N.), as described by TVA in paragraph "5" of Section 2 of the Petition for Bankruptcy Proceedings.

   **Since my client is not a party to the aforementioned agreement, I respectfully request that Your Honor order TVA to produce it in this proceeding so that my client may review its contents and exercise the corresponding rights.**

6. Subsequently, on March 6, 2026, TVA and AlterBank entered into an amendment and restatement agreement to the Credit Agreement referred to in the preceding fact "5."

   Since my client is not a party to the aforementioned agreement, I respectfully request that Your Honor order TVA to produce it in this proceeding so that we may review its contents and exercise the corresponding rights.

7. The execution of the Credit Agreement and its Amendment and Restatement Agreement is freely, voluntarily, and

spontaneously by TVA in *(i)* its petition for declaration of commercial bankruptcy (page 27), *(ii)* in Section 2 titled "Statement of Default or Imminent Generalized Default in the Payment of the Merchant's Obligations" (paragraphs 5 and 6), and *(iii)* in Annex 3 titled "List of Creditors" (identifying AlterBank as a creditor in paragraph 4).

8. However, the execution of the Credit Agreement and its subsequent Amendment and Restatement Agreement constitute a transaction clearly outside market conditions and standard banking and commercial practices, given that, as of January 29, 2026—the date on which the credit agreement was initially executed— **TVA's insolvency was already a matter of public knowledge.**

9. This is because, since at least 2025, various news reports have made public TVA's failure to meet its payment obligations arising from the issuance of the **8.250% Senior Notes Due 2024**, issued pursuant to the Indenture dated August 9, 2017, for a principal amount of US$400,000,000.00 (four hundred million United States dollars), maturing on August 9, 2024, in respect of which TVA ceased making interest payments as of February 9, 2021, and has made no principal or interest payments since then, with BNY acting as Trustee and The Bank of New York Mellon, London Branch, acting as Principal Paying Agent.

Notwithstanding that the foregoing constitutes a matter of public knowledge, as it has been the subject of news reports in various media outlets, the articles published by the following newspapers are attached hereto as **ANNEX 8**:

FRIGNANTO NFL CASTLE FLOOR 7A
3,000 SQFT 3,000 SQFT 3,000 SQFT 3,000 SQFT 3,000 SQFT
1-802-271-6092 27

a) **Reforma newspaper**, article published on July 22, 2025, available at the following link: https://www.reforma.com/aprietan-a-tv-azteca-acreedores-en-ny/ar3042710

b) **Proceso**, article published on December 31, 2025, available at the following link: https://www.proceso.com.mx/nacional/justicia/2025/12/31/tribunales-acorralan-tv-azteca-grupo-elektra-de-ricardo-salinas-pliego-363593.html

c) **Expansión**, article published on December 3, 2025, available at the following link: https://expansion.mx/tecnologia/2025/12/03/la-crisis-quc-acecha-a-tv-azteca

10. The content of the news articles cited in the preceding paragraph indicates that it was public knowledge that TVA was experiencing financial difficulties and had failed to meet its payment obligations to at least the beneficiaries of the global note issued in 2017, as well as that it was contesting various tax liabilities totaling billions of pesos. Furthermore, at least since December 2025, TVA had made it public that its financial situation and tax liabilities made it financially impossible to pay the Notes.

11. Furthermore, as early as 2023, TVA itself published on its website *that "today, the Sixty-Third Civil Court of Mexico City ordered the company not to disclose to the public information regarding its financial situation, in order to avoid causing uncertainty."* This is evidenced by the publication attached hereto as **EXHIBIT 4** and available at the following link: https://www.irtvazteca.com/es/comunicados-de-prensa.

**12.** This had significant implications, as even on January 30, 2023, Fitch Ratings confirmed TV Azteca's rating at *"Restricted Default"* ("RD") due to this unresolved default in the payment of interest on the senior notes, and affirmed the rating of the corresponding issue at "C/RR4." On December 21, 2023, Fitch Ratings completely *withdrew* TV Azteca's rating, expressly noting a lack of access to sufficient information to maintain it.

**In other words, it was public knowledge that there was neither certainty nor transparency regarding TVA's financial information. Moreover, what actually existed was a concealment of that information.**

**13.** TVA's financial distress is also evident from its financial statements—submitted as Exhibit 1 to the Petition for Bankruptcy—since the "Statement of Financial Position" for fiscal year 2025 shows the following:

**a) Total Liabilities in the amount of $29,926,016,000.00 (twenty-nine billion, nine hundred twenty-six million, sixteen thousand pesos 00/100 M.N.).**

**b) Total assets in the amount of $27,006,133,000.00 (twenty-seven billion six million one hundred thirty-three thousand pesos 00/100 M.N.).**

In other words, it is **evident** that TVA's liabilities exceeded its assets as of fiscal year 2025; therefore, it is implausible that a banking institution would decide to grant a loan in January 2026 to a company in such a state of financial distress and "technical insolvency."

Furthermore, its **shareholders' equity** for fiscal year 2025 was $2,919,882,000.00 (two billion nine hundred nineteen million eight hundred eighty-two thousand pesos 00/100 M.N.), an amount that is significantly less than the amount of the loan contracted with AlterBank.

For further reference, below is the relevant excerpt from Annex 1 of the **Bankruptcy Petition:**

| | |
|---|---|
| Stockholders' Equity | |
| Paid-in Capital | 765,142 |
| Reserves and Other Equity Items | 5,615,626 |
| Retained Earnings | (4,234,845) |
| Net Income for the Year | (5,066,805) |
| Total Stockholders' Equity | (2,919,887) |
| Total Liabilities and Stockholders' Equity | 27,006,133 |

14.This financial distress clearly persisted in January 2026, the month immediately preceding the loan agreement—assuming that the company is now in bankruptcy proceedings. According to the financial statements submitted by the Merchant with its Petition for Bankruptcy, its shareholders' equity was $3,136,785,000.00 (three billion one hundred thirty-six million seven hundred eighty-five thousand pesos 00/100 M.N.), **an amount significantly lower than the loan amount contracted with AlterBank**.

For further reference, below is the relevant excerpt from Annex 1 of the Petition for Bankruptcy:

| | |
|---|---|
| Stockholders' Equity | |
| Paid-in Capital | 766,142 |
| Reserves and Other Equity Items | 5,615,626 |
| Retained Earnings | (9,300,650) |
| Net Income for the Year | (216,903) |
| Total Stockholders' Equity | (3,136,785) |
| Total Liabilities and Stockholders' Equity | 25,851,356 |

FRYANKDO DEL CASTILLO BLURZA
Mizrahi 134134, Tel Aviv-Jaffa 63730, Israel
February 27, 2024-4

Furthermore, TVA's total assets as of January 31, 2026, were **$25,851,356,000.00** (Twenty-five billion eight hundred fifty-one million three hundred fifty-six thousand pesos 00/100 M.N.) and the total of its liabilities was **$28,988,141,000.00** (Twenty-eight billion nine hundred eighty-eight million one hundred forty-one thousand pesos 00/100 M.N.). **Needless to say, TVA's insolvency and inability to pay were evident.**

15.In accordance with the regulatory framework, prevailing market conditions, and customary practices, TVA's financial situation had to be disclosed to AlterBank prior to the granting of the loan that is the subject of this proceeding, as this is the **minimum** information any financial institution requires to determine the borrower's ability to pay, especially given the amount of the loan in question.

