# Exhibit J

JUZGADO PRIMERO DE DISTRITO EN MATERIA DE CONCURSOS MERCANTILES
2026 AGO 18 AM 9:30
CON RESIDENCIA EN LA CIUDAD DE MÉXICO Y JURISDICCIÓN EN TODA LA REPÚBLICA MEXICANA

34 anexo'

011058

**COMERCIANTE: TV AZTECA, S.A.B. DE C.V.**

**PROCEDIMIENTO DE CONCURSO MERCANTIL**

**EXPEDIENTE: 22/2026**

**INCIDENTE DE INEFICACIA DE ACTOS EN FRAUDE DE ACREEDORES**

**C. JUEZ PRIMERO DE DISTRITO EN MATERIA DE CONCURSOS MERCANTILES, CON RESIDENCIA EN LA CIUDAD DE MÉXICO Y JURISDICCIÓN EN TODA LA REPÚBLICA MEXICANA.**

**FERNANDO DEL CASTILLO ELORZA,** en mi carácter de apoderado general para pleitos y cobranzas de **THE BANK OF NEW YORK MELLON en su carácter de Fiduciario** (en adelante,"**BNY**" o el "**Trustee**", indistintamente) personalidad que acredito y solicito me sea reconocida en términos del primer testimonio del instrumento público número 70,138 de fecha 10 de agosto de 2026, otorgada ante la fe del licenciado Luis Eduardo Paredes Sánchez, titular de la notaría número 180 de la Ciudad de México, misma que se agrega de forma digitalizada al presente como **ANEXO 1**, la cual **manifiesto bajo formal protesta de decir verdad** que es una copia fiel e íntegra del original, ante Usted, respetuosamente, comparezco y expongo:

**AUTORIZACIÓN DE ACCESO AL EXPEDIENTE ELECTRÓNICO**

Con fundamento en lo dispuesto por los artículos 33, 35 y 36 del Acuerdo General 12/2020 del Pleno del Consejo de la Judicatura Federal (en adelante, "**Acuerdo 12/2020**"), solicito la autorización para consultar el expediente electrónico que se forme con motivo del presente asunto, así como para recibir las notificaciones electrónicas, al usuario en el Portal de Servicios en Línea del Poder Judicial de la Federación "**AnaElizalde**", que corresponde a la licenciada en derecho **ANA LAURA ELIZALDE LEÓN** (Cédula Profesional 4455257), con correo electrónico aelizalde@dc-ca.mx.

**PERSONAS AUTORIZADAS**

Autorizo en términos amplios de lo dispuesto por el tercer párrafo del artículo 1069 del Código de Comercio, de aplicación supletoria a la Ley de Concursos Mercantiles, a los licenciadas en derecho **ANA LAURA ELIZALDE LEÓN** (Cédula Profesional 4455257), **GABRIELA GUADALUPE MEZA DÍAZ DE LEÓN** (Cédula Profesional 3720580), **ALEJANDRA REA ANAYA** (Cédula Profesional 12051950) y **MARICRUZ CERVERA MEDINA** (Cédula Profesional 12550854), indistintamente, quienes quedan facultados en términos amplios de dicho precepto legal, y únicamente para oír y recibir notificaciones, así

como para recoger toda clase de documentos y valores, imponerse de autos y tomar fotografías de las constancias del expediente a los señores **ROCÍO RIVERA ROJAS, LIZZET JHOANA RAMÍREZ CERVANTES, JULIA LOZA HERRERA** y **RODRIGO ARTURO LUNA GONZÁLEZ.**

**INCIDENTE DE INEFICACIA DE ACTOS EN FRAUDE DE ACREEDORES**

Con fundamento en lo dispuesto por los artículos 112, 113, 114, 267 y demás relativos y aplicables de la Ley de Concursos Mercantiles (en adelante, la "**LCM**") promuevo en nombre de mi representada el presente **INCIDENTE DE INEFICACIA DE ACTOS EN FRAUDE DE ACREEDORES** en contra de:

**A. TV AZTECA, S.A.B. DE C.V.** (en adelante, la "**Comerciante**" o "**TVA**", indistintamente), quien tiene su domicilio para ser emplazada en **Boulevard Manuel Ávila Camacho número 32, piso 11, colonia Lomas de Chapultepec, Alcaldía Miguel Hidalgo, Código Postal 11000, Ciudad de México**.

Mediante el presente incidente se reclaman las siguientes:

**PRESTACIONES**

FERNANDO DEL CASTILLO ELORZA

**A.** La declaración de la ineficacia del contrato de crédito de fecha 29 de enero de 2026 celebrado entre **Alter Bank, LTD** (en adelante, "**AlterBank**") en su carácter de agente estructurador, acreditante inicial, agente administrativo y agente de garantías y **TVA** como acreditado, así como de su convenio modificatorio y de reexpresión de fecha 06 de marzo de 2026.

**B.** En consecuencia, la ineficacia de dicho crédito frente a la masa y el resto de los acreedores reconocidos (según estos se determinen en la sentencia de reconocimiento, graduación y prelación de créditos).

**C.** La declaración de que, como consecuencia de la ineficacia de dicho crédito frente a la Masa, AlterBank no puede ser reconocido como acreedor dentro del presente procedimiento concursal y tampoco puede suscribir la propuesta de convenio concursal que se presente.

**D.** Los gastos y costas que deriven del presente incidente.

**LEGITIMACIÓN DE BNY COMO FIDUCIARIO Y DERECHOS DE LOS TENEDORES**

BNY actúa como Fiduciario (*Trustee*) conforme al Contrato de Emisión (*Indenture*) de fecha 09 de agosto de 2017, celebrado entre TVA, las subsidiarias garantes y BNY, respecto de los Bonos Preferentes al 8.250% con vencimiento en 2024.

BNY actúa por cuenta y para beneficio de los titulares de los intereses beneficiarios representados por la Nota Global.

Conforme al Contrato de Emisión de Bonos, BNY tiene el derecho y el deber de hacer cumplir las obligaciones de TVA y de las subsidiarias garantes, incluyendo la presentación y persecución de reclamaciones en procedimientos de insolvencia, como lo es el presente concurso mercantil.

**RESERVA DE DERECHOS**

Se manifiesta a su Señoría que el presente incidente se promueve con base en la información contenida en la Solicitud de Declaración de Concurso Mercantil y el resto de los formatos que a la misma se acompañaron, presentada por TVA el 10 de marzo de 2026 ante la Oficialía de Partes Común de los Juzgados de Distrito en Materia de Concursos Mercantiles con Residencia en la Ciudad de México y Jurisdicción en toda la República Mexicana (en adelante, la "**Solicitud de Concurso**").

Asimismo, se promueve el presente incidente con base en la información pública disponible en los diversos medios de comunicación que se citan a lo largo del Incidente; **sin embargo, se manifiesta bajo protesta de decir verdad que mi representada no ha tenido acceso ni conocimiento del contenido exacto del Contrato de Crédito y su Convenio Modificatorio y de Reexpresión por no ser parte en la celebración de los mismos.**

Finalmente, toda vez que mi representada comparece al procedimiento de concurso mercantil mediante el presente incidente, **me reservo en su nombre su derecho a ampliarlo**, si una vez impuesta del contenido del expediente en que se actúa se advierten elementos que pudieran ser materia del incidente que se promueve.

**CAPÍTULO ESPECIAL SOBRE LA ACCIÓN DE INEFICACIA DE LOS ACTOS COMETIDOS EN FRAUDE DE ACREEDORES EN MATERIA DE CONCURSOS MERCANTILES**

**1. Periodo de Retroacción**

En términos de lo dispuesto por el artículo 112 de la Ley de Concursos Mercantiles (en adelante, la "**LCM**"), la fecha de retroacción es el día 270 natural inmediato anterior a la fecha de la sentencia de declaración del concurso mercantil.

En el concurso mercantil que nos ocupa, la **Fecha de Retroacción** es el **09 de octubre de 2025**, tal como se determinó en la sentencia de declaración de concurso mercantil de fecha 06 de julio de 2026 dictada por su Señoría.

Es de explorado derecho que la retroacción es entendida como la época en que se considera que en **el estado patrimonial del concursado ya existía el incumplimiento generalizado de pagos** (estado de impotencia patrimonial, no transitorio, que impiden al deudor cumplir regularmente con sus obligaciones líquidas y exigibles, mediante recursos genuinos); por ello, **la retroacción tiene su razón de ser en la falta de coincidencia entre el momento en que comienza el incumplimiento generalizado de obligaciones, que es presupuesto para la declaración de concurso mercantil, y el momento de su declaración judicial, periodo en el que opera la presunción de que los actos realizados por el deudor han sido consumados en perjuicio de los acreedores** y, de ahí, que se actualice la retroactividad de los efectos de la sentencia de concurso, a fin de eliminar las consecuencias dañosas que, para ello, tales actos pudieran eventualmente haber producido.

En ese sentido se han pronunciado nuestros más altos Tribunales:

> Registro digital: 166207
> Instancia: Tribunales Colegiados de Circuito
> Novena Época
> Materias(s): Civil
> Tesis: VI.1o.C.132 C
> Fuente: Semanario Judicial de la Federación y su Gaceta. Tomo XXX, Octubre de 2009, página 1413
> Tipo: Aislada
>
> **CONCURSOS MERCANTILES. CONCEPTO DE RETROACCIÓN Y SUS CONSECUENCIAS.**
>
> De una interpretación contextual de la Ley de Concursos Mercantiles, se tiene que la retroacción es entendida como la época en que se considera que, en el estado patrimonial del concursado, ya existía el incumplimiento generalizado de pagos (estado de impotencia patrimonial, no transitorio, que impide al deudor cumplir regularmente con sus obligaciones líquidas y exigibles, mediante recursos genuinos), por ello, la retroacción tiene su razón de ser en la falta de coincidencia entre el momento en que comienza el incumplimiento generalizado de obligaciones, que es presupuesto para la declaración de concurso mercantil, y el de su declaración judicial, periodo en el que opera la presunción de que los actos realizados por el deudor han sido consumados en perjuicio de los acreedores; de ahí que se actualice la retroactividad de los efectos de la sentencia de concurso, a fin de eliminar las consecuencias dañosas que para ello tales actos pudieran eventualmente haber producido; esto es, la retroacción es el periodo decretado por el Juez, mediante el cual se pretende hacer coincidir el estado legal de incumplimiento generalizado de obligaciones, con el estado de incumplimiento generalizado de obligaciones de hecho, posibilitándose la declaración de ineficacia de todas aquellas operaciones o actos realizados por el comerciante en esa época, a la que se retrotraen los efectos de la declaración judicial.
>
> PRIMER TRIBUNAL COLEGIADO EN MATERIA CIVIL DEL SEXTO CIRCUITO.
> Amparo en revisión 105/2009. **********. 2 de julio de 2009. Mayoría de votos. Disidente: Enrique Zayas Roldán. Ponente: Rosa María Temblador Vidrio. Secretario: Ciro Carrera Santiago.

**2. Actos que constituyen fraude de acreedores**

FERNANDO DEL CASTILLO ELORZA
14:02:27 16:02:27

El artículo 114 de la LCM establece un catálogo **objetivo** (es decir independiente del elemento volitivo de las partes) que se materializan como actos en fraude de acreedores, en cuya fracción III se señalan como tal las operaciones celebradas por el Comerciante en las que se hubieren pactado **condiciones o términos que se aparten de manera significativa de las condiciones prevalecientes en el mercado** en el que se hayan celebrado, en la fecha de su celebración, o de los usos o prácticas mercantiles. En el caso, el Contrato de Crédito y su Convenio Modificatorio y de Reexpresión actualizan este supuesto, pues documentan un crédito garantizado de hasta US$290,000,000.00 otorgado a una compañía abiertamente insolvente por una institución sin historial de otorgar créditos a TVA ni financiamientos de tamaño comparable, en términos que incluso colocaban en riesgo la propia viabilidad de AlterBank, tal como se expone en el presente.

A continuación, el artículo en cita:

> ***Artículo 114.-*** *Son actos en fraude de acreedores, los siguientes, siempre que se hayan llevado a cabo a partir de la fecha de retroacción:*
>
> ...
>
> ***III.*** *Las operaciones celebradas por el Comerciante en las que se hubieren pactado condiciones o términos que se aparten de manera significativa de las condiciones prevalecientes en el mercado en el que se hayan celebrado, en la fecha de su celebración, o de los usos o prácticas mercantiles.*
>
> ...

## 3. Actos que se presumen cometidos en fraude de acreedores

La Ley de Concursos Mercantiles establece la presunción legal de que el otorgamiento de garantías o incremento de las vigentes, cuando la obligación original no las contemplaba es un acto cometido en fraude de acreedores **salvo que el interesado pruebe su buena fe.**

A continuación, el artículo en cita:

> **Artículo 115.-** Se presumen actos en fraude de acreedores, si se realizan a partir de la fecha de retroacción, salvo que el interesado pruebe su buena fe:
>
> **I.-** El otorgamiento de garantías o incremento de las vigentes, cuando la obligación original no contemplaba dicha garantía o incremento, y…

## 4. Consecuencias de que un acto sea celebrado en fraude de acreedores

Conforme a lo dispuesto por el artículo 113 de la LCM, la consecuencia legal establecida para los actos cometidos en fraude de acreedores consiste en que éstos sean **ineficaces** frente a la Masa.

Doctrinalmente se ha determinado a la ineficacia en este sentido:

> *En sentido amplio, la ineficacia es un género que comprende la privación total o parcial de los efectos de un acto jurídico entre las partes o frente a terceros. Dentro de sus especies encontramos la invalidez (nulidad y anulabilidad), la inexistencia, la inoponibilidad, la revocación, la resolución y la rescisión.*
>
> *La ineficacia jurídica, stricto sensu, se identifica con la inoponibilidad que consiste en la privación de los efectos típicos del acto, es decir, los limita ante el incumplimiento de alguna condicionante. Tal ineficacia torna inoponible el acto, es decir, permite al tercero interesado actuar como si el acto no existiese.*[1]

Es decir, las consecuencias jurídicas de que un acto haya sido celebrado en fraude de acreedores, como ocurre en el caso que nos ocupa, tiene como consecuencia **necesaria** que los derechos y obligaciones que derivan del mismo no puedan ser oponibles a los acreedores de la comerciante ni a la Masa. Esto es, el acreedor que haya intervenido en el acto celebrado en fraude de acreedores ***(i)*** no podrá ser reconocido en la sentencia de reconocimiento, graduación y prelación de créditos y, en consecuencia, ***(ii)*** no podrá suscribir el convenio propuesto dentro del procedimiento.

Lo anterior tiene que ser así pues es la única manera de salvaguardar los derechos de los acreedores que actuaron de buena fe con el comerciante y proteger la integridad de la Masa. La legislación concursal proscribe que los derechos y obligaciones existentes entre la comerciante y un acreedor que participó en la celebración de un acto en fraude de acreedores –sobre todo en un acto que es taxativamente catalogado como tal por la ley, como en el presente caso– burlen los principios de la ley a través del ejercicio de derechos tales como la suscripción del convenio concursal en perjuicio de terceros.

FERNANDO DEL CASTILLO ELORZA

En mérito de lo anterior y, tal como se acredita en el presente, el crédito otorgado por AlterBank es un acto celebrado en fraude de acreedores por lo que no deberá ser reconocido en la sentencia de reconocimiento, graduación y prelación de créditos –que automáticamente lo elimina de la suma total de pasivos a cargo de la comerciante– y no tendrá el derecho a suscribir la propuesta de convenio que en su momento se presente.

## CAPÍTULO ESPECIAL SOBRE ALTER BANK

*Alter Bank Limited* es una entidad con doble naturaleza jurídica: ***(i)*** como entidad corporativa, es una Sociedad Comercial Internacional (*IBC- International Business Company*) y, ***(ii)*** como institución financiera, es un banco internacional con licencia para operar como tal.

Alter Bank es una sociedad incorporada conforme a la Ley de Sociedades Comerciales Internacionales de Santa Lucía (IBC Act), originalmente constituida y registrada el 23 de enero de 2007 como *StateTrust Bank & Trust Limited*, cambiando de

---

[1] López Gianopoulos, Set Leonel, "La retroacción de los efectos de la sentencia de concurso mercantil. Un análisis desde la seguridad jurídica", *Revista del Instituto de la Judicatura Federal*, México, Instituto de la Judicatura Federal – Consejo de la Judicatura Federal, 2013, pp. 119-138, en específico p. 127. Disponible en: https://revistas-colaboracion.juridicas.unam.mx/index.php/judicatura/article/viewFile/32106/29099

nombre a *Alter Bank Limited*, mediante la resolución de accionistas con efectos al 19 de mayo de 2023.

Por su parte, también es un banco internacional establecido en Santa Lucía e incorporado conforme al Capítulo 12.17 de la Ley de Bancos Internacionales de Santa Lucía (*International Banks Act*), operando con una licencia Clase A No. IB/007(A), emitida por la *Autoridad Reguladora de Servicios Financieros de Santa Lucía* (FSRA) de Santa Lucía. [2]

Conforme a la Ley de Bancos Internacionales, una licencia Clase A permite realizar operaciones bancarias con terceros sin restricción, y requiere un capital mínimo pagado de USD 2,200,000.00 (Dos millones doscientos mil dólares de los Estados Unidos de América), debiendo mantener un depósito regulatorio de USD 300,000.00 (Trescientos mil dólares de los Estados Unidos de América. [3]

De acuerdo con información documental obtenida en el proceso regulado en la Sección 1782 del Título 28 del Código de los Estados Unidos (*Discovery*) seguido ante el Juez de Distrito de los Estados Unidos para el Distrito Sur de Florida, División de Miami, Caso No. 26-23885-MC-MARTINEZ que se acompaña como **ANEXO 2** con su traducción al español por perito certificado como **ANEXO 2 BIS**, AlterBank presentó diversos documentos que formaron parte de los requerimientos exigidos por la FSRA durante el proceso de obtención de su licencia, en el año 2024. De esos documentos, se desprende que el modelo de negocio propuesto por AlterBank se enfoca en ofrecer y prestar sus servicios a **pequeñas y medianas** empresas involucradas en comercio internacional, pagos transfronterizos y servicios bancarios internacionales personalizados.

Su proyección financiera propuesta para este año 2026, implicaba tener activos equivalentes a USD 49,076,134.23 (Cuarenta y nueve millones setenta y seis mil ciento treinta y cuatro dólares de los Estados Unidos de América 23/100), **préstamos por USD 14,356,051.00 (Catorce millones trescientos cincuenta y seis mil cincuenta y un dólares de los Estados Unidos de América 00/100)**, depósitos por USD 45,940,000.00 (Cuarenta y cinco millones novecientos cuarenta mil dólares de los Estados Unidos de América 00/100), entre otras proyecciones para ese año. [4]

Incluso, proyectaron un volumen de transacciones por año, siendo que en 2026 proyectaron un total de 7,674 transacciones que equivaldrían a USD 173,000,000.00 (Ciento setenta y tres millones de dólares 00/100). Entre ellas, las transacciones de salida por transferencias o envío de fondos equivaldrían a $84,500,000.00 (Ochenta y cuatro millones quinientos mil dólares de los Estados Unidos de América 00/100), siendo un total de 3,803

---

[2] Financial Services Regulatory Authority - Regulated Entities
[3] https://fsrastlucia.org/index.php/international-sector/international-banks/overview
[4] Página 8 del Anexo 2 y Anexo 2 Bis (páginas numeradas como JR-Alter).

transacciones, y el resto lo proyectaron como transacciones por recibir, es decir, recursos o fondos que esperaban recibir durante el año.

Por otro lado, de los estados financieros no auditados de AlterBank de fecha 31 de marzo de 2024, se desprende que a esa fecha el banco tenía un total de activos equivalentes a **USD 2.3 millones de dólares de los Estados Unidos de América.** [5]

De acuerdo con la información presentada el crédito otorgado a la comerciante excede de manera considerable las proyecciones del plan de negocio de AlterBank, incluso para el año 2028. No sólo en el valor de la transacción, sino también en el tamaño del cliente, ya que TVA es una empresa con presencia nacional e internacional, siendo una de las principales productoras y difusoras de contenido en español a nivel mundial, que cotizó en la Bolsa Mexicana de Valores como una Sociedad Anónima Bursátil.

Asimismo, la operación parece alejarse de la distribución geográfica contemplada en el plan de negocios, el cual proyectaba que aproximadamente el 80% (ochenta por ciento) de las transacciones se concentraría en Estados Unidos y solo el 20% (veinte por ciento) en otros mercados internacionales.

En este caso, si AlterBank se desvió del plan de negocio presentado para 2024, tuvo que haber informado a la FSRA, autoridad competente en Santa Lucía, de acuerdo con lo explicado por la experta **Renée T. St. Rose KC** en su opinión emitida que se agrega como **ANEXO 3** y su traducción al español por perito certificado como **ANEXO 3 BIS**, de la que se desprende que era obligación del banco reportar un cambio en su plan de negocios.

FERNANDO DEL CASTILLO ELORZA

El crédito que otorgó AlterBank fue exclusivamente a una sola empresa en México, es decir, un cliente que, al momento en el que se otorgó el crédito, había hecho público que enfrentaba las dificultades de una situación financiera deteriorada, siendo que esa única transacción superó cualquier proyección presentada por AlterBank para el periodo 2024 a 2028.

A mayor abundamiento, el **10 de mayo de 2023** la propia TVA publicó en su página de internet "*que el día de hoy el Juzgado Sexagésimo Tercero de lo Civil de la Ciudad de México ordenó a la empresa no presentar al público información relativa a su situación financiera, lo anterior con el fin de no causar incertidumbre*". Lo anterior se acredita con la publicación que se acompaña al presente como **ANEXO 4** y se encuentra disponible en el enlace: https://www.irtvazteca.com/es/comunicados-de-prensa.

Es decir, desde por lo menos **tres años previos** a la celebración del contrato de crédito con AlterBank, TVA había ocultado su información financiera del público inversionista.

[5] Páginas 320 a 334 del Anexo 2 y Anexo 2 Bis (páginas numeradas como JR-Alter).

Asimismo, el 26 de febrero de 2026 Grupo Salinas publicó un comunicado en el que informó los acuerdos alcanzados en la Asamblea General Extraordinaria de Accionistas de TVA de fecha 26 de febrero de 2026, en la que fue aprobada la reorganización corporativa, operativa y financiera de la compañía y sus empresas subsidiarias mediante un concurso mercantil voluntario, cuya solicitud se presentaría en los próximos días, lo anterior en virtud de que manifestaron que desde el año 2018 enfrentaron retos financieros y que desde el año 2021 se inició un proceso para reorganizar sus compromisos financieros **incluída su deuda en moneda extranjera**. El comunicado se acompaña al presente como **ANEXO 5**, mismo que es un hecho notorio para su Señoría por encontrarse publicado en la página de internet de Grupo Salinas https://www.gruposalinas.com/noticias/notas/comienza-tv-azteca-proceso-reorganizacion/.

De acuerdo con el registro corporativo de AlterBank, obtenido del Registro Sociedades Comerciales Internacionales, con relación al proceso de *Discovery*, mismo que se agrega al presente como **ANEXO 6** y su traducción al español por perito certificado como **ANEXO 6 BIS**, los miembros del Consejo de Administración de AlterBank al 28 de enero de 2026, es decir, al momento de que se celebró el contrato de crédito con TVA, son los siguientes: **Wilbert Owen Bascom** (nombrado el 11 de abril de 2023, posteriormente registrado en el Registro como fallecido, sin que se indique la fecha de fallecimiento); **Blas Santander** (Miami, Florida; nombrado el 20 de septiembre de 2023 y renunció el 31 de marzo de 2026); **Timothy Richards** (Coral Gables, Florida; nombrado el 17 de julio de 2025 y renunció el 26 de junio de 2026); **Alexander Soroka** (Plantation, Florida; nombrado el 16 de abril de 2025 y renunció el 17 de junio de 2026); **Augusto César Castillo Chávez** (Ciudad de México, México; nombrado el 30 de diciembre de 2024); y **Kendall Gill** (Santa Lucía; nombrado el 1 de abril de 2009).

Resulta particularmente relevante que diversos miembros del Consejo de Administración que participaban en la dirección de Alter Bank al momento de la celebración del crédito con TVA, dejaron sus cargos en los meses inmediatamente posteriores al inicio del proceso de *Discovery* en Estados Unidos.

Como se desprende de la declaración de José Romero Esclusa, Director General de AlterBank de fecha 14 de julio de 2026, residente en Panamá, declaración rendida en el caso Caso No. 26-23885-MC-MARTINEZ de *Discovery* en Florida, Estados Unidos, que se agrega a la presente como **ANEXO 7** y su traducción al español por perito certificado autorizado por el Consejo de la Judicatura Federal como **ANEXO 7 BIS:** Blas Santander (residente en Miami, Florida) renunció el **31 de marzo de 2026**; Timothy Richards (residente en Miami, Florida) renunció el **26 de junio de 2026**; y Alexander Soroka (residente en Miami, Florida) renunció el **17 de junio de 2026**. Todos ellos miembros del Consejo de Administración, que presentaron sus renuncias coincidentemente en fechas posteriores al

*Discovery* que se había iniciado en Miami, Florida, Estados Unidos, lugar donde residían y podían ser cuestionados con relación al crédito otorgado a TVA.

Por otro lado, de acuerdo con la información obtenida del registro corporativo de AlterBank en Santa Lucía de fecha 28 de enero de 2026, el beneficiario y propietario del 100% (cien por ciento) de las acciones emitidas de AlterBank es el señor **Augusto César Castillo Chávez**, de nacionalidad venezolana y el único director con domicilio registrado en México. Llama la atención que, pese a figurar como beneficiario final del 100% (cien por ciento) de AlterBank y como integrante de su Consejo de Administración al momento de la celebración del crédito con TVA, no se localizaron fuentes públicas que acrediten experiencia profesional, trayectoria ejecutiva o participación relevante de Augusto César Castillo Chávez en instituciones bancarias, financieras o del mercado de capitales. Asimismo, tampoco se identificaron entrevistas, publicaciones especializadas, perfiles corporativos o antecedentes públicos que permitan asociarlo con actividades de dirección o gestión dentro del sector financiero, más allá de su vinculación con AlterBank.

Antes de eso, el registro muestra que el señor Juan Francisco Ramirez, es el anterior beneficiario y propietario del 100% (cien por ciento) de las acciones emitidas por AlterBank desde el **22 de marzo de 2023** y hasta el 30 de diciembre de 2024.

FERNANDO DEL CASTILLO ELORZA
14-02-27 16:03:27

La información reportada en el registro de Santa Lucía, se contradice de la evidencia obtenida en el proceso de *Discovery*, de la que se desprende el correo electrónico de 1° de junio de 2023 [6] sobre una reunión de accionistas que se llevó a cabo el 31 de mayo de 2023, en el que se compartió la distribución accionaria de AlterBank al **31 de mayo de 2023**: ***(i)*** Juan Ramírez (30.95%), quien inició un juicio en Santa Lucía en contra de AlterBank por el traspaso de sus acciones[7]; ***(ii)*** Blas Santanader (15.47%) y, ***(iii)*** Agusto César Castillo Chávez y Tomas Hernádez (53.58%). La razón por la cual se reporta que estos últimos son propietarios de las mismas acciones es desconocida por mi representada a la fecha. Asimismo, la razón por la que se registró una distribución accionaria distinta a la reportada en información interna de AlterBank también es desconocida a la fecha.

Además, la investigación del *Trustee* sugiere que anteriores propietarios y afiliados de AlterBank se encuentran vinculados con actos de fraude y evasión de sanciones, circunstancia que refuerza la falta de capacidad y de credibilidad comercial de la institución para celebrar una operación de esta magnitud.

Derivado de todo lo anterior, la operación con TVA se aparta de manera considerable de las proyecciones financieras de AlterBank, el perfil de clientes y la escala operativa contemplados por la institución al momento de solicitar su licencia en Santa Lucía en el año

---

[6] Página 78 y 79 del Anexo 2 y del Anexo 2 Bis (páginas numeradas como JR- Alter).
[7] Página 133 a 145 del Anexo2 y del Anexo 2 Bis (páginas numeradas como JR- Alter).

2024. Lo anterior, sumado al hecho que AlterBank celebró un contrato de crédito con una empresa en evidente insolvencia, como se explicará a lo largo de este incidente.

**HECHOS**

1. El 10 de marzo de 2026, TVA presentó su solicitud de declaración de concurso mercantil en etapa de conciliación (en adelante, la "**Solicitud de Concurso**") ante la Oficialía de Partes Común de los Juzgados de Distrito en Materia de Concursos Mercantiles con Residencia en la Ciudad de México y Jurisdicción en toda la República Mexicana.

2. La Solicitud de Concurso fue admitida por su Señoría mediante auto de 20 de marzo de 2026.

3. Mediante sentencia de 06 de julio de 2026 se declaró en concurso mercantil en etapa de conciliación a TVA, señalando como **fecha de retroacción el 09 de octubre de 2025** (en adelante, la "**Sentencia de Concurso**"), tal como se advierte del edicto publicado.

4. La Sentencia de Concurso se publicó en el Diario Oficial de la Federación y en el periódico el "Universal" el 10 de agosto de 2026. Lo anterior constituye un hecho notorio para su Señoría.

5. El 29 de enero de 2026, es decir, apenas mes y medio antes de su solicitud de concurso mercantil, TVA celebró en su carácter de acreditado un contrato de crédito con AlterBank, este último en su carácter de agente estructurador, acreditante inicial, agente administrativo y agente de garantías. Dicho crédito fue otorgado hasta por la cantidad de $5,000,000,000.00 (cinco mil millones de pesos 00/100 M.N.) según fue narrado por TVA en el inciso "5" de la Sección 2 de la Solicitud de Concurso.

   Toda vez que mi representada no es parte en el contrato de referencia, solicito respetuosamente a su Señoría requiera a TVA para que lo exhiba dentro del presente incidente, a efecto de conocer su contenido y ejercer los derechos correspondientes.

6. Posteriormente, el 06 de marzo de 2026 TVA y AlterBank celebraron un convenio modificatorio y de reexpresión al Contrato de Crédito señalado en el hecho "5" que antecede.

   Toda vez que mi representada no es parte en el convenio de referencia, solicito respetuosamente a su Señoría requiera a TVA para que lo exhiba dentro del presente incidente, a efecto de conocer su contenido y ejercer los derechos correspondientes.

7. La celebración del Contrato de Crédito y su Convenio Modificatorio y de Reexpresión se encuentra reconocida y confesada de forma libre, voluntaria y

espontánea por TVA en *(i)* su solicitud de declaración en concurso mercantil (página 27), *(ii)* en la Sección 2 denominada "Manifestación de Incumplimiento o inminencia de incumplimiento generalizado en el pago de obligaciones del comerciante" (incisos 5 y 6) y *(iii)* en el Anexo 3 denominado "Relación de Acreedores" (señalando a AlterBank como acreedor en el inciso 4).

**8.** Ahora bien, la celebración del Contrato de Crédito y su posterior Convenio Modificatorio y de Reexpresión constituyen una operación claramente fuera de las condiciones de mercado y de los usos bancarios y comerciales, toda vez que, para el 29 de enero de 2026, fecha en la que inicialmente se celebró el contrato de crédito, **era ya un hecho notorio la situación de insolvencia de TVA.**

**9.** Esto, toda vez que por lo menos desde 2025 existen diversas publicaciones periodísticas que hicieron público el incumplimiento por parte de TVA a sus obligaciones de pago derivadas de la emisión de las **8.250% Senior Notes Due 2024**, realizada al amparo del Contrato de Emisión (Indenture) de fecha 09 de agosto de 2017, por un monto de principal de US$400,000,000.00 (cuatrocientos millones de dólares de los Estados Unidos de América), con vencimiento el 09 de agosto de 2024, respecto de la cual TVA dejó de pagar intereses desde el 09 de febrero de 2021 y no ha realizado pagos de principal ni intereses desde entonces, figurando BNY en su carácter de Fiduciario y The Bank of New York Mellon, London Branch en su carácter de Agente Principal de Pago.

FERNANDO DEL CASTILLO FLORZA

Sin perjuicio de que lo anterior constituye un hecho notorio por ser objeto de publicaciones periodísticas en diversos medios de comunicación, se acompañan al presente como **ANEXO 8** las notas publicadas por los siguientes periódicos:

**a)** **Periódico Reforma**, nota publicada el 22 de julio de 2025, disponible en el enlace: https://www.reforma.com/aprietan-a-tv-azteca-acreedores-en-ny/ar3042710

**b)** **Proceso**, nota publicada el 31 de diciembre de 2025, disponible en el enlace: https://www.proceso.com.mx/nacional/justicia/2025/12/31/tribunales-acorralan-tv-azteca-grupo-elektra-de-ricardo-salinas-pliego-363593.html

**c)** **Expansión**, nota publicada el 03 de diciembre de 2025, disponible en el enlace: https://expansion.mx/tecnologia/2025/12/03/la-crisis-que-acecha-a-tv-azteca

**10.** Del contenido de las notas periodísticas invocadas en el hecho anterior se advierte que era del dominio público que TVA se encontraba en problemas financieros y que había incumplido con sus obligaciones de pago a por lo menos los beneficiarios de la nota global emitida en 2017, así como que se encontraba impugnando diversos créditos fiscales que ascendían a miles de millones de pesos. Asimismo, por lo menos desde diciembre de 2025, TVA había hecho público que su situación financiera y sus pasivos fiscales hacían financieramente imposible pagar las Notas.

11. Es más, desde 2023 la propia TVA publicó en su página de internet "*que el día de hoy el Juzgado Sexagésimo Tercero de lo Civil de la Ciudad de México ordenó a la empresa no presentar al público información relativa a su situación financiera, lo anterior con el fin de no causar incertidumbre*". Lo anterior se acredita con la publicación que se acompaña al presente como **ANEXO 4** y se encuentra disponible en el enlace: https://www.irtvazteca.com/es/comunicados-de-prensa.

12. Lo anterior no tuvo implicaciones menores, pues incluso el 30 de enero de 2023, Fitch Ratings confirmó la calificación de TV Azteca en "*Restricted Default*" ("RD"), con motivo de dicho incumplimiento no subsanado en el pago de intereses de las notas senior, y afirmó en "C/RR4" la calificación de la emisión correspondiente. El 21 de diciembre de 2023, Fitch Ratings **retiró (*withdrew*) por completo la calificación de TV Azteca, señalando expresamente falta de acceso a información suficiente para mantenerla.**

Es decir, era información pública que no existía certeza ni transparencia respecto a la información financiera de TVA. Es más, lo que existía era un ocultamiento de ésta.

13. El estado de estrés financiero de TVA también se advierte de sus estados financieros –presentados como Anexo 1 de la Solicitud de Concurso– ya que el "Estado de Situación Financiera" correspondiente al ejercicio de 2025 muestra lo siguiente:

a) Un **Total de Pasivos** por la cantidad de **$29,926,016,000.00 (veintinueve mil novecientos veintiséis millones, dieciséis mil pesos 00/100 M.N.).**

b) Un **Total de Activos** por la cantidad de **$27,006,133,000.00 (veintisiete mil seis millones ciento treinta y tres mil pesos 00/100 M.N.).**

Es decir, es **evidente** que los pasivos de TVA superaban a los activos desde el ejercicio de 2025, por lo que, resulta inverosímil que una institución bancaria decidiera otorgarle un crédito en enero de 2026 a una sociedad en dicha situación de estrés financiero e "insolvencia técnica".

Es más, su **capital contable** para el ejercicio 2025 era $2,919,882,000.00 (Dos mil novecientos diecinueve millones ochocientos ochenta y dos mil pesos 00/100 M.N.), monto que es significativamente menor al importe del crédito contratado con AlterBank.

Para mejor referencia, a continuación, el extracto correspondiente del Anexo 1 de la Solicitud de Concurso:

| | |
|---|---|
| **Capital Contable** | |
| Capital Social | 765,142 |
| Reservas y otros conceptos de capital | 5,615,626 |
| Resultados Acumulados | (4,234,845) |
| Resultados del Ejercicio | (5,066,805) |
| Suma Capital Contable | (2,919,887) |
| Suma Pasivo y Capital Contable | 27,006,133 |

**14.** Dicho estrés financiero claramente subsistía en enero de 2026 el mes inmediato anterior a la contratación del crédito –presupuesto de que ahora se encuentre declarada en concurso mercantil–. Conforme a los estados financieros que presentó la Comerciante con su Solicitud de Concurso, su capital contable era de $3,136,785,000.00 (tres mil ciento treinta y seis millones setecientos ochenta y cinco mil pesos 00/100 M.N.), **monto significativamente menor al importe del crédito contratado con AlterBank.**

Para mejor referencia, a continuación, el extracto correspondiente del Anexo 1 de la Solicitud de Concurso:

| | |
|---|---|
| **Capital Contable** | |
| Capital Social | 766,142 |
| Reservas y otros conceptos de capital | 5,615,626 |
| Resultados Acumulados | (9,300,650) |
| Resultados del Ejercicio | (216,903) |
| **Suma Capital Contable** | **(3,136,785)** |
| **Suma Pasivo y Capital Contable** | **25,851,356** |

FERNANDO DEL CASTILLO ELORZA
26-02-27 16:09:27

A mayor abundamiento, la suma de activos de TVA al 31 de enero de 2026 era de **$25,851,356,000.00** (Veinticinco mil ochocientos cincuenta y un millones trescientos cincuenta y seis mil pesos 00/100 M.N.) y la suma de sus pasivos, de **$28,988,141,000.00** (Veintiocho mil novecientos ochenta y ocho millones ciento cuarenta y un mil pesos 00/100 M.N.). **Sobra decir que era evidente la situación de insolvencia y falta de capacidad de pago de TVA.**

**15.** De acuerdo con el marco regulatorio, las condiciones imperantes en el mercado y los usos y costumbres, la situación financiera de TVA tuvo que ser hecha del conocimiento de AlterBank previo al otorgamiento del crédito objeto del presente incidente, ya que es la información **mínima** que cualquier institución financiera solicita para determinar la capacidad de pago del acreditado, sobre todo, tomando en consideración el importe objeto del crédito que nos ocupa.

AlterBank se encontraba obligado a realizar un *due diligence* de TVA y recabar la información correspondiente a su situación financiera y obligaciones existentes, esto

es así en términos de su regulación aplicable, tal como se expone en los párrafos 25, 26, 36 y 37 de la opinión emitida por la experta **Renée T. St. Rose KC** que se agrega como **ANEXO 3** y su traducción al español por perito certificado como **ANEXO 3 BIS.** En obvio de repeticiones innecesarias, solicito se tenga por reproducido como si a la letra se insertase lo expresado en la Opinión en los párrafos señalados.

Asimismo, se menciona en los párrafos 11, 13, 14, 15, 38, 39, 40, entre otros, de la opinión de experto que se acompaña al presente como **ANEXO 9**, emitida por Mauricio Basila Lago –ex Director Director General de Emisoras y Vicepresidente de Supervisión Bursátil de la Comisión Nacional Bancaria y de Valores– y Paul Yamil José Aguilar ("Basila Abogados"), mismos que solicito se tengan aquí por reproducidos como si a la letra se insertase en obvio de repeticiones innecesarias.

Ambas opiniones concluyen y reflejan que constituye un estándar internacional de sanas prácticas bancarias realizar una debida y rigurosa diligencia para operaciones de crédito como la celebrada entre AlterBank y TVA.

**16.** De lo hasta aquí expuesto se advierte que ***(i)*** TVA se encontraba en insolvencia desde 2025, circunstancia que es congruente con la fecha de retroacción señalada por su Señoría en la Sentencia de Concurso (09 de octubre de 2025) –se destaca que su capital contable al 31 de enero de 2026 era de $3,136,785,000.00 (tres mil ciento treinta y seis millones setecientos ochenta y cinco mil pesos 00/100 M.N.), **monto significativamente menor al importe del crédito contratado con AlterBank,** sin que existan indicios de un aumento de capital posterior (cuya realización sería contraria al estado de insolvencia que originó su concurso mercantil), ***(ii)*** su insolvencia consta en sus propios estados financieros y en diversas notas periodísticas y ***(iii)*** a pesar de existir una notoria condición de insolvencia, AlterBank decidió otorgarle un crédito a TVA por la cantidad de **USD $290,000,000.00 (doscientos noventa millones de dólares, moneda de curso legal en los Estados Unidos de América)** cuando era más que obvio que TVA iba a incumplir con sus obligaciones de pago.

Se destaca también que dicho crédito constituyó el primer endeudamiento nuevo con un tercero que TVA contrajo en por lo menos cuatro años.

**17.** Aunado a la insolvencia de TVA y su manifiesta incapacidad de pago, el importe del crédito otorgado por AlterBank resulta completamente ajeno al plan de negocio de dicho banco para 2026, que proyectaba tener activos equivalentes a USD 49,076,134.23 (Cuarenta y nueve millones setenta y seis mil ciento treinta y cuatro dólares de los Estados Unidos de América 23/100), **préstamos por USD 14,356,051.00 (Catorce millones trescientos cincuenta y seis mil cincuenta y un dólares de los Estados Unidos de América 00/100)**, depósitos por USD

45,940,000.00 (Cuarenta y cinco millones novecientos cuarenta mil dólares de los Estados Unidos de América 00/100), entre otras proyecciones para ese año.[8]

Lo anterior se encuentra acreditado también en la opinión emitida por la experta **Renée T. St. Rose KC**, que se agrega como **ANEXO 3** y su traducción al español por perito certificado como **ANEXO 3 BIS** particularmente, en los párrafos 58, 59 y 73 inciso "e", mismos que solicito se tengan aquí por reproducidos como si a la letra se insertase en obvio de repeticiones innecesarias.

**18.** De acuerdo con la información presentada por TVA y la documentación obtenida en el proceso de *Discovery*, el crédito otorgado a la Comerciante excede de manera considerable las proyecciones del plan de negocio de AlterBank, incluso para el año 2028. No sólo en el valor de la transacción, sino también en el tamaño del cliente, ya que TVA es una empresa con presencia nacional e internacional, siendo una de las principales productoras y difusoras de contenido en español a nivel mundial, que cotizó en la Bolsa Mexicana de Valores como una Sociedad Anónima Bursátil.

**19.** Es decir, un banco con proyecciones de negocio consistentes en el otorgamiento de créditos a pequeñas y medianas empresas le otorgó un crédito a una empresa que no cumple con dichas características y no sólo eso, sino que se encontraba claramente en estado de insolvencia (circunstancia que necesariamente tuvo que haber sido conocida por AlterBank como parte del proceso de análisis de riesgo) y, por si fuera poco, el importe del crédito representa más del capital que tenía proyectado AlterBank para el año 2026.

FERNANDO DEL CASTILLO ELORZA
[illegible]
14-02-27 16:02:27

Todo lo anterior se aparta claramente de las condiciones de mercado para este tipo de créditos y de la regulación que rige a AlterBank en Santa Lucía, tal como concluye la experta **Renée T. St. Rose KC** en la opinión que se agrega como **ANEXO 3** y su traducción al español por perito certificado como **ANEXO 3 BIS** particularmente, en los párrafos 74 y 75, mismos que solicito se tengan aquí por reproducidos como si a la letra se insertasen en obvio de repeticiones innecesarias.

**20.** Otro elemento que robustece lo apartado de las condiciones de mercado en que se otorgó el crédito en cuestión, es la irrisoria fecha de vencimiento, que de acuerdo con la información señalada por TVA en el Anexo 3 de su Solicitud de Concurso, **es el 29 de julio de 2026**. Resulta imposible de creer que una institución bancaria otorgue un crédito a una empresa insolvente por **USD $290,000,000.00 (doscientos noventa millones de dólares moneda de curso legal en los Estados Unidos de América)** y espere que se lo pague en seis meses, especialmente teniendo en cuenta que TVA, como ya se acreditó, manifestó públicamente encontrarse en crisis financiera.

---

[8] Página 8 del Anexo 2 y Anexo 2 Bis (páginas numeradas como JR-Alter).

21. Ahora, conforme a lo narrado por TVA en su Solicitud de Concurso respecto a la contratación del crédito con AlterBank, dicho crédito fue contratado con motivo de lo siguiente:

**a) En la Solicitud de Declaración**

…En efecto, **TV AZTECA** enfrentaba litigios por adeudos o créditos determinados por la autoridad fiscal, por las siguientes sumas: (i) $3,902,000,000.00 (Tres mil novecientos dos millones de pesos M.N.) por concepto de Impuesto sobre la Renta del ejercicio fiscal 2009 (incluyendo multas y recargos); y (ii) $4,790,000,000.00 (Cuatro mil setecientos noventa millones de pesos 00/100 M.N.) correspondientes al Impuesto Sobre la Renta del ejercicio fiscal 2013 (incluyendo multas y recargos).

Lo anterior se tornó especialmente riesgoso para la viabilidad de **TV AZTECA**, visto que el Código Fiscal de la Federación faculta a la autoridad fiscal a ejecutar créditos fiscales mediante el procedimiento administrativo de ejecución…

En ese contexto, la presión pública e institucional *–al incrementar el riesgo de ejecución fiscal y de afectación inmediata de caja–* obligó a la sociedad a priorizar liquidez para evitar disrupciones operativas críticas.

Por ello, ante la inminencia de medidas de cobro coactivo y la potencial pérdida/restricción de caja, la sociedad se vio compelida a obtener y/o utilizar financiamiento adicional y urgente para atender el pasivo fiscal y mitigar el riesgo de paralización operativa.

Esto impactó directamente la viabilidad como unidad productiva: la detraída o la inmovilización de caja y/o el aumento de pasivos financieros (costos por intereses, garantías, vencimientos) redujo la capacidad de cumplir obligaciones ordinarias de operación (salarios, insumos, transmisión, proveedores críticos) y elevó el riesgo de incumplimiento a diversos acreedores.

Dicho contexto orilló a **TV AZTECA** a adquirir un financiamiento urgente *–con las consecuencias que ello implica–* Alter Bank LTD por la cantidad de hasta $5,000,000,000.00 (Cinco mil millones de pesos 00/100 M.N.); ello como una medida defensiva e indispensable orientada a preservar: **(i)** la continuidad operativa; **(ii)** la estabilidad laboral; y **(iii)** la integridad de activos estratégicos para la operación; sin embargo, a la par, incrementó el pasivo de la Sociedad, deterioró su estructura de capital y redujo su capacidad de maniobra financiera, contribuyendo al agravamiento del estado de insolvencia…

**b) En la Sección 2 de la Solicitud de Declaración**

Dicho crédito ALTER fue adquirido por la compañía como financiamiento adicional y urgente para atender el pasivo fiscal y mitigar el riesgo de paralización operativa…

**22.** Es decir, TVA afirma que contrató el crédito con AlterBank con la finalidad de salvaguardar su operación; sin embargo, dicho crédito se encuentra garantizado mediante las hipotecas constituidas el **06 de marzo de 2026** sobre los títulos de concesión de ***(i)*** Televisora del Valle de México, S.A.P.I. de C.V. y ***(ii)*** Televisión Azteca III, S.A. de C.V. –ambas subsidiarias **controladas** por TVA–.

Lo anterior contradice por completo el supuesto propósito de contratación del crédito, ya que las condiciones financieras de TVA hacían evidente que iba a incumplir con sus obligaciones de pago –situación que fácilmente debió advertir AlterBank a través del análisis de riesgo que debe realizar como institución financiera–, derivando en la ejecución de dichas garantías que **claramente pondría en riesgo su negocio y operación.** Es difícil creer que TVA no previera la posibilidad de ejecución de las garantías otorgadas ante el incumplimiento de pago.

**23.** Con independencia del riesgo del negocio de TVA, el otorgamiento del crédito por parte de AlterBank claramente pone en riesgo su propia viabilidad económica y continuación de negocio, por lo que, es absurdo pensar que estamos en presencia de una operación dentro de las condiciones de mercado. Ninguna institución financiera pondría en riesgo su viabilidad financiera y regulatoria por otorgarle un crédito a un cliente que evidentemente le va a incumplir.

El otorgamiento del crédito a TVA es claramente inusual para una institución bancaria de la naturaleza de AlterBank –insistiendo en la situación de notoria insolvencia de TVA– y alejada del marco normativo aplicable conforme a la legislación de Santa Lucía, tal como expone la experta **Renée T. St. Rose KC** en la opinión que se agrega como **ANEXO 3** y su traducción al español por perito certificado como **ANEXO 3 BIS** particularmente, en el párrafo 27, mismo que solicito se tengan aquí por reproducidos como si a la letra se insertasen en obvio de repeticiones innecesarias.

El crédito objeto del presente incidente es claramente contrario a los Principios para la Gestión de Riesgo Crediticio, el Marco de Supervisión para la Medición y el Control de Grandes Exposiciones y demás Principios y criterios aplicables conforme a los Principios del Comité de Supervisión Bancaria de Basilea (BCBS) y Basilea III que rigen las sanas prácticas y usos bancarios internacionalmente.

**24.** El incumplimiento a las condiciones de mercado y las sanas prácticas bancarias se robustece si analizamos los Estándares Internacionales de Basilea III en particular los Principios para la Gestión de Riesgo Crediticio *"Principles for the Management of Credit Risk"*.

Dichos Principios constituyen, por sí mismos, un estándar global prudencial, para cualquier institución que cumpla con estándares internacionales comúnmente aceptados y aplicables. El marco de Basilea se articula en tres pilares, capital sensible al riesgo, revisión supervisora y disciplina de mercado, de forma que el otorgamiento de crédito no es un acto discrecional de la institución, sino un proceso regulado.

El *Principio 5* del BCBS exige que las instituciones de crédito establezcan límites de exposición a nivel de acreditado individual y de grupos de contrapartes relacionadas, dicho principio es recogido por la legislación de Santa Lucía, particularmente en la sección 15 de la Ley de Bancos Internacionales de Santa Lucía, con relación a la Nota Orientativa N° 11 de la Autoridad Reguladora de Servicios Financieros de Santa Lucía (*FSRA*), tal como expone la experta **Renée T. St. Rose KC** en la opinión que se agrega como **ANEXO 3** y su traducción al español por perito certificado como **ANEXO 3 BIS** particularmente, en los párrafos 27, 32 y en la Sección "F" de dicho documento, mismos que solicito se tengan aquí por reproducidos como si a la letra se insertasen en obvio de repeticiones innecesarias.

La asunción de una exposición crediticia individual de USD $290,000,000.00 (Doscientos Noventa Millones de Dólares, Moneda de los Estados Unidos de América) constituye una concentración de riesgo extrema conforme a dicho estándar, claramente fuera de las condiciones de mercado y usos bancarios.

**25.** Por si lo anterior fuera poco, AlterBank aceptó las garantías hipotecarias (en segundo lugar) constituidas sobre los títulos de concesión de los que son titulares Televisora del Valle de México, S.A.P.I. de C.V. y Televisión Azteca III, S.A. de C.V. **en segundo lugar**. Esto es, AlterBank aceptó que se le garantizara un crédito que claramente iba a ser incumplido con unas concesiones respecto de las que ya existía un acreedor hipotecario con mejor prelación, circunstancia que resulta contraria a lo que cualquier institución bancaria busca para garantizar el cumplimiento de un crédito del importe del otorgado a TVA.

Lo anterior se acredita con las "Constancias de Inscripción en el Registro Público de Concesiones" que se acompañan al presente como **ANEXO 10.**

La inscripción de las hipotecas en favor de AlterBank constituye un hecho notorio para su Señoría toda vez que las Constancias de Folio se encuentran disponibles en la página oficial de la Comisión Reguladora de Telecomunicaciones y disponibles en

los enlaces: https://sert.ift.org.mx//tarifasVE/upload/files/gravamenes/101772_4758_260616161426.pdf y https://sert.ift.org.mx//tarifasVE/upload/files/gravamenes/101771_3933_260616161219.pdf

Como expone la experta **Renée T. St. Rose KC** en la opinión que se agrega como **ANEXO 3** y su traducción al español por perito certificado como **ANEXO 3 BIS** particularmente, en los párrafos 29 y 30 de dicho documento, mismos que solicito se tengan aquí por reproducidos como si a la letra se insertasen en obvio de repeticiones innecesaria que las garantías hipotecarias son de tal naturaleza que un banco internacional prudente de Clase A autorizado en Santa Lucía no las aceptaría, en el curso ordinario de la práctica bancaria comercial, sin contar con documentación excepcional que respalde la justificación de la operación, la evaluación crediticia, el valor y la exigibilidad de las garantías, así como las aprobaciones internas y regulatorias requeridas. En cualquier caso, e independientemente de la caracterización regulatoria de la exposición, la mitigación del riesgo de crédito que normalmente proporciona una garantía hipotecaria se encuentra, con base en la información disponible, sustancialmente reducida en el presente caso.

FERNANDO DEL CASTILLO ELORZA

Asimismo, como se refiere a lo largo del presente, los principios del BCBS y el Marco de Basilea III, constituyen el referente prudencial internacionalmente reconocido para exposiciones crediticias de esta naturaleza. Bajo dicho estándar, la adhesión del Acreditante a una garantía hipotecaria constituida originalmente en 2020 en favor de un tercero, actualmente, *Numchi Servicios, S.A.P.I. de C.V.*, sin que conste su cobertura económica efectiva, recibe un tratamiento prudencial más conservador y un menor reconocimiento como mitigante de riesgo. Estos elementos son consistentes con la premisa de que las características del Crédito no se apegan a las mejores prácticas internacionales de otorgamiento de crédito aplicables a instituciones de crédito, tal como se expone en la opinión que se acompaña como **ANEXO 9**.

**26.** La contravención a las condiciones de mercado y usos comerciales se vuelve aún más evidente tomando en consideración que a la fecha de celebración del Convenio Modificatorio y de Reexpresión de 06 de marzo de 2026 y de la constitución de las garantías hipotecarias señaladas, TVA **ya había adoptado los actos corporativos para solicitar su declaración en concurso mercantil**, tal como se advierte del Anexo 8 de la Solicitud de Concurso, al que se acompañó la escritura pública número 188,710 de fecha **26 de febrero de 2026**, otorgada ante la fe del licenciado Eduardo Garduño García Villalobos, titular de la Notaría número 135 de la Ciudad de México, actuando en el protocolo de la Notaría número 211 de esta misma Ciudad.

Del contenido de dicha escritura se advierte lo siguiente:

a) TVA publicó la convocatoria a la Asamblea Extraordinaria de Accionistas el 10 de febrero de 2026 en el Sistema Electrónico de la Secretaría de Economía; es decir, **tan sólo 12 días después de la contratación del crédito con AlterBank** con la supuesta finalidad de evitar el incumplimiento a diversos acreedores.

b) En Asamblea Extraordinaria de Accionistas de **26 de febrero de 2026** se aprobó que TVA solicitara su declaración en concurso mercantil.

Es decir, TVA celebró el contrato de crédito y el convenio modificatorio y de reexpresión del crédito **a sabiendas** de que iba a presentar su solicitud de declaración de concurso mercantil, con lo que se pone en evidencia su mala fe respecto a la contratación del crédito que nos ocupa ya que no existía la supuesta inminencia de un procedimiento de ejecución por parte de la autoridad fiscal, ya que conforme al artículo 69 de la Ley de Concursos Mercantiles, la declaración en concurso mercantil tiene como efecto suspender los procedimientos administrativos de ejecución de los créditos fiscales.

La publicación de la convocatoria a que hace referencia en el inciso "a" del presente hecho constituye un hecho notorio para su Señoría por realizarse en el Sistema Electrónico de la Secretaría de Economía.

27. La Solicitud de Concurso fue presentada el día 10 de marzo de 2026, esto es, **12 días después** de la aprobación de que TVA solicitara su declaración en concurso mercantil y tan sólo **4 días** después de que se celebrara el Convenio Modificatorio y de Reexpresión con AlterBank y se constituyeran las garantías hipotecarias por parte de las empresas subordinadas antes referidas, lo que pone en evidencia la irregularidad de las operaciones celebradas entre TVA y AlterBank, así como el trato claramente preferente a este acreedor en particular frente al resto de los acreedores de la Comerciante.

28. En mérito de todo lo expuesto, es evidente que AlterBank otorgó un crédito a TVA en completa contravención a las condiciones de mercado y a los usos comerciales y bancarios, al tener conocimiento de la insolvencia de TVA y al tener conocimiento de que ya contaba con autorización para presentar su solicitud de concurso mercantil con anterioridad a la celebración del Convenio Modificatorio y de Reexpresión (esto, como parte de la información que debe recabar de forma previa a la celebración de actos de esta naturaleza).

29. Por otro lado, la propia constitución de garantías hipotecarias en favor de AlterBank el 06 de marzo de 2026 constituyen en sí mismo un acto en fraude de acreedores, en términos de lo dispuesto por la fracción I del artículo 115 de la Ley de Concursos Mercantiles.

Esto, ya que como se expone en el presente incidente las hipotecas fueron constituidas el 06 de marzo de 2026, **fecha posterior al contrato de crédito celebrado el 29 de enero de 2026.**

Toda vez que mi representada no es parte del contrato mediante el que se otorgó la garantía hipotecaria, solicito a su Señoría requiera al Notario 135 de la Ciudad de México, para que exhiba en el presente incidente la escritura pública número 188,839 de fecha 06 de marzo de 2026, mismo que obre en el protocolo a su cargo, apercibiéndolo con la medida de apremio que estime pertinente su Señoría para el caso de que no lo haga en el término que señale.

En consecuencia, solicito se gire atento oficio al citado Notario para que, en auxilio de la administración de justicia, exhiba el instrumento mencionado o remita copia certificada del mismo para que sea agregada a los autos y valorada en el momento procesal oportuno.

**30.** Ahora bien, no pasa inadvertido que las hipotecas en cita fueron otorgadas por las sociedades Televisora del Valle de México, S.A.P.I. de C.V. y Televisión Azteca III, S.A. de C.V.; sin embargo, TVA es accionista mayoritaria y controladora[9] de dichas sociedades, tal como reconoce en su Solicitud de Concurso. Para pronta referencia, a continuación, la solicitud en su parte conducente:

<u>Canales de Televisión Mexicana de **TV AZTECA.**</u>

**13.- TV AZTECA** actualmente es la accionista mayoritaria de 2 (dos) sociedades concesionarias que operan directamente 180 canales independientes de televisión digital terrestre distribuidos a lo largo del territorio nacional. Estos canales son operados en forma independiente, dentro de los cuales se difunde a través de sus señales diverso contenido atendiendo a la cobertura que cada uno de dichos canales tiene. A dichos canales se les reconoce para efectos de identificación comercial en sus títulos de concesión como Azteca 7, Azteca Uno y adn Noticias.

Dicho control no es un dato aislado ni irrelevante para el presente incidente: fue precisamente a través de éste que TVA decidió y ejecutó, por conducto de las sociedades garantes, el otorgamiento de las hipotecas a favor de AlterBank, con posterioridad al otorgamiento del crédito y ya aprobado el inicio del presente

---

[9] **Artículo 15.-** …

Para efectos de lo dispuesto en esta Ley, se entenderá que integran un grupo societario las sociedades controladoras y controladas conforme a lo siguiente:

**I.-** Se considerarán sociedades controladoras aquellas que, directa o indirectamente, mantengan la titularidad de derechos que permitan ejercer el voto respecto de más del cincuenta por ciento del capital de otra sociedad, tengan poder decisorio en sus asambleas, estén en posibilidad de nombrar a la mayoría de los miembros del órgano de administración, o que por cualquier otro medio tengan facultades de tomar las decisiones fundamentales de una sociedad…

concurso mercantil. Es decir, TVA utilizó la estructura societaria bajo su control como instrumento para colocar a AlterBank en una posición de ventaja frente al resto de los acreedores, en un momento en que TVA ya conocía y había determinado su propio estado de insolvencia, a sabiendas de que la constitución de dichas hipotecas sí tiene efectos dentro del concurso mercantil en que se actúa, en términos de la jurisprudencia con número de registro digital 2026693, que se cita más adelante.

31. En ese sentido, y con independencia de que se encuentra actualizado el supuesto previsto en la fracción I del artículo 115 de la Ley de Concursos Mercantiles, se hace énfasis en que es claro que TVA impulsó y decidió el otorgamiento de las garantías señaladas al ser el acreditado en el crédito otorgado por AlterBank, beneficiando indebidamente a AlterBank dentro del proceso de concurso mercantil que ya había aprobado iniciar, exhibiendo una vez más su mala fe.

32. Conforme a la jurisprudencia que se invoca a continuación, el acreedor que tenga una garantía hipotecaria constituida en su favor por un tercero que no sea la comerciante sujeta a concurso mercantil conserva su grado de acreedor con garantía real dentro de dicho procedimiento concursal.

**Registro digital:** 2026693
**Instancia:** Plenos Regionales
**Undécima Época**
**Materia(s):** Constitucional, Civil
**Tesis:** PR.C.CS. J/2 C (11a.)
**Fuente:** Gaceta del Semanario Judicial de la Federación. Libro 26, Junio de 2023, Tomo V, página 4959
**Tipo:** Jurisprudencia

**CONCURSOS MERCANTILES. LA GARANTÍA HIPOTECARIA CONSTI TUIDA EN BIENES DE UN TERCERO NO DEUDOR, EN EJERCICIO DE LA LIBERTAD CONTRACTUAL O DE NEGOCIACIÓN ESTABLECIDA EN EL ARTÍCULO 5o. DE LA CONSTITUCIÓN GENERAL, OPERA COMO UN INSTRUMENTO DE NEGOCIACIÓN EN LA ETAPA DE CONCILIACIÓN.**

Hechos: Los Tribunales Colegiados de Circuito contendientes, al analizar si el acreedor con garantía hipotecaria constituida en bienes de un tercero no deudor debe ser reconocido con el carácter de preferente en la sentencia de reconocimiento, graduación y prelación de créditos, arribaron a conclusiones contrarias, pues mientras uno consideró que la prerrogativa que se otorga a los créditos con garantía real no está condicionada al hecho de que el crédito reclamado sea propiedad del comerciante concursado, el otro resolvió que para efecto de considerar a un acreedor con un privilegio especial, deben formar parte de la masa del concurso.

Criterio jurídico: El Pleno Regional en Materia Civil de la Región Centro-Sur, con residencia en Guadalajara, Jalisco establece que es fundamental el reconocimiento de acreedor con garantía real hipotecaria en bienes de un tercero no deudor, en la sentencia de reconocimiento, graduación y prelación de créditos, porque de esa manera se vuelve efectivo el principio constitucional de libertad contractual o de negociación, pues aun cuando no forme parte de la masa concursal, el acreedor reconocido tiene la posibilidad de utilizar la hipoteca como instrumento de negociación.

Justificación: El contrato de hipoteca a favor del acreedor sobre bienes de un tercero no deudor es susceptible de tener un efecto útil en esta otra etapa de

conciliación del concurso mercantil, pues aun cuando no forme parte de la masa concursal, el acreedor reconocido con ese grado de preferencia tiene la posibilidad de utilizar la hipoteca como instrumento de negociación en términos del artículo 89 de la Ley de Concursos Mercantiles, con las ventajas que ello conlleva, en uso de su libertad contractual o de negociación. En efecto, conforme a lo previsto en el artículo 3o. de la Ley de Concursos Mercantiles, el objetivo de la conciliación es lograr la conservación de la empresa del comerciante mediante el convenio que suscriba con sus acreedores reconocidos. En esa etapa y eventual celebración del convenio necesariamente debe respetarse la autonomía de la voluntad, en su vertiente de libertad contractual o de negociación, por tratarse de un acuerdo entre particulares. Lo anterior, porque se trata de un ámbito donde las partes de una relación jurídica son libres para gestionar su propio interés y regular sus relaciones, sin injerencias externas, salvo que se involucren bienes no disponibles. De otra forma, implicaría una intervención injustificada en la libertad de negociación de los participantes en el concurso mercantil.

PLENO REGIONAL EN MATERIA CIVIL DE LA REGIÓN CENTRO-SUR, CON RESIDENCIA EN GUADALAJARA, JALISCO.

Contradicción de criterios 12/2023. Entre los sustentados por los Tribunales Colegiados Segundo y Tercero, ambos en Materia Civil del Tercer Circuito. 13 de abril de 2023. Tres votos de la Magistrada Martha Leticia Muro Arellano, quien formuló voto concurrente y de los Magistrados Héctor Martínez Flores y Cuauhtémoc Cuéllar De Luna. Ponente: Magistrado Cuauhtémoc Cuéllar De Luna. Secretarios: Laura Icazbalceta Vargas, Miguel Mora Pérez y Luis Fernando Castillo Portillo.
Criterios contendientes:
El sustentado por el Segundo Tribunal Colegiado en Materia Civil del Tercer Circuito, al resolver el amparo directo 275/2018, y el diverso sustentado por el Tercer Tribunal Colegiado en Materia Civil del Tercer Circuito, al resolver el amparo directo 573/2021.
Esta tesis se publicó el viernes 16 de junio de 2023 a las 10:22 horas en el Semanario Judicial de la Federación y, por ende, se considera de aplicación obligatoria a partir del lunes 19 de junio de 2023, para los efectos previstos en el punto noveno del Acuerdo General Plenario 1/2021.

FERNANDO DEL CASTILLO ELORZA
14-02-27 16:07:27

Tal como se lee de en la jurisprudencia anterior, la finalidad de respetar el grado del acreedor hipotecario es que el acreedor reconocido con ese grado de preferencia tenga la posibilidad de utilizar la hipoteca como instrumento de negociación en términos del artículo 89 de la Ley de Concursos Mercantiles, cuestión que evidentemente era del conocimiento de TVA, quien impulsó el otorgamiento de dichas garantías con la finalidad de favorecer a AlterBank en perjuicio del resto de los acreedores.

**33.** Ahora, con independencia de la hipótesis prevista en la fracción I del artículo 115 de la LCM, la aceptación de dicha garantía por parte de AlterBank constituye otra condición fuera de mercado –aplicable a la hipótesis prevista en la fracción III del artículo 114 de la LCM–, ya que bajo el marco de Basilea III, las garantías reales reciben un reconocimiento más favorable en la ponderación del riesgo y en la estimación de la Severidad de la Pérdida (LGD) **únicamente cuando constituyen un gravamen de primer grado, directo y suficiente sobre el bien afectado,** circunstancia que **no acontece en el presente caso,** pues AlterBank es acreedor hipotecario en **segundo** lugar respecto a los títulos de concesión de Televisora del Valle de México, S.A.P.I. de C.V. y Televisión Azteca III, S.A. de C.V., tal como se acredita con las Constancias de Inscripción en el Registro Público de Concesiones con número de inscripción 101771 y 101772 que se acompañan al presente como **ANEXO 10,** sin perjuicio de ser un hecho notorio para su Señoría por encontrarse

publicadas en una página oficial. Lo expresado en este párrafo se expone también en la opinión que se acompaña como **ANEXO 9**, solicitando se tenga por reproducido como si a la letra se insertase en obvio de repeticiones innecesarias.

En virtud de lo expuesto en líneas anteriores, las garantías otorgadas se apartan por completo de las sanas prácticas bancarias y las condiciones de mercado para este tipo de operaciones.

**34.** Por todo lo anterior es evidente que el crédito objeto del presente incidente fue contratado en contravención a las condiciones de mercado, debido a la situación de incumplimiento, falta estructural de liquidez e imposibilidad de refinanciamiento ordinario de TV Azteca que exigían demostrar una fuente primaria de pago suficiente, la viabilidad del adeudo agregado, límites de exposición disponibles, reservas y capital congruentes con el riesgo y una garantía con valor residual efectivo para la celebración del crédito con AlterBank.

La garantía hipotecaria no modifica esta conclusión, pues ya estaba vinculada con una obligación anterior y no se cuenta con elementos para determinar su valor de realización ni cobertura residual. En consecuencia, el financiamiento se aparta de estándares aceptables en capacidad de pago, administración de riesgos, diversificación y mitigación que tanto los principios internacionales como la legislación de Santa Lucía exigen para considerar una operación compatible con las sanas prácticas y usos bancarios nacionales e internacionales.

Por el contrario, la existencia de dicha garantía únicamente actualiza otra conducta que la ley concursal presume como fraudulenta (establecida en la fracción I del artículo 115 de la LCM).

**35.** Se concluye que estamos en presencia de un acto celebrado a modo y de manera fraudulenta por TVA para diluir a los acreedores como los que representa BNY en su carácter de *Trustee* y lograr la aprobación de un convenio abusivo como el que propuso en su Solicitud de Concurso. Lo anterior es evidente, pues en la Solicitud de Concurso se lista a AlterBank como acreedor con garantía real y con prelación superior a las Notas, mientras que la propuesta de convenio concursal contempla para los acreedores comunes una quita de hasta 90% (noventa por ciento) del monto reconocido —es decir, el pago de sólo 10%— y permite que los acreedores garantizados, incluyendo AlterBank, recuperen significativamente más, incluso mediante la venta de activos de radiodifusión, como son las concesiones.

**MANIFESTACIÓN BAJO FORMAL PROTESTA DE DECIR VERDAD**

Con fundamento en lo dispuesto por la fracción VI del artículo 3 del Acuerdo 12/2020 del Pleno del Consejo de la Judicatura Federal, ***manifiesto bajo formal protesta de decir verdad*** que los documentos que se acompañan al presente escrito son una copia fiel y exacta en archivo electrónico en formato PDF de los documentos originales que obran en poder de la Quejosa, disponibles en el domicilio procesal señalado en el capítulo correspondiente y que se encuentran a disposición de ese H. Juzgado de Distrito en caso de así requerirse por dicha autoridad jurisdiccional.

## VALORACIÓN INTEGRAL DE LA DEMANDA

Invoco en favor de mi representada el criterio **jurisprudencial** que a continuación se transcribe, conforme al que la demanda es un acto jurídico susceptible de interpretación integral a la luz de los documentos que a ella se acompañan. Es decir, para la resolución del presente incidente deberán valorarse los documentos que se acompañan, independientemente de su ofrecimiento como pruebas en el siguiente capítulo, sin que mi representada se encuentre obligada a transcribirlos.

> Registro digital: 178475
> Instancia: Tribunales Colegiados de Circuito
> Novena Época
> Materia(s): Civil
> Tesis: XVII.2o.C.T. J/6
> Fuente: Semanario Judicial de la Federación y su Gaceta.
> Tomo XXI, Mayo de 2005, página 1265
> Tipo: Jurisprudencia
>
> **DEMANDA EN EL JUICIO NATURAL. EL ESTUDIO INTEGRAL DEBE COMPRENDER LOS DOCUMENTOS ANEXOS.**
>
> En virtud de que la demanda constituye un todo, su interpretación debe ser integral, de manera que si de su contenido se advierte que se expusieron los motivos esenciales de la causa de pedir, y en relación con ellos se hace cita de **los documentos fundatorios de la acción así como de los relacionados con el litigio, exhibiéndolos, debe considerarse que forman parte de la demanda y su contenido, integrado a ella; pues estimar lo contrario implicaría que en la demanda respectiva se tuvieran que reproducir íntegramente todas aquellas cuestiones contenidas en esos medios de convicción, lo cual resultaría tan complejo como innecesario,** pues para el juzgador el estudio de la demanda no se limita al escrito inicial, sino que comprende además el análisis de los documentos que la acompañan, porque son parte integrante de ella. De no ser así, se podría incurrir en rigorismos tales como el tener que reproducir en el escrito inicial de demanda, tanto los documentos base de la acción como los que se relacionen con el litigio.
>
> SEGUNDO TRIBUNAL COLEGIADO EN MATERIAS CIVIL Y DE TRABAJO DEL DÉCIMO SÉPTIMO CIRCUITO.
> Amparo directo 178/2002. Ernesto Rodríguez Padilla y otra. 12 de abril de 2002. Unanimidad de votos. Ponente: José de Jesús González Ruiz. Secretario: Rogerio Ariel Rojas Novelo.
> Amparo directo 310/2003. GMAC Mexicana, S.A. de C.V., S.F. de O.L.F., antes denominada ABA-Motriz Financiamiento, S.A. de C.V., S.F. de O.L., Ábaco Grupo Financiero. 29 de agosto de 2003. Unanimidad de votos. Ponente: José Martín Hernández Simental. Secretaria: Margarita de Jesús García Ugalde.
> Amparo directo 504/2004. Jaime Arturo Buendía Jiménez. 30 de septiembre de 2004. Unanimidad de votos. Ponente: Salvador Murguía Munguía. Secretario: Abel Ascencio López.
> Amparo directo 66/2005. Luis Manuel Romo Quevedo y otra. 18 de febrero de 2005. Unanimidad de votos. Ponente: Salvador Murguía Munguía. Secretario: José Julio Rojas Vieyra.
> Amparo directo 151/2005. Instituto de Seguridad y Servicios Sociales de los Trabajadores del Estado. 18 de marzo de 2005. Unanimidad de votos. Ponente: José de Jesús González Ruiz. Secretario: Abel Ascencio López.
> Nota: Por ejecutoria del 20 de junio de 2018, la Primera Sala declaró inexistente la contradicción de tesis 404/2017 derivada de la denuncia de la que fue objeto el criterio contenido en esta tesis, al estimarse que no son discrepantes los criterios materia de la denuncia respectiva.

FERNANDO DEL CASTILLO ELORZA
[illegible]
[illegible]

(El énfasis es propio).

**PRUEBAS**

1. **DOCUMENTAL PÚBLICA.-** Consistente en el primer testimonio del instrumento público número 70,138 de fecha 10 de agosto de 2026, otorgada ante la fe del licenciado Luis Eduardo Paredes Sánchez, titular de la notaría número 180 de la Ciudad de México, misma que se agrega de forma digitalizada al presente como **ANEXO 1**.

Con este documento se acredita la personalidad con la que comparece el suscrito, el C. Fernando del Castillo Elorza, como apoderado legal de THE BANK OF NEW YORK MELLON en su carácter de Fiduciario.

Esta prueba se relaciona con los hechos "1" a "35" del presente incidente.

2. **DOCUMENTAL PÚBLICA.-** Consistente en la orden de fecha 03 de junio de 2026 dictada por el juez José E. Martinez, Juez de Distrito de los Estados Unidos para el Distrito Sur de Florida, División de Miami, en el Caso No. 26-23885-MC-MARTINEZ, por la que admitió la solicitud presentada por mi representada THE BANK OF NEW YORK MELLON, para iniciar un proceso conforme a la Sección 1782 del Título 28 del Código de los Estados Unidos (28 U.S.C. Sección 1782), documental debidamente apostillada, acompañada de su traducción al español por perito certificado del Consejo de la Judicatura Federal, que se agrega como **ANEXO 11** y **ANEXO 11 BIS**, respectivamente.

La legislación de los Estados Unidos permite que un tribunal estadounidense ordene la obtención de pruebas (Discovery) de una entidad que "resida o sea encontrada" en los Estados Unidos para su utilización en un procedimiento extranjero o internacional. Conforme al proceso previsto en la Sección 1782 del Título 28 del Código de los Estados Unidos, el tribunal de distrito en el que una persona resida o sea encontrada podrá ordenarle que rinda testimonio o declaración, o que produzca un documento u otro objeto para su uso en un procedimiento extranjero o internacional.

La Suprema Corte de los Estados Unidos ha explicado que la Sección 1782 es el resultado de los esfuerzos del Congreso estadounidense, a lo largo de 150 años, para proporcionar asistencia de los tribunales federales en la obtención de pruebas destinadas a ser utilizadas en tribunales extranjeros.

El 02 de junio de 2026, el THE BANK OF NEW YORK MELLON, en su carácter de Fiduciario, presentó una solicitud en términos de la Sección 1782, ante el Tribunal de Distrito de los Estados Unidos para el Distrito Sur de Florida, División de Miami (*Tribunal de Florida*), con el fin de obtener pruebas de AlterBank Limited, de sus directivos y funcionarios, quienes fueron ubicados en Florida, Estados Unidos. Lo anterior, buscando

obtener información relacionada con el préstamo por USD 290,000,000.00 (Doscientos noventa millones de dólares de los Estados Unidos de América) otorgado por AlterBank Limited a TV Azteca S.A.B de C.V. el 29 de enero de 2026.

Como se demuestra con la documental pública exhibida, el 03 de junio de 2026, el Tribunal de Florida admitió la solicitud de BNY y autorizó la notificación de citatorios dirigidos a AlterBank Limited y, a seis de sus funcionarios y directores.

Derivado de lo anterior, el proceso de *Discovery* se encuentra actualmente en curso y BNY llevó a cabo las notificaciones correspondientes, **por lo que se siguen obteniendo pruebas documentales, testimoniales y otro tipo de evidencia que, una vez que sea producida, se ofrecerá ante su Señoría a efecto de que se admita y sea valorada conforme a los estándares del proceso en el que se actúa**.

*Manifestando bajo formal protesta de decir verdad* que mi representada se ve imposibilitada para precisar qué documentos se obtendrán dentro del procedimiento mencionado, por lo que, se reserva su derecho a ofrecerlos como prueba en el momento procesal oportuno, una vez que tenga conocimiento de los mismos.

Con esta prueba se acredita que inició un proceso de *Discovery* en Estados Unidos con motivo de los hechos que dieron lugar a la acción de fraude que se promueve en esta vía, mismo que se encuentra en trámite y cuyo objeto es auxiliar a la administración de justicia, abonando al acervo probatorio del proceso que se ventila ante su Señoría, para que, en el momento procesal oportuno, este Juzgado resuelva como procedentes las prestaciones reclamadas por mi representada.

FERNANDO DEL CASTILLO ELORZA

Esta prueba se relaciona con los hechos "1" al "35" del presente incidente.

**3. DOCUMENTAL PÚBLICA.-** Consistente en la orden de fecha 24 de junio de 2026 dictada por el juez José E. Martinez, Juez de Distrito de los Estados Unidos para el Distrito Sur de Florida, División de Miami en el Caso No. 26-23885-MC-MARTINEZ, por el que determinó los plazos en los que AlterBank Limitited y Blas Santander (funcionario de AlterBank) deben presentar sus respuestas conforme a las reglas de ese proceso de la Sección 1782, documental debidamente apostillada, acompañada de su traducción al español por perito certificado del Consejo de la Judicatura Federal, que se agrega como **ANEXO 12** y **ANEXO 12 BIS**, respectivamente.

Con esta prueba se acredita que el proceso de *Discovery* se encuentra en trámite y que, derivado de que los plazos apenas transcurrieron en el mes de agosto de 2026, se producirán nuevas pruebas documentales, testimoniales y otro tipo de evidencia relacionadas con el préstamo por USD 290,000,000.00 (Doscientos noventa millones de dólares de los Estados Unidos de América) otorgado por AlterBank Limited a TV Azteca S.A.B de C.V. el

29 de enero de 2026, mismas que se ofrecerán en el momento procesal oportuno para que sean valoradas por su Señoría.

*Manifestando bajo formal protesta de decir verdad* que mi representada se ve imposibilitada para precisar qué documentos se obtendrán dentro del procedimiento mencionado, por lo que, se reserva su derecho a ofrecerlos como prueba en el momento procesal oportuno, una vez que tenga conocimiento de los mismos.

Con esta prueba se acredita que inició un proceso de *Discovery* en Estados Unidos con motivo de los hechos que dieron lugar a la acción que se promueve en esta vía, mismo que se encuentra en trámite y cuyo objeto es auxiliar a la administración de justicia, abonando al acervo probatorio del proceso que se ventila ante su Señoría, para que, en el momento procesal oportuno, este Juzgado resuelva como procedentes las prestaciones reclamadas por mi representada.

Esta prueba se relaciona con los hechos "1" a "35" del presente incidente.

4. **DOCUMENTAL.-** Consistente en el documento obtenido dentro del *Discovery* regulado en la Sección 1782 del Título 28 del Código de Estados Unidos, No. 26-23885-MC- MARTINEZ, ante el Juez de Distrito de los Estados Unidos para el Distrito Sur de Florida, División de Miami, producido por el señor Juan Francisco Ramirez, ex funcionario de Alter Bank Limited, mismo que se acompañan con su debida traducción al español por perito certificado del Consejo de la Judicatura Federal, como **ANEXO 2** y **ANEXO 2 BIS**, respectivamente.

Con esta prueba se acredita, entre otras cosas: ***(i)*** el modelo de negocio de Alter Bank Limited proyectado para los años 2024 a 2028; ***(ii)*** el proceso de obtención del capital regulatorio requerido para obtener la licencia para operar como banco internacional en Santa Lucía en el año 2024; ***(iii)*** la obtención de la licencia para operar como banco Clase A conforme a la ley vigente en Santa Lucía; ***(iv)*** las acciones iniciadas por Juan Ramirez en contra de Alter Bank Limited; ***(v)*** los estados financieros no auditados de Alter Bank Limited al 31 de Marzo de 2024 que denotan activos por únicamente USD 2.3 millones de dólares; ***(vi)*** correo de 1 de junio de 2023, con el asunto "Minuta Reunión Accionistas 31 de mayo de 2023", de la que se desprende la nueva base accionaria de AlterBank Limited, en la que el señor Tomas Hernández (nacionalidad en El Salvador) y Blas Santander (nacionalidad en Estados Unidos) son dueños de un porcentaje del banco.

Esta prueba se relaciona con los hechos "1" a "35" del incidente.

5. **DOCUMENTAL.-** Consistente en la declaración de José Romero Esclusa, Director General de AlterBank de fecha 14 de julio de 2026, residente en Panamá, declaración rendida en el caso Caso No. 26-23885-MC-MARTINEZ de *Discovery* en

Florida, Estados Unidos, que se agrega a la presente como **ANEXO 7** y su traducción al español por perito certificado autorizado por el Consejo de la Judicatura Federal como **ANEXO 7 BIS.**

Con la prueba de mérito se acredita que Blas Santander (residente en Miami, Florida) renunció el **31 de marzo de 2026**; Timothy Richards (residente en Miami, Florida) renunció el **26 de junio de 2026**; y Alexander Soroka (residente en Miami, Florida) renunció el **17 de junio de 2026**. Todos ellos miembros del Consejo de Administración, que presentaron sus renuncias coincidentemente en fechas posteriores al *Discovery* que se había iniciado en Miami, Florida, Estados Unidos, lugar donde residían y podían ser cuestionados con relación al crédito otorgado a TVA.

La prueba es pertinente para lo anterior, toda vez que en dicha declaración consta literalmente la información mencionada.

Esta prueba se relaciona con los hechos "1" al "35" del incidente.

**6.** **DOCUMENTAL.-** Consistente en el registro corporativo de Alter Bank Limited en el Registro de Sociedades Comerciales Internacionales de Santa Lucía al 28 de enero de 2026, con su debida traducción al español por perito certificado del Consejo de la Judicatura Federal, que se acompaña como **ANEXO 6** y **ANEXO 6 BIS**, respectivamente, obtenida con relación al proceso de *Discovery* No. 26-23885-MC- MARTINEZ.

FERNANDO DEL CASTILLO FLORZA
14-02-27 16:02:27

Con esta prueba se acredita, entre otras cosas: ***(i)*** el registro corporativo de Alter Bank Limited No. 2007-00022; ***(ii)*** la fecha de incorporación de Alter Bank Limited el 23 de enero de 2007 antes *StateTrust Bank & Trust Limited*; ***(iii)*** la titularidad del venezolano Augusto César Castillo Chávez como titular del 100% de las acciones de Alter Bank Limited; ***(iv)*** los miembros del Consejo de Administración a la fecha de celebración del contrato de crédito con TVA; ***(v)*** la toma de decisiones de Alter Bank a la fecha de celebración del contrato de crédito con TVA se encontraba principalmente en Florida y México.

Esta prueba se relaciona con los hechos "1" al "35" del incidente.

**7.** **DOCUMENTAL.-** Consistente en la opinión emitida por la licenciada en derecho **Renée T. St. Rose KC**, quien es experta en la materia mercantil, bancaria y financiera, conforme a la legislación de Santa Lucía y del Caribe Oriental –tal como se acredita con sus credenciales consistentes en ***(i)*** Carta Patente de fecha 02 de abril de 2025, emitida por el Secretario Privado del Gobernador General de Santa Lucía debidamente apostillada (misma que se acompaña dentro del **ANEXO 3**); ***(ii)*** el Certificado para el Ejercicio Profesional emitido por el Titular del Registro de la Alta Corte de Justicia en el Estado de Santa Lucía de fecha 30 de diciembre de 2025, debidamente apostillado (mismo que se acompaña dentro del **ANEXO 3**) y ***(iii)*** su currículum vitae (mismo que se acompaña

dentro del **ANEXO 3**), todos ellos traducidos al español por perito traductor certificado autorizado por el Consejo de la Judicatura Federal (traducciones que se acompañan como parte del **ANEXO 3 BIS**).

Dicha opinión se acompaña al presente como **ANEXO 3** con su su traducción al español por perito certificado del Consejo de la Judicatura Federal como **ANEXO 3 BIS**.

Con la prueba en cita se acredita que el crédito otorgado por Alter Bank Limited se encuentra fuera de las condiciones ordinarias de mercado aplicables en Santa Lucía, considerando el marco regulatorio vigente y aplicable en dicha jurisdicción, las prácticas comúnmente observadas en operaciones de esta naturaleza y, en términos generales, el propio modelo de negocio de Alter Bank Limited.

La prueba de referencia es idónea para acreditar lo anterior, toda vez que el derecho extranjero es materia de prueba y su interpretación puede ser válidamente establecida por un profesionista del derecho de la jurisdicción de que se trate, en este caso, Santa Lucía.

Esta prueba se relaciona con los hechos "1" al "35" del presente incidente.

**8.** **DOCUMENTAL.-** Consistente en la opinión emitida por los licenciados en derecho **Mauricio Basila Lago** y **Paul Yamil José Aguilar**, quienes son expertos en la materia bancaria y derecho financiero, misma que se agrega como **ANEXO 9**. Sus credenciales se acreditan con sus cédulas profesionales emitida por Dirección General de Profesiones a cargo de la Secretaría de Educación Pública que se acompañan como **ANEXO 9 BIS**.

Con la prueba en cita se acredita que el crédito otorgado por Alter Bank Limited se encuentra fuera de las condiciones ordinarias de mercado aplicables conforme al marco regulatorio internacional que establece las condiciones estándar de mercado para este tipo de operaciones, las prácticas comúnmente observadas en operaciones de esta naturaleza y, en términos generales, el propio modelo de negocio de Alter Bank Limited.

La prueba de referencia es idónea para acreditar lo anterior, toda vez que quienes suscriben la misma son expertos en materia bancaria.

Esta prueba se relaciona con los hechos "1" al "35" del presente incidente.

**9.** **DOCUMENTAL.-** Consistente en el comunicado de prensa realizado el **10 le mayo de 2023** por la propia TVA en su página de internet informando "*que el día de hoy l Juzgado Sexagésimo Tercero de lo Civil de la Ciudad de México ordenó a la empresa no resentar al público información relativa a su situación financiera, lo anterior con el fin de causar incertidumbre*". Lo anterior se acredita con la publicación que se acompaña al

presente como **ANEXO 4** y se encuentra disponible en el enlace: https://www.irtvazteca.com/es/comunicados-de-prensa.

Con dicha prueba se acredita que TVA ocultaba su información financiera e incluso se decretaron medidas judiciales para ello, con lo que se acredita la opacidad sobre dicha situación, que era indispensable para que cualquier institución de crédito o institución bancaria le otorgara un crédito, más aún un crédito del importe del otorgado por AlterBank.

La prueba en cita es idónea, toda vez que es información pública emitida y publicada por la propia TVA en la que reconoce que no hacía pública su información financiera, pese a tener la obligación legal de hacerlo por ser una empresa que cotizaba en la Bolsa Mexicana de Valores.

Esta prueba se relaciona con los hechos "1" al "35" del presente incidente.

**10. DOCUMENTAL.-** Consistente en el comunicado de fecha 26 de febrero de 2026 en el que Grupo Salinas informó los acuerdos alcanzados en la Asamblea General Extraordinaria de Accionistas de TVA de fecha 26 de febrero de 2026, en la que fue aprobada la reorganización corporativa, operativa y financiera de la compañía y sus empresas subsidiarias mediante un concurso mercantil voluntario, cuya solicitud se presentaría en los próximos días, lo anterior en virtud de que manifestaron que desde el año 2018 enfrentaron retos financieros y que desde el año 2021 se inició un proceso para reorganizar sus compromisos financieros **incluida su deuda en moneda extranjera**. El comunicado se acompaña al presente como **ANEXO 5**, sin perjuicio de que es un hecho notorio para su Señoría por encontrarse publicado en la página de internet de Grupo Salinas https://www.gruposalinas.com/noticias/notas/comienza-tv-azteca-proceso-reorganizacion/

FERNANDO DEL CASTILLO ELORZA

Con dicha prueba se acredita que TVA reconoció enfrentar dificultades económicas desde 2018 y 2021, así como haber aprobado presentar su solicitud de concurso mercantil el 26 de febrero de 2026, circunstancias que hacen evidente que el crédito objeto del presente incidente se otorgó fuera de las condiciones de mercado y en contravención a las sanas prácticas y usos bancarios y comerciales.

La prueba en cita es idónea, toda vez que es información pública emitida y publicada por la propia TVA en la que reconoce que su emproblemada situación financiera desde 2018 y 2021, así como la aprobación para solicitar su declaración en concurso mercantil menos de un mes después de haber contratado el crédito objeto del presente incidente.

Esta prueba se relaciona con los hechos "1" al "35" del presente incidente.

**11. DOCUMENTAL.-** Consistente en la nota periodística de fecha 22 de julio de 2025 publicada en el **Periódico Reforma**, que se acompaña como **ANEXO 8**, misma que

puede consultarse en el enlace https://www.reforma.com/aprietan-a-tv-azteca-acreedores-en-ny/ar3042710.

Con esta prueba se acredita que TV Azteca, S.A.B. de C.V. se encontraba en una situación de deterioro económico desde el año 2025, es decir, con anterioridad a la celebración del contrato de crédito con Alter Bank Limited.

Esta prueba constituye un hecho notorio para su Señoría en términos de la Jurisprudencia de rubro *PÁGINAS WEB O ELECTRÓNICAS. SU CONTENIDO ES UN HECHO NOTORIO Y SUSCEPTIBLE DE SER VALORADO EN UNA DECISIÓN JUDICIAL* citada al pie de página. [10]

Esta prueba se relaciona con los hechos "1" al "35" del presente incidente.

**12. DOCUMENTAL.-** Consistente en la nota periodística de fecha 31 de diciembre de 2025 que se acompaña como **ANEXO 8**, publicada por el periódico **Proceso** disponible en el enlace: https://www.proceso.com.mx/nacional/justicia/2025/12/31/tribunales-acorralan-tv-azteca-grupo-elektra-de-ricardo-salinas-pliego-363593.html.

Con esta prueba se acredita que TV Azteca, S.A.B. de C.V. se encontraba en una situación de deterioro económico desde el año 2025, es decir, con anterioridad a la celebración del contrato de crédito con Alter Bank Limited.

---

[10] Registro digital: 2030262 Instancia: Tribunales Colegiados de Circuito Undécima Época Materias(s): Civil, Común Tesis: I.3o.C. J/8 K (11a.) Fuente: Gaceta del Semanario Judicial de la Federación. Libro 48, Abril de 2025, Tomo II, Volumen 2, página 882 Tipo: Jurisprudencia **PÁGINAS WEB O ELECTRÓNICAS. SU CONTENIDO ES UN HECHO NOTORIO Y SUSCEPTIBLE DE SER VALORADO EN UNA DECISIÓN JUDICIAL.** Hechos: El inconforme alega que la notificación personal, consistente en el emplazamiento de la parte demandada en el juicio de origen, no se entendió con ninguna de las personas previstas en el artículo 116 del Código de Procedimientos Civiles para el Distrito Federal, aplicable para la Ciudad de México, es decir, con el interesado, representante, mandatario, procurador o autorizado en autos, pues se realizó en un domicilio diverso al de la administración de la empresa demandada, que coincide con una de las sucursales que aparecen publicadas en la página electrónica de ésta. Criterio jurídico: Este Tribunal Colegiado de Circuito determina que el contenido de las páginas web o electrónicas es un hecho notorio y susceptible de ser valorado en una decisión judicial. Justificación: Lo anterior, porque los datos publicados en documentos o páginas situados en redes informáticas constituyen un hecho notorio por formar parte del conocimiento público a través de esos medios al momento en que se dicta una resolución judicial, de conformidad con el artículo 88 del Código Federal de Procedimientos Civiles. Ahora bien, el acceso al uso de Internet para buscar información sobre la existencia de personas morales, establecimientos mercantiles, domicilios y en general cualquier dato publicado en redes informáticas, forma parte de la cultura normal de sectores específicos de la sociedad dependiendo del tipo de información de que se trate; de ahí que si bien no es posible afirmar que esa información se encuentra al alcance de todos los sectores de la sociedad, lo cierto es que sí es posible determinar si por el tipo de datos un hecho forma parte de la cultura normal de un sector de la sociedad y pueda ser considerado como notorio por el juzgador y, consecuentemente, valorado en una decisión judicial, por tratarse de un dato u opinión común indiscutible, no por el número de personas que conocen ese hecho, sino por la notoriedad, accesibilidad, aceptación e imparcialidad de este conocimiento. TERCER TRIBUNAL COLEGIADO EN MATERIA CIVIL DEL PRIMER CIRCUITO. Amparo en revisión 365/2012. 7 de diciembre de 2012. Unanimidad de votos. Ponente: Neófito López Ramos. Secretaria: Ana Lilia Osorno Arroyo. Amparo directo 383/2020. 5 de noviembre de 2020. Unanimidad de votos. Ponente: Sofía Verónica Ávalos Díaz. Secretario: Víctor Hugo Solano Vera. Recurso de reclamación 31/2021. 29 de septiembre de 2021. Unanimidad de votos. Ponente: Sofía Verónica Ávalos Díaz. Secretario: José Manuel Martínez Villicaña. Amparo directo 358/2021. 27 de octubre de 2021. Unanimidad de votos. Ponente: Sofía Verónica Ávalos Díaz. Secretario: Saulo García Morán. Amparo directo 647/2021. 2 de febrero de 2022. Unanimidad de votos. Ponente: Víctor Francisco Mota Cienfuegos. Secretario: José Francisco Díaz Estúa Avelino. Nota: Por ejecutoria del 13 de octubre de 2021, la Segunda Sala de la Suprema Corte de Justicia de la Nación declaró inexistente la contradicción de tesis 159/2021, derivada de la denuncia de la que fue objeto el criterio sustentado en el amparo en revisión 365/2012 que forma parte de los precedentes de esta tesis, en virtud de que "los tribunales colegiados tomaron distintos elementos que en cada caso valoraron para determinar si se trataba de un hecho notorio o no, y tal circunstancia impide tener un mismo punto de partida para llegar a una conclusión."
Esta tesis se publicó el viernes 11 de abril de 2025 a las 10:15 horas en el Semanario Judicial de la Federación y, por ende, se considera de aplicación obligatoria a partir del lunes 14 de abril de 2025, para los efectos previstos en el punto noveno del Acuerdo General Plenario 1/2021.

# Translation by DeepL.com

FIRST CIVIL COURT FOR INSOLVENCY PROCEEDINGS
COMMERCIAL
111
AUG 18, 2026, 9:30 AM

WITH RESIDENCE IN MEXICO CITY AND WITH JURISDICTION THROUGHOUT THE REPUBLIC

**BUSINESS ENTITY: TV AZTECA, S.A.B. DE C.V.**

34 an(x0'

**COMMERCIAL BANKRUPTCY PROCEEDINGS.**

011058

**CASE NO.: 22/2026**

**MOTION TO DECLARE ACTS IN CREDITOR FRAUD**

**HONORABLE FIRST DISTRICT JUDGE FOR COMMERCIAL BANKRUPTCY MATTERS, RESIDING IN MEXICO CITY AND HAVING JURISDICTION THROUGHOUT THE MEXICAN REPUBLIC.**

**FERNANDO DEL CASTILLO ELORZA**, in my capacity as general attorney-in-fact for litigation and collections for **THE BANK OF NEW YORK MELLON** in its capacity as **Trustee** (hereinafter, “BNY” or the “Trustee,” interchangeably), a capacity which I attest to and request be recognized in accordance with the first certification of public instrument No. 70,138 dated August 10, 2026, executed before the notary public Luis Eduardo Paredes Sánchez, head of Notary Public Office No. 180 in Mexico City, which is attached hereto in digitized form as **EXHIBIT 1**, and which **I hereby declare, under solemn oath, to be** a **true** and complete copy of the original. I respectfully appear before you and state the following:

**AUTHORIZATION TO ACCESS THE ELECTRONIC CASE FILE**

Pursuant to the provisions of Articles 33, 35, and 36 of General Agreement 12/2020 of the Plenary Session of the Federal Judiciary Council (hereinafter, **Agreement 12/2020**”), I request authorization to access the electronic case file created in connection with this matter, as well as to receive electronic notifications, via the**“AnaElizalde”**Online Services Portal of the Federal Judiciary, assigned to **ANA LAURA ELIZALDE LEÓN**, Esq. (Professional License No. 4455257), whose email address is aelizalde@dc-ca.mx.

**AUTHORIZED PERSONS**

I hereby authorize, in accordance with the broad terms of the third paragraph of Article 1069 of the Commercial Code—which applies on a supplementary basis to the Commercial Bankruptcy Law—the following individuals holding law degrees: **ANA LAURA ELIZALDE LEÓN** (Professional License No. 4455257), **GABRIELA GUADALUPE MEZA DÍAZ DE LEÓN** (Professional License No. 3720580), **ALEJANDRA REA ANAYA** (Professional License No. 12051950), and **MARICRUZ CERVERA MEDINA** (Professional License No. 12550854), collectively, who are hereby authorized in broad terms under said legal provision, solely to hear and receive notifications, as well

as to collect all types of documents and securities, review the case file, and take photographs of the evidence in the file from Ms. **ROCÍO RIVERA ROJAS,** Ms. **LIZZET JHOANA RAMÍREZ CERVANTES,** Ms. **JULIA LOZA HERRERA**, and **Mr. RODRIGO ARTURO LUNA GONZÁLEZ**.

**MOTION TO DECLARE ACTS IN FRAUD OF CREDITORS INEFFECTIVE**

Pursuant to the provisions of Articles 112, 113, 114, 267, and other relevant and applicable provisions of the Commercial Bankruptcy Law (hereinafter, the "LCM"), I hereby file, on behalf of my client, this **MOTION TO DECLARE ACTS INEFFECTIVE DUE TO FRAUD AGAINST CREDITORS** against:

A. TV AZTECA, S.A.B. DE C.V. (hereinafter, the "Merchant" or "TVA, " interchangeably), whose address for service is **32 Manuel Ávila Camacho Boulevard, 11th floor, Lomas de Chapultepec neighborhood, Miguel Hidalgo Municipality, ZIP Code 11000, Mexico City.**

**This motion seeks the following:**

**REMEDIES**

FERNANDO DEL CASTILLO FLORZA
JUDICIAL JURISDICTION 37834-2431-2-16
1-402-27 16-07-27

A. A declaration that ~~the~~ credit ~~agreement~~ dated January 29, 2026, entered into between **Alter Bank, LTD** (hereinafter**"AlterBank"**), acting as structuring agent, initial lender, administrative agent, and collateral agent, and TVA as borrower, as well as its amendment and restatement agreement dated March 6, 2026, ~~is void~~.

**B.** Consequently, the invalidity of said credit against the estate and the remaining recognized creditors (as determined in the judgment recognizing, ranking, and prioritizing claims).

**C.** A declaration that, as a result of the ineffectiveness of said claim against the estate, AlterBank cannot be recognized as a creditor in these bankruptcy proceedings nor can it sign the proposed bankruptcy agreement that may be submitted.

**D.** The expenses and costs arising from this motion.

**STANDING OF BNY AS TRUSTEE AND RIGHTS OF THE HOLDERS**

**BNY acts as Trustee pursuant to the Indemnity Agreement dated August 9, 2017, entered into between TVA, the guarantor subsidiaries, and BNY, with respect to the 8.250% Senior Notes due 2024.**

**BNY acts on behalf of and for the benefit of the holders of the beneficial interests represented by the Global Note.**

Pursuant to the Bond Indemnity Agreement, BNY has the right and duty to enforce the obligations of TVA and the guarantor subsidiaries, including the filing and pursuit of claims in insolvency proceedings, such as the present bankruptcy proceeding.

**RESERVATION OF RIGHTS**

It is hereby stated to Your Honor that this motion is filed based on the information contained in the Petition for a Declaration of Commercial Insolvency and the other forms accompanying it, filed by TVA on March 10, 2026, with the Joint Clerk's Office of the District Courts for Commercial Insolvency Proceedings, located in Mexico City and having jurisdiction throughout the Mexican Republic (hereinafter, the "Petition for Commercial Insolvency").

Furthermore, this motion is filed based on publicly available information in the various media outlets cited throughout the motion; **however, it is hereby stated under oath that my client has had neither access to nor knowledge of the exact content of the Credit Agreement and its Amendment and Restatement Agreement, as my client was not a party to those agreements.**

Finally, since my client is participating in the commercial bankruptcy proceedings through this motion, **I reserve the right on her behalf to expand the scope of this motion** if, upon review of the case file, elements are identified that could be relevant to the motion being filed.

**SPECIAL CHAPTER ON ACTIONS TO DECLARE ACTS COMMITTED IN FRAUD AGAINST CREDITORS INCOMEFECTIVE IN COMMERCIAL BANKRUPTCY PROCEEDINGS**

**1. Retroactive Period**

Pursuant to the provisions of Article 112 of the Commercial Bankruptcy Law (hereinafter, the "LCM"), the retroactive date is the 270th calendar day immediately preceding the date of the judgment declaring commercial bankruptcy.

In the commercial insolvency proceeding at hand, the **Retroactive Date is October 9, 2025**, as determined in the judgment declaring commercial insolvency dated July 6, 2026, issued by Your Honor.

It is well-established law that the retroactive date is understood as the point in time at which it is deemed that **a general default on payments already existed** in **the debtor's financial condition** (a non-transitory state of financial insolvency that prevents the debtor from regularly fulfilling its liquid and due obligations through genuine resources); therefore, **retroactivity is justified by the discrepancy between the time when the widespread failure to meet obligations begins—which is a prerequisite for the declaration of bankruptcy—and the time of its judicial declaration, a period during which there is a presumption that the acts performed by the debtor were carried out to the detriment of the creditors;** and, hence, the retroactive effect of the insolvency judgment is applied in order to eliminate the harmful consequences that such acts might have caused.

**Our highest courts have ruled in this regard:**

Digital Record: 166207
Level: Collegiate Circuit Courts
Ninth Era
Subject(s): Civil
Precedent: VI.1o.C.132 C
Source: Federal Judicial Weekly and its Gazette. Volume XXX, October 2009, page 1413
Type: Isolated

**COMMERCIAL BANKRUPTCY. THE CONCEPT OF RETROACTION AND ITS CONSEQUENCES.**

From a contextual interpretation of the Commercial Bankruptcy Law, it follows that retroactive effect is understood as the point in time at which it is deemed that, in the financial condition of the bankrupt party, there was already widespread default on payments (a non-transitory state of financial insolvency that prevents the debtor from regularly fulfilling its liquid and enforceable obligations through genuine resources), therefore, retroactivity is justified by the discrepancy between the time when the widespread failure to meet obligations begins—which is a prerequisite for the declaration of commercial insolvency—and the time of its judicial declaration, a period during which the presumption applies that the acts performed by the debtor were carried out to the detriment of the creditors; hence, the retroactive effect of the insolvency judgment is applied in order to eliminate any harmful consequences that such acts might have caused; that is, retroactivity is the period decreed by the judge, through which the legal state of widespread default on obligations is intended to coincide with the de facto state of widespread default on obligations, thereby enabling the declaration of the invalidity of all transactions or acts carried out by the business owner during that period, to which the effects of the judicial declaration are retroactively applied.

FIRST COLLEGIATE COURT FOR CIVIL MATTERS OF THE SIXTH CIRCUIT.
**Amparo Appeal 105/2009. ***********. July 2, 2009. Majority opinion. Dissenting opinion: Enrique Zayas Roldán. Reporting Judge: Rosa María Temblador Vidrio. Clerk: Ciro Carrera Santiago.**

**2. Acts Constituting Fraud Against Creditors**

FRIGNANTO DPL CASTELLO PIORZA
26100 (VC) 134820+09032003S1373K303431243K
1482-27 02/16/27

Article 114 of the Commercial Code (LCM) establishes an **objective** list (i.e., independent of the parties' intent) of acts that constitute fraud against creditors. Section III of this article identifies as such any transactions entered into by the merchant in which **conditions or terms** have been agreed upon **that deviate significantly from the prevailing market conditions** at the time **the transaction** was entered into, as of the date of their execution, or from commercial customs or practices. In this case, the Credit Agreement and its Amendment and Restatement Agreement meet this criterion, as they document a secured loan of up to US$290,000,000.00 granted to a company that was clearly insolvent by an institution with no history of granting loans to TVA or financing of comparable size, under terms that even jeopardized AlterBank's own viability, as set forth herein.

**The following is the cited article:**

***Article 114.***— *The following acts constitute acts in fraud of creditors, provided they were carried out on or after the retroactive date:*

***III. Transactions entered into by the merchant in which conditions or terms were agreed upon that deviate significantly from the prevailing market conditions at the time the transaction was entered into, or from commercial customs or practices.***

**3. Acts Presumed to Be Committed in Fraud of Creditors**

The Commercial Insolvency Act establishes a legal presumption that the granting of security interests or the increase of existing ones—when the original obligation did not provide for them—constitutes an act committed in fraud of creditors , **unless the party concerned proves its good faith**.

**The relevant article is as follows:**

**Article 115.**— Acts are presumed to be committed in fraud of creditors if they are performed on or after the retroactive date, unless the interested party proves good faith:

**I.**— The granting of guarantees or the increase of existing guarantees, when the original obligation did not provide for such a guarantee or increase, and...

**4. Consequences of an Act Committed in Fraud of Creditors**

Pursuant to the provisions of Article 113 of the LCM, the legal consequence established for acts committed in fraud of creditors is that such acts are **ineffective** against the estate.

**Legal doctrine has defined this invalidity as follows:**

> *In a broad sense, ineffectiveness is a category that encompasses the total or partial deprivation of the effects of a legal act between the parties or vis-à-vis third parties. Among its subcategories are invalidity (nullity and voidability), non-existence, unenforceability, revocation, rescission, and termination.*
>
> *Legal ineffectiveness, in the strict sense, is identified with unenforceability, which consists of the deprivation of the typical effects of the act; that is, it limits those effects due to the failure to meet a certain condition. Such ineffectiveness renders the act unenforceable; that is, it allows the interested third party to act as if the act did not exist.*[1]

In other words, the legal consequences of an act having been entered into in fraud of creditors—as is the case here— **necessarily** entail that the rights and obligations arising from it cannot be enforced against the merchant's creditors or the estate. That is, a creditor who has participated in the act entered into in fraud of creditors (*i*) cannot be recognized in the judgment acknowledging, classifying, and ranking claims and, consequently, (*ii*) cannot sign the proposed settlement agreement within the proceedings.

This must be the case, as it is the only way to safeguard the rights of creditors who acted in good faith with the business and to protect the integrity of the estate. Insolvency law prohibits the rights and obligations existing between the merchant and a creditor who participated in an act committed in fraud of creditors—especially an act that is expressly classified as such by law, as in the present case—from circumventing the principles of the law through the exercise of rights such as signing the insolvency agreement to the detriment of third parties.

FRIGNANTO DEL CASTELLO FLORA
30014001300003003/03033317303033313422
02/14/27 16:09:27

In light of the foregoing and as evidenced herein, the loan granted by AlterBank constitutes an act committed in fraud of creditors; therefore, it must not be recognized in the judgment recognizing, classifying, and ranking claims—which automatically excludes it from the total amount of liabilities owed by the merchant—and AlterBank will not have the right to sign the proposed arrangement when it is eventually submitted.

## SPECIAL CHAPTER ON ALTER BANK

*Alter Bank Limited* is an entity with a dual legal status: *(i)* as a corporate entity, it is an International Business*Company (IBC*); and *(ii)* as a financial institution, it is an international bank licensed to operate as such.

Alter Bank is a company incorporated under the International Business Companies Act of Saint Lucia (IBC Act), originally formed and registered on January 23, 2007, as *StateTrust Bank & Trust Limited*, changing its name to

[1] López Gianopoulos, Set Leonel, "The Retroactive Effects of a Commercial Bankruptcy Judgment: An Analysis from the Perspective of Legal Certainty," *Journal of the Federal Judiciary Institute*, Mexico, Federal Judiciary Institute – Federal Judiciary Council, 2013, pp. 119–138, specifically p. 127. Available at: https://revistas-colaboracion.juridicas.unam.mx/index.php/judicatura/article/viewFile/32106/29099

***Alter Bank Limited*, pursuant to a shareholders' resolution effective May 19, 2023.**

It is also an international bank established in Saint Lucia and incorporated under Chapter 12.17 of the International Banks*Act* of Saint Lucia, operating under a Class A license No. IB/007(A), issued by the *Financial Services Regulatory Authority* (FSRA) *of Saint Lucia.* [2]

Under the International Banks Act, a Class A license permits unrestricted banking operations with third parties and requires a minimum paid-in capital of USD 2,200,000.00 (two million two hundred thousand United States dollars), with a regulatory deposit of USD 300,000.00 (three hundred thousand United States dollars).[3]

Based on documentary evidence obtained during the proceedings governed by Section 1782 of Title 28 of the United States Code (*Discovery*) before the United States District Judge for the Southern District of Florida, Miami Division, Case No. 26-23885-MC-MARTINEZ, which is attached as **EXHIBIT 2** along with its Spanish translation by a certified expert as **EXHIBIT 2 BIS**, AlterBank submitted various documents that were part of the requirements mandated by the FSRA during the process of obtaining its license in 2024. These documents show that the business model proposed by AlterBank focuses on offering and providing services to **small and medium-sized** enterprises engaged in international trade, cross-border payments, and customized international banking services.

Its proposed financial projection for 2026 called for assets totaling USD 49,076,134.23 (forty-nine million seventy-six thousand one hundred thirty-four dollars and 23/100 of the United States of America), **loans totaling USD 14,356,051.00 (fourteen million three hundred fifty-six thousand fifty-one United States dollars 00/100)**, and deposits of USD 45,940,000.00 (forty-five million nine hundred forty thousand United States dollars 00/100), among other projections for that year.[4]

They even projected an annual transaction volume, forecasting a total of 7,674 transactions in 2026, equivalent to USD 173,000,000.00 (one hundred seventy-three million dollars 00/100). Among these, outbound transactions via transfers or remittances would total $84,500,000.00 (eighty-four million five hundred thousand U.S. dollars 00/100), comprising a total of 3,803

---

[2] **Financial Services Regulatory Authority - Regulated Entities**

[3] https://fsrastlucia.org/index.php/international-sector/international-banks/overview

[4] Page 8 of Annex 2 and Annex 2 Bis (pages numbered as JR-Alter).

**transactions, and the remainder was reported as transactions receivable—that is, funds they expected to receive during the year.**

Furthermore, AlterBank's unaudited financial statements as of March 31, 2024, show that as of that date, the bank had total assets equivalent to **USD 2.3 million**.[5]

According to the information provided, the loan granted to the merchant considerably exceeds the projections in AlterBank's business plan, even for the year 2028. This is true not only in terms of the transaction's value but also in terms of the client's size, as TVA is a company with a national and international presence—one of the world's leading producers and broadcasters of Spanish-language content—that was listed on the Mexican Stock Exchange as a publicly traded corporation.

Furthermore, the transaction appears to deviate from the geographic distribution outlined in the business plan, which projected that approximately 80% (eighty percent) of transactions would be concentrated in the United States and only 20% (twenty percent) in other international markets.

In this case, if AlterBank deviated from the business plan submitted for 2024, it should have reported this to the FSRA, the competent authority in Saint Lucia, as explained by expert **Renée T. St. Rose KC** in her opinion, attached as **ANNEX 3**, and its Spanish translation by a certified expert, attached as **ANNEX 3 BIS**, from which it follows that the bank was obligated to report a change to its business plan.

FRINANDO PFL CASTELLO BLUMZA JUNIOR) 3050103630635157383634313418 02/14/27 4:02:27 PM

The loan granted by AlterBank was exclusively to a single company in Mexico—that is, a client who, at the time the loan was granted, had publicly disclosed that it was facing difficulties due to a deteriorated financial situation—and that single transaction exceeded any projections presented by AlterBank for the period from 2024 to 2028.

Furthermore, **on May 10, 2023,** TVA itself published on its website *"that today the Sixty-Third Civil Court of Mexico City ordered the company not to disclose to the public information regarding its financial situation, in order to avoid causing uncertainty."* This is substantiated by the publication attached hereto as **ANNEX 4** and available at the following link: https://www.irtvazteca.com/es/comunicados-de-prensa.

In other words, for at least **three years prior** to entering into the loan agreement with AlterBank, TVA had concealed its financial information from the investing public.

[5] **Pages 320 through 334 of Annex 2 and Annex 2 Bis (pages numbered as JR-Alter).**

Furthermore, on February 26, 2026, Grupo Salinas issued a press release announcing the resolutions adopted at TVA's Extraordinary General Shareholders' Meeting held on February 26, 2026, at which the corporate, operational, and financial reorganization of the company and its subsidiaries was approved through a voluntary bankruptcy proceeding, the application for which would be filed in the coming days, as they stated that they had faced financial challenges since 2018 and that, beginning in 2021, a process had been initiated to reorganize their financial obligations, **including their foreign-currency debt**. The press release is attached hereto as **ANNEX 5**, which is a matter of public knowledge to Your Honor as it is published on the Grupo Salinas website at https://www.gruposalinas.com/noticias/notas/comienza-tv-azteca-proceso-reorganizacion/.

According to AlterBank's corporate record, obtained from the International Commercial Companies Registry, in connection with the *discovery* process—which is attached hereto as **EXHIBIT 6**, along with its Spanish translation by a certified translator as **EXHIBIT 6 BIS**—the members of AlterBank's Board of Directors as of January 28, 2026, that is, at the time the loan agreement with TVA was entered into, are as follows: **Wilbert Owen Bascom** (appointed on April 11, 2023; subsequently recorded in the Registry as deceased, without the date of death being indicated); **Blas Santander** (Miami, Florida; appointed on September 20, 2023, and resigned on March 31, 2026); **Timothy Richards** (Coral Gables, Florida; appointed on July 17, 2025, and resigned on June 26, 2026); **Alexander Soroka** (Plantation, Florida; appointed on April 16, 2025, and resigned on June 17, 2026); **Augusto César Castillo Chávez** (Mexico City, Mexico; appointed on December 30, 2024); and **Kendall Gill** (Saint Lucia; appointed on April 1, 2009).

It is particularly noteworthy that several members of the Board of Directors who were involved in the management of Alter Bank at the time the loan agreement with TVA was entered into left their positions in the months immediately following the commencement of the *discovery* process in the United States.

As evident from the statement by José Romero Esclusa, CEO of AlterBank, dated July 14, 2026, a resident of Panama, given in Case No. 26-23885-MC-MARTINEZ *in Florida*, United States—which is attached hereto as **EXHIBIT 7**, along with its Spanish translation by a certified expert authorized by the Federal Judiciary Council as **EXHIBIT 7 BIS**—Blas Santander (a resident of Miami, Florida) resigned on **March 31, 2026**; Timothy Richards (resident of Miami, Florida) resigned on **June 26, 2026**; and Alexander Soroka (resident of Miami, Florida) resigned on **June 17, 2026**. All of them were members of the Board of Directors who submitted their resignations coincidentally on dates subsequent to

*Discovery* proceedings that had been initiated in Miami, Florida, United States—the place where they resided and could be questioned regarding the loan granted to TVA.

Furthermore, according to information obtained from AlterBank's corporate registry in Saint Lucia dated January 28, 2026, the beneficial owner of 100% (one hundred percent) of AlterBank's issued shares is Mr. **Augusto César Castillo Chávez**, a Venezuelan national and the only director with a registered address in Mexico. It is noteworthy that, despite being listed as the ultimate beneficiary of 100% (one hundred percent) of AlterBank and as a member of its Board of Directors at the time the loan agreement with TVA was entered into, no public sources were found to substantiate Augusto César Castillo Chávez's professional experience, executive track record, or significant involvement in banking, financial, or capital market institutions. Likewise, no interviews, specialized publications, corporate profiles, or public records were identified that would link him to leadership or management activities within the financial sector, beyond his association with AlterBank.

Prior to that, the record shows that Mr. Juan Francisco Ramirez was the previous beneficiary and owner of 100% (one hundred percent) of the shares issued by AlterBank from **March 22, 2023**, through December 30, 2024.

SIGNED BY PO DEL CASTILLO EL URZA
JUANMANJUANMANJUANMANJUANMANJUAN
02/14/27 4:02:27 PM

The information reported in the Saint Lucia registry contradicts the evidence obtained during the *discovery* process, which includes the June 1, 2023, email [6] regarding a shareholders' meeting held on May 31, 2023, during which AlterBank's share distribution as **of May 31, 2023,** was disclosed **: (i)** Juan Ramírez (30.95%), who filed a lawsuit in Saint Lucia against AlterBank regarding the transfer of his shares[7]; **(ii)** Blas Santanader (15.47%); and **(iii)** Agustín César Castillo Chávez and Tomás Hernández (53.58%). The reason why the latter two are reported to hold the same shares is unknown to my client as of this date. Likewise, the reason why a share distribution different from that reported in AlterBank's internal records was registered is also unknown as of this date.

Furthermore, the *Trustee's* investigation suggests that former owners and affiliates of AlterBank are linked to acts of fraud and evasion of sanctions, a circumstance that reinforces the institution's lack of capacity and commercial credibility to enter into a transaction of this magnitude.

As a result of all of the above, the transaction with TVA deviates significantly from AlterBank's financial projections, customer profile, and operational scale as contemplated by the institution at the time it applied for its license in Saint Lucia in the year

[6] **Pages 78 and 79 of Annex 2 and Annex 2 Bis (pages numbered as JR-Alter).**

[7] Pages 133–145 of Annex 2 and Annex 2 Bis (pages numbered as JR-Alter).

2024. The foregoing, coupled with the fact that AlterBank entered into a loan agreement with a company that was clearly insolvent, as will be explained throughout this proceeding.

**FACTS**

1. On March 10, 2026, TVA filed its petition for a declaration of commercial insolvency in the conciliation stage (hereinafter, the "Insolvency Petition") with the Joint Clerk's Office of the District Courts for Commercial Insolvency Matters, located in Mexico City and having jurisdiction throughout the Mexican Republic.

2. The Bankruptcy Petition was admitted by the Honorable Judge by order dated March 20, 2026.

3. By judgment dated July 6, 2026, TVA was declared to be in commercial bankruptcy in the conciliation stage, **with October 9, 2025**, designated as **the retroactive date** (hereinafter the "Bankruptcy Judgment"), as indicated in the published edict.

4. The Insolvency Judgment was published in the Official Gazette of the Federation and in the newspaper "Universal" on August 10, 2026. This constitutes a matter of public record for Your Honor.

5. On January 29, 2026—that is, just a month and a half before filing for bankruptcy—TVA, in its capacity as borrower, entered into a credit agreement with AlterBank, which acted as structuring agent, initial lender, administrative agent, and collateral agent. This credit was granted in the amount of up to $5,000,000,000.00 (five billion pesos 00/100 M.N.), as described by TVA in paragraph "5" of Section 2 of the Petition for Bankruptcy Proceedings.

**Since my client is not a party to the aforementioned agreement, I respectfully request that Your Honor order TVA to produce it in this proceeding so that my client may review its contents and exercise the corresponding rights.**

6. Subsequently, on March 6, 2026, TVA and AlterBank entered into an amendment and restatement agreement to the Credit Agreement referred to in the preceding fact "5."

Since my client is not a party to the aforementioned agreement, I respectfully request that Your Honor order TVA to produce it in this proceeding so that we may review its contents and exercise the corresponding rights.

7. The execution of the Credit Agreement and its Amendment and Restatement Agreement is freely, voluntarily, and

spontaneously by TVA in *(i)* its petition for declaration of commercial bankruptcy (page 27), *(ii)* in Section 2 titled "Statement of Default or Imminent Generalized Default in the Payment of the Merchant's Obligations" (paragraphs 5 and 6), and *(iii)* in Annex 3 titled "List of Creditors" (identifying AlterBank as a creditor in paragraph 4).

8. However, the execution of the Credit Agreement and its subsequent Amendment and Restatement Agreement constitute a transaction clearly outside market conditions and standard banking and commercial practices, given that, as of January 29, 2026—the date on which the credit agreement was initially executed— **TVA's insolvency was already a matter of public knowledge.**

9. This is because, since at least 2025, various news reports have made public TVA's failure to meet its payment obligations arising from the issuance of the **8.250% Senior Notes Due 2024**, issued pursuant to the Indenture dated August 9, 2017, for a principal amount of US$400,000,000.00 (four hundred million United States dollars), maturing on August 9, 2024, in respect of which TVA ceased making interest payments as of February 9, 2021, and has made no principal or interest payments since then, with BNY acting as Trustee and The Bank of New York Mellon, London Branch, acting as Principal Paying Agent.

Notwithstanding that the foregoing constitutes a matter of public knowledge, as it has been the subject of news reports in various media outlets, the articles published by the following newspapers are attached hereto as **ANNEX 8**:

FRIGNANTO NFL CASTLE FLOOR 7A
3,000 SQFT 3,000 SQFT 3,000 SQFT 3,000 SQFT
1-802-271-6092 27

a) **Reforma newspaper**, article published on July 22, 2025, available at the following link: https://www.reforma.com/aprietan-a-tv-azteca-acreedores-en-ny/ar3042710

b) **Proceso**, article published on December 31, 2025, available at the following link: https://www.proceso.com.mx/nacional/justicia/2025/12/31/tribunales-acorralan-tv-azteca-grupo-elektra-de-ricardo-salinas-pliego-363593.html

c) **Expansión**, article published on December 3, 2025, available at the following link: https://expansion.mx/tecnologia/2025/12/03/la-crisis-quc-acecha-a-tv-azteca

10. The content of the news articles cited in the preceding paragraph indicates that it was public knowledge that TVA was experiencing financial difficulties and had failed to meet its payment obligations to at least the beneficiaries of the global note issued in 2017, as well as that it was contesting various tax liabilities totaling billions of pesos. Furthermore, at least since December 2025, TVA had made it public that its financial situation and tax liabilities made it financially impossible to pay the Notes.

11. Furthermore, as early as 2023, TVA itself published on its website *that "today, the Sixty-Third Civil Court of Mexico City ordered the company not to disclose to the public information regarding its financial situation, in order to avoid causing uncertainty."* This is evidenced by the publication attached hereto as **EXHIBIT 4** and available at the following link: https://www.irtvazteca.com/es/comunicados-de-prensa.

**12.** This had significant implications, as even on January 30, 2023, Fitch Ratings confirmed TV Azteca's rating at *"Restricted Default"* ("RD") due to this unresolved default in the payment of interest on the senior notes, and affirmed the rating of the corresponding issue at "C/RR4." On December 21, 2023, Fitch Ratings completely *withdrew* TV Azteca's rating, expressly noting a lack of access to sufficient information to maintain it.

**In other words, it was public knowledge that there was neither certainty nor transparency regarding TVA's financial information. Moreover, what actually existed was a concealment of that information.**

**13.** TVA's financial distress is also evident from its financial statements—submitted as Exhibit 1 to the Petition for Bankruptcy—since the "Statement of Financial Position" for fiscal year 2025 shows the following:

**a) Total Liabilities in the amount of $29,926,016,000.00 (twenty-nine billion, nine hundred twenty-six million, sixteen thousand pesos 00/100 M.N.).**

**b) Total assets in the amount of $27,006,133,000.00 (twenty-seven billion six million one hundred thirty-three thousand pesos 00/100 M.N.).**

In other words, it is **evident** that TVA's liabilities exceeded its assets as of fiscal year 2025; therefore, it is implausible that a banking institution would decide to grant a loan in January 2026 to a company in such a state of financial distress and "technical insolvency."

Furthermore, its **shareholders' equity** for fiscal year 2025 was $2,919,882,000.00 (two billion nine hundred nineteen million eight hundred eighty-two thousand pesos 00/100 M.N.), an amount that is significantly less than the amount of the loan contracted with AlterBank.

For further reference, below is the relevant excerpt from Annex 1 of the **Bankruptcy Petition:**

| | |
|---|---|
| Stockholders' Equity | |
| Paid-in Capital | 765,142 |
| Reserves and Other Equity Items | 5,615,626 |
| Retained Earnings | (4,234,845) |
| Net Income for the Year | (5,066,805) |
| Total Stockholders' Equity | (2,919,887) |
| Total Liabilities and Stockholders' Equity | 27,006,133 |

14.This financial distress clearly persisted in January 2026, the month immediately preceding the loan agreement—assuming that the company is now in bankruptcy proceedings. According to the financial statements submitted by the Merchant with its Petition for Bankruptcy, its shareholders' equity was $3,136,785,000.00 (three billion one hundred thirty-six million seven hundred eighty-five thousand pesos 00/100 M.N.), **an amount significantly lower than the loan amount contracted with AlterBank**.

For further reference, below is the relevant excerpt from Annex 1 of the Petition for Bankruptcy:

| | |
|---|---|
| Stockholders' Equity | |
| Paid-in Capital | 766,142 |
| Reserves and Other Equity Items | 5,615,626 |
| Retained Earnings | (9,300,650) |
| Net Income for the Year | (216,903) |
| Total Stockholders' Equity | (3,136,785) |
| Total Liabilities and Stockholders' Equity | 25,851,356 |

FRYANKDO DEL CASTILLO BLURZA
Mizrahi 134134, Tel Aviv-Jaffa 63730, Israel
February 27, 2024-4

Furthermore, TVA's total assets as of January 31, 2026, were **$25,851,356,000.00** (Twenty-five billion eight hundred fifty-one million three hundred fifty-six thousand pesos 00/100 M.N.) and the total of its liabilities was **$28,988,141,000.00** (Twenty-eight billion nine hundred eighty-eight million one hundred forty-one thousand pesos 00/100 M.N.). **Needless to say, TVA's insolvency and inability to pay were evident.**

15.In accordance with the regulatory framework, prevailing market conditions, and customary practices, TVA's financial situation had to be disclosed to AlterBank prior to the granting of the loan that is the subject of this proceeding, as this is the **minimum** information any financial institution requires to determine the borrower's ability to pay, especially given the amount of the loan in question.

**AlterBank was obligated to conduct *due diligence* on TVA and gather information regarding its financial situation and existing obligations; this**

is required under applicable regulations, as set forth in paragraphs 25, 26, 36, and 37 of the opinion issued by expert witness **René T. St. Rose, KC**, which is attached as **ANNEX 3**, and its Spanish translation by a certified expert, attached as **ANNEX 3 BIS**. To avoid unnecessary repetition, I request that the content of the Opinion in the indicated paragraphs be deemed to be reproduced here as if it were inserted verbatim.

Likewise, paragraphs 11, 13, 14, 15, 38, 39, and 40, among others, of the expert opinion attached hereto as **ANNEX 9**—issued by Mauricio Basila Lago —former Director General of Issuers and Vice President of Securities Supervision at the National Banking and Securities Commission—and Paul Yamil José Aguilar ("Basila Abogados"), which I request be deemed reproduced here as if inserted verbatim, to avoid unnecessary repetition.

**Both opinions conclude and reflect that it constitutes an international standard of sound banking practices to conduct due and rigorous diligence for credit transactions such as the one entered into between AlterBank and TVA.**

16. From the foregoing, it is evident that *(i)* TVA had been insolvent since 2025, a circumstance consistent with the retroactive date indicated by the Honorable Judge in the Bankruptcy Judgment (October 9, 2025)—it should be noted that its shareholders' equity as of January 31, 2026, was $3,136,785,000.00 (three billion one hundred thirty-six million seven hundred eighty-five thousand pesos 00/100 M.N.), **an amount significantly lower than the loan amount contracted with AlterBank**, with no evidence of a subsequent capital increase (which would be inconsistent with the state of insolvency that led to its bankruptcy proceedings), *(ii)* its insolvency is documented in its own financial statements and in various news reports, and *(iii)* despite the existence of a clear state of insolvency, AlterBank decided to grant TVA a loan in the amount of USD $290,000,000.00 (**two hundred ninety million dollars, the legal tender of the United States of America**) when it was more than obvious that TVA would default on its payment obligations.

**It should also be noted that this loan constituted the first new debt that TVA had incurred with a third party in at least four years.**

17. In addition to TVA's insolvency and its manifest inability to pay, the amount of the loan granted by AlterBank is completely at odds with the bank's business plan for 2026, which projected assets equivalent to USD 49,076,134.23 (forty-nine million seventy-six thousand one hundred thirty-four United States dollars and 23/100), **loans totaling USD 14,356,051.00 (fourteen million three hundred fifty-six thousand fifty-one United States dollars and 00/100)**, and deposits totaling USD

45,940,000.00 (forty-five million nine hundred forty thousand United States dollars 00/100), among other projections for that year.[8]

The foregoing is also corroborated in the opinion issued by expert **Renée T. St. Rose KC**, which is attached as **EXHIBIT 3** and its Spanish translation by a certified expert as **EXHIBIT 3 BIS**, specifically in paragraphs 58, 59, and 73, subsection “e”—which I request be deemed reproduced here as if inserted verbatim to avoid unnecessary repetition.

18. According to the information submitted by TVA and the documentation obtained during the *discovery* process, the loan granted to the Merchant considerably exceeds the projections in AlterBank’s business plan, even for the year 2028. This is true not only in terms of the transaction value but also in terms of the size of the client, since TVA is a company with a national and international presence—one of the world’s leading producers and broadcasters of Spanish-language content—that was listed on the Mexican Stock Exchange as a publicly traded corporation.

19. In other words, a bank whose business projections are based on granting loans to small and medium-sized enterprises granted a loan to a company that does not meet those criteria; not only that, but the company was clearly insolvent (a circumstance that AlterBank must necessarily have been aware of as part of the risk analysis process); and, as if that were not enough, the loan amount exceeds the capital AlterBank had projected for the year 2026.

All of the foregoing clearly deviates from market conditions for this type of loan and from the regulations governing AlterBank in Saint Lucia, as concluded by expert **Renée T. St. Rose KC** in the opinion attached as **ANNEX 3** and its Spanish translation by a certified expert as **ANNEX 3 BIS** —specifically in paragraphs 74 and 75, which I request be deemed reproduced here as if inserted verbatim to avoid unnecessary repetition.

20. Another factor that reinforces the argument regarding the market conditions under which the loan in question was granted is the ridiculously long maturity date, which, according to the information provided by TVA in Annex 3 of its Petition for Bankruptcy, is **July 29, 2026**. It is impossible to believe that a banking institution would grant a loan of **USD $290,000,000.00 (two hundred ninety million dollars, legal tender in the United States of America)** to an insolvent company and expect to be repaid within six months, especially considering that TVA, as has already been established, publicly stated that it was in financial crisis.

---

[8] **Page 8 of Annex 2 and Annex 2 Bis (pages numbered as JR-Alter).**

**21 Now, according to TVA's account in its Petition for Bankruptcy regarding the loan agreement with AlterBank, said loan was entered into for the following reasons:**

**a) In the Petition for Bankruptcy**

...In fact, **TV AZTECA** was facing litigation over debts or tax liabilities determined by the tax authority, in the following amounts: (i) $3,902,000,000.00 (three billion nine hundred two million Mexican pesos) for income tax for the 2009 fiscal year (including fines and surcharges); and (ii) $4,790,000,000.00 (four billion seven hundred ninety million pesos 00/100 M.N.) corresponding to income tax for the 2013 fiscal year (including fines and surcharges).

This situation posed a particularly significant risk to **TV AZTECA**'s viability, given that the Federal Tax Code authorizes the tax authority to enforce tax claims through administrative enforcement proceedings...

**In this context, public and institutional pressure —*as the risk of tax enforcement and an immediate impact on cash flow increased*— forced the company to prioritize liquidity to avoid critical operational disruptions.**

Therefore, faced with the imminence of enforcement measures and the potential loss or restriction of cash flow, the company was compelled to obtain and/or utilize additional and urgent financing to address its tax liabilities and mitigate the risk of operational paralysis.

This directly impacted the company's viability as a productive unit: the withdrawal or immobilization of cash and/or the increase in financial liabilities (interest costs, guarantees, maturities) reduced its ability to meet ordinary operating obligations (salaries, supplies, broadcasting, critical suppliers) and increased the risk of default to various creditors.

This situation compelled **TV AZTECA** to secure emergency financing —*with the consequences that this entails*— from Alter Bank LTD in the amount of up to $5,000,000,000.00 (five billion pesos 00/100 M.N.); as a defensive and indispensable measure aimed at preserving: (i) operational continuity; (ii) job stability; and (iii) the integrity of assets strategic to operations; however, at the same time, it increased the Company's liabilities, deteriorated its capital structure, and reduced its financial flexibility, contributing to the worsening of its state of insolvency...

**b) In Section 2 of the Petition for a Declaration**

> said ALTER loan was obtained by the company as additional and urgent financing to address its tax liabilities and mitigate the risk of operational paralysis...

22. In other words, TVA asserts that it took out the loan with AlterBank for the purpose of safeguarding its operations; however, said loan is secured by mortgages established on March 6, 2026, on the concession titles of (i) Televisora del Valle de México, S.A.P.I. de C.V. and (ii) Televisión Azteca III, S.A. de C.V.—both subsidiaries controlled by TVA—.

This completely contradicts the alleged purpose of the loan, since TVA's financial conditions made it evident that it would default on its payment obligations—a situation that AlterBank should have easily anticipated through the risk analysis it is required to conduct as a financial institution—leading to the enforcement of those guarantees, which **would clearly jeopardize its business and operations**. It is difficult to believe that TVA did not foresee the possibility of the enforcement of the guarantees granted in the event of a default.

**23.** Regardless of the risk associated with TVA's business, AlterBank's granting of the loan clearly jeopardizes its own financial viability and business continuity; therefore, it is absurd to think that this constitutes a transaction conducted under market conditions. No financial institution would jeopardize its financial and regulatory viability by granting a loan to a customer who is clearly going to default.

FRANKANTO NFL CASTILLO FLOREZA
SUSANA GARCIA GONZALEZ
02/14/27 4:07:27 PM

The granting of the loan to TVA is clearly unusual for a banking institution of AlterBank's nature—given TVA's well-known insolvency—and falls outside the applicable regulatory framework under Saint Lucia's legislation, as explained by expert **Renée T. St. Rose KC** in the opinion attached as **ANNEX 3** and its Spanish translation by a certified expert as **ANNEX 3 BIS**, particularly in paragraph 27, which I request be deemed reproduced here as if inserted verbatim to avoid unnecessary repetition.

The credit at issue in this motion is clearly contrary to the Principles for Credit Risk Management, the Supervisory Framework for the Measurement and Control of Large Exposures, and other applicable principles and criteria under the Basel Committee on Banking Supervision (BCBS) Principles and Basel III, which govern sound banking practices and customs internationally.

24. Non-compliance with market conditions and sound banking practices becomes even more evident when we analyze the Basel III International Standards, particularly the "Principles for the Management of *Credit Risk.*"

These Principles constitute, in and of themselves, a global prudential standard for any institution that complies with commonly accepted and applicable international standards. The Basel framework is structured around three pillars: risk-sensitive capital, supervisory review, and market discipline, such that the granting of credit is not a discretionary act of the institution but a regulated process.

BCBS *Principle 5* requires credit institutions to establish exposure limits at the level of individual borrowers and groups of related counterparties; This principle is incorporated into the legislation of Saint Lucia, particularly in Section 15 of the International Banking Act of Saint Lucia, in relation to Guidance Note No. 11 of the Financial Services Regulatory Authority of Saint Lucia (*FSRA*), as explained by expert Renée T. St. Rose KC in the opinion attached as **ANNEX 3** and its Spanish translation by a certified expert as **ANNEX 3 BIS** —specifically in paragraphs 27, 32, and Section "F" of said document—which I request be deemed reproduced here as if inserted verbatim to avoid unnecessary repetition.

Assuming an individual credit exposure of USD $290,000,000.00 (two hundred ninety million U.S. dollars) constitutes an extreme concentration of risk under that standard, clearly outside market conditions and banking practices.

25. As if the foregoing were not enough, AlterBank accepted the mortgage collateral (as second lien) created on the concession titles held by Televisora del Valle de México, S.A.P.I. de C.V. and Televisión Azteca III, S.A. de C.V. **as second lien**. In other words, AlterBank agreed to have a loan—which was clearly going to default—secured by concessions for which there was already a mortgagee with a higher priority, a circumstance that runs counter to what any banking institution would seek to ensure repayment of a loan in the amount granted to TVA.

This is evidenced by the "Certificates of Registration in the Public Registry of Concessions" attached hereto as **ANNEX 10**.

The registration of the mortgages in favor of AlterBank is a matter of public record for Your Honor, since the Folio Certificates are available on the official website of the Telecommunications Regulatory Commission and at

the following **links: <u>https://sert.ift.org.mx/tarifasVE/upload/files/gravamenes/101772_4758_260616161426.pdf</u>** **and** **<u>https://sert.ift.org.mx/tarifasVE/upload/files/gravamenes/101771_3933_260616161219.pdf</u>**

As explained by expert **Renée T. St. Rose, KC**, in the opinion attached as **ANNEX 3** and its Spanish translation by a certified expert as **ANNEX 3 BIS**, particularly in paragraphs 29 and 30 of that document—which I request be deemed reproduced here as if inserted verbatim to avoid unnecessary repetition—that the mortgage guarantees are of such a nature that a prudent, Class A international bank authorized in Saint Lucia would not accept them, in the ordinary course of commercial banking practice, without exceptional documentation supporting the justification for the transaction, the credit assessment, the value and enforceability of the collateral, as well as the required internal and regulatory approvals. In any event, and regardless of the regulatory characterization of the exposure, the credit risk mitigation normally provided by a mortgage collateral is, based on the available information, substantially reduced in the present case.

FRAN ANTO NPI CASTILLO FLORZA
SUMMER SALES 1979–1980
02/18/27 4:07:27 PM

Furthermore, as noted throughout this document, the BCBS principles and the Basel III Framework constitute the internationally recognized prudential benchmark for credit exposures of this nature. Under this standard, the Lender's reliance on a mortgage guarantee originally established in 2020 in favor of a third party—currently *Numchi Servicios, S.A.P.I. de C.V.*—without evidence of its effective financial coverage, is subject to a more conservative prudential treatment and receives less recognition as a risk mitigant. These factors are consistent with the premise that the characteristics of the Loan do not comply with international best practices for credit granting applicable to credit institutions, as set forth in the opinion attached as **ANNEX 9**.

26. The violation of market conditions and commercial practices becomes even more evident when considering that, as of the date of execution of the Amending and Restatement Agreement of March 6, 2026, and the creation of the aforementioned mortgage guarantees, TVA **had already taken the corporate actions necessary to file for bankruptcy**, as evidenced by Annex 8 of the Petition for Insolvency Proceedings, to which was attached Public Deed No. 188,710 dated **February 26, 2026**, executed before Notary Public Eduardo Garduño García Villalobos, head of Notary Office No. 135 in Mexico City, acting in accordance with the protocol of Notary Public No. 211 of the same city.

**The following is noted from the content of said deed:**

a) TVA published the notice convening the Extraordinary Shareholders' Meeting on February 10, 2026, on the Ministry of Economy's Electronic System; that is, **just 12 days after taking out the loan with AlterBank** for the alleged purpose of avoiding default to various creditors.

**b)** At the Extraordinary Shareholders' Meeting held **on February 26, 2026**, it was approved that TVA file for bankruptcy.

In other words, TVA entered into the loan agreement and the amendment and restatement agreement knowing that it was going to file for bankruptcy, thereby demonstrating its bad faith regarding the loan in question, since there was no alleged imminence of enforcement proceedings by the tax authority, since, pursuant to Article 69 of the Commercial Insolvency Law, a declaration of commercial insolvency has the effect of suspending administrative enforcement proceedings for tax claims.

The publication of the notice referred to in subsection "a" of this fact constitutes a matter of public record for Your Honor, as it was posted on the Ministry of Economy's Electronic System.

27.The Petition for Insolvency Proceedings was filed on March 10, 2026 —that is, **12 days after** approval was granted for TVA to file for insolvency and just **4 days** after the Amending and Restatement Agreement with AlterBank was executed and the mortgage guarantees were established by the aforementioned subsidiary companies, which highlights the irregularity of the transactions entered into between TVA and AlterBank, as well as the clearly preferential treatment accorded to this particular creditor compared to the Merchant's other creditors.

**28.**In light of the foregoing, it is evident that AlterBank granted a loan to TVA in complete violation of market conditions and commercial and banking practices, as it was aware of TVA's insolvency and knew that TVA had already been authorized to file for bankruptcy prior to the execution of the Amendment and Restatement Agreement (this being part of the information it is required to gather prior to entering into agreements of this nature).

**29.**Furthermore, the very creation of mortgage guarantees in favor of AlterBank on March 6, 2026, constitutes in and of itself an act of fraud against creditors, pursuant to the provisions of Section I of Article 115 of the Commercial Insolvency Law.

This is because, as set forth in this motion, the mortgages were established on March 6, 2026, **a date subsequent to the credit agreement entered into on January 29, 2026**.

Since my client is not a party to the contract by which the mortgage was granted, I request that Your Honor order Notary Public No. 135 of Mexico City to produce in this motion the public deed No. 188,839 dated March 6, 2026, which is on file in the registry under his or her jurisdiction, and to warn him or her of the enforcement measures Your Honor deems appropriate should he or she fail to do so within the time limit you specify.

Consequently, I request that an official letter be sent to the aforementioned notary so that, in the interest of the administration of justice, he may produce the aforementioned document or provide a certified copy thereof to be added to the case file and evaluated at the appropriate stage of the proceedings.

**30.** It is noteworthy that the mortgages in question were granted by the companies Televisora del Valle de México, S.A.P.I. de C.V. and Televisión Azteca III, S.A. de C.V.; however, TVA is the majority shareholder and controlling entity[9] of those companies, as acknowledged in its Petition for Bankruptcy Proceedings. For quick reference, the relevant portion of the petition is set forth below:

FUNDING BY DEL CASTILLO FLORA
The Department of Child and Adolescent Care at Sheba Medical
Center, Tel Haratz
1-02-27 16:02 27

**TV AZTECA's Mexican Television Channels.**

13.—TV AZTECA is currently the majority shareholder of 2 (two) concessionary companies that directly operate 180 independent digital terrestrial television channels distributed throughout the national territory. These channels are operated independently, and each broadcasts diverse content via its signal in accordance with its respective coverage area. For commercial identification purposes, these channels are recognized in their concession titles as Azteca 7, Azteca Uno, and adn Noticias.

This control is neither an isolated fact nor irrelevant to the present case: it was precisely through this control that TVA decided and executed, through the guarantor companies, the granting of the mortgages in favor of AlterBank, after the loan had been granted and the initiation of the present

---

[9] **Article 15.—...**

**For the purposes of this Act, a corporate group shall be deemed to consist of parent companies and subsidiaries as follows:**

**I.**— Controlling companies shall be those that, directly or indirectly, hold rights that allow them to exercise voting power with respect to more than fifty percent of another company's capital, have decision-making power at its shareholders' meetings, are able to appoint the majority of the members of the board of directors, or that by any other means have the authority to make fundamental decisions regarding a company...

bankruptcy proceedings. In other words, TVA used the corporate structure under its control as a tool to place AlterBank in a position of advantage over the other creditors, at a time when TVA was already aware of and had determined its own state of insolvency, knowing that the creation of such mortgages does have effects within the commercial insolvency proceeding in question, in accordance with the case law bearing digital registration number 2026693, cited below.

31. In this regard, and regardless of whether the circumstances set forth in Section I of Article 115 of the Commercial Insolvency Law have been met, it is emphasized that it is clear that TVA initiated and decided to grant the aforementioned guarantees, as it was the borrower in the loan granted by AlterBank, thereby unduly benefiting AlterBank within the commercial insolvency proceeding that it had already approved to initiate, once again demonstrating its bad faith.

32. In accordance with the case law cited below, a creditor holding a mortgage security interest established in its favor by a third party other than the debtor subject to commercial insolvency proceedings retains its status as a secured creditor within such insolvency proceedings.

**Digital Record: 2026693**
**Level:** **Regional Plenary Sessions**
**Eleventh Term**
**Subject(s):** Constitutional, Civil
**PR.C.CS. J/2 C (11th)**
**Source: Weekly Gazette** Judicial de the Federal.
**Book 26, June 2023, Volume V, page 4959**
**Type:** **Case Law**

**COMMERCIAL BANKRUPTCY PROCEEDINGS. A MORTGAGE SECURITY INTEREST ESTABLISHED ON PROPERTY BELONGING TO A THIRD PARTY WHO IS NOT A DEBTOR, IN EXERCISE OF CONTRACTUAL FREEDOM OR THE NEGOTIATION RIGHTS ESTABLISHED IN ARTICLE 5 OF THE GENERAL CONSTITUTION, FUNCTIONS AS A NEGOTIATION TOOL DURING THE CONCILIATION PHASE.**

Facts: The disputing Circuit Courts, in analyzing whether a creditor holding a mortgage secured by the property of a non-debtor third party should be recognized as a preferred creditor in the judgment recognizing, classifying, and ranking claims, reached conflicting conclusions, since while one held that the privilege granted to secured claims is not contingent on the claimed debt being owned by the bankrupt businessperson, the other ruled that, for the purpose of recognizing a creditor as having a special privilege, the claim must form part of the bankruptcy estate.

Legal Ruling: The Regional Plenary on Civil Matters of the Central-Southern Region, based in Guadalajara, Jalisco, establishes that it is essential to recognize a creditor holding a mortgage security interest in the property of a third party who is not the debtor in the judgment recognizing, classifying, and ranking claims, because this gives effect to the constitutional principle of contractual freedom or freedom of negotiation, since even if the secured creditor is not part of the bankruptcy estate, the recognized creditor has the ability to use the mortgage as a bargaining tool.

**Justification:** A mortgage contract in favor of the creditor on the property of a third party who is not a debtor is capable of having a practical effect in this other stage of

reconciliation phase of the commercial insolvency proceedings, since even though it is not part of the insolvency estate, the recognized creditor with that degree of priority has the possibility of using the mortgage as a negotiating tool under the terms of Article 89 of the Commercial Insolvency Law, with the advantages that this entails, in exercise of their freedom of contract or negotiation. Indeed, in accordance with the provisions of Article 3 of the Commercial Insolvency Law, the objective of the conciliation is to ensure the preservation of the merchant's business through an agreement entered into with its recognized creditors. At this stage and upon the eventual conclusion of the agreement, the autonomy of will—in the sense of contractual or negotiating freedom—must necessarily be respected, as this is an agreement between private parties. This is because it is a sphere in which the parties to a legal relationship are free to manage their own interests and regulate their relationships without external interference, unless non-disposable assets are involved. Otherwise, it would constitute an unjustified interference with the freedom of negotiation of the participants in the commercial reorganization proceedings.

REGIONAL PLENARY SESSION ON CIVIL MATTERS OF THE CENTRAL-SOUTH REGION, SITTING IN GUADALAJARA, JALISCO.

Conflicting Opinions 12/2023. Between those issued by the Second and Third Collegiate Courts, both in Civil Matters of the Third Circuit. April 13, 2023. Three opinions: one by Judge Martha Leticia Muro Arellano, who issued a concurring opinion, and one each by Judges Iléctor Martínez Flores and Cuauhtémoc Cuéllar De Luna. Reporting Judge: Cuauhtémoc Cuéllar De Luna. Clerks: Laura Icazbalceta Vargas, Miguel Mora Pérez, and Luis Fernando Castillo Portillo.
**Conflicting Rulings:**
The position upheld by the Second Collegiate Court for Civil Matters of the Third Circuit in its decision on direct amparo case 275/2018, and the differing position upheld by the Third Collegiate Court for Civil Matters of the Third Circuit in its decision on direct amparo case 573/2021.
This ruling was published on Friday, June 16, 2023, at 10:22 a.m. in the Federal Judicial Weekly and, therefore, is considered mandatory as of Monday, June 19, 2023, for the purposes set forth in paragraph nine of General Plenary Agreement 1/2021.

FRANKINO DEL CASTILLO FLOKZA
MUNSONJ MUNSONMUNSON1973MUN431M438
02/14/27 4:07:27 PM

As stated in the preceding case law, the purpose of respecting the mortgage creditor's priority rank is to ensure that the creditor recognized with that priority rank has the possibility of using the mortgage as a bargaining tool under Article 89 of the Commercial Bankruptcy Law—a matter of which TVA was evidently aware, as it promoted the granting of such guarantees with the intent to favor AlterBank to the detriment of the other creditors.

33. Now, regardless of the scenario provided for in Section I of Article 115 of the Commercial Bankruptcy Law (LCM), AlterBank's acceptance of said security constitutes another non-market condition—applicable to the scenario provided for in Section III of Article 114 of the LCM—since, under the Basel III framework, security interests receive more favorable treatment in risk weighting and in the estimation of Loss Given Default (LGD) **only when they constitute a first-priority, direct, and sufficient lien on the collateral in question**—a circumstance that **does not apply in this case**, since AlterBank is a **second-priority** mortgagee with respect to the concession titles of Televisora del Valle de México, S.A.P.I. de C.V. and Televisión Azteca III, S.A. de C.V., as evidenced by the Certificates of Registration in the Public Registry of Concessions with registration numbers 101771 and 101772, which are attached hereto as **ANNEX 10**, without prejudice to the fact that this is a matter of public knowledge to Your Honor, as it is

**published on an official website.** The statements in this paragraph are also set forth in **the opinion attached as ANNEX 9;** we request that it be deemed reproduced here **as if it were inserted verbatim to avoid unnecessary repetition.**

Based on the foregoing, the guarantees provided are completely at odds with sound banking practices and market conditions for this type of transaction.

34.For all of the foregoing reasons, it is evident that the loan that is the subject of this motion was entered into in violation of market conditions, due to TV Azteca's default, structural lack of liquidity, and inability to obtain ordinary refinancing, which required demonstrating a sufficient primary source of payment, the viability of the aggregate debt, available exposure limits, reserves and capital commensurate with the risk, and a guarantee with effective residual value for the execution of the loan with AlterBank.

The mortgage collateral does not alter this conclusion, as it was already tied to a prior obligation and there is no evidence to determine its realizable value or residual coverage. Consequently, the financing deviates from acceptable standards regarding repayment capacity, risk management, diversification, and mitigation—standards required by both international principles and the laws of Saint Lucia to consider a transaction compatible with sound national and international banking practices and customs.

On the contrary, the existence of said security merely confirms another act that bankruptcy law presumes to be fraudulent (as established in Section I of Article 115 of the Bankruptcy Code).

35.It is concluded that we are dealing with an act carried out fraudulently by TVA to dilute the claims of creditors such as those represented by BNY in its capacity as *Trustee* and to secure approval of an abusive arrangement such as the one proposed in its Petition for Bankruptcy. This is evident, since the Petition for Bankruptcy lists AlterBank as a secured creditor with a higher priority than the Notes, whereas the proposed reorganization plan provides for unsecured creditors a reduction of up to 90% (ninety percent) of the recognized amount—that is, payment of only 10%—and allows secured creditors, including AlterBank, to recover significantly more, including through the sale of broadcasting assets, such as concessions.

**STATEMENT MADE UNDER FORMAL OATH TO TELL THE TRUTH**

Pursuant to the provisions of Section VI of Article 3 of Agreement 12/2020 of the Plenary Session of the Federal Judiciary Council, ***I hereby declare, under solemn oath,*** that the documents attached to this brief are a true and accurate copy, in electronic PDF format, of the original documents in the Complainant's possession, available at the address for service indicated in the corresponding section, and that they are available to this Honorable District Court should said judicial authority so require.

**COMPREHENSIVE ASSESSMENT OF THE COMPLAINT**

I invoke, on behalf of my client, the *jurisprudential* principle transcribed below, according to which the complaint is a legal act subject to comprehensive interpretation in light of the documents accompanying it. That is to say, for the resolution of this motion, the accompanying documents must be evaluated, regardless of whether they are offered as evidence in the following section, and my client is not obligated to transcribe them.

Digital Record: 178475
Instance: Collegiate Circuit Courts
Ninth Era
Subject(s): Civil
Precedent: XVII.2o.C.T. J/6
Source: Weekly Judicial Journal of the Federation and its Gazette. Volume XXI, May 2005, page 1265
Type: Case Law

**COMPLAINT IN ORDINARY PROCEEDINGS. A COMPREHENSIVE REVIEW MUST INCLUDE THE ATTACHED DOCUMENTS.**

Since the complaint constitutes a single whole, its interpretation must be comprehensive; thus, if its content clearly sets forth the essential grounds for the claim, and if it cites **the documents supporting the action as well as those related to the litigation—and presents them—they must be considered part of the complaint and its content, integrated into it; since to hold otherwise would imply that the complaint in question would have to reproduce in full all the matters contained in those supporting documents, which would be both complex and unnecessary**; for the judge, the review of the complaint is not limited to the initial pleading but also includes an analysis of the accompanying documents, as they are an integral part of it. Otherwise, one might be forced to adopt overly strict requirements, such as having to reproduce in the initial complaint both the documents forming the basis of the action and those related to the dispute.

**SECOND COLLEGIATE COURT FOR CIVIL AND LABOR MATTERS OF THE SEVENTEENTH CIRCUIT.**
**Direct Amparo 178/2002. Ernesto Rodríguez Padilla and another. April 12, 2002. Unanimous decision. Reporting Judge: José de Jesús González Ruiz. Clerk: Rogerio Ariel Rojas Novelo.**

**Direct Amparo 310/2003. GMAC Mexicana, S.A. de C.V., S.F. de O.L.F., formerly known as ABA-Motriz Financiamiento, S.A. de C.V., S.F. de O.L., Ábaco Grupo Financiero. August 29, 2003. Unanimous decision. Presiding Justice: José Martín Hernández Simental. Clerk: Margarita de Jesús García Ugalde.**

**Direct Amparo 504/2004. Jaime Arturo Buendía Jiménez. September 30, 2004. Unanimous decision. Reporting Judge: Salvador Murguía Munguía. Clerk: Abel Ascencio López.**

**Direct Amparo 66/2005. Luis Manuel Romo Quevedo and another. February 18, 2005. Unanimous decision. Presiding Justice: Salvador Murguía Munguía. Clerk: José Julio Rojas Vieyra.**

Direct Amparo 151/2005. Institute of Social Security and Services for State Workers. March 18, 2005. Unanimous decision. Presiding Justice: José de Jesús González Ruiz. Clerk: Abel Ascencio López.

**Note: By a ruling dated June 20, 2018, the First Chamber declared that Contradiction of Precedents 404/2017—arising from the complaint challenging the legal principle contained in this precedent—did not exist, finding that the legal principles at issue in the respective complaint were not contradictory.**

FERNANDO DEL CASTILLO ELORZA

**(Emphasis added).**

**EVIDENCE**

1. **PUBLIC DOCUMENT.**— Consisting of the first page of public instrument No. 70,138, dated August 10, 2026, executed before the notary Luis Eduardo Paredes Sánchez, head of Notary Public Office No. 180 in Mexico City, which is attached in digitized form to this document as **ANNEX 1**.

This document certifies the capacity in which the undersigned, Mr. Fernando del Castillo Elorza, appears as the legal representative of THE BANK OF NEW YORK MELLON in its capacity as Trustee.

**This evidence relates to facts "1" through "35"** of this motion.

2. **PUBLIC DOCUMENT**—Consisting of the order dated June 3, 2026, issued by Judge José H. Martínez, U.S. District Judge for the Southern District of Florida, Miami Division, in Case No. 26-23885-MC-MARTINEZ, by which he granted the motion filed by my client, THE BANK OF NEW YORK MELLON, to initiate proceedings pursuant to Section 1782 of Title 28 of the United States Code (28 U.S.C. Section 1782), a document duly apostilled and accompanied by its translation into Spanish by a certified expert from the Federal Judiciary Council, which is attached as EXHIBIT 11 and EXHIBIT 11 BIS, respectively.

U.S. law permits a U.S. court to order the production of evidence (discovery) from an entity that "resides or is found" in the United States for use in a foreign or international proceeding. Pursuant to the procedure set forth in Section 1782 of Title 28 of the United States Code, the district court in which a person resides or is found may order that person to give testimony or a statement, or to produce a document or other item for use in a foreign or international proceeding.

The U.S. Supreme Court has explained that Section 1782 is the result of 150 years of efforts by the U.S. Congress to provide assistance from federal courts in obtaining evidence intended for use in foreign courts.

On June 2, 2026, THE BANK OF NEW YORK MELLON, in its capacity as Trustee, filed a motion under Section 1782 with the United States District Court for the Southern District of Florida, Miami Division (*Florida Court*), seeking to obtain evidence from AlterBank Limited, its directors, and officers, who were located in Florida, United States. This was done in order to

obtain information regarding the loan in the amount of USD 290,000,000.00 (two hundred ninety million United States dollars) granted by AlterBank Limited to TV Azteca S.A.B. de C.V. on January 29, 2026.

As demonstrated by the public documents presented, on June 3, 2026, the Florida court granted BNY's motion and authorized the service of subpoenas on AlterBank Limited and six of its officers and directors.

As a result, the *discovery* process is currently underway, and BNY has served the corresponding notices, **and as a result, documentary, testimonial, and other types of evidence continue to be obtained; once produced, this evidence will be submitted to Your Honor for admission and evaluation in accordance with the standards of the proceedings at hand.**

*I hereby declare under solemn oath that* my client is unable to specify which documents will be obtained in the aforementioned proceeding; therefore, she reserves the right to submit them as evidence at the appropriate procedural stage, once she becomes aware of them.

This evidence establishes that a *discovery* process was initiated in the United States in connection with the facts giving rise to the fraud action being brought in this proceeding, which is currently pending and whose purpose is to assist in the administration of justice by contributing to the body of evidence in the proceeding before Your Honor, so that, at the appropriate procedural stage, this Court may rule in favor of the relief sought by my client.

FERNANDO DEL CASTILLO FLOREZA
Note: June 11, 2553 1373203431 2438
02/14/27 16:09:27

**This evidence relates to facts "1" through "35" of this motion.**

3. **PUBLIC DOCUMENT.**— Consisting of the order dated June 24, 2026, issued by Judge José E. Martínez, U.S. District Judge for the Southern District of Florida, Miami Division, in Case No. 26-23885-MC-MARTINEZ, in which he set the deadlines by which AlterBank Limited and Blas Santander (an AlterBank officer) must file their responses in accordance with the rules governing that Section 1782 proceeding; the document is duly apostilled and accompanied by a Spanish translation certified by an expert certified by the Federal Judiciary Council, which is attached as **EXHIBIT 12** and **EXHIBIT 12 BIS**, respectively.

This evidence establishes that the *discovery* process is ongoing and that, since the deadlines were only met in August 2026, new documentary, testimonial, and other types of evidence will be produced regarding the loan in the amount of USD 290,000,000.00 (two hundred ninety million United States dollars) granted by AlterBank Limited to TV Azteca S.A.B. de C.V. on

**January 29, 2026**, which will be submitted at the appropriate stage of the proceedings so that they may be evaluated by Your Honor.

*I hereby declare, under solemn oath,* that my client is unable to specify which documents will be obtained in the aforementioned proceeding; therefore, she reserves the right to submit them as evidence at the appropriate procedural stage, once she becomes aware of them.

This evidence establishes that a *discovery* process was initiated in the United States in connection with the facts giving rise to the action being brought in this proceeding, which is currently pending and whose purpose is to assist in the administration of justice by contributing to the body of evidence in the case before Your Honor, so that, at the appropriate procedural stage, this Court may rule in favor of the relief sought by my client.

**This evidence relates to facts "1" through "35" of this motion.**

4. **DOCUMENTARY EVIDENCE.**—Consisting of the document obtained through *discovery* pursuant to Section 1782 of Title 28 of the United States Code, No. 26-23885-MC- MARTINEZ, before the United States District Judge for the Southern District of Florida, Miami Division, produced by Mr. Juan Francisco Ramírez, a former employee of Alter Bank Limited, which is accompanied by its proper translation into Spanish by a certified expert from the Federal Judiciary Council, as **EXHIBIT 2** and **EXHIBIT 2 BIS**, respectively.

This evidence establishes, among other things: *(i)* Alter Bank Limited's projected business model for the years 2024 through 2028; *(ii)* the process of obtaining the regulatory capital required to secure a license to operate as an international bank in Saint Lucia in 2024; *(iii)* the obtaining of a license to operate as a Class A bank in accordance with the laws in force in Saint Lucia; *(iv)* the legal actions initiated by Juan Ramirez against Alter Bank Limited; *(v)* the unaudited financial statements of Alter Bank Limited as of March 31, 2024, which show assets totaling only USD 2.3 million; *(vi)* an email dated June 1, 2023, with the subject line "Minutes of the Shareholders' Meeting of May 31, 2023," which reveals the new shareholder structure of AlterBank Limited, in which Mr. Tomas Hernández (a citizen of El Salvador) and Blas Santander (a U.S. citizen) own a percentage of the bank.

**This evidence relates to facts "1" through "35" of the motion.**

5. **DOCUMENTARY EVIDENCE.**— Consisting of the statement by José Romero Esclusa, CEO of AlterBank, dated July 14, 2026, a resident of Panama, a statement given in Case No. 26-23885-MC-MARTINEZ during *the discovery phase* on

Florida, United States, which is attached hereto as **ANNEX 7**, and its Spanish translation by a certified translator authorized by the Federal Judiciary Council as **ANNEX 7 BIS**.

The evidence on the merits establishes that Blas Santander (a resident of Miami, Florida) resigned **on March 31, 2026**; Timothy Richards (a resident of Miami, Florida) resigned on **June 26, 2026**; and Alexander Soroka (a resident of Miami, Florida) resigned on **June 17, 2026**. All of them were members of the Board of Directors who submitted their resignations, coincidentally, on dates after the *discovery proceedings* had begun in Miami, Florida, United States—the place where they resided and could have been questioned regarding the loan granted to TVA.

**This evidence is relevant to the foregoing, since the aforementioned information is verbatim in that statement.**

**This evidence relates to facts "1" through "35" of the motion.**

6. **DOCUMENTARY EVIDENCE.**— Consisting of the corporate record of Alter Bank Limited in the International Commercial Companies Registry of Saint Lucia as of January 28, 2026, with its duly certified Spanish translation by an expert certified by the Federal Judiciary Council, attached as **EXHIBIT 6** and **EXHIBIT 6 BIS**, respectively, obtained in connection with *Discovery* proceeding No. 26-23885-MC-MARTINEZ.

FERNANDO DEI CASTILLO FLUKZA
3U0X0U3U313U3X0U3U35U3U37U38U36U34U3X
02/14/27 4:09:27 PM

This evidence establishes, among other things: *(i)* the corporate registration of Alter Bank Limited, No. 2007-00022; *(ii)* the date of incorporation of Alter Bank Limited on January 23, 2007, as *StateTrust Bank & Trust Limited*; *(iii)* the ownership by the Venezuelan citizen Augusto César Castillo Chávez of 100% of the shares of Alter Bank Limited; *(iv)* the members of the Board of Directors as of the date the credit agreement with TVA was entered into; *(v)* Alter Bank's decision-making process, as of the date the credit agreement with TVA was entered into, was primarily based in Florida and Mexico.

**This evidence relates to facts "1" through "35" of the motion.**

7. **DOCUMENTARY EVIDENCE.**— Consisting of the opinion issued by **Renée T. St. Rose**, Esq., **KC**, who is an expert in commercial, banking, and financial matters under the laws of Saint Lucia and the Eastern Caribbean—as evidenced by her credentials, consisting of *(i)* a Letter Patent dated April 2, 2025, issued by the Private Secretary to the Governor General of Saint Lucia and duly apostilled (which is attached as **ANNEX 3**); *(ii)* the Certificate of Professional Practice issued by the Registrar of the High Court of Justice in the State of Saint Lucia, dated December 30, 2025, duly apostilled (which is attached as **EXHIBIT 3**); and *(iii)* her curriculum vitae (which is attached

**in ANNEX 3), all of which have been translated into Spanish by a certified translator authorized by the Federal Judiciary Council (translations attached as part of ANNEX 3 BIS).**

Said opinion is attached hereto as **ANNEX 3**, with its translation into Spanish by a certified expert from the Federal Judiciary Council as **ANNEX 3 BIS**.

The aforementioned evidence establishes that the loan granted by Alter Bank Limited falls outside the ordinary market conditions applicable in Saint Lucia, considering the regulatory framework in force and applicable in that jurisdiction, the practices commonly observed in transactions of this nature, and, in general terms, Alter Bank Limited's own business model.

The evidence in question is suitable for establishing the foregoing, since foreign law is a matter of evidence and its interpretation can be validly determined by a legal professional from the relevant jurisdiction—in this case, Saint Lucia.

**This evidence relates to facts "1" through "35" of this motion.**

8. **DOCUMENTARY EVIDENCE**—Consisting of the opinion issued by attorneys **Mauricio Basila Lago and Paul Yamil José Aguilar**, who are experts in banking and financial law, which is attached as **EXHIBIT 9.** Their credentials are verified by their professional licenses issued by the General Directorate of Professions under the Ministry of Public Education, which are attached as **EXHIBIT 9 BIS**.

The aforementioned evidence establishes that the loan granted by Alter Bank Limited falls outside the ordinary market conditions applicable under the international regulatory framework that sets forth the standard market conditions for this type of transaction, the practices commonly observed in transactions of this nature, and, in general terms, Alter Bank Limited's own business model.

**The aforementioned evidence is suitable for establishing the foregoing, given that the signatories are experts in banking matters.**

**This evidence relates to facts "1" through "35" of this motion.**

9. **DOCUMENTARY EVIDENCE.**— Consisting of the press release issued **on May** 10 **, 2023,** by TVA itself on its website stating *"that today, the 63rd Civil Court of Mexico City ordered the company not to disclose to the public information regarding its financial situation, with the aim of causing uncertainty."* This is substantiated by the publication attached to

as **ANNEX 4** and is available at the following link: https://www.irtvazteca.com/es/comunicados-de-prensa.

This evidence demonstrates that TVA was concealing its financial information, and judicial measures were even ordered to address this, thereby proving the lack of transparency regarding this situation—which was essential for any credit institution or bank to grant it a loan, let alone a loan in the amount granted by AlterBank.

The cited evidence is appropriate, as it consists of public information issued and published by TVA itself, in which it acknowledges that it did not disclose its financial information, despite having a legal obligation to do so as a company listed on the Mexican Stock Exchange.

**This evidence relates to facts "1" through "35" of this motion.**

10. **DOCUMENTARY EVIDENCE.**— Consisting of the press release dated February 26, 2026, in which Grupo Salinas reported on the resolutions adopted at the Extraordinary General Shareholders' Meeting of TVA held on February 26, 2026, at which the corporate, operational, and financial reorganization of the company and its subsidiaries was approved through a voluntary bankruptcy proceeding, the application for which would be filed in the coming days. This was due to the fact that they stated they had faced financial challenges since 2018 and that, beginning in 2021, a process had been initiated to reorganize their financial obligations, **including their foreign-currency debt**. The press release is attached hereto as **ANNEX 5**, although it is a matter of public knowledge to Your Honor as it is published on the Grupo Salinas website at https://www.gruposalinas.com/noticias/notas/comicenza-tv-azteca-proceso-reorganizacion/

FRANKANDRO DRL CASTILEO FILIURA
JXDXJXJXJXJXJXJXJXJXJXJXJXJXJXJXJXJXJXJX
02/14/27 4:09:27 PM

This evidence demonstrates that TVA acknowledged facing financial difficulties between 2018 and 2021, as well as having approved the filing of its petition for bankruptcy on February 26, 2026—circumstances that make it evident that the loan at issue in this motion was granted outside of market conditions and in violation of sound banking and commercial practices and customs.

The cited evidence is appropriate, as it consists of public information issued and published by TVA itself, in which it acknowledges its troubled financial situation between 2018 and 2021, as well as the approval to file for bankruptcy less than one month after taking out the loan that is the subject of this motion.

**This evidence relates to facts "1" through "35" of this motion.**

11. **DOCUMENTARY EVIDENCE.**— Consisting of the news article dated July 22, 2025, published in the **newspaper Reforma**, attached as **EXHIBIT 8**, which

**can be viewed at the link https://www.reforma.com/apricion-ty/2016/08/08/20160808-ny/ar3042710.**

This evidence demonstrates that TV Azteca, S.A.B. de C.V. has been in a state of financial distress since 2023—that is, prior to entering into the credit agreement with After Bank Limited.

This evidence constitutes a matter of public knowledge for Your Honor under the case law cited in the footnote titled *"WEBSITES OR ELECTRONIC PAGES: THEIR CONTENT CONSTITUTES A MATTER OF PUBLIC KNOWLEDGE AND MAY BE CONSIDERED IN A JUDICIAL DECISION*." [10]

**This evidence relates to facts "1" through "35" of** this motion.

**12. DOCUMENTARY EVIDENCE.**— Consisting of the news article dated December 31, 2025, attached as **EXHIBIT 8**, published by the newspaper **Proceso** and available at the following link: https://www.proceso.com.mx/nacional/justicia/2025/12/3/tribunales-acorralan-tv-azteca-grupo-elektra-de-ricardo-salinas-pliego-363593.html.

This evidence demonstrates that TV Azteca, S.A.B. de C.V. was in a state of financial distress as of 2025—that is, prior to entering into the credit agreement with Alter Bank Limited.

---

"Digital Record: 2030262 Court: Collegiate Circuit Courts, Eleventh Term Subject(s): Civil, General Legal Principle: 13o.C. J/8 K (11th) Source: Gazette of the Federal Judicial Weekly. Book 48, April 2025, Part II, Volume 2, page 882 Type: Case Law WEBSITES OR ELECTRONIC MEDIA. THEIR CONTENT CONSTITUTES A MATTER OF PUBLIC KNOWLEDGE AND MAY BE CONSIDERED IN A JUDICIAL DECISION. Facts: The appellant alleges that the personal service of process, consisting of the summons of the defendant in the original proceeding, was not effected on any of the persons specified in Article 116 of the Code of Civil Procedure for the Federal District applicable to Mexico City—that is, the interested party, representative, agent, attorney, or authorized representative in the case— since it was served at an address other than that of the defendant company's administrative office, which corresponds to one of the branches listed on the company's website. Legal Ruling: This Collegiate Circuit Court determines that the content of websites or web pages constitutes a matter of public record and is subject to consideration in a judicial decision. Justification: This is because the information published in documents or web pages located on computer networks constitutes a matter of public record, as it forms part of public knowledge through those media at the time a judicial decision is rendered, in accordance with Article 88 of the Federal Code of Civil Procedure. That said, access to and use of the Internet to search for information regarding the existence of legal entities, commercial establishments, addresses, and, in general, any data published on computer networks, forms part of the normal culture of specific sectors of society, depending on the type of information in question; hence, while it is not possible to assert that such information is available to all sectors of society, the truth is that it is possible to determine whether, based on the type of data, a fact forms part of the normal culture of a sector of society and may be considered common knowledge by the judge and, consequently, taken into account in a judicial decision—not because of the number of people who are aware of that fact, but because of the notoriety, accessibility, acceptance, and impartiality of this knowledge. THIRD COLLEGIATE COURT FOR CIVIL MATTERS OF THE FIRST CIRCUIT. Amparo in review 365/2012. December 7, 2012. Unanimous decision. Presiding Judge: Neófito López Ramos. Clerk: Ana Lilia Osorno Arroyo. Direct Amparo 383/2020. November 5, 2020. Unanimous decision. Presiding Judge: Sofía Verónica Ávalos Díaz. Clerk: Víctor Hugo Solano Vera. Appeal 31/2021. September 29, 2021. Unanimous decision. Presiding Judge: Sofía Verónica Ávalos Díaz. Clerk: José Manuel Martínez Villcaña. Direct Amparo 358/2021. October 27, 2021. Unanimous decision. Reporting Judge: Sofía Verónica Ávalos Díaz. Clerk: Saulo García Morán. Direct amparo 647/2021. February 2, 2022. Unanimous decision. Reporting Judge: Víctor Francisco Mota Cienfuegos. Clerk: José Francisco Díaz Estéba Avelino. Note: By a ruling dated October 13, 2021, the Second Chamber of the Supreme Court of Justice of the Nation declared that Contradiction of Precedents 159/2021 did not exist. This contradiction arose from a complaint challenging the legal reasoning set forth in the writ of amparo under review 365/2012, which forms part of the precedents for this thesis, since "the collegiate courts considered different elements in each case to determine whether or not the matter was a matter of public knowledge, and this circumstance prevents there from being a single starting point for reaching a conclusion."

This legal opinion was published on Friday, April 11, 2025, at 10:15 a.m. in the Federal Judicial Weekly and, therefore, is considered mandatory as of Monday, April 14, 2025, for the purposes set forth in paragraph nine of General Plenary Agreement 1/2021.

# Exhibit K

**COMERCIANTE: TV AZTECA, S.A.B. DE C.V.**

**CONCURSO MERCANTIL EN ETAPA DE CONCILIACIÓN.**

**EXPEDIENTE NÚMERO: 22/2026-II.**

**INCIDENTE DE INEFICACIA DE ACTOS EN FRAUDE DE ACREEDORES.**

**C. JUEZ PRIMERO DE DISTRITO EN MATERIA DE CONCURSOS MERCANTILES, CON RESIDENCIA EN LA CIUDAD DE MÉXICO Y JURISDICCIÓN EN TODA LA REPÚBLICA MEXICANA.**

**ALFREDO VÁZQUEZ MEYER**, en representación de **TV AZTECA, S.A.B. DE C.V.** (en lo sucesivo y por economía procesal "**TV AZTECA**" o la "**Comerciante**"), personalidad que tengo debidamente reconocida en los autos del procedimiento concursal al rubro citado, ante Usted respetuosamente comparezco y expongo:

ALFREDO VAZQUEZ MEYER
303030313030303030373134373330383535
08/04/29 16:00:55

Que por medio del presente escrito, en legales tiempo y forma y con fundamento en lo dispuesto por el artículo 267 y demás relativos y aplicables de la Ley de Concursos Mercantiles (en lo sucesivo la "**LCM**"), vengo a dar contestación al frívolo e improcedente Incidente de Ineficacia de Actos en Fraude de Acreedores (en lo sucesivo y por economía procesal el "Incidente") promovido por **THE BANK OF NEW YORK MELLON EN SU CARÁCTER DE FIDUCIARIO (*TRUSTEE*) CONFORME AL CONTRATO DE EMISIÓN (*INDENTURE*) DE FECHA 09 DE AGOSTO DE 2017, CELEBRADO ENTRE TVA, LAS SUBSIDIARIAS GARANTES Y BNY, RESPECTO DE LOS BONOS PREFERENTES AL 8.250% CON VENCIMIENTO EN 2024** (en lo sucesivo y por economía procesal el "Incidentista" o "**BONY**" indistintamente); lo que se hace en los siguientes términos:

## I. CONSIDERACIÓN PRELIMINAR.

Antes de dar contestación a las prestaciones y a los hechos, resulta indispensable fijar el marco conceptual conforme al cual deberá juzgarse el Incidente, pues toda su construcción descansa en una desnaturalización de la acción que ejercita.

**1.- Los elementos de la acción.** De la interpretación armónica de los artículos 112 a 119 de la LCM, y conforme a la doctrina civil y concursal, la procedencia de la acción exige la concurrencia de todos y cada uno de los requisitos siguientes: **(i)** un acto del **Comerciante**, celebrado a partir de la fecha de retroacción y antes de la declaración de concurso; **(ii)** que dicho acto haya producido un **perjuicio real a la Masa**, esto es, una disminución del patrimonio del Comerciante o el establecimiento de una preferencia indebida de pago en favor de un acreedor y en detrimento de los demás; **(iii)** que el Comerciante lo haya realizado **defraudando a sabiendas** a sus acreedores; y **(iv)** tratándose de actos onerosos, que el **tercero** que intervino haya tenido **conocimiento de ese fraude** (artículo 113 de la LCM).

Los catálogos de los artículos 114 y 115 no derogan esa lógica, sino que tipifican actos que característicamente producen ese empobrecimiento – *actos gratuitos, contraprestaciones notoriamente desproporcionadas, condiciones significativamente apartadas del mercado, remisiones de deuda, pagos anticipados, garantías no contempladas en la obligación original, pagos en especie distinta* – y por ello relevan o presumen alguno de los elementos subjetivos; pero todos comparten un mismo rasgo estructural, la **salida de valor** del patrimonio del deudor o la **preferencia indebida** de un acreedor. Sin ese rasgo, no hay supuesto legal que aplicar.

ALFREDO VAZQUEZ MEYER
30303031303030303037313437333038353 5
08/04/29 16:00:55

**2.- Los supuestos son de aplicación estricta; la "sospecha" no es una categoría jurídica.** Los artículos 114 y 115 de la LCM establecen un catálogo cerrado de conductas, de interpretación y aplicación estrictas, en tanto conducen a privar de efectos actos jurídicos válidamente celebrados – *lo que constituye una medida excepcional frente a los principios de conservación de los actos jurídicos y de seguridad en el tráfico mercantil* –. Por lo mismo, lo que a un acreedor le parezca "raro", "inusual", "sospechoso" o "anormal" no constituye un supuesto de ineficacia, la extrañeza subjetiva de un acreedor rival no es un

elemento del tipo legal, ni releva a quien acciona de acreditar, con hechos concretos y prueba idónea, cada uno de los elementos de la acción.

Como se demostrará, el Incidente entero está construido sobre esa confusión, sustituye los elementos de la acción por adjetivos como "inverosímil", "irrisorio", "absurdo", "inusual", "llama la atención" y pretende que las suspicacias del Incidentista hagan las veces de los hechos que la ley exige y que jamás se afirman ni se prueban.

**3.- <u>La buena fe se presume; la mala fe se prueba</u>.** Conforme al artículo 807 del Código Civil Federal, de aplicación supletoria, "*la buena fe se presume siempre; al que afirme la mala fe... le corresponde probarla*". Este principio, reconocido por la Primera Sala de la Suprema Corte de Justicia de la Nación como expresión del principio ontológico de la prueba rige la acción intentada, la carga de acreditar el ánimo defraudatorio del Comerciante y el conocimiento del fraude por el tercero corresponde íntegramente al Incidentista (artículo 1194 del Código de Comercio), sin que las presunciones específicas y desvirtuables del artículo 115 lo dispensen de probar los restantes elementos de la acción, señaladamente el perjuicio a la Masa.

ALFREDO VAZQUEZ MEYER
30303030313030303030303731343733303835
08/04/29 16:00:55

**4.- <u>Una operación real y verificable, lo que en la práctica financiera se conoce como una operación "true sale".</u>** Como se detalla al contestar los hechos, la operación materia del Incidente es una transacción genuina y real – *lo que en la práctica financiera se conoce como una operación "true sale"* –, pues: existía una deuda subyacente real, preferente y ejecutable (los créditos fiscales requeridos de pago con apercibimiento de ejecución sobre la negociación misma); una línea de crédito real, dispuesta sólo en forma parcial y en medida acorde con la necesidad que la motivó; flujos de dinero efectivos, trazables y documentados por terceros, que coinciden exactamente con las líneas de captura emitidas por el Servicio de Administración tributaria (“SAT”); una aplicación inmediata, el mismo día, en la que los pagos realizados tuvieron como destinatario final a la Tesorería de la Federación; y efectos económicos reales y favorables a la Masa, cuantificados por la propia autoridad fiscal. Nada es simulado, nada es de papel, nada depende del dicho de mi representada, cada eslabón consta en documentos oficiales verificables. Esa realidad integral

de la operación excluye la imputación de un acto "*celebrado a modo*" que pretende construir **BONY** y constituye, por sí misma, la evidencia más clara de la buena fe de la Comerciante.

**5.- <u>La inminencia de la ejecución fiscal: un riesgo real, actual y documentado, de consecuencias devastadoras para la Comerciante y para la universalidad de sus acreedores.</u>** La urgencia con la que se contrató el financiamiento no es una caracterización de mi representada, está documentada por la propia autoridad fiscal. Al 9 de enero de 2026 concurrían, simultáneamente, todos los presupuestos de una ejecución inmediata: **(i)** créditos fiscales firmes – *agotados los medios de defensa* –; **(ii)** el interés fiscal garantizado desde el 28 de octubre de 2025 con el embargo en vía administrativa de la negociación misma de mi representada (artículo 141, fracción V, del Código Fiscal de la Federación); **(iii)** un requerimiento formal de pago por $8,691,492,061.56, con plazo de 5 (cinco) días; **(iv)** el procedimiento administrativo de ejecución ya iniciado; y **(v)** el apercibimiento expreso, contenido en el propio requerimiento, de que ante la falta de pago la autoridad procedería, indistintamente, a hacer efectiva la garantía a través del procedimiento administrativo de ejecución o a la transferencia de los recursos de las cuentas de la Comerciante en términos del artículo 156-Ter del código. No existe, en el derecho mexicano, una posición de mayor exposición al cobro coactivo que esa.

ALFREDO VAZQUEZ MEYER
30303030313030303030303731343733303835 35
08/04/29 16:00:55

**6.- <u>La antítesis del fraude: un acto que benefició a la Masa</u>.** Bajo ese marco, el presente Incidente exhibe una paradoja que lo torna improcedente, a saber, el acto que se pretende destruir no extrajo valor alguno de la Masa, sino que le ingresó recursos – *un financiamiento puente contratado ante un riesgo real e inminente de ejecución fiscal* –, recursos con cargo a los cuales se pagaron créditos fiscales ejecutables mediante el procedimiento administrativo de ejecución y cuya liquidación permitió a la Comerciante acceder, en términos del Código Fiscal de la Federación, a los beneficios de reducción y condonación de accesorios correspondientes, con una **disminución del pasivo por $1,856,303,526.00 (mil ochocientos cincuenta y seis millones trescientos tres mil quinientos veintiséis pesos 00/100 M.N.)**. Es decir, la operación no sólo no empobreció a la Masa; la benefició de manera neta y cuantificable, en provecho de todos y cada uno de los acreedores. Un acto así es la antítesis conceptual del acto en fraude de acreedores, y ese solo

dato – *que el Incidentista omite por completo* – basta para decretar la improcedencia de la acción, como se desarrolla a lo largo del presente escrito.

**II. CONTESTACIÓN A LAS PRESTACIONES.**

Se niega que la Incidentista tenga acción y derecho para reclamar de mi representada las prestaciones identificadas en los incisos **A**, **B**, **C** y **D** de su escrito incidental. Con independencia de las razones expuestas en las contestaciones a los hechos y en las excepciones y defensas – *que aquí se tienen por reproducidas* –, a continuación, me permito dar contestación a cada una de las prestaciones reclamadas por **BONY** de forma ordenada:

**1.-** Niego acción y derecho a la Incidentista para reclamar de mi mandante la prestación marcada con el inciso **A**. del capítulo correlativo que se contesta y consistente en *"A. La declaración de la ineficacia del contrato de crédito de fecha 29 de enero de 2026 celebrado entre Alter Bank, L TD ( en adelante, "AlterBank") en su carácter de agente estructurador, acreditante inicial, agente administrativo y agente de garantías y TVA como acreditado, así como de su convenio modificatorio y de reexpresión de fecha 06 de marzo de 2026.",* en virtud fundamentalmente de que contrario a lo pretendido, los actos que refiere en la misma de ninguna manera constituyen actos en fraude de acreedores, porque no se actualiza ninguno de los elementos de la acción ni de los supuestos de los artículos 113, 114, fracción III, o 115, fracción I, de la LCM, según se desarrolla a lo largo del presente escrito

ALFREDO VAZQUEZ MEYER
30303030313030303030373134373330383535
08/04/29 16:00:55

**2.-** Niego acción y derecho a la Incidentista para reclamar de mi mandante la prestación marcada con el inciso **B**. del capítulo correlativo que se contesta y consistente en *"B. En consecuencia, la ineficacia de dicho crédito frente a la masa y el resto de los acreedores reconocidos (según estos se determinen en la sentencia de reconocimiento, graduación y prelación de créditos).",* en virtud fundamentalmente de que contrario a lo pretendido, los actos que refiere en la misma de ninguna manera constituyen actos en fraude de acreedores, porque no se actualiza ninguno de los elementos de la acción ni de los supuestos de los artículos 113, 114, fracción III, o 115, fracción I, de la LCM, según se desarrolla a lo largo del presente escrito.

**3.-** Niego acción y derecho a la Incidentista para reclamar de mi mandante la prestación marcada con el inciso **C**. del capítulo correlativo que se contesta y consistente en *"C. La declaración de que, como consecuencia de la ineficacia de dicho crédito frente a la Masa, AlterBank no puede ser reconocido como acreedor dentro del presente procedimiento concursal y tampoco puede suscribir la propuesta de convenio concursal que se presente.",* en virtud fundamentalmente de que contrario a lo pretendido, los actos que refiere en la misma de ninguna manera constituyen actos en fraude de acreedores, porque no se actualiza ninguno de los elementos de la acción ni de los supuestos de los artículos 113, 114, fracción III, o 115, fracción I, de la LCM, según se desarrolla a lo largo del presente escrito.

En adición a lo anterior, las consecuencias que el incidentista pretende en su prestación C. **no están previstas en nuestro ordenamiento**. Los efectos de una eventual declaración de ineficacia son, limitativamente, los restitutorios que establecen los artículos 118 y 119 de la LCM; ningún precepto de nuestro ordenamiento – *ni de los artículos 112 a 115, ni del régimen de reconocimiento de créditos, ni del relativo al convenio concursal* – dispone que el tercero que intervino en un acto declarado ineficaz pierda el derecho a ser reconocido como acreedor ni a suscribir el convenio. De hecho, nuestro ordenamiento sistemáticamente dispone lo contrario, como ejemplo el último párrafo del artículo 114 permite incluso al tercero que restituye lo recibido "*solicitar el reconocimiento de su crédito*", de modo que el legislador contempló la situación del contratante de un acto ineficaz y la resolvió preservando su acceso al reconocimiento, no excluyéndolo.

ALFREDO VAZQUEZ MEYER
30303030313030303030303731343733303835 35
08/04/29 16:00:55

A mayor abundamiento, cuando el legislador quiso privar de sus derechos a un acreedor, lo estableció de manera expresa – *como en el artículo 154 de la LCM, que sanciona los convenios particulares celebrados con posterioridad a la declaración de concurso con la nulidad y la pérdida de los derechos del acreedor que los celebre* –, y tratándose de privaciones de derechos la aplicación es estricta, no se crean por analogía ni por mayoría de razón.

Ni siquiera el fraude de acreedores del derecho común conoce la sanción que aquí se pide, la acción pauliana (artículos 2163 y siguientes del Código Civil Federal) agota sus efectos en la inoponibilidad del acto y las restituciones consecuentes, en beneficio del acreedor que la ejerce y hasta el importe de su crédito, sin privar jamás al tercero de derechos distintos del acto impugnado. Lo que la prestación C solicita no es, pues, la aplicación de una consecuencia legal sino es la creación de una sanción que ni el régimen concursal ni el civil han establecido.

La propia prestación descubre, además, la verdadera finalidad del incidente. Quien demanda la ineficacia de un acto persigue que algo se restituya a la Masa; quien demanda que un acreedor no pueda ser reconocido ni votar el convenio persigue otro fin. El incidentista no reclama la devolución de bien alguno – *ni podría, pues nada salió del patrimonio de la Comerciante con motivo de los actos que impugna; a él ingresaron recursos* –, reclama la eliminación de un acreedor de la masa del convenio concursal, para que su propia participación – *sea cual fuere* – adquiera una posición de poder frente a la Comerciante y los diversos acreedores que sean reconocidos. Lo cierto es que, la ineficacia en fraude de acreedores es un remedio restitutorio establecido en protección de la integridad de la Masa; no es un instrumento para reconfigurar mayorías de voto, y el uso que el incidentista pretende darle la desnaturaliza y evidencia, por sí mismo, la improcedencia de lo pedido.

ALFREDO VAZQUEZ MEYER
3030303031303030303030373134373733303835 35
08/04/29 16:00:55

**4.-** Niego acción y derecho a la Incidentista para reclamar de mi mandante la prestación marcada con el inciso **D.** del capítulo correlativo que se contesta y consistente en *"D. Los gastos y costas que derivan del presente incidente.",* en virtud de que la misma es accesoria a las anteriores, por lo que deberá seguir la misma suerte que aquellas, máxime que, en todo caso, los gastos y costas deberán correr a cargo de la Incidentista, ante la improcedencia del Incidente.

## III. CONTESTACIÓN A LOS CAPÍTULOS PRELIMINARES DEL ESCRITO INCIDENTAL.

**1.-** Con relación al capítulo denominado "***LEGITIMACIÓN DE BNY COMO FIDUCIARIO Y DERECHOS DE LOS TENEDORES***"**.** El contenido de dicho capítulo,

para efectos procesales, se niega. Las manifestaciones que lo integran constituyen meras afirmaciones unilaterales del promovente acerca del carácter con el que dice comparecer y de los derechos y deberes que dice derivan de un contrato de emisión regido por derecho extranjero; afirmaciones que no se encuentran acreditadas en el Incidente.

El Incidentista afirma actuar "…*por cuenta y para beneficio de los titulares de los intereses beneficiarios representados por la Nota Global*…" y tener, conforme al contrato de emisión, "…*el derecho y el deber*…" de presentar y perseguir reclamaciones en procedimientos de insolvencia; sin embargo, no acompaña medio de convicción alguno que demuestre tales extremos.

Desde este momento mi representada se reserva, en los términos más amplios que en derecho procedan, el derecho de controvertir e impugnar la legitimación, personalidad, representación y facultades que el Incidentista se atribuye en el momento procesal oportuno y en las vías, etapas e instancias que correspondan. En consecuencia, ni la presente contestación, ni manifestación alguna contenida en ella, implican ni podrán interpretarse como reconocimiento expreso o tácito de dichas calidades, carácter o facultades, ni como consentimiento con los alcances que el promovente les atribuye.

ALFREDO VAZQUEZ MEYER
30303031303030303037313437333038353 5
08/04/29 16:00:55

**2.-** En cuanto al capítulo denominado "***RESERVA DE DERECHOS*". Se** destaca, por su trascendencia para la litis, la manifestación que el Incidentista formula en dicho capítulo y consistente en que "…*no ha tenido acceso ni conocimiento del contenido exacto del Contrato de Crédito y su Convenio Modificatorio y de Reexpresión…*"; lo que permite advertir no solo la improcedencia del Incidente, sino el dolo y la mala fe con que actúa **BONY,** visto que ejercita una acción cuyo elemento nuclear son las condiciones pactadas en un acto jurídico, confesando ignorar esas condiciones.

Asimismo, desde este momento se hace notar a su Señoría que la cronología del propio Incidente desmiente la pretendida novedad de la acción intentada por **BONY**, quien conforme a sus propias manifestaciones ante la Corte de Distrito para el Distrito Sur de Nueva York en el litigio que ahí sigue contra mi representada: **(i)** desde el 13 de marzo de

2026 – *tres días después de presentada* – solicitó copia de la Solicitud de Concurso; **(ii)** en abril de 2026 la existencia del crédito con Alter Bank fue objeto de notas de prensa que el propio Incidentista invoca; **(iii)** el 2 de junio de 2026 promovió ante la Corte de Distrito Sur de Florida su solicitud conforme a la sección 1782 del título 28 del Código de los Estados Unidos, cuyo objeto – *según sus propias palabras ante el tribunal neoyorquino* – es obtener información "*para su uso en la persecución de potenciales reclamaciones de transferencias fraudulentas conforme al derecho mexicano en el concurso"*; y **(iv)** el 8 de junio de 2026 solicitó autorización para ampliar su demanda en Nueva York, describiendo con detalle el crédito, sus garantías y su prelación.

Es decir, **BONY** no sólo conocía la operación y las circunstancias que hoy invoca desde hacía meses; sino que además anunció formalmente, ante un tribunal extranjero y desde el 2 de junio de 2026, su intención de ejercer precisamente las acciones que presentó hasta el 18 de agosto de 2026. Su "*reserva de ampliar*" el incidente conforme avance el *Discovery* queda así desvirtuada: no es la cautela de quien acaba de conocer los hechos, sino la administración estratégica de un litigio largamente planeado, incompatible con la preclusión que rige la vía incidental.

ALFREDO VAZQUEZ MEYER
30303030313030303030373134373333038353 5
08/04/29 16:00:55

Por si fuera poco, en aquel foro, el Incidentista califica exactamente los mismos hechos – *el crédito de Alter Bank y sus garantías* – como incumplimientos contractuales de *covenants* del contrato de emisión (sus secciones 3.9, 3.10 y 3.15), cuya declaración solicita conforme al derecho de Nueva York ante el tribunal que él mismo eligió. La misma operación es, en Nueva York, un incumplimiento de contrato y, en México, un "*fraude de acreedores*", en conclusión, **BONY** cambia la calificación jurídica según el foro y la conveniencia.

Así, desde este momento se objeta y se solicita desestimar la pretendida "*reserva*" de ampliar el Incidente y de allegar en el futuro pruebas provenientes del procedimiento extranjero de *Discovery* que refiere, por ser contraria a la preclusión y a la litis cerrada que rigen el trámite incidental en términos de lo dispuesto por los artículos 267 de la LCM y 1202 del Código de Comercio de aplicación supletoria a la LCM.

**3.-** Con relación al capítulo denominado "***CAPÍTULO ESPECIAL SOBRE LA ACCIÓN DE INEFICACIA***"**.** Se niega la consecuencia jurídica que pretende **BONY,** a saber, que el acreedor que interviene en un acto declarado ineficaz "*…no podrá ser reconocido…*" ni "*…podrá suscribir el convenio…*", la cual no encuentra apoyo en precepto legal alguno de nuestro ordenamiento.

En efecto, el Incidentista pretende sostener dicha consecuencia exclusivamente en una cita doctrinal, cuya transcripción permite advertir únicamente una definición de la ineficacia *stricto sensu*. Incluso debe anticiparse que el último párrafo del artículo 114 de la LCM – *que BONY omite dolosamente* – establece exactamente lo contrario de lo que se pretende.

Por si fuera poco, tan el efecto pretendido por **BONY** es improcedente, que, cuando el legislador quiso que la consecuencia de un acto fuera la pérdida de los derechos del acreedor en el concurso, así lo previó expresamente, como sucede en la hipótesis prevista por el artículo 154 de la LCM, que sanciona los convenios particulares celebrados a partir de la declaración de concurso no sólo con la nulidad del acto, sino expresamente con la pérdida de los derechos del acreedor que los celebre en el procedimiento concursal. Ninguna disposición semejante existe en el capítulo de actos en fraude de acreedores; y tratándose de una sanción privativa de derechos, de interpretación estricta, no puede aplicarse por analogía a supuestos no previstos.

ALFREDO VAZQUEZ MEYER
30303030313030303030373134373330383535
08/04/29 16:00:55

**4.-** Por último y con relación al capítulo denominado "***CAPÍTULO ESPECIAL SOBRE ALTER BANK***"**.** Ni se afirma ni se niega, por referirse a hechos de un tercero que no son propios de mi representada. En todo caso, se niega que tales cuestiones guarden relación con los elementos de la acción intentada, pues la prudencia del acreditante, su tamaño, los riesgos que asume y sus vicisitudes societarias son ajenos a los supuestos regulados por los artículos 113, 114 y 115 de la LCM, como se expone con mayor precisión al dar contestación a los hechos del Incidente.

## IV. CONTESTACIÓN A LOS HECHOS.

Una vez contestadas las prestaciones reclamadas a mi representada, asi como los capítulos preliminares del Incidente, vengo a dar contestación a todos y cada uno de los hechos narrados por **BONY**, lo que se hace en los siguientes términos:

**1.-** El hecho correlativo que se contesta, para efectos procesales, se niega. Sin perjuicio de lo anterior, se aclara que la existencia, contenido y fecha de presentación de la solicitud de declaración de concurso mercantil de mi representada constan en los autos del expediente en que se actúa, a cuyo texto íntegro deberá estarse.

**2.-** El hecho correlativo que se contesta, para efectos procesales, se niega. Sin perjuicio de lo anterior, la existencia y contenido del auto admisorio de 20 de marzo de 2026 consta en autos, a cuyo texto íntegro deberá estarse.

ALFREDO VAZQUEZ MEYER
30303030313030303030373134373333303835 35
08/04/29 16:00:55

**3.-** El hecho correlativo que se contesta, para efectos procesales, se niega. Sin perjuicio de lo anterior, la existencia, contenido y alcances de la sentencia de 6 de julio de 2026 – *incluida la fecha de retroacción ahí determinada* – constan en autos, a cuyo texto íntegro deberá estarse, precisándose que la fijación de una fecha de retroacción delimita un período de análisis, pero no presume ni prejuzga que acto alguno celebrado dentro de él sea fraudulento, según se ha narrado a lo largo del presente ocurso.

**4.-** El hecho correlativo que se contesta, para efectos procesales, se niega. Sin perjuicio de lo anterior, la realización y contenido de las publicaciones del extracto de la sentencia de declaración de concurso mercantil constan en autos, a cuyas constancias deberá estarse.

**5.-** El hecho correlativo que se contesta, para efectos procesales, se niega. Sin perjuicio de lo anterior, me permito manifestar lo siguiente:

**(A)** La celebración del contrato de crédito de 29 de enero de 2026 con AlterBank (el "**Contrato de Crédito**") fue revelada de manera espontánea por mi representada en su Solicitud de Concurso;

**(B)** El Contrato de Crédito se pactó **en moneda nacional**, como línea de crédito hasta por la cantidad de $5,000,000,000.00 (cinco mil millones de pesos 00/100 M.N.) – *no en dólares de los Estados Unidos de América, como el Incidentista lo denomina en diversos pasajes de su escrito al referirse a "USD $290,000,000.00", cifra ajena a los términos del Contrato de Crédito* –;

**(C)** El monto de la línea de crédito no equivale al importe efectivamente dispuesto, siendo que mi representada dispuso la cantidad de $4,085´000,000.00 (Cuatro mil ochenta y cinco millones de pesos 00/100 M.N.), cifra que fue utilizada en beneficio de la masa y la universalidad de acreedores para **(i)** hacer frente a las obligaciones fiscales de **TV AZTECA,** obteniéndose un beneficio por la cantidad de **$1,856,303,526.00 (mil ochocientos cincuenta y seis millones trescientos tres mil quinientos veintiséis pesos 00/100 M.N.)**, lo que lejos de aumentar el pasivo de la comerciante lo disminuyó significativamente; y **(ii)** en lo restante, conforme al destino pactado en el propio Contrato de Crédito (Cláusula 2.02), que comprende el cumplimiento de obligaciones fiscales y los fines corporativos generales de la acreditada;

ALFREDO VAZQUEZ MEYER
30303030313030303030303737313437333038353535
08/04/29 16:00:55

**(D)** El Contrato de Crédito, en su Clausula 2.02, expresamente previó que el objeto de este es el siguiente "…*El Crédito será utilizado por la Acreditada exclusivamente para el pago y cumplimiento de sus obligaciones fiscales frente a las autoridades fiscales mexicanas (incluyendo, sin limitación, cualesquiera impuestos, contribuciones o pasivos relacionados, federales, estatales o locales) y para fines corporativos generales*…".

**(E)** En cumplimiento al requerimiento contenido en el proveído de 19 de agosto de 2026, adjunto al presente escrito como **anexo número 1)** se exhibe copia certificada del Contrato de Crédito, así como traducción al idioma español por perito traductor certificado, la cual se exhibe como **anexo número 2),** con lo que el requerimiento formulado por su Señoría queda colmado.

**6.-** El hecho correlativo que se contesta, para efectos procesales, se niega. Sin perjuicio de lo anterior, se aclara que el convenio modificatorio y de reexpresión de 6 de marzo de 2026 (el "**Convenio Modificatorio**") no constituyó un nuevo endeudamiento ni una nueva decisión de financiamiento, sino que documentó y reexpresó las obligaciones nacidas del Contrato de Crédito y formalizó el otorgamiento de las garantías contempladas desde la celebración de éste (Cláusula 5.05 del Contrato de Crédito).

En cumplimiento al requerimiento contenido en el proveído de 19 de agosto de 2026, adjunto al presente escrito como **anexo número 3)** se exhibe copia certificada del Convenio Modificatorio, así como traducción al idioma español por perito traductor certificado, la cual se exhibe como **anexo número 4)**, con lo que el requerimiento formulado por su Señoría queda colmado.

**7.-** El hecho correlativo que se contesta, para efectos procesales, se niega. Sin perjuicio de lo anterior, se aclara que, en efecto, mi representada reveló de manera libre, voluntaria y espontánea la existencia del financiamiento y la identidad de su acreedor en su Solicitud de Concurso. Lejos de constituir indicio de irregularidad alguna, esa revelación acredita la transparencia y buena fe con que se condujo la Comerciante, pues contrario a lo que **BONY** pretende hacer creer, los actos fraudulentos se ocultan; no se declaran bajo protesta de decir verdad, ante una autoridad judicial, en el primer escrito del procedimiento universal. El Incidentista pretende convertir la transparencia de mi representada en el fundamento de una imputación de fraude, lo que basta para advertir la inconsistencia de su planteamiento.

ALFREDO VAZQUEZ MEYER
3030303130303030303731343733303835355
08/04/29 16:00:55

**8.-** El hecho correlativo que se contesta, para efectos procesales, se niega, precisándose que no contiene hechos, sino calificaciones jurídicas unilaterales que igualmente se niegan. Con independencia de lo anterior, y a reserva de abundar más adelante sobre cada punto, debe anticiparse a su Señoría lo injustificado de lo aseverado por **BONY,** como se demuestra a continuación:

**(A)** En primer lugar, el artículo 114, fracción III, de la LCM exige la concurrencia de tres elementos: **(i)** los términos y condiciones efectivamente pactados en la operación; **(ii)** las condiciones prevalecientes en el mercado en que la operación se celebró, referidas a la fecha de su celebración, o los usos y prácticas mercantiles; y **(iii)** un apartamiento significativo entre unos y otras. **BONY** no aporta ninguno de los tres elementos:

**(a)** El Incidentista no identifica el mercado relevante ni aporta un solo comparable, tasa de referencia, cotización o estudio de condiciones de financiamiento en México a la fecha de celebración, de hecho, las opiniones que acompaña a su escrito y en las que pretende sustentar sus argumentos NO son idóneas, pues versan sobre la regulación prudencial del acreditante en otra jurisdicción, no sobre condiciones de mercado del financiamiento.

Asimismo, el artículo 114, fracción III, de la LCM ordena confrontar las condiciones o términos pactados en la operación contra las condiciones prevalecientes en el mercado en que se celebró y en la fecha de su celebración. Instituye un contraste objetivo de condiciones contractuales; no un juicio de idoneidad prudencial del acreditante. Por ello, los argumentos planteados por **BONY** son ajenos a la litis, visto que, el capital y los activos de AlterBank, su plan de negocios, su licencia, su regulador, sus consejeros, su accionista y las vicisitudes de su registro societario son cuestiones que ninguna relación guardan con los "*términos pactados*" en la operación.

ALFREDO VAZQUEZ MEYER
30303030313030303030373134373330383535
08/04/29 16:00:55

**(c)** En tercer lugar, mucho menos acredita el tercero de los elementos, visto que arriba a conclusiones partiendo de premisas no probadas o inexistentes, si no acredita las condiciones del acto cuya ineficacia pretende, mucho menos las condiciones de mercado existentes a la fecha de celebración del mismo, desde luego no puede evidenciar un alejamiento del acto jurídico a dichas condiciones prevalecientes; lo cierto es que lo narrado por **BONY** no son sino meras manifestaciones unilaterales, no sustentadas en ninguna prueba.

La forma en que **BONY** pretende formular su Incidente deja a mi representada en estado de indefensión – *no hay condiciones concretas que confrontar ni desviación específica que desvirtuar* –, máxime que de cualquier manera no existió alguna, y priva a la acción de causa de pedir. La demanda incidental es, en este aspecto, oscura y defectuosa, y así se opone formalmente.

**(B)** Por último, de cualquier manera, debe anticiparse que ni el Contrato de Crédito ni el Convenio Modificatorio se apartaron de las condiciones prevalecientes en el mercado relevante en la fecha de su celebración, como se evidencia a continuación:

**(a)** El reproche que **BONY** aduce en su Incidente se reduce, en el fondo, a que AlterBank asumió un riesgo que, a su parecer, es o fue excesivo. Pero la determinación del riesgo que una institución financiera está dispuesta a asumir en una operación concreta – *y de las condiciones bajo las cuales lo asume* – corresponde a esa institución, en ejercicio de su libertad de contratación y de su propio juicio de negocio.

ALFREDO VAZQUEZ MEYER
30303030313030303030303731343733303835 35
08/04/29 16:00:55

Asumir riesgo es la esencia misma de la actividad crediticia. Y la conducta que el propio Incidente relata es la de un acreedor que evaluó su riesgo y lo administró como la práctica ordena: si el riesgo es elevado, se exige garantías, se pacta una tasa acorde y un plazo corto. Si esa asunción de riesgo resultara excesiva conforme a los parámetros internos o regulatorios del banco, las consecuencias – *prudenciales, regulatorias o de negocio* – serían del banco y para el banco, en su jurisdicción; jamás alcanzaría para decretar la ineficacia de los actos del acreditado, y menos aún de actos que beneficiaron a la masa del acreditado, como sucedió en el caso que nos ocupa.

Pretender lo contrario conduce al absurdo de que la diligencia del acreedor (garantizarse) y su apetito de riesgo (prestar donde otros no prestan) se conviertan en armas contra el deudor financiado.

**(b)** Por otra parte, debe decirse que los Acuerdos y Principios del Comité de Supervisión Bancaria de Basilea invocados por el Incidentista no son normas jurídicas

vigentes en México ni en ninguna parte por sí mismos, sino que, en el mejor de los casos son directrices y estándares de coordinación entre autoridades supervisoras – *soft law* –, desprovistos de fuerza vinculante directa, que sólo obligan en la medida y términos en que cada jurisdicción los incorpore a su regulación doméstica, y cuyos destinatarios son los reguladores y las instituciones financieras, no los acreditados.

Su invocación como "*parámetro de mercado*" para efectos del artículo 114, fracción III, de la LCM es jurídicamente insostenible. **BONY** confunde lineamientos prudenciales sobre cómo un banco debe medir y administrar sus riesgos, con las condiciones económicas que rigen las operaciones de financiamiento en un mercado determinado. Lo mismo por cuanto a la legislación de Santa Lucía y las directrices de su autoridad reguladora que el Incidentista pretende invocar, las cuales rigen, en su caso, la relación del banco con su regulador; no la eficacia de los actos del Comerciante en un concurso mexicano.

**(c)** Por último, correctamente definido, el mercado relevante es el del financiamiento a empresas en situación de estrés financiero – *empresa en incumplimiento generalizado, sin calificación vigente, sin acceso a los mercados de capitales y con pasivo fiscal en riesgo de cobro coactivo* –. En ese segmento, podría considerarse que las condiciones prevalecientes son precisamente las que **BONY** tacha de anómalas: tasas superiores al crédito corporativo ordinario, plazos cortos con estructura puente, paquetes de garantías reforzados y acreedores no tradicionales. Las condiciones efectivamente pactadas se ubican dentro de los rangos de dicho mercado en la fecha de celebración.

ALFREDO VAZQUEZ MEYER
30303030313030303030303731343733303835 35
08/04/29 16:00:55

La tesis que plantea **BONY** en el Incidente de ser cierta – *lo que se niega* – haría imposible financiar empresas en crisis. Llevada a sus últimas consecuencias, la construcción del Incidentista implicaría que ninguna empresa en dificultades puede válidamente obtener financiamiento – *pues todo financiamiento en esas condiciones "se apartaría" del crédito bancario ordinario* –, resultado frontalmente contrario a los fines del régimen concursal, que erige la conservación de la empresa en cuestión de interés público y que incluso reconoce y protege el financiamiento de comerciantes en crisis (artículos 1, 3, 37, 75 y 224, fracción II, de la LCM).

**9.-** El hecho correlativo que se contesta, para efectos procesales, se niega. Con independencia de lo anterior, se aclara que el incumplimiento por parte de mi representada a sus obligaciones de pago derivadas de la emisión de las *8.250% Senior Notes Due 2024*, emitidas al amparo del contrato de emisión (*Indenture*) de fecha 9 de agosto de 2017, fue revelado por la propia Comerciante en su Solicitud de Concurso, y forma parte del incumplimiento generalizado que constituye el presupuesto de la declaración de concurso mercantil (artículos 9 y 10 de la LCM).

Ese presupuesto es, por definición, común a todo comerciante concursado, todo concurso mercantil supone un deudor que dejó de pagar. Pretender que de esa circunstancia – *común, revelada y judicialmente declarada* – se siga el carácter fraudulento de los actos de financiamiento que el comerciante celebre para preservar su operación constituye un sin sentido, pues si el incumplimiento previo bastara para calificar de fraude los actos posteriores del deudor, absolutamente todos los actos celebrados por cualquier comerciante en la antesala de su concurso serían fraudulentos, y los artículos 113, 114 y 115 de la LCM – *que exigen un acto determinado, un perjuicio a la Masa, un ánimo defraudatorio y el conocimiento del tercero* – no tendrían razón alguna de existir. El incumplimiento de las notas, ocurrido desde 2021, nada dice, ni prueba, sobre las condiciones en que se pactó un contrato de crédito celebrado cinco años después.

ALFREDO VAZQUEZ MEYER
303030313030303030373134373330383535
08/04/29 16:00:55

Por cuanto hace a las notas periodísticas invocadas, ni se afirma ni se niega su contenido, por no ser hechos propios de mi representada. En todo caso, dichas notas acreditan, a lo sumo, el hecho de su publicación, mas no la veracidad de lo publicado y, mucho menos, las condiciones prevalecientes en el mercado a que se refiere el artículo 114, fracción III, de la LCM, que es lo único que a **BONY** correspondía probar y no hizo. Lo que sí demuestran – *contra lo sostenido por el Incidentista* – es que, en todo caso, la situación financiera de mi representada era pública y notoria, lo que destruye la tesis del "*ocultamiento*" que el propio Incidentista construye en los hechos 11.- y 12.-.

**10.-** El hecho correlativo que se contesta, para efectos procesales, se niega. Sin perjuicio de lo anterior, se formulan las siguientes aclaraciones:

**(A)** La existencia de publicaciones periodísticas sobre la situación financiera de mi representada corrobora que dicha situación, en todo caso, era pública, lo que contradice frontalmente la tesis del "*ocultamiento*" que el propio Incidentista postula en los hechos inmediatos siguientes; ambas versiones no pueden coexistir, y cualquiera de ellas destruye un elemento de su acción: si la crisis era del dominio público, ningún engaño pudo existir; si estaba oculta, el acreditante no pudo conocerla.

**(B)** La circunstancia de que mi representada se encontrara impugnando créditos fiscales – *que el Incidentista presenta como indicio adverso* – constituye el ejercicio legítimo del derecho de defensa que asiste a todo contribuyente; litigar contra el fisco no es ocultar ni defraudar a nadie, y pretender extraer de ello un indicio de fraude revela el método especulativo sobre el que está construido el Incidente.

ALFREDO VAZQUEZ MEYER
30303030313030303030373134373330383535
08/04/29 16:00:55

**(C)** La manifestación pública de que la situación financiera hacía imposible el pago de las notas es plenamente coherente con la decisión de solicitar un concurso mercantil voluntario – *acto de transparencia frente al universo de acreedores* –, no la confesión de acto fraudulento alguno; y

**(D)** Nada de lo narrado en Incidente identifica un acto concreto del Comerciante, una condición pactada fuera de mercado ni un perjuicio a la Masa, que son los extremos que la acción intentada exigía acreditar.

**11.-** El hecho correlativo que se contesta, para efectos procesales, se niega. Sin perjuicio de lo anterior, se aclara que la publicación que el correlativo transcribe da cuenta, en sus propios términos, del acatamiento de una orden judicial dictada por el Juzgado Sexagésimo Tercero de lo Civil de la Ciudad de México. El cumplimiento de un mandato jurisdiccional emanado de autoridad competente es una conducta jurídicamente debida; reprochar a mi representada la obediencia a una orden judicial y presentarla como

ocultamiento doloso es un sin sentido. A ello se agregan dos circunstancias que privan a lo narrado por **BONY** de toda relevancia: **(i)** la publicación invocada es del 10 de mayo de 2023, esto es, casi dos años y medio antes de la fecha de retroacción, por lo que se ubica notoriamente fuera del período que la propia acción intentada delimita como materia de análisis; y ninguna relación guarda con el Contrato de Crédito celebrado en 2026, único acto cuya ineficacia se demanda.

**12.-** El hecho correlativo que se contesta, para efectos procesales, se niega. Sin perjuicio de lo anterior, me permito hacer las siguientes manifestaciones:

**(A)** Las determinaciones de una agencia calificadora extranjera constituyen actos de un tercero, no hechos propios de mi representada, y datan – *según el propio Incidentista* – de enero y diciembre de 2023, esto es, de casi dos años antes de la fecha de retroacción, por lo que resultan inconducentes para la acción intentada.

**(B)** En cuanto al fondo de lo que se insinúa **BONY,** la calificación de *Restricted Default* no reveló nada que no fuera ya conocido – *reflejó el incumplimiento de las notas, hecho público y posteriormente confesado en la propia Solicitud de Concurso* –, y el retiro de la calificación tampoco acredita ocultamiento imputable a la Comerciante, cuya conducta en materia de información estuvo determinada por la orden judicial referida al contestar el hecho inmediato anterior.

ALFREDO VAZQUEZ MEYER
30303030313030303030373134373330383535
08/04/29 16:00:55

Se destaca, además, que ninguna disposición legal erige la existencia de una calificación crediticia en requisito para que un comerciante contrate financiamiento, ni su ausencia en supuesto de ineficacia de los actos que celebre. La conclusión con la que cierra **BONY** consistente en que "*lo que existía era un ocultamiento*" de la información financiera no es un hecho sino una inferencia del Incidentista, que se niega, y que además es incompatible con la notoriedad pública de la crisis que él mismo afirma y pretende probar con notas periodísticas.

**13.-** El hecho correlativo que se contesta, para efectos procesales, se niega. Sin perjuicio de lo anterior, se formulan las siguientes aclaraciones:

**(A)** Los estados financieros a que alude el correlativo fueron exhibidos por la propia Comerciante como anexo de su Solicitud de Concurso, y a su contenido íntegro deberá estarse. Su invocación por el Incidentista demuestra, una vez más, que la información financiera de mi representada estaba disponible y fue proporcionada con transparencia al órgano jurisdiccional y a los acreedores – *conducta incompatible con el ocultamiento que en otros pasajes se imputa* –.

**(B)** La situación de dificultad financiera de mi representada no es un hecho controvertido ni oculto, es el presupuesto mismo del concurso mercantil que voluntariamente solicitó, común por definición a todo comerciante concursado. Construir sobre la insolvencia la prueba del fraude es una petición de principio, equivale a sostener que todo comerciante que se concursa defraudó a sus acreedores con cada acto que celebró en la antesala del concurso.

ALFREDO VAZQUEZ MEYER
30303030313030303030303730313437333038353535
08/04/29 16:00:55

**(C)** La afirmación de que "*resulta inverosímil que una institución bancaria decidiera otorgarle un crédito en enero de 2026 a una sociedad en dicha situación de estrés financiero*" no es un hecho, sino una apreciación subjetiva del Incidentista, desmentida por la realidad del tráfico mercantil. El financiamiento a empresas en situación de dificultad – *el llamado financiamiento puente o de rescate* – es una práctica extendida y reconocida de los mercados de crédito, al grado de que la propia LCM la contempla y la protege como instrumento de conservación de la empresa (artículos 1, 3, 37, 75 y 224, fracción II).

Lo "*inverosímil*" no es que una empresa en crisis obtenga crédito; lo jurídicamente insostenible es pretender que no pueda obtenerlo.

**(D)** La comparación que el correlativo formula entre el capital contable de la Comerciante y el importe del crédito carece de sentido técnico y jurídico, la viabilidad de un financiamiento no se evalúa contrastando el capital contable del acreditado con el monto de

la línea, sino en función de los flujos, los activos, la estructura de la operación y las garantías; y esa evaluación correspondía, en todo caso, hacerla al acreditante, como parte del riesgo que, a él, y sólo a él, incumbía asumir.

**(E)** Por último, debe decirse que lejos de dañar a la Masa, el financiamiento la benefició de manera neta y cuantificable, pues permitió extinguir pasivo fiscal ejecutable con una reducción de accesorios del orden de aproximadamente $1,800,000,000.00 (mil ochocientos millones de pesos 00/100 M.N.) en términos del Código Fiscal de la Federación, según se desarrolla a profundidad al contestar el hecho 21.- de este Incidente.

**14.-** El hecho correlativo que se contesta, para efectos procesales, se niega, y se reproducen, como si a la letra se insertasen, las aclaraciones formuladas al contestar el hecho inmediato anterior.

A lo anterior, se adiciona lo siguiente: el propio hecho que se contesta evidencia que mi representada proporcionó, con su Solicitud de Concurso, información financiera actualizada al 31 de enero de 2026 – *el mes mismo de la celebración del Contrato de Crédito* –, lo que confirma la plena disponibilidad y transparencia de dicha información. Asimismo, las cifras que el Incidentista transcribe, cualesquiera que sean, nada aportan a los elementos de la acción intentada, pues no identifican acto alguno del Comerciante, ni condición pactada que se aparte del mercado, ni perjuicio alguno a la Masa; acreditan, a lo sumo, la situación de insolvencia que constituye el presupuesto – *no la prueba* – del concurso mercantil.

ALFREDO VAZQUEZ MEYER
3030303031303030303030373134373330383535
08/04/29 16:00:55

**15.-** El hecho correlativo que se contesta, para efectos procesales, se niega. Sin perjuicio de lo anterior, se aclara lo siguiente:

**(A)** Los supuestos deberes de *due diligence* del acreditante que **BONY** desarrolla – *con sustento en las opiniones que acompaña* – son cuestiones entre terceros (*res inter alios acta*), conciernen, en su caso, a AlterBank y a su regulador, en su jurisdicción, y su observancia o inobservancia no constituye elemento de ninguno de los supuestos de los

artículos 113, 114, fracción III, y 115, fracción I, de la LCM, ni vicia acto alguno del Comerciante frente a la Masa.

Si un banco presta sin la diligencia que su marco regulatorio le exige – *que se niega haya ocurrido en el caso que nos ocupa* –, en todo caso las consecuencias son regulatorias y recaen sobre el banco; jamás la ineficacia del acto en el concurso de su acreditado, en este caso **TV AZTECA.**

**(B)** Asimismo, la Incidentista parte de una premisa que en modo alguno acredita: que AlterBank no hubiera recabado la información financiera de **TV AZTECA**. Se trata de una mera inferencia unilateral que no se encuentra sustentada en elemento probatorio alguno.

Corresponde a **BONY** acreditar los hechos constitutivos de la acción incidental que ejercita y, por tanto, demostrar no sólo la existencia de la supuesta obligación que atribuye a AlterBank, sino también su incumplimiento y, en su caso, la relevancia que dicho supuesto incumplimiento tendría para actualizar alguna de las hipótesis de ineficacia y fraude de acreedores previstas en la LCM.

ALFREDO VAZQUEZ MEYER
30303030313030303030303731343733303835355
08/04/29 16:00:55

**(C)** Por otra parte, los conceptos a los que **BONY** pretende atribuir carácter vinculante – *tales como las "condiciones en el mercado", los "usos y costumbres" y las "sanas prácticas bancarias"* – no constituyen, por sí mismos, disposiciones jurídicas cuya mera inobservancia permita tener por acreditada la existencia de un acto en fraude de acreedores, sino meras apreciaciones subjetivas.

Aun suponiendo, sin conceder, que determinados criterios pudieran ser considerados prácticas habituales dentro del sector financiero, lo que se niega, ello no significa que constituyan normas jurídicas de observancia obligatoria ni, mucho menos, que su eventual inobservancia tenga como consecuencia automática la actualización de alguno de los supuestos previstos por la LCM en materia de fraude de acreedores.

Por tanto, **BONY** debió acreditar, en primer término, la existencia de la obligación concreta que atribuye a AlterBank, su fuente jurídica, su vigencia y aplicabilidad al caso particular; y, posteriormente, demostrar objetivamente su supuesto incumplimiento y la manera en que éste actualizaría los elementos de la acción incidental que pretende hacer valer, todo ello, además, que haya constituido daño o perjuicio a la Masa concursal. Nada de ello ha sido acreditado.

**(D)** En otro orden de ideas, las opiniones emitidas por los supuestos expertos ofrecidos por **BONY** tampoco constituyen parámetros jurídicamente vinculantes para determinar si la operación materia del presente incidente actualiza alguna de las hipótesis normativas previstas por los artículos 112 a 115 y demás relativos y aplicables de la LCM.

Particularmente, en la medida en que **BONY** pretende sustentar sus afirmaciones en disposiciones o criterios pertenecientes a un orden jurídico extranjero, resulta aplicable lo dispuesto por el artículo 1197 del Código de Comercio, conforme al cual quien invoque derecho extranjero debe acreditar su existencia y aplicabilidad al caso concreto.

ALFREDO VAZQUEZ MEYER
30303030313030303030303737313437333038353535
08/04/29 16:00:55

Para pronta referencia, se transcribe el precepto legal citado:

> **Artículo 1197.-** Solo los hechos están sujetos a prueba: el derecho lo estará únicamente cuando se funde en leyes extranjeras: el que las invoca debe probar la existencia de ellos y que son aplicables al caso.

En el mismo sentido, resulta aplicable el criterio emitido por el Quinto Tribunal Colegiado en Materia Civil del Primer Circuito, que a la letra versa:

> Suprema Corte de Justicia de la Nación
> Registro digital: 2004213
> Instancia: Tribunales Colegiados de Circuito
> Décima Época
> Materias(s): Civil
> Tesis: I.5o.C.42 C (10a.)
> Fuente: Semanario Judicial de la Federación y su Gaceta. Libro XXIII, Agosto de 2013, Tomo 3, página 1638
> Tipo: Aislada

**DERECHO EXTRANJERO. SU APLICACIÓN EN MATERIA MERCANTIL.** Conforme a lo dispuesto en el artículo 1197 del Código de Comercio, cuando en un juicio mercantil existe la necesidad, derivada de la natural labor que corresponde a las partes en tanto tales, de ponderar la aplicabilidad y aplicación del derecho extranjero, **éstas tienen la carga de introducirlo a la controversia (carga de la afirmación) y, además, de acreditar su existencia y aplicabilidad (carga de la prueba)**; sin que al respecto sea válido sostener que el juzgador, en la instancia que fuere, estuviera obligado a aplicarlo oficiosamente pues, precisamente, el derecho extranacional constituye una excepción al principio jurídico de que el juzgador conoce el derecho, que tiene su máxima expresión sólo respecto del nacional, sea legislado o bien jurisprudencial. **Esto es, el derecho extranjero, al no presumirse su conocimiento por el Juez nacional, debe ser invocado y probado por las partes**; sin que ello implique un gravamen procesal excesivo para éstas, pues en el desarrollo de la relación jurídica procesal, en aras de preparar la decisión que implique la aplicación de un orden jurídico extranacional, y si así lo estima pertinente, en acatamiento de lo dispuesto en la fracción I del artículo 14 del Código Civil Federal, el Juez podrá allegarse la información necesaria acerca del texto, vigencia, sentido y alcance legal de dicho derecho; lo que debe entenderse sin perjuicio de que las partes cumplan con las cargas procesales que les corresponden.

QUINTO TRIBUNAL COLEGIADO EN MATERIA CIVIL DEL PRIMER CIRCUITO.

Amparo directo 740/2010. Spectrasite Communications, Inc. 15 de diciembre de 2011. Unanimidad de votos. Ponente: María Soledad Hernández Ruiz de Mosqueda. Secretario: Ricardo Mercado Oaxaca.

ALFREDO VAZQUEZ MEYER
30303030313030303030303737313437333038353535
08/04/29 16:00:55

De lo anterior se desprende que, cuando una parte pretende introducir al debate procesal derecho extranjero, le corresponde la carga de afirmarlo y acreditar su existencia y aplicabilidad. En el caso concreto, **BONY** no acredita de manera suficiente la existencia, vigencia, contenido y aplicabilidad de las disposiciones extranjeras en las que pretende sustentar las obligaciones que atribuye a Alter Bank.

En consecuencia, la opinión emitida por supuestos expertos – *entre ellos, Renée T. St. Rose KC* – respecto de disposiciones de derecho extranjero cuya existencia y aplicabilidad no han sido debidamente acreditadas, así como respecto de supuestos usos y prácticas bancarias, no puede sustituir la carga procesal que corresponde a **BONY** ni

constituir, por sí misma, el fundamento jurídico para tener por actualizados los elementos del fraude de acreedores previsto en la LCM.

**(E)** Por si fuera poco, las opiniones invocadas por **BONY** son documentos privados elaborados a instancia de parte, que versan sobre regulación bancaria extranjera; no acreditan hechos, ni derecho, ni – *lo que es decisivo* – las condiciones prevalecientes en el mercado de financiamiento a la fecha de celebración del acto.

Conviene abundar sobre la opinión de la licenciada Renée T. St. Rose KC, sobre la que el Incidentista hace descansar buena parte de su acción, porque dicho documento NO es inidóneo para acreditar lo que **BONY** pretende, como se evidencia a continuación:

**(a)** Por su naturaleza, es una documental privada elaborada por encargo y a costa del propio Incidentista, que no fue ofrecida como pericial – *sin cuestionario, designación, aceptación ni protesta del cargo (artículo 267, fracción IV, de la LCM)* –, que no estará sujeta a contradicción mediante perito de la contraria, y cuyo valor no puede exceder el de acreditar que su autora la emitió.

**(b)** Por su objeto, versa sobre derecho y regulación de Santa Lucía, esto es, derecho extranjero, cuya existencia, vigencia y alcance son materia de prueba por las vías conducentes (artículo 1197 del Código de Comercio), que una opinión de parte no satisface.

**(c)** Por su contenido, es un dictamen regulatorio, no un estudio de mercado, discurre sobre licencias, capital mínimo, límites de exposición y deberes de reporte ante la autoridad de Santa Lucía, y no contiene una sola tasa de interés, margen, comisión, comparable, ni estructura de precios de operación de crédito alguna, en ninguna jurisdicción; nada, en suma, que pudiera acreditar las "*condiciones prevalecientes en el mercado*" que el artículo 114, fracción III de la LCM exige.

**(d)** Por su método, la autora opina sobre las características de un contrato que no tuvo a la vista, por lo que sus conclusiones sobre el Contrato de Crédito descansan en conjeturas sobre un documento desconocido, y ella misma las formula en términos condicionales y "*con base en la información disponible*".

ALFREDO VAZQUEZ MEYER
3030303031303030303030373134373330383535
08/04/29 16:00:55

**(e)** Por su estándar, juzga lo que un hipotético "*banco internacional prudente de Clase A*" haría, lo que es un hipotético sin sustento, no un dato de mercado y de sus condiciones prevalecientes; y

**(f)** Por su alcance, aun tomada en sus términos, sus conclusiones atañen a la situación del acreditante frente a su regulador en Santa Lucía, cuyas consecuencias – *de existir* – se agotarían en esa esfera y jurisdicción, sin aptitud alguna para producir la ineficacia de los actos del acreditado frente a la Masa de un concurso mexicano. Idénticos defectos de naturaleza, contenido y alcance afectan a la opinión que acompañó **BONY** como anexo 9.

**(F)** Por otra parte, las afirmaciones de **BONY** descansan, en esencia, en apreciaciones subjetivas respecto de aquello que la propia actora incidental y los profesionistas que ésta contrató consideran *"sano"*, *"prudente"* u *"ordinario"* dentro de la práctica financiera, sin que de ello se desprenda, por sí mismo, la existencia de una conducta ilícita atribuible a AlterBank.

ALFREDO VAZQUEZ MEYER
3030303031303030303030373134373330383535
08/04/29 16:00:55

La circunstancia de que, desde la perspectiva de **BONY** hubiera sido *"prudente"*, *"ordinario"* o *"sano"* recabar determinada información, resultan meras apreciaciones y deseos de la Incidentista, pero no demuestra de manera alguna que existiera una obligación jurídica concreta de hacerlo, que AlterBank hubiera incumplido dicha obligación, ni mucho menos que tal supuesto incumplimiento tenga como consecuencia la actualización de un acto en fraude de acreedores conforme a la LCM.

Máxime que **BONY** no aporta elementos objetivos que le permitan afirmar que AlterBank efectivamente omitió recabar la información a la que alude y, como se ha señalado, la propia actora incidental reconoce desconocer el contenido del contrato de crédito celebrado entre **TV AZTECA** y AlterBank, circunstancia que evidencia aún más la falta de sustento de sus afirmaciones.

En consecuencia, las manifestaciones contenidas en el hecho que se contesta constituyen meras inferencias y valoraciones subjetivas que no acreditan, ni siquiera de

manera indiciaria suficiente, la existencia de una obligación jurídica incumplida por AlterBank ni, mucho menos, la actualización de los elementos de la acción incidental de fraude de acreedores que **BONY** pretende hacer valer.

**(G)** El argumento además es insostenible, pues si – *como sostiene BONY* – la situación financiera de mi representada era la información mínima que cualquier institución habría recabado, y esa situación era pública y notoria, entonces el acreditante la conoció y, precisamente por ello, exigió garantías y pactó condiciones acordes al riesgo – *conducta diligente y ordinaria* –, con lo que desaparece todo engaño; y si no la conoció, desaparece el conocimiento del fraude que el artículo 113 de la LCM exige respecto del tercero. En cualquiera de las dos hipótesis, la acción incidental carece de un elemento esencial.

**16.-** El hecho correlativo que se contesta, para efectos procesales, se niega y se reproducen, como si a la letra se insertasen, las aclaraciones formuladas al contestar el hecho inmediato anterior. Con independencia de ello, se formulan las siguientes aclaraciones:

ALFREDO VAZQUEZ MEYER
30303030313030303030373134373333303835 35
08/04/29 16:00:55

**(A)** El Contrato de Crédito se pactó en moneda nacional, como línea hasta por $5,000,000,000.00 (cinco mil millones de pesos 00/100 M.N.); la cifra de "*USD $290,000,000.00*" que el correlativo reitera es una conversión unilateral del Incidentista, ajena a los términos del acto, y el importe de la línea no equivale al importe efectivamente dispuesto.

**(B)** Ahora bien, la sola circunstancia de que **TV AZTECA** atravesara por una situación de estrés financiero para enero de 2026 – *hecho que mi representada reconoció expresamente en su propia Solicitud de Concurso* – no es, por sí misma, un elemento que actualice la hipótesis normativa prevista en el artículo 114, fracción III, de la LCM. Dicho precepto exige demostrar que los términos y condiciones efectivamente pactados en la operación se apartan de manera significativa de las condiciones prevalecientes en el mercado relevante en que se celebró, en la fecha de su celebración, o de los usos y prácticas mercantiles; no basta con acreditar, en abstracto, que el acreditado atravesaba dificultades financieras para tener por actualizado el supuesto legal.

Inclusive debe decirse que existe un segmento de mercado identificado en la práctica financiera internacional como *"bridge lending"*, *"rescue lending"* y *"distressed lending"*, precisamente dirigido a empresas que enfrentan estrés o deterioro financiero significativo. La sola circunstancia de que una institución otorgue crédito a una empresa en dicha situación no constituye, por sí misma, una desviación de las condiciones de mercado; por el contrario, es una característica intrínseca de ese segmento del mercado crediticio, en el que las tasas, comisiones, garantías y plazos naturalmente difieren de los aplicables a créditos corporativos ordinarios con grado de inversión. **BONY** omite comparar la operación celebrada por **TV AZTECA** con operaciones comparables de ese segmento – *único ejercicio idóneo conforme al artículo 114, fracción III, de la LCM* – y en su lugar se limita a la afirmación genérica e inverificable de que *"ninguna institución bancaria"* habría otorgado el crédito, aseveración que resulta contradicha por el solo hecho de que AlterBank sí lo otorgó.

Es importante señalar que, el tipo de financiamientos antes descrito suele representar, para la institución acreditante, una oportunidad de negocio atractiva en virtud del mayor rendimiento y comisiones que conlleva, lo que explica racionalmente por qué una institución financiera decidiría otorgar crédito a una empresa en dificultades financieras, sin que ello implique irregularidad alguna. Tan claro es lo anterior, que la propia LCM permite a la Comerciante solicitar créditos aun estando en concurso mercantil, bajo ciertos requisitos, así que ningún uso y costumbre (no acreditada) que afirma el incidentista tiene relevancia para el caso que nos ocupa.

ALFREDO VAZQUEZ MEYER
30303030313030303030373134373333038353 5
08/04/29 16:00:55

Entonces, la afirmación de que el acreditante otorgó el crédito "…*cuando era más que obvio que TVA iba a incumplir con sus obligaciones de pago…*" es una conjetura que no constituye hecho alguno. Incluso, se insiste en que su conjetura prueba lo contrario de lo que pretende, a saber, los acreedores profesionales prestan a empresas en dificultades precisamente cotizando ese riesgo – *mediante la tasa, el plazo y las garantías* –; asumir un riesgo elevado a cambio de condiciones acordes no es participar en un fraude, es celebrar la operación de crédito característica del segmento. Si la previsibilidad del incumplimiento

tornara fraudulento el financiamiento, no existirían el crédito puente, el financiamiento de rescate ni la reestructura misma; la tesis del Incidentista conduce, otra vez, a la prohibición fáctica de financiar empresas en crisis, contraria a la lógica de los artículos 1 y 3 de la LCM.

**(C)** La afirmación de que el crédito "*…constituyó el primer endeudamiento nuevo con un tercero que TVA contrajo en por lo menos cuatro años…*", lejos de favorecer al Incidentista, corrobora la premisa de la que este escrito parte, mi representada carecía de acceso al crédito ordinario, y el único mercado disponible era el del financiamiento a empresas en situación de estrés financiero, cuyas condiciones características – *tasas, plazos cortos, garantías reforzadas, acreedores no tradicionales* – son exactamente las que el Incidentista tacha de "*inverosímiles*". Ese es el mercado relevante para efectos del artículo 114, fracción III, de la LCM.

El mercado en el que una operación de crédito se celebra no lo determina la cláusula de derecho aplicable – *que es una regla de conflicto de leyes, pactada para regir la interpretación del contrato* –, sino la realidad económica de la operación, quién es el acreditado, en qué moneda se presta, dónde se desembolsa y se paga, qué bienes la garantizan y a qué se destinan los recursos.

ALFREDO VAZQUEZ MEYER
30303030313030303030373134373330383535
08/04/29 16:00:55

En la especie, todos esos elementos tienen puntos de contacto con nuestro país: acreditada mexicana; crédito denominado en pesos; desembolso y repago pactados en cuentas bancarias en México; título de crédito suscrito en la Ciudad de México y sometido a leyes y tribunales mexicanos; garantías regidas por derecho mexicano sobre bienes ubicados en México; y destino consistente en el pago de contribuciones mexicanas. El mercado relevante es, pues, el del financiamiento a empresas mexicanas en situación de estrés financiero – *mercado al que concurren, por igual, acreedores nacionales y extranjeros, siendo el crédito transfronterizo una de sus formas ordinarias* –. Pero aun si se admitiera cualquier otra delimitación – *el mercado de Santa Lucía por la ley elegida para el contrato marco, o el mercado internacional de crédito* –, la suerte del Incidente sería la misma, pues el Incidentista no probó las condiciones prevalecientes de ninguno de esos mercados, pues su material no contiene una sola tasa, margen, comparable o estructura de precios de

operación alguna, celebrada en ninguna jurisdicción. La deficiencia probatoria es causa de la improcedencia de la acción incidental.

**(D)** Asimismo, la fórmula legal "*se aparten de manera significativa*" impone una carga probatoria comparativa, no retórica. Acreditar el supuesto exigía confrontar, cuando menos: los términos exactos pactados en la operación; las condiciones prevalecientes en el mercado relevante; la fecha de celebración; operaciones comparables; y la magnitud de la desviación. El Incidentista no aporta una sola de esas variables: no revela la tasa, ni el costo total, ni un comparable, ni un estudio del mercado de financiamiento a la fecha de celebración. Sin variable observada no existe desviación cuantificable, y sin desviación cuantificada no existe el supuesto del artículo 114, fracción III, de la LCM.

El juicio que el precepto ordena es, además, un juicio *ex ante,* la operación debe apreciarse con la información disponible en la fecha de su celebración esto es, el 29 de enero de 2026, no a la luz del hecho posterior como que la Comerciante solicitó su concurso. **BONY** razona al revés, parte del concurso – *ocurrido después* – y desde ahí decreta que el crédito "*obviamente*" no se pagaría. Ese sesgo en la argumentación del Incidente prueba lo contrario de lo que pretende, es decir, la solicitud posterior de un concurso no demuestra que al contratar existiera imposibilidad de pago ni ausencia de propósito legítimo; demuestra, a lo más, que además de la liquidez obtenida se requería una solución colectiva – *exactamente la que hoy se tramita* –. Siendo que el principió sobre el que descansa su tesis, conforma la cual supuestamente "*resulta inverosímil que una institución bancaria prestara*" quedó refutado por la realidad documental, pues una institución prestó, documentó y desembolsó. Lo que el Incidentista llama inverosímil es, simplemente, lo que ocurrió.

ALFREDO VAZQUEZ MEYER
30303030313030303030303731343733303383535
08/04/29 16:00:55

En consecuencia, se controvierte que la potencial insolvencia de **TV AZTECA** – *por sí sola* – demuestre que el crédito se apartó de las condiciones de mercado, o que haya existido mala fe de AlterBank o de mi representada al momento de su celebración. Además, como se dijo, es común en el mercado el otorgamiento de créditos a empresas en estrés (*distressed debt o special situacions lending*), basta revisar la propia LCM que contempla la posibilidad de otorgar créditos incluso después de la declaración de concurso

mercantil para mantener la operación ordinaria de la empresa, como el pago de impuestos, motivo por el cual no le asiste razón ni derecho a la incidentista, pues en éste último supuesto, los criterios para su otorgamiento no podrían ser el capital contable, sino de las necesidad en ese momento de la empresa.

**(E)** No debe pasarse por alto entonces, que, tras dieciséis hechos, el Incidentista sigue sin identificar una sola condición pactada en el Contrato de Crédito que se aparte del mercado, no aporta un comparable, ni una tasa de referencia, ni un estudio del mercado de financiamiento a enero de 2026. Su acción simple y sencillamente carece de causa de pedir.

**17.-** El hecho correlativo que se contesta, para efectos procesales, se niega. Sin perjuicio de lo anterior, se aclara que el plan de negocios y las proyecciones financieras del acreditante son documentos internos, prospectivos y unilaterales de un tercero, que no constituyen hechos propios de mi representada ni límite jurídico alguno a la capacidad de dicho tercero para contratar. Al respecto, se manifiesta lo siguiente:

ALFREDO VAZQUEZ MEYER
30303030313030303030373134373330383535
08/04/29 16:00:55

**(A)** Lo narrado por **BONY** en este hecho se refiere, en su totalidad, a las proyecciones internas de negocio y a la situación regulatoria propia de AlterBank – *un tercero ajeno a mi representada* –, no a los términos y condiciones del crédito efectivamente pactados por TV AZTECA, ni a las condiciones de mercado que le eran aplicables. A pesar de que no es un hecho propio, debe decirse que el artículo 114, fracción III, de la LCM exige comparar los términos de la operación celebrada por el Comerciante con las condiciones de mercado aplicables a dicho Comerciante; no autoriza, en cambio, evaluar el cumplimiento del acreditante con sus propias proyecciones internas de negocio o con su marco regulatorio en una jurisdicción extranjera. El "plan de negocios" no de un banco, es eso nada más, una proyección de lo que se cree que hubiere sucedido, pero desde luego no es parámetro válido para acreditar la presunción de la Incidentista.

Ninguna norma del derecho mexicano – *ni de ninguna otra jurisdicción que se haya acreditado* – condiciona la validez o eficacia de un contrato de crédito a su

congruencia con las proyecciones internas del acreditante; los planes de negocio se elaboran para orientar la gestión, y las instituciones financieras celebran cotidianamente operaciones que los exceden o modifican cuando su propio análisis de riesgo y oportunidad así lo justifica.

Asimismo, las proyecciones de negocio de una institución financiera no constituyen límites obligatorios o vinculantes, sino estimaciones orientativas que legítimamente pueden ser superadas cuando, a juicio de la propia institución, surgen oportunidades de negocio no contempladas al momento de su elaboración; por lo que el otorgamiento de un crédito que se aparte de dichas proyecciones no es, por sí mismo, indicativo de irregularidad alguna

Esa entonces una decisión de negocio del banco, que evalúa y asume sus propios riesgos. La invocación de este material revela, de nueva cuenta, el método del Incidente, en lugar de identificar y probar los elementos que la ley exige – *condiciones pactadas, mercado relevante, desviación significativa, perjuicio a la Masa* –, especula sobre documentos internos de un tercero que ninguna relación guardan con el acto impugnado ni con su eficacia frente a la Masa.

ALFREDO VAZQUEZ MEYER
30303031303030303030373134373330383535
08/04/29 16:00:55

**(B)** Por si fuera poco, es un hecho no controvertido – *información que la propia actora incidental reconoce haber obtenido, con posterioridad a la celebración del crédito, a través del proceso de discovery tramitado en Estados Unidos* – que mi representada no tuvo acceso ni conocimiento del contenido del plan de negocios de AlterBank, documento privado, interno y confidencial de dicha institución, obtenido posteriormente por **BONY** a través de un proceso de *discovery* tramitado en Estados Unidos. Resulta jurídicamente inadmisible atribuir a mi representada consecuencias derivadas de la desviación – *ya sea real o presunta* – de un tercero respecto de sus propias proyecciones internas, de las cuales mi representada no tenía ni pudo tener conocimiento al momento de contratar.

**(C)** Se invoca nuevamente, como único sustento, la opinión privada de una supuesta experta en derecho de Santa Lucía, respecto de la cual resultan aplicables, en sus términos, las consideraciones expuestas en el hecho 15 que antecede sobre la falta de

acreditación del derecho extranjero conforme al artículo 1197 del Código de Comercio, mismas que solicito se tengan por aquí por reproducidas, como si a la letra se insertasen, en obvio de repeticiones innecesarias.

**18.-** El hecho correlativo que se contesta, para efectos procesales, se niega y se reproducen, como si a la letra se insertasen, las aclaraciones formuladas al contestar el hecho inmediato anterior. Con independencia de ello, se aclara que es exacto el perfil empresarial que el propio Incidentista atribuye a mi representada "…*una empresa con presencia nacional e internacional, una de las principales productoras y difusoras de contenido en español a nivel mundial*…". Ese reconocimiento – *espontaneo* – desmiente la pretendida "*inexplicabilidad*" de la operación, pues una empresa de esa envergadura, con activos, flujos y marcas relevantes, constituye un acreditado de interés legítimo para cualquier acreedor especializado en financiamiento de situaciones especiales, por más que atraviese una crisis de liquidez.

De cualquier manera, el hecho de que una empresa de la envergadura de **TV AZTECA** obtenga financiamiento de una institución cuyo modelo de negocio declarado estuviera inicialmente orientado a empresas de menor tamaño no es, por sí mismo, indicativo de ineficacia, simulación o desviación de mercado; en todo caso, sería un dato relevante para el análisis interno, pero es una cuestión enteramente ajena a la esfera jurídica de mi representada y al objeto del presente incidente.

ALFREDO VAZQUEZ MEYER
30303031303030303037313437333038353 5
08/04/29 16:00:55

En cuanto a que el crédito "*excede las proyecciones del plan de negocio*" del acreditante, se reitera lo expuesto al contestar el hecho inmediato anterior, el plan interno de un banco no es el "mercado" a que se refiere el artículo 114, fracción III, de la LCM, y el apartamiento de un acreedor respecto de sus propias proyecciones no es supuesto de ineficacia de los actos de su acreditado. Lo relativo a los documentos obtenidos en el procedimiento extranjero de *Discovery* no constituye hechos propios de mi representada y resulta inconducente.

**19.-** El hecho correlativo que se contesta, para efectos procesales, se niega y se reproducen, como si a la letra se insertasen, las aclaraciones formuladas al contestar los dos hechos inmediatos anteriores. Sin perjuicio de lo anterior, se aclara lo siguiente:

**(A)** El planteamiento formulado por **BONY** – *que un banco con proyecciones de negocio consistentes en el otorgamiento de créditos a pequeñas y medianas empresas no pudo válidamente prestar a una empresa de otro perfil* – es inconsistente con lo que el propio Incidentista reconoce, a saber, que AlterBank contrató en su carácter de "…*agente estructurador, acreditante inicial, agente administrativo y agente de garantías*…". Esa arquitectura contractual es la propia de las operaciones sindicadas o destinadas a sindicarse, el acreditante inicial origina y estructura el financiamiento y puede ceder participaciones a otros acreedores, sin retener necesariamente la totalidad de la exposición crediticia.

La comparación entre el importe de la línea y el capital del acreditante ignora esa estructura expresamente pactada y carece, por ello, de aptitud demostrativa.

ALFREDO VAZQUEZ MEYER
30303031303030303030373134373330383535
08/04/29 16:00:55

**(B)** La vocación comercial de una institución no limita su capacidad jurídica de contratar; el derecho mexicano no conoce una ineficacia concursal por actos fuera del plan de negocios del acreedor.

**(C)** En cuanto a que la operación se apartó "*de la regulación que rige a AlterBank en Santa Lucía*", se trata, una vez más, de derecho extranjero regulatorio del acreditante, cuya eventual inobservancia produciría consecuencias para el banco frente a su regulador, no la ineficacia del acto frente a la Masa en un concurso mexicano.

Por último, se insiste, nada de lo anterior identifica una condición del acto apartada de las prevalecientes en el mercado relevante, que era la carga probatoria del Incidentista; de hecho, la Incidentista no acaba de explicar en qué consiste la supuesta ineficacia que hace valer por el simple hecho de que se otorgó un crédito a una empresa en dificultades financieras, no explica cómo lo anterior se traduce en una invalidez legal.

**20.-** El hecho correlativo que se contesta, para efectos procesales, se niega. Sin perjuicio de lo anterior, me permito realizar las siguientes manifestaciones:

**(A)** En primer lugar, la afirmación de **BONY** en el sentido de que resulta *"imposible de creer"* constituye una apreciación subjetiva de la actora incidental, no un hecho ni un medio de prueba idóneo para acreditar la actualización de las hipótesis previstas en los artículos 114 y 115 de la LCM. Las creencias individuales de la Incidentista no son elementos suficientes para acreditar absolutamente nada.

**(B)** En segundo lugar, un plazo de vencimiento corto – *como el de seis meses aquí referido* – es una característica ordinaria y reconocida de los financiamientos de tipo puente (*bridge lending*), precisamente diseñados para atender necesidades inmediatas de liquidez mientras se obtiene una solución permanente, incluyendo la eventual conclusión de un proceso de reestructura o concurso mercantil. La propia secuencia cronológica narrada por la actora incidental – *esto es, la celebración del crédito el 29 de enero de 2026 y la presentación de la Solicitud de Concurso el 10 de marzo de 2026, quedando pendiente el trámite y eventual aprobación de un convenio concursal* – resulta plenamente compatible con dicha finalidad puente, sin que ello implique fraude alguno.

ALFREDO VAZQUEZ MEYER
30303030313030303030373134373333038353535
08/04/29 16:00:55

En el mercado relevante, los plazos breves no son una anomalía, son la condición prevaleciente del segmento, pues reducen la exposición del acreedor y disciplinan al deudor hacia la solución de fondo. La calificación de "*irrisoria*" que **BONY** atribuye a la fecha de vencimiento, y la afirmación de que "*resulta imposible de creer*" que un banco preste a seis meses a una empresa en crisis, son expresiones de incredulidad, no medios de prueba, la incredulidad del Incidentista no es un supuesto del artículo 114, fracción III, de la LCM, y la práctica financiera desmiente su asombro cotidianamente.

A ello se suma una inconsistencia que ya no debería pasar inadvertida, el Incidentista califica de "*irrisorias*" las condiciones de pago de un contrato que "supuestamente" no conoce, lo que deja ver la falsedad con la que se conduce, asi como la improcedencia de la supuesta "*reserva de derechos*" que realiza en su Incidente alegando

desconocimiento, más bien lo que pretende la Incidentista es tener la posibilidad de enmendar su pretensión, lo que nuestro ordenamiento no permite bajo ninguna circunstancia.

Finalmente, debe decirse, el vencimiento próximo de un crédito no disminuye la Masa, no confiere preferencia a nadie y no perjudica a acreedor alguno; no encuadra, por tanto, en ninguno de los supuestos de la acción intentada.

**21.-** El hecho correlativo que se contesta, para efectos procesales, se niega. Sin perjuicio de lo anterior, se aclara que la transcripción que el propio Incidentista realiza acredita en su contra los extremos que desvirtúan por completo la acción intentada, como enseguida se expone:

**(A)** En primer lugar, acredita la **<u>finalidad lícita y la necesidad real</u>** del financiamiento. Conforme a la propia transcripción, mi representada enfrentaba créditos fiscales determinados por la autoridad hacendaria por montos de miles de millones de pesos, susceptibles de cobro coactivo inmediato mediante el procedimiento administrativo de ejecución previsto en el Código Fiscal de la Federación – *embargo de cuentas, intervención de ingresos* –. Ese riesgo era real, actual e inminente, la suspensión de los procedimientos de ejecución fiscal que prevé el artículo 69 de la LCM opera únicamente a partir de la sentencia de declaración de concurso mercantil, que en la especie se dictó hasta el 6 de julio de 2026, de modo que en enero de 2026 – *fecha de contratación del crédito* – la autoridad fiscal conservaba íntegras y expeditas sus facultades de cobro sobre la caja de la Comerciante. Obtener liquidez urgente para atender ese pasivo y evitar la paralización operativa no fue un designio fraudulento, fue un acto de administración diligente en protección de la empresa y, con ella, de la fuente de pago de todos los acreedores.

ALFREDO VAZQUEZ MEYER
30303030313030303030303731343733303835 35
08/04/29 16:00:55

Como se anticipó en el Capítulo Preliminar, la urgencia con la que se contrató el financiamiento no es una caracterización de mi representada, está documentada por la propia autoridad fiscal. Al 9 de enero de 2026 concurrían, simultáneamente, todos los presupuestos de una ejecución inmediata: **(i)** créditos fiscales firmes – *agotados los medios de defensa* –; **(ii)** el interés fiscal garantizado desde el 28 de octubre de 2025 con el embargo

en vía administrativa de la negociación misma de mi representada (artículo 141, fracción V, del Código Fiscal de la Federación); **(iii)** un requerimiento formal de pago por $8,691,492,061.56 (Ocho mil seiscientos noventa y un millones cuatrocientos noventa y dos mil sesenta y un pesos 56/100 M.N.), con plazo de 5 (cinco) días; **(iv)** el procedimiento administrativo de ejecución ya iniciado; y **(v)** el apercibimiento expreso, contenido en el propio requerimiento, de que ante la falta de pago la autoridad procedería, indistintamente, a hacer efectiva la garantía a través del procedimiento administrativo de ejecución o a la transferencia de los recursos de las cuentas de la Comerciante en términos del artículo 156-Ter del código. No existe, en el derecho mexicano, una posición de mayor exposición al cobro coactivo que esa.

Las consecuencias de no pagar no eran materia de especulación, están regladas, paso por paso, en el Código Fiscal de la Federación, como se evidencia: **(i)** la transferencia directa de los depósitos bancarios (artículo 156-Ter), esto es, el barrido inmediato de las cuentas de la Comerciante hasta por el monto requerido; **(ii)** la ejecución de la garantía, es decir, el embargo de la negociación con todo lo que de hecho y por derecho le corresponde (artículo 151, fracción II), con la designación de un interventor con cargo a la caja que, tras separar salarios y gastos indispensables, retira hasta el 10% de la totalidad de los ingresos diarios de la empresa para entregarlos al fisco (artículo 165); interventor que, incluso, puede provocar que la autoridad ordene la administración de la negociación – *un interventor administrador designado por el SAT, con todas las facultades del órgano de administración, incluso para actos de dominio, sin sujeción alguna al consejo de administración ni a la asamblea de accionistas (artículo 166)* –, o su enajenación; y **(iii)** de no bastar lo anterior, la enajenación de la negociación o de sus bienes en subasta pública, con la posibilidad de adjudicación al fisco al 60% de su valor (artículos 172 a 191). En síntesis, sin el pago, mi representada enfrentaba – *en cuestión de días, no de meses* – la pérdida de su caja, la intervención de sus ingresos, y potencialmente la pérdida del control de su administración o la venta forzada de la empresa misma.

Conviene subrayar lo que ese escenario habría significado para la universalidad de los acreedores, que es la perspectiva desde la cual este incidente debe

ALFREDO VAZQUEZ MEYER
30303031303030303030373134373330383535
08/04/29 16:00:55

juzgarse. El cobro coactivo del fisco opera antes y fuera de todo procedimiento concursal, con aplicación preferente del producto a gastos de ejecución, recargos y multas antes que a la suerte principal; de haberse consumado, habrían salido del patrimonio de la Comerciante $8,691,492,061.56 (Ocho mil seiscientos noventa y un millones cuatrocientos noventa y dos mil sesenta y un pesos 56/100 M.N.) requeridos, con multas y recargos por mora incluidos; la empresa habría quedado paralizada o intervenida, destruyéndose el valor de la unidad productiva que constituye la fuente de pago de todos los acreedores; y la reestructura ordenada que hoy se tramita ante su Señoría habría sido sencillamente imposible, pues una empresa sin caja, con sus ingresos intervenidos o su administración en manos de un interventor del SAT, no está en aptitud de preparar una solicitud de concurso, de negociar con sus acreedores ni de conservarse como empresa en marcha.

El pago realizado con el financiamiento impugnado produjo exactamente el efecto inverso, en tres planos: **(i)** evitó la ejecución coactiva de $8,691,492,061.56 (Ocho mil seiscientos noventa y un millones cuatrocientos noventa y dos mil sesenta y un pesos 56/100 M.N.), obteniendo un beneficio de aproximadamente $1,856,303,526.00 (mil ochocientos cincuenta y seis millones trescientos tres mil quinientos veintiséis pesos 00/100 M.N.); **(ii)** preservó la caja, la operación y el control de la empresa, manteniendo intacta la fuente de pago de la colectividad; y **(iii)** y por último algo muy importante que merece destacarse, el fisco cobraba por vía de ejecución, al margen de cualquier procedimiento universal y por delante de todos.

ALFREDO VAZQUEZ MEYER
30303030313030303030373134373330383535
08/04/29 16:00:55

**(B)** Acredita el **<u>destino y aprovechamiento de los recursos</u>**. El propio documento en que el Incidentista funda su acción confiesa que el financiamiento se obtuvo y utilizó "*para atender el pasivo fiscal y mitigar el riesgo de paralización operativa*", lo cual de hecho sucedió de esa manera. Los recursos ingresaron al patrimonio de la Comerciante y de ellos se aplicaron $3,925,150,202.00 al pago de los créditos fiscales referidos, en los términos que enseguida se precisan.

Ahora bien, ese pago produjo un beneficio adicional, neto y cuantificable para la Masa, con motivo de la liquidación del pasivo fiscal, mi representada accedió, en términos

del Código Fiscal de la Federación, a los beneficios de reducción y condonación de accesorios correspondientes, obteniendo una **disminución del pasivo del orden de aproximadamente $1,856,303,526.00 (mil ochocientos cincuenta y seis millones trescientos tres mil quinientos veintiséis pesos 00/100 M.N.)**.

Es decir, mediante la operación que el Incidentista tacha de fraudulenta, la Comerciante sustituyó un pasivo fiscal exigible y ejecutable por un pasivo financiero a plazo de importe sustancialmente menor; el pasivo total se redujo, la caja se preservó y la empresa continuó operando.

La secuencia documentada de los hechos demuestra que el financiamiento impugnado no sólo respondió a una necesidad real e inminente, sino que produjo a la Masa un beneficio neto, exacto y cuantificado por la propia autoridad hacendaria, conforme a lo siguiente:

**(a) Los créditos fiscales firmes.** Mediante resolución 900-03-00-00-00-2016-4978, de 1 de abril de 2016, la Administración Central de Fiscalización a Grupos de Sociedades de la Administración General de Grandes Contribuyentes del SAT determinó a cargo de mi representada un crédito por concepto de impuesto sobre la renta consolidado omitido del ejercicio 2009, con actualización, recargos y multas; y mediante resolución 900-03-00-00-00-2017-767, de 13 de enero de 2017 *– modificada por la diversa 900 09 01-2017-12702, de 14 de diciembre de 2017 –*, un crédito por impuesto sobre la renta del ejercicio 2013, con sus accesorios. Ambos créditos fueron combatidos por mi representada a través de los medios de defensa a su alcance y devinieron firmes y exigibles.

ALFREDO VAZQUEZ MEYER
30303031303030303030373134373330383535
08/04/29 16:00:55

**(b) La garantía sobre la empresa misma.** Desde el 28 de octubre de 2025, mediante oficio 400-75-00-03-04-2025-29161, la autoridad fiscal tuvo por aceptada la garantía del interés fiscal en términos del artículo 141, fracción V, del Código Fiscal de la Federación, consistente en el **embargo en la vía administrativa, en su modalidad de negociación, de TV AZTECA, S.A.B. DE C.V.** Es decir, la garantía del fisco era la empresa misma como unidad, de suerte que la ejecución fiscal no amenazaba un bien aislado, sino la

fuente íntegra de ingresos de la Comerciante y, con ella, la fuente de pago de todos sus acreedores.

**(c) El requerimiento de pago:** El **9 de enero de 2026**, mediante oficio 400-75-00-00-00-2026-1130, la Administración Desconcentrada de Recaudación del Distrito Federal "4" **requirió a mi representada el pago de ambos créditos dentro del plazo de cinco días**, cuantificándolos, actualizados a esa fecha, en $3,901,434,927.30 (ejercicio 2009) y $4,790,057,134.26 (ejercicio 2013) – *esto es, **$8,691,492,061.56 en su conjunto*** –, **con** el **apercibimiento expreso de** que, de no realizarse el pago, procedería indistintamente a **hacer efectiva la garantía – *el embargo de la negociación* –** a través del procedimiento administrativo de ejecución (artículos 143, 145 y 173 a 194 del CFF), **o a la transferencia de los recursos de las cuentas de la Comerciante en términos del artículo 156-Ter del propio código**, habiéndose generado ya, incluso, gastos de ejecución. Cabe destacar que las cifras de "$3,902" y "$4,790" millones de pesos que el propio Incidentista transcribe en su hecho 21.- corresponden precisamente a los importes de este requerimiento, su propio escrito corrobora que el riesgo de ejecución era real, actual e inminente, no una invención de mi representada.

ALFREDO VAZQUEZ MEYER
30303030313030303030373134373330383535
08/04/29 16:00:55

Los hechos narrados en los incisos (a), (b) y (c) se acreditan con el oficio número 400-75-00-00-00-2026-1130, Exp. SAT-8S.4-2026 de fecha 9 de enero de 2026, de la Administración General de Recaudación del SAT, mismo que se exhibe adjunto al presente escrito como **anexo número 5).**

**(d) Los beneficios obtenidos, condicionados al pago inmediato.** El **28 de enero de 2026** mi representada solicitó los beneficios previstos en el artículo 70-A del Código Fiscal de la Federación y, en esa misma fecha, la autoridad los otorgó mediante resoluciones contenidas en los oficios 400-75-00-00-00-2026-2940 (ejercicio 2009) y 400-75-00-00-00-2026-2941 (ejercicio 2013): la reducción del 100% de las multas de fondo y la aplicación de la tasa de recargos por prórroga del artículo 8 de la Ley de Ingresos de la Federación, en sustitución de los recargos por mora. Ambas resoluciones quedaron expresamente condicionadas a que el pago se efectuara dentro de los quince días siguientes

*– la del ejercicio 2013, condicionada además al pago del crédito 2009 –,* con la advertencia de que, en caso contrario, quedarían sin efectos y se iniciaría o continuaría de inmediato el procedimiento administrativo de ejecución. Las líneas de captura se emitieron ese mismo 28 de enero de 2026.

Lo anterior se acredita con: (i) el oficio número 400-75-00-00-00-2026-2940 de fecha 28 de enero de 2026, de la Administración General de Recaudación del SAT, mismo que se exhibe adjunto al presente escrito como **anexo número 6); (ii)** el oficio número 400-75-00-00-00-2026-2941 de fecha 28 de enero de 2026, de la Administración General de Recaudación del SAT, mismo que se exhibe adjunto al presente escrito como **anexo número 7); (iii)** la línea de captura con número de documento: 44-132600001701 de fecha 28 de enero de 2026, misma que se exhibe adjunta al presente escrito como **anexo número 8);** y **(iv)** la línea de captura con número de documento: 44-132600001702 de fecha 28 de enero de 2026, misma que se exhibe adjunta al presente escrito como **anexo número 9).**

**(e) El crédito puente y el pago: el mismo día.** El **29 de enero de 2026** mi representada celebró el Contrato de Crédito con AlterBank y, ese mismo día, pagó ambos créditos fiscales mediante transferencias electrónicas: a las 11:56 horas, $2,657,170,823.00 (ejercicio 2009), y a las 12:32 horas, $1,267,979,379.00 (ejercicio 2013), esto es, **$3,925,150,202.00** en total, con lo que ambos créditos quedaron cubiertos. La correspondencia entre el financiamiento y su destino no es materia de inferencias, es documental y de fecha idéntica. Eso es un crédito puente, liquidez inmediata para una necesidad impostergable y cuantificada.

ALFREDO VAZQUEZ MEYER
30303031303030303037313437333038353535
08/04/29 16:00:55

Lo anterior se acredita con los comprobantes de dichas transferencias electrónicas, mismos que se exhiben adjuntos al presente escrito como **anexos números 10)** y **11)**.

**(f) El beneficio exacto para la Masa.** Conforme a la cuantificación de la propia autoridad fiscal en las resoluciones referidas, los beneficios obtenidos con motivo del pago ascendieron a **$1,856,303,526.00 (mil ochocientos cincuenta y seis millones**

**trescientos tres mil quinientos veintiséis pesos 00/100 M.N.)**, integrados así: por el ejercicio 2009, $417,817,205.00 de diferencia entre recargos por mora y por prórroga, más $826,446,897.00 de multa reducida al 100%; y por el ejercicio 2013, $210,050,611.00 de diferencia de recargos, más $401,988,813.00 de multa reducida al 100%. Dicho de otro modo: de no haberse pagado en ese momento, esos mismos créditos habrían importado $5,781,453,728.00; se extinguieron con $3,925,150,202.00. **El pasivo de la Comerciante se redujo en $1,856,303,526.00 – *el 32.11% del adeudo fiscal* – por virtud, precisamente, de la operación que el Incidentista pretende destruir.**

**(g) Conclusión.** La Masa no resintió perjuicio alguno, recibió los recursos del financiamiento, los aplicó a la extinción de un pasivo firme, ejecutable y garantizado con la negociación misma, evitó la ejecución sobre su fuente de ingresos y sus cuentas, y obtuvo una reducción neta de su pasivo por más de mil ochocientos millones de pesos, en beneficio directo de la colectividad de acreedores – *incluidos los que el Incidentista dice representar* –.

ALFREDO VAZQUEZ MEYER
30303030313030303030303731343733303833535
08/04/29 16:00:55

**(C)** Dicho lo anterior, nos encontramos ante una operación real, genuina y verificable, lo que en la práctica financiera se conoce como una operación "*true sale*"; lo cual encuentra sustento documental.

Toda la construcción de **BONY** descansa en la insinuación de que la operación impugnada fue un artificio, un acto "*celebrado a modo*". La respuesta más contundente a esa insinuación no es retórica, sino documental, la operación reúne, uno por uno, los atributos que en la práctica financiera y contable distinguen a una transacción real y genuina de una operación simulada, por ejemplo: sustancia económica efectiva, transferencia real de recursos, contraprestaciones recíprocas, trazabilidad completa de los flujos, registro contable y propósito de negocios verificable. Ninguno de esos atributos es materia de fe, todos constan en documentos emitidos por terceros – *la autoridad hacendaria y las instituciones bancarias* – cuya autenticidad no depende del dicho de mi representada. A efecto de abundar sobre esto, y sin perjuicio de que ya se ha evidenciado, me permito reiterar lo siguiente:

(a) **La deuda subyacente era real, preferente y ejecutable.** En el origen de la operación no hay una necesidad inventada, sino créditos fiscales firmes, determinados por el SAT desde 2016 y 2017, garantizados desde el 28 de octubre de 2025 con el embargo en vía administrativa de la negociación misma de mi representada, y formalmente requeridos de pago el 9 de enero de 2026 – *oficio 400-75-00-00-00-2026-1130* – con un plazo de cinco días y el apercibimiento expreso de ejecutar la garantía sobre la empresa o transferir los recursos de sus cuentas (artículo 156-Ter del Código Fiscal de la Federación). No hay pasivo más real que el que el acreedor – *el fisco federal* – cuantifica, requiere y está en aptitud legal de cobrar coactivamente sobre la caja y sobre la unidad productiva entera.

(b) **El crédito es real.** El financiamiento no fue una asunción abstracta de deuda, fue una línea de crédito comprometida, conforme a su Cláusula 2.02, para el pago de obligaciones fiscales y fines corporativos generales, y dispuesta en forma parcial y medida. La conducta exactamente inversa a la de quien fabrica pasivo artificial. La disposición parcial y medida de una facilidad comprometida es, en la práctica financiera, el indicador típico de un financiamiento con propósito específico (*use of proceeds*) y no de una operación a modo.

(c) **Los flujos existieron.** El 29 de enero de 2026 mi representada pagó al SAT mediante transferencias electrónicas de fondos plenamente identificadas, importes que coinciden exactamente, sin un peso de más ni un peso de menos, con las líneas de captura emitidas por la propia autoridad el 28 de enero de 2026. La cadena completa es verificable de principio a fin: requerimiento → resoluciones → líneas de captura → transferencias → certificaciones de pago. Eso es trazabilidad plena; lo contrario de una simulación.

(d) **(d) La aplicación fue inmediata: los recursos destinados al pago entraron y salieron el mismo día, hacia el fisco.** Entre la celebración del Contrato de Crédito y la aplicación al pago de los importes correspondientes no medió desvío ni tránsito discrecional alguno. Por si fuera poco, el destinatario final de los recursos aplicados fue la Tesorería de la Federación. Las operaciones fraudulentas o simuladas se caracterizan porque el dinero no existe, no se mueve, o regresa por vías circulares a quien lo entregó o a sus relacionados (*round-tripping*); es conceptualmente imposible construir ese esquema cuando el beneficiario último y verificado del flujo es el fisco federal. Nadie monta una simulación cuyo único efecto es pagar impuestos.

ALFREDO VAZQUEZ MEYER
303030313030303030373134373330383535
08/04/29 16:00:55

En suma, no hay en esta operación un solo elemento ficticio que la acción intentada pudiera atacar. Hubo una deuda real, un crédito real, un flujo real, un pago real a un acreedor público real – *cuyo adeudo incluso el propio ejecutivo federal hizo público* – y un beneficio real para la Masa. Frente a una transacción de esa naturaleza – *verificable eslabón por eslabón con documentos oficiales* –, la imputación de un "*acto celebrado a modo*" no sólo carece de prueba, carece de objeto. Y esa realidad integral y documental de la operación es, a la vez, la demostración más elocuente de la buena fe con que mi representada se condujo, quien simula, oculta y entrevera; mi representada dispuso, pagó, registró y reveló.

A mayor abundamiento, las acciones contra actos del deudor en perjuicio de acreedores atacan actos reales – *y exigen, por ello, el ánimo de disminuir la solvencia (consilium fraudis) y el perjuicio efectivo (eventus damni)* –, mientras que la simulación ataca actos ficticios, que sólo existen en apariencia[1]. El propio Incidentista cierra cualquier duda sobre la naturaleza del acto, pues funda la totalidad de su causa en la existencia, monto, vencimiento y efectos del crédito – *no afirma ni podría afirmar que el acto sea ficticio, pues el desembolso bancario, la recepción de los recursos, su aplicación documentada al fisco y el registro contable son incompatibles con cualquier ficción* –. Como consecuencia, entonces nos encontramos ante un acto real y por ende su acción exigía acreditar el ánimo defraudatorio y el perjuicio; y en autos está probado exactamente lo contrario, a saber, una finalidad pactada por escrito y un beneficio neto para la Masa.

ALFREDO VAZQUEZ MEYER
303030313030303030373134373330383535
08/04/29 16:00:55

**(D)** Incluso de existir alguna causa que diera pie a la ineficacia del acto, lo cual se niega rotundamente, en el mejor de los casos se actualizaría al pie de la letra la regla de improcedencia del penúltimo párrafo del artículo 114 de la LCM, a saber "…*No procederá la declaración de ineficacia cuando la Masa se aproveche de los pagos hechos al Comerciante…",* esto es, incluso de considerarse que el Contrato de Crédito y el Convenio Modificatorio se hubieran apartado de las condiciones de mercado – *lo cual se niega rotunda y contundentemente en términos de lo que se ha narrado a lo largo del presente escrito* –, en todo caso la masa se habría aprovechado sustancialmente de los pagos hechos al comerciante,

---

[1] Así lo explicó la Tercera Sala de la Suprema Corte de Justicia de la Nación en la tesis de rubro "***ACCIONES PAULIANA Y DE SIMULACIÓN, DIFERENCIA ENTRE LAS***", Quinta Época, Semanario Judicial de la Federación, Tomo LIV, página 1796, registro digital número 357275.

por lo que en términos de lo expresamente dispuesto por nuestro ordenamiento NO procede la declaración de ineficacia que se pretende en el presente Incidente, tornándolo improcedente.

A mayor abundamiento, las disposiciones del crédito son, en su literalidad más estricta, pagos hechos al Comerciante; y la Masa se aprovechó de ellos en los dos niveles descritos (a) extinción de pasivo ejecutable y (b) reducción neta del pasivo total. Sobre esa base, aun en la hipótesis, no admitida, de que se estimara actualizado alguno de los supuestos invocados por **BONY**, la declaración de ineficacia sería legalmente improcedente por disposición expresa de la ley. Es revelador, por último, que el Incidente guarde silencio absoluto sobre el destino y aprovechamiento de los recursos, ese silencio equivale a la omisión del elemento núcleo de la acción – *el perjuicio a la Masa* –, cuya inexistencia queda demostrada, paradójicamente, con la transcripción contenida en el propio correlativo que se contesta.

**(E)** A todo lo anterior se suma un dato que **BONY** omite dolosamente revelar, no obstante que proviene del documento que constituye la fuente misma del carácter con el que comparece. El pago de contribuciones fiscales es una conducta expresamente contemplada y ordenada por el propio contrato de emisión que el Incidentista administra: su Sección 3.4 (*Payment of Taxes*) obliga a la emisora a pagar o solventar todos los impuestos, contribuciones y cargas gubernamentales que se le impongan, con la única salvedad de aquellos impugnados de buena fe mediante los procedimientos apropiados. Los créditos fiscales de los ejercicios 2009 y 2013 estuvieron comprendidos en esa salvedad mientras se litigaron; al quedar firmes, la salvedad cesó y su pago quedó comprendido de lleno en la obligación de la Sección 3.4, cuyo estándar, pagar las contribuciones incluso antes de que incurran en mora, exige con mayor razón solventarlas cuando son firmes, ejecutables y requeridas de pago. El financiamiento impugnado fondeó, exactamente, el cumplimiento de esa obligación contractual asumida frente a los propios tenedores, cuya finalidad evidente es impedir que el fisco – *acreedor coactivo y preferente* – ejecute el patrimonio que constituye la fuente de pago, no solo de las notas y tenedores, sino de todos y cada uno de los acreedores de la comerciante.

ALFREDO VAZQUEZ MEYER
30303030313030303030303731343733303835
08/04/29 16:00:55

El financiamiento impugnado fondeó, exactamente, el cumplimiento de la Sección 3.4 del propio *Indenture*. De modo que el fiduciario demanda aquí la ineficacia del acto que permitió a la emisora cumplir la obligación que su propio contrato le impone, un contrasentido que ninguna teoría del fraude puede obviar, pues nadie puede ir válidamente contra sus propios actos ni calificar de fraudulento el cumplimiento de lo que él mismo pactó.

Asimismo, conducta procesal del Incidentista frente a esta cláusula es reveladora. Su escrito incidental invoca el contrato de emisión como fuente de su carácter, transcribe de él cuanto estima conveniente y guarda silencio absoluto sobre la Sección 3.4, la única disposición de ese instrumento directamente relevante para juzgar la finalidad del acto que impugna.

**22.-** El hecho correlativo que se contesta, para efectos procesales, se niega. Sin perjuicio de lo anterior, se aclara lo siguiente:

ALFREDO VAZQUEZ MEYER
30303031303030303037313437333038353535
08/04/29 16:00:55

**(A)** No existe la contradicción que el correlativo pretende construir entre la finalidad del crédito – *salvaguardar la operación* – y el otorgamiento de garantías. Financiamiento urgente y garantías son un binomio inseparable en el mercado crediticio, ningún acreedor presta a una empresa en situación de estrés financiero de manera quirografaria, y la exigencia de garantías es la conducta natural, diligente y ordinaria de todo acreedor que percibe un riesgo elevado; ese es, precisamente, el sentido económico de las garantías.

De hecho, si el otorgamiento de garantías reales a favor del acreditante es una práctica ordinaria, usual y esperada en cualquier operación de financiamiento ordinario, más aún en aquellas dirigidas a empresas que atraviesan dificultades financieras, en las que las instituciones acreditantes exigen mayor cobertura precisamente en atención al riesgo asumido. Que el crédito se encuentre garantizado no contradice, sino que refuerza, su naturaleza de financiamiento defensivo, pues fue precisamente a través del otorgamiento de

garantías suficientes que **TV AZTECA** pudo acceder a la liquidez requerida en un momento adverso.

El reproche de **BONY** equivale a sostener que lo normal habría sido prestar cinco mil millones de pesos sin garantía alguna, eso sí sería una operación inexplicable en cualquier mercado.

**(B)** La afirmación de que "…*es difícil creer que TVA no previera la posibilidad de ejecución de las garantías…*" es una conjetura sobre previsiones subjetivas que se niega; la previsión jurídicamente relevante era exactamente la inversa, sin el financiamiento, la ejecución – *fiscal* – no era una posibilidad, sino una inminencia. Entre un riesgo eventual y remoto y uno actual e inmediato, la administración diligente atiende el segundo. Nada de ello configura supuesto alguno de ineficacia.

**23.-** El hecho correlativo que se contesta, para efectos procesales, se niega y se reproducen, como si a la letra se insertasen, las aclaraciones formuladas a lo largo de la presente contestación. Sin perjuicio de lo anterior, se aclara que lo alegado por **BONY** – *que discurre sobre el riesgo que la operación habría representado para la propia viabilidad económica y continuación de negocio» del acreditante* – versa íntegramente sobre los riesgos del negocio de un tercero, que no son hechos propios de mi representada ni elementos de la acción intentada.

ALFREDO VAZQUEZ MEYER
30303030313030303030303731343733303835 35
08/04/29 16:00:55

Como se ha referido, la determinación del riesgo que una institución financiera está dispuesta a asumir en una operación concreta, y de las condiciones bajo las cuales lo asume, corresponde a esa institución en ejercicio de su libertad de contratación[2]; asumir e intermediar riesgo es, además, la esencia misma de la actividad crediticia. Si el acreditante estimó elevado el riesgo, lo administró exactamente como la práctica ordena, exigió garantías y pactó condiciones acordes. Y si su decisión hubiera excedido sus parámetros internos o regulatorios, las consecuencias – *prudenciales, regulatorias o de negocio* – serían del banco

[2] **Código de Comercio**. **Artículo 78.-** En las convenciones mercantiles, cada uno se obliga en la manera y términos que aparezca que quiso obligarse.

y para el banco, en su jurisdicción; el acreditado no es garante de la prudencia de su acreedor, y ninguna imprudencia del acreedor – *real o supuesta* – convierte en fraudulento el acto ni autoriza a privarlo de efectos frente a la Masa, menos aun cuando la Masa obtuvo de la operación un beneficio neto. La calificación de "*absurdo*" que emplea el correlativo es un adjetivo, no un supuesto legal.

**24.-** El hecho correlativo que se contesta, para efectos procesales, se niega, precisándose que no contiene hechos, sino argumentación sobre estándares internacionales y derecho extranjero cuya aplicabilidad al caso igualmente se niega, conforme a lo siguiente:

**(A)** En primer lugar, los Acuerdos y Principios del Comité de Supervisión Bancaria de Basilea – *incluido el Principio 5 sobre límites de exposición que el correlativo invoca* – no son derecho vigente ni aplicable en México, ni en jurisdicción alguna por sí mismos.

El Comité de Basilea es un foro de cooperación entre autoridades supervisoras, carente de potestad normativa; sus acuerdos son directrices o lineamientos de coordinación – *soft law* – que sólo adquieren eficacia en la medida y términos en que cada Estado los incorpore a su regulación doméstica, y cuyos destinatarios son los reguladores y las instituciones financieras, no los acreditados ni los actos que éstos celebran. Su eventual inobservancia podría potencialmente generar consecuencias regulatorias para la institución en su jurisdicción de origen; jamás la ineficacia de los actos celebrados por el acreditado frente a la masa de un concurso mexicano.

ALFREDO VAZQUEZ MEYER
30303030313030303030373134373330383535
08/04/29 16:00:55

Lo anterior no es una interpretación de mi representada, es la declaración del propio organismo. El Comité de Supervisión Bancaria de Basilea reconoce expresamente, en su propio Estatuto (*Charter*), que carece de autoridad supranacional formal y que sus decisiones no tienen fuerza legal, pues sus estándares sólo operan en la medida en que cada jurisdicción los incorpore a su derecho interno. Es decir, la fuente misma que el Incidentista erige en "*parámetro de mercado*" – *más allá de que no lo es* – proclama que no es derecho

aplicable. No puede sostenerse la ineficacia de un acto jurídico sobre la base de lineamientos que su propio emisor califica de jurídicamente no vinculantes.

**(B)** En segundo lugar, dichos estándares tampoco constituyen el parámetro del artículo 114, fracción III, de la LCM. Ese precepto remite a las "*condiciones prevalecientes en el mercado*", esto es una referencia económica y transaccional, saber, qué tasas, plazos, garantías y estructuras se pactan efectivamente en operaciones comparables y a los usos o prácticas mercantiles. Los lineamientos prudenciales sobre cómo un banco debe medir su capital y concentración de riesgos son una cosa; las condiciones de mercado de las operaciones de financiamiento son otra completamente distinta, y el Incidente las confunde de principio a fin.

**(C)** Por otra parte, la sección 15 de la Ley de Bancos Internacionales de Santa Lucía y la "Nota Orientativa 11" de su autoridad reguladora son derecho extranjero de carácter regulatorio, que rige la relación del acreditante con su supervisor; su contenido y alcance son, además, materia de prueba que las opiniones de parte no satisfacen.

ALFREDO VAZQUEZ MEYER
30303030313030303030373134373333038353 5
08/04/29 16:00:55

**(D)** Por último y por cuanto hace a la "*concentración de riesgo extrema*" que BONY imputa a AlterBank es, de nueva cuenta, una métrica prudencial del acreedor – *cuánto riesgo concentra el banco en un cliente y una operación específica* –, no una condición pactada del acto ni un vicio de éste. Todo el correlativo es, en suma, ajeno a la litis.

En efecto, la eventual *"concentración de riesgo"* que la operación pudiera representar para AlterBank es, en todo caso, resultado de una decisión de negocio y de gestión de riesgo interna de dicha institución, ajena por completo al conocimiento, control y responsabilidad de mi representada, quien no tiene por qué conocer ni está obligada a verificar los límites regulatorios de exposición crediticia aplicables a sus acreditantes conforme a la supuesta normativa de una jurisdicción extranjera.

**25.-** El hecho correlativo que se contesta, para efectos procesales, se niega. Sin perjuicio de lo anterior, conviene destacar lo siguiente:

**(A)** En el hecho que nos ocupa, sostiene **BONY:** **(i)** que las garantías hipotecarias de referencia se constituyeron en segundo lugar, detrás de un acreedor hipotecario preexistente con mejor prelación; **(ii)** que constan inscritas en el Registro Público de Concesiones – *publicidad registral que excluye la teoría del ocultamiento* –; y **(iii)** que su constitución operó mediante la adhesión del acreditante al esquema de garantías constituido originalmente el 23 de septiembre de 2020, esto es, más de cinco años antes de la fecha de retroacción.

Contrario a lo aducido por **BONY** la constitución de garantías hipotecarias en segundo grado o lugar es una práctica comercial y bancaria común, particularmente en operaciones de financiamiento de rescate o puente en las que el bien objeto de la garantía ya se encuentra previamente gravado; su aceptación por parte del acreditante corresponde a una decisión de negocio de éste, basada en su propia evaluación de riesgo, valor residual del bien y demás elementos que estimó pertinentes, sin que ello sea, por sí solo, indicativo de fraude o irregularidad alguna imputable a mi representada.

ALFREDO VAZQUEZ MEYER
30303030313030303030303731343733303835 35
08/04/29 16:00:55

Dicho ello, de la propia narrativa que realiza el Incidentista se desprende que, en todo caso, no se creó un gravamen nuevo, sino que se incorporó a un acreedor a un esquema preexistente y que el acreedor quedó en una posición subordinada a la de un tercero.

Debe además apuntarse la inconsistencia en que incurre **BONY** en el hecho que nos ocupa, puesto que si – *como afirma con apoyo en la opinión que se acompaña* – "*…la mitigación del riesgo de crédito que normalmente proporciona una garantía hipotecaria se encuentra, con base en la información disponible, sustancialmente reducida en el presente caso…*", entonces la garantía no confirió ventaja alguna a su beneficiario. En el caso que nos ocupa, por tratarse de un gravamen de segundo grado y de una garantía que – *según el propio Incidentista* – carece de eficacia mitigante, esa ventaja no existe por ningún lado. No hay trato preferente donde no hay ventaja**.** Las consideraciones sobre lo que un "*banco internacional prudente de Clase A*" aceptaría o dejaría de aceptar son, finalmente,

opiniones de parte sobre estándares prudenciales ajenos, que se objetan y que en nada atañen a los elementos de la acción que se pretende dilucidar en el presente Incidente.

**26.-** El hecho correlativo que se contesta, para efectos procesales, se niega. Sin perjuicio de lo anterior, se aclara que las fechas y actos corporativos que el correlativo refiere constan en los documentos que cita, a cuyo contenido íntegro deberá estarse; lo que se niega es la conclusión que sobre ellos se construye, en virtud de lo siguiente:

**(A)** En primer lugar, la cronología que el propio Incidentista narra desmiente su tesis, puesto que el Contrato de Crédito se celebró el 29 de enero de 2026, esto es, antes de la publicación de la convocatoria a la asamblea (10 de febrero de 2026) y antes de la asamblea que aprobó solicitar el concurso (26 de febrero de 2026). Al celebrarse el acto cuya ineficacia se demanda no existía convocatoria, deliberación ni acuerdo social alguno relativo al concurso, es lógica y temporalmente imposible que dicho acto se haya celebrado "*a sabiendas*" de una solicitud que ningún órgano social había siquiera considerado.

ALFREDO VAZQUEZ MEYER
30303030313030303030303731343733303835 35
08/04/29 16:00:55

**(B)** En segundo lugar, el Convenio Modificatorio de 6 de marzo de 2026 no fue una nueva decisión de financiamiento ni creó endeudamiento adicional, sino que documentó y reexpresó las obligaciones nacidas del Contrato de Crédito y formalizó las garantías contempladas desde su celebración Cláusula 5.05 del Contrato de Crédito; el cumplimiento de obligaciones contractuales previamente asumidas no es un acto de mala fe, es el cumplimiento de un contrato.

Lo anterior es relevante, pues el otorgamiento de las garantías ni siquiera se coloca en el supuesto de presunción de la fracción I del artículo 115 de la LCM. La hipótesis normativa exige que "*…la obligación original no contemplaba dicha garantía o incremento…*"; en el caso ocurre exactamente lo contrario, el otorgamiento de las garantías quedó pactado desde la celebración del Contrato de Crédito de 29 de enero de 2026 (Cláusula 5.05), y el Convenio Modificatorio de 6 de marzo de 2026 se limitó a formalizar – *en cumplimiento de una obligación de hacer preexistente* – lo que la obligación original ya

contemplaba. No hubo, pues, garantía sobrevenida alguna, hubo cumplimiento de contrato, y el cumplimiento de lo pactado no actualiza presunción de fraude alguna.

**(C)** Asimismo, es inexacta la afirmación de que "…*no existía la supuesta inminencia de un procedimiento de ejecución por parte de la autoridad fiscal*…" porque el artículo 69 de la LCM suspende tales procedimientos. El texto del precepto es inequívoco, la suspensión de los procedimientos administrativos de ejecución es un efecto de la sentencia de declaración de concurso mercantil, que en la especie se dictó hasta el 6 de julio de 2026. Entre enero y marzo de 2026 – *época de celebración de los actos* – ninguna suspensión existía ni podía existir, y la autoridad fiscal conservaba íntegras y expeditas sus facultades de cobro coactivo sobre la caja de la Comerciante. La lectura del Incidentista presupone que la mera intención de solicitar un concurso suspende la ejecución fiscal – *lo que carece de todo apoyo normativo* – y conduce a un resultado absurdo, que el comerciante deba permanecer inerme frente a la ejecución de su patrimonio durante todo el tiempo que tome preparar y presentar su solicitud.

ALFREDO VAZQUEZ MEYER
30303030313030303030303737313437333030383535
08/04/29 16:00:55

**(D)** Por último, debe decirse que prepararse ordenadamente para un concurso mercantil voluntario no es mala fe, es un deber de administración diligente y una conducta protegida por la finalidad de conservación de la empresa que informa a la LCM (artículos 1 y 3). La ley no exige que el comerciante llegue al concurso paralizado y desmantelado; exige exactamente lo contrario. Y la revelación íntegra del financiamiento en la propia Solicitud de Concurso – *bajo protesta de decir verdad* – es la prueba más elocuente de la buena fe con que mi representada se condujo, buena fe que, además, se presume.

Es completamente ordinario y congruente con una gestión financiera responsable, que una sociedad en dificultades financieras formalice, documente y registre las garantías correspondientes a un financiamiento previamente contratado, mientras simultáneamente avanza en los actos corporativos necesarios para acceder a un procedimiento concursal ordenado. Ambas actuaciones no son incompatibles entre sí, sino complementarias dentro de un mismo proceso de reestructura financiera transparente, iniciado y documentado por la propia **TV AZTECA** sin ocultamiento alguno frente a sus

acreedores, según se desprende de la propia Solicitud de Concurso, en la que se reconoció y reveló el crédito con AlterBank.

**27.-** El hecho correlativo que se contesta, para efectos procesales, se niega y se reproducen, como si a la letra se insertasen, las aclaraciones formuladas al dar contestación al hecho inmediato anterior. Sin perjuicio de lo anterior, conviene destacar lo siguiente:

En el hecho de mérito – *mismo que se niega categóricamente tanto en sus premisas como en su conclusión* – , **BONY** afirma que **TV AZTECA** celebró el contrato de crédito y su convenio modificatorio *"a sabiendas"* de que presentaría su solicitud de concurso mercantil, evidenciando con ello su mala fe, pues – *sostiene* – no existía la supuesta inminencia de un procedimiento de ejecución fiscal, dado que conforme al artículo 69 de la LCM, la declaración en concurso mercantil suspende los procedimientos administrativos de ejecución de créditos fiscales. Al respecto:

**(A) BONY** parte de una premisa jurídicamente errónea, consistente en equiparar la mera presentación de la Solicitud de Concurso —*e incluso los actos corporativos preparatorios previos a ésta*— con la suspensión de los procedimientos de ejecución fiscal prevista en el artículo 69 de la LCM. Sin embargo, dicho efecto suspensivo automático no se produce con la celebración de una asamblea de accionistas ni con la sola presentación de la solicitud, sino hasta que existe sentencia que declare al Comerciante en concurso mercantil; si bien es cierto que, desde la presentación de la solicitud, el juez concursal cuenta con la facultad de decretar medidas precautorias que, en su caso, ordenen la suspensión de procedimientos de ejecución, se trata de una facultad discrecional del juzgador, cuyo otorgamiento no podía darse por sentado ni ser asegurado por mi representada al momento de suscribir el Contrato de Crédito. En el caso concreto, se insiste, dicha sentencia se dictó hasta el 06 de julio de 2026, esto es, más de cinco meses después de la celebración del contrato de crédito con AlterBank (29 de enero de 2026), y casi cuatro meses después de la presentación de la propia Solicitud de Concurso (10 de marzo de 2026).

ALFREDO VAZQUEZ MEYER
30303030313030303030303731343733383535
08/04/29 16:00:55

**(B)** En consecuencia, mi representada se encontraba expuesta al riesgo de ejecución coactiva de los créditos fiscales que la propia actora incidental reconoce en el hecho 21.- que antecede, pues no existía protección procesal automática o garantizada derivada del artículo 69 de la LCM – *cuya suspensión, se reitera, sólo opera de pleno derecho hasta la sentencia de concurso, y cuya eventual anticipación mediante medidas precautorias quedaba sujeta a la facultad discrecional del juzgador* –. La necesidad de liquidez para atender dicho riesgo era, por tanto, real, actual y apremiante al momento de contratar el crédito.

**(C)** No existe incompatibilidad, y mucho menos mala fe, en que una sociedad que atraviesa por dificultades financieras **(a)** obtenga financiamiento urgente para hacer frente a riesgos inminentes de ejecución fiscal y preservar su operación, mientras **(b)** simultáneamente avanza, de manera ordenada y transparente, en los actos preparatorios necesarios para acceder a un procedimiento de concurso mercantil que, por definición, tomará varios meses en tramitarse y resolverse. Sostener lo contrario implicaría, en los hechos, sancionar a cualquier comerciante que, de manera diligente y responsable, planee con anticipación su eventual acceso a un concurso mercantil mientras gestiona su liquidez inmediata, lo cual resulta abiertamente contrario a la finalidad de la LCM.

ALFREDO VAZQUEZ MEYER
30303030313030303030303731343733303835 35
08/04/29 16:00:55

**(D)** Por lo demás, la conducta de mi representada fue en todo momento transparente, la contratación del crédito con AlterBank fue reconocida y confesada de forma libre y espontánea por la propia Comerciante en su Solicitud de Concurso, según lo reconoce la propia actora incidental en el hecho 7.- de su escrito inicial, circunstancia que resulta abiertamente incompatible con la mala fe, el ocultamiento o el propósito fraudulento que pretende atribuírsele.

**28.-** El hecho correlativo que se contesta, para efectos procesales, se niega y se reproducen, como si a la letra se insertasen, las aclaraciones formuladas al dar contestación a todos y cada uno de los hechos anteriores. Sin perjuicio de lo anterior, conviene destacar a guisa de síntesis, lo que se ha evidenciado:

**(A)** No ofrece comparativo alguno con operaciones de mercado equivalentes – *esto es, financiamientos de rescate o puente a emisores en dificultades financieras* – que permita sostener incluso de forma indiciaria una desviación cuantificable de las condiciones prevalecientes del mercado.

**(B)** El conocimiento que AlterBank pudiera o no tener respecto de la situación financiera de la Comerciante, aun de ser cierto, no equivale a mala fe ni acredita fraude, en tanto que el otorgamiento de crédito a una empresa en dificultades financieras no está prohibido por la LCM, sino que, por el contrario, puede ser plenamente compatible con la finalidad de conservación de la empresa que ésta persigue. A mayor abundamiento, **BONY** tampoco pondera que el otorgamiento del crédito pudo obedecer a una oportunidad de negocio identificada por la propia AlterBank —*atendido el mayor rendimiento, comisiones y garantías propios de este tipo de financiamientos*—, circunstancia que refuerza la plausibilidad comercial de la operación y que en modo alguno fue considerada por la actora incidental.

ALFREDO VAZQUEZ MEYER
30303030313030303030373134373330383535
08/04/29 16:00:55

**(D)** Según se expuso en el hecho 27.- que antecede, no existió contradicción alguna entre la contratación del crédito y los actos corporativos preparatorios para acceder al concurso mercantil, dado que ambas actuaciones respondieron a una gestión financiera responsable y transparente frente a una necesidad de liquidez real y actual.

**29.**- El hecho correlativo que se contesta, para efectos procesales, se niega y se reproducen, como si a la letra se insertasen, las aclaraciones formuladas al dar contestación a todos y cada uno de los hechos anteriores. Sin perjuicio de lo anterior, me permito realizar las siguientes manifestaciones:

**(A)** En el presente hecho, **BONY** afirma que la constitución de las garantías hipotecarias a favor de AlterBank el 6 de marzo de 2026 constituye, por sí misma, un acto en fraude de acreedores en términos de la fracción I del artículo 115 de la LCM, por haber sido otorgadas con posterioridad a la celebración del contrato de crédito de fecha 29 de enero de 2026, lo cual es FALSO.

Como se evidenció en líneas que anteceden, el otorgamiento de las garantías NO se coloca en el supuesto de presunción de la fracción I del artículo 115 de la LCM. La hipótesis normativa exige que "*…la obligación original no contemplaba dicha garantía o incremento…*"; en el caso ocurre exactamente lo contrario, el otorgamiento de las garantías quedó pactado desde la celebración del Contrato de Crédito de 29 de enero de 2026 (Cláusula 5.05), y el Convenio Modificatorio de 6 de marzo de 2026 se limitó a formalizar – *en cumplimiento de una obligación de hacer preexistente* – lo que la obligación original ya contemplaba. No hubo, pues, garantía sobrevenida alguna, hubo cumplimiento de contrato, y el cumplimiento de lo pactado no actualiza presunción de fraude alguna.

**(B)** Con independencia de lo anterior, en todo caso, correspondía a **BONY**, como actora incidental, acreditar dicho hecho base para que, en su caso, operara la presunción que invoca; sin embargo, no lo hizo. En tales condiciones, **BONY** se encuentra imposibilitada para acreditar *—y, de hecho, no acredita—* que la obligación original no contemplara desde su origen el otorgamiento de las garantías hipotecarias de que se trata, como condición precedente, obligación de hacer, o mecanismo de disponibilidad sujeto a formalización posterior, lo cual es una práctica común en el otorgamiento de créditos garantizados de esta naturaleza y magnitud.

ALFREDO VAZQUEZ MEYER
30303030313030303030373134373330383535
08/04/29 16:00:55

**(C)** Adicionalmente, el solo transcurso de poco más de un mes entre la celebración del contrato de crédito (29 de enero de 2026) y la formalización de las garantías hipotecarias mediante el Convenio Modificatorio y de Reexpresión (6 de marzo de 2026) resulta plenamente explicable por el tiempo ordinariamente requerido para la negociación, documentación, otorgamiento notarial e inscripción de garantías reales sobre bienes de la naturaleza de los títulos de concesión de que se trata *—cuya inscripción, según reconoce la propia actora, se realiza ante el Registro Público de Concesiones a cargo del Instituto Federal de Telecomunicaciones—*, sin que dicho lapso, por sí mismo, sea indicativo de que la garantía no hubiera sido pactada o contemplada desde el origen de la operación; lo anterior máxime que en términos de la Cláusula 5.05 del Contrato de Crédito se contaba con un plazo de 60 (sesenta) días naturales para dar cumplimiento a la obligación de constituir dichas

garantías, esto es, fue el cumplimiento de una obligación preexistente, no un capricho con el ánimo de defraudar, como pretende inferir **BONY.**

**(D)** Finalmente, no debe perderse de vista que la finalidad de las garantías hipotecarias fue garantizar el pago del propio crédito con el que se hizo frente a obligaciones urgentes de la Comerciante —*como lo fueron los créditos fiscales referidos en el hecho 21.- que antecede*— y no, como sugiere **BONY**, favorecer indebidamente a AlterBank en perjuicio del resto de los acreedores, la garantía es accesoria de una obligación principal cuya causa, según ha quedado expuesto, fue la propia preservación de la operación y del patrimonio de la Comerciante en beneficio, en última instancia, de la masa de acreedores en su conjunto.

**30.-** El hecho correlativo que se contesta, para efectos procesales, se niega. Sin perjuicio de lo anterior, se aclara lo siguiente:

**(A)** En primer lugar, el salto que **BONY** pretende dar en este hecho, el artículo 15 de la LCM, que el correlativo esgrime, no establece lo que se le atribuye, dicho precepto define al grupo societario para efectos de la acumulación de los procedimientos concursales de sus integrantes – *una regla procesal de economía y coherencia* –, no una regla sustantiva de imputación de actos ajenos ni de extensión de ineficacias a actos de sociedades no concursadas.

ALFREDO VAZQUEZ MEYER
30303031303030303030373134373330383535
08/04/29 16:00:55

**(B)** Con independencia de ello, el hecho de que mi representada, como accionista, hubiera concurrido a las decisiones corporativas de sus subsidiarias – *ejercicio lícito de derechos societarios* –, los actos seguirían siendo actos de las subsidiarias, sobre bienes de las subsidiarias, ajenos a la Masa; el control no transforma la identidad del otorgante ni la titularidad de los bienes.

**31.-** El hecho correlativo que se contesta, para efectos procesales, se niega. Sin perjuicio de lo anterior, se aclara que **BONY** realiza una imputación de mala fe sin sustento, visto que no identifica una sola sesión, acuerdo, instrucción, comunicación ni acto

concreto mediante el cual mi representada hubiera "*impulsado y decidido*" el otorgamiento de las garantías con el designio que se le atribuye; afirma un propósito y lo da por probado con su sola afirmación.

La mala fe no se presume, quien la afirma debe probarla. Lo ordinario – *la buena fe* – se presume, mientras que lo extraordinario – *la mala fe* – se demuestra. A ello se agrega que el "beneficio indebido" que se dice procurado en favor del acreditante es jurídicamente inexistente, una garantía de segundo grado, sobre bienes ajenos a la Masa, constituida por adhesión a un esquema preexistente y que —*según el propio Incidentista*— carece de eficacia mitigante, no coloca a su beneficiario en posición de ventaja alguna dentro del concurso de mi representada.

**32.-** El hecho correlativo que se contesta, para efectos procesales, se niega, con excepción de la literalidad del criterio jurisprudencial que transcribe, cuyo texto habla por sí mismo y en contra de quien lo invoca.

ALFREDO VAZQUEZ MEYER
30303030313030303030303731343733303835353
08/04/29 16:00:55

En efecto, la jurisprudencia con registro digital 2026693 resuelve exactamente lo contrario de lo que el Incidentista pretende extraer de ella: **(i)** reconoce la **licitud** de la garantía hipotecaria constituida en bienes de un tercero no deudor, como expresión del principio constitucional de libertad contractual o de negociación (artículo 5o. constitucional); **(ii)** precisa que el bien gravado no forma parte de la masa concursal —*lo que confirma que su gravamen no disminuye la prenda común de los acreedores del concursado*—; y **(iii)** establece que el acreedor así garantizado debe ser **reconocido** con ese grado en la sentencia de reconocimiento, graduación y prelación de créditos.

Que el acreedor pueda utilizar la garantía "*como instrumento de negociación en la etapa de conciliación*" no es un vicio, es el efecto económico normal de toda garantía, que la jurisprudencia invocada califica de legítimo y digno de tutela. Y la afirmación de que ello "*era del conocimiento de TVA*" nada agrega, pues conocer el derecho vigente y contratar conforme a él no es fraude; es exactamente lo que el orden jurídico espera de los particulares. En suma, el criterio que el Incidentista transcribe valida el acto que pretende destruir y

presupone el reconocimiento del acreedor que pretende excluir: difícilmente pudo escoger peor apoyo para su acción.

**33.-** El hecho correlativo que se contesta, para efectos procesales, se niega, incluida su premisa, conforme a lo siguiente:

**(A)** La "aceptación" de una garantía por parte del acreedor no constituye una "*condición o término pactado*" del acto del Comerciante en los términos del artículo 114, fracción III, de la LCM. Dicho precepto ordena confrontar el contenido económico del acto —*tasa, plazo, comisiones, estructura, garantías exigidas al deudor*— contra las condiciones prevalecientes en el mercado; no somete a escrutinio la contabilidad prudencial del acreedor ni la calidad del reconocimiento regulatorio que las garantías recibidas merezcan en su balance.

**(B)** Los estándares de Basilea sobre severidad de la pérdida y mitigantes de riesgo —*conforme a los cuales, dice el correlativo, las garantías reales sólo reciben reconocimiento favorable cuando constituyen un gravamen de primer grado, directo y suficiente*— son métricas de capital regulatorio, determinan cuánto capital debe reservar un banco frente a una exposición; no determinan la validez ni la eficacia de los actos jurídicos de su acreditado, ni son parámetro de mercado alguno, según quedó expuesto al contestar el hecho 24.-.

**(C)** El argumento es, además, ilógico, si la garantía de segundo grado carece de reconocimiento como mitigante, entonces no reporta ventaja a su beneficiario, y sin ventaja no hay trato preferente ni fraude concebible; el Incidentista prueba, con su propio argumento, la inexistencia del elemento central de su acción.

**(D)** Por último, aceptar garantías de segundo grado es, por lo demás, práctica común y racional en el mercado —*por el valor residual del bien, por su función disuasiva y por la posición negocial que confieren*—; la decisión de aceptarlas correspondió al banco,

ALFREDO VAZQUEZ MEYER
30303030313030303030303731343733303835 35
08/04/29 16:00:55

en su esfera y bajo su riesgo, y en nada perjudicó a la Masa, de la que no forman parte los títulos gravados.

**34.-** El hecho correlativo que se contesta, para efectos procesales, se niega, en tanto constituye una reiteración conclusiva de los correlativos anteriores, que se contesta por remisión a todo lo antes expuesto. Sin perjuicio de ello, el hecho que se contesta aporta dos admisiones que se destaca: (i) al afirmar que la garantía hipotecaria "*ya estaba vinculada con una obligación anterior*", el Incidentista reconoce la **preexistencia** del esquema de garantías, con lo que destruye por sus propios términos el supuesto del artículo 115, fracción I, de la LCM que invoca, cuya hipótesis exige precisamente que "*la obligación original no contemplara dicha garantía o incremento"*; y (ii) al confesar que "*no se cuenta con elementos para determinar su valor de realización ni cobertura residual*", el Incidentista admite que carece de los elementos necesarios para afirmar que la garantía confiera ventaja alguna – *y, por ende, para afirmar preferencia o perjuicio* –; la carga de aportar esos elementos era suya (artículo 1194 del Código de Comercio), y su ausencia confesa condena la acción.

ALFREDO VAZQUEZ MEYER
30303030313030303030373134373330383535
08/04/29 16:00:55

En cuanto al catálogo de exigencias con que cierra BONY el hecho que nos ocupa, a saber "fuente primaria de pago suficiente", "viabilidad del adeudo agregado", "límites de exposición disponibles", "reservas y capital congruentes con el riesgo", se trata, una vez más, de la agenda prudencial del acreedor, parámetros conforme a los cuales un banco administra su propio balance, que nada tienen que ver con las "condiciones prevalecientes en el mercado" a que hace referencia el artículo 114, fracción III, de la LCM, ni con la eficacia de los actos del Comerciante frente a la Masa.

**35.-** El hecho correlativo que se contesta, para efectos procesales, se niega, conforme a lo siguiente:

**(A)** En primer lugar, la propuesta de convenio que acompañó a la Solicitud de Concurso tiene carácter preliminar e indicativo. El convenio concursal no es un acto unilateral del comerciante, se construye en la etapa de conciliación, con los Acreedores

Reconocidos, bajo la mediación y vigilancia del conciliador y el control jurisdiccional de su Señoría, y con los resguardos que la propia ley establece en favor de todas las clases de acreedores (artículos 157 a 166 de la LCM, que disciplinan la suscripción calificada del convenio, los pagos mínimos a los acreedores comunes que no lo suscriban, la tutela de los acreedores con garantía y los mecanismos de vista y oposición previos a la aprobación judicial). Toda inconformidad con una eventual propuesta se ventila en esa sede, por esos cauces y en su momento – *no mediante una acción de ineficacia enderezada meses antes de que exista convenio alguno* –. Calificar de "*abusivo*" un convenio inexistente es un juicio de intenciones, no un hecho.

**(B)** La imputación de que el crédito fue un "*acto celebrado a modo y de manera fraudulenta por TVA para diluir a los acreedores*" invierte la realidad. Diluir a los acreedores significaría incorporar al pasivo un crédito ficticio o carente de contraprestación, que redujera artificialmente la participación de los créditos legítimos. Aquí ocurre exactamente lo contrario, el crédito de que se trata es real – *derivado de recursos efectivamente entregados, ingresados, aplicados y aprovechados en sus términos por la Masa* –; y el efecto neto de la operación fue reducir el pasivo total de la Comerciante en aproximadamente $1,800,000,000.00 (mil ochocientos millones de pesos 00/100 M.N.), merced a los beneficios fiscales obtenidos con el pago que el propio financiamiento hizo posible.

ALFREDO VAZQUEZ MEYER
30303030313030303030373134373330383535
08/04/29 16:00:55

Los acreedores comunes – *incluidos los titulares de los intereses que el Incidentista dice representar* – concurren hoy sobre una masa menos endeudada de lo que estaría sin el acto impugnado, eso no es una dilución; es su antítesis.

**(C)** El distinto tratamiento entre acreedores garantizados y comunes que la correlativa denuncia no es un designio fraudulento, sino la consecuencia ordinaria del régimen legal de graduación y prelación de créditos, aplicable en todo concurso; mientras que la referencia a una eventual "*venta de activos de radiodifusión*" es una especulación sobre eventos futuros e inciertos, ajenos por completo a la litis de este incidente.

Por último, conviene insistir en que se niega categóricamente el propósito que se imputa a mi representada; lo cierto es que **BONY** concluye su Incidente como lo empezó, sin un solo hecho concreto constitutivo de fraude, sustituyendo los elementos de la acción por adjetivos y conjeturas.

De hecho, conviene advertir a su Señoría que el propósito real del Incidente ha sido confesado por el propio **BONY** ante la Corte de Distrito para el Distrito Sur de Nueva York. En su promoción del 8 de junio de 2026 manifestó a dicho tribunal que, de no resolverse a su favor la cuestión de los votos, "*...esa deuda, más el crédito de AlterBank, podría dar a TV Azteca votos suficientes para aprobar un plan por encima de la objeción del Fiduciario…*". Ahí está, en sus propias palabras, el sentido de este incidente no es reintegrar valor alguno a la Masa – *que recibió, aprovechó y se benefició de los recursos* –, sino eliminar votos del convenio concursal. La acción de ineficacia no fue instituida para reconfigurar mayorías en favor de un acreedor disidente, y el propio Incidentista ha documentado, ante otro tribunal, que ése es exactamente el uso que pretende darle y que se estima su Señoría no debe permitir.

ALFREDO VAZQUEZ MEYER
30303030313030303030303731343733303835
08/04/29 16:00:55

## V. EXCEPCIONES Y DEFENSAS.

Se oponen todas y cada una de las excepciones y defensas que se desprendan del presente escrito, específicamente todas las que derivan de la contestación a las prestaciones, de la contestación a los capítulos preliminares del escrito incidental y de la contestación a todos y cada uno de los hechos, mismas que se tienen aquí por reproducidas como si a la letra se insertasen, en obvio de repeticiones innecesarias; así como todas aquellas que se desprendan de las documentales ofrecidas por mi representada, de las que ofreció la propia Incidentista en cuanto la favorezcan, y de las demás constancias que integran el expediente en que se actúa, aun cuando no se identifiquen con denominación específica, pues

corresponde a su Señoría calificarlas y resolverlas conforme a derecho, cualquiera que sea el nombre con que se les designe.

Con independencia de lo anterior, a continuación, me permito formular diversas excepciones nominadas específicas:

**(A) EXCEPCIÓN DE OSCURIDAD Y DEFECTO LEGAL DE LA DEMANDA INCIDENTAL.**

**I.-** La presente excepción resulta procedente ante la forma oscura y defectuosa en que el Incidentista propone su acción, que priva a ésta de causa de pedir concreta y deja a mi representada en estado de indefensión, tal y como a continuación se expone:

**(A)** La acción prevista por el artículo 114, fracción III, de la LCM consiste en un contraste entre las condiciones pactadas en una operación y las prevalecientes en el mercado en que se celebró, a la fecha de su celebración. Su ejercicio exige, como mínimo lógico y jurídico, que quien acciona identifique las condiciones concretas del acto que estima apartadas del mercado, el mercado que estima relevante con sus condiciones prevalecientes, y la desviación significativa entre unas y otras.

ALFREDO VAZQUEZ MEYER
30303030313030303030303731343733303383535
08/04/29 16:00:55

**(B)** El Incidente no satisface ese mínimo. A lo largo de treinta y cinco hechos no identifica una sola tasa, comisión, plazo, operación comparable ni estudio de mercado alguno, sustituyendo dicha ausencia de prueba con adjetivos calificativos como "*inverosímil*", "*irrisorio*", "*absurdo*".

**(C)** Esa manera de proponer la demanda deja a mi representada sin condiciones específicas que confrontar ni desviación determinada que desvirtuar, en los términos desarrollados al contestar los hechos 8.-, 16.- y 20.- del Incidente, que aquí se tienen por reproducidos como si a la letra se insertasen.

**II.-** En virtud de las anteriores consideraciones, es procedente declarar fundada la excepción que por este conducto se opone y desestimar la acción intentada, al

carecer de causa de pedir concreta, absolviendo a mi representada de las prestaciones que se le reclaman.

**(B) EXCEPCIÓN DE FALTA DE ACCIÓN Y DE DERECHO (SINE ACTIONE AGIS).**

**I.-** La presente excepción resulta procedente ante la carencia total de acción y de derecho del Incidentista para reclamar de mi representada las prestaciones que pretende, al no actualizarse – *ni haberse probado* – los elementos constitutivos de la acción de ineficacia, tal y como a continuación se expone:

**(A)** De la interpretación armónica de los artículos 112 a 119 de la LCM, la procedencia de la acción exige la concurrencia de todos y cada uno de los elementos siguientes: un acto del Comerciante celebrado a partir de la fecha de retroacción; un perjuicio real a la Masa, esto es, una disminución del patrimonio del Comerciante o una preferencia indebida de pago; que el Comerciante haya actuado "*defraudando a sabiendas*" a sus acreedores; y, tratándose de actos onerosos, el conocimiento de ese fraude por el tercero (artículo 113 de la LCM); o bien, la actualización estricta de alguno de los supuestos de los catálogos cerrados de los artículos 114 y 115, todos los cuales comparten un mismo rasgo estructural: la salida de valor del patrimonio del deudor o la preferencia indebida de un acreedor. La carga de la prueba de tales elementos corresponde íntegramente a quien acciona (artículo 1194 del Código de Comercio), sin que las presunciones específicas y desvirtuables del artículo 115 lo dispensen de probar los restantes.

**(B)** En el presente caso no se actualiza ni se probó elemento alguno: el acto impugnado no extrajo valor de la Masa, sino que le ingresó recursos y redujo su pasivo; su destino quedó pactado desde su celebración y se cumplió en sus términos; la operación fue revelada espontáneamente desde la Solicitud de Concurso – *lo que excluye todo ocultamiento* –; y respecto del tercero no se acreditó el conocimiento de fraude alguno, en el entendido de que el conocimiento que exige el artículo 113 de la LCM versa sobre el designio fraudulento, no sobre la situación financiera del acreditado, que el propio Incidentista califica de pública y notoria. Lo que el Incidente ofrece en su lugar son sospechas, conjeturas y adjetivos; y la

ALFREDO VAZQUEZ MEYER
30303030313030303030373134373330383535
08/04/29 16:00:55

extrañeza subjetiva de un acreedor no es un elemento del tipo legal ni releva a quien acciona de probar cada uno de los elementos de su acción.

**(C)** Lo anterior en los términos de la Consideración Preliminar y de las contestaciones a los hechos 8.- a 35.- del Incidente, que aquí se tienen por reproducidas como si a la letra se insertasen.

**II.-** En virtud de las anteriores consideraciones, es procedente declarar fundada la excepción que por este conducto se opone, absolviendo a mi representada de todas y cada una de las prestaciones que se le reclaman.

**(C) EXCEPCIÓN DE AUSENCIA DE PERJUICIO A LA MASA Y DE EXISTENCIA DE UN BENEFICIO NETO Y CUANTIFICADO EN SU FAVOR.**

**I.-** La presente excepción resulta procedente porque el elemento nuclear y común de toda ineficacia concursal, el perjuicio a la Masa no existe en el presente caso; existe, documentado y cuantificado por la propia autoridad fiscal, exactamente lo contrario, tal y como a continuación se expone:

ALFREDO VAZQUEZ MEYER
30303030313030303030303037313437333038353
08/04/29 16:00:55

**(A)** Todos los supuestos de los artículos 113, 114 y 115 de la LCM presuponen un empobrecimiento de la Masa, sea por la salida de valor del patrimonio del deudor, sea por la preferencia indebida concedida a un acreedor en detrimento de los demás. Sin ese empobrecimiento no hay fraude que perseguir ni interés jurídico que tutelar mediante la acción de ineficacia, que es un remedio restitutorio instituido en protección de la integridad de la Masa.

**(B)** En el caso está documentado lo contrario a eso. Con motivo de la operación impugnada ingresaron al patrimonio de la Comerciante recursos por las sumas que han quedado identificadas; el mismo día de la disposición se pagaron créditos fiscales firmes, garantizados con la negociación misma y formalmente requeridos con apercibimiento de ejecución, mediante transferencias por $3,925´150,202.00 (Tres mil novecientos veinticinco millones ciento cincuenta mil doscientos dos pesos 00/100 M.N.) que coinciden exactamente

con las líneas de captura emitidas por la autoridad; y ese pago activó los beneficios previstos en el artículo 70-A del Código Fiscal de la Federación, con una **reducción del pasivo de $1,856,303,526.00 (mil ochocientos cincuenta y seis millones trescientos tres mil quinientos veintiséis pesos 00/100 M.N.)** cuantificada por la propia autoridad hacendaria. El pasivo total disminuyó, la caja se preservó y la empresa continuó operando como unidad en marcha; los acreedores concurren hoy sobre una masa menos endeudada de lo que estaría sin el acto cuya ineficacia pretende **BONY**, según quedó desarrollado al contestar los hechos 21.- y 35.- del Incidente, cuyas aclaraciones se tienen aquí por reproducidas.

**(C)** Es revelador que el Incidente guarde silencio absoluto sobre el destino y aprovechamiento de los recursos del financiamiento; ese silencio equivale a la omisión del elemento núcleo de la acción y priva a ésta de sustento desde su planteamiento.

**II.-** En virtud de las anteriores consideraciones, es procedente declarar fundada la excepción que por este conducto se opone, absolviendo a mi representada de las prestaciones que se le reclaman.

ALFREDO VAZQUEZ MEYER
30303030313030303030303731343733303835
08/04/29 16:00:55

**(D) EXCEPCIÓN DE IMPROCEDENCIA DE LA DECLARACIÓN DE INEFICACIA POR DISPOSICIÓN EXPRESA DE LA LEY (PENÚLTIMO PÁRRAFO DEL ARTÍCULO 114 DE LA LCM).**

**I.-** La presente excepción resulta procedente porque, aun en la hipótesis – *no admitida y rotundamente negada* – de que se estimara actualizado alguno de los supuestos invocados por el Incidentista, la declaración de ineficacia sería legalmente improcedente por mandato expreso del penúltimo párrafo del artículo 114 de la LCM, tal y como a continuación se expone:

**(A)** El penúltimo párrafo del artículo 114 de la LCM dispone: "*...No procederá la declaración de ineficacia cuando la Masa se aproveche de los pagos hechos al Comerciante...*". Se trata de una regla de cierre del sistema, mediante la cual el legislador

subordinó la ineficacia a su razón de ser – *el perjuicio* –, si la Masa se aprovechó de los recursos, la declaración de ineficacia no procede, cualquiera que sea el supuesto invocado.

**(B)** En el presente caso, las disposiciones del crédito constituyen, en su literalidad más estricta, pagos hechos al Comerciante; y el aprovechamiento por la Masa está acreditado por la extinción de pasivo fiscal firme, ejecutable y garantizado con la negociación misma, y la reducción neta del pasivo total por $1,856,303,526.00 (mil ochocientos cincuenta y seis millones trescientos tres mil quinientos veintiséis pesos 00/100 M.N.), conforme a lo desarrollado al contestar el hecho 21.- del Incidente y a las documentales que se exhiben como **anexos números 5) a 9).**

**(C)** En consecuencia, la prohibición legal opera de manera autónoma y suficiente, aun cuando fueran ciertas las alegaciones del Incidentes – *aunque no lo son como se ha evidenciado* –, la ley veda expresamente la declaración que constituye la primera de sus prestaciones y el presupuesto de todas las demás.

ALFREDO VAZQUEZ MEYER
30303030313030303030303731343733303835 35
08/04/29 16:00:55

**II.-** En virtud de las anteriores consideraciones, es procedente declarar fundada la excepción que por este conducto se opone, absolviendo a mi representada de las prestaciones que se le reclaman.

## (E) EXCEPCIÓN DE INEXISTENCIA DEL SUPUESTO PREVISTO EN EL ARTÍCULO 114, FRACCIÓN III, DE LA LCM.

**I.-** La presente excepción resulta procedente porque las condiciones y términos pactados en el Contrato de Crédito y en el Convenio Modificatorio no se apartaron – *de manera significativa ni de manera alguna* – de las condiciones prevalecientes en el mercado en que se celebraron a la fecha de su celebración, ni el Incidentista probó lo contrario, tal y como a continuación se expone:

**(A)** El supuesto invocado exige la concurrencia probada de tres elementos: las condiciones efectivamente pactadas en la operación; las condiciones prevalecientes en el mercado en que se celebró, referidas a la fecha de celebración, o los usos y prácticas

mercantiles; y un apartamiento significativo entre unas y otras. Se trata de un contraste económico y transaccional entre condiciones de operaciones, <u>no de un juicio de prudencia regulatoria sobre el acreditante</u>.

**(B)** El Incidentista no acreditó ninguno de los tres elementos. No aporta una sola tasa de referencia, comisión, operación comparable ni estudio del mercado de financiamiento a la fecha de celebración; y las opiniones que acompaña versan sobre la regulación prudencial del acreditante en otra jurisdicción, materia ajena al precepto. Los estándares del Comité de Basilea que invoca no son derecho vigente ni aplicable – *su propio Estatuto proclama que carecen de fuerza legal* – ni constituyen "condiciones prevalecientes en el mercado"; son lineamientos sobre cómo un banco administra su capital y sus riesgos, dirigidos a reguladores e instituciones, no a los acreditados ni a los actos que éstos celebran. Sin variable observada no existe desviación cuantificable, y sin desviación cuantificada no existe el supuesto.

ALFREDO VAZQUEZ MEYER
30303030313030303030373134373333303835353
08/04/29 16:00:55

**(C)** Por el contrario, las condiciones que sí constan – *financiamiento de liquidez de corto plazo, tasa fija superior a la del crédito corporativo ordinario, garantías reales y estructura puente* – corresponden a las prevalecientes en el mercado relevante, que es el del financiamiento a empresas en situación de estrés financiero, juzgadas *ex ante* a la fecha de celebración; y cualquiera que fuera la delimitación del mercado que se adoptara, la suerte del Incidente sería la misma, pues el Incidentista no probó las condiciones prevalecientes de ninguno. Todo ello en los términos de las contestaciones a los hechos 8.-, 15.-, 16.-, 20.-, 24.- y 28.- del Incidente, que aquí se tienen por reproducidas.

**II.-** En virtud de lo anterior, es procedente declarar fundada la excepción que por este medio se opone, absolviendo a mi representada de lo que se le reclama.

**(F) EXCEPCIÓN DE INEXISTENCIA DEL SUPUESTO PREVISTO EN EL ARTÍCULO 115, FRACCIÓN I, DE LA LCM.**

**I.-** La presente excepción resulta procedente porque la obligación original sí contemplaba, desde su celebración, las garantías cuya constitución se reprocha, de modo que

el hecho base de la presunción invocada no existe ni fue acreditado, tal y como a continuación se expone:

**(A)** La hipótesis normativa exige que "*...la obligación original no contemplaba dicha garantía o incremento...*". En el caso ocurre exactamente lo contrario: la Cláusula 5.05 del Contrato de Crédito de 29 de enero de 2026 contempló desde su celebración la constitución de las garantías – *incluida la hipotecaria, expresamente pactada en segundo lugar y sobre bienes o concesiones de la acreditada o de sus subsidiarias* –, con un plazo de sesenta días para su formalización y una penalización de tasa para el caso de incumplimiento; y el Convenio Modificatorio de 6 de marzo de 2026 se limitó a formalizar, al día treinta y seis de ese plazo, una obligación de hacer preexistente. No hubo garantía sobrevenida alguna; hubo cumplimiento de contrato, y el cumplimiento de lo pactado no actualiza presunción de fraude alguna (anexos 1 y 3).

**(B)** Con independencia de lo anterior, la carga de acreditar el hecho base de la presunción – *que la obligación original no contemplara la garantía* – correspondía al Incidentista (artículo 1194 del Código de Comercio) y no la satisfizo; antes bien, al afirmar que la garantía hipotecaria "*ya estaba vinculada con una obligación anterior*" admitió la preexistencia del esquema de garantías, destruyendo por sus propios términos el supuesto que invoca. La presunción es, además, *iuris tantum*, y queda desvirtuada con la documentación misma de la operación y con la buena fe acreditada de mi representada.

ALFREDO VAZQUEZ MEYER
30303030313030303030373134373330383535
08/04/29 16:00:55

**II.-** En virtud de las anteriores consideraciones, es procedente declarar fundada la excepción que por este conducto se opone, absolviendo a mi representada de las prestaciones que se le reclaman.

**(G) EXCEPCIÓN DE BUENA FE.**

**I.-** La presente excepción resulta procedente porque la conducta de mi representada estuvo presidida, en todo momento, por la buena fe, que la ley presume y que

en el caso se encuentra, además, positivamente acreditada, tal y como a continuación se expone:

**(A)** Conforme al artículo 807 del Código Civil Federal, de aplicación supletoria, "*...la buena fe se presume siempre; al que afirme la mala fe... le corresponde probarla...*". El Incidentista no probó un solo hecho concreto de mala fe, no identifica sesión, acuerdo, instrucción ni comunicación alguna de la que se desprenda el designio que imputa; afirma propósitos y los da por probados con su sola afirmación.

**(B)** La buena fe está acreditada positivamente, pues la operación se reveló de manera libre, voluntaria y espontánea, bajo protesta de decir verdad, desde la Solicitud de Concurso; se registró en la contabilidad; su destino quedó pactado por escrito y se cumplió en dichos términos, teniendo los pagos realizados como destinatario final a la Tesorería de la Federación; y satisfizo, además, una obligación expresamente asumida frente a los propios tenedores en la Sección 3.4 (*Payment of Taxes*) del contrato de emisión que el Incidentista administra, disposición sobre la cual su escrito guarda silencio absoluto. Quien defrauda oculta; mi representada dispuso, pagó, registró y reveló (hechos 5.-, 7.-, 21.-, 26.- y 27.- del Incidente, cuyas aclaraciones se tienen por reproducidas).

ALFREDO VAZQUEZ MEYER
30303030313030303030373134373330383535
08/04/29 16:00:55

**(C)** Esa buena fe excluye el ánimo de "*defraudar a sabiendas*" que exige el artículo 113 de la LCM, desvirtúa cualquier presunción derivada del artículo 115 y priva de sustento a la imputación genérica de mala fe sobre la que descansa la integridad del Incidente.

**II.-** En virtud de las anteriores consideraciones, es procedente declarar fundada la excepción que por este conducto se opone, absolviendo a mi representada de las prestaciones que se le reclaman.

**(H) EXCEPCIÓN DE IMPROCEDENCIA DE LA PRESTACIÓN C, POR PRETENDER UNA SANCIÓN NO PREVISTA EN NUESTRO ORDENAMIENTO.**

**I.-** La presente excepción resulta procedente porque las consecuencias que el Incidentista pretende en su prestación C – *que AlterBank no pueda ser reconocida como*

*acreedora ni suscribir el convenio concursal* – no están previstas en nuestro ordenamiento, tal y como a continuación se expone:

**(A)** Los efectos de una eventual declaración de ineficacia son, limitativamente, los restitutorios que establecen los artículos 118 y 119 de la LCM. Ningún precepto dispone que el tercero que intervino en un acto declarado ineficaz pierda el derecho a ser reconocido como acreedor ni a suscribir el convenio; la ley dispone exactamente lo contrario, pues el último párrafo del artículo 114 permite incluso al tercero que restituye lo recibido "*solicitar el reconocimiento de su crédito"*, preservando su acceso al reconocimiento, no excluyéndolo.

**(B)** Cuando el legislador quiso privar de sus derechos a un acreedor, lo estableció de manera expresa – *como en el artículo 154 de la LCM, que sanciona los convenios particulares celebrados con posterioridad a la declaración de concurso con la nulidad y la pérdida de los derechos del acreedor que los celebre* –; y tratándose de privaciones de derechos, la aplicación es estricta, no se crean por analogía ni por mayoría de razón. Ni siquiera el fraude de acreedores del derecho común conoce la sanción que se pide, pues la acción pauliana (artículos 2163 y siguientes del Código Civil Federal) agota sus efectos en la inoponibilidad del acto y las restituciones consecuentes, en beneficio del acreedor que la ejerce y hasta el importe de su crédito, sin privar jamás al tercero de derechos distintos del acto impugnado.

ALFREDO VAZQUEZ MEYER
30303031303030303037313437333030383535
08/04/29 16:00:55

**(C)** La propia prestación descubre, además, la verdadera finalidad del Incidente, el Incidentista no reclama la devolución de bien alguno, sino la eliminación de un acreedor de la mesa del convenio concursal, según él mismo lo confesó ante la Corte de Distrito para el Distrito Sur de Nueva York, al manifestar que "*...esa deuda, más el crédito de AlterBank, podría dar a TV Azteca votos suficientes para aprobar un plan por encima de la objeción del Fiduciario...*". La ineficacia en fraude de acreedores es un remedio restitutorio en protección de la Masa, no un instrumento para reconfigurar mayorías de voto, y el uso que

se le pretende dar la desnaturaliza, en los términos de la contestación a las prestaciones y a los hechos 21.- y 35.- del Incidente, que se tienen por reproducidos.

**II.-** En virtud de las anteriores consideraciones, es procedente declarar fundada la excepción que por este conducto se opone y, de manera destacada, absolver a mi representada de la prestación C, cuya sola formulación evidencia la improcedencia del Incidente en su integridad.

## (I) EXCEPCIÓN DE PRECLUSIÓN E IMPROCEDENCIA DE LA PRETENDIDA "*RESERVA DE AMPLIACIÓN*" DEL INCIDENTE.

**I.-** La presente excepción resulta procedente frente a la pretensión del Incidentista de "*reservarse*" el derecho de ampliar el Incidente y de allegar en el futuro pruebas provenientes del procedimiento extranjero de *Discovery* que refiere, tal y como a continuación se expone:

**(A)** La vía incidental se rige por una litis cerrada: la acción se ejercita con los hechos y las pruebas de la demanda incidental (artículo 267 de la LCM), y las pruebas supervenientes sólo son admisibles en los supuestos estrictos que la ley establece (artículo 1202 del Código de Comercio, de aplicación supletoria). Nuestro ordenamiento no contempla "reservas de ampliación" de demandas incidentales; admitirlas equivaldría a mantener abierta la litis indefinidamente, a merced del accionante.

ALFREDO VAZQUEZ MEYER
30303030313030303030373134373330383535
08/04/29 16:00:55

**(B)** La pretendida reserva ni siquiera corresponde a un desconocimiento real: conforme a sus propias manifestaciones ante los tribunales de los Estados Unidos de América, el Incidentista solicitó copia de la Solicitud de Concurso desde el 13 de marzo de 2026, promovió desde el 2 de junio de 2026 su solicitud de *Discovery* con el objeto confesado de perseguir "...*potenciales reclamaciones de transferencias fraudulentas conforme al derecho mexicano en el concurso*..." y describió con detalle el crédito y sus garantías el 8 de junio de 2026; no obstante lo cual presentó su Incidente hasta el 18 de agosto de 2026. Su "reserva" no es la cautela de quien acaba de conocer los hechos, sino la administración estratégica de un litigio largamente planeado, incompatible con la preclusión que rige la vía

incidental, según quedó desarrollado en el capítulo III, numeral 2.-, del presente escrito, que se tiene por reproducido.

**(C)** En consecuencia, debe desestimarse la pretendida reserva y negarse efectos a cualquier ampliación ulterior de la litis o probanza futura con que se pretenda variarla o integrarla.

**II.-** En virtud de las anteriores consideraciones, es procedente declarar fundada la excepción que por este conducto se opone, desestimando la pretendida "*reserva*" de ampliación del Incidente y el anuncio de pruebas futuras, en congruencia con el petitorio TERCERO del presente escrito.

## VI. CAPÍTULO DE OBJECIÓN DE DOCUMENTOS

Con fundamento en lo dispuesto por los artículos 1247, 1296 y demás relativos y aplicables del Código de Comercio de aplicación supletoria a la Ley de Concursos Mercantiles, por todos y cada uno de los motivos expuestos en este escrito mi mandante objeta en cuanto al alcance y valor probatorios que pretende atribuirles incidentista, los documentos exhibidos por la misma adjunto al Incidente.

ALFREDO VAZQUEZ MEYER
303030313030303030303731343733303835 35
08/04/29 16:00:55

Con independencia de lo anterior, desde este momento se anticipa que la objeción obedece a lo siguiente:

**1.**- Por cuanto hace a las documentales consistentes en las órdenes del tribunal de Florida (pruebas 2 y 3) acreditan, a lo sumo, la existencia y trámite de un procedimiento de obtención de pruebas en el extranjero; nada prueban sobre los elementos de la acción, y el procedimiento del que emanan no decide la veracidad de hecho alguno ni produce cosa juzgada sobre fraude, condiciones de mercado o regulación aplicable. Se objeta cualquier pretensión de derivar de ellas efectos probatorios sobre el fondo.

**2.-** Por cuanto hace a los documentos y declaraciones provenientes del *Discovery* (pruebas 4, 5 y 6) son documentales que refieren hechos de terceros – *el acreditante, sus órganos y accionistas* –, ajenos a la litis conforme a lo narrado al dar contestación a los hechos, asi como conforme a las excepciones y defensas opuestas; se objeta su alcance y valor probatorio, destacando que los hechos que con ellas se pretenden acreditar (renuncias de consejeros, composición accionaria, registros societarios) son posteriores o ajenos a la fecha de celebración de los actos impugnados y, por ende, inconducentes.

**3.-** Las opiniones que se acompañan como anexos 3 y 9 (pruebas 7 y 8) se ofrecen como documentales privadas elaboradas a instancia de parte. Pueden acreditar, a lo sumo, que sus autores las emitieron; no constituyen prueba pericial – *no fueron ofrecidas con el cuestionario, designación, aceptación y protesta que exige el artículo 267, fracción IV, de la LCM, ni estarán sujetas a contradicción mediante perito de la contraria y tercero en discordia* – y no relevan al oferente de probar método, datos, comparables y cadena de inferencias. En cuanto pretenden acreditar derecho extranjero, tampoco satisfacen la vía conducente (artículo 1197 del Código de Comercio y disposiciones aplicables de la legislación procesal supletoria). En cuanto al fondo, versan sobre la regulación prudencial del acreditante – *tema ajeno a los elementos del artículo 114, fracción III, de la LCM* –, resultando especialmente impropio que una opinión sobre regulación bancaria extranjera se utilice para concluir, sin comparación alguna de operaciones, que los términos pactados por la Comerciante estaban fuera de mercado.

ALFREDO VAZQUEZ MEYER
30303030313030303030373134373330383535
08/04/29 16:00:55

**4.-** Con relación a los comunicados y notas periodísticas (pruebas 9 a 13) acreditan únicamente la existencia de las publicaciones, no la veracidad de su contenido, y de ninguna manera las "*condiciones prevalecientes en el mercado*" a la fecha de celebración de los actos. La invocación del carácter de "hecho notorio" del contenido de páginas de internet no releva al oferente de la carga de acreditar los elementos de su acción con prueba idónea.

**5.-** Respecto de las documentales consistentes en el Contrato de Crédito, el Convenio Modificatorio y las escrituras públicas relativas (pruebas 14 a 17), mi representada

no se opone a su incorporación; por el contrario, exhibe las dos primeras en cumplimiento al requerimiento judicial, en la certeza de que su contenido corroborará las defensas aquí opuestas.

**6.-** Se objeta la admisión de la confesional a cargo de mi representada (prueba 18) en cuanto pretenda desahogarse sobre hechos que no son propios de la absolvente – *conductas, conocimientos y decisiones de terceros* – o sobre calificaciones y conceptos jurídicos, materia impropia de dicha probanza; se solicita que la calificación de posiciones se realice, en su caso, con el rigor correspondiente.

**7.-** La instrumental de actuaciones y la presuncional (pruebas 19 y 20) se objetan en cuanto pretendan beneficiarse de constancias que, conforme a lo expuesto, favorecen a mi representada; de dichas probanzas deriva, entre otras cosas, la confesión del Incidentista sobre su desconocimiento del contenido de los actos impugnados y su silencio sobre el destino y aprovechamiento de los recursos del financiamiento.

ALFREDO VAZQUEZ MEYER
303030313030303030373134373330383535
08/04/29 16:00:55

## VII. RESERVA DE DERECHOS

En relación con todo el cúmulo de imputaciones y falsedades contenidas en el Incidente, mi mandante deja a salvo todos los derechos adicionales que le asistan al respecto, para hacerlos valer ante las autoridades competentes en la forma y términos que estime pertinentes.

Ahora bien, a efecto de robustecer la improcedencia del Incidente propuesto por la accionante, con fundamento en lo dispuesto por la fracción II del artículo 267 de la Ley de Concursos Mercantiles, ofrezco en nombre de mi mandante las siguientes:

## VIII. PRUEBAS.

Con fundamento en el artículo 267 de la LCM, se ofrecen las siguientes:

**1.- LA DOCUMENTAL PÚBLICA** consistente en copia certificada del **Contrato de Crédito** de 29 de enero de 2026, celebrado entre mi representada, como acreditada, y AlterBank, en su carácter de agente estructurador, acreditante inicial, agente administrativo y agente de garantías, mismo que se exhibe como **anexo número 1) –** *mismo que en términos de lo dispuesto por el artículo 3, fracción VI, del Acuerdo General 12/2020 del Pleno del Consejo de la Judicatura Federal, bajo formal protesta de decir verdad manifiesto que es una copia íntegra e inalterada del documento original* –, así como su traducción al idioma español por perito traductor certificado, que se exhibe como **anexo número 2) –** *mismo que en términos de lo dispuesto por el artículo 3, fracción VI, del Acuerdo General 12/2020 del Pleno del Consejo de la Judicatura Federal, bajo formal protesta de decir verdad manifiesto que es una copia íntegra e inalterada del documento original* –. Esta probanza se relaciona con todos los hechos del Incidente y de la presente contestación, y con ella se acredita, entre otros extremos: la denominación del crédito en moneda nacional; sus términos y condiciones reales – *incluida la tasa fija anual de 17.50%* -; que el otorgamiento de garantías fue contemplado desde la obligación original (Cláusula 5.05); y, en general, la inexactitud de las premisas sobre las que el Incidentista construyó su acción.

ALFREDO VAZQUEZ MEYER
3030303130303030303037373134373330383535
08/04/29 16:00:55

**2.- LA DOCUMENTAL PÚBLICA** consistente en copia certificada del **Convenio Modificatorio y de Reexpresión** de 6 de marzo de 2026, que se exhibe como como **anexo número 3) –** *mismo que en términos de lo dispuesto por el artículo 3, fracción VI, del Acuerdo General 12/2020 del Pleno del Consejo de la Judicatura Federal, bajo formal protesta de decir verdad manifiesto que es una copia íntegra e inalterada del documento original* –, así como su traducción al idioma español por perito traductor certificado, que se exhibe como **anexo número 4) –** *mismo que en términos de lo dispuesto por el artículo 3, fracción VI, del Acuerdo General 12/2020 del Pleno del Consejo de la Judicatura Federal, bajo formal protesta de decir verdad manifiesto que es una copia íntegra e inalterada del documento original* –. Se relaciona con los mismos hechos y con ella se acredita que dicho instrumento no constituyó endeudamiento nuevo ni otorgamiento de garantías no contempladas, sino la documentación y formalización de obligaciones preexistentes.

**3.- LA DOCUMENTAL PÚBLICA** consistente EN el oficio número 400-75-00-00-00-2026-1130, Exp. SAT-8S.4-2026 de fecha 9 de enero de 2026, de la Administración General de Recaudación del SAT, mismo que se exhibe adjunto al presente escrito como **anexo número 5) –** *mismo que en términos de lo dispuesto por el artículo 3, fracción VI, del Acuerdo General 12/2020 del Pleno del Consejo de la Judicatura Federal, bajo formal protesta de decir verdad manifiesto que es una copia íntegra e inalterada del documento original* **–.** Prueba que se relaciona con la contestación a los hechos 13, 14, 16, 21, 26, 27, 28, 34 y 35 del Incidente, y con las excepciones opuestas, y con ella se acredita: que los créditos fiscales de los ejercicios 2009 y 2013 se encontraban firmes y fueron requeridos de pago, actualizados, por $3,901,434,927.30 y $4,790,057,134.26 – *$8,691,492,061.56 en su conjunto* –, con un plazo de cinco días para su pago; que el interés fiscal se encontraba garantizado mediante el embargo en vía administrativa de la negociación misma de mi representada; y el apercibimiento expreso de hacer efectiva dicha garantía a través del procedimiento administrativo de ejecución o de transferir los recursos de las cuentas de la Comerciante en términos del artículo 156-Ter del Código Fiscal de la Federación; esto es, la inminencia real, actual y documentada de la ejecución fiscal a la fecha de contratación del financiamiento impugnado.

ALFREDO VAZQUEZ MEYER
30303031303030303037313437333038535
08/04/29 16:00:55

**4.- DOCUMENTALES.** Consistentes en las resoluciones contenidas en los oficios 400-75-00-00-00-2026-2940 y 400-75-00-00-00-2026-2941, de 28 de enero de 2026, relativas a los beneficios de reducción y condonación de accesorios obtenidos en términos del Código Fiscal de la Federación con motivo del pago de los créditos fiscales referidos, que se exhiben como **anexos números 6)** y **7) –** *mismos que en términos de lo dispuesto por el artículo 3, fracción VI, del Acuerdo General 12/2020 del Pleno del Consejo de la Judicatura Federal, bajo formal protesta de decir verdad manifiesto que son una copia íntegra e inalterada del documento original* –. Se relacionan con los mismos hechos y excepciones que la probanza anterior, y con ellas se acredita el beneficio neto obtenido por la Masa con motivo de la operación impugnada, consistente en la disminución del pasivo de $1,856,303,526.00 (mil ochocientos cincuenta y seis millones trescientos tres mil quinientos veintiséis pesos 00/100 M.N.), conforme a la cuantificación de la propia autoridad fiscal.

**5.- DOCUMENTALES.** Consistentes en las líneas de captura emitidas por la propia autoridad fiscal el veintiocho de enero de dos mil veintiséis para el pago de los créditos fiscales de los ejercicios 2009 y 2013, que se exhiben como **anexos números 8)** y **9)** – *mismos que en términos de lo dispuesto por el artículo 3, fracción VI, del Acuerdo General 12/2020 del Pleno del Consejo de la Judicatura Federal, bajo formal protesta de decir verdad manifiesto que son una copia íntegra e inalterada del documento original* –. Se relacionan con los mismos hechos y excepciones que las probanzas anteriores, y con ellas se acreditan los importes exactos exigidos por la propia autoridad para la extinción de ambos créditos con los beneficios otorgados, cuya coincidencia, peso por peso, con las transferencias realizadas al día siguiente demuestra la trazabilidad íntegra de los pagos y la correspondencia documental entre el financiamiento y su destino.

**6.- DOCUMENTALES.** Consistentes en los comprobantes de las transferencias electrónicas realizadas el veintinueve de enero de dos mil veintiséis, por $2,657,170,823.00 (ejercicio 2009) y $1,267,979,379.00 (ejercicio 2013) – $3,925,150,202.00 en total –, que se exhiben como **anexos números 10)** y **11)** – *mismos que en términos de lo dispuesto por el artículo 3, fracción VI, del Acuerdo General 12/2020 del Pleno del Consejo de la Judicatura Federal, bajo formal protesta de decir verdad manifiesto que son una copia íntegra e inalterada del documento original* –. Se relacionan con los mismos hechos y excepciones que las probanzas anteriores, y con ellos se acredita el pago efectivo de ambos créditos fiscales el mismo día de la disposición del crédito, mediante flujos plenamente identificados cuyos importes coinciden exactamente con las líneas de captura emitidas por la propia autoridad y cuyo destinatario final fue la Tesorería de la Federación.

ALFREDO VAZQUEZ MEYER
30303031303030303037313437333038353535
08/04/29 16:00:55

**7.- LA CONFESIONAL** a cargo de **THE BANK OF NEW YORK MELLON EN SU CARÁCTER DE FIDUCIARIO**, misma que deberá desahogarse por conducto de su representante legal o apoderado legal con facultades suficientes para absolver posiciones, quien deberá presentarse en el local de este H. Juzgado el día y hora que se señalen por su Señoría para absolver las posiciones que se exhiban en sobre cerrado en el momento procesal oportuno, del interrogatorio que mi mandante formule en la audiencia de

ley, apercibiéndola para que en caso de no comparecer sin justa causa se le tenga por confeso, en los términos de ley.

Esta probanza es idónea y pertinente porque versa, única y exclusivamente, sobre hechos propios de la absolvente – *su conocimiento, su conducta y la finalidad de su acción, que ningún otro medio de convicción puede acreditar de manera directa* –, y con ella se acreditará, entre otros extremos: **(i)** que la Incidentista conoció la existencia del Contrato de Crédito y de sus garantías desde marzo y abril de 2026, y que desde el 2 de junio de 2026 anunció ante tribunales extranjeros su intención de ejercer acciones de *"transferencias fraudulentas"* conforme al derecho mexicano; **(ii)** que no realizó ni encargó estudio, comparativo o análisis alguno de las condiciones prevalecientes en mercado alguno de financiamiento a la fecha de celebración de los actos que impugna, y que las opiniones que acompañó versan sobre la situación regulatoria del acreditante y no sobre condiciones de mercado; **(iii)** que conoce el contenido de la Sección 3.4 (*Payment of Taxes*) del contrato de emisión que administra, conforme a la cual la emisora está obligada a pagar sus contribuciones fiscales; y **(iv)** que ante los tribunales de Nueva York califica los mismos hechos que aquí denomina "*fraude de acreedores*" como incumplimientos contractuales de su contrato de emisión, entre otras cosas.

ALFREDO VAZQUEZ MEYER
30303031303030303037313437333038353 5
08/04/29 16:00:55

Esta probanza se relaciona con la totalidad de los hechos del Incidente y de la presente contestación, y de manera destacada con los hechos 8.-, 15.-, 16.-, 21.-, 28.- y 35.-, así como con las excepciones opuestas.

**8.- INSTRUMENTAL DE ACTUACIONES.** Consistente en todas y cada una de las constancias que integran el expediente 22/2026-II, en cuanto favorezcan a los intereses de mi representada, y de manera destacada: la Solicitud de Concurso y sus anexos, la sentencia de declaración de concurso mercantil de seis de julio de dos mil veintiséis, el proveído de diecinueve de agosto de dos mil veintiséis y el propio escrito incidental, del que derivan las confesiones expresas del Incidentista que han quedado destacadas. Se relaciona con la totalidad de los hechos y excepciones.

**9.- PRESUNCIONAL, EN SU DOBLE ASPECTO LEGAL Y HUMANA.** En todo lo que favorezca a los intereses de mi representada, y de manera destacada la que deriva del silencio del Incidentista sobre el destino y aprovechamiento de los recursos del financiamiento, así como de la revelación espontánea e íntegra de la operación en la Solicitud de Concurso. Se relaciona con la totalidad de los hechos y excepciones.

**Por lo expuesto;**

**A USTED C. JUEZ**, atentamente pido se sirva:

**PRIMERO.-** Tenerme por presentado en representación de **TV AZTECA, S.A.B. DE C.V.**, dando contestación en tiempo y forma al incidente de ineficacia de actos en fraude de acreedores promovido por The Bank of New York Mellon en su carácter de Fiduciario (*Trustee*) conforme al Contrato de Emisión (*Indenture*) de fecha 09 de agosto de 2017, celebrado entre TVA, las subsidiarias garantes y BNY, respecto de los Bonos Preferentes al 8.250% con vencimiento en 2024, en los términos del presente escrito.

ALFREDO VAZQUEZ MEYER
30303031303030303037313437333030383535
08/04/29 16:00:55

**SEGUNDO.-** Tener por opuestas las excepciones y defensas que se hacen valer, mismas que, en el momento procesal oportuno deberán ser resueltas procedentes y fundadas, absolviendo a mi representada de las prestaciones que le son reclamadas en el presente Incidente.

**TERCERO.-** Tener por objetadas las pruebas documentales ofrecidas por el Incidentista en los términos del capítulo VI, y por formulada la oposición a la pretendida reserva de ampliación del Incidente y al ofrecimiento de pruebas futuras, desestimándolos por no encontrarse ajustados a derecho.

**CUARTO.-** Tener a mi representada dando cumplimiento al requerimiento contenido en el proveído de 19 de agosto de 2026, con la exhibición de los **anexos números 1) a 4).**

**QUINTO.-** Tener por ofrecidas las pruebas de mi representada, admitirlas y ordenar su preparación y desahogo.

**SEXTO.-** En su oportunidad, declarar improcedente e infundado el Incidente, absolver a mi representada de todas y cada una de las prestaciones reclamadas y condenar al Incidentista al pago de los gastos y costas que este trámite ha generado.

**PROTESTO LO NECESARIO.**
**Ciudad de México, a 28 de agosto de 2026.**

[*Firmado electrónicamente*]

**ALFREDO VÁZQUEZ MEYER.**

ALFREDO VAZQUEZ MEYER
303030313030303030373134373330383535
08/04/29 16:00:55

PODER JUDICIAL DE LA FEDERACIÓN

## EVIDENCIA CRIPTOGRÁFICA - TRANSACCIÓN

**Archivo Firmado:**
**41570020000000000062450006.p7m**
**Autoridad Certificadora:**
**AC DEL SERVICIO DE ADMINISTRACION TRIBUTARIA**
**Firmante(s): 1**

| FIRMANTE | | | | |
|---|---|---|---|---|
| **Nombre:** | ALFREDO VAZQUEZ MEYER | **Validez:** | BIEN | Vigente |
| FIRMA | | | | |
| **No Serie:** | 30.30.30.30.31.30.30.30.30.30.30.37.31.34.37.33.30.38.35.35 | **Revocación:** | Bien | No revocado |
| **Fecha (UTC/ CDMX)** | 29/08/26 04:00:36 - 28/08/26 22:00:36 | **Status:** | Bien | Valida |
| **Algoritmo:** | RSA-SHA256 | | | |
| **Cadena de firma:** | 95 be e4 21 c8 1b 49 b9 5b 6e 72 62 cb c0 e9 c0<br>e4 5c ef 9d 8d d6 7d d2 88 20 8c 17 ac 10 2c ee<br>b9 92 1c fa 8f 79 bc 83 5f 19 a4 4f 50 35 4b 01<br>32 af 46 f3 8a d7 e1 10 64 7e 62 a4 37 fe 93 51<br>45 da 44 d9 c6 0b b8 dd 3b fb f0 28 47 0d ba e1<br>d2 63 22 d6 fa 7b 57 04 79 fc bc 67 ea 17 c9 ad<br>e1 76 d4 a9 c1 5c 77 75 39 37 b4 8a 2b 25 1b 0e<br>28 f6 bf a2 12 00 62 a8 69 42 45 95 27 99 10 06<br>a0 01 30 b6 d5 9b b9 71 00 31 ed 5e 15 b0 78 73<br>58 9e b6 ba f6 86 c6 bd 44 9c 83 b9 73 e4 6f 1c<br>f4 79 5b e2 38 7e e2 f8 ee fa 33 43 65 35 b5 94<br>fe 51 c1 f4 1a 2f f1 9d 01 ba 06 6a 5a 3c 89 c3<br>4b b4 12 07 24 ea 59 27 8b b3 4b 23 66 9d 1c ab<br>de ed 54 69 2e 6b e2 f2 c6 15 21 5f 71 5b 50 4c<br>32 f3 67 92 03 b6 67 71 77 7c a2 57 d7 64 1d a3<br>53 34 3c 90 40 ae de 55 14 20 86 79 49 3e ac 1e | | | |

| OCSP | |
|---|---|
| **Fecha: (UTC/ CDMX)** | 29/08/26 04:00:37 - 28/08/26 22:00:37 |
| **Nombre del respondedor:** | OCSP SAT |
| **Emisor del respondedor:** | AC DEL SERVICIO DE ADMINISTRACION TRIBUTARIA |
| **Número de serie:** | 30.30.30.30.31.30.30.30.30.30.30.37.31.34.37.33.30.38.35.35 |

| TSP | |
|---|---|
| **Fecha : (UTC/ CDMX)** | 29/08/26 04:00:37 - 28/08/26 22:00:37 |
| **Nombre del emisor de la respuesta TSP:** | Autoridad Emisora de Sellos de Tiempo del Consejo de la Judicatura Federal |
| **Emisor del certificado TSP:** | Autoridad Certificadora Intermedia del Consejo de la Judicatura Federal |
| **Identificador de la respuesta TSP:** | 198691998 |
| **Datos estampillados:** | 6soHdUV8kXsnj7xm6UmU2puwOm8= |

# Translation by DeepL.com

**MERCHANT: TV AZTECA, S.A.B. DE C.V.**

**COMMERCIAL BANKRUPTCY IN THE SETTLEMENT PHASE.**

**CASE NUMBER: 22/2026-II.**

**<u>MOTION TO DECLARE ACTS INEFFECTIVE DUE TO FRAUD AGAINST CREDITORS.</u>**

**FIRST DISTRICT JUDGE IN COMMERCIAL MATTERS OF COMMERCIAL BANKRUPTCY, WITH SEAT IN MEXICO CITY AND JURISDICTION THROUGHOUT THE MEXICAN REPUBLIC.**

**ALFREDO VÁZQUEZ MEYER**, on behalf of **TV AZTECA, S.A.B. DE C.V.** (hereinafter, for procedural convenience, **"TV** AZTECA" or the "Merchant"), a legal entity whose status has been duly recognized in the records of the commercial bankruptcy proceeding under the aforementioned case number, respectfully appear before you and state the following:

ALFREDO VAZQUEZ MEYER
3030303130303030303731343733303835353 5
04/29/08 4:00:55 PM

By means of this brief, filed in a timely and proper manner and based on the provisions of Article 267 and other relevant and applicable provisions of the Commercial Insolvency Law (hereinafter the "LCM"), I hereby respond to the frivolous and improper Motion to Declare Acts Void for Fraud Against Creditors (hereinafter, for the sake of procedural brevity, the "Motion") filed by **THE BANK OF NEW YORK MELLON IN ITS CAPACITY AS TRUSTEE (*TRUSTEE*) PURSUANT TO THE INDENTURE DATED AUGUST 9, 2017, ENTERED INTO BETWEEN TVA, THE GUARANTOR SUBSIDIARIES, AND BNY, REGARDING THE 8.250% PREFERRED BONDS MATURING IN 2024** (hereinafter

and, for the sake of procedural convenience, the "Incidentista" or "BONY" interchangeably); which is hereby set forth as follows:

## I. PRELIMINARY CONSIDERATION.

Before responding to the arguments and the facts, it is essential to establish the conceptual framework within which the Motion must be adjudicated, since its entire structure rests on a misrepresentation of the action being brought.

**1. <u>The elements of the action</u>.** Based on a harmonious interpretation of sections 112 through 119 of the Commercial Code (LCM), and in accordance with civil and bankruptcy doctrine, the admissibility of the action requires the concurrence of each and every one of the following requirements: **(i)** an act by **the merchant**, performed on or after the retroactive date and prior to the declaration of bankruptcy; **(ii)** that such act has caused **actual harm to the estate**, that is, a reduction in the Merchant's assets or the establishment of an undue preference in payment in favor of one creditor to the detriment of the others; **(iii)** that the merchant performed the act **with the intent** to **defraud** its creditors; and **(iv)** in the case of onerous acts, that the **third** party involved was **aware of such fraud** (Article 113 of the LCM).

The lists set forth in Articles 114 and 115 do not derogate from this logic but rather define acts that typically result in such impoverishment —*acts performed without consideration, grossly disproportionate consideration, terms significantly deviating from market conditions, debt forgiveness, advance payments, guarantees not provided for in the original obligation, payments in a different form of consideration*—and therefore exempt or presume the existence of certain subjective elements; but they all share the same structural feature: the **outflow of value** from the debtor's assets or the **undue preference** granted to a creditor. Without that feature, there is no legal provision to apply.

ALFREDO VAZQUEZ MEYER
30303030130303030303731343733303835335
04/29/08 4:00:55 PM

**2. <u>The provisions are strictly applied; "suspicion" is not a legal category</u>.** Articles 114 and 115 of the LCM establish an exhaustive list of conduct, subject to strict interpretation and application, insofar as they lead to the invalidation of validly executed legal acts—*which constitutes an exceptional measure in light of the principles of the preservation of legal acts and certainty in commercial transactions*. For this reason, what a creditor may find "strange," "unusual," "suspicious," or "abnormal" does not constitute grounds for invalidity; the subjective strangeness perceived by a rival creditor is not an

element of the legal definition, nor does it relieve the plaintiff of the burden of proving, with specific facts and appropriate evidence, each of the elements of the action.

As will be demonstrated, the entire motion is built upon this confusion; it substitutes the elements of the claim with adjectives such as "implausible," "ridiculous," "absurd," "unusual," and "striking," and seeks to have the motion's author's suspicions serve as the facts required by law—facts that are never asserted or proven.

**3. Good faith is presumed; bad faith must be proven.** Pursuant to Article 807 According to the Federal Civil Code, which applies on a supplementary basis, *"good faith is always presumed; the party alleging bad faith… bears the burden of proving it*." This principle, recognized by the First Chamber of the Supreme Court of Justice of the Nation as an expression of the ontological principle of evidence, governs the action brought; the burden of proving the Merchant's fraudulent intent and the third party's knowledge of the fraud rests entirely with the petitioner (Article 1194 of the Commercial Code), without the specific and rebuttable presumptions of Article 115 exempting the petitioner from proving the remaining elements of the action, notably the harm to the estate.

ALFREDO VAZQUEZ MEYER
303030313030303030373134373330383535
04/29/08 4:00:55 PM

**4.- A genuine and verifiable transaction, which in financial practice is is known as a "true sale" transaction.** As detailed in the response to the facts, the transaction at issue in the motion is a genuine and real *transaction—known in financial practice as a "true sale"*—because: there was a real, preferential, and enforceable underlying debt (tax claims requiring payment with a threat of enforcement against the transaction itself); a real line of credit, drawn down only partially and to the extent necessary to meet the need that prompted it; actual, traceable cash flows documented by third parties, which exactly match the transaction records issued by the Tax Administration Service ("SAT"); an immediate, same-day settlement in which the payments made were ultimately received by the Federal Treasury; and real economic benefits favorable to the Estate, quantified by the tax authority itself. Nothing is simulated, nothing is on paper, nothing depends on the word of my client; every link is documented in verifiable official records. This comprehensive reality

of the transaction precludes the allegation of a *"sham* transaction" that **BONY** seeks to construct and constitutes, in and of itself, the clearest evidence of the Merchant's good faith.

**5. The Imminence of Tax Enforcement: A Real, Current, and documented risk, with devastating consequences for the Merchant and for the all of its creditors.** The urgency with which the financing was arranged is not

is not an assertion by my client; it is documented by the tax authority itself. As of January 9, 2026, all the conditions for immediate enforcement were simultaneously met: **(i)** final tax assessments—*with all avenues of defense exhausted*—; **(ii)** tax interest guaranteed as of October 28, 2025, through the administrative attachment of my client's business operations (Article 141, Section V, of the Federal Tax Code); **(iii)** a formal demand for payment in the amount of $8,691,492,061.56, with a deadline of 5 (five) days; **(iv)** the administrative enforcement proceeding already initiated; and **(v)** the express warning, contained in the demand itself, that in the event of nonpayment, the authority would proceed, at its discretion, either to enforce the guarantee through the administrative enforcement proceeding or to transfer the funds from the Merchant's accounts pursuant to Article 156-Ter of the Code. There is no situation in Mexican law that exposes a party to greater risk of enforcement than this one.

ALFREDO VAZQUEZ MEYER
30303031303030303037313437333030383535
04/29/08 4:00:55 PM

**6. The antithesis of fraud: an act that benefited the Estate.** Within this framework,

the present motion presents a paradox that renders it inadmissible, namely, the act that is sought to be invalidated did not extract any value from the estate, but rather injected funds into it—*bridge financing secured in the face of a real and imminent risk of tax enforcement*—funds used to pay enforceable tax liabilities through the administrative enforcement procedure, the settlement of which allowed the Merchant to access, under the terms of the Federal Tax Code, to the benefits of reduction and waiver of the corresponding ancillary charges, resulting in a **reduction of liabilities by**

**$1,856,303,526.00 (one billion eight hundred fifty-six million three hundred three thousand five hundred twenty-six pesos 00/100 M.N.)**. In other words, not only did the transaction not impoverish the Estate; it provided it with a net and quantifiable benefit, to the advantage of each and every creditor. Such an act is the conceptual antithesis of an act committed in fraud of creditors, and that single

fact—*which the petitioner completely omits*—is sufficient to dismiss the action, as is elaborated upon throughout this brief.

**II. RESPONSE TO THE CLAIMS.**

It is denied that the Intervenor has standing or the right to claim from my client the benefits identified in subsections **A**, **B**, **C,** and **D** of her intervening brief. Notwithstanding the reasons set forth in the responses to the facts and in the exceptions and defenses—*which are hereby deemed to be reproduced herein*—I will now respond to each of the benefits claimed by **BONY** in an orderly manner:

**1.** I deny that the Intervenor has standing or the right to claim from my client the remedy listed under subsection A of the corresponding chapter being answered, which consists of *"A. A declaration of the invalidity of the credit agreement dated January 29, 2026, entered into between Alter Bank, L.T.D. (hereinafter "AlterBank") in its capacity as structuring agent, initial lender, administrative agent, and collateral agent, and TVA as borrower, as well as its amendment and restatement agreement dated March 6, 2026,"* primarily on the grounds that, contrary to what is alleged, the acts referred to therein in no way constitute acts in fraud of creditors, because none of the elements of the action or the provisions of Articles 113, 114, subsection III, or 115, subsection I, of the LCM are met, as explained throughout this brief.

ALFREDO VAZQUEZ MEYER
30303030313030303030303731343733303835353
04/29/08 4:00:55 PM

**2.** I deny the intervenor's cause of action and right to claim from my client the relief set forth in subsection B of the corresponding chapter being contested, which reads: *"B. Consequently, the ineffectiveness of said claim against the estate and the remaining recognized creditors (as determined in the judgment recognizing, ranking, and prioritizing claims),"* primarily because, contrary to what is alleged, the acts referred to therein in no way constitute acts in fraud of creditors, since none of the elements of the action or the circumstances set forth in Articles 113, 114, Section III, or 115, Section I, of the LCM are met, as explained throughout this brief.

**3.** I deny the Intervenor's claim and right to demand from my client the relief set forth in subsection C of the corresponding chapter being answered, which consists of *"C. A declaration that, as a result of the ineffectiveness of said claim against the Estate, AlterBank cannot be recognized as a creditor in these bankruptcy proceedings nor can it sign the proposed bankruptcy agreement that may be submitted."* This is primarily because, contrary to what is alleged, the acts referred to therein in no way constitute acts in fraud of creditors, since none of the elements of the action or the circumstances set forth in Articles 113, 114, Section III, or 115, Section I, of the Bankruptcy Code (LCM) are met, as explained throughout this brief.

In addition to the foregoing, the consequences sought by the petitioner in section C **<u>are not provided for in our legal system</u>**. The effects of a possible declaration of invalidity are, exclusively, the restitutionary remedies established by Articles 118 and 119 of the LCM; no provision of our legal system—*neither Articles 112 through 115, nor the regime for the recognition of claims, nor that relating to the reorganization agreement*—provides that a third party who participated in an act declared ineffective loses the right to be recognized as a creditor or to sign the reorganization agreement. In fact, our legal system consistently provides for the opposite; for example, the last paragraph of Article 114 even allows a third party who returns what was received *to "request recognition of its claim,"* indicating that the legislature considered the situation of a party to an invalid act and resolved it by preserving—rather than excluding—that party's access to recognition.

Furthermore, when the legislature intended to deprive a creditor of its rights, it expressly provided for this—*as in Article 154 of the LCM, which penalizes private agreements entered into after the declaration of bankruptcy with nullity and the loss of the rights of the creditor who enters into them*— and since these involve the deprivation of rights, their application is strict; such deprivations are not created by analogy or by a majority of reasons.

ALFREDO VAZQUEZ MEYER
303030301303030303037313437333038353 5
04/29/08 4:00:55 PM

Not even the common-law doctrine of fraud against creditors provides for the sanction sought here; the action for rescission (Articles 2163 et seq. of the Federal Civil Code) is limited to rendering the act unenforceable and ordering the resulting restitution, for the benefit of the creditor bringing the action and up to the amount of their claim, without ever depriving a third party of rights other than those related to the contested act. What Claim C seeks, therefore, is not the application of a legal consequence but rather the creation of a sanction that neither the bankruptcy nor the civil legal systems have established.

The nature of the claim itself also reveals the true purpose of the motion. A party seeking to declare an act invalid seeks to have something returned to the estate; a party seeking to prevent a creditor from being recognized or from voting on the reorganization plan pursues a different goal. The petitioner does not seek the return of any assets—*nor could they, since nothing left the Merchant's estate as a result of the acts they are challenging; rather, funds were added to it—but rather* seeks the removal of a creditor from the estate under the bankruptcy agreement, so that their own stake—*whatever it may be*—gains a position of power vis-à-vis the Merchant and the various creditors who are recognized. The fact is that the doctrine of ineffectiveness due to creditor fraud is a restitutory remedy established to protect the integrity of the estate; it is not an instrument for reconfiguring voting majorities, and the use the petitioner seeks to make of it distorts its nature and, in and of itself, demonstrates the inadmissibility of the request.

ALFREDO VAZQUEZ MEYER
30303031303030303037313437333038353
04/29/08 4:00:55 PM

**4.** I deny the petitioner's right to claim from my client the payment specified in subsection **D** of the corresponding chapter being contested, which consists of *"D. The expenses and costs arising from this motion,"* since this claim is ancillary to the preceding ones and must therefore be treated in the same manner as those claims, especially since, in any event, the expenses and costs must be borne by the petitioner, given the inadmissibility of the motion.

**III. RESPONSE TO THE PRELIMINARY SECTIONS OF THE MOTION.**

**1.**— Regarding the section titled ***"STANDING OF BNY AS TRUSTEE AND RIGHTS OF THE HOLDERS."*** The content of said section,

for procedural purposes, is denied. The statements contained therein constitute mere unilateral assertions by the petitioner regarding the capacity in which it claims to appear and the rights and duties it claims derive from an issuance agreement governed by foreign law; assertions that are not substantiated in the motion.

The Intervenor claims to act *"…on behalf of and for the benefit of the holders of the beneficiary interests represented by the* Global Note…" and to have, pursuant to *the* issuance agreement, *"…the right and* duty…" to file and pursue claims in insolvency proceedings; however, the Intervenor has not provided any evidence to support these assertions.

As of this moment, my client reserves, to the fullest extent permitted by law, the right to contest and challenge the standing, legal capacity, representation, and powers that the Petitioner claims to possess at the appropriate procedural stage and through the applicable channels, stages, and courts. Consequently, neither this response nor any statement contained herein implies or may be interpreted as an express or tacit acknowledgment of such capacities, status, or powers, nor as consent to the scope that the petitioner attributes to them.

ALFREDO VAZQUEZ MEYER
303030313030303030373134373330383535
04/29/08 4:00:55 PM

**2.-** Regarding the section titled ***"RESERVATION OF RIGHTS."*** Of particular significance to the litigation is the statement made by the petitioner in that section, namely that *"…he has had neither access to nor knowledge of the exact content of the Credit Agreement and its Amendment and Restatement* Agreement…"; which reveals not only the lack of standing for the motion but also the fraud and bad faith with which **BONY** is acting**,** given that it is bringing a claim whose core element consists of the terms agreed upon in a legal instrument, while admitting ignorance of those terms.

Furthermore, at this point, it is brought to Your Honor's attention that the chronology of the motion itself contradicts the alleged novelty of the action brought by **BONY**, who, according to its own statements before the U.S. District Court for the Southern District of New York in the litigation pending there against my client: **(i)** as of March 13,

2026—*three days after it was filed*—requested a copy of the Petition for Bankruptcy; **(ii)** in April 2026, the existence of the claim against Alter Bank was the subject of press releases that the petitioner himself cites; **(iii)** on June 2, 2026, filed a motion with the U.S. District Court for the Southern District of Florida pursuant to section 1782 of title 28 of the United States Code, the purpose of which—*according to his own statements before the New York court*—is to obtain information *"for use in pursuing potential claims of fraudulent transfers under Mexican law in the bankruptcy proceeding"*; and **(iv)** on June 8, 2026, he requested authorization to expand his complaint in New York, describing in detail the claim, its security interests, and its priority.

In other words, **BONY** not only had known about the transaction and the circumstances it now invokes for months, but it also formally announced—before a foreign court and as early as June 2, 2026—its intention to take precisely the actions it filed through August 18, 2026. His *"reservation to* expand" the motion as *discovery* proceeds is thus undermined: it is not the caution of someone who has just learned of the facts, but rather the strategic management of a long-planned litigation, incompatible with the preclusion that governs the motion procedure.

ALFREDO VAZQUEZ MEYER
303030313030303030373134373330383535
04/29/08 4:00:55 PM

As if that were not enough, in that forum, the petitioner characterizes exactly the same facts—*the Alter Bank loan and its collateral*—as breaches of *covenants* under the issuance agreement (sections 3.9, 3.10, and 3.15), a finding he seeks under New York law before the court he himself chose. The same transaction constitutes a breach of contract in New York and *"fraud against* creditors" in Mexico; in short, **BONY** changes the legal characterization depending on the forum and its convenience.

Thus, as of this moment, we object to and request the dismissal of the alleged "reservation" to expand the motion and to submit evidence in the future from the foreign *discovery* proceedings to which it refers, as it is contrary to the principles of res judicata and closed litigation that govern the incidental proceeding, in accordance with the provisions of Article 267 of the LCM and Article 1202 of the Commercial Code, which applies supplementarily to the LCM.

**3.** Regarding the chapter titled ***"SPECIAL CHAPTER ON ACTIONS FOR INVALIDITY."*** We reject the legal consequence asserted by **BONY,** namely, that a creditor who intervenes in an act declared ineffective *"…cannot be recognized…"* nor *"…may sign the agreement…,"* a claim that finds no support in any legal provision of our legal system.

In fact, the petitioner seeks to base this consequence exclusively on a doctrinal citation, the transcription of which reveals only a definition of ineffectiveness *in the strict sense*. It should even be noted that the last paragraph of Article 114 of the LCM—*which BONY maliciously omits*—establishes exactly the opposite of what is claimed.

As if that were not enough, the effect sought by **BONY** is so unfounded that, when the legislature intended the consequence of an act to be the loss of the creditor's rights in the insolvency proceeding, it expressly provided for this, as in the scenario set forth in Article 154 of the LCM, which penalizes private agreements entered into after the declaration of bankruptcy not only with the nullity of the act but also, expressly, with the loss of the rights of the creditor who enters into such agreements in the bankruptcy proceedings. No similar provision exists in the chapter on acts in fraud of creditors; and since this is a sanction involving the deprivation of rights, which must be interpreted strictly, it cannot be applied by analogy to cases not expressly provided for.

ALFREDO VAZQUEZ MEYER
3030303130303030303731343733303835 35
04/29/08 4:00:55 PM

**4.-** Finally, regarding the chapter titled ***"SPECIAL CHAPTER ON ALTER BANK*":** I neither affirm nor deny its contents, as it refers to the actions of a third party that are unrelated to my client. In any case, it is denied that such matters are related to the elements of the action brought, since the creditor's prudence, its size, the risks it assumes, and its corporate vicissitudes are unrelated to the circumstances regulated by Articles 113, 114, and 115 of the LCM, as explained in greater detail in the response to the facts of the motion.

## IV. RESPONSE TO THE FACTS.

Having already responded to the claims made against my client, as well as to the preliminary sections of the motion, I hereby respond to each and every one of the facts alleged by **BONY**, as follows:

**1.-** The corresponding fact to which this response pertains is, for procedural purposes, denied. Notwithstanding the foregoing, it is clarified that the existence, content, and filing date of my client's petition for a declaration of commercial insolvency are recorded in the case file, to the full text of which reference must be made.

**2.-** The corresponding fact to which this response pertains is, for procedural purposes, denied. Notwithstanding the foregoing, the existence and content of the order granting the petition dated March 20, 2026, are on record in the case file, to the full text of which reference must be made.

ALFREDO VAZQUEZ MEYER
3030303130303030303731343733303835
35
04/29/08 4:00:55 PM

**3.-** The related fact being contested is, for procedural purposes, denied. Notwithstanding the foregoing, the existence, content, and scope of the judgment dated July 6, 2026—*including the retroactive date specified therein*—are set forth in the case file, to the full text of which reference must be made, with the clarification that the establishment of a retroactive date defines a period of analysis, but does not presume or prejudge that any act carried out within that period is fraudulent, as has been explained throughout this brief.

**4.-** The related allegation being contested is, for procedural purposes, denied. Notwithstanding the foregoing, the publication and content of the excerpt from the judgment declaring commercial insolvency are on the record, and reference must be made to those records.

**5.-** The related fact in question is denied for procedural purposes. Notwithstanding the foregoing, I wish to state the following:

**(A)** The execution of the credit agreement dated January 29, 2026, with AlterBank (the **"Credit** Agreement") was voluntarily disclosed by my client in its Petition for Bankruptcy;

**(B)** The Credit Agreement was entered **into in local currency**, as a line of credit for up to $5,000,000,000.00 (five billion pesos 00/100 M.N.) – *not in United States dollars, as the Plaintiff refers to it in various passages of his brief when mentioning "USD $290,000,000.00," a figure that is not included in the terms of the Credit Agreement* –;

**(C)** The amount of the credit line does not equal the amount actually drawn down, since my client drew down the amount of $4,085,000,000.00 (four billion eighty-five million pesos 00/100 M.N.), a figure that was used for the benefit of the estate and all creditors to **(i)** meet **TV AZTECA's** tax obligations**,** resulting in a benefit in the amount of **$1,856,303,526.00 (one billion eight hundred fifty-six million three hundred three thousand five hundred twenty-six pesos 00/100 M.N.)**, which, far from increasing the borrower's liabilities, significantly reduced them; and **(ii)** for the remainder, in accordance with the purpose agreed upon in the Credit Agreement itself (Clause 2.02), which includes the fulfillment of tax obligations and the borrower's general corporate purposes;

ALFREDO VAZQUEZ MEYER
30303030313030303030303731343733303835 35
04/08/29 4:00:55 PM

**(D)** Clause 2.02 of the Credit Agreement expressly provides that its purpose is as follows: *"…The Credit shall be used by the Borrower exclusively for the payment and fulfillment of its tax obligations to the Mexican tax authorities (including, without limitation, any related federal, state, or local taxes, levies, or liabilities) and for general corporate purposes…*".

**(E)** In compliance with the request contained in the order dated August 19, 2026, attached to this brief as **Exhibit No. 1**, a certified copy of the Credit Agreement is hereby submitted, along with a translation into Spanish by a certified translator, which is attached as **Exhibit No. 2;** thereby, the request made by Your Honor is satisfied.

**6.** The related allegation being answered is, for procedural purposes, denied. Notwithstanding the foregoing, it is clarified that the amendment and restatement agreement dated March 6, 2026 (the **"Amendment** Agreement") did not constitute new indebtedness or a new financing decision, but rather documented and restated the obligations arising from the Credit Agreement and formalized the provision of the guarantees contemplated since the execution of the Credit Agreement (Clause 5.05 of the Credit Agreement).

In compliance with the request contained in the order dated August 19, 2026, I hereby attach as **Exhibit No. 3** a certified copy of the Amending Agreement, as well as a translation into Spanish by a certified translator, which is attached as **Exhibit No. 4)**, thereby fulfilling the request made by Your Honor.

**7.-** The related allegation being addressed, for procedural purposes, is denied. Notwithstanding the foregoing, it is clarified that, in fact, my client freely, voluntarily, and spontaneously disclosed the existence of the financing and the identity of its creditor in its Petition for Bankruptcy. Far from constituting evidence of any irregularity, this disclosure attests to the transparency and good faith with which the Merchant conducted herself, since—contrary to what **BONY** seeks to imply—fraudulent acts are concealed; they are not declared under oath before a judicial authority in the first pleading of the universal proceedings. The petitioner seeks to turn my client's transparency into the basis for an allegation of fraud, which is sufficient to highlight the inconsistency of its argument.

ALFREDO VAZQUEZ MEYER
30303031303030303037313437333038353535
04/29/08 4:00:55 PM

**8.-** The related fact being contested, for procedural purposes, is denied, with the clarification that it does not contain facts but rather unilateral legal characterizations, which are likewise denied. Notwithstanding the foregoing, and subject to further elaboration on each point below, Your Honor should be made aware of the unfounded nature of **BONY's** assertions**,** as demonstrated below:

**(A)** First, Article 114, Section III, of the LCM requires the concurrence of three elements: **(i)** the terms and conditions actually agreed upon in the transaction; **(ii)** the prevailing market conditions at the time the transaction was entered into, or commercial customs and practices; and **(iii)** a significant discrepancy between the two. **BONY** does not provide any of these three elements:

**(a)** The Claimant fails to identify the relevant market or provide a single comparable example, benchmark rate, quote, or study of financing conditions in Mexico as of the date of execution; in fact, the opinions accompanying his brief—on which he seeks to base his arguments—are NOT appropriate, as they pertain to the lender's prudential regulation in another jurisdiction, not to market conditions for financing.

Furthermore, Article 114, Section III, of the LCM requires that the terms and conditions agreed upon in the transaction be compared with the prevailing market conditions in the market where the transaction took place and as of the date of execution. It establishes an objective comparison of contractual terms; it does not involve a judgment regarding the lender's prudential suitability. Therefore, the arguments raised by **BONY** are irrelevant to the dispute, given that AlterBank's capital and assets, its business plan, its license, its regulator, its board members, its shareholder, and the vicissitudes of its corporate registration are matters that bear no relation to *the "agreed-upon* terms" of the transaction.

ALFREDO VAZQUEZ MEYER
30303030313030303030303731343733303835
04/08/29 4:00:55 PM

**(c)** Third, the third element is even less substantiated, given that it reaches conclusions based on unproven or nonexistent premises; if it fails to substantiate the terms of the transaction whose invalidity it seeks to establish—much less the market conditions existing as of the date of its execution—it certainly cannot demonstrate a deviation of the legal act from those prevailing conditions; The truth is that **BONY's** account consists of nothing more than mere unilateral assertions, unsupported by any evidence.

The manner in which **BONY** seeks to frame its motion leaves my client defenseless—*there are no specific conditions to challenge nor* any *specific deviation to refute*—especially since, in any case, none existed, and this deprives the action of a cause of action. The motion is, in this regard, obscure and flawed, and is therefore formally opposed.

**(B)** Finally, in any event, it must be noted that neither the Credit Agreement nor the Amendment Agreement deviated from the prevailing conditions in the relevant market as of the date of their execution, as evidenced below:

**(a)** The complaint that **BONY** raises in its Motion essentially boils down to the fact that AlterBank assumed a risk that, in BONY's view, is or was excessive. However, the determination of the risk that a financial institution is willing to assume in a specific transaction—*and the conditions under which it assumes that risk*—is a matter for that institution, in the exercise of its freedom to contract and its own business judgment.

ALFREDO VAZQUEZ MEYER
3030303013030303030303731343733303835 35
04/29/08 4:00:55 PM

Assuming risk is the very essence of lending. And the conduct described in the Motion itself is that of a creditor who assessed its risk and managed it as standard practice dictates: if the risk is high, collateral is required, an appropriate interest rate is agreed upon, and a short term is set. If that assumption of risk were to prove excessive according to the bank's internal or regulatory parameters, the consequences—whether *prudential, regulatory, or business-related*—would fall on the bank and affect the bank alone, within its jurisdiction; this would never be sufficient grounds to declare the borrower's actions invalid, much less actions that benefited the borrower's estate, as occurred in the case at hand.

To claim otherwise leads to the absurdity that the creditor's due diligence (securing itself) and its risk appetite (lending where others do not) become weapons against the financed debtor.

**(b)** Furthermore, it must be noted that the Agreements and Principles of the Basel Committee on Banking Supervision invoked by the petitioner are not legal norms

in force in Mexico or anywhere else on their own; rather, at best, they are guidelines and standards for coordination among supervisory authorities—*"soft law"*—devoid of direct binding force, which are binding only to the extent and under the terms that each jurisdiction incorporates them into its domestic regulations, and whose intended recipients are regulators and financial institutions, not borrowers.

Its invocation as *a "market* benchmark" for the purposes of Article 114, Section III, of the LCM is legally untenable. **BONY** confuses prudential guidelines on how a bank should measure and manage its risks with the economic conditions governing financing transactions in a given market. The same applies to the legislation of Saint Lucia and the guidelines of its regulatory authority that the Respondent seeks to invoke, which govern, if applicable, the bank's relationship with its regulator—not the validity of the Merchant's actions in a Mexican insolvency proceeding.

**(c)** Finally, correctly defined, the relevant market is that of financing for companies in financial distress—*companies in widespread default, without a current credit rating, without access to capital markets*, *and with tax liabilities at risk of enforcement*. In that segment, the prevailing conditions could be considered precisely those that **BONY** characterizes as anomalous: rates higher than those for ordinary corporate credit, short-term bridge financing, reinforced collateral packages, and non-traditional creditors. The terms actually agreed upon fall within the ranges typical of that market as of the date of execution.

If the argument put forward **by BONY** in the Motion were true—*which is disputed*—it would make it impossible to finance companies in crisis. Taken to its logical conclusion, the petitioner's argument would imply that no company in financial distress can validly obtain financing —*since all financing under such conditions would "deviate" from ordinary bank credit*—a result that is directly contrary to the purposes of the bankruptcy regime, which establishes the preservation of the company as a matter of public interest and even recognizes and protects the financing of businesses in crisis (Articles 1, 3, 37, 75, and 224, Section II, of the LCM).

ALFREDO VAZQUEZ MEYER
303030313030303030373134373330383535
04/29/08 4:00:55 PM

**9.** The related allegation being contested is, for procedural purposes, denied. Notwithstanding the foregoing, it is clarified that my client's failure to comply with its payment obligations arising from the issuance of the *8.250% Senior Notes Due 2024*, issued pursuant to the indenture dated August 9, 2017, was disclosed by the Debtor itself in its Petition for Bankruptcy, and forms part of the widespread default that constitutes the basis for the declaration of commercial bankruptcy (Articles 9 and 10 of the LCM).

This prerequisite is, by definition, common to all merchants in bankruptcy; every commercial bankruptcy involves a debtor who has ceased to make payments. To claim that this circumstance—which is *common, disclosed, and judicially established*—implies that the financing transactions entered into by the business to preserve its operations are fraudulent is nonsensical; for if the prior default were sufficient to classify the debtor's subsequent acts as fraud, absolutely all transactions entered into by any business in the run-up to its bankruptcy would be fraudulent, and Articles 113, 114, and 115 of the Commercial Code—*which require a specific act, harm to the estate, a fraudulent intent, and the third party's knowledge*—would have no reason to exist. The default on the promissory notes, which occurred in 2021, says nothing about, nor proves, the terms under which a credit agreement entered into five years later was negotiated.

ALFREDO VAZQUEZ MEYER
30303030313030303030303731343733303835353
04/29/08 4:00:55 PM

As for the news articles cited, their content is neither affirmed nor denied, as they do not pertain to my client. In any event, these articles prove, at most, the fact of their publication, but not the veracity of what was published, much less the prevailing market conditions referred to in Article 114, Section III, of the LCM, which is the only thing **BONY** was required to prove and failed to do so. What they do demonstrate—*contrary to the petitioner's contention*—is that, in any event, my client's financial situation was public and well-known, which undermines the argument of "concealment" that the petitioner himself constructs in facts 11 and 12.

**10.** The corresponding allegation being contested, for procedural purposes, is denied.

Notwithstanding the foregoing, the following clarifications are provided:

**(A)** The existence of news reports on my client's financial situation confirms that said situation was, in any case, public knowledge, which directly contradicts the claim of "concealment" that the petitioner himself asserts in the immediately following facts; both versions cannot coexist, and either one undermines an element of his case: if the crisis was public knowledge, no deception could have occurred; if it was concealed, the creditor could not have known about it.

**(B)** The fact that my client was challenging tax assessments—*which the petitioner presents as adverse evidence*—constitutes the legitimate exercise of the right to defense afforded to every taxpayer; litigating against the tax authorities is not concealing or defrauding anyone, and attempting to extract from this an indication of fraud reveals the speculative basis upon which the petition is built.

ALFREDO VAZQUEZ MEYER
30303030313030303030303731343733303835353
04/08/29 4:00:55 PM

**(C)** The public statement that the financial situation made it impossible to pay the bills is fully consistent with the decision to file for voluntary bankruptcy—*an act of transparency toward all creditors*—not an admission of any fraudulent act; and

**(D)** Nothing set forth in the Motion identifies a specific act by the Merchant, a condition agreed upon outside of market terms, or harm to the Estate—which are the elements that the action sought to establish.

**11.** The corresponding fact that is being contested, for procedural purposes, is denied. Notwithstanding the foregoing, it is clarified that the publication cited in the corresponding fact describes, in its own terms, compliance with a court order issued by the Sixty-Third Civil Court of Mexico City. Compliance with a judicial order issued by a competent authority is legally required conduct; to reproach my client for obeying a court order and to portray this as

fraudulent concealment is nonsensical. Added to this are two circumstances that render **BONY's** account entirely irrelevant: **(i)** the publication in question is dated May 10, 2023, that is, almost two and a half years before the retroactive date, and thus falls clearly outside the period that the very lawsuit itself defines as the subject of analysis; and it bears no relation to the Credit Agreement entered into in 2026, the sole act whose invalidity is being sought.

**12.** The related allegation being answered is, for procedural purposes, denied. Notwithstanding the foregoing, I would like to make the following statements:

**(A)** The determinations of a foreign credit rating agency constitute acts of a third party, not acts attributable to my client, and date—*according to the petitioner himself*—from January and December 2023, that is, nearly two years prior to the retroactive date; therefore, they are irrelevant to the action brought.

**(B)** As for the substance of **BONY's** allegations**,** the *"Restricted Default"* rating did not reveal anything that was not already known—*it reflected the default on the notes, a fact that was made public and subsequently admitted in the Petition for Bankruptcy itself*—and the withdrawal of the rating also does not prove any concealment attributable to the Merchant, whose conduct regarding disclosure was governed by the court order referred to in response to the immediately preceding event.

ALFREDO VAZQUEZ MEYER
30303031303030303030373134373330383535
04/08/29 4:00:55 PM

It should also be noted that no legal provision establishes the existence of a credit rating as a requirement for a merchant to obtain financing, nor does its absence render any transactions entered into by the merchant invalid. **BONY's** concluding statement that "*what existed was a* concealment" of financial information is not a fact but an inference by the petitioner, which is denied, and which is also inconsistent with the public notoriety of the crisis that the petitioner himself asserts and seeks to prove with newspaper articles.

**13.** The corresponding allegation, for procedural purposes, is denied. Notwithstanding the foregoing, the following clarifications are provided:

**(A)** The financial statements referred to in the corresponding document were submitted by the Merchant itself as an attachment to its Petition for Bankruptcy, and their full content must be taken into account. The respondent's reliance on these documents demonstrates, once again, that my client's financial information was available and was provided transparently to the court and to the creditors—*conduct inconsistent with the concealment alleged in other passages*.

**(B)** My client's <u>financial difficulties </u>are not a

contested or concealed; <u>it is the very basis of the commercial bankruptcy proceeding </u>that was voluntarily

filed for, a situation common by definition to any business in bankruptcy. To build a case of fraud on the basis of insolvency is a circular argument; it amounts to asserting that any business that files for bankruptcy defrauded its creditors with every act it performed in the run-up to the bankruptcy proceedings.

ALFREDO VAZQUEZ MEYER
30303031303030303037313437333038353535
04/29/08 4:00:55 PM

**(C)** The assertion that *"it is implausible that a banking institution would decide to grant a loan in January 2026 to a company in such a situation of financial* distress" is not a fact, but rather a subjective assessment by the petitioner, refuted by the reality of commercial practice. Financing for companies in financial distress—*so-called bridge or rescue financing*—is a widespread and recognized practice in credit markets, to the extent that the LCM itself provides for and protects it as a means of preserving the company (Articles 1, 3, 37, 75, and 224, Section II).

What is "implausible" is not that a company in crisis obtains credit; what is legally untenable is to claim that it cannot obtain it.

**(D)** The comparison made by the respondent between the Merchant's shareholders' equity and the amount of the loan lacks technical and legal merit; the viability of financing is not assessed by comparing the borrower's shareholders' equity with the amount of

the credit line, but rather based on cash flows, assets, the structure of the transaction, and collateral; and that assessment was, in any case, the responsibility of the lender, as part of the risk that it—and it alone—was required to assume.

**(E)** Finally, it must be noted that, far from harming the Estate, the financing provided it with a net and quantifiable benefit, as it allowed for the extinguishment of enforceable tax liabilities with a reduction in ancillary charges in the amount of approximately $1,800,000,000.00 (one billion eight hundred million pesos 00/100 M.N.) under the Federal Tax Code, as explained in detail in the response to Fact 21 of this Motion.

**14.—**The corresponding fact being answered to is, for procedural purposes, denied, and the clarifications provided in the response to the immediately preceding fact are reproduced here as if inserted verbatim.

In addition to the foregoing, the following is noted: the very fact being answered demonstrates that my client provided, with its Petition for Bankruptcy Proceedings, financial information updated as of January 31, 2026—*the very month the Credit Agreement was entered* into—which confirms the full availability and transparency of said information. Likewise, the figures transcribed by the petitioner, whatever they may be, contribute nothing to the elements of the action brought, as they do not identify any act by the Merchant, nor any agreed-upon condition that deviates from market standards, nor any harm to the estate; at most, they establish the state of insolvency that constitutes the prerequisite—*not the proof*—of the bankruptcy proceeding.

ALFREDO VAZQUEZ MEYER
303030313030303030373134373330383535
04/29/08 4:00:55 PM

**15.-** The corresponding fact being contested is, for procedural purposes, denied. Notwithstanding the foregoing, the following is clarified:

**(A)** The alleged *due diligence* obligations of the creditor set forth by **BONY**—*based on the opinions it submits*—are matters between third parties (*res inter alios acta*); they concern, if at all, AlterBank and its regulator within its jurisdiction, and their observance or non-observance does not constitute an element of any of the provisions of

Articles 113, 114, subsection III, and 115, subsection I, of the LCM, nor does it vitiate any act of the Merchant vis-à-vis the Estate.

If a bank extends a loan without exercising the due diligence required by its regulatory framework—*which it denies occurred in the case at hand*—the consequences are, in any event, regulatory in nature and fall on the bank; they never result in the invalidity of the transaction in the bankruptcy proceedings of its borrower, in this case **TV AZTECA.**

**(B)** Furthermore, the petitioner in the incidental proceeding proceeds from a premise that it fails to substantiate in any way: that AlterBank did not obtain **TV AZTECA's** financial information. This is a mere unilateral inference that is not supported by any evidence.

It is incumbent upon **BONY** to prove the facts constituting the incidental action it is bringing and, therefore, to demonstrate not only the existence of the alleged obligation it attributes to AlterBank, but also its breach and, if applicable, the relevance that such alleged breach would have in establishing any of the grounds for invalidity and creditor fraud provided for in the LCM.

ALFREDO VAZQUEZ MEYER
303030313030303030373134373330383535
04/29/08 4:00:55 PM

**(C)** Furthermore, the concepts to which **BONY** seeks to attribute binding force—*such as "market conditions," "customs and practices," and "sound banking practices"*—do not, in and of themselves, constitute legal provisions whose mere non-compliance would be sufficient to establish the existence of an act in fraud of creditors, but are merely subjective assessments.

Even assuming—without conceding—that certain criteria could be considered standard practices within the financial sector, which is disputed, this does not mean that they constitute legally binding rules, much less that their possible non-compliance automatically triggers any of the scenarios provided for by the LCM regarding fraud against creditors.

Therefore, **BONY** should have first established the existence of the specific obligation it attributes to AlterBank, its legal basis, its validity, and its applicability to the particular case; and, subsequently, objectively demonstrated its alleged breach and the manner in which this would satisfy the elements of the incidental action it seeks to assert—all of which, moreover, would have to have caused damage or harm to the bankruptcy estate. None of this has been proven.

**(D)** On another note, the opinions issued by the so-called experts presented by **BONY** do not constitute legally binding criteria for determining whether the transaction at issue in this proceeding meets any of the legal scenarios provided for in Articles 112 through 115 and other relevant and applicable provisions of the LCM.

In particular, to the extent that **BONY** seeks to base its assertions on provisions or criteria belonging to a foreign legal system, the provisions of Article 1197 of the Commercial Code apply, pursuant to which any party invoking foreign law must prove its existence and applicability to the specific case.

ALFREDO VAZQUEZ MEYER
30303030313030303030303731343733303835 35
04/29/08 4:00:55 PM

For quick reference, the cited legal provision is transcribed below:

> **Article 1197.—**Only facts are subject to proof; the law is subject to proof only when it is based on foreign laws; the party invoking such laws must prove their existence and their applicability to the case.

In the same vein, the ruling issued by the Fifth Collegiate Court for Civil Matters of the First Circuit is applicable, which reads as follows:

> Supreme Court of Justice of the Nation Digital
> Record: 2004213
> Instance: Collegiate Circuit Courts, Tenth Term
> Subject(s): Civil
> Precedent: I.5o.C.42 C (10a.)
> Source: Federal Judicial Weekly and its Gazette. Book XXIII, August 2013, Volume 3, page 1638 Type: Isolated

> **FOREIGN LAW. ITS APPLICATION IN COMMERCIAL MATTERS.** Pursuant to the provisions of Article 1197 of the Commercial Code, when, in a commercial proceeding, there is a need—arising from the natural role of the parties as such—to assess the applicability and application of foreign law, **the parties bear the burden of introducing it into the dispute (burden of assertion) and, furthermore, of proving its existence and applicability (burden of proof)**; and in this regard, it is not valid to argue that the judge, at whatever level, is obligated to apply it ex officio, since foreign law constitutes an exception to the legal principle that the judge knows the law—a principle that applies most fully only to domestic law, whether statutory or case law. **That is to say, since the national judge is not presumed to be familiar with foreign law, it must be invoked and proven by the parties**; this does not, however, impose an excessive procedural burden on them, since in the course of the legal proceedings, for the purpose of preparing a decision that involves the application of a foreign legal system, and if the judge deems it appropriate, in compliance with the provisions of Section I of Article 14 of the Federal Civil Code, the judge may obtain the necessary information regarding the text, validity, meaning, and legal scope of said law; this is to be understood without prejudice to the parties' obligation to fulfill their respective procedural burdens.
>
> FIFTH COLLEGIATE COURT FOR CIVIL MATTERS OF THE FIRST CIRCUIT.
>
> Direct Amparo 740/2010. Spectrasite Communications, Inc. December 15, 2011. Unanimous decision. Reporting Judge: María Soledad Hernández Ruiz de Mosqueda. Clerk: Ricardo Mercado Oaxaca.

ALFREDO VAZQUEZ MEYER
30303030313030303030303737313437333038353535
04/29/08 4:00:55 PM

It follows from the foregoing that, when a party seeks to introduce foreign law into the proceedings, it bears the burden of asserting its existence and applicability and of proving them. In this specific case, **BONY** has not sufficiently proven the existence, validity, content, and applicability of the foreign provisions on which it seeks to base the obligations it attributes to Alter Bank.

Consequently, the opinion issued by so-called experts—*including Renée T. St. Rose, KC*—regarding provisions of foreign law whose existence and applicability have not been duly substantiated, as well as regarding alleged banking customs and practices, cannot substitute for the procedural burden incumbent upon **BONY** nor

constitute, on its own, the legal basis for finding that the elements of creditor fraud under the LCM have been met.

**(E)** As if that were not enough, the opinions cited by **BONY** are private documents prepared at the request of a party, which deal with foreign banking regulations; they do not establish facts, nor the law, nor—*and this is decisive*—the prevailing conditions in the financing market as of the date the transaction was entered into.

It is worth elaborating on the opinion of Ms. Renée T. St. Rose, KC, on which the Respondent bases a significant portion of its case, because that document is NOT suitable for establishing what **BONY** seeks to prove, as evidenced below:

**(a)** By its nature, it is a private document prepared at the request and expense of the Respondent himself, which was not submitted as an expert opinion—*without a questionnaire, appointment, acceptance, or affirmation of the position (Article 267, Section IV, of the Commercial Code)*—and which is not subject to rebuttal by an expert for the opposing party, and whose value is limited to establishing that its author issued it.

ALFREDO VAZQUEZ MEYER
303030313030303030373134373330383535
04/29/08 4:00:55 PM

**(b)** In terms of its subject matter, it deals with the law and regulations of Saint Lucia—that is, foreign law—whose existence, validity, and scope are matters to be proven through the appropriate legal channels (Article 1197 of the Commercial Code), which a partisan opinion does not satisfy.

**(c)** In terms of its content, it is a regulatory opinion, not a market study; it addresses licenses, minimum capital, exposure limits, and reporting obligations to the Saint Lucia authorities, and does not contain a single interest rate, spread, commission, benchmark, or credit transaction pricing structure in any jurisdiction; in short, nothing that could substantiate *the* "*prevailing market* conditions" required by Article 114, Section III of the LCM.

**(d)** Given her methodology, the author offers an opinion on the characteristics of a contract she did not have before her; therefore, her conclusions regarding the Credit Agreement are based on conjecture about an unknown document, and she herself formulates them in conditional terms and *"based on the available information."*

**(e)** By its very nature, it assesses what a hypothetical *"prudent Class A international* bank" would do—which is an unsubstantiated hypothetical, not a reflection of market data or prevailing market conditions; and

**(f)** In terms of its scope, even taken at face value, its conclusions pertain to the lender's situation vis-à-vis its regulator in Saint Lucia, the consequences of which—*if any*—would be limited to that sphere and jurisdiction, with no capacity whatsoever to render the borrower's acts ineffective vis-à-vis the estate in a Mexican insolvency proceeding. Identical defects in nature, content, and scope affect the opinion submitted by **BONY** as Exhibit 9.

**(F)** Furthermore, **BONY's** assertions rest, in essence, on subjective assessments regarding what the incidental plaintiff itself and the professionals it hired consider *"sound," "prudent,"* or *"ordinary"* within financial practice, without this, in and of itself, implying the existence of unlawful conduct attributable to AlterBank.

The fact that, from **BONY's** perspective, it would have been *"prudent," "ordinary,"* or *"sound"* to obtain certain information amounts to mere assessments and wishes on the part of the incidental plaintiff, but in no way demonstrates that there was a specific legal obligation to do so, that AlterBank breached such an obligation, much less that such an alleged breach would result in the characterization of an act as fraudulent conveyance under the LCM.

ALFREDO VAZQUEZ MEYER
30303030313030303030303037313437333038353535
04/29/08 4:00:55 PM

This is all the more so given that **BONY** does not provide objective evidence to support its claim that AlterBank actually failed to obtain the information to which it refers and, as noted, the petitioner itself acknowledges that it is unaware of the content of the credit agreement entered into between **TV AZTECA** and AlterBank—a circumstance that further demonstrates the lack of basis for its assertions.

Consequently, the statements contained in the fact being contested constitute mere inferences and subjective assessments that do not establish—not even with

sufficient circumstantial evidence, the existence of a legal obligation breached by AlterBank, much less the fulfillment of the elements of the incidental action for creditor fraud that **BONY** seeks to assert.

**(G)** The argument is also untenable, since if—*as BONY maintains*—my client's financial situation was the minimum information that any institution would have gathered, and that situation was public and well-known, then the lender was aware of it and, precisely for that reason, demanded guarantees and agreed to terms commensurate with the risk—*diligent and ordinary conduct*—thereby eliminating any deception; and if the lender was not aware of it, the knowledge of fraud required of a third party under Article 113 of the LCM is absent. In either scenario, the incidental action lacks an essential element.

**16.** The related allegation being answered, for procedural purposes, is denied, and the clarifications provided in response to the immediately preceding allegation are reproduced here as if inserted verbatim. Regardless of this, the following clarifications are provided:

ALFREDO VAZQUEZ MEYER
30303030313030303030303731343733303835 35
04/29/08 4:00:55 PM

**(A)** The Credit Agreement was entered into in local currency, as a line of credit up to

$5,000,000,000.00 (five billion pesos 00/100 M.N.); the figure of *"USD $290,000,000.*00" reiterated in the corresponding clause is a unilateral conversion by the Petitioner, unrelated to the terms of the agreement, and the amount of the line of credit does not correspond to the amount actually drawn down.

**(B)** However, the mere fact that **TV AZTECA** was experiencing financial distress as of January 2026—*a fact that my client expressly acknowledged in its own Petition for Bankruptcy*—is not, in and of itself, a factor that triggers the legal scenario provided for in Article 114, Section III, of the LCM. That provision requires proof that the terms and conditions actually agreed upon in the transaction deviate significantly from the prevailing conditions in the relevant market in which it was entered into, as of the date of its execution, or from commercial customs and practices; it is not sufficient to establish, in the abstract, that the borrower was experiencing financial difficulties in order for the legal scenario to be deemed to have materialized.

It should also be noted that there is a market segment identified in international financial practice as *"bridge lending," "rescue lending,"* and *"distressed lending,"* which is specifically aimed at companies facing significant financial stress or deterioration. The mere fact that an institution extends credit to a company in such a situation does not, in and of itself, constitute a deviation from market conditions; on the contrary, it is an intrinsic characteristic of that segment of the credit market, in which rates, fees, collateral, and terms naturally differ from those applicable to ordinary investment-grade corporate loans. **BONY** fails to compare the transaction entered into by **TV AZTECA** with comparable transactions in that segment —*the only appropriate exercise under Article 114, Section III, of the LCM*—and instead limits itself to the generic and unverifiable assertion that *"no banking institution"* would have granted the loan, a claim that is contradicted by the mere fact that AlterBank did grant it.

It is important to note that the type of financing described above typically represents, for the lending institution, an attractive business opportunity due to the higher returns and fees it entails, which rationally explains why a financial institution would decide to extend credit to a company in financial distress, without this implying any irregularity. This is so clear that the Commercial Code (LCM) itself allows the Merchant to apply for loans even while in bankruptcy proceedings, subject to certain requirements; therefore, no (unproven) "custom and practice" asserted by the respondent is relevant to the case at hand.

ALFREDO VAZQUEZ MEYER
303030313030303030373134373330383535
04/29/08 4:00:55 PM

Therefore, the assertion that the lender granted the loan *"...when it was more than obvious that TVA was going to default on its payment* obligations…" is mere conjecture that does not constitute a fact. In fact, it must be emphasized that this conjecture proves the opposite of what it intends: namely, that professional lenders lend to companies in financial distress precisely by pricing in that risk—*through the interest rate, the term, and the collateral*—; assuming a high level of risk in exchange for appropriate terms is not participating in fraud, but rather entering into a credit transaction characteristic of the sector. If the predictability of default

were to render the financing fraudulent, there would be no bridge loans, no rescue financing, and no restructuring itself; the petitioner's argument leads, once again, to a de facto prohibition on financing companies in crisis, contrary to the logic of Articles 1 and 3 of the LCM.

**(C)** The assertion that the loan *"...constituted the first new debt with a third party that TVA incurred in at least four* years…," far from favoring the Respondent, corroborates the premise on which this brief is based: my client lacked access to ordinary credit, and the only available market was that for financing companies in financial distress, whose characteristic conditions—*rates, short terms, enhanced collateral, non-traditional creditors*—are precisely those that the Respondent dismisses as *"implausible*." That is the relevant market for the purposes of Article 114, Section III, of the LCM.

The market in which a credit transaction is entered into is not determined by the governing law clause—*which is a conflict-of-laws rule agreed upon to govern the interpretation of the contract*—but rather by the economic reality of the transaction: who the borrower is, in what currency the loan is denominated, where it is disbursed and repaid, what assets secure it, and for what purpose the funds are used.

ALFREDO VAZQUEZ MEYER
303030313030303030373134373330383535
04/29/08 4:00:55 PM

In this case, all these elements have ties to our country: a Mexican borrower; a loan denominated in pesos; disbursement and repayment agreed upon through bank accounts in Mexico; a credit instrument executed in Mexico City and subject to Mexican laws and courts; collateral governed by Mexican law on assets located in Mexico; and the use of the funds consisting of the payment of Mexican taxes. The relevant market is, therefore, that of financing for Mexican companies in financial distress—*a market in which both domestic and foreign creditors participate equally, with cross-border credit being one of its common forms*. But even if any other definition were accepted—*the Saint Lucia market due to the law chosen for the framework agreement, or the international credit market*—the outcome of the Motion would be the same, since the petitioner failed to prove the prevailing conditions of any of those markets, as the evidence submitted does not contain a single rate, margin, benchmark, or pricing structure for

any transaction entered into in any jurisdiction. This lack of evidence renders the incidental action inadmissible.

**(D)** Furthermore, the legal phrase "*deviate* significantly" imposes a comparative, not a rhetorical, burden of proof. Proving this claim required comparing, at a minimum: the exact terms agreed upon in the transaction; the prevailing conditions in the relevant market; the date of execution; comparable transactions; and the magnitude of the deviation. The appellant does not provide a single one of these variables: it does not disclose the rate, the total cost, a comparable transaction, or a study of the financing market as of the date of execution. Without an observed variable, there is no quantifiable deviation, and without a quantified deviation, the presumption under Article 114, Section III, of the LCM does not apply.

Furthermore, the assessment required by the provision is an *ex ante* assessment*;* the transaction must be evaluated based on the information available as of the date of its execution—that is, January 29, 2026—not in light of the subsequent event that the Merchant filed for bankruptcy. **BONY** reasons in the opposite direction: it starts with the bankruptcy proceeding—*which occurred later*—and from there concludes that the debt "obviously" would not be paid. This bias in the argumentation of the motion proves the opposite of what it intends; that is, the subsequent filing for insolvency proceedings does not demonstrate that, at the time the contract was entered into, there was an impossibility of payment or an absence of legitimate purpose; it demonstrates, at most, that in addition to the liquidity obtained, a collective solution was required—*exactly the one currently being processed*. Given that the principle upon which its argument rests—namely, that *it is* supposedly "*implausible that a banking institution* would lend"—has been refuted by the documentary evidence, since an institution did in fact lend, document, and disburse the funds. What the petitioner calls implausible is, quite simply, what actually happened.

Consequently, it is disputed that **TV AZTECA**'s potential insolvency—*on its own*—demonstrates that the loan deviated from market conditions, or that there was bad faith on the part of AlterBank or my client at the time the loan was entered into. Furthermore, as noted, it is common in the market to grant loans to distressed companies (*distressed debt or special situations lending*); one need only review the Commercial Code itself, which provides for the possibility of granting loans even after a declaration of commercial insolvency

ALFREDO VAZQUEZ MEYER
30303030313030303030303731343733303835353
04/29/08 4:00:55 PM

to maintain the company's ordinary operations, such as the payment of taxes; for this reason, the petitioner has neither a valid argument nor a legal right, since in the latter case, the criteria for granting the loan could not be based on shareholders' equity, but rather on the company's needs at that time.

**(E)** It should not be overlooked, then, that, after sixteen allegations, the Plaintiff has still failed to identify a single term agreed upon in the Credit Agreement that deviates from market conditions, nor has the Plaintiff provided a comparable example, a benchmark rate, or a study of the financing market as of January 2026. The Plaintiff's claim simply lacks a legal basis.

**17.-** The corresponding claim being contested, for procedural purposes, is denied. Without prejudice to the foregoing, it is clarified that the lender's business plan and financial projections are internal, forward-looking, and unilateral documents of a third party, which do not constitute facts specific to my client nor do they impose any legal limitation on that third party's capacity to enter into contracts. In this regard, the following is stated:

ALFREDO VAZQUEZ MEYER
30303030313030303030373134373330383535
04/29/08 4:00:55 PM

**(A) BONY's** account of this matter refers, in its entirety, to AlterBank's internal business projections and its own regulatory situation—*a third party unrelated to my client*—and not to the terms and conditions of the loan actually agreed upon by TV AZTECA, nor to the market conditions applicable to it. Although this is not a matter directly concerning my client, it must be noted that Article 114, Section III, of the LCM requires a comparison of the terms of the transaction entered into by the Merchant with the market conditions applicable to that Merchant; it does not, however, authorize an assessment of the lender's compliance with its own internal business projections or with its regulatory framework in a foreign jurisdiction. A bank's "business plan" is nothing more than a projection of what is believed to have happened, but it is certainly not a valid parameter for establishing the Presumptive Party's presumption.

No provision of Mexican law—*nor of any other jurisdiction that has been cited*—makes the validity or enforceability of a credit agreement contingent upon its

consistency with the lender's internal projections; business plans are developed to guide management, and financial institutions routinely enter into transactions that exceed or modify them when their own analysis of risk and opportunity so warrants.

Furthermore, a financial institution's business projections do not constitute mandatory or binding limits, but rather indicative estimates that may legitimately be exceeded when, in the institution's own judgment, business opportunities arise that were not anticipated at the time of their preparation; therefore, the granting of a loan that deviates from such projections is not, in and of itself, indicative of any irregularity

This, then, is a business decision by the bank, which evaluates and assumes its own risks. The reliance on this material reveals, once again, the approach taken in the Motion: rather than identifying and proving the elements required by law—*agreed-upon terms, relevant market, significant deviation,* and *harm to the estate*—it speculates on internal documents of a third party that bear no relation to the contested act or its validity with respect to the estate.

ALFREDO VAZQUEZ MEYER
30303030130303030303037313437333038353
04/29/08 4:00:55 PM

**(B)** As if that were not enough, it is an undisputed fact—*information that the plaintiff in the incidental proceeding itself acknowledges having obtained, after the loan was granted, through the discovery process conducted in the United States*—that my client had neither access to nor knowledge of the contents of AlterBank's business plan, a private, internal, and confidential document of that institution, subsequently obtained by **BONY** through a *discovery* process conducted in the United States. It is legally inadmissible to attribute to my client consequences arising from a third party's deviation—*whether actual or alleged*—from its own internal projections, of which my client had no knowledge and could not have had knowledge at the time the contract was entered into.

**(C)** Once again, the sole basis invoked is the private opinion of an alleged legal expert from Saint Lucia, to which the considerations set forth in Fact 15 above regarding the lack of

accreditation of foreign law pursuant to Article 1197 of the Commercial Code, which I request be deemed reproduced here, as if inserted verbatim, to avoid unnecessary repetition.

**18.** The related allegation being answered is, for procedural purposes, denied, and the clarifications provided in response to the immediately preceding allegation are hereby reproduced as if inserted verbatim. Regardless of this, it is clarified that the business profile attributed to my client by the petitioner himself is accurate: *"…a company with a national and international presence, one of the leading producers and distributors of Spanish-language content worldwide…*". That acknowledgment—*made spontaneously*—disproves the alleged "inexplicability" of the transaction, since a company of that stature, with significant assets, cash flows, and brands, constitutes a borrower with a legitimate interest for any creditor specializing in financing special situations, even if it is experiencing a liquidity crisis.

In any case, the fact that a company of **TV AZTECA's** stature obtains financing from an institution whose stated business model was initially geared toward smaller companies is not, in and of itself, indicative of inefficiency, fraud, or deviation from market practices; if anything, it would be a relevant factor for internal analysis, but it is a matter entirely outside the legal sphere of my client and the scope of this motion.

ALFREDO VAZQUEZ MEYER
3030303130303030303731343733303835535
04/29/08 4:00:55 PM

As for the claim that the loan "*exceeds the* lender's *business plan projections*," we reiterate the arguments made in response to the immediately preceding allegation: a bank's internal plan is not the "market" referred to in Article 114, Section III, of the LCM, and a creditor's deviation from its own projections does not constitute grounds for the invalidity of its borrower's acts. The matters relating to the documents obtained in the foreign *discovery* proceedings do not constitute facts specific to my client and are irrelevant.

**19.**—The corresponding allegation being answered is, for procedural purposes, denied, and the clarifications provided in response to the two immediately preceding allegations are reproduced here as if they were inserted verbatim. Notwithstanding the foregoing, the following is clarified:

**(A)** The argument put forward by **BONY—***that a bank whose business model consists of granting loans to small and medium-sized enterprises could not validly lend to a company with a different profile*—is inconsistent with what the Respondent itself acknowledges, namely, that AlterBank acted in its capacity as *"…structuring agent, initial lender, administrative agent, and collateral agent…*". This contractual structure is typical of syndicated transactions or those intended to be syndicated; the initial lender originates and structures the financing and may assign shares to other creditors without necessarily retaining the entire credit exposure.

The comparison between the amount of the credit line and the lender's capital ignores this expressly agreed-upon structure and is therefore not probative.

ALFREDO VAZQUEZ MEYER
303030313030303030303731343733303835535
04/29/08 4:00:55 PM

**(B)** An institution's commercial purpose does not limit its legal capacity to enter into contracts; Mexican law does not recognize the invalidity of acts under bankruptcy law merely because they fall outside the creditor's business plan.

**(C)** As for the claim that the transaction deviated *"from the regulations governing AlterBank in Saint Lucia*," this once again pertains to foreign regulatory law applicable to the lender, and any failure to comply with such regulations would result in consequences for the bank vis-à-vis its regulator, not the invalidity of the act vis-à-vis the estate in a Mexican insolvency proceeding.

Finally, it must be emphasized that none of the foregoing identifies a condition of the transaction that differs from those prevailing in the relevant market, which was the burden of proof resting on the Respondent; in fact, the Respondent fails to explain what constitutes the alleged ineffectiveness it asserts merely because a loan was granted to a company in financial distress, nor does it explain how this translates into legal invalidity.

**20.** The corresponding allegation, for procedural purposes, is denied. Notwithstanding the foregoing, I would like to make the following statements:

**(A)** First, **BONY's** assertion that it is *"impossible to believe"* constitutes a subjective assessment by the incidental plaintiff, not a fact or suitable evidence to establish the fulfillment of the conditions set forth in Articles 114 and 115 of the LCM. The incidental plaintiff's personal beliefs are not sufficient to prove anything at all.

**(B)** Second, a short maturity period—*such as the six-month period referred to here*—is a common and recognized characteristic of bridge financing, which is specifically designed to meet immediate liquidity needs while a permanent solution is sought, including the eventual conclusion of a restructuring or bankruptcy proceeding. The chronological sequence described by the incidental plaintiff herself—*that is, the execution of the loan on January 29, 2026, and the filing of the Petition for Insolvency Proceedings on March 10, 2026, with the processing and eventual approval of an insolvency agreement still pending*—is fully consistent with this bridging purpose, without implying any fraud.

ALFREDO VAZQUEZ MEYER
3030303130303030303731343733303835353
04/29/08 4:00:55 PM

In the relevant market, short terms are not an anomaly; they are the prevailing condition in the segment, as they reduce the creditor's exposure and encourage the debtor to seek a substantive resolution. BONY's characterization of the maturity date as *"derisory*," and the assertion that *"it is impossible to* believe" that a bank would grant a six-month loan to a company in crisis, are expressions of disbelief, not evidence; the petitioner's disbelief does not constitute a ground under Article 114, Section III, of the LCM, and financial practice disproves his astonishment on a daily basis.

Added to this is an inconsistency that should no longer go unnoticed: the petitioner describes as "derisory" the payment terms of a contract with which she "allegedly" has no familiarity, which reveals the dishonesty with which she conducts herself, as well as the inadmissibility of the alleged *"reservation of* rights" she makes in her petition by claiming

lack of knowledge; rather, what the petitioner seeks is the opportunity to amend her claim, which our legal system does not permit under any circumstances.

Finally, it must be noted that the imminent maturity of a debt does not reduce the estate, does not grant preference to anyone, and does not harm any creditor; therefore, it does not fall under any of the grounds for the action brought.

**21.** The corresponding fact being contested, for procedural purposes, is denied. Notwithstanding the foregoing, it is clarified that the transcript provided by the petitioner himself establishes against him the facts that completely invalidate the action brought, as set forth below:

**(A)** First, it establishes the **<u>lawful purpose and genuine need</u>** for the financing. According to the transcript itself, my client faced tax liabilities determined by the tax authority in the amount of billions of pesos, subject to immediate enforcement through the administrative enforcement procedure provided for in the Federal Tax Code—*seizure of accounts, seizure of income*. That risk was real, current, and imminent; the suspension of tax enforcement proceedings provided for in Article 69 of the LCM takes effect only as of the judgment declaring commercial insolvency, which in this case was not issued until July 6, 2026, so that in January 2026—*the date the loan was taken out*—the tax authority retained its full and unrestricted collection powers over the Merchant's cash assets. Obtaining urgent liquidity to meet that liability and avoid operational paralysis was not a fraudulent scheme; it was an act of diligent management to protect the company and, with it, the source of payment for all creditors.

ALFREDO VAZQUEZ MEYER
303030313030303030373134373330383535
04/29/08 4:00:55 PM

As anticipated in the Preliminary Chapter, the urgency with which the financing was arranged is not a characterization of my client; it is documented by the tax authority itself. As of January 9, 2026, all the conditions for immediate enforcement were simultaneously met: **(i)** final tax assessments—*with all avenues of defense exhausted*—; **(ii)** tax interest guaranteed as of October 28, 2025, through the

of the very negotiation conducted by my client through administrative channels (Article 141, Section V, of the Federal Tax Code); **(iii)** a formal demand for payment by $8,691,492,061.56 (Eight billion six hundred ninety-one million four hundred ninety-two thousand sixty-one pesos 56/100 M.N.), with a payment term of 5 (five) days; **(iv)** the administrative enforcement proceeding already initiated; and **(v)** the express warning, contained in the demand itself, that in the event of nonpayment, the authority would proceed, at its discretion, either to enforce the guarantee through the administrative enforcement proceeding or to transfer the funds from the Merchant's accounts pursuant to Article 156-Ter of the Code. Under Mexican law, there is no situation that leaves a party more vulnerable to enforcement than this one.

The consequences of nonpayment were not a matter of speculation; they are regulated, step by step, in the Federal Tax Code, as evidenced by: **(i)** the direct transfer of bank deposits (Article 156-Ter), that is, the immediate seizure of the Merchant's accounts up to the required amount; **(ii)** the enforcement of the guarantee, that is, the seizure of the business and all assets that belong to it in fact and in law (Article 151, Section II), with the appointment of a receiver paid from the company's funds who, after setting aside salaries and essential expenses, withholds up to 10% of the company's total daily revenue to be turned over to the tax authorities (Article 165); such a receiver may even cause the authority to order the administration of the business—*an administrative receiver appointed by the SAT, with all the powers of the governing body, including the authority to dispose of assets, without being subject in any way to the board of directors or the shareholders' meeting (Article 166)*—or its disposition; and **(iii)** if the foregoing is insufficient, the sale of the business or its assets at public auction, with the possibility of the tax authority being awarded the assets at 60% of their value (Articles 172 through 191). In short, without payment, my client faced—*in a matter of days, not months*—the loss of its cash reserves, the seizure of its revenues, and potentially the loss of control over its management or the forced sale of the company itself.

It is worth emphasizing what that scenario would have meant for the creditors as a whole, which is the perspective from which this matter must

ALFREDO VAZQUEZ MEYER
30303030130303030303731437333038535
04/29/08 4:00:55 PM

be judged. The tax authority's enforcement proceedings take place prior to and outside of any bankruptcy proceedings, with the proceeds being applied preferentially to enforcement costs, surcharges, and fines before the principal debt; had this been carried out, the following would have been removed from the Merchant's assets
$8,691,492,061.56 (Eight billion six hundred ninety-one million four hundred ninety-two thousand sixty-one pesos 56/100 M.N.) required, including fines and late payment penalties; the company would have been paralyzed or placed under receivership, destroying the value of the productive unit that constitutes the source of payment for all creditors; and the court-ordered restructuring currently pending before Your Honor would have been simply impossible, since a company with no cash on hand, with its revenues seized or its management in the hands of a SAT administrator, is not in a position to prepare a petition for bankruptcy, negotiate with its creditors, or remain in operation as a going concern.

The payment made with the contested financing produced exactly the opposite effect, on three levels: **(i)** it prevented the enforcement of $8,691,492,061.56 (eight billion six hundred ninety-one million four hundred ninety-two thousand sixty-one pesos 56/100 M.N.), yielding a benefit of approximately $1,856,303,526.00 (one billion eight hundred fifty-six million three hundred three thousand five hundred twenty-six pesos 00/100 M.N.); **(ii)** it preserved the company's cash flow, operations, and control, keeping the community's source of payment intact; and **(iii)** finally, something very important that deserves to be highlighted: the tax authorities collected through enforcement proceedings, outside of any general legal process and with priority over all others.

ALFREDO VAZQUEZ MEYER
30303031303030303037313437333033835 35
04/29/08 4:00:55 PM

**(B)** It verifies the **destination and use of the funds**. The very document on which the appellant bases its action admits that the financing was obtained and used *"to address the tax liabilities and mitigate the risk of operational paralysis*," which in fact occurred in that manner. The funds were added to the Merchant's assets, and of these, $3,925,150,202.00 was applied to the payment of the aforementioned tax liabilities, under the terms specified below.

However, that payment produced an additional, net, and quantifiable benefit for the Estate: as a result of the settlement of the tax liability, my client availed itself, under the terms

the Federal Tax Code, to the benefits of reduction and waiver of the corresponding ancillary charges, resulting in a **reduction of the liability in the amount of approximately $1,856,303,526.00 (one billion eight hundred fifty-six million three hundred three thousand five hundred twenty-six pesos 00/100 M.N.)**.

In other words, through the transaction that the Investigator labels as fraudulent, the Merchant replaced a due and enforceable tax liability with a term financial liability of a substantially lower amount; the total liability was reduced, cash flow was preserved, and the company continued to operate.

The documented sequence of events demonstrates that the contested financing not only addressed a real and imminent need but also produced a net benefit for the estate—a benefit that was precise and quantified by the tax authority itself, as follows:

**(a) Final tax assessments.** By Resolution 900-03-00-00-00-2016-4978, dated April 1, 2016, the Central Administration for the Audit of Corporate Groups of the General Administration of Large Taxpayers of the SAT assessed my client a tax liability for omitted consolidated income tax for fiscal year 2009, including adjustments, surcharges, and penalties; and by Resolution 900-03-00-00-00-2017-767, dated January 13, 2017—*amended by Resolution No. 900 09 01-2017-12702, dated December 14, 2017*—it assessed a tax liability for income tax for the 2013 fiscal year, including related charges. Both credits were contested by my client through all available means of defense and became final and enforceable.

**(b) The security over the company itself.** As of October 28, 2025, by means of Official Letter No. 400-75-00-03-04-2025-29161, the tax authority deemed the guarantee of the tax claim accepted under the terms of Article 141, Section V, of the Federal Tax Code, consisting of the **administrative attachment, in its negotiation form, of TV AZTECA, S.A.B. DE C.V.** In other words, the tax authority's guarantee was the company itself as a single entity, such that the tax enforcement did not threaten an isolated asset, but rather the

ALFREDO VAZQUEZ MEYER
30303030313030303030303731343733303835355
04/29/08 4:00:55 PM

entire source of the Merchant's income and, with it, the source of payment for all its creditors.

**(c) The Payment Demand:** On **January 9, 2026**, via official letter 400-75-00-00-00-2026-1130, the Federal District Decentralized Tax Collection Administration "4" **demanded that my client pay both tax liabilities within five days**, quantifying them—adjusted for inflation as of that date—at $3,901,434,927.30 (fiscal year 2009) and $4,790,057,134.26 (fiscal year 2013)—*that is,* ***$8,691,492,061.56 in total***—**with** the **an express warning** that, if payment were not made, **it** would proceed, without distinction, to **enforce the guarantee—*the seizure of the transaction*—**through the administrative enforcement proceedings (Articles 143, 145, and 173 through 194 of the CFF), **or by transferring funds from the Merchant's accounts pursuant to Article 156-Ter of the Code itself**, with enforcement costs having already been incurred. It should be noted that the figures of "$3,902" and "$4,790" million pesos, which the Respondent himself cites in his Fact 21, correspond precisely to the amounts in this demand; his own brief confirms that the risk of enforcement was real, current, and imminent—not a fabrication by my client.

ALFREDO VAZQUEZ MEYER
3030303013030303030373134373330383535
04/29/08 4:00:55 PM

The facts described in subsections (a), (b), and (c) are substantiated by official letter No. 400-75-00-00-00-2026-1130, File No. SAT-8S.4-2026 dated January 9, 2026, from the General Tax Collection Administration of the SAT, which is attached to this brief as **Exhibit No. 5).**

**(d) The benefits obtained are conditional upon immediate payment. On January 28, 2026**, my client requested the benefits provided for in Article 70-A of the Federal Tax Code, and on that same date, the authority granted them through resolutions contained in official letters 400-75-00-00-00-2026-2940 (fiscal year 2009) and 400-75-00-00-00-2026-2941 (fiscal year 2013): a 100% reduction in the principal fines and the application of the surcharge rate for extensions set forth in Article 8 of the Federal Revenue Law, in lieu of late payment surcharges. Both resolutions were expressly conditional upon payment being made within fifteen days

– *the one for fiscal year 2013 was also conditional on payment of the 2009 tax liability* – with the warning that, otherwise, they would be rendered null and void and administrative enforcement proceedings would be initiated or continued immediately. The payment reference numbers were issued on that same day, January 28, 2026.

The foregoing is evidenced by: (i) Official Letter No. 400-75-00-00-00-2026-2940, dated January 28, 2026, from the General Tax Collection Administration of the SAT, which is attached to this letter as **Exhibit No. 6); (ii)** Official Letter No. 400-75-00-00-00-2026-2941, dated January 28, 2026, from the General Tax Collection Administration of the SAT, which is attached to this document as **Exhibit No.**
**7); (iii)** the tax assessment notice with document number 44-132600001701, dated January 28, 2026, which is attached to this letter as **Exhibit No. 8);** and
**(iv)** the tax assessment notice with document number: 44-132600001702, dated January 28, 2026, which is attached to this letter as **Exhibit No. 9).**

**(e) The bridge loan and the payment:** on **the same day. On January 29, 2026,** my client entered into the Loan Agreement with AlterBank and, on that same day, paid both tax liabilities via electronic transfers: at 11:56 a.m., $2,657,170,823.00 (fiscal year 2009), and at 12:32 p.m., $1,267,979,379.00 (fiscal year 2013), that is,
**$3,925,150,202.00** in total, thereby covering both tax credits. The correspondence between the financing and its intended use is not a matter of inference; it is documented and dated identically. This constitutes a bridge loan—immediate liquidity for an urgent and quantified need.

ALFREDO VAZQUEZ MEYER
3030303130303030303731343733303835 35
04/08/29 4:00:55 PM

The foregoing is substantiated by the receipts for said electronic transfers, which are attached to this brief as **Annexes 10)** and **11)**.

**(f) The exact benefit to the Estate.** According to the tax authority's own quantification in the aforementioned resolutions, the benefits obtained as a result of the payment amounted to **$1,856,303,526.00 (one billion eight hundred fifty-six million**

**three hundred three thousand five hundred twenty-six pesos 00/100 M.N.)**, broken down as follows: for fiscal year 2009, $417,817,205.00 representing the difference between late-payment surcharges and extension surcharges, plus

$826,446,897.00 in fines reduced to 100%; and for fiscal year 2013, $210,050,611.00 in surcharges, plus $401,988,813.00 in fines reduced to 100%. In other words: had they not been paid at that time, those same claims would have amounted to

$5,781,453,728.00; they were settled for $3,925,150,202.00. **The Merchant's liability was reduced by $1,856,303,526.00—*32.11% of the tax debt*—precisely by virtue of the transaction that the Petitioner seeks to invalidate.**

**(g) Conclusion.** The Estate suffered no harm whatsoever; it received the financing proceeds, applied them to the settlement of a firm, enforceable liability secured by the transaction itself, avoided enforcement against its source of income and its accounts, and obtained a net reduction in its liabilities of more than 1,800 million pesos, to the direct benefit of the community of creditors—*including those the Petitioner claims to represent*.

ALFREDO VAZQUEZ MEYER
3030303130303030303731343733303835535
04/29/08 4:00:55 PM

**(C)** That said, we are dealing with a real, genuine, and verifiable transaction—what is known in financial practice as a *"true* sale"—which is supported by documentary evidence.

**BONY's** entire argument rests on the insinuation that the contested transaction was a sham, an act *"carried out for appearances' sake*." The most compelling response to that insinuation is not rhetorical but documentary: the transaction meets, one by one, the criteria that, in financial and accounting practice, distinguish a real and genuine transaction from a sham transaction—for example: effective economic substance, actual transfer of funds, reciprocal consideration, complete traceability of cash flows, accounting records, and a verifiable business purpose. None of these attributes is a matter of faith; all are documented in records issued by third parties—*the tax authority and banking institutions*—whose authenticity does not depend on the word of my client. To elaborate on this, and without prejudice to the fact that it has already been demonstrated, I would like to reiterate the following:

(a) **<u>The underlying debt was real, preferential, and enforceable</u>.** The transaction was not based on a fabricated need, but rather on final tax assessments determined by the SAT in 2016 and 2017, secured as of October 28, 2025, by an administrative attachment of my client's business operations, and formally demanded for payment on January 9, 2026 — *Official Letter 400-75-00-00-00-2026-1130*—with a five-day deadline and an express warning to enforce the security interest against the company or transfer the funds from its accounts (Article 156-Ter of the Federal Tax Code). There is no liability more real than that which the creditor—*the federal tax authority*—quantifies, demands, and is legally entitled to collect coercively from the company's cash reserves and the entire productive unit.

(b) **The credit is real.** The financing was not an abstract assumption of debt; it was a committed line of credit, in accordance with Clause 2.02, for the payment of tax obligations and general corporate purposes, and drawn down in a partial and measured manner. This conduct is the exact opposite of that of someone who creates artificial liabilities. The partial and measured drawdown of a committed facility is, in financial practice, the typical indicator of financing for a specific purpose (*use of proceeds*) and not of a transaction carried out for convenience.

(c) **The cash flows occurred.** On January 29, 2026, my client paid the SAT via fully identified electronic funds transfers, in amounts that match exactly—not a single peso more or less—the payment reference numbers issued by the authority itself on January 28, 2026. The entire chain is verifiable from start to finish: request → resolutions → payment reference numbers → transfers → payment certifications. That is full traceability—the opposite of a sham transaction.

ALFREDO VAZQUEZ MEYER
30303030313030303030373134373330383535
04/29/08 4:00:55 PM

(d) **(d) The payment was made immediately: the funds allocated for payment were received and disbursed on the same day to the tax authority.** Between the execution of the Credit Agreement and the payment of the corresponding amounts, there was no diversion or discretionary transfer of funds. Furthermore, the final recipient of the funds was the Federal Treasury. Fraudulent or simulated transactions are characterized by the fact that the money does not exist, does not move, or is returned through circular channels to the person who provided it or to their associates (*round-tripping*); it is conceptually impossible to construct such a scheme when the ultimate and verified beneficiary of the cash flow is the federal treasury. No one sets up a sham whose sole effect is to pay taxes.

In short, there is not a single fictitious element in this transaction that the proposed lawsuit could challenge. There was a real debt, a real credit, a real cash flow, a real payment to a real public creditor—*whose debt even the federal executive branch itself made public*—and a real benefit for the Estate. Faced with a transaction of this nature—*verifiable link by link with official documents*—the allegation of an *"act carried out for the sake of* appearance" not only lacks evidence but also lacks any basis. And that comprehensive, documented reality of the transaction is, at the same time, the most eloquent demonstration of the good faith with which my client conducted herself—whereas the other party simulates, conceals, and obfuscates; my client arranged, paid, recorded, and disclosed.

Furthermore, actions against acts by the debtor to the detriment of creditors challenge actual acts—*and therefore require the intent to diminish solvency (consilium fraudis) and actual harm (eventus damni)*—whereas an action for simulation challenges fictitious acts, which exist only in appearance.[1] The appellant himself dispels any doubt regarding the nature of the act, as he bases his entire case on the existence, amount, due date, and effects of the claim—*he does not assert, nor could he assert, that the act is fictitious, since the bank disbursement, the receipt of the funds, their documented payment to the tax authorities, and the accounting entry are incompatible with any fiction*. Consequently, we are dealing with a genuine act, and therefore the plaintiff's claim required proof of fraudulent intent and actual harm; yet the record in this case proves exactly the opposite, namely, a purpose agreed upon in writing and a net benefit to the estate.

ALFREDO VAZQUEZ MEYER
3030303130303030303731343733303835 35
04/29/08 4:00:55 PM

**(D)** Even if there were any grounds that could render the transaction invalid—which is categorically denied—at best, the rule on inadmissibility set forth in the penultimate paragraph of Article 114 of the LCM would apply to the letter, namely, *"…A declaration of invalidity shall not be granted when the Estate benefits from payments made to the Merchant…,"* that is, even if it were considered that the Credit Agreement and the Amending Agreement deviated from market conditions—*which is categorically and emphatically denied in light of what has been set forth throughout this brief*—in any event, the estate would have substantially benefited from the payments made to the merchant,

---

[1] This was explained by the Third Chamber of the Supreme Court of Justice of the Nation in the legal precedent titled ***"PAULIAN ACTIONS AND ACTIONS FOR SIMULATION: THE DIFFERENCE BETWEEN THEM***," Fifth Epoch, Federal Judicial Weekly, Volume LIV, page 1796, digital record number 357275.

Therefore, in accordance with the express provisions of our legal system, the declaration of invalidity sought in this motion is NOT admissible, rendering the motion inadmissible.

Furthermore, the terms of the loan, taken in their strictest literal sense, constitute payments made to the Merchant; and the Estate benefited from them in the two ways described: (a) extinguishment of enforceable liabilities and (b) a net reduction in total liabilities. On that basis, even under the hypothetical—and unaccepted—scenario that any of the arguments invoked by **BONY** were deemed valid, a declaration of invalidity would be legally inadmissible by express provision of the law. Finally, it is telling that the Motion remains completely silent on the destination and use of the funds; this silence amounts to an omission of the core element of the action—*the harm to the Estate*—the absence of which is demonstrated, paradoxically, by the transcript contained in the very document to which this response is addressed.

**(E)** Added to all of the above is a fact that **BONY** maliciously fails to disclose, even though it comes from the very document that serves as the basis for its position. The payment of taxes is a conduct expressly provided for and mandated by the very issuance agreement administered by the Respondent: Section 3.4 (*Payment of Taxes*) obligates the issuer to pay or settle all taxes, levies, and government charges imposed upon it, with the sole exception of those contested in good faith through the appropriate procedures. The tax assessments for fiscal years 2009 and 2013 were covered by that exception while they were being litigated; once they became final, the exception ceased to apply, and their payment fell fully within the obligation set forth in Section 3.4, whose standard—to pay taxes even before they become delinquent—all the more requires their settlement when they are final, enforceable, and due. The contested financing specifically funded the fulfillment of that contractual obligation assumed toward the noteholders themselves, the evident purpose of which is to prevent the tax authority—*a coercive and preferential creditor*—from seizing the assets that constitute the source of payment, not only for the notes and noteholders but for each and every one of the merchant's creditors.

ALFREDO VAZQUEZ MEYER
3030303130303030303731343733303835353
04/29/08 4:00:55 PM

The contested financing specifically funded compliance with Section 3.4 of *the Indenture* itself. Thus, the trustee is here challenging the validity of the act that allowed the issuer to fulfill the obligation imposed on it by its own contract—a contradiction that no theory of fraud can overcome, since no one can validly act against their own acts or characterize as fraudulent the fulfillment of what they themselves agreed to.

Likewise, the Intervenor's procedural conduct regarding this clause is revealing. Its intervening brief invokes the issuance agreement as the basis for its position, quotes from it whatever it deems convenient, and remains completely silent on Section 3.4—the only provision of that instrument directly relevant to assessing the purpose of the act it challenges.

**22.-** The corresponding fact being contested is, for procedural purposes, denied. Notwithstanding the foregoing, the following is clarified:

**(A)** There is no contradiction, as the opposing party seeks to construct, between the purpose of the loan—*to safeguard the operation*—and the provision of collateral. Urgent financing and security are an inseparable pair in the credit market; no creditor lends to a company in financial distress on an unsecured basis, and the requirement of security is the natural, diligent, and ordinary conduct of any creditor who perceives a high risk; that is, precisely, the economic purpose of security.

ALFREDO VAZQUEZ MEYER
3030303013030303030373134373330383535
04/29/08 4:00:55 PM

In fact, if the provision of security interests in favor of the lender is an ordinary, customary, and expected practice in any standard financing transaction—even more so in those directed at companies experiencing financial difficulties, where lending institutions demand greater coverage precisely because of the risk assumed— The fact that the loan is secured does not contradict, but rather reinforces, its nature as defensive financing, since it was precisely through the provision of

sufficient security that **TV AZTECA** was able to access the required liquidity during an adverse period.

**BONY's** criticism amounts to arguing that the normal course of action would have been to lend five billion pesos without any collateral—which would indeed be an inexplicable transaction in any market.

**(B)** The assertion that *"...it is difficult to believe that TVA did not foresee the possibility of the guarantees being* enforced…" is a conjecture based on subjective assumptions that is refuted; the legally relevant expectation was exactly the opposite: without the financing, enforcement—*by the tax authorities*—was not a possibility, but an imminent reality. Between a potential and remote risk and a current and immediate one, a diligent administration addresses the latter. None of this constitutes any grounds for a finding of ineffectiveness.

ALFREDO VAZQUEZ MEYER
30303030313030303030303731343733303835
04/29/08 4:00:55 PM

**23.-** The corresponding fact being contested, for procedural purposes, is denied, and the clarifications set forth throughout this response are reproduced here as if they were inserted verbatim. Notwithstanding the foregoing, it is clarified that **BONY's** argument—*which concerns the risk that the transaction would have posed to the creditor's "own economic viability and business continuity"*—relates entirely to the business risks of a third party, which are neither facts specific to my client nor elements of the action brought.

As noted, determining the risk a financial institution is willing to assume in a specific transaction—and the conditions under which it assumes that risk—is a matter for that institution in the exercise of its contractual freedom;[2] moreover, assuming and brokering risk is the very essence of the lending business. If the lender considered the risk to be high, it managed it exactly as required by standard practice, demanded collateral, and agreed to appropriate terms. And if its decision had exceeded its internal or regulatory parameters, the consequences—*whether prudential, regulatory, or business-related*—would fall on the bank

[2] **Commercial Code**. **Article 78.—**In commercial agreements, each party is bound in the manner and on the terms that it appears the party intended to be bound.

and for the bank, within its jurisdiction; the borrower is not responsible for the creditor's prudence, and no imprudence on the part of the creditor—*whether actual or alleged*—renders the transaction fraudulent or authorizes depriving it of its legal effect vis-à-vis the estate, much less when the estate derived a net benefit from the transaction. The term "absurd" used by the opposing party is an adjective, not a legal presumption.

**24.** The corresponding fact to which this response pertains is denied for procedural purposes, with the clarification that it does not contain facts but rather arguments regarding international standards and foreign law, the applicability of which to this case is likewise denied, as follows:

**(A)** First, the Agreements and Principles of the Basel Committee on Banking Supervision—*including Principle 5 on exposure limits, which the opposing party invokes*—are not in force or applicable in Mexico, nor in any jurisdiction, on their own.

The Basel Committee is a forum for cooperation among supervisory authorities, with no regulatory authority; its agreements are guidelines or coordination principles—*"soft law"*—that take effect only to the extent and under the terms that each State incorporates them into its domestic regulations, and are intended for regulators and financial institutions, not borrowers or the transactions they enter into. Any failure to comply with them could potentially result in regulatory consequences for the institution in its home jurisdiction; it would never render transactions entered into by the borrower ineffective in the context of a Mexican insolvency proceeding.

The foregoing is not an interpretation by my client; it is the statement of the body itself. The Basel Committee on Banking Supervision expressly acknowledges, in its own Charter, that it lacks formal supranational authority and that its decisions have no legal force, since its standards only apply to the extent that each jurisdiction incorporates them into its domestic law. In other words, the very source that the Respondent holds up as *a "market* benchmark"—*even though it is not one*—declares that it is not applicable law

ALFREDO VAZQUEZ MEYER
3030303031303030303030373134373330383535
04/29/08 4:00:55 PM

applicable. The ineffectiveness of a legal act cannot be argued on the basis of guidelines that the issuer itself characterizes as legally non-binding.

**(B)** Second, these standards also do not constitute the benchmark set forth in Article 114, Section III, of the LCM. That provision refers to *"prevailing market* conditions"—that is, an economic and transactional reference—specifically, what rates, terms, guarantees, and structures are actually agreed upon in comparable transactions and in accordance with commercial customs or practices. Prudential guidelines on how a bank should measure its capital and risk concentration are one thing; the market conditions of financing transactions are something entirely different, and the Motion confuses the two from start to finish.

**(C)** Furthermore, Section 15 of the International Banks Act of Saint Lucia and "Guidance Note 11" issued by its regulatory authority constitute foreign regulatory law governing the lender's relationship with its supervisor; their content and scope are, moreover, matters of evidence that cannot be satisfied by the opinions of the parties.

ALFREDO VAZQUEZ MEYER
30303030130303030303737313437333030383535
04/29/08 4:00:55 PM

**(D)** Finally, with regard to *the* "ext*reme risk* concentration" that BONY attributes to AlterBank, this is, once again, a prudential metric of the creditor—*how much risk the bank concentrates on a specific client and transaction*—not a stipulated condition of the transaction nor a defect therein. All of this, in short, is irrelevant to the litigation.

In fact, any *"risk concentration"* that the transaction might represent for AlterBank is, in any case, the result of a business decision and internal risk management by that institution, entirely beyond the knowledge, control, and responsibility of my client, who has no reason to know nor is obligated to verify the regulatory limits on credit exposure applicable to its lenders under the alleged regulations of a foreign jurisdiction.

**25.-** The related fact that is being contested, for procedural purposes, is denied. Notwithstanding the foregoing, it is important to note the following:

**(A)** In the case at hand, **BONY** argues**:** **(i)** that the mortgage guarantees in question were established as a second lien, behind a preexisting mortgagee with higher priority; **(ii)** that they are registered in the Public Registry of Concessions—*a public record that precludes the theory of concealment*—; and **(iii)** that their creation occurred through the creditor's accession to the security arrangement originally established on September 23, 2020, that is, more than five years prior to the retroactive date.

Contrary to **BONY's** argument, the creation of second-priority mortgage security interests is a common commercial and banking practice, particularly in rescue or bridge financing transactions in which the property serving as collateral is already encumbered; the lender's acceptance of such collateral constitutes a business decision on its part, based on its own assessment of risk, the residual value of the property, and other factors it deemed relevant, without this, in and of itself, being indicative of any fraud or irregularity attributable to my client.

ALFREDO VAZQUEZ MEYER
3030303130303030303731343733303383535
04/29/08 4:00:55 PM

That said, it is clear from the petitioner's own account that, in any event, no new lien was created; rather, a creditor was added to a preexisting arrangement, and that creditor was placed in a position subordinate to that of a third party.

It should also be noted that **BONY** commits an inconsistency in the matter at hand, since if—*as it asserts based on the accompanying opinion*—"*...the mitigation of credit risk normally provided by a mortgage guarantee is, based on the available information, substantially reduced in the present case...,"* then the guarantee did not confer any advantage on its beneficiary. In the case at hand, since this involves a second-lien mortgage and a security interest that—*according to the petitioner himself*—lacks risk-mitigating effectiveness, such an advantage does not exist at all. There is no preferential treatment where there is no advantage**.** Considerations regarding what *a "prudent Class A international* bank" would or would not accept are, ultimately,

biased opinions regarding external prudential standards, which are contested and have no bearing whatsoever on the elements of the action sought to be clarified in this motion.

**26.** The corresponding fact being contested, for procedural purposes, is denied. Notwithstanding the foregoing, it is clarified that the dates and corporate acts referred to in the corresponding fact are set forth in the documents cited, the full content of which must be taken into account; what is denied is the conclusion drawn from them, based on the following:

**(A)** First, the chronology described by the petitioner himself refutes his argument, since the Credit Agreement was entered into on January 29, 2026—that is, before the publication of the notice convening the meeting (February 10, 2026) and before the meeting that approved the request for bankruptcy proceedings (February 26, 2026). Since, at the time the act whose invalidity is being challenged took place, there was no notice, deliberation, or corporate resolution regarding the bankruptcy proceeding, it is logically and chronologically impossible that said act could have been carried out *"with* knowledge" of a petition that no corporate body had even considered.

ALFREDO VAZQUEZ MEYER
30303030130303030303037313437333038535
04/29/08 4:00:55 PM

**(B)** Second, the Amending Agreement of March 6, 2026, was not a new financing decision nor did it create additional debt; rather, it documented and restated the obligations arising from the Credit Agreement and formalized the guarantees provided for in Clause 5.05 of the Credit Agreement from the time of its execution; compliance with previously assumed contractual obligations is not an act of bad faith; it is the fulfillment of a contract.

This is relevant because the granting of the guarantees does not even fall under the presumption set forth in Section I of Article 115 of the LCM. The statutory requirement stipulates that *"...the original obligation did not provide for such a guarantee or increase..."*; in this case, the exact opposite is true: the provision of the guarantees was agreed upon at the time the Credit Agreement was entered into on January 29, 2026 (Clause 5.05), and the Amending Agreement of March 6, 2026, merely formalized—*in fulfillment of a preexisting obligation to perform*—what the original obligation already

provided for. There was, therefore, no subsequent guarantee whatsoever; there was performance of the contract, and the fulfillment of the agreed-upon terms does not give rise to any presumption of fraud.

**(C)** Likewise, the assertion that *"...there was no alleged imminence of enforcement proceedings by the tax* authority…" is inaccurate, because Article 69 of the LCM suspends such proceedings. The text of the provision is unequivocal: the suspension of administrative enforcement proceedings is an effect of the judgment declaring commercial insolvency, which in this case was issued on July 6, 2026. Between January and March 2026—*the period during which the proceedings took place*—no suspension existed nor could it have existed, and the tax authority retained its full and unrestricted powers of compulsory collection against the Merchant's assets. The petitioner's interpretation presupposes that the mere intention to file for bankruptcy suspends tax enforcement—*a view that lacks any legal basis*—and leads to an absurd result: that the merchant must remain defenseless against the enforcement of its assets for the entire time it takes to prepare and file its petition.

ALFREDO VAZQUEZ MEYER
3030303130303030303731343733303835353
04/29/08 4:00:55 PM

**(D)** Finally, it must be noted that preparing in an orderly manner for a voluntary commercial reorganization is not bad faith; it is a duty of diligent management and conduct protected by the principle of preserving the business that underlies the Commercial Reorganization Law (Articles 1 and 3). The law does not require the merchant to enter reorganization in a paralyzed and dismantled state; it requires exactly the opposite. And the full disclosure of the financing in the Insolvency Petition itself—*under oath*—is the most eloquent proof of the good faith with which my client conducted itself, good faith that, moreover, is presumed.

It is entirely standard practice and consistent with responsible financial management for a company facing financial difficulties to formalize, document, and register the collateral corresponding to previously contracted financing, while simultaneously proceeding with the corporate actions necessary to enter an orderly insolvency proceeding. These two actions are not incompatible with one another but rather complementary within the same transparent financial restructuring process, initiated and documented by **TV AZTECA** itself without any concealment from its

creditors, as evidenced by the Insolvency Petition itself, in which the debt owed to AlterBank was acknowledged and disclosed.

**27.** The related allegation being answered, for procedural purposes, is denied, and the clarifications provided in response to the immediately preceding allegation are reproduced here as if inserted verbatim. Notwithstanding the foregoing, the following should be noted:

In the fact in question—*which is categorically denied both in its premises and in its conclusion*—**BONY** asserts that **TV AZTECA** entered into the credit agreement and its amendment *"knowing full well"* that it would file for bankruptcy, thereby demonstrating its bad faith, since—*it argues*—there was no alleged imminence of a tax enforcement proceeding, given that, pursuant to Article 69 of the LCM, the declaration of bankruptcy suspends administrative proceedings for the enforcement of tax claims. In this regard:

**(A) BONY** proceeds from a legally erroneous premise, which consists of equating the mere filing of the Petition for Bankruptcy—*and even the preparatory corporate acts preceding it*—with the suspension of tax enforcement proceedings provided for in Article 69 of the LCM. However, this automatic suspensive effect does not occur upon the convening of a shareholders' meeting or upon the mere filing of the petition, but only once a judgment has been issued declaring the business in commercial insolvency; although it is true that, from the time the petition is filed, the bankruptcy judge has the authority to order precautionary measures that, where appropriate, may suspend enforcement proceedings, this is a discretionary power of the judge, the exercise of which could not be taken for granted or guaranteed by my client at the time the Credit Agreement was signed. In this specific case, it must be emphasized, said judgment was not issued until July 6, 2026—that is, more than five months after the credit agreement with AlterBank was entered into (January 29, 2026), and nearly four months after the filing of the Petition for Bankruptcy itself (March 10, 2026).

ALFREDO VAZQUEZ MEYER
30303030313030303030303737313437333303835535
04/29/29 4:00:55 PM

**(B)** Consequently, my client was exposed to the risk of enforcement of the tax claims—a risk acknowledged by the incidental plaintiff herself in Fact 21 above— since there was no automatic or guaranteed procedural protection under Article 69 of the LCM—*the suspension of which, it is reiterated, only takes effect as a matter of law until the insolvency judgment is rendered, and the possibility of bringing it forward through precautionary measures was subject to the judge's discretion*. The need for liquidity to address this risk was, therefore, real, current, and pressing at the time the loan was taken out.

**(C)** There is no incompatibility—much less bad faith—in a company facing financial difficulties **(a)** obtaining urgent financing to address imminent risks of tax enforcement and preserve its operations, while **(b)** simultaneously proceeding, in an orderly and transparent manner, with the necessary preparatory steps to file for bankruptcy proceedings, which, by definition, will take several months to process and resolve. To argue otherwise would, in effect, penalize any business that, in a diligent and responsible manner, plans in advance for its eventual entry into insolvency proceedings while managing its immediate liquidity, which is clearly contrary to the purpose of the Insolvency Law (LCM).

ALFREDO VAZQUEZ MEYER
3030303130303030303731343733303835353
04/08/29 4:00:55 PM

**(D)** Furthermore, my client's conduct was transparent at all times; the loan agreement with AlterBank was freely and spontaneously acknowledged and admitted by the merchant herself in her Petition for Bankruptcy, as acknowledged by the incidental plaintiff herself in Fact 7 of her initial brief—a circumstance that is clearly incompatible with the bad faith, concealment, or fraudulent intent that she seeks to attribute to my client.

**28.**—The corresponding allegation being contested is, for procedural purposes, denied, and the clarifications provided in response to each and every one of the preceding allegations are reproduced here as if they were inserted verbatim. Notwithstanding the foregoing, it is worth highlighting, by way of summary, what has been demonstrated:

**(A)** It offers no comparison whatsoever with equivalent market transactions—*that is, rescue or bridge financing for issuers in financial distress*—that would provide even circumstantial evidence of a quantifiable deviation from prevailing market conditions.

**(B)** Whether or not AlterBank was aware of the Merchant's financial situation—even if true—does not amount to bad faith nor does it prove fraud, since granting credit to a company in financial distress is not prohibited by the LCM; on the contrary, it may be fully consistent with the LCM's objective of preserving the company. Furthermore, **BONY** also fails to consider that the granting of the loan may have been driven by a business opportunity identified by AlterBank itself—*given the higher returns, commissions, and guarantees characteristic of this type of financing*—a circumstance that reinforces the commercial plausibility of the transaction and which was in no way considered by the incidental plaintiff.

**(D)** As set forth in Fact 27 above, there was no contradiction whatsoever between the execution of the loan agreement and the corporate actions taken in preparation for filing for bankruptcy, given that both actions were part of responsible and transparent financial management in response to a real and current need for liquidity.

ALFREDO VAZQUEZ MEYER
30303030313030303030303731343733303835 35
04/29/08 4:00:55 PM

**29**.—The corresponding fact being contested, for procedural purposes, is denied, and the clarifications provided in response to each and every one of the preceding facts are hereby reproduced, as if inserted verbatim. Notwithstanding the foregoing, I would like to make the following statements:

**(A)** Regarding this specific allegation, **BONY** asserts that the creation of mortgage guarantees in favor of AlterBank on March 6, 2026, constitutes, in and of itself, an act in fraud of creditors under Section 115(I) of the LCM, because they were granted after the execution of the credit agreement dated January 29, 2026, which is FALSE.

As evidenced in the preceding lines, the granting of the guarantees does NOT fall under the presumption set forth in Section I of Article 115 of the LCM. The statutory provision requires that *"…the original obligation did not provide for such a guarantee or increase…"*; in this case, the exact opposite is true: the granting of the guarantees was agreed upon at the time the Credit Agreement was entered into on January 29, 2026 (Clause 5.05), and the Amending Agreement of March 6, 2026, merely formalized—*in compliance with a preexisting obligation to perform*—what the original obligation already provided for. There was, therefore, no subsequent guarantee; there was performance of the contract, and the fulfillment of the agreement does not give rise to any presumption of fraud.

**(B)** Regardless of the foregoing, in any event, it was incumbent upon **BONY**, as an incidental plaintiff, to prove that underlying fact so that, if applicable, the presumption it invokes would apply; however, it failed to do so. Under these circumstances, **BONY** is unable to prove—*and, in fact, does not prove*—that the original obligation did not, from the outset, provide for the granting of the mortgage guarantees in question, whether as a condition precedent, an obligation to perform, or a mechanism subject to subsequent formalization, which is a common practice in the granting of secured loans of this nature and magnitude.

ALFREDO VAZQUEZ MEYER
30303030313030303030303737313437333303835335
04/08/29 4:00:55 PM

**(C)** Furthermore, the mere passage of just over one month between the execution of the loan agreement (January 29, 2026) and the formalization of the mortgage guarantees through the Amendment and Restatement Agreement (March 6, 2026) is fully explainable by the time ordinarily required for the negotiation, documentation, notarization, and registration of security interests in assets such as the concession titles in question—*the registration of which, as the plaintiff itself acknowledges, is carried out with the Public Registry of Concessions administered by the Federal Institute of Telecommunications*—without such a time span, in and of itself, being indicative that the security interest had not been agreed upon or contemplated from the outset of the transaction; this is all the more so given that, under the terms of Clause 5.05 of the Credit Agreement, there was a period of 60 (sixty) calendar days to comply with the obligation to create such

guarantees; that is, it was the fulfillment of a preexisting obligation, not a whim intended to defraud, as **BONY** seeks to imply**.**

**(D)** Finally, it must not be overlooked that the purpose of the mortgage guarantees was to secure payment of the loan itself, which was used to meet the Merchant's urgent obligations—*such as the tax liabilities referred to in Fact 21.—as* stated above— and not, as **BONY** suggests, to unduly favor AlterBank to the detriment of the other creditors; the guarantee is ancillary to a principal obligation whose purpose, as has been explained, was the very preservation of the transaction and the Merchant's assets for the benefit, ultimately, of the body of creditors as a whole.

**30.-** The corresponding fact being contested is, for procedural purposes, denied. Notwithstanding the foregoing, the following is clarified:

**(A)** First, regarding the leap in reasoning that **BONY** seeks to make in this claim, Article 15 of the LCM, which the opposing party cites, does not establish what is attributed to it; rather, that provision defines the corporate group for the purposes of consolidating the insolvency proceedings of its members—*a procedural rule of efficiency and consistency*—not a substantive rule for attributing the acts of others or extending the ineffectiveness of acts to non-insolvent companies.

ALFREDO VAZQUEZ MEYER
30303031303030303037313437333030383535
04/29/08 4:00:55 PM

**(B)** Regardless of this, even if my client, as a shareholder, had participated in the corporate decisions of its subsidiaries—*a lawful exercise of corporate rights*—the acts would still be acts of the subsidiaries, concerning the subsidiaries' assets, and unrelated to the estate; control does not alter the identity of the grantor or the ownership of the assets.

**31.-** The corresponding allegation being contested, for procedural purposes, is denied. Without prejudice to the foregoing, it is clarified that **BONY** makes an unsubstantiated allegation of bad faith, given that it does not identify a single meeting, resolution, instruction, communication, or

through which my client would *have "initiated and* decided" to grant the guarantees with the intent attributed to her; it asserts a purpose and treats it as proven by its mere assertion.

Bad faith is not presumed; whoever alleges it must prove it. The ordinary—*good faith*—is presumed, while the extraordinary—*bad faith*—must be proven. In addition, the "undue benefit" allegedly obtained in favor of the creditor is legally nonexistent—a second-degree guarantee on assets outside the estate, established by adherence to a preexisting arrangement, which—*according to the appellant himself*—lacks mitigating effect and does not place its beneficiary in any advantageous position within the bankruptcy proceedings of my client.

**32.-** The corresponding fact being contested, for procedural purposes, is denied, with the exception of the literal wording of the case law cited, the text of which speaks for itself and against the party invoking it.

In fact, the case law with digital record number 2026693 holds exactly the opposite of what the Petitioner seeks to infer from it: **(i)** it recognizes the **legality** of a mortgage security interest established on the property of a third party who is not a debtor, as an expression of the constitutional principle of freedom of contract or negotiation (Article 5 of the Constitution);

ALFREDO VAZQUEZ MEYER
30303030313030303030303731343733303835 35
April 8, 2029, 4:00:55 PM

**(ii)** it specifies that the encumbered asset is not part of the bankruptcy estate—*which confirms that the encumbrance does not diminish the common security interest of the bankrupt's creditors*—; and **(iii)** it establishes that the creditor thus secured must be **recognized** at that rank in the judgment recognizing, ranking, and prioritizing claims.

The fact that the creditor may use the security *"as a bargaining tool during the conciliation* phase" is not a defect; it is the normal economic effect of any security, which the cited case law characterizes as legitimate and worthy of protection. And the assertion that this *"was known to* TVA" adds nothing, since being aware of the applicable law and contracting in accordance with it is not fraud; it is exactly what the legal system expects of private parties. In short, the criterion cited by the appellant validates the very act it seeks to overturn and

presupposes the recognition of the creditor it seeks to exclude: he could hardly have chosen a worse basis for his action.

**33.** The corresponding fact in question, for procedural purposes, is denied, including its premise, as follows:

**(A)** The creditor's "acceptance" of collateral does not constitute an *"agreed-upon condition or* term" of the merchant's transaction under the terms of Article 114, Section III, of the Commercial Code (LCM). That provision requires a comparison of the economic terms of the transaction

—*rate, term, fees, structure, guarantees required of the* debtor— against prevailing market conditions; it does not subject the creditor's prudential accounting or the quality of the regulatory recognition that the received guarantees merit on its balance sheet to scrutiny.

**(B)** The Basel standards on loss severity and risk mitigants—*according to which, as stated in the corresponding provision, collateral is only recognized favorably when it constitutes a first-lien, direct*, *and* sufficient *security interest*—are regulatory capital metrics; they determine how much capital a bank must set aside against an exposure; they do not determine the validity or effectiveness of the legal acts of the bank's borrower, nor are they any market parameter, as was explained in the response to Fact 24.

ALFREDO VAZQUEZ MEYER
3030303013030303030373134373330383535
04/29/08 4:00:55 PM

**(C)** The argument is, moreover, illogical: if a second-priority security interest is not recognized as a risk mitigant, then it confers no advantage on its beneficiary, and without an advantage, there is no preferential treatment or conceivable fraud; the Appellant proves, through his own argument, the absence of the central element of his action.

**(D)** Finally, accepting second-degree guarantees is, moreover, a common and rational practice in the market—*due to the residual value of the asset, its deterrent function, and the negotiating position they* confer—; the decision to accept them rested with the bank,

within its sphere of authority and at its own risk, and in no way harmed the estate, of which the encumbered securities are not a part.

**34.** The corresponding allegation being answered, for procedural purposes, is denied, insofar as it constitutes a conclusive reiteration of the preceding allegations, which are answered by reference to all of the foregoing. Notwithstanding this, the allegation being answered contains two admissions worth noting: (i) by stating that the mortgage guarantee *"was already linked to a prior obligation*," the Petitioner acknowledges the **preexistence** of the security arrangement, thereby undermining, by its very terms, the premise of Article 115, Section I, of the LCM that it invokes—a premise that specifically requires that *"the original obligation did not provide for such security or increase"*; and (ii) by admitting that *"there is no evidence to determine its realizable value or* residual *coverage*," the petitioner acknowledges that it lacks the necessary evidence to assert that the security provides any advantage—*and, therefore, to assert preference or prejudice*; the burden of providing such evidence rested with the petitioner (Article 1194 of the Commercial Code), and its admitted failure to do so condemns the action.

ALFREDO VAZQUEZ MEYER
30303030313030303030303731343733303835 35
04/08/29 4:00:55 PM

As for the list of requirements with which BONY concludes its analysis of the matter at hand—namely, "sufficient primary source of payment," "viability of the aggregate debt," "available exposure limits," and "reserves and capital commensurate with the risk"—these are, once again, part of the creditor's prudential framework—parameters by which a bank manages its own balance sheet—which have nothing to do with the "prevailing market conditions" referred to in Article 114, Section III, of the Commercial Code (LCM), nor with the validity of the Merchant's acts vis-à-vis the Estate.

**35.-** The related claim being contested, for procedural purposes, is denied, based on the following:

**(A)** First, the proposed arrangement accompanying the Petition for Bankruptcy Proceedings is preliminary and indicative in nature. The bankruptcy arrangement is not a unilateral act by the merchant; it is developed during the conciliation phase in consultation with the creditors.

Recognized under the mediation and supervision of the conciliator and the judicial oversight of the Honorable Judge, and with the safeguards established by law itself in favor of all classes of creditors (Articles 157 through 166 of the LCM, which govern the qualified approval of the agreement, minimum payments to unsecured creditors who do not sign it, the protection of secured creditors, and the mechanisms for hearing and objection prior to judicial approval). Any disagreement with a potential proposal is addressed in that forum, through those channels, and at the appropriate time—*not through an action for invalidity filed months before any agreement* even *exists*. To characterize a nonexistent agreement as "abusive" is a judgment of intent, not a fact.

**(B)** The allegation that the loan was an *"act carried out fraudulently by TVA to dilute the creditors'* claims" reverses the reality. Diluting creditors would mean adding a fictitious credit or one lacking consideration to the liabilities, which would artificially reduce the share of legitimate claims. Here, exactly the opposite is true: the credit in question is real—*derived from funds that were actually delivered, deposited, applied, and utilized in accordance with their terms by the Estate*—; and the net effect of the transaction was to reduce the Merchant's total liabilities by approximately $1,800,000,000.00 (one billion eight hundred million pesos 00/100 M.N.), thanks to the tax benefits obtained through the payment made possible by the financing itself.

ALFREDO VAZQUEZ MEYER
30303031303030303037313437333038353 5
04/29/08 4:00:55 PM

Unsecured creditors—*including the holders of the interests that the Petitioner claims to represent*—now have access to an estate that is less indebted than it would be without the contested act; this is not a dilution; it is the exact opposite.

**(C)** The different treatment of secured and unsecured creditors alleged in the corresponding complaint is not a fraudulent scheme, but rather the ordinary consequence of the legal regime governing the ranking and priority of claims, applicable in all insolvency proceedings; whereas the reference to a possible *"sale of broadcasting assets"* is speculation regarding future and uncertain events, entirely unrelated to the subject matter of this motion.

Finally, it should be emphasized that the intent attributed to my client is categorically denied; the truth is that **BONY** concludes its motion as it began it, without a single concrete fact constituting fraud, substituting the elements of the claim with adjectives and conjecture.

In fact, it is worth noting that **BONY** itself has admitted the true purpose of the motion before the U.S. District Court for the Southern District of New York. In his motion dated June 8, 2026, he stated to that court that, should the voting issue not be resolved in his favor, "*...that debt, plus the AlterBank credit, could give TV Azteca enough votes to approve a plan over the Trustee's objection…*". There it is, in his own words: the purpose of this motion is not to return any value to the Estate—*which received, utilized*, *and benefited from the resources*—but rather to eliminate votes from the bankruptcy plan. The action for invalidity was not instituted to reconfigure majorities in favor of a dissenting creditor, and the petitioner himself has documented, before another court, that this is precisely the use he intends to make of it—and that Your Honor should not permit it.

ALFREDO VAZQUEZ MEYER
30303031303030303037313437333038535
04/29/08 4:00:55 PM

## V. EXCEPTIONS AND DEFENSES.

We raise each and every one of the exceptions and defenses set forth in this brief, specifically all those arising from the response to the allegations, the response to the preliminary sections of the motion, and the response to each and every fact, which are hereby deemed to be reproduced as if inserted verbatim, to avoid unnecessary repetition; as well as all those arising from the documentary evidence submitted by my client, from that submitted by the petitioner herself insofar as it favors her, and from the other evidence comprising the case file, even if they are not identified by a specific designation, since

it is incumbent upon Your Honor to assess and rule on them in accordance with the law, regardless of the name by which they are designated.

Notwithstanding the foregoing, I hereby raise the following specific objections:

**(A) OBJECTION TO THE UNCLEAR AND LEGALLY DEFECTIVE NATURE OF THE CROSS-COMPLAINT.**

**I.**—This objection is warranted given the vague and defective manner in which the plaintiff in the incidental action has framed its claim, which deprives the claim of a specific cause of action and leaves my client defenseless, as explained below:

**(A)** The action provided for in Article 114, Section III, of the LCM consists of a comparison between the terms agreed upon in a transaction and those prevailing in the market in which it was entered into, as of the date of its execution. Bringing such an action requires, as a logical and legal minimum, that the plaintiff identify the specific terms of the transaction that it claims deviate from market conditions, the market it considers relevant along with its prevailing conditions, and the significant deviation between the two.

ALFREDO VAZQUEZ MEYER
30303030313030303030303737313437333303835535
04/29/08 4:00:55 PM

**(B)** The Motion fails to meet this minimum standard. Throughout thirty-five factual allegations, it does not identify a single rate, fee, term, comparable transaction, or market study, substituting this lack of evidence with descriptive adjectives such as *"implausible*,*" "derisory*,*"* and *"absurd*."

**(C)** This manner of filing the complaint leaves my client without specific terms to compare or a specific deviation to refute, as explained in the response to facts 8, 16, and 20 of the Motion, which are hereby deemed to be reproduced here as if they were inserted verbatim.

**II.**—In light of the foregoing considerations, it is appropriate to declare the exception raised herein well-founded and to dismiss the action brought, as it

it lacks a specific cause of action, thereby absolving my client of the obligations claimed against her.

**(B) MOTION TO DISMISS FOR LACK OF CAUSE OF ACTION AND LEGAL STANDING (SINE ACTIONE AGIS).**

**I.**—This exception is admissible given the complete lack of cause of action and legal standing on the part of the petitioner to claim from my client the benefits sought, since the elements constituting the action for invalidity have not been established—*nor have they been proven*—as set forth below:

**(A)** Based on a comprehensive interpretation of Articles 112 through 119 of the Commercial Code, for the action to be admissible, each and every one of the following elements must be present: an act by the merchant performed on or after the retroactive date; actual harm to the estate, that is, a reduction in the Merchant's assets or an improper preference in payment; that the Merchant acted *"knowingly defrauding"* its creditors; and, in the case of onerous acts, the third party's knowledge of such fraud (Article 113 of the LCM); or, strict compliance with one of the scenarios listed in the exhaustive catalogs of Articles 114 and 115, all of which share the same structural feature: <u>the outflow of value from the debtor's assets or the undue preference granted to a creditor</u>. The burden of proof for these elements rests entirely with the party bringing the action (Article 1194 of the Commercial Code), and the specific, rebuttable presumptions of Article 115 do not exempt them from proving the remaining elements.

ALFREDO VAZQUEZ MEYER
3030303013030303030371313437333038535
04/29/08 4:00:55 PM

**(B)** In the present case, none of these elements has been established or proven: the contested act did not withdraw value from the estate, but rather injected funds into it and reduced its liabilities; its purpose was agreed upon at the time of its execution and was carried out in accordance with its terms; the transaction was voluntarily disclosed in the Petition for Bankruptcy—*which rules out any concealment*—; and with respect to the third party, no knowledge of fraud was established, on the understanding that the knowledge required by Article 113 of the Bankruptcy Code pertains to the fraudulent intent, not to the financial situation of the debtor, which the petitioner himself characterizes as public and well-known. What the motion offers instead are suspicions, conjectures, and adjectives; and the

subjective surprise of a creditor is not an element of the legal definition nor does it relieve the plaintiff of the burden of proving each element of their claim.

**(C)** The foregoing is in accordance with the Preliminary Consideration and the responses to facts 8 through 35 of the Motion, which are hereby deemed to be reproduced as if they were inserted verbatim.

**II.**—By virtue of the foregoing considerations, it is appropriate to declare the exception raised herein to be well-founded, thereby exonerating my client from each and every one of the obligations claimed against her.

**(C) EXCEPTION BASED ON THE ABSENCE OF HARM TO THE ESTATE AND THE EXISTENCE OF A NET AND QUANTIFIED BENEFIT IN HER FAVOR.**

**I.**—This defense is valid because the core and common element of any insolvency proceeding—harm to the estate—does not exist in the present case; rather, the exact opposite exists, as documented and quantified by the tax authority itself, as set forth below:

ALFREDO VAZQUEZ MEYER
30303030313030303030303731343733303835355
04/29/08 4:00:55 PM

**(A)** All the scenarios set forth in Articles 113, 114, and 115 of the LCM presuppose an impoverishment of the estate, whether due to the outflow of value from the debtor's assets or due to undue preference granted to one creditor to the detriment of the others. Without such depletion, there is no fraud to prosecute nor any legal interest to protect through the action for invalidity, which is a restitutory remedy established to protect the integrity of the estate.

**(B)** In this case, the evidence shows the opposite. As a result of the contested transaction, funds in the amounts identified were transferred into the Merchant's assets; on the very day of the disposition, final tax liabilities—secured by the transaction itself and formally demanded with a notice of enforcement—were paid via transfers totaling $3,925,150,202.00 (Three billion nine hundred twenty-five million one hundred fifty thousand two hundred two pesos 00/100 M.N.), which exactly match

with the payment reference numbers issued by the authority; and that payment triggered the benefits provided for in Article 70-A of the Federal Tax Code, resulting in a **reduction of the liability of $1,856,303,526.00 (one billion eight hundred fifty-six million three hundred three thousand five hundred twenty-six pesos 00/100 M.N.),** as determined by the tax authority itself. Total liabilities decreased, cash reserves were preserved, and the company continued to operate as a going concern; creditors are now dealing with an estate that is less indebted than it would be without the act whose invalidity **BONY** alleges, as explained in the response to facts 21 and 35 of the Motion, the clarifications of which are hereby deemed reproduced.

**(C)** It is telling that the Motion remains completely silent on the destination and use of the financing funds; this silence amounts to the omission of the core element of the action and deprives it of any basis from the outset.

**II.**—In light of the foregoing considerations, it is appropriate to declare the exception raised herein well-founded, thereby exonerating my client from the obligations claimed against her.

ALFREDO VAZQUEZ MEYER
30303030313030303030303731343733303835353
04/29/08 4:00:55 PM

## (D) EXCEPTION TO THE ADMISSIBILITY OF THE DECLARATION OF INVALIDITY BY EXPRESS PROVISION OF LAW (PENULTIMATE PARAGRAPH OF ARTICLE 114 OF THE LCM).

**I.**—This defense is valid because, even in the hypothetical scenario—which is *not accepted and is categorically denied*—that any of the grounds invoked by the petitioner were deemed to apply, the declaration of invalidity would be legally inadmissible by express mandate of the penultimate paragraph of Article 114 of the LCM, as set forth below:

**(A)** The penultimate paragraph of Article 114 of the LCM provides: "*...A declaration of invalidity shall not be granted when the Estate benefits from the payments made to the Merchant...*". This is a rule that closes the system, by which the legislature

has subordinated the invalidity to its very rationale—*the harm*—and if the Estate benefited from the funds, a declaration of invalidity is not applicable, regardless of the grounds invoked.

**(B)** In the present case, the terms of the loan constitute, in their strictest sense, payments made to the Merchant; and the benefit to the Estate is evidenced by the extinguishment of a final, enforceable tax liability secured by the transaction itself, and the net reduction in total liabilities by $1,856,303,526.00 (one billion eight hundred fifty-six million three hundred three thousand five hundred twenty-six pesos 00/100 M.N.), as explained in the response to Fact 21.- of the Motion and the documentary evidence submitted as **Exhibits 5) through 9).**

**(C)** Consequently, the legal prohibition operates autonomously and sufficiently; even if the allegations in the Motion were true—*which they are not*, *as has been demonstrated*—the law expressly prohibits the declaration that constitutes the first of its provisions and the basis for all the others.

ALFREDO VAZQUEZ MEYER
30303030130303030303731343733303835 35
04/29/08 4:00:55 PM

**II.**—In light of the foregoing considerations, it is appropriate to declare the exception raised herein well-founded, thereby exonerating my client from the obligations claimed against her.

**(E) EXCEPTION BASED ON THE NON-EXISTENCE OF THE CIRCUMSTANCE PROVIDED FOR IN ARTICLE 114, SECTION III, OF THE LCM.**

**I.**—This exception is valid because the terms and conditions agreed upon in the Credit Agreement and the Amendment Agreement did not deviate—*either significantly or in any way*—from the prevailing market conditions at the time they were entered into, nor did the Plaintiff prove otherwise, as explained below:

**(A)** The argument raised requires the proven concurrence of three elements: the terms actually agreed upon in the transaction; the prevailing market conditions at the time the transaction was entered into; or commercial customs and practices

; and a significant deviation between the two. This involves an economic and transactional comparison of transaction terms, <u>not a judgment of prudence</u>

<u>regulatory requirements regarding the lender</u>.

**(B)** The Respondent failed to establish any of the three elements. He does not provide a single reference rate, fee, comparable transaction, or study of the financing market as of the date of execution; and the opinions he submits pertain to the lender's prudential regulation in another jurisdiction, a matter unrelated to the provision in question. The Basel Committee standards invoked are neither current nor applicable law—*its own Charter states that they lack legal force*—nor do they constitute "prevailing market conditions"; they are guidelines on how a bank manages its capital and risks, intended for regulators and institutions, not for borrowers or the transactions they enter into. Without an observed variable, there is no quantifiable deviation, and without a quantified deviation, the alleged breach does not exist.

**(C)** On the contrary, the conditions that are in fact established—*short-term liquidity financing, a fixed rate higher than that of ordinary corporate credit, security interests, and a bridge financing structure*—correspond to those prevailing in the relevant market, which is that of financing for companies in financial distress, as assessed *ex ante* as of the date of execution; and regardless of the market definition adopted, the outcome of the Motion would be the same, since the petitioner failed to prove the prevailing conditions of any such market. All of this is in accordance with the responses to facts 8, 15, 16, 20, 24, and 28 of the Motion, which are hereby deemed to be reproduced herein.

ALFREDO VAZQUEZ MEYER
30303031303030303037313437333030383535
04/29/08 4:00:55 PM

**II.**—In light of the foregoing, it is appropriate to declare the exception hereby raised to be well-founded, thereby exonerating my client from the claims made against her.

**(F) EXCEPTION BASED ON THE NON-EXISTENCE OF THE CIRCUMSTANCE PROVIDED FOR IN ARTICLE 115, SECTION I, OF THE LCM.**

**I.**—This exception is valid because the original obligation did, from the time of its execution, provide for the guarantees whose creation is being challenged; thus,

the factual basis for the presumption invoked does not exist and was not proven, as explained below:

**(A)** The legal hypothesis requires that "...*the original obligation did not provide for such a guarantee or increase*...". In this case, the exact opposite is true: Clause 5.05 of the Credit Agreement dated January 29, 2026, provided from the time of its execution for the creation of guarantees—*including the mortgage, expressly agreed upon as the second security and secured by assets or concessions of the borrower or its subsidiaries*— with a sixty-day deadline for their formalization and a penalty fee in the event of noncompliance; and the Amending Agreement of March 6, 2026, merely formalized, on the thirty-sixth day of that period, a preexisting obligation to perform. <u>There was no new security interest whatsoever; the contract was performed</u>, and performance of the agreement does not give rise to a presumption of fraud (Appendices 1 and 3).

**(B)** Notwithstanding the foregoing, the burden of proving the factual basis for the presumption—*that the original obligation did not include the guarantee*—rested with the petitioner (Article 1194 of the Commercial Code), and the petitioner failed to meet that burden; rather, by asserting that the mortgage guarantee *"was already linked to a prior obligation*," the petitioner admitted the preexistence of the guarantee scheme, thereby undermining, by its own terms, the very premise it invokes. The presumption is, furthermore, *iuris tantum*, and is rebutted by the documentation of the transaction itself and by the proven good faith of my client.

ALFREDO VAZQUEZ MEYER
303030313030303030373134373330383535
04/29/08 4:00:55 PM

**II.**—In light of the foregoing considerations, the defense raised herein should be declared well-founded, thereby absolving my client of the obligations claimed against her.

**(G) EXCEPTION BASED ON GOOD FAITH.**

**I.**—This defense is valid because my client's conduct was guided at all times by good faith, which the law presumes and which

in this case has, moreover, been positively established, as set forth below:

**(A)** Pursuant to Article 807 of the Federal Civil Code, which applies on a supplementary basis, "*...good faith is always presumed; the party alleging bad faith... bears the burden of proving it...*". The appellant failed to prove a single concrete act of bad faith; he does not identify any meeting, agreement, instruction, or communication from which the intent he alleges could be inferred; he asserts certain intentions and treats them as proven by his mere assertion.

**(B)** Good faith has been positively established, as the transaction was disclosed freely, voluntarily, and spontaneously, under oath, beginning with the Bankruptcy Petition; it was recorded in the accounting records; its intended use was agreed upon in writing and carried out in accordance with those terms, with payments made to the Federal Treasury as the final recipient; and it also fulfilled an obligation expressly assumed toward the bondholders themselves in Section 3.4 (*Payment of Taxes*) of the issuance contract administered by the Intervenor—a provision regarding which the Intervenor's brief remains completely silent. Whoever defrauds

conceals; my client arranged, paid, recorded, and disclosed (facts 5, 7, 21, 26, and 27 of the Motion, the clarifications of which are deemed to be reproduced herein).

ALFREDO VAZQUEZ MEYER
3030303013030303030373134373330383535
04/29/08 4:00:55 PM

**(C)** Such good faith precludes the intent to "*knowingly* defraud" required by Article 113 of the LCM, undermines any presumption derived from Article 115, and deprives the generic allegation of bad faith—upon which the entire Motion rests—of any basis.

**II.** In light of the foregoing considerations, the defense raised herein should be upheld, thereby exonerating my client from the benefits claimed against her.

**(H) MOTION TO DISMISS CLAIM C AS UNFOUNDED, ON THE GROUNDS THAT IT SEEKS A PENALTY NOT PROVIDED FOR IN OUR LEGAL SYSTEM.**

**I.**—This defense is valid because the consequences sought by the petitioner in Claim C—*that AlterBank cannot be recognized as*

*a creditor or sign the bankruptcy agreement*—are not provided for in our legal system, as explained below:

**(A)** The effects of a possible declaration of invalidity are, exclusively, the restitutionary remedies established in Articles 118 and 119 of the LCM. No provision states that a third party who participated in an act declared invalid loses the right to be recognized as a creditor or to sign the arrangement; the law provides exactly the opposite, since the last paragraph of Article 114 even allows a third party who returns what was received *to "request recognition of its claim,"* thereby preserving its right to recognition rather than excluding it.

**(B)** When the legislature intended to deprive a creditor of its rights, it expressly provided for this—*as in Article 154 of the LCM, which penalizes private agreements entered into after the declaration of insolvency with nullity and the loss of the rights of the creditor who enters into them*—; and in the case of the deprivation of rights, the application is strict; such deprivations are not created by analogy or by a majority of reasons. Not even the common-law offense of fraud against creditors provides for the sanction sought here, since the action for avoidance (Articles 2163 et seq. of the Federal Civil Code) is limited to rendering the act unenforceable and ordering the resulting restitution, for the benefit of the creditor bringing the action and up to the amount of their claim, without ever depriving a third party of rights other than those arising from the contested act.

ALFREDO VAZQUEZ MEYER
3030303013030303030373134373330383535
04/29/08 4:00:55 PM

**(C)** The nature of the relief sought further reveals the true purpose of the motion: the petitioner is not seeking the return of any property, but rather the removal of a creditor from the bankruptcy reorganization plan, as he himself admitted before the U.S. District Court for the Southern District of New York, stating that "*...that debt, plus AlterBank's claim, could give TV Azteca enough votes to approve a plan over the Trustee's objection...*". The action for fraud against creditors is a restitutory remedy intended to protect the estate, not an instrument for reconfiguring voting majorities, and the use

is intended to be made of it distorts its nature, as set forth in the response to the allegations and facts 21 and 35 of the Motion, which are hereby deemed to be reproduced.

**II.**—In light of the foregoing considerations, it is appropriate to declare the objection raised herein well-founded and, most notably, to acquit my client of claim C, the mere assertion of which demonstrates the inadmissibility of the motion in its entirety.

## (I) EXCEPTION OF PRECLUSION AND INADMISSIBILITY OF THE ALLEGED *"RESERVATION TO* EXPAND" THE MOTION.

**I.**—This objection is valid in light of the petitioner's claim to "reserve" the right to expand the motion and to submit, in the future, evidence from the foreign *discovery* proceedings to which he refers, as explained below:

**(A)** Interlocutory proceedings are governed by a closed case: the action is brought based on the facts and evidence set forth in the interlocutory complaint (Article 267 of the LCM), and new evidence is admissible only in the strict cases established by law (Article 1202 of the Commercial Code, which applies on a supplementary basis). Our legal system does not provide for "reservations for expansion" of incidental claims; admitting them would be tantamount to keeping the proceedings open indefinitely, at the discretion of the plaintiff.

ALFREDO VAZQUEZ MEYER
30303030313030303030303731343733303383535
04/29/08 4:00:55 PM

**(B)** The alleged reservation does not even correspond to a genuine lack of knowledge: according to his own statements before the courts of the United States of America, the plaintiff in the incidental claim requested a copy of the Petition for Bankruptcy as early as March 13, 2026, and filed his motion for *discovery* on June 2, 2026, with the admitted purpose of pursuing "…*potential claims of fraudulent transfers under Mexican law in the insolvency* proceedings..." and described the claim and its security in detail on June 8, 2026; despite this, he did not file his motion until August 18, 2026. Its "reserve" is not the caution of one who has just become aware of the facts, but rather the strategic management of a long-planned litigation, incompatible with the preclusion governing the

interlocutory proceedings, as set forth in Chapter III, Section 2, of this brief, which is hereby deemed to be reproduced.

**(C)** Consequently, the alleged reservation must be dismissed, and any subsequent expansion of the scope of the litigation or future evidence intended to alter or supplement it must be denied.

**II.**—In light of the foregoing considerations, it is appropriate to declare the objection raised herein well-founded, dismissing the alleged "reservation" to expand the motion and the notice of future evidence, in accordance with the THIRD request of this brief.

## VI. CHAPTER ON OBJECTIONS TO DOCUMENTS

Based on the provisions of Articles 1247, 1296, and other relevant and applicable provisions of the Commercial Code, which applies supplementarily to the Commercial Bankruptcy Law, for each and every one of the reasons set forth in this brief, my client objects to the scope and probative value that the petitioner seeks to attribute to the documents submitted by the petitioner and attached to the motion.

ALFREDO VAZQUEZ MEYER
30303030313030303030373134373330383535
04/29/08 4:00:55 PM

Notwithstanding the foregoing, it is hereby stated that this objection is based on the following:

**1**. With regard to the documentary evidence consisting of the orders from the Florida court (Exhibits 2 and 3), they establish, at most, the existence and proceedings of a process for obtaining evidence abroad; they prove nothing regarding the elements of the claim, and the proceedings from which they stem do not determine the truth of any fact nor create res judicata regarding fraud, market conditions, or applicable regulations. We object to any attempt to derive probative value from them regarding the merits of the case.

**2.-** With regard to the documents and statements arising from *discovery* (Exhibits 4, 5, and 6), these are documentary evidence referring to facts involving third parties—*the plaintiff, its governing bodies*, *and shareholders*—that are unrelated to the dispute, as set forth in the answer to the facts and in the raised exceptions and defenses; their scope and probative value are contested, noting that the facts they purport to establish (resignations of directors, shareholding structure, corporate records) are subsequent to or unrelated to the date on which the contested acts were performed and are therefore irrelevant.

**3.** The opinions attached as Exhibits 3 and 9 (Evidence 7 and 8) are submitted as private documents prepared at the request of a party. At most, they can establish that their authors issued them; they do not constitute expert evidence—*they were not submitted with the questionnaire, appointment, acceptance, and affirmation required by Article 267, Section IV, of the Commercial Code, nor will they be subject to cross-examination by an expert for the opposing party or a third party in the dispute*—and they do not relieve the party submitting them from the burden of proving the methodology, data, comparables, and chain of inferences. Insofar as they seek to establish foreign law, they also fail to satisfy the proper procedural requirements (Article 1197 of the Commercial Code and applicable provisions of supplementary procedural law). As for the merits, they concern the prudential regulation of the creditor—*a matter unrelated to the elements of Article 114, Section III, of the LCM*—and it is particularly inappropriate for an opinion on foreign banking regulation to be used to conclude, without any comparison of transactions, that the terms agreed upon by the Merchant were out of line with market conditions.

ALFREDO VAZQUEZ MEYER
303030313030303030373134373330383535
April 8, 2029, 4:00:55 PM

**4.-** With regard to the press releases and news articles (Exhibits 9 through 13), they merely establish the existence of the publications, not the veracity of their content, and in no way do they establish *the "prevailing market* conditions" as of the date the transactions were entered into. Invoking the "notorious fact" status of the content on web pages does not relieve the plaintiff of the burden of proving the elements of its claim with appropriate evidence.

**5.** With regard to the documentary evidence consisting of the Credit Agreement, the Amendment Agreement, and the related notarial deeds (Exhibits 14 through 17), my client

does not object to their admission; on the contrary, she submits the first two in compliance with the court's order, confident that their content will corroborate the defenses raised herein.

**6.** We object to the admission of the confession made by my client (Exhibit 18) insofar as it seeks to address facts that do not pertain to the defendant—*the conduct, knowledge, and decisions of third parties*—or legal characterizations and concepts, which are beyond the scope of such evidence; we request that the characterization of positions be carried out, if applicable, with the appropriate rigor.

**7.-** We object to the procedural and presumptive evidence (Exhibits 19 and 20) insofar as they seek to rely on records that, as explained above, favor my client; such evidence includes, among other things, the petitioner's admission of his lack of knowledge regarding the content of the contested acts and his silence regarding the destination and use of the funding resources.

## VII. RESERVATION OF RIGHTS

ALFREDO VAZQUEZ MEYER
30303030313030303030303731343733303835355
04/29/08 4:00:55 PM

With regard to the entire body of allegations and falsehoods contained in the motion, my client reserves all additional rights to which she is entitled in this regard, to assert them before the competent authorities in the manner and on the terms she deems appropriate.

However, in order to further establish the inadmissibility of the motion filed by the plaintiff, based on the provisions of Section II of Article 267 of the Commercial Bankruptcy Law, I submit the following on behalf of my client:

## VIII. EVIDENCE.

Pursuant to Article 267 of the Commercial Bankruptcy Law, the following are submitted:

**1. PUBLIC DOCUMENTARY EVIDENCE** consisting of a certified copy of **the Credit Agreement** dated January 29, 2026, entered into between my client, as the borrower, and AlterBank, in its capacity as structuring agent, initial lender, administrative agent, and collateral agent, which is attached as **Exhibit No. 1) –** *which, pursuant to the provisions of Article 3, Section VI, of General Agreement 12/2020 of the Plenary Session of the Federal Judiciary Council, and under solemn oath, I hereby declare to be a complete and unaltered copy of the original document –*, as well as its translation into Spanish by a certified translator, which is attached as **Exhibit No. 2) –** *which, pursuant to the provisions of Article 3, Section VI, of General Agreement 12/2020 of the Plenary Session of the Federal Judiciary Council, I hereby solemnly declare under oath to be a complete and unaltered copy of the original document –*. This evidence pertains to all the facts of the Motion and of this response, and it establishes, among other things: the denomination of the loan in national currency; its actual terms and conditions—*including the fixed annual interest rate of 17.50%* -; that the provision of guarantees was contemplated in the original obligation (Clause 5.05); and, in general, the inaccuracy of the premises upon which the petitioner based his action.

**2. THE PUBLIC DOCUMENT** consisting of a certified copy of **the Amending and Restatement Agreement** dated March 6, 2026, which is attached as **Exhibit No. 3) –** *which, pursuant to the provisions of Article 3, Section VI, of General Agreement 12/2020 of the Plenary Session of the Federal Judiciary Council, and under solemn oath*, *I hereby certify is a complete and unaltered copy of the original document –*, as well as its translation into Spanish by a certified translator, which is submitted as **Exhibit No. 4) –** *which, in accordance with the provisions of Article 3, Section VI, of General Agreement 12/2020 of the Plenary Session of the Federal Judiciary Council, and under solemn oath, I hereby certify is a complete and unaltered copy of the original document –*. It relates to the same facts and serves to establish that said instrument did not constitute new indebtedness or the granting of uncontemplated guarantees, but rather the documentation and formalization of preexisting obligations.

ALFREDO VAZQUEZ MEYER
30303031303030303030373134373330383535
04/29/08 4:00:55 PM

**3. THE PUBLIC DOCUMENT** consisting of Official Letter No. 400-75-00-00-00-2026-1130, File No. SAT-8S.4-2026, dated January 9, 2026, from the General Tax Collection Administration of the SAT, which is attached to this document as **Exhibit No. 5) –** *which, pursuant to the provisions of Article 3, Section VI, of General Agreement 12/2020 of the Plenary Session of the Federal Judiciary Council, I hereby certify under oath that it is a complete and unaltered copy of the original document –***.** This evidence relates to the response to facts 13, 14, 16, 21, 26, 27, 28, 34, and 35 of the Motion, and to the objections raised, and it establishes that: the tax assessments for fiscal years 2009 and 2013 were final and payment was demanded, adjusted for inflation, in the amounts of $3,901,434,927.30 and $4,790,057,134.26 – *$8,691,492,061.56 in total*—with a five-day deadline for payment; that the tax interest was secured by the administrative attachment of my client's business itself; and the express warning to enforce said guarantee through administrative enforcement proceedings or to transfer the funds from the Merchant's accounts pursuant to Article 156-Ter of the Federal Tax Code; that is, the real, current, and documented imminence of tax enforcement as of the date the contested financing was contracted.

ALFREDO VAZQUEZ MEYER
3030303031303030303030373134373330383535
04/29/08 4:00:55 PM

**4.- DOCUMENTARY EVIDENCE.** Consisting of the resolutions contained in official letters 400-75-00-00-00-2026-2940 and 400-75-00-00-00-2026-2941, dated January 28, 2026,

regarding the benefits of reduction and waiver of penalties obtained under the Federal Tax Code in connection with the payment of the aforementioned tax liabilities, which are submitted as **Exhibits 6)** and **7)**—*which, pursuant to the provisions of Article 3, Section VI, of General Agreement 12/2020 of the Plenary Session of the Federal Judiciary Council, under solemn oath, I hereby declare that they are a complete and unaltered copy of the original document*—. They relate to the same facts and defenses as the previous evidence, and they substantiate the net benefit obtained by the Estate as a result of the contested transaction, consisting of a reduction in liabilities of

$1,856,303,526.00 (one billion eight hundred fifty-six million three hundred three thousand five hundred twenty-six pesos 00/100 M.N.), as quantified by the tax authority itself.

**5. DOCUMENTARY EVIDENCE.** Consisting of the tax assessment notices issued by the tax authority itself on January 28, 2026, for the payment of tax liabilities for the fiscal years 2009 and 2013, which are attached as **Exhibits 8)** and **9)—***which, pursuant to the provisions of Article 3, Section VI, of General Agreement 12/2020 of the Plenary Session of the Federal Judiciary Council, I hereby declare under oath that they are a complete and unaltered copy of the original document*—. They relate to the same facts and defenses as the preceding evidence, and together they substantiate the exact amounts demanded by the authority itself for the settlement of both tax liabilities with the benefits granted; their exact match, peso for peso, with the transfers made the following day demonstrates the full traceability of the payments and the documentary correspondence between the funds and their intended use.

**6. DOCUMENTARY EVIDENCE.** Consisting of the receipts for the electronic transfers made on January 29, 2026, in the amounts of $2,657,170,823.00 (fiscal year 2009) and $1,267,979,379.00 (fiscal year 2013) – $3,925,150,202.00 in total –, which are attached as **Exhibits 10)** and **11) –** *which, pursuant to the provisions of Article 3, Section VI, of General Agreement 12/2020 of the Plenary Session of the Federal Judiciary Council, I hereby declare under oath that they are a complete and unaltered copy of the original document* –. They relate to the same facts and defenses as the preceding evidence, and they prove the actual payment of both tax liabilities on the same day the funds were made available, through fully identified transactions whose amounts exactly match the payment reference numbers issued by the authority itself and whose final recipient was the Federal Treasury.

**7.- THE ADMISSION** OF GUILT by **THE BANK OF NEW YORK MELLON IN ITS CAPACITY AS TRUSTEE**, which must be presented through its legal representative or authorized agent with sufficient authority to answer questions, who must appear at the premises of this Honorable Court on the date and time designated by Your Honor to answer the questions presented in a sealed envelope at the appropriate procedural moment, in response to the questioning my client will pose at the hearing

ALFREDO VAZQUEZ MEYER
30303030130303030303731437333038353
04/29/08 4:00:55 PM

, and hereby warning the defendant that, should she fail to appear without just cause, she shall be deemed to have admitted the allegations, in accordance with the law.

This evidence is suitable and relevant because it pertains solely and exclusively to facts specific to the defendant—*her knowledge, her conduct, and the purpose of her action, which no other means of proof can directly establish*— and it will establish, among other things: **(i)** that the Petitioner was aware of the existence of the Credit Agreement and its guarantees as early as March and April 2026, and that as of June 2, 2026, she announced before foreign courts her intention to bring claims for *"fraudulent transfers"* under Mexican law; **(ii)** that she did not conduct or commission any study, comparison, or analysis of the prevailing conditions in any financing market as of the date the acts she is challenging were entered into, and that the opinions she submitted pertain to the lender's regulatory status and not to market conditions; **(iii)** that it is aware of the content of Section 3.4 (*Payment of Taxes*) of the issuance agreement it administers, pursuant to which the issuer is obligated to pay its taxes; and **(iv)** that before the courts of New York, it characterizes the same facts that it here refers to as *"creditor* fraud" as breaches of its issuance agreement, among other things.

ALFREDO VAZQUEZ MEYER
30303030130303030303731343733303835353
04/29/29 4:00:55 PM

This evidence relates to all the facts of the Motion and this Answer, and in particular to facts 8, 15, 16, 21, 28, and 35, as well as to the raised defenses.

**8. CASE FILING DOCUMENTS.** Consisting of each and every document comprising Case File 22/2026-II, insofar as they support the interests of my client, and notably: the Petition for Bankruptcy and its attachments, the judgment declaring bankruptcy dated July 6, 2026, the order dated August 19, 2026, and the incidental brief itself, from which the express admissions of the party filing the incidental motion—which have been highlighted—are derived. This pertains to all the facts and defenses.

**9.- PRESUMPTION, IN ITS DOUBLE ASPECT: LEGAL AND HUMAN.**

In all matters that serve the interests of my client, and notably those arising from the petitioner's silence regarding the destination and use of the funding resources, as well as the voluntary and complete disclosure of the transaction in the Petition for Bankruptcy. This pertains to all the facts and defenses.

**In light of the foregoing;**

**TO YOUR HONOR, the Judge**, I respectfully request that you:

**FIRST.**—I hereby appear on behalf of **TV AZTECA, S.A.B. DE C.V.**, and hereby respond in a timely and proper manner to the motion to declare acts invalid due to fraud against creditors filed by The Bank of New York Mellon in its capacity as Trustee pursuant to the Indenture dated August 9, 2017, entered into between TVA, the guarantor subsidiaries, and BNY, with respect to the 8.250% Senior Notes due 2024, in accordance with the terms of this brief.

ALFREDO VAZQUEZ MEYER
30303030313030303030373134373330383535
04/29/08 4:00:55 PM

**SECOND.**—To deem the exceptions and defenses asserted to be contested, which, at the appropriate procedural stage, must be ruled admissible and well-founded, thereby exonerating my client from the obligations claimed against her in this motion.

**THIRD.**—To object to the documentary evidence offered by the petitioner in accordance with Chapter VI, and to file an objection to the alleged reservation to expand the motion and to the offer of future evidence, dismissing them as not in accordance with the law.

**FOURTH.**—To deem my client to have complied with the requirement contained in the order of August 19, 2026, by submitting **exhibits numbered 1) through 4).**

**FIFTH.—**To deem the evidence offered by my client to have been submitted, to admit it, and to order its preparation and presentation.

**SIXTH.—**At the appropriate time, I move to dismiss the motion as improper and without merit, to acquit my client of each and every claim made, and to order the petitioner to pay the expenses and costs incurred in this proceeding.

**I FILE THE NECESSARY OBJECTIONS.**
**Mexico City, August 28, 2026.**

[*Signed electronically*]

**ALFREDO VÁZQUEZ MEYER.**

ALFREDO VAZQUEZ MEYER
30303031303030303037313437333038353
04/08/29 4:00:55 PM

PODER JUDICIAL DE LA FEDERACIÓN

## CRYPTOGRAPHIC EVIDENCE - TRANSACTION

**Signed File: 415700200000000000062450006.p7m**
**Certifying Authority:**
**AC OF THE TAX ADMINISTRATION SERVICE**
**Signatory(ies): 1**

| SIGNATORY | | | | |
|---|---|---|---|---|
| **Name:** | ALFREDO VAZQUEZ MEYER | **Validity:** | GOOD | Valid |
| **SIGNATURE** | | | | |
| **No. Series:** | 30.30.30.30.31.30.30.30.30.30.30.37.31.34.37.33.30.38.35.35 | **Revocation:** | Valid | Not revoked |
| **Date (UTC/Mexico City)** | 08/29/26 04:00:36 - 08/28/26 22:00:36 | **Status:** | Valid | Valid |
| **Algorithm:** | RSA-SHA256 | | | |
| **Signature string:** | 95 be e4 21 c8 1b 49 b9 5b 6e 72 62 cb c0 e9 c0 e4<br>5c ef 9d 8d d6 7d d2 88 20 8c 17 ac 10 2c ee b9 92<br>1c fa 8f 79 bc 83 5f 19 a4 4f 50 35 4b 01<br>32 af 46 f3 8a d7 e1 10 64 7e 62 a4 37 fe 93 51 45<br>da 44 d9 c6 0b b8 dd 3b fb f0 28 47 0d ba e1 d2 63<br>22 d6 fa 7b 57 04 79 fc bc 67 ea 17 c9 ad<br>e1 76 d4 a9 c1 5c 77 75 39 37 b4 8a 2b 25 1b 0e<br>28 f6 bf a2 12 00 62 a8 69 42 45 95 27 99 10 06<br>a0 01 30 b6 d5 9b b9 71 00 31 ed 5e 15 b0 78 73<br>58 9e b6 ba f6 86 c6 bd 44 9c 83 b9 73 e4 6f 1c<br>f4 79 5b e2 38 7e e2 f8 ee fa 33 43 65 35 b5 94 fe 51<br>c1 f4 1a 2f f1 9d 01 ba 06 6a 5a 3c 89 c3 4b b4 12 07<br>24 ea 59 27 8b b3 4b 23 66 9d 1c ab<br>de ed 54 69 2e 6b e2 f2 c6 15 21 5f 71 5b 50 4c<br>32 f3 67 92 03 b6 67 71 77 7c a2 57 d7 64 1d a3<br>53 34 3c 90 40 ae de 55 14 20 86 79 49 3e ac 1e | | | |

| OCSP | |
|---|---|
| **Date: (UTC/Mexico City)** | 08/29/26 04:00:37 - 08/28/26 22:00:37 |
| **Respondent Name:** | OCSP SAT |
| **Responder issuer:** | Tax Administration Service |
| **Serial number:** | 30.30.30.30.31.30.30.30.30.30.30.37.31.34.37.33.30.38.35.35 |

| TSP | |
|---|---|
| **Date: (UTC/Mexico City)** | 08/29/26 04:00:37 - 08/28/26 22:00:37 |
| **Name of the TSP response issuer:** | Timestamp Issuing Authority of the Federal Judiciary Council |
| **TSP Certificate Issuer:** | Intermediate Certification Authority of the Federal Judiciary Council |
| **TSP response identifier:** | 198691998 |
| **Stamped data:** | 6soHdUV8kXsnj7xm6UmU2puwOm8= |

# Exhibit L

**COMERCIANTE: TV AZTECA, S.A.B. DE C.V.**
**PROCEDIMIENTO DE CONCURSO MERCANTIL**
**EXPEDIENTE: 22/2026**

CM. 22/2026
P. 12528
09/09/2026

**INCIDENTE DE INEFICACIA DE ACTOS EN FRAUDE DE ACREEDORES**

**DESAHOGO DE VISTA CON EXCEPCIONES Y DEFENSAS**

**C. JUEZ PRIMERO DE DISTRITO EN MATERIA DE CONCURSOS MERCANTILES, CON RESIDENCIA EN LA CIUDAD DE MÉXICO Y JURISDICCIÓN EN TODA LA REPÚBLICA MEXICANA.**

**FERNANDO DEL CASTILLO ELORZA,** en mi carácter de apoderado general para pleitos y cobranzas de **THE BANK OF NEW YORK MELLON en su carácter de Fiduciario** (en adelante,"**BNY**" o el "**Trustee**", indistintamente) personalidad que tengo debidamente reconocida y acreditada en el expediente en que se actúa, ante Usted, respetuosamente, comparezco y expongo:

En nombre de mi representada, desahogo la vista ordenada mediante auto de fecha 02 de septiembre de 2026, publicado el 03 del mismo mes y año, fecha en que se notificó electrónicamente mi representada, ordenada con las excepciones y defensas opuestas por **TV AZTECA, S.A.B. DE C.V.** (la "**Comerciante**" o "**TVA**", indistintamente) en el incidente de ineficacia de actos en fraude de acreedores promovido por mi representada (el "**Incidente**") en los siguientes términos:

Por medio de la presente manifiesto, en nombre de mi representada, que el presente y, en general, las actuaciones en este procedimiento concursal, no se interpretarán en modo alguno como una renuncia a la jurisdicción y competencia de los tribunales del Estado de Nueva York, Estados Unidos de América, en relación con cualquier asunto relacionado con el Contrato de Emisión y los Bonos con vencimiento en 2024. BNY, en su carácter de *Trustee* se reserva además expresamente, y no renuncia, limita, modifica, menoscaba ni perjudica: ***(i)*** las disposiciones de la Sección 11.7 del Contrato de Emisión, incluidas las relativas a cualquier controversia sobre la interpretación, el cumplimiento, las medidas correctivas y otras cuestiones derivadas del Contrato de Emisión o relacionadas con él; y ***(ii)*** todos los derechos relacionados con la medida cautelar dictada por el Tribunal de Distrito de los Estados Unidos para el Distrito Sur de Nueva York el 22 de septiembre de 2025, por la que se ordena al Comerciante que se abstenga de iniciar o continuar procedimientos en otra jurisdicción, así como todos los derechos para hacer valer, mantener o solicitar medidas cautelares de conformidad con dicha orden.

La comparecencia y participación del *Trustee* en este procedimiento —incluida la presentación del presente escrito— viene impuesta por la propia decisión del Comerciante de solicitar el concurso mercantil y por la necesidad de proteger los derechos derivados del Contrato de Emisión.

**A.- EXCEPCIÓN DE OSCURIDAD Y DEFECTO LEGAL DE LA DEMANDA INCIDENTAL**

En síntesis, TVA afirma que mi representada no expuso claramente su causa de pedir en el Incidente promovido, manifestando que no realizó un contraste entre las condiciones pactadas en la operación y las prevalecientes en el mercado, así como aseverando que las reglas, principios y el marco regulatorio de la institución acreditante únicamente tienen implicaciones respecto de ésta y en modo alguno tienen injerencia en la determinación de que el Contrato de Crédito de 29 de enero de 2026 (el "**Contrato de Crédito**") y su Convenio Modificatorio y de Reexpresión del 06 de marzo de 2026 (el "**Convenio Modificatorio**") cuyo Anexo A es el Contrato de Crédito Modificado y Reformulado el 6 de marzo de 2026 (el "**Crédito Reformulado**") (conjuntamente, referidos como "**Crédito AlterBank**") se hayan celebrado fuera de las condiciones de mercado y/o en contravención a los usos y prácticas bancarios y mercantiles.

Asimismo, refiere que el riesgo es la esencia misma de la actividad crediticia y que en este caso el acreedor evaluó su riesgo y lo administró "como la práctica ordena" ya que "si el riesgo es elevado, se exige garantías, se pacta una tasa acorde y un plazo corto", precisando incluso que "si esa asunción de riesgo resultara excesiva conforme a los parámetros internos o regulatorios del banco, las consecuencias *–prudenciales, regulatorias o de negocio–* serían del banco y para el banco, en su jurisdicción; jamás alcanzaría para decretar la ineficacia de los actos del acreditado".

TVA pretende ofuscar la inteligencia de su Señoría exponiendo que los Acuerdos y Principios del Comité de Supervisión Bancaria de Basilea no son normas jurídicas vigentes en México y que únicamente son *soft law* desprovistos de fuerza vinculante directa, afirma que mi representada confunde lineamientos prudenciales con las condiciones económicas que rigen las operaciones de financiamiento en un mercado determinado.

TVA plantea que el crédito objeto del presente incidente es un crédito otorgado conforme al mercado de financiamiento a empresas en situación de estrés financiero, en el que –según afirma– existen tasas superiores al crédito corporativo ordinario, plazos cortos con estructura puente, paquetes de garantías reforzados y acreedores no tradicionales, TVA refiere dicha práctica financiera internacional como "*bridge lending", "rescue lending"* y *"distressed lending*". De manera claramente falaz, TVA pretende justificar una operación

claramente fraudulenta con base en la finalidad de la Ley de Concursos Mercantiles (la "**LCM**"), esto es, la conservación de la empresa.

TVA expone en su contestación al Incidente que, a su parecer, el único ejercicio idóneo conforme al artículo 114, fracción III de la LCM, sería la comparación del crédito impugnado a la luz de otros celebrados en el sector financiero que refiere y hace énfasis en que este tipo de financiamiento es una oportunidad de negocio atractiva en virtud de un mayor rendimiento y comisiones y que incluso la LCM permite a la Comerciante solicitar créditos aun declarada en concurso mercantil.

Respecto al hecho de que el crédito fue celebrado en moneda nacional, con una línea de crédito de hasta $5,000,000,000.00 (cinco mil millones de pesos 00/100 M.N.) dicha rectificación es intrascendente para el efecto de que dicha operación se encuentra celebrada fuera de condiciones de mercado y, reitero en nombre de mi representada, que hasta antes de la contestación de TVA ésta desconocía el contenido del Crédito AlterBank.

La excepción opuesta por TVA es claramente falaz, infundada e improcedente, tal como se acredita a continuación:

Por principio de orden, es evidente que mi representada no podía exponer detalles del Contrato de Crédito, su Convenio Modificatorio y el Crédito Reformulado, pues se trata de documentos desconocidos para ella y el resto de los acreedores hasta antes del auto de 02 de septiembre de 2026, por lo que, es fácticamente imposible que mi representada manifestara algo respecto a las tasas y demás cuestiones de la operación si no tenía acceso a los documentos que materializaron el crédito que se impugna.

Sin embargo, no existe ninguna oscuridad ni omisión en el planteamiento de la causa de pedir porque aún sin contar con el contenido exacto de dichos documentos, mi representada expuso argumentos suficientes para demostrar que el Crédito AlterBank se encuentra fuera de las condiciones de mercado y contraviene los usos y prácticas mercantiles y bancarios.

Sin perjuicio de lo anterior, ahora que se conocen los términos y condiciones del Crédito AlterBank surgen todavía más elementos y argumentos que hacen evidente que el mismo fue celebrado en contravención a las condiciones de mercado y a los usos y prácticas bancarias y mercantiles.

TVA afirma que el Crédito AlterBank es un crédito celebrado conforme a las condiciones de mercado que prevalecen en el sector que afirma que es una práctica financiera "común" que es el financiamiento de rescate o puente, como menciona en la excepción que se contesta.

En ese sentido, es pertinente definir qué es un "crédito puente" en el mercado financiero, ya que TVA confunde este tipo de operación con el crédito otorgado por AlterBank.

Un crédito puente es un financiamiento de carácter temporal y, generalmente, de corto plazo, destinado a cubrir una necesidad de recursos durante un periodo transitorio, **bajo la expectativa de que será sustituido o pagado mediante una fuente de financiamiento permanente, como la contratación de deuda, la colocación de capital o la venta de activos.**

En el mercado nacional, un crédito puente es un financiamiento de carácter temporal destinado a cubrir las necesidades de recursos de una operación o proyecto durante un periodo transitorio, en tanto se obtiene una fuente de financiamiento posterior o definitiva con la cual se prevé su pago o refinanciamiento.

Es decir, contrario a lo expuesto por TVA, los créditos puente nada tienen en común con el crédito objeto del presente incidente. Esto, toda vez que: ***i)*** el Crédito AlterBank fue otorgado como un crédito definitivo –no como un crédito provisional a ser sustituido con un financiamiento ulterior como lo exige la propia naturaleza de un crédito de ese tipo–; ***ii)*** tampoco se estableció que el mismo sería pagado a través de la venta de activos, de hecho, como reconoce la propia TVA y, se encuentra acreditado en autos, a la fecha de celebración del Convenio Modificatorio y el Contrato Reformulado la Comerciante ya había aprobado su presentación de solicitud de concurso mercantil, con lo que evidentemente no podía incurrir en la venta de sus activos. Sobre este punto en particular llama la atención lo pactado en la Sección 2.03 del Contrato Reformulado, tal como se expone en en líneas posteriores y ***iii)*** tal como se menciona en las opiniones de experto que se acompañan al presente, cualquier crédito de esta naturaleza requiere como mínimo un *due diligence* respecto de obligaciones contractuales existentes a cargo del Acreditado y en el caso que nos ocupa, AlterBank hubiera advertido fácilmente que el crédito viola directamente diversas disposiciones del Contrato de Emisión –que obra ya en los autos del presente concurso– particularmente, las prohibiciones para adquirir nueva deuda, y otorgar garantías.

Así se concluyó en la opinión de experto emitida por los CC. emitida por Mauricio Basila Lago –ex Director Director General de Emisoras y Vicepresidente de Supervisión Bursátil de la Comisión Nacional Bancaria y de Valores– y Paul Yamil José Aguilar ("Basila Abogados, S.C."). en alcance a la diversa de fecha 12 de agosto de 2026 (en adelante, la "**Opinión de Experto Mexicano**") que se acompaña al presente como **ANEXO 2**, particularmente en los párrafos 94 Bis y 94 Ter, mismos que solicito se tengan aquí por reproducidos como si a la letra se insertasen.

Luego entonces, es claro que no estamos en presencia de un crédito puente como erróneamente manifestó TVA. En ese mismo sentido se pronunció la experta Renee Tamara

St. Rose KC en la opinión de experto que se acompaña al presente como **ANEXO 1**, acompañado de su traducción al español por perito traductor certificado como **ANEXO 1 BIS** –véase la Sección B, párrafo 10; Sección D, párrafo 44, mismo que solicito se tenga aquí por reproducido como si a la letra se insertase–.

Ahora, por lo que hace a los "créditos de rescate"o "*rescue lending*"/*"distressed lending"*, estos tampoco se otorgan en los términos expuestos por TVA.

Este tipo de créditos consisten en el otorgamiento de capital nuevo –típicamente deuda– a una empresa en dificultades financieras que ya no tiene acceso al crédito ordinario, a cambio de condiciones que compensen dicho riesgo extraordinario (tasas de interés altas, capitalización de intereses, warrants o garantías perfeccionadas de **forma previa al desembolso** y acciones preferentes) así como mecánicas que subordinan a los acreedores preexistentes. La finalidad de dichos créditos es comprar tiempo y conservar la viabilidad de la empresa que, de otro modo caería en insolvencia.

Dicho de otro modo, los créditos de esta naturaleza persiguen **evitar que el acreditado caiga en situación de insolvencia y dentro de un procedimiento concursal, por ejemplo.**

Es importante mencionar que este tipo de financiamientos son otorgados por fondos especializados y no por instituciones bancarias como lo es AlterBank, distinción que obedece a una consecuencia regulatoria y contable determinada. Una exposición nueva frente a un acreditado en incumplimiento generalizado nace clasificada como deteriorada y obliga a la institución acreditante a constituir reservas preventivas de magnitud cercana a la totalidad de la exposición desde el primer día.

Luego entonces, tal como se concluye en la Opinión de Experto Mexicano el Crédito AlterBank no es ni un crédito puente ni un crédito de rescate –véase el párrafo 115 Quáter de dicho documento, cuyo contenido solicito se tenga aquí por reproducido como si a la letra se insertase–.

Con las constancias de autos que integran el presente concurso mercantil e Incidente –particularmente, con el Contrato de Crédito, Convenio Modificatorio y el Contrato Reformulado– se encuentra claramente acreditado que:

***i)*** La disposición de la línea de crédito fue desembolsada por AlterBank el mismo 29 de enero de 2026, mismo día de su celebración; **sin embargo, no fue fondeado por dicha institución, sino por terceros desconocidos** (cuestión que fue plasmada contractualmente hasta el 06 de marzo de 2026);

***ii)*** A los escasos 12 días posteriores a dicho desembolso, el 10 de febrero de 2026 TVA publicó la convocatoria a su Asamblea Extraordinaria de Accionistas a

celebrarse el 26 de febrero del mismo año (en cuyo orden del día se estableció la aprobación de la presentación de un procedimiento de concurso mercantil);

***iii)*** El 26 de febrero de 2026 se aprobó en dicha asamblea la solicitud de la declaración en concurso mercantil de TVA;

***iv)*** El 06 de marzo de 2026 –8 días después de la celebración de la Asamblea– se celebró el Convenio Modificatorio, así como el Contrato Reformulado. Dicha reestructuración se llevó a cabo sin que existiera incumplimiento de pago ni situación que ordinariamente la justificara –cuestión que resulta apartada de los usos y prácticas bancarios y mercantiles, tal como se expone en el párrafo 36 de la Opinión de Experto Mexicano que solicito se tenga aquí por reproducida como si a la letra se insertase–.

La línea del tiempo anterior es clave y acredita que el crédito objeto del Incidente sí fue celebrado fuera de condiciones de mercado y en contravención a los usos y prácticas bancarios y mercantiles, como se desglosa a continuación.

El desembolso del crédito fue realizado de forma completamente apartada de los usos bancarios y las condiciones de mercado, tal como se menciona en la Opinión de Experto Mexicano.

Esto, toda vez que no existieron condiciones precedentes pactadas en el Contrato de Crédito para el desembolso del crédito. En este caso el crédito fue desembolsado sin que TVA tuviera que entregar documentos corporativos, poderes, certificados de ausencia de incumplimiento, confirmación de declaraciones, evidencia del destino de los recursos y peor aún, sin que se constituyeran ni perfeccionaran las garantías en favor del AlterBank (véanse los párrafos 3 y 52 de la Opinión de Experto Mexicano, mismo que solicito se tenga aquí por reproducido como si a la letra se insertase).

Por su parte, véase la opinión complementaria de Renee Tamara St. Rose KC que se acompaña al presente como **ANEXO 1** acompañado de su traducción al español por perito traductor certificado como **ANEXO 1 BIS,** en sus párrafos 17 y 18, específicamente cuando menciona: *"Una línea de crédito de esta envergadura concedida sin garantía, incluso por un periodo de hasta sesenta (60) días, no es una práctica habitual en el mercado para un préstamo garantizado de tal magnitud."*

Hasta lo aquí expuesto ha quedado demostrado que conforme a la naturaleza del *"distressed lending"* la finalidad perseguida por este tipo de financiamientos es otorgar al acreditado viabilidad financiera y, en el caso que nos ocupa, TVA era ***i)*** claramente insolvente, como reconoce en su propia contestación al Incidente y ***ii)*** había preparado corporativamente su procedimiento de concurso mercantil **antes** de la reexpresión del Contrato de Crédito, pero con posterioridad al desembolso del crédito dispuesto, con lo que queda en evidencia que **el crédito no fue otorgado con el propósito de dotar de solvencia**

**y viabilidad financiera a la empresa**, primer apartamiento de las condiciones de mercado para un crédito de dicha naturaleza.

Así también lo refiere la experta Renee Tamara St. Rose KC en la opinión de experto que se acompaña al presente como **ANEXO 1** acompañado de su traducción al español por perito traductor certificado como **ANEXO 1 BIS** –véase la Sección B, párrafo 14– en la que establece que la condición pública y notoria de insolvencia de TVA constituye uno de los principales indicadores del apartamiento de las condiciones de mercado del Crédito AltberBank.

Es más, en la Opinión de Experto Mexicano se estableció lo siguiente:

> **94.** La eventual caracterización de la operación como financiamient especializado no modifica, por tanto, la conclusión de la Opinión; la agudiza. El Crédito Alter-TVz incorporó el costo característico de un financiamiento de rescate sin incorporar ninguno de los mecanismos de control y protección que económicamente lo justifican. Adicionalmente, para una institución regulada, una exposición nueva frente a un acreditado en incumplimiento genera costos elevados de reservas, capital, liquidez y concentración y, por ello, requiere de una fuente de recuperación extraordinariamente robusta, distribución de riesgo y aprobación reforzadas, elementos que los Documentos del Crédito no acreditan.

En la Opinión de Experto Mexicano también se determinó que en el Contrato de Crédito se omitieron por completo las declaraciones que resultarían críticas para un acreditado en incumplimiento generalizado. Como se puede leer del propio contrato, TVA no declaró nada respecto a la ausencia de litigios o procedimientos relevantes, no hay declaración de incumplimiento bajo otros contratos o instrumentos de deuda, no hay declaración de ausencia de pasivos no revelados, no hay declaración de solvencia, no hay declaración de cambio adverso relevante. Esto es evidentemente contrario a las condiciones de mercado y los usos bancarios y mercantiles.

Conforme a lo pactado en la Cláusula 5 del Contrato de Crédito, el Acreditante contrató sin derecho a recibir información financiera alguna durante la vida del crédito, ya que la obligación estipulada se limita a que TVA mantenga sus propios registros y sistemas contables internos, circunstancia que claramente es contraria a los usos bancarios y mercantiles, ya que la información financiera del acreditado resulta trascendente para la viabilidad de pago del deudor en todos los créditos, más aún en un crédito a una sociedad notoriamente insolvente.

En la Opinión de Experto Mexicano se advierte que lo anterior constituye un apartamiento **grave** de las condiciones de mercado y los usos bancarios y mercantiles. Para mejor referencia, a continuación, los párrafos 47 y 48 de dicho documento:

> 47. Esta ausencia es, desde la perspectiva bancaria y financiera que constituye el objeto del presente Alcance, el hallazgo técnicamente más significativo del Contrato Original. Los *coventants* y las obligaciones de información cumplen en un

> crédito corporativo tres funciones prudenciales que ningún otro elemento del contrato sustituye: **(i)** impiden que el acreditado deteriore unilateralmente el perfil de riesgo sobre el cual se otorgó el financiamiento; **(ii)** generan puntos de detección temprana del deterioro, al convertir en incumplimiento contractual accionable un desvío que de otro modo sólo se manifestaría al vencimiento; **(iii)** otorgan al acreedor una posición negociadora anticipada. El numeral 19 de los Principios del BCBS se refiere a ellas como *obligaciones contractuales diseñadas para limitar cambios en el perfil de riesgo futuro del acreditado*; el numeral 43 exige que el monitoreo crediticio vigile el cumplimiento de los *covenants* existentes; el numeral 39 incluye entre las funciones de la administración crediticia el monitoreo de la documentación, los requisitos contractuales y las obligaciones legales; el numeral 144, inciso e), de las Directrices EBA/GL/2020/6 exige evaluar la estructura de la operación incluidos los *covenants*; y su numeral 164 exige evaluar específicamente las cláusulas de *negative pledge*. Ninguno de esos ejercicios era materialmente posible bajo el Contrato Original, porque el instrumento no generó objeto alguno sobre el cual practicarlos.
>
> 48. … La renuncia simultánea a todas esas protecciones no se explica por la premura de la operación, dado que se trata de cláusulas estándar disponibles en cualquier formulario de mercado y de inclusión inmediata, y sí resulta consistente con un escenario en el que la recuperación del crédito no dependía realmente del comportamiento financiero futuro del Acreditado.

La contravención a las condiciones de mercado y usos y prácticas bancarios y mercantiles resulta cínica con lo pactado en la Cláusula 8.09 del Contrato de Crédito, conforme a la que cada parte sufragará sus propios costos, apartándose de la práctica invariable conforme a la que cada acreditado cubre los gastos de estructuración y de asesoría legal del acreditante. –Véase la Opinión de Experto Mexicano, particularmente el párrafo 8, mismo que solicito se tenga aquí por reproducido como si a la letra se insertase–.

El Contrato de Crédito se aparta claramente de las condiciones de mercado y usos bancarios y mercantiles toda vez que lejos de proteger a los acreditantes, los perjudica. Esto, debido a que existen estipulaciones cuyo efecto es debilitar la posición del acreditante y carecen de precedente en documentación crediticia en el mercado, tal como se expresa en el párrafo 61 de la Opinión de Experto Mexicano, mismo que solicito se tenga aquí por reproducido como si a la letra se insertase.

Para mejor referencia, a continuación, algunas de las cuestiones apuntadas en dicho párrafo:

> **j) Estipulaciones atípicas adversas a la posición del acreedor.**
>
> **61.** El Contrato Original contiene, además de las omisiones señaladas, estipulaciones cuyo efecto es debilitar la posición del propio acreditante y que carecen de precedente en documentación crediticia corporativa de mercado.
>
> - **Fuerza mayor a favor del deudor (Cláusula 8.08).** … En la documentación crediticia de mercado las obligaciones de pago de dinero nunca se sujetan a eximentes de fuerza mayor, precisamente porque ello vaciaría de contenido la obligación principal. Una cláusula de esta naturaleza, en un contrato de crédito por cinco mil millones de pesos, es difícilmente conciliable con la intención de un acreedor de asegurar el cobro.
>
> **…**
>
> - **Ausencia de *gross-up* e indemnización fiscal.** La Cláusula 4.05 reconoce expresamente la existencia de retención conforme a la legislación mexicana respecto de pagos derivados de los Documentos del Crédito. No obstante, el Contrato Original no contiene cláusula alguna de incremento por retenciones

> (*gross-up*) ni de indemnización fiscal, de modo que el rendimiento neto del acreditante frente a la retención mexicana aplicable a intereses pagados a residentes en el extranjero queda contractualmente indeterminado. Se trata de una de las estipulaciones más invariablemente presentes en cualquier financiamiento transfronterizo.
> **…**

Es importante mencionar que, aun cuando en el Contrato Reformulado se realizaron restricciones sobre endeudamientos, gravámenes, operaciones con partes relacionadas, uso de fondos y entrega de información, dicho documento no puede analizarse retroactivamente. Lo relevante es que el Crédito se desembolsó en contravención al estándar mínimo que debía observarse para una operación de esta naturaleza y que su clausulado no corresponde a los estándares de mercado ni a los usos bancarios.

Ahora, en la Sección 2.03 del Contrato Reformulado se pactó que el pago del **monto total del crédito sería en una sola exhibición igual al Desembolso en la fecha de vencimiento –29 de julio de 2026–**; es decir, TVA pretende sostener que era su voluntad realizar el pago en una sola exhibición de $4,085,000,000.00 (cuatro mil ochenta y cinco millones de Pesos 00/100 M.N.)[1] más intereses, cuando ha confesado y obra en autos que aprobó la presentación de su solicitud de concurso mercantil **antes de la celebración del Convenio Modificatorio el Contrato Reformulado**, **conociendo que dentro de las primeras consecuencias legales de ello se encuentra la prohibición para pagar deudas a acreedores**.

Dicho de otro modo, a la fecha de celebración del Convenio Modificatorio y de Reexpresión había pleno conocimiento de que como consecuencia de la admisión de la solicitud de declaración de concurso mercantil TVA se encontraría jurídicamente –con independencia de su estado de insolvencia– impedida para pagar a AlterBank el crédito dispuesto más accesorios en la Fecha de Pago.

Aunado a lo anterior, a la fecha de celebración del Contrato Reformulado ya se encontraban actualizadas las causales de incumplimiento previstas en la Sección 6.01, incisos (h) e (i) de dicho documento:

> Sección 6.01. Casos de Incumplimiento.
> …
> (h) Insolvencia. El Acreditado o cualquier Subsidiaria del Acreditado (cada uno de ellos, una "**Persona Especificada**") se ve incapacitado para pagar sus deudas a medida que venzan, admite por escrito ante un tribunal competente su incapacidad para hacerlo o incumple de manera general en el pago de sus deudas.
>
> (i) Procedimientos de Insolvencia. Cualquier Persona Especificada comete o permite cualquier acto de quiebra o insolvencia, término que incluirá (i) quedar sujeto involuntariamente a una solicitud de quiebra, concurso mercantil, restructura (sic), concurso de acreedores, disolución o liquidación u otro procedimiento

[1] Realmente, es la cantidad de $4,156,487,500.00 (cuatro mil ciento cincuenta y seis millones cuatrocientos ochenta y siete mil quinientos pesos 00/100) en términos de lo pactado en la Sección 4 del Convenio Modificatorio en la que se pactó la capitalización de los intereses devengados a la fecha de celebración de dicho documento.

> análogo en su propósito o efecto, incluyendo, sin limitación, un procedimiento conforme a la Ley de Concursos Mercantiles y el incumplimiento por parte de la Persona Especificada en cuestión de lograr que dicha solicitud presentada por otra parte sea desestimada en un plazo treinta (30) días; (ii) la solicitud voluntaria **o el consentimiento** para el nombramiento de un administrador, liquidador provisional, conservador, síndico, interventor, conciliador,… **o para que se inicie o se conceda la quiebra, concurso mercantil, reestructura,** … **de cualquier Persona Especificada**… (v) **la emisión de cualquier orden judicial o sentencia que confirme la quiebra o insolvencia, el concurso mercantil** … **de cualquier Persona Especificada** (vii) la aprobación de una resolución efectiva, la convocatoria de una reunión de cualquier Persona Efectiva o la adopción de cualquier medida preparatoria con el fin de considerar una solicitud de orden de administración en relación con cualquier Persona Especificada…

Sobra decir que es contrario a las condiciones de mercado suscribir un contrato de crédito que se encuentra incumplido de origen, toda vez que TVA **ya había aprobado en Asamblea de 26 de febrero de 2026 iniciar su procedimiento de concurso mercantil**. Estamos en presencia de algo completamente atípico en operaciones de esta naturaleza, esto es, que en un crédito que supuestamente persigue mantener la viabilidad financiera de la empresa y asegurar el cobro con altos rendimientos ya existía la voluntad del acreditado de someterse a un procedimiento de concurso mercantil al haber sido aprobado en asamblea y pese a ello, se continuó con la celebración de dicho documento. Esto evidencia otro apartamiento de las condiciones de mercado y contravención a los usos y prácticas bancarios y mercantiles.

Dicha contravención es clara, ya que otorgar un crédito que desde el momento de su celebración (en este caso, su reexpresión) se encuentra incumplido es un contrasentido a la naturaleza propia de la operación. Ese incumplimiento de origen evidencia que esta no es una operación dentro de las condiciones de mercado, ya que ninguna institución financiera otorgaría un crédito cuyo incumplimiento más allá de ser inminente ya se hubiera actualizado. No existe la "oportunidad de negocio" que señaló TVA en su contestación al Incidente.

FESUNSAWADQIEZ CASÑIZLO ELORZA
30866630631666363030303507080304316408
04/03/29 16:06:24

Es más, en la Sección 6.02 del Contrato Reformulado las partes excluyeron de manera expresa los supuestos previstos en los incisos (h) o (i) de la Sección 6.01 de las medidas correctivas pactadas; a saber: ***i)*** la rescisión del Contrato y ***ii)*** la declaración de que el Crédito vence y es pagadero en su totalidad. Esto claramente se aparta de los usos y prácticas bancarios y mercantiles, así como de las condiciones de mercado, ya que no existe negocio en otorgar un crédito a una persona insolvente y que se someterá a un procedimiento de concurso mercantil y que, como consecuencia de ello, no pagará el crédito en términos ordinarios, sino que para su cobro se tendría que acudir a la ejecución de garantías; los supuestos previstos en dichos incisos son, incluso precisamente, las causales de incumplimiento más típicas en los contratos de crédito.

La experta Renee Tamara St. Rose KC concluye que lo anteiror es claramente contrario a las condiciones de mercado, tal como consta en la opinión de experto que se acompaña al presente como **ANEXO 1** acompañado de su traducción al español por perito

traductor certificado como **ANEXO 1 BIS** –véase la Sección B, párrafo 15, solicitando se tenga aquí por reproducido como si a la letra se insertase en obvio de repeticiones innecesarias–.

En adición a los apartamientos señalados en líneas anteriores, existen otras cuestiones relacionadas con las tasas de interés del Crédito AlterBank que son claramente contrarias a las condiciones de mercado y prácticas bancarias y mercantiles: ***a)*** tasas altas que parecen obedecer al riesgo de la operación; sin embargo, toda vez que TVA ya se encontraba preparando la presentación de su concurso mercantil dicho argumento resulta inverosímil, realmente las tasas fueron pactadas para asegurar que AlterBank siguiera acumulando intereses a tasas altas durante la tramitación del procedimiento hasta el valor de sus garantías reales (en términos de lo dispuesto por el artículo 89, fracción III de la LCM) y ***b)*** se pactó una tasa moratoria mensual que claramente es de papel, ya que en virtud de lo expuesto, dichos intereses nunca se devengarían máxime que modificaron los pagos de intereses trimestrales para pactar que éstos se pagarían en una sola exhibición al vencimiento del crédito.

La modificación de la periodicidad de la obligación del pago de intereses constituye un tercer apartamiento de las condiciones de mercado, ya que como expone la experta Renee Tamara St. Rose KC en la opinión de experto que se acompaña al presente como **ANEXO 1** acompañado de su traducción al español por perito traductor certificado como **ANEXO 1 BIS**, dicha modificación tendría que haber obedecido en todo caso a una mejora en la expectativa de pago de TVA, circunstancia que no corresponde a la realidad en este caso ,los motivos expuestos –véase la opinión en la Sección B, párrafos 26, 27 y 28 del **ANEXO 1** acompañado de su traducción al español por perito traductor certificado como **ANEXO 1 BIS**, mismos que solicito se tengan aquí por reproducidos como si a la letra se insertasen–.

Conforme a lo pactado por TVA y AlterBank en el Crédito AlterBank la cuenta bancaria a la que se realizaría el pago del Crédito se encuentra aperturada en la institución bancaria que forma parte del grupo empresarial de TVA, cuestión que se aparta de los usos y prácticas bancarios y mercantiles, tal como se expone en el párrafo 64 de la Opinión de Experto Mexicano que solicito se tenga aquí por reproducido como si a la letra se insertase.

Otra particularidad del crédito que se aparta claramente de las condiciones de mercado y los usos y prácticas mercantiles y bancarias es el hecho de que conforme al Contrato de Crédito el crédito sería desembolsado por AlterBank; sin embargo, en el Convenio Modificatorio y el Contrato Reformulado se precisó lo siguiente:

1. En la Sección 4 del Convenio Modificatorio se estableció:

**SECCIÓN 4.** ***Monto del Crédito Desembolsado y Reconocimiento de las Deudas Pendientes.***

El Acreditado reconoce que, a la fecha, ha realizado un Desembolso en virtud del Contrato de Crédito por un monto total de $4,085,000,000.00 (cuatro mil ochenta y cinco millones de pesos 00/100) y que adeuda al Acreditante Inicial $4,085,000,000.00 (cuatro mil ochenta y cinco millones de pesos 100/00) de capital en virtud del Contrato de Crédito, y que dicho monto de capital está pendiente de pago y es pagadero a los Acreditantes según se refleje de tiempo en tiempo en el Registro que lleve el Agente Administrativo. Cualquier referencia al Acreditante Inicial en relación con dicha deuda se hace únicamente en su carácter de titular del registro y representante de los Acreditantes.

**2.** Conforme a la Sección 2.01 del Contrato Reformulado el desembolso del crédito no provino de AlterBank, sino de terceros <u>desconocidos</u>:

Sección 2.01. El Crédito
Sujeto a los términos y condiciones establecidos en el presente, las Partes reconocen en este acto que el Crédito se desembolsó en la Fecha de Desembolso a través del Acreditante Inicial, quien actuó exclusivamente en su carácter de Agente Administrativo y titular de los registros en nombre de los Acreditantes…

Ahora, un crédito sindicado es un financiamiento en el que dos o más acreditantes asumen compromisos directos frente al acreditado bajo una documentación común. Cada acreditante conserva un derecho de crédito propio por su participación, mientras uno o varios agentes coordinan las disposiciones, pagos, comunicaciones y garantías.

El Crédito AlterBank que fue fondeado **de origen** por diversos acreditantes cuya identidad se encuentra oculta, pues no celebraron directamente el contrato de crédito, sino que su participación es objeto de un registro independiente, en términos de lo pactado en la Sección 3.14 del Contrato Reformulado que, para mejor referencia, se transcribe a continuación:

Sección 3.14. Registro; Reconocimiento de los Acreditantes.

El Acreditado reconoce que el Agente Administrativo podrá mantener, de tiempo en tiempo, registros que reflejen la identidad de los Acreditantes y sus respectivas participaciones en el Crédito…

Es decir, AlterBank no es realmente un acreditante, ya que conforme a la literalidad del Contrato Reformulado los fondos no provinieron de dicha institución, sino de terceros. AlterBank únicamente fue el vehículo del dinero en este crédito.

En la práctica ordinaria de los créditos sindicados, los acreditantes originales y sus respectivos compromisos o participaciones se identifican al momento de la celebración del financiamiento —frecuentemente mediante un anexo de acreditantes y compromisos.

Es más, dentro de las estipulaciones más estándar en los créditos sindicados se encuentra la regulación de las facultades y responsabilidades del agente frente a los acreditantes, estipulación que es inexistente en el Crédito AlterBank, apartándose una vez más de las condiciones de mercado y usos y prácticas bancarios y comerciales –véase el párrafo 70 de la Opinión de Experto Mexicano, mismo que solicito se tenga aquí por reproducido como si a la letra se insertase–.

En el párrafo 77 de la Opinión de Experto Mexicano se expresó de manera clara que "El resultado estructural es que con el Contrato Original ninguna persona debe nada a quienes asumen el riesgo económico del financiamiento. Los acreditantes no son destinatarios de las declaraciones ni de las obligaciones del Acreditado, no reciben el título de crédito, no reciben directamente los pagos, no pueden instruir la aceleración, no participan en las modificaciones y renuncias, y carecen de acción contractual frente al Agente, quien no les debe deber fiduciario alguno. En una sindicación de mercado, ese conjunto de facultades se equilibra mediante el régimen de acreditantes requeridos, las materias sujetas a unanimidad, las obligaciones de información y rendición de cuentas del agente y su régimen de sustitución. Ninguno de esos contrapesos existe." Luego entonces, se pone de manifiesto un apartamiento indubitable de las condiciones de mercado y los usos bancarios.

El ocultamiento de los verdaderos Acreditantes (ya que conforme al Contrato Reformulado, AlterBank no lo es) se aparta claramente de las sanas prácticas bancarias y las condiciones de mercado, ya que en un crédito de este tamaño es imposible que el Acreditado decidiera no tener visibilidad del origen de los recursos, **dicha negligencia podría recaer incluso en incumplimientos regulatorios en materia de prevención de lavado de dinero e identificación de operaciones con recursos de procedencia ilícita**.

[illegible] LO ELORZA
[illegible]
[illegible] 16:06:24

Resulta relevante lo expresado en la Opinión de Experto Mexicano que, para mejor referencia se transcribe a continuación:

> **88.** A ello se añade la dimensión de prevención de operaciones con recursos de procedencia ilícita. Conforme al numeral 44, inciso b), de las Directrices EBA/GL/2020/06, la asociación con una operación crediticia de una persona que no es ni el acreditado ni la entidad acreditante constituye, por sí misma, un factor de riesgo que debe identificarse, evaluarse y gestionarse, adoptando medidas para comprender la legitimidad del origen de los fondos. En el marco mexicano utilizado como parámetro, la figura del Propietario Real prevista en las Disposiciones del artículo 115, adoptada en atención a la Recomendación 10 del GAFI, persigue exactamente ese objetivo: determinar quién obtiene en última instancia los beneficios derivados de un contrato u operación y quién ejerce los derechos de disposición sobre los recursos. La estructura documentada en el Contrato Original es, por su diseño, refractaria da esa determinación.

Esta negligencia resulta conveniente para TVA, ya que del contenido del Contrato Reformulado y, en general, del Crédito AlterBank no se advierte de dónde provino el dinero, **lo que válidamente permite sospechar que éste proviniera de partes relacionadas de**

**TVA**. Se destaca que conforme al contenido de la página de internet de AlterBank[2], dicha institución no desempeña habitualmente ninguno de los cargos que asume en el Crédito AlterBank, hecho que robustece esta sospecha.

Por lo que hace a los argumentos vertidos por TVA en relación con que los Acuerdos y Principios del Comité de Supervisión Bancaria de Basilea no son normas jurídicas vigentes en México y que únicamente son *soft law* desprovistos de fuerza vinculante directa, así como que el incumplimiento de los mismos y cualquier regulación aplicable a AlterBank es algo que únicamente le concierne a ella y no trasciende en la determinación de que el Crédito AlterBank se celebró fuera de condiciones de mercado y en contra de los usos y prácticas bancarias y comerciales es completamente falso.

Lo anterior, ya que AlterBank es una institución financiera sujeto a un marco regulatorio conforme al que no puede actuar de forma discrecional, sino que, al igual que ocurre con las instituciones de crédito nacionales, se tiene que someter a lineamientos y regulaciones por parte de la autoridad en su actividad, por lo que si dichos Acuerdos y Principios tienden a las sanas prácticas bancarias y Santa Lucía las implementa en su regulación, es claro que si una operación se aparta de ellas, la misma contraviene de los usos bancarios.

Esto también lo concluye la experta Renee Tamara St. Rose KC en la opinión de experto que se acompaña al presente como **ANEXO 1** acompañado de su traducción al español por perito traductor certificado como **ANEXO 1 BIS** –véase la Sección C, párrafos 38 a 42, mismos que solicito se tengan aquí por reproducidos como si a la letra se insertasen–. Por su parte, se cita la partes relevante de su opinión:

> 39. […] Los principios prudenciales derivados de Basilea a los que se hace referencia en la Opinión Principal tienen relevancia jurídica y normativa en Santa Lucia en la medida en que Se reflejan en el marco legal y regulatorio nacional aplicable a AlterBank. La secci6n 15 de la Ley de la FSRA faculta a la FSRA a emitir directrices destinadas a las entidades reguladas en relación con las normas prudenciales relativas, entre otras cuestiones, a la seguridad y solidez de los fondos, la calidad de los activos, la liquidez, las Operaciones entre partes relacionadas y el gobierno corporativo. En consecuencia, las Notas Orientativas de la FSRA establecen los requisitos prudenciales aplicables a AlterBank, incluyendo los requisitos sobre la exposición frente a un único prestatario establecidos en la Nota Orientativa 11. AlterBank estaba sujeto, además, a las condiciones contenidas en la autorización previa a la apertura de la FSRA, de 23 de febrero de 2024, incluyendo el requisito de mantener un Coeficiente entre el Capital Total Admisible y los Activos Ponderados por Riesgo por encima del 8% y de notificar con antelación cualquier desviación significativa respecto a Su plan de negocio aprobado. Por lo tanto, las obligaciones pertinentes se derivan del marco regulador nacional de Santa Lucia y de las condiciones aplicables a AlterBank, y no de los principios de Basilea que operan de forma independiente como fuente del derecho de Santa Lucia.
>
> 41. No obstante, el marco regulador es relevante para la evaluaci6n comercial. El marco prudencial de Santa Lucia exige a los prestamistas regulados que aborden cuestiones como la suficiencia del capital, el riesgo de concentración, la evaluación crediticia, la liquidez, la valoración de las garantías y la gestión de riesgos. En

[2] https://www.alterbank.com/services

> particular, la Opinión Principal concluyó que AlterBank estaba obligado, antes de aprobar y desembolsar el Préstamo, a realizar una evaluación crediticia adecuada de TV Azteca, incluyendo su situación financiera, flujos de efectivo, capacidad de pago y endeudamiento existente, así como a evaluar la suficiencia y el valor de la garantía. Por lo tanto, un incumplimiento sustancial de dichas normas puede constituir una prueba importante a la hora de evaluar si la operación cumplía con la práctica habitual de concesión de préstamos comerciales.

Todo lo expuesto acredita plenamente que el crédito objeto del presente Incidente se celebró fuera de las condiciones de mercado, así como en contravención a los usos y prácticas bancarias y mercantiles, por lo que, deberá ser declarado como ineficaz frente a la masa, así como también evidencia la notoria improcedencia de la excepción opuesta por TVA en su contestación, por los motivos expuestos y para todos los efectos legales a que haya lugar.

**B.- EXCEPCIÓN DE FALTA DE ACCIÓN Y DE DERECHO (SINE ACTIONE AGIS)**

TVA parte de premisas equivocadas, arribando a conclusiones igualmente erróneas, ya que pretende subsumir la totalidad del capítulo relativo a los actos en fraude de acreedores bajo los mismos presupuestos procesales; sin embargo, el capítulo distingue claramente entre los actos que son **objetivamente fraudulentos** (como el previsto en la fracción III del artículo 114 de la LCM) de aquellos que son fraudulentos conforme a la intervención de la voluntad de las partes, entre otros.

Contrario a lo que manifiesta TVA en la excepción que se contesta, estamos en presencia de un acto **objetivamente** en fraude de acreedores, es decir, la voluntad de la Comerciante de defraudar no es el factor determinante. Así lo establece el propio artículo 114 de la LCM al establecer **taxativamente** un catálogo de actos que **son** en fraude de acreedores, sin establecer ningún requisito adicional más que se hayan celebrado a partir de la fecha de retroacción, como ocurre en el caso que nos ocupa.

Esto es evidente, ya que sería un absurdo estimar que un acto que se aparta por completo de parámetros objetivos como las condiciones de mercado y los usos bancarios y comerciales puede dejar de ser fraudulento por el mero desconocimiento del ánimo de defraudar de una de las partes que intervienen.

Asimismo, TVA expone falazmente que con la contratación del Crédito AlterBank se benefició a la Masa al ingresar recursos y reducir su pasivo. Sin embargo, contrario a lo que expone, no hubo una reducción de pasivo, tal como se expone en la contestación a la excepción siguiente, cuyo contenido solicito se tenga aquí por reproducido como si a la letra se insertase, en obvio de repeticiones innecesarias.

Todo lo expuesto acredita plenamente que el crédito objeto del presente Incidente se celebró fuera de las condiciones de mercado, así como en contravención a los usos y prácticas

bancarias y mercantiles, por lo que, deberá ser declarado como ineficaz frente a la masa, así como también evidencia la notoria improcedencia de la excepción opuesta por TVA en su contestación, por los motivos expuestos y para todos los efectos legales a que haya lugar.

**C. EXCEPCIÓN DE AUSENCIA DE PERJUICIO A LA MASA Y DE EXISTENCIA DE UN BENEFICIO NETO Y CUANTIFICADO EN SU FAVOR**

A lo largo de su contestación al incidente TVA afirma que, la contratación del Crédito Alterbank, fue en exclusivo beneficio de la masa concursal y que esto, generó que "los acreedores concurrieran al Concurso Mercantil de la Comerciante con menos pasivos". Sin embargo, como a continuación se explicará, dicha afirmación es falsa y parte de premisas que no han sido acreditadas por la Comerciante.

En primer término, resulta oportuno recordar que el artículo 4, fracción V de la LCM establece que la masa concursal constituye la porción del patrimonio de la Comerciante declarada en concurso mercantil integrada por los bienes y derechos de su titularidad que no se encuentren expresamente excluidos por la Ley de Concursos Mercantiles, y sobre la cual los Acreedores Reconocidos y demás sujetos legitimados **pueden hacer efectivos sus créditos**.

Por su parte doctrinalmente, Cervantes Ahumada estableció que la masa se divide en dos, masa activa y masa pasiva. Entendiéndose por la primera los bienes de la empresa quebrada, la cual es considerada una universalidad de hecho, esto es, un conjunto variado de bienes afectados a una finalidad: la administración, y en su caso, la liquidación de la empresa para realizar el pago a los acreedores.

Por su parte, la masa pasiva de la empresa estará constituida por todos los acreedores del quebrado que sean susceptibles de ser sometidos al fuero mercantil. Esto, en virtud de los principios de integridad del patrimonio y de universalidad del proceso de quiebra.

Se pone especial énfasis en esta definición otorgada por el reconocido doctrinario Cervantes Ahumada pues, como es de explorado derecho, **los acreedores también forman parte de la masa pasiva concursal**, como en el caso en concreto.

Por otro lado, como ha sido reconocido por el Poder Judicial de la Federación en diversos criterios, la masa se integra no solamente por los bienes y derechos que pertenecían al Comerciante antes de la declaración de concurso mercantil, sino también por aquellos que se incorporen o sean reconocidos con posterioridad, como consecuencia del principio de universalidad que rige al procedimiento concursal.

A nivel jurisprudencial, el Poder Judicial de la Federación ha reconocido que el objetivo principal del concurso mercantil es "*salvaguardar el interés colectivo de los*

*acreedores, mediante la preservación del patrimonio del comerciante concursado*”[3], lo cual reafirma la función estratégica de la masa como núcleo operativo del procedimiento.

**Por tanto, la masa concursal no debe entenderse simplemente como una suma estática de activos del Comerciante, sino como un patrimonio afectado a una finalidad colectiva, la cual busca preservar el valor patrimonial disponible y destinarlo, en última instancia, a la satisfacción ordenada de los acreedores conforme a las reglas de reconocimiento, graduación y prelación previstas en la propia Ley.**

En ese sentido, como se desarrolló previamente, la masa concursal cumple simultáneamente una función de garantía colectiva, de conservación patrimonial y de soporte económico para la continuidad de la empresa o, en su caso, para su liquidación ordenada.

Bajo esa premisa, para determinar si un determinado acto fue realizado “en beneficio de la masa”, no basta con que dicho acto resulte conveniente para la Comerciante ni, mucho menos, que produzca un beneficio individual para alguno de sus acreedores. **El beneficio debe analizarse desde la perspectiva del patrimonio concursal considerado en su conjunto y del interés colectivo de los acreedores.**

Así, se puede concluir que existe beneficio para la masa cuando el acto de que se trate tiene por objeto o efecto incrementar el activo concursal, conservar su valor, recuperar bienes o derechos que deban incorporarse a él, evitar su disminución o deterioro, o generar las condiciones necesarias para que la empresa continúe operando cuando dicha continuidad permita **preservar o maximizar** el valor disponible **para los acreedores.**

Esta interpretación encuentra apoyo en la propia estructura de la Ley de Concursos Mercantiles. Por ejemplo, el artículo 224, fracción IV, reconoce como créditos contra la masa los derivados de diligencias judiciales o extrajudiciales realizadas precisamente “en beneficio de la Masa”, mientras que diversas disposiciones permiten la realización de gastos destinados a la seguridad, conservación y administración de los bienes que la integran. De ello se desprende que el concepto de beneficio no se encuentra limitado a la obtención inmediata de nuevos activos, sino que comprende también aquellos actos razonablemente necesarios para evitar una pérdida o preservar el valor económico del patrimonio concursal.

Esta conclusión ha sido desarrollada en diversos criterios por ese H. Juzgado especializado, pues incluso, el pasado 27 de enero de 2026, dentro del concurso mercantil 15/2023[4], al resolver un recurso de revocación se sostuvo que, para considerar determinada actuación realizada en beneficio de la masa, debe acreditarse **su “estricta necesidad,**

---

[3] *Véase:* Tesis aislada: "Masa Concursal. Su integración como base para la satisfacción de créditos reconocidos." Registro digital: 2005483. Décima Época, Tribunales Colegiados de Circuito, Semanario Judicial de la Federación.

[4] https://sise.cjf.gob.mx/SVP/word1.aspx?arch=4157/4157000032357586202.pdf_1&sec=Roberto_Abihud_Victoria_Villela&svp=1

**pertinencia y racionalidad"**, de manera que pueda determinarse objetiva y previsiblemente que producirá un beneficio para la masa o evitará un perjuicio, en proporción con el costo que dicha actuación implique y siempre que el mismo resultado no pueda alcanzarse mediante una alternativa menos gravosa o más práctica.

Si bien no se pasa de largo que, el estudio de fondo dentro de dicho recurso era determinar si determinado contrato podía ser reconocido como un crédito contra la masa, lo cierto es que, para el caso en concreto el análisis efectuado por ese Juzgado respecto de cuándo un acto se considera en beneficio de la masa resulta ilustrativo para el caso en concreto.

Así, de dicha sentencia se desprenden los siguientes parámetros para determinar si un acto beneficia a la masa concursal: *(i)* que exista una finalidad objetiva vinculada con la preservación, recuperación o incremento del patrimonio concursal; *(ii)* que el beneficio o la prevención del perjuicio sea razonablemente previsible al momento de realizar el acto y no dependa exclusivamente de una valoración posterior; *(iii)* que exista proporcionalidad entre el costo o sacrificio patrimonial asumido por la Comerciante y el beneficio esperado para la masa; *(iv)* **que el mismo resultado no pueda alcanzarse mediante una alternativa menos gravosa o más práctica**; y *(v)* **que la actuación responda al interés colectivo del concurso y no exclusivamente al interés particular de la Comerciante o de alguno de sus acreedores.**

La relevancia de esta distinción deriva precisamente de la naturaleza colectiva del concurso mercantil. El interés de la masa no se identifica con el interés individual del Comerciante ni con el de un acreedor determinado, sino con la preservación y maximización del patrimonio destinado a satisfacer al conjunto de acreedores. **Por ello, un acto que simplemente sustituya un acreedor por otro, incremente el pasivo de la Comerciante sin producir una contraprestación patrimonial correlativa, o beneficie exclusivamente la posición jurídica de un determinado acreedor, no puede calificarse, por esa sola circunstancia, como un acto realizado en beneficio de la masa.**

Por el contrario, deberá acreditarse que dicha operación produjo, o razonablemente estaba encaminada a producir, un incremento, conservación o protección del patrimonio concursal, o bien que evitó un perjuicio económico que, de no haberse realizado el acto, habría recaído sobre ese patrimonio y, consecuentemente, sobre la colectividad de acreedores.

En esa línea, resulta importante realizar un énfasis en que, al resolver el recurso de revocación el 27 de enero de 2026 dentro del concurso mercantil 15/2023, ese H. Juzgado sostuvo lo siguiente:

> *"En efecto, no basta con que los actos hay sido realizados con la "intención" de beneficiar a la masa, sino que deben producir genuinamente un beneficio o evitar un perjuicio a dicho patrimonio. (...)*".

Así, del criterio sostenido por ese H. Juzgado se desprende que las meras intenciones o afirmaciones de TVA en el sentido de que la operación generó un "beneficio" para la masa no pueden tenerse por suficientes sin elementos probatorios que las sustenten, carga de la prueba que corresponde a TVA.

Este entendimiento es congruente, además, con el criterio analizado por la Suprema Corte de Justicia de la Nación en la contradicción de criterios 280/2021, en el que se recogió el razonamiento conforme al cual las consecuencias de determinados actos deben analizarse atendiendo a su trascendencia para la masa y procurando maximizar el patrimonio del Comerciante, particularmente cuando su eficacia pueda producir una disminución de los bienes disponibles para los acreedores.

De todo lo hasta aquí expuesto, es dable concluir que, la afirmación de TVA en el sentido de que el financiamiento otorgado por Alterbank habría sido contratado "en beneficio de la masa" parte de una premisa incorrecta, pues confunde el beneficio que una operación pudiera representar para la Comerciante o para un acreedor determinado con un beneficio efectivo para la masa concursal.

Para sostener que un determinado acto fue realizado en beneficio de la masa debe identificarse cuál fue el efecto patrimonial favorable que produjo para ésta, ya sea mediante el incremento o conservación de sus activos, la recuperación de bienes o derechos, la prevención de una pérdida o la preservación del valor de la empresa en beneficio de la colectividad de acreedores.

Nada de ello se acredita respecto del financiamiento otorgado por Alterbank. Por el contrario, la operación tuvo como efecto inmediato la incorporación de un nuevo pasivo al patrimonio de TVA por una cantidad sustancialmente superior a la obligación que supuestamente pretendía atender, sin que exista una explicación equivalente respecto de la incorporación o conservación de activos en beneficio de la masa; es más, conforme al crédito y las garantías otorgadas, ahora existe un riesgo de ejecución de las mismas en detrimento de la colectividad y la Masa.

A mayor abundamiento, el detrimento en perjuicio de la colectividad se pone de manifiesto con el hecho de que en la víspera de la presentación de la solicitud de concurso mercantil de TVA, se subordinó a los acreedores al Crédito AlterBank –a través de la constitución de garantías en su favor–. Se insiste en que el Crédito AlterBank viola directamente lo dispuesto en las Secciones 3.9, 3.10 y 3.15 del Contrato de Emisión, situación que constituye un ejemplo concreto de cómo se perjudicó a la colectividad.

En efecto, los recursos provenientes del financiamiento no permanecieron en el patrimonio de TVA ni fueron destinados a adquirir activos, generar liquidez para su operación o preservar bienes o derechos que pudieran posteriormente servir para satisfacer a la colectividad de acreedores. Conforme a la propia mecánica de la operación y a los hechos confesados por TVA[5], dichos recursos ingresaron al patrimonio de TVA únicamente de manera transitoria para ser inmediatamente destinados al pago de otra obligación, pues inclusive exhibe comprobantes de pago obtenidos desde la aplicación móvil de diversa institución bancaria.

Por tanto, desde la perspectiva de la masa concursal, la operación no puede analizarse únicamente atendiendo a la entrada momentánea de recursos derivada del financiamiento. Debe examinarse su efecto patrimonial real, en la cual hubo una entrada transitoria de recursos que TVA afirma fue inmediatamente aplicada al pago de un tercero, en donde TVA asumió una nueva obligación frente a Alterbank por un monto considerablemente mayor a lo adeudado al Servicio de Administración Tributaria (en adelante "**SAT**") e, incrementando con ello el pasivo que concurre sobre el patrimonio disponible para satisfacer a los acreedores.

Se destaca que tal como se advierte de los comprobantes de pago exhibidos por TVA, la cuenta desde la que se realizó el pago (aperturada ante BBVA México, S.A., Institución de Banca Múltiple, Grupo Financiero BBVA México) es distinta de la cuenta a la que se depositó el Crédito (aperturada ante Banco Azteca), con lo que existen discrepancias sobre al hecho de que se usara el Crédito realmente para el fin contratado –TVA no acredita haber transferido los recursos de la cuenta de depósito del Crédito a la cuenta desde la que se pagaron los impuestos–. El dinero del Crédito AlterBank puede seguir depositado en la cuenta de TVA en Banco Azteca lo que únicamente representa un beneficio para dicha institución que forma parte del grupo societario de la Comerciante.

Dicho de otra manera, la operación no demuestra haber incrementado la masa activa; lo que sí produjo fue una modificación y, en la medida en que el nuevo financiamiento excediera la obligación satisfecha, un incremento de la masa pasiva. **Ello resulta especialmente relevante porque la incorporación de un nuevo crédito de esa magnitud incide directamente en la posición de los acreedores preexistentes, quienes ahora deben concurrir con un acreedor adicional respecto del mismo patrimonio disponible y, consecuentemente, ven diluida su participación relativa dentro del concurso.**

[5] Como ha sido determinado por diversos criterios, las promociones de las partes constituyen manifestaciones espontaneas, libres de toda coacción y si en ellas se narran hechos propios, estos constituyen confesiones con pleno rango de convicción. Sirva de apoyo a lo anterior, aplicado de manera análoga, los criterios de rubro "**CONFESIÓN JUDICIAL. ALCANCES DE LA PRODUCIDA EN LA DILIGENCIA DE EXEQUENDO.**" y "**PROMOCIONES Y DEMANDA DE LAS PARTES PRESENTADAS EN DIVERSO JUICIO CIVIL. AL SER MANIFESTACIONES ESPONTÁNEAS, LIBRES DE COACCIÓN, QUE CONTIENEN HECHOS PROPIOS, TIENEN NATURALEZA DE CONFESIÓN Y CONSTITUYEN PRUEBA PLENA CONTRA SU AUTOR.**"

Es decir, la operación no incrementó el patrimonio de TVA, no incorporó activos productivos nuevos, no generó flujos adicionales de efectivo ni creó valor susceptible de aprovecharse por la masa concursal. Únicamente sustituyó un acreedor por otro –bajo el capricho unilateral de TVA–, transformando una deuda preexistente en un crédito garantizado que desplazó materialmente las posibilidades de recuperación de los acreedores comunes preexistentes y mejoró sustancialmente la posición jurídica y económica de un acreedor seleccionado en vísperas del concurso mercantil.

De ahí que no sea suficiente afirmar, en abstracto, que el financiamiento permitió a TVA cumplir una obligación. Para sostener que la operación fue efectivamente realizada en beneficio de la masa era necesario demostrar qué obtuvo la colectividad de acreedores a cambio de asumir ese nuevo endeudamiento, la Comerciante no acredita qué activo se incorporó o conservó, qué pérdida patrimonial se evitó, qué valor de la empresa se preservó o, en general, qué ventaja económica concreta recibió la masa que justificara asumir un pasivo por una cantidad sustancialmente superior a la obligación que fue pagada con sus recursos.

Por el contrario, se constituyeron garantías sobre activos de terceros pertenecientes al grupo empresarial de la Comerciante que, para sorpresa de nadie, son los activos más importantes del grupo empresarial, las concesiones de radiodifusión, en adición a las demás garantías otorgadas conforme al Contrato Reformulado.

Se hace especial énfasis en que TVA afirma en su contestación que los créditos fiscales se encontraban garantizados con la negociación mercantil (cuestión que ponía en grave riesgo la operación) sin embargo, decidió garantizar el Crédito AlterBank con los activos que son indispensables para su negocio, las concesiones. Luego entonces, ¿dónde está la maximización de la Masa? Nuevamente existe el riesgo de ejecución de los activos que son indispensables para la operación de TVA en beneficio de un acreedor oportunamente incorporado en vísperas de la declaración de concurso mercantil –que además no es el verdadero titular de la garantía, ya que los titulares se encuentran ocultos–.

El dato verdaderamente relevante no es el beneficio fiscal aislado que obtuvo la Comerciante el 29 de enero de 2026, sino el costo total que la masa concursal asumió para producir dicho resultado, entre otras cosas. Es decir, ¿cuál fue el beneficio neto para la masa de acreedores una vez descontados los intereses, comisiones, garantías constituidas y la afectación patrimonial generada por la creación de un nuevo crédito garantizado? Dicha carga probatoria corresponde a TVA sin que haya ofrecido prueba alguna que así lo acredite.

En ausencia de esa explicación, la operación presenta precisamente el efecto contrario al que TVA pretende atribuirle: los recursos entraron y salieron del patrimonio de la Comerciante, mientras que el nuevo pasivo permaneció. Por ello, el solo hecho de que TVA hubiera recibido formalmente los recursos del financiamiento no demuestra beneficio alguno

para la masa, pues lo relevante no es la existencia de un flujo temporal de efectivo, sino el efecto económico y patrimonial neto que la operación produjo sobre el patrimonio destinado colectivamente a la satisfacción de los acreedores.

A mayor abundamiento, el crédito AlterBank le cuesta diariamente a la Masa y la colectividad aproximadamente $2,020,514.76 (dos millones veinte mil quinientos catorce pesos 76/100 M.N.), lo que equivale aproximadamente a $737,487,886.28 (setecientos treinta y siete millones cuatrocientos ochenta y siete mil ochocientos ochenta y seis pesos 28/100 M.N.). Esto aunado a los costos de las comisiones de estructuración y de reestructuración – aproximadamente, $122,550,000.00 (ciento veintidós millones quinientos cincuenta mil pesos 00/100 M.N.).

La mera contratación y reestructuración del Crédito AlterBank ya representa en costo el 7% del beneficio fiscal obtenido. Por ello, el análisis propuesto por la Comerciante es artificialmente estático, ya que considera únicamente la transacción del 29 de enero de 2026, pero omite estudiar que el perjuicio para la Masa es dinámico y continúa incrementándose diariamente, erosionando el activo disponible para la colectividad de acreedores.

De mantenerse dichas condiciones, el costo financiero acumulado de la operación superará cualquier beneficio fiscal que se invoque para justificarla.

Tampoco puede sostenerse que la contratación del financiamiento con Alterbank hubiera sido necesaria para proteger o beneficiar a la masa concursal frente al procedimiento administrativo de ejecución iniciado por la autoridad fiscal.

En efecto, la propia legislación concursal contempla mecanismos específicamente diseñados para impedir que la ejecución individual de créditos fiscales afecte el patrimonio de una Comerciante sometida a concurso mercantil. En particular, el artículo 65 de la LCM dispone que, desde el dictado de la sentencia de concurso mercantil y hasta la terminación de la etapa de conciliación, deben suspenderse los procedimientos administrativos de ejecución de los créditos fiscales.

Por ello, si la verdadera finalidad de TVA hubiera sido preservar su patrimonio frente a la ejecución del crédito fiscal y, con ello, proteger a la masa y a la colectividad de acreedores, resulta relevante reconocer que la propia legislación concursal contempla mecanismos específicamente dirigidos a enfrentar ese riesgo, es decir, la concursada contaba con mecanismos propios del procedimiento concursal para procurar que dicha ejecución no continuara, sin necesidad de asumir un nuevo endeudamiento por una cantidad sustancialmente superior al crédito fiscal que pretendía atender.

Se destaca que dicha suspensión de los procedimientos de ejecución pudo haberse decretado como medida cautelar con la admisión de la solicitud de concurso mercantil.

La diferencia no es menor. Mientras la suspensión del procedimiento administrativo de ejecución, una vez dictadas las medidas cautelares procedentes o en su caso, la sentencia correspondiente, habría permitido preservar los bienes y recursos de TVA dentro de su patrimonio, sujetos a las reglas de universalidad, reconocimiento, graduación y prelación propias del concurso mercantil, la operación celebrada con Alterbank produjo un resultado distinto pues, TVA obtuvo un nuevo financiamiento, los recursos correspondientes ingresaron transitoriamente a su patrimonio para ser destinados inmediatamente al pago de una obligación preexistente y, una vez realizado dicho pago, permaneció a cargo de la Comerciante un nuevo pasivo por una cantidad considerablemente mayor y comprometió diversos activos indispensables para la operación ordinaria.

Lo anterior se agrava cuando se analiza la secuencia temporal de los actos efectuados por TVA. Me explico.

Según se observa de los anexos 6 y 7 exhibidos en su contestación de demanda, mediante oficios número **400-75-00-00-00-2026-2941 y 400-75-00-00-00-2026-2940**, el 28 de enero de 2026, el SAT, en respuesta a los escritos presentados por TVA en esa misma fecha, es que se detonó el plazo de 15 días para hacer el pago de las contribuciones adeudadas desde 2013 y mantener los beneficios fiscales solicitados.

Así, lejos de demostrarse que el financiamiento constituyera la alternativa necesaria para proteger la masa, el plazo improrrogable para llevar a cabo el pago de las contribuciones fue detonado por la propia Comerciante convenientemente un día antes de la celebración del crédito.

De modo que la urgencia que TVA ahora invoca para justificar la necesidad del financiamiento no constituyó una contingencia externa, súbita e inevitable, sino una circunstancia cuya configuración temporal derivó de actuaciones realizadas por la propia Comerciante inmediatamente antes de contratar el crédito con Alterbank. Es más, las contingencias fiscales vienes de muchos ejercicios anteriores, por lo que, no existe nada súbito al respecto.

Asimismo, es importante resaltar que, ante la existencia de mecanismos concursales específicamente dirigidos a detener la ejecución fiscal evidencia que TVA contaba con alternativas menos gravosas para preservar su patrimonio, sin embargo, la Comerciante optó por tomar el camino más gravoso, asumiendo un nuevo endeudamiento sustancialmente superior a la obligación fiscal que pretendía atender y garantizando el mismo con activos clave para su operación.

Lo anterior cobra especial relevancia porque el análisis sobre el beneficio de la masa no puede limitarse a determinar si la operación permitió solucionar temporalmente una

contingencia particular de la Comerciante, sino que debe atender a su efecto patrimonial neto y a las alternativas disponibles. En esas condiciones, no basta afirmar que el financiamiento permitió pagar el crédito fiscal –como pudo haber sido cualquier otro acreedor con posibilidad de ejecutar una garantía–; es necesario demostrar por qué endeudar adicionalmente a TVA resultaba más favorable para la masa y para la colectividad de acreedores que preservar sus recursos y hacer valer los mecanismos de protección que el propio concurso mercantil ponía a su disposición.

Lo anterior ha sido reconocido por ese H. Juzgado en diversas resoluciones dictadas recientemente, en especifico la sentencia de fecha 10 de diciembre de 2025 dictada dentro del concurso mercantil 35/2022, en la cual se estableció que la retroacción tiene su base en el principio rector del derecho concursal de la unidad e integridad del patrimonio de la comerciante, pues tiene la pretensión de que permanezca inalterado y sea sometido a concurso en su totalidad, al constituir la garantía común de los acreedores, en atención al objetivo del procedimiento; buscando reintegrar el patrimonio erosionado para lograr el cumplimiento rector del principio *par conditio creditorum*.

Asimismo, en dicha interlocutoria se estableció que la retroacción es entendida como la época en que se considera que en el estado patrimonial del concursado ya existía el incumplimiento generalizado de pagos.

De igual forma, en la sentencia interlocutoria de fecha 20 de junio de 2025 dictada por ese H. Juzgado dentro del concurso mercantil 37/2024, se reconoció que el estado de incumplimiento generalizado de pagos no inicia con la declaración judicial del concurso mercantil, sino que es un proceso degenerativo en el tiempo que se produce previamente, y precisamente, en razón de dicha naturaleza se establece la figura de la retroacción. En dicha resolución también se estableció que de una interpretación armónica de los artículos 114 a 117 de la ley concursal, se sigue que los actos en fraude de acreedores se consideran como tales, cuando se realizan de una manera desproporcionada o con prestaciones visiblemente superiores a las que rigen el mercado.

Por su parte, en la interlocutoria de fecha 02 de diciembre de 2025 dictada por ese H. Juzgado dentro del Concurso Mercantil 30/2024, reconoció *(i)* el derecho de los acreedores a una revisión eficaz de los actos realizados en perjuicio de la masa concursal; *(ii)* el principio de protección a la masa concursal y *(iii)* la necesidad de garantizar la unidad de la masa concursal en atención al interés público reconocido en el artículo 1° de la LCM.

**Así, atendiendo a lo expuesto en párrafos precedentes, el análisis de los actos realizados durante el periodo de insolvencia no puede limitarse a determinar si produjeron una disminución directa de los activos de la Comerciante. También debe atenderse a aquellos actos que, mediante la incorporación de nuevos pasivos o la alteración de la posición relativa de los acreedores, puedan afectar la garantía**

**patrimonial común y las condiciones bajo las cuales la colectividad habrá de concurrir sobre ella. Tales actos deben ser examinados a la luz del derecho de los acreedores a una revisión eficaz de los actos realizados en perjuicio de la masa y del principio de protección e integridad de ésta, reconocidos por ese H. Juzgado.**

De igual forma, en la sentencia interlocutoria dictada en el concurso mercantil 30/2024, se explicó y desarrolló la distinción entre la insolvencia de hecho la insolvencia de derecho, la primera se refiere al momento en el cual iniciaron los actos que llevaron a la persona sujeta al proceso concursal a posicionarse en un estado de incumplimiento generalizado de obligaciones y, la segunda se refiere a la determinación judicial que declara formalmente el estado de concurso mercantil, con motivo del incumplimiento generalizado de obligaciones.

En dicha interlocutoria se refiere a que el estado de incumplimiento generalizado no es espontáneo, sino que tiene una gestión prolongada a partir de una serie de hechos continuados que desembocan en un estado de impotencia patrimonial, así durante el periodo de degradación económica, es posible que la comerciante realice una serie de actos que privilegien a algún acreedor, oculte, dilapide, grave, distraiga sus bienes o acuda a prácticas ruinosas, y entre otras, a fin de erosionar la prenda común de los acreedores.

Los criterios confirman que la afirmación, sin sustento, de TVA en el sentido de que el financiamiento otorgado por Alterbank fue contratado "en beneficio de la masa" no resiste un análisis de la operación en su contexto y atendiendo a las alternativas que tenía disponibles la Comerciante al momento de celebrarla.

Como punto de partida, no se cuestiona que, en determinadas circunstancias, la obtención de financiamiento pueda resultar benéfica para una empresa y, eventualmente, para su masa concursal. Lo que debe demostrarse en este caso es algo distinto: por qué la contratación de este financiamiento en particular, por ese monto y en ese momento, constituía la alternativa más favorable para la masa y la colectividad de acreedores de TVA.

Es decir, la operación no fue celebrada en el curso ordinario de una empresa cuya insolvencia fuera entonces imprevisible, sino en un contexto temporal inmediatamente anterior al inicio de un procedimiento concursal y ante una situación de incumplimiento generalizado de pagos que, cuando menos, era inminente. Se insiste en que en este caso, la insolvencia de TVA era pública y existen diversas notas periodísticas –referidas en el Incidente– en las que se había hecho público el incumplimiento de TVA a sus obligaciones de pago conforme al Contrato de Emisión desde 2021.

Como expone Renee Tamara St. Rose KC en su Opinión Complementaria que se agrega al presente como **ANEXO 1** acompañado de su traducción al español por perito traductor certificado como **ANEXO 1 BIS**, los documentos contractuales no identifican

refinanciamiento comprometido alguno, venta de activos, aumento de capital ni ninguna otra fuente concreta y verificable de recursos que permitiera explicar razonablemente cómo TVA pretendía liquidar un crédito superior a **$4,000 millones de pesos** en un plazo aproximado de **seis meses**. La experta concluye que no existe en la documentación contractual una fuente de pago identificada y enfatiza que la existencia de un mecanismo comercialmente creíble de repago adquiere una importancia particular cuando el acreditado ya atraviesa dificultades financieras significativas. Asimismo, destaca que, tratándose de una operación de tal magnitud, un acreedor prudente habría debido evaluar los incumplimientos existentes, la posición de los demás acreedores, la prelación de créditos y las consecuencias que la nueva financiación tendría para ellos.

El análisis del supuesto beneficio para la masa no puede detenerse en la afirmación de que "se obtuvo financiamiento para pagar el crédito fiscal". Debe atender al efecto patrimonial neto de la operación y a las alternativas disponibles en ese momento. Si existía una vía concursal que permitía enfrentar el riesgo de ejecución fiscal sin asumir un nuevo pasivo de esa magnitud, correspondía explicar por qué endeudar adicionalmente a TVA resultaba objetivamente más favorable para la masa que acudir a los mecanismos de protección previstos por la legislación concursal. Carga probatoria correspondiente a TVA.

No se puede aceptar sin mayor demostración la afirmación de que el Crédito AlterBank fue celebrado "en beneficio de la masa" sin explicar cuál fue el beneficio económico concreto que recibió la colectividad de acreedores y, particularmente, por qué se optó por una alternativa que incrementó el endeudamiento de TVA inmediatamente antes de su concurso cuando existían mecanismos concursales menos gravosos para enfrentar precisamente el riesgo que ahora se invoca como justificación de la operación.

**Mientras TVA no ofrezca una justificación objetiva, económica y concursalmente razonable, no puede tenerse por acreditado que el financiamiento con Alterbank hubiera sido contratado en beneficio de la masa.**

Ahora bien, a lo largo del escrito de contestación al incidente, TVA niega genéricamente y para "*efectos procesales*" los hechos narrados por mi representada, arrojándole la carga de la prueba para acreditar lo que conceptualizó como los "*elementos de la acción de fraude*".

Es cierto que en términos de lo dispuesto por el artículo 1194 del Código de Comercio, el que afirma está obligado a probar. Sin embargo, al momento de dar contestación al incidente, TVA construyó su defensa sobre la base de distintas afirmaciones que, también, está obligada a probar.

Una de esas afirmaciones es precisamente que la operación celebrada con AlterBank se realizó para conseguir financiamiento urgente, necesario y real que trajo como resultado un "beneficio a la masa".

Dicho de otro modo, sin perjuicio de la carga probatoria que corresponde a la Incidentista, TVA también tendrá que acreditar aquellos hechos en los que sustenta su defensa, esto es, cuál fue el beneficio concreto, objetivo y económicamente verificable que la contratación del crédito con AlterBank produjo para la masa concursal.

No basta, para ello, acreditar la existencia y validez del contrato de crédito, la entrega de los recursos o su posterior aplicación al pago de una obligación fiscal. Tales circunstancias únicamente demuestran la mecánica de la operación, pero no acreditan que ésta hubiera resultado benéfica para la masa.

Lo que TVA afirma y, por tanto, debe demostrar, es que la decisión de asumir un nuevo pasivo por una cantidad sustancialmente superior al adeudo fiscal produjo un efecto patrimonial favorable para la colectividad de acreedores y no, como se sostiene, un incremento del pasivo concursal que diluyó la posición relativa de los acreedores preexistentes, generando una erosión o afectación sobre la masa pasiva.

Esa carga cobra especial relevancia frente a las circunstancias objetivas que rodearon la operación: *(i)* TVA se encontraba ya ante una situación de incumplimiento generalizado de pagos que desembocaría, apenas unos días después, en la solicitud de concurso mercantil; *(ii)* mediante el concurso contaba con mecanismos legales para enfrentar el procedimiento administrativo de ejecución que ahora invoca como justificación del financiamiento; *(iii)* pese a ello, optó por contratar fuera del concurso un crédito sustancialmente superior al adeudo fiscal; y *(iv)* los recursos obtenidos salieron inmediatamente del patrimonio de TVA, mientras que el nuevo pasivo frente a Alterbank permaneció y posteriormente fue llevado al concurso.

Ante esas circunstancias, no estamos en presencia de una negativa lisa y llana por parte de TVA. Se trata, más bien, de una negativa calificada acompañada de afirmaciones fácticas y autónomas destinadas a neutralizar los hechos narrados en el Incidente promovido por BNY.

La fórmula ritual de TVA de dar contestación a los hechos del incidente negándolos "para efectos procesales" de ningún modo transforma las afirmaciones positivas que introdujo al contruir su defensa y tampoco sirven para trasladar a BNY la carga probatoria.

Es decir, la etiqueta "niego para efectos procesales" no modifica la obligacion de probar que recae en TVA, pues dicha expresión carece de eficacia para alterar las reglas de

distribución de la carga probatoria, especificamente porque TVA, al contestar los hechos del Incidente, introdujo a la litis afirmaciones expresas como justificación de su conducta.

Si sostiene que asumir ese nuevo endeudamiento fue realizado "en beneficio de la masa", le corresponde acreditar en qué consistió ese beneficio, cómo se materializó en el patrimonio concursal y por qué dicha operación resultaba razonablemente más favorable para la colectividad de acreedores que las alternativas menos gravosas que tenía disponibles.

Es más, si TVA afirma categóricamente que el financiamiento contratado "benefició a la Masa", no cabe duda entonces que, es la propia comerciante quien tiene acceso privilegiado a la documentación capaz de demostrar el "beneficio" alegado.

En el caso, TVA no negó lisa y llanamente los hechos del Incidente, sino que, como se explicó líneas arriba, la comerciante contruyó su defensa sobre afirmaciones expresas, tales como: que la operación habría resultado benéfica para la masa concursal. Consecuentemente, corresponde a TVA demostrar en qué consistió el "beneficio" que afirma –más allá del descuento realizado por la autoridad fiscal– y cuál fue el efecto patrimonial favorable, concreto y objetivamente verificable que produjo para la colectividad de acreedores.

Se insiste, en este caso, TVA se encuentra evidentemente en mejor posición probatoria para demostrar las razones económicas y financieras que supuestamente justificaron la operación porque TVA fue ***(i)*** quien decidió contratar el financiamiento; ***(ii)*** quien conocía su situación patrimonial y financiera; ***(iii)*** quien determinó el monto solicitado; ***(iv)*** quien teóricamente debe conocer quiénes son los acreditantes reales; ***(v)*** quien conocía el destino que se daría a los recursos; ***(vi)*** quien podía valorar las alternativas disponibles frente al procedimiento administrativo de ejecución; y ***(vii)*** quien, apenas unos días después, solicitó su propio concurso mercantil.

Cabe destacar que BNY no pretende trasladar a TVA la carga de demostrar la existencia del fraude alegado, mucho menos pretende ser relevada de acreditar los hechos constitutivos de su acción. Lo que BNY pone a consideración de su Señoría es que, resulta clarísimo que la defensa de TVA está construida sobre afrimaciones positivas bajo las cuales sostiente que la contratación del financiamiento fue necesaria y benéfica para la Masa, motivo por el cual, conforme a las reglas de distribución de cargas probatorias, es a TVA a quien le corresponde acreditar el hecho positivo en que descanasa su defensa.

En conclusión, no basta que TVA afirme dogmáticamente que el financiamiento fue contratado "en beneficio de la masa". Debe demostrar qué beneficio obtuvo la masa; cómo se materializó dicho beneficio en su patrimonio; por qué resultaba necesario asumir un pasivo sustancialmente superior al crédito fiscal que pretendía atender; y por qué esa alternativa

resultaba más favorable para la colectividad de acreedores que acudir a los mecanismos de protección que ofrecía el concurso mercantil, cuya presentación era ya inminente.

**D. EXCEPCIÓN DE IMPROCEDENCIA DE LA DECLARACIÓN DE INEFICACIA POR DISPOSICIÓN EXPRESA DE LA LEY (PENÚLTIMO PÁRRAFO DEL ARTÍCULO 114 DE LA LCM)**

La excepción opuesta por TVA es claramente infundada toda vez que el penúltimo párrafo del artículo 114 de la LCM no resulta aplicable en el caso que nos ocupa. Por el contrario, el penúltimo párrafo del artículo en cita se refiere a que los **pagos hechos al comerciante** representen un beneficio para la Masa.

Como se expone a lo largo del Incidente y del presente escrito, en el caso que nos ocupa no existió ningún pago realizado en favor de la Comerciante, por el contrario, estamos en presencia de un endeudamiento adquirido por ésta que, como se expone en la contestación a la excepción inmediata anterior, no cumple con los parámetros de necesidad, pertinencia y racionalidad.

Es más, sin perjuicio de la inaplicabilidad del párrafo en cita, se insiste en que el Crédito AlterBank es un crédito en el que se está ocultando al verdadero acreditante del mismo por lo que tomando en consideración todos los hechos narrados en el presente, es válido presumir que incluso pudiera ser utilizado para beneficiar a partes relacionadas de la Comerciante para beneficiarse ilegalmente y en fraude a la ley del presente concurso mercantil, ejerciendo derechos con el carácter de un acreedor con garantía real que no tiene relación con la Comerciante.

Este ocultamiento del acreditante real no puede representar un beneficio a la masa, bajo el entendido de que ésta es la garantía patrimonial común de los acreedores de la Comerciante y el beneficio fiscal que refiere TVA no basta para afirmar que existe un beneficio para la masa, ya que no existe un beneficio económico concreto para la colectividad de acreedores, toda vez que AlterBank tiene garantías reales, mientras que para el resto de la colectividad, existió una dilución sin la creación de nuevas garantías en su favor.

**E. EXCEPCIÓN DE INEXISTENCIA DEL SUPUESTO PREVISTO EN EL ARTÍCULO 114, FRACCIÓN III DE LA LCM**

En obvio de repeticiones innecesarias solicito se tengan aquí por reproducidos como si a la letra se insertasen los argumentos expuestos a lo largo del presente escrito en relación con que el Crédito AlterBank fue celebrado fuera de las condiciones de mercado y usos y prácticas bancarias y mercantiles.

### F. EXCEPCIÓN DE INEXISTENCIA DEL SUPUESTO PREVISTO EN EL ARTÍCULO 115, FRACCIÓN I DE LA LCM

TVA afirma que en el presente caso no se actualiza el supuesto previsto en la fracción I del artículo 115 de la LCM; sin embargo, su argumento es erróneo.

Esto es así, pues en el Contrato de Crédito se pactó la constitución de garantías reales en beneficio de AlterBank en primer grado de prelación sobre activos del Acreditado –en ese momento el crédito dispuesto correspondería a la cantidad de $4,085,000,000.00 (cuatro mil ochenta y cinco millones de pesos 00/100 M.N.); sin embargo, al momento de celebración del Convenio Modificatorio se pactó la capitalización de los intereses devengados hasta esa fecha, resultando un nuevo capital por la cantidad de $4,156,487,500.00 (cuatro mil ciento cincuenta y seis millones cuatrocientos ochenta y siete mil quinientos pesos 00/100).

Es decir, sí se actualiza la hipótesis normativa prevista en la fracción I del artículo 115 de la LCM, toda vez que sí se incrementaron las garantías pactadas al aumentarse el monto que éstas garantizarían de inicio por concepto de capital –que automáticamente trasciende al cálculo de accesorios que también se encuentran garantizados–.

En consecuencia, deviene a todas luces infundada e improcedente la excepción opuesta por TVA, para todos los efectos legales a que haya lugar.

### G. EXCEPCIÓN DE BUENA FE

La Comerciante pretende ofuscar la inteligencia de su Señoría al exponer que en el caso que nos ocupa se presume la buena fe, quedando a cargo de mi representada acreditar la mala fe.

Sin embargo, se insiste en que el supuesto previsto en la fracción III del artículo 114 de la LCM constituye un acto **objetivamente** en fraude de acreedores, por lo que para determinar que el Crédito AlterBank es fraudulento basta demostrar que el mismo se celebró fuera de condiciones de mercado y en contravención a los usos y prácticas bancarios y mercantiles, tal como hizo mi representada.

Luego entonces, con independencia de la voluntad de la Comerciante en la intervención del acto, el Crédito AlterBank es un acto en fraude de acreedores por los motivos expuestos a lo largo del presente.

Por otro lado, el artículo 115 de la LCM establece con toda claridad una presunción legal de que un acto es en fraude de acreedores si se otorgan garantías o se incrementan las vigentes cuando la obligación original no contemplaba dicha garantía o incremento, como ocurre en el presente caso.

Sin perjuicio de lo anterior, la buena fe con la que afirma haber actuado TVA se desvirtúa con los propios documentos del Crédito AlterBank, en términos de lo expuesto en el Incidente y en el presente.

**H. EXCEPCIÓN DE IMPROCEDENCIA DE LA PRESTACIÓN C, POR PRETENDER UNA SANCIÓN NO PREVISTA EN NUESTRO ORDENAMIENTO**

La excepción debe desestimarse, pues se construye sobre la premisa errónea, consistente en que BNY pretende la imposición de una sanción o privación de derechos no prevista expresamente en la ley, cuando en realidad lo que se sostiene es la producción de los efectos jurídicos inherentes a la declaración de ineficacia prevista en el artículo 113 de la Ley de Concursos Mercantiles.

La propia Comerciante invoca el artículo 114 de la Ley de Concursos Mercantiles, cuyo último párrafo establece: *"Si los terceros devolvieren lo que hubieren recibido de la Comerciante, podrán solicitar el reconocimiento de sus créditos"*.

De la interpretación de dicha disposición se desprende, *a contrario sensu*, que mientras los terceros involucrados en actos declarados ineficaces frente a la masa no restituyan lo recibido de la Comerciante, carecen de legitimación para solicitar el reconocimiento de sus créditos dentro del procedimiento concursal.

En consecuencia, la declaración de ineficacia de dichos actos frente a la masa produce como efecto inmediato que tales terceros no puedan ser reconocidos como acreedores en el concurso mercantil y, por ende, queden impedidos para ejercer derechos de voto en el proceso de aprobación de un convenio concursal.

La Comerciante pretende introducir argumentaciones ajenas al punto controvertido, con el evidente propósito de desviar la atención de Su Señoría de la cuestión central del presente incidente: las consecuencias derivadas de la declaración de ineficacia de actos realizados en fraude de acreedores.

En efecto, los artículos 118 y 119 de la Ley de Concursos Mercantiles no contienen un catálogo exhaustivo de las consecuencias que pueden derivarse de la declaración de ineficacia frente a la Masa, sino que regulan únicamente determinados supuestos específicos y los efectos particulares asociados a éstos. Así, el artículo 118 contempla el caso en que un tercero haya adquirido de mala fe bienes objeto de actos en fraude de acreedores y dichos bienes se pierdan, destruyan u oculten. Por su parte, el artículo 119 regula las consecuencias derivadas de la restitución de bienes o cantidades a la Masa, precisando los conceptos que

deben entenderse comprendidos en dicha devolución, tales como frutos, rendimientos, intereses y demás accesorios.

Ninguno de esos supuestos guarda relación directa con el presente caso. Como la propia Comerciante reconoce, AlterBank no adquirió bien alguno de la Comerciante, sino que le otorgó un crédito. Asimismo, de las constancias de autos y documentos exhibidos en el presente Incidente no se advierte que AlterBank haya recibido pago alguno por parte de la Comerciante, puesto que ésta fue declarada en concurso mercantil sin haber realizado un solo pago respecto del financiamiento contratado, toda vez que no se había actualizado ningún vencimiento conforme al contrato. En consecuencia, resulta improcedente pretender que se actualicen los efectos previstos para hipótesis fácticas completamente distintas a las aquí analizadas.

Sin embargo, lo anterior, de ninguna manera significa que la declaración de ineficacia carezca de consecuencias jurídicas. Por el contrario, una vez declarada la ineficacia del acto frente a la Masa, deben producirse todos aquellos efectos que resulten inherentes a dicha declaración, entre ellos la imposibilidad de reconocer el crédito derivado del acto ineficaz y, por ende, la improcedencia de que dicho crédito sea considerado para efectos de votación del convenio concursal.

En conclusión, el argumento de la Comerciante parte de una premisa equivocada, pues pretende presentar como una "sanción" o una "privación de derechos" lo que en realidad constituye una consecuencia directa del régimen de ineficacia previsto en el artículo 113 de la Ley de Concursos Mercantiles.

La declaración de ineficacia frente a la Masa implica, por definición, que el acto respectivo no puede producir efectos jurídicos oponibles al concurso mercantil. Si el crédito cuya insinuación pretende TVA deriva precisamente del acto cuya ineficacia se demanda, resulta jurídicamente inconsistente sostener, por una parte, que dicho acto es ineficaz frente a la Masa y, por la otra, que el crédito originado en ese mismo acto debe ser reconocido dentro del concurso y producir plenos efectos para determinar mayorías de votación –a través del reconocimiento de AlterBank como acreedor–.

La Comerciante también intenta equiparar la acción de ineficacia concursal con la acción pauliana prevista en el derecho común. Sin embargo, dicha comparación resulta improcedente. La propia Ley de Concursos Mercantiles establece un régimen especial de protección colectiva de los acreedores que persigue salvaguardar la integridad de la Masa en beneficio de la universalidad de acreedores, por lo que los efectos de la ineficacia concursal no pueden restringirse ni interpretarse a partir de las reglas de una acción individual de naturaleza civil diseñada para tutelar intereses particulares.

Más aún, el artículo 113 de la Ley de Concursos Mercantiles expresamente dispone que los actos realizados en fraude de acreedores serán ineficaces frente a la Masa, sin limitar dicha consecuencia exclusivamente a supuestos de restitución de bienes o cantidades. Los artículos 118 y 119 regulan determinados efectos restitutorios para hipótesis específicas, pero de ninguna manera agotan todas las consecuencias jurídicas derivadas de la declaración de ineficacia.

Por ello, la cuestión no consiste en imponer a AlterBank una sanción que el legislador no previó, sino en reconocer que un crédito derivado de un acto declarado ineficaz frente a la Masa carece de aptitud para ser reconocido dentro del concurso mercantil y, en consecuencia, tampoco puede ser computado para efectos de conformar las mayorías necesarias para la aprobación de un convenio concursal. Sostener lo contrario equivaldría a admitir que un acto declarado ineficaz produzca precisamente el efecto que la ley busca impedir.

## I. EXCEPCIÓN DE PRECLUSIÓN E IMPROCEDENCIA DE LA PRETENDIDA "RESERVA DE AMPLIACIÓN" DEL INCIDENTE

Es infundada la excepción planteada por la Comerciante, en virtud de que: *(i)* no existe ampliación de la litis porque la pretensión y la causa de pedir siguen siendo exactamente las mismas; y *(ii)* en todo caso, los hechos y documentos exhibidos con posterioridad por la propia Comerciante justifican plenamente el desarrollo y complementación de argumentos respecto de hechos supervenientes o conocidos con posterioridad.

Contrario a lo que sostiene, esta parte no ha modificado ni ampliado la acción ejercitada, la causa de pedir ni las prestaciones reclamadas en el presente incidente. Desde su promoción inicial, BNY ha sostenido que el crédito de AlterBank deriva de actos que deben ser declarados ineficaces frente a la Masa en términos de la Ley de Concursos Mercantiles, siendo ésa y no otra la cuestión sometida a consideración de Su Señoría.

La Comerciante confunde indebidamente la prohibición de alterar la litis con el derecho de las partes de desarrollar, complementar y robustecer los argumentos jurídicos que sustentan sus pretensiones, particularmente cuando durante la sustanciación del procedimiento **se incorporan documentos y elementos probatorios que no se encontraban disponibles al momento de presentar el incidente**.

Más aún, resulta contradictorio que la propia Comerciante invoque la preclusión para intentar impedir el análisis de hechos y documentos cuya existencia fue ocultada o, cuando menos, no fue revelada oportunamente. Al momento de promover el incidente, BNY no tenía acceso al Contrato de Crédito, a su Convenio Modificatorio, al Convenio Reformulado ni a

los instrumentos relativos a la constitución de garantías en favor de AlterBank. Tales documentos fueron exhibidos únicamente con posterioridad, incluso después de haber sido requeridos a través de este Juzgado, por tratarse de documentos que se encontraban bajo el exclusivo control de AlterBank y la propia Comerciante.

Incluso, BNY presentó un proceso de *Discovery*, como bien reconoce la Comerciante, precisamente para estar en aptitud de obtener más información y documentos relativa al financiamiento otorgado por AlterBank, se destaca que conforme al Crédito AlterBank es la parte que forzosamente conoce quiénes son los Acreditantes reales. Dicho procedimiento se encuentra en trámite actualmente y mi representada continúa intentando obtener mayor información sobre AlterBank y sus funcionarios en relación con el Crédito AlterBank.

En consecuencia, no puede sostenerse válidamente que BNY estaba obligado a formular desde un inicio argumentos respecto de documentos cuyo contenido desconocía y que la contraparte había omitido exhibir. Precisamente, porque dichos instrumentos fueron incorporados al procedimiento con posterioridad, esta parte se encuentra legitimada para formular las observaciones, inferencias y argumentos jurídicos que deriven de ellos.

Debe destacarse que los nuevos razonamientos expuestos por BNY no introducen una pretensión distinta ni persiguen una consecuencia jurídica diversa a la originalmente planteada. Únicamente desarrollan y corroboran los hechos materia del incidente a la luz de documentación que no estaba disponible al momento de su presentación y cuya relevancia para la resolución de la controversia resulta evidente.

Por tanto, la excepción planteada debe desestimarse, pues lo que pretende la Comerciante no es impedir una modificación de la controversia, que no ha ocurrido, sino restringir indebidamente el derecho de esta parte a pronunciarse sobre documentos e información que fueron incorporados al expediente con posterioridad y que, por su propia naturaleza, no pudieron ser materia de análisis al momento de promover el incidente.

Aceptar la postura de la Comerciante conduciría al absurdo de permitir que una parte retenga documentación relevante durante la etapa inicial del procedimiento y posteriormente invoque la preclusión para impedir que la contraparte formule argumentos derivados de esa información una vez que finalmente es exhibida. Tal resultado es incompatible con los principios de contradicción, igualdad procesal y tutela judicial efectiva que rigen el procedimiento concursal. Sirven de apoyo a lo anterior la siguiente **jurisprudencia** y criterios judiciales:

Registro digital: 2018042 Instancia: Primera Sala Décima Época Materias(s): Civil Tesis: 1a./J. 48/2018 (10a.) Fuente: Gaceta del Semanario Judicial de la Federación. Libro 59, Octubre de 2018, Tomo I, página 632 Tipo: **Jurisprudencia**
**AUTORIZADO PARA OÍR NOTIFICACIONES, EN TÉRMINOS DEL ARTÍCULO 1069, PÁRRAFO TERCERO, DEL CÓDIGO DE COMERCIO.**

**NO CUENTA CON FACULTADES PARA DESAHOGAR LA VISTA OTORGADA AL ACTOR CON EL ESCRITO DE CONTESTACIÓN DE DEMANDA.**

**La previsión de dar vista al actor con la contestación de demanda o las excepciones opuestas por el demandado en los juicios mercantiles, tiene como finalidad que el actor se encuentre en equilibrio en relación con la posición del demandado, garantizando así el derecho de contradicción respecto a los hechos expresados en la contestación de demanda y en los que se funden las excepciones y defensas, sobre los cuales el actor no tenía la carga de expresar en su demanda, así como para que ofrezca pruebas contra esos hechos; por lo que al estar vinculada con la pretensión inicial goza de la misma jerarquía de los actos como son la presentación de la demanda, así como sus correspondientes aclaraciones y ampliaciones, y la contestación a la demanda.** Ahora bien, el artículo 1069 del Código de Comercio sólo otorga al autorizado el carácter de persona facultada para oír y recibir notificaciones, pues sus atribuciones se circunscriben al trámite y resolución del proceso en el que fue nombrado, sin que confiera una representación respecto del autorizante. Así, en tratándose del acto mediante el cual se desahoga la vista otorgada al actor con el escrito de contestación a la demanda, solamente resulta exigible al titular del derecho, a su representante o mandatario, al considerarse como la debida formulación de una pretensión. Consecuentemente, el autorizado en los términos indicados, no cuenta con representación de los intereses del autorizante, pues para tales efectos debe constituirse un poder o mandato judicial donde se establezcan fehacientemente esas prerrogativas; de ahí que, no está en aptitud de desahogar la vista y expresar las circunstancias necesarias en relación con los hechos expuestos en la contestación de la demanda, pues es precisamente al actor (o su representante) a quien le corresponde controvertir las cuestiones novedosas planteadas por la demandada. No es obstáculo a lo anterior, el hecho de que el artículo 1069 indicado prevea una cláusula abierta que faculta a los autorizados para que realicen "cualquier acto que resulte necesario para la defensa de los derechos del autorizante"; pues la amplitud de esa estipulación no significa que el autorizado pueda realizar absolutamente cualquier acto en nombre de su autorizante, ya que su participación debe circunscribirse a la actuación procesal para garantizar la protección de sus derechos, empero, la contestación a la vista sólo puede ser reservada al actor (o su representante), al ser una actuación personal por tratarse de actos directamente vinculados con la formulación de la pretensión inicial.

Contradicción de tesis 16/2018. Entre las sustentadas por el entonces Tercer Tribunal Colegiado del Vigésimo Tercer Circuito, actual Segundo Tribunal Colegiado del Trigésimo Circuito y el Décimo Segundo Tribunal Colegiado en Materia Civil del Primer Circuito. 20 de junio de 2018. La votación se dividió en dos partes: mayoría de cuatro votos por la competencia. Disidente: José Ramón Cossío Díaz. Unanimidad de cinco votos en cuanto al fondo, de los Ministros Arturo Zaldívar Lelo de Larrea, José Ramón Cossío Díaz, quien reservó su derecho para formular voto concurrente, Jorge Mario Pardo Rebolledo, Alfredo Gutiérrez Ortiz Mena y Norma Lucía Piña Hernández. Ponente: Jorge Mario Pardo Rebolledo. Secretario: Jorge Arriaga Chan Temblador.

Tesis y criterio contendientes:

El emitido por el entonces Tercer Tribunal Colegiado del Vigésimo Tercer Circuito, actual Segundo Tribunal Colegiado del Trigésimo Circuito, al resolver el amparo directo 623/2006, del que derivaron las tesis aisladas XXIII.3o.15 C, de rubro: "ABOGADO AUTORIZADO PARA OÍR NOTIFICACIONES EN TÉRMINOS DEL ARTÍCULO 1069, PÁRRAFO TERCERO, DEL CÓDIGO DE COMERCIO. CARECE DE FACULTADES PARA PRODUCIR CONFESIÓN EN PERJUICIO DE SU AUTORIZANTE."; y la diversa XXIII.3o.16 C, de rubro: "ABOGADO AUTORIZADO PARA OÍR NOTIFICACIONES EN TÉRMINOS DEL ARTÍCULO 1069, PÁRRAFO TERCERO, DEL CÓDIGO DE COMERCIO. CARECE DE FACULTADES PARA EVACUAR LA VISTA QUE SE DA A SU AUTORIZANTE CON LA CONTESTACIÓN DE DEMANDA, EN LA PARTE EN LA QUE ESTE ÚLTIMO EXPRESARÁ LO QUE A SU DERECHO CONVENGA RESPECTO DE LAS EXCEPCIONES OPUESTAS.", publicadas en el Semanario Judicial de la Federación y su Gaceta, Novena Época, Tomo XXIV, diciembre de 2006, página 1237, con números de registro digital: 173865 y 173866, respectivamente.

El emitido por el Décimo Segundo Tribunal Colegiado en Materia Civil del Primer Circuito, al resolver el amparo directo 132/2017, en el que determinó que en términos del artículo 1069 del Código de Comercio, el autorizado sí está facultado

para desahogar la vista que se le formula a su autorizante, actor en el juicio de origen, con el escrito de contestación de demanda, pues consideró que el autorizado recibe un mandato en términos generales para la realización de los actos que se encuentran señalados en ese numeral, en tanto que de su lectura no se advertía restricción o limitación alguna que impidiera al autorizado para desahogar la vista dada con la contestación de la demanda.
Tesis de jurisprudencia 48/2018 (10a.). Aprobada por la Primera Sala de este Alto Tribunal, en sesión privada de cuatro de julio de dos mil dieciocho.
Esta tesis se publicó el viernes 05 de octubre de 2018 a las 10:15 horas en el Semanario Judicial de la Federación y, por ende, se considera de aplicación obligatoria a partir del lunes 08 de octubre de 2018, para los efectos previstos en el punto séptimo del Acuerdo General Plenario 19/2013.

Registro digital: 2014577 Instancia: Primera Sala Décima Época Materias(s): Constitucional, Civil Tesis: 1a. LXIII/2017 (10a.) Fuente: Gaceta del Semanario Judicial de la Federación. Libro 43, Junio de 2017, Tomo I, página 589 Tipo: Aislada. **VISTA AL ACTOR CON LA CONTESTACIÓN A LA DEMANDA. INTERPRETACIÓN CONFORME AL DEBIDO PROCESO DE LOS ARTÍCULOS 1400 Y 1401 DEL CÓDIGO DE COMERCIO.**

Los artículos 1400 y 1401 del Código de Comercio, al prever dar vista al actor con la contestación de demanda o las excepciones para que en cierto lapso se manifieste sobre éstas y presente pruebas, más que contravenir el principio de igualdad procesal de las partes como manifestación del debido proceso, busca apegarse a éste, a fin de que la posición del actor no quede desequilibrada respecto a la del demandado, bajo el entendido de que la vista conferida al actor en los juicios ejecutivos mercantiles es para darle el derecho de contradicción respecto a los hechos expresados en la contestación de demanda y en los que se funden las excepciones y defensas, sobre los cuales el actor no tenía la carga de manifestarse en su demanda, así como para que ofrezca pruebas contra esos hechos, que tampoco tenía la carga de exhibir desde la demanda. Esto tiene su explicación lógica en que la carga del actor al formular su demanda en el juicio ejecutivo es exhibir el título que traiga aparejada la ejecución en que funde su acción, así como referirse con claridad a los hechos relativos a la formación del título y el derecho contenido en éste; en cambio, el demandado puede oponer excepciones que podrían tratar de hechos diferentes, aunque relacionados con la acción promovida, como la falta de personalidad del actor, la falsedad de la firma del deudor, la alteración o la nulidad del título, la prescripción, la caducidad, la incompetencia del juez, las fundadas en la relación causal, entre otras, sobre los cuales no es exigible al actor referirse en su demanda, pues no está en condiciones de anticipar o saber los hechos a los cuales podría referirse el demandado al contestar la demanda o al oponer excepciones y defensas, sino hasta que ésta se produce; por tanto, como se trata de hechos introducidos a la litis con posterioridad a la intervención ordinaria del actor en la conformación de la materia litigiosa, es necesario que se respete en su favor el derecho de contradicción. En cambio, dicha facultad no podría servir de base para que el actor subsane las omisiones en que hubiera incurrido en la demanda, es decir, para expresar los hechos que debió manifestar desde ese escrito, ni para exhibir pruebas que debió presentar desde entonces, pues de ser así, el juez debe desecharlas, ya que en tal caso los hechos y pruebas se habrían introducido al juicio en contravención a las reglas procesales, y generando un desequilibrio procesal.
Amparo directo en revisión 4389/2014. Vinos y Licores Aragón, S.A. de C.V. 3 de junio de 2015. Cinco votos de los Ministros Arturo Zaldívar Lelo de Larrea, José Ramón Cossío Díaz, Jorge Mario Pardo Rebolledo, Olga Sánchez Cordero de García Villegas y Alfredo Gutiérrez Ortiz Mena. Ponente: José Ramón Cossío Díaz. Secretaria: Mónica Cacho Maldonado.
Esta tesis se publicó el viernes 23 de junio de 2017 a las 10:29 horas en el Semanario Judicial de la Federación.

Como ya se explicó, mi representada no pretende introducir una nueva acción, modificar la causa de pedir ni ampliar las prestaciones reclamadas en el presente incidente. Lo único que busca es ejercer plenamente el derecho de contradicción que le corresponde respecto de hechos, defensas y elementos probatorios cuyo contenido era desconocido para BNY al momento de promover el incidente, ya sea porque fueron exhibidos con posterioridad o porque se encontraban bajo el control exclusivo de la Comerciante.

En ese sentido, la regla de litis cerrada impide a las partes alterar las pretensiones que integran la controversia, pero de ninguna manera puede utilizarse para restringir el derecho de una parte a pronunciarse respecto de hechos, argumentos o documentos incorporados con posterioridad al procedimiento por su contraparte. Sostener lo contrario equivaldría a privar a las partes de su derecho fundamental de contradicción y defensa respecto de elementos que razonablemente no pudieron ser materia de análisis al momento de formular sus planteamientos iniciales.

Así, en observancia de los principios de debido proceso, igualdad procesal y contradicción, mi representada tiene derecho a formular manifestaciones y aportar elementos probatorios relacionados con hechos supervenientes o con información cuyo conocimiento haya sido posterior a la presentación del incidente, particularmente cuando dicha información deriva de documentación exhibida durante la sustanciación del procedimiento en el que se actúa o recabada mediante el proceso de *Discovery*.

En todo caso, corresponderá a su Señoría determinar si los argumentos y medios de convicción que esta parte haga valer efectivamente se encuentran encaminados a controvertir los hechos, defensas y documentos introducidos por la contraparte, así como a contribuir al esclarecimiento de la verdad y a la correcta resolución de la controversia. Por ello, resulta improcedente pretender excluir *a priori* cualquier planteamiento derivado de documentación o información conocida con posterioridad, pues ello implicaría prejuzgar sobre la pertinencia y alcance de elementos que aún deben ser valorados dentro del contexto integral del incidente.

Máxime que el derecho de contradicción tiene precisamente la finalidad de permitir a una parte pronunciarse respecto de cuestiones novedosas introducidas al procedimiento por su contraparte, sin que ello implique una modificación de la litis ni una ampliación de la acción originalmente ejercitada. Sirve de apoyo, el siguiente criterio judicial:

> Registro digital: 2004555 Instancia: Primera Sala Décima Época Materias(s): Civil Tesis: 1a. CCLXXVII/2013 (10a.) Fuente: Semanario Judicial de la Federación y su Gaceta. Libro XXIV, Septiembre de 2013, Tomo 1, página 994 Tipo: Aislada. **PROCEDIMIENTO JUDICIAL DE EJECUCIÓN DE GARANTÍAS OTORGADAS MEDIANTE PRENDA SIN TRANSMISIÓN DE POSESIÓN Y FIDEICOMISO DE GARANTÍA. LA VISTA OTORGADA AL ACTOR SOBRE LA CONTESTACIÓN DE LA DEMANDA RELATIVA, EN TÉRMINOS DEL ARTÍCULO 1414 BIS 14 DEL CÓDIGO DE COMERCIO, INCLUYE EL DERECHO DE ALEGAR Y EL DE APORTAR PRUEBAS PARA DESVIRTUAR LAS EXCEPCIONES DEL DEMANDADO.**
> El precepto citado regula parte del procedimiento judicial de ejecución de garantías otorgadas mediante prenda sin transmisión de posesión y fideicomiso de garantía, al establecer que el juez resolverá sobre la admisión o el desechamiento de pruebas en el auto que tenga por contestada o no la demanda, auto en el cual se dará vista al actor con las excepciones opuestas por el demandado por el término de tres días y se señalará fecha y hora para celebrar la audiencia de pruebas y alegatos. Ahora, si bien es cierto que el contenido literal del artículo 1414 Bis 14 del Código de Comercio, no es concluyente sobre la interrogante relativa a si en el desahogo de

> esa vista el actor, además de tener el derecho de alegar lo que a su derecho convenga, **puede aportar pruebas para desvirtuar las excepciones opuestas, tal cuestión debe resolverse en sentido positivo, por conformar la opción interpretativa que hace compatible a la norma con el derecho humano al debido proceso.** Ello, en primer lugar, porque la norma analizada no contiene alguna porción normativa que excluya esta posibilidad, por lo que cabe afirmar que el derecho probatorio admite su acomodo en la redacción de éste; en segundo lugar, el debido proceso, entendido desde la perspectiva de quien insta la función jurisdiccional para lograr el reconocimiento y la tutela de un derecho, exige a las autoridades judiciales que diriman los conflictos sobre los derechos de las personas mediante un procedimiento que les otorgue una posibilidad efectiva e igual de defender sus puntos de vista y ofrecer pruebas en apoyo de sus pretensiones. Lo anterior no implica reconocer un derecho limitado al actor para probar, pues este derecho de réplica sólo es apto para desvirtuar genuinamente lo manifestado por el demandado en su contestación, por lo cual los jueces encargados de su aplicación deben cuidar que el ejercicio de este derecho se discipline a este fin y no convertirse en una posibilidad para subsanar deficiencias de la demanda original, lo cual implica que se conserven las facultades de la autoridad judicial para admitir o desechar las pruebas, según lo amerite el caso.
>
> Amparo directo en revisión 3758/2012. Maple Commercial Finance, Corp. 29 de mayo de 2013. Cinco votos. Ponente: Alfredo Gutiérrez Ortiz Mena. Secretario: David García Sarubbi.

En mérito de todo lo expuesto solicito a su Señoría resuelva como infundadas e improcedentes las excepciones y defensas hechas valer por TVA y en el momento procesal oportuno resuelva como fundado y procedente el Incidente, teniendo por acreditado que el crédito objeto del presente Incidente se celebró fuera de las condiciones de mercado, así como en contravención a los usos y prácticas bancarias y mercantiles, por lo que, deberá ser declarado como ineficaz frente a la masa, condenando a TVA en los términos precisados en el Incidente.

## REQUERIMIENTO DE INFORMACIÓN

Toda vez que de lo expuesto en el presente y en los documentos que integran el Crédito AlterBank se advierte que el Acreditante real no es AlterBank, solicito respetuosamente a su Señoría requiera a la Comerciante para que manifieste a ese H. Juzgado ***bajo protesta de decir verdad*** quién o quiénes son los Acreditantes reales del Crédito materia del presente incidente y exhiba los documentos correspondientes.

Asimismo, solicito a su Señoría que, toda vez que del contenido del Crédito AlterBank se advierte que el mismo se encuentra garantizado mediante diversos contratos distintos de la garantía hipotecaria, requiera a la Comerciante para que exhiba la totalidad de los contratos y documentos en los que se hicieron constar las garantías del crédito, manifestando ***bajo protesta de decir verdad*** que son la totalidad de las garantías otorgadas; se mencionan de forma enunciativa, mas no limitativa, el contrato de prenda sobre acciones y el contrato de prenda sobre marcas.

Asimismo, solicito respetuosamente a su Señoría le imponga la medida de apremio que estime pertinente para el caso que no dé cumplimiento a lo solicitado dentro del término establecido para tal efecto.

Lo anterior es clave para conocer quién es el verdadero titular de los derechos de cobro derivados del crédito en cita, así como la totalidad de las garantías otorgadas a AlterBank.

**OBJECIÓN DE DOCUMENTOS**

Con fundamento en lo dispuesto por los artículos 1194, 1247, 1296 y demás relativos y aplicables del Código de Comercio, de aplicación supletoria a la Ley de Concursos Mercantiles, mi representada objeta en cuanto a su alcance y valor probatorios las documentales ofrecidas por TVA al dar contestación al presente Incidente. La presente objeción no se dirige a controvertir su autenticidad o existencia material, **sino precisamente a impedir que se les atribuya una eficacia demostrativa distinta y considerablemente mayor a la que jurídicamente les corresponde**, pues, contrario a lo que pretende sostener la Comerciante, **dichos documentos no acreditan que los actos cuya ineficacia se reclama hayan sido celebrados en condiciones de mercado, ni que éstos hayan causado un beneficio a la Masa**.

***(1) Las documentales ofrecidas bajo los numerales 1 y 2 del capítulo de pruebas de la contestación, consistentes en el Contrato de Crédito de 29 de enero de 2026 y el Convenio Modificatorio y de Reexpresión de 6 de marzo de 2026, junto con sus respectivas traducciones.***

Las referidas documentales se objetan en cuanto al alcance y valor probatorios que TVA pretende atribuirles, pues la sola existencia y contenido de los actos cuya ineficacia precisamente constituye la materia del presente Incidente **no** demuestra que éstos se hayan celebrado en condiciones ordinarias de mercado ni, mucho menos, que hayan causado un beneficio a la Masa, como pretende atribuirles TVA.

En efecto, TVA pretende que del propio Contrato de Crédito se tenga por acreditado, entre otros extremos, que sus términos y condiciones fueron los realmente pactados, que el otorgamiento de garantías estuvo contemplado desde la obligación original y que, en general, son inexactas las premisas sobre las cuales mi representada sustentó su acción. Asimismo, respecto del Convenio Modificatorio, pretende concluir que éste no implicó endeudamiento nuevo ni el otorgamiento de garantías distintas a las originalmente convenidas. **Esos son precisamente los alcances que TVA atribuye expresamente a dichas probanzas.**

Sin embargo, tales conclusiones no se desprenden de la mera existencia de los documentos. El Contrato de Crédito y su Convenio Modificatorio únicamente acreditan, en su caso, los términos en que fueron documentados los actos impugnados, pero no constituyen prueba de que dichos términos correspondieran a las condiciones prevalecientes en el mercado al momento de su celebración, ni de que la operación hubiera sido económicamente razonable para TVA, ni de que se causara un beneficio a la Masa.

Sostener lo contrario equivaldría a permitir que los propios actos cuya ineficacia se demanda se constituyeran, por sí mismos, en prueba de su eficacia, cuando precisamente corresponde al órgano jurisdiccional analizar su contenido a la luz de los restantes elementos probatorios y de los supuestos previstos por los artículos 114 y 115 de la Ley de Concursos Mercantiles.

Lo anterior encuentra sustento en el criterio conforme al cual, aun cuando una documental deba tenerse por reconocida, ello no implica que necesariamente deba atribuírsele eficacia probatoria para demostrar todos los extremos que su oferente pretende derivar de ella, pues corresponde al juzgador determinar, atendiendo a las circunstancias particulares del caso, si el documento efectivamente resulta idóneo y suficiente para justificar el hecho concreto que se pretende acreditar.

Lo anterior resulta particularmente evidente respecto de la hipótesis prevista por el artículo 114, fracción III, de la Ley de Concursos Mercantiles, pues dicho precepto exige contrastar las condiciones y términos de la operación impugnada con las condiciones prevalecientes en el mercado al momento de su celebración o con los usos y prácticas mercantiles correspondientes. Por definición, ese parámetro comparativo no puede desprenderse exclusivamente del propio contrato cuya eficacia se controvierte.

Así, que el Contrato de Crédito consigne una tasa anual fija de 17.50%, determinadas comisiones, garantías o cualesquiera otras condiciones financieras únicamente acredita que tales términos fueron documentados por las partes; pero no demuestra que éstos fueran equivalentes a los que un tercero independiente habría aceptado en circunstancias comparables. Para acreditar ese extremo resultaban necesarios elementos objetivos externos a la propia operación, susceptibles de establecer cuáles eran las condiciones prevalecientes en el mercado relevante al 29 de enero de 2026.

**Por tanto, dichas documentales únicamente pueden ser valoradas para acreditar la existencia y contenido formal de los actos impugnados, mas no las conclusiones jurídicas y económicas que TVA pretende derivar unilateralmente de ellos**. La afirmación de TVA de que el crédito benefició a la Masa no es una consecuencia que se presuma de la mera celebración del financiamiento; constituye una proposición fáctica en la que sustenta su defensa y que, conforme al artículo 1194 del Código de Comercio, le corresponde acreditar mediante pruebas idóneas.

***(2) Las documentales ofrecidas bajo los numerales 3, 4, 5 y 6 del capítulo de pruebas, consistentes en el oficio número 400-75-00-00-00-2026-1130; las resoluciones contenidas en los oficios 400-75-00-00-00-2026-2940 y 400-75-00-00-00-2026-2941; las líneas de captura emitidas por el SAT; y los comprobantes de las transferencias electrónicas realizadas el 29 de enero de 2026.***

Las referidas documentales se objetan igualmente en cuanto al alcance y valor probatorios que TVA pretende atribuirles, pues aun cuando pudieran acreditar la existencia de determinados créditos fiscales, los beneficios concedidos por la autoridad fiscal y la realización material de ciertos pagos, situación que se enfatiza no estuvo nunca sobre la mesa su existencia o no, de ninguna manera acreditan que la contratación del Crédito AlterBank haya generado un beneficio para la Masa ni que ésta haya experimentado una disminución neta de sus pasivos.

Por el contrario, de ellas se observa precisamente que TVA contrató un diverso crédito para "cubrir" otro crédito preexistente y que los plazos para llevar a cabo los pagos fueron detonados por la propia Comerciante.

TVA pretende específicamente que las resoluciones emitidas por el SAT acrediten un supuesto "beneficio neto" para la Masa por $1,856,303,526.00, mientras que las líneas de captura y transferencias demostrarían la trazabilidad de los recursos obtenidos mediante el financiamiento y su aplicación al pago de obligaciones fiscales.

Sin embargo, esa conclusión no se desprende de las documentales. Que TVA haya destinado recursos provenientes del Crédito AlterBank al pago de obligaciones fiscales únicamente acredita, en el mejor de los casos, el destino que dio a esos recursos, pero nada demuestra respecto del efecto patrimonial neto que la contratación del nuevo financiamiento produjo sobre la Masa.

Dicho de otra manera, TVA confunde el destino de los recursos con el beneficio a la Masa. El hecho de que una parte de los recursos obtenidos de AlterBank haya sido presuntivamente utilizada para extinguir obligaciones frente al SAT **no significa que el pasivo de la Comerciante se haya reducido en igual proporción**, **pues la obtención de esos recursos tuvo como contrapartida la incorporación de una nueva obligación a cargo de TVA frente a AlterBank.**

Acreditar el destino de los recursos obtenidos mediante un financiamiento constituye un hecho distinto de acreditar el efecto patrimonial neto producido por su contratación.

Para sostener esto último no basta demostrar que determinados recursos fueron destinados al pago de un pasivo preexistente, sino que resultaba necesario acreditar que, consideradas integralmente las obligaciones asumidas como consecuencia del nuevo financiamiento, incluyendo principal, intereses, comisiones y garantías otorgadas, la posición patrimonial de la Comerciante y, particularmente, la Masa sobre la cual concurren sus acreedores, experimentó una mejora efectiva.

Las resoluciones emitidas por el SAT carecen de aptitud probatoria para demostrar ese extremo, pues su objeto se limita a determinar la situación fiscal de TVA y, en su caso, los beneficios fiscales concedidos por la autoridad.

**Ninguna de ellas analiza las obligaciones contraídas frente a AlterBank, el costo financiero del Crédito, las garantías otorgadas, su correspondencia con condiciones de mercado o el efecto que la incorporación de ese nuevo pasivo produjo sobre la posición de los restantes acreedores. Pretender derivar de tales documentos la existencia de un "beneficio neto" de $1,856,303,526.00 supone atribuirles una conclusión económica que ni contienen ni están dirigidos a demostrar.**

Más aún, el oficio de 9 de enero de 2026, lejos de demostrar que la contratación del Crédito AlterBank era la única alternativa disponible para TVA o que necesariamente beneficiaba a la Masa, únicamente acredita la situación existente frente a la autoridad fiscal.

A lo largo de la contestación TVA pretende que dicho oficio demuestre la "inminencia real, actual y documentada de la ejecución fiscal"; ése es expresamente el alcance que atribuye a la probanza. Pero de su contenido no se desprende que la única alternativa jurídica o financiera disponible fuera contratar precisamente el financiamiento impugnado, en los términos y condiciones pactados con AlterBank. Aunado a ello, lo único que acreditan dichas documentales es que estos créditos son pasivos que TVA tenía desde 2013.

En consecuencia, ninguno de estos documentos acredita el hecho central que TVA pretende demostrar con ellos, es decir, que la operación impugnada benefició a la Masa. A lo sumo, acreditan la existencia de obligaciones fiscales, ciertas reducciones concedidas por la autoridad, su posterior pago y el origen inmediato de los recursos utilizados para ello; **cuestiones distintas de determinar si la incorporación del Crédito AlterBank al patrimonio de TVA produjo un beneficio o, por el contrario, un perjuicio para la Masa y sus acreedores**.

Por tanto, resulta improcedente atribuir a dichas documentales el alcance pretendido por TVA, debiendo ser valoradas exclusivamente respecto de los hechos que objetivamente consignan y no como prueba de las conclusiones económicas y jurídicas que unilateralmente pretende derivar de ellas.

## MANIFESTACIÓN DE DOCUMENTOS

Con fundamento en lo dispuesto por la fracción VI del artículo 3 del Acuerdo 12/2020 del Pleno del Consejo de la Judicatura Federal, ***manifiesto bajo formal protesta de decir verdad*** que los documentos que se acompañan al presente escrito son una copia fiel y exacta en archivo electrónico en formato PDF de los documentos originales que obran en poder de

BNY, disponibles en el domicilio procesal y que se encuentran a disposición de ese H. Juzgado de Distrito en caso de así requerirse por dicha autoridad jurisdiccional.

**PRUEBAS**

**1. DOCUMENTAL.**- Consistente en la opinión complementaria emitida por la licenciada en derecho Renée T. St. Rose KC, quien es experta en la materia mercantil, bancaria y financiera, conforme a la legislación de Santa Lucía y del Caribe Oriental –tal como se acreditó con sus credenciales exhibidas en el escrito inicial de BNY.

Dicha opinión se acompaña al presente como **ANEXO 1** con su debida traducción al español por perito certificado del Consejo de la Judicatura Federal como **ANEXO 1 BIS**.

Con la prueba en cita se acredita que el crédito otorgado por AlterBank se encuentra fuera de las condiciones ordinarias de mercado aplicables en Santa Lucía, considerando las características específicas de: ***(i)*** Contrato de Crédito; ***(ii)*** Convenio Modificatorio; y, ***(iii)*** Crédito Reformulado. Lo anterior, también analizando el marco regulatorio vigente en Santa Lucía y aplicable en dicha jurisdicción y las prácticas comúnmente observadas en operaciones de esta naturaleza.

La prueba de referencia es idónea para acreditar lo anterior, toda vez que el derecho extranjero es materia de prueba y su interpretación puede ser válidamente establecida por un profesionista del derecho de la jurisdicción de que se trate, en este caso, Santa Lucía. En el caso que nos ocupa, Renée T. St. Rose KC, acreditó ser licenciada en derecho conforme a la legislación de Santa Lucía y del Caribe Oriental, por lo que es experta en el derecho extranjero que se invoca, tal como se acreditó con las pruebas **DOCUMENTALES PÚBLICAS** que se acompañaron dentro del **ANEXO 3** del escrito inicial de BNY consistentes en: ***(i)*** Carta Patente de fecha 02 de abril de 2025, emitida por el Secretario Privado del Gobernador General de Santa Lucía debidamente apostillada; ***(ii)*** el Certificado para el Ejercicio Profesional emitido por el Titular del Registro de la Alta Corte de Justicia en el Estado de Santa Lucía de fecha 30 de diciembre de 2025, debidamente apostillado; y, ***(iii)*** su currículum vitae, todos ellos traducidos al español por perito traductor certificado autorizado por el Consejo de la Judicatura Federal (traducciones que se acompañaron como parte del **ANEXO 3 BIS** al escrito inicial de BNY).

Esta prueba se relaciona con todos y cada uno de los hechos expuestos en el incidente de fraude promovido por mi representada, así como con los hechos y argumentos desarrollados en el desahogo de vista, y se ofrece para acreditar las circunstancias ahí descritas, así como para demostrar que las excepciones y defensas opuestas por TVA carecen de sustento fáctico, documental y jurídico, resultando infundadas e improcedentes.

**2. DOCUMENTAL**. - Consistente en la opinión complementaria emitida por los licenciados en derecho Mauricio Basila Lago y Paul Yamil José Aguilar misma que se agrega al presente como **ANEXO 2**, quienes acreditaron ser expertos en materia bancaria y derecho financiero con las credenciales que se exhibieron en el escrito inicial de BNY.

Con la prueba en cita se acredita que el crédito otorgado por AlterBank se encuentra fuera de las condiciones ordinarias de mercado aplicables, específicamente analizando las características de considerando las características específicas de: ***(i)*** Contrato de Crédito; ***(ii)*** Convenio Modificatorio; y, ***(iii)*** Crédito Reformulado. Lo anterior, conforme al marco regulatorio internacional que establece las condiciones estándar de mercado para este tipo de operaciones y las prácticas comúnmente observadas en operaciones de esta naturaleza.

La prueba de referencia es idónea para acreditar lo anterior, toda vez que quienes suscriben la misma son expertos en materia bancaria.

Esta prueba se relaciona con todos y cada uno de los hechos expuestos en el incidente de fraude promovido por mi representada, así como con los hechos y argumentos desarrollados en el desahogo de vista, y se ofrece para acreditar las circunstancias ahí descritas, así como para demostrar que las excepciones y defensas opuestas por TVA carecen de sustento fáctico, documental y jurídico, resultando infundadas e improcedentes.

**3. DOCUMENTAL PÚBLICA**.- Consistente en las actuaciones derivadas del procedimiento regulado en la Sección 1782 del Título 28 del Código de los Estados Unidos (*Discovery*) seguido ante el Juez de Distrito de los Estados Unidos para el Distrito Sur de Florida, División de Miami, Caso No. 26-23885-MC-MARTINEZ.

Se ofrece la totalidad de las actuaciones y documentos obtenidos en el procedimiento de Discovery antes referido, como medio de prueba respecto de los hechos, comunicaciones, documentos corporativos, estados financieros, decisiones de negocio y demás circunstancias fácticas reveladas con relación al Crédito AlterBank.

En términos de lo anterior, mi representada se reserva expresamente el derecho de ofrecer y exhibir cualquier prueba superveniente que llegue a obtenerse con motivo del procedimiento de Discovery antes referido, siempre que guarde relación con los hechos materia del presente incidente, con las pretensiones hechas valer en éste, o con los hechos y argumentos expuestos en el desahogo de vista.

Esta prueba ofrece para acreditar los hechos y circunstancias que se desprenden de la documentación y actuaciones obtenidas dentro de dicho procedimiento, así como para demostrar que las excepciones y defensas opuestas por TVA carecen de sustento fáctico, documental y jurídico, resultando por ello infundadas e improcedentes.

**4. INSTRUMENTAL DE ACTUACIONES**.- consistente en todo lo actuado en el presente concurso mercantil, particularmente: ***(i)*** la Solicitud de Declaración de Concurso Mercantil y los Anexos y documentos que a ella se acompañaron; ***(ii)*** el Contrato de Crédito; ***(iii)*** Convenio Modificatorio; ***(iv)*** Crédito Reformulado; ***(v)*** los documentos e instrumentos públicos que instrumentaron las garantías otorgadas por TVA a AlterBank; ***(vi)*** el Contrato de Emisión que obra en autos del concurso mercantil que se tramita; ***(vii)*** así como en el incidente que se tramita, en todo lo que beneficie a mi representada.

Esta prueba se relaciona con todos y cada uno de los hechos expuestos en el incidente de fraude promovido por mi representada, así como con los hechos y argumentos desarrollados en el desahogo de vista, y se ofrece para acreditar las circunstancias ahí descritas, así como para demostrar que las excepciones y defensas opuestas por TVA carecen de sustento fáctico, documental y jurídico, resultando infundadas e improcedentes.

**5. PRESUNCIONAL**.- en su doble aspecto legal y humana, en todo lo que beneficie a los intereses de mi representada.

Esta prueba se relaciona con todos y cada uno de los hechos expuestos en el incidente de fraude promovido por mi representada, así como con los hechos y argumentos desarrollados en el desahogo de vista, y se ofrece para acreditar las circunstancias ahí descritas, así como para demostrar que las excepciones y defensas opuestas por TVA carecen de sustento fáctico, documental y jurídico, resultando infundadas e improcedentes.

[illegible] ELORZA
[illegible]
[illegible] 16:0[illegible]:2[illegible]

Por lo anteriormente expuesto y fundado;

**A USTED C. JUEZ** atentamente pido se sirva:

**PRIMERO.** Tenerme por presente con el carácter que ostento, en representación de **THE BANK OF NEW YORK MELLON en su carácter de Fiduciario**, desahogando la vista ordenada en auto de 02 de septiembre de 2026.

**SEGUNDO.** Admitir las pruebas ofrecidas en el presente ocurso, a efecto de que sean desahogadas y valoradas en el momento procesal oportuno.

**TERCERO.** En el momento procesal oportuno, resolver como fundado el Incidente y en consecuencia, declarar ineficaz frente a la masa el contrato de crédito celebrado entre TVA y AlterBank, por los motivos expuestos y para todos los efectos legales a que haya lugar.

**CUARTO.** Como consecuencia de la ineficacia de dicho crédito frente a la Masa, se declare judicialmente que AlterBank no puede ser reconocido como acreedor dentro del

presente procedimiento concursal y tampoco puede suscribir la propuesta de convenio concursal que se presente.

**PROTESTO LO NECESARIO**

**FERNANDO DEL CASTILLO ELORZA**

Ciudad de México, a la fecha de su presentación.

JESUS VAZQUEZ NUÑEZ
706a6620636a66330000000000000000016a00
07/05/29 10:16:24

ESTADOS UNIDOS MEXICANOS

PODER JUDICIAL DE LA FEDERACIÓN

## EVIDENCIA CRIPTOGRÁFICA - TRANSACCIÓN

**Archivo Firmado:**

**415700200000000000062819800.p7m**

**Autoridad Certificadora:**

**AUTORIDAD CERTIFICADORA**

**Firmante(s): 1**

**Este documento digital es una copia fiel de su versión física o electrónica, la cual corresponde a su original.**

| FIRMANTE | | | | |
|---|---|---|---|---|
| **Nombre:** | FERNANDO DEL CASTILLO ELORZA | **Validez:** | BIEN | Vigente |
| FIRMA | | | | |
| **No Serie:** | 30.30.30.30.31.30.30.30.30.30.30.35.31.37.38.36.34.31.34.38 | **Revocación:** | Bien | No revocado |
| **Fecha (UTC/ CDMX)** | 09/09/26 04:36:17 - 08/09/26 22:36:17 | **Status:** | Bien | Valida |
| **Algoritmo:** | RSA-SHA256 | | | |
| **Cadena de firma:** | 19 b9 4c 35 fb b4 ae bc 1e cf dd 03 c3 c8 92 c9<br>c1 b9 64 98 2e 07 60 f9 f2 23 58 72 80 ee b3 83<br>9b e5 33 65 6c b3 35 51 43 cc 6d 16 93 29 2b 3f<br>3d 00 cc e8 f3 46 7a 58 b1 ac 28 09 48 57 50 77<br>ef 8c 23 63 7b 07 75 cf ec 0f 6e de 45 e7 fd a1<br>a8 0c e0 c6 38 10 c4 d2 fe cc 83 b9 9e 01 1d ab<br>af e2 ee bc f9 a0 8e 6f 47 34 5a 99 40 4c ce d2<br>0d 47 b4 0b 77 5e fa 13 1b c1 e2 25 9f 3b cf 56<br>cb bb 7a 19 75 e7 a8 18 0c f4 eb a9 bf 90 48 25<br>6c 08 03 e8 e1 fc 6d 0c f2 20 84 34 50 ae 5f cc<br>73 77 21 44 81 2b a4 9d 06 f9 fd d5 5a 35 79 91<br>30 0e e6 7e e4 2e d0 f1 aa 9b d3 ae f2 99 18 68<br>1b 61 d0 62 37 30 99 a8 0a e9 e6 34 a3 48 15 90<br>3f f2 bc cd aa 10 46 21 46 b6 3c 66 52 67 eb d7<br>5e fc 9a 76 03 df b8 c4 dd 4b 10 bb e2 48 28 db<br>a9 26 ef 36 59 00 dd 12 f2 c8 dd 87 fb 3e 5e cd | | | |

| OCSP | |
|---|---|
| **Fecha: (UTC/ CDMX)** | 09/09/26 04:36:19 - 08/09/26 22:36:19 |
| **Nombre del respondedor:** | Servicio OCSP SAT |
| **Emisor del respondedor:** | AUTORIDAD CERTIFICADORA |
| **Número de serie:** | 30.30.30.30.31.30.30.30.30.30.30.35.31.37.38.36.34.31.34.38 |

| TSP | |
|---|---|
| **Fecha : (UTC/ CDMX)** | 09/09/26 04:36:19 - 08/09/26 22:36:19 |
| **Nombre del emisor de la respuesta TSP:** | Autoridad Emisora de Sellos de Tiempo del Consejo de la Judicatura Federal |
| **Emisor del certificado TSP:** | Autoridad Certificadora Intermedia del Consejo de la Judicatura Federal |
| **Identificador de la respuesta TSP:** | 203698971 |
| **Datos estampillados:** | gFhCrfBQBfkBjuuFfVd0R5Tt16o= |

# ALCANCE A LA OPINIÓN EN MATERIA BANCARIA

**JUZGADO PRIMERO DE DISTRITO EN MATERIA DE CONCURSOS MERCANTILES CON RESIDENCIA EN LA CIUDAD DE MÉXICO Y JURISDICCIÓN EN TODA LA REPÚBLICA MEXICANA**

**COMERCIANTE:** TV Azteca, S.A.B. de C.V.

**CONCURSO MERCANTIL:** 22/2026

*Basila Abogados, S.C.* (el "**Despacho**") emite el presente alcance (el "**Alcance**") a la Opinión en Materia Bancaria de fecha 12 de agosto de 2026 (la "**Opinión**") rendida en el expediente al rubro citado.

El presente documento constituye un Alcance, esto es, una ampliación y precisión, de la Opinión, y no un dictamen autónomo ni una opinión distinta. Se emite en ejercicio expreso de la reserva formulada en el párrafo 21 de la Opinión, conforme a la cual el Despacho se reservó el derecho de complementar, ampliar o modificar la Opinión en caso de tener acceso a información adicional o distinta a la considerada en su elaboración, incluyendo, de manera enunciativa mas no limitativa, el Crédito Alter-TVAz de 29 de enero de 2026 y el convenio modificatorio y de reexpresión de 6 de marzo de 2026 y sus anexos. Habiéndose tenido a la vista dichos instrumentos con posterioridad a la emisión de la Opinión, el Despacho rinde el presente Alcance, el cual forma parte integrante de aquélla y debe leerse conjuntamente con la misma.

*Los términos con mayúscula inicial que no se definan en el presente Alcance tendrán el significado que se les atribuye en la Opinión o, tratándose de términos definidos en los Documentos del Crédito, el que dichos instrumentos les asignan.*

Mediante el presente Alcance, el Despacho analiza el contrato de crédito de fecha 29 de enero de 2026 celebrado entre *Alter Bank Ltd.* ("**Alter**"), en su carácter de organizador (el "**Organizador**"), acreditante inicial (el "**Acreditante Inicial**"), agente administrativo (el "**Agente Administrativo**") y agente de garantías (el "**Agente de Garantías**"), y TV Azteca, S.A.B. de C.V. ("**TV Azteca**" o el "**Acreditado**") (el "**Contrato Original**"), en su traducción al español certificada por perito traductor auxiliar de la Administración de Justicia que obra en el expediente; así como el primer convenio modificatorio y de reexpresión del contrato de crédito de fecha 6 de marzo de 2026 (el "**Convenio Modificatorio**" o "**Contrato Reformulado**" y, conjuntamente con el Contrato Original, los "**Documentos del Crédito**").

El objeto del Alcance es doble: **(i)** *Primero*, determinar si la estructura, el clausulado, la secuencia documental, el régimen de administración, pagos y garantías de los Documentos del Crédito son consistentes con el contenido ordinario y con los estándares prudenciales aplicables a un contrato de crédito corporativo de esta magnitud otorgado a una empresa en deterioro financiero severo; y **(ii)** *Segundo*, precisar los efectos que la información contenida en los Documentos del Crédito produce sobre las conclusiones de la Opinión y, en particular, sobre el análisis desarrollado en sus párrafos 42 y 50.

El análisis distingue en todo momento entre: **(i)** el contenido del Contrato Original vigente al momento del desembolso; **(ii)** los términos incorporados o reformulados treinta y seis días después mediante el Convenio Modificatorio; y **(iii)** la documentación adicional que sería necesaria para verificar el proceso de originación, fondeo, sindicación, administración y mitigación del riesgo, y que no obra en el acervo revisado.

El Alcance conserva íntegramente el objeto, los límites y las reservas de la Opinión. En particular, y como se reiteró en sus párrafos 8 y 25, el presente documento no cita, asume ni asevera la actualización de fraude de acreedores, la ineficacia concursal de acto alguno, su ubicación dentro del periodo de retroacción, ni la violación de requisito específico previsto en la Ley de Concursos Mercantiles; dichas calificaciones jurídicas corresponden exclusivamente al Juzgador con base en la totalidad del acervo probatorio. Tampoco se emite opinión sobre el derecho de Santa Lucía, ley aplicable al Contrato Original conforme a su Cláusula 8.11.

*Nota preliminar sobre el parámetro de análisis.* Se precisa, para evitar cualquier equívoco sobre el alcance de este documento, que los estándares prudenciales y la práctica documental que en él se invocan no se citan como normas jurídicas vinculantes ni como derecho aplicable a la operación. El Despacho no afirma, ni afirmó en la Opinión, que los Principios del Comité de Supervisión Bancaria de Basilea, las Directrices de la Autoridad Bancaria Europea o los formularios de la Loan Market Association obliguen al Acreditante, al Acreditado o a autoridad alguna, ni que su inobservancia produzca por sí misma consecuencia jurídica alguna. Se invocan, exclusivamente, como evidencia documentada de los usos y prácticas mercantiles que rigen el contenido ordinario de la documentación crediticia corporativa y sindicada en los mercados en que operan acreditantes y acreditados como los de la especie. Su función en este Alcance es acreditar qué se pacta habitualmente en operaciones de esta naturaleza y qué categorías de estipulaciones integran invariablemente su contenido; no la de imponer un deber. Correlativamente, el presente Alcance no emite opinión sobre el derecho de Santa Lucía ni sobre la situación del Acreditante frente a su autoridad supervisora, materias ambas ajenas a su objeto y a la competencia del Despacho.

*Nota preliminar sobre el contraste de condiciones económicas.* En congruencia con lo anterior, y con independencia del parámetro de usos y prácticas, el presente Alcance aporta el contraste objetivo entre las condiciones económicas efectivamente pactadas en los Documentos del Crédito y las condiciones prevalecientes en el mercado mexicano de financiamiento a la fecha de celebración, tomadas de las publicaciones oficiales del Banco de México y relacionadas en el **Anexo "B"**. Dicho contraste se desarrolla en el apartado *III.d)* del presente Alcance. Su formulación es estrictamente descriptiva, no constituye calificación sobre la licitud, la proporcionalidad o la validez del costo financiero, ni cuantificación de daños, ni pronunciamiento sobre los efectos concursales del acto, materias todas ellas reservadas al Juzgador.

## I. RESUMEN EJECUTIVO.

**1.** La revisión del texto del Contrato Original arroja dos hallazgos centrales, ambos convergentes con, y no meramente adicionales a, las conclusiones de la Opinión. El primero es subjetivo, el propio Contrato Original está construido para que la titularidad

económica del crédito resida en personas no identificadas, que se incorporan mediante contratos privados celebrados con Alter, sin intervención ni conocimiento del Acreditado, y sin que su identidad conste en instrumento alguno del expediente. El segundo es objetivo, el Contrato Original, vigente al momento del desembolso, carece de los mecanismos de protección y control que hacen de un contrato de crédito corporativo un instrumento de gestión del riesgo, y contiene además estipulaciones que operan en contra del propio acreedor.

2. **Extensión y arquitectura.** El Contrato Original documenta un financiamiento de hasta $5,000,000,000.00 (cinco mil millones de pesos 00/100 Moneda Nacional) en ocho cláusulas y quince fojas, sin anexo alguno, sin formato de pagaré, sin anexo de compromisos o participaciones, sin formato de contrato de adhesión de acreditantes, sin certificados y sin condiciones precedentes.

3. **Ausencia total de condiciones precedentes.** El Contrato Original no contiene cláusula de condiciones de utilización o condiciones precedentes. La "Fecha de Desembolso" está definida en su Cláusula 1.01 como el 29 de enero de 2026, esto es, la propia fecha de celebración, y la Cláusula 2.03 ordena el desembolso en esa fecha. No se exigió, como condición previa, la entrega de documentos corporativos o poderes, opiniones legales de validez y exigibilidad, certificados de ausencia de incumplimiento, confirmación de declaraciones, evidencia del destino de los recursos, ni la constitución o perfeccionamiento de garantía alguna.

4. **Declaraciones y garantías estructuralmente incompletas.** El Contrato Original sí contiene una Cláusula 4 de Declaraciones y Garantías, integrada por doce subcláusulas. Sin embargo, y como se detalla en el apartado *III.e)*, dicho catálogo omite precisamente las declaraciones que resultaban críticas frente a un acreditado en incumplimiento generalizado, no hay declaración de ausencia de litigios o procedimientos relevantes, no hay declaración de ausencia de incumplimiento bajo otros contratos o instrumentos de deuda, no hay declaración de ausencia de pasivos no revelados, no hay declaración de solvencia, no hay declaración de ausencia de cambio adverso relevante, y la declaración de ausencia de conflicto de la Cláusula 4.02 no comprende los contratos ni los instrumentos de deuda del Acreditado, limitándose a leyes, estatutos, órdenes judiciales y órdenes de autoridades gubernamentales. Las declaraciones no se otorgan a favor de los acreditantes, sino del Agente Administrativo, y no se estipula su repetición.

5. **Ausencia absoluta de obligaciones de no hacer y de entrega de información.** La Cláusula 5 del Contrato Originale se titula "*Obligaciones del Acreditado*" y comprende cinco subcláusulas, todas afirmativas y de contenido ordinario. No existe una sola obligación de no hacer, ninguna restricción a la contratación de deuda adicional, a la constitución de gravámenes, a la disposición o venta de activos, al pago de dividendos, a fusiones o reorganizaciones, a operaciones con partes relacionadas ni a cambios en el giro. No existe razón financiera de mantenimiento alguna; y de manera particularmente reveladora, la Cláusula 5.02, intitulada "*Estados Financieros: Otros Informes*", no impone al Acreditado obligación alguna de entregar estados financieros, reportes o certificados al acreditante o al Agente Administrativo, se limita a exigir que el Acreditado mantenga sus

propios registros y sistemas contables internos. El Acreditante contrató, por tanto, sin derecho a recibir información financiera alguna durante la vida del crédito.

6. **Garantías configuradas como obligación posterior con penalidad, no como condición.** La Cláusula 5.05, del Contrato Original, difiere la firma de la prenda sobre acciones, la prenda sobre marcas, la hipoteca y el fideicomiso sobre cuentas por cobrar hasta sesenta días naturales posteriores al desembolso, y establece como única consecuencia de su falta de otorgamiento un incremento de la tasa de 1.50% anual. La omisión de constituir la totalidad del paquete de garantías no constituye un "Caso de Incumplimiento" conforme a la Cláusula 6.01. del Contrato Original. Adicionalmente, la Cláusula 4.08, del citado Contrato Original declara que los contratos de garantía crearán una garantía real de primer grado de prelación, mientras que la Cláusula 5.05(c) del mismo, contempla expresamente una hipoteca de segundo grado, contradicción interna del propio instrumento.

7. **Casos de incumplimiento reducidos al mínimo.** La Cláusula 6.01 del propio Contrato Original contempla únicamente cuatro supuestos, falta de pago, falsedad de declaraciones, sujeción a procedimiento de insolvencia, e incumplimiento material de obligaciones. No hay incumplimiento cruzado ni aceleración cruzada respecto de la deuda existente del Acreditado, incluidos los bonos preferentes en incumplimiento por USD $400,000,000.00 (cuatrocientos millones de dólares 00/100 moneda de curso legal de los Estados Unidos de América), no hay evento por cambio de control, no hay evento por efecto material adverso, no hay evento por invalidez o falta de perfeccionamiento de las garantías, no hay evento por resoluciones judiciales adversas.

8. **Estipulaciones adversas al propio acreedor.** El Contrato Original incorpora, además, disposiciones que operan en contra de la posición de Alter y que carecen de precedente en documentación crediticia de mercado. La Cláusula 8.08 exime de responsabilidad al Acreditado por retrasos o incumplimientos de sus obligaciones derivados de Casos de Fuerza Mayor, definidos en la Cláusula 1.01 de forma amplia e incluyendo actos gubernamentales y pandemias, sin excluir las obligaciones de pago. La Cláusula 8.09 dispone que cada parte sufragará sus propios costos, apartándose de la práctica invariable conforme a la cual el acreditado cubre los gastos de estructuración y de asesoría legal del acreditante. No se pactó cláusula de *gross-up* ni indemnización fiscal, pese a que la Cláusula 4.05 reconoce expresamente la existencia de retención conforme a la legislación mexicana sobre pagos a residentes en el extranjero.

9. **Sindicación sin mecánica y concentración absoluta en Alter.** La Cláusula 7 del Contrato Original, intitulada "*Sindicación del Crédito*", consta de tres subcláusulas cuyo contenido es exclusivamente exculpatorio del Organizador y de los Agentes. No regula acreditantes requeridos, mayorías, votaciones, materias sujetas a unanimidad, cesiones o participaciones de acreditantes, registro de acreditantes, sustitución del agente, indemnización de los acreditantes al agente, ni distribución proporcional de recuperaciones. Correlativamente, Alter concentra la totalidad de las facultades relevantes, es beneficiario de las declaraciones y de las obligaciones, recibe el pagaré, recibe todos los pagos, es la única parte facultada para acelerar, puede modificar el Contrato Original y otorgar renuncias y consentimientos por sí sola, sin intervención ni consentimiento de acreditante alguno, no

tiene relación fiduciaria con los acreditantes ni deber alguno distinto de los expresamente pactados, y percibe la comisión por estructuración.

**10. Acreditantes no identificados por diseño contractual.** La definición de "*Acreditantes*" de la Cláusula 1.01 del Contrato Original, dispone que además del Acreditante Inicial serán acreditantes las personas que convengan en otorgar una parte proporcional del Crédito Alter-TV mediante la firma de un contrato por escrito con el Agente Administrativo. La incorporación de los verdaderos titulares del riesgo se documenta, así, en instrumentos privados celebrados con Alter, ajenos al Contrato Original, no suscritos por el Acreditado y no aportados al expediente. Ninguna disposición del Contrato Original obliga a Alter a revelar la identidad de los acreditantes, a llevar un registro accesible ni a conciliarlo; el único firmante del lado acreedor es Alter.

**11. Términos económicos y verificación aritmética.** El Contrato Original pactó una tasa fija anual de 17.50%, calculada sobre un año de trescientos sesenta días y días efectivamente transcurridos, incluyendo el primer día y excluyendo el último, una comisión por estructuración de 1.00% del Crédito Alter-TV pagadera al Organizador, y el pago del principal en una sola exhibición el 29 de julio de 2026. El monto de $71,487,500.00 (setenta y un millones cuatrocientos ochenta y siete mil quinientos pesos 00/100 Moneda Nacional) capitalizado por el Convenio Modificatorio corresponde con exactitud a treinta y seis días de intereses sobre $4,085,000,000.00 (cuatro mil ochenta y cinco pesos 00/100 Moneda Nacional) a la tasa de 17.50% y sobre base de trescientos sesenta días, es decir, al periodo comprendido entre el 29 de enero y el 6 de marzo de 2026 computado precisamente conforme a la Cláusula *2.04 (b)* del Contrato Original.

**12. Inexistencia de incumplimiento al momento de la reexpresión.** Conforme a la Cláusula 1.01 del Contrato Original, la primera Fecha de Pago de Intereses correspondía al día numéricamente equivalente del tercer mes posterior al desembolso, esto es, el 29 de abril de 2026, y el plazo de sesenta días naturales para la firma de los Contratos de Garantía vencía el 30 de marzo de 2026. En consecuencia, al 6 de marzo de 2026 no existía Caso de Incumplimiento alguno bajo el Contrato Original, ningún interés era aún exigible y ningún plazo de garantías había vencido. No obstante, en esa fecha las partes capitalizaron intereses aún no devengados como exigibles, difirieron su pago al vencimiento, impusieron una comisión de reestructuración del 2% equivalente a $81,700,000.00 (ochenta y un millones setecientos pesos 00/100 Moneda Nacional) y documentaron la adhesión del Acreditante a la garantía hipotecaria preexistente, cuatro días antes de la presentación de la Solicitud de Concurso Mercantil.

**13. Conclusión del Alcance.** El texto del Contrato Original no es compatible con la hipótesis de un otorgamiento de crédito precedido de un análisis genuino de la viabilidad de pago del Acreditado. Un acreditante cuya recuperación dependiera efectivamente del comportamiento financiero futuro de TV Azteca no habría renunciado simultáneamente a las condiciones precedentes, a las obligaciones de información, a las obligaciones de no hacer, al incumplimiento cruzado, a la exigibilidad de las garantías como condición del desembolso y a la repercusión de sus propios costos, ni habría aceptado una eximente de responsabilidad por fuerza mayor a favor del deudor. El Alcance no presume que los análisis internos de originación no existieron, concluye que su realización y suficiencia no pueden acreditarse

con el acervo revisado y que el propio instrumento contractual es inconsistente con la existencia de tales análisis.

## II. MARCO DE REFERENCIA: CONTENIDO ORDINARIO Y ESTÁNDARES APLICABLES A UN CONTRATO DE CRÉDITO CORPORATIVO Y SINDICADO.

### a) Naturaleza y función del contrato de crédito.

**14.** Conforme al artículo 291 de la Ley General de Títulos y Operaciones de Crédito (la "**LGTOC**"), en virtud de la apertura de crédito el acreditante se obliga a poner una suma de dinero a disposición del acreditado, o a contraer por cuenta de éste una obligación, para que el mismo haga uso del crédito en la forma y términos convenidos, quedando obligado el acreditado a restituir las sumas de que disponga y a pagar los intereses, prestaciones, gastos y comisiones que se estipulen. Los artículos 291 a 301 de la LGTOC integran el régimen supletorio de la figura, y el Código de Comercio rige los actos de comercio y las obligaciones mercantiles correlativas.

**15.** En una operación corporativa, sin embargo, el contrato de crédito no se agota en la documentación de una deuda. Su función económica es distribuir riesgos entre acreditante y acreditado a lo largo de la vida del financiamiento; determinar las condiciones que deben satisfacerse antes de desembolsar, fijar la base de información sobre la cual se otorgó el crédito, imponer límites a la conducta futura del acreditado que podrían deteriorar la posición del acreedor, crear mecanismos de detección temprana del deterioro y regular la aceleración, ejecución y recuperación. Esa función es la que explica por qué el contenido del contrato constituye, en sí mismo, un indicador técnico del análisis crediticio que lo precedió, las cláusulas de protección son el reflejo documental de los riesgos que el acreditante identificó y decidió mitigar.

**16.** Por lo anterior, de manera ordinaria un contrato de crédito corporativo de esta magnitud identifica y regula, cuando menos: **(i)** partes, capacidad y facultades; **(ii)** monto y compromisos individuales; **(iii)** disponibilidad, mecánica y plazos de disposición; **(iv)** destino y control del uso de los recursos; **(v)** intereses, comisiones, impuestos, *gross-up*, costos incrementados e indemnizaciones; **(vi)** vencimiento, amortización, prepago obligatorio y voluntario; **(vii)** declaraciones y garantías del acreditado y de los garantes, con su régimen de repetición en cada disposición y en cada fecha de pago; **(viii)** obligaciones de hacer y de no hacer, incluidas restricciones de endeudamiento, gravámenes, disposición de activos, pagos restringidos, fusiones y operaciones con partes relacionadas; **(ix)** obligaciones de entrega periódica de información financiera y certificados de cumplimiento; **(x)** razones financieras de mantenimiento; **(xi)** condiciones precedentes al desembolso; **(xii)** eventos de incumplimiento, incluidos el incumplimiento cruzado y el efecto material adverso, periodos de cura, aceleración y remedios; **(xiii)** cesiones, transferencias y participaciones, con registro de acreditantes; **(xiv)** garantías, condiciones de constitución y perfeccionamiento y régimen de prelación; **(xv)** disposiciones de agencia y de gobierno de los acreditantes, incluidas mayorías y materias sujetas a unanimidad; y **(xvi)** ley aplicable, jurisdicción, agente de proceso y notificaciones.

**17.** Esta arquitectura no es una construcción doctrinal ni una preferencia del Despacho. Corresponde al índice de los formularios recomendados por la *Loan Market Association* (“**LMA**”), asociación gremial cuyos formatos constituyen el punto de partida de la documentación crediticia sindicada en los mercados internacionales. El formulario recomendado de contrato de crédito publicado en el portal institucional de la LMA se estructura, entre otras, en cláusulas de *Definiciones e interpretación*, *El crédito*, *Destino*, *Condiciones de utilización*, *Utilización*, *Amortización*, *Prepago y cancelación*, *Intereses*, *Periodos de interés*, *Comisiones*, *Retenciones fiscales e indemnizaciones*, *Costos incrementados*, *Otras indemnizaciones*, *Mitigación por los acreditantes*, *Costos y gastos*, *Cuentas bancarias*, *Garantía e indemnidad*, *Declaraciones* y *Obligaciones de información*, seguidas de obligaciones generales, eventos de incumplimiento, cambios en las partes y disposiciones de agencia. La propia LMA distingue entre disposiciones “*duras*”, que no dependen de las circunstancias de la operación, y disposiciones “*blandas*”, razones financieras, obligaciones de hacer y no hacer, declaraciones y eventos de incumplimiento, que se negocian caso por caso. Lo relevante para el presente análisis no es la redacción concreta de cada cláusula, sino que la categoría exista y que su contenido guarde proporción con el riesgo asumido.

### b) El estándar prudencial: los Principios del BCBS.

**18.** Se deja constancia de que, con posterioridad a la publicación de los Principios para la Gestión del Riesgo de Crédito del Comité de Supervisión Bancaria de Basilea de octubre de 2000 invocados en la Opinión, el propio BCBS publicó en abril de 2025 una versión actualizada de dichos Principios (*Principles for the management of credit risk*, BCBS, abril de 2025). Conforme al numeral 3 de su introducción, la revisión confirmó la vigencia de los Principios y se limitó a un conjunto acotado de enmiendas técnicas de alineación con el Marco de Basilea vigente, sin que la actualización pretenda modificar el contenido de los principios ni abarcar temas nuevos. Las referencias contenidas en la Opinión conservan por tanto plena validez, y en el presente Alcance se cita la versión de abril de 2025 por ser la vigente a la fecha.

**19.** Para el análisis de los Documentos del Crédito resultan particularmente aplicables los siguientes contenidos de dichos Principios:

- **Principio 4 y numeral 19.** Los bancos deben operar conforme a criterios de otorgamiento sólidos y bien definidos, que comprendan un entendimiento exhaustivo del perfil de riesgo del acreditado, del propósito y estructura del crédito y de su fuente de pago. El numeral 19 enumera los factores que deben considerarse y documentarse al aprobar un crédito, incluyendo de manera expresa *los términos y condiciones propuestos del crédito, incluidas las obligaciones contractuales (covenants) diseñadas para limitar cambios en el perfil de riesgo futuro del acreditado*, así como la suficiencia y exigibilidad de las garantías bajo distintos escenarios.

- **Numeral 20.** Los bancos necesitan entender a quién le están otorgando crédito; antes de iniciar cualquier nueva relación crediticia deben familiarizarse con el acreditado y tener confianza en que tratan con una persona u organización de reputación y solvencia adecuadas, sin que baste que el acreditado resulte conocido o sea percibido como reputado.

- **Numeral 22.** Tratándose de sindicaciones o consorcios de crédito, el estándar advierte que algunas instituciones depositan una confianza indebida en el análisis del organizador líder y exige que todos los participantes del sindicato realicen su propia debida diligencia, incluyendo un análisis independiente del riesgo de crédito y la revisión de los términos de la sindicación antes de comprometerse, analizando el riesgo y el rendimiento del crédito sindicado del mismo modo que un crédito originado directamente.

- **Numeral 25.** La estructura de la operación, el colateral y las garantías pueden mitigar riesgos, pero las operaciones deben celebrarse primordialmente sobre la fortaleza de la capacidad de pago del acreditado. El colateral no puede sustituir una evaluación integral ni compensar información insuficiente, y los bancos deben contar con procesos que aseguren que el colateral es y continúa siendo exigible y realizable.

- **Numerales 13 y 14.** Los bancos que otorgan crédito internacionalmente asumen, además del riesgo crediticio estándar, riesgo país y riesgo de transferencia, y su monitoreo debe incorporar la exigibilidad de los contratos de crédito y la oportunidad y capacidad de realizar el colateral bajo el marco legal nacional correspondiente.

- **Principio 6 y numeral 35.** Los bancos deben contar con un proceso claramente establecido para aprobar nuevos créditos así como para modificar, renovar y refinanciar créditos existentes, y deben tener políticas sobre la información y documentación necesarias para aprobar nuevos créditos, renovar los existentes y modificar los términos y condiciones de créditos previamente aprobados.

- **Principio 7.** Todo otorgamiento de crédito debe realizarse en condiciones de plena competencia (*arm's-length*); en particular, los créditos a compañías y personas relacionadas deben autorizarse de manera excepcional y monitorearse con particular cuidado.

- **Numerales 38, 39 y 43.** Quienes desempeñan funciones sensibles como la custodia de documentos clave o la transferencia de fondos deben reportar a directivos independientes de las funciones de originación y aprobación, la administración crediticia debe asegurar el monitoreo de la documentación, de los requisitos contractuales, de las obligaciones legales (*covenants*) y del colateral, así como una segregación de funciones adecuada, y un sistema efectivo de monitoreo crediticio debe incluir medidas para vigilar el cumplimiento de los *covenants* existentes.

- **Numeral 54.** Los bancos deben ser cuidadosos en no celebrar operaciones con acreditados o contrapartes que no conozcan, ni participar en actividades crediticias que no comprendan plenamente, aun por razones de diversificación.

**c) Estándares supervisores sobre originación y seguimiento.**

**20.** Las Directrices sobre concesión y seguimiento de préstamos de la Autoridad Bancaria Europea (*Guidelines on loan origination and monitoring*, EBA/GL/2020/06, de 29 de mayo de 2020, aplicables desde el 30 de junio de 2021) constituyen el desarrollo supervisor más detallado y actualmente vigente sobre la materia objeto de este Alcance, y se invocan exclusivamente como referencia técnica de práctica supervisora comparada, sin afirmar su aplicabilidad jurídica al Acreditante. Resultan relevantes, entre otros, los siguientes numerales:

- **Numeral 44, inciso b).** Al nivel de la relación individual, las entidades deben identificar, evaluar y gestionar el riesgo de lavado de dinero y financiamiento al terrorismo, considerando el propósito del crédito y, expresamente, *la medida en que la asociación con la operación crediticia de una persona física o moral que no sea ni el acreditado ni la entidad genera riesgo de lavado de dinero o financiamiento al terrorismo*, adoptando medidas para comprender si los fondos provienen de fuentes legítimas.

- **Numeral 46.** Las entidades deben contar con políticas y procedimientos que aseguren que el desembolso se realice en línea con la decisión de crédito y con el contrato de crédito, con controles apropiados y conservación de registros.

- **Numerales 47 a 52.** Las entidades deben definir su apetito y estrategia para operaciones apalancadas, incluido su apetito para sindicar dichas operaciones y un marco de límites de aseguramiento, establecer una estructura de gobierno que permita una supervisión integral de todas las operaciones apalancadas originadas, sindicadas o adquiridas, y asegurar que todas ellas se aprueben por los responsables de las decisiones de crédito, con procesos de aprobación específicos cuando existan riesgos de sindicación y aseguramiento.

- **Numerales 143 y 144, inciso e).** El colateral no debe ser un criterio predominante para aprobar un crédito ni puede justificar por sí solo su aprobación, es la segunda vía de salida y no la fuente primaria de pago. Al evaluar la solvencia debe analizarse la estructura de la operación, incluido el riesgo de subordinación estructural y los términos relacionados, por ejemplo los *covenants*.

- **Numerales 163 a 166.** Debe evaluarse el colateral pignorado, incluida su valuación, titularidad e inscripción registral, así como las garantías, los *covenants*, las cláusulas de *negative pledge* y los acuerdos de servicio de deuda utilizados para mitigar el riesgo, considerando si el valor del colateral está correlacionado con el negocio del acreditado.

- **Numeral 167.** Cuando, en operaciones de crédito sindicado, los flujos de pago transitan por un tercero, por ejemplo un agente designado, las entidades, o los organizadores líderes o sus agentes nominados, deben evaluar la solidez de dicho agente.

- **Sección 5.3 y numeral 94.** Las entidades deben documentar la información y los datos que condujeron a la aprobación crediticia, incluidas las acciones y evaluaciones realizadas, y conservar dicha documentación cuando menos por la vigencia del contrato de crédito.

**21.** Se deja constancia expresa de que el presente Alcance no se apoya en la *Interagency Guidance on Leveraged Lending* de 21 de marzo de 2013 ni en sus preguntas frecuentes de 7 de noviembre de 2014, emitidas por las autoridades bancarias federales de los Estados Unidos de América, en virtud de que la Oficina del Contralor de la Moneda (*Office of the Comptroller of the Currency*) y la Corporación Federal de Seguro de Depósitos (*Federal Deposit Insurance Corporation*) se apartaron formalmente de dichos documentos mediante declaración interinstitucional de 5 de diciembre de 2025, señalando que en su lugar los bancos deben aplicar los principios generales de sanas prácticas crediticias. Esta precisión se formula para acreditar que la revisión normativa del presente Alcance verificó la vigencia de cada fuente invocada y que ninguna conclusión descansa en criterios abrogados.

### d) El estándar mexicano utilizado como parámetro.

**22.** Conforme al parámetro de referencia adoptado en el apartado V de la Opinión, el artículo 65 de la Ley de Instituciones de Crédito ("**LIC**") exige que la decisión de otorgamiento se sustente en información cuantitativa y cualitativa suficiente para estimar la viabilidad de pago, la solvencia crediticia y la capacidad de pago del acreditado en el plazo previsto del crédito. La Disposiciones de carácter general aplicables a las instituciones de crédito, también conocida como Circular Única de Bancos (la "**CUB**") desarrolla ese estándar mediante, entre otros, los artículos 3 y 6 a 9, sobre políticas, lineamientos y manuales de la actividad crediticia; los artículos 10 a 23, sobre las funciones y controles de originación, evaluación, aprobación, instrumentación, seguimiento y recuperación; el artículo 15, fracción III, sobre la información y documentación mínima para créditos comerciales superiores a dos millones de UDIs; el artículo 24, conforme al cual las renovaciones y reestructuraciones deben someterse nuevamente al proceso crediticio desde su originación; el artículo 25 y el Capítulo IV del Título Segundo, sobre administración integral del riesgo de crédito; el artículo 45, sobre integración y conservación del expediente crediticio; los artículos 110 a 115, sobre clasificación, calificación de cartera comercial y reservas preventivas; y los artículos 117 a 119 y 2 Bis 30 a 2 Bis 32, sobre los requisitos para reconocer garantías como mecanismos efectivos de mitigación del riesgo de crédito.

**23.** En materia de prevención de operaciones con recursos de procedencia ilícita, las Disposiciones de Carácter General a que se refiere el Artículo 115 de la Ley de instituciones de Crédito ("**Disposiciones del Artículo 115**") definen como Propietario Real a aquella persona que, por medio de otra o de cualquier acto o mecanismo, obtiene los beneficios derivados de una cuenta, contrato u operación y es quien, en última instancia, ejerce los derechos de uso, disfrute, aprovechamiento o disposición de los recursos, esto es, el verdadero dueño de los recursos, comprendiendo también a quienes ejerzan el control sobre una persona moral y a quienes puedan instruir o determinar, para beneficio económico propio, los actos susceptibles de realizarse a través de fideicomisos, mandatos o comisiones. Dichas Disposiciones del Artículo 115 han sido reformadas expresamente para atender la Recomendación 10 del Grupo de Acción Financiera Internacional ("**GAFI**") en materia de debida diligencia e identificación del propietario real. La existencia misma de esta figura en el ordenamiento mexicano evidencia que la identificación de quien se encuentra detrás de una estructura contractual constituye un elemento nuclear, y no accesorio, del estándar de debida diligencia exigible.

## III. ANÁLISIS DEL CONTRATO ORIGINAL Y DEL CONVENIO MODIFICATORIO.

### a) Estructura y extensión del Contrato Original.

**24.** El Contrato Original se integra por ocho cláusulas: **(i)** Cláusula 1, Definiciones e Interpretación; **(ii)** Cláusula 2, El Crédito; **(iii)** Cláusula 3, Comisión por Estructuración; **(iv)** Cláusula 4, Declaraciones y Garantías; **(v)** Cláusula 5, Obligaciones del Acreditado; **(vi)** Cláusula 6, Casos de Incumplimiento; **(vii)** Cláusula 7, Sindicación del Crédito; y **(viii)** Cláusula 8, Asuntos Varios, seguidas de una cláusula de liberación de responsabilidad relativa a la firma electrónica y de las páginas de firma. Conforme a la certificación del perito traductor, el instrumento consta de quince fojas.

**25.** El Contrato Original no contiene anexo alguno. No se acompaña formato de pagaré, no se acompaña anexo de compromisos o porcentajes de participación de los acreditantes, no se acompaña formato del contrato escrito de adhesión a que se refiere la definición de "Acreditantes", no se acompañan formatos de certificados ni de solicitudes de disposición, y no se acompañan los proyectos de los contratos de garantía. La totalidad del expediente contractual del financiamiento se agota, por tanto, en el cuerpo del instrumento.

**26.** La extensión y el nivel de desarrollo de un contrato de crédito no constituyen, por sí solos, un parámetro de suficiencia. Sin embargo, sí lo es la presencia o ausencia de categorías completas de estipulaciones. Como se expone a continuación, del catálogo enunciado en el párrafo 16 de este Alcance, el Contrato Original omite íntegramente los incisos **(viii)** obligaciones de no hacer, **(ix)** obligaciones de entrega periódica de información financiera, **(x)** razones financieras de mantenimiento y **(xi)** condiciones precedentes, así como las materias de cesión de acreditantes, registro y gobierno de los acreditantes de los incisos **(xiii)** y **(xv)**.

b) **Monto, disposición y fondeo.**

**27.** La Cláusula 2.01(a) del Contrato Original establece un crédito por un monto total que no exceda de $5,000,000,000.00 (cinco mil millones de pesos 00/100 Moneda Nacional), y la Cláusula 2.01(b) precisa que cada Acreditante estará obligado a fondear el Crédito únicamente respecto de su parte proporcional, configurando obligaciones mancomunadas y no solidarias entre los acreditantes. La Cláusula 2.03(a) dispone que cada Acreditante realizará su parte proporcional del desembolso en la Fecha de Desembolso, definida en la Cláusula 1.01 como el 29 de enero de 2026, esto es, la propia fecha de celebración del Contrato Original. El Convenio Modificatorio reconoce un monto efectivamente dispuesto de $4,085,000,000.00 (cuatro mil ochenta y cinco millones de pesos 00/100 Moneda Nacional).

**28.** Se precisa, para efectos de consistencia con la Opinión, que el equivalente aproximado en dólares de los Estados Unidos de América referido en sus párrafos 43, 44 y 46 corresponde a la conversión del monto autorizado en moneda nacional, y que el saldo reportado en su párrafo 32 con base en la relación de acreedores del comerciante corresponde a un saldo insoluto con accesorios y no al principal dispuesto. Las cifras empleadas en el presente Alcance son las que constan en los propios Documentos del Crédito, expresadas en moneda nacional.

**29.** La Cláusula 2.03(b) del Contrato Original ordena que cada Acreditante abone su parte proporcional a una cuenta designada del Acreditado en Banco Azteca, S.A., identificada por número de cuenta, CLABE y código SWIFT. La Cláusula 2.03(c) dispone que el Acreditado entregará al Agente Administrativo, en la Fecha de Desembolso, el Pagaré que acredite el desembolso, por un monto igual al del Crédito Alter-TVAz conforme a la definición de "*Pagaré*" de la Cláusula 1.01. El título de crédito se suscribe, por tanto, a favor de quien puede no ser el titular económico del crédito, y no a favor de los acreditantes que asumieron la exposición.

**30.** El instrumento no identifica quiénes eran los acreditantes distintos de Alter, qué compromiso asumía cada uno ni qué importe fue aportado por cada participante. La

referencia a partes proporcionales no sustituye un registro verificable de compromisos y desembolsos, por el contrario, lo presupone. Al no haberse aportado dicho registro ni los contratos escritos de adhesión a que se refiere la definición de "*Acreditantes*", no puede verificarse la integración del sindicato ni el origen individual de los fondos desembolsados.

**c) Destino y control del uso de los fondos.**

**31.** La Cláusula 2.02 del Contrato Original establece que el Crédito Alter-TVAz será utilizado exclusivamente para el pago y cumplimiento de las obligaciones fiscales del Acreditado frente a las autoridades fiscales mexicanas, incluyendo sin limitación cualesquier impuestos, contribuciones o pasivos relacionados de carácter federal, estatal o local, y para fines corporativos generales. La Cláusula 4.09 se limita a declarar que los recursos serán utilizados según se establece en la Cláusula 2.02.

**32.** Si bien el pago de pasivos fiscales puede constituir una finalidad específica y verificable, la referencia adicional a fines corporativos generales amplía de manera sustancial el destino permitido y, por sí sola, no establece criterios de aplicación, prioridades de pago ni controles de disposición. El Contrato Original no condiciona el desembolso a la identificación de las obligaciones fiscales a cubrir, no prevé cuentas controladas, pagos directos a las autoridades fiscales, certificaciones de destino ni reportes posteriores de aplicación, y no tipifica el uso indebido de los recursos como *Caso de Incumplimiento* en su Cláusula 6.01. Ello contrasta con el numeral 46 de las Directrices EBA/GL/2020/06, que exige políticas y procedimientos que aseguren que el desembolso se realice en línea con la decisión de crédito y con el contrato. Se deja constancia de que, con posterioridad a la emisión de la Opinión, obra en el expediente evidencia documental de la aplicación de parte de los recursos, comprobantes de transferencias electrónicas de 29 de enero de 2026 por $2,657,170,823.00 (dos mil seiscientos cincuenta y siete millones ciento setenta mil ochocientos veintitrés pesos 00/100 Moneda Nacional) y $1,267,979,379.00 (mil doscientos sesenta y siete millones novecientos setenta y nueve mil trescientos setenta y nueve pesos 00/100 Moneda Nacional), $3,925,150,202.00 (tres mil novecientos veinticinco millones ciento cincuenta mil doscientos dos pesos 00/100 Moneda Nacional) en conjunto, al pago de créditos fiscales, cuyos importes coinciden con las líneas de captura emitidas por la autoridad hacendaria el 28 de enero de 2026. El presente Alcance toma nota de dicha evidencia y no la controvierte. La observación técnica que subsiste es de otro orden: **(i)** el Contrato Original no estableció mecanismo alguno de control del destino, no condicionó el desembolso a la identificación de las obligaciones a cubrir, no previó cuentas controladas ni pagos directos a la autoridad, no exigió certificaciones ni reportes de aplicación y no tipificó el uso indebido de los recursos como Caso de Incumplimiento, de modo que la aplicación efectivamente ocurrida no es atribuible al diseño contractual; y **(ii)** la diferencia entre el monto dispuesto de $4,085,000,000.00 (cuatro mil ochenta y cinco millones de pesos 00/100 Moneda Nacional) y el importe aplicado al pago de contribuciones, esto es $159,849,798.00 (ciento cincuenta y nueve millones ochocientos cuarenta y nueve mil setecientos noventa y ocho pesos 00/100 Moneda Nacional), queda comprendida en la fórmula abierta de "*fines corporativos generales*" de la Cláusula 2.02, sin que en el acervo revisado conste evidencia de su aplicación. La determinación del beneficio o perjuicio que la operación haya producido a la Masa corresponde exclusivamente al Juzgador y excede el objeto de este Alcance.

**d) Intereses, comisiones, capitalización y vencimiento.**

**33.** La Cláusula 1.01 define la Tasa de Intereses como la tasa fija anual del 17.50% y la Fecha de Vencimiento como el 29 de julio de 2026. La Cláusula 2.04(b) dispone que los intereses se devengarán día con día y se calcularán con base en un año de trescientos sesenta días y los días efectivamente transcurridos, incluyendo el primer día y excluyendo el último. La Cláusula 2.05 ordena el pago del monto total del Crédito Alter-TVAz en una sola exhibición en la Fecha de Vencimiento, a una cuenta a nombre de Alter Bank en Banco Azteca, S.A. La Cláusula 2.06 permite el prepago sin penalización con aviso de tres Días Hábiles. La Cláusula 3.01 establece una comisión por estructuración equivalente al 1.00% del Crédito, pagadera al Organizador.

**34.** Conforme a la definición de "*Fecha de Pago de Intereses*" de la Cláusula 1.01 del Contrato Original, la primera fecha de pago correspondía al día numéricamente equivalente del tercer mes posterior a la *Fecha de Desembolso*, esto es, el 29 de abril de 2026. En consecuencia, un plazo de seis meses con pago del principal al vencimiento y dos fechas de pago de intereses concentra la totalidad del riesgo de pago en un horizonte muy breve y exige una fuente de salida claramente identificada, cuya identificación no consta en los Documentos del Crédito ni en instrumento alguno del acervo revisado.

**35.** La cifra de intereses capitalizados por el Convenio Modificatorio permite una verificación aritmética directa contra el propio clausulado del Contrato Original. El monto de $71,487,500.00 (setenta y un millones cuatrocientos ochenta y siete mil quinientos pesos 00/100 Moneda Nacional) corresponde con exactitud al producto de $4,085,000,000.00 (cuatro mil ochenta y cinco millones de pesos 00/100 Moneda Nacional) por 17.50% anual, por treinta y seis días, sobre base de trescientos sesenta días. El periodo transcurrido entre el 29 de enero y el 6 de marzo de 2026, computado incluyendo el primer día y excluyendo el último conforme a la Cláusula 2.04(b), es precisamente de treinta y seis días. De ello se desprende que: **(i)** el cálculo se realizó exactamente conforme a la mecánica pactada; **(ii)** el cómputo corre desde el día mismo del desembolso, lo que confirma que la disposición fue única y total en la fecha de firma; y **(iii)** la suma de $4,085,000,000.00 (cuatro mil ochenta y cinco millones de pesos 00/100 Moneda Nacional) más $71,487,500.00 (setenta y un millones cuatrocientos ochenta y siete mil quinientos pesos 00/100 Moneda Nacional) arroja el principal reexpresado de $4,156,487,500.00 (cuatro mil ciento cincuenta y seis millones cuatrocientos ochenta y siete mil quinientos pesos 00/100 Moneda Nacional), lo que acredita la consistencia interna de la reexpresión.

**36.** Debe subrayarse que esa capitalización se produjo antes de que interés alguno fuera exigible. Al 6 de marzo de 2026 faltaban cincuenta y cuatro días para la primera Fecha de Pago de Intereses. No existía, por tanto, mora, incumplimiento de pago ni situación que ordinariamente justifique una reestructura. Pese a ello, el Convenio Modificatorio capitalizó al principal la totalidad de los intereses devengados y no vencidos, difirió su pago al vencimiento e impuso una comisión de reestructuración del 2% sobre el monto dispuesto, equivalente a $81,700,000.00 (ochenta y un millones setecientos mil pesos 00/100 Moneda Nacional), sin que conste extensión correlativa de la Fecha de Vencimiento.

**37.** Sumando esa comisión a los intereses capitalizados, la carga económica reconocida o impuesta al Acreditado en los treinta y seis días transcurridos entre el desembolso y la reexpresión asciende a $153,187,500.00 (ciento cincuenta y tres millones ciento ochenta y siete mil quinientos pesos 00/100 Moneda Nacional), equivalente al 3.75% del monto dispuesto en dicho periodo, a lo que debe añadirse la comisión por estructuración de la Cláusula 3.01, calculada sobre "*el Crédito*", cuya base es ambigua conforme a la propia definición de dicho término en la Cláusula 1.01, que remite indistintamente al monto autorizado de $5,000,000,000.00 (cinco mil millones de pesos 00/100 Moneda Nacional) o al monto realmente insoluto, ambigüedad que constituye en sí misma un defecto de redacción en una cláusula de precio. Se hace constar expresamente que esta cuantificación se formula únicamente para describir el efecto económico de los términos que constan en los Documentos del Crédito y no constituye una calificación sobre la licitud o proporcionalidad del costo financiero ni una cuantificación de daños, materias excluidas del objeto de la Opinión y del presente Alcance. El contraste de dicho costo contra las referencias oficiales de mercado vigentes a la fecha de celebración se desarrolla en el apartado *III.d bis)* del presente Alcance.

**38.** Resulta asimismo relevante que la comisión por estructuración se pacte a favor del Organizador y no de los acreditantes que aportan los recursos. Conjugada con la circunstancia de que el Organizador puede no conservar exposición económica propia, la estipulación implica que la entidad identificada del lado acreedor percibe una remuneración cierta y anticipada por estructurar la operación, mientras el riesgo de crédito se traslada a participantes no identificados.

**39.** Desde la perspectiva prudencial, lo relevante no es la magnitud del costo sino la ausencia de correlación documentada entre dicho costo y una mejora en la recuperación. Conforme al numeral 35 de los Principios del BCBS y al artículo 24 de la CUB, la modificación de los términos de un crédito previamente aprobado debe someterse al mismo proceso de análisis y documentación que su originación. La capitalización de intereses no vencidos y la imposición de una comisión de reestructuración treinta y seis días después del desembolso, en ausencia de incumplimiento y sin estudio contemporáneo de flujos o de recuperación bajo los términos reexpresados, es inconsistente con dicho estándar.

**d bis) Contraste con las condiciones prevalecientes en el mercado a la fecha de celebración.**

**39 Bis.** Las condiciones económicas efectivamente pactadas, expresadas en los propios Documentos del Crédito, son las siguientes: tasa fija anual de 17.50%, Cláusula 1.01 del Contrato Original; comisión por estructuración del 1.00% pagadera al Organizador en la Fecha de Desembolso, Cláusula 3.01; comisión por reestructuración del 2.00% sobre el monto efectivamente dispuesto, pagadera dentro de los quince días naturales siguientes al 6 de marzo de 2026, Sección 2.05 del Convenio Modificatorio; y Tasa Moratoria equivalente a la Tasa de Interés más 3.00% mensual, Cláusula 1.01 del Convenio Modificatorio, esto es, 53.50% nominal anual.

**39 Ter.** Las referencias oficiales publicadas por el Banco de México a la fecha de celebración del Contrato Original son las siguientes:

- **Tasa de interés objetivo:** 7.00% anual, vigente al 28 de enero de 2026.
- **TIIE de Fondeo a un día:** 7.10%, con fecha del 27 de enero de 2026. Se emplea esta referencia por ser la aplicable a contratos nuevos desde que el Banco de México restringió el uso de la TIIE a 28 días para tal efecto.
- **TIIE a 28 días:** 7.3489%, con fecha del 27 de enero de 2026.
- **Cetes a 28 días:** 6.95%, con fecha del 27 de enero de 2026.
- **Cetes a 182 días:** 7.26% en la primera subasta de 2026. Es la referencia libre de riesgo cuyo plazo corresponde al del Crédito, que venció a seis meses.
- **Bono M a diez años:** rendimiento del orden de 8.9% en el periodo, según cotizaciones interbancarias.
- **Inflación general anual:** 3.77%, correspondiente a la primera quincena de enero de 2026.

**39 Quáter.** Del contraste resultan los siguientes diferenciales, calculados sobre las cifras anteriores. Sobre el cupón considerado aisladamente, la tasa de 17.50% se ubica 1,024 puntos base por encima de los Cetes a 182 días, esto es, en 2.4 veces la referencia libre de riesgo al mismo plazo; y 1,050 puntos base por encima de la tasa objetivo. Anualizando las comisiones sobre el plazo contractual de ciento ochenta y un días, 1.00% de estructuración equivale a 1.99 puntos porcentuales y 2.00% de reestructuración a 3.98 puntos porcentuales, el costo efectivo de la operación se ubica en el orden de 23.5% anual, esto es, 1,624 puntos base sobre los Cetes a 182 días y 3.2 veces su nivel. La Tasa Moratoria pactada, de 53.50% nominal anual, equivale a 7.6 veces la tasa objetivo vigente a la fecha de celebración.

**39 Quinquies.** Se hace constar expresamente que este contraste se formula únicamente para describir, en términos objetivos y verificables contra fuentes oficiales, la relación entre el costo pactado y las referencias de mercado vigentes a la fecha de celebración. No constituye una determinación de que el costo sea o deje de ser el propio de segmento alguno del mercado, ni una calificación sobre su licitud o proporcionalidad, ni una cuantificación de daños. La determinación de cuál sea el mercado relevante y de si las condiciones pactadas se apartan o no de las prevalecientes en él corresponde exclusivamente al Juzgador, con base en la totalidad del acervo probatorio.

**e) Declaraciones y garantías: contenido y omisiones.**

**40.** El Contrato Original sí contiene un apartado de declaraciones y garantías. Su Cláusula 4 comprende doce subcláusulas: *4.01 Facultades y Autoridad; 4.02 Validez, Autorización y Ausencia de Conflicto; 4.03 Aprobaciones Gubernamentales; 4.04 Obligatoriedad del Contrato; 4.05 Retención y Otros Impuestos; 4.06 Inmunidad Soberana; 4.07 Estados Financieros; 4.08 Garantía Real; 4.09 Uso de los Recursos; 4.10 Titularidad de Bienes, Posesión conforme a Arrendamientos y Marcas Registradas; 4.11 Permisos; y 4.12 Cumplimiento de la Ley.*

**41.** La existencia formal del apartado no equivale, sin embargo, a su suficiencia. El examen de su contenido revela que el catálogo omite precisamente aquellas declaraciones

que resultaban materialmente indispensables frente a un acreditado en la situación documentada en los párrafos 9, 27, 29 y 30 de la Opinión. En concreto, el Contrato Original no contiene:

- **Declaración de ausencia de litigios o procedimientos.** No existe manifestación alguna sobre la inexistencia de litigios, procedimientos administrativos, arbitrales o contenciosos relevantes, ni sobre contingencias fiscales, pese a que el propio destino del crédito pactado en la Cláusula 2.02 era el pago de obligaciones fiscales.

- **Declaración de ausencia de incumplimiento bajo otros instrumentos.** No existe manifestación de que el Acreditado no se encuentre en incumplimiento bajo contratos de emisión, contratos de crédito u otros instrumentos de deuda, pese a que a la fecha del Contrato Original se encontraban vencidos y no pagados los bonos preferentes por USD $400,000,000.00 (cuatrocientos millones de dólares 00/100 moneda de curso legal de los Estados Unidos de América) referidos en los párrafos 9 y 28 de la Opinión.

- **Declaración de no contravención de contratos.** La Cláusula 4.02 declara que la celebración y cumplimiento del Contrato no violan disposiciones legales, estatutos, reglas o reglamentos aplicables, el acta constitutiva o los estatutos sociales, ni órdenes de tribunales o de agencias gubernamentales. La declaración no comprende los contratos ni los instrumentos de deuda del Acreditado. La representación de ausencia de conflicto característica de la documentación crediticia corporativa, que abarca expresamente los contratos materiales y los contratos de emisión, fue así excluida del Contrato Original.

- **Declaración de ausencia de pasivos no revelados y de solvencia.** No existe manifestación sobre la inexistencia de pasivos distintos de los reflejados en los estados financieros, ni declaración de solvencia o de capacidad de pago.

- **Declaración de ausencia de cambio adverso relevante.** El término "*Efecto Material Adverso*" se define en la Cláusula 1.01, pero no se emplea en declaración alguna. Su único uso operativo en todo el instrumento es como excepción a favor del Acreditado en la Cláusula 5.03(a), que dispensa el mantenimiento de derechos, permisos, patentes, marcas y franquicias cuando su falta no genere un Efecto Material Adverso. Una definición cuidadosamente redactada que aparece una sola vez y para beneficio del deudor revela el uso de un formato preexistente del cual se suprimieron las estipulaciones protectoras del acreedor.

- **Régimen de repetición.** No se estipula que las declaraciones se entiendan repetidas en la Fecha de Desembolso, en cada Fecha de Pago de Intereses o en cualquier otra fecha, ni se prevé certificación alguna de su vigencia.

**42.** A lo anterior se añaden dos particularidades del propio texto: **(i)** Primera, el proemio de la Cláusula 4 dispone que el Acreditado declara, garantiza y acuerda con el Agente Administrativo, y no con los acreditantes. Conjugado con la Cláusula 7.01, que expresamente descarta toda relación fiduciaria del Agente frente a los Acreditantes y todo deber distinto de los expresamente pactados, el resultado es que las declaraciones se otorgan a favor de una entidad que no responde frente a quienes asumen el riesgo económico; y **(ii)** Segunda, la Cláusula 4.07 declara completos y correctos los estados financieros combinados y no auditados al 31 de diciembre de 2025, entregados por el Acreditado al Agente

Administrativo. El acreditante aceptó, por tanto, como única base financiera de la operación, estados combinados no auditados de un ejercicio cerrado veintinueve días antes, respecto de un emisor cuya calificación crediticia había sido retirada íntegramente en diciembre de 2023 precisamente por falta de acceso a información suficiente, según se documentó en el párrafo 30 de la Opinión.

**43.** Conforme al numeral 22 de los Principios del BCBS, todos los participantes de un sindicato deben realizar su propio análisis independiente del riesgo de crédito y revisar los términos de la sindicación antes de comprometerse; y conforme al numeral 20 de los mismos Principios, un banco no debe otorgar crédito simplemente porque el acreditado le resulte conocido o sea percibido como reputado. Frente a incumplimientos materiales y a un deterioro financiero público y conocido, el acreditante debía verificar la información financiera, el endeudamiento total, las restricciones contractuales y la capacidad de pago del Acreditado, y no limitarse a aceptar declaraciones generales sobre estados financieros no auditados.

JESÚS VÁZQUEZ ... ELORZA
3086603636936300000000007080801640008
04/03/29 10:08:24

**f) Obligaciones del Acreditado: ausencia de obligaciones de no hacer, de razones financieras y de entrega de información.**

**44.** La Cláusula 5 del Contrato Original, intitulada "*Obligaciones del Acreditado*", comprende cinco subcláusulas: 5.01 Cumplimiento de Obligaciones, que reitera el deber de pagar puntualmente; 5.02 Estados Financieros y Otros Informes; 5.03 Mantenimiento y Continuidad del Negocio y Seguros; 5.04 Cumplimiento de la Ley y Aprobaciones Gubernamentales; y 5.05 Obligaciones Posteriores al Desembolso, relativa a la firma de los Contratos de Garantía.

**45.** **No existe en el Contrato Original una sola obligación de no hacer.** No se restringe la contratación de deuda adicional; no se pacta limitación de gravámenes o *negative pledge*; no se restringe la disposición, venta o transferencia de activos; no se limitan los pagos de dividendos, reembolsos de capital u otros pagos restringidos; no se restringen fusiones, escisiones ni reorganizaciones; no se limitan las operaciones con partes relacionadas; y no se restringen los cambios materiales en el giro del negocio. Tampoco se establece razón financiera de mantenimiento alguna: el único índice previsto en el instrumento es el "*Índice de Garantía*" definido en la Cláusula 1.01 como la proporción de 1.3:1 entre las cuentas por cobrar dadas en garantía y el monto insoluto del Crédito, cuyo cumplimiento se remite, conforme a la Cláusula 5.05(d), a los términos del Contrato de Fideicomiso, instrumento que no existía a la fecha del desembolso y que no obra en el expediente.

**46.** La Cláusula 5.02 merece consideración separada. Pese a intitularse "*Estados Financieros: Otros Informes*", su contenido íntegro consiste en que el Acreditado mantendrá sus registros financieros y un sistema contable conforme a los PCGA Mexicanos, y mantendrá un sistema apropiado de planeación y control de operaciones, contabilidad de costos y sistemas de control y reporte financiero. No impone obligación alguna de entregar estados financieros, información financiera periódica, certificados de cumplimiento, presupuestos, proyecciones ni avisos de eventos adversos al acreditante o al Agente Administrativo. El acreditante contrató, en consecuencia, sin derecho contractual a recibir

información financiera alguna durante la vigencia del crédito, respecto de un acreditado cuya calificación había sido retirada por opacidad informativa.

**47.** Esta ausencia es, desde la perspectiva bancaria y financiera que constituye el objeto del presente Alcance, el hallazgo técnicamente más significativo del Contrato Original. Los *covenants* y las obligaciones de información cumplen en un crédito corporativo tres funciones prudenciales que ningún otro elemento del contrato sustituye: **(i)** impiden que el acreditado deteriore unilateralmente el perfil de riesgo sobre el cual se otorgó el financiamiento; **(ii)** generan puntos de detección temprana del deterioro, al convertir en incumplimiento contractual accionable un desvío que de otro modo sólo se manifestaría al vencimiento; y **(iii)** otorgan al acreedor una posición negociadora anticipada. El numeral 19 de los Principios del BCBS se refiere a ellas como *obligaciones contractuales diseñadas para limitar cambios en el perfil de riesgo futuro del acreditado*; el numeral 43 exige que el monitoreo crediticio vigile el cumplimiento de los *covenants* existentes; el numeral 39 incluye entre las funciones de la administración crediticia el monitoreo de la documentación, los requisitos contractuales y las obligaciones legales; el numeral 144, inciso e), de las Directrices EBA/GL/2020/06 exige evaluar la estructura de la operación incluidos los *covenants*; y su numeral 164 exige evaluar específicamente las cláusulas de *negative pledge*. Ninguno de esos ejercicios era materialmente posible bajo el Contrato Original, porque el instrumento no generó objeto alguno sobre el cual practicarlos.

**48.** La incongruencia resulta particularmente acusada en el caso concreto. Un acreditante que otorga hasta cinco mil millones de pesos a una empresa que reportaba pasivos vencidos por más de treinta días por una proporción material de sus pasivos, mantenía en incumplimiento bonos preferentes por USD $400,000,000.00 (cuatrocientos millones de dólares 00/100 moneda de curso legal de los Estados Unidos de América) y había sido calificada en *Restricted Default*, tenía un interés económico evidente en restringir contractualmente la asunción de deuda adicional, el otorgamiento de nuevos gravámenes y la disposición de activos, y en obtener información financiera periódica. La renuncia simultánea a todas esas protecciones no se explica por la premura de la operación, dado que se trata de cláusulas estándar disponibles en cualquier formulario de mercado y de inclusión inmediata, y sí resulta consistente con un escenario en el que la recuperación del crédito no dependía realmente del comportamiento financiero futuro del Acreditado.

**49.** El Convenio Modificatorio incorporó y amplió restricciones sobre endeudamiento, gravámenes, fusiones, operaciones con partes relacionadas, uso de fondos, entrega de información y otras materias. Ese fortalecimiento es consistente con documentación corporativa más robusta, pero fue introducido cuando el desembolso ya había ocurrido. Ello obliga a distinguir con rigor entre las protecciones existentes al cierre y las incorporadas con posterioridad: la reexpresión no debe analizarse retrospectivamente como si hubiera estado vigente desde el desembolso, y su contenido no subsana el estándar aplicable al momento de la originación. Por el contrario, la circunstancia de que las mismas partes hayan podido convenir dicho clausulado treinta y seis días después demuestra que su omisión inicial no obedeció a imposibilidad práctica.

**g) Ausencia de condiciones precedentes.**

**50.** El Contrato Original no contiene cláusula alguna de condiciones de utilización o condiciones precedentes. La Cláusula 2.01(a) se limita a la fórmula genérica "*sujeto a los términos y condiciones de este Contrato*", sin desarrollarla, y la Cláusula 2.03 ordena el desembolso en la Fecha de Desembolso, que la Cláusula 1.01 fija en el 29 de enero de 2026, coincidente con la fecha de celebración.

**51.** En consecuencia, el desembolso no quedó condicionado a la entrega de documentos constitutivos, poderes o resoluciones corporativas; ni a opiniones legales de validez y exigibilidad, ni en Santa Lucía ni en México; ni a certificados de funcionarios; ni a la confirmación de la exactitud de las declaraciones; ni a la inexistencia de un Caso de Incumplimiento; ni a evidencia del destino de los recursos; ni, de manera señalada, a la constitución, otorgamiento o perfeccionamiento de garantía alguna. La Cláusula 2.03(c), que ordena la entrega del Pagaré, la formula como obligación del Acreditado en la Fecha de Desembolso y no como condición previa a éste.

**52.** La ausencia de condiciones precedentes en un financiamiento de esta cuantía es incompatible con el numeral 46 de las Directrices EBA/GL/2020/06, que exige asegurar que el desembolso se realice en línea con la decisión de crédito y con el contrato de crédito, así como con las funciones de instrumentación y control que los artículos 10 a 23 de la CUB atribuyen al proceso crediticio. Desde la perspectiva prudencial, las condiciones precedentes constituyen el mecanismo mediante el cual el acreditante verifica, inmediatamente antes de desprenderse de los recursos, que las premisas de su decisión de crédito subsisten. Su omisión total significa que entre la decisión de otorgamiento y la entrega de $4,085,000,000.00 (cuatro mil ochenta y cinco pesos 00/100 Moneda Nacional) no se interpuso verificación documental alguna.

**h) Garantías: diferimiento, penalidad en lugar de exigibilidad e inconsistencia interna.**

**53.** La Cláusula 5.05 del Contrato Original establece, bajo el rubro "*Obligaciones Posteriores al Desembolso*", que tan pronto como sea posible pero a más tardar dentro de los sesenta días naturales contados a partir de la Fecha de Desembolso, el Acreditado firmará o causará que sus Subsidiarias firmen: **(a)** un contrato de prenda de primer grado sobre el capital social de Operadora Mexicana de Televisión, S.A. de C.V., Publicidad Especializada en Medios de Comunicación de TV Azteca, S.A. de C.V. o cualquier otra Subsidiaria aceptable para el Agente de Garantías; **(b)** un contrato de prenda de primer grado sobre marcas registradas; **(c)** un contrato de hipoteca que otorgue una garantía real de segundo grado de prelación sobre bienes inmuebles y/o concesiones; y **(d)** un contrato de fideicomiso de primer grado sobre cuentas por cobrar, sujeto al Índice de Garantía de 1.3:1.

**54.** Tres consecuencias se siguen del texto: **(i)** Primera, el propio instrumento configuró las garantías centrales como obligaciones posteriores al desembolso y no como condiciones previas al mismo, de modo que la exposición fue asumida en su totalidad sin garantía formalizada ni perfeccionada alguna; **(ii)** Segunda, y de manera determinante, el Contrato Original establece como única consecuencia de la falta de firma oportuna de los Contratos de Garantía el pago de intereses a la Tasa de Intereses más un margen del 1.50% anual a partir de dicha fecha. La omisión de constituir la totalidad del paquete de garantías

no está tipificada como Caso de Incumplimiento en la Cláusula 6.01: el acreditante sustituyó la exigibilidad de la garantía por un recargo de ciento cincuenta puntos base, cuya consecuencia económica es incrementar el adeudo de un deudor insolvente y no mejorar la posición de recuperación; y **(iii)** Tercera, incluso la firma de los contratos dentro del plazo no equivale a su perfeccionamiento; la Cláusula 5.05(e) impone al Acreditado asegurar las inscripciones necesarias en los registros públicos correspondientes, sin plazo cierto ni consecuencia por su incumplimiento.

**55.** El Contrato Original presenta además una contradicción interna material. La Cláusula 4.08 declara que los Contratos de Garantía crearán y otorgarán al Acreditante Inicial una garantía real legal, válida y perfeccionada de primer grado de prelación sobre los activos del Acreditado al momento de su firma y registro; la Cláusula 5.05(c) contempla, en cambio y de manera expresa, una hipoteca de segundo grado de prelación. La declaración de la Cláusula 4.08 es, por tanto, incorrecta respecto de una de las garantías contempladas por el propio instrumento que la contiene, y ello desde su celebración. Se añade que la Cláusula 4.08 identifica como beneficiario de las garantías al Acreditante Inicial, mientras la Cláusula 5.05 las constituye a favor del Agente de Garantías, para su propio beneficio y el de los Acreditantes.

**56.** El Convenio Modificatorio corrige la generalización de la Cláusula 4.08 al referirse a garantías de primer o segundo grado según corresponda, identifica al agente de garantías como fideicomisario en segundo lugar y a *Numchi Servicios, S.A.P.I. de C.V.* como fideicomisario en primer lugar del fideicomiso F/8110, y contempla plazos adicionales de inscripción, incluido uno de hasta cien días desde la firma de la hipoteca para entregar el certificado de inscripción ante el Registro Público de Concesiones. Esa corrección confirma la necesidad de analizar cada garantía individualmente y de no atribuir primer rango al paquete en su conjunto, y es consistente con lo señalado en los párrafos 12, 32, 41 y 48 de la Opinión respecto de la adhesión del Acreditante a una garantía hipotecaria preexistente constituida en 2020 en favor de *Numchi Servicios, S.A.P.I. de C.V.*

**57.** Los Documentos del Crédito no incluyen los contratos de garantía formalizados, el convenio de adhesión al fideicomiso F/8110 ni convenio intercreditorio alguno. En consecuencia, la documentación revisada no permite conocer las reglas de ejecución, distribución de recuperaciones, liberación de garantías y coordinación entre acreedores, ni cuantificar la cobertura residual, al no haberse aportado avalúos, saldos actualizados del beneficiario en primer lugar, elegibilidad y cobrabilidad de las cuentas por cobrar afectadas, ni análisis de valor de liquidación. Conforme al numeral 25 de los Principios del BCBS y a los artículos 117 a 119 y 2 Bis 30 a 2 Bis 32 de la CUB, una garantía sólo produce efectos prudenciales de mitigación cuando es jurídicamente válida, oponible, perfeccionada y económicamente realizable, condiciones ninguna de las cuales se satisfacía a la fecha del desembolso.

**56 Bis.** Debe destacarse un efecto del Contrato Reformulado que incide directamente sobre el régimen de garantías y que consta en su propio texto. La Sección 4.10 dispone que el Acreditado firmará los Documentos de Garantía "dentro de los siguientes 60 (sesenta) días naturales posteriores a la firma del *presente Contrato*", y la Sección 8.01(b) del Convenio Modificatorio establece que toda referencia al Contrato de Crédito se entenderá hecha al

Contrato de Crédito Modificado y Reformulado. En consecuencia, el plazo de sesenta días no venció el 30 de marzo de 2026, sino que volvió a correr desde el 6 de marzo de 2026, con vencimiento aproximado el 5 de mayo de 2026.

**56 Ter.** De ello se siguen dos consecuencias técnicas: **(i)** Primera, el Convenio Modificatorio no formalizó las garantías centrales: difirió su otorgamiento por sesenta días adicionales. Ello es congruente con el hecho de que las definiciones de "*Contrato de Prenda sobre Acciones*", "*Contrato de Prenda sobre Marcas Registradas*", "*Contrato de Hipoteca*" y "*Convenio de Adhesión*" de la Cláusula 1.01 del Contrato Reformulado se formulan íntegramente en tiempo futuro "*que celebrarán*", esto es, como instrumentos aún no otorgados a la fecha de la reexpresión; y **(ii)** Segunda, la exposición asumida el 29 de enero de 2026 permaneció, por virtud del propio Contrato Reformulado, sin garantía formalizada ni perfeccionada durante todo el periodo comprendido entre el desembolso y una fecha posterior a la presentación de la Solicitud de Concurso Mercantil. Se deja constancia de que, si obrare en el expediente evidencia de que alguno de los Documentos de Garantía fue efectivamente otorgado el 6 de marzo de 2026 o en fecha anterior a la indicada, deberá estarse a dicha evidencia; el presente Alcance se limita a exponer lo que resulta del texto de los instrumentos analizados.

**i) Casos de incumplimiento.**

**58.** La Cláusula 6.01 del Contrato Original tipifica únicamente cuatro Casos de Incumplimiento: **(a)** la falta de pago de principal, intereses o cualquier otro monto pagadero; **(b)** que cualquier declaración o garantía resulte incorrecta o engañosa en cualquier aspecto material al momento de realizarse o confirmarse; **(c)** que el Acreditado quede sujeto a cualquier procedimiento de quiebra, insolvencia, reorganización, concurso, moratoria o similar, voluntaria o involuntariamente; y **(d)** el incumplimiento material de cualquiera de sus obligaciones conforme al propio Contrato.

**59.** El catálogo omite los supuestos que resultaban más pertinentes en el caso concreto. No hay incumplimiento cruzado ni aceleración cruzada respecto de la deuda existente del Acreditado, omisión especialmente notable tratándose de un emisor cuya deuda de mercado se encontraba en incumplimiento declarado desde 2024 y calificada en *Restricted Default* desde enero de 2023, en condiciones ordinarias, un acreditante que asume una exposición frente a un deudor en esa situación incorpora precisamente ese mecanismo para vincular su posición a la evolución del resto del pasivo. No hay evento por efecto material adverso, pese a existir la definición. No hay evento por invalidez, inexigibilidad o falta de perfeccionamiento de las garantías, ni por incumplimiento de la obligación de la Cláusula 5.05. No hay evento por cambio de control, ni por resoluciones judiciales o administrativas adversas, ni por ilegalidad sobrevenida, ni por cese de actividades, ni por revocación de concesiones o permisos, pese a que la Cláusula 4.11 declara la vigencia de éstos y a que las concesiones constituían parte del colateral proyectado.

**60.** Conforme a la Cláusula 6.02, ocurrido y continuando un Caso de Incumplimiento, únicamente el Agente Administrativo puede declarar vencido anticipadamente el crédito, sin que se prevea mecanismo alguno de instrucción por parte de los acreditantes. El Convenio Modificatorio desarrolla un catálogo más amplio de eventos,

incluyendo incumplimientos de *covenants*, ilegalidad, insolvencia, cambio de control, gravámenes no permitidos y uso indebido de fondos, lo que confirma que el instrumento inicial no contenía, desde el desembolso, el nivel de protección contractual que razonablemente correspondía a la situación financiera conocida del Acreditado.

**j) Estipulaciones atípicas y adversas a la posición del acreedor.**

**61.** El Contrato Original contiene, además de las omisiones señaladas, estipulaciones cuyo efecto es debilitar la posición del propio acreditante y que carecen de precedente en documentación crediticia corporativa de mercado.

- **Fuerza mayor a favor del deudor (Cláusula 8.08).** Se estipula que ni el Agente Administrativo ni el Acreditado serán responsables por retrasos o incumplimientos en el cumplimiento de sus respectivas obligaciones derivados de Casos de Fuerza Mayor. La definición de la Cláusula 1.01 comprende, de forma amplia, desastres naturales, guerra, terrorismo, actos gubernamentales, pandemias, huelgas laborales u otros eventos imprevisibles. La estipulación no excluye las obligaciones de pago del Acreditado. En la documentación crediticia de mercado las obligaciones de pago de dinero nunca se sujetan a eximentes de fuerza mayor, precisamente porque ello vaciaría de contenido la obligación principal. Una cláusula de esta naturaleza, en un contrato de crédito por cinco mil millones de pesos, es difícilmente conciliable con la intención de un acreedor de asegurar el cobro.

- **Costos y gastos a cargo de cada parte (Cláusula 8.09).** Se pacta que cada uno de los Acreditantes y el Acreditado sufragará sus propios costos relacionados con la negociación y firma del Contrato. La práctica invariable en financiamientos corporativos es que el acreditado cubra los costos de estructuración, documentación y asesoría legal del acreditante, precisamente porque dicha asesoría es el vehículo de la debida diligencia jurídica. La estipulación es congruente con un proceso de documentación en el que el acreditante no incurrió en costos externos de asesoría significativos.

- **Ausencia de *gross-up* e indemnización fiscal.** La Cláusula 4.05 reconoce expresamente la existencia de retención conforme a la legislación mexicana respecto de pagos derivados de los Documentos del Crédito. No obstante, el Contrato Original no contiene cláusula alguna de incremento por retenciones (*gross-up*) ni de indemnización fiscal, de modo que el rendimiento neto del acreditante frente a la retención mexicana aplicable a intereses pagados a residentes en el extranjero queda contractualmente indeterminado. Se trata de una de las estipulaciones más invariablemente presentes en cualquier financiamiento transfronterizo.

- **Cesión unilateralmente regulada (Cláusula 8.07).** La única disposición sobre cesión restringe al Acreditado a ceder sus derechos u obligaciones sin consentimiento previo por escrito "del Acreditante", en singular. No existe disposición alguna que regule la cesión, transferencia o participación por parte de los acreditantes, ni mecánica de certificados de transferencia, ni registro de acreditantes, pese a que la Cláusula 8.06 contempla la revelación de información confidencial a "cesionarios y participantes reales o potenciales". El instrumento contempla, por tanto, la existencia de cesionarios y participantes, pero no regula su incorporación ni su registro.

- **Ausencia de periodos de cura y de mecanismos ordinarios.** El Contrato Original carece de periodos de gracia o subsanación, de cláusulas de costos incrementados, ilegalidad, mitigación, compensación, distribución proporcional entre acreditantes y de indemnización de los acreditantes al Agente, todas ellas de presencia ordinaria en documentación sindicada.

**62.** El conjunto de estas estipulaciones, junto con las inconsistencias de singular y plural entre las Cláusulas 4.08, 8.07 y las disposiciones que se refieren a los Acreditantes en plural, revela que el Contrato Original consiste en un formato bilateral simplificado sobre el cual se superpuso terminología de sindicación, sin desarrollar la mecánica correspondiente ni conservar las protecciones ordinarias del acreedor.

**k) Cuentas de desembolso y de pago.**

**63.** La Cláusula 2.03(b) designa como cuenta de desembolso una cuenta a nombre de TV Azteca, S.A.B. de C.V. en Banco Azteca, S.A., y la Cláusula 2.05 designa como cuenta de pago del principal una cuenta a nombre de Alter Bank, también en Banco Azteca, S.A., identificando a Alter Bank, Ltd. como propietario de la cuenta. La Cláusula 2.04(a) dispone que los intereses se pagarán al Acreditante Inicial "*por cuenta proporcional de los Acreditantes*". El Convenio Modificatorio aclara que la cuenta designada por el agente administrativo opera en beneficio de los acreditantes y que Alter recibe y distribuye fondos únicamente en su carácter de agente.

**64.** El uso de una institución bancaria relacionada con el Acreditado no es, por sí solo, contrario a la práctica de mercado. Adquiere relevancia prudencial por su concurrencia con otros dos elementos, la falta de identificación de los acreditantes económicos y la concentración en Alter de las funciones de Organizador, Acreditante Inicial, Agente Administrativo y Agente de Garantías. Esa concurrencia exigía controles documentados sobre segregación de fondos, conciliación, trazabilidad, derechos de compensación o retención de la institución depositaria, disponibilidad de los recursos en caso de bloqueo o insolvencia de dicha institución y distribución inmediata a los acreditantes. Los Documentos del Crédito no contienen el contrato de cuenta, un acuerdo de control ni una renuncia de Banco Azteca a derechos de compensación, por lo que esos controles no pueden verificarse. Conforme al numeral 38 de los Principios del BCBS, quienes desempeñan funciones de custodia de documentos clave o de transferencia de fondos deben reportar a directivos independientes de las funciones de originación y aprobación; y conforme al numeral 167 de las Directrices EBA/GL/2020/06, cuando los flujos de pago transitan por un agente designado debe evaluarse la solidez de dicho agente.

**l) Ley aplicable, jurisdicción y realización de garantías.**

**65.** La Cláusula 8.11 somete el Contrato Original y cualquier controversia derivada del mismo a las leyes de Santa Lucía y a la jurisdicción exclusiva e irrevocable de los tribunales de Santa Lucía. El Contrato Original no designa agente de proceso, designación que sólo aparece en el Convenio Modificatorio, no contiene renuncia a la inmunidad distinta de la declaración de la Cláusula 4.06, y no prevé régimen alguno de reconocimiento y ejecución de sentencias en México.

**66.** Se reitera que este Alcance no emite opinión sobre el derecho de Santa Lucía. Desde la perspectiva estrictamente prudencial, sin embargo, la elección es técnicamente relevante: se trata de un crédito denominado en pesos mexicanos, desembolsado y pagadero en cuentas abiertas en una institución mexicana, otorgado a un emisor mexicano, y garantizado, conforme a la Cláusula 5.05, con prendas sobre acciones de sociedades mexicanas, prendas sobre marcas, hipoteca sobre inmuebles y concesiones mexicanas y un fideicomiso sobre cuentas por cobrar, todos ellos instrumentos regidos necesariamente por el derecho mexicano y sujetos a inscripción en registros públicos mexicanos. Los numerales 13 y 14 de los Principios del BCBS exigen que el monitoreo del riesgo país y de transferencia incorpore la exigibilidad de los contratos de crédito y la oportunidad y capacidad de realizar el colateral bajo el marco legal nacional aplicable. La elección de un foro sin conexión con los activos, sin agente de proceso y sin previsión de ejecución en la jurisdicción donde se ubican las garantías, incrementa el riesgo de realización en lugar de mitigarlo, y no consta análisis alguno al respecto.

**m) Ausencia de conflicto y contratos financieros preexistentes.**

**67.** Como se señaló en el apartado III.e) del presente, la representación de ausencia de conflicto de la Cláusula 4.02 del Contrato Original no comprende los contratos ni los instrumentos de deuda del Acreditado. El Convenio Modificatorio sí contiene declaraciones expresas en el sentido de que la operación no infringe ni genera incumplimiento bajo ningún contrato de emisión, acuerdo u otro instrumento vinculante para TV Azteca.

**68.** Conforme se desarrolló en el párrafo 38 de la Opinión, una práctica bancaria diligente habría requerido revisar el contrato de emisión de los bonos preferentes, incluyendo restricciones de deuda adicional, limitaciones de gravámenes, garantías, *pari passu*, pagos restringidos, incumplimientos cruzados, excepciones y mecanismos de consentimiento y dispensa, antes de desembolsar y, con mayor razón, antes de constituir las garantías previstas en la Cláusula 5.05. Los documentos revisados no incluyen consentimientos, dispensas, certificados u opiniones legales de no contravención. No puede por tanto verificarse la exactitud de la declaración incorporada en el Convenio Modificatorio ni concluirse, con el acervo disponible, que el Crédito Alter-TVAz no contravino el contrato de emisión. La existencia y alcance de esas restricciones corresponde acreditarlos a las partes y, en su caso, determinar sus efectos jurídicos al Juzgador.

**69.** Debe destacarse que la omisión de la referencia a contratos en la Cláusula 4.02 del Contrato Original, y su incorporación expresa en el Convenio Modificatorio, constituyen una secuencia documentalmente verificable: la declaración que habría permitido al acreditante accionar por falsedad respecto de una eventual contravención del contrato de emisión no existía al momento del desembolso y fue introducida cuando la exposición ya había sido asumida y a cuatro días de la presentación de la solicitud de concurso mercantil.

## IV. ESTRUCTURA SINDICADA, ACREDITANTES NO IDENTIFICADOS Y CONCENTRACIÓN DE FACULTADES.

**a) La sindicación proyectada en el Contrato Original.**

**70.** Un crédito sindicado es un financiamiento en el que dos o más acreditantes asumen compromisos directos frente al acreditado bajo una documentación común. Cada acreditante conserva un derecho de crédito propio por su participación, mientras uno o varios agentes coordinan las disposiciones, pagos, comunicaciones y garantías. La identidad y participación de los acreditantes pueden constar en un registro administrado por el agente y no necesariamente en el cuerpo del contrato; no obstante, deben existir documentos contemporáneos que permitan al agente, al acreditado y a las autoridades competentes verificar compromisos, participaciones, cesiones, derechos de voto y beneficiarios económicos. La práctica de mercado documentada por la LMA en su *Guide to Syndicated Loans & Leveraged Finance Transactions* (abril de 2020) y en su *Guide to Agency Protections* (septiembre de 2018) parte precisamente de la existencia de tales registros y de un régimen contractual desarrollado sobre las facultades y responsabilidades del agente frente a los acreditantes.

[illegible] LO ELORZA

**71.** El Contrato Original adopta esa terminología. La Cláusula 1.01 define a los "*Acreditantes*" como el Acreditante Inicial y cada Persona que se convierta en parte del contrato y convenga en otorgar una parte proporcional del Crédito al Acreditado mediante la firma de un contrato por escrito con el Agente Administrativo, en el que se establezca su compromiso de otorgar su parte proporcional. La Cláusula 2.01(b) obliga a cada Acreditante a fondear únicamente su parte proporcional; la Cláusula 2.03(a) ordena a cada Acreditante realizar su parte proporcional del Desembolso; y la Cláusula 2.04(a) dispone el pago de intereses al Acreditante Inicial por cuenta proporcional de los Acreditantes. Alter, sin embargo, es el único participante identificado y el único firmante del lado acreedor, en su cuádruple carácter de Organizador, Acreditante Inicial, Agente Administrativo y Agente de Garantías.

**72.** De la definición transcrita se desprende un dato de la mayor relevancia técnica y que consta en el propio Contrato Original, no únicamente en el Convenio Modificatorio: la incorporación de los verdaderos titulares del riesgo se documenta en instrumentos privados celebrados exclusivamente entre dichas Personas y Alter, ajenos al contrato de crédito, en los que el Acreditado no interviene y de los que no recibe noticia. Ninguna disposición del Contrato Original obliga a Alter a revelar la identidad de los acreditantes, a llevar un registro accesible, a conciliarlo o a permitir su verificación independiente. El Convenio Modificatorio precisa después que Alter puede actuar, salvo acuerdo escrito separado, únicamente como titular registrado, nominado y canal de desembolso, sin conservar necesariamente exposición económica propia, y remite la identidad y participación de los acreditantes a un registro privado administrado por la propia Alter.

**73.** Se trata, por tanto, de un reconocimiento contractual expreso de las partes en el sentido de que la titularidad económica del crédito puede residir en personas distintas de la única entidad identificada del lado acreedor, y no de una inferencia del Despacho. Al no haberse aportado dicho registro, los contratos escritos de adhesión ni la evidencia individual de fondeo, con los documentos revisados no puede identificarse quién aportó los recursos, qué exposición asumió cada participante ni cuáles eran sus derechos económicos y de voto.

**b) La Cláusula 7: exculpación sin mecánica.**

**74.** La Cláusula 7 del Contrato Original se intitula "*Sindicación del Crédito*" y consta de tres subcláusulas. La Cláusula 7.01 dispone el nombramiento irrevocable del Agente por cada Acreditante y establece que, no obstante cualquier disposición en contrario, ningún Agente tendrá deber ni responsabilidad salvo los expresamente establecidos, ni se considerará que tiene relación fiduciaria alguna con ningún Acreditante, ni se interpretará que existen convenios, funciones, responsabilidades, deberes, obligaciones o pasivos implícitos en contra de ningún Agente. La Cláusula 7.02 permite al Agente cumplir sus funciones por o a través de agentes o apoderados y lo exime de responsabilidad por la negligencia o mala conducta de éstos, salvo negligencia grave o dolo. La Cláusula 7.03 exime al Organizador, al Agente Administrativo y al Agente de Garantías de todo deber, responsabilidad o pasivo, precisa que no serán responsables por no exigir, cobrar o recuperar las garantías ni por el retraso en hacerlo, que no están obligados a vender o disponer de garantía alguna a solicitud de cualquier Persona, y que las facultades conferidas al Agente de Garantías existen únicamente para proteger su propio interés en la garantía, sin imponerle deber de ejercerlas.

**75.** El contenido íntegro de la cláusula de sindicación es, por tanto, exculpatorio. La Cláusula 7 no regula: acreditantes requeridos o mayorías; procedimiento de votación; materias reservadas a unanimidad; instrucciones de los acreditantes al agente y su vinculatoriedad; tratamiento de instrucciones contradictorias; renuncia, remoción o sustitución del agente; indemnización de los acreditantes a favor del agente; obligaciones de información del agente hacia los acreditantes; llevanza, contenido, actualización y conciliación de un registro de acreditantes; mecánica de cesiones y participaciones; distribución proporcional de pagos y recuperaciones; ni tratamiento de acreditantes incumplidos. Se trata de una cláusula de protección del agente desprovista de la mecánica que la justifica.

**c) Concentración de facultades en Alter y ausencia de contrapesos.**

**76.** Del análisis conjunto del Contrato Original resulta que Alter concentra la totalidad de las facultades y de los beneficios de la operación, sin contrapeso alguno y sin responsabilidad frente a quienes asumen el riesgo económico. En particular:

- Es beneficiario de las declaraciones y garantías, que conforme al proemio de la Cláusula 4 se otorgan al Agente Administrativo y no a los acreditantes.
- Es beneficiario de las obligaciones del Acreditado, que conforme al proemio de la Cláusula 5 se convienen con el Agente Administrativo.
- Recibe el Pagaré, conforme a la Cláusula 2.03(c) y a la definición de dicho término en la Cláusula 1.01, por un monto igual al del Crédito.
- Recibe la totalidad de los pagos de intereses y de principal, conforme a las Cláusulas 2.04(a) y 2.05, en cuenta de su titularidad.
- Realiza todos los cálculos de intereses, conforme a la Cláusula 2.04(c), sin previsión de verificación independiente ni de notificación a los acreditantes.

- Es la única parte facultada para declarar el vencimiento anticipado, conforme a la Cláusula 6.02, sin mecanismo alguno de instrucción por los acreditantes.
- Puede modificar el Contrato y otorgar renuncias y consentimientos por sí sola. La Cláusula 8.03 dispone que cualquier modificación deberá constar por escrito y ser firmada por el Agente Administrativo y el Acreditado, y que las renuncias y consentimientos serán efectivos si constan por escrito firmados por el Agente Administrativo. No se requiere consentimiento, instrucción ni conocimiento de acreditante alguno.
- Decide unilateralmente quién se incorpora como Acreditante y en qué términos, conforme a la definición de dicho término en la Cláusula 1.01, sin intervención del Acreditado.
- Percibe la comisión por estructuración en su carácter de Organizador, conforme a la Cláusula 3.01.
- No tiene relación fiduciaria con los acreditantes ni deber implícito alguno frente a ellos, conforme a la Cláusula 7.01, y está exculpada por la Cláusula 7.03 respecto de la exigencia, cobro y recuperación de las garantías.

**77.** El resultado estructural es que en el Contrato Original ninguna persona debe nada a quienes asumen el riesgo económico del financiamiento. Los acreditantes no son destinatarios de las declaraciones ni de las obligaciones del Acreditado, no reciben el título de crédito, no reciben directamente los pagos, no pueden instruir la aceleración, no participan en las modificaciones y renuncias, y carecen de acción contractual frente al Agente, quien no les debe deber fiduciario alguno. En una sindicación de mercado, ese conjunto de facultades se equilibra mediante el régimen de acreditantes requeridos, las materias sujetas a unanimidad, las obligaciones de información y rendición de cuentas del agente y su régimen de sustitución. Ninguno de esos contrapesos existe.

**78.** La consecuencia práctica más significativa de esta arquitectura se materializó en el propio expediente: el Convenio Modificatorio de 6 de marzo de 2026, que capitalizó intereses, impuso una comisión de $81,700,000.00, difirió pagos y documentó la adhesión a la garantía hipotecaria preexistente, pudo ser suscrito válidamente por Alter y el Acreditado, sin intervención ni consentimiento de acreditante alguno, por virtud de la Cláusula 8.03 del Contrato Original.

**d) Gobierno de los acreditantes.**

**79.** La ausencia de una definición o determinación de acreditantes requeridos, de porcentajes de mayoría y de materias sujetas a unanimidad no es meramente atípica para una sindicación multilateral: es incompatible con su funcionamiento ordinario, pues sin ese régimen no existe mecanismo contractual alguno para que una pluralidad de acreedores adopte decisiones colectivas sobre modificaciones, dispensas, aceleración, liberación o ejecución de garantías y aplicación de recuperaciones. Debe confirmarse si tales reglas constan en los contratos escritos de adhesión referidos por la definición de "Acreditantes"; en el acervo revisado no constan, y dichos contratos no fueron aportados.

## V. CONVERGENCIA CON EL ANÁLISIS DE LOS PÁRRAFOS 42 Y 50 DE LA OPINIÓN.

**80.** El párrafo 42 de la Opinión planteó, como interrogante estrictamente técnica, qué circunstancia podría explicar, bajo un estándar prudencial internacionalmente reconocido, que una institución acreditante asumiera una exposición de esa magnitud frente a un acreditado que a la fecha de originación no calificaba como sujeto de crédito, y señaló que la única hipótesis prudencialmente coherente sería la existencia de un mecanismo de mitigación no revelado que cubriera el pago con independencia del perfil crediticio del acreditado; asimismo, indicó que si dicho mecanismo hubiera sido aportado por una parte relacionada del propio Acreditante o de TV Azteca, ello agravaría en lugar de subsanar el apartamiento de los estándares prudenciales. La Conclusión SEXTA de la Opinión, contenida en su párrafo 50, recogió ese análisis dejando constancia de que el expediente entonces disponible no acreditaba dicho mecanismo.

**81.** Los Documentos del Crédito, ahora revisados, no acreditan la existencia de un depósito en efectivo o instrumento equivalente constituido en favor del Acreditante, y el presente Alcance tampoco lo afirma. Aportan, en cambio, dos elementos fácticos nuevos, verificables en el propio texto contractual, que inciden directamente sobre el análisis del párrafo 42.

**82.** El primero, es que la titularidad económica del crédito no reside necesariamente en Alter y que los Documentos del Crédito no identifican en quién reside, remitiendo esa identificación a contratos privados celebrados con Alter y a un registro administrado por ella misma, no aportados.

**83.** El segundo, es que el clausulado del Contrato Original es, en sí mismo, incompatible con la existencia de un análisis crediticio genuino orientado a la recuperación. La ausencia total de condiciones precedentes, de obligaciones de entrega de información financiera, de obligaciones de no hacer, de razones financieras, de incumplimiento cruzado y de exigibilidad de las garantías como condición del desembolso, unida a la presencia de una eximente de fuerza mayor a favor del deudor y a la sustitución de la obligación de otorgar garantías por un recargo de 150 puntos base, no describe el comportamiento de un acreedor que espera cobrar de la operación ordinaria de su deudor.

**84.** De ello se siguen tres consecuencias técnicas.

**85.** **Primera.** Se precisa el sujeto del análisis prudencial. La Opinión analizó la operación bajo la premisa, entonces razonable, de que la exposición había sido asumida por el Acreditante identificado. El texto contractual revela que Alter podía actuar como titular registrado, nominado y canal de desembolso, sin exposición económica propia, percibiendo en cambio la comisión por estructuración. La pregunta prudencial relevante deja de ser únicamente por qué un banco internacional asumiría esa exposición, y pasa a ser quién la asumió efectivamente y bajo qué análisis. Los Documentos del Crédito no permiten responder ninguna de las dos cuestiones, y su propio diseño remite la respuesta a instrumentos privados no aportados.

**86.** **Segunda.** Se refuerza, y no se debilita, la conclusión de la Opinión. La hipótesis del párrafo 42 descansaba en la constatación de que ningún análisis genuino de

riesgo crediticio de TV Azteca podía sustentar la operación. El clausulado del Contrato Original confirma esa constatación desde el propio instrumento: un acreditante que hubiera realizado tal análisis y que dependiera de él para su recuperación no habría renunciado simultáneamente a todas las protecciones enunciadas. La configuración contractual observada es coherente con una operación en la que la recuperación no dependía del comportamiento financiero futuro del acreditado.

**87.** **Tercera.** Se introduce una dimensión adicional de opacidad. El párrafo 42 razonó sobre un mecanismo de mitigación no revelado. El Contrato Original muestra que la propia identidad del titular del riesgo es igualmente no revelada y, más aún, contractualmente resguardada, al remitirse a contratos privados celebrados con el agente y a un registro administrado por él. Bajo el numeral 22 de los Principios del BCBS, cada participante del sindicato debe realizar su propia debida diligencia; bajo el numeral 54, los bancos deben abstenerse de celebrar operaciones con contrapartes que no conozcan; y bajo el Principio 7, todo otorgamiento debe realizarse en condiciones de plena competencia, debiendo autorizarse de manera excepcional y monitorearse con particular cuidado los créditos a personas relacionadas. Una estructura en la que la identidad del acreditante económico no es determinable a partir de los documentos de la operación hace estructuralmente imposible verificar el cumplimiento de esos tres estándares, no puede verificarse que cada participante realizó su análisis independiente, ni que las partes se conocían recíprocamente, ni si la operación se celebró o no entre partes relacionadas y en condiciones de mercado.

**88.** A ello se añade la dimensión de prevención de operaciones con recursos de procedencia ilícita. Conforme al numeral 44, inciso b), de las Directrices EBA/GL/2020/06, la asociación con una operación crediticia de una persona que no es ni el acreditado ni la entidad acreditante constituye, por sí misma, un factor de riesgo que debe identificarse, evaluarse y gestionarse, adoptando medidas para comprender la legitimidad del origen de los fondos. En el marco mexicano utilizado como parámetro, la figura del Propietario Real prevista en las Disposiciones del Artículo 115, adoptada en atención a la Recomendación 10 del GAFI, persigue exactamente ese objetivo: determinar quién obtiene en última instancia los beneficios derivados de un contrato u operación y quién ejerce los derechos de disposición sobre los recursos. La estructura documentada en el Contrato Original es, por su diseño, refractaria a esa determinación.

**89.** Se reitera con toda claridad que el presente Alcance no afirma que el financiamiento haya sido otorgado, fondeado o respaldado por una parte relacionada del Acreditante o de TV Azteca. Lo que se afirma, y consta documentalmente, es que: **(i)** el Contrato Original prevé la incorporación de acreditantes mediante contratos privados celebrados con Alter, sin intervención del Acreditado; **(ii)** el Convenio Modificatorio reconoce que Alter puede no ser el titular económico del crédito; **(iii)** ningún instrumento identifica a quien sí lo es, remitiéndose la identificación a un registro privado administrado por la propia Alter que no fue aportado; y **(iv)** en consecuencia, la hipótesis planteada en el párrafo 42 de la Opinión no puede descartarse con el acervo revisado, y el diseño contractual la hace materialmente inverificable. La acreditación de la identidad y del carácter relacionado o independiente de los acreditantes económicos corresponde a la actividad probatoria de las partes, y su calificación jurídica, exclusivamente al Juzgador.

## VI. SECUENCIA DOCUMENTAL Y PROXIMIDAD TEMPORAL.

**90.** La secuencia que se desprende de los Documentos del Crédito y de los Documentos Analizados en la Opinión es la siguiente, y se enuncia exclusivamente para efectos de su valoración técnica:

- **29 de enero de 2026.** Celebración del Contrato Original y desembolso único de $4,085,000,000.00 (cuatro mil ochenta y cinco pesos 00/100 Moneda Nacional) en la misma fecha, sin condiciones precedentes, sin obligaciones de entrega de información financiera, sin obligaciones de no hacer, sin incumplimiento cruzado y sin garantías formalizadas ni perfeccionadas, cuyo otorgamiento quedó diferido hasta el 30 de marzo de 2026 con un recargo de 1.50% anual como única consecuencia.

- **27 de febrero de 2026.** Mediante el oficio 153/4640/2026 referido en el párrafo 36 de la Opinión, la CNBV inició un procedimiento de cancelación de la inscripción de los valores de TV Azteca en el RNV, requiriendo la constitución de un fideicomiso conforme al artículo 108, fracción I, inciso c), de la LMV.

- **6 de marzo de 2026.** Suscripción del Convenio Modificatorio, siete días después del oficio de la CNBV, treinta y seis días después del desembolso, cincuenta y cuatro días antes de la primera Fecha de Pago de Intereses y veinticuatro días antes del vencimiento del plazo para otorgar las garantías. En esa fecha se capitalizan al principal la totalidad de los intereses devengados y no exigibles, se impone una comisión de reestructuración del 2%, se difieren los pagos al vencimiento, se incorporan declaraciones, *covenants*, eventos de incumplimiento, condiciones de efectividad y régimen de agencia, y el Acreditante se adhiere a la garantía hipotecaria preexistente formalizada mediante la escritura pública 149,805.

- **10 de marzo de 2026.** Presentación de la Solicitud de Concurso Mercantil, cuatro días después del Convenio Modificatorio.

**91.** Esta secuencia es relevante en cuatro sentidos, todos ellos estrictamente técnicos: *Primero*, al 6 de marzo de 2026 no existía Caso de Incumplimiento alguno bajo el Contrato Original, ningún interés era exigible y ningún plazo de garantías había vencido; no había, por tanto, situación que ordinariamente justificara una reestructura, y sin embargo se documentó una, con una comisión de $81,700,000.00 (ochenta y un millones setecientos pesos 00/100 Moneda Nacional) a cargo del deudor; *Segundo*, la totalidad del clausulado de protección se incorporó cuando la exposición ya estaba asumida y no podía ya condicionar la decisión de desembolsar; *Tercero*, conforme al artículo 24 de la CUB y al numeral 35 de los Principios del BCBS, la modificación de los términos de un crédito previamente otorgado debía someterse nuevamente al proceso crediticio desde su originación; el expediente revisado no contiene evidencia de que dicho proceso se hubiera realizado en los treinta y seis días transcurridos ni de que hubiera considerado el procedimiento de cancelación registral iniciado siete días antes; y *Cuarto*, la inmediatez entre la reexpresión, la adhesión a la garantía hipotecaria y la presentación de la solicitud de concurso mercantil consta documentalmente y se señala para efectos de su valoración por el Juzgador, sin que el presente Alcance formule calificación jurídica alguna al respecto ni se pronuncie sobre la ubicación de dichos actos dentro de periodo alguno.

**Distinción entre los dos actos y contenido económico del Convenio Modificatorio.**

**91 Bis.** El análisis técnico exige distinguir con precisión entre los dos actos documentados, porque su contenido económico es enteramente distinto. El Contrato Original de 29 de enero de 2026 produjo la entrega de $4,085,000,000.00 (cuatro mil ochenta y cinco millones de pesos 00/100 Moneda Nacional) al Acreditado. El Convenio Modificatorio de 6 de marzo de 2026, en cambio, no entregó recurso alguno. Del cotejo de sus términos con los del Contrato Original resulta que:

- **No aportó dinero nuevo.** No se documentó desembolso, disposición adicional ni línea disponible; la Sección 2.01 del Contrato Reformulado reconoce que el Crédito ya se desembolsó en la Fecha de Desembolso y que los montos pagados o reembolsados no podrán volver a solicitarse.

- **No extendió el plazo.** La Fecha de Vencimiento permaneció en el 29 de julio de 2026, conforme a la Cláusula 1.01 del Contrato Reformulado.

- **No redujo el costo.** La Tasa de Interés permaneció en 17.50% fija.

- **No liberó ni sustituyó garantías en favor del Acreditado.** Por el contrario, y conforme al párrafo 56 Bis, difirió su otorgamiento por sesenta días adicionales.

- **Incrementó el pasivo en $71,487,500.00** por capitalización al principal de intereses devengados y no exigibles, elevándolo a $4,156,487,500.00.

- **Impuso una comisión de reestructuración de $81,700,000.00** en favor del Organizador, pagadera dentro de los quince días naturales siguientes al 6 de marzo de 2026, esto es, con vencimiento posterior a la presentación de la Solicitud de Concurso Mercantil.

**91 Ter.** El resultado es que el Convenio Modificatorio incrementó el adeudo en $153,187,500.00 sin que del texto de los Documentos del Crédito resulte contraprestación, beneficio económico o concesión alguna en favor del Acreditado. Desde la perspectiva estrictamente técnica que constituye el objeto de este Alcance, el aprovechamiento de recursos que la operación pudo generar corresponde íntegramente al desembolso del 29 de enero de 2026 y no al Convenio Modificatorio, que no fue fuente de ingreso alguno. Se hace constar que la calificación jurídica de esta circunstancia, y en particular su encuadramiento o no en supuesto legal alguno, corresponde exclusivamente al Juzgador.

**91 Quáter.** Debe asimismo distinguirse el origen de los beneficios económicos que la operación haya producido. La reducción de accesorios fiscales que en su caso se hubiere obtenido deriva de la aplicación del régimen del Código Fiscal de la Federación por resolución de la autoridad hacendaria, no de una concesión del Acreditante. Lo aportado por el Acreditante fueron recursos a la Tasa de Interés, comisiones y Tasa Moratoria pactadas. Se trata de dos flujos económicos de origen distinto que no deben confundirse en el análisis, sin que ello implique pronunciamiento alguno sobre el balance neto de la operación para la Masa, materia excluida del objeto de este Alcance.

**91 Quinquies.** Finalmente, y en cuanto elemento de contexto documental, se hace constar que la Sección 7(c) del Convenio Modificatorio contiene la declaración del

Acreditado en el sentido de que "*no se ha producido ni se está produciendo ningún Caso de Incumplimiento*", y su Sección 7(d) ratifica como verdaderas y correctas en todos los aspectos sustanciales, a la fecha del propio Convenio, las declaraciones de la Cláusula III del Contrato Reformulado. Conforme a la Sección 6.01(h) de ese mismo instrumento, constituye Caso de Incumplimiento por "*Insolvencia*" el hecho de que el Acreditado se vea incapacitado para pagar sus deudas a medida que venzan o incumpla de manera general en el pago de las mismas. Dicha declaración se formuló cuatro días antes de la presentación de la Solicitud de Concurso Mercantil. Este Alcance se limita a hacer constar la secuencia documental y no formula calificación alguna sobre la veracidad de la declaración ni sobre sus consecuencias, materias reservadas al Juzgador.

## VII. FINANCIAMIENTO EN SITUACIONES DE DIFICULTAD Y FONDOS ESPECIALIZADOS.

**92.** El mercado reconoce financiamientos otorgados a empresas en dificultades, denominados comúnmente *distressed financing*, *rescue financing* o financiamiento de situaciones especiales. Estos recursos suelen ser proporcionados por fondos especializados, inversionistas de deuda en dificultades o vehículos de capital oportunista, que aceptan riesgos superiores a cambio de mayor rendimiento, garantías reforzadas, control contractual, prioridad o una estrategia específica de recuperación.

**93.** La existencia de ese mercado confirma que una empresa en insolvencia puede obtener financiamiento. No obstante, también demuestra que esas operaciones no se documentan como crédito bancario corporativo ordinario ni, mucho menos, con un clausulado sustancialmente inferior al ordinario. Por el contrario, el financiamiento de rescate se caracteriza por incorporar precio elevado, plazo corto, garantías perfeccionadas como condición previa al desembolso, control estricto del uso de los recursos mediante cuentas controladas o pagos directos, información financiera frecuente, frecuentemente semanal, restricciones contractuales severas, hitos de reestructura y derechos de intervención o ejecución. El Contrato Original presenta únicamente los dos primeros de esos rasgos: precio elevado y plazo corto. Carece de todos los demás.

**94.** La eventual caracterización de la operación como financiamiento especializado no modifica, por tanto, la conclusión de la Opinión; la agudiza. El Crédito Alter-TVAz incorporó el costo característico de un financiamiento de rescate sin incorporar ninguno de los mecanismos de control y protección que económicamente lo justifican. Adicionalmente, para una institución regulada, una exposición nueva frente a un acreditado en incumplimiento genera costos elevados de reservas, capital, liquidez y concentración y, por ello, requiere una fuente de recuperación extraordinariamente robusta, distribución del riesgo y aprobaciones reforzadas, elementos que los Documentos del Crédito no acreditan.

### El crédito puente y el financiamiento de rescate: rasgos documentales característicos.

**94 Bis.** Procede precisar el contenido técnico de la figura del crédito puente, por ser la que la práctica invoca con mayor frecuencia para explicar operaciones de plazo breve y costo elevado. El puente es una figura definida por su salida: su función económica es tender un puente hacia una fuente de repago identificada, una emisión de deuda, una facilidad

permanente, la venta de un activo o una aportación de capital. Por ello, en la documentación de mercado el *bridge facility* incorpora invariablemente cuatro elementos: **(i)** la identificación contractual de la operación de salida; **(ii)** el prepago obligatorio con el producto de dicha operación; **(iii)** comisiones de duración escalonadas que penalizan la permanencia del puente en el tiempo; y **(iv)** mecánica de conversión o refinanciamiento al vencimiento, ordinariamente a plazo o mediante títulos de canje, con tasa tope. El puente es transitorio porque el propio contrato dispone hacia dónde transita.

**94 Ter.** El Contrato Original no contiene ninguno de esos cuatro elementos. No identifica operación de salida alguna; no prevé prepago obligatorio con el producto de fuente determinada, la Cláusula 2.06 contempla únicamente el prepago voluntario; no establece comisión de duración; y no regula conversión ni refinanciamiento al vencimiento. Documenta un vencimiento en una sola exhibición a seis meses sin fuente de repago identificada. Conforme al numeral 19 de los Principios del BCBS, la fuente de pago debe considerarse y documentarse al aprobar el crédito; y conforme a los numerales 143 y 144, inciso e), de las Directrices EBA/GL/2020/06, el colateral constituye la segunda vía de salida y no la fuente primaria de pago. En el acervo revisado no consta la identificación de ninguna de las dos.

**94 Quáter.** Conviene asimismo precisar por qué el financiamiento de empresas en dificultades es característicamente originado por fondos especializados y no por instituciones bancarias, distinción que no obedece a preferencia sino a consecuencia regulatoria y contable determinada. Una exposición nueva frente a un acreditado en incumplimiento generalizado nace clasificada como deteriorada. Conforme a los artículos 110 a 115 de la CUB y a su Anexo 33, la calificación de cartera comercial se determina a nivel del acreditado y no de la operación individual; conforme al documento del Comité de Supervisión Bancaria de Basilea *Prudential treatment of problem assets — definitions of non-performing exposures and forbearance* (abril de 2017), una exposición frente a un obligado respecto del cual existe improbabilidad de pago es no productiva con independencia de los días de mora transcurridos; y conforme a la normativa contable aplicable, un activo financiero originado con deterioro crediticio se reconoce desde su origen en la etapa correspondiente. La consecuencia es que la institución acreditante debe constituir reservas preventivas de magnitud cercana a la totalidad de la exposición desde el primer día, con el correlativo consumo de capital.

**94 Quinquies.** Ese es el motivo por el cual el segmento del financiamiento en dificultades es característicamente atendido por vehículos que no están sujetos a dicho régimen, fondos de deuda en dificultades, vehículos de situaciones especiales y capital oportunista, que valúan a mercado y adquieren riesgo a descuento. Y cuando una institución bancaria sí aporta recursos frescos a un acreditado en dificultades, la operación presenta rasgos documentales igualmente característicos, ninguno de los cuales concurre en la especie:

- **Exposición previa del acreditante.** El financiamiento defensivo se explica por la necesidad de proteger una posición existente. No consta que el Acreditante fuera acreedor del Acreditado con anterioridad al 29 de enero de 2026.

- **Destino a capital de trabajo bajo presupuesto,** con flujo de caja proyectado de corto plazo, obligaciones de reporte frecuente, cuentas controladas y razones de variación

presupuestal. El Contrato Original no contiene ninguno de estos mecanismos, conforme a los apartados III.c) y III.f).

- **Garantía perfeccionada al cierre,** de primer grado. Conforme al apartado III.h) y al párrafo 56 Bis, la exposición se asumió sin garantía formalizada y su otorgamiento se difirió en dos ocasiones sucesivas.

- **Hitos de reestructura y acuerdo con los acreedores existentes.** No constan en el acervo revisado.

**94 Sexies.** Se hace constar, por último, que la Ley de Concursos Mercantiles contempla un régimen propio para el financiamiento de comerciantes en dificultades, con intervención y autorización judicial y con el tratamiento de prelación que dicha ley determina. La caracterización de la operación analizada frente a ese régimen, y la determinación de sus efectos, corresponden exclusivamente al Juzgador; el presente Alcance se limita a exponer que los rasgos documentales del financiamiento de rescate reconocidos por la práctica de mercado no se encuentran presentes en los Documentos del Crédito.

## VIII. CONTRASTE CON EL MARCO MEXICANO Y LAS PRÁCTICAS PRUDENCIALES.

**95.** Aplicando el marco descrito en el apartado II a los hallazgos del apartado III, resulta lo siguiente. El artículo 65 de la LIC exige que el otorgamiento y, conforme al artículo 24 de la CUB, también la reestructura se sustente en análisis cuantitativos y cualitativos de viabilidad y capacidad de pago. Cuando una reestructura se celebra frente a circunstancias financieras adversas, su viabilidad debe apoyarse en análisis que reflejen una mejora en las posibilidades de recuperación; y si además se capitalizan intereses y se imponen nuevas comisiones, debe analizarse la viabilidad del adeudo agregado resultante.

**96.** El artículo 15 de la CUB exige, para créditos comerciales de esta magnitud, contar con estados financieros, fuente primaria de recuperación, exposición total, experiencia de pago, solvencia, capacidad de pago, flujos y, cuando corresponda, análisis de sensibilidad. Los artículos 10 a 23 distribuyen las funciones de originación, evaluación, aprobación, instrumentación, seguimiento y recuperación; el artículo 45 exige integrar y conservar el expediente que documente cada etapa; y los artículos 117 a 119 y 2 Bis 30 a 2 Bis 32 limitan el reconocimiento de garantías a aquellas jurídicamente válidas, oponibles, perfeccionadas y económicamente efectivas.

**97.** Los Documentos del Crédito contienen el resultado contractual de la operación, pero no el memorándum de crédito, la aprobación del órgano facultado, los modelos de flujo, el estudio de recuperación bajo los términos reexpresados, los cálculos de reservas y capital, la verificación de límites de concentración, los avalúos, la evidencia de cobertura residual ni los expedientes de identificación de los acreditantes. Por sí solos, por tanto, no acreditan que la operación cumpliera los elementos prudenciales que podrían justificar un financiamiento excepcional. Más aún, y como se ha desarrollado a lo largo del apartado III, el propio contenido del Contrato Original resulta difícilmente conciliable con la hipótesis de que tales análisis se hubieran realizado, puesto que un análisis genuino de la viabilidad de pago habría conducido necesariamente a exigir las protecciones contractuales

que el instrumento omitió y a no incorporar las estipulaciones que operan en contra del acreedor.

## IX. Efectos sobre la Opinión.

**98.** El Contrato Original y el Convenio Modificatorio confirman: **(i)** la naturaleza extraordinaria del financiamiento y su incongruencia con un crédito corporativo ordinario; **(ii)** la ausencia total de condiciones precedentes y el desembolso en la misma fecha de celebración; **(iii)** la ausencia de obligaciones de entrega de información financiera, de obligaciones de no hacer y de razones financieras; **(iv)** el desembolso previo a la formalización y perfeccionamiento de las garantías, configuradas como obligación posterior con recargo de tasa y no como condición ni como evento de incumplimiento; **(v)** la existencia de garantías de segundo rango o concurrentes y la contradicción interna entre las Cláusulas 4.08 y 5.05(c); **(vi)** un catálogo mínimo de eventos de incumplimiento sin incumplimiento cruzado; **(vii)** la presencia de estipulaciones adversas al acreedor, señaladamente la eximente de fuerza mayor de la Cláusula 8.08; **(viii)** la capitalización de intereses no exigibles y la imposición de una comisión de reestructuración en ausencia de incumplimiento y sin extensión del vencimiento; y **(ix)** la falta de evidencia documental sobre el proceso de evaluación, estructuración y aprobación del crédito.

**99.** Adicionalmente, los Documentos del Crédito precisan que Alter no era necesariamente el titular económico de la exposición y que la operación contemplaba, desde el Contrato Original, la incorporación de acreditantes no identificados mediante contratos privados celebrados con el propio agente. Esta precisión no atenúa las conclusiones de la Opinión. Su efecto es distinto y más significativo: la Opinión pudo razonablemente atribuir la exposición al Acreditante identificado, mientras que los Documentos del Crédito establecen que la identidad de quien asumió efectivamente el riesgo económico no consta y, por diseño contractual, no es determinable a partir de los instrumentos de la operación. Ello sitúa el análisis, con mayor precisión aún, en el espacio fáctico sobre el que razonó el párrafo 42 de la Opinión.

**100.** En consecuencia, el presente Alcance no modifica la conclusión central de la Opinión. La confirma, la refuerza y la precisa: los Documentos del Crédito no muestran, desde el desembolso, el grado de completitud, protección y gobierno contractual razonablemente esperable para un financiamiento de esta cuantía y riesgo, y la estructura adoptada impide verificar quién asumió la exposición y bajo qué análisis.

## X. Conclusiones.

**101. PRIMERA. AUSENCIA TOTAL DE CONDICIONES PRECEDENTES.** El Contrato Original no contiene cláusula alguna de condiciones de utilización o precedentes. La Fecha de Desembolso coincide con la fecha de celebración y el desembolso de $4,085,000,000.00 (cuatro mil ochenta y cinco pesos 00/100 Moneda Nacional) no quedó condicionado a la entrega de documentos corporativos, opiniones legales, certificados, confirmación de declaraciones, evidencia de destino ni constitución de garantía alguna. Entre la decisión de otorgamiento y la entrega de los recursos no se interpuso verificación documental alguna.

**102. SEGUNDA. DECLARACIONES ESTRUCTURALMENTE INCOMPLETAS.** El Contrato Original contiene un apartado de declaraciones y garantías, pero omite las que resultaban materialmente indispensables en el caso concreto: ausencia de litigios, ausencia de incumplimiento bajo otros instrumentos de deuda, ausencia de pasivos no revelados, solvencia y ausencia de cambio adverso relevante. La declaración de ausencia de conflicto de la Cláusula 4.02 no comprende los contratos ni los instrumentos de deuda del Acreditado, y las declaraciones se otorgan al Agente Administrativo y no a los acreditantes, sin régimen de repetición. La única base financiera aceptada fue estados financieros combinados no auditados al 31 de diciembre de 2025, respecto de un emisor cuya calificación había sido retirada por opacidad informativa.

**103. TERCERA. INEXISTENCIA DE OBLIGACIONES DE NO HACER, DE RAZONES FINANCIERAS Y DE ENTREGA DE INFORMACIÓN.** El Contrato Original no contiene una sola obligación de no hacer ni razón financiera de mantenimiento alguna, y su Cláusula 5.02, pese a intitularse "*Estados Financieros: Otros Informes*", no impone obligación de entregar información financiera al acreditante. Conforme al numeral 19 de los Principios del BCBS, las obligaciones contractuales diseñadas para limitar cambios en el perfil de riesgo futuro del acreditado forman parte de los factores que deben considerarse y documentarse al aprobar un crédito. Su ausencia integral, tratándose de un acreditado en incumplimiento generalizado, es objetivamente incongruente con la existencia de un análisis crediticio genuino que dependiera de la capacidad de pago del Acreditado para la recuperación del financiamiento.

**104. CUARTA. GARANTÍAS SUSTITUIDAS POR UN RECARGO DE TASA.** La Cláusula 5.05 configuró las garantías centrales como obligaciones posteriores al desembolso, con plazo de sesenta días naturales y con un incremento de tasa de 1.50% anual como única consecuencia de su falta de otorgamiento; su omisión no constituye Caso de Incumplimiento conforme a la Cláusula 6.01. La exposición fue asumida sin garantía formalizada ni perfeccionada alguna, y el remedio pactado incrementa el adeudo del deudor insolvente en lugar de mejorar la recuperación. La Cláusula 4.08 declara además garantías de primer grado, en contradicción con la hipoteca de segundo grado prevista en la Cláusula 5.05(c) del mismo instrumento.

**105. QUINTA. CATÁLOGO MÍNIMO DE INCUMPLIMIENTOS.** La Cláusula 6.01 tipifica cuatro supuestos y omite el incumplimiento cruzado y la aceleración cruzada respecto de la deuda existente del Acreditado, así como los eventos por efecto material adverso, invalidez o falta de perfeccionamiento de garantías, cambio de control y resoluciones adversas. La omisión del incumplimiento cruzado frente a un emisor cuya deuda de mercado se encontraba en incumplimiento declarado carece de explicación técnica desde la perspectiva del acreedor.

**106. SEXTA. ESTIPULACIONES ADVERSAS AL PROPIO ACREEDOR.** La Cláusula 8.08 exime al Acreditado de responsabilidad por incumplimientos derivados de Casos de Fuerza Mayor, sin excluir las obligaciones de pago, en una definición que comprende actos gubernamentales y pandemias. La Cláusula 8.09 hace que cada parte sufrague sus propios costos, apartándose de la práctica invariable de repercusión al acreditado. No se pactó *gross-up* ni indemnización fiscal pese a que la Cláusula 4.05

reconoce la retención mexicana aplicable. Estas estipulaciones son incompatibles con la conducta de un acreedor que espera recuperar su crédito por la vía ordinaria.

**107. SÉPTIMA. VERIFICACIÓN ARITMÉTICA DE LA CAPITALIZACIÓN.** El monto de $71,487,500.00 corresponde con exactitud a treinta y seis días de intereses sobre $4,085,000,000.00 a la tasa de 17.50%, calculados precisamente conforme a la mecánica de la Cláusula 2.04(b) del Contrato Original. La carga económica reconocida entre el desembolso y la reexpresión, sumando intereses capitalizados y comisión de reestructuración, asciende a $153,187,500.00, equivalente al 3.75% del monto dispuesto en treinta y seis días, sin extensión correlativa del vencimiento.

**108. OCTAVA. INEXISTENCIA DE INCUMPLIMIENTO AL MOMENTO DE LA REEXPRESIÓN.** Al 6 de marzo de 2026 faltaban cincuenta y cuatro días para la primera Fecha de Pago de Intereses y veinticuatro días para el vencimiento del plazo de otorgamiento de garantías. No existía Caso de Incumplimiento alguno. La capitalización de intereses no exigibles y la imposición de una comisión de reestructuración de $81,700,000.00 en esas circunstancias no encuentra explicación en la lógica ordinaria de una reestructura crediticia.

**109. NOVENA. ACREDITANTES NO IDENTIFICADOS POR DISEÑO DEL PROPIO CONTRATO ORIGINAL.** La definición de "Acreditantes" de la Cláusula 1.01 prevé la incorporación de los titulares del riesgo mediante contratos privados celebrados con el Agente Administrativo, sin intervención ni conocimiento del Acreditado, sin obligación de revelación y sin registro accesible o verificable. El Convenio Modificatorio confirma después que Alter puede actuar únicamente como titular registrado, nominado y canal de desembolso, sin exposición económica propia. Alter es el único firmante del lado acreedor y el único titular aparente del Pagaré.

**110. DÉCIMA. SINDICACIÓN SIN MECÁNICA Y CONCENTRACIÓN ABSOLUTA DE FACULTADES.** La Cláusula 7 es exclusivamente exculpatoria y no regula acreditantes requeridos, mayorías, votaciones, unanimidades, instrucciones, sustitución del agente, registro de acreditantes, cesiones ni distribución de recuperaciones. Correlativamente, Alter es beneficiaria de las declaraciones y obligaciones, tenedora del Pagaré, receptora de todos los pagos, calculadora de los intereses, única facultada para acelerar, única facultada para modificar el Contrato y otorgar renuncias sin consentimiento de acreditante alguno conforme a la Cláusula 8.03, decisora de quién se incorpora como acreditante, perceptora de la comisión por estructuración, y carente de relación fiduciaria y de responsabilidad frente a los acreditantes conforme a las Cláusulas 7.01 y 7.03. En el Contrato Original ninguna persona debe deber alguno a quienes asumen el riesgo económico del financiamiento.

**111. DÉCIMA PRIMERA. IMPOSIBILIDAD ESTRUCTURAL DE VERIFICAR EL CUMPLIMIENTO DE LOS ESTÁNDARES PRUDENCIALES.** Una estructura en la que la identidad del acreditante económico no es determinable a partir de los documentos de la operación impide verificar el cumplimiento del numeral 22 de los Principios del BCBS, que exige que cada participante del sindicato realice su propia debida diligencia; del numeral 54, que exige no contratar con contrapartes desconocidas; y del

Principio 7, que exige que todo otorgamiento se realice en condiciones de plena competencia y que los créditos a partes relacionadas se autoricen de manera excepcional. La misma estructura resulta refractaria a la identificación del Propietario Real prevista en las Disposiciones del Artículo 115, adoptada en atención a la Recomendación 10 del GAFI.

**112. DÉCIMA SEGUNDA. LEY Y FORO SIN CONEXIÓN CON LAS GARANTÍAS.** La Cláusula 8.11 somete el Contrato Original a la ley y jurisdicción exclusiva de Santa Lucía, sin agente de proceso ni previsión de ejecución en México, tratándose de un crédito en pesos, desembolsado y pagadero en cuentas de una institución mexicana, garantizado con prendas, hipoteca y fideicomiso sobre activos mexicanos sujetos a registro público mexicano. Conforme a los numerales 13 y 14 de los Principios del BCBS, la exigibilidad de los contratos y la capacidad de realizar el colateral bajo el marco legal nacional forman parte del riesgo que debe evaluarse; no consta análisis alguno al respecto.

**113. DÉCIMA TERCERA. INCORPORACIÓN *EX POST* DE LAS PROTECCIONES.** El Convenio Modificatorio incorporó declaraciones, *covenants*, un catálogo ampliado de eventos de incumplimiento, condiciones de efectividad, régimen de agencia y la identificación de los grados de prelación. Esas protecciones se incorporaron treinta y seis días después de asumida la exposición y cuatro días antes de la presentación de la solicitud de concurso mercantil, por lo que no pueden considerarse vigentes ni operativas al momento de la decisión de otorgamiento. Que las mismas partes hayan podido convenirlas treinta y seis días después demuestra que su omisión inicial no obedeció a imposibilidad práctica.

**114. DÉCIMA CUARTA. FINANCIAMIENTO DE RESCATE SIN ESTRUCTURA DE RESCATE.** Los fondos de deuda en dificultades pueden financiar empresas insolventes, pero lo hacen mediante estructuras con garantías perfeccionadas al cierre, control del uso de los recursos, información frecuente y restricciones severas. El Crédito Alter-TVAz incorporó el costo característico de un financiamiento de esa naturaleza sin incorporar ninguno de sus mecanismos de protección y control.

**115. DÉCIMA QUINTA. CONFIRMACIÓN Y PRECISIÓN DE LA OPINIÓN.** El presente Alcance confirma y precisa la Opinión: conforme a los estándares prudenciales internacionalmente reconocidos y al derecho bancario y financiero mexicano que los recoge, utilizados como parámetro de análisis, una institución bancaria prudente no habría otorgado este financiamiento como crédito corporativo ordinario en los términos documentados. Para justificarlo como operación extraordinaria de rescate se requería evidencia adicional que no consta en los Documentos del Crédito, y la propia configuración contractual de la operación es inconsistente con la existencia de un análisis crediticio genuino de la viabilidad de pago del Acreditado.

**115 Bis. DÉCIMA SEXTA. EL CONVENIO MODIFICATORIO NO APORTÓ CONTRAPRESTACIÓN ALGUNA AL ACREDITADO.** El Convenio Modificatorio de 6 de marzo de 2026 no entregó recursos, no extendió la Fecha de Vencimiento, no redujo la Tasa de Interés y no liberó garantía alguna. Incrementó el adeudo en $71,487,500.00 (setenta y un millones cuatrocientos ochenta y siete mil quinientos pesos 00/100 Moneda Nacional) por capitalización de intereses no exigibles e impuso una comisión

de reestructuración de $81,700,000.00 (ochenta y un millones setecientos pesos 00/100 Moneda Nacional) pagadera con posterioridad a la presentación de la Solicitud de Concurso Mercantil. El aprovechamiento de recursos que la operación haya generado corresponde íntegramente al desembolso de 29 de enero de 2026; el Convenio Modificatorio no fue fuente de ingreso alguno.

**115 Ter. DÉCIMA SÉPTIMA. EL CONVENIO MODIFICATORIO DIFIRIÓ LAS GARANTÍAS EN LUGAR DE FORMALIZARLAS.** La Sección 4.10 del Contrato de Crédito Modificado y Reformulado obliga a firmar los Documentos de Garantía dentro de los sesenta días naturales posteriores a la firma de dicho instrumento, y la Sección 8.01(b) del Convenio Modificatorio remite toda referencia al contrato reexpresado. El plazo volvió a correr, por tanto, desde el 6 de marzo de 2026. Las definiciones de los Documentos de Garantía de la Cláusula 1.01 se formulan en tiempo futuro. La exposición permaneció, conforme al texto de los propios instrumentos, sin garantía formalizada ni perfeccionada durante todo el periodo posterior al desembolso.

JESÚS VÁZQUEZ CASTAÑIZO ELORZA
30666030316666300000000000000000000003040164008
04/03/29 10:08:24

**115 Quáter. DÉCIMA OCTAVA. AUSENCIA DE LOS RASGOS DOCUMENTALES DEL CRÉDITO PUENTE Y DEL FINANCIAMIENTO DE RESCATE.** El Contrato Original carece de los cuatro elementos que definen contractualmente a un crédito puente, operación de salida identificada, prepago obligatorio con su producto, comisión de duración y mecánica de conversión al vencimiento, y de los rasgos característicos del financiamiento de rescate, exposición previa del acreditante, destino a capital de trabajo bajo presupuesto y control, garantía perfeccionada al cierre e hitos de reestructura. Presenta únicamente el precio elevado y el plazo breve propios de ese segmento, sin sus mecanismos de protección y control.

**115 Quinquies. DÉCIMA NOVENA. CONTRASTE CON LAS REFERENCIAS OFICIALES DE MERCADO.** A la fecha de celebración del Contrato Original, la tasa objetivo del Banco de México era de 7.00%, la TIIE de Fondeo de 7.10%, la TIIE a 28 días de 7.3489% y los Cetes a 182 días de 7.26%, con inflación general anual de 3.77%. La tasa pactada de 17.50% se ubica 1,024 puntos base sobre la referencia libre de riesgo al mismo plazo; incorporando las comisiones anualizadas sobre el plazo contractual, el costo efectivo se ubica en el orden de 23.5% anual, esto es, 1,624 puntos base sobre dicha referencia. La Tasa Moratoria pactada en el Contrato Reformulado equivale a 53.50% nominal anual. Este contraste se formula en términos descriptivos y verificables contra fuentes oficiales, sin calificar la licitud ni la proporcionalidad del costo, ni determinar cuál sea el mercado relevante, materias reservadas al Juzgador.

**115 Sexies. VIGÉSIMA. CONTROL DEL DESTINO DE LOS RECURSOS.** Con independencia de la evidencia de aplicación que obre en el expediente, el Contrato Original no estableció mecanismo contractual alguno de control del destino: no condicionó el desembolso a la identificación de las obligaciones a cubrir, no previó cuentas controladas ni pagos directos al acreedor fiscal, no exigió certificaciones ni reportes de aplicación y no tipificó el uso indebido de los recursos como Caso de Incumplimiento. La aplicación que en su caso haya ocurrido no es, por tanto, atribuible al diseño contractual.

## XI. <u>Limitaciones y Reservas.</u>

**116.** El presente Alcance se rige por las mismas limitaciones y reservas expresadas en los apartados III y IV de la Opinión, las cuales se tienen aquí por íntegramente reproducidas, y adicionalmente por las siguientes.

**117.** El Alcance se limita al derecho bancario y financiero mexicano utilizado como parámetro y a los estándares prudenciales internacionales invocados. No contiene opinión sobre el derecho de Santa Lucía, ley aplicable al Contrato Original conforme a su Cláusula 8.11, ni sobre la validez, exigibilidad o interpretación de los Documentos del Crédito bajo esa legislación. Las observaciones formuladas sobre el clausulado se emiten desde la perspectiva de la práctica bancaria y de los estándares prudenciales, y no como calificación de validez o eficacia jurídica de cláusula alguna.

**118.** El Alcance no constituye una opinión de solvencia, valuación, contabilidad o auditoría, ni una calificación sobre la licitud o proporcionalidad del costo financiero, ni una cuantificación de daños. Se precisa que el contraste de condiciones económicas desarrollado en el apartado III.d bis) sí constituye una exposición objetiva de la relación entre las condiciones pactadas y las referencias oficiales de mercado vigentes a la fecha de celebración, y no queda comprendido en la reserva anterior; lo excluido es la determinación de cuál sea el mercado relevante para efectos legales y la calificación jurídica de una eventual desviación, reservadas al Juzgador. Tampoco determina responsabilidad civil, administrativa o penal, ni califica los actos analizados conforme a la Ley de Concursos Mercantiles.

**119.** No se contó con: el registro histórico de acreditantes; los contratos escritos de adhesión a que se refiere la definición de "*Acreditantes*" de la Cláusula 1.01; la evidencia individual de fondeo; el Pagaré; los Contratos de Garantía firmados y completos; el convenio de adhesión al fideicomiso F/8110; convenio intercreditorio alguno; avalúos o cálculos de cobertura; consentimientos, dispensas u opiniones legales de no contravención; actas de aprobación de órganos sociales del Acreditante o del Acreditado; memorándum de crédito; cálculos de reservas y capital; expedientes de identificación y conocimiento del cliente; estados de cuenta y conciliaciones; la evidencia de aplicación de la diferencia entre el monto dispuesto y el importe destinado al pago de contribuciones; ni evidencia del otorgamiento efectivo de los Documentos de Garantía dentro del plazo previsto en la Sección 4.10 del Contrato de Crédito Modificado y Reformulado.

**120.** El análisis del Contrato Original se practicó sobre la traducción al español certificada por perito traductor auxiliar de la Administración de Justicia que obra en el expediente, quien certificó la fidelidad de la traducción sin calificar la autenticidad, validez o licitud del documento. Si existieren diferencias frente al texto original en idioma inglés, prevalecerá el análisis que corresponda al texto auténtico. El Despacho se reserva expresamente el derecho de complementar, ampliar o modificar el presente Alcance si recibe información adicional o distinta a la considerada en su elaboración.

**121.** La revisión normativa del presente Alcance se cerró el 5 de septiembre de 2026. En caso de que el documento se presente en fecha posterior, deberá confirmarse nuevamente la vigencia de cada disposición y estándar invocado.

## XII. PROTESTA Y FIRMA.

**122.** El Despacho declara que el presente Alcance refleja, conforme a su leal saber y entender, el resultado de un análisis jurídico y técnico-profesional independiente, objetivo e imparcial, realizado con base en los Documentos del Crédito y sujeto a las limitaciones expresamente señaladas.

**122 Bis.** Los suscritos manifiestan, bajo protesta de decir verdad, que el presente Alcance se emite conforme a su leal saber y entender, con base en los documentos expresamente identificados en el **Anexo "B"** y sujeto a las limitaciones y reservas señaladas, y que no tienen impedimento ni conflicto de interés que les impida emitirlo. Se acompañan copias de las cédulas profesionales de los firmantes.

Ciudad de México, a 8 de septiembre de 2026.

Atentamente,

**Basila Abogados, S.C.**

**Mauricio Basila Lago**
Socio y
Representante Legal

**Paul Yamil José Aguilar**
Socio

## Anexo "B"

## Fuentes consultadas y verificadas para el presente Alcance

El presente anexo relaciona las fuentes invocadas en el cuerpo del Alcance, con indicación de su emisor, fecha y ubicación pública, a efecto de permitir su verificación directa. En caso de cualquier duda de interpretación, las publicaciones oficiales de los emisores prevalecen sobre el resumen contenido en este Alcance.

### *A. Documentos primarios analizados*

- **Contrato de Crédito de fecha 29 de enero de 2026** celebrado entre Alter Bank Ltd., en su carácter de Organizador, Acreditante Inicial, Agente Administrativo y Agente de Garantías, y TV Azteca, S.A.B. de C.V., en su traducción al español certificada por perito traductor auxiliar de la Administración de Justicia autorizada en términos del Acuerdo 42-04/2024 del Consejo de la Judicatura de la Ciudad de México, que consta de quince fojas y obra en el expediente.

- **Primer convenio modificatorio y de reexpresión del contrato de crédito** de fecha 6 de marzo de 2026, celebrado entre las mismas partes.

### *B. Estándares prudenciales internacionales*

- **Comité de Supervisión Bancaria de Basilea,** Principles for the management of credit risk, abril de 2025, publicación d595. Banco de Pagos Internacionales, www.bis.org/bcbs/publ/d595.pdf. Versión vigente y actualizada de los Principios originalmente publicados en octubre de 2000; conforme al numeral 3 de su introducción, la revisión se limitó a enmiendas técnicas de alineación, sin modificar el contenido de los principios.

- **Comité de Supervisión Bancaria de Basilea,** Principios Básicos para una Supervisión Bancaria Eficaz (versión en español, septiembre de 2012, publicación bcbs230_es) y Basilea III: Finalización de las Reformas Poscrisis (diciembre de 2017, publicación d424_es), conforme se relacionan en el Anexo "A" de la Opinión.

- **Autoridad Bancaria Europea,** Directrices sobre concesión y seguimiento de préstamos (Guidelines on loan origination and monitoring), EBA/GL/2020/06, de 29 de mayo de 2020, aplicables desde el 30 de junio de 2021. Disponibles en versión oficial en español en el portal institucional de la Autoridad Bancaria Europea, www.eba.europa.eu. Se invocan exclusivamente como referencia técnica de práctica supervisora comparada.

- **Grupo de Acción Financiera Internacional,** Recomendación 10, relativa a la debida diligencia del cliente y a la identificación del propietario real, expresamente invocada en los considerandos de las reformas a las Disposiciones del Artículo 115 publicadas en el Diario Oficial de la Federación.

### *C. Práctica documental de mercado*

- **Loan Market Association,** formularios recomendados de contrato de crédito y guías institucionales publicadas en www.lma.eu.com, en particular la Guide to Syndicated Loans & Leveraged Finance Transactions (abril de 2020), la Guide to Agency Protections (septiembre de 2018), la guía Closing a Primary Syndication – Factors to Consider (junio de 2019), la guía Dealing with Requests for Amendments (diciembre de 2016) y la Best Practice

Guide for Term Sheet Completeness (diciembre de 2021, publicada conjuntamente con la European Leveraged Finance Association). Se invocan como evidencia de la estructura y del contenido ordinario de la documentación crediticia sindicada en los mercados internacionales, sin que ello implique su aplicabilidad jurídica a la operación analizada.

*D. Marco jurídico mexicano utilizado como parámetro*

- **Ley de Instituciones de Crédito,** artículos 65 y 115.
- **Ley General de Títulos y Operaciones de Crédito,** artículos 291 a 301, sobre la apertura de crédito.
- **Ley del Mercado de Valores,** artículo 108, fracción I, inciso c).
- **Disposiciones de carácter general aplicables a las instituciones de crédito (Circular Única de Bancos),** artículos 3, 6 a 9, 10 a 23, 15, 24, 25, 45, 110 a 115, 117 a 119 y 2 Bis 30 a 2 Bis 32.
- **Disposiciones de carácter general a que se refiere el artículo 115 de la Ley de Instituciones de Crédito,** en particular la definición de Propietario Real y las obligaciones de identificación correlativas, conforme al texto vigente publicado y reformado en el Diario Oficial de la Federación.
- **Código de Comercio y ordenamientos supletorios.**

*E. Fuente expresamente descartada por pérdida de vigencia*

- **Interagency Guidance on Leveraged Lending** de 21 de marzo de 2013 y sus preguntas frecuentes de 7 de noviembre de 2014, emitidas por las autoridades bancarias federales de los Estados Unidos de América. La Oficina del Contralor de la Moneda y la Corporación Federal de Seguro de Depósitos se apartaron formalmente de dichos documentos mediante declaración interinstitucional de 5 de diciembre de 2025, señalando que en su lugar los bancos deben aplicar los principios generales de sanas prácticas crediticias. En consecuencia, ninguna conclusión del presente Alcance descansa en dichos documentos, y se deja constancia de su exclusión deliberada.

***E. Referencias oficiales de mercado empleadas en el contraste del apartado III.d bis)***

- **Banco de México,** tasa de interés objetivo, TIIE de Fondeo a un día, TIIE a 28 días y Cetes a 28 días, valores publicados con fecha 27 y 28 de enero de 2026, conforme a los indicadores financieros difundidos por dicha institución en su portal www.banxico.org.mx.
- **Banco de México,** resultados de la subasta primaria de valores gubernamentales correspondiente a la primera subasta de 2026, respecto de los Certificados de la Tesorería de la Federación a 182 días.
- **Banco de México,** Índice Nacional de Precios al Consumidor, variación anual correspondiente a la primera quincena de enero de 2026.
- **Rendimiento del Bono M a diez años** conforme a cotizaciones interbancarias del mercado secundario en el periodo enero-marzo de 2026.

- **Comité de Supervisión Bancaria de Basilea,** Prudential treatment of problem assets — definitions of non-performing exposures and forbearance, abril de 2017, publicación d403, invocado exclusivamente en el párrafo 94 Quáter y como referencia técnica sobre la clasificación de exposiciones no productivas.

JESUS VAZQUEZ NUÑEZ
706a6620636a66330000000000000000016a00
07/05/29 10:16:24

PODER JUDICIAL DE LA FEDERACIÓN

## EVIDENCIA CRIPTOGRÁFICA - TRANSACCIÓN

**Archivo Firmado:**
**4157002000000000062819801.p7m**
**Autoridad Certificadora:**
**AUTORIDAD CERTIFICADORA**
**Firmante(s): 1**
**Este documento digital es una copia fiel de su versión física o electrónica, la cual corresponde a su original.**

| FIRMANTE | | | | |
|---|---|---|---|---|
| **Nombre:** | FERNANDO DEL CASTILLO ELORZA | **Validez:** | BIEN | Vigente |

| FIRMA | | | | |
|---|---|---|---|---|
| **No Serie:** | 30.30.30.30.31.30.30.30.30.30.30.35.31.37.38.36.34.31.34.38 | **Revocación:** | Bien | No revocado |
| **Fecha (UTC/ CDMX)** | 09/09/26 04:36:19 - 08/09/26 22:36:19 | **Status:** | Bien | Valida |
| **Algoritmo:** | RSA-SHA256 | | | |
| **Cadena de firma:** | 64 d3 aa 5c 87 71 ca f3 54 75 97 94 56 5a 0c 26 7a fd ce 65 62 d6 a6 00 97 31 2e c3 4c 77 e2 fd 99 11 7f df 4e 00 05 6d ec 64 f6 e6 65 49 19 55 9d 31 0f c4 e9 1b e0 32 b9 81 0b 05 2e 2c f9 04 b6 c6 dc 9c 2e 95 b0 4a 06 20 7f 2d 1d 93 de d2 32 e8 dc 1b 73 70 42 28 5f fc 7d 77 6c 4d 74 47 0c 88 85 94 a8 3b ae 3a e0 67 c6 54 d3 49 42 ce 26 5a 43 a2 ef b3 7e e6 f7 f7 99 0a c8 92 73 8e 44 57 3a c5 07 d9 14 3a 15 06 63 01 4b 9f 9b 39 b9 c8 54 cd d8 95 5a d7 87 9c 60 5b a3 56 78 ab c3 05 df 23 e3 a2 b0 5a 25 41 a9 3f c2 d5 00 58 56 df f2 15 90 a2 86 03 77 d9 a0 73 d8 7a 04 cf 27 ec 81 b8 b4 f3 4b 44 a5 91 4c 91 93 4c d1 cf ba 1a 00 03 ff de d6 e4 90 09 51 67 a9 09 0a 0b 28 17 a7 05 6b 97 15 d5 bc 8e 45 e0 00 99 76 4a 2a 11 02 85 aa e1 c3 26 cd 9a 0e 8c 69 d7 d6 be | | | |

| OCSP | |
|---|---|
| **Fecha: (UTC/ CDMX)** | 09/09/26 04:36:22 - 08/09/26 22:36:22 |
| **Nombre del respondedor:** | Servicio OCSP SAT |
| **Emisor del respondedor:** | AUTORIDAD CERTIFICADORA |
| **Número de serie:** | 30.30.30.30.31.30.30.30.30.30.30.35.31.37.38.36.34.31.34.38 |

| TSP | |
|---|---|
| **Fecha : (UTC/ CDMX)** | 09/09/26 04:36:22 - 08/09/26 22:36:22 |
| **Nombre del emisor de la respuesta TSP:** | Autoridad Emisora de Sellos de Tiempo del Consejo de la Judicatura Federal |
| **Emisor del certificado TSP:** | Autoridad Certificadora Intermedia del Consejo de la Judicatura Federal |
| **Identificador de la respuesta TSP:** | 203698978 |
| **Datos estampillados:** | kZXMDhn1iJwSK9/a62lNWIyCh7c= |

YO, Dr. TIMOTHY JOHN HAVARD (CON DOMICILIO EN INSURGENTES SUR 1228, PISO 3, COL. TLACOQUEMÉCATL DEL VALLE 03100, CIUDAD DE MÉXICO, TEL. 55-5604-9357), PERITO TRADUCTOR CON FOLIO P.109-2019 DEBIDAMENTE AUTORIZADO ANTE EL CONSEJO DE LA JUDICATURA FEDERAL PARA EL AÑO DOS MIL VEINTISEIS PARA EL PRIMER CIRCUITO (CIUDAD DE MÉXICO) DE CONFORMIDAD CON EL ARTÍCULO 80, FRACCIÓN LII, DE LA LEY ORGÁNICA DEL PODER JUDICIAL DE LA FEDERACIÓN, [www.dof.gob.mx/2025/OAJ/listado_peritos_PJF_2026.pdf], PUBLICADO EN EL DIARIO OFICIAL DE LA FEDERACIÓN EL ONCE DE DICIEMBRE DEL AÑO DOS MIL VEINTICINCO, P. 183 DE 191, CERTIFICO QUE LA TRADUCCIÓN ANEXA ES, A MI LEAL SABER Y ENTENDER, UNA TRADUCCIÓN FIEL Y CORRECTA AL IDIOMA ESPAÑOL QUE CONSTA DE 12 PÁGINA(S) DE LOS DOCUMENTOS ORIGINALES EN IDIOMA INGLÉS.

CERTIFICADO EL DÍA Martes 8 DE SEPTIEMBRE DE 2026

Dr. TIMOTHY JOHN HAVARD

PERITO TRADUCTOR AUTORIZADO
POR EL CONSEJO DE LA JUDICATURA FEDERAL

**TRADUCCIÓN DEL INGLÉS**

HESUS VIAJOTEL 2GANNZLO ELORZA
205060306306360300000500070808030616408
04/03/29 10:08:23

## EN EL ASUNTO DE ALTER BANK LTD.
## Y EN EL ASUNTO DE LA INSOLVENCIA (CONCURSO MERCANTIL) DE TV AZTECA, S.A.B. DE C.V.
## Y EN EL ASUNTO DE LAS LEYES DE SANTA LUCÍA

## OPINIÓN COMPLEMENTARIA DE RENEE TAMARA ST. ROSE KC

### A. ALCANCE DEL PRESENTE COMPLEMENTPO

1. Me remito a mi opinión con fecha de 17 de agosto de 2026 relativa a Alter Bank Ltd. ("AlterBank") y al préstamo concedido a TV Azteca, S.A.B. de C.V. ("TV Azteca") (la "Opinión Principal"). La presente Opinión Complementaria debe leerse conjuntamente con la Opinión Principal y, salvo que se indique de otro modo, los términos definidos que se utilicen en este instrumento tienen el significado que se les atribuye en la Opinión Principal.

2. Desde la emisión de la Opinión Principal, se me han facilitado y he revisado el Contrato de Préstamo celebrado el 29 de enero de 2026 (el "Contrato de Enero"), junto con la Primera Modificación y Reformulación del Contrato de Préstamo, con fecha de 6 de Marzo de 2026, y el Contrato de Préstamo Modificado y Reformulado que se adjunta a manera de Anexo A al mismo (denominados en conjunto, la "Modificación de Marzo"). El Contrato de Enero, tal como fuera modificado y reformulado por la Modificación de Marzo, se denomina "Contrato de Préstamo" en esta Opinión Complementaria.

3. Se me ha solicitado, a la luz de dichos documentos, que aborde las siguientes cuestiones: (i) si el Préstamo se califica apropiadamente como un "préstamo puente" convencional o típico y (ii) la relevancia de los principios del Comité de Basilea y el cumplimiento por parte de AlterBank del marco regulatorio y prudencial aplicable para la evaluación del carácter comercial del Préstamo.

4. Por las razones que se exponen a continuación, mi análisis del Contrato de Enero y de la Modificación de Marzo refuerza sustancialmente la conclusión expresada en los apartados 73 a 75 de la Opinión Principal de que, considerado en su conjunto, el Préstamo no refleja la práctica comercial habitual de un banco internacional prudente de Clase A autorizado en Santa Lucía para una línea de crédito de su monto, plazo, perfil de riesgo y carácter.

### B. ¿EL CONTRATO DE PRÉSTAMO SE CALIFICA APROPIADAMENTE COMO UN "PRÉSTAMO PUENTE" CONVENCIONAL O TÍPICO?

#### (i) ¿El préstamo se califica apropiadamente como un préstamo puente típico?

5. Tengo entendido que el Préstamo se ha calificado como un "préstamo puente" típico. En la práctica de la banca comercial, el financiamiento puente se refiere habitualmente a un financiamiento a corto plazo destinado a satisfacer una necesidad de financiamiento provisional a la espera de una fuente de reembolso identificada o razonablemente determinable, tales como un refinanciamiento a un plazo más largo, una enajenación de activos, obtención de capital u otra operación de la que se espere que se liquide la línea de crédito puente. Por lo tanto, el vencimiento a corto plazo y amortización única al vencimiento (*bullet repayment*) son características comúnmente asociadas al financiamiento puente, pero no determinan por sí mismas el carácter comercial de una operación.



Dr. TIMOTHY JOHN HAVARD
PERITO TRADUCTOR AUTORIZADO
POR EL CONSEJO DE LA JUDICATURA FEDERAL

6. A primera vista, el Contrato de Préstamo presenta algunas de las características superficiales de un financiamiento puente. Se trata de una línea de crédito a corto plazo, con vencimiento el 29 de julio de 2026, aproximadamente seis meses después de la Fecha de Desembolso del 29 de enero de 2026, y está estructurada para que el capital pendiente se pague en una única amortización al vencimiento. Si se considera únicamente desde ese punto de vista general, y sin tener en cuenta las condiciones sustantivas realmente acordadas, el préstamo presenta cierto parecido con los financiamientos puente del tipo que se utilizan habitualmente cuando un prestatario necesita liquidez a corto plazo a la espera de un refinanciamiento a más largo plazo u otra fuente permanente de pago.

7. Sin embargo, el vencimiento a corto plazo y el carácter provisional de un préstamo puente no lo colocan, por sí solos, fuera del ámbito de la práctica bancaria habitual entre partes independientes, ni eximen sus términos de un examen minucioso. Aun así, se espera que una línea de crédito puente refleje términos que un prestamista prudente e independiente estaría dispuesto a aceptar, teniendo en cuenta el monto, el plazo y el perfil de riesgo de la línea de crédito, incluyendo la situación financiera y la capacidad de pago del prestatario, la fuente de pago identificada o financiamiento a largo plazo para liquidar un préstamo puente (*take-out*), la naturaleza y el momento de constitución de la garantía, la estructura de precios y comisiones, la evaluación crediticia y la diligencia debida del prestamista, así como la asignación del riesgo entre el prestamista y el prestatario.

8. Con base en la documentación de la que se dispone actualmente, no he identificado ninguna disposición del Contrato de Enero ni de la Modificación de Marzo que indique un refinanciamiento comprometido, una venta de activos, una obtención de capital ni ninguna otra fuente suficientemente determinable a partir de la cual se esperara que se pagara la exposición principal al vencimiento. Los documentos contractuales establecen la obligación de pago al vencimiento; sin embargo, no identifican por sí mismos la operación ni la fuente de fondos destinada a liquidar el Préstamo.

9. Esta consideración es relevante en las circunstancias de este prestatario. Tal y como se explica en la Opinión Principal, TV Azteca ya atravesaba graves dificultades financieras al momento de otorgar el Préstamo. Su solicitud de concurso describe el financiamiento como una inyección adicional y urgente obtenida para hacer frente a obligaciones fiscales y mitigar el riesgo de parálisis operativa, en un contexto de restricciones estructurales de liquidez, flujo de efectivo operativo insuficiente, acceso restringido a crédito y dificultad para refinanciar los pasivos en condiciones normales de mercado. En esas circunstancias, el mero hecho de que el Préstamo venciera en un plazo de seis (6) meses no lo convierte en un financiamiento puente convencional. Un medio de pago comercialmente creíble reviste especial importancia cuando el prestatario ya se encuentra en dificultades financieras.

10. Por lo tanto, no considero que la descripción del Préstamo como "préstamo puente" sea suficiente para calificar la operación como un financiamiento puente típico o habitual. Su vencimiento a corto plazo y su estructura de amortización única al vencimiento son características importantes de la operación, pero no son determinantes de su carácter comercial. Dicha evaluación requiere considerar esas características en el contexto de la ausencia de un refinanciamiento bancario a largo plazo contractual identificado para liquidar el préstamo a corto plazo (*take-out*), la situación financiera de TV Azteca y los demás términos y la asignación del riesgo reflejados en el Contrato de Enero y la Modificación de Marzo, los cuales abordo a continuación.



Dr. TIMOTHY JOHN HAVARD
PERITO TRADUCTOR AUTORIZADO
POR EL CONSEJO DE LA JUDICATURA FEDERAL

**(ii) ¿Los términos del Contrato de Enero y de la Modificación de Marzo, considerados en su conjunto, son coherentes con las condiciones habituales de préstamo entre partes independientes o condiciones de mercado?**

11. En mi opinión, no es posible determinar si el Préstamo se formalizó en condiciones habituales de préstamo entre partes independientes o condiciones de mercado aislando una única disposición del Contrato de Préstamo. Varias de las disposiciones que se identifican a continuación, incluyendo las indemnizaciones, los Casos de Incumplimiento, los derechos de vencimiento anticipado y el nombramiento de agentes, son características habituales de la documentación de los préstamos institucionales y, por sí solas, no harían que una operación quedara al margen de la práctica comercial habitual. La cuestión relevante es si, considerada en su conjunto y a la luz de las circunstancias en las que se concedió el préstamo, la estructura contractual refleja la evaluación crediticia, la asignación de riesgos, la protección mediante garantías y la disciplina comercial que un prestamista prudente e independiente exigiría normalmente para una línea de crédito de este monto, plazo y perfil de riesgo. En mi opinión, no es así por las siguientes razones:

*(a) Las múltiples funciones contractuales de AlterBank:*

12. El hecho de que un único banco actúe en calidad de entidad organizadora, prestamista, agente administrativo y banco titular de la garantía no es, en sí mismo, inusual ni incompatible con la práctica crediticia en condiciones de independencia. Lo que resulta relevante en este caso es la forma en que dichas funciones se desarrollan dentro de la estructura concreta de este Préstamo. AlterBank suscribió el Contrato de Enero en calidad de Entidad Organizadora, Prestamista Inicial, Agente Administrativo y Banco Titular de la Garantía, ocupando así cada una de las funciones principales del lado de los prestamistas conforme a la línea de crédito. La Modificación de Marzo mantuvo dicha estructura, al tiempo que definía como Prestamista Inicial aquel que actuaría en calidad de titular registrado, representante y canal de desembolso para los Prestamistas, salvo que se acordara expresamente de otro modo.

13. Cuando, como en este caso, un banco desempeña las cuatro (4) funciones y, al mismo tiempo, pretende, al menos en una (1) de esas capacidades, actuar en nombre de otros Prestamistas, la estructura contractual a través de la cual un prestatario y sus acreedores podrían normalmente identificar y exigir responsabilidades a la verdadera contraparte económica de la operación se vuelve menos transparente. La concentración de dichas funciones no es en sí misma ilegal ni necesariamente incompatible con la práctica del mercado. Su importancia en este caso radica en la ausencia, con base en la documentación de la cual dispongo, de una correspondencia clara entre las capacidades contractuales de AlterBank y los acuerdos subyacentes de financiamiento y asunción de riesgos. En dichas circunstancias, de la propia estructura contractual no se desprende quién proporcionó en última instancia los fondos, asumió la exposición económica respecto al Préstamo o constituyó la verdadera contraparte económica de TV Azteca. Esa opacidad se ve reforzada por los términos expresos de la propia Modificación de Marzo: la sección 5 (Capacidad; ausencia de inferencia de titularidad efectiva) establece que la designación de cualquier persona como Prestamista Inicial, Agente Administrativo, Entidad Organizadora o Banco Titular de la Garantía no crea ni demuestra, por sí misma, la titularidad efectiva del Préstamo ni la exposición económica al mismo, y que todas las concesiones de crédito son realizadas por los Prestamistas que figuren en cualquier momento en el Registro. Por lo tanto, AlterBank ha negado contractualmente ser identificado como la verdadera parte económica del Préstamo basándose únicamente en sus capacidades contractuales, mientras que la identidad de dichos Prestamistas no es, de acuerdo con los instrumentos celebrados que se me han presentado, determinable de forma independiente. Esa falta de transparencia aumenta sustancialmente la asimetría de la información entre AlterBank, que actúa en sus diversas capacidades contractuales, y TV Azteca y sus demás acreedores.





DR. TIMOTHY JOHN HAVARD
PERITO TRADUCTOR AUTORIZADO
POR EL CONSEJO DE LA JUDICATURA FEDERAL

*b) La situación financiera de TV Azteca en el momento de la Modificación de Marzo:*

14. La Modificación de Marzo se celebró en un contexto de una situación de dificultades financieras prolongada y documentada públicamente de TV Azteca. Tal y como se expone en la Opinión Principal, la insolvencia de TV Azteca era manifiestamente notoria mucho antes de que se concediera el Préstamo el 29 de enero de 2026. TV Azteca había suspendido el pago de sus Pagarés Sénior en febrero de 2021; se declaró el vencimiento anticipado para dichos Pagarés en agosto de 2022 y fueron objeto de procedimientos de cobro. En marzo de 2023 se presentaron demandas de quiebra conforme al Capítulo 11 contra TV Azteca y determinadas subsidiarias, y posteriormente Banco Azteca declaró el vencimiento anticipado de su línea de crédito e inició procedimientos de ejecución. El incumplimiento y sus consecuencias se revelaron en los estados financieros auditados publicados de TV Azteca y fueron objeto de procedimientos de ejecución activos durante varios años antes del Préstamo.

15. Esa notoria situación financiera adquiere especial relevancia cuando se considera a la luz de los Casos de Incumplimiento que el propio AlterBank estipuló en la Modificación de Marzo. La sección 6.01(h) identifica como “Caso de Incumplimiento” la incapacidad del Prestatario o de cualquier Subsidiaria, en general, para pagar sus deudas a su vencimiento. La sección 6.01(i) incluye por separado la sujeción involuntaria del Prestatario o de cualquier Subsidiaria a una demanda de insolvencia, concurso mercantil, quiebra, reorganización o procedimientos análogos, cuando dicha solicitud no se resuelva en un plazo de treinta (30) días. Por lo tanto, el Contrato identifica como “Casos de Incumplimiento” circunstancias que se corresponden estrechamente con aspectos del historial financiero de TV Azteca documentado públicamente y que, como mínimo, demuestran que el prestatario se encontraba en el límite respecto a los mismos riesgos de insolvencia para los que el propio Contrato establecía disposiciones expresas.

16. Una reestructuración acordada con un prestatario cuya insolvencia era notoria y que ya se encontraba en el límite para que se cumplieran las condiciones de insolvencia definidas en el Contrato como Casos de Incumplimiento no puede evaluarse comercialmente en los mismos términos que una línea de crédito concedida a un prestatario solvente y que cumple con sus obligaciones puntualmente. Dichas circunstancias normalmente aumentarían, en lugar de disminuir, la importancia que tiene para un prestamista prudente determinar la capacidad de pago, obtener información financiera fiable y actualizada, evaluar los créditos de los acreedores existentes y garantizar que el paquete de garantías propuesto ofreciera una protección efectiva para el riesgo del prestamista.

*(c) Garantías reales exigidas únicamente tras el desembolso íntegro, en condiciones establecidas de manera unilateral por el Banco Titular de la Garantía:*

17. La sección 5.05 del Contrato de Préstamo Original exigía al Prestatario que formalizara el Contrato de Pignoración de Acciones, el Contrato de Pignoración de Marcas, el Contrato de Crédito Hipotecario y el Contrato de Fideicomiso en un plazo de sesenta (60) días naturales a partir de la Fecha de Desembolso. La sección 4.10 del Contrato de Préstamo Modificado y Reformulado reproduce ese requisito, pero calcula expresamente el plazo de sesenta (60) días a partir de la celebración de la Modificación de Marzo, reajustando así el calendario de garantías de tal manera que no se exigía que los Documentos de Garantía estuvieran en vigor hasta el 5 de mayo de 2026 o en torno a esa fecha, es decir, aproximadamente tres (3) meses después del inicio de una línea de crédito de seis meses. La consecuencia práctica fue que AlterBank estaba dispuesto a adelantar un saldo de capital superior al equivalente a USD 200 millones y a mantener esa exposición sin garantía en el momento de la Modificación de Marzo, antes de que se hubiera creado y perfeccionado el paquete de garantías previsto.





Dr. TIMOTHY JOHN HAVAR

PERITO TRADUCTOR AUTORIZADO
POR EL CONSEJO DE LA JUDICATURA FEDER

18. Una línea de crédito de esta envergadura concedida sin garantía, incluso por un periodo de hasta sesenta (60) días, no es una práctica habitual en el mercado para un préstamo garantizado de tal magnitud. La expectativa del mercado respecto a una línea de crédito supuestamente garantizada por un derecho de primera prelación sobre acciones, marcas y cuentas por cobrar, así como por una hipoteca de segundo grado, es que dicha garantía se perfeccione antes del desembolso o, a más tardar, de forma simultánea a este, y no que quede sujeta a un periodo de gracia de sesenta días una vez que los fondos ya hayan dejado de estar bajo el control del prestamista. Esto reviste especial importancia dada la notoria insolvencia de TV Azteca, los incumplimientos importantes revelados públicamente y los procedimientos de ejecución en curso. Además, tal y como se explica en mi Opinión Principal, la garantía que se constituyó en última instancia consistía en hipotecas de segundo rango sobre concesiones de telecomunicaciones en poder de subsidiarias, y no de la propia TV Azteca, mientras que la garantía de primer rango sobre dichas concesiones ya era objeto de un procedimiento de ejecución.

19. A ello se suma que la Sección 5.05 del Contrato de Préstamo Original establece que cada elemento de la garantía real debe ser "aceptable para el Banco Titular de la Garantía", un criterio establecido de forma unilateral y sin ningún punto de referencia objetivo por AlterBank, el cual también actúa en calidad de Entidad Organizadora, Prestamista Inicial y Agente Administrativo. Un criterio de suficiencia de la garantía real establecido exclusivamente a discreción de una parte con interés propio, sin ningún mecanismo de valoración independiente, sin ningún mínimo de razón de cobertura de la garantía real (*collateral coverage ratio*) aplicable al Contrato de Pignoración de Acciones, al Contrato de Pignoración de Marcas ni al Contrato de Crédito Hipotecario (a diferencia de la Relación Deuda-Garantía (*Collateral Ratio*) de 1.3:1 aplicable únicamente al Contrato de Fideicomiso) y sin recurso alguno para el Prestatario en caso de que el Banco Titular de la Garantía ejerza su discrecionalidad de forma irrazonable, no constituye la distribución habitual en el mercado del riesgo de la garantía real en una línea de crédito garantizada entre partes independientes.

20. En mi opinión, un prestamista prudente e independiente que conceda una línea de crédito de esta magnitud a un prestatario en esas circunstancias exigiría normalmente que la garantía material de la que dependiera su decisión crediticia se constituyera, se estableciera su prelación y exigibilidad y se determinara su valor antes del desembolso o simultáneamente a este, salvo que existiera una razón documentada y comercialmente convincente para asumir la exposición no garantizada en el periodo intermedio.

*(d) Utilización de los fondos del Préstamo para cumplir con obligaciones fiscales existentes sin una fuente de pago identificada:*

21. La sección 2.02 del Contrato de Préstamo Original establece que el Préstamo "será utilizado por el Prestatario exclusivamente para el pago y el cumplimiento de sus obligaciones fiscales ante las autoridades fiscales mexicanas", al tiempo que permite su uso "para fines empresariales generales". La sección 4.09 establece que todos los fondos del Préstamo se utilizarán según lo dispuesto en la Sección 2.02. El Contrato de Préstamo Modificado y Reformulado va más allá, ya que en la Sección 2.01 el Prestatario declara que el Préstamo se utilizó para el pago y el cumplimiento de sus obligaciones fiscales ante las autoridades fiscales mexicanas y para fines corporativos generales, mientras que la Sección 3.09 establece que todos los fondos se utilizarán según lo dispuesto en la Sección 2.01. El uso de los fondos del préstamo para cumplir con obligaciones fiscales u otros pasivos existentes no es, en sí mismo, comercialmente indebido ni necesariamente está al margen de las condiciones de mercado. Su relevancia radica en que en la documentación disponible no se establece ninguna operación identificada ni ningún hecho generador de efectivo capaz de explicar cómo se esperaba que TV Azteca pagara el capital y los intereses devengados en un plazo aproximado de seis (6) meses, a pesar de sus dificultades financieras existentes. En la medida en que los fondos se utilizaron para saldar obligaciones fiscales existentes en





Dr. TIMOTHY JOHN HAVARD
PERITO TRADUCTOR AUTORIZADO
POR EL CONSEJO DE LA JUDICATURA FEDERAL

lugar de destinarse a un fin empresarial para generar efectivo, una línea de crédito superior a USD 200 millones no cumple con la lógica convencional de liquidación automática que suele asociarse al financiamiento puente.

*(e) Ausencia de requisitos de diligencia debida y una declaración de "ausencia de conflictos" que omite a otros acreedores:*

22. El Contrato de Préstamo no impone ninguna condición suspensiva expresa que exija a AlterBank haber llevado a cabo o documentado una diligencia debida crediticia, financiera o sobre garantías respecto a TV Azteca antes del desembolso. El equivalente más cercano, las declaraciones y garantías de la Sección 4 del Contrato de Préstamo Original y de la Cláusula III del Contrato de Préstamo Modificado y Reformulado, son certificaciones del propio Prestatario, en lugar de una verificación independiente por parte del prestamista. Dentro de dichas declaraciones, la Sección 4.02 del Contrato de Préstamo Original (Sección 3.02 del Contrato de Préstamo Modificado y Reformulado), titulada "Validez, autorización y ausencia de conflictos", analiza si la operación infringe los documentos constitutivos del Prestatario, la ley aplicable o cualquier resolución judicial o norma gubernamental, y si constituye un Gravamen sobre los bienes del Prestatario, pero no menciona si la operación entra en conflicto con otros acreedores existentes del Prestatario o con sus acuerdos de financiamiento, ni si supone un incumplimiento de los mismos ni si requiere el consentimiento de estos. Una cláusula de "Ausencia de conflictos" que omite cualquier referencia a los demás acreedores garantizados y no garantizados de un prestatario en dificultades, en un momento en el que, según el análisis de la Opinión Principal, el incumplimiento generalizado del Prestatario y las acciones de ejecución anteriores de los acreedores eran de dominio público, es de gran relevancia para la evaluación de los términos en los que se concedió el Préstamo.

23. Aunque los Contratos contienen declaraciones relativas a conflictos con la ley aplicable y las obligaciones contractuales, dichas declaraciones no sustituyen a la propia diligencia debida crediticia y jurídica del prestamista. Para una línea de crédito de esta magnitud concedida a un prestatario que ya era objeto de importantes medidas de ejecución por parte de sus acreedores, la práctica crediticia prudente habitual exigiría tener en cuenta los instrumentos de deuda existentes, las restricciones al endeudamiento adicional y a los gravámenes, los incumplimientos existentes, la prelación de los acreedores y las consecuencias de la nueva línea de crédito para los acreedores existentes. Las dificultades financieras y los procedimientos de ejecución eran elementos sustanciales para cualquier evaluación razonable de la capacidad de TV Azteca para contraer y pagar endeudamiento adicional.

24. La Opinión Principal señala que no se había presentado ninguna evaluación crediticia, análisis financiero, valoración de la garantía hipotecaria, aprobación crediticia interna ni acta del Consejo de Administración o del Comité de Crédito actuales en relación con el Préstamo. La presentación de los documentos del Préstamo no subsana por sí misma esa falta de pruebas.

HERSON VARGAS DIEZ CASTILLO ELORZA
2016630631649630000000000000700803016408
04/03/29 10:09:24



Dr. TIMOTHY JOHN HAVAR
PERITO TRADUCTOR AUTORIZADO
POR EL CONSEJO DE LA JUDICATURA FEDERA

*(f) Aspectos económicos de la Modificación de Marzo: aplazamiento del pago de intereses hasta el vencimiento a cambio de una comisión del 2%, además de la comisión por estructuración original del 1%:*

25. Conforme al Contrato de Préstamo Original, se devengaban intereses a una tasa fija del 17.50% anual y eran pagaderos en cada Fecha de Pago de Intereses. Tal y como consta en la Sección 4 de la Modificación de Marzo, al 6 de marzo de 2026 el Prestatario había dispuesto de MXN 4,085,000,000 (equivalentes a aproximadamente USD 237 millones a los tipos de cambio coherentes con aquellos adoptados en la Opinión Principal) de la línea de crédito, y se habían devengado intereses ordinarios por un monto de MXN 71,487,500 (equivalentes a aproximadamente USD 4 millones) y que seguían sin pagarse en esa fecha. La Sección 4 de la Modificación de Marzo modificó la Fecha de Pago de Intereses para que coincidiera con la Fecha de Vencimiento y capitalizó dichos intereses devengados sumándolos al capital, incrementando así el saldo pendiente del capital a MXN 4,156,487,500 (equivalentes a aproximadamente USD 241 millones).

26. La Sección 6 de la Modificación de Marzo exigía además a TV Azteca que pagara a la Entidad Organizadora una Comisión por Reestructuración equivalente al 2% del monto realmente dispuesto, pagadera en un plazo de quince (15) días naturales. Dicha comisión era adicional a la Comisión por Estructuración del 1% pagadera a la Entidad Organizadora conforme a la Sección 3.01 del Contrato de Préstamo Original. En esencia, por lo tanto, aproximadamente cinco (5) semanas después del anticipo original, las partes capitalizaron los intereses devengados, aplazaron el pago de los intereses hasta el vencimiento e impusieron una comisión por reestructuración adicional, sin que la documentación disponible en ese momento identifique ninguna mejora correspondiente en la capacidad de pago de TV Azteca.

27. Dadas las circunstancias de las dificultades financieras de TV Azteca, cabría esperar que un prestamista independiente, antes de reestructurar la línea de crédito, reevaluara la situación financiera del prestatario, la suficiencia continua de las garantías, los incumplimientos existentes, las perspectivas de pago y la justificación económica de la reestructuración. La Modificación de Marzo no revela por sí misma ningún análisis crediticio que respalde la decisión de AlterBank de aumentar el capital pendiente mediante la capitalización de los intereses devengados y el aplazamiento de la obligación de pago de intereses.

28. La Modificación de Marzo también debe considerarse a la luz de la situación financiera de TV Azteca en el momento en que se formalizó. Tal y como se expone en la Opinión Principal, la insolvencia de TV Azteca era manifiestamente notoria mucho antes de que se concediera el Préstamo, y sus incumplimientos, así como los procedimientos de ejecución iniciados por los acreedores como consecuencia de los mismos, constaban públicamente desde hacía varios años. Esas circunstancias aumentaron significativamente el riesgo de crédito asociado a cualquier decisión de aplazar el pago, capitalizar los intereses devengados y mantener la exposición.

29. En mi opinión, un prestamista independiente que reestructurara una exposición de esta magnitud frente a un prestatario en esas circunstancias exigiría normalmente un análisis que demostrara en ese momento que la reestructuración estaba comercialmente justificada y ofrecía una perspectiva razonable de pago o una expectativa de cobro mejor que las alternativas disponibles para el prestamista. Según la documentación de la que dispongo, no se ha presentado ningún análisis de reestructuración ni de crédito de ese momento que demuestre los fundamentos comerciales sobre los que AlterBank se basó para optar por capitalizar los intereses devengados, aplazar su pago hasta el vencimiento y mantener su exposición frente a TV Azteca.





Dr. TIMOTHY JOHN HAVARD
PERITO TRADUCTOR AUTORIZADO
POR EL CONSEJO DE LA JUDICATURA FEDERAL

*(g) Los casos de incumplimiento y los recursos favorecían en gran medida al prestamista:*

30. La sección 6.01 del Contrato de Préstamo Modificado y Reformulado establece una amplia lista de Casos de Incumplimiento, entre los que se incluye, en la Sección 6.01(i), una enumeración inusualmente detallada de eventos relacionados con insolvencia, incluyendo tanto procedimientos de demanda de quiebra como de suspensión de pagos o concurso mercantil; el nombramiento de un administrador o funcionario similar; la cesión en beneficio de los acreedores; resoluciones que aprueban una reorganización; órdenes judiciales que confirman insolvencia; la asunción de la gestión financiera del Prestatario por parte de un acreedor; y la convocatoria de juntas de acreedores generales para reestructurar las deudas. La Sección 6.02 permite, por separado, que el Agente Administrativo, conforme a las instrucciones de los Prestamistas, tras un Caso de Incumplimiento distinto de los descritos en las Secciones 6.01(h) o (i), rescinda el Contrato y declare el Préstamo inmediatamente vencido y exigible sin necesidad de presentación, requerimiento, protesto ni ningún otro tipo de notificación, y se considera que el Prestatario renuncia a ello.

31. Las disposiciones extensivas de este tipo relativas al incumplimiento y a la anticipación del vencimiento no son, por sí mismas, inusuales en los préstamos institucionales. Sin embargo, lo que resulta relevante es que fueron acordadas y posteriormente modificadas y reformuladas en el contexto de una situación de dificultades financieras prolongada y documentada públicamente de TV Azteca, así como de los procedimientos de ejecución iniciados por los acreedores, circunstancias que se corresponden estrechamente con los riesgos de insolvencia abordados expresamente en las Secciones 6.01(h) e (i). En tales circunstancias, cabría esperar que un prestamista independiente evaluara la situación financiera actual del Prestatario y sus incumplimientos, las consecuencias para el pago y la ejecución, la suficiencia y prelación de las garantías disponibles, y si mantener la exposición ofrecía una perspectiva de cobro comercialmente razonable.

32. En mi opinión, dichas circunstancias aumentaron de manera significativa la necesidad de realizar un análisis crediticio y de reestructuración en ese momento antes de que AlterBank mantuviera su exposición en virtud de la Modificación de Marzo. Según la documentación de la que dispongo, no se ha presentado ningún análisis realizado en ese momento que demuestre la evaluación de AlterBank sobre dichas cuestiones ni los fundamentos comerciales sobre los que se basó para decidir mantener la exposición a pesar de la situación financiera de TV Azteca.

*(h) Amplia obligación de indemnizar a favor de AlterBank:*

33. La Sección 8.05 del Contrato de Préstamo Original exigía al Prestatario indemnizar al Agente Administrativo y a sus funcionarios, consejeros, empleados, agentes y asesores por las reclamaciones, daños y perjuicios, pérdidas, responsabilidades y gastos, incluyendo los costos legales, derivados del incumplimiento del Contrato por parte del Prestatario. La Sección 8.03(b) del Contrato de Préstamo Modificado y Reformulado amplía sustancialmente dicha obligación. Obliga al Prestatario a indemnizar al Agente Administrativo, a sus accionistas, funcionarios, consejeros, agentes y apoderados, a los Prestamistas y a sus Partes Relacionadas por las pérdidas, reclamaciones, daños y perjuicios, responsabilidades y gastos relacionados derivados de la formalización o el cumplimiento de los Documentos del Préstamo, el Préstamo o el uso de sus fondos, o se vinculen con ello, así como por reclamaciones, litigios, investigaciones o procedimientos, reales o posibles, relacionados con lo anterior, incluyendo las reclamaciones presentadas por el propio Prestatario. La indemnización está sujeta, principalmente, a una resolución judicial firme e inapelable que declare negligencia grave o conducta dolosa o, en el caso de una reclamación interpuesta por el Prestatario, el incumplimiento de mala fe de las obligaciones del Perjudicado conforme a los Documentos del Préstamo.

Dr. TIMOTHY JOHN HAVARD

PERITO TRADUCTOR AUTORIZADO
POR EL CONSEJO DE LA JUDICATURA FEDERAL

34. La Sección 8.03(c) establece además que el Prestatario renuncia a cualquier reclamación contra un Perjudicado por daños y perjuicios especiales, indirectos o punitivos. Dichas protecciones se aplican junto con la Sección 7.03, conforme a la cual la Entidad Organizadora, el Agente Administrativo y el Banco Titular de la Garantía no asumen ningún deber, responsabilidad ni obligación, salvo en los casos expresamente previstos en los Documentos del Préstamo, y el Banco Titular de la Garantía queda sustancialmente protegido frente a la responsabilidad por el incumplimiento o el retraso en la ejecución de la garantía real, salvo en caso de negligencia grave o conducta dolosa. Las Secciones 6.02 y 6.04 establecen además que el Agente Administrativo y el Banco Titular de la Garantía no están obligados a iniciar ni a llevar a cabo procedimientos de ejecución a título propio, a menos que reciban una indemnización satisfactoria y, si así se les solicita, financiamiento de los prestamistas.

35. Aunque estas disposiciones sobre indemnización y limitación de responsabilidad no establecen, por sí solas, que el Préstamo se realizara al margen de las condiciones de mercado, su alcance es relevante para la evaluación global de la operación. La indemnización, el reembolso de gastos y las limitaciones de la responsabilidad de los agentes son características habituales de los acuerdos de financiamiento sofisticados. En este caso, forman parte de la distribución global del riesgo en el marco de una línea de crédito en la que AlterBank desempeñaba las funciones de Entidad Organizadora, Prestamista Inicial, Agente Administrativo y Banco Titular de la Garantía, al tiempo que asumía una exposición sustancial antes de que se hubiera constituido la garantía prevista, concedía un préstamo a un prestatario con una situación de dificultades financieras prolongada y documentada públicamente y, posteriormente, capitalizaba los intereses devengados y aplazaba su pago.

36. En mi opinión, cuando se considera de forma acumulativa con las demás características del Préstamo identificadas anteriormente, el alcance de las protecciones de indemnización y limitación de responsabilidad otorgadas a AlterBank contribuye a una asignación general del riesgo contractual y económico que resulta inusualmente favorable para AlterBank, teniendo en cuenta el correspondiente riesgo de crédito que asumió. Lo anterior respalda aún más mi conclusión de que los términos del Préstamo, considerados en su conjunto, no se ajustaban a las condiciones normales de mercado entre partes independientes.

*(i) Conclusión sobre la calificación:*

37. Teniendo en cuenta estas características en conjunto, en mi opinión, el Contrato de Préstamo, tal y como fuera modificado y reformulado por la Modificación de Marzo, no puede calificarse apropiadamente como un préstamo puente típico o habitual formalizado en condiciones de mercado, a pesar de su vencimiento a corto plazo y de su estructura de amortización única al vencimiento. La (i) combinación de las cuatro funciones que se concentraron en AlterBank; (ii) el hecho de que el préstamo se concediera y se modificara posteriormente en un contexto de una situación de dificultades financieras prolongada y documentada públicamente de TV Azteca, así como de procedimientos de ejecución por parte de los acreedores; (iii) el aplazamiento de la ejecución y el perfeccionamiento de las garantías reales hasta después del desembolso completo, en condiciones aceptables para AlterBank en su calidad de Banco Titular de la Garantía; (iv) el uso de los fondos sin una fuente de pago identificada; (v) la ausencia de cualquier condición de diligencia debida independiente y el carácter restrictivo de la declaración de "Ausencia de conflictos"; (vi) la imposición de una comisión por reestructuración adicional del 2% en relación con una modificación que capitalizó los intereses devengados y aplazó su pago hasta el vencimiento; (vii) el amplio régimen de incumplimiento y recursos; y (viii) el alcance de las protecciones de indemnización y limitación de responsabilidad otorgadas a AlterBank son, en su conjunto, incompatibles con los términos que un prestamista prudente e independiente y un prestatario





Dr. TIMOTHY JOHN HAVAR
PERITO TRADUCTOR AUTORIZADO
POR EL CONSEJO DE LA JUDICATURA FEDER

prudente e independiente acordarían normalmente para una línea de crédito de este monto y carácter.

### C. LOS PRINCIPIOS DE BASILEA NO SON VINCULANTES Y SON ANALÍTICAMENTE DISTINTOS DE LA CUESTIÓN DE SI EL PRÉSTAMO SE CONCEDIÓ EN CONDICIONES DE MERCADO

*¿Cuál es el rango jurídico de los principios del Comité de Basilea a efectos de la ley de Santa Lucía y cuál es la relación entre el incumplimiento normativo de AlterBank y la cuestión independiente de si el Préstamo y la Modificación de Marzo se formalizaron al margen de las condiciones de mercado?*

38. Las normas prudenciales a las que se hace referencia en la Opinión Principal, incluyendo las normas de suficiencia de capital y de exposición frente a un único prestatario establecidas en las Notas Orientativas de la FSRA y en la autorización previa a la apertura de AlterBank, se basan en los principios asociados al Comité de Supervisión Bancaria de Basilea ("BCBS", por sus siglas en inglés), un organismo internacional de normalización que opera bajo los auspicios del Banco de Pagos Internacionales. Los Principios Básicos para una Supervisión Bancaria Eficaz del BCBS proporcionan puntos de referencia internacionales para la regulación y la supervisión bancarias. No constituyen legislación ni crean obligaciones directamente exigibles conforme a la ley de Santa Lucía.

39. Santa Lucía no es miembro del BCBS. Los principios prudenciales derivados de Basilea a los que se hace referencia en la Opinión Principal tienen relevancia jurídica y normativa en Santa Lucía en la medida en que se reflejan en el marco legal y regulatorio nacional aplicable a AlterBank. La sección 15 de la Ley de la FSRA faculta a la FSRA a emitir directrices destinadas a las entidades reguladas en relación con las normas prudenciales relativas, entre otras cuestiones, a la seguridad y solidez de los fondos, la calidad de los activos, la liquidez, las operaciones entre partes relacionadas y el gobierno corporativo. En consecuencia, las Notas Orientativas de la FSRA establecen los requisitos prudenciales aplicables a AlterBank, incluyendo los requisitos sobre la exposición frente a un único prestatario establecidos en la Nota Orientativa 11. AlterBank estaba sujeto, además, a las condiciones contenidas en la autorización previa a la apertura de la FSRA, de 23 de febrero de 2024, incluyendo el requisito de mantener un Coeficiente entre el Capital Total Admisible y los Activos Ponderados por Riesgo por encima del 8% y de notificar con antelación cualquier desviación significativa respecto a su plan de negocio aprobado. Por lo tanto, las obligaciones pertinentes se derivan del marco regulador nacional de Santa Lucía y de las condiciones aplicables a AlterBank, y no de los principios de Basilea que operan de forma independiente como fuente del derecho de Santa Lucía.

40. El incumplimiento normativo de AlterBank y la cuestión de si el Préstamo y la Modificación de Marzo se celebraron en condiciones de mercado son cuestiones distintas. El incumplimiento de un límite de exposición aplicable u otro requisito prudencial conlleva principalmente las consecuencias supervisoras y normativas previstas por la ley de Santa Lucía y no hace, por el mero hecho del incumplimiento, que el Préstamo subyacente o la garantía sean inválidos o inejecutables. Por el contrario, determinar si el Préstamo se formalizó en condiciones de mercado requiere examinar las condiciones sustantivas y las características comerciales de la operación y compararlas con las que normalmente acordarían un prestamista y un prestatario en condiciones de independencia y en una situación similar.



Dr. TIMOTHY JOHN HAVARD
PERITO TRADUCTOR AUTORIZADO
POR EL CONSEJO DE LA JUDICATURA FEDERAL

41. No obstante, el marco regulador es relevante para la evaluación comercial. El marco prudencial de Santa Lucía exige a los prestamistas regulados que aborden cuestiones como la suficiencia del capital, el riesgo de concentración, la evaluación crediticia, la liquidez, la valoración de las garantías y la gestión de riesgos. En particular, la Opinión Principal concluyó que AlterBank estaba obligado, antes de aprobar y desembolsar el Préstamo, a realizar una evaluación crediticia adecuada de TV Azteca, incluyendo su situación financiera, flujos de efectivo, capacidad de pago y endeudamiento existente, así como a evaluar la suficiencia y el valor de la garantía. Por lo tanto, un incumplimiento sustancial de dichas normas puede constituir una prueba importante a la hora de evaluar si la operación cumplía con la práctica habitual de concesión de préstamos comerciales.

42. En el presente caso, mi conclusión se deriva de forma independiente de las características comerciales de la operación identificadas anteriormente, incluyendo su magnitud en relación con el perfil financiero divulgado por AlterBank, la situación financiera de TV Azteca, la ausencia de una fuente de pago identificada para una línea de crédito a corto plazo con amortización al vencimiento, el anticipo de fondos antes de que se constituyera la garantía prevista, la naturaleza y prioridad de la garantía obtenida en última instancia, la posterior capitalización y aplazamiento de los intereses devengados y la ausencia, en la documentación presentada, de análisis crediticios y de garantías elaborados en ese momento que expliquen los fundamentos comerciales sobre los que un prestamista independiente y prudente habría aceptado el riesgo de crédito correspondiente.

## D. RELACIÓN CON LA OPINIÓN PRINCIPAL

43. Las conclusiones de esta Opinión Complementaria son adicionales a las que se llegaron en la Opinión Principal y son coherentes con ellas. La Opinión Principal abordó la situación regulatoria de AlterBank conforme a la Ley de Bancos Internacionales, la Ley de la FSRA y las Notas Orientativas asociadas, así como la situación del Préstamo conforme al Derecho civil y concursal de Santa Lucía, mediante referencia a la documentación de la que disponía en ese momento, la cual no incluía el Contrato de Préstamo ni la Modificación de Marzo celebrados. Tras haber revisado ahora dichos instrumentos celebrados, confirmo que nada de lo que figura en ellos altera las conclusiones a las que se llegó en la Opinión Principal. Por el contrario, los términos realmente establecidos en el Contrato de Préstamo y en la Modificación de Marzo celebrados, los cuales se resumen en la Sección C anterior, refuerzan mi conclusión de que el Préstamo no refleja la práctica bancaria comercial habitual entre partes independientes para un banco internacional de clase A autorizado en Santa Lucía.





Dr. TIMOTHY JOHN HAVARD
PERITO TRADUCTOR AUTORIZADO
POR EL CONSEJO DE LA JUDICATURA FEDERA

44. No considero determinante la calificación del Préstamo como "préstamo puente". Si bien la línea de crédito presentaba ciertas características formales asociadas con el financiamiento puente, en particular, su vencimiento a corto plazo y su amortización única al vencimiento, dichas características no explican la ausencia de una fuente de pago claramente identificada y comercialmente creíble, ni las demás características crediticias excepcionales señaladas anteriormente.

45. Los documentos contractuales refuerzan sustancialmente mi conclusión anterior, en lugar de refutarla. Establecen que se desembolsaron fondos sustanciales antes de que se perfeccionara la garantía prevista; que AlterBank desempeñó múltiples funciones en el marco de una estructura que contemplaba que los prestamistas efectivos subyacentes (*underlying economic lenders*) podían ser personas distintas de AlterBank; y que, aproximadamente cinco (5) semanas después del desembolso, las partes capitalizaron los intereses devengados, aplazaron el pago de los intereses hasta el vencimiento e impusieron una comisión por reestructuración adicional del 2%.

46. Todos los aspectos antedichos deben evaluarse junto con las dificultades financieras de TV Azteca y las medidas de ejecución de sus acreedores, que se han hecho públicas; el carácter subordinado y la constitución tardía de la garantía; la magnitud de la exposición en relación con la situación financiera revelada por AlterBank y su plan de negocio aprobado; y la ausencia, en la documentación presentada, de registros de crédito, valoración y aprobación de ese momento que expliquen la justificación comercial de la operación. En mi opinión, consideradas de forma conjunta, estas características son incompatibles con los términos y la asignación de riesgos sobre los que un prestamista independiente y prudente concedería normalmente un crédito comparable entre partes independientes. Por lo tanto, el Préstamo y su posterior reestructuración no se ajustaban a las condiciones habituales de mercado para una operación de esta naturaleza.

47. Me reservo el derecho a complementar o modificar esta opinión en caso de que se disponga de información adicional.

A 8 de septiembre de 2026

______________________________

Renee Tamara St. Rose KC





Dr. TIMOTHY JOHN HAVARD
PERITO TRADUCTOR AUTORIZADO
POR EL CONSEJO DE LA JUDICATURA FEDERAL

JESUS VAZQUEZ NUÑEZ
706a6620636a663300000000000000016a00
07/05/29 10:16:24

PODER JUDICIAL DE LA FEDERACIÓN

## EVIDENCIA CRIPTOGRÁFICA - TRANSACCIÓN

**Archivo Firmado:**
**4157002000000000062819802.p7m**
**Autoridad Certificadora:**
**AUTORIDAD CERTIFICADORA**
**Firmante(s): 1**
**Este documento digital es una copia fiel de su versión física o electrónica, la cual corresponde a su original.**

| FIRMANTE | | | | |
|---|---|---|---|---|
| **Nombre:** | FERNANDO DEL CASTILLO ELORZA | **Validez:** | BIEN | Vigente |

| FIRMA | | | | |
|---|---|---|---|---|
| **No Serie:** | 30.30.30.30.31.30.30.30.30.30.30.35.31.37.38.36.34.31.34.38 | **Revocación:** | Bien | No revocado |
| **Fecha (UTC/ CDMX)** | 09/09/26 04:36:23 - 08/09/26 22:36:23 | **Status:** | Bien | Valida |
| **Algoritmo:** | RSA-SHA256 | | | |
| **Cadena de firma:** | 4d ba 91 13 d7 5f 21 7b 1e 76 f1 f5 02 d4 f9 f2 d1 10 7b aa cc d8 98 59 e7 68 9a b0 de 6f 01 a6 eb 76 89 88 16 bd 46 0c 0d ba ea 4f 66 84 3d d2 ce 6e 2f b6 d2 63 2d ca d1 65 54 1d 1a e8 ec 12 db 49 57 03 6e 06 a9 43 fd 42 33 6c 8c 5e 9a a4 51 bc b2 33 4d d2 a3 f9 e7 a0 29 c6 be 8b b5 06 b0 4b 37 9c 9a 93 01 2c d6 7a 5b c7 36 b1 1c a0 3a 9e de 2c 17 c7 4a 6a dc cf 19 67 00 19 5b c9 4c 9c cf 9a 1b d2 cc 44 44 a7 53 70 13 f3 82 91 d6 33 31 5f aa ff ac 25 ea 15 ed ff 5e f9 1a 78 bd 05 00 78 d6 e1 ce 28 5d 01 75 4a 77 0c b8 d5 8c 01 40 fc 15 0f 2a f5 b1 09 c3 f7 87 83 9d 65 f4 c3 c3 76 ff f6 26 28 5b 27 b5 ec 8b 8c 36 07 38 66 a8 de a7 21 d4 51 ad 19 59 f7 47 30 cf c4 e4 86 a5 b7 b1 d5 cb c3 34 da 1c 8f 19 54 a5 c8 94 35 93 72 2a 0e 34 07 98 c1 81 0a 0a 75 21 15 | | | |

| OCSP | |
|---|---|
| **Fecha: (UTC/ CDMX)** | 09/09/26 04:36:24 - 08/09/26 22:36:24 |
| **Nombre del respondedor:** | Servicio OCSP SAT |
| **Emisor del respondedor:** | AUTORIDAD CERTIFICADORA |
| **Número de serie:** | 30.30.30.30.31.30.30.30.30.30.30.35.31.37.38.36.34.31.34.38 |

| TSP | |
|---|---|
| **Fecha : (UTC/ CDMX)** | 09/09/26 04:36:24 - 08/09/26 22:36:24 |
| **Nombre del emisor de la respuesta TSP:** | Autoridad Emisora de Sellos de Tiempo del Consejo de la Judicatura Federal |
| **Emisor del certificado TSP:** | Autoridad Certificadora Intermedia del Consejo de la Judicatura Federal |
| **Identificador de la respuesta TSP:** | 203698985 |
| **Datos estampillados:** | W6+PP5Pv7w83tSBkb6tUfy2wMUo= |

**IN THE MATTER OF ALTER BANK LTD.**
**AND IN THE MATTER OF THE INSOLVENCY (CONCURSO MERCANTIL) OF TV AZTECA, S.A.B. DE C.V.**
**AND IN THE MATTER OF THE LAWS OF SAINT LUCIA**

**SUPPLEMENTAL OPINION OF RENEE TAMARA ST. ROSE KC**

## A. SCOPE OF THIS SUPPLEMENT

1. I refer to my Opinion dated 17 August 2026 concerning Alter Bank Ltd. ("AlterBank") and the loan extended to TV Azteca, S.A.B. de C.V. ("TV Azteca") (the "Principal Opinion"). This Supplemental Opinion should be read together with the Principal Opinion and, unless otherwise stated, defined terms used herein bear the meanings given to them in the Principal Opinion.

2. Since issuing the Principal Opinion, I have been provided with and reviewed the executed Loan Agreement dated 29 January 2026 (the "January Agreement"), together with the First Amendment and Restatement to the Loan Agreement dated 6 March 2026 and the Amended and Restated Loan Agreement attached as Exhibit A thereto (collectively, the "March Amendment"). The January Agreement, as amended and restated by the March Amendment, is referred to in this Supplemental Opinion as the "Loan Agreement".

3. I have been asked, in light of those documents, to address the following issues: (i) whether the Loan is properly characterised as a conventional or typical "bridge loan" and (ii) the relevance of the Basel Committee principles and AlterBank's compliance with the applicable regulatory and prudential framework to the assessment of the commercial character of the Loan.

4. For the reasons set out below, my review of the January Agreement and the March Amendment materially reinforces the conclusion expressed at paragraphs 73–75 of the Principal Opinion that, considered as a whole, the Loan does not reflect the ordinary commercial practice of a prudent Class A international bank licensed in Saint Lucia for a facility of its size, tenor, risk profile and character.

## B. WHETHER THE LOAN AGREEMENT IS PROPERLY CHARACTERISED AS A CONVENTIONAL OR TYPICAL "BRIDGE LOAN"?

### (i) Is the Loan properly characterised as a typical bridge loan?

5. I understand that the Loan has been characterised as a typical "bridge loan". In commercial banking practice, bridge financing ordinarily refers to short-term funding intended to meet an interim financing requirement pending an identified or reasonably ascertainable source of repayment, such as longer-term refinancing, an asset disposal, a capital raising or another transaction from which the bridge facility is expected to be taken

[illegible] ELORZA
[illegible]
[illegible] 10:08:24

out. Short tenor and bullet repayment are therefore features commonly associated with bridge financing but they do not themselves determine the commercial character of a transaction.

6. On its face, the Loan Agreement carries certain of the surface features of a bridge financing. It is a short-term facility, maturing on 29 July 2026, approximately six months after the Disbursement Date of 29 January 2026 and is structured for repayment of the outstanding principal in a single bullet payment at maturity. Considered only at that level of generality, and without regard to the substantive terms actually agreed, the Loan bears some resemblance to bridge financings of the kind commonly used where a borrower requires short-term liquidity pending a longer-term refinancing or other permanent source of repayment.

7. However, a bridge loan's short tenor and interim character do not, without more, place it outside the scope of ordinary arm's-length banking practice and they do not immunise its terms from scrutiny. A bridge facility is still expected to reflect terms which a prudent arm's-length lender would be prepared to accept having regard to the size, tenor and risk profile of the facility, including the borrower's financial condition and repayment capacity, the identified source of repayment or "take-out", the nature and timing of the security, the pricing and fee structure, the lender's credit assessment and due diligence and the allocation of risk between lender and borrower.

8. On the materials presently available, I have identified no provision of the January Agreement or the March Amendment identifying a committed refinancing, asset sale, capital raising or other sufficiently ascertainable source from which the principal exposure was expected to be repaid at maturity. The contractual documents establish the maturity obligation but do not themselves identify the transaction or source of funds intended to take out the Loan.

9. That consideration is material in the circumstances of this borrower. As explained in the Principal Opinion, TV Azteca was already experiencing significant financial distress at the time of the Loan. Its concurso petition describes the financing as additional and urgent funding obtained to address tax liabilities and mitigate the risk of operational paralysis, against a background of structural liquidity constraints, insufficient operating cash flow, restricted access to credit and difficulty refinancing liabilities under ordinary market conditions. In those circumstances, the mere fact that the Loan matured within six (6) months does not convert it into conventional bridge financing. A commercially credible means of repayment assumes particular importance where the borrower is already financially distressed.

10. I therefore do not consider the description of the Loan as a "bridge loan" sufficient to characterise the transaction as a typical or customary bridge financing. Its short tenor and bullet repayment structure are relevant features of the transaction, but they are not determinative of its commercial character. That assessment requires consideration of those features in the context of the absence of an identified contractual take-out, TV

Azteca's financial condition and the other terms and allocation of risk reflected in the January Agreement and the March Amendment, which I address below.

**(ii) Are the terms of the January Agreement and the March Amendment, taken as a whole, consistent with ordinary arm's-length or market lending conditions?**

11. Whether the Loan was entered into on ordinary arm's-length or market lending conditions cannot, in my opinion, be determined by isolating any single provision of the Loan Agreement. A number of the provisions identified below, including indemnities, Events of Default, acceleration rights and the appointment of agents, are familiar features of institutional lending documentation and would not, standing alone, place a transaction outside ordinary commercial practice. The relevant question is whether, considered cumulatively and against the circumstances in which the Loan was made, the contractual structure reflects the credit assessment, risk allocation, security protection and commercial discipline that a prudent arm's-length lender would ordinarily require for a facility of this size, tenor and risk profile. In my opinion, it does not for the following reasons:

*(a) AlterBank's multiple contractual capacities:*

12. The fact that a single bank acts as arranger, lender, administrative agent and collateral agent is not, of itself, unusual or inconsistent with arm's-length lending practice. What is material here is the manner in which those capacities operate within the particular structure of this Loan. AlterBank executed the January Agreement as Arranger, Initial Lender, Administrative Agent and Collateral Agent and thereby occupied each of the principal lender-side roles under the facility. The March Amendment retained that structure while defining the Initial Lender as acting as record holder, nominee and disbursement conduit for the Lenders except where otherwise expressly agreed.

13. Where as here one bank occupies all four (4) roles while at the same time purporting, in at least one (1) of those capacities, to act on behalf of other Lenders, the contractual structure through which a borrower and its creditors would ordinarily be able to identify and hold to account the true economic counterparty to the transaction becomes less transparent. The concentration of those roles is not in itself unlawful or necessarily inconsistent with market practice. Its significance here lies in the absence, on the materials available to me, of a clear correspondence between AlterBank's contractual capacities and the underlying funding and risk-bearing arrangements. In those circumstances, it is not apparent from the contractual structure itself who ultimately provided the funds, bore the economic exposure to the Loan or constituted the true economic counterparty to TV Azteca. That opacity is reinforced by the express terms of the March Amendment itself: Section 5 (Capacity; No Beneficial Ownership Inference) records that the designation of any person as Initial Lender, Administrative Agent, Arranger or Collateral Agent does not, of itself, create or evidence beneficial ownership of, or economic credit exposure to, the Loan, and that all extensions of credit are made by the Lenders from time to time reflected in the Register. AlterBank has therefore contractually disclaimed being identified as the true economic party to the Loan by reference to its contractual capacities alone, while the

identity of those Lenders is not, on the executed instruments produced to me, independently ascertainable. That lack of transparency materially increases the informational asymmetry between AlterBank, acting in its several contractual capacities, and TV Azteca and its other creditors.

*(b) TV Azteca's financial condition at the time of the March Amendment:*

14. The March Amendment was executed against the background of TV Azteca's longstanding and publicly documented financial distress. As set out in the Principal Opinion, TV Azteca's insolvency was demonstrably notorious well before the Loan was made on 29 January 2026. TV Azteca had suspended payment on its Senior Notes in February 2021; those Notes were accelerated in August 2022 and became the subject of recovery proceedings. Involuntary Chapter 11 petitions were filed against TV Azteca and certain subsidiaries in March 2023 and Banco Azteca subsequently accelerated its facility and commenced enforcement proceedings. The default and its consequences were disclosed in TV Azteca's published audited financial statements and were the subject of active enforcement proceedings for several years before the Loan.

15. That notorious financial condition assumes particular significance when considered against the Events of Default which AlterBank itself stipulated in the March Amendment. Section 6.01(h) identifies as an Event of Default the inability of the Borrower or any Subsidiary generally to pay its debts as they become due. Section 6.01(i) separately includes the involuntary subjection of the Borrower or any Subsidiary to a petition for bankruptcy, insolvency, *concurso mercantil*, *quiebra*, reorganisation or analogous proceedings where such petition is not discharged within thirty (30) days. The Agreement therefore identifies as Events of Default circumstances which correspond closely with aspects of TV Azteca's publicly documented financial history and, at a minimum, demonstrate that the borrower was at the threshold of the very insolvency risks for which the Agreement itself made express provision.

16. A restructuring transacted with a borrower whose insolvency was notorious and which was already at the threshold of the insolvency conditions defined by the Agreement as Events of Default cannot commercially be assessed on the same footing as a facility extended to a solvent, performing borrower. Those circumstances would ordinarily heighten, rather than diminish, the importance to a prudent lender of establishing repayment capacity, obtaining reliable and current financial information, assessing existing creditor claims and ensuring that the proposed security package provided effective protection for the lender's exposure.

*(c) Collateral required only after full disbursement, on terms fixed unilaterally by the Collateral Agent:*

17. Section 5.05 of the Original Loan Agreement required the Borrower to execute the Stock Pledge Agreement, Trademark Pledge Agreement, Mortgage Agreement and Trust Agreement within sixty (60) calendar days after the Disbursement Date. Section 4.10 of the Amended and Restated Loan Agreement replicates that requirement but expressly

measures the sixty (60) day period from the execution of the March Amendment, thereby resetting the collateral timetable so that the Collateral Documents were not required to be in place until on or about 5 May 2026, being approximately three (3) months into a six-month facility. The practical consequence was that AlterBank was prepared to advance a principal balance in excess of US$200 million equivalent, and to continue that exposure on an unsecured basis at the point of the March Amendment, before the contemplated security package had been created and perfected.

18. A facility of this size extended on an unsecured basis, even for a period of up to sixty (60) days, is not ordinary market practice for a secured loan of this magnitude. The market expectation for a facility purportedly secured by a first-priority interest over shares, trademarks and receivables and a second-priority mortgage, is that such security is perfected before, or at the latest contemporaneously with, disbursement, not left to a sixty-day grace period after the funds have already left the lender's control. That is particularly significant given TV Azteca's notorious insolvency, substantial publicly disclosed defaults and existing enforcement proceedings. Further, as explained in my Principal Opinion, the security ultimately taken comprised second-ranking mortgages over telecommunications concessions held by subsidiaries rather than TV Azteca itself, while first-ranking security over those concessions was already subject to enforcement.

19. Compounding that feature, Section 5.05 of the Original Loan Agreement provides that each item of collateral must be "acceptable to the Collateral Agent", a standard set unilaterally and without any objective benchmark, by AlterBank that also acts as Arranger, Initial Lender and Administrative Agent. A collateral adequacy standard set solely at one self-interested party's discretion, with no independent valuation mechanism, no minimum collateral coverage ratio applicable to the Stock Pledge Agreement, Trademark Pledge Agreement or Mortgage Agreement (as distinct from the 1.3:1 Collateral Ratio applicable only to the Trust Agreement) and no recourse for the Borrower if the Collateral Agent's discretion is exercised unreasonably, is not the ordinary market allocation of collateral risk in an arm's-length secured facility.

20. In my opinion, a prudent arm's-length lender advancing a facility of this magnitude to a borrower in those circumstances would ordinarily require the material security upon which its credit decision depended to be executed, its priority and enforceability established and its value assessed before or contemporaneously with disbursement, absent a documented and commercially compelling reason for assuming the intervening unsecured exposure.

*(d)* *Use of Loan proceeds to satisfy existing tax liabilities without an identified repayment source*:

21. Section 2.02 of the Original Loan Agreement provides that the Loan "will be used by the Borrower exclusively for the payment and fulfillment of its tax obligations with Mexican tax authorities", while also permitting its use "for general corporate purposes". Section 4.09 provides that all proceeds of the Loan shall be used as provided in Section 2.02. The Amended and Restated Loan Agreement goes further in that Section 2.01 records the

Borrower's statement that the Loan was used for the payment and fulfilment of its tax obligations with Mexican tax authorities and for general corporate purposes, while Section 3.09 provides that all proceeds shall be used as provided in Section 2.01. The use of loan proceeds to satisfy tax or other existing liabilities is not itself commercially improper or necessarily outside market conditions. Its significance arises from the absence, on the materials available, of an identified transaction or cash-generating event capable of explaining how TV Azteca was expected to repay the principal and accrued interest within approximately six (6) months notwithstanding its existing financial distress. To the extent that the proceeds were used to discharge existing tax liabilities rather than for a cash-generating corporate purpose, a facility in excess of US$200 million does not possess the conventional self-liquidating rationale ordinarily associated with bridge financing.

*(e) Absence of due diligence requirements and a "No Conflicts" representation that omits other creditors:*

22. The Loan Agreement imposes no express condition precedent requiring AlterBank to have conducted or documented credit, financial or collateral due diligence on TV Azteca before disbursement. The closest analogue, the representations and warranties in Section 4 of the Original Loan Agreement and Article III of the Amended and Restated Loan Agreement, are self-certifications by the Borrower rather than independent verification by the lender. Within those representations, Section 4.02 of the Original Loan Agreement (Section 3.02 of the Amended and Restated Loan Agreement), headed "Validity, Authorization and No Conflict", addresses whether the transaction violates the constitutive documents of the Borrower, applicable law or any court order or governmental rule and whether it creates a Lien on the Borrower's property, but is silent on whether the transaction conflicts with, defaults under, or requires the consent of, the Borrower's other existing creditors or their financing agreements. A "No Conflicts" clause that omits any reference to a distressed borrower's other secured and unsecured creditors, at a time when, on the Principal Opinion's analysis, the Borrower's generalised default and prior creditor enforcement actions were a matter of public record, is materially relevant to the assessment of the terms upon which the Loan was made.

23. Although the Agreements contain representations concerning conflicts with applicable law and contractual obligations, those representations are not a substitute for the lender's own credit and legal due diligence. For a facility of this magnitude to a borrower already subject to substantial creditor enforcement, ordinary prudent lending practice would require consideration of existing debt instruments, restrictions upon additional indebtedness and liens, existing defaults, creditor priority and the consequences of the new facility for existing creditors. The financial distress and enforcement proceedings were material to any reasonable assessment of TV Azteca's capacity to incur and repay additional indebtedness.

24. The Principal Opinion records that no contemporaneous credit assessment, financial analysis, valuation of the mortgage security, internal credit approval or Board or Credit

Committee minute relating to the Loan had been produced. The production of the Loan documents does not itself cure that evidential absence.

*(f) The March Amendment's economics: deferral of interest to maturity against a 2% fee, on top of the original 1% structuring fee:*

25. Under the Original Loan Agreement, interest accrued at the fixed rate of 17.50% per annum and was payable on each Interest Payment Date. As recorded in Section 4 of the March Amendment, by 6 March 2026 the Borrower had drawn MXN 4,085,000,000 (equivalent to approximately US$237 million at exchange rates consistent with those adopted in the Principal Opinion) under the facility, and ordinary interest of MXN 71,487,500 (equivalent to approximately US$4 million) had accrued and remained unpaid at that date. Section 4 of the March Amendment amended the Interest Payment Date to coincide with the Maturity Date and capitalised that accrued interest into principal, thereby increasing the outstanding principal balance to MXN 4,156,487,500 (equivalent to approximately US$241 million).

26. Section 6 of the March Amendment additionally required TV Azteca to pay the Arranger a Restructuring Fee equivalent to 2% of the amount actually drawn, payable within fifteen (15) calendar days. That fee was additional to the 1% Structuring Fee payable to the Arranger under Section 3.01 of the Original Loan Agreement. In substance, therefore, approximately five (5) weeks after the original advance, the parties capitalised accrued interest, deferred the payment of interest until maturity and imposed an additional restructuring fee, without the materials presently available identifying any corresponding improvement in TV Azteca's repayment capacity.

27. In the circumstances of TV Azteca's financial distress, an arm's-length lender would ordinarily be expected, before restructuring the facility, to reassess the borrower's financial position, the continuing adequacy of security, existing defaults, repayment prospects and the economic justification for the restructuring. The March Amendment does not itself disclose the credit analysis supporting AlterBank's decision to increase the outstanding principal by capitalising accrued interest and defer the interest-payment obligation.

28. The March Amendment must also be considered against TV Azteca's financial condition at the time it was executed. As set out in the Principal Opinion, TV Azteca's insolvency was demonstrably notorious well before the Loan was made and its defaults and the resulting creditor enforcement proceedings had been publicly documented for several years. Those circumstances materially heightened the credit risk associated with any decision to defer payment, capitalise accrued interest and continue the exposure.

29. In my opinion, an arm's-length lender restructuring an exposure of this magnitude to a borrower in those circumstances would ordinarily require contemporaneous analysis demonstrating that the restructuring was commercially justified and offered a reasonable prospect of repayment or a better expected recovery than the alternatives available to the lender. On the materials available to me, no contemporaneous restructuring or credit analysis has been produced demonstrating the commercial basis upon which AlterBank

elected to capitalise accrued interest, defer its payment until maturity and continue its exposure to TV Azteca.

*(g) Events of default and remedies weighted heavily in the lender's favour:*

30. Section 6.01 of the Amended and Restated Loan Agreement sets out an extensive list of Events of Default, including, at Section 6.01(i), an unusually granular enumeration of insolvency-related events, including voluntary and involuntary bankruptcy or *concurso mercantil* proceedings, appointment of an administrator or similar official, assignment for the benefit of creditors, resolutions approving reorganisation, court orders confirming insolvency, a creditor assuming financial management of the Borrower and the convening of meetings of general creditors to restructure debts. Section 6.02 separately permits the Administrative Agent, on the Lenders' instruction, following an Event of Default other than one described in Sections 6.01(h) or (i), to terminate the Agreement and declare the Loan immediately due and payable without presentment, demand, protest or other notice, all of which the Borrower is deemed to waive.

31. Extensive default and acceleration provisions of this kind are not, on their own, unusual in institutional lending. However, what is material is that they were agreed and then amended and restated against the background of TV Azteca's longstanding and publicly documented financial distress and creditor enforcement proceedings, circumstances corresponding closely with the insolvency risks expressly addressed by Sections 6.01(h) and (i). In those circumstances, an arm's-length lender would ordinarily be expected to assess the Borrower's existing financial condition and defaults, the consequences for repayment and enforcement, the adequacy and priority of the available security and whether continuing the exposure offered a commercially reasonable prospect of recovery.

32. In my opinion, those circumstances materially heightened the need for contemporaneous credit and restructuring analysis before AlterBank continued its exposure under the March Amendment. On the materials available to me, no contemporaneous analysis has been produced demonstrating AlterBank's assessment of those matters or the commercial basis upon which it elected to continue the exposure notwithstanding TV Azteca's financial condition.

*(h) Broad indemnification in AlterBank's favour:*

33. Section 8.05 of the Original Loan Agreement required the Borrower to indemnify the Administrative Agent and its officers, directors, employees, agents and advisors against claims, damages, losses, liabilities and expenses, including legal costs, arising from the Borrower's breach of the Agreement. Section 8.03(b) of the Amended and Restated Loan Agreement substantially widens that obligation. It requires the Borrower to indemnify the Administrative Agent, its shareholders, officers, directors, agents and attorneys-in-fact, the Lenders and their Related Parties against losses, claims, damages, liabilities and related expenses arising out of or in connection with the execution or performance of the Loan

Documents, the Loan or use of its proceeds and actual or prospective claims, litigation, investigations or proceedings relating to the foregoing, including claims brought by the Borrower itself. The indemnity is subject principally to a final, non-appealable judicial determination of gross negligence or wilful misconduct or, in the case of a claim brought by the Borrower, bad-faith breach of the Indemnitee's obligations under the Loan Documents.

34. Section 8.03(c) further provides that the Borrower waives any claim against an Indemnitee for special, indirect, consequential or punitive damages. Those protections operate alongside Section 7.03, under which the Arranger, Administrative Agent and Collateral Agent assume no duties, responsibilities or liabilities except as expressly provided in the Loan Documents and the Collateral Agent is substantially protected from liability for failure or delay in enforcing the collateral, subject to gross negligence or wilful misconduct. Sections 6.02 and 6.04 further provide that the Administrative Agent and Collateral Agent are not required to commence or prosecute enforcement proceedings in their own names unless they receive satisfactory indemnity and, if requested, funding from the Lenders.

35. Notwithstanding that these indemnification and limitation-of-liability provisions do not, standing alone, establish that the Loan was outside market conditions, their breadth is relevant to the overall assessment of the transaction. Indemnification, expense-reimbursement and limitations on agent liability are common features of sophisticated financing arrangements. Here, they form part of the overall allocation of risk under a facility in which AlterBank occupied the roles of Arranger, Initial Lender, Administrative Agent and Collateral Agent, while advancing a substantial exposure before the contemplated security was in place, lending to a borrower with longstanding publicly documented defaults and subsequently capitalising accrued interest and deferring its payment.

36. In my opinion, when considered cumulatively with the other features of the Loan identified above, the breadth of the indemnification and limitation-of-liability protections afforded to AlterBank contributes to an overall allocation of contractual and economic risk that is unusually favourable to AlterBank having regard to the corresponding credit risk it assumed. This further supports my conclusion that the terms of the Loan, viewed as a whole, were outside ordinary arm's-length market conditions.

*(i) Conclusion on characterisation:*

37. Taking these features together, in my opinion the Loan Agreement, as amended and restated by the March Amendment, is not properly characterised as a typical or customary bridge loan transacted on market terms, notwithstanding its short tenor and bullet repayment structure. The (i) combination of AlterBank's collapsed four-capacity role; (ii) fact that the Loan was made and subsequently amended against the background of TV Azteca's longstanding and publicly documented financial distress and creditor enforcement proceedings; (iii) deferral of collateral execution and perfection until after full disbursement, on terms acceptable to AlterBank as Collateral Agent; (iv) use of proceeds without an identified repayment source; (v) absence of any independent due-diligence

condition and the narrowness of the 'No Conflicts' representation; (vi) imposition of a further 2% restructuring fee in connection with an amendment that capitalised accrued interest and deferred its payment to maturity; (vii) extensive default and remedies regime; and (viii) breadth of the indemnification and limitation-of-liability protections afforded to AlterBank are, cumulatively, inconsistent with the terms that a prudent, arm's-length lender and a prudent, arm's-length borrower would ordinarily agree for a facility of this size and character.

## C. BASEL PRINCIPLES ARE NON-BINDING AND ARE ANALYTICALLY DISTINCT FROM THE QUESTION WHETHER THE LOAN WAS ENTERED INTO ON MARKET TERMS

*What is the legal status of Basel Committee principles as a matter of Saint Lucia law and what is the relationship between AlterBank's regulatory non-compliance and the separate question whether the Loan and the March Amendment were entered into outside market conditions?*

38. The prudential standards referred to in the Principal Opinion, including the capital adequacy and single-borrower exposure standards reflected in the FSRA's Guidance Notes and in AlterBank's pre-opening approval, draw on principles associated with the Basel Committee on Banking Supervision ("BCBS"), an international standard-setting body operating under the auspices of the Bank for International Settlements. The BCBS Core Principles for Effective Banking Supervision provide international benchmarks for banking regulation and supervision. They do not constitute legislation or create directly enforceable obligations under the law of Saint Lucia.

39. Saint Lucia is not itself a member of the BCBS. The Basel-derived prudential principles referred to in the Principal Opinion have legal and regulatory significance in Saint Lucia to the extent that they are reflected in the domestic statutory and regulatory framework applicable to AlterBank. Section 15 of the FSRA Act empowers the FSRA to issue guidelines to regulated entities in respect of prudential standards concerning, among other matters, the safety and soundness of funds, asset quality, liquidity, related-party transactions and corporate governance. The FSRA Guidance Notes accordingly prescribe prudential requirements applicable to AlterBank, including the single-borrower exposure requirements in Guidance Note 11. AlterBank was separately subject to the conditions contained in the FSRA's pre-opening approval of 23 February 2024, including the requirement to maintain a Total Qualifying Capital to Risk Weighted Assets ratio of not less than 8% and to give prior notice of significant deviations from its approved business plan. The relevant obligations therefore arise from Saint Lucia's domestic regulatory framework and the conditions applicable to AlterBank, rather than from the Basel principles operating independently as a source of Saint Lucia law.

40. AlterBank's regulatory non-compliance and whether the Loan and the March Amendment were entered into on market terms are distinct inquiries. A breach of an applicable

exposure limit or other prudential requirement principally attracts the supervisory and regulatory consequences prescribed by Saint Lucia law and does not, by reason of the breach alone, render the underlying Loan or security invalid or unenforceable. Whether the Loan was entered into on market terms instead requires consideration of the substantive terms and commercial characteristics of the transaction against those that a similarly situated arm's-length lender and borrower would ordinarily agree.

41. The regulatory framework is nevertheless relevant to the commercial assessment. Saint Lucia's prudential framework requires regulated lenders to address matters including capital adequacy, concentration risk, credit assessment, liquidity, security valuation and risk management. In particular, the Principal Opinion concluded that AlterBank was required, before approving and advancing the Loan, to undertake an appropriate credit assessment of TV Azteca, including its financial condition, cash flows, repayment capacity and existing indebtedness and to assess the adequacy and value of the security. A material departure from those standards may therefore constitute relevant evidence in assessing whether the transaction was consistent with ordinary commercial lending practice.

42. In the present case, my conclusion arises independently from the commercial characteristics of the transaction identified above, including its scale relative to AlterBank's disclosed financial profile, TV Azteca's financial condition, the absence of an identified repayment source for a short-term bullet facility, the advance of funds before the contemplated security was constituted, the nature and priority of the security ultimately obtained, the subsequent capitalisation and deferral of accrued interest and the absence, on the materials produced, of contemporaneous credit and security analysis explaining the commercial basis upon which an independent prudent lender would have accepted the corresponding credit risk.

## D. RELATIONSHIP TO THE PRINCIPAL OPINION

43. The conclusions in this Supplemental Opinion are additional to and consistent with the conclusions reached in the Principal Opinion. The Principal Opinion addressed AlterBank's regulatory position under the International Banks Act, the FSRA Act and associated Guidance Notes and the position of the Loan under Saint Lucian civil and insolvency law, by reference to the materials then available to me, which did not include the executed Loan Agreement or the March Amendment. Having now reviewed those executed instruments, I confirm that nothing in them alters the conclusions reached in the Principal Opinion. On the contrary, the terms actually recorded in the executed Loan Agreement and the March Amendment, summarised in Section C above, reinforce my conclusion that the Loan does not reflect ordinary arm's-length commercial banking practice for a Class A international bank licensed in Saint Lucia.

44. I do not consider the description of the Loan as a "bridge loan" determinative. While the facility possessed certain formal characteristics associated with bridge financing particularly its short tenor and bullet maturity, those characteristics do not explain the

absence of a clearly identified and commercially credible source of repayment nor the other exceptional credit features identified above.

45. The contractual documents materially strengthen rather than displace my earlier conclusion. They establish that substantial funds were disbursed before the contemplated security was completed; that AlterBank occupied multiple roles under a structure which contemplated that the underlying economic lenders could be persons other than AlterBank; and that approximately five (5) weeks after disbursement the parties capitalised accrued interest, deferred interest payment until maturity and imposed an additional 2% restructuring fee.

46. Those matters must be assessed together with TV Azteca's publicly disclosed financial distress and creditor enforcement, the subordinate character and delayed constitution of the security, the magnitude of the exposure relative to AlterBank's disclosed financial position and approved business plan and the absence from the materials produced of contemporaneous credit, valuation and approval records explaining the commercial rationale for the transaction. In my opinion, considered cumulatively, those features are inconsistent with the terms and risk allocation upon which a prudent independent lender would ordinarily extend comparable credit on an arm's-length basis. The Loan and its subsequent restructuring were therefore outside ordinary market conditions for a transaction of this nature.

47. I reserve the right to further supplement or modify this opinion should additional information become available.

Dated this 8th day of September, 2026

______________________________

Renee Tamara St. Rose KC

PODER JUDICIAL DE LA FEDERACIÓN

## EVIDENCIA CRIPTOGRÁFICA - TRANSACCIÓN

**Archivo Firmado:**
**415700200000000000062819803.p7m**
**Autoridad Certificadora:**
**AUTORIDAD CERTIFICADORA**
**Firmante(s): 1**
**Este documento digital es una copia fiel de su versión física o electrónica, la cual corresponde a su original.**

JESUS VAZQUEZ NUÑEZ
706a6620636a663300000000000000000016a00
07/05/29 10:16:24

| FIRMANTE | | | | |
|---|---|---|---|---|
| **Nombre:** | FERNANDO DEL CASTILLO ELORZA | **Validez:** | BIEN | Vigente |

| FIRMA | | | | |
|---|---|---|---|---|
| **No Serie:** | 30.30.30.30.31.30.30.30.30.30.30.35.31.37.38.36.34.31.34.38 | **Revocación:** | Bien | No revocado |
| **Fecha (UTC/ CDMX)** | 09/09/26 04:36:24 - 08/09/26 22:36:24 | **Status:** | Bien | Valida |
| **Algoritmo:** | RSA-SHA256 | | | |
| **Cadena de firma:** | 86 ba 2f 26 f0 8c a1 9c d0 51 42 63 dc f0 18 60<br>f7 4b 74 ce 8c f4 9d f0 61 37 27 37 2d eb e1 69<br>ae f0 c6 dd b4 a6 ba b2 73 79 2a bb 23 95 d8 74<br>3e 73 8e f0 a7 a2 ac 52 6e 97 48 cf 0f b6 d2 c4<br>c5 88 3e a0 96 b8 82 13 58 c5 ed ed 87 cf e3 e5<br>9f 45 61 5d 22 b5 bb d2 7a 12 80 90 1b 15 fe b0<br>92 e6 9d 2b 8a 1c 16 c2 87 f3 14 f2 81 76 27 c4<br>6f 68 63 99 f4 6c 35 cc 19 2c 72 66 fe 75 f3 61<br>36 fc 1c 78 54 6e ef f3 69 cc 37 a9 de dc 32 01<br>45 e8 e2 06 1c c9 81 d6 09 f7 1a 17 d4 c5 4c 95<br>bc df 98 20 15 9b b1 14 2f 07 72 4a 76 f2 6c 26<br>84 34 4e cb c4 cc 6a e1 35 4f b1 ab f1 48 82 d6<br>d3 4c c7 1f 1d ce d1 4a 9f e1 eb 2a 25 b9 f1 6a<br>8f 06 61 34 ff 84 8d 8b af 09 60 ef d6 bf a0 13<br>13 5f 1d 76 4a 03 16 e3 ea 29 6e 46 26 0f e4 94<br>1c e0 76 f2 82 e0 24 fa 7f e7 dd 56 61 68 33 0c | | | |

| OCSP | |
|---|---|
| **Fecha: (UTC/ CDMX)** | 09/09/26 04:36:25 - 08/09/26 22:36:25 |
| **Nombre del respondedor:** | Servicio OCSP SAT |
| **Emisor del respondedor:** | AUTORIDAD CERTIFICADORA |
| **Número de serie:** | 30.30.30.30.31.30.30.30.30.30.30.35.31.37.38.36.34.31.34.38 |

| TSP | |
|---|---|
| **Fecha : (UTC/ CDMX)** | 09/09/26 04:36:25 - 08/09/26 22:36:25 |
| **Nombre del emisor de la respuesta TSP:** | Autoridad Emisora de Sellos de Tiempo del Consejo de la Judicatura Federal |
| **Emisor del certificado TSP:** | Autoridad Certificadora Intermedia del Consejo de la Judicatura Federal |
| **Identificador de la respuesta TSP:** | 203698989 |
| **Datos estampillados:** | cB8r2IS2kS2/fy3/H+1L6MWVnBw= |

PODER JUDICIAL DE LA FEDERACIÓN

## EVIDENCIA CRIPTOGRÁFICA - TRANSACCIÓN

**Archivo Firmado:**
**166868331_41570000412936600131180125280025.p7m**
**Autoridad Certificadora:**
**Autoridad Certificadora Intermedia del Consejo de la Judicatura Federal**
**Firmante(s): 1**
**Este documento digital es una copia fiel de su versión física o electrónica, la cual corresponde a su original.**

| FIRMANTE | | | | |
|---|---|---|---|---|
| **Nombre:** | JESUS VAZQUEZ NUÑEZ | **Validez:** | BIEN | Vigente |

| FIRMA | | | | |
|---|---|---|---|---|
| **No Serie:** | 70.6a.66.20.63.6a.66.33.00.00.00.00.00.00.00.00.00.00.01.6a.00 | **Revocación:** | Bien | No revocado |
| **Fecha (UTC/ CDMX)** | 10/09/26 00:43:07 - 09/09/26 18:43:07 | **Status:** | Bien | Valida |
| **Algoritmo:** | RSA-SHA256 | | | |
| **Cadena de firma:** | 84 4f d3 d8 21 5e 17 6c e0 33 8d 88 3b c9 9a 1e<br>d4 b9 62 4a 52 69 9b 0c 22 df c5 76 3e 36 20 d9<br>01 c6 ee 17 44 07 b1 79 58 b4 c5 f8 76 fc cd 96<br>61 a4 17 59 dc 37 52 90 03 48 d3 61 9e d7 a1 db<br>64 40 bf b5 d9 42 81 70 97 1e 2a 82 f4 74 42 95<br>58 80 31 13 b7 0b 97 6b f6 41 b5 87 ce 32 66 b7<br>61 cc cc 87 a0 13 9b d9 35 63 82 d8 e9 8d 51 13<br>e8 b8 2e a2 e6 cb f4 b1 4c cf 71 01 31 54 ce 23<br>2c f8 49 4e 4a 48 d3 cb df 55 79 2e 4d 50 28 10<br>fc b8 cf 8a 9f 92 3f ed 2f 9d c9 9f c8 07 b7 4a<br>cf 97 f9 66 85 fa 87 7f 23 38 7b a2 8a 30 06 ff<br>d5 6f b7 82 06 d1 82 c3 84 85 22 83 41 6c 20 f8<br>f0 b4 28 9e 75 43 43 69 cc d1 6e 1d c2 02 03 10<br>b4 03 e6 67 9d 69 f9 ca 56 90 21 48 1f 18 75 d6<br>46 a8 f3 6f 5c 76 8f 2f 88 0f 28 60 d3 a6 71 de<br>bf 2a 4a 62 37 c0 0a 48 0f 01 70 ec 7d b1 21 8c<br>b7 17 08 11 84 d4 00 84 ee c3 4b 30 1d 10 d2 76<br>f7 4e ac fe 06 c8 09 f5 02 e9 09 b1 d6 d9 44 4d<br>fc ea 0b f8 c4 5a 73 ae 16 2d 8c c1 fd 38 5e fc<br>10 cb 7f 4b 9e 4d 53 1d bb 76 dd dc 2a 7c 49 38<br>c2 42 a2 8d ea 86 61 08 89 60 f0 29 91 31 ab 85<br>66 ee 48 0e f7 10 f4 49 83 e8 6a 02 4a f9 7d e0<br>6a d4 ed b9 a3 b1 90 84 52 4a 77 37 ae e8 fb 77<br>74 e8 c4 9c ad a7 1f 54 1c 41 f7 23 ac 27 a2 87 | | | |

| OCSP | |
|---|---|
| **Fecha: (UTC/ CDMX)** | 10/09/26 00:43:08 - 09/09/26 18:43:08 |
| **Nombre del respondedor:** | Servicio OCSP ACI del Consejo de la Judicatura Federal |
| **Emisor del respondedor:** | Autoridad Certificadora Intermedia del Consejo de la Judicatura Federal |
| **Número de serie:** | 70.6a.66.20.63.6a.66.33.00.00.00.00.00.00.00.00.00.00.01.6a.00 |

| TSP | |
|---|---|
| **Fecha : (UTC/ CDMX)** | 10/09/26 00:43:08 - 09/09/26 18:43:08 |
| **Nombre del emisor de la respuesta TSP:** | Autoridad Emisora de Sellos de Tiempo del Consejo de la Judicatura Federal |
| **Emisor del certificado TSP:** | Autoridad Certificadora Intermedia del Consejo de la Judicatura Federal |
| **Identificador de la respuesta TSP:** | 204359013 |
| **Datos estampillados:** | DFEwFreOzRyRtq4sEguEojV2WR4= |

# Translation by DeepL.com

**MERCHANT: TV AZTECA, S.A.B. DE C.V.**

**PROCEDURE FOR COMMERCIAL**

**BIDDING PROCEDURE**

**CASE NO.: 22/2026**

CM. 22/2026
P. 1 2528
September 9, 2026

**MOTION TO DECLARE ACTS INEFFECTIVE IN CREDITOR FRAUD CASE**

**HEARING OF HEARING WITH EXCEPTIONS AND DEFENSES**

**C. FIRST DISTRICT JUDGE FOR COMMERCIAL BANKRUPTCY MATTERS, RESIDING IN MEXICO CITY AND HAVING JURISDICTION THROUGHOUT THE MEXICAN REPUBLIC.**

**FERNANDO DEL CASTILLO ELORZA,** in my capacity as general counsel for litigation and collections for **THE BANK OF NEW YORK MELLON in its capacity as Trustee** (hereinafter, "BNY" or the **"Trustee**," interchangeably)—a capacity that is duly recognized and documented in the case file—I respectfully appear before you and state the following:

On behalf of my client, I respond to the hearing ordered by a court order dated September 2, 2026, published on September 3 of the same month and year—the date on which my client was notified electronically—which was ordered in response to the objections and defenses raised by **TV AZTECA, S.A.B. DE C.V.** (the "Merchant" or **"TVA**," interchangeably) in the motion to declare acts in fraud of creditors invalid, filed by my client (the "Motion"), as follows:

I hereby state, on behalf of my client, that this document and, in general, the proceedings in this bankruptcy case shall not be construed in any way as a waiver of the jurisdiction and competence of the courts of the State of New York, United States of America, with respect to any matter related to the Issuance Agreement and the Bonds maturing in 2024. BNY, in its capacity as *Trustee*, further expressly reserves—and does not waive, limit, modify, impair, or prejudice—***(i)*** the provisions of Section 11.7 of the Indenture, including those relating to any dispute regarding the interpretation, performance, remedies, and other matters arising out of or relating to the Indenture; and ***(ii)*** all rights relating to the preliminary injunction issued by the United States District Court for the Southern District of New York on September 22, 2025, ordering the Merchant to refrain from commencing or continuing proceedings in another jurisdiction, as well as all rights to enforce, maintain, or seek injunctive relief in accordance with that order.

*The Trustee's* appearance and participation in these proceedings—including the filing of this brief—are necessitated by the Merchant's own decision to file for bankruptcy and by the need to protect the rights arising from the Issuance Agreement.

**A. — OBJECTION TO THE VAGUITY AND LEGAL DEFECT OF THE CROSS-CLAIM**

In summary, TVA asserts that my client did not clearly state the grounds for her claim in the motion filed, arguing that she failed to compare the terms agreed upon in the transaction with prevailing market conditions, and asserting that the rules, principles, and regulatory framework of the lending institution have implications solely with respect to that institution and in no way affect the determination that the Credit Agreement dated January 29, 2026 (the **"Credit** Agreement") and its Amendment and Restatement Agreement dated March 6, 2026 (the "**Amendment** Agreement"), whose Annex A is the Credit Agreement Amended and Restated on March 6, 2026 (**the "Restated** Credit") (collectively referred to as **the "AlterBank** Credit"), were entered into outside of market conditions and/or in violation of banking and commercial customs and practices.

It also states that risk is the very essence of lending activity and that, in this case, the creditor assessed its risk and managed it "as standard practice dictates," since "if the risk is high, collateral is required, an appropriate interest rate is agreed upon, and a short term is set," even specifying that "if such risk-taking were to prove excessive according to the bank's internal or regulatory parameters, the consequences—whether *prudential, regulatory, or business-related*—would fall on the bank and be borne by the bank within its jurisdiction; this would never be sufficient grounds to declare the lender's actions invalid."

TVA seeks to mislead Your Honor by arguing that the Agreements and Principles of the Basel Committee on Banking Supervision are not legal norms in force in Mexico and are merely *"soft law"* lacking direct binding force; it asserts that my client confuses prudential guidelines with the economic conditions governing financing transactions in a given market.

TVA argues that the loan at issue in this proceeding is a loan granted in accordance with the market for financing companies in financial distress, in which—as it asserts—there are higher interest rates than for ordinary corporate credit, short terms with a bridge structure, reinforced collateral packages, and non-traditional creditors; TVA refers to this international financial practice as *"bridge lending," "rescue lending,"* and *"distressed lending*." In a clearly fallacious manner, TVA seeks to justify a transaction

that is clearly fraudulent based on the purpose of the Commercial Bankruptcy Law (the "LCM"), namely, the preservation of the company.

In its response to the motion, TVA states that, in its view, the only appropriate course of action under Article 114, Section III of the LCM would be to compare the contested loan with others entered into in the financial sector; it refers to and emphasizes that this type of financing is an attractive business opportunity due to higher returns and commissions, and that the LCM even allows the Merchant to apply for loans even if it has been declared in bankruptcy proceedings.

With regard to the fact that the loan was entered into in local currency, with a credit line of up to $5,000,000,000.00 (five billion pesos 00/100 M.N.), such a correction is irrelevant given that the transaction was entered into outside of market conditions, and I reiterate on behalf of my client that, until TVA's response, she was unaware of the terms of the AlterBank Loan.

The objection raised by TVA is clearly fallacious, unfounded, and inadmissible, as demonstrated below:

As a matter of procedure, it is evident that my client could not have disclosed details of the Credit Agreement, its Amendment Agreement, and the Restructured Loan, as these were documents unknown to her and the rest of the creditors until the court order of September 2, 2026; therefore, it is factually impossible for my client to have made any statements regarding the rates and other aspects of the transaction if she did not have access to the documents that gave rise to the loan in question.

10470252791600196274

However, there is no ambiguity or omission in the statement of claim because, even without knowing the exact content of those documents, my client presented sufficient arguments to demonstrate that the AlterBank Loan is outside market conditions and contravenes commercial and banking customs and practices.

Notwithstanding the foregoing, now that the terms and conditions of the AlterBank Loan are known, even more evidence and arguments have emerged that make it clear that the loan was entered into in violation of market conditions and banking and commercial customs and practices.

TVA asserts that the AlterBank Loan is a loan entered into in accordance with prevailing market conditions in the sector and claims that rescue or bridge financing is a "common" financial practice, as mentioned in the answer to the motion to dismiss.

In this regard, it is important to define what a "bridge loan" is in the financial market, since TVA confuses this type of transaction with the loan granted by AlterBank.

A bridge loan is a temporary and generally short-term form of financing intended to cover a need for funds during a transitional period, **with the expectation that it will be replaced or repaid through a permanent source of financing, such as debt issuance, a capital raise, or the sale of assets.**

In the domestic market, a bridge loan is a temporary form of financing intended to cover the funding needs of a transaction or project during a transitional period, while a subsequent or definitive source of financing is secured, with which repayment or refinancing is anticipated.

In other words, contrary to TVA's assertions, bridge loans have nothing in common with the loan at issue in this proceeding. This is because: ***(i)*** the AlterBank Loan was granted as a definitive loan—not as a provisional loan to be replaced by subsequent financing, as required by the very nature of such a loan; ***ii)*** nor was it established that it would be repaid through the sale of assets; in fact, as TVA itself acknowledges—and as is established in the case record—by the date the Amended Agreement and the Restated Contract were executed, the Merchant had already approved the filing of its petition for commercial reorganization, meaning it clearly could not proceed with the sale of its assets. On this particular point, the provisions of Section 2.03 of the Restated Agreement are noteworthy, as discussed below; and ***iii)*** as mentioned in the expert opinions attached hereto, any loan of this nature requires, at a minimum, *due diligence* regarding the Borrower's existing contractual obligations; and in the case at hand, AlterBank would have easily noticed that the loan directly violates various provisions of the Issuance Agreement—which is already on the record in the present insolvency proceedings—particularly the prohibitions on incurring new debt and granting guarantees.

JEHSRUNSAWADZQUIEHZCNAUSÑIHZOHORZA
73618616021663161616161616161616161616161610816341008
1047/025279160.0196274

This was the conclusion reached in the expert opinion issued by Mauricio Basila Lago—former Director General of Issuers and Vice President of Securities Supervision at the National Banking and Securities Commission—and Paul Yamil José Aguilar ("Basila Abogados, S.C."). This is set forth in the **expert opinion** dated August 12, 2026 (hereinafter, **the "Mexican Expert** Opinion"), which is attached hereto as **EXHIBIT 2**, particularly in paragraphs 94 Bis and 94 Ter, which I request be deemed reproduced herein as if they were inserted verbatim.

It is therefore clear that we are not dealing with a bridge loan, as TVA erroneously claimed. Expert Renee Tamara

St. Rose KC in the expert opinion attached hereto as **EXHIBIT 1**, accompanied by its Spanish translation by a certified translator as **EXHIBIT 1 BIS**—see Section B, paragraph 10; Section D, paragraph 44, which I request be deemed reproduced here as if inserted verbatim—.

Now, as for "rescue loans" or *"rescue lending"/"distressed lending,"* these are not granted under the terms described by TVA either.

This type of loan involves providing new capital—typically debt—to a company in financial distress that no longer has access to ordinary credit, in exchange for terms that compensate for that extraordinary risk (high interest rates, interest capitalization, warrants, or security interests perfected **prior to disbursement**, and preferred stock), as well as mechanisms that subordinate pre-existing creditors. The purpose of such loans is to buy time and preserve the viability of the company, which would otherwise become insolvent.

In other words, loans of this nature aim **to prevent the borrower from becoming insolvent and entering bankruptcy proceedings, for example.**

It is important to note that this type of financing is provided by specialized funds and not by banking institutions such as AlterBank—a distinction that stems from specific regulatory and accounting requirements. A new exposure to a borrower in widespread default is classified as impaired from the outset and requires the lending institution to set aside provisions amounting to nearly the full value of the exposure from day one.

Therefore, as concluded in the Mexican Expert Opinion, the AlterBank loan is neither a bridge loan nor a rescue loan—see paragraph 115 Quater of that document, the content of which I request be deemed reproduced here as if inserted verbatim.

Based on the evidence in the case file comprising this commercial insolvency proceeding and the Motion—particularly the Loan Agreement, the Amendment Agreement, and the Restated Agreement—it is clearly established that:

***i)*** The credit line was disbursed by AlterBank on January 29, 2026, the very day the agreement was executed; **however, it was not funded by that institution, but rather by unknown third parties** (a matter that was contractually reflected as late as March 6, 2026);

***ii)*** Just 12 days after that disbursement, on February 10, 2026, TVA published the notice of its Extraordinary Shareholders' Meeting to

be held on February 26 of that same year (the agenda for which included the approval of filing for bankruptcy proceedings);

***iii)*** On February 26, 2026, the request for TVA to file for bankruptcy was approved at said meeting;

***iv)*** On March 6, 2026—8 days after the meeting was held—the Amending Agreement and the Restated Agreement were executed. This restructuring was carried out without any default on payment or any situation that would ordinarily justify it—a matter that deviates from banking and commercial customs and practices, as set forth in paragraph
36 of the Mexican Expert Opinion, which I request be deemed reproduced here as if it were inserted verbatim—.

The above timeline is key and demonstrates that the loan at issue in the Motion was indeed entered into outside of market conditions and in violation of banking and commercial customs and practices, as detailed below.

The loan was disbursed in a manner completely at odds with banking practices and market conditions, as mentioned in the Mexican Expert Opinion.

This is because there were no conditions precedent agreed upon in the Loan Agreement for the disbursement of the loan. In this case, the loan was disbursed without TVA having to provide corporate documents, powers of attorney, certificates of no default, confirmation of statements, evidence of the use of the funds, and, worse still, without the security interests in favor of AlterBank having been created or perfected (see paragraphs 3 and 52 of the Mexican Expert Opinion, which I request be deemed reproduced here as if inserted verbatim).

For its part, see the supplementary opinion of Renee Tamara St. Rose, KC, attached hereto as **ANNEX 1,** accompanied by its Spanish translation by a certified translator as **ANNEX 1 BIS,** in paragraphs 17 and 18, specifically where it states: *"A line of credit of this magnitude granted without collateral, even for a period of up to sixty (60) days, is not standard market practice for a secured loan of such magnitude."*

Based on the foregoing, it has been demonstrated that, in accordance with the nature of *"distressed lending,"* the purpose of this type of financing is to provide the borrower with financial viability; and, in the case at hand, TVA was ***i)*** clearly insolvent, as acknowledged in its own response to the Motion, and ***ii)*** had corporately prepared its bankruptcy proceedings **prior** to the restatement of the Credit Agreement, but after the disbursement of the credit facility, which makes it clear that **the credit was not granted for the purpose of providing solvency**

**and financial viability to the company**—the first deviation from market conditions for a loan of this nature.

This is also noted by expert Renee Tamara St. Rose, KC, in the expert opinion attached hereto as **ANNEX 1,** accompanied by its Spanish translation by a certified translator as **ANNEX 1 BIS**—see Section B, paragraph 14– in which she states that TVA's publicly known and notorious insolvency constitutes one of the main indicators of the deviation from market conditions in the AltberBank Loan.

Furthermore, the Mexican Expert Opinion established the following:

> **94.** The possible characterization of the transaction as specialized financing therefore does not alter the conclusion of the Opinion; rather, it reinforces it. The Alt-TVz Loan incorporated the characteristic cost of a rescue financing arrangement without incorporating any of the control and protection mechanisms that would economically justify it. Additionally, for a regulated institution, a new exposure to a borrower in default generates high costs related to reserves, capital, liquidity, and concentration; therefore, it requires an exceptionally robust source of recovery, enhanced risk distribution, and strengthened approval processes—elements that the Loan Documents do not demonstrate.

The Mexican Expert Opinion also determined that the Loan Agreement completely omitted the representations that would be critical for a borrower in widespread default. As can be seen from the contract itself, TVA made no representations regarding the absence of material litigation or proceedings; there is no representation regarding defaults under other contracts or debt instruments; there is no representation regarding the absence of undisclosed liabilities; there is no representation regarding solvency; and there is no representation regarding material adverse changes. This is clearly contrary to market conditions and standard banking and commercial practices.

As agreed in Clause 5 of the Credit Agreement, the Lender entered into the agreement without the right to receive any financial information during the term of the loan, since the stipulated obligation is limited to TVA maintaining its own internal accounting records and systems—a circumstance that clearly runs counter to banking and commercial practices, given that the borrower's financial information is critical to assessing the debtor's ability to repay all loans, especially in the case of a loan to a company that is notoriously insolvent.

The Mexican Expert Opinion notes that the foregoing constitutes a **serious** deviation from market conditions and banking and commercial practices. For further reference, paragraphs 47 and 48 of that document are set forth below:

> 47. From the banking and financial perspective that is the subject of this Report, this omission is the most technically significant finding in the Original Agreement. The *covenants* and disclosure obligations fulfill a

> Corporate credit agreements have three prudential functions that no other element of the contract can replace: **(i)** they prevent the borrower from unilaterally deteriorating the risk profile on which the financing was granted; **(ii)** they provide early warning signs of deterioration by turning a deviation—which would otherwise only become apparent at maturity—into an actionable breach of contract; **(iii)** they give the lender an early negotiating position. Paragraph 19 of the BCBS Principles refers to them as *contractual obligations designed to limit changes in the borrower's future risk profile*; paragraph 43 requires that credit monitoring ensure compliance with existing *covenants*; Paragraph 39 includes, among the functions of credit management, the monitoring of documentation, contractual requirements, and legal obligations; Paragraph 144(e) of Guidelines EBA/GL/2020/6 requires an assessment of the transaction structure, including *covenants*; and Paragraph 164 requires a specific assessment of *negative pledge* clauses. None of these exercises was materially possible under the Original Agreement, because the instrument did not create any subject matter upon which to perform them.
>
> 48. … The simultaneous waiver of all these protections cannot be explained by the urgency of the transaction, given that these are standard clauses available in any market form and subject to immediate inclusion; rather, it is consistent with a scenario in which the recovery of the loan did not actually depend on the Borrower's future financial performance.

The violation of market conditions and banking and commercial customs and practices is at odds with the provisions of Clause 8.09 of the Loan Agreement, pursuant to which each party shall bear its own costs, departing from the established practice under which each borrower covers the lender's structuring and legal advisory expenses. –See the Mexican Expert Opinion, particularly paragraph 8, which I request be deemed reproduced here as if it were inserted verbatim.–

The Credit Agreement clearly deviates from market conditions and banking and commercial practices, since, far from protecting the lenders, it harms them. This is because there are provisions whose effect is to weaken the lender's position and which lack precedent in credit documentation on the market, as stated in paragraph 61 of the Mexican Expert Opinion, which I request be deemed reproduced here as if inserted verbatim.

For further reference, below are some of the issues highlighted in that paragraph:

> **j) Unusual provisions that are detrimental to the creditor's position.**
>
> **61.** In addition to the omissions noted, the Original Agreement contains provisions that have the effect of weakening the lender's own position and that lack precedent in standard corporate credit documentation in the market.
>
> - **Force majeure in favor of the debtor (Clause 8.08).** … In market-standard credit documentation, obligations to pay money are never subject to force majeure exemptions, precisely because that would render the principal obligation meaningless. A clause of this nature, in a credit agreement for five billion pesos, is hardly consistent with a creditor's intention to ensure repayment.
>
> **…**
>
> - **Absence of *gross-up* and tax indemnification.** Clause 4.05 expressly acknowledges the existence of withholding under Mexican law with respect to payments arising from the Credit Documents. However, the Original Agreement contains no clause providing for a gross-up for withholdings

> (*gross-up*) or tax indemnification, such that the lender's net return in light of the Mexican withholding tax applicable to interest paid to foreign residents remains contractually undetermined. This is one of the most consistently included provisions in any cross-border financing arrangement.
> **…**

It is important to note that, even though the Amended Agreement imposed restrictions on indebtedness, liens, transactions with related parties, use of funds, and disclosure of information, that document cannot be applied retroactively. What is relevant is that the loan was disbursed in violation of the minimum standard that should have been observed for a transaction of this nature and that its terms do not comply with market standards or banking practices.

Now, Section 2.03 of the Amended Agreement stipulates that payment of **the total amount of the loan would be made in a single lump sum equal to the Disbursement on the maturity date—July 29, 2026—**; that is, TVA claims that it was its intention to make a single lump-sum payment of $4,085,000,000.00 (four billion eighty-five million pesos 00/100 M.N.)[1] plus interest, even though it has admitted—and the record shows—that it approved the filing of its petition for commercial insolvency proceedings **prior to the execution of the Amending Agreement to the Restated Contract**, **knowing that one of the immediate legal consequences of such a filing is the prohibition on paying debts to creditors**.

In other words, as of the date of execution of the Amending and Restatement Agreement, there was full knowledge that, as a result of the admission of the petition for a declaration of commercial reorganization, TVA would be legally—regardless of its state of insolvency—prevented from paying AlterBank the disbursed loan plus accessories on the Payment Date.

In addition to the foregoing, as of the date of execution of the Restated Agreement, the grounds for default set forth in Section 6.01, subsections
(h) and (i) of said document had already been met:

> Section 6.01. Events of Default.
> …
> (h) Insolvency. The Borrower or any Subsidiary of the Borrower (each, a **"Specified** Person") becomes unable to pay its debts as they become due, admits in writing before a competent court its inability to do so, or is generally in default on the payment of its debts.
>
> (i) Insolvency Proceedings. Any Specified Person commits or permits any act of bankruptcy or insolvency, which term shall include (i) becoming involuntarily subject to a petition for bankruptcy, commercial reorganization, restructuring (sic), creditors' meeting, dissolution, or liquidation, or any other proceeding

[1] In fact, the amount is $4,156,487,500.00 (four thousand one hundred fifty-six million four hundred eighty-seven thousand five hundred pesos 00/100) as agreed upon in Section 4 of the Amending Agreement, which provided for the capitalization of interest accrued as of the date of execution of said document.

> analogous in purpose or effect, including, without limitation, a proceeding under the Commercial Bankruptcy Law and the failure by the Specified Person in question to ensure that such a petition filed by another party is dismissed within thirty (30) days; (ii) a voluntary petition **or consent** to the appointment of an administrator, provisional liquidator, receiver, trustee, auditor, conciliator, … **or for the initiation or granting of bankruptcy, commercial insolvency proceedings, restructuring,** … **of any Specified** Person… (v) **the issuance of any court order or judgment confirming the bankruptcy or insolvency, commercial** reorganization… **of any Specified Person** (vii) the approval of an effective resolution, the calling of a meeting of any Effective Person, or the adoption of any preparatory measure for the purpose of considering a petition for an administration order with respect to any Specified Person…

Needless to say, it is contrary to market conditions to enter into a credit agreement that is in default from the outset, given that TVA **had already approved, at its shareholders' meeting on February 26, 2026, the initiation of its bankruptcy proceedings**. We are dealing with a situation that is completely atypical in transactions of this nature: namely, that in a loan supposedly intended to maintain the company's financial viability and ensure repayment with high returns, the borrower had already expressed its intention to undergo insolvency proceedings—as approved at a shareholders' meeting—and yet the contract was entered into nonetheless. This demonstrates yet another deviation from market conditions and a violation of banking and commercial customs and practices.

This violation is clear, since granting a loan that, from the moment of its execution (in this case, its restatement), is already in default runs counter to the very nature of the transaction. This inherent default demonstrates that this is not a transaction conducted under market conditions, since no financial institution would grant a loan whose default—far from being imminent—had already occurred. There is no "business opportunity" as claimed by TVA in its response to the Motion.

Furthermore, in Section 6.02 of the Restated Agreement, the parties expressly excluded the scenarios set forth in subsections (h) or (i) of Section 6.01 from the agreed-upon remedial measures; namely: ***(i)*** termination of the Agreement and ***(ii)*** a declaration that the Loan is due and payable in full. This clearly deviates from banking and commercial customs and practices, as well as from market conditions, since there is no business rationale for granting a loan to an insolvent party who will undergo insolvency proceedings and who, as a result, will not repay the loan under ordinary terms, but rather will require the enforcement of collateral for its collection; the scenarios set forth in those subsections are, in fact, precisely the most common grounds for default in credit agreements.

Expert Renee Tamara St. Rose, KC, concludes that the foregoing is clearly contrary to market conditions, as set forth in the expert opinion attached hereto as **ANNEX 1,** accompanied by its Spanish translation by an expert.

certified translator as **ANNEX 1 BIS**—see Section B, paragraph 15; it is requested that this be deemed reproduced here as if the text were inserted verbatim, to avoid unnecessary repetition—.

In addition to the discrepancies noted above, there are other issues related to the interest rates on the AlterBank loan that are clearly contrary to market conditions and banking and commercial practices: ***a)*** high rates that appear to reflect the risk of the transaction; however, given that TVA was already preparing to file for bankruptcy, this argument is implausible; in reality, the rates were agreed upon to ensure that AlterBank would continue to accrue interest at high rates throughout the proceedings up to the value of its security interests (in accordance with the provisions of Article 89, Section III of the LCM); and ***b)*** a monthly default interest rate was agreed upon that is clearly nominal, since, by virtue of the foregoing, such interest would never accrue—especially since they modified the quarterly interest payments to stipulate that these would be paid in a single lump sum upon maturity of the loan.

The modification of the frequency of the interest payment obligation constitutes a third deviation from market conditions, since, as explained by expert Renee Tamara St. Rose, KC, in the expert opinion attached hereto as **ANNEX 1,** accompanied by its Spanish translation by a certified translator as **ANNEX 1 BIS**, such a modification would have had to be based, in any event, on an improvement in the expectation of payment by TVA, a circumstance that does not correspond to reality in this case,for the reasons set forth—see the opinion in Section B, paragraphs 26, 27, and 28 of **ANNEX 1**, accompanied by its Spanish translation by a certified translator as **ANNEX 1 BIS**, which I request be deemed reproduced here as if inserted verbatim—.

As agreed upon by TVA and AlterBank in the AlterBank Loan, the bank account into which the loan payment would be made is held at a financial institution that is part of TVA's business group, a matter that deviates from standard banking and commercial practices, as set forth in paragraph 64 of the Mexican Expert Opinion, which I request be deemed to be reproduced herein as if inserted verbatim.

Another distinctive feature of the loan that clearly deviates from market conditions and commercial and banking practices is the fact that, pursuant to the Loan Agreement, the loan was to be disbursed by AlterBank; however, the Amending Agreement and the Restated Agreement specified the following:

1. Section 4 of the Amendment Agreement provides:

**SECTION 4.** ***Amount of the Disbursed Loan and Acknowledgment of Outstanding Debts.***

The Borrower acknowledges that, to date, it has received a Disbursement pursuant to the Credit Agreement in the total amount of $4,085,000,000.00 (four billion eighty-five million pesos 00/100) and that it owes the Initial Lender $4,085,000,000.00 (four billion eighty-five million pesos 100/00) in principal under the Credit Agreement, and that such principal amount is outstanding and payable to the Lenders as reflected from time to time in the Register maintained by the Administrative Agent. Any reference to the Initial Lender in connection with such debt is made solely in its capacity as the registrant and representative of the Lenders.

**2.** Pursuant to Section 2.01 of the Restated Agreement, the loan disbursement did not come from AlterBank, but from <u>unknown</u> third parties:

Section 2.01. The Loan
Subject to the terms and conditions set forth herein, the Parties hereby acknowledge that the Loan was disbursed on the Disbursement Date through the Initial Lender, who acted exclusively in its capacity as Administrative Agent and record holder on behalf of the Lenders…

Now, a syndicated loan is a form of financing in which two or more lenders assume direct obligations to the borrower under a single set of documents. Each lender retains its own claim for its share of the loan, while one or more agents coordinate disbursements, payments, communications, and collateral.

The AlterBank Loan was **originally** funded by various lenders whose identities are concealed, as they did not directly enter into the loan agreement; rather, their participation is the subject of a separate registration, in accordance with the terms set forth in Section 3.14 of the Restated Agreement, which, for ease of reference, is transcribed below:

Section 3.14. Registration; Recognition of Lenders.

The Borrower acknowledges that the Administrative Agent may, from time to time, maintain records reflecting the identity of the Lenders and their respective interests in the Loan…

In other words, AlterBank is not actually a lender, since, according to the plain language of the Restated Agreement, the funds did not come from that institution but from third parties. AlterBank merely served as the conduit for the funds in this loan.

In standard syndicated loan practice, the original lenders and their respective commitments or participations are identified at the time the financing is arranged—often through a schedule of lenders and commitments.

Furthermore, among the most standard provisions in syndicated loans is the regulation of the agent's powers and responsibilities vis-à-vis the lenders, a provision that is absent from the AlterBank Loan, once again deviating from market conditions and banking and commercial customs and practices—see paragraph 70 of the Mexican Expert Opinion, which I request be deemed reproduced here as if it were inserted verbatim.

Paragraph 77 of the Mexican Expert Opinion clearly states that "The structural result is that, under the Original Contract, no person owes anything to those who assume the economic risk of the financing. The lenders are not the intended recipients of the borrower's representations or obligations; they do not receive the credit instrument; they do not directly receive payments; they cannot direct acceleration; they do not participate in amendments or waivers; and they have no contractual claim against the Agent, who owes them no fiduciary duty whatsoever. In a market-based syndication, this set of powers is balanced by the system of required lenders, matters subject to unanimity, the agent's disclosure and accountability obligations, and its substitution provisions. None of these checks and balances exist." Consequently, there is an undeniable departure from market conditions and banking practices.

The concealment of the true Lenders (since, according to the Restated Agreement, AlterBank is not one) clearly deviates from sound banking practices and market conditions, as in a loan of this size it is impossible for the Borrower to decide not to have visibility into the origin of the funds; **and such negligence could even result in regulatory violations regarding anti-money laundering and the identification of transactions involving funds of illicit origin**.

The statements in the Mexican Expert Opinion are relevant; for better reference, they are transcribed below:

> **88.** Added to this is the aspect of preventing transactions involving funds of illicit origin. Pursuant to paragraph 44(b) of Guidelines EBA/GL/2020/06, the involvement of a person who is neither the borrower nor the lending institution in a credit transaction constitutes, in and of itself, a risk factor that must be identified, assessed, and managed, by taking measures to understand the legitimacy of the funds' source. Within the Mexican framework used as a benchmark, the concept of the "Beneficial Owner" set forth in the provisions of Article 115—adopted in accordance with FATF Recommendation 10—pursues precisely this objective: to determine who ultimately reaps the benefits derived from a contract or transaction and who exercises the rights to dispose of the funds. The structure documented in the Original Contract is, by its very design, resistant to such a determination.

This omission is convenient for TVA, since the content of the Amended Contract and, in general, the AlterBank Loan does not reveal the source of the funds, **which reasonably gives rise to the suspicion that they originated from related parties of**

**TVA**. It should be noted that, according to the information on AlterBank's website[2], that institution does not typically perform any of the functions it assumes in the AlterBank Loan, a fact that reinforces this suspicion.

With regard to the arguments put forward by TVA concerning the fact that the Agreements and Principles of the Basel Committee on Banking Supervision are not legal norms in force in Mexico and are merely *"soft law"* lacking direct binding force, as well as the claim that noncompliance with them and any regulation applicable to AlterBank is a matter that concerns only AlterBank itself and does not affect the determination that the AlterBank Loan was entered into outside of market conditions and contrary to banking and commercial customs and practices—is completely false.

This is because AlterBank is a financial institution subject to a regulatory framework under which it cannot act at its own discretion but, just as with domestic credit institutions, it must comply with the guidelines and regulations established by the relevant authority governing its activities. Therefore, if these Agreements and Principles promote sound banking practices and Saint Lucia incorporates them into its regulations, it is clear that any transaction deviating from them contravenes standard banking practices.

This conclusion is also reached by expert Renee Tamara St. Rose, KC, in the expert opinion attached hereto as **ANNEX 1,** accompanied by its Spanish translation by a certified translator as **ANNEX 1 BIS**—see Section C, paragraphs 38 through 42, which I request be deemed reproduced herein as if inserted verbatim—

. For its part, the relevant portion of its opinion is quoted as follows:

> 39. […] The Basel-derived prudential principles referred to in the Lead Opinion have legal and regulatory significance in Saint Lucia to the extent that they are reflected in the national legal and regulatory framework applicable to AlterBank. Section 15 of the FSRA Act empowers the FSRA to issue guidelines to regulated entities regarding prudential standards relating, among other matters, to the safety and soundness of funds, asset quality, liquidity, related-party transactions, and corporate governance. Consequently, the FSRA Guidance Notes set forth the prudential requirements applicable to AlterBank, including the requirements regarding exposure to a single borrower set forth in Guidance Note 11. AlterBank was also subject to the conditions contained in the FSRA's pre-opening authorization dated February 23, 2024, including the requirement to maintain a Total Eligible Capital to Risk-Weighted Assets Ratio above 8% and to provide advance notice of any significant deviation from its approved business plan. Therefore, the relevant obligations stem from Saint Lucia's national regulatory framework and the conditions applicable to AlterBank, and not from the Basel Principles, which operate independently as a source of law in Saint Lucia.
>
> 41. Nevertheless, the regulatory framework is relevant to the commercial assessment. Saint Lucia's prudential framework requires regulated lenders to address issues such as capital adequacy, concentration risk, credit assessment, liquidity, collateral valuation, and risk management. In

[2]https://www.alterbank.com/services

> particular, the Lead Opinion concluded that AlterBank was obligated, prior to approving and disbursing the Loan, to conduct an adequate credit assessment of TV Azteca, including its financial condition, cash flows, repayment capacity, and existing indebtedness, as well as to evaluate the adequacy and value of the collateral. Therefore, a material breach of these standards may constitute significant evidence when assessing whether the transaction complied with standard commercial lending practices.

All of the foregoing fully establishes that the loan at issue in this motion was entered into outside of market conditions, as well as in violation of banking and commercial customs and practices, and therefore, it must be declared ineffective with respect to the estate; it also demonstrates the manifest groundlessness of the defense raised by TVA in its answer, for the reasons set forth and for all applicable legal purposes.

**B.—PLAINTIFFER'S LACK OF STANDING AND RIGHT TO SUE (SINE ACTIONE**

**AGIS)**

TVA proceeds from erroneous premises, reaching equally erroneous conclusions, since it seeks to subsume the entire chapter relating to acts committed in fraud of creditors under the same procedural assumptions; however, the chapter clearly distinguishes between acts that are **objectively fraudulent** (such as those provided for in Section III of Article 114 of the LCM) and those that are fraudulent based on the intent of the parties, among other factors.

Contrary to what TVA asserts in the motion to dismiss being contested, we are dealing with an act **that is objectively** in fraud of creditors; that is, the Merchant's intent to defraud is not the determining factor. This is established by Article 114 of the LCM itself, which **exhaustively** sets forth a list of acts that **constitute** fraud against creditors, without establishing any additional requirement other than that they were entered into on or after the retroactive date, as is the case here.

This is evident, since it would be absurd to hold that an act that completely deviates from objective parameters—such as market conditions and banking and commercial practices—could cease to be fraudulent merely because of a lack of knowledge regarding the intent to defraud on the part of one of the parties involved.

Likewise, TVA fallaciously argues that the AlterBank Loan benefited the Estate by injecting funds and reducing its liabilities. However, contrary to its assertion, there was no reduction in liabilities, as explained in the response to the following exception, the content of which I request be deemed reproduced here as if inserted verbatim, to avoid unnecessary repetition.

All of the foregoing fully establishes that the loan at issue in this motion was entered into outside of market conditions, as well as in violation of banking and commercial customs and practices

, and therefore must be declared ineffective with respect to the estate; it also demonstrates the manifest groundlessness of the objection raised by TVA in its response, for the reasons set forth and for all applicable legal purposes.

**C. DEFENSE BASED ON THE ABSENCE OF HARM TO THE BANKRUPTCY ESTATE AND THE EXISTENCE OF A NET AND QUANTIFIED BENEFIT IN ITS FAVOR**

Throughout its response to the motion, TVA asserts that the Alterbank Loan was entered into exclusively for the benefit of the bankruptcy estate and that this resulted in "creditors entering the Merchant's bankruptcy proceedings with fewer liabilities." However, as will be explained below, this assertion is false and is based on premises that have not been substantiated by the Merchant.

First, it is worth noting that Article 4, Section V of the Commercial Bankruptcy Law (LCM) establishes that the bankruptcy estate consists of that portion of the assets of the merchant declared in commercial bankruptcy, comprising the property and rights owned by the merchant that are not expressly excluded by the Commercial Bankruptcy Law, and against which Recognized Creditors and other entitled parties **may enforce their claims**.

From a doctrinal perspective, Cervantes Ahumada established that the estate is divided into two parts: the active estate and the passive estate. The former refers to the assets of the bankrupt company, which is considered a de facto universality—that is, a diverse set of assets dedicated to a single purpose: the administration and, where applicable, the liquidation of the company to make payments to creditors.

For its part, the company's passive estate consists of all creditors of the bankrupt entity who are subject to commercial jurisdiction. This is based on the principles of the integrity of the estate and the universality of the bankruptcy proceeding.

Special emphasis is placed on this definition provided by the renowned legal scholar Cervantes Ahumada because, as is well established in law, **creditors also form part of the bankruptcy estate**, as in the specific case at hand.

Furthermore, as recognized by the Federal Judiciary in various rulings, the estate consists not only of the assets and rights that belonged to the merchant prior to the declaration of commercial bankruptcy but also of those that are subsequently incorporated or recognized, in accordance with the principle of universality governing the bankruptcy proceedings.

In terms of case law, the Federal Judiciary has recognized that the primary objective of commercial bankruptcy is *"to safeguard the collective interests of the*

*creditors by preserving the assets of the bankrupt* merchant”[3] , which reaffirms the strategic role of the estate as the operational core of the proceedings.

**Therefore, the bankruptcy estate should not be understood simply as a static sum of the Merchant’s assets, but rather as assets set aside for a collective purpose, which seeks to preserve the available asset value and ultimately allocate it to the orderly satisfaction of creditors in accordance with the rules of recognition, classification, and priority set forth in the Act itself.**

In this regard, as previously discussed, the bankruptcy estate simultaneously serves as a collective guarantee, a means of preserving assets, and a source of financial support for the continuity of the business or, where applicable, for its orderly liquidation.

Under this premise, to determine whether a particular act was performed “for the benefit of the estate,” it is not sufficient that such act be advantageous to the Merchant, much less that it produce an individual benefit for any of its creditors. **The benefit must be analyzed from the perspective of the bankruptcy estate considered as a whole and the collective interest of the creditors.**

Thus, it can be concluded that a benefit to the estate exists when the act in question has the purpose or effect of increasing the estate’s assets, preserving their value, recovering assets or rights that must be incorporated into the estate, preventing their reduction or deterioration, or creating the necessary conditions for the company to continue operating when such continuity allows **for the preservation or maximization** of the value available **to the creditors.**

This interpretation is supported by the very structure of the Commercial Insolvency Law. For example, Article 224, Section IV, recognizes as claims against the estate those arising from judicial or extrajudicial proceedings carried out precisely “for the benefit of the estate,” while various provisions permit the incurring of expenses intended for the security, preservation, and administration of the assets comprising the estate. It follows that the concept of “benefit” is not limited to the immediate acquisition of new assets, but also encompasses those acts reasonably necessary to prevent a loss or preserve the economic value of the bankruptcy estate.

This conclusion has been elaborated upon in various rulings by this Honorable Specialized Court; indeed, as recently as January 27, 2026, in commercial bankruptcy case 15/2023[4], when ruling on an appeal for revocation, it was held that, in order for a particular action to be considered as having been taken for the benefit of the estate, **its “strict necessity”** must be established**,**

---

[3] *See:* Isolated legal opinion: “Insolvency Estate. Its Composition as the Basis for the Satisfaction of Recognized Claims.” Digital Record: 2005483. Tenth Era, Collegiate Circuit Courts, Federal Judicial Weekly.
[4] https://sise.cjf.gob.mx/SVP/word1.aspx?arch=4157/4157000032357586202.pdf_1&sec=Roberto_Abihud_Victoria_Ville

la&svp=1

**"relevance and rationality,"** so that it can be objectively and predictably determined that it will produce a benefit for the estate or prevent harm, in proportion to the cost involved in such action, and provided that the same result cannot be achieved through a less burdensome or more practical alternative.

Although it cannot be overlooked that the underlying issue in that appeal was to determine whether a specific contract could be recognized as a claim against the estate, the fact remains that, in this particular case, the analysis conducted by that court regarding when an act is considered to be for the benefit of the estate is instructive for this specific case.

Thus, the following criteria emerge from that ruling to determine whether an act benefits the bankruptcy estate: *(i)* there must be an objective purpose linked to the preservation, recovery, or increase of the bankruptcy estate's assets; *(ii)* the benefit or prevention of harm must be reasonably foreseeable at the time the act is performed and must not depend exclusively on a subsequent assessment; *(iii)* **there** must be proportionality between the cost or financial sacrifice borne by the Merchant and the expected benefit to the estate; *(iv)* **the same result cannot be achieved through a less burdensome or more practical alternative**; and *(v)* **the action must serve the collective interest of the bankruptcy proceeding and not exclusively the particular interest of the Merchant or any of its creditors.**

The significance of this distinction stems precisely from the collective nature of insolvency proceedings. The interests of the estate are not identical to the individual interests of the Debtor or those of any specific creditor, but rather to the preservation and maximization of the assets intended to satisfy the creditors as a whole. **Therefore, an act that merely substitutes one creditor for another, increases the Merchant's liabilities without producing a corresponding financial consideration, or exclusively benefits the legal position of a specific creditor, cannot be classified, on that basis alone, as an act performed for the benefit of the estate.**

On the contrary, it must be proven that such a transaction resulted in, or was reasonably intended to result in, an increase, preservation, or protection of the estate's assets, or that it prevented financial harm that, had the act not been performed, would have been inflicted upon those assets and, consequently, upon the body of creditors as a whole.

In this regard, it is important to emphasize that, in ruling on the appeal for revocation on January 27, 2026, in commercial bankruptcy case 15/2023, this Honorable Court held as follows:

> *"Indeed, it is not sufficient that the acts were performed with the 'intention' of benefiting the estate; rather, they must genuinely produce a benefit or prevent harm to said estate. (...)*".

Thus, it follows from the reasoning upheld by that Honorable Court that TVA's mere intentions or assertions that the transaction generated a "benefit" for the estate cannot be deemed sufficient without supporting evidence, the burden of proof for which rests with TVA.

This understanding is also consistent with the reasoning analyzed by the Supreme Court of Justice of the Nation in Case No. 280/2021, in which it held that the consequences of certain acts must be analyzed in light of their significance for the estate and with a view to maximizing the merchant's assets, particularly when their effectiveness could result in a reduction of the assets available to creditors.

From all that has been set forth thus far, it is reasonable to conclude that TVA's assertion that the financing provided by Alterbank was contracted "for the benefit of the estate" is based on an incorrect premise, as it confuses the benefit that a transaction might represent for the Merchant or for a specific creditor with an actual benefit to the bankruptcy estate.

To argue that a particular act was performed for the benefit of the estate, one must identify the favorable financial effect it produced for the estate—whether through the increase or preservation of its assets, the recovery of property or rights, the prevention of a loss, or the preservation of the company's value for the benefit of the collective body of creditors.

None of this has been established with respect to the financing provided by Alterbank. On the contrary, the immediate effect of the transaction was the addition of a new liability to TVA's balance sheet in an amount substantially greater than the obligation it purportedly sought to address, without any corresponding explanation regarding the addition or preservation of assets for the benefit of the estate; moreover, given the loan and the guarantees provided, there is now a risk that these guarantees will be enforced to the detriment of the creditors as a whole and the estate.

Furthermore, the detriment to the public interest is evident in the fact that, on the eve of TVA's filing for bankruptcy, creditors were subordinated to the AlterBank Loan—through the creation of guarantees in its favor. It is emphasized that the AlterBank Loan directly violates the provisions of Sections 3.9, 3.10, and 3.15 of the Issuance Agreement, a situation that constitutes a concrete example of how the collective was harmed.

In fact, the funds from the financing did not remain in TVA's assets nor were they used to acquire assets, generate liquidity for its operations, or preserve assets or rights that could subsequently be used to satisfy the creditors as a whole. According to the very mechanics of the transaction and the facts admitted by TVA[5], these funds entered TVA's assets only temporarily, to be immediately used to pay another obligation, as evidenced by payment receipts obtained from the mobile app of various banking institutions.

Therefore, from the perspective of the bankruptcy estate, the transaction cannot be analyzed solely based on the temporary inflow of funds resulting from the financing. Its actual impact on the estate must be examined, as there was a temporary inflow of funds that TVA asserts was immediately used to pay a third party, whereby TVA assumed a new obligation to Alterbank for an amount considerably greater than that owed to the Tax Administration Service (hereinafter "SAT"), thereby increasing the liabilities against the assets available to satisfy creditors.

It should be noted that, as evident from the payment receipts submitted by TVA, the account from which the payment was made (held at BBVA México, S.A., Institución de Banca Múltiple, Grupo Financiero BBVA México) is different from the account into which the loan proceeds were deposited (held at Banco Azteca), thereby raising discrepancies regarding whether the Loan was actually used for the contracted purpose—TVA does not provide evidence that it transferred the funds from the Loan's deposit account to the account from which the taxes were paid. The funds from the AlterBank Loan may still be deposited in TVA's account at Banco Azteca, which solely benefits that institution, which is part of the Merchant's corporate group.

In other words, the transaction does not appear to have increased the assets; what it did produce was a change in the balance sheet and, to the extent that the new financing exceeded the obligation that was satisfied, an increase in liabilities. **This is particularly relevant because the addition of a new loan of that magnitude directly affects the position of pre-existing creditors, who must now compete with an additional creditor for the same available assets and, consequently, see their relative share in the bankruptcy proceedings diluted.**

---

[5] As has been established by various legal precedents, the parties' submissions constitute spontaneous statements, free from any coercion, and if they recount their own facts, these constitute admissions with full probative value. In support of the foregoing, applied by analogy, see the rulings under the headings **"JUDICIAL CONFESSION. SCOPE OF THE CONFESSION MADE DURING THE EXECUTION** PROCEEDINGS" and **"SUBMISSIONS AND CLAIMS BY THE PARTIES FILED IN A SEPARATE CIVIL PROCEEDING. AS THEY ARE SPONTANEOUS STATEMENTS, FREE FROM COERCION, THAT CONTAIN FACTS PERTAINING TO THE PARTY HIMSELF, THEY CONSTITUTE A CONFESSION AND AMOUNT TO FULL PROOF AGAINST THE AUTHOR**."

In other words, the transaction did not increase TVA's net worth, did not incorporate new productive assets, did not generate additional cash flows, nor did it create value that could be utilized by the bankruptcy estate. It merely substituted one creditor for another—at TVA's unilateral discretion—transforming a preexisting debt into a secured claim that materially reduced the chances of recovery for the preexisting unsecured creditors and substantially improved the legal and economic position of a selected creditor on the eve of the bankruptcy proceedings.

Therefore, it is not sufficient to assert, in the abstract, that the financing enabled TVA to fulfill an obligation. To argue that the transaction was effectively carried out for the benefit of the estate, it was necessary to demonstrate what the creditors as a group received in exchange for assuming that new debt; the Merchant fails to demonstrate which asset was acquired or retained, which loss of equity was avoided, what value of the company was preserved, or, in general, what specific economic benefit the estate received that would justify assuming a liability for an amount substantially greater than the obligation that was paid with its resources.

On the contrary, collateral was established on third-party assets belonging to the Merchant's business group—which, to no one's surprise, are the business group's most important assets, namely the broadcasting concessions—in addition to the other guarantees granted under the Restated Agreement.

Particular emphasis is placed on the fact that TVA asserts in its response that the tax claims were secured by the commercial transaction (an issue that seriously jeopardized the operation); however, it decided to secure the AlterBank Loan with the assets that are indispensable to its business—the concessions. So, where is the maximization of the estate's value? Once again, there is a risk of foreclosure on assets that are indispensable to TVA's operations for the benefit of a creditor who was opportunistically added on the eve of the declaration of bankruptcy—a creditor who, moreover, is not the true holder of the security, since the actual holders are concealed.

The truly relevant fact is not the isolated tax benefit that the Merchant obtained on January 29, 2026, but rather the total cost that the bankruptcy estate incurred to produce that result, among other things. That is to say, what was the net benefit to the creditors' estate after deducting interest, fees, the security interests created, and the impact on the estate's assets resulting from the creation of a new secured claim? The burden of proof lies with TVA, yet it has not offered any evidence to substantiate this.

In the absence of such an explanation, the transaction has precisely the opposite effect of what TVA seeks to attribute to it: the funds entered and exited the Merchant's assets, while the new liability remained. Therefore, the mere fact that TVA formally received the financing funds does not demonstrate any benefit

to the estate, since what matters is not the existence of a temporary cash flow, but rather the net economic and equity effect that the transaction had on the assets collectively allocated to satisfy the creditors.

Furthermore, the AlterBank loan costs the public and the community approximately $2,020,514.76 (two million twenty thousand five hundred fourteen pesos 76/100 M.N.) daily, which is equivalent to approximately $737,487,886.28 (seven hundred thirty-seven million four hundred eighty-seven thousand eight hundred eighty-six pesos 28/100 M.N.). This is in addition to the costs of structuring and restructuring fees—approximately $122,550,000.00 (one hundred twenty-two million five hundred fifty thousand pesos 00/100 M.N.).

The mere execution and restructuring of the AlterBank Loan already represents, in terms of cost, 7% of the tax benefit obtained. Therefore, the analysis proposed by the Merchant is artificially static, as it considers only the transaction of January 29, 2026, but fails to account for the fact that the loss to the Estate is dynamic and continues to increase daily, eroding the assets available to the creditor community.

If these conditions persist, the cumulative financial cost of the transaction will exceed any tax benefit invoked to justify it.

Nor can it be argued that securing financing from Alterbank was necessary to protect or benefit the estate in the face of the administrative enforcement proceeding initiated by the tax authority.

In fact, the insolvency legislation itself provides for mechanisms specifically designed to prevent the individual enforcement of tax claims from affecting the assets of a business entity subject to commercial insolvency proceedings. In particular, Article 65 of the Commercial Insolvency Law (LCM) provides that, from the issuance of the commercial insolvency judgment until the conclusion of the conciliation phase, administrative enforcement proceedings for tax claims must be suspended.

Therefore, if TVA's true purpose had been to preserve its assets against the enforcement of the tax claim and, thereby, to protect the estate and the body of creditors, it is important to recognize that the insolvency law itself provides mechanisms specifically designed to address that risk, that is, the debtor had mechanisms inherent to the bankruptcy proceedings to ensure that such enforcement would not continue, without the need to incur new debt for an amount substantially greater than the tax claim it sought to address.

It should be noted that such a suspension of enforcement proceedings could have been ordered as a preliminary injunction upon the admission of the petition for commercial bankruptcy.

The difference is significant. While the suspension of the administrative enforcement proceedings—once the appropriate precautionary measures or, as the case may be, the corresponding judgment had been issued—would have allowed TVA's assets and resources to remain within its estate, subject to the rules of universality, recognition, ranking, and priority inherent to commercial insolvency proceedings, the transaction entered into with Alterbank produced a different result because, TVA obtained new financing; the corresponding funds temporarily entered its estate only to be immediately allocated to the payment of a preexisting obligation; and, once that payment was made, the Merchant remained liable for a new debt in a considerably larger amount and committed various assets essential to its ordinary operations.

This situation is exacerbated when analyzing the chronological sequence of the actions taken by TVA. Let me explain.

As can be seen from Exhibits 6 and 7 submitted in its answer to the complaint, via official letters numbered **400-75-00-00-00-2026-2941 and 400-75-00-00-00-2026-2940**, on January 28, 2026, the SAT, in response to the briefs filed by TVA on that same date, triggered the 15-day deadline to pay the taxes owed since 2013 and maintain the requested tax benefits.

Thus, far from demonstrating that the financing constituted the necessary alternative to protect the estate, the non-extendable deadline for paying the taxes was triggered by the Merchant itself, conveniently one day before the loan agreement was executed.

Consequently, the urgency that TVA now invokes to justify the need for financing did not constitute an external, sudden, and unavoidable contingency, but rather a circumstance whose timing resulted from actions taken by the Merchant itself immediately prior to entering into the loan agreement with Alterbank. Moreover, the tax liabilities date back to many previous fiscal years; therefore, there is nothing sudden about them.

Likewise, it is important to note that, given the existence of bankruptcy mechanisms specifically designed to halt tax enforcement, it is evident that TVA had less burdensome alternatives available to preserve its assets; however, the Merchant chose to take the most burdensome path, assuming new debt substantially greater than the tax obligation it intended to address and securing that debt with assets critical to its operations.

This is particularly relevant because the analysis of the benefit to the estate cannot be limited to determining whether the transaction temporarily resolved a

particular contingency for the Company; rather, it must consider its net effect on the company's net worth and the available alternatives. Under these circumstances, it is not sufficient to assert that the financing allowed the tax liability to be paid—as any other creditor with the ability to enforce a security interest might have done—; it is necessary to demonstrate why incurring additional debt with TVA was more favorable to the estate and to the body of creditors than preserving their resources and invoking the protective mechanisms made available to them by the insolvency proceedings themselves.

This has been recognized by this Honorable Court in various recently issued rulings, specifically the judgment dated December 10, 2025, issued in commercial bankruptcy proceeding No. 35/2022, in which it was established that retroactivity is based on the guiding principle of bankruptcy law regarding the unity and integrity of the debtor's assets, as it aims to ensure that such assets remain unchanged and are subject to the insolvency proceedings in their entirety, constituting the common security for creditors in accordance with the objective of the proceedings; seeking to restore the eroded assets to achieve compliance with the guiding principle of *par conditio creditorum*.

Likewise, that interlocutory ruling established that the retroactive effect is understood as the point in time at which it is deemed that a general default on payments already existed in the debtor's financial position.

Similarly, in the interlocutory ruling dated June 20, 2025, issued by the Honorable Court in commercial insolvency proceeding No. 37/2024, it was recognized that the state of widespread default on payments does not begin with the judicial declaration of commercial insolvency, but rather is a degenerative process over time that occurs beforehand; and it is precisely because of this nature that the concept of retroaction is established. That ruling also established that, based on a harmonious interpretation of Articles 114 through 117 of the Insolvency Law, acts in fraud of creditors are considered as such when they are carried out in a disproportionate manner or with benefits that are visibly superior to those prevailing in the market.

For its part, in the interlocutory ruling dated December 2, 2025, issued by that Honorable Court in Commercial Bankruptcy Case No. 30/2024, the Court recognized *(i)* the creditors' right to an effective review of acts carried out to the detriment of the bankruptcy estate; *(ii)* the principle of protection of the insolvency estate; and *(iii)* the need to ensure the unity of the insolvency estate in accordance with the public interest recognized in Article 1 of the Commercial Insolvency Law (LCM).

**Thus, in light of the foregoing, the analysis of acts performed during the insolvency period cannot be limited to determining whether they resulted in a direct reduction of the Merchant's assets. Consideration must also be given to those acts which, by creating new liabilities or altering the relative position of creditors, may affect the**

**common estate and the conditions under which the creditors as a group will have to share in it. Such acts must be examined in light of the creditors' right to an effective review of acts carried out to the detriment of the estate and the principle of the estate's protection and integrity, as recognized by this Honorable Court.**

Similarly, in the interlocutory ruling issued in commercial bankruptcy case 30/2024, the distinction between de facto insolvency and de jure insolvency was explained and elaborated upon; the former refers to the moment when the acts that led the party subject to the insolvency proceedings to find itself in a state of widespread default on its obligations began, and the latter refers to the judicial determination that formally declares the state of commercial insolvency due to such widespread default.

The interim ruling states that the state of widespread default is not spontaneous but rather the result of a prolonged process stemming from a series of ongoing events that lead to a state of financial insolvency; thus, during the period of economic decline, it is possible for the business owner to engage in a series of acts that favor a particular creditor, conceal, squander, encumber, or divert their assets, or resort to ruinous practices—among other actions—in order to erode the common security of the creditors.

The criteria confirm that TVA's unsubstantiated assertion that the financing provided by Alterbank was obtained "for the benefit of the estate" does not hold up to an analysis of the transaction in its context and in light of the alternatives available to the Merchant at the time it was entered into.

To begin with, it is not disputed that, under certain circumstances, obtaining financing may be beneficial for a company and, ultimately, for its estate. What must be demonstrated in this case is something different: why entering into this particular financing arrangement, for that amount and at that time, constituted the most favorable alternative for the estate and the collective body of TVA's creditors.

In other words, the transaction was not entered into in the ordinary course of business of a company whose insolvency was then unforeseeable, but rather in a timeframe immediately preceding the commencement of insolvency proceedings and in the face of a situation of widespread default on payments that was, at the very least, imminent. It is emphasized that, in this case, TVA's insolvency was public knowledge, and there are various news articles—cited in the Motion—in which TVA's failure to meet its payment obligations under the Issuance Agreement since 2021 had been made public.

As Renee Tamara St. Rose, KC, explains in her Supplementary Opinion, which is attached hereto as **ANNEX 1** along with its Spanish translation by a certified translator as **ANNEX 1 BIS**, the contractual documents do not identify

No committed refinancing, sale of assets, capital increase, or any other specific and verifiable source of funds that would reasonably explain how TVA intended to repay a loan exceeding **4,000 million pesos** within approximately **six months**. The expert concludes that there is no identified source of payment in the contractual documentation and emphasizes that the existence of a commercially credible repayment mechanism takes on particular importance when the borrower is already experiencing significant financial difficulties. She also points out that, given the scale of the transaction, a prudent creditor should have assessed the existing defaults, the position of the other creditors, the priority of claims, and the consequences that the new financing would have for them.

The analysis of the alleged benefit to the estate cannot be limited to the assertion that "financing was obtained to pay the tax liability." It must consider the net financial impact of the transaction and the alternatives available at that time. If there was an insolvency proceeding that allowed for addressing the risk of tax enforcement without assuming a new liability of that magnitude, it was necessary to explain why incurring additional debt for TVA was objectively more favorable to the estate than resorting to the protective mechanisms provided for under insolvency law. The burden of proof lies with TVA.

The assertion that the AlterBank loan was entered into "for the benefit of the estate" cannot be accepted without further demonstration, without explaining what specific economic benefit the body of creditors received and, in particular, why an alternative was chosen that increased TVA's debt immediately prior to its insolvency proceedings when less burdensome insolvency mechanisms existed to address precisely the risk now invoked as justification for the transaction.

**Unless TVA provides an objective, economic, and bankruptcy-law-reasonable justification, it cannot be deemed proven that the financing with AlterBank was arranged for the benefit of the estate.**

However, throughout its brief in response to the motion, TVA generically denies—for *"procedural* purposes"—the facts set forth by my client, shifting the burden of proof to my client to establish what TVA characterized as the *"elements of the fraud claim*."

It is true that, pursuant to Article 1194 of the Commercial Code, the party making the assertion bears the burden of proof. However, in its response to the motion, TVA built its defense on the basis of various assertions that it, too, is obligated to prove.

One of those assertions is precisely that the transaction entered into with AlterBank was carried out to obtain urgent, necessary, and genuine financing that resulted in a "benefit to the estate."

In other words, without prejudice to the burden of proof resting with the Petitioner, TVA will also have to prove the facts on which it bases its defense—that is, what specific, objective, and economically verifiable benefit the loan agreement with AlterBank produced for the bankruptcy estate.

To this end, it is not sufficient to prove the existence and validity of the loan agreement, the disbursement of the funds, or their subsequent use to pay a tax liability. Such circumstances merely demonstrate the mechanics of the transaction but do not prove that it was beneficial to the estate.

What TVA asserts—and must therefore demonstrate—is that the decision to assume a new liability for an amount substantially greater than the tax debt produced a favorable financial effect for the body of creditors and not, as is claimed, an increase in the insolvency liabilities that diluted the relative position of pre-existing creditors, thereby eroding or adversely affecting the estate's liabilities.

This burden takes on particular significance in light of the objective circumstances surrounding the transaction: *(i)* TVA was already facing a situation of widespread default on payments that would lead, just a few days later, to the filing for bankruptcy; *(ii)* through the insolvency proceedings, it had legal mechanisms available to address the administrative enforcement proceeding that it now invokes as justification for the financing; *(iii)* despite this, it chose to take out a loan outside the insolvency proceedings that was substantially greater than the tax debt; and *(iv)* the funds obtained immediately left TVA's assets, while the new liability to Alterbank remained and was subsequently included in the insolvency proceedings.

Given these circumstances, we are not dealing with a plain and simple denial on the part of TVA. Rather, it is a qualified denial accompanied by factual and independent assertions intended to counter the facts set forth in the motion filed by BNY.

TVA's standard formula of responding to the facts of the motion by denying them "for procedural purposes" in no way alters the affirmative assertions it made in constructing its defense, nor does it serve to shift the burden of proof to BNY.

In other words, the label "denial for procedural purposes" does not alter the burden of proof that rests with TVA, since that expression has no effect on the rules governing the

allocation of the burden of proof, specifically because TVA, in its response to the facts of the motion, introduced express assertions into the proceedings as justification for its conduct.

If she maintains that taking on this new debt was done "for the benefit of the estate," it is her responsibility to prove what that benefit consisted of, how it materialized in the bankruptcy estate, and why that transaction was reasonably more favorable to the body of creditors than the less burdensome alternatives available to her.

Moreover, if TVA categorically asserts that the financing obtained "benefited the estate," there is no doubt that it is the business owner herself who has privileged access to the documentation capable of demonstrating the alleged "benefit."

In this case, TVA did not outright deny the facts of the motion; rather, as explained above, the business owner based her defense on explicit assertions, such as that the transaction would have been beneficial to the bankruptcy estate. Consequently, it is up to TVA to demonstrate what the "benefit" it claims consisted of—beyond the discount granted by the tax authority—and what favorable, concrete, and objectively verifiable financial effect it produced for the body of creditors.

To reiterate, in this case, TVA is clearly in a better position to provide evidence demonstrating the economic and financial reasons that allegedly justified the transaction because TVA was ***(i)*** the party that decided to secure the financing; ***(ii)*** the party that knew its financial and asset situation; ***(iii)*** the party that determined the amount requested; ***(iv)*** the party that theoretically should know who the actual lenders are; ***(v)*** the party that knew how the funds would be used; ***(vi)*** the party that could assess the available alternatives in light of the administrative enforcement proceedings; and ***(vii)*** the party that, just a few days later, filed for its own bankruptcy.

It should be noted that BNY does not seek to shift the burden of proving the existence of the alleged fraud to TVA, much less does it seek to be relieved of the burden of proving the facts constituting its claim. What BNY submits for Your Honor's consideration is that it is abundantly clear that TVA's defense is built upon affirmative assertions under which it maintains that the financing arrangement was necessary and beneficial to the estate; for this reason, in accordance with the rules governing the allocation of the burden of proof, it is incumbent upon TVA to prove the affirmative fact upon which its defense rests.

In conclusion, it is not sufficient for TVA to assert dogmatically that the financing was arranged "for the benefit of the estate." It must demonstrate what benefit the estate obtained; how that benefit materialized in its assets; why it was necessary to assume a liability substantially greater than the tax liability it intended to address; and why that alternative

was more favorable to the body of creditors than resorting to the protective mechanisms offered by the bankruptcy proceedings, the filing of which was already imminent.

**D. MOTION TO DISMISS THE DECLARATION OF INVALIDITY ON THE GROUNDS OF AN EXPRESS PROVISION OF LAW (PENULTIMATE PARAGRAPH OF SECTION 114 OF THE LCM)**

The objection raised by TVA is clearly unfounded, since the penultimate paragraph of Article 114 of the LCM is not applicable in the case at hand. On the contrary, the penultimate paragraph of the cited article refers to **payments made to the merchant** that represent a benefit to the estate.

As explained throughout the Motion and in this brief, in the case at hand, no payment was made to the Merchant; on the contrary, we are dealing with a debt incurred by the Merchant which, as explained in the response to the immediately preceding objection, does not meet the criteria of necessity, relevance, and rationality.

Furthermore, without prejudice to the inapplicability of the cited paragraph, we insist that the AlterBank Loan is a loan in which the true creditor is being concealed; therefore, taking into account all the facts set forth herein, it is reasonable to presume that it could even be used to benefit the Merchant's related parties, allowing them to profit illegally and in violation of the law governing this commercial reorganization, by exercising rights as a secured creditor with no relationship to the Merchant.

This concealment of the actual lender cannot constitute a benefit to the estate, given that the estate is the common asset pool of the Merchant's creditors, and the tax benefit referred to by TVA is insufficient to establish that there is a benefit to the estate, since there is no concrete economic benefit for the collective body of creditors, given that AlterBank holds security interests, whereas for the rest of the creditors, there was a dilution without the creation of new security interests in their favor.

**E. EXCEPTION BASED ON THE NON-EXISTENCE OF THE CIRCUMSTANCE PROVIDED FOR IN ARTICLE 114, SECTION III OF THE LCM**

To avoid unnecessary repetition, I request that the arguments set forth throughout this brief regarding the fact that the AlterBank Loan was entered into outside of market conditions and banking and commercial customs and practices be deemed to be reproduced here as if they were inserted verbatim.

### F. EXCEPTION BASED ON THE NON-EXISTENCE OF THE CIRCUMSTANCE PROVIDED FOR IN ARTICLE 115, SECTION I OF THE LCM

TVA asserts that the scenario provided for in Section I of Article 115 of the LCM does not apply in this case; however, its argument is erroneous.

This is because the Credit Agreement provided for the creation of security interests in favor of AlterBank with first priority over the Borrower's assets—at that time, the drawn-down credit amounted to $4,085,000,000.00 (four billion eighty-five million pesos 00/100 M.N.); however, at the time the Amending Agreement was executed, it was agreed to capitalize the interest accrued up to that date, resulting in a new principal amount of $4,156,487,500.00 (four billion one hundred fifty-six million four hundred eighty-seven thousand five hundred pesos 00/100).

In other words, the regulatory scenario set forth in Section I of Article 115 of the LCM does apply, since the agreed-upon guarantees were indeed increased by raising the principal amount they were originally intended to secure—which automatically affects the calculation of ancillary amounts that are also secured.

Consequently, the objection raised by TVA is clearly unfounded and inadmissible for all applicable legal purposes.

### G. EXCEPTION BASED ON GOOD FAITH

The Merchant seeks to mislead the Court by arguing that good faith is presumed in the case at hand, leaving it to my client to prove bad faith.

However, it is emphasized that the scenario provided for in Section III of Article 114 of the LCM constitutes an act **that is objectively** in fraud of creditors; therefore, to determine that the AlterBank Loan is fraudulent, it suffices to demonstrate that it was entered into outside of market conditions and in violation of banking and commercial customs and practices, as my client has done.

Therefore, regardless of the Merchant's intent in entering into the transaction, the AlterBank Loan constitutes an act in fraud of creditors for the reasons set forth throughout this brief.

Furthermore, Article 115 of the LCM clearly establishes a legal presumption that an act constitutes fraud against creditors if guarantees are granted or existing ones are increased when the original obligation did not provide for such a guarantee or increase, as is the case here.

Notwithstanding the foregoing, the good faith with which TVA claims to have acted is undermined by the AlterBank Loan documents themselves, as set forth in the Motion and in this brief.

**H. MOTION TO DISMISS CLAIM C ON THE GROUNDS THAT IT SEEKS A PENALTY NOT PROVIDED FOR IN OUR LEGISLATION**

The objection must be dismissed, as it is based on the erroneous premise that BNY seeks the imposition of a penalty or deprivation of rights not expressly provided for by law, when in fact what is being argued is the application of the legal effects inherent in the declaration of invalidity provided for in Article 113 of the Commercial Bankruptcy Law.

The Merchant itself invokes Article 114 of the Commercial Bankruptcy Law, the last paragraph of which provides: *"If third parties return what they have received from the Merchant, they may request recognition of their claims."*

It follows from the interpretation of this provision, *a contrario sensu*, that as long as third parties involved in acts declared ineffective against the estate do not return what they received from the Merchant, they lack standing to request recognition of their claims within the insolvency proceedings.

Consequently, the declaration that such acts are ineffective against the estate has the immediate effect of preventing such third parties from being recognized as creditors in the commercial insolvency proceeding and, therefore, from exercising voting rights in the process of approving an insolvency agreement.

The Merchant seeks to introduce arguments unrelated to the issue at hand, with the clear intent of diverting the Honorable Judge's attention from the central issue of this motion: the consequences arising from the declaration of the ineffectiveness of acts committed in fraud of creditors.

In fact, Articles 118 and 119 of the Commercial Insolvency Law do not contain an exhaustive list of the consequences that may arise from a declaration of invalidity with respect to the estate, but rather regulate only certain specific cases and the particular effects associated with them. Thus, Article 118 addresses the case in which a third party has acquired, in bad faith, assets that were the subject of acts committed in fraud of creditors, and such assets are lost, destroyed, or concealed. For its part, Article 119 governs the consequences arising from the restitution of assets or sums to the estate, specifying the items that

The following shall be deemed to be included in said refund: fruits, returns, interest, and other incidental amounts.

None of these scenarios has a direct bearing on the present case. As the Merchant itself acknowledges, AlterBank did not purchase any goods from the Merchant, but rather granted it a loan. Furthermore, the record of the proceedings and the documents submitted in this motion do not indicate that AlterBank received any payment from the Merchant, since the Merchant was declared in bankruptcy without having made a single payment on the contracted financing, given that no due date had been updated in accordance with the contract. Consequently, it is inappropriate to seek to apply the consequences provided for in factual scenarios that are entirely different from those analyzed here.

However, this in no way implies that the declaration of invalidity lacks legal consequences. On the contrary, once the act has been declared ineffective with respect to the estate, all effects inherent in such a declaration must take effect, including the impossibility of recognizing the claim arising from the ineffective act and, consequently, the inappropriateness of considering such a claim for the purposes of voting on the reorganization plan.

In conclusion, the Merchant’s argument is based on a flawed premise, as it seeks to present as a “sanction” or a “deprivation of rights” what in reality constitutes a direct consequence of the regime of ineffectiveness provided for in Article 113 of the Commercial Bankruptcy Law.

A declaration of ineffectiveness with respect to the estate implies, by definition, that the respective act cannot produce legal effects enforceable against the commercial insolvency proceeding. If the claim that TVA seeks to file derives precisely from the act whose invalidity is being challenged, it is legally inconsistent to argue, on the one hand, that said act is invalid vis-à-vis the estate and, on the other hand, that the claim arising from that same act must be recognized within the insolvency proceedings and have full effect in determining voting majorities—through the recognition of AlterBank as a creditor.

The Merchant also attempts to equate the action for invalidity in insolvency proceedings with the “paulian” action provided for under general law. However, such a comparison is inappropriate. The Commercial Insolvency Act itself establishes a special regime for the collective protection of creditors that seeks to safeguard the integrity of the estate for the benefit of all creditors; therefore, the effects of insolvency-related invalidity cannot be restricted or interpreted based on the rules of an individual civil action designed to protect private interests.

Furthermore, Article 113 of the Commercial Insolvency Act expressly provides that acts committed in fraud of creditors shall be ineffective against the estate, without limiting this consequence exclusively to cases involving the restitution of assets or sums of money. Articles 118 and 119 regulate certain restitutionary effects for specific scenarios, but by no means exhaust all the legal consequences arising from a declaration of invalidity.

Therefore, the issue is not to impose on AlterBank a sanction that the legislature did not foresee, but rather to recognize that a claim arising from an act declared ineffective against the estate lacks the standing to be recognized within the bankruptcy proceedings and, consequently, cannot be counted toward forming the majorities necessary for the approval of a reorganization plan. To argue otherwise would be tantamount to admitting that an act declared ineffective produces precisely the effect that the law seeks to prevent.

## I. EXCEPTION OF PRECLUSION AND INADMISSIBILITY OF THE ALLEGED "RESERVATION OF EXPANSION" OF THE MOTION

The objection raised by the Merchant is without merit, given that: *(i)* there is no expansion of the scope of the litigation because the claim and the cause of action remain exactly the same; and *(ii)* in any event, the facts and documents subsequently presented by the Merchant itself fully justify the development and supplementation of arguments regarding supervening or subsequently discovered facts.

Contrary to its assertions, this party has not modified or expanded the action brought, the cause of action, or the relief sought in this motion. Since the motion was initially filed, BNY has maintained that AlterBank's claim arises from acts that must be declared ineffective against the estate under the Commercial Bankruptcy Law, and that is—and nothing else—the issue submitted for Your Honor's consideration.

The Merchant unduly confuses the prohibition against altering the scope of the litigation with the parties' right to develop, supplement, and strengthen the legal arguments supporting their claims, particularly when **documents and evidence that were not available at the time the motion was filed are introduced** during the course of the proceedings.

Furthermore, it is contradictory for the Merchant itself to invoke preclusion in an attempt to prevent the analysis of facts and documents whose existence was concealed or, at the very least, not disclosed in a timely manner. At the time the motion was filed, BNY did not have access to the Credit Agreement, its Amendment Agreement, the Restated Agreement, or

the instruments relating to the creation of security in favor of AlterBank. These documents were produced only later, even after they had been requested through this Court, as they were documents that were under the exclusive control of AlterBank and the Merchant itself.

In fact, BNY filed a *discovery* motion—as the Merchant acknowledges—precisely to be in a position to obtain more information and documents regarding the financing provided by AlterBank. It should be noted that, under the AlterBank Loan Agreement, AlterBank is the party that necessarily knows who the actual lenders are. That proceeding is currently pending, and my client continues to seek further information regarding AlterBank and its officers in connection with the AlterBank Loan.

Consequently, it cannot validly be argued that BNY was obligated from the outset to raise arguments regarding documents whose content it was unaware of and which the opposing party had failed to produce. Precisely because those instruments were subsequently introduced into the proceedings, this party is entitled to raise the observations, inferences, and legal arguments derived from them.

It should be noted that the new arguments presented by BNY do not introduce a different claim nor do they seek a legal consequence different from that originally raised. They merely elaborate on and corroborate the facts at issue in the motion in light of documentation that was not available at the time of its filing and whose relevance to the resolution of the dispute is evident.

Therefore, the objection raised must be dismissed, since the Merchant's intent is not to prevent a modification of the dispute—which has not occurred—but rather to unduly restrict this party's right to comment on documents and information that were subsequently added to the record and that, by their very nature, could not have been analyzed at the time the motion was filed.

Accepting the Merchant's position would lead to the absurdity of allowing a party to withhold relevant documentation during the initial stage of the proceedings and subsequently invoke preclusion to prevent the opposing party from raising arguments based on that information once it is finally disclosed. Such an outcome is incompatible with the principles of adversarial proceedings, procedural equality, and effective judicial protection that govern insolvency proceedings. The following **case law** and judicial criteria support the foregoing:

> Digital Record: 2018042 Instance: First Chamber, Tenth Term Subject(s): Civil Legal Precedent: 1a./J. 48/2018 (10th) Source: Gazette of the Federal Judicial Weekly. Book 59, October 2018, Volume I, page 632 Type: **Case Law**
> **AUTHORIZED TO RECEIVE NOTIFICATIONS, PURSUANT TO ARTICLE 1069, THIRD PARAGRAPH, OF THE COMMERCIAL CODE.**

**DOES NOT HAVE THE AUTHORITY TO CONDUCT THE HEARING GRANTED TO THE PLAINTIFF IN THE ANSWER TO THE COMPLAINT.**

**The provision requiring that the plaintiff be served with the answer to the complaint or the defenses raised by the defendant in commercial proceedings is intended to place the plaintiff on an equal footing with the defendant, thereby guaranteeing the right to rebut the facts set forth in the answer to the complaint and upon which the defenses are based, regarding which the plaintiff was not required to provide details in the complaint, as well as to allow the plaintiff to present evidence against those facts; therefore, since it is linked to the initial claim, it holds the same legal standing as other procedural acts, such as the filing of the complaint, along with its corresponding clarifications and amendments, and the answer to the complaint.** However, Article 1069 of the Commercial Code only grants the authorized representative the status of a person empowered to hear and receive notifications, since their powers are limited to the proceedings and resolution of the case in which they were appointed, without conferring any authority to represent the principal. Thus, with regard to the act by which the plaintiff is given the opportunity to present its case in response to the answer to the complaint, this obligation applies only to the holder of the right, their representative, or agent, as it is considered the proper formulation of a claim. Consequently, the person authorized under the terms indicated does not represent the interests of the authorizing party, since for such purposes a power of attorney or judicial mandate must be executed that reliably establishes those prerogatives; hence, they are not authorized to conduct the hearing and present the necessary circumstances regarding the facts set forth in the answer to the complaint, since it is precisely the plaintiff (or their representative) who is responsible for contesting the new issues raised by the defendant. The fact that the aforementioned Article 1069 provides for an open-ended clause authorizing the authorized representative to perform "any act necessary for the defense of the principal's rights" does not preclude the foregoing; for the broad scope of that provision does not mean that the authorized representative may perform absolutely any act on behalf of the principal, since their participation must be limited to procedural actions to ensure the protection of the principal's rights; however, the response at the hearing may only be reserved for the plaintiff (or their representative), as it is a personal act directly linked to the formulation of the initial claim.

Contradiction of Thesis 16/2018. Between the theses upheld by the then Third Collegiate Court of the Twenty-Third Circuit—now the Second Collegiate Court of the Thirtieth Circuit—and the Twelfth Collegiate Court for Civil Matters of the First Circuit. June 20, 2018. The vote was divided into two parts: a majority of four votes in favor of jurisdiction. Dissenting opinion: José Ramón Cossío Díaz. Unanimous decision of five votes on the merits, by Justices Arturo Zaldívar Lelo de Larrea, José Ramón Cossío Díaz (who reserved the right to file a concurring opinion), Jorge Mario Pardo Rebolledo, Alfredo Gutiérrez Ortiz Mena, and Norma Lucía Piña Hernández. Presiding Justice: Jorge Mario Pardo Rebolledo. Clerk: Jorge Arriaga Chan Temblador.

Contending Theses and Criteria:

The ruling issued by the then Third Collegiate Court of the Twenty-Third Circuit—now the Second Collegiate Court of the Thirtieth Circuit—in resolving direct amparo proceeding No. 623/2006, from which the isolated legal principles XXIII.3o.15 C were derived, under the heading: "ATTORNEY AUTHORIZED TO RECEIVE NOTIFICATIONS PURSUANT TO ARTICLE 1069, THIRD PARAGRAPH, OF THE COMMERCIAL CODE. LACKS THE AUTHORITY TO ENTER INTO A CONFESSION TO THE DETRIMENT TO HIS PRINCIPAL."; and the separate precedent XXIII.3o.16 C, titled: "ATTORNEY AUTHORIZED TO RECEIVE NOTIFICATIONS PURSUANT TO ARTICLE 1069, THIRD PARAGRAPH, OF THE COMMERCIAL CODE. LACKS THE AUTHORITY TO RESPOND ON BEHALF OF HIS PRINCIPAL TO THE OPPONENT'S ANSWER TO THE COMPLAINT, IN THE PART WHERE THE LATTER WILL SET FORTH HIS LEGAL POSITION REGARDING THE RAISED DEFENSES.", published in the Federal Judicial Weekly and its Gazette, Ninth Series, Volume XXIV, December 2006, page 1237, with digital registration numbers: 173865 and 173866, respectively.

The ruling issued by the Twelfth Collegiate Court for Civil Matters of the First Circuit, in resolving direct amparo proceeding 132/2017, in which it determined that, under Article 1069 of the Commercial Code, the authorized representative is indeed empowered

to respond to the request made to his principal—the plaintiff in the original proceeding—in the answer to the complaint, since it considered that the authorized representative receives a general mandate to perform the acts specified in that provision, and that a reading of the provision revealed no restriction or limitation whatsoever that would prevent the authorized representative from responding to the request made in the answer to the complaint.
Case Law Ruling 48/2018 (10th). Approved by the First Chamber of this High Court, in a closed session on July 4, 2018.
This legal principle was published on Friday, October 5, 2018, at 10:15 a.m. in the Federal Judicial Weekly and, therefore, is considered mandatory as of Monday, October 8, 2018, for the purposes set forth in paragraph seven of General Plenary Agreement 19/2013.

Digital Record: 2014577 Instance: First Chamber, Tenth Term Subjects: Constitutional, Civil Precedent: 1a. LXIII/2017 (10a.) Source: Gazette of the Federal Judicial Weekly. Book 43, June 2017, Volume I, page 589 Type: Isolated.
**SERVICE OF THE ANSWER TO THE COMPLAINT ON THE PLAINTIFF. INTERPRETATION OF ARTICLES 1400 AND 1401 OF THE COMMERCIAL CODE IN ACCORDANCE WITH DUE PROCESS.**

Articles 1400 and 1401 of the Commercial Code, by providing that the plaintiff be served with the answer to the complaint or the defenses so that the plaintiff may, within a certain period, respond to them and present evidence, rather than contravening the principle of procedural equality of the parties as an expression of due process, seek to adhere to this principle, so that the plaintiff's position is not placed at a disadvantage relative to that of the defendant, on the understanding that the opportunity granted to the plaintiff in commercial enforcement proceedings is intended to give the plaintiff the right to rebut the facts set forth in the answer to the complaint—and upon which the exceptions and defenses are based—regarding which the plaintiff was not required to address in the complaint, as well as to present evidence against those facts, which the plaintiff was also not required to present at the time of filing the complaint. The logical explanation for this is that the plaintiff's burden when filing a complaint in an enforcement proceeding is to present the title giving rise to the enforcement action on which the claim is based, as well as to clearly state the facts relating to the formation of the title and the right contained therein; in contrast, the defendant may raise defenses that may concern different facts—albeit related to the action brought—such as the plaintiff's lack of legal standing, the forgery of the debtor's signature, the alteration or nullity of the instrument, the statute of limitations, the expiration of the claim, the judge's lack of jurisdiction, or defenses based on the causal relationship, among others, regarding which the plaintiff is not required to address in the complaint, since the plaintiff is not in a position to anticipate or know the facts to which the defendant might refer when answering the complaint or raising exceptions and defenses until such time as this occurs; therefore, since these are facts introduced into the litigation after the plaintiff's ordinary participation in defining the subject matter of the dispute, the plaintiff's right to be heard must be respected. On the other hand, this right cannot serve as a basis for the plaintiff to remedy any omissions in the complaint—that is, to state facts that should have been included in that document—nor to present evidence that should have been submitted at that time, since, if that were the case, the judge must dismiss them, as in such a situation the facts and evidence would have been introduced into the proceedings in violation of procedural rules, thereby creating a procedural imbalance.
Direct Amparo Appeal No. 4389/2014. Vinos y Licores Aragón, S.A. de C.V. June 3, 2015. Five votes by Justices Arturo Zaldívar Lelo de Larrea, José Ramón Cossío Díaz, Jorge Mario Pardo Rebolledo, Olga Sánchez Cordero de García Villegas, and Alfredo Gutiérrez Ortiz Mena. Reporting Justice: José Ramón Cossío Díaz. Clerk: Mónica Cacho Maldonado.
This decision was published on Friday, June 23, 2017, at 10:29 a.m. in the Federal Judicial Weekly.

As previously explained, my client does not intend to file a new claim, modify the cause of action, or expand the relief sought in this motion. Her sole purpose is to fully exercise her right to respond with respect to facts, defenses, and evidence whose content was unknown to BNY at the time the motion was filed, either because they were produced subsequently or because they were under the exclusive control of the Merchant.

In this regard, the rule of closed litigation prevents the parties from altering the claims that form part of the dispute, but it cannot in any way be used to restrict a party's right to respond to facts, arguments, or documents introduced by the opposing party after the proceedings have begun. To argue otherwise would amount to depriving the parties of their fundamental right to present counterarguments and a defense regarding evidence that could not reasonably have been analyzed at the time they formulated their initial arguments.

Thus, in accordance with the principles of due process, procedural equality, and the right to be heard, my client has the right to make statements and submit evidence related to supervening facts or to information that came to light after the filing of the motion, particularly when such information derives from documentation produced during the course of the proceedings in question or obtained through the *discovery* process.

In any event, it is up to Your Honor to determine whether the arguments and evidence asserted by this party are in fact intended to challenge the facts, defenses, and documents submitted by the opposing party, as well as to contribute to the clarification of the truth and the proper resolution of the dispute. Therefore, it is improper to seek to exclude *a priori* any argument derived from documentation or information that became known subsequently, as this would imply prejudging the relevance and scope of elements that must still be assessed within the overall context of the motion.

This is all the more true given that the right to respond is intended precisely to allow a party to address new issues introduced into the proceedings by the opposing party, without this implying a modification of the subject matter of the dispute or an expansion of the action originally brought. The following judicial precedent supports this view:

> Digital Record: 2004555 Instance: First Chamber, Tenth Term Subject(s): Civil Thesis: 1a. CCLXXVII/2013 (10th) Source: Weekly Judicial Gazette of the Federation and its Official Gazette. Book XXIV, September 2013, Volume 1, page 994 Type: Isolated. **JUDICIAL PROCEEDINGS FOR THE ENFORCEMENT OF SECURITIES GRANTED THROUGH A PLEDGE WITHOUT TRANSFER OF POSSESSION AND A SECURITY TRUST. THE OPPORTUNITY GRANTED TO THE PLAINTIFF TO RESPOND TO THE DEFENDANT'S ANSWER TO THE RELEVANT COMPLAINT, PURSUANT TO ARTICLE 1414 BIS 14 OF THE COMMERCIAL CODE, INCLUDES THE RIGHT TO PRESENT ARGUMENTS AND TO SUBMIT EVIDENCE TO REBUT THE DEFENDANT'S DEFENSES.**
> The aforementioned provision governs part of the judicial procedure for the enforcement of guarantees granted through a pledge without transfer of possession and a guarantee trust, by establishing that the judge shall rule on the admission or rejection of evidence in the order determining whether the complaint has been answered or not; in that order, the plaintiff shall be given notice of the defenses raised by the defendant for a period of three days, and a date and time shall be set for the hearing on evidence and arguments. Now, while it is true that the literal wording of Article 1414 Bis 14 of the Commercial Code is not conclusive regarding the question of whether, during the hearing

> that hearing the plaintiff, in addition to having the right to argue as he sees fit, **may present evidence to rebut the raised defenses, this question must be resolved in the affirmative, as it constitutes the interpretive approach that renders the provision compatible with the human right to due process.** This is, first, because the provision in question contains no normative provision that excludes this possibility; therefore, it may be affirmed that the law of evidence allows for its incorporation into the wording of the provision; second, due process—understood from the perspective of the party invoking the judicial function to secure the recognition and protection of a right—requires judicial authorities to resolve disputes over individuals' rights through a procedure that affords them an effective and equal opportunity to defend their positions and present evidence in support of their claims. This does not imply recognizing a limited right for the plaintiff to present evidence, since this right of reply is only intended to genuinely refute the statements made by the defendant in their answer, and therefore the judges responsible for applying this principle must ensure that the exercise of this right is confined to this purpose and does not become a means to remedy deficiencies in the original complaint; this implies that the judicial authority retains the power to admit or reject evidence, as warranted by the case.
>
> Direct Appeal for Review No. 3758/2012. Maple Commercial Finance, Corp. May 29, 2013. Five votes. Reporting Judge: Alfredo Gutiérrez Ortiz Mena. Clerk: David García Sarubbi.

In light of the foregoing, I request that Your Honor rule that the exceptions and defenses raised by TVA are unfounded and inadmissible, and, at the appropriate procedural stage, rule that the Motion is well-founded and admissible, finding that the credit at issue in this Motion was entered into outside of market conditions and in violation of banking and commercial customs and practices, and therefore, it must be declared ineffective with respect to the estate, and TVA must be ordered to pay in accordance with the terms specified in the motion.

## REQUEST FOR INFORMATION

Since it is evident from the foregoing and from the documents comprising the AlterBank Loan that the actual lender is not AlterBank, I respectfully request that Your Honor order the Merchant to state before this Honorable Court, ***under oath,*** who the actual lender(s) of the loan that is the subject of this motion are, and to produce the corresponding documents.

Furthermore, I request that Your Honor, given that the content of the AlterBank Loan indicates that it is secured by various contracts other than the mortgage, order the Merchant to produce all contracts and documents in which the loan's security interests were recorded, stating ***under oath*** that these constitute all the security interests granted; These include, but are not limited to, the pledge agreement regarding shares and the pledge agreement regarding trademarks.

Furthermore, I respectfully request that Your Honor impose whatever enforcement measure you deem appropriate should the Merchant fail to comply with this request within the established timeframe.

This is essential to determine who is the true holder of the collection rights arising from the aforementioned loan, as well as the full scope of the collateral granted to AlterBank.

**OBJECTION TO DOCUMENTS**

Pursuant to the provisions of Articles 1194, 1247, 1296, and other relevant and applicable provisions of the Commercial Code, which apply supplementarily to the Commercial Bankruptcy Law, my client objects to the scope and probative value of the documents submitted by TVA in its response to this motion. This objection is not intended to dispute their authenticity or physical existence, **but rather to prevent them from being attributed a probative value that is distinct from and considerably greater than that which legally corresponds to them**; for, contrary to what the Merchant seeks to argue, **said documents do not prove that the acts whose invalidity is being claimed were entered into under market conditions, nor that they resulted in a benefit to the Estate**.

***(1) The documentary evidence submitted under items 1 and 2 of the evidence section of the Answer, consisting of the Credit Agreement dated January 29, 2026, and the Amendment and Restatement Agreement dated March 6, 2026, together with their respective translations.***

These documents are challenged with respect to the probative scope and value that TVA seeks to attribute to them, since the mere existence and content of the acts—whose invalidity is precisely the subject matter of this motion—**do not** demonstrate that they were entered into under ordinary market conditions, much less that they resulted in a benefit to the Estate, as TVA claims.

In fact, TVA argues that the Credit Agreement itself establishes, among other things, that its terms and conditions were those actually agreed upon, that the provision of guarantees was contemplated from the outset of the original obligation, and that, in general, the premises on which my client based its action are inaccurate. Likewise, with regard to the Amending Agreement, TVA seeks to conclude that it did not involve new indebtedness or the provision of guarantees other than those originally agreed upon. **These are precisely the implications that TVA expressly attributes to said evidence.**

However, such conclusions cannot be drawn from the mere existence of the documents. The Credit Agreement and its Amending Agreement merely establish, if anything, the terms under which the contested acts were documented; however, they do not constitute proof that those terms corresponded to prevailing market conditions at the time of their execution, nor that the transaction was economically reasonable for TVA, nor that a benefit was provided to the Estate.

To argue otherwise would amount to allowing the very acts whose invalidity is being challenged to constitute, in and of themselves, proof of their validity, when it is precisely the court's responsibility to analyze their content in light of the remaining evidence and the provisions set forth in Articles 114 and 115 of the Commercial Bankruptcy Law.

This is supported by the principle that, even when a document is deemed authentic, this does not necessarily mean that it must be accorded probative value to prove all the facts that the party presenting it seeks to establish, since it is up to the judge to determine, based on the specific circumstances of the case, whether the document is in fact suitable and sufficient to substantiate the specific fact that is sought to be proven.

This is particularly evident in the scenario provided for in Article 114, Section III, of the Commercial Bankruptcy Law, as that provision requires comparing the terms and conditions of the contested transaction with the prevailing market conditions at the time of its execution or with the corresponding commercial customs and practices. By definition, this comparative benchmark cannot be derived exclusively from the contract itself, the validity of which is in dispute.

Thus, the fact that the Credit Agreement specifies a fixed annual rate of 17.50%, certain fees, guarantees, or any other financial terms merely establishes that such terms were documented by the parties; it does not prove that they were equivalent to those that an independent third party would have accepted under comparable circumstances. To establish this point, objective evidence external to the transaction itself was necessary—evidence capable of determining the prevailing conditions in the relevant market as of January 29, 2026.

**Therefore, these documents can only be evaluated to establish the existence and formal content of the contested acts, but not the legal and economic conclusions that TVA seeks to unilaterally derive from them**. TVA's assertion that the loan benefited the estate is not a consequence that can be presumed merely from the execution of the financing agreement; it constitutes a factual claim upon which it bases its defense and which, pursuant to Article 1194 of the Commercial Code, it must prove through appropriate evidence.

***(2) The documentary evidence submitted under items 3, 4, 5, and 6 of the evidence section, consisting of official letter No. 400-75-00-00-00-2026-1130; the resolutions contained in official letters 400-75-00-00-00-2026-2940 and 400-75-00-00-00-2026-2941; the tax payment receipts issued by the SAT; and the receipts for the electronic transfers made on January 29, 2026.***

These documents are also contested with regard to the evidentiary scope and value that TVA seeks to attribute to them, since even if they could prove the existence of certain tax credits, the benefits granted by the tax authority, and the actual making of certain payments—a situation whose existence or nonexistence, it is emphasized, was never in question—they in no way prove that the AlterBank loan generated a benefit for the Estate or that the Estate experienced a net reduction in its liabilities.

On the contrary, these documents clearly show that TVA took out a separate loan to "cover" another preexisting loan and that the deadlines for making the payments were triggered by the Merchant itself.

TVA specifically claims that the resolutions issued by the SAT attest to an alleged "net benefit" for the Estate in the amount of $1,856,303,526.00, while the transaction lines and transfers would demonstrate the traceability of the funds obtained through the financing and their application toward the payment of tax obligations.

However, that conclusion does not follow from the documentary evidence. The fact that TVA allocated funds from the AlterBank loan to the payment of tax obligations merely establishes, at best, the use to which those funds were put, but provides no evidence regarding the net financial effect that securing the new financing had on the Estate.

In other words, TVA confuses the use of the funds with the benefit to the Estate. The fact that a portion of the funds obtained from AlterBank was presumably used to settle obligations with the SAT **does not mean that the Merchant's liabilities were reduced in equal proportion**, **since the acquisition of those funds was offset by the creation of a new obligation owed by TVA to AlterBank.**

Proving the destination of the funds obtained through financing is distinct from proving the net financial effect produced by entering into the financing agreement.

To establish the latter, it is not sufficient to demonstrate that certain funds were used to pay a preexisting liability; rather, it was necessary to prove that, taking into full account the obligations assumed as a result of the new financing—including principal, interest, fees, and guarantees provided—the Merchant's financial position, and particularly the estate from which its creditors are paid, experienced an actual improvement.

The rulings issued by the SAT lack probative value to demonstrate this point, as their purpose is limited to determining TVA's tax status and, where applicable, the tax benefits granted by the authority.

**None of them analyzes the obligations incurred with AlterBank, the financial cost of the loan, the guarantees provided, their alignment with market conditions, or the effect that the addition of this new liability had on the position of the remaining creditors. To claim that such documents establish the existence of a "net benefit" of $1,856,303,526.00 is to attribute to them an economic conclusion that they neither contain nor are intended to demonstrate.**

Furthermore, the official letter dated January 9, 2026, far from demonstrating that entering into the AlterBank Loan was the only available alternative for TVA or that it necessarily benefited the Estate, merely confirms the existing situation with respect to the tax authority.

Throughout its response, TVA argues that this official letter demonstrates the "real, current, and documented imminence of tax enforcement"; that is expressly the scope it attributes to the evidence. However, its content does not indicate that the only available legal or financial alternative was to enter into precisely the contested financing agreement, under the terms and conditions agreed upon with AlterBank. Furthermore, the only thing these documents establish is that these loans are liabilities that TVA has had since 2013.

Consequently, none of these documents substantiates the central fact that TVA seeks to demonstrate with them—namely, that the contested transaction benefited the estate. At most, they establish the existence of tax obligations, certain reductions granted by the tax authority, their subsequent payment, and the immediate source of the funds used for that purpose—**matters distinct from determining whether the incorporation of the AlterBank Credit into TVA's assets resulted in a benefit or, conversely, a detriment to the Estate and its creditors**.

Therefore, it is inappropriate to attribute to these documents the scope claimed by TVA; they must be evaluated exclusively with respect to the facts they objectively record and not as evidence of the economic and legal conclusions that TVA unilaterally seeks to derive from them.

**DECLARATION REGARDING DOCUMENTS**

Pursuant to the provisions of Section VI of Article 3 of Agreement 12/2020 of the Plenary Session of the Federal Judiciary Council, ***I hereby declare, under solemn oath,*** that the documents attached to this brief are a true and accurate electronic copy in PDF format of the original documents held by

BNY, available at the address for service, and which are at the disposal of this Honorable District Court should said judicial authority so require.

**DOCUMENTARY EVIDENCE**

**1. DOCUMENTARY** EVIDENCE.—Consisting of the supplementary opinion issued by Renée T. St. Rose, KC, Esq., who is an expert in commercial, banking, and financial matters under the laws of Saint Lucia and the Eastern Caribbean—as evidenced by her credentials submitted in BNY's initial brief.

Said opinion is attached hereto as **EXHIBIT 1,** along with its duly certified Spanish translation by an expert certified by the Federal Judiciary Council, as **EXHIBIT 1 BIS**.

The aforementioned evidence establishes that the loan granted by AlterBank falls outside the ordinary market conditions applicable in Saint Lucia, considering the specific characteristics of: ***(i)*** the Loan Agreement; ***(ii)*** the Amendment Agreement; and ***(iii)*** the Restructured Loan. This is further supported by an analysis of the regulatory framework in effect in Saint Lucia and applicable in that jurisdiction, as well as the practices commonly observed in transactions of this nature.

The evidence in question is suitable for establishing the foregoing, since foreign law is a matter of evidence and its interpretation may be validly determined by a legal professional from the relevant jurisdiction—in this case, Saint Lucia. In the case at hand, Renée T. St. Rose, KC, demonstrated that she is licensed to practice law under the laws of Saint Lucia and the Eastern Caribbean, and is therefore an expert in the foreign law being invoked, as evidenced by the **PUBLIC DOCUMENTARY** EVIDENCE attached in **ANNEX 3** of BNY's initial brief, consisting of: ***(i)*** a Letter Patent dated April 2, 2025, issued by the Private Secretary to the Governor General of Saint Lucia, duly apostilled; ***(ii)*** the Certificate of Professional Practice issued by the Registrar of the High Court of Justice in the State of Saint Lucia, dated December 30, 2025, duly apostilled; and, ***(iii)*** her curriculum vitae, all of which were translated into Spanish by a certified expert translator authorized by the Federal Judiciary Council (translations that were attached as part of **ANNEX 3 BIS** to BNY's initial brief).

This evidence relates to each and every one of the facts set forth in the fraud motion filed by my client, as well as to the facts and arguments presented during the hearing, and is submitted to substantiate the circumstances described therein, as well as to demonstrate that the exceptions and defenses raised by TVA lack factual, documentary, and legal basis, rendering them unfounded and inadmissible.

**2. DOCUMENTARY EVIDENCE**. — Consisting of the supplementary opinion issued by attorneys Mauricio Basila Lago and Paul Yamil José Aguilar, which is attached hereto as **EXHIBIT 2**; both attorneys have demonstrated their expertise in banking and financial law through the credentials presented in BNY's initial brief.

The aforementioned evidence demonstrates that the loan granted by AlterBank falls outside the applicable standard market conditions, specifically upon analyzing the specific characteristics of: ***(i)*** the Loan Agreement; ***(ii)*** the Amendment Agreement; and ***(iii)*** the Restructured Loan. This is in accordance with the international regulatory framework that establishes standard market conditions for this type of transaction and the practices commonly observed in transactions of this nature.

The expert opinion in question is suitable for establishing the foregoing, given that its authors are experts in banking matters.

This evidence relates to each and every one of the facts set forth in the fraud motion filed by my client, as well as to the facts and arguments presented during the hearing, and is offered to substantiate the circumstances described therein, as well as to demonstrate that the exceptions and defenses raised by TVA lack factual, documentary, and legal basis, rendering them unfounded and inadmissible.

**3. PUBLIC DOCUMENTARY EVIDENCE.**—Consisting of the proceedings arising from the *discovery* process governed by Section 1782 of Title 28 of the United States Code, conducted before the United States District Judge for the Southern District of Florida, Miami Division, Case No. 26-23885-MC-MARTINEZ.

All proceedings and documents obtained in the aforementioned discovery proceedings are submitted as evidence regarding the facts, communications, corporate documents, financial statements, business decisions, and other factual circumstances disclosed in connection with the AlterBank Loan.

In light of the foregoing, my client expressly reserves the right to submit and present any subsequent evidence that may be obtained as a result of the aforementioned discovery proceedings, provided that it is relevant to the facts at issue in this motion, to the claims asserted herein, or to the facts and arguments presented during the hearing.

This evidence is submitted to substantiate the facts and circumstances evident from the documentation and proceedings obtained during said process, as well as to demonstrate that the objections and defenses raised by TVA lack factual, documentary, and legal basis, and are therefore unfounded and inadmissible.

**4. CASE FILE.**—consisting of all proceedings in this commercial insolvency case, specifically: ***(i)*** the Petition for a Declaration of Commercial Insolvency and the Annexes and documents attached thereto; ***(ii)*** the Loan Agreement; ***(iii)*** the Amendment Agreement; ***(iv)*** the Restructured Loan; ***(v)*** the documents and public instruments that formalized the guarantees granted by TVA to AlterBank; ***(vi)*** the Issuance Agreement on file in the records of the ongoing bankruptcy proceedings; ***(vii)*** as well as in the pending motion, in all matters that benefit my client.

This evidence relates to each and every one of the facts set forth in the fraud complaint filed by my client, as well as to the facts and arguments presented during the hearing, and is offered to substantiate the circumstances described therein, as well as to demonstrate that the objections and defenses raised by TVA lack factual, documentary, and legal basis, rendering them unfounded and inadmissible.

**5. PRESUMPTION**—in both its legal and human aspects—in every respect that serves the interests of my client.

This evidence relates to each and every one of the facts set forth in the fraud proceeding filed by my client, as well as to the facts and arguments presented during the hearing, and is offered to substantiate the circumstances described therein, as well as to demonstrate that the objections and defenses raised by TVA lack factual, documentary, and legal basis, rendering them unfounded and inadmissible.

Based on the foregoing and well-founded arguments;

I respectfully request that **YOUR HONOR**:

**FIRST.** To recognize my presence in my official capacity, representing **THE BANK OF NEW YORK MELLON in its capacity as Trustee**, to present the case as ordered in the court order dated September 2, 2026.

**SECOND.** To admit the evidence offered in this petition, so that it may be presented and evaluated at the appropriate stage of the proceedings.

**THIRD.** At the appropriate stage of the proceedings, rule that the motion is well-founded and, consequently, declare the credit agreement entered into between TVA and AlterBank to be ineffective against the estate, for the reasons set forth and for all applicable legal purposes.

**FOURTH.** As a consequence of the ineffectiveness of said credit claim against the estate, it is hereby judicially declared that AlterBank cannot be recognized as a creditor within the

this insolvency proceeding, nor may it sign the proposed insolvency agreement that is submitted.

**I HEREBY PROTEST AS NECESSARY**

**FERNANDO DEL CASTILLO ELORZA**

Mexico City, on the date of submission.

PODER JUDICIAL DE LA FEDERACIÓN

## CRYPTOGRAPHIC EVIDENCE - TRANSACTION

**Signed File:**
**415700200000000000062819800.p7m**
**Certification Authority:**
**CERTIFICATION AUTHORITY**
**Signatory(ies): 1**
**This digital document is a true copy of its physical or electronic version, which corresponds to the original.**

JESUS VAZQUEZ NUÑEZ
706a6620636a66330000000000000000016a00
05/29/07 10:16:24

| SIGNATORY | | | | | |
|---|---|---|---|---|---|
| **Name:** | FERNANDO DEL CASTILLO ELORZA | **Validity:** | GOOD | Valid | |
| **SIGNATURE** | | | | | |
| **No. Series:** | 30.30.30.30.31.30.30.30.30.30.30.35.31.37.38.36.34.31.34.38 | **Revocation:** | Valid | Not revoked | |
| **Date (UTC/CDMX)** | 09/09/26 04:36:17 - 08/09/26 22:36:17 | **Status:** | Valid | Valid | |
| **Algorithm:** | RSA-SHA256 | | | | |
| **Signature string:** | 19 b9 4c 35 fb b4 ae bc 1e cf dd 03 c3 c8 92 c9<br>c1 b9 64 98 2e 07 60 f9 f2 23 58 72 80 ee b3 83<br>9b e5 33 65 6c b3 35 51 43 cc 6d 16 93 29 2b 3f<br>3d 00 cc e8 f3 46 7a 58 b1 ac 28 09 48 57 50 77<br>ef 8c 23 63 7b 07 75 cf ec 0f 6e de 45 e7 fd a1<br>a8 0c e0 c6 38 10 c4 d2 fe cc 83 b9 9e 01 1d ab<br>af e2 ee bc f9 a0 8e 6f 47 34 5a 99 40 4c ce d2<br>0d 47 b4 0b 77 5e fa 13 1b c1 e2 25 9f 3b cf 56<br>cb bb 7a 19 75 e7 a8 18 0c f4 eb a9 bf 90 48 25<br>6c 08 03 e8 e1 fc 6d 0c f2 20 84 34 50 ae 5f cc<br>73 77 21 44 81 2b a4 9d 06 f9 fd d5 5a 35 79 91<br>30 0e e6 7e e4 2e d0 f1 aa 9b d3 ae f2 99 18 68<br>1b 61 d0 62 37 30 99 a8 0a e9 e6 34 a3 48 15 90<br>3f f2 bc cd aa 10 46 21 46 b6 3c 66 52 67 eb d7<br>5e fc 9a 76 03 df b8 c4 dd 4b 10 bb e2 48 28 db<br>a9 26 ef 36 59 00 dd 12 f2 c8 dd 87 fb 3e 5e cd | | | | |

| OCSP | |
|---|---|
| **Date: (UTC/Mexico City)** | 09/09/26 04:36:19 - 08/09/26 22:36:19 |
| **Responder Name:** | SAT OCSP Service |
| **Responder Issuer:** | CERTIFICATION AUTHORITY |
| **Serial number:** | 30.30.30.30.31.30.30.30.30.30.30.35.31.37.38.36.34.31.34.38 |

| TSP | |
|---|---|
| **Date: (UTC/CDMX)** | 09/09/26 04:36:19 - 08/09/26 22:36:19 |
| **Name of the TSP response issuer:** | Timestamp Issuing Authority of the Federal Judiciary Council |
| **TSP Certificate Issuer:** | Intermediate Certification Authority of the Federal Judiciary Council |
| **TSP response identifier:** | 203698971 |
| **Stamped data:** | gFhCrfBQBfkBjuuFfVd0R5Tt16o= |

# OPINION ON BANKING MATTERS

**FIRST DISTRICT COURT FOR COMMERCIAL BANKRUPTCY MATTERS, LOCATED IN MEXICO CITY AND HAVING JURISDICTION THROUGHOUT THE MEXICAN REPUBLIC**

**COMMERCIAL ENTITY:** TV Azteca, S.A.B. de C.V.

**COMMERCIAL BANKRUPTCY CASE:** 22/2026

*Basila Abogados,* S.C. (the **"Firm")** issues this scope statement (the **"Scope Statement")** regarding the Banking Opinion dated August 12, 2026 (the **"Opinion")** rendered in the case file under the aforementioned heading.

This document constitutes a Supplement—that is, an expansion and clarification—of the Opinion, and is not an independent legal opinion or a separate opinion. It is issued in express exercise of the reservation set forth in paragraph 21 of the Opinion, pursuant to which the Firm reserved the right to supplement, expand, or modify the Opinion should it gain access to information additional to or different from that considered in its preparation, including, but not limited to, the Alter-TVAz Loan dated January 29, 2026, and the amendment and restatement agreement dated March 6, 2026, and its annexes. Having reviewed these instruments after the issuance of the Opinion, the Firm issues this Supplement, which forms an integral part of the Opinion and must be read in conjunction with it.

*Capitalized terms not defined in this Scope Statement shall have the meaning attributed to them in the Opinion or, in the case of terms defined in the Loan Documents, the meaning assigned to them by such instruments.*

In this Scope, the Firm analyzes the credit agreement dated January 29, 2026, entered into between *Alter Bank Ltd.* **("Alter"),** in its capacity as arranger (the **"Arranger"),** initial lender (the **"Initial Lender"),** administrative agent (the **"Administrative Agent"),** and collateral agent (the **"Collateral Agent"),** and TV Azteca, S.A.B. de C.V. **("TV Azteca"** or the **"Borrower")** (the **"Original Agreement"),** in its Spanish translation certified by a court-certified assistant translator and included in the case file; as well as the first amendment and restatement agreement to the credit agreement dated March 6, 2026 (the **"Amendment Agreement" or "Restated Agreement"** and, together with the Original Agreement, the **"Credit Documents").**

The purpose of the Scope is twofold: **(i)** *First,* to determine whether the structure, provisions, document sequence, administration regime, payments, and guarantees of the Credit Documents are consistent with standard practice and with the prudential standards applicable to a corporate credit agreement of this magnitude granted to a company in severe financial distress; and **(ii)** *Second,* to clarify the effects that the information contained in the Credit Documents has on the conclusions of the Opinion and, in particular, on the analysis set forth in paragraphs 42 and 50 thereof.

The analysis distinguishes at all times between: (i) the content of the Original Agreement in effect at the time of disbursement; (ii) the terms incorporated or restated thirty-six days later through the Amending Agreement; and (iii) the additional documentation that would be necessary to verify the origination, funding, syndication, administration, and risk mitigation processes, and which is not included in the reviewed collection.

The Scope fully preserves the purpose, limitations, and reservations of the Opinion. In particular, and as reiterated in paragraphs 8 and 25, this document does not cite, assume, or assert the existence of fraud against creditors, the invalidity of any act under bankruptcy law, its occurrence within the retroactive period, or the violation of any specific requirement set forth in the Commercial Bankruptcy Law; such legal determinations are the exclusive purview of the adjudicating judge based on the entirety of the evidence. Nor does this document express an opinion on the law of Saint Lucia, which is the applicable law to the Original Contract pursuant to its Clause 8.11.

*Preliminary note on the framework for analysis*. To avoid any misunderstanding regarding the scope of this document, it should be noted that the prudential standards and documentary practices cited herein are not cited as binding legal rules or as law applicable to the transaction. The Firm does not assert, nor did it assert in the Opinion, that the Basel Committee on Banking Supervision's Principles, the European Banking Authority's Guidelines, or the Loan Market Association's forms are binding on the Lender, the Borrower, or any authority, nor that failure to comply with them automatically gives rise to any legal consequences. They are invoked exclusively as documented evidence of the commercial customs and practices governing the standard content of corporate and syndicated loan documentation in the markets where lenders and borrowers such as those in this case operate. Their function in this Scope is to establish what is customarily agreed upon in transactions of this nature and what categories of provisions invariably comprise their content; not to impose a duty. Accordingly, this Opinion does not express any view on the law of Saint Lucia or on the Lender's position vis-à-vis its supervisory authority, both of which are matters outside the scope and jurisdiction of this Firm.

*Preliminary Note on the Comparison of Economic Terms*. Consistent with the foregoing, and regardless of the standard of industry customs and practices, this Opinion provides an objective comparison between the economic terms actually agreed upon in the Credit Documents and the prevailing terms in the Mexican financing market as of the date of execution, as taken from the official publications of the Bank of Mexico and listed in <u>Annex **"B."**</u> This comparison is set forth in Section *III(d)* of this Scope. Its formulation is strictly descriptive; it does not constitute an assessment of the legality, proportionality, or validity of the financing cost, nor a quantification of damages, nor a ruling on the insolvency law implications of the act—all of which are matters reserved for the judge.

## I. <u>EXECUTIVE SUMMARY.</u>

**I.** A review of the text of the Original Contract reveals two key findings, both of which align with—and are not merely supplementary to—the conclusions of the Opinion. The first is subjective: the Original Contract itself is structured such that ownership

of the credit rests with unidentified persons, who are incorporated through private contracts entered into with Alter, without the Borrower's involvement or knowledge, and without their identities being recorded in any document in the case file. The second is objective: the Original Contract, in effect at the time of disbursement, lacks the protection and control mechanisms that make a corporate credit agreement a risk management tool, and it also contains provisions that work against the creditor itself.

2. **Scope and Structure.** The Original Agreement documents financing of up to $5,000,000,000.00 (five billion pesos 00/100, National Currency) in eight clauses and fifteen pages, with no annexes, no promissory note format, no annex of commitments or participations, no standard form lender agreement, no certificates, and no conditions precedent.

3. **Complete absence of conditions precedent.** The Original Agreement contains no clauses regarding conditions of use or conditions precedent. The "Disbursement Date" is defined in Clause 1.01 as January 29, 2026—that is, the date of execution itself—and Clause 2.03 mandates disbursement on that date. The following were not required as preconditions: the submission of corporate documents or powers of attorney, legal opinions on validity and enforceability, certificates of no default, confirmation of representations, evidence of the use of funds, or the creation or perfection of any security interest.

4. **Structurally Incomplete Representations and Warranties.** The Original Agreement does contain a Clause 4 on Representations and Warranties, consisting of twelve subclauses. However, as detailed in section *111*.e), this list specifically omits the representations that were critical in the case of a borrower in widespread default: there is no representation regarding the absence of relevant litigation or proceedings, no representation regarding the absence of default under other contracts or debt instruments, no representation regarding the absence of undisclosed liabilities, there is no representation of solvency, no representation regarding the absence of any material adverse change, and the representation regarding the absence of conflicts in Clause 4.02 does not cover the Borrower's contracts or debt instruments, but is limited to laws, statutes, court orders, and orders from government authorities. The representations are not made in favor of the lenders, but rather in favor of the Administrative Agent, and there is no provision for their repetition.

5. **There are absolutely no "do-not" obligations or obligations to provide information.** Clause 5 of the Original Agreement is titled *"Obligations* of the Borrower" and comprises five subclauses, all of which are affirmative and of a standard nature. There is not a single "do-not" obligation, nor any restriction on incurring additional debt, creating liens, disposing of or selling assets, paying dividends, engaging in mergers or reorganizations, conducting transactions with related parties, or changing the nature of the business. There is no financial covenants whatsoever; and, particularly revealing, Clause 5.02, titled *"Financial Statements: Other Reports,"* does not impose any obligation on the Borrower to provide financial statements, reports, or certificates to the Lender or the Administrative Agent, but merely requires the Borrower to maintain its



own records and internal accounting systems. The Lender therefore entered into the agreement without any right to receive financial information during the term of the loan.

6. **Security interests established** as a subsequent obligation subject to a penalty, not as a condition. Clause 5.05 of the Original Agreement defers the execution of the pledge of shares, the pledge of trademarks, the mortgage, and the trust in accounts receivable until sixty calendar days after disbursement, and establishes as the sole consequence of failure to execute them an increase in the interest rate of 1.50% per annum. Failure to establish the entire security package does not constitute an "Event of Default" under Clause 6.01 of the Original Agreement. Additionally, Clause 4.08 of the aforementioned Original Agreement states that the security agreements will create a first-priority security interest, while Clause 5.05(c) of the same agreement expressly provides for a second-priority mortgage, constituting an internal contradiction within the instrument itself.

7. **Cases** of default **are kept** to a minimum. Clause 6.01 of the Original Agreement itself provides for only four scenarios: failure to pay, misrepresentation, subjection to insolvency proceedings, and material breach of obligations. There is no cross-default or cross-acceleration with respect to the Borrower's existing debt, including the defaulted senior notes in the amount of USD $400,000,000.00 (four hundred million dollars 00/100, legal tender of the United States of America); there is no change-of-control event, no material adverse effect event, no event relating to the invalidity or failure to perfect the security interests, and no event relating to adverse judicial rulings.

8. **Provisions Adverse** to the Lender Itself. The Original Agreement also includes provisions that work against Alter's position and are unprecedented in market lending documentation. Clause 8.08 exempts the Borrower from liability for delays or defaults on its obligations arising from Force Majeure Events, which are broadly defined in Clause 1.01 to include government actions and pandemics, without excluding payment obligations. Clause 8.09 provides that each party shall bear its own costs, departing from the established practice under which the borrower covers the lender's structuring and legal advisory expenses. No *gross-up* clause or tax indemnification was agreed upon, even though Clause 4.05 expressly acknowledges the existence of withholding under Mexican law regarding payments to foreign residents.

9. Syndication without specific procedures and absolute concentration in Alter. Clause 7 of the Original Agreement, titled *"Syndication of the Loan,"* consists of three subclauses whose content serves exclusively to exonerate the Organizer and the Agents. It does not address required creditors, majorities, voting, matters subject to unanimity, assignments or interests of creditors, registration of creditors, replacement of the agent, indemnification of the agent by the creditors, or proportional distribution of recoveries. Consequently, Alter holds all relevant powers, is the beneficiary of the representations and obligations, receives the promissory note, receives all payments, is the only party authorized to accelerate the debt, may amend the Original Agreement, and may grant waivers and consents on its own, without the intervention or consent of any creditor, not

has no fiduciary relationship with the borrowers nor any duty other than those expressly agreed upon, and receives the structuring fee.

**10.** Lenders not identified by **contractual** design. The definition of *"Lenders"* in Clause 1.01 of the Original Contract provides that, in addition to the Initial Lender, lenders shall include those persons who agree to grant a proportional share of the Alter-TV Loan by signing a written contract with the Administrative Agent. The inclusion of the actual risk bearers is thus documented in private instruments entered into with Alter, separate from the Original Contract, not signed by the Borrower, and not included in the case file. No provision of the Original Contract obligates Alter to disclose the identity of the lenders, to maintain an accessible record, or to reconcile accounts; the sole signatory on the creditor's side is Alter.

**11.** Financial Terms and Arithmetic Verification. The Original Contract stipulated a fixed annual rate of 17.50%, calculated based on a year of three hundred sixty days and days actually elapsed—including the first day and excluding the last—a structuring fee of 1.00% of the Alter-TV Loan payable to the Organizer, and a lump-sum repayment of the principal on July 29, 2026. The amount of $71,487,500.00 (seventy-one million four hundred eighty-seven thousand five hundred pesos 00/100 National Currency) capitalized by the Amending Agreement corresponds exactly to thirty-six days of interest on $4,085,000,000.00 (four billion eighty-five million pesos 00/100 National Currency) at a rate of 17.50% and based on three hundred sixty days—that is, the period from January 29 to March 6, 2026, calculated precisely in accordance with Clause *2.04(b)* of the Original Contract.

**12.** **No** Default **at** the Time **of** Restatement. Pursuant to Clause 1.01 of the Original Agreement, the first Interest Payment Date corresponded to the numerically equivalent day of the third month following the disbursement, that is, April 29, 2026, and the sixty-calendar-day period for signing the Guarantee Agreements expired on March 30, 2026. Consequently, as of March 6, 2026, there was no Event of Default under the Original Agreement, no interest was yet due, and no guarantee deadline had expired. However, on that date, the parties capitalized interest not yet accrued as due, deferred its payment until maturity, imposed a 2% restructuring fee equivalent to $81,700,000.00 (eighty-one million seven hundred pesos 00/100 in national currency), and documented the Lender's accession to the pre-existing mortgage guarantee, four days prior to the filing of the Petition for Commercial Bankruptcy.

**13.** Conclusion **on the Scope**. The text of the Original Agreement is inconsistent with the assumption that the loan was granted following a genuine analysis of the Borrower's ability to repay. A lender whose recovery effectively depended on TV Azteca's future financial performance would not have simultaneously waived the conditions precedent, the disclosure obligations, the "do not" obligations, cross-default, the enforceability of the guarantees as a condition of disbursement, and the passing on of its own costs, nor would it have accepted a force majeure defense in favor of the debtor. The Scope does not presume that internal origination analyses did not exist; it concludes that their performance and adequacy cannot be substantiated

with the revised body of law, and that the contractual instrument itself is inconsistent with the existence of such analyses.

## II. FRAMEWORK REFERENCE REFERENCE: ORDINARY ORDINARY AND STANDARDS APPLICABLE TO A CORPORATE AND SYNDICATED CREDIT AGREEMENT.

a) Nature **and** function **of** the credit agreement**.**

**14.** Pursuant to Article 291 of the General Law on Credit Instruments and Transactions (the **"LGTOC"**), by virtue of the extension of credit, the lender undertakes to make a sum of money available to the borrower, or to assume an obligation on the borrower's behalf, so that the borrower may use the credit in the manner and on the terms agreed upon, with the borrower being obligated to repay the sums made available and to pay the interest, fees, expenses, and commissions as stipulated. Articles 291 through 301 of the LGTOC constitute the supplementary regime governing this legal concept, and the Commercial Code governs commercial acts and the corresponding commercial obligations.

**15.** In a corporate transaction, however, the credit agreement is not limited to the documentation of a debt. Its economic function is to distribute risks between the lender and the borrower throughout the life of the financing; to determine the conditions that must be met before disbursement; to establish the basis of information upon which the credit was granted; to impose limits on the borrower's future conduct that could impair the creditor's position; to create mechanisms for the early detection of impairment; and to regulate acceleration, enforcement, and recovery. It is this function that explains why the content of the agreement constitutes, in and of itself, a technical indicator of the credit analysis that preceded it; the protective clauses are the documentary reflection of the risks that the lender identified and decided to mitigate.

**16.** Consequently, a corporate credit agreement of this magnitude typically identifies and regulates, at a minimum: (i) the parties, their legal capacity, and powers; (ii) the amount and individual obligations; (iii) availability, drawdown procedures, and drawdown periods; (iv) the intended use and control of the funds; (v) interest, fees, taxes, gross-up, cost overruns, and indemnities; (vi) maturity, amortization, and mandatory and voluntary prepayment; (vii) representations and warranties of the borrower and the guarantors, with provisions for their renewal upon each drawdown and on each payment date; (viii) obligations to act and not to act, including restrictions on indebtedness, encumbrances, disposition of assets, restricted payments, mergers, and transactions with related parties; (ix) obligations to periodically provide financial information and certificates of compliance; (x) financial covenants; (xi) conditions precedent to disbursement; (xii) events of default, including cross-default and material adverse effect, cure periods, acceleration, and remedies; (xiii) assignments, transfers, and interests, including a registry of lenders; (xiv) guarantees, conditions for creation and perfection, and priority rules; (xv) agency and creditor governance provisions, including majorities and matters requiring unanimity; and (xvi) governing law, jurisdiction, process agent, and notices.

17. This structure is neither a doctrinal construct nor a preference of the Firm. It corresponds to the table of contents of the forms recommended by the Loan Market Association ("LMA"), a trade association whose formats serve as the starting point for syndicated loan documentation in international markets. The recommended loan agreement form published on the LMA's institutional website is structured, among other sections, into clauses on Definitions and Interpretation, The Loan, Purpose, Conditions of Use, Drawdown, Amortization, Prepayment *and* Cancellation, Interest, Interest Periods, Fees, Withholding Taxes and Indemnities, Incremental Costs, Other Indemnities, Mitigation *by* Lenders, Costs *and* Expenses, Bank Accounts, Warranty and Indemnity, Representations and Disclosure Obligations, followed by General Obligations, Events of Default, Changes in the Parties, and Agency Provisions. The LMA itself distinguishes between "hard" provisions—which do not depend on the circumstances of the transaction—and "soft" provisions—financial covenants, obligations to act or refrain from acting, representations, and events of default,
—which are negotiated on a case-by-case basis. What is relevant for this analysis is not the specific wording of each clause, but rather that the category exists and that its content is proportionate to the risk assumed.

**b)** The prudential standard: the BCBS Principles.

18. It is hereby noted that, following the publication of the Basel Committee on Banking Supervision's "Principles for the Management of Credit Risk" of October 2000, cited in the Opinion, the BCBS itself published an updated version of those Principles in April 2025 ("Principles *for* the Management of Credit *Risk*," BCBS, April 2025). According to paragraph 3 of its introduction, the review confirmed the continued validity of the Principles and was limited to a limited set of technical amendments to align them with the current Basel Framework; the update does not seek to modify the content of the Principles or cover new topics. The references contained in the Opinion therefore remain fully valid, and this Scope cites the April 2025 version as it is the one currently in effect.

19. The following provisions of these Principles are particularly relevant for the analysis of the Loan Documents:

- Principle **4** and paragraph **19.** Banks must operate in accordance with sound and well-defined lending criteria, which include a comprehensive understanding of the borrower's risk profile, the purpose and structure of the loan, and its source of repayment. Paragraph 19 lists the factors that must be considered and documented when approving a loan, expressly including the proposed terms *and* conditions of the loan, including contractual obligations (covenants) designed to *limit* changes in the borrower's future risk profile, as well as the adequacy and enforceability of collateral under various scenarios.

- Paragraph **20**. Banks need to understand whom they are extending credit to; before entering into any new credit relationship, they must familiarize themselves with the borrower and be confident that they are dealing with an individual or organization of adequate reputation and solvency, and it is not sufficient for the borrower merely to be well-known or perceived as reputable.

- **Paragraph 22**. In the case of syndicated loans or credit consortia, the standard warns that some institutions place undue reliance on the lead arranger's analysis and requires that all syndicate participants conduct their own due diligence, including an independent credit risk analysis and review of the syndication terms before committing, analyzing the risk and return of the syndicated loan in the same manner as a directly originated loan.

- Paragraph 25. The structure of the transaction, collateral, and guarantees can mitigate risks, but transactions must be entered into primarily based on the borrower's ability to pay. Collateral cannot replace a comprehensive assessment or compensate for insufficient information, and banks must have processes in place to ensure that the collateral is and remains enforceable and realizable.

- Paragraphs **13** and 14. Banks that extend credit internationally assume, in addition to standard credit risk, country risk and transfer risk, and their monitoring must incorporate the enforceability of credit agreements and the timeliness and ability to realize collateral under the relevant national legal framework.

- Principle 6 and paragraph 35. Banks must have a clearly established process for approving new loans as well as for modifying, renewing, and refinancing existing loans, and must have policies regarding the information and documentation required to approve new loans, renew existing ones, and modify the terms and conditions of previously approved loans.

- Principle 7. All credit extensions must be made on an *arm's-length* basis; in particular, loans to related companies and individuals must be authorized only in exceptional circumstances and monitored with particular care.

- Paragraphs 38**,** 39, and **43**. Those who perform sensitive functions, such as the safekeeping of key documents or the transfer of funds, must report to executives who are independent of the origination and approval functions; credit management must ensure the monitoring of documentation, contractual requirements, legal obligations ***(covenants)***, and collateral, as well as an adequate segregation of duties, and an effective credit monitoring system must include measures to oversee compliance with existing covenants.

- Paragraph 54. Banks must be careful not to enter into transactions with borrowers or counterparties they do not know, nor to participate in lending activities they do not fully understand, even for diversification purposes.

**e)** Supervisory Standards on Loan Origination and Monitoring.

**20.** *The* European Banking Authority's ***Guidelines*** on *Loan* Origination and Monitoring *(*EBA/GL/2020/06, dated May 29, 2020, effective as of June 30, 2021) constitute the most detailed and currently applicable supervisory guidance on the subject matter covered by this Scope, and are cited solely as a technical reference for comparative supervisory practice, without asserting their legal applicability to the Lender. The following sections, among others, are relevant:

- Paragraph 44, subsection (b). At the individual transaction level, institutions must identify, assess, and manage the risk of money laundering and terrorist financing, taking into account the purpose of the loan and, specifically, the extent to which the involvement of a natural or legal person—*other than* the borrower *or* the *institution*—in the credit transaction poses a risk of money laundering or terrorist financing, and must take measures to determine whether the funds come from legitimate sources.

- Paragraph 46. Entities must have policies and procedures in place to ensure that disbursement is made in accordance with the credit decision and the credit agreement, with appropriate controls and record-keeping.

- Paragraphs 47 through 52. Entities must define their appetite and strategy for leveraged transactions, including their appetite for syndicating such transactions and a framework for underwriting limits; establish a governance structure that allows for comprehensive oversight of all leveraged transactions originated, syndicated, or acquired; and ensure that all such transactions are approved by those responsible for credit decisions, with specific approval processes in place when syndication and underwriting risks exist.

- Paragraphs 143 **and** 144, subsection (e). Collateral should not be a predominant criterion for approving a loan nor can it, by itself, justify its approval; it is the secondary source of repayment and not the primary source of payment. When assessing creditworthiness, the structure of the transaction must be analyzed, including the risk of structural subordination and related terms, such as covenants.

- Paragraphs 163 through 166. The pledged collateral must be evaluated, including its valuation, ownership, and registration, as well as the guarantees, covenants, negative pledge clauses, and debt service agreements used to mitigate risk, taking into account whether the value of the collateral is correlated with the borrower's business.

- Paragraph **167**. When, in syndicated loan transactions, payment flows pass through a third party—such as a designated agent—entities, or the lead arrangers or their nominated agents, must assess the soundness of such agent.

- Section 5.3 **and** Paragraph 94. Institutions must document the information and data that led to the credit approval, including the actions taken and assessments made, and retain such documentation for at least the term of the credit agreement.

21. *It* is expressly noted that this Scope does not rely on the *Interagency* Guidance on *Leveraged* Lending dated March 21, ***2013***, or its frequently asked questions dated November 7, 2014, issued by the federal banking authorities of the United States of America, since the Office of the Comptroller of the *Currency* and the Federal Deposit Insurance Corporation formally distanced themselves from those documents via an interagency statement dated December 5, 2025, stating that banks must instead apply the general principles of sound lending practices. This clarification is provided to confirm that the regulatory review of this Scope verified the validity of each cited source and that no conclusion is based on repealed criteria.

d) The Mexican standard used as a benchmark.

22. In accordance with the benchmark adopted in Section V of the Opinion, Article 65 of the Credit Institutions Law ("LIC") requires that the decision to grant a loan be based on sufficient quantitative and qualitative information to assess the borrower's ability to repay, creditworthiness, and capacity to make payments within the loan's specified term. The General Provisions Applicable to Credit Institutions, also known as the Single Banking Circular (the **"CUB"**), elaborates on this standard through, among others, Articles 3 and 6 through 9, regarding policies, guidelines, and manuals for lending activities; Articles 10 through 23, regarding the functions and controls for origination, evaluation, approval, execution, monitoring, and recovery; Article 15, Section III, regarding the minimum information and documentation required for commercial loans exceeding two million UDis; Article 24, pursuant to which renewals and restructurings must be resubmitted to the credit process from the origination stage; Article 25 and Chapter IV of Title II, regarding comprehensive credit risk management; Article 45, regarding the compilation and retention of credit files; Articles 110 through 115, regarding classification, commercial portfolio rating, and preventive reserves; and Articles 117 through 119 and 2-Bis 30 through 2-Bis 32, regarding the requirements for recognizing collateral as effective mechanisms for mitigating credit risk.

23. With regard to the prevention of transactions involving funds of illicit origin, the General Provisions referred to in Article 115 of the Credit Institutions Act ("Provisions of Article 115") define the Beneficial Owner as the person who, through another person or by any act or mechanism, obtains the benefits derived from an account, contract, or transaction and who ultimately exercises the rights to use, enjoy, exploit, or dispose of the funds—that is, the true owner of the funds—including those who exercise control over a legal entity and those who may instruct or determine, for their own economic benefit, the acts that may be carried out through trusts, mandates, or commissions. These provisions of Article 115 have been expressly amended to comply with Recommendation 10 of the Financial Action Task Force ("FATF") regarding due diligence and the identification of the beneficial owner. The very existence of this concept in Mexican law demonstrates that identifying the person behind a contractual structure is a core—rather than an ancillary—element of the required due diligence standard.

**111.** ANALYSIS **OF** THE **ORIGINAL** CONTRACT **AND THE** AMENDMENT AGREEMENT.

a) <u>Structure and Scope of the Original Contract.</u>

24. The Original Contract consists of eight clauses: (i) Clause 1, Definitions and Interpretation; (ii) Clause 2, The Loan; (iii) Clause 3, Structuring Fee; (iv) Clause 4, Representations and Warranties; (v) Clause 5, Obligations of the Borrower; (vi) Clause 6, Events of Default; (vii) Clause 7, Syndication of the Loan; and (viii) Clause 8, Miscellaneous, followed by a liability release clause regarding the electronic signature and the signature pages. According to the certified translator's attestation, the instrument consists of fifteen pages.





25. The Original Contract contains no annexes whatsoever. No promissory note form is attached; no annex setting forth the lenders' commitments or participation percentages is attached; no form of the written adhesion contract referred to in the definition of "Lenders" is attached; no certificate or drawdown request forms are attached; and no draft guarantee contracts are attached. The entire contractual file for the financing is therefore limited to the body of the instrument.

26. The length and level of detail of a credit agreement do not, in and of themselves, constitute a measure of adequacy. However, the presence or absence of entire categories of provisions does. As set forth below, from the list set forth in paragraph 16 of this Scope, the Original Agreement entirely omits subparagraphs (viii) obligations not to act, (ix) obligations to periodically provide financial information, (x) financial grounds for maintenance, and (xi) conditions precedent, as well as the matters of assignment of creditors, registration, and governance of creditors in subparagraphs (xiii) and (**xv**).

b) Amount**, Disposition,** and Funding.

27. Clause 2.01(a) of the Original Agreement establishes a credit for a total amount not to exceed $5,000,000,000.00 (five billion pesos 00/100, National Currency), and Clause 2.01(b) specifies that each Lender shall be obligated to fund the Loan solely with respect to its proportional share, thereby creating joint but not several obligations among the lenders. Clause 2.03(a) provides that each Lender shall make its proportional share of the disbursement on the Disbursement Date, defined in Clause 1.01 as January 29, 2026, that is, the very date on which the Original Agreement was executed. The Amendment Agreement acknowledges an amount actually disbursed of $4,085,000,000.00 (four billion eighty-five million pesos 00/100, in local currency).

28. For the sake of consistency with the Opinion, it is clarified that the approximate equivalent in United States dollars referred to in paragraphs 43, 44, and 46 corresponds to the conversion of the authorized amount in national currency, and that the balance reported in paragraph 32 based on the merchant's list of creditors corresponds to an outstanding balance including incidental charges and not to the principal amount disbursed. The figures used in this Scope are those contained in the Credit Documents themselves, expressed in national currency.

29. Clause 2.03(b) of the Original Agreement provides that each Lender shall deposit its proportional share into a designated account of the Borrower at Banco Azteca, S.A., identified by account number, CLABE, and SWIFT code. Clause 2.03(c) provides that the Borrower shall deliver to the Administrative Agent, on the Disbursement Date, the Promissory Note evidencing the disbursement, in an amount equal to that of the Alter-TVAz Loan, in accordance with the definition of "Promissory Note" in Clause 1.01. The credit instrument is therefore made out in favor of a party who may not be the economic owner of the credit, and not in favor of the lenders who assumed the exposure.

30. The instrument does not identify who the lenders other than Alter were, what commitment each one assumed, or what amount was contributed by each participant. The

Reference to proportional shares does not replace a verifiable record of commitments and disbursements; on the contrary, it presupposes such a record. ***Since*** neither such a record nor the written adhesion contracts referred to in the definition of *"Lenders"* have been provided, it is not possible to verify the composition of the syndicate or the ***individual*** origin of the disbursed funds.

e) Allocation and control **of** the use of funds.

31. Clause 2.02 of the ***Original*** Agreement provides that the Alter-TVAz Loan shall be used exclusively for ***the*** payment and fulfillment of the Borrower's tax obligations to the Mexican tax authorities, including, without limitation, any federal, ***state***, or ***local*** taxes, levies, or related liabilities, and for general corporate purposes. Clause 4.09 merely states that the proceeds will be used as set forth in Clause 2.02.

32. While the payment of tax liabilities may constitute a specific and verifiable purpose, the ***additional*** reference to general corporate purposes ***substantially*** broadens the permitted use of funds and, on its own, does not establish criteria for application, payment priorities, or controls on the use of funds. ***The Original*** Agreement does not condition disbursement on the identification of the tax obligations to be covered, does not provide for controlled accounts, direct payments to tax authorities, certifications of use, or subsequent reports on the use of funds, and does not classify ***the*** misuse of funds as an Event of Default under Clause 6.01. This contrasts with ***paragraph*** 46 of Guidelines EBA/GL/2020/06, which requires policies and procedures to ensure that disbursement is made in accordance with the credit decision and ***the*** contract. It is noted that, following the issuance of the Opinion, ***the*** file now contains documentary evidence of the use of part of the funds, including receipts for electronic transfers dated January 29, 2026, for $2,657,170,823.00 (two billion six hundred fifty-seven million one hundred seventy ***thousand*** eight hundred twenty-three pesos 00/100 National Currency) and $1,267,979,379.00 (***one*** billion two hundred sixty-seven million nine hundred seventy-nine thousand three hundred seventy-nine pesos 00/100 ***National*** Currency), $3,925,150,202.00 (three ***billion*** nine hundred twenty-five million one hundred fifty ***thousand*** two hundred two pesos 00/100 ***National*** Currency) in total, for the payment of tax liabilities, the amounts of which correspond to the tax assessment notices issued by the tax authority on January 28, 2026. This Scope takes note of said evidence and does not dispute it. The remaining technical observation is of a different nature: (i) the ***Original*** Contract did not establish any mechanism to ***control*** the use of funds, did not condition disbursement on the identification of the obligations to be covered, did not provide for controlled accounts or direct payments to the authority, did not require certifications or reports on the use of funds, and did not classify the misuse of funds as an Event of Default; thus, the actual use of funds that occurred is not attributable to the contractual design; and (ii) the difference between ***the*** amount disbursed of $4,085,000,000.00 (four billion eighty-five million pesos 00/100 National Currency) and the amount applied ***toward*** the payment of taxes, that is, $159,849,798.00 (one hundred fifty-nine million eight hundred forty-nine thousand seven hundred ninety-eight pesos 00/100 ***National*** Currency), falls under the open-ended category of "general corporate *purposes"* in Clause 2.02, although there is no evidence of ***its*** application in the reviewed records. The determination of whether the transaction resulted in a benefit or loss to the Estate falls exclusively within the jurisdiction of the Judge and exceeds the scope of this Report.

**d)** Interest, fees, compounding, and maturity.

33. Clause 1.01 defines the Interest Rate as a fixed annual rate of 17.50% and the Maturity Date as July 29, 2026. Clause 2.04(b) provides that interest shall accrue daily and be calculated based on a year of three hundred sixty days and the days actually elapsed, including the first day and excluding the last. Clause 2.05 requires payment of the total amount of the Alter-TVAz Loan in a single lump sum on the Maturity Date to an account in the name of Alter Bank at Banco Azteca, S.A. Clause 2.06 allows for prepayment without penalty upon three Business Days' notice. Clause 3.01 establishes an arrangement fee equal to 1.00% of the Loan, payable to the Arranger.

34. In accordance with the definition of "Interest Payment Date" in Clause 1.01 of the Original Agreement, the first payment date corresponded to the numerically equivalent day of the third month following the Disbursement Date, that is, April 29, 2026. Consequently, a six-month term with principal repayment at maturity and two interest payment dates concentrates the entire payment risk within a very short time frame and requires a clearly identified source of funds, the identification of which is not set forth in the Loan Documents or in any instrument in the revised set of documents.

35. The amount of interest capitalized under the Amending Agreement allows for a direct arithmetic verification against the terms of the Original Contract itself. The amount of $71,487,500.00 (seventy-one million four hundred eighty-seven thousand five hundred pesos 00/100, National Currency) corresponds exactly to the product of S4,085,000,000.00 (four billion eighty-five million pesos 00/100, National Currency) ;,at 17.50% per annum, for thirty-six days, based on a 360-day year. The period between January 29 and March 6, 2026—calculated by including the first day and excluding the last, in accordance with Clause 2.04(b)—is precisely thirty-six days. It follows that: (i) the calculation was performed exactly in accordance with the agreed-upon mechanism; (ii) the calculation runs from the very day of disbursement, which confirms that the disbursement was a single and complete payment on the date of signature; and (iii) the sum of $4,085,000,000.00 (four billion eighty-five million pesos 00/100, National Currency) plus $71,487,500.00 (seventy-one million four hundred eighty-seven thousand five hundred pesos 00/100, National Currency) results in a restated principal amount of $4,156,487,500.00 (four billion one hundred fifty-six million four hundred eighty-seven thousand five hundred pesos 00/100 National Currency), which confirms the internal consistency of the restatement.

36. It should be emphasized that this capitalization occurred <u>before any interest became due.</u> As of March 6, 2026, there were fifty-four days remaining until the first Interest Payment Date. There was, therefore, no delinquency, default, or situation that would ordinarily justify a restructuring. Despite this, the Amending Agreement capitalized the entire amount of accrued but unpaid interest into the principal, deferred its payment until maturity, and imposed a 2% restructuring fee on the amount drawn down, equivalent to $81,700,000.00 (eighty-one million seven hundred thousand pesos 00/100 National Currency), without any corresponding extension of the Maturity Date on record.

37. Adding this commission to the capitalized interest, the financial burden recognized or imposed on the Borrower during the thirty-six days between the disbursement and the restatement amounts to $153,187,500.00 (one hundred fifty-three million one hundred eighty-seven thousand five hundred pesos 00/100 in National Currency), equivalent to 3.75% of the amount drawn down during that period, to which must be added the structuring fee under Clause 3.01, calculated on "the Loan," the basis for which is ambiguous according to the very definition of that term in Clause 1.01, which refers indiscriminately to the authorized amount of $5,000,000,000.00 (five billion pesos 00/100 National Currency) or to the amount actually outstanding; this ambiguity constitutes, in and of itself, a drafting defect in a pricing clause. It is expressly noted that this quantification is provided solely to describe the economic effect of the terms set forth in the Loan Documents and does not constitute an assessment of the legality or proportionality of the financial cost nor a quantification of damages, matters excluded from the scope of the Opinion and this Scope. The comparison of said cost against the official market benchmarks in effect as of the date of execution is addressed in section IIId bis) of this Scope.

38. It is also relevant that the structuring fee is agreed upon in favor of the Organizer and not the lenders who provide the funds. Combined with the fact that the Organizer may not retain its own economic exposure, this stipulation implies that the identified entity on the creditor side receives a certain and advance remuneration for structuring the transaction, while the credit risk is transferred to unidentified participants.

39. From a prudential perspective, what matters is not the magnitude of the cost but the absence of a documented correlation between that cost and an improvement in recovery. In accordance with paragraph 35 of the BCBS Principles and Article 24 of the CUB, any modification of the terms of a previously approved loan must undergo the same analysis and documentation process as its origination. The capitalization of accrued but unpaid interest and the imposition of a restructuring fee thirty-six days after disbursement—in the absence of default and without a contemporaneous analysis of cash flows or recovery under the restated terms—is inconsistent with that standard.

(d-bis) Comparison **with** prevailing market conditions as of the date of **execution.**

39A. The economic terms actually agreed upon, as set forth in the Credit Documents themselves, are as follows: a fixed annual rate of 17.50%, Clause 1.01 of the Original Agreement; a structuring fee of 1.00% payable to the Arranger on the Disbursement Date, Clause 3.01; a restructuring fee of 2.00% of the amount actually drawn down, payable within fifteen calendar days following March 6, 2026, Section 2.05 of the Amending Agreement; and a Delinquency Rate equal to the Interest Rate plus 3.00% per month, Clause 1.01 of the Amending Agreement, that is, a nominal annual rate of 53.50%.

39 Ter. The official benchmarks published by the Bank of Mexico as of the date of execution of the Original Agreement are as follows:

- Target **interest** rate**:** 7.00% per annum, effective as of January 28, 2026.
- Overnight TIIE**:** 7.10%, dated January 27, 2026. This benchmark is used because it applies to new contracts since the Bank of Mexico restricted the use of the 28-day TIIE for this purpose.
- **28-day** TIIE**:** 7.3489%, dated January 27, 2026.
- **28-day CETES:** 6.95%, dated January 27, 2026.
- **182-day Cetes:** 7.26% at the first auction of 2026. This is the risk-free benchmark with a term corresponding to that of the loan, which matured in six months.
- **10-year** M Bond**:** yield of approximately 8.9% for the period, according to interbank quotes.
- Annual headline inflation**:** 3.77%, corresponding to the first half of January 2026.

39-C. The comparison yields the following spreads, calculated based on the figures above. When considering the coupon in isolation, the rate of 7.50% is 1,024 basis points above the 82-day Cetes, that is, 2.4 times the risk-free benchmark for the same maturity; and 1,050 basis points above the target rate. When annualizing the fees over the contractual term of 181 days, a 1.00% structuring fee is equivalent to 1.99 percentage points and a 2.00% restructuring fee to 3.98 percentage points; the effective cost of the transaction is in the range of 23.5% per annum, that is, 1,624 basis points above the 182-day CETES and 3.2 times their level. The agreed-upon default interest rate, at a nominal annual rate of 53.50%, is equivalent to 7.6 times the target rate in effect as of the date of execution.

39 **Quinquies**. It is expressly noted that this comparison is made solely to describe, in objective terms verifiable against official sources, the relationship between the agreed-upon cost and the market benchmarks in effect as of the date of execution. It does not constitute a determination as to whether the cost is or is not typical of any segment of the market, nor an assessment of its legality or proportionality, nor a quantification of damages. The determination of what constitutes the relevant market and whether or not the agreed-upon terms deviate from those prevailing in that market rests exclusively with the Judge, based on the totality of the evidence.

e) **Representations** and **Warranties:** Content and **Omissions**.

40. The Original Contract does contain a section on representations and warranties. Clause 4 comprises twelve subclauses: *4.01* Powers and Authority*; 4.02* Validity*,* Authorization*,* and Absence of Conflict*; 4.03* Government Approvals*; 4.04* Binding Nature of the Agreement*; 4.05* Withholding and Other Taxes*; 4.06* Sovereign Immunity*;*
*4.07* Financial Statements*; 4.08* Security Interest*; 4.09* Use of Resources*; 4.*10 Ownership of Property*,* Possession under Leases, and Trademarks*; 4.11* Permits*;* and *4. 12* Compliance with the Law.

41. The mere existence of this section does not, however, mean it is sufficient. An examination of its content reveals that the list omits precisely those statements

which were materially indispensable given the circumstances documented in paragraphs 9, 27, 29, and 30 of the Opinion. Specifically, the Original Contract does not contain:

- A declaration of **the absence** of litigation **or** proceedings. There is no statement whatsoever regarding the absence of relevant litigation, administrative proceedings, arbitration proceedings, or contentious proceedings, nor regarding tax contingencies, despite the fact that the very purpose of the loan agreed upon in Clause 2.02 was the payment of tax obligations.

- A declaration of no **default under** other instruments. There is no statement that the Borrower is not in default under issuance agreements, credit agreements, or other debt instruments, even though, as of the date of the Original Agreement, the preferred bonds in the amount of USD $400,000,000.00 (four hundred million dollars 00/100, legal tender of the United States of America) referred to in paragraphs 9 and 28 of the Opinion were past due and unpaid.

- Declaration of Non-Violation of Contracts. Clause 4.02 states that the execution and performance of the Agreement do not violate any applicable laws, statutes, rules, or regulations, the articles of incorporation or bylaws, or orders of courts or government agencies. This representation does not cover the Borrower's contracts or debt instruments. The representation regarding the absence of conflicts of interest—a standard feature of corporate credit documentation that expressly covers material contracts and issuance agreements—was thus excluded from the Original Agreement.

- Representation Regarding the Absence of Undisclosed Liabilities and Solvency. There is no representation regarding the absence of liabilities other than those reflected in the financial statements, nor is there a representation regarding solvency or the ability to pay.

- Declaration of Absence of Material **Adverse Change**. The term "Material Adverse Effect" is defined in Clause 1.01 but is not used in any declaration. Its sole operational use throughout the instrument is as an exception in favor of the Borrower in Clause 5.03(a), which waives the requirement to maintain rights, permits, patents, trademarks, and franchises when their absence does not result in a Material Adverse Effect. A carefully worded definition that appears only once and benefits the borrower reveals the use of a pre-existing template from which the provisions protecting the lender were removed.

- Reaffirmation Provision. There is no provision stating that the representations are deemed reaffirmed on the Disbursement Date, on each Interest Payment Date, or on any other date, nor is there any requirement for certification of their continued validity.

42. Added to the foregoing are two specific features of the text itself: (i) First, the preamble to Clause 4 provides that the Borrower represents, warrants, and agrees with the Administrative Agent, and not with the lenders. When considered together with Clause 7.01, which expressly excludes any fiduciary relationship between the Agent and the Lenders and any duty other than those expressly agreed upon, the result is that the representations are made in favor of an entity that is not liable to those who assume the economic risk; and (ii) Second, Clause 4.07 certifies that the unaudited combined financial statements as of December 31, 2025, submitted by the Borrower to the Agent, are complete and accurate

Administrative. The lender therefore accepted, as the sole financial basis for the transaction, unaudited combined financial statements for a fiscal year that had ended twenty-nine days earlier, regarding an issuer whose credit rating had been fully withdrawn in December 2023 precisely due to a lack of access to sufficient information, as documented in paragraph 30 of the Opinion.

43. In accordance with paragraph 22 of the BCBS Principles, all participants in a syndicate must conduct their own independent analysis of credit risk and review the terms of the syndication before committing; and in accordance with paragraph 20 of the same Principles, a bank must not extend credit simply because the borrower is known to it or is perceived as reputable. In the face of material defaults and a public and well-known financial deterioration, the lender was required to verify the borrower's financial information, total indebtedness, contractual restrictions, and ability to pay, and not merely accept general statements regarding unaudited financial statements.

**f)** Obligations of the Borrower**:** Absence of Obligations Not to Act**,** Financial Justification***, and*** Disclosure of Information.

44. Clause 5 of the Original Contract, titled "Obligations of the Borrower," comprises five subclauses: 5.01 Performance of Obligations, which reiterates the duty to pay on time; 5.02 Financial Statements and Other Reports; 5.03 Maintenance and Continuity of the Business and Insurance; 5.04 Compliance with the Law and Government Approvals; and 5.05 Post-Disbursement Obligations, relating to the execution of the Guarantee Agreements.

45. There is not a single "no-action" obligation in the Original Agreement. There are no restrictions on incurring additional debt; no limitation on encumbrances or *negative pledge* is agreed upon; there are no restrictions on the disposition, sale, or transfer of assets; there are no limitations on dividend payments, capital repayments, or other restricted payments; there are no restrictions on mergers, spin-offs, or reorganizations; there are no limitations on transactions with related parties; and there are no restrictions on material changes in the nature of the business. Nor is any financial maintenance requirement established: the only ratio provided for in the instrument is the "Guarantee *Ratio*," defined in Clause 1.01 as the 1.3:1 ratio between the accounts receivable pledged as collateral and the outstanding amount of the Loan, compliance with which is subject, pursuant to Clause 5.05(d), to the terms of the Trust Agreement, an instrument that did not exist as of the disbursement date and is not on file.

46. Clause 5.02 warrants separate consideration. Although titled "Financial Statements*:* Other Reports," its entire content consists of the Borrower's obligation to maintain its financial records and an accounting system in accordance with Mexican GAAP, and to maintain an appropriate system for operational planning and control, cost accounting, and financial control and reporting systems. It imposes no obligation whatsoever to submit financial statements, periodic financial information, certificates of compliance, budgets, projections, or notices of adverse events to the lender or the Administrative Agent. The lender therefore entered into the agreement without any contractual right to receive

any financial information during the term of the loan regarding a borrower whose credit rating had been revoked due to a lack of transparency in the information provided.

47. From the banking and financial perspective that is the subject of this Scope, this omission is the most technically significant finding in the Original Agreement. In a corporate loan, covenants and disclosure obligations fulfill three prudential functions that no other element of the agreement can replace: (i) they prevent the borrower from unilaterally deteriorating the risk profile on which the financing was granted; (ii) they provide early warning signs of deterioration by turning a deviation—which would otherwise only become apparent at maturity—into an actionable breach of contract; and (iii) they give the lender an early negotiating position. Paragraph 19 of the BCBS Principles refers to them as contractual obligations designed to limit changes in *the* borrower's future risk *profile*; paragraph 43 requires that credit monitoring oversee compliance with existing covenants; paragraph 39 includes, among the functions of credit management, the monitoring of documentation, contractual requirements, and legal obligations; Paragraph 144(e) of Guideline EBA/GL/2020/06 requires an assessment of the transaction structure, including covenants; and paragraph 164 specifically requires an assessment of negative pledge clauses. None of these exercises was materially possible under the Original Agreement, because the instrument did not create any basis on which to carry them out.

48. The inconsistency is particularly striking in this specific case. A lender that extended up to five billion pesos to a company that reported liabilities past due for more than thirty days constituting a material portion of its total liabilities, and that had preferred bonds in default in the amount of USD $400,000,000.00 (four hundred million dollars 00/100, legal tender of the United States of America) in preferred bonds that were in default and had been rated as "Restricted Default." The lender had a clear economic interest in contractually restricting the assumption of additional debt, the creation of new liens, and the disposition of assets, as well as in obtaining periodic financial information. The simultaneous waiver of all these protections cannot be explained by the urgency of the transaction, given that these are standard clauses available in any market form and subject to immediate inclusion; rather, it is consistent with a scenario in which the recovery of the loan did not actually depend on the Borrower's future financial performance.

49. The Amendment Agreement incorporated and expanded restrictions on indebtedness, liens, mergers, transactions with related parties, use of funds, disclosure of information, and other matters. This strengthening is consistent with more robust corporate documentation, but it was introduced after the disbursement had already taken place. This requires a strict distinction between the protections in place at closing and those incorporated subsequently: the restatement should not be analyzed retrospectively as if it had been in effect since the disbursement, and its content does not remedy the standard applicable at the time of origination. On the contrary, the fact that the same parties were able to agree on such provisions thirty-six days later demonstrates that their initial omission was not due to practical impossibility.

g) Absence of conditions precedent.

50. The Original Agreement contains no provisions regarding conditions of use or conditions precedent. Clause 2.01(a) is limited to the generic phrase "subject to the terms *and* conditions ***of this*** Agreement," without further elaboration, and Clause 2.03 mandates disbursement on the Disbursement Date, which Clause 1.01 sets as January 29, 2026, coinciding with the date of execution.

51. Consequently, the disbursement was not contingent upon the delivery of articles of incorporation, powers of attorney, or corporate resolutions; nor upon legal opinions regarding validity and enforceability, either in Saint Lucia or in Mexico; nor upon certificates from officers; nor upon confirmation of the accuracy of the representations; nor upon the absence of an Event of Default; nor upon evidence of the use of the funds; nor, notably, to the creation, grant, or perfection of any security interest. Clause 2.03(c), which mandates the delivery of the Promissory Note, frames this as an obligation of the Borrower on the Disbursement Date and not as a precondition to such disbursement.

52. The absence of conditions precedent in a financing transaction of this magnitude is inconsistent with paragraph 46 of Guidelines EBA/GL/2020/06, which requires ensuring that the disbursement is made in accordance with the credit decision and the credit agreement, as well as with the implementation and control functions that Articles 10 through 23 of the CUB assign to the credit process. From a prudential perspective, conditions precedent constitute the mechanism by which the lender verifies, immediately prior to releasing the funds, that the premises underlying its credit decision remain valid. Their complete omission means that no documentary verification whatsoever took place between the decision to grant the loan and the disbursement of $4,085,000,000.00 (four billion eighty-five million pesos 00/100 in national currency).

**h)** Guarantees: **deferral**, penalty in lieu of enforceability, and internal inconsistency.

53. Clause 5.05 of the Original Agreement provides, under the heading "Post-Disbursement Obligations," that as soon as possible but no later than sixty calendar days from the Disbursement Date, the Borrower shall sign or cause its Subsidiaries to sign: (a) a first-priority pledge agreement over the capital stock of Operadora Mexicana de Televisión, S.A. de C.V., Publicidad Especializada en Medios de Comunicación de TV Azteca, S.A. de C.V., or any other Subsidiary acceptable to the Security Agent; (b) a first-priority pledge agreement over registered trademarks; (c) a mortgage agreement granting a second-priority security interest in real property and/or concessions; and (d) a first-priority trust agreement over accounts receivable, subject to a Security Ratio of 1.3:1.

54. Three consequences follow from the text: (i) First, the instrument itself established the core guarantees as obligations subsequent to the disbursement and not as preconditions thereto, such that the exposure was assumed in its entirety without any formalized or perfected security; (ii) Second, and crucially, the Original Agreement establishes that the sole consequence of the failure to sign the Guarantee Agreements in a timely manner is the payment of interest at the Interest Rate plus a margin of 1.50% per annum as of that date. The failure to establish the entire package of guarantees

is not classified as an Event of Default under Clause 6.01: the lender substituted the enforceability of the security for a surcharge of one hundred fifty basis points, the economic consequence of which is to increase the debt of an insolvent debtor rather than improve the recovery position; and (iii) Third, even the signing of the contracts within the deadline does not constitute their formation; Clause 5.0S(e) requires the Borrower to ensure the necessary registrations in the relevant public records, without a specific deadline or consequences for noncompliance.

55. The Original Agreement also contains a material internal contradiction. Clause 4.08 states that the Security Agreements shall create and grant the Initial Lender a legal, valid, and perfected security interest of first priority over the Borrower's assets upon their execution and registration; Clause 5.0S(c), however, expressly provides for a mortgage of second priority. The statement in Clause 4.08 is therefore incorrect with respect to one of the security interests provided for by the instrument itself, and this has been the case since its execution. Furthermore, Clause
4.08 identifies the Initial Lender as the beneficiary of the security interests, whereas Clause 5.05 establishes them in favor of the Security Agent, for its own benefit and that of the Lenders.

56. The Amending Agreement clarifies the general wording of Clause 4.08 by referring to first- or second-degree security interests, as applicable; it designates the security agent as the second trustee and Numchi Servicios*,* S.A.*P.l de* C. *V* as the first-ranking trustee of Trust F/81 10, and provides for additional registration deadlines, including one of up to one hundred days from the signing of the mortgage to file the registration certificate with the Public Registry of Concessions. This correction confirms the need to analyze each security interest individually and not to attribute first-ranking status to the package as a whole, and is consistent with the statements in paragraphs 12, 32, 41, and 48 of the Opinion regarding the Lender's accession to a preexisting mortgage security interest established in 2020 in favor of Numchi Servicios, S.A.*P.I. de* C.*V.*

57. The Loan Documents do not include the executed security agreements, the agreement to join Trust F/8 1 10, or any intercreditor agreement. Consequently, the reviewed documentation does not allow for an understanding of the rules governing enforcement, distribution of recoveries, release of collateral, and coordination among creditors, nor does it allow for the quantification of residual coverage, as no appraisals, updated balances of the first-priority beneficiary, eligibility and collectibility of the affected accounts receivable, or liquidation value analysis have been provided. In accordance with paragraph 25 of the BCBS Principles and Articles 1.17 through 1.19 and 2-Bis 30 through 2-Bis 32 of the CUB, a collateral only produces prudential mitigation effects when it is legally valid, enforceable, perfected, and economically realizable—none of which conditions were met as of the disbursement date.

56 Bis. It is important to highlight one provision of the Restated Agreement that directly affects the collateral regime and is set forth in the text of the agreement itself. Section 4.10 provides that the Borrower shall sign the Guarantee Documents "within the following 60 (sixty) calendar days following the signing of *this* Agreement," and Section 8.0l(b) of the Amending Agreement provides that any reference to the Credit Agreement shall be deemed to refer to the

Amended and Restated Credit Agreement. Consequently, the sixty-day period did not expire on March 30, 2026, but rather began anew on March 6, 2026, with an approximate expiration date of May 5, 2026.

56 Ter. Two technical consequences follow from this: (i) First, the Amending Agreement did not formalize the core security interests: it deferred their creation for an additional sixty days. This is consistent with the fact that the definitions of "Stock ***Pledge*** *Agreement*," "Trademark ***Pledge*** *Agreement*," "Mortgage ***Agreement***," and "Adhesion Agreement" in Clause 1.01 of the Restated Agreement are formulated entirely in the future tense—***"which*** shall be entered into," that is, as instruments not yet executed as of the date of the restatement; and (ii) Second, the exposure assumed on January 29, 2026, remained—by virtue of the Restated Agreement itself—without a formalized or perfected security interest throughout the entire period between the disbursement and a date subsequent to the filing of the Petition for Commercial Bankruptcy. It is hereby noted that, should evidence appear in the case file showing that any of the Guarantee Documents was in fact executed on March 6, 2026, or on a date prior to that, such evidence shall prevail; this Opinion is limited to setting forth what results from the text of the instruments analyzed.

i) Events of Default**.**

58. Clause 6.01 of the Original Agreement specifies only four Events of Default: (a) failure to pay principal, interest, or any other amount due; (b) any representation or warranty proving to be incorrect or misleading in any material respect at the time it is made or confirmed; (e) the Borrower becoming subject to any bankruptcy, insolvency, reorganization, receivership, moratorium, or similar proceeding, whether voluntary or involuntary; and (d) a material breach of any of its obligations under the Agreement itself.

59. The list omits the scenarios that were most relevant to the specific case. There is no cross-default or cross-acceleration with respect to the Borrower's existing debt—an omission that is particularly notable given that this is an issuer whose market debt had been in declared default since 2024 and rated "Restricted Default" since January 2023; under ordinary circumstances, a creditor assuming exposure to a debtor in that situation would precisely incorporate such a mechanism to link its position to the performance of the remainder of the debt. There is no event triggered by a material adverse effect, despite the existence of the definition. There is no event triggered by the invalidity, unenforceability, or failure to perfect the security interests, nor by a breach of the obligation under Clause 5.05. There is no event due to a change of control, nor due to adverse judicial or administrative rulings, nor due to supervening illegality, nor due to cessation of operations, nor due to revocation of concessions or permits, even though Clause 4.11 states that these are in effect and the concessions constituted part of the projected collateral.

60. Pursuant to Clause 6.02, once an Event of Default has occurred and continues, only the Administrative Agent may declare the loan due and payable in advance, with no mechanism provided for review by the lenders. The Amending Agreement sets forth a broader list of events,

including breaches of covenants, illegality, insolvency, change of control, unauthorized encumbrances, and misuse of funds, which confirms that the initial instrument did not, from the time of disbursement, contain the level of contractual protection that reasonably corresponded to the Borrower's known financial situation.

**j)** Unusual provisions that are detrimental to the creditor's position.

61. In addition to the omissions noted, the Original Agreement contains provisions that have the effect of weakening the lender's own position and that lack precedent in standard corporate credit documentation.

- Force majeure in favor **of the** borrower (Clause 8.08). It is stipulated that neither the Administrative Agent nor the Borrower shall be liable for delays or failures to perform their respective obligations arising from Events of Force Majeure. The definition in Clause 1.01 broadly encompasses natural disasters, war, terrorism, governmental acts, pandemics, labor strikes, or other unforeseeable events. This provision does not exempt the Borrower from its payment obligations. In standard credit documentation, monetary payment obligations are never subject to force majeure exemptions, precisely because doing so would render the principal obligation meaningless. A clause of this nature, in a credit agreement for five billion pesos, is difficult to reconcile with a creditor's intention to ensure repayment.

- Costs and Expenses Bearing by Each Party (Clause 8.09). It is agreed that each of the Lenders and the Borrower shall bear its own costs related to the negotiation and execution of the Agreement. It is standard practice in corporate financing for the borrower to cover the lender's costs of structuring, documentation, and legal counsel, precisely because such counsel serves as the vehicle for legal due diligence. This provision is consistent with a documentation process in which the lender did not incur significant external legal counsel costs.

- Absence of ***Gross-Up*** and **Tax** Indemnification. Clause 4.05 expressly acknowledges the existence of withholding under Mexican law with respect to payments arising from the Credit Documents. However, the Original Agreement contains no provision for gross-up or tax indemnification, so the lender's net return, net of the Mexican withholding tax applicable to interest paid to foreign residents, remains contractually undetermined. This is one of the provisions most consistently included in any cross-border financing arrangement.

- Unilaterally Regulated Assignment (Clause 8.07). The sole provision regarding assignment restricts the Borrower from assigning its rights or obligations without the prior written consent of "the Lender," in the singular. There is no provision governing assignment, transfer, or participation by lenders, nor any mechanism for transfer certificates or a lender registry, even though Clause 8.06 provides for the disclosure of confidential information to "actual or potential assignees and participants." The instrument therefore provides for the existence of assignees and participants but does not regulate their inclusion or registration.

- Absence of cure periods and standard mechanisms. The Original Agreement lacks grace or cure periods, as well as clauses regarding cost increases, illegality, mitigation, set-off, proportional allocation among lenders, and indemnification of the Agent by the lenders—all of which are standard features in syndicated documentation.

62. Taken together, these provisions—along with the singular-plural inconsistencies in Clauses 4.08 and 8.07 and the provisions referring to the Lenders in the plural—reveal that the Original Agreement consists of a simplified bilateral template onto which syndication terminology was superimposed, without developing the corresponding mechanics or preserving the ordinary protections of the creditor.

**k)** Disbursement and Payment Accounts.

63. Clause 2.03(b) designates as the disbursement account an account in the name of TV Azteca, S.A.B. de C.V. at Banco Azteca, S.A., and Clause 2.05 designates as the principal payment account an account in the name of Alter Bank, also at Banco Azteca, S.A., identifying Alter Bank, Ltd. as the account owner. Clause 2.04(a) provides that interest shall be paid to the Initial Lender "on a pro rata basis among the Lenders." The Amending Agreement clarifies that the account designated by the administrative agent operates for the benefit of the lenders and that Alter receives and distributes funds solely in its capacity as an agent.

64. The use of a banking institution affiliated with the Borrower is not, in and of itself, contrary to market practice. It becomes a matter of prudential concern due to its concurrence with two other factors: the failure to identify the economic lenders and the concentration in Alter of the roles of Organizer, Initial Lender, Administrative Agent, and Security Agent. This combination required documented controls regarding the segregation of funds, reconciliation, traceability, the depository institution's rights of set-off or retention, the availability of funds in the event of a freeze or insolvency of said institution, and immediate distribution to the lenders. The Credit Documents do not contain an account agreement, a control agreement, or a waiver by Banco Azteca of its rights of set-off; therefore, these controls cannot be verified. In accordance with paragraph 38 of the BCBS Principles, those performing functions related to the safekeeping of key documents or the transfer of funds must report to senior management independent of the origination and approval functions; and in accordance with paragraph 167 of Guidelines EBA/GL/2020/06, when payment flows pass through a designated agent, the soundness of that agent must be assessed.

**l)** Governing **Law,** Jurisdiction, and Enforcement of Security Interests.

65. Clause 8.11 subjects the Original Agreement and any dispute arising therefrom to the laws of Saint Lucia and to the exclusive and irrevocable jurisdiction of the courts of Saint Lucia. The Original Agreement does not designate a process agent—a designation that appears only in the Amending Agreement—does not contain any waiver of immunity other than the statement in Clause 4.06, and does not provide for any regime for the recognition and enforcement of judgments in Mexico.

66. It is reiterated that this Scope does not express an opinion on the law of Saint Lucia. From a strictly prudential perspective, however, the choice is technically relevant: this is a loan denominated in Mexican pesos, disbursed and payable into accounts held at a Mexican institution, granted to a Mexican issuer, and secured, pursuant to Clause 5.05, by pledges of shares in Mexican corporations, pledges of trademarks, mortgages on real property and Mexican concessions, and a trust in accounts receivable—all of which are instruments necessarily governed by Mexican law and subject to registration in Mexican public records. Paragraphs 13 and 14 of the BCBS Principles require that the monitoring of country and transfer risk incorporate the enforceability of credit agreements and the timeliness and ability to realize collateral under the applicable national legal framework. The choice of a forum with no connection to the assets, no process agent, and no provision for enforcement in the jurisdiction where the collateral is located increases the risk of realization rather than mitigating it, and there is no analysis on this matter.

m) No Conflict and Pre-existing Financial Agreements.

67. As noted in Section III.e) herein, the representation regarding the absence of conflict in Clause 4.02 of the Original Agreement does not cover the Borrower's contracts or debt instruments. The Amending Agreement does contain express representations to the effect that the transaction does not violate or constitute a default under any issuance contract, agreement, or other instrument binding on TV Azteca.

68. As discussed in paragraph 38 of the Opinion, prudent banking practice would have required a review of the preferred bond issuance agreement—including restrictions on additional debt, encumbrance limitations, security interests, pari passu provisions, restricted payments, cross-default provisions, exceptions, and consent and waiver mechanisms—prior to disbursement and, a fortiori, before establishing the security provided for in Clause 5.05. The reviewed documents do not include consents, waivers, certificates, or legal opinions of non-violation. Therefore, the accuracy of the statement incorporated into the Amending Agreement cannot be verified, nor can it be concluded, based on the available evidence, that the Alter-TVAz Loan violated the issuance agreement. It is incumbent upon the parties to prove the existence and scope of these restrictions and, if applicable, for the court to determine their legal effects.

69. It should be noted that the omission of any reference to contracts in Clause 4.02 of the Original Contract, and its express inclusion in the Amending Agreement, constitute a sequence that is verifiable through the documents: the statement that would have allowed the lender to bring an action for fraud regarding a possible breach of the broadcasting contract did not exist at the time of disbursement and was introduced after the risk had already been assumed and four days before the filing of the petition for bankruptcy.

## IV. SYNDICATED STRUCTURE, UNIDENTIFIED LENDERS, AND CONCENTRATION OF AUTHORITY.

a) The syndication outlined in the Original Agreement.

70. A syndicated loan is a form of financing in which two or more lenders assume direct obligations to the borrower under a single set of documents. Each lender retains its own claim for its share of the loan, while one or more agents coordinate disbursements, payments, communications, and collateral. The identity and participation of the lenders may be recorded in a register maintained by the agent and not necessarily in the body of the contract; however, there must be contemporaneous documents that allow the agent, the borrower, and the competent authorities to verify commitments, participations, assignments, voting rights, and beneficial owners. The market practice documented by the LMA in its *Guide to Syndicated Loans & Leveraged Finance Transactions* (April 2020) and in its *Guide to *Agency* Protections* (September 2018) is based precisely on the existence of such records and on a contractual framework governing the agent's powers and responsibilities vis-à-vis the lenders.

71. The Original Agreement adopts this terminology. Clause 1.01 defines "Lenders" as the Initial Lender and each Person who becomes a party to the agreement and agrees to extend a pro rata portion of the Loan to the Borrower by signing a written agreement with the Administrative Agent, setting forth its commitment to extend its pro rata portion. Clause 2.01(b) requires each Lender to fund only its pro rata share; Clause 2.03(a) requires each Lender to make its pro rata share of the Disbursement; and Clause 2.04(a) provides for the payment of interest to the Initial Lender on a pro rata basis by the Lenders. Alter, however, is the only identified participant and the sole signatory on the creditor side, in its fourfold capacity as Organizer, Initial Lender, Administrative Agent, and Security Agent.

72. From the transcribed definition emerges a fact of the utmost technical significance, which is set forth in the Original Agreement itself—not merely in the Amending Agreement: the inclusion of the true risk bearers is documented in private instruments entered into exclusively between those Persons and Alter, separate from the credit agreement, in which the Borrower does not participate and of which it receives no notice. No provision of the Original Contract obligates Alter to disclose the identity of the lenders, to maintain an accessible record, to reconcile it, or to allow for its independent verification. The Amending Agreement further specifies that, unless otherwise agreed in writing, Alter may act solely as the registered holder, nominee, and disbursement channel, without necessarily retaining its own economic exposure, and refers the identity and participation of the lenders to a private registry administered by Alter itself.

73. This is, therefore, an express contractual acknowledgment by the parties that the beneficial ownership of the credit may reside with persons other than the sole entity identified on the creditor's side, and not an inference made by the Firm. Since neither said registry, the written adhesion contracts, nor individual evidence of funding has been provided, the documents reviewed do not allow for the identification of who contributed the funds, what exposure each participant assumed, or what their economic and voting rights were.

b) Clause 7: Indemnification without a mechanism.

74. Clause 7 of the Original Agreement is titled "Syndication of the Credit" and consists of three subclauses. Clause 7.01 provides for the irrevocable appointment of the Agent by each Lender and establishes that, notwithstanding any provision to the contrary, no Agent shall have any duty or liability other than those expressly set forth, nor shall any Agent be deemed to have any fiduciary relationship with any Lender, nor shall any implied agreements, functions, responsibilities, duties, obligations, or liabilities be construed to exist against any Agent. Clause 7.02 permits the Agent to perform its functions by or through agents or representatives and exempts it from liability for their negligence or misconduct, except in cases of gross negligence or willful misconduct. Clause 7.03 exempts the Organizer, the Administrative Agent, and the Collateral Agent from any duty, liability, or obligation, specifies that they shall not be liable for failing to demand, collect, or recover the guarantees or for any delay in doing so; that they are not obligated to sell or dispose of any guarantee at the request of any Person; and that the powers conferred upon the Security Agent exist solely to protect its own interest in the guarantee, without imposing a duty upon it to exercise them.

75. The full text of the syndication clause is, therefore, exculpatory. Clause 7 does not address: required creditors or majorities; voting procedures; matters requiring unanimity; instructions from creditors to the agent and their binding nature; handling of conflicting instructions; resignation, removal, or replacement of the agent; indemnification of the agent by the creditors; the agent's disclosure obligations to the creditors; the maintenance, content, updating, and reconciliation of a creditor registry; the mechanics of assignments and participations; the proportional distribution of payments and recoveries; or the treatment of defaulting creditors. This is a clause designed to protect the agent but lacks the operational mechanisms that would justify it.

c) Concentration of powers in Alter and absence of checks and balances.

76. A comprehensive analysis of the Original Agreement reveals that Alter concentrates all the powers and benefits of the transaction, without any checks and balances and without any liability toward those who assume the economic risk. In particular:

- It is the beneficiary of the representations and warranties, which, according to the preamble to Clause 4, are granted to the Administrative Agent and not to the lenders.
- It is the beneficiary of the Borrower's obligations, which, pursuant to the preamble to Clause 5, are agreed upon with the Administrative Agent.
- It receives the Promissory Note, in accordance with Clause 2.03(c) and the definition of that term in Clause 1.01, in an amount equal to the Loan.
- It receives all interest and principal payments, in accordance with Clauses 2.04(a) and 2.05, into an account held in its name.
- Performs all interest calculations, in accordance with Clause 2.04(c), without provision for independent verification or notification to the lenders.

- It is the only party authorized to declare early maturity, in accordance with Clause 6.02, without any mechanism for instructions from the lenders.
- It may amend the Agreement and grant waivers and consents on its own. Clause 8.03 provides that any amendment must be in writing and signed by the Administrative Agent and the Borrower, and that waivers and consents shall be effective if they are in writing and signed by the Administrative Agent. No consent, instruction, or knowledge from any lender is required.
- It unilaterally decides who is admitted as a Lender and under what terms, in accordance with the definition of that term in Clause 1.01, without the involvement of the Borrower.
- It receives the structuring fee in its capacity as Organizer, in accordance with Clause 3.01.
- It has no fiduciary relationship with the creditors nor any implied duty toward them, in accordance with Clause 7.01; and is exempted by Clause 7.03 with respect to the enforcement, collection, and recovery of the guarantees.

77. The structural result is that, under the Original Agreement, no person owes anything to those who assume the economic risk of the financing. The lenders are not the intended recipients of the Borrower's representations or obligations; they do not receive the credit instrument; they do not receive payments directly; they cannot direct acceleration; they do not participate in amendments or waivers; and they lack any contractual recourse against the Agent, who owes them no fiduciary duty whatsoever. In a market-based syndication, this set of powers is balanced by the system of required lenders, matters subject to unanimity, the agent's disclosure and accountability obligations, and its substitution provisions. None of these checks and balances exist.

78. The most significant practical consequence of this structure became evident in the case file itself: the Amending Agreement of March 6, 2026—which capitalized interest, imposed a fee of $81,700,000.00, deferred payments, and documented the addition to the pre-existing mortgage guarantee—was validly executed by Alter and the Borrower, without the intervention or consent of any lender, by virtue of Clause 8.03 of the Original Contract.

d) Governance of the Lenders.

79. The absence of a definition or determination of required lenders, majority percentages, and matters subject to unanimity is not merely atypical for a multilateral syndicated loan: it is incompatible with its ordinary operation, since without such a framework there is no contractual mechanism whatsoever for a plurality of creditors to make collective decisions regarding amendments, waivers, acceleration, release, or enforcement of guarantees, and the application of recoveries. It must be confirmed whether such rules are included in the written standard-form contracts referred to by the definition of "Lenders"; they do not appear in the reviewed documents, and those contracts were not submitted.

## V. CONVERGENCE WITH THE ANALYSIS IN PARAGRAPHS 42 AND 50 OF THE OPINION.

80. Paragraph 42 of the Opinion raised, as a strictly technical question, what circumstance could explain—under an internationally recognized prudential standard—that a lending institution would assume an exposure of that magnitude with respect to a borrower who, as of the origination date, did not qualify as a creditworthy entity, and noted that the only prudentially consistent hypothesis would be the existence of an undisclosed mitigation mechanism that would guarantee payment regardless of the borrower's credit profile; furthermore, it indicated that if such a mechanism had been provided by a related party of the Lender itself or of TV Azteca, this would exacerbate rather than remedy the deviation from prudential standards. The SIXTH Conclusion of the Opinion, contained in paragraph 50, reflected this analysis, noting that the record available at that time did not substantiate the existence of such a mechanism.

81. The Credit Documents, as now revised, do not establish the existence of a cash deposit or equivalent instrument established in favor of the Creditor, nor does this Opinion assert such a fact. Instead, they provide two new factual elements—verifiable in the contractual text itself—that directly impact the analysis in paragraph 42.

82. The first is that the beneficial ownership of the credit does not necessarily lie with Alter, and the Credit Documents do not identify who holds it, referring that identification to private contracts entered into with Alter and to a registry administered by Alter itself—neither of which have been provided.

83. The second is that the provisions of the Original Contract are, in and of themselves, incompatible with the existence of a genuine credit analysis aimed at recovery. The complete absence of conditions precedent, obligations to provide financial information, "no-action" obligations, financial justifications, cross-default provisions, and the enforceability of guarantees as a condition for disbursement—combined with the inclusion of a force majeure exemption in favor of the debtor and the substitution of the obligation to provide guarantees with a 150-basis-point surcharge—does not reflect the behavior of a creditor who expects to collect from the debtor's ordinary course of business.

84. Three technical consequences follow from this.

85. First. The subject of the prudential analysis must be specified. The Opinion analyzed the transaction under the premise—reasonable at the time—that the exposure had been assumed by the identified Lender. The contractual text reveals that Alter could act as the registered owner, nominee, and disbursement channel, without any economic exposure of its own, while receiving the structuring fee in return. The relevant prudential question is no longer merely why an international bank would assume that exposure, but rather who actually assumed it and under what analysis. The Credit Documents do not allow for an answer to either of these questions, and their very design defers the answer to private instruments that have not been provided.

86. Second. The conclusion of the Opinion is reinforced, not weakened. The hypothesis in paragraph 42 rested on the finding that no genuine analysis

TV Azteca's credit risk could support the transaction. The provisions of the Original Agreement confirm this finding based on the instrument itself: a lender who had conducted such an analysis and whose recovery depended on it would not have simultaneously waived all the protections set forth therein. The contractual structure observed is consistent with a transaction in which recovery did not depend on the borrower's future financial performance.

87. Third. An additional layer of opacity is introduced. Paragraph 42 discussed an undisclosed mitigation mechanism. The Original Contract shows that the identity of the risk holder is likewise undisclosed and, moreover, contractually protected, as it refers to private contracts entered into with the agent and to a registry administered by the agent. Under Principle 22 of the BCBS Principles, each syndicate participant must conduct its own due diligence; under Principle 54, banks must refrain from entering into transactions with counterparties they do not know; and under Principle 7, all lending must take place under conditions of full competition, with loans to related parties requiring exceptional authorization and being monitored with particular care. A structure in which the identity of the ultimate lender cannot be determined from the transaction documents makes it structurally impossible to verify compliance with these three standards; it cannot be verified that each participant conducted ***its own*** independent analysis, nor that the parties knew one another, nor whether the transaction took place between related parties and under market conditions.

88. Added to this is the aspect of preventing transactions involving funds of illicit origin. Pursuant to paragraph 44(b) of Guidelines EBA/GL/2020/06, the involvement of a person who is neither the borrower nor the lender in a credit transaction constitutes, in and of itself, a risk factor that must be identified, assessed, and managed, with measures taken to understand the legitimacy of the funds' origin. Within the Mexican framework used as a benchmark, the concept of the "Beneficial Owner" set forth in the provisions of Article 115—adopted in accordance with FATF Recommendation 10—pursues precisely this objective: to determine who ultimately reaps the benefits derived from a contract or transaction and who exercises the rights to dispose of the funds. The structure documented in the Original Contract is, by its very design, resistant to such a determination.

89. It is reiterated in no uncertain terms that this Scope does not assert that the financing was granted, funded, or backed by a related party of the Lender or TV Azteca. What is asserted—and is documented—is that: (i) the Original Agreement provides for the incorporation of lenders through private agreements entered into with Alter, without the Borrower's involvement; (ii) the Amending Agreement acknowledges that Alter may not be the beneficial owner of the loan; (iii) no instrument identifies who the beneficial owner is, as such identification is referred to a private registry administered by Alter itself, which was not submitted; and **(iv)** consequently, the hypothesis set forth in paragraph 42 of the Opinion cannot be ruled out based on the reviewed evidence, and the contractual structure renders it materially unverifiable. The burden of proving the identity and the related or independent status of the beneficial owners rests with the parties, and their legal characterization rests exclusively with the judge.



## VI. DOCUMENTARY SEQUENCE AND TEMPORAL PROXIMITY.

90. The sequence derived from the Loan Documents and the Documents Analyzed in the Opinion is as follows, and is set forth solely for the purposes of its technical evaluation:

- January 29, 2026. Execution of the Original Agreement and a single disbursement of $4,085,000,000.00 (four billion eighty-five million pesos 00/100 in national currency) on the same date, without any conditions precedent, without any obligations to provide financial information, without any "no-action" obligations, no cross-default, and no formalized or perfected guarantees, the granting of which was deferred until March 30, 2026, with an annual surcharge of 1.50% as the sole consequence.

- February 27, 2026. By means of Official Letter No. 1,53/4640/2026 referred to in paragraph 36 of the Opinion, the CNBV initiated proceedings to cancel the registration of TV Azteca's securities in the RNV, requiring the establishment of a trust in accordance with Article 1,08, Section I, Subsection c), of the LMV.

- March 6, 2026. Signing of the Amendment Agreement, seven days after the CNBV's official letter, thirty-six days after the disbursement, fifty-four days before the first Interest Payment Date, and twenty-four days before the deadline for providing the guarantees. On that date, all accrued but unpaid interest is capitalized into the principal; a 2% restructuring fee is charged; payments due are deferred; declarations, covenants, events of default, conditions precedent, and agency provisions are incorporated; and the Lender joins the pre-existing mortgage guarantee formalized by Public Deed No. 1 49,805.

- March 10, 2026. Filing of the Petition for Bankruptcy Proceedings, four days after the Amending Agreement.

91. This sequence is relevant in four respects, all of them strictly technical: First, as of March 6, 2026, there was no Event of Default under the Original Agreement, no interest was due, and no guarantee term had expired; therefore, there was no situation that would ordinarily justify a restructuring; yet one was documented, with a fee of $8 1,700,000.00 (eighty-one million seven hundred pesos 00/100 in national currency) payable by the debtor; Second, all of the protective clauses were incorporated after the exposure had already been assumed and could no longer condition the decision to disburse funds; Third, pursuant to Article 24 of the CUB and Paragraph 35 of the BCBS Principles, any modification of the terms of a previously granted loan must be resubmitted to the credit approval process from the time of its origination; the reviewed file contains no evidence that such a process was carried out within the thirty-six days that elapsed, nor that it took into account the registration cancellation procedure initiated seven days earlier; and Fourth, the immediacy between the restatement, the execution of the mortgage, and the filing of the petition for bankruptcy is documented and is noted for the purposes of the Judge's assessment; however, this Report does not offer any legal assessment in this regard nor does it rule on the timing of these acts within any specific period.

Distinction Between the Two Documents and the Economic Content of the Amending Agreement.

91 Bis. **A** technical analysis requires a precise distinction between the two documented acts, because their economic content is entirely different. The Original Contract of January 29, 2026, resulted in the payment of $4,085,000,000.00 (four billion eighty-five million pesos 00/100, National Currency) to the Borrower. The Amendment Agreement of March 6, 2026, on the other hand, did not result in the disbursement of any funds. A comparison of its terms with those of the Original Contract reveals that:

- It did not provide new funds. No disbursement, additional drawdown, or available line of credit was documented; Section 2.01 of the Restated Agreement acknowledges that the Loan was already disbursed on the Disbursement Date and that amounts paid or reimbursed may not be requested again.

- It did not extend the term. The Maturity Date remained July 29, 2026, in accordance with Clause 1.01 of the Restated Agreement.

- The cost was not reduced. The Interest Rate remained at a fixed 17.50%.

- It did not release or replace any guarantees in favor of the Borrower. On the contrary, and in accordance with paragraph 56 Bis, it deferred their granting for an additional sixty days.

- It increased the liability by $71,487,500.00 through the capitalization of accrued but unpaid interest into the principal, bringing the total to $4,156,487,500.00.

- It imposed a restructuring fee of $81,700,000.00 in favor of the Organizer, payable within fifteen calendar days following March 6, 2026—that is, with a due date after the filing of the Petition for Commercial Bankruptcy.

91 Ter. The result is that the Amended Agreement increased the debt by $1,53,187,500.00, without the text of the Credit Documents providing for any consideration, economic benefit, or concession in favor of the Borrower. From the strictly technical perspective that is the subject of this Opinion, the proceeds that the transaction may have generated correspond entirely to the disbursement of January 29, 2026, and not to the Amended Agreement, which was not a source of any income. It is hereby noted that the legal characterization of this circumstance—and, in particular, whether or not it falls under any legal provision—is the exclusive purview of the adjudicating judge.

91-Quater. The origin of any economic benefits produced by the transaction must also be distinguished. Any reduction in tax penalties that may have been obtained derives from the application of the provisions of the Federal Tax Code pursuant to a resolution by the tax authority, not from a concession by the Lender. The Lender's contribution consisted of funds at the agreed-upon interest rate, commissions, and late payment charges. These are two separate streams of funds that must not be conflated in the analysis, without this implying any ruling on the net balance of the transaction for the Estate, a matter excluded from the scope of this Opinion.

91 Quinquies. Finally, as a point of documentary context, it is noted that Section 7(c) of the Amending Agreement contains the statement of the

Borrower to the effect that "no Event of Default *has* occurred or is occurring," and its Section 7(d) confirms as true and correct in all material respects, as of the date of the Amendment Agreement itself, the representations set forth in Clause III of the Restated Agreement. Pursuant to Section 6.0l(h) of that same instrument, an Event of Default due to "Insolvency" occurs when the Borrower is unable to pay its debts as they become due or generally defaults on the payment thereof. That statement was made four days prior to the filing of the Petition for Bankruptcy. This Report is limited to documenting the sequence of events and makes no determination regarding the veracity of the declaration or its consequences, matters reserved for the judge.

## VII. FINANCING IN **DIFFICULT** SITUATIONS AND SPECIALIZED FUNDS.

**92.** The market recognizes financing provided to companies in financial distress, commonly referred to as distressed financing, rescue financing, or special-situation financing. These funds are typically provided by specialized funds, distressed debt investors, or opportunistic capital vehicles, which accept higher risks in exchange for higher returns, enhanced collateral, contractual control, priority, or a specific recovery strategy.

**93.** The existence of this market confirms that an insolvent company can obtain financing. However, it also demonstrates that these transactions are not structured as ordinary corporate bank loans, much less with terms substantially less favorable than those of ordinary loans. On the contrary, rescue financing is characterized by high pricing, short terms, perfected collateral as a precondition for disbursement, strict control over the use of funds through escrow accounts or direct payments, frequent—often weekly—financial reporting, severe contractual restrictions, restructuring milestones, and intervention or enforcement rights. The Original Agreement exhibits only the first two of these characteristics: high cost and short term. It lacks all the others.

**94.** The possible characterization of the transaction as specialized financing therefore does not alter the conclusion of the Opinion; rather, it reinforces it. The Alter-TVAz Loan incorporated the characteristic cost of a rescue financing arrangement without incorporating any of the control and protection mechanisms that economically justify it. Additionally, for a regulated institution, a new exposure to a borrower in default generates high costs related to reserves, capital, liquidity, and concentration; therefore, it requires an exceptionally robust source of recovery, risk distribution, and enhanced approvals—elements that the Loan Documents do not demonstrate.

### Bridge Loans and Rescue Financing: Characteristic Documentary Features.

**94 Bis**. It is necessary to clarify the technical content of the concept of a bridge loan, as this is the term most frequently invoked in practice to explain short-term, high-cost transactions. A bridge loan is defined by its exit strategy: its economic function is to bridge the gap to an identified source of repayment, such as a debt issuance or a credit facility

permanent, the sale of an asset, or a capital contribution. Therefore, in market documentation, the *bridge facility* invariably incorporates four elements: **(i)** the contractual identification of the exit transaction; **(ii)** mandatory prepayment with the proceeds of said transaction; **(iii)** tiered term fees that penalize the continued existence of the bridge facility over time; and **(iv)** a mechanism for conversion or refinancing at maturity, typically as a term loan or through exchangeable securities, with a cap rate. The bridge facility is temporary because the contract itself specifies the path it will take.

**94 Ter.** The Original Contract contains none of these four elements. It does not identify any exit transaction; it does not provide for mandatory prepayment with proceeds from a specific source—Clause 2.06 provides only for voluntary prepayment; it does not establish a term fee; and it does not regulate conversion or refinancing at maturity. It provides for a six-month lump-sum maturity with no identified source of repayment. Pursuant to paragraph 19 of the BCBS Principles, the source of payment must be considered and documented when approving the loan; and pursuant to paragraphs 143 and 144(e) of Guidelines EBA/GL/2020/06, collateral constitutes the secondary exit strategy and not the primary source of payment. The revised credit portfolio does not identify either of these.

**94-C.** It is also important to clarify why financing for companies in financial distress is typically provided by specialized funds rather than by banking institutions—a distinction that stems not from preference but from specific regulatory and accounting requirements. A new exposure to a borrower in widespread default is classified as impaired from the outset. In accordance with Articles 110 through 115 of the CUB and its Annex 33, the classification of a commercial portfolio is determined at the borrower level and not at the level of the individual transaction; according to the Basel Committee on Banking Supervision's document *Prudential Treatment *of* Problem Assets* ——— Definitions *of* Non-Performing Exposures and Forbearance (April 2017), an exposure to a borrower for whom payment is unlikely is non-performing regardless of the number of days past due; and in accordance with applicable accounting standards, a financial asset originated with credit impairment is recognized from the outset in the corresponding category. The consequence is that the lending institution must set aside provisions amounting to nearly the entire exposure from day one, with the corresponding consumption of capital.

**94 Quinquies.** That is why the distressed financing segment is typically served by vehicles not subject to that regime—distressed debt funds, special-purpose vehicles, and opportunistic capital—which value assets at market price and acquire risk at a discount. And when a banking institution does provide fresh funds to a borrower in distress, the transaction exhibits equally characteristic documentary features, none of which are present in this case:

- **Prior exposure of** the **lender.** Defensive financing is driven by the need to protect an existing position. There is no evidence that the Lender was a creditor of the Borrower prior to January 29, 2026.
- **Allocation to budgeted working capital,** with projected

, frequent reporting requirements, monitored accounts, and reasons for variances

'f

budgetary. The Original Contract does not contain any of these mechanisms, in accordance with sections III.c) and 111.f).

- First-lien security interest perfected at closing. Pursuant to section IIJ.h) and paragraph 56 Bis, the exposure was assumed without a formalized security interest, and its granting was deferred on two successive occasions.

- Restructuring milestones and agreement with existing creditors. These are not included in the revised documentation.

94 Sexies. Finally, it is noted that the Commercial Bankruptcy Law provides for a specific regime for the financing of merchants in financial distress, involving judicial intervention and authorization, and subject to the priority treatment established by said law. The characterization of the transaction under analysis in light of that regime, and the determination of its effects, fall exclusively within the jurisdiction of the judge; this Report is limited to stating that the documentary features of rescue financing recognized by market practice are not present in the Credit Documents.

## VIII. COMPARISON **WITH** THE MEXICAN FRAMEWORK **AND** PRUDENTIAL PRACTICES.

95. Applying the framework described in Section II to the findings in Section III yields the following. Article 65 of the LIC requires that the granting of a loan—and, pursuant to Article 24 of the CUB, the restructuring as well—be based on quantitative and qualitative analyses of viability and repayment capacity. When a restructuring is entered into under adverse financial circumstances, its viability must be supported by analyses that reflect an improvement in the prospects for recovery; and if, in addition, interest is capitalized and new fees are imposed, the viability of the resulting aggregate debt must be analyzed.

96. Article 15 of the CUB requires, for commercial loans of this magnitude, financial statements, a primary source of recovery, total exposure, payment history, creditworthiness, repayment capacity, cash flows, and, where applicable, sensitivity analyses. Articles 10 through 23 outline the functions of origination, evaluation, approval, execution, monitoring, and collection; Article 45 requires the creation and retention of a file documenting each stage; and Articles 117 through 119 and 2 Bis 30 through 2 Bis 32 limit the recognition of collateral to those that are legally valid, enforceable, perfected, and economically effective.

97. The Credit Documents contain the contractual terms of the transaction, but not the credit memorandum, the approval by the authorized body, the cash flow models, the recovery analysis under the restated terms, the reserve and capital calculations, the verification of concentration limits, the appraisals, the evidence of residual coverage, or the files identifying the lenders. On their own, therefore, they do not prove that the transaction met the prudential requirements that could justify exceptional financing. Furthermore, as discussed in Section III, the very content of the Original Contract is difficult to reconcile with the assumption that such analyses were conducted, since a genuine analysis of payment feasibility would necessarily have led to the requirement of contractual protections

that the instrument omitted and to not incorporate provisions that work against the creditor.

## IX. EFFECTS ON THE OPINION.

98. The Original Agreement and the Amending Agreement confirm: *(i)* the extraordinary nature of the financing and its inconsistency with an ordinary corporate loan;
*(ii)* the complete absence of conditions precedent and the disbursement on the same date as execution; *(iii)* the absence of obligations to provide financial information, of "no-action" obligations, and of financial justifications; (iv) the disbursement prior to the formalization and perfection of the security interests, which are treated as a subsequent obligation subject to a surcharge rather than as a condition or an event of default; *(v)* the existence of second-ranking or concurrent security interests and the internal contradiction between Clauses
4.08 and 5.05(c); (vi) a minimal list of events of default without cross-default; (vii) the presence of provisions adverse to the creditor, notably the force majeure exemption in Clause 8.08; (**viii**) the capitalization of non-accrued interest and the imposition of a restructuring fee in the absence of default and without an extension of the maturity date; and (**ix**) the lack of documentary evidence regarding the process of evaluating, structuring, and approving the loan.

99. Additionally, the Loan Documents specify that Alter was not necessarily the economic owner of the exposure and that the transaction provided, from the Original Agreement onward, for the inclusion of unidentified lenders through private agreements entered into with the agent itself. This clarification does not diminish the conclusions of the Opinion. Its effect is different and more significant: the Opinion could reasonably attribute the exposure to the identified Lender, whereas the Credit Documents establish that the identity of the party who actually assumed the economic risk is not on record and, by contractual design, cannot be determined from the transaction instruments. This situates the analysis, with even greater precision, within the factual context addressed in paragraph 42 of the Opinion.

100. Consequently, this Scope does not alter the central conclusion of the Opinion. It confirms, reinforces, and clarifies it: the Credit Documents do not demonstrate, as of the disbursement date, the degree of completeness, protection, and contractual governance reasonably expected for financing of this amount and risk, and the structure adopted prevents verification of who assumed the exposure and under what analysis.

## X. CONCLUSIONS.

101. FIRST. TOTAL ABSENCE OF CONDITIONS PRECEDENT.
The Original Agreement contains no clauses regarding conditions of use or conditions precedent. The Disbursement Date coincides with the date of execution and the disbursement of
$4,085,000,000.00 (four billion eighty-five million pesos 00/100 in national currency) was not contingent upon the delivery of corporate documents, legal opinions, certificates, confirmation of statements, evidence of use, or the creation of any security. No documentary verification took place between the decision to grant the loan and the disbursement of the funds.

***102.*** SECOND. STATEMENTS STRUCTURALLY INCOMPLETE. The Original Agreement contains a section on representations and warranties, but omits those that were materially essential in this specific case: absence of litigation, absence of default under other debt instruments, absence of undisclosed liabilities, solvency, and absence of material adverse change. The representation regarding the absence of conflicts in Clause 4.02 does not cover the Borrower's contracts or debt instruments, and the representations are made to the Administrative Agent rather than to the lenders, without recourse. The only accepted financial basis was unaudited combined financial statements as of December 31, 2025, regarding an issuer whose rating had been withdrawn due to a lack of transparency in its disclosures.

103. THIRD. ABSENCE OF NO-ACTION OBLIGATIONS, FINANCIAL REASONS, AND INFORMATION DISCLOSURE REQUIREMENTS. The does not contain a single "do-not" obligation or any financial maintenance requirement, and its Clause 5.02, despite being titled "Financial Statements: Other Reports," does not impose an obligation to provide financial information to the lender. Pursuant to paragraph 19 of the BCBS Principles, contractual obligations designed to limit changes in the borrower's future risk profile are among the factors that must be considered and documented when approving a loan. Their complete absence, in the case of a borrower in widespread default, is objectively inconsistent with the existence of a genuine credit analysis that relied on the borrower's ability to pay to recover the financing.

104. FOURTH. COLLATERAL REPLACED BY A RATE. Clause 5.05 established the primary guarantees as obligations arising after disbursement, with a sixty-calendar-day term and an annual rate increase of 1.50% as the sole consequence of their failure to be provided; their omission does not constitute an Event of Default under Clause 6.01. The exposure was assumed without any formalized or perfected security, and the agreed-upon remedy increases the insolvent debtor's debt rather than improving recovery. Clause 4.08 further declares first-priority security interests, in contradiction to the second-priority mortgage provided for in Clause 5.05(c) of the same instrument.

105. FIFTH. CATALOG MINIMUM DEFAULTS. Clause Clause 6.01 sets forth four scenarios and omits cross-default and cross-acceleration with respect to the Borrower's existing debt, as well as events involving material adverse effects, invalidity or failure to perfect security interests, change of control, and adverse rulings. The omission of cross-default with respect to an issuer whose market debt was in declared default lacks a technical explanation from the creditor's perspective.

106. SIXTH. PROVISIONS ADVERSE TO THE CREDITOR ITSELF. Clause 8.08 exempts the Borrower from liability for defaults arising from Force Majeure events, without excluding payment obligations, in a definition that includes government actions and pandemics. Clause 8.09 requires each party to bear its own costs, departing from the standard practice of passing such costs on to the borrower. No gross-up or tax indemnification was agreed upon, even though Clause 4.05

acknowledges the applicable Mexican withholding tax. These provisions are inconsistent with the conduct of a creditor who expects to recover its claim through ordinary legal channels.

107. SEVENTH. VERIFICATION ARITHMETIC OF THE CAPITALIZATION. The amount of $71,487,500.00 corresponds exactly to thirty-six days of interest on $4,085,000,000.00 at a rate of 17.50%, calculated precisely in accordance with the provisions of Clause 2.04(b) ***of*** the ***Original*** Agreement. The financial burden recognized between the disbursement and the restatement, including capitalized interest and the restructuring fee, amounts to $153,187,500.00, equivalent to 3.75% ***of*** the disbursed amount over thirty-six days, without a corresponding extension of the maturity date.

108. EIGHTH. NO ***DEFAULT*** AS ***OF THE*** OF THE RESTATEMENT. As of March 6, 2026, there were fifty-four days remaining until the first Interest Payment Date and twenty-four days until ***the*** expiration of the guarantee provision period. There was no Event of Default whatsoever. The capitalization of non-accrued interest and the imposition of a restructuring fee of $81,700,000.00 under these circumstances cannot be explained by the ordinary logic of a loan restructuring.

109. NINTH. UNIDENTIFIED CREDITORS BY ***DESIGN*** FROM ***THE*** ORIGINAL ***CONTRACT ITSELF***. The definition of "Lenders" in Clause 1.01 provides for the inclusion of the risk holders through private contracts entered into with the Administrative Agent, without the involvement or knowledge of the Borrower, without any disclosure obligation, and without any accessible or verifiable record. ***The*** Amending Agreement further confirms that Alter may act solely as the registered holder, nominee, and disbursement channel, without any financial exposure of its own. Alter is the sole signatory ***on*** the creditor's side and the sole apparent holder of the Promissory Note.

110. TENTH. SYNDICATION WITHOUT MECHANISM AND CONCENTRATION FULL POWER OF ATTORNEY. Clause 7 is exclusively exculpatory and does not govern required authorizers, majorities, votes, unanimity, instructions, replacement of the agent, registration of authorizers, assignments, or distribution of recoveries. Accordingly, Alter is the beneficiary of the representations and obligations, the holder ***of*** the Promissory Note, the recipient of all payments, the party responsible for calculating interest, the sole party authorized to accelerate payment, the sole party authorized to amend the Agreement and grant waivers without the consent of any creditor pursuant to Clause 8.03, the party that decides who is admitted as a creditor, the recipient of the structuring fee, and a party that has no fiduciary relationship with or liability to the creditors pursuant to Clauses 7.01 and 7.03. Under ***the*** Original Agreement, no person owes any obligation to those who assume ***the*** economic risk of the financing.

111. TENTH FIRST. **IMPOSIBILITY** TO TO VERIFY ***COMPLIANCE*** WITH PRUDENTIAL STANDARDS. A

A structure in which the identity of the financial lender cannot be determined from the transaction documents prevents verification ***of*** compliance ***with*** paragraph 22 of the BCBS Principles, which requires that each syndicate participant conduct its own due diligence; ***with paragraph*** 54, which requires that no contracts be entered into with unknown counterparties; and ***with***

an

d,,-

Principle 7, which requires that all transactions be conducted under conditions of full competition and that loans to related parties be authorized only on an exceptional basis. This same structure makes it difficult to identify the Beneficial Owner as required by the provisions of Article 11(5), adopted in accordance with FATF Recommendation 1O.

112. TWELFTH. GOVERNING LAW AND JURISDICTION UNRELATED TO THE SECURITIES. Clause 8.1.1 subjects the Original Agreement to the law and exclusive jurisdiction of Saint Lucia, without a process agent or provision for enforcement in Mexico, even though it involves a loan in pesos, disbursed and payable into accounts at a Mexican institution, secured by a pledge, mortgage, and trust on Mexican assets subject to Mexican public registration. In accordance with paragraphs 13 and 14 of the BIS Principles, the enforceability of contracts and the ability to realize collateral under the national legal framework are part of the risk that must be assessed; there is no analysis on this matter.

113. TENTH THIRD. INCORPORATION EX ***POST*** THE PROTECTIONS. The Amending Agreement incorporated representations, covenants, an expanded list of events of default, conditions precedent, an agency framework, and the identification of priority levels. These protections were incorporated thirty-six days after the exposure was assumed and four days before the filing of the petition for bankruptcy proceedings; therefore, they cannot be considered in force or effective at the time of the decision to grant the loan. The fact that the same parties were able to agree to them thirty-six days later demonstrates that their initial omission was not due to practical impossibility.

114. TENTH FOURTH. FINANCING OF RESCUE WITHOUT RESCUE STRUCTURE. Distressed debt funds can finance insolvent companies, but they do so through structures featuring secured collateral at closing, control over the use of funds, frequent reporting, and severe restrictions. The Alter-TYAz Loan incorporated the typical cost of such financing without incorporating any of its protective and control mechanisms.

115. TENTH FIFTH. CONFIRMATION AND CLARIFICATIONOF THE OPINION. This Scope confirms and clarifies the Opinion: in accordance with internationally recognized prudential standards and the Mexican banking and financial law that incorporates them—used as a benchmark for analysis—a prudent banking institution would not have granted this financing as an ordinary corporate loan under the documented terms. To justify it as an extraordinary rescue transaction, additional evidence was required that is not included in the Loan Documents, and the very contractual structure of the transaction is inconsistent with the existence of a genuine credit analysis of the Borrower's ability to repay.

115 Bis. SIXTEENTH. THE AMENDMENT AGREEMENT DID NOT PROVIDE ANY CONSIDERATION TO THE BORROWER. The Amendment Agreement of March 6, 2026, did not provide any funds, did not extend the Maturity Date, did not reduce the Interest Rate, and did not release any collateral. It increased the debt by $71,487,500.00 (seventy-one million four hundred eighty-seven thousand five hundred pesos 00/100 in national currency) due to the capitalization of non-accrued interest and imposed a fee

restructuring amount of $81,700,000.00 (eighty-one million seven hundred pesos 00/100, National Currency) payable after the filing of the Petition for Commercial Bankruptcy. Any proceeds generated by the transaction are entirely allocated to the disbursement on January 29, 2026; the Amending Agreement did not generate any revenue.

115 Ter. SEVENTEENTH. THE **AMENDMENT AGREEMENT DEFERRED** THE GUARANTEES RATHER THAN FORMALIZING THEM. Section 4.10 of the Amended and Restated Credit Agreement requires the Guarantee Documents to be executed within sixty calendar days following the signing of said instrument, and Section 8.01(b) of the Amending Agreement refers to the restated agreement. The deadline therefore began anew on March 6, 2026. The definitions of the Security Documents in Clause 1.01 are phrased in the future tense. According to the text of the instruments themselves, the exposure remained without a formalized or perfected security interest throughout the entire period following the disbursement.

115-C. TENTH EIGHTH. ABSENCE OF THE DOCUMENTARY FEATURES OF **THE** BRIDGE **LOAN** AND THE RESCUE FINANCING. The Original Agreement lacks the four elements that contractually define a bridge loan—an identified exit transaction, mandatory prepayment with its proceeds, a term fee, and a conversion mechanism at maturity—as well as the characteristic features of rescue financing, such as prior exposure by the lender, allocation to working capital under budget and control, a security interest perfected at closing, and restructuring milestones. It features only the high price and short term typical of that segment, without its protective and control mechanisms.

115 Quinquies: NINETEENTH. COMPARISON WITH OFFICIAL **MARKET** REFERENCE RATES. As of the date of execution of the Original Contract, the Bank of Mexico's target rate was 7.00%, the TIIE for funding was 7.10%, the 28-day TIIE was 7.3489%, and the 182-day CETES were at 7.26%, with an annual headline inflation rate of 3.77%. The agreed-upon rate of 17.50% is 1,024 basis points above the risk-free benchmark for the same term; incorporating the annualized fees over the contract term, the effective cost is approximately 23.5% per annum, that is, 1,624 basis points above said benchmark. The default interest rate agreed upon in the Restated Contract is equivalent to a nominal annual rate of 53.50%. This comparison is presented in descriptive terms and is verifiable against official sources, without assessing the legality or proportionality of the cost, nor determining which market is relevant—matters reserved for the judge.

115 Sexies. TWENTIETH. CONTROL OVER THE **USE** OF FUNDS. Regardless of the evidence of use contained in the case file, the Original Contract did not establish any contractual mechanism for controlling the use of funds: it did not condition disbursement on the identification of the obligations to be covered, did not provide for controlled accounts or direct payments to the tax creditor, did not require certifications or reports on the use of funds, and did not classify the misuse of funds as a Breach of Contract. Any use of funds that may have occurred is therefore not attributable to the contractual design.

XI. <u>LIMITATIONS AND RESERVATIONS.</u>

116. This Scope is subject to the same limitations and reservations set forth in Sections III and IV of the Opinion, which are hereby deemed to be reproduced in their entirety, and additionally to the following.

117. The Scope is limited to Mexican banking and financial law used as a benchmark and to the international prudential standards invoked. It does not contain an opinion on the law of Saint Lucia—the law applicable to the Original Agreement pursuant to its Clause 8.11—nor on the validity, enforceability, or interpretation of the Credit Documents under that law. The observations made regarding the provisions are issued from the perspective of banking practice and prudential standards, and not as an assessment of the legal validity or effectiveness of any provision.

_118. The Scope does not constitute a solvency, valuation, accounting, or audit opinion, nor does it constitute an assessment of the legality or proportionality of the financial cost, nor a quantification of damages. It should be noted that the comparison of economic conditions set forth in Section III.d bis) does constitute an objective presentation of the relationship between the agreed-upon terms and the official market benchmarks in effect as of the date of execution, and is not covered by the foregoing disclaimer; what is excluded is the determination of which market is relevant for legal purposes and the legal assessment of any deviation, which are reserved for the court. Nor does it establish civil, administrative, or criminal liability, nor does it classify the acts analyzed under the Commercial Bankruptcy Law.

119. The following were not provided: the historical record of guarantors; the written adhesion agreements referred to in the definition of "Guarantors" in Clause 1.01; individual evidence of funding; the promissory note; the signed and completed Guarantee Agreements; the agreement to join Trust F/811O; any intercreditor agreement; appraisals or coverage calculations; consents, waivers, or legal opinions of non-violation; minutes of approval by the Lender's or Borrower's governing bodies; credit memorandum; reserve and capital calculations; customer identification and know-your-customer records; account statements and reconciliations; evidence of the application of the difference between the amount drawn down and the amount allocated for the payment of taxes; or evidence of the actual execution of the Security Documents within the time period provided for in Section 4.1O of the Amended and Restated Credit Agreement.

**120.** The analysis of the Original Agreement was based on the Spanish translation certified by an assistant translator certified by the Administration of Justice, which is included in the case file; the translator certified the accuracy of the translation without assessing the authenticity, validity, or legality of the document. If there are any discrepancies with the original English text, the analysis corresponding to the authentic text shall prevail. The Firm expressly reserves the right to supplement, expand, or modify this Scope if it receives additional information or information different from that considered in its preparation.

**121.** The regulatory review of this Scope was completed on September 5, 2026. If the document is submitted at a later date, the validity of each provision and standard cited must be reconfirmed.

## XII. CERTIFICATION AND SIGNATURE.

122. The Firm declares that this Scope reflects, to the best of its knowledge and belief, the result of an independent, objective, and impartial legal and technical-professional analysis, conducted based on the Credit Documents and subject to the limitations expressly stated.

122 Bis. The undersigned declare, under oath, that this Scope is issued to the best of their knowledge and belief, based on the documents expressly identified in Annex **"B"** and subject to the limitations and reservations set forth, and that they have no impediment or conflict of interest preventing them from issuing it. Copies of the signatories' professional licenses are attached.

Mexico City, September 8, 2026.

Sincerely, Basila

Abogados, **S**.C.

**Mauricio Basila Lago**
SociLegal
RepreRepresentativ
e

Paul Yamil **José Aguilar**
Socio

## Appendix "B"

## Sources consulted and verified for this Scope

This appendix lists the sources cited in the body of the Scope, indicating their issuer, date, and public location, to allow for direct verification. In the event of any doubt regarding interpretation, the official publications of the issuers take precedence over the summary contained in this Scope.

### *A. Primary Documents Analyzed*

- **Credit Agreement dated January 29, 2026,** entered into between Alter Bank Ltd., acting as Arranger, Initial Lender, Administrative Agent, and Security Agent, and TV Azteca, S.A.B. de C.V., in its Spanish translation certified by an assistant expert translator of the Administration of Justice authorized under Agreement 42-04/2024 of the Mexico City Judicial Council, consisting of fifteen pages and included in the case file.

- **First amendment and restatement agreement to the credit agreement** dated March 6, 2026, entered into between the same parties.

### *B. International Prudential Standards*

- **Basel Committee on Banking Supervision,** "Principles for the Management of Credit Risk," April 2025, publication d595. Bank for International Settlements,www.bis.org/bcbs/publ/d595.pdf . Current and updated version of the Principles originally published in October 2000; in accordance with paragraph 3 of its introduction, the revision was limited to technical alignment amendments, without modifying the content of the principles.

- **Basel Committee on Banking Supervision,** Core Principles for Effective Banking Supervision (Spanish version, September 2012, publication bcbs230_es) and Basel III: Completion of Post-Crisis Reforms (December 2017, publication d424_es), as listed in Annex "A" of the Opinion.

- **European Banking Authority,** Guidelines on Loan Origination and Monitoring (EBA/GL/2020/06), dated May 29, 2020, applicable as of June 30, 2021. Available in the official Spanish version on the European Banking Authority's institutional website, www.eba.europa.eu. They are cited exclusively as a technical reference for comparative supervisory practice.

- **Financial Action Task Force,** Recommendation 1 O, regarding customer due diligence and the identification of the beneficial owner, expressly cited in the recitals of the amendments to the Provisions of Article 115 published in the Official Gazette of the Federation.

### *C. Market-standard documentation*

- **Loan Market Association,** recommended loan agreement forms and institutional guidelines published at www.lma.eu.com, in particular the Guide to Syndicated Loans & Leveraged Finance Transactions (April 2020), the Guide to Agency Protections (September 2018), the guide Closing a Primary Syndication – Factors to Consider (June 2019), the guide Dealing with Requests for Amendments (December 2016), and the Best Practice

*Guide for Ten Sheet Completeness (December 2021, published jointly with the European Leveraged Finance Association). These are cited as evidence of the structure and standard content of syndicated loan documentation in international markets, without this implying their legal applicability to the transaction under analysis.*

*D. Mexican legal framework used as a benchmark*

- **Law** on Credit Institutions, *Articles 65 and 115.*
- General **Law** on Credit Instruments **and** Transactions**,** *Articles 291 through 301, regarding the granting of credit.*
- Securities Market **Law**, *Article 108, Section I, Subsection c).*
- General Provisions Applicable to Credit Institutions **(**Unified Banking **Circular)**, *Articles 3, 6 through 9, 1 O through 23, 15, 24, 25, 45, 1 1 O through 1 15, 1 17 through 119, and 2 Bis 30 through 2 Bis 32.*
- General provisions referred to in Article **115** of the Credit Institutions **Law**, *in particular the definition of "Beneficial Owner" and the corresponding identification obligations, in accordance with the current text published and amended in the Official Gazette of the Federation.*
- Commercial Code **and** supplementary regulations**.**

*E. Source expressly* ***excluded*** *due to* ***expiration*** *of* ***validity***

- **"Interagency** Guidance **on** Leveraged **Lending"** *dated March 21, 2013, and its frequently asked questions dated November 7, 2014, issued by the federal banking authorities of the United States of America. The Office of the Comptroller of the Currency and the Federal Deposit Insurance Corporation formally distanced themselves from those documents in an interagency statement dated December 5, 2025, noting that banks should instead apply the general principles of sound lending practices. Consequently, no conclusions in this Scope are based on those documents, and their deliberate exclusion is hereby noted.*

***E. Official market references used in the comparison in Section IILd bis)***

- Bank of Mexico**,** target interest rate, TIIE for overnight funding, 28-day TIIE, and 28-day CETES, values published on January 27 and 28, 2026, in accordance with the financial indicators disclosed by said institution on its website www.banxico.org.mx.
- Bank of Mexico, results of the primary auction of government securities corresponding to the first auction of 2026, regarding 182-day Federal Treasury Certificates.
- Bank of Mexico, National Consumer Price Index, annual change for the first half of January 2026.
- Yield on the 10-year M Bond based on interbank quotes on the secondary market for the January–March 2026 period.

- Basel Committee on Banking Supervision, "Prudential Treatment of Problem Assets——Definitions of Non-Performing Exposures and Forbearance," April 2017, Publication D403, cited exclusively in paragraph 94-Quater and as a technical reference regarding the classification of non-performing exposures.



PODER JUDICIAL DE LA FEDERACIÓN

## CRYPTOGRAPHIC EVIDENCE - TRANSACTION

**Signed File:**

**415700200000000000062819801.p7m**

**Certification Authority:**

**CERTIFICATION AUTHORITY**

**Signatory(ies): 1**

**This digital document is a true copy of its physical or electronic version, which corresponds to the original.**

JESUS VAZQUEZ NUÑEZ
706a6620636a66330000000000000000000016a00
05/29/07 10:16:24

| SIGNATORY | | | | |
|---|---|---|---|---|
| **Name:** | FERNANDO DEL CASTILLO ELORZA | **Validity:** | GOOD | Valid |

| SIGNATURE | | | | |
|---|---|---|---|---|
| **No. Series:** | 30.30.30.30.31.30.30.30.30.30.30.35.31.37.38.36.34.31.34.38 | **Revocation:** | Valid | Not revoked |
| **Date (UTC/CDMX)** | 09/09/26 04:36:19 - 08/09/26 22:36:19 | **Status:** | Valid | Valid |
| **Algorithm:** | RSA-SHA256 | | | |
| **Signature string:** | 64 d3 aa 5c 87 71 ca f3 54 75 97 94 56 5a 0c 26 7a fd ce 65 62 d6 a6 00 97 31 2e c3 4c 77 e2 fd 99 11 7f df 4e 00 05 6d ec 64 f6 e6 65 49 19 55 9d 31 0f c4 e9 1b e0 32 b9 81 0b 05 2e 2c f9 04 b6 c6 dc 9c 2e 95 b0 4a 06 20 7f 2d 1d 93 de d2 32 e8 dc 1b 73 70 42 28 5f fc 7d 77 6c 4d 74 47 0c 88 85 94 a8 3b ae 3a e0 67 c6 54 d3 49 42 ce 26 5a 43 a2 ef b3 7e e6 f7 f7 99 0a c8 92 73 8e 44 57 3a c5 07 d9 14 3a 15 06 63 01 4b 9f 9b 39 b9 c8 54 cd d8 95 5a d7 87 9c 60 5b a3 56 78 ab c3 05 df 23 e3 a2 b0 5a 25 41 a9 3f c2 d5 00 58 56 df f2 15 90 a2 86 03 77 d9 a0 73 d8 7a 04 cf 27 ec 81 b8 b4 f3 4b 44 a5 91 4c 91 93 4c d1 cf ba 1a 00 03 ff de d6 e4 90 09 51 67 a9 09 0a 0b 28 17 a7 05 6b 97 15 d5 bc 8e 45 e0 00 99 76 4a 2a 11 02 85 aa e1 c3 26 cd 9a 0e 8c 69 d7 d6 be | | | |

| OCSP | |
|---|---|
| **Date: (UTC/Mexico City)** | 09/09/26 04:36:22 - 08/09/26 22:36:22 |
| **Responder Name:** | SAT OCSP Service |
| **Responder Issuer:** | CERTIFICATION AUTHORITY |
| **Serial number:** | 30.30.30.30.31.30.30.30.30.30.30.35.31.37.38.36.34.31.34.38 |

| TSP | |
|---|---|
| **Date: (UTC/CDMX)** | 09/09/26 04:36:22 - 08/09/26 22:36:22 |
| **Name of the TSP response issuer:** | Timestamp Issuing Authority of the Federal Judiciary Council |
| **TSP Certificate Issuer:** | Intermediate Certification Authority of the Federal Judiciary Council |
| **TSP response identifier:** | 203698978 |
| **Stamped data:** | kZXMDhn1iJwSK9/a62lNWIyCh7c= |

I, Dr. TIMOTHY JOHN HAVARD (RESIDING AT INSURGENTES SUR 1228, FLOOR , COL. TLACOQUEMÉCATL DEL VALLE 03100, MEXICO CITY, TEL. 55-5604-9357), CERTIFIED TRANSLATOR WITH REGISTRATION NO. P.109-2019, DULY AUTHORIZED BY THE FEDERAL JUDICIARY COUNCIL FOR THE YEAR TWO THOUSAND ONE HUNDRED TWENTY-SIX FOR THE FIRST CIRCUIT (MEXICO CITY) IN ACCORDANCE WITH ARTICLE 80, SECTION LII, OF THE ORGANIC LAW

JUDICIAL JUDICIARY OF THE FEDERATION, [www.dof.gob.mx/2025/OAJ/listado eritos_PJF_2026,pdÇ, PUBLISHED IN THE OFFICIAL GAZETTE OF THE FEDERATION ON DECEMBER 11, 2025, P. 183 OF 191, I CERTIFY THAT THE ATTACHED TRANSLATION IS, TO THE BEST OF MY KNOWLEDGE AND BELIEF, A FAITHFUL AND ACCURATE TRANSLATION INTO SPANISH OF THE / PAGE(S) OF THE ORIGINAL DOCUMENTS IN ENGLISH.

CERTIFIED ON Martes 8 DE SEPTIEMBRE DE 2026

Dr. TIMOTHY JOHN HAVARD

PERITO TRADUCTOR AUTORIZADO
POR EL CONSEJO DE LA JUDICATURA FEDERAL

**IN THE MATTER** OF ALTER BANX LTD.
AND IN THE MATTER OF THE INSOLVENCY (COMMERCIAL BANKRUPTCY) OF TV AZTECA, S.A.B. de C.V.
**AND IN THE MATTER** OF THE LAWS OF SAINT LUCIA

SUPPLEMENTARY OPINION BY RENEE TAMARA ST. ROSE KC

A. SCOPE OF THIS SUPPLEMENT

1. I refer to my opinion dated August 17, 2026, regarding Alter Bank Ltd. ("AlterBank") and the loan granted to TV Azteca, S.A.B. de C.V. ("TV Azteca") (the "Main Opinion"). This Supplemental Opinion should be read in conjunction with the Main Opinion, and, unless otherwise indicated, the defined terms used in this document have the meanings assigned to them in the Main Opinion.

2. Since the issuance of the Main Opinion, I have been provided with and have reviewed the Loan Agreement entered into on January 29, 2026 (the "January Agreement"), together with the First Amendment and Restatement of the Loan Agreement, dated March 6, 2026, and the Amended and Restated Loan Agreement attached thereto as Exhibit A (collectively, the "March Amendment"). The January Agreement, as amended and restated by the March Amendment, is referred to as the "Loan Agreement" in this Supplemental Opinion.

3. I have been asked, in light of these documents, to address the following issues:
(i) whether the Loan is properly classified as a conventional or typical "bridge loan," and
(ii) the relevance of the Basel Committee's principles and AlterBank's compliance with the applicable regulatory and prudential framework for assessing the commercial nature of the Loan.

4. For the reasons set forth below, my analysis of the January Agreement and the March Amendment substantially reinforces the conclusion expressed in paragraphs 73 through 75 of the Lead Opinion that, taken as a whole, the Loan does not reflect the usual commercial practice of a prudent, Class A international bank authorized in Saint Lucia for a line of credit of its amount, term, risk profile, and nature.

B. IS THE LOAN AGREEMENT **PROPERLY CLASSIFIED AS A CONVENTIONAL** OR TYPICAL "BRIDGE LOAN"?†

(i) Is the Loan properly classified as a typical bridge loan?

5. It is my understanding that the Loan has been characterized as a "typical bridge loan." In commercial banking practice, bridge financing typically refers to short-term financing intended to meet a temporary financing need pending an identified or reasonably determinable source of repayment, such as refinancing to a longer term, a sale of assets, raising capital, or another transaction expected to settle the bridge credit line. Therefore, a short-term maturity and a lump-sum repayment at maturity *(bullet repayment)* are characteristics commonly associated with bridge financing, but they do not in and of themselves determine the commercial nature of a transaction.

Dr. TIMOTHY JOHN iJ ÁV . 5D





PERITO TRADUCTOR AUTORIZADO
POR EL CONSEJO DE LA JUDICATURA FEDERAL

**TRANSLATION FROM ENGLISH**

6. At first glance, the Loan Agreement exhibits some of the superficial characteristics of bridge financing. It is a short-term line of credit, maturing on July 29, 2026—approximately six months after the Disbursement Date of January 29, 2026—and is structured so that the outstanding principal is repaid in a single lump-sum payment at maturity. If considered solely from that general perspective, and without taking into account the substantive terms actually agreed upon, the loan bears some resemblance to the type of bridge financing typically used when a borrower needs short-term liquidity pending longer-term refinancing or another permanent source of repayment.

7. However, the short-term maturity and temporary nature of a bridge loan do not, in and of themselves, place it outside the scope of standard banking practice between independent parties, nor do they exempt its terms from careful scrutiny. Even so, a bridge credit line is expected to reflect terms that a prudent and independent lender would be willing to accept, taking into account the amount, term, and risk profile of the credit line, including the borrower's financial condition and repayment capacity, the identified source of repayment or long-term financing to repay a bridge loan *(take-out), the* nature and timing of the security, the pricing and fee structure, the lender's credit assessment and due diligence, as well as the allocation of risk between the lender and the borrower.

8. Based on the documentation currently available, I have not identified any provision in the January Agreement or the March Amendment that indicates a committed refinancing, an asset sale, a capital raise, or any other sufficiently identifiable source from which the principal exposure would be expected to be repaid at maturity. The contractual documents establish the obligation to pay at maturity; however, they do not themselves identify the transaction or the source of funds intended to settle the Loan.

9. This consideration is relevant in the circumstances of this borrower. As explained in the Main Opinion, TV Azteca was already experiencing serious financial difficulties at the time the Loan was granted. Its petition for bankruptcy protection describes the financing as an additional and urgent injection of funds obtained to meet tax obligations and mitigate the risk of operational paralysis, against a backdrop of structural liquidity constraints, insufficient operating cash flow, restricted access to credit, and difficulty in refinancing liabilities under normal market conditions. Under these circumstances, the mere fact that the Loan matured within six (6) months does not make it conventional bridge financing. A commercially credible means of payment is of particular importance when the borrower is already in financial distress.

10. Therefore, I do not consider the description of the Loan as a "bridge loan" to be sufficient to classify the transaction as a typical or customary bridge financing arrangement. Its short-term maturity and its structure of a single lump-sum repayment at maturity are important characteristics of the transaction, but they are not determinative of its commercial nature. Such an assessment requires considering these characteristics in the context of the absence of an identified long-term contractual bank refinancing to settle the short-term *"take-out"* loan*,* TV Azteca's financial situation, and the other terms and risk allocation reflected in the January Agreement and the March Amendment, which I address below.



Dr. TIMOTHY JGHN H AVARD

PERITO TRADUCTOR AUTORIZADO
POR EL CONSEJO DE LA JUDICATURA FEDERAL

(ii) Are the terms of the January Agreement and the March Amendment, considered as a whole, consistent with the usual terms of a loan between independent parties or market conditions?'7

11. In my opinion, it is not possible to determine whether the Loan was entered into on terms customary for loans between arm's-length parties or on market terms by isolating a single provision of the Loan Agreement. Several of the provisions identified below—including indemnities, Events of Default, rights of acceleration, and the appointment of agents—are standard features of institutional loan documentation and, on their own, would not cause a transaction to deviate from standard commercial practice. The relevant question is whether, considered as a whole and in light of the circumstances under which the loan was granted, the contractual structure reflects the credit assessment, risk allocation, protection through collateral, and commercial discipline that a prudent and independent lender would normally require for a line of credit of this amount, term, and risk profile. In my opinion, this is not the case for the following reasons:

*(a) AlterBank's multiple contractual roles:*

12. The fact that a single bank acts as the organizing entity, lender, administrative agent, and bank holding the security is not, in and of itself, unusual or incompatible with independent lending practices. What is relevant in this case is the manner in which these functions are carried out within the specific structure of this Loan. AlterBank entered into the January Agreement as the Organizing Entity, Initial Lender, Administrative Agent, and Collateral-Holding Bank, thereby assuming each of the primary functions on the lenders' side under the credit line. The March Amendment maintained this structure, while defining the Initial Lender as the party that would act as the registered holder, representative, and disbursement channel for the Lenders, unless expressly agreed otherwise.

13. When, as in this case, a bank performs all four (4) functions and, at the same time, seeks—in at least one (1) of those capacities—to act on behalf of other lenders, the contractual structure through which a borrower and its creditors could normally identify and hold the true economic counterparty to the transaction liable becomes less transparent. The concentration of these functions is not in itself illegal nor necessarily inconsistent with market practice. Its significance in this case lies in the absence—based on the documentation available to me—of a clear correspondence between AlterBank's contractual capacities and the underlying financing and risk-assumption agreements. Under these circumstances, it is not clear from the contractual structure itself who ultimately provided the funds, assumed the economic exposure with respect to the Loan, or constituted TV Azteca's true economic counterparty. This opacity is reinforced by the express terms of the March Amendment itself: Section 5 (Capacity; No Presumption of Beneficial Ownership) provides that the designation of any person as an Initial Lender, Administrative Agent, Organizing Entity, or Guarantee Holder Bank does not, in and of itself, create or demonstrate beneficial ownership of the Loan or economic exposure to it, and that all credit facilities are extended by the Lenders listed in the Registry at any given time. Therefore, AlterBank has contractually denied being identified as the true economic party to the Loan based solely on its contractual capacities, while the identity of said Lenders is not, according to the executed instruments presented to me, independently determinable. This lack of transparency substantially increases the information asymmetry between AlterBank, which acts in its
various contractual capacities, and TVAztl2Cá and SLIS demÓS tCr£?f3d

TH AND JOHN I-I A'J.ü R D



PERITO TRADUCTOR AUTORIZADO
POR EL CONSEJO DE LA JUDICATURA FEDERAL

**TRANSLATION FROM ENGLISH**

*b)* TY *Azfeca's financial* situation *at the time of the March* Amendment*:*

14. The March Amendment took place against the backdrop of TV Azteca's prolonged and publicly documented financial difficulties. As set forth in the Main Opinion, TV Azteca's insolvency was manifestly evident long before the Loan was granted on January 29, 2026. TV Azteca had suspended payments on its Senior Notes in February 2021; those Notes were declared due and payable in August 2022 and became subject to collection proceedings. In March 2023, Chapter 11 bankruptcy petitions were filed against TV Azteca and certain subsidiaries, and Banco Azteca subsequently declared its line of credit due and paid in full and initiated enforcement proceedings. The default and its consequences were disclosed in TV Azteca's published audited financial statements and were the subject of active enforcement proceedings for several years prior to the Loan.

15. This well-known financial situation takes on special significance when considered in light of the Events of Default that AlterBank itself stipulated in the March Amendment. Section 6.01(h) defines as an "Event of Default" the inability of the Borrower or any Subsidiary, generally, to pay its debts as they become due. Section 6.01(i) separately includes the involuntary subjection of the Borrower or any Subsidiary to a insolvency insolvency proceeding, commercial commercial, bankruptcy, reorganization, or similar proceedings, when such a petition is not resolved within thirty (30) days. Therefore, the Agreement identifies as "Events of Default" circumstances that closely correspond to aspects of TV Azteca's publicly documented financial history and that, at a minimum, demonstrate that the borrower was on the verge of the very insolvency risks for which the Agreement itself established express provisions.

16. A restructuring agreed upon with a borrower whose insolvency was well-known and who was already on the verge of meeting the insolvency conditions defined in the Agreement as Events of Default cannot be evaluated commercially on the same terms as a line of credit granted to a solvent borrower who meets its obligations on time. Such circumstances would normally increase, rather than decrease, the importance for a prudent lender of determining the borrower's ability to pay, obtaining reliable and up-to-date financial information, evaluating the claims of existing creditors, and ensuring that the proposed collateral package provided effective protection against the lender's risk.

*(c) Security interests required only after full disbursement, under conditions unilaterally established by the Bank Holding the Security:*

17. Section 5.05 of the Original Loan Agreement required the Borrower to execute the Stock Pledge Agreement, the Trademark Pledge Agreement, the Mortgage Agreement, and the Trust Agreement within sixty (60) calendar days from the Disbursement Date. Section 4.10 of the Amended and Restated Loan Agreement reproduces that requirement, but it expressly calculates the sixty (60)-day period from the execution of the March Amendment, thereby readjusting the collateral schedule such that the Collateral Documents were not required to be in effect until May 5, 2026, or around that date—that is, approximately three (3) months after the commencement of a six-month credit line. The practical consequence was that AlterBank was willing to advance a principal balance in excess of T, equivalent to USD 200 million, and to maintain that unsecured exposure at the time of the March Amendment, before the intended collateral package had been created and perfected.



Dr. TIMOTHY JOHN HAVAR

PERITO TRADUCTOR AUTORIZADO

**TRANSLATION FROM ENGLISH**

18. A line of credit of this magnitude granted without collateral—even for a period of up to sixty (60) days—is not standard market practice for a secured loan of such magnitude. The market's expectation regarding a line of credit allegedly secured by a first-priority lien on shares, trademarks, and accounts receivable, as well as by a second-priority mortgage, is that such security be perfected prior to disbursement or, at the latest, simultaneously with it, and not that it be subject to a sixty-day grace period once the funds are no longer under the lender's control. This is particularly important given TV Azteca's well-known insolvency, the significant defaults that have been publicly disclosed, and the ongoing enforcement proceedings. Furthermore, as explained in my Lead Opinion, the security ultimately provided consisted of second-priority mortgages on telecommunications concessions held by subsidiaries—and not by TV Azteca itself—while the first-priority security on those concessions was already the subject of enforcement proceedings.

19. Added to this is the fact that Section 5.05 of the Original Loan Agreement stipulates that each element of the security interest must be "acceptable to the Collateral Holder Bank," a criterion established unilaterally and without any objective benchmark by AlterBank, which also acts as the Organizing Entity, Initial Lender, and Administrative Agent. A criterion for the adequacy of the security interest established solely at the discretion of a party with a self-interest, without any independent valuation mechanism, without any minimum *collateral coverage* ratio applicable to the Stock Pledge Agreement, the Trademark Pledge Agreement, or the Mortgage Loan Agreement (unlike the Debt-*Collateral Ratio* of 1.3:1 applicable solely to the Trust Agreement) and without any recourse for the Borrower in the event that the Bank Holding the Security exercises its discretion unreasonably, does not constitute the customary market allocation of security interest risk in a secured line of credit between independent parties.

20. In my opinion, a prudent and independent lender granting a line of credit of this magnitude to a borrower under these circumstances would normally require that the collateral on which its credit decision depends be provided, that its priority and enforceability be established, and that its value be determined prior to or simultaneously with the disbursement, unless there were a documented and commercially compelling reason to assume the unsecured exposure during the interim period.

*(d) Use of Loan Proceeds to Meet Existing Tax Obligations Without an Identified Source of Payment:*

21. Section 2.02 of the Original Loan Agreement provides that the Loan "shall be used by the Borrower exclusively for the payment and fulfillment of its tax obligations to the Mexican tax authorities," while also permitting its use "for general business purposes." Section 4.09 provides that all Loan proceeds shall be used in accordance with Section 2.02. The Amended and Restated Loan Agreement goes further, as in Section 2.01 the Borrower declares that the Loan was used for the payment and fulfillment of its tax obligations to the Mexican tax authorities and for general corporate purposes, while Section 3.09 provides that all funds shall be used in accordance with Section 2.01. The use of loan proceeds to meet tax obligations or other existing liabilities is not, in and of itself, commercially improper nor is it necessarily outside market conditions. Its significance lies in the fact that the available documentation does not identify any specific transaction or cash-generating event capable of explaining how TV Azteca was expected to repay the principal and accrued interest within approximately six (6) months, despite its existing financial difficulties. To the extent that the funds were used to settle existing tax obligations in



Dr. TIMOT K .I HN AV



PERITO TRADUCTOR AUTORIZADO
POR EL CONSEJO DE LA JUDICATURA FEDERAL

Rather than being used for a business purpose to generate cash, a line of credit exceeding USD 200 million does not conform to the conventional logic of automatic repayment typically associated with bridge financing.

*(e) Absence of due diligence requirements and a "no conflicts" statement that omits other creditors:*

22. The Loan Agreement does not impose any express condition precedent requiring AlterBank to have conducted or documented credit, financial, or collateral due diligence with respect to TV Azteca prior to disbursement. The closest equivalent—the representations and warranties in Section 4 of the Original Loan Agreement and Clause III of the Amended and Restated Loan Agreement—are self-certifications by the Borrower, rather than an independent verification by the lender. Among these representations, Section 4.02 of the Original Loan Agreement (Section 3.02 of the Amended and Restated Loan Agreement), titled "Validity, Authorization, and Absence of Conflicts," addresses whether the transaction violates the Borrower's articles of incorporation, applicable law, or any judicial ruling or government regulation, and whether it constitutes a Lien on the Borrower's assets, but it does not mention whether the transaction conflicts with the Borrower's other existing creditors or its financing agreements, nor whether it constitutes a breach of such agreements or requires their consent. A "No Conflict" clause that omits any reference to the other secured and unsecured creditors of a distressed borrower, at a time when, according to the analysis in the Lead Opinion, the Borrower's widespread default and prior enforcement actions by creditors were public knowledge, is highly relevant to the assessment of the terms under which the Loan was granted.

23. Although the Agreements contain provisions regarding conflicts with applicable law and contractual obligations, such provisions do not substitute for the lender's own credit and legal due diligence. For a line of credit of this magnitude granted to a borrower who was already subject to significant enforcement measures by its creditors, prudent lending practice would typically require taking into account existing debt instruments, restrictions on additional indebtedness and encumbrances, existing defaults, the priority of creditors, and the consequences of the new line of credit for existing creditors. The financial difficulties and enforcement proceedings were material factors in any reasonable assessment of TV Azteca's ability to incur and repay additional debt.

24. The Lead Opinion notes that no credit assessment, financial analysis, appraisal of the mortgage collateral, internal credit approval, or minutes of the current Board of Directors or Credit Committee had been submitted in connection with the Loan. The submission of the Loan documents does not, in and of itself, remedy this lack of evidence.

or. TiuOTyY ›HN HAvAf



PERITO TRADUCTOR AUTORIZADO
POR EL CONSEJO DE LA JUDICATURA FE

*(f) Economic Aspects of the March Amendment: Deferral of interest payments until maturity* in *exchange for a* fee *of* 2%, *in addition to* the *original structuring* fee *of 1%:*

25. Under the Original Loan Agreement, interest accrued at a fixed rate of 17.50% per annum and was payable on each Interest Payment Date. As set forth in Section 4 of the March Amendment, as of March 6, 2026, the Borrower had drawn down MXN 4,085,000,000 (equivalent to approximately USD 237 million at exchange rates consistent with those adopted in the Lead Opinion) from the credit line, and ordinary interest in the amount of MXN 71,487,500 (equivalent to approximately USD 4 million) had accrued and remained unpaid as of that date. Section 4 of the March Amendment modified the Interest Payment Date to coincide with the Maturity Date and capitalized such accrued interest by adding it to the principal, thereby increasing the outstanding principal balance to MXN 4,156,475,000 (equivalent to approximately USD 241 million).

26. Section 6 of the March Amendment also required TV Azteca to pay the Arranger a Restructuring Fee equal to 2º/ of the amount actually drawn down, payable within fifteen (15) calendar days. This fee was in addition to the 1% Structuring Fee payable to the Organizing Entity pursuant to Section 3.01 of the Original Loan Agreement. In essence, therefore, approximately five (5) weeks after the original advance, the parties capitalized the accrued interest, deferred interest payments until maturity, and imposed an additional restructuring fee, without the documentation available at that time identifying any corresponding improvement in TV Azteca's ability to pay.

27. Given the circumstances of TV Azteca's financial difficulties, one would expect an independent lender, prior to restructuring the credit line, to reassess the borrower's financial condition, the continued adequacy of the collateral, existing defaults, the prospects for repayment, and the economic justification for the restructuring. The March Amendment does not, in and of itself, reveal any credit analysis supporting AlterBank's decision to increase the outstanding principal by capitalizing accrued interest and deferring the obligation to pay interest.

28. The March Amendment must also be considered in light of TV Azteca's financial situation at the time it was formalized. As set forth in the Lead Opinion, TV Azteca's insolvency was manifestly evident long before the Loan was granted, and its defaults, as well as the enforcement proceedings initiated by creditors as a result thereof, had been public knowledge for several years. These circumstances significantly increased the credit risk associated with any decision to defer payment, capitalize accrued interest, and maintain the exposure.

29. In my opinion, an independent lender restructuring an exposure of this magnitude with a borrower under such circumstances would normally require an analysis demonstrating at that time that the restructuring was commercially justified and offered a reasonable prospect of repayment or a better recovery outlook than the alternatives available to the lender. According to the documentation in my possession, no restructuring or credit analysis from that time has been presented to demonstrate the commercial rationale on which AlterBank relied in choosing to capitalize the accrued interest, defer its payment until maturity, and maintain its exposure to TV Azteca.

Dr. TIMOTHY JOHN HAVARD



PERITO TRADUCTOR AUTORIZADO
POR EL CONSEJO DE LA JUDICATURA FEDERAL

*(g) The cases of default and the appeals largely favored the lender.*

30. Section 6.01 of the Amended and Restated Loan Agreement sets forth a comprehensive list of Events of Default, including, in Section 6.01(i), an unusually detailed enumeration of events related to insolvency, such as bankruptcy proceedings, suspension of payments, or commercial insolvency proceedings; the appointment of an administrator or similar official; assignment for the benefit of creditors; resolutions approving a reorganization; court orders confirming insolvency; the assumption of the Borrower's financial management by a creditor; and the convening of general creditors' meetings to restructure debts. Section 6.02 separately permits the Administrative Agent, in accordance with the Lenders' instructions, following an Event of Default other than those described in Sections 6.01(h) or (i), to terminate the Agreement and declare the Loan immediately due and payable without the need for presentation, demand, protest, or any other form of notice, and the Borrower is deemed to waive such rights.

31. Broad provisions of this type regarding default and acceleration are not, in and of themselves, unusual in institutional loans. However, what is relevant is that they were agreed upon and subsequently amended and restated in the context of TV Azteca's prolonged and publicly documented financial difficulties, as well as enforcement proceedings initiated by creditors—circumstances that closely correspond to the insolvency risks expressly addressed in Sections 6.01(h) and (i). Under such circumstances, one would expect an independent lender to assess the Borrower's current financial condition and its defaults, the implications for payment and enforcement, the adequacy and priority of the available collateral, and whether maintaining the exposure offered a commercially reasonable prospect of recovery.

32. In my opinion, these circumstances significantly increased the need to conduct a credit and restructuring analysis at that time before AlterBank maintained its exposure under the March Amendment. According to the documentation in my possession, no analysis conducted at that time has been presented to demonstrate AlterBank's assessment of these issues or the commercial rationale on which it based its decision to maintain its exposure despite TV Azteca's financial situation.

*(h) Broad Indemnification Obligation in Favor of AlterBank:*

38 Section 8.05 of the Original Loan Agreement required the Borrower to indemnify the Administrative Agent and its officers, directors, employees, agents, and advisors against claims, damages, losses, liabilities, and expenses—including legal costs—arising from the Borrower's breach of the Agreement. Section 8.03(b) of the Amended and Restated Loan Agreement substantially expands this obligation. It requires the Borrower to indemnify the Administrative Agent, its shareholders, officers, directors, agents, and authorized representatives, the Lenders, and their Related Parties for any related losses, claims, damages, liabilities, and expenses arising from the execution or performance of the Loan Documents, the Loan, or the use of its proceeds, or related thereto, as well as for any actual or potential claims, litigation, investigations, or proceedings related to the foregoing, including claims brought by the Borrower itself. Indemnification is subject, primarily, to a final and non-appealable court ruling finding gross negligence or willful misconduct or, in the case of a claim brought by the Borrower, a breach in bad faith of the Indemnified Party's obligations under the Loan Documents.

Br. TI f/ Ü"T HY J CH N H AVA RE





PERITO TRADUCTOR AUTORIZADO
POR EL CONSEJO DE LA JUDICATURA FEDERA

34. Section 8.03(c) further provides that the Borrower waives any claim against an Affected Party for special, indirect, or punitive damages. These protections apply in conjunction with Section 7.03, pursuant to which the Organizing Entity, the Administrative Agent, and the Secured Bank assume no duty, liability, or obligation, except as expressly provided in the Loan Documents, and the Guarantee-Holding Bank is substantially protected from liability for failure or delay in enforcing the security interest, except in cases of gross negligence or willful misconduct. Sections 6.02 and 6.04 further provide that the Administrative Agent and the Guarantee-Holding Bank are not obligated to initiate or carry out enforcement proceedings on their own behalf, unless they receive satisfactory indemnification and, if so requested, financing from the lenders.

35. Although these provisions on indemnification and limitation of liability do not, on their own, establish that the Loan was made outside of market conditions, their scope is relevant to the overall assessment of the transaction. Indemnification, reimbursement of expenses, and limitations on the agents' liability are common features of sophisticated financing agreements. In this case, they form part of the overall risk allocation within the framework of a credit line in which AlterBank served as the Arranging Institution, Initial Lender, Administrative Agent, and Guarantee-Holding Bank, while simultaneously assuming substantial exposure before the intended security had been established, extending a loan to a borrower with a prolonged and publicly documented history of financial difficulties, and subsequently capitalizing accrued interest and deferring its payment.

36. In my opinion, when considered cumulatively with the other characteristics of the Loan identified above, the scope of the indemnification and liability limitation protections granted to AlterBank contributes to an overall allocation of contractual and economic risk that is unusually favorable to AlterBank, given the corresponding credit risk it assumed. This further supports my conclusion that the terms of the Loan, considered as a whole, did not conform to normal market conditions between independent parties.

*(i) Conclusion on the rating:*

37. Taking these characteristics into account as a whole, in my opinion, the Loan Agreement, as amended and restated by the March Amendment, cannot be properly characterized as a typical or customary bridge loan entered into on market terms, despite its short-term maturity and its structure providing for a single repayment at maturity. (i) the combination of the four functions concentrated at AlterBank; (ii) the fact that the loan was granted and subsequently amended in the context of TV Azteca's prolonged and publicly documented financial difficulties, as well as enforcement proceedings by creditors; (iii) the deferral of enforcement and the perfection of security interests until after full disbursement, under terms acceptable to AlterBank in its capacity as the Lead Lender; (iv) the use of the funds without an identified source of repayment; (v) the absence of any independent due diligence requirements and the restrictive nature of the "No Conflicts" representation; (vi) the imposition of an additional 2% restructuring fee in connection with a modification that capitalized accrued interest and deferred its payment until maturity; (vii) the broad default and remedy provisions; and (viii) the scope of the indemnification and liability limitation protections granted to AlterBank are, taken as a whole, inconsistent with the terms that a prudent and independent lender and a borrower





Dr. TIMOTHY JOHN HAVA
PERITO TRADUCTOR AUTORIZADO
POR EL CONSEJO DE LA JUDICATURA FED

A prudent and independent party would normally agree to a line of credit of this amount and nature.

## C. **THE BASEL PRINCIPLES ARE NOT BINDING AND ARE ANALYTICALLY DISTINCT** FROM THE QUESTION OF WHETHER THE LOAN WAS GRANTED **ON MARKET TERMS**

*What is the legal standing of the Basel Committee's principles under Saint Lucia law, and what is the* relationship between *AlterBank's regulatory noncompliance and the separate question of* whether *the Loan and the March Amendment* were *entered into outside of market conditions?*

38. The prudential standards referred to in the Lead Opinion—including the capital adequacy and single-borrower exposure standards set forth in the FSRA's Guidance Notes and in AlterBank's pre-opening authorization—are based on the principles associated with the Basel Committee on Banking Supervision ("BCBS"), an international standard-setting body operating under the auspices of the Bank for International Settlements. The BCBS's Core Principles for Effective Banking Supervision provide international benchmarks for banking regulation and supervision. They do not constitute legislation nor do they create directly enforceable obligations under the laws of Saint Lucia.

39. Saint Lucia is not a member of the BCBS. The Basel-derived prudential principles referred to in the Lead Opinion have legal and regulatory significance in Saint Lucia to the extent that they are reflected in the national legal and regulatory framework applicable to AlterBank. Section 15 of the FSRA Act authorizes the FSRA to issue guidelines to regulated entities regarding prudential standards relating to, among other matters, the safety and soundness of funds, asset quality, liquidity, related-party transactions, and corporate governance. Consequently, the FSRA Guidance Notes set forth the prudential requirements applicable to AlterBank, including the requirements regarding exposure to a single borrower set forth in Guidance Note 11. AlterBank was also subject to the conditions contained in the FSRA's pre-opening authorization dated February 23, 2024, including the requirement to maintain a Total Eligible Capital to Risk-Weighted Assets Ratio above 8% and to provide advance notice of any significant deviation from its approved business plan. Therefore, the relevant obligations arise from Saint Lucia's national regulatory framework and the conditions applicable to AlterBank, and not from the Basel Principles, which operate independently as a source of law in Saint Lucia.

40. AlterBank's regulatory noncompliance and the question of whether the Loan and the March Amendment were entered into on arm's-length terms are separate issues. A breach of an applicable exposure limit or other prudential requirement primarily entails the supervisory and regulatory consequences provided for under Saint Lucia law and does not, by the mere fact of the breach, render the underlying Loan or the security invalid or unenforceable. By contrast, determining whether the Loan was entered into on arm's-length terms requires examining the substantive terms and commercial characteristics of the transaction and comparing them to those that a lender and a borrower would typically agree upon as independent parties in a similar situation.



Dr. TI L\OTH** JOHN Ü AV.0 R



PERITO TRADUCTOR AUTORIZADO
POR EL CONSEJO DE LA JUDICATURA FEDE

41. Nevertheless, the regulatory framework is relevant to the commercial assessment. Saint Lucia's prudential framework requires regulated lenders to address issues such as capital adequacy, concentration risk, credit assessment, liquidity, collateral valuation, and risk management. In particular, the Lead Opinion concluded that AlterBank was required, prior to approving and disbursing the Loan, to conduct an adequate credit assessment of TV Azteca, including its financial condition, cash flows, repayment capacity, and existing indebtedness, as well as to evaluate the adequacy and value of the collateral. Therefore, a material breach of these standards may constitute significant evidence when assessing whether the transaction complied with standard commercial lending practices.

42. In the present case, my conclusion is derived independently from the commercial characteristics of the transaction identified above, including its magnitude in relation to the financial profile disclosed by AlterBank, TV Azteca's financial condition, the absence of an identified source of payment for a short-term credit line with repayment at maturity, the advance of funds before the intended collateral was established, the nature and priority of the collateral ultimately obtained, the subsequent capitalization and deferral of accrued interest, and the absence, in the documentation provided, of credit analyses and collateral evaluations prepared at that time that explain the commercial rationale on which an independent and prudent lender would have accepted the corresponding credit risk.

## D. RELATIONSHIP TO THE MAIN OPINION

43. The conclusions of this Supplementary Opinion are in addition to those reached in the Main Opinion and are consistent with them. The Main Opinion addressed AlterBank's regulatory status under the International Banks Act, the FSRA Act, and the associated Guidance Notes, as well as the status of the Loan under the civil and insolvency laws of Saint Lucia, based on the documentation available at that time, which did not include the Loan Agreement or the March Amendment. Having now reviewed those executed instruments, I confirm that nothing contained therein alters the conclusions reached in the Main Opinion. On the contrary, the terms actually set forth in the executed Loan Agreement and the March Amendment—which are summarized in Section C above—reinforce my conclusion that the Loan does not reflect standard commercial banking practice between arm's-length parties for a Class A international bank authorized in Saint Lucia.

ar. TI/V\OTH'r :';:'Ü N H¢.•/.ñF





PERITO TRADUCTOR AUTORIZADO
POR EL CONSEJO DE LA JUDICATURA FEDE

44. I do not consider the classification of the Loan as a "bridge loan" to be decisive. Although the line of credit had certain formal characteristics associated with bridge financing—in particular, its short-term maturity and its single repayment at maturity—these characteristics do not explain the absence of a clearly identified and commercially credible source of payment, nor the other exceptional credit characteristics noted above.

45. The contractual documents substantially reinforce my previous conclusion, rather than refuting it. They establish that substantial funds were disbursed before the intended collateral was perfected; that AlterBank performed multiple functions within a structure that provided that the underlying *economic* lenders could be entities other than AlterBank; and that, approximately five (5) weeks after disbursement, the parties capitalized the accrued interest, deferred interest payments until maturity, and imposed an additional 2% restructuring fee.

46. All of the aforementioned aspects must be evaluated in conjunction with TV Azteca's financial difficulties and the enforcement actions taken by its creditors, which have been made public; the subordinated nature and late establishment of the guarantee; the magnitude of the exposure relative to the financial situation disclosed by AlterBank and its approved business plan; and the absence, in the documentation submitted, of contemporaneous credit records, valuations, and approvals that explain the commercial rationale for the transaction. In my opinion, when considered together, these characteristics are inconsistent with the terms and risk allocation under which an independent and prudent lender would normally grant a comparable loan between independent parties. Therefore, the Loan and its subsequent restructuring did not conform to standard market conditions for a transaction of this nature,

47. I reserve the right to supplement or amend this opinion should additional information become available.

September 8, 2026 Renee

Tamara St. Rose, KC





Dr. 1'I?\GTHY JOHN HAVA kD
PERITO TRADUCTOR AUTORIZADO
POR EL CONSEJO DE LA JUDICATURA FEDERA

PODER JUDICIAL DE LA FEDERACIÓN

## CRYPTOGRAPHIC EVIDENCE - TRANSACTION

**Signed File:**
**41570020000000000062819802.p7m**
**Certifying Authority:**
**CERTIFICATION AUTHORITY**
**Signatory(ies): 1**
**This digital document is a true copy of its physical or electronic version, which corresponds to the original.**

JESUS VAZQUEZ NUÑEZ
706a6620636a6663300000000000000000016a00
07/05/29 10:16:24

| SIGNATORY | | | | |
|---|---|---|---|---|
| **Name:** | FERNANDO DEL CASTILLO ELORZA | **Validity:** | GOOD | Valid |

| SIGNATURE | | | | |
|---|---|---|---|---|
| **No. Series:** | 30.30.30.30.31.30.30.30.30.30.30.35.31.37.38.36.34.31.34.38 | **Revocation:** | Valid | Not revoked |
| **Date (UTC/CDMX)** | 09/09/26 04:36:23 - 08/09/26 22:36:23 | **Status:** | Valid | Valid |
| **Algorithm:** | RSA-SHA256 | | | |
| **Signature string:** | 4d ba 91 13 d7 5f 21 7b 1e 76 f1 f5 02 d4 f9 f2<br>d1 10 7b aa cc d8 98 59 e7 68 9a b0 de 6f 01 a6<br>eb 76 89 88 16 bd 46 0c 0d ba ea 4f 66 84 3d d2<br>ce 6e 2f b6 d2 63 2d ca d1 65 54 1d 1a e8 ec 12<br>db 49 57 03 6e 06 a9 43 fd 42 33 6c 8c 5e 9a a4<br>51 bc b2 33 4d d2 a3 f9 e7 a0 29 c6 be 8b b5 06<br>b0 4b 37 9c 9a 93 01 2c d6 7a 5b c7 36 b1 1c a0<br>3a 9e de 2c 17 c7 4a 6a dc cf 19 67 00 19 5b c9<br>4c 9c cf 9a 1b d2 cc 44 44 a7 53 70 13 f3 82 91<br>d6 33 31 5f aa ff ac 25 ea 15 ed ff 5e f9 1a 78<br>bd 05 00 78 d6 e1 ce 28 5d 01 75 4a 77 0c b8 d5<br>8c 01 40 fc 15 0f 2a f5 b1 09 c3 f7 87 83 9d 65<br>f4 c3 c3 76 ff f6 26 28 5b 27 b5 ec 8b 8c 36 07<br>38 66 a8 de a7 21 d4 51 ad 19 59 f7 47 30 cf c4<br>e4 86 a5 b7 b1 d5 cb c3 34 da 1c 8f 19 54 a5 c8<br>94 35 93 72 2a 0e 34 07 98 c1 81 0a 0a 75 21 15 | | | |

| OCSP | |
|---|---|
| **Date: (UTC/Mexico City)** | 09/09/26 04:36:24 - 08/09/26 22:36:24 |
| **Respondent Name:** | SAT OCSP Service |
| **Responder Issuer:** | CERTIFICATION AUTHORITY |
| **Serial number:** | 30.30.30.30.31.30.30.30.30.30.30.35.31.37.38.36.34.31.34.38 |

| TSP | |
|---|---|
| **Date: (UTC/CDMX)** | 09/09/26 04:36:24 - 08/09/26 22:36:24 |
| **Name of the TSP response issuer:** | Timestamp Issuing Authority of the Federal Judiciary Council |
| **TSP Certificate Issuer:** | Intermediate Certification Authority of the Federal Judiciary Council |
| **TSP response identifier:** | 203698985 |
| **Stamped data:** | W6+PP5Pv7w83tSBkb6tUfy2wMUo= |

**IN THE MATTER OF ALTER BANK LTD.**
**AND IN THE MATTER OF THE INSOLVENCY (COMMERCIAL BANKRUPTCY) OF TV AZTECA, S.A.B. DE C.V.**
**AND IN THE MATTER OF THE LAWS OF SAINT LUCIA**

**SUPPLEMENTAL OPINION OF RENEE TAMARA ST. ROSE KC**

## A. SCOPE OF THIS SUPPLEMENT

1. I refer to my Opinion dated August 17, 2026, concerning Alter Bank Ltd. ("AlterBank") and the loan extended to TV Azteca, S.A.B. de C.V. ("TV Azteca") (the "Principal Opinion"). This Supplemental Opinion should be read in conjunction with the Principal Opinion, and, unless otherwise stated, defined terms used herein have the meanings given to them in the Principal Opinion.

2. Since issuing the Principal Opinion, I have been provided with and have reviewed the executed Loan Agreement dated January 29, 2026 (the "January Agreement"), together with the First Amendment and Restatement to the Loan Agreement dated March 6, 2026, and the Amended and Restated Loan Agreement attached as Exhibit A thereto (collectively, the "March Amendment"). The January Agreement, as amended and restated by the March Amendment, is referred to in this Supplemental Opinion as the "Loan Agreement."

3. I have been asked, in light of those documents, to address the following issues: (i) whether the Loan is properly characterized as a conventional or typical "bridge loan" and (ii) the relevance of the Basel Committee principles and AlterBank's compliance with the applicable regulatory and prudential framework to the assessment of the commercial nature of the Loan.

4. For the reasons set out below, my review of the January Agreement and the March Amendment substantially reinforces the conclusion expressed in paragraphs 73–75 of the Principal Opinion that, considered as a whole, the Loan does not reflect the ordinary commercial practice of a prudent Class A international bank licensed in Saint Lucia for a facility of its size, term, risk profile, and nature.

## B. WHETHER THE LOAN AGREEMENT IS PROPERLY CHARACTERIZED AS A CONVENTIONAL OR TYPICAL "BRIDGE LOAN"?

### (i) Is the Loan properly characterized as a typical bridge loan?

5. I understand that the Loan has been characterized as a typical "bridge loan." In commercial banking practice, bridge financing ordinarily refers to short-term funding intended to meet an interim financing requirement pending an identified or reasonably ascertainable source of repayment, such as longer-term refinancing, an asset disposal, a

capital raising, or another transaction from which the bridge facility is expected to be repaid

out. A short term and a lump-sum repayment are therefore features commonly associated with bridge financing, but they do not in and of themselves determine the commercial nature of a transaction.

6. On its face, the Loan Agreement bears certain superficial characteristics of a bridge financing. It is a short-term facility, maturing on July 29, 2026—approximately six months after the Disbursement Date of January 29, 2026—and is structured for repayment of the outstanding principal in a single lump-sum payment at maturity. Considered only at that general level, and without regard to the substantive terms actually agreed upon, the Loan bears some resemblance to bridge financings of the kind commonly used when a borrower requires short-term liquidity pending longer-term refinancing or another permanent source of repayment.

7. However, a bridge loan's short term and interim nature do not, in and of themselves, place it outside the scope of ordinary arm's-length banking practice, nor do they exempt its terms from scrutiny. A bridge facility is still expected to reflect terms that a prudent, arm's-length lender would be prepared to accept, taking into account the size, term, and risk profile of the facility—including the borrower's financial condition and repayment capacity, the identified source of repayment or "take-out," the nature and timing of the security, the pricing and fee structure, the lender's credit assessment and due diligence, and the allocation of risk between lender and borrower.

8. Based on the materials currently available, I have identified no provision in the January Agreement or the March Amendment that specifies a committed refinancing, asset sale, capital raising, or other sufficiently ascertainable source from which the principal exposure was expected to be repaid at maturity. The contractual documents establish the maturity obligation but do not themselves identify the transaction or source of funds intended to repay the Loan.

9. That consideration is material in the circumstances of this borrower. As explained in the Principal Opinion, TV Azteca was already experiencing significant financial distress at the time of the Loan. Its concurso petition describes the financing as additional and urgent funding obtained to address tax liabilities and mitigate the risk of operational paralysis, against a backdrop of structural liquidity constraints, insufficient operating cash flow, restricted access to credit, and difficulty refinancing liabilities under ordinary market conditions. In those circumstances, the mere fact that the Loan matured within six (6) months does not make it conventional bridge financing. A commercially credible means of repayment is particularly important when the borrower is already financially distressed.

10. I therefore do not consider the description of the Loan as a "bridge loan" sufficient to characterize the transaction as typical or customary bridge financing. Its short term and bullet repayment structure are relevant features of the transaction, but they are not determinative of its commercial nature. That assessment requires consideration of those features in the context of the absence of an identified contractual take-out, TV

Azteca's financial condition, and the other terms and allocation of risk reflected in the January Agreement and the March Amendment, which I address below.

**(ii) Are the terms of the January Agreement and the March Amendment, taken as a whole, consistent with ordinary arm's-length or market lending conditions?**

11. Whether the Loan was entered into on ordinary arm's-length or market lending terms cannot, in my opinion, be determined by isolating any single provision of the Loan Agreement. A number of the provisions identified below—including indemnities, Events of Default, acceleration rights, and the appointment of agents—are standard features of institutional lending documentation and would not, on their own, render a transaction inconsistent with ordinary commercial practice. The relevant question is whether, considered cumulatively and in light of the circumstances under which the Loan was made, the contractual structure reflects the credit assessment, risk allocation, security protection, and commercial discipline that a prudent arm's-length lender would ordinarily require for a facility of this size, tenor, and risk profile. In my opinion, it does not, for the following reasons:

*(a) AlterBank's multiple contractual roles:*

12. The fact that a single bank acts as arranger, lender, administrative agent, and collateral agent is not, in and of itself, unusual or inconsistent with arm's-length lending practices. What is material here is the manner in which those roles function within the specific structure of this Loan. AlterBank executed the January Agreement as Arranger, Initial Lender, Administrative Agent, and Collateral Agent and thereby assumed each of the principal lender-side roles under the facility. The March Amendment retained that structure while defining the Initial Lender as acting as record holder, nominee, and disbursement conduit for the Lenders, except where otherwise expressly agreed.

13. Where, as in this case, a single bank occupies all four (4) roles while at the same time purporting, in at least one (1) of those capacities, to act on behalf of other Lenders, the contractual structure through which a borrower and its creditors would ordinarily be able to identify and hold to account the true economic counterparty to the transaction becomes less transparent. The concentration of these roles is not in itself unlawful or necessarily inconsistent with market practice. Its significance here lies in the absence, based on the materials available to me, of a clear correspondence between AlterBank's contractual capacities and the underlying funding and risk-bearing arrangements. Under these circumstances, it is not apparent from the contractual structure itself who ultimately provided the funds, bore the economic exposure to the Loan, or constituted the true economic counterparty to TV Azteca. That opacity is reinforced by the express terms of the March Amendment itself: Section 5 (Capacity; No Beneficial Ownership Inference) states that the designation of any person as Initial Lender, Administrative Agent, Arranger, or Collateral Agent does not, in and of itself, create or evidence beneficial ownership of, or economic credit exposure to, the Loan, and that all extensions of credit are made by the Lenders as reflected from time to time in the Register. AlterBank has therefore contractually disclaimed being identified as the true economic party to the Loan

based solely on its contractual capacities, while the

identity of those Lenders is not, based on the executed instruments provided to me, independently ascertainable. This lack of transparency materially increases the information asymmetry between AlterBank—acting in its various contractual capacities—and TV Azteca and its other creditors.

*(b) TV Azteca's financial condition at the time of the March Amendment:*

14. The March Amendment was executed against the backdrop of TV Azteca's longstanding and publicly documented financial distress. As set forth in the Principal Opinion, TV Azteca's insolvency was demonstrably well known long before the Loan was made on January 29, 2026. TV Azteca had suspended payments on its Senior Notes in February 2021; those Notes were accelerated in August 2022 and became the subject of recovery proceedings. Involuntary Chapter 11 petitions were filed against TV Azteca and certain subsidiaries in March 2023, and Banco Azteca subsequently accelerated its facility and commenced enforcement proceedings. The default and its consequences were disclosed in TV Azteca's published audited financial statements and had been the subject of active enforcement proceedings for several years prior to the Loan.

15. That notorious financial condition takes on particular significance when considered in light of the Events of Default that AlterBank itself stipulated in the March Amendment. Section 6.01(h) identifies as an Event of Default the inability of the Borrower or any Subsidiary, generally, to pay its debts as they become due. Section 6.01(i) separately includes the involuntary subjection of the Borrower or any Subsidiary to a petition for bankruptcy, insolvency, *concurso mercantil*, *quiebra*, reorganization, or analogous proceedings where such petition is not dismissed within thirty (30) days. The Agreement therefore identifies as Events of Default circumstances that closely correspond to aspects of TV Azteca's publicly documented financial history and, at a minimum, demonstrate that the borrower was on the verge of the very insolvency risks for which the Agreement itself made express provision.

16. A restructuring transaction with a borrower whose insolvency was well-known and who was already on the verge of meeting the insolvency conditions defined by the Agreement as Events of Default cannot, from a commercial perspective, be assessed on the same basis as a facility extended to a solvent, performing borrower. Such circumstances would ordinarily heighten, rather than diminish, the importance to a prudent lender of establishing repayment capacity, obtaining reliable and current financial information, assessing existing creditor claims, and ensuring that the proposed security package provided effective protection for the lender's exposure.

*(c) Collateral required only after full disbursement, on terms set unilaterally by the Collateral Agent:*

17. Section 5.05 of the Original Loan Agreement required the Borrower to execute the Stock Pledge Agreement, Trademark Pledge Agreement, Mortgage Agreement, and Trust Agreement within sixty (60) calendar days after the Disbursement Date. Section 4.10 of the Amended and Restated Loan Agreement replicates that requirement but expressly

calculates the sixty (60) day period from the execution of the March Amendment, thereby resetting the collateral timeline so that the Collateral Documents were not required to be in place until on or about May 5, 2026—approximately three (3) months into a six-month facility. The practical consequence was that AlterBank was prepared to advance a principal balance in excess of the equivalent of US$200 million and to maintain that exposure on an unsecured basis at the time of the March Amendment, before the contemplated security package had been created and perfected.

18. A facility of this size extended on an unsecured basis, even for a period of up to sixty (60) days, is not standard market practice for a secured loan of this magnitude. The market expectation for a facility purportedly secured by a first-priority interest in shares, trademarks, and receivables, as well as a second-priority mortgage, is that such security be perfected before, or at the latest simultaneously with, disbursement—not left to a sixty-day grace period after the funds have already left the lender's control. This is particularly significant given TV Azteca's notorious insolvency, substantial publicly disclosed defaults, and existing enforcement proceedings. Furthermore, as explained in my Principal Opinion, the security ultimately taken consisted of second-ranking mortgages on telecommunications concessions held by subsidiaries rather than TV Azteca itself, while first-ranking security on those concessions was already subject to enforcement.

10470252791600196274

19. Compounding this issue, Section 5.05 of the Original Loan Agreement provides that each item of collateral must be "acceptable to the Collateral Agent"—a standard set unilaterally and without any objective benchmark by AlterBank, which also acts as Arranger, Initial Lender, and Administrative Agent. A collateral adequacy standard set solely at the discretion of a single self-interested party, with no independent valuation mechanism, no minimum collateral coverage ratio applicable to the Stock Pledge Agreement, Trademark Pledge Agreement, or Mortgage Agreement (as distinct from the 1.3:1 Collateral Ratio applicable only to the Trust Agreement) and no recourse for the Borrower if the Collateral Agent exercises its discretion unreasonably, does not represent the ordinary market allocation of collateral risk in an arm's-length secured facility.

20. In my opinion, a prudent arm's-length lender extending a facility of this magnitude to a borrower under those circumstances would ordinarily require the material security upon which its credit decision depended to be executed, its priority and enforceability established, and its value assessed before or contemporaneously with disbursement, absent a documented and commercially compelling reason for assuming the intervening unsecured exposure.

*(d) Use of Loan Proceeds to Satisfy Existing Tax Liabilities Without an Identified Repayment Source*:

21. Section 2.02 of the Original Loan Agreement provides that the Loan "will be used by the Borrower exclusively for the payment and fulfillment of its tax obligations to Mexican tax authorities," while also permitting its use "for general corporate purposes." Section 4.09

provides that all proceeds of the Loan shall be used as provided in Section 2.02. The Amended and Restated Loan Agreement goes further in that Section 2.01 records the

Borrower's statement that the Loan was used for the payment and fulfillment of its tax obligations to Mexican tax authorities and for general corporate purposes, while Section Section 3.09 provides that all proceeds shall be used as set forth in Section 2.01. The use of loan proceeds to satisfy tax or other existing liabilities is not in itself commercially improper or necessarily inconsistent with market conditions. Its significance stems from the absence, based on the available materials, of an identified transaction or cash-generating event capable of explaining how TV Azteca was expected to repay the principal and accrued interest within approximately six (6) months, notwithstanding its existing financial distress. To the extent that the proceeds were used to discharge existing tax liabilities rather than for a cash-generating corporate purpose, a facility in excess of US$200 million does not meet the conventional self-liquidating rationale ordinarily associated with bridge financing.

*(e) Absence of due diligence requirements and a "No Conflicts" representation that omits other creditors:*

22. The Loan Agreement imposes no express condition precedent requiring AlterBank to have conducted or documented credit, financial, or collateral due diligence on TV Azteca prior to disbursement. The closest equivalent—the representations and warranties in Section 4 of the Original Loan Agreement and Article III of the Amended and Restated Loan Agreement—consist of self-certifications by the Borrower rather than independent verification by the lender. Among those representations, Section 4.02 of the Original Loan Agreement (Section 3.02 of the Amended and Restated Loan Agreement), titled "Validity, Authorization, and No Conflict," addresses whether the transaction violates the Borrower's governing documents, applicable law, or any court order or governmental rule, and whether it creates a lien on the Borrower's property, but is silent on whether the transaction conflicts with, constitutes a default under, or requires the consent of the Borrower's other existing creditors or their financing agreements. A "No Conflicts" clause that omits any reference to a distressed borrower's other secured and unsecured creditors—at a time when, according to the Principal Opinion's analysis, the Borrower's generalized default and prior creditor enforcement actions were a matter of public record—is materially relevant to the assessment of the terms upon which the Loan was made.

23. Although the Agreements contain representations regarding conflicts with applicable law and contractual obligations, those representations are not a substitute for the lender's own credit and legal due diligence. For a facility of this magnitude extended to a borrower already subject to substantial creditor enforcement actions, ordinary prudent lending practice would require consideration of existing debt instruments, restrictions on additional indebtedness and liens, existing defaults, creditor priority, and the consequences of the new facility for existing creditors. The financial distress and enforcement proceedings were material to any reasonable assessment of TV Azteca's capacity to incur and repay additional indebtedness.

24. The Principal Opinion notes that no contemporaneous credit assessment, financial

analysis, valuation of the mortgage collateral, internal credit approval, or Board or Credit

Committee minutes relating to the Loan had been produced. The production of the Loan documents does not in itself remedy that evidentiary deficiency.

*(f) The economics of the March Amendment: deferral of interest until maturity in exchange for a 2% fee, in addition to the original 1% structuring fee:*

25. Under the Original Loan Agreement, interest accrued at a fixed rate of 17.50% per annum and was payable on each Interest Payment Date. As recorded in Section 4 of the March Amendment, by March 6, 2026, the Borrower had drawn MXN 4,085,000,000 (equivalent to approximately US$237 million at exchange rates consistent with those adopted in the Principal Opinion) under the facility, and ordinary interest of MXN 71,487,500 (equivalent to approximately US$4 million) had accrued and remained unpaid as of that date. Section 4 of the March Amendment amended the Interest Payment Date to coincide with the Maturity Date and capitalized that accrued interest into principal, thereby increasing the outstanding principal balance to MXN 4,156,487,500 (equivalent to approximately US$241 million).

26. Section 6 of the March Amendment further required TV Azteca to pay the Arranger a Restructuring Fee equivalent to 2% of the amount actually drawn, payable within fifteen (15) calendar days. That fee was in addition to the 1% Structuring Fee payable to the Arranger under Section 3.01 of the Original Loan Agreement. In essence, therefore, approximately five (5) weeks after the original advance, the parties capitalized accrued interest, deferred interest payments until maturity, and imposed an additional restructuring fee, without the currently available materials identifying any corresponding improvement in TV Azteca's repayment capacity.

27. Given TV Azteca's financial distress, an arm's-length lender would ordinarily be expected, prior to restructuring the facility, to reassess the borrower's financial position, the continued adequacy of the collateral, existing defaults, repayment prospects, and the economic justification for the restructuring. The March Amendment does not itself disclose the credit analysis supporting AlterBank's decision to increase the outstanding principal by capitalizing accrued interest and deferring the interest payment obligation.

28. The March Amendment must also be considered in light of TV Azteca's financial condition at the time it was executed. As set forth in the Principal Opinion, TV Azteca's insolvency was demonstrably well known long before the Loan was made, and its defaults and the resulting creditor enforcement proceedings had been publicly documented for several years. Those circumstances materially heightened the credit risk associated with any decision to defer payment, capitalize accrued interest, and continue the exposure.

29. In my opinion, an arm's-length lender restructuring an exposure of this magnitude to a borrower under those circumstances would ordinarily require a contemporaneous analysis demonstrating that the restructuring was commercially justified and offered a reasonable prospect of repayment or a better expected recovery than the alternatives available to the lender. Based on the materials available to me, no contemporaneous restructuring or credit analysis has been produced demonstrating the commercial basis

upon which AlterBank

chose to capitalize accrued interest, defer its payment until maturity, and continue its exposure to TV Azteca.

*(g) Events of default and remedies heavily favor the lender:*

30. Section 6.01 of the Amended and Restated Loan Agreement sets forth an extensive list of Events of Default, including, in Section 6.01(i), an unusually detailed list of insolvency-related events, including voluntary and involuntary bankruptcy or *concurso mercantil* proceedings, the appointment of an administrator or similar official, assignment for the benefit of creditors, resolutions approving reorganization, court orders confirming insolvency, a creditor assuming financial management of the Borrower, and the convening of meetings of general creditors to restructure debts. Section 6.02 separately permits the Administrative Agent, upon the Lenders' instruction, following an Event of Default other than one described in Sections 6.01(h) or (i), to terminate the Agreement and declare the Loan immediately due and payable without presentation, demand, protest, or other notice, all of which the Borrower is deemed to waive.

31. Extensive default and acceleration provisions of this kind are not, in and of themselves, unusual in institutional lending. However, what is material is that they were agreed upon and subsequently amended and restated against the backdrop of TV Azteca's longstanding and publicly documented financial distress and creditor enforcement proceedings—circumstances that closely correspond to the insolvency risks expressly addressed by Sections 6.01(h) and (i). In those circumstances, an arm's-length lender would ordinarily be expected to assess the Borrower's existing financial condition and defaults, the consequences for repayment and enforcement, the adequacy and priority of the available security, and whether continuing the exposure offered a commercially reasonable prospect of recovery.

32. In my opinion, those circumstances materially heightened the need for a contemporaneous credit and restructuring analysis before AlterBank continued its exposure under the March Amendment. Based on the materials available to me, no contemporaneous analysis has been produced demonstrating AlterBank's assessment of those matters or the commercial basis upon which it chose to continue the exposure despite TV Azteca's financial condition.

*(h) Broad indemnification in favor of AlterBank:*

33. Section 8.05 of the Original Loan Agreement required the Borrower to indemnify the Administrative Agent and its officers, directors, employees, agents, and advisors against claims, damages, losses, liabilities, and expenses—including legal costs—arising from the Borrower's breach of the Agreement. Section 8.03(b) of the Amended and Restated Loan Agreement substantially broadens that obligation. It requires the Borrower to indemnify the Administrative Agent, its shareholders, officers, directors, agents, and attorneys-in-fact, the Lenders, and their Related Parties against losses, claims, damages, liabilities, and related expenses arising out of or in connection with the

execution or performance of the Loan

Documents, the Loan, or the use of its proceeds, as well as actual or prospective claims, litigation, investigations, or proceedings relating to the foregoing, including claims brought by the Borrower itself. The indemnity is subject primarily to a final, non-appealable judicial determination of gross negligence or willful misconduct or, in the case of a claim brought by the Borrower, a bad-faith breach of the Indemnitee's obligations under the Loan Documents.

34. Section 8.03(c) further provides that the Borrower waives any claim against an Indemnitee for special, indirect, consequential, or punitive damages. These protections operate alongside Section 7.03, under which the Arranger, Administrative Agent, and Collateral Agent assume no duties, responsibilities, or liabilities except as expressly provided in the Loan Documents, and the Collateral Agent is substantially protected from liability for failure or delay in enforcing the collateral, subject to gross negligence or willful misconduct. Sections 6.02 and 6.04 further provide that the Administrative Agent and Collateral Agent are not required to initiate or pursue enforcement proceedings in their own names unless they receive satisfactory indemnification and, if requested, funding from the Lenders.

35. Although these indemnification and limitation-of-liability provisions do not, on their own, establish that the Loan was outside market conditions, their scope is relevant to the overall assessment of the transaction. Indemnification, expense reimbursement, and limitations on agent liability are common features of sophisticated financing arrangements. Here, they form part of the overall allocation of risk under a facility in which AlterBank served as Arranger, Initial Lender, Administrative Agent, and Collateral Agent, while extending substantial exposure before the contemplated security was in place, lending to a borrower with a long history of publicly documented defaults, and subsequently capitalizing accrued interest and deferring its payment.

36. In my opinion, when considered cumulatively with the other features of the Loan identified above, the breadth of the indemnification and limitation-of-liability protections afforded to AlterBank contributes to an overall allocation of contractual and economic risk that is unusually favorable to AlterBank, given the corresponding credit risk it assumed. This further supports my conclusion that the terms of the Loan, viewed as a whole, were outside ordinary arm's-length market conditions.

*(i) Conclusion on Characterization:*

37. Taking these features together, in my opinion, the Loan Agreement, as amended and restated by the March Amendment, is not properly characterized as a typical or customary bridge loan transacted on market terms, notwithstanding its short term and bullet repayment structure. The (i) combination of AlterBank's collapsed four-capacity role; (ii) fact that the Loan was made and subsequently amended against the backdrop of TV Azteca's longstanding and publicly documented financial distress and creditor enforcement proceedings; (iii) deferral of collateral execution and perfection until after full disbursement, on terms acceptable to AlterBank as Collateral Agent; (iv) the use of proceeds without an identified source of repayment; (v) the absence of any independent

due diligence

condition and the narrow scope of the "No Conflicts" representation; (vi) the imposition of an additional 2% restructuring fee in connection with an amendment that capitalized accrued interest and deferred its payment until maturity; (vii) an extensive default and remedies regime; and (viii) the breadth of the indemnification and limitation-of-liability protections afforded to AlterBank are, taken together, inconsistent with the terms that a prudent, arm's-length lender and a prudent, arm's-length borrower would ordinarily agree upon for a facility of this size and nature.

### C. THE BASEL PRINCIPLES ARE NON-BINDING AND ARE ANALYTICALLY DISTINCT FROM THE QUESTION OF WHETHER THE LOAN WAS ENTERED INTO ON MARKET TERMS

*What is the legal status of the Basel Committee's principles under Saint Lucian law, and what is the relationship between AlterBank's regulatory non-compliance and the separate question of whether the Loan and the March Amendment were entered into outside of market conditions?*

38. The prudential standards referred to in the Principal Opinion—including the capital adequacy and single-borrower exposure standards reflected in the FSRA's Guidance Notes and in AlterBank's pre-opening approval—draw on principles associated with the Basel Committee on Banking Supervision ("BCBS"), an international standard-setting body operating under the auspices of the Bank for International Settlements. The BCBS Core Principles for Effective Banking Supervision provide international benchmarks for banking regulation and supervision. They do not constitute legislation or create directly enforceable obligations under the law of Saint Lucia.

39. Saint Lucia is not itself a member of the BCBS. The Basel-derived prudential principles referred to in the Principal Opinion have legal and regulatory significance in Saint Lucia to the extent that they are reflected in the domestic statutory and regulatory framework applicable to AlterBank. Section 15 of the FSRA Act empowers the FSRA to issue guidelines to regulated entities regarding prudential standards concerning, among other matters, the safety and soundness of funds, asset quality, liquidity, related-party transactions, and corporate governance. The FSRA Guidance Notes accordingly prescribe prudential requirements applicable to AlterBank, including the single-borrower exposure requirements set forth in Guidance Note 11. AlterBank was separately subject to the conditions contained in the FSRA's pre-opening approval dated February 23, 2024, including the requirement to maintain a Total Qualifying Capital to Risk-Weighted Assets ratio of not less than 8% and to provide prior notice of significant deviations from its approved business plan. The relevant obligations therefore arise from Saint Lucia's domestic regulatory framework and the conditions applicable to AlterBank, rather than from the Basel principles operating independently as a source of Saint Lucia law.

40. AlterBank's regulatory non-compliance and whether the Loan and the March Amendment were entered into on market terms are separate issues. A breach of an applicable

exposure limit or other prudential requirement primarily triggers the supervisory and regulatory consequences prescribed by Saint Lucia law and does not, by reason of the breach alone, render the underlying Loan or security invalid or unenforceable. Whether the Loan was entered into on market terms, however, requires consideration of the substantive terms and commercial characteristics of the transaction against those that a similarly situated arm's-length lender and borrower would ordinarily agree upon.

41. The regulatory framework is nevertheless relevant to the commercial assessment. Saint Lucia's prudential framework requires regulated lenders to address matters including capital adequacy, concentration risk, credit assessment, liquidity, collateral valuation, and risk management. In particular, the Principal Opinion concluded that AlterBank was required, prior to approving and disbursing the Loan, to conduct an appropriate credit assessment of TV Azteca—including its financial condition, cash flows, repayment capacity, and existing indebtedness—and to assess the adequacy and value of the collateral. A material deviation from those standards may therefore constitute relevant evidence in determining whether the transaction was consistent with ordinary commercial lending practice.

42. In the present case, my conclusion is based independently on the commercial characteristics of the transaction identified above, including its scale relative to AlterBank's disclosed financial profile, TV Azteca's financial condition, the absence of an identified source of repayment for a short-term bullet facility, the advance of funds prior to the establishment of the contemplated security, the nature and priority of the security ultimately obtained, the subsequent capitalization and deferral of accrued interest, and the absence, in the materials provided, of contemporaneous credit and security analyses explaining the commercial basis upon which an independent, prudent lender would have accepted the corresponding credit risk.

## D. RELATIONSHIP TO THE PRINCIPAL OPINION

43. The conclusions in this Supplemental Opinion are in addition to and consistent with the conclusions reached in the Principal Opinion. The Principal Opinion addressed AlterBank's regulatory status under the International Banks Act, the FSRA Act, and associated Guidance Notes, as well as the status of the Loan under Saint Lucian civil and insolvency law, based on the materials then available to me, which did not include the executed Loan Agreement or the March Amendment. Having now reviewed those executed instruments, I confirm that nothing in them alters the conclusions reached in the Principal Opinion. On the contrary, the terms actually set forth in the executed Loan Agreement and the March Amendment—summarized in Section C above—reinforce my conclusion that the Loan does not reflect ordinary arm's-length commercial banking practice for a Class A international bank licensed in Saint Lucia.

44. I do not consider the description of the Loan as a "bridge loan" to be determinative. While the facility possessed certain formal characteristics associated with bridge financing—particularly its short term and bullet maturity—those characteristics do not explain the

absence of a clearly identified and commercially credible source of repayment, nor the other exceptional credit features identified above.

45. The contractual documents substantially reinforce rather than contradict my earlier conclusion. They establish that substantial funds were disbursed before the contemplated security was established; that AlterBank played multiple roles within a structure that provided for the underlying economic lenders to be entities other than AlterBank; and that approximately five (5) weeks after disbursement, the parties capitalized accrued interest, deferred interest payments until maturity, and imposed an additional 2% restructuring fee.

46. These matters must be assessed in conjunction with TV Azteca's publicly disclosed financial distress and creditor enforcement actions, the subordinate nature and delayed establishment of the security, the magnitude of the exposure relative to AlterBank's disclosed financial position and approved business plan, and the absence from the submitted materials of contemporaneous credit, valuation, and approval records explaining the commercial rationale for the transaction. In my opinion, when considered cumulatively, these features are inconsistent with the terms and risk allocation upon which a prudent, independent lender would ordinarily extend comparable credit on an arm's-length basis. The Loan and its subsequent restructuring were therefore outside ordinary market conditions for a transaction of this nature.

47. I reserve the right to further supplement or modify this opinion should additional information become available.

Dated the 8th day of September, 2026

________________________________

Renee Tamara St. Rose, KC

JESUS VAZQUEZ NUÑEZ
706a6620636a66330000000000000000016a00
07/05/29 10:16:24

PODER JUDICIAL DE LA FEDERACIÓN

## CRYPTOGRAPHIC EVIDENCE - TRANSACTION

**Signed File:**
**4157002000000000062819803.p7m**
**Certification Authority:**
**CERTIFICATION AUTHORITY**
**Signatory(ies): 1**
**This digital document is a true copy of its physical or electronic version, which corresponds to the original.**

| SIGNATORY | | | | |
|---|---|---|---|---|
| **Name:** | FERNANDO DEL CASTILLO ELORZA | **Validity:** | GOOD | Valid |
| **SIGNATURE** | | | | |
| **No. Series:** | 30.30.30.30.31.30.30.30.30.30.30.35.31.37.38.36.34.31.34.38 | **Revocation:** | Valid | Not revoked |
| **Date (UTC/CDMX)** | 09/09/26 04:36:24 - 08/09/26 22:36:24 | **Status:** | Valid | Valid |
| **Algorithm:** | RSA-SHA256 | | | |
| **Signature string:** | 86 ba 2f 26 f0 8c a1 9c d0 51 42 63 dc f0 18 60 f7 4b 74 ce 8c f4 9d f0 61 37 27 37 2d eb e1 69 ae f0 c6 dd b4 a6 ba b2 73 79 2a bb 23 95 d8 74 3e 73 8e f0 a7 a2 ac 52 6e 97 48 cf 0f b6 d2 c4 c5 88 3e a0 96 b8 82 13 58 c5 ed ed 87 cf e3 e5 9f 45 61 5d 22 b5 bb d2 7a 12 80 90 1b 15 fe b0 92 e6 9d 2b 8a 1c 16 c2 87 f3 14 f2 81 76 27 c4 6f 68 63 99 f4 6c 35 cc 19 2c 72 66 fe 75 f3 61 36 fc 1c 78 54 6e ef f3 69 cc 37 a9 de dc 32 01 45 e8 e2 06 1c c9 81 d6 09 f7 1a 17 d4 c5 4c 95 bc df 98 20 15 9b b1 14 2f 07 72 4a 76 f2 6c 26 84 34 4e cb c4 cc 6a e1 35 4f b1 ab f1 48 82 d6 d3 4c c7 1f 1d ce d1 4a 9f e1 eb 2a 25 b9 f1 6a 8f 06 61 34 ff 84 8d 8b af 09 60 ef d6 bf a0 13 13 5f 1d 76 4a 03 16 e3 ea 29 6e 46 26 0f e4 94 1c e0 76 f2 82 e0 24 fa 7f e7 dd 56 61 68 33 0c | | | |

| OCSP | |
|---|---|
| **Date: (UTC/CDMX)** | 09/09/26 04:36:25 - 08/09/26 22:36:25 |
| **Responder Name:** | SAT OCSP Service |
| **Responder Issuer:** | CERTIFICATION AUTHORITY |
| **Serial number:** | 30.30.30.30.31.30.30.30.30.30.30.35.31.37.38.36.34.31.34.38 |

| TSP | |
|---|---|
| **Date: (UTC/CDMX)** | 09/09/26 04:36:25 - 08/09/26 22:36:25 |
| **Name of the TSP response issuer:** | Timestamp Issuing Authority of the Federal Judiciary Council |
| **TSP Certificate Issuer:** | Intermediate Certification Authority of the Federal Judiciary Council |
| **TSP response identifier:** | 203698989 |
| **Stamped data:** | cB8r2IS2kS2/fy3/H+1L6MWVnBw= |

PODER JUDICIAL DE LA FEDERACIÓN

## CRYPTOGRAPHIC EVIDENCE - TRANSACTION

**Signed File: 166868331_41570000412936600131180125280025.p7m**
**Certification Authority:**
**Intermediate Certification Authority of the Federal Judiciary Council**
**Signatory(ies): 1**
**This digital document is a true copy of its physical or electronic version, which corresponds to the original.**

| SIGNATORY | | | | |
|---|---|---|---|---|
| **Name:** | JESUS VAZQUEZ NUÑEZ | **Validity:** | OK | Valid |
| **SIGNATURE** | | | | |
| **No. Series:** | 70.6a.66.20.63.6a.66.33.00.00.00.00.00.00.00.00.00.00.01.6a.00 | **Revocation:** | Valid | Not revoked |
| **Date (UTC/CDMX)** | 09/10/26 00:43:07 - 09/09/26 18:43:07 | **Status:** | Valid | Valid |
| **Algorithm:** | RSA-SHA256 | | | |
| **Signature string:** | 84 4f d3 d8 21 5e 17 6c e0 33 8d 88 3b c9 9a 1e<br>d4 b9 62 4a 52 69 9b 0c 22 df c5 76 3e 36 20 d9<br>01 c6 ee 17 44 07 b1 79 58 b4 c5 f8 76 fc cd 96<br>61 a4 17 59 dc 37 52 90 03 48 d3 61 9e d7 a1 db<br>64 40 bf b5 d9 42 81 70 97 1e 2a 82 f4 74 42 95<br>58 80 31 13 b7 0b 97 6b f6 41 b5 87 ce 32 66 b7<br>61 cc cc 87 a0 13 9b d9 35 63 82 d8 e9 8d 51 13<br>e8 b8 2e a2 e6 cb f4 b1 4c cf 71 01 31 54 ce 23<br>2c f8 49 4e 4a 48 d3 cb df 55 79 2e 4d 50 28 10<br>fc b8 cf 8a 9f 92 3f ed 2f 9d c9 9f c8 07 b7 4a<br>cf 97 f9 66 85 fa 87 7f 23 38 7b a2 8a 30 06 ff<br>d5 6f b7 82 06 d1 82 c3 84 85 22 83 41 6c 20 f8<br>f0 b4 28 9e 75 43 43 69 cc d1 6e 1d c2 02 03 10<br>b4 03 e6 67 9d 69 f9 ca 56 90 21 48 1f 18 75 d6<br>46 a8 f3 6f 5c 76 8f 2f 88 0f 28 60 d3 a6 71 de<br>bf 2a 4a 62 37 c0 0a 48 0f 01 70 ec 7d b1 21 8c<br>b7 17 08 11 84 d4 00 84 ee c3 4b 30 1d 10 d2 76<br>f7 4e ac fe 06 c8 09 f5 02 e9 09 b1 d6 d9 44 4d<br>fc ea 0b f8 c4 5a 73 ae 16 2d 8c c1 fd 38 5e fc<br>10 cb 7f 4b 9e 4d 53 1d bb 76 dd dc 2a 7c 49 38<br>c2 42 a2 8d ea 86 61 08 89 60 f0 29 91 31 ab 85<br>66 ee 48 0e f7 10 f4 49 83 e8 6a 02 4a f9 7d e0<br>6a d4 ed b9 a3 b1 90 84 52 4a 77 37 ae e8 fb 77<br>74 e8 c4 9c ad a7 1f 54 1c 41 f7 23 ac 27 a2 87 | | | |

| OCSP | |
|---|---|
| **Date: (UTC/CDMX)** | 09/10/26 00:43:08 - 09/09/26 18:43:08 |
| **Name of the responder:** | ACI OCSP Service of the Federal Judiciary Council |
| **Responder Issuer:** | Intermediate Certification Authority of the Federal Judiciary Council |
| **Serial number:** | 70.6a.66.20.63.6a.66.33.00.00.00.00.00.00.00.00.00.00.01.6a.00 |

| TSP | |
|---|---|
| **Date: (UTC/CDMX)** | 09/10/26 00:43:08 - 09/09/26 18:43:08 |
| **Name of the TSP response issuer:** | Timestamp Issuing Authority of the Federal Judiciary Council |
| **TSP Certificate Issuer:** | Intermediate Certification Authority of the Federal Judiciary Council |
| **TSP response identifier:** | 204359013 |
| **Stamped data:** | DFEwFreOzRyRtq4sEguEojV2WR4= |