**AlterBank was obligated to conduct *due diligence* on TVA and gather information regarding its financial situation and existing obligations; this**

is required under applicable regulations, as set forth in paragraphs 25, 26, 36, and 37 of the opinion issued by expert witness **René T. St. Rose, KC**, which is attached as **ANNEX 3**, and its Spanish translation by a certified expert, attached as **ANNEX 3 BIS**. To avoid unnecessary repetition, I request that the content of the Opinion in the indicated paragraphs be deemed to be reproduced here as if it were inserted verbatim.

Likewise, paragraphs 11, 13, 14, 15, 38, 39, and 40, among others, of the expert opinion attached hereto as **ANNEX 9**—issued by Mauricio Basila Lago —former Director General of Issuers and Vice President of Securities Supervision at the National Banking and Securities Commission—and Paul Yamil José Aguilar ("Basila Abogados"), which I request be deemed reproduced here as if inserted verbatim, to avoid unnecessary repetition.

**Both opinions conclude and reflect that it constitutes an international standard of sound banking practices to conduct due and rigorous diligence for credit transactions such as the one entered into between AlterBank and TVA.**

16. From the foregoing, it is evident that *(i)* TVA had been insolvent since 2025, a circumstance consistent with the retroactive date indicated by the Honorable Judge in the Bankruptcy Judgment (October 9, 2025)—it should be noted that its shareholders' equity as of January 31, 2026, was $3,136,785,000.00 (three billion one hundred thirty-six million seven hundred eighty-five thousand pesos 00/100 M.N.), **an amount significantly lower than the loan amount contracted with AlterBank**, with no evidence of a subsequent capital increase (which would be inconsistent with the state of insolvency that led to its bankruptcy proceedings), *(ii)* its insolvency is documented in its own financial statements and in various news reports, and *(iii)* despite the existence of a clear state of insolvency, AlterBank decided to grant TVA a loan in the amount of USD $290,000,000.00 (**two hundred ninety million dollars, the legal tender of the United States of America**) when it was more than obvious that TVA would default on its payment obligations.

**It should also be noted that this loan constituted the first new debt that TVA had incurred with a third party in at least four years.**

17. In addition to TVA's insolvency and its manifest inability to pay, the amount of the loan granted by AlterBank is completely at odds with the bank's business plan for 2026, which projected assets equivalent to USD 49,076,134.23 (forty-nine million seventy-six thousand one hundred thirty-four United States dollars and 23/100), **loans totaling USD 14,356,051.00 (fourteen million three hundred fifty-six thousand fifty-one United States dollars and 00/100)**, and deposits totaling USD

45,940,000.00 (forty-five million nine hundred forty thousand United States dollars 00/100), among other projections for that year.[8]

The foregoing is also corroborated in the opinion issued by expert **Renée T. St. Rose KC**, which is attached as **EXHIBIT 3** and its Spanish translation by a certified expert as **EXHIBIT 3 BIS**, specifically in paragraphs 58, 59, and 73, subsection "e"—which I request be deemed reproduced here as if inserted verbatim to avoid unnecessary repetition.

18. According to the information submitted by TVA and the documentation obtained during the *discovery* process, the loan granted to the Merchant considerably exceeds the projections in AlterBank's business plan, even for the year 2028. This is true not only in terms of the transaction value but also in terms of the size of the client, since TVA is a company with a national and international presence—one of the world's leading producers and broadcasters of Spanish-language content—that was listed on the Mexican Stock Exchange as a publicly traded corporation.

19. In other words, a bank whose business projections are based on granting loans to small and medium-sized enterprises granted a loan to a company that does not meet those criteria; not only that, but the company was clearly insolvent (a circumstance that AlterBank must necessarily have been aware of as part of the risk analysis process); and, as if that were not enough, the loan amount exceeds the capital AlterBank had projected for the year 2026.

FERNANDO DEL CASTILLO ELORZA

All of the foregoing clearly deviates from market conditions for this type of loan and from the regulations governing AlterBank in Saint Lucia, as concluded by expert **Renée T. St. Rose KC** in the opinion attached as **ANNEX 3** and its Spanish translation by a certified expert as **ANNEX 3 BIS** —specifically in paragraphs 74 and 75, which I request be deemed reproduced here as if inserted verbatim to avoid unnecessary repetition.

20. Another factor that reinforces the argument regarding the market conditions under which the loan in question was granted is the ridiculously long maturity date, which, according to the information provided by TVA in Annex 3 of its Petition for Bankruptcy, is **July 29, 2026**. It is impossible to believe that a banking institution would grant a loan of **USD $290,000,000.00 (two hundred ninety million dollars, legal tender in the United States of America)** to an insolvent company and expect to be repaid within six months, especially considering that TVA, as has already been established, publicly stated that it was in financial crisis.

[8] **Page 8 of Annex 2 and Annex 2 Bis (pages numbered as JR-Alter).**

**21 Now, according to TVA's account in its Petition for Bankruptcy regarding the loan agreement with AlterBank, said loan was entered into for the following reasons:**

**a) In the Petition for Bankruptcy**

...In fact, **TV AZTECA** was facing litigation over debts or tax liabilities determined by the tax authority, in the following amounts: (i) $3,902,000,000.00 (three billion nine hundred two million Mexican pesos) for income tax for the 2009 fiscal year (including fines and surcharges); and (ii) $4,790,000,000.00 (four billion seven hundred ninety million pesos 00/100 M.N.) corresponding to income tax for the 2013 fiscal year (including fines and surcharges).

This situation posed a particularly significant risk to **TV AZTECA**'s viability, given that the Federal Tax Code authorizes the tax authority to enforce tax claims through administrative enforcement proceedings...

**In this context, public and institutional pressure —*as the risk of tax enforcement and an immediate impact on cash flow increased*— forced the company to prioritize liquidity to avoid critical operational disruptions.**

Therefore, faced with the imminence of enforcement measures and the potential loss or restriction of cash flow, the company was compelled to obtain and/or utilize additional and urgent financing to address its tax liabilities and mitigate the risk of operational paralysis.

This directly impacted the company's viability as a productive unit: the withdrawal or immobilization of cash and/or the increase in financial liabilities (interest costs, guarantees, maturities) reduced its ability to meet ordinary operating obligations (salaries, supplies, broadcasting, critical suppliers) and increased the risk of default to various creditors.

This situation compelled **TV AZTECA** to secure emergency financing —*with the consequences that this entails*— from Alter Bank LTD in the amount of up to $5,000,000,000.00 (five billion pesos 00/100 M.N.); as a defensive and indispensable measure aimed at preserving: (i) operational continuity; (ii) job stability; and (iii) the integrity of assets strategic to operations; however, at the same time, it increased the Company's liabilities, deteriorated its capital structure, and reduced its financial flexibility, contributing to the worsening of its state of insolvency...

**b) In Section 2 of the Petition for a Declaration**

> said ALTER loan was obtained by the company as additional and urgent financing to address its tax liabilities and mitigate the risk of operational paralysis...

22. In other words, TVA asserts that it took out the loan with AlterBank for the purpose of safeguarding its operations; however, said loan is secured by mortgages established on March 6, 2026, on the concession titles of (i) Televisora del Valle de México, S.A.P.I. de C.V. and (ii) Televisión Azteca III, S.A. de C.V.—both subsidiaries <u>controlled</u> by TVA—.

This completely contradicts the alleged purpose of the loan, since TVA's financial conditions made it evident that it would default on its payment obligations—a situation that AlterBank should have easily anticipated through the risk analysis it is required to conduct as a financial institution—leading to the enforcement of those guarantees, which **would clearly jeopardize its business and operations**. It is difficult to believe that TVA did not foresee the possibility of the enforcement of the guarantees granted in the event of a default.

**23.** Regardless of the risk associated with TVA's business, AlterBank's granting of the loan clearly jeopardizes its own financial viability and business continuity; therefore, it is absurd to think that this constitutes a transaction conducted under market conditions. No financial institution would jeopardize its financial and regulatory viability by granting a loan to a customer who is clearly going to default.

FRANKANTO NFL CASTILLO FLOREZA
SUSANA GARCIA GONZALEZ
02/14/27 4:07:27 PM

The granting of the loan to TVA is clearly unusual for a banking institution of AlterBank's nature—given TVA's well-known insolvency—and falls outside the applicable regulatory framework under Saint Lucia's legislation, as explained by expert **Renée T. St. Rose KC** in the opinion attached as **ANNEX 3** and its Spanish translation by a certified expert as **ANNEX 3 BIS**, particularly in paragraph 27, which I request be deemed reproduced here as if inserted verbatim to avoid unnecessary repetition.

The credit at issue in this motion is clearly contrary to the Principles for Credit Risk Management, the Supervisory Framework for the Measurement and Control of Large Exposures, and other applicable principles and criteria under the Basel Committee on Banking Supervision (BCBS) Principles and Basel III, which govern sound banking practices and customs internationally.

24. Non-compliance with market conditions and sound banking practices becomes even more evident when we analyze the Basel III International Standards, particularly the "Principles for the Management of *Credit Risk.*"

These Principles constitute, in and of themselves, a global prudential standard for any institution that complies with commonly accepted and applicable international standards. The Basel framework is structured around three pillars: risk-sensitive capital, supervisory review, and market discipline, such that the granting of credit is not a discretionary act of the institution but a regulated process.

BCBS *Principle 5* requires credit institutions to establish exposure limits at the level of individual borrowers and groups of related counterparties; This principle is incorporated into the legislation of Saint Lucia, particularly in Section 15 of the International Banking Act of Saint Lucia, in relation to Guidance Note No. 11 of the Financial Services Regulatory Authority of Saint Lucia (*FSRA*), as explained by expert Renée T. St. Rose KC in the opinion attached as **ANNEX 3** and its Spanish translation by a certified expert as **ANNEX 3 BIS** —specifically in paragraphs 27, 32, and Section "F" of said document—which I request be deemed reproduced here as if inserted verbatim to avoid unnecessary repetition.

Assuming an individual credit exposure of USD $290,000,000.00 (two hundred ninety million U.S. dollars) constitutes an extreme concentration of risk under that standard, clearly outside market conditions and banking practices.

25. As if the foregoing were not enough, AlterBank accepted the mortgage collateral (as second lien) created on the concession titles held by Televisora del Valle de México, S.A.P.I. de C.V. and Televisión Azteca III, S.A. de C.V. **as second lien**. In other words, AlterBank agreed to have a loan—which was clearly going to default—secured by concessions for which there was already a mortgagee with a higher priority, a circumstance that runs counter to what any banking institution would seek to ensure repayment of a loan in the amount granted to TVA.

This is evidenced by the "Certificates of Registration in the Public Registry of Concessions" attached hereto as **ANNEX 10**.

The registration of the mortgages in favor of AlterBank is a matter of public record for Your Honor, since the Folio Certificates are available on the official website of the Telecommunications Regulatory Commission and at

the following **links:** **<u>https://sert.ift.org.mx/tarifasVE/upload/files/gravamenes/101772_4758_260616161426.pdf</u>** and **<u>https://sert.ift.org.mx/tarifasVE/upload/files/gravamenes/101771_3933_260616161219.pdf</u>**

As explained by expert **Renée T. St. Rose, KC**, in the opinion attached as **ANNEX 3** and its Spanish translation by a certified expert as **ANNEX 3 BIS**, particularly in paragraphs 29 and 30 of that document—which I request be deemed reproduced here as if inserted verbatim to avoid unnecessary repetition—that the mortgage guarantees are of such a nature that a prudent, Class A international bank authorized in Saint Lucia would not accept them, in the ordinary course of commercial banking practice, without exceptional documentation supporting the justification for the transaction, the credit assessment, the value and enforceability of the collateral, as well as the required internal and regulatory approvals. In any event, and regardless of the regulatory characterization of the exposure, the credit risk mitigation normally provided by a mortgage collateral is, based on the available information, substantially reduced in the present case.

Furthermore, as noted throughout this document, the BCBS principles and the Basel III Framework constitute the internationally recognized prudential benchmark for credit exposures of this nature. Under this standard, the Lender's reliance on a mortgage guarantee originally established in 2020 in favor of a third party—currently *Numchi Servicios, S.A.P.I. de C.V.*—without evidence of its effective financial coverage, is subject to a more conservative prudential treatment and receives less recognition as a risk mitigant. These factors are consistent with the premise that the characteristics of the Loan do not comply with international best practices for credit granting applicable to credit institutions, as set forth in the opinion attached as **ANNEX 9**.

FRAN ANTO NPI CASTILLO FLORZA
SUMMER SALES 1979–1980
02/18/27 4:07:27 PM

26. The violation of market conditions and commercial practices becomes even more evident when considering that, as of the date of execution of the Amending and Restatement Agreement of March 6, 2026, and the creation of the aforementioned mortgage guarantees, TVA **had already taken the corporate actions necessary to file for bankruptcy**, as evidenced by Annex 8 of the Petition for Insolvency Proceedings, to which was attached Public Deed No. 188,710 dated **February 26, 2026**, executed before Notary Public Eduardo Garduño García Villalobos, head of Notary Office No. 135 in Mexico City, acting in accordance with the protocol of Notary Public No. 211 of the same city.

**The following is noted from the content of said deed:**

a) TVA published the notice convening the Extraordinary Shareholders' Meeting on February 10, 2026, on the Ministry of Economy's Electronic System; that is, **just 12 days after taking out the loan with AlterBank** for the alleged purpose of avoiding default to various creditors.

**b)** At the Extraordinary Shareholders' Meeting held **on February 26, 2026**, it was approved that TVA file for bankruptcy.

In other words, TVA entered into the loan agreement and the amendment and restatement agreement knowing that it was going to file for bankruptcy, thereby demonstrating its bad faith regarding the loan in question, since there was no alleged imminence of enforcement proceedings by the tax authority, since, pursuant to Article 69 of the Commercial Insolvency Law, a declaration of commercial insolvency has the effect of suspending administrative enforcement proceedings for tax claims.

The publication of the notice referred to in subsection "a" of this fact constitutes a matter of public record for Your Honor, as it was posted on the Ministry of Economy's Electronic System.

27.The Petition for Insolvency Proceedings was filed on March 10, 2026 —that is, **12 days after** approval was granted for TVA to file for insolvency and just **4 days** after the Amending and Restatement Agreement with AlterBank was executed and the mortgage guarantees were established by the aforementioned subsidiary companies, which highlights the irregularity of the transactions entered into between TVA and AlterBank, as well as the clearly preferential treatment accorded to this particular creditor compared to the Merchant's other creditors.

**28.**In light of the foregoing, it is evident that AlterBank granted a loan to TVA in complete violation of market conditions and commercial and banking practices, as it was aware of TVA's insolvency and knew that TVA had already been authorized to file for bankruptcy prior to the execution of the Amendment and Restatement Agreement (this being part of the information it is required to gather prior to entering into agreements of this nature).

**29.**Furthermore, the very creation of mortgage guarantees in favor of AlterBank on March 6, 2026, constitutes in and of itself an act of fraud against creditors, pursuant to the provisions of Section I of Article 115 of the Commercial Insolvency Law.

This is because, as set forth in this motion, the mortgages were established on March 6, 2026, **a date subsequent to the credit agreement entered into on January 29, 2026**.

Since my client is not a party to the contract by which the mortgage was granted, I request that Your Honor order Notary Public No. 135 of Mexico City to produce in this motion the public deed No. 188,839 dated March 6, 2026, which is on file in the registry under his or her jurisdiction, and to warn him or her of the enforcement measures Your Honor deems appropriate should he or she fail to do so within the time limit you specify.

Consequently, I request that an official letter be sent to the aforementioned notary so that, in the interest of the administration of justice, he may produce the aforementioned document or provide a certified copy thereof to be added to the case file and evaluated at the appropriate stage of the proceedings.

**30.** It is noteworthy that the mortgages in question were granted by the companies Televisora del Valle de México, S.A.P.I. de C.V. and Televisión Azteca III, S.A. de C.V.; however, TVA is the majority shareholder and controlling entity[9] of those companies, as acknowledged in its Petition for Bankruptcy Proceedings. For quick reference, the relevant portion of the petition is set forth below:

FUNDING BY DEL CASTILLO FLORA
The Department of Child and Adolescent Care at Sheba Medical Center, Tel Haratz
1-02-27 16:02 27

**TV AZTECA's Mexican Television Channels.**

13.—TV AZTECA is currently the majority shareholder of 2 (two) concessionary companies that directly operate 180 independent digital terrestrial television channels distributed throughout the national territory. These channels are operated independently, and each broadcasts diverse content via its signal in accordance with its respective coverage area. For commercial identification purposes, these channels are recognized in their concession titles as Azteca 7, Azteca Uno, and adn Noticias.

This control is neither an isolated fact nor irrelevant to the present case: it was precisely through this control that TVA decided and executed, through the guarantor companies, the granting of the mortgages in favor of AlterBank, after the loan had been granted and the initiation of the present

[9] **Article 15.—...**

**For the purposes of this Act, a corporate group shall be deemed to consist of parent companies and subsidiaries as follows:**

**I.—** Controlling companies shall be those that, directly or indirectly, hold rights that allow them to exercise voting power with respect to more than fifty percent of another company's capital, have decision-making power at its shareholders' meetings, are able to appoint the majority of the members of the board of directors, or that by any other means have the authority to make fundamental decisions regarding a company...

bankruptcy proceedings. In other words, TVA used the corporate structure under its control as a tool to place AlterBank in a position of advantage over the other creditors, at a time when TVA was already aware of and had determined its own state of insolvency, knowing that the creation of such mortgages does have effects within the commercial insolvency proceeding in question, in accordance with the case law bearing digital registration number 2026693, cited below.

31. In this regard, and regardless of whether the circumstances set forth in Section I of Article 115 of the Commercial Insolvency Law have been met, it is emphasized that it is clear that TVA initiated and decided to grant the aforementioned guarantees, as it was the borrower in the loan granted by AlterBank, thereby unduly benefiting AlterBank within the commercial insolvency proceeding that it had already approved to initiate, once again demonstrating its bad faith.

32. In accordance with the case law cited below, a creditor holding a mortgage security interest established in its favor by a third party other than the debtor subject to commercial insolvency proceedings retains its status as a secured creditor within such insolvency proceedings.

**Digital Record: 2026693**
**Level:** **Regional Plenary Sessions**
**Eleventh Term**
**Subject(s):** Constitutional, Civil
**PR.C.CS. J/2 C (11th)**
**Source: Weekly Gazette** **Judicial dc the Federal.**
**Book 26, June 2023, Volume V, page 4959**
**Type:** **Case Law**

**COMMERCIAL BANKRUPTCY PROCEEDINGS. A MORTGAGE SECURITY INTEREST ESTABLISHED ON PROPERTY BELONGING TO A THIRD PARTY WHO IS NOT A DEBTOR, IN EXERCISE OF CONTRACTUAL FREEDOM OR THE NEGOTIATION RIGHTS ESTABLISHED IN ARTICLE 5 OF THE GENERAL CONSTITUTION, FUNCTIONS AS A NEGOTIATION TOOL DURING THE CONCILIATION PHASE.**

Facts: The disputing Circuit Courts, in analyzing whether a creditor holding a mortgage secured by the property of a non-debtor third party should be recognized as a preferred creditor in the judgment recognizing, classifying, and ranking claims, reached conflicting conclusions, since while one held that the privilege granted to secured claims is not contingent on the claimed debt being owned by the bankrupt businessperson, the other ruled that, for the purpose of recognizing a creditor as having a special privilege, the claim must form part of the bankruptcy estate.

Legal Ruling: The Regional Plenary on Civil Matters of the Central-Southern Region, based in Guadalajara, Jalisco, establishes that it is essential to recognize a creditor holding a mortgage security interest in the property of a third party who is not the debtor in the judgment recognizing, classifying, and ranking claims, because this gives effect to the constitutional principle of contractual freedom or freedom of negotiation, since even if the secured creditor is not part of the bankruptcy estate, the recognized creditor has the ability to use the mortgage as a bargaining tool.

**Justification:** A mortgage contract in favor of the creditor on the property of a third party who is not a debtor is capable of having a practical effect in this other stage of

reconciliation phase of the commercial insolvency proceedings, since even though it is not part of the insolvency estate, the recognized creditor with that degree of priority has the possibility of using the mortgage as a negotiating tool under the terms of Article 89 of the Commercial Insolvency Law, with the advantages that this entails, in exercise of their freedom of contract or negotiation. Indeed, in accordance with the provisions of Article 3 of the Commercial Insolvency Law, the objective of the conciliation is to ensure the preservation of the merchant's business through an agreement entered into with its recognized creditors. At this stage and upon the eventual conclusion of the agreement, the autonomy of will—in the sense of contractual or negotiating freedom—must necessarily be respected, as this is an agreement between private parties. This is because it is a sphere in which the parties to a legal relationship are free to manage their own interests and regulate their relationships without external interference, unless non-disposable assets are involved. Otherwise, it would constitute an unjustified interference with the freedom of negotiation of the participants in the commercial reorganization proceedings.

REGIONAL PLENARY SESSION ON CIVIL MATTERS OF THE CENTRAL-SOUTH REGION, SITTING IN GUADALAJARA, JALISCO.

Conflicting Opinions 12/2023. Between those issued by the Second and Third Collegiate Courts, both in Civil Matters of the Third Circuit. April 13, 2023. Three opinions: one by Judge Martha Leticia Muro Arellano, who issued a concurring opinion, and one each by Judges Iléctor Martínez Flores and Cuauhtémoc Cuéllar De Luna. Reporting Judge: Cuauhtémoc Cuéllar De Luna. Clerks: Laura Icazbalceta Vargas, Miguel Mora Pérez, and Luis Fernando Castillo Portillo.

**Conflicting Rulings:**

The position upheld by the Second Collegiate Court for Civil Matters of the Third Circuit in its decision on direct amparo case 275/2018, and the differing position upheld by the Third Collegiate Court for Civil Matters of the Third Circuit in its decision on direct amparo case 573/2021.

This ruling was published on Friday, June 16, 2023, at 10:22 a.m. in the Federal Judicial Weekly and, therefore, is considered mandatory as of Monday, June 19, 2023, for the purposes set forth in paragraph nine of General Plenary Agreement 1/2021.

FRANKINO DEL CASTILLO FLOKZA
MUNSONJ MUNSONMUNSON1973MUN431M438
02/14/27 4:07:27 PM

As stated in the preceding case law, the purpose of respecting the mortgage creditor's priority rank is to ensure that the creditor recognized with that priority rank has the possibility of using the mortgage as a bargaining tool under Article 89 of the Commercial Bankruptcy Law—a matter of which TVA was evidently aware, as it promoted the granting of such guarantees with the intent to favor AlterBank to the detriment of the other creditors.

33. Now, regardless of the scenario provided for in Section I of Article 115 of the Commercial Bankruptcy Law (LCM), AlterBank's acceptance of said security constitutes another non-market condition—applicable to the scenario provided for in Section III of Article 114 of the LCM—since, under the Basel III framework, security interests receive more favorable treatment in risk weighting and in the estimation of Loss Given Default (LGD) **only when they constitute a first-priority, direct, and sufficient lien on the collateral in question**—a circumstance that **does not apply in this case**, since AlterBank is a **second-priority** mortgagee with respect to the concession titles of Televisora del Valle de México, S.A.P.I. de C.V. and Televisión Azteca III, S.A. de C.V., as evidenced by the Certificates of Registration in the Public Registry of Concessions with registration numbers 101771 and 101772, which are attached hereto as **ANNEX 10**, without prejudice to the fact that this is a matter of public knowledge to Your Honor, as it is

**published on an official website.** The statements in this paragraph are also set forth in **the opinion attached as ANNEX 9;** we request that it be deemed reproduced here **as if it were inserted verbatim to avoid unnecessary repetition.**

Based on the foregoing, the guarantees provided are completely at odds with sound banking practices and market conditions for this type of transaction.

34. For all of the foregoing reasons, it is evident that the loan that is the subject of this motion was entered into in violation of market conditions, due to TV Azteca's default, structural lack of liquidity, and inability to obtain ordinary refinancing, which required demonstrating a sufficient primary source of payment, the viability of the aggregate debt, available exposure limits, reserves and capital commensurate with the risk, and a guarantee with effective residual value for the execution of the loan with AlterBank.

The mortgage collateral does not alter this conclusion, as it was already tied to a prior obligation and there is no evidence to determine its realizable value or residual coverage. Consequently, the financing deviates from acceptable standards regarding repayment capacity, risk management, diversification, and mitigation—standards required by both international principles and the laws of Saint Lucia to consider a transaction compatible with sound national and international banking practices and customs.

On the contrary, the existence of said security merely confirms another act that bankruptcy law presumes to be fraudulent (as established in Section I of Article 115 of the Bankruptcy Code).

35. It is concluded that we are dealing with an act carried out fraudulently by TVA to dilute the claims of creditors such as those represented by BNY in its capacity as *Trustee* and to secure approval of an abusive arrangement such as the one proposed in its Petition for Bankruptcy. This is evident, since the Petition for Bankruptcy lists AlterBank as a secured creditor with a higher priority than the Notes, whereas the proposed reorganization plan provides for unsecured creditors a reduction of up to 90% (ninety percent) of the recognized amount—that is, payment of only 10%—and allows secured creditors, including AlterBank, to recover significantly more, including through the sale of broadcasting assets, such as concessions.

**STATEMENT MADE UNDER FORMAL OATH TO TELL THE TRUTH**

Pursuant to the provisions of Section VI of Article 3 of Agreement 12/2020 of the Plenary Session of the Federal Judiciary Council, ***I hereby declare, under solemn oath,*** that the documents attached to this brief are a true and accurate copy, in electronic PDF format, of the original documents in the Complainant's possession, available at the address for service indicated in the corresponding section, and that they are available to this Honorable District Court should said judicial authority so require.

**COMPREHENSIVE ASSESSMENT OF THE COMPLAINT**

I invoke, on behalf of my client, the *jurisprudential* principle transcribed below, according to which the complaint is a legal act subject to comprehensive interpretation in light of the documents accompanying it. That is to say, for the resolution of this motion, the accompanying documents must be evaluated, regardless of whether they are offered as evidence in the following section, and my client is not obligated to transcribe them.

Digital Record: 178475
Instance: Collegiate Circuit Courts
Ninth Era
Subject(s): Civil
Precedent: XVII.2o.C.T. J/6
Source: Weekly Judicial Journal of the Federation and its Gazette. Volume XXI, May 2005, page 1265
Type: Case Law

**COMPLAINT IN ORDINARY PROCEEDINGS. A COMPREHENSIVE REVIEW MUST INCLUDE THE ATTACHED DOCUMENTS.**

Since the complaint constitutes a single whole, its interpretation must be comprehensive; thus, if its content clearly sets forth the essential grounds for the claim, and if it cites **the documents supporting the action as well as those related to the litigation—and presents them—they must be considered part of the complaint and its content, integrated into it; since to hold otherwise would imply that the complaint in question would have to reproduce in full all the matters contained in those supporting documents, which would be both complex and unnecessary**; for the judge, the review of the complaint is not limited to the initial pleading but also includes an analysis of the accompanying documents, as they are an integral part of it. Otherwise, one might be forced to adopt overly strict requirements, such as having to reproduce in the initial complaint both the documents forming the basis of the action and those related to the dispute.

**SECOND COLLEGIATE COURT FOR CIVIL AND LABOR MATTERS OF THE SEVENTEENTH CIRCUIT.**
**Direct Amparo 178/2002. Ernesto Rodríguez Padilla and another. April 12, 2002. Unanimous decision. Reporting Judge: José de Jesús González Ruiz. Clerk: Rogerio Ariel Rojas Novelo.**

**Direct Amparo 310/2003. GMAC Mexicana, S.A. de C.V., S.F. de O.L.F., formerly known as ABA-Motriz Financiamiento, S.A. de C.V., S.F. de O.L., Ábaco Grupo Financiero. August 29, 2003. Unanimous decision. Presiding Justice: José Martín Hernández Simental. Clerk: Margarita de Jesús García Ugalde.**

**Direct Amparo 504/2004. Jaime Arturo Buendía Jiménez. September 30, 2004. Unanimous decision. Reporting Judge: Salvador Murguía Munguía. Clerk: Abel Ascencio López.**

**Direct Amparo 66/2005. Luis Manuel Romo Quevedo and another. February 18, 2005. Unanimous decision. Presiding Justice: Salvador Murguía Munguía. Clerk: José Julio Rojas Vieyra.**

Direct Amparo 151/2005. Institute of Social Security and Services for State Workers. March 18, 2005. Unanimous decision. Presiding Justice: José de Jesús González Ruiz. Clerk: Abel Ascencio López.

**Note: By a ruling dated June 20, 2018, the First Chamber declared that Contradiction of Precedents 404/2017—arising from the complaint challenging the legal principle contained in this precedent—did not exist, finding that the legal principles at issue in the respective complaint were not contradictory.**

FERNANDO DEL CASTILLO ELORZA

**(Emphasis added).**

**EVIDENCE**

1. **PUBLIC DOCUMENT.**— Consisting of the first page of public instrument No. 70,138, dated August 10, 2026, executed before the notary Luis Eduardo Paredes Sánchez, head of Notary Public Office No. 180 in Mexico City, which is attached in digitized form to this document as **ANNEX 1**.

This document certifies the capacity in which the undersigned, Mr. Fernando del Castillo Elorza, appears as the legal representative of THE BANK OF NEW YORK MELLON in its capacity as Trustee.

**This evidence relates to facts "1" through "35"** of this motion.

2. **PUBLIC DOCUMENT**—Consisting of the order dated June 3, 2026, issued by Judge José H. Martínez, U.S. District Judge for the Southern District of Florida, Miami Division, in Case No. 26-23885-MC-MARTINEZ, by which he granted the motion filed by my client, THE BANK OF NEW YORK MELLON, to initiate proceedings pursuant to Section 1782 of Title 28 of the United States Code (28 U.S.C. Section 1782), a document duly apostilled and accompanied by its translation into Spanish by a certified expert from the Federal Judiciary Council, which is attached as EXHIBIT 11 and EXHIBIT 11 BIS, respectively.

U.S. law permits a U.S. court to order the production of evidence (discovery) from an entity that "resides or is found" in the United States for use in a foreign or international proceeding. Pursuant to the procedure set forth in Section 1782 of Title 28 of the United States Code, the district court in which a person resides or is found may order that person to give testimony or a statement, or to produce a document or other item for use in a foreign or international proceeding.

The U.S. Supreme Court has explained that Section 1782 is the result of 150 years of efforts by the U.S. Congress to provide assistance from federal courts in obtaining evidence intended for use in foreign courts.

On June 2, 2026, THE BANK OF NEW YORK MELLON, in its capacity as Trustee, filed a motion under Section 1782 with the United States District Court for the Southern District of Florida, Miami Division (*Florida Court*), seeking to obtain evidence from AlterBank Limited, its directors, and officers, who were located in Florida, United States. This was done in order to

obtain information regarding the loan in the amount of USD 290,000,000.00 (two hundred ninety million United States dollars) granted by AlterBank Limited to TV Azteca S.A.B. de C.V. on January 29, 2026.

As demonstrated by the public documents presented, on June 3, 2026, the Florida court granted BNY's motion and authorized the service of subpoenas on AlterBank Limited and six of its officers and directors.

As a result, the *discovery* process is currently underway, and BNY has served the corresponding notices, **and as a result, documentary, testimonial, and other types of evidence continue to be obtained; once produced, this evidence will be submitted to Your Honor for admission and evaluation in accordance with the standards of the proceedings at hand.**

*I hereby declare under solemn oath that* my client is unable to specify which documents will be obtained in the aforementioned proceeding; therefore, she reserves the right to submit them as evidence at the appropriate procedural stage, once she becomes aware of them.

This evidence establishes that a *discovery* process was initiated in the United States in connection with the facts giving rise to the fraud action being brought in this proceeding, which is currently pending and whose purpose is to assist in the administration of justice by contributing to the body of evidence in the proceeding before Your Honor, so that, at the appropriate procedural stage, this Court may rule in favor of the relief sought by my client.

FERNANDO DEL CASTILLO FLOREZA
Note: June 11, 2553 13732034312438
02/14/27 16:09:27

**This evidence relates to facts "1" through "35" of this motion.**

3. **PUBLIC DOCUMENT.**— Consisting of the order dated June 24, 2026, issued by Judge José E. Martínez, U.S. District Judge for the Southern District of Florida, Miami Division, in Case No. 26-23885-MC-MARTINEZ, in which he set the deadlines by which AlterBank Limited and Blas Santander (an AlterBank officer) must file their responses in accordance with the rules governing that Section 1782 proceeding; the document is duly apostilled and accompanied by a Spanish translation certified by an expert certified by the Federal Judiciary Council, which is attached as **EXHIBIT 12** and **EXHIBIT 12 BIS**, respectively.

This evidence establishes that the *discovery* process is ongoing and that, since the deadlines were only met in August 2026, new documentary, testimonial, and other types of evidence will be produced regarding the loan in the amount of USD 290,000,000.00 (two hundred ninety million United States dollars) granted by AlterBank Limited to TV Azteca S.A.B. de C.V. on

**January 29, 2026**, which will be submitted at the appropriate stage of the proceedings so that they may be evaluated by Your Honor.

*I hereby declare, under solemn oath,* that my client is unable to specify which documents will be obtained in the aforementioned proceeding; therefore, she reserves the right to submit them as evidence at the appropriate procedural stage, once she becomes aware of them.

This evidence establishes that a *discovery* process was initiated in the United States in connection with the facts giving rise to the action being brought in this proceeding, which is currently pending and whose purpose is to assist in the administration of justice by contributing to the body of evidence in the case before Your Honor, so that, at the appropriate procedural stage, this Court may rule in favor of the relief sought by my client.

**This evidence relates to facts "1" through "35" of this motion.**

4. **DOCUMENTARY EVIDENCE.**—Consisting of the document obtained through *discovery* pursuant to Section 1782 of Title 28 of the United States Code, No. 26-23885-MC- MARTINEZ, before the United States District Judge for the Southern District of Florida, Miami Division, produced by Mr. Juan Francisco Ramírez, a former employee of Alter Bank Limited, which is accompanied by its proper translation into Spanish by a certified expert from the Federal Judiciary Council, as **EXHIBIT 2** and **EXHIBIT 2 BIS**, respectively.

This evidence establishes, among other things: *(i)* Alter Bank Limited's projected business model for the years 2024 through 2028; *(ii)* the process of obtaining the regulatory capital required to secure a license to operate as an international bank in Saint Lucia in 2024; *(iii)* the obtaining of a license to operate as a Class A bank in accordance with the laws in force in Saint Lucia; *(iv)* the legal actions initiated by Juan Ramirez against Alter Bank Limited; *(v)* the unaudited financial statements of Alter Bank Limited as of March 31, 2024, which show assets totaling only USD 2.3 million; *(vi)* an email dated June 1, 2023, with the subject line "Minutes of the Shareholders' Meeting of May 31, 2023," which reveals the new shareholder structure of AlterBank Limited, in which Mr. Tomas Hernández (a citizen of El Salvador) and Blas Santander (a U.S. citizen) own a percentage of the bank.

**This evidence relates to facts "1" through "35" of the motion.**

5. **DOCUMENTARY EVIDENCE.**— Consisting of the statement by José Romero Esclusa, CEO of AlterBank, dated July 14, 2026, a resident of Panama, a statement given in Case No. 26-23885-MC-MARTINEZ during *the discovery phase* on

Florida, United States, which is attached hereto as **ANNEX 7**, and its Spanish translation by a certified translator authorized by the Federal Judiciary Council as **ANNEX 7 BIS**.

The evidence on the merits establishes that Blas Santander (a resident of Miami, Florida) resigned **on March 31, 2026**; Timothy Richards (a resident of Miami, Florida) resigned on **June 26, 2026**; and Alexander Soroka (a resident of Miami, Florida) resigned on **June 17, 2026**. All of them were members of the Board of Directors who submitted their resignations, coincidentally, on dates after the *discovery proceedings* had begun in Miami, Florida, United States—the place where they resided and could have been questioned regarding the loan granted to TVA.

**This evidence is relevant to the foregoing, since the aforementioned information is verbatim in that statement.**

**This evidence relates to facts "1" through "35" of the motion.**

6. **DOCUMENTARY EVIDENCE.**— Consisting of the corporate record of Alter Bank Limited in the International Commercial Companies Registry of Saint Lucia as of January 28, 2026, with its duly certified Spanish translation by an expert certified by the Federal Judiciary Council, attached as **EXHIBIT 6** and **EXHIBIT 6 BIS**, respectively, obtained in connection with *Discovery* proceeding No. 26-23885-MC-MARTINEZ.

FERNANDO DEI CASTILLO FLUKZA
3U0X0U3U313U3X0U3U35U3U37U38U36U34U34X
02/14/27 4:09:27 PM

This evidence establishes, among other things: *(i)* the corporate registration of Alter Bank Limited, No. 2007-00022; *(ii)* the date of incorporation of Alter Bank Limited on January 23, 2007, as *StateTrust Bank & Trust Limited*; *(iii)* the ownership by the Venezuelan citizen Augusto César Castillo Chávez of 100% of the shares of Alter Bank Limited; *(iv)* the members of the Board of Directors as of the date the credit agreement with TVA was entered into; *(v)* Alter Bank's decision-making process, as of the date the credit agreement with TVA was entered into, was primarily based in Florida and Mexico.

**This evidence relates to facts "1" through "35" of the motion.**

7. **DOCUMENTARY EVIDENCE.**— Consisting of the opinion issued by **Renée T. St. Rose**, Esq., **KC**, who is an expert in commercial, banking, and financial matters under the laws of Saint Lucia and the Eastern Caribbean—as evidenced by her credentials, consisting of *(i)* a Letter Patent dated April 2, 2025, issued by the Private Secretary to the Governor General of Saint Lucia and duly apostilled (which is attached as **ANNEX 3**); *(ii)* the Certificate of Professional Practice issued by the Registrar of the High Court of Justice in the State of Saint Lucia, dated December 30, 2025, duly apostilled (which is attached as **EXHIBIT 3**); and *(iii)* her curriculum vitae (which is attached

**in ANNEX 3), all of which have been translated into Spanish by a certified translator authorized by the Federal Judiciary Council (translations attached as part of ANNEX 3 BIS).**

Said opinion is attached hereto as **ANNEX 3**, with its translation into Spanish by a certified expert from the Federal Judiciary Council as **ANNEX 3 BIS**.

The aforementioned evidence establishes that the loan granted by Alter Bank Limited falls outside the ordinary market conditions applicable in Saint Lucia, considering the regulatory framework in force and applicable in that jurisdiction, the practices commonly observed in transactions of this nature, and, in general terms, Alter Bank Limited's own business model.

The evidence in question is suitable for establishing the foregoing, since foreign law is a matter of evidence and its interpretation can be validly determined by a legal professional from the relevant jurisdiction—in this case, Saint Lucia.

**This evidence relates to facts "1" through "35" of this motion.**

8. **DOCUMENTARY EVIDENCE**—Consisting of the opinion issued by attorneys **Mauricio Basila Lago and Paul Yamil José Aguilar**, who are experts in banking and financial law, which is attached as **EXHIBIT 9.** Their credentials are verified by their professional licenses issued by the General Directorate of Professions under the Ministry of Public Education, which are attached as **EXHIBIT 9 BIS**.

The aforementioned evidence establishes that the loan granted by Alter Bank Limited falls outside the ordinary market conditions applicable under the international regulatory framework that sets forth the standard market conditions for this type of transaction, the practices commonly observed in transactions of this nature, and, in general terms, Alter Bank Limited's own business model.

**The aforementioned evidence is suitable for establishing the foregoing, given that the signatories are experts in banking matters.**

**This evidence relates to facts "1" through "35" of this motion.**

9. **DOCUMENTARY EVIDENCE.**— Consisting of the press release issued **on May** 10 **, 2023,** by TVA itself on its website stating *"that today, the 63rd Civil Court of Mexico City ordered the company not to disclose to the public information regarding its financial situation, with the aim of causing uncertainty."* This is substantiated by the publication attached to

as **ANNEX 4** and is available at the following link: https://www.irtvazteca.com/es/comunicados-de-prensa.

This evidence demonstrates that TVA was concealing its financial information, and judicial measures were even ordered to address this, thereby proving the lack of transparency regarding this situation—which was essential for any credit institution or bank to grant it a loan, let alone a loan in the amount granted by AlterBank.

The cited evidence is appropriate, as it consists of public information issued and published by TVA itself, in which it acknowledges that it did not disclose its financial information, despite having a legal obligation to do so as a company listed on the Mexican Stock Exchange.

**This evidence relates to facts "1" through "35" of this motion.**

10. **DOCUMENTARY EVIDENCE.**— Consisting of the press release dated February 26, 2026, in which Grupo Salinas reported on the resolutions adopted at the Extraordinary General Shareholders' Meeting of TVA held on February 26, 2026, at which the corporate, operational, and financial reorganization of the company and its subsidiaries was approved through a voluntary bankruptcy proceeding, the application for which would be filed in the coming days. This was due to the fact that they stated they had faced financial challenges since 2018 and that, beginning in 2021, a process had been initiated to reorganize their financial obligations, **including their foreign-currency debt**. The press release is attached hereto as **ANNEX 5**, although it is a matter of public knowledge to Your Honor as it is published on the Grupo Salinas website at https://www.gruposalinas.com/noticias/notas/comicenza-tv-azteca-proceso-reorganizacion/

FRANKANDRO DRL CASTILEO FILIURA
JXDXJXJXJXJXJXJXJXJXJXJXJXJXJXJXJXJXJX
02/14/27 4:09:27 PM

This evidence demonstrates that TVA acknowledged facing financial difficulties between 2018 and 2021, as well as having approved the filing of its petition for bankruptcy on February 26, 2026—circumstances that make it evident that the loan at issue in this motion was granted outside of market conditions and in violation of sound banking and commercial practices and customs.

The cited evidence is appropriate, as it consists of public information issued and published by TVA itself, in which it acknowledges its troubled financial situation between 2018 and 2021, as well as the approval to file for bankruptcy less than one month after taking out the loan that is the subject of this motion.

**This evidence relates to facts "1" through "35" of this motion.**

11. **DOCUMENTARY EVIDENCE.**— Consisting of the news article dated July 22, 2025, published in the **newspaper Reforma**, attached as **EXHIBIT 8**, which

**can be viewed at the link https://www.reforma.com/apricion-ty/2016/08/08/20160808-ny/ar3042710.**

This evidence demonstrates that TV Azteca, S.A.B. de C.V. has been in a state of financial distress since 2023—that is, prior to entering into the credit agreement with After Bank Limited.

This evidence constitutes a matter of public knowledge for Your Honor under the case law cited in the footnote titled *"WEBSITES OR ELECTRONIC PAGES: THEIR CONTENT CONSTITUTES A MATTER OF PUBLIC KNOWLEDGE AND MAY BE CONSIDERED IN A JUDICIAL DECISION*." [10]

**This evidence relates to facts "1" through "35" of** this motion.

**12. DOCUMENTARY EVIDENCE.**— Consisting of the news article dated December 31, 2025, attached as **EXHIBIT 8**, published by the newspaper **Proceso** and available at the following link: https://www.proceso.com.mx/nacional/justicia/2025/12/3/tribunales-acorralan-tv-azteca-grupo-elektra-de-ricardo-salinas-pliego-363593.html.

This evidence demonstrates that TV Azteca, S.A.B. de C.V. was in a state of financial distress as of 2025—that is, prior to entering into the credit agreement with Alter Bank Limited.

"Digital Record: 2030262 Court: Collegiate Circuit Courts, Eleventh Term Subject(s): Civil, General Legal Principle: 13o.C. J/8 K (11th) Source: Gazette of the Federal Judicial Weekly. Book 48, April 2025, Part II, Volume 2, page 882 Type: Case Law WEBSITES OR ELECTRONIC MEDIA. THEIR CONTENT CONSTITUTES A MATTER OF PUBLIC KNOWLEDGE AND MAY BE CONSIDERED IN A JUDICIAL DECISION. Facts: The appellant alleges that the personal service of process, consisting of the summons of the defendant in the original proceeding, was not effected on any of the persons specified in Article 116 of the Code of Civil Procedure for the Federal District applicable to Mexico City—that is, the interested party, representative, agent, attorney, or authorized representative in the case— since it was served at an address other than that of the defendant company's administrative office, which corresponds to one of the branches listed on the company's website. Legal Ruling: This Collegiate Circuit Court determines that the content of websites or web pages constitutes a matter of public record and is subject to consideration in a judicial decision. Justification: This is because the information published in documents or web pages located on computer networks constitutes a matter of public record, as it forms part of public knowledge through those media at the time a judicial decision is rendered, in accordance with Article 88 of the Federal Code of Civil Procedure. That said, access to and use of the Internet to search for information regarding the existence of legal entities, commercial establishments, addresses, and, in general, any data published on computer networks, forms part of the normal culture of specific sectors of society, depending on the type of information in question; hence, while it is not possible to assert that such information is available to all sectors of society, the truth is that it is possible to determine whether, based on the type of data, a fact forms part of the normal culture of a sector of society and may be considered common knowledge by the judge and, consequently, taken into account in a judicial decision—not because of the number of people who are aware of that fact, but because of the notoriety, accessibility, acceptance, and impartiality of this knowledge. THIRD COLLEGIATE COURT FOR CIVIL MATTERS OF THE FIRST CIRCUIT. Amparo in review 365/2012. December 7, 2012. Unanimous decision. Presiding Judge: Neófito López Ramos. Clerk: Ana Lilia Osorno Arroyo. Direct Amparo 383/2020. November 5, 2020. Unanimous decision. Presiding Judge: Sofía Verónica Ávalos Díaz. Clerk: Víctor Hugo Solano Vera. Appeal 31/2021. September 29, 2021. Unanimous decision. Presiding Judge: Sofía Verónica Ávalos Díaz. Clerk: José Manuel Martínez Villcaña. Direct Amparo 358/2021. October 27, 2021. Unanimous decision. Reporting Judge: Sofía Verónica Ávalos Díaz. Clerk: Saulo García Morán. Direct amparo 647/2021. February 2, 2022. Unanimous decision. Reporting Judge: Víctor Francisco Mota Cienfuegos. Clerk: José Francisco Díaz Estéba Avelino. Note: By a ruling dated October 13, 2021, the Second Chamber of the Supreme Court of Justice of the Nation declared that Contradiction of Precedents 159/2021 did not exist. This contradiction arose from a complaint challenging the legal reasoning set forth in the writ of amparo under review 365/2012, which forms part of the precedents for this thesis, since "the collegiate courts considered different elements in each case to determine whether or not the matter was a matter of public knowledge, and this circumstance prevents there from being a single starting point for reaching a conclusion."

This legal opinion was published on Friday, April 11, 2025, at 10:15 a.m. in the Federal Judicial Weekly and, therefore, is considered mandatory as of Monday, April 14, 2025, for the purposes set forth in paragraph nine of General Plenary Agreement 1/2021.